# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN AIRLINES GROUP INC. and JETBLUE AIRWAYS CORPORATION, <br><br> Defendants. | Civil Action No. 1:21-cv-11558-LTS |

## MEMORANDUM IN SUPPORT OF
## AMERICAN AIRLINES GROUP INC. AND JETBLUE AIRWAYS CORPORATION'S
## MOTION TO DISMISS

Page

INTRODUCTION ...............................................................................................................1

STATEMENT OF FACTS ...................................................................................................6

    A.    The NEA .................................................................................................6

    B.    American and JetBlue Implemented the NEA After the DOT Review .......9

    C.    The DOJ Investigation and Complaint ......................................................10

ARGUMENT .....................................................................................................................10

    I.    THE COMPLAINT DOES NOT ALLEGE ADVERSE EFFECTS AS
        REQUIRED TO STATE A SHERMAN ACT SECTION 1 CLAIM ..................11

    A.    The Complaint Does Not Plead Actual Harm to Competition ..................12

    B.    The NEA Is Not Subject to Challenge Under Merger Standards
        Developed Under Section 7 of the Clayton Act.........................................13

    C.    Plaintiffs Cannot Satisfy Their Burden of Pleading Adverse Effects
        with Speculative Allegations that the NEA "Likely" Will Cause
        Future Harm ...............................................................................................16

        1.    The Complaint Does Not Adequately Allege that the NEA as a
            Whole Is Inherently Anticompetitive.............................................20

        2.    Revenue Sharing Is Not Inherently Anticompetitive.....................24

        3.    Capacity Coordination Within the NEA Is Not Inherently
            Anticompetitive..............................................................................26

    II.    THE COMPLAINT DOES NOT ADEQUATELY ALLEGE MARKET
        POWER..............................................................................................................28

    A.    Plaintiffs Have Failed to Plead that the NEA Gives American and
        JetBlue the Ability to Raise Any Marketwide Price by Restricting
        Their Own Output ......................................................................................29

    B.    Plaintiffs' New York Market Definitions Ignore Indisputable—And
        Previously Admitted—Competition .........................................................31

CONCLUSION..................................................................................................................35

**CASES**

*A.G. v. Elsevier, Inc.*,
732 F.3d 77 (1st Cir. 2013)............................................................................11, 26

*Addamax Corp. v. Open Software Found., Inc.*,
152 F.3d 48 (1st Cir. 1998)...........................................................................15, 18

*In re AMR Corp.*,
625 B.R. 215 (Bankr. S.D.N.Y. 2021)..........................................................30, 32

*Apple, Inc. v. Psystar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ..............................................................35

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................6, 10, 22

*Augusta News Co. v. Hudson News Co.*,
269 F.3d 41 (1st Cir. 2001)...........................................................................18, 27

*Beddall v. State St. Bank & Tr. Co.*,
137 F.3d 12 (1st Cir. 1998).................................................................................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................... *passim*

*Bridges v. MacLean-Stevens Studios*, *Inc.*,
35 F. Supp. 2d 20 (D. Me. 1998) .......................................................................34

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979)..........................................................................................2, 11

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U. S. 209 (1993)...........................................................................................30

*Burns v. Cover Studios, Inc.*,
818 F. Supp. 888 (W.D. Pa. 1993).......................................................................34

*California Dental Ass'n v. FTC*,
526 U.S. 756 (1999)............................................................................................19

*Cal. ex rel. Harris v. Safeway, Inc.*,
651 F.3d 1118 (9th Cir. 2011) ...........................................................................25

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
532 F.3d 1111 (10th Cir. 2008) .........................................................................32

*Catrone v. Ogden Suffolk Downs, Inc.*,
  683 F. Supp. 302 (D. Mass. 1988) ........................................................18

*CCBN.com, Inc. v. Thomson Fin., Inc.*,
  270 F. Supp. 2d 146 (D. Mass. 2003) ....................................................18

*Chapman v. N.Y. State Div. for Youth*,
  546 F.3d 230 (2d Cir. 2008) ..................................................................32

*Chi. Pro. Sports Ltd. P'ship v. NBA*,
  95 F.3d 593 (7th Cir. 1996) ...................................................................20

*Coastal Fuels of P.R. Inc. v. Caribbean Petroleum Corp.*,
  79 F.3d 182 (1st Cir. 1996) ...................................................................29

*Concord Assocs., LP v. Ent. Props. Tr.*,
  817 F.3d 46 (2d Cir. 2016) ....................................................................34

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984) ..............................................................................20

*E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n*,
  357 F.3d 1 (1st Cir. 2004) ................................................................28, 31

*FTC v. Advocate Health Care Network*,
  841 F.3d 460 (7th Cir. 2016) .................................................................34

*FTC v. Facebook, Inc.*,
  No. 20-3590, 2021 WL 2643627 (D.D.C. June 28, 2021) .................6, 12, 17

*FTC v. Freeman Hosp.*,
  69 F.3d 260 (8th Cir. 1995) ...................................................................35

*Garnica v. Hometeam Pest Def., Inc.*,
  230 F. Supp. 3d 1155 (N.D. Cal. 2017) .................................................34

*Gordon v. Lewistown Hosp.*,
  423 F.3d 184 (3d Cir. 2005) ..................................................................34

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ...............................................................32

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
  733 F. App'x 380 (9th Cir. 2018) ...........................................................31

*Image Tech. Servs. Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ...............................................................30

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
    61 F.3d 123 (2d Cir. 1995)................................................................19

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)....................................................................11

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
    833 F.3d 172 (2d Cir. 2016)........................................................19, 28

*Malaney v. UAL Corp.*,
    434 F. App'x 620 (9th Cir. 2011) ...............................................32, 33

*Malaney v. UAL Corp.*,
    552 F. App'x 698 (9th Cir. 2014) .....................................................35

*Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*,
    751 F.3d 368 (5th Cir. 2014) ......................................................12, 16

*In re McCormick & Co., Inc.*,
    217 F. Supp. 3d 124 (D.D.C. 2016) .............................................12, 16

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
    922 F.3d 713 (6th Cir. 2019) ......................................................20, 24

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
    354 F.3d 661 (7th Cir. 2004) ..........................................................28

*Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*,
    381 U.S. 311 (1965)....................................................................14

*NCAA v. Alston*,
    __ U.S. __, 141 S. Ct. 2141 (2021)........................................... *passim*

*New Eng. Carpenters Health Benefits Fund v. McKesson Corp.*,
    573 F. Supp. 2d 431 (D. Mass. 2008) ...........................................3, 12

*Ohio v. Am. Express Co.*,
    __ U.S. __, 138 S. Ct. 2274 (2018)........................................... *passim*

*In re Online DVD Rental Antitrust Litigation*,
    No. M 09-2029, 2011 WL 5883772 (N.D. Cal. Nov. 23, 2011)
    .....................................................................................25

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
    776 F.2d 185 (7th Cir. 1985) ..........................................................21

*Pro. Mkt. Rsch., Inc. v. AC Nielsen Corp.*,
    No. 03-2314, 2008 WL 11504726 (D.P.R. Sept. 12, 2008)....................34

*Procaps S.A.v. Patheon, Inc.*,
  845 F.3d 1072 (11th Cir. 2016) .................................................20

*Realcomp II, Ltd. v. FTC*,
  635 F.3d 815 (6th Cir. 2011) ....................................................19

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ....................................................29

*Rodríguez-Ramos v. Hernández-Gregorat*,
  685 F.3d 34 (1st Cir. 2012) .......................................................11

*Ross v. Trans Nat'l Travel*,
  No. 88-1763, 1990 WL 79229 (D. Mass. June 5, 1990) .......................25

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1986) ............................................. *passim*

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
  373 F.3d 57 (1st Cir. 2004) .......................................................11

*In re Sulfuric Acid Litig.*,
  703 F.3d 1004 (7th Cir. 2012) ..................................................15

*Sullivan v. NFL*,
  34 F.3d 1091 (1st Cir. 1994) .....................................................24

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) ................................................................34

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) .......................................................... *passim*

*United States v. Baker Hughes Inc.*,
  908 F.2d 981 (D.C. Cir. 1990) ...................................................30

*United States v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) ................................................................31

*United States v. Ivaco, Inc.*,
  704 F. Supp. 1409 (W.D. Mich. 1989) .........................................14

*United States v. Penn-Olin Chem. Co.*,
  378 U.S. 158 (1964) ................................................................14

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963) ................................................................34

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)............................................................................22

*Wojcieszek v. New Eng. Tel. & Tel. Co.*,
    977 F. Supp. 527 (D. Mass. 1997) ....................................................31

*Yagoozon, Inc. v. Kids Fly Safe*,
    No. 14-040, 2014 WL 3109797 (D.R.I. July 8, 2014)........................18

## STATUTES

15 U.S.C.
    § 1......................................................................................... *passim*
    § 4..............................................................................................17
    § 18................................................................................4, 13, 14

49 U.S.C.
    § 41308.......................................................................................22
    § 41309.......................................................................................22
    § 41720.........................................................................................9

## RULES

Fed. R. Civ. P. 12(b)(6)..............................................................................1

## TREATISES

PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN
    ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION
    (4th ed. 2018)...........................................................................11, 18, 29

## OTHER AUTHORITIES

DOJ & FTC, *Antitrust Guidelines for Collaborations Among
    Competitors* (Apr. 2000).......................................................2, 14, 15, 19

Herbert Hovenkamp, *The Rule of Reason*, 70 FLA. L. REV. (2018) ..............................12

Defendants American Airlines Group Inc. ("American") and JetBlue Airways Corporation ("JetBlue") (together, "Defendants") respectfully submit this memorandum in support of their Motion to Dismiss the Complaint of Plaintiffs United States of America, State of Arizona, State of California, District of Columbia, State of Florida, Commonwealth of Massachusetts, Commonwealth of Pennsylvania and Commonwealth of Virginia (collectively, "Plaintiffs"), filed September 21, 2021, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## **INTRODUCTION**

This antitrust lawsuit challenges a strategic procompetitive alliance between American and JetBlue that encompasses four airports serving the Boston and New York metropolitan regions (the "Northeast Alliance" or "NEA"). Since implementation began in February 2021, the NEA has allowed American and JetBlue to offer consumers the benefits of a broader and deeper network at these airports—more flights and seats to more places—so that each airline can become more competitive with the dominant carriers in the Northeast, Delta Air Lines, Inc. ("Delta") and United Airlines, Inc. ("United"). Through schedule coordination, asset swaps, codesharing, reciprocal frequent flyer benefits, seamless service initiatives, and a revenue sharing arrangement designed specifically to incentivize each airline to grow capacity, the NEA makes American and JetBlue more attractive to consumers, more efficient and much more productive with the finite resources available. The NEA has increased output in Boston and New York, including more flights to more destinations and large increases in every airline industry measure of output.

