# EXHIBIT C

**Agreement with U.S. Department of Transportation regarding Northeast Alliance Between American Airlines, Inc. and JetBlue Airways Corporation**

I. **PREAMBLE**

In the period between July 22 and October 27, 2020, American Airlines, Inc. ("American") and JetBlue Airways Corporation ("JetBlue") submitted cooperative agreements, including code-sharing, frequent flyer, interline, revenue sharing, and alliance agreements, regarding the Northeast Alliance between American and JetBlue (the "NEA") to the U.S. Department of Transportation ("DOT"). American and JetBlue also submitted documents describing their plans for developing and implementing the alliance.

Through the cooperative agreements and supporting documentation, American and JetBlue represent to DOT that the purpose of the NEA is to deliver significant customer benefits with an alliance that optimizes each carrier's network in the Northeast. In furtherance of their objectives, American and JetBlue intend to engage in code sharing, frequent flyer cooperation, sharing of existing assets, marketing, planning, and revenue sharing. American and JetBlue represent their plan to generate significant incremental growth in capacity – as measured in seats and new routes, among other measures – versus the status quo.

DOT reviewed the agreements and supporting documentation submitted by the two carriers under 49 U.S.C. 41720. American and JetBlue offered to make certain commitments to address competitive issues arising from the NEA (the "Commitments" described in Section III of this Agreement). For the purposes of this Agreement, the term "slot" means: (1) operating authorization (or its equivalent) granted by a Federal Aviation Administration ("FAA") Order or regulation to conduct an arrival or departure at John F. Kennedy International Airport ("JFK") or LaGuardia Airport ("LGA"); or (2) operating authorization (or its equivalent) to conduct an arrival or departure at Ronald Reagan Washington National Airport ("DCA") granted by DOT regulation.

Subject to the terms and conditions in this Agreement, DOT will terminate its review.

II. **PARTIES**

The parties to this Agreement are DOT, American, and JetBlue.

III. **COMMITMENTS**

  A. **JetBlue's JFK Services:** JetBlue agrees not to exit any non-seasonal, nonstop JFK route it served as of February 2020 other than JFK-LGB, JFK-OAK, and JFK-ORH for the term of this Agreement.[1]

  B. **Communication Protocols:** American and JetBlue agree to amend the NEA agreements so that there are mandatory limitations on what can be discussed during network planning sessions and how those discussions are conducted. The amendments will provide that:

---

[1] Independent of the NEA, JetBlue indicates that it has closed its stations at LGB, OAK, and ORH. Nothing in this Agreement prohibits DOT from exercising statutory authority under the CARES Act or the Omnibus/COVID Relief act signed by the President on December 27, 2020.

1. There shall be no discussions of future fares, fare levels, or revenue management strategies within or outside of the NEA;

2. There shall be no discussions of route, scheduling, or capacity decisions with respect to any flights outside the scope of the NEA, including any discussion of network adjustments to flying that is not in scope of the NEA;

3. Any material meetings or teleconferences involving the Senior Planning Team and/or NEA Implementation Team[2] will be conducted under the guidance of in-house and/or external legal counsel and will have pre-established agendas that will only include issues related to the NEA network; and

4. Prior to implementation, American and JetBlue shall establish and provide to DOT for review and comment protocols to ensure that the information being exchanged is necessary to the operation of the NEA and does not disclose information concerning capacity decisions on routes outside the scope of the NEA or future fares, fare levels, or revenue management strategies within or outside the NEA. American and JetBlue agree to provide any material revisions to the protocols to DOT.

C. **Non-Interference:** American and JetBlue will amend the NEA agreements to limit discretion to withdraw assets and assistance provided under the NEA.

1. American and JetBlue will be prohibited from withdrawing, reducing or degrading the provision of slots and gates in response to, or to influence, the other's competitive behavior, including but not limited to its pricing, within or outside of the geographies covered by the NEA.

2. With respect to slots specifically, the NEA will be amended so that slots will be leased between American and JetBlue for a minimum of two IATA seasons, unless the slot lease is for seasonal flying only.

