# EXHIBIT D

Order 2010-7-8
Served: July 20, 2010



**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 20th Day of July 2010

| | |
|---|---|
| **Joint Application of:**<br><br>**AMERICAN AIRLINES, INC.<br>BRITISH AIRWAYS PLC<br>FINNAIR OYJ<br>IBERIA LÍNEAS AÉREAS DE ESPAÑA, S.A.<br>ROYAL JORDANIAN AIRLINES**<br><br>**Under 49 U.S.C. §§ 41308-41309 for approval of and antitrust immunity for alliance agreements** | **Docket DOT-OST-2008-0252** |
| **Joint Application of:**<br><br>**AMERICAN AIRLINES, INC.<br>and<br>BRITISH AIRWAYS, PLC**<br><br>**Under 14 C.F.R. Part 212 and 49 U.S.C. § 40109 for amended statements of authorization** | **Docket DOT-OST-2002-13861** |

**FINAL ORDER**

**I. SUMMARY**

By this order, we approve a series of agreements establishing an alliance among five members of "oneworld" – American Airlines, British Airways, Iberia, Finnair, and Royal Jordanian (collectively, the "Joint Applicants" or "applicants" or "oneworld") and grant them antitrust immunity to implement those agreements. The agreements include plans for an integrated joint venture in which American, British Airways, and Iberia would cooperate on all of their transatlantic flights and services. We have concluded that the

joint venture, as well as the overall alliance, is, on balance, pro-competitive and that it is likely to generate substantial public benefits to the traveling and shipping public.

To ensure adequate competition and enhance the public benefits of the alliance, our approval and grant of immunity is subject to a number of conditions.[1]   Among the conditions is a requirement that the applicants relinquish landing and takeoff rights, otherwise known as "slots," at London's Heathrow International Airport ("Heathrow") so that competitors may launch competing services.[2]   This slot remedy requires oneworld to transfer four Heathrow slot pairs to competitors, which will be sufficient to support four new daily round-trip flights between the United States and Heathrow.   The implementation of the slot remedy will be governed by procedures agreed to by the applicants and the European Commission, which oversees European slot regulation.   We find that these procedures are sufficient to achieve the Department's objectives for the slot remedy.


## II. Background

Under the umbrella of the oneworld alliance, the five applicants in this case plan to enhance commercial cooperation on a worldwide basis.   The focus of the alliance's efforts, at least initially, is the implementation of an integrated joint venture operated by American, British Airways, and Iberia.   The joint venture partners will share revenues and cooperate on all major aspects of airline service in transatlantic markets in an attempt to provide more competitive products and services to customers.

To implement the joint venture, as well as the overall alliance, the applicants are seeking three actions by the Department:  (1) a grant of blanket code-share authority for American and British Airways, (2) approval of their commercial alliance agreements, and (3) a grant of immunity from the U.S. antitrust laws to implement the alliance agreements.

On February 13, 2010, the Department issued a show-cause order with our proposed decision.   The Show-Cause Order explained that we had tentatively decided to grant the applicants' requests, subject to conditions, and provided an opportunity for public comments.[3]   In the Show-Cause Order, we tentatively concluded that the oneworld alliance would be, on balance, pro-competitive and that it would be likely to produce

---

[1] We provide a list and description of the conditions in Section IV(E) of this order.

[2] A slot is the right to takeoff or land at a particular time and date at a slot-controlled airport such as Heathrow.  To conduct a daily round-trip flight, airlines must hold a pair of slots for each day of the week - one slot for landing and one for takeoff.  In this way, one slot pair is sufficient to support one daily round-trip flight, or seven weekly frequencies, to/from the slot-controlled airport.

[3] Order 2010-2-8 (Feb. 13, 2010).

substantial benefits for the traveling and shipping public.[4]  We also tentatively found that the alliance would enhance competition by creating a viable third immunized alliance that is comparable to and competitive with the product and service offerings of oneworld's competitors, Star Alliance and SkyTeam, which have already received grants of antitrust immunity and are proceeding with their own alliance plans and integrated joint ventures.[5]

To support the tentative conclusions in the Show-Cause Order, we conducted a review of the record evidence and made a number of tentative findings.  We assessed the changes in market structure and competitive effects that would result from the alliance and tentatively concluded that the alliance would not substantially reduce competition in any relevant market.  This tentative conclusion included the imposition of a slot remedy that would allow competitors to launch new services to the United States from Heathrow.  The slot remedy we proposed in the Show-Cause Order required the applicants to make four slot pairs available at Heathrow:  two pairs for services in the Boston-London market to address potential lost competition where we tentatively determined the effects would be most acute (the "fixed slots"), and two pairs for services in any U.S.-Heathrow markets to address potential network-level effects (the "flex slots").  We also set forth some general principles that should govern the transfer of slots at Heathrow and the establishment of a workable "implementation mechanism."

We tentatively found that approval of the alliance, as conditioned, would produce a number of potential benefits for the traveling and shipping public, including:

- Lower fares on more itineraries between city-pairs;
- Accelerated introduction of new routes;
- Additional flights on existing routes;
- Improved schedules;
- Reduced travel and connection times; and
- Product and service enhancements that would allow the applicants to provide full reciprocal access to their networks.

The tentative conclusions in the Show-Cause Order were premised upon a number of additional conditions, including the requirements that the oneworld carriers submit progress reports and Origin and Destination Survey data to the Department on a regular basis and implement the alliance within 18 months to ensure that public benefits promised by the alliance are realized as soon as possible.  The Department also tentatively required the applicants to make a number of changes to their joint venture agreement to remove competitive constraints and maximize public benefits.[6]

---

[4] Order 2010-2-8 at 28-29 (Feb. 13, 2010).

[5] *See* Order 2010-2-8 at 2 (Feb. 13, 2010).

[6] The applicants filed an amended Joint Business Agreement on March 30.  *See* Letter to Ms. Dorothy Beard, Chief of DOT Dockets, from Paul Jasinski, Carl Nelson, and William Karas, Attorneys for American Airlines, British Airways, and Iberia (Mar. 30, 2010).

In the Show-Cause Order, the Department also noted that the European Commission (the "Commission") was conducting its own review of this transaction.  That review is now complete.  On July 14, the Commission announced that it had made a final decision that would allow the alliance to proceed under immunity from enforcement action for a period of 10 years.[7]  The Commission's decision includes a slot remedy at Heathrow and establishes a detailed mechanism to implement that remedy.  The remedy and the implementation mechanism are set forth in formal written commitments, undertakings made to the Commission by the joint venture partners American, British Airways, and Iberia (the "Commitments"), which have been declared legally binding by the Commission.

Throughout this case, we have considered the views of the U.S. Department of Justice, as well as other commenting parties.  We consulted with DOJ as part of our preliminary assessment of the competitive effects of the alliance.  When DOJ filed comments on the record, we adopted many of its recommendations.

## III. Responsive Pleadings

We invited public comment on the Show-Cause Order.  The comment period closed on April 14, 2010.  The Department received a number of comments in response to the Show-Cause Order.  We summarize the responsive pleadings below.

**Virgin Atlantic** filed objections and a reply.[8]  In its objections, Virgin Atlantic argues that the Department's findings are not based on substantial evidence and that the remedies proposed are insufficient to address the potential competitive harm created by the alliance.[9]  Virgin Atlantic believes that the Department has not paid enough attention to the unique dynamics of the alliance, notably the competitive conditions at Heathrow airport.[10]  In Virgin Atlantic's view, the record demonstrates that the alliance is a threat to competition because slots at Heathrow are scarce and costly, there is little chance of competitive entry on the routes in which the applicants offer overlapping services, and services operated by other alliances via connecting points in Continental Europe offer no meaningful competition on the nonstop overlap routes.  Virgin Atlantic also argues that the public benefits of the alliance are overstated.  Virgin Atlantic asserts that there is no reason to believe that the applicants will deliver on some of the potential benefits of alliances, such as new nonstop routes, more frequencies, and greater overall capacity.

