# EXHIBIT E

Order 2019-8-2
Served August 2, 2019



UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.

Issued by the Department of Transportation
on the 2nd day of August, 2019

| Joint Application of<br><br>VIRGIN ATLANTIC AIRWAYS, LTD.<br>DELTA AIR LINES, INC.<br>SOCIÉTÉ AIR FRANCE<br>KONINKLIJKE LUCHTVAART MAATSCHAPPIJ N.V.<br>ALITALIA COMPAGNIA AEREA ITALIANA S.P.A.<br><br>for Approval of and Antitrust Immunity for Alliance Agreements under 49 U.S.C. §§ 41308 and 41309 | Docket DOT-OST-2013-0068 |
|---|---|

**ORDER TO SHOW CAUSE**

**I.   SUMMARY**

By this Order, the U.S. Department of Transportation (the Department) tentatively approves, and tentatively grants global antitrust immunity (ATI) to, alliance agreements submitted by Delta Air Lines, Inc. (Delta), Société Air France (Air France), Koninklijke Luchtvaart Maatschappij N.V. (KLM), and Virgin Atlantic Airways, Ltd. (Virgin) (collectively, the Joint Applicants).[1,2]

The proposed alliance would remove the existing gaps preventing full coordination between Delta's two parallel joint ventures with Virgin on the one hand, and Air France/KLM on the other.  As part of this tentative decision, we are also tentatively revoking our previous grants of ATI amongst the Joint Applicants as well as CSA Czech Airlines (Czech) and Alitalia Compagnia Aerea Italiana S.P.A. (Alitalia) after six (6) months.  As the Amended JVA will replace the previously immunized agreements, our previous grants of ATI will be obsolete.  Further, while both Czech and Alitalia were included in previous alliance agreements, neither is included in the agreements at issue here.  As such, the underlying predicate for ATI covering

---

[1] Common names of the carriers are used throughout this Show Cause Order.
[2] The agreement is the "Amended and Restated Transatlantic Joint Venture Agreement" hereinafter the "Amended JVA."

these carriers no longer exists. We are also proposing a five-year review requirement, as well as our standard conditions.

## II. BACKGROUND

In 2008, the Department approved, and granted ATI to, a joint venture amongst Delta, Air France, KLM, Northwest Airlines Corp. (Northwest), Czech, and Alitalia (the "SkyTeam" joint venture).[3] Separately, in 2013, the Department approved, and granted ATI to, an alliance between Delta and Virgin (the Delta-Virgin joint venture), covering air transportation between the United States and the United Kingdom (UK).[4] At that time, the Department found that "relatively few passengers fly between the U.S. and London via continental European hubs" and that, "[b]ecause North America-United Kingdom flying will be carved-out of the existing SkyTeam Joint Venture," the operation of the two parallel joint ventures did not present competitive concerns or dilute claimed public benefits.[5] The Department also noted at the time that it was likely the two joint ventures would eventually seek to merge.[6]

Included in the approval of the 2013 Delta-Virgin joint venture was approval of a five-way cooperation agreement (the Cooperation Agreement) between Delta, Virgin, Air France, KLM, and Alitalia. The Cooperation Agreement permits global cooperation amongst the five parties, including joint or coordinated sales and marketing initiatives and activities; joint contracting with corporate and agency accounts; joint purchasing opportunities, including ground-handling services, distribution arrangements and other third-party transactions; and joint advertising and promotion programs. The Cooperation Agreement permits even deeper alignment with respect to U.S.-UK routings, where it permits coordination of pricing (including surcharges and ancillary products and services), inventory management, network and capacity decisions, and cargo services on routings between points in the UK and points in North America.

On July 20, 2018, Delta, Air France, KLM, and Virgin submitted a motion to amend Order 2013-9-14 by replacing the agreements immunized by that order with a new, single joint venture agreement covering these carriers globally. The Joint Applicants seek to remove the remaining seams from the two parallel joint ventures by merging the two existing joint venture agreements into a single agreement, as well as updating and revising the underlying cooperation terms and formulae. Coincident with the transaction, Air France/KLM agreed to purchase a 31 percent equity stake in Virgin Atlantic.

On July 23, 2018, we issued a notice suspending the procedural schedule in the case and, on August 7, 2018, we issued a notice providing access to confidential supporting documents.[7] On November 27, 2018, JetBlue Airways Corporation (JetBlue) filed a motion requesting the

---

[3] Order 2008-5-23, May 22, 2008. Air France and KLM merged in 2004. Likewise, Northwest and Delta merged in 2008.
[4] Order 2013-9-14, Sep. 23, 2013.
[5] Order 2013-8-21 at 14.
[6] *Id.*
[7] DOT-OST-2013-0068-0034 and DOT-OST-2013-0068-0036.

Department to require the filing of additional information concerning slot holdings by the Joint Applicants, past slot remedies, and slot allocation procedures at certain European airports. On December 28. 2018, the Joint Applicants supplemented the record with information on slot holdings at London-Heathrow (LHR), London-Gatwick (LGW), Paris-Charles de Gaulle (CDG), and Amsterdam-Schiphol (AMS).[8] On January 23, 2019, we issued Order 2019-1-3 denying JetBlue's motion and declaring the record substantially complete and establishing a procedural schedule, including a public comment period. Answers to the Joint Applicant's motion were due no later than February 6, 2019, and replies to answers were due no later than February 15, 2019.

