# EXHIBIT I

Order 2020-11-9
Served:  November 16, 2020



# UNITED STATES OF AMERICA
# DEPARTMENT OF TRANSPORTATION
# OFFICE OF THE SECRETARY
# WASHINGTON, D.C.

Issued by the Department of Transportation
on the 16th day of November, 2020

---

**Joint Application of**

**AMERICAN AIRLINES, INC.**
**BRITISH AIRWAYS PLC**
**OPENSKIES SAS**
**IBERIA LÍNEAS AÉREAS DE ESPAÑA, S.A.**
**FINNAIR OYJ**
**AER LINGUS GROUP DAC**
**ROYAL JORDANIAN AIRLINES**

**Under 49 U.S.C. §§ 41308 and 41309 for**
**Approval of and Antitrust Immunity for**
**Alliance Agreements**

**Docket DOT-OST-2008-0252**

---

## ORDER TO SHOW CAUSE

### I.  SUMMARY

By this Order, the U.S. Department of Transportation (the Department) tentatively grants the motion of American Airlines, Inc. (American), British Airways PLC (British Airways), OpenSkies SAS (OpenSkies), Iberia Líneas Aéreas de España, S.A. (Iberia), Finnair OYJ (Finnair), and Aer Lingus Group DAC (Aer Lingus) (collectively, "the Parties") to amend DOT Order 2010-7-8 and extend the existing grant of antitrust immunity (ATI) to Aer Lingus.  The Department, subject to the conditions in this Order, tentatively approves, and grants antitrust immunity for, the set of agreements the Parties have submitted in Appendix 1 of the Joint Motion (Amended JBA).[1]

### II.  BACKGROUND

In 2010, the Department approved, and granted ATI for, alliance agreements among American, British Airways, Iberia, Finnair, and Royal Jordanian (Oneworld Immunized Alliance).[2]  The agreements called for a coordinated revenue-sharing joint venture between

---

[1] Joint Motion to Amend Order 2010-7-8 for Approval of and Antitrust Immunity for Amended Joint Business Agreement (Joint Motion), Dec. 21, 2018, DOT-OST-2008-0252-3427.
[2] Order 2010-7-8, Jul. 20, 2010.

American, British Airways, Iberia, and Finnair (Existing JB).[3]  At that time, the Department concluded that the joint venture, as well as the overall alliance, was, on balance, pro-competitive, and that it would likely generate substantial public benefits to the traveling and shipping public.[4]

In 2015, International Consolidated Airlines Group, S.A. (IAG), the parent company of British Airways, Iberia, and OpenSkies, acquired Aer Lingus.  Aer Lingus, based in Dublin, Ireland, serves 115 destinations in North America and Europe, and provides nonstop service to 13 destinations in North America.  On December 21, 2018, the Parties filed the Joint Motion to expand the Existing JB to include Aer Lingus (Proposed JB).  On December 26, 2018, the Department issued a notice suspending the procedural schedule and granting access to confidential documents.[5]

On January 30, 2019, JetBlue Airways Corporation (JetBlue) filed a motion to consolidate this proceeding with another proceeding, pending at the time, involving Delta Air Lines and its partners.[6]  In support of its motion to consolidate, JetBlue argued that Aer Lingus' inclusion in the Existing JB would necessitate regulatory scrutiny given its potential impact on transatlantic competition and IAG's increased London slot portfolio since the Department granted ATI to the Parties in 2010.  The Department denied the motion to consolidate the cases.

On November 7, 2019, the Department issued an order requesting additional information from the Parties.[7]  The Parties replied on February 6, 2020[8] and again on June 5, 2020.[9]  The Parties subsequently addressed discrepancies with the data they submitted on June 5 and re-submitted the corrected data on July 27, 2020.  On August 13, 2020, the Department issued a notice declaring the record substantially complete and establishing a procedural schedule.[10]  In that notice, the Department stated that it is "coordinating with the [United Kingdom's Competition and Markets Authority (CMA)] as that authority reviews and seeks to address potential competition concerns regarding transatlantic competition.[11] The Department's decision in this matter may address issues present in this case record that are also being reviewed and addressed by the CMA."

---

[3] The joint business was initially between American, British Airways, and Iberia, with Finnair added in 2013.

[4] Order 2010-7-8, Jul. 20, 2010, at 1-2.

[5] Notice (Access to Documents and Suspension of Procedural Schedule), Dec. 26, 2018, DOT-OST-2008-0252-3428.

[6] Motion of JetBlue Airways Corporation to Consolidate and Petition for Reconsideration of Order 2019-1-3, Jan. 30, 2019, DOT-OST-2008-0252-3431.

[7] Order 2019-11-3, Nov. 7, 2019.

[8] Response to Order Requesting Additional Information, Feb. 5, 2020, DOT-OST-2008-0252-3441.

[9] Supplemental Confidential Joint Response to the Department's November 7, 2019 Information Request, Jun. 5, 2020, DOT-OST-2008-0252-3443.

[10] Notice Establishing Procedural Schedule, Aug. 12, 2020, DOT-OST-2008-0252-3444.

[11] *See* UK CMA Investigation of the Atlantic Joint Business Agreement, case number 50616, available at https://www.gov.uk/cma-cases/investigation-of-the-atlantic-joint-business-agreement.

### III.  RESPONSIVE PLEADINGS

The Department received answers from JetBlue and Delta.  The Parties, Delta, and JetBlue filed replies.  The pleadings, as well as the complete public record of the case, can be found at www.regulations.gov by searching for Docket DOT-OST-2008-0252.

