# EXHIBIT J

Order 2010-10-4
Served: October 6, 2010



**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 6th Day of October, 2010

| | |
|---|---|
| **U.S.-Japan Alliance Case** | **Docket DOT-OST-2010-0059** |

**SHOW CAUSE ORDER**

### I.   SUMMARY

By this order, the Department of Transportation tentatively grants approval of and antitrust immunity ("**ATI**") for the separate applications of (1) Star Alliance members All Nippon Airways Co., Ltd,[1] Continental Airlines, Inc.,[2] and United Air Lines, Inc. ("**NH/CO/UA**" or "**Star**")[3] and (2) American Airlines, Inc., and Japan Airlines International Co. Ltd. ("**AA/JL**" or "**oneworld**").    The tentative decisions in this order are conditioned upon the U.S.-Japan Open Skies aviation agreement being applied.

The Star applicants and oneworld applicants (collectively, the "**ATI Applicants**")[4] have requested a grant of immunity from the U.S. antitrust laws to operate separate commercial alliances: for the Star applicants, a Joint Venture Agreement ("**JVA**"), and for the oneworld applicants, a Joint Business Agreement ("**JBA**").    These air carriers already have basic

---

[1]    All Nippon Airways Co., Ltd. includes its wholly-owned subsidiary, Air Japan Co., Ltd.

[2]    Continental Airlines, Inc. includes its wholly owned subsidiary, Air Micronesia, Inc. ("AMI"), and AMI's subsidiary, Continental Micronesia, Inc.

[3]    For the purpose of our analysis, we have considered United and Continental to be separate entities.  On May 2, 2010, United's parent company, UAL Corporation ("UAL") and Continental announced their intention to merge operations, whereby a wholly owned subsidiary of UAL will merge with and into Continental, with Continental surviving as a wholly owned subsidiary of UAL. Upon completion of the merger, UAL would be the parent company of both United and Continental, and UAL's name would change to United Continental Holdings, Inc.  The merger agreement was approved after separate antitrust review at the U.S. Department of Justice on August 27, 2010.  The planned merger also received clearance by the European Commission on July 27.  On August 30, the Department issued a *pendente lite* exemption, which allows the two air carriers to operate under the common ownership of United (Order 2010-8-15).  This exemption is contingent upon Continental and United remaining separate and independently operated corporations pending the Department's action on the air carriers' *de facto* route transfer application.  The shareholders approved the merger on September 17, 2010, and it closed on October 1, 2010.

[4]    The Department conducted separate analyses of each application.  Where findings are specific to an individual application (**NH/CO/UA** or **AA/JL**), that application is noted.  Where findings are relevant to both applications, the term "**ATI Applicants**" is used.  Also, common names of carriers are used: ANA, Continental, United, American, and JAL, respectively.

marketing agreements in place to sell each other's products and services.  If the Star and oneworld Applications are approved in a final order, the members of each alliance will be able to utilize antitrust immunity to more closely coordinate their own international operations and launch integrated joint ventures in transpacific markets.

Based on our evaluation of the Star Application and oneworld Application,[5] we tentatively determine that, overall, each alliance will be procompetitive.  In reaching this conclusion, we make the following tentative findings: (1) inter-alliance competition would likely be strengthened in U.S.-Asia and U.S.-Japan markets as result of immunizing the Star applicants and the oneworld applicants and (2) market forces are likely to address potential competitive effects in the six city-pair markets,[6] including Washington-Tokyo and Chicago-Tokyo, in which multiple members of one or both ATI Applicants currently provide nonstop service.

By sharing risk and optimizing the joint network, the Star applicants and oneworld applicants each state that they will be able to accelerate the introduction of new capacity, give consumers more travel options and shorter travel times, and reduce fares due to the elimination of multiple additions by each carrier to the fare.  Because both (1) American and JAL and (2) United, Continental, and ANA engage in codesharing[7] and have experience as alliance partners, we tentatively determine that the ATI Applicants have, via their respective ongoing cooperative ventures, demonstrated the inclusion of a broad network of routes, as well as investment in and implementation of compatible systems and procedures that will make it possible to pass on quickly the additional benefits of an immunized alliance to consumers.

We also tentatively conclude that the Star applicants and the oneworld applicants have each made a strong showing that substantial public benefits are likely to result from their proposed immunized cooperation.  These proposed benefits result from a broad range of service, fare, and product improvements.  While antitrust immunity is not necessary to achieve every public benefit envisioned by the Star applicants' JVA or the oneworld applicants' JBA, it is necessary to achieve the most important benefits.  The ATI Applicants have also stated that they will not go forward with their transactions without immunity.

Provided the ATI Applicants abide by the conditions that we propose here, we tentatively conclude that the potential benefits of each application outweigh any potential harm.  Therefore, we tentatively grant antitrust immunity, subject to conditions, separately to (1) the Star applicants and (2) the oneworld applicants.  We direct any interested parties to say why we should not adopt those findings and conclusions in a final order.  Parties have 21 calendar days in which to file answers and seven business days in which to submit replies.

---

[5]   We use the term "Star Application" to mean the application filed by ANA, Continental, and United, all members of the Star Alliance, and the term "oneworld Application" to mean the application filed by JAL and American, both members of the oneworld Alliance.

[6]   These city-pairs are Tokyo and Los Angeles, San Francisco, Honolulu, New York, Chicago, and Washington.

[7]   Initial codeshare authority for Continental and ANA was granted on January 19, 2010 (*see* Docket DOT-OST-2009-0344) and initial authority for United and ANA codesharing was granted on August 7, 1998 (*undocketed*). American and JAL were granted initial codeshare authority on February 18, 1999, and have an application pending to amend that authority (*see* Docket DOT-OST-1999-4994).

## II.   SUMMARY OF THE RECORD

On December 11, 2009, the U.S. and Japan initialed a Memorandum of Understanding ("MOU") that will establish an Open Skies relationship between the two countries when it is signed.[8]   On December 23, 2009, the **Star applicants** filed the NH/CO/UA Application in Docket DOT-OST-2009-0350, which included a written application requesting ATI, copies of the JVA, alliance agreements, and supporting documents.   Seven weeks later, on February 12, 2010, the **oneworld applicants** filed the AA/JL Application in Docket DOT-OST-2010-0034, which included a written application requesting ATI and copies of the JBA and alliance agreements; American supplemented its application with additional information on March 8 and March 9.[9]   Both applications describe plans by the ATI Applicants to launch joint ventures for the carriage of transpacific traffic, focusing on the U.S.-Japan market, and both note that they will not proceed with the proposed joint ventures absent antitrust immunity.

Citing the fact that both cases involve the transpacific market and that certain facts are pertinent to making a decision on both cases, American and JAL moved to consolidate both ATI cases into one proceeding.   ANA, Continental, and United answered on February 24, 2010, stating that they did not oppose consolidation, as long as doing so would expedite a final decision on their ATI application and not result in any delays.   On March 31, by Order 2010-3-10, the Department granted the motion, consolidating both cases into Docket DOT-OST-2010-0059, noting that the two cases involve the same issues pertaining to the effect of immunized alliances in the transpacific market and, in particular, the U.S.-Japan market.   The order also stated that, due to the common facts of each case, joint consideration of the cases would result in a more efficient and expedited ruling.

On December 24, 2009, and February 17, 2010, we issued notices granting interim access to confidential documents submitted with the applications, limited to interested parties who filed confidentiality affidavits.[10]   Based on our review of data submitted by the ATI Applicants, on April 16, by Order 2010-4-9, the Department requested additional information and documentation from the parties.   On May 10, American and JAL provided a joint response to our request for additional information and, on May 14, ANA, Continental, and United provided their joint response to the Department's request.

On June 8, by Order 2010-6-12, we declared the record in the case to be substantially complete and established a procedural schedule for public comments and responses.   Answers were due on June 29 and Replies were due on July 9.

