# EXHIBIT K

Order 2013-8-21
Served: August 30, 2013



**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 30th day of August, 2013

<table>
<tr><td>

Application of

**VIRGIN ATLANTIC AIRWAYS, LTD.
DELTA AIR LINES, INC.
SOCIÉTÉ AIR FRANCE
KONINKLIJKE LUCHTVAART MAATSCHAPPIJ N.V.
ALITALIA COMPAGNIA AEREA ITALIANA S.P.A.**

under 49 U.S.C. §§ 41308 and 41309 for approval of
and antitrust immunity for alliance agreements

</td><td>

**Docket DOT-OST-2013-0068**

</td></tr>
</table>

# SHOW CAUSE ORDER

## I. SUMMARY

By this order, the Department of Transportation (the "**Department**") tentatively grants approval of and antitrust immunity ("**ATI**") for the application of Virgin Atlantic Airways, Ltd. ("**Virgin Atlantic**"), Delta Air Lines, Inc. ("**Delta**"), Société Air France ("**Air France**"), Koninklijke Luchtvaart Maatschappij N.V. ("**KLM**"), and Alitalia Compagnia Aerea Italiana S.P.A. ("**Alitalia**").[1]

The applicants (collectively, the "**ATI Applicants**") have requested a grant of antitrust immunity from the U.S. antitrust laws in order to allow Delta and Virgin Atlantic to operate a joint venture ("**Joint Venture**" or "**Delta-Virgin Atlantic Joint Venture**") between North America and the United Kingdom.[2]  If the application is given final approval, the ATI Applicants will coordinate their international operations through the Joint Venture and the close commercial relationship that will occur by virtue of Delta's 49% stake in Virgin Atlantic.[3]

---

[1]     The common names of these and other carriers are used throughout the Show Cause Order.
[2]     *See* Docket DOT-OST-2013-0068, "Joint Application for Approval of and Antitrust Immunity for Alliance Agreements," hereinafter "**Joint Application**," at 2.  For purposes of the Joint Application, North America refers to Canada, Mexico, and the United States.
[3]     The 49% stake was previously held by Singapore Airlines.  Delta's 49% equity investment in Virgin Atlantic was reviewed by the U.S. Department of Justice ("**DOJ**") under the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a, as well as the European Commission and other relevant competition authorities.  On June 20, 2013, DOJ and the European Commission cleared the transaction.  Delta and Singapore Airlines closed on the 49% share acquisition on June 24, 2013.  *See* http://news.delta.com/index.php?s=43&item=2026

Through the Joint Venture Agreement ("**Joint Venture Agreement**"), Delta and Virgin Atlantic will coordinate their network planning, revenue management, pricing, sales, and other functions in covered markets.  The two carriers will jointly promote their products and services in a "metal neutral" fashion, and will also pool their revenues and share profits.[4]  With the exception of Virgin Atlantic, the parties to this application will also continue to operate the SkyTeam Joint Venture ("**SkyTeam Joint Venture**"), which the Department approved and immunized in 2008.[5] The SkyTeam Joint Venture, focused on the U.S.-Europe market and behind and beyond, and the Delta-Virgin Atlantic Joint Venture, focused on the North America-United Kingdom market, will co-exist and be managed separately.

Based on our evaluation and analysis of the present application, we tentatively conclude that, overall, the alliance will be procompetitive.  In reaching this conclusion, we make the following tentative findings: (1) inter-alliance competition will likely be strengthened in the U.S.-Europe and U.S.-United Kingdom markets ("**U.S.-UK market**"); (2) there are unlikely to be anti-competitive effects in any city-pair markets because there are no city-pair markets in which both Delta and Virgin Atlantic currently provide the only nonstop service[6]; and (3) competition will likely be strengthened in the large New York-London market.

We also tentatively conclude that the ATI Applicants have made a strong showing that substantial public benefits are likely to result from their proposed immunized cooperation.  These claimed benefits include additional services and schedule optimization, elimination of "double marginalization" or double markups, and other improvements.  We tentatively conclude that antitrust immunity is necessary to achieve most of these important benefits.  The ATI Applicants have also stated that they will not implement the Joint Venture without antitrust immunity.

Because the proposed Joint Venture is part of a transaction that included Delta purchasing a 49% equity stake in Virgin Atlantic for $360 million, we tentatively determine that there is added economic incentive for the ATI Applicants to fully implement the Joint Venture, which will make it possible for the carriers to pass on the additional benefits of an immunized alliance to consumers.

Provided that the ATI Applicants accept the conditions that we are proposing below, we tentatively conclude that the potential benefits of the application outweigh any potential harm. Therefore, we tentatively grant antitrust immunity, subject to conditions, to the ATI Applicants. We direct any interested parties to state why we should not adopt these findings and conclusions in a final order.  Parties have 14 calendar days in which to file answers and 7 calendar days in which to submit replies.

---

[4]     *See* Joint Application, at 12 ("The Joint Venture is structured to ensure that each carrier is motivated to maximize the profitability of the Joint Venture as a whole.").

[5]     *See* DOT Order 2008-5-32 and DOT Order 2009-6-26.  CSA Czech Airlines is also immunized with the SkyTeam Joint Venture carriers, but is not part of the SkyTeam Joint Venture and no longer operates transatlantic service.

[6]     If there were a city-pair market in which Delta and Virgin Atlantic were the only providers of transatlantic service, a grant of antitrust immunity would effectively allow a duopoly market to become a monopoly market.  No such situation would occur here, as discussed in more detail throughout the Show Cause Order.

## II.  SUMMARY OF THE RECORD

On April 8, 2013, Virgin Atlantic, Delta, Air France, KLM, and Alitalia filed a joint application requesting approval of and antitrust immunity for alliance agreements covering foreign air transportation between North America and the United Kingdom.  They also filed a joint motion seeking confidential treatment for supporting documents and information pursuant to Rule 12 of the Department's procedural regulations (14 C.F.R. § 302.12).

The ATI Applicants requested approval of and antitrust immunity for alliance agreements that would allow Delta and Virgin Atlantic to operate a joint venture between North America and the United Kingdom.  The ATI Applicants argued that a grant of antitrust immunity would not reduce competition in any relevant market and would lead to substantial consumer benefits through new services and increased competition.

In particular, the ATI Applicants argued that a grant of antitrust immunity would allow Delta and Virgin Atlantic to be more effective competitors against American and British Airways, particularly in the two markets in which Delta and Virgin Atlantic overlap: New York-London and Boston-London.  The ATI Applicants stated that a grant of antitrust immunity would lead to substantial public benefits including optimized schedules, new service offerings such as Seattle-London, and more.  The ATI Applicants noted that Delta's ability to enter into an immunized joint venture with Virgin Atlantic was a major factor in its decision to purchase a 49% equity stake in Virgin Atlantic and that "antitrust immunity is essential to the full realization of the consumer benefits and procompetitive effects of the Joint Venture."[7]

On April 10, 2013, we issued a Notice suspending the procedural schedule and granting interim access to confidential documents submitted with the applications, limited to interested parties who filed confidentiality affidavits.  On May 3, 2013, the ATI Applicants submitted confidential and public versions of supplemental interrogatories.

On May 14, 2013, we issued a Notice that declared the record substantially complete and established a procedural schedule for public comments.  Answers were due on June 4, 2013, and Replies were due on June 13, 2013.

On June 4, 2013, seven parties filed answers in support of the ATI Applicants' request for antitrust immunity.  No party filed in opposition to the request.  No replies were filed.

