# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, ET AL.,

Plaintiffs,

v.

AMERICAN AIRLINES GROUP INC. and
JETBLUE AIRWAYS CORPORATION,
Defendants.

Civil Action No. 1:21-cv-11558-LTS

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS BY DEFENDANTS
AMERICAN AIRLINES GROUP INC. AND JETBLUE AIRWAYS CORPORATION**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

PLAINTIFFS' COMPLAINT............................................................................................5

ARGUMENT ...................................................................................................................7

I.       Defendants Urge the Court to Adopt an Elevated Legal Standard Contrary to
         Statutory Text and Controlling Precedent...........................................................9

         A.       Section 1 Violations Can Be Established Based on a Harm to Competition
                  or Likely Anticompetitive Effects. ..........................................................9

         B.       Both Section 1 of the Sherman Act and Section 7 of the Clayton Act Seek
                  to Prevent Anticompetitive Conduct Before It Harms Consumers.......................16

II.      The Northeast Alliance Is Anticompetitive. ......................................................21

III.     The Northeast Alliance Enhances Defendants' Market Power..........................27

         A.       Plaintiffs Sufficiently Allege That Defendants Have Market Power....................27

         B.       Plaintiffs' Alleged Geographic Market for New York City Is Based on
                  Established Legal Principles. ..................................................................33

CONCLUSION...............................................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*Addamax Corp. v. Open Software Foundation, Inc.*,
    152 F.3d 48 (1st Cir. 1998) ........................................................................ 14, 15, 23

*American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*,
    456 U.S. 556 (1982) ............................................................................................... 23

*Associated Press v. United States*,
    326 U.S. 1 (1945) ...................................................................................... 11, 12, 15

*Augusta News Co. v. Hudson News Co.*,
    269 F.3d 41 (1st Cir. 2001) .................................................................................. 14

*Blackburn v. Sweeney*,
    53 F.3d 825 (7th Cir. 1995) ................................................................................. 24

*Chicago Board of Trade v. United States*,
    246 U.S. 231 (1918) ........................................................................................ 11, 15

*California Dental Ass'n v. FTC*,
    526 U.S. 756 (1999) ........................................................................................ 15, 17

*California Ass'n of Realtors, Inc. v. PDFfiller, Inc.*,
    No. CV 16-11021-IT, 2018 WL 1403330 (D. Mass. Mar. 2, 2018) ...................... 34

*California ex rel. Harris v. Safeway, Inc.*,
    651 F.3d 1118 (9th Cir. 2011) ............................................................................. 22

*California v. American Stores Co.*,
    495 U.S. 271 (1990) ............................................................................................... 11

*Catrone v. Ogden Suffolk Downs, Inc.*,
    683 F. Supp. 302 (D. Mass. 1988) ....................................................................... 14

*CCBN.Com, Inc. v. Thomson Financial, Inc.*,
    270 F. Supp. 2d 146 (D. Mass. 2003) .................................................................. 14

*Chicago Bridge & Iron Co. v. FTC*,
    534 F.3d 410 (5th Cir. 2008) ............................................................................... 14

*Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*,
    754 F.2d 404 (1st Cir. 1985) ..................................................................... 13, 31, 33

*Citizen Publishing Co. v. United States*,
    394 U.S. 131 (1969) ............................................................................................... 21

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*,
  79 F.3d 182 (1st Cir. 1996) ............................................................................. 28

*Continental Airlines, Inc. v. United Air Lines, Inc.*,
  120 F. Supp. 2d 556 (E.D. Va. 2000) ............................................................. 35

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) ................................................................................. 18, 23

*Eastern Food Services, Inc. v. Pontifical Catholic University Services Ass'n, Inc.*,
  357 F.3d 1 (1st Cir. 2004) ............................................................ 4, 27, 28, 31

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992) ......................................................................................... 27

*Flovac, Inc. v. Airvac, Inc.*,
  817 F.3d 849 (1st Cir. 2016) ......................................................................... 33

*FTC v. AbbVie Inc.*,
  976 F.3d 327 (3d Cir. 2020) ........................................................................... 26

*FTC v. Actavis, Inc.*,
  570 U.S. 136 (2013) ............................................................................. 9, 11, 15

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ....................................................................... 18

*FTC  v. Indiana Federation of Dentists*,
  476 U.S. 447 (1986) ......................................................................................... 15

*FTC v. Penn State Hershey Medical Center*,
  838 F.3d 327 (3d Cir. 2016) ........................................................................... 29

*Giuliano v. Sandisk Corp.*,
  No. C 10-02787 SBA, 2015 WL 10890654 (N.D. Cal. May 14, 2015) ................. 18

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
  733 F. App'x 380 (9th Cir. 2018) .................................................................. 32

*Impax Laboratories Inc. v. FTC*,
  994 F.3d 484 (5th Cir. 2021) ...................................................................... 9, 13

*In re AMR Corp.*,
  625 B.R. 215 (Bankr. S.D.N.Y. 2021) .................................................... 31, 32

*In re Intuniv Antitrust Litigation*,
    496 F. Supp. 3d 639 (D. Mass. 2020) ............................................................. 19, 33

*In re Online DVD Rental Antitrust Litigation*,
    No. M 09-2029, 2011 WL 5883772 (N.D. Cal. Nov. 23, 2011)............................ 22

*K.M.B. Warehouse Distributors, Inc. v. Walker Manufacturing Co.*,
    61 F.3d 123 (2d Cir. 1995)................................................................... 12, 16

*Kestenbaum v. Falstaff Brewing Corp.*,
    575 F.2d 564 (5th Cir. 1978) ..................................................................... 16

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)................................................................................ 17

*Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co.*,
    381 U.S. 311 (1965)................................................................................ 17

*Morales-Villalobos v. Garcia-Llorens*,
    316 F.3d 51 (1st Cir. 2003)......................................................................... 5

*National Society of Professional Engineers v. United States*,
    435 U.S. 679 (1978)................................................................................. 9

*NCAA v. Alston*,
    141 S. Ct. 2141 (2021)................................................................. 3, 8, 17, 23

*NCAA v. Board of Regents of the University of Oklahoma*,
    468 U.S. 85 (1984).......................................................................... 8, 10, 22

*Nuance Communications, Inc. v. Omilia Natural Language Solutions, Ltd.*,
    No. CV 19-11438-PBS, 2020 WL 2198362 (D. Mass. May 6, 2020)................. 5, 34

*Ocasio-Hernández v. Fortuño-Burset*,
    640 F.3d 1 (1st Cir. 2011)........................................................................... 8

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018)...................................................................... 8, 12, 16, 31

*Palmer v. BRG of Georgia, Inc.*,
    498 U.S. 46 (1990)................................................................................. 21

*Polk Bros. v. Forest City Enterprises, Inc.*,
    776 F.2d 185 (7th Cir. 1985) ..................................................................... 24

*Polygram Holding, Inc. v. FTC,*
    416 F.3d 29 (D.C. Cir. 2005) ............................................................. 21

*Realcomp II, Ltd. v. FTC,*
    635 F.3d 815 (6th Cir. 2011) ................................................ 12, 13, 15, 16

*Rebel Oil Co. v. Atlantic Richfield Co.,*
    51 F.3d 1421 (9th Cir. 1995) ............................................................ 27

*Rodríguez-Reyes v. Molina-Rodríguez,*
    711 F.3d 49 (1st Cir. 2013) ............................................................... 8

*Rodríguez-Vives v. Puerto Rico Firefighters Corps,*
    743 F.3d 278 (1st Cir. 2014) ............................................................. 8

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
    792 F.2d 210 (D.C. Cir. 1986) ...................................................... 20, 24

*Spirit Airlines, Inc. v. Northwest Airlines, Inc.,*
    431 F.3d 917 (6th Cir. 2005) ............................................................ 32

*Standard Oil Co. v. FTC,*
    340 U. S. 231 (1951) ...................................................................... 9

*Steward Health Care System, LLC v. Blue Cross & Blue Shield of Rhode Island,*
    997 F. Supp. 2d 142 (D.R.I. 2014) ..................................................... 34

*Sullivan v. NFL,*
    34 F.3d 1091 (1st Cir. 1994) ................................................. 8, 9, 10, 24

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006) ....................................................................... 24

*United States v. Addyston Pipe & Steel Co.,*
    85 F. 271 (6th Cir. 1898) ............................................................... 24

*United States v. Andreas,*
    216 F.3d 645 (7th Cir. 2000) ........................................................... 21

*United States v. Anthem, Inc.,*
    855 F.3d 345 (D.C. Cir. 2017) ........................................................... 9

*United States v. Blue Cross Blue Shield of Michigan,*
    809 F. Supp. 2d 665 (E.D. Mich. 2011) ................................................ 28

*United States v. Brown University*,
    5 F.3d 658 (3d Cir. 1993) ............................................................................ 10, 13, 22

*United States v. Columbia Steel Co.*,
    334 U.S. 495 (1948) ................................................................................................ 18

*United States v. First National Bank & Trust Co. of Lexington*,
    376 U.S. 665 (1964) ............................................................................ 10, 15, 17, 28

*United States v. General Dynamics Corp.*,
    415 U.S. 486 (1974) ................................................................................................ 14

*United States v. Penn-Olin Chemical Co.*,
    378 U.S. 158 (1964) ........................................................................................... 18, 23

*United States v. Philadelphia National Bank*,
    374 U.S. 321 (1963) ....................................................................................... 9, 10, 28

*United States v. Realty Multi-List, Inc.*,
    629 F.2d 1351 (5th Cir. 1980) ............................................................................... 12

*United States v. Rockford Memorial Corp.*,
    898 F.2d 1278 (7th Cir. 1990) ..................................................................... 16, 17, 20

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ................................................................................................ 21

*United States v. United Continental Holdings, Inc.*,
    No. 2:33-AV-0001 (D.N.J. Nov. 10, 2015) ........................................................... 34

*United States v. Union Pacific Railroad Co.*,
    226 U.S. 61 (1912) .................................................................................................. 10

*United States v. US Airways Group, Inc.*,
    No. 1:13-cv-01236 (D.D.C. Sept. 5, 2013) ........................................................... 34

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003) .................................................................................. 28

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) .................................................................................... 31

*Vantico Holdings S.A. v. Apollo Management, LP*,
    247 F. Supp. 2d 437 (S.D.N.Y. 2003) .................................................................... 17

