**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA, ET AL.,

Plaintiffs,

v.

AMERICAN AIRLINES GROUP INC. and
JETBLUE AIRWAYS CORPORATION,

Defendants.

Civil Action No. 1:21-cv-11558-LTS

**DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO
AMERICAN AIRLINES GROUP INC. AND JETBLUE AIRWAYS CORPORATION'S
MOTION TO DISMISS**

**TABLE OF CONTENTS**

                                                                                                                                                **Page**

I.     THE NEA IS A COMPETITOR COLLABORATION SUBJECT TO DISTINCT LEGAL STANDARDS, WHICH PLAINTIFFS REFUSE TO FOLLOW ......................... 1

II.    THE COMPLAINT FAILS TO PLEAD A RULE OF REASON CLAIM ........................ 4

        A.     Plaintiffs Greatly Overstate Plaintiffs' Ability to Predict Future Harm Under The Rule of Reason and Specifically With Regard to Joint Ventures ..................... 4

        B.     Plaintiffs Have Not Pled Adverse Effects Consistent With *Twombly* ..................... 7

III.   PLAINTIFFS HAVE NOT PLED MARKET POWER ....................................................... 9

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Addamax Corp. v. Open Software Found., Inc.*,
  152 F.3d 48 (1st Cir. 1998) ................................................................................................... 4, 7

*Ass'n of Indep. Television Stations, Inc. v. Coll. Football Ass'n*,
  637 F. Supp. 1289 (W.D. Okla. 1986) ....................................................................................... 6

*Augusta News Co. v. Hudson News Co.*,
  269 F.3d 41 (1st Cir. 2001) ....................................................................................................... 9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................................. 1, 7

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979) ..................................................................................................................... 3

*Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*,
  754 F.2d 404 (1st Cir. 1985) ..................................................................................................... 5

*Citizen Publ'g Co. v. United States*,
  394 U.S. 131 (1969) ................................................................................................................. 8

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984) ................................................................................................................. 3

*FTC v. Actavis, Inc.*,
  570 U.S. 136 (2013) ................................................................................................................. 5

*Impax Lab'ys, Inc. v. FTC*,
  994 F.3d 484 (5th Cir. 2021) .................................................................................................... 5

*A.G. ex rel. Maddox v. Elsevier, Inc.*,
  732 F.3d 77 (1st Cir. 2013) ....................................................................................................... 1

*Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*,
  751 F.3d 368 (5th Cir. 2014) .................................................................................................... 7

*NCAA v. Alston*,
  _ U.S. _, 141 S. Ct. 2141 (2021) ........................................................................................ 2, 3

*Ohio v. Am. Express Co.*,
  _ U.S. _, 138 S. Ct. 2274 (2018) ........................................................................................ 4, 6

*Palmer v. BRG of Georgia, Inc.*,
    498 U.S. 46 (1990) .................................................................................................................8

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
    776 F.2d 185 (7th Cir. 1985) ...................................................................................................6

*Realcomp II, Ltd. v. FTC*,
    635 F.3d 815 (6th Cir. 2011) ...................................................................................................5

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ............................................................................................2, 9

*Sullivan v. NFL*,
    34 F.3d 1091 (1st Cir. 1994) ....................................................................................................6

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ...................................................................................................7

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) .....................................................................................................................2

*United States v. Andreas*,
    216 F.3d 645 (7th Cir. 2000) ...................................................................................................9

*United States v. Brown Univ.*,
    5 F.3d 658 (3d Cir. 1993) ........................................................................................................5

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ...............................................................................................................10

*United States v. Rockford Mem'l Corp.*,
    898 F.2d 1278 (7th Cir. 1990) ..........................................................................................2, 10

*ViaMedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2021) ...................................................................................................5

**STATUTES**

15 U.S.C.
    § 1 .................................................................................................................................. *passim*
    § 4 .............................................................................................................................................4
    § 18 .......................................................................................................................................1, 2
    § 26 ...........................................................................................................................................4

**RULES**

Fed. R. Civ. P. 12(b)(6) ..................................................................................................................7

**TREATISES**

A<small>NTITRUST</small> L<small>AW</small> D<small>EVELOPMENTS</small> ...................................................................................................3, 10

