## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>AMERICAN AIRLINES GROUP INC. and<br>JETBLUE AIRWAYS CORPORATION,<br><br>*Defendants*. | Case No. 1:21-cv-11558-LTS |

## PLAINTIFFS' MOTION *IN LIMINE* NO. 2 TO EXCLUDE EVIDENCE OF DEFENDANTS' ALLEGED CARVE-OUT ROUTES

Plaintiffs respectfully move this Court pursuant to Federal Rules of Evidence 401, 402, and 403 for an order precluding Defendants from introducing evidence of their decision, driven by a desire to improve their litigation position rather than any demonstrable business rationale, to amend their Northeast Alliance ("NEA") in order to set aside—for now—two of its most anticompetitive provisions on certain routes.  In the midst of a Department of Justice investigation that Defendants knew could lead to this challenge, they amended the NEA to carve out, at their own discretion, certain routes from its most anticompetitive provisions—revenue sharing and capacity coordination.  These carve-outs apply to high-market-share routes, those with fewer than two other nonstop competitors.  All aspects of the NEA other than revenue sharing and capacity coordination continue to apply to these highly-concentrated routes.  Courts are rightly skeptical of such stratagems to improve a party's litigation position.

Defendants' voluntary agreement is not subject to oversight from any government agency or mandated by court order.  Instead, Defendants may modify or stop the carve-outs at any time

for any reason.  And once trial ends, Defendants will no longer need these carve-outs to improve

their litigating position and there will be nothing to stop them from once again[1] sharing revenues

and coordinating capacity on these routes.  Rather, it will be in their best interest financially to

do just that: rescind these carve-outs, revert to the original terms of the NEA, and reap additional

profits by sharing revenue and coordinating capacity.[2]

Even if Defendants maintain their carve-out agreement, those carve-outs are insufficient

to counter the anticompetitive effects of the NEA.  On all NEA routes—including the carve-out

routes—the NEA (1) facilitates price coordination and enables Defendants to earn revenue off of

each other's flights through code-sharing,[3] and (2) incentivizes Defendants to cede particular

routes to the other airline, effectively allocating markets to either American or JetBlue.  The

Court should exclude evidence and argument concerning Defendants' carve-out routes under

Federal Rules of Evidence 401, 402, and 403 because it would be irrelevant, confusing,

misleading and would waste trial time, including but not limited to the time devoted to expert

testimony on this issue.

---

[1] While the amendment is dated January 15, 2021, Defendants did not sign their Mutual Growth Incentive Agreement Amendment until July 7, 2021—many months after their partnership went into effect.  *See* Ex. 3 (PX0871), Email from Devon Diggs to Dick Doidge (August 3, 2021).

[2] Defendants might argue that such an about-face would be too damaging to their brand and industry reputation to implement in practice.  But Defendants will have the ability to alter these carve-out routes incrementally in a manner that does not attract significant public scrutiny.  As just one example, Defendants can take advantage of certain contractual provisions and update their list of carve-out routes in a way that makes the list under-inclusive, thereby increasing the number of highly concentrated routes subject to revenue sharing and capacity coordination—as described more fully in Section A, *infra*.

[3] Code-sharing refers to a marketing arrangement in which an airline places its designator code on a flight operated by another airline and sells tickets for that flight.  In a traditional code-sharing agreement the marketing airline earns a commission for selling tickets on the other airline's flights, as is discussed in more detail in Section B, *infra*. Under the NEA, American and JetBlue can code-share, i.e., market one another's flights, on all routes covered by their agreement—including the carve-out routes.  Where the route on which they code-share also involves revenue sharing, they do not pay one another a commission, however, because the revenue share is greater compensation.

## BACKGROUND

On July 7, 2021, JetBlue and American Airlines—fully aware that the Department of Justice was investigating and might ultimately seek to enjoin the NEA—signed an amendment to revise two components of their partnership, the revenue-sharing provision in the Mutual Growth Incentive Agreement ("MGIA Amendment") and the capacity coordination provision in the NEA.  The amendments eliminated revenue sharing and capacity coordination from routes in which American and JetBlue have "a high market share."  Ex. 1 (DX-120), First Amendment to the Mutual Growth Incentive Agreement at ¶¶ 1.1, 1.2 (eliminating revenue sharing on carve-out routes); Ex. 2 (PX0001-a), Second Amendment to the Northeast Alliance Agreement, at p. 49, ¶ 1.1 (agreeing "not to coordinate capacity" on the same routes carved out for revenue sharing).  Specifically, they carve out from revenue sharing and capacity coordination "any non-seasonal, non-stop Service between two cities" in which either (1) JetBlue and American are the only carriers providing non-stop service, or (2) JetBlue and American both have at least 5% market share and are two of three carriers providing non-stop service.  Ex. 1 at ¶ 1.2.  In other words, routes that the NEA would transform into effective monopolies or duopolies for JetBlue and American.

