# EXHIBIT C

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - - X

 4    UNITED STATES OF AMERICA,        :

 5    STATE OF ARIZONA, STATE OF       :

 6    CALIFORNIA, DISTRICT OF          :

 7    COLUMBIA, STATE OF FLORIDA,      :

 8    COMMONWEALTH OF                  :

 9    MASSACHUSETTS, COMMONWEALTH      :

10    OF PENNSYLVANIA and              :

11    COMMONWEALTH OF VIRGINIA,        :

12         Plaintiffs,                 :   Case No.

13              v.                     :   1:21-cv-11558

14    AMERICAN AIRLINES GROUP INC.,    :

15    and JETBLUE AIRWAYS              :

16    CORPORATION,                     :

17         Defendants.                 :

18    - - - - - - - - - - - - - - - X

19                 HIGHLY CONFIDENTIAL

20                 Remote Deposition

21                 Tuesday, August 23, 2022

22
```

1  irrelevant to ask the question what does someone

2  think the data say, but I'm looking at what the data

3  is actually saying and that's what I'm using.

4         So I don't want to imply that, you know,

5  there aren't knowledgeable people in American and

6  JetBlue.  I'm just saying for the question I'm

7  posing, which is a data question, I can answer it

8  with the data.

9     Q.   Is there any information that you asked

10 for or wished that you had had that you didn't have

11 when you were carrying out your assignment?

12    A.   Well, I mean, yes and no.  When you ask an

13 economist that question, you can always say I wish I

14 had great data and the data were better.  Economic

15 data are always subject to not being perfect.  But

16 that's just the nature of economic data.  And the job

17 of an economist is to use the data that's available

18 to see whether they can answer relevant questions.

19         But, you know, one of the things I should

20 mention is that since I've done my report, like I

21 just said, economists always like more data, the DB1B

22 has published additional -- you know, updated their



1  data to -- and published data for 2022 quarter 1,

2  which was not available at the time my report was

3  done.  So that's an example.  That's good and I now

4  have a list that is more data.  So, you know, more

5  data is always better than less data.

6      Q.   Have you done any additional work with

7  that additional quarter of DB1B data?

8      A.   Yes.  I redid the relevant tables in my

9  report -- I mean, recalculated the relevant tables in

10 my report.  Some of the relevant tables.

11     Q.   Do you intend to disclose those opinions

12 in a written report?  Those updated opinions?

13     A.   No one's asked me to, but I'm happy to

14 tell you that it doesn't alter my conclusions and, if

15 anything, confirms them, but --

16     Q.   Okay.  We'll get to that later.

17     A.   Okay.

18     Q.   Why don't we take a look at your report.

19 I'm going to ask Jissel to send through the chat,

20 Professor Carlton, your rebuttal report in this case

21 and I'll ask the court reporter to mark it as Exhibit

22 1.  But you can refer to the clean copy that you have



1       Q.    It might be more helpful actually to look

2   at Professor Miller's reply report.  I think I can

3   point you to the text.  If you look at paragraph 147

4   of Professor Miller's reply report, it's page 67.

5       A.    That's not what I was looking for.  I'm

6   sure the number 37 appears.  Hold on.

7             MR. WALL:  What you just pointed to,

8   Justin, has a reference to a $37 figure I cited in my

9   initial report.

10            MR. HEIPP:  Right.  That's what I'm --

11            THE WITNESS:  Yes, it is the $37 figure.

12  Yes.  Yes.

13  BY MR. HEIPP:

14      Q.    So then, Dr. Carlton, let me direct you up

15  to Exhibit 7 on that same page from Professor

16  Miller's reply report.

17      A.    Yep.

18      Q.    Do you understand that Exhibit 7 to be

19  conveying that JetBlue actually charges relatively

20  little in ancillary fees relative to other airlines?

21      A.    I mean, the exhibit speaks for itself, but

22  that is $37 that I was citing and that I was

1  remembering and that I think comes from his original

2  report.  But I take Exhibit 7 to be contrasting the

3  LCCs and ULCCs and to see how much, you know, they

4  charge.  And it does say that JetBlue is number 9.

5      Q.    So earlier when you were comparing the $37

6  to estimates of implied marginal costs, you were

7  using a number that is low relative to other

8  airlines, right?

9      A.    Yeah.  But I was -- I told you if you go

10 into his data and you ask what is the marginal -- how

11 often is the marginal cost of JetBlue -- yeah, of

