# EXHIBIT V

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| |
|---|
| UNITED STATES OF AMERICA, *et al.* |
| *Plaintiffs*, |
| v. |
| AMERICAN AIRLINES GROUP INC. |
| and |
| JETBLUE AIRWAYS CORPORATION |
| *Defendants*. |

Case No. 1:21-cv-11558

# EXPERT REPLY REPORT OF ROBERT J. TOWN, Ph.D.

## August 8th, 2022

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### B. Dr. Lee's Critique of my Capacity Discipline Analysis is Flawed

#### 1. Dr. Lee wrongly asserts that all reductions in legacy capacity were driven by LCC entry

32.     Dr. Lee asserts that it is entry by lower cost carriers, rather than consolidation, that drove reductions in legacy capacity: "Dr. Town reaches an obviously flawed conclusion that consolidation, and not the competitive incursions by a host of lower cost and more nimble competitors, were the primary cause of legacy network carriers' capacity reductions."[69]  He goes on to claim that my capacity discipline model "omits a variable that accounts for legacy network carriers' persistent share loss to lower cost carriers," and that "[t]hat share loss forced the legacy network carriers to withdraw from unprofitable routes and thereby reduce capacity."[70]  In support of this argument, Dr. Lee provides examples of a mere two routes (BOS-SFO, and BOS-FLL) that appear to show exit by American and Delta subsequent to entry by LCCs.[71]  Notably, American exited BOS-FLL in 2006 (prior to the capacity discipline period), Delta exited BOS-FLL in 2010 (though Delta had minimal presence on the route already in 2009 at the beginning of the capacity discipline period), and American exited BOS-SFO in 2011 (though United stayed, and captured some of American's market share).  These are three cherry-picked examples of legacy carriers exiting a route—the first of which occurred prior to the capacity discipline period, the second of which involved a small reduction at the very beginning of the capacity discipline period, and the third of which involved another legacy carrier capturing some of the market share from the exiting carrier.  My capacity discipline analysis showed sustained capacity restraint from 2009 through at least 2016;[72] these examples cannot explain my findings.

33.     More importantly, Dr. Lee's story does not stand up to systematic scrutiny.  To test Dr. Lee's theory, I examine the routes exited by legacy carriers during 2002–2019 and find that the majority of routes exited by legacy carriers during this period did not have any lower-cost competitors.  These results are shown in Exhibit 9.  Of the 2,054 routes exited by legacy carriers during 2002–2019, only 428 or 21 percent of them had a lower-cost competitor at the time of legacy exit, while 1,626 or 79 percent of them had no lower-cost competitors at the time of exit.

---

[69]   Lee Report at ¶ 67.

[70]   Lee Report at ¶ 70.

[71]   Lee Report at ¶ 68 and Exhibit 22.

[72]   *See* Town Report at ¶ 72 and Exhibits 8 and C-2.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Furthermore, presence of a lower cost carrier at the time of exit does not imply the lower cost carrier *caused* the exit, meaning that the share of routes exited for other reasons may be even larger than 79 percent.

**Exhibit 9**
**Most Routes Exited by Legacy Carriers**
**had No Non-Legacy Competitor Offering**
**Service at the Time of the Legacy Exit**

Domestic Routes, 2002–2019

| Number of Non-Legacy Competitors at the Time of Legacy Exit | Number of Routes | Share of Routes |
| --- | --- | --- |
| Zero | 1,626 | 79% |
| One or More | 428 | 21% |
| Total | 2,054 | 100% |

Notes: Exit defined as a legacy carrier no longer providing any service on a route where they had previously provided 26 flights (an average of at least one weekly flight each direction). Non-Legacy service is defined as a non-legacy carrier offering at least 26 flights in the quarter of the legacy carrier exit.
Source: OAG Data.

34.    Dr. Lee also asserts that "the capacity reductions by legacy network carriers since 2000 have effectively been replaced by lower cost capacity."[73]  This assertion is inconsistent with the data.  My capacity discipline analysis shows that aggregate industry capacity (which includes the capacity of lower cost carriers) was lower than predicted capacity during the capacity discipline period,[74] and that the capacity decisions of non-legacy carriers do not offset this.[75]

35.    Furthermore, despite Dr. Lee's claims, point-to-point seat-miles do not replace hub network capacity one-for-one.  Dr. Lee says that "[t]he fact that the 'replacement' of legacy network carrier capacity by lower cost carriers is less than 100% is not surprising … because lower cost carriers typically utilize point-to-point networks, they require fewer ASMs to carry

---

[73]    Lee Report at ¶ 81.
[74]    *See* Town Report Exhibits 8 and C-2.
[75]    *See* Town Report Exhibits 10 and C-4.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the same traffic as GNCs."[76]  While this may be true for a single route between two cities for which a legacy network carrier only offers connecting service through their hub and a lower cost point-to-point carrier offers nonstop service, this logic breaks down when considering a larger network.  As Dr. Lee himself points out, "hub-and-spoke architecture allows airlines to take advantage of larger, more cost-efficient aircraft while adding greater flight frequency than local passenger demand alone could support, a phenomenon known as 'economies of traffic density.'"[77]  Dr. Lee's stylized example in his Exhibit 2 demonstrates a hypothetical scenario in which a hub-and-spoke network carrier can service ten city pairs with only four routes while a point-to-point carrier would need ten routes to service the same ten city pairs.  If the network carrier were to exit just one of those four routes, it would effectively eliminate four city pairs from its network and the point-to-point carrier would have to enter four routes to serve those four city pairs.

## 2.  Dr. Lee does not dispute the documents in the record suggesting that industry participants believed that consolidation facilitated capacity discipline

36.    In response to my capacity discipline analysis, Dr. Lee relies primarily on his unfounded theory that all legacy capacity reductions were driven by lower cost carrier entry (in addition to a few macroeconomic shocks).  As I demonstrate in the previous section, this cannot be the only explanation.  In my opening report, on the other hand, I discuss numerous documents in the record which suggest that industry executives pursued—and attempted to coordinate[78]— capacity discipline, and both industry executives and analysts believed that consolidation facilitated capacity discipline.[79]  Dr. Lee does not does discuss—let alone refute—any of this.  Dr. Lee also does not discuss the findings reported in published economic literature (that I discussed in my initial report) of a coordinated capacity discipline effect facilitated by public statements made on quarterly earnings calls.[80]

---

[76]    Lee Report at footnote 214.

[77]    Lee Report at ¶ 17 and Exhibit 2.

[78]    *See, for example*, AA-NEA-00502467 at -469, in which American's then CEO Doug Parker indicates that American will not "be able to close a $2B earnings gap entirely with independent decisions," that "[i]ndustry capacity growth plans would need to be reduced as well," and that he is "modestly encouraged by the actions described by our largest competitors on their 2Q earnings calls."

[79]    *See generally* Town Report Section IV.B.2.

[80]    Aryal, Gaurab, Federico Ciliberto, and Benjamin Leyden, "Coordinated Capacity Reductions and Public Communication in the Airline Industry," *The Review of Economic Studies*, 2021, pp. 1-61.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

37.   Furthermore, a leading airline industry textbook includes a discussion of capacity discipline in the airline industry, which lends additional support to my conclusion that the industry experienced a coordinated capacity discipline effect:

> Several mergers of large airlines have led to an unexpected recent consolidation of the US industry – Delta merged with Northwest, United with Continental, American with US Airways, and even LCCs Southwest and AirTran combined their forces.  This unprecedented consolidation has left over 85% of US domestic capacity in the hands of four large competitors.  It has allowed the merged airlines to rationalize their networks and eliminate redundant operations, and has led to a strategy of 'capacity discipline' among the major players.  Under this strategy, there has been little or no growth in available capacity in US domestic markets for several years, with no major increases expected in the near future.
>
> …
>
> Constrained capacity growth has allowed all of the largest competitors to simultaneously increase both their load factors and yields (average fares), a difficult to achieve combination that explains much of the recent profit performance of US airlines.  As shown in Figure 17.2, after a period in the early 2000s when load factors increased at the expense of declining yields, US domestic load factors increased to over 83% between 2009 and 2013, a 5-year period in which yields were also increasing.  However, because such capacity discipline reflects an unstable equilibrium, there is always an incentive for one competitor to unilaterally expand its capacity in search of greater market share.  In the US airline industry, there is thus much speculation on how long the current equilibrium can be sustained.[81]

### 3.   Dr. Lee's capacity discipline regression is misspecified

38.   Dr. Lee claims that my capacity discipline regression model suffers from omitted variable bias:

> It is well understood that regression models can produce unreliable results when they exclude important explanatory variables. This problem—referred to by economists as "omitted variable bias"—can render the estimated coefficients on the other variables biased and potentially unreliable.  There is no doubt that Dr. Town's capacity regressions for legacy network carriers is plagued with this problem.[82]

39.   It is equally well understood that regression models can produce unreliable results when they include explanatory variables that are caused by the outcome variable; economists refer to such explanatory variables as "endogenous."  Consider, for example, a regression of whether it rains on a given day on the number of people carrying umbrellas to work.  In this example, "whether it rains on a given day" is the outcome variable, and "the number of people carrying umbrellas to work" is the explanatory variable.  Such a regression is sure to result in a

---

[81]   Belobaba, Peter, William Swelbar, and Amedeo Odoni, "Critical Issues and Prospects for the Global Airline Industry," in Peter Belobaba, Amedeo Odoni, and Cynthia Barnhart, *The Global Airline Industry*, 2nd Edition, Wiley & Sons, Inc., 2016, pp. 490-491.

[82]   Lee Report at ¶ 91.

positive and statistically significant coefficient on the number of people carrying umbrellas to work. Observing this, one might naively conclude that more people carrying umbrellas to work leads to a higher probability of rain. Dr. Lee's "corrected"[83] capacity discipline regression suffers from a similar problem.

40.   To see this, consider how Dr. Lee's explanatory variable "LCC_RPM_Share" is calculated:

$$LCC\_RPM\_Share = \frac{LCC\ RPMs}{Total\ RPMs} = \frac{LCC\ RPMs}{LCC\ RPMs + Legacy\ RPMs + Other\ RPMs}$$

In this equation, RPMs are a measure of passenger traffic—one RPM is one revenue passenger traveling one mile; total RPMs then is equal to the sum of all miles flown by all revenue passengers. Note that the formula for calculating LCC_RPM_Share contains legacy carrier RPMs, a variable that is determined by the outcome variable, legacy ASMs—in order for a revenue passenger to fly a mile, there has to be an available seat mile.

