# EXHIBIT A

## <span style="color:red">HIGHLY CONFIDENTIAL</span>



Transcript of **Ronald C. DiLeo, Jr.**

Friday, August 19, 2022

*U.S. v. American Airlines and JetBlue Airways*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 119163

```
 1                  UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF MASSACHUSETTS

 3      - - - - - - - - - - - - - - - - - - - - - x

 4      UNITED STATES OF AMERICA,

 5      STATE OF ARIZONA,

 6      STATE OF CALIFORNIA,

 7      DISTRICT OF COLUMBIA ,

 8      STATE OF FLORIDA,

 9      COMMONWEALTH OF MASSACHUSETTS,

10      COMMONWEALTH OF PENNSYLVANIA,

11      and COMMONWEALTH OF VIRGINIA,

12                      Plaintiffs,

13         V.                    CASE NO. 1:21-CV-11558

14      AMERICAN AIRLINES GROUP INC.,

15      and JETBLUE AIRWAYS CORPORATION,

16                      Defendants.

17      - - - - - - - - - - - - - - - - - - - - - x

18                     HIGHLY CONFIDENTIAL

19                  VIDEOTAPED DEPOSITION OF

20                    RONALD C. DILEO, JR.

21                     LATHAM & WATKINS LLP
                   John Hancock Tower, 20th Floor
22                    200 Clarendon Street
                       Boston, MA 02116
23                    August 19, 2022
                         9:39 a.m.
24

25      Reporter:  Rosemary F. Grogan, RPR, CSR No. 112993
```

1   owned by Lufthansa.

2      Q.   So other than working for OpenSkies and then

3   in a company owned by Lufthansa, have you worked for any

4   other airlines?

5      A.   I have not.

6      Q.   And with AirPlus, you were not involved in the

7   operations of Lufthansa; is that right?

8      A.   That's correct.

9      Q.   Do you have a degree in economics?

10      A.   I do not.

11      Q.   Do you have a degree in law?

12      A.   I do not.

13      Q.   Have you been trained in economics in some

14   other way?

15      A.   No.

16      Q.   Have you been trained in law in some other

17   way?

18      A.   No.

19      Q.   You attended Notre Dame; is that right?

20      A.   I did.

21      Q.   We may have a conversation about that during

22   the break.  We'll hold that -- we'll hold that for the

23   break.

24      A.   Okay.

25      Q.   Your first job after college, was that with --

1    with Rosenbluth?

2         A.   It was.

3         Q.   And that was a travel management company,

4    correct?

5         A.   It's a travel agency and a travel management

6    company.

7         Q.   You started there in '78 --

8         A.   Yes.

9         Q.   -- is that right?

10        A.   1978.

11        Q.   Stayed until '03, correct?

12        A.   That's correct.  We sold the business to

13   American Express.

14        Q.   And what was your position when you started at

15   Rosenbluth?

16        A.   Delivery guy.

17        Q.   And your final position was chief operating

18   officer, correct?

19        A.   That's correct.

20        Q.   As chief operating officer at Rosenbluth, what

21   were your responsibilities?

22        A.   My responsibilities were pretty much

23   everything having to do with the day-to-day operation of

24   the business and the positioning of the company in

25   various parts of the world as in a competitive way.  So



1    it included operations, it included supply air

2    management, it included human resources, it included

3    technology, it included sales, marketing, account

4    management, client retention, growth.

5          That was pretty much it.

6      Q.   You also had responsibilities for maintaining

7    supplier relations; is that right?

8      A.   That's correct.

9      Q.   And what did maintaining supplier

10   relationships entail?

11     A.   Well, there's a client component to that and

12   there's a general day-to-day component to it.  On the

13   client component, my role was to give a view of the

14   travel industry to procurement people and the travel

15   managers that they could use in terms of managing their

16   own programs anticipating, you know, what their

17   program -- what was going to shape their program, and

18   then in some cases acti- -- actively being involved with

19   negotiating with airlines on -- on their behalf.

20         On the travel management company side of

21   things, the -- the objective was to manage the

22   relationships with each of the airline pro- --

23   suppliers, excuse me, hotel suppliers, car rental

24   suppliers, ground transportation.  You know, anyone who

25   was a supplier for Rosenbluth, in that case, and -- and



1   ultimately, I had the same kind of role in American

2   Express, but it was in Europe.

3       Q.   So part of your -- your responsibility as

4   chief operating officer at Rosenbluth was working

5   directly with airlines; is that right?

