## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN AIRLINES GROUP INC. and JETBLUE AIRWAYS CORPORATION, <br><br> Defendants. | Civil Action No. 1:21-cv-11558-LTS |

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* NO. 2 TO EXCLUDE EVIDENCE OF DEFENDANTS' ALLEGED CARVE-OUT ROUTES

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     BACKGROUND ...................................................................................................3

III.    ARGUMENT .........................................................................................................7

A.      The Carve-out Routes are Highly Relevant in Assessing the Shortcomings
        of Plaintiffs' Proof of Anticompetitive Harm ..........................................8

B.      Courts Have Routinely Considered Behavioral Changes and Transaction
        Amendments in Assessing Competitive Effects in Antitrust Cases .....................10

        1.      Transaction Limitations Designed to Address Potential for Harm
                are Plainly Relevant and Often Successful, Even in Mergers ..................10

        2.      The Carve-out Routes Are Not a "Stopgap Measure" for This
                Litigation ...........................................................................................11

        3.      There is No Rule that "Private Agreements" Are Not Relevant...............12

C.      The Carve-out Routes May Not be Excluded Under Rule 403 ............................13

IV.     CONCLUSION....................................................................................................14

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Achille Bayart & CIE v. Crowe*,
    238 F.3d 44 (1st Cir. 2001) ...................................................................................................7

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ...............................................................................................................7

*FTC v. Arch Coal, Inc.*,
    329 F. Supp. 2d 109 (D.D.C. 2004) ....................................................................................11

*FTC v. Arch Coal, Inc.*,
    No. 04-0534, slip op. (D.D.C. July 7, 2004) .......................................................................11

*Gulf States Utils.. Co. v. Ecodyne Corp.*,
    635 F.2d 517 (5th Cir. 1981) ...............................................................................................14

*Huddleston v. United States*,
    485 U.S. 681 (1988) ...............................................................................................................2

*Miller v. City of Cincinnati*,
    709 F. Supp. 2d 605 (S.D. Ohio 2008), *aff'd* 622 F.3d 524 (6th Cir. 2010) ....................3, 14

*United States v. AT&T, Inc.*,
    916 F.3d 1029 (D.C. Cir. 2019) .....................................................................................10, 11

*United States* v. *Cameron*,
    729 F. Supp.2d 411 (D. Me. 2010) ......................................................................................14

### STATUTES

15 U.S.C.
    § 1 .........................................................................................................................................12
    § 15 .......................................................................................................................................12

### RULES

Fed. R. Evid.
    401 .........................................................................................................................................2
    402 .........................................................................................................................................2
    403 ...........................................................................................................................2, 3, 7, 13, 14

## OTHER AUTHORITIES

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for Collaborations Among Competitors* (Apr. 2000)...............................................................................................2

American Airlines Group Inc. ("American") and JetBlue Airways Corporation ("JetBlue," and collectively "Defendants") submit this Response in Opposition to Plaintiffs' September 2, 2022, Motion *in Limine* (ECF No. 144) (the "Motion").

## I.      INTRODUCTION

Plaintiffs' motion asks the Court to exclude evidence of certain parts of the agreements between American and JetBlue governing the Northeast Alliance (the "NEA"), the very set of agreements Plaintiffs challenge as unlawful, on the grounds that they are irrelevant. Specifically, they seek to exclude evidence of one of several provisions of the NEA that limit its scope and how American and JetBlue collaborate:  the terms that "carve out" from the NEA's revenue sharing and capacity optimization provisions certain routes where American and JetBlue are substantial competitors and there are fewer than two other competitors operating on the route (the "Carve-out Routes").  They address concerns over the NEA that the Department of Justice ("DOJ") raised during its investigation with a mechanism, the carve-outs, that DOJ has long advocated.  But for DOJ interference, the requirement to have carve-out routes would be in the agreement the Parties executed with the Department of Transportation ("DOT") in January 2021, in which case they would be part of a "public" agreement, resolving Plaintiffs' unfounded concerns over "private" agreements.  In their calculation of predicted overcharges, Plaintiffs pretend as if the Carve-out Routes were not carved out, estimating over $200 million in consumer harm on routes exempt from the key practices at the heart of their case:  revenue sharing and capacity coordination. Apparently, the point of this motion is to allow Plaintiffs to present their analysis of predicted harms on the Carve-out Routes without Defendants being able to point out how anomalous and implausible those estimates are because the portions of the NEA that will supposedly cause overcharges—revenue sharing and capacity coordination—do not apply to the Carve-out Routes.

