# Exhibit E

**Plaintiffs' Position Statement on Evidentiary Disputes**

**I.     Defendants' Relevance Objections to Plaintiffs' Exhibits**

Through shotgun-style relevance objections to more than 100 exhibits, Defendants seek

to shield from the record American's long history of attempts to consolidate the airline industry

through acquisitions and partnerships—and JetBlue's equally long history of criticizing those

efforts—as well as other core aspects of this case. These objections implicate some of

Defendants' key business documents over the course of several years, which they now seek to

exclude from playing any role in this case. Defendants' myopic view of relevance runs afoul of

First Circuit law. Below, Plaintiffs address four categories of exhibits, concerning: (1) capacity

discipline and industry coordination; (2) airline partnerships; (3) competition between

Defendants before they formed the Northeast Alliance ("NEA"); and (4) the impact of low-cost

carriers ("LCCs") and the JetBlue Effect. Each category provides relevant information on the

disputes at issue. Plaintiffs respectfully request that the Court overrule these objections.

**A.     Legal Standard for Relevance**

Just two months ago, the First Circuit reiterated the well-established rule that "Rule 401

'set[s] a very low bar for relevance.'" *Gonpo v. Sonam's Stonewalls & Art, LLC*, 41 F.4th 1, 14

(1st Cir. 2022) (alteration in original). Evidence clears this "very low bar" if it "'move[s] the

inquiry forward to some degree' on a fact of consequence," determined "in light of the

underlying substantive law," *Franchina v. City of Providence*, 881 F.3d 32, 49 (1st Cir. 2018)

(describing relevance objections as a "rather tough sell"). Such principles carry even greater

force in a bench trial, where the Court can give evidence its due weight. *See, e.g.*, *De La Rosa v.*

*650 Sixth Ave Trevi LLC*, 2019 WL 6245408, at *4 (S.D.N.Y. Nov. 22, 2019) ("[C]ourts often

apply the relevance standard with little rigor during a bench trial."). Here, Defendants' relevance

1

objections are a baseless proxy fight over the weight of the evidence.

### B.    Capacity Discipline and Industry Coordination

The exhibits that Defendants seek to prevent the Court from considering paint a picture of the relationship between airfares, the number of seats airlines fly, and industry consolidation over time. Industry participants, led by American's current executives, keenly understand the tight relationship between capacity, measured by available seats per mile, and pricing—more capacity equals lower prices. *See, e.g.*, PX0344, at -112[1] (Derek Kerr, current American CFO: "Capacity discipline . . . has been the major thing why . . . we have been able to increase [revenue per unit of capacity] over time."); PX0015, at -460 (U.S. Airways presentation quoting analyst statement that American's "plan to grow 20% over 5 years is toxic to industry pricing"). Legacy mergers have enabled these airlines to collectively restrain capacity growth—efforts that airline executives and industry analysts described as "capacity discipline." PX0012, at -024 (American presentation: "The industry has shown capacity discipline due to consolidation and fuel price volatility."). As Doug Parker, American's recently retired CEO and current Chairman of the Board, warned American's board of directors in 2015, "[C]apacity coming on in excess of demand leads to lower prices . . . ." PX0039, at -639.

Defendants seek to exclude these statements because they predate the NEA.[2] At trial, Defendants can argue that they have changed their ways, but these exhibits are plainly relevant. First, evidence of the airline industry's susceptibility to coordination implicates the risk the NEA creates for future coordination. *See, e.g.*, *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 60 (D.D.C. 2009) ("Whether a merger will make coordinated interaction more likely depends 'on

---

[1] The Appendix contains exhibit excerpts in order of appearance. Pincites refer to the Bates stamp on the cited page.
[2] Defendants have not indicated on what specific date they contend relevance rises or falls. Regardless, antitrust analysis is flexible and not so limited. *See, e.g.*, *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 78 (D.D.C. 2011) (as to coordinated effects, pointing to "highly persuasive historical act" from 6-8 years before the merger).

whether market conditions, on the whole, are conducive to reaching terms of coordination and detecting and punishing deviations from those terms.'"). Second, a trend towards concentration is relevant to the assessment of the anticompetitive consequences of industry participants' conduct. *Brown Shoe Co. v. United States*, 370 U.S. 294, 332 (1962). Finally, intent evidence reveals the conduct's likely consequences and belies Defendants' purported procompetitive justifications. *See, e.g.*, *Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) ("[K]nowledge of intent may help the court to interpret facts and predict consequences."). Each of these bases supports admission of Plaintiffs' exhibits.

### C.    Airline Partnerships

American and JetBlue have previously acknowledged the unprecedented nature and anticompetitive effects of an agreement with features like the NEA's. Several exhibits to which Defendants now object on relevance grounds contain their recent analyses on the potential impact of such agreements. For example, in 2018, American told the United States Department of Transportation that "[n]o airline has engaged in a revenue-pooling JBA [Joint Business Agreement] with a partner airline that operates overlapping services"—as American and JetBlue now propose—absent a grant of antitrust immunity because of the "significant risk of antitrust litigation." PX0277, at -574. That same year, JetBlue's CEO Robin Hayes explained another airline would not partner with JetBlue due to fears of retaliation from American, PX0718, at -099—accommodating behavior Plaintiffs have alleged would result from the NEA. This evidence informs the NEA's likely anticompetitive consequences, an element of Plaintiffs' case.

### D.    Pre-NEA Competition

Several exhibits to which Defendants object illustrate their competition pre-NEA. Yet Defendants speciously contend that such evidence of competition on routes subject to the NEA is

irrelevant to whether the NEA eliminates competition, when their own documents show them, among other things, responding to each other's aggressive discounts to win market share. *See* PX0678, at -595 (discussion of head-to-head bidding related to a corporate customer). The apparent basis for their position is that such evidence dates to early 2018—even though it concerns future business and occurred just two years before the NEA was signed. Defendants' arbitrary line conflicts with antitrust precedent. *See United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 216 (D.D.C. 2017) ("Relevant evidence of a merger's potential unilateral effects include . . . the history of head-to-head competition between the two merging parties."); *id.* at 216–18 (analyzing evidence from 5-6 years before proposed merger). In addition, the COVID-19 pandemic interrupted normal competitive dynamics in 2020; sustaining Defendants' objection would restrict evidence of competition to a single year prior to the pandemic.

### E.     LCC Competition and the JetBlue Effect

Defendants object to exhibits with statements about the importance of competition from LCCs, and from JetBlue in particular. PX0422, at -464 (LCCs are the "primary determinant of prices in the U.S. domestic airline industry."); PX0716, at -058 (showing JetBlue has more "core amenities" than other LCCs, including Southwest). Such evidence is relevant because "elimination of a particularly aggressive competitor," like JetBlue, increases the likelihood of anticompetitive effects. *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 43 (D.D.C. 2017).

## II.    Defendants' Authenticity Objections to Plaintiffs' Exhibits

In discovery, Defendants demanded that Plaintiffs search their files and produce thousands of documents from prior investigations relating to airlines—which Defendants themselves identified. These included documents that American (or its predecessor, U.S. Airways) had produced in prior investigations. *See, e.g.*, PX0912 (email thread and attachment

between American executives from December 2012); PX0011 (email thread involving Doug Parker discussing airline slots at Reagan National Airport). All of these documents came from files compiled by Plaintiffs in their investigative capacities, and almost all were produced by American or other airlines in response to compulsory or voluntary process. Unsurprisingly, documents from these very same investigations also appear on Defendants' exhibit list.

What is surprising, however, is that Defendants now seek to exclude 39 such exhibits on Plaintiffs' list on authenticity grounds, even though "[t]he burden imposed by Rule 901 is a relatively modest one." *Echavarria v. Roach*, 2022 WL 1473604, at *6 (D. Mass. May 10, 2022) ("The proponent need only 'produce evidence sufficient to support a finding that the item is what the proponent claims it is.'"). Plaintiffs easily satisfy this "modest" requirement.

First, these documents were produced originally, and have been reproduced, with Bates labels from the original producing party, which "permit[s] the court to authenticate under Federal Rule of Evidence Rule 901(b)(4)." *Young v. Cate*, 2013 WL 684450, at *3 (E.D. Cal. Feb. 22, 2013). This includes 20 exhibits produced from Defendants' *own* files in prior investigations and a further 16 obtained by Plaintiffs in response to compulsory or voluntary process. Indeed, Plaintiffs produced in this litigation the original letters *from Defendants* showing that Defendants produced to DOJ the very same documents that they now challenge on authenticity grounds. *See, e.g.*, AA-AAUS-00000299 (May 7, 2013 letter from U.S. Airways, covering production of the Bates range including PX0010). Second, objections to three exhibits involving communications from senior American executives who will testify at trial can be dismissed because the witnesses have "knowledge" that the "item is what it is claimed to be." *See* Fed. R. Evid. 901(b)(1); (PX0008, PX0011, PX0012). In sum, more than sufficient evidence establishes that the exhibits to which Defendants object are what Plaintiffs claim them to be. Fed. R. Civ. P. 901(a).

