# EXHIBIT B

CONFIDENTIAL

**Observations on DOJ Staff Concerns Related to the
Northeast Alliance Between American Airlines and JetBlue Airways**

November 6, 2020

## I.  INTRODUCTION

American Airlines, Inc. ("American") and JetBlue Airways Corporation ("JetBlue") have entered into an alliance agreement that will allow them to optimize the use of their complementary assets at four Northeast airports to dramatically increase output, create new and better travel options for consumers, and enhance competition—without in any way compromising JetBlue's position as a disruptive low-cost carrier ("LCC").  The alliance, which the carriers are calling the "Northeast Alliance" or "NEA," will dramatically strengthen JetBlue as an airline and, in turn, strengthen the carrier as the cause of "the JetBlue Effect," which numerous studies have shown to be a principal determinant of airlines' fares wherever JetBlue flies.

American is willing to strengthen JetBlue because the NEA addresses its longstanding weaknesses in New York City ("NYC") – a particularly serious weakness for a carrier that competes based on network quality since NYC is the largest and most important business travel market in the world – and Boston, the fourth largest business travel market in the United States. Collaborating with JetBlue, American can immediately rectify an enduring network disadvantage to United Airlines ("United") and Delta Airlines ("Delta") with regard to every important NYC competitive metric, including daily departures (which will increase under the NEA by 98%), nonstop routes (up 83%), and coverage of the most heavily traveled domestic nonstop routes (up 105%).  In short, the NEA makes JetBlue a better LCC, and makes American a better network carrier.

The NEA was inspired by, and many of its terms based upon, the "metal-neutral" joint business arrangements ("JBAs") that have come to define competition on most international routes, e.g., the competing transatlantic JBAs among SkyTeam members including Delta and Air France/KLM, Star Alliance members including United, Lufthansa, and Air Canada, and **one**world members including American and British Airways.  Those JBAs have demonstrably increased output and consumer choice, leading to billions of dollars in consumer benefits.[1]  The NEA will do the same for the Northeast, in a striking way:

- 16.3% increase in total Available Seat Miles (ASMs)

- 28 new nonstop routes

- 34 new daily roundtrip departures

- 227% JetBlue seat growth at LaGuardia Airport ("LGA")

- 9 new American international flights at John F. Kennedy International Airport ("JFK")

**PLAINTIFFS EXHIBIT
PX0453**
1:21-CV-11558

---

[1] *See, e.g.,* Calzaretta, Eilat, & Israel, *Competitive Effects of International Airline Cooperation*, 13 J. Comp. L. and Econ., 501 (2017).

CONFIDENTIAL

- More than double the number of nonstop round-trip itineraries available into or out of the four NEA airports for both American and JetBlue passengers.

Consumer benefits have been estimated using the methodology the Department of Justice ("DOJ") pioneered, and in this case—assuming the flying that a "Clean Team" predicted, and upon which American and JetBlue decided to go forward—consumer benefits are conservatively estimated at about $800 million per year. Consumer reaction has been strongly positive, with only other airlines complaining—itself a strong indication that the NEA is procompetitive.

The NEA, however, differs from conventional JBAs in three important respects, all of which weaken any case for a prospective enforcement action. First and foremost, it does not involve joint pricing—the feature of immunized JBAs that has most concerned the Antitrust Division. The parties understood that any arrangement that threatened to destroy or significantly compromise JetBlue's pricing independence and the resulting JetBlue Effect would be unacceptable. Furthermore, neither airline wanted to coordinate pricing, as they pursue very different competitive strategies grounded in different cost structures and largely targeting different flyers. Therefore, under the NEA, both JetBlue and American are *entirely in control of the pricing for flights they operate*. JetBlue will remain committed to its strategy of expanding the market with low fares enabled by its cost structure, and the JetBlue effect will become more prevalent. American will continue to price independently as well, yet now with a stronger service offering, more seats to sell, and as a stronger competitor against United and Delta for the substantial portion of the market that "buys the network" when choosing an airline, especially business travelers.

Second, because the NEA will not have antitrust immunity, it has been carefully designed to qualify for, and pass muster under, the Rule of Reason. There is a genuine, efficiency-enhancing integration of complementary and scarce assets such as traffic flows, frequent flyer programs, and NEA slots, gates, and facilities. There is revenue sharing, but the allocation formula is designed so that increasing capacity entitles a carrier to a *higher percentage* of the total revenue pool (unlike the textbook revenue-sharing case where percentages are fixed). This has the purpose and effect of incentivizing growth, including competition *between American and JetBlue to grow the most*. And while the parties intend to coordinate capacity and schedules on NEA flights in order to squeeze the most output out of their NEA assets, each remains in control of its own pricing, capacity, schedules and expansion plans—as JetBlue made clear when on the eve of the NEA's announcement it independently went forward with a major expansion of its Newark ("EWR") service. Furthermore, the NEA is an alliance among partners that are uniquely able to collaborate because their differing business models make them more "distant" competitors to one another than Delta and United are to American and Southwest and other LCCs are to JetBlue. Economic analysis shows that any "loss" of American-JetBlue rivalry has minimal-to-no effects on fares and is overwhelmed by the NEA's consumer benefits.

Third, American and JetBlue will own the full antitrust risk of whatever practices and conduct occur under the auspices of the NEA—risks no immunized JBA ever faces. That is important because it means there is no need for the Division to base any decision about an enforcement action on speculation about potential adverse effects, e.g., whether American might use restrictions on codesharing to influence JetBlue pricing or expansion, or whether predicted output expansion will actually occur. The Division has the option to wait and see what actually becomes of the NEA, with no risk that "eggs cannot be unscrambled," or that the doctrine of laches precludes injunctive relief. Waiting also allows the Division to meet its burden under

2

CONFIDENTIAL

Section 1 of the Sherman Act to show, as the Rule of Reason requires, "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market."[2] Proving *actual* anticompetitive effects is entirely different than crafting argument that a collaboration *might have* such effects.

In that regard it is important to emphasize that this is not a merger that requires the Division to address all probable future concerns in one up-front action. We appreciate that fully integrated joint ventures—those that "encompass[] all aspects of a line of business, including manufacturing, distribution, marketing, and sales" and wholly eliminate competition between the parties—are evaluated as mergers, and potentially even under Section 7 of the Clayton Act.[3] But the NEA is far from a fully integrated joint venture, since each airline will continue to operate independently in most respects, including within the NEA territory. We note Staff's question in a November 4 email: "Do you disagree that we should assess the NEA as if it is a single entity with a unified profit objective?" The answer is unequivocally "yes, we disagree." There is no single entity; there is no unified profit objective; there is not even traditional (fixed percentage) revenue sharing, but rather, revenue sharing built to create incentives for the parties to compete for a greater share of the revenue by adding capacity. This is a different kind of collaboration that deserves and is legally entitled to a chance to succeed, and condemned based only on proven anticompetitive effects if and when they materialize. The Division can also forebear with the sure and certain knowledge that the parties will be perpetually subject to an antitrust enforcement action (including from private parties) should the NEA turn out to be other than as advertised.

Of course, we realize that DOJ Staff has concerns. We are deeply appreciative of how quickly DOJ Staff has conducted its investigation and the transparency evident in the October 8 State of Play meeting. And therefore we want to take this opportunity to address what seemed to be the most significant concerns—and what might be done about them. The issues we address below are:

- What are the risks of competitive harm on nonstop overlap routes, and what can be done about them if they are substantial?

- Is it appropriate for JetBlue and American to be coordinating capacity and scheduling as the NEA contemplates, generally and in the event their discussions result in market exits or reductions in capacity on particular routes?

- Is there a realistic danger that because American is not irreversibly committed to providing NEA assets (slots, gates, flows, frequent-flyer program ("FFP") benefits) to JetBlue, it could force JetBlue into accommodating behaviors?

- Does revenue sharing pursuant to the "Mutual Growth Incentive Agreement" ("MGIA") –a key element of the NEA – distort competitive incentives in a way that is unacceptable under the Rule of Reason?

---

[2] *Ohio v. Am. Express Co.,* 585 U.S. ___, 138 S. Ct. 2274, 2284 (2018); *Texaco Inc. v. Dagher,* 547 U.S. 1, 5 (2006) (addressing a joint venture: "antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful").

[3] ABA Antitrust Section, ANTITRUST LAW DEVELOPMENTS (8th ed.) Chptr. 4C.

3

_

CONFIDENTIAL

Preliminarily, we address the Rule of Reason analysis that would apply to any DOJ challenge to the NEA. As you will see, although the Parties believe the proposed NEA is lawful as contemplated, at worst it requires peripheral changes, nothing that goes to its core.

## II.   THE RULE OF REASON APPLIES TO THE NEA

The NEA is not a merger, to which the incipiency standards of Section 7 of the Clayton Act apply. It is a joint venture, or collaboration, to which Section 1 of the Sherman Act and the Rule of Reason applies.[4] Joint ventures "are presumptively lawful and antitrust's duty is only to 'disapprove' those provisions that seem, on balance, to produce greater competitive harms than efficiency gains."[5] Division policy is in accord.[6]

The NEA easily passes the threshold requirement for Rule of Reason treatment: that there is an efficiency-enhancing integration of economic activity. We are confident this is not in doubt, but the significant growth and output expansion and the associated consumer benefits from the NEA – some of which was summarized above – are made possible through optimization of JetBlue's and American's complementary assets in the Northeast, including hard assets like gates, slots, traffic flows, and equipment, but also brand presence and customer bases in Boston and New York.[7] We have heard the concerns regarding the *quantification* of the consumer benefits, including whether they may be overstated because some might be realized in other ways. But nothing about that discussion alters the conclusion that because consumer benefits are realized through integration of complementary assets, the Rule of Reason applies. That is black letter antitrust law applied to indisputable facts.

