# EXHIBIT H

Message
_____

**From:**      Wark, Robert [Bruce.Wark@aa.com]
**Sent:**      11/21/2020 12:13:56 PM
**To:**        Homan, Todd (OST) [Todd.Homan@dot.gov]
**CC:**        Wilkinson, Molly [Molly.Wilkinson@aa.com]; Land, Robert [/o=ExchangeLabs/ou=Exchange Administrative Group
               (FYDIBOHF23SPDLT)/cn=Recipients/cn=6d48348af76c49678e2a6733618fa3e9-Land, Robert]
**Subject:**   American/JetBlue NEA


Todd:

We received your email yesterday and were taken aback that it included upfront slot divestitures at JFK and
DCA.  Before we sent you our proposal, and in light of the commitments that we sent you earlier this month,
we asked in separate conversations with you and Joel for a complete view of DOT's concerns and the remedies
needed to address those concerns. That was important to us after the disconnect between what Joel asked for
in our first conversation with him (focus on  slot utilization) and the follow up call we had with you (which
introduced upfront slot divestitures.)  Both of you agreed that our request for a full view was reasonable, and
that was the context when you suggested the concept of a "springing commitment" to divest slots as an
alternative—not an addition—to an upfront divestiture.  We followed up our discussion with a short call with
Joel to confirm we were moving in the right direction and there would not be any more surprises.

So, when we sent you our proposal Thursday night, we had every reason to believe that we had a full view of
DOT's concerns, and we worked hard to be responsive. We accepted the suggestion of springing slot
divestitures with respect to LGA and JFK believing that would pave the way to a deal.  Thus, we were stunned
when your response reintroduced upfront divestitures, including DCA slots under a new theory of harm that
was being introduced at this late date.  We want to continue to be responsive, and hope that you view this
email (which does have some new commitments) as productive.  But that does not change the
disappointment or frustration we feel about the content of your latest response.

We will increase the NYC growth commitment, and we will add growth commitments for the DCA shuttles and
DCA overall, as follows.

LGA/JFK

Your point about the AA MAX waivers affecting the 2019 base is reasonable.  We will therefore agree to
increase the LGA+JFK capacity targets by 5 percentage points in both years.  The 2022 target would increase to
10% and the 2023 target would increase to 15%.  Given that this 5% applies to the larger base of LGA+JFK, we
believe it will more than compensate for any lost flying arising from the MAX waivers at JFK.

We are not willing to divest JFK slots now in addition to these conditional divestitures.  First of all, it does not
makes sense to remove slots from the asset base of the NEA at the same time we are accepting a springing
divestiture commitment.  That divestiture would likely make those growth goals unachievable.  But more
importantly, we would not have made those springing divestiture commitments had we known that you
expected a slot divestiture on top of that.  We were told these were alternatives.

A few points are worth emphasizing.

First, through the clean team exercise and our economic analyses we have demonstrated that by working
together, American and JetBlue can operate more routes at NYC airports with larger aircraft as compared to

Confidential Pursuant to the Court's Default PO                                                    JBLU-LIT-03860904

what they were able to operate independently in 2019.  That growth is, by definition, good for consumers, and our economists have shown it is worth hundreds of millions of dollars to consumers.  Thus, we do not agree with the premise that this collaboration leads to consumer harms that justify any divestiture, springing or up front.  The springing or conditional divestiture commitment is insurance in case we turn out to be wrong, which is highly unlikely.  It is also a sword over the parties' heads, providing further incentive to increase output.  In essence, we have given you assurances that consumers will either get the expected benefits from capacity expansion (which will always outweigh any possible harms) or a proportionate and timely remedy in the form of divestitures.

Second, we acknowledge the concern about carrier exits, which would be a substantial issue if it were the full story.  But it is not.  There are no net exits under the NEA; there are net entries and expansions.  As we explained in response to the DOJ's concerns about exits, these result from "funding" output expansions with the assets—including the slots at issue—elsewhere.  And in substantially every case you will see that either American or JetBlue is a small, marginal carrier on the route, there is substantial competition from other carriers on the route, and notwithstanding the exit NEA output on the route increases.  In every instance, the decision to go to one brand on a route was driven by the pro-consumer principles the planning teams used as their guide, e.g., taking advantage of brand attributes, fleet types, and airport assets to create a schedule that led to more overall flying, not less.  It is inappropriate, therefore, to leap to a conclusion of consumer harm just because the clean team has preliminarily identified a route as one where one carrier should exit.

Third, we have addressed through carve-outs from revenue-sharing the only routes where there is any plausible argument of possible consumers harm: the 2-1s and 3-2s (with the exception of the shuttle, which we all agree will benefit consumers, and for which we offer a new commitment below).  Upfront slot divestitures are not reasonable in light of that commitment.

Finally, it is important to emphasize that every theory of competitive harm we are hearing is based on speculation that a collaboration that leaves JetBlue free to be JetBlue, American free to be American, and both setting their own prices should be treated akin to a merger  But this is not a merger, nor is there any basis for treating this as an ATI application because we are not asking for immunity.  Should any consumer harm materialize, it will be because of decisions the parties make under the NEA for which the parties will remain accountable under the antitrust laws.  The parties will remain subject to DOT scrutiny as well, which we are enabling by agreeing to a rigorous set of reporting requirements that are designed to improve oversight and accountability.  We know that both DOT and DOJ will be watching this innovative alliance carefully.  If we fail to deliver the envisioned growth and other benefits, we will be held to account under the terms of our deal with DOT and, separately, under the antitrust laws.

DCA

As noted, we were similarly surprised to see a request for a divestiture of slots at DCA, which is not one of the four airports that define the NEA.  Although the parties operate flights from DCA to the NEA airports, those are principally on shuttle routes to LGA and BOS.  We thought we were in agreement that the improved shuttle product largely in JetBlue's hands would leave consumers be better off than they are now.  We don't understand the need for any DCA remedy.

However, to alleviate any concern, we are willing to consider another conditional or springing divestiture on those routes.  We will agree to grow ASMs on these BOS-DCA+DCA-LGA routes by 5% by the end of 2022 and by 10% by the end of 2023.  Should we fail to meet those targets, we would agree to divestitures consistent with the principles we have adopted for the NYC flying.  In addition, although DCA is not one of the four NEA airports, AA will agree to expand overall DCA ASMs by 5% by 2023.  With more capacity, more time of day

JBLU-LIT-03860905

options, and a more standardized product, consumers flying between DCA and the NEA airports will benefit from the proposed alliance.  There is no need, or justification, for a divestiture.

\*\*\*

We hope that this email and the new proposals it contains put us across the finish line.  The parties are excited about what the NEA will mean for their respective companies, employees, and **customers**.  The NEA was designed to create a better product and more service in a highly competitive region, and we are already seeing our competitors react. That alone speaks to the potential pro-competitive impact of the NEA.

We have been working with you and your team for four months as you review the proposed NEA.  That process has included hundreds of thousands of business documents, regression analyses and other economic work, and all too many meetings and presentations.  We know that your team has worked just as hard as we have.  We stand ready to talk with you and your team at any time, so that this alliance can finally get off the ground.  To keep the dialogue moving in a positive direction, Rob, Molly, and I would like to catch up with you this weekend.  We hope that's possible, and we will make any time work.  To get the bidding started, would 3 pm CST work?

Best regards,

Bruce


Sent from Mail for Windows 10

Confidential Pursuant to the Court's Default PO

JBLU-LIT-03860906