# EXHIBIT J

**Agreement with U.S. Department of Transportation regarding Northeast Alliance Between American Airlines, Inc. and JetBlue Airways Corporation**

**I.     PURPOSE**

On July 22, 2020, American Airlines, Inc. ("American") and JetBlue Airways Corporation ("JetBlue") submitted cooperative agreements, including code-sharing, frequent flyer, interline, revenue sharing, and alliance agreements, regarding the Northeast Alliance between American and JetBlue (the "NEA"), to the U.S. Department of Transportation ("DOT"). DOT reviewed the agreements submitted by the two carriers under 49 U.S.C. 41720. Subject to the conditions in this agreement (the "Agreement"), the DOT has determined not to bring an enforcement proceeding alleging that the implementation of the NEA would constitute an unfair or deceptive practice or unfair method of competition as long as this Agreement remains in effect.

**II.    PARTIES**

The parties to this Agreement are DOT, American, and JetBlue.

**III.   COMMITMENTS**

A.   American and JetBlue agree to amend the NEA agreements so that the revenue-sharing provisions of the Mutual Growth Incentive Agreement (the "MGIA") do not apply to (a) non-seasonal[1] city-pair markets on which American and JetBlue are the only competitors providing nonstop service, and (b) non-seasonal city-pair markets on which American and JetBlue are substantial competitors providing nonstop service and there is only one other competitor providing nonstop service.[2]

   1.   The amendment will use a 5% passenger market share standard for determining whether American or JetBlue are substantial competitors.

   2.   These exclusions will be based on full-year 2019 data, as that is the last full year before the COVID-19 pandemic disrupted the industry. This has the effect of eliminating revenue-sharing on Boston-Phoenix, Boston-Rochester, Boston-Syracuse, Boston-Charlotte, and Boston-Philadelphia.

   3.   American and JetBlue may continue to codeshare, with or without codeshare commissions chargeable to each other, on excluded routes in order to maintain a seamless experience for customers.

B.   JetBlue agrees not to exit any non-seasonal, nonstop JFK route it served as of February 2020 other than JFK-LGB, JFK-OAK, and JFK-ORH.[3]

---

[1] Non-seasonal routes are routes that fly at least six months out of the year.

[2] These and all other amendments referenced hereto will be provided to DOT upon execution.

[3] Independent of the NEA, JetBlue has closed its stations at LGB, OAK, and ORH.

    C.    American and JetBlue agree to amend the NEA agreements so that there are mandatory limitations on what can be discussed during network planning sessions and how those discussions are conducted.  The amendments will provide:

        1.    There shall be no discussions of future fares, fare levels, or revenue management strategies within or outside of the NEA;

        2.    There shall be no discussions of route, scheduling, or capacity decisions with respect to any flights outside the scope of the NEA, including any discussion of network adjustments to flying that is not in scope of the NEA;

        3.    Any material meetings or teleconferences involving the Senior Planning Team and/or NEA Implementation Team[4] will be conducted under the guidance of in-house and/or external legal counsel and will have pre-established agendas that will only include issues related to the NEA network; and

        4.    Prior to initial implementation, American and JetBlue shall establish and provide to DOT for review and comment protocols to ensure that the information being exchanged is necessary to the operation of the NEA and does not disclose information concerning capacity decisions on routes outside the scope of the NEA or future fares, fare levels, or revenue management strategies within or outside the NEA.

    D.    American and JetBlue agree to amend the NEA agreements to limit discretion to withdraw assets and assistance provided under the NEA.

        1.    American and JetBlue will be prohibited from withdrawing, reducing or degrading the provision of slots and gates in response to, or to influence, the other's competitive behavior, including but not limited to its pricing, within or outside of the geographies covered by the NEA.

        2.    With respect to slots specifically, the NEA will be amended so that slots will be leased between American and JetBlue for at minimum more than one season, unless the slot lease is for seasonal flying only.

