# EXHIBIT K

Message
___

| | |
|---|---|
| **From**: | Wark, Robert [Bruce.Wark@aa.com] |
| **Sent**: | 12/3/2020 9:53:39 PM |
| **To**: | Homan, Todd (OST) [Todd.Homan@dot.gov] |
| **CC**: | Wilkinson, Molly [Molly.Wilkinson@aa.com]; Land, Robert [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=6d48348af76c49678e2a6733618fa3e9-Land, Robert] |
| **Subject**: | FW: Privileged - DOT Draft |
| **Attachments**: | CONFIDENTIAL - Compare - Draft Term Sheet - December 3 2020[12476].pdf; CONFIDENTIAL - Draft Term Sheet - December 3 2020[12477].pdf |

Todd,

Thanks to you and your team for the call yesterday. Attached is a new version of the term sheet reflecting the changes that we have made in response to that conversation. In many cases we have adopted your suggestion. On others, we have not made changes or have proposed something different. I do not intend to comment on all these changes, but I do want to share our thinking on some of the issues.

**First**, you had indicated that you and your team were still considering if there needs to be any change to end of Section 1 which commits the Department to not take enforcement action for the term of the agreement. We have not made any change to that language. If it helps, this is not intended to prevent the Department from taking enforcement action for any violation of the agreement, nor on account of some behavior arising in the future that the agreement does not address. It is meant to say that with regard to the issues addressed, these terms are the agreed solution and the Department will not use a new enforcement action to change them.

**Second**, you proposed eliminating section III.A, which carves some routes out of the revenue share agreement. We are fine making that change, but we intend to operate the alliance with these limitations in place in any event. If the Department decides it would like to incorporate the carve outs back into a binding commitment, we will gladly put it back in.

**Third**, we are not proposing any automatic remedy for a breach of what is now C.1. which bars the parties from using slots and leases to discourage competitive actions. As explained in our call, this language is similar to language in DOJ consent decrees, which do not ordinarily contain automatic penalties. In fact, the only automatic penalty provisions we know of concern repeat offenders of a consent decree prohibition. The parties intend to take their obligation under this provision very seriously since this is the type of behavior that would likely lead to future antitrust enforcement action with all its punitive components. Moreover, given the general language of this provision, it is hard to envision a one size fits all kind of remedy.

**Fourth**, we are happy to include reporting on slot and gate utilization. We have left a blank for your team to suggest language. We understand your interest in this information and are confident that this information will further validate the benefits of the alliance. The only concerns on our side will be those relating to how data is captured and kept, so the specific request will matter.

**Fifth**, you have raised concerns about the growth commitments. As we stated on the call, we were surprised by these concerns since the size of these commitments were clearly set out in the emails when we both confirmed that we had "an agreement in principle." We knew that details needed to be worked out but were surprised that you expected us to continue to negotiate one of the most important components of the agreement. The decisions that we made on other parts of the agreement, such as how many slots we would divest up front, were made with these specific growth commitments in mind.

In any event, we would like to address the suggestion that the growth commitments are not meaningful after you take into account AA's JFK slot waivers and plans for LGA regional flying. We have already conceded that the 2019 MAX slot waivers were a one-off event that lowered the baseline, and we understood that we needed a growth commitment that

required more than simply flying these slots in future years.  The 5% and 10% seat growth commitments are materially higher than the number of seats that could be reasonably attributed to that loss flying.  In trying to figure that out, the best proxy is the March 2021 schedule that is currently available for public sale. This schedule was put together months ago, it fully utilizes our JFK slots, and it has remained unchanged by COVID. It shows a larger schedule than what we flew in March of 2019. Using this schedule as proxy for what would have been flown in a normal 2019, results in about 3% more flying.

With regard to the regional flying at LGA, we disagree with your premise.  To be clear, without the alliance with JetBlue, we had taken no decisions on operating a significant number of larger RJs on the LGA slots. We did produce documents that contemplated the possibility of future up-gauging before the alliance was contemplated, but those reflected considerations, not final plans by any means. By the time we made the concrete decision to close the Envoy base, we anticipated being able to take advantage of the efficiencies inherent in the alliance. But, even if you assumed (incorrectly) that AA would up-gauge all of its 44 and 50 RJs to 76 seat RJs, that would account for less than 3% growth. Thus, even after aggressively adjusting for both the MAX waivers and uncertainty around LGA up-gauging, a 10% commitment offers meaningful growth, which should be considered in its full context:

