# EXHIBIT M

LATHAM&WATKINS LLP    SHEARMAN & STERLING LLP

January 12, 2021

**BY EMAIL**

Makan Delrahim
 Assistant Attorney General
Robert A. Lepore
 Chief, Transportation, Energy & Agriculture Section
J. Richard Doidge
 Trial Attorney
Antitrust Division
Department of Justice
Washington, DC 20530

        Re:    <u>American Airlines and JetBlue Airways</u>

Dear Makan, Bobby and Dick:

    We are writing to update our letter of November 12, 2020, concerning changes to the Northeast Alliance ("NEA") that American and JetBlue are making to address competitive concerns that we have heard from DOJ staff and in the course of the Department of Transportation's review of the NEA.

    American and JetBlue have now reached and executed an agreement with DOT, attached, resolving DOT's concerns about potential adverse competitive effects from the NEA. The DOT Agreement is, in most respects, similar to the November 30 draft term sheet we provided to you on December 1, but both the DOT Agreement and the Parties' implementation plans have evolved somewhat since then, so it is helpful to summarize where we now find ourselves.

    ***First,*** you will recall that, to address DOJ Staff's concerns about potential competitive effects in nonstop overlap routes from coordination and revenue-sharing, the Parties committed in November to amend the NEA agreements so that the revenue-sharing provisions of the MGIA do not apply to (a) non-seasonal city-pair markets on which American and JetBlue are the only substantial competitors providing nonstop service, and (b) non-seasonal city-pair markets on which American and JetBlue are substantial competitors providing nonstop service and there is only one other competitor providing nonstop service. This, we said, would have the immediate effect of eliminating revenue-sharing on five routes: Boston-Phoenix, Boston-Rochester, Boston-Syracuse, Boston-Charlotte, and Boston-Philadelphia.

    The November 30 draft term sheet had a provision about this. It would have obligated the Parties to amend the NEA agreements so that it would have been a violation of the DOT agreement to include these routes in revenue-sharing. DOT subsequently advised us that DOJ objected to this provision because it did not also prohibit codesharing on these routes. The executed DOT agreement therefore does not contain this term. Nevertheless, the Parties have

Confidential

AA-NEA-03325371

DX-0185-0001

Makan Delrahim
Robert A. Lepore
J. Richard Doidge
January 12, 2021
Page 2

determined that they will not engage in either capacity coordination or revenue-sharing on routes serving city pair markets in which American and JetBlue are substantial competitors providing non-seasonal nonstop service and there is only one other or no other competitor providing nonstop service. The current, highly abnormal supply and demand conditions require exceptions to this principle, but since it has of been of interest be advised that for the time being the Parties will not engage in either capacity coordination or revenue-sharing on Boston-Dallas, as Southwest Airlines suspended its service to this market due to COVID-19.

The Parties make this change notwithstanding our strong view that there is no credible argument that the unique form of capacity coordination and revenue-sharing contemplated by the NEA Agreements is anticompetitive, regardless of market conditions. But understanding the Division has raised concerns about that, we will be coordinating capacity and sharing revenue only on routes where the Parties are not substantial competitors and/or where there are at least two other carriers with competing nonstop service.

*Second,* in order to address concerns about potential adverse effects in concentrated city pair markets and, relatedly, slot concentration, the DOT agreement provides for both mandatory and conditional slot divestitures.

- Mandatory DCA Divestitures: American and JetBlue have agreed to divest six slot pairs at DCA. American will divest four DCA slot pairs and JetBlue will divest two. The divestitures will be in the form of leases that will renew automatically throughout the life of the NEA, at the option of the lessee, and also have a minimum five year term. The slots can only be divested to DOT-determined eligible carriers, and in a "bundle" intended to ensure that the receiving carrier can use the slots in an operationally efficient schedule. Of course, neither American nor JetBlue will have control over how the slots are used by the recipient carrier(s).

- Mandatory JFK Divestitures: American and JetBlue have agreed to divest seven slot pairs at JFK, four from American and three from JetBlue. The JFK divestitures are permanent and non-revocable transfers of slot rights, not leases. Otherwise the terms of the divestitures are the same as for the DCA slots.

- Conditional JFK Divestitures: As you know, the Parties have projected substantial output enhancement from the NEA—far more than would be necessary to eliminate the risk of adverse fare effects. The DOT required the Parties to achieve significant projected growth at the two affected New York airports (LGA and JFK) on pain of losing additional JFK slots through permanent and non-revocable divestitures (not leases). The formula, in short, establishes incremental capacity targets that the Parties must meet to keep their current JFK slots. DOT set the capacity targets based on its view that, after accounting for growth that would result from the termination of MAX waivers or already-planned upgauging at LGA (and therefore should not be regarded as NEA-driven growth), the Parties' projected NEA growth in LGA and JFK

Confidential                                                                                              AA-NEA-03325372

DX-0185-0002

combined, after full recovery from the effects of COVID-19, was approximately 16%. The capacity targets require 15% growth over COVID-recovery (and growth related to the MAX waiver and upgauging issues) to avoid further slot divestitures, which equates to over 90% of what DOT viewed as true projected growth from the NEA at LGA and JFK. All 10 additional JFK slot pairs would be lost if the NEA grows LGA/JFK capacity by "only" 13%. At bottom, the conditional slot divestitures require the Parties to "put their money where their mouths are" by either accomplishing a large capacity expansion or losing valuable slots.

