# EXHIBIT O

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| United States of America, State of Arizona, State of California, District of Columbia, State of Florida, Commonwealth of Massachusetts, Commonwealth of Pennsylvania, and Commonwealth of Virginia<br><br>     Plaintiff,<br><br>v.<br><br>American Airlines Group Inc.,<br><br>   and<br><br>JetBlue Airways Corporation,<br>       Defendants. | Case No. 1:21-cv-11558-LTS<br><br>**CONFIDENTIAL** |

**EXPERT REPORT OF NATHAN H. MILLER, PH.D.**

June 9, 2022

222. Taken together, these two analyses provide strong empirical evidence that competition between airlines—including between American and JetBlue—leads to lower prices for consumers. The analysis of legacy competition based on the hub network demonstrated that additional legacy competitors in a market leads to lower prices, including lower prices in markets in which legacies compete with LCCs. The analysis of the Boeing 737 MAX grounding showed that when American's ability to compete is dampened, JetBlue specifically and other carriers generally respond by raising prices. In the next section, I further quantify the extent to which the NEA will lead to higher prices for consumers in NEA markets in which Defendants possess market power.

### 6.3. The effects of reduced competition between American and JetBlue in domestic markets that are fully or partially within the scope of the NEA

223. In this section, I quantify the effects of the reduced competition between American and JetBlue due to the NEA, focusing on domestic markets that involve itineraries touching NEA airports. I use standard economic modeling frameworks—upward pricing pressure and a model of effects from the agreement that draws on merger simulation methods—to measure the impetus to raise price in these markets. I find consistent evidence that the NEA is likely to cause a substantial lessening of competition. My baseline simulation of combining American and JetBlue interests through the NEA using data from 2019 shows annual overcharge to consumers of approximately $696 million.[278]

#### 6.3.1. UPP and GUPPI show the potential for the NEA to substantially lessen competition in NEA nonstop overlap markets

224. In this section, I quantify the effects of the NEA on competition using a pair of closely related statistics—*upward pricing pressure ("UPP")* and *gross upward pricing pressure index ("GUPPI")*. UPP and GUPPI measure the change in incentives for Defendants and have been shown more generally to correlate with price effects of mergers.[279] They can be computed relatively easily and their calculation helps illuminate the intuition behind the unilateral competitive effects of mergers and profit-sharing agreements.

---

[278] As I discuss in more detail in footnote 196, I understand that six NEA nonstop overlap markets (12 directional markets) are currently carved out of the NEA. See First Amendment to the MGIA. These markets represent roughly $204 million of the $696 million in total harm.

[279] For example, see Nathan H. Miller et al., "Upward Pricing Pressure as a Predictor of Merger Price Effects," *International Journal of Industrial Organization*, 52(C), 2017, pp. 216–247 ("Miller et al. 2017").