# EXHIBIT P

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3

 4   _____
                                   )
 5   UNITED STATES OF AMERICA,     )
     et al.,                       )
 6                                 )
              Plaintiffs,          )    Civil Action
 7                                 )
     vs.                           )No. 1:21-cv-11558-LTS
 8                                 )
     AMERICAN AIRLINES GROUP       )
 9   INC. and JETBLUE AIRWAYS      )
     CORPORATION,                  )
10                                 )
              Defendants.          )
11   _____)

12

13

14

15       DEPOSITION OF NATHAN H. MILLER, Ph.D.

16                  Washington, DC

17                 August 17, 2022

18

19

20

21

22

23

24   Reported by:  John L. Harmonson, RPR

25   Job No. 213777
```

```
                                                    Page 137
 1                       N. MILLER
 2    ------------------------------------------------
 3                    AFTERNOON SESSION
 4                        1:18 p.m.
 5    ------------------------------------------------
 6            THE VIDEOGRAPHER:  We are back on the         13:19
 7    record at 1:18.                                       13:19
 8    BY MR. WALL:                                          13:19
 9        Q.   All right.  Let's pick up with sort of       13:19
10    the basic question of why you're simulating that     13:19
11    the NEA is like a merger.  So let me begin and        13:19
12    let's see if we can agree on a few things.            13:19
13            So you agree that technically,                13:19
14    formalistically, the NEA is not a merger; right?      13:19
15        A.   That's right.  It's an agreement             13:19
16    between JetBlue and American.                         13:19
17        Q.   It's a bilateral contract or set of          13:19
18    contracts.                                            13:19
19        A.   Okay.                                        13:19
20        Q.   So American doesn't have any right to        13:19
21    choose board members for JetBlue or vice versa;       13:19
22    right?                                                13:20
23        A.   Okay.                                        13:20
24        Q.   I mean, is that consistent with your         13:20
25    understanding?                                        13:20
```

Page 138

1        N. MILLER

2     A.    Yes, it is.    13:20

3     Q.    Okay.  The NEA is not going to lead to    13:20

4  the elimination of the JetBlue brand; correct?    13:20

5     A.    I haven't seen any evidence that it    13:20

6  would.    13:20

7     Q.    Okay.  Nor the American brand; right?    13:20

8     A.    Same for American.    13:20

9     Q.    Okay.  And you haven't seen any    13:20

10 evidence that the NEA requires JetBlue to adopt    13:20

11 or conform to American's so-called legacy or    13:20

12 general network carrier business model, have you?    13:20

13    A.    No, I don't think there is language    13:20

14 that requires JetBlue to do that.    13:20

15    Q.    There is no permanent transfer of    13:20

16 assets through the NEA, is there?    13:20

17    A.    No.    13:20

18    Q.    And there is no pricing coordination    13:20

19 in the NEA, is there?    13:20

20    A.    I do not believe the NEA provides a    13:20

21 structure for JetBlue and American to talk about    13:21

22 the prices that they're setting.    13:21

23    Q.    There is no aggregate capacity    13:21

24 coordination of the kind that Dr. Town talks    13:21

25 about in his report in connection with capacity    13:21

```
                                            Page 139
 1                    N. MILLER
 2   discipline, is there?                              13:21
 3       A.    The NEA is a bilateral contract          13:21
 4   between American and JetBlue, and I believe        13:21
 5   Professor Town when he talks about capacity        13:21
 6   coordination, what you're referring to is          13:21
 7   something more industry-wide, and the contract is  13:21
 8   going to cover coordination of capacity between    13:21
 9   JetBlue and American specifically.                 13:21
10       Q.    But it doesn't -- they do not discuss    13:21
11   or coordinate the setting of their industry-wide   13:21
12   capacity; the size of their fleets, for example,   13:21
13   those sorts of things?                             13:22
14       A.    Certainly I think that the results       13:22
15   would have bearing on that.  But I believe what    13:22
16   the agreement allows for is coordination on        13:22
17   capacity in routes that connect to an NEA          13:22
18   airport.                                           13:22
19       Q.    Okay.  So then go ahead and -- in        13:22
20   light of all of that, go ahead and just explain    13:22
21   for the record why it is that you believe that     13:22
22   the competitive effects of the NEA can be fairly   13:22
23   addressed through a merger simulation.             13:22
24       A.    Sure.  First of all, for                 13:22
25   clarification, the model that I'm using            13:22
```

