# EXHIBIT Q

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| United States of America, State of Arizona, State of California, District of Columbia, State of Florida, Commonwealth of Massachusetts, Commonwealth of Pennsylvania, and Commonwealth of Virginia<br><br>    Plaintiff,<br><br>v.<br><br>American Airlines Group Inc.,<br><br>  and<br><br>JetBlue Airways Corporation,<br>      Defendants. | Case No. 1:21-cv-11558-LTS<br><br>**CONFIDENTIAL** |

## EXPERT REPLY REPORT OF NATHAN H. MILLER, PH.D.

August 8, 2022

rivals a signal to expect capacity growth, that signal is limited to a message that growth *somewhere* is likely, not a signal that American and JetBlue will increase capacity *everywhere* or even increase it *anywhere* specifically.

185. What rivals do know about the NEA in terms of capacity choices and specific markets is that the NEA enables American and JetBlue to coordinate capacity planning for specific NEA markets. As I discussed in my initial report, such coordination has different implications from any unilateral incentive effects of isolated terms in the detailed MGIA revenue sharing formula.[217] This joint capacity planning is where the NEA aligns Defendants' incentives to maximize joint profit in each NEA market,[218] whether that be by expanding capacity and lowering price or by reducing capacity and raising price. I analyzed the competitive effects of these incentives to maximize joint profit, subject to the revenue sharing under the MGIA, in my initial report.

186. The results from my initial report are clear. In NEA nonstop overlap markets, Defendants' incentives are to reduce capacity and raise prices, which leads to significant harm to consumers.[219] None of the math in Dr. Israel's Appendix contradicts this result. In fact, in section 4.4.3 I use Dr. Israel's own code to show that the incentive to reduce capacity and raise prices on NEA nonstop overlap routes remains in Dr. Israel's Stackelberg model. In addition, Dr. Israel argues that for Defendants to find it profitable to expand capacity in a particular market, it must be the case that their "rivals [in that market] are relatively large"[220] in terms of their market share. However, rivals' market shares are not relatively large in nonstop overlaps—instead, I showed in my initial report that those markets are highly concentrated, that Defendants have a significant market share, and that rivals are unable to prevent Defendants from exercising market power under the NEA by raising prices (and lowering quantities).[221]

---

[217] This underscores the point I made in my initial report that it is not appropriate to analyze the incentives of the MGIA revenue sharing formula—a single component of the NEA—in isolation, but rather an analysis of the incentives created by the NEA should include an analysis of all of the features of the NEA.

[218] I note that Dr. Israel's "Generalization" in his Appendix does not show, as he asserts, that "with the revenue sharing agreement terms, it is on the margin profitable for American and JetBlue to increase their aggregate capacity." In particular, Dr. Israel continues to focus on each Defendant's unilateral incentive—i.e., the incentive of the Defendant who owns the plane. This does not reflect their joint incentives (i.e., those that exclude any exploitation incentive) that they would act upon when they jointly set capacity on a route.

[219] In footnote 46 above, I also showed that this result holds regardless of whether I model Bertrand competition as I did in my initial report or Cournot competition as Dr. Israel suggests.

[220] Israel Report, Appendix, ¶¶ 30–32.

[221] Miller Report §§ 6.1, 6.3.