## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

STATE OF ARIZONA

STATE OF CALIFORNIA

DISTRICT OF COLUMBIA

STATE OF FLORIDA

COMMONWEALTH OF
MASSACHUSETTS

COMMONWEALTH OF
PENNSYLVANIA

and

COMMONWEALTH OF VIRGINIA

       *Plaintiffs*,

       v.

AMERICAN AIRLINES GROUP INC.

and

JETBLUE AIRWAYS CORPORATION

       *Defendants*.

Civil Action No. 1:21-cv-11558-LTS

## PLAINTIFFS' PRETRIAL BRIEF

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND ................................................................................................. 6

   A.   Domestic Air Travel: "a startling concentration of power"................................ 6

   B.   JetBlue: "Our brand boxes far above our weight" ........................................... 8

   C.   AA: "we are going to fight like hell in BOS if I have anything to do with it" ................. 10

   D.   Defendants "will engage in network planning as if their Northeast assets were in a single airline".................................................................................................................. 11

   E.   JetBlue's Attempt to Acquire Spirit Would Exacerbate the Harms of the NEA .............. 13

III.  LEGAL FRAMEWORK ................................................................................... 14

IV.   ARGUMENT ................................................................................................... 17

   A.   Plaintiffs Have Properly Defined Relevant Markets ...................................... 18

      1.   Scheduled Air Passenger Service Is a Relevant Product Market ................... 19

      2.   Origin and Destination Pairs Constitute Relevant Geographic Markets........ 20

   B.   Defendants Possess Market Power ................................................................ 22

   C.   The NEA Likely Harms Competition in the Relevant Markets........................ 24

      1.   The NEA Likely Harms Competition in Domestic Markets to and from Boston.......... 25

      2.   The NEA Likely Harms Competition in Domestic Markets to and from New York .... 27

      3.   The NEA Likely Harms Competition in Markets to and from London ....................... 28

      4.   The NEA Likely Harms Competition Across the Country ............................ 30

      5.   The Harms Will Cost the Public Hundreds of Millions of Dollars Per Year................ 32

   D.   Defendants Cannot Rebut the Likely Harms to Competition ......................... 33

      1.   The Claimed Benefits Are Illusory .......................................................... 33

      2.   "Good Behavior" During Threatened and Pending Litigation Is Not Evidence of Pro-Competitive Benefit ................................................................................. 36

      3.   Defendants' Commitments Are Inadequate ............................................... 37

   E.   Defendants Could Achieve the Claimed Benefits Through Less Restrictive Alternatives 40

V.    CONCLUSION .................................................................................................. 42

## TABLE OF AUTHORITIES

**Cases**

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ............................................................................................ 18, 19

*Chicago Board of Trade v. United States*,
  246 U.S. 231 (1918) ............................................................................................ 16, 25

*Chicago Bridge & Iron Co. v. FTC*,
  534 F.3d 410 (5th Cir. 2008) ............................................................................. 37

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ............................................................................................... 23

*Eastern Food Services, Inc. v. Pontifical Catholic University Services Association, Inc.*,
  357 F.3d 1 (1st Cir. 2004) ....................................................................... 16, 18, 22

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992) ............................................................................................ 18

*FTC v. Actavis*,
  570 U.S. 136 (2013) ............................................................................................ 16

*FTC v. Hackensack Meridian Health, Inc.*,
  30 F.4th 160, 167 (3d Cir. 2022) ...................................................................... 19

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ...................................................................... 34, 35

*FTC v. Indiana Federation of Dentists*,
  476 U.S. 447 (1986) ............................................................................................ 16

*FTC v. Penn State Hershey Medical Center*,
  838 F.3d 327 (3d Cir. 2016) ............................................................................ 24, 34

*Hospital Corporation of America v. FTC*,
  807 F.2d 1381 (7th Cir. 1986) ........................................................................... 37

*Impax Laboratories, Inc. v. FTC*,
  994 F.3d 484 (5th Cir. 2021) ......................................................................... 16, 40

*In re Intuniv Antitrust Litigation*,
  496 F. Supp. 3d 639 (D. Mass. 2020) .............................................................. 19

*K.M.B. Warehouse Distributors, Inc. v. Walker Manufacturing Co.*,
  61 F.3d 123 (2d Cir. 1995) ................................................................................. 15

*Los Angeles Memorial Coliseum Commission v. National Football League*,
  726 F.2d 1381 (9th Cir. 1984) ........................................................................... 40

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*,
  866 F.2d 525 (1st Cir. 1989) .............................................................................. 36

*National Collegiate Athletic Association v. Alston*,
  141 S. Ct. 2141 (2021) ................................................................................. 14, 15, 40

*National Collegiate Athletic Association v. Board of Regents*,
  468 U.S. 85 (1984) ....................................................................................... passim

*Ohio v. American Express Co.*,
  138 S. Ct. 2274 (2018) ................................................................................. 15, 25, 40

*Saint Alphonsus Medical Center Nampa Inc. v. St. Luke's Health System, Ltd.*,
   778 F.3d 775 (9th Cir. 2015) ................................................................................................ 34, 35

*Sullivan v. National Football League*,
   34 F.3d 1091 (1st Cir. 1994) ................................................................................................ 16, 17, 40

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006) ................................................................................................................ 14

*Times-Picayune Publishing Co. v. United States*,
   345 U.S. 594 (1953) ............................................................................................................ 21

*United States v. Addyston Pipe & Steel Co.*,
   85 F. 271 (6th Cir. 1898) .................................................................................................... 17

*United States v. Addyston Pipe & Steel Co.*,
   175 U.S. 211 (1899) ............................................................................................................ 17

*United States v. Aetna, Inc.*,
   240 F. Supp. 3d 1 (D.D.C. 2017) ........................................................................................ 19

*United States v. American Airlines Group. Inc.*,
   No. 1:21-cv-11558-LTS (D. Mass. 2022) ........................................................................... 16

*United States v. Anthem, Inc.*,
   855 F.3d 345 (D.C. Cir. 2017) ............................................................................................ 35

*United States v. Blue Cross Blue Shield of Michigan*,
   809 F. Supp. 2d 665 (E.D. Mich. 2011) ............................................................................. 23

*United States v. Brown University*,
   5 F.3d 658 (3d Cir. 1993) ................................................................................................... 36

*United States v. E.I. duPont de Nemours & Co.*,
   351 U.S. 377, 395 (1956) .................................................................................................... 18

*United States v. First National Bank & Trust Co. of Lexington*,
   376 U.S. 665 (1964) ............................................................................................................ 16, 23, 36

*United States v. General Dynamics Corp.*,
   415 U.S. 486 (1974) ............................................................................................................ 37

*United States v. Paramount Pictures*,
   334 U.S. 131 (1948) ............................................................................................................ 15

*United States v. Philadelphia National Bank*,
   374 U.S. 321 (1963) ............................................................................................................ 23

*United States v. Realty Multi-List Inc.*,
   629 F.2d 1351 (5th Cir. 1980) ............................................................................................ 17

*United States v. Rockford Memorial Corp.*,
   898 F.2d 1278 (7th Cir. 1990) ............................................................................................ 21

*United States v. Union Pacific Railroad Co.*,
   226 U.S. 61 (1912) .............................................................................................................. 36

*Toys "R" Us, Inc. v. FTC*,
   221 F.3d 928, 937 (7th Cir. 2000) ...................................................................................... 23

*United States v. Visa*,
   344 F.3d 229 (2d Cir. 2003) ............................................................................................... 23

**Statutes**

15 U.S.C. § 1 .................................................................................................................. 14

**Other Authorities**

*DOJ & FTC, Horizontal Merger Guidelines*,
   (2010) ................................................................................................................ passim

## I.      INTRODUCTION

For nearly twenty years, American Airlines ("AA") and JetBlue have competed fiercely for passengers flying to and from Boston and New York City.  While AA complained internally about the "fare destruction B6 [JetBlue] have wrought,"[1] the public reaped the benefits of that competition: lower prices and higher quality service.  The rivalry between AA and JetBlue was a rare source of vigorous competition in an industry where competition is in scarce supply.  Over the past decade and a half, mergers and acquisitions have killed off several major airlines, leaving just a handful in control of the vast majority of domestic air travel.  Surveying the state of the industry in 2019, JetBlue's CEO summed it up well: "there's been a lot of consolidation in the U.S., and we really don't have a competitive industry."[2]

Now, the largest airline in the world, AA, and its long-time competitor, JetBlue, have entered an unprecedented and anticompetitive pact.  Under the Northeast Alliance ("NEA"), these rivals have agreed to stop competing on domestic flights in Boston and New York City. Instead, AA and JetBlue are coordinating how many flights each will offer and which routes each will serve—right down to jointly planning daily schedules and what planes to use.  They are also sharing their revenue: under the NEA, each airline earns the same amount regardless of whether a passenger flies on an AA or a JetBlue plane.  As a result, AA and JetBlue have effectively merged their operations in Boston and New York—ending the competition between the two airlines on domestic flights to and from those airports, increasing their incentives to accommodate one another across the country, and severely diminishing JetBlue's role as the independent and disruptive force it had long been.  The NEA will further erode competition in the industry and cost air travelers hundreds of millions of dollars per year, all against the

---

[1] PX0195 at 2.
[2] PX0459 at 2.

backdrop of historic flight cancelations and frustrating delays.

Before the NEA, JetBlue fought AA as a scrappy opponent that, in JetBlue's own words, boxed "far above" its weight.[3]  When JetBlue first launched service in Boston in 2004, it took on AA by offering travelers low fares and high-quality service.  In response, AA was forced to lower its fares.  Passengers rewarded JetBlue with their business.  By 2019, JetBlue estimated that it had saved travelers flying in and out of Boston more than $3 billion dollars since it began operating in the city.[4]

In New York, JetBlue was AA's most disruptive rival.  When JetBlue challenged AA and other major airlines by launching service at John F. Kennedy International Airport ("JFK"), the number of passengers using that airport nearly doubled.[5]  As in Boston, competition between AA and JetBlue in New York lowered prices and improved quality.  JetBlue's documents describe how, in response to competition from JetBlue, AA lowered fares to "match B6 [JetBlue] levels."[6]

Before the NEA, the rivalry between AA and JetBlue was poised to escalate.  Having fallen behind in Boston, AA had vowed to "*win BOS back*" by adding destinations and increasing flights on existing routes.[7]  Likewise, JetBlue had announced more flights in Boston, including nearly doubling its flights between Boston and New York's LaGuardia Airport ("LaGuardia").  Similarly, JetBlue and AA each had plans to expand in New York City.  And JetBlue had just announced new flights to and from AA's hubs in Philadelphia and Miami, deepening competition with AA.  As a JetBlue network planning executive explained in June 2020, "one of the most common trends in JetBlue's 20 year history is easily stealing share from

---

[3] PX0673 at 12.
[4] PX0518 at 1–2.
[5] PX0574 at 21.
[6] PX0544 at 2.
[7] PX0046 at 1 (emphasis in original).

