# EXHIBIT 2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.* <br><br> *Plaintiffs*, <br><br> v. <br><br> AMERICAN AIRLINES GROUP INC. <br><br> and <br><br> JETBLUE AIRWAYS CORPORATION <br><br> *Defendants*. | Case No. 1:21-cv-11558 |

**INITIAL EXPERT REPORT OF ROBERT J. TOWN, Ph.D.**

**June 9th, 2022**

willing to grant such waivers given "the large number of slots [American was] not planning to use at JFK," a source close to the FAA told American "it comes down to three choices": American could choose to "1) fly the slots.  2) complete un-even (aka 1-way) trades to OA [other airlines].  3) risk losing the slots… which is albeit a certainty."[255]  As such, American developed plans to lease slots to other carriers.[256]

125. If American sold or leased slots to JetBlue, JetBlue could add the same capacity, albeit not necessarily to serve the same markets, as under the NEA.  For example, JetBlue's pre-COVID five-year planning spreadsheets show JetBlue flying significant capacity from JFK to Minneapolis, Louisville, and Miami, using slots that JetBlue was intending to acquire in some way.[257]

C. The NEA Does Not Leverage Significant Geographic Complementarities

126. Airlines proposing joint ventures (or mergers) typically claim that the merger will enable the merged firm to serve origin and destination markets that neither could serve prior to the venture,[258] and will typically contrast this expansion in origin and destination markets to the limited number of nonstop overlap routes of the two firms.[259]  The NEA stands in stark contrast to these historical ventures.

127. In Exhibit 19 below, I compare the number of airports that are uniquely served by legacy airlines' alliance partners, comparing international alliances to the NEA.[260]  Unique

---

[255] AA-NEA-01305461 at -461-462.

[256] *See* AA-NEA-00242873. Vasu Raja and Brent Alex discuss leasing slots to B6 (JetBlue), DL (Delta), and NK (Spirit) in this email exchange.

[257] *See* JBLU01095700 ("New Mkts" tab); Friedman CID Deposition at 227:17–229:11.

[258] *See, for example*, Witness Statement of William Douglas Parker in *In re Carolyn Fjord, et al, v. AMR Corp., et al,* March 4, 2014 (AA-NEA-02538499) at -517 (explaining that the AA-US Airways merger would "create about 1,300 new connecting opportunities that did not exist with a standalone US Airways and American").  *See also* AA-NEA-02543931 at -954 (May 2, 2012 US Airways presentation identifying 31 US Airways cities not served by American and 56 American cities not served by US Airways).

[259] *See, for example*, Consumer Benefits from a Merger of US Airways and American Airlines, April 26, 2013, at pp. 1, 17, and 20: American and US Airways claim that a "merger will expand the size of the network of destinations to consumers" and create a merged carrier that "will offer new online service between airports currently served by only one of the pre-merger carriers." They explicitly claim "that these consumer welfare gains from the proposed merger swamp, many times over, any from fare increases that DOJ might posit on the small set of overlapping routes."

[260] American and JetBlue have expressly compared the NEA to international airline alliances in key respects – most notably, the inclusion of revenue sharing – and they have used the purported benefits of those alliances to justify the NEA.  *See, for example,* Defendants' Memorandum in Support of their Motion to Dismiss, at pp. 22-26 (asserting that "[t]he NEA agreements follow [the] model" of revenue sharing in international alliances).

service to an airport creates the ability for the two airlines to serve origin and destination markets that neither served prior to the venture.  We see that in Exhibit 19 international joint ventures allow the domestic partner to reach dozens of new cities; in contrast, JetBlue only served four airports in 2019 (Cape Cod, Massachusetts (HYA); Aguadilla, Puerto Rico (BQN); La Romana, Dominican Republic (LRM); and Ponce, Puerto Rico (PSE)) that American does not already serve.

**Exhibit 19**
**Number of Airports That Domestic Carriers Gained Access to through Alliances**



*Figure Depicts the Number of Airports Served by the Second-Named Carrier That Are Not Served by the First-Named Carrier*

Notes:
[1] As of September 2019.
[2] JetBlue–American category only includes airports from which American provides service to an NEA airport.

Source: OAG Data.

128. Similarly, of the routes served by an alliance, the share of overlap routes—those that likely present the most antitrust risk—is substantially larger for the NEA than for the international alliances.  Exhibit 20 shows, for the same alliances as above, the share of each domestic carrier's nonstop routes where the other carrier in the alliance also operates a nonstop flight (i.e., the "overlap share").  The overlap share for the international alliances is negligible (less than 1 percent), while the overlap share for the NEA is much higher for both American and JetBlue—roughly 30 for American's nonstop routes and just under 25 percent JetBlue's nonstop routes.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# Exhibit 20
# Percentage of Domestic Carriers' Nonstop Routes That Are Served by the Other Carrier in the Alliance

*Figure Depicts the Percentage of the First-Named Carrier's Nonstop Routes That Are Also Served Nonstop by the Second-Named Carrier*



Notes:
[1] As of September 2019.
[2] American and JetBlue data restricted to routes where the origin or destination is an NEA airport.

Source: OAG Data.

129. Despite Defendants' claims that the NEA will increase their presence and capacity in New York City and Boston, the Alliance does not generate any meaningful new domestic itineraries, according to the Defendants' own predictions. The estimated change in passengers on a given itinerary is based on a comparison of two scenarios from the Raven model I describe above in Section III: the September 2019 Baseline scenario and an NEA scenario based on the Clean Team Schedule. The September 2019 Baseline scenario forecasts the average fares and passengers using the fleets and schedules in effect in September 2019, and the NEA scenario forecasts the average fares and passengers based on the Clean Team's claims about the fleets and schedules that Defendants will implement under the NEA.[261]

---

[261] *See* "Economic Analysis of Consumer Benefits from the Proposed American Airlines – JetBlue Northeast Alliance," *Compass Lexecon*, August 27, 2020 ("August 2020 White Paper"), at ¶4: "Based on internal projections the parties assume that the industry will return to the annual 2019 level by 2023 and, in particular, that their standalone networks and industry annual traffic levels in 2023 will match those in 2019." *See also* August 2020 White Paper at ¶5: "As discussed above, the standalone [baseline] scenario assumes that, absent the NEA, AA and JetBlue's networks in 2023 will be the same as in 2019"; "Responses to September 22, 2020 DOJ Raven Questions" at p. 8: "As explained, the Clean Team chose September 2019 as the best available approximation for what a post-COVID world schedule would look like given all of the uncertainties facing the airline industry."