# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, ET AL.,

        Plaintiffs,

vs.

AMERICAN AIRLINES GROUP INC.

and

JETBLUE AIRWAYS CORPORATION,

        Defendants.

Civil Action No.: 1:21-cv-11558-LTS

## [PROPOSED] *AMICUS CURIAE* BRIEF OF THE ALLIED PILOTS ASSOCIATION

September 23, 2022

Michelle C. Yau (MA Bar No. 657236)
Daniel A. Small
Daniel McCuaig
Louis R. Katz
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW, 5th Floor
Washington, DC 20005
(202) 468-4600
myau@cohenmilstein.com
dsmall@cohenmilstein.com
dmccuaig@cohenmilstein.com
lkatz@cohenmilstein.com

*Attorneys for The Allied Pilots Association*

**I.      INTRODUCTION**

The Allied Pilots Association ("APA") respectfully offers this *amicus curiae* brief, primarily to make clear: (i) the same suppressed output that the Northeast Alliance ("NEA") causes in the market for scheduled air passenger service also harms pilots and other American Airlines ("AA") and JetBlue employees by reducing their incomes (with no expectation that such "cost savings" will flow through to passengers given the decreased competitive pressures that AA and JetBlue experience in the affected output markets); and (ii) the need for rigorous antitrust review of the NEA is heightened by the agreement's functional-but-not-formal merger of AA's and JetBlue's Boston and New York operations, which may allow the airlines to avoid certain labor law protections to which unions such as the APA otherwise could turn to ameliorate some of the NEA's anticompetitive effects.

**II.     INTEREST OF AMICUS CURIAE**

The APA, an unincorporated association located at 14600 Trinity Blvd., Suite 500, Fort Worth, TX 76155-2512, is a labor union founded in 1963 by a group of American Airlines pilots. The APA is the largest independent pilots' union in the world. The APA is the certified collective bargaining agent for approximately 14,367 American pilots. The APA can offer hard-earned experience regarding how agreements like the NEA inevitably affect employees. The APA also can explain how the NEA in particular tilts the bargaining table and inflicts anticompetitive harm on the APA's membership and other airline employees even while it may evade the review and protections that labor law would provide if AA and JetBlue formally merged their Boston and New York operations.

**III.    THE NEA IMPOSES MERGER-LIKE HARMS ON LABOR**

Plaintiffs' Pretrial Brief ably explains how and why the NEA operates as a partial merger of AA and JetBlue, with straightforward and predictable anticompetitive impacts in the *output*

1

(i.e., passenger) markets where those two airlines previously served as meaningful competitive constraints on one another. *See* Plaintiffs' Br. (Doc. No. 160) at 24-33. The anticompetitive effects in the airlines' labor *input* markets are no less straightforward and predictable. *See Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001) (Sotomayor, J.) (recognizing that "a horizontal conspiracy among buyers to stifle competition"—there, a conspiracy among oil companies to suppress the compensation of their employees—"is as unlawful as one among sellers"); *Vogel v. Am. Soc'y of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) ("Just as a sellers' cartel enables the charging of monopoly prices, a buyers' cartel enables the charging of monopsony prices; and monopoly and monopsony are symmetrical distortions of competition from an economic standpoint."), *quoted in Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 321 (2007).

The NEA harms pilots (and other airline employees) in two fundamental ways. First, the NEA's network planning and revenue sharing provisions create the incentive and ability for AA and JetBlue collectively to suppress output below the level that would prevail absent the NEA— and thus to suppress labor costs (i.e., employee compensation) even while increasing passenger seat prices. Second, the NEA unlawfully increases each airline's bargaining leverage in labor negotiations, likely leading to worse outcomes for AA and JetBlue employees at the negotiating table.

<u>Suppressed output</u>. Vis-à-vis AA and JetBlue pilots—at least those who fly out of or into Boston or New York—the NEA creates many of the same incentives and abilities for the airlines that a formal, consummated merger would generate. Namely, the NEA-incentivized and NEA-facilitated "capacity discipline" that drives up airline fares to passengers, Plaintiffs' Br. (Doc. No. 160) at 31-32, simultaneously drives down compensation to pilots and other airline employees. That is because pilot compensation is determined by two key variables: (1) flight hours; and

(2) class of aircraft flown, with larger aircraft generally providing higher pay rates than smaller ones. Essentially, every case of fewer or smaller planes in the sky than would have been there absent the NEA decreases pilot compensation while at the same time increasing the prices passengers must pay for their seats.

The capacity discipline problem is most obvious on those routes where AA and JetBlue face minimal competition from other airlines and thus find it profitable to cut flights or reduce aircraft size in order to charge more for each seat while also cutting labor costs. That is simply classic monopoly (or cartel) pricing behavior. *See* 9F Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Applications ¶ 983 (5th ed. 2022) ("[J]ust as high concentration of producers leads to high price-cost margins in product sales, so too it leads to infracompetitive prices in employment markets."). It also appears from the airlines' pretrial brief that the "schedule optimization" they envision includes a soft market allocation scheme, with each carrier slowing down its pre-NEA expansion plans and instead shifting aircraft from flights that made sense when they used to compete against each other (including "flying at the same time," Defendants' Br. (Doc. No. 162) at 10) to those where they face less competition, which will have the inevitable effect of depressing output not just in the NEA cities but network wide—to the detriment of pilots and other employees as well as passengers.

