# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, ET AL.,

Plaintiffs,

v.

AMERICAN AIRLINES GROUP INC. and
JETBLUE AIRWAYS CORPORATION,

Defendants.

Civil Action No. 1:21-cv-11558-LTS

## DEFENDANTS' CORRECTED PRETRIAL BRIEF[*]

---

[*] This Brief contains corrections to certain statistics on pages 1, 4, 5, and 19.

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    FACTUAL BACKGROUND .................................................................................6

    A.    American and JetBlue .................................................................................6

    B.    Competition in Northeast Airline Markets and the Need for the NEA...................7

    C.    The NEA Is a Narrowly Tailored Collaboration, Not a Merger, And Is Focused on Growing Traffic to Compete with United and Delta ...........................9

        1.    The NEA Features Multiple Components of Collaboration Each Designed to Generate Growth......................................................................9

        2.    The Parties Entered An Agreement with the DOT Requiring Additional Growth and Providing Safeguards Against Potential for Anticompetitive Harm ...............................................................................14

    D.    The NEA Mitigates Network Disadvantages and Facilitates Growth by Both American and JetBlue ......................................................................16

        1.    The NEA Creates Growth Through More Efficient Use of Scarce Complementary Assets ............................................................................16

    E.    The NEA Is Working, Generating Significant Consumer Benefits......................19

    F.    There Is No Evidence of Any Adverse Effects....................................................25

III.    LEGAL STANDARD...........................................................................................26

    A.    The Rule of Reason...............................................................................................26

    B.    Plaintiffs Cannot Show That The NEA Has Produced Or Is Producing Anticompetitive Effects ........................................................................27

    C.    Defendants Will Show That The NEA Has a Procompetitive Rationale And Is Producing Numerous, Substantial Benefits..............................................36

    D.    Plaintiffs Cannot Show That The Benefits of The NEA Could Be Accomplished Through Less Restrictive Alternatives .........................................38

IV.    CONCLUSION....................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Addamax Corp. v. Open Software Found., Inc.*,
  152 F.3d 48 (1st Cir. 1998) ...................................................................................27, 28, 29

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979) ...............................................................................................................35, 36

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993) ...........................................................................................37

*FTC v. Actavis, Inc.*,
  570 U.S. 136 (2013) ...........................................................................................................27

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. (1984) ...................................................................................................................35

*M & H Tire Co., Inc. v. Hoosier Racing Tire Corp.*,
  733 F.2d 973 (1st Cir. 1984) ...........................................................................................38

*MacDermid Printing Solutions LLC v. Cortron Corp.*,
  833 F.3d 172 (2d Cir. 2016) ...........................................................................................26

*Nat'l Collegiate Athletic Ass'n v. Alston*,
  141 S. Ct. 2141 (2021) ........................................................................................... *passim*

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ...............................................................................................27

*O'Bannon v. NCAA*,
  802 F.3d 1049 (9th Cir. 2015) .......................................................................................37, 38

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ...................................................................................26, 27, 29, 33, 35

*Paladin Assocs., Inc. v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) .......................................................................................35

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1986) .......................................................................................29

*Tampa Elec. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) ...........................................................................................................34

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963)................................................................................................34

## STATUTES

15 U.S.C.
    § 1........................................................................................................2, 26, 27, 28
    § 1312........................................................................................................................14

49 U.S.C. § 41720........................................................................................................14

Clayton Act § 7 ............................................................................................................27

## TREATISES

Areeda & Hovenkamp, Antitrust Law: An Analysis Of Antitrust Principles And Their
    Application  (4th ed. 2018) ...............................................................................25, 33

## OTHER AUTHORITIES

DOJ & FTC, *Antitrust Guidelines for Collaborations Among Competitors* (2000)......3, 25, 26, 36

Defendants American Airlines Group Inc. ("American") and JetBlue Airways Corporation ("JetBlue," and together with American, "Defendants") respectfully submit this Pretrial Brief pursuant to the Case Management Order, ECF No. 65.

## I.   INTRODUCTION

As this case goes to trial after extensive discovery, the Northeast Alliance (or "NEA") has been in effect for about 18 months.  Plaintiffs concede that there is *no evidence* of any anticompetitive fare increase or reduction in output.  A rigorous analysis of fares on NEA routes shows *the Plaintiffs' predicted fare increases simply have not materialized*.  Plaintiffs do not have any evidence that the NEA, when analyzed on its own terms, reduces output and/or increases fares—or even has a high likelihood of doing so.  A proper analysis ends here.  On this record, Plaintiffs cannot meet their initial burden under the rule of reason to show anticompetitive effects.

Yet the lack of any proven harms is only part of the story.  Over its first 18 months, the NEA has produced readily apparent consumer benefits.  Through the NEA—which Delta Airlines aptly described as a "██████████████" in the competitive landscape—JetBlue and American created a high-quality "NEA network" that has expanded output and improved the quality of travel to and from Boston and New York.  American and JetBlue have increased available seat miles ("ASMs"), a standard measure of air carrier capacity, by more than 200% in the NEA region.  This new flying includes flights on approximately 50 new routes, and increased capacity (more frequencies and/or larger aircraft) on approximately 130 existing routes.  Through collaborative scheduling, codesharing, and frequent flyer program integration, JetBlue and American customers can choose flights from an expanded menu of well-timed options and can accrue and redeem frequent flier points for travel on their airline of choice.  Corporate customers also have access to the expanded services of the NEA network, and the majority have elected to add NEA codeshare flights to their respective contracts with American and JetBlue.  Applying a methodology that the

Department of Justice (the "DOJ") invented and used in prior airline transactions, the NEA has already produced *hundreds of millions of dollars in consumer benefits*.

Considering that there is no evidence of adverse effects, the NEA has been all upside for traveling consumers.

And yet Plaintiffs say the NEA should be enjoined as anticompetitive.  They argue that the NEA should be seen as a disguised "merger" of JetBlue and American's northeast operations.  This leads to a circular argument that since (a) the NEA is tantamount to a *merger*, and (b) any such merger would be problematic under the Government's *Merger Guidelines*, then (c) a *"merger simulation"* can be used to predict the NEA's competitive effects, and (d) that exercise predicts substantial fare increases.  Indeed, the only quantitative proof of adverse competitive effects in Plaintiffs' case comes from its static "merger simulation," a tool which assumes merged firms do not compete at all and by design *always* predicts increased prices.  In fact, Plaintiffs' expert admits that the "merger simulation" *does not model the NEA on its own terms* but rather assumes the parties will disregard the express terms of the NEA agreement and *"behave"* in different, more merger-like ways.

This does not meet a plaintiff's burdens in a case brought under Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs' approach is far too speculative, with the entire case turning on flawed analogies rather than the agreements at issue or evidence of the NEA's actual performance.  But more than that, Plaintiffs' case ignores the particulars and limitations of the NEA agreements at issue—the alleged "contract[s] … in restraint of trade" violating Section 1.  The NEA agreements limit when and how JetBlue and American collaborate and thus preserve competition like no merger would.  For example:

- There is no coordination on pricing.

- Each carrier retains its distinct business model—meaning that JetBlue remains the exact same disruptive low-cost carrier that Plaintiffs celebrate. The undisputed evidence is that JetBlue has not and will not change its low-fare, high-service-level business model because of the NEA.

- There is no coordination of fleet plans, overall industry capacity, or overall NEA capacity; even route-specific capacity planning is non-binding.

- Instead of profit-sharing, there is revenue-sharing on terms that even Plaintiffs' and their experts concede create unilateral incentives for each partner to grow by expanding capacity.

- There is no revenue sharing or capacity coordination on select "carve out" routes where American and JetBlue face limited competition.

Plaintiffs' arguments and modeling also ignore the restrictions, obligations, and continuous oversight that the Department of Transportation ("DOT") imposed as a condition to terminating its review of the NEA. These conditions include limitations on what can be discussed during network planning sessions, prohibitions on manipulating the provision of slots and gates to influence competitive behavior, a ban on JetBlue exiting non-seasonal, nonstop JFK routes it served as of February 2020, and annual growth targets that, if not met, result in the forced divestiture of valuable slots at JFK.

Collectively, (a) the carriers' actual agreements, with all of the terms that preserve competition as well as those that arguably restrict it, and (b) the limitations, restrictions, and continuing governmental oversight by DOT *define the conduct at issue*. By the terms of the Government's own *Collaboration Guidelines,* they demand "antitrust scrutiny different from that required for mergers."[1] Yet here, even though Plaintiffs cannot and do not deny the objective facts about the NEA and its many self-imposed and DOT-imposed limitations, they ignore them all and base this case on attacking a merger strawman rather than any actual data on the NEA's real-world

---

[1] *See* U.S. Dep't of Justice and Fed. Trade Comm'n, Antitrust Guidelines for Collaborations Among Competitors (2000), § 1.3 ("Collaboration Guidelines").

competitive effects.  In sharp contrast to the DOT, Plaintiffs chose to speculate, not "wait and see" to assess the NEA on its actual merits.

