1          UNITED STATES DISTRICT COURT
2             DISTRICT OF MASSACHUSETTS

3    _____

4    UNITED STATES OF AMERICA, et al.

5         Plaintiffs,                    Civil Action No.
                                         1:21-cv-11558-LTS
6         v.

7    AMERICAN AIRLINES GROUP, INC.,
     et al.,
8
          Defendants.
9

10   _____

11

12      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                  FINAL PRETRIAL CONFERENCE

15

16              Monday, September 19, 2022
                        3:29 p.m.

17

18

19

20

21   John J. Moakley United States Courthouse
     Courtroom 13
     One Courthouse Way
22   Boston, Massachusetts

23

24   Rachel M. Lopez, CRR
     Official Court Reporter
25   raeufp@gmail.com

1                         **A P P E A R A N C E S**

2

3     On behalf of the Plaintiff United States of America:

4         UNITED STATES DEPARTMENT OF JUSTICE
          BY:  WILLIAM H. JONES, III; SARAH P. MCDONOUGH; JAMES
          MOORE, III; JAMES H. CONGDON; AND JUSTIN T. HEIPP
5         450 Fifth Street, Northwest
          Suite 8000
6         Washington, D.C.  20530
          (202) 514-0230
7         bill.jones2@usdoj.gov
          sarah.mcdonough@usdoj.gov
8         james.moore4@usdoj.gov
          james.congdon@usdoj.gov
9         justin.heipp@usdoj.gov

10

11    On behalf of the Defendant American Airlines Group, Inc.:

12        LATHAM & WATKINS, LLP
          BY:  DANIEL M. WALL; ALLYSON M. MALTAS; MARGUERITE M.
13        SULLIVAN; SEUNG WAN (ANDREW) PAIK;
          505 Montgomery Street
14        Suite 2000
          San Francisco, California  04111
15        (415) 391-0600
          dan.wall@lw.com
16        allyson.maltas@lw.com
          marguerite.sullivan@lw.com
17        seung.paik@lw.com

18

19    On behalf of the Defendant JetBlue Airways Corporation:

20        SHEARMAN & STERLING LLP
          BY:  RICHARD F. SCHWED,
21        599 Lexington Avenue
          New York, New York  10022
22        (212) 848-4000
          richard.schwed@shearman.com
23

24

25

1               **P R O C E E D I N G S**

2               (In open court.)

3               THE DEPUTY CLERK:  The United States District Court

4      for the District of Massachusetts is now in session, the

5      Honorable Leo T. Sorokin presiding.

6               THE COURT:  Please be seated.

7               THE DEPUTY CLERK:  Today is Monday, September 19,

8      2022, and we are on the record in civil case number 21-11558,

9      the United States of America et, al., versus American

10     Airlines Group, Inc., et al.

11              THE COURT:  So what I'm going to ask you to do is

12     one of you for each party identify yourself.  And then the

13     rest of you when you speak identify yourself.  And then maybe

14     afterwards, you can give the list of everybody that you want

15     listed to the court reporter, rather than we don't have to

16     spend time running through everybody's name.

17              For the government?

18              MR. JONES:  Good afternoon, Your Honor.  Bill Jones

19     for the United States.

20              THE COURT:  Okay.  Good afternoon.

21              MR. WALL:  Good afternoon, Your Honor.

22     Daniel Wall, Latham & Watkins for American Airlines.

23              THE COURT:  Good afternoon.

24              MR. SCHWED:  Good afternoon, Your Honor.

25     Richard Schwed, Shearman & Sterling, for JetBlue.

1            THE COURT:  Good afternoon.

2            So I have a whole list of items to go over, and I'm

3       sure you do, too.  So I'll run through my list, and then

4       we'll take them one by one.  And then when I'm done, if

5       there's anything left that I haven't covered that you want to

6       go over, I'm happy to go over whatever else you think we need

7       to discuss.

8            So first, just with respect to public access to the

9       trial -- and I'm not talking yet about the whole issue about

10      sealing things, just some practical things.  The question

11      that I have for you is do you think we need an overflow --

12      well, let me step back.

13           Some people have inquired of the clerk's office or

14      the court reporter about Zoom streaming of the trial to

15      locations outside the courtroom.  Does anybody have any

16      concerns about that?  I will tell you, I'm prepared to permit

17      Zoom -- what I view as permissible Zooming under the rules

18      that govern the court, because you know we're prohibited and

19      we do not broadcast.  So the way I understand that is there

20      could be a Zoom feed.  To be -- you can just -- it's not a

21      feed that anybody could log into.  If you want the Zoom feed,

22      you contact the clerk's office.  You provide them your

23      identifying information, and then they provide you the link

24      and then you can obtain a Zoom feed.

25           That Zoom feed doesn't permit you to speak.  It

1    just permits you to watch and to listen.  You're not -- all

2    of the rules that apply to all of the people who come into

3    the courtroom apply to people on the Zoom feed.  So there's

4    no recording, there's no retransmitting, there's no

5    photography.

6           If you violate those rules, you'll not only be

7    objected from the Zoom, but you'll face all the same

8    consequences that you would face if you did it in the

9    courtroom.  That's how we've done it for all of the hearings.

10   And there's also limited space, more space than we have in

11   the courtroom, but there's not an unlimited number of people

12   who can join the Zoom.  But it's more than sufficient, I

13   suspect.

14          So in any event, I'm open to doing that, unless

15   somebody objects.  And I'm not clear who wants this, whether

16   it's like media, nonparties of interest, or all of you.  And

17   so that's one thing that people have been inquiring about

18   I've looked into, and that's one thing -- depending on what

19   you think about it.

20          MR. JONES:  Your Honor, for plaintiffs, no

21   objection to that arrangement.

22          THE COURT:  Okay.

23          MR. WALL:  Your Honor, I don't think the defendants

24   have any objection to it.  To be candid, we were caught a

25   little bit unaware about it, but I don't think it's a

1    problem.  And if there is any problem, we'll certainly let

2    you know.

3              THE COURT:  Fine.  So for now, I just want to know

4    so I can let IT know.  So that's fine.

5              I don't know from whom the inquiry came.  The -- I

6    don't know if it was Ms. Belmont -- it was Ms. Belmont.  So I

7    think it must have come from -- it may have come from --

8              Do you know?

9              THE DEPUTY CLERK:  The media.

10             THE COURT:  I think it's some media members had

11   inquired.

12             And the second is whether I think you've inquired,

13   I don't know which one of you, but some of the parties

14   inquired about getting the realtime feed that you can get in

15   the courtroom in your offices, elsewhere.  So that's -- under

16   the following rubric, that's okay with me.  One, it's --

17   that's available only to the parties.  If somebody wants that

18   who's not a party, they have to file a motion and then in the

19   ordinary course.  That seems a little bit different than

20   streaming and watching.

21             And so for the parties, you can work it out with

22   the court reporter, under whatever the arrangements are.  And

23   then all the same rules apply.  It's -- obviously, you can't

24   restream.  You can't stream that anywhere.  It's just to

25   watch.  And the other thing is all of the rules that govern

```
 1    if we close -- if, for some reason, anything that comes
 2    across that realtime feed that's sealed, all the same
 3    restrictions apply.  So all of you could look at it, because
 4    you're the lawyers in the case, but you can't have someone in
 5    the room who's not authorized to see it.  All right.  And if
 6    you have any questions about it, you can bring it up.
 7            I assume we don't need an overflow courtroom, but
 8    if somebody thinks that we need that, you should tell me, and
 9    I could look into arranging that.  Okay.
10            All right.  I don't have anything else on that.
11            So running through the things that you had in the
12    proposed pretrial order, you had some disagreements on the
13    time issues.  Let me first say about the time that I'm
14    assuming closing arguments don't count in the amount of time
15    we've had.  And one of the questions that I had about your
16    time calculation -- you had added up the hours, which I
17    hadn't done.  Did you account for, like -- did you just take
18    the time from the start and the end and add it up?
19            MR. WALL:  The answer to your question is, no, we
20    did not account for downtime during the course of the day.
21            THE COURT:  All right.  So let me just tell you, I
22    likely -- I think we're going to need to take a break for me
23    at some point, for the court reporter, and probably for all
24    of you, maybe less so for you, because you can rotate in and
25    out people.  A few more of you than us.  So in any event, my
```

thought about that is I may add another day at the end or
something, because if you take out 15 minutes, over all the
time, you end up with less time.  So I haven't looked back at
my calendar to figure that out, but I will make that up
somehow.  And I'll let you know once -- where we can put it
in.

So I had another question.  Also, I assume we'll
figure out later about closing arguments.  I didn't know if
you wanted to do closing arguments at the end of all the
evidence or whether you want to do it after you submit the
post-trial submissions or whether you want to do a little bit
of both.  My thought, unless you have really firm ideas now,
would be to discuss that when we're deeper into this.  And
I'll have a better idea of what would be helpful to me, and
you will probably have a better idea of what would be better
to you.  And obviously that's not going to count toward
the -- in the time that I booked out.

One thing, just one more on the closing arguments
that would be helpful, you talked about -- I just want to
confirm, paper versions and flash drives with linked
electronic versions.  And one thing I'll be talking about a
little bit today is just getting -- you've given us courtesy
copies of some things, but I have some thoughts about some
binders that I'd like to have, I think, or also in an
electronic form, maybe both.  And so I'll tell you about

1    that, and we could talk about that.

2           With respect to the hours, I've looked at that.  I

3    think that the plaintiff has the burden of proof in this, so

4    I think it's a 55/45 split for that reason.  And I tell you,

5    I've thought about the -- so that's my resolution of

6    paragraph 10.

7           I've thought about the overall time, and I'll just

8    give you this perspective on it.  To be perfectly candid, the

9    three weeks, maybe you -- I don't recall the origin of

10   approximately three weeks now.  I don't know if that came

11   from all of you suggesting that at the outset of the trial

12   last year when we picked this date, or whether that evolved

13   from what my schedule looked like and how much time was

14   available.  It seems to me a roughly reasonable time.

15          I think, Mr. Wall, you are correct.  I'm fully

16   persuaded by what you said, that you would consume, all of

17   you, would consume however much time I gave you.  And if I

18   transferred three weeks into three months, you would be,

19   "That's fine, Judge.  We can fill it up.  We've got plenty of

20   witnesses."  So I think three weeks seems about right.

21          But if along the way you think that, you know, a

22   materially different amount of time, other than I can account

23   for with the breaks, you can tell me.  If you think it really

24   is significant, then you'll tell me and we'll talk about that

25   and what to do about that.

1          I read the witness sequestration proposals, if you

2     will.  So I confess -- and here's -- I have a resolution.  I

3     didn't totally -- I was trying to figure out how this all

4     worked, each of your proposals with respect to witnesses and

5     what it meant.  So let me just tell you what I was thinking

6     about in light of this.  And feel free to tell me either that

7     you don't like it and why or how it differs.  Because I'm not

8     really sure what I'm about to articulate is exactly the

9     government's proposal or exactly yours.

10          So my thought was this.  When a party that I drew

11     apart from just my thinking about it, in part from I read

12     from both of you, when a parties calls a fact witness that's

13     hostile to the lawyer who called the witness, then the other

14     party's counsel can't discuss the substance of the testimony

15     with that witness from the moment they're sworn on direct to

16     the end.

