# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

AIR TRANSPORT ASSOCIATION OF
AMERICA, INC.,
                    Plaintiff,               Civil Action
                                             No. 18-10651-ADB

V.


MAURA HEALEY,                                Pages 970 - 1096
In her official capacity as
Attorney General,
Commonwealth of Massachusetts,
                    Defendant.


_____



BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE

BENCH TRIAL DAY 7
SEPTEMBER 20, 2022



UNITED STATES DISTRICT COURT
JOHN J. MOAKLEY U.S. COURTHOUSE
COURTROOM 17
ONE COURTHOUSE WAY
BOSTON, MA 02210



Kelly Mortellite, RMR, CRR
Kathleen Silva, RMR, CRR
Official Court Reporters
One Courthouse Way, Room 3200
Boston, MA 02210
mortellite.com

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:
      James R. Carroll
 3    Alisha Quintana Nanda
      Emily M. Jennings
 4    Skadden, Arps, Slate, Meagher & Flom LLP
      500 Boylston Street
 5    Boston, MA 02116
      617-573-4800
 6    Email: James.Carroll@skadden.com
      Email: Alisha.Nanda@skadden.com
 7    Email: Emily.Jennings@skadden.com

 8
      FOR THE DEFENDANT:
 9    Eric A. Haskell
      Douglas S. Martland
10    Matthew Q. Berge
      James Sweeney
11    Trini Gao
      Attorney General's Office
12    18th Floor
      One Ashburton Place
13    Boston, MA 02108
      617-963-2062
14    Email: Eric.haskell@state.ma.us
      Email: Douglas.martland@state.ma.us
15    Email: Matthew.berge@state.ma.us

16

17

18

19

20

21

22

23

24

25
```

1

2                                      INDEX

3

4       WITNESS                                                    PAGE

5

        DANIEL AKINS
6
            Direct Examination By Mr. Haskell                    990
7           Cross-Examination By Mr. Carroll                     1062
            Redirect Examination By Mr. Haskell                  1087
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DX-1080-0003

```
 1                    P R O C E E D I N G S
 2            THE COURT:  So we have the two motions.  The
 3    demonstratives from yesterday I'm going to allow in.  It goes
 4    to weight, not admissibility.
 5            But let me ask you a question.  Why are they missing
 6    all these dates?
 7            MR. HASKELL:  We can speak to that if you want to hear
 8    from us on that point, Your Honor.
 9            THE COURT:  Isn't it them turning the data over to
10    you?
11            MR. HASKELL:  It is.  We have a side of that story to
12    tell.  I'll let them go first.
13            MS. NANDA:  Well, Your Honor, to begin, I don't
14    represent American Airlines.  The documents that were produced
15    pursuant to a third-party subpoena to American Airlines, my
16    understanding is that the documents were produced, timely
17    produced, within the range that was agreed upon after
18    meet-and-confers with the Attorney General.  I'm not aware of
19    any motion to compel or any other type of motion practice
20    regarding the sufficiency of those productions.  My
21    understanding is those reports just weren't included as
22    attachments in the emails that were produced in response to
23    that third-party subpoena.  That's it.
24            MR. HASKELL:  So relevant document discovery on this
25    point, Your Honor, happened really in two phases, and this
```

1    actually goes to two batches of documents that Mr. Zadmehran

2    spoke about yesterday.  First, in February, March of this

3    year -- it was February, I think -- we received a big, big

4    chunk of documents from American Airlines pursuant to a third-

5    party subpoena.  That subpoena was actually addressed to emails

6    and attachments in the custody of the testifying witnesses.  So

7    we got like 40,000 pages of documents in response to that back

8    in February.

9           So we explained part of this in that motion practice

10   last month around taking the keeper's deposition.  We sifted

11   through those documents.  We saw these reports and said, Hey,

12   these are important.  We want to get more of these.  And so it

13   was probably the third week of June of this year we served

14   another third-party subpoena on American Airlines saying, with

15   respect to these reports, that Mr. Zadmehran testified he had

16   55 percent coverage on.  What we asked for actually was every

17   one of those reports between 2014 and the present.

18          And the response we got back from American Airlines,

19   and American Airlines was represented on that by an attorney

20   named Chris Hollinger.  He's sitting in the back there, the

21   gentleman with the beard.  He also has an appearance in this

22   case on behalf A4A.  So it's always been a little murky to us

23   which entity is speaking, but the response we got back from

24   American Airlines was we only made that report between 2019 and

25   2020 and we're going to give you all of them.  We're going to

1    search for all of them and give you all of them.

2         So the return date -- and obviously we didn't file any

3    sort of motion to compel because the response was we're going

4    to give you everything we have.  So the return date on that

5    subpoena was the third week of July.  We received a whole bunch

6    of these flight service reports from American the third week of

7    July, transmitted them to Mr. Zadmehran, and that's the second

8    batch that he testified about yesterday.

9         And then, when he worked on the summary charts, it

10   really happened in a bang-bang fashion over the course of about

11   two weeks at the end of July and beginning of August.  When he

12   looked at the summary charts, he looked at them and said, Hey,

13   we're missing a bunch of dates here.  We scratched our heads

14   and said, wait a minute, American was supposed to give us

15   everything.  The problem was, though, Your Honor, we were up

16   against the clock.  As you know, exhibit lists and exhibit

17   trial exhibit disclosures were due on Friday, August 5.  So at

18   that point we kind of ran out the clock, and that's how we wind

19   up with 55 percent coverage.

20        Our view is that American said they were going to give

21   us all these documents.  They ought to have given us all of

22   these documents.  To the extent they did not give us all of

23   these documents, that should be on them, not on us.  But that's

24   how it came to be.

25        I would also point out, Your Honor, you may not have

```
1    had a chance to review the testimony that we eventually took of

2    the American keeper to authenticate, lay the foundation for and

3    explain these documents.  But what those witnesses said, there

4    was one for each of the three types of reports we're talking

5    about.  What each of those witnesses said was these reports

6    represent a snapshot of data as of a certain point in time

7    that's kept in the database.  That database goes back many,

8    many years, like up to ten years.  And if you wanted to, we

9    could run a query and pull this data out of that database in

10   the span of a day at most.  As a matter of fact, I think one of

11   the witnesses said we could do that within several seconds or

12   several minutes.  So the data is out there, and that's our side

13   of the story.

14           THE COURT:  I'm going to let it in, but obviously, you

15   know, its impact is weakened by what's missing.

16           MR. HASKELL:  We're aware of that, Your Honor.  And we

17   aren't thrilled with the way it worked out, but that's --

18           THE COURT:  Well, I'll just say it's too late for this

19   case, but if you're running up against a time issue on a

20   deadline like that, all you have to do is ask me for an

21   extension and explain the circumstances.  Getting ready for

22   trial, I'm flexible on that kind of stuff.

23           Then we still have one more motion for argument on.

24   That was about the demonstratives being admitted as exhibits.

25           MS. NANDA:  Yes, Your Honor.
```

```
 1          THE COURT:  Do you want to do that now, or do you want
 2     to do it -- do you want to get the expert on and off and then
 3     do it today?
 4          MR. HASKELL:  We can do that now.  Does that work?
 5          MS. PRASAD:  Good morning, Your Honor.  We'd like to
 6     submit Dr. Lee's charts that are at PD006, the demonstrative
 7     that we used with him during his direct, at pages 5 through 18.
 8     We believe they are admissible under Rule 1006.
 9          As Your Honor is aware, there are certain requirements
10     that must be satisfied before a summary chart is admitted into
11     evidence.  In fact, there are five requirements, Your Honor,
12     and we would argue that Dr. Lee's charts meet all of them.
13          The first one is that the source materials must be so
14     voluminous that they cannot be conveniently examined in court.
15     Your Honor, the underlying data for Dr. Lee's charts fall into
16     three distinct categories.  One is the sick leave data that
17     Dr. Lee received directly from the carriers.  Those are
18     voluminous records.  They span several years across several
19     carriers.
20          The second category is data that Dr. Lee pulled from
21     the DOT databases.  And, once again, those are incredibly
22     voluminous records that cannot be conveniently examined in
23     court.  And then the third category is data that he pulled from
24     a database called OAG, which is the Official Airline Guide and,
25     once again, he pulled several data points from that database.
```

1    So the underlying records are voluminous, Your Honor.

2          The second requirement is that the underlying

3    documents should be independently admissible.  And as I

4    mentioned, the three categories that Dr. Lee relied on, they

5    are independently admissible, Your Honor.  The sick leave data,

6    those are business records of the carriers, and so they would

7    be admissible under 803.6.  The DOT data, Your Honor, those are

8    public records since DOT is required to maintain those

9    databases under a mandate, a legal mandate.  So they would be

10   admissible under 803.8.  Then the database that I mentioned,

11   the Official Airline Guide, Your Honor, that database, the data

12   from that would be admissible under 803.17, which covers market

13   quotations, lists, directories or other compilations that are

14   generally relied on by experts in the field, and the OAG

15   database is indeed relied on by economists and aviation

16   experts.  So that's the second requirement, Your Honor.

17         The third is that the charts and the underlying data

18   should have been reasonably made available to the opposing

19   party.  Dr. Lee's charts and the underlying data were made

20   available to the Attorney General as part of his initial report

21   and rebuttal report that were disclosed in 2018 and 2019.  In

22   fact, Appendix B of Dr. Lee's initial report and Appendix A of

23   Dr. Lee's rebuttal report actually provides a very

24   comprehensive list of documents that Dr. Lee relied on, and my

25   understanding is that when those reports were produced, the

1    underlying data was also produced simultaneously at that time

2    as well.

3            The fourth requirement, Your Honor, is that the charts

4    should be accurate and not prejudicial, and we do believe that

5    the charts are indeed accurate.  They summarize the data

6    accurately and they are non-prejudicial.  And in any event,

7    Your Honor, the Attorney General has had the opportunity to

8    sift through those charts and those data since at least 2018.

9    They've deposed Dr. Lee and, Your Honor, they also had a chance

10   to examine him in court about those charts.  And the Attorney

11   General had the opportunity to put forth their own experts and

12   their own charts if they so wished to do so.

13           Then the last requirement, Your Honor, is that the

14   charts should be admitted through the testimony of someone who

15   supervised the preparation of those charts.  And indeed Dr. Lee

16   is the person who supervised the preparation of those charts.

17   And as Your Honor found on Friday, he is a qualified expert and

18   he did create these charts with his team.

19           So those are the five requirements, Your Honor, and we

20   would argue that Dr. Lee's charts meets all of them and thus

21   they should be admitted under 1006.

22           THE COURT:  Just curious, why do you want them

23   admitted versus just as demonstratives?  They're still in the

24   record.  They can be relied on.  What's the end game?

25           MS. PRASAD:  Your Honor, the charts would be helpful

1    to you, we believe, in making your decision, and that's really

2    the point of the rule, which is to create these charts that

3    summarize the voluminous data, and the charts can then be

4    admitted into evidence as substitutes for that voluminous

5    information.

6            So it's really a tool to help you, Your Honor,

7    respectfully, as you make your decision, and so that's why I

8    would like to admit them into evidence.

9            THE COURT:  What's the objection?

10           MR. MARTLAND:  Your Honor, the objection here is that

11   they have not either authenticated the underlying records or

12   established a foundation for them as business records of the

13   respective airlines.  The airlines, or the plaintiff here, had

14   ample opportunity to examine any of the multiple airline

15   witnesses that testified in this case regarding both the

16   authentication and the foundation of these records as business

17   records and specifically failed to do so.

18           These witnesses did not describe how and when the

19   records were made, whether they are kept in the regular course

20   of business, whether the records were a regular part of the

21   company's business, or even the method of preparation or the

22   trustworthiness of the record.  In fact, the testimony that

23   they put forward in some cases was that their own records were

24   not trustworthy.  So we think all of those reasons where they

25   had ample opportunity with the multiple airline witnesses that

1    testified and failed to pursue that line of inquiry, and again

2    had an opportunity with Dr. Lee to potentially provide that

3    foundation and again failed to do so, is reason to deny the

4    motion and admit them into evidence.

5         I'll also add, Your Honor, that there's a significant

6    prejudice here to admitting these records.  The airlines or the

7    plaintiff was on notice as to when exhibits in this case needed

8    to be disclosed.  That was at some point in early August, as

9    Attorney Haskell was just saying.  They've had all this

10   information since well before summary judgment, and there was

11   no reason why they had to wait until the last day of their

12   testimony at trial to seek to submit them into evidence.  We

13   are prejudiced because we did not have an opportunity to pursue

14   that type of inquiry with any of the airline witnesses.  Had we

15   known that, we may well have made a different decision about

16   how our cross-examinations would have gone.

17        Similarly, we had no notice that they would be

18   introducing these through the testimony of Dr. Lee and, again,

19   if we had notice back in August, over a month ago, month and a

20   half now, we may have made different decisions about how we

21   would have pursued the cross-examination of Dr. Lee.

22        THE COURT:  Same question to you.  What difference

23   does it make?

24        MR. MARTLAND:  Again, Your Honor, they're offering

25   these charts for the truth of the matter asserted.  We don't

1    think they should be in evidence.  We did not oppose them being

2    submitted as chalks, and that's where we stand.

3         I'll also add just two other points, that several of

4    the charts, although it sounds like they're narrowing some of

5    the charts, that they're seeking to submit just the charts

6    themselves as opposed to the PowerPoints containing Dr. Lee's

7    opinion, some of the charts are a little argumentative in terms

8    of labeling and titling them as corrections to testimony that

9    hasn't even been given yet.  I'd point the Court specifically

10   to page 6.  Mr. Akins is not testifying until today.  There's

11   also labeling as things like "Typical" on page 12 of the

12   document.

13        THE COURT:  Okay.  Which -- tell me, now that he's

14   raised that, tell me specifically which charts you're trying to

15   move in.

16        MS. PRASAD:  Yes, Your Honor, so PD006, starting at

17   page 5, page 5 through page 18.

18        THE COURT:  All right.  What about authenticating

19   them?

20        MS. PRASAD:  So, Your Honor, I'd like to address that.

21   The sick leave data that counsel talked about, similar sick

22   leave records appear on plaintiff's exhibit list, Your Honor.

23   And when those exhibit lists were exchanged, counsel raised no

24   hearsay objections to that data.  So that would be one.

25        As for the other two categories of data, Your Honor,

1    the DOT records and the OAG database, the Attorney General's

2    experts themselves rely on those data sources in their reports

3    as well, particularly the DOT data.  So that would be that,

4    Your Honor.  We believe that those records don't have a hearsay

5    objection.  Similar records received no hearsay objection.

6            THE COURT:  Hold on.  Hearsay is different than

7    authentication.

8            MS. PRASAD:  Right.  Agreed, Your Honor.

9            THE COURT:  Let me think about that.  Mr. Hollinger,

10   while I have you here, the thing with these American Airlines

11   records is bothering me because I'm letting them in for what

12   they're worth, but AA is part of -- American Airlines is part

13   of A4A, and it seems like by not producing those documents

14   you're prejudicing them to their advantage and it bothers me.

15           MR. HOLLINGER:  Your Honor, we, and I personally know

16   how much time American spent to track down as many of these

17   reports as we could.  Mr. Haskell states that we said we would

18   produce all the reports.  We said we'd produce all the reports

19   we could find.

20           The reports have been discontinued at least one or two

21   years ago.  In response to the subpoena, we went back and

22   consulted other sources at American, other than the initial

23   email custodians with respect to whom the first batch of

24   reports were located, and we found additional reports, and we

25   produced them.

1          But the main reason why we didn't produce, quote, "all
2    of the reports" is because we don't have a master repository of
3    every single report within a period of time.  This is a report
4    that has been discontinued, and we went back and looked again
5    in response to the subpoena to find as many of those reports as
6    we could and we produced all the ones we could find.

7          THE COURT:  It seems odd that an operation like
8    American Airlines doesn't have a central repository for every
9    report that's prepared basically on a daily basis.

10         MR. HOLLINGER:  It was prepared on a daily basis for a
11   short period of time.  I can't speak to whether or not American
12   Airlines maintains a master repository of every single report
13   for every single day for 10 years or 15 years even though those
14   reports are no longer produced.  I mean, the report was
15   discontinued.  It's not like this is a report that is
16   continuing to be produced to this day.  It was discontinued for
17   reasons that, frankly, the Attorney General could have asked
18   Mr. Blaska.  I honestly don't know whether they did, but they
19   could have.  He's the person who has been identified as the
20   person who could speak to why the reports were discontinued,
21   and he was identified as such in one of the recordkeeper
22   depositions that Mr. Haskell has referred to.

23         But at no time did the Attorney General say, Well,
24   hey, can you recreate reports?  Can you, you know, do something
25   else to, quote, "fill in the gaps"?  We looked for every single

1    report we could find, and we produced every single report we

2    could find.

3            THE COURT:  Mr. Haskell is standing up.

4            MR. HASKELL:  I am, Your Honor.  And I guess what I

5    want to emphasize is that these recordkeeper depositions that

6    we took, I guess it was a couple of weeks ago, it was the 1st

7    of September, 2nd of September, we learned about a distinction

8    between the reports which are a snapshot of the data as it

9    exists at the time the report is run on a daily basis and the

10   database that contains that data, and what each of the

11   deponents indicated is that that database is there.  It's kept

12   for a very long time.  It's easy to access.  American goes to

13   that data frequently and relies on it to help them improve

14   their operation.  And so even if we were to take Mr. Hollinger

15   at his word that the reports can't be found, the data

16   underlying the reports is plainly out there.

17           And I guess what we would say, Your Honor, is that if

18   the Court is interested in getting this information and

19   believes it would be helpful to its decision, you know, we're

20   certainly amenable to doing what it takes, with leave of court,

21   to get the information.  Frankly, everything we've seen in this

22   data from American Airlines indicates that it's going to be

23   extremely probative and it's also going to be in a great deal

24   of tension with the testimony you heard from American's

25   management last week.

1          THE COURT:  So you asked for the reports but you never

2     asked for the data.

3          MR. HASKELL:  That's right.  Frankly, because at the

4     time we served that subpoena, we didn't understand the

5     relationship between the data and the reports.

6          I should mention, Your Honor, the subpoena that we

7     served, as well as the responses we received from American, are

8     already in the record.  They were attached to -- I think I made

9     out an affidavit in connection with the opposition to the

10    motion in limine that we filed last week or two weeks ago, I

11    guess.  But that's already in the record, if you'd like to

12    consult it directly.

13         Mr. HOLLINGER:  I just want to emphasize, nor did the

14    Attorney General request that we do anything once they were

15    able to determine that some of these dates of these reports

16    were, quote-unquote, "missing."

17         Now, I understand the time constraints of trials and

18    things like that, but it's not accurate for Mr. Haskell to

19    suggest that somehow or another American Airlines is hiding

20    reports or something like that.  They could have -- at any time

21    they could have said, Oh, you know, if the data is still there,

22    what about A, B and C?  And they didn't.

23         Again, many of these reports were produced as early as

24    the February and March time frame.  They were originally

25    produced and located because of mutually agreed email search

