# Exhibit 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AIR TRANSPORT ASSOCIATION OF AMERICA, INC. d/b/a AIRLINES FOR AMERICA, | No. _____ |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| MAURA HEALEY, in her official capacity as Attorney General, Commonwealth of Massachusetts, | |
| Defendant. | |

## I.    INTRODUCTION

1.      The Massachusetts Earned Sick Time Law, Mass. Gen. L. ch. 149 § 148C, and regulations promulgated by Defendant thereunder, 940 CMR 33.00 (collectively referred to herein as the "Earned Sick Time Law" or "Law"), violate the United States Constitution as applied to airline flight crew and ground crew personnel.

2.      Specifically, the Earned Sick Time Law, as applied to flight crew, violates the Dormant Commerce Clause, which limits the power of states to enact legislation that affects interstate commerce when a national, uniform policy is required.  Uniformity in regulation of air carriers is a national necessity, and only regulation by a single governmental authority can ensure efficient airline operations.  Accordingly, Congress and federal government agencies regulate nearly every facet of the air transportation industry, and this federal regulation is "intensive and exclusive."  *Northwest Airlines v. Minnesota*, 322 U.S. 292, 303 (1944) (Jackson, J., concurring); *see also New England Legal Found. v. Massachusetts Port Auth.*, 883 F.2d 157, 172 (1st Cir. 1989) (stating that "The DOT, through the FAA, has broad authority and responsibility to regulate navigable airspace to assure its efficient use…Indeed, 'it would be difficult to visualize

1

a more comprehensive scheme of combined regulation, subsidization, and operational participation than that which Congress has provided in the field of aviation.'") (citation omitted); 49 U.S.C. § 40103(a)(1) (stating that the federal government has exclusive sovereignty over the airspace of the United States).

3.     The Earned Sick Time Law, as applied to flight crew, thwarts the uniform system of federal regulation because, if Massachusetts can regulate sick leave for flight crew, other states and municipalities can too.  Indeed, at least 37 state and local jurisdictions have enacted laws requiring and regulating sick leave.  These various regimes impose different (and inconsistent) obligations on airlines.  For example, a flight crew departing from Logan International Airport, landing at LaGuardia Airport, and continuing to SeaTac International Airport could potentially be subject to governmental enforcement action or private lawsuits based on the alleged applicability of three different sick leave laws in a single duty period – each with its own accrual, compensation, reporting, and other requirements.  Similarly, if states and localities were permitted to enforce disparate laws against air carriers, flight crew who worked the entire trip (Boston to Seattle) could potentially receive paid leave benefits different from those received by flight crew who flew the second leg (New York to Seattle) but not the first (Boston to New York) – even though the employees worked on the same plane.  Not only does this state of affairs cause mass confusion, but the task of untangling the snarl of conflicting sick leave rules imposes a substantial burden on air carriers in violation of the Dormant Commerce Clause.

4.     The Earned Sick Time Law, as applied to flight crew, also violates the Fourteenth Amendment's Due Process Clause because it purports to apply extraterritorially, i.e., to work performed outside the Commonwealth of Massachusetts.

5.      The Earned Sick Time Law, as applied to both flight and ground crews, is also preempted by the federal Airline Deregulation Act ("ADA") because the Law relates to air carrier prices, routes, and services.  *See* 49 U.S.C. § 41713(b).  Among other things, sick leave laws, like Massachusetts's, severely limit an airline's ability to monitor and prevent abuse of sick leave and result in significant spikes in flight and ground crew absences – which, in turn, leads to an increase in delayed and cancelled flights.  In at least one location with a similar sick leave law, these effects were so great that one of Plaintiff's member airlines closed a flight attendant base of operations.

6.      Plaintiff's member airlines already provide sick leave benefits to flight and ground crews, and have for years.  Many extensively negotiate these benefits in nationwide collective bargaining agreements, and these comprehensive bargained-for benefits allow flight and ground personnel, for example, to take paid time off to care for themselves and their family members.  In exchange, airlines typically preserve the right to monitor employee attendance and reliability in order to ensure compliance with federal regulations governing duty period limitations, family and medical leave, rest requirements, and aviation safety – and to ensure the appropriate level of staffing for on-time departures of flights.  The Earned Sick Time Law conflicts with these carefully-negotiated provisions.  Because the burdens on operations imposed by the Earned Sick Time Law substantially impact airline prices, routes and services, the Law is both unconstitutional and preempted by the ADA.

