# Exhibit 4

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|   |   |
|---|---|
| ) | |
| AIR TRANSPORT ASSOCIATION OF ) | |
| AMERICA, INC., d/b/a AIRLINES FOR ) | |
| AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Act. No. 1:18-cv-10651 |
| ) | |
| MAURA HEALEY, in Her Official Capacity As ) | |
| Attorney General, Commonwealth of ) | |
| Massachusetts, ) | |
| ) | |
| Defendant. ) | |

_____

## DEFENDANT'S MEMORANDUM IN SUPPORT
## OF HER MOTION FOR SUMMARY JUDGMENT

### MAURA HEALEY
### ATTORNEY GENERAL

Douglas S. Martland, BBO # 662248
Kimberly A. Parr, BBO # 679806
  *Assistant Attorneys General*
Pierce O. Cray, BBO # 104630
  *Senior Appellate Counsel*
Office of the Attorney General
Government Bureau
One Ashburton Place
Boston, MA 02108
617-963-2062/2489/2084
douglas.martland@mass.gov
kimberly.parr@mass.gov
pierce.cray@mass.gov

Matthew Q. Berge, BBO # 560319
  *Senior Trial Counsel*
Kate Watkins, BBO # 683276
Amanda I. Morejón, BBO # 696737
  *Assistant Attorneys General*
Office of the Attorney General
Public Protection and Advocacy Bureau
One Ashburton Place
Boston, MA 02108
617-963-2310/2317/2037
matthew.berge@mass.gov
kate.watkins@mass.gov
amanda.morejon@mass.gov

Dated: December 18, 2020

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................1

ARGUMENT ......................................................................................................1

   I.    GIVEN THE EXTENSIVE CONTACTS THAT THE AIRLINES AND
        THEIR BOSTON-BASED FLIGHT CREWS INDISPUTABLY HAVE
        WITH MASSACHUSETTS, DUE PROCESS IS NOT VIOLATED
        WHEN THE STATE APPLIES ITS EARNED SICK TIME LAW TO
        THOSE FLIGHT CREWS ......................................................................... 1

   II.   SINCE THE ESTL IN NO WAY ADVANTAGES IN-STATE
        COMPANIES OVER OUT-OF-STATE ONES, THE AIRLINES'
        "UNDUE BURDEN" DORMANT COMMERCE CLAUSE CLAIM
        SIMILARLY FAILS AS A MATTER OF LAW. .................................... 2

   III.  BECAUSE THE AIRLINES HAVE NOT ESTABLISHED THAT THE
        ESTL "RELATES TO" OR HAS A "SIGNIFICANT IMPACT" ON ANY
        PRICE, ROUTE, OR SERVICE, ADA PREEMPTION IS ALSO
        UNWARRANTED. .......................................................................... 11

        A.    The ESTL Does Not Expressly Reference Carrier Prices, Routes,
             or Services. ................................................................................. 11

        B.    The ESTL Does Not Have a "Significant Impact" on Carrier
             Prices, Routes, or Services Either. ............................................. 11

             1.    The ESTL Regulates How Companies Behave as
                 *Employers*, Requiring Them to Provide Earned Sick Time
                 to Employees Based in Massachusetts......................................... 12

             2.    The Airlines Have Not Demonstrated that the ESTL's
                 Indirect Economic Effects Are So Acute as to Mandate, or
                 to Prohibit Them From Offering, Particular Prices, Routes,
                 or Services.................................................................................. 16

        C.    The Presumption Against Preemption Should Apply in Full Force. ........ 19

CONCLUSION....................................................................................................20

## INTRODUCTION

Workers who anticipate lost wages, reprisals, or job loss due to absences are more likely to go to work sick, to send sick children to school, and to delay preventive medical care. The Massachusetts Earned Sick Time Law ("ESTL") addresses these public health problems by providing paid leave that employees can use to care for themselves and their families due to illness, injury, or routine medical care. The law couples the promise of paid leave with protections from penalties for using that leave and from employer policies conditioning its use.

Paid sick leave under the ESTL is always important, and it has never been more important than now. The law promotes both workplace health and safety *and* the health of the public at large: protecting workers at their jobs, containing the spread of contagious disease, and advancing other essential public health objectives, all as part of the Commonwealth's broad authority to regulate its workers' conditions of employment. To defend this critical public health law from a challenge by the national air carriers, suing through the plaintiff Air Transport Association of America, Inc. (hereafter "Airlines"), the defendant Attorney General of Massachusetts submits this Memorandum in Support of her Motion for Summary Judgment on all three counts in the Complaint. Since as explained in the Motion the grounds for summary judgment are all matter-of-law arguments, *see Celotext Corp. v. Catrett*, 477 U.S. 317, 323 (1986), the Attorney General sets forth the relevant facts as necessary in the argument below, with no prefatory overview.

## ARGUMENT

## I. GIVEN THE EXTENSIVE CONTACTS THAT THE AIRLINES AND THEIR BOSTON-BASED FLIGHT CREWS INDISPUTABLY HAVE WITH MASSACHUSETTS, DUE PROCESS IS NOT VIOLATED WHEN THE STATE APPLIES ITS EARNED SICK TIME LAW TO THOSE FLIGHT CREWS.

The Complaint's final count is the one most promptly disposed of. In Count III, the Airlines, assert that the application of the ESTL to Boston-based pilot and flight-attendant "flight crews" violates the Fourteenth Amendment's Due Process Clause as an extraterritorial application of state law. Cmpt. ¶¶ 71-74; *see id*. ¶¶ 4, 19-20, 24-25, 37, 47, 71-74; M.G.L. c. 149, § 148C. The Airlines made a similar challenge to Washington's sick-time law, however, and the

District Court there entered summary judgment against them. *Air Transp. Ass'n v. Wash. Dept. of Labor*, 410 F.Supp.3d 1162, 1179-80 (W.D. Wash. 2019). The Airlines then dropped the due process claim in their Ninth Circuit appeal.

This same claim is likewise without merit here. While a state cannot "control activities wholly beyond its boundaries," *Watson v. Em'ers Liab. Assur. Corp*., 348 U.S. 66, 70-71 (1954), "multistate transactions" *are* within its purview. *Id*. at 72. All that must exist for a state to regulate them is a "significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 308 (1981) (plurality op.); *accord Phillips Pet. Co. v. Shutts*, 472 U.S. 797, 821 (1985); *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 206 (1st Cir. 1988) (recognizing *Hague* in international context). Here the Complaint itself reveals a "significant aggregation of [Massachusetts] contacts": it admits both that "a substantial part of the events . . . giving rise to [the] claims have occurred" in Massachusetts, Cmpt. ¶ 18; and that the relevant air carriers have pilot and/or flight attendant "bases" in Boston, where those employees, among other things, "generally begin and end their [multi-flight] trips," *id*. ¶¶ 24-25 & n.1; *see also* Statement of Material Facts ("SMF") ¶¶ 2-10, 12-26 (summarizing the extensive contacts). This case indeed strongly resembles *Alaska Packers* v. *Indus. Acc. Comm'n*, 294 U.S. 532, 538-42 (1935), which rejected a due process challenge to applying California law to an employer that transported its workers back and forth from California to Alaska, where the actual work was done. Boston-based flight crews similarly go to and from Massachusetts on company planes to do their work, and Count III's due process claim fails as a matter of law.

