UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA, et al.

     Plaintiffs,                        Civil Action No.
                                    1:21-cv-11558-LTS

     v.

AMERICAN AIRLINES GROUP, INC.,
et al.,

     Defendants.

_____


BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE


BENCH TRIAL
Day 1



Tuesday, September 27, 2022
9:00 a.m.




John J. Moakley United States Courthouse
Courtroom 13
One Courthouse Way
Boston, Massachusetts

Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

1                              **A P P E A R A N C E S**

2

3    On behalf of the Plaintiff United States of America:

4        UNITED STATES DEPARTMENT OF JUSTICE
         BY:  WILLIAM H. JONES, III; JOHN STAIGE DAVIS; KATE M.
         RIGGS, AND JUSTIN T. HEIPP
5        450 Fifth Street, Northwest
         Suite 8000
6        Washington, D.C.  20530
         (202) 514-0230
7        bill.jones2@usdoj.gov
         john.davis10@usdoj.gov
8        kate.riggs@usdoj.gov
         justin.heipp@usdoj.gov

9

10

11   On behalf of the Plaintiff Commonwealth of Massachusetts:

12       ATTORNEY GENERAL'S OFFICE
         BY:  WILLIAM T. MATLACK
         One Ashburton Place, 18th Floor
13       Boston, Massachusetts  02108
         (617) 727-2200
14       william.matlack@mass.gov

15

16   On behalf of the Defendant American Airlines Group, Inc.:

17       LATHAM & WATKINS, LLP
         BY:  DANIEL M. WALL; ALLYSON M. MALTAS; MARGUERITE M.
18       SULLIVAN; AND TARA L. TAVERNIA
         505 Montgomery Street
19       Suite 2000
         San Francisco, California  04111
20       (415) 391-0600
         dan.wall@lw.com
21       allyson.maltas@lw.com
         marguerite.sullivan@lw.com
22       tara.tavernia@lw.com

23

24

25

1             **A P P E A R A N C E S ,   C o n t.**

2

3    On behalf of the Defendant JetBlue Airways Corporation:

4        SHEARMAN & STERLING LLP
         BY:  RICHARD F. SCHWED; MATTHEW L. CRANER; AND RYAN LESKE
5        599 Lexington Avenue
         New York, New York  10022
6        (212) 848-4000
         richard.schwed@shearman.com
7        matthew.craner@shearman.com
         ryan.leske@shearman.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        <u>**TABLE OF CONTENTS**</u>

2                         **TRIAL WITNESSES**

3    On behalf of the Plaintiff:                            <u>Page</u>

4     ROBIN HAYES

5         By Mr. Davis                                       107

6


7


8                            **EXHIBITS**

9                                                         <u>Admitted</u>

10   Unobjected to exhibits admitted                          6

11   Number page 106, line 17 to 21                         166

12   Number 439                                             257

13   Number 739-A                                           268

14   Number 807                                             204

15


16


17                         **MISCELLANEOUS**

18                                                          <u>Page</u>

19   Opening Statement by Plaintiff USA                      15

20   Opening Statement by Plaintiffs MA, PA, DC, VA,         42

21   FL, AZ, and CA

22   Opening Statements by Defendant JetBlue                 47

23   Opening Statements by Defendant American                70

24   Airlines

25

1                    **P R O C E E D I N G S**

2              (In open court at 9:00 a.m.)

3              THE COURT:  Please be seated.  So a couple of

4    preliminary matters.  Just to make it easy for the court

5    reporter, if we need to have, essentially, sidebars, the

6    easiest thing I think is for everyone to stay at the tables

7    if we need to excuse the witness.  We'll sort of see how it

8    goes, but stay at the tables, and we'll just do it from

9    there.  And we have this whisper tech technology.  That's

10   what I think we'll be using, and we'll turn off the Zoom at

11   that point because it will be a sidebar.

12              And if we need to go to sidebar, we can go to

13   sidebar.  That's fine, too, but we'll do that either way.

14              So with respect to the motion to seal the trial

15   exhibits -- so the motion is allowed.  It's in supplemental

16   appendix 245-2 that you all agreed to.

17              As to the exhibits in dispute, I think I have to

18   look at some of them.  I just don't think I can resolve it

19   just on the arguments.  And I think you may have submitted a

20   flash drive yesterday that might have them on there, I'm not

21   sure.  But flash drives have to go through IT, and I wasn't

22   here yesterday, so the bottom line is I haven't seen them.

23              So my thought is, to the extent that they're coming

24   up today, will any of them come up today?  I'm -- do you

25   know?

1          MR. JONES:  I don't believe so, Your Honor.

2          THE COURT:  Okay.  Fine.  So my thought -- when you

3     think they're coming up, let me know, and I'll look at

4     whatever exhibits and I'll resolve those so we can keep

5     going.  And otherwise, I'll look at the ones in the exhibit

6     and try to resolve it as soon as we can.

7          Is there anything else to address before we get

8     going?

9          MR. JONES:  One matter for the United States,

10    Your Honor.  We would like to move in the unobjected-to

11    exhibits.

12         THE COURT:  Well, no objection to that, right?

13         MR. WALL:  No objection.

14         THE COURT:  All right.  So the unobjected-to

15    exhibits -- do you want to just -- do you have something for

16    the --

17         MS. RIGGS:  I have copies, Your Honor.

18         THE COURT:  Yes.  Either you can -- the numbers or

19    the -- are the numbers listed on that?

20         MS. RIGGS:  Yes.

21         THE COURT:  Okay.

22         MS. RIGGS:  May I approach?

23         THE COURT:  Yes.  All right.  So the unobjected-to

24    exhibits are admitted, and they are what you have just given

25    up to -- one set to the clerk and one set to defense counsel.

1          MS. TAVERNIA:  Your Honor, defendants also have

2    unobjected-to exhibits to move in.

3          THE COURT:  All right.  And those I think you're

4    not objecting to.

5          MR. JONES:  No objection.

6          THE COURT:  All right.  I will take those into

7    evidence, as well, and defense counsel I see is giving a copy

8    to the clerk and to plaintiffs' counsel.

9          If I recall you wanted to do openings and about how

10   long do you think you'll be?

11         MR. JONES:  Your Honor, for the plaintiffs both for

12   the United States and the Commonwealth of Massachusetts, we

13   think they will be an hour, a little bit more, combined

14   between the two, myself and Mr. Matlack.

15         THE COURT:  All right.  Has anyone else -- no one

16   else is opening for the plaintiffs, right?

17         MR. JONES:  No, sir.

18         THE COURT:  All right.  And for the defendants?

19         MR. SCHWED:  For the defendants, we expect combined

20   to be probably closer to 90 minutes, Your Honor.

21         THE COURT:  Okay.  All right.  And I know I told

22   you about adding a little time at the end because of breaks

23   and things like that, so we'll figure that out a little later

24   today or tomorrow or sometime this week.

25         Okay.  Then go ahead, Mr. Jones.

1          MR. JONES:  Your Honor, may I proceed from the

2     podium?

3          THE COURT:  Sure.  Of course.

4          MR. JONES:  Good morning, again, Your Honor, and

5     I'll say good morning again to Mr. Wall, to Mr. Schwed, and

6     to your teams.

7          Your Honor, the Northeast Alliance extinguishes

8     head-to-head competition between American and JetBlue at four

9     airports in the northeast, at Logan, at LaGuardia, at JFK,

10    and at Newark, competition that has been ongoing for around

11    20 years.  Competition that has benefitted travelers and the

12    end of which will cost travelers in this country hundreds of

13    millions of dollars.

14         For its part JetBlue has opted from going with that

15    head-to-head competition with American to entangling itself

16    with American.  Your Honor, it's abandoning its historic

17    disruptive role in the airline industry.  A role that, by

18    JetBlue's own calculations, has saved travelers in this

19    country $10 million since its founding.  JetBlue's

20    calculations, Your Honor, $3 billion in savings to Boston

21    area travelers alone.

22         Now, JetBlue and American are collaborators instead

23    of competitors at those four airports in the Northeast, and

24    JetBlue won't be that disruptive competitive check that it

25    had been.

1      And it didn't have to be this way, Your Honor.

2  They could have continued to fight, and they could have

3  continued that head-to-head competition that had been

4  ongoing, and their business documents will show that they

5  were planning on continuing that competition.

6      For example, one of American's most senior

7  executives told other employees at American that they should

8  gird their loins and that they should be prepared to swing

9  the bat in Boston, that it was time to swing the bat in

10 Boston.  So they were prepared to continue fighting, but

11 instead they adopted this collaboration.

12     The collaboration, Your Honor, the Northeast

13 Alliance, the NEA, is unprecedented between domestic airlines

14 in this country, never been done before.  But, really, it

15 just disguises what is a de facto merger at those four

16 airports.

17     Now, defendants may suggest that the NEA, because

18 it's technically not a merger, couldn't possibly eliminate

19 competition, but that's putting form over substance.  And I

20 suspect the defendants will -- will get up here at some point

21 and say they figured out how to preserve competition by

22 constructing some complicated revenue-sharing formula that

23 tries to create incentives for each of them to continue

24 growing.

25     But, you know, Your Honor, they can say that, but

1    that doesn't make it so.  And it's not so because of this

2    unremarkable observation that, if given the chance to make

3    more money rather than less, they'll take the chance to make

4    more money.  And it's the NEA that allows them to do that, to

5    do -- to do both.

6              On top of that, Your Honor, the NEA further

7    consolidates the airline industry, an industry where already

8    the biggest four carriers in this country carry over

9    80 percent of the travelers in the United States.

10             The loss of the type of competition that the NEA

11   causes, the competition that helps travelers through lower

12   prices and higher quality, the loss of that competition is

13   the type of harm that the antitrust laws seek to prevent.

14   And, Your Honor, the *Sherman Act* can prevent harm before it

15   happens, not just after consumers have suffered the

16   consequences of an anticompetitive traction.

17             We'll spend part of the time in the trial talking

18   about also all of the supposed benefits that defendants claim

19   will flow from the NEA.  Those benefits, Your Honor, we will

20   submit are either illusory or they could have been achieved

21   through other means without this anticompetitive packet that

22   the defendants have entered.

23             And I say, Your Honor, this isn't conjecture or

24   theory on our part, on the part of the plaintiffs.  It's the

25   very reality that the defendants' business executives have

1    already recognized.

2              The evidence, Your Honor, on this point will

3    include late-night text messages between executives of

4    American that show that these executives recognized that

5    their purported benefits weren't real when they concluded

6    that, if you look at the NEA across their whole networks,

7    that the results were, quote, no bueno, end quote.  Their

8    words, Your Honor.  Not mine.  And that if they were the DOJ,

9    they could, quote, "easily kill any deal."

10             With all of that said, let me start at the heart of

11   the story here, that head-to-head competition between

12   American and JetBlue here in Boston and in New York.  For

13   starters, there's no dispute that JetBlue has been a unique

14   competitive force in the airline industry.  JetBlue has

15   called itself a fundamentally different kind of airline, and

16   it's distinguished itself from legacy carriers like American.

17   As you'll see during the trial, also, Your Honor, JetBlue's

18   CEO highlighted JetBlue's critical role -- critical role --

19   in keeping the immense power of the legacy airlines in

20   check -- legacies, again, like American.

21             And this is -- this isn't just talk in regulatory

22   filings and in speeches either, Your Honor.  We have the

23   receipts, or I should say JetBlue has the receipts.  Taking

24   Boston Logan, for example, when JetBlue started serving

25   Cleveland from Logan, average fares dropped 53 percent in the

1    first year from what they were before JetBlue started serving

2    that market.  Fares dropped by double-digits percentages in

3    other markets JetBlue entered as well.

4           And after a while, you take a double-digit drop

5    here and a double-digit drop there, and it starts to add up

6    to some real money, some real savings -- $3 billion, again,

7    for Boston area travelers, according to JetBlue's

8    calculations.

9           It's also not just the fares dropping when JetBlue

10   enters a market.  They shoot up when JetBlue exits a market

11   as well.  When JetBlue exited the route from JFK to

12   Pittsburgh, fares shot up 75 percent.  When JetBlue exited

13   the market JFK to Richmond, fares shot up 65 percent.

14          The result of these efforts, Your Honor, is the

15   back bone here of the competition between American and

16   JetBlue before they formed the NEA, the competition that

17   benefited travelers.  And first and foremost, Your Honor, it

18   benefited travelers to and from Boston and popular locations

19   like Los Angeles, Miami, Washington National, LaGuardia, and

20   JFK.

21          And the eleven markets where both American and

22   JetBlue operated, competing nonstop service before they

23   entered the NEA, the combined market shares of these two

24   defendants ranged from nearly 49 percent to 96 percent --

25   meaning that in these markets, many travelers were choosing

1  between American and JetBlue to fly these routes.

2          And these are markets, Your Honor, from here in

3  Boston that a lot of people traveled, across all airlines,

4  8.9 million passengers.  And across all airlines, again, in

5  2019, they spent $1.78 billion in these markets, across all

6  airlines.

7          The impact of the competition between American and

8  JetBlue can be seen in the so-called "shuttle markets," those

9  markets from Boston to Washington National and from Boston to

10  LaGuardia and LaGuardia to Washington National.

11          In two of those markets, JetBlue entered and

12  offered its blend of low prices and high quality; and in the

13  other one, it didn't.  And we can just look at the fares to

14  see which one is which.

15          Before JetBlue started competing with American and

16  with Delta in the Boston to Washington National market, the

17  lowest walkup fare -- that's a fare for a ticket with zero

18  advanced purchase, so you can just walk up to the counter and

19  buy it the same day -- the lowest walkup fare was $597.

20  After JetBlue entered that market, it was $206.

21          Same thing happened in the Boston-LaGuardia market.

22  Before JetBlue entered, the lowest walkup fare was $383.

23  After, it was $119.  But it wasn't the same in the LaGuardia,

24  Washington National market where JetBlue didn't enter.  The

25  lowest walkup fare there that JetBlue reported was $448 --

1     more than the twice the fare from Boston to DC, even though

2     it's only half the distance.

3          Now, the impact of competition at Logan won't just

4     be seen through the numbers, not just through those receipts

5     I talked about.  Defendants' own contemporaneous business

6     documents and their public statements also illustrate that

7     American and JetBlue were intense competitors.  Documents,

8     Your Honor, like an internal American e-mail identifying the

9     fare destruction B6 have wrought -- the B6 is the airline

10    code for JetBlue just like AA is the airline code for

11    American.

12         The fare destruction that JetBlue have wrought,

13    that's the reason that an American employee identified that

14    Boston didn't perform as well from a profitability

15    perspective for American, as other cities American served.

16         And while American may have worried about fare

17    destruction that JetBlue have wrought, in the real world, for

18    the rest of us, for the traveling public, that fare

19    destruction actually means lower prices and savings.

20         Before --

21         THE COURT:  Pause for a minute.

22         Those of you at the door, just in front of the

23    door, can you -- there's plenty of room for you in the

24    courtroom.  Can you just move in, people in the seats, like

25    just squish together a little bit so they can -- just so

1    there aren't people standing in front of the door.

2            Okay.  Go ahead.  Thanks.

3              **OPENING STATEMENTS BY COUNSEL FOR**

4              **THE PLAINTIFF UNITED STATES OF AMERICA**

5            MR. JONES:  Thank you, sir.

6            Before they entered the NEA, American and JetBlue

7    were about to heat up that competition here in Boston as

8    well.  American wasn't going the take the fare destruction

9    laying down.  American's chief commercial officer, Mr. Raja,

10   told other American employees that American was going to

11   fight in Boston and his -- and that they should gird their

12   loins, and that it was time to swing the bat in Boston.  And

13   this wasn't just cheerleading.  American was going to do

14   something about this as well.

15           And just like in Boston, travelers in New York City

16   benefited from the competition between American and JetBlue

17   as well.  Again, travelers on the nonstop routes that both

18   American and JetBlue offered to 18 markets from New York

19   City, including nonstops to and from LaGuardia or JFK to

20   Chicago or San Francisco or Orlando, those were the travelers

21   who benefited most from that head-to-head competition between

22   American and JetBlue before they formed the NEA.

23           And, again, Your Honor, in many of those markets,

24   American and JetBlue have high -- had high market shares,

25   shares often reaching above 45 percent.  And, again, these

1    are markets where a lot of people flew, just like the Boston

2    nonstop overlap markets.  Here, from JFK to LaGuardia, 2019,

3    23.1 million passengers across all airlines.  They spent

4    5.37 billion in those markets -- again, across all airlines

5    as well.

6            This, again, Your Honor, can be seen not just

7    through the numbers.  So the competition can be seen through

8    the business documents as well and the actions that the

9    business documents reflect.  For example, when JetBlue

10   introduced new low fares for flights out of New York City,

11   American responded by matching JetBlue's prices.  And that's

12   the kind of head-to-head competition that benefited travelers

13   to and from New York.

14           That competition, that competition between

15   defendants in Boston -- back to Boston, Your Honor, shifting

16   back -- that competition in Boston, Your Honor, before they

17   entangled themselves, was set to intensify, set to heat up.

18   American, for its part, was fighting the way Mr. Raja said.

19   It was adding new destinations from Boston.

20           And JetBlue, from its part, it was fighting as

21   well, telling corporate customers about its plan to add up

22   to -- to go up to 200 daily departures in Logan.  And what

23   that means, Your Honor, with more capacity in a market,

24   meaning more flights, more available seats or both, consumers

25   reap the benefits of that added capacity simply because of

1    supply and demand.  As supply goes up, capacity goes up,

2    prices go down, and it benefits travelers.

3            Down in New York, Your Honor, competition there was

4    set to heat up as well.  American was going to continue to

5    aggressively pursue flying larger planes out of LaGuardia.

6    And JetBlue had planned to increase the number of flights

7    that it flew out of JFK from 174 in 2019 to 191 in 2022.

8    And, again, more capacity means more options in a market; it

9    means lower prices for travelers.

10           That's not all, though.  Not only was the

11   competition between American and JetBlue set to heat up in

12   Boston and New York, but JetBlue was also about to launch

13   another fight with American and the legacy airlines.  In

14   2019, JetBlue was prepared to take on American and its

15   partners in transatlantic markets between Boston and New York

16   and Europe.

17           And American, it took note of JetBlue's potential

18   impact in this area.  It concluded that it was, quote,

19   "reasonable to assume 50 to 60 percent fare drop in the

20   Boston London markets once JetBlue started nonstop service."

21           But despite promises and pledges of swinging bats

22   and of girding loins and fighting, we know how the story

23   ends.  Rather than continuing to slug it out, American and

24   JetBlue decided to collaborate rather than to continue

25   competing.

1        And so I want to turn now, Your Honor, briefly to

2   how the NEA works and how it enables the defendants to

3   collaborate as if they were a single airline at those four

4   northeast airports.

5        To start, defendants say that the NEA is not a

6   merger, but, again, form over substance.  The NEA allows

7   American and JetBlue to coordinate about when they fly, where

8   they fly, how often they fly, what planes they fly, when and

9   where they land and park those planes, and then they split

10  the revenues that flow from those coordinated efforts.

11       The NEA destroys incentives to compete the same way

12  that a merger would on the nonstop overlap routes in Boston

13  and New York.  On those routes, where American and JetBlue

14  have competed head to head for years, they no longer have the

15  incentives to compete with each other in the same ways.  In

16  this way, Your Honor, the NEA is a merger in all but name at

17  those four airports.

18       Let me talk about two of the pieces of the NEA that

19  are at the heart here of issue.  First, I want to talk about

20  capacity coordination.  Now, defendants have previously

21  talked about it as being a core or a foundation of the NEA,

22  but they are a lot quieter about that aspect of the NEA these

23  days.  I can say though that during the justice department's

24  investigation of the NEA, American and JetBlue told us that

25  by allowing them to coordinate their networks, their

1    schedules, and their capacity, the NEA allows them to operate

2    like, quote, "a single airline," end quote at NEA airports.

3            That was true then.  It's still true now.  And you

4    don't have to squint, Your Honor, to see this or turn the

5    evidence sideways, or look at it at an angle in the light.

6    It's pretty clear to see.  Pretty easy to see.  This deal,

7    like a traditional merger, allows these parties to act like a

8    single airline at the expense of competition and at the

9    expense of travelers.

10           We can see this effect particularly on the nonstop

11   routes.  The ability to jointly set their capacity levels and

12   schedules creates the same incentives that a merger would

13   create.  The incentive to maximize profits by reducing

14   capacity and increasing prices.

15           Defendants' own documents acknowledge that capacity

16   coordination is about, quote, "mutual benefit," end quote --

17   mutual benefit for both airlines, Your Honor.  The head of

18   the NEA for JetBlue, for example, told his team that when

19   planning schedules, they should, quote, "See what is in the

20   best overall JV solution, as that is what drives the

21   economics," end quote -- the best overall JV solution, not

22   the best solution for Jet Blue, but the best overall JV

23   solution.

24           And as said in this e-mail, the economics of the

25   NEA are driven by American and JetBlue making decisions in

1   their joint interest.

2           Let me give a simple illustration that will show

3   why this is the case.  So defendants are going to argue, we

4   anticipate, that the unique features of the NEA creates

5   incentives for each of American and JetBlue to expand

6   capacity.  But this simple graphic on the nonstop overlap

7   routes illustrates why that doesn't really -- it doesn't

8   really add up.  It doesn't really make any sense.

9           If they work together, American and JetBlue will

10  set their capacity at a level that maximizes joint profit,

11  and that's the bar on the far left.  If either of them seeks

12  to add additional capacity, that extra capacity will cause

13  prices to fall, which will reduce the overall revenue of the

14  partnership, and you can see that in the two middle bars.

15          In those scenarios, the one that's expanded

16  capacity does capture more revenue for itself, but it does so

17  at the expense of its partner and at the expense of the

18  partnership overall.  If both American and JetBlue add

19  capacity, prices will fall even farther, and both airlines

20  will be worse off.  That's the bar on the far right.

21          Defendants are arguing that American and JetBlue

22  will choose the option on the far right even though the NEA

23  gives them the ability to achieve the outcome on the far left

24  by coordinating their capacity decisions.  That doesn't make

25  any sense, Your Honor.  It just doesn't make a lick of sense.

 1    These are businesses operating to maximize their profit.  It

 2    doesn't make any sense that they're going to choose some

 3    other course.

 4            Their internal business documents say this, and

 5    it's consistent with the fact that American and JetBlue will

 6    make capacity decisions that make them more money, not less

 7    money.  And just to be clear on this point, Your Honor, while

 8    the bar on the far right may mean lower profits for American

 9    and JetBlue, it means more savings for travelers, more

10    savings for the traveling public, and that's what happens

11    when they compete, when they go after each other to win

12    customers from each other.

13            Now, I want to turn -- I want to turn for a moment

14    to the revenue-sharing aspect of the NEA.  The NEA revenue

15    sharing is defined by an agreement the defendants call the

16    "mutual growth incentive agreement," or the MGIA.  The MGIA

17    includes formulas that calculate a transfer of payment that

18    will be paid from one of the defendants to the other

19    defendant in each year.

20            And that means, Your Honor, whenever JetBlue takes

21    a customer from American on an overlap flight, that American

22    is going to get a share of the lost revenue and vice versa.

23    Both American and JetBlue clearly acknowledge in their

24    ordinary course of business documents that revenue sharing

25    makes them, quote, "metal neutral," end quote, which means

1    they are indifferent as to which airline a new passenger

2    carries [*sic*].

3            Any arrangement, Your Honor, where you win even

4    when you lose is not competition.  It's actually the

5    opposite.  Competitors should not be indifferent about

6    whether they win customers against the other competitor.

7    That's a core of competition.  And I will say they were not

8    indifferent before they formed the NEA.  They actually sought

9    to win passengers from each other and to win business from

10   each other.

11           But the revenue-sharing component of the NEA

12   eliminates any incentive to reduce prices to attract

13   customers, even though American and JetBlue still retain the

14   nominal ability to price independently.  That indifference

15   and that neutrality, though, that's the opposite of

16   competition.

17           If one of them were to reduce fares to attract a

18   customer from the other, then their joint revenue would go

19   down, and each of them would take home less revenue than

20   there would be if there were no discount.

21           So even though both American and JetBlue can set

22   prices independently still, the revenue sharing means that

23   there's no reason that they would actually reduce their

24   prices to win customers from the other airline because it

25   would cost them both money.

1          Now, defendants will likely argue that the MGIA

2     creates incentives for them to grow their capacity, but we

3     can't forget about the fact that the agreement explicitly

4     allows them to coordinate on those capacity decisions, and

5     that eliminates any incentive to grow in a way that would

6     reduce their joint profit.  Your Honor, they won't

7     intentionally lose money if they have the power to avoid it,

8     which they do, and the MGIA does not undo what capacity

9     coordination allows.

10          Scott Laurence, who now works for American but who

11     used to work for JetBlue, he confirmed the same point during

12     the justice department's investigation of the NEA, that the

13     revenue-sharing component of the NEA means that American and

14     JetBlue no longer compete on NEA routes.  With the NEA in

15     place -- we asked Mr. Laurence, "With the NEA in place, do

16     you agree that the revenue-sharing component means that it

17     makes more sense to cooperate with American than compete for

18     NEA routes?"

19          Mr. Laurence answered, "For NEA routes, yes. " That

20     head-to-head competition that has given so many benefits to

21     travelers, that's gone, and the loss of that competition will

22     cause prices to rise and quality to fall at those four

23     Northeast airports where the NEA applies.

24          Your Honor, from where I sit, there are some deals

25     that are so anticompetitive that you can see that from

1    30,000 feet, and you don't need an advanced degree in

2    economics to see it, and you don't need an advanced degree in

3    economics to understand why they're anticompetitive, and I

4    would submit that this is one of those deals.

5            Again, though, the way this all works and the way

6    I'm describing it comes straight from the airlines

7    themselves.  Mr. Hayes explained how international airline

8    joint ventures, which usually have a capacity-coordination

9    component and revenue-sharing component, how those joint

10   ventures work in the real world.  They wipe out a competitor.

11   And fare growth tends to outpace capacity growth in markets

12   with a joint venture.  And there's no reason to believe that

13   the effects of the NEA will be any different -- just none.

14           Now, the Court will hear a lot of evidence over the

15   course of the trial about the markets at issue in the case,

16   and just to establish some parameters, the 29 nonstop markets

17   where American and JetBlue both had offered nonstop service,

18   those markets are where over 90 percent of the harm is likely

19   to be felt, because those are the markets where the

20   competition between American and JetBlue was most intense

21   before the NEA formed.

22           Those travelers in the eleven nonstop overlap

23   markets from Boston and the 18 markets that both American and

24   JetBlue had served nonstop from New York City, those are the

25   travelers that will suffer the brunt of the higher prices the

1   NEA will cause.  And, of course, it won't just be travelers

2   in the Boston area or in the New York City area, but it will

3   be travelers from all over the country that come here or go

4   to New York.  The map being displayed, Your Honor, shows the

5   far-reaching impact here that the NEA will have.

6           We also anticipate that you're going to hear from

7   defendants about their nonbinding carve-out agreement.  I

8   know we briefed that in a motion in limine, so I won't go

9   into that, Your Honor, other than to say that the Court

10  shouldn't credit those carve-out arguments primarily because

11  the defendants' going to abandon them at any moment, and so

12  they shouldn't get credit for those as solving the

13  competitive problems here.

14          I will also say, turning to the law for a moment,

15  that antitrust law, when competitors who seek to partner, who

16  seek to merge, have high combined market shares, and that

17  market is highly concentrated, such a proposed transaction --

18  such a transaction can be presumptively anticompetitive

19  because competitors with high shares are presumed to be able

20  to harm consumers by raising prices or reducing capacity or

21  all of the above.

22          The market shares here are high enough that they

23  establish JetBlue and American at a market power in many of

24  the markets at issue.  The combined fares -- the combined

25  market share figures for American and JetBlue and Boston in

those nonstop overlap markets, they have some staggeringly
high combined market share figures, Your Honor:  88 percent
between Boston and Washington National, 76 percent in the
Boston-Miami market, nearly 63 percent in the
Boston-Los Angeles market, and it goes on and on and on.

And it shows that travelers had chosen American and
JetBlue with their feet and with their dollars in those
markets before the two airlines started collaborating.  And
even though it appears that there's still some choice between
these airlines, it's actually gone, and the market shares are
high enough that these markets are presumptively
anticompetitive.

And the story -- the story isn't much different in
New York City.  In the markets where American and JetBlue had
competed to offer nonstop flights before they entangled
themselves in the NEA, before that, those combined shares
were large enough in many markets where the transaction is
presumptively illegal, markets like New York
City-Los Angeles, where defendants controlled 57 percent of
the market, markets like New York City-Orlando, where they
controlled 55 percent of the market, markets like New York
City-Phoenix, where they controlled 62 percent of the market.

Now, we also are going to talk a bit in the trial
about Newark when it comes to the New York City markets.
Defendants argue that Newark should be in the same geographic

1    market as LaGuardia and JFK.  We submit that they're not

2    right about that and that the economic analysis and other

3    evidence will show that consumers view LaGuardia and JFK

4    differently from how they view Newark.

5            Ultimately, though, the -- any quibbling about

6    that, about where Newark fits in, just doesn't change much.

7    The deal is still bad in New York City, and only two markets

8    that are impacted by this dispute, are grayed out here on the

9    slide, Your Honor, that move from presumptively

10   anticompetitive to outside of that category.  So even if

11   Newark is included in the same geographic market as LaGuardia

12   and JFK, American still has high enough market shares.

13   American and JetBlue have high enough shares that the

14   combined market shares are anticompetitive, presumptively

15   anticompetitive.

16           All in all here, the loss of competition between

17   American and JetBlue in those nonstop overlap markets and in

18   other markets adds up to hundreds of millions of dollars a

19   year in harm.  Professor Miller of Georgetown, he estimates

20   that the annual harm to travelers the NEA will cause is

21   around $700 million a year.

22           Defendants can and will argue and I suspect nitpick

23   about the specificity of that number, but there's no question

24   the NEA will cause hundreds of millions of dollars in

25   consumer harm annually, and that harm will hurt a lot of

1    travelers and impact a lot of flights in this country.

2              But the NEA doesn't just end the head-to-head

3    competition between American and JetBlue on the nonstop

4    overlap markets in Boston and New York.  It also threatens

5    that historic disruptive role that JetBlue has played in the

6    industry that I mentioned, Your Honor.

7              Before JetBlue entered the NEA, its management

8    warned its board that JetBlue, quote, "may lose some level of

9    independence," end quote, and quote "may be co-opted by

10   Connie manipulation," end quote.  "Connie" is the code name

11   that JetBlue gave to American and the NEA during

12   negotiations, so JetBlue's management raised this risk with

13   the JetBlue board, and they were right to be concerned.  This

14   map shows all of JetBlue's domestic routes in the

15   United States, and as you can see just from kind of

16   eyeballing the map here, the -- the flights are significantly

17   clustered in Boston and New York City.

18             Now, this next map, this shows in red JetBlue's

19   routes that are part of the NEA overlying the overall

20   domestic route map for JetBlue.  So the remaining blue lines

21   that you see, those are JetBlue's routes that are not

22   immersed in the NEA.  And depending on how you count it, up

23   to 75 percent of JetBlue's business flies into or out of the

24   NEA airports.

25             So just looking at the map here, there's a lot more

1    red than blue.  JetBlue's management, it was right to be

2    concerned about potentially losing some independence to

3    American and right to be concerned about potential

4    manipulation by American.  Beyond, though, just the

5    significant impact of the NEA on travelers on those nonstop

6    overlap routes, and even beyond the potential for the NEA to

7    allow American to manipulate -- JetBlue's words, not mine --

8    to manipulate JetBlue, the NEA is likely to have broader

9    effects as well, Your Honor.

10            I think it would come as no surprise to anyone who

11   has flown on a commercial airline over the last several

12   decades that that airline industry, as a whole, has grown

13   more concentrated over time, particularly through a series of

14   mega mergers from 2000 to 2013.  The largest airlines have

15   gotten significantly larger, such that the biggest four

16   airlines now, American, Delta, United, and Southwest, they

17   now control a much larger share of the overall capacity in

18   this country than just 20-odd years ago.

19            Icons of commercial aviation in this country,

20   Your Honor, like TWA, like Northwest Airlines, have been

21   gobbled up by larger players.  And it stands potentially to

22   get worse with JetBlue's announced acquisition of Spirit

23   Airlines.

24            Spirit is one of those small airlines that helped

25   keep the immense power of the legacy airlines in check, as

Mr. Hayes mentioned.  One of the airlines that defendants'
experts will claim will help prevent harm from the NEA, now
American potentially gets to co-opt two disruptive
competitors for the price of one -- buy one get one.

Professor Robert Town of the University of Texas
will explain, Your Honor, that prior consolidation led to a
period of slower capacity growth between 2009 and 2017.  Now,
the airline industry called that slower capacity growth
"capacity discipline" -- a seemingly innocuous phrase but
it's a phrase that refers to an effort by the large legacy
carries to grow more slowly than they otherwise would have,
as long as everyone else kept doing the same.  That would
maximize the industry profits as they were -- as the economy
recovered from the Great Recession.

Ordinary business documents from the airlines
identify the existence of capacity discipline from this
period, and they discuss how to keep it in place.  This
document, from US Airways, during the capacity discipline
period, describes how discipline is the key to building
sustained profits for both US Airways and the industry.  And
it further notes that all but JetBlue and Virgin American are
exercising restraint.

American's own documents from this period make
plain its view that consolidation led to reduced capacity.
This document emphasized that point by predicting that

1   American's own merger with US Airways would be unlikely to
2   lead to growth in line with the broader industry.
3           It also helpfully identifies who capacity
4   reductions impact; including suppliers, customers,
5   communities, people.
6           The NEA increases the risk that capacity discipline
7   will return to the industry.  Just as in 2009, the industries
8   were recovering -- in the midst of recovering from a serious
9   crisis.  When the pandemic hit, huge amounts of airline
10  capacity was pulled from the system in response to plunging
11  demand.  Now, with demand returning, the airlines have a
12  collective incentive not to add back too much capacity and to
13  keep prices high.
14          The NEA fits the bill perfectly.  American itself
15  recognized that it could build its own network and grow
16  organically, or it could take a shortcut and borrow.  Borrow
17  from another airline's network through consolidation.
18  Building a network would mean real growth, more capacity,
19  more seats, and lower prices for consumers.  Building a
20  network and growing in that way is what fighting in Boston
21  would look like.
22          Borrowing means piggybacking off of what someone
23  else has done so that you don't have to make investments
24  needed to grow yourself.  American chose to borrow rather
25  than to build.

1          And it chose to borrow not just from any other

2     airline, but from JetBlue -- as I said, among the most

3     disruptive and fastest growing airlines in the industry, what

4     those of us in the antitrust world would call a "maverick

5     competitor," one that doesn't follow the herd.

6          So the NEA allows American to kill three birds with

7     one stone.  First, American avoids the cost of growing

8     organically.  Second, it co-opts a maverick competitor whose

9     growth has historically been higher than the industry norm.

10    Third, it does all of this at a time when the industry is

11    recovering from the pandemic.

12         As American's then-president/now-CEO, Robert Isom,

13    said to American's chief commercial officer, Mr. Raja, "The

14    industry is going to have to shed a tremendous amount of

15    capacity.  Turning the dial back five years as a guide to

16    what 2021 looks like."  And then he goes on to say later,

17    "Let's not question.  Let's go there, fast and hard."

18         And your AS -- AS is the airline code for Alaska

19    Airlines, your AS and B6.  B6, again, is JetBlue.  "Your AS

20    and B6 ideas will help facilitate."

21         Now, some of this may be industry speak, but it's

22    clear that shedding a tremendous amount of capacity means

23    fewer seats and fewer options for travelers.  And it's

24    plainly there in black and white with American's now-CEO

25    saying that the NEA will help facilitate this shedding of

1    capacity.

2            Now, with the lost competition that the NEA has

3    caused and threatens to cause, defendants will try to justify

4    the NEA.  But instead of doing so, they've thrown out a bunch

5    of claims that we submit miss the mark and simply muddy the

6    waters here.

7            They claim that the NEA will unlock new growth, but

8    American, the largest airline in the country, and JetBlue,

9    one of the fastest growing, could have grown without the NEA.

10   They claim that they needed the NEA to compete effectively.

11   But they could have chosen to partner in ways that don't

12   restrict competition as much as the NEA does.

13           They claim that the NEA will enhance competition

14   with Delta and United, but Delta and United themselves

15   haven't responded to the NEA.  And they claim plaintiffs

16   can't meet their burden to show fare increases or reduction

17   in output, but plaintiffs will show that the NEA will likely

18   harm consumers and that there has already been some loss of

19   competition.

20           To start, defendants are going to say that American

21   and JetBlue's networks compliment each other, that they work

22   well together, but that's -- that's not the case.

23   Defendants' own expert, Dr. Israel, testified during his

24   deposition when defendants analyzed the two networks of

25   American and JetBlue together as they were -- as they existed

1    in September of 2019, there weren't any real consumer
2    benefits.
3            That's in part because there was almost nowhere
4    that JetBlue flew that American didn't already fly.  So if
5    there aren't many consumer benefits, if you just put together
6    American and JetBlue's then-existing networks, how do you
7    make it seem like there are benefits?
8            Well, you have to assume that the networks are
9    going to change.  You have to assume that there's going to be
10   growth and that's what defendants have done here.  They've
11   assumed that there will be growth and that every -- and that
12   everything flows from that assumption.  But there's no good
13   reason here to think that the NEA was necessary for any of
14   that assumed growth.
15           And it wasn't necessary for that growth in large
16   part because American and JetBlue already planned to grow
17   without the NEA.  This e-mail, Your Honor, from Eric
18   Friedman, a network planner at JetBlue, in this e-mail he
19   expressed concern that, quote, "We are including value here
20   that would have been generated anyway," and said, "If we are
21   looking at this from a 'what does JetBlue look like with
22   Connie versus without,' we are currently attributing a lot of
23   revenue to Connie that would have already existed."
24           In New York City, the defendants were discussing
25   transferring slots, slots -- those authorizations to take off

and land.  They were discussing transferring slots before they finalized the NEA.  They were discussing this well before they entered the NEA, apart from the NEA.

But the defendants and their experts are giving the NEA credit for facilitating the transfer of these slots. They shouldn't get credit for doing something that was in the process of happening anyway, that would have happened anyway.

To their -- to the extent there is any growth at those four NEA airports, it would -- it's likely to come at the expense, Your Honor, of some other parts of the country. It's not new growth, it's moving -- it is just moving assets from one place to the other.  And defendants don't get to ignore the effects of their deal on some travelers because it enables some supposed benefit to other travelers.

For -- in fact, Your Honor, the way I would put it is for JetBlue to grow at the NEA airports, it has to rob Peter to pay Paul.  It has to rob service and aircrafts from other parts of the country to fund their growth in the NEA airports.

A JetBlue presentation recognized this, noting that meeting JetBlue's growth commitments would mean deprioritizing other areas, like Fort Lauderdale, like Orlando.