American and JetBlue briefed the United States Department of Justice ("DOJ") and the United States Department of Transportation ("DOT") before announcing the alliance in July 2020, and both agencies commenced thorough and lengthy investigations into whether the NEA was anticompetitive. After completing its exhaustive six-month investigation, the DOT allowed

1

the NEA to go forward, but conditioned on a package of commitments designed to ensure that the NEA expands output as promised.[1]  The commitments included up-front divestitures of takeoff and landing slots (so that there is an output boost from other airlines), growth targets that American and JetBlue must meet to avoid additional slot divestures, extensive reporting requirements and various provisions designed to ensure the NEA does not improperly restrict competition between American and JetBlue.  As explained below, the DOT's investigation and ultimate termination of its review of the NEA are wholly consistent with its prior review of multiple similar alliances involving international carriers.  In contrast, the DOJ has chosen to challenge the NEA, joined by six states and the District of Columbia.

The Complaint is defective as a matter of law because ***Plaintiffs have not alleged that the NEA has actually harmed competition***.  The NEA has been underway for nine months, yet Plaintiffs do not allege that it has caused a single higher price, any reduction in quality or the slightest reduction in output.

Antitrust law is clear about the legal standards applicable to competitor collaborations such as the NEA.  So long as they involve "an efficiency-enhancing integration of economic activity"—which is undisputed with regard to the NEA—they are generally viewed as *procompetitive.  See* DOJ & FTC, *Antitrust Guidelines for Collaborations Among Competitors* 4 (Apr. 2000) ("*Collaboration Guidelines*");[2] *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) ("Joint ventures and other cooperative arrangements are . . . not usually

---

[1] As explained in Part II.A, below, anticompetitive effects require *reduced* output.  By requiring the parties to show *increased* output, the DOT remedies are intended to keep the NEA far from the line at which anticompetitive effects are even plausible.

[2] https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf (citations omitted). (All internal quotation marks and citations herein are omitted, unless otherwise noted.)

unlawful . . . .").  A legal challenge to a collaboration proceeds under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the "rule of reason."  *See, e.g., NCAA v. Alston*, __ U.S. __, 141 S. Ct. 2141, 2155 (2021).  That means that "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market."  *Ohio v. Am. Express Co.*, __ U.S. __, 138 S. Ct. 2274, 2284 (2018) ("*Amex*").  Without proof of ***substantial, marketwide anticompetitive effects***, a challenge to an efficiency-enhancing joint venture fails as a matter of law.  *See Alston*, 141 S. Ct. at 2160.  Likewise, a complaint that lacks non-conclusory allegations of anticompetitive effects is deficient as a matter of law and should be dismissed on the pleadings.  *See*, *e.g.*, *New Eng. Carpenters Health Benefits Fund v. McKesson Corp.*, 573 F. Supp. 2d 431, 435–36 (D. Mass. 2008).

Instead of alleging actual anticompetitive effects, the Complaint attempts to predict adverse effects, repeatedly alleging that the alliance "likely will harm competition," Compl. ¶ 51, or is "likely to have" various harmful effects, *id*. ¶ 85.  Plaintiffs' "predictive" allegations, however, are conclusory and speculative, amounting to nothing more than an *ipse dixit* assertion that at some unidentified day in the unknown future the NEA will result in a reduction in capacity and other unspecified "harms to competition."  Even when viewed under the standards applied to a motion to dismiss, that is not enough.  The argument below develops four points.

*First,* the absence of any allegation that the NEA has caused or is causing any actual harm to competition takes this case far outside of the antitrust mainstream.  *See infra* Part I.A.  Anticompetitive effects are not just the threshold burden in a rule of reason case, but practically speaking the most important element.  Indeed, in *Alston*, the Supreme Court noted that "courts have disposed of nearly all rule of reason cases in the last 45 years on the ground that the plaintiff failed to show a substantial anticompetitive effect."  141 S. Ct. at 2160–61.  Plaintiffs

cannot minimize the fact that nine months into the implementation of the NEA they cannot allege *anything* in the nature of an adverse effect.

    *Second,* the NEA is not a merger and therefore there is no legal basis for Plaintiffs' allegation that adverse effects from the NEA can be inferred "using analytical tools from merger analysis." Compl. ¶ 48; *see infra* Part I.B. Merger analysis proceeds under the incipiency standards of Section 7 of the Clayton Act, 15 U.S.C. § 18, which asks whether the effect of an acquisition "may be substantially to lessen competition." This rule reflects a practical necessity since nearly all challenges under Section 7 are brought *before* the merger has been consummated. In contrast, collaborations *short of a merger,* particularly *ongoing* collaborations, are assessed under Section 1 of the Sherman Act, and the issue is whether the challenged conduct *is* harming competition, or *has*, not whether it potentially *may*. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 220–21 (D.C. Cir. 1986). Plaintiffs' extensive allegations using "tools from merger analysis" are therefore deficient with respect to the NEA. They do not meet Plaintiffs' threshold burden to plead anticompetitive effects.

    *Third*, Plaintiffs' conclusory speculation that the NEA "likely" will cause some undefined harm to competition at some undefined future time does not state a viable claim. We discuss below the difficult, rarely traveled path by which an antitrust plaintiff might be permitted to bring a claim that relies on predicting future adverse effects in a rule of reason case. *See infra* Part I.C. At a minimum, a plaintiff pursuing such a claim must plead *market power* plus a *specific* basis for concluding that the challenged conduct will harm competition. To our knowledge no one has ever successfully challenged an ongoing collaboration on that basis, much less one that is already creating benefits for consumers like the NEA. But even assuming that is possible, here Plaintiffs only allege the *conclusion* that something unspecified about the NEA is

4

likely to harm consumers, without any cogent, much less factual, explanation for why that must be so or how it has manifested in the implemented NEA. As such, the claim fails to clear the well-established pleading standard the Supreme Court laid out in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

This failure is particularly evident with regard to the three main objections Plaintiffs seem to have to the NEA: (a) that American somehow will "co-opt" JetBlue to change its trademark low-fare business model; (b) that American and JetBlue share revenues on the alleged joint venture routes; and (c) that American and JetBlue optimize schedules and capacity together for the NEA airports (which Plaintiffs deride as "output coordination"). In each instance Plaintiffs disregard the governing legal standard and simply allege with minimal explanation that "JetBlue will be beholden to its larger partner," Compl. ¶ 12, that NEA coordination has "tendencies to increase prices and reduce output," *id.* ¶ 20, or that capacity optimization could, theoretically, lead to output reductions, *id.* These conclusory speculations do not even give Defendants fair notice of Plaintiffs' arguments, let alone comply with *Twombly,* and they certainly do not justify dispensing with allegations of actual adverse effects.

*Fourth*, the Complaint is defective for the independent reason that Plaintiffs have failed to adequately plead market power, without which every rule of reason claim fails. *Amex*, 138 S. Ct. at 2283–84. The problem, again, is that Plaintiffs' approach to pleading market power is to treat the NEA like a merger subject to Clayton Act standards. But in a Section 1 rule of reason case, "[m]arket power is the ability to raise price profitably *by restricting output*." *Id.* at 2288 (emphasis in original). Here, that would mean that the NEA enables American and JetBlue to raise marketwide prices in a relevant market by restricting their own output. But Plaintiffs do not allege that. Furthermore, Plaintiffs' attempted merger-like approach to market power fails

5

with respect to the 17 New York routes pled in Appendix B.  Those allegations are based not on

defining the relevant markets as city-pairs (*e.g.*, New York–Los Angeles), as the DOJ itself has

argued in previous cases, but by surgically excising Newark Liberty International airport

("Newark")—the enormous New York hub of United, which touts itself as "New York's leading

airline"—out of the relevant market definition.  Even at the pleading stage, that gambit fails.

In sum, Plaintiffs, like the DOT, should have given the NEA a chance to continue to

prove itself in the market, particularly given the commitments to the DOT that require output

expansion, address the possibility of anticompetitive effects and provide for ongoing oversight.

Having chosen to sue, however, Plaintiffs have the same obligations to plead, and later prove,

actual adverse effects as every other plaintiff.  *See Amex*, 138 S. Ct. at 2284 (requiring that the

government show "substantial anticompetitive effect that harms consumers in the relevant

market"); *FTC v. Facebook, Inc.*, No. 20-3590, 2021 WL 2643627, at *12 (D.D.C. June 28,

2021) (dismissing the FTC's complaint for failure to allege facts supporting allegations of

market power).  Because they have not met that obligation, the Complaint fails to state a claim

under the Sherman Act and should be dismissed with prejudice as a matter of law.