D. **Reporting:** American and JetBlue agree to maintain and provide to the DOT data and records pertaining to NEA performance. American and JetBlue will provide reports to the DOT that are similar in substance and form to those DOT requires from immunized alliances. The reports will include the following information:

1. <u>Optimization</u>: American and JetBlue will provide, annually, due by the last day of January, records and data regarding changes to the NEA "optimized schedule" made by the NEA Implementation Team and, separately, the Senior Planning Team, for each year from implementation of the NEA;

2. <u>Market Capacity and Stimulation</u>: American and JetBlue will provide,

---

[2] The Senior Planning Team will consist of director or executive-level representatives that will set high-level goals of the NEA. The NEA Implementation Team will consist of manager-level representatives from the Network Planning groups of American and JetBlue. Members of the teams will be confirmed prior to implementation and will be subject to change.

annually, by the last Monday of January, internal 100% seat and departure numbers per distinct nonstop O/D airport-pair market served broken out on a monthly basis, including data on new or incremental airport pairs added, or any airport pairs that have been removed during the prior January to December period. American and JetBlue will provide data sufficient to determine the incremental (or decremental) passengers that the NEA has added (or removed) to the total market size, overall and by O/D airport-pair market served;

3. <u>Slot Utilization</u>: American and JetBlue will provide, twice per year, due by the last Monday of January and the last Monday of June, a report detailing their utilization of each slot at JFK and LGA covering activities from the most recently completed IATA traffic season under both the methodology contained in the most recent FAA or DOT order or regulation governing slot usage at U.S. airports and the IATA Worldwide Airport Slots Guidelines' series of slots methodology. The report should at minimum provide metrics required to determine slot utilization for each slot under each methodology;

4. <u>Gate Utilization</u>: American and JetBlue will provide, annually, due by the last Monday of January, gate utilization metrics at each NEA airport for the prior January – December period. The report should detail, on a monthly basis, gate utilization metrics for all carrier and non-carrier flights on each exclusive or preferential use leased gate at each NEA airport; the total (arrival and departure) number of seats per gate; the total number of departures per gate; and the average number of seats per departure for American, JetBlue, and any American/JetBlue partners who sublease or utilize American/JetBlue leased gates at each NEA airport; and

5. <u>Supporting Documentation</u>: American and JetBlue will submit, annually, due by the last Monday of January, other supporting documentation such as NEA planning meeting agendas, meeting minutes, copies of lease agreements, and other alliance implementation documents for the prior January to December period.

E. **Slot Divestitures:** American and JetBlue agree to divest slots subject to the terms and conditions described below.

1. <u>Upfront divestitures</u>: American and JetBlue agree to divest seven (7) slot pairs at JFK and six (6) slot pairs at DCA.

    a. General terms applying to both JFK and DCA divestitures:

        (1) The auction process for the upfront divestitures will occur the earlier of three months after the last industry-wide COVID-19 slot utilization waiver is withdrawn or one year from the date of execution of this Agreement.

        (2) Prior to the auction process, American and JetBlue will provide DOT with a timeline and implementation plan, and seek from DOT the list of eligible carriers.

3

      (3)     American and JetBlue will offer the slot pairs in single bundles at each airport that offerors may pursue independently (a JFK bundle and a DCA bundle). American and JetBlue must seek prior approval to auction and transfer slot pairs in amounts smaller than these bundles.

      (4)     American and JetBlue will seek prior approval from DOT of the terms of the final agreements associated with the upfront divestitures.

      (5)     Carriers receiving divested slots may be required to demonstrate to American and JetBlue that they have exhausted reasonable efforts to seek accommodation for terminal space and other necessary infrastructure, including by availing themselves of any applicable airport lease terms and policies. Should those carriers receiving divested slots prove unable to find adequate accommodation, American and JetBlue will provide it at commercially reasonable rates.

  b.    JFK:

      (1)     American agrees to divest four (4) slot pairs and JetBlue agrees to divest three (3) slot pairs at JFK.