---

[7] *See* Press Release, European Commission, Antitrust: British Airways, American Airlines and Iberia Commitments to Ensure Competition on Transatlantic Passenger Air Transport Markets Made Legally Binding, July 14, 2010, *available at* http://ec.europa.eu/competition/elojade/isef/case_details.cfm?proc_code=1_39596.

[8] Objection of Virgin Atlantic (Mar. 30, 2010); Reply of Virgin Atlantic (April 14, 2010).

[9] Objection of Virgin Atlantic at 4 (Mar. 30, 2010).

[10] *See* Objection of Virgin Atlantic at 5, 6-7, 10, 12, 13-14 (Mar. 30, 2010); Reply of Virgin Atlantic at 3-4 (April 14, 2010).

In its April 14th reply, Virgin Atlantic revisits many of the same points raised in its objections.  Virgin Atlantic argues that the slot remedy is inadequate because it does not require new entrants to launch competing services before the alliance is approved.  Virgin Atlantic also contends that the applicants' proposed changes to the joint venture agreement are insufficient to address competitive concerns.[11]

The **Interactive Travel Services Association and the American Society of Travel Agents** (collectively referred to as "ITSA/ASTA") filed objections on behalf of travel agents and distributors.[12] Like Virgin Atlantic, ITSA/ASTA argues that the Department's tentative decision is not based on substantial evidence.  Additionally, ITSA/ASTA asserts that the alliance will harm travel agents unless it is conditioned upon a "carve-out" to prevent oneworld from coordinating the distribution of airline services.  The tentative decision is flawed, ITSA/ASTA believes, because it fails to consider the cumulative competitive harm created by three large immunized alliances, it fails to address how the concentration in U.S.-U.K. markets will affect travel distribution, and it fails to explain why the proposed remedies will address harm to travel agents.  In the event that the Department does not impose a carve-out for travel distribution, ITSA/ASTA asks the Department to require the applicants to report annually on their coordination activities with regard to travel distribution.

**Mr. Hubert Horan** filed objections.[13]  Mr. Horan rejects all of the Department's findings.  Specifically, he states that the Department has failed to conduct a legitimate competitive analysis and has ignored evidence of large consumer welfare losses.  Additionally, he states that the Department has used false and illegitimate claims as the entire basis for its determination that immunity is required by the public interest.  In sum, Mr. Horan argues that we must reject the immunity application on both competitive and public interest grounds.

The **Dallas/Ft. Worth International Airport** ("DFW") filed a reply.[14]  DFW's reply focuses on the discussions in the Show-Cause Order and Virgin Atlantic's objections concerning the London-Dallas/Ft. Worth route.  London-DFW is an "overlap" route in which American and British Airways currently provide the only nonstop service.  DFW expresses support for a grant of immunity even though the alliance will reduce the number of non-stop competitors on that route.  DFW believes that the alliance is pro-competitive and will benefit DFW and its travelers because the London-DFW route will

---

[11] Virgin Atlantic has also argued that the terms of the joint venture agreement are "absolutely dispositive of the question whether this proposed alliance will produce any alleged public benefits," and thus interested parties need the opportunity to comment on proposed revisions. Objection of Virgin Atlantic at 16 (Mar. 30, 2010).  This issue is moot because, on March 30, the applicants submitted their proposed changes in response to the Show-Cause Order. All parties had the opportunity to review and comment before the reply period ended.

[12] Objections of ITSA/ASTA (Mar. 30, 2010).

[13] Comments of Hubert Horan (Mar. 4, 2010).

[14] DFW Reply (April 14, 2010).

develop into a "pipeline" route with improved services.  DFW states that increased frequencies on the London-DFW route, a better spread of nonstop flights throughout the day, and the new American nonstop service on the Madrid-DFW route are clear public benefits resulting from the immunized alliance.  DFW claims that Virgin Atlantic's concerns about competition on the London-DFW route are misplaced.  In particular, DFW disagrees with Virgin Atlantic's contention that a "carve-out" of immunity for certain types of traffic on the London-DFW route is necessary; rather, DFW contends that such a carve-out remedy would be counter-productive because a high percentage of the traffic on the route is connecting and will reap benefits from the improved services that are made possible by the alliance coordination.

The **Joint Applicants** filed comments, an amendment to the Joint Business Agreement, and a reply.[15] In their comments, the applicants express their overall support for the tentative decision and their willingness to adopt the proposed remedies in order to receive final approval.  Nevertheless, the applicants disagree with certain aspects of the Show-Cause Order. For example, the applicants disagree with the Department's finding that U.S.-Heathrow services constitute a separate relevant market, and thus they do not believe that there is a solid foundation for a slot remedy.  Further, the applicants do not agree that the Joint Business Agreement should be modified to eliminate competitive constraints affecting capacity decisions.  However, rather than contest the issue, they have submitted a revised agreement to address the Department's concerns.  The revision provides that all decisions for the joint venture will be made by consensus, and that parties to the agreement will have a unilateral right to add capacity.[16]

The applicants express their support for the Department's efforts to consult with the European Commission on certain aspects of this case, since the applicants sought simultaneous review of the alliance in the United States and Europe. The applicants state that this case presents an opportunity to show that the Department can work with the European Commission.  To this end, the applicants seek a modification of the tentative decision to ensure that the final remedies adopted by the Department and the Commission are compatible.  Specifically, they ask the Department to delay the disposition of the flex slots until the summer of 2013.[17]

In their reply, the applicants urge the Department to set aside the objections filed by commenters and grant final approval of the alliance.  The applicants argue that Virgin Atlantic's objections have no merit because Virgin Atlantic has ignored the secondary market for Heathrow slots, downplayed the competitive constraint offered by one-stop service, discounted the public benefits offered by the alliance, and failed to point out any

---

[15] Joint Applicants' Comments (Mar. 30, 2010); Letter to Dorothy Beard, Chief of DOT Dockets, from Paul Jasinski, Carl Nelson, and William Karas, Attorneys for American Airlines, British Airways, and Iberia (Mar. 30, 2010); Joint Applicants' Consolidated Reply (April 14, 2010).

[16] *See* Joint Applicants' Comments at 8 (Mar. 30, 2010).

[17] DFW supports this request.  *See* DFW Reply at 3 (April 14, 2010).  Virgin Atlantic does not oppose it; however, it prefers a longer period of time.  *See* Reply of Virgin Atlantic at 6-7 (April 14, 2010).

fatal flaws in the proposed remedies. The applicants argue that ITSA/ASTA's objections have no merit because the travel agents have misstated the positions of the Department of Justice and the European Commission, failed to meet their burden of proof in showing that the Department incorrectly dismissed their arguments, and relied upon theories of harm that are not supported by evidence or economic theory. Finally, the applicants argue that Mr. Horan's objections are also without merit because he draws false conclusions from flawed data and his criticism of the public benefits is not well founded.

## IV. DECISION

We have decided to approve the applicants' requests to permit them to implement their alliance, subject to conditions. In arriving at our decision, we have applied the relevant legal and policy standards to the facts of this case and have considered the views expressed by commenting parties. We have determined that no individual or party has made a convincing argument that we erred in our tentative findings or conclusions in the Show Cause Order. Therefore, today we are making those findings and conclusions final, subject to the minor modifications described below.