### III. RESPONSIVE PLEADINGS

The Department received pleadings from JetBlue, the Joint Applicants, Air Travel Fairness,[9] Travelers United, and the American Antitrust Institute. The pleadings as well as the complete public record of the case can be found at www.regulations.gov by searching for docket DOT-OST-2013-0068.

### IV. PROCEDURAL CONTEXT

At issue in this proceeding is the motion submitted by the Joint Applicants seeking to amend Order 2013-9-14 (approving and immunizing the Delta-Virgin alliance) to include their new Amended JVA among the list of agreements approved and immunized by that order. In cases where the Department has already approved alliance agreements and/or made a grant of ATI, our final orders typically allow for revised or updated alliance agreements to be submitted off the record for informal review by the Department. This was the process followed in the Delta-Korean Air proceeding in 2018, for example.[10]

In this instance, the Joint Applicants submitted their revised alliance agreements as a motion to replace their current alliance agreements and amend existing authorities. The Joint Applicants made their motion in a public docket.

JetBlue opposes the motion and argues that more is needed. JetBlue argues that a *de novo* review of the original grants of ATI to Delta-Air France-KLM and Delta-Virgin is required. As in the Delta-Korean proceeding, the issue we face is how to provide adequate review of the Amended JVA to ensure that the arrangement will not reduce or eliminate competition and will provide sufficient public benefits to warrant a grant of ATI. Unlike in the Delta-Korean proceeding, the Joint Applicants have here made a public application (in the form of a motion) with a robust evidentiary record and the Department has entertained public comment on the application.

---

[8] "Joint Response to Unauthorized Sur-Reply of JetBlue and Supplemental Production of Airport Slot Information," Dec. 28, 2018, DOT-OST-2013-0068-0054.
[9] Air Travel Fairness reincorporated under the name Travel Fairness Now during the pendency of this proceeding.
[10] Order 2002-6-18, Jun. 27, 2002 at 14, and "Approval of Joint Venture Arrangement between Delta Air Lines, Inc. and Korean Air Lines Co., Ltd." Nov. 20, 2017, DOT-OST-2002-11842-0021.

We tentatively disagree with JetBlue. The Department has made explicit provision for review of updated agreements as a part of its previous ATI orders. Additionally, it is unclear, given the due process that the Department has afforded to date, what additional steps JetBlue would like the Department to undertake in a *de novo* review. The Department has reviewed the motion, including up-to-date documents and data, as well as the public comments received, and is here issuing a tentative decision that will itself be subject to public comment. JetBlue states that "[t]he Department must not short-circuit its statutory obligation to conduct a thorough, on-the-record review of the Applicants' request for approval and ATI."[11] We are conducting such a review.

V. **STATUTORY STANDARDS**

JetBlue argues that to grant the motion, we must find that the Joint Applicants have satisfied the statutory criteria at 49 U.S.C. sections 41308 and 41309.[12] We agree. The Department typically engages in a two-step process, first conducing a competitive analysis under § 41309 and a public benefits analysis under § 41308. In the forthcoming sections, we will examine the competitive issues raised by commenters and discuss the public benefits claimed by the Joint Applicants.

If the Department concludes, after its initial review of the application under § 41309(b), that the agreements are not adverse to the public interest, § 41309(b) directs us to approve the agreements. In that case, the Department next examines whether there are sufficient public benefits to grant ATI under § 41308(b).

The Department's public interest analysis under both §§ 41309(b) and 41308(b) entails a balancing of any anti-competitive effects against likely public benefits. The standard in § 41308(b) ("required by") is higher than that in § 41309(b) ("not adverse to"). A party opposing approval of an agreement, in this case JetBlue, has the burden of demonstrating that the agreements would substantially reduce or eliminate competition.

VI. **COMPETITIVE ISSUES**

We will first examine the application under § 41309(b) to determine whether the agreements are adverse to the public interest because they would substantially reduce or eliminate competition (the "Competitive Effects Analysis"). If we determine that the agreements are not adverse to the public interest, we must approve them.

JetBlue raises concerns about the state of competition, generally, between the United States and the UK and between the United States and continental Europe.[13] JetBlue argues that approval of the Amended JVA would reduce and foreclose competition. JetBlue states that the SkyTeam, Oneworld, and Star alliances control over 90% of the U.S.-Europe market, which should prompt

---

[11] "Answer of JetBlue Airways Corporation," Feb. 7, 2019, DOT-OST-2013-0068-0057 at 5.
[12] *Id.* at 8.
[13] "Answer of JetBlue Airways Corporation," Feb. 6, 2019, DOT-OST-2013-0068-0057 at 8.

4

regulators to question any further increases in ATI scope.[14] The Department also received comments from several consumer organizations, including Travelers United[15] and the American Antitrust Institute (AAI).[16] Travelers United and AAI's comments closely mirror the objections of JetBlue. They both argue that concentration in the transatlantic market is too high and that the concentration and slot restrictions at London Heathrow airport (LHR) and Amsterdam (AMS) prevent new entry to the detriment of consumers. Additionally, AAI argues that the network effects of the Amended JVA will have greater impacts to competition than the Joint Applicants claim in their motion.