*Answer of JetBlue*

JetBlue filed an answer on September 9, 2020.  JetBlue states that it does not take any position on the merits of the instant motion, provided that the Department maintains or expands the London-Heathrow Airport (LHR) remedies in place, including that the remedy slots be made available to new-entrant carriers.[12]  JetBlue notes that it has been a (non-immunized) partner with Aer Lingus since 2008 and hopes to maintain and grow that relationship as JetBlue launches its own transatlantic services.  Likewise, JetBlue states that, while it and American have recently announced a proposed partnership focusing on Boston and New York City, JetBlue's future transatlantic operations are excluded from this partnership.  JetBlue argues that because of this, it is and will remain a vigorous, independent competitor in the transatlantic market.

JetBlue argues that the U.S.–LHR market has become even more concentrated since 2010, with the Oneworld and SkyTeam alliances now controlling over 70 percent of LHR slots.  JetBlue states that carriers that may have been new entrants in 2010, such as Delta and Virgin Atlantic, are now part of dominant immunized alliances, while LCC's have largely left the market, reducing competition.  Given these facts, JetBlue argues that the 2010 slot remedy should be restructured to address the lack of access at LHR for new entrant carriers.  JetBlue argues that providing remedy slots to JetBlue or other new entrants will not affect the existing or planned operations of incumbent carriers given their capacity reductions related to COVID-19.  JetBlue states that the U.S.–LHR market is open in name only as no slots are available for new entry and competition.  JetBlue argues that only government action will enable JetBlue to enter the market and compete with the existing alliances.  JetBlue states that it is the best-positioned carrier to enter the U.S.–LHR market and provide vigorous competition.  JetBlue supports an extension of the 2010 remedy, including maintaining two of the four slot pairs on a one-stop flex basis.  However, JetBlue argues that the existing remedy slot holders have more than enough slots to operate their existing and planned operations.  Therefore, JetBlue argues that the remedy should be modified to allow for the reallocation of the remedy slots to JetBlue.

*Answer of Delta*

Delta filed an answer on September 9, 2020.  Delta states that it is a strong proponent of the Department's ATI framework and believes strongly in the consumer benefits generated by immunized airline alliances that are supported by much empirical evidence.  Delta has no objection to the motion at hand, so long as the Department takes appropriate steps to ensure competition is not foreclosed at LHR.  Delta states that it does not dispute the Department's findings in Order 2010-7-8, or the nature and scope of the benefits claimed by the applicants in their motion.  However, Delta argues that the concerns raised in 2010 by the Department and the European Commission's Directorate-General for Competition (DG COMP), specifically the applicants' dominant slot position at LHR, must be addressed in any order granting ongoing ATI

---

[12] We use the terms "remedies" and "commitments" interchangeably.

to the Parties.  Delta points to the fact that the Parties' slot share at LHR has grown from 46 to 59 percent since 2010, while Delta's has remained steady at eight percent.  Delta further states that, for various reasons, LHR slots remain largely unattainable for competitors.  Delta states that it has participated in a consultation process with the U.K. Competition and Market's Authority (CMA) regarding potential remedies where Delta has suggested that the CMA temporarily extend the existing Commitments.  Delta urges the Department to condition any ATI grant in the instant proceeding on the continuing enforcement of the existing commitments for the duration of the ATI grant, and that any order granting ATI should indicate that the Department will undertake a comprehensive review of the Proposed JB if the current commitments are allowed to expire or are otherwise diluted.

*Reply of the Parties*

The Parties submitted a reply on September 16, 2020, noting that neither of the answers filed by Delta and JetBlue question the consumer benefit claims developed in the case record, and neither answer opposes granting ATI.  The Parties state that both answers focus instead on the slot situation at LHR.  The Parties contend that the LHR slot situation is already under investigation by the CMA and is unrelated to the issues pending in the motion before the Department.  The Parties argue that, given the CMA review, the Department's coordination with the CMA on that review, and the CMA's consultations with Delta and JetBlue, the issues raised in the replies are more properly raised with the CMA.  Therefore, the Parties argue that the Department need not take action on the requests of Delta and JetBlue.  To do so, they argue, would undermine the Department's cooperation with the CMA and interfere with the outcome of the CMA's review.  Furthermore, the Parties argue that the Department need not address Delta's request to condition an ATI grant on a comprehensive review of the joint business if the commitments expire or are otherwise weakened, since the Department retains the authority to review any grant of ATI at any time.

*Reply of Delta*

Delta filed a reply to JetBlue's answer on September 18, 2020.  Delta argues that JetBlue makes multiple implausible statements regarding its proposed strategic partnership with American; while JetBlue portrays itself as a maverick competitor to the American–British Airways alliance on Heathrow routes, its decision to enter into a partnership with American contradicts this position.  Delta contends that the proposed Northeast Alliance (NEA) between JetBlue and American amounts to a market allocation agreement covering flights to and from Boston and New York City, creating interdependence, not independence, between the carriers.  Delta argues that, if approved, the NEA should disqualify JetBlue from receiving any LHR remedy slots.  Delta states that rather than competing head-to-head at New York City and Boston, JetBlue and American will rationalize and optimize service in the two cities to better feed American's current and JetBlue's prospective transatlantic services, rendering JetBlue an ineffective competitor on those transatlantic services.  Delta argues that recent network and schedule announcements by the carriers indicate that this coordination has already begun.  Delta further argues that JetBlue's restraint from seeking additional LHR divestitures in its answer suggest that it is already reluctant to take an aggressive approach against American.  For these reasons, Delta argues that, for purposes of this proceeding, JetBlue should be considered at least "connected" to American and therefore precluded from receiving any LHR remedy slots.