On June 29, the City of Houston and the Greater Houston Partnership ("Houston") and Dallas-Fort Worth International Airport ("DFW") filed answers.   DFW expressed strong support

---

[8]   *See* U.S.-Japan agreement of December 14, 2009, available at
http://www.state.gov/e/eeb/rls/othr/ata/j/ja/133510.htm.
[9]   *See* Docket DOT-OST-2010-0034, Letter from Carol Gosain, Attorney for Japan Airlines, noting the filing of confidential documents; Letter from Carl Nelson, Jr., Attorney for American Airlines noting the filing of confidential documents.
[10]   *See* Docket DOT-OST-2010-0059; Order 2009-12-22, Notice Providing Access to Documents and Suspending Procedural Schedule (December 24, 2009).

for the oneworld applicants, encouraging the Department to promptly approve their application. Houston expressed its support of the Star applicants, urging that their application for ATI be granted as soon as possible and JAL's application for ATI with American "be considered separately and on its own merits without delaying the review of the [NH/CO/UA] application."[11]

In addition to those filed by Houston and DFW, comments were also filed by the Air Line Pilots Association, International, the Allied Pilots Association, and the Association of Flight Attendants.  The three groups expressed concern about the potential effects that the agreements could have on employment opportunities for aircraft crews and requested that the Department approve the agreements with a condition that U.S. carriers conduct a certain portion of the joint ventures' flying.

On February 16, 2010, Mr. Hubert Horan filed an affidavit requesting access to confidential documents, and, on February 19 and 22, three employees of the Dallas-Fort Worth International Airport also filed affidavits.  The Star applicants moved on several occasions to strike all four of these affidavits.  On June 8, by Order 2010-6-12, the Department struck those affidavits on the grounds that the individuals were neither in-house or outside attorneys for a party in the case nor an outside consultant to a party.  On July 8,[12] Mr. Hubert Horan filed an answer requesting that the Department reconsider its position regarding those affidavits.

## III.   DECISIONAL STANDARDS

The requests pending in this docket are for grants of antitrust immunity covering a series of alliance agreements for NH/CO/UA (the "**Star ATI Alliance Agreements**")[13] and AA/JL (the "**oneworld ATI Alliance Agreements**"),[14] respectively.

Under 49 U.S.C §§ 41308-41309, we normally engage in a two-step analysis of foreign air transportation agreements submitted for our approval.  We first determine under § 41309(b) whether the agreements *are adverse* to the public interest because they would substantially reduce or eliminate competition (the "competitive analysis").  If we make that affirmative determination, § 41309 (b)(1)(A) directs us to decide whether they are nevertheless necessary to meet a serious transportation need or to achieve important public benefits; U.S. foreign policy goals are a key element of these benefits.  If we make that finding, and also find that those public benefits cannot be met or achieved by reasonably available and materially less anticompetitive alternatives, we *must* approve the agreements pursuant to § 41308(b).  Section 41309(c)(2) provides that a party opposing approval has the burden of showing that the agreement or request would substantially reduce or eliminate competition and that less anticompetitive alternatives are

---

[11]   *See* Docket DOT-OST-2010-0059; Answer of the City of Houston and the Greater Houston Partnership, at 9 (June 29, 2010).

[12]   We are accepting Mr. Horan's late filing, which was filed without a motion for leave to comment after the Department's deadline, in order to have a full record and because there is no prejudice to any party.

[13]   Star ATI Alliance Agreements are the business agreements listed on page 1 of Exhibit JA-1 of the Joint Application of ANA, Continental and United for Antitrust Immunity (December 23, 2009).

[14]   oneworld ATI Alliance Agreements are the business agreements discussed on page 1 of the Joint Application of American and JAL for Antitrust Immunity (February 12, 2010).

available.  On the other hand, the party seeking approval of the agreement or request must establish the transportation need or public benefits.

If, however, we do not find the agreements to be adverse to the public interest, § 41309(b) directs us to approve them.  In that event, we next decide whether there are sufficient public benefits to grant immunity under 49 U.S.C. § 41308(b) (the "public benefits analysis").  In that subsection, Congress has given the Department the authority to exempt airlines from the antitrust laws to the extent necessary to allow a proposed transaction to proceed, provided that the exemption is *required by* the public interest.  While the public interest determination under both §§ 41309(b) and 41308(b) entails a comparison of anti-competitive effects and public benefits, the standard in § 41308(b) ("required by" rather than "not adverse to") is higher.[15]

The intended commercial effects of the ATI Applicants' respective joint business agreements are similar to those resulting from a merger.  As part of our overall analysis, we apply the Clayton Act test, which is used to predict the competitive effects of a proposed merger.[16]   The Clayton Act test requires us to consider whether a grant of ATI is likely to substantially reduce competition and facilitate the exercise of market power – that is, to allow the ATI Applicants to profitably charge supra-competitive prices or reduce service or quality below competitive levels in any relevant market.  To determine whether an alliance is likely to create or enhance market power, we primarily consider whether the alliance would significantly increase market concentration, whether the alliance causes potential competitive harm, and whether new entry into the market would be timely, likely, and sufficient either to deter or to counteract the potential competitive harm.

## IV.   COMPETITIVE EFFECTS ANALYSIS

Under § 41309(b), we must determine whether the agreements are adverse to the public interest because they would substantially reduce or eliminate competition.  In this section, we conduct an analysis of the changes in competition that would result from approving both applications.  We conduct three levels of analysis for relevant competitive markets: a broad network level, a country-pair level, and a city-pair level.  Additionally, we consider the potential competitive effects of slot constraints at Narita.

### A.   NETWORK LEVEL

The proposed ATI Alliance Agreements involve large global airlines whose networks reach hundreds of points around the world. The core focus of each alliance – (1) by the oneworld applicants, integrating the services of American and JAL, and (2) by the Star applicants, integrating the services of United, Continental, and ANA – will be traffic over the Pacific Ocean. Accordingly, our analysis will focus on evaluating the competitive effects of the proposed transactions in the transpacific market.

---

[15]   *See, e.g.,* Star Alliance, Docket OST-2008-0234, Show Cause Order 2009-4-5, at 18 (April 7, 2009), *quoting* Northwest/KLM, Order 93-1-1, at 11 (January 11, 1993).

[16]   *See* Acquisition of Northwest/Wings Holdings, Inc., Show Cause Order 92-11-27, at 13 (November 16, 1992); SkyTeam II, Show Cause Order 2008-4-17, at 5 (April 9, 2008).

**Table 1**
**Onboard Share in the U.S.-Asia[17] Market**

| Pre-transaction | Passengers | Share | Post-transaction | Passengers | Share |
|---|---|---|---|---|---|
| Delta, Korean (immunized) | 2,794,877 | 27.6% | ANA, Asiana, Continental/Continental Micronesia, United (immunized) | 2,998,260 | 29.6% |
| Asiana,[18] United (immunized) | 1,821,685 | 18.0% | Delta, Korean (immunized) | 2,794,877 | 27.6% |
| JAL/JALways | 1,239,218 | 12.2% | American, JAL/JALways (immunized) | 1,643,681 | 16.2% |
| Continental/Continental Micronesia[19] | 779,742 | 7.7% | Cathay Pacific | 643,734 | 6.4% |
| Cathay Pacific | 643,734 | 6.4% | China Airlines | 508,176 | 5.0% |
| China Airlines | 508,176 | 5.0% | EVA Air | 460,879 | 4.5% |
| EVA Air | 460,879 | 4.5% | Other Traffic | 1,080,564 | 10.7% |
| American | 404,463 | 4.0% | | | |
| ANA | 396,833 | 3.9% | | | |
| Other Traffic | 1,080,564 | 10.7% | | | |
| **Total** | 10,130,171 | 100.0% | **Total** | 10,130,171 | 100.0% |

Source: T-100 traffic data for the 12 months ended December 2009.

There are approximately 20 airlines, including members of the three alliances, operating nonstop scheduled service in the market.  Table 1, above, presents an overview of competition in the U.S.-Asia market.  As these data indicate, the overall U.S.-Asia market is generally competitive. The immunized SkyTeam alliance, anchored by Delta and Korean, held the leading market position in 2009 with 27.6 percent of all passengers.  This market presence is almost ten percentage points higher than the currently immunized Star carriers – Asiana and United – and more than 15 percentage points higher than JAL's share in the market.  In addition to its passenger share in the market, SkyTeam remains a significant competitor due to its strategically placed Seoul hub, which the alliance uses to flow passengers to multiple points not only in Japan, but also throughout Asia.

Historical data suggest that the competitive balance in the overall U.S.-Asia market would ultimately be enhanced by approving both ATI Applications.  Post-transaction, the immunized

---

[17]   For the purposes of this Show Cause Order, "Asia" includes the following: Brunei, Cambodia, China (including the Hong Kong Special Administration Region), Indonesia, Japan, Laos, Malaysia, Mongolia, Myanmar, Philippines, Singapore, South Korea, Taiwan, Thailand,  and Vietnam.