The Port of Seattle ("**Port of Seattle**"), the Massachusetts Port Authority ("**Massport**"), the Wayne County Airport Authority ("**WCAA**"), the Port Authority of New York and New Jersey ("**PANYNJ**"), and Tampa International Airport ("**Tampa**") all noted the positive benefits that a grant of antitrust immunity would, in their view, bring to the traveling public in their communities.

The Port of Seattle noted Delta and Virgin Atlantic's plans, if granted antitrust immunity, to launch a new nonstop flight in the Seattle-London market, which would compete with British Airways.  The Port of Seattle stated that British Airways has served the Seattle-London market

---

[7]  *See* Joint Application, at 57.

3

since 1980 and currently offers the only nonstop service in the market.

Massport stated that it believes the proposed immunized Joint Venture will help Delta and Virgin Atlantic prosper in the Boston market and that Boston consumers will benefit from more meaningful competitive choices.

WCAA stated that it supports a grant of antitrust immunity because it would strengthen Delta's existing Detroit-London flight due to Virgin Atlantic's strong presence in the United Kingdom. WCAA also pointed out that it believes Detroit could support a second daily flight to London and that the Delta-Virgin Atlantic Joint Venture increases the likelihood of Detroit obtaining that second daily flight.

PANYNJ declared that approval of the Joint Venture would promote vigorous competition among the three alliances serving the New York-London market, with each having five or more daily roundtrip flights.

Tampa stated that it believes a grant of the Joint Application might lead to new nonstop service between Tampa and the United Kingdom.

Hartsfield-Jackson Atlanta International Airport, the Atlanta Convention & Visitors Bureau, and the Metro Atlanta Chamber filed a joint Answer stating that a grant of antitrust immunity may lead to additional Atlanta-United Kingdom flights and has the potential to increase the number of United Kingdom-originating visitors to Atlanta.

The Delta Master Executive Council of the Air Line Pilots Association, International ("**Delta MEC**"), stated its strong support for a grant of antitrust immunity because the Joint Venture would increase Delta's competitive presence in London and would produce new flying opportunities for Delta pilots. The Delta MEC has been pleased with the positive results of Delta's existing joint ventures, which it believes have resulted in value for the company, employees, and the traveling public alike. The Answer also noted that new flights resulting from Delta's joint ventures have been equitably apportioned between Delta-metal flying and Delta joint venture partner-metal flying.

## III. DECISIONAL STANDARDS

The requests before us are for a grant of antitrust immunity covering a series of alliance agreements between Virgin Atlantic, Delta, Air France, KLM, and Alitalia (the "**ATI Alliance Agreements**"). The ATI Alliance Agreements include the Joint Venture Agreement between Delta and Virgin Atlantic, a five-way Coordination Agreement among Virgin Atlantic, Delta, Air France, KLM, and Alitalia, and several implementing agreements between Delta and Virgin Atlantic, including a Codeshare Agreement, a Special Prorate Agreement, a Lounge Agreement, and a Frequent Flier Program Agreement.[8]

Under 49 U.S.C. §§ 41308-09, the Department engages in a two-step analysis of foreign air transportation agreements submitted for our approval. We first examine the application under

---

[8] *See* Joint Application, at 12 and 19.

§ 41309(b) to determine whether the agreements are adverse to the public interest because they would substantially reduce or eliminate competition (the "**Competitive Effects Analysis**").  If we make that affirmative determination, § 41309(b)(1)(A) directs the Department to decide whether the agreements are nevertheless necessary to meet a serious transportation need or to achieve important public benefits.  If we make that finding, and conclude that those public benefits cannot be met or achieved by reasonably available and materially less anticompetitive alternatives, we must approve the agreements pursuant to § 41308(b).  A party opposing approval of antitrust immunity has the burden of demonstrating that the agreements would substantially reduce or eliminate competition, and that less anticompetitive alternatives are available.  The party seeking approval of antitrust immunity has the burden of demonstrating, however, that the agreements meet a serious transportation need or achieve important public benefits.

If the Department concludes, after our initial review of the application under § 41309(b), that the agreements are not adverse to the public interest, § 41309(b) directs us to approve the agreements.  In that circumstance, the Department next examines whether there are sufficient public benefits to grant immunity under § 41308(b) (the "**Public Benefits Analysis**").  Congress has authorized the Department to exempt airlines from the antitrust laws to the extent necessary to allow a proposed transaction to proceed, provided the exemption is required by the public interest.

The Department's public interest analysis under both §§ 41309(b) and 41308(b) entails a balancing of any anti-competitive effects and public benefits.  The standard in § 41308(b) ("**required by**") is higher than that in § 41309(b) ("**not adverse to**").

Integrated joint ventures allow airlines to achieve merger-like efficiencies in covered markets.  Because approval of the application would have intended commercial effects similar to those resulting from a merger, the Department also examines the application under the Clayton Act test.  The Clayton Act test is used to predict the competitive effects of a proposed merger, and requires us to consider whether a grant of ATI is likely to substantially reduce competition and facilitate the exercise of market power.  The Department applies the Clayton Act test to determine whether approval of the application would allow the ATI Applicants to profitably charge supra-competitive prices or reduce service or product quality below competitive levels in any relevant market.  In examining whether an alliance is likely to create or enhance market power, we examine: (1) whether the alliance would significantly increase market concentration; (2) whether the alliance would cause potential competitive harm; and (3) whether new entry into the market would be timely, likely, and sufficient either to deter, or to discipline, the potential competitive harm.

## IV.  COMPETITIVE EFFECTS ANALYSIS

Section 41309(b) requires a determination as to whether the agreements are adverse to the public interest because they would substantially reduce or eliminate competition.  The Department conducts an analysis of the competitive effects that would result from approving the application on three levels of analysis of relevant competitive markets: at a broad network level, at a country-pair level, and at a city-pair level.  In this application, we also consider the potential

competitive effects of slot constraints at London Heathrow Airport ("**London Heathrow**" or "**Heathrow**").

### A. NETWORK LEVEL

The proposed Joint Venture involves Delta, a large U.S. airline with an extensive worldwide network, and Virgin Atlantic, a British airline that primarily serves long-haul, worldwide routes out of London.  The ATI Alliance Agreements cover traffic between North America and the United Kingdom.  Because the United Kingdom is the only country that Virgin Atlantic serves in Europe, our analysis will focus on traffic flows to and from the United Kingdom in Subsections B and C, below.

In North America, Virgin Atlantic operates to Boston, Cancun, Chicago, Las Vegas, Los Angeles, Miami, New York, Orlando, San Francisco, Vancouver, and Washington, D.C.[9]  Virgin Atlantic's beyond-London flights will be excluded from the scope of the Joint Venture, however, and the ATI Applicants state that Delta does not have plans to codeshare on Virgin Atlantic's beyond-London flights.[10]  The SkyTeam Joint Venture will continue to be the primary driver of Delta's beyond-Europe traffic flows.[11]

As part of Delta's proposed joint venture with Virgin Atlantic, North America-United Kingdom flying will be shifted from the SkyTeam Joint Venture to the new Delta-Virgin Atlantic Joint Venture.  The SkyTeam Joint Venture currently encompasses just 26% of U.S.-Europe traffic flows.  If granted the authority it seeks, Delta will be participating in two distinct immunized joint ventures in the transatlantic market.  Nonetheless, the ATI Applicants would all be immunized and capture a combined 33% share in the U.S.-Europe market.