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ........................................................... 18, 22, 26

*Wojcieszek v. New England Telephone & Telegraph Co.*,
  977 F. Supp. 527 (D. Mass. 1997) ............................................................. 32

*Toys "R" Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ................................................................... 28

*Yagoozon, Inc. v. Kids Fly Safe*,
  No. 14-040, 2014 WL 3109797 (D.R.I. July 8, 2014) .................................. 14

**Statutes**
15 U.S.C. § 1 ....................................................................................................... 8

15 U.S.C. § 4 ........................................................................................... 1, 3, 11

15 U.S.C. § 26 ......................................................................................... 1, 3, 11

49 U.S.C. 41720(h) ........................................................................................... 25

**Rules**
Federal Rule of Civil Procedure 12(b)(6) ........................................................... 1

**Treatises**
*Phillip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and
  Their Application,*
  (4th ed. 2018) ............................................................................................. 13

**Other Authorities**
*DOJ & FTC, Antitrust Guidelines for Collaborations Among Competitors*,
  (2000) ..................................................................................... 15, 18, 19, 23

*Herbert Hovenkamp, The Rule of Reason*,
  70 FLA. L. REV. 81 (2018) ........................................................................ 15

Plaintiffs United States of America ("United States"), State of Arizona, State of California, District of Columbia, State of Florida, Commonwealth of Massachusetts, Commonwealth of Pennsylvania, and Commonwealth of Virginia ("Plaintiff States") (collectively, "Plaintiffs") hereby respond to Defendants American Airlines Group Inc.'s ("American") and JetBlue Airways Corporation's ("JetBlue") (collectively, "Defendants") motion pursuant to Federal Rule of Civil Procedure 12(b)(6) filed November 22, 2021.

## INTRODUCTION

Plaintiffs have filed suit to enjoin the "Northeast Alliance" between American and JetBlue.  The Northeast Alliance effectively merges the operations of the world's largest airline and a uniquely disruptive low-cost competitor on flights to and from airports in Boston and New York serving millions of customers and generating billions in annual revenue.  The federal antitrust laws charge the United States "to prevent and restrain" this kind of unlawful combination, 15 U.S.C. § 4, and empower States to prevent precisely this sort of "threatened loss or damage," 15 U.S.C. § 26.  Plaintiffs have fulfilled that responsibility here.  Yet Defendants argue that this case must be dismissed because the Court is powerless "to prevent" this "threatened . . . damage" until after consumers have suffered increased prices, decreased output, or diminished quality.  This extraordinary claim disregards clear statutory text and a century of controlling precedent.  It should be rejected and Defendants' Motion to Dismiss denied.

Millions of Americans rely on airlines to travel within the United States and around the world.  In recent years, however, consolidation has left consumers with fewer and fewer alternatives.  Legacy airlines—American, Delta, and United—and Southwest control more than 80 percent of domestic air travel.  Legacy airlines and their international alliances also control most traffic between the United States and Europe.  In the face of this consolidation, JetBlue "boxes far above [its] weight" and "play[s] a critical role in keeping the commercial aviation

1

industry competitive and keeping the immense power of the legacy airlines in check."  Compl.
¶ 5.  It does so by lowering fares and offering better service, forcing its rivals—including
American—to do the same.  As a result, JetBlue estimates it has saved consumers more than
$10 billion since its founding.  Moreover, legacy airlines like American have reduced capacity in
recent years.  But JetBlue has done the opposite, cutting into legacy airlines' market share by
increasing capacity in Boston, New York, and elsewhere.  JetBlue's success prompted one
American executive to promise that they would "fight like hell" in Boston by adding more flights
to win back share.  *Id.* ¶ 55.

The Northeast Alliance will extinguish this competition between American and JetBlue.
Rather than aggressively competing with each other, American and JetBlue will use the
Northeast Alliance to share revenues so they are "indifferent" about whether customers fly
American or JetBlue to and from Boston and New York City.  The Northeast Alliance also
allows American and JetBlue to coordinate their output on Alliance routes by deciding together
which routes to fly, when to fly them, who will fly them, and what size planes to use.  While
Defendants refer to this as output "optimization," in reality Defendants can decide between
themselves to "cut the number of seats they fly in a market and, in so doing, raise fares."
*Id.* ¶ 20.  The Northeast Alliance therefore eliminates competition between American and
JetBlue on routes that cover two-thirds of JetBlue's overall business.  It will have far-reaching
negative consequences for consumers across the country as well by diminishing Defendants'
incentive to compete across their networks and allowing them to reduce capacity more generally.

Plaintiffs have brought this action to prevent a significant loss of competition and
hundreds of millions of dollars in annual harm to consumers that will likely occur as a result.

2

Defendants move to dismiss by presenting arguments that misstate the law, ignore the allegations in the Complaint, and raise no more than factual disputes.  Each one should be rejected.

*First*, Defendants argue that Section 1 of the Sherman Act requires Plaintiffs to wait until Defendants have increased prices, reduced output, or diminished service quality before filing suit.  This misstatement of law contradicts Congress's command that "it shall be the *duty*" of the United States "to *prevent* and restrain" Sherman Act violations, 15 U.S.C. § 4 (emphasis added), and that state attorneys general may bring actions to stop "*threatened* loss or damage," 15 U.S.C. § 26 (emphasis added).  It also contradicts more than a century of controlling precedent. Moreover, Defendants do not dispute that if they structured their Northeast Alliance as a merger it would be subject to a forward-looking challenge and be presumptively anticompetitive. Instead, they contend that the predictive tools used in merger cases do not apply because they have engineered a partnership that merely replicates many of the economic effects of a merger. Defendants apparently think they have uncovered a clever trick to avoid scrutiny under the antitrust laws—a strategy that, if endorsed, would allow competitors to eliminate competition while the United States, Plaintiff States, and courts are powerless to do anything about it until consumers suffer quantifiable harm.

*Second*, Defendants insist their joint venture is "presumptively *procompetitive*."  Mot. at 20 (emphasis in original).  This argument flies in the face of *NCAA v. Alston*, 141 S. Ct. 2141 (2021), which recently rejected a similar argument by the NCAA.  141 S. Ct. at 2155–56. The potential for anticompetitive harm here is not difficult to see.  When two direct competitors agree to coordinate rather than compete, as Defendants have done through the Northeast Alliance, their agreement to do so is naturally susceptible to scrutiny under Section 1 of the Sherman Act.  That is particularly true when their agreement eliminates or diminishes price

competition (which is ordinarily condemned without a detailed rule-of-reason inquiry).
Defendants' contrary arguments are meritless and do not justify dismissal.

*Third*, Defendants complain that Plaintiffs' market power allegations "treat the
[Northeast Alliance] like a merger" and rely on implausible geographic markets. Mot. at 5.
But courts routinely infer market power from market shares and concentration in merger and
non-merger cases alike. *See, e.g.*, *E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n,
Inc.*, 357 F.3d 1, 6 (1st Cir. 2004). And Plaintiffs have alleged that the Northeast Alliance will
significantly increase Defendants' market share and concentration across more than a hundred
markets, making what JetBlue's own CEO characterized as airlines' "startling" and "immense"
power even worse. Compl. ¶¶ 5, 23. Defendants simply ignore these allegations and claim it is
"generally understood and accepted" that barriers to entry and expansion in the airline industry
are so low that *even a merger to monopoly would not raise concerns*. Mot. at 30. This fanciful
picture of competition in the airline industry contradicts JetBlue's own prior statements, cited in
the Complaint, and Defendants' own brief, which claims that the Northeast Alliance will benefit
consumers by helping JetBlue overcome barriers to expansion in New York. *Id.* at 8. In any
event, Plaintiffs' Complaint contains detailed allegations about barriers to entry in all the alleged
markets. Defendants' disagreement with these allegations, at most, raises a factual dispute and is
not an appropriate basis for a motion to dismiss.

Defendants' arguments about market definition likewise raise nothing more than a factual
dispute about whether enough consumers view Newark Liberty International Airport ("Newark")
as a reasonable substitute for John F. Kennedy International Airport ("JFK") and LaGuardia
Airport ("LaGuardia") to discipline an exercise of market power. Plaintiffs allege they do not,
and so Plaintiffs' alleged geographic markets include domestic origin and destination pairs to

4

and from JFK and LaGuardia but not Newark consistent with well-established methods for defining antitrust markets based on consumer preference. Defendants argue the opposite, contradicting JetBlue's own prior statements. This kind of factual dispute cannot be resolved on a motion to dismiss. *See, e.g., Nuance Commc'ns, Inc. v. Omilia Nat. Language Sols., Ltd.*, No. CV 19-11438-PBS, 2020 WL 2198362, at *6 (D. Mass. May 6, 2020) ("Market definition is a question of fact that generally cannot be decided on a motion to dismiss." (citing *Morales-Villalobos v. Garcia-Llorens*, 316 F.3d 51, 55 (1st Cir. 2003)).

At its core, the Northeast Alliance seeks to accomplish through a joint venture what would not be tolerated as a merger: eliminating significant competition between a dominant airline and a uniquely disruptive competitor. This strategy is familiar and the tactics here—sharing revenues, coordinating output, and consolidating market share—are not complicated or novel. If allowed to stand, Defendants' Northeast Alliance will cost consumers hundreds of millions of dollars. Defendants' promised benefits do not justify these harms. At a minimum, however, their promises should be tested through discovery and trial, not accepted based on claims in a brief.

## PLAINTIFFS' COMPLAINT

Four airlines dominate the airline industry: three "legacy" airlines—American, Delta, and United—and Southwest. Together, they control 80 percent of domestic air travel. Compl. ¶ 1. As JetBlue's CEO put it, "this is a startling concentration of power." *Id.* ¶ 23.

In the face of consolidation, JetBlue has served "as an important counterweight," "lowering fares, stimulating demand, and raising the bar in Customer service." *Id.* ¶ 5. JetBlue estimates that it has saved consumers more than $10 billion by offering lower fares and better service and forcing its competitors to do the same. *Id.* And while legacy airlines "boast[ed] about capacity discipline," i.e., reducing the number of overall seats available to consumers and

raising prices, and reduced domestic capacity by 4 percent between 2004 and 2019, JetBlue grew its domestic capacity by 149 percent during the same period.  *Id.* ¶ 32.  JetBlue also planned to "defend and increase [its] leading market share position" by adding new flights to and from Boston, New York, and other cities.  *Id.* ¶ 56.  That included transatlantic service to challenge what JetBlue identified as "obscene" prices charged by legacy airlines like American.  *Id.* ¶ 8.