P<small>HILLIP</small> A<small>REEDA</small> & H<small>ERBERT</small> H<small>OVENKAMP</small>, A<small>NTITRUST</small> L<small>AW</small>: A<small>N</small> A<small>NALYSIS OF</small> A<small>NTITRUST</small>
   P<small>RINCIPLES AND</small> T<small>HEIR</small> A<small>PPLICATION</small> (4th ed. 2018) ........................................................ *passim*

**OTHER AUTHORITIES**

DOJ & FTC, *Antitrust Guidelines for Collaborations Among*
   *Competitors* (Apr. 2000) ......................................................................................................2, 3

DOJ & FTC, *Horizontal Merger Guidelines* (Aug. 2010) .......................................................2, 10

Plaintiffs' Opposition ignores both the substantive law governing collaborations and the pleading requirements mandated by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Plaintiffs do not so much as cite *Twombly*, let alone follow it. They approach the Opposition as if government plaintiffs can get by on "labels[,] conclusions, and a formulaic recitation of the elements," when *Twombly* unequivocally holds that "will not do." *Id*. at 555. Plaintiffs' repeated answer to the argument that allegations are "so threadbare that they omit any meaningful factual content," *A.G. ex rel. Maddox v. Elsevier, Inc*., 732 F.3d 77, 81 (1st Cir. 2013), is to quote each conclusory allegation and say, in a circular fashion, it is sufficient. And Plaintiffs never address the particulars of the NEA agreements incorporated into the Complaint, ignoring everything contradicting their mantra that the NEA is a merger in disguise.

Substantively, there is no credible dispute that collaborations like the NEA are subject to the full rule of reason. Plaintiffs' constant citations to cartel, "quick look" and merger cases are all off point. Nor is there a credible dispute that, under the rule of reason, Plaintiffs must allege anticompetitive effects such as higher fares, reduced capacity or lower quality—which Plaintiffs concede they have *not* alleged "directly." The remaining question is the legal sufficiency of Plaintiffs' "indirect" case and its two main components: (a) attempting to apply merger standards to a collaboration that is indisputably not a merger and (b) inferring future competitive harm from features of the NEA that are common to virtually all competitor collaborations without any factual support as to why, in this case, they are predictably anticompetitive. Plaintiffs cannot meet their burdens under the rule of reason or *Twombly* with these arguments.

I.  **THE NEA IS A COMPETITOR COLLABORATION SUBJECT TO DISTINCT LEGAL STANDARDS, WHICH PLAINTIFFS REFUSE TO FOLLOW**

Plaintiffs argue that adverse effects from the NEA can be inferred "using analytical tools from merger analysis." Compl. ¶ 48. Indeed, Plaintiffs' market power arguments treat the NEA *exactly* like a merger, summing market shares and calculating HHIs for firms that have not merged. *Id.* Apps. A–C. The Opposition carries forward this argument, dismissing the differences between Section 7 of the Clayton Act and Section 1 of the Sherman Act as "word play." Opp. at 16.

There is no basis to deny the existence of distinct bodies of case law for collaborations, on the one hand, and mergers on the other. Antitrust treatises address the topics separately,[1] and the DOJ and FTC developed *Antitrust Guidelines for Collaborations Among Competitors* that are materially different than their *Horizontal Merger Guidelines.* The distinction begins with the different statutes. *See* Mem. at 13–15.[2] Section 7 is explicitly forward-looking, asking what the effect of a merger "may" be, and it is designed for challenges that normally occur *before* the merger has taken place. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 230 (D.C. Cir. 1986) (predictive standards are used for mergers because "that is all the nature of the problem allows").[3] In Section 1 litigation, examining actual effects is both feasible and fundamental to rule of reason analysis. *NCAA v. Alston*, _ U.S. _, 141 S. Ct. 2141, 2160–61 (2021).[4]

Mergers and joint ventures also limit competition between the parties differently, requiring different decisional rules. Mergers result in a single firm under unitary management, and normally extinguish all competition between the merging parties, permanently. In collaborations, "we are dealing with firms that are merely limiting internal competition and are not merging to eliminate competition between firms." *Rothery*, 792 F.2d at 220. Both the degree to which competition has

---

[1] *See, e.g.*, PHILLIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶¶ 900 et seq. (concerning mergers), 2100 et seq. (concerning joint ventures) (4th ed. 2018) ("AREEDA & HOVENKAMP").