These amendments to the MGIA and NEA (collectively, the "Carve-Out Amendments") do not bind Defendants to continue to carve routes out from revenue sharing and capacity coordination for any particular length of time.[4]  Nor are they part of any agreement with the Department of Transportation ("DOT").  The Carve-Out Amendments are instead a promise that

---

[4] Nothing in the text of either of the Carve-Out Amendments, or of the broader NEA, restricts Defendants' ability to rescind or further amend the Carve-Out Amendments.  Indeed, the NEA requires good faith discussions regarding proposed amendments upon notice from one of the parties.  *See, e.g.*, Ex. 2 (PX0001-a), Northeast Alliance Agreement at ¶ 5.1 ("[during the term of the Northeast Alliance], the Parties will discuss in good faith amending this Agreement or the Related Agreements to address [any] Party's concerns.").

can be retracted, evaded, manipulated, or simply amended at any time for any reason. Defendants will have a financial motive and obligation to its shareholders to do just that, as any profit-maximizing entity would, when their actions are no longer being scrutinized by the Court. And even if Defendants observe the Carve-Out Amendments in good faith, the Amendments do not adequately remedy the competitive harm caused by the NEA, as will be discussed in Section B, *infra*.

Given the illusory, revocable nature of these promises, the probative value of the Carve-Out Amendments is minimal at best, but the distraction, confusion, and waste of the court's time is significant. Defendants' expert reports mention carve-outs 38 times across 24 different paragraphs, footnotes, appendices, and diagrams. At trial, fact witnesses are also expected to testify about the Carve-Out Amendments, as a number of Defendants' witnesses brought up the carve-outs in depositions. For the reasons enumerated below, the Court should not allow Defendants to waste scarce time at trial with speculative, misleading evidence of a remedy that is clearly inadequate to address the anticompetitive harm caused by their partnership.

## ARGUMENT

### A. Evidence of Defendants' Non-Binding Agreement on Carve-Out Routes Is Speculative and Irrelevant to Evaluating the Anticompetitive Harm Caused by the NEA

The Carve-Out Amendments are neither an enforceable decree of a court nor a binding agreement with DOT. They are instead a private agreement between business partners generated in the face of government scrutiny that Defendants can simply ignore, alter, or rescind. For this reason, Defendants' agreement to carve out six routes from revenue sharing and capacity coordination is not relevant to the question before the Court, namely whether the NEA is anticompetitive. *See United States v. H&R Block, Inc.,* 833 F. Supp. 2d 36, 82 (D.D.C. 2011) ("While the Court has no reason to doubt that defendants would honor their promise [to maintain

the acquired firm's current prices for three years post-merger], this type of guarantee cannot rebut a likelihood of anticompetitive effects in this case") (citing *FTC v. Cardinal Health, Inc.,* 12 F. Supp. 2d 34, 64 (D.D.C. 1998). Rather than rebutting a likelihood of anticompetitive effects, if anything such promises are evidence that Defendants are aware of the anticompetitive nature of the NEA. *See Cardinal Health*, 12 F. Supp. 2d at 67 (the fact that Defendants are willing to make such a promise "strongly supports the fears" of anticompetitive effects).

Defendants' agreements represent a short-term stopgap measure designed to paper over the evidence of the anticompetitive harms from the NEA. They thus are properly viewed with skepticism. *See Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986) (holding that evidence of "a post-acquisition transaction that may have been made to improve [the defendant's] litigating position" need not be credited); *United States v. Aetna Inc*., 240 F. Supp. 3d 1, 74–78 (D.D.C. 2017) (not crediting evidence that Aetna had withdrawn from operating in 17 counties because the Court found it did so to improve its litigation position).