12 JetBlue $37, minus $37, the answer is -- I can't

13 remember the exact number off the top of my head --

14 but it's somewhere between 10 and 15 percent.

15          So what I'm telling you is there are a lot

16 of examples in his merger simulation where he's

17 getting a number -- when marginal cost is negative,

18 it can't possibly be explained by his ancillary

19 evidence -- by ancillary evidence.  That's what I'm

20 saying.

21     Q.    Is it true that in Professor Miller's

22 model, the ULCC products are the ones most likely to



1  have negative marginal costs?

2      A.   I'd have to check that.  But what I just

3  told you is what I remember -- what I remember from

4  asking/inquiring about the relationship between

5  JetBlue's marginal costs and $37.  Now, if I use $30,

6  I get even more of a problem.  But the fact is there

7  are a significant number of problems for JetBlue.

8           Whether there are problems for other

9  airlines, I could go through and try and figure out.

10  But I focused on JetBlue to show you how erroneous

11  his model is.  And, in particular, if you have these

12  negative marginal costs, when you simulate the model

13  assuming a merger, you get ridiculous price effects.

14  And that's one cause of his ridiculous price effects

15  when he makes predictions that American Airlines and

16  B6 are going to raise fares by very large amounts.

17  And I go through that in the report.

18      Q.   So I asked you whether, in Professor

19  Miller's model, the ULCC products are the ones most

20  likely to have negative marginal costs.  Is it

21  correct that your answer is that you don't know

22  sitting here today?



1  A.  You know, I don't recall that exact

2  number.  It wouldn't surprise me, but, you know, I'd

3  have to -- I'd have to look at that exact question.

4  Q.  And compared to other airlines, ULCCs are

5  the ones that are most likely to earn more revenue

6  from ancillary fees, right?

7  A.  That's true.  But, you know, I do go

8  through in the report some of the peculiar

9  simulations and those are simulations in which he

10 makes predictions about AA and B6 fares going up.

11 And some of the most egregious ones that I think are

12 most unreliable have to do with situations in which

13 either AA or B6 have negative marginal costs.

14 Q.  Okay.  Dr. Carlton, continuing on in your

15 report, you further criticize Professor Miller for

16 assuming that airlines other than American and

17 JetBlue would not enter the overlap routes.

18       Did I get that right?

19 A.  Yeah.  Ignoring that possibility, yes.

20 Q.  So I first want to clarify some of the

21 terminology here because you refer to both entry and

22 expansion.

1   A.   Yes.

2   Q.   Is it correct that entry refers to an
3   airline beginning service on a particular O&D route?

4   A.   Yes. That's how I generally refine it,
5   yes.

6   Q.   And is it correct that expansion refers to
7   an airline adding frequencies or up-gaging on a route
8   that it already serves?

9   A.   That's fair, yes.

10  Q.   So Professor Miller's model does account
11  for up-gaging; isn't that right?

12  A.   No. He simply assumes Bertrand
13  competition with constant returns to scale. So he
14  doesn't recognize any concerns about expansion to
15  assume that there are constant returns to scale.

16       However, let me just be clear. I have to
17  look at his demand model again, but I don't think
18  he's changing frequency in his model, which obviously
19  would be expansion. I think he's holding that fixed.
20  I'd have to go back and check. That's my
21  recollection.

22       So just to clarify, when I say expansion,

1  impact of that event with what Professor Miller

2  predicts?

3     A.   I've not studied it, so how -- I'm not

4  sure I particularly see the relevance, but, you know,

5  the report speaks for itself.

6         MR. WALL:  Are we about at a point we can

7  take a break here sometime?

8         MR. HEIPP:  Yeah, getting pretty close.

9  BY MR. HEIPP:

10     Q.   And you haven't attempted to compare other

11  examples of JetBlue entry on routes to what Professor

12  Miller predicts, correct?

13     A.   Well, wait.  The JetBlue effect which I --

14  my recollection of the JetBlue effect is something

15  like 5 percent, but I'd have to check.  But it's

16  nothing like 55 percent.  I'm not aware of that.

17         But if you're asking me do I think it's

18  important to look at the JetBlue effect in order to

19  validate my results, I don't see why.  What Professor

20  Miller is predicting, very large fare effects, very

21  large relative to what's in the economic literature