41.   To demonstrate how Dr. Lee's regression suffers from the endogeneity of including this variable, I separate his LCC_RPM_Share into three variables: LCC_RPMs, Legacy_RPMs, and other RPMs. Using these three variables (and the variables from my original regression model), I run a series of three regressions: one including LCC RPMs, legacy RPMs, and other RPMs; one including only legacy RPMs; and one including only LCC RPMs. These results are shown in Exhibit 10. As shown in Column 3, including LCC RPMs, legacy RPMs, and other RPMs separately results in an R-squared[84] similar to that in Dr. Lee's regression (Column 2), but the coefficient on LCC RPMs is statistically insignificant—only the coefficient on legacy RPMs is statistically significant. Indeed, as shown in Column 4, including only legacy RPMs (and excluding LCC RPMs and other RPMs) results in a R-squared that is almost as high as that in Dr. Lee's regression; this is because most of the explanatory power in Dr. Lee's LCC_RPM_Share comes from the legacy RPM term. Finally, Column 5 shows a regression that includes only LCC RPMs; this results in a statistically insignificant coefficient, and an R-squared and coefficient estimates on the yearly capacity discipline dummies that are very similar to those in my original specification (Column 1). Dr. Lee claims that including LCC_RPM_Share in his

---

83   Lee Report Exhibit 29.

84   R-squared is a standard measure of "goodness of fit" of a regression model to the data. It indicates how well the variation in the variables included on the right-hand side explain the variation in the left-hand side variable.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

regression improves the "statistical 'fit'" of the model,[85] which means he is claiming that his model does a better job of explaining the variation in legacy capacity. The results in Models 2–5 indicate that most of the added explanatory power comes from the legacy RPM term in his variable, not from the LCC RPM term.

### Exhibit 10
## Modifications to Original Capacity Regressions
### Legacy Carriers (Including Regional Operating Carriers)
### Q3 1992 to Q1 2020

| Dependent Variable: | Model | | | | |
|---|---|---|---|---|---|
| Log Capacity | (1) | (2) | (3) | (4) | (5) |
| Year=2009 | -0.155*** | -0.026 | -0.091*** | -0.115*** | -0.153*** |
| Year=2010 | -0.124*** | 0.014 | -0.033 | -0.038* | -0.123*** |
| Year=2011 | -0.123*** | 0.020 | -0.040 | -0.038* | -0.121*** |
| Year=2012 | -0.138*** | 0.023 | -0.042 | -0.040* | -0.137*** |
| Year=2013 | -0.147*** | 0.017 | -0.038 | -0.034 | -0.146*** |
| Year=2014 | -0.161*** | -0.006 | -0.041 | -0.036 | -0.161*** |
| Year=2015 | -0.162*** | -0.020 | -0.033 | -0.024 | -0.163*** |
| Year=2016 | -0.149*** | 0.017 | -0.027 | -0.018 | -0.150*** |
| Year=2017 | -0.122*** | 0.052* | -0.011 | 0.000 | -0.123*** |
| Year=2018 | -0.071*** | 0.082*** | 0.037 | 0.048* | -0.072*** |
| Year=2019 | -0.037* | 0.100*** | 0.039 | 0.060** | -0.039 |
| LCC RPM Share (lagged) | | -2.053*** | | | |
| Log Legacy RPM (lagged) | | | 0.750*** | 0.636*** | |
| Log LCC RPM (lagged) | | | -0.052 | | -0.007 |
| Log Other RPM (lagged) | | | -0.014 | | |
| Adjusted $R^2$ | 0.811 | 0.894 | 0.879 | 0.876 | 0.809 |

Notes:
[1] * p<0.1, ** p<0.05, *** p<0.01
[2] Model (1) is the original Town regression from Exhibit 9/C-3. Model (2) is Dr. Lee's "corrected" version.
[3] Full output for all models is displayed in Appendix Exhibit B-3.

Sources: Backup materials to the Lee Report; U.S. Bureau of Transportation Statistics (TranStats), T-100 Data; OAG Data; U.S. Bureau of Economic Analysis, Gross Domestic Product (accessed from FRED); U.S. Energy Information Administration, Kerosene-Type Jet Fuel Prices (accessed from FRED); U.S. Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers (accessed from FRED); OAG Data.

---

[85]   Lee Report at ¶ 94.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

42.    Dr. Lee himself acknowledges this endogeneity problem, saying that he lags LCC_RPM_Share by a year "to mitigate against potential endogeneity between the two variables."[86]  Lagging the endogenous variable, however, does not solve the problem in this case. The documents in the record, and my own empirical analysis demonstrate a coordinated effect that lasted for several years.  Since legacy RPMs are a function of legacy capacity decisions (ASMs), legacy RPMs are artificially reduced throughout the period too.  In Dr. Lee's specification, the predicted value of legacy capacity in 2011 depends on the value of legacy RPMs in 2010; but legacy RPMs in 2010 are a function of legacy ASMs in 2010, and so are also tainted by capacity discipline (reducing capacity reduces passenger traffic).  This is a typical case of reverse causality (a type of endogeneity) and means that one cannot infer that RPMs are causing ASMs in the way that Dr. Lee does.

### 4.  Dr. Lee wrongly claims that airfares are informative about capacity discipline

43.    Dr. Lee asserts that "there is no evidence that GNCs have been able to extract systematically higher fares from consumers as a result of their mergers."[87]  He goes on to describe a trend in prices, without actually showing that trend: "Even though a greater proportion of GNCs' passengers flew at lower fares, *average fares* for the legacy network carriers rose modestly between 2007 and 2019 and, broadly speaking, moved together. Excluding the Great Recession year of 2009, the legacy network carriers' average fares between 2007 and 2019, adjusted for inflation (to 2020 dollars) and standardized to a 1,000 mile trip, ranged from a low of $240 in 2010 to a high of $268 in 2014, ending the period at $241, *one dollar less than the start of the period ($242)*."[88]

44.    Airfares depend on a multitude of factors including passenger demand and jet fuel prices.  Jet fuel prices fell sharply at the beginning of the capacity discipline period in 2009, then increased during 2009 and 2010 and plateaued for a few years before falling again in 2014 and 2015 while capacity discipline was still in effect.[89]  These types of cost fluctuations can render simple price comparisons alone uninformative about market power.  While an increase in costs alone (without any change in market power) can cause price to increase, economics has long

---

[86]    Lee Report at ¶ 95.

[87]    Lee Report at ¶ 82.

[88]    Lee Report at ¶ 84 (emphasis in original).

[89]    *See* Town Report at ¶ 65 and Exhibit 5.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

recognized that well measured price-cost margins are informative as to the exercise of market power.[90]  Indeed, recent empirical industrial organization literature has used markups and margins as a way to document market power in the airline industry.[91]  For example, mergers can create efficiencies, lowering costs; if, however, price does not decrease accordingly (increasing margins), that is an indication that the increased concentration increased market power.  In order to truly understand the impact of capacity discipline on airfares, one would have to analyze what happened to margins during the capacity discipline period relative to a but-for world without capacity discipline.  I do not have the data to do so, but it is worth noting that the U.S. Government Accountability Office report, cited by Dr. Lee,[92] also finds that capacity discipline contributed to higher fares, explaining that growth in industry profitability had been aided "by three factors: (1) an increase in passenger traffic; (2) capacity restraint (i.e., limiting the supply of available seats in relation to the level of demand), which has contributed to a rise in airfares; and (3) increased revenues from ancillary fees."

45.    Capacity and output are themselves informative, however.  Indeed, Professor Carlton and Dr. Israel agree.  In a recent study, Professor Carlton and Dr. Israel assert that output is more informative than price about the competitive effects of mergers.[93]   Further, in his report in the litigation of the American-US Airways merger, Professor Carlton said that "the effect on output is the most useful simple summary measure of a merger's competitive effects."[94]  And finally, in his report in this matter, Dr. Israel claims that capacity is itself informative about the net benefits of a collaboration,[95] suggesting that a reduction in capacity indicates harm.

46.    Setting aside these issues, Dr. Lee's own data and analyses do not support his claims.  It is interesting that Dr. Lee chooses to describe rather than depict a price trend;

---

[90]    Bain, Joe S., "Relation of Profit Rate to Industry Concentration: American Manufacturing, 1936–1940," *The Quarterly Journal of Economics,* Vol. 65, No. 3, 1951, pp. 293-324.

[91]    *See, for example*, Bet, Germán. "A Retrospective Study of Recent US Airline Mergers: What Can We Learn from Production Data?," *SSRN*, 2021, pp. 1-61, ("Bet (2021)").

[92]    "Airline Competition: The Average Number of Competitors in Markets Serving the Majority of Passengers Has Changed Little in Recent Years, but Stakeholders Voice Concerns about Competition," *U.S. GAO, GAO-14-515*, June 2014, available at https://www.gao.gov/assets/gao-14-515.pdf (accessed August 5, 2022) at p. 13.

[93]    Carlton, Dennis, Mark Israel, Ian MacSwain, and Eugene Orlov, "Are Legacy Airline Mergers Pro- or Anti-Competitive? Evidence From Recent U.S. Airline Mergers," *International Journal of Industrial Organization*, Vol. 62, 2019, pp. 58-95, ("Carlton et al. (2019)") at footnote 2.

[94]    AA-AAUS-00015869 (Expert Report of Professor Dennis W. Carlton, November 8, 2013), at ¶ 146.

[95]    Israel Report at p. 119.

unsurprisingly, the data do not actually support his argument. Using the data that Dr. Lee references, I plot the trend in legacy network carriers' inflation-adjusted fares, standardized to a 1,000-mile trip, in Exhibit 11. This exhibit shows that fares were elevated during the capacity discipline period,[96] and only fell to the levels observed prior to the capacity discipline period in 2016 when, as I explain in my initial report, capacity discipline started weakening.[97]

### Exhibit 11
### Dr. Lee's Legacy Network Carriers' Average Fares Over Time
Referenced in Lee Report ¶ 84



Notes:
[1] Average legacy fares are adjusted for inflation (to 2020 dollars) and standardized to a 1,000 mile trip.
[2] Capacity discipline marked in gray between 2009–2017, the years with significant negative coefficients in Town Report Appendix Exhibit C-2.
Source: Backup materials to the Lee Report.

47.    Dr. Lee also presents yield data from 1993 to 2021 to support his claim that fares have generally declined since deregulation (a proposition I do not dispute).[98] Dr. Lee, however, does not acknowledge that his own data show that yields were higher during the capacity discipline period. Despite the continued growth of LCCs—the long-run trend in yields is declining from 1993 into the early- to mid-2000s, but the trend reverses during the capacity discipline period, and by 2014 yields were higher than in 2003 before they started declining again as capacity discipline weakened.[99]

---

[96]  Fuel prices were also higher, on average, during this period (*see, for example,* Town Report Exhibit 5). However, jet fuel prices dropped substantially beginning in mid-2014, while prices remained high.

[97]  *See* Town Report Section IV.B.4.

[98]  Lee Report Exhibit 20.