6       A.   That's correct.

7       Q.   And with hotels --

8       A.   Mm-hmm.

9       Q.   -- is that right?

10      A.   Yes.

11      Q.   And other travel suppliers; is that right?

12      A.   That's correct.

13      Q.   And after Rosenbluth, you worked at American

14   Express, right?

15      A.   That's correct.

16      Q.   And that was after American Express acquired

17   Rosenbluth; is that right?

18      A.   That's right.

19      Q.   And your final role at American Express was

20   senior vice president and general manager of -- and had

21   business in Europe and the Middle East; is that right?

22      A.   The EMEA, Europe, Middle East and Africa,

23   that's correct.

24      Q.   And what were your responsibilities in that

25   role?



1     A.   Okay.

2     Q.   And under your entry for The Association of

3  Corporate Travel Executives, do you see that in the

4  middle of the -- middle of the page?

5     A.   I do.

6     Q.   It -- it states there that -- is that

7  pronounced ACTE?

8     A.   ACTE.

9     Q.   ACTE.  Okay.  That "ACTE focused on education

10  and advancing the interests of both buyers and suppliers

11  in the business travel segment."

12         Do you see that?

13     A.   I do.

14     Q.   So can you explain to me what ACTE did to

15  advance the interests of both buyers and suppliers in

16  the business travel segment?

17     A.   Okay.  So what we would do is we would

18  identify best practices in procurement and travel

19  management in general between, you know, different

20  companies and we would showcase them and set up

21  education sessions, panel discussions, and so forth,

22  where we openly discussed the best practices and -- and

23  gave -- had -- had sessions.

24         I was about a big believer in experiential

25  learning, right, which is rather than doing classroom

1  stuff, we created events, you know, where we created

2  experiences where people could actually kind of feel,

3  you know, what they were learning as opposed to just

4  reading about it. And so that -- we did a lot of that,

5  right?

6         So we had two global conferences -- well, two

7  and a half, really, global conferences a year; one in

8  the U.S., one in Europe, and one in Singapore. And then

9  we had probably 50 or so other smaller conferences in

10  various cities in the world. And then each of those

11  cities, there would be a set of best practices or things

12  that -- where people could learn from each other, you

13  know, in terms of travel management, experiences, and --

14  and how to negotiate with suppliers, how to manage

15  your -- your traveling population, how to make, you

16  know, the travel function in your company something

17  that's, you know, a productive function, not just a cost

18  center, you know, those type -- those types of things.

19     Q.  And here, "buyers" refers to travel management

20  companies; is that right?

21     A.  Generally buyers are -- work for the

22  corporation. They're -- you know, and sometimes they're

23  travel managers, you know, depending on, you know, how a

24  company is -- is organized. They could be both a travel

25  manager and a procurement person or they could just be a



1   procurement person that's supporting a travel manager.

2      Q.   And "suppliers," as you state in your CV in

3   that entry for ACTE, suppliers means airlines and

4   hotels, among others; is that right?

5      A.   Yep.  Yes.

6      Q.   And in 2014, you -- you joined ALTOUR; is that

7   right?

8      A.   That's correct.

9      Q.   And ALTOUR is a travel management company,

10   correct?

11      A.   They're a travel agency and a travel

12   management company.

13      Q.   How did those two functions as an agency and

14   as a travel management company differ?

15      A.   So the travel agency side is primarily dealing

16   with vacation planning where the travel agents kind of

17   create an experience, you know, and -- and the agents,

18   you know, explain that experience and the destinations

19   that they're traveling to, and it's all the pleasure

20   side, the fun part of the travel industry.

21      The travel management company side is all of

22   the corporate -- the corporate travel, which is, you

23   know, the stuff I was talking about before, travel

24   management, helping companies negotiate programs with

25   their suppliers, helping them to manage compliance



1     A.  Well, much like, you know, this -- this

2  relationship with -- with Latham & Watkins, you get

3  paid, you know, by -- typically in a TMC role, we get

4  paid on a retainer, you know.  So it would be a

5  monthly -- a monthly fee and -- and we would do, you

6  know, whatever we needed -- whatever needed to be done,

7  you know, in exchange for a monthly -- a month retainer.

8      In this particular case, as you know, I broke

9  this down to two other options, you know, which is

10  hour- -- an hourly rate, daily rate, you know, and then

11  there's a monthly retainer if we -- if those two are

12  actually exceeded, but that's -- that's the nature of --

13  of how In the Black operates; obviously plus expenses.