Plaintiffs cannot handpick the parts of the NEA that they want the Court to consider, let alone by excluding evidence on *relevance* grounds.  That seems obvious, given the broad standards of Rules 401 and 402 for determining relevance:  whether evidence "makes the existence of any fact [that is of consequence] more or less probable."  *Huddleston v. United States*, 485 U.S. 681, 687 (1988); Fed. R. Evid. 401, 402.  Plaintiffs made the Carve-out Routes relevant by mentioning them in the Complaint, including by listing them as relevant markets, and then predicting over $200 million in consumer harm associated with these routes.  That makes every term of the NEA agreements that affects the Carve-out Routes relevant.  Plaintiffs seem to accept that other terms limiting the scope of the NEA are relevant, *e.g.*, Section 2.1 of the NEA Agreement which restricts the geographic scope of the NEA to flights at New York and Boston airports, and Section 3.1.1. of the NEA Agreement that prohibits any joint decision-making on pricing.  Ex. A, NEA Agmt. §§ 2.1; 3.1.1 (DX-0128).  The provisions establishing the Carve-out Routes are no different.  They unquestionably make Plaintiffs' predictions of harm on those routes "less probable."  *Huddleston*, 485 U.S. at 687.  Ignoring them is irrational.  DOJ's (and FTC's) own Antitrust Guidelines for Collaborations Among Competitors state that "the Agencies assess the competitive effects of the *overall collaboration* and *any individual agreement or set of agreements* within the collaboration that may harm competition."  U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for Collaborations Among Competitors* at § 2.3 (Apr. 2000) ("Collaboration Guidelines") (emphasis added).  In short, all the terms matter, not just the ones advancing one side's case.

Plaintiffs also rely on Federal Rule of Evidence 403, arguing that evidence of the Carve-out Routes would be "confusing, misleading, and []waste trial time."  Mot. at 2.  But it is not confusing, misleading, or a waste of trial for this Court to hear evidence that the Carve-out Routes are subject to a materially different set of provisions under the NEA.  Nor is Rule 403 an avenue

for Plaintiffs to avoid having to explain why they treat the Carve-out Routes identically to every other route in the NEA or the anomalously high predicted overcharges they associate with these routes. Certainly those anomalous results cast doubt upon Plaintiffs' entire predictive approach to this case and Plaintiffs would like to brush them aside, but that is not a basis for exclusion under Rule 403. Furthermore, Rule 403 is designed to protect a *jury* from having to consider and weigh evidence that might confuse or prejudice them—not a judge, who is both the trier of fact and law. *See*, *e.g.*, *Miller v. City of Cincinnati*, 709 F. Supp. 2d 605, 620 (S.D. Ohio 2008), *aff'd* 622 F.3d 524 (6th Cir. 2010).

In the remainder of this memorandum, Defendants will describe the context and background for the NEA terms establishing the Carve-out Routes, which is not fairly recounted in Plaintiffs' motion. In short, these terms grew out of parallel discussions with the DOT and DOJ. Once the origins and rationale of the Carve-out Routes is understood, it is plain how relevant and probative they are for evaluating the competitive effects of the NEA.