# Appendix

# EXHIBIT 170

PLAINTIFFS EXHIBIT
PX0344
1:21-CV-11558

## Thomson StreetEvents℠

### LCC - US Airways Group Inc at Rodman & Renshaw LLC Airline Conference

Event Date/Time: Dec. 06. 2011 / 2:55PM GMT

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2011 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by
framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the
Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



Confidential

Highly Confidential Pursuant to Court's Default PO

AA-CAPMDL-0008407969

AA-NEA-02515111

Dec. 06. 2011 / 2:55PM, LCC – US Airways Group Inc at Rodman & Renshaw LLC Airline Conference

## CORPORATE PARTICIPANTS

**Derek Kerr**
*US Airways Group, Inc. – EVP & CFO*

## CONFERENCE CALL PARTICIPANTS

**Dan McKenzie**
*Rodman & Renshaw – Analyst*

## PRESENTATION

**Dan McKenzie** - *Rodman & Renshaw - Analyst*

Good morning once again. Welcome back. Next up is -- next presenting is US Airways and speaking for US Airways in Derek Kerr, Executive Vice President and Chief Financial Officer. He is responsible for US Airways corporate finance, financial planning and analysis, accounting, information technology, purchasing, and investor relations functions. Joining Derek is Dan Craven, Managing Director of Investor Relations for US Airways. Without further ado, please welcome Derek Kerr.

---

**Derek Kerr** - *US Airways Group, Inc. - EVP & CFO*

Thanks, Dan, and thanks for having us here. All right, forward-looking statement; you guys all have that. Just all the stuff in here; I will let you read that.

What I really want to do is spend some time going through the industry. I think a lot of you have probably seen this presentation before. There is not a lot new, but I think it really tells the story of why the industry has changed over time and why things have gotten better; where the industry is not back to where it needs to be or is not where it needs to be, but it's getting much more healthy due to a lot of things we have had to do over 2007 and 2008.

Consolidation has played a major role in this and we will talk a little bit about that. Capacity discipline and continued capacity discipline, which we are seeing within the industry, and then the ancillary revenues that I believe are here to stay for a long time.

We have this year been able to pass through a lot of the fuel price increases so we are an industry that lost a lot of money back in 2008 at a high fuel price and now it looks to be a lot more stable in that environment and possibly making money through this year. I think we are well-positioned in that environment to succeed.

Key thing in this industry has been consolidation. You know we have been a proponent of consolidation since 2005. We have gone from 12 major airlines with 1% of the traffic down to seven major airlines.

You can see that, it's a significant change and the ability to -- pricing power and the ability to take out capacity by consolidation. So this has been the first step, we have talked about this all along. Four major mergers since 2005 and possibly room for more as we move forward to make the industry a little bit healthier.

Capacity discipline, this has been the major thing why the RASM is where it is and why we have been able to increase RASM over time. We have been down 18% since 2005, since the merger. Other network carriers right around that at about 18%. The industry down over 7%.

This is unprecedented. We haven't seen this in a long time. The low-cost carriers are growing, but are a much smaller portion of the overall pie than the network carriers. They continue to grow a little bit, most of that is JetBlue and Spirit. Southwest you

**1**

©2011 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

 **THOMSON REUTERS**

Confidential

Highly Confidential Pursuant to Court's Default PO

AA-CAPMDL-0008407970

AA-NEA-02515112

# *US Airways – American Airlines*
## A Request for a Level Playing Field

**PLAINTIFFS EXHIBIT**

**PX0015**

1:21-CV-11558

1

Based on Public Information   U·S AIRWAYS

AAJB–DUMMY–00058530
AA-AAUS-00030421

# *Appendix*

**38**

Based on Public Information   US AIRWAYS

US AIRWAYS CONFIDENTIAL

4(c) – 103

AA-JB-DUMMY-00058567
AA-AAUS-0003D458

# What People Are Saying – Timing: Why Merge Now?

"My problem is when American showed me [their standalone] business plan: there is nothing new, except that they are going to bring the more premier passengers back on American. How are they going to do that? You don't think United is going to try to do that? Other carriers are, so I asked them, 'what are you going to do differently?' 'We're going to continue doing what we're doing, because we do it well.' Bad answer. You can't continue doing things the way you're doing. You've got to look at things differently. The [US Airways] model that I saw made a tremendous amount of sense and I haven't seen a downside to this."

  – JIM LITTLE, INTERNATIONAL PRESIDENT, TRANSPORT WORKERS UNION (6/18/12)

"I don't know anybody who's looked at it from 30,000 feet that would tell you that they think the standalone scenario is superior. [AMR] has not competed well when it was going from No. 1 to No. 2 now to the third position, and I don't see how a standalone would solve that, especially with this 'shrink and then re-grow' strategy they are doing."

  – ROBERT W. MANN, AIRLINE ANALYST, R.W. MANN & COMPANY (06/07/12)

"AMR's standalone plan contradicts itself, in our view. Just this afternoon AMR's restructuring adviser said AMR would consider a merger because management's fiduciary duty involves "maximizing stakeholder value." If that's true then why not explore one now? Is labor not a stakeholder? Even in a post-BK merger with LCC, wouldn't AMR standalone have to reset wages higher? To us this feels more about self-preservation than maximizing stakeholder value, which an LCC bid would seem to do."

  – HUNTER KEAY, SENIOR AIRLINE ANALYST, WOLFE TRAHAN &CO. (4/25/12)

"Looking ahead, AMR's plan to grow 20% over 5 years is toxic to industry pricing, which makes it bad for AMR & the industry in our view. Ultimately, AMR suffers a billion dollar plus revenue deficit to the industry & creditors must decide which is the stronger revenue model: AMR standalone? Or AMR/LCC combined? The network muscle AMR would inherit to support domestic & int'l flying makes it an open and closed case in favor of LCC in our view."

  – DAN MCKENZIE, ANALYST, RODMAN & RENSHAW (4/20/12)

"If they merge in bankruptcy, they can keep the extra value inside... The airline could invest in the company and in making labor happy."

  – VAUGHN CORDLE, ANALYST, AIRLINEFORECASTS LLC  (4/20/12)

**40**  US Airways does not, by its reference to or distribution of these statements, imply its endorsement of or concurrence with the opinions, conclusions or recommendations quoted above.  **Based on Public Information**  US AIRWAYS

AAJB-DUMMY-00058569
AA-AAUS-00030460

| | |
|---|---|
| **From:** | Ela, David [David.Ela@aa.com] |
| **Sent:** | Wednesday, January 25, 2012 3:25 PM |
| **To:** | Casey, Don; Overbeek, Brent; Parsons, Elizabeth; Agarwal, Yogesh |
| **Subject:** | 2012 Revenue Plan Slides (Revised) |
| **Attachments:** | 2012 Revenue Plan - All Slides v3.pdf; 2012 Revenue Plan - All Slides.pptx; Backup to Revenue Forecast.pdf |

Per yesterday's conversation, I re-ran our Consolidated regression model including B6 with OA capacity. This new model significantly lowers the discrepancy between the Revenue Plans and the Consolidated model, as it predicts PRASM growth more accurately. For example, after applying the assumptions from the 2012 Revenue Plan, the new model forecasts 2012 Consolidated PRASM growth of 4.3% (versus 4.4% from the Revenue Plans). The new model "plug" has been lowered to $34M (i.e. that which the model does not explain).

Our 2012 revenue and PRASM are unchanged at $21,897M and 13.06, respectively, with yr/yr PRASM growth of 6.0%.

The independent variables are all statistically significant, and the model's $R^2$ increases from 0.85 to 0.86. See slide 23 in the first attachment for details. I have updated the relevant slides in the presentation to reflect the coefficients and statistical summary of the revised model.

**From:** Ela, David
**Sent:** Wednesday, January 25, 2012 12:18 PM
**To:** Casey, Don; Overbeek, Brent; Parsons, Elizabeth; Agarwal, Yogesh
**Subject:** 2012 Revenue Plan Slides (Revised)

I have attached the revised version of the 2012 Revenue Plan slides. I modified slide 10 to also include PRASM growth in 4Q11 without the AAdvantage adjustment.

I have also attached a copy of the crib slides we developed for the 2013-2017 plan.

-David

1

PENGAD 800-631-6989

**EXHIBIT**

36

Casey

**PLAINTIFFS EXHIBIT**
**PX0012**
**1:21-CV-11558**

CONFIDENTIAL

AA-SR-00075550

AA-AAUS-00023012

CONFIDENTIAL

# 2012 Revenue Plan

AMR Consolidated Forecast

1/25/2012



**AmericanAirlines®**

AA-AAUS-00023013

AA-SR-00075551

CONFIDENTIAL

# Executive Summary

- The industry has shown capacity discipline due to consolidation and fuel price volatility
  - We expect continued restraint by U.S. carriers in adding capacity
  - WN indicated no planned capacity growth for 2012 in its 4Q2011 earnings call

- Low cost carriers like WN are facing increased cost pressure and must improve revenue performance to maintain margin performance
  - Running historically high load factors leaves little room to improve revenue performance without increasing yields

- Increases in fares by WN allows other carriers to increase fares in markets where WN operates and typically sets the low end of fares

12                                                                    **AmericanAirlines**

AA-AAUS-00023024          AA-SR-00075562

CONFIDENTIAL

# Consolidation and Fuel Price

- Industry consolidation and ongoing fuel price volatility has largely kept capacity discipline intact - CAGR (0.1%) in the last 6 years



**AmericanAirlines**

AA-AAUS-00023025          AA-SR-00075563

.

| **From:** | Parker, Doug |
| **Sent:** | Wednesday, May 20, 2015 11:29 PM |
| **To:** | Alberto Ibarguen; Jim Albaugh; Ray Robinson; Mr. John T. Cahill; Rick Schifter; Michael Embler; Jeff Benjamin; Rich Kraemer; Denise O'Leary; Matthew J. Hart |
| **Cc:** | Kirby, Scott; Kerr, Derek J.; Isom, Robert D.; Johnson, Stephen L.; Eberwein, Elise R.; Leibman, Maya; Goulet, Beverly; Ris, Will; Wimberly, Kenneth; Ray, Caroline |
| **Subject:** | update |