For the same reasons, the NEA can in no way be regarded as some artifice to provide cover for naked collusion.[8] The NEA is fundamentally about output expansion, and the NEA agreements, which do not coordinate pricing and utilize a revenue-sharing formula that incentivizes growth, make no sense in relation to any kind of naked-collusion theory.

The NEA also does not fall within the rule allowing a Section 7 analysis for fully integrated joint ventures that fully eliminate competition between the parties.[9] The NEA does

---

[4] *See, e.g., Dagher,* 547 U.S. at 6 ("Had respondents challenged [the joint venture], they would have been required to show that its creation was anticompetitive under the rule of reason.").

[5] Phillip Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 2100 (4th ed. 2018); *see also Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 768 (1984) ("[J]oint ventures . . . hold the promise of increasing a firm's efficiency and enabling it to compete more effectively. Accordingly, such combinations are judged under a rule of reason, an inquiry into market power and market structure designed to assess the combination's actual effect.").

[6] *See* U.S. Dep't of Justice & FTC, *Antitrust Guidelines for Collaborations Among Competitors* at 1 (2000) (*"Collaboration Guidelines"*) ("In order to compete in modern markets, competitors sometimes need to collaborate. . . . Such collaborations often are not only benign but procompetitive. Indeed, in the last two decades, the federal antitrust agencies have brought relatively few civil cases against competitor collaborations.").

[7] *See Collaboration Guidelines* ¶ 3.2 at 8 (emphasizing "efficiency-enhancing integration . . . [of] complementary assets . . . that the participants could not achieve separately").

[8] *Id.* at 9 (stating that the per se rule will apply to "what is merely a device to raise price or restrict output"); *see also* Br. for the U.S. as Amicus Curiae, *Texaco v. Dahger,* ("There is no suggestion here that the joint venture is a sham to mask cartel conduct; rather, … the venture is an efficiency-enhancing integration of the participants' businesses."), https://www.justice.gov/atr/case-document/file/510706/download.

[9] *See Collaboration Guidelines* ¶ 1.3.

DOJ-NEA-00002127

CONFIDENTIAL

not even eliminate all competition between JetBlue and American within the NEA territory, let alone generally. Most importantly, the NEA leaves the two airlines free to set their own prices, notwithstanding the certainty that with fundamentally different business models and cost structures they will often charge very different fares. Even the capacity and scheduling coordination envisioned to help maximize output expansion is fundamentally advisory, with each party able to make a final, unilateral decision as to what schedule and how much capacity it devotes to any given route, and with the revenue-sharing formula explicitly designed to enhance capacity expansion incentives.

We note Staff's November 4 assertion that "[b]ecause the parties will be engaging in joint capacity deployment, scheduling and market allocation decisions in the NEA, it appears that it should be treated as a single entity with a unified profit objective with respect to operations involving BOS, EWR, LGA and JFK." That is not accurate as a description of the NEA. It is not even a close or useful approximation, given that the parties make separate decisions about pricing and where to add/deploy their own capacity, and most importantly can and will continue to pursue fundamentally different business strategies. If the NEA would result in a "single entity," the Parties would not be sharing revenue but pricing independently; they would take advantage of the *Texaco* decision and set prices together. They would not leave each airline free to reject recommendations from the network planning teams. From a legal perspective, the NEA does not deprive the market of "independent centers of decisionmaking," but rather preserves and strengthens the "separate corporate consciousness" that each will apply to their Northeast operations.[10] And from an economic perspective, the details of the revenue-sharing explicitly create incentives for the parties to continue to compete with each other by adding additional capacity. The Parties are therefore not transformed into a "single-entity."

Likewise, the NEA presents no occasion for segregating certain terms and attacking them as unlawful *per se*. It is evident that Staff has concerns about capacity coordination, discussions of exits and capacity reductions, and revenue sharing. However, it is well-established that in joint ventures, ancillary restraints, meaning coordination that is "reasonably related to the joint venture's procompetitive ventures . . .[,] should be judged under the rule of reason."[11] This includes coordination that, standalone, would be illegal *per se*.[12]

In sum, Section 1 of the Sherman Act and the Rule of Reason apply to the NEA, meaning that in any challenge, the Division would bear the threshold burden of proving "a substantial anticompetitive effect that harms consumers in the relevant market," and—since there are obviously procompetitive effects from the NEA—the ultimate burden of establishing that the NEA has a net anticompetitive effect.[13]

---

[10] *See Am. Needle, Inc. v. National Football League,* 560 U.S. 183, 197 (2010).

[11] *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.,* 922 F.3d 713, 724–25 (6th Cir. 2019). *See also Rothery Storage & Van Co. v. Atlas Van Lines,* 792 F.2d 210, 224 (D.C. Cir. 1986) ("To be ancillary, and hence exempt from the *per se* rule, an agreement eliminating competition must be subordinate and collateral to a separate, legitimate transaction. The ancillary restraint is subordinate and collateral in the sense that it serves to make the main transaction more effective in accomplishing its purpose.").

[12] *See, e.g., Dagher,* 547 U.S. at 5–6 (coordinated pricing); *August News Co. v. Hudson News Co.,* 269 F.3d 41 (1st Cir. 2001) (joint selling and customer allocation).

[13] *Am. Express Co.,* 138 S. Ct. at 2284.

DOJ-NEA-00002128

CONFIDENTIAL

These are also the substantive principles that would apply should the Division seek a preliminary injunction.  The general principles that govern the granting of equitable relief would apply to any such motion, not the more lenient standard that results from the interplay of Section 7's predictive substantive standards (that a merger "may" lessen competition) and predictive preliminary injunctions standards.[14]  With some minor Circuit variation, the Division would need to prove "a likelihood of success on the merits and [that] the balance of equities tips in its favor," considering four factors: "(1) whether the plaintiff has a substantial likelihood of success on the merits; (2) whether the plaintiff will suffer irreparable harm if the injunction is denied; (3) whether the defendant will suffer a disproportionate injury if injunctive relief is granted; and (4) whether the public interest favors the issuance of the preliminary injunction."[15]

Finally, were the Division to seek a preliminary injunction, the district court is sure to ask why a prospective challenge is necessary, and why the Division cannot wait to see if the NEA actually leads to anticompetitive effects.  The answer cannot be "to avoid the doctrine of laches." Laches is not a defense to a suit by the government to enforce a public right or to protect a public interest.[16]  For instance, in *United States v. Firestone Tire & Rubber Co.*, the Government alleged that from 1959 to 1975 Firestone engaged in numerous activities designed to secure a monopoly in violation of federal antitrust laws.[17]  In its answer, Firestone argued that the United States was not entitled to relief due to unconscionable delay.[18]  The Court summarily rejected the laches defense, finding that defense "wholly insufficient as a matter of law."[19]  The Court noted "it remains clear . . . that principles of equity may not be applied to the United States in such a manner as to frustrate the purpose of its laws or to thwart its public policy."[20]

In all events, the doctrine of laches is grounded in prejudicial delay—in this case prejudice to American and JetBlue because the Division delays a challenge.  But American and JetBlue *are asking the Division to forebear,* and therefore would be in no position to raise any kind of laches defense.  It would be one thing if the Division believed that elements of the NEA we illegal *per se.*  Those would demand immediate challenge.  But since that is not, and could

---

[14] *See* ANTITRUST DIVISION MANUAL at IV-15.

[15] Mem. of the U.S. in Support of Motion for Preliminary Injunction, *U.S. v. Microsoft Corp.,* at 13 (May 18, 1998), https://www.justice.gov/sites/default/files/atr/legacy/2006/03/13/1762.pdf; *cf. U.S. v. Siemens Corp.,* 621 F.2d 499, 506 (2d Cir. 1980) (noting that even in a Section 7 case, where "irreparable harm to the public should be presumed," the Government must prove likelihood of success on the merits and the court "clearly may deny injunctive relief" where consummation does not jeopardize the court's ability to provide ultimate relief).

[16] *U.S. v. Phillip Morris, Inc.,* 300 F. Supp. 2d 61, 72 (D.D.C. 2004).  *See also U.S. v. du Pont,* 353 U.S. 586, 622 (1957) ("[I]t is doubtful what the doctrine of laches applies as against the Government."); *U.S. v. Summerlin,* 310 U.S. 414, 416 (1940) ("It is well settled that the United States is not . . . subject to the defense of laches in enforcing its rights.").

[17] 374 F. Supp. 431, 432 (N.D. Ohio 1974).

[18] *Id.* at 433.

[19] *Id.*

[20] *Id.*  The Supreme Court has also rejected the defense of laches when used against the Government.  For example, in *Cal. v. Am. Stores Co.,* 495 U.S. 271, 274 (1990), the State of California sued American Stores Co. alleging that its merger with a major competitor violated federal antitrust laws and would harm consumers in 62 California cities. At issue on appeal was whether divestiture was a form of injunctive relief within the meaning of 15 U.S.C. § 16; however, in considering whether the district court had the power to order divestiture, the Court noted that "equitable defenses, such as laches . . . may protect consummated transactions from belated attacks by private parties *when it would not be too late* for the Government to vindicate the public interest" (emphasis added).

6

CONFIDENTIAL

not be, the case, and given the indisputable consumer benefits that will result from the NEA, there is no sound basis in law or policy for a preemptive Rule of Reason challenge.