    E.    American and JetBlue agree to provide annual reports similar in substance and form to those DOT requires from immunized alliances.  American and JetBlue also agree to maintain and provide annually data and records in three areas:

        1.    **Optimization**: American and JetBlue will maintain records and data regarding changes to the NEA "optimized schedule" made by the NEA

---

[4] The Senior Planning Team will consist of director or executive-level representatives that will set high-level goals of the NEA.  The NEA Implementation Team will consist of manager-level representatives from the Network Planning groups of American and JetBlue.  Members of the teams will be confirmed prior to implementation and will be subject to change.

2

        Implementation Team and, separately, Senior Planning Team, for each year from implementation of the NEA;

  2.  **Market Capacity**: American and JetBlue will maintain seat and departure numbers per distinct nonstop O/D market served on a quarterly basis, including data on new or incremental city pairs added, or any city pairs that have been removed; and

  3.  **Market Stimulation**: American and JetBlue will maintain data sufficient to determine the incremental passengers that the NEA has added to the total market size, overall and by O/D market served.

F.  American and JetBlue agree to divest slots subject to the following conditions:

  1.  American and JetBlue agree to divest 7 slot pairs at JFK and 6 slot pairs at DCA (the "upfront divestitures").

    a.  American will divest 4 slot pairs at JFK and 4 slot pairs at DCA.

    b.  JetBlue will divest 3 slot pairs at JFK and 2 slot pairs at DCA.

    c.  The auction process for the upfront divestitures will occur the earlier of three months after the last COVID waiver is withdrawn or one year from the date of execution of this Agreement.

    d.  The slots that will be divested as the upfront divestitures are as follows: [Slot times to be identified]

  2.  American and JetBlue agree to potential additional slot divestitures at JFK pursuant to F.2.c. below under the following conditions:

    a.  If American and JetBlue meet Capacity Targets (as defined below) at JFK+LGA no additional slot divestitures will be required.[5] And if American and JetBlue fail to meet Capacity Targets, American and JetBlue will divest additional slot pairs as described below.

    b.  Capacity Targets at JFK+LGA are determined as follows:

      (1)  At JFK+LGA (combined), the Capacity Target is for American and JetBlue to operate during the calendar year 2022 a combined seat capacity at JFK+LGA that is 105% of their combined seat capacity at JFK+LGA during the calendar year 2019, and during the calendar year 2023 is

---

[5] Annual seats for purposes of calculating Capacity Targets and whether they have been met will be extracted from Diio Mi, a common source for industry published schedule information, in January for the preceding 12 calendar months (i.e. Jan 2023 for Jan-Dec 2022).

3

        110% of their combined seat capacity at JFK+LGA during the calendar year 2019.

    (2)    American's growth on any transatlantic route will only be counted in determining whether the Capacity Targets have been met if the growth on that route is also incremental to the total capacity on that route for all Atlantic Joint Business (the "AJB") carriers in the six-months preceding the introduction of the new capacity. Specifically, if American adds transatlantic capacity, by up-gauging, adding frequencies, or starting a new service, on a route that is served by an AJB partner, the seats on that flight will only count towards the Capacity Targets to the extent they add AJB capacity to that route taking into account any reductions in the form of down-gauges, frequency reductions, or route exits by AJB partners within the prior six months. Any such reductions by AJB carriers will be netted against any claimed capacity increases by American on that route only.

    (3)    Following the measurement period in 2023, American and JetBlue will maintain at least that same level of overall capacity during the calendar years 2024 and 2025. If they fail to do so, they will divest according to the same seat for seat formula provided below.

c.    If the Capacity Targets are not met, American and JetBlue agree to divest up to 10 additional slot pairs, the number of which will be calculated in the following manner. First, the parties will determine the number of seats by which American and JetBlue fell short of the applicable Capacity Target at the end of the year. Then the parties will determine how many seats the relevant carrier(s) operated per slot pair. The parties will then divide the number of seats short of the applicable Capacity Target by the ratio of seats per slots at JFK+LGA and round the number to the nearest number of slot pairs to determine the number of additional slot pairs that must be divested at JFK for a given year.