•   We are making these commitments at airports where we cannot expand our asset base.  All of this growth will have to come from using the efficiencies of the alliance to create more opportunities for international flying and larger aircraft on domestic routes.
•   The upfront JFK divestitures eliminate about 2 percentage points of potential growth.  Viewed differently, we are accomplishing this growth with seven fewer slots that you will use to create new entry, and even more seats in the market. That's only possible with the alliance in place.
•   And, perhaps most importantly, the impact of this commitment cannot be measured by the figures of 5% and 10% off a 2019 base.  The growth commitment from where we are today, when we will be implementing the alliance, is vastly steeper.  Getting back to 2019 levels, plus some, by 2022, regardless of how quickly demand returns, is a huge commitment (and risk) by the parties.  This commitment will force both airlines to make growth at NYC a priority, at the expense of other parts of their system as we crawl out of the very deep hole created by the pandemic. With these commitments, we expect that NYC will be among, if not the, fastest recovering part of our network.  The commitment to expedite the return to 2019 levels at these airports, even before we top it off with another 10%, is a serious stretch, and is only made possible by the alliance.
In sum, if we are going to avoid the pain of further slot divestitures, we will need to significantly improve the utilization of the slots.  In addition, we will be providing you with a robust set of information on utilization.

**Sixth**, you asked if we would be willing to use T100 data, showing actual operations, rather than schedule data.  We believe that a backward-looking review of final scheduled seats is the right metric.  There simply are too many factors that our outside our control, such as the frequency of severe storms, and airfield and airspace constraints, that can vary from year to year. It would be unfair for the parties to have to divest slots because more of these events happened in 2022 or 2023 than occurred in 2019.  And, rest assured, airlines pay a heavy price when they do not fly the final published schedule.  This is not something we could game.

**Finally**, we continue to disagree on whether the slot divestitures at JFK should be by lease or by sale.  We have already exchanged views on this issue, so I won't repeat what has been said.  I would only note that our senior management signed off of the concept of upfront divestitures because we understood that these divestitures would be done through leases that would be co-terminus with the alliance.  Without an alliance, there is no competitive harm that requires remediation under any theory.  We will accept your suggestion that any lease for new entrants (which might incur unique up-front costs) will have a minimum term.  We suggest three years, which should be more than adequate for them to monetize any such investment.

We know that you prefer sales over leases, and this is an issue where I think we just had different understandings coming out of our calls.  But, to be honest, our team – especially our senior management -- is still struggling with the idea that there is any up-front cost to pay before they implement an alliance that is designed to deliver huge consumer benefits, and for which we are taking all the antitrust risk.  If the alliance produces the benefits that we expect, no

Confidential Pursuant to the Court's Default PO
JBLU-LIT-01558511

remedy should be required.  If it does the opposite, we will be held accountable under some of the strictest, most punitive, laws in the land.  Despite these beliefs, over the past four and half months, we have worked hard to address you and your team's concerns.  We would like to have an agreement with the DOT that gives you the comfort that consumers have additional protections, so long as the price of those commitments are reasonable.  We know that is what you are seeking to accomplish, and we know you and your team have worked hard, including nights and weekends, trying to reach an agreement.   If the definition of a good deal is one that it includes elements that both sides dislike, rest assured that has been accomplished on our side of the ledger. We have tried to be responsive to your concerns and fulsome in our explanations when we disagree.  We believe the attached revised term sheet provides real and significant guarantees for the Department, and consumers, and although neither side may view it as perfect, it is an agreement that reflects how far we are willing to go.

Best regards,

Bruce


Sent from Mail for Windows 10

---

**From:** Wark, Robert
**Sent:** Thursday, December 3, 2020 6:40 PM
**To:** Laurence, Scott; Raja, Vasu; Bhargava, Anmol; David.Fintzen@jetblue.com; Schweinzger, Chad; Kaleigh, James; Jessica Delbaum (Jessica.Delbaum@Shearman.com); Daniel Wall; Malone, Farrell (DC) <Farrell.Malone@lw.com>; Andrew.Paik@lw.com; Horlacher, Steffen; Wilkinson, Molly; Aiyar, Priya; Gatten, Nathan; Rob Land
**Subject:** FW: Privileged - DOT Draft


Re-sending

Sent from Mail for Windows 10

Confidential Pursuant to the Court's Default PO                                                                                                JBLU-LIT-01558512