***Third,*** in order to address DOJ Staff's concerns about coordinated market exits, in particular JetBlue exits that might eliminate the "JetBlue Effect," the Parties have committed to DOT not to have JetBlue exit any non-seasonal, nonstop JFK route it served as of February 2020 (with the exception of three routes JetBlue cannot readily operate since, independent of the NEA, it closed its stations at Long Beach, Oakland, and Worcester).

***Fourth,*** to address concerns about potential spillover effects from NEA coordination, the Parties have agreed to mandatory limitations on what can be discussed during network planning sessions and how those discussions are conducted. The DOT Agreement is similar to the November 30 draft term sheet, requiring among other things the Parties to adopt and implement prohibitions on discussions of (a) future fares, fare levels, or revenue management strategies within or outside of the NEA, and (b) route, scheduling, or capacity decisions with respect to any flights outside the scope of the NEA, including any discussion of network adjustments to flying that is not in scope of the NEA.

***Fifth,*** in order to address concerns we first heard from DOJ Staff about potential manipulation of NEA assets to influence a partner's competitive behavior, the Parties have committed to DOT that they shall not, and the NEA agreements will be amended, to provide that they shall not, withdraw, reduce or degrade the provision of slots and gates in response to, or to influence, the other's competitive behavior, including but not limited to its pricing, within or outside of the geographies covered by the NEA. Furthermore, with respect to slots specifically, we are also amending the "Slot Term" provision of the Northeast Alliance Agreement so that slots will be leased between American and JetBlue for a minimum of two IATA seasons, unless the slot lease is for seasonal flying only.

***Sixth,*** so that DOT can effectively monitor the NEA, the Parties have agreed to maintain data and records related to, *inter alia*, changes to the NEA "optimized schedule," the effect of the NEA on market capacity and output effects, slot utilization and gate utilization. The parties have also agreed to submit to DOT, annually, NEA planning meeting agendas, meeting minutes, copies of lease agreements, and other alliance implementation documents. DOT's intent is to monitor the Parties' implementation of the NEA not only annually, but especially after five years, at which point the Parties must undergo a self-assessment. To that end, the DOT Agreement provides that nothing in the Agreement prohibits or limits DOT from exercising its regulatory authorities, including but not limited to investigation and enforcement regarding

Makan Delrahim
Robert A. Lepore
J. Richard Doidge
January 12, 2021
Page 4

"[c]onduct inconsistent with the purpose of the NEA as set forth in the Preamble of this Agreement or the NEA Agreements (including as generally described in plans submitted to DOT as part of its review of the NEA) or the failure to implement core provisions of the NEA."

The DOT terminated its review of the NEA based on the commitments described in second through sixth above. We believe DOJ should as well, since in light of the relief DOT has obtained and the Parties' decision not to engage in either capacity coordination or revenue-sharing on routes without substantial competitive constraints, there are no plausible grounds for any prospective challenge to the NEA.

DOJ has now been reviewing the NEA for almost six months. Looking back on that, we see consensus between DOJ and DOT that the NEA will lead to substantial consumer benefits. The disagreement, such as it is, between DOJ and DOT staffs seems mostly about the magnitude of the benefits and whether adverse effects might exceed the benefits. The DOT, based on its extensive experience with metal-neutral joint business arrangements and revenue-sharing, is willing to give the NEA a chance, albeit with conditions. Some DOJ staff members appear ready to condemn revenue-sharing and the NEA without giving it a chance. But without seeing what the Parties do with the NEA, there is no way to answer with any measure of certainty the most important questions, including (a) whether the NEA will turbocharge JetBlue growth, as we say, or compromise the JetBlue effect, as DOJ staff asserts, (b) whether MGIA revenue-sharing will incentivize output expansion, as we say, or restrain competition, as DOJ staff fears, (c) whether, contrary to JetBlue's many statements, the NEA will compromise JetBlue's transatlantic entry plans, and (d) the ultimate question, whether there will ever be any actual adverse effects—which under the applicable Section 1 standards are the foundational condition for any legal challenge—let alone adverse effects that outweigh benefits. Put another way, we have reached the limits of what we can predict based on theory or ill-conceived analogies to mergers. Only evidence that will be developed over time, as the Parties implement the NEA, can tell us whether DOJ staff's concerns about potential effects are well-founded.

American and JetBlue have worked tirelessly and in good faith to cooperate with the Division's investigation over the past six months. With the extraordinary challenges ahead of them, recovering from the effects of COVID-19, and with the DOT review at its conclusion, it is time to move on. We will continue to cooperate with the DOJ's review of the NEA in whatever form that takes, but respectfully it is time for a hiatus from investigation. The NEA deserves a chance to succeed. Consumers deserve the benefits the NEA will bring to them. Therefore, the Parties will now proceed to implement the NEA, mindful of their responsibilities under the antitrust laws and of course their obligations under the DOT Agreement.

Thank you for all of the time and personal attention you have paid to this matter. Please let us know of any questions you may have.

Confidential
AA-NEA-03325374

DX-0185-0004

Makan Delrahim
Robert A. Lepore
J. Richard Doidge
January 12, 2021
Page 5

Best regards,

*[signature: Daniel M. Wall]*

Daniel M. Wall
of LATHAM & WATKINS LLP
for American Airlines, Inc.

*[signature: Jessica K. Delbaum]*

Jessica K. Delbaum
of SHEARMAN & STERLING LLP
for JetBlue Airways

Enclosure
cc: Jeffrey A. Rosen, Esq.
    Acting Attorney General