```
                                                 Page 140
 1                     N. MILLER
 2    characterizes the incentives that are created by      13:23
 3    the NEA specifically, not those of a generic          13:23
 4    merger.  So I prefer to call it just the              13:23
 5    simulation model.                                     13:23
 6              The model incorporates that when the        13:23
 7    NEA is in place and in effect on particular           13:23
 8    routes, that JetBlue benefits if American's           13:23
 9    revenue increase, and American benefits if            13:23
10    JetBlue revenue increase.  And that creates          13:23
11    incentives, according to economic theory, to         13:23
12    raise price in a way that's mutually beneficial      13:23
13    for JetBlue and American along the particular        13:23
14    markets that I've studied.  And that's laid out      13:23
15    in Section 4 of the report.                          13:24
16              Of course the NEA is more broad than       13:24
17    only the sharing of revenue.  It also creates an     13:24
18    avenue for capacity coordination.  And I've          13:24
19    considered the arguments that were put forth by      13:24
20    the defendants' economist in the course of the       13:24
21    investigation, and also put forth by Dr. Israel      13:24
22    in his expert report that the NEA would provide      13:24
23    unilateral incentives for each party to expand       13:24
24    output.                                              13:24
25              And I've pointed out both in my report     13:24
```

Page 141

| | |
|---|---|
| 1    N. MILLER | |
| 2    and in my initial report, reply report, that it | 13:24 |
| 3    would be inappropriate to consider those | 13:25 |
| 4    unilateral incentives in a context in which | 13:25 |
| 5    JetBlue and American are coordinating. | 13:25 |
| 6              In fact, if they were to act on the | 13:25 |
| 7    unilateral incentives of the MGIA to expand | 13:25 |
| 8    capacity instead of coordinating capacity with | 13:25 |
| 9    each other, the effect would be that each party | 13:25 |
| 10   would subsidize unprofitable expansion of the | 13:25 |
| 11   other and thereby exploit the other partner. | 13:25 |
| 12   Joint profits would go down. | 13:25 |
| 13             And therefore, it does not seem | 13:25 |
| 14   reasonable or likely that decisions taken in the | 13:25 |
| 15   midst of capacity coordination would undermine or | 13:25 |
| 16   alter the effects of revenue sharing on pricing | 13:25 |
| 17   incentives that the agreement creates. | 13:26 |
| 18             And that is the way that my model | 13:26 |
| 19   captures the incentives that are created by the | 13:26 |
| 20   NEA. | 13:26 |
| 21      Q.   Okay.  Thank you. | 13:26 |
| 22             So in Section 4.1 of your initial | 13:26 |
| 23   report, around page 21, you lay out your argument | 13:26 |
| 24   that incentive alignment, not a change in | 13:26 |
| 25   coordination or control, is what makes a | 13:26 |

|    |                                                        |       |
|----|--------------------------------------------------------|-------|
|    | Page 167                                               |       |
| 1  | N. MILLER                                              |       |
| 2  | that are most meaningful, I believe.                   | 14:03 |
| 3  | Q. In the case of nonstop overlap routes               | 14:03 |
| 4  | that touch the NEA airports, how, if at all, does      | 14:03 |
| 5  | your simulation differ from a generic merger           | 14:03 |
| 6  | simulation?                                            | 14:03 |
| 7  | A. Those routes also can feature connect               | 14:03 |
| 8  | traffic from American or JetBlue, or possibly          | 14:03 |
| 9  | both. And in those settings, the effects of the        | 14:03 |
| 10 | competing nonstop, the prices that are put on the      | 14:03 |
| 11 | competing nonstop route -- or on the connect           | 14:03 |
| 12 | route are only partially internalized, which is        | 14:03 |
| 13 | consistent with the terms of the NEA.                  | 14:04 |
| 14 | Q. Okay. So if I understand it, what                   | 14:04 |
| 15 | you're saying is, say for example, San Francisco       | 14:04 |
| 16 | to New York, that some amount of the passengers        | 14:04 |
| 17 | are going to go New York, Chicago, to San              | 14:04 |
| 18 | Francisco. In a generic merger simulation, that        | 14:04 |
| 19 | would be fully internalized. But in this               | 14:04 |