AA and eventually winning[.]  So that applies to PHL [Philadelphia] and MIA [Miami]."[8]

Before consolidating its own Boston and New York operations with those of the largest airline in the world, JetBlue used to criticize consolidation.  JetBlue complained: "We believe the mega-carriers are large enough—we don't think it's in the interest of consumers or airline workers to allow the giants to get even bigger and more powerful."[9]  JetBlue warned: "All that power in the hands of a few very deep-pocketed airlines has implications for consumers in the form of reduced options, high fares and often poor service."[10]  JetBlue told the public: "Consumers effectively have very little choice in markets where JVs [joint ventures] have a stranglehold – and they also face higher fares.  This runs afoul of everything JetBlue has stood for during the past 15 years."[11]

But now, JetBlue has sold out and cashed in.  Instead of continuing to compete against AA in Boston and New York for the benefit of passengers, JetBlue has entered a joint venture like those it has long criticized.  The stated intent of this joint venture—which includes coordinating output and sharing revenue—is to make, in Defendants' own words, "each carrier indifferent," about whether a passenger chooses to fly AA or JetBlue to or from Boston or New York.[12]  That is exactly what it has done: turned JetBlue and AA from competitors into allies, extinguishing competition between the rivals on flights to and from Boston and New York.

The impact of the NEA will fall most heavily on those who have benefitted the most from competition between AA and JetBlue: the millions of passengers traveling on routes where both Defendants provided non-stop service to and from Boston or New York.  In those markets,

---

[8] PX0710 at 3.
[9] PX0542 at 21.
[10] PX0536 at 16.
[11] PX0569 at 65.
[12] PX0450 at 3.

Defendants will exert substantial and, in some cases, extraordinary power.  In most of them, Defendants control more than 50 percent market share.  In nine of them, Defendants' share exceeds 80 percent.[13]  Passengers in all of those markets, as well as others across the country, will be harmed as a result of the NEA—to the tune of hundreds of millions of dollars per year.  Already, in several of the markets where AA and JetBlue once competed, one or the other has ceased flying altogether, surrendering the market to its new ally.

Threatening to further exacerbate the harms of the NEA, JetBlue has now signed an agreement to acquire yet another disruptive airline, Spirit Airlines, the largest ultra-low-cost carrier in the country.  Spirit has opposed the NEA.  Spirit has stated that the NEA is "highly anticompetitive" and that, given Defendants' pact, it is "unrealistic to think that American [AA] and JetBlue will actively compete against each other" on flights to and from Boston and New York.[14]  Now, JetBlue's agreement to acquire Spirit risks extending the reach of Defendants' "highly anticompetitive" pact further still, by aligning not just one, but two of the nation's few disruptive, low-cost competitors with AA.

To justify their elimination of competition, Defendants assert that the NEA will enable them to grow more than they could independently, but Defendants' own documents disprove their claim.  Those documents reveal that much of the growth that Defendants now try to attribute to the NEA was already planned by AA and JetBlue independently beforehand—and could have been achieved without their pact.

The remaining growth that Defendants try to credit to the NEA is nothing more than a shell game.  Any growth by JetBlue or AA in Boston or New York will simply come from them shifting flights from elsewhere across their networks.  The net result is no growth at all.

---

[13] *See* PX0461 at 88, Ex. 16 (showing market shares).
[14] PX0895 at 5–6.

For its part, JetBlue is constrained by a shortage of planes and pilots. Thus, in the short term, any growth by JetBlue in Boston and New York will necessarily require JetBlue to rob resources from the rest of its network, offsetting any claimed growth with shrinkage elsewhere. Over the long-term, the NEA has compromised JetBlue's incentives to expand its network in Boston and New York. Instead of adding flights and flying bigger planes, thereby lowering fares for passengers, JetBlue now can simply sell higher-priced tickets on AA's flights and share in the resulting proceeds.

AA's purported growth under the NEA is also illusory. The NEA allows AA to piggyback off JetBlue's network in Boston and New York. That, in turn, enables AA to downsize or forgo growth of its own, like in Philadelphia, which AA previously used to connect many of the same origins and destinations it will now connect through JetBlue's network in Boston and New York. As AA executives have explained in their internal documents, the partnership with JetBlue "will erode its [Philadelphia's] unique value" for AA,[15] causing Philadelphia to be "de prioritized."[16]

This case is straightforward. The NEA eliminates competition between the largest airline in the world and a disruptive competitor on flights to and from Boston and New York. It deprives the public of the benefits that the rivalry has brought to passengers for two decades. It fundamentally alters JetBlue's role as an independent competitor that has saved passengers more than $10 billion since its founding.[17] Its effects are likely to be most acute in markets to and from some of the nation's most congested airports, protected by some of the highest barriers to entry in the country, with scarce opportunity for other airlines to replace the lost competition.

---

[15] DX0007 at 9.
[16] PX0132 at 1.
[17] PX0518 at 1–2.

And Defendants cannot meet the "heavy burden" that the law requires to justify the NEA's significant harms to competition. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 113 (1984).

Plaintiffs respectfully request that this Court enjoin the NEA.

## II.   BACKGROUND

### A.   Domestic Air Travel: "a startling concentration of power"[18]

The past decade and a half of mergers and acquisitions have left domestic air travel with only a handful of major players.  Today, U.S. air travel is dominated by four airlines: AA, Delta, United, and Southwest.  AA is the largest of these airlines.  As the following internal JetBlue presentation shows, the four airlines together control over 80 percent of domestic air travel.[19]



JetBlue's CEO, Robin Hayes, has remarked: "this is a startling concentration of power."[20]

While JetBlue criticized consolidation, AA's management cheered it on.  The Chairman of AA's Board of Directors, Doug Parker, who served as AA's CEO until this year, is a self-proclaimed "proponent of consolidation in the industry."[21]  Indeed, Mr. Parker led much of the

---

[18] PX0569 at 70 (speech by JetBlue's CEO, Robin Hayes).
[19] PX0668 at 5.
[20] PX0569 at 70.
[21] PX0458 at 2.

consolidation himself.  He served as CEO of America West when it merged with US Airways in 2005.  He then served as CEO of US Airways when it merged with AA in 2013.  He also served as CEO of AA when it entered the NEA with JetBlue.  Internally, AA refers to him as the "Godfather of consolidation."[22]  Today, "domestic consolidation" remains one of AA's long-term goals.[23]  As with past mergers, AA identifies "[f]urther domestic consolidation" as a leading value of the NEA.[24]

While AA, United, and Delta—"legacy" airlines—were busy consolidating, JetBlue was attacking the harms that consolidation inflicted on passengers.  Before JetBlue entered the NEA, its CEO stated that consolidation "has come at a cost to consumers.  Just look at the fares in some of the fortress hubs and in some of the legacy-dominated markets without low-fare competition.  Chances are, you'll see fares that are higher than they should be, and in that construct there's very little incentive to provide great service or to innovate."[25]

One way that consolidation has produced this result is by enabling AA and the other legacy airlines to collectively restrict "capacity," the industry's term for the number of seats made available to consumers.  As Plaintiffs' expert, Professor Robert Town, will explain, between roughly 2009 and 2017, the legacy airlines engaged in a practice they called "capacity discipline."  That is, they grew their capacities at or less than anticipated growth in demand. With fewer seats available—less supply—passengers had to pay more for each seat.

Consolidation made it easier for airlines to engage in "capacity discipline."  One way that consolidation did so is by giving legacy airlines a means to extend their networks without adding capacity to the industry and thereby lowering fares.  By consolidating with another airline,

---

[22] PX0188 at 4.
[23] PX0125 at 1.
[24] PX0125 at 38.
[25] PX0569 at 57.

legacy airlines marketed their partner's existing network as their own, rather than add flights or use larger planes to offer more seats.  Prior mergers also enabled legacy airlines to shutter hubs.

While "capacity discipline" was most acute between 2009 and 2017, the airline industry continues to be susceptible to the practice.  Because only a small number of legacy airlines remain in the United States, there are few competitors needed to coordinate effectively, few capacity decisions to monitor, and few threats of deviation from a legacy consensus to restrict growth.  Because capacity decisions are often publicly disclosed, it is easy to monitor rivals' behavior.  And because airlines tend to compete against each other in many markets at once, opportunities abound for legacy airlines to punish a rival's decision to add capacity.[26]

## B.      JetBlue: "Our brand boxes far above our weight"[27]

For more than two decades, JetBlue served as the legacy airlines' foil in the northeastern United States.  As JetBlue's Head of Revenue, Dave Clark, put it, "our brand boxes far above our weight and there's no question we're a disruptor."[28]  JetBlue explained that "[s]maller carriers like JetBlue play a critical role in keeping the commercial aviation industry competitive and keeping the immense power of the legacy airlines in check."[29]  JetBlue served "as an important counterweight to the concentration of power held by our largest competitors; the benefits we bring to the market—lowering fares, stimulating demand, and raising the bar in Customer service—are clear."[30]

JetBlue's business model was unique.  One of JetBlue's competitive advantages was that it had a significantly lower cost structure than its legacy competitors,[31] allowing it to operate

---

[26] *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 7.2 (2010) ("*Guidelines*") (describing how those conditions facilitate coordination).
[27] PX0673 at 12 (presentation by JetBlue's Head of Revenue, Dave Clark).
[28] PX0673 at 12.
[29] PX0628 at 4.
[30] PX0628 at 4.
[31] PX0716 at 16.

profitably while charging lower fares.[32]  As a result, JetBlue had a long and public track record of entering markets and, in doing so, forcing competitors to lower their fares.