Tilting the bargaining table. The ability of AA and JetBlue under the NEA's revenue sharing provisions to realize income from flights flown by *the other airline* allows each carrier to exercise enhanced bargaining leverage vis-à-vis its employees. Prior to the NEA, if AA surrendered a route to JetBlue, both AA and its employees would feel the full pain of that loss. With the NEA in place, however, AA is compensated through the NEA's revenue sharing provisions while its employees still feel the full pain of the loss—with their pain translating to

3

"labor costs avoided" for AA. The NEA's revenue sharing provisions thus enable AA to credibly threaten during labor negotiations to surrender flights to JetBlue if its demands are not met (and, of course, create the same potential for JetBlue).

Threatening to cede flights to a partner airline is particularly credible for AA because of its history of engaging in exactly that behavior. For example, AA already has largely conceded the New York-Boston route to JetBlue. *See* Michelle Baran, *American Airlines Drops 18 New York Routes Amid Sweeping Service Cuts*, AFAR (Nov. 15, 2021), https://www.afar.com/magazine/american-drops-18-new-york-routes-amid-sweeping-service-cuts.[1] Likewise, in the international context, AA has at least temporarily abandoned the Seattle-London route to its Atlantic Joint Business Agreement partner British Airways—despite touting the route as a benefit to both passengers and labor when promoting its West Coast International Alliance ("WCIA") with Alaska Airlines. *See* Andrew Tangel & Alison Sider, *American Airlines Trims More International Flights as Boeing Dreamliner Delays Drag On*, Wall Street Journal (Feb. 18, 2022), https://www.wsj.com/articles/american-airlines-trims-more-international-flights-as-boeing-dreamliner-delays-drag-on-11645210860.[2] Indeed, measured by "available seat miles ('ASMs')," which the airlines describe as "a standard measure of air carrier capacity," Defendants' Br. (Doc. No. 162) at 1, AA's output in Seattle has shrunk from 326,005,184 ASMs in July of

---

[1] As Plaintiffs point out, JetBlue, in turn, has abandoned the Boston-Rochester route to AA. Plaintiffs' Br. (Doc. No. 160) at 39.

[2] AA has claimed it will resume flying the Seattle-London route at the end of October. *See* Sebastián Polito, *American Airlines to resume flights between Seattle and London*, Aviacionline (Aug. 10, 2022), https://www.aviacionline.com/2022/08/american-airlines-to-resume-flights-between-seattle-and-london/. Such claims, though, may not prove out—or any resumption could turn out to last only as long as this litigation. And any argument that the route abandonment was driven by aircraft manufacturing delays rather than easing competitive pressures needs to explain why the aircraft AA used to fly the route prior to the WCIA no longer are sufficient.

4

2016 to just 185,073,136 ASMs in July of 2022. Notably, the WCIA, like the NEA, "includes revenue-sharing," as the airlines concede. Defendants' Br. (Doc. No. 162) at 11 n.13.

To the extent the airlines attempt to present "cost savings" as an NEA "efficiency," the Court must recognize that the portion of such "cost savings" (and increased profits) generated by lower labor costs resulting from contract negotiations or re-allocated flights represents a bug, not a feature, of the NEA. Using NEA-generated market power and bargaining leverage to force the transfer of funds from pilots (and other employees) to the airlines violates the Sherman Act as plainly as using the same tools to extract additional dollars from passengers.

Courts have recognized that a disruption in the competitive process causing harm to a trading partner—here, in the form of a reduction in employee group pay—violates the antitrust laws even when that disruption is not accompanied by a decrease in output. In *ProMedica Health Systems, Inc. v. FTC*, for instance, the Sixth Circuit rejected a challenge to the FTC's determination that the merger of two providers violated the antitrust laws. 749 F.3d 559, 561 (6th Cir. 2014). The merging hospitals' greater "leverage in demanding higher rates" from insurers by itself constituted a harm to competition that violated the antitrust laws. *Id.* at 570. On similar facts, the Ninth Circuit affirmed a district court finding that a hospital merger violated the Clayton Act where "the acquisition limited the ability of insurers to negotiate with the merged entity" and "the merged companies would use this increased bargaining power to raise prices." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 786-87 (9th Cir. 2015). Other courts have recognized that significant shifts in bargaining leverage constitute a competitive harm of the kind antitrust law was designed to prevent. *See FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 71 (D.D.C. 2018) (agreeing that the FTC established a harm to competition where it showed "that the merger will result in the loss of a proven strategy—the ability to leverage one large, global

5

supplier against another—that appears to be the most effective price constraint" in the market); *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1084 (N.D. Ill. 2012) ("[T]he proposed merger in this case would give the combined entity significant bargaining leverage, which would in turn allow the combined entity to extract higher prices from [insurers]."); *see also* C. Scott Hemphill & Nancy L. Rose, *Mergers That Harm Sellers*, 127 Yale L.J. 2078, 2100 (2018) (explaining that "a harm to input markets suffices to establish an antitrust violation" where that harm is attributable to "increased bargaining leverage" even in the absence of "increased classical monopsony power"); Ioana Marinescu & Herbert J. Hovenkamp, *Anticompetitive Mergers in Labor Markets*, 94 Ind. L. J. 1031, 1063 (2019) (recognizing that "[i]n cases where output does not decrease, the anticompetitive harm to trading partners [such as workers] can also be invoked" by antitrust law).