The parties did not enter into the NEA to replicate a merger, control the decisions of each other, or facilitate changes to each other's business models.  Rather, the overwhelming evidence surrounding the negotiation and consummation of the NEA shows that the parties sought to use the NEA to become *stronger competitors in a region dominated by United Airlines and especially Delta Airlines*.  The NEA addresses competitive weaknesses that JetBlue and American had in New York and Boston, particularly in competing with United and Delta for local originating passengers and corporate customers.  In New York, United and Delta are each roughly *twice as large* as each of JetBlue and American, and they have used this network size advantage to continue to gain market share at JetBlue's and American's expense.  Because of slot restrictions at LaGuardia and John F. Kennedy airports in New York, neither JetBlue nor American has an independent path to close this network disadvantage and reverse that trend.  It is a similar dynamic in Boston, where Delta has used its global network and an aggressive growth plan to threaten JetBlue's longtime leading position.  There is nothing JetBlue can do independently to answer Delta's network offerings.

The NEA upends the competitive dynamic in Boston and New York and—in Delta's words again—"████████████████████████████████████."[2]  It creates a broader network without a merger.  Overnight, it's a new ballgame.

In New York, the NEA network now serves approximately the same number of nonstop routes as Delta and United, and offers more daily seats.  While, before the NEA, American and JetBlue each served fewer than 35 of the top 50 most heavily traveled routes from NYC, with the

---

[2] DX-0238 (████████████████████████████████), at -0002.

NEA, the two carriers together served 47 out of 50 as of August 2022, essentially matching Delta and United (who serve all of those 50 markets). In Boston, the "NEA network" is a much better match for Delta than what JetBlue and American offered separately, creating a *more*, not less, competitive environment.

These network benefits are undeniable—and undeniably good for consumers. As one of Plaintiffs' few airline witnesses explains, the NEA allows JetBlue and American to "███████████ ███████████████████████████████████████████████".[3] That statement could define "procompetitive." And importantly, JetBlue and American are taking northeast market share from United and Delta for the first time in years—a sure sign of a procompetitive collaboration.

Before this case, the Government readily acknowledged that larger, more integrated airline networks, whether through mergers or alliances, "generate consumer benefits by facilitating schedule improvements, by allowing for a more efficient allocation of aircraft across the network, and through marketing synergies that could make the [combined carriers'] service more attractive to consumers."[4] The legacy airline mergers that Plaintiffs now disparage all included some number of highly concentrated routes, but also large network efficiencies. DOJ permitted them to close with few or no remedies because even the most conservative estimates of consumer benefits from an improved network exceeded potential harms on routes where the two carriers used to compete directly. Applying that approach here leads at the very least to the conclusion that the NEA deserves a chance to prove itself in the marketplace, the conclusion the DOT effectively reached.

---

[3] ████████████████████████████████████████████████████████████ ███████████

[4] DX-1068 (Ken Heyer, Carl Shapiro and Jeffrey Wilder, The Year in Review: Economics at the Antitrust Division, 2008–2009, Rev. of Indus. Org., Vol. 35, No. 4, (December 2009), pp. 349-367).

And, unlike a merger, there are no practical limitations to bringing a later challenge based on real evidence of anticompetitive effects.

Plaintiffs have cited no facts or law that justify condemning, through speculation alone, a collaboration that to date is only doing good and which will always be subject to antitrust scrutiny from the Government and private treble damages actions.

## II.     FACTUAL BACKGROUND

### A.     American and JetBlue

American and JetBlue are two of many airline competitors in the United States.  American is a "global network carrier" (a "GNC") headquartered in Fort Worth, TX.  Through use of "hub" airports (like Dallas-Fort Worth (DFW) in Texas), American offers connecting itineraries that connect thousands of cities – "from anywhere to everywhere."  As a GNC, American's operations are more complex and with that complexity comes a higher cost structure.  The model works, however, by using the network as a competitive differentiator.  American's largest GNC competitors are Delta and United, both of which have extensive service offerings in the Northeast, much larger than American's current offering in Boston and New York.[5]

JetBlue, headquartered in Long Island City, NY, is a "low-cost carrier" or "LCC."  Given their lower cost structure and more "point-to-point" networks (with very little reliance on "hub" airports to create connecting itineraries), LCCs are able to offer lower fares than GNCs like American, Delta, and United.  JetBlue is unique among LCCs (like Southwest, and "ultra" LCCs

---

[5] GNCs are also referred to as "legacy carriers," which operate with a hub-and-spoke model that provides significant connectivity through large airport bases and infrastructure that has been developed and strategically located over time.  *See, e.g.,* DX-0041 (July 2020 American Board of Directors Meeting), at -0067 ("Our network advantage is driven by the strength of our hubs and the proximity of spokes to our hubs").  Legacy carrier fares provide fulsome, multi-class service, the ability to select a seat on most flights, and widespread lounge availability.

or "ULCCs" like Frontier and Spirit) in that it aims to couple lower LCC fares with a higher quality of travel.  The presence of JetBlue (or other LCCs) on a route generally has a significant (downward) impact on the level of fares.  From JetBlue's perspective, one of the primary goals of entering into the NEA is to expand and amplify the "JetBlue Effect" (*i.e.*, the tendency of fares to significantly decrease and passenger traffic to increase when JetBlue enters a route), by taking advantage of American's broader network, and in effect "supercharging" JetBlue through more growth in the Northeast.

### B.    Competition in Northeast Airline Markets and the Need for the NEA

American and JetBlue entered into the NEA to create a true third network competitor to Delta and United in the Northeast.  Delta and United are the dominant carriers in this important travel region (New York is the largest air travel market in the country).  Delta and United each offer local originating passengers in New York (*i.e.,* travelers who reside or work in the area and therefore begin their journeys in New York) roughly twice as many daily seats as American or JetBlue alone, and many more nonstop destinations.[6]  United serves the New York market almost exclusively from Newark International Airport (EWR) in New Jersey, while Delta has its largest presence in New York at LaGuardia (LGA).  Because of the much smaller presence and "relevance" in New York, American internally considered itself to be "a niche carrier in NYC,"[7] more in the business of flying passengers *to* New York than serving the local originating passenger. JetBlue has substantial New York operations, roughly the size of American's, but it was facing limitations in the infrastructure (access to gates and takeoff and landing slots) needed to operate additional flying.  As for Boston, Delta has in recent years rapidly grown into a more powerful

---

[6] 2019 OAG data.

[7] DX-0011 (Sept. 2018 American NYC Strategy Update), at -0004.

player,[8] doubling in size since 2015, and poses a major threat to JetBlue because its ability to leverage network strength that JetBlue lacks.[9]  American and JetBlue have, of course, sought to improve their competitiveness in New York and Boston, with stated plans (at least pre-COVID) to grow to some degree, but between infrastructure limitations and their network disadvantages relative to United and Delta, there is no reason to think that on their own JetBlue or American could have meaningfully changed their trajectories.[10]

The NEA offered a game-changing solution to the fundamental problem of a weak network proposition vis-à-vis passengers living in the greater Boston and New York areas.  It was conceived in the first half of 2020 (during the onset of the COVID-19 pandemic) based on the core belief that working together through a limited alliance, JetBlue and American can offer consumers a better network—and without merging, harmonizing business models, or coordinating pricing.  The express goals of the NEA include "[a]dress[ing the Parties'] 'incomplete' customer proposition relative to DL/UA in NYC," "[m]aximiz[ing] customer value and connectivity" in New York City

---

[8] *See, e.g.*, DX-0259 (████████████████████████████), at -0009 ("████████████ ████████████████████████████"); DX-0111 (American 2021-2026 Five Year Plan), at -0024 ████████████████████████████████████."); DX-0257 (████████████████████████████), at -0001 (████████████████ ████████████████████████); DX-0290 (Jan. 2019 JetBlue Board Presentation), at -0004 (showcasing a timeline of how "Delta [has] continue[d] to grow aggressively in Boston").

[9] DX-0290 (Jan. 2019 JetBlue Board Presentation), at -0029 ("Threats. . . Delta growing larger than JetBlue would eliminate many of our advantages and public claims.").

[10] DX-0011 (Sept. 2018 American NYC Strategy Update), at -0005, -0003 ("B6 is investing in their terminal in JFK but without access to more slots they cannot grow JFK and will always lag behind DL in departures;" "AA had "no 'organic' path to secure a leadership position in NYC. . . . In this landscape we have no ability to grow – even absent gates/slots/airport restrictions, growing NYC is prohibitively expensive."); DX-0111, (American 2021-2026 Five Year Plan), at -0024 ("Similar to NYC, [American] has continually lost share in BOS while JetBlue has faced a growing threat from Delta.").

and Boston, and "[i]mprov[ing] overall customer relevance/competitiveness in the Northeast region."[11]

C.     The NEA Is a Narrowly Tailored Collaboration, Not a Merger, And Is Focused on Growing Traffic to Compete with United and Delta

1.     The NEA Features Multiple Components of Collaboration Each Designed to Generate Growth

The NEA joins in an alliance structure American and JetBlue flights to/from Boston's Logan Airport (BOS) and to/from New York's Kennedy (JFK), LaGuardia (LGA), and Newark (EWR) airports (collectively, the "NEA Airports").[12]  The purpose of the NEA is to create growth through a much better utilization of the Parties' northeast assets—growth in absolute terms (more flights, more seats, etc.) and growth relative to United and Delta.  The NEA achieves this growth through multiple components specified in contracts, each aimed at aligning the parties' incentives in the narrow but vitally important respect of maximizing growth and improving the quality of travel in the Northeast.  The NEA is *not* a merger:  the carriers maintain complete and separate control of their independent brands, business models, product offerings, pricing (setting of fares), profits and losses, and aggregate capacity decisions (and all capacity decisions outside the NEA airports).  The NEA works *because* each airline brings its independent strengths and business models to the table.  The key components of the NEA include codesharing, schedule optimization (including sharing of slots and gates at NEA airports), revenue sharing, and frequent flier program integration.