17          That when a party calls a fact witness who's not

18     hostile, then they can talk to -- they can talk to the

19     witness about the substance of their testimony until the end

20     of their direct, until they're tendered for cross, if you

21     will.

22          And that for their own experts, you can talk to

23     them whenever you want, except during cross, to the extent

24     that's different than what I just said.

25          And if you have something different that you want,

1    you can just tell me right now.  That's fine.  I'm not saying

2    that this is like completely settled.  This just seemed like

3    a simple, to me, explanation of how to approach it.

4              MR. JONES:  Your Honor, one clarification.  So with

5    witnesses called by an attorney, their witness, once they're

6    tendered to cross, that means no discussion of the substance

7    of the testimony relating to redirect, as well.  Is that --

8              THE COURT:  I would think so.  Because the

9    redirect -- I understand this is a little bit -- here's the

10   thing that I'm just thinking about.  The way I just

11   articulated it, that would be the application of that.  I

12   understand that sort of the rub here a little bit, and I

13   haven't thought this all the way through, is that you're

14   sensibly, to my mind, sensibly calling witnesses once.

15             So if you call Witness X who works for JetBlue,

16   right, hostile to you, your defendants are not limiting your

17   examination to simply a, quote, cross, of the witness.

18   You're going to do whatever you want with that witness, and

19   you're not going to call that witness.  That makes total

20   sense to me.  And so that is -- and I'm not --

21             I understand that if we called them twice, the rule

22   as you articulate it, Mr. Jones, about how it would apply if

23   you called the person, and under what I just articulated when

24   the defendants called that witness, you would get to talk to

25   that person about their direct.  And so in that way, you're

1    not getting to do that under this rubric.  And I'm not quite

2    sure -- I'm not -- I'm not intending to drive over that as

3    much as I'm not sure then how to --

4           I think you're right to call the witness once.

5    That's a lot easier for the witness.  It makes more sense for

6    me to hear the witness once.  If you haven't -- I will tell

7    you, I was talking to one of my -- so if you have another

8    thought about it, I'm happy to hear you.

9           I'll tell you a different way to do all of this,

10   that one of my colleague does -- I don't generally do this.

11   So my colleague says anybody can talk to anybody, any time

12   they want.  So for example, the witness is in the middle of

13   cross-examination in a jury trial or a bench trial, and, you

14   know, any of the lawyers could go talk to the witness on the

15   break.  But he leaves open the -- but then any lawyer can

16   also, like -- after the break and the cross, and the cross

17   resumes, then you can say, "So what did you talk to that

18   lawyer about?" and it's all fair game.

19          That strikes me as like consuming a lot of time and

20   putting witnesses in awkward position, vis-a-vis their

21   lawyers.

22          But I'm opened, if you have an issue.  You want to

23   address that in some way, because I understand that's the rub

24   for you people, probably.

25          MR. SCHWED:  Yeah, if I may, Your Honor.  I think

```
 1    the one nuance to what Your Honor has proposed, I think we're
 2    comfortable with the vast majority of it, and it's a
 3    compromise or an approach that recognizes the odd nature of
 4    this, of witnesses both being crossed and direct at the same
 5    time.  And usually my rule -- what I've understood the rule
 6    to be is you don't talk on cross.
 7               THE COURT:  Right.
 8               MR. SCHWED:  But given the odd nature with hostile
 9    witnesses, that doesn't exactly work.  We were comfortable
10    expanding this to when they were on direct, after they've
11    been called hostilely.  But where we thought it didn't make
12    sense would be --
13               THE COURT:  So pause there, just so I understand.
14    So you're saying the government calls one of your client's
15    employees.  The way I've articulated, you're comfortable with
16    that.
17               MR. SCHWED:  Yes, with the exception that there
18    seems to be a reasonable likelihood there are going to be
19    employees who go overnight or over a day off or over
20    weekends.  And it does seem to be more efficient -- generally
21    you can talk to a client -- a witness during direct.  You can
22    hone their testimony, it streamlines it.  And it seems more
23    efficient, and there's nothing inherently wrong with that
24    because that's a very common approach.
25               THE COURT:  Sure.
```

1          MR. SCHWED:  And we thought that would be a

2     reasonable middle ground, which is we won't talk to them if

3     it's in one day.  But if there's overnight or over a weekend

4     or over a holiday, we could talk to them.  And that's what we

5     would think would be a fair compromise.

6          THE COURT:  So that's with respect to when they're

7     on direct or when they're on --

8          MR. SCHWED:  Only -- sorry, Your Honor.

9          THE COURT:  Go ahead.

10          MR. SCHWED:  Only when they're on -- so it's my

11     JetBlue witness, only after the government examines, the

12     government's done, I start direct, my direct gets interrupted

13     by the night or weekend.

14          THE COURT:  So all of this whole discussion is

15     really just about JetBlue and American employees who get

16     called by the government.

17          MR. SCHWED:  Exactly.

18          THE COURT:  As to everybody else, this is perfectly

19     fine, and you'll agree to that.  And this is really so

20     when -- when Mr. Jones calls whomever at JetBlue or American,

21     he's done with his, quote, direct, which is a form of a

22     cross, because it's a hostile witness; and then you get up,

23     and it's cross, but it's really a direct, and you now are

24     going to be to go beyond, likely, with these witnesses, the

25     scope of his direct.

```
 1              MR. SCHWED:  Absolutely, Your Honor.
 2              THE COURT:  So what you want then is, if it's an
 3     overnight, you don't really care about not talking to the
 4     person on the 15-minute break or the one-hour lunchtime about
 5     their testimony.  But if it's overnight or over the weekend
 6     or over a holiday, you want to be able to talk to them.  And
 7     so this really would only apply to the JetBlue and American
 8     employees called by the government.
 9              MR. SCHWED:  Exactly, Your Honor.
10              THE COURT:  I see.  All right.  And so it's he
11     calls them.  You do that.  And then he recrosses them, if you
12     want to call it that.  And then what happens when you bring
13     them up again?
14              MR. SCHWED:  So once he's on -- so if there's an
15     overnight break in the middle of my direct, or weekend break,
16     I can talk to them.  I finish my direct, let's just say
17     hypothetically, or at some point or he's in the middle of the
18     cross or recross, if he's in the middle of recross and we
19     break for the night or the weekend, then I'm stuck.
20              THE COURT:  I see.  So whenever he's examining him
21     under your rubric, you're stuck.  You can't -- whether it's
22     his -- just to keep it straight, his, quote, direct or
23     redirect, you can only do it if it's on your, quote, cross or
24     recross of this group of witnesses.
25              MR. SCHWED:  Correct, Your Honor.
```

1          THE COURT:  I see.

2          What about that?

3          MR. JONES:  Your Honor, that doesn't solve the

4     problem from our perspective.  Because, as you noted, our

5     cross effectively starts as soon as the witness takes the

6     stand when we're doing an adverse direct.  So it just kind of

7     draws a line that doesn't make sense to us that you can't

8     talk to them during breaks during the day.  But if a break is

9     longer, say overnight or over a weekend, you can, even though

10    they've started their cross, technically, or the adverse

11    direct, because they've gone on the stand and plaintiffs' --

12         THE COURT:  But putting aside the smoothness of the

13    line, the clarity of the line, that they've made an exception

14    favorable to you that makes the line a little bit murky.  I

15    mean, they could certainly -- or I could draw the line, they

16    could do it on both occasions.  Right?  Forgetting about the

17    smoothness of the line, but what's the -- I mean, there is an

18    aspect when they're on direct when he's examining them.

19    What's the concern?

20         MR. JONES:  The concern, Your Honor, is twofold.

21    One, it has the potential to encourage, kind of, inefficiency

22    in an examinations.  So if someone is close to the end of a

23    day, close to a weekend break --

24         THE COURT:  They drag it out to get to a break.

25         MR. JONES:  -- they drag it out so they can talk to

 1    them overnight or over the weekend.

 2              Also, Your Honor, we think here that it really

 3    isn't necessary in a sense that we think that for their

 4    witnesses, for their executives, and certainly known who

 5    these folks are for a very long time and have had more than

 6    enough time, probably, to prep them, we would argue --

 7              MR. WALL:  Your Honor, can I just make a quick

 8    comment to put a more concrete aspect to this.  We know that

 9    the government is starting off the case with the -- with a

10    group of witnesses that includes both CEOs and some other

11    very senior people.  A lot that happens in this trial is

12    going to happen in the first week.  And we are right now

13    preparing our examinations of these folks, with uncertainty

14    about what the government is intending to cover and what it

15    won't cover.  And there will be some surprises and everything

16    like that.  We need to be able to adjust and adapt, because

17    this is our one-and-done chance to --

18              THE COURT:  Sure.

19              MR. WALL:  -- talk to these people.

20              We understand what we're not supposed to do.

21    Right?  You don't always have to have a rule for everything.

22    And lawyers understand what we're not supposed to do.  We're

23    not supposed to tell them how to answer the cross-examination

24    questions or the government's questions or anything like

25    that.  But we do need to say that, "Hey, we have to add this

module now, and I'm going to be asking you about this," or,
"We're not going to do this module anymore because you've
covered it."  Right?  That's just practical.  That's what we
do.  Nobody would ever raise the slightest bit of question
with that if it happened in our case-in-chief because it is
what happens all the time.

THE COURT:  Right.

MR. WALL:  So respectfully, the proposal is taking
away what we always get to do.

THE COURT:  Right.

Yes?

MR. JONES:  Your Honor, we've gone through months
of discovery here.  The likelihood of surprise is pretty low,
I would think.  And certainly we don't think there should be
surprises here.  So I don't think we're going to see that
play out.

And beyond that, Your Honor, if a module is cut in
an examination, it's simple.  The examining attorneys just
don't have to ask those questions of their witness.  That
seems like that's an easy resolution from their standpoint.

THE COURT:  Yeah, but witnesses are sometimes prone
to say what they want to say, without regard to what the
question is, if they think it's important.

Okay.  I want to think about this a little more.
I'll resolve this pretty promptly for you.  But I'm not, so

1    we're clear --

2           Your concern, Mr. Jones, about gamesmanship at the

3    end of the day to stretch it out, sure, is it possible that

4    someone is thinking they have five minutes left, and let's

5    stretch it out?  Yeah, I think that's quite possible.  And

6    honestly, sensible lawyers might often do that.  But that --

7    it's impossible, if one wants to eliminate that kind of --

8    there's just the opportunity for that kind of, if you want to

9    call it gamesmanship, gamesmanship, at every trial at every

10   moment.  And there are -- whatever the rules are, all of you,

11   wisely, I think, figure out what the rules are, and try to,

12   you know, comply with the rules, but do the best you can for

13   your client.

14          So I'm not -- let me think -- I'll think about the

15   larger issue, but there's a certain sense to, I think, the

16   reasons the defendants advance, and I want to think about

17   that a little bit longer.  So you have -- so understand the

18   general rubric, and so I'm really just thinking about with

19   respect to your witnesses.  And I'll resolve that for you

20   very fast, because I know you need to know.