```
 1    terms and search results mand at no time have they asked us to
 2    do anything other than the produce the actual reports we could
 3    find, and we produced all of them.
 4         THE COURT:  I'm not trying to assign blame.  I mean,
 5    it seems like -- I mean, if one is looking to assign blame, it
 6    could be spread around pretty well.  On the other hand,
 7    everybody more or less kind of did what they were supposed to
 8    do at each step along the way.  But what I am wondering is if
 9    it makes sense to try to get a more complete dataset before we
10    make a decision in this case.  Now, they want it.  You --
11         MS. NANDA:  I would object to that, Your Honor.  We
12    are in day seven of trial.
13         THE COURT:  I get it.
14         MS. NANDA:  It's highly prejudicial to our case.
15         THE COURT:  But they're part of you.  I mean, you want
16    me to make a decision on incomplete data that's incomplete
17    because --
18         MS. NANDA:  I'm not asking that you make a decision on
19    incomplete data at all.  We've put forth data in this case.
20    We've put forward the testimony of Mark Blaska and the data
21    that he put forth.  We have data that we put forth through our
22    expert Darin Lee.  We're not relying on this other data.  This
23    is in their defense.
24         Now, to open up discovery on such a major issue in the
25    middle of a trial when we've already rested our case is wildly
```

1    prejudicial.  I mean, we would have to open up everything

2    again.  We don't know what the data says.  And again, we have

3    not relied on this data in our case in chief.

4           So to say that somehow data that they've raised in

5    defense, which is incomplete, that somehow they're asking for a

6    do-over to start and open up discovery again is just I think a

7    bridge too far.

8           THE COURT:  I don't know that I would do it because

9    it's late in the game.  But it doesn't open up everything.

10   Either -- you've undermined their data because it's incomplete.

11   And it's incomplete -- I'm not casting blame on it, but the

12   control of that data is on your side of the V.  And it doesn't

13   open up everything because you're not going to tell me that

14   you're going to change your case based on what the data says,

15   right?  Either this is a substantial disruption or it isn't.

16          MS. NANDA:  There may be further discovery that may

17   need to be taking place and we may need to call witnesses again

18   with respect to those data sources.  And we'll have to --

19          THE COURT:  I disagree with that.  I'll take it that

20   it's late in the day and I'm not sure I want to open it up and

21   keep the evidence open on something that could have been raised

22   before trial.  But I'm not buying the rest of it.

23          This is the -- they've already put in the data.

24   They've told you what they're using it for.  They have an

25   expert.  They have charts.  All they would do is fill in the

1    gaps in the charts.

2            MS. NANDA:  Your Honor, they never even told us about

3    the gaps in the chart.  We were given the charts as continuous

4    date ranges with averages.  We only learned about the gaps in

5    the chart from doing all of the reconciliation work that you

6    saw in the demonstratives.  They never put that information in

7    the exhibits to their charts.  We deposed Mr. Zadmehran on his

8    charts, and he said at his deposition that he couldn't identify

9    the days of the missing reports.

10           I mean, in terms of hiding the ball, they have hidden

11   the ball with respect to these exhibits.  And it was not until

12   we did a complete audit of all of these documents that we

13   realized that those charts were missing many, many days of

14   data.  For whatever reason, they are missing data.

15           So the only point we're trying to make is that they

16   are what they are.  They summarize what they summarize, which

17   are certain days within those date ranges.  And that's where we

18   are, Your Honor.  And it's been that way for quite a long time.

19   So on day seven, to suggest that we go to primary source data,

20   you know, primary source data, not even these reports, we don't

21   even know what they would say or how long it would take to do

22   that in the middle of trial.

23           THE COURT:  Minutes.  He says minutes.  Maybe seconds.

24           MS. NANDA:  It is --

25           MR. HASKELL:  That's American's testimony, Your Honor.

```
 1          MS. NANDA:  I can assure you that that is not true,
 2     that to pull data, you always have to do a quality review.
 3     Even his own witness had to do quite a lot of quality review
 4     when just reviewing the third-party vendors' inputting of data
 5     from the PDFs into, you know, Excel spreadsheets.  So I think
 6     that is hyperbole to say it is seconds, Your Honor.
 7          THE COURT:  All right.  It's late in the game to add
 8     more data.  Everybody could have taken steps to complete the
 9     data before.  I'm not going to order it supplemented at this
10     point, but the whole thing sort of bugs me.  It leaves a bad
11     taste, let me say that.
12          I'll take the other motion under advisement.  I just
13     want to go back and look at those charts specifically again.
14          Why don't you go ahead and call your witness,
15     Mr. Haskell.
16          MS. PRASAD:  Thank you, Your Honor.
17          MR. HASKELL:  So the Attorney General calls Daniel
18     Akins.
19          DANIEL AKINS, Sworn
20          THE CLERK:  Would you please state your name and spell
21     your last name for the record.
22          THE WITNESS:  Sure.  My name is Daniel W.  Akins,
23     A-k-i-n-s.
24     DIRECT EXAMINATION BY MR. HASKELL:
25     Q.   Good morning, Mr. Akins.
```

1    A.    Good morning.

2    Q.    Can I ask you to please tell the court what you do for a

3    living.

4    A.    I'm an air transport economist, and I work as a

5    professional consultant in the air transport industry.

6    Q.    For whom do you work?

7    A.    I'm self-employed, and I also have another partnership in

8    Colorado.  It's an LLC.  And I'm also president of a nonprofit,

9    the Airline Workforce Alliance.

10   Q.    And can I ask you, Mr. Akins, to please pull the

11   microphone closer to you and keep your voice up.

12   A.    Sure.

13   Q.    The partnership that you mentioned, what's the name of

14   that outfit?

15   A.    Flightpath Economics.

16   Q.    And the nonprofit that you mentioned, can you speak a bit

17   about what that is and what it does?

18   A.    Sure.  I think we've all heard about the problems plaguing

19   the air transport industry recently, but even before the

20   pandemic there was a shortage of skilled technicians, which are

21   mechanics that have licenses at the airlines to service

22   airplanes.  And there's also a dire need for qualified pilots

23   that are needed for the expansion and retirement of pilots in

24   the airline business.

25        I started that business.  We had several airlines

1   supporting it.  We had airports supporting it.  And with my 35

2   years of experience in the business, I knew what was coming.

3   It's here now.  And since 2014, I've tried to get legislation

4   and work with flight schools and airlines to try and develop

5   programs to encourage, support financially, as well as qualify

6   mechanics and pilots to serve in the air transport business.

7   Q.   Mr. Akins, where were you educated?

8   A.   I got a post-graduate degree from the London School of

9   Economists in air transport economics in 2003.  Prior to that I

10  got a BA from a small school in Minnesota called Gustavus

11  Adolphus College.

12  Q.   You mentioned a moment ago, Mr. Akins, your 35 years

13  experience with respect to the airline industry.  What types of

14  matters have you worked on during those 35 years?

15  A.   I wouldn't call them matters.  They're more projects.

16  This is a matter.  The projects I've worked on have included

17  projects for airlines, projects for airports, airframe

18  manufacturers, labor unions, and affiliated companies related

19  to the air transport industry.

20  Q.   And let me break that down and start first with labor

21  unions.  Could you describe the type of projects that you've

22  worked with labor unions on?

23  A.   Sure.  I think in the past 20 years primarily that I've

24  worked with labor unions, I've worked on a number of

25  bankruptcies as an adviser to labor unions and advisers to

1   creditors committees in those bankruptcies.  And they include

2   pretty much every airline bankruptcy, which includes almost

3   every airline.  And most unions have gone through some type of

4   restructuring as a result of 9/11 or thereafter.

5       I've worked with labor unions primarily recently in

6   supporting contract negotiations, which involves preparing

7   estimates of costs and operational impacts of changes to

8   collective bargaining agreements on behalf of unions nationwide

9   that represent pilots, flight attendants, mechanics, ramp

10  provisioning agents, dispatchers, people that work in

11  mechanical stores, people that work with simulators, both as

12  technicians and instructors.  So it kind of covers soup to nuts

13  labor in the airline business.

14  Q.   And you also mentioned a moment ago that you have been

15  retained by airlines for certain projects.  Can you speak about

16  those as well?

17  A.   Right.  Well, there's a couple of different buckets.  Back

18  in the day, the U.S. DOT would negotiate with foreign countries

19  under bilateral agreements to provide air service expansion

20  between the two countries.  That protocol, the international

21  bilateral agreements have gone away.  We operate now under free

22  skies which allows a more liberal expansion of air services

23  between countries, but back in the day I worked for carriers

24  such as American and Southern Air Transport.  There was a

25  company called American International Airways, which was a

1    cargo company, in which I supported economic and operational

2    data efforts to prove to the United States DOT that those

3    carriers best represented American interests in expanding to

4    foreign countries.  That was done mostly in the '90s.

5        I've worked with Air Canada in a matter against their

6    pilot union, which at the time was called ACPA.  I've worked

7    with Lufthansa to expand service to the United States.  I've

8    worked with Lufthansa as well in an endeavor in the early '90s

9    with a financial investor in California called Marvin Davis to

10   potentially purchase Continental Airlines.  I've worked on a

11   number of other matters for large and small airlines with the

12   AWA pilot endeavors.

13   Q.   I'm sorry, the AWA is?

14   A.   AWA is my nonprofit, Aviation Workforce Alliance.

15   Q.   Got it.  You also mentioned, Mr. Akins, that you've worked

16   on projects on behalf of airports?

17   A.   Yes.

18   Q.   Can you speak a bit about that experience?

19   A.   Sure.  I worked on behalf of a number of large airports,

20   and it's sort of a fact of the business of airports that they

21   actually market themselves to airlines.  They want service to

22   be provided to various corridors of interest either in the

23   United States or internationally.

24       So I've worked with Metropolitan Washington Airports

25   Authority for a number of years.  I've worked with the City of

1    Nashville, worked with the City of Jacksonville and number of

2    other airport authorities to develop new routes and services

3    and perhaps new carriers to serve their markets.

4    Q.   Mr. Akins, have you done work on behalf of the United

5    States Postal Service?

6    A.   Yes.  There was sort of an odd project that popped up.  I

7    was heavily involved in the cargo industry.  The United States

8    Postal Service was proffering its overnight express business to

9    be served by FedEx rather than by postal service contracted

10   aircraft, and I did the financial and operational analysis for

11   the U.S. Postal Service of the transfer of its overnight

12   network of packages to a third-party vendor, which was FedEx.

13   And that's at the time when FedEx posted all of their purple

14   boxes outside of every U.S. Postal Service as a part of that

15   deal.

16   Q.   Have you also been involved, Mr. Akins, with -- let me

17   ask, the payroll support program --

18   A.   Sure.

19   Q.   -- is that something of which you're aware?

20   A.   Sure.

21   Q.   What is the payroll support program?

22   A.   Sure.  It's the program that provided funds for airlines

23   to pay for the payrolls and benefits of their employees during

24   COVID.  It came in three tranches under three different laws.

25   And I was, you know, proudly the one who developed the basis

1    for those payments, which was based on financial data that's

2    commonly available and is available from the U.S. DOT filed by

3    the carriers which represented the cost of full-time employment

4    and benefits to airline employees across the industry.  And

5    they utilize that analysis to put in place the law which

6    provided about $55 billion in government service support for

7    airline workers during the pandemic.

8    Q.   And around when did that work take place?

9    A.   It took place in, I want to say, late March.

10   Q.   Of?

11   A.   2020.

12   Q.   So towards the beginning of the coronavirus pandemic?

13   A.   Right.  And there was a very big concern in the airline

14   business, as well as generally in the airline industry, as well

15   as government, that we were seeing something that was worse in

16   terms of the impact on the airline business than all of the

17   other maladies that have occurred in history, bigger than 9/11,

18   bigger than SARS, bigger than the global financial meltdown.

19   All at once, within three or four days, we lost 90 percent of

20   the demand, and that's never happened before.

21       For comparison, 9/11 was like a 15 percent hit on revenue.

22   This was a 90 percent hit or greater.

23   Q.   15, one-five?

24   A.   One-five.

25   Q.   Compared to 90?

1    A.    Right.

2    Q.    Have you testified in court as an expert before,

3    Mr. Akins?

4    A.    Yes.

5    Q.    About how many times?

6    A.    I would say about a dozen.

7    Q.    That's over the course of your 35-year career?

8    A.    Yes.

9    Q.    And what kinds of matters have you addressed in those

10   previous expert testimony projects?

11   A.    A variety of things.  A lot of it involved Chapter 11

12   proceedings where I testified on behalf of either members of

13   the creditors committee or labor unions.  Some matters involved

14   pilot wage loss disputes.  There were a couple of instances I

15   testified on behalf of Continental in U.S. District Court in

16   Fort Worth on behalf of Continental Airlines to allow them to

17   expand services at Dallas Love Field, which Southwest was

18   contesting at the time.  But most of the matters involved

19   either airlines, airports or labor unions.

20   Q.    And going back to the work you've done relative to

21   negotiation of collective bargaining agreements, about how many

22   such negotiations have you been involved in in doing work for?

23   A.    I don't want to say countless, but it's probably several

24   hundred.

25   Q.    And have some of those involved the carriers that are here

1  in court today through A4A?

2  A.   Yes.

3  Q.   United, Alaska, American, Southwest, JetBlue and -- I

4  forget.

5  A.   Delta.

6  Q.   Thank you.

7  A.   Yes, all of them.

8  Q.   All of them?

9  A.   All of them at some point in my career, yes.

10  Q.   Okay.

11       MR. HASKELL:  At this time, Your Honor, we would

12  tender Mr. Akins as an expert in the economics and operations

13  of the airline industry.

14       MR. CARROLL:  No objection, Your Honor.

15       THE COURT:  All right.  He's qualified as an expert

16  and can testify as such.

17       MR. HASKELL:  Thank you.

18  Q.   So Mr. Akins, I'd like to start by talking about

19  operations in the airline industry and first start by talking

20  about on-time performance.

21  A.   Sure.

22  Q.   In your experience, is on-time performance something that

23  is important to airlines?

24  A.   It's important to airlines, and it's important to their

25  customers.

```
 1    Q.   And how do airlines measure on-time performance of their
 2    flights?
 3    A.   Well, we know internally that airlines such as American
 4    measure a very discrete level of on-time performance day to
 5    day, month to month for various aspects of their operation.  I
 6    think what we're talking about is publicly available
 7    measurements of airline performance which really came to
 8    fruition in the early 2000s when the government responded to
 9    consumer complaints about the lack of information regarding
10    flight integrity, that is the on-time nature of certain
11    flights.  And now we all benefit from that collection of data
12    by the U.S. Department of Transportation that every time we
13    file for a flight record to find out if the flight operates on
14    time, it will generally show a history of that flight's
15    operating record in terms of the performance, whether it's been
16    on time 90 percent or whether it's been canceled 10 percent of
17    the time.
18         So the original intent was to put together back in the
19    early 2000s a book that came out each month that would rank
20    each airlines' performance in terms of on-time delivery of
21    their product.  And it had various buckets, and the DOT and FAA
22    determined that the best bucket for impactful delays were
23    delays above 15 minutes.  And then there were other buckets
24    above 15 minutes, but on time according to the official
25    government statistics are below 15 minutes delay.
```

1  Q.   So I want to unpack a couple of aspects of what you said

2  there.

3       So airlines report to the federal government on-time

4  performance at the flight level?

5  A.   Yes.

6  Q.   And is that pursuant to law?

7  A.   Yes.

8            MR. HASKELL:   Okay.  And actually at this point if we

9  can put up on the screen Defendant's Demonstrative 8, and I'll

10  hand out hard copies as well.

11           THE CLERK:   I have to connect you.  What are you

12  hooked into?

13           MR. HASKELL:   No luck.  Let's proceed with the paper

14  copy then.

15  Q.   So Mr. Akins, the demonstrative that I just put in front

16  of you, have you seen that before?

17  A.   Yes.

18  Q.   And fair to say that this image we're looking at is

19  something that you prepared in connection with your opinion in

20  this case?

21  A.   Yes, it is.

22  Q.   And so can you explain to us what we're looking at here?

23  A.   Sure.  Underneath the requirements for the airlines to

24  submit flight information, all flight information, whether it's

25  delayed or not, the U.S. Department of Transportation also

1   requires them to file the delays as attributable to five

2   different types of causes that are determined by the airline

3   but mostly are in the five buckets that we see in the left,

4   which include air carrier, extreme weather, the national

5   aviation system, which is really the air traffic control

6   system, late-arriving aircraft, and security, which is really

7   airport clearance through TSA.

8   Q.   And I see that the graphic seems to break out the first of

9   those five buckets, the air carrier bucket, into subcategories.

10  Can you speak about what we're looking at there?

11  A.   Sure.  The airlines are instructed to file as air

12  carrier -- there we go -- air carrier-related delays those

13  issues which are represented by the list of 42 items on the

14  right-hand side.  So of the five categories, large categories

15  of delay causes, there is a 42-part breakdown of air

16  carrier-caused delays.

17  Q.   And so I guess I want to be clear here.  What is it that

18  an airline reports to the U.S. DOT?  Is it just the big bucket

19  air carrier-related delays, or do they report each of these 42

20  subcategories to the DOT as well?

21  A.   Just the five major categories.

22  Q.   Okay.  In your experience, Mr. Akins, do airlines commonly

23  track causes for delays internally in a more fine-grained

24  fashion than these five big categories that they're required to

25  report to the DOT?

1    A.    Yes.

2    Q.    Okay.  And just so we have this on the record, you've

3    spoken about the components of category one, air carrier

4    delays.  Is that sometimes referred to as carrier-caused

5    delays?

6    A.    Yes.

7    Q.    Okay.  The second bucket, extreme weather, what kind of

8    delays would be attributed to that bucket?

9    A.    Those would be the events that occur in the atmosphere,

10   either at the airport, in flight or on arrival which have

11   affected, according to the airline, the arrival or departure

12   time of a flight.

13   Q.    And the third bucket for national aviation system, what

14   kind of delays are attributed to that?

15   A.    Those are the types of delays that probably all of us

16   experience when there's metering of the air traffic control

17   system because of congestion in the airspace.

18   Q.    And the fourth bucket, late-arriving aircraft?

19   A.    That's just generally airplanes that have arrived late

20   that have impacted the departure of the next flight.

21   Q.    And that's a separate category of delays that airlines are

22   required to report to DOT?

23   A.    Right.

24   Q.    Is there any subcategorization there, or is that

25   regardless of the reason why an aircraft arrived late?