## II.      NATURE OF ACTION

7.      Plaintiff Air Transport Association of America, Inc. d/b/a Airlines For America ("A4A" or "Plaintiff") seeks a declaration, pursuant to 42 U.S.C § 1983 and 28 U.S.C. §§ 2201 and 2202, that the Earned Sick Time Law, as applied to flight crew, violates the Dormant

Commerce Clause of the United States Constitution because the Law substantially impairs interstate commerce when a national, uniform system of regulation is required.

8.    A4A seeks a declaration, pursuant to 42 U.S.C § 1983 and 28 U.S.C. §§ 2201 and 2202, that the ADA preempts the Earned Sick Time Law, as applied to both flight and ground crew personnel, because the Law relates to (and adversely affects) air carrier prices, routes, and services.

9.    A4A seeks a declaration, pursuant to 42 U.S.C § 1983 and 28 U.S.C. §§ 2201 and 2202, that the Earned Sick Time Law, as applied to flight crew, violates the Fourteenth Amendment to the United States Constitution because it purports to apply Massachusetts law extraterritorially.

10.    A4A also seeks a permanent injunction prohibiting enforcement of the Earned Sick Time Law against airlines with respect to their flight and ground crew personnel.

### III.    PARTIES

11.    A4A is a nonprofit corporation organized under the laws of the District of Columbia, with its principal place of business in Washington, D.C.  A4A advocates for its member carriers on issues of safety, security, customer service, environment, energy, taxes, economic growth, and other policies and measures relevant to the airline industry.  A4A also works with its members in legal, political, and regulatory arenas to foster a business and regulatory environment which promotes a safe, secure, and financially-stable airline industry in the United States.

12.    A4A is the principal trade association representing federally-regulated air carriers, including Alaska Airlines, Inc.; American Airlines, Inc.; Atlas Air, Inc.; Federal Express Corp.; Hawaiian Airlines, Inc.; JetBlue Airways Corp.; Southwest Airlines Co.; United Airlines, Inc.;

and United Parcel Service Co. A4A's members and affiliated airlines account for more than 70% of the annual passenger and cargo traffic on U.S. airlines and provide more than 450,000 full-time equivalent airline-industry jobs.

13. A4A members operate at Massachusetts airports, specifically including Logan International Airport in Boston, and, absent relief from this Court, will continue to be subject to the Earned Sick Time Law.

14. Defendant Maura Healey is the Attorney General for the Commonwealth of Massachusetts, and is named in her official capacity. As Attorney General, she is charged with enforcing the Earned Sick Time Law and has promulgated rules and regulations thereunder.

## IV. JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, because Plaintiff A4A's claims arise under the United States Constitution – specifically, Art. I, Sec. 8, Cl. 3 (the "Commerce Clause"); Art. VI, Cl. 2 (the "Supremacy Clause"), and Amend. XIV, Sec. 1 (the "Fourteenth Amendment") – as well as the ADA, an Act of Congress regulating commerce.

16. The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, authorizes the declaratory and other relief sought herein.

17. Plaintiff A4A has standing as an organization to bring claims for declaratory and injunctive relief. "[A]n association has standing to sue in their own right when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also United Food & Commercial Workers Union*

*Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552-553 (1996). A4A's members subject to the Earned Sick Time Law are substantially and adversely affected by it. These members would have standing in their own right to challenge the Law and its implementing regulations. A4A is an organization that exists to promote its members' business and commercial interests, which are subject to ongoing harm caused by the Law and its implementing regulations. The relief A4A seeks – a judgment declaring the Law unconstitutional and/or preempted as applied to airline flight and ground crews, and an injunction barring its enforcement – does not require an individualized determination necessitating the participation of all of A4A's members in this lawsuit. *See Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 306 (1st Cir. 2005) (explaining that "'just because a claim may require proof specific to individual members of an association does not mean the members are required to participate as parties in the lawsuit,'" and ruling that "[e]ven though a takings inquiry is intensely fact specific and [the association] will be required to introduce proof of specific [member] practices and effects of the [challenged act] on specific [members], we see no reason that [the association's] [members] would be required to participate as parties in this litigation.") (internal citation omitted).

18. Venue is proper in this Court under 28 U.S.C. § 1391(b), as this Court is located in the judicial district where a substantial part of the events or omissions giving rise to A4A's claims have occurred, are now occurring, and will occur in the future; and because Defendant resides or is found in this judicial district.