## II. SINCE THE ESTL IN NO WAY ADVANTAGES IN-STATE COMPANIES OVER OUT-OF-STATE ONES, THE AIRLINES' "UNDUE BURDEN" DORMANT COMMERCE CLAUSE CLAIM SIMILARLY FAILS AS A MATTER OF LAW.

A like fate awaits Count I's claim that the ESTL violates the "dormant" aspect of the Commerce Clause by "impermissibly burden[ing]" interstate commerce—a claim that the Airlines also lost in Washington. Cmpt. ¶¶ 56-63; *see Air Transp.*, 410 F.Supp.3d at 1169-78; U.S. Const. art. I, § 8, cl. 3. The basic Commerce Clause standards are familiar:

> [T]wo primary principles . . . mark the boundaries of a State's authority to regulate interstate commerce. First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce. State laws that discriminate against interstate commerce face "a virtually *per se* rule of invalidity." *Granholm v. Heald*, 544 U.S. 460, 476 … (2005). State laws that "regulat[e] even-handedly to effectuate a legitimate local public interest ... will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 [1970] ….

*S. Dakota v. Wayfair*, 138 S. Ct. 2080, 2090 (2019). As in Washington, "the Airlines do not argue that [the ESTL] is discriminatory." *Air Transp.*, 410 F.Supp.3d at 1169; *see* Cmpt. ¶¶ 56-63; Airlines Sum. J. Mem. [Dckt. # 36] ("Airlines SJ Mem.") p. 9. They instead contend that it "impermissibly burdens interstate commerce . . . as applied to flight crew personnel," Cmpt. ¶ 63, because of the administrative difficulties individual carriers supposedly face in dealing with a "patchwork" of varying sick time laws across the country. *Id*. ¶¶ 60-62; Airlines SJ Mem. pp. 9-13. This company-focused approach is inconsistent with the settled rule that the Commerce "Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon Corp. v. Gov. of Md*., 437 U.S. 117, 127-28 (1978).

The Airlines' claim also suffers from a more fundamental flaw, as shown by the fate on appeal of the main decision relied upon in their 2018 Summary Judgment Memorandum [Dckt. # 36]. There the Airlines stressed at length language in *Hirst v. SkyWest, Inc.,* 283 F.Supp.3d 684, 698-701 (N.D. Ill. 2017), that does emphasize the burden on individual air carriers of complying with multiple states' minimum-wage laws. Airlines SJ Mem. pp. 10-11, 12-13 (also quoting earlier unpublished decision in same case). Since the Airlines' 2018 filing, however, the Seventh Circuit reversed the *Hirst* Commerce Clause rulings on a purely legal ground:

> SkyWest is subject to many minimum wage laws that impose serious compliance costs. But the existence of a great regulatory burden on an employer does not necessarily mean minimum wage laws have a discriminatory effect on interstate commerce. State and local wage laws can burden companies within their own localities just as much, if not more, than out-of-state ones. All airlines—indeed all employers—are subject to these laws, regardless of state citizenship. "*Pike* balancing is triggered *only* when the challenged law *discriminates* against interstate commerce in practical application." *Park Pet Shop*, 872 F.3d at 502 (emphasis in original). SkyWest has failed to allege any discrimination against interstate commerce. This failing precludes the application of the dormant Commerce Clause to the Flight Attendants' … claims.

*Hirst v. SkyWest, Inc.,* 910 F.3d 961, 967 (7th Cir. 2018). Here, as in *Hirst*, the ESTL does not treat in-state employers more favorably—if anything, they will be more burdened by the Law, since it will cover a greater percentage of their payrolls. *Cf. Nat'l Solid Waste Mgm't v. Pine Belt*, 389 F.3d 491, 502 (5th Cir. 2004) ("burden imposed on wholly intrastate contracts … will likely be *greater* than that imposed … on plaintiffs' interstate contracts" (emphasis in original)). And once an "undue burden" on "interstate commerce" is precluded as a matter of law, then "*Pike* balancing" is not "triggered," *Hirst*, 910 F.3d at 967, and this Court need not ever reach the ESTL's clear public-health benefits to resolve the Airlines' Commerce Clause claim. *See, e.g.*, *id.*; *N.Y. Pet Welfare Ass'n v. N.Y.*, 850 F.3d 79, 92 (2nd Cir. 2017).

As suggested by the just-quoted passage in *Hirst*, the rule that an undue burden on interstate commerce means one that "in practical application" falls more heavily on it, 910 F.3d at 67, is a longstanding one in the Seventh Circuit. *Park Pet Shop v. Chicago*, 872 F.3d 495, 502 & n.1 (7th Cir. 2017); *Nat'l Paint & Coatings v. Chicago*, 45 F.3d 1124, 1130-32 (7th Cir. 1995). That Circuit is not alone; since 2017 three others have also recognized the general principle that an undue burden is one that has an unfavorable differential impact on interstate as opposed to intrastate commerce. *Wal-Mart v. Tex. Alch. Bev. Com'n*, 945 F.3d 206, 223 (5th Cir. 2019) (no "impermissible burden" "[w]hen in-state firms have no competitive advantage over out-of-state firms"), *cert. petition filed* June 2, 2020; *Rosenblatt v. Santa Monica*, 940 F.3d 439, 452 (9th Cir. 2019) (affirming Rule 12(b)(6) dismissal) ("*Pike* balancing is required only if the challenged law has a discriminatory effect on interstate commerce"); *N.Y. Pet*, 850 F.3d at 91 (affirming 12(b)(6) dismissal) ("An incidental burden is one that weighs more heavily on interstate commerce than intrastate"). A later Second Circuit decision directly links this construction of undue burden to the Commerce Clause's core concern with local protectionism:

> The *Pike* test is often directed at differentiating "protectionist measures" from those that "can fairly be viewed as ... directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Philadelphia v. New Jersey*, 437 U.S. 617, 624 … (1978). In order to sufficiently allege that Connecticut's E–Waste Law is "protectionist" rather than dedicated to "legitimate local concerns," VIZIO must at least

demonstrate that the "burden on interstate commerce ... is qualitatively or quantitatively different from that imposed on intrastate commerce." *Town of Southold*, 477 F.3d at 50. *VIZIO v. Klee*, 886 F.3d 249, 259 (2nd Cir. 2018) (affirming 12(b)(6) dismissal).