Now, when American and JetBlue were thinking about what their joint schedule would look like, they acknowledged

that there would be little overall growth if you looked across their whole networks.  Late on a Friday in May of 2020, JetBlue employees sent their counterparts at American a proposed joint schedule that envisioned JetBlue having to pull planes from elsewhere in country to fund flying at NEA reports.

When that group of American employees saw the schedule, they sent each other a series of frenzied, worried late night text messages on a Friday in May.  American's Chad Schweinzger, who is on the witness list, he texted several of his colleagues at 10:02 p.m. on a Friday night to tell them that, quote, "If we show full network results" that means if one was to look at JetBlue's whole network, including the shuffling of airplanes that would be necessary to increase the flying at NEA reports -- "If we show full network results -- no bueno.  Based on what I'm hearing here, if I was DOJ, I could easily kill any deal," end quote.

Mr. Pack, who you'll hear from in a few days, Your Honor, he wrote later in the text chain, "I think the regulatory case for this domestic JV" -- this domestic joint venture -- "I think the regulatory case for this domestic joint venture with ATI" -- or antitrust immunity -- "doesn't exist.  It's going to be a constant uphill battle and we are not going to convince DOJ."

Well, Your Honor, we're here today because Mr. Pack

1    was right about that.  And Mr. Schweinzger and Mr. Pack, they

2    knew that the NEA didn't actually generate any real growth

3    when you look at the two networks together.

4           Here, again, though, this isn't a criticism that we

5    came up with on plaintiffs' side of the -- on plaintiffs'

6    tables here, Your Honor.  It's not something we came up with.

7    It's American executives, the people charged with working

8    with JetBlue on a combined network, on a combined schedule,

9    their concerns, Your Honor, expressed to each other late on a

10   Friday night in May when discussing the combined network of

11   the NEA.

12          Another significant problem with defendants'

13   benefits claims is that, even if you accept their claims

14   about growth, they could have done this through less

15   restrictive means.  That is, defendants could have enabled

16   that growth without coordinating capacity and without sharing

17   revenues on the nonstop overlap routes.  Without eliminating

18   that competition that's benefited travelers.

19          They could have done a few things, Your Honor.

20   Most importantly, American could have simply leased its slots

21   at JFK and LaGuardia to JetBlue.  The growth by JetBlue that

22   the defendants anticipate at New York City airports under the

23   NEA is almost entirely the result of the slots it acquired

24   from American.  If JetBlue had been able to acquire those

25   slots, it could have grown in New York City while still

1    continuing to compete with American.

2             And to the extent there are additional benefits of

3    the NEA beyond those that could have been achieved through

4    American leasing New York City slots to JetBlue, those

5    benefits could have been achieved through a code-sharing

6    arrangement.

7             Finally, Your Honor, American and JetBlue could

8    have pursued a deal that did not include Boston or London.

9    JetBlue itself recognized the weakness of any benefits claims

10   in Boston in particular given that JetBlue's -- JetBlue had

11   grown to be the number one carrier in Boston, the number one

12   airline in Boston, and the fact that JetBlue's path to growth

13   here in Boston wasn't limited by the lack of slots in the way

14   it was in New York City.

15            Now, none of this is to say that any of those

16   alternatives are legal in and of themselves.  That would have

17   been a question to examine, but it is to say that none of

18   them would have been as bad as the anticompetitive deal the

19   defendants ended up striking.  It's almost as if they chose

20   the most restrictive alternative here, instead of looking at

21   the less restrictive ones.

22            Also, Your Honor, defendants will talk a lot about

23   Delta and United in this trial.  We anticipate that.  You'll

24   likely hear that Delta and United are so formidable that

25   American and JetBlue just had no choice but to get together

1    to take them on.  And likely, there will be documents in the

2    case that show shortly after the NEA was announced Delta and

3    American sought to determine what the NEA was and what it

4    meant for them.

5          But at the end of the day, we anticipate that Delta

6    and American -- Delta and United executives will say when

7    they're asked about the NEA that it hasn't really impacted

8    them.  As illustrated by a deposition designation that we

9    will submit to Your Honor today from Mr. Nocella of United.

10   He said that United hasn't focused on the NEA, hasn't

11   factored into its plans, and doesn't pay much attention to

12   it.

13         So contrary to defendants' claims that they've made

14   improvements or are making improvements that will

15   meaningfully take the fight to Delta and United, well, one

16   would think if they had that Mr. Nocella that United would

17   take note of that.

18         But more fundamentally here, the problem with

19   defendants' claim on Delta and United and with their benefits

20   claims more generally is that they would have the Court

21   believe that American Airlines, the largest airline in the

22   United States, one of the largest airlines in the world -- if

23   not the largest -- needs to partner with JetBlue in order to

24   compete and to serve passengers effectively at those four

25   airports.  One of the largest airlines in the world needs a

1  partner.  That's the fundamental question that defendants

2  want the Court to buy into.

3          Finally, Your Honor, that defendants argue that

4  plaintiffs don't show actual fare increases or reductions in

5  output.  Well, first of all, that claim doesn't much take

6  into account how COVID and its effects really wrecks the

7  ability to learn much about the state of competition in the

8  airline industry now to show my post-NEA fare increases or

9  much of anything else.

10         But beyond that, the antitrust laws enable the

11 United States and the plaintiff states to prevent harms to

12 consumers before they happen.  The language of the *Sherman*

13 *Act* as well as case law both say as much.

14         Another reason that defendants' claims about the

15 lack of actual effects ring hollow is because they've been

16 under scrutiny by some combination of the Department of

17 Justice and the plaintiff states since they announced the

18 NEA.  That they would avoid taking any actions that would

19 undermine their litigation positions is common sense, almost.

20 But beyond that, it's also a concept that the case law

21 captures as well.

22         And defendants also ignore what this deal has

23 already done.  It's eliminated an independent competitor at

24 four major airports in the United States.  Just here at

25 Logan, travelers went from having the option of the three

1    biggest airlines at Logan to two of those biggest three

2    combining for practical purposes here at Logan.  To borrow

3    Mr. Hayes's phrase, again, Your Honor, it wiped out a

4    competitor.

5            Also, the NEA has turned two airlines that had been

6    fierce competitors trying to win travelers to their own

7    airlines, often at the expense of their now partner, it

8    turned those two airlines into ones that are now metal

9    neutral and indifferent as to whether a passenger flies with

10   them or the other airline.

11           Plus, Your Honor, the NEA has redirected defendants

12   once independent plans for growing and competing in Boston

13   and New York.  JetBlue, for example, had its plans to enter

14   the Boston-London Heathrow market upended by the NEA.

15           Finally on this point, now that JetBlue has

16   entangled itself with American, it lacks the incentive that

17   it had before to be that disruptive and a competitor.  Now,

18   when JetBlue makes competitive decisions, it has to take into

19   account the impact of its decisions not just on itself, but

20   also on its partner.

21           So where will this leave us at the close of the

22   evidence?  Well, Mr. Hayes, he had it right stating that the

23   airline industry has never been more concentrated than it is

24   today and that the concentration of market power in the hands

25   of a very few deep-pocketed airlines has implications for

1    consumers in the form of reduced options, high fares, and

2    often poor service.

3              Mr. Hayes is also right -- was also right that

4    JetBlue serves as an important counterbalance.  The documents

5    and the testimony in the trial will show that the NEA, no

6    matter how it's dressed up, is bad for travelers in this

7    country.  The *Sherman Act* prohibits it.

8              And as a result, at the close of evidence,

9    Your Honor, we'll ask the Court to preserve JetBlue as that

10   important counterbalance in a concentrated industry and

11   protect the competition that has lead to benefits for

12   consumers and join the NEA.

13             Your Honor, my colleague, Mr. Matlack, with the

14   Commonwealth of Massachusetts, would also like to address the

15   Court as well.

16             THE COURT:  All right.  Thank you, Mr. Jones.

17             Before you begin, Mr. Matlack, again, just the

18   people -- just in front of the door, the couple of you, you

19   can move in.  There are a couple of seats here and there.  If

20   you can just squeeze in.  That would be helpful.  There's a

21   seat in the back row over there on the right.

22             Okay, go ahead, Mr. Matlack.

23        **OPENING STATEMENTS BY COUNSEL FOR THE PLAINTIFFS**

24      **MASSACHUSETTS, PENNSYLVANIA, DISTRICT OF COLUMBIA,**

25         **VIRGINIA, FLORIDA, ARIZONA, AND CALIFORNIA**

1           MR. MATLACK:  Good morning, Your Honor.  I'm

2     William Matlack for the Commonwealth of Massachusetts.  I'm

3     chief of the Antitrust Division at the Massachusetts Attorney

4     General's Office.  I'm also speaking today on behalf of the

5     reps of the nonfederal plaintiffs, the Commonwealth of

6     Pennsylvania, the District of Columbia, the Commonwealth of

7     Virginia, and the State's of Florida, Arizona, and

8     California.

9           I'd like to tell you why we're here today, together

10    with Department of Justice colleagues.  We're here and the

11    attorney generals of our respective states filed this case

12    with the United States because the evidence you will hear

13    includes harm that directly impacts the people, the

14    businesses, and the economies of our respective states and

15    districts.

16           I will highlight some of that evidence most

17    relevant to the seven states and district plaintiffs, which

18    together make up more than 97 million people.

19           Speaking for Massachusetts, the evidence will show

20    that the Northeast Alliance eliminates head-to-head

21    competition between JetBlue and American on 11 nonstop routes

22    and many other indirect routes that fly in and out of Boston

23    Logan airport.  As Mr. Jones told you, the evidence will show

24    that this is presumptively anticompetitive because it is like

25    a merger in all but name and, in any event, creates market

power on these routes, and that it will increase prices to the flying public totalling hundreds of millions of dollars a year.

We who live here know how critical affordable airline travel out of Logan airport is for our jobs, for our families, and for our leisure travel. It's also critical for the Massachusetts economy. You will hear evidence about the loss of head-to-head competition for corporate travel business. Under the NEA, JetBlue and American no longer compete and try to undercut each other on price or other metrics for business accounts with our local companies and institutions.

These harms, obviously, don't just impact Massachusetts. My co-plaintiffs from the other six states or districts are here because the NEA harms their people, their businesses, and their economies, too. For example, the loss of competition on the route between Boston and Reagan National Airport in northern Virginia harms the District of Columbia and Virginia as well as Massachusetts. This is a route where the combined JetBlue-American market share is 88 percent.

But as you will hear, while they dominate this route, the defendants are not going to compete and undercut each other on price anymore. The Boston to Philadelphia route is similar. JetBlue and American together hold

1    86 percent of that market.  And as in other areas of the

2    country, the evidence will show that the harm to Pennsylvania

3    is also broader than just this route.  You will hear that,

4    prior to the NEA, Philadelphia was a connecting hub for

5    American; but because of the NEA, American will deprioritize

6    and likely reduce its capacity in Philadelphia, further

7    degrading competition there.  This harms both Pennsylvania

8    consumers and its local economy.

9         The same is true in Florida.  For example, you will

10   hear that because of the NEA, JetBlue has pulled back or is

11   planning to pull back its growth plans in South Florida and

12   Orlando.  This is in addition to the loss of competition on

13   the Boston-to-Miami/Fort Lauderdale route where the

14   defendants' combined market share is 76 percent.

15        You'll hear the same types of harm impact

16   California.  For example, the loss of competition on the

17   Boston to Los Angeles route where the defendants hold

18   62 percent of the market, and that JetBlue is planning to or

19   has canceled or reduced its growth plans in Los Angeles

20   because of the NEA.

21        And for California, you will also hear that the NEA

22   increases concentration to presumptively anticompetitive

23   levels for routes into a number of other California cities,

24   as well.  For example, San Diego, San Francisco, and

25   Sacramento.

1          Finally, Arizona is impacted by the loss of

2     competition between the defendants -- for example, on the

3     Boston to Phoenix route where the defendants hold 85 percent

4     of the market -- and under the NEA, the defendants will no

5     longer compete for business on that route.

6          Your Honor, the evidence will show that the NEA

7     will increase prices and cost the people of our states and

8     districts hundreds of millions of dollars a year and that it

9     will dramatically reduce competition by taking JetBlue out of

10    the picture as an aggressive competitor that holds American

11    and other airlines' feet to the fire to provide lower prices

12    and good quality service.

13         This harm impacts much of the country, but it

14    particularly impacts the people, the businesses, and the

15    economies of each of our respective states and districts.

16    And that's why we're here, to work with our Department of

17    Justice colleagues to present this evidence to you.  And

18    that's why we will also ask the Court to injoin this unlawful

19    alliance and redress the harm that's already happened and to

20    prevent the further harm that it will cause.

21         Thank you.

22         THE COURT:  Thank you.

23         How are you splitting -- are you doing one of you?

24    I'm just thinking of the court reporter and taking a break

25    around 11:00 or so.

1          MR. SCHWED:  Yes, Your Honor.  We will be splitting

2     the opening.  I'll will going maybe about 35 or 40 minutes,

3     and then Mr. Wall will do the second half of the opening, so

4     we are happy to --

5          THE COURT:  Why don't you go and then when you're

6     done, we'll take a brief break for the court reporters, and

7     then you'll go, Mr. Wall.

8          MR. SCHWED:  I just need one second here to --

9          THE COURT:  Sure, take your time.

10          MR. SCHWED:  I'm happy to address the Court from

11     counsel table.

12          THE COURT:  Whatever is more comfortable for you.

13     I'm fine with you there.  I'm fine with you at the podium.

14     There's no jury, so whatever is easier for you.

15          MR. SCHWED:  I'll just stand here.

16          THE COURT:  That's fine.

17          MR. WALL:  Your Honor, we have copies of our

18     presentation that we prefer to hand up to the court staff, if

19     that's okay.

20          THE COURT:  Sure.  Yes.

21          **OPENING STATEMENTS BY COUNSEL FOR DEFENDANT JETBLUE**

22          MR. SCHWED:  Thank you, Your Honor.

23          The evidence in this case is going to show that the

24     Northeast Alliance is a highly procompetitive partnership

25     that already has delivered substantial benefits to consumers.

1          Now, these are examples of the immediate, tangible

2     benefits to consumers that have already taken place in the

3     first 18 months.  And if you were to listen to the opening

4     you just heard, you probably wouldn't even know that the NEA

5     has been in effect and has been helping consumers for

6     18 months.  It's all talking about the future.  There's

7     actually the present and that present is very important.

8          And these numbers are compared to pre-COVID,

9     pre-Northeast Alliance from 2019.  And it's saying, what

10    is -- what do these markets look like today compared to what

11    they looked like in 2019?  And these are just examples.

12         There are 50 new nonstop routes, 90 nonstop routes

13    that have more capacity.  There are 17 new Northeast

14    Alliance -- these are all within the Northeast Alliance --

15    international routes, including to places like Athens, Delhi,

16    Doha, and Tel-Aviv.  There's a 17½ percent increase in NEA

17    and ASMs.  And you'll -- the Court will hear about the ASMs,

18    it's a very standard -- it's available seat miles, it's a

19    very standard measure of airline capacity.  And 27 percent in

20    New York City alone.

21         There are 45 daily departures that have been

22    upgauged -- and, again, that's another term that will appear

23    a lot.  That's when you move from a smaller plane to a bigger

24    plane.  45 departures have been upgauged from 50-seat, very

25    small regional jets in New York City.

1            And talking about just about JetBlue and increasing

2      the presence of JetBlue, not decreasing the presence of

3      JetBlue, there are 189 percent more low-fare JetBlue seats in

4      LaGuardia.

5            Now, it's important to note that these are not

6      hypothetical predicted benefits based on a merger simulation.

7      These are actual benefits based on actual flights and actual

8      schedules.  And it is a fundamental tenant of both the

9      antitrust law and basic economics that more output, like we

10     are seeing here, is highly procompetitive and leads to lower

11     fares.  Even plaintiffs' experts do not dispute that and they

12     have no answer for these real-world results.

13           Now, what -- it's not just what we are saying.

14     It's important to see what our competitors are saying.  And

15     to hear their opening, you would think that our competitors

16     don't care about the Northeast Alliance.  But they see it the

17     same way that we do as creating a better competitor from --

18     by JetBlue and American, that we are more competitive with

19     them.

20           And how did Delta refer to this?  They referred to

21     the Northeast Alliance as a seismic change.  They recognized

22     that American and JetBlue are an enhanced competitive threat

23     to them.  And this is probably the -- sums it up very well,

24     that the Northeast Alliance created one relevant competitor

25     out of two weak ones.

1          United -- did United think that this was going to

2     cause an output reduction by JetBlue, is going to make

3     JetBlue go away?  No, they say it has accelerated network

4     growth plans for JetBlue.

5          Southwest recognized that together American and

6     JetBlue are more attractive to customers because of improved

7     schedules.  And you will hear about the improved schedules

8     under the Northeast Alliance.

9          And Alaska says, "The NEA creates a stronger

10    competitive proposition in the northeast that will likely

11    necessitate a competitive response from Delta and United."

12         Now, what's interesting is one of the plaintiffs in

13    this case, the plaintiff you just heard from about three

14    minutes ago, now has publicly recognized the benefits of the

15    Northeast Alliance.  Just last week in a trial that happened

16    in this very courthouse, the Massachusetts attorney general

17    solicited this testimony from its own expert witness on

18    direct examination.  And this is very different from what you

19    just heard in the opening.

20         And it's so important I'm just going to read it,

21    but now we have what I think from an economist's perspective

22    is an incredibly healthy mix of competition at Boston, which

23    has Delta competing -- Delta competing -- against what's

24    called the Northeast Alliance, which is American and

25    JetBlue's alliance to codeshare flights in the northeast.

1    And if you look at a lot of the routes Delta is adding,

2    increasing capacity, good for competition, they're right on

3    top of JetBlue or American.  So that level of competition is

4    sort of a planner's dream to drive fares down and to offer

5    more frequency and a wider array of services, which is

6    exactly what's happening at Boston currently.

7              How can the plaintiffs now say that Delta doesn't

8    care and is not going to respond to the Northeast Alliance?

9              As I said before I started talking, Mr. Wall and I

10   will share the opening.  I will briefly outline how the day

11   is -- the morning is going to go.  I will talk about the

12   topics on the left.  I will start by talking about the

13   competitive environment in the Northeast before the Northeast

14   Alliances, the specific challenges that JetBlue and American

15   faced that led them to the Northeast Alliance, and then I

16   will get into what the Northeast Alliance is and is not.

17             Mr. Wall will then cover the expert proofs.  He

18   will also discuss the rule of reason and how the parties plan

19   to meet their burden under the legal standard.

20             Fundamentally, the Northeast Alliance addresses

21   competitive challenges that JetBlue and American faced in the

22   northeast region.  In Boston, JetBlue faced a strong

23   challenge from Delta, which had been pouring resources into

24   Boston and leveraging its global network, something that

25   JetBlue did not have.

1          And in New York City, American and JetBlue badly
2    trailed United and Delta in the largest business market in
3    the world.  And I'm going to start, Your Honor, by talking
4    about New York City, and then I'll go to Boston.

5          In New York, United and Delta led by every measure
6    of network relevance.  And, again, that's a term that you
7    will hear about, so I'll just pause for a moment to talk
8    about what relevance is.  It's one element of competitiveness
9    but an important element, and it's the extent to which local
10   originating passengers view an airline as best positioned to
11   meet their overall needs and allow them to maximize frequent
12   flyer benefits.

13         So what does that mean in a practical sense?  Take,
14   for example, a corporate customer, a potential corporate
15   customer in New York City or Boston.  That corporate customer
16   wants to pick an airline that satisfies all of its needs.
17   And what does that mean?  It means they want an airline that
18   gets it to the -- all the different places its employees need
19   to go, whether they're in the United States or outside of the
20   United States.

21         It wants an airline that provides high frequency
22   service to the places its employees need to go, so that way,
23   when its employees finish a business meeting or maybe a court
24   appearance, they can go to the airport, get on a plane, and
25   come home and not wait for hours at the airport or maybe even

cost them money by having to stay another night, and they
want to provide their employees with frequent flyer benefits
that are useful to their employees.

In every metric of relevance, JetBlue and American
trailed United and Delta.  And I'm going to go through these
relatively briefly.

This shows one measure, daily seats, just how many
seats there are on planes in New York City.  And this is all
from 2019, pre-COVID, pre-NEA.  This shows that American and
JetBlue are roughly half the size of Delta and United.

Another common metric is the number of nonstop
destinations that are served -- again, very important.  How
many different places can my preferred airline get me to?
Again, American and JetBlue were roughly half the size of
Delta and United.  And we heard almost nothing about the size
of Delta and United and their dominant market position in
New York.

Number of top 50 destinations.  So not just how
many places you go, but how many of the most important
places.  And this is one, American and JetBlue were slightly
better, roughly 60 percent of Delta and United.

Another question is -- another metric is
international long-haul markets.  "Long-haul" means roughly
South America, most of Europe, Middle East, Asia, the places
you need bigger planes to fly longer distances to.  And the

1   situation looked a lot worse for American and JetBlue in this

2   metric, where they were greatly dwarfed.

3          And what was the trend in this important New York

4   City market?  Since 2014, American and JetBlue were losing

5   market share.  And who was gaining it?  United and Delta.

6          Now, what were the impediments to growth in

7   New York City that these airlines faced?  In LaGuardia and

8   JFK, slot constraints -- and, again, you'll hear a lot about

9   slots.  They're -- the simplest way to think of them --

10  sometimes they referred to as slots or slot pairs, their

11  legal permission slips to take off and land, and you can't --

12  and they effectively cap the number of takeoff -- takeoffs

13  and landings, the number of flights that any airline can have

14  in the few slot constrained airports in the United States,

15  and two of them are LaGuardia and JFK.

16         Newark is not a slot-constrained airport, but it is

17  what it is referred to as a schedule facilitated airport with

18  limited runway space.  And so what that means is that

19  carriers generally retain scheduling priority based off

20  actual operations conducted in the previous season.  And

21  those constraints plus also some operational constraints,

22  primarily terminal access and where the gates are and access

23  to gates, also restrain growth and limit growth in Newark

24  airport.

25         And these are not just things that -- these are not

just things that we are saying today.  These restrictions,
these restraints, these challenges were recognized by both
airlines well before the Northeast Alliance.  This is an
ordinary course, quarterly document, a planning document that
JetBlue has always produced and it's from early 2019.  And
what are they saying?  Slot constraints limit our ability to
grow JFK -- a constant refrain at JetBlue.  And, in fact, the
situation at LaGuardia was even worse for JetBlue.

What was American saying?  And this document is
from 2018.  That in New York City, they had no organic path
to secure a leadership position in New York City.  They
recognized their constraint and that they had no ability to
grow.

And on the bottom, that bottom table, it's not
remarkable, it's just -- in some sense, it's just an ordinary
course business document that outlined the lack of relevance
that I showed on the prior slides.  And you can see roughly
how much United and Delta were a dominant one and two and
American and JetBlue were a distant three and four.

Now, what's the story in Boston?  It's actually a
slightly different story in Boston, but an equally compelling
one.  In Boston, JetBlue, in 2019, before COVID, was the
largest carrier by most metrics.  It had about 30 percent or
so, depending on the metrics.  And -- but the problem that
JetBlue faced is that Delta was coming after them.  And Delta

wasn't shy about it.  These are from Delta ordinary course
documents, and what was Delta saying?  Delta's long-term
vision looks to secure its position as Boston's number one
global airline.  Delta was not going to sit tight at number
two.

And we -- we didn't even hear about Delta when we
heard about the competitive environment in New York City.  It
wasn't even mentioned.  You wouldn't know -- although I'm
sure anyone in Boston knows -- you wouldn't know Delta even
flew in Boston if you listened to the opening presentation.

And this wasn't just talk by Delta.  This graph
shows what they had done in just the four years from 2015 to
2019, how much they had grown from roughly 130 flights to
roughly 190.  And it's a classic hockey stick growth chart
and it was going to continue.

Now, what is the significance of that from a
JetBlue perspective again?  This is an ordinary course
document where they are -- it's called something you'll hear
about called "Project Revere," and that's a project designed
to address Delta -- Delta's challenge in Boston.  And what --
and what they recognized is Delta growing larger than JetBlue
would eliminate many of our advantages and public claims.

The reason that is, is JetBlue does not have a
global or a national network like a large carrier like Delta
has.  So what it needs to do to compete in Boston, where it's

1    a more business-oriented market specifically, what Delta --

2    what JetBlue needs to do, what its competitive advantage was,

3    was being the biggest.  And JetBlue saw that that competitive

4    advantage was being taken on by Delta, which was insistent on

5    not letting that happen.

6            And Delta -- what JetBlue also recognized in the

7    second bullet that's highlighted, is Delta is just a lot --

8    three to four times bigger than JetBlue and has the resources

9    to pour into Boston in a way that JetBlue never could.

10           How did the NEA address these challenges?  The way

11   a good joint venture, any good joint venture or partnership

12   or alliance addresses challenges:  by bringing together the

13   advantages of one airline with the advantages or

14   disadvantages of the other.  Each airline provided what it

15   was good at and what it -- assets it had that addresses the

16   other airline's deficits.

17           American, they provided slots and gates, and we've

18   heard about how slots and gates were such a challenge in the

19   New York City marketplace.  The other thing American provided

20   is national and international relevance, something that

21   JetBlue just did not have.

22           JetBlue, on the other hand, had a very strong

23   New York City and Boston customer base.  They also had feeder

24   traffic.  Feeder traffic generally refers to traffic from

25   outside a region into the region, where feeder traffic fits

1    in this puzzle is feeder traffic that comes into the region,

2    and as well as the strong New York City customer base, can

3    then connect on, for example, to American flights because

4    American has that national and international relevance.

5            That, in turn, allows American to schedule and

6    create more international routes because it has more

7    passengers to feed those routes, and it also makes the

8    combined effort more attractive to JetBlue customers who know

9    they can come to New York and then connect on to some of

10   those new places, like Tel-Aviv or Athens.

11           I'm going to pause -- I'm going to switch now to a

12   question of what the Northeast Alliance is, and maybe equally

13   importantly, what it is not.

14           Geographically, it covers four airports:  Boston,

15   LaGuardia, John F. Kennedy, and Newark.  It also excludes all

16   JetBlue transatlantic flying.

17           The basic elements of the Northeast Alliance are

18   best understood by thinking about what the goal of the

19   Northeast Alliance -- the goal of it creating an expanded

20   virtue network.

21           What that means is -- we've heard about relevance,

22   a more relevant airline or a more relevant combination and

23   virtually, not actually; and that gives more options and more

24   frequent flyer benefits to consumers.

25           The way this is done is through a number of

1    different agreements and different elements, the NEA itself

2    has multiple agreements under it.  The first thing is

3    codesharing.  Codesharing is the ability of one airline to

4    market and sell another airline's flights.  So an American

5    customer can go on the American website or app and buy a seat

6    on a plane operated and flown by JetBlue and vice versa.

7          Slot and gate pooling -- we've heard about the slot

8    and gate limitations within New York City in particular.

9    What the Northeast Alliance does is takes those valuable

10   assets, combines them and looks at them together and says,

11   "Which airline can make the best use of which asset?  We have

12   a slot that arrives at a particular time.  Which airline

13   can -- based on the planes and its customer base -- can make

14   the best use of that asset?"

15         Joint scheduling -- the parties can work together

16   to create a better schedule to better serve -- again, it's

17   all about serving customers, so there are more frequent

18   flights along the course of the day and there are better

19   connections to different flights.  And Mr. Wall will talk a

20   little bit about this and give some examples in his

21   presentation.

22         Finally there's reciprocal frequent flyer benefits,

23   what this means is that a loyal American customer advantage

24   member can earn points on JetBlue flights and can redeem them

25   on JetBlue flights and vice versa, a loyal JetBlue true blue

1   member can earn and redeem on American flights -- giving

2   customers more options, a more valuable product.

3            The last element of this is seamlessness.  All of

4   these things have to work together, so that from the customer

5   perspective -- because it's all about the customer -- it has

6   to appear like one network that they can take advantage of

7   and get more benefit from.  And Mr. Wall will explain why

8   these elements are nothing at all like a merger.  They are a

9   far cry from a merger.

10           So what's not in the Northeast Alliance?  There is

11  no coordination on pricing.  And you will hear from multiple

12  witnesses that JetBlue is maintaining its pricing

13  independence and prices independently and has the same

14  pricing philosophy it has ever had and will always have.

15  That's part of what makes JetBlue JetBlue, and it will not

16  and could not even change that.

17           Each carrier retains its distinct business model.

18  There's not a single shred of evidence JetBlue -- to the

19  contrary -- JetBlue will remain -- you heard the word

20  "maverick."  JetBlue will remain a maverick.

21           There is no coordination whatsoever on fleet plans

22  or overall capacity.  The coordination is limited to very

23  specific -- to the specific routes within the Northeast

24  Alliance on a route-by-route basis, and there is no profit

25  sharing.  There is only revenue sharing.

1           And the way the revenue-sharing agreement works,

2      it's called a "mutual growth incentive agreement," that --

3      you'll hear more about that during the trial -- that

4      incentivizes growth.

5           American and JetBlue both recognize that the

6      express goal of the Northeast Alliance in their business

7      documents is to unlock customer value.  This is from an

8      American presentation about what they refer to as Project

9      Garland, which is their code term for -- North American's

10     code for a project name for this -- for this Northeast

11     Alliance.  What does it do?  It addresses American's and

12     JetBlue's incomplete customer proposition relative to Delta

13     and United in New York City.

14          It maximizes customer value and connectivity in

15     JFK, LaGuardia, and Boston.  And it improves overall customer

16     relevance and competitiveness in the northeast region.

17          And I'm going to pause for a second at this slide.

18     This is the slide that American's CEO presented to the board

19     of directors of American when he was explaining this

20     alliance.  And if you look at it, some of the numbers here

21     will look familiar, because the two left columns are showing

22     American and JetBlue from before the Northeast Alliance,

23     before COVID.  The two right columns are showing Delta and

24     United.  And like some of the earlier bar charts we showed,

25     they show that American and JetBlue on metrics are roughly,

1    in New York City, half the size of Delta and United.

2          And the green column combines the two.  And what's

3    important here is not just that the green column makes

4    American and JetBlue a competitor, a viable competitor with

5    Delta and United, the green column shows that the whole is

6    greater than the sum of the parts.

7          If you look at the middle line there, because

8    that's the easiest one to understand, I think, on this, the

9    one that says daily seats, that's just the number of seats --

10   we saw that bar chart before -- American before had 62,000.

11   JetBlue, 61,000.  And when you add them together, you would

12   think you would get around 123,000.  This is an ordinary

13   course document.  There's a little bit of rounding going on

14   here.

15         But what you see is that the total in the green

16   column is 142,000 seats under the NEA.  That's because the

17   Northeast Alliance unlocks growth and will result in more

18   than the each one added -- than each one had before the

19   Northeast Alliance.

20         How did JetBlue propose this to its board?  The

21   strategic rationale of project Connie, the Northeast

22   Alliance, right there, it's to leverage the partnership to

23   accelerate the organic plan.  And you will see that the

24   organic plan means growth and bring low fares and

25   award-winning service to more New York City and Boston

customers.

That is accomplished through two of the things we talked about:  network relevance and also what it results in is increased customer utility.  It benefits customers.

This is also the same way that JetBlue and American -- they're not hiding what they're doing.  They're not behind some closed door trying to say we're going to coordinate capacity and do something secretive.  This is exactly how jet -- American and JetBlue are touting the Northeast Alliance to corporate customers.  This is an actual sales or it's a town hall meeting deck where American and JetBlue are saying, hey, look how much benefit we are bringing to you, the corporate customer.

And it's all the same things that we've seen before:  expanded service, domestic growth, international growth, and a seamless experience.

This is an executive update within JetBlue, and this document, it included -- so the executives would know, this was the employees -- some of the employees telling the executives, this is how we are advertising the Northeast Alliance.  It's all the same things:  increased JetBlue flights, more perks for customers, expanded access to American's global network via JetBlue, and the ability to earn TrueBlue points -- those are JetBlue's frequent flyer points -- on American flights.  And there's also -- it's not

1    mentioned here, the ability to redeem them on American

2    flights.

3          The competition understood exactly what the

4    Northeast Alliance was about.  I showed in the second or

5    third slide some of the competitor responses.  I am not going

6    to repeat that, but I do think it's worth dwelling on one

7    right here.

8          This is a Delta document from three weeks after the

9    announcement of the Northeast Alliance.  It took them three

10   weeks to put together a detailed competitive assessment.

11   That's how concerned they were.

12         What was their assessment?  It says that

13   American -- that it creates a more relevant competitor.  And

14   it focused -- it recognized that it helped both American and

15   JetBlue grow and compete against Delta.

16         American -- it improves its relevance in many

17   competitive cities by leveraging B6's existing network --

18   that's American -- and that codeshare improves B6 -- that's

19   JetBlue's -- prospect of winning corporate share.  American

20   and JetBlue, by working together, are a much more competitive

21   force against the dominant airline in New York City and

22   the -- and the growing airline in Boston, Delta.

23         And we've already seen some quotes from United, but

24   also, they didn't just stop there and sort of include sort of

25   high level analysis.  They went city by city.  And there's

1    actually -- this deck has a page on each of these cities, and

2    it's in that -- analyzing the competitive threat by both

3    American and JetBlue at each of these cities.

4           This was not, as you might have believed from the

5    opening, taken lightly by Delta.  They knew exactly what they

6    were facing, which is a competitive force.

7           Southwest had a similar reaction.  The NEA will

8    benefit JetBlue the most with access to American's extensive

9    hub network, lounges, and coordinated schedules in some of

10   the most competitive routes.  And those are things that

11   JetBlue did not have, a hub network or lounges.

12          Network enhancement will be greatest for JetBlue

13   based on American's existing extensive network and hubs along

14   the East Coast.

15          What's missing from the record is any evidence, any

16   real business record evidence, that supports plaintiffs'

17   claims.  There's not a single piece of evidence that suggests

18   that the Northeast Alliance will in any way diminish the

19   JetBlue effect that you have heard so much about.  And that's

20   one point that we all agree, there's a JetBlue effect and

21   it's great.  But the difference is, the actual evidence will

22   show, and Mr. Hayes will testify, that this is going to

23   expand the JetBlue effect, not decrease it in any way.

24          There's no evidence whatsoever that the Northeast

25   Alliance allows American to control JetBlue -- none.  There

1    is no evidence whatsoever -- you heard a lot of history about

2    capacity discipline that supposedly started in -- we don't

3    agree with it -- but supposedly started a decade ago and

4    ended half a decade ago.

5        There's no -- that ancient history is irrelevant,

6    and there's not a single shred of evidence that the Northeast

7    Alliance somehow will promote capacity discipline.  There is

8    not a shred of evidence that has led to nor will lead to

9    higher fares, less output, or less competition.

10       I want to turn to the agreement with the Department

11   of Transportation.  And why that's relevant is, first of all,

12   because the Department of Transportation, this agreement that

13   they say is so obviously anticompetitive you can smell it

14   from 30,000 feet, well, the Department of Transportation, who

15   knows something about airlines, had a very different view.

16   The Department of Transportation reached a very different

17   judgment after a very thorough process than the Department of

18   Justice did.

19       They recognized the potential that this brought,

20   the benefits that it could bring.  And they were willing to

21   let it go forward, and it has gone forward, with certain

22   commitments and ongoing monitoring by the Department of

23   Transportation.

24       Now, the agreement -- I guess now is -- into

25   evidence after this morning and it has a lot of different

1    provisions.  I'm not going to try to, in this opening, cover
2    all of the different provisions and the commitments that are
3    contained in the Department of Transportation agreement.  I
4    want to just talk about a few.  At the very top, there are
5    slot pairs, seven slot pairs at JFK and six at DCA that are
6    going to be divested or leased.

7         The next few bullets talk about very specific
8    commitments that were made by the airlines.  And then at the
9    bottom is, also, a very important commitment, which is -- or
10   aspect of this -- which is the ongoing monitoring by the
11   Department of Transportation.  And the suggestion somehow
12   that the minute this litigation ends, JetBlue and American
13   are just going to be changing their tune, first of all, makes
14   no sense from a business perspective for either airline, but
15   also ignores this important oversight and the fact that the
16   Department of Justice can sue at any time.

17        Then the -- another big component of the north --
18   of the agreement with the Department of Transportation are
19   growth commitments.  So when JetBlue and American were
20   presenting the Northeast Alliance to the regulators, they had
21   growth targets and the growth target here is shown as
22   16 percent.  That's after some DOT adjustments based on
23   expiration of slot waivers, upgauging in slot divestitures.
24   But you can think of it as a 16 percent -- that's how they
25   viewed it, you might think of it, as a 16 percent target that

1    the airlines set.

2              And what happened is the DOT said put your money

3    where your mouth is.  Can you guarantee you're actually going

4    to grow?  And the airlines put ten additional slot pairs, in

5    addition to the divestitures that we saw and the leases we

6    saw on the prior page, ten additional slot pairs on the line

7    committing to growth.

8              And if the two airlines do not meet 10 percent

9    growth above this baseline and the baseline, again, is 2019,

10   pre-NEA, pre-COVID, with some adjustments that the DOT

11   wanted, if they don't meet a 10 percent growth, they forfeit

12   all ten slot pairs.  And if they're between 10 percent and

13   15 percent, there's a proportionate forfeiture.

14             And what's important to this is not just that the

15   parties are committing to growth, but what these numbers

16   mean.  10 percent, a transaction that results in 10 percent

17   growth, which we're losing ten slots in that case, that

18   transaction, by -- already is highly competitive.  You

19   don't -- any growth is highly competitive.  10 percent is a

20   huge boom to competition.

21             There's also one other feature.  This has been

22   covered a lot in the briefing, so I'm not going to get into

23   too much detail, but there is no revenue sharing and no

24   coordination on what's been referred to as the carve-out

25   routes that are all listed here.  I'm not going to read them

1    all, but they're in the DOT -- they're in the papers.  This

2    is D -- as you saw in the papers, this is a direct result of

3    discussions with the regulators, and it's part of a binding

4    contract between the parties.

5         I want to just -- before I hand over or maybe we'll

6    take a break and then I'll hand it over to Mr. Wall, talk

7    about one red herring, the Spirit acquisition.  The Spirit

8    acquisition has absolutely nothing to do with this case.

9    Why?  First, if it has any relevance whatsoever, it is

10   further independence of -- further evidence of JetBlue's

11   independence.  JetBlue didn't ask American for permission to

12   engage in the -- to bid for Spirit.  American had no

13   involvement, didn't know a thing about it until they read

14   about it when it was made public, like everyone else.

15        The Spirit transaction, as JetBlue has made clear

16   from the day it made its bid, has one goal:  to enable

17   JetBlue growth outside the NEA, just like the Northeast

18   Alliance helps JetBlue grow and bring more of the JetBlue the

19   effect inside the Northeast Alliance airports, the Spirit

20   transaction allows that to happen outside and makes JetBlue

21   more of a nationwide competitor, more of a force on low

22   fares, more of a force that will bring low fares and better

23   competition to consumers.