### STATEMENT OF FACTS[3]

### A.  The NEA

American and JetBlue entered into the NEA on July 15, 2020.  Compl. ¶ 19.  The

Complaint alleges that the NEA is a joint venture, *see id.* ¶ 29, by which JetBlue and American

work together to "optimize each Party's network to enhance the experience of passengers flying

---

[3] Defendants dispute many of the facts contained in the Complaint, but for purposes of this
motion accept Plaintiffs' factual allegations that are actually well-pled.  *See Ashcroft v. Iqbal*,
556 U.S. 662, 678–79 (2009) (citing *Twombly*, 550 U.S. at 555-57, 570).

to and from certain airports in New York and Boston," Ex. A (NEA Agmt.) at Recital 1.[4]  By its

terms, the NEA is intended to encourage, among other things, growth and enhancement of

services in the Northeast, the addition of new routes, improved scheduling and improved

connections between flights operated by the two airlines.  *Id.* at Recital 3.  The NEA thus allows

JetBlue and American to deploy their collective assets (*e.g.*, aircraft, slots,[5] gates, personnel) to

create by contract and ongoing collaboration a broader, deeper and more competitive network

consisting of virtually all of their flights to and from Boston and New York airports (excluding

JetBlue's transatlantic flights and a few other routes).  *Id*. at 1, § 2.1; Ex. A (Second Amend. to

the NEA Agmt.) § 1.1; Ex. B (First Amend. to the Mutual Growth Incentive Agmt. ("MGIA")) §

1.2.  Through "codesharing," both airlines are able to market the full network to consumers.

   To create the expanded and optimized network, network planning personnel from both

airlines "endeavor in good faith to optimize their respective, individual network plans." Ex. A

(NEA Agmt.) § 3.1.2.1.  Under this process, American and JetBlue teams together develop and

propose detailed schedules, equipment assignments, slot and gate assignments and other logistics

necessary to offer consumers the optimized network.  For example, the planning teams may

jointly develop and propose a schedule of flights for a route, say New York to San Francisco,

that will give consumers a wider choice of options throughout the day on a combination of

American and JetBlue aircraft.  Whereas, for instance, each airline may have operated flights at

---

[4] The Court can consider the agreements in full in deciding this motion.  *Beddall v. State St. Bank & Tr. Co.,* 137 F.3d 12, 16–17 (1st Cir. 1998) (holding that when a "complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)")(collecting authorities).  The NEA agreements are attached to this motion as Exhibit A.

[5] A "slot" is regulatory permission for a plane to takeoff or land within a specified window.  The three New York airports are all access restricted because of slot and/or gate restrictions.

7:00 a.m. and 10:00 a.m.—leaving no flights directly opposite United or Delta flights at 8:00 a.m. and 9:00 a.m.—under the NEA American and JetBlue might offer consumers the choice of a 7:00 a.m., 8:00 a.m., 9:00 a.m. or 10:00 a.m. flight. Each airline then makes its own decision as to whether to adopt some or all of the recommended flights. *Id*. § 3.1.1.

Slot swaps are another important NEA feature. JetBlue has been unable to grow in New York, especially at LaGuardia Airport ("LaGuardia"), because it has not been able to get access to additional takeoff and landing slots. Under the NEA "American and JetBlue have . . . agreed to pool their 'slots' at JFK and LaGuardia." Compl. ¶ 21; Ex. A (NEA Agmt.) § 3.4. This allows the parties to make optimal use of their combined slot portfolios, including enabling immediate JetBlue growth and expansion of its low-cost model at LaGuardia.

The NEA uses revenue sharing "to incentivize optimization and expansion of each Party's network." Ex. B (MGIA) at Recital 2. In other words, instead of mandating particular network changes, the MGIA's revenue sharing mechanism creates financial incentives for both parties to optimize the combined network and expand output. The Complaint ignores the specific, nuanced revenue-sharing provisions of the MGIA; it literally says *nothing* about the relevant formula. In fact, under the MGIA, American and JetBlue only share revenues above an annually adjusted base position (that is meant to reflect each airline's performance during a prior time period), which creates ongoing incentives for both airlines to grow NEA capacity. *See id*., App. 4. Plaintiffs do not plead how that formula, based on promoting growth, could be anticompetitive.

The NEA unarguably is not a merger. American and JetBlue remain separate carriers and separate corporations with different shareholders, management and boards. Each airline carries on with its own unique business model and cost structure. The Complaint acknowledges that

"JetBlue has a significantly lower cost structure than the legacy airlines, allowing it to operate profitably even when offering consumers lower fares." Compl. ¶ 18. That does not change at all under the NEA. Even within the NEA airports, each airline continues to price independently, and the NEA imposes strict prohibitions against discussions regarding pricing. Ex. A (NEA Agmt.) § 3.1.1; *see also id.* at Recital 5 ("[E]ach will retain full control over all aspects of their respective businesses, including setting pricing for their services . . . .").[6] Even the capacity optimization plans are not obligatory: each Party makes independent decisions "regarding . . . capacity and network management." Ex. A (NEA Agmt.) § 3.1.1.

### B. American and JetBlue Implemented the NEA After the DOT Review

As the chief regulator of U.S. air travel, the DOT has authority to investigate a collaboration such as the NEA. *See generally* 49 U.S.C. § 41720. The DOT reviewed the NEA from July 2020 until January 10, 2021, terminating its review after American and JetBlue agreed to commitments to address potential competitive concerns that the DOT had identified. Compl. ¶¶ 79–80.[7] These commitments include permanent divestitures of seven slot pairs at John F. Kennedy International Airport ("JFK"), leases of six slot pairs at Ronald Reagan Washington National Airport ("DCA"), and potential additional slot divestitures that would be triggered if Defendants failed to meet substantial future growth metrics. Ex. C (DOT Agreement) at § III.E. To that end, the parties agreed to report regularly on key output metrics, such as schedules flown,

---

[6] The NEA complies with a longstanding DOJ policy requirement that in a codesharing relationship, the airline that operates the flight sets the fares.

[7] The agreement among JetBlue, American and the DOT is also incorporated by reference into the Complaint, and in all events a matter of public record, and therefore for the convenience of the Court is attached as Ex. C.

slot and gate utilization, and passenger growth, and DOT expressly retained authority to investigate and enjoin any unfair or deceptive trade practices.  *Id.* at §§ III.D, VII.[8]

## C.  The DOJ Investigation and Complaint

The DOJ also began investigating the NEA in July 2020.  It took no action to stop the implementation of the NEA in February 2021.  Instead, almost eight months after American and JetBlue implemented the NEA, Plaintiffs filed the instant lawsuit.  The Complaint seeks to permanently enjoin the entire NEA.  Compl. ¶ 87(b).  Notably, the Complaint does not allege that the NEA has caused any actual harm, such as increased prices, decreased capacity or decreased service in the months since the implementation.  Nor does it dispute the NEA's procompetitive effects.  Instead, without a single allegation of actual harm, Plaintiffs speculate that the NEA will at some undefined point in the future cause capacity reductions and increased fares that will outweigh the procompetitive effects.  *See, e.g.*, *id.* ¶¶ 52, 72, 73, 77.

## **ARGUMENT**

To survive a motion to dismiss, plaintiffs must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678.  This requires a plaintiff to plead facts sufficient to "nudge[] [its] claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Moreover, "rote recital of the elements of a cause of action is not

---

[8] American and JetBlue agreed to place mandatory limitations on communications between them, including a prohibition on any discussion of fares, and JetBlue agreed to not discontinue nonseasonal service that it provided from JFK on a nonstop basis as of February 2020.  *Id*. § III.D., III.B; *see also* Ex. A (2d Amend. to NEA Agmt.) at §1.1.  The DOT commitments also provide that neither party may retaliate against the other by withdrawing NEA assets in response to pricing or other competitive conduct.  Ex. C (DOT Agreement) § III.C.

enough, by itself, to nudge a case past the plausibility threshold. . . . When allegations, though disguised as factual, are so threadbare that they omit any meaningful factual content, [this Circuit] will treat them as what they are: naked conclusions." *A.G. v. Elsevier, Inc*., 732 F.3d 77, 81 (1st Cir. 2013); *see also Rodríguez-Ramos v. Hernández-Gregorat*, 685 F.3d 34, 40–41 (1st Cir. 2012) ("[S]peculative" allegations are "inadequate.").

## I.  THE COMPLAINT DOES NOT ALLEGE ADVERSE EFFECTS AS REQUIRED TO STATE A SHERMAN ACT SECTION 1 CLAIM

Plaintiffs challenge the NEA under Section 1 of the Sherman Act, 15 U.S.C. § 1.  Compl. ¶¶ 82–87.  A Section 1 complaint must contain well-pled facts that, if true, will prove a combination between at least two legally distinct economic entities that unreasonably restrains trade.  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007).

Courts apply two general approaches to assess the legality of a given restraint: *per se* liability and the "rule of reason."  *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004).  Except in narrow circumstances not present here, courts "presumptively appl[y] rule of reason analysis."  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (holding that rule of reason applies to challenges to joint ventures); *see also Leegin*, 551 U.S. at 885 (noting that the rule of reason is the "accepted standard for testing whether a practice restrains trade in violation of § 1").  The rule of reason is clearly the test for joint ventures. *Broad. Music, Inc.*, 441 U.S. at 23; *Texaco*, 547 U.S. at 5; *Alston*, 141 S. Ct. at 2155.  In fact, it is widely accepted that joint ventures are "presumptively lawful," and that "antitrust's duty is only to 'disapprove' those provisions [of a joint venture agreement] that seem, on balance, to produce greater competitive harms than efficiency gains."  *See* PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 2100 (4th ed. 2018) ("AREEDA & HOVENKAMP").