      (2)     The slots to be offered for upfront divestitures are identified in the Appendix. American and JetBlue, on the one hand, and the recipient carrier(s), on the other hand, will have the option to mutually agree upon different slot times;

      (3)     The JFK divestitures shall be permanent and non-revocable. American and JetBlue shall not seek to lease these slot pairs. The carriers will further agree to take reasonable steps such as swapping slots or assisting the recipient in trying to find other potential trading partners.

  c.    DCA:

      (1)     American agrees to divest four (4) slot pairs and JetBlue agrees to divest two (2) slot pairs at DCA.

      (2)     The slots to be offered for upfront divestitures are identified in the Appendix. American and JetBlue, on the one hand, and the recipient carrier(s), on the other hand, will have the option to mutually agree upon different slot times;

      (3)     The DCA divestitures will be in the form of renewable lease(s).

            •    American and JetBlue will submit the lease agreements to DOT for prior approval;

- American and JetBlue will offer a lessee commercially reasonable and industry standard provisions that enable vigorous competition; provided, however, that once the slots have been divested neither American nor JetBlue will have control over how the slots are used by the recipient carriers. The lease terms will not give American and JetBlue the right to re-negotiate the amount of compensation due, but may include reasonable price escalators to account for inflation;

- Leases will renew automatically throughout the life of the NEA, at the option of the lessee; provided, that American and JetBlue, upon termination of the NEA, will have the right to terminate the lease five years from the execution of the first lease or six months from the termination of the NEA, whichever is later. Upon termination, American and JetBlue will be able to use the slots;

- If a lessee chooses not to renew its lease, American and JetBlue shall re-let the DCA slots according to the same procedures and rules established in this Agreement for the upfront divestitures; provided that American and JetBlue, upon termination of the NEA, will have the right to terminate the lease five years from the execution of the first lease by the initial lessee of the slot or six months from the termination of the NEA, whichever is later. Upon termination, American and JetBlue will be able to use the slots; and

2. <u>Conditional divestitures</u>: American and JetBlue agree to make additional permanent and non-revocable slot divestitures at JFK pursuant to section III.E.2.c. below under the following conditions:

   a. If American and JetBlue meet Capacity Targets (as defined below) at JFK+LGA, no additional slot divestitures will be required.[3] If American and JetBlue fail to meet Capacity Targets, American and JetBlue will offer to divest additional slot pairs as described below.

   b. Capacity Targets at JFK+LGA are determined as follows:

---

[3] "Seat capacity" for purposes of calculating Capacity Targets and Baseline Seat Number and whether they have been met will be extracted from DOT's carrier reported T-100 segment data, a public source for carrier reported information, no later than 30 days after it is published for domestic and international travel for the preceding 12 calendar months (i.e. Mar 2023 for Jan-Dec 2022). Seat capacity will be calculated using arrival and departure (bi-directional) capacity.

(1) At JFK+LGA (combined), the Capacity Target is for American and JetBlue to operate during the calendar year 2022 a combined seat capacity at JFK+LGA that is 105% of their combined seat capacity at JFK+LGA as modified below ("Baseline Seat Number"). For calendar years 2023 and 2024, American and JetBlue will operate seat capacity that is 110% of the Baseline Seat Number, and for calendar year 2025, they will operate seat capacity that is equal to 115% of the Baseline Seat Number.

(2) The Baseline Seat Number will be calculated using American's and JetBlue's 2019 combined seat capacity at LGA, plus JetBlue's 2019 seat capacity at JFK, plus American's 2018 seat capacity at JFK. The Baseline Seat Number will be reduced by the number of JFK slots initially divested (*i.e.* fourteen) multiplied by 72 seats per operation, multiplied by an 80% utilization factor.