### A.  Decisional Standards

We evaluate the code-share request by American and British Airways under 14 C.F.R. Part 212. Where airlines have underlying economic authority from the Department, we will issue a statement of authorization to allow code sharing if we find that it is in the public interest. In determining the public interest, we consider, among other things, the extent to which the authority sought is covered by and consistent with bilateral agreements to which the United States is a party, the extent to which a foreign applicant's home country deals with U.S. air carriers on the basis of substantial reciprocity, and whether the applicants have previously violated our code-share rules.[18]

We evaluate the applicants' antitrust immunity request under 49 U.S.C §§ 41308-41309. We engage in a two-step analysis of foreign air transportation agreements submitted for our approval. We must first determine under § 41309 whether the agreements are adverse to the public interest because they would substantially reduce or eliminate competition (the "competitive analysis"). If so, we must determine whether they are nonetheless necessary to meet a serious transportation need or to achieve important public benefits. U.S. foreign policy goals are a key element of these benefits. If we make that finding, we will approve the agreements, provided that these public benefits cannot be met or achieved by reasonably available and materially less anticompetitive alternatives. A party opposing approval has the burden of showing that the agreement or request would substantially reduce or eliminate competition and that less anticompetitive alternatives are available. On the other hand, the party seeking

---

[18] 14 C.F.R. § 212.11.

approval of the agreement or request must submit evidence establishing the transportation need or public benefits.

If we approve the agreements under the analysis outlined above, we next decide whether to grant immunity under 49 U.S.C. § 41308.  Under § 41308(b), Congress has given the Department the authority to exempt airlines from the antitrust laws to the extent necessary to allow a proposed transaction to proceed, provided that the exemption is *required by* the public interest.  While the public interest determination under both sections 41309(b) and 41308(b) entails a comparison of anti-competitive effects and public benefits, the standard in section 41308(b) ("required by" rather than "not adverse to") is higher.[19]  We grant immunity if the public interest requires it and the parties to such an agreement would not otherwise go forward with the transaction.[20]

If we determine that the transaction *would* substantially reduce or eliminate competition, yet meets the test for approval under section 41309(b)(1), then we *must* exempt the parties to the transaction, pursuant to 49 U.S.C. § 41308(c).

In this case, we have concluded that the transaction will not substantially reduce or eliminate competition, will not be adverse to the public interest, and will not otherwise violate the statute.  We further conclude that the grant of antitrust immunity described below is required by the public interest and necessary to allow the applicants to proceed with the transaction.

Below, we address the arguments made by commenting parties in response to the Show-Cause Order by topic area, outline the minor changes that we are making in response to the comments, and explain our final decision.

**B. Competition**

In the Show-Cause Order, we tentatively found that the alliance should be approved because, as conditioned, it would not be adverse to the public interest and would not substantially reduce competition.[21]  Two commenting parties who oppose the application – Virgin Atlantic and Mr. Hubert Horan – object to our findings.

Virgin Atlantic argues that our tentative decision cannot be reconciled with a number of our findings in the Show-Cause Order.  Virgin Atlantic argues that the Department

---

[19] *See* United/ Lufthansa, Docket DOT-OST-96-1116, Order 96-5-12 at 2 (May 9, 1996); Star, Docket DOT-OST-2008-0234, Order 2009-4-5, at 18 (April 7, 2009), *quoting* Northwest/KLM, Docket 46371, Order 93-1-1 at 11 (Jan. 11, 1993). *See also* SkyTeam I, Docket DOT-OST-2004-19214, Order 2005-12-12 at 32 (Dec. 22, 2005); Air Canada/ Austrian/ bmi/ LOT/ Lufthansa/ SAS/ Swiss/ TAP/ United, Docket DOT-OST-2005-22922, Order 2006-12-17 at 15 (Dec. 18, 2006).

[20] *See* SkyTeam II, Docket DOT-OST-2007-28644, Order 2008-4-17 at 17 (April 9, 2008); Air Canada/ Austrian/ bmi/ LOT/ Lufthansa/ SAS/ Swiss/ TAP/ United, Docket DOT-OST-2005-22922, Order 2006-12-17 at 8 (Dec. 18, 2006).

[21] Order 2010-2-8 at 28-29 (Feb. 13, 2010).

should not grant antitrust immunity to the oneworld alliance agreements because of their negative effects in the overlap markets and the lack of constraints on the combined power of American and British Airways.[22]

Virgin Atlantic would have us disapprove the application outright on the basis that there is some potential harm in certain specific nonstop overlap markets, regardless of the severity of that harm or the potential competitive benefits to be derived from the alliance as a whole. This approach is too narrow. Consistent with the statute and our precedents, we made a broad assessment of the alliance at the network, country-pair, and city-pair levels, and applied a balancing test. We tentatively concluded that:

> On the one hand, the proposed alliance will provide a third global network that can better discipline the fares and services offered by the Star and SkyTeam alliances. The enhanced inter-alliance competition is beneficial for consumers across many markets, in particular the hundreds of transatlantic markets in which the applicants become more competitive as a direct result of the alliance. Travelers in those markets instantly gain new competitive options. On the other hand, the proposed alliance will increase concentration in several U.S.-London markets where the applicants would be in a position to potentially leverage substantial advantages in frequency, schedules, and access to corporate customers to exclude rivals. To address these potential anti-competitive effects, we have proposed a flexible slot transfer remedy that would require the applicants to make available four slot pairs at Heathrow to allow competitors to introduce new services.[23]

In our analysis, we weighed both pro- and anti-competitive effects across a number of different markets, consistent with statute and precedent.[24] Virgin Atlantic provides no sound basis to justify ignoring the broader competitive environment. While it is true that the transaction will result in a reduction in the number of competitors in nonstop overlap markets, the analysis does not end there. Accordingly, we considered a number of factors, such as traffic volume and connecting share in the affected markets, to more thoroughly assess the competitive effects of the alliance. A more thorough examination revealed that the anti-competitive effects in the nonstop overlap markets would be limited.[25] As DFW pointed out in its reply, the connecting services available in the nonstop overlap markets discipline the fares charged for nonstop service.[26] For example, in the case of the Dallas/Ft. Worth-London route, which concerned Virgin Atlantic because it will effectively have one competitor in the nonstop market following the transaction, we determined that approximately one-quarter of the passengers already use connecting services in the overall city-pair.

---

[22] Objection of Virgin Atlantic at 6-7 (Mar. 30, 2010).

[23] Order 2010-2-8 at 28-29 (Feb. 13, 2010).

[24] *See, e.g.*, Star, DOT-OST-2008-0234, Order 2009-4-5 at 6-13 (April 7, 2009) (conducting a broad assessment of the alliance at the network, country-pair, and city-pair levels).

[25] Order 2010-2-8 at 21, Table 5 (Feb. 13, 2010) (showing connecting share, market size, and structural factors in each nonstop overlap market).

[26] DFW Reply at 2 (April 14, 2010).

Furthermore, Virgin Atlantic's analysis of the constraints at Heathrow airport does not prove that the agreements are anti-competitive and should, therefore, be disapproved. We directly addressed the issue of Heathrow access in the Show-Cause Order. Even though the immunized oneworld members will collectively hold almost half of Heathrow slots, there are still a number of other competitors at Heathrow. There are also some important mitigating factors that Virgin Atlantic does not adequately consider. First, since the provisional application of the U.S.-EU open-skies agreement, at least three major airlines have begun serving the United States from Heathrow, and the overall U.S.-Heathrow market has enjoyed an expansion and diversification of services.[27] The new entrants have enhanced competition and will continue to exert competitive discipline in the market when the joint venture is implemented.