When conducting a competitive analysis, we typically examine the incremental change in competition resulting from a transaction. For example, we look at the incremental change in market share that the proposed alliance would create, and if that position would create a dominant position in the market or allow the alliance to engage in other anticompetitive behavior, such as charging supra-competitive prices or excluding competitors. In this instance, since Delta already possesses bilateral immunity with Virgin on the one hand, and Air France/KLM on the other, all transatlantic routings of the Amended JVA are currently immunized under existing authorities. As such, this transaction would cause no significant change in the competitive situation in the transatlantic market, since, as JetBlue concedes, almost all of the cooperation contemplated under the Amended JVA (and all of the transatlantic cooperation) is already immunized under existing agreements.[17] Conversely, denying the motion would not reduce the concentration levels about which JetBlue raises concerns.

For the avoidance of doubt, we examined market shares between the United States and UK, and between the United States and continental Europe. We found that the Amended JVA would not change the market share of the proposed alliance, nor would it result in a dominant position vis-à-vis the other alliances in the market.

---

[14] *Id.* at 25-26.
[15] "Comments of Travelers United," Feb. 15, 2019, DOT-OST-2013-0068-0061.
[16] "Motion for Extension of Time and for Leave to File an Otherwise Unauthorized Document, and Comments of the American Antitrust Institute in Response to Consolidate Joint Reply," Feb. 26, 2019, DOT-OST-2013-0068; "Correction to Comments of the American Antitrust Institute in Response to Consolidated Joint Reply," Feb. 28, 2019, DOT-OST-2013-0068-0067; and "Reply of the American Antitrust Institute to Response of Joint Venture Parties in Opposition to Motion for Extension of Time and for Leave to File an Unauthorized Document," Mar. 11, 2019, DOT-OST-2013-0068-0070.
[17] "Answer of JetBlue Airways Corporation," Feb. 6, 2019, DOT-OST-2013-0068-0057 at 11 and 14.

5

| U.S.-UK Nonstop Passengers | | |
|---|---|---|
| **Alliance** | **Passengers** | **Percent** |
| Star | 2,448,906 | 11.72% |
| SkyTeam | 5,128,092 | 24.53% |
| Oneworld | 10,645,081 | 50.93% |
| Unaligned | 2,680,942 | 12.83% |
| Total | 20,903,021 | 100% |

| U.S.-Europe (Ex-UK) Nonstop Passengers | | |
|---|---|---|
| **Alliance** | **Passengers** | **Percent** |
| Star | 14,408,347 | 31.42% |
| SkyTeam | 15,231,358 | 33.22% |
| Oneworld | 5,952,595 | 12.98% |
| Unaligned | 10,264,315 | 22.38% |
| Total | 45,856,615 | 100% |

**Source: T100 Segment – YE March, 2019**

Further, we typically examine competition on country-pair and city-pair bases by identifying nonstop overlap routes where both parties operate and where their combination would effectively eliminate a competitor from the market. There are no such markets in this transaction. Air France-KLM does not operate nonstop service from the United States to the UK, nor does Virgin operate nonstop service from the United States to continental Europe.

JetBlue also argues that the Department should not approve the Amended JVA without conducting an independent study to quantify the consumer benefits of immunized joint ventures.[18] JetBlue states that most ATI applications have included economic reports that project the consumer benefits that will result from the approval of a given joint venture. However, JetBlue is unaware of any application that has included an economic analysis of the consumer benefits that its alliance has already produced. The Department is aware of several academic studies that have been conducted finding that immunized joint ventures have produced significant consumer benefits.[19]

### a. Flybe

JetBlue has also raised concerns about the acquisition of Flybe, a UK regional carrier, by a consortium that includes Virgin. The Virgin-Flybe transaction is separate from, but linked to, the application before us here. Flybe holds slots at LHR, AMS, and CDG. JetBlue further

---

[18] *Id.* at 29.
[19] *See, e.g.*, Brueckner, Jan K. and Singer, Ethan, Pricing by International Airline Alliances: A Retrospective Study Using Supplementary Foreign-Carrier Fare Data (2019). CESifo Working Paper No. 7649. Available at SSRN: https://ssrn.com/abstract=3422230; Brueckner, J.K., Whalen, W.T., 2000, "The price effects of international airline alliances" Journal of Law and Economics 43, 503-545; Brueckner, J.K., Lee, D., Singer, E., 2011, "Alliances, codesharing, antitrust immunity and international airfares: Do previous patterns persist?" Journal of Competition Law and Economics 7, 573-602; Whalen, W.T., 2007, "A panel data analysis of code sharing, antitrust immunity and open skies treaties in international aviation markets," Review of Industrial Organization 30, 39-61.

argues that Virgin's acquisition of FlyBe changes the competitive landscape at these airports by increasing the share of slots that the Joint Applicants will hold.  JetBlue also argues that it has been unable to access slots at LHR and AMS.  The following charts show the shares of slots at LHR and AMS.



Source: OAG Schedule Data for August, 2019

The transaction will result in approximately two percent more slots for the SkyTeam partners at both LHR and AMS.  At LHR, the incremental gain in slots will result in an approximately 10 percent share of slots for SkyTeam.  This would not result in a meaningful change in SkyTeam's market share at LHR and would be unlikely to result in competitive harm.  The SkyTeam alliance would remain the third-largest alliance at LHR and continue to face competition from alliances with larger slot portfolios, particularly the Oneworld alliance.