*Reply of JetBlue*

JetBlue filed a reply in response to Delta's answer on September 18, 2020.  JetBlue agrees with Delta that DOT should only extend an ATI grant in this case if a robust LHR slot remedy is "preserved and extended" for as long as the Parties retain ATI.  Rather than simply allowing Delta to retain remedy slots for an extended period, despite significantly changed competitive circumstances and developments since 2010, JetBlue urges DOT to reallocate slots to enable JetBlue's entry into U.S.–LHR markets.  JetBlue argues that Delta, along with its joint venture partners, is one of the largest slot holders at LHR and the second-largest operator in the U.S.–LHR market. JetBlue claims it is the only new-entrant carrier positioned to enter the market and compete with the Proposed JB and the Blue Skies joint venture.  JetBlue argues that Delta understates its LHR slot holdings by omitting those held by its joint venture partner Virgin Atlantic and as such, no longer needs the remedy slots to retain access to LHR.  JetBlue states that, based on announced schedule reductions, Delta will hold at least four extra slot pairs for summer-2021 compared to summer-2020.  JetBlue states that it has no objection to a one-year extension of the existing remedy framework, so long as the Department requires that one additional slot pair be made available on the Boston–LHR route, and that Delta–Virgin Atlantic will no longer be eligible for remedy slots beyond March 2022 due to changed circumstances. JetBlue argues that the Department retains independent authority to administer the 2010 slot remedy, as it did not impose a ten-year limit on the remedy as did DG COMP.  JetBlue reiterates that the Department should restructure and repurpose the 2010 remedy to reallocate the slots to new entrants, thereby increasing competition and consumer choice in the U.S.–LHR market.

## IV.  STATUTORY STANDARDS

In reviewing applications for a grant of ATI, the Department typically engages in a two-step process, first conducting a competitive analysis under § 41309 and a public benefits analysis under § 41308.  In the forthcoming sections, we will examine the competitive issues raised by commenters and discuss the public benefits claimed by the Parties.

If the Department concludes, after its initial review of the application under section 41309(b), that the agreements are not adverse to the public interest, section 41309(b) directs us to approve the agreements.  In that case, the Department next examines whether there are sufficient public benefits to grant ATI under section 41308(b).  The Department's public interest analysis under both sections 41309(b) and 41308(b) entails a balancing of any anti-competitive effects against likely public benefits.  The standard in section 41308(b) ("required by") is higher than that in section 41309(b) ("not adverse to").  A party opposing approval of an agreement has the burden of demonstrating that the agreements would substantially reduce or eliminate competition.

Immunized alliances allow two or more carriers to achieve merger-like efficiencies in covered markets.  Because approval of the Amended JBA would have intended commercial effects similar to those resulting from a merger, the Department examines the Joint Motion under the Clayton Act test.  The Clayton Act test is used to predict the competitive effects of a proposed merger, and requires us to consider whether a grant of ATI is likely to reduce competition substantially and facilitate the exercise of market power.  The Department applies the Clayton Act test to determine whether approval of the Joint Motion would allow the applicants to profitably charge supra-competitive prices or reduce service or product quality below competitive levels in any relevant market.  In examining whether an alliance is likely to

create or enhance market power, we examine: (1) whether the alliance would significantly increase market concentration; (2) whether the alliance would cause potential competitive harm; and (3) whether new entry into the market would be timely, likely, and sufficient either to deter or to discipline the potential competitive harm.

Where new entry would not otherwise be sufficient to address competitive harm, or where there are external factors, such as infrastructure constraints in the marketplace that exacerbate competitive harm, remedies may be necessary to address potential competition problems resulting from the alliance.

## V.   COMPETITIVE ANALYSIS

The Department, in the competitive analysis of the Parties' Joint Motion, assesses impacts on competition resulting from the Proposed JB by undertaking analysis of relevant markets, including at a broad network level, a country-pair level, and a city-pair level. The focus of our analysis is the impact on competition resulting from the addition of Aer Lingus to the Existing JB.

*Network Level*

The geographic scope of the alliance is transatlantic services between North America and Europe. Aer Lingus serves up to 14 destinations in North America to/from Ireland, with connecting options intra-Ireland, as well as to the United Kingdom and continental Europe. The carrier, through its hub in Dublin, offers onward connections to 47 destinations in Europe, including 12 unique European destinations to which American currently does not market services. The Dublin hub is well suited to offer connecting itineraries, and the Department has, in past grants of ATI (including the Existing JB) looked to Aer Lingus' connecting competition as a potential disciplining force to counteract immunized alliances. Prior to the COVID-19 public health emergency, Aer Lingus was one of the largest transatlantic operators, after Norwegian Air Shuttle (inclusive of its affiliates referred to as "Norwegian"), that is not currently part of the three transatlantic joint ventures. While the Proposed JB will limit Aer Lingus' disciplining potential, Aer Lingus only carries three percent of travelers between the United State and Europe. With a relatively small market share, and absent the loss of any further independent competitors with a material share of U.S.–Europe traffic, we do not expect the Proposed JB to impact competition significantly at the broader U.S.–Europe level.