[18]   Asiana is not part of the Star Joint Application. Nonetheless, for the purpose of this analysis, it is grouped with Star because of its existing antitrust immunity with United.

[19]   For the purposes of this analysis, we treat Continental and Continental Micronesia as a single entity.

Star Alliance carriers would capture the largest onboard share, 29.6 percent, two percentage points higher than that of SkyTeam and the largest in the market. An immunized oneworld would carry 16.2 percent of onboard passengers in the market. While an immunized oneworld would have less share in the market relative to its alliance rivals, a grant of immunity would create a more effective competitor in the marketplace (relative to JAL's current presence) and would likely improve oneworld's competitiveness across the Pacific in the long run. Non-immunized carriers would still carry more than 10 percent of passengers in the market, giving consumers options to choose other services and giving the alliances an incentive to pass cost savings and quality improvements along to consumers.

T-100 market data[20] provide a picture of passenger shares in the market. However, booking data from Marketing Information Data Tapes ("MIDT") can offer a more comprehensive view of the competitive effects.[21] The ATI Applicants provided, as part of their applications, MIDT data.[22] As part of our analysis, we evaluate that data to corroborate our tentative findings and reach similar conclusions. Approval of the ATI Applications would establish Star as a second leading alliance, along with SkyTeam, in the U.S.-Asia market. In addition, oneworld would become a more viable third competitor, while independent airlines would continue to hold a competitively significant stake in the market.

We therefore tentatively find that approving the Star Application and the oneworld Application would lead to improved competitive balance in the U.S.-Asia market and would increase the competitive discipline versus SkyTeam.

## B. COUNTRY-PAIR LEVEL

Where multiple carriers in an application provide service to the same market, there is a potential for a reduction in competition in that market. Here, overlapping service in the U.S.-Japan market is provided by ANA, United, and Continental, in the case of the Star applicants, and by JAL and American, in the case of the oneworld applicants. We use T-100 traffic data to evaluate the potential competitive effects of each application in this country-pair.

As shown in Table 2, below, and based on 2009 data, approval of both transactions would likely result in three immunized alliance competitors with comparable market shares and three non-immunized, independent competitors in the U.S.-Japan market. Immunity for the Star applicants and oneworld applicants would make each, with over 30 percent of market passengers, more competitive with the immunized SkyTeam carriers. The anticipated result of approving both applications is, therefore, a balanced competitive inter-alliance dynamic in the U.S.-Japan market.

---

[20]   T-100 market data consist of monthly traffic and operational data for each reporting air carrier, for each city-pair market that the carrier operated, and monthly traffic, capacity and operational data for each aircraft type that the airline flew in each city-pair flight segment,

[21]   *See* Star Show Cause Order 2009-4-5, at 8-10 (April 7, 2009) where the differences between T-100 traffic data and Market Information Data Tapes booking data is explained.

[22]   [Confidential] Star Application and [confidential] oneworld Application.

**Table 2**
**Onboard Share in the U.S.-Japan[23] Market**

| Pre-transaction | Passengers | Share | Post-transaction | Passengers | Share |
|---|---|---|---|---|---|
| Delta, Korean (immunized) | 1,694,187 | 33.6% | Delta/Northwest, Korean immunized | 1,694,187 | 33.6% |
| JAL/JALways | 1,239,218 | 24.6% | American, JAL/JALways (immunized) | 1,582,402 | 31.4% |
| Asiana,[24] United (immunized) | 668,391 | 13.2% | ANA, Asiana, Continental, Continental Micronesia, United (immunized) | 1,580,951 | 31.3% |
| Continental/Continental Micronesia[25] | 515,727 | 10.2% | Other Traffic | 189,670 | 3.7% |
| ANA | 396,833 | 7.9% | | | |
| American | 343,184 | 6.8% | | | |
| Other Traffic | 189,670 | 3.7% | | | |
| **Total** | 5,047,210 | 100.0% | **Total** | 5,047,210 | 100.0% |

Source: T-100 traffic data for the 12 months ended December 2009.

In addition to T-100 traffic data, the Department analyzed other data sources to gain a more complete view of the U.S.-Japan market and verify the claims made by the ATI Applicants in their public filings.[26]  Based on July 2010 Official Airline Guide (OAG) seat share data, and assuming these shares prevail following approval of both ATI Applications, an immunized Star would have 35.9 percent of the seats in the market, immunized SkyTeam would have 34.3 percent, and immunized oneworld would have 26.4 percent.  We tentatively believe this provides further evidence of the competitive balance that would result if both agreements were approved.  While an immunized oneworld would have the smallest stake in the market, we tentatively believe it is sufficient to exert competitive pressure on SkyTeam and Star.

These figures differ slightly from the T-100 data analysis in Table 2, above.  However, they suggest that our tentative decision to approve both the Star Application and oneworld Application would likely result in a more balanced competitive dynamic for the three alliances in the nonstop market and would likely preserve or enhance competitiveness in the U.S.-Japan market overall.

---

[23]    In addition to Tokyo, "Japan" includes airports throughout the country.

[24]    Asiana is not part of the Star Joint Application.  For the purpose of this analysis, they are grouped with Star because of their existing antitrust immunity with United.

[25]    For the purposes of this analysis, we treat Continental and Continental Micronesia as a single entity.

[26]    *See* oneworld Joint Application, Exhibit JA-6, at 2; Star Joint Application, Exhibit JA-8, at 2.  In their public applications, both sets of applicants cite 2009 Official Airline Guide (OAG) and MIDT data to show that the transactions would not disrupt the competitive balance in the U.S.-Asia market.

### C.   CITY-PAIR LEVEL

As explained in Section III, we use traditional antitrust analysis to define relevant markets and measure concentration; city pairs are a relevant market for consideration. We have identified several city-pair markets of potential concern, where at least one carrier operates service that overlaps with another ATI Applicant from the same alliance. In three city-pairs, both ATI Applicants have carriers that overlap with each other.

**Table 3**
**Nonstop Overlap City-Pairs**

| Market | Overlapping Alliances | Post-Transaction Competitors in the Overall Market[27] | Change in Overall Competitors | Change in Nonstop Competitors |
|---|---|---|---|---|
| Washington-Tokyo | Star | oneworld (immunized) SkyTeam (immunized) Star (immunized) | 3 > 3 | 2 > 1 |
| Chicago-Tokyo | oneworld, Star | oneworld (immunized) Star (immunized) | 4 > 2 | 4 > 2 |
| San Francisco-Tokyo | Star | oneworld (immunized) SkyTeam (immunized) Star (immunized) | 4 > 3 | 4 > 3 |
| Honolulu-Tokyo | Star | oneworld (immunized) SkyTeam (immunized) Star (immunized) | 4 > 3 | 4 > 3 |
| New York-Tokyo | oneworld, Star | oneworld (immunized) Star (immunized) SkyTeam (immunized) | 6 > 3 | 5 > 3 |
| Los Angeles-Tokyo | oneworld, Star | oneworld (immunized) Star (immunized) SkyTeam (immunized) Singapore Airlines | 6 > 4 | 6 > 4 |

Source: Star Application (Exhibit JA-14); oneworld Application (Exhibit JA-7). Change in overall competitors does not reflect Hawaiian's announced nonstop service between Honolulu and Tokyo-Haneda.

The six city-pairs, shown in Table 3, above, present the greatest potential for competitive harm, because a grant of ATI would effectively eliminate some competitors from these city-pairs. The resulting increased concentration could, in theory, give one airline or alliance an increased ability to exercise market power to increase fares to supra-competitive levels. The table also shows the change in the total number of competitors (providing both connecting and nonstop service in the market), along with the change in competitors offering only nonstop service on the route.