Our analysis indicates that there is little evidence that granting antitrust immunity in this case would result in a competitive imbalance in the large U.S.-Europe market.  Furthermore, our broader analysis of traffic between the United States and Europe indicates that competition remains robust and healthy.  **Table 1**, below, presents an overview of competition in the U.S.-Europe market.  There are approximately 36 airlines, including multiple members of the three major global immunized alliances, operating nonstop scheduled service in the market.[12]  Several Star Alliance airlines are immunized and capture 30% of the U.S.-Europe market.  These airlines include Air Canada, Air New Zealand, Austrian, Brussels, LOT, Lufthansa, SAS, Swiss, Tap Air Portugal, and United.  Within that group of immunized carriers, Air Canada, Austrian, Brussels, Lufthansa, Swiss, and United operate a joint venture ("**Star A++ Joint Venture**").[13]  American, British Airways, Finnair, and Iberia also operate an immunized joint venture in the transatlantic

---

[9]   Some of these flights are operated on a seasonal basis.  Virgin Atlantic operates several long-haul flights beyond London to the following non-U.S. destinations: Accra (ends September 23, 2013), Cape Town, Delhi, Dubai, Hong Kong, Johannesburg, Lagos, Mumbai, Shanghai, Sydney, Tokyo, and various points in the Caribbean.

[10]   *See* Joint Application, at 53-55.

[11]   We understand Delta's approach to the Joint Venture as one that would allow, but not actively promote, connections to Virgin Atlantic's limited long-haul network beyond London (*e.g.*, Mumbai).  In contrast, the SkyTeam Joint Venture will continue to develop services across the entire U.S.-Europe market, while also actively promoting connections behind and beyond the United States and Europe.

[12]   Based on June 2013 published schedules.

[13]   *See* DOT Order 2009-7-10 and DOT Order 2011-11-16.

market that captures 24% of the market.[14]

| Table 1: Onboard Passenger Share in the U.S.-Europe Market | | | | | |
|---|---|---|---|---|---|
| **Pre-transaction** | **Passengers** | **Share** | **Post-transaction** | **Passengers** | **Share** |
| Immunized Star Alliance | 15,875,686 | 30% | Immunized SkyTeam + Virgin Atlantic<br>Immunized SkyTeam<br>+<br>Virgin Atlantic | 17,045,599<br>13,820,762<br>+<br>3,224,837 | **~32-33%**<br>~26%<br>+<br>~6% |
| Immunized SkyTeam | 13,820,762 | ~26% | Immunized Star Alliance | 15,875,686 | 30% |
| Immunized oneworld | 12,315,759 | 24% | Immunized oneworld | 12,315,759 | 24% |
| Other | 4,552,578 | 9% | Other | 4,552,578 | 9% |
| Virgin Atlantic | 3,224,837 | ~6% | US Airways | 2,536,231 | 5% |
| US Airways | 2,536,231 | 5% | | | |
| **Grand Total** | **52,325,853** | **~100%** | **Grand Total** | **52,325,853** | **~100%** |

Source: T-100 traffic data for the 12 months ended December 2012.

In view of the Delta-Virgin Atlantic Joint Venture's limited impact on market share, we tentatively find that approving the application would not substantially reduce or eliminate competition in the U.S.-Europe market.

### B.  COUNTRY-PAIR LEVEL

Multiple carriers provide service in the U.S.-UK market.  There is a potential for reduction in competition if we approve the application because there will be one fewer carrier operating in the U.S.-UK market.

We primarily used T-100 traffic data to evaluate the potential competitive effects of the application in the U.S.-UK market.[15]  T-100 traffic data provides a snapshot of passenger gate-to-gate shares in the market.  Booking data from Marketing Information Data Tapes ("**MIDT**") offers a more comprehensive view of the market, however, and can be a useful tool in analyzing possible competitive effects.  The ATI Applicants provided MIDT data as part of their application, which we also analyzed.  In addition to T-100 traffic data and MIDT, other data sources were utilized to gain a more complete view, including origin and destination ticket data and published airline schedules.

As shown in **Table 2**, below, approval of the application would result in three immunized alliance competitors and several small, non-immunized, independent competitors in the U.S.-UK market.  The oneworld Joint Venture currently carries 54% of the traffic in the market.  The next largest competitors—Virgin Atlantic with 19% of the traffic, the immunized Star Alliance grouping of carriers with 15% of the traffic, and the SkyTeam Joint Venture with 8% of the traffic—all trail the oneworld Joint Venture by a substantial margin.[16]  By implementing the

---

[14]   *See* DOT Order 2010-7-8.  The oneworld parties refer to their joint venture as a "Joint Business Agreement."  For consistency, we refer to it as the "**oneworld Joint Venture**."  Royal Jordanian is also immunized with the oneworld Joint Venture carriers, but is not part of the oneworld Joint Venture and does not operate transatlantic service between the United States and Europe.

[15]   T-100 traffic data consists of monthly operational data for each reporting carrier by aircraft type for each city-pair segment that the carrier operated.

[16]   Although Delta and United's joint venture partners do not serve the U.S.-UK market on a nonstop basis with their own aircraft (metal), the SkyTeam Joint Venture and Star A++ Joint Venture effectively assures that all of the

Joint Venture, Delta and Virgin Atlantic would combine their shares and become a stronger unified competitor versus the oneworld Joint Venture. Based upon historical traffic data, immunizing the ATI Applicants would give them a combined 27% share of the U.S.-UK market.

| Table 2: Onboard Passenger Share in the U.S.-UK Market | | | | | |
|---|---|---|---|---|---|
| **Pre-transaction** | **Passengers** | **Share** | **Post-transaction** | **Passengers** | **Share** |
| Immunized oneworld | 9,100,562 | 54% | Immunized oneworld | 9,100,562 | 54% |
| Virgin Atlantic | 3,224,090 | 19% | Immunized SkyTeam + Virgin Atlantic<br>Immunized SkyTeam<br>+<br>Virgin Atlantic | 4,516,301<br>1,292,211<br>+<br>3,224,090 | **27%**<br>8%<br>+<br>19% |
| Immunized Star Alliance | 2,604,903 | 15% | Immunized Star Alliance | 2,604,903 | 15% |
| Immunized SkyTeam | 1,292,211 | 8% | US Airways | 505,812 | 3% |
| US Airways | 505,812 | 3% | Other | 177,204 | 1% |
| Other | 177,204 | 1% | | | |
| **Grand Total** | **16,904,782** | **100%** | **Grand Total** | **16,904,782** | **100%** |

Source: T-100 traffic data for the 12 months ended December 2012.

Theoretically, the proposed alliance and Joint Venture would effectively eliminate an independent competitor from the market. The ATI Applicants point out, however, that Virgin Atlantic faces significant challenges to its business model. It lacks scale at London Heathrow and the scarcity of slots there makes it difficult to grow its network organically. As stated in the Joint Application, "With IAG's purchase of bmi, Virgin Atlantic's access to feed traffic is under threat. Without an alliance partner, Virgin Atlantic faces serious challenges to its ability to grow and compete."[17] The Joint Venture will help ensure the continuation of Virgin Atlantic's capacity in the U.S.-UK market, which is important to maintaining competition in that market.

We therefore tentatively find that approving the application would lead to an improved competitive balance in the U.S.-UK market and would result in increased competition among the three immunized alliances. We tentatively conclude that there will be no substantial reduction or elimination of competition in the U.S.-UK market. Furthermore, we tentatively find that the three competitive joint ventures, along with other non-aligned carriers, operating in this market will continue to have sufficient size and scope to ensure robust competition in the market.