JetBlue also has an established record of competing head to head with American and winning.  As one JetBlue executive remarked in June 2020, "one of the most common trends in JetBlue's 20 year history is easily stealing share from [American] and eventually winning."  *Id.* ¶ 7.  American worried internally that JetBlue's expansion, particularly on transatlantic routes, would force it to lower fares.  *See, e.g.*, *id.* ¶ 8 (predicting a "50–60% fare drop" on one route). American's Manager of Sales Planning even lamented that American's operations in Boston do "not perform well from a profitability perspective . . . largely due to the fare destruction [JetBlue] ha[s] wrought."  *Id.* ¶ 54.  And before entering into the Northeast Alliance, American planned to "fight like hell in BOS" by adding new flights to compete with JetBlue.  *Id.* ¶¶ 7, 55.

Instead of fighting with JetBlue, American now seeks to co-opt it.  *Id.* ¶ 9.  Under the Northeast Alliance, American and JetBlue will pool and apportion revenues earned on flights to and from four major airports: Boston Logan International Airport ("Boston Logan"), JFK, LaGuardia, and Newark.  *Id.* ¶ 19.  As a result, Defendants will earn the same revenues regardless of whether a passenger flies these routes with American or JetBlue.  *Id.*  Indeed, an explicit goal of the Northeast Alliance is to make Defendants "indifferent" about whether a passenger chooses American or JetBlue for a particular flight to or from these four airports.  *Id.* American and JetBlue will also coordinate which routes to fly, when to fly them, who will fly them, and what size planes to use on flights to and from these four airports.  *Id.*

6

The Northeast Alliance therefore effectively merges American's and JetBlue's operations in Boston and New York City—covering two-thirds of JetBlue's business—and eliminates competition that has resulted in substantial benefits for consumers. *Id.* ¶ 9. But the harms threatened by the Northeast Alliance extend well beyond Boston and New York City. *Id.* ¶ 10. "[B]y tying JetBlue's success to that of American, the Northeast Alliance will significantly dampen JetBlue's incentive to continue to compete with its much larger partner in the Northeast and beyond . . . resulting in a wide-ranging diminution in competition in an industry in which competition is already in critically short supply." *Id.* ¶¶ 11–12.

Following investigations by the United States and Plaintiff States, Plaintiffs filed suit to enjoin the Northeast Alliance as a violation of Section 1 of the Sherman Act.

## ARGUMENT

Plaintiffs allege that the Northeast Alliance will result in less competition, more concentration, and likely harms to consumers in over a hundred relevant markets throughout the United States. In particular, the Northeast Alliance eliminates competition between American and JetBlue in dozens of markets to and from Boston and New York City, *see, e.g.*, *id.* ¶¶ 53–62, and diminishes their incentive to compete with each other in many other markets, *see, e.g.*, *id.* ¶¶ 20–22, 51, 63. The Northeast Alliance also significantly increases concentration in more than a hundred markets, resulting in levels of and changes in concentration so high they would be presumptively illegal under any merger analysis. *Id.* ¶¶ 48–50; App. A–C. And by tying JetBlue's fate to American's across two-thirds of JetBlue's business, the Northeast Alliance diminishes American's and JetBlue's incentive and ability to compete against each other on flights across their networks. *Id.* ¶¶ 11–12, 50, 68–75.

"Dismissal of a complaint pursuant to Rule 12(b)(6) is inappropriate if the complaint satisfies Rule 8(a)(2)'s requirement of 'a short and plain statement of the claim showing that the

pleader is entitled to relief.'" *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011) (quoting Fed. R. Civ. P. 8(a)(2)). Plaintiffs are not required to "allege every fact necessary to win at trial," *Rodríguez-Vives v. P.R. Firefighters*, 743 F.3d 278, 283 (1st Cir. 2014), or "establish a prima facie case," *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013). "The sole inquiry under Rule 12(b)(6) is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Ocasio-Hernández*, 640 F.3d at 7. Plaintiffs' allegations easily clear this threshold.

Section 1 of the Sherman Act outlaws "[e]very contract, combination . . . or conspiracy" that unreasonably restrains trade. 15 U.S.C. § 1. Restraints may be unreasonable per se or under the rule of reason, but in every case "the criterion to be used in judging the validity of a restraint on trade is its impact on competition." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 (1984).[1] Plaintiffs' allegations more than sufficiently allege that the Northeast Alliance violates the Sherman Act because it harms competition and will harm consumers. Defendants' arguments to the contrary misstate the law, misread the Complaint, and ultimately miss the mark.

---

[1] Assessing a restraint's impact on competition under the rule of reason typically involves a multi-step burden shifting framework. At the first step, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("*Amex*"). Defendants must then "competitively justif[y]" their restraint and its "apparent deviation from the operations of a free market." *Bd. of Regents*, 468 U.S. at 113. "[I]f a reasonable, less restrictive alternative to the [restraint] exists that would provide the same benefits," or if a restraint's "anticompetitive effects . . . outweigh the [restraint's] legitimate business justifications," then the restraint violates the Sherman Act. *Sullivan v. NFL*, 34 F.3d 1091, 1103, 1096 (1st Cir. 1994). These steps "do not represent a rote checklist," however, and "some agreements among competitors so obviously threaten to reduce output and raise prices that they might be . . . rejected after only a quick look." *Alston*, 141 S. Ct. at 2160, 2156.

I.   **DEFENDANTS URGE THE COURT TO ADOPT AN ELEVATED LEGAL STANDARD CONTRARY TO STATUTORY TEXT AND CONTROLLING PRECEDENT.**

A.   **Section 1 Violations Can Be Established Based on a Harm to Competition or Likely Anticompetitive Effects.**

Defendants argue that dismissal is required because Plaintiffs have not alleged that the Northeast Alliance "***has actually harmed competition***" by causing "a single higher price, any reduction in quality or the slightest reduction in output." Mot. at 2 (emphasis in original). That argument is flawed in two significant respects.

*First*, proof of higher prices, reduced output, and decreased quality is not the only way to show anticompetitive effects. Among other things, a plaintiff can also show decreased innovation or harm to the competitive process (i.e., harm to competition itself). *See FTC v. Actavis, Inc*., 570 U.S. 136, 157 (2013) (explaining that attempts to "prevent the risk of competition . . . constitute[] the relevant anticompetitive harm"); *Impax Lab'ys, Inc. v. FTC,* 994 F.3d 484, 493 (5th Cir. 2021) ("Eliminating potential competition is, by definition, anticompetitive."); *United States v. Anthem, Inc.*, 855 F.3d 345, 361 (D.C. Cir. 2017) ("threat to innovation is anticompetitive in its own right"); *see also Sullivan*, 34 F.3d at 1097 ("[A]n action harms the competitive process 'when it obstructs the achievement of competition's basic goals— lower prices, better products, and more efficient production methods.'").

Indeed, "[t]he heart of our national economic policy long has been faith in the value of competition." *Standard Oil Co. v. FTC*, 340 U.S. 231, 248 (1951). "The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers." *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978); *see also United States v. Phila. Nat'l*

*Bank*, 374 U.S. 321, 368 (1963) ("Competition among banks exists at every level—price, variety of credit arrangements, convenience of location, attractiveness of physical surroundings, credit information, investment advice, service charges, personal accommodations, advertising, miscellaneous special and extra services").  For this reason, proof of harm to the competitive process often is "the most significant" type of anticompetitive effect.  *Bd. of Regents*, 468 U.S. at 106–07; *see also Sullivan*, 34 F.3d at 1101 ("The Supreme Court has emphasized, however, that overall consumer preferences in setting output and prices is more important than higher prices and lower output, *per se*, in determining whether there has been an injury to competition.").

Thus, when a collaboration or merger eliminates substantial competition between the participants or gives them substantial market power, that is the basis of the violation, and it can be condemned under Section 1 even without proof of higher prices, reduced output, or decreased quality.  *See United States v. First Nat'l Bank & Tr. Co. of Lexington*, 376 U.S. 665, 670 (1964) ("*Lexington Bank*") ("It was enough that the two roads competed, that their competition was not insubstantial and that the combination put an end to it."); *United States v. Union Pac. R.R. Co.*, 226 U.S. 61, 88 (1912) ("Nor does it make any difference that rates for the time being may not be raised . . . .  It is the scope of such combinations and their power to suppress or stifle competition or create monopoly which determines the applicability of the act."); *United States v. Brown Univ.*, 5 F.3d 658, 674 (3d Cir. 1993) (Section 1 violation can be established without proof of "higher price or lower output" because "actual dollar amount effects do not necessarily reflect the harm to competition which Congress intended to eliminate in enacting the Sherman Act").

The Northeast Alliance harms the competitive process in exactly the way the antitrust laws seek to prevent: it eliminates competition between American and JetBlue in certain markets and significantly diminishes their incentive to compete in others.  *See infra* Part II.

*Second*, Section 1 is concerned with likely as well as ongoing anticompetitive effects. As the Supreme Court explained in *Actavis*, the "traditional antitrust factors" under the rule of reason include "*likely* anticompetitive effects, redeeming virtues, market power, and potentially offsetting legal considerations present in the circumstances."  570 U.S. at 149 (emphasis added); *see also Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) (the rule of reason involves an assessment of "the nature of [a] restraint and its effect, *actual or probable*" (emphasis added)).  Section 4 of the Sherman Act, under which the United States filed suit, declares that "it shall be the [United States'] *duty* . . . to *prevent* and restrain" violations of Section 1.  15 U.S.C. § 4 (emphasis added).  Section 16 of the Clayton Act, under which Plaintiff States filed suit, likewise authorizes injunctive relief to prevent "*threatened* loss or damage."  15 U.S.C. § 26 (emphasis added).  "[T]he evident import of Congress' reference to '*threatened* loss or damage' is not to constrict the availability of injunctive remedies against violations that have already begun or occurred, but rather to expand their availability against harms that are as yet unrealized."  *California v. Am. Stores Co.*, 495 U.S. 271, 282 n.8 (1990) (emphasis in original).