[2] *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278 (7th Cir. 1990), is not to the contrary because it has *nothing to do with joint ventures*; it was a merger case. So even if Section 1 and Section 7 standards have coalesced *for mergers*, the fact remains that there is a separate body of joint venture law grounded in the rule of reason and its threshold requirement of demonstrable anticompetitive effects. *See, e.g.*, *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006).

[3] Plaintiffs misleadingly assert that the *Rothery* court endorsed the use of merger analysis for joint ventures because it considered HHI concentration figures. Opp. at 20–21. The court used *low* concentration to *rule out* any problem with the joint venture, as is common. *Rothery*, 792 F.2d at 220. The court added that it was not implying "that if the HHI were higher and within one of the more concentrated categories, the arrangement would necessarily be illegal." *Id*.

[4] Plaintiffs suggest that it is too soon to tell whether the NEA is anticompetitive. Opp. at 14. But precisely because the NEA is not a merger, Plaintiffs did not need to challenge it prospectively. More fundamentally, their choice to do so prematurely (i.e., before they can allege adverse effects) does not lighten their burdens under Section 1.

been limited and the degree to which it has been preserved must be considered in the analysis of a collaboration. Section 1.3 of DOJ's own *Guidelines for Collaborations* acknowledges this, stating that one applies merger standards only if a collaboration "eliminates all competition" between the parties, while "[t]he potential for future competition between participants in a collaboration requires antitrust scrutiny different from that required for mergers." *See* Mem. at 14–15.

The differences between collaboration and merger standards are substantial. They permit businesses, fully consistent with antitrust law, "to accomplish through a joint venture what would not be tolerated as a merger." Opp. at 5. That happens frequently, resulting in lawful collaborations between the likes of GM and Toyota, or Boeing and Lockheed—pairings that could not merge. *See* 1-4 ANTITRUST LAW DEVELOPMENTS 4C, nn.101, 105. Designing a collaboration within the latitude the law allows is not a "clever trick." Opp. at 3. It is normal and entirely proper.

Try as Plaintiffs might to deny it, courts do not treat joint ventures between competitors as presumptively unlawful or suspicious. In fact, the leading antitrust treatise states directly that joint ventures are "presumptively lawful." *See* AREEDA & HOVENKAMP ¶ 2100g; *see also Broad. Music, Inc. v. Columbia Broad. Sys. Inc.*, 441 U.S. 1, 23 (1979) ("Joint ventures and other cooperative arrangements are . . . not usually unlawful."). The Supreme Court's *Alston* decision does not in any way "reject" this perspective. *See* Opp. at 23 (citing *Alston*, 141 S. Ct. at 2155). Plaintiffs cite language in which the Court rejects a special and more permissive "abbreviated deferential review" for restraints related to education. *Alston*, 141 S. Ct. at 2155. That is irrelevant to the NEA. Otherwise, *Alston* applied the full rule of reason, *id.* at 2151, emphasized that actual anticompetitive effects were proven and largely undisputed, *id.* at 2161–62, and called out the "procompetitive benefits" of joint ventures, which "surely stands as a caution against condemning their arrangements too reflexively." *Id.* at 2155.[5]

---

[5] Similarly, *Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 768 (1984) does not stand for the proposition that joint ventures are "fraught with anticompetitive risk." To the contrary, the Court includes joint ventures in a list of competitor combinations that "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively." *Id.*

Tellingly, Plaintiffs do not cite a single case in which a joint venture or similar collaboration that did not eliminate all competition between the parties was condemned under merger standards. To be clear, we do not mean a case in which a common *issue*, like market definition, is approached with principles borrowed from merger analysis; that is not the point. The fundamental issue is whether Plaintiffs have sufficiently pled anticompetitive effects, and repeatedly stating that if the NEA were a merger it would be unlawful cannot meet their burden.

## II.  THE COMPLAINT FAILS TO PLEAD A RULE OF REASON CLAIM

Plaintiffs overreach with their arguments that government antitrust enforcers would be "powerless" to bring preventative antitrust suits were Defendants' arguments accepted. Defendants explicitly acknowledged Plaintiffs' power under 15 U.S.C. § 4 and 15 U.S.C. § 26 to file suits and obtain forward-looking injunctive relief to prevent or restrain future harm. Mem. at 17. The questions raised by Defendants' motion are: (a) what is the standard to state a claim for a Section 1 violation and (b) have Plaintiffs pled to that standard? More specifically, it is whether Plaintiffs have plausibly alleged that the NEA or any of its specific features is so inherently likely to harm competition that allegations of actual effects are unnecessary. They have not.