Defendants' proposed remedy is also illusory because the Carve-Out Amendments enable Defendants to update the list of carve-out routes in a way that makes the list under-inclusive, thereby increasing the number of highly concentrated routes subject to revenue sharing and capacity coordination. The Amendments currently carve out six routes and empower Defendants, "from time to time … and no later than the end of each year," to add routes that meet the criteria and remove routes that do not. Ex. 1 (DX-120), First Amendment to MGIA at ¶ 1.2. Because the parties must only reexamine the list of carve-out routes once a year—at a time of their choosing—they can pick a time that minimizes the number of routes to be carved out.

They can do so because competitive conditions and market shares might be very different on particular routes at different points in a year. For instance, if Defendants know a carrier is

likely to exit a route in July, thereby increasing concentration on that route enough to trigger a carve-out, Defendants can conduct their assessment in June rather than at the end of the year and omit that route from the list of carve-out routes.  This is further proof that the Carve-Out Amendments' promised relief is illusory.  For this reason, evidence of the Agreements has no "tendency to make a fact more or less probable" and should be excluded.  Fed. R. Evid. 401(a). *See also Hosp. Corp. of Am.*, 807 F. 2d at 1384 ("Post-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight.").

Here, the routes at issue were *included* in Defendants' original NEA.  Defendants only suggested the Carve-Out Amendments long after agreeing to the other terms of the NEA, while the NEA was being investigated by the Department of Justice, and while Defendants were negotiating an agreement to terminate DOT's review of the NEA.  This Court "should not reward such stratagems." *Fashion House, Inc. v. K mart Corp.*, 892 F.2d 1076, 1090 (1st Cir. 1989). Rather, the Court should exercise its broad discretion to exclude this speculative, irrelevant evidence.  *See Morales Feliciano v. Rullan*, 378 F.3d 42, 57 (1st Cir. 2004) ("It is axiomatic that district courts enjoy wide latitude in matters concerning the ordering of proof and the presentation of evidence.")

### B.   Evidence of Defendants' Carve-Out Amendments Should Also be Excluded under FRE 403 Because they are Inadequate to Remedy the Anticompetitive Harm Caused by the Northeast Alliance

Even if Defendants observe the Carve-Out Amendments in good faith, they are inadequate to counter the anticompetitive impact of the NEA on the carve-out routes.  Evidence pertaining to the Carve-Out Amendments should therefore be excluded under Fed. R. Evid. 403 because it would be confusing, misleading, and would waste trial time.  This is true for two reasons.

6

*First*, the Amendments allow code-sharing on carve-out routes, meaning that Defendants can earn a commission from selling seats on each other's flights on these routes even if they are not eligible, by virtue of the carve-out, for revenue sharing.  These routes also enjoy frequent flyer reciprocity[5] and are included in joint corporate contracts.[6]  Putting aside the impact of revenue sharing and capacity coordination, these three aspects of the NEA on their own create risk of anticompetitive harm, particularly when employed on nonstop overlap routes (i.e., routes JetBlue and American both serve and competed on prior to the NEA).  For example, JetBlue can sell American's flights on its website and JetBlue's frequent flyers can earn miles on American's flights in the carve-out routes; and vice versa.  As such, either airline could exit the route while still offering customers service there—making it easier to opt out of serving a route, which would effectively allow Defendants to allocate these highly-concentrated nonstop overlap routes among themselves as described in more detail below.  Further, under the code-sharing provisions, the carrier marketing a route to customers will not only receive a commission for any ticket it sells on the flights of the other carrier, it will also apply the other carriers' pricing.  These entanglements mean that one carrier's revenues related to these routes are determined in part by the other carrier's pricing, thus blunting incentives to compete on price.  Historically,

---

[5] Under frequent flyer reciprocity agreements between two airlines, passengers who are members of one airlines' loyalty program can earn loyalty points or miles when they fly on a flight operated by the other airline and can redeem their points or miles on the other airline.  For example, under the NEA, a member of JetBlue's TrueBlue loyalty program can earn TrueBlue points when they fly on a flight operated by American from Boston to Dallas Ft. Worth and can also use their TrueBlue points to "pay" for all or part of the cost of the American flight.