22  on merger effects.



1            So I'm having to look at the JetBlue

2  effect and I'd have to look at what happened at DCA.

3  I don't know off the top of my head.  But the general

4  JetBlue effect is nothing like 55 percent if I'm

5  remembering the merger correctly.  And if that's what

6  you're suggesting that it is, I'll have to go back

7  and look at the literature, but that doesn't square

8  with my recollection.

9            MR. HEIPP:  Okay.  Let's take a break.

10           THE VIDEOGRAPHER:  Off the record at 3:08

11  p.m.

12           (Recess.)

13           THE VIDEOGRAPHER:  On the record at 3:29

14  p.m.

15  BY MR. HEIPP:

16     Q.   Dr. Carlton, I have just a couple of

17  follow-up questions for you on the conversation that

18  we were having before the break.

19           Is it your testimony that Dr. Miller's

20  predictions of fare increases from the NEA are

21  implausible because they are so large?

22     A.   Well, I would say they are very large.

1  They are out of the realm of what prior merger
2  retrospectives have found even when they are -- find
3  on average price increases.  If you look at the
4  specifics of where he is postulating large fare
5  increases, oftentimes they correspond to those places
6  where marginal costs in his model are negative, are
7  highly negative.
8            That should make you suspicious of the
9  credibility of his results combined with the fact my
10 recollection is that on some of these routes where he
11 finds very large price/fare increases, if you look at
12 who's increasing the price, it's AA and B6, American
13 Airlines and JetBlue, and the other carrier, say
14 Delta or whoever else the other carrier is, often
15 their fares go up only a little.  And that strikes me
16 as a very odd pattern.
17            So combining all of those together does
18 lead me to think that his creative price increases
19 are not credible, combined with the fact that they
20 actually don't occur in the actual data.  So for
21 those reasons, I do find his models, his merger
22 simulation to be not a credible way to make



1  predictions, in addition -- for those reasons as well

2  as the fact that I don't think he's modeling the NEA.

3         I should also add, when you asked me about

4  the JetBlue effect, the number of 5 percent or so --

5  and I'd have to check that -- is really the effect of

6  when JetBlue's the second carrier to enter.  If it

7  were the first carrier to enter, that's like the

8  first LCC, not the second LCC, the effect of a first

9  LCC I think -- I'd have to look at the data, I mean,

10 the literature.  My rough recollection is it's

11 somewhere between, you know, 10 and 20 percent, but

12 I'd have to check.

13    Q.   In reaching your opinion about the

14 credibility of Dr. Miller's predictions, did you

15 consider any of the historical examples of fare

16 changes associated with JetBlue entry or exit on a

17 route?

18    A.   Not specifically.  I mean, you know, I

19 might have read if there was a discussion of them in

20 the expert reports, but I don't think I focused on

21 them in evaluating the reliability of his model.  And

22 that, you know, my report speaks for itself as to



Dennis W. Carlton, Ph.D.    HIGHLY CONFIDENTIAL    8/23/2022
Case 1:21-cv-11558-LTS   Document 146-3   Filed 09/02/22   Page 14 of 15
Page 167

1  what I did.

2       Q.    Okay. Dr. Carlton, let's change topics.

3  I'd like to ask you about -- it's section 5 of your

4  report, your opinions relating to the American-US

5  Airways merger.

6       A.    Okay. Yes.

7       Q.    Are you offering the opinion in this case

8  that the American-US Airways merger was

9  procompetitive?

10      A.    That is my belief, yes.

11      Q.    And what is your basis for that opinion?

12      A.    Well, the -- I was the economist for AA-US

13 in the merger investigation and in the subsequent

14 bankruptcy, and I also wrote a paper in 2019 where I

15 discussed that particular merger. So I would say my

16 general conclusion is that the merger I expected to

17 be procompetitive and, if you look at the data of

18 what has happened since the merger occurred, it was

19 procompetitive.

20      Q.    When you refer to the data of what has

21 happened since the merger occurred, are you referring

22 to the retrospective analysis that's contained in

## CERTIFICATE OF REPORTER

UNITED STATES OF AMERICA ) ss.:

STATE OF MARYLAND )

I, **MARY GRACE CASTLEBERRY**, RPR, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties for the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

*Notary Public in and for*

*the State of Maryland*