[99]  Yields including bag and change fees, which started growing in 2009, reached 2003 levels in 2010, and did not fall below 2003 levels again until 2016.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

48.   As further purported evidence of an overall trend in declining fares, Dr. Lee presents a chart of tenth percentile industry fares over time, and highlights a 35 percent drop from 2014 to 2019.[100]  As Dr. Lee acknowledges, this is due in large part to the expansion of ULCCs,[101] who engaged in "unbundl[ing]" to "offer the lowest base fares possible."[102]  Setting aside the fact that Dr. Lee does not include ancillary fees in his analysis and thus does not analyze the "all in" prices paid by passengers,[103] I examine a version of Dr. Lee's exhibit restricted to legacy carriers (see Exhibit 12).  While legacy carriers' tenth percentile fares also decline between 2014 and 2019, they do so to a lesser extent (15 percent versus 35 percent in Dr. Lee's exhibit including ULCCs) and, more importantly, Dr. Lee fails to acknowledge that that decrease follows an upward trend in legacy carriers' fares during the first five years of the capacity discipline period.

---

[100]   Lee Report Exhibit 21.

[101]   Lee Report at ¶ 58.

[102]   Lee Report at ¶ 29.

[103]   Dr. Lee himself says that "the total cost to travel on a ULCC for those passengers who purchase ancillary products and services… narrows the price gap between ULCCs and other carriers" (*see* Lee Report at ¶ 31).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Exhibit 12**
# Inflation-Adjusted 10th Percentile One-Way Fare for Legacy Carriers Only (1993–2019)
### Modification of Dr. Lee's Exhibit 21



Notes:
[1] Average fares are adjusted for inflation (to 2020 dollars) and standardized to a 1,000-mile trip.
[2] Methodology to calculate tenth percentile domestic one-way fares follows that of Dr. Lee's Exhibit 21.
[3] Dr. Lee displays the tenth percentile fare across all carriers in his Exhibit 21; I display tenth percentile fares for legacy carriers only. I define legacy carriers to be carriers classified as "GNC," "GNC Predecessor," or "Legacy Ceased" in Dr. Lee's backup materials.
[4] ULCC share is measured in terms of ASMs. I define ULCC to be carriers classified as "ULCC" in Dr. Lee's backup materials.

Sources: Backup materials to the Lee Report; U.S. Bureau of Transportation Statistics (TranStats), T-100 Data.

49.   I also modify Dr. Lee's exhibit to show the trends in median fares (see Exhibit 13). These show a similar trend of increasing during the first five years of the capacity discipline period, consistent with the analysis of capacity discipline in my initial report.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Exhibit 13**
# Inflation-Adjusted Median Domestic One-Way Fare (1993–2019)
### Modification of Dr. Lee's Exhibit 21



Notes:
[1] Median fares are adjusted for inflation (to 2020 dollars) and standardized to a 1,000 mile trip.
[2] Methodology to calculate median domestic one-way fares follows that of Dr. Lee's Exhibit 21.
Source: Backup materials to the Lee Report.

## III.  DR. LEE IGNORES MY UPDATED HUB PREMIUM ANALYSIS (AND MORE RECENT STUDIES)

50.   Dr. Lee's mischaracterizations of my report are not limited to my capacity discipline opinions.  In response to my hub premium analysis,[104] Dr. Lee asserts that I simply repeat "'hub premium' arguments made popular by studies conducted using data *from the 1980s*."[105]  Dr. Lee ignores a more recent study that I cite from 2010,[106] using data through 2005,[107] and, more importantly, he completely disregards my own empirical analysis.  In my initial report, I present a series of regressions using various measures of airport presence, and demonstrate, using data from 2010 through 2021, that there is a meaningful and statistically significant fare premium

---

[104]   *See* Town Report Section V.D.

[105]   Lee Report at ¶ 126 (emphasis in original).

[106]   *See* Town Report at ¶ 135 and footnote 275.

[107]   Ciliberto, Federico, and Jonathan W. Williams, "Limited access to airport facilities and market power in the airline industry," *The Journal of Law and Economics*, Vol. 53, No. 3, (2010): pp. 467-495, at p. 491.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

with increased airport presence.[108]  Dr. Lee ignores this, and presents no analysis of his own; there is nothing to rebut.

## IV. PROFESSOR CARLTON'S CLAIM THAT THE MERGER BETWEEN AMERICAN AND US AIRWAYS RESULTED IN NET CONSUMER BENEFITS IS ERRONEOUS AND UNINFORMATIVE AS IT PERTAINS TO THE NEA

51.   Professor Carlton claims that a retrospective analysis of the American-US Airways merger can be informative about the likely competitive effects of the NEA.[109]  As purported evidence that the 2013 merger between American and US Airways was procompetitive—and that, by extension, the NEA is likely to be similarly procompetitive—Professor Carlton relies primarily on prior testimony and a study he conducted with Dr. Israel and others.[110]  Professor Carlton concludes: "[s]imply put, my analysis of the American-US Airways merger – including my published paper and what I presented in the bankruptcy court trial – lends no support at all to the notion that there were adverse effects from that merger and therefore that there will be similar adverse effects from the NEA."[111]

52.   Professor Carlton failed to provide backup materials that would allow me to assess whether his reported findings are correct and test the robustness of his conclusions. I have, however, reviewed Carlton et al. (2019) carefully, and I find that it suffers from several methodological flaws that invalidate the authors' conclusions regarding the impact of the American-US Airways merger and Professor Carlton's extrapolation of those results to the NEA.

---

[108]  *See* Town Report Exhibit 23.

[109]  Section V of Professor Carlton's report discusses the probative value of his American-US Airways merger retrospective but does not mention the probative value of the international airline alliances that the NEA is patterned after. Dr. Israel's footnote 326 cites an article that he cowrote that considers international alliances (Calzaretta, Robert J., Yair Eilat, and Mark A. Israel (2017), "Competitive Effects of Airline Cooperation," Journal of Competition Law & Economics, 13(3): 501–548). But Dr. Israel's footnote fails to note that Professor Brueckner has also co-written an article about the impacts of international alliances (Brueckner, Jan K. and Ethan Singer, "Pricing by International Airline Alliances: A Retrospective Study", *Economics of Transportation*, Vol. 20, 2019, pp. 1-25). Professor Brueckner's coauthored article finds that the effect on "gateway-to-gateway" (essentially nonstop) economy fares of an alliance with revenue sharing and antitrust immunity is equivalent to removing a competitor, while a non-immunized alliance without revenue sharing also increases economy fares but by a lesser amount. Professor Brueckner's coauthored article does find consumer benefits from the international alliances in connecting markets enabled by putting together the two complementary networks, but, as I explained in my initial report, in contrast to the international immunized alliances, the NEA does not involve significant complementarity (*see* Town Report Section V.C.).

[110]  Carlton et al. (2019).

[111]  Carlton Report at ¶ 62.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### A. Professor Carlton's Analysis Suffers from Several Methodological Flaws

53.    Before discussing the methodological flaws of Carlton et al. (2019) in detail, I provide below some general background on the empirical approach.

#### 1. Difference-in-difference estimation

54.    At the heart of the analysis on which Professor Carlton bases his opinion in this matter is a methodological approach called a "difference-in-difference." The idea behind difference-in-difference is to construct a framework to examine the impact of a policy—in this case an airline merger—as if it were an actual experiment in which airline markets were randomly assigned to a "treatment group" (markets with a significant pre-merger overlap by the merger parties) and "control group" (markets with no pre-merger overlap). Changes observed in the control group are assumed to be unrelated to the merger, so they serve as a benchmark for the "counterfactual" or but-for outcome.  Although the econometric details are somewhat complicated, the treatment effect of the merger is essentially determined by changes in the outcome of interest (e.g., passenger traffic or airfares) from the pre-treatment period to the post-treatment period in the treatment group relative to the control group.  Exhibit 14 shows an illustration of how this works.  The red line represents how average airfares evolve over time in the control group, and the green line represents how prices evolve over time in the treatment group; "$t_0$" represents the time of treatment (in this case the merger closing).  The height of the line labelled "Control Group Difference" represents the change in average airfares on routes in the control group from $t_{-2}$ (two years prior to the merger) to $t_2$ (two years post-merger); this is the benchmark for the change in average airfares but-for the merger.  The height of the line labelled "Treatment Group Difference" represents the change in average airfares on routes in the treatment group from $t_{-2}$ to $t_2$; note that this difference is larger than the height of the bar labelled "True Treatment Effect."  The difference in difference estimate of the True Treatment Effect is equal to the Treatment Group Difference minus the Control Group Difference—hence the term difference-in-difference.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### Exhibit 14
## Difference-in-Difference Estimate of Treatment Effect

Treatment Effect = Treatment Group Difference − Control Group Difference



55.    For example, if average airfares are observed to increase by one percent in the control group, it is assumed that average airfares in the treatment group also would have increased by one percent in a world but-for the merger; if, in the actual world, average airfares in the treatment group increased by two percent, then the difference-in-difference estimate of the effect of the merger is a one-percent increase in average airfares.[112]

56.    Due to its apparent simplicity, difference-in-difference methodology is often assumed to be a quick and easy way to answer causal questions. However, for the difference-in-difference methodology to generate estimates of the true causal impact of an intervention (in this case, the merger between American and US Airways), several conditions must be met. The evidence suggests that Carlton et al. (2019) fails to meet any of these necessary conditions.

57.    The difference-in-difference method requires the researcher to define treatment and control groups. As I discuss in more detail below, finding and carefully defining both the treatment and control is essential to make valid causal inference in difference-in-difference

---

[112]   2% - 1% = 1%.

estimation.  Poorly or incorrectly defined treatment and/or control groups renders the difference-in-difference estimates biased and not reflective of the true cause of effects under examination.

58.   If the assignment of markets to treatment and control groups were truly random as in gold-standard experimental designs, then a simple comparison of the difference in the outcomes in the post-treatment period is all that is needed to determine the causal impact of the intervention. However, in non-experimental settings like the assessment of the impact of a merger as in Carlton et al. (2019), the treatment and control groups are not randomly assigned. This necessitates the second difference in the difference-in-difference methodology. The second difference removes any pre-intervention differences in the treatment and control groups.

59.   While difference-in-difference is an attractive approach for inferring treatment effects of policy interventions in non-experimental settings, it is well known that for a difference-in-difference approach to yield an unbiased estimate of the true treatment effect, three assumptions must hold.[113]

a) <u>The Treatment group must not be differentially affected by factors that affect its outcomes in the post-period that are unrelated to the treatment effect.</u> The importance of this assumption is obvious – if the treatment group is simultaneously and differentially affected by other factors, then difference-in-difference estimates will confound the true treatment effect and the factors that are differentially affecting the treatment group.  Exhibit 15 shows an example of a violation of this assumption. Note that, unlike in Exhibit 14, the change in the treatment group (represented by the green line) is larger than the true treatment effect.  In this case, the difference-in-difference estimate would be biased—the estimate would be larger than the true treatment effect.