14      If there's travel involved or if there's

15  materials or something like that, then that gets billed

16  as well, but I wouldn't consider that to be revenue.

17     Q.  And you mentioned that 70% of In the Black's

18  business is with -- made up of revenue from agencies and

19  TMCs, right?

20     A.  That's right.

21     Q.  What comprises the remaining 30%?

22     A.  So we do executive coaching work.  We do

23  operations work, particularly as related to call

24  centers.  We do sales and marketing training.  We do

25  account management training.  We do proposal pitch



1   training, presentation pitches training, all things that

2   help an agency to optimize the resources that they have,

3   you know, in their -- in their company.

4      Q.   Does In the Black perform any work directly

5   for airlines?

6      A.   The only work that's ever been done directly

7   for airlines was the British Airways work.  It started

8   out as a project, you know, and then they asked me to

9   become an employee, which I did, you know, which is --

10  which is why, you know, I can concurrently have the In

11  the Black Group and have a full-time job at the same

12  time.  I just stopped doing the consulting stuff and

13  turn it back on again if I'm in between, you know,

14  full-time, full-time roles.

15       But the British Airways work is the only

16  airline that -- that we've ever done any -- any direct,

17  you know, consulting with.  You limited that to

18  airlines, right?  Because I -- we did do some work with

19  the Intercontinental Hotel Group, with their board, but

20  those were just like one-time projects.

21       I wasn't sure -- I don't remember if you said

22  airlines only or suppliers in general.

23      Q.   I did limit that to the airlines.

24      A.   Okay.

25      Q.   Is it fair to say that In the Black negotiates

1   supplier agreements on behalf of agencies and TMCs with

2   airlines?

3       A.   It's in conjunction with whoever heads up the

4   supply relations of that travel agency or TMC, you know.

5   So, in other words, we don't negotiate directly with an

6   airline and then hand over, you know, a finished

7   project.  We -- we sit down, you know, with -- I sit

8   down, you know, largely with whoever runs the supply

9   relations area of the travel agency or TMC, and I

10   understand what their objectives are, and then together

11   we negotiate with -- with the airlines.

12       Q.   So it's fair to say that In the Black has a

13   role in negotiating contracts with airlines on behalf of

14   TMCs; is that right?

15       A.   As counsel.

16       Q.   To the extent negotiations occur face-to-face,

17   you're in the room, right?

18       A.   I am.

19       Q.   Has In the Black negotiated or taken part in

20   negotiating any supplier contracts on behalf of travel

21   management companies with American Airlines in the last

22   five years?

23       A.   American Airlines was -- was included in some

24   negotiations with various airlines on behalf of a TMC in

25   New York that I've done a lot of work with, but it



1    wasn't just American Airlines.

2        Q.   Was that for one particular TMC?

3        A.   It was.

4        Q.   Which one was that?

5        A.   Ovation.

6        Q.   In the last --

7        A.   Who is actually owned by American Express.

8    They were just acquired.

9        Q.   Other than working with Ovation has In the

10   Black taken part in any other travel management company

11   supplier agreement negotiations with American Airlines

12   in the last five years?

13       A.   Not in the last five years, no.

14       Q.   Has In the Black taken part in any travel

15   agency negotiations of supplier contracts with American

16   Airlines in the last five years?

17       A.   I think I just answered that.  Just Ovation

18   was the only client that we've done that kind of

19   negotiating with in the last five years.  I mean, we've

20   done a lot of negotiating over -- over time, you know,

21   but in the last five years, Ovation is probably the only

22   one.

23       Q.   When you say, a lot over time, what do you

24   mean?