## II.      BACKGROUND

The Carve-out Routes were implemented in the context of a lengthy parallel regulatory review by the DOJ and DOT, both of which have statutory authority to consider the competitive consequences of airline alliances. These investigations began in July 2020, soon after the Defendants announced the NEA. Through the course of the next six months, Defendants provided DOJ and DOT a substantial amount of information through document and data production, responses to requests for information, and videoconference discussions, (i) to assist DOJ and DOT in identifying potential concerns regarding the NEA and; (ii) to find solutions to address those concerns that would allow the Defendants to implement the NEA without significantly undermining its operations.

In October 2020, DOJ provided Defendants with a list of concerns it had about the NEA, one among them was that there were certain "overlap routes" where American and JetBlue were either the only carriers or had little competition.  *See* Ex. B, Nov. 6, 2020 Observations on DOJ Staff Concerns Related to the Northeast Alliance Between American Airlines and JetBlue Airways (PX0453), at 3.  On November 6, 2020, Defendants submitted a document responding to DOJ's expressed concerns, including proposing that if DOJ remained "unconvinced by the Parties' arguments about the low likelihood of fare increase on nonstop overlap routes . . . carving-out 3-airline and 2-airline routes would be the maximum reasonable remedy."  *Id.* at 11.  Subsequently, on November 12, 2020, Defendants informed DOJ of "some forthcoming changes to the Parties' NEA agreements" explicitly, "without prejudice to [the Defendants'] view that under the applicable legal standard pursuant to Section 1 of the Sherman Act . . . , the NEA is lawful in its present form."  Ex. C, Nov. 12, 2020 Email from Robert Wark to Todd Homan (AA-NEA-01526166).  The Defendants explained that they "listened to DOJ Staff's concerns carefully and in good faith, and determined that most can be addressed with changes that do not substantially undermine the integrative efficiencies that the NEA will bring about."  *Id.*[1]  In the attachment, Defendants explained that "Parties will amend the NEA agreements" with carve-out provisions to "address DOJ Staff's concerns about potential competitive effects in nonstop overlap routes and

---

[1] *See also* Ex. D, Nov. 11, 2020 Email from Robert Wark to Todd Homan (AA-NEA-01526162) (sending the draft letter to DOJ regarding the remedies pointing out that the "letter currently carve[s] out 2-1s and 3-2s where both [American] and [JetBlue] are substantial competitors" and noting "this is not a merger so if there are proven adverse fare effects on any routes, the parties would be open to enforcement action.  That would suggest carve outs are not necessary to protect consumers since the antitrust laws remain in effect.  It's also worth noting that we really don't see these as true 2-1s and 3-2s because the services will continue to be priced independently. Regardless, we are considering offering DOJ some carve outs to eliminate any reasonable concern on these more concentrated routes.").

revenue-sharing[.]"  Ex. E, Nov. 12, 2020 Letter from Daniel Wall and Jessica Delbaum to Robert Lepore  (AA-NEA-01526168).

Carve-outs were not some new idea of Defendants' making.  DOJ has been a proponent of carve-outs in the context of airline joint ventures, arguing that they are "relatively easy to administer and preserve the incentives of the current market participants to compete" even going as far to argue that they "may be the only effective remedy on routes where slot divestitures would not lead to entry."  Ex. F, American Airlines, Inc. et al., Public Version of the Comments of the Department of Justice (DOT-OST-2008-2052), at 32; *see also* Ex. G, Ken Heyer, Carl Shapiro and Jeffrey Wilder, The Year in Review: Economics at the Antitrust Division, 2008–2009, Rev. of Indus. Org., Vol. 35, No. 4, (Dec. 2009), 349-367, (DX-1068) (DOJ describing carve-outs as "an attractive solution" in airline joint ventures because "[t]hey preserve competition on the affected routes while allowing the carriers in the alliance to realize broader alliance efficiencies.").  Defendants, in other words, proposed a standard, DOJ-endorsed way of dealing with a small number of overlap routes in a broader, procompetitive alliance.