I wanted to give you an update on a few items:

-   Our stock, along with all airlines, traded off pretty big today.  American and United were down 10%, Southwest 9%, and Delta, JetBlue, Alaska and Spirit were down 5-6%.  The sell-off is being attributed to a number of factors including comments made by Scott and me yesterday in New York.  This was no concerted tag-team effort, just coincidence. Scott was speaking at an investor conference; I was on a quick media run to NYT, Bloomberg and CNBC at the request of Corporate Communications.  Scott and I separately but consistently described the current revenue outlook as troubling, due to projected industry capacity additions that exceeded any forecast of demand growth.  The capacity announcements were already public (Southwest actually bumped up their 2106 growth projections from 7% to 8% yesterday) yet the market hadn't seemed to make the connection that supply>demand= falling RASM and that falling RASM=lower margins unless there is some corresponding decline in CASM (which no one foresees – fuel is forecast to be higher).  We each also made the corollary point that capacity coming on in excess of demand leads to lower prices and that American would match those lower prices.  While the capacity growth information was already public, it seems the logical conclusion that it would affect margins somehow had not fully sunk in, so our factual representations may have been news to some.  There were other factors that may have played a larger role -- Southwest did raise their growth forecast and oil prices were up today -- but there has been written speculation that our comments played a role so I thought you would be appreciate  the details.
-   I filed a 10b5-1 stock sales plan today.  I have 1.2 million options that were issued by US Airways between 2006-2009 and which expire between now and April 2016.  The plan will sell 113k options each month for eleven months, with the first sale occurring on June 22.  There is no disclosure required for the plan being filed, so the first required disclosure would be two days after the sale on June 22.  We want to alert employees to the situation, though, so sometime in the next couple of weeks we intend to issue an internal communication and file that as an 8-K. While this won't be great news to communicate to the team, we believe the combination of an introductory overview followed by a very regular series of sales is the best approach.  The recent announcement of my compensation moving to all equity will help also.
-   All else is well.  When we aren't having severe thunderstorms in DFW, we are running a pretty good airline.  Our integration efforts continue on track – we had a hiccup on an integrated voice response (IVR) integration yesterday that caused disruption to our reservations call centers, but the team pulled together well and got the phones back up.  We received good news on the labor front this week – the NMB certified the TWU/IAM alliance so we now have a collective bargaining agent representing our mechanics and fleet service clerks.

**PLAINTIFFS EXHIBIT**

**PX0039**

**1:21-CV-11558**

AA-CID-0000205639

Let me or any member of the team know if you have any questions or comments.  Thanks.

dp

NOTICE: This email and any attachments are for the exclusive and confidential use of the intended recipient(s). If you are not an intended recipient, please do not read, distribute, or take action in reliance upon this message. If you have received this in error, please notify me immediately by return email and promptly delete this message and its attachments from your computer.

**CONFIDENTIAL**

**AA-CID-0000205640**

**BEFORE THE**
**U.S. DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| Joint Application of | |
| AMERICAN AIRLINES, INC. | |
| and | Docket DOT-OST-2018-0030- |
| QANTAS AIRWAYS LIMITED | |
| under 49 U.S.C. §§ 41308 and 41309 for approval of and antitrust immunity for proposed joint business agreement | |

## CONFIDENTIAL
## RESPONSE TO ORDER REQUESTING ADDITIONAL INFORMATION

American Airlines, Inc. and Qantas Airways Limited (together, the "Parties") hereby

submit their Joint Response to the Department of Transportation's June 13, 2018 Order

Requesting Additional Information. **The Parties adopt and incorporate by reference the**

**Joint Motion for Confidential Treatment filed on February 26, 2018, in this proceeding.**

Accordingly, the Parties request that the enclosed Confidential Joint Response and its associated

confidential appendices receive maximum confidentiality protection under all applicable rules

and regulations, including the DOT Rules of Conduct and applicable exemptions from the

Freedom of Information Act. This Joint Response is also available—via an online site hosted by

American—to interested parties who file confidentiality affidavits with the Department. A

redacted version of this Joint Response has been filed on the public docket.

PLAINTIFFS EXHIBIT
**PX0277**
1:21-CV-11558

AA QF Joint Response
<u>CONFIDENTIAL</u>

**BEFORE THE**
**U.S. DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| Joint Application of<br><br>AMERICAN AIRLINES, INC.<br><br>and<br><br>QANTAS AIRWAYS LIMITED<br><br>under 49 U.S.C. §§ 41308 and 41309 for approval<br>of and antitrust immunity for proposed joint<br>business agreement | Docket DOT-OST-2018-0030- |

**<u>RESPONSE TO ORDER REQUESTING ADDITIONAL INFORMATION</u>**

Communications with respect to this document should be addressed to:

For American Airlines:

Stephen L. Johnson
  Executive Vice President – Corporate Affairs
R. Bruce Wark
  Vice President and Deputy General Counsel
Robert A. Wirick
  Managing Director – Regulatory and
  International Affairs
James K. Kaleigh
  Senior Antitrust Attorney
AMERICAN AIRLINES, INC.
4333 Amon Carter Blvd.
Fort Worth, Texas 76155
(817) 963-1234
*bruce.wark@aa.com*
*james.kaleigh@aa.com*

For Qantas Airways:

Andrew J. Finch
  General Counsel and Company Secretary
Anna R. Pritchard
  Head of Legal and Assistant Company
  Secretary
QANTAS AIRWAYS LIMITED
QCA1, 10 Bourke Road
Mascot NSW 2020
+61 (02) 9691-3636
*andrewfinch@qantas.com.au*
*annapritchard@qantas.com.au*

Dated:  August 29, 2018

AA QF Joint Response
CONFIDENTIAL

**BEFORE THE**
**U.S. DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

Joint Application of

AMERICAN AIRLINES, INC.

and                                                                 Docket DOT-OST-2018-0030-

QANTAS AIRWAYS LIMITED

under 49 U.S.C. §§ 41308 and 41309 for approval
of and antitrust immunity for proposed joint
business agreement

**RESPONSE TO ORDER REQUESTING ADDITIONAL INFORMATION**

American Airlines, Inc. ("American") and Qantas Airways Limited ("Qantas") provide

the following information in response to the Department of Transportation's ("Department's")

June 13, 2018 Order Requesting Additional Information ("Request").

                    *              *              *

**OVERVIEW**

The Proposed Joint Business ("Proposed JBA") integrates Qantas' Australasian route

network with American's U.S. network, significantly increasing connectivity and resulting in

consumer benefits that are conservatively estimated at up to $310 million annually.[1]  This

estimate is conservative because it does not account for the additional benefits unlocked by the

close coordination made possible only by a grant of ATI, including improved scheduling to

---

[1] *See* Application, Summary and Section II.A.

1

Finally, the Department has repeatedly recognized the very significant consumer benefits of revenue-pooling JBAs, finding that they give the partners "common incentives to promote the success of the alliance over [their] individual corporate interests" and thereby allow them "to achieve merger-like efficiencies and deliver public benefits that would not otherwise be possible" because of national laws that prevent mergers between carriers from two different countries.[18] Consistent with this, the Department has granted ATI to at least ten similar relationships in the past two decades.[19]

The Department's Request tests these conclusions by asking the Parties to address three possible scenarios, summarized below and in Appendix 1:

Scenario 1:   Parties proceeding in a "non-immunized joint business" ("Scenario 1"), presumably with revenue-pooling.[20]

Scenario 2:   Parties working together "within the guidelines of their membership in the **one**world Alliance" ("Scenario 2"). **one**world is a marketing alliance that does not require or incentivize any codesharing[21] or any investments in sales and revenue management coordination beyond minimal coordination of services such as frequent flyer, lounge access, and customer service.

---

[18] *See* Continental-United-Air Canada-Austrian-bmi-Brussels-LOT-Lufthansa-SAS-TAP, DOT-OST-2008-0234, Show Cause Order 2009-4-5, at 4, 19.

[19] *See, e.g.*, American-British Airways-Finnair-Iberia-Royal Jordanian, DOT-OST-2008-0252, Final Order 2010-7-8; American-Japan Airlines, DOT-OST-2010-0059, Final Order 2010-11-10; Delta-Aeromexico, DOT-OST-2015-0070, Final order 2016-12-13; Delta-Northwest-Air France/KLM-Alitalia-Czech Airlines, DOT-OST-2007-28644, Final Order 2008-5-32; Delta-Korean Air, DOT-OST-2002-11842, Final Order 2002-6-18; Delta-Virgin Australia, DOT-OST-2009-0155, Final Order 2011-6-9; Delta-Virgin Atlantic, DOT-OST-2013-0068, Final Order 2013-9-14; United-Brussels-Lufthansa-Air Canada-SAS-Austrian-BMI-LOT-Swiss-TAP, DOT-OST-2008-0234, Final Order 2009-7-10; United-ANA, DOT-OST-2010-0059, Final Order 2010-11-10; United-Air New Zealand, DOT-OST-1999-6680, Final Order 2001-4-2.

[20] A non-immunized, revenue-pooling joint business is different from the level of cooperation that existed between the Parties when they initially established their JBA in 2011 without ATI (which did not entail revenue pooling). As explained below, either way Scenario 1 is very unlikely, if not impossible, absent ATI.

[21] In 2017, for example, American cancelled its codeshare agreement with **one**world member Qatar Airways.