## III.   DISCUSSION OF STAFF CONCERNS

### A. Potential Harm to Competition on NEA Overlap Routes

JetBlue and American provide competing nonstop service on 36 of the 229 total NEA routes and 30 of the 165 total NEA domestic routes. The point has been made that this is greater than the number of nonstop overlaps between America and US Airways ("US") at the time of their merger. That is true, because the American/US merger (like the legacy airline mergers before it) was between carriers that overwhelmingly served different parts of the country. The NEA is focused on a part of the country that nearly every airline serves because it is so heavily populated and heavily traveled. So there are more overlaps, but also more competition, both overall and on the overlaps themselves. In fact, there are only *four* domestic city-pair routes on which the NEA—were it a merger—would present "3-to-2s" or "2-to-1s." And the NEA is not a merger. With very few exceptions, the parties will continue to compete against each other on overlapping routes. The "3s" will still be "3s," the "2s" will still be "2s."

Nonetheless, even assuming the NEA was a merger or akin to a merger, consumers on the overlap routes will not be harmed. First, econometric analysis by Compass Lexecon ("Compass") has shown that American's presence on a route has no statistically significant effect on fares when another legacy airline serves the route.[21] JetBlue's presence has an effect of course, but American's presence or absence simply does not have a statistically significant impact on fares. So there is little reason to be concerned about any of the overlap routes. This is particularly true of routes on which Delta and/or United will still compete, *which includes every NEA overlap route other than Boston-Phoenix, Boston-Dallas, Boston-Charlotte, Boston-Rochester, and Boston-Syracuse*.[22] Importantly, these are Boston routes, which means there are no significant barriers to entry. In the highly unlikely event that fares on these routes were to rise, any of the many carriers already serving Boston could enter and force prices back to competitive levels.

Otherwise, every other NEA overlap route has at least two other carriers providing nonstop service (two other than American and JetBlue, such that if the NEA were a merger the affected routes would be no worse than "4-to-3s"). That is a strong indication that there could be no adverse effects, since the economic literature has shown that the presence of a fourth competitor on a route does not significantly reduce fares on a route, and the presence of a third legacy carrier does not significantly reduce fares on a route.[23]

---

[21] *Competitive Effects of the Proposed American Airlines – JetBlue Northeast Alliance,* COMPASS LEXECON, (Sept. 10, 2020) ("Competitive Effects Submission").

[22] Additionally, the Clean Team optimized schedule shows that the carriers do not plan to decrease their combined capacity on any of these routes.

[23] *See,* e.g., Robert J. Calzaretta, Yair Eilat and Mark A. Israel, "Competitive Effects of Airline Cooperation," *Journal of Competition Law & Economics,* Vol. 13, No. 3, September 2017; and J. Brueckner, D. Lee, and E. Singer. (2013); "Airline Competition and Domestic U.S. Airfares: A Comprehensive Appraisal." *Economics of Transportation,* 2(1).

DOJ-NEA-00002130

CONFIDENTIAL

We now turn to a discussion of the city-pair markets the Division might find most concerning.

### 1. Four-Airline City-Pairs

There are nine 4-airline overlap routes under the NEA.  Compass's economic analysis indicates that a hypothetical merger of American and JetBlue would have no adverse fare effects on those routes, implying even fewer effects from the NEA, which is not a merger.[24]  This becomes even more apparent when taking a closer look at the routes because Delta and United have a strong presence on almost all of the 4-airline routes at issue.  In fact, as shown in the table below, Delta and United combined carry over 55% of seats in five of the nine 4-airline overlap city-pairs.  On the other hand, American's presence on those city-pairs is relatively small.

### Table 1:  4-Airline Overlaps (2019)

| City-Pair | Total Seats | American Seat Share | JetBlue Seat Share | Combined Seat Share | Third Competitor Seat Share | Fourth Competitor Seat Share |
|---|---|---|---|---|---|---|
| NYC-BOS | 3,207,060 | 19% | 25% | 43% | *31% (DL)* | *26% (UA)* |
| NYC-RDU | 1,525,383 | 19% | 8% | 31% | *40% (DL)* | *30% (UA)* |
| BOS-DFW | 1,020,516 | 68% | 16% | 85% | 11% (WN) | 4% (NK) |
| NYC-CHS | 689,894 | 5% | 27% | 32% | *38% (DL)* | *30% (UA)* |
| NYC-PUJ | 616,868 | 4% | 33% | 37% | *36% (UA)* | *27% (DL)* |
| NYC-PWM | 499,806 | 11% | 11% | 22% | *44% (DL)* | *34% (UA)* |
| NYC-BDA | 280,556 | 30% | 36% | 66% | 25% (DL) | 9% (UA) |
| NYC-MVY | 43,481 | 19% | 69% | 88% | 10% (DL) | 2% (9K) |
| BOS-PHL | 1,792,008 | 70% | 20% | 90% | 10% (DL) | TBD (F9)* |

*Frontier announced its entry into BOS-PHL in January 2020.[25]*

The four city-pairs where Delta and United do not have at least 55% passenger share are two Boston-to-American hub routes, BOS-DFW and BOS-PHL, and two lightly traveled routes, NYC-BDA (Hamilton, Bermuda) and NYC-MVY (Martha's Vineyard, MA).  Competitive harm on these routes is very unlikely as well:

- On BOS-DFW, American serves slightly more than two-thirds of all passengers, with the remainder served by three LCCs:  JetBlue, Southwest and Spirit.  The Parties' intention is not to reduce capacity on this route, as evidenced by the Clean Team schedule.[26]  DFW is a hub for American, and as the NEA restores American's

---

[24] When limiting the regression in Table 1 of the Competitive Effects Submission to routes that have exactly two non-JetBlue non-American nonstop competitors, the nonstop presence of American has a small and not statistically-significant fare effect, regardless of whether JetBlue is present on the route, while JetBlue's presence has a large statistically significant negative fare effect.

[25] *Frontier Airlines Announces 3 New Nonstop Routes from Philadelphia to Boston, Chicago and Los Angeles,* (January 29, 2020), https://news.flyfrontier.com/frontier-airlines-announces-3-new-nonstop-routes-from-philadelphia-to-boston-chicago-and-los-angeles/.

[26] The Clean Team schedule used for Compass's benefits analysis shows an increase in capacity of 1%.

DOJ-NEA-00002131

CONFIDENTIAL

presence in Boston, American will have every incentive to maintain and even grow one-stop offerings for Boston-originating passengers connecting through DFW. Nevertheless, were JetBlue or American to reduce capacity on this route, that would most likely lead Southwest or Spirit to increase capacity, and/or Delta to enter the route. American and JetBlue have neither motive nor ability to try to raise prices or reduce capacity in this city-pair.

▪ On BOS-PHL, JetBlue found itself flying an inefficient eight departures per day to keep pace with American's ten departures per day. Working together, the Parties designed a schedule that reduces frequencies without reducing capacity. There is no reason to think that with the same American/JetBlue capacity and with JetBlue still flying the route, fares should rise. However, if that happened, Delta could expand its capacity, and Frontier—which announced its intention to commence BOS-PHL service just prior to the COVID-19 outbreak—could expand its capacity as well.

▪ In NYC-BDA, a relatively smaller city-pair, both Delta and United have significant presence, with 25% seat share and 9% seat share respectively. Thus, the two carriers will continue to constrain American and JetBlue within the NEA, and could expand capacity in the event of higher fares. In any event, American and JetBlue plan to increase total capacity by 2% in the NEA.

▪ NYC-MVY is an extremely small city-pair with seasonal daily service for American and JetBlue where Delta also has a significant presence with 10% share. Cape Air also serves Martha's Vineyard year round from JFK, albeit with small commuter aircraft. Neither carrier plans to reduce capacity under the NEA.

Thus, there is no reason for concern on any 4-airline overlap routes in the NEA.

## 2. Three-Airline City-Pairs

There is only one domestic 3-airline overlapping city pair in the NEA. On BOS-CLT, American had (pre-COVID-19) an 87% seat share, reflecting the fact that Charlotte is an American hub with more than 700 flights serving primarily the southeastern United States. Prior to COVID-19, JetBlue was flying the route three times daily from/to BOS, which accounts for its 11% seat share. Frontier is (or was) the remaining competitor. The Parties will both continue to serve BOS-CLT, and plan on increasing BOS-CLT capacity by 4.3%, justified by American's improved presence in Boston and improved competitiveness for Boston-originating passengers. Moreover, as American's gateway hub to southeastern US destinations in competition with Delta through its Atlanta hub, American has every incentive to keep BOS-CLT fares low and attract more flow traffic. Finally, with a second LCC on the route, neither American or JetBlue could profitably raise fares. Were JetBlue to raise fares, most of the diverted passengers would go to Frontier flights, not American flights. There are also no evident barriers to expansion for Frontier, or barriers to entry.

There are two international 3-airline overlapping city pairs in the NEA. One of them, NYC-SJO (San Jose, Costa Rica), is a seasonal route on which United has 91% of seats. The parties do not envision any change in their capacity directed to this route, JetBlue will still fly it, so the NEA should not have an impact on fares. Much more likely, the NEA will create a stronger option to compete with United in a way that neither JetBlue's nor American's offering can do alone today. The other is NYC-ANU (Antigua), where American operates 50% of the

DOJ-NEA-00002132

CONFIDENTIAL

seats and JetBlue operates 32% of seats.  United is a strong competitor on the route, with 18% seat share.  JetBlue plans to increase capacity on NYC-ANU by 33.3% for a total increase by the NEA of 24.6%, which leaves the route more competitive than it is today.

### 3.   BOS–DCA, BOS–LGA and DCA-LGA Service

Comments made by DOJ Staff during the state of play meeting suggest that the short-haul, high-frequency service between BOS-DCA, BOS-LGA, and LGA-DCA (sometimes referred to as "shuttle" service) should be assessed as airport markets rather than city-pair markets.  If so, BOS-DCA and BOS-LGA would be additional 3-airline markets.