    (1)    Example 1: If in 2023 American and JetBlue operate 500,000 seats short of achieving 10% growth at JFK+LGA, and American and JetBlue operate an average of 100,000 seats per slot pair at JFK+LGA, American and JetBlue must divest an additional 500,000/100,000 = 5 slot pairs at JFK in 2023.

d.    American and JetBlue agree to complete any additional divestiture of slots as required by failure to meet the applicable Capacity

Confidential Pursuant to the Court's Default PO        AA-NEA-01526179

      Target under this provision within six months following the end of the applicable measurement period.

   e. The commitments in this section F.2. are conditioned on American and JetBlue having continued access to their current portfolio of slots at JFK and LGA and that the government not take any action to reduce those portfolios of slots. If the parties are required to divest slots following measurement periods in 2022 and 2023, the commitments for future years will be adjusted downward by the number of slots divested times the average number of seats per slot.

  3. The upfront divestitures and any additional divestitures pursuant to F.2. above will be in the form of leases that shall remain in effect during the life of the NEA. American and JetBlue will submit form lease agreements to the DOT for review to ensure that the leases contain reasonable and industry standard provisions.

  4. Should the NEA terminate, American and JetBlue will have the right to terminate the leases subject to a six-month wind-down period for any reason. Upon termination, American and JetBlue will be able to use the slots.

  5. American and JetBlue may auction off or otherwise enter into leases only with eligible airlines as defined by DOT. DOT shall define the list of eligible airlines prior to each auction or lease.

**IV. FORCE MAJEURE**

  A. Parties agree that Force Majeure Events are acts of God, war, acts of terrorism, sabotage, natural disaster, strike, lockout, labor dispute, work stoppage, fire, serious accident, epidemic, pandemic (including without limitation the continuation of the COVID-19 pandemic) or quarantine restriction, acts of government or any other cause, whether similar or dissimilar, beyond the reasonable control of a Party.

  B. Parties agree that a Force Majeure Event will excuse American and JetBlue from potential additional divestiture of slots as a result of failing to meet Capacity Targets as described in III.F.2. If a Force Majeure Event affects the entire industry and a substantial number of carriers ask for and receive slot waivers from the FAA (including if, not at the parties' behest, the FAA extends the current COVID-related slot waivers past March 26, 2021), such Force Majeure Event shall be deemed to continue until the FAA lifts those slot waivers.[6]

---

[6] For the avoidance of doubt, Capacity Targets (defined above) as a result of a Force Majeure Event will not trigger additional divestitures of slots.

5

    **C.**    Notwithstanding the tolling of the Commitments above, if any Force Majeure Event results in the FAA deciding to remove slots from carriers that are unwilling to operate their slots and to transfer those slots to other carriers willing to fly despite the Force Majeure Event, nothing would prohibit American and JetBlue from losing slots in that process, as long as American and JetBlue are treated on a fair and nondiscriminatory basis, and in a manner consistent with other large incumbent carriers at the NYC airports. Additionally, nothing in this agreement will prejudice American's and JetBlue's ability to acquire additional slots in the aforementioned process.

**V.**    **DISCLOSURE**

    **A.**    Upon execution of this Agreement by all signatories, this Agreement may be disclosed to the U.S. Department of Justice, U.S. Department of Treasury, state attorneys general, and the general public by DOT, American, or JetBlue.

**VI.**    **COMPLETE AGREEMENT**

    **A.**    This Agreement constitutes the entire agreement between and among DOT, American, and JetBlue regarding the NEA.

**VII.**    **TERM**

    **A.**    This Agreement shall take effect upon execution by the signatories and will continue so long as the NEA remains in effect.

    **B.**    Five years from the implementation date of the NEA, American and JetBlue will cooperate and provide information to DOT as part of an informal self-assessment. Upon completion of that self-assessment, DOT may terminate this Agreement notwithstanding VII.A.

Confidential Pursuant to the Court's Default PO    AA-NEA-01526181

## VIII. SIGNATURES

On behalf of the U.S. Department of Transportation

_____   Date: _____

On behalf of American Airlines, Inc.

_____   Date: _____

On behalf of JetBlue Airways Corporation

_____   Date: _____