| 20 | simulation, that particular feature of the             | 14:04 |
| 21 | connect traffic that competes with the nonstop         | 14:04 |
| 22 | traffic is subject to partial internalization?         | 14:04 |
| 23 | A. That's correct.                                     | 14:04 |
| 24 | Q. Okay. Anything else besides that?                   | 14:04 |
| 25 | A. As I said, aside from the, you know,                | 14:04 |

|  |  |  |
|---|---|---|
|  | Page 168 |  |
| 1 | N. MILLER |  |
| 2 | trying to constrain it only to NEA markets, I | 14:04 |
| 3 | think those are the big two that came to mind. | 14:04 |
| 4 | But I'll refer you to the report because there | 14:04 |
| 5 | might be nuances that come up, you know, looking | 14:04 |
| 6 | at different markets. | 14:05 |
| 7 |     Q.   Okay.  So focusing back on the | 14:05 |
| 8 | importance of revenue sharing, is it appropriate | 14:05 |
| 9 | to analyze the effects of the NEA on routes in | 14:05 |
| 10 | which the parties do not share revenues as a | 14:05 |
| 11 | merger?  Let me say that again.  I kind of | 14:05 |
| 12 | botched it. | 14:05 |
| 13 |          Is it appropriate to predict the | 14:05 |
| 14 | competitor effects of the NEA on nonstop overlap | 14:05 |
| 15 | routes on which the parties do not share revenue? | 14:05 |
| 16 |          MR. DeRITA:  Objection to form. | 14:05 |
| 17 |          THE WITNESS:  It can be appropriate. | 14:06 |
| 18 | And I believe that I've done so in my report in | 14:06 |
| 19 | the sense that I've tried to get a sense for how | 14:06 |
| 20 | outcomes might change in other markets if the | 14:06 |
| 21 | competitive effects of the NEA extend beyond what | 14:06 |
| 22 | is explicitly covered in the NEA agreement. | 14:06 |
| 23 | BY MR. WALL: | 14:06 |
| 24 |     Q.   I'm sorry.  I'm not talking about -- | 14:06 |
| 25 | my question was limited to the nonstop overlap | 14:06 |

|   |   |   |
|---|---|---|
|   | Page 169 |   |
| 1 | N. MILLER |   |
| 2 | routes.  There's a number of carve-out routes in | 14:06 |
| 3 | which there's no revenue sharing; right? | 14:06 |
| 4 | A.    I thought you were talking about, for | 14:06 |
| 5 | example, maybe Miami to LA. | 14:06 |
| 6 | Q.    No, that's not what I'm talking about. | 14:06 |
| 7 | I'm talking like, for example, Boston to | 14:06 |
| 8 | Charlotte, Boston to Philadelphia, Boston to | 14:06 |
| 9 | Phoenix. | 14:06 |
| 10 | A.    Okay.  With that in mind, could you | 14:06 |
| 11 | ask the question?  I'll try to get through it. | 14:06 |
| 12 | Q.    Yeah. | 14:06 |
| 13 |        Can you explain to me how you can | 14:06 |
| 14 | justify predicting the competitive effects of the | 14:06 |
| 15 | NEA as if it were a merger with respect to those | 14:07 |
| 16 | nonstop overlap routes that are carved out of | 14:07 |
| 17 | revenue sharing? | 14:07 |
| 18 | A.    I am -- I have doubts as to the | 14:07 |
| 19 | effectiveness of the proposed carve-outs.  And as | 14:07 |
| 20 | a result of those doubts, I elected to provide | 14:07 |
| 21 | results summarizing the likely competitive | 14:07 |
| 22 | effects both including and excluding the six | 14:07 |
| 23 | carve-out routes. | 14:07 |
| 24 | Q.    What is the basis of your doubts about | 14:07 |
| 25 | the effectiveness of revenue sharing? | 14:07 |

| | | |
|---|---|---|
| | Page 170 | |
| 1 | N. MILLER | |
| 2 | A.  First, my understanding is that | 14:07 |
| 3 | American and JetBlue can modify the NEA as they | 14:08 |
| 4 | wish, and so a carve-out that exists now may not | 14:08 |
| 5 | exist in the future. | 14:08 |
| 6 | Second, the NEA capacity coordination | 14:08 |
| 7 | that I think matters quite a deal here, it may be | 14:08 |
| 8 | hard to separate out flight decisions along one | 14:08 |
| 9 | particular route from flight decisions at | 14:08 |
| 10 | airports like New York or like Boston where the | 14:08 |
| 11 | route connects.  And in that sense, it could well | 14:08 |
| 12 | be that the carve-out routes are intertwined with | 14:08 |
| 13 | NEA decisions even though they are carved out. | 14:08 |
| 14 | Furthermore, there is some prospect | 14:09 |
| 15 | that the NEA creates a willingness of American | 14:09 |
| 16 | and JetBlue to soften price competition between | 14:09 |
| 17 | them in these markets where there is not a lot of | 14:09 |
| 18 | other competitors in a way that would harm | 14:09 |
| 19 | consumers. | 14:09 |
| 20 | And putting those together, I | 14:09 |
| 21 | determined that it would be appropriate to report | 14:09 |
| 22 | results that both include and exclude the | 14:09 |
| 23 | carve-out routes. | 14:09 |
| 24 | Q.  Do you have an opinion, however, as to | 14:09 |
| 25 | whether the harms that you quantify with respect | 14:09 |