Another advantage was JetBlue's high-quality service.  Unlike other smaller airlines, JetBlue offers two classes of service.  JetBlue advertises its business class cabin, Mint, as "the best premium product in the market."[33]  Mint allowed JetBlue to compete effectively against AA and other legacy airlines for high-paying business and leisure travelers in ways other small airlines could not.  In economy class, JetBlue was also an innovator.  JetBlue was the first airline to offer live TV.  It was the first to offer free, high-speed Wi-Fi.  Those features helped JetBlue attract economy passengers.

JetBlue's business model succeeded.  While AA and its fellow legacy airlines sought to restrict capacity growth and raise fares, JetBlue introduced new capacity and lowered fares.  Consumers rewarded JetBlue with their business.

JetBlue's growth was especially remarkable in markets to and from cities in the Northeastern United States, where JetBlue focused its operations.[34]  By 2019, JetBlue had grown into the fourth largest airline in those markets, as measured by available seat miles, a common industry measure of capacity.  JetBlue controlled roughly 16 percent of capacity, after AA (21 percent), Delta (21 percent), and United (20 percent).  To achieve that status, JetBlue grew its capacity by approximately 70 percent between 2009 and 2019.  By contrast, AA and the other legacy airlines grew their capacity in those markets by only about 15 percent.

---

[32] PX0716 at 37.
[33] PX0716 at 35.
[34] For purposes of this calculation, endpoints in the Northeastern United States are defined to include those in Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, and Vermont.  *See* U.S. Census Bureau, Census Regions and Divisions of the United States (2010), https://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf.

JetBlue's growth was also remarkable in markets between cities on the East Coast.[35]  By 2019, JetBlue had grown into the third largest airline in those markets, with roughly 16 percent of capacity, after Delta (26 percent) and AA (23 percent).  To achieve that status, JetBlue grew its capacity by approximately 50 percent between 2009 and 2019.  By contrast, AA and the other legacy airlines grew their capacity in those markets by only about 16 percent.

JetBlue's growth was a boon to consumers.  By challenging AA and other legacy airlines, JetBlue forced them to lower fares.  JetBlue called this the "JetBlue Effect."  As JetBlue's CEO explained, "just look at markets in New York where a legacy airline flies without competition and one where JetBlue flies against them, you see a massive difference in the fares."[36]

## C.    AA: "we are going to fight like hell in BOS if I have anything to do with it"[37]

Before the NEA, competition between AA and JetBlue was poised to intensify.  Having fallen behind JetBlue in Boston, AA's Vice President of Planning, Vasu Raja, affirmed his commitment to win back market share: "WE [sic] are not done in BOS" and "we are going to fight like hell in BOS if I have anything to do with it."[38]  AA was planning to add service to new destinations and to substantially increase departures.[39]  To defend its leading position in Boston, JetBlue had announced new flights to and from AA's strongholds like Washington, DC, threatening to increase its flights in those markets to an almost hourly pace.

JetBlue was positioned to grow in New York too.  Sensing that the Federal Aviation Administration ("FAA") was growing impatient with its chronic underutilization of "slots"— take-off and landing rights granted by the FAA at certain congested airports—AA was

---

[35] For purposes of this calculation, the East Coast includes Connecticut, Delaware, the District of Columbia, Florida, Georgia, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Vermont, and Virginia.
[36] PX0459 at 3.
[37] PX0122 at 1 (email from AA's Vice President of Planning, Vasu Raja).
[38] PX0122 at 1.
[39] PX0065 at 1.

considering transferring those assets to JetBlue.  Airlines risk losing slots if they do not comply

with utilization requirements.  For years, AA underutilized its slots by flying small regional jets,

doing the minimum required, and even incurring financial losses rather than allow another airline

to use those slots to compete against AA.  That strategy deprived competitors of slots in New

York and enabled AA to restrict capacity in support of higher prices.

But the jig was up.  A month before AA approached JetBlue about a potential

partnership, a liaison to the FAA advised AA that "it comes down to three choices": AA could

choose to "1) fly the slots. 2) complete un-even (aka 1-way) trades to OA [other airlines]. 3) risk

losing the slots… which is albeit a certainty."[40]  Before the NEA, and reluctantly, AA developed

plans to lease New York slots to JetBlue.  Gaining access to the slots would have enabled

JetBlue to expand service in New York, intensifying its rivalry with AA.

JetBlue threatened to challenge AA elsewhere across the country as well.  Before the

NEA, JetBlue considered expanding its service at AA's hubs at Philadelphia and Miami.  In its

most ambitious project, JetBlue was planning to win passengers from AA on flights to and from

London.  "These fares are obscene," JetBlue's CEO complained of AA's and other legacy

airlines' London service months before entering the NEA.[41]  "You should be paying a fraction of

that, and that's what we're going to do."[42]

### D.  Defendants "will engage in network planning as if their Northeast assets were in a single airline"[43]

Faced with the significant and growing competitive threat from JetBlue, AA has now

returned to its consolidation playbook.  At Boston Logan International Airport ("Boston"), JFK,

---

[40] PX0257 at 2.
[41] PX0631 at 5.
[42] PX0459 at 3.
[43] PX0456 at 1.

LaGuardia, and Newark Liberty International Airport ("Newark"), AA and JetBlue have agreed to coordinate their competitive decision-making and to share revenue.[44]  To more fully consolidate their operations, they have also agreed to a host of other contracts.  One is a "codeshare" agreement, through which AA and JetBlue market each other's flights to and from the four airports.[45]  Another is a frequent flyer agreement, through which Defendants provide frequent flyer reciprocity.[46]

When rivals effectively merge their operations, as AA and JetBlue have done on domestic flights to and from Boston and New York, it eliminates competition between them.  As Defendants themselves have acknowledged, "they will engage in network planning as if their Northeast assets were in a single airline."[47]

Defendants attempt to disguise the extent of their consolidation by repeating that AA and JetBlue price independently.  But as a matter of basic economics and common sense, if capacity—supply—is reduced, prices will rise.  That is true regardless of whether Defendants communicate openly about prices.  There are many ways Defendants can coordinate to increase fares, and thereby their joint profits, without mentioning price explicitly.  One is by agreeing to cut the number of seats they fly on a route.  The effect of artificially restricting supply will be higher fares.  Another is by one Defendant exiting a market where it used to compete against the other.  The remaining Defendant, now facing less competition, will be free to raise its prices.  Under the revenue-sharing component of the NEA, the Defendant who exits will then share in the other Defendant's increased proceeds, ensuring it is compensated for ceding the market to its

---

[44] PX0001-a at 4–5.
[45] Codesharing refers to a marketing arrangement in which an airline places its designator code on a flight operated by another airline and sells tickets for that flight.
[46] Frequent flyer reciprocity refers to the ability to earn and redeem frequent flyer rewards on both airlines' flights.
[47] PX0456 at 1.

ally.  Either way, the NEA enables Defendants to raise prices.  Whether Defendants, in doing so, say the magic word "price" does not matter.  Passengers will suffer all the same.

To support their assertion that the NEA will not cause harm, Defendants also claim that the NEA's revenue-sharing component, standing alone, is structured to incentivize growth by AA and JetBlue.  That, too, is beside the point.  The revenue-sharing agreement does not stand alone; it exists alongside other provisions of the NEA.  Under the NEA, Defendants coordinate "on all aspects" of network planning.[48]  As such, Defendants will deploy their planes in those markets in the way that maximizes their joint profits.  On routes where Defendants once competed, this means Defendants likely will reduce capacity and, in doing so, raise fares.  There is no basis to believe that AA and JetBlue—for-profit corporations—will do anything else.

No domestic alliance in the United States so fully consolidates the operations of two rivals and, in doing so, so completely extinguishes competition between them.  Even the West Coast International Alliance ("WCIA") between AA and Alaska Airlines does not permit codesharing on domestic routes where the two airlines provide competing non-stop service.  Indeed, any codesharing under the WCIA is subject to restrictions imposed by a court-ordered consent decree.  The WCIA contemplates only limited revenue-sharing.  Nor does the WCIA permit any capacity coordination.  The NEA is unprecedented in U.S. airline history.

**E.     JetBlue's Attempt to Acquire Spirit Would Exacerbate the Harms of the NEA**

In the absence of legal intervention, it is clear that consolidation will continue, and competition and consumers will suffer.  Threatening to compound the anticompetitive effects of the NEA, JetBlue has recently entered an agreement to acquire yet another disruptive airline, Spirit Airlines.  That transaction, combined with the NEA, now risks placing not one, but two

---

[48] PX0001-a at 5.

low-cost airlines under the thumb of AA, neutralizing their disruptiveness and aligning their interests with those of the largest airline in the world.  The impact of this race to consolidation will fall on the traveling public.

Before Spirit entered a merger agreement with JetBlue, Spirit's CEO wrote a letter to JetBlue's CEO, explaining Spirit's opposition to Defendants' plan:

> We struggle to understand how JetBlue can believe DOJ, or a court, will be persuaded that JetBlue should be allowed to form an anticompetitive alliance that aligns its interests with a legacy carrier [AA] and then undertake an acquisition that will eliminate the largest ULCC [ultra-low-cost] carrier [Spirit].[49]

Plaintiffs agree.  Passengers will suffer if AA, the largest airline in the world, is permitted to co-opt one—and now maybe two—of its most disruptive rivals.  AA and JetBlue should not be permitted to extinguish the competition that, for more than twenty years, has lowered fares, increased choice, and improved service for millions of passengers.

## III.   LEGAL FRAMEWORK

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy" that unreasonably restrains trade.  15 U.S.C. § 1.  Some restraints are condemned *per se*, but determining whether a restraint is unreasonable ordinarily "calls for . . . a 'rule of reason analysis.'"  *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2151 (2021) (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)).  Courts typically undertake a rule of reason analysis using a multi-step burden-shifting framework.  *Alston*, 141 S. Ct. at 2160.