Thus, the augmentation of each airline's bargaining leverage vis-à-vis its employees created by (and only by) the NEA's revenue sharing provisions alone renders the NEA an unlawful "contract . . . in restraint of trade." 15 U.S.C. § 1.

## IV. THE NEA MAY EVADE LABOR LAW PROTECTIONS THAT A FORMAL MERGER WOULD TRIGGER

Antitrust law must be attuned to "the existence of a regulatory structure designed to deter and remedy anticompetitive harm." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 412 (2004). Where such regulation is absent, that fact weighs in favor of "an expansion of the contours" of the Sherman Act. *Id*. Notably here, certain labor law rights and procedures that unions such as the APA could use to attempt to ameliorate some of the anticompetitive harms generated by the NEA are triggered by formal mergers—and may be evaded by the NEA. Because the functional-but-not-formal merger of AA's and JetBlue's Boston and New York operations embodied by the NEA may allow the airlines to skirt these safeguards against

the anticompetitive effects of consolidation, it is all the more incumbent upon this Court to perform a full, searching functional-merger review of the NEA.

Specifically, a formal merger of AA and JetBlue would trigger the "Merger Procedures" of the National Mediation Board, which regulates airline labor disputes under the Railway Labor Act. National Mediation Board Representation Manual ("Manual") §§ 19.1-19.7. When a triggering merger occurs, a union can request a Board determination that a "single transportation system" exists across the merged airlines. *Id.* § 19.4. If the Board agrees, it then "proceed[s] to address the representation of the proper craft or class." *Id.* § 19.6. In the case of the merger of AA's and JetBlue's Boston and New York operations, the likely result would be unified labor representation across the merged operations. *Cf.*, *Ass'n of Flight Attendants, AFL-CIO v. USAir, Inc.*, 24 F.3d 1432, 1435 (D.C. Cir. 1994) (explaining, with regard to the USAir-Shuttle merger, that "the Board issued a decision declaring USAir and Shuttle to be a 'single transportation system'" and "[a]ccordingly, . . . extended [the Association of Flight Attendant's] certification to cover Shuttle flight attendants").

Unified representation of AA's and JetBlue's pilots (as with other employee groups) could serve to counterbalance at least some of the additional bargaining leverage the airlines have acquired through the NEA. In the event the NEA is not subject to National Mediation Board review, that standard check on airlines using consolidation to acquire additional bargaining leverage over their employees will be off the table.

Likewise, were AA and JetBlue to formally merge, federal law would require that the airlines and their employee groups merge the seniority lists that govern employees' employment opportunities and workday lives in a "fair and equitable" manner. *See* 49 U.S.C. § 42112 note; *Flight Attendants in Reunion v. American Airlines*, 813 F.3d 468, 471 (2016). The NEA's

functional-but-not-formal merger of AA's and JetBlue's Boston and New York operations likely deprives employees of this protection, too.

The airlines, of course, center their defense of the NEA on the argument that the Court should look past the reality that they have agreed to functionally merge their Boston and New York operations, rejecting the government's proposed searching merger-like analysis in favor of a more cursory review of the combination. Defendants' Br. (Doc. No. 162) at 26-30. The proposal to elevate form over substance would be improper in any event, and is all the more so here, where the flexibility of antitrust law provides the Court with the opportunity—and obligation—to "expand[]" Sherman Act contours as necessary to account for any absence of other "regulatory structure[s] designed to deter and remedy anticompetitive harm." *Verizon Commc'ns*, 540 U.S. at 412-13.

## V.   CONCLUSION

The NEA functionally merges AA's and JetBlue's Boston and New York operations. Although the government has focused its case on the harms this combination will inflict on the flying public, the harms pilots and other airline employees will suffer are no less real. The Court must act to eliminate these anticompetitive input market effects by either enjoining the NEA in its entirety or striking its anticompetitive provisions.

September 23, 2022

Respectfully submitted,

*/s/ Michelle C. Yau*
Michelle C. Yau (MA Bar No. 657236)
Daniel A. Small
Daniel McCuaig
Louis R. Katz
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW, 5th Floor
Washington, DC 20005
(202) 468-4600
myau@cohenmilstein.com
dsmall@cohenmilstein.com
dmccuaig@cohenmilstein.com
lkatz@cohenmilstein.com

*Attorneys for The Allied Pilots Association*