---

[11] DX-0037 (undated American internal deck discussing NEA), at -0002.

[12] One exception is that JetBlue's transatlantic flying from NEA Airports (including JetBlue's recently launched service to London Heathrow) is not included in the NEA, although American's transatlantic service from NEA Airports is part of the NEA.

*Codesharing*.  Codesharing is an arrangement where one carrier (the "marketing carrier") places its airline "code" on another carrier's (the "operating carrier's") operated flight, allowing the marketing carrier to sell seats on the operating carrier's flight.  With codesharing in the NEA, American can sell seats on JetBlue's flights and *vice versa*.  Codesharing increases the available travel options for consumers, since American can list all of JetBlue's NEA flights for sale, for example, on its website www.aa.com (and vice versa for JetBlue with American's flights).  Codesharing can also facilitate new connecting flight options and itinerary possibilities that neither carrier could offer on its own.  As Plaintiffs agree, the benefits of codesharing alone are limited, but when it is combined with other components of the NEA, including revenue sharing and capacity coordination, codesharing unlocks substantial consumer benefits.

*Schedule optimization*.  A central component of the NEA is optimization of American's and JetBlue's route network and schedule of flight times and frequencies at the NEA Airports.  It should be no surprise that if one were to take JetBlue and American schedules as fixed, they would make poor, even irrational, combined schedules.  They would be doing some amount of flying at the same time, and it is very unlikely that their schedules would facilitate good connections.  Through the NEA, American and JetBlue teams create proposed schedules that make sense operationally, competitively (to beat United and Delta), and most of all from the passenger's perspective.  To facilitate these schedule and network changes, the Parties have agreed to pool airport infrastructure, such as takeoff and landing slots (essentially rights to operate) and airport gates, to maximize efficiency and create opportunities for new flights and frequencies.  This level of coordination and deployment of shared assets is essential to achieve the growth goals of the NEA because it is precisely what allows American and JetBlue to create an NEA network capable

10

of competing with Delta and United in the Northeast (*i.e.*, a network that facilitates connections and offers an attractive schedule).[13]

Importantly, however, the carriers do not coordinate aggregate capacity.[14]  In other words, while the Parties will coordinate the most efficient use of slots and gate assets in New York and Boston and decide, for example, the optimal number of frequencies to particular destinations, they will not coordinate more generally on how much capacity each carrier will have overall, or what types of planes they purchase or contribute to the NEA (or not).  And even within the NEA each carrier maintains independent control of final decision-making, including on capacity and network strategy at the NEA airports.

*Revenue sharing*.  Under the terms of the Mutual Growth Incentive Agreement ("MGIA"), one of the operative agreements in the NEA, the Parties have agreed to share revenue from NEA flights based on a specific formula that is designed to incentivize growth.  The terms are challenging to understand, but the rationale for revenue sharing is not.

A long history of airline alliances with and without revenue sharing has shown that alliance partners that do not share revenues (or profits), do not fully commit to the alliance and its potential for generating consumer benefits.  They make self-interested decisions to constrain the resources they commit to the alliance, for example codesharing only on routes where they will keep most of the revenue.  Revenue-sharing that allows the airlines to participate in each other's growth solves this problem.  They prioritize getting a passenger on an alliance aircraft rather than just their own aircraft specifically, which means that when establishing a joint schedule they do not need to fight

_____

[13] American has a separate alliance with Alaska Airlines, called the West Coast International Alliance, or WCIA.  The WCIA includes revenue-sharing, but unlike the NEA the WCIA requires less capacity coordination because the focus of the WCIA is facilitating connections between Alaska's domestic U.S. flying and American's trans-Pacific services.

[14] This undermines a key Plaintiff argument that the NEA promotes "capacity discipline."

over who gets the "best" opportunities created by the alliance.  They focus on the network and schedule.  The DOT has repeatedly recognized that revenue sharing provides participants "common incentives" to promote joint capacity growth, thereby allowing them to achieve "efficiencies and deliver benefits that would not otherwise be possible."[15]

The MGIA is a modified version of the revenue-sharing formulas that have been prevalent in international airline alliances for years and endorsed by the DOT.  To the extent it has any distinctive features, it is how it incentivizes growth in the NEA regions—a clearly procompetitive incentive.

The MGIA works by determining the incremental revenue (i.e., revenue over a baseline amount) generated by the NEA during a given period and distributing that revenue in accordance with *each carrier's share of capacity in the NEA in that year*.  For example, if in 2022 JetBlue provides 55% of NEA capacity, it will receive 55% of incremental revenue, but if in 2023 it provides 60% of NEA capacity, it will receive 60% of incremental revenues.  Furthermore, there is another mechanism in the MGIA that subsidizes growth—so much so that Plaintiffs' expert suggests it is too good to be true.  At bottom, the MGIA formula protects carriers from one of the risks of growth, which is that adding new capacity on a route tends to lower average fares on that route.  The MGIA formula gives the carrier adding capacity the benefit of an assumption that average fares did not go down.  The MGIA therefore encourages American and JetBlue to grow

---

[15] Continental-United-Air Canada-Austrian-bmi-Brussels-LOT-Lufthansa-SAS-TAP, DOT-OST-2008-0234, Show Cause Order 2009-4-5, at 4, 19; *see also* U.S.-Japan Alliance Case, DOT-OST-2010-0059, Order 2010-10-4,( at 14, 17 (refusing to place restrictions on revenue sharing because it was "intrinsic to the efficiencies and benefits promoted by a grant of antitrust immunity" and noting that "without . . . sharing of costs and revenues, two carriers are more reluctant to closely align their frequent flyer programs . . . [and] less likely to invest in other product improvements . . . ."); Delta et al., DOT-OST-2013-0068, Order 2013-8-21, at 17 (granting antitrust immunity because it would "allow the [applicants] to engage in the kind of revenue and benefit sharing that is necessary to alleviate the commercial risks and create substantial public benefits").

the NEA by growing their individual contributions to NEA capacity.  Again, Plaintiffs' economists deny none of this.  They literally choose not to believe the Parties will behave consistent with the incentives created by the terms they negotiated over, and therefore model the NEA as if the Parties do something else.

   ***Frequent Flyer Program (FFP) Integration***.  As part of the NEA, American and JetBlue have expanded their frequent flyer programs to provide reciprocal benefits, so American AAdvantage members can earn miles while flying on JetBlue NEA flights and JetBlue TrueBlue members can earn miles while flying on American NEA flights.  American AAdvantage points can be redeemed for travel on JetBlue and (soon) vice versa.  This integration is particularly important for corporate travelers (and corporate travel programs) who place significant value on frequent flier programs, accruing points, and redeeming benefits.  With FFP alignment and NEA codesharing being included in the respective and entirely independent American and JetBlue corporate travel programs, the NEA addresses an important element of competition for air travel and source of consumer benefits, especially competition for corporate demand in the Northeast.

   In sum, everything about travel in the NEA—the network of destinations, the timing and frequency of flights, the choice of equipment (plane), the airport experience, and the frequent flier benefits—is vastly better for consumers, and this is apparent from evidence in the record *today*. Passengers at the NEA airports can, today, book travel for American and JetBlue on either carrier's website and choose from the combined NEA network of flights.  Because of revenue sharing, each of American and JetBlue have an incentive to market and sell all of those flights, making any and all of their seats available whether booked through American or JetBlue.  With capacity coordination, passengers now have the option to depart at a variety of convenient times to maximize flexibility.  Regardless of which carrier a passenger flies on, they will earn frequent flier

points that they can redeem on either carrier, and for the most frequent fliers that have achieved

greater status, that status will be recognized across American and JetBlue in the NEA.

At the same time, even with all these integrative efficiencies from the NEA, American and

JetBlue have maintained their separate identities, with American still focused on competing most

closely with the other domestic GNCs (Delta and United), while JetBlue is now armed with the

tools needed to accelerate its growth strategy and "expand the JetBlue Effect."  The fact that there

is no pricing coordination is also evident simply by comparing American and JetBlue fares on

routes where they both offer service.  JetBlue continues to leverage its lower cost structure to

undercut American's fares as it consistently has.  Nothing about that important competitive

dynamic has changed in the least on account of the NEA.