21          Paragraph 42, so let me just see if I understand

22   the dispute.  This is about data after the close of expert

23   discovery.  And so what I understand is that expert discovery

24   closed on 8/25.  The government's position is that anything

25   after 8/25, new data shouldn't be before -- the experts

1    shouldn't be relying on data between August 25th and whatever

2    date they testify.  And the defendants' position is that you

3    should be able to use more recent data, that is, data after

4    8/25.

5          Is that basically this dispute on that paragraph?

6          MR. JONES:  Yes, sir, Your Honor, as it relates

7    specifically to demonstratives and to summary exhibits under

8    Rule 1006.

9          THE COURT:  Okay.  So it's more -- okay.

10         So here's my perspective on it.  The evidence has

11   to end at some point.  I mean, you know, there has to be sort

12   of a fixed record, and my thought is this.  8/25 it ends on,

13   except with this caveat.  If you think that there's -- you,

14   the defendants, think that there's evidence post 8/25 that's

15   material and meaningful, then file a motion to say, "Look,

16   Judge, here's this extra evidence of what it is," and tell me

17   what it is.  And you can do that at any point before I render

18   my decision.

19         My thought about this is like there has to be --

20   like, I'm going to get the evidence.  Right?  And then I'm

21   going to decide on whatever the evidence is.  And while I'm

22   deciding on it, between the close of evidence and when you

23   submit your briefs, there's going to be more airplane

24   flights, and more data is being accumulated.  And that's

25   going to be happening while I'm writing.  So there has to be

1    an endpoint.

2            If you think that between 8/25, and whether it's

3    9/19 or 11/17 or any other date you've looked at it, and

4    there's a group of evidence that's a demonstrative exhibit or

5    summary you want, file a motion.  And just say, "Look, this

6    extra evidence has come up, and this is what it is."  And

7    then they know what it is, and you propose it.  And you'll

8    say, "Look, Judge, it's important and it's material," and

9    then you propose it, and that's fine.

10           Likely, if it's meaningful material, I'll probably

11   give you a fair opportunity to respond and allow it, because

12   it's material.  But I think there has to be sort of a fix.

13           MR. SCHWED:  Your Honor, as defendants, we're

14   comfortable with that, as long as it's not a blanket rule

15   that says never.

16           THE COURT:  I'm not saying never.  If you have

17   evidence that's important, yeah, we should get -- I should

18   get it right.

19           MR. SCHWED:  And I don't think this is going to be

20   overwhelming the Court with lots of data at the last minute.

21   I think we're talking about very discrete, potentially

22   discrete pieces of data.  Because the DOT, for example,

23   regularly publishes, or on a periodic basis publishes data,

24   and it may make sense to do some updating.  But obviously

25   we'll address it if and when we want to introduce that.

1          THE COURT:  Okay.

2          MR. JONES:  And Your Honor, to be clear, our

3     concern doesn't lie with publically available data

4     necessarily.  Our concern primarily lies with private data

5     available only to defendants that --

6          THE COURT:  So you don't care if they add in post

7     8/25 publically available data.

8          MR. JONES:  Well, we think the evidence has to end

9     at some point.  We certainly agree with that.  But the heart

10    of our concern is about privately available data that is put

11    into a summary exhibit or into a demonstrative.

12         THE COURT:  Well, my question is if they offer

13    publically available data that was published after 8/25, do

14    you, like -- just come in, or do you say "objection"?

15         MR. JONES:  Your Honor, it depends on --

16         THE COURT:  If it's a demonstrative or a summary.

17         MR. JONES:  It depends on when, how far down the

18    tracks we are, Your Honor.

19         THE COURT:  I see.  Okay.  So you can talk to each

20    other about that.  My perspective on it is there has to be

21    some endpoint, but it's not artificial.  So if you think

22    there's important and material evidence, then just tell me.

23    Propose what it is, and then we'll look at it that way.

24         And then they're not surprised.  They'll get the

25    motion.  They'll get to see what it is.  They'll get to

1    respond, and they'll say whatever because they want to make

2    it easier for them to address.

3            So the next is Exhibits E and F.  And this -- I've

4    read your submissions on this.  I haven't looked at the

5    underlying exhibits.  I'm not really clear, to be perfectly

6    frank, whether I actually have the underlying exhibits.  If I

7    do have all of the underlying exhibits, then I confess, my

8    mistake, I don't know where they are.

9            MS. MALTAS:  Your Honor, Allyson Maltas from Latham

10   & Watkins for American Airlines.

11           You do not have the underlying exhibits.

12           THE COURT:  Okay.  So --

13           MR. MOORE:  Your Honor, just to clarify --

14           This is Jimmy Moore for the United States.

15           We attached to our submission some of the ones that

16   were cited, but you certainly do not have the entire record.

17   We have some experts in the submission.

18           THE COURT:  Okay.  So I don't think -- I don't

19   think I can resolve it completely on a categorical basis.  I

20   think in the end it's going to -- I hate to say this, but it

21   just depends.  I have some -- but I have some observations

22   that maybe will be helpful to you.

23           One issue is the relevance of pre-2016 information.

24   And so I'm not -- I'm not prepared to say that it's so old,

25   therefore it's utterly irrelevant and it can't be introduced.

1    I can see why information -- I can see why -- well, two
2    things.
3             One, as I understand it, you all understand what
4    happened to the airline industry between 2008 and 2016.  And
5    to be perfectly candid with all of you, before I started
6    digging into this case, I had no particular idea about what
7    happened with the airline industry from 2008 to 2016, other
8    than what I vaguely observed when I went on vacation or went
9    to a government meeting or something.  So, to some extent, if
10   you want me to understand what you understand, you're going
11   to have to give me some of that information, or otherwise I'm
12   not going to know.  And to the extent it informs your
13   understanding of things.  You will choose, in a sense -- just
14   your choice is about what evidence.
15            But secondarily, or the second point is, it does
16   seem to me that that information has some bearing on the
17   case.  I do think -- so in that sense, I'm not prepared to
18   rule it all out.  I'm not saying that all of it comes in.  I
19   think an obvious point is that, as a general matter, older
20   evidence is less powerful than newer evidence.  Right?  So
21   what was going on in -- the world -- the economy was
22   different in 2009 than today.  There were different
23   challenges, different issues, different composition of the
24   airline industry.  Things people were thinking then aren't as
25   significant as what they're thinking now.

1          So that's sort of what I could tell you at the

2     moment on a categorical level, without having read the

3     individual exhibits.

4          In terms of authenticity, in some sense it's the

5     same answer.  I don't -- I can't resolve the authenticity or

6     not all of them en masse without looking at them, but I do

7     have these observations.  One, to the extent that -- the

8     defendants, you think that the DOJ's -- either their files

9     were incomplete or disorganized or they haven't established

10    how they kept them, beyond that they did in some way, that

11    seems more to go to completeness and weight than it does to

12    authenticity.  That doesn't seem to challenge that this is a

13    document that came from whomever they say it came from.

14          Yes, in theory, was it in a warehouse?  Who was

15    guarding the warehouse door?  But these are garden variety

16    documents, and so there's no reason to think that if they've

17    stored them, they've stored them, and they got them where

18    they say they got them.

19          The other issues you raised seem to me to go more

20    to weight, completeness, what to do with the document.  But

21    I'm not sure I can rule categorically that they're all

22    authentic until, sort of, they come up.

23          I know that's not a very satisfactory answer to any

24    of you, since you'd like a categorical answer, but I think

25    that that's the -- the only way -- that's the level of ruling

1    I can give you now and the level of observations that I have

2    about it, without having looked at the individual exhibits.

3              Any questions about any of that?

4              MR. MOORE:  No, Your Honor.  That's helpful.  I

5    think we can meet-and-confer now, having had a little bit

6    more guidance from the Court, and that will be helpful for

7    us.

8              THE COURT:  Sure.

9              MS. MALTAS:  Thank you, Your Honor.  We're, of

10   course, we're willing to meet-and-confer with plaintiffs, but

11   we do think that a number of these issues will have to be

12   addressed when and if the plaintiffs actually introduce these

13   exhibits with a witness.

14             THE COURT:  I agree with you.  I think that since I

15   haven't ruled categorically, if you offer them, and you

16   object, I will resolve it.  I think this is the way it will

17   have to be.  And maybe some of those resolutions will clarify

18   these issues.  Okay.

19             So two things that I want to turn to, before we

20   turn to the motions in limine.  Just one, with respect to

21   this Delta motion, that's not ripe yet, so we're not going to

22   talk about it.  I'll wait, and then I'll see once I get it

23   whether I need a hearing or not and whether you're going to

24   do a reply.  I don't know if you want to do that or not.

25             MS. SULLIVAN:  Good afternoon, Your Honor.  Maggie

1    Sullivan from Latham & Watkins on behalf of American

2    Airlines.

3              There is a motion to expedite the briefing

4    schedule.

5              THE COURT:  I allowed that, didn't I?

6              MS. SULLIVAN:  Okay.

7              MR. JONES:  Yes, sir.

8              MS. SULLIVAN:  Perfect.  Then we're all set.

9              THE COURT:  Okay.  The other is, just with respect

10   to sealing, if we -- it may be -- putting aside what the

11   resolution of all the sealed issues and disputes you have

12   are, I just -- if for some reason we need to seal the

13   courtroom, that is if there's something that is sealed and

14   not public -- I don't know that that will happen.  I would

15   rather that not happen.  Or if it does happen, I would rather

16   it happen as little as possible.  But if it does, there is

17   just a couple of things.  And to some extent, I have to rely

18   upon all of you for this.  If you think that's coming, you

19   should say so beforehand, because I would like to impose the

20   sealing of the transcript before the sealed information

21   begins.

22             And that -- and what I'm inclined to do at that

23   point is stop the Zoom, stop the remote -- I might stop the

24   remote realtime feed.  So in other words -- and we'll seal

25   the courtroom and whatever it is happens in the courtroom.

1    That might just keep that simpler.  But if there's something

2    else that should happen, this isn't the kind of case where

3    you can say after we start, we get into it, because sort of

4    the toothpaste is out of the tube.  So you'll need to be

5    paying attention to that, all of you.

6              Any questions about that?

7              MS. MCDONOUGH:  Your Honor, Sarah McDonough for the

8    United States.  No questions about sealing the courtroom, and

9    I think that sounds workable to the plaintiffs.

10             And maybe you're going to get to this later in the

11   hearing, but we would -- plaintiffs would ask that the Court

12   rule on our opposition denying the motion to seal and also

13   give us some guidance on the categories that we proposed in

14   our opposition so that we can meet-and-confer and resolve as

15   many of these confidentiality issues before that moment in

16   the courtroom.

17             THE COURT:  Sure.  Agreed.  I'm going to talk about

18   that and hopefully quite a bit helpful.  And maybe we

19   should -- that's the motion to seal, number 159?

20             So let me first say what, from reading it, I

21   understand is not really in dispute.  The defendants made a

22   motion to seal that sort of had -- one category was personal

23   information.  And my read of what you did and didn't say in

24   the opposition was that's all agreeable to you.

25             Is that right?

1          MS. MCDONOUGH:  Yes, Your Honor, that's right.

2          THE COURT:  So that part of the motion, with

3     respect to all the personal permissions, is allowed.  You can

4     redact, and that's all sealed.