```
 1   A.   There's nothing filed publicly about late-arriving
 2   aircraft.  There may be something internally because obviously
 3   there's a cause for the late-arriving aircraft, so the airlines
 4   are determining the impact of what they'd consider to be the
 5   cause of a delay being late-arriving aircraft, for any cause.
 6   Q.   And the fifth category or bucket that airlines are
 7   required to report to the federal government security, what
 8   kind of delays might fall into that bucket?
 9   A.   That could be delays related to either flight crew or
10   passengers transgressing through the TSA security system at the
11   airport.  And that tends to be a nonfactor.  That's less than
12   say 1 or 2 percent.
13           THE COURT:  You guys, do me a favor.  Can you blow up
14   that list on the right?  My thing is blurry.
15           MR. HASKELL:  It may be --
16           THE COURT:  The copy is blurry but --
17           THE WITNESS:  I could read, Your Honor, if you'd like,
18   what I can make out.
19           THE COURT:  I just wanted it a little bigger.
20   A.   It's pretty much everything, even number 5, awaiting
21   alcohol, awaiting gate spares, baggage loading, cabin
22   servicing, cargo loading, catering, computer, something,
23   carrier equipment.  It's everything within the function of the
24   airline that could go wrong and does go wrong to delay flights
25   on occasion.
```

1    THE COURT:  So the reason I wanted to see it, can you

2  just -- why is late-arriving aircraft separate?  Why is that

3  not under air carrier?

4    THE WITNESS:  Because it could derive for a different

5  reason, and I'm not sure why that's in there either because it

6  seems to me that it's arriving late because of some cause.  And

7  all I can think of is, when they made this, they didn't really

8  think through that that's going to be connected to something

9  else.  Because aircraft themselves don't arrive late.  There's

10  a reason.  And it's weather, it's air traffic control.  It's

11  one of these 42 items.  And so it's a little bit of a gray

12  area.  It's not too big of a chunk of the explanation of

13  delays, but it is a conundrum for me as well.

14  Q.   And again, Mr. Akins, just to be clear, the five big

15  categories we're talking about here, those are proscribed by

16  the federal government?

17  A.   Yes.

18  Q.   And so when you talk about "they" making a decision to

19  treat late-arriving aircraft as a separated category, the

20  "they" refers to whom?

21  A.   The DOT and Congress effectively, that this probably

22  looked like a good list sitting around the table in Washington

23  in 2002.  To create this new report they probably had, you

24  know, several departments and people's hands in it.  But when

25  you actually break it down and look at it, the late-arriving

1    aircraft does not make sense on its own because it has to be

2    caused by something, I would believe.

3         And perhaps it's the thought that, if it's not air

4    carrier, extreme weather, national aviation system or security,

5    but there's still a delay, maybe this is a catch-all bucket for

6    something that they didn't think about that could affect

7    arriving aircraft.  But it's hard to imagine what that would

8    be.

9         Maybe internationally there was some passport issue or

10   something about, you know, international airspace, going around

11   Ukraine and having it take longer to go from Turkey to London.

12   Those aren't air carrier, extreme weather, aviation system or

13   security, but I'm just guessing as to what would be thought

14   about as fitting in that bucket when they first designed this

15   back in D.C. 20 years ago.

16   Q.   Got it.  And the right portion of your graphic here with

17   the 42 things that might fall into air carrier delays, when you

18   prepared this graph here, where did you get the list of 42?

19   A.   That was a screenshot from the source I listed down below

20   from the online explanation of what's in air carrier delay.

21   Q.   And what is the source listed at the bottom there?

22   A.   It's Bureau of Transportation Statistics, which is the

23   repository of the government's online publicly available

24   airline and airport data, which includes a wide variety of

25   other information besides flight delays.

1    MR. HASKELL:  Got it.  I think we can take this down

2    off the screen.  Thank you.

3    THE COURT:  I have another question.  So I'm just

4    looking at this.  If you have late crew and then you have

5    stowing baggage, are they really allocated -- there's a late

6    flight.  Are they picking one of those two things?

7    THE WITNESS:  I think, Your Honor, what they're asking

8    airlines to do is, if any one of these affected the flight

9    time, that it's attributable to air carrier delay.  There's no

10   requirement that the airlines themselves submit at this

11   discrete level.  If the problem fits within one of these

12   buckets on the right-hand side, the airline reports to the

13   government that it was an air carrier-caused delay.

14   THE COURT:  So your next slide is not going to be the

15   number of delays attributable to item 24.

16   THE WITNESS:  No.  There's no public information,

17   which is a great point, which is part of why we've presented

18   this exhibit.  There is no way to discern from the government's

19   data the degree to which or not late crew has affected a

20   flight.  It's just one of the 42.

21   So when we measure in terms of the best we can do with

22   government information, air carrier is the bucket in which late

23   crew fits.  But there's a whole bunch of other stuff, as you

24   can see, that are in there.

25   Q.   I guess it's probably best, Mr. Akins, to put a finer

```
 1    point on that to clear it up a little.
 2         So the 42 items that we see there, the federal government
 3    doesn't require airlines to submit data specific to each of
 4    those 42 items as part of this reporting requirement, does it?
 5    A.   No.  It specifically says they don't.  They're to report
 6    air carrier causes for any of the items listed on the right as
 7    a single number --
 8    Q.   So the -- I'm sorry.
 9    A.   -- as a single number.
10    Q.   Got it.  Does the federal government even require airlines
11    to keep track of delays at the level of granularity that we see
12    in the 1 through 42?
13    A.   I know of no rule or law that requires such information be
14    kept.
15    Q.   But I think you testified earlier that in your experience
16    many airlines do keep that kind of level of granularity for
17    their own internal purposes.
18    A.   Yes.
19    Q.   And for what reasons might an airline look to that
20    granular level of data?
21    A.   Well, if five of these categories are causing the majority
22    of their air carrier delays, they would like to implement, I'm
23    sure, investigations to figure out what's causing the delays in
24    their operation.  And we've seen already evidence I guess from
25    what we discussed earlier today that American Airlines keeps a
```

1   variety of information about day-to-day or month-to-month

2   reviews of flight crew or absentee information.

3        So my experience is that these are represented most likely

4   by different departments.  If you've got a broken lavatory,

5   it's air carrier-caused.  That has nothing to do with the labor

6   relations department which would be looking into issues of late

7   crew.  So you've got sort of companywide interest that's

8   probably, my best guesstimate, best business practices would be

9   to assign fixing theses problems if they come up to the various

10  departments in which they occur.

11       So, you know, I don't know specifically if you say United

12  Airlines has a cargo handling derivative off of this that says

13  we've got to figure out what's going on with cargo handling,

14  but they might, it might assist them in fixing a problem that

15  may be occurring with, quote, "cargo handling."

16  Q.   Has your experience in the airline industry given you

17  insight into how many internal delay cause codes a given

18  airline might have?

19  A.   Yes.

20  Q.   And can you speak about that?  How many are we talking?

21  A.   Dozens and dozens and dozens just for flight crew alone.

22  I've seen information from Delta.  I've seen information from

23  Southwest.  I've seen information from American over my career.

24  And they tend to have very deep dives on causes by base, by

25  day, by time in terms of issues that have arisen relating to

1   late flight crews.

2   Q.   Okay.  So if we can switch gears just a little bit and

3   speak about airline operations with particular respect to

4   staffing and ensuring adequate staffing.  I'd like to break

5   this down into two categories:  flight crew and ground crew.

6   And I suspect we're going to break each of those into

7   subcategories.

8        First of all, flight crew, what do you understand flight

9   crew to mean in the context of the airline industry?

10  A.   Flight crew is the cabin crew, which are flight

11  attendants, and the cockpit crew, which are pilots.

12  Q.   Okay.  And are you familiar with the governmental

13  regulation of each of those two categories of employee?

14  A.   Yes.

15  Q.   And again, let's break it down, flight attendants first.

16  Can you speak a bit about the way in which the federal

17  government regulates flight attendants and what they can do

18  particularly with respect to their work?

19  A.   Right.  So there's sort of two buckets we'll talk about.

20  One is the certification or licensing requirements that the

21  federal government requires of certain employee groups to be

22  employed by airlines, and the other one has to do with the

23  federal government prescribing various aspects of scheduling

24  rest or duty time or work time provisions.

25       Flight attendants don't have licensing, but flight

1   attendants do have requirements to be trained on safety

2   procedures, to evacuate airplanes, to apply first aid, these

3   days to have handcuffs to assist the other flight attendants to

4   subdue, you know, what we've seen in the air these days.  And

5   so they don't have the kind of oversight that, say, pilots do,

6   which require probably the most government oversight in terms

7   of licensing of any profession in the United States, maybe

8   outside of a heart surgeon.

9        They are required to have a minimum number of hours of

10  training.  They're required to pass on a six-month basis what's

11  called a Class 1 Medical Certificate to prove that they're

12  healthy.  They have to be under age 65.  They have to now

13  obtain something called an air transport pilot license, which

14  has been in effect for about the past nine years, in order to

15  fly, in order to get a job with an airline.  That training for

16  a pilot takes about three to four years these days to become a

17  paid professional pilot.  Flight attendants, generally a couple

18  of months.

19       Hence the problem with cockpit crew that I discussed

20  earlier, that the regulations that govern piloting geared

21  toward safety are much more restrictive and severe in terms of

22  training requirements and licensing requirements and health

23  requirements than any other group of employees that I'm aware

24  of.

25  Q.   Now, it's your understanding, or is it your understanding,

1    Mr. Akins, that pilots and flight attendants are subject to a

2    minimum staffing requirement for each flight?

3    A.    Yes.

4    Q.    And with respect to flight attendants, what is that

5    requirement?

6    A.    The requirement is that the federal government requires a

7    single flight attendant for a ratio of one to 50 seats.  So if

8    you've got a 50-seat airplane -- and the reason why we have so

9    many 50-seat airplanes is due to the fact that the government

10   requires one flight attendant for 50 seats.  If we had 51,

11   there would be two flight attendants on those airplanes.  So

12   there's always a circular connection between the regulation and

13   what's actually operated.

14        That requirement used to, in the day, be exceeded.

15   Oftentimes you would find carriers staffing toward their

16   marketing goals or their service levels, especially on

17   international flights, where you may require six or eight

18   flight attendants, they may have 10 or 11 flight attendants

19   onboard.

20        So it used to be more typical than it is today that flight

21   attendants staffing exceeded FAA minimums.  Now I don't think

22   there's any air carrier that operates domestically, domestic

23   flights that has an excess of flight attendants on board, but

24   there are some that have service derived excess flight

25   attendants on board on international flying.

1    Q.   On international.  Did I understand you correctly that

2    that's not common on domestic flights?

3    A.   It's not and it's not required.  It's above the FARs.  So

4    there is some flexibility for carriers to overstaff.  There's

5    no flexibility to understaff.  The flight can't leave.

6    Q.   So you mentioned that back in the day, I think you said

7    airlines would staff more flight attendants than were required.

8    In your experience about when did that change?

9    A.   It changed gradually after deregulation which occurred in

10   1979, in October, which took the government out of the business

11   of regulating the airline services.  But gradually, over time,

12   I would say it came to an end quickly after 9/11 when airlines

13   were under incredible stress to continue operating.

14   Q.   And before we move off of regulations, flight attendants

15   are also subject to federal regulation relative to the time

16   that they can work and the time that they need to rest; is that

17   correct?

18   A.   It's mostly the rest of part of it.  Generally, collective

19   bargaining agreements that I've worked on deal with scheduling

20   and maximum duty times.  But it's really the newest laws from

21   the Federal Aviation Administration have been to govern the

22   amount of sleep or rest after a sequence of flying that flight

23   attendants are required to have before they can commence

24   another flight, and the new rule is ten hours.

25   Q.   I'm sorry, ten hours?

1   A.   Ten hours of -- ten hours off the airplane, not

2   necessarily at the hotel or away from the airport.  It's ten

3   hours of nonpaid, off-the-airplane rest.

4   Q.   And that's ten hours between what and what?

5   A.   The door open and the report time.  It's generally called

6   debrief time.  And some airlines start their briefing a half

7   hour, 45 minutes before the flight, depending on whether it's

8   international or domestic.  It's normally known for flight

9   attendants and pilots as check-in time.

10  Q.   Okay.  I'm sorry, the regulation you spoke about a moment

11  ago regarding minimum staffing of flight attendants on

12  flights --

13  A.   Right.

14  Q.   Is it fair to say that if the minimum number of flight

15  attendants is not available, that plane just doesn't take off,

16  perhaps doesn't push back from the gate?

17  A.   Right, that's exactly right.  It may not be that obvious,

18  but I didn't get to pilots.  But for now, given the extreme

19  strain on pilots, it may change, but for now, the Department of

20  Transportation, pretty much every regulatory body worldwide

21  requires that there be two pilots on board every cockpit.

22  That's changing.

23       Right here in Boston, Boeing has invested over a billion

24  dollars in Cambridge to develop automated flight, which will

25  allow for a single pilot.  And that's due to the extreme lack

1  of availability of pilots at this point.  And so that could

2  change.

3       So we need two pilots, one captain and one first officer,

4  both with the requisite licensing time and training.  If you're

5  flying internationally or over eight hours, you need what's

6  called an augmentation to the crew.  That would be a first

7  officer that could fly during the mid-flight sequence so that

8  no pilot is actually at the yolk for over eight hours.  If

9  you're going over 12 hours nonstop, you need two additional

10  pilots.  They're called bunkies or supplementals.

11  Q.   So I think we began to touch on this a moment ago when we

12  spoke about staffing to the minimum versus overstaffing.  How

13  does an airline go about ensuring that it has an adequate

14  number of, say, flight attendants for a given flight?

15  A.   Sure.  You know, each airline is doing it slightly

16  different and has slightly different constraints or flexibility

17  built within their collective bargaining agreement.  Delta does

18  not have a collective bargaining agreement, so it perhaps has

19  the most flexibility.

20       But in terms of staffing to meet the FARs, there are sort

21  of two categories for both pilots and flight attendants that

22  airlines have developed.  One is called the line fliers, which

23  you bid for a sequence of flights.  The initial training

24  usually for pilots and for flight attendants initially starts

25  in a different bucket, which is called reserve.  That's the

1    system by which the airlines sort of spackle-in for staffing

2    irregularities or shortages during the given flight or period

3    of time.

4        So the line flight attendants bid for flights.  The

5    reserve flight attendants back up those bids in case something

6    happens where a line flight attendant cannot serve.  But there

7    are buckets that are left open called open time, of all things,

8    where no line flight attendant or pilot has been assigned, and

9    the airline can essentially make flight attendants or pilots

10   aware that there's available time to fill if they want it.  If

11   it's not filled voluntarily, generally airlines fill it with

12   reserves.

13   Q.   And I guess that gets to my next question.  How does an

14   airline go about ensuring that it has the right number of

15   flight attendants to fill all the open time that needs to be

16   filled?  What pools does the airline use?

17   A.   There are incredibly complex scheduling systems.  Most of

18   them are PBS systems, preferential bidding, which is a way in

19   which airline crews use their seniority and longevity in the

20   job to present a set of criteria to their company that says I

21   don't want to work specific flights; I don't want to work

22   weekends; I don't want to work on, you know, overnight flights,

23   whatever.

24       And the computer assigns flying to those line flight

25   attendants and pilots based on the preferences that were

1    expressed each month for that particular individual.  And it

2    tries to optimize the flying that was provided based on the

3    preferences indicated by the individual flight attendant or

4    pilot.

5        So those flights again get filled.  The schedules are

6    assigned.  After they're assigned, flight attendants and pilots

7    can trade trips generally with each other to make sure that,

8    you know, one pilot needed a Saturday off, and they're trading

9    that Saturday for the previous Saturday with another pilot.

10   That's generally done under the radar.  They can do it in

11   automated systems within the company's scheduling software.

12       At the end of the day, there are a number of ways that an

13   airline can ensure that flights have the proper number of crew,

14   but generally the tools that they have aren't just the reserve

15   system.  There are other ways to fill those buckets.

16   Q.   And with respect to the reserve system specifically, fair

17   to say there's more than one type of reserve?

18   A.   Sure.

19   Q.   Can you speak about those.

20   A.   Sure.  Most carriers have airport-ready or standby flight

21   attendants and pilots that are in a crew lounge or stationed at

22   the airport for periods of four to six hours.  Those

23   ready-reserve assignments complement a backstop of reserves

24   that are available usually within two to three hours of the

25   flight departure time.  So if they're called and available,

```
 1    they have to have generally between 12 and as much as 15 to 24

 2    hours of availability either in their domicile or somewhere

 3    that's within two to three miles -- two to three hours away

 4    from the airport that they're sitting reserve in.

 5         So there's the airport-ready reserve to fill immediate

 6    problems, and then there's sort of the longer call reserves

 7    that fill reserve needs that are generally notified for longer

 8    periods of time, two to three hours.

 9    Q.   And in your experience, how do airlines determine the

10    number of both ready reserves and airport standbys that they

11    need to have?

12    A.   There is a very refined and structurally very organized

13    systematic historical look at big data involving all types of

14    information regarding the availability of crew on a historic

15    basis for pretty much every day of the year for every flight

16    for every destination that they fly.  And those algorithms tell

17    the crew schedulers the probability of needing a certain amount

18    of reserve staffing to back up what is likely to be a shortage

19    in staffing for a particular day, particular flight at a

20    particular time.  And so it's evolved into a very complex

21    computer program that's looking at historical data based on the

22    likelihood of a staffing shortage on a particular day.

23    Q.   And in your experience do different airlines approach that

24    task in different fashions?