## V. THE AIRLINE INDUSTRY

19. All of A4A's members are federally-regulated air carriers, and most operate domestic and/or international flights daily out of airports in Massachusetts.

20.     As used herein, the term "flight crew" refers to pilots and flight attendants, and the term "ground crew" includes (but is not limited to) mechanics, fleet service workers, customer service agents, flight dispatchers, baggage handlers, and catering employees.

21.     Many A4A members have negotiated methods for employee scheduling, as well as calculating pay and accrued sick leave or other paid time off, in collective bargaining agreements ("CBAs") with the employees' union representatives.  Some A4A members have had CBAs in place for flight and ground crews for decades.  Other A4A members address flight crew and ground crew scheduling, as well as calculation of pay and accrued sick leave or other paid time off, through employment policies developed by the carriers.

22.     A4A members also maintain attendance and reliability policies for flight and ground crews, many of which also are incorporated into CBAs.  The purpose of these policies is to allow airlines to monitor whether an employee works when scheduled, to ensure on-time operations, and to make sure the airlines are able to staff their flights properly.  These policies consider an airline's need to comply with comprehensive federal safety laws and regulations on work hours and staffing, including those related to duty period limitations, flight crew family and medical leave, rest requirements, and aviation safety.  They also take into account an airline's need to provide consistent, on-time service to its customers; and to treat a highly-mobile work force fairly and consistently throughout its entire operation, regardless of where any given employee works.

23.     Because flight and ground crew absences can cause significant operational disruptions, A4A members often assess points for absences, and impose discipline when an employee accrues too many points, under applicable attendance and reliability CBA provisions and policies.

7

## FLIGHT CREW

24.     Flight crew are highly mobile workers who do not work regularly-scheduled shifts.  Their schedules vary widely and are determined by bidding processes that take into account crewmember preferences and seniority, Federal Aviation Administration-mandated flight duty limitations, CBA limitations, and crewmember or "base" airports.[1]  A4A members American Airlines, Inc. ("American") and JetBlue Airways Corp. ("JetBlue") have flight crew bases (for both flight attendants and pilots) at Logan International Airport in Boston, and United Airlines, Inc. ("United") has a flight attendant base there as well.  A4A's members do not require flight crew personnel to live in the same city or state as their base airport.  Many of these employees live in cities and states geographically distant from their base, and commute to and from work by air travel.

25.     Because A4A's members operate no flights which both begin and end in Massachusetts, pilots and flight attendants based in Massachusetts begin or end flights in Massachusetts – but spend little time actually working in Massachusetts.  These employees spend the bulk of their work time in federally-regulated airspace; they often pass through multiple airports in the course of a single day, spending just enough time on the ground in each location to prepare for the next flight.

26.     Because pilots and flight attendants typically have a right under their CBAs or employer policies to trade, add and drop flights (without employer control or even advance notice), they do not work regularly-scheduled shifts flying between the same airports or with standard start and end times for their shifts.  Rather, they work fluctuating schedules which

---

[1]     A pilot's or flight attendant's "base" refers to the airport where they generally begin and end their trips – it does *not* refer to where they live.  A pilot or flight attendant with a "base" at Logan International Airport could live in Maine, Vermont, New Hampshire, or Rhode Island, and commute to and from work.

depend on seniority, bidding preferences and choices, regulatory requirements, CBA limitations, and base assignments.

27.     A4A's members calculate flight crew pay according to several different methods, many of which are not based on hours worked.

28.     For example, for each flight duty period (including deadheading, when a pilot flies to a location as a passenger in order to position himself for an on-duty assignment) American's pilots are paid the greatest of the following:  (a) flight time pay and flight time credit actually earned; (b) one minute of flight time pay and flight time credit for each two minutes of a scheduled or rescheduled on-duty period; or (c) one minute of flight time pay and flight time credit for each two minutes of an actual on-duty period.  The amount of hours an American pilot works is, however, determined by looking at the pilot's "on-duty period," which starts with the one-hour (for pilots flying) or thirty-minute (for pilots deadheading) reporting time before the first flight of a duty period and ends with the fifteen- (for domestic sequences) or thirty- (for international sequences) minute debrief time after the arrival of the last flight in the duty period. The on-duty period runs continuously between the start and end times, unless broken by a rest period.  Both the amount paid and the hours worked could be different for each flight a pilot flies (or deadheads), including flights on the same route but on a different day, due to unforeseen circumstances (e.g., weather).