While the First Circuit has not yet addressed the recent approach of the Second, Third, Fifth, and Seventh, it agrees with the approach's animating principle that "[t]he core purpose of the dormant Commerce Clause is to prevent states … from promulgating protectionist policies." *Houlton Citizen's Coal. v. Houlton*, 175 F.3d 178, 188 (1st Cir. 1999). This Court should therefore follow *Hirst*, 910 F.3d at 967, and not entertain an undue burden claim unless a differential impact on interstate vs. intrastate commerce is shown—an impact that the Airlines have not alleged, let alone tried to prove. *See* Cmpt. ¶¶ 56-63. In this regard, the Seventh Circuit's differential-impact requirement is categorical, *see Hirst*, 910 F.3d at 67, but the other three Circuits have several seeming elaborations on it, set forth below. While the Attorney General contends that *Hirst*'s categorical rule should be adopted, she would be equally entitled to judgment as a matter of law under any of the other Circuits' variations.

The Ninth Circuit thus allows that "laws that [a]re genuinely nondiscriminatory" can still violate the Commerce Clause if they involve "regulation of activities that are inherently national." *Rosenblatt*, 940 F.3d at 452. The Airlines insist that aviation is just such a field, Cmpt. ¶¶ 2, 58, but the Tenth Circuit has specifically rejected the idea of interstate transportation companies being inherently national:

> The courts have not held that certain modes of interstate commerce always require uniform regulation. They have examined particular types of regulation and made individual determinations. For example, the Supreme Court has not held that all regulation of interstate railroads must be national in scope. In *Southern Pacific* [*v. Ariz.,* 325 U.S. 761 (1945)] the Court held that the length of interstate trains could not be regulated state by state, *see* 325 U.S. at 781-82, … but it did not retreat from its prior decisions allowing individual states to impose some safety measures, such as limitations on the size and composition of crews on interstate trains, *see id.* at 779, 782 ….

*Quick Payday*, 549 F.3d 1302, 111-12 (10th Cir. 2008).[1] The Ninth Circuit has similarly indicated that state labor laws do not transgress any national-uniformity concept when applied to

---

[1]    The Supreme Court in *S. Pacific* in fact cited three prior decisions where state laws requiring "full train crews"— *i.e*., laws regulating employment on instrumentalities of interstate commerce—were

a transportation industry. *Alaska Airlines v. Schurke*, 898 F.3d 904, 919 (9th Cir. 2018) (Railway Labor Act—which applies to airlines as well as to railroads—"does not provide for, nor does it manifest any interest in, national or system wide uniformity in substantive labor rights."); *Air Transp.*, 410 F.Supp.3d at 1171 (relying on *Schurke* in this regard).

For its part, the Second Circuit has ruled that "laws that weigh[ ] more heavily on interstate commerce" include "laws that regulate beyond the state's borders." *N.Y. Pet*, 850 F.3d at 91. While the Airlines do not challenge the ESTL on such an "extraterritoriality" basis in the Commerce Clause (as opposed to due process) context, their Commerce Clause arguments in the Washington case do touch on it. This relative deemphasis is understandable, since the First Circuit requires "a statute that *directly controls* commerce occurring *wholly outside* the boundaries of a State," *IMS v. Mills*, 616 F.3d 7, 29 (1st Cir. 2010) (emphasis in original), *vac. on other grounds* 564 U.S. 1051 (2011), and neither element is met here. As for "wholly outside," this Court has already found that airline "fli[ghts] in and out of Boston"—which are what Boston-"based" flight crews fly, Cmpt. ¶ 24 n. 1—do not satisfy it. *Stone v. Frontier Airlines*, 256 F.Supp.2d 28, 46 (D. Mass. 2002) (Young, C.J.) (Massachusetts tort law applies to death on such a flight); *accord Pac. Merch. v. Goldstene*, 639 F.3d 1155, 1179 (9th Cir. 2011) (same for "vessels traveling to and from California's ports"). And as for "directly controls," "the measure of extraterritoriality is whether the [state law] 'inescapably require[s]' [companies] to operate on the [state]'s terms even when doing business elsewhere." *N.Y. Pet*, 850 F.3d at 91; *accord Cotto Waxo v. Williams*, 46 F.3d 790, 794 (8th Cir. 1995) ("necessarily requires"). Here the Airlines make no allegation that the ESTL requires anything for their employees who are *not* "based" in Massachusetts; if a carrier decides it is just simpler to apply the ESTL's standards elsewhere, that is its own choice, but there is no legal compulsion to do so. *See VIZIO*, 886 F.3d at 256 ("VIZIO is not compelled to conduct its business outside of Connecticut on the state's

---

upheld under the Commerce Clause as appropriate safety measures. 325 U.S. at 779 (citing *Chicago, R.I. & P. Ry. v. Ark.*, 219 U.S. 453 (1911); *St. Louis, I.M. & S.R. v. Ark.*, 240 U.S. 518 (1916); and *Mo. Pac. R. v. Norwood*, 283 U.S. 249 (1931)); *accord Bhd. of Locomotive Fireman v. Chicago, R.I. & P. Ry*, 393 U.S. 129, 131 (1959) ("reaffirm[ing] those decisions").

proscribed terms."); *Int'l Dairy Foods v. Boggs*, 622 F.3d 628, 647 (6th Cir. 2010); *Air Transp.*, 410 F.Supp.3d at 1173.

The Second Circuit also considers "laws that create regulatory inconsistencies between states" to be "laws that weigh[ ] more heavily on interstate commerce." *N.Y. Pet*, 850 F.3d at 91. While fear of a multi-state regulatory "patchwork" is a claim the Airlines raise here, Cmpt. ¶¶ 3, 54-55, 60-61, it has two fatal flaws as a matter of law. First, "state laws which merely create additional, but not irreconcilable, obligations are not considered to be 'inconsistent' for this purpose." *Instruct'l Sys. v. Comput. Curriculum Corp.*, 35 F.3d 814, 826 (3rd Cir. 1994); *accord SPGGC v. Blumenthal*, 505 F.3d 183, 196 (2nd Cir. 2007) ("there must be an actual conflict"). The Airlines have identified no law in any other state that they cannot "simultaneously" comply with, *N.Y. Pet,* 850 F.3d at 92, or that would "impose demands on [them] which would require them to violate [Massachusetts] law or vice versa," *Instruct'l Sys.*, 35 F.3d at 826. Second, "the [Supreme] Court has never invalidated a state . . . law under the dormant Commerce Clause based upon mere speculation about the possibility of conflicting legislation." *Ass'n des Eleveurs v. Harris*, 729 F.3d 937, 951 (9th Cir. 2013); *accord Air Transp.*, 410 F.Supp.3d at 1170. "It is not enough to point to a risk of conflict," *N.Y. Pet*, 850 F.3d at 92, which the most that the Airlines could be said to have done here.