24        And finally, and maybe it's the most importantly,

25   of course, that's subject to a separate Department of Justice

```
 1    investigation.  And the Department of Justice will have its

 2    chance to assess whether that is or is not procompetitive

 3    based on the evidence.

 4              Thank you and I will hand it to Mr. Wall or take a

 5    break as the Court sees fit.

 6              THE COURT:  How long do you think you'll be,

 7    Mr. Wall?

 8              MR. WALL:  I think we should probably take a break,

 9    because it will be 35 minutes or so, something like that.

10              THE COURT:  All right.  We'll take a brief break.

11    Thank you very much.

12              THE DEPUTY CLERK:  Court's in recess.

13              (Court in recess at 10:50 a.m.

14              and reconvened at 11:02 a.m.)

15              THE COURT:  Please be seated.  Just a reminder,

16    that if you don't want, at counsel table, your side-to-side

17    discussions among yourselves to be broadcasted, to be picked

18    up on the Zoom, you need to mute the microphones.  There's no

19    other way for us to do this.

20              MR. WALL:  Thank you, Your Honor.

21              Shall I proceed?

22              THE COURT:  Go right ahead.

23    OPENING STATEMENTS BY COUNSEL FOR DEFENDANT AMERICAN AIRLINES

24              MR. WALL:  Thank you.

25              Your Honor, once again, I'm Dan Wall.  Along with
```

1    Sullivan, Ms. Maltas, and a small cast of thousands behind

2    us, I have the honor of representing American Airlines in

3    this case, and I'll be giving the remainder of the opening

4    statement.

5            I actually want to say good morning to Mr. Jones

6    and his team and thank you all for your service.  I

7    appreciate it.

8            My job this morning is actually to talk a lot about

9    how the expert proofs are going to come in, but I've also

10   found it useful in these kinds of cases to try to map the

11   proofs that are going to come in to the legal standards and

12   how the parties are intending to meet their respective

13   burdens.  And there's a difference in this case, a fairly

14   significant difference, and that needs to be highlighted at

15   the beginning to understand why we're doing the things that

16   we're doing the way that we're doing them.

17           We're putting up here on a slide the articulation

18   of the three-step rule of reason that comes from last year's

19   Supreme Court decision in the *NCCA v. Alston* case.  The

20   standard in recent years, the plaintiff has the initial

21   burden to prove that the challenge restraint as a substantial

22   anticompetitive effect.  Should the plaintiff carry that

23   burden, the burden then shifts to the defendant to show a

24   competitive rational, and then if the defendant can make that

25   showing, the burden shifts back to the plaintiff to

demonstrate that the procompetitive efficiencies can be
reasonably achieved through less anti-competitive means,
that's the so-called less restrictive alternatives.

We will be putting our proofs in against that
standard but the government will be putting its proofs in
against a markedly different standard, which we note here in
the -- first of all, on the first step, the government has
put in its brief that the test is whether the challenged
restraint is likely to harm competition.

There was a reference to that in the opening
statement citing a case from 1945.  That is not the test.
I'll explain some of the distinctions in a moment, but that's
what the plaintiff is going to be putting on proofs about.

Step 2 is supposed to be just a fairly modest
burden to show a procompetitive rationale.  What we saw in
the plaintiffs' trial brief is that they want the burden to
be on the defendants to actually show the lawfulness of the
restraint at the second step by what they call sufficient
procompetitive effects.

And this, again, was very evident in Mr. Jones'
opening where one of the major themes was that we were
supposed to justify the NEA as if it is our burden to
convince the Court that it is justified in some overall
sense.  That's actually not the second burden.  The second
step burden is a much, much more modest one than that.

1          And then with respect to the third step, less

2     restrictive alternatives, a rather radical departure that is

3     argued for in the plaintiffs' trial brief, instead of having

4     to prove a less restrictive alternative, they argue that

5     there should be -- they should have two options, to either

6     show that there's a less restrictive alternative or that a

7     weighing of the injury and the benefits to competition favors

8     condemning the NEA.

9          Now, you may ask why one would want to change the

10    legal standard that dramatically?  I think we can save that

11    for another day.  But one point I do want to make, though,

12    the last point as a foundational point, is an observation

13    that the Supreme Court made in the *Alston* case about the rule

14    of reason and what it's about, and it was made in the context

15    of the third step, the balancing of alternatives.

16          And it was the admonition that courts should not

17    second guess degrees of reasonable necessity, and this is the

18    quote:  "Antitrust law does not require businesses to use

19    anything like the least restrictive alternative.  To the

20    contrary, courts should not second-guess degrees of

21    reasonable necessity so that the lawfulness of conduct turns

22    on judgments of degrees of efficiency."

23          Now, I think it was pretty clear from Mr. Jones'

24    opening that the plaintiffs case, rather from beginning to

25    end, is about second-guessing the need for the NEA.  In fact,

1    it was very stark in one of his final slides in which he is

2    actually framing the issue as if it is a question of whether

3    the defendants needed to go this far.  That's not how the law

4    works.  The law allows businesses to achieve procompetitive

5    efficiencies and it sets up a less restrictive alternative

6    test to judge whether they have done so properly or

7    improperly.  And that's how we will proceed in this case and

8    that's how we will put on our proofs.

9         Now, I'm going to go into the main issue now and

10   this, as in most cases, is adverse effects.  You know, this

11   is the observation from the *Alston* case about virtually all

12   cases in the last 45 years have failed because the plaintiff

13   could not show the substantial antitrust effect.

14        The standard is has a substantial anticompetitive

15   effect and I don't know why we're debating this.  This is the

16   Supreme Court in the last two decisions, the *Alston* decision

17   and the *AmEx* decision, which was a case in which the -- that

18   the Department of Justice brought, was actually appealed by

19   the State of Ohio, which is why it's called *Ohio v.*

20   *American Express*, but it was a DOJ prosecution, and the

21   standard is phrased as has a substantial anticompetitive

22   effect.

23        I think where the confusion comes in is that we do

24   have these two ways of proving the substantial

25   anticompetitive effect that are called the direct and

1    indirect way.  In a direct proof case, there is -- it's no

2    inference.  It is -- the actual adverse effect is proven by

3    evidence that prices have gone up, output has gone down, or

4    quality has decreased, something like that.

5              There is an indirect path, as the government has

6    pointed out in the past, which is inferential.  We seek an

7    inference of the effect, the present adverse effect, but the

8    inference of that effect based upon a combination of the

9    market power and the nature of restraint.

10             That is the point in this analysis at which

11   likelihoods are properly part of the assessment.  And I want

12   to make it clear we are not saying that Your Honor shouldn't

13   consider what are the likely effects of the things that we

14   are doing as part of the NEA, because you most certainly

15   should.

16             But you -- but that is -- we can't confuse

17   relevance with the governing legal principle, with the

18   ultimate legal conclusion.  The ultimate legal conclusion is

19   has a substantial effect -- but like in most walks of life

20   and most kinds of cases in the law, we very often make

21   inferences about what is happening based upon circumstantial

22   evidence and inferences, and so that's how it fits in.

23             And to drill one step further on that, the logic of

24   indirect proof begins with market power, because it is --

25   it's just one of our holy of holy tenants in the antitrust

1    rule that affirms that under a strong competitive constraint

2    and therefore cannot exercise market power, cannot harm

3    consumers in the competitive process in the way that the rule

4    of reason requires, so that is a necessary but not sufficient

5    condition.

6            And then we look at the nature of the restraint.

7    And so we will have proofs in this case that go to that as

8    well.  Does the conduct that is at issue have a tendency to

9    restrict the competitive process and to harm competition?

10   And that's the path that the government goes down, for the

11   most part.

12           In fact, what we do on this slide is more of an

13   organizing device this morning.  There's a number of issues

14   around market power, the merger simulation that Dr. Miller

15   offers.  There are theories of anticompetitive tendencies

16   about revenue sharing and about capacity coordination and

17   what I, frankly, call "atmospheric arguments" about the

18   elimination of the JetBlue effect and the promotion of

19   capacity discipline -- atmospheric because there's no proof

20   that any of these things are happening.  They're just

21   thematic arguments that are made.  These are the major points

22   that I'm going to be covering because that's their case.

23           Now, I'm not going to do that, though, without

24   pausing to make the big point, which is that this case has

25   come to trial with no direct evidence of actual adverse

1    effects.  And I don't want to just slough that off and run by

2    it, because it's a big deal.  It's exceedingly unusual.

3          When the government brings rule of reason cases, it

4    almost always comes to court with some amount of direct

5    evidence of anticompetitive effects.  In the *AmEx* case, which

6    was about these anti-steering rules, it came in with direct

7    evidence that it had the effect of raising merchant fees.

8          You know, this is the ordinary way to go because

9    most cases don't get brought until there is -- there is some

10   tangible evidence that the practices are doing harm.  But in

11   this case, even though the NEA has been in effect for

12   18 months, and even though the DOT had taken this wait and

13   see approach as Mr. Schwed had indicated, the Department of

14   Justice insists on ignoring the record of those 18 months.

15         And, actually, their experts will go so far as to

16   argue that you can't tell anything about the NEA, about those

17   18 months, or maybe even in the future as a kind of setup to

18   saying that instead you should do all of this speculation

19   based upon merger simulations and other predictive proofs.

20         But the fact is is that the plaintiff, in a rule of

21   reason case, showed up for trial without any direct evidence

22   of actual adverse effects, and they did so when the -- excuse

23   me -- when the defendants showed up with what is now

24   unrefuted evidence of procompetitive effects -- and taking on

25   the burden to prove the negative, the absence of any adverse

1    fare effects, which we'll get to the expert testimony that
2    we're putting in.
3              So we have not just a one-sided record on actual
4    effects, it's actually a default on the plaintiffs' side and
5    substantial evidence of more flights, more output, more seat
6    capacity, more of all of these things from the defense side.
7              So this is -- the heart of that will be the
8    testimony of two of our experts, Mark Israel and Dennis
9    Carlton.  Doctors Israel and Carlton have divided up the
10   work, and they have respectively looked at the benefits and
11   the output effects of the NEA and then looking for any
12   evidence of adverse effects during the 18 months.
13             Dr. Israel will testify -- and it's really not even
14   contested -- that in the 18 months since the NEA went into
15   effect, there has been an increase in all measures of
16   capacity and output and product quality and all of these --
17   all of these things.
18             When I say it's uncontested is because what
19   Mr. Jones was not telling you, is not that it's happening,
20   but rather that they have some theory that it might have
21   been -- that that growth might have occurred through some
22   other way.  That's a consideration that goes into the final
23   parts of the rule of reason analysis.  But with respect to
24   the question of adverse effects, the evidence will show
25   enhanced output, which is the opposite of an anticompetitive

effect.

And then Dr. Dennis Carlton, who is one of the giants of the antitrust world -- used to be the chief economist and deputy assistant attorney general in the antitrust division -- has actually conducted a very careful study of these nonstop overlap routes on Boston and New York NEA routes that they focus on.

He's compared what's going on with fares on those routes to a set of control routes, which are also NEA routes that their experts said there shouldn't be any adverse effects on, and it shows that the -- the pricing is essentially the same.  There's no statistical -- statistically significant difference in the control and the treatment groups.

Okay.  I want you to turn to market power -- a fundamental concept in the antitrust.  It exists.  The idea is that firms can raise market prices by restricting their own output because there's not enough restraint on them. Rivals will not keep them from doing it.  Rivals can't expand their output.  Rivals can't enter and so forth.

So we usually look at two things.  What is the market position?  You have to have a sufficiently large market share, a certain freedom from competition, if you will.  And then you have to look at the supply side of the market, at the questions of entry and expansion to ask the

important question of whether there is anything stopping other firms from increasing their capacity if you try to restrict yours.

This is a very plain antitrust orthodox way of addressing market power.  And in this case, the plaintiffs make no effort to meet their burden of proof that way.  And that's a just strong statement, I understand, but it is -- it calls for a strong statement because it's literally true.

Here's the situation in these markets and why the parties understood that they could do the NEA.  Boston and New York are both, as Mr. Schwed indicated, extremely competitive regions.  They're big cities with a lot of air travel, very attractive to airlines.  And as you would expect, lots of airlines target them and target them with a lot of capacity.

Now, what the plaintiffs did in their opening, and what they did in their trial brief and their expert reports and so forth, is to try to draw the Court's attention to a particular number of Boston routes and a particular number of New York routes that they say are problematic because of the parties' combined market shares.

But let's look at the big picture, because the legality of the NEA turns on holistic analysis of the alliance and the benefits and the harms to all of the consumers in the Boston and New York region.  And this is

1    what you see.

2            First of all, the parties, prior to the NEAs, one

3    or the other or both served 64 destinations with nonstop

4    service from Boston.  Only 12 actually overlapped.  What I'm

5    saying is that on 52 of the routes that are affected by the

6    NEA, the parties weren't even competitors.  Forget all of

7    this stuff about such big competitors that they couldn't

8    merge -- which is a diversion -- they wouldn't even

9    competitors at all.  So with respect to those 52 routes,

10   Bostonians get the benefits of the NEA with no possible

11   downside.  That's the starting point for all this.

12           Of the 12 remaining routes, six of those are in the

13   carve-outs.  And you can see now why it's so important for

14   them to convince you to ignore the carve-outs.  Because half

15   their case goes away by number of routes, and well more than

16   half of their case for Boston goes away by the volume of

17   traffic on those routes, because, no surprise, a lot of the

18   carve-out routes happen to be these hub-to-hub routes that

19   carry lots and lots of passengers from one American Airlines

20   hub to another, and that's why they were carved out.

21           Most -- so now we're six routes, six out of 64.

22   And as to the -- three of those six are to Miami,

23   Los Angeles, and Chicago, which are huge routes with lots of

24   competition, and which it is speculative, to say the least,

25   that these parties could ever, by any means, exercise market

power.  So at the end of the day, then, you're down to a very
small number of routes that are Boston.  And guess what,
you're going to hear a lot about those routes, because that's
where they want to draw your attention.  But that's the story
in Boston.

Now, in New York, it's even more extreme.  There's
about just shy of 100, 99 routes in New York that, again,
either American, JetBlue, or both serve nonstop prior to the
NEA.  The DOJ is complaining about 18 of them.  Those are the
ones that counsel mentioned on one of -- on one of his chart.

And you'll remember he had the chart that said that
on their -- on those routes, their market shares -- their
combined market shares would be as high as 96.8 percent.
Well, that's because the highest one that they could identify
had a market share of 96.8 percent.

But look at the chart that we put up here, which is
actually showing the bigger picture in New York.  The reality
is that United and Delta dominate the New York routes.
That's why there is an NEA.  You saw that from Mr. Schwed.
The reason there is an NEA is to do something about the
dominant position of United and Delta, which was growing
while we were shrinking.

And on these -- on this graph, what we've done is
we've displayed the market shares of the airlines other than
American and JetBlue.  So American and JetBlue would be in

1    the white space.  And on so many of these routes, what you

2    see is blue or red signifying United or Delta that occupy

3    most of the space.  They have most of the capacity.  Because

4    most of these routes are large routes in which United and

5    Delta have a commanding position, making it frivolous to

6    think that, through the NEA or not, American and JetBlue

7    could exercise market power.

8            Because, remember, exercising market power has to

9    mean that the competitive constraint from United and Delta is

10   insufficient.  And it's not going to be insufficient when the

11   markets look like that.

12           So what do plaintiffs do to prove market power?

13   First point I want to make is that they quite literally do a

14   merger analysis.  Now, we've heard since the motion to

15   dismiss in this case that the plaintiffs' position is that

16   they are entitled to, as they put it, use tools of merger

17   analysis to attack the NEA.  And fine.  So be it.

18           But they don't just use tools of merger analysis.

19   With respect to market power, they do nothing more than a

20   standard merger analysis, which is -- which -- in our tribe

21   of antitrust, what we do is, for historic reasons, we sum

22   market shares and then square them into this thing that's

23   call the Herfindahl-Hirschman Index.

24           And Dr. Miller, in the key exhibits in his report,

25   what we are displaying here are the Boston ones, is what he

does, is he does that.  He pretends that we merged, and he sums the market shares and then squares them into HHIs, just like you do in a merger case.

Well, at the appropriate time, we will argue that that is legally impermissible, and the main reason is because the collaboration doesn't take a player off the field.  The shares aren't combined.  They're still in American.  They're still at JetBlue.  Yes, they're collaborating and Your Honor needs to make certain judgments about that, but you can't approach making that judgment by assuming they're separate existence away.

They had a separate existence.  They're still competing with different business models, with different pricing, and so forth, and none of that gets reflected in what Dr. Miller is doing.

Dr. Miller also ignores entry and expansion.  It became very clear through his expert report in his deposition that he approached the issue of entering and expansion as if this was a merger, subject to the DOJ's merger guidelines, in which they had placed the burden of proof with respect to entry and expansion on the merging parties, which is -- which is consistent with Section 7 law under the *Clayton Act.*

But that's not the way it works in a Section 1 case.  The burden of proof to prove market power encompasses a burden to prove that the market position is protected by

1    barriers to entry or expansion.  And they don't even try to

2    meet that burden.

3            Now, it's even worse when we get to New York

4    because, as counsel alluded, yes, we're going to talk about

5    Newark and it starts now.  Because what's going on in -- with

6    respect to these New York markets is they can't even justify

7    a merger analysis based in New York, based upon a full

8    accounting of the competitive dynamics in that market and

9    especially the position that United Airlines holds as the

10   number two airline serving New York.

11           So in a classic antitrust maneuver, they have used

12   market definition to try to create a false appearance of more

13   concentrated markets.  And in particular, they are -- they're

14   arguing that Newark is a separate market.  United Airlines,

15   therefore, gets written out of the script.

16           They ask Your Honor to decide the lawfulness of the

17   NEA by pretending that United Airlines service at Newark

18   Airport doesn't exist.  That's what it comes to.  That's how

19   far they need to go to justify the New York case.

20           And since -- I wasn't going to make this point, but

21   since the point was made by Mr. Matlack about why the states

22   are here, let's point out that the New York attorney general

23   is not here and because the New York attorney general did not

24   join this case.  And it's because New York is an unqualified

25   winner from the Northeast Alliance with little or no

1    possibility of any meaningful downside.

2            But we have principles, economic and legal, for how

3    we do geographic markets.  And the foundation is that the

4    geographic markets have got to encompass all of the sellers

5    to which consumers presently turn or could turn if prices

6    were to go up.  And upon that standard, there is just no

7    doubt whatsoever that United and its service from Newark

8    belongs in this market.

9            In fact, I'm not going to belabor this, but you

10   will hear the testimony in this case.  United says these

11   three airports are one market.  Delta says so.  Other

12   airlines say so.  We'll put on an expert study, which is an

13   updating of an actual published study in the economic

14   literature that says that these three airports are one

15   market.

16           The DOT says these are one market as recently as a

17   few months ago.  And frankly, the Department of Justice said

18   that these were one market when it filed suit to try to block

19   the American US Airways merger.  So this is not a close call.

20   If it is, we could resolve it the way that we resolve

21   everything we do in the world these -- these days.  We could

22   google it.  We could actually just go on Google Flights and

23   you could just type in a destination from New York to

24   somewhere else.

25           On this one, we used New York to San Diego.  You

1    hit search, and you will get flights from Newark, and you

2    will get flights from JFK, because that is the world that we

3    live in.

4            Now, I want to turn to Dr. Miller's merger

5    simulation.  I am going to do so mindful of the fact that you

6    are already acquainted with it as a result of the *Daubert*

7    motion.  To begin with, the easy part in what I would think

8    would be the dispositive part, but it isn't, and that's that

9    the NEA is not a merger.  And it isn't in so many ways.

10           In a merger -- you know, one of the -- one of the

11   most definitional things about a merger is combination and

12   control.  You get the entire -- the two enterprises become

13   under one person's single control.  And this is recognized in

14   the economic literature.  Well, there's none of that here.

15           The companies maintain separate management.  When

16   Robin Hayes gets up here today and you hear what he has said

17   and what he still says about legacy airlines, ask yourself

18   whether you think he's under American Airlines 'control,

19   because he is not in any way, shape, or form.

20           There's no permanent transfer of assets.  There's

21   no combination of the fleets.  One of the things that

22   characterizes airlines mergers is this extraordinarily

23   complicated process of actually combining the fleets and

24   getting a common certificate.

25           The NEA is two distinct fleets, two distinct fleet

plans.  Normally, you reconcile the brands.  Well, not here.
JetBlue is still JetBlue.  We're still American.  We actually
use the NEA to sell differentiated offerings to our combined
customers.

If you want -- I flew out here on JetBlue using my
American app and the American codesharing.  It's -- it's what
this is all about is creating an option for people of both
JetBlue options and American options.

And critically, I really don't understand why this
is not dispositive.  There's no pricing coordination.
Everything you will hear about the merger simulation is
grounded in the idea that a merged firm prices its products
differently than firms that are independent and unilaterally
profit maximizing.

And if there were pricing coordination here, I
could see them making this argument, but there isn't pricing
coordination here, there is independent pricing, and that is
undisputed.

And that can't be ignored because the DOJ actually
has this right in its collaboration guidelines.  It's
collaboration guidelines talk about when it is appropriate
and when it is not appropriate to treat collaborations like
mergers.

And it's very clear -- we have some of the quotes
here, others are in our pretrial brief, that the key thing is

1    whether the collaboration has eliminated all competition.

2    The DOJ makes it very clear that it is only in the case when

3    the collaboration has eliminated all competition between the

4    parties that the merger analysis is appropriate.

5            Otherwise, you have to consider how competition has

6    preserved, or otherwise you undoubtedly overstate the effects

7    of the collaboration.  I mean, this seems so obvious, and yet

8    it is disputed in this case.

9            And the way it's disputed is with Dr. Miller's

10   theory about revenue sharing.  Now, the other day in the

11   *Daubert* motion, counsel for the government made an argument

12   that we were very surprised to hear.  They tried to suggest

13   that the reason that you can treat the NEA like a merger is

14   because the parties are coordinating capacity.  And the fact

15   that they're revenue sharing is of secondary importance.

16           And we heard the same thing earlier in Mr. Jones'

17   argument when he said that revenue sharing won't counter what

18   capacity coordination allows, again trying to set this up as

19   if the capacity coordination is the foundation of the

20   plaintiffs' argument justifying a merger simulation but that,

21   Your Honor, is just flat not true.

22           The primary basis that Dr. Miller argues for

23   treating the NEA like a merger in applying a merger

24   simulation is revenue sharing.

25           The quotation on your screen right now is actually

a section heading from Section 4.1 of Dr. Miller's report, in
which he states, "An agreement to share revenue or profit
creates similar incentives to exercise market power as a full
horizontal merger."  That was the foundation of it.

There was a secondary consideration in his report,
a supporting argument, with a very distinct role about
capacity coordination and what he calls "side payments."  And
what he was -- and he had a predicament, and the predicament
was that the revenue-sharing formula in the MGIA is nothing
like what the parties would do in a merger.  It creates
unilateral incentives for growth.

And so he came up with a second-level are argument
that the parties would use capacity coordination and side
payments to negate the features of their own revenue sharing.
It's a pretty convoluted argument, but that's how it was.

And, again, all this is happening is because
Dr. Miller can't deal with the MGIA revenue sharing on its
own terms; and therefore, in his report, he literally changes
them in this footnote we mentioned in the *Daubert* motion,
where he says, "I'm going to assume that as a mechanical
matter," that means outwardly, "the parties are going to
behave" -- are going to act -- they're going to jointly set
capacity and then share revenues the way the contract says;
but I'm going to assume that they behave as though they had a
different arrangement, an arrangement based upon sharing

profits according to a static formula, which means fixed proportion, profit sharing."  That, he argues, is close enough to a merger to do a merger simulation.  It's this Rube Goldberg kind of logic train, but it is based on first saying that revenue sharing is the foundation and then ignoring what we're actually doing about revenue sharing.

Well, we will argue that the actual NEA terms are the best evidence of how the parties will behave.  Economists should be the first to agree with that.  Economists believe in what are called "revealed preferences," that your actions actually speak to which your incentives are; and if you choose these contract terms, that must mean you think that they're the best way to run your collaboration.  And I think it's very clear that what's really going on here is that they just don't have any way of dealing with the NEA terms.

The other point I want to make about this, which was also previewed in the *Daubert* motion, is how wildly unrealistic the results of this so-called merger simulation are.  Your Honor will learn that there's a lot of literature. Economists have spent a lot of time assessing through what are called retrospective studies, the effects of prior airline mergers.  And, in fact, you're going to hear from four economists in this case who made significant contributions to that literature.

And the interesting thing is there's a fair degree

of consensus about the actual effects of prior airline
mergers.  And none other than Dr. Town, their expert,
summarized that in his reply report with this quote here in
which he is saying that the -- that, "The literature
generally finds low single-digit impact of the mergers on
price one way or the other."  And then he goes on to say,
"For example, Le finds a combined overall average increase of
price of about 3 percent."

Now, there's a bit of spin going on there.  What
the literature actually shows is that there's a bigger
problem on connect routes than they are on nonstop overlap
routes, and that's where you could get like this 3 percent
effect.  Generally, the literature shows that on the heavily
trafficked, nonstop overlap routes, the kind the government
is using to say that consumers are going to be harmed, prior
airline mergers have reduced fairs modestly.  They've
actually reduced fares modestly.

So a merger simulation, if it's really simulating a
merger, should get similar results to that.  But what does
Dr. Miller get?  These are his overall price changes that he
predicts on the Boston endpoint routes:  54 percent,
90 percent, 44 percent, and so forth, 30 times the high end
of the average of the literature in one case.  But,
typically, ten or 15, or 20 times what the literature shows.
And then, of course, infinitely higher than what the

1    literature shows about the effects on heavily trafficked

2    nonstop routes.

3            So the merger simulation, we shouldn't be doing it

4    in the first place because there's no merger.  But those

5    results do not make plaintiffs' case.  They impeach

6    plaintiffs' case.

7            Now, Dr. Carlton will come along, and he will -- he

8    will address this.  He'll make a number of points about how

9    Dr. Miller has ignored benefits and some of these -- the

10   literature.  But the key thing about -- in Dr. Carlton's

11   analysis is he's actually analyzed the post-implementation

12   data.  And using the same techniques that he has used in

13   published studies, he will show that there is no evidence of

14   any adverse fare effects from the NEA.

15           So I'm going to move on now to the case that

16   plaintiffs have to say that revenue sharing and capacity

17   coordination meet that required characteristic of being

18   inherently anticompetitive, which is necessary to the

19   inference of adverse effects through an indirect method.

20           And I want to begin by just kind of stepping back

21   for a moment and say the parties did not just invent the NEA

22   out of whole cloth.  There is a history of airline alliances

23   in the industry.  You're going to hear the plaintiffs try to

24   make use of that history in a moment when Mr. Hayes

25   testified, because he's been a critic of these alliances.

1    But regardless of that, there -- the DOT, under its

2 powers to grant antitrust immunity, regularly looks at

3 structures that airlines have adopted in international

4 alliances as part of its public benefit calculation.

5    And the typical immunized alliance is a combination

6 of codesharing, joint scheduling, revenue sharing, and

7 coordinated pricing.  In those immunized alliances, they

8 actually do get to set prices, which is why Mr. Hayes thinks

9 that it's legalized price fixing.

10    Okay.  The idea for the NEA came about because one

11 of the witnesses you'll hear from, Mr. Vasu Raja, thought one

12 day, couldn't we address some of our network weaknesses with

13 the same mechanisms that we use in the international

14 alliances in which that has been so successful?  And so the

15 answer -- what the answer turns out to be, what we think the

16 answer turns out to be, is you can, but you can't go as far

17 because you wouldn't be able to coordinate pricing, and you

18 have to realize that you'll be operating without antitrust

19 immunity.

20    And so that's what the NEA is.  It is the

21 codesharing, the joint scheduling, and it's the revenue

22 sharing, but it's independent pricing, and we fully assume

23 the ongoing risk -- which does not end with Your Honor's

24 decision -- that if the NEA turns out to be anticompetitive,

25 we could pay treble damages or the government could sue us.

1            And that is no minor risk.  If you look at the

2    history of virtually every other rule of reason type of case

3    that the government has brought in history, it's been

4    accompanied by huge, private litigation, you know, class

5    actions that were filed for damages.  So we have to be

6    extremely sensitive to that.

7            But we decided that we would do codesharing, joint

8    scheduling, and revenue sharing.  And the reason that we did

9    revenue sharing is because of this concept of metal

10   neutrality that the DOJ and the plaintiffs belittle.  And

11   it's interesting, because we didn't invent this term.  This

12   is a term that the Department of Transportation has used in

13   its antitrust immunity cases to describe the incentive system

14   that needs to be in place to have a successful alliance that

15   focuses on creating the consumer benefits as opposed to

16   having internecine warfare between the collaborators of who

17   is going to get most of the benefits and bear the least of

18   the costs.

19           And in this quote here, which is representative of

20   any number we could have pulled from DOT decisions, it's

21   talking about metal neutrality.  It's called metal neutral,

22   because the idea is that you want the passenger to fly your

23   alliance, but you -- there is a degree of indifference or

24   neutrality as to whose air crafts, whose metal, they fly on.

25           And the DOT has said over and over again that the

1     revenue sharing promotes enough of this metal neutrality to
2     make for a stable partnership.
3              Now, I heard Mr. Jones say that they're going to
4     put on some deposition testimony from Andrew Nocella of
5     United and I look forward to that.  Because an interesting
6     thing happened at Mr. Nocella's deposition.  He was very
7     dismissive of the NEA.  He said I don't think I have to worry
8     about the NEA.
9              And then when we probed further, it turns out that
10    Mr. Nocella did not understand that there was revenue sharing
11    in the NEA.  And what he testified, at some length, was that
12    he doesn't think that a domestic alliance can succeed unless
13    there's revenue sharing because the partners will splinter it
14    and it will fall apart.  That was his point and he's
15    operating under the mistaken belief that the NEA didn't have
16    revenue sharing and was dismissive of it on that the ground.
17             So it is a standard mechanism and we are using it
18    and it's a modified version of something that American
19    Airlines has used in the past.  And it has three features
20    that you'll hear a lot about that I'm just going to highlight
21    very quickly.  One, the parties are sharing just the upside,
22    the incremental growth, not -- there was a statement made
23    that sounds like we share everything.  We don't.  We share
24    the upside.
25             That your share -- your share of that is based upon

1    your contribution to capacity growth.  And there's a built-in

2    capacity expansion incentive.  So it's a very unique and

3    procompetitive thing.  It's not just normal -- it's not the

4    profit sharing with fixed proportions that Dr. Miller is

5    trying to pretend it is.

6          Now, with capacity coordination, the plaintiffs are

7    just not owning up to what it is and what it's not.  Okay?

8    It's a product of a feature of the agreement.  Section 3.1 of

9    the agreement says that in order to minimize connecting

10   passenger waiting time and to maximize passenger convenience

11   and service, the parties are going to engage in joint

12   scheduling.  It also says that they're otherwise going to

13   make their own capacity decisions.  It's all in the

14   agreement, what it is and what it isn't.

15         And there can't be any doubt that the joint

16   scheduling part of this is manifestly procompetitive.  Let me

17   give you a couple of examples.  This is an American Airlines

18   document that was based upon the study of Project Garland,

19   what became the NEA.  And what you see on your screen here,

20   on the left is a set of rows with different cities by their

21   airport code, Orlando, San Francisco, Las Vegas, and so

22   forth.

23         And what it was observing here was that if you just

24   combined the American and JetBlue networks through

25   codesharing without doing joint scheduling work, there would

be some winners, but some losers, in the sense that in some
cities, like Orlando, you would, by happenstance, have decent
connections to America's transatlantic flights.

But in other cities like Las Vegas, they would be
out of luck, because the JetBlue flights don't arrive at the
right times to connect, at least reasonably, to American
airlines flights.  But if you actually plan a joint schedule,
you can fix that.

And I'm going to show you a demonstrative that we
will use with Vasu Raja.  This is based upon one of the
brand-new NEA flights which is from New York to Tel-Aviv.  So
this is an American Airlines service, so if you don't have
anything, any relationship, no codesharing or anything, then
you don't get any connectivity other than on American
Airlines.

Now, in the next step here, we'll assume that we're
just going to have a codesharing relationship with JetBlue.
The good news for some, it works for you if you're in
Seattle, San Francisco, Los Angeles, a few of these cities,
but it doesn't work for you if you are in a lot of other
places.  By retiming the flights the way that network
planners do, this is the first thing that happens.  You get
twice as many JetBlue connections.  Now, the connectivity is
much richer than it was before because you've moved the
flights into the right windows in order to have reasonable

1   connections.

2          And then when you overlay the American service on

3   that, you get the NEA in full bloom, where somebody flying

4   from Tel-Aviv to New York can make all of those different

5   connections on American and JetBlue airplanes, enormous

6   consumer value to that.

7          And by the way, as you will hear Mr. Raja -- that's

8   what makes that flight from JFK to Tel-Aviv possible in the

9   first place, because it is the aggregate connectivity that

10  makes that flight something that is profitable to fly.

11         Another quick example -- this is schedules.  This

12  is New York City to Raleigh-Durham, pre-NEA schedules,

13  American and JetBlue each have two flights a day.  You can

14  see the Delta and United schedules they're competing

15  against -- much richer, much deeper, a lot more relevance to

16  the consumer.

17         After the NEA, there is a -- there is a better

18  schedule on American and JetBlue, and there's are more

19  flights on JetBlue.  Because through this optimization

20  process, they were able to create a richer product, which is

21  now the most competitive offering in the market.

22         Okay.  So finally, I just want to -- again,

23  Mr. Schwed covered this, and we'll cover it with Dr. Town.

24  This capacity discipline argument, I call it the road to

25  nowhere.  Because as interesting as it is, they -- they never

1     connected to the NEA.

2             What they did in their opening statement -- I don't

3     know how bad it's got to be before you go here -- they showed

4     you a slide that was an e-mail exchange between Robert Isom

5     and Vasu Raja that talked about making it a much smaller

6     airline and moving fast to turn to reduce capacity, if you

7     remember that.  If you don't know anything more than that,

8     that probably sounds pretty bad.

9             The date of that slide is March 28, 2020.  Do you

10    remember what we were all doing on March 28, 2020?  This is

11    when COVID slammed us.  This is when everything changed in

12    the world.  And airlines, whether they're in the NEA or not,

13    all drew down their capacity massively because they lost

14    90 percent of their demand.  That's the kind of evidence

15    they're going to give you to say that the NEA is problematic.

16            And then again, this JetBlue effect, a reasonable

17    person would think this is the most important issue in this

18    case.  Honestly, if the JetBlue effect were to be lost or

19    compromised, that would be serious.  Nobody is going to tell

20    you otherwise.  But we come here with zero evidence of any

21    change or effect on the JetBlue effect.  Nothing.  And this

22    is their day to do it, because Robin Hayes is here.  If they

23    don't do it by the end of court today, they never will.

24            The JetBlue effect is not a subtle thing.  The

25    studies of this talk about it as a 15 to 20 percent effect on

1   fares based upon entry and exit; not mergers or

2   collaborations, but entry or exit.  It would be impossible to

3   miss this if it happened.  It would leap off the data.  And

4   yet they come here with absolutely nothing in the box of

5   evidence that relates to any loss of the NEA effect.

6           So we will come back to you at the end of their

7   case and ask you to enter judgment as a matter of law on the

8   absence of effects, because none of these theories are

9   supported by evidence.

10          Now, quickly, I want to talk about -- we will

11  establish the consumer benefits.  I don't think this is going

12  to be hard.  There's so many -- qualitatively, we have the

13  more flights, the better experiences, and the stimulation of

14  competition that you have seen in the documents from the

15  other airlines.

16          But a couple of data points -- Mr. Schwed mentioned

17  that in antitrust, output is king.  If the collaboration

18  expands -- this is practically the holding of the

19  *American Express* case in the Supreme Court.  If a

20  collaboration expands output, it's procompetitive.  It can't

21  be anticompetitive.

22          And yet we see here in this chart that, as we climb

23  out of the hole that we're all in because of COVID, American

24  and JetBlue that were losing, a long-term circular trend of

25  losing market share in the Northeast has been reversed, and

1    they are now putting back capacity and faster than a cohort

2    of all of their other Northeast competitors combined.

3            This is another representation of it.  For years,

4    American and JetBlue, if you added them up, would have had

5    around 18 to 19 percent of Northeast capacity.  Now, they

6    have 26.7 percent in 2021.  It's probably higher now, or at

7    least it's close to that I'm sure.

8            Dr. Israel will quantify this.  Many years ago in

9    the context of mergers, the DOJ invented a way of quantifying

10   the consumer benefit from an enhanced network offering, and

11   it basically says how much more growth are you getting

12   because of that enhanced network offering.  And if you can

13   identify that growth, you can then -- there's a mental

14   exercise of what kind of price decrease would it have taken

15   to stimulate that much new demand.  If you think about, it

16   sort of makes sense.

17           When Dr. Israel does it, he gets -- over three

18   different methods -- over half a billion in annual consumer

19   benefits.  So it's not minor.  It is enormous.

20           My last section is definitely my briefest.  On less

21   restrictive alternatives, the burden is clear it's on them.

22   They have to show that there's something that's substantially

23   less restrictive, feasible, and would achieve the same

24   procompetitive benefits.  They can't argue that we should

25   only get 50 percent of the competitive benefits and take

1    less.  That is an illegitimate argument under the *Alston*
2    decision.
3              Well, they don't try to do this, not in any way
4    that we can recognize as being responsive to the legal
5    standard.  Their expert on this is Dr. Town.  He hasn't
6    identified any particular set of alternatives and calculated
7    the likely benefits from them.  He hasn't identified how the
8    qualitative benefits from the schedule coordination that I
9    showed you could be replicated without that schedule
10   coordination.  He hasn't done anything with respect to how we
11   can have a stable partnership without revenue sharing.  They
12   just didn't even address the fundamental parts of their
13   burden of proof.
14             The reality is that the main thing they want to
15   talk about is codesharing, but the evidence will show that
16   the parties looked at codesharing.  They thought about
17   codesharing.  And the reason they didn't adopt codesharing is
18   because it doesn't improve the network.  It's -- you have to
19   optimize the network.  You have to create that seamless
20   experience that Mr. Schwed talked about to get the consumer
21   benefits, and codesharing doesn't do it.  Codesharing --
22   domestic codesharing relationships have all fallen apart in
23   this country.  That's why we took the antitrust risk of
24   adopting these structures of revenue sharing and joint
25   scheduling from the international world to bring these

1    benefits to the United States.

2             Lastly, the suggestion that balancing can somehow

3    save plaintiffs' case, they don't balance either.  None of

4    their experts present a balancing exercise or net

5    calculations of harm versus benefits.  So that's just

6    rhetoric.

7             So we're confident, Your Honor.  We're happy to be

8    here.  We're confident that the evidence is going to show

9    that the NEA is hardly anticompetitive, is one of the most

10   procompetitive alliances that has ever come along, making

11   stronger competitors as the expert for the state of

12   Massachusetts recognized two doors down last week, unlocking

13   growth, media tangible benefit to consumers, full absence of

14   evidence of adverse effects.