Rule of reason analysis proceeds under a three-step burden-shifting test, which at the first step requires a plaintiff to plead and prove that the restraint caused "substantial anticompetitive effects" in a relevant market. *Alston*, 141 S. Ct. at 2160–61.[9] "Post-*Twombly* decisions have consistently held that in antitrust cases pled under the rule of reason a plaintiff must adequately plead market power and the anticompetitive effects of the challenged restraints." Herbert Hovenkamp, *The Rule of Reason,* 70 FLA. L. REV. 81, 88 (2018); *see, e.g.*, *New Eng. Carpenters Health Benefits Fund*, 573 F. Supp. 2d at 435–36 (dismissing complaint for failure to allege that the agreement reduced competition in any relevant market); *Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 376 (5th Cir. 2014) (affirming dismissal of a rule of reason claim because the plaintiff's "assertions regarding market injury [were] completely speculative"); *In re McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 137 (D.D.C. 2016) ("Because anticompetitive effect is an essential element of a claim under the rule of reason, plaintiffs must plausibly allege it in their complaint." (citing *Twombly*, 550 U.S. 555)), *amended on reconsideration*, 275 F. Supp. 3d 218 (D.D.C. 2017).

The obligation to allege and prove harm to competition is no different when the plaintiff is the government. *Amex*, 138 S. Ct. at 2284; *Facebook, Inc.*, 2021 WL 2643627, at *12.

### A. The Complaint Does Not Plead Actual Harm to Competition

The Complaint should be dismissed as a matter of law because it does not attempt to plead an actual anticompetitive effect of any kind. There is not a single allegation that the NEA has led to increased prices, decreased output or diminished quality in Boston, New York or

---

[9] Only after the plaintiff makes this initial showing does the burden shift "to the defendant to show a procompetitive rationale for the restraint." *Alston*, 141 S. Ct. at 2160. Then "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id*.

anywhere else. The inability to plead any allegation of actual harm is particularly telling given that the DOJ investigated the NEA for more than a year before filing suit, including eight months during which American and JetBlue have been openly operating the NEA in compliance with their commitments to the DOT. Furthermore, Plaintiffs allege 28 nonstop markets and 98 connecting markets on which the NEA "likely will significantly diminish Defendants' ability and incentive to compete," Compl. ¶ 50, but do not plead a single, actual adverse effect in even one of *126 markets.* Adverse effects are the foundation for any plaintiff advancing a rule of reason claim. Non-conclusory allegations of adverse effects are required—and normally made in DOJ rule of reason complaints. And yet here there are none.

### B. The NEA Is Not Subject to Challenge Under Merger Standards Developed Under Section 7 of the Clayton Act

The most prominent basis in the Complaint for predicting an adverse competitive effect from the NEA commences at Paragraph 48, in which Plaintiffs state: "Where a collaboration between competitors effectively operates like a merger, it is appropriate to evaluate the collaboration using analytical tools from merger analysis." Thereafter the Complaint reads as if this is a merger challenge under Section 7 of the Clayton Act. But the NEA is not a merger, as the Complaint admits. *Id.* ¶ 9. It is a limited, contractual collaboration subject to the Sherman Act and the rule of reason, not Section 7 of the Clayton Act, and not "merger analysis."

There is a fundamental difference between Section 1 of the Sherman Act, the statute alleged to be violated in this case, and Section 7 of the Clayton Act, under which merger standards have been developed. Section 1 proscribes unreasonable restraints of trade and (save for *per se* offenses) requires proof of actual adverse effects. Section 7 is an "incipiency" statute that requires no showing of actual anticompetitive effects. By its terms, Section 7 allows courts to block or unwind mergers when "the effect of such acquisition *may be* substantially to lessen

competition." 15 U.S.C. § 18 (emphasis added).  As the Supreme Court explained in *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 170–71 (1964), *aff'd sub nom. United States v. Pennolin Co.*, 389 U.S. 308 (1967) (per curiam), "[t]he grand design of [Section 7 is] to arrest incipient threats to competition which the Sherman Act did not ordinarily reach.  It follows that actual restraints need not be proved" for  Section 7 cases.  *Id.*; *see also Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 323 (1965) ("[T]he Commission's Clayton Act proceeding required proof only of a potential anticompetitive effect while the Sherman Act carries the more onerous burden of proof of an actual restraint.").  Predictive merger standards therefore do not "fit" Section 1's actual effects requirement.  *See Rothery Storage*, 792 F.2d at 220–21 (explaining that merger standards were developed for and "apply to mergers between firms that ordinarily have no internal competition[,] . . . [not] firms that are merely limiting internal competition and are not merging").

The DOJ and a few courts have suggested that joint ventures that *replicate mergers* can be challenged under merger standards, but that principle cannot apply to the NEA.  It is reserved for a very narrow set of joint ventures that fully consolidate the parties' operations and eradicate all competition between them in the relevant market.  *See, e.g., United States v. Ivaco, Inc.*, 704 F. Supp. 1409, 1426 (W.D. Mich. 1989) (enjoining a joint venture between two manufacturers under Section 7 of the Clayton Act where it fully combined the parties' productive assets and "completely eliminate[d] price competition" between them).  This is plain from the *Collaboration Guidelines* that Plaintiffs cite in Paragraph 48:  Section 1.3 states that the application of merger standards is appropriate only where, among other requirements, the joint

venture "eliminates all competition" between the joint venture partners in the relevant market.[10] In every other circumstance, and certainly where a joint venture preserves some degree of internal competition, the rule of reason, with its requirement of actual adverse effects, applies. *See, e.g.*, *Texaco*, 547 U.S. at 4–8 (applying the rule of reason test where Texaco and Shell Oil pooled resources, shared risks and profits and established joint management of a joint venture); *Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 52 (1st Cir. 1998) (applying the rule of reason to a research and development joint venture); *In re Sulfuric Acid Litig.*, 703 F.3d 1004, 1013 (7th Cir. 2012) (applying the rule of reason when two manufacturers and a distributor combined accounts receivable and inventory, assigned leases, contributed cash and seconded personnel, and pooled output in a joint venture).

We acknowledge the Complaint's *allegation* that "American and JetBlue have violated Section 1 of the Sherman Act by effectively merging their operations in Boston and New York City." Compl. ¶ 9. But this conclusion is meaningless under *Twombly* pleading standards. *Twombly*, 550 U.S. at 555–57 (rejecting "labels and conclusions"). It is also contradicted by the Complaint itself and the NEA agreements incorporated into the Complaint. Plaintiffs never plead to the DOJ's *own standard* that the collaboration "eliminates all competition" between the parties in the relevant markets. Plaintiffs know that is not true for any number of reasons, one of which is that *pricing*, a central concern of antitrust law, is *not coordinated through the NEA*. *See* Compl. ¶ 20 (conceding "American and JetBlue technically retain the ability to price independently under the Northeast Alliance"); Ex. A (NEA Agmt.) § 3.1.1. In fact, there is no allegation that JetBlue's low-fare pricing model, which the Complaint rightly praises as a source

---

[10] The NEA is also term limited, and therefore fails another part of the DOJ's own test in the Collaboration Guidelines for when a joint venture may be assessed akin to a merger. *See Collaboration Guidelines* § 1.3.

of enormous benefit to consumers, *see e.g.,* Compl. ¶¶ 5, 6, is no longer in effect in the Northeast (or elsewhere) or has diminished in the least. The only plausible inference is that JetBlue *is* competing on price with American—destroying any analogy to a "merger."

The unambiguous language of the NEA agreements also show that, far from a merger, the NEA is an arm's-length contractual relationship with carefully defined duties, obligations, rights and benefits. For example, there is a duty on the parties to "endeavor in good faith to optimize their respective, individual network plans," Ex. A (NEA Agmt.) § 3.1.2.1, yet also an explicit reservation of rights for each to make its own final decisions "regarding their capacity and their route networks," *id.* Recital 5. The revenue-sharing terms are nothing like the general pooling of revenues and profits that would occur in a merger. The NEA also explicitly carves out from capacity optimization or revenue sharing in the MGIA on certain routes that are more "concentrated" as between American and JetBlue. Compl. ¶ 80; Ex. A (Second Amend. to the NEA Agmt.) § 1.1; Ex. B (First Amend. to the MGIA) § 1.2. Finally, the NEA does not "take a player off the field" as a merger does. JetBlue is still operating as JetBlue, a lost-cost carrier. American is still operating as American, a network carrier. There has been no merger, and therefore there is no basis for predicting adverse effects "using analytical tools from merger analysis." Compl. ¶ 48.

### C. Plaintiffs Cannot Satisfy Their Burden of Pleading Adverse Effects with Speculative Allegations that the NEA "Likely" Will Cause Future Harm

Plaintiffs cannot overcome the lack of actual alleged harm by contending that the NEA creates a risk of "likely," but altogether speculative and unspecified, harm. *See Marucci Sports,* 751 F.3d at 376 ("[S]peculation about anticompetitive effects is not enough."); *In re McCormick*, 217 F. Supp. at 137 ("Conclusory allegations of supracompetitive prices are not sufficient.").