(3) American's growth on any transatlantic route will be counted only in determining whether the Capacity Targets have been met if the growth on that route is also incremental to the total capacity on that route for all Atlantic Joint Business (the "AJB") carriers in the two IATA seasons preceding the introduction of the new capacity. The same provision will apply for American's growth on any transpacific route as part of American's pacific joint business with Japan Airlines (the "PJB"). Specifically, if American adds transatlantic (or transpacific) capacity, by up-gauging, adding frequencies, or starting a new service, on a route that is served by an AJB partner (or PJB partner), the seats on that flight will count only towards the Capacity Targets to the extent they add AJB (or PJB) capacity to that route taking into account any reductions in the form of down-gauges, frequency reductions, or route exits by AJB (or PJB) partners within the prior two IATA seasons. Any such reductions by AJB (or PJB) carriers will be netted against any claimed capacity increases by American on that route only.

(4) Only capacity additions that are within the scope of the NEA will count towards seat capacity. Specifically, JetBlue transatlantic capacity will not be included in calculating the number of additional seats offered by American and JetBlue in a future period.

(5) In the event that 2021 total passenger traffic at JFK and LGA across all scheduled passenger carriers serving those airports is less than 75% of total 2019 traffic, the carriers will have the option to modify the capacity commitments

6

        in subsection (1) to (1) 105% for 2023; (2) 110% for 2024; (3) 115% for 2025; and (4) 115% for 2026.[4]

    c.    If the Capacity Targets are not met, American and JetBlue agree to divest up to ten (10) additional slot pairs at JFK, the number of which will be calculated in the following manner. First, American and JetBlue will determine the number of seats by which American and JetBlue fell short of the applicable Capacity Target at the end of the year. Then American and JetBlue will determine how many seats they operated per slot pair. American and JetBlue will then divide the number of seats short of the applicable Capacity Target by the ratio of seats per slots at JFK+LGA. That number rounded to the nearest number of slot pairs will be the number of additional slot pairs that must be offered to be divested at JFK for a given year. unless that number is less than 0.5. If the number is less than 0.5, then American and JetBlue will divest one slot pair. Capacity changes by American on routes done in coordination with its AJB (or PJB) partners, as described in section E.2.b.(2), will not count towards calculation of seats operated per slot pair.

        (1)    Example: If in 2023 American and JetBlue operate 500,000 seats short of achieving 10% growth at JFK+LGA, and American and JetBlue operate an average of 100,000 seats per slot pair at JFK+LGA, American and JetBlue must offer to divest an additional 500,000/100,000 = 5 slot pairs at JFK in 2023.

    d.    American and JetBlue agree to complete any additional divestiture of slots as required by failure to meet the applicable Capacity Target under this provision within six months following the end of the applicable measurement period.

    e.    American, JetBlue, and DOT agree that JFK slots divested through this conditional procedure will generally follow the same procedures as the upfront divestitures for JFK, including prior approvals from DOT. In the event that JFK is operating at the equivalent of IATA Level 2 at the time of the conditional divestitures, American and JetBlue may request that eligible carriers exhaust efforts to obtain equivalent slots from the FAA in the hour(s) that slots would have been divested prior to receiving new slots from American and JetBlue.

    f.    The slots to be offered as conditional divestitures are identified in the Appendix. The conditional divestiture slots, if required, will be offered in tranches. To the extent that slots must be divested as set forth in section III.E.2.c., they will be offered in the tranches identified in the Appendix, beginning with Tranche A, moving from top to bottom in the table (i.e., morning to evening) until that tranche is exhausted, and then to the Tranche B in the same

---

[4] Total passenger traffic shall be determined using DOT T-100 segment data.

                fashion, and so on, until all slots that must be divested according to section III.E.2.c. are offered and divested.

        g.    The commitments in this section III.E.2. are conditioned on DOT and FAA not implementing additional competition remedies to reduce American's or JetBlue's portfolios of slots with respect to the NEA at JFK and LGA. If American and JetBlue are required by DOT or FAA to divest slots following the applicable measurement periods, the commitments for future years will be adjusted downward by the number of slots divested times the average number of seats per slot times the average percent utilization of slots at JFK for that year by American and JetBlue; provided that, such downward adjustment will not apply to the extent of any slots that are revoked or otherwise required to be relinquished by the FAA or any other applicable governmental agency as a result of either American's or JetBlue's failure, including the failure of a third-party leasing an American or JetBlue slot, to operate such slots at or above the minimum utilization rate required by the "use-it-or lose-it" regulations or as a result of misuse.