Second, airlines have increasing flexibility to acquire slots from commercial partners or on the secondary market. Virgin Atlantic's characterization of this flexibility as "fanciful" is not supported by the record.[28]  On the contrary, the record contains convincing evidence that trading mechanisms have accommodated new entry in the market.[29]  Moreover, approval of the oneworld alliance will not prevent Virgin Atlantic from adding new transatlantic services because, if there is sufficient demand, it has slots available to do so if it chooses.[30]

Virgin Atlantic is correct that slot trading may require carriers to reduce their short-haul or feeder flights, which would be an opportunity cost of the trade.[31]  However, we disagree that the opportunity cost would inevitably cause competitive harm. As the applicants point out, airlines and their alliance partners have sufficient flexibility to maintain their networks with existing slot portfolios while still adding long-haul services. For example, airlines can use prime slots more efficiently by using larger aircraft.[32] The more flexible trading environment will help to create a more credible threat of new entry if the oneworld alliance were to attempt to charge supra-competitive prices. That threat reduces the risk of potential harm. Additionally, there will be opportunities for new entry as a result of the slot remedy imposed here.

---

[27] Order 2010-2-8 at 13, footnote 40 (Feb. 13, 2010).

[28] Objection of Virgin Atlantic at 8 (Mar. 30, 2010).

[29] Order 2010-2-8 at 13, footnote 40 (Feb. 13, 2010).  In fact, since the Show-Cause Order was issued, both Delta and Continental have announced plans for new Heathrow services from the New York City area.  *See* Press Release, Delta Air Lines, Delta Adding New Service Between New York and Key Business Markets, May 11, 2010; Press Release, Continental Airlines, Continental Airlines Announces Additional New York-Heathrow Flights for Summer, Winter 2010, Jan. 29, 2010.

[30] The record reflects that Virgin Atlantic is leasing a number of slots to competitors that it could instead use for transatlantic services.  *See, e.g.,* Reply of Virgin Atlantic at 5 (April 14, 2010).

[31] *See, e.g.*, Objections of Virgin Atlantic at 8 (Mar. 30, 2010).

[32] *See* Joint Applicants' Consolidated Reply at 5 (April 14, 2010).

Mr. Horan's objections are broader than Virgin Atlantic's.  He rejects the entirety of the Department's competitive analysis because, in his view, the Department did not conduct a legitimate Clayton Act market power test.  According to Mr. Horan, the Department fails to acknowledge the "extreme concentration" in the North Atlantic market and "multi-billion dollar consumer welfare losses," which should preclude approval of the alliance.[33]

The applicants respond that Mr. Horan draws false conclusions from flawed data. They assert that, even if Mr. Horan's view of market conditions were correct, the alliance would be the solution to the problem because it would enhance inter-alliance competition.[34]

Mr. Horan does not accurately characterize the Department's analysis.  We did, in fact, conduct an in-depth competitive analysis, which included the Clayton Act test to assess market power and potential supply-side responses (new entry) in relevant markets. We thoroughly reviewed competitive changes at the network, country-pair, and city-pair levels using historical data to estimate market shares pre- and post-transaction.  The post-transaction shares did not, in our view, support the conclusion that the alliance would be in a position to exercise power to restrict capacity or raise fares above competitive levels for a number of reasons:  the shares were not high enough to raise concerns, there were other significant competitors in the market, or there was connecting competition that would discipline the alliance.[35]  Moreover, we conditioned our approval upon the adoption of a flexible slot remedy that would mitigate the potential harm identified, restore lost competition, and discipline oneworld's network.

### C.  Public Benefit Issues

In the Show-Cause Order, we tentatively found that the alliance would likely produce substantial public benefits, and that a grant of antitrust immunity is required by the public interest to fully realize those benefits.[36]  Both Virgin Atlantic and Mr. Horan object to those findings.

Virgin Atlantic argues that the public benefits identified in the Show-Cause Order are overstated.  Due to prevailing competitive conditions, such as high market share and Heathrow's slot constraints, Virgin Atlantic asserts that the alliance will decrease – not increase – capacity, and thus the alliance's purported public benefits will never materialize.

The essence of Virgin Atlantic's argument is that the alliance will acquire undue market power and that it will use that increased market power to restrict capacity and raise fares to the detriment of consumers.  Our competitive analysis, grounded in

---

[33] Comments of Hubert Horan at 1, 4 (Mar. 4, 2010).

[34] Joint Applicants' Consolidated Reply at 17-18 (April 14, 2010).

[35] Order 2010-2-8 at 23-24 (Feb. 13, 2010).

[36] Order 2010-2-8 at 36 (Feb. 13, 2010).

historical traffic data, found otherwise.[37]  With the conditions we are placing on our approval, the alliance will not likely enable the applicants to raise fares above competitive levels.  It will likely result in increased capacity, due to the efficiencies and incentives created by the joint venture.  By creating economies of scale, scope and density,[38] the joint venture positions the alliance to improve the utilization of existing capacity and enhance traffic flows over several hubs in Europe, not just British Airways' hub at Heathrow.[39]  The tentative findings in the Show-Cause Order were based on a detailed review of the joint venture agreement, the operating environments in London and Madrid, and the structure of the affected markets which, in the Department's experience, suggests that benefits such as new direct routes and increased capacity are likely to develop over time as synergies from the joint venture are realized.[40]  We see nothing in Virgin Atlantic's submission that persuades us to alter those findings here.

Virgin Atlantic does not believe that the historical benefits of the existing immunized alliances will materialize in this case.  Virgin Atlantic relies on the notion that oneworld is different from the other alliances because it operates a hub at slot-constrained Heathrow.  As discussed above, however, we do not find that Heathrow's slot constraints are dispositive here.  The current operating environment at Heathrow will not shield oneworld from competition.  Due to the growing presence of alliances and the increasingly liquid market for slot trades, oneworld's competitors will be able to respond if service is reduced below competitive levels.  Since oneworld will be subject to competitive forces, it has a clear incentive to maximize the efficiencies of the joint venture and pass on benefits to the consumer.

Mr. Horan objects because he believes that the public benefit findings in the Show-Cause Order are based entirely upon claims about cooperative pricing.[41]  Focusing on this single issue, Mr. Horan rejects the idea that the alliance will utilize a grant of antitrust immunity to price more efficiently on combined itineraries.

Contrary to Mr. Horan's assertions, our decision to approve the alliance is not based solely on the theory of cooperative pricing.  It is based upon a broader set of public benefits that are likely to result from the alliance, such as greater options for travelers due to schedule and inventory coordination, volume discounting, expanded access to discount fares, reduced costs, and expanded code sharing and frequent-flyer program

---

[37] *See* Order 2010-2-8 at 29 (Feb. 13, 2010).

[38] "Economies of scale" occur when increases in a firm's size lower the costs of production for each unit being sold.  "Economies of scope" refers to lower costs obtained by providing and marketing a wider range of related products.  "Economies of density" refers to lower costs from serving more customers, due to spreading fixed costs over a larger number of people and serving more people with a given network or facility.  It should be noted that economies of scale, scope, and density only increase up to a certain point, after which per-unit costs begin to rise.

[39] *See* Order 2010-2-8 at 30-32 (Feb. 13, 2010).

[40] *See* Order 2010-2-8 at 22 (Feb. 13, 2010).