At AMS, SkyTeam is already by far the largest slot holder at the airport with approximately 59 percent of operations.  The Virgin-Flybe transaction results in SkyTeam increasing its share by slightly more than two percent, to a new total of 61 percent.  Such a large market share at a major and constrained hub airport would typically raise competition concerns because such a large share of slots held in common by one alliance -- or, as here, an integrated joint venture -- may allow it to foreclose competition as the lack of available slots presents a barrier to entry for new competitors.  JetBlue, for example, states that it has been told slots at AMS will not be available "in the foreseeable future."[20]

The Directorate General for Competition (DG COMP) of the European Commission examined the Virgin-Flybe transaction under its merger protocols.  Its investigation determined that the transaction would result in quasi-monopolies on two intra-Europe routes (Birmingham-Amsterdam and Birmingham-Paris) resulting from Air France-KLM's indirect control over Flybe, via its joint control over Virgin.[21]  To resolve these concerns, the parties agreed to the release of five daily slot-pairs at AMS and three daily slot-pairs at CDG.  DG COMP has

---

[20] "Answer of JetBlue Airways Corporation," Feb. 6, 2019, DOT-OST-2013-0068-0057 at 6.
[21] "Commission approves the acquisition of Flybe by Connect Airways, subject to conditions," Jul. 4, 2019, https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=uriserv:OJ.LI.2019.085.01.0049.01.ENG.

7

published an interim version of the commitments agreed to with the parties.[22] While the slot-pairs are initially tied to the identified routes of concern, the commitments include a grandfathering provision allowing the recipient of the slots to use them for any destination after six consecutive seasons of proper use (*i.e.*, three years). The immediate release of the slots reduces the increased concentration of the Blue Skies parties at Amsterdam resulting from the transaction, and the potential for future unrestricted use allows for the possibility of new transatlantic service in the future. Nevertheless, the Department remains concerned about the Blue Skies parties' market share at AMS, and we are proposing a review requirement, discussed in more detail below. While there is no information in the record indicating that potential competitors are seeking slots for use immediately, given SkyTeam's share of slots at this gateway, there is a future possibility that new entry could be effectively foreclosed, and that the Department might need to reassess whether its grant of immunity could be exacerbating a competition concern.

      b. **Brexit**

JetBlue argues that the Department should proceed with caution and adjudicate this application, along with the Oneworld-Aer Lingus application, in the context of the aeropolitical environment that will exist post-Brexit.[23] The Department, in Order 2019-4-20, already denied JetBlue's motion to consolidate the Blue Skies and Oneworld-Aer Lingus proceedings.[24] The form and timing of Brexit continues to remain in flux. Since JetBlue filed its answer, the date for Brexit has once again been extended to October 31, 2019.[25] As we explained in Order 2019-4-20, the Department recognizes that, whatever form Brexit ultimately takes, it will have implications for multiple matters before the Department that will be dealt with at the appropriate time.[26] Brexit is an internal political question of the UK, and the Department will not take the extraordinary step of delaying action on pending applications to await the outcome of that process. Moreover, on March 27, 2019, the European Parliament approved legislation to ensure that a measure of aviation connectivity between the UK and continental Europe is maintained in the event the UK leaves the European Union without a deal on the Brexit Withdrawal Agreement.[27] Likewise, on November 28, 2018, the United States and UK concluded a new Open-Skies aviation agreement

---

[22] Non-confidential Version of Commitments: http://ec.europa.eu/competition/mergers/cases/additional_data/m9287_881_5.pdf.
[23] "Answer of JetBlue Airways Corporation," Feb. 6, 2019, DOT-OST-2013-0068-0057 at 27.
[24] Order 2019-4-20, Apr. 24, 2019.
[25] "European Council (Art. 50) conclusions, 10 April 2019" https://www.consilium.europa.eu/media/39042/10-euco-art50-conclusions-en.pdf.
[26] Order 2019-4-20 at 5.
[27] "Regulation (EU) 2019/502 of the European Parliament and of the Council on common rules ensuring basic air connectivity with regard to the withdrawal of the United Kingdom of Great Britain and Northern Ireland from the Union." https://oeil.secure.europarl.europa.eu/oeil/popups/summary.do?id=1580717&t=f&l=en.

that will take effect immediately upon the United Kingdom's departure from the European Union.[28]

### c. Other Comments

The Department also received comments from Travel Fairness Now (TFN).[29] TFN argues that carriers, including Delta, have moved to block access to publicly available flight information and have made it difficult for consumers to find lower fares and see all available flight options. TFN argues that the Department should condition any grant of ATI by prohibiting the Joint Applicants from jointly or collectively restraining the distribution of airline fare, schedule, and availability information by online travel agencies (OTAs) or metasearch sites.

TFN's comments implicate the fare distribution and sales functions of the alliance. A key component of achieving metal neutrality in a joint venture is the parties' ability to coordinate their sales and distribution practices. It would be contrary to the Department's policy of promoting fully-integrated joint ventures to place restrictions on such a key aspect of that integration. Further, the Department has a separate proceeding in place to gather information on this broad issue.[30]

Therefore, we tentatively determine that JetBlue has not met its burden to demonstrate that the Amended JVA would be adverse to the public interest on competitive grounds and should not be approved. We have, however, identified potential competitive risks at AMS arising from the Virgin-Flybe transaction and the Amended JVA parties' resultant increase in AMS slots. We note that DG COMP has reviewed and cleared the transaction, with commitments. As such, and as explained further below, we are proposing to condition the alliance on compliance with the DG COMP commitments and to review the alliance after five years.