*Country-Pair Level*

At the country-pair level, the U.S.–Ireland market is the only identified relevant market where Aer Lingus has a significant market share. In this market, Aer Lingus is the largest competitor at 44 percent and, with the Proposed JB, its share will rise substantially to just under 60 percent (see Figure 1). This represents a significant market share, with potential anticompetitive implications. However, with the combination of Aer Lingus with the Existing JB carriers, four carriers remain in the market, with the second largest carrier being Norwegian, a low-cost carrier (LCC) that has shown an aggressive ability to challenge established carriers in the transatlantic market with its low-fare pricing model. Several carriers on both sides of the Atlantic have on order newer narrow-body aircraft, such as derivatives of the Airbus A321-neo

and Boeing 737 Max families of aircraft.  These aircraft offer the capability of transatlantic flying with relatively fewer seats and lower trip costs, and are potentially suited to markets such as the east coast of the United States to Ireland.  Given the presence of an LCC with substantial market share pre-COVID, the relatively low barriers to entry that will be further reduced, and the presence of three other competitors to Aer Lingus, the Department anticipates ample competition will exist to thwart any potentially anticompetitive behavior that could result from approving the Proposed JB.

*Figure 1*



SABRE Market Intelligence – YE 2019Q1

*City-Pair Level*

In analyzing the relevant city-pair markets for a transaction, the Department typically reviews two elements.  First, the Department assesses travel in all city-pair markets, on a connecting and nonstop basis, to determine the potential for a significant reduction in competition—referred to as share-shift analysis.  Second, the Department identifies nonstop overlap routes where the Proposed JB carriers both operate services, and assesses the competitive consequences in such markets.

As part of the share-shift analysis, all origin and destination (O&D) city pairs between the United States and Europe are stratified based on passenger density (*i.e.*, number of O&D passengers per day), stage length (route distance), and the number of carriers competing on that route, with competitors being defined as those airlines with greater than five percent market share.  Aer Lingus' shares are then combined with the Existing JB carriers' share to reflect a single operating entity and comparisons are made between the pre- and post-ATI number of competing carriers to identify markets that could be significantly affected.

*Table 1*

### Share-shift Analysis Summary[13]

| Competitors *Pre*-ATI | Competitors *Post*-ATI | Markets | Bi-directional Passengers | Percent of Total Passengers |
|---|---|---|---|---|
| 2 | 1 | 20 | 326,616 | 0.5 % |
| 3 | 2 | 80 | 769,411 | 1.3 % |
| 4 | 3 | 283 | 2,539,283 | 4.1 % |
| 5 | 4 | 88 | 3,068,420 | 5.0 % |
| 6 | 5 | 12 | 222,464 | 0.4 % |
| 1 | 2 | 3 | 2,455 | 0.0 % |
| 2 | 3 | 29 | 336,481 | 0.6 % |
| 3 | 4 | 14 | 1,198,209 | 1.9 % |
| 4 | 5 | 4 | 3,416 | 0.0% |
| No Change | | 5,060 | 53,061,197 | 86.2 % |
| *Total* | | *5,593* | *61,527,952* | *100%* |

MIDT Adjusted T100 – YE 2019Q1

Results of the share-shift analysis reveal that the addition of Aer Lingus to the Existing JB would be unlikely to impact competition for 90 percent of U.S.–Europe passengers. Markets that go from three to two, or two to one competitors raise the most significant concern, and they represent less than two percent of all U.S.–Europe passengers in 100 out of a total of 5,593 markets. The remaining markets that may see a loss of a competitor will have ample competition from remaining competitors.

Next, we assess the two nonstop overlap markets where Aer Lingus directly competes with American using year ending first quarter of 2019 MIDT and T100 data: Chicago–Dublin, and Philadelphia–Dublin. The city-pair market of Chicago–Dublin would go from three competitors to two following the consummation of the transaction with the Proposed JB accounting for just over 75 percent of market share. Aer Lingus is the only carrier with year-round service, while American and United offer summer-seasonal service. The city-pair market of Philadelphia–Dublin is a two to one competitor market, split approximately 60-40 between American and Aer Lingus, with both carriers offering year-round service.

The Philadelphia–Dublin market will see a significant reduction in competition on a year-round basis, while Chicago–Dublin will be impacted during the summer season. Despite the competition concerns, the markets have limited barriers to entry and the opportunity for several intervening hubs to offer connecting competition that would restrain the ability of the Proposed JB to offer sustained increases in fares. These hubs include Newark, New York City-Kennedy, Boston, Reykjavik, and Toronto-Pearson. Furthermore, Philadelphia is within narrow-body aircraft range of Dublin, and as LCCs take delivery of next generation aircraft, the threat or even actualization of market entry will provide further competition to the overlap markets, as well the handful of markets that were identified as competitive concerns in the share-shift analysis.

---

[13] Markets in which the number of competitors increases post-ATI are due to Aer Lingus and the Existing JB carriers being below the five-percent threshold to be counted as a competitor pre-ATI, but above five percent once combined.