After identifying the overlap city-pair markets of potential concern, we then determine whether the proposed alliance will give the ATI Applicants the ability to sustainably increase prices or decrease output in any relevant market, and whether the proposed alliance raises competitive concerns in light of factors such as market structure, the likelihood that competing carriers will enter the affected markets if the proposed alliance is approved, and any infrastructure constraints. We also consider changes in both nonstop and connecting

---

[27]   MIDT data YE 2009q4, using a five percent standard. An immunized alliance, carrier, or carrier grouping must have at least a 5-percent stake in the market to be considered a competitor.

competition.  In addition to T-100 traffic data, the Department analyzed other data sources to gain a more complete view of these city-pair markets and verify the claims made by the applicants in their public filings.[28]

As seen in Table 3, four of the six identified markets would have three or more competitors, in both the nonstop and overall markets, if both ATI Applications were approved.  Despite the effective loss of two competitors, Los Angeles-Tokyo would emerge with four carriers, none of whom would have more than a 50-percent share.  Of the six overlapping markets, Los Angeles generates the second largest passenger volume to Tokyo.  We believe that this four-way competition among the three immunized alliances and the major Star carrier, Singapore Airlines, will be sufficient to discipline fares in the market.  Also, SkyTeam[29] and Star carriers plan to launch new nonstop service to Haneda, potentially providing customers additional service options in this market.

Honolulu-Tokyo and New York-Tokyo are two other markets in which a grant of ATI is not likely to alter the competitive landscape.  Honolulu-Tokyo is a large, leisure-oriented market that would lose one competitor if ANA and United are able to cooperate on the route, but will gain one competitor as Hawaiian enters the market with its new Haneda authority, as it plans.  In New York-Tokyo, a grant of ATI would also leave three carriers in a relatively sizeable market.  Each of the three alliances would ultimately have less than a 50-percent stake in the total market, suggesting that no one carrier or alliance would emerge as dominant.  We therefore tentatively find there is little chance for competitive harm in these two city-pair markets.

San Francisco-Tokyo, a hub-to-hub market for Star, would only lose one competitor as a result of ATI, but consolidation would give ANA and United a greater share of the nonstop market.  Should the Star Alliance airlines attempt to increase prices, we believe that passengers will have ample opportunity and incentive to shift to competing services.  Also, oneworld carrier JAL will initiate the only nonstop service between SFO and Haneda, likely an effective means of competing in the competitor's hub-to-hub market.

The two remaining markets, Chicago-Tokyo and Washington-Tokyo, merit additional scrutiny given the potential levels of concentration that would follow grants of immunity.  Chicago-Tokyo would shift from a four-competitor market to a duopoly, while Washington-Tokyo would move from a duopoly to a monopoly on a nonstop basis.  Nonetheless, other factors – aside from the number of competitors in the market – must be analyzed to assess the potential for use of market power.

For example, the local Chicago-Tokyo market is a significantly smaller market, in terms of number of passengers, than New York-Tokyo, Los Angeles-Tokyo, and San Francisco-Tokyo.[30]

---

[28]   *See* oneworld Joint Application, Exhibit JA-6, at 2; Star Joint Application, Exhibit JA-8, at 2.  In their public applications, both sets of applicants cite 2009 Official Airline Guide (OAG) and MIDT data to show that the transactions would not disrupt the competitive balance in the U.S.-Asia market.

[29]   *See* Docket DOT-OST-2010-0018, 2010 U.S.-Haneda Combination Services Allocation Proceeding (July 6, 2010).

[30]   *See* Docket DOT-OST-2010-0059, oneworld Joint Application (Public) Exhibit JA-7.  The oneworld carriers allude to this disparity in size.  Using 2009 MIDT and OAG data, the parties assert that Chicago-Tokyo had 99,231

The Star applicants note that approximately 82 percent of passengers in this relatively thin market use the route as one part of a connecting itinerary.[31]  Furthermore, a small percentage of passengers originating in Chicago currently choose to fly from Chicago to Tokyo on a connecting itinerary, despite the availability of four nonstop service providers.

While Chicago-Tokyo would become a duopoly route, the ATI Applicants would face limited incentives to raise fares above competitive levels because of current connecting traffic volumes.  First, these connecting passengers are not tied to the nonstop route and could select an alternative alliance (SkyTeam) and its connecting hubs to complete their itinerary.  In fact, Chicago-Asia and Chicago-Tokyo will likely remain competitive, based on SkyTeam's extensive connecting opportunities from Chicago to points beyond Seoul, its existing nonstop service to Japan from Detroit and Minneapolis, and its newly awarded Detroit-Haneda service.

We believe that, given this city-pair's unique position as a primary route for two major alliances and given the high volume of connecting traffic between the U.S. and Asian gateways, the Star applicants and oneworld applicants will likely face strong incentives to maintain or expand capacity in the Chicago-Tokyo market.  Failure to do so could ultimately hamper the alliances' abilities to efficiently route connecting traffic.  While the airlines may be able to reap additional profit in the non-stop market by cutting capacity, these gains could come at the expense of profits on behind and beyond routes that are essential to a robust and functional alliance.  We therefore tentatively see little risk of competitive harm to consumers in the Chicago-Tokyo market.

While the Washington-Tokyo nonstop market would become even more concentrated on a nonstop basis than Chicago-Tokyo, there are other competitive factors that merit consideration. The overall Washington-Tokyo market supports the fewest passengers of any of the six overlap city-pair markets of concern, according to the Department's review of MIDT data.[32]  The Star applicants note that over 30 percent of Washington-Tokyo local passengers choose connecting service,[33] despite two current nonstop service options. This portion is larger than the similar one in the Chicago-Tokyo market and indicates the competitive pressure of connecting service. Furthermore, approximately 80 percent of passengers are using that route as a part of a connecting itinerary,[34] reflecting United's hubs on both ends of the route as well as ANA's hub in Tokyo.

These factors, in particular, should limit the Star applicants' incentive to exercise market power on this route.  Post-transaction, two competitors to immunized Star would offer connecting service in the Washington-Tokyo market, giving passengers ample opportunity for competitive options should nonstop fares be increased.  Because most customers flying on the route are using it as one segment of travel from cities behind Washington and/or to cities beyond Tokyo,[35] these passengers can choose from a number of different connecting routings for their

---

annual bookings, while New York-Tokyo had 356,860 annual bookings and Los Angeles-Tokyo had 467,454 annual bookings.

[31]  *See* Docket DOT-OST-2010-0059, Star Joint Application, Exhibit JA-14, at 5.

[32]  [Confidential] Star Application.

[33]  See Docket DOT-OST-2010-0059, Star Joint Application, Exhibit JA-14, at 6.

[34]  *See* Star Joint Application, Exhibit JA-14, at 5.

[35]  *Ibid.*

origin-destination itineraries. Thus, while the Star carriers may want to raise prices on the Washington-Tokyo route, they should face a countervailing incentive to increase capacity – not only to facilitate connecting traffic within their network but also to capture a greater share of those local passengers that have, until now, opted to utilize competitors' connecting itineraries. Although new nonstop entry is less likely in this Star hub-to-hub city pair, connecting travel on competing alliances over Detroit, JFK or Seoul will provide consumers with additional connecting choices.

The Department tentatively finds, therefore, that approving both ATI Applications would not significantly affect competition on the city-pair level, including nonstop overlap markets. We also tentatively find that there are sufficient incentives in the Chicago-Tokyo and Washington-Tokyo markets to encourage continued competition. Because these markets serve as trunk routes for connecting traffic for one or both ATI Applicants, the carriers face strong disincentives to cut capacity and raise prices. We also tentatively conclude that, given the market factors likely to constrain potential competitive harm in a limited number of markets, each ATI Application is, on the whole, pro-competitive.

### D.   INFRASTRUCTURE AND CAPACITY AT NARITA

Narita currently serves as Tokyo's main international gateway airport, where carriers must obtain slots to operate service. In order to ascertain each carrier's presence at the airport, the Department analyzed OAG schedule data for the airport covering July 2010. Our analysis found that, based on these data, no one alliance would have a majority of capacity at Narita if both ATI Applications were approved. An immunized oneworld would hold 28.2 percent of the slots, an immunized Star would hold 31.4 percent, and an immunized SkyTeam would hold 16.6 percent. Furthermore, the Japanese government currently plans to increase capacity significantly at Narita between now and 2014,[36] providing additional opportunities for new entrants and existing carriers/alliances to increase the level of competition at the airport.

For these reasons, we tentatively find that approving both the Star Application and the oneworld Application would not lead to an anticompetitive imbalance at Narita. We also tentatively find that growth opportunities will allow airlines and alliances to increase services and enhance competition in the market over the long term.