## C. CITY-PAIR LEVEL

Our analysis must examine whether the proposed alliance would give the ATI Applicants the ability to sustainably increase prices or decrease output in any relevant market, and whether the proposed alliance raises competitive concerns in light of factors such as market structure, the likelihood that competing carriers will enter the affected markets if the proposed alliance is approved, and any infrastructure constraints such as slot restrictions. The Department analyzed multiple data sources to gain a more complete view of these city-pair markets and to verify the claims made by the applicants in their public filings.

There are two city-pair markets of potential concern that warrant further analysis. The two

---

carriers are represented in the market. Multiple immunized and non-immunized carriers also place their code on United's U.S.-UK flights.

[17] *See* Joint Application, at 37.

markets are New York-London and Boston-London, which both Delta and Virgin Atlantic currently operate with overlapping nonstop service.[18] These two city-pairs present the greatest potential for competitive harm because a grant of antitrust immunity would effectively eliminate an independent competitor from these markets. In theory, the increased concentration that would result could give the new entity an increased ability to exercise market power to increase fares to supra-competitive levels. As we have noted in past orders, there are several factors that have a significant impact on competition in these markets.[19] The geographical locations of the two cities limit the ability of other airlines to discipline competition with connecting services. Boston and New York are located in the far northeastern United States with a direct routing over the Atlantic Ocean to London. There are few intervening hub airports that could facilitate attractive connecting service, particularly for time sensitive travelers.

There are also severe infrastructure constraints at Heathrow for transatlantic services. There are no firm plans to increase capacity at London Heathrow in the near future. Thus, airlines wishing to add service to Heathrow in the future will most likely continue to have to obtain slots on the very limited secondary market. Our analysis, however, indicates that this slot restriction at Heathrow is balanced out by several factors in this case that lead us to conclude that there is no competitive harm by a grant of antitrust immunity. First, the fact that London Heathrow is open to any carrier wishing to serve the U.S.-London market is an important consideration, as it was in 2010 when we granted antitrust immunity to the oneworld Joint Venture. Second, although Heathrow is the preferred airport for business travelers, there are few barriers to entry preventing potential competitors, including low-cost carriers that have expressed interest in launching transatlantic service, from launching service at another London airport. In short, there are some opportunities for new entrants and existing carriers to increase the level of service and competition between the United States and London, including at London Heathrow.

For these reasons, we tentatively conclude that a grant of antitrust immunity will not lead to a competitive imbalance at London Heathrow and will not affect the possibility of new entrants serving the market.

## I.   City-Pair Level:  New York-London

The New York-London market is the largest international market for travelers to and from the United States. According to published schedules, there are approximately 31 daily roundtrip flights between the two cities.[20] There are strong business and cultural ties between the two cities. Historical service patterns indicate that demand is strongest between Kennedy and Heathrow airports. The New York-London market is, in many ways, representative of the overall U.S.-UK market in that it has undergone recent and dynamic change. For many years, the U.S.-UK Air Services Agreement placed heavy restrictions on air services. The result was that only two carriers from each country had the right to fly between the U.S. and London Heathrow. From the early 1990s until 2008, the four designated carriers were American, British

---

[18]   The vast majority of international passenger traffic in the New York metropolitan area flows to and from John F. Kennedy International Airport ("**Kennedy**") and Newark Liberty International Airport ("**Newark**"). In London, traffic flows to and from Heathrow, London Gatwick Airport, London Stansted Airport, London Luton Airport, and London City Airport.

[19]   *See, e.g.*, DOT Order 2010-7-8.

[20]   Based on June 2013 published schedules.

Airways, United, and Virgin Atlantic.[21]

The 2007 U.S.-EU Open Skies Agreement, which entered into force on March 30, 2008, ended the access restriction at London Heathrow.  Continental, Delta, Northwest, and US Airways all launched service at Heathrow.[22]   In addition to the U.S.-EU Open Skies Agreement, several other factors contributed to an evolution in the nature of service between New York and London since 2008.  Air India ended its long-standing New York-London Heathrow-India service in 2009.  In 2010, the Department granted antitrust immunity to permit American, British Airways, and Iberia to launch an integrated, metal neutral joint venture.[23] Finally, domestic airline consolidation in the United States has led to fewer legacy airlines in the market.  The 2008 merger between Delta and Northwest and the 2010 merger between United and Continental has led to the loss of independent competitors in the U.S.-London market.

The proposed alliance and Delta-Virgin Atlantic Joint Venture would unite two competitors and ultimately create a strong, competitive counterweight to the oneworld Joint Venture, which currently commands a 55% share of the New York-London market with approximately twelve daily roundtrip flights between Kennedy and Heathrow, approximately three daily roundtrip flights between Newark and Heathrow, and approximately two daily roundtrip flights between Kennedy and London City Airport.[24]   Delta currently operates three daily roundtrip flights between Kennedy and Heathrow, and Virgin Atlantic currently operates four daily roundtrip flights between Kennedy and Heathrow and two daily roundtrip flights between Newark and Heathrow.  All nine of Delta and Virgin Atlantic's flights would continue to operate following a grant of antitrust immunity.  The following two tables, **Tables 3 and 4**, show the share shift that would occur as a result of a grant of antitrust immunity in the New York-London market and specifically in the Kennedy-London market.

| Table 3: Onboard Passenger Share in the New York-London Market | | | | | |
|---|---|---|---|---|---|
| **Pre-transaction** | **Passengers** | **Share** | **Post-transaction** | **Passengers** | **Share** |
| Immunized oneworld | 2,239,290 | 55% | Immunized oneworld | 2,239,290 | 55% |
| Virgin Atlantic | 896,288 | ~22% | Immunized SkyTeam + Virgin Atlantic <br> Immunized SkyTeam <br> + <br> Virgin Atlantic | 1,286,610 <br> 390,322 <br> <br> 896,288 | **~32%** <br> ~10% <br> + <br> ~22% |
| Immunized Star Alliance | 460,053 | 11% | Immunized Star Alliance | 460,053 | 11% |
| Immunized SkyTeam | 390,322 | ~10% | Other | 59,533 | 2% |
| Other | 59,533 | 2% | | | |
| **Grand Total** | **4,045,486** | **~100%** | **Grand Total** | **4,045,486** | **100%** |

Source: T-100 traffic data for the 12 months ended December 2012.

---

[21]    Several other carriers have historically operated between their respective homelands and London Heathrow with local traffic rights to carry passengers between London and the United States including, among others, Air India, Air New Zealand, El Al Israel Airlines, Japan Airlines, Kuwait Airways, and Qantas.  Air New Zealand and Kuwait Airways continue to operate from London Heathrow to Los Angeles and New York, respectively.

[22]    This may have led to several of those carriers ending service at London Gatwick Airport.  Delta ended service to London Gatwick in 2012, and US Airways ended service to London Gatwick in 2013.

[23]    *See* DOT Order 2010-7-8.  Finnair later joined the oneworld Joint Venture.

[24]    Based on June 2013 published schedules.

| Table 4: Onboard Passenger Share in the Kennedy-London Market | | | | | |
|---|---|---|---|---|---|
| **Pre-transaction** | **Passengers** | **Share** | **Post-transaction** | **Passengers** | **Share** |
| Immunized oneworld | 1,903,925 | 65% | Immunized oneworld | 1,903,925 | 65% |
| Virgin Atlantic | 557,113 | ~19% | Immunized SkyTeam + Virgin Atlantic<br>Immunized SkyTeam<br>+<br>Virgin Atlantic | 947,435<br>390,322<br>+<br>557,113 | **~32-33%**<br>~13%<br>+<br>~19% |
| Immunized SkyTeam | 390,322 | ~13% | Other | 59,716 | 2% |
| Other | 59,716 | 2% | | | |
| **Grand Total** | **2,911,076** | **~100%** | **Grand Total** | **2,911,076** | **~100%** |

Source: T-100 traffic data for the 12 months ended December 2012.