Under Defendants' standard, however, Plaintiffs would be powerless to "prevent" anything.  Instead, they would have to wait for a conspiracy to result in higher prices, a boycott to drive competitors out of business, or an acquisition to reduce output before acting. That makes no sense and is not the law.  Thus, in *Associated Press v. United States*, 326 U.S. 1 (1945), the Supreme Court condemned a joint venture's restraints under Section 1 "without regard to their past effect" because "[c]ombinations are no less unlawful because they have not

as yet resulted in restraint." 326 U.S. at 12. The Fifth Circuit did the same in *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980), condemning an association's bylaws even though it "ha[d] never applied" them because "the antitrust laws do not require that we wait until the restraint is accomplished before we hold invalid a rule which gives an association power to produce unjustified anticompetitive effects; the Sherman Act is offended by the power as well as the deed." 629 F.2d at 1385 (citing *Associated Press*, 326 U.S. at 12–13).

*Amex* does not support Defendants' "actual anticompetitive effects" standard (Mot. at 12) either. Instead, the Supreme Court specifically recognized that antitrust plaintiffs can establish "an anticompetitive effect . . . directly *or* indirectly." *Amex*, 138 S. Ct. at 2284 (emphasis added). Under the direct method, Plaintiffs can provide "proof of actual detrimental effects," *id.*, which, as discussed above, includes harm to the competitive process and not only measurable price increases or output decreases. Alternatively, under the indirect method, plaintiffs may establish that the defendant has market power and there are "grounds to believe that the defendant's behavior will harm competition market-wide." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995); *see also Amex*, 138 S. Ct. at 2284 ("proof of market power plus some evidence that the challenged restraint harms competition").[2] Those grounds can relate to the nature of the challenged restraint, i.e., it is of the type that, when imposed by parties with market power, is "*likely* to have an anticompetitive effect." *Realcomp II Ltd. v. FTC*, 635 F.3d 815, 825 (6th Cir. 2011) (emphasis in original).

Defendants assert without support that the indirect method of proof is a "narrow path." Mot. at 18. That is incorrect. The indirect method is the traditional way of establishing liability

---

[2] In *Amex*, "plaintiffs rel[ied] exclusively on direct evidence," and thus the Court only addressed the sufficiency of plaintiffs' evidence under the direct method. 138 S. Ct. at 2284–85.

under the rule of reason.  *See, e.g.*, *Brown*, 5 F.3d at 668 ("the existence of actual anticompetitive

effects . . . is often impossible to make" and so "courts typically allow proof of the defendant's

'market power' . . . [as] a surrogate for detrimental effects"); Phillip Areeda & Herbert

Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1912d

(5th ed. 2021) ("In nearly all cases, however, the tribunal does not actually measure the reduction

in output that results from a restraint.  Rather, the tribunal queries whether the natural tendency

of a particular agreement, in the presence of significant market power, will be to reduce

output.").

Not surprisingly, then, Defendants' statement that they "are unaware of any rule of

reason case in which predictions of adverse effects sufficed even though information was

available to assess the *actual* effects of the challenged conduct" (Mot. at 18) lacks merit.

Courts have relied on indirect evidence of anticompetitive effects in cases where the challenged

conduct was already underway (and in many other cases).  *See, e.g.*, *Cia. Petrolera Caribe, Inc.*

*v. Arco Caribbean, Inc.*, 754 F.2d 404, 406–12 (1st Cir. 1985) (reversing summary judgment

where district court wrongly "require[d] plaintiff to show *fact* of injury" in challenge to already

consummated merger under Section 1 (emphasis in original)); *Impax*, 994 F.3d at 495–96

(affirming challenge to prior reverse payment for eliminating "possible" competition);

*Realcomp II*, 635 F.3d at 829–34 (affirming challenge to real-estate listing policies based on their

"anticompetitive tendencies").

Courts have also repeatedly recognized that the absence of evidence of actual price

increases or output decreases before suit was brought is not even particularly probative, let alone

a basis to dismiss.  It is not hard to see why.  If the absence of quantifiable effects during the

pendency of a government investigation into a transaction were given too much weight, antitrust

13

"violators could stave off [challenge] merely by refraining from aggressive or anticompetitive behavior when [an enforcement] suit was threatened or pending." *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 504–05 (1974); *see also Chi. Bridge & Iron Co. v. FTC*, 534 F.3d 410, 435 (5th Cir. 2008) (rejecting post-acquisition evidence because "such evidence *could arguably* be subject to manipulation" by the defendants (emphasis in original)).  There is also an obvious reason, specific to this case, why the Northeast Alliance may not have yet resulted in observable output reductions: demand for airline travel is still recovering from the unprecedented and ongoing pandemic.  *See, e.g.*, Compl. ¶¶ 13, 78.

Defendants eventually concede, as they must, that "some courts have recognized . . . a plaintiff [can] show adverse effects on competition by pointing to" what Defendants call "potential future harm."  Mot. at 18.  But Defendants admit only in a footnote that "some courts" includes the First Circuit and several district courts in the First Circuit.  *See* Mot. at 18 n.13 (citing *Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 53 (1st Cir. 1998); *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 47, 49 (1st Cir. 2001); *Catrone v. Ogden Suffolk Downs, Inc.*, 683 F. Supp. 302, 308 (D. Mass. 1988); and *Yagoozon, Inc. v. Kids Fly Safe*, No. 14-040, 2014 WL 3109797, at *7 (D.R.I. July 8, 2014)).  And they never so much as acknowledge the long line of Supreme Court cases recognizing that restraints may be condemned based on their tendency to produce anticompetitive effects.[3]

---

[3] The lone case Defendants cite to suggest that allegations of "potential" harm do not suffice (Mot. at 18) dismissed a complaint for failure to allege "antitrust injury"—undisputedly not an element of Plaintiffs' case here.  *Compare CCBN.Com, Inc. v. Thomson Fin., Inc.*, 270 F. Supp. 2d 146, 156 (D. Mass. 2003) ("A conclusory allegation of **antitrust injury** will not suffice . . . ." (emphasis added)), *with* Mot. 17 n.12 (conceding Plaintiffs need not satisfy the "injury requirement").  And the law review article Defendants cite to justify dismissal (Mot. at 12) recognizes that "once sufficient market power is found, a practice that can be reasonably expected to restrain output or increase price should be sufficient to shift the burden to the

Having offered this concession, Defendants then mischaracterize what courts require in these cases, arguing that "potential future harm" suffices only when conduct is "inherently anticompetitive."  Mot. at 18–28.  This argument improperly conflates two different concepts.

A restraint can be so inherently anticompetitive that it is condemned without detailed inquiry into firms' market power.  *See* FTC and Dep't of Justice, *Antitrust Guidelines for Collaborations Among Competitors* § 3.3 (Apr. 2000) ("*Collaboration Guidelines*").  This is often called a "quick-look," and it "carries the day when the great likelihood of anticompetitive effects can easily be ascertained."  *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

A plaintiff can also establish a prima facie rule-of-reason violation under the indirect method based on defendants' market power *and* the anticompetitive nature of their restraint. In this situation, the essential focus is whether a restraint *risks* anticompetitive effects, not whether the restraint is *inherently* anticompetitive.  *See, e.g.*, *Chi. Bd. of Trade*, 246 U.S. at 238 ("probable" effect); *Associated Press*, 326 U.S. at 12–14 ("tend[s] to . . . frustrate the free enterprise system"); *Lexington Bank*, 376 U.S. at 669–70 ("tends to foreclose competition"); *Actavis*, 570 U.S. at 153 ("'potential for genuine adverse effects on competition'" (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447,  460–61 (1986)); *Addamax*, 152 F.3d at 53 ("sufficiently high *risk* of an anticompetitive effect" (emphasis in original)); *Realcomp II*, 635 F.3d at 831 ("likely to have an adverse impact on competition").  *See also* Herbert Hovenkamp, *The Rule of Reason*, 70 FLA. L. REV. 81, 107 (2018) ("reasonably expected to restrain output or increase price").[4]  And in the context of a collaboration or merger that eliminates horizontal competition,

---

defendants ***without evidence of an actual output restraint or price increase***."  Herbert Hovenkamp, *The Rule of Reason*, 70 FLA. L. REV. 81, 107 (2018) (emphasis added).
[4] Defendants cite a single brief that the United States filed in a district court case to support their "inherently anticompetitive" standard.  Mot. at 19.  In that case, however, the United States argued that, under Second Circuit precedent, the plaintiffs could "carry their burden in the rule of

this risk can be established by showing "[i]ncreased concentration, as shown by a change in relative market shares." *Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564, 571 (5th Cir. 1978).

By conflating the indirect method with a "quick look," Defendants confuse two different ways Plaintiffs may establish that the Northeast Alliance violates Section 1 of the Sherman Act. *See, e.g.*, *Realcomp II*, 635 F.3d at 825–26 (distinguishing between a "quick-look analysis" and "the more extended rule-of-reason analysis" based on likely anticompetitive effects). In any event, the Complaint alleges that the Northeast Alliance violates the Sherman Act under either approach. *See infra* Part II.

**B.   Both Section 1 of the Sherman Act and Section 7 of the Clayton Act Seek to Prevent Anticompetitive Conduct Before It Harms Consumers.**

The fact that Plaintiffs allege a violation of Section 1 of the Sherman Act, rather than Section 7 of the Clayton Act, does not mean, as Defendants argue, that "actual anticompetitive effects" are required (Mot. at 3) or that the Court cannot "us[e] analytical tools from merger analysis" (Mot. at 4) to assess the Northeast Alliance.