### A.  Plaintiffs Greatly Overstate Plaintiffs' Ability to Predict Future Harm Under The Rule of Reason and Specifically With Regard to Joint Ventures

Under the rule of reason, a plaintiff must plead facts showing "substantial anticompetitive effects." *Ohio v. Am. Express Co.*, _ U.S. _, 138 S. Ct. 2274, 2284 (2018) ("*Amex*"). Yet Plaintiffs spend the majority of their brief preparing the Court for the fact that they will never have tangible evidence that the NEA harms competition through higher fares, lower output or reduced quality. They try to normalize this by saying that "indirect proof" of "likely" effects "is the traditional way" of proving anticompetitive effects. Opp. at 12. But it is not with respect to joint ventures. The First Circuit has observed that in practice "most courts would be unlikely to condemn an otherwise legitimate joint venture absent some showing of anticompetitive effect." *Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 53 (1st Cir. 1998). And there are *no examples* of a court finding a legitimate joint venture unlawful strictly on the basis of predictive or inferential proofs.

4

Plaintiffs cite numerous cases in which this "traditional way of establishing liability" was supposedly followed. Opp. at 12–13, 15. But *none* is a joint venture case, let alone one in which inferential proofs established liability. They are generally cases about irrelevant conduct, such as reverse payment schemes,[6] price fixing,[7] a monopolistic refusal to deal,[8] or (in one wildly mischaracterized case) an actual merger.[9] In the most analogous case Plaintiffs cite, *Realcomp II, Ltd. v. FTC*, 635 F.3d 815 (6th Cir. 2011), the court held the association's restrictions on the distribution of certain kinds of listings unlawful based on evidence showing that the rules actually reduced output, "severely restricted consumers' access to limited service listings" and "created barriers to the dissemination of discount listings to public websites." *Id.* at 829–30. In other words, "indirect proof" *was combined with evidence of actual adverse effects*, not asked to carry the load alone. That is not the authority Plaintiffs need for ignoring actual effects.

Plaintiffs' repeated argument that "harm to the competitive process" is enough, *e.g.,* Opp. at 9, also fails. As the First Circuit has held, anticompetitive effects may be "commonly referred to as . . . 'harm to the competitive process,'" but under either verbiage, harm is "usually measured

---

[6] *FTC v. Actavis, Inc.,* 570 U.S. 136 (2013), and *Impax Lab'ys, Inc. v. FTC,* 994 F.3d 484 (5th Cir. 2021) are two of numerous "reverse payment" cases involving payments by an incumbent pharmaceutical maker to potential entrants in which "[p]ayment for staying out of the market keeps prices at patentee-set levels and divides the benefit between the patentee and the challenger, while the consumer loses." *Actavis,* 570 U.S. at 138; *see also Impax*, 994 F.3d at 495 (explaining that reverse payment settlement schemes are unique in that they "replace[] the 'possibility of competition with the certainty of none'").

[7] *United States v. Brown Univ.,* 5 F.3d 658, 674 (3d Cir. 1993), was a price fixing case arising out of an agreement among Ivy League schools to distribute financial aid exclusively on the basis of need and collectively determine the amounts students would be awarded.

[8] *ViaMedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 438 (7th Cir. 2021) was a monopolization case in which a joint venture that the court recognized was procompetitive at the outset (even though it involved capacity coordination and revenue sharing) was captured through a series of mergers and then used as an exclusionary tool. *Id.* at 443–44.

[9] *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc*., 754 F.2d 404, 406–12 (1st Cir. 1985), does not even interpret the Sherman Act, let alone hold that "Courts have relied on indirect evidence of anticompetitive effects." Opp. at 13. *Petrolera* concerns whether for *standing* under Section 16 of the Clayton Act, a plaintiff must have itself "sustained an actual measurable injury in the short term flowing from the merger." *Petrolera*, 754 F.2d at 408. It is irrelevant.