[6] *See* 68 FR 3293, Termination of Review Under 49 U.S.C. 41720 of Delta/Northwest/Continental Agreements, at 3297 (Jan. 23, 2003) (DOT order describing how Delta, Northwest, and Continental's plans to offer joint corporate contracts "threaten competition in two respects. First, if they make joint offers, they are less likely to compete individually for corporate customers and travel agency patronage. Second, they could leverage their combined market share in ways that preclude any effective competition from unaffiliated airlines. For example, the Alliance Carriers could offer a corporate customer discounts on Northwest's transpacific services only if the customer booked most of its domestic travel on a particular domestic route on Delta rather than on a competing airline. The tying of the partners' services in this way could make it extremely difficult for other airlines, especially those that do not have a worldwide network like that operated by the proposed alliance, to compete.").

DOT and the Department of Justice have been concerned about the risk of price coordination that could arise in code-sharing involving nonstop overlaps and, thus, nonstop overlaps have typically been carved-out from traditional domestic code-sharing agreements.[7]

*Second,* carving routes out of revenue sharing and capacity coordination does not prevent either American or JetBlue from deliberately opting out of serving any given route, which effectively would allocate those same routes between Defendants in order to extract higher fares. Indeed, this has happened already.  Less than a year after the NEA went into effect, JetBlue exited the Boston-to-Rochester (NY) route, one of the routes carved out from revenue sharing and capacity coordination, leaving American as the only carrier serving that route nonstop.  (*See* Ex. 4, Hayes Dep. Tr. at 325:17–20 (acknowledging that "since the Northeast Alliance implementation has begun, JetBlue exited Boston to Rochester")).

Because the carved-out routes are all subject to these other anticompetitive aspects of the NEA, Defendants should not be permitted to rely on the Carve-Out Amendments to argue that the NEA does not cause anticompetitive harm.  Untangling the overall anticompetitive effects of

---

[7] *See e.g.,* 67 FR 62846-02, Review Under 49 U.S.C. 41720 of United/US Airways Agreements, at 62846-48 (Oct. 8, 2002) (DOT order noting that "[u]nder the agreement with the Justice Department, United and U.S. Airways will not code-share on local traffic on routes where both offer nonstop service", and further noting that "[t]hese restrictions primarily bar the airlines from code-sharing on certain nonstop routes and engaging in certain pricing conduct that could provide a vehicle for signaling and collusion. The two airlines have also agreed with the Justice Department that each airline will independently establish the terms and conditions for its frequent flyer program."); Press Release, U.S. Dept. of Justice, *Department of Justice Approves Northwest/Continental/Delta Marketing Alliance with Conditions* (January 17, 2003), https://www.justice.gov/archive/atr/public/press_releases/2003/200645.htm (noting that one condition of the consent decree "prohibits the carriers from code-sharing on each other's flights wherever they offer competing nonstop service"); Competitive Impact Statement, *United States of America v. Alaska Air Group, Inc. and Virgin Airlines*, 1:16-cv-02377-RBW, Dkt. No. 4 at 7-11 (D.D.C. 2016), https://www.justice.gov/opa/press-release/file/915621/download (after Alaska purchased Virgin America and also entered into a codeshare agreement with American Airlines, the Department of Justice negotiated a consent decree prohibiting code-sharing "on all routes on which Alaska and American both offer competing nonstop service" as well as "on routes where Virgin and American both offer competing nonstop service"; the United States sought these remedies because "[t]he codeshare agreement between Alaska and American creates an incentive for Alaska to cooperate rather than compete with American. … In some cases, Alaska may completely stop service on the routes with its own flights, and instead simply market American's flights between the destinations, thereby eliminating an independent and meaningful competitive choice for millions of consumers").

the NEA from the anticompetitive effects of the revenue-sharing and capacity coordination provisions would confuse the issues.  This would needlessly waste trial time and complicate expert testimony that is already likely to be highly complex and time-intensive.  Allowing evidence of the carve-outs would also likely waste valuable time while examining fact witnesses.  Not only do defendants' expert reports mention carve-outs 38 times across 24 different paragraphs, footnotes, appendices, and diagrams, but a number of Defendants' fact witnesses also brought up the carve-outs in depositions.

## CONCLUSION

This Court should exclude evidence of Defendants' voluntary and litigation-driven Carve-Out Amendments under Federal Rules of Evidence 401 and 402.  This evidence is not relevant to the issue of anticompetitive harm because Defendants can revise or remove the carve-outs, rendering any benefits speculative, misleading, and illusory.  Even if the Amendments had some marginal relevance to the Court's analysis—which they do not—any marginal probative value is substantially outweighed by the danger of confusing the issues and wasting time and should be excluded under Rule 403.