---

[113]   There are several additional assumptions that must hold for the difference-in-difference estimates to be unbiased. I focus on these three assumptions as they are the ones that the difference-in-difference literature mostly focuses upon, and they are assumptions that likely do not hold in Professor Carlton's analysis.  *See, for example*, Lechner, Michael. "The estimation of causal effects by difference-in-difference methods." *Foundations and Trends® in Econometrics* 4, no. 3 (2011): 165-224; (note, my phrasing of the assumptions differs somewhat from this article, but the underlying concepts are the same).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Exhibit 15**
# Difference-in-Difference Estimate of Treatment Effect

Treatment Effect = Treatment Group Difference − Control Group Difference − Unrelated Factors



b) <u>The Control group is unaffected or uncontaminated by the treatment.</u> The inference of the causal impact of the treatment is based on the difference between the treatment and control groups. However, if the control group is affected by the treatment group in some way, relying on difference-in-difference analysis to estimate the causal effects of the treatment will yield biased and unreliable estimates of the causal effects. Exhibit 16 shows a violation of this assumption.  Note that in this case, the change in the control group (represented by the green line) is affected by the treatment effect. This would also bias the difference-in-difference estimate; in this example, the estimate would indicate no treatment effect, when in reality there is one.  The intuition behind the impact of a contaminated control group is straightforward. In a difference-in-difference analysis, the control group serves as a proxy for the outcomes of the treatment group in a world but-for the treatment. If the control group is contaminated by the treatment, it is no longer a valid proxy for the counterfactual of no treatment for the treatment group.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Exhibit 16**
# Difference-in-Difference Estimate of Treatment Effect
Treatment Effect ≠ Treatment Group Difference – Control Group Difference



c) <u>Parallel trends between treatment and control groups</u>. The parallel trend assumption implies that the difference in the outcomes between the treatment and control groups that are observed in the pre-treatment period would have remained the same if no treatment would have been administered to the treatment group. There is a significant econometrics literature devoted to the implications of the parallel trend assumption for causal inference.[114] Exhibit 17 shows and example of a violation of parallel trends assumption. Note that the red and green lines are not parallel (unlike the trends in Exhibit 14 above, which are parallel). In this example, it is assumed that the true treatment effect is zero. The difference-in-difference approach is again biased and

---

[114] *See, for example*, Roth, Jonathan, "Pre-test with Caution: Event-study Estimates After Testing for Parallel Trends," *American Economic Review: Insights,* forthcoming, 2019, pp. 1-22, ("Roth (2019)"), Bilinski, Alyssa, and Laura Hatfield, "Nothing to see here? Non-inferiority approaches to parallel trends and other assumptions," *arXiv*, 2019, pp. 1-65, ("Bilinski and Hatfield (2019)"), and Kahn-Lang, Ariella, and Kevin Lang, "The Promise and Pitfalls of Differences-in-Differences: Reflections on *16 and Pregnant* and Other Applications", *Journal of Business & Economic Statistics*, Volume 38, Issue 3, 2020, pp. 613-620, ("Kahn-Lang and Lang (2020)"). (Note, this was available as an NBER working paper in 2018, prior to the publication of Carlton et al. (2019). *See* Kahn-Lang, Ariella, and Kevin Lang. "The Promise and Pitfalls of Differences-in-Differences: Reflections on '16 and Pregnant'and Other Applications." *NBER Working Paper* w24857 (2018).)

estimates a large positive treatment effect when there is no treatment effect. Here it is assumed that the true treatment effect is zero, but this could be true even in a scenario in which the true treatment effect is negative. In sum, when the parallel trends assumption does not hold, any policy decision that relies on the results of the difference-in-difference analysis as a factual underpinning for that decision risks relying on a "fact" that is not true.

## Exhibit 17
## Difference-in-Difference Estimate of Treatment Effect

Treatment Effect = 0 ≠ Treatment Group Difference – Control Group Difference



60. While these three assumptions are central to the validity of the difference-in-difference approach, in general, it is not possible to directly test their validity. However, well executed difference-in-difference analyses will carefully select both the treatment and the control group to maximize the likelihood that assumptions (a), (b) and (c) hold. Furthermore, the study will provide indirect evidence of the validity of these assumptions.

61. As I explain in more detail below, there is evidence that all three of the requisite difference-in-difference assumptions fail to hold in Carlton et al. (2019). Furthermore, even ignoring the issues regarding the validity of the key difference-in-difference assumptions, the evidence that the American-US Airways merger was pro-competitive is remarkably thin.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Therefore, Professor Carlton's conclusion that the American-US Airways merger was benign is unsubstantiated. Before discussing the evidence on the validity of the key assumptions, I briefly overview Carlton et al. (2019).

### 2. Professor Carlton's empirical approach

62.    As I mention above, Defendants have refused to provide the backup data for Carlton et al. (2019). Nevertheless, as Professor Carlton acknowledges, I have extensive knowledge of the merger itself and the litigation Professor Carlton refers to as the "American-US Airways merger challenge."[115]   As such, I carefully review and evaluate Carlton et al. (2019) based on this expertise; before presenting my conclusions, I provide a brief summary of its empirical approach.

63.    Carlton et al. (2019) studies three of the major airline mergers I discuss in my initial report: Delta-Northwest, United-Continental, and American-US Airways.[116]   In my initial report, I examined the role of previous legacy airline mergers in facilitating capacity discipline by analyzing the documentary record,[117] and confirming the implications of the documentary record with aggregate data.[118]   In that report, I explained that I focus on aggregate data to avoid the pitfalls of Carlton et al. (2019)—in particular, "[w]hen one of the effects of a merger is to facilitate coordination, and/or accommodation, the anticompetitive effects of that merger may not be restricted to the markets where the merging parties overlap."[119]   In the event that there are also anticompetitive effects in non-overlap markets, that would tend to diminish the ability to detect anticompetitive effects in overlap markets relative to non-overlap markets.

64.    Carlton et al. (2019), on the other hand, uses an analysis data set in which an observation is a city pair route (e.g., Chicago to Washington D.C.) and a year-quarter (e.g., Q3 2013). The paper is unclear on whether an observation in the dataset is directional (e.g., whether Chicago to Washington D.C. is a different observation from Washington D.C. to Chicago). The

---

[115]   Carlton Report at ¶ 60, referencing my role as a testifying expert in the "AA/US Airways merger challenge" brought by the U.S government and several states against the merging parties, and my published case study of the merger (Olley, Steven, G.  and Robert Town, "End of an Era: The American Airline-US Airways Merger (2014)," in John E. Kwoka, Jr. and Lawrence J. White,  *The Antitrust Revolution: Economics, Competition, and Policy, 7th ed*., Oxford University Press, 2019, ("Olley and Town (2019)") pp. 448-470.)

[116]   Carlton et al. (2019) at pp. 59-60.

[117]   *See* Town Report Section IV.B.2.

[118]   *See* Town Report Section IV.B.3.

[119]   *See* Town Report at ¶ 42.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

variables of interest are: mean fares across all carriers serving the route; the total number of passengers flown on the route (including passengers of both the merging and non-merging carriers); the 90th percentile fare on the route; and the total number of available direct seats on that route. For the American-US Airways merger analysis the data span Q4 2011 to Q4 2015 (excluding Q4 2013, the quarter the merger was approved).[120] That is, there are eight observations on each route before the merger and eight observations on each route after the merger. Carlton et al. (2019) assumes that the impact of the merger will manifest starting in Q1 2014, not allowing any period of integration before the impact of the merger is realized. This is problematic because if one uses a post-merger period during which the parties have not fully integrated, the comparison would not fully capture the effects of the merger.[121]

65.   Carlton et al. (2019) defines the treatment group as those routes in which the merging carriers overlapped prior to the merger and the number of alternative carriers is below a given threshold (either two or three pre-merger competitors, including the merging carriers). The control group is defined as those routes in which the merging carriers for any of the three mergers did not overlap prior to their respective mergers, and where the number of operating carriers was below the same threshold as in the treatment group. Carlton et al. (2019) argues that its control group reflects what would have happened in the treatment group but-for the merger. However, as I show below, the control group is very different from the treatment group. This is not surprising as at least one of the merging carriers chose not to enter the routes that comprise the control group, implying that market conditions are different in the treatment and control groups.

66.   Carlton et al. (2019) breaks its analysis into two parts. First, it studies the impact on routes where American and US Airways both provided nonstop service, focusing on routes where there were two or three carriers offering nonstop service prior to the merger. It is the results from this non-stop overlap analysis that serves as the principal basis for Professor Carlton's opinion in this matter that the American-US Airways merger was procompetitive—the

---

[120]   The paper considers the time period Q3 2011 to Q4 2015 (Carlton et al. (2019) at p. 68), but it also says "we take two years of data before and after each merger's approval by the Department of Justice, and we exclude the quarter of the merger's approval from the analysis" (Q4 2013 for the American/US Airways merger), so I believe the pre-merger period starts in Q4 2011.

[121]   Indeed, Carlton et al. (2019) says that the post-merger period "must reflect … joint decision-making by the merging parties … so that the effect of the merger on decision variables such as fare is laid bare" (*see* p. 67).

difference-in-difference estimates imply that the merger increased passenger traffic and reduced fares on the five routes in the nonstop overlap treatment group.

67.   The second part of Carlton et al. (2019) focuses on routes in which at least one of American or US Airways offered connecting service and the other offered nonstop or connecting service, both carriers have at least a 10-percent market passenger share, and both combined have at least a 40-percent market passenger share.[122] This analysis yields statistically insignificant estimates of the impact of the merger on fares and passenger traffic.  Notably, the point estimate for the coefficient on average fares is 0.010, and the standard error of the estimate is 0.014; this means that the upper bound of the 95 percent confidence interval is 0.037, so the confidence interval includes up to a 3.7 percent price *increase* in fares on connecting routes.[123]

### 3.   Professor Carlton's Analysis Violates Assumption (a) – Treatment Groups are Differentially Affected by Factors Unrelated to the American-US Airways Merger

68.   The nonstop overlap analysis of the American-US Airways merger in Carlton et al. (2019) contains only five routes[124] in the treatment group out of the thousands of different routes that American or US Airways served prior to the merger. That is, Professor Carlton's opinion

---

[122]   This is equivalent to a change in HHI of 800, considerably higher than the threshold used by the DOJ to assess the likelihood of adverse competitive effects.  According to the Horizontal Merger guidelines, mergers that would result in "moderately concentrated markets," involving a change in HHI of more than 100, "potentially raise significant competitive concerns and often warrant scrutiny;" and mergers that result in "highly concentrated markets" and involve a change in HHI of more than 200 "will be presumed to be likely to enhance market power;" these are often referred to as "presumptive markets" (see  U.S. Department of Justice, and U.S. Federal Trade Commission, "Horizontal Merger Guidelines," *U.S. Department of Justice*, 2010 at Section 5.3). Carlton et al. (2019) makes no mention of the level of concentration in their treatment (or control groups), but in its Complaint in the American-US Airways matter, the DOJ identified more than 1,000 routes on which American and US Airways competed head-to-head and the post-merger HHI would exceed 2,500 points and increase the HHI by more than 200 points (presumptive markets; *see* Complaint *UNITED STATES ET AL. V. US AIRWAYS GROUP, INC. AND AMR CORPORATION*, September 5, 2013, ("AA-US Complaint") at ¶ 38). The higher threshold for the change in HHI of 800 used in Carlton et al. (2019) excludes the majority of these routes; indeed, according to the description in the study, some of these markets may even be included in the control group.  This is problematic for reasons I discuss in more detail below.