25       A.   A number of different travel management

```
 1   companies and travel agencies.

 2       Q.   Over the last 10 years, have you negotiated

 3   supplier contracts on behalf of clients with American

 4   Airlines other than Ovation which you've mentioned?

 5       A.   In the last 10 years?

 6       Q.   Yes, sir.

 7       A.   So that would be 2012, so yes.

 8       Q.   For which clients?

 9       A.   Travelocity, Egencia, which is the business

10   travel part of Expedia; a company called Ultramar,

11   Flight Center Group, American Express, Casto Travel.

12   Those -- there could be others, but those are the -- the

13   ones that -- that jump to mind.

14       Q.   And all of those took place between 2012 --

15       A.   '12.

16       Q.   -- and 2017?

17       A.   Yeah -- no, 2012 and 2022.  You said 10 years,

18   right?

19       Q.   I -- I did.  I had understood your answer

20   about the last five years to only include Ovation.

21       A.   Oh, okay.  Right, right, right.  Got it.

22       Q.   And so, just -- just so we're on the same page

23   here, in the last five years Ovation is the only client

24   with whom you helped negotiate a supplier contract with

25   American Airlines, correct?
```



```
 1        A.    And other airlines, not just American, yes.

 2        Q.    Which other airlines?

 3        A.    United, Delta, British Airways, and then the

 4   Alliance -- you know, the Alliance groups, like Star

 5   Alliance, Oneworld, Air France, which is, you know, part

 6   of the whole Delta and SkyTeam alliance.

 7             So, you know, an -- an agency has some formal

 8   relationship with -- you know, with, you know, all the

 9   airlines, you know, but they have relationships that

10   are, you know, more specific -- have more specific

11   deliverables associated with them with -- you know, with

12   the primary, you know, carriers.  And, you know, clearly

13   I didn't mention JetBlue in here because JetBlue really

14   wasn't that big in the business travel world and these

15   were business-travel-dominated agencies, you know,

16   that -- I mean, the programs would apply across -- you

17   know, across the board.

18             But anyway, yeah.  This is kind of a glaring

19   glimpse of the obvious, that JetBlue wasn't in that mix,

20   and I just thought I would clarify that.

21        Q.    Well, let -- let me -- let me ask the question

22   just so -- just so I have it clearly, then.

23             Has In the Black negotiated any supplier

24   contracts on behalf of clients with JetBlue in the last

25   five years?
```



1   industry?

2      A.   Same answer.

3      Q.   Have you performed any consulting work for

4   American Airlines?

5      A.   I have not.

6      Q.   Have you performed any consulting work for

7   JetBlue?

8      A.   I have not.

9      Q.   Have you consulted for any corporate customer

10   considering contracting with American Airlines?

11      A.   Not in the -- in the context of contracting

12   with American.  I've consulted with corporate customers

13   on a variety of things, but not specifically about

14   American Airlines.

15      Q.   When you say "not specifically about American

16   Airlines," what do you mean?

17      A.   Well, for example, this would be a company out

18   of Texas called McKesson, and I did a mentorship for

19   their travel manager, and part of the mentorship was

20   educating him on supply negotiations.  And they happened

21   to, you know, have -- you know, about a year later, they

22   did some -- you know, they did an airline RFP, and he

23   led that.

24      You know, so not -- nothing directly related

25   to American or even directly related to airlines in



1   and publications, and you can turn to Appendix B, if you

2   need to, but my question is just a general question

3   regarding the -- The Points Guy --

4        A.    Mm-hmm.

5        Q.    -- as a source.

6           Did you speak with the authors of any of The

7   Points Guy's articles or blog posts that you cite in the

8   report?

9        A.   I did not speak -- I didn't speak with anyone.

10        Q.   And actually, let me ask you to turn to

11   Appendix B on page 34.

12        A.   Okay.

13        Q.   You have a section there on page 34 in

14   Appendix B titled, "Case Documents," right?

15        A.   That's correct.

16        Q.   Does this list of case documents in Appendix B

17   comprise the complete list of case documents that you

18   relied upon in forming your opinion?

19        A.   No, there are other case documents.  These are

20   the ones that I thought best supported points I was

21   making in the expert report, so you'll find these cited

22   in the footnote sections, but there was a -- there were

23   other documents that -- that I didn't think were as

24   relevant as these.

25        Q.   So there were other documents that you relied

1    upon in forming your opinion that you don't identify in

2    Appendix B, correct?

3         A.    These -- these capture the documents that --

4    that enabled me to render my opinion.  You know, the

5    other documents were interesting, but there's nothing

6    incremental about them in -- in shaping my opinion.  If

7    all I had read were these, I would have had -- what

8    you're reading is what -- what is -- is what you're --

9    what you're reading, what would be my report.

10        Q.    Well -- so my question, then, is whether there

11   are other documents that you relied upon in forming your

12   opinion that you don't identify in Appendix B?

13        A.    There's other documents that I looked at that

14   aren't referenced here in -- in Appendix B, but they

15   didn't do anything to really render my opinion or shape

16   my opinion.

17        Q.    So there are other documents you looked at

18   that aren't in Appendix B that you didn't rely on in

19   forming your opinion; is that fair?