In parallel, Defendants were discussing the NEA with DOT staff.  Unlike DOJ, the DOT never voiced any fundamental objections to the NEA or the revenue-sharing and capacity coordination terms that DOJ attacks.  DOT's concerns were narrow enough that by late November 2020, Defendants were negotiating with DOT a set of commitments that would allow DOT to terminate its review of the NEA (the commitments that became the January 10, 2021, "DOT Agreement").  In that context, Defendants proposed including mandatory carve-out terms in the

DOT Agreement.[2]  A November 30, 2021, draft term sheet sent by Defendants to DOT staff included the carve-out provisions.[3]

Defendants then informed DOJ that the draft DOT Agreement included the carve-out provisions.  A few days later, DOT asked Defendants to cut the carve-out provisions from the DOT Agreement.  Ex. K, Dec. 3, 2020 Email from Robert Wark to Todd Homan (JBLU-LIT-01558510) ("you proposed eliminating section III.A., which carves some routes out of the revenue share agreement.").  Defendants complied with DOT's request, but noted Defendants "intend to operate the alliance with [the carve-out] limitations in place in any event" and that "[i]f the [DOT] decides it would like to incorporate the carve outs back into a binding commitment, [Defendants] will gladly put it back in."  *Id.*  As a result, the carve-out provisions were not included in the final DOT Agreement.  *See* Ex. L, Jan. 10, 2021 DOT Agreement (DX-0063) .

On January 12, 2021, Defendants sent a letter to DOJ notifying DOJ of the DOT Agreement.  Ex. M, Jan. 12, 2021 Letter from Dan Wall to DOJ (DX-0185).  In the letter, Defendants explained to DOJ that the carve-out provisions "to address DOJ Staff's concerns about potential competitive effects in nonstop overlap routes" were ultimately not included in the DOT Agreement because DOT advised Defendants "that DOJ objected to this provision because it did not also prohibit codesharing on these routes."  *Id*. at 1.  Defendants nevertheless informed DOJ that they will "not engage in either capacity coordination or revenue-sharing" on the carve-out routes and that they make this change "notwithstanding [their] strong view that there is no credible

---

[2] *See* Ex. H, Nov. 21, 2020 Email from Robert Wark to Todd Homan (JBLU-LIT-03860904) ("We have addressed through carve-outs from revenue-sharing the only routes where there is any plausible argument of possible consumer[] harm.").

[3] *See* Ex. I, Nov. 30, 2020 Email from Robert Wark to Todd Homan (AA-NEA-01526175); Ex. J, Nov. 30, 2020 Draft Term Sheet (AA-NEA-01526176) (including the carve-out provisions in Section III.A.).

argument that the unique form of capacity coordination and revenue-sharing contemplated by the NEA Agreements is anticompetitive, regardless of market conditions." *Id*. at 2.

Starting February 2021, Defendants implemented the NEA, honoring both the carve-out obligations and the provisions of the DOT Agreement.  On July 9, 2021, Defendants shared with DOT the "amendments to the NEA and MGIA that include changes that address commitments made in the [DOT Agreement] as well as to the DOJ," and explained that "[a]lthough these Amendments have been documented and executed only recently, JetBlue and American have been operating since implementation consistent with them."  Ex. N, July 9, 2021 Email from Reese Davidson to Todd Homan et al. (JBLU-LIT-01552527).

The Carve-out Routes have been in effect since January 2021.  Defendants intend to continue to operate the NEA with the Carve-out Routes.

## III.    ARGUMENT

Plaintiffs' request to exclude evidence of the Carve-out Routes fails to meet the threshold requirements under Rules 401, 402, or 403.  Carve-out Routes are highly relevant and probative and Plaintiffs' motion should be denied.  Under Rule 401, the First Circuit has held that "[e]vidence is relevant only if it tends to make the existence of a fact that is of consequence more or less probable." *Achille Bayart & CIE v. Crowe*, 238 F.3d 44, 49 (1st Cir. 2001); *see also Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 587 (1993) (citing Fed. R. Evid. 401) (holding that relevant evidence is that "which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence'").