7

Scenario 3:   Parties proceeding at the level of cooperation "similar to that since the November
2016 Show Cause Order (SCO)" ("Scenario 3"). In this interim period, the Parties
are currently seeking to preserve what they can of the relationship and continue to
anticipate a grant of ATI.[22]

If ATI is denied, Scenario 2 is the *only* scenario that is likely to occur – where the Parties
remain **one**world members, open to negotiating some minimal level of codesharing, but without
any incentive to engage in broader cooperation or codesharing in the way possible in an
immunized JBA. Specifically:

Scenario 1 (a non-immunized, revenue-pooling JBA) will not occur without ATI.[23] The
Department recognizes that integrated, pro-competitive JBAs require ATI because they involve
revenue and benefit-sharing arrangements that expose airlines to significant risk of antitrust
litigation, including the risk of liability to treble damages.[24] Even where claims would ultimately
be defeated, recurring risk of liability, litigation costs, and ongoing business disruption operate as
an absolute deterrent to any JBA without ATI. In many cases it is ultimately more efficient to
settle even non-meritorious claims, meaning that it is simply too great a risk to implement
revenue-pooling without ATI. No airline has engaged in a revenue-pooling JBA with a partner
airline that operates overlapping services absent the Department's grant of ATI and the Parties
would not do so here if ATI is denied.[25]

---

[22] *See* QF codeshare contract, Dec. 21, 2016, AA QF 000885 (American's internal e-mail describing a new codeshare agreement with Qantas as a "keep the lights on" agreement).

[23] If the Department instead intended Scenario 1 to be the level of cooperation between the Parties in 2011 (non-immunized but also not revenue-pooling), this level of cooperation is not possible today (or if ATI is denied) because the Parties now have competing trunk route services. The incentive for each Party to favor their own service (metal) will cause the cooperation to unravel. *See* Application, Section I.A; *see also* infra footnote 25.

[24] *See* American-British Airways-Finnair-Iberia-Royal Jordanian, DOT-OST-2008-0252, Show Cause Order 2010-2-8, at 35-36.

[25] The Parties did have a non-immunized JBA in 2011, as referenced in Appendix 1. The Parties had sought ATI for their 2011 JBA, but the Department indicated that ATI would not be available because American, at the time, did not offer service to Australasia. As indicated in the Parties' 2011 Joint Application for approval of that JBA, the

8

AA QF Joint Response
CONFIDENTIAL

Scenario 3, referring to the level of cooperation between the Parties today in the wake of the Department's November 2016 SCO, is also unlikely because it is not sustainable if ATI is denied (*see* Application, Section II.D.). Prior to the SCO, the Parties had made strides both in terms of network integration and enhancing cooperation because (1) from 2011 to December 2015, American did not fly any competing long-haul flights from the United States to Australasia and (2) the Parties acted under the assumption that the Department will eventually grant ATI and approve the Proposed JBA. Following the SCO, Qantas removed its code from American's LAX-SYD flight and American removed its code from Qantas' DFW-SYD and LAX-SYD flights. American also removed its code from Qantas' "tag" routes from Sydney, Melbourne, and Brisbane, with service to New York (with a stop in Los Angeles). As shown below, more than 90,000 passengers utilized these options that were eliminated in the wake of the SCO.

Table A.2: Number Of Passengers Affected By The SCO

| Segment | Operating Carrier | Marketing Carrier | Actual # Passengers in 2016 |
|---|---|---|---|
| LAX-SYD | AA | QF | 48,759 |
| SYD-DFW | QF | AA | 30,744 |
| SYD-LAX* | QF | AA | 11,526 |
| Tag Routes** | QF | AA | 303 |
| **Total** | - | - | **93,066** |

*SYD-LAX includes passengers flying SYD-LAX-JFK operated by QF and marketed by AA
**Tag routes include routes from SYD, MEL, and BNE to JFK with a stop in LAX

The reduction of feed support from Qantas' codesharing on American's long-haul flights forced American to down-gauge its LAX-SYD flight to a smaller aircraft (American also

---

JBA was premised on the "existing lack of competition between American and Qantas and the inability of American to operate its own service to the South Pacific (Australia and New Zealand)." American-Qantas Joint Application, DOT-OST-2011-0111-0001. Now that the Parties both operate service to Australasia, the Parties will not implement the Proposed JBA if ATI is denied.

9

AA-NEA-01479575

# PX0718

Leave to File Under Seal Requested

# PX0678

Leave to File Under Seal Requested

13-01392-shl    Doc 142    Filed 05/12/17    Entered 05/12/17 23:09:19    Main Document
Pg 1 of 16

LATHAM & WATKINS LLP
    Daniel M. Wall (admitted *pro hac vice*)
    Sadik Huseny (admitted *pro hac vice*)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

HEARING DATE & TIME:  TBD
OBJECTION DEADLINE:  06/09/2017

*Attorneys for Defendant Merged Entity*
*American Airlines Group Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
**In re**                                                 :
                                                          :    **Case No. 11-15463-SHL**
                                                          :
**AMR CORPORATION, *et al.*,**                            :    **Chapter 11**
                                                          :
                              **Debtors.**                :    **(Jointly Administered)**
-------------------------------------------------------------x
-------------------------------------------------------------x
**CAROLYN FJORD, *et al.*,**                              :    **Adversary No. 13-01392-SHL**
                              **Plaintiffs,**             :
            **vs.**                                       :
                                                          :
**AMR CORPORATION, *et al.*,**                            :
                                                          :
                              **Defendants,**             :
-------------------------------------------------------------x

**DEFENDANT AMERICAN AIRLINES GROUP INC.'S STATEMENT OF**
**UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**PLAINTIFFS EXHIBIT**
**PX0422**
**1:21-CV-11558**

DOJ-NEA-00000450

Pursuant to Local Rule 7056-1(b) of the United States Bankruptcy Court for the Southern

District of New York, Defendants AMR Corporation, American Airlines, Inc., US Airways

Group, Inc., and US Airways, Inc. (now merged as American Airlines Group Inc.)

("Defendants") respectfully set forth below material facts as to which they contend there is no

genuine issue to be tried.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### *Background on Defendants*

1.      American Airlines Group Inc. ("AAG") is a publicly traded airline holding

company. Pls.' First Am. Compl. ("FAC") ¶ 22, Adv. Dkt. 103. Its wholly-owned subsidiaries

include American Airlines, Inc. ("American"), among others. *Id.* ¶¶ 20-21. AAG was formerly

named AMR Corporation ("AMR") prior to its emergence from Chapter 11 Bankruptcy on

December 9, 2013. *Id.* ¶¶ 19, 22.

2.      American operates airline carriers and provides scheduled air transportation

services for passengers. *Id.* ¶ 21. American provides both domestic and international service.

*Id.*

3.      US Airways Group, Inc. ("US Airways Group") is a former Delaware corporation

and holding company that merged with a subsidiary of AMR on December 9, 2013. *Id.* ¶¶ 10,

22. US Airways Group's primary business was the operation of network air carriers through its

subsidiaries, including US Airways, Inc. ("US Airways"). FAC ¶ 13.

4.      On November 29, 2011, AMR filed a voluntary petition for Chapter 11

reorganization in the U.S. Bankruptcy Court for the Southern District of New York. *In re AMR*

*Corporation*, Bankr. Pet., Case No. 11-15463-shl (Bankr. S.D.N.Y. Nov. 11, 2011), Dkt. 1.

DOJ-NEA-00000451

the Delta Air Lines-Northwest Airlines and United Airlines-Continental Airlines mergers. *Id.*, Annex B at 18-19.

90.     Despite the claim that the Merger would eliminate US Airways' Advantage Fares program, a pricing program that US Airways implemented to undercut the prices of rivals' nonstop routes with lower prices on US Airways connecting routes, this did not occur. *Id.* ¶¶ 29-33.  American maintained the Advantage Fares program after the Merger. *Id.*; *see also* Ex. 7 (Nocella Dep. Tr.) at 102:22-23.  In fact, American introduced the Advantage Fares program on new routes after the Merger.  Ex. 4 (Mar. 31, 2017 Carlton Report) ¶ 31.  Other legacy carriers, Delta Air Lines and United Airlines, implemented similar programs. *Id.* at ¶¶ 31-33.

***Competition in the Airline Industry***

91.     The domestic U.S. passenger air service market is highly competitive and remains so after the Merger.  Ex. 6 (Mar. 31, 2017 Kasper Report) ¶ 52; *see also* Ex. 5 (Mar. 31, 2017 Ordover Report) ¶ 5.

92.     The Merger did not elevate the risk of successful coordination.  Ex. 5 (Mar. 31, 2017 Ordover Report) ¶ 6.  The airline industry is not susceptible to coordinated behavior, in part because LCCs drive competition in the airline industry, and disrupt any price or other form of coordination. *Id.*

93.     LCCs are a disruptive force for pricing in the airline industry.  Ex. 4 (Mar. 31, 2017 Carlton Report) ¶ 14 & Annex A at ¶¶ 19-23.

94.     At the time that the Merger was pending in 2013, the existence of LCCs on many of the overlapping US Airways and American routes, as well as the ease of entry on many routes, reduced the likelihood of adverse competitive effects from the Merger. *Id.* ¶ 13 & Annex A ¶¶ 13-18.

95.     The divestitures that were part of the settlement of the DOJ Action further enhanced the competitiveness of the LCCs.  Ex. 5 (Mar. 31, 2017 Ordover Report) ¶ 6.

DOJ-NEA-00000463

96.     Over the last few decades, LCCs "have been—and will continue to be—the
dominant competitive force and primary determinant of prices in the U.S. domestic airline
industry."  Ex. 6 (Mar. 31, 2017 Kasper Report) ¶ 32.