The NEA aspires to improve service between these three airports.  That will be accomplished by turning over to JetBlue as much of this service as American can consistent with its labor agreements.  The NEA will lead to BOS-DCA and BOS-LGA becoming much more of a JetBlue product than it is today, with JetBlue fares, and JetBlue will add DCA-LGA service.

- On LGA-BOS, JetBlue will add 9 additional daily roundtrip frequencies 2,629 daily seats (263% increase).

- JetBlue will enter LGA-DCA service with LGA slots obtained through the NEA. JetBlue intends to fly substantially larger aircraft than American now flies on this route.

- JetBlue and American will both continue to offer BOS-DCA service.  Scheduling adjustments pursuant to the NEA will allow the carriers to offer similar number of seats as they did in 2019 (only a 12% decline) with ten fewer frequencies on larger aircraft.[27]

History indicates that expanded JetBlue service will be a win for consumers.  When JetBlue launched its LGA-BOS service in 2016, the lowest walk-up fare dropped from $383 to $119.[28]  JetBlue, however, was limited to flying only 6 frequencies daily (compared to 17 operated daily by Delta) due to slot constraints at LGA.  On the other hand, American has struggled to compete in this market with its higher costs and relative weakness compared to Delta in both New York and Boston.[29]

The tentative plan is therefore for American to pull its LGA-BOS services so that JetBlue can use American's slots at LGA to match Delta's frequencies to further stimulate demand and enhance competition.  JetBlue adds 11 daily frequencies so that there is a 20% increase in BOS-LGA seats after accounting for American's exit.  With expanded capacity and LCC economics, JetBlue is uniquely equipped to meet the demands of these markets effectively.  Its lower-cost model allows JetBlue to set lower fares that will stimulate additional demand from customers that may otherwise drive or take the bus or train.  JetBlue's formula for success—operating

---

[27] Again, this more efficient schedule will free up frequencies that will be added to other new or existing routes.

[28] In its Complaint challenging the American-US Airways merger, the Division cited JetBlue's entry into LGA-BOS and BOS-DCA service as examples of the fare effects of LCCs.

[29] For example, American has struggled to stay competitive in the shuttle markets out of New York.  AA-NEA-00010934 ("[O]ur immediate concerns are moving towards the widening gaps with DL . . . We hear routinely from customer. . . about the inconsistencies with our product & delivery given the facility constraints, aircraft, schedule etc. . . . I know you have seen the worsening financial performance too and I'm now concerned we're losing more market share (and potential diminishing relevance) with our corporate accounts in NYC.").

10

CONFIDENTIAL

bigger planes with lower fares to attain higher load factors and improve flight performance—is ideal in shuttle markets. The NEA will create a stronger rival for Delta's "shuttle" service, on each of the three Northeast airport pairs. The net result will be procompetitive.

### 4.   Two-Airline City-Pairs

There are three overlaps between American and JetBlue on city-pairs with no other current competitors. For two of them, BOS-ROC and BOS-SYR, American plans to exit within the NEA, so they are akin to 2-to1s. Those exits are motivated by JetBlue's comparative advantage with its lower cost model in serving these shorter-haul smaller markets. American has struggled to stay competitive in these markets recently,[30] while JetBlue has successfully leveraged its lower cost model and low fares to stimulate demand. JetBlue plans to add two new frequencies in BOS-ROC and one frequency in BOS-SYR with larger aircraft. Overall, there will be 20% more seats in BOS-ROC and 33% more seats in BOS-SYR within the NEA.

Both carriers plan to continue to operate BOS-PHX. Phoenix is one of American's hubs, and American will continue to be motivated to drive traffic from Boston passengers connecting beyond Phoenix. At the same time, JetBlue, which will be motivated to fill its planes with local passengers by stimulating demand through lower fares, will continue to compete aggressively against American.

### 5.   The Minimal Problematic Overlaps Could be Addressed Without Fundamentally Altering the NEA

If the Division is unconvinced by the Parties' arguments about the low likelihood of fare increases on nonstop overlap routes, we respectfully request to see the economic analysis that justifies such a conclusion. At the end of the day, however, this issue is, worst case, peripheral to the NEA as a whole. There are only a handful of potentially problematic routes, and most (e.g., BOS-SYR, BOS-ROC, NYC-BDA, NYC-MVY) are small.

Under those circumstances, carving-out 3-airline and 2-airline routes would be the maximum reasonable remedy. We do not believe it is in consumers' best interest to carve-out high-traffic routes, particularly originating or terminating in Boston, where there is no reason to doubt that entry or expansion by other carriers, as well as incentives to increase flow traffic through American hubs at Charlotte and Phoenix, can restrain potential anticompetitive behavior. But in all events, a handful of concentrated overlaps routes does not justify any broader remedy, and could not support broader injunctive relief against the NEA.

---

[30] AA-NEA-00213135; AA-NEA-00216534.

DOJ-NEA-00002134

CONFIDENTIAL

## B.  Potential Harm from Coordination of Capacity

The NEA unlocks significant benefits through the promise of deploying the Parties' complementary assets in a jointly optimized schedule and service offering that stimulates customer demand and competes more effectively against Delta and United.  The Division has raised concerns, however, that the coordination of capacity may be akin to market allocation that will harm consumers.  Yet coordination and optimization that is "reasonably related to the joint ventures' procompetitive ventures" is evaluated under the Rule of Reason, just like the NEA overall.[31]

Capacity optimization is in fact the rudder that will ensure that the NEA will create a genuinely superior product that will attract customers in the Northeast.  The "virtual network" that the Parties are trying to create will not design itself.  It takes extensive consultation by network planning personnel and highly detailed schedules, equipment assignments, slot and gate assignments, and much more logistically to turn American and JetBlue assets into the output expansion machine that is the NEA.  The Parties know this because they have already simulated it within the Clean Team.  Individuals from American and JetBlue formed a Clean Team and collaborated to create a joint schedule that would create the best customer proposition, most competitive against Delta and United.  They conducted this exercise with a joint pool of slots and gates, determining how best to deploy each carrier's different aircraft to capture the significant demand that will be unlocked by the integration of the Parties' networks and sales, brand, and FFP presences.[32]

The modeling performed by the Clean Team was designed to create an expanded and more competitive consumer offering in NYC and BOS.  This objective encompassed five broad growth principles: (1) "Jointly create or expand network coverage in the largest US NYC OD markets, especially where AA/B6 combined are especially weak in generating NYC origin passengers"; (2) "Play to metal strength both from a marketing and aircraft usage perspective; Ensure the right aircraft is in the right market"; (3) "Ensure [American transatlantic flights'] connectivity with flow market coverage"; (4) "Propose new markets or opportunities where joint partnership enables a market to be successful"; and (5) "Evaluate potential for BOS market coverage; use B6 local marketing strength in BOS."[33]  Every one of those principles is in full alignment with antitrust objectives, in particular output expansion.  The results are striking, creating significant growth and unlocking new demand for air travel in a way that neither American nor JetBlue have done or could do standalone.

The Clean Team created an optimized schedule that will rival the breadth and depth of service of Delta and United with significantly more output and more international flights facilitated by better connections, as shown below.  Overall, the Clean Team identified 27 new JetBlue nonstop routes and 7 new American nonstop routes that will be launched by American, with an overall seat increase of 14.2%.  There are also projected to be increases in frequencies on

---

[31] *Med. Ctr. at Elizabeth Place, LLC,* 922 F.3d at 724–25.

[32] Of course, post-implementation of the NEA, the joint planning teams may make changes at the margins to the Clean Team schedule.  These changes are not expected to be significant, as the Clean Team schedule reflects the parties' best projection of the value that can be generated by the transaction.

[33] AA-NEA-01151830.

CONFIDENTIAL

many routes.  The optimized schedule, when compared to the September 2019 schedule, will generate an additional $800 million in benefits for consumers annually.[34]

**Figure 1:  Changes in Coverage and Output in Optimized NYC Schedule**

| NYC EWR/JFK/LGA | Pre-Alliance | Pre-Alliance | jetBlue | | |
|---|---|---|---|---|---|
| **Nonstop Markets** | 54 | 61 | 120 | 107 | 125 |
| **Daily Seats** *Bi-Directional Total* | 62k | 61k | 142k | 120k | 113k |
| **Domestic Nonstop OD PDEW Coverage** | 59% | 69% | 91% | 89% | 90% |
| **Top 50 NYC OD** *MAC Markets Nonstop (D+I)* | 30/50 | 29/50 | 48/50 | 49/50 | 50/50 |
| **INTL Long-haul Markets** *(South America/EMEA/Asia)* | 8 | 1 | 21 | 25 | 35 |

*Pre-Alliance and competitor values based on September 2019 schedule.*
*Source: Diio*
*International Long-haul markets exclude any possible JetBlue Transatlantic that is not contemplated nor included in NEA*

The Clean Team created this significantly better schedule under a near "zero sum" capacity assumption, utilizing mostly the assets that the Parties operated and deployed at NEA airports in September 2019 (the balance being order book).  Capacity additions on NEA routes—and there are many—had to be "funded," which meant in some cases moving the capacity from one route to another.  The Clean Team looked for inefficiencies in the existing schedule and opportunities to reduce frequencies or swap metal to create opportunities to improve the overall joint schedule through better aircraft and better utilization of slots and gates.  As the Division has noted, some of the Clean Team decisions result in one carrier exiting or reducing capacity on a route.  That is inevitable—the nature of the beast—when solving for the NEA as a whole.  Each of these changes were made uniformly in order to fund better alternatives that would make consumers better off.