```
                                                    Page 171
 1                      N. MILLER
 2   to the carve-out routes are likely to                    14:09
 3   materialize?                                             14:09
 4        A.   I have concerns about the                      14:09
 5   effectiveness of the carve-outs in the contracts         14:09
 6   in ameliorating harm.  And I'll note that if             14:10
 7   there is a way for the parties to soften price           14:10
 8   competition along those routes it would be               14:10
 9   profitable to do so.                                     14:10
10             And so I do view it as reasonably              14:10
11   likely that harm would occur along those routes.         14:10
12        Q.   Okay.  I know you're sort of new to            14:10
13   this game.  But, sir, do you understand that in          14:10
14   litigation an expert is allowed only to testify          14:10
15   to opinions that he or she has reached as a              14:10
16   result of some analysis consistent with their            14:10
17   expertise?                                               14:10
18             MR. DeRITA:  Objection to form.                14:10
19             THE WITNESS:  Yes.                             14:10
20   BY MR. WALL:                                             14:10
21        Q.   Okay.  And have you or have you not            14:10
22   reached an opinion as to whether the harms on the        14:10
23   carve-out routes are what you quantify them to           14:10
24   be?                                                      14:10
25        A.   I think that there is likely to be             14:10
```

Page 172

1         N. MILLER

2   substantial harm on the carve-out routes due to                14:11
3   concerns that I have about the carve-outs.                     14:11
4       Q.   How likely?                                           14:11
5       A.   Reasonably likely.                                    14:11
6       Q.   You said that.  That's why I followed                 14:11
7   up.  How likely is reasonably likely?                          14:11
8       A.   I haven't quantified a particular                     14:11
9   percentage if that's what you're asking for.                   14:11
10      Q.   More or less likely than the harm on                  14:11
11  the routes that are actually subject to revenue                14:11
12  sharing?                                                       14:11
13      A.   Oh, okay.  I do observe that the                      14:11
14  carve-outs are intended to fix competitive                     14:11
15  problems.  They may be successful at doing so.  I              14:11
16  have doubts.  And so, you know, if you had to                  14:11
17  rank the likelihoods, I would say, you know, at                14:11
18  the top would be the ones that are not subject to              14:11
19  the carve-outs, and below that would be the ones               14:12
20  that are subject to the carve-outs.                            14:12
21      Q.   Do you have any basis for believing                   14:12
22  that, notwithstanding the carve-outs, American                 14:12
23  and JetBlue are sharing revenues on the carve-out              14:12
24  routes?                                                        14:12
25      A.   No, I do not believe that they share                  14:12

Page 173

1      N. MILLER

2  revenue on the carve-out routes.                           14:12

3      Q.   So right now, American has no stake in           14:12
4  JetBlue's revenues on those carve-out routes and          14:12
5  JetBlue has no stake in American's revenues on            14:12
6  those carve-out routes; correct?                          14:12

7      A.   There is no direct financial stake.              14:12

8      Q.   So if they are thinking of adjusting             14:12
9  their pricing based upon the internalization of           14:12
10 diversion from one to the other, there is no              14:12
11 point to it right now because they don't                  14:12
12 internalize the diversion, do they?                       14:12

13     A.   No.  That's correct.  There would not            14:13
14 be internalization about diversion so long as the         14:13
15 routes remain carved out.                                 14:13

16     Q.   You are aware, aren't you, that MGIA             14:13
17 is structured similarly to the revenue-sharing            14:13
18 provisions in the Atlantic joint business?                14:13

19     A.   I've read a representation that that's           14:13
20 the case but I have not studied the other                 14:13
21 agreements.                                               14:13

22     Q.   That was going to be my question to              14:13
23 you.  Have you done anything to study the                 14:13
24 incentive effects or behavioral effects of                14:13
25 revenue sharing in the Atlantic joint business or         14:13

Page 290

1                    N. MILLER

2              C E R T I F I C A T E

3

4    DISTRICT OF COLUMBIA

5            I, JOHN L. HARMONSON, a Notary Public

6    within and for the District of Columbia, do

7    hereby certify that NATHAN H. MILLER, Ph.D., the

8    witness whose deposition is hereinbefore set

9    forth, was duly sworn by me and that such

10   deposition is a true record of the testimony

11   given by such witness.

12           That before completion of the

13   proceedings, review and signature of the

14   transcript was requested.

15           I further certify that I am not related

16   to any of the parties to this action by blood or

17   marriage; and that I am in no way interested in

18   the outcome of this matter.

19           IN WITNESS WHEREOF, I have hereunto set

20   my hand this 22nd day of August, 2022.

21

22           _____
23           JOHN L. HARMONSON, RPR

24           My commission expires: 04/14/26

25