At the first step, the plaintiff has the initial burden to "prove that the challenged restraint has a substantial anticompetitive effect."  *Id.*  At this stage, some restraints are so plainly anticompetitive that courts condemn them absent a competitive justification, without any need

---

[49] PX0439 at 4.

for "a detailed market analysis" of the defendants' market power or the actual effects of the restraint. *Bd. of Regents*, 468 U.S. at 110.  Examples of such restraints include horizontal agreements to limit output or to share profit with competitors.  *See, e.g.*, *id.*, 468 U.S. at 100 ("output limitation" condemned under abbreviated rule of reason analysis because it "on its face constitutes a restraint upon the operation of a free market"); *United States v. Paramount Pictures*, 334 U.S. 131, 149 (1948) (profit-pooling agreements condemned as "bald efforts to substitute monopoly for competition").  These kinds of agreements between competitors are often condemned as *per se* unlawful because they have the same tendencies to increases prices and reduce output as explicit horizontal pricing agreements.  *Alston*, 141 S. Ct. at 2156.  Because such plainly anticompetitive restraints are condemned as *per se* violations, they can also be found unlawful under an abbreviated, "quick look" form of the rule of reason.  *Id.*  When plainly anticompetitive restraints are alleged, the burden shifts to the defendant to provide "some competitive justification" for the restraint.  *Bd. of Regents*, 468 U.S. at 110.

Alternatively, the plaintiff can also meet its initial burden by showing that a restraint has an anticompetitive effect.  *Alston*, 141 S. Ct. at 2160.  One way is by showing an anticompetitive effect such as "reduced output, increased prices, or decreased quality in the relevant market."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("*Amex*") (citations and brackets omitted).  The second is by establishing (1) "proof of market power" in one or more relevant markets and (2) "some evidence that the challenged restraint harms competition."  *Id.*; *see also K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995) (proof of market power, plus "grounds to believe that the defendant's behavior will harm competition market-wide").

"Market power is the ability to raise prices above those that would be charged in a

competitive market," *Bd. of Regents*, 468 U.S. at 109 n.38, or to "exclude competition," *E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 5 (1st Cir. 2004).  The "conventional way" to create a presumption of market power is by showing that "the relevant actor or combination has a sufficient percentage share of a 'relevant market' to give it or them power to raise price over cost without losing so many customers as to defeat the effort."  *Id.* at 6.

The plaintiff need *not* show that the restraint has already inflicted quantifiable effects on consumers.  The test is whether the challenged restraint is *likely* to harm competition.  *See Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) ("actual or probable" effect); *United States v. First Nat'l Bank & Trust Co. of Lexington*, 376 U.S. 665, 669 (1964) (proof that the restraint "tends to foreclose competition"); *FTC v. Actavis*, 570 U.S. 136, 153 (2013) ("potential for genuine adverse effects on competition") (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986)); Order Denying Motion to Dismiss (Doc. No. 67) at 2, *United States et al. v. Am. Airlines Grp. Inc., et al.*, No. 1:21-cv-11558-LTS (D. Mass. June 9, 2022), ECF No. 103 ("likely to harm competition").

Because the central question is a restraint's impact on competition, evidence of harm to the competitive process can be particularly probative.  *Sullivan v. NFL*, 34 F.3d 1091, 1101 (1st Cir. 1994); *see also Bd. of Regents*, 468 U.S. at 106–07 (harm to the competitive process itself is often "the most significant" harm to competition); *see also Actavis*, 570 U.S. at 157 (attempts to "prevent the risk of competition . . . constitute[] the relevant anticompetitive harm"); *Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 493 (5th Cir. 2021) ("Eliminating potential competition is, by definition, anticompetitive.").

Once the plaintiff proves likely harm to competition, the burden shifts to the defendant to "show the lawfulness of [the restraint] under the rule of reason."  *Actavis*, 570 U.S. at 156.  At

this second step, the defendant must establish a justification for the restraint by proving that it has sufficient procompetitive effects. *Bd. of Regents*, 468 U.S. at 113. Where a plaintiff has shown significant anticompetitive effects, the defendant faces a "heavy burden" at this second step. *Id*.

Finally, assuming the defendant satisfies its burden under step two, the court engages in "a weighing of the injury and the benefits to competition." *Sullivan*, 34 F.3d at 1111. If a restraint's "anticompetitive effects . . . outweigh the [restraint's] legitimate business justifications," or "if a reasonable, less restrictive alternative to the [restraint] exists that would provide the same benefits," then the restraint violates the Sherman Act. *Id.* at 1096, 1103. Thus, even where joint venture restraints have procompetitive effects, the restraints at issue "themselves must be reasonably necessary to the accomplishment of the legitimate goals and narrowly tailored to that end." *United States v. Realty Multi-List Inc.*, 629 F.2d 1351, 1375 (5th Cir. 1980); *see also United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899).

## IV.   ARGUMENT

At trial, Plaintiffs will prove that the NEA violates Section 1 of the Sherman Act because it fails to satisfy the rule of reason. First, the agreements to share revenue and to limit output are precisely the type of restraints courts condemn as facially anticompetitive, and thus suitable for a "quick look," abbreviated rule of reason analysis. Second, Defendants have market power and the NEA is likely to harm competition.

As described further below, the evidence will show that air travel between the origin and destinations pairs where Defendants compete or likely would compete absent the NEA are relevant antitrust markets, *see subsection A*, and in those markets, Defendants possess market

power, *see subsection B*.  The evidence will show that the NEA is both likely to result in reduced

output and increased prices, and that Defendants' market power is likely to harm competition,

*see subsection C*.  The evidence will show that any claimed benefits to competition from the

NEA are illusory, *see subsection D*, and thus Defendants cannot carry their burden under either a

"quick look" or a full-blown analysis under the rule of reason.  Finally, the NEA should be

condemned because less restrictive alternatives to this effective merger exist (even if those

alternatives themselves may be anticompetitive), *see subsection E*.

### A.      Plaintiffs Have Properly Defined Relevant Markets

Proof of market power is "ordinarily the first step in any rule of reason claim."  *E. Food

Servs.*, 357 F.3d at 5.  "This in turn requires the identification of some economic market in which

power can be measured and the consequences of the [challenged] act or transaction assessed."

*Id.*  The evidence will show that Plaintiffs have properly defined relevant markets here.

A relevant market has two components: a relevant product market, and a relevant

geographic market.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).  A relevant

product market consists of those products that are "reasonably interchangeable by consumers for

the same purposes."  *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 395 (1956).

The market is established by examining the substitutes that a consumer might employ and "the

extent to which consumers will change their consumption of one product in response to a price

change in another, *i.e.*, the 'cross-elasticity of demand.'"  *Eastman Kodak Co. v. Image Tech.

Servs., Inc.*, 504 U.S. 451, 469 (1992).  "The criteria to be used in determining the appropriate

geographic market are essentially similar to those used to determine the relevant product

market."  *Brown Shoe*, 370 U.S. at 336.

To determine the scope of a relevant market, courts often use an analytical tool called the

hypothetical monopolist test.  *See, e.g.*, In re *Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639, 664 (D. Mass. Oct. 9, 2020) (the hypothetical monopolist test from the Horizontal Merger Guidelines "remains . . . the touchstone of market definition, even in contexts outside of horizontal mergers") (internal quotation marks omitted)).  "A proposed market is properly defined, under this test, if a hypothetical monopolist who owns all the firms in the proposed market could profitably impose a small but significant non-transitory increase in price ('SSNIP') on buyers in that market," because not enough buyers would substitute to other products, or to suppliers in other geographic areas, to make the SSNIP unprofitable.  *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 167 (3d Cir. 2022) (citing *Guidelines* § 4.1.1).

The existence of one properly defined relevant market does not exclude the possibility that others also exist.  "The Guidelines make clear that the hypothetical monopolist test does not aim to identify a 'single relevant market.'"  *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 39 (D.D.C. 2017).  "Rather, the test 'ensures that markets are not defined too narrowly' and, in so doing, identifies a market that will 'illuminate the evaluation of competitive effects.'"  *Id.* (quoting *Guidelines* § 4.1.1); s*ee also Brown Shoe*, 370 U.S. at 336 (within a broader product or geographic market, "well-defined submarkets may exist which, in themselves, constitute [relevant markets] for antitrust purposes").  The government may evaluate a transaction in "any relevant market satisfying the [hypothetical monopolist] test," and will "usually do so in the smallest market that qualifies."  *Aetna*, 240 F. Supp. 3d at 40.

Applying these principles, Plaintiffs have properly defined relevant markets in which to assess the competitive effects of the NEA.

### 1.     Scheduled Air Passenger Service Is a Relevant Product Market

There is a relevant product market for scheduled air passenger service.  Air travel enables

consumers to travel quickly and efficiently between airports, offering them significant time savings over other forms of transportation, such as trains, buses, and cars.  Defendants do not appear to seriously contest that air travel is a relevant product market.  Nor could they.

As the evidence will show, other forms of transportation do not constrain the price of air travel.  For trips over longer distances—such as between the East and West Coasts—travel by train, bus, and car takes days longer than air travel and offers a significantly differentiated customer experience.  Even over shorter distances, the ability of customers to switch to trains, cars, or buses does not keep airline fares in check.  As Plaintiffs' expert, Professor Nathan Miller, will testify, the hypothetical monopolist test confirms that other modes of transportation are not a sufficiently close substitute to air travel for enough passengers that they should be included in the relevant product market.

### 2.    Origin and Destination Pairs Constitute Relevant Geographic Markets

The origin and destination pairs where both AA and JetBlue compete or likely would compete absent the NEA are relevant geographic markets.  Travelers seek to depart from airports close to where they live and work, and arrive at airports near their intended destinations.  As a result, travelers within a particular metropolitan area may strongly prefer service at a particular airport or airports.  For that reason, in some metropolitan areas that contain more than one airport, a specific airport or airports may constitute a distinct origin or destination for the purposes of defining relevant markets.

Based on the litigation to date, Defendants do not appear to seriously contest the vast majority of the geographic markets defined by Plaintiffs.  Instead, Defendants focus their efforts on arguing that Newark should be counted as the same endpoint as JFK and LaGuardia for purposes of domestic travel.  In support of that position, Defendants cite opinions from their

experts that Newark competes with JFK and LaGuardia.  They also cite limited evidence that

certain customers, including some who live in Manhattan, view Newark as a substitute to JFK

and LaGuardia.