> **2.    The Parties Entered An Agreement with the DOT Requiring
> Additional Growth and Providing Safeguards Against Potential for
> Anticompetitive Harm**

In July 2020, shortly after the NEA was announced, Defendants submitted copies of the

NEA, the MGIA, and the Codeshare Agreement to the DOT and DOJ for regulatory review

pursuant to 49 U.S.C. § 41720 (DOT's statutory waiting period allowing for review of airline

alliances) and 15 U.S.C. § 1312 (DOJ's civil investigative authority), respectively.  Defendants

fully cooperated with both agencies to facilitate their reviews, including by producing significant

volumes of data and documents concerning the NEA and competition in the Northeast.

By November 2020, the DOT was prepared to allow the Parties to proceed with the NEA,

but wanted some assurances that growth encouraged by MGIA would actually take place.[16]

Defendants continued to work with the DOT on a series of commitments and safeguards that would

---

[16] Ex. C to Defs.' Opp. to Pls.' Mot. in Limine No. 2, AA-NEA-01526166 (Nov. 12, 2020 email
from Robert Wark to Todd Homan FW: AA/JetBlue NEA – CONFIDENTIAL), at -166.

ensure that the NEA remained procompetitive, generating the significant growth that it promised, with safeguards and monitoring in place to ensure that there was no anticompetitive harm. These discussions culminated in a letter agreement reached with DOT in January 2021, in which Defendants committed to divestitures of seven slot pairs at JFK, leases of six slot pairs at DCA, and potential additional slot divestitures that would be triggered if Defendants failed to meet substantial growth commitments in the initial years of NEA implementation. Additionally, Defendants agreed (a) that JetBlue will not exit any non-seasonal, nonstop route from JFK that it served as of February 2020 (with limited exceptions), (b) to implement mandatory limitations on out-of-scope communications including discussion regarding fares or out-of-scope flying, (c) to amend the NEA to ensure that slot leases will be in place for sufficiently long duration, and (d) to maintain and provide to DOT detailed records regarding the implementation and operation of the NEA.[17]

        In January 2021, Defendants voluntarily made several amendments to the NEA and MGIA to alleviate concerns identified *by DOJ*. The full story of these amendments is told in Defendants' memorandum opposing Plaintiffs' *in limine* motion concerning "carveouts." In short, DOJ told the Parties in October 2020 that it had particular concerns around revenue-sharing and capacity coordination on non-stop overlap routes in the NEA where American and JetBlue compete but there was little other competition. Therefore, to address DOJ's concerns and further assure DOT that the NEA will remain procompetitive, Defendants amended the NEA and the MGIA to exclude coordination and revenue sharing on routes where Defendants were the only significant carriers or

---

[17] *See generally* DX-0063 (Jan. 10, 2021 DOT Agreement).

where there was only one other carrier providing nonstop service on the route.[18]  These "carve out"

routes" are updated annually to account for changes in competitive conditions.

     **D.**     **The NEA Mitigates Network Disadvantages and Facilitates Growth by Both American and JetBlue**

          **1.**     **The NEA Creates Growth Through More Efficient Use of Scarce Complementary Assets**

Together, the components of the NEA mitigate and even overcome American's and

JetBlue's disadvantages in the Northeast, creating the opportunity for growth that neither carrier

could achieve on its own.  The NEA leverages each carrier's complementary assets and consumer

propositions at the NEA airports, with each carrier providing a key ingredient for growth that the

other is missing.  As a GNC, American has an extensive domestic network and is well-capable of

transporting passengers from anywhere in the United States to the Northeast, but it lacks the

presence that Delta has (in Boston and New York) and that United has in New York to attract local

originating passengers.  American's offering in the Northeast is simply not comparable to that of

Delta and United.  Especially for corporate customers, pre-NEA, American was an afterthought in

the Northeast, considering itself "a niche carrier in NYC."[19]

JetBlue, on the other hand, had a sizeable footprint and history in Boston, but in recent

years has quickly lost ground to Delta, which set its sights on Boston and now has the most daily

flights from Boston.  And in New York, JetBlue's desire to grow has been significantly hampered

by its inability to reliably secure convenient takeoff and landing slots.  JetBlue is also significantly

---

[18] *See generally* DX-0185 (Jan. 12, 2021 letter from Dan Wall to DOJ); Ex. N to Defs.' Opp. to Pls.' Mot. in Limine No. 2, JBLU-LIT-01552527 (July 9, 2021 email from Reese Davidson to Todd Homan et al.), at -527.

[19] DX-0011 (Sept. 2018 American NYC Strategy Update), at -0004.

limited by its much smaller network, since JetBlue as an LCC is more focused on point-to-point flying with smaller volumes of connecting passengers.

By efficiently integrating their complementary assets in the NEA, American and JetBlue in the NEA seek to unlock significant potential for growth, and consumers benefit from more and higher-quality flying.  This growth motive in the NEA—and a desire to create opportunities and consumer benefits through the NEA—is precisely how each of American and JetBlue management described the NEA to their respective Boards of Directors.  American's ordinary course documents describe the goal of "maximizing connectivity and unlocking value"[20] and creating "a new ability to compete with DL and UA" as shown in the below excerpt from an American Board presentation considering the NEA:



> **A combined network creates a new ability to compete with DL and UA**      American Airlines

| NYC<br>EWR/JFK/LGA | AA<br>Pre-IV | B6<br>Pre-IV | AA+B6<br>Post-IV, Optimized<br>(Unique Values) | DL | UA |
|---|---|---|---|---|---|
| **Nonstop Markets** | 54 | 61 | 120 (+13) | 107 | 125 |
| **Daily Seats**<br>Bi-Directional Total | 62k | 61k | 142k (+17k) | 120k | 113k |
| **Domestic Nonstop OD**<br>PDEW Coverage | 59% | 69% | 91%<br>(1st vs DL/UA) | 89% | 90% |
| **Top 50 NYC OD**<br>MAC Markets Nonstop (O+) | 30/50 | 29/50 | 48/50 | 49/50 | 50/50 |
| **INTL Long-haul Markets**<br>(South America/EMEA/Asia) | 8 | 1 | 21 (+12) | 25 | 35 |

Historical based on 1Q8Y20 schedules from Diio M
Domestic PDEW from DOT DB1B L12M Dec19. Top 50 NYC OD MAC markets from DDS L12M Dec19
AA/B6 unserved MAC: TYL/VBX (MEX excluded in B6 2019 base as it was exited by B6)

Source: DX-0041 (July 2020 American Board of Directors Meeting), at -0065

---

[20] DX-0037 (undated American internal deck discussing NEA), at -0007.

JetBlue management similarly described to its Board that the NEA "increases customer utility" and is designed to "incentivize both carriers to grow capacity," with a combined network that "will turbocharge JetBlue."



Source  DX-0356 (June 2020 JetBlue Board of Directors Meeting), at -0058

Importantly, the Parties' competitors see the NEA precisely the same way, for what it is, a growth engine and competitive threat (especially to Delta and United):



- **Delta:** NEA is a ▉▉▉▉▉▉▉▉." "▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉."[21]

- **United:** NEA has "▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉."[22]

---

[21] DX-0238 (▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉), at -0002.

[22] DX-0507 (▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉), at -0050.

- **Southwest:** NEA ███████████████████████████████."[23]

- **Alaska:** NEA creates a "█████████████████████████████████████
  █████████████████████████████████████."[24]

### E.   The NEA is Working, Generating Significant Consumer Benefits

In the 18 months since the Parties began implementing the NEA, it has generated consumer benefits, as planned, creating growth in flying, new destinations, and better schedules.  Even in the wake of the COVID-19 pandemic and rocky recovery, there are hard data to support that the NEA has created consumer benefits, including:

- Approximately 50 new nonstop routes that were not previously served by American or JetBlue have been introduced at the NEA airports;

- 17 new international flights launched by American or JetBlue out of New York since the NEA was implemented, including nonstop flights from JFK to Athens, Delhi, Doha, and Tel Aviv;

- Replacement of smaller aircraft with larger aircraft;

- Cross-selling of each other's services through codesharing that greatly expands consumer choice;[25]

- Frequent flyer reciprocity that allows members to accrue frequent flyer miles on the other carrier's flights;[26]

- Frequent flyer status benefits recognized on each other's flights;[27]

_____

[23] ██████████████████████████████████

[24] DX-0221 (███████████████████████████████████████), at -0002.

[25] *See id.* ("The airlines are now codesharing on 185 routes").

[26] *See id.* at -0027 (The NEA provides "[c]ross carrier mileage earn and AAdvantage members may redeem miles for JetBlue flights.").

[27] *See id.* at -0012 ("New AAdvantage Status Benefits on JetBlue" include "Complimentary Even More Space seats for all Status Members," "Complimentary Same Day Switch," and the ability "to access Admirals Club lounges."); DX-0096 (undated internal American presentation about the

- Expanding the network offering to corporate customers by including the NEA codeshare flights in each airline's unilateral corporate programs;[28]

- Schedule improvements that expand time of day options on existing routes;[29]

- Busing solution between Terminals 5 and 8 in JFK that greatly reduces connecting times;[30] and

- IT improvements to facilitate a more seamless customer experience.[31]

These improvements are not just "COVID recovery" (as Plaintiffs will argue). The NEA has enabled (and is enabling) a dramatic increase in capacity at the NEA Airports, significantly outpacing all other carriers, as shown below:

---

NEA), at-0002 ("AAdvantage status and TrueBlue Mosaic members now get enhanced benefits when traveling on either carrier").