5          I sense, possibly, some things that the --

6     something that the defendants thought was a personal

7     discussion you might have -- you referred to something in

8     your opposition about "embarrassing" information, but it was

9     still admissible.  And I don't know if that fell within the

10    rubric of personal discussions or the manner in which people

11    express themselves.  So I don't know if anyone wants to be

12    heard with all of that, or whether that's better for you all

13    to meet-and-confer.  And if you have some -- one

14    conversation, or something, then bring it up if you can't

15    agree.

16         MS. MCDONOUGH:  Yes, Your Honor.  There is a

17    distinction, in our view, between information that's

18    personal, which the defendants mentioned in their motion,

19    such as a phone number, and then information that the

20    defendants redacted that we labeled "employee discourse,"

21    which is sometimes quite substantive and it just happens to

22    have occurred over a text message or a chat and is

23    surrounding by chatter, which is not particularly

24    competitively sensitive but is personal.  And our reading of

25    the case law is that that is not sufficient to seal --

```
1            THE COURT:  Is that personal information -- that
2    chatter or -- is not -- is it information that's relevant to
3    this case?
4            MS. MCDONOUGH:  Yes.  The information that we
5    have -- we have tried to narrow our objections to information
6    that's relevant to the case.  For example, one of the
7    exhibits that we attached to our opposition to the motion to
8    seal is a text exchange between -- and I won't get into the
9    details -- between two JetBlue employees talking about a
10   market in -- under the Northeast Alliance.  We attached it as
11   an example so that the Court could understand what we mean
12   when we object to documents that are employee discourse.
13           THE COURT:  I don't --
14           MS. MCDONOUGH:  That would be Exhibit F.
15           (The Court and the law clerk confer.)
16           MR. PAIK:  Your Honor, Andrew Paik, from Latham &
17   Watkins, on behalf of American Airlines.
18            I just want to raise to the Court that we don't
19   actually think that there is a significant disagreement
20   between the parties on the categories of information that
21   should be properly redacted, Your Honor.  Just as background,
22   we engaged in significant meet-and-confer, good-faith
23   meet-and-confer process.  And if you've noticed, Appendix B
24   has a lot more documents where we've agreed through a course
25   of this constant redaction process.
```

1          So to the extent that the United States has --

2     opposes the specific exhibit, we're happy to discuss that.

3     But we don't think that is representative of where we are,

4     which is --

5          THE COURT:  So as to all -- first of all, it's

6     clear to me that all of you have put in a tremendous amount

7     of effort to prepare this case, and I see that in all of the

8     filings.  And it's much appreciated by me, and I hope it's

9     appreciated by all of your respective clients, public and

10    private, because it's clear that all of you have done a

11    tremendous job putting this together.  I don't have any

12    question about that, and I'm not -- I don't have any question

13    for all of you.  You're in good faith doing your best to

14    resolve the issues that can be resolved, and bring to the

15    Court for resolution those issues that can't.

16         With respect to the category of the group of all of

17    the things that you're agreed upon to be sealed, my view is

18    that's fine.  Those can be sealed subject only to when I look

19    at them.  If I think something needs to be unsealed, then I

20    will raise it with all of you.  And that leaves -- that much

21    of the motion is allowed.

22         That leaves the portion which you don't agree upon.

23    And those --

24         I'm sorry, I don't remember your name.

25         MS. MCDONOUGH:  I'm Sarah McDonough.

1          THE COURT:  Ms. McDonough, my apologies.

2          I have -- it may be on ECF, I don't have any reason

3   to doubt you -- the opposition with the sort of Appendix A,

4   which is the objections, but it lists -- it's the spreadsheet

5   that's sort of the nature of each of these things, but I

6   don't have the actual documents.  I may have them -- you

7   might have filed them, but I haven't seen them if you did.

8   And I apologize for that.

9          MS. MCDONOUGH:  Yes, Your Honor.  So we didn't

10  submit the entire set of documents that you see in the

11  spreadsheet, but we did submit six example documents.  They

12  were filed under temporary seal.  So we submitted them to

13  your clerk's office, but we would be happy to provide a

14  courtesy copy or make sure that they get to you as soon as

15  possible.

16          (The Court and the law clerk confer.)

17          THE COURT:  Got it.  I understand now.  They're not

18  on the original filing, because you couldn't file them.  And

19  we're printing them out now.  I'll look at those, and I'll

20  see what kind of guidance I can give you to be helpful about

21  resolving issues on Appendix A.

22          I think that brings us --

23          Is there more to say at the moment about the motion

24  to seal?

25          MS. MCDONOUGH:  I would just add, Your Honor, that

1     plaintiffs would request that we meet-and-confer by

2     September 22nd and submit a joint status update to the Court

3     by September 23rd so that we can be sure to have these issues

4     addressed this week and prepare an efficient and open

5     presentation to the Court at trial.

6               MR. PAIK:  That's fine with us, Your Honor.

7               THE COURT:  Okay.  You can do that.  Or should do

8     that.

9               Okay.  That leaves the motions in limine.

10              MS. MCDONOUGH:  Your Honor, may I add one point

11    about confidentiality?

12              THE COURT:  Of course.

13              MS. MCDONOUGH:  We also have a dispute with the

14    defendants over the process for designating deposition

15    transcripts confidential.  We were supposed to receive

16    confidentiality designations from the defendants on

17    July 27th, and we never did.  We proposed redactions to their

18    transcripts on September 2nd, and they tell us that they'll

19    provide their confidentiality designations tomorrow.

20              The United States -- plaintiffs are concerned about

21    this delay, because the confidentiality designations for the

22    transcripts will affect what we might be able to use for

23    impeachment and also give us a guide for what topics need to

24    be confidential when we ask witnesses on the stand.  So we

25    would ask that we meet-and-confer and provide a status update

1    to the Court with the same timing that we will

2    meet-and-confer and provide a status update for the exhibits

3    on the 22nd and the 23rd.

4         MS. MALTAS:  Your Honor, there's no dispute between

5    the parties on this point.

6         What Ms. McDonough is referring to is the request

7    made by the plaintiffs that the defendants revisit the

8    confidentiality designations that we made timely to all of

9    our depositions that were taken in the spring.  There was no

10   requirement under any order, case management order,

11   scheduling order in this case that we revisit those by any

12   time.

13        We have agreed to provide significantly pared-down

14   confidentiality designations for all of the witnesses that

15   plaintiffs are calling in their case-in-chief by tomorrow,

16   which will give the plaintiff seven days to know what is

17   confidential, should they need guidance in order to do their

18   examinations of our witnesses and also for impeachment

19   purposes.

20        We've also said that we'll supply the remaining

21   pared-down confidentiality designations by Friday for all of

22   the witnesses that we're calling in our case-in-chief.  So

23   that gives them about two weeks for those.

24        So I can attest that for American Airlines, we're

25   talking about significantly pared-down confidentiality

1    designations, and we don't think that there will be any

2    concern with the plaintiffs being able to use those in order

3    to craft their examinations for the trial to begin next week.

4            THE COURT:  What do you say?

5            MS. MCDONOUGH:  Your Honor, I believe that our

6    disagreement might be our different interpretations of the

7    case management order.  The confidentiality designations that

8    the defendants are referring to are designations that they

9    provided under the protective order, which we view as

10   different from confidentiality designations at trial.  The

11   Justice Department supports open courtrooms, and we believe

12   that it's very important that we are able to organize our

13   examinations in a way that allows for an open courtroom.  And

14   under the protective order, understandably, the vast majority

15   of the defendants' transcripts were designated confidential.

16   That makes sense for discovery, but not for trial.

17           THE COURT:  They're giving you revisions, right,

18   tomorrow?

19           MS. MCDONOUGH:  Yes, that's right.  So we are

20   optimistic that we'll be able to resolve --

21           THE COURT:  I mean, I do agree with you that what's

22   confidential in discovery and confidential in the courtroom

23   are different, and one can be more -- lawyers tend to be much

24   more expansive in discovery as to what's confidential than I

25   would be willing to permit in the courtroom.  If it's in

1    discovery, that's fine; but in the courtroom, it's different.

2              But they're giving you revisions.  So then what you

3    want to do is look at those and then meet-and-confer on the

4    same schedule.

5              Does that work for you?

6              MS. MALTAS:  That's fine for us.  I can definitely

7    say that we -- all of the work that was done in order to

8    designate confidential material in the PXs and DXs that will

9    be the exhibits for trial have guided what we've done in

10   terms of narrowing our designations of confidential

11   information for the testimony, as well.  So for us it was

12   very helpful to go through that process first.  Everything

13   will be consistent.

14             To the extent that there's any ongoing disputes on

15   individual documents, we can continue to discuss that with

16   regard to the testimony, as well, but it will be very

17   limited.

18             MS. MCDONOUGH:  That works for us, Your Honor.

19             THE COURT:  Okay.

20             MR. WALL:  Your Honor, if I can just make one more

21   comment, not about this in particular.

22             THE COURT:  Sure.

23             MR. WALL:  But today the Court has already started

24   getting and will get a bunch more motions by third parties

25   seeking confidentiality protections.  And it always happens

1    in these cases, 100 percent of the time.  And for the

2    third-parties, it's pretty much a free option to just seek as

3    much confidentiality as they possibly can get.

4              THE COURT:  Sure.

5              MR. WALL:  They don't care about an open courtroom.

6    And I think you would find that plaintiffs and defendants are

7    a lot closer on that than you might think.

8              But it is going to be -- we're going to start off

9    this case with -- from the opening statement forward, with

10   documents that were found from other airlines, analyzing the

11   Northeast Alliance and so forth.  And I hope that one thing

12   we can all agree on pretty quickly here is that a value of

13   the documents about the Northeast Alliance are just at the

14   heart of this case.  And if it's an open courtroom, those

15   kinds of documents, we need to be able to talk about them.

16             And so I'm sort of previewing something that's

17   going to happen, but I already see it in some of the early

18   motions that have been filed, that we're going to have

19   disputes with third-parties over this and we're going to need

20   to resolve them pretty quickly.

21             THE COURT:  Like United or Delta or some other

22   airline third-party.

23             MR. WALL:  Exactly.

24             THE COURT:  Their value to the documents about

25   this --

1          MR. WALL:  Yes.

2          THE COURT:  Let's just -- I suppose they might have

3     done an evaluation of what does this mean for us?

4          MR. WALL:  For us, the competition, for everything.

5     Just evaluating its strategy, whatever the case may be.

6          THE COURT:  Right.  And that, they're going to want

7     that confidential.

8          MR. WALL:  They're going to want everything

9     confidential, trust me.  It's very simple for them.  There's

10    just no reason for them to kind of hold back.  So it's going

11    to be very, very broad.

12         THE COURT:  Yes?

13         MR. JONES:  Your Honor, the related, but not

14    directly responsive to Mr. Wall's point, I would note in the

15    proposed pretrial order that we jointly submitted, the

16    third-parties are required to file all of their motions to

17    seal by today, but the order itself hasn't been entered.  So

18    it's a little bit --

19         THE COURT:  Which?  The joint pretrial order?

20         MR. JONES:  Yes, sir.  We filed it, but not

21    entered.  So it puts potentially third-parties in a little

22    bit of a bind.