25    A.   Yes, they do.
```

1    Q.   And how does that work?

2    A.   Well, I mean, each carrier has a value assigned to

3    ensuring that delays are minimized, right?  Traditionally Delta

4    has been known in the last few years to run some of the lowest

5    delay ratios of any carrier.  JetBlue on the other hand runs

6    some higher delays.

7         I've worked with their flight attendants.  I know how

8    their system works in terms of scheduling, and I realize that

9    Delta has placed on a corporate level a much higher priority in

10   ensuring on-time integrity in their system than, say, JetBlue.

11        So when JetBlue looks at the same set of circumstances,

12   their reserve staffing is likely less as a percentage of flight

13   staff than Delta, which wants to cover those flights and likely

14   has excess flight attendants or pilots who don't get used

15   during their reserve period simply because the company has a

16   higher priority on ensuring that the schedule integrity is

17   maintained.

18   Q.   And the tools and techniques and processes that you spoke

19   about relative to flight attendants, is it fundamentally

20   different than the way airlines ensure adequate coverage for

21   pilots?

22   A.   No.  It's the same.

23   Q.   So I'd like to pivot from flight crew, which we just spoke

24   about, to ground crew.  Let me ask, to your understanding what

25   comprises ground crew?

1    A.    Ground crew is a much bigger pool of employees in terms of

2    the number of employees at an airline.  Some of the larger

3    buckets are the people that we see loading bags and driving

4    tugs out the window of our aircraft.  Those involve ramp folks

5    that deal with marshalling airplanes into the gate as well as

6    hauling bags to and from the terminal and other aircraft for

7    connecting flights.  And they also do a bit of tug work in

8    airports that require tugs to assist airplanes in getting to

9    the runway.

10        The second bucket I would think of employees that are a

11   fairly large group are mechanics.  United and Delta and

12   American each have around 10,000 or more technicians.  They're

13   licensed technicians.  They work on airplanes.  They fix things

14   that are broken.  They're the fellows that come on with the

15   clipboard when we've had a flight issue, and the pilot says,

16   Unfortunately, there's something wrong with the airplane, we

17   have to have maintenance take a look, those are the people that

18   come out and fix it.  They're also the ones that do heavier

19   maintenance on airplanes and hangars.

20        There's a huge -- well, it's not as big as it used to be,

21   but customer service representatives used to be the people we'd

22   call to get tickets before everybody started using computers.

23   They're now the people that we call generally when our flight

24   is delayed or canceled to get a new booking.  There are several

25   thousands of those at most carriers.

1       These is also a group of dispatchers that track flights

2   and plan flights, weight and balance issues, fueling issues

3   that airlines are required to have on board.  There are people

4   who take care of maintenance equipment and maintenance parts.

5   They're called stores employees, sort of a librarian for parts

6   and services within the airlines that have to do with

7   maintenance.

8       There are flight simulator instructors, flight simulator

9   technicians, provisioning agents that put food on airplanes.

10  Within each of those categories are subcategories.  For

11  instance, in maintenance, some maintenance departments also do

12  repairs for other airlines as a retail business, like

13  American's operation in Tulsa.

14  Q.   Mr. Akins, one category, if you did mention, I didn't

15  catch it, were gate agents.  Are those folks also considered

16  part of the ground crew?

17  A.   Yes, yes.  And as Dr. Lee testified yesterday, the gate

18  agents are required to board an airplane.

19  Q.   Okay.  So of the various categories of ground crew workers

20  that you just mentioned, are any of them subject to federal

21  regulation in a manner similar to the flight attendants you

22  testified about earlier?

23  A.   I think there's a couple of categories that you would

24  consider to be somewhat subject to federal oversight in terms

25  of licensing or in terms of their maximum duty times.  The

1    mechanics that work for airlines that touch airplanes that deal

2    with FAA-certificated or FAA-approved parts and equipment have

3    to have an A and P license.

4    Q.    What's an A and P license?

5    A.    Which is an airframe and power plant license, which is a

6    specific training in a technical school.  And the FAA requires

7    that mechanics that essentially fix airplanes have those two

8    licenses.

9         And generally most technicians have those licenses in

10   addition to other licenses that they may possess.

11   Surprisingly, and it's not a comfort to me to know this, but

12   mechanics can work every day, all day, up until 26 days in a

13   30-day month without any FAA oversight.  They only require four

14   days of rest during a month.

15        So that flexibility is a lot different, and we'll talk

16   about that compared to flight attendants and pilots who have

17   very strict requirements about how much rest they need, how

18   much work they can do.  But it's highly unusual that the sort

19   of governance that are on the flight crew exists anywhere

20   outside the cabin or the cockpit.

21   Q.    So when I asked you a moment ago about regulation of these

22   folks' work, you mentioned perhaps licensing regulations and

23   also duty time regulations, you spoke about the A and P

24   license --

25   A.    Right.

1  Q.   -- that mechanics may possess.  Are there other licensing

2  requirements applicable to any of the ground crew work

3  categories that you described?

4  A.   The dispatchers need to be certificated in what's called

5  flight-following, and it's not really a license.  It's more of

6  a carrier certification.

7  Q.   Let me break that down if it's okay.  When you speak about

8  dispatchers, who are those folks; what do they do?

9  A.   Those are the ones that make the final determination of

10 the capabilities of the aircraft in terms of the load of

11 passengers and the ability to fly, the particular route has

12 enough fuel and has a particular route where that fuel will

13 sort of allow them to either land at the point of destination

14 or an alternate destination in case there's some problem in

15 flight.  So they're essentially flight planners.

16     However, once they get in the air, the flights that get in

17 the air, they track where the airplanes are for a system kind

18 of network integrity basis.  But once you're in the air, it's

19 generally air traffic control who is selecting for the pilots

20 where to go.  But the pilots ultimately have the final say in

21 which track that they choose.

22     If there's something going on with the airplane in terms

23 of the fuel or whatever, they're reporting back to dispatch or

24 they're reporting back to maintenance about issues.  So they're

25 an integral part of the daily operation.  And every carrier has

1    them.  They tend to be centralized in one location generally

2    where the headquarters is.

3    Q.   Okay.  And to your knowledge do any of the A4A carriers

4    employ dispatchers at Boston Logan Airport, or do you know?

5    A.   I know that they don't.

6    Q.   They do not, okay.

7         And so besides, I think you testified, airline internal

8    certifications that are associated with dispatchers and the

9    licensing that's associated with mechanics, any other licensing

10   regulations applicable to any of the ground crew?

11   A.   Not that I'm aware.  Obviously they have to be trained up

12   to some corporate standard or, you know, some safety standard

13   if you're on the ramp around airplanes.  But to my

14   understanding, there isn't any federal or license granted to

15   people that are marshalling airplanes or people that are

16   working at the gate.

17   Q.   Okay.  And you also mentioned duty time regulations, and I

18   think you spoke a little bit about duty time regulations that

19   might govern mechanics.  Are there others of which you're aware

20   in terms of regulatory standards?

21   A.   Right.  In terms of the ground crew, no, no.  I forgot to

22   mention that the bigger constraint on pilot supply in terms of

23   the amount of hours that a pilot can fly, the FARs require that

24   a pilot not fly any more than 1,000 hard hours, which are

25   actual flying hours in a given year or 100 hours in a given

1    month.  None of that, as far as I know, exists for ground crew.

2    Q.   Okay.  And so in terms of staffing, it might make sense to

3    break some of the ground crew down into categories.  So let's

4    take the ramp workers first.  I think you testified that the

5    ramp workers are the folks who marshal the aircraft, load and

6    unload the baggage, operate the tugs.  Anything else that

7    rampers do?

8    A.   They sometimes do provisioning.  Right now, what's the new

9    technology, they actually snap bag tags so that the airline can

10   facilitate a more efficient distribution and collection and,

11   you know, connecting system for bags so that we get our

12   information that says your bags made the flight.

13        Five to ten years ago, that wasn't available, and it's

14   what the rampers are doing now that they used to not do.

15   Q.   When you say "snap the bag tag" --

16   A.   They'll take a picture of the barcode with a machine.

17   You'll see, if you're in an airplane, you'll look down, as I

18   always do, to see what's going on with the bags and making sure

19   my bag is loaded, you'll see them with a gun, with a reader,

20   barcode reader, and that's being fed into a central computer

21   that says this bag was loaded onto this airplane.  And in fact

22   that information is used by dispatchers to do what's called a

23   weight and balance analysis, how many bags are on board, how

24   many people are on board a particular flight.

25        So rampers are essentially running around handling all the

1  duties on the ramp, marshalling, tugging, bag transfer, driving

2  the tugs.  People that are driving those tugs sometimes at

3  outrageous speeds trying to connect to flights are rampers

4  generally.

5  Q.   Okay.  And I think you testified earlier you've

6  represented rampers groups in connection with CBA negotiations

7  in the past, right?

8  A.   Yes.

9  Q.   And so in your experience and knowledge, at a given

10 airport, understanding that it may be different carrier to

11 carrier, how does a carrier organize its ramp workers?

12 A.   Right.  They're sort of, I guess it's dependent on the

13 airport where the rampers are employed.

14 Q.   If you'd focus specifically on Boston Logan Airport, if

15 you're aware of that, that would be helpful.

16 A.   Well, Boston Logan I think would be representative just by

17 the size of the operations at air carriers there.  I would say

18 companies like A4A carriers that operate at Boston Logan have

19 company-employed rampers on a full-time basis primarily that

20 service in those functions that I just mentioned.

21      Airports that have smaller operations may have part-time

22 rampers, or they may have outsourced rampers that are

23 essentially provided by a third party.  It's very common,

24 JetBlue I believe uses them in New York.  They may use them

25 here, but they have outsourced some of their ramp function to a

1    third party company.

2        So the ones that work for the A4A carriers generally are

3    under a CBA, collective bargaining agreement, and have

4    eight-hour scheduled work times with a lunch break.  They also

5    have in a common circumstance what are called relief agents.

6    And those folks serve sort of at the peak of operations.

7        Hub-and-spoke airports we haven't talked about, which is

8    the places like Boston is becoming for Delta, which have very

9    high activity in a very short window of time where flights are

10   de-planing, inplaning when people are connecting to flights,

11   there tends to be situations and timeframes in which the staff

12   of rampers that are just regular rampers or part-time rampers

13   need assistance, and so there are relief agents available.

14   Sometimes they're supervisors, management supervisors.

15   Sometimes they're relief agents.  So they're just there for a

16   few hours to assist with peak times.

17   Q.   In your experience are ramp workers organized into crews

18   at the airport?

19   A.   Not in terms of their scheduling.  They may be in terms of

20   crews in terms of, you know, working with your buddies.  But,

21   you know, generally they have staggered times of start based on

22   an array of flight scheduling, but they're not really crews the

23   way you would think of like a flight crew.

24   Q.   Okay.  And similar to the question I asked earlier about

25   flight attendants, how does -- how might a given carrier go

1   about ensuring that it has an adequate number of folks working

2   on the ramp, you know, on a given day at a given airport to

3   meet its needs?

4   A.   Well, that's an interesting question because I think

5   Southwest and other carriers have found that the primary way to

6   make sure you have enough rampers or other employees is to make

7   sure they're getting compensated at a rate that equals at least

8   what they're making at other types of opportunities in the

9   community.

10      That is, Southwest ran into this problem where they had a

11  very severe staffing shortage, and they were paying well below

12  what the market was demanding, for instance, in Denver, and had

13  to raise their rates.  In fact, they had to double their rates

14  from about $7 dollars an hour to $15 an hour.

15      So point one is to make sure you're compensating what the

16  market demands.  And number two, they do have, you know,

17  various ways to either voluntarily or force people on the ramp

18  to spend time in overtime if they assume that there's going to

19  be a shortage.

20      There are manpower control operations at each airport that

21  are in the purview of management.  And if somebody calls in

22  sick or is otherwise absent or gets hurt on the job, rampers

23  can either assist in a way that they were sort of doubling

24  their efforts to cover flights, or the company can require that

25  rampers stay for a period of time to cover existing flights

1    that they weren't planning on covering, essentially working

2    overtime without their volition.  But for the most part, in my

3    experience rampers and other ground employees have the

4    opportunity to volunteer for overtime.

5         And generally that carrot works, you know, for the most

6    part to get people to stay for overtime.  If it doesn't work,

7    in reverse seniority order, employees that are either at the

8    airport or about to be scheduled at the airport are mandatorily

9    assigned overtime shifts to make sure there's enough.

10   Q.   And in your experience, Mr. Akins, do airlines make

11   decisions about the level of staff to put out on the ramp in

12   reliance on the possibility of overtime?

13   A.   Yes.  And it's one of the more interesting things that I

14   found in my career, is that just like flight crews -- and I

15   spoke about open time.  A lot of airlines purposely understaff

16   on a financial basis in certain bases and rely on people

17   volunteering for overtime because it might be cheaper for those

18   airlines to have someone occasionally pay time and a half or

19   double time than it would be to have an additional staff person

20   that's got all the benefits and requires training, on-staff

21   that isn't really needed on a full-time basis.

22        So there's a wide variety of ways in which carriers

23   supplement the staffing or staffing requirements are filled by

24   the airlines.

25   Q.   In your report in this matter you mentioned a technique

1   called job continuation assignments.

2   A.   Right.

3   Q.   What's that?

4   A.   That's essentially asking someone to continue their,

5   whatever they're working on, mostly mechanics, if they're in

6   the middle of fixing something, to carry that work on to

7   another shift.  If they were supposed to get off at 5:00 and

8   they've got another half hour to fix a tire or repair an engine

9   cowling that day, they would be asked to continue that job not

10  for another full shift but just until that job is complete

11  because the inefficiency of someone that's coming on a shift to

12  first get debriefed on what is wrong with the aircraft or tug

13  or whatever they're trying to fix is more expensive than it

14  would be just for the person to continue with that job.

15  Q.   And you mentioned earlier in connection to flight

16  attendants the opportunity to trade shifts amongst themselves.

17  A.   Right.

18  Q.   In your experience, are similar opportunities available

19  with respect to the folks who work on the ramp?

20  A.   Yes.

21  Q.   Okay.  And does it ever come to pass that supervisors or

22  some sort of manager at the airlines is asked to work on the

23  ramp?

24  A.   Yes.

25  Q.   And how might that happen?

1   A.   A lot of times that happens or doesn't happen because it's

2   either allowed or not allowed according to the collective

3   bargaining agreement.  And usually it's a fight that the unions

4   want to have their members doing the work.  And managers,

5   sometimes in the operation, suggest that it's more efficient to

6   have a supervisor help with bags or with tugging.

7        And so a supervisor, if the collective bargaining

8   agreement allows it, can help out, a management person can help

9   out in loading bags or marshalling airplanes.  That's a rarity

10  because most collective bargaining agreements don't allow that.

11  Q.   Fair enough.  Then you mentioned a bit earlier relief

12  shifts or relief lines.  Could I ask you, how exactly do those

13  work?

14  A.   Well, at Southwest I've been working with the TW members,

15  union members of their ramp and provisioning craft.  There's

16  about 15,000 of them.  And management has the ability to staff

17  relief agents, I think it's up to 20 percent of that number, so

18  it's essentially a 20 percent, quote, "reserve pool."

19  Q.   What exactly does a relief agent do on a given day?

20  A.   As I suggested, they're there primarily not as the

21  baseline staffing but for peak periods and for filling in when

22  there's perhaps shortages of staff.  They're backup.

23  Q.   I'm sorry?

24  A.   They're backup staffing essentially.

25  Q.   And are these relief agents actually at the airport ready

1    to be plugged in where needed or are they at home?

2    A.   Yes, yes, they're at the airport.

3    Q.   They're at the airport.  So you spoke about multiple

4    different categories of ground crew, and we've covered the

5    rampers in some detail.  For the next few I just want to focus

6    on the differences, if there are any.  I don't think we need to

7    repeat everything.

8         But, say, with respect to the mechanics and the

9    maintenance staff, do the airlines generally have the same

10   tools and techniques and processes available to ensure adequate

11   maintenance staff that you described with respect to rampers?

12   A.   Right.  And I think, again, the category of maintenance in

13   my mind, because it's a license-certificated category, is a

14   different kind of profession than a ramp employee which doesn't

15   require those types of certificates or training.  And in my

16   experience, airlines do not have any problems whatsoever with

17   mechanic staffing.

18        There's a certain esprit de corps that I've seen

19   especially in the mechanic ranks, which is, they will pick up

20   work voluntarily where it's available, and they'll sign up

21   voluntarily for overtime.  And mechanics, starting mechanics

22   now make pretty good money, and to pay double time or time and

23   a half to those mechanics is enough of a carrot to essentially

24   cover any issues that may arise with staffing.

25        The other part of the mechanic's job, and I think it's the

1  flexibility of the employee to be able to work overtime, is one

2  part of the staffing coverage.  The other part of it is their

3  jobs are fungible that an aircraft that's sitting in the hangar

4  that's having a tire change perhaps for a flight tomorrow

5  morning can be a lower priority than a problem at the gate

6  with, say, a hydraulic filter or light, an instrument light

7  that's out.  So they can stop the job, prioritize the problem

8  at the gate and move from the problem they were working on,