29.     Flight attendants employed by American are paid the greatest of the following: (1) the greater of scheduled or actual flight time pay and flight time credit on a leg-by-leg basis; (2) a minimum of five hours flight time pay and flight time credit multiplied by the number of duty periods within a sequence (provided that any sequence which contains more than one duty period will be credited with a minimum of three hours flight time pay and flight time credit for

each duty period); (3) the greater of scheduled or actual on-duty time (calculated at the rate of one hour for every two hours of on-duty time); or (4) the greater of scheduled or actual trip-rig (calculated at the rate of 1 hour for every 3.5 hours of a sequence). As such, an American flight attendant's pay does not necessarily reflect the number of hours worked.

30.     A4A members allow flight crew to accrue generous paid sick-leave benefits. For instance, American's pilots receive collectively-bargained short- and long-term sick leave banks, and pilots are credited with five (5) hours of sick leave for each month of service with the airline. The accumulated sick leave for each calendar year is available for use during the following year, except that a pilot who has completed the first six months of service may use up to 30 hours of accumulated sick leave in the calendar year in which he completes the first six months of service. Pilots use long-term sick leave for injury/illness lasting more than 14 days. Then, each January 1, a pilot's sick leave hours accrued during the preceding year are applied first to the pilot's short-term sick leave bank, up to a maximum of 60 hours, and excess hours either replace, on a one-for-one basis, any long-term sick leave hours used during the prior calendar year or are paid out to the pilot, depending on the number of sick-leave hours the pilot has accumulated. American has a contractual right under the CBA to investigate (regardless of the number of days of work missed) any possible abuse of sick leave for cause (which includes, but is not limited to, frequency of sick leave use, sick leave patterns, and sick leave use in conjunction with holidays, vacations or training).

31.     JetBlue has a Paid Time Off ("PTO") program, which combines sick-leave hours with paid time away from work for the purpose of rest, relaxation, holidays, or other personal or family needs. Under this program, JetBlue flight crew personnel accrue PTO based on years of service. For example, a flight attendant who has zero to five years of service accrues 0.296 hours

of PTO per day, with a maximum of 108 hours per year. A flight attendant with six to ten years of service accrues 0.345 hours per day, with a maximum of 126 hours per year, and a flight attendant with eleven to fifteen years of service accrues 0.395 hours per day, with a maximum of 144 hours per year. These PTO hours are determined based on days in a month and not days worked.

## GROUND CREW

32.     Ground crew employees typically live near the airport where they work. Depending on the particular job in question, ground crew functions include performing maintenance work on aircraft, handling baggage, providing customer service at airport ticket counters and gates, and loading food/beverage items onto airplanes. These employees typically are paid based on hours worked and are scheduled to work either four 10-hour days, or five 8-hour days, per week. For example, mechanics at United and fleet service workers at American are paid hourly and work either four 10-hour days or five 8-hour days per week, depending on their location, and have the other three or two days off each week.

33.     As they do for pilots and flight attendants, A4A member airlines provide generous sick leave to ground crew employees. For example, United's mechanics accrue eight hours of sick pay credit for each month they are in a paid status up to a maximum of 1,600 hours. When a United mechanic uses sick pay, he is paid at his base rate until his bank has been exhausted. United has the right under its CBA to require the mechanic to submit to a physical examination to verify the sickness. Fleet service employees for American receive 2.5 sick leave days after completing their first six months of employment, and then they accrue five-twelfths of one day of sick leave for each calendar month of service, up to a maximum of five days in any calendar year. When fleet service employees use their sick leave, they are paid based on their regular

11

hourly rates.  American is permitted under the CBA to require a doctor's slip whenever circumstances suggest abuse of the sick leave policy, regardless of the number of workdays missed.  At Southwest Airlines Co. ("Southwest"), mechanics earn eight hours of sick leave each month, up to a maximum of 2,000 hours.  When mechanics use sick leave, they are paid at their straight-time rate.  Southwest also has the right under its CBA to investigate the circumstances of any absence due to illness or injury (regardless of the number of workdays missed), and any fraudulent absence can be cause for discipline.

## VI. THE MASSACHUSETTS EARNED SICK TIME LAW

34.     On November 4, 2014, the voters of Massachusetts approved Massachusetts General Law Chapter 149, Section 148C (herein referred to as the "Earned Sick Time Law" or the "Law"), which requires every employer with eleven or more employees in Massachusetts to provide paid sick leave to every employee (all other employers must provide an equivalent amount of unpaid sick leave to their employees).