Finally, the Fifth Circuit has provided that a state law "impermissibl[y] burden[s]" interstate commerce if it "inhibit[s] the flow of interstate goods." *Wal-Mart*, 945 F.3d at 223. However, "it is a trade *barrier* to the free flow of goods … across state lines that violates the dormant Commerce Clause. The Clause does not purport to … protect [market] …participants' chosen way of doing business." *Brown v. Hovatter*, 561 F.3d 357, 364 (4th Cir. 2009) (citing *Exxon*, 437 U.S. at 127) (emphasis added); *accord Walgreen v. Rullan*, 405 F.3d 50, 55 (1st Cir. 2005) (Clause "limits the power of states 'to erect barriers against interstate trade'"). The Airlines therefore were unsuccessful with a "flow" argument in the Washington case:

> In short, WPSLL does not unavoidably obstruct interstate commerce in the same way as other regulations that have been invalidated under the Dormant Commerce Clause. *See Raymond*, 434 U.S. at 445 … (truck length regulations "slow the movement of goods");

> *Bibb*, 359 U.S. at 527 … (mud guards requirements "caus[e] a significant delay"). Instead, the extent to which the Airlines allow delays from slightly increasing because of WPSLL boils down to a calculation of compliance costs. This does not amount to a substantial burden on commerce.

*Air Transp.*, 410 F.3d at 1177. Abundant authority supports this ruling, since a state law that simply requires a company doing business within the state to operate in a certain manner when doing so, including as regards employment, does not constitute a trade "barrier."[2] While the Airlines contend that the ESTL will cause increased sick-time usage and therefore commerce-impeding flight delays, Cmpt. ¶¶ 5, 51-53, 69, the older Supreme Court cases they have cited here and in the Washington case all involved laws that made delay *unavoidable*: the affected companies either had to stop at the state border to perform a task (changing mudguards or train lengths) or lengthen their routes to go around the state altogether. No amount of expenditure could avoid this reality. Here, in contrast, the Airlines can adjust their operations or spend additional money on reserves to prevent the small number of delays they project would result from any increase in sick-time usage, and to the extent they have to do that, no cognizable Commerce Clause burden would arise in either case. *See*, *e.g.*, *Fla. Transp. Svcs. v. Miami-Dade*, 703 F.3d 1230, 1258 (11th Cir. 2012) ("[I]ncreased costs are insufficient alone to constitute an unreasonable burden on interstate commerce");[3] *Wine & Spirits Retailers v. R.I.*, 481 F.3d 1, 15-

---

[2]  *See Boggs*, 622 F.3d at 647 ("Ohio [milk labelling] Rule … does not impede or control the flow of milk products across the country"; distinguishing *S. Pacific*, where "train operators were forced to break up their trains prior to entering Arizona and reassemble them upon leaving the state"); *Burlington N. v. Dep't of Pub. Svc. Reg.*, 763 F.2d 1106, 1114 (9th Cir. 1985) (state can require railroads to maintain and staff freight offices in small towns; "a loss to the company does not, without more, suggest that the Montana statute 'impede[s] substantially the free flow of commerce from state to state'"); *Bernstein v. Virgin Am.*, 227 F.Supp.3d 1049, 1068 (N.D. Cal. 2017) ("[R]equiring Virgin to pay its California employees in accordance with California law simply does not impede the flow of interstate transportation like the [conflicting state truck mud-guard] regulations at issue in *Bibb*").

[3]  *Accord Pharm. Research v. Concannon*, 249 F.3d 66, 84 (1st Cir. 2001*), aff'd* 538 U.S. 644 (2003) ("[T]he fact that a law may have 'devastating economic consequences' on a particular interstate firm is not sufficient"); *Pac. Merch.*, 639 F.3d at 1159 (no Commerce Clause violation even though compliance with state law would cost industry hundreds of millions of dollars annually). The older Supreme Court cases themselves distinguished cost. *Bibb*, 359 U.S. at 526 ("If we had here only a question whether the cost of adjusting an interstate operation to these new local safety regulations … unduly burdened interstate commerce, we would have to sustain the law …."); *S. Pacific*, 325 U.S. at 782 ("While the full train crew laws undoubtedly placed an added financial burden on the railroads in order to serve a local interest, they did not obstruct interstate transportation").

16 (1st Cir. 2007) ("Supreme Court … has rejected the notion that the dormant commerce clause protects particular … methods of operation"); *Wal-Mart*, 945 F.3d at 223 (same).[4]

As previously noted, the lack of any cognizable burden is sufficient by itself to resolve the Commerce Clause claim. *See, e.g., N.Y. Pet*, 850 F.3d at 92. But even if the Court were also to consider the ESTL's "putative local benefits," those benefits would vastly outweigh any "burden" that might be assumed.[5] It should be kept in mind both that an asserted benefit is assessed under a very deferential standard, *see, e.g.*, *Walmart*, 945 F.3d at 224 ("not wholly irrational"); *Colon Health v. Hazel*, 733 F.3d 535, 545 (4th Cir. 2013) ("rational basis test"), and that "the health and safety of state citizens [is] a traditionally paramount state interest." *Stone*, 256 F.Supp.2d at 47; *accord United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342-43 (2007) (States have "great latitude under their police powers" to protect the health of all persons); *Lebanon Farms v. Lebanon*, 538 F.3d 241, 250 (3rd Cir. 2008) ("federal courts hold sacrosanct 'state legislation in the field of safety'"). Particularly when viewed through this lens, the record evidence of the ESTL's benefits is overwhelming. Indeed, the ESTL substantially benefits the workers who gain access to these rights, as well as their families and employers, the economy, and Massachusetts' public-health system. *See* SMF ¶ 29. It specifically allows employees to address both their own and their family members' health needs *before* situations worsen, reducing the need for emergency or critical care down the line.

---

[4]     To be clear, the Attorney General strongly disagrees with the Airlines' factual assertions (1) that the ESTL will meaningfully increase flight-crew sick-time abuse (as opposed to legitimate uses by employees no longer deterred by ESTL-violative employer disciplinary policies) and (2) that any such use will substantially increase flight delays. *See* Airline SJ Mem. p. 19. But the Court need not reach these factual disputes in the Commerce Clause context, because the contested facts are not *material* to the matter-of-law arguments set forth in the text above. And again, the minimal increase in flight delays the Airlines project can be remedied by minor expenditures and operational changes. *See* SMF ¶¶ 11, 42, 50-51, 78. Because *any* burden on interstate commerce must be "substantial," *see, e.g.*, *Dennis v. Higgins*, 498 U.S. 439, 447 (1991), the Airlines certainly have not provided sufficient proof that that any such unavoidable residuum of delay would *standing by itself* rise to the "substantial" level. The *Air Transp.* Court made a separate ruling to essentially this effect in that case. *See* 410 F.Supp.3d at 1177.

[5]     The Attorney General incorporates by reference here, as an additional ground for summary judgment on the Commerce Clause claim, all its arguments in Section III *infra* regarding why the Airlines have failed to meet their burden of proof on these same factual claims in the ADA preemption context.