15            Thank you, Your Honor.

16            THE COURT:  Thank you, Mr. Wall.

17            Ready for your first witness, Mr. Jones?

18            MR. DAVIS:  The defendant calls Robin Hayes,

19   Your Honor.

20            THE COURT:  You are?

21            MR. DAVIS:  I'm John Davis, Your Honor, for the

22   antitrust division.  I'll be examining Mr. Hayes.

23            MS. RIGGS:  Your Honor, if I may briefly, before

24   Mr. Davis begins, we also have deposition designations

25   prepared, excerpts from witnesses that will not be appearing

1    live; and we would like, under the pretrial order,

2    paragraph 35, to move those into evidence.  There are some

3    pending objections to specific designations.  We've flagged

4    those in the binders we've prepared.

5            THE COURT:  All right.  I'll take those subject to

6    my resolution of the pending objections.

7            Are you -- do you want to identify them or -- some

8    way or hand them up?

9            MS. RIGGS:  They are in boxes.  If we may bring

10   them up during the break, I think that would be easier.

11           MR. WALL:  Just a point of clarification, are they

12   going to be used during the witness or later on?

13           MS. RIGGS:  No.

14           MR. WALL:  Okay.  That's fine.  Thank you.

15           THE COURT:  Why don't we bring them up, then, when

16   we break at 1:00.

17           MS. MALTAS:  And, Your Honor, defendants will be

18   filing a motion to temporarily impound the highly

19   confidential portions of the depositions to be followed by a

20   motion to seal.

21           THE COURT:  All right.  Just so you're all clear if

22   there's a request to impound something I'm going to treat it

23   as impounded until I resolve whether it will be impounded or

24   not.  So if one party moves to impound something, rather than

25   filing multiple like impoundment motions, if you -- just

1   those things that you just described that you just referred

2   to, you haven't identified, those will be impounded and then

3   I'll resolve whether they should be sealed or not, and you

4   can file the motion to seal and explain why they should be if

5   there's a disagreement or what have you.

6           MS. MALTAS:  Thank you, Your Honor.

7           THE COURT:  We'll automatically treat them that way

8   until we resolve it.

9           MS. MALTAS:  Wonderful.  And I believe we've marked

10  them highly confidential, as well.

11          THE COURT:  Mr. Hayes?

12          THE WITNESS:  Thank you.

13          THE COURT:  If you come forward and remain standing

14  for Ms. Belmont to administer the oath.

15          (Witness duly sworn.)

16          THE DEPUTY CLERK:  Thank you.

17          THE COURT:  Please have a seat.

18          THE WITNESS:  Thank you.

19          THE COURT:  State your name for the record and you

20  can go ahead, Mr. Davis.

21          THE WITNESS:  Robin Hayes.

22          MR. DAVIS:  Your Honor, I would ask Mr. Hayes, who

23  is the CEO of JetBlue, to be treated as an adverse witness

24  for purposes of Rule 611 in this examination.

25          THE COURT:  Yes.  That request is allowed.

1          MR. DAVIS:  Thank you.

2                    **ROBIN HAYES**

3          having been duly sworn, testified as follows:

4          **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS**

5     BY MR. DAVIS:

6     **Q.**  Mr. Hayes, how are you employed?

7     **A.**  I'm employed as the chief executive of JetBlue.

8     **Q.**  And how long have you worked for JetBlue?

9     **A.**  I've worked for JetBlue since August of 2018.

10    **Q.**  What positions have you held and over what periods,

11    please?

12    **A.**  From August 2008 through to December 2013, I was the

13    executive vice president and chief commercial officer; from

14    January 2014 to February 2015, I was the president of

15    JetBlue; and I've been the CEO of JetBlue since

16    February 2015.

17    **Q.**  And did you work previously in the airline industry?

18    **A.**  I did.  I worked for another airline called British

19    Airways.

20    **Q.**  And how long in total have you worked in the airline

21    industry?

22    **A.**  I celebrated my 33 anniversary on Sunday.

23    **Q.**  When was JetBlue founded, Mr. Hayes?

24    **A.**  JetBlue was founded back in 1998, by David Newman.

25    **Q.**  And is JetBlue headquartered in New York?

1    **A.**   Yes, we are.

2    **Q.**   The airline industry today has a big four; is that right?

3    **A.**   In the US, yes.

4    **Q.**   And that's three legacy airlines:  American, Delta, and

5    United, correct?

6    **A.**   The three legacy airlines and then Southwest.

7    **Q.**   And Southwest is the fourth, right?

8    **A.**   Yes.

9    **Q.**   And would you agree that the approximate domestic market

10   share of those big four airlines is 80 percent?

11   **A.**   Yes.

12   **Q.**   And is today JetBlue our sixth largest domestic airline?

13   **A.**   We are.

14   **Q.**   And you have an outsized presence in the Northeast; is

15   that fair?

16   **A.**   The Northeast is our largest base of operations.

17   **Q.**   For instance, JetBlue is either number one or number two

18   at JFK in New York City, right?

19   **A.**   In JFK, yes.

20   **Q.**   And JetBlue is also number one or number two at Boston,

21   correct?

22   **A.**   Yes.

23   **Q.**   So JetBlue, in just two decades, grew to become the sixth

24   largest airline in the United States, right?

25   **A.**   Yes.

1    **Q.**   And JetBlue is called an LCC in the jargon, right?

2    **A.**   Yes.  LCC stands for low cost carrier.

3    **Q.**   All right.  And is an LCC different from a ULCC?

4    **A.**   A ULCC is used to describe the term "ultra low cost

5    carrier."  How I view the difference between the two, both

6    are committed to offering lower fares, but the LCCs like

7    JetBlue, also invest in more service attributes, as well.

8    **Q.**   And the ULCCs are more no frills?

9    **A.**   Yes.

10   **Q.**   All right.  And what are examples of ULCCs today in the

11   United States?

12   **A.**   Spirit, Frontier, Allegiant, Avelo, Breeze, Sun Country.

13   **Q.**   All right.  Does JetBlue have a unique place in the US

14   airline industry, in your view?

15   **A.**   Yes.

16   **Q.**   What makes it unique?

17   **A.**   Multiple of, really, offering customers, not just lower

18   fares, but also great service as well.  We fundamentally

19   believe that someone shouldn't have to choose between a low

20   fare a great service.

21   **Q.**   Do you also have a distinctive front of the cabin premium

22   product?

23   **A.**   We do on about 30 -- about 38, 40 of our airplanes of the

24   total fleet, about 284.  So, yes, in about 15 percent of our

25   aircraft, we do have that.

1   **Q.**   And that's called Mint?

2   **A.**   It's called Mint, yes.

3   **Q.**   And what is Mint?

4   **A.**   Mint is our premium cabin, so it offers customers a more

5   traditional what you describe as a first class experience.

6   **Q.**   All right.  And has Mint been quite popular?

7   **A.**   Yes, Mint has been very popular.

8   **Q.**   And has gathered quite a following?

9   **A.**   I believe it has, yes.

10  **Q.**   All right.  And so is Mint part of what makes JetBlue

11  distinctive?

12  **A.**   It's one of many things that I believe make JetBlue

13  distinctive.

14  **Q.**   All right.  Your familiar with the term "JetBlue effect,"

15  correct?

16  **A.**   I am.

17  **Q.**   What is the JetBlue effect?

18  **A.**   Well, the JetBlue effect was coined by the MIT, actually,

19  right here in Boston back in the -- I think it was the 2012

20  or 2013 timeline.  And it really described the effect of when

21  JetBlue started flying on a specific market, the impact we

22  have in lowering fares, not just on JetBlue, but also because

23  all of our competitors would match those fares, as well.

24          And so whilst JetBlue may only represent about

25  5 percent of the market, the customer benefit of the JetBlue

1    effect was, in fact, much broader than that.

2    Q.   So JetBlue, the JetBlue effect is JetBlue enters a market

3    at a lower fare and other airlines have to match it; is that

4    fair?

5    A.   That's -- yes.  The JetBlue effect was a study where MIT

6    looked at the impact on the whole of the airline industry.

7    Q.   And the JetBlue effect is also that when JetBlue exits a

8    market, fares invariably go back up; is that right?

9    A.   Yes, we've seen that, too.

10   Q.   All right.  Now, JetBlue announced the Northeast Alliance

11   in July of 2020, right?

12   A.   Yes.

13   Q.   And before that NEA, as we'll call it, JetBlue had never

14   merged with another airline, right?

15   A.   Well, we still haven't merged with another airline.

16   Q.   All right.  And it had not entered into a joint venture

17   with another domestic airline, correct?

18   A.   Yes, that is correct.

19   Q.   And the NEA, as agreed upon with American Airlines,

20   covers four airports, right?

21   A.   Yes.

22   Q.   And that's Boston Logan, right here, and LaGuardia, JFK,

23   and Newark, correct?

24   A.   Yes.

25   Q.   And JetBlue has been operating at those airports for most

1   of its history, right?

2   **A.**   Yes.

3   **Q.**   You started at JFK in 2000, right, at the beginning,

4   right?

5   **A.**   February 2000, yes.

6   **Q.**   And Boston in approximately '04?

7   **A.**   Yes.

8   **Q.**   LaGuardia in 2004?

9   **A.**   I don't specifically recall the year of service we

10  started in LaGuardia.

11  **Q.**   Okay.

12  **A.**   That was before I joined JetBlue, but I have no reason to

13  dispute what you're saying.

14  **Q.**   And Newark in 2005?  Is that about right?

15  **A.**   It sounds about right.

16  **Q.**   All right.  And, again, before the NEA, some 60 percent

17  of JetBlue's flights originated from those four airports,

18  correct?

19  **A.**   We -- that was before the NEA.  That's -- 153 -- 100 --

20  yeah, that's about right.

21  **Q.**   All right.  So let's talk about Boston Logan Airport.

22  Boston Logan Airport is a JetBlue success story.  Would you

23  agree?

24  **A.**   It's something that we've invested in heavily over the

25  years and are very proud of the success that we've made here.

**Q.**  Meaning Boston Logan is a place where JetBlue grew from nothing to a leading position among all the other airlines, right?

**A.**  Yes, certainly true up to 2019.

**Q.**  And you've talked about the JetBlue effect, that happened right here in Boston?

**A.**  Yes.

**Q.**  And JetBlue managed to bring lower fares to all kinds of air passengers in Boston, correct?

**A.**  Yes.

**Q.**  All right.  Let's look at the first exhibit for today, which is Plaintiffs' Exhibit 536 in evidence, Your Honor?  If I can --

MR. SCHWED:  We had agreed that there would be hard copies provided to all the witnesses in a binder and, of course, to counsel.

MR. JONES:  May we approach, Your Honor?

THE COURT:  You may.  Go ahead.

Do you have it?

THE WITNESS:  I do.

THE COURT:  And you have it, too, right?

MR. SCHWED:  Yes, Your Honor.  We've got two binders.  One looks like it's deposition transcripts and the other is exhibits.

Is that what was --

```
 1                THE COURT:  All right.

 2                MR. WALL:  If maybe there's another set I could

 3      have?  Thank you.

 4                THE COURT:  Just -- I have one binder, but it seems

 5      like it has two parts.  Is that right?

 6                MR. JONES:  Apologies, Your Honor.

 7                THE COURT:  I have two binders.  But if you have

 8      another set, that would be great.  Sorry.  If you don't --

 9                MR. JONES:  We do, Your Honor.

10                THE COURT:  Okay.

11                MR. DAVIS:  So may I proceed, Your Honor?

12                THE COURT:  Yes.

13      BY MR. DAVIS:

14      Q.  And Mr. Hayes, you have your binder, if you need it?

15      A.  I have two binders, yes.

16      Q.  Very good.  So first exhibit is Plaintiffs'

17      Exhibit 536 --

18                MR. DAVIS:  Which is in evidence, Your Honor.

19                THE COURT:  All right.

20                MR. DAVIS:  May we publish it, Your Honor, so

21      Mr. Hayes can see --

22                THE COURT:  Yes.  You can go ahead and publish all

23      the exhibits in evidence unless there's an issue about

24      confidentiality that hasn't been addressed.

25                MR. DAVIS:  And I'll raise that if there is.
```

1    BY MR. DAVIS:

2    **Q.**  All right.  So 536 is now in front of you.  Do you see

3    that, Mr. Hayes?

4    **A.**  I do, yes.

5    **Q.**  And that's an e-mail dated May 1, 2019, about a

6    presentation for new employees at an orientation; is that

7    right?

8    **A.**  Yes.

9    **Q.**  And that -- the e-mail relates to an orientation deck for

10   the new JetBlue employees, that year in 2019?

11   **A.**  Yes.

12   **Q.**  And this is now the year before the NEA is announced,

13   2019, correct?

14   **A.**  Yes.

15   **Q.**  And as CEO, do you regularly present at JetBlue's new

16   employee orientation on JetBlue history and culture?

17   **A.**  Not as much as I'd like to, but yes.

18   **Q.**  All right.  So let's turn to the page ending in 353,

19   along with the attachment and the speaker notes.  Do you see

20   both of those in front of you on the screen, Mr. Hayes?

21   **A.**  I do.

22   **Q.**  And, Mr. Hayes, feel free to use your binder, but I'll

23   only ask you about a document if you have it in front of you

24   on the screen.  Okay?

25   **A.**  Okay.

1    **Q.**  All right.  Now, JetBlue focuses new employees on how

2    it's brought lower fares to Boston, right?

3    **A.**  We -- we focus our -- if I use the word "crew members,"

4    like I -- it does mean employees.  It's something we're all

5    trained to do, but, yes, we actually teach JetBlue crew

6    members about how we lower fares really across the board,

7    including Boston.

8    **Q.**  All right.  And on this particular slide, you focus on

9    the JetBlue effect and LaGuardia and Boston is the first

10   example, right?

11   **A.**  Yes.

12   **Q.**  And then you have got your speaker notes accompanying the

13   slide on the right side, right?

14   **A.**  Yes.

15   **Q.**  And you see that you write about Boston to LaGuardia

16   there in the middle of the slide, Boston to LaGuardia?  Do

17   you see that?

18   **A.**  Yes.

19   **Q.**  And you -- and your notes say, "Boston to LaGuardia has

20   long been one of the most lucrative airline routes.  It's a

21   short flight filled with business travelers whose companies

22   are willing to pay the high prices legacy airlines charge.

23   After many years of wanting to fly this route, we launched it

24   in October 2016.  The day before our first flight, the legacy

25   airlines were charging $434 each way for a walkup ticket.

1    The next day, with JetBlue in the market, we had dropped

2    fares to just $129."

3              Did I read that correctly, Mr. Hayes?

4    **A.**  Yes.

5    **Q.**  So JetBlue entered Boston in October 2016 and had an

6    immediate impact, right?

7    **A.**  Yes.

8    **Q.**  Literally an overnight impact, right?

9    **A.**  Overnight.

10   **Q.**  And walkup tickets dropped about 70 percent roughly on

11   day one that you offered service, right?

12   **A.**  Yes.

13   **Q.**  And the slide over there on the left, it shows that, over

14   the three-year period -- well, one-year period here -- it led

15   to a 51 percent fare reduction for consumers flying from

16   Boston to LaGuardia, right?

17   **A.**  Yes.  We used October '15 as the reference month from the

18   year before.

19   **Q.**  All right.

20   **A.**  And then October '16 was the month that we launched.

21   **Q.**  So fares reduced 51 percent in that one-year period?

22   **A.**  50 -- yes.  Once we launched, fares came down 51 percent

23   compared to the year before.

24   **Q.**  All right.  And one of the airlines you competed with on

25   that route then was American Airlines, correct?

1     **A.**   Yes.

2     **Q.**   And American Airlines was one of the competitors that

3     dropped its rates on the Boston to LaGuardia route in

4     response to JetBlue's lower fares, right?

5     **A.**   Yes.   Something -- we used average fare data, so I don't

6     specifically know what any of the competitors on that market

7     did, but, yes, they were a significant player in that market.

8               I do want to add, though, one of the challenges

9     that we had at the time was that, because of our lack of

10    slots in LaGuardia, we were only able to launch -- I think it

11    was six flights a day.  So whilst fares came down and we had

12    a broad stimulation effect on the market, it wasn't a very

13    competitive offering for our Boston or New York corporate

14    customers.

15    **Q.**   We'll talk about slots in a bit.  Let me ask you, though,

16    on this slide, you also highlighted other examples of the

17    JetBlue effect, correct?

18    **A.**   Yes.

19    **Q.**   When JetBlue started flying from Boston to Buffalo, that

20    lowered fares by 50 percent, correct?

21    **A.**   Yes.

22    **Q.**   And traffic, as you say, soared nearly 200 percent,

23    meaning three times as many people flying, right?

24    **A.**   Yes.

25    **Q.**   And when JetBlue entered, that Boston to Buffalo route

1    was served by US Airways, correct?

2    **A.**   I don't specifically recall who served it at that time,

3    but it could well have been.

4    **Q.**   Okay.  And when you entered Boston to Washington Reagan

5    National, that lowered fares by 30 percent, right?

6    **A.**   Yes.

7    **Q.**   And traffic shot up nearly 100 percent, right?

8    **A.**   Yes.

9    **Q.**   And before your entry, Delta and US Airways were already

10   serving Boston to DC, correct?

11   **A.**   Yes.

12   **Q.**   So lower prices that you implemented on flights out of

13   Boston Logan have saved customers flying from this city, by

14   your calculation, over $3 billion, correct?

15   **A.**   I -- I would say that JetBlue has saved customers

16   billions of dollars across the country, including in Boston

17   since we were created.

18   **Q.**   And now more than 3 billion in Boston alone, right?

19   **A.**   Where are you getting that number from?

20   **Q.**   Are you not sure?  That's all right.  I'll move on if

21   you're not familiar.

22   **A.**   Yes.

23   **Q.**   The lower prices resulted in many more people flying on

24   those routes, right?

25   **A.**   Yes.  The JetBlue stimulation effect is about lowering

1   fares and increasing the size of the market.

2   Q.   And, in fact, competition that JetBlue provided in Boston

3   was so successful that, by 2011, JetBlue was flying more

4   departures out of Boston than any other airline, right?

5   A.   I can't remember specifically the year that we operated

6   the most direct flights, but you know, it was some point

7   around that period.

8   Q.   All right.   So just -- it took just a few years for

9   JetBlue to become the largest airline out of Boston Logan,

10  right?

11  A.   Well, and I think the important context is that after the

12  financial crisis of 2008/2009, you know, a lot of airlines

13  reduced capacity, and that created an opportunity for JetBlue

14  to grow Boston.

15  Q.   All right.   And you seized that opportunity, and as of

16  2019, you were still number one in Boston, right?

17  A.   Yes, in 2019, for the most direct markets.

18  Q.   So the competition that you brought to this place led you

19  from a zero percent frequency share in 2003 to a 29 percent

20  frequency share approximately in 2019, that year before the

21  NEA was signed, right?

22  A.   Yes.   Although, again, I think it's important for

23  context, in terms of that 29 percent, that is still a lot

24  lower than many large airlines have in some of the largest

25  hubs, so once we were the largest airline, it was nowhere

1   near as large as you would get in really many -- dozens and

2   dozens of other markets in the US.

3   **Q.**   And Boston continues to be important to JetBlue.  In this

4   month alone, JetBlue is still flying more airplanes out at

5   Boston Logan than any other airline; is that right?

6   **A.**   I'm not -- I'm not quite sure.  There's been -- Delta had

7   been growing Boston very significantly.  We reduced capacity

8   here earlier in the year.  I would say that it's fairly close

9   at the moment.

10  **Q.**   You reduced capacity in Boston, right?

11  **A.**   We've reduced capacity across a number of JetBlue

12  markets --

13  **Q.**   All right.

14  **A.**   -- earlier this year.

15  **Q.**   So let's go to a different exhibit, also in evidence,

16  showing you now on your screen PX-574, which is dated

17  September of 2019, that same year.

18          And do you see this e-mail chain where the top

19  e-mail from Alan Proud to you, again, dated September 18,

20  2019?

21  **A.**   Yes.

22  **Q.**   And Mr. Proud is forwarding a briefing document for you

23  to speak at *The Beat Live*, right?

24  **A.**   Yes.

25  **Q.**   And *The Beat* is a business travel newsletter?

1   **A.**   Yes.  It was a conference.

2   **Q.**   And this has talking points for your interview, correct?

3   **A.**   Yes.

4   **Q.**   All right.  So let's turn to page 9, ending in 349.  The

5   first bullet there under Boston, do you see that, Mr. Hayes?

6   **A.**   Yes.

7   **Q.**   The talking point says, "We've built a network in Boston

8   based on carrying the customers where they want to go.  We

9   are focused on local customers in Boston where we see a very

10  clear first choice preference for JetBlue."

11           Correct?

12  **A.**   Yes.

13  **Q.**   The second bullet say, "We continue to invest in

14  meaningful ways to strengthen our Boston franchise."

15           Correct?

16  **A.**   Yes.

17  **Q.**   And what follows below that on the page are examples of

18  investments JetBlue has made at Boston, right?

19  **A.**   Are you referring to that list of --

20  **Q.**   Yes.  You see it -- we continue to invest in meaningful

21  ways and then you list a number of attributes?

22  **A.**   Okay.  Attributes.  Yes.  Yes.

23  **Q.**   Very good.  And on the -- let's go to the page ending in

24  358 on the same document.  Are they examples, more examples

25  of the JetBlue effect?

1    **A.**  Yes.

2    **Q.**  All right.  And those are all Boston routes, correct?

3    **A.**  Yes, Boston-Atlanta, Boston-Newark, and Boston-LaGuardia.

4    **Q.**  All right.  And the Boston to Newark entry shows after

5    JetBlue entered the Boston to Newark market, which was

6    previously a monopoly market, JetBlue increased traffic

7    158 percent while fares dropped 54 percent.  Do you see that?

8    **A.**  Yes.

9    **Q.**  So a monopoly market there refers to a market with only

10   one competitor, in that case, United; is that right?

11   **A.**  Yes.

12   **Q.**  Mr. Hayes, are you also familiar with the term "Boston

13   200"?

14   **A.**  I am.

15   **Q.**  And what is that?

16   **A.**  So Boston 200 was an aspirational goal that we set

17   internally, pre-COVID, to build Boston up to 200 flights a

18   day.  I think it's also important to note that one of the

19   unique aspects of our network in Boston is it is more

20   dependent on business travel than elsewhere in our network.

21   And so we had a plan to continue to grow that out and give

22   both our leisure and our corporate customers more choice.

23   **Q.**  All right.  So that Boston 200 initiative was announced

24   before 2019, correct?

25   **A.**  Yes.

1    **Q.**  But it was very much a live project as of the end of

2    2019, correct?

3    **A.**  Yes, until, you know, as I said earlier, because Boston

4    was so dependent on business travel.  As we went into COVID

5    and we saw the devastating impact COVID had on our industry,

6    but still on the corporate travel side, it's something that

7    was very, very present back in 2019.  But I -- as I think

8    everyone is aware, corporate business travel has still far

9    from recovered.

10   **Q.**  In December 2019, did JetBlue's board of directors

11   approve additional investors in Boston Logan?

12   **A.**  The investments would normally be a matter for the

13   leadership team.

14   **Q.**  All right.  So you're not sure?  Is that what you're

15   saying?

16   **A.**  I'm not sure what investments you're referring to.

17   **Q.**  Okay.  And all of JetBlue's success at Boston Logan that

18   we've been talking about here happened without the NEA,

19   correct?

20   **A.**  Yes.

21   **Q.**  All right.  So let's talk about the airline industry more

22   generally.  The three legacy airlines and Southwest, you've

23   already said, collectively control 80 percent of the domestic

24   market today, right?

25   **A.**  Yes.

**Q.**  And with those four airlines controlling 80 percent,
would you agree this is a consolidated industry?

**A.**  Yes.  I've been making public comments on this for
several years.

**Q.**  And would you characterize JetBlue as a disrupter in this
consolidated industry?

**A.**  I have done that, yes.

**Q.**  All right.  So let's go back to Plaintiffs' Exhibit 536,
and page 359, the page ending in page 359.

And do you see the top line?  I'm sorry, Mr. Hayes.
It should be on your screen.

**A.**  It is.  I'm just -- call me old school, but I always
prefer a copy paper, as well.

**Q.**  Very good.

**A.**  Okay.  Thank you for your patience.

**Q.**  The top line says, "Our industry has never been more
concentrated than it is today."  That was your note on that
point, right?

**A.**  Yes.

**Q.**  And you agree with that as of 2019, that's true?

**A.**  Yes.

**Q.**  And in the middle of the paragraph, starting at "all that
power," it says, "All that power in the hands of a very
few" -- or sorry -- "of a few very deep-pocketed airlines has
implications for consumers in the form of reduced options,

1    high fares, and often poor service.  JetBlue serves as an

2    important counterbalance."

3            Correct?

4    **A.**  Yes.

5    **Q.**  You're commenting on the market share there of Delta,

6    United, American, and Southwest, right?

7    **A.**  Yes.

8    **Q.**  And you're saying that all that power refers to the high

9    market share of those legacy airlines and Southwest, right?

10   **A.**  Yes.

11   **Q.**  And that all that power leads to what you say here,

12   reduced options, high fares, poor service, right?

13   **A.**  Yes.

14   **Q.**  And reduced options, that means fewer airlines competing,

15   right?

16   **A.**  Yes.  I mean, it was my view at the time that when legacy

17   airlines compete with each other, they don't really compete.

18   It needs the JetBlue -- a more disruptive airline to bring

19   real competition.

20   **Q.**  Legacy airlines don't really compete with each other?

21   **A.**  Yes.  That model is really to focus more on the corporate

22   customer, focus on more higher fares and maintaining capacity

23   levels.  Our business model is very different.

24   **Q.**  And the distressing situation you're talking about here,

25   this is because there's been so much consolidation in the

1    industry, right?

2    **A.**  Yes.

3    **Q.**  And JetBlue is a counterbalance to all that power, right?

4    **A.**  Yes.

5    **Q.**  So part of the power that consolidated deep-pocketed

6    legacies have now is the power to target smaller airlines

7    using predatory pricing.  Would you agree with that?

8    **A.**  Well, they have a number of ways to target the smaller

9    airlines.

10   **Q.**  Well, I just want to ask you now about that one,

11   predatory pricing.  Is that one you've written about?

12   **A.**  Yes.

13   **Q.**  All right.  So I will show you Plaintiffs' Exhibit 496.

14   This is an e-mail from you to Joanna Geraghty, dated

15   January 29, 2020.  And I'll wait for you to get there,

16   Mr. Hayes.

17   **A.**  496?

18   **Q.**  It is 496, correct, in evidence.

19   **A.**  Exhibit 496?

20   **Q.**  Yes.  I'm sorry Plaintiffs' Exhibit -- when I say PX,

21   it's Exhibit 496.

22   **A.**  Okay.  I have it.

23   **Q.**  And this is about a revenue goal write-up?  Is that

24   right?

25   **A.**  Yes.

1    **Q.**   And Mr. Hayes, this is something you're writing kind of

2    in January about the prior year, kind of as an analysis?  Is

3    that fair?

4    **A.**   Yes.  That's part of our annual end-of-year process.

5    **Q.**   And this is, again, before the NEA and shortly before

6    COVID, of course, right?

7    **A.**   Yes.

8    **Q.**   And so you write -- do you see the line on the left side

9    lower down, it -- in the bottom part of the first paragraph,

10   we also saw, do you see that, significant competitive growth?

11   Do you see that sentence that you wrote?

12   **A.**   Oh, yes.  "We also saw" -- yes.

13   **Q.**   So what you wrote then is, "We also saw significant

14   competitive growth from Spirit in the region challenging some

15   of our traditional strength in the visiting friends and

16   relatives market," right?

17   **A.**   Yes.

18   **Q.**   And the region you're writing about here is Latin America

19   international flights for JetBlue, correct?

20   **A.**   Yes.

21   **Q.**   And then you write in the next sentence, "The real issue

22   is that the legacy airlines react to this by lowering the

23   fares to well below cost and spreading it to other markets to

24   drive the ultra low cost carriers out."

25           Is that right?

1   **A.**   Yes.

2   **Q.**   So the legacies react to Spirit's growth here with below

3   cost fares?

4   **A.**   That's what I write.

5   **Q.**   And all in an effort to drive out ULCCs like Spirit,

6   right?

7   **A.**   Well, JetBlue has also seen a number of attempts over the

8   years, as well.

9   **Q.**   As a low cost carrier, right?

10  **A.**   Yes.

11  **Q.**   And a little below that, you wrote you see some investors

12  are questioning -- you wrote, "Some investors are questioning

13  whether we can compete in some of these markets if they

14  continue to attract this sort of predatory pricing by legacy

15  airlines," right?

16  **A.**   Yes.

17  **Q.**   And on the next page, the last paragraph of this

18  discussion, you write to Joanna Geraghty, we need to rethink

19  a few things in light of the ever increasing tendency of the

20  legacy airlines to invest considerable margin to suppress the

21  success of the smaller airlines," correct?

22  **A.**   Yes.

23  **Q.**   And you add, "If American rediscovers its mojo, then this

24  will be become even more problematic," right?

25  **A.**   Yes.

1    **Q.**  And the consolidated legacies we're talking about can

2    afford to fly well below cost for a time because they have so

3    much scale, right?

4    **A.**  Yes.  The benefits of scale are vast.

5    **Q.**  And such deep pockets, right?

6    **A.**  Yes.

7    **Q.**  Now, a lot of this industry consolidation we talked about

8    has happened during JetBlue's existence, right?

9    **A.**  Yes.

10   **Q.**  JetBlue has been able to succeed in the face of and

11   despite that consolidation.  You agree?

12   **A.**  Yes, although I think we have to reflect that for a

13   significant part of our history, the legacy airlines were

14   going through a lot of bankruptcy, reorganizations.  Their

15   fleets were old.  They were sort of having -- they were

16   restructuring.

17            I think what's been harder for JetBlue,

18   significantly harder over the last few years, even before

19   COVID, was as these legacy airlines consolidated and became

20   more profitable, it got a lot more challenging.

21            And that was really what was behind my concern here

22   in Boston.  Delta had clearly turned its attention to Boston,

23   to JetBlue.  There was also a line in that document as well.

24   And that was making it extremely hard for us to continue to

25   prosper.

1   **Q.**  The legacy airlines were restructuring, as you say, but

2   they're also merging, right?

3   **A.**  Yes.

4   **Q.**  And one thing you did during that period was to grow

5   capacity faster than the legacy airlines did, right?

6   **A.**  Yes.

7   **Q.**  What does capacity refer to in airline language?

8   **A.**  So the measure that we normally use is what's called an

9   ASM and what an ASM is is available seat miles.  So think of

10  one seat flying one mile.  That's an available seat mile.  So

11  that is the capacity measure that we tend to use.

12  **Q.**  So we'll talk in this trial about ASMs, correct?

13  **A.**  Yes.

14  **Q.**  All right.  And so I'm showing you next PX-841, also in

15  evidence, which is 2014 Investor Day slides.  And these go

16  back a ways there from November of 2014.  Do you see that,

17  Mr. Hayes?

18  **A.**  Yes.

19  **Q.**  I'm going to let you get there and then -- you have it

20  now?

21  **A.**  Yes.

22  **Q.**  Very good.  And slides and talking points for JetBlue's

23  Investor Day were for you as you were preparing to step up

24  into the role of CEO at JetBlue, right?

25  **A.**  That's right.  It was a few months before.

1   **Q.**  Okay.  Please turn to page 12 ending in 183 at the

2   bottom.  This slide is titled "Delivering Improved Revenue

3   Results."  Do you see that?

4   **A.**  Yes.

5   **Q.**  And there's a chart titled "A4A PRASM and Capacity, 2008

6   to 2013," right?

7   **A.**  Yes.

8   **Q.**  And A4A is an industry trade group in the airline

9   industry?

10  **A.**  Yes.  It stands for Airlines for America.

11  **Q.**  And do you serve on the board?

12  **A.**  I do.

13  **Q.**  And this chart shows capacity CAGR and PRASM CAGR, right?

14  **A.**  Yes.

15  **Q.**  And CAGR is compound annual growth rate, so that's a rate

16  of growth, correct?

17  **A.**  Yes.

18  **Q.**  And PRASM is passenger revenue per available seat mile;

19  is that right?

20  **A.**  Yes.

21  **Q.**  And you could also call that unit revenues, right?

22  **A.**  Yes.

23  **Q.**  All right.  So if you look at the left side of the chart

24  which is about the rest of the airline industry, not JetBlue,

25  the darker bar graph is showing that the industry had

1    negative capacity growth from '08 to '13, right?

2    **A.**   Yes.

3    **Q.**   Negative 0.8 percent, right?

4    **A.**   Yes.

5    **Q.**   So that means the industry was flying fewer planes with

6    fewer passengers over that five-year period, right?

7    **A.**   Yes.

8    **Q.**   And during this same time period, on the right side of

9    the chart, there in dark blue, JetBlue grew capacity at 5. --

10   5.7 percent per year, right?

11   **A.**   Yes.

12   **Q.**   So, basically, the chart shows JetBlue increasing

13   domestic and Latin capacity while the legacies are decreasing

14   capacity at the same time, right?

15   **A.**   Yes.  Again, I think the context of the time is very

16   important.  The first 2, 2½ years of that was the financial

17   crisis which clearly had a profound effect on more the

18   business travel side.  And so that was very material to these

19   growth rates as well.

20   **Q.**   All right.  You were adding flights and passengers,

21   though, while your industry competitors were shedding them,

22   right?

23   **A.**   Yes, because we focused on the leisure customer, and so

24   we're a lot less dependent on the corporate travel, which was

25   most impacted at that time.

1   **Q.**   Okay.  So if you go back to the left side of the chart,

2   the lighter blue bar shows that, during that period where the

3   rest of the industry had negative capacity growth, their unit

4   revenues increased by 3 percent for the rest of the industry,

5   right?

6   **A.**   Yes.

7   **Q.**   So the industry earned higher unit revenues at the same

8   time they were reducing capacity, right?

9   **A.**   Yes.

10  **Q.**   And in this industry, is there any surprise about that

11  relationship?

12  **A.**   No.  I would say that's normally true.

13  **Q.**   All right.  And so explain that.  What do you mean?

14  **A.**   Well, if you are -- if you have less seats in the market,

15  there's less supply, then the supply may not be enough to

16  carry all of the demand, which will mean higher load factors

17  on airplanes, in other words -- so a load factor is a

18  percentage of seats on an aircraft that have been sold.

19          And so that is going to help your unit revenue

20  performance.  And we have seen that this summer with all the

21  pull-downs in the industry.  Low factors have really been at

22  record levels.

23  **Q.**   When capacity is kept under control, fares go up, right?

24  **A.**   Well, fares -- fares can go up.  Also load factors can go

25  up.  PRASM is a measure not just of the fare, PRASM is a

1    measure of the fare and also the total number of people

2    flying.

3           So it can be the fares go up.  It could also be

4    that the load factors have gone from 70 percent to

5    90 percent, and so you have 20 percent more people on the

6    airplane, and that's what driving your higher PRASM.

7    **Q.**  Fair enough.  Now, on the right side of this chart,

8    JetBlue had unit revenue growth of 4.3 percent, right?

9    **A.**  Yes.

10    **Q.**  And that outperformed the industry, right?

11    **A.**  Yes.

12    **Q.**  All right.  So, in other words, controlling supply tends

13    to lead to higher revenues, right?

14    **A.**  It can do.

15    **Q.**  And conversely, as the airlines industry adds marginal

16    capacity, it drives down fares; is that right?

17    **A.**  It can do.

18    **Q.**  All right.  And in the face of capacity control by legacy

19    airlines, JetBlue has vowed to add capacity to keep fares

20    competitive.  Is that fair?

21    **A.**  Yes.  That's been our business model over the years,

22    growing, you know, stimulating new demand by lowering fares,

23    increasing the size of the market, and then growing to carry

24    that traffic.

25    **Q.**  And that model for capacity growth is very different than

1    a legacy airline's, right?

2    **A.**   Historically, that's been the case, yes.

3    **Q.**   And JetBlue has a history of attempting to grow capacity

4    faster than GDP, right?

5    **A.**   Yes, we do.

6    **Q.**   And is that growing capacity faster than a legacy part of

7    what makes JetBlue a distinctive disrupter airline?

8    **A.**   Yes.

9    **Q.**   All right.  Let's go back to PX 574 to page 16 ending in

10   356.  Do you see it?

11   **A.**   Yes, I have it.  Thank you.

12   **Q.**   And this still notes for *The Beat Live* interview that you

13   did in September 2019, right?

14   **A.**   Yes.

15   **Q.**   And that first bullet at the top says, "Smaller carriers

16   like JetBlue play a critical role in keeping the commercial

17   aviation industry competitive and keeping the immense power

18   of the legacy airlines in check," right?

19   **A.**   Yes.

20   **Q.**   So the smaller carriers are JetBlue and some other

21   low-cost airlines, and they play a critical role in checking

22   the immense power of the legacies, right?

23   **A.**   Yes.

24   **Q.**   And further on, 356, that same page, you see where your

25   writing -- or the notes say, "Take Kennedy airport as an

1    example."

2            "Take Kennedy Airport as an example.  Since JetBlue

3    entered the market, overall JFK passenger traffic has nearly

4    doubled from 31.7 million annual travelers in '99 to

5    62 million in 2018.  That happened because of us," correct?

6    **A.**   Yes.

7    **Q.**   So prior to the NEA, JetBlue's entry at JFK had doubled

8    passenger traffic at that airport, right?

9    **A.**   Yes.

10   **Q.**   And then you write in the next bullet, "Back then, JFK

11   had fewer departures than Reagan National in Washington, and

12   it was a ghost town for much of the day.  Today JFK is slot

13   controlled and rather full.  JetBlue was the impetus for that

14   growth," correct?

15   **A.**   Yes.

16   **Q.**   And what do you mean that JFK was slot controlled?

17   **A.**   A slot is really a permission slip to arrive and take

18   off.  Some people count an arrival and a departure slot as

19   two.  When I use the word "slot," I really mean one, a slot

20   pair, arrival and takeoff.  And when JetBlue was created, it

21   was awarded some slots by the DOT and FAA so it could

22   establish a base of operations at JFK.

23   **Q.**   And they were at JFK, correct?

24   **A.**   Yes.

25   **Q.**   And today, which airports in the United States are slot

1    controlled?

2    **A.**   Well, the large ones that are slot controlled are JFK,

3    LaGuardia, and DCA.

4    **Q.**   And JFK was not slot controlled way back in 2000, right?

5    **A.**   That's right.   It was slot controlled some years later.

6    **Q.**   So JFK grew so much that it became one of the very few

7    slot controlled airports in the country, right?

8    **A.**   Well, yes, the history of JFK was as largely an

9    international airport.   And what JetBlue created at JFK was a

10   new domestic-based, low-cost carrier.

11   **Q.**   And that growth at JFK is the result of competition that

12   JetBlue brought, right?

13   **A.**   Yes.   As JetBlue grew, JFK grew.

14   **Q.**   All right.   And looking further down under the subheading

15   "industry consolidation," do you see that?

16   **A.**   Yes.

17   **Q.**   And you write, "However, the industry consolidation that

18   followed has placed incredible market power and slots and

19   gates and infrastructure at key airports in the hands of

20   three deep-pocketed legacy airlines," right?