As a threshold matter, it is indisputable that the government is subject to the same rule of reason as everyone else, and subject to the same pleading rules. *See Amex*, 138 S. Ct. at 2284 (providing that the government plaintiff is required to show "substantial anticompetitive effect that harms consumers in the relevant market"); *Facebook, Inc.*, 2021 WL 2643627, at *12 (dismissing the FTC's complaint for failure to allege facts supporting allegations of market power). In past cases the DOJ has argued that, as a government plaintiff, it is authorized by Section 4 of the Sherman Act, 15 U.S.C. § 4, to "institute proceedings in equity to prevent and restrain" violations, and therefore it does not need to wait to file suits until it is in a position to plead actual adverse effects. United States of America's Opp'n to Def. United Continental Holdings, Inc.'s Mot. to Dismiss at 28, *United States v. United Continental Holdings Inc.*, Case No. 15-cv-07992-WHW-CLW (D.N.J. Feb. 12, 2016), ECF No. 35. This confuses process and substance. Section 4 says, and no one disputes, that the DOJ is authorized to bring, and the courts have jurisdiction to hear, suits "to prevent and restrain" antitrust violations.[11] Nevertheless, any claim the government chooses to bring is subject to the relevant *substantive* provision of the Sherman or Clayton Acts and the precedent interpreting it. And under the extensive body of Section 1 rule of reason law, 130 years in the making, there is no distinction between what a government or private plaintiff must plead and prove on the merits, generally or with regard to competitive effects.[12]

---

[11] Section 4 is entitled "Jurisdiction of courts; duty of United States attorneys; procedure," and states in relevant part: "The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title; and it shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations."

[12] The government does have one advantage: when it acts as an enforcer (as opposed to a market participant), the government need not show that the anticompetitive harm injured the government. That relieves it of a Clayton Act "injury" requirement, nothing having to do with

Within the rule of reason, some courts have recognized a very narrow path for a plaintiff to show adverse effects on competition by pointing to potential future harm. Cases where plaintiffs successfully walk this path are rare, probably because as Judge Boudin noted in *Addamax*, 152 F.3d at 53, "as a practical matter, most courts would be unlikely to condemn an otherwise legitimate joint venture absent some showing of anticompetitive effect."[13] We are unaware of any rule of reason case in which predictions of adverse effects sufficed even though information was available to assess the *actual* effects of the challenged conduct (as is true with respect to the NEA). In antitrust generally, courts accept inferences and predictions of adverse effects only when it is impractical to assess them directly. *See CCBN.com, Inc. v. Thomson Fin., Inc.*, 270 F. Supp. 2d 146, 156 (D. Mass. 2003) (stating that "conclusory allegation[s] of [harm do] not suffice" at the pleading stage, particularly "where plaintiff is in a position to ascertain the effect of the impermissible conduct"). Particularly now, after the Supreme Court in *Amex* and *Alston* reiterated that "the plaintiff has the initial burden to prove that the challenged restraint ***has*** a substantial anticompetitive effect that harms consumers," there is no basis for substituting speculative predictions for well-pled allegations of actual effects. *Amex*, 138 S. Ct. at 2284 (emphasis added); *Alston*, 141 S. Ct. at 2160.

---

the Sherman Act. *See* Areeda & Hovenkamp ¶ 326 (noting that unlike private parties, the government is authorized "to 'prevent and restrain' violations without any causal linkage of harm to any person," but adding: "Of course, a properly defined antitrust violation presumably harms, but *satisfaction of that requirement lies in the assessment of substantive legality*." (emphasis added)).

[13] *Addamax* notes in *dicta* that it is theoretically possible to predict adverse effects where there is a "sufficiently high *risk* of an anticompetitive effect, coupled with marginal benefits (or none at all that could not be achieved through an easily available less restrictive alternative)." 152 F.3d at 53 (emphasis in original). There are also references to "potential" and "threatened" effects in *Augusta News Co. v. Hudson News Co*., 269 F.3d 41, 47, 49 (1st Cir. 2001); *Catrone v. Ogden Suffolk Downs, Inc.,* 683 F. Supp. 302, 308 (D. Mass. 1988); and *Yagoozon, Inc. v. Kids Fly Safe*, No. 14-040, 2014 WL 3109797, at *7 (D.R.I. July 8, 2014).

Notwithstanding these cases, the DOJ has previously argued that in lieu of actual anticompetitive effects, plaintiffs can meet their burden under the first prong of the rule of reason by showing "that [defendants have] market power plus 'other grounds to believe that the defendant's behavior will harm competition market-wide, such as the *inherent anticompetitive nature* of defendant's behavior or the structure of the interbrand market.'"[14]  In its *Collaboration Guidelines*, the DOJ argues this is analogous to the "quick look" version of the rule of reason under which the analysis is truncated because "the likelihood of anticompetitive harm is evident from the nature of the agreement."  *Collaboration Guidelines* § 3.3 (citing *California Dental Ass'n v. FTC,* 526 U.S. 756, 770, 778 (1999) (holding that an "obvious anticompetitive effect[]" would permit a court to abbreviate the full rule of reason analysis).

The First Circuit has never adopted this standard.[15]  But even assuming the First Circuit would, the Complaint still fails because it does not plead *facts* plausibly showing that "defendant's behavior will harm competition market-wide, such as the inherent anticompetitive nature" of the collaboration.  *K.M.B. Warehouse Distribs.*, 61 F.3d at 129.  Plaintiffs rely entirely

---

[14] This is the standard the DOJ urged in the *Amex* litigation.  *See* Pls.' Mem. of Law in Opp'n to Summ. J. at 7, *Amex*, No. 1:10-cv-04496 (E.D.N.Y. Feb. 20, 2014), ECF No. 321 (emphasis added) (citing *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127–29 (2d Cir. 1995)), https://www.justice.gov/atr/case-document/file/485791/download.

[15] A few courts outside the First Circuit have at least entertained this possibility.  *See K.M.B. Warehouse Distribs*, 61 F.3d at 129; *Realcomp II, Ltd. v. FTC,* 635 F.3d 815, 827 (6th Cir. 2011) ("Market power and the anticompetitive nature of the restraint are sufficient to show the potential for anticompetitive effects under a rule-of-reason analysis . . . .").  But in reviewing this very issue, the Second Circuit also has recognized (a) that although "it is possible, at least in theory," to prove adverse effect on "competition indirectly," in reality, "[i]n no case [has the Second Circuit] actually held that [this approach] was sufficient to prove an adverse effect on competition as a whole," and (b) that "in no precedential opinion in [the Second Circuit] has a plaintiff successfully proved an adverse effect on competition without offering evidence of changed prices, output, or quality," and "our cases have always required, as a practical matter, some evidence that the challenged action has *already* had an adverse effect on competition." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182–85 (2d Cir. 2016).

19

on conclusory allegations that fail to give rise to any inference that the NEA is likely to harm consumers. This is evident with respect to Plaintiffs' core objections to (1) the general framework of the NEA, including a contention that American somehow will "co-opt" JetBlue to change its long-standing and successful low-fare business model; (2) the NEA's revenue sharing provision; and (3) capacity optimization at the NEA airports. As we explain below, none of these theories is pled in a way that would meet even the DOJ's preferred standard.

### 1. *The Complaint Does Not Adequately Allege that the NEA as a Whole Is Inherently Anticompetitive*

As already noted, the antitrust principles for evaluating alleged joint ventures are based on their demonstrated *procompetitive* potential. *See, e.g., Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 724–25 (6th Cir. 2019) ("Because joint ventures often have procompetitive efficiencies, when a joint venture is itself challenged as anticompetitive, that claim is reviewed under the rule of reason." (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984))). There is no legal basis for taking a category of conduct that is presumptively *procompetitive* and inferring (rather than proving) *adverse effects* from it. That is illogical, and it is contrary to numerous Section 1 cases holding that it is inappropriate to truncate or diminish the full rule of reason analysis, including the foundational requirement of actual adverse effects, when the practice at issue has plausible procompetitive potential. *See, e.g., Chi. Pro. Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 600 (7th Cir. 1996) (concluding that because the joint venture was integrated and generated efficiencies, the full rule of reason analysis applied); *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1083–84 (11th Cir. 2016) (rejecting truncated

analysis where "procompetitive efficiencies . . . might flow" from the competitor collaboration).[16]

Plaintiffs' protests about the NEA as a whole boil down to the assertion that American and JetBlue compete and therefore the NEA may reduce competition between them on certain routes, that the collaboration allows American to rely on JetBlue operations and avoid the time and expense of making its own investments, and that the NEA "aligns the interests of JetBlue with American" to some extent. *See, e.g.*, Compl. ¶¶ 10–11, 53–57, 71. But that is what all joint ventures do by their very nature: they reduce competition between the venturers in a limited way in order to enhance competition overall by allowing the partners to create a new or better product or service that would not be previously available. *See Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188 (7th Cir. 1985) ("Antitrust law is designed to ensure an appropriate blend of cooperation and competition, not to require all economic actors to compete full tilt at every moment. When cooperation contributes to productivity through integration of efforts, the Rule of Reason is the norm."). Plaintiffs cannot meet their burden of pleading inherently anticompetitive conduct by alleging that the NEA has ordinary qualities of a joint venture.

Plaintiffs' primary theory appears to be that the NEA gives American the ability to punish or "co-opt" JetBlue, and this creates a risk to future competition. Compl. ¶¶ 9, 30, 72. But this speculative theory is wholly unsupported by factual allegations and cannot come close to satisfying *Twombly*. Indeed, the Complaint does not allege a single fact indicating that JetBlue has altered or plans to alter in any way its low-fare business model; to the contrary, the document

---

[16] Plaintiffs do not argue that the NEA is a sham, devoid of any procompetitive potential. Nor could they, because even Plaintiffs, for all the vitriol they aim at the NEA, cannot deny that the NEA combines complementary American and JetBlue assets and thereby generates efficiencies. In fact, the Complaint implicitly acknowledges the NEA *does* so in a paragraph devoted to claims that harms will "outweigh" consumer benefits. Compl. ¶ 77.