    3.    American and JetBlue will not engage in non-arms-length cooperation with recipient(s) of the divested slots with respect to those divested slots.

    4.    In the event that slots made available for divestiture, as required in Section E, are not taken up by eligible recipients, the slots will continue to be available for divestiture to eligible recipients under the same terms established in Section E. The continued availability of slots, or the inability of the recipient carrier to operate divested slots through no fault of American and JetBlue, does not constitute a breach of this Agreement.

## IV. FORCE MAJEURE

    A.    Except as otherwise provided in IV.C., a Force Majeure Event means an event beyond the reasonable control of a party that has a material adverse effect on the NEA: acts of God, war, acts of terrorism, sabotage, natural disaster, strike, lockout, labor dispute, work stoppage, fire, serious accident, acts of government, or epidemic, pandemic or quarantine restriction. The parties agree that the continuation of the COVID-19 pandemic is a Force Majeure Event so long as it has a material adverse effect on the NEA.

    B.    Provided American and JetBlue promptly notify DOT and take reasonable efforts to mitigate the effects of the Force Majeure Event, American and JetBlue will not be required to offer additional divestitures of slots for the period of time during which a continuing Force Majeure Event prevents American and JetBlue from meeting Capacity Targets described in section III.E.2. A Force Majeure Event will be deemed to be continuing (1) if the FAA has granted general slot usage waivers to air carriers operating at Level 3 airports due to a Force Majeure Event affecting the entire industry (including if, not solely at the behest of American and JetBlue, the FAA extends the current COVID-related slot usage waivers past March 26, 2021); (2) during the period of time that the Force Majeure Event has a material

8

adverse effect on the NEA and American and JetBlue are working in good faith to recover operations to the level American and JetBlue operated prior to the Force Majeure Event; and (3) any other circumstances mutually agreed by the parties.

    C.    An act of government related to the legality of the NEA, including the pendency of an investigation or unresolved claims by a competent competition or other law enforcement authority, shall not be deemed a Force Majeure Event. In the event that any such investigation or claim is resolved by a court order or settlement that materially impacts the ability of the NEA to meet the growth commitments in Section III.E.2., American and JetBlue may request that DOT engage in good faith negotiations to discuss how the growth commitments could be adjusted, if at all, to protect the purpose and intent of this Agreement; provided, that DOT may decline such negotiations if DOT, in its reasonable discretion, determines that such court order or settlement does not affect the ability of American and JetBlue to meet the growth commitments.

    D.    Notwithstanding the tolling of the Commitments above, if any Force Majeure Event results in the FAA deciding to withdraw slots from carriers that are unwilling to operate their slots and to transfer those slots to other carriers willing to fly despite the Force Majeure Event, nothing would prohibit American and JetBlue from losing slots in that process, as long as American and JetBlue are treated on a fair and nondiscriminatory basis, and in a manner consistent with other large incumbent carriers at the NYC area airports.

## V. DISCLOSURE

    A.    Upon execution of this Agreement by all signatories, this Agreement may be disclosed to any Federal agency, state or territory attorneys general, and the general public by DOT, American, or JetBlue.

## VI. COMPLETE AGREEMENT

    A.    This Agreement constitutes the entire agreement between and among DOT, American, and JetBlue regarding the NEA.

## VII. ADDITIONAL TERMS

    A.    This Agreement shall take effect upon execution by the signatories and will continue so long as the NEA remains in effect.

    B.    In addition to the reporting required in section III.D, not later than five years from the implementation date of the NEA, American and JetBlue will cooperate and provide information to DOT as part of an informal self-assessment.