[41] Comments of Hubert Horan at 8 (Mar. 4, 2010) (stating that "The entire public benefit question boils down to an absolutely clear-cut, digital "double marginalization" dispute).

reciprocity.[42] In the Show-Cause Order, we tentatively determined that there would be a range of potential benefits resulting from the alliance, and that fare reductions from cooperative pricing would be just one of many potential benefits.[43] Mr. Horan does not persuade us to change those conclusions.  Specifically as to cooperative pricing, Mr. Horan has failed to convincingly demonstrate why the type of cooperative pricing benefits realized by other alliances would not be forthcoming here.

### D.  Distribution Issues

In the Show-Cause Order, we considered ITSA/ASTA's argument that the alliance would harm travel agents.  We then considered and tentatively rejected ITSA/ASTA's proposed "carve-out" remedy that would prevent the applicants from coordinating in the areas of sales and distribution.  ITSA/ASTA object to the decision, arguing that the Department failed to consider the harm that will befall travel agents and distributors and how the conditions proposed in the Show-Cause Order would address that harm.

We find no sound basis in ITSA/ASTA's objection to change the tentative decision. While some of the facts in this case are different from the *Star* case, ITSA/ASTA has not persuaded us why those differences compel a different result.  ITSA/ASTA's emphasis on factual differences ignores the Department's fundamental tentative finding that the alleged harm (the reduction in travel agent commissions) is attributable to structural changes in the travel industry and not grants of antitrust immunity.  Our tentative decision to reject ITSA/ASTA's request was based on this finding, yet it is not addressed in ITSA/ASTA's objections.

ITSA/ASTA also argues that the Department has failed to consider the cumulative competitive harm of immunizing oneworld "together with Star and SkyTeam."[44] ITSA/ASTA's premise is that an additional immunized alliance in the transatlantic market will give three airline groups excessive control and market power, allowing them to offer less competitive terms to travel distributors and ultimately consumers.  The evidence does not support ITSA/ASTA's view.  As shown in the Department's competitive analysis in the Show-Cause Order, the transaction will not result in anti-competitive market shares in the transatlantic market.  Instead, it will create a viable third alliance, which will be an improvement from the status quo.  The three major immunized alliances will have comparable market shares and the incentive to compete.[45] ITSA/ASTA has not supplied any persuasive evidence to show that the future structure of the market – with three alliances and a number of independent competitors – would have a detrimental effect on sales and distribution.  We think the evidence shows the likelihood of a contrary effect:  airlines will compete vigorously to develop more effective means of selling and distributing their products and services.  The benefits of

---

[42] *See* Order 2010-2-8 at 2, 30 (Feb. 13, 2010).

[43] Order 2010-2-8 at 2, 30-32 (Feb. 13, 2010).

[44] Objections of ITSA/ASTA at 6 (Mar. 30, 2010).

[45] *See* Order 2010-2-8 at 13-14 (Feb. 13, 2010).

this enhanced competition are likely to extend to all participants in the market, including travelers, travel agents, and travel distributors.

ITSA/ASTA goes on to argue that the Department has failed to explain how our proposed remedies would alleviate harm to travel agents and distributors in the U.S.-Heathrow market.[46]  We have already addressed a key pillar of this argument by finding that any potential harm suffered by travel agents and distributors would not be attributable to the alliance.   Additionally, we have also addressed how the proposed remedies would alleviate potential competitive harm in the U.S.-Heathrow market.  In the Show-Cause Order, we stated that the slot remedy is designed to address "lost competition, particularly where it is most acute, in the Boston-London market, while also addressing the diffuse network-level effects of the proposed alliance across all U.S.-London markets…."[47]   We also made clear that the purpose of the remedy was to encourage new competitive entry by airlines.  By enhancing competition and creating more opportunities for airline services in the U.S.-Heathrow, we would expect travel agents and distributors to potentially benefit along with travelers.

Throughout its objections, ITSA/ASTA requests that we remedy the alleged harm to travel agents and distributors by preventing oneworld from coordinating in the areas of sales and distribution.  As in the *Star* case, we find that such a remedy is not justified.[48]  The benefits of the joint venture are inextricably linked to the joint venture partners' plans to cooperate in the areas of sales and distribution, and ITSA/ASTA has not provided us with a valid reason to interfere in the joint venture operations in this manner.

Lastly, ITSA/ASTA requests that distribution issues be covered in the annual reporting that the applicants must provide to the Department as a condition of approval.  As we stated in the recent *Star* case, the Department intends that annual reports should cover all core airline activities undertaken to achieve the full range of public benefits, which include cooperation in sales and distribution and joint negotiations with travel agents.[49]   Therefore, we agree to ITSA/ASTA's request. We will require the Joint Applicants to provide a comprehensive report in this and other areas of cooperation.

### E.  Conditions of Final Approval and Grant of Antitrust Immunity

The Show-Cause Order tentatively approved the alliance, subject to the following conditions:

(1) The transfer of four slot pairs to competitors at Heathrow airport;

(2) Timely implementation of a revised joint venture agreement to ensure prompt realization of public benefits;

---

[46] Objections of ITSA/ASTA at 9-10 (Mar. 30, 2010).

[47] Order 2010-2-8 at 26 (Feb. 13, 2010).

[48] *See* Star, DOT-OST-2008-0234, Order 2009-7-10 at 24 (July 10, 2009).

[49] *See* Star, DOT-OST-2008-0234, Order 2009-7-10 at 26 (July 10, 2009).

(3) Annual reporting regarding the progress of the alliance;

(4) Origin & Destination Survey data reporting;

(5) Withdrawal from IATA tariff coordination;

(6) Separation of CRS management functions from the alliance;

(7) The obligation to seek prior approval of any common branding; and

(8) Standard procedures for code sharing.[50]

Additionally, the Department stated that the proposed alliance must operate within a liberalized regulatory framework, such as that provided by the U.S.-EU Air Transport Agreement.[51]  We hereby make final our tentative decision to impose all of the above conditions, with one minor modification to the slot remedy, as discussed below.

### 1. Slot Remedy

In the Show-Cause Order, we tentatively concluded that a slot remedy is necessary to preserve competition that would be lost as a result of the alliance.  The slot remedy requires that four slot pairs be transferred:  two fixed slots in the Boston-London market and two flex slots that could be used in any U.S.-Heathrow market.  The Department sought comment on an appropriate mechanism for implementing the slot remedy.  We tentatively determined that any such mechanism should comport with the following general principles:

(1) Eligibility must be limited to airlines that are *not* members or affiliates of oneworld;

(2) Slots made available by oneworld must be at times that are usable for transatlantic service;

(3) oneworld may decide to lease slots on a long-term basis, and collect some compensation under the lease;

(4) The slot remedy must be administered expeditiously and independently by a trustee, who is approved by DOT; and

(5) The slot remedy should, to the extent possible, be compatible with any remedy adopted by the European Commission.[52]

---

[50] Order 2010-2-8 at 36-39 (Feb. 13, 2010).

[51] Order 2010-2-8 at 29 (Feb. 13, 2010).

[52] Order 2010-2-8 at 26-27 (Feb. 13, 2010).

The applicants have been discussing a slot remedy with the Commission for several months on a separate track.  The product of that discussion – the Commitments described in the Background section of this order[53] – is now final and binding on the oneworld carriers.  The Commission adopted the Commitments in its final decision on July 14.