## VII. PUBLIC BENEFITS

JetBlue has argued that, in order to grant ATI to the Amended JVA, the Joint Applicants must demonstrate, and the Department must validate, significant public benefits that will be generated by the Amended JVA.[31] This is the standard the Department typically applies in a *de novo* alliance/ATI application. As we have stated above, the case before us is not a *de novo* application, but rather the replacement of two separate, and approved, alliance agreements with a single integrated agreement. As such, we must examine whether the Amended JVA would

---

[28] "U.S.-UK Air Transport Agreement of November 28, 2018," U.S. Department of State, https://www.state.gov/u-s-uk-air-transport-agreement-of-november-28-2018/.
[29] "Comments of Air Travel Fairness," Feb. 7, 2019, DOT-OST-2013-0068-0058. *See* Motion for Leave to File Surreply and Sur-reply of Travel Fairness Now," Feb. 25, 2019, DOT-OST-2013-0068-0064 at 1. "Travel Fairness Now - Supplement to Motion for Leave to File Surreply and Sur-Reply (Travel Technology Association Charles River Associates Study)," Feb. 28, 2019, DOT-OST-2013-0068-0066.
[30] *See* Docket DOT-OST-2016-0204.
[31] "Answer of JetBlue Airways Corporation," Feb. 6, 2019, DOT-OST-2013-0068-0057 at 12.

9

preserve and enhance the public benefits on which the grants of ATI for its predecessor agreements were predicated.  We will also look for evidence that those benefits are occurring.

Based upon our analysis, we expect that the proposed transaction will maintain the existing public benefits that have been generated from the current SkyTeam and Delta/Virgin joint ventures and will likely incrementally increase consumer benefits overall.

In the previous *SkyTeam I & II* cases, the applicants similarly sought to combine two pre-existing alliances under a single agreement:  Northwest/KLM on the one hand, and Delta/Air France/Alitalia/Czech, on the other.[32]  ATI was initially denied in the *SkyTeam I* case due to the applicants' inability to demonstrate to the Department that they could promptly implement the combined alliance and produce substantial public benefits.[33]  However, as we found in the *SkyTeam II* decision, greater alignment of incentives, to the point of metal neutrality, is key to producing public benefits.[34]  In the present case, the Amended JVA would further align all parties' incentives by establishing a common bottom line amongst Delta, Air France, KLM, and Virgin, providing for metal-neutrality across all parties' networks.  This is consistent with DOT's policy to encourage fully integrated joint ventures.

The Department has recognized several forms of public benefits that immunized joint ventures can foster, including:  reductions in double marginalization, cost and operational efficiencies, broader network coverage (resulting in more paths between a given origin and destination), network and capacity coordination, increased capacity (beyond a market's expected growth rate), and alignment of frequent flyer benefits.[35]  The Joint Applicants claim that, in addition to the public benefits that have been derived from the SkyTeam and Virgin joint ventures, the Amended JVA will generate an additional $85 million in incremental consumer benefits annually through enhanced codesharing and reduced double-marginalization, more attractive schedule and routing options, reciprocal frequent flyer benefits and redemptions, and other synergies, through the introduction of metal-neutrality between Virgin and Air France/KLM.[36]

In their 2007 application, Delta/Air France/KLM argued that approval of, and ATI for, their proposed alliance would result in demonstrable public benefits including:  new nonstop

---

[32] *See* Dockets DOT-OST-2004-19214 and DOT-OST-2007-28664.
[33] "Additionally, in the particular circumstances of this case, we are reluctant to immunize the alliance agreements when the Joint Applicants have given us so little information about their plans for implementing a grant of antitrust immunity under section 41308." Order 2005-12-12 at 34, and; "The Joint Applicants provide few specifics about how the Joint Applicants plan to cooperate under the protection of immunity and how or when they might be in a position to implement second-stage agreements involving more advanced benefit-sharing that would undoubtedly require antitrust immunity." Order 2005-12-12 at 37.
[34] "[T]he Joint Applicants now supply a detailed joint venture agreement that integrates international operations to such an extent as to suggest metal neutrality and seamless travel across one joint network." Order 2008-4-17 at 15.
[35] *See* Order 2008-4-17 at 15; Order 2009-4-5 at 18-19.
[36] "Joint Motion to Amend Order 2013-9-14 to Approve and Extend Antitrust Immunity to Amended and Restated Transatlantic Joint Venture Agreement," Jul. 20, 2018, DOT-OST-2013-0068-0033 at 19-20.

transatlantic routes, additional routings, better time-of-day coverage and elapsed time savings, and expanded competition between the United States and LHR.

Similarly, in their 2013 application, Delta and Virgin stated that their proposed alliance would result in greater competition in the New York-LHR and Boston-LHR markets, new nonstop service from Seattle to LHR, and the possibility of additional nonstop LHR service from Delta's hub cities, such as Detroit and Salt Lake City.

As documented in their motion, the two preexisting joint ventures have delivered significant consumer benefits to-date. For example, nonstop capacity on four key trunk routes has more than doubled since 2009, as shown in the chart below.