In summary, the competitive analysis shows that the addition of Aer Lingus to the Existing JB may enhance the Parties competitive position in the U.S.–Ireland market, with a significant reduction in competition on the two overlap routes as well as a handful of connecting markets. However, the arrival of the next generation of aircraft will bring Ireland within range of more LCC competition, the existing presence of an LCC competitor (Norwegian) in the U.S.–Ireland market, and the presence of some intervening hubs to offer a limited amount of connecting competition, will help to address many of the competitive concerns identified. These assumptions are predicated on new competition, particularly LCC competitors in the transatlantic market, and the track record of LCC business models in the transatlantic remains unclear. We note Norwegian's struggle as of late and great uncertainty surrounding the company's future, the recent demise of WOW air, as well as other recent transatlantic upstarts. Given this uncertainty, and the loss of Aer Lingus as an independent transatlantic competitor, we are proposing to review the Parties' Proposed JB in five years, as discussed below. Upon review of the evidence in the record, the Department tentatively concludes that, subject to the conditions in this Order, the Amended JBA does not substantially reduce competition, is not adverse to the public interest, and should therefore be approved under section 41309.

## VI.  PUBLIC BENEFITS

Our public benefits examination focuses on whether the Amended JBA, with its addition of Aer Lingus to the Existing JB, would increase the public benefits on which the grant of ATI for its predecessor agreement was predicated. We note that none of the parties that filed responsive pleadings on the record disputed the claimed public benefits from the Proposed JB. Based upon our review of the case record, we expect that the inclusion of Aer Lingus to the Existing JB will generate substantial public benefits and add to the consumer benefits generated by the Existing JB that the Parties cite in the Joint Motion.

The Department has recognized several forms of public benefits that immunized joint ventures can foster, including: reductions in double marginalization,[14] cost and operational efficiencies, broader network coverage (resulting in more paths between a given origin and destination), network and capacity coordination, increased capacity (beyond a market's expected growth rate), and alignment of frequent flyer benefits.[15]  The Parties claim that, in addition to the public benefits that have been derived to-date from the Existing JB, the Amended JBA will generate an additional $67 million in incremental consumer benefits annually through increased connectivity, including 72 new unique codeshare destinations; expanding Aer Lingus' service with new connections and routes to North America; introducing a new hub to the Existing JB's network (Dublin), thereby providing more routings between the U.S. and Europe; lower fares; stimulating up to 16,800 new passengers per year; and facilitating a cargo joint business.[16]

---

[14] "Reductions in double marginalization" refers to the phenomenon where itineraries that previously involved interline connections between two carriers were subject to a markup by each carrier.  A JV allows the carriers to price jointly with a single markup—often resulting in a lower price for the total trip.

[15] *See, e.g.*, Order 2008-4-17, Apr. 9, 2008 at 15; Order 2009-4-5, Apr. 7, 2009 at 18-19.

[16] Joint Motion at 3-5.

We examine the likelihood of the benefits claimed by the Parties from the Proposed JB by assessing benefits the Existing JB has delivered since 2010.  As documented in the Joint Motion, the Existing JB has brought about a number of benefits such as increased transatlantic capacity, as well as new nonstop services, including from San Jose, Las Vegas, Austin, New Orleans, Nashville, Fort Lauderdale, Charleston, and Pittsburgh.[17]  Additionally, ATI-enabled schedule alignment has also allowed the carriers to reduce travel times by aligning connecting banks to reduce total elapsed travel time for consumers.[18]  Frequent flier program participants have also gained the ability to earn and redeem miles across all alliance partners, increasing the program's value to consumers.[19]  Finally, the Parties have also invested in technology and infrastructure enhancements to improve consumers' travel experience, including the ability to view all partner's flight options through any partner's website, improved baggage handling accuracy, automatic re-accommodation for cancelled or delayed flights, and enhancements to lounges and terminal locations.[20]

Approximately 44 percent of U.S.–Ireland O&D passengers connect to reach their destination, with 27 percent connecting in the U.S., and 15 percent in Europe (see Figure 2). With a substantial number of passengers connecting, and the inherent distances that are involved in transatlantic travel, the Department believes that there is considerable potential for network synergies that would stem from the Proposed JB.  By linking Aer Lingus' network within the Existing JB, this is likely to result in increased connectivity, expanding Aer Lingus' service to/from North America, enhancing the joint business's network, lowering fares, stimulating new demand, and facilitating a cargo joint business.[21]  Aer Lingus will also integrate its frequent flyer program with the Existing JB, allowing passengers to earn and redeem miles across all Proposed JB carriers.

---

[17] Joint Motion at 12-14.

[18] Joint Motion at 18.

[19] Joint Motion at 19.

[20] Joint Motion at 19-21.

[21] Joint Motion at 22.

*Figure 2*



MIDT Adjusted T100 – YE 2019Q1

Our analysis indicates that adding Aer Lingus to the Existing JB will result in public benefits that are greater than any potential competitive harm stemming from the Proposed JB.  In view of the substantial presence of Aer Lingus in the market and its integration into IAG, we also expect the benefits to be substantial and proximate to a final order.  We tentatively find that the public benefits could not be achieved without a grant of antitrust immunity.  Therefore, we tentatively conclude that a grant of immunity is required by the public interest under section 41308, subject to the conditions explained in the following section.