### V.   PUBLIC BENEFITS ANALYSIS

Having tentatively found no substantial reduction or elimination of competition, we must now determine whether ATI is required by the public interest, pursuant to § 41308(b); this requires an examination of the extent of the potential public benefits as well as the need for immunity in achieving those benefits. In this section we address the question of whether the proposed alliance will generate sufficient public benefits to justify a grant of immunity. In their applications, the Star applicants and the oneworld applicants each claim that their respective transactions will result in substantial benefits to consumers in the transpacific market. No party challenges the ATI Applicants' claimed public benefits on the record and several, in particular,

---

[36]   *See* "Expanding Narita's Network," published on Narita International Airport's Official Website, available at http://www.narita-airport.jp/en/whats_new/100330.html.

express support for the ATI Applicants' claims.  In their comments to the record, DFW and Houston express support for the ATI Applicants' claims, asserting that immunizing the oneworld and Star carriers would result in increased inter-alliance competition and would expand the service for consumers at each airport.[37]

In their joint application, the oneworld applicants point to a number of benefits to be realized by consumers: (1) an expanded route network; (2) increased opportunities for new or expanded transpacific routes and service; (3) new and enhanced connecting options; (4) increased inter-alliance competition with Star and SkyTeam; (5) fare reductions from fare combinability; and (6) cost savings from consolidation and activities such as joint procurement.[38]  In addition to discussing these benefits, the applicants mention plans to coordinate their frequent flyer programs and engage in other quality improvements on their transpacific routes.[39]

The Star applicants describe a number of similar benefits that they expect to make available to consumers. Specifically, they discuss: (1) reduction in fares through elimination or reduction of double marginalization on routes; (2) maintaining and expanding nonstop service; (3) an increased network with enhanced online service; (4) better access to lower fares; (5) frequent flyer program cooperation; and (6) reduced costs from consolidation and other efficiencies.[40]  The Star application also discusses the benefits that will result from enhanced inter-alliance competition following a grant of immunity.[41]

We tentatively find that these, and other, benefits are likely to accrue to consumers if both applications are approved.  The likelihood that these proposed benefits will be realized is supported by both our historical experience reviewing antitrust immunity cases and several independent third-party studies of immunized alliances.  In a review of international airline cooperation between 1990 and 2000, Whalen found that immunized alliances are associated with 50 percent higher passenger volumes and 16 to 21 percent lower fares than non-immunized alliances.[42]  Other studies have pointed to fare reductions and welfare gains that occur when cooperating alliances eliminate or reduce two separate markups, or double marginalization, on interline routes.[43]  In this case, the two ATI Applications together involve more than 30,000 new city pairs that would see potential for double marginalization reductions.[44]

---

[37]   *See* Answer of the City of Houston and the Greater Houston Partnership (June 29, 2010); Answer of Dallas-Fort Worth International Airport in Support of the Joint Application of American Airlines/Japan Airlines for Antitrust Immunity (June 29, 2010).

[38]   *See* Docket DOT-OST-2010-0059, oneworld Joint Application, at 17-24.

[39]   *See* oneworld Joint Application, at 10-11.

[40]   *See* Star Joint Application, at 14-28.

[41]   *See* Star Joint Application, at 34.

[42]   W.T. Whalen. "A Panel Data Analysis of Code Sharing, Antitrust Immunity, and Open Skies Treaties in International Aviation Markets." *Review of Industrial Organization* 30: 39-61 (2007)

[43]   *See, e.g.*, J.K. Brueckner & W.T. Whalen.  "The Price Effects of International Airline Alliances." *Journal of Law and Economics*. 43: 503-545 (2000).  *See also* J.K. Brueckner "International Airfares in the Age of Alliances: The Effects of Code-Sharing and Antitrust Immunity." *Review of Economics and Statistics*. 85: 105-118 (2003); W.T. Whalen.  "A Panel Data Analysis of Code Sharing, Antitrust Immunity, and Open Skies Treaties in International Aviation Markets."  *Review of Industrial Organization*, 30: 39-61 (2007).  For an application of double marginalization in transatlantic alliance cases, *see* Docket OST-2008-0252 (oneworld Joint Application, Exhibit JA-19, Affidavit of the Brattle Group, (Aug. 14, 2008)).

[44]   *See* oneworld Joint Application, at 17, Star Joint Application, at 15.

We have observed that product quality improvements, expanded frequent flyer coordination, and other benefits arise from immunized alliances in the transatlantic market, and we tentatively see no fundamental reason why these benefits would not also be achieved in the transpacific market as a result of granting immunity to the ATI Applicants. Both ATI applicants have submitted cooperative agreements – a JVA (Star applicants) and JBA (oneworld applicants) – incorporating metal (aircraft)-neutral revenue sharing and sales, which facilitate a number of other benefits. For example, without such sharing of costs and revenues, two carriers are more reluctant to closely align their frequent flyer programs because customers may choose to earn and redeem miles on different carriers within the alliances. Carriers are also less likely to invest in other product improvements when doing so could help a competitor to a greater extent than themselves. Metal neutrality eliminates these barriers by allowing carriers to value revenue on the network instead of revenue on their individual aircraft (metal). With immunity, carriers can achieve these efficiencies and pass benefits on to consumers.

The Department believes that each set of applicants provides a detailed account of how its members will jointly manage their capacity and organize decision-making, thereby taking advantage of currently unexploited efficiency gains that are likely to benefit the traveling and shipping public. We also tentatively find that a grant of antitrust immunity is necessary to achieve many of these benefits. In the current environment, the two sets of parties are unable to cooperate on fares, route coordination, and other business plans on a network-wide basis because of the risk of a legal challenge. As such, the carriers are currently unable to implement many of the provisions that would deliver the most significant consumer benefits: joint pricing, joint scheduling, and network coordination. Given the prohibitive cost of doing so, no one entity would be able to expand to cover all of the transpacific city pairs that an immunized alliance is able to serve. Absent the ability to share revenues and establish a truly metal-neutral network, the alliances would also lack the commercial incentive to fully integrate their networks.

We also believe that, given the ATI Applicants' history of cooperation in the transpacific market, a grant of ATI will yield enhanced public benefits. While JAL only became a full member of oneworld in 2007, the carrier received codesharing authority with American in 1999.[45] Likewise, ANA and United have been codesharing since 1998, and ANA joined the Star Alliance the prior year. In addition, Continental first received its codeshare authority in January of 2010 and has moved to implement that authority with ANA.[46] We believe that in their decade of experience cooperating in the transpacific market, the ATI Applicants have exploited many of the existing benefits of arm's length cooperation.

Additionally, we tentatively find that a grant of immunity will be beneficial by enhancing inter-alliance competition across the Pacific. Delta and Korean Air currently operate with immunity, have a strategically placed immunized connecting hub in Seoul, and have a sizable presence in the U.S.-Asia market. Without immunity, the Star applicants and oneworld applicants would likely not be able to match the size and scope of SkyTeam in the transpacific market. We believe that competition among the three alliances is important to consumer benefits

---

[45] See Docket DOT-OST-1999-4994; Joint Application of American Airlines and Japan Airlines for Amendment to Authorize Blanket Open Skies Codesharing, at 1.
[46] See Docket DOT-OST-2009-0344.

in the short and long term: immunizing the oneworld applicants and Star applicants would help prevent any single competitor from gaining a share of the market that would diminish competition.

We have carefully evaluated the ATI Applicants' claimed benefits in light of each alliance's commercial incentives, the structure and dynamics of the transpacific market, and the historical experience with immunized alliances.  We specifically note the ATI Applicants' intentions to introduce new nonstop services and facilitate long-term operational changes, product enhancements, and investment in infrastructure.[47]

We note that this case involves two applications for antitrust immunity, and we have the authority to approve one application while denying the other.  While broadening the level of consolidation increases the alliances' ability to deliver consumer benefits, it also increases the potential for consumer harm through consolidation.  However, we tentatively find that each ATI Application offers substantial potential benefits and, based on our investigation, we tentatively find that the fullest extent of public benefits is likely to be realized if ATI is granted to both ATI Applicants at this time.