The ATI Applicants argue that a stronger second alliance competitor in the New York-London market will significantly enhance competition due to the unique structure of this market. The ATI Applicants claim that, as standalone carriers, their schedule offerings are significantly less desirable for business travelers, who require the flexibility of the oneworld Joint Venture's "shuttle-like" product.[25]  The ATI Applicants contend that granting antitrust immunity would allow Delta and Virgin Atlantic to optimize their schedule offerings between Kennedy and Heathrow to better compete with the oneworld Joint Venture in this unique market.[26]  We find this argument to be persuasive because, in a fully integrated, metal neutral joint venture, the carriers have natural incentives to maximize schedule offerings in order to attract corporate contracts and increase options for all travelers.  Time-of-day coverage is a major factor in allowing airlines to gain corporate contracts, especially in large business markets.  In the New York-London market, the proposed Delta-Virgin Atlantic Joint Venture would offer nine daily roundtrip flights between the two cities, compared to the approximately seventeen daily roundtrip flights of the oneworld Joint Venture.[27]  In addition, the existing immunized SkyTeam Joint Venture carriers would continue to offer service to both London and regional UK cities from their mainland-Europe hubs.

The Department is aware that the proposed alliance will reduce the number of competitors; however, the market's unique position as a trunk route for multiple airlines and alliances, as well as its size, creates incentives for all competitors to maintain or expand capacity.  This should, in turn, preserve the quality of services at competitive prices.

Several other arguments further support our tentative conclusion that there is unlikely to be competitive harm in the New York-London market.  First, the ATI Applicants made a convincing argument about the unique pricing attributes in the New York-London market.  The ATI Applicants point out that carriers schedule frequencies on routes with heavy business traffic with the goal of "capturing the largest possible share of premium time-sensitive passengers."[28]  They also argue that this "need to compete on frequency ensures a ready supply of non-premium

---

[25]  *See* Joint Application, at 43-45.

[26]  *See* Joint Application, at 24-25.

[27]  Based on June 2013 published schedules.  In conjunction with the SkyTeam Joint Venture, Delta also flies from Newark to Amsterdam and Paris.  The SkyTeam Joint Venture's ability to offer multiple daily transatlantic flights from both Newark and Kennedy is a testament to the size and importance of the New York market and the advantages of the schedule flexibility that is crucial for business travelers in the New York market.

[28]  *See* Joint Application, at 42.

seats, which in turn generates strong competition for non-time-sensitive passengers."[29]   If granted antitrust immunity, Delta and Virgin Atlantic will compete more effectively with the oneworld Joint Venture for premium passengers, and this will likely result in "creating increased capacity and downward pricing pressure for non-premium sales."[30]   Second, the European Commission's oneworld Joint Venture slot remedy acts as a safeguard against possible reduction in capacity in the market that could cause price increases.[31]   Third, Kennedy is the only airport that Virgin Atlantic flies to in the United States where Delta operates a hub.  Unlike American and British Airways, which operate out of separate terminals at Kennedy and have not announced plans to co-locate their facilities, Delta and Virgin Atlantic both operate out of the recently expanded Terminal 4 at Kennedy.[32]   Thus, of all of Virgin Atlantic's destinations in the United States, Kennedy will have the most connecting opportunities for Virgin Atlantic passengers.  This suggests that Delta and Virgin Atlantic will maintain or expand capacity in the New York-London market.

## II. City-Pair Level:  Boston-London

The Boston-London market, unlike the New York-London market, would shift from a three-competitor market to a duopoly market should ATI be granted.  The market warrants additional scrutiny given the potential levels of concentration that would follow such a decision.  According to published schedules, American ceased flying Boston-London on March 31, 2013.  It had previously operated a peak schedule of three daily roundtrip flights with Boeing 757-200 aircraft.  British Airways, part of the oneworld Joint Venture, added a fourth daily Boston-London roundtrip flight following American's withdrawal from the market.  Virgin Atlantic operates one daily roundtrip flight in the Boston-London market.  Following the joint Department-European Commission remedy that resulted in a grant of antitrust immunity for the oneworld Joint Venture in 2010, Delta applied for, and was awarded, remedy slots at London Heathrow in order to launch two daily roundtrip flights to Boston.  The competitive dynamic in the market, however, led Delta to cease operation of one of the two daily roundtrip flights in October 2011.[33]

Our analysis indicates that, although this market would become a duopoly nonstop route, the ATI Applicants would face limited incentives to raise fares above competitive levels or to cut service levels because the market will remain competitive.  Virgin Atlantic has served the

---

[29]   *Id.*

[30]   *Id.*

[31]   The Department and the European Commission examined competitive impacts in the New York-London market when reviewing the oneworld Joint Venture.  In that proceeding, the Department, in conjunction with the European Commission, decided that "slot transfers would best address the potential competitive harm in this case."  The European Commission articulated specific concerns in the New York-London market that, were they to occur, would automatically make slots available at Kennedy and Heathrow for competitors of the oneworld Joint Venture.  The condition would trigger if the number of competitive frequencies, excluding those of the oneworld Joint Venture, were to fall below a certain threshold.  Because this threshold has not been crossed since the remedy package was adopted, it has not yet been used in the New York market.  Nonetheless, the availability of an automatically-triggered slot remedy ensures a level of competitive capacity if the market were to change between now and 2021, when the slot remedy period expires.

[32]   The Department is cognizant of the fact that many Delta domestic flights continue to operate out of Terminal 2 at Kennedy, which is connected to Terminal 4 via an airside bus, and that there are no firm plans for Delta to fully consolidate in Terminal 4.

[33]   *See* Joint Application, at 46.

Boston-London market since 1991, and Delta has demonstrated an ability to serve the market since receiving remedy slots in 2011.  Delta also has a considerable presence in Boston, with service to several key business cities in the United States, products such as the Delta Shuttle, and, in conjunction with the SkyTeam Joint Venture, service to Amsterdam, Paris, and Rome. The proposed Delta-Virgin Atlantic Joint Venture would enable the two carriers to offer a pattern of service more competitive with that of the oneworld Joint Venture for travelers in Boston and London and thus strengthen inter-alliance competition.  **Table 5**, below, shows the share shift that would occur as a result of a grant of antitrust immunity in the Boston-London market.

| Table 5: Onboard Passenger Share in the Boston-London Market | | | | | |
|---|---|---|---|---|---|
| **Pre-transaction** | **Passengers** | **Share** | **Post-transaction** | **Passengers** | **Share** |
| Immunized oneworld | 713,332 | 73% | Immunized oneworld | 713,332 | 73% |
| Virgin Atlantic | 154,995 | 16% | Immunized SkyTeam + Virgin Atlantic | 261,556 | **27%** |
| Immunized SkyTeam | 106,561 | 11% | Immunized SkyTeam | 106,561 | 11% |
| | | | + | + | + |
| **Grand Total** | **974,888** | **100%** | Virgin Atlantic | 154,995 | 16% |
| | | | **Grand Total** | **974,888** | **100%** |

Source: T-100 traffic data for the 12 months ended December 2012.

Although geographic realities limit the number of hubs between Boston and London, there are some connecting options for passengers flying between the two cities, particularly given AerLingus' presence in the Boston-Ireland market, which can connect passengers to and from London.  The presence of such competition is likely to provide some competitive discipline in the market.  The local Boston-London market is also significantly smaller than the New York-London market.