Courts have rejected this "argument that section 7 prevents *probable* restraints and section 1 *actual* ones" as "word play." *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1283 (7th Cir. 1990) (Posner, J.) (emphasis in original). In *Rockford*, after the Seventh Circuit held that the defendants' merger could not be challenged under Section 7 of the Clayton Act, the

---

reason's first step" based on "proof that Amex has market power plus 'other grounds to believe that the defendant's behavior will harm competition market-wide, ***such as*** the inherent anticompetitive nature of defendant's behavior or the structure of the interbrand market.'" Pls.' Mem. of Law in Opp'n to Summ. J. at 7, *Amex*, No. 1:10-cv-04496, Dkt. No. 321 (E.D.N.Y. Feb. 20, 2014) (quoting *K.M.B. Warehouse Distribs.*, 61 F.3d at 129 (emphasis added)). That does not suggest conduct must be "inherently anticompetitive" to be subject to scrutiny under the rule of reason. Nor is the standard from *K.M.B. Warehouse Distributors*, which still requires plaintiffs to prove market power, equivalent to a quick look.

court went on to analyze the merger under Section 1 of the Sherman Act using the same

analytical tools and the same evidence that the district court had used to analyze the merger

under the Clayton Act.  In doing so, the court rejected the same argument Defendants raise here

(Mot. at 13) as "word play" because "[b]oth statutes as currently understood prevent transactions

likely to reduce competition substantially."  *Id.* at 1283; *see also Vantico Holdings S.A. v. Apollo*

*Mgmt.*, 247 F. Supp. 2d 437, 458 (S.D.N.Y. 2003) (reaching the same conclusion and citing

*Rockford*).[5]

The Supreme Court's decision in *Lexington Bank* clearly forecloses Defendants'

suggestion that merger tools are inapplicable in Section 1 cases as well.  There, the Court

surveyed decades of cases involving merger challenges under Section 1 of the Sherman Act and

read them to hold that "where merging companies are major competitive factors in a relevant

market, the elimination of significant competition between them, by merger or consolidation,

itself constitutes a violation of § 1 of the Sherman Act."  376 U.S. at 671–72.  Defendants'

contrary suggestion—that merger analysis is only relevant "under the incipiency standards of

Section 7 of the Clayton Act" (Mot. at 4)—is simply wrong and ignores decades of merger

challenges brought under Section 1 of the Sherman Act (as *Lexington Bank* recognized).

The Supreme Court has also repeatedly emphasized that the rule of reason "furnish[es] an

enquiry meet for the case, looking to the circumstances, details, and logic of a restraint."  *Alston*,

141 S. Ct. at 2160 (citing *Cal. Dental*, 526 U.S. at 781; *Leegin Creative Leather Prods., Inc. v.*

---

[5] *Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311
(1965), on which Defendants rely (Mot. at 14), does not support Defendants' argument either.
While the Court noted that "the Sherman Act carries the more onerous burden of proof of an
actual restraint," as compared to the Clayton Act, the next sentence recognized the FTC *met* that
burden without showing price increases or output decreases.  *Minn. Min. & Mfg.*, 381 U.S. at
323.  The following paragraph also noted that alleging conduct "may substantially lessen
competition" and conduct "has actually done so" is "a distinction without a difference."  *Id.*

*PSKS, Inc.*, 551 U.S. 877, 885 (2007); *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)).  It makes no sense to argue, as Defendants do (Mot. at 13–16), that when a joint venture effectively operates like a merger, as Plaintiffs allege here, courts should not analyze the circumstances, details, and logic of the venture using certain analytical tools because those tools are also used in cases brought under Section 7 of the Clayton Act.  *See, e.g.*, *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 170 (1964) ("Overall, the same considerations apply to joint ventures as to mergers, for in each instance we are but expounding a national policy enunciated by the Congress to preserve and promote a free competitive economy."); *United States v. Columbia Steel Co.*, 334 U.S. 495, 507 n.7 (1948)  ("It must be assumed, however, that the public policy announced by § 7 of the Clayton Act is to be taken into consideration in determining whether acquisition of assets . . . with the same economic results as the purchase of the stock violates the prohibitions of the Sherman Act against unreasonable restraints.").

Accordingly, courts have expressly rejected Defendants' argument that analytical tools used in merger cases are inapposite in cases brought under the Sherman Act.  For example, courts evaluating joint ventures typically consider whether a venture will "'facilitate[] explicit or tacit collusion . . . through increased market concentration.'"  *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 477 (7th Cir. 2020) (quoting *Collaboration Guidelines* §§ 2.2, 3.31).  These same concerns inform how courts evaluate mergers.  *See, e.g.*, *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001).  Courts also use the Herfindahl-Hirschman Index ("HHI"), i.e., the sum of the squares of firms' market shares, to measure market concentration in merger and non-merger cases.  *See, e.g.*, *Giuliano v. Sandisk Corp.*, No. C 10-02787 SBA, 2015 WL 10890654, at *8 (N.D. Cal. May 14, 2015) ("SanDisk has not cited any authority demonstrating that the HHI . . . is inapplicable [to claims under Section 2 of the Sherman Act]." (internal citations

18

omitted)); *see also In re Intuniv Antitrust Litig.*, No. 1:16-CV-12396-ADB, 2020 WL 5995326, at *7 (D. Mass. Oct. 9, 2020) (noting that the hypothetical monopolist test from the Horizontal Merger Guidelines "remains . . . the touchstone of market definition, even in contexts outside horizontal mergers" (internal quotation marks omitted)).

Defendants again eventually concede that "a few courts" have rejected their argument and applied "merger standards" in cases under Section 1 of the Sherman Act.  Mot. at 14. But Defendants' attempt to distinguish these cases away simply ignores the allegations in the Complaint.  *Compare* Mot. at 15–16 ("[T]here is no allegation that JetBlue's low-fare pricing model . . . has diminished in the least."), *with* Compl. ¶ 52 ("[T]he Northeast Alliance . . . will significantly curtail JetBlue's independence and dampen its incentives to compete with American to serve consumers across the country.").  Perhaps the most glaring example is Defendants' claim that "Plaintiffs never plead to DOJ's *own standard* that the collaboration 'eliminates all competition' between the parties in the relevant markets."  Mot. at 15 (emphasis in original).  That is factually wrong.[6]  The Complaint repeatedly alleges that the Northeast Alliance "will eliminate competition between American and JetBlue" for routes to and from Boston and New York City, *see, e.g.*, Compl. ¶¶ 53, 58, and "will significantly diminish" their incentive to compete on other routes, *see, e.g.*, *id.* ¶ 50.  The Complaint also alleges that making Defendants "indifferent" about which airline customers use—as a merger would—is "[a]n explicit goal" of the Northeast Alliance.  *See, e.g.*, *id.* ¶ 19.

---

[6] Defendants' claim is also legally wrong.  The *Collaboration Guidelines* do not create an "eliminates all competition" test (Mot. at 15).  *See Collaboration Guidelines* § 1.3.  Nor do the *Collaboration Guidelines* suggest that "term limited" joint ventures cannot be analyzed using merger tools (Mot. at 15 n.10).  The example of a joint venture properly analyzed under the Horizontal Merger Guidelines in the *Collaboration Guidelines* included a twelve-year term limit. *Collaboration Guidelines*, App. § 1.3.  Regardless, the Northeast Alliance is not similarly term limited; it renews automatically unless either American or JetBlue decides to terminate it.

Defendants' argument that courts cannot rely on merger standards and tools in these circumstances contradicts their other arguments as well.  On the one hand, Defendants insist that their restraints are spared from per se or quick look treatment because they are necessary for the "integration of economic activity" between them (Mot. at 2), while on the other hand they argue that this integration of economic activity (that effectively operates like a merger) cannot be assessed using the analytical tools used to evaluate mergers.  Simply put, Defendants cannot have their cake and eat it too.

Defendants' final attempt to argue that "[p]redictive merger standards . . . do not 'fit' Section 1's actual effects requirement" relies on a misreading of *Rothery Storage*.  Mot. at 14 (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 220–21 (D.C. Cir. 1986)).  In the few paragraphs preceding Defendants' quotation from *Rothery Storage*, the D.C. Circuit used HHI numbers in assessing the defendants' market power.  792 F.2d at 219–20.  The court went on to explain that since a "merger" involving the defendants "would not even be challenged under the [Horizontal Merger Guidelines]" it was safe to infer that defendants lacked market power.  *Id.* at 230; *id.* at 220–21 ("the resulting HHI would be only 868 . . . which demonstrates the absence of market power").  Indeed, it could "think of no good reason not to apply the same inferences to Atlas' ancillary restraints" since "[a] joint venture . . ., in economic terms, is the same thing as a corporate merger."  *Id.* at 230.

Here, unlike *Rothery Storage,* if the Northeast Alliance were analyzed under the Horizontal Merger Guidelines it would be *presumptively unlawful*.  It makes little sense to reach a different result under the rule of reason.  *See, e.g.*, *Rockford*, 898 F.2d at 1285–86.  At the very least, there is no support for the proposition that a joint venture cannot—or should not—be

analyzed using the same analytical tools developed to assess whether mergers may substantially lessen competition.

## II.    THE NORTHEAST ALLIANCE IS ANTICOMPETITIVE.

Plaintiffs' allegations that the Northeast Alliance "likely will cause significant and wide-ranging harms to consumers across the country," Compl. ¶ 52, clearly establish that the Northeast Alliance violates Section 1 of the Sherman Act because it harms competition and will harm consumers.

Under the Northeast Alliance, two direct competitors—American and JetBlue—have "agreed to share their revenues and coordinate which routes to fly, when to fly them, who will fly them, and what size planes to use."  Compl. at 2.  As the Complaint explains, this kind of agreement harms competition in the same way "as explicit horizontal agreements on price."  *Id.* ¶ 20.[7]  For example, "[w]hile American and JetBlue technically retain the ability to price independently," by design "neither airline will have the incentive to undercut the other on price because doing so would simply reduce the revenues each earns under the revenue-sharing arrangement."  *Id.*  Likewise, Defendants may technically maintain independent networks, but

---

[7] The Supreme Court has found that agreements among horizontal competitors on price and output are so anticompetitive as to be unlawful per se.  *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) ("Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se"); *United States v. Andreas*, 216 F.3d 645, 667 (7th Cir. 2000) (noting that "output restrictions have long been treated as per se violations" and citing cases); *see also Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49–50 (1990) (revenue-sharing and market allocation agreements); *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 135 (1969) (comparing agreement involving "[p]ooling of profits" to price fixing and concluding that the former is a violation of the Sherman Act "beyond peradventure"). The Complaint does not allege that the revenue-sharing or output-coordination provisions of the Northeast Alliance constitute per se price-fixing, but courts have condemned under a quick look restraints that bear a "close family resemblance" to ones that fall in a per se category.  *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 37 (D.C. Cir. 2005).

they will "coordinate 'on all aspects' of network planning at Boston Logan, JFK, LaGuardia, and Newark." *Id.* ¶ 19.  As a result, they "can raise fares simply by one of them exiting a market where it competed against the other" previously.  *Id.* ¶ 20.  The Northeast Alliance therefore has "significant potential for anticompetitive effects."  *Bd. of Regents*, 468 U.S. at 104; *see also Brown*, 5 F.3d at 673 (plaintiffs met their burden under the rule of reason where agreement "eliminate[d] price competition" among competing schools).[8]

Moreover, Plaintiffs allege that the Northeast Alliance will "eliminate" or "significantly diminish" competition between Defendants more generally.  *See, e.g.*, Compl. ¶¶ 53, 58, 63, 68.  The fact that American and JetBlue can still earn revenue by "attract[ing] customers of other airlines" (Mot. at 26) is beside the point.  That would be true regardless of their alliance.  The point is that, in dozens of markets, the Northeast Alliance eliminates or significantly diminishes their incentive to attract *each other's* customers.  A restraint between two competitors can—and often does—violate Section 1 of the Sherman Act even if not *all* competitors are part of it.  Likewise, mergers that result in consolidation well short of a monopoly can still substantially lessen competition in violation of Section 7 of the Clayton Act.