by a reduction in output and an increase in prices in the relevant market." *Sullivan v. NFL*, 34 F.3d 1091, 1096–97 (1st Cir. 1994). Otherwise the concept has no meaning. In *Amex*, DOJ argued for the same sort of amorphous conception of "harm to the competitive process" that Plaintiffs assert here, but the Supreme Court disagreed and held that proof of anticompetitive effects means "actual detrimental effects [on competition], . . . such as reduced output, increased prices, or decreased quality in the relevant market." *Compare Ohio v. Am. Express Co.*, Br. for the United States, at 46, https://www.justice.gov/atr/case-document/file/1016721/download, *with Amex*, 138 S. Ct. at 2284. In all events, "an action harms the competitive process 'when it obstructs the achievement of competition's basic goals—lower prices, better products, and more efficient production methods.'" *Sullivan*, 34 F.3d at 1097. Competitor collaborations such as the NEA *advance those goals*, which is why they are never condemned absent anticompetitive effects.

Even more extreme is Plaintiffs' claim that the NEA can be condemned because it "eliminates or significantly diminishes [American's and JetBlue's] incentive to attract *each other's* customers." Opp. at 22 (emphasis in original). The argument, if adopted, would be a sea change in the law since the entire approach that antitrust law takes towards joint ventures is based on the belief that competitor collaborations, even if they reduce competition between the parties—which they normally do—can make *markets* more competitive.[10] Moreover, under the rule of reason, anticompetitive effects are always in relation to the relevant market or markets *as a whole*, not competition between particular competitors. *See Amex*, 138 S. Ct. at 2287 (declining to credit proof of adverse effects that was limited to just part of the relevant market); AREEDA &

---

[10] *See, e.g.*, *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 191 (7th Cir. 1985) (agreement among two partners in a retail joint venture not to compete on the products they sold did not constitute harm to competition); *Ass'n of Indep. Television Stations, Inc. v. Coll. Football Ass'n*, 637 F. Supp. 1289, 1297 (W.D. Okla. 1986) ("Joint ventures . . . may unleash positive economic forces and thus advance the ends of competition," and "[i]t is commonplace that these desirable results are necessarily accompanied by restrictions on competition among the venturers."); AREEDA & HOVENKAMP ¶ 2100c ("[J]oint ventures are calculated to enable firms to do something more cheaply or better than they did it before. For this reason, joint ventures are presumably efficient . . . .").

HOVENKAMP ¶ 1914b ("[T]he relevant output . . . is marketwide output, not merely the output of the participants to the restraint."). Unsurprisingly, Plaintiffs cite no case supporting their position.

### B. Plaintiffs Have Not Pled Adverse Effects Consistent With *Twombly*

Contrary to Plaintiffs' suggestion, Defendants are not asking the Court to hold that an "indirect" attack on a competitor collaboration is impossible. *See* Mem. at 18. We accept that such a challenge is theoretically possible, even if unlikely to prevail. *Addamax*, 152 F.3d at 53. Plaintiffs still have a pleading burden under *Twombly,* and "assertions regarding market injury [that] are completely speculative" do not meet that burden. *Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n,* 751 F.3d 368, 376 (5th Cir. 2014). Plaintiffs' generalized, empty allegations about features of the NEA that are common to every collaboration—coordination of certain business operations and revenue (or cost) sharing—do not meet that standard.

<u>That the NEA is Tantamount to a Merger</u>: Plaintiffs incorporated the NEA agreements into their Complaint, and Defendants provided the full text of those agreements to the Court "to '[p]revent [] plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting . . . documents upon which their claims are based,'" and thus alleging facts inconsistent with the documents. *Swartz v. KPMG LLP,* 476 F.3d 756, 763 (9th Cir. 2007) (alterations in original). Yet Plaintiffs' Opposition does not quote *one word* from the NEA agreements, or explain how, in light of these agreements, the NEA can be treated as a merger. Unlike a merger, American and JetBlue remain separate companies. American has no power to instruct JetBlue how to run its business and vice versa. The NEA does not even eliminate all competition between American and JetBlue within the NEA region, much less outside of that region, as a merger would. Indeed, while low fares are central to JetBlue's strategy as a "disruptive" competitor, *see* Compl. ¶ 36, Plaintiffs concede that, unlike any merger, both American and JetBlue unilaterally set fares for every flight they operate under the NEA, Opp. at 21, and they make no claim that JetBlue has altered its low fares strategy. There is no allegation that Defendants even communicate with one another about price. The NEA agreements also make clear that the parties' optimization process (e.g., network

7

planning, flight schedules) does not mean that American and JetBlue make all capacity decisions "together," as Plaintiffs argue. *See* Opp. at 2, 6. These *ipse dixit* arguments about merger equivalence are in willful disregard of the actual agreements and should count for nothing.