Dated: September 2, 2022

<u>/s/ William H. Jones II</u>

William H. Jones II
James H. Congdon
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW
Washington, DC 20530
Phone: 202-514-0230
Fax: 202-307-5802
bill.jones2@usdoj.gov

*Attorneys for Plaintiff United States of America*

MARK BRNOVICH
Attorney General

/s/ Robert Bernheim
ROBERT BERNHEIM (AZ Bar No.
024664)

Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Tel: (520) 628-6507
Email: robert.bernheim@azag.gov

*Attorneys for Plaintiff State of Arizona*


ROB BONTA
Attorney General

KATHLEEN E. FOOTE
Senior Assistant Attorney General

NATALIE S. MANZO
MICHAEL W. JORGENSON
Supervising Deputy Attorneys General

ROBERT B. McNARY
JAMIE L. MILLER
Deputy Attorneys General

/s/ Robert B. McNary
ROBERT B. McNARY
Deputy Attorney General
California State Bar No. 253745
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Phone: 213-269-6283
E-mail: robert.mcnary@doj.ca.gov

*Attorneys for Plaintiff State of California*


KARL A. RACINE
Attorney General

KATHLEEN KONOPKA (DC Bar No. 495257)
Deputy Attorney General

/s/ Arthur T. Durst
ARTHUR T. DURST (DC Bar No. 888273305)
ADAM GITLIN

Office of the Attorney General for the District of Columbia
400 Sixth Street NW, Tenth Floor
Washington, DC 20001
Tel: (202) 442-9853
Email: arthur.durst@dc.gov

*Attorneys for Plaintiff District of Columbia*

ASHLEY MOODY
Attorney General

/s/ Colin G. Fraser
LIZABETH A. BRADY (FL Bar No. 457991)
RACHEL S. BRACKETT (FL Bar No. 109775)
COLIN G. FRASER (FL Bar No. 104741)

Office of the Attorney General, State of Florida
PL-01, The Capitol
Tallahassee, FL 32399
Tel: (850) 414-3300
Email: Liz.Brady@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

MAURA HEALEY
Attorney General

/s/ William T. Matlack
WILLIAM T. MATLACK (MA Bar No. 552109)
DANIEL H. LEFF (MA Bar No. 689302)

Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Tel: (617) 727-2200
Email: William.Matlack@mass.gov
Email: Daniel.leff@mass.gov

*Attorneys for Plaintiff Commonwealth of
Massachusetts*


JOSH SHAPIRO
Attorney General

JAMES A. DONAHUE, III (PA Bar No.
42624)
Executive Deputy Attorney General
Public Protection Division

  /s/ Jennifer A. Thomson
TRACY W. WERTZ (PA Bar No. 69164)
JOSEPH S. BETSKO (PA Bar No. 82620)
JENNIFER A. THOMSON (PA Bar No.
89360)

Pennsylvania Office of Attorney General
Antitrust Section
14th Floor Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
Email: twertz@attorneygeneral.gov

*Attorneys for Plaintiff Commonwealth of
Pennsylvania*


JASON S. MIYARES
Attorney General

/s/ Tyler T. Henry
TYLER T. HENRY (VA Bar No. 87621)
Assistant Attorney General
Antitrust Unit
Office of the Virginia Attorney General
202 North Ninth Street
Richmond, Virginia 23219

Tel: (804) 692-0485
Email: <u>THenry@oag.state.va.us</u>

*Attorneys for Plaintiff Commonwealth of Virginia*

## LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1(a)(2), I hereby certify that I conferred with counsel for

Defendants in a good faith effort to resolve or narrow the issues presented in this motion prior to

filing.  Defendants confirmed that they opposed the motion.

         /s/ James H. Congdon
James H. Congdon
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW
Washington, DC 20530
Phone: 202-299-4574
Fax: 202-307-5802
james.congdon@usdoj.gov

*Attorney for United States of America*

14

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document, which was filed with the Court through the

CM/ECF system, will be sent electronically to all registered participants as identified on the Notice

of Electronic Filing.

<u>/s/ William H. Jones II</u>
William H. Jones II
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW
Washington, DC 20530
Phone: 202-514-0230
Fax: 202-307-5802
bill.jones2@usdoj.gov

*Attorney for Plaintiff United States of America*