[123]   Carlton et al. (2019) at Table 7 (0.037 = 1.96*0.014 + 0.010).

[124]   Charlotte-Dallas, Charlotte-Miami, Dallas-Phoenix, Dallas-Philadelphia, and Miami-Phoenix. *See* Carlton et al. (2019) at p. 68.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

that the American-US Airways merger is procompetitive is based on only five American-US Airways overlap routes.[125,126]

69.    The treatment group in this analysis violates difference-in-difference assumption (a). Three of the five routes were affected by a contemporaneous event unrelated to the American-US Airways merger, confounding and misattributing treatment group outcomes to the American-US Airways merger. Until 2014, Dallas's Love Field (DAL) was operating under the Wright Amendment.[127] The Wright Amendment prohibited carriers from operating full-sized airliners between Love Field and states outside of Texas and its four neighboring states.[128] The Wright Amendment was fully repealed in October 2014—the fourth of the eight quarters in the post-merger period in Carlton et al. (2019). The repeal of the Wright Amendment changed the competitive dynamics on Dallas endpoint routes as air carriers could then use Love Field as an alternative to the Dallas-Fort Worth airport. While Southwest offered connecting service out of Love Field prior to the repeal of the Wright Amendment, since its repeal, Southwest has started offering nonstop service on each of the Dallas treatment routes.[129]  Given the well-documented "Southwest Effect" referenced by Dr. Lee,[130] the nonstop treatment group in Carlton et al. (2019) is likely affected by this Southwest entry, and therefore confounds the effects of the repeal of the Wright Amendment with the American-US Airways merger.  To the extent that Southwest entry

---

[125]    In his analysis of the United-Continental merger, Professor Carlton only identifies three nonstop overlap routes. *See* Carlton et al. (2019) at p. 68.

[126]    In "Robustness checks and sensitivity analyses," Professor Carlton also examines the impact of American-US Airways nonstop overlap markets where there were four airlines operating prior to the merger (*see* Carlton et al. at pp. 79 and 81). He does not report the endpoints of these additional routes. However, there are likely only a few extra routes added to the treatment group as the number of total observations used in the analysis increases modestly in this specification (*see* Carlton et al. (2019) at p. 81). The addition of these observations meaningfully reduces the estimated coefficient, however, implying that expanding the sample size—even only modestly—weakens the results.

[127]    International Air Transportation Competition Act of 1979, Pub. L. No. 96-192, § 29, 94 Stat. 35, 48-49 (1980) (the "Wright Amendment").

[128]    The Wright Amendment was modified in 1997 to include Alabama, Kansas and Mississippi (Department of Transportation & Related Agencies Appropriations Act of 1998, Pub. L. No. 105-66, § 337, 111 Stat. 1425, 47 (1997)), and Missouri was added in 2005 (Transportation, Treasury, Housing and Urban Development, the Judiciary, the District of Columbia, and Independent Agencies Appropriations Act, 2006, Pub. L. No. 109-115, § 181, 119 Stat. 2396, 30 (2005)).

[129]    Southwest began nonstop service between Dallas and Phoenix in November 2014, and between Charlotte and Dallas, and Dallas and Philadelphia in August 2015.

[130]    *See* Lee Report at ¶ 25.  Dr. Lee discusses several studies documenting this effect, including one coauthored by him: Brueckner, Jan, Darin Lee, and Ethan Singer, "Airline Competition and Domestic U.S. Airfares: A Comprehensive Reappraisal," *Economics of Transportation,* Vol. 2, No. 1, 2013, pp. 1-17.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

on the Dallas routes lowered fares and increased traffic, that is in part driving the results of Carlton et al. (2019).

70.    Additionally, as part of the settlement agreement (that ended the American-US Airways antitrust litigation) referenced by Professor Carlton, the parties agreed to divest assets at seven airports,[131] including two gates each at Love Field and Miami International.[132]  This further affects the Dallas treatment routes, in addition to the two other nonstop treatment routes that have Miami as an endpoint. The competitive environment for these routes may have changed because of the divestitures.

71.    Thus, all five routes in the Carlton et al. (2019) nonstop treatment group were likely affected by events unrelated to potential merger efficiencies, and Carlton et al. (2019) does not even acknowledge the repeal of the Wright Amendment and divestitures, let alone make any attempt to disentangle their effects from the impact of the merger itself. This fact alone invalidates Professor Carlton's conclusions in his nonstop overlap analysis.

72.    While the Carlton et al. (2019) connecting overlap analysis uses more observations in the treatment group than the nonstop overlap analysis—61 routes—the study is silent as to which routes these are, so I am not able to ascertain whether any of the routes include Dallas and/or Miami as endpoints and thus would also be affected by the repeal of the Wright Amendment and/or divestitures.

73.    In total, Carlton et al. (2019) studies 66 overlap routes,[133] missing more than 94 percent of the routes that the DOJ identified as having an anticompetitive concern.  All of these are potential candidates for a treatment group.  If any of them are unaffected by the factors unrelated to the American-US Airways merger that I discuss above—which tend to bias the estimates of Carlton et al. (2019) towards finding price decreases and increases in passenger traffic—they would constitute a better treatment group than the routes used in Carlton et al. (2019).  Using routes that are uncontaminated by factors unrelated to the merger that tend to decrease prices and increase traffic would provide more accurate estimates of the actual effects

---

[131]   Carlton Report at ¶ 60.
[132]   Olley and Town (2019) at p. 465.
[133]   5 nonstop + 61 connecting = 66.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of the merger.  Yet Carlton et al. (2019) does not even examine or discuss this issue of contamination among the included or excluded routes.

### 4.  Professor Carlton's Analysis Violates Assumption (b) – Control Groups are Contaminated

74.    Difference-in-difference analysis also requires the control group, here non-American-US Airways overlap routes to be unaffected by the merger.  This is assumption (b) from above and the evidence suggests that it too is violated.  First, I discussed above that the Carlton et al. (2019) analysis includes only six percent of the markets that the DOJ identified as raising anticompetitive concerns.  Since these routes do not meet the Carlton et al. (2019) definition of "overlap" routes, some of these routes may be included in their control group.[134] This means that their control group could be contaminated; to the extent that there are routes affected by the merger included in the control group, the difference between the treatment group and control group is muted, rendering the conclusions regarding the effect of the merger on treatment markets relative to the control markets unreliable.

75.    An equally concerning violation of the assumption that the control group is unaffected by the merger is that the evidence (which I discuss below) suggests that there was a coordinated effects response by the merging and non-merging carriers to the merger.  This would also affect the control groups, as in Exhibit 16 (above) because some non-overlap markets are likely affected by the coordinated conduct.  To the extent that the merger has an impact on the coordinated conduct, the control group would be affected by the treatment effect (here, the merger) and the use of difference-in-difference to estimate the causal effects of the merger is not reliable.

76.    As I discussed in my initial report, the airline industry contains a number of features that make is susceptible to coordinated conduct.  For example, the industry contains relatively few participants who compete with each other in many markets and who have the ability to monitor and respond to changes in pricing.[135]  Economist Robert Porter makes a similar observations in a recent publication:

---

[134]   Since Professor Carlton did not provide the backup data for this analysis, I cannot determine whether any or how many of these routes are included in his control group.

[135]   *See* Town Report at ¶ 41.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

There are two unusual features of airline markets that may make them vulnerable to collusion.  First, firms can monitor rival prices almost continuously, and seat availability quickly.  Second, there is multi-market contact, with airlines having well defined spheres of influence associated with their hub operations.[136]

77.    Prior to the American-US Airways merger, one source of coordinated conduct related to the US Airways Advantage Fare program.  I will now turn to this issue.

### a.   US Airways' Advantage Fare program

78.    In its complaint in the American and US Airways merger litigation, the DOJ outlined a coordinated effects theory as one of the consequences of the merger.[137]  The complaint notes that legacy carriers generally "respect[ed]" the pricing of the nonstop carrier on a given route.  That is, legacy carriers did not discount their connecting service on routes where their rivals offered nonstop service.[138]  The underlying reason for legacy carriers to respect the nonstop pricing of the other legacy carriers is that if, say, Delta were to offer its connecting fares at prices that undercut the nonstop pricing of American on routes where American offered nonstop service, then American would respond by pricing its connecting service so that it undercut Delta's nonstop prices on routes where Delta offered nonstop service.[139]  The characteristics of the marketplace that I described in my initial report would be expected to facilitate such conduct.  For example, if Delta were to undercut American's pricing, American would see this right away because airline prices are readily observable.  In addition, because the airlines compete with each other in multiple markets ("multi-market contact"), American could respond to Delta's aggressive pricing in one market by undercutting Delta's fares in a different market.  American could also respond quickly because of the high frequency of sales and the relative ease at which airlines adjust prices.

79.    Prior to the American-US Airways merger, while American, Delta, and United tended to respect each other's pricing, US Airways deployed a different strategy.  It offered discounted "Advantage Fares" on routes with connecting service through a US Airways hub and where at least one of the legacy carriers offered non-stop service.[140]  US Airways priced

---

[136]   Porter, Robert, "Mergers and Coordinated Effects," *International Journal of Industrial Organization,* Vol. 73, 2020, pp. 1-14 ("Porter (2020)") at p. 10.

[137]   AA-US Complaint at ¶¶ 5–7.

[138]   AA-US Complaint at ¶¶ 6, 48.

[139]   Porter (2020) at pp. 10–11.

[140]   AA-US Complaint at ¶ 5.

connecting fares—especially those associated with tickets purchased close to the day of departure—at a significant discount off the rival nonstop fare.[141]  That is, US Airways offered its connecting service at prices that undercut the nonstop fares of the other legacy carriers.

80.   Timothy Lyon, Managing Director of Domestic Pricing at US Airways at the time of the merger,[142] explained the US Airways Advantage Fare discounts as follows:

> Our setup when another airline has a non-stop and U.S. Airways has a connect is to take the lowest walk-up or 0 AP, zero-day advance purchase, fare that the other airline has, and discount it 40 percent and file our own 0 AP at that price point.