20        A.    There -- there -- there are documents that had

21   information that was, you know, interesting, but they

22   didn't really have anything to do with, you know, my --

23   drawing my -- the opinions that you see in my report, if

24   that makes sense.

25        Q.    Did you maintain a list of the documents that



Ronald C. DiLeo, Jr.      HIGHLY CONFIDENTIAL      8/19/2022
Case 1:21-cv-11558-LTS  Document 155-1  Filed 09/09/22  Page 20 of 27
Page 74

1  There is -- you know, I -- there's opinions in here

2  that -- that I stated that say how American, for

3  example, has struggled for as long as I can remember

4  them being competitive in the Boston and, you know, New

5  York markets.  And I remember distinctly one of the

6  presentations shows -- it's an American Airlines

7  presentation, shows American's share.  You know, I

8  believe it was Boston just going down year over year.

9         And it was like I knew it.  I didn't have the

10  data to support it, but I knew it, you know, just

11  from -- you know, from my watching what's going on in

12  those markets.  That's what people pay me to do, is

13  understand the dynamics of any given market.

14         That's just an example, but -- so all these

15  documents did something like that, you know, for me.

16     Q.   Did you already have an opinion on the

17  Northeast Alliance before you reviewed the documents

18  that you identify in Appendix B?

19     A.   If you get to know me, you'll know me.  I have

20  an opinion on everything.  And I had an opinion about,

21  you know, the Northeast Alliance just from what I read,

22  you know, in the -- you know, the media.  And then when

23  I was, you know -- when I was awarded this, you know,

24  this -- this opportunity to be an expert to testify, I

25  dug into the details and validated the opinions that I



1    had already kind of formed.

2             If -- if something would have come up that

3    invalidated, you know, those opinions, I would have said

4    that in -- in the document.  I take this stuff very

5    seriously.

6        Q.   So you already had an opinion about the

7    Northeast Alliance before you looked at any of the case

8    documents, correct?

9        A.   I had, you know, a casual opinion; nothing

10   that I would call an expert opinion.  You know, the

11   documents made me an expert on my -- you know, in

12   validating, you know, my -- my -- kind of my thoughts

13   about how the alliance was -- you know, was going to

14   operate.

15       Q.   So you already had a casual opinion about the

16   Northeast Alliance before you read any case documents;

17   is that fair?

18       A.   I think it's fair to say that I already had a

19   view of the Northeast Alliance and what it was going to

20   bring to the table for customers for, you know, the

21   industry in general, and in -- in doing the deeper

22   research associated with this project, these documents

23   helped to -- to, you know, kind of validate all of what

24   I was -- I was thinking.

25             None of this was preconceived, you know, if



1    that's what you're alluding to.  There's no preconceived

2    notions here, but, you know, you have to start

3    somewhere.  And I had a -- you know, kind of a view of

4    what I thought the alliance was and the details, you

5    know, brought themselves to life in what you see here in

6    the attachments.

7              MS. SULLIVAN:  Bill, I don't want to

8         interrupt, but we've been going an hour.  So when

9         you're ready, I would like to take a break.

10             MR. JONES:  Okay.  I have a few more questions

11        and then --

12             MS. SULLIVAN:  Yeah.  Yeah, I figured you're

13        still in the middle.

14   BY MR. JONES:

15        Q.   So you had a view about the Northeast Alliance

16   before you read any of the depositions in this case as

17   well, correct?

18        A.   Mm-hmm.

19             MS. SULLIVAN:  Asked and answered.

20        A.   Yes.

21        Q.   And you had a view about the Northeast

22   Alliance before you conducted any interviews with

23   American or Jet -- JetBlue employees; is that right?

24        A.   That's correct.

25        Q.   Did you seek out any documents that challenged

1      Q.    Have you been involved in the conducting of

2    surveys in your other work in the travel industry?

3      A.    I have.

4      Q.    Can you describe those occasions in which

5    you've been involved in the conducting of surveys in the

6    travel industry?

7      A.    Sure.  So, for example, one of my clients out

8    of Germany is a car rental company.  They -- I did some

9    work with them on their loyalty program development and

10   they wanted to align their loyalty programs with some

11   airline -- with some of the key airline loyalty

12   programs.

13            And I conducted a survey to have a database of

14   travel managers and -- and -- and buyers of what would

15   be important to them in -- in seeing, you know, a

16   loyalty program, and a loyalty program that is aligned

17   with one of their, you know, preferred airlines.