A. **The Carve-out Routes are Highly Relevant in Assessing the Shortcomings of Plaintiffs' Proof of Anticompetitive Harm**

It is uncontested that Plaintiffs bear the initial burden of showing that the NEA Agreements have a substantial anticompetitive effect at trial. *See* Plaintiffs' Opposition to Motion to Dismiss at 8 n.1 (ECF No. 80). As the Court will see at trial, the way Plaintiffs try to meet that burden is route-by-route, focusing nearly all of their attention on a small minority of the routes allegedly affected by the NEA and claiming—through their "merger simulation" (of a collaboration that is not a merger)—that Defendants will be able to raise airfares on those routes. Six of those routes— all of which are Boston routes, and half of the Boston nonstop overlap routes that are allegedly problematic—are Carve-out Routes. Through his "merger simulation" Plaintiffs' lead expert witness, Dr. Nathan H. Miller, predicts over $200 million of harm from the NEA on the Carve-out Routes. This is nearly one-third of Plaintiffs' total estimate of harm on nonstop overlaps (New York and Boston airports combined), and almost half of the predicted harm on Boston nonstop overlap routes. Ex. O, Expert Report of Nathan H. Miller, Ph.D. ("Miller Rpt."), ¶ 223, n. 278.[4] Plaintiffs absolutely understand that the fact these routes are carved-out of revenue sharing and capacity coordination is "of consequence." They repeatedly argue in the Motion that the Carve-out Routes are not sufficient to counteract the alleged anticompetitive effects of the NEA, which is of course a fact of consequence in this case. *See, e.g.,* Mot. at 3, 4, 6, 7, 8. Even Dr. Miller "observe[s] that the carve-outs are intended to fix competitive problems," and acknowledges that "[t]hey may be successful at doing so." Ex. P, Deposition of Nathan H. Miller, Ph.D. ("Miller

---

[4] To be conservative, the harm estimate used here includes Boston-JFK/LaGuardia, which could be included in either the Boston or JFK/LaGuardia harm estimates, but not both. Excluding Boston-JFK/LaGuardia would increase the drop in Dr. Miller's estimated harms for Boston nonstop overlap routes to *over 50%*.

Tr.") 172:13-15.  He nevertheless includes the harm estimates for these routes because he "ha[s] doubts" about how effective they will be. *Id*. 169:18-19.

Dr. Miller's "doubts" do not erase the carve-out provisions or make the Carve-out Routes irrelevant.  Nor can Dr. Miller plausibly contend that the Carve-out Routes are inconsequential. His entire approach to this case is to shoehorn the NEA into a fictitious *merger* to which "tools from merger analysis" and specifically a "merger simulation" can be applied.  His primary argument for using this approach is that American and JetBlue (a) share revenues and (b) coordinate capacity on NEA routes.  Ex. Q, Reply Report of Nathan H. Miller, Ph.D. ("Miller Reply Rpt.), ¶ 185 ("[T]he NEA enables American and JetBlue to coordinate capacity planning for specific NEA markets . . . such coordination has different implications from any unilateral incentive effects of isolated terms in the detailed MGIA revenue sharing formula.  This joint capacity planning is where the NEA aligns Defendants' incentives to maximize joint profit in each NEA market."); Ex. P, Miller Tr. 139:24-141:20, 170:6-13.  *But the Defendants do not do either on the Carve-out Routes*.  As a result, by the logic of Dr. Miller's argument, such that it is, the Carve-out Routes should not be subject to a "merger analysis" and there is no basis to use a "merger simulation" to predict higher fares on those routes.  Nevertheless he treats them the same as every other NEA nonstop overlap route.  That makes the Carve-out Routes relevant for the independent reason of impeaching Dr. Miller's methodology.