97.     Today, LCCs share approximately 39% of the domestic airline passenger market,
up from 7% in 1990.  *Id.* ¶ 14.  With the expansion of LCCs, airline fares have steadily declined:
between 1990 and the third-quarter of 2016 airfares dropped 36% (based on price per mile).  *Id*
¶ 32.  LCCs not only serve "76% of legacy carrier hub-to-hub routes" (*id.* ¶ 32), but are
continuing to penetrate the market for business travel, a market historically served by the legacy
airlines (*id.* ¶ 18).

98.     Competition in the airline industry is further impacted by the rise of *ultra-low cost
carriers* such as Spirit and Allegiant.  *Id.* ¶¶ 15-18.  The continued expansion of LCCs mitigates
entry barriers in the airline industry that preclude effective competition.  *Id.* ¶¶ 22-32.

99.     Successful and lasting coordination in the airline industry is also unlikely because
the process of setting airfares and determining the number of seats to offer at each fare is highly
complex.  Ex. 5 (Mar. 31, 2017 Ordover Report) ¶¶ 13-17.  Although the airlines can receive
published fare data from the Airline Tariff Publishing Company ("ATPCO"), an entity that
collects and distributes published fare data, the information provided to and distributed by
ATPCO is incomplete.  *Id.* at ¶¶ 18-27.  Coordination on price is further impeded because the
airlines themselves do not publicly display the number of tickets they offer for sale in each fare
class.  *Id.* at ¶ 29.

100.    Actual airline fares after the Merger are highly dispersed at any point in time, and
have not moved in a systematic and parallel manner, which is inconsistent with an industry
characterized by coordination.  *Id.* at ¶¶ 33-35.

101.    System-wide concentration levels based on HHI calculations also do not trigger
coordination concerns.  *Id.* at ¶ 50.  System-wide concentration at a national level was only

DOJ-NEA-00000464

"moderately concentrated" under the Department of Justice and Federal Trade Commission's

2010 Merger Guidelines. *Id.*

102.    Economic factors such as the Great Recession in 2008-2009, increased fuel

prices, and large losses (in part from legacy carriers' high operating costs) have challenged the

economic viability of legacy carriers. Ex. 6 (Mar. 31, 2017 Kasper Report) ¶¶ 41, 45.  But over

the last few years, with "firmer financial footing, broader network scope achieved through

mergers, and the strengthening of the U.S. economy (and hence, demand for airline services),

American and other large network carriers have been increasing capacity." *Id.* ¶ 45.

Dated:  May 12, 2017

By: /s/ Sadik Huseny
Daniel M. Wall (admitted *pro hac vice*)
Sadik Huseny (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

*Attorneys for Defendant Merged Entity
American Airlines Group Inc.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

JETBLUE AIRWAYS CORPORATION                                        CONFIDENTIAL TREATMENT REQUESTED

| | |
|---|---|
| **From:** | michael.coppola@barclays.com |
| **Sent:** | Wednesday, June 10, 2020 9:31 AM |
| **To:** | Hurley, Ursula;Hayes, Robin;Priest, Steve;Brocker, Michael;Habachy, Dora |
| **Cc:** | Singh, Dimpy;Greene, Rosemary;benjamin.metzger@barclays.com;michael.miller3 @barclays.com;gianmaria.gianforme@barclays.com;christoph.stelter@barclays.com |
| **Subject:** | RE: Prep: Debt Deal Investor Call |
| **Attachments:** | 2020.06_JetBlue Lender Presentation_vF.pdf; 2020.06.03_JetBlue Investor QA_v11.pdf |

All,

Ahead of our call, attached please find the lender presentation and latest Q&A.

Best,
Mike

-----Original Appointment-----
**From:** Stacey.Romano@jetblue.com <Stacey.Romano@jetblue.com> **On Behalf Of** Hurley, Ursula
**Sent:** Monday, June 08, 2020 9:51
**To:** Hurley, Ursula; Hayes, Robin; Priest, Steve; Brocker, Michael; Habachy, Dora
**Cc:** Singh, Dimpy; Greene, Rosemary; Metzger, Benjamin J: Banking (NYK); Miller, Michael: US Leveraged Finance (NYK); Coppola, Michael: Banking (NYK)
**Subject:** Prep: Debt Deal Investor Call
**When:** Wednesday, June 10, 2020 9:30 AM-10:30 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:**

This mail originated from outside our organisation - Ursula.Hurley@jetblue.com

---

Join Microsoft Teams Meeting

+1 347-566-2624   United States, New York City (Toll)

Conference ID: 704 196 808#

Local numbers | Reset PIN | Learn more about Teams | Meeting options



Help

---

1

PLAINTIFFS EXHIBIT
PX0716
1:21-CV-11558

JBLU02550025

JETBLUE AIRWAYS CORPORATION

CONFIDENTIAL TREATMENT REQUESTED



jetBlue 2020

**LENDER PRESENTATION**

**JUNE 2020**

JBLU02550027

JETBLUE AIRWAYS CORPORATION

CONFIDENTIAL TREATMENT REQUESTED

# ① LEADING POSITION ON U.S. EAST COAST



**2019 Air Travel Revenue by Region**

West Coast 25% of U.S. Revenue

Central 33% of U.S. Revenue

East Coast 41% of U.S. Revenue

**2019 % of U.S. ASMs on East Coast**

jetBlue 77% — 50% — 46% — 44% — 42% — 42% — 31% — 28% — 15% — 5%

**2019 Average SLA PRASM by Region[1]**

East Coast 10.66¢ | Central 10.39¢ | West Coast 10.06¢

*JetBlue is focused on the largest and most profitable air travel region in the U.S.*

jetBlue 2020

Source: DDS 2019, Diio Mi.
1.  Total 2019 PRASM, stage-length adjusted to 1,000 miles for major carriers.

20

JBLU02550052

JETBLUE AIRWAYS CORPORATION

CONFIDENTIAL TREATMENT REQUESTED

# ② LEADING CARRIER AT NYC'S JFK AIRPORT



**2019 JFK Passenger Market Share**

- 36% jetBlue
- 33%
- 14%
- 5%
- Other 12%

**JetBlue's 2019 JFK Route Map**

JFK Airport
- 64 Nonstop Destinations
- 11 Seasonal Destinations
- 11 Mint Destinations

**2019 Average SLA PRASM[1]**

- JFK: 13.50¢
- Other Domestic: 10.48¢

*JetBlue is the largest carrier at New York's largest airport and one of the world's key gateways*

Source: Diio Mi, Company website
Note: Market share based on domestic mainline operations.
1.   Total 2019 PRASM, stage-length adjusted to 1,000 miles for major carriers.

jetBlue 2020

21

JETBLUE AIRWAYS CORPORATION

CONFIDENTIAL TREATMENT REQUESTED

# ② SLOT CONSTRAINED NYC HOME MARKET

| Airport Slot Overview | Annual NYC Domestic Flight Departures (2010 – 2019)[1] |
|---|---|

*(000s)*

- JFK, LGA and DCA are the only slot-controlled airports in the United States



- Slots dictate authorization to either take-off or land at a particular airport during a specific time

- Take off and arrival capacity at slot restricted airports is fixed, meaning the only way for a carrier to increase flights is to obtain additional slots or to lease slots from competing carriers



*NYC domestic departures are flat since 2010 given slot constraints*

jetBlue 2020

Source: Diio Mi, Press, Federal Aviation Administration.
1.   Includes domestic departures from JFK and LGA for all carriers.

22

JBLU02550054

JETBLUE AIRWAYS CORPORATION

CONFIDENTIAL TREATMENT REQUESTED

# ② LIMITED LCC AND ULCC PRESENCE AT JFK AND LGA



**Low Cost Carrier High Peak Slots[1] in NYC**

JFK    LGA

**LCCs Cannot Penetrate the New York Market**

*"Given our relatively small position at Newark and LaGuardia, and our inability to add any meaningful number of flights at either market, it makes sense for us to consolidate our New York City flying into one airport."*

**- Gary C. Kelly, Chairman & CEO**

Southwest

*"I think the biggest constraint for us is New York. We have a gate in Newark. And so we can only get so big there. We have two in LaGuardia. We'd like to be bigger in New York."*

**- Robert L. Fornaro, Former CEO**

spirit

jetBlue 2020

Source: JFK / LGA websites, FAA slot data.
1.   JFK High Peak defined as slots between 07:00 – 09:59 and 13:00 – 22:29. JFK slot data presented based on Friday slot allocation. LGA slots are all High Peak.

JBLU02550055

JETBLUE AIRWAYS CORPORATION

CONFIDENTIAL TREATMENT REQUESTED

# **③ IRREPLACEABLE NETWORK ASSETS AT JFK**



| JetBlue is a Cornerstone of JFK Airport | JFK High Peak Slots[1] Breakdown – Top 5 |
|---|---|

**Total JFK High Peak[1] Slots = ~1,000 / day**

338  256  170  35  20

**Terminal 5**

- Flagship JetBlue terminal in NYC
- The Company holds a long term lease with the New York Port Authority running through 2042
- Potential connection to Terminal 7 and a redeveloped Terminal 6
- 19 acres of space

**Redevelopment of Terminal 6[2]**

- JetBlue holds exclusive rights to enter into an agreement with the Port Authority to develop T6 by November 2021, and negotiations are underway to execute these rights

*The top 5 JFK slot holders control ~85% of the high peak slots at the airport with JetBlue controlling ~25% itself*

Source: JFK / LGA websites, FAA slot data.
1. JFK High Peak defined as slots between 07:00 – 09:59 and 13:00 – 22:29. JFK slot data presented based on Friday slot allocation.
2. Development plans still being contemplated and the actual layout of T6 may change.