**1.  Routes Optimized from JetBlue to American**

In the optimized schedule, JetBlue will operate ***20% more seats*** than it did prior to the NEA.  JetBlue will continue to operate most of its (pre-COVID-19) routes.  There are, however, a few exceptions, which were primarily motivated by fleet limitations.  Decisions regarding these JetBlue exits were driven by identifying where JetBlue struggled to compete sustainably and where American could serve a flight or route more effectively and efficiently.  As shown in the table below, the Clean Team plan, if adopted, would cause JetBlue to exit only the few routes where it struggles with relatively weak presence and where American has the brand presence and network advantages to serve the route more efficiently with a better customer proposition.  These routes are also highly competitive with at least one other LCC present.  Thus, any hypothetical harm relative to the significant benefits enabled by deploying JetBlue assets elsewhere in the NEA will be minimal.

---

[34] *Economic Analysis of Consumer Benefits from the Proposed American Airlines – JetBlue Northeast Alliance*, COMPASS LEXECON (Aug. 27, 2020).

DOJ-NEA-00002136

CONFIDENTIAL

**Table 2:  Routes Exited by JetBlue in Optimized Schedule**

| City-Pair | American Seat Share (2019) | JetBlue Seat Share (2019) | Other Competitors Seat Share | NEA Change in American Frequencies | NEA Change in JetBlue Frequencies | Net Change in Seats |
|---|---|---|---|---|---|---|
| NYC-CLT | 70% | 3% | 16% (DL) 9% (UA) 2% (NK) | 23 ⇒ 25 | 2 ⇒ 0 | +3.3% |
| NYC-ORD | 29% | 2% | 36% (UA) 15% (DL) 14% (WN) 4% (NK) | 20 ⇒ 22 | 2 ⇒ 0 | +2.1% |
| NYC-PHX | 51% | 7% | 19% (UA) 17% (DL) 5% (WN) 1% (F9) | 7.5 ⇒ 8.5 | 1 ⇒ 0 | +4.3% |
| NYC-AUS | 13% | 18% | 32% (UA) 26% (DL) 11% (WN) | 1 ⇒ 4 | 2 ⇒ 0 | +45.3% |
| NYC-ATL | 6% | 4% | 68% (DL) 9% (UA) 9% (WN) 2% (NK) 2% (F9) | 5.5 ⇒ 7.5 | 2 ⇒ 0 | (23.5%) |
| NYC-IAH | *0%* | 4% | 68% (UA) 11% (DL) 11% (WN) 6% (NK) | 0 ⇒ 2 | 1 ⇒ 0 | +0.7% |

What jumps out is that in most cases JetBlue's exit is associated with a larger American capacity increase.  On the two routes on which that is not the case, both American and JetBlue are very small competitors, Delta or United is dominant and at least one other LCC has a bigger share than JetBlue.

**New York-Charlotte.**  New York-Charlotte is technically not an exit attributable to the NEA.  JetBlue announced its exit from this route last summer.[35]  Scott Laurence explained on an earnings call that the route was "performing below system average."[36]

**New York-Chicago.**  New York-Chicago is highly competitive with four other competitors including two LCCs.  On top of that, both American and United operate a hub in Chicago.  As a result, JetBlue has a very weak presence in the market, with only 2% seat share.  On the other hand, American has unlocked significant network efficiencies and maintains a strong brand presence in Chicago.  Additionally, American's premium aircraft fit the Chicago market better, helping to ensure that international passengers connecting through JFK to Chicago would get a consistent product throughout the journey.  As a result, JetBlue would eliminate its two frequencies on the route while American would add two frequencies, with a net increase in 2% in seat capacity on the route.

**New York–Phoenix.**  JetBlue's presence on this route is particularly insignificant because it operates one "red-eye" flight on this market.  Customers heavily disfavor red-eye flights.  Thus, customers are better served by American, which has a strong brand presence in Phoenix and network synergies in Phoenix to provide a broad range of services at more favorable times of the day.  American therefore plans to add two frequencies.  Overall, customers will enjoy a net of 4% more seats.

---

[35] *Why this low-cost carrier is making changes at CLT,* (July 24, 2019), https://www.bizjournals.com/charlotte/news/2019/07/24/low-cost-carrier-nixing-route-adding-service-for.html.
[36] *Id.*

DOJ-NEA-00002137

CONFIDENTIAL

**New York-Austin.**  Austin is a rapidly growing business market where the ability to serve corporate customers with convenient flights to and from New York has become increasingly important.  American has a strong presence with corporate customers in Austin, serving the route with a wide range of products on its premium aircraft.  On the other hand, JetBlue has been servicing the route with aircraft that have no premium service.  American can serve the route better, and indeed American plans to add three additional frequencies, expanding its seat capacity on the route by 300%.  Overall, customers of American and JetBlue on NYC-AUS will end up with net 45% more seats with access to American's product (and brand and sales presence in Texas) which is much better suited for the market.

**New York-Atlanta.**  Delta is by far the largest carrier on this route, which of course includes its main hub.  American and JetBlue trail both United and Southwest, with 6% and 4% seat share, respectively.  JetBlue plans to cut its two frequencies from JFK, while American adds two frequencies out of JFK with the right aircraft (two-cabin aircraft) for what is primarily a feeder route connecting to transatlantic flights.  The market will be at least if not more competitive than it is today.

**New York-Houston.**  American is not present on New York-Houston at all today; the route is dominated by United's Newark to Houston, hub-to-hub service. JetBlue has a 4% seat share, trailing United, Delta, Southwest, and Spirit.  Things can only get better from that starting position.  In the optimized schedule, JetBlue's one flight to New York-Houston will be replaced by two flights by American, the logic being that this creates a better international connecting proposition out of JFK.  Houston has a strong base of international connecting passengers.

**2.  Routes with Decreased JetBlue Frequencies**

There is similarly no cause for concern on any plans by JetBlue to reduce frequencies.  On routes where American and JetBlue provide overlapping operations, the reduced frequencies reflect elimination of wingtip flying in order for the carriers to serve customers more efficiently (i.e. fewer roundtrips and bigger planes).  This will allow the carriers to serve their customers at similar levels of service and at the same time free up more slots, gates, and aircraft to add capacity on other routes, meaning the changes are efficient and procompetitive.

For example, on Boston–Philadelphia**,** JetBlue plans to spread out the schedule in a way that will effectively serve nonstop short-haul passengers and also facilitate seamless connections in Philadelphia and in Boston.  Delta and Frontier will provide a strong check on any potential effort to raise fares.  Similarly, in Boston-DCA, the considerations centered primarily on maximizing short-haul shuttle-type service between the destinations more efficiently by reducing frequencies to free up gates for other flying while maintaining similar levels of service overall.  Delta also entered this route only in late September 2019, thus it is likely to expand share going forward.  In BOS-JFK, BOS-ORD, NYC-BDA, and NYC-LAX, the carriers will also be able to provide the same or greater level of service with fewer usage of slots, gates, and aircraft.

Changes to frequencies at NYC-SDQ and NYC-STI reflect JetBlue's decision to deploy its assets on better flying opportunities created by the NEA.  There is no basis for market allocation concerns as American has no presence on these routes.

DOJ-NEA-00002138

CONFIDENTIAL

**Table 3:  Routes with Decreased Frequencies from JetBlue in Optimized Schedule**

| City-Pair/ Airport-Pair | American Seat Share (2019) | JetBlue Seat Share (2019) | Other Competitors Seat Share (2019) | NEA Change in American Frequencies | NEA Change in JetBlue Frequencies | Net Change in Seats |
|---|---|---|---|---|---|---|
| BOS-CLT | 87% | 11% | 2% (F9) | 17.5 ⇒ 17.5 | 2.5 ⇒ 2 | +4.3% |
| BOS-DCA* | 52% | 44% | 3% (DL) | 11.5 ⇒ 9.5 | 13 ⇒ 5.5 | (12%) |
| BOS-ORD | 31% | 9% | 29% (UA) 27% (WN) 2% (NK) 2% (DL) | 14 ⇒ 15 | 4.5 ⇒ 3.5 | +11.8% |
| BOS-PHL | 61% | 26% | 13% (DL) | 9.5 ⇒ 9.5 | 7.5 ⇒ 3.5 | +0.3% |
| BOS-JFK* | 14% | 40% | 46% (DL) | 1 ⇒ 1 | 6 ⇒ 5 | (7%) |
| NYC-BDA | 30% | 36% | 25% (DL) 9% (UA) | 1 ⇒ 2 | 2 ⇒ 1 | +1.9% |
| NYC-LAX | 12% | 25% | 27% (UA) 21% (DL) 14% (AS) | 11 ⇒ 14 | 16 ⇒ 14.5 | +9.9% |
| NYC-SDQ | *0%* | 52% | 24% (DL) 17% (UA) 6% (NK) | 0 ⇒ 0 | 6.5 ⇒ 6 | (8.6%) |
| NYC-STI | *0%* | 64% | 27% (DL) 9% (UA) | 0 ⇒ 0 | 8 ⇒ 7.5 | (2.6%) |

*Shares are provided on airport-basis.

16

CONFIDENTIAL

3. **Routes Optimized from American to JetBlue (Or Decreased American Frequencies)**

American reduces capacity on some routes as well, but again in almost every case where JetBlue was present or will enter, that is more than made up for by a corresponding increase in JetBlue capacity, making these changes inherently procompetitive.