Defendants' argument misconstrues the relevant inquiry.  As the Supreme Court has

explained, "a relevant market cannot meaningfully encompass th[e] infinite range" of products or

geographies that *some* buyers might view as equivalent.  *Times-Picayune Publ'g Co. v. United

States*, 345 U.S. 594, 612 n.31 (1953).  Rather, a relevant market should "exclude any other

product to which, within reasonable variations in price, only a limited number of buyers will

turn; in technical terms, products whose 'cross-elasticities of demand' are small."  *Id.*; *see also

United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1284–85 (7th Cir. 1990) (Posner, J.)

(affirming market definition of "the provision of inpatient services by acute-care hospitals in

Rockford and its hinterland" even though some "people who live in Rockford . . . use hospitals

outside the area"); *Guidelines* § 4.1.1 ("The hypothetical monopolist test may identify a group of

products as a relevant market even if customers would substitute significantly to products outside

that group in response to a price increase.").

Thus, the question here is not whether Newark "competes" with JFK and LaGuardia nor

whether *some* or even *many* customers, such as those in parts of Manhattan, view Newark as a

reasonable option; it is whether *enough* passengers who fly to and from JFK and LaGuardia

would switch to Newark or elsewhere to make a small but significant price increase at JFK and

LaGuardia unprofitable.  Here, the evidence will show they would not.

The simple proximity of airports to each other does not always determine consumer

preferences, and it does not do so here.  Indeed, JetBlue's own internal analysis has concluded

that customers who fly from JFK and LaGuardia tend to live east of the Hudson River, while

customers who fly from Newark tend to live to the west of it.  In July 2020, the very month

JetBlue entered the NEA, JetBlue acknowledged when preparing for an investor call that

Newark's catchment area "does not largely overlap with LGA [LaGuardia] or JFK."[50]

This squares with common sense.  The significant majority of passengers who fly to and

from JFK and LaGuardia—including the approximately 8 million Americans who live on Long

Island—are unlikely to switch to Newark or elsewhere in response to a small, but significant

price increase at JFK and LaGuardia.  That is why taxi data and Defendants' own data show that

Newark primarily draws passengers from different areas than do JFK and LaGuardia.  The

economic evidence, including the hypothetical monopolist test, will also confirm that Newark is

properly treated as a distinct endpoint from JFK and LaGuardia for purposes of domestic travel.

Even if Newark, JFK, and LaGuardia were treated as one endpoint for purposes of

defining domestic markets, however, it would not make a material difference.  If the three

airports were lumped together, AA and JetBlue would still control substantial shares in nearly all

the markets to and from New York where Defendants provided non-stop service prior to the

pandemic.  In addition, as Professor Miller will explain, the inclusion of Newark within the New

York market definition would not significantly reduce the NEA's estimated total likely harms.

### B.  Defendants Possess Market Power

Once Plaintiffs have shown the existence of relevant markets, the inquiry shifts to power

in those markets.  Plaintiffs can demonstrate market power by establishing that Defendants

control a "sufficient percentage share" of those markets.  *E. Food Servs.*, 357 F.3d at 6.  Those

market shares provide a "presumptive basis for inferring market power."  *Id.*

Here, Defendants together control substantial shares in the relevant markets.  Indeed, in

---

[50] PX0488 at 12.

most of the markets to and from Boston and New York where AA and JetBlue competed to provide non-stop service prior to the pandemic, Defendants' market share exceeds 50 percent. In many, their share exceeds 70 percent. In several, their share is at, or near, monopoly levels.[51]

Courts routinely find that lower market share percentages merit an inference of market power. *See, e.g.*, *United States v. Visa*, 344 F.3d 229, 239–40 (2d Cir. 2003) (Mastercard had market power with a 26 percent market share); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (20–49 percent share); *United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665, 673–74 (E.D. Mich. 2011) ("market share . . . rang[ing] from 40% to more than 80%"); *see also Lexington*, 376 U.S. at 669–70 (combined share of approximately 50 percent); *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 364 (1963) (30 percent share).

In addition to market share percentages, the high levels of concentration in the relevant markets provide an inference of market power. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 44 (2013) ("The Guidelines, and any standard antitrust treatise, explain why firms in highly concentrated markets normally have the power to raise prices significantly above competitive levels.").

Concentration is typically measured by the Herfindahl-Hirschman Index ("HHI"). The HHI is calculated by summing the individual market shares of all the competitors. Markets in which the HHI exceeds 2,500 points are considered highly concentrated. Increases in the HHI of more than 200 points are considered to be significant increases in concentration. If a merger would increase the HHI by more than 200, and would result in an HHI above 2,500, the merger is presumed likely to enhance market power and substantially lessen competition. *See Guidelines* § 5.3.

---

[51] *See* PX0461 at 88, Ex. 16 (showing market shares as high as 96.8 percent).

In the dozens of markets where the NEA eliminates competition between Defendants and thus functions like a merger—domestic markets to and from Boston and New York where AA and JetBlue both provided non-stop service—the NEA would significantly increase concentration, resulting in highly concentrated markets.[52]  Those increases, and the levels of concentration they produce, far exceed those where courts have presumed market power in prior cases.  *See, e.g.*, *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 347 (3d Cir. 2016) ("a merger that increases the HHI by more than 200 points is 'presumed to be likely to enhance market power.'") (quoting *Guidelines* § 5.3).

Significant barriers to entry and expansion protect Defendants from competition, further strengthening Defendants' market power.  Among the most significant barriers to entry by new airlines or expansion by existing airlines is airport infrastructure, including gates and slots.  In order to add flights at any airport, airlines need enough gates at which to offload and onboard passengers.  In addition, at two of the airports covered by the NEA—JFK and LaGuardia—airlines require FAA authorizations, or "slots," to take off and land.  The evidence will show, and JetBlue itself has admitted, that gates and slots are scarce and guarded by incumbent airlines.  In 2018, JetBlue's CEO explained: "The fact is that in some of the most established and important markets in this country the infrastructure is tightly controlled by a few deep-pocketed airlines."[53]  Again, in 2020, JetBlue boasted to ratings agencies of its "protected presence" at JFK and LaGuardia, stating that "[s]lot constraints limit the ability for competitors to grow in NYC."[54]

### C.    The NEA Likely Harms Competition in the Relevant Markets

Having shown that Defendants possess market power, Plaintiffs then complete their

---

[52] *See* PX0461 at 88, Ex. 16 (HHI increases up to 3,868 and resulting HHI levels as high as 9,372).
[53] PX0569 at 56.
[54] PX0683 at 9, 28.

prima facie case by showing "some evidence that the challenged restraint harms competition." *Amex*, 138 S. Ct. at 2284; *see also Chi. Bd. of Trade,* 246 U.S. at 238 ("probable" effect).  Here, the evidence will show that the NEA's likely harms to competition are significant.  The NEA extinguishes competition between AA and JetBlue in domestic markets to and from Boston and New York City.  It significantly diminishes competition in markets to and from London.  It also dampens competition elsewhere across the country, where AA and JetBlue purport to remain full throated rivals.

### 1.    The NEA Likely Harms Competition in Domestic Markets to and from Boston

Before the NEA, AA and JetBlue battled to win air travelers from each other on flights to and from Boston.  When JetBlue first launched service in Boston in 2004, JetBlue took on AA (and US Airways, which has now been consolidated into AA) by offering consumers lower fares and high-quality service.  Consumers voted with their feet and, in 2010, JetBlue became Boston's most popular airline.  In 2013, the merger of AA and US Airways made AA the second largest airline in Boston.

Passengers reaped the benefits of Defendants' rivalry.  When JetBlue fought AA by launching flights between Boston and AA's hub at LaGuardia, for example, average fares fell from $223 to $115.[55]  Likewise, when JetBlue challenged AA by launching service between Boston and AA's hub at Ronald Reagan Washington National Airport ("Reagan National"), average fares dropped from $164 to $117.[56]

Before the NEA, the fight between AA and JetBlue was poised to escalate.  To win back Boston, AA had planned to add new destinations and increase its Boston departures between

---

[55] PX0623 at 4.
[56] PX0574 at 24.

2019 and 2024.[57]  JetBlue was doubling down too.  It had announced new flights between Boston

and AA's hubs at JFK, LaGuardia, Reagan National, and Philadelphia International Airport.[58]

That growth promised to bring JetBlue into even closer competition with AA.

      AA and JetBlue had battled in Boston for more than a decade and a half before they

entered the NEA.  Although AA had recently fallen to third in Boston, behind JetBlue and Delta,

AA was well positioned to fight back.  AA need only look to Delta's example to see what

fighting back looks like.  A decade and a half ago, Delta was more popular than JetBlue in

Boston.  Knocked back by JetBlue, Delta invested in growth, won back market share, and

overtook AA.  Delta did so by competing—not by entering a competition-killing pact, as AA

seeks to do with the NEA.

      The NEA now ends the rivalry between AA and JetBlue in domestic markets to and from

Boston, including the following eleven markets where AA and JetBlue both provided non-stop

service prior to the pandemic.

### Domestic Boston Markets Where Defendants Both Provided Non-Stop Service

| Market | Market Revenue[59] | Combined Share[60] |
|---|---|---|
| Boston (BOS) – Los Angeles (BUR/ONT/LAX/LGB/SNA) | $393.2M | 62.6% |
| Boston (BOS) – Chicago (MDW/ORD) | $253.1M | 48.5% |
| Boston (BOS) – Miami (MIA/FLL) | $223.8M | 76.5% |
| Boston (BOS) – Washington National (DCA) | $203.0M | 88.0% |
| Boston (BOS) – NYC (JFK/LGA) | $194.4M | 49.8% |
| Boston (BOS) – Dallas/Fort Worth (DFW/DAL) | $166.1M | 83.6% |
| Boston (BOS) – Philadelphia (PHL) | $132.0M | 86.8% |
| Boston (BOS) – Phoenix (AZA/PHX) | $116.5M | 85.2% |
| Boston (BOS) – Charlotte (CLT) | $84.7M | 96.1% |
| Boston (BOS) – Rochester (ROC) | $7.4M | 86.2% |
| Boston (BOS) – Syracuse (SYR) | $4.1M | 82.1% |

---

[57] PX0065 at 1.

[58] PX0508 at 10.

[59] Market revenue shows total revenue generated in the market in 2019, the last full year before the pandemic.