[28] *See* DX-0135 (July 2021 American NEA Network Update), at -0006 (American providing a table demonstrating a number of new peak-day trips to high frequency markets).

[29] *See id.* at -0007 (American providing a table demonstrating the "Scheduling Improvement" in the DCA-BOS market leading to broader timing options for customers).

[30] *See* DX-0091 (Mar. 2021 JetBlue presentation about the NEA), at -0006–0016 (describing the Bus solution connecting terminals 5 and 8 at JFK).

[31] *See* DX-0096 (undated internal American presentation about the NEA), at -0001, 0003 (listing IT integrations).



*Source: OAG Scheduling Data*

These significant improvements in American and JetBlue's offerings as a result of the NEA have been quantified by Defendants' expert Dr. Mark Israel, in two different ways. First, as he will explain at trial, Dr. Israel quantifies the NEA's consumer value by estimating how much American and JetBlue's market share has gone up after the NEA, and he calculates the equivalent price decrease that would yield the same increase in passengers ("quality-adjusted prices"). This is a standard method of calculating consumer benefits in airline cases and has been used and cited by DOJ in prior matters.[32] Dr. Israel relied on the Parties' estimates of incremental passengers that would be generated in a world with the NEA, which was calculated during the planning phase of the NEA using American's ordinary course share-prediction tool, Raven. American's modeling

_____

[32] *See, e.g.*, DX-1068.

predicted that the NEA will attract about 5.7 million passengers annually—which Dr. Israel quantifies as roughly $635 million in consumer benefits—once the NEA is fully implemented.[33] Dr. Israel's estimate is conservative because the planning teams did not include any additional international flying, like American's new routes from New York to Athens and Tel Aviv, that the carriers launched as a result of the NEA.[34]

Second, to confirm that predictive analysis with actual data, Dr. Israel looked at actual share changes realized by American and JetBlue since implementation of the NEA. Dr. Israel observes based on publicly-available data that the NEA is already attracting more than 3.3 million incremental passengers annually compared to the standalone carriers pre-NEA, equaling $511 to $610 million in consumer benefits due to a substantial reduction in quality-adjusted prices.[35] This estimate only reveals a portion of the NEA's ultimate benefits, with additional benefits to come as the NEA continues to be rolled out and the effects of COVID-19 (on business travel in particular) continue to recede.[36] Moreover, it is a conservative estimate because it does not account for competitor airlines' procompetitive responses to the NEA, such as capacity increases on existing routes and improvements to their own networks; nor does it account for American and JetBlue's share gains at non-NEA airports as a result of a better network in the Northeast.[37]

---

[33] Mark Israel Expert Rep. ¶¶ 279-80.

[34] *Id.* ¶¶ 276, 279.

[35] *Id.* ¶ 286.

[36] *Id.* ¶ 281.

[37] *Id.* ¶ 283.

Not surprisingly, competitors have in fact responded to the increased competition from the NEA, generating even more benefits for consumers.[38]  Delta and United have both announced expansion and product improvement plans.[39]  Competitors of JetBlue and American have repeatedly characterized the NEA as a major development in the Northeast that will spur competition in that region and enhance JetBlue's and American's networks.[40]

Plaintiffs have and will attempt to diminish these benefits by citing the carriers' 2019 standalone growth plans.  That is, Plaintiffs' main argument in this case is not to deny the growth



_____

[38] DX-0221 ████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████

[39] *See* ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████

[40] *See, e.g.*, DX-0238 (███████████████████████████████████), at -0002
(████████████████████████████████████████████████████
████████████████████████████████████████████); DX-0242
(██████████████████████████████), at -0001 (███████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████); ███████████████████████|
█████████████████████████████████); DX-0501 (████████████
██████████████████████████████████), at 0010 (████████████████
████████████████████████████████████████████
██████████████████████████████████); 
████████████████████████████████████████; DX-0221 (████████
█████████), at -0002 (████████████████████████████████████████
████████████████████████████████████████████████████); 
██████████████); 
████████████████████████████████████████████████████
██████████████████████████).

but rather the need for the NEA to achieve it, supposedly because JetBlue and American had unrealized standalone potential for growth.  Every business looks for, and analyzes, prospects for growth.  American and JetBlue were no different.  But, profitability is a prerequisite to effective growth, and many growth aspirations never come to pass.  For American and JetBlue, those realities included a debilitating network deficiency and no path to close that deficiency.  The NEA changes that calculus in two ways: (1) it gives each carrier a broader line up of products, one that finally puts them on par with United and Delta; and (2) it gives them a revenue sharing agreement that de-risks and encourages growth and entry into new markets.  The NEA has even given the carriers the confidence to commit to meaningful growth commitments at the risk of losing slots (per the agreement with DOT), despite the continuing uncertainties arising from COVID.  The Plaintiffs' only response is to cherry pick vague pre-NEA (and generally pre-COVID) statements that suggest an aspiration to grow, but with no clear plan, with no commitment of resources, and most of all *nothing to address the network deficiencies*.  Plaintiffs cannot dispute that the NEA makes American and JetBlue stronger competitors because of how it changes their network propositions.

Dr. Israel's estimates of consumer benefits from the NEA are based on what the carriers expected the NEA to achieve and what, even amidst all of the disruption from COVID, they have been able to achieve.  JetBlue's own documentation analyzing the NEA describes true growth, requiring dozens more aircraft (an incremental ~40 aircraft into the fleet plan).[41]  The commitments the parties made to the DOT require 15% true growth.  That is the whole point of the NEA, which unlocks the potential for more growth and opportunities than either American or JetBlue could pursue on their own.

---

[41] DX-0356.

F.      There Is No Evidence of Any Adverse Effects

As described above, there is significant, demonstrable, and quantifiable evidence of procompetitive benefits and consumer benefits created in just the first 18 months of the NEA. Plaintiffs have put forth no evidence, because there is no evidence, of any adverse effects from the implementation of the NEA.  Plaintiffs' only "evidence" of adverse effects from the NEA will depend on their expert witness Dr. Nathan Miller, who by his own admission has made no attempt "to analyze the NEA effects with post-implementation data."[42]   If Dr. Miller is permitted to testify,[43] his testimony will rely on a merger simulation to model the NEA, even though the NEA is not a merger for the reasons described above.  Dr. Miller's model purports to predict the likely price effects of the NEA in the future, assuming it has merger-like effects and ignoring the actual terms of the NEA and MGIA.

To test whether there have been any adverse fare effects as a result of the NEA, based on actual fares since implementation of the NEA, Defendants' expert Dr. Dennis Carlton analyzed the change in actual fares on NEA nonstop overlap routes between the second, third, and fourth quarters of 2019 and 2021, respectively,[44] and compared this to the change in actual fares on a set of "control" routes unaffected by the NEA over the same time period.  Dr. Carlton found, and will testify, that the evidence *cannot* support a claim that the NEA has harmed competition.

---

[42] Miller Dep. 31:3-20 ("Q: [D]id you at least attempt to analyze the NEA effects with post-implementation data?  A: No.").

[43] Defendants have moved to exclude Dr. Miller from offering opinions or testimony that rely on the results of his "merger simulation" model as unreliable for purposes of modeling the competitive effects of the NEA, which is not a merger.  *See* ECF No. 141 (Defs. *Daubert*  and Mot. in Limine).

[44] The most recent periods post-NEA implementation for which data are publicly available.

In summary, since the implementation of the NEA, American and JetBlue have significantly, and measurably, expanded and improved travel in the Northeast, spurring competitive responses from other carriers.  Plaintiffs themselves cite no evidence of any present adverse effects.  The NEA remains subject to the antitrust laws in the future, and American and JetBlue remain liable in the event the NEA causes anticompetitive effects that arise in the future.

## III.   LEGAL STANDARD

### A.   The Rule of Reason

The legal analysis of the NEA begins with the Supreme Court's recognition that "many joint ventures are calculated to enable firms to do something more cheaply or better than they did it before," and its accompanying admonition that "the fact that joint ventures can have such procompetitive benefits surely stands as a caution against condemning their arrangements too reflexively."  *Nat'l Collegiate Athletic Ass'n v. Alston,* 141 S. Ct. 2141, 2155 (2021); *see also Collaboration Guidelines* at 1 ("[C]ollaborations often are not only benign but procompetitive."); Phillip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 2100 (4th ed. 2018) (joint ventures "are presumptively lawful," and courts may only condemn "those provisions that seem, on balance, to produce greater competitive harms than efficiency gains.").

As Plaintiffs concede, the full "rule of reason" applies when assessing the NEA, under which the analysis proceeds in three stages:

- *First,* Plaintiffs have the threshold burden to prove "that the challenged restraint has a substantial anticompetitive effect."  *Id.* at 2155.  Plaintiffs may meet that burden either "directly" with evidence of higher prices or restricted output, or "indirectly" by showing that firms with *market power* are engaging in *conduct that predictably harms the competitive process*.