23         THE COURT:  So Kellyann, can you allow that?

24         THE DEPUTY CLERK:  Yeah.

25         THE COURT:  We'll take care of that.

1          MR. WALL:  I won't be surprised if we all have to
2     talk about this before we start on Tuesday, just to see where
3     we are.
4          THE COURT:  Well, I assume that's going to be -- I
5     mean, one of the more difficult issues that strikes me in
6     this case, other than the merits, is the sealing issue.
7     Because you're going to have a value of documents like that,
8     that there's going to be a range.  And the core -- the core
9     ones, you're not going to want them to be revealed publically
10    because they reveal what you would -- you don't want United
11    or Delta or whomever to get their hands on them.
12         MR. WALL:  Correct.
13         THE COURT:  And that's -- and at the same time, you
14    want to be able to talk to your experts and the government's
15    experts about that information, I assume.
16         MR. WALL:  And I can say that the plaintiffs have
17    been pretty reasonable about this.  We're working fine.
18         THE COURT:  Yeah.
19         MR. WALL:  We'll get pretty close.  But there are
20    going to be issues, and some of it -- we were talking before
21    court started about just things about not publishing the
22    documents on the screens or on the Zoom, and sometimes asking
23    the question without revealing certain details that counsel
24    can kind of do on the fly.  We can do a lot of things like
25    that, that allow us to address the substance with minimal

1  intrusion.

2          THE COURT:  Yes.  I think the more you can do of

3  that nature, the better.  And to the extent that you need to

4  do something to clue me in, like to -- where to focus,

5  because it's not up on the screen, or what have you, there's

6  a -- you can tell me in a variety of different ways and

7  that's helpful.  And the more we can do that -- I mean, I

8  prefer not to close the courtroom, and I would prefer to

9  limit the number of documents that would require that or the

10  number of discussions.  So the more you can sort of solve

11  that problem, the easier it will be for all of us, I think.

12  I agree with that.

13          And nothing -- so we're clear, nothing about your

14  discussion with each other or my comments should indicate

15  that I think you're not working well together.  It strikes me

16  that actually you're doing really well together.  And you've

17  resolved a lot of issues, and it makes sense.  And the ones

18  you're presenting to me, I understand why you are.  There are

19  disputes, that's fine.  That's why I come here every day.  So

20  it's fine.

21          Okay.  That leaves, I think, the motions in limine.

22  So my thought is this.  I've read all the -- I have not read

23  all of the exhibits that you attached to the motions; I have

24  read all of the motions and oppositions and replies.  I've

25  read some of the expert reports.  If you think it's helpful

1    for me to -- this comment is not limited to the motions in

2    limine, but if you think as context it's helpful for me to

3    read the -- like one of the --

4            Like the government's expert who's in dispute, I

5    don't have a complete copy of the report.  I have certain

6    pages, I think, in the different iterations.  If you think --

7    I understand it might -- the report itself might not come

8    into evidence.  If you think it's helpful and it's unobjected

9    to for me to read it for, like -- the way I would in a jury

10   trial, I might read the expert report so I know when someone

11   makes an objection beyond the scope of the report, even

12   though the report is not coming into evidence, I have to read

13   the report so I can figure that out.  If you think in that

14   vein it's useful for me to read the report, you can give it

15   to me, and I'll try to do that.

16           You've given me plenty of paper, so I'm not asking

17   for you to just give me more.  I understand he's obviously an

18   important expert, an important witness, so if you think that,

19   then you can.

20           I've read all of the motions.  I'm happy to hear

21   you.  I'm not going to do three arguments.  I'm happy to hear

22   you.  You can address all the motions.  And then I'll hear

23   the other side, address all the motions.  You can split it

24   up, if you want to, the people who talk, you know, some

25   period of time.  And then I'm happy to give you some

1      tentative thoughts if you want.

2            MR. JONES:  Yes, sir, Your Honor.  We would

3      certainly welcome a brief opportunity to argue our motions in

4      limine, the plaintiffs' motions in limine.  Mr. Congdon will

5      argue those for the United States.

6            THE COURT:  All right.

7            MR. CONGDON:  Your Honor, what I would propose then

8      is I can do these.  And then I don't know if defendants want

9      to respond or you want to have me do these.  And then whoever

10     is going to do defendants' motion after that.  Whatever is

11     most convenient.

12            THE COURT:  Are you going to do whatever response

13     there is to their motions?

14            MR. CONGDON:  I'm not, actually.  Mr. Heipp is

15     going to do that.

16            THE COURT:  All right.  So why don't you talk

17     briefly about your -- you have two, the carve-out and the

18     precluding DiLeo.  Right?

19            MR. CONGDON:  That's correct.

20            THE COURT:  Go ahead.

21            MR. CONGDON:  Thank you, Your Honor.  And I

22     understand you've read all the papers, so I'll be as concise

23     as I can.  And if okay with Your Honor, I'll start with the

24     motion to exclude the testimony of Mr. DiLeo.

25            Your Honor, Mr. DiLeo's testimony should be

1    excluded under Rule 702 in *Daubert*, because it's unreliable.

2             THE COURT:  Let me say one thing to all of you

3    about this and more generally about this and future arguments

4    about motions.  My view is, you -- the only way you waive

5    something is when you say the words "I waive."  Whatever

6    follows those words, you will have waived.  But if you don't

7    say anything, you won't have waived anything.  Because it's

8    in the papers.  Whatever is in the papers is preserved.  So I

9    read the papers, but even if I didn't read the papers, you'd

10   have them in your papers and you'd be protected anyway.  So

11   it just occurs to me, I haven't said that to all of you, but

12   you can keep that in mind.

13            And go ahead.

14            MR. CONGDON:  Sure.  And I feel confident I'm not

15   going to say the words "I waive."

16            THE COURT:  I bet that made Mr. Jones feel really

17   good.  And we have defibrillators in the building, on every

18   floor.

19            MR. CONGDON:  Your Honor, my first goal is to

20   persuade you on these motions, and my second goal was to not

21   have Mr. Jones take up your invitation to disclaim anything I

22   said after.

23            Mr. DiLeo's testimony should be excluded under

24   Rule 702 in *Daubert* because it's fundamentally unreliable.

25   Mr. DiLeo purports to testify about actual benefits of the

1    Northeast Alliance, but he's done no work to independently

2    verify those benefits.  He's simply relying on a handful of

3    documents from defendants, some media reports and press

4    releases, and asserting the existence of those benefits.

5         THE COURT:  So let me ask you this question,

6    though.  So why can't -- why doesn't all of that just go to

7    the weight of his testimony?  In other words, I think what

8    the defendants are going to tell me is this guy has worked in

9    the airline industry for a long time, in a variety of

10   different capacities.  He reads the agreement.  He

11   understands what the agreement says.  He sees what he

12   perceives the terms of the agreement are, and he says, "Well,

13   given that and given my experience, I think here's all these

14   different benefits."

15        And you might -- you might eviscerate him on cross

16   because he didn't verify and he didn't do this and he didn't

17   do that and the other thing.  But why doesn't that just go to

18   how much credibility or weight or how thoughtful the opinions

19   are, what have you, as opposed to whether it's admissible?

20        MR. CONGDON:  Sure, Your Honor.  And to be clear,

21   it does go.

22        THE COURT:  Sure.  I know you're conceding it would

23   go to weight, too.

24        MR. CONGDON:  But Your Honor, the law in antitrust

25   cases in the First Circuit is that an expert has to do more.

1    There has to be a reliable methodology behind it.  And I'll

2    get to the point about what customers want or what customers

3    value, but when it comes to the actual benefits of the

4    Northeast Alliance, he hasn't done any work to verify them.

5    And let me give maybe -- a couple of examples would be

6    helpful to see where this matters.

7            So for example, Mr. DiLeo says the

8    Northeast Alliance allows JetBlue and American to offer a

9    better schedule to its customers.  That's his report.  And

10   all he points to for support of that is one American document

11   that says, somewhere in the middle of it in a presentation to

12   customers, that we offer hourly service now on seven routes,

13   near hourly service.

14           But he hasn't actually done any work.  He hasn't

15   compared it to the before schedule.  Right?  He hasn't looked

16   at the schedules, matched them up, and analyzed them and tell

17   you why it's a better schedule for customers.  There's no

18   methodology behind it.  He's simply pointing to documents

19   that defendants have where they say it's a better schedule

20   and asserting that exists.

21           And this is going, Your Honor -- the reason this is

22   important is the context is, you know, defendants have cited

23   to cases where industry experts have been allowed to testify

24   about the industry generally.  Right?  Some of those cases

25   are clearly not applicable here.  They're breach of contract

cases where the question of industry custom or practice is a
canning of contract interpretation.  It's not applicable
here.

In antitrust cases, those experts have been talking
about competitive dynamics for market definition purposes.
What Mr. DiLeo is doing here is seeking to help there burden
at step two and establish that there are, in fact, benefits,
that there are existing benefits to the Northeast Alliance.
And to do that, Your Honor, we say he has to have actually
done some work.  He can't simply read defendants' documents
and parrot what it says in there.  We have fact witnesses for
that.  Your Honor can read that just as easily.  And the law
says that an expert has to actually provide some methodology
beyond simply reading documents that the defendants' fact
witnesses can read themselves.

THE COURT:  Why couldn't he be -- why couldn't he
just be an expert by experience?

MR. CONGDON:  So, Your Honor, defendants obviously
talk about his experience a lot.  The law is not different
for defendants for experts who want to testify based on
experience.  Of course, experts can testify based on their
experience.  They don't have to be scientific in any way.
But what the federal rule of evidence 702 advisory committee
note say is that the amendment rejects the premise that an
expert's testimony should be treated more permissively simply

1    because it's outside the realm of science, that it's based

2    solely on experience.  And that's from the advisory committee

3    notes defendant cited multiple times.

4         And, in fact, what that note says, it cites a Fifth

5    Circuit case that seems exactly backwards that you can avoid

6    sort of the reliability questions under *Daubert* by simply

7    saying, "It's experience.  I haven't done any work.  I

8    haven't done any modeling or analysis," and you can have

9    somehow have a lower bar for scrutiny by being based simply

10   on experience and being able to say nothing more than your

11   *ipse dixit*.

12        THE COURT:  Well, what would be the reliable

13   method, then?

14        MR. CONGDON:  Well, I would say for Your Honor what

15   I just said.  If he wants to opine that there is a better

16   schedule under the Northeast Alliance, he could have actually

17   looked at the schedules.  Right?  He could have compared a

18   before schedule to an after schedule and actually showed some

19   work as to why he thinks it is better for customers.  He

20   didn't actually do that, though.  He simply asserted that the

21   schedule is better with no other support.

22        THE COURT:  Well, I'm not sure -- I read his

23   report, but I'm not sure he says -- and if he does -- I don't

24   know the answer factually to whether he says that the present

25   schedule under the NEA is, in fact, better than the schedule

1    pre the NEA.  What I thought he said, but you could point me

2    otherwise, was that the terms of the agreement between

3    American and JetBlue enable them to do what they call

4    "schedule optimization," and that if they do, that enables

5    them to be more competitive with United and Delta, and lets

6    them offer schedules that will be more appealing.  I didn't

7    understand him to be saying, "And, in fact, they've done

8    that."