9  which is a longer-term problem, to something that's a critical

10  problem.

11  Q.   I see.  And moving on to another category of ground crew

12  workers, the customer service representatives that you

13  mentioned earlier.

14  A.   Right.

15  Q.   In your experience do the airlines have similar tools,

16  techniques and processes available to ensure adequate coverage

17  of CSRs as they do or for other categories of ground crew?

18  A.   Yes.

19  Q.   Are there any differences with respect to CSRs that are

20  worth mentioning?

21  A.   CSRs now largely work from their place of choice, largely

22  their homes.  There's a few CSR centers still.  They've sort

23  of -- like everybody probably in this room has done a lot more

24  work at home than we have in the office in the past couple of

25  years.

1        But the CSR job, again, is one where there's been some

2   wage pressure on airlines.  Those jobs are very flexible.

3   Generally people can sign in or sign out, take breaks when they

4   need to.  So again, there's a flexibility there that I don't

5   think is available or is as critical as on a ramp in terms of

6   not marshalling in a plane because you're short-staffed or not

7   being able to put a tug on the airplane because you're

8   short-staffed.  Those types of problems don't exist with a CSR

9   I believe in the same way.

10  Q.   Okay.  And then another category of ground crew you

11  mentioned is gate agents.  Is it fair to say, so you've

12  represented those groups of employees in connection with CBA

13  negotiations and the like?

14  A.   Yes.  I'm currently involved with the former American U.S.

15  Airways CSRs.

16  Q.   And I'm sorry, CSRs or gate agents --

17  A.   Sorry.  Customer service reps.

18  Q.   Okay.  With respect to gate agents -- let me ask, gate

19  agents and CSRs, do airlines typically treat those as separate

20  categories?

21  A.   Yes, but they can be covered by the same collective

22  bargaining agreement.

23  Q.   Got it, got it.  So I think you've already testified about

24  CSRs, but with respect to gate agents, specifically, in your

25  experience do the airlines have the same tools, techniques,

1  processes available to ensure adequate staffing as you've

2  already testified about with respect to other categories of

3  ground crew?

4  A.  Yes, yes, my understanding, yes.

5  Q.  Okay.  Mr. Akins, do you have an opinion about how

6  impactful the role of ground crew workers are respecting the

7  potential delay of flights?

8  A.  I would say they're much less impactful than flight crew

9  at a minimum, and at a maximum I'd say they really have very

10  little, if any, effect.

11  Q.  And why is that your view?

12  A.  Because of the indirect association that most of those

13  jobs have with the departure of a flight, they're not as

14  critical.  I believe that your ability to board an airline and

15  have it depart on time is a lot different than fixing a tire

16  or, you know, moving a bag around in terms of the integrity of

17  the schedule.  They're less connected to the on-time delivery

18  of the product.  Even though they're absolutely critical and

19  are required for an airline to function, their jobs aren't as

20  closely tied to the operation of a flight as flight crew.

21  Q.  So I would like to switch topics a bit, Mr. Akins, and

22  speak about Boston Logan Airport, particularly over the past

23  six or seven years.  In your work have you had the opportunity

24  to observe and study what's happened at Logan Airport during

25  that period of time?

1  A.    Yes, I have.

2  Q.    And what has happened at Boston Logan Airport during that

3  time?

4  A.    Boston is an incredible example of an extremely successful

5  airport.

6  Q.    In what way?

7  A.    It has had what I would call explosive growth.  It's had

8  the addition of new routes and services.  It's had a reduction

9  in overall fares.  It's had enormous investment by the

10  community and just recently by the federal government in terms

11  of developing Boston Logan to handle the incredible growth and

12  demands that are being placed on it.  There's been crew bases

13  established there recently, both Delta and JetBlue.  And with

14  JetBlue, the carrier associated with it in the northeast is

15  American.  They've all developed focuses and hubs that have

16  expanded services to a degree that I don't think Boston Logan

17  has ever seen in the past in terms of growth rates or in terms

18  of traffic levels.  It's an extremely healthy environment at

19  Boston Logan.

20       MR. HASKELL:  All right.  Let's break that down a

21  little bit.  And to do so we're going to take a look at

22  Defendant's Demonstrative 3.  I'll hand out paper copies and

23  also see if we can get it up on the screen.

24  Q.    So this graphic we're looking at, Mr. Akins, is this

25  something you prepared in connection with preparing your

1    testimony for this case?

2    A.    Yes.

3    Q.    And walk us through it.  What are we looking at here?

4    A.    Sure.  This is at the source, you can see it's called U.S.

5    DOT T-100 data, which again is part of this collection of

6    information that the Department of Transportation has publicly

7    accessible online and by other means by private vendors.  It

8    represents a period in time for A4A carriers after MESTL -- and

9    I've got it in most of my charts ESTL.  I was unaware that we

10   changed the acronym to MESTL.  But it's MESTL.  Since 2015 A4A

11   carriers have had an increase of 16.5 percent in departures and

12   20 percent in passenger inplanements.

13        We're talking about a very major, large-scale airport here

14   that is adding significantly to its existing base of traffic

15   during the period immediately following the establishment of

16   MESTL.  So we've got this very successful measure of empirical

17   data which suggests that Boston is a healthy and growing

18   airport for A4A carriers.

19   Q.    And let's break down the graphic a little, please.  First

20   of all, it's focusing on A4A carriers.  I know you formed your

21   opinion in this case some time ago and that Delta joined or

22   rejoined A4A recently.  Do the figures we're looking at here

23   include Delta?

24   A.    No.

25   Q.    Okay.  And I think you testified earlier that Delta has

1    been an example of growth in Boston recently?

2    A.   If Delta were included in this, they'd be larger --

3    Q.   Okay.

4    A.   -- these numbers.

5    Q.   And the 16.5 percent growth in departures that we see

6    between 2015 and 2019, what are you referring to when you say

7    departures?

8    A.   That's all international and domestic passenger departures

9    from each of the A4A carriers combined.

10   Q.   And is that in terms of number of flights or number of

11   passengers or what?

12   A.   Flights, flight departures.

13   Q.   I'm sorry, you said flights?

14   A.   Flight departures.

15   Q.   Got it.

16   A.   An airplane taking off is one departure.

17   Q.   Got it.  And the graphic also shows a 21.1 percent in

18   passenger inplanements between 2015 and 2019.  What do you mean

19   by passenger inplanement?

20   A.   Those are folks getting on the airplane in Boston.

21   Q.   So those are passengers?

22   A.   Regardless of whether they originated in Boston or

23   elsewhere and are just connecting.

24        MR. HASKELL:  Got it.  If we could get Demonstrative 5

25   on the screen.  I'll give you a copy of this as well.

1   Q.   So Demonstrative 5, is this also a graph that you prepared

2   in connection with your testimony in this case?

3   A.   Yes.

4   Q.   And what are we looking at here, Mr. Akins?

5   A.   We're looking at the growth overall in the same types of

6   figures for inplanements for passengers but only on a

7   year-by-year analyzed basis.  And the black lines on the

8   left-hand side show the annual growth from 2016 over 2015

9   versus the U.S. average growth in passenger inplanement.

10      So for each one of these years, the black bar is bigger

11   than the orange bar showing that Boston was in fact growing

12   faster after ESTL than the U.S. average for all airports, for

13   both international passengers for all airlines.

14   Q.   And these graphs that we're looking at here, are they

15   limited to A4A carriers or a certain subset of A4A carriers?

16   A.   No.  These are all carriers.

17       MR. HASKELL:  I'll hand out Defendant's Chalk 4, DDO4.

18   Q.   So what are we looking at here, Mr. Akins?

19   A.   We're looking at the same information in the left or the

20   right-hand three bars or four bars between 2015 and 2019,

21   they're the same data that was shown on the previous chart,

22   which is the post-MESTL experience.

23      What we didn't see in the last chart was the pre-MESTL

24   experience, which are the years 2011 to 2015.  And it shows

25   that all of the bars of growth before MESTL at Boston Logan

1   were lower prior to the implementation of the law than after.

2   Q.   And from the data that you've analyzed and shown us in the

3   last three charts, do you draw any conclusions about MESTL's

4   effect on the growth of passenger traffic at Boston Logan

5   Airport?

6   A.   Well, if it were in some way connected to the tremendous

7   growth, I would say it would have been a boon to the operations

8   at Boston.  I don't see how it's connected to this growth.  I

9   would think it's not connected in that this growth proves that

10  there hasn't been a significant impact of the implementation of

11  MESTL on Boston traffic.  This is against all of the

12  prognostications of Dr. Lee in terms of his analytical forecast

13  that this should not be occurring.

14  Q.   Now, when I asked you a few moments ago -- we can put

15  aside this graph.

16      When I asked you a few moments ago, Mr. Akins, about

17  what's happened at Boston Logan Airport, what's happened over

18  the past six or seven years, the first thing I think you

19  mentioned was growth, and I think you also referenced Delta and

20  JetBlue.

21      Let's take those one at a time.  With respect to Delta,

22  how has Delta contributed to the growth?

23  A.   I think it was mid-January of 2019, maybe it was June,

24  Delta decided it had established a hub in Boston about three

25  and a half years after MESTL was in place.

1    And by establishing a hub in Boston, Delta has focused new

2    services and new routes and has taken over Terminal A.  As

3    anybody who flies in and out of Boston recognizes, they've

4    gotten bigger in Boston.  And not only have they gotten bigger,

5    they're establishing Boston as a second primary international

6    gateway on the east coast, secondary to JFK.

7        It now flies to nine nonstop international markets.  It

8    just added Tel Aviv and Athens recently, and it's flying not

9    just on those routes, but it's flying with its brand new

10   premier, high-tech A330 600 long haul airplanes.  So it's

11   positioning the hub to have some sparkle and some pizzaz to

12   attract business customers.

13       Domestically, it's also greatly expanded its domestic

14   service operations with nonstop service all up and down the

15   east coast.  Nonstop service was established in May to Denver

16   and San Diego, and it established that nonstop service with

17   brand new, again, high-tech, state-of-the-art A321neo

18   airplanes.

19       So it's putting into this hub a new terminal focussing on

20   growth and new markets for Delta, some new markets nonstop to

21   Boston, lots of new international markets using brand new,

22   state-of-the-art, high-tech airplanes.  So this is a primary

23   focus for Delta.  They've got great expansion plans which were

24   interrupted by COVID, but they're now back on track.

25       And you folks who live in Boston see the paper, read about

1    this.  It's happening, it's real.  Delta is now a major player

2    in the Boston area seven years after the MESTL law came into

3    effect.

4         And again, the import of this is that, according to the

5    contentions of the other side, just the potential for

6    compliance with MESTL, it should be doing the opposite in terms

7    of the attractiveness of Boston to Delta.  It should be driving

8    away, using old planes, shrinking service, costing a lot more

9    and having fare hikes.  And none of that has occurred.  In

10   fact, the opposite is occurring.

11        So empirically, the evidence from Boston in realtime is

12   that it's a very healthy, growing airport with lower fares and

13   huge public benefits by the establishment of both Delta and

14   JetBlue with hubs in Boston.

15   Q.   By the way, Mr. Akins, I appreciate your nod to we folks

16   who live in Boston.  Where do you make your home, sir?

17   A.   A little north of here in Stowe, Vermont.

18   Q.   And do you ever have occasion to be at Boston Logan

19   Airport or use the airport in Boston?

20   A.   Yes, but for some reason we don't have nonstop service to

21   Boston.

22   Q.   From Stowe?

23   A.   No.  From Burlington.

24   Q.   You also testified a moment ago, Mr. Akins, about the

25   effect of the coronavirus on what we've seen in Delta's actions

1  at Boston over the past few years.

2  A.    Right.

3  Q.    On the coronavirus, have you had the opportunity to study

4  the -- what's the right word here?  Have you had the

5  opportunity to study the extent to which folks were using the

6  national aviation system during the coronavirus?

7  A.    Yes.

8  Q.    And what have you seen there?

9  A.    Again, as I testified earlier, the industry dropped

10  revenues immediately after the World Health Organization

11  declared COVID a pandemic, I think in March, mid-March of 2020.

12  There was a drop in about 95 percent of passengers, which means

13  that there's way too many airplanes and employees out there to

14  service 5 percent of the people that comprise who was flying at

15  that point.

16      And that window I think existed of this huge drop in

17  demand up until about mid-2021 when the viruses came out and

18  the airlines were aggressively expanding capacity to meet the

19  new demand post-COVID.  There was a lot of pent-up especially

20  discretionary demand for vacations and for people to get back

21  on airplanes.

22      And I looked at the data from the evaluation of the TSA

23  throughput information as to how many people were actually

24  going into airports and going through security.  Prior to

25  COVID, prior to March, it was around 2 million people a day.

1   For a year and a half or thereabouts, it was less than a couple

2   hundred thousand for the beginning of COVID, and it rose out of

3   the COVID-related period to about 90 percent of pre-COVID TSA

4   throughput in the month of July of 2021.

5       So there was, if you can picture it, a big drop in demand

6   for a period of about 15 or 14 months, and we're still not back

7   generally on a nationwide basis to the level we had in 2019

8   pre-COVID, but we're getting close.

9   Q.   And so did I understand your testimony correctly that, as

10  of July of 2021, the number of passengers using the national

11  aviation system on a given day had reached 90 percent what it

12  was prior to March of 2020?

13  A.   Right.  For each of the days of July 2021, it was the

14  first month in which each day was 90 percent or greater of the

15  throughput that existed on average before in 2019.

16  Q.   And what data was it that you looked at to determine that?

17  A.   It's Transportation Security Administration scanning data,

18  how many people go through the checkpoints.

19  Q.   And that's also publicly available?

20  A.   Yes.

21  Q.   Okay.  So we got diverted a bit talking about the

22  coronavirus.  I think previously we were talking about Delta

23  and what it's been doing at Boston Logan Airport.  And did I

24  catch you testifying earlier that Delta has opened at least one

25  crew base in Boston in recent years?

1    A.    It's Republic, a regional feeder to Delta that was I think

2    a complement of Delta having a hub here.

3    Q.    And what base has Republic opened in Boston?

4    A.    I think a pilot and flight attendant base from my

5    recollection.  But Delta in 2019 had the aspirations of

6    building Boston obviously much faster than it's been able to

7    build it, given COVID, but they're now on track to exceed what

8    they planned in 2019.

9         And again, this is at odds with the analytical work that

10   was done in the case and we heard about the last couple of

11   days.  And I would equate it to a weather report that predicted

12   a big storm four years ago that we can now look back and say

13   that storm never hit; in fact, it was a very sunny day and the

14   best weather we've ever had.

15   Q.    Thank you, Mr. Akins.  And I do want to make clear the

16   relationship between Republic, the outfit that opened the crew

17   bases recently, and Delta.  What is that relationship?

18   A.    Republic is one of a number of independent regional

19   operators that Delta utilizes to connect to flights at Boston.

20   They're Delta connection flights.  And if you go to places, if

21   there was a flight to Burlington from Delta, it would probably

22   be a United connection on a Republic Airways E175 aircraft with

23   the Delta livery on the side of it.  So Delta sells the tickets

24   that passengers use to get on Republic.  In some instances,

25   American or United also use Republic, but Delta at Boston is

1    using Republic as a codeshare regional affiliate.

2    Q.   I understand.  Is that kind of like the difference between

3    American and American Eagle?

4    A.   Yes, exactly the same.  Only American Eagle, some of which

5    are owned, Endeavor is the only wholly owned for Delta.

6    Q.   Okay.

7    A.   And they also fly to Boston.

8    Q.   So speaking about the growth at Boston Logan Airport as

9    seen in recent years, you mentioned Delta.  We spoke it about

10   Delta.  You also mentioned JetBlue.  Can you speak about

11   JetBlue's experience in Boston in recent years?

12   A.   Sure.  JetBlue doesn't necessarily call their focus

13   operations hubs, but JetBlue has had a high growth and a focus

14   in Boston since prior to MESTL and has continued such growth,

15   again, with the impact of COVID interrupting that.

16        But now we have what I think from an economist's

17   perspective is an incredibly healthy mix of competition at

18   Boston, which has Delta competing against what's called the

19   Northeastern Alliance, which is American and JetBlue's alliance

20   to codeshare flights in the Northeast.  And I noticed that the

21   hearing -- hearing was in the room next door to us regarding

22   that this week, that competition of Delta trying to best

23   JetBlue on routes that JetBlue already flies.  And if you look

24   at a lot of the routes Delta is adding, they're right on top of

25   JetBlue or American.  So that level of competition is sort of a

1   planner's dream to drive fares down and to offer more frequency

2   and a wider array of services, which is exactly what's

3   happening at Boston currently.

4   Q.   So going back to -- we'll say going back to the time that

5   the MESTL law became effective in July of 2015, can you put a

6   number, either an absolute number or percentage number on

7   growth that we've seen in JetBlue's operations of Boston since

8   that time?

9   A.   I did some math on this.  I think I introduced it in one

10  of my reports, but JetBlue, between say July of 2015 and the

11  end of 2019 I think was at 34 percent growth in departures.

12  Q.   So we've spoken about Delta's recent growth at Boston.

13  We've spoken about JetBlue's.  What about the other carriers;

14  what's their experience been in Boston in the past six or seven

15  years?

16  A.   There was a pretty big growth by Alaska pre-COVID, about

17  20 percent.  Southwest I believe was 20 percent, and American

18  was flat and is now growing again.

19  Q.   American is growing again?

20  A.   Yes.

21  Q.   In what time period?

22  A.   Post-COVID, again, there's more of a focus on Boston by

23  American in their partnership with JetBlue than there was

24  pre-COVID, and I think that's in response to competition with

25  Delta.

1   Q.   And I'm sorry.  You I think mentioned earlier in your

2   testimony that JetBlue or perhaps American, that at least one

3   of the two had opened a crew base in Boston in recent years?

4   A.   There's a crew base here from American for sure, but

5   that's not a recent opening.

6   Q.   Sure.

7   A.   The crew base that I know about that's new is Republic,

8   and Delta in correspondence with the sort of chicken-and-egg

9   problem that I think is kind of obvious here is that crew bases

10  generally open where airlines have hubs or significant amounts

11  of service.