35.     The Earned Sick Time Law requires employers to "provide a minimum of one hour of earned sick time for every thirty hours worked by an employee," up to 40 hours per year. Mass. Gen. L. ch. 149 § 148C(d)(1), (4).

36.     The Law also directs the Attorney General to promulgate rules and regulations implementing the Law, and to enforce the Law through injunctive and declaratory relief, and civil enforcement actions, including citations and penalties.  Mass. Gen. L. ch. 149 § 148C(l); *see also* Mass. Gen. L. ch. 49 § 27C (sections incorporated by reference in § 148C(1)).  The Attorney General has promulgated implementing rules and regulations.  *See* 940 CMR 33.00 *et. seq.*

37.     The Attorney General has sought to enforce the Earned Sick Time Law against A4A's members.  For example, the Attorney General's Fair Labor Division opened an investigation into a member airline after it received a complaint from a Boston-based flight attendant asserting that the airline had violated the Law.  The airline's response to the Fair Labor Division, in part, challenged the Fair Labor Division's assertion that the Earned Sick Time Law applied to flight attendants simply because they returned to Boston at the completion of their work assignment.  This matter remains pending to the best of the airline's knowledge.

38.     The Earned Sick Time Law also creates a private right of action to enforce its provisions.  *See* Mass. Gen. L. ch. 149 § 150; 940 CMR 33.10.  By statute, any employee who prevails in such an action is entitled to mandatory treble damages and attorneys' fees.  *See* Mass. Gen. L. ch. 149 § 150.

39.     The Law defines "employee" broadly, as "any person who performs services for an employer for wage, remuneration, or other compensation…"  Mass. Gen. L. ch. 149 § 148C(a).  The implementing regulation promulgated by Defendant clarifies this definition, as including "full time, part-time, seasonal, and temporary employees," and carves out six exceptions, none of which is applicable here.  940 CMR 33.02.  Because the Law provides no exemption for flight or ground crews, or for employees covered by CBAs, airline flight and ground crew personnel are covered by the Law (i.e., unless the Law is enjoined).

40.     "Employer" likewise is defined broadly, as "any individual, corporation, partnership or other private or public entity, including any agent thereof, who engages the services of an employee for wages, remuneration or other compensation . . . ."  Mass. Gen. L. ch. 149 § 148C(a).  Thus, A4A member carriers are covered by the Law (i.e., unless the Law is enjoined).

13

41.     Under the Law, employees accrue and can use earned sick time "if the employee's primary place of work is in Massachusetts regardless of the location of the employer," 940 CMR 33.03(1), and "[i]f an employee is eligible to accrue and use earned sick time, then all hours the employee works must be applied toward accrual of earned sick time regardless of the location of the work and regardless of the location of the employer."  940 CMR 33.03(2).  The example provided by Defendant's implementing regulations is as follows:  "In a single year, an employee of a catering company works 550 hours in Massachusetts, 350 hours in New Hampshire and 200 hours in Maine.  The caterer will accrue earned sick time on all 1,100 hours worked for the catering company."  *Id.*

42.     Under the Law, employees begin to accrue earned sick time on their date of hire and must be permitted to use earned sick time 90 days after the start of their employment. 940 CMR 33.03(29).  Employees can use up to 40 hours of paid sick time per calendar year and can carry over 40 hours of unused paid sick leave every year.  Mass. Gen. L. ch. 149 § 148C(d)(4), (7).

43.     The Law requires that employers allow use of sick time in increments as small as one hour, and for any period greater than one hour, in the smaller of hourly increments or the smallest increment the employer's payroll system uses to account for absences or other time.  *See* 940 CMR 33.03(14).

44.     The Law also states that when employees use paid sick time, they "must be paid on the same schedule as regular wages are paid" and at the "same hourly rate listed in 940 CMR 33.02:  Same Hourly Rate."  The "Same Hourly Rate" provision in Defendant's implementing regulations specifies use of the employee's regular hourly rate, for employees compensated on an hourly basis, 940 CMR 33.02, but "[f]or employees who receive different

14

pay rates for hourly work from the same employer, the same hourly rate means either:  (1) the wages the employee would have been paid for the hours absent during use of earned sick time if the employee had worked; or (2) the blended rate, determined by taking the weighted average of all regular rates of pay over the previous pay period, month, quarter, or other established period of time the employer customarily uses to calculate blended rates for similar purposes."  *Id.*