*Id*. If as a result fewer workers go to work sick (and by extension fewer children go to school and care programs sick), the spread of infectious diseases decreases. *Id*. By staying home when sick, workers also quicken recovery periods, are more productive at work, are less likely to be injured on the job, and are more likely to stay in the workforce. *Id*. And when workers obtain preventative care and seek timely treatment for illness, they are less dependent on emergency care, resulting in cost savings for public and private insurers, hospitals and doctors, and Massachusetts taxpayers. *Id*.

Although airlines often provide paid sick leave benefits that exceed the 40 hours required by the ESTL, their sick leave policies discourage workers from actually taking that sick leave, by assessing them disciplinary points that lead to warnings, discipline, and, in some cases, termination. *See* SMF ¶¶ 30-32, 34. To avoid accumulating such disciplinary points, flight and ground crew work sick. *See id*. ¶ 32. Massachusetts-based airline employees thus benefit substantially from having access to discipline-free paid sick leave under the ESTL, especially right now, when preventing the spread of illness is of paramount importance.[6] *See id*. ¶¶ 27-39. And the representative declarations from Logan-Airport-based flight and ground crew vividly affirm the critical importance of discipline-free paid sick time for airline employees. *See* SMF ¶¶ 30-38 & declarations cited. Given this evidence, summary judgment for the Attorney General is even more clearly appropriate on the Commerce Clause claim if ESTL's manifest benefits are considered.

---

[6]      The ESTL applies only to Massachusetts-based airline employees. Declaration of Cynthia Mark ("Mark Dec.") ¶¶ 23-25. This includes all "ground crew" (*e.g.,* mechanics, ramp agents, and customer service representatives), because Massachusetts is where they report to work every day, perform all their work, and receive their direct supervision. *Id*. ¶ 24. *See* SMF ¶ 8 It also includes Massachusetts-based flight crews. Mark Dec. ¶¶ 21, 23, 25. Although Massachusetts-based flight crews do much of their physical work in federally-regulated airspace, under Massachusetts law their primary place of work is in Massachusetts because, as explained in SMF ¶¶ 1-26, the Airlines have large operations in Massachusetts, made strategic decisions to "base" flight crew here to staff flights leaving the Commonwealth, assign flight crew to assignments (flights or pairings) that begin and end at Logan Airport, use the base to determine, in part, the crew members' seniority, and locate the crew's immediate supervisors at the base. Mark Dec. ¶¶ 23-25.

## III. BECAUSE THE AIRLINES HAVE NOT ESTABLISHED THAT THE ESTL "RELATES TO" OR HAS A "SIGNIFICANT IMPACT" ON ANY PRICE, ROUTE, OR SERVICE, ADA PREEMPTION IS ALSO UNWARRANTED.

As in Washington, the Airlines fare no better relying on the preemption clause of the Airline Deregulation Act ("ADA"). Airline SJ Mem. pp. 17-20; *see Air Transp.*, 410 F.Supp.3d at 1178-79. Passed in 1978 to "promote 'efficiency, innovation, and low prices' in the airline industry through 'maximum reliance on competitive forces and on actual and potential competition,'" *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 280 (2014) (quoting 49 U.S.C. §§ 40101(a)(6), (12)(A)), the ADA includes a provision preempting state laws "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). "Under this rubric, a state statute is preempted if it expressly references, or has a significant impact on, carriers' prices, routes, or services." *Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11, 17-18 (1st Cir. 2014) ("*MDA*").[7] By contrast, "State laws whose effect is only 'tenuous, remote, or peripheral' are not preempted.'" *Id*. at 18 (quoting *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008)). The Airlines have not established that preemption is warranted here.

### A. The ESTL Does Not Expressly Reference Carrier Prices, Routes, or Services.

The "express reference" inquiry is easily resolved here—the ESTL, on its face, does not refer to, let alone dictate, mandate, or prohibit, any carrier's prices, routes, or services. *See* M.G.L. c. 149, § 148C. Presumably because the ESTL requires just employers with Massachusetts-based workers to provide those workers EST, *see supra*, n.6, the Airlines do not contend that it is preempted on this basis. *See* Airline SJ Mem. pp. 17-20.

### B. The ESTL Does Not Have a "Significant Impact" on Carrier Prices, Routes, or Services Either.

Like the EST law at issue in *Air Transp.*, *see* 410 F.Supp.3d at 1178-79, the ESTL also does not have a "significant impact" on carrier prices, routes, and services. Its impact is instead "too tenuous for preemption," as it regulates the Airlines in their capacity as employers, with any

---

[7]     Congress patterned the "related to" language in the Federal Aviation Administration Authorization Act, 49 U.S.C. § 14501(c)(1), on the ADA's preemption provision, and the two provisions have been interpreted and cited interchangeably. *MDA*, 769 F.3d at 17.

impact multiple steps removed from the Airlines' prices, routes, and services. *Id*. And while the Airlines contend that ESTL compliance might marginally increase operational costs, that alone is not enough, *id*., and they have not established that any indirect effects are so acute as to effectively mandate (or prohibit) a particular price, route, or service. *Id*.

1. **The ESTL Regulates How Companies Behave as *Employers*, Requiring Them to Provide Earned Sick Time to Employees Based in Massachusetts.**

The First Circuit draws the "dividing line" for ADA preemption between state laws that regulate how a "service" is performed (preempted) and those that regulate how the carrier behaves as an employer or proprietor (not preempted). *Tobin v. Fed. Exp. Corp.*, 775 F.3d 448, 456 (1st Cir. 2014); *DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 86 (1st Cir. 2011). While the term service is broadly defined, *see Tobin*, 775 F.3d at 453 ("'[S]ervice' represents a 'bargained-for or anticipated provision of labor from one party to another,' thus leading to a 'concern with the contractual arrangement between the [motor carrier] and the user of the service.'"); *see also Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1258 (11th Cir. 2003) ("'[S]ervices' do not "include those aspects of airline operations that are not bargained-for by carriers and their passengers."), the focus is on impermissible interference with the carrier-customer relationship. Thus, that the ESTL regulates the Airlines just in their capacity as employers, multiple steps removed from any possible impact on the Airlines' services (and prices and routes), *see supra* pp. 16-19, should control the "significant impact" inquiry. *Air Transp.*, 410 F.Supp.3d at 1179 (state EST law's effects "too tenuous for preemption" because they were "too far removed" from the carriers' prices, routes, and services, "control[ling just] how the Airlines must treat their employees").

This result is consistent with how other Circuit Courts have addressed similar issues.[8] From prevailing wage and meal- and rest- breaks to discrimination and safety-related whistleblower claims, the Second, Third, Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh

---

[8]     The Supreme Court has never addressed when a state employment law "relates to" a carrier price, route, or service for purposes of the ADA or the FAAAA.