21   **A.**   Yes.

22   **Q.**   And, again, those airlines are American, Delta, United,

23   right?

24   **A.**   Yes.

25   **Q.**   And this is saying consolidation by those legacies has

1    given them incredible market power, right?

2    **A.**  Yes.

3    **Q.**  You talked about slots again.  A slot has considerable

4    value at a crowded airport.  Do you agree?

5    **A.**  Yes.

6    **Q.**  And a single slot pair at a slot-controlled airport can

7    be worth millions of dollars, right?

8    **A.**  Yes.  I mean, in the US, they're not traded like that, in

9    other international markets, where they can be, yes.

10   **Q.**  All right.  And --

11              THE COURT:  You can't trade slots here?

12              THE WITNESS:  You can trade them, but you don't

13   sell.

14              THE COURT:  You can't sell.  So you can't auction

15   them off to whomever --

16              THE WITNESS:  There have been auction procedures

17   that have been run by the DOT FAA as part of a regulatory

18   process.

19              THE COURT:  But not you?

20              THE WITNESS:  But yes because it's only for a

21   couple of seasons, and so it's not necessarily an indefinite

22   right.

23              THE COURT:  Can you sell it for the period that you

24   have it?

25              THE WITNESS:  You can lease them.

```
 1                   THE COURT:  At the market rate?

 2                   THE WITNESS:  Yeah.

 3                   THE COURT:  Okay.  Go ahead.

 4     BY MR. DAVIS:

 5     Q.  You can lease slots, correct?

 6     A.  Yes.

 7     Q.  All right.  And one of the things that the legacies do is

 8     sit on slots, correct?

 9     A.  Yes.

10     Q.  Meaning the legacies hang onto their slots even when

11     they're not fully using them, right?

12     A.  Yes.

13     Q.  And they sit on slots because they don't want other

14     airlines to be able to come in and use them; is that fair?

15     A.  Yes.

16     Q.  And as of the beginning of 2020, JetBlue knew that

17     American was sitting on slots in the Northeast, right?

18     A.  Yes.  There was a unique circumstance in 2019 as well

19     where, because of the max grounding, American had been

20     granted a slot waiver by the FAA, meaning they did not have

21     to use all of their slots at JFK.

22     Q.  All right.  At the bottom of that same page, 356, you see

23     highlighted "Particularly in markets where LCCs do not

24     compete, consumers generally pay higher fares per mile and

25     have fewer choices.  The presence of smaller competitive
```

1  carriers like JetBlue helps push fares down across the

2  board," right?

3  **A.**  Yes.

4  **Q.**  And so you're saying that in markets without LCC

5  competition, consumers pay higher fares, right?

6  **A.**  Yes.  That's my --

7  **Q.**  And that's also true of markets without ULCC competition,

8  right?  When you say "LCC," you're referring to both in that

9  line?

10  **A.**  Well, something I believe that's different between

11  JetBlue and ULCCs is that when JetBlue flies a market,

12  competitors react more broadly than when a ULCC flies the

13  market, because JetBlue is flying a broader set of customers

14  than ULCCs.

15  **Q.**  More business class than say --

16  **A.**  Not just business class, more -- you know, more of

17  different types of leisure customers and smaller, medium size

18  customers, corporate customers.  And we see a broad-based

19  fare matching, whereas with ultra low cost carriers, I don't

20  always see that.

21  **Q.**  But certainly the presence of an ultra low cost carrier

22  in a market also helps push fares down, you agree with that,

23  don't you?

24  **A.**  It can do, because that ULCC is present with low fares.

25  **Q.**  Okay.  And looking at the second bullet on the next page,

1    which is 357, you see that "We believe the mega carriers are

2    large enough, we don't think it's in the interest of

3    consumers or airline workers to allow the giants to get even

4    bigger and more powerful," right?

5    **A.**  Yes.  I suspect airline workers is a typo, but you have a

6    point.

7    **Q.**  So in September of 2019, you're saying that allowing the

8    mega carriers to get even bigger is not in the interest of

9    consumers, right?

10   **A.**  Yes.

11   **Q.**  And the growth of smaller airlines is in the interest of

12   consumers, correct?

13   **A.**  Absolutely.

14   **Q.**  All right.  Let's go to page 358, the next page at the

15   top.  The presence of JetBlue or LCCs in the market -- sorry?

16            THE COURT:  Go ahead.  I think that was someone

17   who --

18   BY MR. DAVIS:

19   **Q.**  You see the top bullet, Mr. Hayes?

20   **A.**  Yes.

21   **Q.**  "The presence of JetBlue or LCCs in a market helps

22   discipline fares in an airport while growing traffic," right?

23   **A.**  Yes.

24   **Q.**  And the next bullet on 358 reads, "Absent the entry of a

25   low fare competitor like JetBlue in a market, our legacy

1    competitors have routinely provided subpar product/services

2    at extremely high fares," correct?

3    **A.**   Yes.

4    **Q.**   Can you give an example of a subpar product or service in

5    that context?

6    **A.**   Well, I think Mint is a very good example.  You referred

7    to it earlier, but when we started flying between JFK and LAX

8    with our new Mint first-class product, I believe it elevated

9    the customer experience by offering them a full flat-fare

10   experience at a much lower fare than they were paying before.

11   **Q.**   And before that, the legacies were offering an inferior

12   product, right?

13   **A.**   In my view, yes.

14   **Q.**   All right.  So let's look at Plaintiffs' Exhibit 459,

15   which is a transcript again from fall of 2019, *Taking Flight*

16   with the *Washington Post*," I believe.

17            MR. DAVIS:  This is in evidence, Your Honor.

18            THE WITNESS:  459?

19            MR. DAVIS:  Yes.  Plaintiffs' 459.

20            THE WITNESS:  I have it.

21   BY MR. DAVIS:

22   **Q.**   And this is a transcript from an interview you gave to

23   the *Washington Post*, correct?

24   **A.**   Yes.

25   **Q.**   All right.  And going to the second page, ending in 208,

1    a third of the way down, you see, "But look, there's been a

2    lot of consolidation in the US, and we really don't have a

3    competitive industry," right?

4    **A.**  Yes.

5    **Q.**  And the same page, further down, you write -- it starts

6    with, "So there are many."  Let me just find that.

7         Do you see that, Mr. Hayes?

8    **A.**  Yes.

9    **Q.**  So there are -- you wrote or said, "So, there are many,

10   many, many examples were legacy airlines don't really compete

11   with each other.  When they fly on the same route, they love

12   the high fares and it requires airlines like JetBlue to come

13   in and keep fares low and keep aviation more accessible,"

14   right?

15   **A.**  Yes.

16   **Q.**  That's what you told the *Washington Post* that day,

17   correct?

18   **A.**  Yes.

19   **Q.**  Why are there so many examples of where legacy airlines

20   don't really compete with each other?  What does that mean?

21   **A.**  Well, I mean, it's simply -- you have four large airlines

22   with 80 percent.  On most markets, they will be competing

23   with each other.  They may or may not even be one of the

24   smaller airlines flying it.  And then it all tends to be

25   different in terms of they will focus on making money by

1   limiting capacity growth and also in higher fares.

2   **Q.**   And their model is different, as you say, because --

3   because neither one lowers fares significantly to compete

4   with the other?  Is that what you're saying?

5   **A.**   That is my belief.

6   **Q.**   That -- actually, legacy airlines, you could have two or

7   three of them flying a route, and they're not competing on

8   fares, right?

9   **A.**   Yes.  My view is it's not how many airlines are flying a

10   route, it's who is flying that route that determines if it's

11   competitive.

12   **Q.**   You need smaller airlines that are actually flying at low

13   fares, right?

14   **A.**   You need a bigger JetBlue.

15   **Q.**   And you need -- you need airlines with low cost, right,

16   to do that?

17   **A.**   You need lower costs.

18   **Q.**   Because you can't do that without low costs.  Do you

19   agree?

20   **A.**   It's a combination of low cost and a stimulative business

21   model of trying to grow markets.

22   **Q.**   All right.  And a little further down on the same page,

23   you see, "Look, if it happened in any other industry"?  You

24   said, "Look, if it happened in any other industry, they'd

25   march you off to the penitentiary," right?

1    **A.**  Yes.

2    **Q.**  And what you're talking about there is the international

3    joint ventures that the legacies are part of; is that right?

4    **A.**  That is correct.

5    **Q.**  All right.  So let's go to that -- let's go now to

6    international joint ventures.  You're familiar with the

7    so-called international JVs; is that right?

8    **A.**  Yes.

9    **Q.**  And each of the three legacies, American, Delta, United,

10   has its own international JV with other foreign carriers,

11   right?

12   **A.**  Yes, multiple.

13   **Q.**  And in particular, American has an international JV with

14   British Airways, right, and other carriers?

15   **A.**  Yes.

16   **Q.**  And JetBlue and you have historically been vocal and

17   complaining about the international JVs as being

18   anticompetitive, right?

19   **A.**  Yes.  My concern about the international JVs is that they

20   were given approval to enter into them without any safeguards

21   or any ability for other airlines like JetBlue to come in and

22   compete with them.

23   **Q.**  All right.  And, for example, you've more than once used

24   the word "obscene" to characterize fares charged by legacy

25   JVs, right?

1    **A.**   I have used that word, yes.

2    **Q.**   And in respect to the US government, international JVs

3    must apply for and be granted antitrust immunity, or ATI,

4    right?

5    **A.**   Yes.

6    **Q.**   And that ATI protects them from antitrust lawsuits,

7    right?

8    **A.**   Yes.

9    **Q.**   So they can't be marched off to the penitentiary, right?

10   **A.**   Not for that.

11   **Q.**   All right.  Fair enough.

12           And as you said, DOT is charged with awarding that

13   ATI?

14   **A.**   I'm sorry.  Can you repeat that?

15   **Q.**   The Department of Transportation is the agency in charge

16   of that?

17   **A.**   Yes.

18   **Q.**   And all three of the legacy international JVs have

19   received ATI from DOT, right?

20   **A.**   Yes.

21   **Q.**   All right.  So another exhibit is PX 569, which is a big

22   exhibit.  I'll be asking you about the attachment that ends

23   in 552, Mr. Hayes?

24           MR. DAVIS:  This is in evidence, Your Honor.

25

1    BY MR. DAVIS:

2    **Q.**  Do you see that, Mr. Hayes?

3    **A.**  552.  I've got 50 --

4    **Q.**  On the screen is the cover e-mail, as we say, right?

5    **A.**  Yeah.

6    **Q.**  And that's an e-mail from Jeffrey Goodell to you in July

7    of 2019?

8    **A.**  Yes.

9    **Q.**  And he's sending you background material including

10   several speeches that you had delivered in connection with a

11   White House meeting, right?

12            THE COURT:  Take your time to --

13            THE WITNESS:  Yeah, it went blank, but I've got it

14   back now.

15            Yes, that's right.

16   BY MR. DAVIS:

17   **Q.**  All right.  And this -- the one that ends in 552, I'm

18   going to go to -- that's the fourth page.  This is your

19   address to the Aviation Club of the UK in April of '19; is

20   that right?

21   **A.**  552 is, yes.

22   **Q.**  And that event is just after JetBlue announced it would

23   in the future enter service from the US to London, right?

24   You announced in 2019 --

25   **A.**  Yes.  I was just trying to get the date straight in my

1    mind, yes.

2    **Q.**  And at that point, JetBlue had not begun transatlantic

3    service, right?

4    **A.**  That's correct.

5    **Q.**  And you had been aspiring to do that for some time, yes?

6    **A.**  Yes.

7    **Q.**  So turning to the page ending 555, in the first few

8    paragraphs, here you're talking about how US flights to

9    London have extremely high fares, correct?

10   **A.**  Yes.

11   **Q.**  And at the line that begins "70 percent," you say in this

12   address, "70 percent of the traffic between US and Europe is

13   flown today by airlines in joint ventures who have secured

14   immunity from antitrust laws," right?

15   **A.**  Yes.

16   **Q.**  And that those joint ventures are, again, the three

17   international JVs, right?

18   **A.**  Yes.

19   **Q.**  And then -- and then you say, "And as we know, what that

20   means is these airlines team up in partnerships to coordinate

21   schedules, coordinate prices, share revenue -- it's legalized

22   collusion, it's perfectly legal, they got permission to do

23   it -- what they really do is wipe out a competitor.  They

24   gain strength and market share that often prevents new

25   competitors from even considering or stepping into market,"

1    right?

2    **A.**   Yes.

3    **Q.**   So you're referring to coordinating schedules,

4    coordinating prices, and sharing revenue as legalized

5    collusion in this context, right?

6    **A.**   Yes.

7    **Q.**   And what you say what they really do is wipe out a

8    competitor, what you're saying is when they bring in an

9    airline into their international JV, the effect of that is to

10   wipe a competitor right out of that market, right?

11   **A.**   Yes.  So it's exactly as you say.  If you have two

12   airlines that start working together, they become one.  And

13   what my public comments on this have been on this over the

14   years, and they've been very consistent, is that I don't

15   oppose these joint ventures per se, but they have lacked

16   adequate safeguards that would allow competitors like JetBlue

17   to come in and provide that competing airline.

18   **Q.**   And these joint ventures can then work together to reduce

19   capacity, right?

20   **A.**   They -- they can reduce -- they can, if that's what they

21   choose to do.

22   **Q.**   And when they do, that tends to drive up fares, right?

23   **A.**   Yes, which is why these ventures should have

24   capacity-increase commitments in them, which --

25   **Q.**   All right.  And so looking down to the next to last

1    paragraph, you say, "In the past, United and Lufthansa used

2    to compete, but not anymore.  Air France and KLM used to

3    compete, but not anymore," correct?

4    **A.**  Yes.

5    **Q.**  And United and Lufthansa's JV, joint venture, involved

6    revenue sharing, capacity coordination, and price

7    coordination, right?

8    **A.**  I'm not sure what the specific elements of each of these

9    joint ventures are.  They all look a little differently, but

10   they usually involve some form of pricing and scheduling

11   coordination and --

12   **Q.**  And Air France and KLM, the same, right?

13   **A.**  Yes, and then throw Delta into that.

14   **Q.**  And you said pricing and scheduling and also revenue

15   sharing, right?

16   **A.**  Can be a profit share, can be some form of revenue share.

17   I believe a lot of these have evolved to profit-sharing

18   models; but, again, I'm not familiar with the details.

19   **Q.**  And American Airlines and your former airline, British

20   Airways, is another example of one of those JVs, right?

21   **A.**  Yes.

22   **Q.**  And you continue on -- that's page 555 -- "And these

23   joint ventures."  Do you see that?

24            "And these joint ventures, I think, are becoming a

25   bigger and bigger issue around the world.  They were formed

1    out of, some would argue, necessity at the time.  The

2    industry was in a lot less healthy shape, but a lot of that

3    has changed.  A lot of airlines are very profitable.  They're

4    making a lot of money.  And these joint ventures have now

5    become a way to just fuel those profits further," right?

6    **A.**   I'm sorry; would you mind bringing that one up on the

7    screen so I can read along?

8    **Q.**   So it should be in front of you.

9          THE COURT:  I have it in front of me.  It should be

10   blown up in front of you or no?  What he just read is blown

11   up.

12          THE WITNESS:  Okay.  Yeah.  Okay.

13          Yes.

14   BY MR. DAVIS:

15   **Q.**   You agree with that?

16   **A.**   Yes.

17   **Q.**   All right.  You're saying that joint ventures are a way

18   to fuel profits, right?

19   **A.**   If not done in the right way and without the adequate

20   competitive safeguards in place.

21   **Q.**   And if we keep reading, you continue that "When airlines

22   seek to form joint ventures, they make promises of the

23   benefits that are going to flow down to consumers," right?

24   **A.**   Which?  I'm sorry.  I lost it.

25   **Q.**   Sorry.  The second full paragraph at the top of page 556.

**A.**  Yes.  So what I was getting at here and I think it's an
important that when these joint ventures are presented, they
make commitments of consumer benefits.  And there are many
consumer benefits to many of these joint ventures, but
there's no review process by regulators to make sure these
airlines are delivering these benefits.  And so that
regulatory supervision is extremely important, in my opinion.

**Q.**  All right.  And the next paragraph below that says,
"Unfortunately, as you know, there's little to no public
reporting or public information on whether these promises
become reality.  We've done a lot of work on this, and we see
that fare growth tends to outpace capacity growth in markets
where you have joint venture, compared to those where you
have nonjoint venture airlines flying where there is more
genuine competition."

Did I read that correctly?

**A.**  Yes.

**Q.**  So you're saying that JetBlue has studied joint ventures,
right?

**A.**  Yes.  What we did was -- the joint ventures that we
studied that were behind this comment were some of the
European joint ventures that you referred to earlier.  And I
think, again, the context of this speech, obviously, was we
were trying to get a pathway into flying into Heathrow and,
you know, arguing there should have been more regulatory help

1    over the years to get new entrance into airports like

2    Heathrow.

3    **Q.**   So you're trying to get entry, but there's no question

4    about these facts being true, correct?

5    **A.**   The public -- well, so on the public -- on the reporting,

6    DOT did argue back to us when we pressed them on this over

7    the years that they, in fact, did review these joint

8    ventures.  But we never saw any public comment in response to

9    that.  We never saw any public records updated or public

10   feedback on their review.

11   **Q.**   But you had studied -- you, at JetBlue -- you had studied

12   joint ventures and found that fare growth outpaced capacity

13   growth, correct?

14   **A.**   In the European joint ventures that we studied, yes.

15   **Q.**   All right.  And joint ventures, in your study, you're

16   saying, have led to higher fares compared to where there's

17   more genuine competition, right?

18   **A.**   Yes.

19   **Q.**   So genuine competition means something different than

20   competition between the legacies legally colluding, as you

21   say, with their partners; is that right?

22   **A.**   Yes, create an environment where other airlines can come

23   in and compete with these joint ventures.

24   **Q.**   All right.  Let's look at a different speech in

25   Plaintiffs' Exhibit 569, which is your International Aviation

1   Club address in October of 2015.  The Bates number there ends

2   in 569.

3           So this speech goes back a little bit to October of

4   2015.  Do you see that, Mr. Hayes?

5   A.  Yes.

6   Q.  And please go to the joint ventures section, which is the

7   page ending in 571, about halfway down the page.  Underneath

8   the bullets, there's a longer paragraph, beginning "What's

9   clear."

10  A.  Yes.

11  Q.  Are you with me?

12  A.  I have it.

13  Q.  "So what's clear is that grants of antitrust immunity,

14  coupled with metal neutrality have created a perverse

15  incentive for the carriers to prop up flying by their

16  European partners."  You said that, correct?

17  A.  Yes.

18  Q.  And what does "metal neutrality" mean?

19  A.  Metal neutrality is where the airlines who have created

20  this joint venture don't really have -- you know, it doesn't

21  really matter to them if you're flying on airline one or

22  airline two if they're both in the joint venture.

23  Q.  All right.  They're indifferent as to which airline the

24  passenger chooses in that relationship, right?

25  A.  Yes.  And there were some unique factors around some of

1    the European joint ventures that make that more relevant.

2    **Q.**   And you go on in that same paragraph, "If, for example,

3    Lufthansa and Air France lose revenue on their flights due to

4    competition from the Gulf carriers, their US legacy partners

5    will suffer financial consequences under their metal-neutral

6    JVs," right?

7    **A.**   Yes.

8    **Q.**   So in this example, the metal-neutral joint venture is

9    incentivizing the legacy airline to try to stifle other

10   airlines from competing against its partners, right?

11   **A.**   I think the point -- I mean, it was a long time ago.  I

12   believe the point I have trying to make there was that you

13   were starting to see in Europe some concerns about the Gulf

14   carriers, which you later saw here in the US as well.  And

15   because a lot of these metal-neutral JVs are profit sharers,

16   if one carrier starts to lose money because of the impact

17   from the Gulf carriers, it will impact the other one.

18   **Q.**   All right.  So it shows how, if a joint venture partner

19   losing revenue, it hurts the other partner financially as

20   well, right?

21   **A.**   Yes.

22            MR. DAVIS:  And, Your Honor --

23            THE COURT:  Unless -- did you have -- what did you

24   have?

25            MR. DAVIS:  I just wanted to say I just have a few

 1    more questions on this section, and it might be a good -- I'm

 2    not sure when the Court --

 3            THE COURT:  I was thinking of taking the lunch

 4    break from 1:00 to 2:00.  How much -- how little do you have

 5    left?

 6            MR. DAVIS:  I have just two-thirds of one page, so

 7    five minutes, if that.

 8            THE COURT:  And then you're done?

 9            MR. DAVIS:  Well, I'm not done.

10            THE COURT:  Done with this section?

11            MR. DAVIS:  Done with this section, correct.

12            THE COURT:  We'll do that.

13            MR. DAVIS:  So continue?

14            THE COURT:  Yes, just for that two-thirds of a

15    page.

16            MR. DAVIS:  Thank you.

17    BY MR. DAVIS:

18    **Q.**  Finally showing you Plaintiffs' Exhibit 631, which is an

19    October -- October of 2019 address to International Aviation

20    Club in Washington, DC, and that should just be one exhibit,

21    one speech on that one, Mr. Hayes.

22    **A.**  Got it.

23    **Q.**  You've got it?  And you spoke extensively about

24    international JVs in that speech, too, right?

25    **A.**  Well, I'd need to -- I'm not doubting you.  I would just

1     need to read it.

2     **Q.**   I'm going to the page ending in 079, second full

3     paragraph.

4     **A.**   Okay.  Yep.

5     **Q.**   You're talking about international JVs there?

6     **A.**   Yes.

7     **Q.**   And, again, we're back to fall of 2019, the year before

8     the NEA is signed, right?

9     **A.**   Yes.

10    **Q.**   In that second full paragraph, you said in this speech,

11    "My prediction is that JVs will continue to try and convince

12    government that they need to keep growing for the consumers'

13    own good with arguments like 'My competition is getting

14    bigger, so I need to get bigger too.'  That logic is a bit

15    perverse when it comes to immunity from laws designed to

16    protect competition," right?  That's what you said?

17    **A.**   Yes.

18    **Q.**   So you predicted that the international JVs would argue

19    that they're getting bigger actually benefits the consumer

20    because the other international JVs are also getting bigger,

21    right?

22    **A.**   Yes.  That was part of the issue.

23    **Q.**   And what do you mean when you say that logic is perverse

24    there?

25    **A.**   Well, again, it's what I was saying earlier.  All of

1  these joint ventures were being approved by regulators with

2  very few safeguards.  And I think it was a missed

3  opportunity.  For an airline like JetBlue, which is

4  recognized, I think, by many to lower fares and improve

5  service, if we'd been given or if other airlines had been

6  given more regulatory relief as these things were being

7  formed, we'd have a very viable and more competitive

8  industry.  That was not done.

9  **Q.**  A little further down the same page, you state,

10  "Competition, in our view" -- do you see that paragraph?  You

11  said --

12  **A.**  Yes.

13  **Q.**  -- "Competition, in our view, is not merely two or three

14  immunized joint ventures charging identical high fares --

15  which is exactly in many cases what the definition of

16  competition has become -- and maintaining how competitive

17  things are."  That's what you said, right?

18  **A.**  Yes.

19  **Q.**  You're -- you continue that, "Competition, which

20  regulators are charged with protecting, means not excluding

21  different and new business models from the marketplace,"

22  right?

23  **A.**  As I just said, this was about, as you approve these

24  joint ventures, create an opportunity for other airlines like

25  JetBlue to offer competition.  That was not done by

```
 1   regulators.
 2           MR. DAVIS:  All right.  Your Honor, I'll stop here.
 3           THE COURT:  All right.  So we'll take a break for
 4   an hour.  We'll return in five after 2:00.
 5           (Court in recess at 1:06 p.m.)
 6           (The following reported by Rachel Lopez.)
 7           (Court reconvened at 2:05 p.m.)
 8           THE DEPUTY CLERK:  The United States District Court
 9   for the District of Massachusetts is now in session, the
10   Honorable Leo T. Sorokin presiding.
11           THE COURT:  Please be seated.
12           Go ahead.  Sorry.
13           THE WITNESS:  My first time.  I wasn't quite sure,
14   Your Honor.
15           THE COURT:  No problem.
16           Ready, Mr. Davis.  You can proceed.
17           MR. DAVIS:  Thank you, Your Honor.
18           Good afternoon, Mr. Hayes.
19           THE WITNESS:  Good afternoon.
20   BY MR. DAVIS:
21   Q.  Sir, you talked a little bit in discussing the
22   international JVs about the safeguards that were not in
23   place; is that right?
24   A.  Yes.
25   Q.  And you're basically saying regulators are not doing an
```

1    adequate job with the three international JVs that the

2    legacies have; is that right?

3    **A.**   Well, it's those JVs, but also other applications that

4    have been made over the years, for example, Delta's joint

5    venture application with Aeromexico.

6    **Q.**   And international JVs are not just regulated by United

7    States authorities, right?

8    **A.**   That is correct.

9    **Q.**   And there are international authorities that may have

10   jurisdiction and may do real regulatory work for

11   international JVs, correct?

12   **A.**   Yes.

13   **Q.**   What are the -- what are examples of safeguards that, in

14   your view, are not in place now that should be?

15   **A.**   Well, three of the conditions that JetBlue has suggested

16   over the years are, first of all, these joint ventures should

17   be of a finite term, so that they can be reviewed.  When

18   airlines enter into joint ventures they make a number of

19   representations for consumer benefit, so by making it a fixed

20   term rather than open ended, then a regulator can go back and

21   review that to make sure that those benefits have been

22   delivered, oversight of the joint venture, so it's clear that

23   someone is actually looking at it.

24        Secondly, the removal of exclusivity provisions in

25   these joint ventures that would preclude members from working

1    with other airlines.  We've had a number of airlines over the

2    years that would have liked to have done more with JetBlue,

3    they just couldn't because they were part of these joint

4    ventures and they were prohibited from doing so.

5            And thirdly, when these joint ventures are flying

6    into congested airports, whether they be slotted or just busy

7    airports where it's hard to get gates and slots, those slots

8    are divested so that new entrants, whether that be JetBlue or

9    anybody else, can benefit from the joint venture by providing

10   some additional competition.

11   **Q.**  Of course, when slots are divested in those situations,

12   it makes sense to divest them to independent airlines.  Do

13   you agree with that?

14   **A.**  Independent of those in the joint venture?

15   **Q.**  Yes.

16   **A.**  Yes, I believe they should be divested to airlines that

17   can provide real competition.

18   **Q.**  All right.  So let's move on to -- I want to talk about

19   the NEA itself, a little bit.  Again, that agreement, the NEA

20   was announced between JetBlue and American in July of 2020,

21   right?

22   **A.**  Yes.

23   **Q.**  And when did talks on that alliance between the two

24   companies begin, approximately?

25   **A.**  We had -- I would say approximately the late part of the

1  year before, but then accelerated into 2020, with the onset

2  of COVID.

3  **Q.**  All right.  And then culminated in the announcement of

4  the NEA on July 16th of 2020, right?

5  **A.**  Yes.

6  **Q.**  And who led the negotiations that culminated in the NEA

7  for JetBlue?

8  **A.**  Our lead negotiator on the JetBlue side was Scott

9  Laurence.

10  **Q.**  And who for American?

11  **A.**  Vasu Raja.

12  **Q.**  Is it fair to say that the two companies worked quite

13  intensively on that alliance in the winter and spring of 2020

14  and on into the summer?

15  **A.**  I would say it started fairly slowly.  Initially, we were

16  talking about a slot lease at JFK and then obviously with the

17  onset of COVID and certainly from a JetBlue perspective,

18  really being concerned about our survival, we accelerated

19  those in order to try to see if there was something that

20  would work for us.

21  **Q.**  But certainly by, say, April and May of 2020, it was a

22  big project at both airlines, correct?

23  **A.**  It was certainly a big project to JetBlue and I assume it

24  was a big project to American.

25  **Q.**  All right.  And as we've discussed, the NEA includes four

1  airports and the flights in and out of those four airports,

2  right?

3  **A.**  Yes.

4  **Q.**  And NEA also includes an agreement to coordinate capacity

5  at those airports, right?

6  **A.**  Yes.  On markets.  There are some carve out markets that

7  some of the those airports are not in the NEA, but on the

8  rest, it includes an element of schedule coordination.

9  **Q.**  The NEA likewise includes a revenue sharing agreement,

10  correct?

11  **A.**  It has what's called an MGIA, which is a revenue sharing

12  agreement that incentivizes growth.

13  **Q.**  The MGIA is a revenue sharing agreement?

14  **A.**  Well, revenue sharing agreements mean different things to

15  different people.  Sometimes they can look very differently.

16  The unique thing about this, the MGIA, was it was a revenue

17  sharing agreement that directly incentivized airlines to

18  grow.

19  **Q.**  All right.  Did you previously state that the NEA does

20  not have a revenue share agreement?

21  **A.**  Well, there are -- the point I was trying to make was

22  that the MGIA is different to how I understand more

23  traditional revenue sharing agreements were in that it

24  directly attributed to as an incentive around growth.

25  **Q.**  Do you recall testifying in June of '22, just a few

1    months ago?

2    **A.**  Yes.

3    **Q.**  And you did say then that the NEA does not have a revenue

4    share agreement, correct?

5    **A.**  Well, the MGIA was part of the agreement, the point that

6    I was trying to make was it was different to other revenue

7    sharing agreements in that it incentivizes growth, and in my

8    view, that's a fairly unique feature.

9    **Q.**  So at that time, the agreement was so different that you

10   actually stated under oath that the NEA did not have a

11   revenue share agreement, correct?

12   **A.**  Well, I would have to check the context of the question,

13   but it is different -- revenue sharing means different things

14   to different people sometimes.

15   **Q.**  All right.  So just turning to page 106 of your

16   litigation deposition.  Do you see that, Mr. Hayes?

17   **A.**  106?

18   **Q.**  Yes, 106.

19   **A.**  Stand by.

20         Yes, I have it.

21   **Q.**  And at line 17, do you see the question asked you, "Is it

22   true that you would not characterize the NEA as having a

23   revenue share agreement?

24   **A.**  Yes.

25   **Q.**  And your answer was, "Yes, it does not have a revenue

1  share agreement, right?

2  **A.**  Yes, because it's a revenue share that's very focused on

3  growth.

4          MR. DAVIS:  Your Honor, I'd move to admit that

5  question and answer pair as a party admission.

6          THE COURT:  Any objection?

7          MR. SCHWED:  No.  No objection, Your Honor.

8          THE COURT:  Admitted.  So page 106, line 17 to 21.

9          MR. SCHWED:  As a party, we should move into

10  evidence.

11          THE COURT:  Yes, I'm asking whether you object to

12  its admissibility, not whether you agree with his

13  interpretation.

14          MR. SCHWED:  Thank you, Your Honor.

15          THE COURT:  I'm assuming you don't agree with his

16  interpretation.

17          MR. SCHWED:  Correct, Your Honor.

18          (Plaintiff Exhibit No. Page 106, line 17 to 21

19          admitted into evidence.)

20  BY MR. DAVIS:

21  **Q.**  So Mr. Hayes, your view is that there is a kind of

22  revenue share agreement, but a different kind?

23  **A.**  Yeah.  No, I mean, there are many of these agreements all

24  over the world, they look very different -- they look very

25  differently.  What is different about this agreement, in my

1    opinion, is like unlike some other joint ventures where

2    revenue gets allocated by other formulas, this revenue

3    formula incentivizes airlines to grow.  If you are an airline

4    in this partnership that is growing more slowly than another

5    one, which is one of my big concern about these JV airlines,

6    they are not incentivized to grow, then you are at a

7    disadvantage to the other airline in the partnership.  I

8    think that's unique, and we did it because, one, it helps

9    JetBlue stay true to who we are, and two, in my belief, it's

10   very pro-consumer.

11   **Q.**  All right.  So we'll talk about that a little in a bit,

12   but would you agree that the NEA has what's called an

13   agreement to share incremental revenues?

14   **A.**  Yes.

15   **Q.**  Incremental revenues are different from just regular

16   revenues, right?

17   **A.**  Yes.  The way the agreement works is that the revenues of

18   both companies in 2019 were taking as a base, and then the

19   incremental revenue is factored in together with the growth

20   that each airline has made in that interim period.

21   **Q.**  And do you regard the NEA as a joint venture, like the

22   international joint ventures we've just discussed?

23   **A.**  No.  Again, joint ventures mean different things to

24   different people.  When I think about international joint

25   ventures, it has three elements.  It has schedule

1  coordination, which is in the NEA, on the markets that are

2  not carved out.  It includes pricing coordination, which is

3  absolutely not in the NEA.  And to me, that is usually, I

4  think, the most important part of one of the international

5  joint ventures.  And then we have an incremental revenue or a

6  revenue model that incentivizes growth, and that's very

7  different to the profit sharing model that exists in many of

8  these international joint ventures.  So I view it very

9  differently, but other people may refer to it as a joint

10  venture.

11  **Q.**  Do you agree that the NEA was modeled after

12  American Airlines international joint ventures?

13  **A.**  I don't know.  I'm not familiar with the detail of those

14  joint ventures.  At the beginning of the NEA, they sent us a

15  deck that outlined some features of some of their other joint

16  ventures, but then our team negotiated something that was,

17  you know, right for JetBlue.

18  **Q.**  Is it your understanding that American Airlines

19  international joint venture is a profit share?

20  **A.**  I don't know.  I'm not privy to how their joint ventures

21  work.

22  **Q.**  But you agree that the American Airlines international

23  joint ventures has a capacity coordinating feature that's

24  important, right?

25  **A.**  The international joint venture.

1    **Q.**  Yes.

2    **A.**  Yes.

3    **Q.**  And also has a revenue sharing agreement that's

4    important, correct?

5    **A.**  Their international joint ventures.

6    **Q.**  Yes.

7    **A.**  Again, I'm not sure if it's a revenue share or a profit

8    share or some other form.

9    **Q.**  All right.  But your view is that the revenue -- the

10   revenue share arrangement that's in the NEA is materially

11   different from the arrangement in the American Airlines

12   international joint venture; is that right?

13   **A.**  Again, I'm not privy to what is in the American joint

14   ventures.

15   **Q.**  You really don't know that arrangement, right?

16   **A.**  Yes, that would be something between the parties.  And it

17   may have evolved over the years, as well.  There was so many

18   of these joint ventures out there, it is very hard to keep on

19   top of them a bit.

20   **Q.**  But you are convinced that your NEA is materially

21   different from whatever American is doing; is that right?

22   **A.**  Well, again, I don't know precisely what

23   American Airlines are doing.  What I do know is what the NEA

24   has, which is some capacity coordination.  It has no pricing

25   coordination, and it is an incremental revenue sharing model

1   based on growth.

2   **Q.**  All right.  So let's look at plaintiff Exhibit 717, which

3   is in evidence.  The subject is "revenue sharing."

4   **A.**  717?

5   **Q.**  Yes.  Just a two-page e-mail.

6   **A.**  Yes.

7   **Q.**  Do you have that, Mr. Hayes?

8   **A.**  I do.

9   **Q.**  And this is an e-mail chain, February 3rd and 4th of

10  2020?

11  **A.**  Yes.

12  **Q.**  And this is fairly early in the NEA negotiations we've

13  been talking about?

14  **A.**  Yes.  Extremely early.

15  **Q.**  And you can see that the bottom e-mail, which would be

16  the start of it, is Vasu Raja and American having sent Scott

17  Laurence a deck that, quote, "gives an overview of how we do

18  revenue sharing."  Do you see that?

19  **A.**  Yes.

20  **Q.**  All right.  And that makes its way to you, right?

21  **A.**  Yes.

22  **Q.**  And at the top, you make a reply.  And it's just those

23  two lines at the top, right?

24  **A.**  Yes.

25  **Q.**  You say, "We aren't anywhere near as familiar at these

1    agreements as they are.  Steve P may be helpful as he was

2    running the BA/AA JV, which had similar arrangements."

3         Correct?

4    **A.**  Yes.

5    **Q.**  And by, "They" there, do you mean American Airlines?

6    **A.**  Yes.

7    **Q.**  And by "BA/AA JV," you mean British Airways/American

8    Airlines joint ventures, correct?

9    **A.**  Yes.

10   **Q.**  And you're saying that JetBlue didn't have prior

11   experience with revenue sharing arrangements, right?

12   **A.**  Yes, we didn't have any prior experience.  All of our

13   airline partnerships were, you know, more traditional

14   codeshare interline type models.  So we would have no one who

15   had worked on these types of agreements before.

16   **Q.**  And you're indicating Steve P.  Is that Steve Priest?

17   **A.**  Yes, it is.

18   **Q.**  And Steve Priest is someone who had experience working on

19   the British Airways/American Airlines joint venture, right?

20   **A.**  Yes, he was really the only executive at a senior level

21   in our company, Steve Priest was our chief financial officer

22   at the time.  And he had some background in some of these

23   agreements, and I felt it would be very useful to have him

24   review what was being talked about.

25   **Q.**  And you're saying that the international JV between BA

1   and AA had similar arrangements in terms of revenue sharing,

2   right?

3   **A.**   Well, again, at this point, we had made no -- we hadn't

4   had any negotiations on this.  It was very high level.

5   American approached us with some form of, you know, revenue

6   sharing model, and we were just getting familiar, and we were

7   just getting smarter at this point.

8   **Q.**   All right.  So but you recognize from the beginning

9   stages of the NEA that the revenue sharing agreement, you

10  would be using was derived, at least, from American's

11  international JV, right?

12  **A.**   No, I don't think you can draw that conclusion.

13  **Q.**   Vasu Raja is sending you a deck that is how they do

14  revenue share, right?

15  **A.**   Yes.

16  **Q.**   And is it your testimony that one ended up as the NEA is

17  materially different from that deck?

18  **A.**   No, what I'm saying is that we were getting smarter and

19  we were educating ourselves on some of these agreements, how

20  they looked like, we had no knowledge at that point whether

21  we would even enter into the agreement, let alone what it

22  would look like.

23  **Q.**   Mr. Hayes, you're well aware that the arrangement you

24  eventually struck was very similar to the deck that Vasu Raja

25  sent you on February 4th of 2020, right?

1    **A.**  I only reviewed that deck when it was sent.  After that,

2    it was -- my team was having discussions and we reviewed

3    those discussions directly with the team.

4    **Q.**  So you don't know whether it was similar or not?

5    **A.**  I don't -- in terms of how it evolved, I just focused on

6    the agreement that we had with American.  I'm not familiar

7    with how the revenue or profit share models worked with other

8    partners.

9    **Q.**  All right.  So you know the NEA feature is a section

10   about network growth and consultation, right?

11   **A.**  Which -- yes.

12   **Q.**  Right?  And there, American and JetBlue agreed to

13   coordinate what are called NEA services, right?

14   **A.**  Yes.

15   **Q.**  And they further agreed to attempt to optimize their

16   respective network plans after consultation, right?

17   **A.**  Yes.

18   **Q.**  And that provision allows American and JetBlue to jointly

19   optimize capacity in the Northeast Alliance scope, right?

20   **A.**  Yes, and for JetBlue, this was important, because we were

21   trying to create a more compelling global alternative to

22   compete with Delta and United.  And as part the NEA, American

23   had offered to make investments in certain local markets that

24   we just couldn't fly ourselves.