Plaintiffs cite in support of their purported "co-opting" theory discusses the contractual provisions JetBlue used to *protect its independence.* *Id.* ¶ 11.  The Complaint also strains to presume that American will act in ways directly contrary to the DOT's agreement with American and JetBlue in connection with terminating its review of the NEA, which expressly prohibits the parties from withdrawing assets from one another in response to pricing or other competitive conduct.  Ex. C (DOT Agreement) § III.C.  *Cf. Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 412 (2004) ("One factor of particular importance is the existence of a regulatory structure designed to deter and remedy anticompetitive harm.  Where such a structure exists, the additional benefit to competition provided by antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny.").  Merely assuming that Defendants are likely to breach their commitments to the DOT is implausible.  And it makes even less sense to assume that JetBlue will suddenly change its low-fare business strategy that has been a hallmark of the brand for more than two decades.  *See Iqbal*, 556 U.S. at 679 (determining plausibility is "context-specific" and "requires the reviewing court to draw on its judicial experience and common sense").

Plaintiffs also analogize the NEA to international airline alliances.  Compl. ¶ 22.  But that only undermines their contention that the NEA is inherently anticompetitive.  Tellingly, the DOT has extensively studied the consumer welfare implications of international airline alliances and repeatedly found that they generate *procompetitive* consumer benefits.[17]  These include "[l]ower

---

[17] Under 49 U.S.C. §§ 41308–41309, Congress authorizes the DOT to approve and to grant antitrust immunity ("ATI") over joint venture agreements between U.S. and foreign carriers.  DOT grants ATI if it determines the agreement is *required* by the public interest.  49 U.S.C. § 41308(b).  The DOT has repeatedly found that granting ATI for international airline joint ventures are required by the public interest, finding in favor of international alliances with revenue sharing and capacity coordination more than 15 times in the past 20 years.  *See e.g.,*

fares on more itineraries between city-pairs; [a]ccelerated introduction of new routes;
[a]dditional flights on existing routes; [i]mproved schedules; [r]educed travel and connection
times; and [p]roduct and service enhancements that . . . allow the applicants to provide full
reciprocal access to their networks." Ex. D (American et al., Order 2010-7-8 (DOT-OST-2008-
0252)) at 3; *see also* Ex. E (Delta et al., Order 2019-8-2 (DOT-OST-2013-0068)) at 10
(recognizing that international airline joint ventures create "cost and operational efficiencies,
broader network coverage (resulting in more paths between a given origin and destination),
network and capacity coordination, increased capacity (beyond a market's expected growth rate)
and alignment of frequent flyer benefits.").

     Retrospectively, the DOT has recognized that American's transatlantic joint venture,
which Plaintiffs allege has increased "consolidation," Compl. ¶ 29, "brought a number of
benefits such as increased transatlantic capacity, as well as new nonstop services, . . . reduce[d]
travel times[,] . . . ability to earn and redeem miles across all alliance partners, . . . [and]
invest[ment] in technology and infrastructure enhancements to improve consumers' travel
experience, including the ability to view all partner's flight options through any partner's
website, improved baggage handling accuracy, automatic re-accommodation for cancelled or

---

American et al., Order 2020-12-20 (DOT-OST-2008-0252) (approving and granting ATI for
joint venture among American, British Airways PLC, OpenSkies SAS, Iberia Líneas Aéreas de
España, S.A., Finnair OYJ, and Aer Lingus Group DAC); Delta et al., Order 2019-11-14 (DOT-
OST-2013-0068) (approving and granting ATI for joint venture among Delta, Société Air
France, Koninklijke Luchtvaart Maatschappij N.V., and Virgin Atlantic Airways, Ltd.); United
et al., Order 2011-11-16 (DOT-OST-2008-0234) (approving and granting ATI for joint venture
among United, Air Canada, The Austrian Group, British Midland Airways, Ltd., Brussels
Airlines NV/SA, Continental Airlines, Inc., Deutsche Lufthansa AG, Polskie Linie Lotnicze
LOT S.A., Scandinavian Airlines System, Swiss International Air Lines Ltd., and TAP Air
Portugal). The DOT decisions, which are publicly available on Regulations.gov, are attached to
this motion as Exhibits D–K.

delayed flights, and enhancements to lounges and terminal locations," Ex. I (American et al., Order 2020-11-9 (DOT-OST-2008-0252)) at 10.[18] The DOT's expert opinions on this subject, over time and with regard to the NEA, at least take the NEA far outside any category of "inherently suspect" practices that can be condemned without tangible allegations (and ultimately proof) of actual anticompetitive effects.

### 2. Revenue Sharing Is Not Inherently Anticompetitive

Implicitly recognizing that they cannot allege that the NEA as a whole is anticompetitive, Plaintiffs allege, also in a conclusory fashion, that revenue sharing between American and JetBlue is "inherently anticompetitive." Compl. ¶¶ 20–22. Antitrust law has special rules for challenges to particular practices within a joint venture. Such practices may be (a) "core" activities, meaning they are "integral to the running" of the venture, *Texaco*, 547 U.S. at 7; (b) "ancillary" restraints, which support and are "reasonably related to the joint venture's procompetitive features," *Med. Ctr. at Elizabeth Place*, 922 F.3d at 724–25;[19] or (c) "naked" restraints that restrict competition without meaningfully advancing the procompetitive purposes of the venture," *id.* Practices in the first two categories receive rule of reason treatment, and generally speaking if the joint venture itself is permissible, "core" and "ancillary" restraints are

---

[18] The DOT has similarly recognized that Delta's joint ventures with Virgin Atlantic and separately with Air France and KLM "have delivered significant consumer benefits," observing "nonstop capacity on four key trunk routes [that] has more than doubled since 2009," "new transatlantic routes," and "expand[ed] time-of-day coverage at key transatlantic hubs." Ex. E (Delta et al., Order 2019-8-2 (DOT-OST-2013-0068)) at 11.

[19] In *Sullivan v. NFL*, 34 F.3d 1091 (1st Cir. 1994), the First Circuit described an ancillary restraint as "one that is required to make the joint activity more efficient." *Id.* at 1102 (citing cases). More commonly, courts hold that a restraint is ancillary if "it serves to make the main transaction," here the NEA, "more effective in accomplishing its purpose." *Rothery Storage*, 792 F.2d at 224.

as well.  *See Texaco*, 547 U.S. at 7–8 (explaining that a restraint "that is ancillary to the legitimate and competitive purposes of the business association [is] thus valid").

There is no basis in law or logic for contending, as the Complaint alleges, that revenue sharing in a joint venture is inherently anticompetitive.  A joint venture by definition envisions some degree of profit-sharing.  *See Ross v. Trans Nat'l Travel*, No. 88-1763, 1990 WL 79229, at *2 (D. Mass. June 5, 1990) ("The necessary elements of a joint venture are: first, a joint interest in a common business; second, an agreement to share profits and losses; and third, a right to joint control.").  There is no case law at all questioning whether it is anticompetitive or not (at least) "ancillary."[20]

In fact, there is a long history of revenue sharing in international airline alliances, and the practice has been recognized as so integral to generating *consumer benefits* that the DOT effectively *requires* carriers to enter into a revenue sharing arrangement as a condition for receiving antitrust immunity.  *See* Ex. J (U.S.-Japan Alliance Case, Order 2010-10-4 (DOT-OST-2010-0059)) at 14, 17 (refusing to place restrictions on revenue sharing because it was "intrinsic to the efficiencies and benefits promoted by a grant of antitrust immunity" and noting that "without . . . sharing of costs and revenues, two carriers are more reluctant to closely align their frequent flyer programs . . . [and] less likely to invest in other product

---

[20] Courts have addressed revenue sharing outside of the context of a joint venture as well, and have held that revenue sharing can be procompetitive and should be judged under the rule of reason. For example, in *In re Online DVD Rental Antitrust Litigation*, No. M 09-2029, 2011 WL 5883772 (N.D. Cal. Nov. 23, 2011), *aff'd*, 779 F.3d 914 (9th Cir. 2015), the court found that an agreement whereby Netflix agreed to pay a "10% revenue share" to Walmart was subject to the rule of reason because the agreement did not restrict the ability of either party to make sales, and it "not only distinguishe[d] both [parties'] core online competencies, but offer[ed] a complementary solution of value, service, and convenience to customers."  2011 WL 5883772 at *3, 8–9; *see also Cal. ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1135–36 (9th Cir. 2011) (en banc) (holding that an agreement among competitors that contained profit-sharing was subject to the rule of reason).

improvements . . . ."); Ex. K (Delta et al., Order 2013-8-21 (DOT-OST-2013-0068)) at 17 (granting antitrust immunity because it would "allow the [applicants] to engage in the kind of revenue and benefit sharing that is necessary to alleviate the commercial risks and create substantial public benefits").

The NEA agreements follow that model, but with particular terms that create incentives for the parties each to grow the collective NEA business. Ex. B(MGIA) § 2.9.1. The Complaint ignores this altogether, as it fails to say a word to explain why MGIA revenue sharing is not "ancillary"; nor does it explain why the MGIA's revenue sharing formula is anticompetitive. The only thing Plaintiffs say is generic—that parties that share revenue have less incentive to "undercut the other" because "doing so would simply reduce the revenues each earns under the revenue-sharing arrangement." Compl. ¶ 20. That conclusory opinion does not come close to pleading that *MGIA revenue sharing* is inherently anticompetitive. It is not even about MGIA revenue sharing specifically, which is the challenged conduct, and which Plaintiffs have investigated for over a year. And it entirely ignores that if American and JetBlue are able to attract customers of other airlines, such as United and Delta, it would increase revenue for each of them. To the extent Plaintiffs' argument is true, it would condemn all revenue sharing in alleged joint ventures in a manner antitrust law does not. The few threadbare sentences in the Complaint regarding revenue sharing are the epitome of "naked conclusions" that are to be disregarded under *Twombly* pleading standards. *See Elsevier, Inc*., 732 F.3d at 81.