    C.    Nothing in this Agreement shall expand or restrict DOT's existing statutory and regulatory authorities, or at any time prohibit or limit DOT from exercising those authorities, including but not limited to investigation and enforcement regarding:

1. Potentially unfair or deceptive practices;
2. Potentially exclusionary practices;
3. Acquisition or operation of additional slots or gates not currently held by American or JetBlue;
4. Conduct inconsistent with the purpose of the NEA as set forth in the Preamble of this Agreement or the NEA Agreements (including as generally described in plans submitted to DOT as part of its review of the NEA) or the failure to implement core provisions of the NEA.

## VIII. SIGNATURES

On behalf of the U.S. Department of Transportation

s/ Joel Szabat
Assistant Secretary for Aviation & International Affairs        January 10, 2021
                                                         Date: _____

On behalf of American Airlines, Inc.

s/ Robert Wark                                                   January 10, 2021
VP & Deputy General Counsel
                                                         Date: _____

On behalf of JetBlue Airways Corporation

s/ Scott M. Lawrence                                             January 10, 2021
Head of Revenue & Planning
                                                         Date: _____

**JOINT DEFENSE / COMMON INTEREST MATERIAL**
*Privileged and Confidential*

### JFK Initial / Immediate set of 7 Pairs

| Airport | Time Channel | Carrier | Slot ID |
|---|---|---|---|
| JFK | 0800D | AA | 21179 |
| JFK | 0900D | AA | 21413 |
| JFK | 1000A | AA | 21155 |
| JFK | 1100D | AA | 20158 |
| JFK | 1230A | B6 | 20476 |
| JFK | 1330D | B6 | 20229 |
| JFK | 1430A | AA | 21144 |
| JFK | 1530D | AA | 20523 |
| JFK | 1900A | B6 | 20134 |
| JFK | 2000D | AA | 21108 |
| JFK | 2100A | B6 | 21001 |
| JFK | 2200D | B6 | 20312 |
| JFK | 2200A | AA | 21366 |
| JFK | 2230A | B6 | 20677 |

### JFK Second / Springing set of 10 pairs

| Airport | Time Channel | Carrier | Slot ID | Pair | Tranche |
|---|---|---|---|---|---|
| JFK | 0930A | AA | 20231 | 1 | A |
| JFK | 1030D | B6 | 20124 | 1 | A |
| JFK | 1130A | B6 | 20018 | 4 | A |
| JFK | 1230D | AA | 20498 | 4 | A |
| JFK | 2100A | B6 | 20025 | 8 | A |
| JFK | 2200D | AA | 21879 | 8 | A |
| JFK | 1100A | AA | 20256 | 2 | B |
| JFK | 1200D | AA | 21210 | 2 | B |
| JFK | 1330A | AA | 20368 | 5 | B |
| JFK | 1430D | AA | 20727 | 5 | B |
| JFK | 2130A | B6 | 20066 | 9 | B |
| JFK | 2230D | B6 | 20413 | 9 | B |
| JFK | 1100A | B6 | 20417 | 3 | C |
| JFK | 1200D | B6 | 20001 | 3 | C |
| JFK | 2000A | AA | 20455 | 6 | C |
| JFK | 2100D | AA | 21079 | 6 | C |
| JFK | 2130A | B6 | 20066 | 10 | C |
| JFK | 2230D | B6 | 20473 | 10 | C |
| JFK | 2100A | AA | 20557 | 7 | D |
| JFK | 2130D | B6 | 20112 | 7 | D |

### DCA Initial / Immediate set of 6 Pairs

| Airport | Time Channel | Carrier | Slot ID |
|---|---|---|---|
| DCA | 600 | AA | 1196 |
| DCA | 600 | AA | 1235 |
| DCA | 900 | AA | 1035 |
| DCA | 1000 | B6 | 1018 |
| DCA | 1300 | B6 | 1034 |
| DCA | 1400 | AA | 1015 |
| DCA | 1800 | AA | 1260 |
| DCA | 1900 | AA | 1095 |
| DCA | 2000 | B6 | 1097 |
| DCA | 2100 | AA | 1115 |
| DCA | 2200 | B6 | 1642 |
| DCA | 2300 | AA | 1170 |