*Compatibility of the Remedies*

The Department's slot remedy is similar to that of the Commission's.  Both remedies aim to make four slot pairs available immediately.  Whereas the Department requires two slot pairs for Boston-Heathrow and two slot pairs to competitors of the oneworld alliance for any U.S.-Heathrow services, the Commission requires two slot pairs for Boston-Heathrow and two additional slot pairs for use in two specific U.S. markets served from Heathrow.   Under the Commission's remedy, these latter two pairs are initially designated for nonstop services in Dallas/Ft. Worth-London (one pair) and Miami-London (one pair).  If, however, no competitors utilize either or both of the latter two slot pairs within two years, the unused slots may be used on a flexible basis for any U.S.-Heathrow services, provided those services offer one-stop competition to Dallas/Ft. Worth and Miami.  In this way, the Commission's approach is essentially the same as the Department's, except for the initial two-year period in which the use of the latter two pairs of slots is limited to Heathrow-Dallas/Ft. Worth and Miami nonstop services.

The Commission has also set aside an additional three slot pairs for services in the New York-London market.  However, given the new entry that has occurred or is planned in the market, the Commission will *not* require the applicants to make those slot pairs available at this time.  The New York-London slot pairs will only be required to be made available if the new services are canceled and if the total number of frequencies operated by oneworld's competitors is reduced below a threshold that the Commission has identified as necessary to maintain adequate competition.[54]

The New York-London set-asides are unique to the Commission's handling of this transaction.  We have not proposed an equivalent condition.  Nevertheless, the possible disposition of these slot pairs may affect how the Department's remedy is implemented.  If at any time there are available flex slots under the Department's remedy, and slots are made available by oneworld in the New York-London market pursuant to the

---

[53] A draft of the Commitments was made available for public comment by Notice in the Official Journal of the European Union.  *See* Notice in Case COMP/39.596, 2010/C 58/07, Mar. 3, 2010.  The applicants provided notice of the Commitments in the docket.  *See* Letter to Dorothy Beard, Chief of DOT Dockets, from Jeffrey Ogar, Attorney for American Airlines (April 9, 2010), Docket DOT-OST-2008-0252.  The Commission made minor changes and published the final Commitments with its final decision on July 14.  *See* Press Release, European Commission, Antitrust: British Airways, American Airlines and Iberia Commitments to Ensure Competition on Transatlantic Passenger Air Transport Markets Made Legally Binding, July 14, 2010, *available at* http://ec.europa.eu/competition/elojade/isef/case_details.cfm?proc_code=1_39596.

[54] *See* Commitments at § 1.1.3, July 14, 2010, *available at* http://ec.europa.eu/competition/elojade/isef/case_details.cfm?proc_code=1_39596.

Commitments, any new entry in New York utilizing the slots provided by oneworld would satisfy the criteria for flex slots and reduce the obligations by the requisite amount. In short, the slot pairs designated for New York-London service by the Commission would "count" as flex slots for our purposes if they were ever utilized by competitors. This is a logical result, and one that is necessary to ensure that the remedies imposed by the Department and the Commission are compatible.

In the same vein, the applicants suggest a minor modification to the remedy proposed by the Department in the Show-Cause Order. Specifically, they ask the Department to delay the implementation of the flex slot remedy until the summer of 2013, consistent with the Commission's timeline. Additionally, the applicants wish to ensure that their obligation to provide flex slots is satisfied to the extent that competitors introduce nonstop service in the London-Dallas/Ft. Worth and Miami markets.

We agree to the suggested modification and note that no party opposes it. This minor adjustment will eliminate inconsistency between the remedy packages proposed by us and the Commission, prevent the possibility of unnecessarily additive remedies, and give consumers the best chance of obtaining new entry on the Dallas/Ft. Worth-London and Miami-London nonstop overlap routes. Importantly, this modification does not impair our objective of encouraging new entry. We have considered Virgin Atlantic's opinion that Summer 2013 is too early to allow competitors to take advantage of flex slots.[55] Although we are willing to make a small change from the remedy described in the Show-Cause Order to ensure consistency, we believe that our objective of encouraging new entry will be better met if the delay in creating flex slots is as brief as possible. We think that the applicants' suggested approach is the most reasonable solution available under the circumstances.

As a matter of procedure, the Commitments offered to the Commission are far more detailed than the general principles that we set forth in the Show-Cause Order. Nevertheless, we find that the Commitments fully comport with those principles and will achieve the Department's objectives in imposing a slot remedy. The Commitments ensure an efficient, open, and transparent process that will effectively restore lost competition. Rather than creating a wholly separate process with the same objective, we think the public interest is best served in this case by establishing a single mechanism for implementing the slot remedy, governed by the detailed Commitments. The Department will consult with the Commission on all major competitive issues. The Department will separately reserve the right to approve the Trustee.[56] We will also maintain oversight of the alliance and its compliance with the slot remedy by virtue of our statutory authority and the standard condition that we are placing on the grant of immunity, which permits us to review the matter at any time.[57]

---

[55] *See* Reply of Virgin Atlantic at 7 (April 14, 2010).

[56] *See* Ordering Paragraph 3.

[57] *See* Ordering Paragraph 10 of this Order.

*Implementing the Remedies*

The Commitments establish the following mechanism to implement the slot remedy:

- The process begins at the end of August 2010 to allow the competitors to launch new services by March 2011, which is the beginning of the International Air Transport Association ("IATA") 2011 Summer Season;

- The oneworld carriers will name a candidate to serve as Trustee to manage the day-to-day tasks;

- Potential recipients of slots must demonstrate that they are independent of and unconnected to oneworld, and that they cannot otherwise obtain commercially viable slots from their own portfolios or the general slot pool;

- Potential recipients must submit requests for slots at least seven weeks prior to the Slot Request Submission Deadline published by IATA.  At least one week prior to the Slot Request Submission Deadline, the oneworld carriers will identify the slots they would release to meet the requests, and those slots must be within +/- 60 minutes of the times requested.  If the oneworld carriers do not have slots within that window, they must offer to provide slots that are closest in time to the original request;

- By the Slot Request Submission Deadline, potential recipients must submit a formal proposal.  The proposal will include key terms such as the timing of the slot and the frequencies/schedule to be operated, as well as a detailed business plan.  The potential recipient must also describe any potential compensation it is willing to offer for the slots;

- In the event that there are multiple airlines interested in a single slot, the competing proposals will be ranked by the Trustee and the Commission.  Preference will be given to the airline(s) that provide the most effective competitive constraints on the identified city-pair, without regard to the country in which the airline is licensed or has its principal place of business.  The most effective competitive constraints for a given city-pair will be determined by a number of factors, including whether the airline will operate year-round service, the number of services/frequencies, overall capacity, pricing structure, and service offerings.

- If, following this evaluation, several airlines would provide similarly effective competitive constraints, proposals will then, and only then, be ranked by the types of compensation offered;

- Prior to the IATA scheduling conference, the Trustee will inform the potential recipients of their rankings.  Within three weeks of the end of the conference, winners will be selected and the Trustee will supervise the negotiation of a slot

release agreement, which shall be concluded within six weeks of the end of the conference; and

- Slots will be transferred by long-term lease. If, for whatever reason, slots are not transferred in the initial years of the Commitments, they remain available for lease while the Commitments are in force, which is 10 years. Recipients have significant flexibility to determine the lease term; they may enjoy a lease term of up to 10 years. They may terminate early or renew annually for the full period that the Commitments are in force.

The mechanism established by the Commitments will achieve the Department's objective of encouraging new entry. Because the Commitments are taking effect in tandem with a grant of antitrust immunity, airlines interested in using the slots will be able to start operations before the alliance is significantly developed.

We note Virgin Atlantic's remaining concerns that the Department's remedy is inadequate because it provides too few slots to competitors and allows the applicants to retain ownership over the slots and potentially collect limited compensation when the slots are leased. Virgin Atlantic prefers that the applicants be required to permanently divest a greater number of slots without compensation.