**OAG Schedule Data**

In addition to increased capacity on existing trunk routes, the cooperation allowed by the two preexisting joint ventures has enabled new transatlantic routes including: Portland-Amsterdam; Salt Lake City-London, -Paris, and -Amsterdam; Pittsburgh-Paris; Raleigh-Paris; Philadelphia-London; Seattle-London; New York (JFK)-Manchester, -Glasgow, and -Edinburgh; San Francisco-Manchester; and Orlando-Belfast.[37] The metal-neutral nature of the joint ventures also enables the carriers to expand time-of-day coverage at key transatlantic hubs, rather than clustering both partners' flights at popular times ("wingtip-to-wingtip" flying), thereby offering consumers more choices.[38]

In addition to the continuation of these and other public benefits resulting from the preexisting joint ventures, the Joint Applicants estimate that $85 million in incremental annual consumer

---

[37] "Joint Motion to Amend Order 2013-9-14 to Approve and Extend Antitrust Immunity to Amended and Restated Transatlantic Joint Venture Agreement," Jul. 20, 2018, DOT-OST-2013-0068-0033 at 16-18.
[38] *Id.* at 18.

11

benefits will result from the Amended JVA.  These will result from the implementation of fully reciprocal codesharing between all the parties, which will enable new routing options for passengers, particularly for those travelling to/from the UK outside of London.  The parties will also fully align their frequent flier programs, providing passengers more options for earning and redeeming miles.

Our analysis indicates that the maintenance of the existing public benefits of the SkyTeam and Delta/Virgin joint ventures, as well as the likely incremental benefits gained from the Amended JVA, make a grant of ATI required by the public interest.  We therefore tentatively propose to grant ATI to the Amended JVA, subject to the conditions explained in the following section.

## VIII.   CONDITIONS
### a. ATI Scope

When making a grant of ATI, the Department's practice is to do so only to the extent necessary to enable the proposed transaction to proceed and only in conjunction with an approved alliance agreement.  As described above, the Amended JVA replaces two pre-existing agreements:  the Delta/Air France/KLM/Alitalia/Czech SkyTeam agreement, and the Delta-Virgin agreement.  The Amended JVA contemplates cooperation amongst Delta, Air France, KLM, and Virgin.  However, Alitalia and Czech are not parties to the Amended JVA.  As such, there would no longer be an underlying basis or need for antitrust immunity amongst the Amended JVA parties and Alitalia or Czech.  Therefore, while we tentatively propose to grant ATI to the Amended JVA, we also tentatively propose to terminate all prior grants of ATI to the above parties six (6) months from the date of a final order in this proceeding.  This will provide an opportunity for the parties to wind down any current cooperation that will not continue under the Amended JVA (and will therefore be unimmunized), without subjecting the parties to immediate antitrust risk.

### b. Review

Our analysis indicates that the Amended JVA will not reduce or eliminate competition in any covered market.  Further, we believe that it will continue to generate the significant public benefits that have resulted from its two constituent joint ventures, and likely produce incremental benefits.  However, we have also identified a risk to competition concerning slot control at AMS that warrants a time-limited review. We are here proposing a requirement that the alliance be reviewed after five years.  The commitments entered into between Virgin and DG COMP permit unrestricted use of the slots after six seasons (*i.e.*, three years) of proper use.  A five-year review will allow time for the receiving carrier(s) to start up service with the slots and for the Department to assess what use has been made of the slots once grandfathered status has been reached.  The review would consist of both a self-assessment by the parties, as well as an internal examination by the Department.

We tentatively propose that the review would function as follows:

- Six months before the five-year anniversary of the implementation of the Amended JVA, the Joint Applicants will provide the Department with a self-assessment for its review.[39]

- The self-assessment should quantitatively document the continued provision of the public benefits generated by the preceding constituent agreements, as well as progress made on delivering the incremental public benefits identified in the motion.

- Specifically with regard to AMS, the self-assessment must identify any new transatlantic competitive entry at AMS (carrier(s) and route(s)); any third-party slot transactions at AMS that any of the alliance partners were party to; any requests by third-party carriers to engage in a slot transaction that was denied by one of the alliance partners;[40] and any actual or proposed developments at AMS that have or will affect capacity (positively or negatively) at the airport.[41]

The Department would conduct its own internal review of the performance and competitiveness of the alliance, as well as a thorough examination of the self-assessment. If, after its review, the Department determines that any action is necessary to alleviate a competition concern, it will initiate the appropriate regulatory process to address the issue.

### c. Compliance with DG COMP

We tentatively determine that our grant of antitrust immunity should be conditioned on the relevant parties' implementation of the commitments established for the clearance of DG COMP case number M.9287.[42]

### d. Annual Reporting

We tentatively find that it is necessary for the Joint Applicants to report to the Department commercial developments in the alliance and the degree to which the anticipated public benefits are being realized. As in our previous ATI decisions, we are proposing annual reports.[43] The reports should focus on progress made toward implementing the Amended JVA and its stated goals, present or future planned cooperation among the alliance partners in all core airline functions, a discussion of the public benefits that are being realized, and compliance with commitments.

---

[39] If warranted, the parties may submit, and the Department will entertain, a motion for confidential treatment under 14 C.F.R. § 302.12 (Rule 12) of the Department's regulations to protect any confidential, proprietary, or commercially sensitive information contained in the assessment.

[40] Short-term trades or leases lasting less than one IATA scheduling season need not be included, but any longer (and/or permanent) trades, leases, or sales should be.

[41] Developments should include both physical infrastructure changes, as well as any policy or legal developments that may affect capacity.