## VII. Conditions

### a. ATI Scope

When making a grant of ATI, the Department's practice is to do so only to the extent necessary to enable the proposed transaction to proceed, and only in conjunction with an approved alliance agreement.[22]  Royal Jordanian, while a party to the Oneworld Immunized Alliance, is not part of a metal-neutral revenue sharing joint venture with the Parties.  The carrier does not offer services between the United States and Europe, which is the geographic scope of the Existing JB and Proposed JB.  Furthermore, American does not serve Amman, Jordan, and there is no overlap in services between Royal Jordanian and American.  The Parties and Royal Jordanian have previously stated that "it is only the closer cooperation through a joint venture based on metal neutrality … that will maximize the consumer benefits that immunized alliances makes possible," and "this lack of network overlap led the Joint Applicants to conclude that the benefits of transatlantic integration could be achieved at this time without including … Royal Jordanian…."[23]  The Parties, in response to the Department's question asking them to elaborate on their cooperation with Royal Jordanian, acknowledged that the benefits of transatlantic

---

[22] *See, e.g.*, Order 2019-8-2, Aug. 2, 2019, at 12.

[23] Joint Application for Antitrust Immunity, Aug 14, 2008, DOT-OST-2008-0252-0001 at 11.

integration has been achieved without Royal Jordanian.[24]  The Parties highlight the number of connecting passengers between American and Royal Jordanian, as well as the codeshare and frequent flyer relationship.  The arrangement between the two carriers is closer in nature to a standard codeshare relationship, which does not require antitrust immunity and is not required by the public interest.  Therefore, we tentatively propose to terminate the Department's prior approval of and grant of ATI to agreements between Royal Jordanian and the Parties six months from the date of a final order in this matter.

### b.  Ongoing Slot Remedies and Compliance with the CMA Interim Measures

When the Department approved the Oneworld Immunized Alliance in 2010, it reached consensus with DG COMP on certain necessary remedies to preserve competition, and incorporated those remedies into its approval.[25]  In 2018, in advance of the remedy's expiration in 2020 and in anticipation of Brexit and potential competitive impacts affecting the United Kingdom, the UK's CMA began an investigation into the Parties' Atlantic Joint Business.

On September 17, 2020, the CMA announced that it would not be able to complete its investigation before the expiry of the commitments, which would result in a lapse of the commitments.  The CMA found that such a lapse would be adverse to the public interest and, as such, decided to implement interim measures that will protect competition while the investigation is completed.  The interim measures will extend the existing commitments for three years (*i.e.*, until March 2024) and allow carriers to utilize the remedy slots through March 2022.  In March 2022, the CMA will conduct a tender process to reallocate the slots for a further two years.  As noted above, the Department has been in coordination with the CMA regarding its separate but overlapping investigation of the Parties' joint business.[26]

In our 2010 approval of the Oneworld Immunized Alliance, the Department identified serious competitive concerns in the U.S.-London market due to access constraints.  We noted that, while the Department and DG COMP arrived at slightly different, yet compatible remedies, it would be in the public interest to establish a single method for implementing the slot remedy, namely, the detailed process conducted by DG COMP.[27]

In its pleadings, Delta argued that it did not oppose a grant of ATI in the instant proceeding, as long as the Department took appropriate steps to protect competition at LHR.  Specifically, Delta argued that ongoing ATI should be conditioned on the continuing enforcement of the existing commitments.  JetBlue, in its pleadings argued, likewise, that competition concerns remain at LHR, but further, that Delta no longer needs the remedy slots that it had been awarded under the DG COMP remedy.  JetBlue believes that the remedy slots should be reallocated to new entrant carriers.  Finally, the Parties argued that the Department need not take action in this proceeding, since all concerns raised by Delta and JetBlue are being investigated by the CMA, in coordination with the Department.

---

[24] Response to Order Requesting Additional Information, Feb. 5, 2020, DOT-OST-2008-0252-3441 at 80.

[25] Order 2010-7-8, Jul. 20, 2010, at 15-20.

[26] The public record of the CMA's investigation can be found at: https://www.gov.uk/cma-cases/investigation-of-the-atlantic-joint-business-agreement.

[27] Order 2010-7-8, Jul. 20, 2010, at 17.

We see merit in the arguments made by Delta, JetBlue, and the Parties. The record supports the ongoing importance of the Parties' joint business slot access remedies in London for transatlantic services. The Department tentatively finds that such ongoing remedies are a necessary condition of the grant of antitrust immunity for an expanded joint business. The interim measures imposed by the CMA satisfy the concerns raised by Delta (that the existing commitments remain in place) and JetBlue (by providing a tendering process for the slots), and they address the Parties' request that we defer action on competition issues while the CMA continues its investigation. Therefore, we tentatively conclude that, as a condition of continuing approval and a grant of antitrust immunity, the Parties must continue to make slots available as directed by CMA's interim measures. The Department will continue to coordinate with the CMA on its investigation and implementation of the interim measures, as well as conduct its own reviews of competitive conditions as needed.

### c. Five-year Review

The Department tentatively proposes to review its grant of ATI five years from the date of a final order in this matter. In its review, the Department will use information submitted by the Parties to undertake analysis of the Proposed JB, including its impacts on fares, capacity, new services, and the level of transatlantic competition. We will assess whether the Proposed JB brought about public benefits or whether there were any undue restraints on competition. However, we are not proposing a *de novo* review with a new application, and the Parties would continue to possess ATI absent any further action by the Department.

We believe a five-year review is necessary in light of the concerns raised in the competitive analysis section of this Order, and the uncertainty regarding critical segments of transatlantic competition. This uncertainty is magnified by the financial adversity faced by the airline industry following the COVID-19 outbreak, which may also affect the Parties' ability to make necessary investments, as well as to realize some of the claimed benefits of the Proposed JB.