Of course, many of the public benefits discussed above depend upon the implementation of the joint venture and the ATI Applicants have not yet finalized some of the specific terms of their respective agreements.  They await a grant of immunity to share the competitively sensitive information necessary to do so.  Therefore, as in the recent SkyTeam, Star, and oneworld cases,[48] we propose to limit the duration of the immunity unless and until the applicants finalize the details of their agreements.  This condition will encourage the oneworld applicants and Star applicants to implement their respective joint ventures and allow the consumer benefits to be realized quickly.[49]


## VI.   TENTATIVE DECISION

In this section, we discuss the tentative decision reached by the Department regarding (1) the Star Application and (2) the oneworld Application.

### A.   TENTATIVE APPROVAL OF ALLIANCE AGREEMENTS

Based on our analysis of the potential competitive effects and public benefit effects of the proposed ATI Alliance Agreements, we tentatively determine to approve both (1) the Star Alliance Agreements and (2) the oneworld Alliance Agreements.

---

[47]   *See* Star ATI Application, at 17, 23- 24 (December 24, 2009); oneworld ATI Application, at 17 (February 12, 2010).

[48]   *See* SkyTeam II, Show Cause Order 2008-4-17, at 15-16 (April 9, 2008); Star, Show Cause Order 2009-4-5, at 19 (April 7, 2009); oneworld, Show Cause Order 2010-2-8 at 41 (February 13, 2010).

[49]   *See* Star ATI Application, at 61 (December 24, 2009); oneworld ATI Application, at 35 (February 12, 2010). The ATI Applicants in this case have indicated that they will accept this condition.

### B. TENTATIVE GRANT OF ANTITRUST IMMUNITY

Because we have tentatively found that each of the proposed alliances – that of the Star applicants and that of the oneworld applicants – will deliver public benefits, we must now decide whether a grant of immunity is justified for one or both. Our policy is to grant immunity if the parties to the transaction would not otherwise go forward without it, and if we find that the public interest requires that we grant it. With regard to the latter element, we have found in previous cases,[50] and we tentatively find here, that immunity is required by the public interest because the benefits are substantial and proximate to the granting of the authority.

Both sets of ATI Applicants argue that a grant of immunity is necessary to achieve many of the public benefits of the transaction, and we tentatively find their positions to be credible. The efforts to integrate their entire global networks, with a focus on transpacific markets, carry commercial risk. We tentatively find that immunity is necessary to facilitate the transaction and allow the partners to engage in the kind of revenue and benefit sharing that is necessary to alleviate the commercial risks and create substantial public benefits. The Star applicants and oneworld applicants both state that they will not proceed without a grant of antitrust immunity, due to the litigation risk inherent in the joining of two (oneworld) or three (Star) large networks and the commercial risks associated with the sharing of competitively sensitive information that would be necessary to complete the negotiations for the joint venture.

We tentatively conclude that a grant of antitrust immunity is required by the public interest. Therefore, we tentatively make a grant of antitrust immunity, subject to conditions, to implement their proposed alliances to (1) the Star applicants and (2) the oneworld applicants

### C. OTHER ISSUES

The public interest standard guides the Department in determining how to remedy any competitive harm that might occur following the approval of an alliance. When required, conditions can be vital to preserve competition and ensure that consumers realize benefits from the alliance. Even where transactions are pro-competitive on balance, competition regulators routinely search for ways to reduce any negative effects that may occur. The application of remedies is particularly difficult in the airline industry for three primary reasons: (1) key assets are mobile by definition and easily adaptable to new markets, (2) a single flight carries traffic in many different city-pair markets, and (3) routes cannot be simply "spun" off the network like the sale of a business unit.

On June 29, 2010, two airline labor groups, the Air Line Pilots Association, International ("ALPA") and the Allied Pilots Association ("APA"), submitted answers requesting that the Department condition approval of ATI upon U.S. carriers being required to operate a certain share of the alliance's flights. Subsequently, the Association of Flight Attendants ("AFA"), which represents flight attendants at United Airlines and Continental Airlines, submitted a response in support of ALPA's answer.[51]

---

[50] *See* SkyTeam II, Show Cause Order 2008-4-17, at 14-16 (April 9, 2008); Star, Show Cause Order 2009-4-5, at 18-19 (April 7, 2009).

[51] We are accepting AFA's late filing, which was filed without a motion for leave to comment after the Department's deadline, in order to have a full record and because there is no prejudice to any party.

Both ALPA[52] and APA[53] claim that a metal-neutral revenue-sharing agreement means that the alliance is indifferent as to which airline conducts the flying.   Because ALPA and APA identify the wages and working conditions of airline employees[54] as one of the potential public benefits to be considered by the Department as part of its review of the applications, they have requested that grants of immunity be conditioned by operating restrictions.   AFA echoed ALPA's request that a condition of a minimum amount of flying for U.S. carriers be part of any grant of ATI to prevent against the loss of certain airline jobs.[55]

In their answer to APA's comments, American and JAL urge the Department not to impose the flying conditions requested by APA; they argue that both carriers in the Joint Venture would already have incentives to increase flying and that the Department did not impose labor protection provisions when considering previous ATI cases.  In their answer, ANA, Continental, and United similarly ask that the Department reject ALPA's analogous metal condition.  The Star Alliance carriers assert that ALPA has provided no evidence that U.S. carriers will lose flying and the joint venture will instead encourage the growth of each party's services.

This issue has been raised in prior antitrust immunity cases.[56]  In those cases, we have found "metal-neutral" joint ventures, and their corresponding revenue flexibility, as intrinsic to the efficiencies and benefits promoted by a grant of antitrust immunity.  The partners in these joint ventures must maintain their networks and execute their business plans to continue under the venture.  In short, we believe that American, Continental, and United, like their partners, have the incentive to increase capacity if possible, which could provide more opportunities for pilots and other labor groups.   Accordingly, we have tentatively determined not to require, as a condition of a grant of immunity to either the Star applicants or the oneworld applicants, restrictions on ATI Applicants' share of flying.

ALPA also requests that the Department require separate approval, via a docketed proceeding with the opportunity for comment, "for any new or revised agreement that includes cost sharing."[57]  Specifically, ALPA asserts that the Department has not addressed, in prior ATI cases, the public interest concerns that may be associated with the conversion of the Star applicants' JVA to a cost-sharing arrangement.  We note that our standard conditions for approval of and grant of antitrust immunity to alliance agreements include several requirements that would address ALPA's concerns about implementation, by the Star applicants, of an expanded JVA that could incorporate cost sharing.   In particular, we have required joint applicants to (1) submit for prior approval subsequent agreements implementing their alliance agreements, (2) file a complete and unredacted copy of the joint agreement, and (3) submit

---

[52]   ALPA represents pilots at Continental and United.
[53]   APA represents pilots at American.
[54]   *See* Docket DOT-OST-2010-0059, Answer of Allied Pilots Association, at 2, (June 29, 2010); Public Answer of Air Line Pilots Association, International, at 8 (June 29, 2010).
[55]   The Association of Professional Flight Attendants ("APFA"), the union representing flight attendants at American Airlines, submitted a letter to DOT Secretary LaHood on July 20.  APFA urged the Department to approve the oneworld carriers' request for ATI without condition.
[56]   *See* Star Final Order 2009-7-10, at 25 (July 10, 2009); oneworld Show Cause Order 2010-2-8, at 34 (February 13, 2010).
[57]   *See* Public Answer of ALPA, at 10.

annual progress reports as long as the alliance agreements are effective.[58]  Expansion of the Star applicants' JVA to include cost sharing provisions would be reported by one or more of these means.  Therefore, we have tentatively determined not to impose separate and additional approval requirements for changes to the JVA and Alliance Agreements tentatively granted immunity in this order, beyond those identified in *Section VII*.