Moreover, there are several other long-term competitive factors that merit consideration. Boston-London is a relatively short flight by transatlantic standards, and can potentially be served by narrowbody aircraft if another entrant wished to serve the market.  The likelihood of this occurring may be increased by the fact that Delta no longer uses the second remedy slot pair that is made available by the European Commission on a biannual basis.  In short, there remains some possibility of new entry in the Boston-London market.  Any airline other than a oneworld Joint Venture carrier, including both Delta and Virgin Atlantic, could seek the slots to launch additional Boston-London service at any time using the available slot remedy.

### III.  City-Pair Level:  Conclusion

In conclusion, the Department tentatively finds that approving the application would not result in a substantial reduction or elimination of competition on the city-pair level, including in the two nonstop overlap markets.  We also tentatively find that granting antitrust immunity to Delta and Virgin Atlantic is likely to be pro-competitive by enhancing inter-alliance competition in the New York-London and Boston-London markets.  As discussed in more detail in Section V, below, we tentatively conclude that a prime benefit of a grant of antitrust immunity would be to allow Delta and Virgin Atlantic to jointly offer a combined frequency level that would allow the two airlines to more effectively compete against the oneworld Joint Venture in both the New York-London and Boston-London markets.

## V.  PUBLIC BENEFITS ANALYSIS

Having completed our analysis under § 41309(b) and having tentatively found no substantial reduction or elimination of competition, we turn to our analysis under § 41308(b) to determine whether ATI is required by the public interest.  Our analysis under § 41308(b) requires an examination of the extent of the potential public benefits, as well as a determination on the need for immunity to achieve those benefits.

The application before us presents some novel issues in that it involves a new joint venture that would operate in parallel to an existing immunized joint venture.  This fact alone does not necessarily raise competitive concerns or dilute the claimed public benefits because we tentatively find that the U.S.-London market is somewhat distinct from the U.S.-Continental Europe market; that is, relatively few passengers fly between the U.S. and London via continental European hubs.  Because North America-United Kingdom flying will be carved out of the existing SkyTeam Joint Venture, however, the parties in the SkyTeam Joint Venture will have to file a modified Transatlantic Joint Venture Agreement as required by DOT Order 2008-5-32.

Nonetheless, the Department's policy on immunized alliances encourages carriers to take a holistic view of the alliance network in order to foster metal neutrality that leads to public benefits otherwise unobtainable.  We note press reports that Virgin Atlantic may eventually seek to be fully integrated into the existing SkyTeam Joint Venture at a future point.[34]  The Department will continue to monitor how the two joint ventures operate in tandem.  The Department will, as requested by the ATI Applicants and as is our past practice, extend the grant of antitrust immunity to each of the ATI Applicants' majority-owned corporate affiliates.

The parties claim that their application—including the Joint Venture Agreement and five-way Coordination Agreement—will result in substantial benefits to consumers in the North America-United Kingdom market.  No party has challenged any aspect of the ATI Applicants' claims, including their claimed public benefits.  Several parties, as described previously in Section II, expressed support for the application and asserted that granting antitrust immunity would result in increased inter-alliance competition and would expand consumer service options.

The ATI Applicants make several arguments regarding public benefits to be realized from a grant of antitrust immunity, including: (1) the creation of a meaningful competitive alternative to the oneworld Joint Venture; (2) optimized schedules to improve service offerings, including connections; (3) new flights, such as Seattle-London Heathrow[35]; (4) a full metal neutral codeshare network; (5) elimination of "double marginalization" or double markups on flights involving two or more carriers; and (6) efficiencies resulting from joint sales forces and airport co-location.  The ATI Applicants state that Delta's Quality of Service Index predicts that consumers will enjoy at least $187 million in annual efficiencies from synergies that result from

---

[34]  *See, e.g.*, http://www.telegraph.co.uk/finance/newsbysector/transport/9968125/Virgin-planning-talks-with-Air-France-KLM-and-Alitalia-over-joint-venture.html

[35]  On July 23, 2013, Delta announced that it would begin Seattle-London Heathrow service on March 29, 2014. Delta announced that its service was in "anticipation of receiving antitrust immunity later this year for its joint venture with Virgin Atlantic Airways."  *See* http://news.delta.com/index.php?s=43&item=2055

the Joint Venture.[36]

We tentatively find that these and other benefits are likely to accrue to consumers from a grant of antitrust immunity.  The likelihood that these proposed benefits will be realized is supported by the Department's historical experience in reviewing antitrust immunity cases and annual reports submitted by certain immunized carriers, which have allowed the Department to monitor the extent to which consumer benefits have materialized.

In this case, Delta and Virgin Atlantic have strong financial and fiduciary incentives to maximize cooperation and to promptly implement the Joint Venture due to Delta's $360 million investment for a 49% equity stake in Virgin Atlantic.  The ATI Applicants state that this is the first time a major U.S. carrier has taken such a sizable equity stake in a European carrier, and that Delta's ability to enter into an immunized joint venture with Virgin Atlantic was a major factor in its decision to purchase the 49% equity stake.[37]  As the ATI Applicants also note, Delta and Virgin Atlantic have already agreed to a fully-detailed Joint Venture Agreement.  The parties represent that they will move expeditiously to implement the Joint Venture because of the strong financial incentives that exist for Delta, including a contractual obligation to implement the Joint Venture within six months after receipt of antitrust immunity, and that the associated public benefits will begin to materialize from it soon thereafter.[38]  In addition, Delta and Virgin Atlantic have negotiated agreements that will allow their passengers reciprocal access to each other's airline lounges, as well as recognition of each other's frequent flyer program.

A prime benefit of a grant of antitrust immunity would be to allow Delta and Virgin Atlantic to jointly offer a combined frequency level that would allow them to compete more effectively against the oneworld Joint Venture in both the New York-London and Boston-London markets.[39]  The ATI Applicants indicate that corporate sales account managers have repeatedly turned down Delta due to its inadequate frequency level and time-of-day coverage in the New York-London market.  The ATI Applicants state that Delta captures only 7% of premium traffic on the route, despite having 10% of overall capacity in the market.[40]  Delta has made growth in the New York market a priority, and the increased frequency offerings to London will improve Delta's strategic position in the New York market and thereby increase options for consumers. The ATI Applicants have included a table that shows how Delta and Virgin Atlantic's time-of-day coverage could be optimized in the New York-London and Boston-London markets.[41]  The ATI Applicants also contend that the Joint Venture could lead to additional U.S.-London flights as a result of Delta's expanded competitive presence and improved point of sale marketing in the United Kingdom.[42]

---

[36]   *See* Joint Application, at 5.
[37]   *See* Joint Application, at 3.
[38]   *See* Joint Application, at 13.
[39]   Should ATI be granted, the Delta-Virgin Atlantic Joint Venture would offer nine daily roundtrip flights in the New York-London market and two daily roundtrip flights in the Boston-London market.  The oneworld Joint Venture would offer approximately seventeen daily roundtrip flights in the New York-London market and four daily roundtrip flights in the Boston-London market.  Based on June 2013 published schedules.
[40]   *See* Joint Application, at 23 and 43-44.
[41]   *See* Joint Application, at 25.
[42]   *See* Joint Application, at 29.