These allegations are more than sufficient.  For example, in *Viamedia*, the Seventh Circuit noted, in the context of a case brought under Section 2 of the Sherman Act, that a number of factors can show an agreement between competitors has anticompetitive potential, including "whether the collaboration may . . . 'reduce the participants' ability or incentive to compete

---

[8] Defendants' reliance on *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118 (9th Cir. 2011) and *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029, 2011 WL 5883772 (N.D. Cal. Nov. 23, 2011) to suggest otherwise (Mot. at 25 n.20) is misplaced.  *Safeway* involved "temporary revenue sharing during the duration of a labor dispute," 651 F.3d at 1137, and *In re Online DVD Rental* involved Netflix paying a referral fee to Walmart, 2011 WL 5883772 *6–7.  Neither involved direct competitors making each other "indifferent" about whether a customer used one service or another (as the Northeast Alliance does).

independently'" or "'facilitate[] explicit or tacit collusion . . . through increased market concentration.'"  951 F.3d at 477 (quoting *Collaboration Guidelines* §§ 2.2, 3.31).  The Northeast Alliance does all of the above.  And, as a result, consumers will likely pay higher prices, receive worse service, and have fewer choices.  *See, e.g.*, Compl. ¶¶ 57, 62, 67, 74.

The fact that Defendants structured their agreement as a joint venture does not shield it from antitrust scrutiny.  As the Court explained in *Copperweld*, "[c]oncerted activity inherently is fraught with anticompetitive risk" because it "not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction." 467 U.S. at 768–69.  That is true whether concerted action takes the form of a joint venture, a merger, or any other kind of agreement between competitors.  In the end, "[a]ny joint venture, especially one that involves competitors, tends to be susceptible to attack under section 1's rule of reason."  *Addamax*, 152 F.3d at 52; *see also Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982) (competitor collaborations "can be rife with opportunities for anticompetitive activity"); *Penn-Olin*, 378 U.S. at 169 ("The joint venture, like the 'merger' and the 'conglomeration,' often creates anticompetitive dangers.").

Defendants' claim that the Northeast Alliance should not raise concern because "it is widely accepted that joint ventures are 'presumptively lawful'" (Mot. at 11) or "presumptively *procompetitive*" (Mot. at 20) was flatly rejected by the Supreme Court in *Alston*.  There, the NCAA argued, like Defendants here, that joint venture agreements are presumptively lawful. *Alston*, 141 S. Ct. at 2155.  The Court explained, however, that neither the NCAA's status as a joint venture nor its need to collaborate to produce a joint product "categorically exempt its restraints from ordinary rule of reason review" or justify "foreshortened review."  *Id.* at 2155–56. The Court did recognize that "joint ventures can have . . . procompetitive benefits," but it held

that the NCAA had to prove those benefits under the rule of reason.  *Id.* at 2155.  It was certainly

no basis to presume that the NCAA's restraints were lawful—the Court unanimously held the

opposite.  *Id.* at 2160–66.

Defendants' claim that their revenue sharing and output coordination are "ancillary" or

"core" to the Northeast Alliance does not mean they are procompetitive either.  *See, e.g.*, Mot. at

24–27.  On some occasions, restraints may be exempt from the per se rule and instead subject to

scrutiny under the rule of reason if the restraints are ancillary to a broader, efficiency-enhancing

collaboration such as a legitimate joint venture.  *See Sullivan*, 34 F.3d at 1102; *Polk Bros. v.*

*Forest City Enters., Inc.*, 776 F.2d 185, 189–90 (7th Cir. 1985) (a restraint that satisfies the

criteria for ancillarity is exempt from per se invalidation and subject to a "discriminating

assessment" under "the Rule of Reason").  Restraints are "ancillary" when they are "subordinate

and collateral to a separate, legitimate transaction," and "reasonably necessary" to the

transaction's procompetitive goals.  *Rothery Storage*, 792 F.2d at 223–24, 227; *see also Sullivan*,

34 F.3d at 1102 (restraint must be "required to make the joint activity more efficient").  But it is

Defendants' burden to show ancillarity.  *See, e.g.*, *United States v. Addyston Pipe & Steel Co.*, 85

F. 271, 281–91 (6th Cir. 1898) (Taft, J.), *aff'd*, 175 U.S. 211 (1899); *Blackburn v. Sweeney*, 53

F.3d 825, 828 (7th Cir. 1995) (Posner, J.).  And, even if they succeed in doing so, as the First

Circuit explained in *Sullivan*, courts "do not throw the 'rule of reason' out the window merely

because one establishes that a given practice among joint venture participants is ancillary to

legitimate and efficient activity—the injury to competition must still be weighed against the

purported benefits under the rule of reason."  34 F.3d at 1102; *Texaco Inc. v. Dagher*, 547 U.S. 1,

7–8 (2006) ("core" restraints still subject to the rule of reason).

24

Defendants also argue that since studies found nowhere in the Complaint supposedly say international alliances can "generate *procompetitive* consumer benefits" then the Northeast Alliance must do so too.  Mot. at 22 (emphasis in original).  But these cherry-picked studies do not establish as a matter of law that all international airline alliances, much less the domestic Northeast Alliance, lack the potential to cause anticompetitive effects.  Moreover, unlike international alliances, American and JetBlue are combining largely overlapping and otherwise competing domestic networks.  Regardless, as JetBlue's CEO explained and as alleged in the Complaint, international alliances use revenue sharing "to collude" and "set pricing," conduct that, "if it happened in any other industry, they'd march you off to the penitentiary."  Compl. ¶ 29.  The Northeast Alliance, by Defendants' own admission, "follow[s] that model."  Mot. at 26.

Nor do the Complaint's allegations about the Northeast Alliance's likely anticompetitive effects "presume that American will act in ways directly contrary to the [Department of Transportation's ("DOT")] agreement with American and JetBlue."  *Id.* at 22.[9]  The Complaint alleges in detail how American's agreement with the DOT still leaves plenty of room for American to exercise significant influence over JetBlue in ways that reduce JetBlue's ability and incentive to compete.  Compl. ¶¶ 11–12.  For example, "American can selectively prevent JetBlue from being able to market American flights . . . [or] reward JetBlue by allowing it to

_____

[9] The DOT entered into an agreement with Defendants in January 2021.  *See* Mot., Ex. C. Spirit Airlines filed a petition asking DOT to reconsider this agreement in light of the Northeast Alliance's likely impact on competition, but the DOT has stayed that proceeding "[d]uring the pendency of [this case]."  DOT Notice, *Complaint of Spirit Airlines*, DOT-OST-2021-0001 at 2; *see also* 49 U.S.C. 41720(h) (DOT's authority to review joint ventures involving domestic airlines "shall not in any way limit the authority of the Attorney General to enforce the antitrust laws").  Regardless, the Complaint alleges that even if Defendants comply with DOT's agreement, it "fail[s] to remedy the harms likely to result from the Northeast Alliance."  Compl. ¶ 79.  For example, while Defendants tout "growth targets" in the agreement (Mot. at 2), they ignore that Defendants would have grown on their own even without the Northeast Alliance. Compl. ¶ 77.

market additional American flights." *Id.* ¶ 72. The Complaint even cites an example of American not "pricing connecting service as aggressively as it otherwise would" against one of its international alliance members. *Id.* ¶ 73. Defendants may believe JetBlue will be more aggressive in dealing with American than American is in dealing with its own partners, but that is a factual dispute.

Finally, Defendants' argument that revenue sharing and output coordination will offer "myriad consumer benefits" like "more flights, more capacity and more consumer choices" (Mot. at 25–27) is just that—an argument. Whether Defendants add more flights relative to pre-pandemic levels, beyond what they would have done absent their alliance, and whether those benefits outweigh the potential for harm, are quintessential fact questions. *See, e.g.*, *Viamedia*, 951 F.3d at 462 ("[T]he calculation of procompetitive benefits net of anticompetitive harms does not easily lend itself to a *pleading* standard." (emphasis in original)). And Plaintiffs have alleged that these purported benefits, to the extent they exist or are even cognizable, would not outweigh the likely harm. *See, e.g.*, Compl. ¶ 77. The Court should not disregard these allegations in favor of Defendants' self-serving statements that their joint venture will benefit consumers. *See FTC v. AbbVie Inc*, 976 F.3d 327, 356 (3d Cir. 2020) ("If a plaintiff plausibly alleges that an agreement's anticompetitive effects outweigh its procompetitive virtues, the district court must accept that allegation and allow the plaintiff to take discovery.").

Ultimately, Defendants argue, at the pleading stage, that there is nothing even *potentially* anticompetitive about the Northeast Alliance—even though it is an agreement between the largest airline in the world and its disruptive rival that allows them to coordinate their output and share their revenues, even though it eliminates competition in certain markets and significantly diminishes Defendants' incentive to compete in others, and even though it results in

26

concentration that would be presumptively unlawful if Defendants had structured their

partnership as a merger.  That is contrary to common sense and the law.

## III.    THE NORTHEAST ALLIANCE ENHANCES DEFENDANTS' MARKET POWER.

Defendants' remaining two arguments simply dispute the factual allegations in the

Complaint.  First, in spite of allegations that clearly establish market power—combined market

shares between 31 to 100 percent, levels of and changes in concentration so high they would be

presumptively illegal under any merger analysis, significant barriers to entry and expansion, and

an industry where JetBlue's own CEO recognized that the four largest airlines have a "startling

concentration of power"—Defendants ask the Court to conclude, as a matter of law, that

Defendants will not have market power in any of the relevant markets.  Second, contrary to the

factual allegations and JetBlue's own prior admissions as alleged in the complaint, Defendants

ask the Court to conclude, again as a matter of law, that Newark serves as a close enough

substitute to LaGuardia and JFK for purposes of domestic air travel to discipline an exercise of

market power at those two airports.  Neither argument has merit.