That JetBlue Being a "Uniquely Disruptive Low-Cost Competitor" Means the NEA is Anticompetitive: This theme permeates the Complaint and the Opposition. But there is no legal principle that collaborations with "disruptive" or low-cost competitors are inherently or uniquely suspect and thus unlawful irrespective of their actual effects. There is likewise no rule that "disruptive" competitors are categorically forbidden from entering into collaborations with more established competitors. If Plaintiffs intend to pursue this novel theory, they are obligated to plead *facts* that plausibly suggest that a relationship that plainly *strengthens* JetBlue will (not just may) lead to the kind of manipulation and control Plaintiffs hypothesize—something that has not happened. *See* Mem. at 21–22. All Plaintiffs plead is that this *could* happen, which is a far cry from facts supporting that it predictably *will* happen.

That Sharing Revenues Predicts Higher Airfares: Plaintiffs do not contest that revenue sharing is a common feature of joint ventures. They likewise cite absolutely nothing to indicate that revenue sharing is unlawful in a joint venture.[11] Nevertheless, they act as if NEA revenue sharing is so self-evidently unlawful that they should not even be required to state the basis of their complaints about it. The only hint of a theory is the repeated threadbare allegation that the goal of NEA revenue sharing is to make American and JetBlue "indifferent" to each other about which airline NEA customers choose. Opp. at 2, 6, 19 and 22 n.8. That is not suspicious in a competitor collaboration; it is axiomatic that where partners contribute their resources to a joint offering like

---

[11] Footnote 7 in Plaintiffs' Opposition cites to *Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 49–50 (1990), and *Citizen Publ'g Co. v. United States,* 394 U.S. 131, 135 (1969), but neither case is remotely on point. *Palmer* concerned a market allocation agreement between providers of bar review courses that included revenue sharing but would have been per se illegal with or without it. 498 U.S. at 49–50. *Citizen Publ'g Co.* concerned a newspaper joint operating agreement, which effectively was a merger of the only two newspapers in Tucson, Arizona. "The purpose of the agreement was to end any business or commercial competition between the two papers," 394 U.S. at 134, and the papers jointly fixed subscription and advertising prices. *Id.* The NEA does none of those things.

the NEA network, they will be compensated from the revenue that the collaboration creates. This is why the DOT finds revenue sharing "intrinsic to the efficiencies and benefits" of international airline alliances. *See* Mem. Ex. J (U.S.-Japan Alliance Order) at 14, 17.

Plaintiffs, moreover, have not said anything about *NEA revenue sharing in particular* even though the Mutual Growth Incentive Agreement ("MGIA") is part of the record. *See* Mem. Ex. B. If Plaintiffs want to attack the MGIA and require Defendants to defend it, they need to plead the factual basis for contending that it is inherently anticompetitive. Saying nothing at all is not sufficient.

That NEA Capacity and Schedule Optimization is Anticompetitive: Plaintiffs cannot and do not deny that capacity coordination within a joint venture is normal and ordinarily lawful. *See* Mem. at 26–27. Once again, they cite to inapposite cartel cases,[12] and not one joint venture case. What little they do say on this subject is a conclusory defense of similarly conclusory statements in the Complaint. *See, e.g.*, Opp. at 30 (arguing without explanation that the NEA "will likely cause reductions in capacity, i.e., output," which is followed by a string cite to similar conclusions in the Complaint). None of this explains why NEA coordination is so predictably anticompetitive that Plaintiffs should be able to challenge it without alleging actual anticompetitive effects.

## III. PLAINTIFFS HAVE NOT PLED MARKET POWER

As the opening brief explains, the Complaint is deficient as a matter of law for the independent reason that Plaintiffs fail to plead market power. *See* Mem. at 28–34. Plaintiffs' approach to market power is, once again, to pretend the NEA is a merger. They sum the market shares of two firms that have not merged and say they result in "levels of concentration that would make a merger presumptively unlawful." Opp. at 28. *Antitrust law has no rules of presumptive*

---

[12] *United States v. Andreas,* 216 F.3d 645, 667 (7th Cir. 2000), is a criminal case concerning "a conspiracy to limit the producers' output and thereby raise prices." It holds, uncontroversially, that naked "output restrictions have long been treated as *per se* violations." *Id.* It has nothing to do with joint ventures, in which it is common for parties to coordinate output to compete more effectively. *See, e.g.*, *Rothery*, 792 F.2d at 224; *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 48–49 (1st Cir. 2001).