> On the fares below the zero-day advance purchase, we undercut the advance purchase restriction of the non-stop carrier.  In our case when another carrier has a three-day advance purchase or a seven-day advance purchase, we file a 0.  When the other carrier has a 14-day advance purchase, we file a 7.  And when the carrier has a 21-day advance purchase, we file a 14-day advance purchase.[143]

81.   The DOJ contended in its complaint that US Airways offered Advantage Fares because its hub structure generated less revenue from passengers flying nonstop than the other legacy carriers.  The benefit of attracting additional connecting passengers from undercutting the legacy nonstop fares outweighed the cost of facing lower fares from its competitors on its non-stop routes.[144]   In a recent study of the US Airways-American merger, economists Soo Jin Kim and Yongjoon Park make a similar observation:

> The underlying driving factor that allowed *US Air* to implement the price discount program was that its hubs, located in Charlotte, Philadelphia, Phoenix, and Washington, D.C., generate less revenue from nonstop services because they have lower traffic than the hubs of other legacy carriers.[145]

82.   According to the DOJ, other legacy carriers responded in-kind to the Advantage Fare program by undercutting US Airways' fares on US Airways' non-stop routes, but not on routes where other legacies offered non-stop service.[146]

83.   The DOJ also contended that the merged American-US Airways carrier would end Advantage Fares on routes where either American or US Airways offered non-stop service, as it

---

[141]   AA-US Complaint at ¶¶ 50–51.

[142]   Deposition of Timothy Lyon (Managing Director of Domestic Pricing at U.S. Airways), July 12, 2013 ("Lyon Deposition"), at 7:17–19.

[143]   Lyon Deposition at 57:5–57:17.

[144]   AA-US Complaint at ¶¶ 5, 7, 49.

[145]   Kim, Soo Jin, and Yongjoon Park, "Examining the Coordinated Effects of the AA/USAir Merger," January 21, 2022 ("Kim and Park (2022)") at p. 2.

[146]   AA-US Complaint at ¶ 6.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

would not undercut itself.[147]  This is a unilateral effect of the merger.  The DOJ complaint further argued that the merged carrier would have an incentive to terminate the Advantage Fare program on Delta and United non-stops, including on routes where American did not offer service.[148]  This is a coordinated effects impact of the merger.

> b.   Empirical evidence of the Advantage Fare program and coordinated effects

84.   Using DB1B data, I evaluated the effects of the Advantage Fare program and the DOJ's contentions described above.  My analysis proceeds as follows:

85.   I begin by analyzing prices prior to the American-US Airways merger.  I define the pre-merger period as the two-year period from the fourth quarter of 2011 through the third quarter of 2013.  This is the same period that Professor Carlton and Dr. Israel use as the pre-merger period in their paper.[149]  I first identified those routes where only one airline carrier offered consistent nonstop service during the pre-merger period and there was no nonstop entry or exit after the merger.[150]  Next, I analyzed the legacy carrier fares for connecting flights on routes where another legacy carrier offered consistent nonstop service.  I examine the patterns of the connecting fares based on the carrier offering the connecting service and the carrier offering the competing nonstop service and I observe how these patterns changed after the American-US Airways merger.

86.   The DB1B data do not include information on the booking window of ticket purchases, so I cannot identify fares associated with purchases during the booking windows that Mr. Lyon described.  However, because tickets purchased near to the day of departure are generally priced higher than tickets purchased earlier, I use the average fare across the top quintile prices as a proxy for "last-minute" fares.[151]

87.   Exhibit 18 below, shows the legacy connecting prices (average top quintile fare) on the routes where a competing legacy carrier was the only carrier (including non-legacies)

---

[147]   AA-US Complaint at ¶¶ 5, 7, 57.

[148]   AA-US Complaint at ¶¶ 55, 56.

[149]   Carlton et al. (2019) at p. 68.

[150]   I classify a carrier as offering "consistent nonstop service" if the carrier offered at least a daily flight on the route in all quarters of the pre-merger period.

[151]   In my main results, I use the mean fare across the to quintile itineraries.  I also analyzed the mean fare across the top decile itineraries and the 90th percentile fare (which is the equivalent to the median fare across the top quintile itineraries).  The results of these analyses are qualitatively very similar.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

offering consistent nonstop service.  Each panel in the chart corresponds to one of the three legacy carriers other than US Airways: American, Delta, and United.  The set of routes included in each panel are those for which each legacy carrier—American, Delta, or United—was the only carrier offering consistent nonstop service.[152]  Each bar in the chart shows the average top quintile fare for a competing legacy carrier's connecting service on those routes.  For example, the leftmost bar in the middle panel of the chart (the bar labeled "US Fares" in the panel labeled "Delta Nonstop Routes"), shows the average top quintile fare for US Airways' connecting itineraries on routes where Delta was the only carrier offering consistent nonstop service.[153]

## Exhibit 18
## US Airways Offered Low Connecting Fares on Rivals' Nonstop Routes
### Top Quintile Connecting Fares, Q4 2011 to Q3 2013



Note: Prices are the average top quintile connecting fares on rivals' nonstop routes from Q4 2011 to Q3 2013.  Each panel corresponds to a set of routes with one legacy carrier offering consistent nonstop service (at least one flight per day on average) and the bars correspond to the rival legacy carriers' connecting fares on those routes.

Source: DB1B.

---

[152]  Because I ultimately analyze how the pricing changes after the American-US Airways merger, I also exclude routes where, in the post-merger period, the carrier was no longer the only carrier offering consistent nonstop service on the route.  Using these criteria, I identify 119 American nonstop routes, 332 Delta nonstop routes, 78 United nonstop routes, and 128 US Airways nonstop routes.  These are the routes the I focus on in my analysis.

[153]  I also performed versions of the analyses discussed in this section that use a regression-based approach to control for a number of factors that could affect pricing, such as the number of competitors on the route, airport presence, jet fuel prices, and distance.  The result of these analyses are shown in Appendix Exhibits B-4 through B-7.  The pricing patterns based on these adjusted prices are very similar to the patterns using the unadjusted prices shown in Exhibit 18 through Exhibit 21.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

88.   The chart shows clear evidence of the Advantage Fare program.  US Airways' top quintile connecting fares were the lowest among the other connect-competing legacy carriers on American's, Delta's, and United's nonstop routes.  For example, on routes where Delta was the only carrier offering consistent nonstop service, the US Airways average top quintile connecting fare was $376.  The top quintile connecting fares of American and United on these same routes were $484, and $496, respectively—much higher than the US Airways connecting fare.  Similar patterns emerge when focusing on the American and United nonstop routes—the US Airways connecting fare is the lowest on these routes as well.

89.   What is particularly interesting, however, is that the data also show evidence of other carriers discounting their connecting prices on US Airways' nonstop routes—presumably in response to US Airways' discounts on their routes.  This can be seen comparing American's, Delta's, and United's connecting prices on the US Airways nonstop routes with their connecting prices on the nonstop routes of other legacy carriers.  This analysis is presented in Exhibit 19.

90.   Like Exhibit 18, Exhibit 19 shows each legacy carrier's top quintile connecting fares on the routes where competing legacy carriers offered consistent nonstop service.  However, Exhibit 19 is organized differently than Exhibit 18: the panels in Exhibit 19 correspond to the carrier offering the connecting service and the bars correspond to the carrier offering the nonstop service.  For example, the bar labeled "US Nonstops" in the panel titled "Delta's Connecting Fares" shows Delta's average top quintile connecting fare on routes where US Airways was the only carrier offering consistent nonstop service.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Exhibit 19**
## Other Legacy Carriers Offered Low Connecting Fares on US Airways' Nonstop Routes
Top Quintile Connecting Fares, Q4 2011 to Q3 2013



Note: Prices are the average top quintile connecting fares on rivals' nonstop routes from Q4 2011 to Q3 2013.  Each panel corresponds to a legacy carrier's connecting fares and each bar corresponds to a set of routes where a rival legacy carrier was the only carrier offering consistent nonstop service (at least one flight per day on average).
Source: DB1B.

91.   Exhibit 19 shows that American, Delta, and United each offered lower connecting fares on the US Airways' nonstop routes than on each other's nonstop routes, which is consistent with the coordinated effects theory that the DOJ articulated in its complaint.  Focusing, for example, on Delta's top quintile connecting fares (the middle panel), Delta's price on US Airways' nonstop routes was $328, and its prices on American's and United's nonstop routes were higher—$428 and $473, respectively.  The top quintile connecting fares for American and United show similar patterns—their connecting fares are lower on the US Airways' nonstop routes than on the nonstop routes of other legacy carriers.  US Airways' Advantage Fare program appears to have motivated other carriers to offer lower connecting prices on US Airways' nonstop routes relative to their connecting prices on other legacy competitors' nonstop routes.

92.   Having established that there is empirical evidence of the US Airways Advantage Fares, and other legacy carriers' responses to those fares, I now examine whether the pricing differentials shown in Exhibit 18 and Exhibit 19 persisted after US Airways merged with American.  When analyzing the post-merger prices, I focus on the eight quarters from the first

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

quarter of 2014 through the fourth quarter of 2015—the same post period that Carlton et al. (2019) uses in its analyses.  I classify nonstop routes based on whether the carrier offered consistent nonstop service in the pre-merger period.  Thus, the routes that I refer to as "US Airways nonstop routes" are those routes where US Airways was the only carrier offering consistent nonstop service prior to the merger.  In other words, I hold fixed each set of routes and analyze the pricing before and after the merger.

93.    Exhibit 20 shows Delta's relative connecting pricing before and after the merger. The panel on the left shows Delta's relative pricing in the pre-merger period and the panel on the right shows Delta's relative pricing in the post-merger period.  The green bars correspond to Delta's top quintile connecting fares on US Airways nonstop routes (routes where US Airways was the only carrier offering consistent nonstop service in the pre-merger period) relative to Delta's top quintile connecting fares on American nonstop routes (routes where American was the only carrier offering consistent nonstop service in the pre-merger period).  The blue bars correspond to Delta's top quintile connecting fares on US Airways nonstop routes relative to its price on United nonstop routes.

94.    In the pre-merger period, Delta's prices of its top quintile connecting fares on the US Airways nonstop routes were on average 23.4 percent lower than its prices on the American nonstop routes and 30.7 percent lower than its prices on United's nonstop routes.  In the post-merger period, the price differentials were much smaller—5.2 and 18.9 for the American nonstop routes and United nonstop routes, respectively.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Exhibit 20**
# Delta's Prices Relative to Other Legacy Carriers Increased after the AA-US Merger
Top Quintile Connecting Fares



**Notes:**

[1] Based on Delta's average top quintile connecting fares on rivals' nonstop routes before and after the American–US Airways merger. Pre-merger period defined as Q4 2011 to Q3 2013; post-merger period defined as Q1 2014 to Q4 2015.

[2] Other legacies' nonstop routes are routes where one legacy competitor was the only carrier offering consistent nonstop service (at least one flight per day on average) prior to the merger.

Source: DB1B.