18            And I -- you know, it was a just a simple,

19   10 -- you know, 10-question survey, and I would be able

20   to use some of those results to help shape the alignment

21   of the royalty programs between this car rental company

22   and -- and a few airlines.

23      Q.    Were you involved in any surveys when you were

24   the executive director of ACTE?

25      A.    Not me personally, but the association



1  in survey because, you know, that's a whole world of its

2  own.  And so we had -- we kind of had the technical

3  skill, you know, on staff, but we may have also farmed

4  some of it out if that person was uncomfortable in --

5  you know, in developing the survey for the purposes that

6  were -- you know, that were put forward.

7      Q.  Is it fair to say that -- that you found

8  surveys as a beneficial way of understanding the views

9  of ACTE's members when you were executive director of

10  ACTE?

11      A.  Yeah, I think, because, you know, we're an

12  association that belongs to the -- to the people.  You

13  know, we weren't an association setting our own

14  messages.  We were an association representing our

15  members and delegates.

16      So you can only do that effectively if you ask

17  people what -- you know, what they want to talk about

18  and what they want to learn.  And so we relied heavily

19  on those, yes.

20      Q.  Did you consider conducting a survey as part

21  of forming your opinion in this case?

22      A.  Absolutely not.  I was told not -- not to have

23  a conversation with anyone about this -- about this case

24  or my -- or my report.

25      Q.  Would you have liked to have conducted a



1   survey of corporate customers to help in forming your

2   opinion?

3       A.   Don't need it.  I've got 44 years of -- of

4   understanding of what makes customers happy and what

5   they look for and -- and -- and what puts them off.  I

6   know that stuff cold.

7       Q.   So no need to conduct any surveys of

8   corporate --

9       A.   Not for this report, no, no need.  Sorry to

10  interrupt.

11      Q.   Yeah.  Let me just caution you on -- on that.

12  Like even if you know where my question is going --

13      A.   Yeah, yeah, yeah, you told me that.

14      Q.   -- please let me finish, and I will do the

15  same with you on your answers.

16      A.   Got it.

17      Q.   Was there anything that you wanted to do to

18  develop your opinions in this case that you were unable

19  to do?

20      A.   No.

21      Q.   And let me ask -- let me ask the same about

22  your report.

23        Was there anything you wanted to do to prepare

24  your report here that you were unable to do?

25      A.   No.



1   card and I was a participant on the airline part.

2      Q.   When you say "a participant on the airline

3   part," what did you do?

4      A.   Evaluated the proposals that came in, went --

5   sat through their presentations, gave guidance, you

6   know, to the buyer as to what I thought was, you know,

7   the best possible outcome as we kind of went through

8   their decision process.

9      Q.   You mentioned earlier today that sometimes

10   serving as a mentor to corporate customers' travel

11   departments.

12         Is that the role you were serving with

13   Quintiles?

14      A.   No.

15      Q.   What role -- role were you serving there?

16      A.   It was a [sic] outsource procurement role

17   where Quintiles hired my firm and another firm that I

18   collaborated with to help them to kind of guide them

19   through this RFP process.

20      Q.   What was the other firm that you collaborated

21   with?

22      A.   Partnership Travel Consulting.

23      Q.   How did your firm and Partnership Travel

24   Consulting divide the work?

25      A.   Quintiles was a partnership travel consulting

```
 1                   C E R T I F I C A T E

 2   COMMONWEALTH OF MASSACHUSETTS

 3   COUNTY OF PLYMOUTH

 4              I, Rosemary F. Grogan, a Registered

 5   Professional Reporter and Notary Public duly

 6   commissioned and qualified in and for the Commonwealth

 7   of Massachusetts, do hereby certify:

 8              That RONALD D. DILEO, JR., the witness whose

 9   deposition is hereinbefore set forth, appeared and was

10   duly identified and sworn by me, and that the foregoing

11   transcript is a true record of the testimony given by

12   such witness to the best of my ability.

13              I further certify that I am not related to any

14   of the parties in this matter by blood or marriage, and

15   that I am in no way interested in the outcome of this

16   matter.

17              IN WITNESS WHEREOF, I have hereunto set my

18   hand this 234d day of August, 2022.

19              _____

20              Rosemary F. Grogan, RPR

21              CSR No. 112993

22   My Commission Expires:  December 6, 2024

23

24

25
```