It is spurious to suggest under these circumstances that the Court should not even hear evidence on the Carve-out Routes, their significant impact on Dr. Miller's harm calculations, and how Dr. Miller ignores his own foundation for when a "merger analysis" is appropriate.  There is no basis to claim evidence of the carve-out provisions is irrelevant, and it would be an egregious error, unfairly prejudicial to Defendants, to exclude it.

**B.      Courts Have Routinely Considered Behavioral Changes and Transaction Amendments in Assessing Competitive Effects in Antitrust Cases**

In their Motion, Plaintiffs argue that Defendants are engaged in "stratagems:"  actions taken while "the NEA was being investigated by the Department of Justice, and while Defendants were negotiating an agreement to terminate DOT's review of the NEA," should be "viewed with skepticism."  Mot. at 5-6.  Proposing (or implementing) a change to a transaction to avoid any potential anticompetitive harms is a well-established practice, both in general and in the airline industry.  Such legal actions, without something more, are not a "stratagem."  Plaintiffs' skepticism of evidence that *weakens their case* does not make it irrelevant.

1.      *Transaction Limitations Designed to Address Potential for Harm are Plainly Relevant and Often Successful, Even in Mergers*

Plaintiffs' position and the cases they cite are a product of merger practice under Clayton Act Section 7, in which the Government has a long history of opposing "fixes" that it has not endorsed.  They cite no Sherman Act Section 1 cases on this point.  Even in the Section 7 cases they cite, no court *excluded* the evidence of the "fix" or limitations on the deal.  Rather, the courts in those cases *chose* after hearing the evidence not to credit or give substantial weight to the evidence for reasons specific to those cases.  And there is another side to that story that Plaintiffs ignore:  cases in which self-imposed limitations or fixes were the reason, or one of the reasons, for the Court to rule in Defendants' favor.

One such example is *United States v. AT&T, Inc.*, 916 F.3d 1029, 1035 (D.C. Cir. 2019).  In *AT&T*, one week after the DOJ filed suit to enjoin AT&T's proposed merger with Time Warner, one of the defendants sent letters to content distributors offering to engage in binding arbitration for a set period of time to resolve any pricing disputes.  *Id.*  The express purpose of this offer was to "address the government's concern that as a result of being . . . commonly owned by AT&T, [Turner Broadcasting] would have an incentive to drive prices higher and go dark with [its]

affiliates." *Id.* (brackets in original).  Far from finding these time-limited private contracts to be irrelevant (or prejudicial), the court credited the district court's finding that the offers to arbitrate contributed to its decision that the DOJ had not met its burden to prove the merger was unlawful. *Id.* at 1041.  Indeed, perhaps even more apt for this case, the *AT&T* court criticized DOJ's expert who ignored the private contractual provisions in his analysis and the "real world effect" they would have.  *Id* at 1038, 1041.  Likewise, in *FTC v. Arch Coal, Inc*., one of the merging parties during the course of the FTC's investigation of the merger "informed the FTC that it intended to divest one of the acquired mines . . . ."  329 F. Supp. 2d 109, 114 (D.D.C. 2004).  When the FTC moved to exclude evidence of the divestiture at trial, the court held that it could not ignore the divestiture because the "Court's task in determining the likelihood of the FTC's success in showing that the challenged transaction may substantially lessen competition . . . requires the Court to review the entire transaction in question."  *FTC v. Arch Coal, Inc*., No. 04-0534, slip op. at 7 (D.D.C. July 7, 2004).  The court ultimately denied the FTC's request for a preliminary injunction against the merger, taking into account the proposed divestiture.  *Arch Coal*, 329 F. Supp. 2d at 160.