JBLU02550056

JETBLUE AIRWAYS CORPORATION

CONFIDENTIAL TREATMENT REQUESTED

# 4 MOST LEGROOM ACROSS SEAT CLASSES



**JetBlue's seats have the largest pitch in the U.S.**

jetBlue 2020

Source: Company filings, company websites.
1.  Competitors' lie-flat seat pitch based on transcontinental routes.
2.  Average across fleet where available.

25

JBLU02550057

JETBLUE AIRWAYS CORPORATION

CONFIDENTIAL TREATMENT REQUESTED

# 4  SUPERIOR CORE AMENITIES



| Core Amenity Comparison | jetBlue | | | | | | | | | |
|---|:---:|:---:|:---:|:---:|:---:|:---:|:---:|:---:|:---:|:---:|
| Complimentary High Speed Wi-Fi | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ |
| Seatback Screens in Every Seat | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ |
| Free IFE Streamed to Personal Device | ✓ | ✓ | ✗ | ✓ | ✓ | ✗ | ✓ | ✓ | ✗ | ✓ |
| Complimentary Carry-On Bag In All Classes | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✓ | ✓ | ✗ | ✗ |
| Complimentary Refreshments | ✓ | ✓ | ✗ | ✓ | ✓ | ✗ | ✓ | ✓ | ✗ | ✓ |

**Inflight Entertainment Partners**









*JetBlue is the only airline in the U.S. offering complimentary Wi-Fi and seat back screens in every seat*

jetBlue 2020

Source: Company filings, company website.

JBLU02550058

**From:** Butler, Jim [Jim.Butler@aa.com]
**Sent:** Thursday, December 06, 2012 2:51 PM
**To:** Vahidi, Virasb
**Subject:** RE: Deck
**Attachments:** 2012 12 06 Response to US Airways merger offer.pdf

**Importance:** High

Virasb,

Very important that you use this version.  I can explain later!  While it is still rough, it
is a bit more cleaned up.

Jim

-----Original Message-----
From: Butler, Jim
Sent: Thursday, December 06, 2012 2:28 PM
To: Vahidi, Virasb
Subject: RE: Deck

Virasb,

Here is a new copy of the deck.  We have addressed a number of your thoughts below, but some
I don't believe areas relevant in the new version that we were on.  I am happy to revert back
if you prefer but what I have been working on is actioning your thoughts that it was too
wordy and needed to be more punchy.  Thus, I am fairly confident that you will prefer the
newer version.  Apologies as there is one slide you will see that we need to rework and,
while I believe I have found all typos, we may have missed one or two.

On Laura's stuff, I have been working with her to prepare for their upcoming discussions so
will get with her about this deck when she gets a minute.

I now need to shift to the standalone deck for a while as I understand we may need that much
sooner (possibly next week).

Jim

-----Original Message-----
From: Vahidi, Virasb
Sent: Thursday, December 06, 2012 10:17 AM
To: Butler, Jim
Subject: Deck

Jim

Some thoughts on the Response deck. You need to call Laura and catch up with her on the labor
dissynergy work.

Page 2: we may arrive at a place when the economic split doesn't work given the labor
dissynergy.  I would say creates value not brings some value.

1



**PLAINTIFF EXHIBIT**
**PX0912**
1:21-CV-11558

GOVERNMENT
EXHIBIT
Vahidi 21

CONFIDENTIAL

AA-SR-00380015

AA-AAUS-00022568

Page 4: let's make sure the numbers match the $2b cost numbers that we have talked about and you have on page 6.  Put the numbers in arrow 1 and 2 and make sure they add. I would say we have returned to profitability and will drive to industry leading profitability.

Should we swap 4 and 5.

Page 6 is confusing. Can we show the impact on margin of new cost structure in first nine months.

Page 7 gets into the weeds.  Confusing since it doesn't add to 2B

Page 10 and 9 should swap. Page 10 should come after revenue. And make the point that the margin impact of revenue is small.

Page 17: be careful with united at 70.

Should 24 and 25 come after we explain our network versus them?  Cause and effect. I would also reiterate the Fortune 500 facts and some of the expected corporate facts you had sent me.

Like the delta pages.

Page 36: remove example on cost.  Need a better labor explanation from Laura.

Page 38: customers not passengers.

Page 40. Liked the nonstop market story from previous slides. Isn't that more effective.

Page 41. Are these the simples examples?

Page 43: Laura

51. What's the point?

Will read the rest later.

Overall great work and making progress.  Can you make some of these changes and send to me in PDF before 3;30 JFK time so I can share it with Tom on way to DFW.

Thanks!

2

CONFIDENTIAL

AA-SR-00380016

AA-AAUS-00022569

CONFIDENTIAL

HIGHLY CONFIDENTIAL - RESTRICTED DISSEMINATION ONLY



# Response to US Airways merger offer

AA-SR-00380017

AA-AAUS-00022570



| From: | Parker, Doug |
|---|---|
| To: | Kirby, Scott |
| Sent: | 3/1/2011 8:03:37 PM |
| Subject: | Re: DCA slots |

I agree but also know that if we had done nothing at all, we'd be getting five exemptions and no conversions, which is worse that 1,2 or 3. Thx.

----- Original Message -----
From: Kirby, Scott
Sent: Tuesday, March 01, 2011 07:54 PM
To: Parker, Doug
Subject: Re: DCA slots

And what I've learned from this is that we can't push legislation that benefits us more than the industry. In the end, we will not have the juice to get it done.

----- Original Message -----
From: Parker, Doug
Sent: Tuesday, March 01, 2011 07:51 PM
To: Kirby, Scott
Cc: Howlett, CA; Johnson, Stephen
Subject: Re: DCA slots

Thanks. That's what I thought. We're OK with nothing, but if you insist on giving away exemptions to "limited incumbents" you have to give conversions to those of us that already fly to DCA -- and since they're conversions of existing flying, ratable share of existing flying is only the logical distribution mechanism.

Steve, CA, see in a few minutes and we can discuss further. Thx.

----- Original Message -----
From: Kirby, Scott
Sent: Tuesday, March 01, 2011 07:39 PM
To: Parker, Doug
Subject: Re: DCA slots

I'd rank 1 and 3 equal and if forced to choose, I'd take 3. I reached the conclusion months ago that we were headed towards something like 2 and prefer option 3 as a result. It's definitely a bluff worth making because it's a bluff that I hope gets called. With all this new capacity, these won't be particularly good markets even under option 1.

----- Original Message -----
From: Parker, Doug
Sent: Tuesday, March 01, 2011 07:31 PM
To: Kirby, Scott
Subject: DCA slots

PLAINTIFFS EXHIBIT
PX0011
1:21-CV-11558

I'm considering our slot strategy over the next couple of days and am modestly worried we have been cast as the bad guys and are going to pressured by legislators and OAL to quit holding up FAA reauth by continuing to work the slot issue, fight for our fair share of the conversions, etc.

The best way to avert that is to argue, "Look, we're OK with no slot language at all. But what is completely unacceptable is to give exemptions and not allow conversions. It's giving very valuable monopoly flying (pork) to one airline for free."

That will deflect the bad guy rap to Alaska and allow us to freely fight for conversions, so I like it. The downside is there's a chance the exemptions and the conversions both go away. I think that's a pretty small chance because Alaska has their exemptions in both the House and Senate bills (unlike us) and I can't imagine they'd just drop it. But there is some chance we get our bluff called so I'm wondering how bad that would be.

How would you rank the following scenarios?:

1) We get 5-6 of 11 conversions; there are 5 exemptions
2) We get 2-3 of 11 conversions; there are 5 exemptions
3) No conversions; no exemptions

I'm guessing our preference is 1,3,2 which makes me OK with this strategy (I fear we're headed to scenario 2 if we're cast as the troublemakers -- scenario 2 gets full indy support). I'd like to know if you agree though. Also any color on your feelings about the strength of preference for these scenarios vs just the ordinal values would be helpful. (I'm starting to wonder if 3 isn't the best scenario -- I'm not sure how 16 flights being added to DC and us getting 5 of them is extremely good for us -- it's just a lot better than 5 exemptions being added and us getting nothing, right?)

I'm hoping you see this tonight and can give me a quick note back as I'm about to go discuss this with CA and Steve. Thanks a lot.

US AIRWAYS CONFIDENTIAL

# CADWALADER

Cadwalader, Wickersham & Taft LLP
700 Sixth Street, N.W., Washington, DC 20001
Tel +1 202 862 2200  Fax +1 202 862 2400
www.cadwalader.com

New York  London  Charlotte  Washington
Houston  Beijing  Hong Kong  Brussels

**CONFIDENTIAL TREATMENT REQUESTED**

**US AIRWAYS CONFIDENTIAL**

May 7, 2013

**VIA COURIER**

Michael Billiel, Esq.
Caroline Laise, Esq.
Amanda Klevorn, Esq.
U.S. Department of Justice
Antitrust Division – T.E.A. Section
450 Fifth Street, NW
Washington, DC 20530

Re:   DOJ File No: 60-481111-0048; Request for Additional Information Relating to
      the Proposed US Airways/American Merger

Dear Mike, Caroline, and Amanda:

On behalf of US Airways Group, Inc. ("US Airways"), enclosed are materials listed below in connection with the above-referenced Second Request.

- One (1) certification executed by Howard Kass, Vice President – Legal and Government Affairs at US Airways pursuant to the HSR Act.  A copy of the certification is also being sent to the Premerger Notification Unit.

- One (1) hard drive labeled "USAA004" containing the final production of documents from the files of the agreed-upon custodians.

| Volume | Bates Number Range |
|--------|--------------------|
| USAA004 | US-AA-00162295 – US-AA-02111009 |

\* Native files of all Excels, an index of documents contained in the production, and a custodian append report are included in this volume.