**Table 4:  Routes with Reduced Frequency from American in Optimized Schedule**

| City-Pair/ Airport-Pair | American Seat Share (2019) | JetBlue Seat Share (2019) | Other Competitors Seat Share (2019) | NEA Change in American Frequencies | NEA Change in JetBlue Frequencies | Net Change in Seats |
|---|---|---|---|---|---|---|
| NYC-BNA | 18% | 0% | 33% (WN) 25% (UA) 24% (DL) | 6.5 ⇒ 4.5 | 0 ⇒ 2 | +42.2% |
| NYC-LAS | 7% | 20% | 36% (UA) 29% (DL) 6% (NK) 1% (F9) | 1 ⇒ 0 | 4 ⇒ 4 | (6%) |
| NYC-SFO | 6% | 16% | 38% (UA) 20% (AS) 19% (DL) 1% (WN) | 4.5 ⇒ 0 | 7.5 ⇒ 11.5 | +11.7% |
| NYC-MCO | 4% | 39% | 24% (DL) 22% (UA) 9% (NK) 2% (F9) | 1 ⇒ 0 | 16.5 ⇒ 19 | +10.6% |
| NYC-CHS | 5% | 27% | 38% (DL) 30% (UA) | 1 ⇒ 0 | 2.5 ⇒ 3 | (4.5%) |
| NYC-RDU | 22% | 8% | 40% (DL) 30% (UA) | 8.5 ⇒ 7.5 | 2.5 ⇒ 3 | +6.9% |
| BOS-ROC | 57% | 43% | - | 3 ⇒ 0 | 1 ⇒ 3 | +20% |
| BOS-SYR | 28% | 72% | - | 1 ⇒ 0 | 1 ⇒ 2 | +33.3% |
| BOS-DCA* | 52% | 44% | 3% (DL) | 11.5 ⇒ 9.5 | 13 ⇒ 5.5 | (12%) |
| BOS-LGA* | 38% | 19% | 44% (DL) | 11 ⇒ 0 | 5 ⇒ 13.5 | +15.2% |
| LGA-DCA* | 54% | *0%* | 46% (DL) | 8.5 ⇒ 0 | 0 ⇒ 9 | +57.3% |
| NYC-IAD | 26% | *0%* | 38% (DL) 36% (UA) | 10 ⇒ 2 | 0 ⇒ 9 | +49.3% |
| NYC-YUL | 12% | *0%* | 48% (KV) 27% (DL) 5% (AC) 4% (C5) 4% (UA) | 4 ⇒ 3.5 | 0 ⇒ 0 | +66.3% |
| NYC-CLE | 15% | *0%* | 49% (UA) 36% (DL) | 5 ⇒ 4 | 0 ⇒ 0 | +22.4% |
| NYC-GSO | 22% | *0%* | 46% (DL) 32% (UA) | 3.5 ⇒ 2.5 | 0 ⇒ 0 | +36.7% |
| NYC-CMH | 30% | *0%* | 42% (DL) 28% (UA) | 6.5 ⇒ 6 | 0 ⇒ 0 | (1.5%) |
| NYC-ORF | 28% | *0%* | 46% (DL) 26% (UA) | 6.5 ⇒ 3 | 0 ⇒ 0 | (23.6%) |
| NYC-RIC | 25% | *0%* | 48% (DL) 27% (UA) | 5 ⇒ 3.5 | 0 ⇒ 0 | (20.8%) |
| BOS-MDT | 100% | *0%* | - | 1 ⇒ 0 | 0 ⇒ 0 | (100%) |
| NYC-CAE | 25% | *0%* | 75% (DL) | 1 ⇒ 0 | 0 ⇒ 0 | (100%) |
| NYC-TYS | 29% | *0%* | 37% (DL) 23% (G4) 11% (UA) | 2 ⇒ 0 | 0 ⇒ 0 | (100%) |

*Shares are provided on airport-basis.

17

CONFIDENTIAL

There is a strong business logic, unrelated to any anticompetitive effects or motives, for each of these decisions.  For example:

American drops two daily departures on New York-Nashville, but the reason is a testament to how the NEA benefits consumers.  Nashville is primarily a leisure destination, fitting most comfortably within the JetBlue consumer proposition.  In fact, American was flying the route with small regional jets, primarily to connect passengers to international longer-haul flights from JFK.  Thus, the Clean Team identified this mismatch and determined that JetBlue could operate the route with larger aircraft and lower fares to target leisure demand to the customers' benefit.  Capacity increases by 42%.

In New York-Las Vegas, American pulls its sole roundtrip on the route, but JetBlue upgauges its flights so that it can more efficiently serve existing customers with only a net decrease of 6% in seats.  Similarly, American plans to pull sole roundtrip services from New York to Orlando and Charleston, which are better served by JetBlue, which will add frequencies to provide similar or more seats. In New York-RDU, American will pull one roundtrip frequency and JetBlue increased its frequency for a net increase in seats of 7%.

New York–San Francisco is a highly competitive route served (prior to COVID-19) by six airlines.  American was the fifth-place carrier, largely because of poor local relevance on both ends of the route.  Five daily frequencies on a high-value, business-traveler-heavy route translated into just a 6% market share.  The Clean Team optimized the schedule pattern in New York-San Francisco to create a more competitive NEA offering with 12% more capacity while using fewer planes.  The Clean Team eliminated wingtip flying as shown below.  The expanded schedule will be much more attractive to San Francisco-based passengers than what JetBlue or American offered prior to COVID-19, as well-spaced frequencies is a much better match for United's 15-frequencies schedule.

**Figure 2:  NYC-SFO Schedule Optimization**



**9% Increase in seats**

Many of the other routes exited or reduced by American include short-haul routes in the Northeast (*e.g.*, BOS-LGA, BOS-DCA, LGA-DCA, BOS-ROC, BOS-SYR).  As explained above, JetBlue is uniquely positioned to serve these routes effectively, with greater ability to stimulate demand through lower fares.  On almost all of these routes, despite American reducing frequencies, JetBlue will more than make up for the lost capacity.

Finally, there are ten routes on which American is exiting or reducing frequencies, but on which JetBlue does not operate any competing flights.  American plans to upgauge its aircraft on

18

CONFIDENTIAL

many of the reduced-frequency routes so that it can more efficiently maintain greater or similar levels of service while freeing up slots.  Plans to exit other routes also free up slots for better use.  This will allow JetBlue to launch significant new capacity (227.1% increase in seats at LGA, far exceeding the number of seats American is removing) that will lower fares and benefit consumers.

### 4.   NEA Coordination is Reasonable, Output- and Efficiency-Enhancing, and Should be Permitted

As this discussion demonstrates, the coordination envisioned by the NEA and exemplified by the Clean Team's work is on-the-merits and efficiency-enhancing management of pooled American and JetBlue NEA assets, leading to better consumer outcomes and expanded output.  Not one of the hundreds of recommendations made by the Clean Team can be squared with any theory that coordination leads to lower output and higher fares.  This includes the rare decisions to reduce capacity, which occur in circumstances where competition from other airlines make market-wide fare effects implausible.  And while we understand that proposals to have one airline exit a route may raise eyebrows at first, in every case there is a strong business rationale—aligned with antitrust interests—to do so, and little or no chance of adverse effects on consumers.

Antitrust law permits coordination in an efficiency-enhancing joint venture such as the NEA.[37]  Case law and Division policy accept this, and are mostly concerned with spillover effects such as the use of opportunities for legitimate coordination as a forum for information sharing or explicit coordination on competition outside the scope of the collaboration.[38]  That concern is usually addressed by "appropriate safeguards governing information sharing."[39]

The Parties have already adopted their own safeguards.  Any meetings or teleconferences involving the joint-planning teams will be conducted under the guidance of in-house and/or external legal counsel and will have pre-established agendas that will only include issues related to the NEA network and routes that are reasonably necessary to implement the NEA.  During the implementation and planning process, all information sharing will be first reviewed and approved by the legal departments of both companies, and competitively sensitive information will be managed through clean teams if necessary.  The legal teams will also develop and implement additional protocols to ensure that information being exchanged is necessary to the operation of the NEA and does not disclose information concerning capacity decisions on routes outside the scope of the NEA or pricing decisions, period.  In addition, the parties are willing to accept mandatory restrictions on the sharing of information such as those that are typically found in DOJ consent decrees on vertical mergers and mergers among producers of complements.

There is no good argument for any broader restriction on the parties' ability to use active coordination on network planning as a tool to increase joint output.  It would be impossible to replicate the kind of nuanced analysis evident in the Clean Team work without active

---

[37] *See, e.g.,* Collaboration Guidelines ¶ 3.2 ("If, however, participants in an efficiency-enhancing integration of economic activity enter into an agreement that is reasonably related to the integration and reasonably necessary to achieve its procompetitive benefits, the Agencies analyze the agreement under the rule of reason, even if it is of a type that might otherwise be considered per se illegal.").

[38] *See id.* at ¶ 3.34(e).

[39] *Id.*

DOJ-NEA-00002142

CONFIDENTIAL

coordination. It is too complicated, there are too many levers to pull, and there are too many interdependencies with other decisions the carriers make to do it any other way. It is more than enough that the recommendations of the network planning teams remain advisory, permitting both airlines to overrule any proposal based on an assessment of their self-interest.

## C. Potential Harm from Using NEA Assets to Control or Discipline JetBlue, Resulting in "Accommodating Behaviors"

A theme that was evident in Staff questions received before the October 8 meeting was that the NEA might risk changing JetBlue's disruptive behaviors because once JetBlue receives access to American assets pursuant to the NEA, it risks losing those assets unless it adopts accommodating behaviors. As we understand the concern, American could use access to codes, flows, slots, etc. for what amounts to "cross-market initiatives," keeping access open when JetBlue adopts accommodating behaviors and shutting it off to some degree when JetBlue is too disruptive, within or even outside of the NEA territories.