[60] Market shares are based on 2019 revenue.  For Boston (BOS) – Washington National (DCA), shares are based on Q4 2019 data only to account for the fact that Delta began offering nonstop service during Q3 2019.

### 2. The NEA Likely Harms Competition in Domestic Markets to and from New York

Before the NEA, JetBlue lowered fares and improved the quality of its service in New York as it sought to upend the dominance of AA and the other legacy airlines. The dynamic between AA and JetBlue in New York was simple: JetBlue offered lower fares, AA responded, and passengers cashed in on the savings.

JetBlue's launch of Mint, a premium cabin that competed with AA's business class, demonstrates the impact that JetBlue had on AA in New York. In 2014, JetBlue added Mint service on flights between JFK and Los Angeles International Airport ("LAX"), a route that AA also served. In response, AA lowered its fares to match JetBlue's fares.[61] AA's business class fares plummeted by as much as 49 to 79 percent.[62] AA also improved the quality of its business cabin to better compete with JetBlue, including by adding lie-flat seating to its planes.[63]

Competition between Defendants in New York was not a one-way ratchet. AA also kept JetBlue's fares in check. In 2019, for example, AA suspended service between JFK and San Diego International Airport, a route on which AA competed with JetBlue. Temporarily freed of competition from AA, JetBlue "effectively increased fares by $20 to $40," making service between JFK and San Diego, in JetBlue's words, "one of the highest fare trans-con markets in the system."[64] The elimination of AA as a competitor had allowed JetBlue to raise fares.

The NEA now ends competition between AA and JetBlue not just on flights between New York and San Diego, but on *all* domestic flights to and from New York, including the following eighteen markets where Defendants provided non-stop service prior to the pandemic.

---

[61] PX0544 at 2.
[62] PX0544 at 2.
[63] PX0725 at 23.
[64] PX0614 at 1.

**Domestic New York City Markets Where Defendants Both Provided Non-Stop Service**

| Market | Market Revenue[65] | Combined Share[66] |
|---|---|---|
| NYC (JFK/LGA) – Los Angeles (BUR/ONT/LAX/LGB/SNA) | $1,223.1M | 57.0% |
| NYC (JFK/LGA) – Miami (MIA/FLL) | $733.1M | 55.9% |
| NYC (JFK/LGA) – San Francisco (SJC/OAK/SFO) | $670.6M | 45.7% |
| NYC (JFK/LGA) – Chicago (MDW/ORD) | $513.1M | 36.2% |
| NYC (JFK/LGA) – Atlanta (ATL) | $375.2M | 15.8% |
| NYC (JFK/LGA) – Orlando (MCO) | $348.9M | 55.3% |
| NYC (JFK/LGA) – Las Vegas (LAS) | $266.4M | 46.5% |
| NYC (JFK/LGA) – Boston (BOS) | $194.4M | 49.8% |
| NYC (JFK/LGA) – West Palm Beach/Palm Beach (PBI) | $193.4M | 60.0% |
| NYC (JFK/LGA) – San Diego (SAN) | $166.3M | 44.7% |
| NYC (JFK/LGA) – Phoenix (AZA/PHX) | $162.5M | 61.5% |
| NYC (JFK/LGA) – Austin (AUS) | $130.8M | 44.6% |
| NYC (JFK/LGA) – Raleigh/Durham (RDU) | $114.5M | 47.8% |
| NYC (JFK/LGA) – Charleston (CHS) | $61.7M | 43.6% |
| NYC (JFK/LGA) – Savannah (SAV) | $43.5M | 46.5% |
| NYC (JFK/LGA) – Portland, ME (PWM) | $24.3M | 37.4% |
| NYC (JFK/LGA) – Nantucket (ACK) | $10.9M | 96.8% |
| NYC (JFK/LGA) – Martha's Vineyard (MVY) | $6.2M | 92.5% |

Passengers in these important markets, which collectively generate more than $5 billion per year in revenue, will pay higher fares and receive worse service due to the NEA.

### 3. The NEA Likely Harms Competition in Markets to and from London

Before the NEA, JetBlue complained that AA and other legacy airlines controlled an "alarmingly high portion of the transatlantic . . . marketplace."[67] As JetBlue's CEO's explained:

> If you look, say, between the U.S. and Europe, you'd think there's about 12-15 airlines flying, but there really isn't. You know, there are three large joint ventures. In these joint ventures, these airlines have a permission slip to collude, set pricing, set scheduling together. Look, if it happened in any other industry, they'd march you off to the penitentiary, but in aviation it's taken hold . . . . And that's why you get such high fares.[68]

---

[65] Market revenue shows total revenue generated in the market in 2019.
[66] Market shares are based on 2019 revenue.
[67] PX0542 at 10.
[68] PX0459 at 2.

JetBlue had planned to win away London business from AA by offering a low-cost alternative. JetBlue stated that it intended "to disrupt the stale, uncompetitive travel market between the U.S. and the United Kingdom."[69] JetBlue explained that it was "the only U.S. airline currently with the capabilities . . . and interest and proven track record to do this."[70] It is no surprise, then, that AA worried about the impact that JetBlue's entry would have on its fares. On flights between Boston and London, for example, AA projected that business fares would experience a "**50-60% fare drop** in BOSLON once B6 [JetBlue] starts non-stop service."[71]

Now, AA has bought off JetBlue through the NEA. Unlike on domestic flights to and from Boston and New York, revenue-sharing under the NEA is not reciprocal on flights to and from London. AA does not share in the revenue that *JetBlue* earns on flights between Boston and London and between New York and London. JetBlue does, however, share in the revenue that *AA* earns on those flights. The revenue-sharing component of the NEA requires JetBlue to reimburse AA if JetBlue lowers AA's revenues in those markets. As a result, JetBlue's incentive to win away passengers from AA in London markets is diminished.

JetBlue executives themselves have acknowledged that the NEA alters their incentives. Shortly before entering the NEA, a JetBlue executive complained to a colleague that the NEA's revenue-sharing mechanism "kinda screws up [our] DOJ argument in its entirety. Meaning if we [JetBlue] come in and screw up fares, they [AA] pull down pricing and we [JetBlue] pay transfer pymt [payment]" to AA, making JetBlue its "own worst enemy."[72] In other words, by competing aggressively against AA in markets to and from London—and thereby reducing the revenue AA earns on those flights—JetBlue will harm itself because the revenue-sharing provisions of the

---

[69] PX0576 at 3.
[70] PX0631 at 4.
[71] PX0190 at 99 (emphasis in original).
[72] PX0706 at 11–12.

NEA will require JetBlue to reimburse AA for some of that loss.  Later internal analysis from JetBlue confirmed that JetBlue would likely have to reimburse AA between $9 million and $17 million per year via the NEA's transfer payments if it disrupted AA as previously planned, significantly offsetting any profits JetBlue could expect from transatlantic service.[73]

Already, the NEA has diminished JetBlue's disruptiveness in markets to and from London.  Before the NEA, JetBlue had boasted that the slots it needed to serve London's Heathrow Airport from the United States four times per day were "basically ours."[74]

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████.[75]  Immediately following that decision, a JetBlue executive vented to the United Kingdom's Foreign & Commonwealth Office that JetBlue's "low-fare impact for the benefit of UK travelers will be reduced."[76]  Now, JetBlue can only serve London Heathrow twice per day, cutting by at least half the capacity JetBlue could have introduced at Heathrow if it had not entered the NEA.

### 4.  The NEA Likely Harms Competition Across the Country

The NEA also harms air travelers far beyond the markets where AA and JetBlue previously competed to provide service to and from Boston and New York.

### a.  The NEA Makes AA and JetBlue More Likely to Accommodate Each Other on Routes Outside of Boston and New York

The NEA dampens AA's and JetBlue's incentives to compete against each other on routes beyond Boston and New York.  Because JetBlue's operations focus on the Northeast,

---

[73] PX0854 at 1.
[74] PX0491 at 2.
[75] PX0805 at 4.
[76] PX0806 at 1.

three-quarters of JetBlue's total business is entangled with AA as part of the NEA. From the outset, JetBlue recognized the dangers of its close dependence on the largest airline in the world. JetBlue warned its Board of Directors that the NEA created a risk of JetBlue being "co-opted by Connie [JetBlue's codename for the NEA] manipulation" and noted that potential ways to alleviate this risk might help preserve only some level of JetBlue's independence.[77]

JetBlue's concern was well-founded. AA's partnerships have a history of dampening competition between allies, even beyond the scope of the partnership. During AA's alliance with Latin American airline LATAM, for example, Doug Parker, AA's then-CEO, explained in an internal document how AA did "a lot of things in the spirit of 'partnership,'" including not pricing its connecting flights as aggressively as it otherwise would have in markets where LATAM offered non-stop service.[78]

The pattern of mutual accommodation now continues under the NEA. Already, AA and JetBlue have disregarded their supposedly independent economic interests in the "spirit of partnership." Just this year, JetBlue owed AA a transfer payment in excess of $200 million under the NEA. Despite being entitled to that payment, AA forgave all but $27 million of JetBlue's debt.[79] AA's nine figure bail-out of JetBlue demonstrates the degree to which the NEA has entangled the interests of the long-time rivals. It also illustrates the way in which the NEA creates opportunities for Defendants to reward and punish each other—such as by forgiving each other's transfer payments—depending on the actions the other takes in the marketplace.

> b.  The NEA "Will Help Facilitate" Capacity Discipline Across the Industry

Finally, as Professor Town will testify, the NEA enhances the risk of capacity

---

[77] PX0807 at 66.
[78] PX0242 at 2.
[79] PX0330 at 2.

discipline.[80]  Rather than invest in growth of its own, which would increase capacity, lower fares, and enable more passengers to fly, AA can now simply market JetBlue's network as its own in Boston and New York.  This helps AA avoid adding new capacity to the industry and, in doing so, helps keep airline fares high.  The then-President, and now CEO, of AA himself has drawn the connection between the NEA and reducing capacity.  In March 2020, he explained to his colleagues, "the industry is going to have to shed a tremendous amount of capacity."[81]  The partnership with JetBlue, he said, "will help facilitate" capacity reductions.[82]

The NEA also facilitates capacity discipline by enabling AA to neutralize the disruptive JetBlue.  Historically, JetBlue's capacity growth has mitigated the effects of capacity discipline, by providing an influx of capacity and disrupting the legacy airlines' attempt to keep industry capacity growth in check.  Under the NEA, however, JetBlue's limited number of planes and pilots are increasingly tied up backfilling routes that were flown by AA prior to the NEA, and that AA has now ceded to JetBlue.  As a result, JetBlue has fewer planes and pilots available to grow elsewhere.  A July 2021 internal JetBlue presentation explains that the "NEA requires a significant shell [aircraft] investment," leaving only "limited growth" in other areas.[83]  With JetBlue's planes tied up, AA, meanwhile, can retrench and shrink capacity across the country.