- *Second,* if Plaintiffs meet their threshold burden, "the burden then shifts to the defendant[s] to show a procompetitive rationale for the restraint." *Id.* This is a modest burden easily met with respect to the NEA.

- *Third,* upon a showing of a procompetitive justification, the burden shifts back to the Plaintiffs to show that the same "procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* A "less restrictive alternative" must be substantially less restrictive, practical, and equally effective as the challenged conduct in generating procompetitive benefits.

The evidence will show that Plaintiffs cannot carry their first burden, let alone their third-step burden, assuming the analysis gets to that step.

**B.    Plaintiffs Cannot Show That The NEA Has Produced Or Is Producing Anticompetitive Effects**

To prove anticompetitive effects under a rule of reason analysis, Plaintiffs are required to show "actual detrimental effects [on competition], . . . such as reduced output, increased prices, or decreased quality in the relevant market." *Ohio v. Am. Express Co.,* 138 S. Ct. 2274, 2284 (2018). While this can be proven "indirectly" as a matter of inference, and courts "sometimes describe[] 'direct' and 'indirect' proof as alternative ways of satisfying the adverse-effect requirement, there is really only one way to prove an adverse effect on competition under the rule of reason: by showing actual harm to consumers in the relevant market." *MacDermid Printing Solutions LLC v. Cortron Corp.,* 833 F.3d 172, 182 (2d Cir. 2016).

Plaintiffs insist that "Section 1 is concerned with likely as well as ongoing anticompetitive effects," and that an actual effects standard would leave the Government powerless to prevent anticompetitive practices. Pltfs.' Opp. to Mot. To Dismiss, ECF 80, at 11. That misses the point. In antitrust as in other legal disciplines, the tendency of a behavior to have certain effects can be used as inferential evidence that it is having those effects. Thus, one commonly sees phrases such as "likely anticompetitive effects" in lists of factors relevant to a rule of reason analysis. *FTC v. Actavis, Inc.,* 570 U.S. 136, 149 (2013). Defendants are not arguing that the Court cannot consider

the NEA's "likely" effects; it most certainly should.  But that factor (and others) are assessed in

relation to whether the predicted adverse effects are "real and immediate," as Section 1 requires,

"not conjectural or hypothetical."  *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522

F.3d 6, 14-15 (1st Cir. 2008) (reversing finding that plaintiff had established threat of injury where

it did not present any evidence that circumstances would change such that the predicted harm

would likely occur).  In other words, the analysis of adverse effects in a Section 1 case does not

end at "likely," as it does in merger challenges under Section 7 of the Clayton Act.  Instead,

likelihoods are part of the required analysis of "actual detrimental effects [on competition], . . .

such as reduced output, increased prices, or decreased quality in the relevant market."  *Am.*

*Express*, at 2284.[45]

Plaintiffs here, however, pursue the rare case under the rule of reason without proffering

tangible evidence of actual adverse effects, *i.e.,* some proof that consumers have actually been

harmed.  In fact, the Government intends to argue that *it is not possible to tell* whether the NEA

has harmed consumers because (1) the effects of the COVID-19 pandemic on the industry make it

too difficult to measure,[46] and (2) the fact of the litigation means the carriers' current behavior

should not be trusted (they will begin anticompetitive behavior post-trial).  With respect to the first

point, airlines are still competing as they recover from the depths of COVID, and generating reams

of publicly available pricing and output data as they do.  Economists can and regularly do model

---

[45] *Dicta* in *Addamax Corp. v. Open Software Found., Inc.,* 152 F.3d 48, 53 (1st Cir. 1998), states
that it is "technically" possible to establish adverse effects through a combination of "a sufficiently
high risk of an anticompetitive effect, coupled with marginal benefits."  This is not a materially
different standard than the articulation in *New Motor Vehicles* and similar cases since the
conditions that would establish the "sufficiently high risk" referenced in *Addamax* would likely
permit an inference of "real and immediate" adverse effects as well.

[46] Miller Dep. Tr. 34:19-25 ("[M]y opinion is that the data do not allow us to isolate the effects of
the NEA.").

the competitive effects of transactions while controlling for various factors, even historic demand shocks like 9/11, the Great Recession, and COVID-19.  Defendants' economic experts have done just that, and the actual data reflects that the NEA has had no negative effects and a strongly net positive effect on consumers.  As for litigation risk, that risk will never go away – the NEA will forever remain subject to the antitrust laws.  Assuming for the sake of argument that the NEA causes harm in the future, the DOJ or private plaintiffs could bring a Section 1 claim at that time – presumably then with some actual evidence as opposed to hypotheses and conjecture.

Indeed, if Plaintiffs are right and it is not possible to discern harm because of COVID and litigation risk, that logically should lead to two conclusions:  (1) the case has been brought prematurely, and (2) on the present record Defendants prevail.  The only reason the Court is faced with these challenges is that, unlike the DOT, Plaintiffs decided to force this case to decision now, attempting to condemn the NEA with no evidence of actual harm, and to that end press what can only amount to an "indirect" proof case, if any case at all.  While that approach is "technically" possible, *Addamax*, 152 F.3d at 53, *there has never been a reported case in which an ongoing, efficiency-enhancing joint venture like the NEA was condemned based solely on predicting adverse effects with indirect proofs.*

The reason is partly because, "as a practical matter, most courts would be unlikely to condemn an otherwise legitimate joint venture absent some showing of anticompetitive effect."  *Id*.  More importantly, a legitimate joint venture will rarely, if ever, provide a reasoned basis for an inference of adverse effects.   The inference requires conduct that is "inherently anticompetitive."  *Ohio v. Am. Express Co.,* 138 S. Ct. 2274, 2289 (2018).  That is, the inference arises from the *expected effect* of the behavior, which must be to make markets less competitive and thus harm consumers.  Joint ventures, however, are often *procompetitive*.  *Alston,* 141 S. Ct.

at 2155.  So unless the joint venture partners have plainly overreached and unnecessarily restricted competition, no inference of adverse effects is reasonable or appropriate.

*Plaintiffs' Merger Narrative.*  This is perhaps why Plaintiffs reach for the untenable proposition that the NEA is effectively a merger.  Mergers, by definition, eliminate existing competition between the merging parties.  And the "merger simulation" that Plaintiffs offer as proof of adverse effects *always* predicts higher prices – it is a static model that completely ignores all other factors (like the fact that the NEA incentivizes increased capacity, or that Delta and United have already responded to the NEA).  Regardless, the NEA is not a merger, and neither strained analogies to mergers nor analytical tools from the merger context can predict the NEA's effects, especially if (as Plaintiffs have done) one ignores every other aspect of the NEA, including the growth incentives its creates and competitive responses by other airlines.[47]  Yet Plaintiffs, apparently unable to come up with anything better, cite Dr. Miller's static merger simulation results as the end of the analysis on competitive effects.  Plaintiffs' "merger simulation" should not even be received into evidence, let alone credited.[48]

*Capacity Discipline.*  Plaintiffs have also introduced a theory, championed by their expert witness Dr. Robert Town, that the NEA will increase the likelihood of "capacity discipline" in the airline industry.  According to Dr. Town, historical increases in industry concentration, which were the result of airline mergers beginning around 2009 and ending in 2013 (Delta/Northwest, United/Continental, Southwest/AirTran, and American/US Airways), enabled "legacy" carriers[49]

---

[47] *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 220 (D.C. Cir. 1986) (explaining that merger standards were developed for and "apply to mergers between firms that ordinarily have no internal competition[,] . . . [not] firms that are merely limiting internal competition and are not merging").

[48] *See generally* ECF No. 142 (Mem. in Support of Defs. *Daubert* and Mot. in Limine).

[49] The predecessors of American, United, and Delta.

to coordinate their behavior, and specifically to suppress the growth of capacity (*i.e.*, to engage in "capacity discipline") to put upward pressure on airfares.  To support his theory, Dr. Town relies on a series of regressions measuring the differences between actual legacy capacity and capacity predicted based on the historical relationship between capacity, GDP, and jet fuel prices.  Dr. Town purports to identify a period of "capacity discipline" (or less growth by legacy carriers) until around 2016, when he says capacity discipline begins to "unravel."  Note that this is about what happened *six to thirteen years ago.*  Despite that huge gap in time and circumstances, and without any evidence or even explanation, Dr. Town alleges that the NEA will somehow bring back "capacity discipline."

There are two major technical problems with Dr. Town's capacity discipline theory.  First, as Defendants' expert Dr. Darin Lee will testify, the overwhelming majority of lower legacy capacity that Dr. Town identifies, started way *before* the period that Dr. Town focuses on.  These changes by legacy carriers were in direct response to increasingly intense competition from LCCs that were growing rapidly and capturing share of air travel, which combined with a series of external shocks (such as 9/11 and then the Great Recession), undermined the profitability of legacy carriers, caused billions of dollars of losses, and forced these carriers to aggressively pursue cost-saving measures, including cutting uneconomic capacity.  It is no wonder that *every one* of today's surviving legacy carriers filed for bankruptcy during this period, a fact that goes wholly unaddressed in Dr. Town's revisionist history of the airlines.  The legacy carriers cut capacity because they needed to, not for some sinister plan to raise airfares.