9         MR. CONGDON:  Well, they can correct me.  I

10   understood Mr. DiLeo to be saying, in fact, that the NEA is

11   creating a better schedule as we speak and asserting that

12   these benefits are real.  And I think that's what they said

13   in their opposition, that he is identifying benefits that he

14   sees in the marketplace currently happening.  I think that's

15   what they said.

16        THE COURT:  Well, if he wants to identify benefits

17   that are actually happening, then he has to point to things

18   to show that they're actually happening.

19        But is that what he's opining?

20        MS. SULLIVAN:  Good afternoon, Your Honor,

21   Maggie Sullivan from Latham & Watkins on behalf of American

22   Airlines.

23        Mr. DiLeo is, in fact, as you indicated, stating

24   that the NEA enables American and JetBlue to offer better

25   schedules and most importantly that corporate customers value

1    those schedules.  That's the crux of --

2              THE COURT:  But not that, in fact, post inking of

3    the NEA, they have, in fact, optimized their schedules in a

4    particular way and that that particular way is, in fact, a

5    way that's appealing to corporate customers.

6              MS. SULLIVAN:  Well, he has been observing what's

7    been happening with the NEA.

8              So Mr. Congdon indicated or argued that Mr. DiLeo

9    has only read a handful of documents.  That's not at all

10   correct.  He has read a large volume of documents.  He has

11   read all of the deposition testimony, including

12   third-parties.  He has read publically available information,

13   press releases, articles in the trade publications about the

14   airline industry.  So he's observing what's actually

15   happening.  He's observing additional routes being added.

16   He's observing improved schedules.  And he's opining that

17   those things are beneficial and extremely valuable to

18   corporate customers, based on his 40 years of experience, as

19   you noted, in the airline industry actually negotiating the

20   contracts that the corporate customers are negotiating.

21             MR. CONGDON:  And to be clear, to respond to

22   Ms. Sullivan's point, he only cited the handful of documents

23   that he actually said he relied upon.  He said later, at

24   deposition actually, "I read a lot more documents, but I

25   didn't need them for my opinion."  Right?  The handful of

1    documents that he actually cited in Appendix B of his report,

2    and under Rule 26 he's required to identify all of the

3    sources that he actually relied upon in forming his opinion,

4    that was the small handful of documents that I referred to.

5              MS. SULLIVAN:  Your Honor, if I may respond to

6    that.  There's an order regarding expert testimony in this

7    case, and that order specifically states -- it's

8    paragraph (2)(b)(2).  It specifically states that all

9    Mr. DiLeo was required to cite in his report were the

10   documents that he specifically relied on.  He was not

11   required to cite every document that he considered in forming

12   his opinions.

13             And he did testify very clearly in his deposition

14   that he considered far more than what he cited in his report.

15   The report was really the documents that he was citing for

16   specific propositions, and, therefore, documents that he was

17   specifically relying on for the sentences in his report, not

18   in forming his opinions.

19             MR. CONGDON:  Your Honor, that's fine.  But we

20   asked him at deposition, and it's not like he identified a

21   whole new set of specific documents that he could point to in

22   support of the opinions.  He said, "Yeah, there were some

23   other documents I read."  Even asked at deposition, he wasn't

24   able to do it on the stand.  He's not going to be able to

25   point to other documents besides what is cited to in his

1    report and be able to say, "Yes, I relied on these for my

2    opinion."  We asked him that, and he wasn't able to do it.

3    Just, "Yeah, I looked at other documents," but he wasn't able

4    to --

5              THE COURT:  For which opinion are you talking

6    about?

7              MR. CONGDON:  Well, for either of them, Your Honor.

8              THE COURT:  When you say "either," say again what

9    they are.

10             MR. CONGDON:  Sorry.  The opinion -- and I'm

11   thinking -- and I'll explain why I actually think that

12   they're related.  But he has -- you can think of it as two

13   opinions.  One, the NEA is actually delivering these

14   benefits; and, two, magically that happens to match up

15   exactly with the five things that I think corporate customers

16   want and value.  So I think those two things are related, but

17   those were the two different opinions that I was referring

18   to.

19             THE COURT:  That was delivering these things --

20   well, but isn't the -- whether it's delivering those things,

21   in the end, that's a fact that the defendants are going to

22   have to prove through somebody other than an expert.  And

23   it's his opinion.  And if there's no underlying factual basis

24   for that, then it won't -- he needs an independent -- there

25   needs to be an independent basis in fact for his opinions,

1     doesn't there?

2          MR. CONGDON:  I agree.  And what I'm proposing is

3     that Mr. DiLeo himself is not providing any independent basis

4     for those opinions.  He hasn't done any actual work for the

5     analysis, whether it's the schedule, whether it's the

6     network, whether it is any of the other benefits that he

7     provides to show independently there actually happening.

8          You're right, defendants are going to have to prove

9     that through their own fact witnesses and potentially through

10    other experts.  But Mr. DiLeo himself is not proof of that.

11    He won't be able to offer an opinion that stands as proof of

12    those benefits.

13         THE COURT:  But why wouldn't his opinion that those

14    things -- to the extent that he thinks those things are

15    happening, from whatever he's read, he thinks they're

16    happening, and that may -- he may be wrong.  You may not be

17    able to prove that they're happening.  But why doesn't that

18    go to his -- the weight, rather than the admissibility?

19         MR. CONGDON:  Because I think, Your Honor,

20    ultimately an expert has to have something more, and the case

21    law is clear on this, than saying, "I think this is

22    happening."  Right?  That's just him saying it.  He has to

23    actually be able to prove that he's done the work to verify

24    that.  I don't think an expert, even one testifying based on

25    experience, can simply say, "I think this is happening,"

1    without more to back it up, Your Honor.  And I think that's

2    what defendants are offering Mr. DiLeo to do.

3              THE COURT:  Anything you want to say about that?

4              MS. SULLIVAN:  I think all of this goes to the

5    weight of Mr. DiLeo's testimony.  I think that Mr. Congdon

6    can cross-examine Mr. DiLeo and point out all of the things

7    that he did or didn't do, and then it's up to Your Honor to

8    decide if he did enough to support his opinions.  But

9    defendants are not offering Mr. DiLeo to prove the benefits

10   that the NEA brings to customers.

11             THE COURT:  To prove that the benefits are

12   occurring.

13             MS. SULLIVAN:  Correct.  Correct.  The defendants

14   have a wealth of evidence --

15             THE COURT:  Other evidence.

16             MS. SULLIVAN:  Correct.

17             THE COURT:  That the schedule is somehow better or

18   optimized is not going to be proven through him.

19             MS. SULLIVAN:  That's right, Your Honor.  We have

20   tons of evidence of the benefits of the NEA that will come in

21   through other witnesses.  And the First Circuit is clear.

22             THE COURT:  You want him to say that those things

23   are benefits.

24             MS. SULLIVAN:  He will say that he believes that

25   they are benefits, but also that they are highly valued by

1    corporate customers based on his experience.

2           THE COURT:  Right.

3           MS. SULLIVAN:  And the First Circuit is clear that

4    the type of verification that plaintiffs are suggesting

5    needed to happen here is not required because expert

6    witnesses come in all shapes and sizes, and an expert can

7    testify based on his 40 years of experience.

8           THE COURT:  Any last point on that?

9           MR. CONGDON:  Sure.  My last point, Your Honor, is

10    I don't believe that's what the case law says.  I think the

11    case law is clear for Rule 702, all the way down through

12    *Daubert* and *Kumho Tire* from the Supreme Court, and other

13    cases, that even when testifying experiences, an expert has

14    to give more than simply reading a couple of defendant's

15    documents and asserting that something exists.  I don't

16    believe that's the law.

17           THE COURT:  Okay.  What do you have on the

18    carve-out?

19           Before you get to that --

20           Kellyann, did you allow the joint pretrial order?

21           THE DEPUTY CLERK:  I did.

22           THE COURT:  You should add to the clerk's notes,

23    subject to the resolutions of paragraphs 10, 25, and 42 as

24    described in open court, just so the record is clear.

25           Go ahead.  Sorry.

1          MR. CONGDON:  Sure, Your Honor.  And again, I'll be
2    very concise on this.
3          Your Honor, there's three primary reasons why the
4    voluntary carve-outs agreed to by defendants have little, if
5    any, probative value as to competitive harm.  First, they
6    don't actually alleviate the harm.  And so they still
7    allow -- and we point to this in our brief.  They allow --
8          THE COURT:  Don't alleviate or don't eliminate -- I
9    mean, alleviate --
10          Well, I guess, my question would be I understand
11    for sure your position that they don't eliminate harm.  But
12    do they not, in some way, if made in good-faith and followed
13    through on, that in some way, arguably at least, mitigate to
14    some degree the harm that you've otherwise identified in your
15    case?
16          MR. CONGDON:  So, Your Honor, I think we identified
17    ways in which maybe it could potentially be different harm,
18    but our argument would still be even with the carve-outs
19    there would still be harm on those routes and for a couple of
20    different reasons.
21          THE COURT:  Even on the routes that are carved out.
22          MR. CONGDON:  Correct.  And the carve-outs -- and I
23    know Your Honor has read this --
24          THE COURT:  Because they don't eliminate all
25    aspects of the NEA on even the carved-out routes.

 1          MR. CONGDON:  Correct, Your Honor.

 2          THE COURT:  But even as to that, aren't the

 3     carved-out routes, because they've -- if you carved out part

 4     of the provisions of the NEA, then arguably mitigating to the

 5     harm that would -- then it would be without that.

 6          MR. CONGDON:  So, again, Your Honor, I would say it

 7     would simply potentially cause different harm.  It might not

 8     be the exact harm that the other routes provide, but they

 9     still provide harm, which is why they don't think that they

10     are actually relevant to our case-in-chief in terms of

11     proving it.

12          THE COURT:  But wouldn't it be less harm?

13          MR. CONGDON:  Huh?

14          THE COURT:  Wouldn't it be less harm?

15          MR. CONGDON:  I don't know that that's the case,

16     Your Honor.

17          THE COURT:  Okay.

18          MR. CONGDON:  For example, they still allow

19     co-chairing on overlapping routes.  And again, these are

20     routes in which they are by definition the only carriers or

21     there's only one other carrier.  Right?  And historically DOT

22     and DOJ have been not in favor of co-chairing direct,

23     overlapping routes for obvious reasons.  They affect economic

24     incentives, and even more so, they allow for market

25     allocation in which one carrier can simply exit the route.

1    The other now has a monopoly.  And in fact, we've seen that.

2    And for two of the six routes that are currently carved out,

3    JetBlue has already exited that route, and American is the

4    only carrier, creating a monopoly.

5        Now defendants have said that is only temporary,

6    and that may be the case.  But that is what we've seen happen

7    so far.

8        So, Your Honor, when combined with the fact that

9    this was done -- and the defendants dispute this again -- in

10   the shadow of litigation, and we think this is equivalent to

11   the types of voluntary promises in the *H&R Block* case and the

12   *Cardinal Health* cases, that the Courts in those cases did not

13   credit in considering an anticompetitive harm.