12       So if Delta didn't have a crew base here before, and I

13  didn't focus on this because they weren't part of the case

14  until after I did my reports, it would be logical that if Delta

15  didn't have a crew base here, given the level of operations,

16  that they would put a crew base here.  So if they didn't have

17  one here, it's highly likely they'd have one now.

18            MR. HASKELL:  Got it.  I'm going to hand out

19  Defendant's Chalk Number 6.

20  Q.   Mr. Akins, is this also something that you prepared in

21  connection with your testimony in this case?

22  A.   Yes.

23  Q.   And what are we looking at here?

24  A.   We're looking at a couple of representatives of the

25  average roundtrip fare in two different periods, 2015 and 2018.

1   And it's extracted from the A4A website online.  And

2   essentially, it's all carriers, average fare, based on a state

3   or the U.S. average.

4       So I've got, the orange bars here represent the average

5   roundtrip passenger fare with inflation taken out.  Both in

6   2015 and 2018, Massachusetts average was above the U.S.

7   average, as you can see, by about $8 in 2015, $393.30 above the

8   orange bar, and $385.72 above the U.S. average bar.

9       Taking a snapshot in 2018, again, according to the

10  evidence we've heard before, this shouldn't happen with the

11  impact of MESTL, that Boston's, relative to U.S. passenger

12  fares, have dropped faster by almost 15 percent over a

13  three-year period versus about a 12 percent drop in the U.S.

14  average.  And at the end of the day, the snapshot shows that

15  not only has Boston decreased faster but now has a lower

16  average fare in real dollars of $334.53 versus $340.28 for U.S.

17  average.

18      And that is a phenomenal impact of the growth at Boston,

19  coupled with the airplanes creating bases and hubs focusing on

20  Boston.  And it's an incredible part of what I believe to be

21  this amazing success story here in Massachusetts about the

22  development of Boston airport, not just a growing place but as

23  a dynamically changing place that's taking advantage of the

24  inherent underlying economic value, the demographics as well as

25  the location of Boston Logan Airport in a way that's never been

1    there before.

2         Boston has got incredible drivers of air transport demand,

3    including higher education, high tech, medical facilities that

4    are world class, a huge dynamic population that's from a lot of

5    places that aren't Massachusetts or Boston that need transport

6    as well as this location which is the closest large geographic

7    airport to Europe.

8         So you combine all of those and you look at the services,

9    the routes, the drop in fares, and this is all a wonderful

10   story for the public benefit in Boston for what's happening as

11   determined by the carriers serving Boston on top of the MESTL

12   law.

13   Q.   On Defendant's Chalk 6 here, I see the data begins in 2015

14   and goes through 2018.  Why is that?

15   A.   I believe at the time I put this chart together that was

16   the latest available data that A4A had on the website.

17   Q.   And fair to say that -- well, when did you put this chart

18   together?

19   A.   Sometime prior to December 27 of 2019.  So the 2019 data

20   obviously wasn't in yet and wasn't available.

21   Q.   And that's the time at which you prepared your expert

22   report for this matter?

23   A.   Right.  And I probably worked on this sometime during the

24   summer to the fall.

25   Q.   Sure, sure.  I suppose I should ask the same question.  I

 1   did mean to ask the same question with respect to the last two

 2   chalks that we looked at, Defendant's 3, 4, and 5, those last

 3   three, is that also why those chalks only represent data up

 4   through 2018, 2019?

 5   A.   Right.  And you'll notice at the bottom I footnoted that

 6   for the latest available data, which is March 31 of each year.

 7   So I tried to capture at the time I did this analysis the

 8   latest available data that was available.  And for those

 9   chalks, those information, those bars, it was the year ended

10   March 31 because obviously 2019 hadn't been completed yet.

11   Q.   Got it.  Okay.  We can put Defendant's 6 aside.

12        So I think earlier, Mr. Akins, you also testified about

13   the investment that has been and is being made at Boston Logan

14   Airport.  Can you expand on that a bit.

15   A.   Sure.  I think when Delta first came here in 2002, they

16   realized that Boston was an older facility and they wanted to

17   upgrade it, and they put some money in 2002 into Terminal A.  I

18   believe it was, you know, tens of millions of dollars.

19        What's happening today not only with the federal

20   government investing tens of millions of dollars in Terminal E,

21   which is the international terminal -- and Biden was just here

22   I think a week or two ago announcing that out of the

23   billion-dollar fund that the FAA has to allocate to airports to

24   develop services and facilities, Boston got the largest chunk

25   of that, which again suggests that the U.S. is banking on

 1  Boston to be a large international gateway, okay.  They're

 2  upgrading Terminal E.

 3      There's been billions of dollars put into Boston to

 4  upgrade things that everybody here has flown through Boston not

 5  only appreciates but at least sees the physical infrastructure,

 6  the edifice of the airport is changing, not just on the runway

 7  or lightings or striping in the parking lot but the physical

 8  nature of the airport is changing and hopefully for the better.

 9  Q.   The one that comes to mind is the new rental car terminal.

10  Is that part of what you're describing?

11  A.   Yes.  Everything involved with the facilitations of

12  passengers and services at the airport.  There's a master plan,

13  I think it's a good one, and I think it was needed to

14  essentially handle what we're seeing in terms of the growth and

15  demands on the airport that it wouldn't be possible without

16  investment to handle this new amount of demand.  And they're

17  planning for the future, which is great.

18  Q.   And does that reflect a certain level of partnership or

19  cooperation between the carriers and MassPort?

20  A.   Sure.  And it's the growth that we're seeing now that is

21  going to continue and that Boston has a very important future

22  in both Delta and JetBlue and American's operations on the east

23  coast.  So it is an investment in the future.

24  Q.   Look at Chalk 7.  So Mr. Akins, is this another graph that

25  you prepared in connection with your testimony in this case?

1    A.    Yes, it is.

2    Q.    And did you prepare it around the same time you were

3    describing earlier, 2019?

4    A.    Yes.

5    Q.    Okay.  And can you tell us what we're looking at here.

6    A.    So I wanted to focus on something that we really haven't

7    talked about as far as I know in this room, which is the delays

8    that occur at Boston with each carrier for a variety of reasons

9    that we looked at earlier this morning.

10        Totaled together, not by any particular reason, I'm

11   looking at A4A flight departure delays of greater than 15

12   minutes within 2018.  I picked the latest year that had a full

13   complement of months, and I looked at the months with the

14   highest delay of departures and the lowest.  And so the blue

15   bar for, say, American on the left side shows that in the worst

16   performance month at Boston for American in 2018, they had 22.5

17   percent of their flights departing Boston late.  The best

18   performing month was 10.8 percent.

19        And so I wanted to see the variability that airlines on a

20   daily basis or monthly basis are dealing with in terms of the

21   variation in absolute flight delay volumes occurring at Boston.

22   As you see, JetBlue, as I described earlier, has a higher kind

23   of latent amount of demand both in terms of the highest months,

24   33.3 percent, and the lowest month at 19.3 percent.

25        So JetBlue is generally viewed in the industry as having

1   the highest, if not the highest, amount of flights departing

2   with delays.  And that's shown here.  The variation between

3   JetBlue is about the average for all carriers, which is about

4   14 percentage points between the high and the low.

5        So airlines have to manage situations a lot of times that

6   they don't foresee or control the 14 percent gap between

7   month-to-month variability.  And within those months there are

8   sometimes bigger variations on a daily basis due to weather or

9   other factors.

10       So we've got, the importance of this graph is to show that

11  there is no normal month or normal day.  Flights depart Boston

12  with a background in a departure of around 21 percent delayed

13  flights on average in that particular year.  And that's

14  generally the case in Boston.  It's 21 percent.  Sometimes I've

15  seen 23 percent, but overall the average is around the mid-20s

16  on an annual basis at Boston.  So you've got a one in five

17  chance of having a flight delay right now in Boston or at least

18  in 2018.

19  Q.   So let me just break down to be clear about the data we're

20  seeing reflected in this chart.  First of all, does this draw

21  on the data that the carriers report to the U.S. Department of

22  Transportation that you testified about earlier?

23  A.   Yes.

24  Q.   And the delays that we see reflected in this chart, is it

25  all delays?  Is it just that bucket of carrier-caused delays?

1    Is it some combination?  What kind of delays are we looking at

2    here?

3    A.    It's all five buckets combined.

4    Q.    All five buckets combined, okay.

5    A.    Right.

6    Q.    You spoke a bit just a moment ago about, you know,

7    different airlines' tolerance, say, for delays.  In your

8    experience, Mr. Akins, does a carrier commonly set a goal for

9    the amount of delay that it's expecting or is willing to

10    tolerate?

11    A.    I don't think they set a goal in terms of, you know, the

12    maximum amount of delay they're willing to tolerate.  I think

13    they set a goal for the allocation of staff to offset whatever

14    delays that they expect.  But again, airlines can't control the

15    air traffic control system, the weather or other factors that

16    may influence cancellations or departure delays.

17       So it's sort of a crap shoot to say we're willing to

18    accept a certain amount of delays, knowing that many of the

19    delays that they experience are outside of their control.  So I

20    think airlines try to staff in terms of carrier resources zero

21    delays.  But again, there are so many other factors that

22    influence delays that that's only one of the other components

23    that could affect delays.

24    Q.    And you also spoke in your testimony just now, Mr. Akins,

25    about the variability between the best months and the worst

1   months for a given carrier.  Can you speak about how that

2   variability relates to the management of staffing that you

3   testified about a little while back?

4   A.   Right.  Again, the public data doesn't show us

5   staffing-related or crew-related delays.  They tell us

6   carrier-related delays.  So as far as the internal data

7   systems, I don't have a dataset or a view into those internal

8   data systems unless I've been provided it by the carrier in

9   situations like this.  So I don't have a good read across these

10  carriers as to what's being done in terms of measuring this.

11       But obviously, as I said before, each day in history has

12  its own unique profile based on weather, based on events, based

13  on day of the week.  And carriers recognize that, and there's a

14  history there.  And so in the past, if there is a chance for

15  lower or higher staffing issues than are expected, carriers

16  will generally amend their staffing of reserves or their

17  assignments of open time to essentially fill in those potential

18  forecast voids in staffing.

19       So it's an internal function.  And I think they do a

20  really incredible job.  And again, it's happening today, it's

21  happening tomorrow, it's happening at every airport with every

22  airline that they're having to cover staffing issues on a

23  normal basis for the nature of their business.

24  Q.   Let's take a look at Chalk 9, please.  So is this also a

25  graph that you prepared in connection with your testimony in

1   this case, Mr. Akins?

2   A.   Yes, it is.

3   Q.   And walk us through this.  What are we looking at here?

4   A.   So we're looking at essentially two graphs.  The one large

5   line graph that we see all the squiggly lines on has two

6   components.  The orange component is the departure delays of

7   all A4A carriers on average and the percent of departure delays

8   that were carrier-caused, again, that bucket of 42.

9        So if you're looking at the impact of MESTL on carrier

10  delays, we can't look at from public data those that are

11  staffing-caused.  All we know is it's part of that bucket of 42

12  items.  So this is not a very clear indicator of impact of

13  anything from MESTL on airplane or aircraft delays.  It's

14  essentially saying, within the bucket of delays that are

15  carrier-caused, the orange line represents each month's value

16  of the percent of A4A flights combined that were late due to

17  carrier causes.

18  Q.   And to find more fine-grained information about the

19  specific cause of a delay, you can't get that from public

20  sources.  You would need to go to a carrier's internal data to

21  find that?

22  A.   Yes, yes, you would.  And the blue line represents the

23  arrival delays at Boston from other places.  And I think it's

24  kind of interesting that the blue line and the orange line,

25  that is flights coming into Boston that are late with the blue

1  line flights that are departing, are very close together due to

2  carrier causes.

3      And again, we have this discussion that we had earlier

4  today about, if the orange line represents -- sorry, the blue

5  line represents departures that are carrier-caused, it

6  completely excludes departures that were late aircraft-caused.

7  Right?  Because that's the bucket that wouldn't be represented

8  here.

9      But it is interesting to me that the orange line arrivals

10  into Boston as a percentage -- sorry -- the blue line arrivals

11  into Boston looks very similar to the orange line, and they

12  move sort of in the same direction.

13  Q.   So let me break this down and make sure that we have this

14  right.  So the blue line we see on the graph is the percentage

15  of flights that are arriving in Boston and are arriving at a

16  delay; is that right?

17  A.   Right, due to carrier causes.

18  Q.   Due to carrier causes.  And that delay, because you're

19  basing it on information that's recorded to and provided by the

20  U.S. DOT, we're talking about 15-minute-plus delays here?

21  A.   Yes.

22  Q.   Okay.  And so the orange line is the percentage of flights

23  out of Boston that are delayed for carrier causes by more than

24  15 minutes; is that right?

25  A.   Yes, on a monthly basis for the period shown.

1   Q.   Got it.  And so is it correct to think that where the blue

2   line for arrival delays into Boston is higher for a given month

3   than the orange line of departure delays out of Boston, that

4   indicates that time is being made up on the ground?

5   A.   It could be on average in a month that there was times

6   when the schedule essentially recovered some of the inbound

7   flying.  But again, what isn't represented here is the percent

8   of departures that were not carrier-caused but were

9   attributable to other causes.  And again, it's this gray area

10  of where do late aircraft fit.

11       So if a flight is coming in late due to carrier causes, it

12  seems to me it fits in two buckets.  It's in the carrier-caused

13  and the late-arriving flight.  So I don't know how to sort out

14  the arrival piece.  But I think the important part is that up

15  in that little square in the top with the bar charts that the

16  blue side represents arrivals into Boston, which are less

17  reflective I think of the MESTL impact, as Dr. Lee has pointed

18  out, but I think the orange lines, the orange bars that show

19  departures from Boston on average for all A4A carriers combined

20  represents a decrease, which is surprising, and it's against

21  the forecast of what the other side has suggested would happen

22  at Boston with the implementation of MESTL.

23  Q.   And what you're referring to there is the box at the top

24  right of the chart that includes a small imbedded bar graph?

25  A.   Right.

1  Q.   So what that shows is that the monthly percentage of

2  flights that were delayed for carrier causes prior to July 2015

3  at Boston departures was 5.27 percent.  Am I looking at the

4  right thing?

5  A.   Yes.

6  Q.   And then the percentage of flights after MESTL's effective

7  date in July of 2015 that were delayed by more than 15 minutes

8  out of Boston for carrier-caused reasons is 5.13 percent?

9  A.   Right.  I would say it's at worst flat but at best it's a

10  little bit less.  And that's the period pre to post.

11  Q.   Got it.

12  A.   You can see it's flat.  It doesn't take a real analysis.

13  There's no jump in the data that I can discern from this.

14  Q.   So I think we can leave it up.  So from all of this

15  analysis and this data that you reviewed, Mr. Akins, do you

16  have a view of the impact -- you're familiar with the

17  Massachusetts Earned Sick Time Law, yes?

18  A.   Yes, yes.

19  Q.   Do you have a view of the impact that enactment of that

20  law in July 2015 and the various carriers' choice to comply

21  with that law with respect to certain categories of employees,

22  do you have a view of how that has affected carrier on-time

23  performance at Boston Logan Airport?

24  A.   Let me answer it in a slightly liberal and creative way.

25  That if I didn't know and was a martian and landed in this room

1   what ESTL was, I would think it was some type of airline growth

2   stimulant that actually has caused fares to go down and traffic

3   to explode at Boston in a way that hasn't been seen here

4   before.

5       Now that I know what it is and I know the forecast of what

6   the impacts were supposed to be based on analytical work by Dr.

7   Lee and his team, none of that has occurred.  In fact, I think

8   this is an incredible empirical rebuttal in Boston with the

9   experience we've had since MESTL and with all of the new routes

10  and services and carrier bases and hubs and growth that MESTL

11  does not seem to have any impact whatsoever on the operations

12  in Boston.

13      And I've held that view since I first opened up my report

14  and started critiquing what Dr. Lee had done.  And as time has

15  gone on, this case is getting stronger, that it does not seem

16  that carriers are doing the things that would be suggested by

17  Dr. Lee in his forecast.

18          MR. HASKELL:  If I could have a moment, Your Honor.

19          THE COURT:  Yeah.

20          MR. HASKELL:  Your Honor, we have no further questions

21  for Mr. Akins at this time.  And it looks like we're wrapped up

22  by 11:25.

23          THE COURT:  And I screwed up the schedule here.  So

24  Kathy, my apologies for this.  I just remembered I had a call

25  at 12:00.  So would you guys mind taking an hour now, like

1    11:30 to 12:30?  Sorry, Kathy, about that.

2            MR. CARROLL:  That's fine.

3            THE COURT:  Does that work for everybody else?  Is

4    that okay with you, Kathy?

5            COURT REPORTER:  Yes, yes, Your Honor.

6            THE COURT:  That works for us, too.  Let's take an

7    hour.  We'll be back at 12:30, hour and five minutes.  Thanks,

8    everyone.

9            Beginning cross-examination, so no more talking to

10   them.  You can have lunch with them, if you want.

11           THE WITNESS:  I don't want to talk about this.

12           (Recess, 11:25 a.m. - 12:33 p.m.)

13           THE COURT:  Before we start, you gave me the

14   deposition designations the other day.

15           MR. HASKELL:  Yes.

16           THE COURT:  Is this everything I'm supposed to read?

17           MR. HASKELL:  In terms of -- it's --

18           THE COURT:  This is what you want me to read?

19           MR. HASKELL:  Those are the deposition designations

20   from the three American Airlines keepers that relate to the

21   reports.  There's going to be a few more deposition

22   designations coming, but...

23           THE COURT:  But the idea is that -- I'm noticing that

24   some of it's redacted.  So you're just -- you've not redacted

25   the parts of it you want me to read?