45.     The Law prohibits employers from counting sick-leave absences towards discipline.  940 CMR 33.08(1)-(3).  Under the Law, an employer may only require written documentation for an employee's use of earned sick time which:  (a) "exceeds 24 consecutively scheduled work hours"; (b) "exceeds three consecutive days on which the employee was scheduled to work"; (c) "occurs within two weeks prior to an employee's final scheduled day of work before termination of employment…"; (d) "occurs after four unforeseeable and undocumented absences within a three-month period"; or (e) "for employees younger than 18 years old, occurs after three unforeseeable and undocumented absences within a three month period."  940 CMR 33.06 (1)(a)-(e).  These provisions do not permit discipline under other circumstances, such as those contained in A4A's member airlines' CBAs or policies.

46.     The Law, further, imposes various recordkeeping and notice obligations on employers.  Mass. Gen. L. ch. 149 § 148C(*o*); 940 CMR 33.09.

47.     Since implementation, the Massachusetts Attorney General's Office has published Frequently Asked Questions ("FAQs") regarding the Law.  Under "Subsection B:  Employees Eligible for Earned Sick Time," the FAQs state that unionized employees are eligible for Earned Sick Time and that "If the employee spends work hours traveling outside Massachusetts (making deliveries, engaging in sales, etc.) but returns regularly to a Massachusetts base of operations before resuming a new travel schedule, Massachusetts is the primary place of work."

Massachusetts Attorney General's Office, *Earned Sick Time in Massachusetts Frequently Asked Questions*, http://www.mass.gov/ago/docs/workplace/earned-sick-time/est-faqs.pdf, at 3 (Accessed February 26, 2018).

## VII.     THE LAW CAUSES SUBSTANTIAL HARM

48.     The Earned Sick Time Law and its implementing regulations substantially harm A4A's member airlines.  By way of example and without limitation:

49.     The Law imposes an hourly sick-leave accrual rate, whereas flight and ground crew personnel employed by A4A members often accrue sick leave in ways that are not easily convertible into hours worked.

50.     The Law interferes with A4A member airlines' enforcement of nationwide attendance and reliability policies, which are designed to comply with comprehensive federal laws and regulations related to duty period limitations and rest requirements, flight crew family and medical leave, rest requirements, and aviation safety.  (See, by way of illustration only: 14 C.F.R. § 91.1057; 14 C.F.R. §§ 117 *et seq.*; 14 CFR § 121.391, .467, .471, and .503; 14 CFR §§ 135.261 *et. seq.*; 29 CFR § 825.802; 42 U.S.C. §§ 40101 *et seq.*; 49 U.S.C. §§ 44701 *et seq.*; 49 U.S.C. §§ 44901 *et seq.*; 49 CFR §§ 1542.1 *et seq.*; and 49 CFR §§ 1544.1 *et seq.*)  For instance, the Law's three-day minimum absence requirement for requesting medical verification of illness, practically speaking, substantially eliminates airlines' ability to investigate flight and ground crew absences.

51.     In addition to significantly impairing airlines' abilities to investigate fraud and abuse of sick leave, compliance with the Earned Sick Time Law leads to more employee absences, which then causes more delays and flight cancellations; interferes with interstate travel; adversely affects customer experiences; does lasting damage to air carriers' brands; and

16

otherwise burdens interstate commerce. Regular and predictable flight and ground crew attendance is vital to ensuring passenger safety, FAA compliance, and timely flight departures.

52.     For example, Federal Aviation Administration regulations set the minimum staffing levels for every commercial flight. Without the requisite number of crewmembers on board, a plane cannot take off. If a scheduled crewmember unexpectedly calls out sick, a replacement crewmember must be found through a process which often causes a delay in the flight's departure. If a replacement crewmember cannot be found, either because of scheduling or because no reserve crewmembers are stationed at the relevant airport, the flight may be cancelled in its entirety. And because flight crew schedules are built with a complex array of connections and transfers, a delayed departure due to an unexpected absence in one location can ripple across the system, leading to additional delays and possibly cancellations at other airports across the country. Indeed, one A4A member airline closed a flight attendant base because compliance with a local jurisdiction's paid sick leave law led to a rapid increase in the number of sick calls, which caused disruptions to the airline's operation. Similarly, for example, if there is an increase in the number of ground crew employees who call in sick, airlines will not have enough ground crew employees to perform maintenance on aircraft, handle baggage and/or prepare and load food and beverage items onto the airplane. This will cause interruptions to a carrier's service in the form of an increase in flight delays and, potentially, cancellations.