Circuits have consistently determined that state laws regulating carriers in their capacity as employers fall outside the scope of "relate to" preemption under the ADA and the Federal Aviation Administration Authorization Act ("FAAAA"):

**Second**: *See Abdu-Brisson v. Delta Air Lines, Inc.*, 128 F.3d 77, 84 (2nd Cir. 1997) ("[p]ermitting full operation of New York's age discrimination law will not affect competition between airlines—the primary concern underlying the ADA").

**Third**: *Bedoya v. Am. Eagle Express*, 914 F.3d 812, 824 (3rd Cir. 2019) (FAAAA does not preempt state's ABC employment classification test); *Gary v. Air Grp., Inc.*, 397 F.3d 183, 189 (3rd Cir. 2005) ("garden variety employment claim[s]" evade ADA preemption because they are "too remote and too attenuated" from carrier prices, services, or routes").

**Fifth**: *Anderson v. Am. Airlines*, 2 F.3d 590, 597-98 (5th Cir. 1993) (ADA does not preempt state law claim that airline retaliated for filing workers' compensation claim).

**Sixth**: *See Wellons v. Nw. Airlines, Inc.*, 165 F.3d 493, 494 (6th Cir. 1999) (rejecting an ADA preemption challenge to a Michigan statute prohibiting racial discrimination in employment,"[b]ecause the plaintiff's claims bear only the most tenuous relation to airline rates, routes, or services").

**Seventh**: *See Costello v. Beavex*, 810 F.3d 1045, 1055-56 (7th Cir. 2016) (rejecting FAAAA preemption challenge to Illinois statute's definition of employee that operates one or more steps away from carrier-customer relationship); *S.C. Johnson & Son, Inc. v. Trans. Corp. of Am., Inc.*, 697 F.3d 544, 558 (7th Cir. 2012) (state laws regulating "inputs" to motor-carriers operations—such as "labor inputs...affected by a network of labor laws"—were not FAAAA-preempted merely because such laws could increase labor costs and thus affect carrier prices or services).

**Eighth**: *Watson v. Air Methods Corp.*, 870 F.3d 812, 818-19 (8th Cir. 2017) (ADA does not preempt state law wrongful discharge claim)

**Ninth**: *See Cal. Trucking Ass'n v. Su*, 903 F.3d 953, 963-65 (9th Cir. 2018) (FAAAA does not preempt state's standard for determining whether carrier has properly classified drivers as independent contractors); *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 647-49 (9th Cir. 2014) (FAAAA does not preempt laws mandating meal- and rest-breaks even though they modestly increase labor costs for trucking companies); *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1186, 1188-89 (9th Cir. 1998) (FAAAA does not preempt California's "prevailing wage" statute despite employer's claim law would result in 25% price increase).

**Eleventh**: *See Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1260 (11th Cir. 2003) (state law safety-related whistleblower claim "not [ADA] preempted because safety is not a basis on which airlines compete for passengers, and as such is not something for which

air travelers bargain"); *see also Amerijet Int'l, Inc. v. Miami-Dade Cty.*, 627 Fed. Appx. 744, 750-51 (11th Cir. 2015) (increases in carrier's costs attributable to living-wage ordinance are indirect economic influences, insufficient to establish ADA preemption); *accord Parise v. Delta Airlines, Inc.*, 141 F.3d 1463, 1467-68 (11th Cir. 1998) (airline employee's State-law age-discrimination claim not ADA-preempted).

Among these, the seminal case for why state laws regulating carriers' behavior as employers fall outside the scope of "relate to" preemption is the Seventh Circuit's oft-cited *S.C. Johnson* decision. *See, e.g., Bedoya*, 914 F.3d at 821-822; *Watson*, 870 F.3d at 818-19; *Dilts*, 769 F.3d at 646. It explains that state laws regulating "inputs" to carrier operations—such as "labor inputs...affected by a network of labor laws, including minimum wage laws, worker-safety laws, anti-discrimination laws, and pension regulations"—"operate one or more steps away from the moment at which the [carrier] offers its customer a service for a particular price." *S.C. Johnson*, 697 F.3d at 558. And while the Seventh Circuit acknowledged that such laws could increase the cost of labor-related inputs and, in turn, increase the price of the outputs, that indirect effect alone is too remote to trigger "relate to" preemption. *Id.*; *see also DiFiore*, 646 F.3d at 87 (acknowledging breadth of circuit cases on indirect impact and suggesting the Supreme Court would be "unlikely" to "free airlines" from such claims, but preempting the state law because it crossed the "dividing line" and "d[id] more than simply regulate the employment relationship").[9]

The First Circuit's "dividing line" for ADA preemption is also in lockstep with the Supreme Court's *ERISA* "relate to" preemption decisions, which are the cases from which the

---

[9]    Although generally in tension with the clear circuit trend, *see Bedoya*, 914 F.3d at 824; *Su*, 903 F.3d at 963-65; *Beavex*, 810 F.3d at 1055-56, and, in the Attorney General's view, wrongly decided, *Schwann* v. *FedEx Ground Package Sys., Inc.*, 813 F.3d 429 (1st Cir. 2016), and *Mass. Delivery Ass'n v. Healey*, 821 F.3d 187 (1st Cir. 2016), do not compel a different result in this particular case. Those cases concerned an "anomal[ous] state employment law ("Prong 2" of M.G.L. c. 149, § 148B) that, as applied, did more than simply regulate the employment relationship. It precluded carriers from providing last-mile delivery services with independent contractors and forced them instead to use employees. *Schwann*, 821 F.3d at 437-38. The ESTL, in contrast, operates multiple steps removed from the Airlines' services (and prices and routes), and it does not interfere with a carrier's decision on what services the "company provides and how it chooses to provide them." *Id*. at 438. Nor under Massachusetts law is consideration of the Airlines' services necessary to adjudicating whether an employee is entitled to EST. *Cf. id*. at 438 ("state law poses serious potential impediment [when] a court, rather than the market participant, would ultimately determine what services that company provides and how it chooses to provide them"). Finally, *Schwann* is clear that "relate to" preemption does not "exempt" carriers from "state laws that are more or less nationally uniform," *id*. at 440, which is the case here. *See infra*, pp. 18-19.

meaning and scope of ADA "relate to" preemption was derived, *see Morales v. Trans World Airlines*, 504 U.S. 374, 384, 390 (1992) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 100 n.21 (1983) and adopting ERISA's "connection with," "reference to," and "too tenuous" standards for ADA preemption), and which both the Court and Circuits continue to find influential. *See, e.g., Dan's City*, 133 S. Ct. at 1778 (citing *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995) as evidence that "the breadth of the words 'related to' does not mean the sky is the limit").[10] These ERISA cases further the conclusion that "relate to" preemption does not reach laws that affect a carrier only in its capacity as employer and result in indirect economic effects in the form of somewhat increased labor costs. *Travelers*, 514 U.S. at 649-50, 659-60 (1995) (no preemption of law imposing surcharges on hospital bills paid by commercial insurers, even though surcharge could incentivize ERISA plans to purchase insurance from Blue Cross/Blue Shield instead of commercial insurers and "thus have an indirect economic effect on choices made by ... ERISA plans"); *Shaw*, 463 U.S. at 108 (while state may not direct the terms of an ERISA plan, "relate to" preemption does not preclude a state from setting a floor for the level of benefits that employers in the state must provide in some fashion).[11] Indeed, a state law's indirect economic effects only cross the "dividing line" when they are so acute as to effectively mandate or prohibit a particular price, route, or service. *See Travelers*, 514 U.S. at 659-60. They are not here.