25   **Q.**  And optimizing capacity means the same thing as

1    coordinating capacity, right?

2    **A.**  Oh, yes.

3    **Q.**  So optimizing means coordinating.

4    **A.**  Yes, I don't want to split hairs on the words.

5    **Q.**  All right.  And the same part of the NEA says that if

6    roots are underperforming when measures against forecast, the

7    parties will attempt to agree to a course of remedial action,

8    correct?

9    **A.**  I don't recall those specific detailed provisions in the

10   agreement.

11   **Q.**  All right.  So let's just look briefly at Plaintiff

12   Exhibit 1-A at page 4.  And Mr. Hayes, I don't know if that's

13   in your notebook or not, but 1-A is in evidence, Your Honor?

14            THE COURT:  I have them.  I think it's in your

15   notebook, or it's in mine.

16            THE WITNESS:  This?  1-A.

17            MR. DAVIS:  Yes.  It's the first, outstanding A,

18   it's just one.

19            THE WITNESS:  Okay.

20   BY MR. DAVIS:

21   **Q.**  All right.  Do you have page 4?

22            MR. DAVIS:  Could we see it on the screen?

23   BY MR. DAVIS:

24   **Q.**  And do you see page 3 in the middle 3.1.2.3?

25   **A.**  Yes.

1    **Q.**  And do you see there that it says, "If any roots within

2    the NEA services are underperforming when measured against

3    the expected performance forecast for such routes by the

4    party operation such services, or as jointly agreed by the

5    parties, the parties will endeavor in good faith to agree to

6    a course of remedial action while each party will maintain

7    its independent decision-making authority."

8           Did I read that correctly?

9    **A.**  Yes.

10   **Q.**  So when NEA routes aren't making money, the parties get

11   together to choose a course of remedial action; is that

12   right?

13   **A.**  Yes.  I think this clause just actually represents what

14   happens anyway.  I mean, at JetBlue, if we have a market

15   that's underperforming, if it's unprofitable, we will try to

16   turn it around, we will try to make it profitable.  And if

17   ultimately we can't, we will need to fly somewhere else.

18   **Q.**  Well, it happens anyway at JetBlue, but this is the first

19   time in history that it's happening with JetBlue and its

20   competitor, right?

21   **A.**  As part of the NEA, yes.  We were working with American

22   and if we had a market that's underperforming, we would try

23   to fix it.  No one wants to pull off a market that they've

24   started to serve.

25   **Q.**  So both parties are getting together to choose a course

1   of remedial action, right?

2   **A.**   Yes.  But I would represent that these are exactly what

3   would happen anyway.  Certainly at JetBlue, if it was not

4   performing.

5   **Q.**   But, again, Mr. Hayes, you say exactly what would happen

6   anyway at an airline that's independent, right?

7   **A.**   Yes.

8   **Q.**   What's different here is this is two airlines pledging to

9   do this together, agreed?

10  **A.**   Yes.  To create a viable third competitor in the

11  northeast to compete with Delta and United.

12  **Q.**   Do you agree with -- that this agreement is an agreement

13  between two competitors, at least previous competitors, to

14  get together to choose remedial action when a route

15  underperforms?

16  **A.**   So in the markets, in the NEA, yes.  But of course, we

17  still compete with American very aggressively outside of the

18  NEA.

19  **Q.**   All right.  And remedial action under the provision could

20  include a joint decision by the parties to cancel an

21  unprofitable route, right?

22  **A.**   It could -- yes, it could.

23  **Q.**   All right.  And this agreement extends now to two-thirds

24  of JetBlue's business, right?

25  **A.**   Yes.

1    **Q.**  Roughly?

2    **A.**  Yes.

3    **Q.**  So the largest global airline now has a say about

4    two-thirds of your network, right?

5    **A.**  No.  Because ultimately JetBlue will make independent

6    decisions as to what we fly and what we don't fly.

7    **Q.**  But you're making an agreement here, right?  You're

8    agreeing to regularly review performance together, right?

9    **A.**  Which we -- where he, we would -- yes, we would review it

10   together, just as JetBlue would review these markets

11   independently anyway.

12   **Q.**  All right.  And you're agreeing that if the routes are

13   underperforming, together, you're going to look at ways to

14   make adjustments together, right?

15   **A.**  Yes.  I mean, look, let's say we had a JetBlue market

16   that was underperforming that was in the NEA.  We would work

17   as part of the process to try to improve it.  As I say,

18   JetBlue does not want to pull off markets, and one of the

19   benefits of us being in the NEA, is we now have some tools

20   that American can bring to the partnership to allow us to

21   better compete with two airlines three to four times our

22   size.

23   **Q.**  So in general, can parties to a joint venture coordinate

24   capacity so as to reduce capacity, that is, if they have ATI,

25   at least.

1    **A.**   I'm sorry.  Can you say that question again?

2    **Q.**   Can parties to a joint ventures, in general, with

3    antitrust immunity, can they coordinate capacity so as to

4    reduce capacity?

5    **A.**   They can, which is why in the NEA, we changed -- we

6    modeled it around an incentive that encourages growth.  We

7    have the MGIA, and we also have the additional slot

8    divestitures that we have to make if we do not grow.

9    **Q.**   And a joint -- sorry, are you finished?

10   **A.**   Yes.

11   **Q.**   And a joint ventures jointly reduced capacity, that would

12   give them more pricing power.  Do you agree with that?

13   **A.**   If you did that without the growth incentive or without

14   the growth commitments in the NEA, that would be true, that

15   is not the case in the NEA.

16   **Q.**   Can parties to a joint venture coordinate capacity to

17   allocate markets between them so as not to compete in each

18   other's markets?

19   **A.**   Hypothetically, that could be true.

20   **Q.**   Well, specifically, does market allocation occur within

21   the NEA?

22   **A.**   Could you just clarify what you mean by market

23   allocation?

24   **Q.**   So since the Northeast Alliance implementation began,

25   American Airlines has exited its service to Boston-LaGuardia,

1   right?

2   **A.**   That is correct.

3   **Q.**   That service previously overlapped with JetBlue's, right?

4   **A.**   Yes.

5   **Q.**   And Boston-LaGuardia is certainly within the NEA, right?

6   **A.**   Yes, but I will represent to you, and I think most people

7   in Boston and New York know this, that market is much more

8   competitive with JetBlue flying 15 or 16 a day, next Delta,

9   then JetBlue flying six flights, and American and Delta

10  competing with each other.

11  **Q.**   But American Airlines is no longer in the route at all,

12  right?

13  **A.**   Yes, but more -- JetBlue is in the route to an extent

14  we've never been, and that has had a very positive effect on

15  fares.

16  **Q.**   And many of your speeches you talk about fewer choices

17  that consumers have, you mean when there are fewer airlines

18  in a route, right?

19  **A.**   Well, the context of my speeches really were referring to

20  legacy airlines, and as I was saying earlier today, it's less

21  about how many airlines are flying, but who's flying it.  And

22  if you look at the fares on the three shuttle markets today,

23  that fares that JetBlue is in, the two shuttle markets that

24  we're in, Boston-LaGuardia, DCA-Boston, the fares are lower

25  than the market that we don't compete in, which is Boston

1   to DCA -- LaGuardia to DCA.  So again, I don't think it's how

2   many airlines fly it, it's who's flying it.

3   **Q.**  Was the exit of American Airlines from the Boston

4   -LaGuardia route, was that an example of network optimization

5   under the NEA?

6   **A.**  Well, I certainly -- I think that we were -- by we

7   wanted -- we wanted to be bigger in Boston-LaGuardia a long

8   time.  This was an opportunity to do it.  So with the slots

9   that became available from American by the NEA, in LaGuardia,

10  we able now to do this a lot.

11  **Q.**  All right.  So do you agree that in that instance, at

12  least, within the NEA, the two parties agreed to allocate the

13  Boston-LaGuardia market to JetBlue, correct?

14  **A.**  American came off of that market and we grew in that

15  market.  And there was discussion around that as part of that

16  optimization process.

17  **Q.**  Is that a yes?

18  **A.**  Yes.

19  **Q.**  Thank you.  All right.  Mr. Hayes, American Airlines also

20  plans to exit JFK-San Francisco under the Northeast Alliance,

21  correct?

22  **A.**  Say parts of that again?

23  **Q.**  Doesn't American Airlines plan to exit JFK-San Francisco

24  under the NEA?

25  **A.**  That I don't know.

1  **Q.**  You're not aware of that?

2  **A.**  There's been some discussions about that.  But as of now,

3  I don't believe that American planned to exit JFK-San

4  Francisco, but that's just to my knowledge.

5  **Q.**  So if that's being planned, you don't know about it?

6  **A.**  I don't know if it's being planned.

7  **Q.**  And understanding you don't know, if it were being

8  planned, it would be an NEA route that would be part of the

9  network optimization discussions between the two airlines,

10  correct?

11  **A.**  Well, yes, but I think we need to establish whether that

12  is planned or not, you know.  It sounds quite hypothetical.

13  **Q.**  You don't know about it, correct?

14  **A.**  No, I do -- I'm aware of some discussions that have

15  happened about markets like JFK or San Francisco, but I don't

16  believe any decision by American has been taken to come out

17  of it.

18  **Q.**  All right.  So back to capacity coordination.  But

19  coordinating with American under the NEA, your two airlines

20  now control collectively about 46 percent of all flights out

21  of Boston, right?

22  **A.**  Our share is about 31 percent.  I'm not sure what

23  American's share is.

24  **Q.**  Almost half collectively?

25  **A.**  Again, I'm not sure of what American's share is today.

1    **Q.**  Would you agree that, as they optimize the networks in

2    the NEA, JetBlue and American now function as a single

3    airline?

4    **A.**   In terms of optimizing capacity, yes.  Not in terms of

5    pricing or many other aspects of our business.

6    **Q.**  And would you agree that, within the NEA, where the two

7    airlines are coordinating capacity, JetBlue and American no

8    longer compete with each other, correct?

9    **A.**   In terms of the markets in the NEA that are not carved

10   out, we don't compete with each other directly.

11   **Q.**  You're now collaborating, right?

12   **A.**   Yes, we're collaborating because, again, for JetBlue, our

13   largest issue is how do we sustain ourselves in the

14   northeast, and compete against two much larger airlines in

15   the form of Delta and United.

16   **Q.**  Okay.  Now, you said that the NEA incentivizes growth by

17   American and JetBlue, right?

18   **A.**   Yeah.

19   **Q.**  And that growth incentive comes from the so-called MGIA

20   that's part of the NEA, correct?  Sorry about all the

21   acronyms.

22   **A.**  Yes, that's correct.

23   **Q.**  All right.  And the revenue sharing provision in the NEA

24   called the MGIA is actually the Mutual Growth Incentive

25   Agreement, right?

**A.** Yes.

**Q.** And the purpose of that MGIA is to incentivize growth.
That's it's purpose, right?

**A.** Yes.

**Q.** And under the MGIA, the parties share something called
incremental revenues?

**A.** Yes.

**Q.** And incremental revenues can be positive, right?

**A.** Yes.

**Q.** And incremental revenues also can be negative, correct?

**A.** I think -- I think if you're referring to the transfer
payment.

**Q.** Yes.

**A.** A better way of phrasing it would be one party may have
more incremental revenue than another.

**Q.** Well, one could have negative incremental revenue where
one has experienced lower unit -- unit growth, right?

**A.** Yes.  And certainly during COVID, that was an issue for
all airlines.

**Q.** All right.  And so that situation, where the rate of unit
pricing is reduced from a 2019 base, that generates negative
incremental revenue, right?

**A.** Well, it could do.

**Q.** Okay.

**A.** But you could get to the same answer in the MGIA with a

1    different set of circumstances.

2    **Q.**  Okay.  And we've already discussed that capacity

3    increases generally result in lower fares, right?

4    **A.**  Yes, they can do.

5    **Q.**  All right.  And again, under the MGIA, a party that

6    increases capacity at a lower unit revenue, again, lower than

7    the 2019 base, generates negative incremental revenue, right?

8    **A.**  Negative incremental unit revenue.

9    **Q.**  Okay.

10   **A.**  But not incremental revenue in terms of dollars.

11   **Q.**  All right.  And an NEA party growing capacity at a lower

12   unit revenue may then receive a transfer payment from its

13   partner airline, right?

14   **A.**  Again, that is one situation, but there are other

15   combination, as well, that would drive a transfer payment.

16   **Q.**  All right.  But in that circumstance that I identified --

17          THE COURT:  Wait, are you saying -- is the question

18   that if you're -- if you have lower incremental revenue, then

19   you receive a payment?

20          MR. DAVIS:  That's the question.

21          THE COURT:  Is that right?

22          THE WITNESS:  Yes.  Would it help if I just gave a

23   summary of how it works?

24          THE COURT:  Yes.  Help me.

25          THE WITNESS:  So how the MGIA payment works at a

1     basic level, Your Honor, is we take the revenues both

2     airlines had in 2019 as the base.  Because in aviation terms,

3     that's the last normal year we had.

4             THE COURT:  Court terms, too.

5             THE WITNESS:  And it looks at how much capacity

6     each airline is adding to its 2019 base, and it looks to how

7     much revenue that each party has added, and it effectively

8     creates a unit revenue to say of the incremental capacity

9     you've added and -- of all the capacity that you've added and

10    all the revenue generated what is effectively your unit --

11    incremental unit revenue and it compares those between the

12    two parties.  And the parties with the higher incremental

13    unit revenue, which is the incremental revenue, the highest

14    unit revenue makes a transfer payment to the airline with the

15    lower incremental unit revenue.

16            THE COURT:  The unit revenue is a function --

17    explain that again.

18            THE WITNESS:  So the unit revenue is a function of

19    the revenue itself and how much you've grown in capacity.  So

20    if you think of it --

21            THE COURT:  If the capacity is 10 percent.

22            THE WITNESS:  Yes.  So let's say I had -- if I was

23    generating $100 -- bigger number, say I was generating

24    $10,000 on an aircraft, and I had that aircraft flew -- and

25    it had 100 seats, right?  So that's $100 per seat.  All the

 1   seats were full.  And let's assume that airplane flew

 2   1,000 miles, that would be .1 cent of unit revenue.  So

 3   that's how the calculation is done.

 4            THE COURT:  And if that were extra over 2019, you

 5   would have a .1 unit revenue.

 6            THE WITNESS:  In that case, yes.  I was just giving

 7   one flight example.

 8            THE COURT:  Yes.  And then if the other partner was

 9   exactly at base, so they would be at zero.

10            THE WITNESS:  Yes.

11            THE COURT:  So you have grown.

12            THE WITNESS:  Yes.

13            THE COURT:  And then you would make the payment to

14   the other people?

15            THE WITNESS:  Yes.  So the airline that has the

16   highest unit -- that incremental revenue unit would make a

17   transfer payment to the one with the lower unit revenue

18   growth.

19            THE COURT:  Okay.

20   BY MR. DAVIS:

21   Q.  And you agree, Mr. Hayes, that incremental unit revenue

22   only happens when there is a change in unit revenue?

23   A.  Well, I mean, unit revenues change all the time.

24   Q.  Sure.  But in the hypothetical, where unit revenue is

25   exactly the same as 2019?

1   **A.**   Yes.

2   **Q.**   It doesn't matter if you add a capacity or decrease

3   capacity, there's no incremental revenue.  Do we agree on

4   that?

5   **A.**   Well, if you decrease capacity, and your revenue hasn't

6   changed, your unit revenue will go up.

7   **Q.**   If you decrease capacity and your RESM --

8   **A.**   RESM is different to the -- yeah, I mean, you're talking

9   about incremental?

10  **Q.**   Yes, I'm talking about incremental revenue, right?

11  **A.**   In the context of MGIA or more broadly?

12  **Q.**   Yes, in the context of the -- we're talking about a

13  transfer payment, right?

14  **A.**   Yes.

15  **Q.**   In the situation where your RESM doesn't change?

16          THE COURT:  What is the RESM?

17          MR. DAVIS:  I'm sorry, Your Honor.  That's revenue

18  per estimated seat mile; is that right?

19          THE COURT:  What is it?

20          THE WITNESS:  No.

21          THE COURT:  What is it?

22          THE WITNESS:  Well, I forget what the E stands for,

23  as well.  So I think it's equivalent, maybe.

24          MR. DAVIS:  Equivalency mile, right.

25          THE WITNESS:  Yeah.  So I don't want to appear to

1    be avoiding your asking the question, so forget RESM for a

2    minute.  RASM is revenue per available seat mile.  That is

3    what we use on a daily basis.  And then RESM, which is the

4    revenue per equivalency seat mile, is trying to get to the

5    incremental unit revenue growth that's in the MGIA.  So both

6    parties say in 2019, this is what the world looked like,

7    we've adjusted capacity since 2019, we've generated

8    incremental revenue, we're both going to calculate what the

9    unit -- incremental unit revenue growth is, and then in order

10   to -- because the party that's grown more quickly is going

11   to -- will tend to have the lower unit revenue.  And so they

12   will get a transfer payment from the airline that is arguably

13   going less quickly, because they are going to have a higher

14   unit revenue --

15            THE COURT:  So why would the party growing less

16   quickly have lower incremental revenue?

17            THE WITNESS:  Because as a matter of general rule,

18   the more capacity that you're putting into the market, you

19   know, it generates more volume.

20            THE COURT:  And you might have a lower load

21   initially?

22            THE WITNESS:  Yeah, you're going to have a lower

23   load to -- you know, we started Boston-Heathrow flies last

24   week.  Our load factor is quite low.  In two or three months,

25   hopefully, it's going to be higher.  It just takes time to

1    ramp up.

2            THE COURT:  So the theory is that the way you

3    incentivize growth is the lower -- the party with the lower

4    incremental unit revenue is going to get the transfer

5    payment, because the theory is that when you create more

6    capacity by adding a route or by adding more planes on an

7    existing route, initially your load factor is going to be

8    lower, and you're going to be bearing costs and so therefore,

9    your incremental revenue will be decreased and so that's why

10   the person with the lower rate receives the payment.

11           THE WITNESS:  Yes, what we're trying to do,

12   Your Honor, in every aspects of this agreement, is to create

13   the right incentives for the parties to grow because I am

14   more aware than anyone else in all my public comments over

15   the years, of the dangers to competition, if these joint

16   ventures get formed, our prices get fixed between the

17   airlines and there is not incentive to grow.  This was very

18   important to JetBlue to make sure we stayed who we were.

19           THE COURT:  Go ahead.

20   BY MR. DAVIS:

21   **Q.**  So Mr. Hayes, can we agree at a high level that an NEA

22   party growing capacity, at a lower unit revenue, may then

23   receive a transfer payment from its partner airline.  That's

24   kind of the point of the incentive we're talking about.

25   **A.**  Yes.  But I think this is helpful to have the explanation

1   because this is a complicated agreement.

2   **Q.**   So theoretically, at least, if one partner airline goes

3   out and adds a bunch of capacity and new flying, and of

4   course, usually the RASM associated with that flying is

5   actually going to go down because you've increased capacity,

6   right?

7   **A.**   Yes.

8   **Q.**   In that situation, the partner airline that didn't do

9   that same aggressive capacity growth now actually owes money

10   under the MGIA, right?

11   **A.**   Yes, again, it was set up in a way that both parties

12   would actually then be incentivized, which would minimize the

13   need for a transfer payment.

14   **Q.**   So in that circumstance, the partner airline effectively

15   subsidizes the other airlines capacity growth at lower unit

16   revenue, via this transfer payment, do you agree with that?

17   **A.**   If you've got one airline that is not growing as quickly

18   as the other, then the airline that is growing less quickly,

19   you know, in effect, would be supporting some of the unit

20   revenue ramp up than the airline that was growing more

21   quickly.

22   **Q.**   And that that we're discussing right now is how the NEA

23   incentivizes growth; is that right?

24   **A.**   That is one of the ways that it incentivizes growth.

25   **Q.**   All right.  But for the two decades before now, JetBlue

1   didn't receive a subsidy from another airline when it was

2   growing capacity, right?

3   **A.**   Well, again, I wouldn't describe it as a subsidy.

4   You're --

5   **Q.**   Right.  A transfer payment?

6   **A.**   Yeah.  I mean, you're forming a business together.

7   You're both making investments in that business.  And it

8   reflects the flat fact that the revenue may come in

9   differently at different times.

10   **Q.**   And previously, JetBlue didn't -- previously before the

11   NEA, JetBlue didn't need a transfer payment to have the

12   incentive to grow, did it?

13   **A.**   True.  But nor could we serve some of these markets that

14   we can now serve in the NEA, because we have no partner or

15   aircraft to serve them.

16   **Q.**   So now JetBlue does need a transfer payment to have the

17   incentive to grow.  Is that your testimony?

18   **A.**   No, again, what the transfer payment does is really, in

19   effect, as airlines are growing, it is providing some revenue

20   relief for the airline that has maybe invested more in the

21   capacity growth in that year.  It is not a subsidy.  And

22   again, the choice for JetBlue was quite clearly not being

23   able to serve all of these markets that American is now

24   serving as part of our partnership.  We weren't competitive

25   before with Delta and united, because we couldn't get

1   customers to many of these markets.

2   **Q.**   Okay.  And again, the transfer payment that we're talking

3   about here, that transfer payment comes from your partner

4   airline, right?

5   **A.**   Yes.  When there's a transfer payment, it's going to come

6   from the other airline.

7   **Q.**   So that's revenue for JetBlue, but a cost for your

8   partner, right?

9   **A.**   Well, it, again -- so the way we account for it is

10   usually as a revenue transfer.  So the revenue -- and it's no

11   different, by the way, if you're selling through a business

12   travel agency and they're keeping a percentage.  What you end

13   up remitting back is a lower revenue number.  It doesn't

14   actually affect your cost line.

15   **Q.**   But overall the two carriers in the joint alliance are no

16   better off, right?

17   **A.**   Well, in terms of the -- in terms of the net -- the net,

18   yes.  There's no net -- there's no one else contributing to

19   the transfer payment, if that's what's behind the question.

20   **Q.**   All right.  But again, your coordinating capacity with

21   that same partner airline, right?

22   **A.**   In the NEA markets and in the markets that aren't carved

23   out, yes.

24   **Q.**   And you're both in business, obviously, to maximize

25   profit for your shareholders, right?

1    **A.**  We need to make money.  We've not made money for ten

2    quarters.

3    **Q.**  And your partner airline is not going to knowingly agree

4    to a capacity plan that requires it to make a large transfer

5    payment to JetBlue, right?

6    **A.**  Sorry, could you rephrase that?

7    **Q.**  Your partner airline that you're coordinating capacity

8    with --

9    **A.**  Right.

10   **Q.**  -- is not going to make a plan with JetBlue when that

11   partner airline sees that the result of this plan is going to

12   be a big transfer payment to JetBlue?

13   **A.**  Well, again, I think that's not the right way of looking

14   at it.  The way I look at it is to say with this partnership,

15   all the revenues that JetBlue is generating, or the

16   incremental revenue that we are able to generate because of

17   this partnership, all the revenue that American is making,

18   that is big -- those are billions of dollars.  And as part of

19   that, there is a transfer payment, which is a relatively

20   small part of the total.  So I don't believe that the

21   transfer payment is material to how we certainly are making

22   decisions.  It's just not -- it's not material enough.

23   **Q.**  It's not material to how you're making decisions, but

24   it's the incentive to grow in the NEA?

25   **A.**  As I said, it's one of the incentives to grow.  Because

1    we also have a slot divestiture commitment at Kennedy that

2    increases if we don't grow.  And we've also made certain

3    growth commitments to the DOT as part of our agreement there.

4    **Q.**  But the incentive that's in the formula that you have

5    touted repeatedly, the revenue sharing agreement with

6    American Airlines, that incentive, is this transfer payment

7    that we're talking about right now, right?

8    **A.**  The transfer payment is not really an incentive.  The

9    transfer payment is really trying to balance out the relative

10   revenue growth and costs that both parties have had as

11   they've grown their business together.

12   **Q.**  But I thought the point of the growth incentive was that

13   you'd be more willing to do low unit revenue capacity growth

14   because you're going to get your partner airline to subsidize

15   part of it?

16   **A.**  Yes.  I mean, as I said, that's one of the -- you know,

17   we wanted a number of measures in place to incentivize

18   growth.  Whilst the transfer payment is there, in terms of

19   the overall materiality of the agreement, I would say that,

20   for example, if we don't meet our growth commitments and have

21   to divest lots of JFK, that would be a bigger concern for me.

22   **Q.**  So Mr. Hayes, does the transfer payment matter or not?

23   **A.**  The transfer payment is an important part of this

24   agreement.  I'm just saying that it doesn't really -- it's

25   not that material in terms of how we think about how we grow

1    as JetBlue and where we grow.

2    **Q.**  All right.  But the partner airline we're talking about

3    here, of course, is American Airlines, right?

4    **A.**  Yes.

5    **Q.**  And for the better part of two decades, American Airlines

6    has been focused like a laser on restricting capacity growth

7    to keep prices high, right?

8    **A.**  I've made those comments, yes.

9    **Q.**  But now the MGIA formula incentivizes American to throw

10   away its business plan.  Is that the idea here?

11   **A.**  Well, that's a question you should probably put to

12   American Airlines, you know, what was of interest for me was

13   to make sure that this NEA did not change who we were.  That

14   our model of growth was important.  And we needed

15   American Airlines to grow in JFK.  We needed

16   American Airlines to grow in Boston in order to help

17   customers who have flown JetBlue in the years reach new

18   destinations that we just didn't simply have the scale or

19   aircraft to meet.  So entering into this agreement with

20   American and not having them grow would not have met the

21   needs of JetBlue or its customers.

22   **Q.**  All right.  So we testified about the phrase "metal

23   neutrality," right?

24   **A.**  Yes.

25   **Q.**  What is metal neutrality in the context of a revenue

1    sharing agreement?

2    **A.**  So again, metal neutrality can mean different things to

3    different people.  At one level what it is saying I would

4    rather have a customer in the NEA flying on either JetBlue or

5    American versus say flying on Delta or United.

6    **Q.**  But you don't care as between JetBlue and American; is

7    that right?

8    **A.**  I care very much.

9    **Q.**  But in a metal neutral agreement, you don't, right?

10   **A.**  Well, again, this is why I said it means different things

11   to different people.  The second part of that question is, is

12   there a benefit within the NEA when a customer flies on

13   JetBlue over American.  And the answer from JetBlue is very

14   much yes.  Whilst there is revenue in the -- in the MGIA,

15   there's other revenue benefits such as our loyalty program,

16   our co-brand credit card program, our vacations business,

17   where we can sell additional revenue if that customer is

18   flying on JetBlue.  So it's metal neutral in terms of the way

19   it competes with Delta and United, but I still want people on

20   JetBlue rather than American, when I can.

21   **Q.**  In a metal neutral agreement, Mr. Hayes, one partner

22   gains nothing from winning a customer away from the other.

23   Do you agree with that?

24   **A.**  Well, again, people use the phrase metal neutral in this

25   industry meaning different things.  I think the definition

1    I'm most comfortable that says if I have a partnership with

2    another airline, then I'd rather have them fly me or that

3    partner versus another airline.

4    **Q.**   So when the arrangement is metal neutral, you don't care

5    if a customer goes to your website and decides to buy a

6    ticket on your partner's metal, right?

7    **A.**   Well, that's why I just said to you I do care and I would

8    rather that they fly JetBlue, but if they're not going to fly

9    JetBlue, then I want them to fly American in the NEA markets.

10   **Q.**   And in a metal neutral agreement, it makes more sense to

11   cooperate with your partner than to compete, right?

12   **A.**   Yes, because what we're trying to do here is bring our

13   customers a much more competitive global network than we've

14   been able to do before.

15   **Q.**   Is the NEA's revenue sharing provision designed to

16   establish metal neutrality in your mind?

17   **A.**   Well, I think what we were very careful about when we

18   entered into the NGIA from the JetBlue perspective was to

19   make sure that we only included the revenue elements that

20   were directly attributable to that flight.  And also, we only

21   wanted to include costs that were directly attributable to

22   that ticket.  And so that was our negotiating objective as we

23   went into the MGIA and I believe I was comfortable where it

24   ended up.

25   **Q.**   So Mr. Hayes, I'll repeat my question, is the NEA's

1    revenue sharing provision designed to establish metal

2    neutrality?

3    **A.**   Well, again, I'm not trying to avoid the question, but at

4    one level, yes, because it's creating a joint partnership.

5    However, JetBlue also benefits when customers fly on our

6    metal, even within the NEA.  And that sits outside of the NEA

7    agreement.

8             THE COURT:  Why is that?

9             THE WITNESS:  Because, Your Honor, if they are

10    flying on us and they sign up into our loyalty program,

11    TrueBlue, or they become a Mosaic customer and they get the

12    JetBlue credit card, or they buy one of our vacations or

13    hotels, because they're on a JetBlue flight, all of those

14    revenues sit outside of the partnership with American and are

15    retained by JetBlue, and those are very substantial.  I mean,

16    I'll keep the numbers high level, because they're kind of

17    quite confidential, but for most airlines, those revenue

18    streams themselves are more than the profit, operating profit

19    of the entire operating company.  The loyalty programs are

20    very valuable.

21    **Q.**   Is the --

22             THE COURT:  I see.  Just one more question.

23             So when you talked about how it was important to

24    you about the cost structure?

25             THE WITNESS:  Yes.

1        THE COURT:  That you wanted to limit the revenue

2    just to the flight.

3        THE WITNESS:  Yes.

4        THE COURT:  And the cost just to the flight.

5        THE WITNESS:  Yes.

6        THE COURT:  So the revenue side that you did not

7    want included was the loyalty program, the vacation package,

8    the other things like that, that you just referred to, right?

9        THE WITNESS:  Yes.

10       THE COURT:  And what was the significance, why was

11   the structure and the cost structure the way you did matter

12   to you the way you're describing.

13       THE WITNESS:  Well, for us, you know, as I look at

14   some of these other joint ventures that can be more profit

15   share based, or at least that's the way I understand them to

16   work, this is a partnership between a legacy airline and a

17   low cost carrier.  The last thing that we wanted was to

18   jeopardize our cost structure by now sharing some of these

19   costs with American, because if we started including lounge

20   costs and some of the other things, that would add pressure

21   to the JetBlue cost structure, Your Honor, which is -- and

22   quite frankly, one of the reasons that the legacy airlines

23   have to offer higher fares, is they have higher cost

24   structures.  We have to protect ours, so we wanted to keep

25   all of those out.

1          THE COURT:  What would those kinds of things be,

2     besides lounges?

3          THE WITNESS:  It can be lounges, it could be

4     airport costs that you could share.  I mean, airport costs

5     can be very expensive and you know lounge -- we do not have

6     lounges at JetBlue, because they're very expensive.

7          THE COURT:  Go ahead.

8     BY MR. DAVIS:

9     Q.  Would you agree, Mr. Hayes, that the MGIA helps align

10    JetBlue and American's economic incentives within the NEA?

11    A.  Yes, in terms of competing with Delta and United.  Yes.

12    Q.  Well, not just in competing with Delta and United.  Would

13    you agree that it aligns economic incentives in the NEA?

14    A.  Again, I'll repeat what I said earlier.  Yes, in terms of

15    I want people to fly in the NEA versus Delta and United.  But

16    in the NEA, I would much rather have a customer on a JetBlue

17    airplane than an American airplane, which is why we kept some

18    of these other revenue benefits outside.

19    Q.  You have never before seen a revenue sharing agreement

20    and an alliance between domestic carriers who are also

21    coordinating capacity on overlap routes; is that right?

22    A.  I haven't seen it in the US and I haven't really studied

23    it to see if it exists elsewhere in the world.

24    Q.  Would you agree that such an agreement seems risky when

25    it comes to regulators?

**A.**   Yes.  I think we knew that this would face a lot of regulatory review.  You know, JetBlue, it was definitely -- we were sort of thinking outside the box, and we were trying to solve some long term structural challenges that we faced in order to grow.

**Q.**   All right.  Showing you now PX 807.

MR. DAVIS:  Which is not in evidence, Your Honor, so please don't publish at this time.

THE COURT:  All right.  What number did you say?

MR. DAVIS:  807.

THE COURT:  Okay.

BY MR. DAVIS:

**Q.**   Do you have that, Mr. Hayes?

**A.**   807.

**Q.**   Yes.

**A.**   Is it the one that's "Dear Robin Reese"?

**Q.**   It's an e-mail from April Carr at CMA --

**A.**   Yes, I have it.

**Q.**   And that's an e-mail from April Carr at the United Kingdom Competition and Markets Authority to JetBlue, attaching documents JetBlue had submitted to the CMA; is that right?

**A.**   Yes.

**Q.**   And the attachments in plaintiff Exhibit 807 include, among other things, slides from a June 2020 meeting of

1    JetBlue's board of directors.  Correct?

2    **A.**  I'm sorry.  What page are you on?

3    **Q.**  It's one of the attachments, and it's the June 2020

4    meeting of JetBlue's board of directors.  It starts

5    out, "Today we'll focus on five of the nine work streams,"

6    and then the slide page ends in 947.  Do you see that?

7    **A.**  I'll get there in a second.  I'm just --

8    **Q.**  I'm sorry I'm going too fast, Mr. Hayes?

9    **A.**  That's all right.  I just know I better be looking at the

10   right page before you ask me questions.

11          2-4 --

12   **Q.**  947, the first slide ends.

13          THE COURT:  I'm sorry, there are two Bates numbers

14   on some of these.  94.

15          MR. DAVIS:  There can be, Your Honor, I think.

16          THE COURT:  Oh, I see it.  Okay.  "Today we'll

17   focus on five of nine."

18          THE WITNESS:  How many pages is it into the deck,

19   that might be the easiest.

20          THE COURT:  Pretty far in.

21          MR. DAVIS:  Yeah, there are several attachments.

22          THE COURT:  Either one of you can help him find it,

23   if that will make it easier.

24          Maybe one of you can go.

25          THE WITNESS:  I got it.

1          THE COURT:  You got it.

2          THE WITNESS:  It's right at the back.  Okay.  I'm

3     going to mess up all of these pages.  Okay.  I have it.

4     BY MR. DAVIS:

5     **Q.**  And you see the first slide is "today we'll focus on five

6     of the nine work streams" correct?

7     **A.**  Yes.

8     **Q.**  And is that a deck from a June 2020 meeting of JetBlue's

9     board of directors?

10    **A.**  Yes.

11         MR. DAVIS:  Your Honor, I move to admit 807 in

12    evidence.

13         MR. SCHWED:  Can you just give me one second,

14    Your Honor?

15         THE COURT:  Sure.

16         Are you admitting the whole thing or just this

17    page?

18         MR. DAVIS:  I'd be content to admit the -- this

19    deck.  That's all I'll ask questions about, in any event.

20         MR. SCHWED:  I'm sorry, are you moving to admit the

21    whole deck, or just the specific portion.

22         MR. DAVIS:  The entire deck.

23         MR. WALL:  Just this deck, one of several -- the

24    document has several parts.

25         MR. SCHWED:  And there are two different sets of

1    Bates numbers.  I'm having trouble finding which Bates number

2    is the deck you're talking about, if I may.

3            MR. DAVIS:  The first slide in question ends in

4    947.

5            MR. SCHWED:  We have no objection to that,

6    Your Honor.

7            THE COURT:  All right.  Fine.  So we're admitting

8    as -- I'm admitting as plaintiffs' Exhibit 807 just the slide

9    deck.  That's what you offered?

10           MR. DAVIS:  The slide deck, again, beginning with

11   the, "Today we'll focus on five of the nine work streams."

12           THE COURT:  Beginning at Bates number, the last

13   three digits are 947.

14           MR. DAVIS:  Correct.

15           THE COURT:  That goes through to the end of 961.

16   That's the last page of the exhibit.

17           MR. DAVIS:  Yes, I think so.

18           THE COURT:  Okay.  That is admitted.

19           (Plaintiff Exhibit No. 807 admitted into evidence.)

20           MR. DAVIS:  Thank you, Your Honor.

21   BY MR. DAVIS:

22   Q.  Again, these are slides presented to JetBlue's board of

23   directors about the Northeast Alliance, right?

24   A.  Yes.

25   Q.  And could we publish, beginning at page 6, which ends in

1    952 with the title "Connie poses various risks that should be
2    considered."
3                Do we have that one, Mr. Hayes?
4    **A.**  I do, yes.
5    **Q.**  All right.  I'm waiting for that to come up.
6    **A.**  Yes, it's up.
7    **Q.**  All right.  And under the -- you see there's a "Risks"
8    column on the left?
9    **A.**  Yes.
10   **Q.**  And again, Connie is the code word for American Airlines
11   and the NEA that's being negotiated, right?
12   **A.**  Yes.
13   **Q.**  And under the risks column, the first risk is identified
14   as, "Connie utilized payment model to fund loss-making
15   capacity."
16               Do you see that?
17   **A.**  Yes.
18   **Q.**  So that is a risk that American will use the MGIA to fund
19   loss-making flights in NEA airports, right?
20   **A.**  Yes.
21   **Q.**  That would have forced JetBlue to fund American's losses,
22   right?
23   **A.**  Yes.
24   **Q.**  And under potential alleviations over on the right, it
25   says, "Contract calls for concurrence capacity deployment,"

1  right?

2  **A.**  Yes.

3  **Q.**  That means network optimization, right?

4  **A.**  Yes.

5  **Q.**  All right.  And the fifth risk down reads, "JetBlue may

6  lose some kind of independence and may be co-opted by Connie

7  manipulation."

8            Do you see that?

9  **A.**  I do.

10 **Q.**  Do you agree that the NEA poses a risk that JetBlue will

11 lose its independence now that it's aligned with

12 American Airlines?

13 **A.**  So before we went into the NEA with American, we spent a

14 lot of time as a leadership team and board making sure we

15 understood the risks and making sure that, before we entered

16 into the agreement with American, that we had suitable

17 alleviations and mitigations for those risks.  So whilst it

18 was absolutely a risk that we identified when you're an

19 airline CEO, you're in the risk business every day, we

20 wouldn't, and I wouldn't have certainly entered into the NEA

21 if I didn't feel we had adequate alleviations to mitigate

22 those risks.

23 **Q.**  So Mr. Hayes, your answer to my question is yes, correct,

24 you did agree that the NEA poses a risk that JetBlue is going

25 to lose its independence, right?

1          MR. SCHWED:  Objection, Your Honor,

2    mischaracterizes.

3          THE COURT:  Overruled.  You can answer.

4          THE WITNESS:  Yeah, the reason I didn't answer the

5    question in the way, perhaps, you had wanted me to was I felt

6    you were alluding to it being a risk now.  The distinction

7    that I was trying to make was that that was something that we

8    evaluated before we went into the NEA, and as a result of

9    that evaluation, felt we had alleviated and mitigated that

10   risk.  That isn't something that I've been concerned about

11   since we've been in the NEA.

12   BY MR. DAVIS:

13   **Q.**  Mr. Hayes, I don't want you to answer my question any one

14   way or the other, I just want you to answer the question.

15          Is that clear?

16   **A.**  Very much and I believe I have.