### 3. *Capacity Coordination Within the NEA Is Not Inherently Anticompetitive*

The Complaint's allegations concerning the treatment of NEA capacity optimization are equally deficient. *See* Compl. ¶ 21. Competitor collaborations have wide latitude under the law to provide for otherwise prohibited forms of coordination when it meaningfully contributes to the realization of collaborative efficiencies. *See, e.g.*, *Rothery Storage*, 792 F.2d at 224. Courts do

not consider coordination that is reasonably related to the achievement of a joint venture's procompetitive objectives to be inherently anticompetitive, and such coordination is hardly ever found unlawful.  *See, e.g.*, *Augusta News*, 269 F.3d at 48–49 (analyzing joint selling and customer allocation in joint venture under rule of reason); *Texaco*, 547 U.S. at 5–6 (assessing coordinated pricing in joint venture context under rule of reason).  Coordination is especially unlikely to be problematic when it contributes to creating something jointly (like the expanded NEA network) that the parties are unable to create separately.  *See Rothery Storage*, 792 F.2d at 230 ("A joint venture made more efficient by ancillary restraints, is a fusion of the productive capacities of the members of the venture.").[21]

Capacity optimization—which Plaintiffs deride as "output coordination," Compl. ¶ 22— is "core" to, and the foundation of, the NEA's myriad consumer benefits.  It creates the expanded virtual network that provides more flights, more capacity and more consumer choices.  The reason is elemental:  the network will not design itself; it takes teams of network planners to realize and act upon the potential of American and JetBlue assets (planes of various sizes, gates, slots and network breadth) to form a broader, deeper and more compelling network.  Nothing in the Complaint alleges that Defendants could replicate the benefits of joint capacity optimization otherwise.  It is not enough, even for pleading purposes, to just assert that capacity optimization is harmful.

_____

[21] Once again, the DOT recognizes capacity coordination as a "public benefit" of airline joint ventures.  Ex. E (Delta et al., Order 2019-8-2 (DOT-OST-2013-0068)) at 10 ("The Department has recognized several forms of public benefits that immunized joint ventures can foster, including . . . network and capacity coordination . . . ."); Ex. I (American et al., Order 2020-11-9 (DOT-OST-2008-0252)) at 9 (same); Ex. J (U.S. Japan Alliance Case, Order 2010-10-4 (DOT-OST-2010-0059)) at 14 ("The Department believes that each set of applicants provides a detailed account of how its members will jointly manage their capacity and organize decision-making, thereby taking advantage of currently unexploited efficiency gains that are likely to benefit the traveling and shipping public.").

The bottom line is (a) there is no allegation that marketwide capacity *has* decreased, anywhere, even though airline schedules and aircraft assignments are public knowledge, and (b) everything Plaintiffs allege about possibilities is entirely speculative. The Court should not allow this case to go forward based on such conclusory allegations of "likely" adverse effects.

## II.     THE COMPLAINT DOES NOT ADEQUATELY ALLEGE MARKET POWER

The Complaint is defective as a matter of law for the independent reason that it fails to adequately allege market power, which is a necessary element of every rule of reason claim but especially so in a predictive challenge. *See E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n,* 357 F.3d 1, 5 (1st Cir. 2004); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) ("The first requirement in every suit based on the Rule of Reason is market power, without which the practice cannot cause those injuries (lower output and the associated welfare losses) that matter under the federal antitrust laws.") (collecting cases); *MacDermid Printing Sols.*, 833 F.3d at 183 ("[A] plaintiff that is unable to prove an actual adverse effect through price, output, or quality must *at least* establish that defendants possess the requisite market power . . . ."). To plead market power, a plaintiff must allege facts showing the defendants have "the ability to raise price profitably *by restricting output*." *Amex*, 138 S. Ct. at 2288. Plaintiffs have not done so. They have altogether ignored the Section 1 standard, with its emphasis on the ability to restrict output. Furthermore, with respect to all 17 New York markets alleged, Plaintiffs have engaged in blatant market gerrymandering that, even at the pleading stage, is patently impermissible.[22]

---

[22] Plaintiffs also allege that American and JetBlue have market power on over 90 routes listed in Appendix C. These are all connecting service routes that do not originate or terminate in Boston or New York and pass through hubs, including American hubs "such as Philadelphia or Charlotte," Compl. ¶ 74, *that are not within the scope of the NEA.* The only allegations Plaintiffs make about these routes is that Defendants' "incentives to compete against each other" will be

### A. Plaintiffs Have Failed to Plead that the NEA Gives American and JetBlue the Ability to Raise Any Marketwide Price by Restricting Their Own Output

The entirety of the Complaint's market power allegations is a conclusory statement: "Under the Northeast Alliance, Defendants will collectively have market power in the sale of scheduled air passenger service in the markets listed in the Appendices, and in other markets where Defendants compete or likely would compete in the future." Compl. ¶ 83. The Appendices then simply list alleged markets, market shares and "HHIs"—as is standard in merger challenges.

What is not found—anywhere—is any allegation that something about the NEA gives American and JetBlue the ability to exercise market power by controlling, and restricting, marketwide output. It is a glaring omission because it is uncontroversial that market power means that "there are significant barriers to entry in that market and that existing competitors lack the capacity to increase their output in the short run." *Coastal Fuels of P.R. Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 197 (1st Cir. 1996); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) ("The plaintiff[s] must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the [defendant]'s high price."). Where rivals—United, Delta and Southwest Airlines, for example—can "expand their output to satisfy buyers repelled by the defendant's price increase," AREEDA & HOVENKAMP ¶ 5.01, there is no basis for finding market

---

"diminish[ed]" because American (a) will share the revenues that JetBlue generates by providing connecting service through Boston or JFK, *id.,* and (b) can try to "co-opt" JetBlue by "selectively prevent[ing] JetBlue from being able to market American flights on connecting routes that JetBlue does not serve, *id.* at ¶ 72. These cursory allegations are neither well-pled nor plausible. One of the NEA's primary objectives is to *facilitate* JetBlue connecting service through Boston and JFK. And American *cannot* deny JetBlue codesharing on connecting service consistent with their commitments to the DOT.

power.[23] Ignoring the ability to restrict output is what led the DOJ to lose the *Amex* case: the DOJ argued that a combination of market share, "must have" status or consumer preference, and an unchecked ability to increase merchant fees proved that American Express had market power, but there was no evidence that in a properly defined market "output was restricted or prices were above a competitive level." *Amex*, 138 S. Ct. at 2288 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U. S. 209, 237 (1993)). The claim therefore failed.

This is a critical issue in any airline case because it is generally understood and accepted that with very few exceptions entry and expansion into city-pair markets are easy and happen frequently. *See In re AMR Corp.*, 625 B.R. 215, 258 (Bankr. S.D.N.Y. 2021) ("While there are substantial capital costs for new entrants into the airline industry generally, barriers to entry for existing carriers into new routes are relatively low . . . ."). Entry does not require creating a new airline, and may not even require acquiring new airplanes, because in the airline industry carriers can choose on short notice to chase profitable flying opportunities by directing capacity to attractive routes. *Id.* To be sure, some routes are protected by entry barriers because of slot restrictions or gate shortages. But there are no slot restrictions at Boston's Logan Airport, and while there are at LaGuardia and JFK airports, Plaintiffs have made no effort to plead that they facilitate the exercise of NEA market power in any particular market.

Barriers to entry and expansion by other airlines, if they exist, will be market-specific. Plaintiffs therefore need to plead them *by market*; there is no legal basis for requiring Defendants

---

[23] Even monopoly-level market shares fail to establish market power in the absence of entry barriers. *See, e.g.*, *Image Tech. Servs. Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1208 (9th Cir. 1997) ("Even a 100% monopolist may not exploit its monopoly power in a market without entry barriers."). And even if one were to apply merger standards, the absence of barriers to entry or expansion would clearly be fatal to Plaintiffs' claim. *See, e.g., United States v. Baker Hughes Inc.,* 908 F.2d 981, 987 (D.C. Cir. 1990) ("In the absence of significant [entry] barriers, a company probably cannot maintain supracompetitive pricing for any length of time.").

to defend allegations of market power on putative markets that are not even alleged to be protected by barriers to entry and expansion.  *Wojcieszek v. New Eng. Tel. & Tel. Co.*, 977 F. Supp. 527, 533–34 (D. Mass. 1997) ("[D]ismissal is appropriate where the 'complaint does not allege any barriers that would prevent entry into the market.'").  The one-paragraph treatment of this issue in the Complaint is both conclusory and categorical, making no effort to specify which, if any, of the many alleged relevant markets are protected by entry barriers.  Compl. ¶ 76.  That is insufficient.  *See Hip Hop Beverage Corp. v. Monster Energy Co.,* 733 F. App'x 380, 381–82 (9th Cir. 2018) (affirming dismissal of Sherman Act claim when plaintiff failed to allege that "there are significant barriers to entry and . . . that existing competitors lack the capacity to increase their output in the short run").

### B. Plaintiffs' New York Market Definitions Ignore Indisputable—And Previously Admitted—Competition

Finally, Plaintiffs' market power allegations are deficient because their New York market definitions are indefensible.  To create false inferences of concentration, they have carved out of all New York markets all domestic flights to and from Newark, including the *hundreds* of flights that United offers to serve demand for travel to and from New York.