We think that the transfer of four slot pairs by long-term lease is the most reasonable and proportionate approach to address the anti-competitive effects associated with the alliance without imposing unnecessary costs upon the applicants. In 2002, we tentatively required the divestiture of 16 slot pairs in the American/ British Airways II case. In this case, however, the changes in the competitive environment that have occurred since 2002 require a different approach. A liberalized open-skies-plus agreement now governs the market, a number of airlines are already providing new transatlantic services at Heathrow as a result of that agreement, and airlines are enjoying increasing flexibility to serve the U.S.-U.K. market by acquiring or trading for slots.

Our approach in this case is consistent with prevailing market conditions. We note that Virgin Atlantic is itself leasing some of its Heathrow slots to other carriers. We do not think airlines will be deterred from serving the U.S.-Heathrow market simply because the slots will be leased. We agree with Virgin Atlantic, however, that the prospect of new entry is directly affected by its cost. Among other things, the total price of the slots must be acceptable. The Commitments do not consider the amount of compensation offered by an airline unless there are multiple airlines interested in the same slot and those airlines would each provide similar competitive constraints in the market. Thus, if there are committed new entrants, the price will be set by what the new entrants are willing to pay.

In sum, we are satisfied that the remedy proposed in the Show-Cause Order, as modified, is appropriate because it is reasonable under the circumstances and proportionate to address the potential competitive harm. We are also satisfied because the Commitments offered by the oneworld carriers to the Commission will achieve the Department's objectives and effectively implement the slot remedy. Under these

circumstances, we find that the applicants have met the statutory and policy standards required for approval of the alliance and a grant of antitrust immunity.

### 2. Changes to the Joint Venture Agreement

In the Show-Cause Order, we tentatively determined that the applicants needed to make changes to their joint venture agreement to enhance the economic incentives necessary to provide maximum public benefits. The specific changes were detailed in a confidential appendix.

On March 30, the applicants submitted a revised joint venture agreement to address the concerns raised by the Department.[58] Virgin Atlantic argues that the revisions to the joint venture agreement are not sufficient.[59]  Virgin Atlantic continues to believe that the terms of the agreement will allow the applicants to maintain a "firm clamp" on pricing and capacity in the U.S.-Heathrow market.

We are satisfied with the changes to the agreement, because they are specifically designed to promote metal neutrality, which will enhance the benefits of the alliance for the traveling public.  With the conditions that we are placing on our approval, we have found that the applicants will not be able to exercise anti-competitive market power in the U.S.-U.K. market. Virgin Atlantic's continued objections to the revised agreement are not convincing.

### 3. Decision Not to Impose Carve-Outs

In the Show-Cause Order, we tentatively determined not to impose "carve-outs" on nonstop overlap routes.  Virgin Atlantic and Mr. Horan ask us to reconsider this position. Virgin Atlantic suggests that the carve-outs should apply to all hub-to-hub nonstop overlap markets in which competitive entry is unlikely.  Virgin Atlantic also states that the Department's willingness to grant immunity before the joint venture is implemented is at odds with settled precedent.  Mr. Horan argues that we have no evidence to support our conclusion about carve-outs.  Based on his experience in the field, Mr. Horan suggests that carve-outs are manageable because airlines can readily optimize alliances where some nonstop routes are carved out.

We are not persuaded to reverse our tentative findings or conclusions.  Neither Virgin Atlantic nor Mr. Horan provides any factual or statistical evidence that demonstrates why carve-outs would be necessary.  Additionally, both commenting parties misunderstand key facts underpinning our tentative decision.

Contrary to Virgin Atlantic's assertions, our decision is not at odds with precedent. As the applicants point out, the Department does not make a practice of imposing carve-

---

[58] *See* Letter to Ms. Dorothy Beard, Chief of DOT Dockets, from Paul Jasinski, Carl Nelson, and William Karas, Attorneys for American Airlines, British Airways, and Iberia (Mar. 30, 2010).
[59] Reply of Virgin Atlantic at 8 (April 14, 2010).

outs prior to joint venture implementation.  The carve-outs in the *Star* case to which Virgin Atlantic refers were pre-existing carve-outs that had been in place for many years, dating back to the initial United/Lufthansa case in 1996.[60]  In a recent case, the Department determined that the pre-existing carve-outs would no longer be appropriate in light of new joint venture cooperation; however, we had no basis to remove the carve-outs until the joint venture was implemented.[61]  Here, in contrast, there are no pre-existing carve-outs.

We are, however, taking precautions to ensure that the joint venture is implemented quickly following the grant of antitrust immunity to ensure the prompt realization of the anticipated public benefits.  The applicants must, therefore, submit an executed and complete joint venture agreement within 18 months of the effective date of their authority.

Mr. Horan's comments do not account for the true scope and applicability of the Department's traditional carve-outs.  The carve-outs imposed in the *SkyTeam* and *Star* cases, as well as in other alliance cases, did not affect all traffic on covered routes. Instead, in most cases, they prohibited the alliance partners from coordinating services for full-fare, business, and first-class local traffic from the U.S. point-of-sale.[62]  In other cases, the carve-outs prohibited airlines from coordinating services for all fare classes in the local nonstop market.[63]  When the SkyTeam and Star applicants presented the Department with integrated joint ventures of substantial scope, the Department ultimately decided that the carve-outs would undermine the efficiencies of the joint venture, and thus we removed the carve-outs on affected routes.  (Certain carve-outs remain on routes that are not subject to joint venture cooperation.)  The key point is that carve-outs affecting only certain passengers on the aircraft introduce inefficiencies for joint venture partners whose alliance is otherwise pro-competitive.  The costs of managing the carve-out for select fare classes or select travelers disrupt the efficient functioning of the joint venture and impair metal-neutrality, which limits the benefits for both nonstop and connecting passengers.[64]  In short, we have concluded that the disadvantages of carve-outs outweigh the advantages in markets where there is joint venture cooperation.  We find that this conclusion applies to the facts of this case as well.

---

[60] *See* United/ Lufthansa Case, Docket DOT-OST-1996-1116, Order 96-5-27 (May 20, 1996).

[61] *See* Star, Docket DOT-OST-2008-0234, Order 2009-7-10 at 18 (July 10, 2009) and Order 2009-4-5 at 12-13 (April 7, 2009).  *See also* SkyTeam II, Docket DOT-OST-2007-28644, Order 2008-4-17 at 9-10 (April 9, 2008).

[62] *See e.g.*, Delta/ Air France/ Alitalia/ Czech Case, Docket DOT-OST-2001-10429, Order 2002-1-6, Appendix A (Jan. 18, 2002).

[63] *See* United/ Air Canada Case, Docket DOT-OST-1996-1434, Order 97-9-21, Appendix A (Sept. 19, 1997).

[64] The applicants submitted, and the Department considered before making its tentative decision, some specific evidence from oneworld on this issue.  *See* Joint Applicants' Answer to Department of Justice Comments at 45-51 (Jan. 11, 2010).

In light of everything stated above, we make final the findings and conclusions in the Show-Cause Order, with the single modification described in the previous section.  We will serve this order on all parties on the service list in this docket.