[42] Connect Airways/Flybe – Case Number M.9287. http://ec.europa.eu/competition/elojade/isef/case_details.cfm?proc_code=2_M_9287

[43] *See* Star, Docket DOT-OST-2008-0234, Final Order 2009-7-10 at 26 (July 10, 2009); SkyTeam, DOT-OST-2007-28644, Order 2009-6-26 at 2 (June 26, 2009).

### e. O&D Survey Data Reporting

For many years, we have required foreign carriers to submit traffic data as a condition of obtaining immunity from U.S. antitrust laws. We ask those carriers to continue to file data comparable to the Department's Origin-Destination Survey of Airline Passenger Traffic (O&D DB1B), which requires U.S. carriers to submit traffic data in markets they serve singularly or jointly with foreign airlines. Without foreign carrier participation in this effort, we would receive no detailed market information for passengers traveling to or from the United States when their entire trip is on foreign airlines, except for T-100 data for nonstop and single-plane markets. The absence of such foreign carrier data would handicap our ability to evaluate the competitive effects of alliances. As in previous cases,[44] we have tentatively decided to require the foreign carrier applicants to continue to report full-itinerary O&D Survey information for all passenger itineraries that include a U.S. point. This requirement encompasses all traffic to third countries for which the itinerary includes a U.S. point.

To prevent this reporting requirement from unfairly harming the foreign applicants' competitive positions, we tentatively decide to continue to grant confidentiality to their O&D Survey reports and special reports on codeshare passengers. Currently, we grant confidential treatment to all international Origin-Destination data. We propose to provide these data confidential treatment because of the potentially damaging competitive impact on U.S. airlines and the potential adverse effect upon the public interest that would result from unilateral disclosure of these data (data covering the operations of foreign airlines that are similar to the information collected in the Passenger O&D Survey are generally not available to the Department).[45]

Our regulation, 14 C.F.R. Part 241, Section 19-7(d)(1), provides for disclosure of international O&D Survey data to air carriers directly participating in and contributing to the O&D Survey. While we have tentatively found it appropriate to direct the foreign carrier applicants in this proceeding to continue to provide certain limited O&D Survey data, they are not air carriers within the meaning of Part 241. The regulation, 14 C.F.R. Part 241, Section 03, defines an air carrier as "[a]ny citizen of the United States who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in air transportation." The foreign carrier applicants would have no access to the data filed by U.S. air carriers. Therefore, we would keep submissions confidential while maintaining the current restriction on access to U.S. air carrier O&D Survey data by foreign air carriers.

### f. IATA Tariff Activities

As we have found in earlier decisions, it is contrary to the public interest to permit immunized alliances to participate in certain price-related coordination that is already immunized within

---

[44] *See*, *e.g.*, United/ Lufthansa/ Austrian/ SAS/ Swiss/ LOT/ TAP/ Air Canada, Docket DOT-OST-2005-22922, Order 2007-2-16 (Feb. 13, 2007).

[45] We treat the foreign airlines' O&D data as confidential, do not allow U.S. airlines any access to the data, and do not allow foreign airlines any access to US airline O&D Survey data. We use these data only for internal analytical purposes.

IATA tariff coordination. We therefore tentatively decide to continue to condition our grant of antitrust immunity by requiring the Joint Applicants to withdraw, or to remain withdrawn, from participation in any IATA tariff activities that affect or discuss any proposed through fares, rates or charges applicable between the United States and any countries whose airlines have been or are subsequently granted antitrust immunity by the Department for participation in similar alliances. Such countries include the homelands of the applicants. We tentatively find that this condition is in the public interest for the same reasons as stated in Order 2009-4-5.

### g. CRS Issues

Consistent with past cases, we are not proposing any conditions regarding the management of Computer Reservations Systems (CRSs).[46] Any coordination between the applicants concerning the operation of separate businesses, such as CRSs, would not be transactions specifically approved or necessarily contemplated by our orders in this proceeding. While the Joint Applicants, individually or collectively, may maintain an interest in a CRS, the grant of immunity in this Order thus would not extend to their management of those interests.[47] On the other hand, the applicants' alliance relationships will likely require the coordination of the presentation and sale of the airlines' own services in the CRSs and each airline's operation of its internal reservations systems. Those activities will necessarily be covered by a grant of antitrust immunity.

### h. Operation Under a Common Name

Because implementation of the Amended JVA could raise important consumer issues and "holding out" questions, if the Joint Applicants choose to operate under a common name or use "common brands," they must seek separate approval from the Department prior to such operations. For example, it is Department policy to consider the use of a single air carrier designator code by two or more airlines to be unfair and deceptive unless the airlines give reasonable and timely notice to passengers of the actual operator of the aircraft.[48]

**ACCORDINGLY:**

1. We direct all interested persons to show cause why we should not issue an order making final our tentative findings and conclusions discussed herein. Objections or comments to our tentative findings and conclusions shall be due no later than 14 calendar days from the service date of this Order, and answers to objections shall be due no later than 7 business days thereafter. In the event that no objections are filed, all further procedural steps shall be deemed waived, and we may enter an order making final our tentative findings and conclusions;

---

[46] *See, e.g.,* SkyTeam II, Docket DOT-OST-2007-28644, Order 2008-5-32 (May 22, 2008).