### d. Exclusivity

The limitations on new codeshares contained in the Amended JBA[28] are tantamount to an exclusivity clause that the Department has disallowed in several recent ATI decisions.[29] The provisions require any Party that wishes to enter into a codeshare relationship with a third-party carrier within the Amended JBA's geographic scope must first consult with and/or obtain the consent of the other Parties. Given the issues raised in the pleadings concerning transatlantic competition and access at LHR, the Department will not approve, or grant ATI to, alliance agreements that contain provisions that allow a party or parties to the agreements to foreclose actual or potential competition. Therefore, we tentatively determine that the Parties must strike section 2.6 from the Amended JBA and any similar provisions from the accompanying alliance and implementing agreements.

Furthermore, the Department tentatively determines that the Parties must strike exclusivity provisions in bilateral alliance agreements the Department has previously approved with respect

---

[28] Amended JBA § 2.6.
[29] *See*, *e.g.*, Order 2016-11-2, Nov. 16, 2016, at 28; Order 2020-10-13, Oct. 23, 2020, at 32-33.

to the Oneworld Immunized Alliance and the Existing JB.  This includes striking section 3 from the Alliance Agreement between American and British Airways, the Alliance Agreement between American and Iberia, and the Alliance Agreement between American and Finnair.  The Department is proposing to withdraw its approval of and grant of immunity for all agreements and side letters that are in effect for the Oneworld Immunized Alliance and the Existing JB that contain exclusivity provisions, including provisions that require approval of or coordination with another party in order to allow any type of cooperation with a third-party (including interline, codeshare, or frequent flyer cooperation).  These agreements may be submitted to the Department as implementing agreements once exclusivity provisions have been excised, along with the submission of any agreements where conforming changes are also required.

### e.  Annual Reporting

We tentatively find that it is necessary for the Parties to report to the Department commercial developments in the alliance and the degree to which the anticipated public benefits are being realized.  As in our previous ATI decisions, we are proposing annual reports.[30]  The reports should focus on progress made toward implementing the Amended JBA and its stated goals, present or future planned cooperation among the alliance partners in all core airline functions, a discussion of the public benefits that are being realized, and compliance with commitments.

### f.  O&D Survey Data Reporting

Consistent with its past practice of granting ATI, the Department has tentatively decided to require the foreign carrier applicants to begin or continue to report full-itinerary Origin-Destination Survey of Airline Passenger Traffic ("O&D Survey") information for all passenger itineraries that contain a United States point.  The duty encompasses all traffic to third countries in which the itinerary includes a U.S. point.  Without this data, we would be severely limited in monitoring the competitive effects of the proposed alliance, as we receive no detailed market information for passengers traveling to or from the United States when their entire trip is on the foreign carrier, except for T-100 data for nonstop and a handful of single-plane markets.

Our basis for proposing this condition is the same as in previous cases, as are the terms, conditions, and limitations that DOT proposes for its use of the data.[31]  To prevent this reporting requirement from unfairly harming the foreign carrier applicants' competitive position, we tentatively decide to grant confidentiality to their O&D Survey reports and special reports on codeshare passengers.  Foreign carriers are not provided access to O&D Survey reports submitted by U.S. carriers.  It would place the foreign carrier applicants at a competitive disadvantage to allow their rivals to see their information on an unreciprocated basis.

### g.  IATA Tariff Activities

As we have found in earlier decisions, it is contrary to the public interest to permit immunized air carriers to participate in certain price-related coordination that is already immunized within International Air Transport Association (IATA) tariff coordination.  We therefore tentatively decide to condition our grant of antitrust immunity by requiring the Joint

---

[30] See e.g., Order 2008-5-32, May 22, 2008, at 3; Order 2009-7-10, Jul., 10, 2009, at 26.
[31] See, e.g., Order 2016-11-2, Nov. 4, 2016, at 31.

Applicants to withdraw, or to remain withdrawn, from participation in any IATA tariff activities that affect or discuss any proposed through fares, rates, or charges applicable between the United States and any countries whose airline(s) have been or are subsequently granted antitrust immunity by the Department for participation in similar alliances. Such countries include the homelands of the applicants. We tentatively find that this condition is in the public interest for the same reasons stated in DOT Order 2010-7-8.

### h. CRS and GDS Issues

Consistent with recent cases, we are not proposing any conditions regarding the management of Computer Reservations System (CRS) or Global Distribution System (GDS) interests.[32] Any coordination between the applicants concerning the operation of separate businesses, such as CRSs, would not be transactions specifically approved or necessarily contemplated by our orders in this proceeding. While the Joint Applicants, individually or collectively, may maintain an interest in a CRS, the grant of immunity in this Order thus would not extend to their management of those interests. On the other hand, the applicants' alliance relationships will likely require the coordination of the presentation and sale of the airlines' own services in GDSs and each airline's operation of its internal reservations systems. Those activities will necessarily be covered by a grant of antitrust immunity.