On February 16, 2010, Mr. Hubert Horan filed an affidavit requesting access to confidential documents, and on February 19 and 22, three employees of the Dallas-Fort Worth International Airport ("DFW") also filed similar affidavits.  The Star applicants asked on several occasions to strike all four of these affidavits.[59]  On June 8, by Order 2010-6-12, the Department struck the affidavits on the grounds that the individuals were neither in-house or outside attorneys for a party nor outside consultants to a party.  On July 8,[60] Mr. Hubert Horan filed an answer requesting that the Department (1) withdraw the Order, (2) reaffirm that the rules regarding access to confidential data in ATI cases as they pertain to competing airlines and to the rules in place at the time of the December Notice remain unchanged, (3) deny NH/CO/UA's Motion to Strike the confidentiality affidavits, (4) grant the confidentiality affidavits of Mr.  Horan as well as the DFW employees, and (5) delay the publication of a procedural schedule so that Mr. Horan and the DFW employees have time to review the confidential data.[61]

Mr. Horan's Answer regarding access to confidential data argues that the Department, in striking his and the DFW employees' confidentiality affidavits, bases its argument on a reinterpretation of a long-standing rule where only attorneys are allowed access to confidential information.  He states that the Department's decision is contrary to the language in other Department Notices, including the most recent case.[62]  He argues that because these earlier Notices were not limited to attorneys,[63] they "clearly recognized" that someone in his position as an independent expert would require the same access to confidential data as would attorneys.[64]

We disagree with Mr. Horan's argument.  The Department's policy regarding access to confidential data is well established.  For example, during the AA/BA I case, we stated in Order 97-3-42 that affiants must be a counsel for an interested party or an independent expert providing services to an interested party.  This policy was consistently followed in subsequent cases.[65]  Mr. Horan is neither an attorney for a party nor an outside expert providing services to any party.  Accordingly, we reaffirm our decision to strike these affidavits.

---

[58]   *See* SkyTeam Final Order 2008-5-32, at 4-5 (May 28, 2008); Star Final Order 2009-7-10, at 27-29 (July 10, 2009); oneworld Final Order 2010-7-8, at 22-23 (July 20, 2010).

[59]   *See* separate Joint Motions of All Nippon Airways Co., Ltd., Continental Airlines, Inc., and United Air Lines, Inc. to Strike Confidentiality Affidavits (February 24, 2010; March 31, 2010) in Docket DOT-OST-2010-0059.

[60]   We are accepting Mr. Horan's late filing, which was filed without a motion for leave to comment after the Department's deadline, in order to have a full record and because there is no prejudice to any party.

[61]   *See* Answer of Hubert Horan in Reply to DOT Order 2010-6-12, at 10 (July 8, 2010).

[62]   *See* DOT Order 2009-12-22, a Notice regarding access to documents and a suspension of the procedural schedule (December 24, 2009).

[63]   *See* Answer of Hubert Horan in Reply to DOT Order 2010-6-12, at 3 (July 8, 2010).

[64]   *See* Answer of Hubert Horan in Reply to DOT Order 2010-6-12, at 3 (July 8, 2010).

[65]   *See*, for example, Order 2008-10-2 (October 3, 2008), Notice Providing Access to Documents (Docket DOT-OST-2008-0252, August 19, 2008), Notice Providing Access to Documents (Docket DOT-OST-2008-0234, July 24, 2008), Notice (Docket DOT-OST-2009-0155, July 16, 2009), Notice (Docket DOT-OST-2009-0350, December 25, 2009), and Notice (Docket DOT-OST-2010-0034, February 17, 2010).

## VII.   TENTATIVE CONDITIONS

In this section, we summarize and explain the proposed conditions and remedies to be applied to our tentative grant of immunity to the ATI Applicants.  Unless otherwise noted, these tentative conditions are applicable to both (1) the Star applicants and (2) the oneworld applicants.

### A.   IMPLEMENTATION OF THE JOINT VENTURE

We tentatively find that we should not make an indefinite grant of immunity for the ATI Applications at this time, due to the risk that many of the public benefits will not be realized unless its respective joint venture is implemented in a prompt fashion.  We are, therefore, proposing to require the ATI Applicants to submit evidence that their JBA (oneworld applicants) and JVA (Star applicants) have been implemented in order to retain the antitrust immunity.  If, within 18 months of the issuance of a final order, an applicant has not submitted (1) verified statements attesting to the full implementation of its JVA or JBA and (2) a copy of its executed agreement, the antitrust immunity granted to those applicants' proposed alliance will automatically expire.

### B.   ANNUAL REPORTING

The competitive issues associated with the proposed alliance are complex.  We tentatively find that it is necessary for the ATI Applicants to report to the Department concerning commercial developments in their respective alliances and the degree to which the public benefits envisioned in each application are being realized.  As we have in recent decisions, we are proposing annual reports.[66]  The reports should focus on progress made toward achieving the alliance's stated goals, specific actions taken to implement each of the alliance agreements (including especially joint venture agreements), present or future planned cooperation among the alliance partners in all core airline functions, and a discussion of the public benefits that are being realized.

### C.   O&D SURVEY DATA REPORTING

For many years, we have required foreign carriers to submit traffic data as a condition of obtaining immunity from U.S. antitrust laws.  We require those carriers to participate in the Department's Origin-Destination Survey of Airline Passenger Traffic ("O&D Survey"), which requires U.S. carriers to submit traffic data in markets they serve singularly or jointly with foreign airlines. Without foreign carrier participation in this effort, we would receive no detailed market information for passengers traveling to or from the United States when their entire trip is on foreign airlines, except for T-100 data for nonstop and single-plane markets.[67]  The absence of such foreign carrier data severely handicaps our ability to evaluate the competitive effects of alliances.

As in previous cases,[68] we have tentatively decided to require the foreign carrier applicants – ANA and JAL – to report full-itinerary O&D Survey information for all passenger itineraries that

---

[66]   *See* Star Final Order 2009-7-10, at 26 (July 10, 2009); oneworld Final Order 2010-7-8, at 15 (July 20, 2010).

[67]   Data covering the operations of foreign airlines that are similar to the information collected in the O&D Survey are generally not available to the Department, to U.S. airlines, or to other U.S. interests.

[68]   *See* Star Final Order 2009-7-10, at 29-30 (July 10, 2009); oneworld Final Order 2010-7-8, at 24 (July 20, 2010).

contain a United States point.  This duty encompasses all traffic to third countries in which the itinerary includes a U.S. point and is a new requirement for these applicants.

To prevent this reporting requirement from unfairly harming the foreign applicants' competitive positions, we tentatively decide to grant confidentiality to their O&D Survey reports and special reports on codeshare passengers.  Currently, we grant confidential treatment to all international Origin-Destination data.  We propose to provide confidential treatment for these data because of the potentially damaging competitive impact on U.S. airlines and the potential adverse effect upon the public interest that would result from unilateral disclosure of these data.[69]

Our regulation, 14 C.F.R. Part 241, section 19-7(d)(1), provides for disclosure of international O&D Survey data to air carriers directly participating in and contributing to the O&D Survey.  While we have tentatively found it appropriate to direct the foreign carrier applicants in this proceeding to provide certain limited O&D Survey data, they are not air carriers within the meaning of Part 241.  The regulation, 14 C.F.R. Part 241, Section 03, defines an air carrier as "[a]ny citizen of the United States who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in air transportation."  ANA and JAL would have no access to the data filed by U.S. air carriers.  Therefore, we would keep submissions confidential while maintaining the current restriction on access to U.S. air carrier O&D Survey data by foreign air carriers.

### D.    WITHDRAWAL FROM IATA TARIFF COORDINATION

As we have found in earlier decisions, it is contrary to the public interest to permit immunized alliances to participate in certain price-related coordination that is already immunized within IATA tariff coordination.  We therefore tentatively decide to condition our grant of antitrust immunity by requiring the ATI Applicants to withdraw, or to remain withdrawn, from participation in any IATA tariff activities that affect or discuss any proposed through fares, rates or charges applicable between the United States and any countries whose airline(s) have been or are subsequently granted antitrust immunity by the Department for participation in similar alliances.  Such countries include the homelands of the applicants.[70]  We tentatively find that this condition is in the public interest for the same reasons stated in Order 2010-7-8.

---

[69]    We treat the foreign airlines' O&D data as confidential, do not allow U.S. airlines any access to the data, and do not allow foreign airlines any access to U.S. airline O&D Survey data.  We use these data only for internal analytical purposes.