15

The ATI Applicants note that Virgin Atlantic has recently added domestic, intra-UK flights out of London Heathrow, and that these flights will provide important feeder service for Delta and Virgin Atlantic flights at Heathrow. Our analysis has raised some doubts about whether these intra-UK flights will greatly increase consumer choice and benefits. First, the flights operate out of Terminal 1 at London Heathrow, meaning that any passenger arriving from the United States on Delta or Virgin Atlantic flights will have to transfer terminals. Second, the three intra-UK destinations that Virgin Atlantic serves from London are all currently served through more efficient routings by the SkyTeam Joint Venture via KLM's hub at Amsterdam and Air France's hub at Paris. Despite these reservations, the Department tentatively concludes that there are benefits from providing consumers with additional paths between origin and destination points, and experience shows that consumers use these opportunities and benefit from the additional capacity in the city-pair markets served.

The ATI Applicants state that they will strive to co-locate facilities at airports whenever possible, including at London Heathrow, and note that they are already co-located in Terminal 4 at Kennedy, which will likely be the station with the largest amount of connecting Virgin Atlantic passengers, due to Delta's hub there. Airport co-location is important to realizing the consumer benefits of metal neutral joint ventures.

With the Delta-Virgin Atlantic Joint Venture in place, the ATI Applicants expect to deliver substantial benefits from comprehensive integration of their operations, alignment of products and services, and improved service options for consumers.[43] Delta and Virgin Atlantic have already begun to place their codes on each other's transatlantic flights. As the Department has noted in the past, the economic incentives of non-immunized codesharing encourage each carrier to maximize its own profit without regard to the financial position of the other carrier. In an immunized joint venture, both carriers become indifferent as to which carrier operates the flight, focusing instead on maximizing traffic flows across combined networks.[44] This dynamic may eliminate double marginalization pricing and other inefficiencies that burden consumers. The ATI Applicants point to Virgin Atlantic's own experience as an example of the economics of arm's length codesharing. Although Virgin Atlantic codeshared with US Airways on certain flights beyond Virgin Atlantic's U.S. gateways, the parties' data show that less than 3% of traffic on Virgin Atlantic's flights travel beyond its U.S. gateways, while 10% of traffic on British Airways' flights travel beyond its U.S. gateways as part of its immunized joint venture with American.[45] While this might be due to the limited presence of US Airways at Virgin Atlantic's U.S. gateways, especially in New York, it is also likely true that the benefits of a joint venture, including metal neutral scheduling, pricing, and revenue management, contribute to more options for connections and greater traffic flows. In the present case, Delta will place its code, and the traveling public will have online connections, on Virgin Atlantic flights between North America

---

[43]   *See* Joint Application, at 32.

[44]   Delta recently announced a new policy regarding minimum spending requirements for frequent fliers to attain elite status that will take effect in 2014. It is our understanding that the minimum spending requirements can only be satisfied with tickets either issued by Delta directly or booked with the Delta (DL) code, and not through tickets issued by Delta's joint venture partner airlines on those airlines' codes, even if the flights at issue are part of a joint venture and subject to revenue sharing. The Department will monitor the implementation of this new policy to determine whether it may erode metal neutrality, which is a prerequisite for many of the consumer benefits resulting from immunized alliances.

[45]   *See* Joint Application, at 33. Virgin Atlantic and US Airways officially ended their codeshare on June 12, 2013.

and the United Kingdom. This will strengthen the position of Delta, as well as the already immunized SkyTeam Joint Venture, in key business markets in the United States that Virgin Atlantic, but not Delta, currently serves from London, such as Chicago, Los Angeles, Miami, San Francisco, and Washington, D.C. Virgin Atlantic, for its part, will gain access to dozens of new markets in the United States where it currently lacks a codeshare partner.

After examining the record before us, we tentatively conclude that the ATI Applicants have presented a persuasive case regarding the claimed public benefits.

## VI.  TENTATIVE DECISION

In this section, we discuss the tentative decision reached by the Department regarding the ATI Applicants' request for antitrust immunity.

### A.  TENTATIVE APPROVAL OF ALLIANCE AGREEMENTS

Based on our analysis of the potential competitive effects and public benefits of the proposed alliance, we tentatively approve the ATI Alliance Agreements.

### B.  TENTATIVE GRANT OF ANTITRUST IMMUNITY

We have tentatively determined that the proposed alliance will deliver public benefits. Thus, we must now decide whether a grant of antitrust immunity is justified. The Department's policy has been to grant immunity only if the parties to the transaction will not otherwise proceed without it and if we conclude that the public interest requires that we grant it.

The ATI Applicants argue that an absence of immunity would expose the parties to "unacceptable antitrust risk," and we tentatively find their position to be credible.[46]  We tentatively conclude that antitrust immunity is necessary to facilitate this particular transaction and allow the partners to engage in the kind of revenue and benefit sharing that is necessary to alleviate the commercial risks and create substantial public benefits.

## VII.  TENTATIVE CONDITIONS

In this section, we summarize and explain the proposed conditions to be applied to our tentative grant of antitrust immunity to the ATI Applicants.

### A.  IMPLEMENTATION OF THE JOINT VENTURE

Because many of the anticipated public benefits will not be realized unless the Joint Venture is implemented in a timely manner, we propose to require the ATI Applicants to submit evidence that their Joint Venture Agreement has been implemented in order to retain the antitrust immunity. If, within twelve months of the issuance of a final order, an applicant has not submitted: (1) verified statements attesting to the full implementation of the Joint Venture Agreement and five-way Coordination Agreement, and (2) a copy of the executed agreements,

---

[46]  *See* Joint Application, at 21.

the antitrust immunity granted to those applicants' proposed alliance will automatically expire.

Our precedent has been to allow ATI applicants eighteen months to satisfy this condition; however, the ATI Applicants have indicated that they have a contractual obligation to implement the Joint Venture Agreement within six months following a grant of ATI.  Thus, we are shortening the period according to the facts of this case, while still allowing enough time for the ATI Applicants to conclude the arrangement in the event of unforeseen developments.  Because the ATI Applicants in this case have negotiated and signed a Joint Venture Agreement and state that they are contractually obligated to implement the agreement within six months following a grant of antitrust immunity, we are not anticipating delays in this regard.

### B.  ANNUAL REPORTING

The competitive issues associated with any proposed alliance and antitrust immunity application are complex.  Relief from the antitrust laws is a major regulatory action.  We tentatively find that it is necessary for the ATI Applicants to report to the Department concerning commercial developments in their alliance and the degree to which the public benefits envisioned in the application are being realized.  As we have in recent decisions, we are proposing annual reports.  The reports should focus on progress made toward achieving the alliance's stated goals, specific actions taken to implement each of the ATI Alliance Agreements (including, especially, the Joint Venture Agreement), a description of present or future planned cooperation among the alliance partners in all core airline functions, and a discussion of the public benefits that are being realized.  The reports are also an opportunity for the parties to address any developments or concerns that the Department highlights in its regular, ongoing oversight of international alliances.

### C.  O&D SURVEY DATA REPORTING

For many years, we have required foreign carriers to submit traffic data as a condition of obtaining immunity from U.S. antitrust laws.  We require those carriers to participate in the Department's Origin-Destination Survey of Airline Passenger Traffic ("**O&D Survey**"), which requires U.S. carriers to submit traffic data in markets they serve singularly or jointly with foreign airlines.  Without foreign carrier participation in this effort, we would receive no detailed market information for passengers traveling to or from the United States when their entire trip is on foreign airlines, except for T-100 data for nonstop and single-plane markets.  The absence of such foreign carrier data severely handicaps our ability to evaluate the competitive effects of alliances.

As in previous cases, we have tentatively decided to require the foreign carrier applicants— Air France, Alitalia, KLM, and Virgin Atlantic—to report full-itinerary O&D Survey information for all passenger itineraries that contain a United States point.  This duty encompasses all traffic to third countries in which the itinerary includes a U.S. point and is a new requirement for one of these applicants.