### A.    Plaintiffs Sufficiently Allege That Defendants Have Market Power.

A firm's (or combination of firms') ability to increase prices, restrict output, or otherwise

exclude competition beyond what would occur in a competitive market is referred to as "market

power."  *E. Food Servs.*, 357 F.3d at 5.  The "conventional way" to assess market power is by

examining firms' market shares.  *Id.* at 6; *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d

1421, 1434 (9th Cir. 1995) (circumstantial evidence such as market share is "[t]he more common

type of proof").  From there, courts typically infer or presume market power.  *See, e.g.*, *Eastman

Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992) ("The existence of [market]

power is ordinarily inferred from the seller's possession of a predominant share of the market.");

*E. Food Servs.*, 357 F.3d at 6 (high market share "presumptive basis for inferring market power"); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir. 2003) (district court properly "inferred market power from the defendants' large shares of a highly concentrated market"). That presumption can be overcome in the presence of other relevant evidence, such as very low barriers to entry, but the ultimate question of whether a firm has market power is a question of fact. *See, e.g.*, *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196–97 (1st Cir. 1996). Based on these principles, the Complaint more than plausibly alleges that Defendants will exercise market power in the relevant markets.

First, the Complaint alleges that the Northeast Alliance will give Defendants combined market shares ranging from 31 to 100 percent in more than a hundred relevant markets. *See* Compl., App. A-1, App. B-1, App. C-1, App. C-2.[10] Courts have found comparable market shares support an inference of market power. *See, e.g.*, *Visa*, 344 F.3d at 239–40 (Mastercard had market power with a 26 percent market share); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (20–49 percent share); *United States v. Blue Cross Blue Shield of Mich*. 809 F. Supp. 2d 665, 673–74 (E.D. Mich. 2011) ("market share . . . rang[ing] from 40% to more than 80%"); *see also Lexington Bank*, 376 U.S. at 669–70 (combined share of approximately 50 percent); *Phila. Nat'l Bank*, 374 U.S. at 364 (30 percent market share).

Second, the Northeast Alliance will produce changes in and levels of concentration that would make a merger presumptively unlawful. *See, e.g.*, Compl., App. A-1 (showing HHI

---

[10] Defendants suggest the shares listed in Appendix C are irrelevant because those markets are not included in the scope of the Northeast Alliance. Mot. at 28 n.22. But the Complaint alleges that the Northeast Alliance aligns Defendants' incentives on these routes, allowing them to charge higher prices. *See, e.g.*, Compl. ¶¶ 50, 74. JetBlue itself recognized that the Northeast Alliance "create[s] a risk of JetBlue being 'co-opted by [American].'" *See id.* ¶ 11. Defendants' contrary argument that they will continue to compete raises nothing but a factual dispute and does not contest that the shares here are significant.

increases ranging from 940 to 3870 for Boston); Compl., App. B-1 (HHI increases ranging from 207 to 2584 for New York City); Compl., App. C-1, C-2 (HHI increases ranging from 247 to 4119 for other markets). Taken together, Defendants' combined share and the resulting increase in concentration from the Northeast Alliance far exceed levels where courts have presumed market power in other cases. *See, e.g.*, *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 347 (3d Cir. 2016) ("[A] merger that increases the HHI by more than 200 points is 'presumed to be likely to enhance market power.'").

Third, Plaintiffs allege that new entrants in the relevant markets "face significant barriers to success," including detailed allegations about several specific barriers. Compl. ¶ 76 (citing "difficulty in obtaining access to slots and gate facilities"; "the effects of corporate discount programs offered by dominant incumbents"; "loyalty to existing frequent flyer programs"; "an unknown brand"; and "the risk of aggressive responses to new entry by the dominant incumbent carrier"). Even Defendants' own brief repeatedly acknowledges several of these same barriers to entry. *See, e.g.*, Mot. at 8 ("JetBlue has been unable to grow in New York, especially at [LaGuardia], because it has not been able to get access to additional takeoff and landing slots."); *id.* at 30 ("To be sure, some routes are protected by entry barriers because of slot restrictions or gate shortages").

Plaintiffs further allege that other competitors are unlikely to increase their capacity enough to discipline Defendants if they raise prices or restrict output. *See, e.g.*, Compl. ¶ 76. In fact, the Complaint explains that consolidation in the airline industry has caused major airlines—with the notable exception of JetBlue—to *reduce* capacity, a trend that the Northeast Alliance will make worse. *See, e.g.*, *id.* ¶ 33.

Fourth, not only will the Northeast Alliance give Defendants market power, it will do so in an already concentrated industry dominated by a few airlines.  JetBlue has repeatedly recognized that the domestic airline industry is highly concentrated and not competitive. *See, e.g.*, *id.* ¶ 5 ("concentration of power held by our largest competitors"); *id.* ¶ 23 ("'a startling concentration of power'"); *id.* ¶ 28 ("'there's been a lot of consolidation in the U.S., and we really don't have a competitive industry'").  As a result, according to JetBlue, legacy airlines like American exert "immense power," *id.* ¶ 5.  The Northeast Alliance extends this "immense power" even further.  That only strengthens the inference of market power here.

Defendants do not attempt to rebut these allegations.  Nor could they.  Instead, they argue that Plaintiffs fail to allege that Defendants will have "the ability to exercise market power by controlling, and restricting, marketwide output."  Mot. at 29.  But that simply ignores what the Complaint actually says.  Plaintiffs repeatedly allege that the Northeast Alliance will likely cause reductions in capacity, i.e., output.  Compl. ¶ 52 ("[T]he Northeast Alliance likely will facilitate reductions in capacity."); *id.* ¶ 53 ("reductions in capacity, higher fares, and lower quality of service"); *id.* ¶ 58 ("reductions in capacity, higher fares, and lower quality of service"); *id.* ¶ 69 ("will help American reduce service and restrict capacity growth, and enhance its efforts to achieve capacity discipline"); *id.* ¶ 70 ("particularly likely to lead to a reduction in capacity in Philadelphia"); *id.* ¶ 85 ("Unless enjoined, the Northeast Alliance likely would have the following effects, among others, in the relevant markets . . . capacity would be lower than it otherwise would be.").  The Complaint even cites American's President explaining that the Northeast Alliance will "help facilitate" "the [airline] industry . . . shed[ding] a tremendous amount of capacity."  *Id.* ¶ 69.  If Defendants mean to ignore these allegations by distinguishing

30

limiting *capacity* and reducing *output*, that is just more word play.  *See id.* ¶ 26 (describing capacity as "the industry's term for the number of seats made available to consumers").

Regardless, reducing output is not the only way for Defendants to exercise market power. *See E. Food Servs.*, 357 F.3d at 5 (defining market power as "the power to control prices or exclude competition").  The Complaint also alleges that Defendants will likely exercise their market power in other ways, most notably by increasing prices.  *See, e.g.*, Compl. ¶ 62 (citing evidence that "the elimination of American as a competitor on [a] route allowed JetBlue to raise fares" and alleging that "[t]he elimination of competition between American and JetBlue after the Northeast Alliance will similarly lead to higher prices and worse service for consumers").  To the extent Defendants assert that *Amex* means Plaintiffs can only rely on evidence of output restrictions (Mot. at 28), courts have rejected this argument.  *See, e.g.*, *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 63 (2d Cir. 2019) (rejecting the argument that "price increases only matter if they demonstrate that the defendant is able to raise prices profitably by restricting output").

Defendants do not contest that the Northeast Alliance will increase their market share or market concentration to presumptively unlawful levels.  They simply claim that high levels of concentration are no cause for concern because "it is generally understood and accepted that with very few exceptions that entry and expansion into city-pair markets are easy and happen frequently."  Mot. at 30 (citing *In re AMR Corp.*, 625 B.R. 215 (Bankr. S.D.N.Y. 2021)).  But the existence and extent of barriers to entry and expansion are *factual* issues.  *See, e.g.*, *Cia. Petrolera*, 754 F.2d at 412 (characterizing "what the barriers to entry into this market are" and "whether these barriers are significant" as "crucial facts at issue").  Defendants' attempt to sidestep Plaintiffs' factual allegations with their own say-so has no place in a motion to dismiss.

31

*In re AMR* does not support this extraordinary claim either.  The bankruptcy court's conclusions about entry barriers, correct or not, were based on *facts* developed on a full trial record.  *In re AMR Corp.*, 625 B.R. at 258.  And other courts have concluded that significant entry barriers exist in the airline industry.  *See, e.g.*, *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 947 (6th Cir. 2005) (recognizing that "the economics of th[e] [airline] industry could reasonably be found to establish significant barriers to entry").

Finally, Defendants complain that Plaintiffs' allegations of entry barriers are "categorical," and thus provide "no legal basis for requiring Defendants to defend allegations of market power," because Plaintiffs did not plead entry barriers "*by market*" for each of the more than 126 relevant markets identified in the Complaint.  Mot. at 30–31.  But Defendants do not cite a single case imposing such a requirement.  For example, in *Wojcieszek v. New Eng. Telephone & Telegraph Co.*, which Defendants cite (Mot. at 31), the plaintiff did not identify "*any* barriers to entering the [relevant] market" and "concede[d]" that other firms would "take business away from any company attempting to exercise monopoly power by raising rates."  977 F. Supp. 527, 533 (D. Mass 1997) (emphasis added).  By contrast, Plaintiffs here have alleged several barriers to entry for all the relevant markets, *see, e.g.*, Compl. ¶ 76, and explained why existing carriers are unlikely to discipline Defendants' exercise of market power, *see, e.g.*, *id.* ¶¶ 26–27, 31–34, 52, 69, 85.  Nor does *Hip Hop Beverage Corp. v. Monster Energy Co.,* 733 F. App'x 380 (9th Cir. 2018), an unpublished Ninth Circuit opinion spanning a few paragraphs, require market-by-market pleading.  Instead, Defendants claim—without support—that any barriers to entry here "will be market-specific" and so market-by-market allegations are required. Mot. at 30.  The clear implication of Defendants' claim is that Plaintiffs should have repeated, route by route, the same allegations on entry and expansion, separately, for each of the more than

32

126 markets alleged in the Complaint.  But pleading standards do not require Plaintiffs to draft

the Complaint following Defendants' preferred structure.  Plaintiffs have alleged that there are

barriers to entry and expansion for all the relevant markets.  *See, e.g.*, Compl. ¶ 76.  The *extent* to

which barriers limit entry or expansion on a particular route is a factual dispute, not a legal one.