*unlawfulness for joint ventures.* Structural presumptions used for mergers are inapposite for joint ventures because they presume a full loss of competition and "a reduction in the number of market participants," when most joint ventures, like the NEA, merely limit competition for greater procompetitive purposes. *See* AREEDA & HOVENKAMP ¶ 2122b (explaining the limited utility of concentration indexes used in mergers for evaluating joint ventures).

Plaintiffs also complain that they should not have to plead barriers to entry and expansion for each market they include within the scope of this case. But why should Defendants have to defend markets such as Boston-Chicago or Boston-Los Angeles if Plaintiffs cannot allege barriers to entry and expansion that matter to those routes? If Plaintiffs want the benefit of contending, for example, that the NEA threatens Boston-Chicago travelers, they have the burden of pleading why expanded service by United, Delta, and others will not protect consumers.

Finally, Plaintiffs' Opposition signals an intention to argue that in defining New York markets it does not matter "whether Newark 'compete[s]' . . . or is 'at least an option' . . . for customers using JFK and LaGuardia," because the DOJ *Horizontal Merger Guidelines* permit markets to be smaller than actual substitution patterns. Opp. at 33–34. Whatever internal screening procedures DOJ uses to evaluate mergers, case law does *not* permit that. The foundational principle of market definition is that the relevant market "is composed of products [or services] that have reasonable interchangeability for the purposes for which they are produced." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404 (1956). All actual substitutes are included in the market, even if they differ, and even if consumers have favorites. 1-6 ANTITRUST LAW DEVELOPMENTS 6-B(1)(a). If United is competing for traffic to and from New York from Newark, which it indisputably is, it cannot be erased from these markets with any market definition trick, including alleged consumer preferences for patronizing the nearest airport. *See Rockford*, 898 F.2d at 1284 (explaining how consumers preferring low-calorie soft drinks are protected by those who would switch between all soft drinks). Plaintiffs' JFK/LGA-only markets are deficient as a matter of law.

10

Dated: December 27, 2021  Respectfully submitted,

/s/ Daniel M. Wall
Daniel M. Wall (*pro hac vice*)
Elizabeth C. Gettinger (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
dan.wall@lw.com
elizabeth.gettinger@lw.com

Ian R. Conner (*pro hac vice)*
Michael G. Egge (*pro hac vice*)
Farrell J. Malone (*pro hac vice*)
Allyson M. Maltas (*pro hac vice*)
Marguerite M. Sullivan (*pro hac vice*)
Seung Wan Paik (*pro hac vice*)
Tara L. Tavernia (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
ian.conner@lw.com
michael.egge@lw.com
farrell.malone@lw.com
allyson.maltas@lw.com
marguerite.sullivan@lw.com
andrew.paik@lw.com
tara.tavernia@lw.com

David C. Tolley (BBO #676222)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
david.tolley@lw.com

*Attorneys for Defendant*
*American Airlines Group Inc.*

11

/s/ Richard Schwed
Richard Schwed (*pro hac vice*)
Matthew L. Craner (*pro hac vice*)
Jessica K. Delbaum (*pro hac vice*)
Martha E. Vega-Gonzalez (*pro hac vice*)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-5445
rschwed@shearman.com
matthew.craner@shearman.com
jessica.delbaum@shearman.com
martha.vega-gonzalez@shearman.com

Brian Hauser (*pro hac vice*)
Shearman & Sterling LLP
401 9th Street, NW
Washington, DC 20004
Telephone: (202) 508-8005
brian.hauser@shearman.com

Glenn A. MacKinlay, BBO #561708
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
Telephone: (617) 449-6548
gmackinlay@mccarter.com

*Attorneys for Defendant*
*JetBlue Airways Corporation*

**CERTIFICATE OF SERVICE**

      I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.

                                                        <u>/s/ Daniel M. Wall</u>
                                                        Daniel M. Wall