95.    An analysis of United's connecting prices, shown in the Exhibit 21, reveals similar patterns. Prior to the merger, United's top quintile connecting fares on US Airways' nonstop routes were on average 20.8 percent lower than its prices on American's nonstop routes and 18.8 percent lower than its prices on Delta's nonstop routes. After the merger, these price differentials dropped to 3.0 and 3.1.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Exhibit 21**
# United's Prices Relative to Other Legacy Carriers Increased after the AA-US Merger
Top Quintile Connecting Fares



Notes:
[1] Based on United's average top quintile connecting fares on rivals' nonstop routes before and after the American–US Airways merger. Pre-merger period defined as Q4 2011 to Q3 2013; post-merger period defined as Q1 2014 to Q4 2015.
[2] Other legacies' nonstop routes are routes where one legacy competitor was the only carrier offering consistent nonstop service (at least one flight per day on average) prior to the merger.
Source: DB1B.

96.   The evidence presented above suggests that the US Airways Advantage Fare program benefitted consumers directly by giving them a lower-priced alternative to high-priced last-minute nonstop fares and that the program benefitted consumers indirectly by causing American, Delta, and United to price their connecting fares more aggressively in other markets. After US Airways and American merged, Delta and United no longer offered discounted fares on the US Airways nonstop routes (routes where US Airways was the only carrier offering consistent nonstop service prior to the merger).  Kim and Park (2022) analyze the effects of the American-US Airways merger on the Advantage Fare program using a regression-based approach and reach similar conclusions.  As stated in the abstract:

> In our empirical analysis, we find that postmerger nonmerging legacy carriers substantially increased their connecting price on routes where US Airways had a dominant position.  From

our theoretical analysis, these empirical findings can be explained by the merger's coordinated effects.[154]

97.   This evidence of coordinated effects suggests one should use caution when drawing conclusions from the difference-in-difference approach employed in Carlton et al. (2019).  The Carlton et al. (2019) analysis does not consider or address this issue, and the "control" group routes are potentially tainted because of the coordinated effects impact of the merger.

### 5.   Professor Carlton's Analysis Likely Violates Assumption (c) – The Evidence Suggests that the Parallel Trends Assumption Does Not Hold

98.   The parallel trends assumption, as I mention above, is not directly testable. However, econometricians recommend examining auxiliary evidence in difference-in-difference analysis to assess the plausibility of the parallel trend assumption.

99.   For example, Kahn-Lang and Lang (2020) make the following recommendations for the best practices regarding the parallel trends assumption in a difference-in-difference analysis. They state:

> Any DiD [difference-in-difference] paper should address why the original levels of the experimental and control groups differed or, in other words, why the experimental design failed. The researcher should then provide justification for the assertion that the same mechanism would not impact trends. If the researcher believes that the groups did not differ before the intervention, that, too, must be established.[155]

100.   The treatment and control samples in Carlton et al. (2019) have very different levels, raising the concern that they could have different trends. Tables 2 and 3 from Carlton et al. (2019),[156] reproduced below, presents summary statistics from the paper's nonstop overlap and connecting overlap analyses, respectively. First, focusing on the American-US Airways merger nonstop overlap sample in the per-merger period, average fares in the treatment group are 24 percent ($47.23) higher than the control group, while the average number of passengers per day carried each way on the routes in the treatment groups is 25 percent higher than the control group.[157] The same pattern is apparent in the connecting overlap analysis—average fares in the treatment group are 17 percent ($40.85) higher than the control group, and the average number

---

[154]   Kim and Park (2022).

[155]   Kahn-Lang and Lang (2020) at p. 614.

[156]   Carlton et al. (2019) Table 2 at p. 70 and Table 3 at p. 72.

[157]   The table appears to have several typos.  I assume that the total number of passengers per day each way on the control routes is 160,927, which is an average of 354 per route on the 455 routes.  The average number of passengers per day each way on the treatment routes is 443 (= 2,217/5).  443/354 – 1 = 25%.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of passengers per day, each way, in the control group routes is 21 percent higher than in the treatment group.[158] The treatment and control group routes differ substantively; the different levels of passengers in particular could suggest different economic and/or demographic trends (e.g., population and/or economic growth), suggesting that more effort is needed to confirm that the parallel trend assumption is not violated.  Carlton et al. (2019) do not heed the advice of Kahn-Land and Lang (2020), however; there is no mention of a "…justification for the assertion that the same mechanism would not impact trends."

## Table 2 from Carlton et al. (2019)

Table 2
Descriptive statistics for nonstop overlap and control routes.

| Variable | Pre-merger | Post-merger | Percentage difference (%) |
|---|---|---|---|
| **I. Delta/Northwest** | | | |
| **Overlaps (2→1 routes: 4; 3→2 routes: 3)** | | | |
| Average price | $177.75 | $177.35 | −0.2 |
| Total passengers per day each way | 1983 | 1916 | −3.4 |
| Total seats per day each way | 7688 | 8370 | 8.9 |
| **Control routes (2→1 routes: 385; 3→2 routes: 145)** | | | |
| Average price | $163.28 | $166.97 | 2.3 |
| Total passengers per day each way | 2,03,035 | 1,83,750 | −9.5 |
| Total seats per day each way | 5,54,517 | 5,06,196 | −8.7 |
| **II. United/Continental** | | | |
| **Overlaps (2→1 routes: 0; 3→2 routes: 3)** | | | |
| Average price | $232.27 | $272.19 | 17.2 |
| Total passengers per day each way | 1742 | 1810 | 3.9 |
| Total seats per day each way | 4218 | 4904 | 16.3 |
| **Control routes (2→1 routes: 0; 3→2 routes: 140)** | | | |
| Average price | $164.01 | $187.59 | 14.4 |
| Total passengers per day each way | 81,453 | 83,207 | 2.2 |
| Total seats per day each way | 2,13,799 | 2,11,337 | −1.2 |
| **III. American/US Airways** | | | |
| **Overlaps (2→1 routes: 3; 3→2 routes: 2)** | | | |
| Average price | $246.33 | $229.60 | −6.8 |
| Total passengers per day each way | 2217 | 2807 | 26.6 |
| Total seats per day each way | 8173 | 9670 | 18.3 |
| **Control routes (2→1 routes: 317; 3→2 routes: 138)** | | | |
| Average price | $199.10 | $207.33 | 4.1 |
| Total passengers per day each way | 1,60,927 | 1,72,670 | 7.3 |
| Total seats per day each way | 4,40,334 | 4,50,353 | 2.3 |

---

[158] Again, I assume that there is a typo in the table and that the total number of passengers per day each way on the routes in the connecting control group is 108,624, amounting to an average of 87 per route on the 1,243 routes. The average number of passengers per day each way on the routes in the connecting treatment group is 72 (= 4,389/61) and 87 is 21 percent higher than 72 (87/72 − 1 = 0.21).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# Table 3 from Carlton et al. (2019)

Table 3
Descriptive statistics for connecting overlap and control routes.

| Variable | Pre-merger | Post-merger | Percentage difference (%) |
|---|---|---|---|
| **I. Delta/Northwest** | | | |
| **Overlaps (2→1 routes: 9; 3→2 routes: 51)** | | | |
| Average price | $220.53 | $202.56 | −8.2 |
| Total passengers per day each way | 2143 | 2215 | 3.4 |
| **Control routes (2→1 routes: 536; 3→2 routes: 606)** | | | |
| Average price | $205.01 | $199.50 | −2.7 |
| Total passengers per day each way | 96,784 | 91,930 | −5.0 |
| **II. United/Continental** | | | |
| **Overlaps (2→1 routes: 0; 3→2 routes: 13)** | | | |
| Average price | $253.18 | $300.85 | 18.8 |
| Total passengers per day each way | 870 | 864 | −0.6 |
| **Control routes (2→1 routes: 0; 3→2 routes: 639)** | | | |
| Average price | $200.12 | $226.52 | 13.2 |
| Total passengers per day each way | 58,289 | 59,775 | 2.5 |
| **III. American/US Airways** | | | |
| **Overlaps (2→1 routes: 9; 3→2 routes: 52)** | | | |
| Average price | $274.78 | $289.07 | 5.2 |
| Total passengers per day each way | 4389 | 4679 | 6.6 |
| **Control routes (2→1 routes: 556; 3→2 routes: 687)** | | | |
| Average price | $233.93 | $244.69 | 4.6 |
| Total passengers per day each way | 1,08,624 | 1,13,622 | 4.6 |

101. In their paper, Professor Carlton and Dr. Israel claim to test the validity of the parallel trends assumption. They claim that they "confirmed that the trends in the fares and output on nonstop and connecting overlaps and on the corresponding sets of control routes are not statistically different in each of the three pre-merger periods."[159]  However, what they do not discuss in their paper is that the power of the statistical test, given the pre-merger trend they are using, is low. A statistical test has low power when there are few observations (Professor Carlton and Dr. Israel are testing the trends on eight per-merger quarters—a very small sample size). When a statistical test has low power, its ability to detect the true effect (a difference in pre-merger trends) is low, even if such a difference exists.  The literature is clear that Carlton et al. (2019) is using the wrong methodology to examine the parallel trends assumption, and its approach frequently yields misleading results.  Kahn-Lang and Lang (2020) notes: "[i]ncreasingly, researchers point to a statistically insignificant pre-trend test to argue that they,

---

[159]   Carlton et al. at p. 79.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

therefore, accept the null hypothesis of parallel trends. … However, failing to reject that outcomes in years prior to treatment exhibit parallel trends, should not be confused with establishing the validity of the parallel trends counterfactual."[160]  Instead, Kahn-Lang and Lang (2020) recommends testing the robustness of difference-in-difference estimates by running a specification of the difference-in-difference estimation that allows the trends to differ across the treatment and control routes, and checking whether that affects the results: "[i]n a regression context, it is natural to consider whether adding a linear (or other) trend interacted with group membership changes the results."[161]  Professor Carlton and Dr. Israel present no such results.[162]

102.  Professor Carlton and Dr. Israel do not estimate a "model with a more complex trend difference than is believed to be the case" as recommended by Bilinski and Hatfield (2019) and Kahn-Lang and Lang (2020). Because they do not properly test and account for the role of the parallel trend assumption in their paper, and there is substantial evidence to believe that it does not hold (the treatment and control groups have very different characteristics), the paper likely falls into the class of published papers whose results are "misleading."

### 6. Even if Professor Carlton's Analysis Did Not Violate Three Fundamental Assumptions Rendering its Analysis Biased and Unreliable, the Results Would Still Not Be Informative of the Impact of the NEA

103.  There are two additional fatal flaws in Carlton et al. (2019) that render the results uninformative as they pertain to the impact of the NEA. First, the merger occurred within the capacity discipline period. As I demonstrated in my initial report, the legacy airlines coordinated their capacity decisions and showed "capacity discipline" from approximately 2009 through the mid- to late-2010s. The documentary evidence and the data show that the legacy airlines

---

[160]  Kahn-Lang and Lang (2020) at pp. 617-618.

[161]  Kahn-Lang and Lang (2020) at p. 614.