2.     *The Carve-out Routes Are Not a "Stopgap Measure" for This Litigation*

Plaintiffs next argue that the Court should pretend the Carve-out Routes are not really carved out because the Defendants are motivated by a desire to avoid legal scrutiny, and Defendants will revert to something else—such as "rescind[ing] the[] carve-outs, revert[ing] to the original terms of the NEA"—after trial.  Mot. at 2.  Plaintiffs, of course, cite no evidence to support any of this.  This is part of a broader theme that will become evident at trial:  arguments that ask the Court to ignore the NEA's actual terms and assume it will be worse than it is on the unfounded grounds that once this litigation is over, Defendants will be free to change their behavior and act anticompetitively.  The problem with this particular argument is that the threat of litigation under

Section 1 *never goes away*.  There is nothing to stop Plaintiffs or any private party from pursuing litigation at any future date if the NEA results in any anticompetitive effects, including through any changed behavior or renegotiating of the Carve-out Routes.  Ex. R, Deposition of Dr. Dennis W. Carlton, Ph.D. ("Carlton Tr.") 125:20-126:7 ("[Dr. Miller] seems to say the agreement and its details are irrelevant because it's really just a subterfuge to allow two firms to get together and conspire.  If that in fact is true . . . I would think that that continued scrutiny as well as the threat of antitrust actions and treble damages would continue.").  That ongoing threat includes private treble damages action under 15 U.S.C. § 15.

If the NEA at a future date causes anticompetitive effects, including on the imagined day Defendants decide to rescind or otherwise ignore the Carve-out Routes (or any other binding obligation of the NEA agreements), Plaintiffs may file a new challenge against the NEA, citing the change in behavior as reason to reassess the competitive effects of the NEA.  That would be true even if Defendants prevail at the upcoming trial.  But none of these considerations rise to the level of a *relevance* argument anyway.  They are, to the contrary, relevant points to make.

        3.      <u>There is No Rule that "Private Agreements" Are Not Relevant</u>

Finally, there is no legal basis for suggesting that any "private agreement between business partners" is untrustworthy.  Mot. at 4.  This entire litigation is an attack on a set of "private agreement[s] between business partners" and Plaintiffs would be the first to complain if Defendants tried to argue that the NEA is *less* than the agreements make it out to be.  The NEA Agreements *in toto* are the alleged "contract[s] … in restraint of trade" violating Section 1 of the Sherman Act, 15 U.S.C. § 1.  They must be the focus of the Court's analysis.

If the concern is that the carve-outs are not in a "public" agreement, DOJ has no one but itself to blame.  Defendants and the DOT were including the carve-out requirements in the DOT Agreement until DOJ interfered.  *See supra*, Background Section.

### C.   The Carve-out Routes May Not be Excluded Under Rule 403

Plaintiffs' arguments that evidence of the Carve-out Routes would be confusing, misleading, and would waste trial time are meritless.  First, Plaintiffs have not even seriously tried to meet the standards for exclusion under Rule 403.  Instead, Plaintiffs ask this Court to pre-judge that the carve-out provisions have no effect and for a holding that it is proper for the Carve-out Routes to be analyzed in precisely the same manner as every other route within the scope of the NEA.  And they make this ask notwithstanding their expert's acknowledgment that the sole basis for his use of a merger simulation (to analyze this non-merger) are the provisions that Plaintiffs concede are not applicable to the Carve-out Routes.  There is nothing confusing or misleading about the Carve-out Routes, and it would not be a waste of time for this Court to understand how the Carve-out Routes (among many other things) highlight the glaring inconsistencies and flaws in Plaintiffs' analysis.