- One (1) hard copy of US Airways' privilege log, list of numbers of documents withheld for non-logged custodians, and names index, and one (1) disc labeled "US Airways Privilege Log" containing electronic versions of the same.  The privilege log contains a

Andrew J. Forman  Tel +1 202 862 2243   Fax +1 202 862 2400    andrew.forman@cwt.com

AA-AAUS-00000299

**C A D W A L A D E R**

Michael Billiel, Esq.
Caroline Laise, Esq.
Robert Young, Esq.
Amanda Klovers, Esq.
May 7, 2013

column (titled "Inst. P Mod.") indicating documents subject to the Instruction P(2)e. modification.   In the column for privilege designation, the abbreviations "AC," "WP," and "CI" refer to attorney-client privilege, work product, and the common interest doctrine, respectively.

- One (1) hard copy of US Airways' narrative responses to the Second Request.   An electronic copy of the narrative responses is also included on the hard drive labeled "US Airways Interrogatory Response."

- One (1) electronic copy of the exhibits to the narrative responses that remain outstanding.  This information is included on the hard drive labeled "US Airways Interrogatory Response."

- One (1) hard copy of the list of contracts that US Airways is not required to produce in the first instance per agreement with the Division.  An electronic copy of this list also is included on the hard drive labeled "US Airways Interrogatory Response."

This letter and the enclosed materials have been labeled US AIRWAYS CONFIDENTIAL and contain highly confidential material.  Accordingly, please afford these materials and all information contained therein confidential treatment to the fullest extent possible under all applicable agreements, laws, and regulations.

Please do not hesitate to contact me with any questions.

Best regards,

Andrew J. Forman, Esq.

Cc:     Howard Kass, Esq., US Airways
        Benjamin T. Slocum, Esq., US Airways
        Charles F. (Rick) Rule, Esq.
        Paul T. Denis, Esq.
        Gorav Jindal, Esq.
        Daniel Howley, Esq.
        Stephen Ravas, Esq.
        William Dolan, Esq.

Encls.

AA-AAUS-00000300

| | |
|---|---|
| **From:** | Johnson, Stephen |
| **To:** | Parker, Doug; Kirby, Scott; Kerr, Derek; Eberwein, Elise; Isom, Robert |
| **CC:** | Cravens, Daniel |
| **Sent:** | 3/22/2011 5:57:57 PM |
| **Subject:** | RE: JPM |



Exactly. And everyone now has more legroom. And, having seen Richard's TV commercial twice, I know Jeff is sitting in his office on Wacky Drive grinding his teeth in envy.

But, hey, I was the one who a few minutes ago asked that it be extended to the DCA flights.

-----Original Message-----
From: Parker, Doug
Sent: Tuesday, March 22, 2011 4:21 PM
To: Johnson, Stephen; Kirby, Scott; Kerr, Derek; Eberwein, Elise; Isom, Robert
Cc: Cravens, Daniel
Subject: Re: JPM

Easy now. Consolidation will help stop much of the stupid stuff but inflight internet is not one of them. And with fewer of us now, it's more obvious if you're an outlier on something people care about.

----- Original Message -----
From: Johnson, Stephen
Sent: Tuesday, March 22, 2011 04:06 PM
To: Parker, Doug; Kirby, Scott; Kerr, Derek; Eberwein, Elise; Isom, Robert
Cc: Cravens, Daniel
Subject: RE: JPM

...next it will be more legroom. Then industry standard labor contracts. Then better wines. Then the ability to book on Facebook. Penultimately, television commercials. Then, finally, we will pay the NYSE an exorbitant fee to change our ticker symbol.

-----Original Message-----
From: Parker, Doug
Sent: Tuesday, March 22, 2011 4:01 PM
To: Kirby, Scott; Kerr, Derek; Johnson, Stephen; Eberwein, Elise; Isom, Robert
Cc: Cravens, Daniel
Subject: Re: JPM

Yeah, I know. I was kidding, but the reality is four or five people are using it in this first class cabin. It'll never pay for itself, but if we don't have it and everyone else does, it will create a large negative perception about our airline over time. We might as well look into doing it before we get to that point.

----- Original Message -----
From: Kirby, Scott
Sent: Tuesday, March 22, 2011 03:56 PM
To: Parker, Doug; Kerr, Derek; Johnson, Stephen; Eberwein, Elise; Isom, Robert
Cc: Cravens, Daniel
Subject: Re: JPM

We're going to conclude we have to. It will be a defensive payback. Industry will cost itself money with no share shift since we'll all have it.

----- Original Message -----
From: Parker, Doug
Sent: Tuesday, March 22, 2011 03:47 PM
To: Kerr, Derek; Johnson, Stephen; Kirby, Scott; Eberwein, Elise; Isom, Robert
Cc: Cravens, Daniel
Subject: Re: JPM

PLAINTIFFS EXHIBIT
PX0010
1:21-CV-11558

He is a "Distinguished Research Scholar" at NYU Law School -- whatever that is. He's a lot smaller because he had lap band surgery about ten years ago. Why was he there?

US AIRWAYS CONFIDENTIAL                                                       US-AA-01618236

And, btw, I knew what his title was thanks to the Google, which I accessed inflight through the miracle of gogo. We really need to put this on every airplane in the fleet.

----- Original Message -----
From: Kerr, Derek
Sent: Tuesday, March 22, 2011 03:18 PM
To: Johnson, Stephen; Kirby, Scott; Parker, Doug; Eberwein, Elise; Isom, Robert
Cc: Cravens, Daniel
Subject: Re: JPM

He is a professor. Not sure if it is Law.

----- Original Message -----
From: Johnson, Stephen
Sent: Tuesday, March 22, 2011 03:18 PM
To: Kerr, Derek; Kirby, Scott; Parker, Doug; Eberwein, Elise; Isom, Robert
Cc: Cravens, Daniel
Subject: RE: JPM

He is a law school professor now?

-----Original Message-----
From: Kerr, Derek
Sent: Tuesday, March 22, 2011 3:17 PM
To: Johnson, Stephen; Kirby, Scott; Parker, Doug; Eberwein, Elise; Isom, Robert
Cc: Cravens, Daniel
Subject: Re: JPM

Yes THE Levine. Or half the Levine I used to know.

----- Original Message -----
From: Johnson, Stephen
Sent: Tuesday, March 22, 2011 03:14 PM
To: Kerr, Derek; Kirby, Scott; Parker, Doug; Eberwein, Elise; Isom, Robert
Cc: Cravens, Daniel
Subject: RE: JPM

THE Levine?

-----Original Message-----
From: Kerr, Derek
Sent: Tuesday, March 22, 2011 3:11 PM
To: Kirby, Scott; Parker, Doug; Eberwein, Elise; Johnson, Stephen; Isom, Robert
Cc: Cravens, Daniel
Subject: Re: JPM

I thought the day went well. Scott did well with the presentation and QA. As he said the only negative, if any, was the rev guidance of 13% in the first half of March and 3% in the back half. He followed up with 12% in April (partly due to shift in Easter) so that calmed everyone. The reduction of 1-2% capacity in the 4th quarter was received well. Although people did ask that if we were really covering all the fuel increase with revenue, why pull capacity. We explained it is the right thing to do in this volatile environment.
All else good. Conference was very well attended. We saw at least 25 people in our so called one on ones. Levine was sucking up to Scott about the brilliant hedge strategy.

Dan watched some other presentations and will send a follow-up later tonight.

----- Original Message -----
From: Kirby, Scott
Sent: Tuesday, March 22, 2011 02:57 PM
To: Parker, Doug; Kerr, Derek
Subject: Re: JPM

Our march guidance was negative but otherwise good. Same ole same ole - fuel and revenue. But more and more people seek us out to tell us we have the smartest fuel hedging strategy and the can't understand why oa don't see it. Mike levine actually tracked me down to tell me that. Ow, largely uneventful. Eetc guys tomorrow

US AIRWAYS CONFIDENTIAL

US-AA-01618237

AA-AAUS-00020863

----- Original Message -----
From: Parker, Doug
Sent: Tuesday, March 22, 2011 02:42 PM
To: Kirby, Scott; Kerr, Derek
Subject: JPM

How'd it go? Thx.

**From:** Parker, Doug
**To:** Johnson, Stephen; Eberwein, Elise; Kirby, Scott; Kerr, Derek; Isom, Robert; Howlett, CA
**Sent:** 6/18/2010 12:54:40 PM
**Subject:** Re: Swelblog / Swelbar on Airlines

I know -- that's what I'm worried about. Surely these guys aren't really planning to keep Cleveland open. I'm hopeful they're just saying what they need to (including to Bill) to get this approved.

**From:** Johnson, Stephen
**To:** Parker, Doug; Eberwein, Elise; Kirby, Scott; Kerr, Derek; Isom, Robert; Howlett, CA
**Sent:** Fri Jun 18 11:33:10 2010
**Subject:** Re: Swelblog / Swelbar on Airlines

Very unlike Swelbar to go out on a limb like that without inside info.

**From:** Parker, Doug
**To:** Eberwein, Elise; Kirby, Scott; Kerr, Derek; Johnson, Stephen; Isom, Robert; Howlett, CA
**Sent:** Fri Jun 18 11:10:33 2010
**Subject:** Re: Swelblog / Swelbar on Airlines

This is nicely done. I hope he is wrong about Cleveland though.