While the logic is clear enough, we do not understand the legal basis for advancing this theory prospectively under a Section 1 framework. We say that acknowledging and not quarreling with the observation in the *Collaboration Guidelines* that "[c]ompetitor collaborations also may facilitate explicit or tacit collusion through facilitating practices such as the exchange or disclosure of competitively sensitive information or through increased market concentration."[40] Of course, information sharing can violate Section 1, and unnecessary information sharing—for example, because it concerns competition outside the scope of the venture—may as well. We also do not doubt that if this actually happened during the course of the NEA, the combination of American's "stimulus" (e.g., arbitrarily "toggling" codes) and JetBlue's "response" (e.g., raising fares) might establish an agreement actionable under Section 1.[41] But we have found no authority for the proposition that an otherwise lawful joint venture or collaboration can be found to violate Section 1 because the flow of benefits to the partners *might be* "toggled on and off" to seek and obtain accommodating behaviors.

There is also some irony to this theory, because what allows it is the fact that the NEA agreements are based on a concept of *enabling* procompetitive integration while *mandating* very little. For example, network planning personnel can meet and decide that it makes sense to move capacity from Route A to Route B, but neither airline is then required to do that. When Staff first raised this theory, it cited provisions from the NEA agreements by which the parties retained discretion not to codeshare or share slots. We would have thought that the looser and less obligatory the agreements, the fewer problems one would foresee, since looser agreements permit more unilateral behavior. But instead, we are presented with a theory in which insufficient commitment seems to be the problem.

We strongly believe this is not a problem, and it does not need to be fixed. If American and JetBlue are foolish enough to do what this theory posits, they will expose themselves to Section 1 claims and severe consequences. But until that happens, the possibility that assets contributed to a legitimate joint venture might be withdrawn for collusive purposes does not state any kind of viable legal claim. Furthermore, even if it did, it would not support some broad

---

[40] *Collaboration Guidelines* ¶ 2.2.

[41] This would be comparable to the Division's theory in *United States v. Airline Tariff Publ'g Co.*, Civ. No. 92-2854 (D.D.C. filed Dec. 21, 1992), *available at* www.usdoj.gov/atr/cases/f4700/4796.pdf.

DOJ-NEA-00002143

challenge to the NEA.  At most, the relief the Division could achieve would be comparable to the 2004 Settlement Agreement and Order between the Division and American, arising out of the ATPCO decree.[42]  That Settlement addressed allegations that American had used advance travel dates in published fares and cross market initiatives to influence rival airlines to raise fares.  The Settlement enjoined and restrained American from using travel dates in initiating or extending a cross market initiative, defining "cross market initiative" as "a reduced or less restrictive fare filed by an airline in a city or airport pair important to a second airline **in response to** (1) the second airline having filed a reduced or less restrictive fare in a city or airport pair important to the first airline, or (2) the second airline having failed to match a fare increase filed by the first airline."[43]  Schematically, American was enjoined from undertaking a facilitating practice in response to a competitive practice.  It was not obliged to discontinue its participation in ATPCO.

### D.  Potential Harm from Revenue Sharing

During the October 8 meeting, it was clear that Staff has concerns over revenue sharing pursuant to the parties' MGIA.  Staff's November 4 email expanded on those concerns.  But we do not actually understand the legal basis for those concerns.  Both revenue sharing and profit sharing are common in joint ventures, and yet there is no body of law questioning revenue sharing as an anticompetitive practice.  To the contrary, case law is more likely to refer to sharing profits and risks as defining elements of a legitimate joint venture.[44]  The leading case on revenue sharing under Section 1 holds that the Rule of Reason applies.[45]

The Division has also reviewed and then not challenged joint ventures notwithstanding revenue sharing.  For example, the Division conducted an eight-month investigation of the SABMiller – Molson Coors joint venture, which included revenue sharing, without seeking any remedies.[46]  The Division also investigated but then did not challenge Delta Air Lines' equity investment in Virgin Atlantic Airways Ltd. and their related trans-Atlantic joint venture, even though Delta's 49% equity investment was akin to revenue sharing.[47]  We have not seen any Division challenges to a joint venture or collaboration, including settlements by consent decree, that turn on revenue sharing.  We have reviewed numerous Division filings on DOT ATI dockets that comment on revenue sharing, but even those do not state either a categorical objection to revenue sharing or a set of principles to distinguish permissible versus impermissible revenue sharing.  Of course, we understand the basic concern:  that having a stake in a rival's revenues

---

[42] *See* https://www.justice.gov/atr/case-document/settlement-agreement-and-order.

[43] *Id.,* Def. II.b. (emphasis added).

[44] *See, e.g., Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners,* No. 3:12-cv-26, 2012 U.S. Dist. LEXIS 123408, at *17 n.11 (S.D. Ohio 2012) ("The existence of shared functions and joint management, along with the pooling of capital and the consolidation of revenues is the very definition of a joint venture.").

[45] *California ex rel. Harris v. Safeway, Inc.,* 651 F.3d 1118, 1139 (9th Cir. 2011) (*en banc*).

[46] Department of Justice, *Statement of the Department of Justice's Antitrust Division on Its Decision to Close Its Investigation of the Joint Venture Between SABMiller PLC and Molson Coors Brewing Company*, (June 5, 2008), https://www.justice.gov/archive/atr/public/press_releases/2008/233845.pdf.

[47] Department of Justice, *Statement of the Department of Justice Antitrust Division on Its Decision to Close Its Investigation of Delta Air Lines' Acquisition of an Equity Interest in Virgin Atlantic Airways*, (June 20, 2013), https://www.justice.gov/opa/pr/statement-department-justice-antitrust-division-its-decision-close-its-investigation-delta.

DOJ-NEA-00002144

CONFIDENTIAL

alters competitive incentives on the margin. But altered incentives is a far cry from a complete and coherent Section 1 theory of harm.

Revenue sharing is a central component to the NEA agreements. It distinguishes the parties' proposed relationship from a garden-variety codeshare agreement that would provide for far fewer consumer benefits by attempting to replicate the alignment of interests that has proven so beneficial in metal-neutral joint ventures. As DOT noted in its August 2, 2019 Show Cause Order in the *Delta-Virgin Atlantic* proceeding, "greater alignment of incentives, to the point of metal neutrality, is key to producing public benefits."[48] Of the $800 million in consumer benefits conservatively calculated by Compass, less than $50 million comes from expanded codesharing.[49] The larger benefits, for both the parties and consumers, come in the form of expanded capacity with new routes, better patterns of service, and larger aircraft. Those benefits are a direct result of the optimization process and revenue-sharing, with the former identifying ways to improve their combined product offerings and the latter—revenue-sharing—providing the incentive to seize those opportunities. That is, the prospect of sharing the upside is what gives the parties a reason to move assets around (e.g. American providing slots to JetBlue at LGA), move flight times around to accommodate a better overall pattern of service (e.g. a pattern of service to RDU that is finally competitive to Delta's), re-time flights to create better connections (e.g. JetBlue-provided incremental feed for new transatlantic flying by American), or expand frequent flyer cooperation (e.g. American, in particular, would have no reason to give JetBlue access to American's corporate customer base or its much larger, and more lucrative, AAdvantage program). Each of these moves will benefit consumers, but each also involves a substantial transfer of value between the carriers. Revenue-sharing allows the parties to share in the upside created by cooperation and enables a much better customer proposition.

### 1. Revenue Sharing Pursuant to the MGIA is Not Anticompetitive

There is no realistic danger that revenue-sharing in the MGIA will lead to *less* competitive behavior by American or JetBlue. On the contrary, as we have repeatedly explained through extensive submissions, including by Compass, the NEA will greatly *increase* output with more routes, more frequencies, and more seats. A lot of things come together to make this growth possible, but the incentive effects of the MGIA play a very large role.[50] Without repeating the entire Compass submission, we note the key points.

As you know, the MGIA is not a "first dollar" revenue-sharing formula. That is, JetBlue and American do not simply share all NEA-related revenues according to fixed proportions. The parties designed a revenue-sharing formula to share risks and rewards above a base that depends on the (pre-COVID-19) status quo, and with the strong expectation that the NEA will allow them to do much better—to have higher output and better load factors because of a better product— than either could do on its own. And the specific, intentional way that the MGIA defines the base in each year, and computes revenue sharing relative to that base, creates incentives to strive for that outcome, making it strongly procompetitive.

The details matter here, and explain why this is not simple fixed-percentage revenue

---

[48] Delta-Virgin Atlantic, DOT-OST-2013-0038, Show Cause Order, Order 2019-8-2, at 10.

[49] Calculated based on the Raven run provided in response to question 2a of the Division's 9/22 Raven questions.

[50] *See Effect of the Proposed American Airlines – JetBlue Northeast Alliance on the Carriers' Incentives to Increase Capacity,* COMPASS LEXECON (Oct. 26, 2020).

DOJ-NEA-00002145

CONFIDENTIAL

sharing, but rather is explicitly designed to create capacity expansion incentives. Specifically, the MGIA calculates each carrier's "share" of the revenue in the following way. Each carrier first receives its "going-in" average revenue per seat mile, or its "Base Position" (calculated as average revenue per seat mile in what is called the Base Period (2019), multiplied by the carrier's current year capacity). The Base Position represents a floating estimation of the amount a carrier would have generated in revenue if all of the carrier's NEA capacity for a given year performed at the same level (same average revenue per seat mile) that it did prior to entering the NEA. Importantly, the carriers get the benefit of their "going-in" average revenue per seat mile even if by adding capacity their average revenue per seat mile declines.