### 5.    The Harms Will Cost the Public Hundreds of Millions of Dollars Per Year

Combined, the NEA's harms to competition are substantial.  In total, Professor Miller's simulation model estimates that the effects of the NEA in domestic markets to and from Boston and New York alone will cost air travelers roughly $700 million per year.  As Professor Miller

---

[80] *See* Section II.A, *supra*.
[81] PX0069 at 1.
[82] *Id*.
[83] PX0791 at 15.

will explain, though the harm may be somewhat higher or lower than the roughly $700 million his simulation model estimates, the price effects would be large in either scenario.

### D.    Defendants Cannot Rebut the Likely Harms to Competition

Because Plaintiffs have established a prima facie case that the NEA will likely have significant anticompetitive effects, the burden shifts to Defendants to rebut it.  To meet this "heavy burden," Defendants must prove "an affirmative defense which competitively justifies th[e] apparent deviation from the operations of a free market."  *Bd. of Regents*, 468 U.S. at 113. This is a burden Defendants cannot meet.

Defendants advance three main defenses for the NEA, but none has merit.

### 1.    The Claimed Benefits Are Illusory

First, Defendants assert an "efficiencies" defense.  AA and JetBlue claim that by consolidating under the NEA, they will have greater incentive to grow their capacities than they would independently.  Specifically, Defendants assert that the NEA will enable them to align their respective flights to create more efficient schedules, improving the quality of their offerings, and prompting a virtuous cycle of increased demand and more investment in capacity growth.  To quantify that growth, Defendants present analyses comparing Defendants' level of flying in 2019 to flying that they purport to attribute to the NEA.  This argument fails at the starting gate.

As an initial matter, the bar for Defendants' "efficiencies" defense is virtually impossible to clear.  The NEA functions effectively as a merger in domestic markets to and from Boston and New York.  In several of those markets, Defendants' shares are at, or near, monopoly levels.[84] Claims of increased efficiency "almost never justify a merger to monopoly or near-monopoly."

---

[84] *See* PX0461 at 88, Ex. 16 (identifying nine markets, for example, where Defendants' market shares exceed 80 percent, and two where they exceed 96 percent).

*Guidelines* § 10.  In highly concentrated markets, like those here, "proof of 'extraordinary efficiencies'" is required "to avert monopolies."  *Saint Alphonsus Med. Ctr. Nampa Inc. v. St. Luke's Health Sys., Ltd*., 778 F.3d 775, 790 (9th Cir. 2015) (quoting *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720 (D.C. Cir. 2001)); *see also Penn State Hershey*, 838 F.3d at 347 (defendants "must show either that the combination would not have anticompetitive effects or that the anticompetitive effects of the merger will be offset by extraordinary efficiencies").  Here, Defendants cannot prove *any* real efficiencies, much less "extraordinary ones."  *Saint Alphonsus*, 778 F.3d at 790.

Defendants could have achieved most of their claimed "growth" absent the NEA.  In fact, Defendants had plans to do so.  Before the NEA, AA anticipated adding dozens of new departures in Boston.  *See, e.g.*, PX0065 at 1 ("Planning on going from 96 to 104 peak day departures by Summer 2020 to start incremental growth towards a [sic] 2024 peak day departures ~ 140").  So too did JetBlue.  *See, e.g.*, PX0633 at 2 ("JetBlue will phase in added flights in 2020 on more than a dozen routes, coast-to-coast").  In New York, JetBlue was negotiating a slot lease with AA, enabling JetBlue to fly larger planes using slots AA had hoarded and under-utilized.  *See, e.g*., PX0493 at 1 (acknowledging "JFK slots we had already secured from AA").

Re-packaging pre-existing and independent growth plans and dressing them up as a benefit of the NEA does not make it so.  JetBlue's executives knew that.  That is why, behind closed doors, they raised concerns about attributing already-planned growth to the NEA.  In June 2020, a JetBlue network planning executive evaluating the benefits to JetBlue of the NEA objected to Defendants' methodology.  He wrote: "We still believe that we are including value here that would have been generated anyway."[85]  He then explained: "my point is just that we

---

[85] PX0751 at 5.

intend to fly BUR Mint [addition of Mint service to Burbank Airport in California] and other five year plan markets regardless of Connie [JetBlue's codename for the NEA]."[86]  Yet again, he repeated: "If we're looking at this from a 'What does JetBlue look like with Connie vs without' we're currently attributing a lot of revenue to Connie that would have already existed."[87]

Asserted "efficiencies" do not justify a restraint unless they in fact result *from* the restraint.  *See, e.g.*, *Bd. of Regents*, 468 U.S. at 114 (condemning a restraint because it did not produce "any procompetitive efficiencies" that the defendant could not have achieved "just as effectively" without it); *United States v. Anthem*, Inc., 855 F.3d 345, 356 (D.C. Cir. 2017) ("Any claimed efficiency must be shown to be merger-specific, meaning that it 'cannot be achieved by either company alone.'" (quoting *Heinz*, 246 F.3d at 722)); *Saint Alphonsus*, 778 F.3d at 790 (same).  Where, as here, "asserted benefits can be achieved without the concomitant loss of a competitor," they receive no weight in a court's analysis.  *Anthem*, 855 F.3d at 356.[88]

The remaining growth that Defendants try to attribute to the NEA simply comes at the expense of growth that would have otherwise occurred elsewhere.  JetBlue has a limited number of planes and pilots in its fleet.  Thus, in the near term, any "growth" by JetBlue to replace AA's use of its own planes and pilots in Boston and New York will necessarily require JetBlue to rob those resources from other markets where JetBlue otherwise would have deployed them.  JetBlue's internal documents explain that "[w]ith current aircraft constraints," other areas previously targeted for growth by JetBlue, such as "LAX, South Florida, MCO, and SJU[,] all see limited to no growth."[89]

---

[86] PX0751 at 4.
[87] *Id*.
[88] In particular, the Court should not credit efficiencies claimed by Defendants that are merely the result of increased capacity operated from AA's slots.  This claimed "benefit" simply derives from AA's threat that, absent the NEA, it will continue to underutilize a scarce public resource, which it received for free, rather than use it more efficiently or lease it to another airline that will.
[89] PX0791 at 45.

Behind closed doors, Defendants have acknowledged that their claimed growth is overstated.  In May 2020, AA and JetBlue modeled their joint schedule under the NEA.  They concluded that in order to free up planes to grow under the NEA, JetBlue would need to reduce its flying on other routes, offsetting the purported benefits of the NEA.  Beyond the glare of litigation, AA employees wrote to each other, admitting their shell game:

> if we show full network results . . . no bueno . . . Based on what I'm hearing here if I was DOJ I could easily kill any deal.[90]

### 2.   "Good Behavior" During Threatened and Pending Litigation Is Not Evidence of Pro-Competitive Benefit

Defendants' second defense is to contend that their pact should be adjudged neutral or pro-competitive because they have temporarily held off on observably raising prices or reducing output during the pendency of a government investigation and this subsequent litigation.  This argument misunderstands the purpose of antitrust law.

When an agreement eliminates significant competition or gives defendants substantial market power, as it does here, that loss of competition by itself violates the Sherman Act.  The Sherman Act "seeks to protect the competitive *process*."  *Monahan's Marine, Inc. v. Bos. Whaler, Inc.*, 866 F.2d 525, 527 (1st Cir. 1989) (emphasis added).  Thus, a plaintiff can show a Section 1 violation without proof that the agreement has already caused "higher price or lower output."  *United States v. Brown Univ.*, 5 F.3d 658, 674 (3d Cir. 1993).  These "actual dollar amount effects do not necessarily reflect the harm to competition which Congress intended to eliminate."  *Id.*  Rather, it is "enough" that the defendants "competed, that their competition was not insubstantial and that the[ir] combination put an end to it."  *Lexington*, 376 U.S. at 670; *see also United States v. Union Pac. R.R. Co.*, 226 U.S. 61, 88 (1912) ("Nor does it make any

---

[90] PX0373 at 24, 27.

difference that rates for the time being may not be raised . . . .  It is the scope of such combinations and their power to suppress or stifle competition or create monopoly which determines the applicability of the act.").

Courts around the country have rejected Defendants' argument that a lack of measurable price and output effects during an ongoing investigation and litigation demonstrates an agreement's procompetitive benefits.  It is not hard to see why.  Defendants' argument, if endorsed, would create a massive loophole in the antitrust laws.  Antitrust "violators could stave off [challenge] merely by refraining from aggressive or anticompetitive behavior when [an enforcement] suit was threatened or pending."  *United States v. Gen. Dynamics Corp*., 415 U.S. 486, 504–05 (1974); *see also Chi. Bridge & Iron Co. v. FTC*, 534 F.3d 410, 435 (5th Cir. 2008) ("The probative value of such evidence [supporting the transaction] is deemed limited not just when evidence is actually subject to manipulation, but rather is deemed of limited value whenever such evidence *could arguably* be subject to manipulation.") (emphasis in original); *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986) ("Post-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight.").

### 3. Defendants' Commitments Are Inadequate

Defendants' final defense is to claim that commitments they made to the U.S. Department of Transportation ("DOT") in January 2021, along with voluntary, piecemeal, revocable carve-outs they cobbled together on the eve of litigation, effectively remedy the significant harms to competition inflicted by the NEA.  They do not.

#### a. Defendants' Commitments to DOT Are Superficial

Defendants' commitments to DOT include promises to grow their capacity in New York City, and to divest to competitor airlines a small number of slots at JFK and Reagan National.

These commitments are inadequate for at least six reasons.