The second major flaw in Dr. Town's analysis is that he fails to make any attempt to control for this LCC growth and its effects on legacy capacity.  When Dr. Lee accounts for LCC growth

in Dr. Town's capacity discipline model, the alleged evidence of capacity discipline all but *disappears*.

In all events, Dr. Town's argument that the NEA risks capacity discipline is completely divorced from the realities of what the NEA is and what it is intended to accomplish. Dr. Town's theory is about what decisions carriers make with respect to their *aggregate* industry capacity, roughly speaking how many planes they buy and put into service. There is no coordination of aggregate capacity in the NEA; in fact, it is strictly off limits. It is no wonder then that Plaintiffs do not have a single piece of evidence discussing the NEA as an opportunity to cut back on capacity growth. To the contrary, all of the contemporaneous business documents, including those presented to the Boards of American and JetBlue, focus on the NEA as an opportunity for *growth* to compete with United and Delta, not some amorphous concept of "discipline." American and JetBlue would not have entered into the NEA and MGIA, a contract that rewards growth, if their intent was the opposite.

***Loss of JetBlue Effect:***  This case began with a Complaint that alleged the most serious danger to competition posed by the NEA was that American would somehow control or co-opt JetBlue, causing it to change its "disruptive" business model and dampen if not eliminate the low fares that cause the JetBlue Effect. There is not a shred of evidence that has happened or will happen. The NEA preserves and further expands JetBlue's "disruptive" business model and independence. JetBlue continues to undercut American's fares every day on routes within the NEA and outside of it. Since implementation of the NEA, JetBlue has (1) launched London routes in 2021 with aggressive fares in competition with American and its alliance partners; (2) acquired more Heathrow slots in 2022; (3) added capacity and routes from MIA and LAX in competition with American; and (4) entered into a merger agreement with Spirit Airlines with the stated

purpose of extending the reach of JetBlue's disruptive business model.[50]  JetBlue remains JetBlue.

Significantly, Plaintiffs' expert does not even try to model a loss of JetBlue Effect into his

competitive effects proofs.

*Customer Reactions:*  Another remarkable feature of this case, practically unheard of in

Government antitrust cases, is that Plaintiffs' witness list does not include any customers

complaining about the effects of the NEA.[51]  Nor will the Court see any significant documentary

evidence of complaints or negative customer reactions to the NEA.  The complaints the Parties

have received have been very few overall and mostly concerning "seamlessness," meaning the

state of technical and operational integration between American and JetBlue, which is an ongoing

process.[52]  Overall, the NEA has been very positively received by passengers.

*Market Power and New York Market Definition:*  Plaintiffs will also fail to prove market

power, without which there can be no inference of adverse effects.  Plaintiffs' proposed proof of

market power is nothing more than summing American and JetBlue market shares as if they had

merged.  But in respect to a collaboration, market power cannot be proven that way.  *See* Areeda

& Hovenkamp, Antitrust Law: An Analysis Of Antitrust Principles And Their Application ¶ 2122b

(4th ed. 2018) ("Because the competitive threat [from a joint venture] does not result from a

reduction in the number of market participants—or indeed from any measurable increase in market

---

[50] Neither of Plaintiffs' experts attempt to predict adverse effects by modeling the loss of the so-called JetBlue Effect.

[51] The only purchaser of air travel on the witness list is a witness from the federal government (Jerome Bristow of the GSA).  And he testified that he was not aware of any situation in which either American or JetBlue reduced service because of the NEA. Bristow Dep. Tr. 88:5-9.

[52] The Court will hear of customer complaints about American's decision to discontinue its Boston-New York LaGuardia shuttle service.  But it will not hear that this has allowed JetBlue to exercise market power on that route.  Far from it, as JetBlue competes with Delta on a route that has been severely affected by post-pandemic changes in business travel patterns.

concentration at all—concentration indexes such as the HHI … are of less utility"). What is required is proof that Defendants have the ability to raise prices by restricting output. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018).

There is no way Defendants have that power in a region dominated by United and Delta, and the NEA does not create such power. Eighty percent of the Parties' nonstop 2019 flights to/from BOS did not even overlap. The Government focuses its attention on (and predicts most adverse effects from) just 12 nonstop overlaps with Boston endpoints, but half of those are carved out of the revenue-sharing and capacity coordination provisions, which are the only features of the NEA that Plaintiffs rely on to support the use of a merger simulation to predict fare increases. The remaining six routes are mostly highly trafficked, competitive routes such as Boston-Miami, Boston-Los Angeles, and Boston-Chicago. It is specious to claim American and JetBlue have market power on those routes.

There is not even a good faith argument that JetBlue and American have market power in New York. These markets are clearly dominated by United and Delta. And this is what leads to Plaintiffs' specious and result-oriented effort to deny United's New York presence by defining its New York hub—Newark Liberty Airport (EWR)—outside the "relevant markets" in this case. Plaintiffs' exclusion of Newark from its New York market definition belies industry evidence, common sense, and the DOJ's own allegation and expert proofs in its challenge to the American/US Airways merger, in which it properly included Newark in the New York market endpoints.

The Court will hear Plaintiffs' expert Dr. Miller try to wrap this absurd argument into the DOJ's Horizontal Merger Guidelines and its so-called "hypothetical monopolist test." That work leads to implausible predictions such as that a consumer would pay a "hypothetical monopolist"

hundreds of dollars of overcharge on LaGuardia or JFK flights rather than take an existing, much cheaper flight from Newark.  It makes no sense.[53]  In reality, Plaintiffs are asking the Court to ignore the cardinal rule of market definition which starts by asking what products or services *presently compete* and then asks whether the market may need to be *broader* to account for where consumers might turn to avoid the exercise of market power.  *See, e.g.*, *United States v. Phila. Nat'l Bank,* 374 U.S. 321, 359 (1963) (relevant geographic market is "the 'area of effective competition . . . in which the seller operates, and to which the purchaser *can practicably turn* for supplies") (quoting *Tampa Elec. v. Nashville Coal Co.,* 365 U.S. 320, 327 (1961)) (emphasis modified).

 This blatant attempt at gerrymandering, which artificially overstates JetBlue and American's competitive significance by essentially erasing United Airlines, should be seen for what it is—Plaintiffs attempt to pick and choose any market that enhances their case.  It is an argument the Court must accept to find market power on New York routes, but which is impossible to accept.

 In sum, Plaintiffs have failed to show that the NEA has generated or is generating any anticompetitive effects, nor have they adequately demonstrated that the NEA has such a strong tendency to create anticompetitive effects that actual effects may be inferred.  As such, their case must be dismissed.  *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. at 2, 31 (1984) ("Without a showing of actual adverse effect on competition, [a plaintiff] cannot make out a case under the antitrust laws.").

---

[53] Furthermore, Plaintiffs have admitted that the trio of Newark (EWR), LaGuardia (LGA), and John F. Kennedy (JFK) is *also* a "relevant market that would pass the [merger] guidelines test." Miller Dep. Tr. 244:23-245:8.  So even on its own terms this test in inconclusive.

### C.   Defendants Will Show That The NEA Has a Procompetitive Rationale And Is Producing Numerous, Substantial Benefits

If the Court finds that Plaintiffs can establish that the challenged restraint harms competition (which it should not), the burden shifts to Defendants to provide a procompetitive justification for the NEA. *See Alston*, 141 S. Ct. at 2160. Importantly, at this step, Defendants must "show only that . . . [the alleged conduct] collectively yield[s] a procompetitive benefit," and "courts must give wide berth to business judgments before finding liability." *Id.* at 2162, 2163. Courts have held that procompetitive justifications that suffice for a defendant to meet its burden under this step include enhanced efficiency and "[i]mproving customer choice," *see Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1157 (9th Cir. 2003); increased output and the creation of new products, *see Broadcast Music*, *Inc. v. Columbia Broad. Sys., Inc.,* 441 U.S. 1, 19–20, 23 (1979); and "improved [product] quality," *Am. Express*, 138 S. Ct. at 2289. Here, Defendants can proffer more than enough evidence of the NEA's procompetitive benefits to satisfy their burden at this stage.

To begin, the NEA plainly has a procompetitive rationale—*i.e.*, to pool JetBlue and American's resources so that the two carriers can better compete against other carriers (like Delta and United) in the Northeast and "maximize customer value."[54] Indeed, doing so will allow JetBlue and American to functionally expand their networks, increase connectivity, permit greater scheduling convenience, add routes, increase frequencies on existing routes, and in general, expand output.[55] Such goals are plainly procompetitive. *See Copperweld*, 467 U.S. at 768 ("[J]oint

---

[54] *See* DX-0037 (undated American internal deck discussing NEA), at -0002 ("Project Garland is focused on creating a post – COVID position in NYC/BOS that generates competitive consumer benefits compared to DL & UA.").