14       Now, it's true that those cases were decided on the

15   merits.  I will grant that.  Defendants pointed that out to

16   me.  That's absolutely correct.  But what the courts there

17   said was that -- and there's a key distinction between those

18   cases and the cases the defendants cite in the merger

19   context.  The cases defendants cited, *Arch Coal* and *AT&T*,

20   were fundamentally different.  Because there, there was some

21   binding aspect, right, to the agreement.

22       With AT&T, there were irrevocable offers of

23   arbitration that were meant to remedy the harm.  And the D.C.

24   circuit identified irrevocable, used that word three or four

25   different times in the opinion in explaining why that matter.

1          In *Arch Coal*, there was an actual divestiture.

2     They got rid of the assets.  There was nothing the partners

3     could do with it after.

4          By contrast, in *H&R Block* and *Cardinal Health*,

5     there were mere promises not to raise prices after the

6     merger.  And what the court said there is even if we -- first

7     of all, there's nothing binder to that.  But even taking them

8     at their word, it doesn't solve all the competitive harms in

9     the same way, Your Honor, that we're saying here.  And the

10     court said ultimately it doesn't affect the government's

11     case, the *prima facie* case of anticompetitive harm.

12          THE COURT:  But don't I need to hear all of that

13     evidence to figure all of that out?

14          MR. CONGDON:  So obviously you can, Your Honor, and

15     we would submit that when you hear that evidence, for all of

16     the reasons that I've said, you should give very little

17     weight, if any, to these routes.  We think, in light of those

18     cases, though, and what they said, and in light of the law on

19     seeking to improve your litigation position, both in the

20     Seventh Circuit, Judge Posner's opinion in *Hospital Corp. of*

21     *America*, and in the First Circuit opinion in *Kmart*, that you

22     can discount these as a matter of law sitting here today.

23     And that's why we put it in the motion.

24          THE COURT:  Okay.  I'm not prepared to discount it

25     as a matter of law of right now.  Whether -- whether it turns

1    out after I hear all the evidence that it should have no

2    weight because it's -- it was a litigation strategem or

3    whether it's -- it has no significance or just minimizes --

4    it isn't significant, I just have to see all the evidence to

5    see.  And so I'm not going to -- I'm going to deny that

6    motion.

7           I'm going to memorialize, by the way, all of these

8    rulings about the motions in just a simple written order,

9    just so you have it all.  But I'm going to deny that motion.

10          I'm not inclined to exclude Mr. DiLeo.  And it

11   strikes me that the challenge goes more to the weight than to

12   the admissibility.

13          I'll hear you briefly on the --

14          MR. WALL:  Thank you, Your Honor.  And I'm going to

15   be very brief, because I will start by acknowledging that

16   this is asking a lot for a *Daubert* motion in the context of

17   this case, and I'm not going to pretend otherwise.  And I

18   fully understand the most likely outcome here is that you're

19   going to take this under advisement and wait to hear the

20   testimony.

21          But the reason that we filed this motion is because

22   the issue is extreme.  It's using, ostensibly, a scientific

23   tool that was designed for mergers that incorporates into it

24   logic that is specific to mergers, including the complete

25   elimination of competition between the parties, and using it

1    as a basis for an expert opinion in a case which isn't about

2    a merger.

3           And we offer the analogy of the expert in accident

4    reconstruction that models the wrong speed, or something like

5    that.  Well, that's essentially what this is.  Mergers

6    eliminate more competition than collaborations.  That's

7    essentially the fundamental distinction that those of us in

8    the antitrust world believe.  That's what their collaboration

9    guidelines say.  Practically the whole art of dealing with

10   the collaboration is figuring out what the delta is -- no pun

11   intended -- what the difference is between merger and

12   collaboration, and this tool doesn't do that.  It's math.

13   It's just a model.  It's an equation that goes into a

14   computer, and it doesn't have -- it doesn't model the NEA.

15          There is a point which we quoted, and which is

16   undisputed, in -- it was in a footnote, that where Dr. Miller

17   says that, "Even though I see what they're actually doing

18   with the NEA, with the revenue sharing and it's dynamic, I'm

19   assuming that they will behave as if they are involved in

20   static profit sharing."  And that's what allows him to use

21   this tool.  That's the accident reconstruction expert saying,

22   "I think it's really going 100 miles an hour, rather than the

23   50," and that's how he does it.

24          And to quote counsel just a moment ago, you know,

25   an expert has to have more than, "I think this is happening."

1    Well, Dr. Miller is simply providing, in a circular manner,

2    his own foundation by saying, "Well, I think it's going to be

3    like a merger.  I think it's close enough to be like a

4    merger," and that's just too much.

5              And we think that the record in this case should

6    reflect that we have objected to this testimony based upon

7    its admissibility; that this a fit issue under the *Daubert*

8    case; that there is a requirement that scientific testimony

9    be calibrated to the actual facts of the case, not

10   something -- this isn't horseshoes.  You can't just say,

11   "Well, it's sort of close, so I can use this tool."  They can

12   say that --

13             THE COURT:  Can you do that in horseshoes?

14             MR. WALL:  Well, if you're close, you can claim the

15   win.

16             THE COURT:  Okay.

17             MR. WALL:  If it's horseshoes.  I should probably

18   be using a more modern analogy.

19             THE COURT:  No, I should know.

20             MR. WALL:  But this is expert testimony.  The

21   lawyers can argue whatever they want.  If they want to say

22   that it's looked at it like a merger and use merger tools,

23   you know, they're entitled to.  An expert can't do that.  An

24   expert has to have -- has to have scientific basis.  And

25   there isn't a scientific basis in literature, in theory, in

1    anything else for using a merger simulation in a nonmerger

2    context, like a collaboration.

3              I will even say that if he wanted -- that if he had

4    built a bespoke NEA simulation, he might have been able to do

5    that.  But he didn't.  He simply said, "I am going to assume

6    that they won't follow the terms" -- I mean, it's pretty

7    remarkable testimony.  He says, "I'm assuming they're going

8    to go through the mechanics of complying with what they

9    actually agreed to, but they'll behave like they're doing

10   something else.  And upon that assumption, I will model this

11   as a merger."  And this is all they have on competitive

12   effects.  This is 100 percent of their case on competitive

13   effects.

14             So, again, I fully understand that Your Honor is

15   probably going to say, "I want to hear it," but we will

16   renew -- if that's what you rule, that's what we're going --

17   we will renew the objection at that time, because we don't

18   believe that this, on the fit issue, makes it into evidence.

19             Now, there's a reliability component to this.  I

20   won't take up your time with that today.  This is the

21   comparison between the predicted increases and what

22   literature actually says actual real mergers do.  And that's

23   a separate issue.  But for today's purposes, I'll just quit

24   there.

25             THE COURT:  All right.

```
 1              MR. WALL:  No waiver on anything.
 2              THE COURT:  No waiver on anything.
 3              MR. HEIPP:  Good afternoon, Your Honor.
 4    Justin Heipp for the United States.  I wish I had a better
 5    analogy of a backyard game that would be more appropriate
 6    here.  I have not played horseshoes in a long time.
 7              First of all, Mr. Wall's statement that the merger
 8    simulation model that Professor Miller uses is 100 percent of
 9    the plaintiffs' case on the bed of effects is just not
10    correct.  But even looking at the simulation model standing
11    on its own, it was adopted and used by Professor Miller
12    exactly with the NEA in mind.  The argument about, "Oh, this
13    is not a merger," is a classic example of elevating form over
14    substance, and this flows both from their textbook principles
15    of economics, but more importantly it flows from the
16    defendants' own statements in their documents, in statements
17    that they've made to the government during the investigation
18    of the NEA.
19              I think the key to understanding how Professor
20    Miller's use of the simulation model fit the NEA is to think
21    about what the defendants consistently do not talk about,
22    which is that the NEA allows American and JetBlue to
23    coordinate their capacity.  They call it schedule
24    optimization, which is a nice euphemism for what it actually
25    is, which is that American and JetBlue get together, they
```

1    jointly plan their schedules, their routes, their

2    frequencies, what kinds of planes they fly on.  When they do

3    that, they are going to seek to maximize their joint profit.

4    That's a fundamental principle of economics, that when two

5    firms get together, two competitors in this case get together

6    and they jointly plan their capacity in this case, they're

7    going to do it to maximize the benefit to them jointly.  And

8    that's what they do here.

9         That's not only a principle of economics, but it's

10   in their documents where they talk about the purpose of

11   capacity coordination being to ensure their mutual benefit,

12   as that is what, quote, drives the economics.  And actually,

13   the defendants, even in their pretrial brief, said something

14   similar to this.  They said, quote, when establishing a joint

15   schedule, American and JetBlue do not need to fight over who

16   gets the best opportunities created by the allowance.  They

17   focus on the network and the schedule, end quote.

18        Exactly.  Just like if they were merged, the NEA

19   allows American and JetBlue to focus on creating the network

20   and schedule that's best for them and for their bottom line.

21        So when you understand that they can coordinate

22   their schedules and their networks, it makes sense, then, to

23   look at the other piece that the defendants do talk a lot

24   about, the revenue sharing, to look at it the way that

25   Professor Miller does.  And the reason that the revenue

1    sharing creates this effect that's very similar to a merger

2    is something the defendants consistently have said and they

3    say it in their documents, and it's that it makes them,

4    quote, mettle neutral.

5           And that's a phrase that you've undoubtedly read

6    and that means it doesn't matter to them on which of them a

7    new passenger flies.  It's sort of the opposite of

8    competition.  When they were competing, they very much cared

9    which one a passenger would fly on, because they would get

10   all the revenue from that passenger.  But under the NEA, as

11   they plainly state, they're neutral.  They're not competing

12   anymore for those new passengers.  So it's not a remarkable

13   conclusion to say that the revenue sharing is similar in that

14   way to a merger in that it eliminates the competition between

15   them.

16          So when you take the capacity coordination on the

17   one hand and the revenue sharing on the other, put them

18   together, the incentives that the NEA creates look alike lot

19   like a merger.  And Professor Miller models them, and he

20   actually even tailored his model to the specifics of the NEA.

21          What Mr. Wall referred to as a footnote in his

22   report about static revenue sharing, first of all, that only

23   really applies to markets that are not fully within the NEA.

24   Almost all of the harm that is predicted here, that static

25   formula that Mr. Wall referred to doesn't really matter.

1    What that formula is used for by Professor Miller is to

2    account for markets where maybe one of them has a connecting

3    flight that doesn't touch the NEA.  And so, actually, it was

4    Professor Miller specifically accounting for the details of

5    the NEA.  It's truly a misunderstanding of what that analysis

6    was about.

7               THE COURT:  Okay.

8               MR. HEIPP:  And I'll just --

9               THE COURT:  Go ahead.

10              MR. HEIPP:  And I'll just -- briefly on the last

11   point that Mr. Wall made about comparisons of the results to

12   the literature, just very quickly -- and we say this in our

13   papers, so I won't dwell on it.  But Professor Miller's

14   results are quite comparable in line with the best historical

15   experience of what we're actually talking about here, which

16   is the elimination of JetBlue as an independent competitor.