```
 1              MR. HASKELL:  That's correct.  That's correct.

 2              THE COURT:  What?

 3              MR. CARROLL:  May we begin, Your Honor?

 4              THE COURT:  Oh, sorry.

 5              MR. CARROLL:  I'm sorry.  Mr. Akins is getting a head

 6  start on my cross-examination.

 7              THE COURT:  Oh, I'm sorry.

 8              THE WITNESS:  I'm done.

 9              THE COURT:  I'm sorry.

10              MR. HASKELL:  We blacked out the portions that nobody

11  designated.

12              THE COURT:  Okay.  You shut that binder.  And we can

13  finish our conversation.

14              MR. CARROLL:  I'm sorry for interrupting, Your Honor.

15              THE COURT:  That's okay.  You had -- I thought I was

16  boring you, which is entirely possible but you're usually more

17  subtle than that.

18              Go ahead, Mr. Carroll.

19  CROSS-EXAMINATION BY MR. CARROLL:

20  Q.   Good afternoon, Mr. Akins.

21  A.   Good afternoon, Mr. Carroll.

22  Q.   Let's start with what you termed the "incredible empirical

23  rebuttal."

24       Now, your testimony this morning emphasized at some length

25  the great growth at Logan Airport, correct?
```

1   A.   Yes.

2   Q.   And you attempt to connect that up, that growth, with

3   MESTL, but you never once said this morning that of all the

4   airlines we're talking about at Logan, only one of them fully

5   complies with MESTL, correct?

6   A.   That's my understanding, yes.

7   Q.   But you didn't bring that up this morning, right?

8   A.   I wasn't asked.

9   Q.   And the only airline that fully complies with MESTL didn't

10  grow during the period you're talking about, right?

11  A.   That's correct.

12  Q.   And you didn't bring that up either, did you?

13  A.   I wasn't asked about it.

14  Q.   We'll come back to -- you know, it's American Airlines,

15  correct?

16  A.   Yes.

17  Q.   That's the only one that fully complies.  Okay.

18       And the largest of all the airlines, the one that has the

19  most flights by far at Logan Airport and that grew

20  substantially during the period you're looking at, is which

21  airline?

22  A.   JetBlue.

23  Q.   Right.

24       And JetBlue doesn't comply at all with MESTL, correct?

25  A.   That's my understanding.

1  Q.   But when it came to your opinions, you thought they did,

2  correct?

3  A.   I believed they did, yeah.

4  Q.   Let's look at -- let's look at paragraph 17.  That's going

5  to be in your binder, so this is binder PI 528.  I want to

6  direct your attention to page 17 of your report.

7  A.   Do you want me to open it?

8  Q.   Yes.  You can look at it now.

9  A.   Okay.  And this is the --

10  Q.   This is your expert rebuttal report.

11  A.   Okay.  Page --

12  Q.   That is paragraph 17.

13  A.   I see it.

14  Q.   We can use the screen but if you want to consult your

15  report --

16  A.   I'll trust the screen.

17  Q.   Okay.  So when you came to your opinions in this case, you

18  said, "All A4A carriers operating in Boston, except Alaska,

19  have had four years experience complying with ESTL."

20       Now, you didn't know that you were wrong about JetBlue,

21  did you?

22  A.   As the sentence was prefaced, "It is my understanding," so

23  yeah.

24  Q.   What do you mean, "as the sentenced was prefaced"?

25  A.   You didn't bring in the part or underline where it says,

1    "It is my understanding that all A4A carriers..."

2    Q.   Well, you say are complying with the ground crew

3    employees, that's right.  And you thought JetBlue complied with

4    ground, right?

5    A.   I did, but I also know that JetBlue outsources its ground.

6    Q.   Well, outsourced or not, it didn't comply, right?

7    A.   It didn't comply.

8    Q.   And you thought it did, right?

9    A.   I thought they did.

10   Q.   Okay.  So the fact that they outsource or not doesn't

11   really matter.  You were assuming they complied when, in fact,

12   they didn't, correct?

13   A.   Correct.

14   Q.   Okay.  And so what you're attempting to do here in a

15   case -- this case involves what it would mean for the airlines

16   to fully comply with MESTL, correct?

17   A.   Yes.

18   Q.   Right.  And you're trying to draw conclusions tying growth

19   to airline behavior when the data you're relying on is fully

20   infused with airlines not complying with MESTL in whole or

21   part, correct?

22   A.   "Fully infused."  It has data from carriers that didn't

23   comply, correct.

24   Q.   Well, the only one that did is American, right?

25   A.   Correct.

1   Q.   And relative to JetBlue or Delta or United, it's

2   relatively small, correct?

3   A.   Relative to JetBlue, yeah, those guys are small.

4   Q.   And did you perform any kind of regression analysis to

5   attempt to control for variables such as MESTL compliance or

6   noncompliance?

7   A.   Nope.

8   Q.   But you're familiar with what regression analysis is,

9   correct?

10  A.   Yes.

11  Q.   But you just didn't do any of it?

12  A.   I wasn't tasked to do it.  We had a different professional

13  that we heard from yesterday.

14  Q.   Well, you're talking about Mr. Tregillis from yesterday?

15  A.   Yes.

16  Q.   He didn't do it either, did he?

17  A.   Didn't do what either?  To control for the --

18  Q.   He didn't attempt -- other than a regression he did with

19  respect to Virgin and American, he didn't attempt to perform a

20  regression analysis of the kind that Dr. Lee performed,

21  correct?

22  A.   No.

23  Q.   I'm sorry.  I didn't hear you.

24  A.   No.

25  Q.   Okay.  Thank you.

1          You introduced yourself as an air transport economist; is

2     that right, Mr. Akins?

3     A.    Yes.

4     Q.    You've got no Ph.D. in economics?

5     A.    No, I don't.

6     Q.    And you don't have a master's degree in economics either,

7     do you?

8     A.    I've got what I consider to be the equivalent of a

9     master's from LSE.

10    Q.    Well, does LSE consider it the equivalent of a master's?

11    A.    I think they do.  A postgraduate degree.  It's a diploma.

12    I got a mark of merit in it.  I studied air transportation.

13    There was an MSC above that, an MPhil, and a Ph.D.

14    qualification, none of which I got.

15    Q.    Well, the London School of Economics offers master's

16    degrees in economics, doesn't it?

17    A.    Not MAs.  MSCs.  It's different than here.

18    Q.    Okay.  In any event, you don't have one?

19    A.    No.

20    Q.    And you've never been an employee at a significant

21    airline, correct?

22    A.    As a consultant, yes, but not a direct employee.

23    Q.    Not as an consultant but actually as an employee with

24    responsibility, you've never been that, right?

25    A.    No.

1    Q.   And so you talked a lot about your experience with crew

2    scheduling and your experience with coding and your experience

3    with sophisticated staffing algorithms and alike at some

4    length.  You've never had any direct personal responsibility

5    for any of those functions, correct?

6    A.   That's correct.

7    Q.   And mostly what you do professionally is work closely with

8    unions, correct?

9    A.   It changes.  Time to time there is sort of periods when I

10   work more with unions than not.  But yes, I think that's

11   correct recently.

12   Q.   Over the last five or six years, you've been mostly

13   working mostly with unions, correct?

14   A.   Yeah, I think that's correct.

15   Q.   And you've been hired in a case involving Atlas Airlines

16   to criticize Dr. Lee's opinions, right?

17   A.   That's not why I was hired.

18   Q.   Well, did you in a case involving Atlas Airlines criticize

19   Dr. Lee's opinions?

20   A.   Yes.

21   Q.   Okay.  And that was a case in which Atlas Airlines was

22   claiming that the pilots for Atlas were refusing to take any

23   overtime slots and were calling in sick at the last minute and

24   otherwise doing things to impair the Atlas operation, correct?

25   A.   Correct.  And I'd assumed -- I'd done two analysis for

1    Atlas.  One was a contract arbitration.  And I think you're

2    referring to a previous issue before the District of Columbia

3    U.S. Court --

4    Q.    Yeah, that's --

5    A.    -- which is a different thing, so I just had to reset.

6    Q.    That's okay.  So I want to talk about the court case --

7    A.    Okay.

8    Q.    -- where you were hired by the union as an expert contra

9    to Dr. Lee.

10   A.    That's right.

11   Q.    We're together?

12   A.    Right.

13   Q.    Right.  Am I right, generally speaking, what was happening

14   there was the pilots were not picking up overtime or calling in

15   sick at the last minute or otherwise doing things to interfere

16   with the operation of the airlines?

17   A.    That's what it was about, yes.

18   Q.    Right.  And in that case, Dr. Lee did a regression

19   analysis to attempt to isolate the reasons for the delays that

20   were occasioned by the interference with the airlines and he

21   demonstrated it was because of this change in behavior of the

22   pilots that they were taking these steps in the middle of union

23   negotiations to try and get more pay, correct?

24   A.    That's what he claimed, yes.

25   Q.    That's what he claimed.  And you claimed that, well, maybe

1  they weren't taking any overtime because they wanted to spend

2  more time with their families, right?

3  A.   I can't remember what I said.  I mean, it's a long time --

4  Q.   Well, would it remind you if one of the things you also

5  said was maybe they were refusing to take any overtime during

6  the collective bargaining negotiations because they just didn't

7  need the money?  Does that sound right?

8  A.   It could be.

9  Q.   Maybe I can refresh you.  Let's take a look at PI 534.

10  A.   Is it on the screen or in the book?

11  Q.   It will come up.  Mr. Shorr is good but he's not that

12  good.

13      Okay.  And so you'll recall that was a case that went --

14  it was in the district court and it went up, as you said, to

15  the United States Court of Appeals for the District of

16  Columbia, correct?

17  A.   Yes.

18  Q.   And the court there considered the evidence that was in

19  front of the district court, correct?

20  A.   Yes.

21  Q.   And the district court had rejected your opinions,

22  correct?

23  A.   In some instances, yeah.  I didn't really follow all the

24  ins and outs of the decision but I believe the union was happy

25  with half the decision and not happy with the other half.  So

1    I'm not -- I wasn't really --

2    Q.   Was there any part of the decision you were happy with?

3    A.   It didn't matter to me.  I didn't really care.  I just

4    presented what I saw.

5    Q.   What the court said here, and I've got it highlighted --

6    let me show you, Mr. Akins -- the court said, in part, "The

7    district court did not err in accepting Dr. Lee's reasoned

8    analysis over Mr. Akins's unsupported speculation."

9        Do you see that?

10        MR. HASKELL:  What page of PI 1534 are we on here?

11   I'm trying to follow along.

12        MR. CARROLL:  You can look at page 13 on the Westlaw

13   printout that's in your binder or it's right on the screen.

14        MR. HASKELL:  Thank you.

15   Q.   All right.  And so what you offered to the court in that

16   case was unsupported speculation, correct?

17        MR. HASKELL:  Objection.

18   A.   I'm not sure --

19        THE COURT:  Basis?

20        MR. HASKELL:  Mr. Carroll is speaking about the Court

21   of Appeals description of the district court's finding.  I

22   don't think it's a fair question of Mr. Akins whether he

23   offered unsupported --

24        THE COURT:  You can rephrase the question.  I got it.

25        MR. HASKELL:  Thank you.

1    Q.   And you hadn't recalled earlier, but if you look at your

2    screen in the upper left, it says "The union also suggests this

3    change might have occurred because individual pilots chose to

4    decline open time for personal reasons such as a desire to

5    spend more time with their families or because they did not

6    need the money."

7         Do you see that?

8    A.   Yes.

9    Q.   And that's part of the reasons that you suggested for the

10   change in pilot behavior, correct?

11   A.   I don't see my name near that.  Where are we pulling this

12   from?  Oh, Mr. Akins.  Okay.  Yeah.  I think the unsupported

13   speculation, if you read above that, had to do with

14   deadheading.  Didn't it?

15   Q.   Pardon me, sir?

16   A.   Didn't the -- part of the page here that you're not

17   highlighting in yellow have interest about deadheading

18   policies?

19   Q.   Yeah, I think there's a reference to deadheading in there.

20        In any event, the court rejected your analysis as

21   speculation --

22   A.   Sure.

23   Q.   -- and accepted Dr. Lee's regression analysis, correct?

24   A.   You know, I'll take your word that they accepted it, but I

25   didn't -- this was in the appellate level.  I was completely

1  out of the picture.  So this is the first time I'm even seeing

2  or hearing about any of this.

3  Q.   You don't have to take my word for it.  Just at the bottom

4  right, in the section, it's not all the way highlighted but it

5  says -- the appellate court is talking about what the district

6  court did in affirming it.  It says, "The district court did

7  not reject each theory of why an individual pilot might decline

8  open time.  The court adequately made clear it credited

9  Dr. Lee's conclusion that this change did not merely stem from

10  a series of individual decisions."

11      Right?

12  A.   Sure.  Yes.

13  Q.   So I won't ask if that refreshes your recollection if

14  you've never seen it before but you know the case, right?

15  A.   I do.

16  Q.   Now, we talked a little bit earlier about American

17  Airlines.  You talked about this wonderful explosive growth and

18  I want to just explore that with you.

19      You testified that American didn't grow, but you testified

20  this morning that American stayed flat, right?

21  A.   Depending on which period you look at.  I mean, there were

22  around -- I'm thinking, off the top of my head, 27,000, 25,000

23  operations a year, and I think that kind of stayed within a

24  band of flat depending on how far back and how far forward you

25  go, because we had numerous periods of sort of looking at this

1  in my expert report and my summary report.  So I would think

2  they were, at best, flat.

3  Q.   Okay.  And that's something you studied in connection with

4  forming your opinions in this case?

5  A.   Yeah, a while back.

6  Q.   A while back.  Okay.

7       And you understand that US Airways and American merged

8  back in 2013, correct?

9  A.   Oh, yeah, I was part of that.

10 Q.   Okay.  So it should be very familiar to you that while

11 once separate airlines, now they're the same airline, correct?

12 A.   Right.

13 Q.   Right.

14      After the merger, planes stop flying with the United --

15 the US Airways flag some time in 2015, correct?

16 A.   Yeah.  There was a rebranding throughout the fleet with

17 the ugly design that Tom Horton picked unfortunately.

18 Q.   Okay.  Well, let's focus on your testimony about them

19 staying flat.

20      Take a look, please, at Exhibit PI 536, which is in your

21 binder, sir.

22          MR. CARROLL:  And I'm going to ask Mr. Shorr to put it

23 up.

24 A.   Okay.

25 Q.   And this is that same -- you recognize this data as that

1  same Department of Transportation data that you use, right?

2  A.   Not in this format.

3  Q.   Okay.  Well, I'll represent to you that this chart comes

4  from the DOT data and what we're going to look at is the total

5  flights for American Airlines out of Boston in 2015.

6  A.   Right.

7  Q.   Right.

8       And you can see there, the total is just a hair under

9  20,000 flights, correct?

10  A.   Yes.

11  Q.   But in 2015, some flights were still going out with the

12  USAir flag, right?

13  A.   With the US Airways livery, but they were American

14  Airlines flight numbers.

15  Q.   They were indeed.  So let's see what the number was with

16  the US Airway livery.

17       MR. CARROLL:  That's PI 537, Mr. Shorr.

18  Q.   And you see that is 8,510 flights, correct?

19  A.   I'm not sure what that right side is.  I don't see a US

20  Airways...

21  Q.   Well, if you look at the top of the page --

22  A.   Right.  It says "flights, American," and it's the same

23  totals you just showed me.

24  Q.   Yeah.  Well, let me pull it up here.

25  A.   I guess it's the problem on the 537, that it's not tied to

1    anything.

2    Q.   So PI 537, you see at the top of the page, it says

3    "Flights (US Airways-Boston, MA, Logan International)"?

4    A.   I see this big bar.  I don't see on the top of -- oh,

5    okay.  I do now.  Sorry.

6    Q.   Okay.  We're together?

7    A.   Yes.

8    Q.   All right.  So we saw just under 20,000 -- just under

9    20,000 American flights.  Now we're looking at the USAir --

10   A.   Right.

11   Q.   -- and we see -- and I'll represent to you this was the

12   last year they were flying under the flag USAir --

13   A.   Right.

14   Q.   -- 8,500, right?

15   A.   Right.

16   Q.   So you add that together, in 2015, preMESTL, we get

17   roughly 28,000 flights, correct?

18   A.   Yes.

19   Q.   Now, that's before American started complying with MESTL,

20   right?

21   A.   Because the law didn't apply at that point.

22   Q.   That's right.

23        So now let's jump ahead and look at 2019.  You studied the

24   period 2015 to 2019 in the numbers you showed us this morning,

25   right?

| | |
|---|---|
| 1 | A.    I think that was from the supplemental, yeah. |
| 2 | Q.    Yeah.  Okay.  So now we're going to do the same thing. |
| 3 | We're going to look at 2019 and see what happened to American. |
| 4 | Now, by 2019, there's no more USAir; it's all going out |
| 5 | under American, correct? |
| 6 | A.    Correct. |
| 7 | Q.    Okay.  How many flights from American in Logan in 2019? |
| 8 | A.    It's blocked off.  Is that -- it says 24,992, and there's |
| 9 | a number -- a big number that says 25,086.  Sorry, I was |
| 10 | looking at the middle column. |
| 11 | Q.    So the total is 25,086, correct? |
| 12 | A.    Right. |
| 13 | Q.    So during the period you were talking about this morning |
| 14 | of the explosive growth -- |
| 15 | A.    Right. |
| 16 | Q.    -- American Airlines lost thousands of flights out of |
| 17 | Boston Logan, correct? |
| 18 | A.    I don't think they lost them.  They chose not to fly them. |
| 19 | Q.    They didn't fly, correct? |
| 20 | A.    That's correct. |
| 21 | Q.    So in that same period of explosive growth the only |
| 22 | airline, the only one that fully complied with MESTL, declined |
| 23 | by thousands of flights, correct? |
| 24 | A.    That's correct. |
| 25 | Q.    You didn't mention that anywhere in your testimony or your |

1   report, did you?

2   A.   No.  I didn't mention a lot of things, like what's going

3   on now with American.

4   Q.   Did you attempt to do any kind of analysis as to whether

5   the growth that you observed this morning in the airlines,

6   other than the MESTL compliant airlines, would have been even

7   more in the absence of MESTL?

8   A.   I don't know how to do that.

9   Q.   You also gave some testimony about lower airfares

10  prevailing at Logan, correct?

11  A.   Correct.

12  Q.   Now, I think you testified earlier that the carrier that

13  has experienced very significant growth and is by far the

14  largest at Logan is JetBlue, correct?

15  A.   Yes.

16  Q.   All right.  And you'll agree with me that JetBlue is a

17  low-cost, low-fare airline, correct?

18  A.   That's correct.

19  Q.   So doesn't it stand to reason that if JetBlue is growing

20  significantly and it's a low-cost, low-fare airline, that's

21  going to have a pretty big impact on the average fares out of

22  Logan Airport?

23  A.   Yes.  That's because other carriers tie into what JetBlue

24  is charging and lower their fares as well.  That's part of the

25  strategy of buying Spirit.

1  Q.   And JetBlue doesn't comply with MESTL at all, correct?

2  A.   Correct.

3  Q.   I want to take a look at one of the exhibits that you had

4  up this morning.  It's page 9 of the defendant's demonstrative.

5  I don't know if I could impose -- there you go.

6  A.   Sure.

7  Q.   Thank you.

8  A.   Sure.

9  Q.   You remember this one?

10 A.   Yes.

11 Q.   And you say this is the average monthly share of Boston

12 departures and arrivals that were delayed due to carrier

13 causes, right?

14 A.   That's correct.

15 Q.   And this, too, is part of the great empirical rebuttal,

16 right?

17 A.   Yes.

18 Q.   Now, when you put this together, you used simple averages

19 from all the airlines, correct?

20 A.   I used an unweighted average, correct.

21 Q.   Okay.  And so what that means, in simple terms, so you

22 treated Alaska Airlines's delay rate as having the same weight

23 in your analysis as JetBlue?

24 A.   That's correct.

25 Q.   How many times bigger is JetBlue than Alaska?

1    A.   You mean corporate-wise or at Boston?

2    Q.   Flights out of Logan.

3    A.   I don't know, ten, maybe more.

4    Q.   It's more than ten, isn't it?

5    A.   I don't know.  I mean, show me.  I don't know off the top

6    of my head.  I don't keep --

7    Q.   Well, Alaska only runs a handful of flights a day, right?

8            (Reporter requests clarification.)

9            MR. CARROLL:  I'll slow down.  Sorry.

10   Q.   Alaska only runs a handful of flights a day out of Logan,

11   right?

12   A.   That's correct.

13   Q.   And JetBlue runs dozens and dozens --

14   A.   Hundreds.

15   Q.   -- every day out of Logan?  Hundreds and hundreds, right?

16   A.   Yes.

17   Q.   Right, and so -- well, did you look at this same analysis

18   at all on a weighted-average basis?

19   A.   Yes.

20   Q.   Why isn't that in your report?

21   A.   Because I think what I found is that JetBlue has an

22   inherently high carrier caused delay preESTEL and postESTEL and

23   if you weight them and if we're looking for the impact of

24   MESTL, it clouds and it biases the departure delays because

25   they bring in by growing a higher background level of delays.

1     That's why I did the average of averages because I thought

2   it was more representative of the average A4A carrier.  Not

3   because one carrier that's got two and a half times the carrier

4   caused delay rate of everybody else.

5   Q.   If you're looking for the impact of MESTL, you can't look

6   at JetBlue, can you?

7   A.   No, you can't.

8   Q.   You criticized Dr. Lee in his report for making the point

9   that the existence of MESTL could constitute a reason for an

10   airline to consider closing a base or refrain from making a

11   decision to open a base in Boston Logan, right?

12   A.   Generally, yes.

13   Q.   Right.  And you say that's a hypothetical exaggeration,

14   right?

15   A.   I think it's contrary to the facts.

16   Q.   You weren't here to hear any of the fact witnesses, were

17   you?

18   A.   No.

19   Q.   Did you at least take the time to read their testimony in

20   the transcript?

21   A.   I didn't have much leisure time in the last week or so.

22   So I've read a few, but not all.

23   Q.   Who have you read?

24   A.   Dr. Lee and the witness, whoever that was before him that

25   morning.

1  Q.   Do you know the names of any of the fact witnesses in the

2  case?

3  A.   Yeah.  I know Cindi Simone.  But I don't -- I'm not

4  keeping up with the case as if it's an important thing.  I do

5  my job, I move on to other stuff.  So my relationship to the

6  case is to do my work, to back up my reports and show up here.

7  Q.   Okay.

8  A.   I didn't follow who was in the cast.

9  Q.   So your opinions aren't impacted by the facts here?

10       MR. HASKELL:  Objection.

11       THE COURT:  Sustained.

12  Q.   Let's take a look at some testimony that was given in the

13  case from Mr. Byrnes.  This is Brady Byrnes, the vice president

14  of flight service for American, and I'm going to show you Trial

15  Transcript 606.

16  A.   Right.

17  Q.   Right.

18       Are you aware that last week there was an announcement by

19  American that they were going to close the flight attendant

20  base in San Francisco?

21  A.   Yes.

22  Q.   Okay.  And Mr. Byrnes testified that one of the main

23  factors going into that decision, the contributing factors is

24  the fact that it was unreliable in terms of high absenteeism

25  rates.  He's talking about the flight attendants.

1    A.    Right.

2    Q.    Do you have any factual basis to disagree with that?

3    A.    No.  San Francisco had almost the most consistently

4    absentee rates of any base and it's been like that for a

5    decade.  Los Angeles exceeds it.  Boston is at the bottom of

6    the absentee ranks consistently.

7    Q.    Let's take a look at the testimony that Michael Sasse gave

8    from the trial.  Mr. Sasse is the managing director of crew

9    scheduling, planning, and administration for United.  I want to

10   show you his testimony.

11        And the question was:  "Has United ever closed a base due

12   to high sick rates among flight attendants?"

13        And he says:  "Yes.  Recently, so in 2021, we

14   announced" -- he goes on to say, "close the Seattle satellite

15   base, which we ultimately closed in May of 2021.  It was

16   directly attributed to sick rate."

17        Do you see that, sir?

18   A.    Yes.

19   Q.    You would acknowledge that high flight attendant

20   absenteeism can interfere with the airline operations, correct?

21   A.    Correct.

22   Q.    And it can contribute to a decision to close a base,

23   correct?

24   A.    Correct.

25   Q.    And you'd also agree that -- strike that.

1    Let me show you testimony from Lindy Johnston.  And Lindy
2  Johnston is the director of in-flight crew planning at
3  Southwest.
4    She testified that Southwest does take into consideration
5  laws like the Massachusetts Earned Sick Time Law when
6  considering whether to open a potential new flight attendant
7  base.
8    Do you see that?
9  A.   Yes.
10  Q.   Do you have any factual basis to disagree with that?
11  A.   I don't know the woman and I don't know -- I mean, what
12  was her title.  Lindy Johnston?
13  Q.   Yeah.  Her title was the director of in-flight crew
14  planning --
15  A.   Okay.
16  Q.   -- and analytics at Southwest Airlines.
17  A.   Okay.  I don't know her.  I guess I should because I work
18  with them a lot.
19  Q.   Well, you work with their unions, right?
20  A.   Well, I work with their management team a lot because
21  they're sitting at the table.
22  Q.   But you're not working with them; you're working on behalf
23  of the unions, correct?
24  A.   Right.
25  Q.   Southwest Airlines doesn't hire you, correct?

1    A.   Not that I can recall, no.

2    Q.   Back to Ms. Johnston's testimony.  Do you have any factual

3    basis to disagree?

4    A.   No.

5    Q.   And you would acknowledge, would you not, sir, that flight

6    delays happen because of flight attendant absenteeism

7    sometimes?

8    A.   Sometimes, yes.

9    Q.   And if there was a flight leaving out of Logan going to

10   Dallas-Fort Worth, let's say the flight attendants -- one

11   flight attendant didn't show up and the flight had to leave an

12   hour late.  It was an hour late getting into Dallas.  And the

13   next flight out of Dallas was an hour late.  The flight out of

14   Dallas being an hour late, that would be coded late due to late

15   arriving aircraft, correct?

16   A.   I don't know.  I don't know what that would be coded as.

17   Again, is it coded as carrier caused because the flight

18   attendant was late or didn't show up?  That's in that box of

19   42.  So is it a late arriving aircraft because of that?  And

20   that's kind of the gray area I was discussing this morning.  I

21   don't know how airlines deal with that.

22   Q.   You testified this morning about sophisticated systems

23   airlines use for staffing, correct?

24   A.   Yes.  Yes.

25   Q.   And you've seen those in action as a consultant to the

1   industry or a representative of unions, correct?

2   A.   Yes.

3   Q.   Okay.  Do you understand that all the sophistication that

4   the airlines may have notwithstanding, there's times when they

5   simply can't fill overtime slots, for example?

6   A.   When you're talking about ground crew?  There's no

7   overtime in the aircrew.

8   Q.   Let's talk about the ground crew.

9   A.   Okay.

10  Q.   There's been testimony in this case from the head of

11  United's operations at Logan that there are times when he just

12  can't get anybody to fill the overtime slots, particularly in

13  the summer or when there's bad weather.

14       Do you have any reason to disagree with that?

15  A.   Which work group are you talking about?

16  Q.   Ramp people.

17  A.   Ramp, no.  I think that's a problem.

18  Q.   If you can't fill the ramp -- if you can't fill the ramp

19  spots and the airline has to operate short shift, it's going to

20  impact the service the airlines provides to the traveling

21  public, correct?

22  A.   Not necessarily.  It could.  There's a likelihood it

23  could.

24       MR. CARROLL:  Mr. Akins, thank you very much.  That's

25  all I have for the moment.