53.     A4A members also will be required to increase the reserve pool headcount for flight crew personnel to guard against potential service interruptions caused by high levels of pilot and flight attendant sick calls related to unpredictable factors such as very hot or very cold weather. And, even where high usage of sick leave is predictable, e.g., the Super Bowl, Mother's Day, Halloween, and all major holidays, increasing the reserve pool does not solve an

17

airline's problem, because the reserve flight crew personnel themselves are protected under the Earned Sick Time Law and can also call out sick with effective immunity. Accordingly, hiring more flight crew will only increase the costs of airline operations – it will not resolve the core problem of being required to comply with the various sick leave regimes.

54.     The Earned Sick Time Law will further expose A4A member airlines to a patchwork of inconsistent state and municipal regulatory regimes, adversely affecting efficient, on-time air transportation. Several of the airports to which A4A members fly are in jurisdictions with their own paid sick-leave regimes. At least seven other states have mandatory paid sick leave laws – Arizona, California, Connecticut, Maryland, Oregon, Vermont, and Washington – and there are more than 30 sick leave regimes at the local level.

55.     These sick leave regimes impose different (and inconsistent) obligations on employers and grant employees different rights with respect to paid leave. For example, these regimes authorize different uses for sick leave, different accrual and annual carryover limits, different compensation rate formulas, different employee notification requirements, and different restrictions on when employers can request medical verification of an illness. Complying with the laws of each state or municipality in which a carrier operates (and over which it flies) means tracking each flight crewmember's hours worked and the locations in which they worked on a given day and then calculating different accrued sick leave benefits for each employee (those calculations will differ for each employee and will even differ day-to-day for any given employee). And although it does not happen as regularly as with flight crew members, even ground crew personnel work in multiple locations for their airline employers. Often times, the tracking of hours worked and work locations is different from how duty time is tracked for pay purposes (especially for flight crew members), meaning an airline would have to maintain

multiple systems for complying with separate administrative requirements.  Not only are the administrative costs of complying onerous and unreasonable, but attempts to comply simultaneously with these different regimes will cause mass confusion and expose A4A member airlines to a flood of new lawsuits and enforcement proceedings.

## VIII.    CLAIMS

### COUNT I

### THE EARNED SICK TIME LAW VIOLATES THE COMMERCE CLAUSE OF THE U.S. CONSTITUTION

56.     Plaintiff re-alleges and incorporates herein each of the preceding allegations.

57.     Article 1, Section 8, Clause 3, of the United States Constitution empowers Congress – and not states or municipalities – to "regulate Commerce with foreign Nations, and among the several States."  Accordingly, this clause limits the powers of state and local governments to enact laws affecting foreign and interstate commerce when a national, uniform policy is required.

58.     The United States Government has exclusive sovereignty of the airspace of the United States.  *See* 49 U.S.C. § 40103(a)(1).  Federal control of air travel is intensive and exclusive.  Uniformity in regulation of air transportation is a national necessity to ensure efficient airline operations.

59.     A4A member airlines engage in interstate and foreign commerce as federally-regulated air carriers.

60.     The Earned Sick Time Law and similar laws enacted in other states and municipalities in which A4A member airlines operate, as applied to flight crew, impose impermissible burdens on air transportation and interstate commerce.

61. The evolving patchwork of state regulation of sick leave exposes A4A member airlines to inconsistent and potentially conflicting state and local regulations. Compliance with every state or local sick leave law imposed by jurisdictions in which A4A member airlines operate is nearly impossible, and even if it were possible, it would be extremely burdensome.

62. The burdens imposed by the Earned Sick Time Law are excessive in relation to its putative local benefits, particularly given that A4A's member airlines already provide generous paid sick leave, including through CBAs negotiated with the flight crew employees' union representatives.

63. Because the Earned Sick Time Law impermissibly burdens interstate commerce, the Law, as applied to flight crew personnel, violates the Commerce Clause of the United States Constitution.

## COUNT II:

## THE AIRLINE DEREGULATION ACT PREEMPTS THE EARNED SICK TIME LAW

64. Plaintiff re-alleges and incorporates herein each of the preceding allegations.

65. The Supremacy Clause, Article VI, Clause 2, of the United States Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the Supreme Law of the land."

66. Under the Supremacy Clause, federal law preempts any state or local regulation in an area in which Congress has expressly or impliedly exercised exclusive authority.