---

[10] *See also Abdu-Brisson,* 128 F.3d at 82-83 (Second); *Watson*, 870 F.3d at 818 (Eighth); *Mendonca*, 152 F.3d at 1188-89 (Ninth); *Amerijet*, 627 Fed. Appx. at 751 (Eleventh).

[11] *See also De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 816-17 (1997) (state law taxing certain health facilities, including those used or operated by ERISA plans, was among "'myriad state laws'" that "impose some burdens on the administration of ERISA plans but nevertheless do not 'relate to' them within the meaning of [ERISA]").*Cal. Div. of Labor Stds. Enf. v. Dillingham Constr.*, 519 U.S. 316, 330, 332, 334 (1997) (prevailing-wage laws and apprenticeship standards "quite remote from the areas with which ERISA is expressly concerned"; the Court could not preempt "a state law in an area of traditional state regulation based on so tenuous a relation without doing grave violence to our presumption that Congress intended nothing of the sort"); *Travelers*, 514 U.S. at 660-61 (state laws that indirectly affect an ERISA plan's costs—"[e]ven basic regulation of employment conditions [that] invariably affect the cost and price of services"—have "only a tenuous, remote, or peripheral connection with covered plans").

**2.     The Airlines Have Not Demonstrated that the ESTL's Indirect Economic Effects Are So Acute as to Mandate, or to Prohibit Them From Offering, Particular Prices, Routes, or Services.**

The Airlines advance four arguments to show that the ESTL does more than regulate them in their capacity as employers. But just as in *Air Transp.*, even if one views their evidence in the most favorable light, they have not met their burden. 410 F.Supp.3d at 1179.

First, the Airlines recycle the "generic argument" that they unsuccessfully advanced in Washington—that compliance will increase their labor costs. *See id.*; Airline SJ Mem. pp. 18-20. Their primary evidentiary support for this argument is their suggestion that the logical effect of complying with the ESTL is that more workers will take sick leave. *Id.* p. 18; *MDA*, 769 F.3d at 21. But while it is logical that the Airlines' labor costs might be marginally higher if employees do not face discipline for using up to 40 hours of sick leave when they or a family member is sick, *see* Airline SJ Mem. p. 20, this alone is insufficient to trigger ADA preemption. Indeed, courts have uniformly rejected the "higher [labor] cost equals preemption argument." *DiFiore*, 646 F.3d at 89 (refusing to "endorse [a carrier's] view that state regulation is preempted wherever it imposes costs on [carriers] and therefore affects fares because costs 'must be made up elsewhere, *i.e.*, other prices raised or charges imposed'"); *S.C. Johnson*, 697 F.3d at 558; *Mendonca*, 152 F.3d at 1186, 1188-89 (rejecting carrier's "higher cost equals preemption" argument despite employer's claim that state prevailing wage law would result in 25% price increase). And between flight-crew "reserves" and other staffing solutions, the Airlines have ample mechanisms in place to cover any minor increase in absences. *See* SMF ¶¶ 11, 78.

Second, the Airlines offer another argument rejected in *Air Transp.*—that complying with the ESTL may increase flight delays. Airline SJ Mem. p. 19; *see Air Transp.*, 410 F.Supp.3d at 1179. But the increase calculated by the Airline's expert, Dr. Darrin Lee, is quite small, *see* SMF ¶ 49 (projecting delay increase between 0.9 to 2.5% on days with high sick-time use), *id.* ¶¶ 68-70 (Virgin America's 0.16% increase in carrier-caused delays due to sick leave between April 2015 and March 2017 and a 1.2% increase between April and October 2017 due to NYC's EST law) & *id.* ¶ 50 (Dr. Lee's regression analysis projecting an extra 53 seconds of delay, on

average), an increase hardly noticeable to customers departing from Logan, who are conditioned to industry-wide delays, *id*. ¶ 42, and well within the Airlines' control given the Airlines' existing mechanisms for addressing the high levels of delay inherent in the industry. *Id*. ¶¶ 11, 42, 78 (the Airlines aspire to only an 80-85% on-time performance rate, and Logan airport has one of the highest flight delay rates in the country, with 21.6% of flights on average being delayed 15 minutes or more); *see id*. ¶ 50.[12] This small increase—just one to two flights delayed per day at current flight volume levels, *see id*. ¶ 51—is much less than the existing monthly variation in delay rate that the Airlines already manage at Boston, *see id*. ¶ 42 (delay rate varies by average of 14% between highest and lowest months), using measures like schedule padding, sophisticated scheduling software, and positioning of reserve employees to account for staffing shortages. SMF ¶¶ 11, 78. Thus, as in *Air Transp.*, "it appears more likely that the Airlines' own decisions about expenditures will determine whether paid sick leave laws have any limited effects on delays and cancellations." 410 F.Supp.3d at 1179.

Third, the Airlines theorize that increased operating costs due to ESTL compliance "could" cause the Airlines to increase fares or "may distort" route choices. Airline SJ Mem. p. 20. But their argument, made in a Memorandum filed before discovery even began, is fundamentally at odds with the testimony of airline executives who, during Fed. R. Civ. P. 30(b)(6) depositions, both (1) disclaimed that the Airlines consider the economics of sick leave when deciding where to fly or the rates to charge, *see* SMF ¶ 43 & cited exhs. (American Airlines executive: "[s]ick leave is not part of what we consider when we are building our network"; it "is not germane to the conversation"; and it has no "impact as to where we fly or

---

[12]     The five categories of flight delay are weather, air traffic control, security, late-arriving aircraft, and carrier-caused. SMF ¶ 40. Carrier-caused delays in turn include 42 subcategories, of which "late crew" is only one. *Id*. Late crew encompasses delays caused by crewmembers, including delays caused by sick leave use. *Id*. "Cabin-caused" delays are a small percentage of overall delays and "sick call-outs" are an even smaller percentage of "carrier-caused" delays. *Id*. ¶¶ 40-41. Delays at Logan are due primarily to air traffic control issues, weather, and late inbound aircraft. *Id*. ¶ 41. The Airlines have not quantified the number of sick call-outs due to ESTL in the context of the increase in carrier-caused delays. *Id*. ¶¶ 54-55, 57-58.

where we don't fly," because consumer demand is the biggest driver of whether to fly to a market), and (2) uniformly stated that they have no plans to close their bases in locations with State or local EST laws. SMF ¶¶ 43, 48. Further, recent history at Logan serves as a real-world rebuttal to the Airline's prediction of increased fares and fewer routes. SMF ¶¶ 3-6, 44-46. Since the ESTL when into effect in 2015, carrier routes and services in Boston increased dramatically, with JetBlue and Delta—two Airlines that did not even submit declarations from executives— establishing operational hubs and Logan consistently ranking in the top five of large U.S. airports for traffic growth.[13] SMF ¶ 3-5; *see also id.* ¶6 (Southwest's Boston expansion). Moreover, Delta's Boston-specific revenue growth has been three times higher than its average unit-revenue growth in its U.S. system, and in 2019 it established, rather than closed, flight and ground crew bases at Logan. *Id.* ¶¶ 4, 44. Meanwhile, average air fares in Massachusetts dropped faster than the national average for each of the years following the ESTL's enactment in 2015. *Id.* ¶ 45.