17   **Q.**  Thank you.

18          You also stated here that JetBlue could be co-opted

19   by American manipulation, right?

20   **A.**  I do, yes.

21   **Q.**  All right.  Now, would you please flip ahead six pages to

22   the slide that says, "Project Connie:  Spectrum of potential

23   antitrust risk."?

24   **A.**  Yes, I have it.

25   **Q.**  And there's a blue banner with an arrow to the right

1    that's hard to read.  Right?  Right in front of the plane, do

2    you see that?

3    **A.**  Yeah, I do.

4    **Q.**  And it says, "Increasing antitrust risk" going to the

5    right, right?

6    **A.**  Yes.

7    **Q.**  All right.  And number one on the left, that number one

8    is, "Reprotect and interline," right?

9    **A.**  Yes.

10   **Q.**  And what's an interline in airline lingo?

11   **A.**  An interline is when you're selling a ticket on airline

12   A.  So let's say you're going from Buffalo to JFK to

13   Frankfurt.  If you flew the Buffalo-JFK leg on JetBlue and

14   you flew the JFK leg to Frankfurt on Lufthansa, you would get

15   the ticket that would say this flight is on JetBlue, this

16   flight is on Lufthansa, but you can through check yourself

17   and you can through check your bag.  So it offers customers

18   that convenience.

19   **Q.**  Okay.  And number two, moving on to the spectrum is

20   "codeshare" with a footnote one, right?  You see the

21   footnotes down at the bottom?

22   **A.**  Yes.

23   **Q.**  And footnote one notes that a codeshare agreement is

24   where the parties operate independently setting their own

25   capacity, schedule, and pricing, and incentivize to sell

1    seats on operated flights.  Do you see that?

2    **A.**  I do.

3    **Q.**  And the first bullet underneath codeshare notes as

4    potential concern capacity reductions, especially when

5    already overlapped on codeshare routes, right?

6    **A.**  Um --

7    **Q.**  I'm sorry, up at the top, back up at the top?

8    **A.**  Okay.  You're not on the footnote anymore.

9    **Q.**  Yeah.  Sorry.

10   **A.**  Okay.

11   **Q.**  Capacity reductions, especially when already overlap on

12   codesshare routes?

13   **A.**  Yes.

14   **Q.**  All right.  And codeshares are done between airlines with

15   some frequency, right?

16   **A.**  That's correct, yes.

17   **Q.**  And what's a codeshare, just briefly.

18   **A.**  So going back to my Buffalo-Frankfurt example, and

19   someone going from Buffalo to JFK to Frankfurt, if now -- I

20   could be flying JetBlue from Buffalo to JFK and then

21   Lufthansa from JFK to Frankfurt, instead of that second

22   flight being on Lufthansa, it's on a flight operated by

23   Lufthansa, but it would have the JetBlue marketing, we call

24   it the marketing code.  So the difference between interline

25   and codeshare is that if I'm a member of that airline's

1    frequent flyer program, like our program is TrueBlue, I can

2    get miles on that Lufthansa segment.

3    **Q.**  Okay.

4    **A.**  It's a theoretical example, because we do not codeshare

5    with Lufthansa.

6    **Q.**  All right.  Number three on the spectrum is codeshare

7    plus in New York City, but no transatlantic, right?

8    **A.**  Yes.

9    **Q.**  TATL is a common abbreviation for transatlantic?

10   **A.**  It is, yes.

11   **Q.**  And with a footnote 2, under codeshare plus, right -- you

12   see down at the bottom again?

13   **A.**  Yes.

14   **Q.**  And it says that "plus includes at least RSA," which is

15   revenue sharing agreement, "capacity optimization, frequent

16   flyer plan, and some sales and marketing coordination,"

17   right?

18   **A.**  Yes.

19   **Q.**  And again, RSA there is the revenue sharing agreement,

20   right?

21   **A.**  Yes.

22   **Q.**  The first bullet under potential concerns for option 3

23   reads:  "RSA and capacity optimization may reduce incentives

24   to compete and diminish JetBlue effect," right?

25   **A.**  Yes.

1   **Q.**  And same with bullets 2 and 4, joint marketing, frequent

2   flyer plan, joint corporate customer dealing also may

3   diminish incentive to compete, right?

4   **A.**  Yes.

5   **Q.**  And that's a moderate risk in -- as presented to the

6   JetBlue board in June of 2020, right?

7   **A.**  Yes.

8   **Q.**  And finally, number 4, on the far right of the spectrum,

9   reads:  "Codeshare plus in New York City, including

10   transatlantic and/or Boston."

11        Do you see that?

12   **A.**  Yes.

13   **Q.**  So in this slide, Boston and transatlantic are included

14   only on option number four, right?

15   **A.**  Yes.

16   **Q.**  And option number four is identified as having the

17   highest antitrust risk on this chart, right?

18   **A.**  Yes.

19   **Q.**  And the row that reads "risks," the first bullet for

20   option four says, "high risk due to extent of integration and

21   geographic scope," right?

22   **A.**  Yes.

23   **Q.**  And in the row for potential concerns, the first bullet

24   for option four says, "JetBlue much stronger in Boston

25   already," right?

1    **A.**   Yes.

2    **Q.**   And the second bullet reads, "Partnership could change

3    JetBlue's incentives for entry into pricing of

4    transatlantic," right?

5    **A.**   Yes.

6    **Q.**   So a partnership with American Airlines could actually

7    change your incentives for entry into and your pricing of the

8    transatlantic flying you were hoping to launch, right?

9    **A.**   It could do, which is why we kept London outside of the

10   agreement.

11   **Q.**   And the third bullet reads:

12           "Since cooperation would involve around 65 percent

13   of the JetBlue network, increases likelihood DOJ

14   investigations network wide effects of partnership," right?

15   **A.**   Yes.

16   **Q.**   So number four on this chart, on the far right, is a high

17   risk option, right?

18   **A.**   It's -- yeah.  We were laying out for our board, we were

19   educating for our board the various forms of partnership, and

20   the different levels of risk that went with each of those.

21   **Q.**   And number four is what JetBlue chose, right?

22   **A.**   Yes.  I mean, we obviously did not include our London

23   flying, but in terms of scope, the four NEA airports, yes, we

24   ended up looking closer to option 4.

25   **Q.**   Well, you didn't have any London flying in June of '20,

1    right?

2    **A.**   No.  But we started two months later, so we were all --

3    already well on the way to we had announced it.

4    **Q.**   And American had a whole lot of London flying that is

5    included in the NEA, right?

6    **A.**   Yes.

7    **Q.**   All right.  And now number 4 is the NEA, right,

8    basically?  Do you agree with that?

9    **A.**   Yes.  Close enough, yeah.

10   **Q.**   So do you agree that JetBlue has taken a pretty big risk

11   here?

12   **A.**   No, I don't believe we've taken a big risk, because part

13   of this board that was making sure that we had mitigations

14   for the risks before we entered into the agreement.

15   **Q.**   You chose the highest risk option on this chart, right?

16   **A.**   Well, we chose the -- I think it's important to recognize

17   what JetBlue was trying to accomplish.  We were trying to

18   compete in New York against two airlines much larger than us

19   at the time, and we were trying to ensure that we had a long

20   term viable position in Boston that could be successful, as

21   Delta continued to grow and focus on growing here.

22           So we felt, when we looked at the benefits for the

23   transaction for JetBlue, that providing we found ways of

24   mitigating the risks, it was the part that we felt was best

25   for us to take.

```
 1              MR. DAVIS:  All right.  Your Honor, the next
 2    question that I want to ask about is about transfer payment
 3    for 2021 and I wanted to ask if I could have a brief word
 4    with counsel.
 5              THE COURT:  Sure.
 6              MR. DAVIS:  Thank you.
 7              MR. SCHWED:  Are we finished on this one?
 8              MR. DAVIS:  Yes.  We're finished with that.
 9              (Counsel confers.)
10              MR. DAVIS:  That's all, Your Honor.
11              THE COURT:  No more questions?
12              MR. DAVIS:  No, no.
13    BY MR. DAVIS:
14    Q.  Mr. Hayes, by the second half of 2021, it was becoming
15    clear that under the MGIA formula, JetBlue was going to owe a
16    lot of money in a transfer payment to American Airlines,
17    right?
18    A.  Yes.
19    Q.  More than $100 million?
20    A.  Yes.
21    Q.  And that's not what you had expected when you signed the
22    NEA?
23    A.  Yes.
24    Q.  And when did you first become aware in '21 that JetBlue
25    potentially faced 100 plus million transfer payment to
```

1    American under the MGIA?

2    **A.**   Yeah, the context of that was that the -- two things had

3    really significantly impacted us, really, because of COVID.

4    First of all, the international long-haul markets which is

5    what American had invested in and grown at JFK and Boston

6    were still very slow to recover.  There were still a lot of

7    government travel restrictions including here in the US.  And

8    the second element was just the much slower recovery of

9    business travel.  Those were the two elements of partnership

10   that we were really looking for American to deliver on, and

11   those were the two things that were most impacted by COVID.

12   So that's what drove this kind of really exceptional one-off

13   flow.

14          It's something that we were talking about as we

15   went into the middle of the year, to answer your question.

16   But I would say it never really -- it never was something

17   that I didn't feel that we would end up resolving.

18   **Q.**   So let's look at plaintiff Exhibit 770, about revenue

19   update that's in evidence, Your Honor.

20          That's an e-mail chain, with the top e-mail dated

21   October 19, 2021.  Do you see that, Mr. Hayes?

22   **A.**   Uh-huh.  Yes.

23   **Q.**   And that's an e-mail chain between you and Scott

24   Laurence, again, dated October 19th, '21?

25   **A.**   Yes.

1   **Q.**   And you've had a question to Mr. Laurence in response to

2   a weekly revenue update, correct?

3   **A.**   Yes.

4   **Q.**   And you asked for the rationale behind the $20 million

5   MGIA payment for the fourth quarter of '21?

6   **A.**   Yes.

7   **Q.**   And Mr. Laurence replies to you that American is pushing

8   for a payment of 50 million and JetBlue is targeting a

9   payment of 15 million, so 20 million seems appropriate,

10  right?

11  **A.**   Yes.

12  **Q.**   Now, that 20 million amount is a compromise amount to

13  settle a claim, correct?

14  **A.**   Yes, it is.

15  **Q.**   15 million and 50 million were actually considerably less

16  than the transfer payment actually due under the MGIA formula

17  for the full year of '21, right?

18  **A.**   Yes, I think everyone recognized that what drove that

19  transfer payment was sort of once in a generational issue due

20  to COVID and it was not normal.  It was not the normal course

21  of business.  And, you know, we ended up working on something

22  that was, I think, closer to something that we had originally

23  expected.

24  **Q.**   And so the actual MGIA revenue formula yielded transfer

25  payment obligation of more than $200 million.  Is that

1    correct?

2    **A.**   I can't remember the exact number, but it was -- it was

3    well over $100 million.

4    **Q.**   You don't remember the exact number?

5    **A.**   I don't.

6    **Q.**   You don't remember whether it was over 200 million?

7    **A.**   No.  Because as I say, it was never really something that

8    was seriously discussed.

9    **Q.**   Okay.  And looking to your reply, you write in this

10   e-mail, "Thanks on the MGIA, my question is really the math

11   behind the forecast.  I want to understand how we are

12   modeling this, given the numbers getting larger, which is

13   hopefully a good thing, the large difference between our

14   power modeling and AA's is probably worthy of analysis in

15   itself, as that is a wide spread."  Right?

16   **A.**   Yes.

17   **Q.**   You're saying JetBlue and American are modeling different

18   forecasts for the quarterly transfer payment?

19   **A.**   Well, again, I think you have to remember the period we

20   were in.  It was 2021; the industry was still largely

21   impacted by COVID.  There were big changes every month -- or

22   I should say big changes on small basis every month.  We were

23   all wondering when business travel was going to recover.  Is

24   the CDC and the US government going to lift its international

25   restrictions?  And so, you know, frankly, as we were working

1    through this and this was a new agreement, it was something

2    that was subject to a lot of change and uncertainty.  And in

3    fact, if my memory serves me correctly, we actually agreed to

4    delay starting the MGIA for a quarter or two, just to try to

5    get some normality.

6    **Q.**  But you still had an obligation of, you say, more than

7    $100 million, right?

8    **A.**  Well, again, what I'm going to -- we're in the middle of

9    COVID.  We had an obligation to Airbus to buy billions of

10   dollars of airplanes that Airbus deferred, because when

11   you're in these exceptional times, contracts don't always

12   foresee these things, and you have to react with the parties

13   in front of you.

14   **Q.**  So the growth incentive formula with the MGIA, in this

15   case, resulted in an obligation from JetBlue to make a

16   transfer payment of more than $100 million to

17   American Airlines, right?

18   **A.**  Yes.  But again, that was something that was -- none of

19   my team ever had a concern that that was even close to

20   something that would end up turning out like it did.

21   **Q.**  But you're two businesses, right?

22   **A.**  Yes.

23   **Q.**  And you're maximizing profits for shareholders, right?

24   **A.**  Yes.

25   **Q.**  And you've negotiated an agreement?

1   **A.**   Yes.

2   **Q.**   One of whose purposes is to incentivize growth by means

3   of this very transfer payment, right?

4   **A.**   Yes.  Again, I think you have to recognize the time that

5   we were in with COVID.  It was an exceptional time.  And I

6   would say if you look at most companies or organizations, all

7   of them had to make some pretty big changes to what they had

8   expected to happen.

9   **Q.**   And for your whole history, you were competing against

10  American Airlines, right?

11  **A.**   Yes.

12  **Q.**   But by fall of '21, you weren't even worried about this.

13  Is that what you're saying?

14  **A.**   Worried about the --

15  **Q.**   You weren't worried that you were actually going to have

16  to pay any real money to American Airlines under the MGIA

17  formula?

18  **A.**   No, because I think the issues that had gone on with

19  COVID I think were well known, they were well publicized.

20  And so, you know, as -- I think both parties recognized it

21  was throwing up an exceptional one-off result.

22  **Q.**   How much did JetBlue actually pay American in transfer

23  payments for 2021 total?

24  **A.**   I believe it was 20 million.

25  **Q.**   20 million.  You're not sure of the amount?

1    **A.**   The sum was paid the following year.  I just don't know

2    how it broke up by quarters.

3    **Q.**   But you agree that American gave you a substantial

4    discount, correct?

5    **A.**   No.  I think that the way I look at it is COVID threw out

6    some exceptional events, and the parties reached an

7    understanding, as many parties do all the time, on

8    differences when they arise.

9    **Q.**   And American let you off the hook for more than

10   $100 million that you owed them under the terms of the NEA,

11   right?

12   **A.**   Well, again, this issue didn't even escalate to my desk

13   as an issue.  It was resolved very -- it was resolved at a

14   much lower level in the organization, because everyone

15   recognized COVID threw off some exceptional results.

16   **Q.**   Did you feel beholden to American for saving JetBlue

17   millions of dollars for the debt that you owed them?

18   **A.**   Not at all.

19   **Q.**   Aren't you grateful that they forgave that debt?

20   **A.**   No.

21   **Q.**   Is it your understanding that American wants the NEA to

22   continue, so they're willing to write-off a debt of that

23   magnitude?

24   **A.**   Well, we wanted the NEA to continue, too.

25   **Q.**   You both wanted it to continue, right?

1  **A.**  Yes.

2  **Q.**  Okay.  And the only instance that we have so far of a

3  full year of the MGIA formula operating is 2021, right?

4  **A.**  Yes.

5  **Q.**  And in that instance, you just kind of brushed it into

6  the waistband, right?

7  **A.**  Well, I don't know.  I mean, it was something that

8  happened, and the parties reached a conclusion.

9  **Q.**  Right.

10  **A.**  And again, I don't think we can -- I had much bigger

11  concerns than that, in terms of some of our contractual

12  commitments to Airbus and some other parties.  COVID was a

13  devastating things for airlines.

14  **Q.**  Fair enough.  Let's talk a little bit about aircraft

15  funding.  Are you familiar with the concept of aircraft

16  funding?

17  **A.**  I am.

18  **Q.**  And what does aircraft funding mean?

19  **A.**  Well, it can mean how do you finance or pay for

20  airplanes, or it could mean do you have airplanes to fly a

21  particular market or a route.

22  **Q.**  And in the situation where you're making network plans

23  and you need to come up with airplanes to fly new routes or

24  additional routes, you have to fund with airplanes from other

25  places, right?

1   **A.** Not necessarily.

2   **Q.** But you may have to, correct?

3   **A.** You can buy new airplanes, you can lease airplanes.  You

4   can extend the time of airplanes, you can fly airplanes more

5   hours per day, and you can fund airplanes like that.

6           For example, if JetBlue was to -- if we were to fly

7   every airplane another 40 minutes a day, we would probably

8   generate about 15, 16 incremental airplanes.

9   **Q.** Are you familiar with the idea of harvesting aircraft

10  from your network?

11  **A.** Yes.  We use the term "harvesting" or redeploying.

12  **Q.** All right.  And in the context of the NEA, you knew that

13  new NEA flying would not just materialize out of thin air,

14  right?

15  **A.** You're referring to the extra slots that we picked up?

16  **Q.** Well, new routes that you're try flying in the NEA.

17  **A.** Yes, those -- yeah, that would be the airplanes.

18  **Q.** The airplanes to fly those don't just appear.  They have

19  to come from somewhere.  That's what you just said, right?

20  **A.** Right.

21  **Q.** You have to make other arrangements to make that happen?

22  **A.** Yes.

23  **Q.** And obviously when you shift an airplane from one market

24  to start flying in a new market, that airplane is no longer

25  flying in the original market, right?

1    **A.**   Yes.

2    **Q.**   And whatever revenues that airplane was generating in the

3    old market are no longer being earned, right?

4    **A.**   Yes.

5    **Q.**   Would you also agree that to accurately evaluate the NEA,

6    you have to identify the effects that truly are caused by the

7    NEA?

8    **A.**   I'm sorry; could you clarify that question?

9    **Q.**   That is, to accurately evaluate the effects of the NEA,

10   you have to identify the effects that truly are caused by the

11   NEA.  We agree on that, right?

12   **A.**   I'm not sure what you --

13   **Q.**   That is, if you say something is a benefit of the NEA --

14   **A.**   Yes.

15   **Q.**   -- that benefit has to be something truly caused by the

16   NEA?

17   **A.**   Yes.  Yes.

18   **Q.**   And that wouldn't have happened anyway, right?

19   **A.**   Right.

20   **Q.**   All right.  And you'd have to exclude effects.  When

21   you're evaluating the effects of the NEA, you have to exclude

22   effects that would have come about whether or not the

23   Northeast Alliance was formed, right?

24   **A.**   Yes.

25   **Q.**   All right.  So let's look at plaintiff Exhibit 492, which

1    is in evidence, briefly.

2              THE COURT:  Hold on one second.

3              Go ahead.

4    BY MR. DAVIS:

5    **Q.**  This is an e-mail from June 2, 2020, Mr. Hayes?

6    **A.**  Yes.

7    **Q.**  And this is an e-mail to you from Andrea Lusso in the

8    month before the NEA was announced.  Right?

9    **A.**  Yes.

10   **Q.**  And Mr. Lusso is sending a network briefing about Project

11   Connie ahead of the clean team's briefing the next day,

12   right?

13   **A.**  Yes.

14   **Q.**  And you say you are going to spend the next couple of

15   hours on this?

16   **A.**  Yes.

17   **Q.**  And you note that your numbers are slightly different,

18   right?

19   **A.**  I'm not quite sure that -- I can't recall the context of

20   the e-mail.

21   **Q.**  All right.  But you say "not enough to be a problem."  Do

22   you see that?  "My numbers are slightly different, but not

23   enough to be a problem"?

24   **A.**  Yeah, I'm not sure which numbers I was referring to.

25   **Q.**  Okay.

1    **A.**  Yeah.

2    **Q.**  But then you say, "So much is buried in assumptions,"

3    right?

4    **A.**  Yes.

5    **Q.**  And then you write, "One clarifying question, which

6    perhaps explains it, how do you reconcile the JFK slots that

7    we had already secured from American Airlines" -- remember

8    that?

9    **A.**  Yes.

10   **Q.**  -- "with what is in here as the increase in JFK flying is

11   less than I'd expected, but perhaps you have it in the base

12   already," right?

13   **A.**  Yes.

14   **Q.**  And the JFK slots you had already secured from

15   American Airlines were slots that you reached agreement on in

16   January of 2020, right?

17   **A.**  Yes.  I can't recall exactly what the status of those

18   slots were in January, but we had been talking to American

19   about a slot lease agreement in JFK.

20   **Q.**  And what do you mean by having it in the base already?

21   What does a base refer to?

22   **A.**  Well, so I'll answer this question with a bit of

23   trepidation, because I can't quite exactly remember what I

24   was saying, but to the best of my recollection, part of what

25   we were presenting was a significant increase in slots for

1    JFK, for JetBlue in New York.  And I was just trying to

2    understand how much of that was above and beyond what we may

3    have already been talking to them about leasing.

4    **Q.**  Okay.  All right.  Now, on June 18, 2020, JetBlue

5    announced 30 new routes in Newark.  Do you recall that?

6    **A.**  Yes, I do.

7    **Q.**  So JetBlue is announcing 30 new routes in Newark less

8    than a month before the NEA was announced, right?

9    **A.**  Yes.  That was actually part of a project called "Project

10   Reach," which was actually about 100 new routes in total, of

11   which about 30 were at Newark.

12   **Q.**  And, of course, Newark is a NEA airport, right?

13   **A.**  It is.

14   **Q.**  And when JetBlue announced those new flights, American

15   executives were not happy with you, correct?

16   **A.**  I don't know.  I heard they weren't happy; but, frankly,

17   I didn't care.

18   **Q.**  You didn't care what they thought?

19   **A.**  No.

20   **Q.**  American was unhappy with you because if you just waited

21   a few weeks, you could have claimed that the 30 new routes at

22   Newark were part of the NEA, right?

23   **A.**  Well, again, JetBlue is going to act independently, and

24   we're going to do what's right for JetBlue.  We were five

25   months into COVID.  The airline industry was clinging from

1    its fingertips.  We were trying to generate cash on a daily

2    basis.

3            We were losing millions of dollars a day at this

4    time.  And frankly, we needed to go now.  And what we were

5    trying to do is find routes that we felt could generate some

6    incremental cash to try to just sustain us a little bit

7    longer.

8    **Q.**  And more than all of that, Mr. Hayes, a claim that those

9    30 routes in June of 2020, were NEA routes would have been

10   false, right?  You weren't going to do that.

11   **A.**  Well, the NEA didn't stop in June of 2020.

12   **Q.**  Exactly, right?

13   **A.**  Yes.

14   **Q.**  All right.  Let's talk a little bit about cost.  JetBlue

15   has a lower cost structure than legacy airlines, right?

16   **A.**  Yes.

17   **Q.**  And JetBlue's lower cost structure is an important part

18   of the NEA.  Would you agree?

19   **A.**  Yes.

20   **Q.**  That is, American, with higher costs, has been

21   unsuccessful flying many of their routes out of LaGuardia, in

22   particular.

23   **A.**  Yes.  I mean, the higher costs you have, the more

24   dependent you are on higher unit revenues to make money.

25   **Q.**  And that's why American used small airplanes are sat on

1    slots at LaGuardia, right?

2    **A.**   Yes.  I would say they were playing defense in LaGuardia.

3    **Q.**   But because JetBlue, because of a lower cost structure,

4    could fly many of those LaGuardia markets more profitably,

5    right?

6    **A.**   Yeah, a combination of our low cost structure and also

7    our lower fares stimulating the market and creating more

8    demand.

9    **Q.**   Now, the NEA is the largest undertaking JetBlue has ever

10   committed to.  Would you agree?

11   **A.**   Yes.

12   **Q.**   And fair to say that it requires quite an investment to

13   implement it?

14   **A.**   Yes.

15   **Q.**   And those NEA investments have increased JetBlue's cost,

16   right?

17   **A.**   Well, if we look at the nature of the cost increases, I

18   would argue that these are good costs, because what we have

19   said is that the implementation of the NEA would increase our

20   cost by between two to four points a year.

21          Most of that is in the decision to keep extra

22   aircraft to fly the NEA routes.  So we deferred the timing of

23   30 Embraer 190s, which came at a cost, but it came at a cost

24   of keeping those airplanes, because we had previously

25   announced their retirement.

1          And secondly, because we're bigger and the NEA

2    makes JetBlue bigger in the Northeast, our airport costs go

3    up in the Northeast.  But, again, that's directly linked to

4    growth.  It's a cost that's directly attributable to growth.

5          Where there was an investment of several million

6    dollars which we wouldn't have had otherwise is in the IT

7    systems and some of the investments we were making to create

8    a more seamless experience between JetBlue and American

9    customers.  So I would say the vast majority of those costs

10   are directly attributable to the growth presented by the NEA.

11   **Q.**  All right.  So you agree that the NEA has caused

12   JetBlue's unit cost to increase between 2 to 4 percent per

13   year?

14   **A.**  Yes, because we've added more capacity.

15   **Q.**  Okay.  And another acronym, CASM -- C-A-S-M -- that

16   refers to cost per available seat mile, right?

17   **A.**  It does.

18   **Q.**  So with the implementation of the NEA, did JetBlue see

19   high increases in CASM?

20   **A.**  Well, we have seen a lot of increases in CASM this year,

21   as other airlines have.  The vast majority of that actually

22   is not relevant to the -- directly linked to the NEA

23   investments.  It's linked to just the lower aircraft

24   utilization, so we have fewer hours per day on the airplanes.

25   We have our fixed costs spread over less capacity.

1        We've seen significant labor cost increases this
2   year.  And we are still catching up, paying additional fees
3   from airplanes that they deferred during COVID and that we've
4   been catching up.  So all of that together has created
5   significant pressure on costs, of which some of the NEA costs
6   are a part of that.
7   **Q.**  But, again, you agree that the NEA is increasing
8   JetBlue's unit cost 2 to 4 percent per year, right?
9   **A.**  The growth is increasing the cost.  So if I kept the 190s
10  and flown them outside of the NEA instead of retiring them, I
11  would have had the same cost increase.
12  **Q.**  All right.  And so in 2021, did JetBlue senior leadership
13  look at various options to reduce costs?
14  **A.**  At what time?  Sorry.
15  **Q.**  In 2021.
16  **A.**  Actually, that process start indeed January 2020 -- in
17  February/March 2020, with the onset of COVID.
18  **Q.**  But in earnest, in 2021, late '21, you were looking at
19  some new options to reduce costs, right?
20  **A.**  No.  I would say, actually, most of our focus on costs
21  was the year before.
22  **Q.**  All right.  Were you also looking at options to raise
23  revenues?
24  **A.**  Yes.  Again, that's an ongoing process, but as we stepped
25  out of COVID -- and to give you a context, our revenue, in

1    2021, from memory, was about $6 billion, and we would have

2    expected that to be over $9 billion, and that was directly

3    attributed to COVID.

4    **Q.**  All right.  So I'm not going to ask you about specific

5    revenue-raising option.  Okay?  So don't mention that.  All

6    right?

7    **A.**  Okay.

8    **Q.**  That's confidential, by agreement, with JetBlue.

9    **A.**  Okay.

10   **Q.**  All right?

11          Would you agree that certain revenue-raising

12   options that you considered in 2021, perhaps in '20, would

13   have been unprecedented in JetBlue history?

14   **A.**  Well, I will take the -- I'll take the other booking

15   example.  I don't mind sharing that.  So JetBlue doesn't

16   overbook.  We did look at whether we should start overbooking

17   again -- again, more driven by COVID, than anything else --

18   but we decided not to.

19          And what I would say is we've done a number of

20   things over the years, in terms of we started charging for

21   bags.  We've charged for change fees.  We took change fees

22   away again.  And, you know, it's an ongoing process of

23   review.

24   **Q.**  And what's overbooking, Mr. Hayes?

25   **A.**  Overbooking is where you sell more seats on a flight than

1  you have seats available.

2  **Q.**  All right.  And is that something American Airlines does?

3  **A.**  Yes.  So most airlines used to do a lot of it.  There was

4  a well-publicized incident several years ago from one of our

5  competitors where someone was dragged off an airplane.  After

6  that, airlines damped that down very significantly.  I think

7  a little bit still goes on, but we've never done it.

8         And the challenge is that on every -- even a

9  JetBlue flight, if we've got 150 seats, there's always a few

10  people that don't show up.  And so, in theory, you are

11  leaving money on the table by not overbooking; however, you

12  know, we've always been of the view, if a customer buys the

13  seat, they should have the right to that seat if they turn

14  up.

15  **Q.**  All right.  So let's look at Plaintiffs' Exhibit 821.

16  And this is in evidence.

17  **A.**  Yes.

18         THE COURT:  Do you want this displayed?

19         MR. DAVIS:  Your Honor, I'll just ask the question.

20  I'd ask not to publish at this point.

21         THE COURT:  All right.

22  BY MR. DAVIS:

23  **Q.**  Do you see 821 in front of you, Mr. Hayes?

24         THE COURT:  In your book.

25         THE WITNESS:  Oh, in my book.  Sorry.

1           821?

2           MR. DAVIS:  Yes.

3           THE WITNESS:  Yes, I've got it.

4  BY MR. DAVIS:

5  **Q.**  And you see the first bullet labeled "revenue" that

6  Dave -- and that's Dave Clark -- is working some revenue

7  options, right?

8  **A.**  I'm sorry; I might be on the wrong one.  What number did

9  you say?

10 **Q.**  This is 821.

11 **A.**  Oh, yeah, sorry.  I went to 841.  Apologies.

12 **Q.**  Okay.

13 **A.**  Yes, I've got it.  I have it.

14          MR. DAVIS:  And counsel will advise, if counsel

15 objects.  I just want to ask the one sentence.

16          MR. SCHWED:  Yeah, we're actually okay with this

17 document, from a confidentiality point of view.

18          MR. DAVIS:  Okay.  So we can publish the full

19 document.

20          THE COURT:  All right.

21 BY MR. DAVIS:

22 **Q.**  Do you see "Revenue," that first paragraph?

23 **A.**  Yes.

24 **Q.**  You see, "Dave is working some other revenue options --

25 e.g., overbooking, removal of bag guarantee, and other

1    ideas -- so we can see what they're worth" --

2    **A.**  Yes.

3    **Q.**  -- right?

4    **A.**  Yes.

5    **Q.**  "Dave is" --

6            MR. DAVIS:  And can you blow up below that further,

7    please, the line below?

8    BY MR. DAVIS:

9    **Q.**  -- "to close any gap we may have, while keeping our fares

10   low," right?

11   **A.**  Yes.

12   **Q.**  And then you say, "With the NEA, we have to look at

13   overbooking again," right?  Right?

14   **A.**  Yes.

15   **Q.**  So JetBlue is evaluating whether to change a long-held

16   policy in order to offset NEA costs, right?

17   **A.**  Yes.

18   **Q.**  And you actually recommended that JetBlue change that

19   policy?

20   **A.**  No.  I said we should look at it.

21   **Q.**  Okay.  And ultimately, to be clear, that policy was not

22   adopted, right?

23   **A.**  Yeah.  So I would say in my time with JetBlue, we've

24   looked at overbooking every three to four years to see if

25   it's worth it.  With a largely leisure customer group basis,

1    they tend to turn up.

2            One of the reasons we wanted to enter into the NEA

3    was to improve our access to corporate customers.  And, you

4    know, we know people will take a booking on a

5    Boston-LaGuardia at 4:00, 5:00, and 6:00, and there's only

6    one of them.  And so you end up flying a lot of empty seats

7    if you don't overbook.

8            So what I was trying to express there was, as we

9    were successfully are getting more access to corporate

10   travelers, we're going to see more no-shows, and we might

11   have to look at overbooking.  But we've made absolutely no

12   decision at this point to do that.

13   **Q.**   Okay.  JetBlue also adopted in February of '21 something

14   called "Fare Options 2.1," right?

15   **A.**   Yes.

16   **Q.**   And before, JetBlue had always allowed its passengers one

17   free carry-on bag, right?

18   **A.**   Yes.

19   **Q.**   And in Fare Options 2.1, it announced in February of '21,

20   you eliminated the free carry-on bag for Blue Basic

21   customers, right?

22   **A.**   Yes.

23   **Q.**   The only way for Blue Basic customers to have a carry-on

24   bag is now to purchase the higher priced Blue fare, right?

25   **A.**   Yes.

1    **Q.**  So JetBlue eliminated a free carry-on bag for the first

2    time, the same month that it began to implement the NEA,

3    right?

4    **A.**  Yes.  I mean, the timing was co-incidental.  We had taken

5    the decision to make those changes a long time before,

6    because the IT development takes time.  And it was -- we made

7    some other changes, like removing change fees for our Blue

8    fares as well.

9    **Q.**  So fare options 2.1 has proved lucrative for JetBlue,

10   correct?

11   **A.**  Well, it's been helpful.

12          I will point out that we are -- still have not made

13   a profit in either Q1 or Q2 this year.  We've been

14   unprofitable for ten quarters.  So I'm not sure I'd use the

15   word "lucrative," but it's been beneficial and helpful to

16   make sure we get through COVID.

17   **Q.**  Well, let's talk about it.  So --

18          MR. DAVIS:  And, Your Honor, I probably have ten-

19   to 15-more minutes, and then I'm done with direct.

20          THE COURT:  All good.  We're going to 4:30 today.

21   BY MR. DAVIS:

22   **Q.**  Showing you next PX438 -- 438.

23   **A.**  Yes.

24   **Q.**  And that's from your first-quarter earnings call,

25   April 26th of '22.  That's this year.  In evidence.

```
 1                  THE COURT:  I'm sorry, what exhibit did you say?
 2                  MR. DAVIS:  I'm sorry, Your Honor, it's PX438.
 3                  THE COURT:  Ms. Belmont might need to interrupt for
 4     a moment.  Apparently there's a problem with the Zoom.  If
 5     she does, just to make an announcement for the people on the
 6     Zoom when they reconnect.  But she'll do that if she needs
 7     to.
 8                  Go ahead.  438.
 9     BY MR. DAVIS:
10     Q.  Do you have it, Mr. Hayes?
11     A.  Yes.
12     Q.  Do you recognize this as the 2022 first-quarter earnings
13     call for JetBlue?
14     A.  Yes.
15     Q.  And in those earnings calls, you and --
16                  THE COURT:  You can go ahead.
17                  THE WITNESS:  That wasn't me.
18                  MR. DAVIS:  I didn't know where that came from.
19     BY MR. DAVIS:
20     Q.  In an earnings call, you and other executives give
21     presentations for investors and take questions, right?
22     A.  That's right.
23     Q.  And turning to page 3, in the sixth paragraph, you
24     said -- and it begins, "To help."  "To help restore our
25     operational reliability, we are reducing our capacity growth
```

1    even further as we plan more conservatively for the summer

2    and make investments to derisk the operation."  Right?

3    **A.**  Yes.

4    **Q.**  So JetBlue had already reduced capacity in the spring,

5    right?

6    **A.**  That's correct.

7    **Q.**  And a lot of that had to do with pilot shortages?

8    **A.**  Pilot training and pilot retention, more than pilot

9    shortages.

10   **Q.**  Okay.

11   **A.**  But also some of the fragility in the external

12   environment, like air traffic control.  So, for example, in

13   the first 20 days of April, because of the shortages in the

14   Jacksonville control center, we were in ground delay

15   programs, which are air traffic control delays, for 115

16   hours.  And no one felt it more than our customers here in

17   Boston.

18   **Q.**  So you reduced capacity in the spring, right?

19   **A.**  Yes.

20   **Q.**  And now you're announcing additional capacity reductions

21   in the summer, right?

22   **A.**  Well, we -- yes.  We made most of our -- what we did was

23   once we started to see the issue occur, the way we schedule

24   is a month at a time.  So we dealt with the months that were

25   in front of us.  And then as we got into the summer, we

1    continued to roll those capacity reductions through the rest

2    of the year.  So they weren't additional in that we cut it

3    once and then we cut it again; it was more of a rolling cut

4    as we continued to get through the year.

5    **Q.**  So you had projected over 2019, and is it fair to say

6    that because of COVID, 2019 is kind of used as a comparison

7    year in airline planning a lot?

8    **A.**  It is the last year that existed in airline planning

9    terms.

10   **Q.**  So you had originally projected capacity growth over 29

11   at 11 to 15 percent for this period of 22; is that right?

12   **A.**  That's correct.

13   **Q.**  And you revised that projection from 11 to 15 percent

14   growth to 1 to 5 percent, right?

15   **A.**  That is correct.

16   **Q.**  So that's a reduction of about ten percentage points,

17   right?

18   **A.**  Yes.

19   **Q.**  And on pages 13 and 14, so a good bit further in this

20   earnings call, you're discussing the growth in New York.  Do

21   you see that?  At the very bottom of 13 and on to 14.

22   **A.**  Yes, I have it.

23   **Q.**  And you say, "In terms of the growth in New York, one of

24   the areas that we have been adjusting is Newark."

25   **A.**  Yes.

1   **Q.**  "And we have some of the capacity changes that we make

2   have reduced our flying in and out of Newark," right?

3   **A.**  Yes.

4   **Q.**  "Obviously from the JFK and LaGuardia perspective, with

5   just slotted airports, that is something that's much harder

6   to do."  Right?

7   **A.**  Yes.

8   **Q.**  So in making these capacity cuts you're announcing that

9   JetBlue is planning to decrease capacity at Newark Airport,

10  right?

11  **A.**  Yes.

12  **Q.**  But JetBlue is not making adjustments at JFK or

13  LaGuardia, right?

14  **A.**  Yes.  We couldn't make adjustments at JFK, LaGuardia, or

15  DCA because they were slotted airports.

16  **Q.**  So that's much harder to do, as you said, right?

17  **A.**  Well, if you do it, you lose the slot.

18  **Q.**  So that's one thing you're not going to do, right?

19  **A.**  We're not going to do that unless we get a waiver to do

20  it.

21  **Q.**  All right.  And so you have to fly those NEA routes or

22  risk losing slots potentially to other airlines, right?

23  **A.**  Yeah.  So in LaGuardia and JFK, which are NEA markets,

24  yes.  And DCA obviously has the same constraint, which is a

25  nonNEA market.

1    **Q.**  And some of those slots are from American Airlines,

2    right?

3    **A.**  Yes.

4    **Q.**  So now you're covering American Airlines slots at JFK and

5    LaGuardia, right?

6    **A.**  Well, we're treating them like our own slots.

7    **Q.**  Right and you're prioritizing covering those slots at the

8    expense of other flying.  Do you agree?

9    **A.**  Yeah.  And I think you will find that that's something

10   every airline has done in terms of protecting flights at

11   slotted airports.  Again, JetBlue is not alone in making

12   these reductions as I think you're aware.  Almost all US

13   airlines this year have reduced their capacity over what was

14   originally planned.

15   **Q.**  And so, in effect, now you're sitting on slots that used

16   to be American Airlines slots, right?

17   **A.**  Well, we're flying them.  I mean, I think you're

18   co-mingling terms, because normally you use the word

19   "sitting" because I'm holding a slot, but I'm not flying it.