It is well-settled that market shares do not support a claim of market power unless the market is well-defined.  *See Amex,* 138 S. Ct. at 2285 ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market.  'Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.'").  Therefore, even at the pleadings stage, antitrust plaintiffs must adhere to the *law* of market definition, especially the core principle that a market is "composed of products [or services] that have reasonable interchangeability for the purposes for which they are produced." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404 (1956); *see also E. Food*

*Servs.,* 357 F.3d at 7 (rejecting the argument that "the district court had no business making th[e] determination [that a geographic market was too narrow] on a motion to dismiss"); *Chapman v. N.Y. State Div. for Youth,* 546 F.3d 230, 238 (2d Cir. 2008) (concluding that dismissal is appropriate where a complaint "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in the plaintiff's favor"). There have been many cases in which plaintiffs have tried to create a false appearance of a dominant market share by pleading obviously underinclusive markets, only to have their claims dismissed. *See, e.g.,* *Campfield v. State Farm Mut. Auto. Ins. Co.,* 532 F.3d 1111, 1118–19 (10th Cir. 2008) ("If the market described in the complaint fails to include 'reasonably good substitutes' then the plaintiff has not adequately alleged a relevant market."); *Hicks v. PGA Tour, Inc.,* 897 F.3d 1109, 1121 (9th Cir. 2018) (affirming dismissal of claims against the PGA where the proposed market omitted obvious economic substitutes).

There are well-established and accepted standards for defining airline service markets. The customary rule, capturing both the product and geographic dimensions of the market, is that the relevant market is scheduled passenger airline service between "city pairs." *See, e.g.,* *In re AMR*, 625 B.R. at 247 (concluding, in a private challenge to the merger of US Airways and American Airlines, that "city-pairs constitute the 'proper geographic market'"); *Malaney v. UAL Corp.*, 434 F. App'x 620, 621 (9th Cir. 2011) ("*Malaney I*"). A city pair captures both the origin and destination of a flight, and includes at each end reasonably proximate airports to which consumers could turn for service. The Ninth Circuit in *Malaney I* explained why city pairs are appropriate (with a specific reference to New York): "A price increase on a flight from San Francisco to Newark could be defeated by the threat of travelers switching to a flight from Oakland to LaGuardia." 434 F. App'x at 621. It added: "The city-pair market has also been

endorsed as the most appropriate market for antitrust analysis by all academics and government agencies in the record, including the Department of Justice and the Government Accountability Office." *Id.* Indeed, in their own challenge to the merger of US Airways and American, numerous plaintiffs from this very case (DOJ, Arizona, District of Columbia, Florida and Pennsylvania) alleged that "each city pair [on which the parties competed] is a relevant geographic market," including 33 city-pairs treating JFK, LaGuardia and Newark jointly as "NYC." Am. Compl. ¶ 28 & App. A, *United States v. US Airways Grp., Inc.*, No. 1:13-cv-01236 (D.D.C. Sept. 5, 2013), ECF No. 73.

Here, in attacking the NEA, Plaintiffs abandon city-pair markets and allege that with respect to domestic flights serving New York (a) LaGuardia and JFK airports constitute the New York end of the relevant markets, and (b) *flights to or from Newark are not in the relevant markets*. Compl. ¶ 45. For example, unlike in *United States v. US Airways Grp. Inc.,* where all flights between New York and Raleigh/Durham were in the market denominated "New York, NY (NYC) - Raleigh-Durham, NC (RDU)," Plaintiffs now allege a market denominated "NYC (JFK/LGA) to Raleigh-Durham (RDU)." Compl. at App. B-1. The notable and significant difference is that Newark was cut from the alleged market in this case.

Plaintiffs' motive for doing this is obvious. By carving Newark out of the alleged market, they are able to virtually ignore United, which consolidated its New York operations in Newark six years ago—but still touts itself as "New York's Leading Airline."[24] Of course, United did not leave New York, and it is specious for anyone to argue that United flights serving

---

[24] Press Release, United Airlines, United Airlines Strengthens New York/New Jersey Hub with Move of p.s. Transcontinental Service to Newark (June 16, 2015), https://united.mediaroom.com/2015-06-16-United-Airlines-Strengthens-New-York-New-Jersey-Hub-with-Move-of-p-s-Transcontinental-Service-to-Newark.

New York from Newark do not compete with American, JetBlue, Delta or other airlines serving the same routes from JFK. This is just a sleight of hand to artificially increase the market shares for American and JetBlue (which mainly fly out of LaGuardia and JFK) by taking United flights and other Newark flights out of the market shares for New York routes.

This tactic of pleading narrow markets coextensive with the challenged conduct is not new, and it is consistently rejected as "tautological." *See, e.g.*, *Bridges v. MacLean-Stevens Studios*, *Inc.*, 35 F. Supp. 2d 20, 29 (D. Me. 1998), *aff'd*, 201 F.3d 6 (1st Cir. 2000); *Burns v. Cover Studios, Inc.*, 818 F. Supp. 888, 892 (W.D. Pa. 1993) ("The plaintiff's definition of the relevant market as coextensive with the parties to his competitor's contract is . . . patently invalid because it is tautological."). Market realities determine market boundaries, and a geographic market is "the 'area of effective competition . . . in which the seller operates, and to which the purchaser *can practicably turn* for supplies.'" *United States v. Phila. Nat'l Bank,* 374 U.S. 321, 359 (1963) (quoting *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327 (1961)) (emphasis modified); *see also Pro. Mkt. Rsch., Inc. v. AC Nielsen Corp.*, No. 03-2314, 2008 WL 11504726, at *7 (D.P.R. Sept. 12, 2008) (describing the geographic market as "the geographic area in which defendant faces competition"). It is, in other words, "that area in which a potential buyer may rationally look for the goods or services he seeks." *Gordon v. Lewistown Hosp.,* 423 F.3d 184, 212 (3d Cir. 2005); *see also Garnica v. Hometeam Pest Def., Inc.,* 230 F. Supp. 3d 1155, 1159 (N.D. Cal. 2017) (explaining the market is "the geographic area where customers can access alternative sources of supply"). A market must include the "competitors that discipline the [defendants'] prices," *FTC v. Advocate Health Care Network,* 841 F.3d 460, 476 (7th Cir. 2016), even if they are less convenient or disadvantaged, so long as they presently compete for sales or could were there an attempt to exercise market power. *See Concord Assocs., LP v. Ent.*

*Props. Tr.,* 817 F.3d 46, 53–54 (2d Cir. 2016); *Malaney v. UAL Corp.*, 552 F. App'x 698, 701–02 (9th Cir. 2014) ("*Malaney II*"); *FTC v. Freeman Hosp.,* 69 F.3d 260, 269 (8th Cir. 1995).

The Complaint ignores these principles. The one paragraph that addresses these JFK/LaGuardia-only markets contains just one conclusory factual allegation: that "many passengers traveling to and from JFK or LaGuardia do not view service to Newark Liberty as a reasonable substitute to JFK or LaGuardia." Compl. ¶ 45.[25] That means nothing. Of course there must be some passengers who, because they live close to JFK, prefer it over Newark. But Newark and JFK airports are both approximately 17 miles from Midtown Manhattan, meaning that they are both *at least an option* for (a) all inbound travel and (b) the huge base of passengers who live in Manhattan or other points in between the two airports. To excise Newark-based flights from the market, Plaintiffs must plead that Newark flights serving New York *do not compete* with LaGuardia and JFK flights serving New York, and *cannot discipline the prices* of LaGuardia and JFK flights serving New York. Plaintiffs have failed to plead anything close to that, and their gerrymandered market definition that ignores the realities of New York air travel does not come close to meeting their pleading burden.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss Plaintiffs' Complaint with prejudice.

---

[25] Paragraph 45 also contains a conclusory statement that the "hypothetical monopolist test," a market definition methodology, is satisfied. But as a bare legal conclusion, not a fact, that contention is not entitled to any weight. *See Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198, 1203 (N.D. Cal. 2008) (granting Apple's motion to dismiss because Psystar's "conclusory allegations . . . merely restate[d] a commonly used test for market definition without providing any factual basis for the claim"); *see also, supra* n.23.

Dated: November 22, 2021

Respectfully submitted,

/s/ Daniel M. Wall
Daniel M. Wall (*pro hac vice*)
Elizabeth C. Gettinger (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
dan.wall@lw.com
elizabeth.gettinger@lw.com

Ian R. Conner (*pro hac vice*)
Michael G. Egge (*pro hac vice*)
Farrell J. Malone (*pro hac vice*)
Allyson M. Maltas (*pro hac vice*)
Seung Wan Paik (*pro hac vice*)
Marguerite M. Sullivan (*pro hac vice*)
Tara L. Tavernia (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
ian.conner@lw.com
michael.egge@lw.com
farrell.malone@lw.com
allyson.maltas@lw.com
andrew.paik@lw.com
marguerite.sullivan@lw.com
tara.tavernia@lw.com

David C. Tolley (BBO #676222)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
david.tolley@lw.com

*Attorneys for Defendant*
*American Airlines Group Inc.*

<u>/s/ Richard Schwed</u>
Richard Schwed (*pro hac vice*)
Matthew L. Craner (*pro hac vice*)
Jessica K. Delbaum (*pro hac vice*)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-5445
rschwed@shearman.com
matthew.craner@shearman.com
jessica.delbaum@shearman.com

Brian Hauser (*pro hac vice*)
Shearman & Sterling LLP
401 9th Street, NW
Washington, DC 20004
Telephone: (202) 508-8005
brian.hauser@shearman.com

Glenn A. MacKinlay, BBO #561708
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
Telephone: (617) 449-6548
gmackinlay@mccarter.com

*Attorneys for Defendant*
*JetBlue Airways Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.

/s/ Daniel M. Wall
Daniel M. Wall