**ACCORDINGLY:**

1.  We approve and grant antitrust immunity to alliance agreements between and among American Airlines, Inc. (along with its affiliates American Eagle, Inc. and Executive Airlines, Inc. d/b/a American Eagle), British Airways PLC (along with its affiliate OpenSkies SAS), Finnair OYJ, Iberia Líneas Aéreas de España, S.A., and Royal Jordanian Airlines, in so far as such agreements relate to foreign air transportation.[65] The grant of this authority is subject to the condition that the Joint Applicants:

    a.  Submit for prior approval subsequent agreements implementing their Alliance Agreements;[66]

    b.  Resubmit the Alliance Agreements before five years from the date of issuance of the final order in this case; and

    c.  Obtain prior approval if they choose to operate or hold out service under a common name or use common brands;

2.  Subject to the conditions set forth in the attached Appendix A, we renew the existing statements of authorization of American Airlines, Inc. and British Airways Plc and amend their existing authority to allow blanket reciprocal open-skies code sharing under 14 CFR Part 212 for:

    a.  The display of British Airways Plc's "BA" designator code on flights operated by American Airlines, Inc.  or its affiliates between (i) points in the United States, (ii) points in the United States and points in the European Union (either nonstop or via intermediate points in third countries), (iii) points in the United States and points in third countries, and (iv) points in the European Union and points in third countries; and

---

[65] The alliance agreements shall mean those agreements referred to on page 2 and Exhibits JA-1 and JA-4 of the Joint Application filed on August 14, 2008 in this docket.

[66] Regarding this requirement, we do not expect the Joint Applicants to provide the Department with minor technical understandings that are necessary to implement fully their day-to-day operations but that have no additional substantive significance.  We do, however, expect and direct them to provide the Department with all unredacted contractual instruments that implement or materially alter, modify, or amend the cooperation agreements, joint ventures, or confidentiality/antitrust guidelines.  For avoidance of doubt, the applicants shall submit any slot release agreements entered into pursuant to the immunized alliance and any agreements with a trustee.  All documents shall be submitted to the Director, Office of Aviation Analysis.

b. The display of American Airlines, Inc.'s "AA" designator code on flights operated by British Airways Plc between (i) points in the European Union, (ii) points in the European Union and points in the United States (either nonstop or via intermediate points in third countries), (iii) points in the European Union and points in third countries, and (iv) points in the United States and points in third countries;

3. We direct the Joint Applicants to make available four slot pairs at London's Heathrow International Airport to duly authorized airlines that are not affiliates of the applicants or members of oneworld, for a period of up to 10 years from the date of the issuance of this order, at times that are usable for transatlantic services, for the purpose of introducing new services between the U.S. and London as described in this order. The Joint Applicants shall nominate and submit for prior approval to the Department a candidate or candidates to serve as Trustee to administer the transfer of the slots;

4. We direct the Joint Applicants to file with the Director of the Office of Aviation Analysis the following as evidence that the joint venture agreement (known as the "Joint Business Agreement") has been implemented:

a. Verified statement(s) in Docket OST-2008-0252 attesting that the Joint Business Agreement has been executed and implemented; and

b. A complete and unredacted copy of the Joint Business Agreement with appendices.

If the Joint Applicants do not make the filings described in this ordering paragraph within eighteen months of the date of the issuance of this order, the authority granted in Ordering Paragraph 1 (including the grant of antitrust immunity) will expire;

5. We direct the Joint Applicants to submit annual progress reports to the Office of Aviation Analysis, beginning one year from the date of issuance of this order, and continuing each year thereafter while the Alliance Agreements are effective;[67]

6. We direct American Airlines, Inc., British Airways PLC, Finnair OYJ, Iberia Líneas Aéreas de España, S.A., and Royal Jordanian Airlines to withdraw, or to remain withdrawn, from participation in any International Air Transport Association tariff coordination activities that discuss any proposed through fares, rates, or charges applicable between the United States and any countries

---

[67] The Joint Applicants shall deliver the progress report by the close of business on the anniversary date. If that date falls on a weekend or federal holiday, the Joint Applicants may deliver the report by the close of business on the following business day.

whose airlines have been or are subsequently granted antitrust immunity, or renewal thereof, to participate in similar alliance activities with a U.S. airline(s);

7.      We delegate to the Director of the Office of International Aviation the authority to determine the applicability of the directive set forth in Ordering Paragraph 6 as to specific prices, markets, and tariff coordination activities, consistent with the scope and purpose of the condition, as previously described;

8.      We direct British Airways PLC, Finnair OYJ, Iberia Líneas Aéreas de España, S.A., and Royal Jordanian Airlines, to begin or to continue to report full-itinerary Origin-Destination Survey of Airline Passenger Traffic for all passenger itineraries that include a U.S. point;[68]

9.      We defer action on all motions for confidential treatment submitted in this docket to date; and

10.     We may amend, modify, or revoke this authority at any time without hearing.

By:

**SUSAN L. KURLAND**
Assistant Secretary for Aviation
and International Affairs

(SEAL)

*An electronic version of this document is available at http://www.regulations.gov*

---

[68] We treat the foreign airlines' O&D data as confidential, do not allow U.S. airlines any access to the data, and do not allow foreign airlines any access to U.S. airline O&D Survey data. We use these data only for internal analytical purposes.

APPENDIX A
## Code-Share Conditions

The statements of authorization are subject to the following conditions:

(1)   The statements of authorization will remain in effect only as long as (a) American and British Airways continue to hold the necessary underlying authority to operate the code-share services at issue, and (b) the code-share agreement providing for the code-share operations remains in effect;

(2)  American and/or British Airways must notify the Department no later than 30 days before they begin any new code-share service under the code-share services authorized here.  Such notice shall identify the market(s) to be served, which carrier will be operating the aircraft in the code-share market added, and the date on which the service will begin.  Such notices should be filed in Docket DOT-OST-2002-13861;

(3)   American and/or British Airways must notify the Department immediately if the code-share agreement under which these code-share services are operated is no longer in effect or if the carriers decide to cease operating all or a portion of the approved code-share services.  Such notices should be filed in Docket DOT-OST-2002-13861;[69]

(4)  The code-sharing operations conducted under this authority must comply with 14 CFR Part 257 and with any amendments to the Department's regulations concerning code-share arrangements that may be adopted.  Notwithstanding any provisions in the contract between the carriers, our approval here is expressly conditioned upon the requirements that the subject foreign air transportation be sold in the name of the carrier holding out such service in computer reservation systems and elsewhere; that the carrier selling such transportation (i.e., the carrier shown on the ticket) accept responsibility for the entirety of the code share journey for all obligations established in its contract of carriage with the passenger; and that the passenger liability of the operating carrier be unaffected;

(5)  Any service provided shall be consistent with the provisions of the U.S.-EU agreement, and all applicable agreements with other foreign countries involved.  Furthermore, (a) nothing in the award of the blanket statement of authorization to American should be construed as conferring upon American rights (including code-share, fifth-freedom intermediate and/or beyond rights) to serve markets where U.S. carrier rights are limited unless American notifies us of its intent to serve such market and unless and until the Department has completed any necessary carrier selection procedures to determine which carrier(s) should be authorized to exercise such rights;[70] and (b) should there be a request by any carrier to use the limited-entry route rights that are included in American's authority by virtue of the blanket statement of authorization granted here, but that are not being used by American, the holding of such authority will not be considered as providing any preference for American in a carrier selection proceeding to determine which carrier(s) should be entitled to use the authority at issue.

(6)   The authority granted here is specifically conditioned so that neither American nor British Airways shall give any force or effect to any contractual provisions between themselves that are contrary to these conditions; and

(7) We may amend, modify, or revoke the authority granted at any time without hearing at our discretion.

---

[69] We expect this notification to be received within 10 days of such non-effectiveness or of such decision.

[70] The notice referenced in condition (2) above may be used for this notification.

1