[47] While any antitrust immunity granted in this proceeding would not cover the activities of any system in which one of the Joint Applicants has an interest, the Department has the authority under 49 U.S.C. § 41712 to prohibit any system operating in the United States from engaging in unfair or deceptive practices or unfair methods of competition. The Court of Appeals has upheld our determination that we had such jurisdiction. *Sabre, Inc. v. Dept. of Transportation*, 429 F.3d 1113 (D.C. Cir. 2005). We also have the authority to take action against conduct by a foreign system or a foreign airline that unreasonably discriminates against a U.S. system. 49 U.S.C. § 41310(g).

[48] *See* 14 C.F.R. § 399.82.

2. We tentatively approve and grant antitrust immunity to the Amended and Restated Transatlantic Joint Venture Agreement amongst Delta Air Lines, Inc., Société Air France, Koninklijke Luchtvaart Maatschappij N.V., Virgin Atlantic Airways, Ltd., and the majority owned corporate affiliates of the aforementioned carriers.  Tentatively, the approval and grant of antitrust immunity would be limited as follows;

    a. The approval and grant of immunity will expire within six (6) months of the date of a Final Order in this matter unless the Joint Applicants have, prior to that six-month expiration date, submitted in the docket verified statements by officers of Delta Air Lines, Inc., Société Air France, Koninklijke Luchtvaart Maatschappij N.V., and Virgin Atlantic Airways, Ltd., attesting that the Amended JVA has been implemented, that the relevant parties have complied with the commitments agreed to with the Directorate General for Competition of the European Commission in case number M.9287, and unless the Joint Applicants have submitted to the Director of the Office of Aviation Analysis a complete and unredacted copy of the most recent agreement(s) and any appendices;

    b. Four years and six months after the date of the Final Order, the Joint Applicants are directed to submit a detailed Self-Assessment to the Director of the Office of Aviation Analysis, consistent with the guidance provided in this Order, including specifically the areas described in Section VIII.b., above;

3. We tentatively determine that on a date six (6) months after the date of a Final Order in this matter, our prior grants of antitrust immunity made amongst any combination of Delta Air Lines, Inc., Société Air France, Koninklijke Luchtvaart Maatschappij N.V., Virgin Atlantic Airways, Ltd., CSA Czech Airlines, and Alitalia Compagnia Aerea Italiana S.P.A. will terminate;

4. We tentatively direct the Joint Applicants to submit an annual progress report as described in this Order, to the Director of the Office of Aviation Analysis, beginning one year from the effective date of ATI, and continuing each year thereafter while the alliance agreements are effective;[49]

5. We tentatively direct Société Air France, Koninklijke Luchtvaart Maatschappij N.V., and Virgin Atlantic Airways, Ltd., to continue to report full-itinerary Origin-Destination Survey of Airline Passenger Traffic for all passenger itineraries that include a US point;[50, 51]

---

[49] We expect the Joint Applicants to deliver the progress report by the close of business on the anniversary date of the issuance of a Final Order.  If that date falls on a weekend or Federal holiday, the Joint Applicants may deliver the report by the close of business on the following business day.

[50] We expect Air France, KLM, and Virgin to continue to report the O&D data.  Detailed instructions are available from the Department's Office of Airline Information at the Bureau of Transportation Statistics.  We treat the foreign airlines' O&D data as confidential, do not allow US airlines any access to the data, and do not allow foreign airlines any access to US airline O&D Survey data.  We use these data only for internal analytical purposes.

[51] Czech and Alitalia must continue reporting full-itinerary Origin-Destination data until the date established in ordering paragraph 3.

6. We tentatively determine that the Joint Applicants shall submit for prior approval any subsequent subsidiary agreements implementing the Amended JVA;[52]

7. We tentatively determine that the Joint Applicants shall obtain prior approval if they choose to hold out service under a common name or use common brands;

8. We tentatively direct Delta Air Lines, Inc., Société Air France, Koninklijke Luchtvaart Maatschappij N.V., and Virgin Atlantic Airways, Ltd., to remain withdrawn from participation in any International Air Transportation Association tariff coordination activities that discuss any proposed through fares, rates, or charges applicable between the United States and any countries whose airlines have been or are subsequently granted antitrust immunity, or renewal of, to participate in similar alliance activities with a U.S. airline(s).  We tentatively delegate to the Director of the Office of International Aviation the authority to determine the applicability of the directive set forth in this paragraph as to specific prices, markets, and tariff coordination activities, consistent with the scope and purpose of the condition, as previously described;[53]

9. We tentatively determine that we may amend, modify, or revoke this authority at any time, without hearing; and

10. We will serve this Order on all parties on the service list in this docket, as well as CSA Czech Airlines and Alitalia Compagnia Aerea Italiana S.P.A.

By:

**JOEL SZABAT**
Assistant Secretary
Aviation and International Affairs

(SEAL)

*An electronic version of this document is available at:* <http://www.regulations.gov>

---

[52] Regarding this requirement, we do not expect the Joint Applicants to provide the Department with minor technical understandings that are necessary to implement fully their day-to-day operations but that have no additional substantive significance. We do, however, expect and direct them to provide the Department with all unredacted contractual instruments that implement or materially alter, modify, or amend the cooperation agreements, joint ventures, or confidentiality/antitrust guidelines.  Any appropriate documents shall be submitted to the Director of the Office of Aviation Analysis.

[53] This provision also applies to Czech and Alitalia until the date established in ordering paragraph 3.