### i. Operation Under a Common Name

Because implementation of the Amended JBA could raise important consumer issues and "holding out" questions, if the Joint Applicants choose to operate under a common name or use "common brands," they must seek separate approval from the Department prior to such operations. For example, it is Department policy to consider the use of a single air carrier designator code by two or more airlines to be unfair and deceptive unless the airlines give reasonable and timely notice to passengers of the actual operator of the aircraft.[33]

**ACCORDINGLY:**

1. We direct all interested persons to show cause why we should not issue an order making final our tentative findings and conclusions discussed herein. Objections or comments to our tentative findings and conclusions shall be due no later than 14 calendar days from the service date of this Order, and answers to objections shall be due no later than 7 business days thereafter. In the event that no objections are filed, all further procedural steps shall be deemed waived, and we may enter an order making final our tentative findings and conclusions;

2. We tentatively approve the Joint Motion submitted by American Airlines, Inc., British Airways PLC, OpenSkies SAS, Iberia Líneas Aéreas de España, S.A., Finnair OYJ, and Aer Lingus Group DAC to amend Order 2010-7-8, and to approve and grant antitrust immunity for agreements the Parties have submitted in Appendix 1 of the Joint Motion. Tentatively, the approval and grant of antitrust immunity would be limited as follows:

[32] See, e.g., Order 2008-5-32, May 22, 2008.
[33] See 14 C.F.R. § 399.82.

a. The approval and grant of immunity will expire six (6) months from the date of a final order in this matter unless the Parties strike section 2.6 of the Amended and Restated Joint Business Agreement and submit a complete and unredacted copy of the revised agreement to the Director of the Office of Aviation Analysis;

b. The approval and grant of immunity will expire six (6) months from the date of a final order in this matter unless the Parties submit to the Department, as implementing agreements, any previously approved agreement(s) governing the Proposed JB that contain exclusivity clauses or other provisions that limit or hinder the ability of a Proposed JB carrier to engage in any third-party cooperative agreement or relationship.  The submitted agreement(s) shall remove all exclusivity clauses and restraints on any type of commercial cooperation.  Six months after a final order is issued in this matter, the Department's approval of, and grant of antitrust immunity for, any previously approved and immunized agreement between the Parties that still contain exclusivity clauses will cease;

c. The approval and grant of immunity will expire six (6) months from the date of a final order in this matter unless the Parties submit to the Department, as implementing agreements, any previously approved agreement(s) governing the Proposed JB to which Royal Jordanian is a party.  Six months after a final order is issued in this matter, the Department's approval of, and grant of antitrust immunity for, any previously approved and immunized agreement amongst the Parties to which Royal Jordanian is still a party, will cease, and Royal Jordanian will no longer have a grant of antitrust immunity.

3. We tentatively direct the Joint Applicants to continue complying with the slot access commitments required by Order 2010-7-8, ordering paragraph 4, as implemented by the European Commission's Commitment Package, now extended and modified by the UK's Competition and Markets Authority in interim measures announced on September 17, 2020;

4. We tentatively direct the Parties to submit annual progress reports, as described in this Order, to the Director of the Office of Aviation Analysis, beginning one year from the effective date of ATI, and continuing each year thereafter while the alliance agreements are effective;[34]

5. We tentatively determine that the Department will undertake a review of its grant of antitrust immunity in five years' time to assess whether potential benefits have been realized, and the impacts on competition in relevant markets.  We propose that the grant of immunity is indefinite unless the Department takes action pursuant to Ordering Paragraph 11;

6. We tentatively direct British Airways PLC, OpenSkies SAS, Iberia Líneas Aéreas de España, S.A., Finnair OYJ, and Aer Lingus Group DAC, to begin or continue to report full-itinerary

---

[34] We expect the Parties to deliver the progress report by the close of business on the anniversary date of the issuance of a final order.  If that date falls on a weekend or federal holiday, the Parties may deliver the report by the close of business on the following business day.

Origin-Destination Survey of Airline Passenger Traffic for all passenger itineraries that include a US point;[35]

7.  We tentatively determine that the Parties shall submit for prior approval any subsequent subsidiary agreements implementing their immunized alliance;[36]

8.  We tentatively determine that the Parties shall obtain prior approval if they choose to hold out service under a common name or use common brands;

9.  We tentatively direct American Airlines, Inc., British Airways PLC, OpenSkies SAS, Iberia Líneas Aéreas de España, S.A., Finnair OYJ, and Aer Lingus Group DAC, to remain withdrawn from participation in any International Air Transportation Association tariff coordination activities that discuss any proposed through fares, rates, or charges applicable between the United States and any countries whose airlines have been or are subsequently granted antitrust immunity, or renewal of immunity, to participate in similar alliance activities with a U.S. airline(s).  We tentatively delegate to the Director of the Office of International Aviation the authority to determine the applicability of the directive set forth in this paragraph as to specific prices, markets, and tariff coordination activities, consistent with the scope and purpose of the condition, as previously described;

10. We tentatively determine that we may amend, modify, or revoke this authority at any time, without hearing; and

---

[35] We expect foreign-carrier applicants to report the O&D Survey data beginning with the first full quarter following the date of the issuance of a final order.  Detailed instructions are available from the Department's Office of Airline Information at the Bureau of Transportation Statistics.

[36] Regarding this requirement, we do not expect the Parties to provide the Department with minor technical understandings that are necessary to implement fully their day-to-day operations, but that have no additional substantive significance. We do, however, expect and direct them to provide the Department with all unredacted contractual instruments that implement or materially alter, modify, or amend the cooperation agreements, joint ventures, or confidentiality/antitrust guidelines.  Any appropriate documents shall be submitted to the Director of the Office of Aviation Analysis.

11. We will serve this Order on all parties on the service list in this docket.


By:



**JOEL SZABAT**
Assistant Secretary
Aviation and International Affairs

(SEAL)


*An electronic version of this document is available at*
https://www.regulations.gov