[70]    This condition currently applies to prices in markets that are subject to our prior antitrust immunity orders.  Those markets are U.S.-Netherlands, U.S.-Germany (Order 96-5-27 at 17), U.S.-Denmark/ Norway/ Sweden (Order 96-11-1 at 23), U.S.-Austria (Order 2001-1-19 at 16), U.S.-Chile (Order 99-9-9 at 21), U.S.-Iceland (Order 2000-10-13 at 16), U.S.-Panama (Order 2001-5-1 at 11), U.S.-New Zealand (Order 2001-4-2 at 3), U.S.-Czech Republic/ France/ Italy (Order 2002-1-6 at 7), U.S.-Republic of Korea (Order 2002-6-18 at 14; Order 2003-5-18 at 12), U.S.-Finland (Order 2002-7-39 at 10), U.S.-Belgium (Order 2004-4-10 at 12), U.S.-Jordan (Order 2005-1-23 at 13), U.S.-Peru (Order 2005-10-8), U.S.-Poland/ Portugal/ Switzerland/ Canada (Order 2007-2-6), U.S.-United Kingdom (Order 2007-9-12), and U.S.-Finland/Jordan/Spain (Order 2010-7-8).  Also, by letter dated May 8, 1996, Northwest and KLM indicated their willingness to limit voluntarily their participation in IATA (Dockets DOT-OST-96-1116 and DOT-OST-95-618).

### E.    CRS ISSUES

Consistent with recent cases, we are not proposing any conditions regarding the management of Computer Reservations Systems ("CRSs").[71]   Any coordination between the applicants concerning the operation of separate businesses, such as CRSs, would not be transactions specifically approved or necessarily contemplated by our orders in this proceeding.   While the ATI Applicants, individually or collectively, may maintain an interest in a CRS, the grant of immunity in this Order thus does not extend to their management of those interests.[72]   On the other hand, the ATI Applicants' alliance relationships will likely require the coordination of the presentation and sale of the airlines' own services in the CRSs and each airline's operation of its internal reservations systems.   Those activities will necessarily be covered by a grant of antitrust immunity.

### F.    OPERATION UNDER A COMMON NAME

Because implementation of the ATI Applicants' respective joint business agreements could raise important consumer issues and "holding out" questions, if NH/CO/UA or AA/JL choose to operate under a common name or use "common brands," they must seek separate approval from the Department prior to such operations.   For example, it is Department policy to consider the use of a single air carrier designator code by two or more airlines to be unfair and deceptive, unless the airlines give reasonable and timely notice to passengers of the actual operator of the aircraft.[73]

**ACCORDINGLY:**

1.    We tentatively approve and grant antitrust immunity to ATI Alliance Agreements between (1) All Nippon Airways Co., Ltd, Continental Airlines, Inc., and United Air Lines, Inc. and (2) American Airlines, Inc., and Japan Airlines International Co.  Ltd., in so far as such agreements relate to foreign air transportation.[74]   This tentative approval and grant of immunity is subject to the condition that the U.S.-Japan Open Skies aviation agreement is applied.   Without regard to other conditions described in the ordering paragraphs below, the approval and grant of antitrust immunity shall remain in effect indefinitely, subject to Ordering Paragraph 7, provided that the ATI Applicants:

---

[71]    *See, e.g.,* oneworld, Final Order 2010-7-8, at 15 (July 20, 2010).

[72]    While any antitrust immunity granted in this proceeding would not cover the activities of any system in which one of the ATI Applicants has an interest, we do, of course, have the authority under 49 U.S.C. § 41712 to prohibit any system operating in the United States from engaging in unfair or deceptive practices or unfair methods of competition.  The Court of Appeals has upheld our determination that we had such jurisdiction.  *Sabre, Inc. v. Dept. of Transportation*, 429 F.3d 1113 (D.C. Cir. 2005).  We also have the authority to take action against conduct by a foreign system or a foreign airline that unreasonably discriminates against a U.S. system.  49 U.S.C. § 41310(g).

[73]    *See* 14 C.F.R. § 399.82.

[74]    The Alliance Agreements shall mean the Star ATI Alliance Agreements (the business agreements listed on page 1 of Exhibit JA-1 of the Joint Application of ANA, Continental and United for Antitrust Immunity (December 23, 2009)) and the oneworld ATI Alliance Agreements (the business agreements discussed on page 1 of the Joint Application of American and JAL for Antitrust Immunity (February 12, 2010)).

    a. Submit for prior approval subsequent subsidiary agreements implementing their most recent ATI Alliance Agreements;[75]

    b. Resubmit the oneworld and Star ATI Alliance Agreements before five years from the date of issuance of the final order in this case; and

    c. Obtain prior approval if they choose to operate or hold out service under a common name or use common brands;

2. We tentatively direct the oneworld applicants and the Star applicants to file with the Director of the Office of Aviation Analysis the following as evidence of implementation:

    a. For the oneworld applicants, a verified statement(s) in Docket OST-2010-0059 attesting that the Joint Business Agreement has been executed and implemented pursuant to the terms described in the Joint Application, Exhibit JA-2 (Joint Business Agreement), and a complete and unredacted copy of the most recent American/Japan Airlines Joint Business Agreement and any appendices; and

    b. For the Star applicants, a verified statement(s) in Docket OST-2010-0059 attesting that the Joint Venture Agreement has been executed and implemented pursuant to the terms described in the Joint Application, Exhibit JA-1 (Joint applicants' Alliance Agreements), and a complete and unredacted copy of the most recent ANA-Continental-United Transpacific Joint Venture Agreement and any appendices;

    We tentatively determine that, unless the ATI Applicants make the filings described in this ordering paragraph within eighteen months of the issuance of a final order in this case, the authority herein shall expire and the grant of antitrust immunity shall be automatically withdrawn from the non-compliant ATI Applicants;

3. We tentatively direct the ATI Applicants to submit annual progress reports to the Office of Aviation Analysis, beginning one year from the date of issuance of a final order in this case, and continuing each year thereafter while their respective ATI Alliance Agreements are effective;[76]

---

[75] Regarding this requirement, we do not expect the ATI Applicants to provide the Department with minor technical understandings that are necessary to implement fully their day-to-day operations but that have no additional substantive significance. We do, however, expect and direct them to provide the Department with all unredacted contractual instruments that implement or materially alter, modify, or amend the cooperation agreements, joint ventures, or confidentiality/antitrust guidelines. .

[76] We expect the ATI Applicants to deliver the progress report by the close of business on the anniversary date. If that date falls on a weekend or federal holiday, the ATI Applicants may deliver the report by the close of business on the following business day.

4.      We tentatively direct All Nippon Airways Co., Ltd., Continental Airlines, Inc., United Air Lines, Inc., American Airlines, Inc., and Japan Airlines International Co. Ltd. to withdraw, or to remain withdrawn, from participation in any International Air Transport Association tariff coordination activities that discuss any proposed through fares, rates, or charges applicable between the United States and any countries whose airlines have been or are subsequently granted antitrust immunity, or renewal thereof, to participate in similar alliance activities with a U.S. airline(s);

5.      We tentatively delegate to the Director, Office of International Aviation, the authority to determine the applicability of the directive set forth in Ordering Paragraph 4 as to specific prices, markets, and tariff coordination activities, consistent with the scope and purpose of the condition, as previously described;

6.      We tentatively direct All Nippon Airways Co., Ltd., Continental Airlines, Inc., United Air Lines, Inc., American Airlines, Inc., and Japan Airlines International Co. Ltd. to begin or to continue to report full-itinerary Origin-Destination Survey of Airline Passenger Traffic for all passenger itineraries that include a U.S. point;

7.      We tentatively determine that we may amend, modify, or revoke this authority at any time without hearing;

8.      We accept the late filings of the Association of Flight Attendants, submitted on July 13, 2010, and Hubert Horan, submitted on July 8, 2010, which were filed without a motion for leave to comment after the Department's deadline;

9.      We reaffirm our decision[77] to grant the motions of All Nippon Airways, Co., Ltd., Continental Airlines Inc., and United Air Lines, Inc., submitted on February 24, 2010 and March 31, 2010, to strike confidentiality affidavits;

10.     We reaffirm our decision to strike the affidavits of Hubert Horan, dated February 16, 2010 and submitted in Docket DOT-OST-2009-0350; Damian Brooke, dated February 18, 2010, and submitted in Docket DOT-OST-2010-0034; William Frainey, dated February 18, 2010, and submitted in Docket DOT-OST-2010-0034; and Mr. Joseph Lopano, dated February 19, 2010, and submitted in Docket DOT-OST-2010-0034; and

---

[77]     *See* Order 2010-6-12, at 3-4 (June 8, 2010).

11.     We will serve this Order on all parties on the service list in this docket.


By:



**SUSAN L. KURLAND**
Assistant Secretary for Aviation
and International Affairs

(SEAL)

*An electronic version of this document is available at: http://www.regulations.gov*