To prevent this reporting requirement from unfairly harming the foreign applicants' competitive positions, we tentatively decide to grant confidentiality to their O&D Survey reports

and special reports on codeshare passengers. Currently, we grant confidential treatment to all international Origin-Destination data. We propose to provide confidential treatment for this data because of the potentially damaging competitive impact on airlines and the potential adverse effect upon the public interest that would result from unilateral disclosure of these data.[47]

Section 19-7(d)(1) of 14 C.F.R. Part 241 provides for disclosure of international O&D Survey data to air carriers directly participating in and contributing to the O&D Survey. While we have tentatively found it appropriate to direct the foreign carrier applicants in this proceeding to provide certain limited O&D Survey data, they are not air carriers within the meaning of Part 241. 14 C.F.R. Part 241, § 03, defines an air carrier as "[a]ny citizen of the United States who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in air transportation." Air France, Alitalia, KLM, and Virgin Atlantic would have no access to the data filed by U.S. air carriers. Therefore, we would keep submissions confidential while maintaining the current restriction on access to U.S. air carrier O&D Survey data by foreign air carriers.

## D. WITHDRAWAL FROM IATA TARIFF COORDINATION

As we have found in earlier decisions, it is contrary to the public interest to permit immunized alliances to participate in certain price-related coordination that is already immunized within International Air Transport Association ("**IATA**") tariff coordination. We therefore tentatively decide to condition our grant of antitrust immunity by requiring the ATI Applicants to withdraw, or to remain withdrawn, from participation in any IATA tariff activities that affect or discuss any proposed through fares, rates, or charges applicable between the United States and any countries whose airline(s) have been or are subsequently granted antitrust immunity by the Department for participation in similar alliances. Such countries include the homelands of the applicants. We tentatively find that this condition is in the public interest for the same reasons stated in DOT Order 2010-7-8.

## E. CRS ISSUES

Consistent with recent cases, we are not proposing any conditions regarding the management of Computer Reservations Systems ("**CRSs**"). Any coordination between the applicants concerning the operation of separate businesses, such as CRSs, would not be transactions specifically approved or necessarily contemplated by our orders in this proceeding. While the ATI Applicants, individually or collectively, may acquire an interest in a CRS, the grant of antitrust immunity in this Show Cause Order thus does not extend to their management of those interests. On the other hand, the ATI Applicants' alliance relationships will likely require the coordination of the presentation and sale of the airlines' own services in the CRSs and each airline's operation of its internal reservations systems. Those activities will necessarily be covered by a grant of antitrust immunity.

---

[47]  We treat the foreign airlines' O&D data as confidential, do not allow U.S. airlines any access to the data, and do not allow foreign airlines any access to U.S. airline O&D Survey data. We use these data only for internal analytical purposes.

### F.  OPERATION UNDER A COMMON NAME

Because implementation of the ATI Alliance Agreements could raise important consumer issues and "holding out" questions, if Delta or Virgin Atlantic choose to operate under a common name or use "common brands," they must seek separate approval from the Department prior to such operations.  For example, it is Department policy to consider the use of a single air carrier designator code by two or more airlines to be unfair and deceptive, unless the airlines give reasonable and timely notice to passengers of the actual operator of the aircraft.

## ACCORDINGLY:

1.     We direct all interested persons to show cause why we should not issue an order making final our tentative findings and conclusions discussed herein.  Objections or comments to our tentative findings and conclusions shall be due no later than 14 calendar days from the service date of this Order, and answers to objections shall be due no later than 7 calendar days thereafter. In the event that no objections are filed, all further procedural steps shall be deemed waived, and we will enter an order making final our tentative findings and conclusions;

2.     We tentatively approve and grant antitrust immunity to the ATI Alliance Agreements between Virgin Atlantic Airways, Ltd., Delta Air Lines, Inc., Société Air France, Koninklijke Luchtvaart Maatschappij N.V., and Alitalia Compagnia Aerea Italiana S.P.A., in so far as such agreements relate to foreign air transportation.  Subject to the terms and conditions described in the ordering paragraphs below, the approval and grant of antitrust immunity shall remain in effect indefinitely, provided that the ATI Applicants:

      a.  Submit for prior approval subsequent subsidiary agreements implementing their most recent ATI Alliance Agreements[48];

      b.  Resubmit the ATI Alliance Agreements, including the Joint Venture Agreement and the five-way Coordination Agreement, before five years from the date of issuance of the final order in this case; and

      c.  Obtain prior approval if they choose to hold out service under a common name or use common brands;

---

[48]   Regarding this requirement, we do not expect the ATI Applicants to provide the Department with minor technical understandings that are necessary to implement fully their day-to-day operations but that have no additional substantive significance.  We do, however, expect and direct them to provide the Department with all unredacted contractual instruments that implement or materially alter, modify, or amend the cooperation agreements, joint ventures, or confidentiality/antitrust guidelines.

3.      We tentatively direct the ATI Applicants to file with the Director, Office of Aviation Analysis, the following as evidence of implementation of the Joint Venture:

> a.  Verified statements by Virgin Atlantic Airways, Ltd. and Delta Air Lines, Inc. attesting that the Joint Venture Agreement has been implemented pursuant to the terms described in the Joint Application, and a complete and unredacted copy of the most recent Joint Venture Agreement and any appendices;

We tentatively determine that, unless the ATI Applicants make the filings described in this ordering paragraph within twelve months of the issuance of a final order in this case, the authority herein shall expire and the grant of antitrust immunity shall be automatically withdrawn from the non-compliant ATI Applicants;

4.      We tentatively direct the ATI Applicants to submit annual progress reports to the Office of Aviation Analysis, beginning one year from the date of issuance of a final order in this case, and continuing each year thereafter while their respective ATI Alliance Agreements are effective[49];

5.      We tentatively direct Virgin Atlantic Airways, Ltd., Delta Air Lines, Inc., Société Air France, Koninklijke Luchtvaart Maatschappij N.V., and Alitalia Compagnia Aerea Italiana S.P.A. to withdraw, or to remain withdrawn, from participation in any International Air Transport Association tariff coordination activities that discuss any proposed through fares, rates, or charges applicable between the United States and any countries whose airlines have been or are subsequently granted antitrust immunity, or renewal thereof, to participate in similar alliance activities with a U.S. airline(s);

6.      We tentatively delegate to the Director, Office of International Aviation, the authority to determine the applicability of the directive set forth in Ordering Paragraph 5 as to specific prices, markets, and tariff coordination activities, consistent with the scope and purpose of the condition, as previously described;

7.      We tentatively direct Virgin Atlantic Airways, Ltd., Delta Air Lines, Inc., Société Air France, Koninklijke Luchtvaart Maatschappij N.V., and Alitalia Compagnia Aerea Italiana S.P.A. to begin or to continue to report full-itinerary Origin-Destination Survey of Airline Passenger Traffic for all passenger itineraries that include a U.S. point;

---

[49]    We expect the ATI Applicants to deliver the progress report by the close of business on the anniversary date.  If that date falls on a weekend or federal holiday, the ATI Applicants may deliver the report by the close of business on the following business day.

8.     We tentatively determine that we may amend, modify, or revoke this authority at any time without hearing;

9.     We will serve this Order on all parties on the service list in this docket.


By:



**SUSAN L. KURLAND**
Assistant Secretary for Aviation
and International Affairs

(SEAL)


*An electronic version of this document is available at: http://www.regulations.gov*