*See Cia. Petrolera*, 754 F.2d at 412.

> **B.      Plaintiffs' Alleged Geographic Market for New York City Is Based on
>           Established Legal Principles.**

Plaintiffs allege that the Northeast Alliance will give Defendants market power in dozens

of geographic markets, including domestic origin and destination pairs to and from JFK and

LaGuardia.  As the Complaint alleges, "an origin or destination [pair] is no broader than all

airports in a metropolitan area, but in some areas that contain more than one airport, a specific

airport or airports may constitute a distinct origin or destination for the purposes of defining

relevant markets."  Compl. ¶ 42.  Including JFK and LaGuardia, but not Newark, in these

markets for domestic travel reflects consumer preferences and market reality because, "[f]or

domestic travel, many passengers traveling to and from JFK or LaGuardia do not view service to

Newark Liberty as a reasonable substitute to JFK or LaGuardia."  *Id.* ¶ 45; *Flovac, Inc. v. Airvac,

Inc.*, 817 F.3d 849, 854–55 (1st Cir. 2016) ("It is the consumer's options and the consumer's

choices among them on which relevant market analysis ultimately depends.").  Consistent with

these allegations, JetBlue itself has recognized that Newark's catchment area is "distinct" and

"does not largely overlap with" LaGuardia or JFK.  Compl. ¶ 45.

Plaintiffs further allege that these alleged markets satisfy the hypothetical monopolist

test, "the touchstone of market definition, even in contexts outside of horizontal mergers," *In re

Intuniv Antitrust Litig.*, 496 F. Supp. 3d at 664 (internal quotation marks omitted).  Under that

test, the question is not, as Defendants argue, whether Newark "compete[s]" (Mot. at 33–34) or

is "at least an option" (Mot. at 35) for customers using JFK and LaGuardia. It is whether enough customers would switch from using JFK and LaGuardia to using Newark to defeat a small exercise of market power, e.g., a 5% increase in price. *See* Horizontal Merger Guidelines § 4.1.1. The Complaint alleges they would not. *See* Compl. ¶ 45.

Defendants' arguments (Mot. at 31–35) simply ignore these factual allegations.[11] For example, Defendants' suggestion that Plaintiffs "abandon" the city-pair methodology or disregard market realities (Mot. at 33–35) is incorrect, but, in any event, raises nothing but a factual dispute over Plaintiffs' allegation that consumers at JFK and LaGuardia do not view Newark as a reasonable substitute and "not enough passengers . . . would switch to [Newark] to defeat" an exercise of market power. Compl. ¶ 45. Whether two geographies are reasonable substitutes, and thus in the same market, "is a question of fact that generally cannot be decided on a motion to dismiss." *Nuance Commc'ns*, No. CV 19-11438-PBS, 2020 WL 2198362, at *6; *Cal. Ass'n of Realtors, Inc. v. PDFfiller, Inc.*, No. CV 16-11021-IT, 2018 WL 1403330, at *6 (D. Mass. Mar. 2, 2018) (similar); *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*, 997 F. Supp. 2d 142, 162–63 (D.R.I. 2014) (denying motion to dismiss where "some Rhode Island residents cross state lines to obtain medical services" because there was no reason to accept on the pleadings "that this practice [was] widespread" enough to make a market for medical services in Rhode Island implausible). Indeed, courts have denied motions to dismiss

---

[11] Defendants make much of Newark being included with LaGuardia and JFK in *American/US Airways*. Mot. at 33. But the contours of the market in New York were not an important issue in that case; the focus was Reagan National in Washington, D.C., and the plaintiffs alleged—as Plaintiffs also allege here—that consumers had distinct preferences for Reagan National over other D.C. area airports. More recently, and in keeping with the practice of alleging a narrower market where it is appropriate to do so, the United States alleged that consumers had distinct preferences for Newark and for JFK and LaGuardia in *United States v. United Continental Holdings, Inc. & Delta Air Lines, Inc.*, No. 2:33-AV-0001 (D.N.J. Nov. 10, 2015).

where, as here, parties disagree about whether some airports in the same metro area, but not others, belong in the same market. *See, e.g., Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 567–68 (E.D. Va. 2000) (denying a motion to dismiss where defendant argued that the relevant market included "all the flights from the Washington D.C. metropolitan area" rather than the flights from a single airport in the D.C. area).

JetBlue's own statements to the DOT, submitted less than a week after Plaintiffs filed the Complaint, contradict Defendants' arguments.  In those statements, JetBlue argued that fifteen routes from Newark to various destinations, including Charleston, SC, were "monopoly markets that only United served" even though customers could travel to those same destinations on JetBlue flights from JFK.  *See* Comments of JetBlue Airways Corporation, DOT-OST-2021-0103-0025 at 2;[12] *see also* Compl., App. B-1 (alleging a geographic market including flights from JFK/LGA to Charleston but not from Newark to Charleston).  JetBlue wants to have it both ways, arguing that *its own flights* to and from JFK could not discipline United's "monopoly" power at Newark but that United's flights from Newark will sufficiently discipline JetBlue's exercise of market power at JFK and LaGuardia.

Plaintiffs have plausibly alleged that Defendants can exercise market power in the markets identified in the Complaint, including the domestic origin and destination pairs to and from New York City.  Taken together with the allegations establishing that the Northeast Alliance creates the potential for anticompetitive effects, *see supra* Part II, these allegations satisfy Plaintiff's initial burden under the Sherman Act, *see supra* Part I.

## **CONCLUSION**

Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss.

---

[12] Available at https://www.regulations.gov/document/DOT-OST-2021-0103-0025.

Dated:  December 13, 2021                    Respectfully submitted,

                                             /s/ William H. Jones II
                                             William H. Jones II
                                             Grant A. Bermann
                                             James H. Congdon
                                             Eric D. Dunn
                                             Kate M. Riggs (MA Bar No. 670510)

                                             U.S. Department of Justice
                                             Antitrust Division
                                             450 Fifth Street NW, Suite 8000
                                             Washington, DC 20530
                                             Tel: (202) 598-8805
                                             Fax: (202) 307-5802
                                             Email: bill.jones2@usdoj.gov

                                             *Attorneys for Plaintiff United States of America*

                                             MARK BRNOVICH
                                             Attorney General

                                             /s/ Dana R. Vogel
                                             DANA R. VOGEL (AZ Bar No. 030748)
                                             ROBERT BERNHEIM (AZ Bar No. 024664)
                                             CHRISTINA GREY (AZ Bar No. 035822)

                                             Arizona Attorney General's Office
                                             2005 North Central Avenue
                                             Phoenix, AZ 85004
                                             Tel: (602) 542-7748
                                             Email: Dana.Vogel@azag.gov

                                             *Attorneys for Plaintiff State of Arizona*

ROB BONTA
Attorney General

KATHLEEN E. FOOTE
Senior Assistant Attorney General

NATALIE S. MANZO
MICHAEL W. JORGENSON
Supervising Deputy Attorneys General

ROBERT B. McNARY
JAMIE L. MILLER
Deputy Attorneys General

*/s/* Robert B. McNary
ROBERT B. McNARY
Deputy Attorney General
California State Bar No. 253745
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Phone: 213-269-6283
E-mail: robert.mcnary@doj.ca.gov

*Attorneys for Plaintiff State of California*

KARL A. RACINE
Attorney General

KATHLEEN KONOPKA (DC Bar No.
495257)
Deputy Attorney General

*/s/* Arthur T. Durst
ARTHUR T. DURST (DC Bar No.
888273305)

Office of the Attorney General for the
District of Columbia
400 Sixth Street NW, Tenth Floor
Washington, DC 20001
Tel: (202) 442-9853
Email: arthur.durst@dc.gov

*Attorneys for Plaintiff District of Columbia*

37

ASHLEY MOODY
Attorney General

*/s/* Lizabeth A. Brady
LIZABETH A. BRADY (FL Bar No. 457991)
RACHEL S. BRACKETT (FL Bar No. 109775)
COLIN G. FRASER (FL Bar No. 104741)

Office of the Attorney General, State of Florida
PL-01, The Capitol
Tallahassee, FL 32399
Tel: (850) 414-3300
Email: Liz.Brady@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

MAURA HEALEY
Attorney General

*/s/* William T. Matlack
WILLIAM T. MATLACK (MA Bar No. 552109)
DANIEL H. LEFF (MA Bar No. 689302)

Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Tel: (617) 727-2200
Email: William.Matlack@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

JOSH SHAPIRO
Attorney General

JAMES A. DONAHUE, III (PA Bar No. 42624)
Executive Deputy Attorney General
Public Protection Division

*/s/* Tracy W. Wertz
TRACY W. WERTZ (PA Bar No. 69164)

JOSEPH S. BETSKO (PA Bar No. 82620)
JENNIFER A. THOMSON (PA Bar No. 89360)

Pennsylvania Office of Attorney General
Antitrust Section
14th Floor Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
Email: twertz@attorneygeneral.gov

*Attorneys for Plaintiff Commonwealth of Pennsylvania*

MARK R. HERRING
Attorney General

ERIN B. ASHWELL
Chief Deputy Attorney General

RICHARD S. SCHWEIKER, JR.
Senior Assistant Attorney General and Chief
Consumer Protection Section

*/s/* Sarah Oxenham Allen
SARAH OXENHAM ALLEN (VA Bar No. 33217)
TYLER T. HENRY (VA Bar No. 87621)

Office of the Virginia Attorney General
Antitrust Unit
202 North Ninth Street
Richmond, VA 23219
Tel: (804) 786-6557
Email: SOAllen@oag.state.va.us

*Attorneys for Plaintiff Commonwealth of Virginia*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 13, 2021, I filed the foregoing document with the United States District Court for the District of Massachusetts using the CM/ECF system, and caused it to be served on all registered participants via the notice of electronic filing (the "NEF").


Dated: December 13, 2021                    /s/ William H. Jones II
                                            William H. Jones II