[162]  *See also* Bilinski and Hatfield (2019), which agrees with Kahn-Lang and Lang (2020), and states in its abstract: "Many causal models make assumptions of 'no difference' or 'no effect.' For example, difference-in-differences (DID) assumes that there is no trend difference between treatment and comparison groups' untreated potential outcomes ('parallel trends'). Tests of these assumptions typically assume a null hypothesis that there is no violation. When researchers fail to reject the null, they consider the assumption to hold. We argue this approach is incorrect and frequently misleading. These tests reverse the roles of Type I and Type II error and have a high probability of missing assumption violations. Even when power is high, they may detect statistically significant violations too small to be of practical importance. We present test reformulations in a non-inferiority framework that rule out violations of model assumptions that exceed some threshold. We then focus on the parallel trends assumption, for which we propose a "one step up" method: 1) reporting treatment effect estimates from a model with a more complex trend difference than is believed to be the case and 2) testing that that the estimated treatment effect falls within a specified distance of the treatment effect from the simpler model."

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

meaningfully reduced their total ASMs relative to their historical relationship to demand and cost variables.  This affects both the pre-merger and post-merger periods, as well as the treatment and control routes (though possibly differentially, depending on the concentration on those routes). As the legacy airlines were successfully coordinating, at least to some degree, on their capacity over the span of Carlton et al. (2019), their unilateral response to the merger was likely muted. This is because standard models of oligopoly behavior predict that if firms are successfully colluding, the impact of a merger on price and output will be less than if the firms were competing in a non-cooperative fashion.

104.  It is illustrative to consider a simple example of a market with two firms that produce a homogenous product.  In a scenario in which those firms are perfectly colluding so that they jointly earn monopoly profits, a merger between those two firms in such a cooperative market (with no efficiencies or diseconomies) will not induce the firms to raise price or reduce output. Prior to the merger, they were already setting prices to maximize aggregate firm profits.[163]  The impact of the merger on price and output in this collusive example is not informative of the impact of a merger in a similar setting where firms are non-cooperatively competing; in that case, the firms may well have an incentive to reduce output and raise prices. The latter scenario is more applicable to the NEA.  As I demonstrated in my initial report (and above in Section II.A), JetBlue engages in disruptive growth and competes with legacy carriers across a broad range of customer types.  Furthermore, as I discussed in my initial report, capacity discipline started weakening around 2016.[164]  Thus, the NEA is different from a merger between legacy carriers operating in a context of coordination and/or accommodation, and the Carlton et al. (2019) results are not informative about the competitive effects of the NEA.

105.  Second, as I discuss in my initial report, to secure the plaintiff states' approval of their merger, American and US Airways signed a consent decree requiring, among other things, that for a period of three years, American would "maintain in a manner generally consistent with historical operations" seven of the American and US Airways hubs.[165]  As such, American was constrained in its ability to pull down capacity—beyond that which it was already doing as a

---

[163]   An obvious question to ask, in this example, is why the firms merge if they were already earning maximum profits? One possible reason is that by merging they are able to maintain the collusive agreement going forward.

[164]   *See* Town Report Section IV.B.4.

[165]   American Airlines Form 8-K, November 12, 2013, at Exhibit 10.3 (Supplemental Stipulated Order), at p. 3.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

result of capacity discipline—at several airports until Q4 2016. Putting aside the role of capacity discipline in affecting the Carlton et al. (2019) results, any unilateral impact of the American-US Airways merger is surely muted at those airports while the consent decree was in place. However, that decree expires a full year after the Carlton et al. (2019) sample (Q4 2015), so they are unable to measure the true unilateral impact of the American-US Airways merger.

## B. Other Academic Papers Find that the Carlton et al. (2019) Results are not Robust

106.  Several other papers have conducted similar retrospective analyses of airline mergers in general, and the American-US Airways merger in particular.  While these papers also use the difference-in-difference approach and therefore suffer from some of the same drawbacks of Carlton et al. (2019), three important aspects of these papers are notable: 1) they study many more routes than Carlton et al. (2019); 2) they use a more appropriate post-merger period (starting in 2016, after American and US Airways had fully integrated, US Airways had ceased independent operations, and the consent decrees restricting the ability of the newly merged carrier to rationalize capacity had expired); and 3) they find that the results are not robust across different specifications and/or routes.  Indeed, as Carlton et al. (2019) notes, "studies of more recent mergers are generally inconclusive as to the overall effect of specific mergers."[166]

107.  One recent paper examines the American-US Airways merger using a difference-in-difference model.[167]  While Le (2019) suffers from some of the same drawbacks that apply to the analysis in Carlton et al. (2019), there is one notable difference: Le (2019) provides more discussion about how routes are constructed and classified into treatment and control groups. The study classifies routes into markets based on whether American and US Airways both operated on the route, whether only one merging firm operated on the route but the other merging firm was present at the origin or destination airport, whether only one merging firm operated on the route and the other merging firm was not present at the origin and destination airport, or the control group where neither merging airline served the route.[168]  Notably, this clearly indicates that the control group does not contain any routes operated by either American

---

[166]  Carlton et al. (2019) at p. 61.  The authors go on to claim their paper is the first to study the effects of the American-US Airways merger; there are now others, as I discuss in this section.

[167]  Le, Huubinh B. "An Ex Post Analysis of the US Airways/American Airlines Merger." *Review of Economic Analysis* Vol. 11, No. 3, 2019, pp. 383-398 ("Le (2019)").

[168]  Le (2019) at p. 386.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

or US Airways prior to the merger.  Additionally, the treatment group includes 3,254 overlap routes,[169] compared to the 66 in Carlton et al. (2019).   The results are mixed, suggesting that the results of Carlton et al. (2019) are not robust.  Le (2019) finds that:

    a)  Overall, across all overlap routes, prices increased, and passenger traffic decreased;[170]

    b)  While the merger tended to reduce prices and increase passenger traffic on nonstop routes, especially when both endpoints are hubs, it increased prices and decreased traffic on connecting routes;[171] and

    c)  Prices increased and output decreased substantially in "potential competitor" markets (routes for which one of American or US Airways served the route and the other operated at both endpoints without serving the route), in particular when US Airways was the potential competitor.[172]

108.  Le (2019) concludes that, while the merger tended to decrease prices and increase output on routes associated with one of American's or US Airways' hubs, the merger was "quite harmful in markets in which they indirectly competed, particularly when that competitor is US."[173]  It is notable that the majority of markets for which Le (2019) found consumer harm are excluded in Carlton et al. (2019).  These markets dominate the overall effect leading to an average net increase in prices and decrease in passenger traffic across all routes.

109.  Another recent study again considers a much larger treatment group than Carlton et al. (2019)—11,100 routes in which either American, US Airways, or both offered service pre-merger.[174]  Das (2019) finds that, while price decreased in larger markets (some of which are included in Carlton et al. (2019)), price increased in smaller markets suggesting that consumers in smaller markets were harmed.[175]  Notably, Carlton et al. (2019) does not include these smaller markets.

---

[169]  Le (2019) at Table 1.

[170]  Le (2019) at Table 3.

[171]  Le (2019) at Table 6.

[172]  Le (2019) at Table 5.

[173]  Le (2019) at p. 397.

[174]  Das, Somnath. "Effect of merger on market price and product quality: American and US airways." *Review of Industrial Organization,* Vol. 55, No. 3, 2019, pp. 339-374, ("Das (2019)") at p. 347.

[175]  Das (2019) at Table 7.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

110. A recent working paper takes a different approach.[176]  Bet (2021) also examines the impact of the American-US Airways merger, but reaches a different conclusion from Carlton et al. (2019). Using an increasingly commonly used methodology from the industrial organization literature to assess market power from production data, Bet (2021) studies the effects of airline mergers on production and cost data.  Bet (2021) concludes that "in most cases, mergers did not significantly improve merging parties' productivity, marginal costs, or technology (i.e., scale elasticity)."[177]  In particular, the study finds that the merger increased American's markup by approximately 20 percent, on average, without a corresponding change in productivity or marginal costs,[178] suggesting an increase in market power.[179]

111. It is worth noting that, these papers generally finds low single digit impacts on price (one way or the other).  For example, Le (2019) finds a five percent decrease in price in nonstop overlap markets, and a five to six percent increase in price in connecting overlap markets (and a combined, overall average increase in price of about three percent).  Das (2019) finds results of a similar magnitude.  The estimated price effect on nonstop routes in Carlton et al. (2019), on the other hand, is a 12 percent reduction, which is quite high compared to the other studies.  As I have discussed, there are methodological flaws in the Carlton et al. (2019) study that would bias results in this direction—in particular, the reliance on only five nonstop overlap routes that are all affected by factors unrelated to the merger that would tend to decrease prices.

112. In his report, Professor Carlton touts the opinion of the bankruptcy court, which cites his retrospective. However, the Court's opinion does not discuss any of the above identified critical flaws in his analysis, nor any of the contradictory results in the literature.[180]

---

[176] Bet (2021).

[177] Bet (2021) at p. 30.

[178] Bet (2021) at p. 29.

[179] Carlton et al. (2019) also finds that the Delta-Northwest and United-Continental mergers were procompetitive. The broader literature has not reached a consensus on this, however.  For example, Orchinik and Remer find that the United-Continental merger led to higher prices, and were unable to draw any consistent conclusions about the Delta-Northwest merger (the results depended on the estimation technique; *see* Orchinik, Reed, and Marc Remer, "What's the Difference? Measuring the Effect of Mergers in the Airline Industry," *Econometric Modeling: Corporate Finance & Government eJournal,* 2021, p. 1-67.

[180] United States Bankruptcy Court for the Southern District of New York, Judgement in *Fjord v. AMR Corp. (In re AMR Corp.)*, filed January 29, 2021.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### C. Professor Carlton's Opinion About the Competitive Effects of the American-US Airways Merger is Uninformative About the Likely Competitive Effects of the NEA

113. In the sections above, I demonstrate that:

a) Professor Carlton and Dr. Israel examine only a small number of American-US Airways overlap routes, excluding from their treatment group the vast majority of those identified by the DOJ in its complaint as potentially posing a threat to competition;

b) All of the routes in their nonstop treatment group are affected by either the repeal of the Wright Amendment and/or divestitures, which change the competitive landscape;

c) Some of those routes excluded from their treatment group may in fact be included in their control group; and

d) The treatment and control groups are further contaminated by coordinated effects—both by ending US Airways' Advantage Fare Program (affecting the control group), and by the capacity discipline period (potentially affecting the treatment and control groups in different ways)—as I demonstrate above, and in my initial report.

114. Professor Carlton relies entirely on his single study as the basis for his opinion that the American-US Airways merger was procompetitive and extrapolates from this opinion to conclude that the NEA will likely be procompetitive. I demonstrate above that his results with respect to the American-US Airways merger are suspect for a variety of reasons. Furthermore, other published research reaches different conclusions from that of Professor Carlton and Dr. Israel, casting further doubt on the reliability of their results. In particular, the presence of coordinated effects means that the likelihood that one can learn anything meaningful about the competitive effects of the American-US Airways merger—especially as they pertain to the likely competitive effects of the NEA—using the difference-in-difference approach is exceedingly low.