Plaintiffs' second Rule 403 argument asks this Court to, in effect, grant them summary judgment on the point that the Carve-out Routes are illusory and that American and JetBlue at some point will decide to change their agreement or simply to allocate markets amongst themselves.  That is an improper use of a motion *in limine*.  In all events, Plaintiffs do not cite any evidence that anyone at either carrier has ever contemplated this "bait and switch" strategy nor do they explain why DOJ or DOT would be unable to take action if the Parties did do so.  Indeed, amply illustrating why merits issues should not be decided in the context of a motion *in limine* is Plaintiffs' half-truth about JetBlue's "exit" from Boston-Rochester.   JetBlue temporarily suspended that route due to a combination of low demand and operational challenges that magnified the pilot shortages that have been plaguing the industry.  JetBlue is restarting Boston-Rochester in February.  Either way, if Plaintiffs want to try to prove that the carve-out provisions

are illusory, that is their decision to try to do so, but they cannot establish that as a matter of undisputed fact through the guise of a motion *in limine*.

In addition, Rule 403 is designed to protect a *jury* from having to consider and weigh evidence that might confuse or prejudice them, and, as such, "Rule 403 has no application where the court sits as both trier of fact and law." *Miller v. City of Cincinnati*, 709 F. Supp. 2d 605, 620 (S.D. Ohio 2008), *aff'd*, 622 F.3d 524 (6th Cir. 2010) (internal citations omitted); *see also U.S.* v. *Cameron*, 729 F. Supp.2d 411, 415–16 & n. 3 (D. Me. 2010) (quoting *Gulf States Utils.. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981) for the proposition that "excluding relevant evidence on the basis of 'unfair prejudice' is a useless procedure" in a bench trial because "[r]ule 403 assumes a trial judge is able to discern and weigh the proper inferences, and then balance those improprieties against probative value and necessity" (internal quotation marks omitted)).

## IV.   CONCLUSION

Defendants respectfully request that the Court deny in its entirety Plaintiffs' motion to exclude evidence and testimony regarding the Carve-out Routes.  In the alternative, Defendants respectfully request that the Court reserve ruling on Plaintiffs' motion so that the Court may consider the admissibility question after hearing the testimony.

Dated:  September 9, 2022

Respectfully submitted,

/s/ Daniel M. Wall
Daniel M. Wall (pro hac vice)
Elizabeth C. Gettinger (pro hac vice)
Elise M. Nelson (pro hac vice)
Nitesh Daryanani (pro hac vice)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
dan.wall@lw.com
elizabeth.gettinger@lw.com
elise.nelson@lw.com
nitesh.daryanani@lw.com

Ian R. Conner (pro hac vice)
Michael G. Egge (pro hac vice)
Farrell J. Malone (pro hac vice)
Allyson M. Maltas (pro hac vice)
Marguerite M. Sullivan (pro hac vice)
Tara L. Tavernia (pro hac vice)
Seung Wan Paik (pro hac vice)
Jesse A. Vella (pro hac vice)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
ian.conner@lw.com
michael.egge@lw.com
farrell.malone@lw.com
allyson.maltas@lw.com
marguerite.sullivan@lw.com
andrew.paik@lw.com
tara.tavernia@lw.com
jesse.vella@lw.com

David C. Tolley (BBO #676222)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
david.tolley@lw.com

*Attorneys for Defendant American Airlines
Group Inc.*

/s/ Richard Schwed
Richard Schwed (pro hac vice)
Matthew L. Craner (pro hac vice)
Jessica K. Delbaum (pro hac vice)
Leila Siddiky (pro hac vice)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-5445
rschwed@shearman.com
matthew.craner@shearman.com
jessica.delbaum@shearman.com
leila.siddiky@shearman.com

Brian Hauser (pro hac vice)
Ryan Leske (pro hac vice)
Shearman & Sterling LLP
401 9th Street, NW
Washington, DC 20004
Telephone: (202) 508-8005
brian.hauser@shearman.com
ryan.leske@shearman.com

Glenn A. MacKinlay, BBO #561708
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
Telephone: (617) 449-6548
gmackinlay@mccarter.com

*Attorneys for Defendant JetBlue Airways
Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.

<u>/s/ Daniel M. Wall</u>
Daniel M. Wall