**From:** Eberwein, Elise
**To:** Parker, Doug; Kirby, Scott; Kerr, Derek; Johnson, Stephen; Isom, Robert; Howlett, CA
**Sent:** Fri Jun 18 05:24:16 2010
**Subject:** Fw: Swelblog / Swelbar on Airlines

**From:** noreply+feedproxy@google.com <noreply+feedproxy@google.com>
**To:** Eberwein, Elise
**Sent:** Fri Jun 18 03:33:13 2010
**Subject:** Swelblog / Swelbar on Airlines



**PLAINTIFFS EXHIBIT
PX0008**
1:21-CV-11558

Swelblog / Swelbar on Airlines

EXHIBIT
_12_
Parker

Link to
Swelblog
/
Swelbar
on
Airlines

## my testimony on the continental - united merger before the house judiciary committee

Posted: 16 Jun 2010 04:38 PM PDT

Good afternoon Chairman Conyers, Ranking Member Smith and members of the committee.

My name is William Swelbar. I am a Research Engineer with the Massachusetts Institute of Technology's International Center for Air Transportation. Our program is focused on the economic, financial, operational and competitive aspects of the global airline industry. I appreciate the opportunity to speak today in support of the merger of United and

Continental Airlines. Whereas I have worked with each United and Continental in a consulting capacity in the past, I appear today as an independent expert on the U.S. and global airline industry.

Many see the global airline industry as somehow U.S.-centric. It is not. In aviation, the U.S. is but one piece of a big puzzle that is influenced by global economic interdependencies, just as the U.S. economic recovery could be affected by events in Greece, Portugal, Spain and Hungary.

United and Continental presented in their testimony before the Senate Committee on Commerce Science and Transportation an exhibit showing where U.S. airlines have fallen in their ranking among the globe's largest airlines. I am bothered by the fact that the U.S. carriers have been surpassed by Lufthansa/Swiss and Air France/KLM. This fact is but one reason that helps to explain why United and Continental are pursuing this merger.

For the network carriers like United and Continental, this round of consolidation is as much about preparing to compete with the world's other big carriers for international traffic as it is about competing with low cost carriers (LCCs) like Southwest, AirTran, jetBlue or Frontier in the domestic market. After all, it is the network carriers and not the low cost carriers that serve communities of all sizes. Despite the footprint established by the low fare carriers that is now national in scope, with their share of domestic traffic approaching 40 percent, it is the network carriers that connect the smallest U.S. markets to the globe's air transportation grid.

**I would like to debunk some of the myths I have heard said about the merger of United and Continental.**

- **OVERLAPPING ROUTES/HIGHER PRICES:** There are just 15 nonstop, overlapping routes flown by each United and Continental. None of the 15 would be a monopoly United route after the proposed merger. Eleven of the 15 overlapping city pairs would have at least two competitors. Of the four routes that would have but one other nonstop competitor (Houston – Washington, Houston – Los Angeles, Houston – San Francisco and Cleveland – Denver), that other competitor is Southwest Airlines in three of the four and Frontier on the other. In each of the four routes, the LCC competitor has at least a 25 percent share of traffic.

In addition to a nonstop competitor, two of the routes have four other carriers providing connecting service; one has three other carriers providing connecting service; and one has two other carriers providing connecting service. The airline industry is a network industry and connecting options for passengers must be taken into account when considering competitive impacts as they also work to discipline prices.

The U.S. market should not fear the "end to end" network consolidation like Delta – Northwest and the proposed United – Continental merger. The low cost carrier segment of the US airline industry would regale in the fact that network carriers would price well above the market as was the case in the late 1990s and early 2000s as it would serve as the catalyst for growth at the expense of the network carriers again. The market has demonstrated time and again that where competition is vulnerable, a new entrant will exploit that vulnerability. Where there are market opportunities, there will be a carrier to leverage that opportunity. And where there is insufficient capacity, capacity will find the insufficiency.

- **START OF ANOTHER BIG MERGER WAVE:** Some predicted that the Northwest-Delta merger in 2008 would be the catalyst to a big merger wave. Two years later, we have a second merger announcement. That hardly seems to be a wave. Nonetheless, each merger case should be considered on its own merits, not based upon what someone speculates might happen. Moreover, the concerns are most relevant in highly concentrated industries. The U.S. domestic airline industry will remain fragmented should the proposed merger be approved as seven airlines will have at least a 5 percent market share.

When thinking about airlines in a global context, no one airline has a 5 percent share of the global market. The top 10 firms producing mobile handsets comprise 85 percent of their industry; the top 10 automotive manufacturers make up 76 percent of their industry; and the top 10 container shipping firms equal 63 percent of their industry. Yet the world's 10 largest airlines make up only 36 percent of the global airline industry. These define a fragmented industry prohibited from operating as other global industries, not a concentrated one.

US AIRWAYS CONFIDENTIAL

- **HUB CLOSURES AND FLIGHT REDUCTIONS:** The fear mongers would have us believe unequivocally that there will be reductions in flying, the dislocation of small communities from the global airline map and even hub closures because of consolidation. Many use TWA and its St. Louis hub as an example. American Airlines did not merge with a failing TWA. Rather it acquired certain assets of a failed TWA. As a result it is a very poor example of what could happen to a hub.

But was it consolidation of the industry that ultimately caused American to downsize St. Louis or was it the events of 9/11 and the changed economics of the industry that followed that ultimately rendered St. Louis uneconomic? Might the local economy in St. Louis have contributed to the city no longer being an attractive hub city that produces significant local traffic to support the hub carrier? St. Louis is but one example of hub closures since September 2001 as US Airways/America West has in effect closed it Las Vegas hub and its Pittsburgh hub. Neither of the closures can be laid at the feet at the carrier's merger with US Airways. In fact if America West had not agreed to merge with US Airways it is highly likely that the old US Airways would have been liquidated.

In the case of this merger, there has been much speculation about the future of Continental's Cleveland hub. There is nothing that I can see from this merger that would make Cleveland redundant. Without knowing what the internal data might say but being knowledgeable about airline planning models, I would guess that the modeling would suggest that Cleveland would be made stronger as a result of the merger and not weaker. The answer to Cleveland remaining a critical point on the combined carrier map will have everything to do with the condition of the local Cleveland economy as well as the price of oil and little to nothing to do with the decision to merge.

- **EMPLOYEE/EMPLOYMENT DISRUPTIONS:** Since 2001, the industry has shed nearly 140,000 airline jobs. But 400,000+ good jobs where wages and benefits average over $81,000 per year per full time equivalent remain. In fact, the average wage for airline employment reached its high point for the decade during the third quarter of 2009. This average employee cost comes after the significant concessions granted at each of the five remaining network carriers between 2002 and 2007. Headcount reductions were significant during the period as well as companies were forced to reduce their size in response to a changed revenue environment and increasing fuel prices. The reductions continued into 2008 as oil climbed to $147 per barrel and jet fuel to the equivalent of $172 per barrel. 2009 marked the second largest decrease in industry capacity since 1942.

Susan Carey of The Wall Street Journal wrote an article titled: "Airline Industry Sees Pain Extending Beyond the Recession." In this critically insightful piece Carey examines the relationship of airline industry revenue to U.S. Gross Domestic Product. "For decades U.S. airlines could rely on a remarkably stable relationship between their revenue and gross domestic product. Year after year, domestic revenue came in at 0.73% of GDP on average, and total passenger revenue was equal to 0.95% of GDP. For the year ended March 31, domestic revenue was 0.54% of GDP, while total passenger revenue was 0.76% of GDP". What this means is that based on the historic norm of the revenue to GDP relationship, there is $27 billion less in revenue today to be shared among the industry's competitors than there was just 10 years ago.

Consolidation is not the culprit of lost airline jobs or declining airline wages. Airlines were left with little choice but to restructure given the changed revenue environment precipitated by the growth of the low cost carriers and the transparency in fares facilitated by the internet as a distribution vehicle.

What is clear to me is that no individual airline except possibly Southwest and Delta would have the financial wherewithal to withstand another geopolitical event similar to what occurred on September 11, 2001. Unlike other rounds of consolidation that focused primarily on network scope, scale, revenue and cost synergies, this round is different. Now the industry is looking at the balance sheet. Consolidated carriers promise more stability to employees and communities that benefit from the combined strength of the respective balance sheets.

- **RE-REGULATION:** Some suggest that re-regulation of the industry will improve the economic well being of certain stakeholders. Isn't a goal of policy makers to maximize the number of good paying jobs? The airline business sells what is best characterized as a highly price elastic product. Only a segment of the buyers of airline services is less sensitive to price. Over the past 30 years, the industry has competed away the savings/benefits

AA-AAUS-00020712

of nearly every innovation (ex. reduced commission expense) in the name of low and lower fares for consumers. Some think that reverting back to the days of a regulated industry will benefit certain segments of the industry. I firmly believe it would harm the industry by causing it to contract further as prices rise as inefficient costs are passed through to the consumer. A smaller industry would employ fewer workers.

Many government officials and certain industry watchers have instilled fear into the marketplace regarding the impact of current and prospective industry consolidation. Fears of higher prices, reduced service, more monopoly routes, and labor strife are not well founded. Their analysis of the industry today parallels an analysis appropriate in a regulated period.

Simply put, the network carrier model of the 1980's and 1990's does not work in today's environment. Consolidation is a logical step to position airlines in a highly fragmented domestic and global industry to better weather the financial challenges that have caused years of economic pain for many stakeholders and a rising tide of red ink.

Thank You.



---

You are subscribed to email updates from Swelblog / Swelbar on Airlines
To stop receiving these emails, you may unsubscribe now.
Google Inc., 20 West Kinzie, Chicago IL USA 60610

Email delivery powered by Google

US AIRWAYS CONFIDENTIAL