Depending on the parties' performance under the NEA in a given year, there may either be a shortfall (the NEA did not generate sufficient revenue to account for each carrier's Base Position) or an excess (the NEA generated revenue greater than the sum of each carrier's Base Position). Either way, the shortfall or excess is referred to as "Incremental Revenue." Each carrier gets an "Attributed Proportion" of the Incremental Revenue, as calculated by the percentage share of the carrier's current period capacity (the carriers estimate that this will be around 50/50 in the NEA). Thus, if there is a shortfall, the carriers share the losses. If there is excess revenue, then the carriers share the excess revenue. An annual transfer payment trues things up.

As the Compass paper explained, the MGIA therefore changes the incentives of the carriers in two ways:

First, the MGIA encourages carriers to grow more aggressively than they would have absent the NEA by sharing the cost of adding incremental capacity. In general, all else equal, marginal capacity is less profitable (has lower revenue per seat mile) than existing capacity. Therefore, ordinarily, it lowers average revenue per seat mile. The MGIA gives each carrier the benefit of expanding capacity without the cost of lower average revenue per seat mile, because the revenue-sharing formula uses a constant—Base Period (2019) average revenue per seat mile—in determining a carrier's Base Position in any year. This has the effect of subsidizing capacity growth—an unthinkable term if the parties intend to reduce capacity.

Take, for instance, the most likely scenario where JetBlue adds capacity with a lower average revenue per seat mile than it saw in the Base Period. Assume JetBlue adds a flight and only generates $0.08 per seat mile when JetBlue generated on average $0.10 per seat mile in the Base Period. JetBlue unambiguously has greater incentive within the NEA than absent the NEA to add capacity in this scenario. Absent the NEA, JetBlue would receive only $0.08 per seat mile. Within the NEA, American will share in the shortfall compared to the Base Period. Thus, assuming a 50/50 Attributed Share, JetBlue will receive $0.09 per seat mile for the added capacity. That alone proves a greater incentive. But now assume that the cost of adding the flight was $0.085 per seat mile. In the NEA, the flight is profitable; absent the NEA, the flight is not profitable and JetBlue probably does not add the capacity.

Second, the MGIA aligns the incentives of American and JetBlue to improve the performance of each other's flights, and increase average revenue per seat mile in that way. As already discussed, there is little-to-no practical ability for American and JetBlue to raise fares in any anticompetitive way. There are very few concentrated routes, most are unprotected by barriers to entry or expansion, and even if one were to add them all up they are a very small percentage of the contemplated NEA flying. So the only real-world way that JetBlue and

23

CONFIDENTIAL

American are going to be able to *increase* average revenue per seat mile is through quality increases that, for example, improve load factors. That is the intention behind the NEA; its fundamental business logic is that together American and JetBlue can make improvements that neither can apart, and a share of the benefits they can realize from increased quality will always be greater than 100% of a benefit that will not be realized in the standalone case.

Compass has shown how this can lead to entry and expansion that would not otherwise occur, because it is unprofitable in the standalone case.

> To illustrate, suppose that in the standalone scenario, if [American] started serving a new route its revenue would be $100,000 below its Base Position. This route would be operated at a loss and so, in general, [American] would not serve the route. Now assume that because of additional feed from JetBlue's network and the associated increase in revenue per equivalent seat mile, serving that new route under the NEA would increase [American's] revenue by $100,000 more than the increase in its Base Position. In the NEA scenario, [American] would need to share about half of benefit (i.e., revenue above the Base Position) with JetBlue, so it would net about $50,000 per year from serving the route. Nevertheless, the NEA scenario is plainly the better one, because adding capacity on the route is unprofitable in the absence of the NEA (-$100,000), but profitable in the NEA scenario (+$50,000).[51]

This is all manifestly procompetitive. *It incentivizes American and JetBlue to add capacity generally, and to compete against each other specifically with respect to who grows NEA capacity the most, as that leads to a greater share of the gains*.

## 2. Comments on Staff's November 4 Questions regarding the MGIA

Finally, we take this opportunity to address some of the questions and comments in Staff's November 4 email.

First, we want to be clear that we are not saying that "incentives cannot be considered on a route-by-route basis." Of course they can, since as noted aggregate performance results from the sum of decisions made at the route level. But that observation does not allow one to ignore the structure of the MGIA that leads to transfer payments based on aggregate performance only. That matters too. The MGIA is intended to create incentives to expand output generally throughout the NEA territory, not just on some routes. Those are the dominant incentives it creates, and that would matter most in any Rule of Reason analysis. As one clear example, when one partner adds a flight that helps revenue on the overall network, those are the effects that matter, not revenue effects isolated to the route in question. More generally, hypothesizing the odd route where there might be an ability to engineer an anticompetitive outcome is never going to be an effective counter to the MGIA's broader incentive effects. The MGIA creates incentives to expand capacity all-in; alleged route specific counter-examples simply cannot refute that.

We do agree with part of the point made in Question 4, that "[t]he mere fact that they will share if it is jointly optimal to add capacity doesn't, standing alone, resolve the competition question of whether, in any specific market, it is optimal to add capacity." All that means is that high-level or general incentives will interact with potential deviations from those incentives on particular routes. We have not ignored that level of analysis. The Compass UPP paper and much of the material above is intended to show that there are very few opportunities to raise fares no matter how closely JetBlue and American coordinate on capacity. If the Division

---

[51] *Id.*

DOJ-NEA-00002147

CONFIDENTIAL

believes there are exceptions, and that the 5% proposed capacity reduction on BOS-DCA is a good example, it should finish the analytical process and explain how *revenue-sharing* factors in to whatever conclusion it reaches about the effect of the optimized BOS-DCA schedule.  Otherwise, this is nothing more than an observation that the NEA allows efficient re-allocation of assets across routes, something the Division cannot possibly oppose.

Next, as we have already said above, it is not correct that "under the governance structure of the NEA, American and JetBlue will make joint decisions about capacity deployment, schedules and market allocations."  It is disappointing that anyone would continue to say that at this point.  But putting that aside, what has it got to do with revenue-sharing?  Of course every element of the NEA "operates in conjunction with" other elements, but we see no basis for theorizing that there is a different antitrust approach to revenue-sharing depending on other aspects of a joint venture's management structure.  When revenue-sharing is problematic, it is because internalizing losses to the revenue-sharing partner creates incentive to raise prices (and market conditions allow the price increase).  It is not because the revenue-sharing partners are engaging in *other conduct* that might lead to anticompetitive outcomes.  And what the Compass analysis shows is that the form of revenue-sharing in this case creates capacity expansion incentives, not the reverse.

Question 2 in the email seems to suggest that coordination will override "what would otherwise have been the unilateral incentives that flow from the MGIA."  But that ignores the *limitations* of that coordination under the NEA, which ought to be unacceptable to anyone citing the need to consider everything together.  In all events, the Compass MGIA Paper is not "effectively assuming a scenario where unified decision-making breaks down and the alliance falls back to independent decision-making driven by unilateral incentives."  That is Staff's characterization, not ours and not the truth.  Compass is assuming as much coordination as is contemplated under the NEA, but no more, and as much freedom to operate as there is, and no less.  That is the only objective way to isolate the effects of revenue-sharing.  An analysis that assumes revenue-sharing leads to "unified decision-making" is nothing short of circular, and incorrect given that the parties remain independent firms that will maximize profits separately, simply taking into account the efficiency out output-enhancing potential of the NEA and the revenue-sharing terms of the MGIA, all of which make additional capacity more feasible and profitable.

Finally, Staff argues that "the MGIA … causes one partner to share in the reduction in RESM of its alliance partner, and so tends to discourage expansions that could (pro-competitively) cause that reduction."  Presumably, this is based on the extremely narrow view that if JetBlue adds capacity on a route, this would harm American's RESM on that route, and JetBlue would "share in the reduction."  This ignores that when JetBlue grows, it largely does so by stimulating overall traffic on the route and certainly not primarily by taking traffic from American, both of which are points JetBlue and Compass have made repeatedly.  But this is also where Staff's continued refusal to recognize the importance of the aggregate nature of the revenue sharing is laid most bare.  When JetBlue adds capacity anywhere, what matters is the effect on American's RESM throughout the NEA, and, by the nature of a partnership with broad codesharing, this overall effect of additional capacity is highly likely to be positive for American.  By Staff's own logic, JetBlue would share in this increase, creating capacity expansion incentives.  Finally and most importantly, Staff continues to search for edge cases while ignoring the center of the MGIA.  While the parties could have adopted a simple textbook revenue share with fixed percentages, they did not; instead, they added terms such that the percentage of

25

CONFIDENTIAL

revenue grows with capacity, thus intentionally building in a capacity expansion incentive that would not be present in the simple textbook form of revenue sharing.

## IV.   CONCLUSION

There is no legal basis for the Division to challenge the NEA, and there won't be unless and until it results in the *actual adverse effects on competition* that are required in any Section 1 Rule of Reason action.  Forbearance—"wait to see"—is therefore the appropriate enforcement action, unless the Division believes there are *per se* issues, which we do not understand to be the case.

In that regard, we have advised the DOT that we are prepared to accept a robust self-assessment, reporting and "look-back" provision similar to those imposed in some ATI orders.  The self-assessment for the NEA would include:  (a) a detailed description of changes to the NEA "optimized schedule" made by the NEA Implementation Team and, separately, Senior Planning Team, separately for each year from implementation of the NEA; (b) seat and departure numbers per distinct nonstop O &D market served on a quarterly basis during the evaluation period; and (c) reporting on the incremental passengers that the NEA has added.  Of course, the parties will provide those reports to the Division when filed with DOT.

DOJ-NEA-00002149