First, Defendants' commitments cover only New York. They do nothing to protect passengers on flights to and from Boston, including those in the nearly dozen markets to and from Boston where both Defendants provided non-stop service prior to the pandemic.

Second, the commitments do not extend beyond 2025, so at best, they purport to defer some of the NEA's harms, but that deferral is not permanent.

Third, the levels of growth required by the commitments are so low that it is unclear that they require any growth beyond that which Defendants could have achieved absent the NEA. As noted above, most of the growth that Defendants try to attribute to the NEA in New York could have occurred simply by AA leasing or transferring slots to JetBlue. Nothing prevented AA from transferring slots to another airline or flying larger planes itself. As such, the DOT commitments do not bind Defendants to grow in New York in any way that they could not achieve without the NEA.

Fourth, the growth commitments are generalized to New York as a whole, not tied specifically to those markets where the NEA's harms will land hardest: the markets where Defendants both competed to provide non-stop service. As a result, Defendants can satisfy the commitments by adding capacity on any New York routes they choose, while still gutting capacity on routes where Defendants used to compete and where consumers will suffer most.

Fifth, the seven slots being divested in New York fall far short of the dozens of New York slots that each of AA and JetBlue uses to compete there and, by extension, that a new entrant would need to replace the competition lost as a result of the NEA.

Sixth, the slot divestitures in New York are not tied to those markets where harm from the NEA is most acute. The commitments fail to impose any requirements on where the

divestiture buyer flies, so the buyer could use its slots to fly whichever routes it chooses.  That might provide no benefit to the passengers most harmed by the NEA.

          b.     <u>The Carveouts Are Voluntary, Revocable, and Ineffective</u>

While the NEA was under investigation by the federal government and many States for violating the antitrust laws, Defendants also agreed between themselves to carve out from the revenue-sharing and capacity coordination components of the NEA six extraordinarily concentrated markets to and from Boston where Defendants competed previously.  The carved-out markets, however, still remain subject to other provisions of the NEA, including those that permit codesharing.

Recognizing the inherently anticompetitive nature of their pact, Defendants presumably assembled this "remedy" with an eye toward improving their litigation position.  Their agreement, however, is nothing more than a contract between Defendants.  As such, it is voluntary and revocable.  Once litigation ends, nothing prevents Defendants from altering, ignoring, or rescinding the carveouts.

Even if the carveouts remained in effect, they would fail to remedy the harms inflicted by the NEA.  They do nothing, for example, to prevent either Defendant from exiting any of the six markets, extinguishing competition between AA and JetBlue.  Indeed, that has already occurred, despite the supposed effectiveness of Defendants' "remedy."  JetBlue has abandoned one of the six markets—air travel between Boston and Rochester—surrendering it to AA.  The carveouts also do nothing to address the dozens of other markets where the NEA harms competition.

The benefits of the NEA, if any, do not outweigh the likely harms of the NEA: roughly $700 million per year in higher fares, fewer airline options, and worse service.  Nor do Defendants' commitments or carve-outs prevent or remedy their pact's harms to competition.

For that reason, the Sherman Act condemns the NEA.

### E. Defendants Could Achieve the Claimed Benefits Through Less Restrictive Alternatives

Even if Defendants could meet their "heavy burden" of proving that the pro-competitive effects of the NEA may justify its harms to competition, *Bd. of Regents*, 468 U.S. at 113, the NEA would still be unlawful because "it is possible to meet" Defendants' "objective in less restrictive ways." *Amex*, 138 S. Ct. at 2291 (Breyer, J., dissenting); *see also L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1396 (9th Cir. 1984) (there are "less restrictive alternatives which could serve the same purpose") (internal quotation marks and citation omitted).

Indeed, where a less restrictive alternative to a restraint exists, the restraint is unreasonable, *see Alston*, 141 S. Ct. at 2161, so there is no need for any further analysis. *See Sullivan*, 34 F.3d at 1103; *see also Impax*, 994 F.3d at 497 ("it is unreasonable to justify a restraint of trade based on a purported benefit to competition if that same benefit could be achieved with less damage to competition").

Here, several less restrictive alternatives exist. Before entering the NEA, Defendants considered each of them. Identifying those alternatives as less restrictive than the NEA does not imply that any of them is pro-competitive, or even legal. Instead, their existence simply proves that Defendants' selection of the NEA—the *most* restrictive alternative—is unlawful.

As a threshold matter, Defendants could achieve much of the purported growth they seek to attribute to the NEA simply by AA leasing or transferring New York slots to JetBlue. In Defendants' own analysis, JetBlue's use of those slots is the largest driver of the purported benefits of the NEA. As the evidence will show, before the NEA, Defendants considered entering exactly such a lease or transfer. Indeed, before the NEA, JetBlue's own internal plans

showed JetBlue flying from JFK to Minneapolis, Louisville, and Miami, using slots that JetBlue intended to obtain independent of the NEA.[91]

Even assuming that benefits result from the NEA beyond those that would be achieved through a slot lease or transfer, Defendants could achieve those purported benefits through a less restrictive partnership.  Defendants could, for example, enter a codeshare agreement for flights to and from Boston and New York City, excluding routes where both Defendants provide non-stop service.  Such a codeshare could also include an agreement on frequent flyer reciprocity, or even limited revenue-sharing without capacity coordination.  As the evidence will show, AA's own internal analysis suggests that an agreement with JetBlue that allows codesharing on routes where it does not compete with AA, in conjunction with slot transfers to JetBlue, would produce roughly the same number of incremental passengers as Defendants claim result from the NEA.

Finally, Defendants could exclude all flights to and from Boston and London from the scope of the NEA.  JetBlue itself recognized that including those flights within the NEA would create particular competitive dangers.  In June 2020, JetBlue highlighted to its Board of Directors that ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████"[92]  As a result, ████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████[93]

---

[91] *See* PX0621 at 166–67 ("New Mkts" tab).
[92] PX0807 at 72.  JetBlue sent the Board of Directors presentation to the United Kingdom's Competition and Markets Authority and produced it to Plaintiffs in the present litigation.
[93] *Id.*



To the extent the NEA produces any benefits in New York, which it does not, Defendants could achieve those purported benefits by limiting the scope of the NEA, and its harms, to New York.

All these alternatives are less restrictive than the NEA, whether due to their lack of revenue-sharing, their lack of capacity coordination, or their reduced geographic scope.  As JetBlue's presentation shows, Defendants considered various options for achieving their claimed benefits.  They chose not the least restrictive alternative, but the *most* restrictive one.

## V.    CONCLUSION

At trial, Plaintiffs will show that the NEA likely harms competition, costing passengers hundreds of millions of dollars per year in higher fares, reducing choice, and generating worse service.  This may be a transaction that passed muster in the boardroom, but it should fail in the courtroom because the Sherman Act prohibits such inherently anticompetitive restraints. Plaintiffs respectfully request that this Court permanently enjoin Defendants from continuing and further implementing the NEA.

Dated: September 9, 2022                   Respectfully submitted,

 /s/ William H. Jones II

William H. Jones II
Grant A. Bermann
J. Richard Doidge (MA Bar No. 600158)
Kate M. Riggs (MA Bar No. 670510)

U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 8000
Washington, DC 20530
Tel: (202) 598-8805
Fax: (202) 307-5802
Email: bill.jones2@usdoj.gov

*Attorneys for Plaintiff United States of America*

MARK BRNOVICH
Attorney General

 /s/ Robert Bernheim

ROBERT BERNHEIM (AZ Bar No. 024664)

Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Tel: (520) 628-6507
Email: robert.bernheim@azag.gov

*Attorneys for Plaintiff State of Arizona*

ROB BONTA
Attorney General

KATHLEEN E. FOOTE
Senior Assistant Attorney General

NATALIE S. MANZO
MICHAEL W. JORGENSON
Supervising Deputy Attorneys General

ROBERT B. McNARY
JAMIE L. MILLER
Deputy Attorneys General

 /s/ Robert B. McNary
ROBERT B. McNARY
Deputy Attorney General
California State Bar No. 253745
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Phone: 213-269-6283
E-mail: robert.mcnary@doj.ca.gov

*Attorneys for Plaintiff State of California*

KARL A. RACINE
Attorney General

KATHLEEN KONOPKA (DC Bar No.
495257)
Deputy Attorney General

/s/ Arthur T. Durst
ARTHUR T. DURST (DC Bar No.
888273305)
ADAM GITLIN

Office of the Attorney General for the
District of Columbia
400 Sixth Street NW, Tenth Floor
Washington, DC 20001
Tel: (202) 442-9853
Email: arthur.durst@dc.gov

*Attorneys for Plaintiff District of Columbia*

ASHLEY MOODY
Attorney General

 /s/ Lizabeth A. Brady
LIZABETH A. BRADY (FL Bar No.
457991)
RACHEL S. BRACKETT (FL Bar No.
109775)
COLIN G. FRASER (FL Bar No. 104741)

Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399
Tel: (850) 414-3300
Email: Liz.Brady@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

MAURA HEALEY
Attorney General

 /s/ William T. Matlack
WILLIAM T. MATLACK (MA Bar No.
552109)
DANIEL H. LEFF (MA Bar No. 689302)

Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Tel: (617) 727-2200
Email: William.Matlack@mass.gov
Email: Daniel.leff@mass.gov

*Attorneys for Plaintiff Commonwealth of
Massachusetts*

JOSH SHAPIRO
Attorney General

JAMES A. DONAHUE, III (PA Bar No.
42624)
Executive Deputy Attorney General
Public Protection Division

/s/ Tracy W. Wertz
TRACY W. WERTZ (PA Bar No. 69164)
JOSEPH S. BETSKO (PA Bar No. 82620)
JENNIFER A. THOMSON (PA Bar No.
89360)

Pennsylvania Office of Attorney General
Antitrust Section
14th Floor Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
Email: twertz@attorneygeneral.gov

*Attorneys for Plaintiff Commonwealth of
Pennsylvania*

JASON S. MIYARES
Attorney General

/s/ Tyler T. Henry
TYLER T. HENRY (VA Bar No. 87621)
Assistant Attorney General
Antitrust Unit
Office of the Virginia Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Tel: (804) 692-0485
Email: THenry@oag.state.va.us

*Attorneys for Plaintiff Commonwealth of
Virginia*