[55] *See id.* at -0007 (clean team analysis demonstrating the potential benefits of the NEA including increased nonstop coverage, new shuttle product, better schedule patterns and expansion to new markets, among others.); DX-0041 (July 2020 American Board of Directors Meeting), at -0065

ventures . . . hold the promise of increasing a firm's efficiency and enabling it to compete more effectively."); Collaboration Guidelines at 1 ("In order to compete in modern markets, competitors sometimes need to collaborate. . . .   Such collaborations often are not only benign but procompetitive.   Indeed, in the last two decades, the federal antitrust agencies have brought relatively few civil cases against competitor collaborations.").

In addition, as described above, Defendants can readily show that the NEA has generated, and continues to generate, numerous significant benefits to consumers.  Indeed, Dr. Mark Israel, using methodology consistent with DOJ practice in previous cases, has estimated that the NEA has resulted in up to $610 million annually in consumer benefits—a conservative estimate given that the NEA is not yet fully implemented.

Notably, the NEA has improved upon JetBlue's and American's independent growth plans.  And—directly contrary to Plaintiffs' claims—the NEA is spurring JetBlue's and American's competitors to compete and expand output.[56]  The benefits of this increased competition have not

---

(forecasting that the NEA will lead to service to 13 additional markets, increase daily seats offered by the carriers, and expand carrier coverage in the Northeast); DX-0356 (June 2020 JetBlue Board of Directors Meeting), at -0058 ("optimized network will provide customers" with "more new 2023 destinations," "lower fares and [add] more seats to destinations from BOS and NYC," and "[e]arn-and-burn capabilities on linked Loyalty programs" among other benefits); *id.* At -0060-61 (noting that benefits of the NEA include "enhance[ing] competitive status in BOS and NYC," "restoring JetBlue's pre-crisis size faster," "accelerating a larger JetBlue in the next 3 years," and "driv[ing] an incremental ~40 aircraft into the fleet").

[56] *See, e.g.*, DX-0240 (████████████████████████████████████████), at -0003 (█████████████████████████████████████████████████████████████ ██████████████); DX-0244 (██████████████████████████████). at -0001 (██ █████████████████████████████████████████); DX-0243 (███████████████ ██████████████), at - 0001 (███████████████████████████████████████ ██████████████); DX-0249 (█████████████████████████████████), at -0002 (█████████████████████████████████████████████████████████); DX-0248 (███████████████████████████████████), at -0002 (████████████████ ██████████████████████████████████████); DX-0510 (█████████████████

been quantified or incorporated into Defendants' estimate of consumer benefits from the NEA, meaning that actual procompetitive effects exceed Dr. Israel's calculations.

In sum, Defendants have more than adequately shown that the NEA has, is, and will continue to result in consumer benefits.

> ### D. Plaintiffs Cannot Show That The Benefits of The NEA Could Be Accomplished Through Less Restrictive Alternatives

Once a defendant has established a procompetitive justification, the burden shifts back to the plaintiff to show that the procompetitive effects could be achieved through a substantially less restrictive alternative. *See Alston*, 141 S. Ct. at 2160. To satisfy this burden, the plaintiff must "demonstrate that any legitimate collaborative objectives proffered by defendant could have been achieved by . . . [means] that would be less prejudicial to competition as a whole." *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993). Importantly, any less restrictive alternative must be "virtually as effective in serving the procompetitive purposes" of the conduct. *O'Bannon v. NCAA*, 802 F.3d 1049, 1074 (9th Cir. 2015) (internal quotations omitted). In other words, it is not enough to show you can do less with less – Plaintiffs must show that there are less restrictive alternatives that can achieve virtually the same benefits. The Supreme Court's *Alston* decision emphasized that "courts should not second-guess 'degrees of reasonable necessity' so that 'the lawfulness of conduct turn[s] upon judgments of degrees of efficiency.'" *Alston*, 141 S. Ct. at 2161.

Here, Plaintiffs have made no effort to show the existence of a less restrictive alternative that would achieve the same consumer benefits as the NEA—much less demonstrating an alternative "virtually as effective in serving the procompetitive purposes of . . . [the NEA], and

---

█████████████████████████                    ), at -0001(█████████████████████
█████████████████████████                ).

without significantly increased cost." *See O'Bannon*, 802 F.3d at 1074 (internal quotations omitted). Indeed, none of Plaintiffs' experts have affirmatively shown the benefits of any such alternative.[57] Plaintiffs have at times alluded to the possibility of standalone codesharing, or other alliance structures like that American has used with other airlines, but none of these alternatives can as a practical matter create the same consumer benefits as the NEA, including not only revenue-sharing but also the optimization in use of American's and JetBlue's scarce resources – slots, schedules, and gates – at the NEA airports. Alternatives that are "more hypothetical than practical" do not suffice. *See M & H Tire Co., Inc. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 987 (1st Cir. 1984).

Most importantly, Plaintiffs have not even attempted to demonstrate that *network enhancements* and associated consumer benefits of the NEA can be replicated by any practical alternative.[58] Their case is about nothing more than marginal growth opportunities without the network improvements needed to compete with United and Delta. Such arguments are miles away from meeting a plaintiff's third-step burdens. Plaintiffs essentially second-guess the need for network improvements, which is improper. *Alston*, 141 S. Ct. at 2161 ("[Allowing routine second-guessing of business arrangements] would be a recipe for disaster, for a skilled lawyer will have little difficulty imagining possible less restrictive alternatives to most joint arrangements.") (internal quotations omitted).

The NEA solves a problem neither American nor JetBlue could have solved alone. It does so while fostering the independent, strategic identities of American and JetBlue—which means

---

[57] *See* Town Dep. Tr.  210:12-214:19.

[58] *See, e.g.*, Town Dep. Tr. 207:12-14 ("Q:  But you didn't quantify the benefits of the NEA, correct? A: No, I did not."); Town Dep. Tr. 198:19-22 ("Q: Did you make any attempt to assess the number of slot leases or swaps that would have been required to achieve the benefits of the NEA? A: No, I didn't do that calculation.").

that it is not very "restrictive" in the first place.  There is nothing even less restrictive that could possibly generate its benefits.

## IV.      CONCLUSION

Plaintiffs cannot meet their burden under the rule of reason.  Plaintiffs are unable to show that the NEA has produced or is producing any anticompetitive harm, failing the first prong of the rule of reason analysis.  Even if the Court finds that Plaintiffs have met their initial burden of demonstrating harm to competition, the Court should still find in favor of Defendants because the NEA has generated and will continue to generate significant consumer benefits that could not equally be achieved through less restrictive means.

Dated:  September 24, 2022                        Respectfully submitted,

                                                                       /s/ Daniel M. Wall
                                                                       Daniel M. Wall (*pro hac vice*)
                                                                       Elizabeth C. Gettinger (*pro hac vice*)
                                                                       Elise M. Nelson (*pro hac vice*)
                                                                       Nitesh Daryanani (*pro hac vice*)
                                                                       LATHAM & WATKINS LLP
                                                                       505 Montgomery Street, Suite 2000
                                                                       San Francisco, CA 94111-6538
                                                                       Telephone: (415) 391-0600
                                                                       Facsimile: (415) 395-8095
                                                                       dan.wall@lw.com
                                                                       elizabeth.gettinger@lw.com
                                                                       elise.nelson@lw.com
                                                                       nitesh.daryanani@lw.com

Allyson M. Maltas (*pro hac vice*)
Ian R. Conner (*pro hac vice*)
Michael G. Egge (*pro hac vice*)
Farrell J. Malone (*pro hac vice*)
Marguerite M. Sullivan (*pro hac vice*)
Tara L. Tavernia (*pro hac vice*)
Seung Wan Paik (*pro hac vice*)
Jesse A. Vella (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
allyson.maltas@lw.com
ian.conner@lw.com
michael.egge@lw.com
farrell.malone@lw.com
marguerite.sullivan@lw.com
andrew.paik@lw.com
tara.tavernia@lw.com
jesse.vella@lw.com

David C. Tolley (BBO #676222)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
david.tolley@lw.com

*Attorneys for Defendant*
*American Airlines Group Inc.*

/s/ Richard Schwed
Richard Schwed (*pro hac vice*)
Matthew L. Craner (*pro hac vice*)
Jessica K. Delbaum (*pro hac vice*)
Leila Siddiky (*pro hac vice*)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-5445
rschwed@shearman.com
matthew.craner@shearman.com
jessica.delbaum@shearman.com
leila.siddiky@shearman.com

Brian Hauser (*pro hac vice*)
Ryan Leske (*pro hac vice*)
Shearman & Sterling LLP
401 9th Street, NW
Washington, DC 20004
Telephone: (202) 508-8005
brian.hauser@shearman.com
ryan.leske@shearman.com

Glenn A. MacKinlay, BBO #561708
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
Telephone: (617) 449-6548
gmackinlay@mccarter.com

*Attorneys for Defendant*
*JetBlue Airways Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a true, unredacted version of the foregoing document was served by electronic mail on all counsel of record this 24th day of September, 2022.

/s/ Daniel M. Wall
Daniel M. Wall