17              So when you look at JetBlue's own analyses of prior

18   entry and exit events when JetBlue goes into a market, it has

19   this huge effect on fares, double-digit percentage drops in

20   fares, hundreds of dollars of savings per ticket for

21   consumers.  When you look at those, which is actually the

22   best comparison of what we're looking at here, Professor

23   Miller's results are very much in line with those.

24              THE COURT:  Okay.  Briefly.

25              MR. WALL:  Just a few comments, if I may.

1           THE COURT:  Yes.

2           MR. WALL:  I'll be quick.

3           Let me just pick up on this last part.  The -- a

4     merger simulation does not simulate entry and exit.  It

5     simulates mergers.  If you want to validate it, you have to

6     validate it against what we know about mergers, not what we

7     know about the effects of entry or exit.  You can't justify

8     the science of a merger simulation and the outcome of a

9     merger simulation by looking at a completely different kind

10    of event and saying that my results are somewhat like that.

11    It doesn't -- that just doesn't hold.

12          But the other thing that I think it's just very

13    important to underscore here is this whole bit, this whole

14    line about that his argument that firms will seek to maximize

15    joint profits, it's subtle, but this is the ultimate

16    circularity.  Firms that merge maximize joint profits, firms

17    that don't merge maximize unilateral profits under whatever

18    contract they have because they're not merged.  So their

19    unilateral profit functions change because they now have a

20    contract.  They might have revenue sharing.  It doesn't have

21    to have revenue sharing; it just means I have to pay you a

22    certain amount, so I think about that.  But firms that don't

23    merge have a unilateral profit function.

24          The circularity is what Dr. Miller does is he

25    says, "I think that they will behave like they're maximizing

1    joint profits; therefore, it's like a merger; therefore, I

2    can use a merger simulation."  Okay.  That -- that is just

3    one fiction after another designed to use this tool, which

4    has absolutely no basis in literature or theory for use

5    outside of mergers.  I mean, it is using a thermometer to

6    take barometric pressure.  It wasn't built for that.  And

7    that's the fundamental *Daubert* issue.  It wasn't built for

8    what they're asking it to do.

9            THE COURT:  Okay.

10           MR. HEIPP:  If I can just --

11           THE COURT:  30 seconds.

12           MR. HEIPP:  Very briefly, Your Honor.  I think the

13   best or very good example of how we know that American and

14   JetBlue, when they're coordinating their capacity are seeking

15   to maximize their joint profits, is the fact that they've

16   never had a significant disagreement over what the capacity

17   should be.  David Fintzen, from JetBlue, who you'll hear

18   testimony from during the trial, he's the head of the NEA for

19   JetBlue, testified during his deposition that they've always

20   been able to reach consensus over what the joint schedule

21   should be.  They're not pursuing their own unilateral

22   incentives the way that Mr. Wall said.  They're doing what

23   economics would predict:  They're seeking to maximize the

24   benefit of the partnership by agreeing on their capacity.

25           THE COURT:  A couple of thoughts.  One, I'm going

1    to deny the motion without prejudice.

2          The other two motions that I denied, I'm also

3    denying without prejudice in the sense that you can renew

4    them at any point if you think that it is appropriate to do

5    so.  If the briefs are the same, you don't need to refile the

6    briefs.  You can file like one paragraph that says, "We renew

7    it, and we rely upon the arguments that we made before."

8          I think I really need to hear and see the testimony

9    to evaluate particularly this issue further, Mr. Wall.  If

10   you think that your -- that the admissibility question itself

11   is like an ongoing, significant question based on the fit,

12   then I think you should -- somebody should give me a complete

13   copy of his report, just because it's harder to read when

14   it's missing pages, even if you're not relying on those pages

15   in response to the argument.  It's one complete copy of it.

16   Or if he has a copy and a reply version, then both of them.

17   I'll have them.  Because I think that argument would turn not

18   only on his testimony, but it's really a renewed *Daubert*

19   motion in light of what happened, I think I might have to

20   read the whole report.

21          MR. WALL:  I was going to ask you, would you just

22   like to have all the expert reports?  They don't go into

23   evidence, per se, but it's something that we wanted to know.

24          THE COURT:  Yes.  Unless there's a reason not to, I

25   think I would be inclined to -- it would be nice to have a

1     binder -- in other words, a binder and a flash drive or

2     electronic copy of the expert reports from all the experts.

3          I also was thinking that I would like to have a

4     binder like -- what this whole case turns on in the first

5     instance is the contract.  It's more than one contract, but

6     the contracts.  And I would like to -- you all talk about the

7     contracts, but -- and I think I would like to have a binder

8     with the contracts and to be able to look at them.

9          I had questions about the deposition transcripts

10    are going to be coming into evidence, some number of

11    deposition transcripts, and so -- well, two issues.  And

12    exhibits.

13         One issue is just there's going to be -- there are

14    sealed and unsealed -- take exhibits, sealed and unsealed

15    exhibits.  And then there are exhibits that are objected to,

16    and those which are not.  So it would be helpful -- rather

17    than just having one -- it might be a little higher than my

18    hands here -- but one stack of all the exhibits, and then an

19    index that said 1 to 1,000, what's agreed to, what's objected

20    to.

21         If it's not too hard, it would be really nice on

22    the exhibits to have them marked like on the tab or

23    something, green means no objections.  Red means it's sealed.

24    Yellow means it's like sealed and something -- you know,

25    something like that, or not -- some color coding of the

different sealed categories and the admitted and objected to
categories, or objected to or not objected to.

So we know that, rather than every time we look at
an exhibit and we're writing something, we have to go back to
the index to try to figure out what it is or not.  Like one
of the things it will do, to be perfectly frank, it will
speed up the resolution of this, which is something that you
might want.

So and with the depositions, when you give them, I
think I only need what you're designating.  And it's fine,
from my perspective, if you give me the printouts that have
more than one page on a page, sort of four-page deposition
printouts.

I think we'd want everything electronically, as
well as in paper, and probably -- except -- I was going to
say two sets of everything, but maybe the exhibits.  I don't
know how voluminous that is, and that might be maybe we don't
want two sets of that.  So I think what we should do is on
the other things two sets, like the experts and the
contracts.

And maybe give me a sense or give the clerk a sense
of what's the physical size, if we get it, in paper of the
depositions and the exhibits, because that will have some
bearing on whether we want one copy or two.

MR. WALL:  I think that's what we're talking about,

1    the embarrassing part, the things we don't really want to

2    come out.

3              THE COURT:  You don't have to file it publically.

4              MR. JONES:  Your Honor, just a clarification

5    question.  On the deposition designations we submit, does

6    Your Honor want the full transcripts with the color-coded

7    designations, or is Your Honor okay with just the experts?

8              THE COURT:  I think I'm okay with -- well, the

9    question is for what -- when you're giving me something that

10   it's not objected to and you're just relying on, you can just

11   give me the experts because it's just what you're relying on.

12   And if for some reason we read it and think we want the page

13   before, we'll tell you.  But I think we'll be getting enough,

14   so just the experts -- excerpts.

15             And then if there's what's objected to, then mark

16   in some way so we can figure out.  We can look at that and

17   rule on those objections.  But, yes, I think just the

18   excerpts of what is the universe of what's being submitted

19   and objected to.

20             MS. MALTAS:  So I think what we're planning is

21   paper and electronic.  It will be just the excerpts.  We will

22   use a color code to show if it is defendants' or plaintiffs',

23   and then we're going to mark on the page what the objection

24   is and who's objected to it, and then tab the exhibits

25   behind.

1          THE COURT:  That will be good.  That sounds like a

2    reasonable way to do it.  Okay.  Fine.

3          MS. SULLIVAN:  And Your Honor, with respect to

4    exhibits, the parties also would like to have specific

5    witness binders with exhibits that we'd like to hand up.

6          THE COURT:  Sure.  Like a binder for each witness.

7    That's fine.  That's helpful.  At least for sure we'll need

8    an electronic copy of all the exhibits.  And depending on the

9    volume, I mean, ordinarily I would say I want a paper copy of

10   the exhibits, but I don't know how many -- I know it's at

11   least 2,000 pages, because there's 1,000 exhibits and 1,000

12   tabs, so I think it's longer than that.  So maybe later give

13   Ms. Belmont an idea of what it might look like.

14          In the meantime, a binder for each witness makes a

15   lot of sense.

16          MS. SULLIVAN:  Okay.  Thank you, Your Honor.

17          THE COURT:  That's fine.

18          MR. CONGDON:  Your Honor, just to clarify, on the

19   deposition designations, our plan was we're working with

20   defendants to put them together now and to hand them up on

21   the first day of trial.  Does that work?

22          THE COURT:  That's fine.  Because they'll come in,

23   and you'll give them to me, and I'll rule when I have to

24   rule.  But if I don't have them -- you don't need to know the

25   answer to that before the start of the trial, I take it.

1          MR. CONGDON:  No.

2          MS. MALTAS:  No.

3          THE COURT:  Okay.  Fine.

4          Is there anything else anyone else wanted to bring

5    up?

6          MR. JONES:  Your Honor, one topic you raised

7    earlier, the timing of closings.  We actually would prefer

8    the closings to take place at the conclusion of the evidence,

9    but we understand Your Honor will hear from both sides at

10   some point in the future about preferences.  But I did want

11   to raise that preference.

12         THE COURT:  Okay.  So I'll think about it.  So one

13   thing that I'm going to do is look at the schedule and see if

14   I can add in a little bit to account for the breaks and -- at

15   the end for some sort of closing argument at the end of the

16   evidence for both of you.  There's a reasonable likelihood,

17   though I'm not promising this, that after I digest everything

18   after the trial and digest the post-trial briefs, that I'll

19   want to talk to you again in the form of --

20         Essentially, this is just a summary judgment,

21   except it's with evidence and it's without the summary

22   judgment standard.

23         MR. WALL:  That's why we didn't want to set it yet,

24   frankly, because --

25         THE COURT:  Right.

1          MR. WALL:  At least my experience is -- I'm not

2     going to tell you how to do your business, but that seems to

3     be more useful to judges, is after they've seen the sharpness

4     of the post-trial briefing, and they want to ask us about it.

5          THE COURT:  Right.  I'm not going to set a hearing

6     date after receiving the post-trial briefs until I've gone

7     through it all, and then you'll hear from me when I'm ready.

8     And in a perfect world, that would be a week, but it won't

9     be.  So, yes, that how I'm thinking about.  And I'm thinking,

10    if nothing else, all the lingering issues will be resolved,

11    and whatever I'll issue then.

12          All right.  Anything else from anybody?

13          MR. JONES:  Nothing from plaintiffs, Your Honor.

14          MR. WALL:  Nothing from defendants.  Thank you very

15    much for your time, Your Honor.

16          THE COURT:  All right.  And then I'll see you all

17    next Tuesday morning, unless, based on one of the motions, I

18    need to see you earlier.

19          All right.  Thank you.

20          THE DEPUTY CLERK:  Court is in recess.

21          (Court in recess at 5:04 p.m.)

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5    and for the United States District Court for the District of

6    Massachusetts, do hereby certify that pursuant to Section

7    753, Title 28, United States Code, the foregoing pages

8    are a true and correct transcript of the stenographically

9    reported proceedings held in the above-entitled matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13                    Dated this 20th day of September, 2022.

14

15

16

17              /s/ RACHEL M. LOPEZ

18

19

20         _____

          Rachel M. Lopez, CRR
21         Official Court Reporter

22

23

24

25