```
 1              MR. HASKELL:  Just a few on cross-examination.
 2                       REDIRECT EXAMINATION
 3    BY MR. HASKELL:
 4    Q.   Mr. Akins, you testified just a moment ago that short
 5    staffing on, say, the ramp could impact the traveling public.
 6         What did you mean by that?
 7    A.   Well, I know from experience, again, that -- in particular
 8    Southwest at Denver has had a really hard time getting rampers
 9    not just to show up for overtime but just to show up, and part
10    of it was the market rate for work had eclipsed what was in the
11    contracts at airlines.
12         It's happening kind of across the U.S. but most workers
13    aren't unionized and there's more flexibility, say, for
14    carriers.
15         So in the Southwest example, they were chronically short
16    of folks to transfer bags from the flights to the terminal or
17    to marshal planes into gates.  And that was causing flight
18    delays in the extreme.
19         In terms of other sort of better staffed areas that pay
20    sort of the market rate, carriers have had an easier time
21    filling staffing positions, but I'm thinking of the sort of
22    postCOVID environment.
23         If you think preCOVID, the ability for three rampers to do
24    the work of four is different than the ability of one pilot to
25    do the work of two.  That's not allowed.  Right?  But there's
```

1    some fungibility between the staffing that occurs at different

2    bases between the jobs.  One guy's running the tug, another guy

3    is in the bin.  There are two guys are in the bin, which is the

4    lower lobe of the airplane.  They're throwing bags.

5        Southwest has a very skeletonized crew.  If you look at

6    what American or Delta's got, there's way more people around

7    airplanes.  Right?  And so Southwest might be a bit tighter in

8    terms of staffing but there still is the ability to -- if

9    people are there and show up for work, to force either

10   mandatory overtime or allow for voluntary overtime.

11       And I'm not sure what Mr. Sasse said because I didn't read

12   it, but generally the contracts I've seen, and I don't think

13   I've seen the ramp contract at United because it's IAM, I

14   believe, they may or may not have mandatory overtime.

15       Most carriers that have chronic overtime problems have a

16   voluntary list, and what I've been told during negotiations is

17   about 90 percent of the voluntary lists for most work groups

18   absorbs the need for grabbing overtime from ground workers.  So

19   I don't know if there's some unique situation where that

20   doesn't work and they have to mandatory people or if people

21   don't work overtime, but I think the ramp is kind of a specific

22   area.

23   Q.   Well, let me ask:  The ramp situation at Southwest

24   encountered in Denver that you just described, do you know what

25   Southwest did to deal with that situation?

1    A.    Sure.

2          They went out there and essentially got a leaf blower full

3    of money and advertised jobs and said, we're going to hire

4    people because our operation at Denver is a critical part of

5    our network and it's not working because we don't have enough

6    people because there are other high paying jobs that rampers

7    are leaving to go to.

8    Q.    And is that what you described earlier this morning in

9    your direct testimony?  I think you mentioned they raised the

10   rate from $7 an hour.  Is that the same situation?

11   A.    That's the situation, right.  And, again, you know, my

12   experience is that prior to COVID, the $15 an hour minimum wage

13   was a really big legislative issue.  It's now turned into a

14   market issue.

15         The market supports that as a minimum now for the place I

16   ate at lunch, for bag handlers, you know, in Denver.  So I

17   think there's been a real sea change in the sort of unskilled

18   lower level jobs at airlines, that they're having a harder time

19   keeping people generally.

20   Q.    And to your knowledge, what Southwest did at Denver in

21   terms of raising the wage and hiring folks to staff that

22   operation appropriately, to your knowledge, did that address

23   the problem that Southwest was experiencing?

24   A.    I think it did.  I think it's calmed down.  But, again, it

25   was a very gigantic problem, and a huge issue for Southwest

1    operations in Denver.  I didn't see the kind of impact that

2    Southwest was having that other carriers may or may not have

3    had like United at Denver.  But I know that working with

4    Southwest -- again, working with the unions at Southwest, that

5    this was a big issue and they were trying to solve it.

6    Q.    Now, you testified just a moment ago on cross-examination

7    that short staffing on ramp could impact the traveling public.

8          Are there circumstances in which short staffing on ramp

9    would not actually impact the traveling public?

10   A.    Right.  And we'd be -- it would be invisible that all of

11   the bags got to the next flight later, you know, got on time

12   rather than being late, and that workers essentially doubled

13   down.  Instead of having two folks in the bin loading bags,

14   there may be light bags and there's only one person needed, or

15   they may have been overstaffed for whatever reason, needing 15

16   people a shift and they had 17 there.  So if they missed two

17   people from being sick, they're at their operating level.

18         But those kinds of jobs, again, are a little bit more

19   flexible in terms of being able to cover other employee's work

20   but there is a limit to that coverage.

21   Q.    And is that what you were getting at a moment ago when you

22   testified about three workers doing the job of four on the ramp

23   in the way that one pilot cannot do the job of two in the

24   cockpit?

25   A.    Right.  And, again, if you look at Southwest workers, and

1  not to prejudice the airline against other airlines, but their

2  workers per head are doing more bag tossing than anybody per

3  head in the business.  And that means their people are able to

4  do more with less.

5       So I'd imagine if United had a shortage, they would be

6  able to do more with less as well as.

7  Q.   In your experience, that notion of rampers in particular

8  doing more with less, is that common, is that uncommon in the

9  industry?

10  A.   I don't think it's uncommon.  I think that's what they're

11  forced into, is when there's an issue with staffing, that they

12  have people doing more work than they otherwise would.

13  Q.   And you were asked on cross-examination by Mr. Carroll

14  about circumstances in which an airline's offer of overtime may

15  not actually succeed in providing the staffing needs that the

16  airline is looking for.  Did I get that right?

17  A.   Yes.

18  Q.   And is that true of all categories of ground employee,

19  other than the ramp that you spoke about?

20  A.   I think it's true for mechanics.  I'm not sure about the

21  dispatchers, but they're a critical part.  So, you know, my

22  depth of knowledge here is what I've worked on most recently,

23  and I know the mechanics have a voluntary list for overtime,

24  not a mandatory list, at least at United.  They have what I was

25  talking about earlier, is they're able to shift priorities,

1    that if they don't have enough folks to do what's called line

2    maintenance on airplanes that are broken at the gate that we

3    sometimes sit on, those folks come out of the hangar in trucks

4    with yellow lights and they probably are coming from a job in

5    the hangar, not sitting on a couch, and they're fixing things

6    that are sort of routine maintenance until they get called to

7    Gate 52 to check a vent or a valve or the hydraulics in an

8    engine.

9        You know, those things are fungible and they can make up

10   for people not showing up for work in those ways.

11   Q.   Okay.

12   A.   But from what I've heard, United has no problem with

13   mechanics attendance whatsoever.  And, again, there's a

14   proclivity, for some reason, for mechanics to pick up open time

15   more willingly over time than other groups.  It's easier to do.

16   Q.   Okay.  And so I think the way I phrased my question, the

17   way you phrased the beginning of your answer, you may have

18   cleared this up but I do want to be clear.

19       Is it your testimony that, say, United has any trouble

20   staffing the mechanics that it needs by offering overtime?

21   A.   Everything I know about United and working with the

22   Teamsters on their last contract, they do not.

23   Q.   They do not have that problem?

24   A.   They don't have mandatory overtime and they do not have a

25   staffing problem anywhere in their system.

1   Q.   Got it.

2        You also testified a little bit on cross-examination about

3   JetBlue's level of delays.  Is it fair to say, sir, that among

4   the carriers operating out of Boston Logan Airport, JetBlue

5   tends to experience the highest percentage of delays?

6   A.   That's right.  And I think in response to plaintiff's

7   counsel's question, I'd kind of forgotten something that you

8   just jarred in my mind, that, when I did the weighted average

9   including JetBlue, in order to sort of assess my understanding

10  of what I was doing with the average average -- right? -- I

11  took JetBlue out and did another analysis weighting all the

12  carriers -- right?  And it wasn't for the purposes that he

13  said.  I just did it because I wanted to see how much of an

14  impact JetBlue had had on departure delays.

15       And I found that it dropped significantly without JetBlue

16  for the reason that JetBlue experiences 2.77 times the

17  departure delays related to carrier causes than the other four

18  carriers do on average.

19  Q.   And of course --

20            MR. CARROLL:  Objection to that testimony.  Move to

21  strike, Your Honor.  That's nowhere in this witness's expert

22  report.

23            THE COURT:  Yeah.  What's your basis for keeping that?

24            MR. HASKELL:  The testimony about JetBlue's -- the

25  impact of removing JetBlue from the analysis?  I do certainly

 1    think it's relevant, Your Honor.

 2            THE COURT:  No, not removing it.  Doing a weighted

 3    analysis that's not included in his report.

 4            MR. HASKELL:  If it's not in his report, then it's not

 5    in his report, Your Honor.

 6            THE COURT:  All right.  I'm not going to strike it.

 7    But I'm not going to consider it.  I won't consider that

 8    either.

 9            MR. CARROLL:  Thank you, Your Honor.

10    Q.   What I do want to ask, Mr. Akins, is:  It's your

11    understanding, as you sit here today, that JetBlue doesn't

12    comply with MESTL with respect to any of its employees in

13    Boston, right?

14    A.   That's correct.

15    Q.   Not flight attendants or pilots that are based here?

16    A.   No.

17    Q.   Not ground crew who work here?

18    A.   Nope.

19    Q.   And so it's -- it's not in your testimony that any of

20    those delays are caused my MESTL, is it?

21    A.   No, they can't be because they don't comply with it.

22    Q.   Okay.

23            MR. HASKELL:  Nothing further.

24            MR. CARROLL:  Nor here, Your Honor.

25            THE COURT:  You're excused.  Thank you.

```
 1              THE WITNESS:  Thank you.
 2              MR. HASKELL:  That, Your Honor, was our one and only
 3    witness today.
 4              THE COURT:  What's the plan for tomorrow?
 5              MR. HASKELL:  So we have two witnesses in line for
 6    tomorrow.  We'll be ready to start whenever the court and
 7    counsel and the court reporter are.
 8              THE COURT:  Well, I can start at 9:00.  I have a
 9    meeting at 8:15, but I'll be over pretty close to 9:00.  So I
10    can start at 9:00, if you want, or we can -- how much time do
11    you think the two witnesses are going to fill?
12              MR. HASKELL:  Between the two of them, I'd say it
13    would bring us about up until lunchtime, give or take.
14              THE COURT:  Decide whether you want to -- I don't care
15    what time we start.
16              MS. NANDA:  9:00 is fine with us.
17              (Discussion with court reporter.)
18              THE COURT:  Okay.  Let's start at 9:00.
19              MR. HASKELL:  Great.
20              THE COURT:  So great.  We will see everyone at 9:00.
21    The case is recessed today.
22              MR. HASKELL:  Thank you.
23              MR. CARROLL:  Thank you.
24    (Proceedings adjourned at 1:16 p.m.)
25
```

1    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8          We certify that the foregoing is a correct transcript

9    from the record of proceedings taken September 20, 2022 in the

10   above-entitled matter to the best of our skill and ability.

11

12

13   /s/ Kelly Mortellite

     Kelly Mortellite, RMR, CRR
14   Official Court Reporter

15

16   /s/ Kathleen Mullen Silva                    9/20/22

17   Kathleen Mullen Silva, RPR, CRR              Date
     Official Court Reporter
18

19

20

21

22

23

24

25

DX-1080-0127