67. Congress enacted the ADA to deregulate the airline industry; to ensure maximum reliance on competitive market forces; to encourage efficiency, innovation, and lower prices; and to meet the needs of consumers and the commerce of the United States. To prevent states from undoing federal deregulation of air transportation, Congress enacted a broad express preemption

provision. The ADA expressly prohibits state and local governments from enacting or enforcing "a law, regulation or other provision having the force and effect of law related to a price, route, or service of an air carrier …" 49 U.S.C. § 41713(b).

68.     The Earned Sick Time Law, as applied to flight and ground crews, relates to, and significantly affects, A4A member airlines' "prices, routes, or services," and thereby interferes with Congress's intent in enacting the ADA.

69.     By way of example and without limitation, the Law impedes A4A member airlines' abilities to enforce attendance and reliability policies designed to ensure safe, on-time, and efficient operations. As a result, the Law will lead to delays, cancelled departures and, in some cases, closed bases of operations. In these and other ways, the Law impermissibly relates to the prices, routes, and services of air carriers.

70.     Because the Earned Sick Time Law, as applied to flight and ground crews, impermissibly regulates and relates to airline "prices, routes, or services," the ADA preempts the Earned Sick Time Law.

## COUNT III

### THE EARNED SICK TIME LAW VIOLATES THE PROHIBITION AGAINST EXTRATERRITORIALITY IMPLICIT IN THE FOURTEENTH AMENDMENT

71.     Plaintiff re-alleges and incorporates herein each of the preceding allegations.

72.     The Fourteenth Amendment to the United States Constitution provides, "No state shall make or enforce any law which shall abridge the privileges or immunities of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law[.]"

73.     Pursuant to this provision, states lack the power to exercise extraterritorial jurisdiction to regulate or control activities beyond their boundaries.

74.     The Earned Sick Time Law purports to regulate activity outside Massachusetts as well as the terms and conditions of work of employees who do not live in Massachusetts and who work only fleetingly in Massachusetts.  Because the bulk of the work done by A4A member airlines' flight crews is wholly or mostly outside of Massachusetts's borders, the Law constitutes an extraterritorial application of Massachusetts law in violation of the Fourteenth Amendment.

## IX.     PRAYER FOR RELIEF

75.     WHEREFORE, Plaintiff asks for the following relief:

a.     Judgment against Defendant declaring that the Earned Sick Time Law and its implementing regulations, as applied to flight crew:

i.     Violate the Commerce Clause of the United States Constitution;

ii.     Are preempted by the Airline Deregulation Act; and

iii.     Are unconstitutional, because they constitute impermissible extraterritorial application of state law.

b.     Judgment against Defendant declaring that the Earned Sick Time Law and its implementing regulations, as applied to ground crew, are preempted by the Airline Deregulation Act.

c.     Permanent injunctive relief prohibiting enforcement of the Law against A4A member airlines.

d.     An award to A4A for its attorneys' fees and costs incurred in this action under 42 U.S.C. § 1988, and any other applicable law.

e.     Any other relief the Court may deem just and appropriate.

DATED this 4th day of April, 2018

AIR TRANSPORT ASSOCIATION OF
AMERICA, INC. d/b/a AIRLINES FOR
AMERICA,
By its Attorneys,
By */s/ Robert A. Siegel*
Robert A. Siegel
# 64604 (CA)
O'Melveny& Myers LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6005
E-mail: rsiegel@omm.com

Chris A. Hollinger
# 147637 (CA)
Adam P. KohSweeney
# 229983 (CA)
O'Melveny & Myers LLP
2 Embarcadero Center
28th Floor
San Francisco, CA 94111
Telephone: (415) 984-8700
E-mail: chollinger@omm.com
            akohsweeney@omm.com
(*Pro hac vice* motions filed concurrently or
to be filed)

By */s/ John Hodges-Howell*
Harry J. F. Korrell
WSBA # 23173
John Hodges-Howell
WSBA # 42151
Davis Wright Tremaine
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
Telephone: (206) 622-3150
E-mail: harrykorrell@dwt.com
            jhodgeshowell@dwt.com
(*Pro hac vice* motions to be filed)

By */s/ David P. Mason*
David P. Mason
MA BBO # 663028
Ogletree, Deakins, Nash, Smoak & Stewart,
P.C.
One Boston Place, Suite 3500

Boston, MA 02108
Telephone: (617) 994-5700
E-mail: david.mason@ogletree.com

33604611.1