Finally, the Airlines' "regulatory patchwork" argument fails. They do not identify any actual conflict between the ESTL, which applies only to Massachusetts-based airline employees, *see* Mark Dec. ¶¶ 21, 23-25, and other jurisdictions' sick time laws. *See supra*, p. 7. This makes sense—the ESTL is not an "anomal[ous]" state law that, as applied, does more than regulate the employment relationship. *Cf. Schwann* v. *FedEx Ground Package Sys., Inc.*, 813 F.3d 429 (1st Cir. 2016) (addressing "anomal[ous]" state employment law ("Prong 2" of G.L. c. 149, § 148B) that, as applied, actually did more than regulate the employment relationship). Rather, as in *Air Transp.*, the ESTL's "practical application and relation to other jurisdictions' sick leave laws do not create an unmanageable tangle of conflicting regulations." 410 F.Supp.3d at 1172. *See* A Better Balance, "Overview of Paid Sick Time Laws in the United States" (July 16, 2020);[14] *Bedoya*, 914 F.3d at 826 (no preemption of state's ABC classification test because it "is similar

---

[13]     Between 2015 and 2020, passenger traffic grew 30%, with Logan handling over 40 million travelers for the first time in 2018. Akins Rep. ¶¶ 19, 21.

[14]     Available at https://www.abetterbalance.org/paid-sick-time-laws/?export (last checked Dec. 18, 2020) (summarizing the provisions of each state and local law currently in effect nationwide).

to that used in many other states"). It operates several steps removed from the Airlines' services (and prices and routes), without interfering with a carrier's decision on what services the "company provides and how it chooses to provide them." *Schwann*, 821 F.3d at 438. And it leaves the decision to the Airlines on how best to satisfy its directives.[15]

### C. The Presumption Against Preemption Should Apply in Full Force.

"In all pre-emption cases, and particularly in those in which Congress has 'legislated...in a field which the [s]tates have traditionally occupied,'" the Supreme Court "'start[s] with the assumption that the historic police powers of the [s]tates were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U. S. 470, 485 (1996)). In ADA cases the First Circuit has treated the presumption against preemption either as inapplicable, due to the historic, pervasive federal regulation of air carriers,[16] or as overcome, given the state law's direct regulation of the carrier-*customer* relationship or significant impact on actual air-carrier prices, routes, or services.[17] But neither rationale is applicable here. The ESTL is aimed at the traditional state concern of employee protection and, as set forth above, it regulates how the Airlines behave as employers. It does not regulate the carrier-customer relationship directly or have a significant impact on carrier prices, routes, or services. *See supra*, pp. 11-19. Thus, the presumption against preemption should apply in full force. *See Air Transp.*, 410 F.Supp.3d at

---

[15] One such mechanism is providing the state-law benefit only to workers in that state. Another is adopting a sick leave policy generous enough to comply simultaneously with the laws of *all* the jurisdictions the airline operates in, by having policies that for each separate aspect of sick time match the requirements of the state that is the most generous for that particular aspect of sick time (*i.e.*, the most generous notice provisions, the broadest range of relatives covered, etc.).

[16] *Brown v. United Airlines*, 720 F.3d 60, 68 (1st Cir. 2013) (ADA preempts common law claim for tortious interference and unjust enrichment that would, if allowed to proceed, materially affect carrier's prices and services); *United Parcel Serv., Inc., v. Flores-Galarza*, 318 F.3d 323, 336 (1st Cir. 2003).

[17] *DiFiore*, 646 F.3d at 86, 87-88 (tips law regulating how airline performed baggage service and displayed service's price to customers); *see Tobin*, 775 F.3d at 456 (tort claims for air-carrier's mis-delivery of package); *Buck v. Am. Airlines*, 476 F.3d 29 (1st Cir. 2007) (customers' state-law claims seeking partial refunds of airline ticket prices). *Tobin* and *Buck* did not discuss the presumption, likely because the state laws' direct and significant regulatory impact was manifest.

1179. And because the Airlines cite to nothing establishing it was Congress' "clear and manifest" intent for ADA "relate to" preemption to reach labor-protection laws that have at very most only minor, indirect economic effects on carriers' prices, routes, or services, this Court should "accept the reading that disfavors preemption." *Altria Grp. v. Good*, 555 U.S. 70, 76-77 (2008); *see Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 756 (1985) (no ERISA "relate to" preemption of state law setting minimum labor standards because, in part, "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State.") (*quoting DeCanas v. Bica*, 424 U.S. 351, 356 (1976)).

## CONCLUSION

For the foregoing reasons, this Court should allow the Attorney General's motion for summary judgment.

Respectfully submitted,

MAURA HEALEY,
Attorney General of Massachusetts

/s/ Douglas S. Martland
Douglas S. Martland, BBO # 662248    Matthew Q. Berge, BBO # 560319
Kimberly A. Parr, BBO # 679806    *Senior Trial Counsel*
 *Assistant Attorneys General*    Kate Watkins, BBO # 683276
Pierce O. Cray, BBO # 104630    Amanda I. Morejón, BBO # 696737
 *Senior Appellate Counsel*     *Assistant Attorneys General*
Office of the Attorney General    Office of the Attorney General
Government Bureau    Public Protection & Advocacy Bur.
One Ashburton Place    One Ashburton Place
Boston, MA 02108    Boston, MA 02108
617-963-2062/2489/2084    617-963-2310/2317/2037
douglas.martland@mass.gov    matthew.berge@mass.gov
kimberly.parr@mass.gov    kate.watkins@mass.gov
pierce.cray@mass.gov    amanda.morejon@mass.gov

December 18, 2020

## **CERTIFICATE OF SERVICE**

     I, Douglas S. Martland, Assistant Attorney General, hereby certify that the foregoing document, which was filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 18, 2020.

                               /s/ Douglas S. Martland
                               Douglas S. Martland, BBO # 662248
                               Assistant Attorney General