20   In this case, we're flying the slot.  So I don't view that as

21   sitting.

22   **Q.**  But in Newark, where there aren't slots you're reducing?

23   **A.**  The issue at Newark was actually much bigger than slots.

24   Newark has been the most delayed airport in the country.  We

25   were originally due to move into a new terminal in the

1    summer.  That terminal was delayed.  It's still not opened.

2    And the port authority was very appreciative of our agreement

3    to delay, to reduce flying in Newark.  And United Airlines

4    also, as you've seen, has done the same thing.  It is a very

5    challenged airport at the moment.

6    **Q.**  So now in 2022, JetBlue's projected overall capacity

7    growth for the year is zero to three percent; is that right?

8    **A.**  Yes.  I mean, that's approximately right.

9            THE COURT:  As compared to 2019.

10   BY MR. DAVIS:

11   **Q.**  Correct?

12   **A.**  Compared to 2019.

13   **Q.**  So we have the NEA, right?

14   **A.**  Yes.

15   **Q.**  And we're kind of coming out of COVID, right?  And you're

16   now at zero to three percent capacity growth, right?

17   **A.**  Yes.  Which is still one of the few airlines growing in

18   the US over 2019.

19   **Q.**  All right.  In JetBlue's earnings call for the second

20   quarter of 2022, you also talked about record revenue growth

21   at the top end of our original guidance range, correct?

22   **A.**  Yes.

23   **Q.**  And you also refer to a record quarterly revenue result

24   for JetBlue, right?

25   **A.**  Which one are you -- I'm sorry, which --

1    **Q.**  Your second -- your first half of 2022, your earnings

2    call for the second quarter of 2022.  Do you remember the

3    record revenue growth that you announced?

4    **A.**  That's not in this transcript, though, right?

5    **Q.**  Correct.

6    **A.**  Okay.  Yes, so we had a good revenue quarter.  However,

7    it was still unprofitable.

8    **Q.**  So capacity is down, but revenue is record high, right?

9    **A.**  Yes.  Capacity was down on 2019.  Our cost was

10   significantly up and revenues were up.

11   **Q.**  And JetBlue's capacity cuts with any -- in the NEA are

12   now made in coordination?

13          THE COURT:  I'm sorry, revenue up as compared to

14   2019.

15          THE WITNESS:  Yes, in terms of unit revenues were

16   up, Your Honor.

17          THE COURT:  Okay.  Go ahead.  Sorry.

18   BY MR. DAVIS:

19   **Q.**  And JetBlue's capacity cuts within the NEA are now made

20   in coordination with American Airlines, right?

21   **A.**  Well, not really.  Not -- I mean, before anything,

22   JetBlue had about 1,000 flights a day.  We effectively cut

23   10 percent.  So we went down to 900 flights a day.  If you

24   look at how many of those flight are in and out of slotted

25   airports, whether they are NEA or nonNEA that we can't

1    reduce, it's 550, so in effect, that 100 flight reduction

2    that we did for operational reasons fell over the 450 flights

3    that we have outside.  So Boston was impacted, New York was

4    impacted, Fort Lauderdale was impacted, Orlando was impacted.

5    But it was not directly linked to the NEA, it was linked to

6    which airports were slotted.

7    **Q.**   Let's talk briefly about transatlantic.  JetBlue has long

8    held aspirations, as we said, to fly transatlantic, right?

9    **A.**   Yes.

10   **Q.**   And in 2019 you announced plans to fly to London from

11   Boston and New York City?

12   **A.**   Yes.

13   **Q.**   But that plan depended on JetBlue's ability to obtain

14   so-called remedy slots at Heathrow in Boston -- I'm sorry, in

15   London, right?

16   **A.**   No.

17   **Q.**   It did not?  But JetBlue had an opportunity to obtain

18   four slot pairs from the CMA?

19   **A.**   Yes.  But you asked me if it depended on that plan, and

20   it didn't.

21   **Q.**   Fair enough.  You were going to find some other way?

22   **A.**   Which we did.

23   **Q.**   Okay.  But you had an opportunity in 2020 to win four

24   prime slot pairs through the CMA at the U K Competition and

25   Market Authority, right?

**A.**   Well, that was an option, but I also think that we have

to recognize that those slots potentially came with

conditions.  So we thought that those remedy slots were

originally to bring competition from Dallas to London, from

Philadelphia to London, so it was not as straightforward as

just adding a flight between JFK and Heathrow.

**Q.**   Isn't that sour grapes, Mr. Hayes?  Didn't you have every

intention of winning those slots in the first part of 2020?

**A.**   Do you know what I've learned in this business, is you

don't take -- you don't want to count on anyone else and

you've got to take action into your own hands.  So as we went

into London, I didn't want to depend on a regulator, that was

one path we had, certainly, but we had three other paths that

we were pursuing for Heathrow slots.  Many people doubted

that we could get them and JetBlue is now the proud operator

of two Heathrow slots.

**Q.**   Actually, very few people doubted that JetBlue was going

to win the four slots as of early 2020.  You had, by far, the

best application, right?

**A.**   Well, again, that's something that you would have to ask

the CMA.

**Q.**   Well, you knew -- you had been working on this for two

years and you knew you were very well positioned to win those

four slots, right?

**A.**   Again, we didn't know what conditions might come of those

1    slots.  So, for example, would we have to put a flight from

2    Dallas to JFK, and JFK to London?  We had a number of

3    pathways and we never had all our eggs in one basket, and

4    we -- other pathways came through.  So we did not need the

5    remedy slots.  And frankly, if those remedy slots had come

6    with conditions, we may not have taken them anyway and

7    pursued these other pathways.

8    **Q.**  So you were in prime position to win the slots, but then

9    you were denied them in late 2020, right?

10   **A.**  The CMA, yes, they awarded them to -- they awarded one

11   slot to United Airlines from Boston to Heathrow and then they

12   deferred the other slots.

13   **Q.**  And you certainly appealed that decision denying those

14   slots, right?

15   **A.**  Yes.

16   **Q.**  You made a whole other attempt that got turned down in

17   June of '21, right?

18   **A.**  Yes.

19   **Q.**  All right.  So you're still trying, even though you have

20   other possibilities?

21   **A.**  We're never going to give up.  But we have two slots at

22   Heathrow -- and by the way, as I've made all my public

23   comments about, it wasn't just about flying to Heathrow, we

24   sought a path to more than one London airport.  We've also

25   been able to secure permanent slots at Gatwick.

1    **Q.**   The reason JetBlue was ineligible for Heathrow remedy

2    slots from the CMA was because JetBlue was no longer

3    considered a new entrant due to its alliance with

4    American Airlines, right?

5    **A.**   That's the explanation the CMA gave us.

6    **Q.**   In other words, now you're in partnership with

7    American Airlines, so you're not really independent?

8    **A.**   I disagree with that analysis, but that's the --

9    **Q.**   But that was the reason they gave you, right?

10   **A.**   That's the reason that they gave us, yeah.

11   **Q.**   So without the NEA, JetBlue would have been a new

12   entrant, but the partnership meant that you no longer were a

13   new entrant, right?

14   **A.**   Again, that was their analysis.

15   **Q.**   And JetBlue leadership, including you, recognized, when

16   it formed the NEA, there was a significant risk that

17   membership in the NEA would disqualify you from receiving

18   those remedy slots, right?

19   **A.**   Yes.  And -- yes, that's true.

20   **Q.**   But you went forward with the NEA, anyway, right?

21   **A.**   Because I had other pathways to Heathrow slots.

22   **Q.**   All right.  And so JetBlue has begun its own London

23   service now from Boston and New York City?

24   **A.**   Yes.

25   **Q.**   And Boston starts when?

1    **A.**   Boston-Heathrow started, actually, on the 20th of

2    September.

3    **Q.**   So Boston's just started in September of '22, right?

4    **A.**   Yes.

5    **Q.**   And you have two slots, you said, in Heathrow?

6    **A.**   Yes.

7    **Q.**   You could have won four slots from the CMA, right?

8    **A.**   Well, again, I don't -- I don't know that, whether we had

9    got all of those, and whether those slots would have come

10   with conditions of serving from Philadelphia and Dallas and

11   other markets that we had no interest in doing.

12   **Q.**   And those slots were at peak hours, correct?

13   **A.**   I'm not quite familiar with the timing, but the slots we

14   have today at Heathrow are peak slots.

15   **Q.**   But the four slots are gone, right?

16   **A.**   Well, we're going to -- they've been deferred.  There

17   will be an application again in the future and we'll apply

18   again.

19   **Q.**   And your market share of transatlantic from Heathrow is

20   quite small, right?

21   **A.**   Yes.

22   **Q.**   Would you agree that the NEA really had a negative impact

23   on JetBlue's entry in the transatlantic flying?

24   **A.**   No.

25   **Q.**   Would you agree that impact was harmful?

1   **A.**   I didn't agree there was any impact.

2   **Q.**   I didn't say you did.  I asked if you agree it was

3   harmful?

4   **A.**   The NEA.

5   **Q.**   No.  Would you agree that the -- the NEA has impacted

6   your entry into transatlantic in a harmful way?

7   **A.**   Not at all.

8   **Q.**   All right.  And now under the Northeast Alliance, JetBlue

9   shares in positive incremental revenues from American's

10  transatlantic flying to London, right?

11  **A.**   Yes.

12  **Q.**   That's a pretty valuable stake to have, isn't it?

13  **A.**   Well, again, it depends on how it performs.

14  **Q.**   And there's an asymmetry in the NEA regarding

15  transatlantic, right?  You've already talked about that.

16  **A.**   In terms of London's not in it, and the other routes are?

17  **Q.**   Yes.  That is American's international flying out of New

18  York and Boston is within the scope of the NEA.

19  **A.**   Yeah.  One of the attractions of the NEA for us is we do

20  not have the airplanes to get to most of Europe.  The

21  airplanes we are flying to London are good for London.

22  They'll work to Paris.  They'll work to Amsterdam.  They'll

23  work to Dublin.  But American brings us the rest of the

24  European network, so we can compete with Delta and United who

25  fly those markets with lot of width and depth.

1  **Q.**  American's flying from London to New York City is, at

2  least in normal times, a very profitable route, relatively

3  speaking, right?

4  **A.**  I would imagine so.

5  **Q.**  It has been described as the most valuable route in the

6  world, right?

7  **A.**  British Airways did okay on it.

8  **Q.**  And then there's a big high percentage of premium fares,

9  right?

10  **A.**  There's a lot of premium fares, which is why we were so

11  keen to start flying it and bring them down.

12  **Q.**  And as you said American and its international JV

13  partners control a very high percentage of the traffic to

14  London, right?

15  **A.**  Well, you've got -- actually, it's BA/AA.  It's Delta,

16  Virgin.  I mean, they have a very large share between them.

17  **Q.**  And you've criticized that many, many times right?

18  **A.**  Yes.

19  **Q.**  But now you're profiting from it, right?

20  **A.**  Well, we have carved our own path to London and taking a

21  very sort of JetBlue maverick disruptor approach to do it

22  ourself and lower fares.

23  **Q.**  If JetBlue undercuts American's fares to London and

24  actually makes American's unit revenues lower, that would

25  negatively impact the revenues from American's flights that

1    you're now getting in the NEA, right?

2    **A.**   I don't give any thought to that.  We're doing what we

3    want to do on London.

4    **Q.**   In fact, if competition from JetBlue actually made

5    American's flying less profitable transatlantic, JetBlue

6    could end up owing a transfer payment to American to cover

7    American's negative incremental revenue, right?

8    **A.**   Well, you know what I would like to think, if we come on

9    the market and lower fares and our competitors do, we

10   stimulate more demand, and everyone can make money at lower

11   fares.

12   **Q.**   You're making money without doing anything right now from

13   American's flying, right?

14   **A.**   We're not making any money at the moment.  We've had ten

15   unprofitable quarters.

16   **Q.**   You will be, right?

17   **A.**   Well, I hope so.  I hope this quarter is better.

18   **Q.**   All right.  So let's just look at Plaintiff Exhibit 940.

19   This is in evidence.  It's a "Connie Pre Board Meeting

20   Touchpoint."  June 23rd of '20.

21   **A.**   90?

22   **Q.**   I'm sorry, Mr. Hayes, Plaintiff Exhibit 940.

23   **A.**   Oh, yeah, I have it.

24   **Q.**   You see it's the Connie Pre Board Meeting Touchpoint?

25   **A.**   Uh-huh.

1    **Q.**  And this shows, "Frequently asked questions and answers

2    for JetBlue board members about the upcoming announcement of

3    the NEA," right?

4    **A.**  Yes.

5    **Q.**  And you say, on the second page at the top, the "Key

6    points of the deal"?

7    **A.**  Yes.

8    **Q.**  It says, "Joint venture, including capacity

9    coordination," right?

10   **A.**  Yes.

11   **Q.**  "Powerful sales force agnostic to metal," right?

12   **A.**  Oh, the last point, yes.

13   **Q.**  And that means metal neutral, right?

14   **A.**  Well, again, I think the context is important.  One of

15   the benefits that we were getting out of this is access to

16   American Airlines global sales force.  I think our sales team

17   is five or six people.  The legacy airlines have dozens, if

18   not hundreds of people working in sales around the world.  So

19   the benefit here was getting access to the American sales

20   team, so that they could sell, whether it was JetBlue or

21   American.

22   **Q.**  And then at the bottom of that same page, the last two

23   questions, do you see those?

24   **A.**  Yes.

25   **Q.**  And one question is, "Where are we pulling the flying

1  from to support this flying," right?

2  **A.**  Yes.

3  **Q.**  But that's not answered, right?

4  **A.**  Yes.  Not here.

5  **Q.**  And the last question is -- or the next-to-last question,

6  "Does this alter our transatlantic strategy," right?

7  **A.**  Yes.

8  **Q.**  But there's no answer given for that question, right?

9  **A.**  Well, the answer is no.  And the answer is to the second

10  question is we delayed the time of 30 Embraer 190s, and then

11  we converted 30 to 20 options to fund deliveries to fund the

12  flying of the NEA.

13  **Q.**  All right.  Mr. Hayes, lastly, I want to ask you a little

14  bit about Spirit Airlines.

15  **A.**  Yes.

16  **Q.**  Earlier this year, JetBlue made an offer to buy Spirit

17  Airlines, correct?

18  **A.**  We did.

19  **Q.**  And on July 28th of this year, JetBlue announced a

20  proposed 3.8 billion acquisition of Spirit Airways, which is

21  the nation's largest ULCC, correct?

22  **A.**  Yes.

23  **Q.**  And as CEO, you were involved in JetBlue's negotiations

24  with Spirit on that deal?

25  **A.**  Yes.

1   **Q.**  And before signing that agreement, JetBlue had attempted

2   to acquire Spirit through a hostile tender offer, correct?

3   **A.**  Well, I don't like to think of it as hostile, because

4   they put themselves up for sale and we decided to make a bid.

5   But I understand others would call it hostile.

6   **Q.**  You made a bid that was rejected in April, correct?

7   **A.**  Yes.

8   **Q.**  And that was an unsolicited bid to buy Spirit for

9   3.6 billion in cash, right?

10  **A.**  Yes.

11  **Q.**  And JetBlue attempted that offer after Spirit had already

12  agreed to merge with Frontier Airlines, correct?

13  **A.**  Yes.

14  **Q.**  When did you become aware that Frontier had agreed to

15  acquire Spirit?

16  **A.**  When the news was made public earlier in the year.

17  **Q.**  And that was in February of 2022?

18  **A.**  Yes.

19  **Q.**  As of May of '22, early May, Spirit's board of directors

20  determined that your initial offer was not a, quote,

21  "superior proposal to Frontier's," right?

22  **A.**  Yes.

23  **Q.**  And they actually wrote you a letter, right?

24  **A.**  They did.

25  **Q.**  And I want to bring up PX439, which is also not in

1   evidence.

2          THE COURT:  So don't publish it.

3          MR. DAVIS:  So don't publish.

4          THE COURT:  439?

5          MR. DAVIS:  439.  It should be in your book,

6   Mr. Hayes.

7          THE WITNESS:  Okay.  Thank you.  Give me a second.

8          THE COURT:  I don't think I have 439.  438 and 459.

9          MR. DAVIS:  It should be 439.

10          THE WITNESS:  Yeah, I don't have it, either.

11          MR. DAVIS:  Okay.  Can we bring it up and not

12   publish?  Is that possible?

13          THE COURT:  We can bring it up on the witness'

14   screen, my screen, and the lawyers' screens.

15          MR. DAVIS:  I'm sorry, Your Honor.  Is there an

16   objection to publication?

17          MR. SCHWED:  I have no objection to publication.

18          MR. DAVIS:  All right.  Your Honor, I move to --

19          THE COURT:  So we'll just publish the whole

20   document to everyone.

21          MR. DAVIS:  I move to admit 439.

22          THE WITNESS:  Yes.  I think I released it publicly,

23   anyway.

24          MR. SCHWED:  I have no objection to the admission

25   of 439, as long as it's not for the truth of the matter

1    asserted, the fact that it was -- that these statements were

2    made by Spirit, I have no objection to it.

3         THE COURT:  I'll certainly admit it for that now.

4    I don't know what it is.  So we'll see.  If you want it for

5    more than that, you can tell me after I look at it.

6         MR. DAVIS:  May I have just a moment, Your Honor?

7         THE COURT:  Yes.  I just don't know what it is.

8         MR. DAVIS:  It's a citizen 8-K filed by Spirit, and

9    it includes a letter to Mr. Hayes from Spirit.

10        THE COURT:  All you care about is the letter or the

11   whole 8-K in terms of the truth?

12        MR. DAVIS:  Really it's the letter.  And I -- we

13   may be able to agree on this.

14        THE COURT:  Yeah, talk to each other.  That's fine.

15        MR. SCHWED:  Again, Your Honor, we're not denying

16   the letter was written, the fact that the letter was written.

17   It can be admitted for those facts, but there's a lot of

18   assertions in there made by Spirit and certainly we do not

19   accept those for the truth of the matter asserted.  And

20   Your Honor, I don't think they need them for the truth of the

21   matter asserted, given how irrelevant the whole Spirit

22   transaction is to begin with.

23        MR. DAVIS:  Your Honor, we'll agree to admit it for

24   the limited purpose of showing notice to Mr. Hayes and not

25   for the truth of the matter asserted.

1        THE COURT:  Fine.  So 439, the letter is admitted

2   for the fact that it was said and not for the truth and the

3   fact that Mr. Hayes received it and was on notice of whatever

4   it said.

5        (Plaintiff Exhibit No. 439 admitted into evidence.)

6        MR. DAVIS:  Thank you, and thank you, Counsel.

7   BY MR. DAVIS:

8   **Q.**  As of May '22, again, Spirit's board of directors

9   determined that JetBlue's offer was illusory.  Is that right?

10       THE COURT:  You can publish -- I don't think any of

11  us have it on the screen.

12       MR. DAVIS:  Can we publish 439?

13       THE WITNESS:  Could you expand it a little bit?

14  BY MR. DAVIS:

15  **Q.**  And Mr. Hayes, what is this document?

16  **A.**  This was a press release that Spirit issued.  Thank you.

17  This was a press release that they issued basically saying

18  that they did not constitute our proposal as a superior

19  offer, and then they attached in the press release the letter

20  that they sent to me, which actually, I read from the press

21  release.

22  **Q.**  So this is a personal letter to you, Robin Hayes, that's

23  in an 8-K filing of the --

24  **A.**  I think the personal -- did.

25  **Q.**  Did the letter come in the mail, Mr. Hayes?

**A.**  I don't know.  Probably.

**Q.**  So will you agree with me that Spirit board of directors found an unacceptable level of closing risk with a low probability of receiving antitrust clearance so long as the NEA remains?

**A.**  That's what they said.

**Q.**  All right.  And the letter notified JetBlue that it's then proposal was rejected, right?

**A.**  Yes.

**Q.**  And the rejection was definitely in part because of the NEA, right?

**A.**  That's what they claimed.

**Q.**  All right.  And in the letter to you, near the end, do you see the sentence beginning, "We struggle"?  This is on the next page.

           MR. SCHWED:  I think you need to call up the next page.

           THE COURT:  Yeah, you have to call up the next page.

BY MR. DAVIS:

**Q.**  At the bottom of the second full paragraph, do you see that?

           MR. SCHWED:  It might be helpful if --

           THE COURT:  Blow it up.

           MR. SCHWED:  You expand this a little.  At least

1    for me.  I'm having trouble seeing it.

2              THE COURT:  It's the last sentence in that full

3    paragraph.

4              MR. DAVIS:  It takes a little while to come up.

5    Sorry, Your Honor.

6              THE COURT:  That's all right.

7    BY MR. DAVIS:

8    Q.  And you see the sentence beginning, "As you know,"

9    Mr. Hayes?

10   A.  Yes, I do.

11   Q.  And the next sentence is -- well, what Spirit says is,

12   "As you know, Spirit and many other airline and air travel

13   constituencies have publically opposed the NEA on grounds

14   that it is anticompetitive."

15             Right?

16   A.  Yes that's what it says.

17   Q.  And then, "We struggle to understand how JetBlue can

18   believe DOJ or a court will be persuaded that JetBlue should

19   be allowed to form any competitive alliance that aligns its

20   interest with a legacy carrier, and then undertake an

21   acquisition that will eliminate the largest ULCC carrier."

22             Right?

23   A.  That's what it says.

24   Q.  That's what Spirit told you back in May of 2022, right?

25   A.  Yes.

1  **Q.**  Now, the Frontier deal was ultimately -- that's enough on

2  that exhibit.  Now, the Frontier deal was ultimately rejected

3  by the shareholders, right?

4  **A.**  Yes.

5  **Q.**  And before that deal was abandoned, JetBlue offered

6  Spirit and its shareholders better terms on a number of

7  occasions, right?

8  **A.**  Yes.

9  **Q.**  The signed JetBlue/Spirit deal that has now been agreed

10  upon includes a 4 million reverse break-up fee, correct?

11  **A.**  Yes.

12  **Q.**  And JetBlue agreed to prepay a portion of its 400 million

13  break-up fee directly to Spirit shareholders, right?

14  **A.**  Yes.

15  **Q.**  The prepayment included $2.50 per share in cash on

16  initial approval, right?

17  **A.**  Yes.

18  **Q.**  And it also included an ongoing fee of ten cents every

19  month while the merger is pending, starting in January of

20  '23, right?

21  **A.**  Yes.

22  **Q.**  JetBlue's agreement to pay this reverse break-up fee to

23  Spirit was done at least in part because the proposed merger

24  with Spirit presents antitrust risk, right?

25  **A.**  Well, yeah.  It is -- yes, and also the time of getting

1    regulatory approval was something that shareholders certainly

2    had views about and I would also remind you that Frontier

3    also improved its offer to include a reverse break-up fee, as

4    well.

5    Q.   And you understood that your alliance with

6    American Airlines was a significant factor in the antitrust

7    risks presented by the JetBlue/Spirit combination, right?

8    A.   That's what they said.

9    Q.   Does competition from Spirit limit the prices that

10   JetBlue can charge?

11   A.   I mean, what we're trying to do with the Spirit merger is

12   to create a truly more national, low cost carrier to compete

13   with the big four legacy airlines.

14   Q.   So I asked you, does competition from Spirit limit the

15   prices that JetBlue can charge?  What's the answer to that

16   question?  Do you know?

17   A.   Well, again, we've always been very proud of our focus on

18   low fares and great service.

19   Q.   Are you going to answer the question, Mr. Hayes, or not?

20   A.   I'm going to re -- JetBlue has had the commitment of low

21   fares for over 20 years.

22   Q.   I'm asking you if competition from Spirit -- this is the

23   third time I've asked it.

24   A.   Yeah.

25   Q.   -- limit the prices that JetBlue can charge consumers?

1    **A.**   I mean, again, a lot of things go into pricing decisions.

2    I can't give you a yes or no answer to that.  Sometimes we

3    will -- we react to what Spirit's doing, sometimes they react

4    to what they're doing, sometimes we won't react at all.

5    **Q.**   So you're the CEO of JetBlue and you can't answer the

6    question whether the largest ULCC in America limits the

7    prices that JetBlue can charge consumers; is that right?

8    **A.**   I did answer your question.

9    **Q.**   You didn't answer it, sir, respectfully.

10   **A.**   I answered it in the way that I feel is true, in that

11   sometimes they will -- we will react to what they're doing,

12   sometimes they will react to what we're doing.  There are

13   other airlines that also will change pricing, so I don't

14   think you can answer that just one very high level.

15   **Q.**   Does competition from Spirit influence JetBlue's capacity

16   decisions?

17   **A.**   Not directly, no.

18   **Q.**   Does competition from Spirit influence JetBlue's other

19   business decisions, any of them?

20   **A.**   Not directly, no.

21   **Q.**   If JetBlue buys Spirit, Spirit will no longer be a

22   competitive constraint on JetBlue or the NEA; is that right?

23   **A.**   I think a combined JetBlue/Spirit will be one of the most

24   powerful disruptive forces that this country has seen in

25   competition, by combining both low fares and good service.

1   **Q.**  And when you combine, Spirit will no longer be a

2   competitive constraint on JetBlue or the NEA, correct, if and

3   when you combine?

4   **A.**  We're getting ahead of things.  Look, I think we want

5   to -- the competitive issue in this country, we've spent a

6   lot of time talking about it, are the four large airlines

7   with 80 percent share.  I think two small airlines coming

8   together can have a profound and transformational effect in

9   improving and not reducing competition.

10  **Q.**  But you've testified today that three of those four

11  airlines, the legacy airlines, don't actually compete with

12  each other, right?

13  **A.**  Yes.  And that's what the issue is, we have four large

14  airlines with 80 percent.

15  **Q.**  Is Spirit a competitor of JetBlue today?

16  **A.**  We compete with Spirit in certain markets today.

17          MR. DAVIS:  If I may have just a moment,

18  Your Honor?

19          THE COURT:  Yes.

20          (Counsel confers.)

21          MR. DAVIS:  Two more short areas.  I'm sorry,

22  Your Honor.

23          THE COURT:  All right.

24  BY MR. DAVIS:

25  **Q.**  Mr. Hayes, let's look at plaintiff Exhibit 573 in

1    evidence.

2    **A.**  Yeah, I have it.

3    **Q.**  This is dated July 1, 2020?

4    **A.**  Yes.

5    **Q.**  And it is marked, "Latest."  Do you see that?

6    **A.**  Yes.

7    **Q.**  And this is an e-mail from Scott Laurence?

8    **A.**  Yes.

9    **Q.**  And it's late in the NEA negotiations, right?

10   **A.**  Yes, towards the end.

11   **Q.**  And you're discussing the change of control, right?

12   **A.**  I know that's what it says, but my recollection, this was

13   something different.

14   **Q.**  Isn't the issue here that American Airlines wanted a

15   specific date for the change of control?  Isn't that what

16   you're talking about here?

17   **A.**  There was a specific day, but I felt that was more in

18   terms of regulatory -- like a date that, you know, we would

19   sort of get going, as opposed to waiting to see if there was

20   a regulatory path.

21   **Q.**  All right.  You see the highlighted portion, Mr. Hayes,

22   in front of you now?

23   **A.**  Yeah, I'm not disputing it's there, it's just --

24   **Q.**  All right.  It says --

25              THE COURT:  "Changing control" here means when the

```
 1    NEA begins, or does it mean something else?
 2              MR. DAVIS:  Yes, my recollection of the discussion
 3    was we knew that there was a lot of work to do with both the
 4    DOT and the DOJ before we could start the NEA, and we were
 5    looking for a date where we would sort of start it.  And I
 6    think American sort of preferred a fixed date, whereas we
 7    wanted to perhaps think about some regulatory fences or get
 8    to a certain regulatory point.  But honestly, I don't have
 9    great recollection of what this one was about.
10    BY MR. DAVIS:
11    Q.  Okay.  Well, I'll just ask you about what's on the page
12    here.  You want to know American Airlines' rationale for
13    wanting a specific date, and you think it should be in 2021,
14    correct?
15    A.  Yes.
16    Q.  At some point in '21.  And Mr. Laurence, who is, again,
17    the chief negotiator for JetBlue says that, "Steve was very
18    specific on needed a date, as we would have the ability to
19    game the approval with Justice by stalling."
20              Right?
21    A.  Yes.  Okay.  I remember now.
22    Q.  And in other words, and is Steve at American Airlines?
23    A.  Yes, that was Steve Johnson at American Airlines.
24    Q.  So Steve doesn't trust JetBlue not to play games by
25    stalling, correct?
```

1    **A.**   Yes.

2    **Q.**   And you responded, right?

3    **A.**   Yes.

4    **Q.**   And you wrote, "Then why don't you share back that I was

5    personally horrified to learn that was the reason and if they

6    don't trust us on this when we are willing to burn a decade

7    of goodwill we have put into this to make the case for lower

8    fares and more choice, then it means it's hard to see we are

9    compatible partners."

10           You wrote that, right?

11   **A.**   Yes, I did.

12   **Q.**   And then you wrote, "I suggest it's a call to Vasu and

13   not a text."

14   **A.**   Yes.

15   **Q.**   And you wrote that, too?

16   **A.**   Yes.

17   **Q.**   And Vasu was Vasu Raja at American Airlines?

18   **A.**   Yes, it is.

19   **Q.**   So you as CEO of JetBlue were willing to burn a decade of

20   goodwill to bring about the NEA; is that right, Mr. Hayes?

21   **A.**   Well, no, I think the point I'm trying to make was that

22   we knee people would be surprised, potentially, that we were

23   entering into this partnership with a legacy airline.  In

24   fact, it would require a lot of explanation to different

25   stakeholders, our employees, our customers, regulators,

1    political contacts that we had.  That would face a lot of

2    questions as to why we were doing it.  We were willing to go

3    through that because of the upside for JetBlue's growth.  And

4    I was frustrated that American was trying to bounce us into a

5    date when we weren't quite ready to make that date

6    commitment.

7    **Q.**  Let's look at plaintiff Exhibit 739.

8            MR. DAVIS:  And Your Honor, we're using here a

9    demonstrative for the actual exhibits, and the demonstrative

10   has certain redactions made at request of JetBlue counsel,

11   and I won't be asking questions, and would ask Mr. Hayes not

12   to make any answers based on the redacted portions.

13           THE COURT:  All right.

14           MR. DAVIS:  Is it redacted in here?

15           MR. DAVIS:  It's not redacted in the paper.

16           THE WITNESS:  But it will be on there.

17           THE COURT:  The first page under 739 says

18   "Plaintiffs' Demonstrative, 739-A."

19           MR. DAVIS:  Correct.

20           THE COURT:  That one has the redactions.

21           MR. DAVIS:  Your Honor, I move to use 739-A as a

22   demonstrative.  And I further --

23           THE COURT:  Is that right?

24           MR. SCHWED:  No objection, Your Honor.

25           MR. DAVIS:  And I further move to admit 739, the

1    underlying documents, but will not seek to publish them at

2    this time.

3              MR. SCHWED:  No objection, Your Honor.

4              THE COURT:  Fine.  Allowed.

5              (Plaintiff Exhibit No. 739-A admitted into

6              evidence.)

7    BY MR. DAVIS:

8    **Q.**  So looking at 739-A, these are text messages between you

9    and Scott Laurence on April 7th of 2020; is that right,

10   Mr. Hayes?

11   **A.**  Yes.

12   **Q.**  And you can see, it may take you a minute to get

13   oriented, but the Bates number is on the left.  And there's

14   one Bates number per text.  Do you see that?

15   **A.**  Oh, you're on that screen.  Yes.  Okay.  Yes.

16   **Q.**  Yes.  So just looking at the summary that --

17             THE COURT:  Would you mind blowing it up on the

18   screen?  I'm not sure who's controlling it.

19             MR. DAVIS:  Sorry.

20             MR. SCHWED:  He's asking if you can make it a

21   larger font.  The paper copy --

22             MR. DAVIS:  Is that better, Mr. Hayes?

23             THE WITNESS:  Could you go one more?

24             Okay.  I can make that work.

25             THE COURT:  Try the question and see if it can work

1    for him.

2              MR. DAVIS:  All right.

3    BY MR. DAVIS:

4    **Q.**  So again, AA and JetBlue are in in the midst of

5    negotiating the NEA, right?

6    **A.**  Yes.

7    **Q.**  All right.  And in the first text of plaintiff

8    Exhibit 739, which is the one ending in 810, that's the very

9    top one, that's you writing Robin Hayes to Scott Laurence,

10   right?

11   **A.**  Yes.

12   **Q.**  And you write about an alternative idea.  "Which market

13   do we think a legacy could abandon we could build as our

14   seventh focus city?"

15             Right?

16   **A.**  Yes.

17   **Q.**  That's you asking that question, right?

18   **A.**  That is.

19   **Q.**  And is that because by that time in negotiating the NEA

20   you and Scott Laurence have realized that a legacy airline

21   might just be willing to abandon markets to JetBlue if the

22   price is right?

23   **A.**  No.  I think the context of that comment was, as we

24   came -- again, we're three months into COVID, our revenues

25   are probably 85 percent down our normal and we really had

1   three objectives coming into COVID.  Take care of all of our

2   crew members to make sure --

3           THE COURT:  Well, wait, this is April 7th, 2020.

4           THE WITNESS:  Yes, so three months into COVID.

5           THE COURT:  Was COVID hitting you in January?

6           THE WITNESS:  February.  Well, two months into

7   COVID, probably.  So revenues were probably worse than

8   85 percent.  And so, you know, take care of our people, make

9   sure that JetBlue could get through COVID financially, but

10  also look for opportunities for JetBlue to be the JetBlue

11  people know and love after COVID.  So part of this

12  opportunity with American and I was questioning Scott, are

13  there other opportunities here that we should think about,

14  really, Boston, because after the financial crisis, airlines

15  walked away from it, legacy airlines, and it gave us an

16  opportunity to grow it.

17          MR. DAVIS:  All right.  So you're talking to

18  Mr. Laurence about a legacy airline abandoning a market that

19  you could build, right?

20  **A.**  Yes.

21  **Q.**  And you're negotiating the NEA, right?

22  **A.**  Yes.

23  **Q.**  All right.  And down on the page ending 817, you tell

24  Mr. Laurence, "Think big," with three exclamations, right?

25  **A.**  Yes.

1   **Q.**  And you're talking about a possible three way codeshare

2   at this point; is that right?

3   **A.**  Yes, I would say we had a lot of ideas on the table back

4   then.  Again, we're two months into COVID and we're trying to

5   throw as much on the table as possible to see what we think

6   could work.  So LAX was mentioned there, as well, because we

7   felt it was an opportunity for us to get bigger in LAX,

8   something that we always wanted to be.

9   **Q.**  All right.  And I'm not going to ask you about the other

10  airline.

11          So this three way codeshare would be JetBlue,

12  American Airlines, and then a third airline, right?

13  **A.**  Well, either a three way codeshare or two bilateral -- or

14  a series of bilateral partnerships.

15  **Q.**  And then at number 831, further down, you write again,

16  correct?

17  **A.**  Yes.

18  **Q.**  And there you write, "Also, I think if it's AA and the

19  other airline, it feels more balanced and less that we are in

20  AA's pocket."

21          Right?

22  **A.**  Yes.  Yes.

23  **Q.**  That's what you wrote to Mr. Laurence on your text?

24  **A.**  Correct.

25  **Q.**  And Mr. Laurence replied, "Concur.  It swats away the

1  black helicopters."

2        Right?

3  **A.**  Yes.

4  **Q.**  So you're saying that under the arrangement, you're

5  thinking about a codeshare with American and another airline,

6  that other airline would make it feel a little less like

7  JetBlue was in American Airlines's pocket, right?

8  **A.**  Yes, I mean, again, I was very conscious of doing the

9  partnership with American, that it would lead to a lot of

10 speculation about what would happen next.  The reference to

11 black helicopters are -- since I've joined JetBlue, there's

12 been rumors that we are being bought or merged with somebody

13 else.  And I also felt that by having different partnerships

14 here announced, it would reduce some of the dependency on any

15 one partner.

16 **Q.**  You didn't want it to look like your company was in the

17 pocket of the biggest airline in the world now, right?

18 **A.**  I mean, it goes back to what we discussed earlier, a risk

19 that I had to evaluate and make sure that we mitigated was

20 the sense of avoiding being co-opted by American.

21 **Q.**  Mr. Hayes, under the Northeast Alliance, JetBlue got from

22 American Airlines millions of dollars worth of slots in New

23 York City and access to the most valuable airline loyalty

24 program in the world, right?

25 **A.**  Yes, we got slots and access to their frequent flyers.

1    **Q.**  And American Airlines, what they got, what they got was

2    JetBlue in their pocket, right?

3    **A.**  I don't agree with that, no.  What they got was the

4    ability to build a long-haul network out of JFK and to be

5    successful in the northeast with a partner which is something

6    that everyone knows in the industry is something that they've

7    struggled to do for many years.

8              MR. DAVIS:  No further questions.  Thank you.

9              THE COURT:  All right.  We'll stop for the day.

10   You'll do your direct tomorrow, or your cross direct.

11             MR. SCHWED:  Yes.

12             THE WITNESS:  Thank you, Your Honor.

13             THE COURT:  Anything before we adjourn?

14             MR. SCHWED:  May I just confirm for, we had some

15   discussions -- he's now off cross?

16             THE COURT:  Correct.

17             MR. SCHWED:  Thank you.

18             THE COURT:  Yes.

19             THE COURT:  One -- two minor things.  One is -- you

20   can sit down if you wish, Mr. Hayes, or you can stay.  It

21   doesn't matter.

22             THE WITNESS:  I'll stay if that's okay.

23             THE COURT:  One is just there was an amicus -- a

24   motion to file an amicus brief.  They said the defendants

25   would oppose.  I don't know if you want to file an opposition

1      or not.

2              MR. WALL:  We're not going to file anything on

3      that, Your Honor.

4              THE COURT:  Okay.  Fine.  I just didn't -- didn't

5      want to evaluate it if you were going to file something.

6              MR. WALL:  Neither do we.

7              THE COURT:  Okay.  All right.  And the -- are there

8      any of these sealing issues that I need to resolve for

9      tomorrow morning?

10             MR. SCHWED:  There is nothing in my examination of

11     Mr. Hayes that will involve any disputed sealing issues.

12     There are a few things that are not contested.

13             THE COURT:  Okay.  Fine.

14             MS. RIGGS:  And none from the plaintiffs' side,

15     either, Your Honor.

16             THE COURT:  Fine.  Okay.  All right.  And then I'll

17     see you tomorrow morning.  We're in recess.  Thank you.

18             (Court in recess at 4:34 p.m.)

19

20

21

22

23

24

25

1

2                    **C E R T I F I C A T I O N**

3

4           I certify that the foregoing is a correct

5    transcript of the record of proceedings in the above-entitled

6    matter to the best of my skill and ability.

7

8

9

10   /s/ Rachel M. Lopez                 September 27, 2022

11   /s/ Robert W. Paschal

12

13

14   _____         _____

15   Rachel M. Lopez, CRR             Date

16   Robert W. Paschal, RMR, CRR

17   Official Court Reporters

18

19

20

21

22

23

24

25