<table>
<tr><td>1</td><td></td></tr>
<tr><td>2</td><td></td></tr>
</table>

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA, et al.

     Plaintiffs,                    Civil Action No.
                                    1:21-cv-11558-LTS

   v.

AMERICAN AIRLINES GROUP, INC.,
et al.,

     Defendants.

_____

BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

BENCH TRIAL
Day 2

Wednesday, September 28, 2022
8:59 a.m.

John J. Moakley United States Courthouse
Courtroom 13
One Courthouse Way
Boston, Massachusetts

Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

1                        **A P P E A R A N C E S**

2

3    On behalf of the Plaintiff United States of America:

4        UNITED STATES DEPARTMENT OF JUSTICE
         BY:  WILLIAM H. JONES, III; JOHN STAIGE DAVIS; KATE M.
         RIGGS, SETH J. WIENER, AND MAISIE A. BALDWIN

5        450 Fifth Street, Northwest
         Suite 8000

6        Washington, D.C.  20530
         (202) 514-0230

7        bill.jones2@usdoj.gov
         john.davis10@usdoj.gov

8        kate.riggs@usdoj.gov
         seth.wiener@usdoj.gov

9        maisie.baldwin@usdoj.gov

10

11   On behalf of the Plaintiff Commonwealth of Massachusetts:

12       ATTORNEY GENERAL'S OFFICE
         BY:  DANIEL H. LEFF

13       One Ashburton Place, 18th Floor
         Boston, Massachusetts  02108

14       (617) 727-2613
         daniel.leff@mass.gov

15

16

17   On behalf of the Defendant American Airlines Group, Inc.:

18       LATHAM & WATKINS, LLP
         BY:  DANIEL M. WALL; ALLYSON M. MALTAS; AND SEUNG WAN
         PAIK

19       505 Montgomery Street
         Suite 2000

20       San Francisco, California  04111
         (415) 391-0600

21       dan.wall@lw.com
         allyson.maltas@lw.com

22       seung.paik@lw.com

23

24

25

1                **A P P E A R A N C E S ,   C o n t.**

2

3    On behalf of the Defendant JetBlue Airways Corporation:

4        SHEARMAN & STERLING LLP
         BY:  RICHARD F. SCHWED AND MATTHEW L. CRANER

5        599 Lexington Avenue
         New York, New York  10022

6        (212) 848-4000
         richard.schwed@shearman.com

7        matthew.craner@shearman.com

8

9    Also present for Southwest Airlines:

10       MAYER BROWN
         BY:  WILLIAM H. STALLINGS

11       1999 K Street, Northwest
         Washington, D.C.  20006

12       (202) 263-3000
         wstallings@mayerbrown.com

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **<u>TABLE OF CONTENTS</u>**

2

3    **TRIAL WITNESSES**

4    On behalf of the Plaintiffs:                              <u>Page</u>

5    ROBIN HAYES

6          By Mr. Schwed                                          7

7          By Mr. Davis                                          56

8          By Mr. Schwed                                         86

9    ANDREW M. WATTERSON

10         By Mr. Wiener                                         97

11         By Mr. Wall                                          129

12         By Mr. Wiener                                        175

13         By Mr. Wall                                          194

14   BARRY McMENAMIN

15         By Mr. Leff                                          204

16

17

18                            **EXHIBITS**

19   On behalf of the Plaintiffs:                          <u>Admitted</u>

20    Number page 68, lines 3 through 10                      216

21    Number 662                                              232

22

23   On behalf of the Defendants:                          <u>Admitted</u>

24    Number 378                                               41

25

1              **P R O C E E D I N G S**

2              (In open court at 8:59 a.m.)

3              THE DEPUTY CLERK:  The United State District Court

4      for the District of Massachusetts is now in session, the

5      Honorable Leo T. Sorokin presiding.

6              THE COURT:  Please be seated.

7              One small thing that would -- if it's not too

8      difficult, that might be helpful.  Is it possible -- I don't

9      want to impose -- I know you have these -- the teams seem to

10     be dwindling a little bit.  You have less of an audience

11     today than you did yesterday, to get the exhibit -- the

12     witness binders like at the end of the day for the next day?

13     In other words, is that -- or is that -- or you're not ready

14     yet?

15             MR. WALL:  I think it assumes a fact not in

16     evidence that those would be ready.

17             THE COURT:  I'm not trying to redirect -- I know

18     you have a lot to do.  If that's not reasonable, I don't want

19     you to think, oh, the Judge asked for it; you have to do it.

20             MR. WALL:  We can try to do it, Your Honor, it's

21     just -- you know, honestly, it's a question of whether

22     they're ready or not.  But we hear you and we'll try to do

23     our best.

24             THE COURT:  I mean, like honestly, if it's not all

25     done, and you give me something, and then it's revised,

1    that's okay.  Like I don't -- it just makes it a little

2    easier.  It might make it a little easier.  I can't say that

3    I'm going to read all of it the night before, but at least to

4    look through it.  And especially -- with respect to -- I know

5    there might be an issue with a Southwest witness, so if you

6    get to it today, there might be an issue about sealed

7    materials or something.  To the extent that you know about

8    things like that, if you can give it to me at the end of the

9    day before, I can look at it and be in a better position to

10   rule on it, especially things like that, the next day.

11        MR. JONES:  Yes, Your Honor.  We can certainly

12   endeavor to do that, but also we can certainly get them very

13   early in the morning as a potential alternative, if that

14   would work.  We can try.

15        THE COURT:  You don't need to do that.  Like if

16   it's like -- if it distorts -- it's a little convenient to

17   have them the day before, but if you -- if it can't be, it

18   can't be, and it's not -- don't -- it's not the end of the

19   world.

20        So these two -- now that Mr. Hayes is on his

21   examination by JetBlue's counsel, these two binders for the

22   moment I don't need.  We're going to use the other binder?

23        MR. SCHWED:  Yes, Your Honor.  We have a new binder

24   and we actually included the one plaintiffs' exhibit that

25   they used that we're planning to also use for the convenience

1   of the Court and the witness.  And we'll hand those out to

2   everybody.  We previously handed two copies to the clerk and

3   we'll give it to plaintiffs now.

4           THE COURT:  Hold on one second.

5           (The Court and the law clerk confer.)

6           THE COURT:  Okay.  Mr. Hayes.  Where is he?  Come

7   forward.  I remind you, Mr. Hayes, you remain under oath.

8           And go ahead, you can begin your examination.

9           MR. SCHWED:  Your Honor, I'm comfortable --

10          THE COURT:  I'm fine, you can do it in either

11  place.

12          MR. SCHWED:  Thank you.

13                        **ROBIN HAYES**

14     having been previously duly sworn, testified as follows:

15       **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT JETBLUE**

16  BY MR. SCHWED:

17  **Q.**  Good morning, Mr. Hayes.

18  **A.**  Good morning.

19  **Q.**  You've been -- placed in front of you, there's a new

20  notebook, and then hopefully most of what I will be doing

21  today will be in that notebook.  If you could just start by

22  turning to the plaintiffs' -- Plaintiffs' Exhibit PX536.

23  **A.**  Yes, I have it.

24  **Q.**  Do you recall that you were shown this exhibit by

25  Mr. Davis?

**A.**  I do.

**Q.**  And is this the training deck or training orientation materials?

**A.**  That is correct.

**Q.**  Can you please turn to the page ending on 351, with the Bates number 351?

**A.**  I have it.

**Q.**  Can you just tell us what this slide is showing?

**A.**  What this slide is showing is one of the first things that we want all new JetBlue crew members to understand when they come to JetBlue for their very first day on their very first session is how different we are.  And what this is trying to do is to lay out -- and there's a number of slides behind it that sort of substantiate it, lay out our unique positioning of commitment to competitive prices, but also customer centric service, and we believe that is something that is truly unique in the US.  So we call that our sweet spot.

**Q.**  And as of today, is anybody else in your mind in that sweet spot?

**A.**  No, I would say Virgin America were similar to us, but, of course, they were acquired by Alaska Airlines a few years ago.

**Q.**  The top of this slide is entitled "Industry Landscape in 2000."  Do you see that?

1    **A.**  I do.

2    **Q.**  Would you say that the depiction of JetBlue today is

3    consistent with this slide or different?

4    **A.**  Our positioning is different.  There's just a lot less

5    airlines.

6    **Q.**  But how about where JetBlue fits in?

7    **A.**  It's the same.

8    **Q.**  Still in the sweet spot?

9    **A.**  Still in the sweet spot.

10   **Q.**  And now that JetBlue has entered the Northeast Alliance,

11   have you removed this slide from the orientation materials?

12   **A.**  No.

13   **Q.**  Are you planning to?

14   **A.**  No.

15   **Q.**  Can you turn to the page ending 354?  And this is a page

16   that you were shown before, again, by Mr. Davis, and it talks

17   about the JetBlue effect and that it says, "Lower fares allow

18   more people," and they use a typo, can travel, "and that's

19   fundamental to our business plan."

20   **A.**  Yes.

21   **Q.**  Is this something you talk about with new hires?

22   **A.**  Yes.

23   **Q.**  Why is that?

24   **A.**  Because a lot of them have either come from outside our

25   airline industry, or they come from another airline, and it's

1  very important that they understand how different we are.

2  And we're different because fundamentally we want to attract

3  new customers with lower fares, retain their loyalty, because

4  of the service that they get on JetBlue will be better than

5  what we believe they will get on another airline.  And

6  through that, we can grow our market, we can acquire new

7  customers, and we can grow, which is the other fundamental

8  part of our business plan.

9  **Q.**  Have you stopped talking about this with new crew members

10  now that JetBlue is in the Northeast Alliance?

11  **A.**  No, not only is this something that we discussed with new

12  crew members at orientation, it's something that we discuss

13  almost every day.

14  **Q.**  And are you planning to change that?

15  **A.**  Not at all.

16  **Q.**  Do you recall that you were also shown portions of this

17  orientation presentation that you might say were critical of

18  consolidation in legacies?

19  **A.**  Yes.

20  **Q.**  Have you stopped presenting those materials to new crew

21  members?

22  **A.**  No.

23  **Q.**  Are you planning to stop presenting those materials to

24  new crew members now that you're part of the Northeast

25  Alliance?

1      **A.**   No, it's very important that our crew members understand

2      the history and what created JetBlue.

3      **Q.**   And did you enter the Northeast Alliance because you

4      wanted to change JetBlue's business model?

5                MR. DAVIS:  Objection, leading.

6                MR. SCHWED:  They've made an allegation that that's

7      a reason that JetBlue has entered the Northeast Alliance.  I

8      believe the brief said that JetBlue has cashed in and --

9                THE COURT:  Overruled for now.

10               MR. SCHWED:  Go ahead.

11               THE WITNESS:  Sorry, could you repeat the question?

12     BY MR. SCHWED:

13     **Q.**   Yeah.  Did you enter the Northeast Alliance because you

14     wanted to change the JetBlue business model?

15     **A.**   No.  We entered the Northeast Alliance because it would

16     allow JetBlue to accelerate our business model in the

17     northeast.

18     **Q.**   Do you plan to change that business model?

19     **A.**   No.

20     **Q.**   And do you have a view one way or the other if the

21     Northeast Alliance is going to affect the JetBlue effect?

22     **A.**   No, in fact, it will allow us to bring the JetBlue effect

23     to more customers in more markets.

24     **Q.**   So can you explain why JetBlue entered the Northeast

25     Alliance?

1    **A.**   Certainly.  So from a New York perspective, one of the

2    biggest constraints, if not the biggest constraint that we

3    face was the ability to grow.  We were still a distant third

4    behind Delta and United when you look at all of the New York

5    airport system, and there were still many markets that we

6    could not fly to.  There were many markets that we could not

7    have the frequency that we needed.  And so the NEA presented

8    a generational opportunity, particularly coming out of COVID,

9    to accelerate that growth, and people in New York are happy.

10   I mean, we've been able to go from 200 flights a day to

11   probably nearly 300 flights a day across the New York airport

12   system, and customers are benefitting in terms of more

13   JetBlue routes and more low fares.

14           In Boston, it was slightly different.  Boston is

15   not an airport that has been constrained, but we were facing

16   a significant threat from Delta.  As I mentioned yesterday,

17   our business model in Boston is different, in that it depends

18   more on business travel.  That is called to the DNA of Legacy

19   Airlines.  They have to focus on business travel because they

20   need more -- the higher fares to offset the higher cost

21   structure.  And as Delta grew Boston, I was concerned about

22   how sustainable some of our network here would be in the face

23   of them really focusing on them and bringing the vast

24   benefits of their scale.  Again, an airline, as I said

25   yesterday, had three to four times our slots.  So we wanted

1  to stay large in Boston, we wanted to stay relevant in Boston

2  for both business and leisure travel, and the NEA was

3  critical to that.

4  **Q.**  You've talked about growth a fair amount.  Is overall

5  growth important to JetBlue?

6  **A.**  It's core to our business model.

7  **Q.**  Why is that?

8  **A.**  Because, again, our business model is about offering low

9  fares and great service, but offering low fares and great

10  service doesn't come for free.  We're a for profit company,

11  so we have to generate margin and be profitable.  And so the

12  way that we do that is that we generate profitability by

13  continuing to lower fares, and that allows us in some

14  examples we went through yesterday, of growing the market,

15  and by growing the market, JetBlue will have access to more

16  customers and that's allowing us to grow.  So I describe it

17  as the virtuous circle, and it's something that we've been

18  doing for 20 years, with the exception of COVID, when

19  obviously we reduced flying.

20  **Q.**  What did you see as impeding or hindering JetBlue's

21  growth in New York, in particular?  And I want to just focus

22  now, preNEA, pre -- before the NEA, before COVID, I want to

23  just sort of get your -- how you viewed the marketplace in

24  New York, what, if anything, did you see as hindering

25  JetBlue's growth?

**A.**   The number one hindrance to growth we had was just the
lack of slots.  As I said, we were a distant third behind
Delta and United.  We had tried for years to get slots.  We
had tried to get them through a regulatory processes.  We
tried to get them by bidding for them.  They don't come up
very often because the airlines who have them don't want to
let them go and we had had very little success in the New
York area.

**Q.**   And leading into the Northeast Alliance, how many
slots -- or I should say how many slot pairs did JetBlue have
at LaGuardia Airport?

**A.**   Pre the Northeast Alliance, we were operating about 19
flights a day.  That was due to go down to 15 or 16 flights a
day, because three of those flights were slots that were
leased to us by another airline, who had sold them to
Southwest, who outbid us for those slots.  And as a result of
that, we were due to actually reduce flying in LaGuardia.
And again, that had the potential to jeopardize our potential
to fly Boston-LaGuardia because there were only 15 slots, and
all of the flights from LaGuardia to Florida, I wasn't sure
how we would even be able to keep 15 flights a day.

**Q.**   And as a result of the Northeast Alliance, how many slot
pairs does JetBlue now have at LaGuardia?

**A.**   This summer we were operating around 50 flights a day
into LaGuardia, so an increase of -- I mean, more than

1    tripling the size.

2    **Q.**  Now, you talked a little bit about Boston.  Can you just

3    describe why you viewed Delta's growth there as a competitive

4    threat?

5    **A.**  Yes.  So, again, I think it's important to note that

6    JetBlue's core DNA is in leisure flying.  We've always had a

7    very low share of business travel.  In Boston, as we grew

8    Boston, we took an advantage -- we took advantage, really, of

9    the financial crisis in 2008, when the number of airlines

10   backed away from Boston.  You know, Delta had invested in a

11   terminal here and others withdrew.  So you know, we saw an

12   opportunity.  We know it's very hard for an airline the size

13   of JetBlue to go up against a big Legacy Airline, but we saw

14   an opportunity.  And for many years we were successful in

15   Boston.  But then as we look forward and as Delta decided to

16   really start ramping up flying, and we'd seen the impact of

17   what they had done in Seattle to Alaska Airlines in terms of

18   growing there, we knew we had some challenges on the business

19   travel side particularly.  You know, we don't have the global

20   frequent flyer program that Delta has, we don't have the

21   corporate sales force of hundreds of people.  We don't have

22   the ability to leverage domestic corporate travel contracts

23   for international contracts.  So as Delta grew

24   internationally, they used that to leverage domestic business

25   travel, and so I was concerned about that.  And so, you know,

1    coming into COVID had started to think about what we needed

2    to do to address that.  And so the NEA opportunity with the

3    resources that American would bring in that area, I think

4    really allows JetBlue to sustain and continue to grow in

5    Boston.

6    **Q.**  Can you briefly describe what the Northeast Alliance is?

7    **A.**  Yes.  The Northeast Alliance is really a commercial

8    partnership that we have with American Airlines that, one,

9    allows JetBlue to grow in the northeast for the reasons that

10   we've talked about, but also to deliver other benefits for

11   JetBlue customers.  So again, even in New York, one of the

12   challenges we had as a younger, newer, smaller airline was

13   that we don't -- we don't have the aircraft and the access to

14   some of the long-haul markets that Delta and United had.  And

15   so one of the attractive elements of the NEA for us was

16   American's commitment to grow some of those long-haul markets

17   so we could offer those benefits to our customers, including

18   our TrueBlue members, who one of their biggest complaints

19   about the program, they want enough destinations that I can

20   fly.  There aren't enough other airlines that I can redeem

21   on.

22   **Q.**  And can you open up to Defendants' Exhibit 356.  There's

23   a redacted version, please.

24   **A.**  I have it, yeah.

25   **Q.**  Do you recognize this document?

1    **A.**   I do.  This was a board of directors briefing that we did

2    in June of 2020.

3    **Q.**   And if you can turn to page 58 of this presentation.  Do

4    you have it in front of you?

5    **A.**   I do.

6    **Q.**   Can you explain what this page is?

7    **A.**   Yes.  This was a summary that we prepared for our board,

8    and also used in internal leadership team briefings to

9    describe the main strategic rationale of the partnerships

10   with American.

11   **Q.**   And was this actually presented to the board?

12   **A.**   Yes.

13   **Q.**   And do you remember when that presentation was?

14   **A.**   It was in June of 2020.

15   **Q.**   And you had reviewed this before it was presented?

16   **A.**   Yes.

17   **Q.**   And do you believe -- if you look on the -- right at the

18   top, it says "strategic rationale of Project Connie," and

19   then there's a description right after that.  Do you believe

20   that to be an accurate description of the strategic rationale

21   for Project Connie, or the NEA?

22   **A.**   I do.

23   **Q.**   And then in the left-hand column, there's a picture of an

24   airplane and something that says, "Network relevance."  Do

25   you see that?

**A.**  I do.

**Q.**  Can you describe what network relevance means to you or JetBlue?

**A.**  Yes.  So network relevance, really, think of it in terms of all the destinations that people want to fly, how many destinations can I fly to.  And we used the term "direct network relevance," so how many of those markets can I serve directly.  And there's also this concept of indirect network relevance, which is, you know, how can I get to different destinations with one stop.  So it really talks about how many places that we're flying to that we need to fly to.

**Q.**  And why is that important?

**A.**  Because if you look at the number one -- in my opinion, the number one driver for most customers, it's, as they make decisions about what airline they're going to fly and what frequent flyer program they're going to be in, what credit card they're going to get is which airline flies to most of the markets that I want to fly to.  And so relevance is an extremely important concept for an airline.  And again, we always struggled because even in the biggest focus cities of New York and Boston historically, we've had a much lower share of the market than other large airlines have in their home markets.

**Q.**  And the first bullet point below that header says, "Increased depth and breath accelerates standalone plans in

1    Boston."

2              Do you see that?

3    **A.**  I do.

4    **Q.**  Can you describe what the terms "breadth and depth" mean

5    in the airline industry?

6    **A.**  So breadth is very specifically the number of places that

7    I fly and depth is the -- think of it in terms of the number

8    of flights to that destination I might have had in a certain

9    day.  So you know, in a core business market, you may fly

10   there, if it's a one a day flight, but it's not going to be

11   very effective, so you need to have depth and have multiple

12   frequencies a day.

13   **Q.**  And why did you include this bullet point in the deck?

14   **A.**  Again, it just goes back to the critical strategic

15   benefit for JetBlue entering into this to, one, overcome some

16   very significant structural disadvantages we had in New York,

17   relative to our largest two competitors, and in Boston, it

18   was creating a path as to sustain here and grow over time.

19   **Q.**  And what do you mean that it would accelerate the

20   standalone plan in Boston -- let me just read it.  "In

21   Boston, accelerates standalone plan."  What did you mean by

22   that?

23   **A.**  So what that means is that it is something that we had --

24   you know, we had been growing Boston organically.  We were

25   looking for ways to continue to grow that and I wanted to

1    make sure we had a path where we could continue to grow that

2    in light of, you know, Delta's focus on that market.

3    **Q.**   The next bullet also uses a couple of terms.  It says,

4    "Asset pooling and schedule optimization provide expanded

5    customer utility at JFK."

6              Can you just describe what asset pooling and

7    schedule optimization are?

8    **A.**   Yes.  So on the issue of asset pooling, one of the

9    challenges that we had always had in JFK is once we had been

10   slotted in JFK, we were underslotted in the peak 4:00 p.m. to

11   8:00 p.m. period.  That created quite a few challenges for us

12   in terms of -- you know, those are key times a day,

13   particularly for international flight arrivals and certain

14   departures.  So by pooling assets with American, we were able

15   to use some of their slots in that period to create better

16   schedules for JetBlue.

17             And schedule optimization really talks about the

18   concept yesterday about partnering with American to create

19   connective schedules, so customers who would fly on a mix of

20   JetBlue and American would now have schedules that work, you

21   know, two to three hour layovers in JFK, as opposed to 6 to

22   12 hour layovers or not being able to fly to a market, and

23   again, that allows us to be competitive to Delta and United.

24   If you go into travel agents and you look at the distribution

25   systems that they use, one of the factors that they

1   prioritize is total length of trip.  And so having, you know,

2   having competitive total length of trip is important.

3   **Q.**  And when you say total length of trip, are you talking

4   about connecting flights?

5   **A.**  Yes.

6   **Q.**  And that includes -- well, how does schedule optimization

7   affect the total length of the trip?

8   **A.**  Because if we know there's a long-haul international

9   market that American has added and we know what some of the

10  key connecting markets that JetBlue may be serving, we can

11  change the timing of those flights to, and the slots that

12  they fly in to allow us to connect more customers and bring

13  new customers to both JetBlue and American.

14  **Q.**  Does asset pooling play any role in that process?

15  **A.**  Yes, that is the process in which we move the slots

16  around.  That allows JetBlue to fly into those flights.  So

17  as I said, we had a dearth of slots between 4:00 to 8:00 p.m.

18  It's always been a real restrictive element of our position

19  at JFK and this allowed us to address that.

20          THE COURT:  Can I just jump in for a second?

21          MR. SCHWED:  Yes.

22          THE COURT:  So the assets you're pooling are the

23  slot.

24          THE WITNESS:  Yes.

25          THE COURT:  And when you have a slot in New York,

1   is that slot for a specific time?

2           THE WITNESS:  Yes, Your Honor.

3           THE COURT:  So when you want to optimize the

4   schedule to make a better connection say, as you were saying

5   for a feeder flight to feed into a long-haul flight, can you

6   just unilaterally change your landing time or who do you

7   negotiate with?

8           THE WITNESS:  So how it works, Your Honor, is we

9   have hour-long slots, and we can move flights around within

10  those slots.  So if I had a JetBlue flight -- if I have a

11  slot in the 3:00 to 4:00 hour, and we have a slot in the 4:00

12  to 5:00 hour, I don't need permission to swap those.  But if

13  I had a flight in the 3:00 To 4:00 hour and a flight in the

14  4:00 to 5:00 hour, and I wanted to take that 3:00 to 4:00

15  hour flight and have a second flight in the 4:00 to 5:00

16  hour, I would need a slot to do that.  And if I didn't have

17  it, I wouldn't be able to do it.

18          THE COURT:  So then to do that, you'd need to trade

19  with somebody who had a 4:00 to 5:00 that wanted to go to a

20  3:00 to 4:00.

21          THE WITNESS:  Yes, you'd need to trade, but the

22  challenge with that particular time of day is there isn't --

23  it's very hard to trade because that is the time --

24          THE COURT:  Everybody wants the 4:00 to 5:00.

25          THE WITNESS:  Yeah.  And a lot of the

1    internationals are arriving in at that time, and then they're

2    departing again in, you know, the early evening.

3              THE COURT:  And the slots are for one hour?  A one

4    hour window?

5              THE WITNESS:  I -- that's roughly right.  You know,

6    sometimes it can be more restrictive than that, but I've not

7    seen it go outside of the hour window.

8              THE COURT:  I see.  Okay.

9              Go ahead, thank you.

10   BY MR. SCHWED:

11   **Q.**  So in the example that you were just giving, how would

12   the NEA facilitate JetBlue getting, say, that additional slot

13   in the 4:00 to 5:00 hour?

14   **A.**  Because part of the NEA has been the pooling of slots

15   with American and the ability for JetBlue to fly those slots.

16   So, for example, at JFK, where we used to be about 150, 160

17   departures a day before the NEA, with the NEA that's now up

18   to close to 200.  So there's been a net gain by JetBlue of

19   about 40 slots, which has allowed us to build our JFK

20   operation.

21   **Q.**  And has JetBlue obtained additional slots in the

22   desirable late afternoon hours that you were just describing?

23   **A.**  As a result of the NEA, yes.

24   **Q.**  And who had those slots before the NEA?

25   **A.**  Well, they were American slots.

 1   **Q.**  And had JetBlue tried before to get those kind of slots

 2   from other means?

 3   **A.**  Yes.  I mean, I think every airline on the planet knows

 4   that if JFK slots are, you know -- good JFK slots available,

 5   JetBlue is interested.  The reality is, if they have came up,

 6   we are likely going to be outbid by a much larger competitor.

 7   **Q.**  And so how do -- the phrase here is that "asset pooling

 8   and schedule optimization provide expanded customer utility

 9   at JFK."

10        How does it help customer utility?

11   **A.**  Which one?

12   **Q.**  It should be highlighted on your screen.

13   **A.**  I got it.

14   **Q.**  I'll withdraw that.

15   **A.**  No, no, that's okay.  Customer utility.  I got it.  I'm

16   sorry.

17   **Q.**  Yeah.

18   **A.**  So again, it really is back to what I was talking about

19   by creating more JetBlue flights, direct flights, and more

20   connectivity because of more JetBlue flights with American.

21   It's giving our customers a lot more choice than they had

22   before.

23   **Q.**  Thank you.

24        Then the next bullet says, "Secures valuable

25   airport access at LaGuardia and gains traction with corporate

1  accounts."

2          What do you mean by airport access at LaGuardia?

3  **A.**  Well, we touched on that earlier.  You know, we had

4  always had a very, very small slot holding at LaGuardia.  It

5  was actually having to reduce because of these -- I think it

6  was these three leases that were going back.  And as a result

7  of that, you know, we really only just flew to Florida and

8  the six Boston flights I talked about.  And so LaGuardia is a

9  preferred airport for many in New York, depending on where

10  you live, and it's been a strategic imperative for us for

11  some time to try to grow that.

12  **Q.**  Why do you reference corporate accounts in this bullet?

13  **A.**  Because being so small in LaGuardia and, you know, being

14  a distant third in the New York area to the large two

15  airlines, we had only had limited traction with corporate

16  accounts in New York.  And for us, being able to add more

17  slots at LaGuardia would've allowed us to be more successful

18  in trying to get more corporate business on JetBlue.  It is

19  also enabled us -- it was the key enabler to grow

20  Boston-LaGuardia up to the level of frequency that we had.

21  Because as I said, we were at six a day.  I think that was

22  something that we would have had to review, because we were

23  probably going to be losing -- we were going to be losing

24  some of these slots and this allowed us to actually go in the

25  other direction.

1    **Q.**  I'd like to just turn to the middle column on this page,

2    and the top says "increased customer utility."

3           Do you see that?

4    **A.**  I do.

5    **Q.**  To you, what does the phrase "customer utility" mean?

6    **A.**  It really means customer choice.  It gives customers more

7    abilities, and more ability to fly JetBlue, whether that's a

8    one-off customer looking to buy a flight on a search engine,

9    or one of our loyalty TrueBlue or Mosaic members who are just

10   looking for more destinations and reasons to want to stay in

11   our program.

12   **Q.**  Now that you're 18 months into the Northeast Alliance, or

13   more than 18 months into the Northeast Alliance, in your

14   view, has it increased customer utility?

15   **A.**  Absolutely and we've seen record levels of credit card

16   expenditure.  And how that's linked is one of the ways that

17   you can tell if customers engage with your airline is they

18   get your credit card, because they're earning points on the

19   credit card to spend on your airline.  We've seen really

20   impressive growth there and we've seen impressive growth at

21   both of our TrueBlue and Mosaic membership bases.  And we're

22   addressing the key concern that JetBlue customers have been

23   raising for years, that my loyalty program is not doing

24   enough for me.  You do not have the breadth and depth of

25   other airlines.

**Q.**  If you look below that, there's a bold heading that
says, "Optimized network will provide customers" and then
there's a list.  You've talked about a lot of these things
before, so I'm not going to go through them.  But I just want
to go to the last bullet point, because again there's some
terminology there.  "Earn and burn capabilities on linked
loyalty programs."  Let's just start -- what do "earn and
burn" me?

**A.**  Well, let me -- I think one knows what a loyalty program
is, but I think it's important to recognize how important
they are.  So for Legacy Airlines with sort of these very
mature programs, it is not unusual for over 15 percent of
their total revenue to come from that loyalty program.

        THE COURT:  When you say that, what do you mean?
You mean from people who are members of the loyalty program?

        THE WITNESS:  Yes, Your Honor.  Because if you're a
member of the loyalty program, you know, you may have a
credit card.  There's other commercial activities that go on.
And if you look at these programs that the Legacy Airlines
have, they're so vast and they're so large, and it's such a
source of big competitor advantage for them, that it is, you
know, usually at least 15 percent of their revenues.  And if
you think that an airline in a good year may make a
10 percent, 12 percent operating margin, you can see that
15 percent of revenues are material, and these revenues

1   normally come at about a 30, 35 percent -- the margin is 30,

2   35 percent.  So it's always been a disadvantaged that younger

3   airlines have to overcome that we don't have those revenue

4   streams to the same degree.

5           And so if I then give you the JetBlue equivalent

6   number as a percentage of revenue, we have tried to get it up

7   to 10 percent, we've normally been between 7 to 10 percent,

8   so it's a much smaller part of our revenue total.

9           So for us to run the things that we have to do is

10  try to, overtime, close that gap.  And so one of the ways of

11  doing that is make your loyalty program more relevant for

12  people to give them more choices of how to earn points and to

13  redeem points.  So on your answer to your answer in terms of

14  earn and burn, earning means I'm flying on an airline, and

15  I'm earning JetBlue TrueBlue points.  With the NEA, we can

16  now be flying on American.  So we can bring to our customers

17  markets and routes that we weren't able to do before.  And

18  then the burn part of this is the ability for our TrueBlue

19  members to now redeem on both JetBlue, but also redeem on the

20  American network.  And we're in the middle of rolling this

21  out now.  Some of these benefits will be rolled out this

22  year, some will be rolling out next year.  And so as a result

23  of that, our TrueBlue members will have a lot more options.

24  We believe it will make them feel that they want to stay and

25  grow in our program, maybe switch from another credit card to

1    the JetBlue credit card.  And hopefully every time, help us

2    close -- we'll never get to the 15, 17 percent that legacies

3    have in operating revenues and loyalty programs, but we can

4    get closer.

5              THE COURT:  So the idea that because there's more

6    destinations and more places to go, that will, (a), make more

7    people interested in the loyalty program, and maybe make them

8    get a JetBlue credit card instead of a non-airline affiliated

9    card or switch from another airline affiliated card, number

10   one.

11             And then number two, more likely to sort of focus

12   on JetBlue flights, because they want to build up their

13   points because they see the points as more useful because

14   there's more places to go.

15             THE WITNESS:  Yes, Your Honor.  And I think that's

16   important.  Because the benefit the Legacy Airlines have,

17   even Delta and United in New York, where they're bigger, they

18   can still offer a lot of one-stop markets behind the other

19   hubs, if they don't fly out of New York.  The choices

20   customers have is so vast.  This is allowing us to be more

21   competitive and giving our TrueBlue members more places

22   to redeem -- we don't fly to Hawaii, for example, so the

23   eventually the ability to redeem your points to Hawaii on

24   American, it will be a huge benefit.

25             THE COURT:  And the benefit is not that they -- for

1   you, the benefit is not so much that they went to Hawaii, but

2   that it makes them want to stay, buy JetBlue -- choose a

3   JetBlue flight over a Delta flight, or it makes them want to

4   get a JetBlue credit card?

5            THE WITNESS:  Yes, Your Honor.  Exactly.

6            THE COURT:  Are there other benefits?

7            THE WITNESS:  Of being in the --

8            THE COURT:  For you.  In other words, to move from

9   7 to 15 percent.  One is you get more people in the credit

10  card.

11           THE WITNESS:  Yes.

12           THE COURT:  And the second way you do that is

13  people pick JetBlue flights.

14           THE WITNESS:  Yes.

15           THE COURT:  What are the other ways that -- what

16  else produces that 7 percent or turns it into 15 or closer?

17           THE WITNESS:  You know, as the program -- there are

18  other commercial partnerships that we can -- so sometimes you

19  maybe see.

20           THE COURT:  Hotel or --

21           THE WITNESS:  Hotels or airlines.  We also have our

22  travel product subsidiary, which is our own in-house non-air,

23  so it sells vacations, hotels, and cars.  That's one of the

24  ways that we've been trying to counter these big loyalty

25  programs.  So if I can get the size of our TrueBlue program

1    bigger by 50 percent, then I've got more people I can market

2    these products to, as well.

3              THE COURT:  I see.  Okay.  Thank you.

4    BY MR. SCHWED:

5    Q.  So you've been talking mostly about I guess the burn

6    aspect of this -- burn is redeem?

7    A.  Yes.

8    Q.  And so you've mostly been talking about how JetBlue

9    members can redeem their points.  And can you just talk about

10   how -- and I think you may have mentioned this, but how the

11   Northeast Alliance affects JetBlue TrueBlue member's ability

12   to earn points or miles?

13   A.  Yes.  So again, what our TrueBlue members can now do is

14   earn miles on American flights, as well.  So if there's a

15   market that we don't fly, they can now earn those on

16   American.

17              Again, we have no airplane that's going to operate

18   more than 3,900 miles.  You know, American have a lot of

19   those airplanes.  And so the ability for our members now to

20   earn on those flights, as well, gives us a better competitive

21   answer to Delta and United.

22   Q.  So if a customer flies a -- a TrueBlue member flies an

23   American flight, who decides which airline points that

24   TrueBlue member gets?

25   A.  The customer would choose.  So what you'll often do is

1    you will -- you may be in both programs and you can choose if

2    you want to get American miles or TrueBlue points.  But

3    there's always an advantage, whilst you offer benefits of --

4    because the other thing we haven't covered is our TrueBlue

5    members will now get benefits on these flights in the same

6    way that American Airlines Advantage members will get.  So

7    prior to check-in and free bags is another benefit for our

8    members, and that's been very important, as well.

9    **Q.**  Does the Northeast Alliance make those benefits

10   reciprocal, or are they one way?

11   **A.**  They're reciprocal benefits.

12   **Q.**  And how about the earn and burn piece of it?

13   **A.**  They're reciprocal benefits, they're still in the process

14   of rolling some things out.  So the full burn part of it

15   hasn't been rolled out yet.  That's planned for next year,

16   because it requires a bit of IT work to get us to be able to

17   do that.

18   **Q.**  And is undertaking the IT work necessary to roll out all

19   of the frequent flyer benefits that you described?

20   **A.**  Yes.  We have a major cut over to a new saver system,

21   probably in the next couple of months, and then there's some

22   coding work that we have to do beyond that for TrueBlue, but

23   we're currently planning for something like a Quarter 2

24   rollout next year.

25   **Q.**  In presenting the Northeast Alliance to the board before

1    you signed the agreements, did you tell the board that

2    JetBlue was no longer going to be a disruptor?

3    **A.**   No.  I reassured the board that this would allow us to

4    disrupt more.

5    **Q.**   Can you turn to Plaintiffs' Exhibit 807.  And there's a

6    page in 6958, there's four pages -- it's hard to find, the

7    numbers are small, but it's roughly four pages from the back,

8    and it's up on your screen now, if it makes it easier to

9    find?

10   **A.**   Yup.

11   **Q.**   Are you there?

12   **A.**   Yes.

13   **Q.**   Do you recall being shown this page by Mr. Davis?

14   **A.**   I do.

15   **Q.**   And I know this is a different document, but was this

16   part of a board presentation?

17   **A.**   Yes.

18   **Q.**   Was it the same board presentation?

19   **A.**   I believe it was --

20   **Q.**   If you don't remember --

21   **A.**   Yes, June 2020.  Yeah.

22   **Q.**   As of June 2020, when you were presenting this to the

23   board, did you believe that the Northeast Alliance was going

24   to be anticompetitive?

25   **A.**   No.

**Q.**   So why did you present this slide to the board?

**A.**   Because this was a big undertaking and it's my job as CEO
is to think through every angle of this.  And prepare the
board for -- whilst we were passionate that this was one of
the most procompetitive things that JetBlue could do, it
would face regulatory scrutiny.

**Q.**   And would your board have been happy if you hadn't
presented this and you were sitting in court today?

**A.**   I don't think they'd be happy, but -- look, when you're
now a CEO, you're in the risk business.  We have a thousand
flights a day that take off and land and we micromanage every
aspect of that risk.  And so we have a whole culture in our
company as a leisure team discussing all sorts of risks with
the board, and certainly as we're going into a transaction
like this, commercial risk, regulatory risk, operational
risk, all the sorts of things that we would need to cover
with them.

**Q.**   Can you turn to Defendants' Exhibit 372, please.

**A.**   I have it.

**Q.**   Can you identify this document?

**A.**   Yes, this is the Blue Note.  A Blue Note is our brand for
internal communication.  And it was the Blue Note that we
used to announce the partnership with American.

**Q.**   Who do Blue Notes get sent to?

**A.**   They go to all of our crew members.

1  **Q.**  All crew members across the --

2  **A.**  Yes and a reminder from yesterday, all employees are crew

3  members, yeah.

4  **Q.**  And who is this Blue Note from?

5  **A.**  This Blue Note went from myself and Joanna Geraghty, and

6  she's our president and chief operating officer.

7  **Q.**  And right below the Blue Note logo, it says, "announcing

8  a strategic partnership with American Airlines."  And it

9  says, "Dear crew members."  Is the strategic partnership

10  referenced here the Northeast Alliance?

11  **A.**  Yes.

12  **Q.**  And why did you send this Blue Note to crew members?

13  **A.**  Well, again, it was a very strategic undertaking, we were

14  in the middle of COVID.  You know, there was a lot of concern

15  about the -- you know, people's jobs and what was going to

16  happen, and even what airline was going to be able to

17  continue to be around.  And so we felt this was really good

18  news for them in terms of giving them real hope.  Because as

19  part of this announcement, we also delayed our time of some

20  airplanes.  And once of the worst things when you work for an

21  airline is when you hear that bosses are retiring airplanes

22  because you know that's going to have an impact on your job.

23  And JetBlue, we've been around 22 years, we've never

24  furloughed a single crew member in our history.  We're very

25  proud of that.

1    **Q.**  And you've already discussed a lot of the elements of

2    this where it describes the Northeast Alliance, but I do want

3    to direct your attention to one section where it says crew

4    member benefits.

5    **A.**  Yes.

6    **Q.**  And it says, "It will also give crew members new options

7    to provide customers who have had disrupted or canceled

8    travel plans, which is a pain point when we have weather or

9    operational challenges."

10   **A.**  Yes.

11   **Q.**  Do you see that?

12   **A.**  Yes.

13   **Q.**  What is the "it," first of all?

14   **A.**  Okay.  So this refers to -- as part of the NEA, a

15   representation agreement that we put in place with American,

16   that, in the event of JetBlue flights being delayed or

17   canceled, we would be able to rebook those customers on

18   American.

19   **Q.**  And why is that helpful?

20   **A.**  Well, again, it's been in the news a lot recently, as

21   well.  The reason that it's helpful is every airline is going

22   to face disruption.  You need -- JetBlue has the highest

23   percentage of our flights that operate in and out of

24   constrained air space of any US airline.  You know, we are --

25   a lot of our flights go into New York and Boston and Florida.

1    And those are -- and continue to be very challenging markets.

2    And so when a flight was delayed or canceled, usually due to

3    air traffic control, but sometimes a maintenance issue or

4    others, we had no options other than to rebook people on

5    JetBlue flights, because our model is high load factors, it's

6    sometimes hard.  And the legacies have such a huge advantage

7    here because --

8              THE COURT:  What do you mean -- oh, high load

9    factors is your model is you're trying to run the planes

10    full.

11              THE WITNESS:  Yes, that allows us to help keep our

12    fares down, so we have less spaces.  We also don't have the

13    network size.  So when Delta cancels a flight in Boston, I

14    can reroute customers through New York, Atlanta, Detroit, I

15    have so many options.

16    BY MR. SCHWED:

17    Q.   When you say "I" in that, you mean Delta?

18    A.   Yes.  I'm sorry.  We don't have that and it's been a pain

19    point for years.  And so we'd asked the Legacy Airlines in

20    the past, we had written to them and asked if they would

21    enter into a representation agreement with us.  You don't

22    have to have another partnership to do that.  They all

23    refused, with the exception of American Airlines about ten

24    years ago, when we had a smaller commercial partnership with

25    them, and then they removed that after a few years.

1          And so this was a huge win for our crew members.

2    When they were at an airport and the snow -- the fog has

3    rolled in, and they're looking to cancel the flight, you can

4    now go in the system and you can see -- and I've sat behind

5    the desk in Boston, and I've seen it work, you can see all

6    the other options that we can rebook customers on in

7    American Airlines, and it's been a massive benefit to our

8    crew members and a massive benefit to our customers and if we

9    didn't have the NEA, we would not have had that ability.

10   **Q.**  And just to be clear, going into the NEA, right, before

11   the NEA, did you have a representation agreement with any

12   other major airline?

13   **A.**  No.  As part of COVID, we did put one in place with

14   Alaska Airlines at some point, but again, that really only of

15   limited use on certain transcon markets.

16   **Q.**  Can you --

17          MR. SCHWED:  Please don't publish it.

18   BY MR. SCHWED:

19   **Q.**  Can you turn to Defendants' Exhibit 378, because there is

20   an objection, I believe, to this document.  Let me know when

21   you have it.  378.

22   **A.**  Yes.

23   **Q.**  Can you tell me what this document is?

24   **A.**  Yeah.  This is another note to our crew members.  I

25   believe it was another Blue Note, but it's -- I can't see

1    that on here.  And it was just really an update on the NEA,

2    and as the benefits had started to -- the benefits had

3    started to roll out and we were providing an update.

4    **Q.**  If you look at the subject line, does that help you

5    assess whether this is or is not a Blue Note?

6    **A.**  Oh, yes, you're right.  I should have read that.  That's

7    right.

8    **Q.**  And I apologize.

9    **A.**  It is a Blue Note.

10   **Q.**  In the printing process, some images may not have come

11   through.

12          Why did you send this?

13   **A.**  Because we were several months into the NEA, and we

14   wanted to give our crew members an update on all the benefits

15   that, you know, both they and our customers had been seeing.

16   **Q.**  Is it a regular practice of yours to send Blue Notes when

17   important things happen?

18   **A.**  Yes.

19          MR. SCHWED:  I'd like to admit this into evidence,

20   Your Honor.

21          MR. DAVIS:  Objection, hearsay, Your Honor.  This

22   is an out of court statement for the truth.  It's written on

23   September 21st of '21.  It's a self-promoting summary of the

24   NEA and it's hearsay.

25          THE COURT:  You're offering it for what purpose?

1      For the truth or for the fact that his state of mind and

2      what --

3              MR. SCHWED:  I think for his -- for the state of

4      mind.  It is also just -- it's an ordinary course business

5      document.  Mr. Hayes has testified that when important things

6      happen, they send -- they send Blue Notes.  There's also the

7      pretrial order, the case management orders make it clear --

8              THE COURT:  Why isn't that just a business record

9      in the sense that they regularly send updates and this is a

10     regular update that they send?

11             MR. DAVIS:  Only, Your Honor, that the important

12     thing happened 14-months earlier.  This is self-promotion.

13     It's not --

14             THE COURT:  Well, isn't one of the important things

15     the -- this is, I assume, prompted by the lawsuit.  I don't

16     remember the exact day it's filed, but it seems to be, from a

17     quick look, the explanation to the employees about their view

18     of the lawsuit, right?

19             MR. DAVIS:  Yes.

20             MR. SCHWED:  Yes, Your Honor.  And that's exactly

21     the type -- it is exactly --

22             THE COURT:  Well, I'll certainly take it for the

23     fact that they said it and they're stated -- their state of

24     mind at the time and whether it's a business record or not

25     for the truth.  I'll figure that out later.  After I hear

1    more about it.  It's at least overruled to that extent.

2                (Defendant Exhibit No. 378 admitted into evidence.)

3                THE COURT:  Go ahead.

4    BY MR. SCHWED:

5    **Q.**  I just want to ask you one question about a question and

6    answer that you got yesterday and for counsel.  You don't

7    have in front of you, but just for counsel, it's in the

8    afternoon session, page 26, it starts on the last line of

9    page 26, and you were asked the following question.

10               "QUESTION:  Would you agree that within the NEA,

11   where the two airlines are coordinating capacity, JetBlue and

12   American no longer compete with each other, correct?"

13               And you answered, "In terms of the markets in the

14   NEA that are not carved out, we don't compete with each other

15   directly."

16               What did you mean by that answer?

17   **A.**  So what I meant by that was that in the markets where we

18   were optimizing capacity, you know, we were working to create

19   schedules that compete with Delta and United, however our

20   business models remain very different.  And as we talked

21   about yesterday, for example, we price independently.  So

22   JetBlue may or may not have different pricing structures in

23   those markets.  We want TrueBlue members to fly on JetBlue.

24               I think I also made clear yesterday whilst it's one

25   level metal neutral in terms of we want people to fly NEA

1    versus Delta and United, I still -- JetBlue is still acting

2    differently, we're pricing independently.  You know, we had

3    all of those wonderful offers that went out a couple of weeks

4    ago to customers and we want people to be able to fly on

5    JetBlue, rather than American, everywhere we can.

6    **Q.**  When you said the phrase "pricing independently," does

7    JetBlue discuss any prices with American at all?

8    **A.**  Absolutely not.

9    **Q.**  I want to just sort of bring forward from the -- now

10   we're talking about the time before the NEA was signed, but

11   think about today, and in the 18 months or so since the

12   parties began implementing, in your view, has the Northeast

13   Alliance brought any benefits to consumers?

14   **A.**  Significant benefits to consumers.

15   **Q.**  Can you describe those?

16   **A.**  More JetBlue flights, with more lower fares, regional

17   jets coming off markets and airplanes of between 100 to 200

18   seats, going on them, giving people much more choice.

19   Everyone on those flights are benefitting from, you know, the

20   most leg room, free live TV, free WiFi, which they weren't

21   before.  Our TrueBlue members are getting more benefits in

22   the loyalty program, and we've been able to also offer

23   corporate customers more than we've ever been able to do

24   before.

25   **Q.**  You mentioned regional jets.  Can you just describe what

1    a regional jet is and why that was relevant?

2    **A.**   Yeah, I'm sorry.  My view was American were playing

3    defense -- again, this is my view, American were playing

4    defense in New York.  So a lot of 70 seat smaller regional

5    jets, the ones we get on, we have to valet our bags before we

6    get on the airplane sometimes.  We don't have any of those,

7    the smallest airplane we have is the Embraer 190 with 100

8    seats.  We are retiring those.  We are replacing them with

9    1820s 20s with 140 seats.  And so not only were we bringing

10   more JetBlue flying with the JetBlue pricing model, the

11   JetBlue stimulation model, we were also up-gauging on to

12   bigger airplanes, so bringing more seats on to the market.

13   **Q.**   And has the NEA affected the availability or options for

14   JetBlue flyers internationally?

15   **A.**   Well, it's in the hard stack, as I was saying earlier.

16   We can now because of the co-chair partnership and because of

17   the evolving and improving frequent flyer program benefits,

18   customers can now fly on a number of longer American markets,

19   again, giving us much better competitive tools to compete

20   with Delta and United.

21   **Q.**   Would a co-chair agreement, alone, provide the benefits

22   overall that you described in the last few answers?

23   **A.**   Co-chair will give you a small fraction of the benefits.

24   You know, co-chair relationships are quite normal.  I think

25   the real value for this connectivity is the optimization of

1    the schedules that come with it.  So that we can make sure

2    that we can create meaningful connectivity, meaningful

3    schedules.  We don't leave a customer 12 hours in JFK because

4    the only flight is in the morning and the American departure

5    is in the afternoon.  We can create that connectivity.  And

6    for JetBlue, which is a much smaller airline, we've only been

7    around 20 years, we just don't have the aircraft to fly these

8    markets ourselves.

9    **Q.**  Now, you testified yesterday about some capacity

10   reductions or pull downs or schedule reductions this year

11   because of operational issues.

12          Do you recall that?

13   **A.**  I do.

14   **Q.**  Can you just explain, like as a practical matter, how

15   schedule reductions or capacity reductions relate or may help

16   with operational issues?

17   **A.**  Sure.  So the challenge that we faced coming into this

18   year, we have to own it as JetBlue, I just -- the only

19   mitigating fact that I will give, is that the whole industry

20   saw this to various degrees, but we had our issues, too.  So

21   we came out of Omicron.  We got behind on our pilot training.

22   The pilot attrition levels, which is number of pilots leaving

23   JetBlue was significantly up, most of them were going to

24   Delta and United.  And --

25          THE COURT:  Why?

1          THE WITNESS:  Sorry, Your Honor?

2          THE COURT:  Why were they going to Delta?

3          THE WITNESS:  Because what's happening at the

4     moment is that the -- during COVID, the Legacy Airlines, so

5     the large ones, lost a lot of pilots.  They offered early

6     retirement and other things.  There's been some stories in

7     the news about that.  So as they're ramping back up now, they

8     have this huge hiring need.  And so for the smaller airlines,

9     whether it's a Spirit or an Alaska or JetBlue, we've all made

10    public comments around, you know, we've seen pilot attrition

11    increase because the legacies are now trying to --

12         THE COURT:  And why would a pilot -- what's the

13    advantages from a pilot's perspective working for one of the

14    legacies?  They pay more?  Or they're long-haul routes.

15         THE WITNESS:  I would say the pay rates -- what we

16    pay a JetBlue captain who's flown an Airbus for, say, ten

17    years, is pretty similar to what the United, Delta, American

18    would pay, so it's not so much the light pay, Your Honor.

19    It's more that these larger -- these Legacy Airlines, they

20    have a lot of wide bodied capacity, you know, the triple

21    sevens, the longer, the bigger airplanes which pay more.  So

22    because of all these retirements, there's now all of these

23    opportunities to join.

24         THE COURT:  So your pay rate depends in part on

25    what your flying.

1          THE WITNESS:  Absolutely.  The pay rate tends to be
2     linked to the size or tonnage of the airplane that you're
3     flying.
4          THE COURT:  I see.  And they have more of those.
5          THE WITNESS:  Yes.  And there's definitely a
6     squeeze going on.  You know, some of the regional operators
7     have had to sit airplanes on the ground now, because there
8     aren't enough pilots coming into the profession.  And we also
9     lost people early retired.  So we were behind on training.
10    We've seen attrition go up.
11          And so we -- we also saw a lot of challenges in the
12    external environment, so I mentioned yesterday, ATC delays
13    were significantly up.  There's also less traffic controllers
14    now than in 2019, or at least that's my understanding in the
15    New York area, Jacksonville, for example.  So what that meant
16    was as more flights were delayed.  We didn't have enough
17    pilots to cover these delayed flights, because once pilots
18    reach a certain number of hours a day, they can't be used
19    anymore.
20          So you have to find way to reserve pilots.  So we
21    didn't have adequate reserves coming into that, and we were
22    hit by these very challenging external environments.  And
23    that came to a head in April, particularly here in Boston.  I
24    had to come up and give some media interviews to apologize to
25    customers about what happened.

1          And we course corrected very quickly, and we took

2    about 10 percent of flying out.  And what that enabled us to

3    do is say, okay, we now need less pilots actually flying and

4    we can boost our reserve levels, which is what we did, and

5    for the most part, that's worked.

6          And now we are very aggressively trying to hire

7    pilots again, so we can bring that capacity back into next

8    year, and we expect to grow next year again.

9    BY MR. SCHWED:

10   **Q.**  You use the word "reserves."

11   **A.**  Uh-huh.

12   **Q.**  Can you just say what that means in this context?

13   **A.**  Yes.  So a reserve pilot is someone who is scheduled to

14   like be ready to fly today, but you don't have a flight

15   scheduled.  And there's both long-haul reserves, which is

16   I'll let you know the day before what I want you to do

17   tomorrow, and there's a short call reserve, which is I need

18   you at the airport in three hours.  And so what that means is

19   when we get into delays, we have these reserves that can pick

20   up flights rather than cancelling it.

21   **Q.**  And were you able to increase the reserves without

22   cutting back flying?

23   **A.**  It would have been impossible to do that.

24   **Q.**  Do you view the operational issues or the resulting

25   schedule reductions as affecting the ability to achieve the

1    growth that you anticipated when entering the Northeast

2    Alliance?

3    **A.**   I mean, I view these as temporary issues.  Again, we've

4    said publically that we expect 2023 to be, you know,

5    significantly better than 2022.  But we're not out of COVID

6    yet and you still see pockets of staffing shortages across

7    different industries.  But I'm confident we're on the right

8    track.  And as I say, actually having pulled down, we added a

9    little bit of flying back in August, and I'm hopeful, as we

10   get into next year, that we'll grow back -- we have the

11   hurricane going on right now, which is definitely impacting a

12   lot of canceled flights, but those are weather, natural

13   events.

14   **Q.**   And did these schedule changes that led to increased

15   reserves, did they actually work?

16   **A.**   Yes.  Yes.  I mean, our operation -- I mean, again,

17   summer is always very challenging, particularly for JetBlue,

18   because we just have the most flights in this more complex,

19   constrained air space.  But overall, I'm pleased with how the

20   summer went.

21   **Q.**   I want to turn to JetBlue's transatlantic flying.  And

22   you talked about that yesterday?

23            THE COURT:  Just before you turn to that.

24            MR. SCHWED:  Yes.

25            THE COURT:  So on the cost -- are there differing

1  models for the number of, like, for example, reserve pilots

2  that must affect your cost structure, right?

3         THE WITNESS:  Yes, Your Honor.

4         THE COURT:  So if you have no reserve pilots, it's

5  cheaper, but then you bear the risk of if a pilots gets sick

6  or has COVID, or a plane gets delayed and they're out of

7  time, then customers are burned.

8         THE WITNESS:  Yes, that's right.  There is actually

9  a curve that says if I'm too low on reserves, I'm going to

10  incur a lot of costs and cancel flights, so I'm going to lose

11  a lot of revenue.  I get up to that optimized level where I'm

12  investing in reserves, and I can cover my operation.  And

13  then if you go above that, you're spending money on reserves

14  for little benefit.

15         One of the things we mention every day is reserve

16  coverage, which is by fleet, by seat, by pilot or first

17  officer, and by base, Orlando, Fort Lauderdale, what is our

18  reserve coverage.  And you really want to keep the reserve

19  coverage under 75 percent, because if you go above that,

20  you're relying too much ore serves.

21         THE COURT:  And the ultra low cost carriers have a

22  different reserve model than, say, the Legacy Airlines?

23         THE WITNESS:  No, I would say that I don't know

24  quite what all reserve numbers that we all have, because

25  something we obviously don't talk about.  But I would say we

1    have all gone into this year with higher level of reserves

2    than we had originally expected.  So we may have had

3    different levels of reserve, but everyone has increased them.

4              THE COURT:  No, but forgetting about COVID, is that

5    generally something that -- just like lounges, the legacies

6    have lounges.

7              THE WITNESS:  Yeah, I would say one of the

8    benefits -- one of the ways a low cost carrier can keep its

9    cost down is, you know, you try to be more productive.  You

10   try to operate with lower levels of reserves.  You fly your

11   airplanes more hours per day.  So you try to get more from

12   the assets like that.  I think one of the unique challenges

13   JetBlue has had, Your Honor, just because of our geography,

14   in terms of the congested northeast, we haven't really been

15   able to operate with very low level reserves in the past, and

16   we've actually now taken them up fairly significantly.

17             THE COURT:  Okay.  Go ahead.

18   BY MR. SCHWED:

19   Q.  I just wanted to clarify one thing I think I heard.  I

20   think you said we all went into this year with higher level

21   of reserves than expected?

22   A.  Uh-huh.

23   Q.  Is that what you meant?

24   A.  Yeah.  What I meant was, if you look at what airlines

25   have done this year, pretty much every airline has reduced

1    capacity, because they've had staffing challenges, they've

2    had coverages challenges, and by reducing that capacity, that

3    allows them to increase the number of reserves.

4    **Q.**   And that reduction happened before the year started or

5    over the course of the year?

6    **A.**   It's really been happening throughout the year.

7            THE COURT:   It's not a function of increasing your

8    reserves, it's not a function of decreasing the top number,

9    but lowering capacity.

10           THE WITNESS:   Yes, and that allows you then.

11           THE COURT:   Then your reserve percentage goes up.

12   BY MR. SCHWED:

13   **Q.**   I just want to clarify one thing.  If you lower capacity,

14   does that also increase not just the percentage, but the

15   number of reserves you have?

16   **A.**   Yes, if I reduce capacity, and my numbers of pilots are

17   unchanged, then I'm going to have more pilots on reserve,

18   because I'm going to need less actual pilots to fly those

19   flights.  And the number of pilots and the percentage of

20   pilots will both increase.

21   **Q.**   I want to turn to a different topic, which is

22   transatlantic flying.  You discussed that a little yesterday

23   with Mr. Davis?

24   **A.**   Yes.

25   **Q.**   And I don't want to repeat what you discussed, but as of

1   today, just for context, how many flights a day is JetBlue

2   flying to London, to and from London?

3   **A.**  We're operating right now two flights a day from Boston

4   to London, two flights a day from New York to London, one to

5   Heathrow and one to Gatwick, from both of those airports.

6   And then in about four weeks, at the end of October, we will

7   be announcing a fifth flight, which will be another

8   New York-Gatwick flight.

9   **Q.**  What has been JetBlue's approach to fares for its London

10   service?

11   **A.**  Again, we've taken the same approach that we've always

12   taken, which is to lower fares, stimulate the demand, and try

13   and operate with fuller -- full airplanes.

14   **Q.**  Has the Northeast Alliance affected JetBlue's pricing for

15   its London service?

16   **A.**  No.

17   **Q.**  Does the pricing team at JetBlue consider the Mutual

18   Growth Incentive Agreement in setting fares for London?

19   **A.**  No.

20   **Q.**  In your view, has the Northeast Alliance changed

21   JetBlue's culture?

22   **A.**  No.

23   **Q.**  Does JetBlue consult with American in any way, about any

24   decision outside the Northeast Alliance?

25   **A.**  Absolutely not.  We compete.

1  **Q.**  And within the Northeast Alliance, does JetBlue ever

2  discuss pricing with American?

3  **A.**  Absolutely not.

4  **Q.**  Does JetBlue consult with American about its overall

5  fleet size?

6  **A.**  Absolutely not.

7  **Q.**  Has JetBlue limited in any way its aggressiveness in

8  competing with American outside the Northeast Alliance?

9  **A.**  No.  We compete -- we've talked a lot about New York and

10  Boston.  Fort Lauderdale is our third largest focus city and

11  we compete directly with Miami.  In fact, we opened Miami.

12  we've opened up operations to Miami a couple of years ago.

13  We've opened markets like Miami and LAX, with our Mint

14  service to compete with American.  So outside of the NEA, we

15  are full blooded competitors.

16  **Q.**  And have you changed your model in terms of the sweet

17  spot of high quality product and low fares?

18  **A.**  We can't.  I mean, even --

19        THE COURT:  You can't or you haven't?

20        THE WITNESS:  I'm sorry?

21        THE COURT:  You can't or you haven't?

22        THE WITNESS:  We can't.  I mean, we're not.  We're

23  a with-profits company, we have to find a business model that

24  makes money.  We found a unique model here in the US, which

25  is to focus on being a very efficient airline and keep our

1    cost down, offer low fares, offer customers a better service

2    and grow.  We can't become a -- I say orientation, we can't

3    become like a Legacy Airline because we needed to go back 70

4    years and get all of the harbors and global connectivity

5    that -- but we can't have.  And I think there's a huge need

6    for an airline like JetBlue, we just need to be bigger.

7    BY MR. SCHWED:

8    Q.   Plaintiffs have made some allegations that given the

9    Northeast Alliance, JetBlue lacks an incentive to be a

10   disruptive independent competitor.  Do you agree with that?

11   A.   Not only do I don't agree with it, and again, we've

12   rolled out London, we've launched with much lower fares.  You

13   know, we did some work back in May that showed the impact of

14   Mint fares to London were 40 to 50 percent lower in New York,

15   and before we entered it, fares on Boston and Chicago, for

16   example, hadn't changed.  This is before we started flying to

17   Boston.  So we continue to disrupt, because it's our DNA.

18   It's called our business model.

19   Q.   Is JetBlue planning to change the way it competes or its

20   business model once this litigation is over?

21   A.   No.

22            MR. SCHWED:  I have nothing further.

23            THE COURT:  All right.

24            (Counsel confers.)

25            MR. SCHWED:  Sorry.

1    BY MR. SCHWED:

2    **Q.**  I just wanted to go back to one thing that you said a few

3    minutes ago that may not have been clear.  You said you'll be

4    announcing a new flight to Gatwick in two weeks.  Do you mean

5    that you --

6    **A.**  I'm sorry, we start operating it.  We've already

7    announced it.  My apologies.

8              MR. SCHWED:  Thank you.  No further questions.

9              THE WITNESS:  I hope we sell some tickets on it.

10             THE COURT:  Mr. Wall, no questions?

11             MR. WALL:  No, Your Honor.

12             THE COURT:  All right.  Any redirect, so to speak?

13             MR. DAVIS:  Yes, Your Honor.

14             Can we take a short break?

15             THE COURT:  Sure.  How long you want?

16             MR. DAVIS:  Ten minutes.

17             THE COURT:  All right.  Take a ten minute break.

18   Stand in recess.

19             (Court in recess at 10:09 a.m.

20             and reconvened at 10:21 a.m.)

21             THE DEPUTY CLERK:  The United State District Court

22   for the District of Massachusetts is now in session, the

23   Honorable Leo T. Sorokin presiding.

24             THE COURT:  Please be seated.

25             MR. DAVIS:  May I proceed, Your Honor?

 1              THE COURT:  Oh, yes.  I'm sorry.

 2          **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

 3   BY MR. DAVIS:

 4   **Q.**  Good morning, again, Mr. Hayes.

 5   **A.**  Good morning.

 6   **Q.**  I just have a few questions.

 7              Mr. Hayes, you talked about transatlantic flying

 8   again, right?

 9   **A.**  Yes.

10   **Q.**  And the new flying that JetBlue is now doing out of

11   London, Heathrow, and Gatwick, right?

12   **A.**  Yes.

13   **Q.**  And today you have two slots at Heathrow, right?

14   **A.**  Two slot pairs.

15   **Q.**  Two slot pairs.  And one of those is from Qatar Airlines,

16   right?

17   **A.**  Yes.

18   **Q.**  One of them is from Aeroflot, right?

19   **A.**  Indirectly.

20   **Q.**  But just to be clear here, those two slots are not in

21   lieu of the four CMA remedy slots, correct?

22   **A.**  It's an alternative pathway.  So as I said yesterday, we

23   had a number of options to getting Heathrow slots.  I

24   certainly never had all my eggs in the CMA basket and so

25   these are some other examples.

1   **Q.**  It's an alternative pathway, because it's a different

2   pathway, right?

3   **A.**  Yes, it's a different pathway.

4   **Q.**  But there's no reason that different pathway couldn't be

5   in addition to the CMA remedy slots, right?

6   **A.**  Well, we don't have the airplanes to fly the four CMA

7   slots, even if they had been awarded, and the Gatwick slots

8   and those other two slots.  We only have -- we currently have

9   four long-range airplanes because of continued delays by

10  Airbus, and yesterday I learned that the fifth one that we

11  were due to get I think next week has been delayed again, as

12  well.

13  **Q.**  But you would sure rather fly out of Heathrow than

14  Gatwick if you had the chance, right?

15  **A.**  Actually, if you looked at all of our public comments we

16  talked about serving more than one London airport.

17  **Q.**  You still want those four CMA slots, right?

18  **A.**  Again, we have a plan to grow Heathrow, if we can.  We

19  have other pathways that we continue to look at.  I have to

20  balance that growth with Gatwick.  I have to balance that

21  growth with other markets in Europe that we want to fly in.

22  And if you get a slot, you have to fly.  And so you need to

23  have an airplane to fly.  And unfortunately, with all of our

24  long-range airplane delays, we've had to -- that has kind of

25  delayed us.

1   **Q.**  So is that a yes?

2   **A.**  A yes to?

3   **Q.**  You're still planning to apply for the CMA remedy slots?

4   **A.**  We need to make a decision on that.

5   **Q.**  You haven't made it yet?

6   **A.**  I haven't made it yet.

7   **Q.**  Would you agree, you might have had by now six slots at

8   Heathrow?

9   **A.**  No, I don't agree with that.

10  **Q.**  Would you agree that it's sure better to have six slots

11  at Heathrow than two.

12  **A.**  If we had the airplanes to offer, if we had six Heathrow

13  slots today, we couldn't have operated them.  We only have

14  the ability to operate four at the moment.

15  **Q.**  All right.  You talked a good bit today about frequent

16  flyer programs and frequent flyer revenue.  Do you recall

17  that?

18  **A.**  Yes.

19  **Q.**  And do you remember yesterday the judge talked to you

20  about loyalty programs and whether loyalty programs were

21  included or excluded from the MGIA?

22  **A.**  Yes.  Yes.

23  **Q.**  And did you tell him they were excluded?

24  **A.**  Well, the value of the credit card and all of the other

25  benefits are excluded.  What is in the MGIA is, if you redeem

1    a ticket, in lieu of cash, you spend points, and then the
2    cash for that is in the MGIA.  But that's the -- that's the
3    transactional part of the frequent flyer program that's
4    linked to the flight.  The value for JetBlue is in the
5    program and all the other commercial services that go into
6    the loyalty program.
7    **Q.**  So net frequent flyer revenue is very much a part of what
8    goes into the MGIA, right?
9    **A.**  Well, frequent -- the earn and burn related to that
10   specific flight goes into the MGIA.  But credit card
11   revenues, which is where, frankly, you make most of your
12   money, do not.
13   **Q.**  All right.  But in the included revenue and in the MGIA
14   agreement, net frequent flyer revenue is number three on the
15   list, right?  It's right there.
16   **A.**  Because if you are earning or burning on that particular
17   flight, you're basically using points instead of cash, and
18   there's an imputed value of those points for cash.
19   **Q.**  All right.  Could we go back to --
20           THE COURT:  What is net frequent flyer revenue,
21   then, in the MGIA?
22           THE WITNESS:  Well, so if you think about --
23           THE COURT:  I get that the credit cards --
24           THE WITNESS:  Yeah, yeah.  So what it is, if I'm --
25   if JetBlue -- if a JetBlue customer is redeeming points on an

1    American Airlines flight in the NEA, we're taking points from
2    that customer.  They are then getting a seat on American.  So
3    we will pay, effectively pay a value for those points to
4    American, right?  Because we've collected the points.
5                THE COURT:  You'll pay for the seat.
6                THE WITNESS:  Correct.  And we're effectively
7    buying that seat.  So all of that goes into the --
8                THE COURT:  How do you determine what rate you pay
9    for that seat?
10               THE WITNESS:  It's a negotiation between the
11   parties.
12               THE COURT:  Okay.
13               THE WITNESS:  And if you -- in the NEA agreement,
14   there's a set of agreements, and one of them is the FFP.
15               THE COURT:  So it will be pursuant to the FFP to --
16               THE WITNESS:  Yeah, I'm not sure if the rates are
17   in the FFP, but my team kind of get involved in that.
18               THE COURT:  Okay.
19   BY MR. DAVIS:
20   Q.  While we're talking about FFPs, there is a risk you're
21   taking by aligning yourself with American Airlines and their
22   FFP program, right?
23   A.  Yes, one of the risks we evaluated going into the NEA was
24   that risk.  And again, we felt that the changes we made to
25   our TrueBlue program mitigated that risk.

1           THE COURT:  What is that risk?

2           THE WITNESS:  Sorry.

3           THE COURT:  What is the risk of aligning with

4      American's frequent flyer program?

5           THE WITNESS:  Well, so if you are in the TrueBlue

6      and American program today, and suddenly you can fly JetBlue

7      and get American points, you know, is there a risk that you

8      don't need to be in the TrueBlue program?  I don't want to

9      represent the question, but I think maybe that's what was

10     behind it.

11          THE COURT:  That was the risk you were thinking

12     about.

13          THE WITNESS:  That's the risk.  So what we had to

14     say is how can we change our TrueBlue program to still make

15     it more -- again, even in the NEA, we compete to a certain

16     extent, other people --

17          THE COURT:  So the fear is that because American is

18     a legacy airline, with a much bigger network than JetBlue,

19     and a lot more of the -- they're more -- you would think

20     they're more at the 15 percent level, that customers who have

21     the American frequent flyer membership might decide I don't

22     need the TrueBlue anymore, I'll get rid of the TrueBlue card,

23     I won't do TrueBlue.  I'll just get on -- when I fly JetBlue,

24     I'll get on --

25          THE WITNESS:  Yes, Your Honor, so what we do is we

1     track a series of metrics, we look at engagements, so

2     potentially people flying on JetBlue who are TrueBlue members

3     in the NEA markets, is that different to the non-NEA markets,

4     credit card sign-ups, have they slowed down in the NEA

5     markets.  So that's one of the things that we do to measure

6     whether that risk has been -- has happened.  I'm pleased to

7     say so far we've seen very positive results.  We also have

8     some changes coming to our TrueBlue program early next year,

9     which aren't public yet, but we think will further give

10    people a reason to fly JetBlue -- TrueBlue rather than

11    American airplanes.

12              THE COURT:  I see.

13              Go ahead.

14    BY MR. DAVIS:

15    **Q.**  So you've calculated that being in this alliance with

16    American Airlines overcomes the loss of people who are now

17    going to choose to be in American Airlines AAdvantage program

18    instead of JetBlue, right?

19    **A.**  Well, we evaluated that risk.  I can't tell you how much

20    modeling and analysis that we did on that.  I think we got to

21    the place where we felt that the upside was significant for

22    JetBlue.

23    **Q.**  And at that net upside, you're making money either way,

24    right?

25              MR. SCHWED:  Objection.  I'm not sure what "either

1   way" means.

2           MR. DAVIS:  I'm sorry.

3   BY MR. DAVIS:

4   **Q.**  You're making money whether that customer chooses the

5   AAdvantage or JetBlue, right?

6   **A.**  Well, clearly versus flying on Delta and United, yes.

7   But there is a significant value premium for them choosing

8   the TrueBlue loyalty number, rather than American Advantage.

9   Because all the other -- most of these loyalty programs they

10  make all of their money from the credit card.  And so that's

11  why we want engagement in the TrueBlue program.

12  **Q.**  All right.  So let's go to DX356 again, if I could.

13  Could that be brought up?

14          THE COURT:  How do you make money, putting aside

15  the frequent flyer choice, if the customer just chooses

16  American?

17          THE WITNESS:  Say that again, Your Honor?  How do

18  we make money?

19          THE COURT:  If the customer just chooses -- within

20  the NEA, and they choose an American flight?

21          THE WITNESS:  A JetBlue TrueBlue member?

22          THE COURT:  Well, I understand you have a benefit

23  if they do the American flight.

24          THE WITNESS:  Yeah.

25          THE COURT:  And link it to their TrueBlue account.

 1              THE WITNESS:  Yeah.

 2              THE COURT:  But if they don't, do you make money?

 3              THE WITNESS:  So are you talking about an American

 4    Advantage member flying on an American flight.

 5              THE COURT:  Within the NEA.

 6              THE WITNESS:  Within the NEA.  Yes, that goes into

 7    the overall MGIA formula.  So because of that, American will

 8    be generating more revenue from that transaction, which goes

 9    into the -- sorry -- that goes into the other MGIA payment.

10    But in the hierarchy of what do we want to happen is

11    JetBlue --

12              THE COURT:  Sure.  So there is some benefit to you.

13              THE WITNESS:  Yea.  I mean, the bottom of the

14    hierarchy is they fly Delta or United.  The next one up is

15    American frequent flyer on American flight within the NEA,

16    then it's JetBlue customer flying with JetBlue code on an

17    American flight, then it's the JetBlue customer flying on a

18    JetBlue flight, so that's the hierarchy of benefit to

19    JetBlue.

20              THE COURT:  Okay.  Go ahead.

21    BY MR. DAVIS:

22    Q.  Could we have DX356, please, and the slide ending in 486.

23    A.  Oh, I'm sorry, wrong one.  I'm sorry.  I was in his file.

24    Q.  So the exhibit is DX356.

25    A.  Oh, DX356.

1  **Q.**  Yes.  And the slide is 486.

2  **A.**  Okay.

3        MR. SCHWED:  It may be easier to find, at the

4  bottom of every page, right after 356, there's actually a

5  page number, and this one is "-104."

6        MR. WALL:  Is he in the right binder?

7        MR. SCHWED:  Are you in the binder that we handed

8  you?

9        THE WITNESS:  Yes.

10        MR. SCHWED:  Okay.  So it's page number 104, so

11  it's DX356-104.  It's a little bigger font.

12        MR. DAVIS:  Thank you.  Mr. Hayes I'll wait for you

13  to find that.

14        THE WITNESS:  One of the take outs on this case is

15  I need to go and do an eye test.

16        Okay.  I got it.  Thank you for your patience.

17  BY MR. DAVIS:

18  **Q.**  All right.  So you see this is the spectrum of potential

19  partnership options that JetBlue was looking at in 2020,

20  correct?

21  **A.**  Yes.

22  **Q.**  And you see kind of in the middle, there's a column for

23  the codeshare option, right?

24  **A.**  Yes.

25  **Q.**  And under that codeshare option, it says that some

1    schedule coordination is possible, correct?  You see that

2    schedule coordination on the left and then some possible on

3    the right?

4    **A.**  Yes.

5    **Q.**  All right.  And it talks about slot swaps, right?  A

6    little further down?

7    **A.**  Yes.

8    **Q.**  And slot swaps are possible under the codeshare, correct?

9    **A.**  Yes.

10   **Q.**  And then there's network expansion, right?

11   **A.**  Yes.

12   **Q.**  And also in that column, under the codeshare, it

13   says, "Some possible."  Right?

14   **A.**  Yes.

15   **Q.**  And then under that, there's, "Frequent flyer plan

16   benefits," right?

17   **A.**  Yes.

18   **Q.**  And that's a check mark.  You can definitely have

19   frequent flyer plan benefits in a partnership that is a

20   codeshare, correct?

21   **A.**  Yes.

22   **Q.**  And at the top, in the description under codeshare, the

23   overall description there is improved connectivity and

24   customer experience, right?

25   **A.**  Yes.

1    **Q.**  Would you agree with me that a lot of what you testified

2    about this morning is covered in those five different

3    categories under the codeshare option?

4              MR. SCHWED:  Objection.  He testified about a lot

5    of things, Your Honor.

6              THE COURT:  You just want him to clarify the

7    question.

8              MR. SCHWED:  Yes, please.

9              THE COURT:  All right.

10   BY MR. DAVIS:

11   **Q.**  Would you agree that all of those subjects, schedule

12   coordination, slot swaps, network expansion, FFP benefits,

13   and improved connectivity and customer experience were all

14   aspects of your testimony this morning, right?

15   **A.**  We covered -- we covered those, yeah.

16   **Q.**  You covered a lot of them, didn't you?

17   **A.**  Yeah.  Yes.

18   **Q.**  All right.  And your slide from 2020 shows that all of

19   those things are quite possible under a codeshare, right?

20   **A.**  Yes.

21              What date was this in, 2020?

22              THE COURT:  I think it was June 22nd.

23              THE WITNESS:  It was the June 2020 date?  Yeah.

24              So, yes, again.  I think that we --

25              MR. DAVIS:  I'm sorry, I didn't have a question.

1  Maybe I did.

2            THE WITNESS:  I'm not sure.

3            MR. DAVIS:  You wanted to know when it was.

4            THE WITNESS:  All right.  Thank you.

5  BY MR. DAVIS:

6  Q.  So you can do all of that in a codeshare arrangement,

7  right?

8  A.  Well, again, I think what we ended up with was something

9  that sat between this codeshare and joint venture, because as

10 you know, we can't sit down and coordinate schedules in a

11 normal codeshare environment, so I think the slide was

12 slightly inelegantly labeled, and it was more to educate the

13 board in terms of the different options.

14 Q.  So the next -- the far to the right column, that's what's

15 currently under consideration as of June 20th, right?

16 A.  Yes.

17 Q.  And that says "joint venture," right?

18 A.  Yes.

19 Q.  And that says, "Integration of businesses" --

20            THE COURT:  Just to correct.  I said June 20th, but

21 I was mistaken.  The first page of this exhibit says

22 Thursday, June 25th.  So just to clarify.

23            MR. DAVIS:  Thank you, Your Honor.

24            THE COURT:  I don't know if that applies to the

25 whole document, but.

BY MR. DAVIS:

**Q.** That's what's currently under consideration, the integration of businesses, right?

**A.** Well, again, I think it's -- with hindsight, I think it's inelegantly worded, because I think what is in the NEA is clearly laid out and this was still very much in the stage of educating our board what the options are, and again, a lot of these require the other party to consent and want to enter into the agreement in that way.

**Q.** But the approximate value capture is higher under joint venture than the others, right?  80 percent?

**A.** Yes, again, I think that just is alluding to the fact that the more you can connect schedules together, the more benefits that you can get.

**Q.** Now, codeshares have been around in the airline industry for decades, right?

**A.** Yes.

**Q.** And in the United States, at least, before the NEA, airlines negotiated codeshare agreements in arm's length transactions, right?

**A.** Yes.  But it -- it's a different type of model, because you're normally working with international partners to often connect one or two departures out of an airport.

**Q.** But today you are accomplishing, by your testimony, schedule coordination, slot swaps, network expansion,

1    frequent flyer benefits, and improved connectivity and

2    customer experience, you're accomplishing that with a

3    different kind of agreement, right?

4    **A.**  Yes.

5    **Q.**  Your agreement has capacity coordination over two-thirds

6    of your business, right?

7    **A.**  Yes.

8    **Q.**  And it also has revenue sharing imported from the

9    international JV model, right?

10   **A.**  Well, we have an NEA revenue sharing model, I don't know

11   how similar that is to the international JV model.

12   **Q.**  So let me ask you about one other exhibit.

13   **A.**  So the other thing that I think is important to know on

14   that slide was that value capital was from an 8-K industry

15   analysis.  It wasn't our numbers.  There's a small asterisk

16   down at the bottom.

17   **Q.**  But that's presented to the board, right?

18   **A.**  Well, we were using it to educate the board on different

19   options.  It's not necessarily numbers that we had validated

20   or vetted.  They didn't do the work for us, it was part of a

21   general study.

22   **Q.**  Mr. Hayes, you talked today about the weaknesses you had

23   in New York, right?

24   **A.**  Yes.

25   **Q.**  And your concerns about constraints in New York, right?

1    **A.**  Yes.

2    **Q.**  All right.  I want to ask you a few questions about

3    JetBlue's position in the New York market as of right before

4    the NEA.  Could you -- could we turn, please, to plaintiff

5    Exhibit 716 in evidence?

6             MS. RIGGS:  Your Honor, it's not in the binder.

7    May I pass up copies?

8             THE COURT:  Sure.  Yeah.

9             MR. DAVIS:  Thank you.

10            Everyone set?  You got it, Mr. Hayes.

11            THE WITNESS:  Yes, I do.

12   BY MR. DAVIS:

13   **Q.**  All right.  Thanks.

14            All right.  So again, this is an e-mail attaching a

15   June 2020 lender presentation for JetBlue?

16   **A.**  Yes.

17   **Q.**  So turning to the slide ending in 029, you were a

18   presenter for this lender presentation, right?

19   **A.**  Yes.

20   **Q.**  And a lender presentation is what, briefly?

21   **A.**  So this was one of, I think, 18 or 19 transactions that

22   we did during 2020 to raise money.

23   **Q.**  And part of this is COVID situation, I assume?

24   **A.**  It's all COVID.

25   **Q.**  All COVID?

1  **A.**  Yeah.

2  **Q.**  All right.  And of course, in a lender presentation, you

3  want to be accurate, right?  Because people are going to be

4  lending you money, maybe, based on what you tell them,

5  correct?

6  **A.**  Yes.

7  **Q.**  All right.  Let's go to the page ending in 039.  You see

8  the second bullet there?

9  **A.**  Yes.

10  **Q.**  All right.  And so again, you are in the market to get a

11  loan, right?  From this lender?

12  **A.**  Yes.

13  **Q.**  And what you tell the lender is that "New York's hometown

14  airline, with strong market positions in the largest and most

15  capacity constrained US markets, including New York City,

16  Boston, and Florida."  Right?

17  **A.**  Yes.

18  **Q.**  And then let's go to page 043.  And that's

19  called, "Leading positions in key US markets," right?

20  **A.**  Yes.

21  **Q.**  And again, this is June of 2020.  So the NEA is still a

22  month away of even being announced, right?

23  **A.**  Yes.

24  **Q.**  Although you're negotiating it, right?

25  **A.**  Yes.

1  **Q.**  And this slide provides 2019 market shares for New York

2  City, Boston, and south Florida, right?

3  **A.**  Yes.

4  **Q.**  And on the left is a pie chart showing JetBlue 2019

5  market share for New York City, right?

6  **A.**  Yes.

7  **Q.**  Now, if you Zoom in on Footnote 2 at the bottom left-hand

8  portion of the slide, that indicates that the New York City

9  market share pie chart is about JFK and LaGuardia, right?

10  **A.**  Yes.

11  **Q.**  And so that's how JetBlue defined New York City when you

12  were seeking a credit rating to get financing, right?

13  **A.**  Yes.

14  **Q.**  The chart indicates that JetBlue was the second largest

15  carrier in the New York City market in 2019, right?

16  **A.**  Again, if you just factor in JFK and LaGuardia.

17  **Q.**  Which is exactly what you were just factoring in,

18  correct?

19  **A.**  In this document, that does that.

20      I will tell you in pretty much every other walk of

21  life, we considered Newark as part of that New York airport.

22  **Q.**  This walk of life is when it's particularly important to

23  be truthful and accurate, would you agree?

24  **A.**  And it is.

25  **Q.**  And it is truthful and accurate here, correct?

1  **A.**  Yes.  Because it excludes Newark.  Which, with hindsight,

2  we should have included Newark.  I wish I had spotted that

3  when these slides were prepared.

4  **Q.**  All right.  So again, JetBlue is the second largest

5  carrier in the New York City market in 2019, right?

6  **A.**  We're the third largest if you factor in the New York

7  City area airports.

8  **Q.**  But this slide shows it as second largest?

9  **A.**  Yes, but that's not how customers choose.  My son lives

10  on Perry Street in New York, it is 17 miles to JFK, 13 miles

11  to Newark, 11 miles to LaGuardia.

12  **Q.**  Mr. Hayes, I wasn't asking you about where your son

13  lived.  I was asking you about what this chart shows?

14  **A.**  Yes.  But you're characterizing -- we do not view Newark

15  as not part of the competitive set.  Everyone in New York I

16  believe understands that.

17  **Q.**  I understand your position.  American was the third

18  largest carrier in New York City in 2019, correct?  On this

19  pie chart?

20  **A.**  Well, again, it excludes United's massive presence in New

21  York.  So if I look at New York City, I would say American is

22  the fourth largest airline.

23  **Q.**  But this chart shows it as the third?

24  **A.**  Yes, again, with hindsight, I wish -- this slide is

25  truthful, but I wish I had included Newark because on pretty

1    much every other deck that we had had, we included Newark.

2    **Q.**   Moving to Boston, the Boston market share pie chart shows

3    JetBlue is the leading carrier in Boston in 2019, right?

4    **A.**   Yes.

5    **Q.**   And JetBlue was the largest carrier by approximately 20

6    percentage points over American and Delta, right?

7    **A.**   Yes.  Can -- just can you -- I just want to -- is that

8    seats or ASMs?

9             THE COURT:  I think it's ASMs.  I think that's what

10   Footnote 1 says.

11            MR. DAVIS:  I think it says market share based, on

12   the bottom.

13            THE WITNESS:  Yes.

14   BY MR. DAVIS:

15   **Q.**   So which one is it, Mr. Hayes, for the record?

16   **A.**   I'm not sure.  If you -- I can't see the bottom.

17   **Q.**   Based on main line operations?  Do you see that?

18   **A.**   So it's domestic seat miles, ASMs.

19   **Q.**   Great.  ASMs.  Familiar territory, right?

20   **A.**   Yes.  Sorry.

21   **Q.**   Okay.  So JetBlue in Boston again is the largest carrier

22   by about 20 percentage points of American and Delta, right?

23   **A.**   Yes, at that point.

24   **Q.**   And American was tied with Delta for the second largest

25   carrier in Boston in 2019, correct?

1   **A.**  At that time, yes.

2   **Q.**  So you would agree that this chart shows that JetBlue and

3   American both held significant market share in Boston and New

4   York City in 2019, right?

5   **A.**  Yes, at that time.

6   **Q.**  All right.  Let's turn to page 052 briefly.  This, again,

7   is part of the presentation to the lender?

8   **A.**  Yes, that's right.

9   **Q.**  And the head line here is, "Leading position on US East

10  Coast," right?

11  **A.**  Yes.

12  **Q.**  So you're representing that JetBlue has a strong East

13  Coast presence, right?

14  **A.**  Yes.

15  **Q.**  And, in fact, since its founding, JetBlue has been

16  flighting against the legacies in these high value

17  geographies, as you describe them, right?

18  **A.**  Yes.

19  **Q.**  Right?  Let's go to 053, the next slide in this, I think.

20          Do you see that leading carrier at New York City's

21  JFK airport?

22  **A.**  Yes.

23  **Q.**  And that slide shows JetBlue being the largest carrier at

24  JFK in 2019, right?

25  **A.**  Yes.

1   Q.  And let's go to 055, two more slides away.  Now, what

2   does that slide say at the top?

3   A.  "Limited LCC and ULCC presence at JFK and LaGuardia."

4   Q.  All right.  And over in the black bars on the right, it

5   says, "Low cost carriers cannot penetrate the New York

6   market," right?

7   A.  Yes.

8   Q.  And the slide shows that JetBlue holds approximately

9   15 percent of all slots available in New York City, while low

10  cost competitors collectively hold less than five percent,

11  right?

12  A.  Where is the -- where are you getting the 15 percent

13  from?

14  Q.  Would you agree that the bar chart -- I'm not sure where

15  the 15 percent --

16         THE COURT:  I think 15 percent of the low cost

17  carrier plus slots, on not JetBlue -- if you do a quick math

18  on the 287.

19         MR. DAVIS:  Thank you, Your Honor.

20  BY MR. DAVIS:

21  Q.  So the slide shows that in New York City, low cost

22  competitors collectively hold less than five percent, right?

23  A.  Are you including Southwest and Alaska in that number?

24  Q.  It looks like it is, right?

25  A.  Okay.  Well, rather than do mental gymnastics in my head,

1  I just refer to the numbers on the slide.

2  **Q.**  Right.  And this slide is presented to lenders focused on

3  how JetBlue faces limited lower fare competition in New York

4  City, right?

5  **A.**  Yeah, the context of the -- the context of this debt from

6  recollection is we were looking to take out collateral on our

7  slots and so we just wanted to make sure that the lender knew

8  that, you know, the slots were something that were robust and

9  and that they had value.

10  **Q.**  Because usually, when you're talking about slot

11  constraints and low fare, low cost airlines, you're making

12  the point that it's very hard and very unfortunate that it's

13  so difficult for low cost airlines to get those slots, right?

14  That's usually what B6 is talking about.

15  **A.**  Yes.

16  **Q.**  But on this slide, what you're saying to the lenders is

17  we have almost all of them and almost no one else is even

18  there, right?

19  **A.**  Well, no.  We clearly don't have nearly all of them,

20  because across the New York City airports, we're still a

21  distant third to Delta and United.  What we do know is that

22  all New York airports are congested, and so it's hard for new

23  entrants to get involved.

24         I would add, though, Southwest did have a

25  meaningful presence at Newark, which they decided to walk

1  away from.

2  **Q.**  Of course, you don't have nearly all of them, but you

3  have nearly all of the slots that low cost, low fare airlines

4  actually have, right?

5  **A.**  Well, we are the low cost airline for New York.  That's

6  where we were born.

7  **Q.**  Well, there's a lot of others that are trying, right?

8  **A.**  Well, again, Southwest walked away from them, so I

9  wouldn't categorize that as trying.  They had a big operation

10  from Newark that they decided to shut down.

11  **Q.**  Would you agree that in this lender presentation in June

12  of 2020, JetBlue is presenting the fact that none of the

13  other, or very few of the other slots for low cost carriers

14  in New York City are held by any other low fare competitor?

15  **A.**  Well, that's a -- the slot holdings were a factor there.

16  **Q.**  All right.  So you know very well, and you recognize, and

17  you even market here.  You know how difficult it is for low

18  fare airlines to break into New York, right?  Because they

19  can't get slots.

20  **A.**  It's -- yeah and we've had similar challenges breaking

21  into other slot congested airports ourselves.  But again,

22  Southwest has walked away from slots, Spirit has picked up

23  additional slots, Frontier has walked away from -- they had

24  slots that they decided not to operate.  So I don't think

25  it's -- that lot of this is some of the decisions that these

1    airlines have made not to operate in and out of New York.

2    Q.  All right.  Last slide here, and I'm almost done.  On

3    page 056, here you're telling the lender that JetBlue has

4    irreplaceable network assets at JFK, right?

5    A.  Yes.

6    Q.  And on the left, it says, "JetBlue holds a long term

7    lease in terminal five, through 2042," right?

8    A.  Yes.

9    Q.  And JetBlue holds exclusive rights to enter into an

10   agreement to redevelop terminal 6 at JFK, right?

11   A.  Yes.

12   Q.  And on the right, JetBlue has 250 high peak slots at JFK,

13   right?

14   A.  Yes.

15   Q.  That's about one quarter of all peak slots at JFK, right?

16   A.  Yes.

17   Q.  Your small airline is the second largest slot holder with

18   American third, right?

19   A.  Again, at JFK.  But people in New York look at the New

20   York airports together and they look at total capacity

21   together.

22   Q.  And again, this is what you're telling lenders in June of

23   2020, one month before the NEA, right?

24   A.  Yes.  Because we're looking for -- we're looking to lend

25   against our JFK slots.  We're not looking to loan against our

1    LaGuardia or Newark operation.

2    **Q.**  And now you're telling this Court that you had to enter

3    into the NEA because you were so weak in New York City,

4    right?

5    **A.**  We were a distant third in New York City.  We wanted to

6    bring more low fares and more choice to customers so that we

7    could compete better with Delta and United.

8    **Q.**  All right.  Mr. Hayes, you did enter the NEA in July of

9    2020, as we've established, right?

10   **A.**  Yes.

11   **Q.**  And we've talked about some of the things that have

12   happened since as a result of the NEA, right?

13   **A.**  Yes.

14   **Q.**  And one of them is that for the first full year of its

15   existence, the growth incentivizing MGIA formula generated a

16   200 million payment that JetBlue was supposed to pay

17   American, right?

18           MR. SCHWED:  Objection, Your Honor, this is -- was

19   covered yesterday and is way beyond the scope.  I didn't talk

20   about this at all.

21           THE COURT:  Well --

22           MR. DAVIS:  It's cross-examination, Your Honor.

23   I'm about to sit down.

24           THE COURT:  All right.  Overruled.

25   BY MR. DAVIS:

**Q.** You agree that occurred, right?

**A.** I'm sorry. Could you repeat that?

**Q.** You agree that the MGIA payment for the first full year of the NEA required a $200 million payment from JetBlue to American?

**A.** Well, as I said, a number of unusual things happened during COVID, and that number was never seriously contemplated by JetBlue as the payment, as I said that yesterday.

**Q.** And you were already so comfortable with your new partner that it didn't even worry you, and you jointly decided just to essentially ignore it, right?

**A.** No, I mean, when you're -- when you're the leader of an organization, you end up spending your time on the issues that are most pressing and others you can't solve. And on this particular issue, our team solved it at a relatively low level, with no escalation required. It was really a briefing item for me, and that was all.

**Q.** You had to move planes from planned growth in other parts of the country to cover the NEA, right?

**A.** At a high level. What we did, because of the NEA, was keep airplanes, actually. We were due to retire 30 E-190s, which we announced that we would no longer retire to cover NEA flying. And in addition to that later on, we announced 30 to 20 options to become firm orders also to grow.

1          So was there maybe have been some tactical moving

2     around to cover slots, moving different fleet types around,

3     we did secure extra airplanes because of the NEA.

4     **Q.**  You lost the CMA remedy slots at Heathrow because of the

5     NEA, right?

6     **A.**  Well, again, that was what was represented to me.  I

7     think they were wrong.  And fortunately, we have other

8     pathways that we worked, and we have an operation at Heathrow

9     today that frankly is the size of what we can operate with

10    the number of airplanes that we have.

11    **Q.**  And back in New York City, the ULCCs were still no closer

12    to entry in that important city because there were still

13    locked out, right?

14    **A.**  No, again, as I just told you, Southwest had an operation

15    that they walked away from, so you had to ask them why they

16    did that.  Frontier had an operation in Newark that they

17    walked away from.  They were operating it.  And Spirit had

18    picked up slots in New York, just as we've added flights to

19    Newark.  So no, I don't think it's fair to characterize the

20    low cost carriers as locked out from New York airports.  They

21    made decisions not to operate.  It is hard, New York air

22    space, and it is not easy, always, for low cost carriers to

23    do it, because some of these operational cost and constraints

24    that come with that.

25    **Q.**  And in the overall domestic airline market, you had

1  already said 80 percent of it is for airlines, right?

2  **A.**  Yes.

3  **Q.**  But now, after the NEA, and you include Alaska, the West

4  Coast partner of American Airlines, and JetBlue, the East

5  coast partner, we're up to about 90 percent, right?

6  **A.**  What is that 90 percent?

7  **Q.**  The amount of the domestic airline market that is

8  controlled by a very, very small number of airlines.

9  **A.**  Well, that's the same before.  We had four large airlines

10  with 80 percent and then JetBlue and Alaska had about ten

11  percent.  So we were the same airlines we were, so it was

12  always six airlines with 90 percent.

13  **Q.**  They're the same, except now Alaska and JetBlue are

14  partners with the largest world airline, right,

15  American Airlines?

16  **A.**  Yes, but with separate businesses and everything that

17  we've talked about.

18  **Q.**  So that's 90 percent in some kind of relationship with

19  each other, right, or being domestics?

20  **A.**  Well, I don't want to speak for the Alaska relationship

21  with American, but we have a commercial partnership with

22  American.

23  **Q.**  All right.  So the Legacy Airline, Southwest -- I'm

24  sorry, Alaska and JetBlue are about 90 percent today, right?

25  **A.**  As --

```
 1              MR. SCHWED:  Objection, Your Honor.

 2              THE COURT:  Sustained.  I understand.

 3              MR. DAVIS:  Okay.

 4    BY MR. DAVIS:

 5    Q.   And now you want to buy Spirit, right?

 6    A.   Yes.

 7    Q.   And that would eliminate half of the ULCC capacity?

 8              MR. SCHWED:  Objection.  We're also beyond the

 9    scope on this.

10              THE COURT:  Sustained.

11    BY MR. DAVIS:

12    Q.   After the NEA, Mr. Hayes, what's left for the rest of the

13    airline industry?

14    A.   Well, I mean, that's for you to put to them.  What I'd

15    say is all of the smaller airlines need to think outside the

16    box and be creative in order to have sustainable, competitive

17    business models to keep -- compete with these four large

18    legacy airlines.

19    Q.   And that's what you did your whole history until the NEA,

20    right?

21    A.   That's what we've done up to and including the NEA,

22    because the NEA is enabling us to do more of what we do best.

23    Q.   And your testimony today is that the NEA has helped the

24    state of competition in the US airline industry; is that

25    right?
```

1      **A.**   Yes, I believe a bigger JetBlue is good for competition.

2                  MR. DAVIS:  No further questions.

3                  THE COURT:  All right.  Anything else?

4                  MR. SCHWED:  I just have a couple of quick things.

5                  THE COURT:  Sure.

6      **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT JETBLUE**

7      BY MR. SCHWED:

8      **Q.**   Can you just pull up DX356, at page 104, that you were

9      shown by Mr. Davis.

10                  And he asked you some questions about the codeshare

11     column.  Do you see that?

12     **A.**   Yes.

13     **Q.**   And it says "schedule coordination," it says "some

14     possible."  Do you see that?

15     **A.**   Yes.

16     **Q.**   And is schedule coordination part of an ordinary

17     codeshare?

18     **A.**   No, again, I think in hindsight, we look at these slides

19     and would make changes.  I think with codeshare, there isn't

20     normally any schedule coordination that would go on, because

21     that's not something that you would do.  So in our other

22     partners where we have codeshare with some international

23     partners, then we don't -- we can't talk about schedules.

24     **Q.**   And there's a -- it says "slot swaps possible."  Do you

25     see that?

1    **A.**   Yes.

2    **Q.**   Are slot swaps part of an ordinary codeshare?

3    **A.**   No.  Again, I think it's a little bit inelegantly

4    labeled.  It is possible.  You do do -- you can do slot swaps

5    with different airlines to move slots around, but you can do

6    that outside of the codeshare partnership.

7    **Q.**   Okay.  And then if you can just go back to PX716, which

8    you were shown.

9            TRIAL TECHNICIAN:  What page?

10           MR. SCHWED:  I'm sorry, it's at the ones bates

11   numbered 043.  And if you can just zoom into the footnote,

12   please.

13   BY MR. SCHWED:

14   **Q.**   And you see it says, "Market share based on main line

15   operations" and then the first thing, it says, "domestic

16   available seat miles."  Do you see that?

17   **A.**   Yes.

18   **Q.**   Would this graph change if it were not limited to

19   domestic.

20   **A.**   Yes, it would have changed -- I should have spotted that.

21   I didn't spot it.

22   **Q.**   In what way?

23   **A.**   Again, if you look at airlines like the legacies at the

24   big hub like JFK, they have a lot of capacity dedicated to

25   long-haul international markets.  They fly all over the

1    world.  So if you were looking at total capacity in the

2    airport, then you would need to show that.

3    Q.   And just how would that effect JetBlue's percentage,

4    compared to, say, Delta, on the pie charts?

5    A.   I'd have to check, but it would reduce the relative

6    percentage between Delta and JetBlue.  The other thing that I

7    would need to check is -- this says based on main line

8    operations, so, you know, Delta, American, all use regional

9    jet operations, which would, again, potentially add to that

10   share number, so I also would have to check whether that was

11   included.  I don't know.

12   Q.   And just for some terminology.  What is main line?

13   A.   I'm so sorry.  Main line is -- so when the airline flies

14   the airplane itself, so you get on a JetBlue airplane with a

15   JetBlue pilot, it's a main line flight.  You can fly Delta,

16   American, or United.  They use regional jet partners, for

17   public, endeavor, where they basically outsource the service.

18   We call those regional operations.  And I don't know if

19   that's including in this analysis.

20   Q.   And does JetBlue have any regional jet operations?

21   A.   We have zero.

22   Q.   Okay.  And you said you'd have to check -- just to be

23   clear, would you have to check to know directionally which

24   way, including international, would move the numbers,

25   or would you have to --

1    **A.**  No, international, I'm confident, just in main line

2    operations, I don't know how that's been defined.

3    **Q.**  And if main line -- if regional jet flying is not

4    included, and you did include it, what would that do to

5    JetBlue's numbers?

6    **A.**  It would, again, reduce our share because we don't have

7    any, and the other three airlines in that area do.

8    **Q.**  And how about in Boston?

9    **A.**  The same.  So Delta, significant portion of Delta

10   services in Boston, our regional jet service, maybe up to 50,

11   maybe 40, 50 percent, even.

12   **Q.**  And the international long-haul, you would have to check?

13   **A.**  Yeah.

14   **Q.**  But if that were being included, just without knowing a

15   number, which direction?

16   **A.**  It would reduce our share versus the -- because a seat

17   mile is very -- based on how long that flight is, for the

18   reasons that I was telling you earlier.  So because of all

19   the Delta's flights to Europe, South America, United's

20   flights, that number, their share would go up, ours would

21   come down.  I just don't know to what degree, because our

22   international flights would be excluded, as well, but it's

23   going to be a smaller percentage of this.

24          THE COURT:  Basically, you didn't have any

25   international in 2019, right?

```
 1              THE WITNESS:  We did, Your Honor, to the Caribbean
 2    and markets like that, but it's small airplanes flies four
 3    hours, as opposed to wide big airplanes flying 10, 15 hours.
 4    And a seat mile is a function of the number of seats and the
 5    distance.
 6              MR. SCHWED:  I have nothing further.
 7              THE COURT:  All right.  Thank you very much.
 8              Any questions?
 9              MR. DAVIS:  No questions.
10              THE COURT:  All right.  You're excused.
11              THE WITNESS:  May I leave this?
12              THE COURT:  Yes, you can leave them all there.
13    You're paying for them for something.
14              MR. JONES:  Yes, Your Honor, the plaintiffs call
15    Andrew Watterson of Southwest Airlines.  And Your Honor,
16    Mr. Watterson is going slightly out of order of what we had
17    previously intended, but in an effort to accommodate a
18    schedule of a third party witness.
19              THE COURT:  Okay.  Good.
20              MR. STALLINGS:  Your Honor, I represent Southwest.
21    I had hoped to petition the Court about a confidentiality
22    issue before Mr. Watterson takes the stand.
23              THE COURT:  All right.  What's the issue?
24              MR. STALLINGS:  The issue is this.  So we --
25              THE COURT:  I'm sorry, just say your name again.  I
```

1    didn't catch it.

2           MR. STALLINGS:  Yes, sir.  William Stalling, from

3    Mayer Brown.  So during the course of the litigation,

4    Southwest produced thousands of documents.  The defendants

5    marked, I believe it was 12 documents as potential trial

6    exhibits.  Five of those we have absolutely no concern over.

7    The remainder, though, are internal Southwest documents, and

8    these are documents that were never meant to see the light of

9    day, they're prepared by and for the most senior decision

10   makers.  And we understand that, on the cross-examination --

11          THE COURT:  Of the defendants.

12          MR. STALLINGS:  -- some of them may be used.

13          THE COURT:  Okay.

14          MR. STALLINGS:  What we proposed to counsel for

15   American is that they can obviously discuss the documents,

16   they could show the documents to the witness, to Your Honor,

17   to counsel.  Our concern, though, is that we don't want them

18   shown to the gallery, and most importantly, we don't want

19   them shown to our competitors, who as you probably know from

20   the Zoom calls are monitoring this trial very closely.  The

21   documents -- if you look at them, there's individual --

22          THE COURT:  So what you simply don't want -- you'd

23   be content if, (a), they're not published on the screens, and

24   (b), certain of the particulars weren't mentioned in the

25   question or the answer.

1          MR. STALLINGS:  Absolutely.  Yes, sir.  And I think

2     the question, the Q and A can be phrased easily in a way that

3     does not elicit the sensitive information.

4          THE COURT:  And all of this is with respect to the

5     cross, not the government's examination?

6          MR. STALLINGS:  I understand from the - I've

7     discussed with the government, I don't expect any

8     confidential information or documents to be used by the

9     government.

10          THE COURT:  And does that work for you or not work

11     for you, Mr. Wall?

12          MR. WALL:  Yes, Your Honor.  I can say that I don't

13     think we have been more accommodating of anybody's

14     confidential concerns than Southwest.

15          THE COURT:  I'm only asking, are you comfortable

16     with what he proposes?

17          MR. WALL:  No, because what we're talking about

18     here, the things -- this comes down to about three documents,

19     the content of which all is directly about the

20     Northeast Alliance.  It's not about Southwest's other plans.

21          THE COURT:  Is it a problem for you, putting it on

22     the screen, or is the problem of you is that you want to ask

23     more particular questions?

24          MR. WALL:  The problem is that I don't want to have

25     to conform my cross-examination to not having a full

 1  discussion of everything.

 2           THE COURT:  I get it.  And it's about three -- of

 3  the seven he refers to, three matter, four don't.

 4           MR. WALL:  Yeah, the ones --

 5           THE COURT:  How about this -- how long is the

 6  government going to be, about, on your direct?

 7           MR. WIENER:  Approximately 20, 25 minutes,

 8  Your Honor.

 9           MR. JONES:  Your Honor, that is also, that is my

10  colleague, Seth Wiener, who will be handling the examination

11  for us.

12           THE COURT:  I'm sorry, what did you say your name

13  was?

14           MR. STALLINGS:  William Stallings.

15           THE COURT:  How about if you give me the three --

16  you and Mr. Wall can give me the three.  We'll do the direct

17  examination.  We're going to need to take another break for

18  the court reporter at some point, anyway, so maybe after the

19  direct, before you do the cross, I'll read the three, and

20  then I'll hear the two of you, and then I'll be able to --

21           MR. STALLINGS:  Sir, if I can explain, what's

22  important to understand about the documents is that they are

23  of -- they are sensitive internal documents prepared for the

24  leadership of the company.  And one of them is our 2027 work

25  plan.  It is the definition of forward-looking material, in

terms of what is competitively sensitive.  The fact of what
we put in those documents and what our executives consider is
crucial in terms of how we think about the industry and what
we want to make sure that we -- that our competitors don't
have insight into.

And so in looking at the documents, there's a
difference between, I think, looking at individual words, on
individual pages, versus the context.  And what is, I think,
just the most easiest workaround here, is just simply don't
publish them to the gallery.  From what I hear, the only
issue is whether or not American thinks the public should see
all of Southwest's internal information.

THE COURT:  Well, I think that Mr. Wall doesn't
care about publishing them.

MR. WALL:  Well, to be clear, what I care about is
having an unfettered examination of them so I don't have to
watch what my words are, because I will be quoting from the
documents in my questions.

THE COURT:  Right.  Which I think is what your
concern is.

MR. WALL:  Right.  Your Honor, I think your
suggestion, if I may, is the right one.  We -- with all due
respect to Mr. Stallings, that's really not an accurate
characterization of what we're doing.  We're using very
discrete parts of this that happen to not be about their

1    business, but about our business.  And much of the content is

2    indistinguishable from the Delta documents.

3            THE COURT:  So let me tell you this, so we can keep

4    moving.  One is, I think you should give me the three

5    documents, and I'll look at them.  We'll take a break before

6    the examinations so you have a chance to raise the issue

7    again, and I can resolve it before it's joined.

8            The resolution that you don't publish them seems

9    perfectly reasonable.  I'm open to that.  But I want to look

10   at them first before I conclude that.  And then the real

11   question is maybe what he wants to ask isn't about the sort

12   of forward-looking part, but maybe it is, and I'll have to

13   resolve it.  But I'll need to at least look at it to have

14   some context for the decision.

15           MR. STALLINGS:  I believe, if it's not published to

16   the courtroom, I think we can probably accommodate everything

17   very quickly in a break.  The state of play as of this

18   morning was they wanted to publish it to the courtroom, and

19   that was our main concern.

20           THE COURT:  You don't care about publishing, or you

21   do?

22           MR. WALL:  I don't know why I can't publish what

23   they're saying about the NEA, so I would like to be able to

24   do that, as I will do with the Delta witnesses, as I will do

25   with others.

```
1              THE COURT:  I got it.  Okay.  Hand them to me.

2              Do you have them right there?

3              MR. PAIK:  Your Honor, we have, actually, a --

4              May I approach?

5              THE COURT:  Sure.

6              MR. STALLINGS:  Your Honor, as you're looking at

7    them, could I explain one document?

8              THE COURT:  Sure.  Let me just see, so I know which

9    ones are the -- the ones with the yellow markers are the ones

10   in issue?  There's four of them.

11             MR. PAIK:  Yes, that's correct, Your Honor.

12             MR. STALLINGS:  So, Your Honor, you may -- I'm not

13   sure which version was sent to you, but one of them has

14   blacked-out pages.  And the reason for that is when we made

15   the production -- and I very much appreciate Mr. Wall

16   accommodating this -- that is the forward-looking work plan.

17   We blacked out any material that was irrelevant to the NEA.

18             What is very important, though, is that the pages

19   that remain all are still competitive, sensitive,

20   confidential information.  They just so happen to -- counsel

21   believes they relate to the NEA.  So I just wanted Your Honor

22   to know that this is not a redacted copy.

23             THE COURT:  The redacted doesn't solve this issue.

24             MR. STALLINGS:  Yes, sir.

25             THE COURT:  Got it.  Okay.  I'll look at them on
```

1    the break.

2                    MR. STALLINGS:  Thank you.

3                    THE COURT:  And then I'll hear you again.

4                    Go ahead, take the witness stand, if you would, and

5    remain standing for Ms. Belmont to administer the oath.

6                    (The witness was duly sworn.)

7                    THE DEPUTY CLERK:  Can you please state your name

8    for the record.

9                    THE WITNESS:  Andrew Martin Watterson.

10                    THE DEPUTY CLERK:  Thank you.

11                    THE COURT:  Go ahead.

12                    Counsel, just say your name for the record, because

13    I don't know if the court reporter got it, but I didn't.

14                    MR. WIENER:  Absolutely, Your Honor.  Good morning.

15    My name is Seth Wiener for the United States and on behalf of

16    the plaintiff states.

17                    May I proceed?

18                    THE COURT:  You may.  Go ahead, Mr. Wiener.

19                          **ANDREW M. WATTERSON**

20              having been duly sworn, testified as follows:

21          **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS**

22    BY MR. WIENER:

23    **Q.**  Good morning, Mr. Watterson.

24    **A.**  Good morning.

25    **Q.**  You are currently employed by Southwest Airlines; is that

1    correct?

2    **A.**   That's correct.

3    **Q.**   What's your current position with Southwest?

4    **A.**   I'm the executive vice president and chief commercial

5    officer.

6    **Q.**   How long have you held that position?

7    **A.**   Approximately three years, I believe.

8    **Q.**   And I understand that on Monday, Southwest announced

9    that, as of October 1st, you'll be in a new role in

10   Southwest.  What does that look like?

11   **A.**   I'll be the chief operating officer as of Saturday.

12   **Q.**   Congratulations.

13   **A.**   Thank you very much.

14   **Q.**   And what are your primary responsibilities as --

15              THE COURT:  Is that congratulations?

16              THE WITNESS:  Thank you, sir.

17              THE COURT:  Is it congratulations becoming the

18   chief operating officer?

19              THE WITNESS:  If you said condolences, I would have

20   also acknowledged that.

21   BY MR. WIENER:

22   **Q.**   What are your primary responsibilities as chief

23   commercial officer and executive vice president?

24   **A.**   In general, I'm responsible for the revenue line item,

25   all the activities we do for planning and production of the

1  revenue that Southwest Airlines achieves.

2  **Q.**  Does that include network planning?

3  **A.**  Yes, sir.

4  **Q.**  And pricing?

5  **A.**  Yes, sir.

6  **Q.**  Does it include marketing?

7  **A.**  Yes, it does.

8  **Q.**  Sales to individual flyers?

9  **A.**  Yes, sir.

10  **Q.**  Sales to corporate customers?

11  **A.**  Yes, sir.

12  **Q.**  Does it include Southwest's customer relations?

13  **A.**  Yes, it does.

14  **Q.**  Does it include Southwest's monitoring competitors and

15  understanding the industry more generally?

16  **A.**  Yes, that is certainly a part.  Other departments may

17  also have a role.

18          THE COURT REPORTER:  I'm sorry, can you slow down a

19  little bit.

20          THE WITNESS:  I talk fast.

21          THE COURT REPORTER:  Can you repeat it?

22          THE WITNESS:  Yes, that is correct that other

23  departments may have similar responsibilities for that last

24  one.

25  BY MR. WIENER:

**Q.**   When did you join Southwest, Mr. Watterson?

**A.**   I joined approximately nine years ago.

**Q.**   And prior to becoming the executive vice president and chief commercial officer, what were your roles with Southwest?

**A.**   Prior to that, I was the chief revenue officer, which is my current responsibilities, minus marketing.  Prior to that, I was a senior vice president in charge of revenue management and network planning, and I joined the company as vice president of network planning and performance.

**Q.**   And prior to coming to Southwest, where did you work?

**A.**   I worked for just shy of three years for Hawaiian Airlines before that.

**Q.**   And prior to Hawaiian Airlines?

**A.**   I was a management consultant specializing in airlines and travel for 12 years at Oliver Wyman, and three years before that at Ernst & Young.  And then started my career in the US Army.

**Q.**   Thank you.  So I'd like to go over some background on airlines and business models, if I may.  Are you familiar with the term "legacy airline"?

**A.**   Yes, I am.

**Q.**   And what is a legacy airline?

**A.**   In general, it's airlines with a long history that predominantly they're a hub-and-spoke model, offer multiple

1    classes of service, global network powered by this hub and

2    spoke, with many partners, and pretty much offer you travel

3    from anywhere to anywhere.

4    **Q.**   Okay.  Who are the legacy airlines?

5    **A.**   In general, United, American, and Delta are considered

6    legacy, and often Alaska Airlines.

7    **Q.**   Are you familiar with the term "low cost carrier" or

8    "LCC"?

9    **A.**   Yes, I am.

10   **Q.**   What's an LCC?

11   **A.**   Low cost carriers, as the name implies, generally have

12   lower costs than legacy carriers and endeavor to offer

13   customers low fares and a high level of service.

14   **Q.**   Okay.  You mentioned that low cost carriers have lower

15   costs than legacy airlines.  Are there other ways in which

16   LCC's differ from legacies?

17   **A.**   LCCs, in general, don't offer hub-and-spoke type

18   networks.  They generally offer a single class of service,

19   and they simplify fleet, so they try to use a high

20   productivity to generate a lower cost.

21   **Q.**   And these lower costs, are they lower costs to the

22   airline or lower cost to customers or both?

23   **A.**   The lower cost to the airlines allows the LCCs to offer

24   lower fares profitably.

25   **Q.**   Okay.  Are you familiar with the term "ultra low cost

1    carrier" or "ULCC."

2    **A.**   Yes, I am.

3    **Q.**   What is an ULCC?

4    **A.**   As the name implies, they have even lower costs than

5    general carriers and they generally offer a product which is

6    highly debundled to allow for the lower costs, so that

7    customers have to buy add-ons to the seat only type of

8    product.

9    **Q.**   What kind of airline is Southwest?

10   **A.**   Southwest views itself as a low cost carrier.

11   **Q.**   What kind of airline is JetBlue?

12   **A.**   I believe JetBlue started as a low cost carrier and it's

13   on a multiyear migration to legacy carrier.

14   **Q.**   And in what ways has JetBlue made that shift from LCC to

15   legacy?

16   **A.**   They've gone from a single fleet type like LCCs generally

17   do to three fleet types.  They offered first class product

18   like legacies do.  They've started charging for bags like

19   legacies and started offering basic economy fares like

20   legacies do.  They fly transatlantic and now they have the

21   premium heavy configuration like legacies, and now they have

22   the majority of their capacity in kind of a joint venture

23   with a legacy, which kind of seals the deal.

24   **Q.**   And for completeness, you mentioned that

25   American Airlines is a legacy airline?

1    **A.**   Yes, sir, American Airlines is a legacy carrier.

2    **Q.**   So you outlined some differences between the LCCs and

3    legacy airlines and what they offer to consumers, do LCCs

4    compete against legacy airlines?

5    **A.**   Oh, yes, we do.

6    **Q.**   And in what ways?

7    **A.**   They compete on price and service and schedule.  So we

8    view them as a competitive for other customers who we would

9    like to choose us.

10   **Q.**   And how does Southwest attract customers?

11   **A.**   We believe that our low fares and high service will allow

12   customers to be attracted to us with a low price, and the

13   high service will allow them to enjoy it and to repurchase us

14   over and over again.

15   **Q.**   In your current role as part of your many

16   responsibilities, are you also responsible for understanding

17   customer's preferences?

18   **A.**   Yes, I am.

19   **Q.**   And do customers preferences vary, at all?

20   **A.**   Each person has their own opinion, but in general, we

21   tend to measure customer satisfaction through net promoter

22   score.  When you ask customers what airlines they would

23   recommend, that's a good value, and also the customers who

24   choose you with their wallet to fly you.

25   **Q.**   Are there certain attributes of an airline that some

1  customers may value more than other attributes of an airline?

2  **A.**  Price tends to be the number one choice driver, over all,

3  but if you segment customers into different travel purposes,

4  you know, a business traveler will often prefer a schedule

5  and convenience over price.  The price may be second or

6  third, and the loyalty program will also come in there along

7  with the pricing schedule.

8  **Q.**  And can attributes like the ones you just mentioned

9  effect the customer mix that an airline might attract?

10  **A.**  Yes, I imagine that the level of attractiveness of those

11  measures could attract the value and attribute of others.

12  **Q.**  And earlier you indicated that JetBlue had shifted to

13  more of a legacy model.  Approximately when did that shift

14  begin to occur?

15  **A.**  I think it's a multiyear shift, in my opinion.  It

16  started, I don't recall the actual date.  They went from one

17  fleet type to multifleet type a number of years ago, and same

18  with the first class cabin.  So it's been a multiyear

19  transition towards that end state.

20  **Q.**  At least four or five years?

21  **A.**  Yes, sir.  More than four years ago, I would say, easily.

22  **Q.**  And notwithstanding the shift, what do you observe when

23  JetBlue begins flying into or out of a new market?

24  　　　　　MR. WALL:  Objection, no foundation.

25  　　　　　THE COURT:  Sustained.

1    BY MR. WIENER:

2    **Q.**   Okay, Mr. Watterson, as part of your responsibilities, do

3    you monitor, you know, competitors entry or exit from

4    particular markets?

5    **A.**   I have a team that monitors that and reports to me, so I

6    receive reports on that.

7    **Q.**   Okay.  And when JetBlue starts flying in a new market,

8    what does your team observe and report to you?

9            MR. WALL:  Same objection, Your Honor.  He just

10   said his foundation is hearsay.

11           THE COURT:  Overruled.

12           You can answer.

13           THE WITNESS:  I view entry by any airline brings

14   more supply into a market.  So the airline that's entering, I

15   don't distinguish too much between the different airlines and

16   entire markets.

17   BY MR. WEINER:

18   **Q.**   So let's talk a little bit about network planning in

19   Southwest.  Without divulging any confidential Southwest

20   information, can you explain to the Court what network

21   planning entails?

22   **A.**   Network planning entails deciding where we're going to

23   fly, how many flights we're going to fly between those cities

24   and the size of the aircraft.  We have two aircraft sizes.

25   And so they, overall, choose those markets in which we will

1    compete.

2    **Q.**  Okay.  And generally speaking, how does Southwest

3    determine which routes to serve?

4    **A.**  We evaluate every potential point to point route that we

5    could fly at least once a year, up to maybe six times a year,

6    and then based on forecasted performance and observed

7    performance, we'll allocate capacity to existing or new

8    markets.

9    **Q.**  Does Southwest ever discuss these decisions with other

10   airlines?

11   **A.**  Oh, goodness, no.

12   **Q.**  And why is that?

13   **A.**  My understanding is that's illegal.

14   **Q.**  Okay.  If another airline approached Southwest to discuss

15   those decisions with Southwest, how would you respond?

16   **A.**  I would report that to general counsel immediately and my

17   staff knows that, as well.

18   **Q.**  You used the term "capacity" in your answer about route

19   decisions.  What do you mean by capacity in this context?

20   **A.**  Well, usually when we talk about serving between two

21   airport pairs, capacity would mean the number of flights,

22   whether we enter it or not, and then how many flights we'd

23   operate on that city pair, and then the size of the aircraft.

24   **Q.**  Okay.  And is there a specific measure that you use for

25   capacity in the ordinary course?

1   **A.**   There are three that we use, depending on the

2   circumstances.   The first is broadly known by the financial

3   community is available seat miles, or ASMs, second is seats

4   that happen on a particular market, and the third is trips,

5   which I think is self-explanatory.

6   **Q.**   And again, without divulging any confidential

7   information, how does Southwest determine the capacity that

8   it would provide on a given route?

9   **A.**   That's a -- the responsibility of a specific team called

10   capacity planning, and they, as I mentioned, analyze every

11   possible route accommodation and do sort of a mini business

12   case of each one before proposing that we fly a particular

13   route and by how much.

14   **Q.**   Does Southwest discuss its capacity decisions with other

15   airlines when it is making those capacity decisions?

16   **A.**   No, we do not.

17   **Q.**   And why is that?

18   **A.**   My understanding is it is illegal.

19   **Q.**   And if another airline approached Southwest to discuss

20   these decisions with Southwest, how would you respond?

21   **A.**   I would report to general counsel immediately.

22   **Q.**   At a high level, how does Southwest determine its flight

23   schedule?

24   **A.**   We take the capacity plan that I just mentioned and then

25   we have to turn that into a specific set of departures and

1    arrivals --

2              THE COURT REPORTER:  I'm sorry.  Departures and

3    arrivals.  Can we start from there?

4              THE WITNESS:  Actually, I may start over.  I forgot

5    what I was saying.

6              THE COURT REPORTER:  You were talking about

7    customers.

8              THE WITNESS:  So we take the capacity plan that I

9    just mentioned and we have software that allows us to turn

10   that into a set of departure and arrival times that is

11   available -- that is scheduled and is sellable to customers.

12             THE COURT:  Can you pull the microphone slightly

13   closer to you.  It'll easily pick you up.  I think that will

14   help.

15             THE WITNESS:  Is that better?

16             THE COURT:  I think so.

17             THE WITNESS:  Sorry about that.

18   BY MR. WEINER:

19   **Q.**  Does Southwest ever coordinate with other airlines when

20   it is making these schedule decisions?

21   **A.**  No, we do not.

22   **Q.**  Why not?

23   **A.**  My understanding is that's illegal.

24   **Q.**  And has another airline ever tried to coordinate with

25   Southwest when making these decisions?

1   **A.**  Not to my knowledge.

2   **Q.**  Does Southwest compete for business customers?

3   **A.**  Yes, we do.

4   **Q.**  And again, without divulging any confidential Southwest

5   information, how does Southwest compete for business

6   customers?

7   **A.**  Well, we treat them as business is a travel purpose, not

8   a customer.  So we view the customer as having different

9   purposes for travel, sometimes it's business, sometimes it's

10  leisure, sometimes it's visiting friends and relatives.  So

11  we look to offer a product that the -- someone that travels

12  in business would appreciate, which the schedule is the

13  defining characteristic.  We also want to make sure we have

14  good pricing, so we negotiate with large corporations for

15  discounts for -- off of the published fares for employees to

16  travel.  Then we make sure that our loyalty program and other

17  kind of not priced attributes are appealing to someone

18  travelling for business.

19  **Q.**  Do you ever offer these corporate customers incentives in

20  your contracts?

21  **A.**  Primarily in the form of price discounts, but also

22  sometimes loyalty program benefits.

23  **Q.**  Do you have an understanding of how joint contracting may

24  work for airlines seeking to contract with corporate

25  customers?

1    **A.**   What do you mean by "joint contracting"?

2    **Q.**   Where two airlines might contract together to a single

3    corporate customer?

4    **A.**   My understanding is that's not allowed.

5    **Q.**   If Southwest were to partner with another airline to

6    jointly contract with customers, how would that work?

7    **A.**   I'm not sure I can answer that.  That's setting prices

8    together, so I would not -- we would not do that.

9    **Q.**   Okay.  And in what way would it be setting prices

10   together?

11   **A.**   Well, the defining characteristic of these contracts is

12   mostly a discount off of the rack rate, so it's pricing.  So

13   you can't discuss pricing with another airline.

14           MR. WALL:  Your Honor, I've been trying to let it

15   go, but this is some kind of quasi-legal testimony.

16           THE COURT:  So I'm viewing it just entirely as his

17   understanding of what he's permitted to do and not do and not

18   as a legal opinion on whether that's legal or not legal.

19           MR. WALL:  Understood.  Thank you.

20           THE COURT:  I take it, essentially, you haven't

21   done that.  In other words, you don't have joint -- you and

22   another airline haven't bid for or obtained through a bid, or

23   any other mechanism, a contract with a particular corporate

24   customer.  It's just not something you guys do.

25           THE WITNESS:  No, sir.  I'm taken aback by that.  I

1    thought that was, like, a red line, and one should not.

2             THE COURT:  I'm not saying it is or it isn't.  I'm

3    just --

4             THE WITNESS:  I apologize.

5             THE COURT:  No, nothing to apologize for.  You are

6    testifying as to your understanding, which is totally fine.

7    I'm just clarifying that you haven't done it.  You probably

8    don't have much experience with it, because you haven't done

9    it.

10             THE WITNESS:  No, sir.

11             THE COURT:  And you didn't do it because you didn't

12    think you could.

13             THE WITNESS:  That's correct, sir.

14             THE COURT:  Go ahead.

15    BY MR. WIENER:

16    **Q.**  So I'd like to turn to the Northeast Alliance or NEA.

17    Are you familiar with the NEA?

18    **A.**  Yes, sir.

19    **Q.**  And what do you understand the NEA to be?

20    **A.**  The NEA was American Airlines and JetBlue and their

21    partners can cooperate in four specific airports with regard

22    to how they serve those airports with the schedule and

23    loyalty program and other types of offerings.

24    **Q.**  Okay.  And which four airports do you understand the NEA

25    covers?

1   **A.**   Boston-Logan, Newark-Liberty, New York-LaGuardia, and

2   New York-JFK.

3   **Q.**   And does Southwest serve any of those airports today?

4   **A.**   We serve Boston-Logan, we serve New York-LaGuardia, and

5   we used to serve Newark.

6   **Q.**   Why doesn't Southwest serve Newark anymore?

7   **A.**   We were unsuccessful in Newark and withdrew in 2019.

8   **Q.**   So let's focus on LaGuardia for a moment.  Does Southwest

9   fly to LaGuardia from Hartsfield-Jackson Airport in Atlanta?

10  **A.**   Yes, we do.

11  **Q.**   Do any other airlines provide service on that route?

12  **A.**   Delta Air Lines does, and I believe American Airlines

13  does.

14  **Q.**   And how would you describe your relationship with Delta

15  and American on that route?

16  **A.**   They're our primary competitors in that route.

17  **Q.**   Does customers ever choose to fly with either Delta or

18  American, rather than Southwest?

19  **A.**   Based on the data, yes.

20  **Q.**   And what's your reaction when a customer choose either

21  Delta or American over Southwest?

22  **A.**   I wish they had chosen us.

23  **Q.**   And does Southwest try to win their business on future

24  flights?

25  **A.**   Yes, we do.

1  **Q.**  Has Southwest ever tried to partner with Delta instead of

2  winning their business on future flights?

3  **A.**  No, sir, we have not.

4  **Q.**  Has Southwest ever tried to partner with American,

5  instead of winning these customers' business on future

6  flights?

7  **A.**  No, sir, we have not.

8  **Q.**  So taking a step back, can you describe Southwest's

9  operations at LaGuardia?

10  **A.**  We have approximately 37 daily departures from LaGuardia.

11  It's a slot controlled airport, so the departures are

12  governed by when we have the slots for the time of day to

13  depart.

14  **Q.**  Does Southwest have large operations at LaGuardia?

15  **A.**  It's a modest operation.  It's a medium-sized station,

16  maybe.

17  **Q.**  Are there particular characteristics of the customers

18  that Southwest serves either to or from LaGuardia?

19  **A.**  The minority of our customers for the LaGuardia or New

20  York based or New York origin, the majority are from other

21  cities where Southwest has a larger customer base.

22  **Q.**  Can Southwest expand its operations in LaGuardia?

23  **A.**  Not without extra slots, we cannot.

24  **Q.**  Okay.  Well, since you've mentioned the S word, let's

25  discuss slots in a little bit more detail.  What are slots?

**A.**   Well, in layman's terms, they're the -- kind of the right
to be able to operate at a congested airport at a certain
point in time for departures and arrivals as governed by the
FAA.

**Q.**   And how do airlines obtain slots?

**A.**   We obtain slots by other airlines being required to vest
them as part of prior government settlements.  I think
originally, when the airports were capacitated with slots,
those who were already operating were granted slots.  And in
Washington Reagan, occasionally the FAA reauthorizations,
Congress will create new slots that have to be allocated
according to rules that they set.

**Q.**   Okay.  And if an airport is slot restricted, how can an
airline expand without getting more slots?

**A.**   You cannot.

**Q.**   Okay.  So turning back to LaGuardia, has Southwest tried
to grow its presence at LaGuardia?

**A.**   Yes, over time, we've managed to get some new slots and
have expanded.  I can't remember the numbers but expanded
from our original entry up to the current 37.

**Q.**   Has Southwest expanded as much as it's wanted to?

**A.**   No, we have not.

**Q.**   Okay.  And why not?

**A.**   Because there are slots unavailable.

**Q.**   Has Southwest tried to get more slots at LaGuardia?

1    **A.**   Yes, we have.

2    **Q.**   From who?

3    **A.**   From the former Virgin America, Alaska Airlines, JetBlue

4    Airlines, and United Airlines.

5    **Q.**   And has Southwest been successful?

6    **A.**   We currently are still leasing slots from Alaska

7    Airlines.

8    **Q.**   But otherwise has Southwest gotten slots from any of the

9    airlines you've mentioned?

10   **A.**   Only when there were government forced divestitures.

11   **Q.**   Okay.  Did Southwest ever approach American Airlines for

12   slots?

13   **A.**   We did when the US Airways merger required them to

14   divest.  Otherwise, I don't recall them approaching that.

15   **Q.**   Not since that time period?

16   **A.**   I don't recall that, sir.

17   **Q.**   Okay.  Were you aware if American wanted to lease slots

18   at LaGuardia?

19   **A.**   Say it again, please.

20   **Q.**   Were you aware if American wanted to lease slots at the

21   LaGuardia?

22   **A.**   In the past, if airlines wanted to lease or sublease

23   slots, they would maybe send out a notification to slot

24   coordinators, each airline.  That would be a common practice.

25   I was not aware of American Airlines doing that.

1    **Q.**  Do you know if Southwest received any kind of a

2    notification like that?

3    **A.**  From American Airlines?

4    **Q.**  From American in the past, say, five years?

5    **A.**  I'm not aware of that.

6    **Q.**  Okay.  So moving north to Boston, can you describe

7    Southwest's presence at Boston-Logan?

8    **A.**  Boston-Logan is -- we have a modest presence here.  We

9    have five gates.  We are -- our current flight schedule has

10   not yet been restored post-COVID, and so it's a modest

11   offering right now.

12   **Q.**  Okay.  And how do Southwest operations compare to

13   American's here at Boston-Logan?

14   **A.**  We're modest, compared in size to them.

15   **Q.**  How do Southwest's operations compare to JetBlue's at

16   Boston-Logan?

17   **A.**  Oh, it would be quite small compared to JetBlue at

18   Boston-Logan.

19   **Q.**  And prior to the NEA, how did Southwest view JetBlue's

20   competitive significance in Boston?

21   **A.**  They were, to us the market leader.  They had a quite

22   good customer franchise in Boston, in our view.

23   **Q.**  Prior to the NEA, how did Southwest view American's

24   competitive bids in Boston?

25   **A.**  We viewed American as having a modest presence, but not

1    the leader.

2    **Q.**   Okay.  Do you know which airline is the largest airline

3    at Boston-Logan today?

4    **A.**   As measured by seats and departures, my recollection is

5    JetBlue is a small bit ahead of Delta Airlines.

6    **Q.**   Okay.  Are there other measurements where Delta might be

7    ahead of JetBlue?

8    **A.**   ASMs, available seat miles, when one flies wide, flies

9    across an ocean, that can rack up the ASMs really quickly and

10   so I don't have a good measure of that in my head.

11   **Q.**   Okay.  But regardless of the metric, is either Delta or

12   JetBlue number one in Boston-Logan?

13   **A.**   I believe JetBlue would be number one in Boston-Logan.

14   **Q.**   And if JetBlue is number one, is the other one number

15   two?

16   **A.**   Yes, sir.  They are very close.

17   **Q.**   Do you know where American ranks in Boston-Logan?

18   **A.**   My recollection is American is number three.

19   **Q.**   Where would a combined American/JetBlue rank?

20   **A.**   From my understanding, JetBlue plus American would be

21   number one at Boston-Logan, as far as capacity.

22   **Q.**   And would it be across all metrics?

23   **A.**   I don't have the AS Ms in my head, I apologize, but with

24   seats and departure, yes, sir.

25   **Q.**   Okay.  Is Boston-Logan slot controlled?

```
 1    A.   No, sir.  It is not.

 2    Q.   But can Southwest expand at Boston-Logan?

 3    A.   We would have to acquire more gates, which would require

 4    a negotiation with Mass Port.

 5    Q.   Okay.  How do -- how does the acquisition of more gates

 6    limit Southwest's ability to expand?

 7              MR. WALL:  Objection, leading.

 8              THE COURT:  Sustained as to the form.

 9    Q.   You mentioned that you would need to negotiate with

10    Massport to get more gates.  How would that work?

11    A.   We have a group called "airport affairs," and they

12    specialize in negotiating leases with airport authorities.

13    And the terms of conditions of those lease specify the

14    facilities one has in an airport, whether that's gates or

15    ticket counters or other space, and the terms and conditions

16    for using that.  So you would have to modify your lease with

17    an airport authority to get more space.

18    Q.   Does Southwest think it can get more space at

19    Boston-Logan?

20    A.   I'm unaware of how much more space we could get at

21    Boston-Logan, as I've not looked into it recently.

22    Q.   Okay.  You mentioned that Southwest has still not

23    restored all of its capacity to pre-COVID levels.

24              Do you recall that testimony?

25    A.   Yes, that's correct.
```

**Q.** Is Southwest planning to do so?

**A.** Yes, sir, we are.

**Q.** Once Southwest does so, can it expand any further at Boston-Logan?

**A.** Once we've restored, we can expand, perhaps, a bit more. I'm unaware, as I said before, about how many more gates we could get. The terminal we're in right now, all the gates are allocated, is my understanding.

**Q.** If Southwest doesn't get any more gates at Boston-Logan, can it expand more?

**A.** No, sir, it cannot.

**Q.** So moving back down south to Washington national airport or DCA. Does Southwest fly to DCA?

**A.** Yes, sir, we do.

**Q.** Is DCA one of the NEA airports?

**A.** No, sir, it's not.

**Q.** Does American Airlines have routes to DCA from any NEA airports?

**A.** Yes, sir.

**Q.** Does JetBlue have routes to DCA from any NEA airports?

**A.** Yes, sir, they do.

**Q.** Is DCA slot controlled?

**A.** Yes, it is.

**Q.** Are there certain DCA routes where American and JetBlue were the only airlines that offered service prior to the

1    implementation of the NEA?

2    **A.**   There was a period of time where there was no one else in

3    DCA-Boston, but I think Delta has since entered that one.  As

4    far as other DCA routes, I can't recall.

5    **Q.**   How does Delta's frequency on that route compare to

6    American and JetBlue's?

7                 THE COURT:  At Boston --

8                 MR. WIENER:  DCA-Boston.

9                 THE COURT:  DCA-Boston.

10                MR. WIENER:  Yes, sir.  Yes, Your Honor.

11                THE WITNESS:  DCA-Boston, Delta has less than

12   American and JetBlue.

13   BY MR. WIENER:

14   **Q.**   Can you ballpark how much less?

15   **A.**   My recollection is they had seven to eight departures,

16   and I thought JetBlue had 14.  But I haven't looked at it

17   recently.

18   **Q.**   And how about American?

19   **A.**   I thought it was ten, but once again, my recollection

20   could be hazy.

21   **Q.**   Does Southwest have plans to fly that route?

22   **A.**   No, we do not.

23   **Q.**   And why is that?

24   **A.**   It would require more slots than we have available.

25   **Q.**   Has Southwest tried to get more slots at DCA?

1    **A.**  Yes, sir, over time we have.

2    **Q.**  And has Southwest been successful?

3    **A.**  No, we have not.

4         THE COURT:  Is that for Boston-DCA, or slots at DCA

5    for other kinds of flights?

6         THE WITNESS:  Slots for DCA in general.  The slots

7    at DCA sometimes come with strings attached, the city is much

8    to be operated to.  But we were just looking for DCA slots in

9    general.

10    BY MR. WIENER:

11    **Q.**  Earlier you had testified that Southwest has acquired

12    slots through past divestitures.  Do you recall that

13    testimony?

14    **A.**  Yes, sir.

15    **Q.**  Did you acquire any slots at DCA as a result of a past

16    divestiture?

17    **A.**  Yes, we did.

18    **Q.**  Do you recall which matter resulted in that divestiture?

19    **A.**  Primarily the most recently one was the American Airlines

20    and US Airways merger.

21    **Q.**  Did Southwest also acquire slots through the US

22    Airways/Delta slot swap?

23    **A.**  That was before my time at Southwest Airlines.  I recall

24    that we did not win the -- the bidding for that, but it was

25    before my time.

1    **Q.**  Who did win the bidding for that?

2    **A.**  Jet Blue, WestJet, I believe, and I can't recall the

3    others.

4    **Q.**  Do you recall which airports were involved in that slot

5    swap?

6    **A.**  New York-LaGuardia and Washington national.

7    **Q.**  And do you recall, you know, who swapped the slots at

8    which airports?

9    **A.**  Yes, sir.  American Airlines' predecessor, US Airways,

10   traded a number of their slots at New York-LaGuardia to Delta

11   in exchange for Delta's slots at Washington Reagan.

12   **Q.**  Okay.  And so while we're discussing some slot

13   divestitures, are you aware the defendants reached a

14   January 2021 agreement with the Department of Transportation

15   regarding slot divestitures?

16   **A.**  In regards to the NEA?

17   **Q.**  Yes, sir.

18   **A.**  Yes, sir, I am.

19   **Q.**  And how did you learn about that agreement?

20   **A.**  From our regulatory affairs department.

21   **Q.**  Okay.  Are you aware of what that divestiture agreement

22   included?

23   **A.**  Roughly, yes, sir.

24   **Q.**  Okay.  And what did it include?

25   **A.**  A handful of slots at Washington Reagan and New York-JFK.

1   **Q.**   Did it include any slots at LaGuardia?

2   **A.**   Not to my recollection, no, sir.

3   **Q.**   Any gates at Boston-Logan?

4   **A.**   No, sir.

5   **Q.**   Did Southwest assess the divestitures in this agreement?

6   **A.**   Yes, sir, we did.

7   **Q.**   And, you know, what result did Southwest reach?

8   **A.**   Two.  The first was the limited duration of the slot

9   divestitures made them unattractive for us to request --

10  request them.  And that secondly, we were disappointed that

11  the slot divestitures that American previously did from the

12  slot swap and the merger would then be de facto returned back

13  to American through this cooperation.  We thought that was

14  outrageous.

15  **Q.**   Those were the slots that were divested to JetBlue?

16  **A.**   Yes, sir.  In the slot swap and in the merger.

17              MR. WIENER:  Thank you, Mr. Watterson.

18              MR. WEINER:  I have no further questions at this

19  time.  I pass the witness, Your Honor.

20              THE COURT:  All right.  I think at this time, we'll

21  take a brief break.  I'll look at these documents and I'll

22  talk to you, Mr. Wall, and counsel for Southwest.

23              (Court in recess at 11:45 a.m.

24              and reconvened at 11:59 a.m.)

25              THE DEPUTY CLERK:  The United State District Court

1    for the District of Massachusetts is now in session, the

2    Honorable Leo T. Sorokin presiding.

3            THE COURT:  Please be seated.  Okay.  I have looked

4    at the documents and I have a couple of tentative thoughts

5    and then I'll hear you further to the extent these don't

6    clarify.

7            The first is, given all the different sealing

8    motions by all the different nonparties, all of which were

9    essentially unopposed, but I understand that there's -- I

10   reserved, to some extent, and I understand that you all might

11   be bringing up issues but didn't want to litigate things that

12   weren't going to become issues.  So what would be really

13   helpful is when you think they're going to come up, tell me

14   about them the day before, so tell them about them on this

15   afternoon, if they're going to come up tomorrow, and then I

16   can look at those things tonight, and be more prepared to

17   talk to all of you, even if the counsel for the nonparty is

18   not here, you can just tell me what you anticipate, and I can

19   look at the documents.  That's helpful, to the extent you

20   now.

21           MR. WALL:  I understand, Your Honor.  Thank you.

22           THE COURT:  Second, I think the default is, having

23   allowed all those motions that they're confidential, that

24   doesn't mean that I'm not going to revisit it or hear these

25   kinds of things, but they're confidential, so I think

1    whichever one of you wants to make it more public than that

2    order provides should take the onus to say we want to make it

3    more public and here's what it is.  It's not necessarily

4    reconsideration, in the formal sense of that kind of

5    reconsideration standard, but it's moving away from sort of

6    whatever I resolved.

7              With respect to these, it seems to me that there

8    are a couple of things, just observations, and then I'll hear

9    you.  One is, I don't see any particular reason why they need

10   to be published on the screens, so I'm not -- I'm inclined to

11   leave that as it is and not have them published on the

12   screen.  With respect to the -- they seem to fall, from my

13   quick review, into sort of two categories.  One is, for lack

14   of a better term, descriptions about the state of the -- of

15   things in the industry, like there's -- people have this many

16   planes or they've retired this many planes and there's

17   analysis of different airlines, and I don't see that as

18   particularly confidential information.  If there's anything

19   confidential about it, it's the fact that they chose to think

20   about that, as opposed to something else.  But it's hard for

21   me to imagine that anyone in the airline industry wasn't

22   thinking about that.  That doesn't seem like rocket science,

23   like you would be thinking about what people would be doing

24   with their planes and which ones they're retiring and what

25   that means to their fleet, and maintenance costs, and all of

1    the related things.

2            So I'll hear you, but I'm not sure why you really

3    need to step carefully so much around that.  I take it what

4    you're most interested in is things like whether it commented

5    on the NEA and what it might mean.  The thing that I think is

6    different and I do think you might have to step carefully

7    around is there are some parts in here about what Southwest

8    is thinking about in terms of their future planning and

9    growth and I -- I don't see, (a), why that's all that

10   important here.

11           MR. WALL:  I don't think anything I'm covering

12   falls in that category, Your Honor.

13           THE COURT:  So you're not even going to touch

14   those.  So while they're within some of these exhibits, it's

15   not those slides or pages that you care about.

16           MR. WALL:  Right.  I think there's things about the

17   NEA and then things about the northeast in particular that

18   are more in the descriptive sense that you mentioned earlier.

19           THE COURT:  So that -- are you comfortable with

20   that resolution, you can stand up any time he asks a question

21   and object.

22           MR. STALLINGS:  Yes, Your Honor, our main issue is

23   we just do not want to publicize.

24           THE COURT:  So I'm not going to have him publish on

25   the screens the exhibits, although do you particularly

1   care -- for example, let's just say I was looking at the last

2   exhibit that you marked, which is number 503.  So would you

3   particularly care about 503, page 3, the first page 3?

4           MR. STALLINGS:  503, page 3.  So actually,

5   Your Honor, we actually did allow American -- American asked

6   us if they could use that in the opening statement, and we

7   did allow them to use that in the opening statement.  I don't

8   believe they actually did, so that one we would be okay with.

9           THE COURT:  Because a lot of them.

10          MR. STALLINGS:  I think slide ten was the same way.

11          THE COURT:  Slide ten on that document?

12          MR. STALLINGS:  Yes, sir.

13          MR. PAIK:  Your Honor, may I approach opposing

14  counsel so they can see the binders that we're looking at, as

15  well?

16          THE COURT:  Oh, sure.

17          MR. STALLINGS:  Your Honor, I'm sorry, I have the

18  wrong document.  Let me look at 503.

19          Sir, the issue that we have with publicizing it,

20  and I totally take your point that a lot of this information

21  is based on public knowledge, and it's derived from

22  statements American made or capacity information that's out

23  in the public.  We understand that.  The key point for us, is

24  that it is, for lack of a better phrase, a deliberate

25  process.  This is the information that was picked out for our

1    most senior executives of the company.  And that type of

2    competitive, you know, analysis, competitive interpretation

3    is what is -- what is at issue.

4           Now, I think -- as I said before, we have no

5    problem with Mr. Wall asking questions about it, and even

6    quoting from the document if it's stuff about the NEA.

7           THE COURT:  So I think this is maybe what we'll do.

8    You can ask about it.  The thing that it does seem like it's

9    different, you're not asking about, is their own

10   forward-looking information.  So you can ask.  You won't have

11   to dance around anything in terms of your cross.  It

12   doesn't -- your cross.  And just you won't put them up on the

13   screen.  We'll refer to them in the books.

14          And to the extent that I think, in the -- the

15   extent the pages that you refer to, if I think they're

16   relevant when it's all said and done in terms of the

17   decision, then I will put them in the decision, and we'll

18   know that these documents are sealed.  And we'll either --

19   you'll have an opportunity then to say, "Well, they shouldn't

20   be public," before I release the -- that portion of the

21   decision, or something like that.  We'll give you a chance to

22   address it if I think it needs to be in the decision.  Or if

23   it's material to my decision, it would be in the decision.

24   And if it -- if I thought there was a reason to make it

25   public, I would give you another chance to weigh in on that.

```
 1                MR. STALLINGS:  Great.  Thank you.

 2                And if I could just add one more thing.  I very

 3    much appreciate your point about any type of forward-looking

 4    statements or Southwest competitive strategy is something

 5    that you might see me jumping up and down about.  And in

 6    connection with that, during the break, tell Mr. Wall some

 7    very specific pages and very specific statements that we

 8    would have concerns about.

 9                THE COURT:  Do you think those are likely to come

10    up?

11                MR. WALL:  All but -- all but one weren't likely to

12    come up, and I think the other one is in a 50/50 category.

13                THE COURT:  So maybe there's one.

14                MR. WALL:  Yeah.  Yeah.

15                THE COURT:  All right.  Thank you.

16                Go ahead.

17                MR. PAIK:  Your Honor, may I approach with the

18    deposition transcripts?

19                THE COURT:  Of course.

20     CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT AMERICAN AIRLINES

21    BY MR. WALL:

22    Q.  Good afternoon, Mr. Watterson.  It's good to see you

23    again.

24    A.  Likewise.  Thank you.

25    Q.  Mr. Watterson, I want to begin by discussing something
```

1  that's been going on in this courtroom for much of the last

2  two days.  Mr. Hayes was up here from JetBlue and testified

3  about a practice he has of lumping Southwest Airlines in with

4  the three legacy carriers as part of a big four that dominate

5  the US airline industry.

6          Did you hear about that?

7  **A.**  I didn't pay attention to the testimony yet.

8  **Q.**  Okay.  Is it -- do you think that it is fair to lump in

9  Southwest Airlines with the legacy airlines as part of a big

10 four who, as a group, dominate the US airline industry?

11 **A.**  No, sir.  We view them as the big three.

12          THE COURT:  And you're not one of them.

13          THE WITNESS:  No, sir.

14 BY MR. WALL:

15 **Q.**  And indeed, Southwest, in its public affairs messaging,

16 will frequently make mention of the big three as a

17 distinction from Southwest and other low cost carriers,

18 right?

19 **A.**  Yes, sir.

20 **Q.**  Now, the other thing that I want to just follow-up on is

21 I gather from your testimony this morning, as well as some

22 things that you said in your deposition, that you don't

23 actually think that JetBlue qualifies as a low cost carrier

24 any longer, correct?

25 **A.**  They are in a migration path away from low cost carrier

1    to legacy was my testimony.  So they're kind of in between

2    the categories right now, in my opinion.

3    **Q.**  And correct me if I'm wrong, but as I recall at your

4    deposition, you said that that migration precedes the NEA,

5    correct?

6    **A.**  Yes, sir, I believe it does.

7    **Q.**  Okay.  Thank you, sir.

8              Now, I want to talk about this concept in the

9    airline industry that has come up a couple of times already,

10   known as relevance.  And do you recall we discussed that at

11   your deposition, right?

12   **A.**  Yes, sir.

13   **Q.**  And you made the point that Southwest seeks improved

14   relevance and attractiveness at LaGuardia airport, which

15   comes down to your ability to expand your schedule offering,

16   and that requires slots, correct?

17   **A.**  If you -- can I look at the transcript?  I don't remember

18   my exact words.

19   **Q.**  Sure.  Absolutely.  If you want to grab it there.  It's

20   at page 28, line 6.

21             THE COURT:  Are you asking whether he said that, or

22   whether that's correct?

23             MR. WALL:  Well, I think maybe we can just shorten

24   it and ask him whether it's correct.

25   BY MR. WALL:

1    **Q.**  Is it true, sir --

2          THE COURT:  You don't have to look at your

3    deposition.

4    BY MR. WALL:

5    **Q.**  Without regard to your testimony, your deposition

6    testimony, that Southwest seeks improved relevance and

7    attractiveness at LaGuardia.

8    **A.**  Yes, sir.

9    **Q.**  And in that context, I asked you to define this concept

10   of relevance.  And could you define it now for Judge Sorokin?

11   **A.**  In general, if I would paraphrase what I said earlier,

12   relevance would be able to offer a flight schedule or network

13   to local customers that meets multiple travel purposes.  As I

14   referenced before, sometimes we travel for business,

15   sometimes you travel for holidays, sometimes you travel to

16   visit friends and relatives, so in having a network that

17   meets those different travel purposes allows you to be

18   relevant, in the terms that I described, to a local customer.

19   **Q.**  And you've mentioned twice in that answer the local

20   customers.  So relevance is measured from the perspective of

21   a local customer?

22   **A.**  When we're speaking about a metro area, our relevance is,

23   yes, indeed, about that customer who originates in that

24   geography.

25   **Q.**  Okay.  And so certain customer segments put a particular

1    premium on that notion of relevance, correct?  Business

2    customers in particular.

3    **A.**   The -- as I mentioned earlier, we view that as a travel

4    purpose, not necessarily a business customer.  A customer

5    traveling on business.  So a customer traveling on business

6    would value flights to a business destination and a flight

7    schedule that offered convenience, being the right time and

8    the number of -- number of frequencies.

9    **Q.**   Okay.  Thank you, sir.

10           And having relevance can be very important

11   competitively to an airline, correct?

12   **A.**   Perhaps.  We view relevance as having enough to attract

13   the customer set, rather than necessarily versus others, per

14   se.

15           THE COURT:  So let me just pause you here for a

16   minute, Mr. Wall.

17           So would relevance, for example, for Southwest at

18   LaGuardia be a function in part whether if your purpose at

19   LaGuardia is to bring people from places that you're -- you

20   have a biggest presence to and from New York, as opposed to

21   capturing people in New York who wish to go elsewhere?

22           THE WITNESS:  Correct me if I'm not answering it

23   correctly, please, but the relevance, say, to -- we have a

24   big customer segment in Nashville and Chicago and Atlanta.

25   And having LaGuardia is important to the customers there that

1  we can take them many places, including New York City.  And

2  so -- and so we feel like that's part of a portfolio of

3  offering in those cities.  And then if you're taking New York

4  City and say, "What do we offer the New York City customer?"

5  it would be what we offer there.  And so having New York

6  improves or relevance in Nashville and Chicago, but having

7  just Nashville and Chicago doesn't make us terribly relevant

8  in New York City because we are only taking you to like three

9  locations.

10         THE COURT:  So New York would be very relevant to

11  you for Nashville and Chicago, for example, but not

12  particularly relevant in terms of New York origin customers.

13         THE WITNESS:  Yes, we have low relevance in that

14  situation.  Yes, sir.

15         THE COURT:  I see.  Okay.

16  BY MR. WALL:

17  **Q.**  Yeah.  Following up on that, in fact Southwest ceased

18  operations at Newark-Liberty airport, in part, because

19  Newark, as you put it, skews towards customers who originate

20  their journey in New York City and Southwest was unable to

21  generate that kind of local customer base, right?

22  **A.**  Yes, sir.  We were unsuccessful in Newark and primarily,

23  in our opinion, came down to the fact that we did not have a

24  local originating customer base sufficient for our operation.

25  **Q.**  What did you mean when you said that Newark skews towards

1    customers who originate their journey in New York City?

2    **A.**   It was a comparison to New York-LaGuardia, and if you

3    look at the percentage of customers they're traveling on,

4    either our airplanes or the industry in general, the

5    proportion of those who begin their journey is Newark is more

6    than 50 percent, and then those are originating outside of

7    New York is less than 50 percent, and then for New

8    York-LaGuardia, it's the opposite.  The minority of customers

9    and our clients, and I believe in the industry, start the

10   journey in New York-LaGuardia and the majority start their

11   journey outside of New York-LaGuardia going to New York.

12   **Q.**   Okay.  And with that reasoning in mind, you decided that

13   it would be a better strategy for Southwest to move its New

14   York operations to LaGuardia to appeal to those customers who

15   are originating outside of New York City and traveling to New

16   York City?

17   **A.**   Because it's slot control, we weren't actually able to

18   move any flights from Newark to LaGuardia, we were able to

19   move our staff and some ground equipment to consolidate them

20   there for cost efficiencies, but we weren't able to actually

21   move flights.

22   **Q.**   Right, you're capped by your slots, whatever they are at

23   whatever point in time, right?

24   **A.**   Yes, sir.  That's correct.

25   **Q.**   Okay.  And that's true of all the airlines, right?

1    **A.**   At New York-LaGuardia.  Yes, sir.

2    **Q.**   All right.  So now you're -- Southwest's strategy with

3    respect to New York is about bringing people to New York City

4    from other cities where Southwest has this higher relevance,

5    right?

6    **A.**   We have a large customer base.  Yes, sir.  We bring them

7    to New York City.  We don't discount New York customers, but

8    we just don't have pretensions the we will be considered a

9    hometown carrier in New York City.

10   **Q.**   And that leads us to the next question.  Thank you, sir.

11   You used the term "hometown carrier."  That's the phrase that

12   Southwest uses a lot in its ordinary course of business,

13   right?

14   **A.**   That is frequently used.  Yes, sir.

15   **Q.**   Okay.  Can you tell Judge Sorokin what that means?

16   **A.**   It is not strictly defined, but it generally means we

17   have a large enough customer base there, Southwest fans, our

18   customers that reuse us over and over again, that we have a

19   kind of self-sustaining operation.  So we're a hometown

20   carrier even if we're not the hometown carrier.

21   **Q.**   It's related to relevance, right?

22   **A.**   I guess when you achieve hometown status, you also

23   achieve relevance in that situation, I agree with that, yes,

24   sir.

25   **Q.**   Okay.  And one of the advantage of achieving that

1    hometown carrier status is you will have what you refer to in

2    your deposition as high customer trial and loyalty, right?

3    **A.**   When we have a big enough customer base, we believe by

4    having the low fares, plus the good service, customers try

5    us, and then will try us over and over again, so we get that

6    repeat purchase behavior, so then you become the hometown

7    carrier to them.

8    **Q.**   Right.  So trial means they'll give you a shot, they'll

9    try you out, right?

10   **A.**   Yes, sir.

11   **Q.**   And then loyalty means that, once they've done that, they

12   will repurchase.

13   **A.**   Yes, sir.

14   **Q.**   Or at least have a higher probability of repurchasing?

15   **A.**   Yes, sir.

16   **Q.**   Okay.  And Southwest has found that if it achieves a

17   critical mass of local customer base, it will see that repeat

18   purchasing behavior, right?

19   **A.**   Repeat that again, please.

20   **Q.**   Southwest has found that if it achieves a critical mass

21   of local customer base, it will see an increase -- it will

22   see repeat purchase behavior?

23   **A.**   If we have a critical mass of the customer base and

24   they're pleased with our products.  We have good customer

25   satisfaction scores and good prices, they will come back.

**Q.**  Right.  Okay.  So and having that hometown carrier status
generally leads to a better financial performance for
Southwest, right?

**A.**  It's a consequence, if you please your customers and they
come back, it leads to good financial performance.

**Q.**  Precisely.  The relationship is between -- the trial and
the loyalty, pleasing the customer, and that leads to a
happier customer and better financial performance for the
airline, right?

**A.**  The happier customers coming back means we spend less
money to acquire customers, more cost efficient, and more
profitable.

**Q.**  That hometown status also creates an advantage against
Southwest's competitors, right?

**A.**  Not necessarily.  It can in some cases and not in others.

**Q.**  At your deposition, I asked you whether having hometown
status creates competitive advantage for Southwest in those
markets, and you answered, "We believed that if we have a
strong customer loyalty, then it will create an advantage
versus competitors by having that loyalty."

Do you still believe that?

**A.**  Yeah, what page is that?

**Q.**  That will be 43, lines -- from line 3, page 43, to
line 10?

**A.**  To page 43.

1    **Q.**   Line 3?

2    **A.**   Line 3.

3            MR. WALL:  You can put that up.

4            There's no problem putting the deposition up,

5    right?

6            MR. STALLINGS:  Your Honor, we marked this part as

7    highly confidential and it was part of the sealing.  I mean,

8    I don't know if being on the fly here, we can --

9            THE COURT:  He's just looking at it.  It's fine.

10           MR. WALL:  I was going to put it up for his

11   convenience.

12           THE COURT:  If somebody recognized the question,

13   and he's looking at it, and they didn't understand what it

14   was and they're in the gallery or on Zoom, then they're

15   probably not understanding anything else that's happening

16   here.

17           MR. WALL:  And I just read it out loud.  So the

18   cat's out of the bag.

19           THE COURT:  It's perfectly fine to have read it out

20   loud.  He didn't object.  There's no issue with you having

21   read it out loud.  I don't think this is deliberative process

22   or highly confidential question and answer there.

23           MR. WALL:  Right.

24           THE COURT:  I think the question was:  Do you still

25   believe that?

1          THE WITNESS:  In reading the deposition, I see that

2     I also -- the phrase that I just talked about, it gives us an

3     advantage because it lowers our cost to acquire customers,

4     and therefore, it gives us a better financial outcome.  So

5     it's more in response to the cost efficiency that allows us

6     to be profitable, it gives us the advantage.

7     BY MR. WALL:

8     **Q.**   Okay.  Thank you for that, sir.  You can put that down.

9          Now, the Northeast Alliance provides JetBlue and

10    American with increased relevance in the northeast, does it

11    not, sir?

12    **A.**   It improves their schedule quality in the northeast.

13    **Q.**   Indeed, you recall that at your deposition, I asked

14    you -- you told me about an interview that you had had with

15    the Department of Justice lawyers, and I had asked you at

16    that time what you had told them about how the Northeast

17    Alliance would affect Southwest's ability to compete.  Do you

18    recall that?

19    **A.**   Yes, I do.

20    **Q.**   And when I asked you that, you related it to the ability

21    to get takeoff and landing slots, right?

22    **A.**   It sounds reasonable.  I don't recall the exact words.

23    **Q.**   Right.  And what you said was that by combining their

24    slots, American and JetBlue would become more attractive to

25    customers because of improved schedules, right?

1    **A.**   The combined airline would become more attractive

2    relative to Southwest Airlines because these are limited

3    entry markets and their schedule becomes more attractive

4    because of the combination and we can't respond; therefore,

5    they get a structural advantage of being more attractive.

6    **Q.**   Right.  And can you explain for Judge Sorokin why, by

7    pooling their slots together, they become more attractive to

8    customers?

9    **A.**   They become more attractive relative to us.  Take two

10   airlines, put them together, the number of flights may not --

11   it doesn't likely change, because it's slot controlled.  So

12   as a customer, you don't see, "Oh, it's more convenient or

13   attractive to travel from point A to point B."  But if you

14   look at saying that that one airline offers that, that

15   airline is more attractive, compared to the other airline,

16   being us, because we might only have a few number of flights.

17           THE COURT:  You might have four.  JetBlue -- I'm

18   making these numbers up.  You might have four, JetBlue might

19   have six, and American might have seven.  And you're

20   competing against people with six and seven, and now you're

21   competing against one with 13.

22           THE WITNESS:  Yes, sir.

23           THE COURT:  To an individual customer, they're

24   making the choice of 13 versus four.

25           THE WITNESS:  The flight schedule may be the same

1  as it was the day before, but now one carrier offers more and

2  one carrier offers less.  Then the carrier that offers more,

3  I don't know when my meeting is going to end, I don't know

4  when I'm going to get out of court, so I take the flight

5  back, and if they have a lot more options, I'll choose them.

6  BY MR. WALL:

7  **Q.**  And that advantage can then be enhanced if they're

8  actually coordinating a schedule that spreads those flights

9  across the day into a more fulsome and regular schedule

10  throughout the day, right?

11  **A.**  A schedule that has a good pattern and service, we call

12  it in the airline industry, is more attractive than one that

13  does not have a good pattern and service meet, kind of spread

14  throughout the day or rush hour time.

15  **Q.**  And you described that idea of having an improved

16  schedule as a form of nonprice competition, right?

17  **A.**  Yes, sir.  I believe so.

18  **Q.**  Okay.  And therefore, the thing that concerns you is that

19  through the NEA, JetBlue and American would be more

20  attractive to customers because of improved schedules,

21  correct?

22  **A.**  I was -- from a competitive standpoint, I thought they

23  would be more competitive relative to Southwest Airlines,

24  without Southwest Airlines being able to have an equal

25  opportunity.

1    **Q.**   Exactly.  And to be fair, sir, you weren't complaining

2    about the fact that American and JetBlue become more

3    attractive, as much as you were saying that you just pointed

4    that Southwest doesn't have an equivalent opportunity to

5    improve its schedule, right?

6    **A.**   I believe I was also complaining, though, that they were

7    using the slots that had been divested by American and its

8    predecessors to compete back against us, when it was intended

9    that those slots be used to compete against American, not for

10   American's benefit.

11   **Q.**   Okay.  But the things about it is they figured out a way

12   through the NEA to increase their relevance that Southwest

13   can't match, right?

14   **A.**   In the slot controlled airports, we cannot match their

15   new schedule relevance.

16   **Q.**   Right.  And neither could American or JetBlue

17   independently create that higher relevance of the combined

18   schedule, could it?

19   **A.**   Not without additional slots.  They could not create a

20   different schedule than they already had.

21   **Q.**   Right.  They're up against the same problem that you

22   have.  Every airline, regardless of how many slots that it

23   has, is up against the same problem that you can't get more,

24   right?

25   **A.**   That is correct.  They are all -- the slots are not

1    determined by the airlines.

2    **Q.**  Okay.  Now, let's talk about some of the analysis that

3    Southwest Airlines has done about the NEA.

4              Now, as we all know from the confidentiality

5    discussion that we've had at length, the -- Southwest, in the

6    ordinary course of business, prepared various strategy

7    documents that analyze or reference the Northeast Alliance,

8    right?

9    **A.**  Many of them were reporting documents, not necessarily

10   strategy documents, but a couple were strategy documents that

11   referenced the Northeast Alliance, as well.

12   **Q.**  Well, counsel said earlier that some of them are

13   documents that were sensitive because they were prepared to

14   tell the senior executives what were the most salient and

15   important things about the Northeast Alliance; is that right?

16   **A.**  That's correct.

17   **Q.**  Okay.  Okay.  And one of the points that has been made

18   about the NEA in Southwest's analyses of it, is that the NEA

19   is part of a broader strategy by American Airlines, these

20   partnerships, to enhance its network and create network

21   advantages, right?

22   **A.**  Could you point me to the -- it sounds relatively in

23   line, but I usually talk about their -- an asset-like

24   strategy.

25   **Q.**  Right.  This isn't a pop quiz, so we can -- it's an open

1   book test.  So we can go to it.

2          Why don't you open your binder to Defendants'

3   Exhibit 500, sir.

4          MR. STALLINGS:  Which number?

5          MR. WALL:  500.

6          THE COURT:  I don't think 500 is in my book.

7          MR. SCHWED:  It's kind of buried in 499 the way the

8   tabs are.

9          THE COURT:  Oh, I see.  Thank you.

10          MR. WALL:  So just to be clear, Your Honor, the 500

11   is a cover e-mail, 501 is the document, which is the more

12   substantive one, but for whatever reason, it's a different

13   number.

14          THE COURT:  You wanted to get to 1,000 exhibits.

15          MR. WALL:  No, it's not actually the reason.

16   BY MR. WALL:

17   **Q.**  So you see this, do you not, sir, this is a document

18   dated February 11, 2021?

19   **A.**  Yes, sir.  I apologize.  Yes, sir.

20   **Q.**  And this has a number of individuals named on them.  I

21   won't bother saying their names out loud, but those are

22   members of Southwest's network planning team, right?

23   **A.**  They're part of the team, the network planning team

24   that's called network strategy, that's referred to in the

25   first line.

1    **Q.**  Right.  An e-mail refers to an attachment that is a

2    network strategy deck that's still a work in process, right?

3    **A.**  Yes, it's a deck prepared by the network strategy team

4    and these are individual contributors of those teams that are

5    discussing this.

6    **Q.**  Okay.  So now I'm going to show you what's already been

7    entered into evidence as Defendants' Exhibit 501.  It should

8    be the next document in your binder.

9    **A.**  Yes, sir.

10   **Q.**  And that's the attached deck, right?

11   **A.**  Yes, sir.

12   **Q.**  And that is entitled "American Expanded Partnership

13   Review"?

14   **A.**  Yes.

15   **Q.**  Okay.  And if you could, turn over to slide two, the next

16   page?

17   **A.**  Yes, sir.

18   **Q.**  And the document reads that American -- the title,

19   "American on boarding new partnerships" with the subtitle "AA

20   is further enhancing its network advantage with unique

21   partnerships to provide a more attractive network for

22   customers in an asset-like manner."

23          Right?

24   **A.**  Yes, sir.

25   **Q.**  Okay.  And that statement means, as it goes on to say

1    down below, that these partnerships allow American to

2    strengthen its overall network with minimal asset investment,

3    right, the bottom line?

4    **A.**  Yes, that's what the author is saying, yes.

5    **Q.**  And asset light, in the top of the document, and minimal

6    asset investment mean the same thing in this context, right?

7    **A.**  Yes, they mean they don't have to purchase aircraft and

8    fly these routes in order to get the benefit.

9    **Q.**  Right.  They get the network benefit without the capital

10    outlay of buying new aircraft, right?

11    **A.**  Yes, sir.

12    **Q.**  Okay.  And then on the left side of the document?

13    THE COURT:  Or taking on the burden to staff the

14    planes and maintain them and all that goes along after buying

15    them?

16    THE WITNESS:  Yes.  The cost of servicing those

17    routes then becomes less.  You have to split the revenue with

18    somebody, but the cost often becomes less if you have to do

19    it yourself, both for operating and capital expense.

20    THE COURT:  Right.

21    BY MR. WALL:

22    **Q.**  So then on the left side of the document, we have the

23    domestic partnerships with Alaska Airlines and JetBlue,

24    correct?

25    **A.**  Yes, sir.

1    **Q.**  And on the right are the international partnerships with

2    Qatar and GOL in South America, right?

3    **A.**  Correct.

4    **Q.**  And the commentary with respect to the NEA in the lower

5    left quadrant is that American's partnership with JetBlue

6    strengthens its northeast network in north/south routes along

7    the eastern seaboard, right?

8    **A.**  Yes, sir.  That's what it says.

9    **Q.**  And at your deposition, you told me you generally agree

10   with those statements, right?

11   **A.**  Yes, I do generally agree with the statement.

12   **Q.**  And you still do?

13   **A.**  Yes, sir.

14   **Q.**  Now, turning to slide 10, if you would.

15          Do you see at the top the slide talks about Alaska

16   and JetBlue combined northeast network, right?

17   **A.**  Yes, sir.

18   **Q.**  That's a typo.  "Alaska" should really be "American"?

19   **A.**  Yeah.  Based on the content on this page, it was clearly

20   a mistake.  It should have been American.

21   **Q.**  Alaska and JetBlue don't have a partnership, do they,

22   sir?

23   **A.**  Not that I'm aware of, no, sir.

24   **Q.**  Okay.  And there's a route map, and underneath the title,

25   the slide says that, "The NEA will benefit B6," meaning

1    JetBlue, "the most, with access to American Airlines'

2    extensive hub network, lounges, coordinated, and some of the

3    most competitive routes," correct?

4    **A.**  Yes, it says that.  I think the author may have

5    misunderstood the NEA a little bit, but conceptually, yes.

6    **Q.**  What do you think was, perhaps, missed in that?

7    **A.**  When they say access to AA's extensive hub network, the

8    NEA doesn't cover the hub network; it covers the four

9    airports that we mentioned.  So they may be misunderstanding

10   that.

11   **Q.**  So it covers part of the American network, not the entire

12   American network is what you're saying?

13   **A.**  Yes, sir.  Well, it says "extensive hub network," but I

14   think they misunderstood that.

15          But the lines that are depicted here, I believe --

16   you know, the lines here don't -- show a misunderstanding, as

17   well.

18          THE COURT:  Because they show flights beyond

19   flights originating or ending up in the four NEA airports?

20          THE WITNESS:  Yes, sir.  It appears to me that they

21   include to and from Philadelphia, such that if that top one

22   is Buffalo, New York, there looks to be a line going from

23   Buffalo, New York, to Philadelphia, which would not be within

24   the Northeast Alliance.  There are other examples like that.

25   That's the easiest one to pick out if one knows geography.

1    BY MR. WALL:

2    **Q.**  You're talking about the blue line?

3    **A.**  There's a red line.  So if you take Buffalo -- if

4    everyone agrees where Buffalo is --

5    **Q.**  Oh, I see what you're talking about.  I get it.

6    **A.**  Then your lines goes from Buffalo -- there's only one

7    line from Buffalo, and that line is to Philadelphia, not to

8    New York or the other -- and then there's some other examples

9    of -- there's a blue line to Buffalo-LaGuardia, which would

10   be part of the NEA, and then Buffalo to DCA, which would not

11   be part of the --

12            So the author has clearly jumbled some of the

13   definitions here, but it was intended, indeed, to be about

14   Alaska -- excuse me, American and JetBlue's combined network.

15   **Q.**  Okay.  But let's just put aside the map for a moment.

16            You agree that the NEA provides JetBlue with some

17   access to the American network, right?

18   **A.**  I do.  And I would also agree that it may benefit them

19   the most in the sense of American has a lot more slots, then

20   American is giving slots to JetBlue to upgrade as part of

21   this Northeast Alliance.  So I think the author asserting

22   that B6 would get more of out of it, at least on the surface,

23   would be directionally correct.

24   **Q.**  Okay.  Thank you, sir.  Let me then go on to the next

25   document, which is going to be Defendants' Exhibit 503, also

1     in evidence.  And let me know when you have that.

2     **A.**  Yes, sir.  Yes, sir, I have it.

3     **Q.**  Okay.  This one is entitled "STC-0A" overview?

4     **A.**  Yes, sir.

5     **Q.**  And you remember we talked about this at your deposition.

6     It's dated February 21, 2021.  Why don't you tell

7     Judge Sorokin what STC means?

8     **A.**  It means stump the chump, and I'm the chump.  And so

9     my --

10              THE COURT:  Stop the chump?

11              THE DEPUTY CLERK:  Stump the chump.

12              THE COURT:  Stump the chump.

13              THE WITNESS:  Evidently there was a radio show in

14    San Antonio by that name.  And my boss gives me great

15    latitude in my job, but in recompense, I -- once a quarter,

16    he can ask me any question about anything.  So we spend all

17    day going through multiple different topics that I bring and

18    he brings.  So this document was me bringing a discussion

19    document of other airline review.

20              THE COURT:  You're trying to stump him, or --

21              THE WITNESS:  He tries to stump me, so I'm the

22    chump.

23              THE COURT:  Does he?

24              THE WITNESS:  I try not to do it too much, but you

25    have to do it every once in awhile, or else the boss gets

1    upset.

2              THE COURT:  That's how you got that job starting on

3    Saturday.

4              Do you want me to seal that part of the transcript?

5    Direct your lawyer not to tell him?

6              MR. WALL:  You can certainly establish that you're

7    here to tell the truth.

8    BY MR. WALL:

9    **Q.**  Okay.  So now why don't we turn to page 5, which is

10   entitled AA and B6 partnership.

11   **A.**  Yes, sir.  I'm there.

12   **Q.**  Okay.  And this is a version that was used as part of

13   this conversation with Mr. Kelley and this stump the chump

14   session, right?

15   **A.**  Yes.  Or it was Mr. Jordan, February -- oh, '21, yes,

16   Mr. Kelley.  Yes.

17   **Q.**  And so the message that you -- you presented to

18   Mr. Kelley in this context is that the NEA is a, quote,

19   "Strategic partnership focused on northeast cooperation and

20   growth opportunities across complimentary networks."

21             Right?

22   **A.**  Yes, and this one, I can see, you know, it's a better

23   document and that we're referring to investor material and

24   company commentary here, but yes, this is what we presented

25   that JetBlue and B6 were up to and how they described it in

1    their words.

2    **Q.**   Okay.  And then underneath, there's a map on the left

3    side entitled "AA partnership related network changes."

4              Do you see that?

5    **A.**   Yes, I do.

6    **Q.**   And there's a bunch of blue lines on the map to different

7    points on the map, right?

8    **A.**   That's correct.

9    **Q.**   And those blue lines are indicating new routes that are

10   NEA partnership related, right?

11   **A.**   Yes, sir.

12   **Q.**   Okay.  And then to the -- on the top right there are a

13   few blue lines that are going off the page of that chart.

14             Do you see that?

15   **A.**   Yes, sir.

16   **Q.**   Where it says JFK to ATH, and JFK to TLV, right?

17   **A.**   Yes, sir.

18   **Q.**   And those are airport codes for Athens and Tel Aviv,

19   correct?

20   **A.**   That is correct.

21   **Q.**   And so what it's referring to here is the new long-haul

22   flights to New York from New York to Athens and Tel-Aviv that

23   American put in as part of the NEA, correct?

24   **A.**   Yes, sir.

25   **Q.**   Okay.  And that is -- there is a legend on the chart that

1    is referring to that as long-haul international growth from

2    JFK, right?

3    **A.**  Yes, sir.  That's correct.

4    **Q.**  Okay.  And on the right side, there's also a map entitled

5    "B6 partnership related network changes," right?

6    **A.**  Yes, sir.

7    **Q.**  Okay.  And once again, which we see is a whole bunch of

8    blue lines that are emanating with one exception from the

9    northeast, right?

10   **A.**  Yes, sir.  It says from Newark, I think.  It's an

11   indication, but I did not count the lines.

12   **Q.**  Well, what it says is announced 29 new domestic and

13   international EWR, meaning Newark markets, right?

14   **A.**  Yes, sir.

15          THE COURT:  And that they're all originating -- new

16   things, except for the one from Miami?  Is that your

17   question?

18          MR. WALL:  Right.

19   BY MR. WALL:

20   **Q.**  But -- so you do see Miami to LA, right?

21   **A.**  Yes, Miami to LA, and then the other ones, I believe

22   there's Newark.  I can't tell from the documents but I can

23   infer by the call out that it's Newark that -- where they're

24   emanating from.

25   **Q.**  So this may be inclusive of all of the new flights that

1    are coming out of the four NEA networks?

2    **A.**   Yes, sir, because especially since some of these are slot

3    controlled if you have an addition, you probably have to have

4    a subtraction, so -- and I'm not sure of the time frame that

5    it -- when this was operated.  Usually there is a footnote,

6    but they didn't that this time, so as of at least February of

7    '21, this is what future schedules showed these airlines

8    operating as part of the new venture.

9    **Q.**   Except that Miami to Los Angeles would be outside of the

10   NEA, right?

11   **A.**   Yes, sir.  Just like we discussed in the previous pages,

12   the authors sometimes misunderstand exactly the scope of it.

13   **Q.**   Right, but what -- the reason that line is there is

14   because outside of the NEA, JetBlue had actually started

15   service competing head to head with American Airlines between

16   American's hub in Miami and American's hub in Los Angeles,

17   right?

18   **A.**   They started -- I don't know why the line was in here, so

19   I don't know the author's intent, it does seem a bit of an

20   anomaly.  There's no commentary on it other than it launched

21   in February, which I'm assuming means it's a Los Angeles

22   line, but otherwise I --

23   **Q.**   How about we just take it out of context of this for a

24   moment.  Are you aware of the fact that after the NEA

25   started, JetBlue entered head-to-head against

1   American Airlines on LA-Miami?

2   **A.**   I remember they announced LA expansion, including Miami.

3   They have not continued all of their LA flights, so I don't

4   know which ones stayed and which ones didn't operate.

5   **Q.**   Okay.  So --

6   **A.**   I didn't monitor that closely.

7   **Q.**   So I want to ask you next about page 6, which is a slide

8   entitled American and JetBlue royalty program comparison?

9   **A.**   Uh-huh.

10  **Q.**   And it -- you know, the sub heading here is "both loyalty

11  programs offer attractive accruals, redemptions, and

12  benefits."

13          Do you see that?

14  **A.**   Yes, sir.

15  **Q.**   And then it goes on to make a reference that this is

16  particularly in the competitive East Coast markets, right?

17  **A.**   Yes, sir.

18  **Q.**   Okay.  So the question that I just want to ask you, why

19  was it important in this stump the chump session with

20  Mr. Kelley to make these observations about the loyalty

21  programs and in the context of the NEA?

22  **A.**   To indicate that it wasn't just codesharing, that they

23  also were harmonizing or coordinating their loyalty programs,

24  as well.

25  **Q.**   And does that have competitive significance?

1    **A.**   In -- similar to what we discussed about schedules, their

2    way to a schedule becomes more attractive is because of the

3    loyalty element, the kind of repeat purchase behavior, the

4    loyalty program helps cement that.  And so you attract a

5    schedule, really, needs a coordinated loyalty program to get

6    the benefit.

7    **Q.**   Thank you, sir.

8         The deck also has a lot of material about other

9    airlines.  I don't want to cover a lot of that, but I do want

10   to just quickly direct your attention, if I could, to slide

11   19, which is entitled Delta airlines capacity changes.  Let

12   me know when you're there.

13   **A.**   Yes, sir.  I'm there, yes.

14   **Q.**   Okay.  So -- so you -- the deck overall goes through all

15   the other airlines and has certain data points about their

16   capacity changes, right?

17   **A.**   Yes, sir.

18   **Q.**   Okay.  And in the case of the Delta Airlines, the -- the

19   chart is listing out on the right-hand side the -- the

20   markets in -- you know, sort of in blue or teal bars, the

21   markets which have the largest additions of Delta capacity,

22   right?

23   **A.**   This was the -- as of February, the largest seat

24   capacity -- as measured in seats for the upcoming June.  So

25   those were as context, from February '21, the vaccines were

1    just rolling out.  We thought things would return to normal,

2    they didn't.  And so the schedules that were actually offered

3    in June '21, were different than what was actually discussed

4    in this document, because airlines subsequently had staffing

5    problems.

6              THE COURT:  So this is what you were thinking might

7    happen in June based on what you knew of --

8              THE WITNESS:  This is what they published.

9    Everyone had published schedules for the summer.  We thought

10   that we would operate them.  And then in February, this is

11   what they had published and so these were inferring -- us

12   inferring their intents, as far as where they were going to

13   put their capacity, and what was important to them, and

14   therefore, what it meant for us, obviously the world evolved

15   differently, and they did not operate this.

16   BY MR. WALL:

17   **Q.**  Right.  The world did, indeed, evolve differently, did it

18   not, sir?

19   **A.**  Yes, sir.

20   **Q.**  It's taken a lot longer than anybody expected to get out

21   of COVID, right?

22   **A.**  Indeed.

23   **Q.**  However, at this time, in your stump-the-chump session --

24   that's hard to say -- session with Mr. Kelly, which you

25   indicated, based upon its public schedules, is that Delta Air

1    Lines' largest capacity increases by seats would be in

2    Boston, right?

3    **A.**   For domestic schedules, yes, sir.

4    **Q.**   And then if you turn the page --

5    **A.**   Yes, sir.

6    **Q.**   -- to United Airlines, same slide, United Airlines

7    capacity changes?

8    **A.**   Yes, sir.

9    **Q.**   What the -- what you told Mr. Kelly was, based upon the

10   published schedules, that United's largest capacity change by

11   seats was going to be the addition of capacity in Newark,

12   right?

13   **A.**   As far as the domestic schedule.  This excludes

14   international schedules for international capacity.  But for

15   domestic, Newark would have been the largest seat addition in

16   June of 2021.

17   **Q.**   So to summarize, these two charts are showing us that the

18   largest domestic increase in capacity is measured by seats

19   between June 2021 and June 2019, from Delta and United, were

20   in the territories of the Northeast Alliance?

21   **A.**   Yes, sir, that is correct.

22   **Q.**   Let's turn to another document.  It's Exhibit 498.

23   **A.**   Yes, sir.

24   **Q.**   And this document is another one that has this STC

25   designation, right?

1   **A.**   Yes, sir.  One year later.

2   **Q.**   Right.  One year later.

3           You're still the chump?

4   **A.**   Still the chump.

5   **Q.**   You do get to no longer be the chump now that you're the

6   COO?

7   **A.**   No, sir, I'll just have different topics.

8   **Q.**   Now, this --

9           MR. WALL:  Your Honor, this one is almost all pages

10   are blacked out by agreement, based upon the relevance

11   consideration that Mr. Stallings was mentioning.

12   BY MR. WALL:

13   **Q.**   I would like to sort of set a foundation here.  This

14   document is created every year as part of Southwest's

15   five-year planning exercise, right?

16   **A.**   Yes, sir.  This is the beginning of the discussions for

17   what we call the work plan, which are five -- beginning of

18   the five-year exercise, which involves, you know, where we

19   could grow over the next -- the upcoming five years.

20   **Q.**   Okay.  And part of that exercise is making observations

21   about market conditions like demand, supply, and competition,

22   right?

23   **A.**   There's some elements for that, certainly for reference,

24   yes.

25   **Q.**   Okay.  So turn, if you could, to slide 38.  And can you

1   describe just generally for the Court what is depicted -- and

2   I don't mean the specific content because there's

3   confidentiality issues about that, but just generally the

4   makeup of this slide and its role in your deliberative

5   processes?

6   **A.**   So the meat of the discussion was what we're going to do.

7   And then the appendix, we have reference material on the

8   market conditions as Mr. Wall talked about.  And in this

9   situation, we have a couple summary pages by airline, what we

10  infer the other airline's network strategy to be, and then

11  set -- next to that, what are the implications that could

12  be -- have for Southwest Airlines as a result of the

13  preceding pages on, you know, capacity and statements by

14  other airlines.

15  **Q.**   Okay.  Thank you, sir.  And so if you look under

16  American Airlines -- and I must say that I cannot read the

17  slide to save my life, because it's just the way it's been

18  printed.

19          MR. STALLINGS:  Your Honor, can I interrupt?  This

20  is one of the slides that I did have concerns about and I

21  don't know what Mr. Wall is about to read, but in terms of

22  the implications for Southwest column, it does -- there are

23  competitively sensitive statements in there.  I'm not sure

24  which one he's going to use.

25          THE COURT:  The other column that describes what

1    they think American Airlines is doing or what that means for

2    Southwest?

3              MR. WALL:  I am actually going to just stay on the

4    left column for this one, Your Honor.

5              THE COURT:  Okay.

6              MR. STALLINGS:  Thank you.

7    BY MR. WALL:

8    Q.  So the summary of American Airlines network strategy has

9    a few lines in there.

10   A.  Yes, sir.

11   Q.  But the last part of it says, "supporting coastal

12   relationships in Seattle, Alaska Airlines, as well as in

13   Boston and New York, JetBlue."

14             Right?

15   A.  Yes, sir.

16   Q.  Okay.  And then with respect to Delta, the third bullet

17   is coordinating -- or excuse me, is "continuing to prioritize

18   coastal hubs, Boston and Seattle."  Right?

19   A.  Yes, sir.

20   Q.  And if you turn to the next page -- oh, excuse me, I'm

21   sorry.  I forgot one point.

22             Under United, it talks about something called the

23   "United Next Initiative."  Do you see that?

24   A.  Yes, sir.

25   Q.  And it refers to that as unprecedented capacity growth,

1  correct?

2  **A.**  That's correct.

3  **Q.**  Okay.  Now, moving over to the next slide, that has the

4  entry for JetBlue, correct?

5  **A.**  Yes.

6  **Q.**  And again, in the description of JetBlue's network

7  strategy, which work plan says is "leveraging

8  Northeast Alliance with American to aggressively expand in

9  New York, designated as New York, JFK, and LaGuardia and

10 Boston."  Correct?

11 **A.**  That's correct.

12 **Q.**  And you agree, do you not, sir, that JetBlue is

13 concentrating its growth efforts in the northeast, leveraging

14 the NEA?

15 **A.**  They are moving their capacity increasingly into the

16 northeast, especially now that they have the slots for

17 American Airlines to operate in some of these geographies.

18 **Q.**  Right.  So to the extent that anybody is claiming that

19 the effect of the Northeast Alliance is to create a reduction

20 of capacity on northeast routes, your observations are to the

21 contrary, correct, sir?

22 **A.**  Not necessarily, since some of these are limited entry

23 markets.  Growth by JetBlue would then have to be at the

24 expense of American, if they're just trading slots in

25 between, and a market that's not slot controlled, say like a

1    Boston, it wouldn't necessarily be zero sum, but the slot

2    controlled, it almost has to be somewhat zero sum.

3    **Q.**  Well, but if JetBlue puts a bigger plane on a slot that

4    American was using, all else being equal, that's going to

5    result in capacity growth, right?

6    **A.**  It could be, but they've got both airlines have multiple

7    size aircrafts, as I mentioned earlier.

8    **Q.**  I understand, but stick with my question.  It's not a

9    single question; I'm going to cover some other things.

10   Starting out, if JetBlue puts 130 seat plane on a slot that

11   American was flying, a 50 seat regional jet, then all else

12   equal, that's going to be an increase in capacity, right?

13   **A.**  It's an increase in capacity, but American could have

14   done that, but sure.

15   **Q.**  Okay.  And then if American, instead, opens up new

16   service to Tel-Aviv or Athens as a result of the NEA, all

17   else equal, that's an increase in capacity, right?

18   **A.**  If it's slot controlled, that would have to apply a

19   reduction in somewhere else, if JFK is slot controlled, and

20   JFK-Athens -- or you said JFK-Tel Aviv is new, that slot had

21   to come from somewhere, so --

22   **Q.**  Let's just put it out there.  Do you have any evidence

23   that you want to provide Judge Sorokin here -- I'm going to

24   ask you a big, fat, softball question -- that indicates to

25   you that, as a result of the NEA, and not the other factors

1   that are affecting the airline industry right now, American

2   and JetBlue have reduced capacity in the northeast?

3   **A.**   No, I don't have any evidence that they've reduced

4   capacity.

5   **Q.**   Okay.

6           THE COURT:  Does the slot -- this is sort of

7   unrelated to Mr. Wall's question.

8           THE WITNESS:  Yes, sir.

9           THE COURT:  If you have a slot at a slot controlled

10  airport.

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Does that impose any restrictions on

13  what size plane you fly in or out.

14          THE WITNESS:  In general, no, sir, it does not.

15          THE COURT:  In general, you could fly in the

16  biggest 747, or what have you, or you could fly in a much

17  smaller regional jet?

18          THE WITNESS:  Yes, sir, that is correct.

19          THE COURT:  Okay.  Go ahead.

20          MR. WALL:  Let me pick up on that.  Important

21  point.

22  BY MR. WALL:

23  **Q.**   So you can -- so what American can do in New York, given

24  its slot portfolio, is up-gauge, right?

25  **A.**   Yes, sir.

1    **Q.**   That's its option, right?

2    **A.**   For an airline, yes, sir.

3    **Q.**   But if it up-gauges, it still has the same number of

4    takeoffs and departures, right?

5    **A.**   Yes, sir.

6    **Q.**   It isn't able to increase its overall relevance in New

7    York because it's still operating the same number of slots,

8    right?

9    **A.**   You mean the schedule of relevance we discussed earlier?

10   **Q.**   The schedule relevance.

11   **A.**   The schedule, in general, the service pattern stays the

12   same.  If you haven't merged the departure and arrival times,

13   there's no change to the pattern of service.

14   **Q.**   And in reality, for all we talk about American's slot

15   holdings and JetBlue's slot holdings at both LaGuardia and

16   JFK, Delta is by far the largest slot holder, correct?

17   **A.**   At LaGuardia, Delta is the largest slot holder.  I don't

18   master JFK well enough since we don't operate there to affirm

19   that, but they are very large there.

20   **Q.**   And so short of coming up with a creative solution like

21   the NEA, there's nothing that American -- even though the

22   plaintiffs' say it's the largest airline in the world,

23   there's nothing that American can do to create the kind of

24   depth and breadth of schedule that Delta has because it

25   doesn't have the slots, right?

1    **A.**   At LaGuardia, Delta holds the majority -- I think the

2    majority of slots; therefore, you cannot challenge JetBlue --

3    excuse me, Delta's service offering, given the number of

4    slots available at LaGuardia airport.

5    **Q.**   Thank you, sir.

6            Now, getting back to Southwest's end and its

7    efforts to get slots, in its advocacy at the DOT and in its

8    discussions with the Department of Justice, Southwest has

9    said that it believes that in order for the parties to be

10   able to go forward with the Northeast Alliance, there ought

11   to be slot divestitures, more slot divestitures, right?

12   **A.**   I believe we said at the minimum, the ones that JetBlue

13   required, as a result of American's forced divestitures,

14   should not return back into this alliance.  I think that

15   was -- we said it was a minimum required.

16   **Q.**   And the particular argument that you made in that context

17   was that as a result of creating alliance with a legacy

18   airline, they should not be regarded as a low cost carrier

19   that would provide the public benefits that are supposed to

20   come from slot divestitures, right?

21   **A.**   I believe we argued that they would no longer be

22   considered a low cost carrier as defined by the DOJ in

23   deciding who could receive the slots as related to that

24   divestiture, so they could provide competition back to both

25   American Airlines and Delta airlines in the slot swap

1    situation.

2    **Q.**  So you were making the same argument against JetBlue

3    domestically that other airlines made against JetBlue in the

4    CMA, in the United Kingdom, which is why they weren't able to

5    get the -- why they lost their eligibility on these remedy

6    slots?

7                MR. WIENER:  Objection.  Foundation.

8                THE COURT:  Sustained.

9                MR. WALL:  Don't answer.  He said "sustained."

10               THE WITNESS:  I don't know what you're talking

11   about, anyway.

12   BY MR. WALL:

13   **Q.**  Okay.  Very well.  I'll definitely move on from that.

14   But the fact of the matter is, is that LCCs and ULCCs have

15   been complaining to regulators and the DOJ for years about

16   too many slots being in the hands of the legacy carriers,

17   right?

18   **A.**  We've been on the record for that and the fact that they

19   fly small airplanes with that rather than big airplanes.

20   **Q.**  Right.  And JetBlue, Southwest, Spirit, Allegiant, all of

21   you have engaged in long term public affairs advocacy about

22   legacy airline mergers and alliances in hopes of getting slot

23   relief out of those transactions, right?

24   **A.**  I think we were asking for a level playing field and

25   worried about the concentration in limited entry airports, so

1    that's why we were complaining.

2    Q.   And it's worked for you, sir, right?  Southwest Airlines

3    acquired 12 take-off and landing slots for six round trip

4    flights at LaGuardia that were divested by American as part

5    of the remedies in the merger with US Airways, correct?

6    A.   I can't remember the number, but I accept that it's 12.

7    And the only way we've gotten slots, except for our lease

8    from Alaska was from divestitures, and even Alaska is -- what

9    they're leasing to us is from divestiture.  So it's the only

10   way one can, you know, enter these markets.

11   Q.   Right.  And you also got your Newark slots for remedies

12   in the United/Continental merger, right?

13   A.   That's correct.

14   Q.   Okay.  So back to the NEA, I fully understand,

15   Mr. Watterson, that Southwest wants slots, needs slots, but I

16   want to go back to your earlier discussion and your earlier

17   testimony about how the NEA disadvantages Southwest by making

18   American and JetBlue, who get to share their slots, more

19   attractive to customers.  Do you remember that?

20   A.   On what page?

21   Q.   No.  Today.  Here.

22   A.   No, today.  Oh, I'm sorry.  Yes.

23   Q.   So let's be clear.  If the NEA is enjoined, Southwest

24   won't have anymore slots than it has today, will it?

25   A.   I imagine that's correct.

1   **Q.**  So the only benefit to Southwest in that scenario is that

2   prohibiting the NEA would reverse what the NEA does to make

3   American and JetBlue more attractive to customers.  Right?

4   **A.**  More attractive relative to us.  I don't know if they

5   actually become more attractive to customers.

6   **Q.**  But you -- excuse me?  I think your prior answer was that

7   they become -- that your disadvantage comes from them

8   becoming more attractive to customers as a result of the

9   deeper schedules?

10          MR. STALLINGS:  Objection, Your Honor.  That was

11   not his testimony.

12          THE COURT:  Overruled.  I think he's perfectly --

13   he's not stumped by this one.

14          THE WITNESS:  I'll live with that forever.

15          Relative to us.  So the fact that if they each have

16   four slots and now combined has eight, that's no more flights

17   for the customer, but it's eight compared to our four.

18   They're more attractive relative to us, which I think is

19   distinct from being more attractive to -- the customer

20   finding it more attractive.

21   BY MR. WALL:

22   **Q.**  Let me -- let's go back to your deposition, page 25,

23   line 3.  And --

24          THE COURT:  How much longer do you have, Mr. Wall?

25          MR. WALL:  I'm sorry?

```
1              THE COURT:  How much longer do you have?

2              MR. WALL:  30 seconds.

3              THE COURT:  Okay.  Go ahead.

4              MR. WALL:  And I'd actually like to play the video

5    of this, if I may, Your Honor.

6              Go ahead.

7              (Video plays.)

8    BY MR. WALL:

9    Q.  All right.  You stand by that testimony, sir?

10   A.  Yes, that's --

11             MR. WIENER:  Objection, Your Honor.  Improper

12   impeachment.

13             THE COURT:  Well, I'm not sure it impeached his

14   testimony.

15             MR. WALL:  It's not impeachment.  I'm asking it as

16   the foundation for the question.

17             THE COURT:  All right.  Go ahead.  Overruled.

18   BY MR. WALL:

19   Q.  Do you stand by the testimony, sir?

20   A.  As I mentioned before you played it, it's the relative to

21   us, which I believe was substantiated by what I said in the

22   video.

23   Q.  So if the NEA were enjoined, the relative to us part

24   would be remedied from the Southwest perspective, but the

25   customers would be worse off?
```

1    **A.**   I do not believe that's what it says.  It would be

2    relative to us, and I believe my testimony says relative to

3    us.

4              MR. WALL:  Thank you, sir.  No more questions.

5              THE COURT:  All right.  Are you going to have

6    redirect?

7              MR. WIENER:  Yes, I will, Your Honor.

8              THE COURT:  So more than, like, five minutes?

9              MR. WIENER:  Probably, Your Honor.

10             THE COURT:  All right.  Fine.  So we'll take the

11   lunch break now.  We'll come back a couple minutes after

12   2:00, and we'll resume.

13             We stand in recess.

14             (Court in recess at 1:04 p.m.)

15             (The following reported by Robert Paschal.)

16             (In open court at 2:03 p.m.)

17             THE COURT:  Before we begin, can I just see the

18   three of you at sidebar for one second, so I can just . . .

19             (Beginning of sealed sidebar.)

20   ██████████████████████████████

21   ██████████████████████████████████████

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████

24   ██████████████████████

25   ████████████████████████████████████████





17    (End of sealed sidebar.)

18         THE COURT:  Before we begin, I just want to remind

19    everybody, those here and those on the Zoom, that this is a

20    proceeding in the federal court and there are certain rules

21    that govern those of you who are on the Zoom or those of

22    you -- and those of you who are in the audience.  And among

23    other rules -- this is not an exhaustive and complete list --

24    but among those rules include no recording, no photography,

25    no video recording, no audio recording, no broadcasting, no

1    rebroadcasting, no streaming, no restreaming.

2              You can watch, and you can take notes, whether

3    you're here -- and you can take notes whether you want to do

4    it old school with a piece of paper and a pencil.  If you

5    have permission to bring an electronic device in, you can

6    take notes with the device, but there's no recording,

7    wherever you are.  Okay?

8              And those are enforceable rules of the Court with a

9    whole panoply of sanctions if you violate them.

10             Go ahead.

11             MR. WIENER:  Thank you, Your Honor.

12   **REDIRECT EXAMINATION BY COUNSEL FOR THE GOVERNMENT**

13   BY MR. WIENER:

14   **Q.**  Welcome back, Mr. Watterson.

15   **A.**  Thank you.

16   **Q.**  Earlier, Mr. Wall asked you about new routes that

17   American and JetBlue might be adding to their schedules.  Do

18   you recall that testimony?

19   **A.**  Yes, sir, I do.

20   **Q.**  What you would have been basing this on -- would you have

21   been basing this on American and JetBlue's public statements?

22   **A.**  Either public statements or filed schedules.

23   **Q.**  And those would be public documents?

24   **A.**  Yes, sir.

25   **Q.**  What basis does Southwest have to know whether a route

 1   was added because of the NEA?

 2   **A.**   For that, we would have to attribute that to something

 3   either party said.

 4   **Q.**   When you were discussing this with Mr. Wall, you said,

 5   quote, "If you have an addition, you have to have a

 6   subtraction."  What did you mean by that?

 7   **A.**   In general, I was referring to slot-controlled airports,

 8   which two of the four are slot controlled and one is

 9   coordinated, not slot controlled.

10          And in order to -- the number of slots fixes the

11   number of departures you may have in that airport.  And so if

12   you pool your slots and one airline adds a route, then you

13   have to subtract it from a different slot.  So the -- you

14   have to -- any addition has to be counterbalanced with a

15   subtraction.

16   **Q.**   And do airlines have a limited number of aircraft at any

17   given time?

18   **A.**   They have large fleets and -- that's correct, yeah.

19   **Q.**   If you want to add a new route in one place, would you

20   need to take -- take an aircraft off of a different route in

21   order to add that new route?

22   **A.**   Not necessarily.  You can use your aircraft more

23   intensely to generate additional flying.  There's a limit to

24   that, because it becomes stressful in the operation and

25   extends the day.  But in a -- up to a certain limit, you can

1    do more flying by increasing the utilization of the aircraft,

2    after which, you need new aircraft.

3    Q.   And Mr. Wall also asked you some questions about the

4    relative attractiveness of the American/JetBlue network

5    compared to Southwest.  Do you recall those questions?

6    A.   Yes, sir.

7    Q.   Do you recall your testimony?

8    A.   Yes, sir.

9    Q.   Are you aware of what JetBlue's plans would have been but

10   for the NEA?

11   A.   I would not be privy to their plans.  I can recall other

12   public statements with their focus areas.  They've previously

13   talked about growing Fort Lauderdale, Orlando, Boston, and

14   LAX as focus cities in the past, but I don't know what their

15   specific plans were for those.

16   Q.   Could they have -- could these, but for the NEA plans,

17   have been to grow organically?

18          MR. WALL:  Objection.  Leading.

19   BY MR. WIENER:

20   Q.   Would one possibility for JetBlue's plans been to grow

21   organically?

22   A.   Yes, sir.

23   Q.   Are you aware of what American's plans would have been

24   but for the NEA?

25   A.   Once again, I know their public statements regarding

1    growth in Charlotte -- strengthening their hub there --

2    growth in DFW -- strengthening their hub there.  And they

3    also pulled down their LAX gateway for all intents and

4    purposes.  So those are the other statements regarding their

5    future plans that I recall.

6                THE COURT:  I'm sorry.  Were those statements

7    pre-NEA or post-NEA?  Or -- if you know.

8                THE WITNESS:  They were -- they were during --

9    these all came about -- the focus on Dallas and Charlotte

10   were pre- -- was pre-COVID, pre-NEA.  The LAX reduction and

11   de-emphasizing that as a gateway hub was during COVID.  I do

12   not recall if it was pre or post the NEA announcement.

13   BY MR. WIENER:

14   **Q.**   Would one possibility for American have been to grow

15   organically, but for the NEA?

16   **A.**   Yes, of course.

17   **Q.**   If either airline had grown organically, would that have

18   given them a more attractive network compared to Southwest?

19   **A.**   It depends on where that growth took place, whether that

20   would mean it would be impactful on relative attractiveness

21   to Southwest or not.

22   **Q.**   Okay.  Would it be relevant to your answer to these

23   questions if JetBlue had been seeking more slots at JFK prior

24   to the NEA?

25   **A.**   Could you explain that, please?

1   **Q.**  Would it be relevant to the testimony that you just

2   gave --

3   **A.**  Uh-huh.

4   **Q.**  -- about, you know, organic growth but for the NEA, if

5   JetBlue had been seeking more slots at JFK prior to the NEA?

6   **A.**  And how that reflects on our schedule attractiveness or a

7   complete separate question?

8   **Q.**  How it would reflect on the attractiveness of JetBlue,

9   but for the NEA?

10  **A.**  JetBlue has a good position at JFK, and if they were --

11  if they were to come to additional slots at JFK, I imagine

12  that would have improved their situation in New York.  As it

13  relates to -- relative to Southwest, we don't participate in

14  that airport, so I'm not -- it would have only marginal,

15  perhaps, relevance to Southwest Airlines.

16  **Q.**  Would it be relevant to your answer to these questions if

17  JetBlue had negotiated an agreement with another airline for

18  additional slots at JFK prior to the NEA?

19          MR. WALL:  Objection.  Calls for speculation,

20  Your Honor.

21          THE COURT:  Sustained.

22  BY MR. WIENER:

23  **Q.**  Do you know if JetBlue had an agreement with American

24  Airlines to lease dozens of slots at JFK prior to the NEA?

25  **A.**  No, I do not.

1    **Q.**  If JetBlue had obtained additional slots a JFK and had

2    not entered the NEA, how would that network have compared to

3    JetBlue's pre-NEA network?

4              MR. WALL:  Objection.  Foundation.

5              THE COURT:  Can you repeat the question?  I'm not

6    sure I understand.

7    BY MR. WIENER:

8    **Q.**  Of course.  If JetBlue had obtained additional slots at

9    JFK and JetBlue had not entered the NEA, how would JetBlue's

10   network compare in that scenario to JetBlue's NEA -- to

11   JetBlue --

12             THE COURT:  If they obtained those slots at the

13   time of the NEA, but in --

14             MR. WIENER:  But in lieu of the NEA, Your Honor.

15             THE COURT:  And how many slots?  I imagine his

16   answer would be different if they got 1 or 100.

17             MR. WIENER:  The slot --

18   BY MR. WIENER:

19   **Q.**  Mr. Watterson?

20             THE COURT:  I don't know what the question is.

21             MR. WALL:  I mean, where are we?

22             THE COURT:  I think --

23             MR. WIENER:  Let me rephrase, Your Honor.

24             THE COURT:  There you go.

25

1    BY MR. WIENER:

2    **Q.**  If JetBlue had contracted to obtain slots at the JFK --

3    at JFK, in lieu of entering the NEA, would those additional

4    slots improve JetBlue's network?

5            MR. WALL:  Assumes a fact not in evidence.

6    Foundation.  Speculation.

7            THE COURT:  Well, what's the significance of it,

8    putting aside the evidentiary objections?

9            MR. WIENER:  The "but for" world, Your Honor.

10           THE COURT:  You mean as to an alternative?

11           MR. WIENER:  Exactly, Your Honor.

12           THE COURT:  Overruled, to the extent you can

13   answer.

14           THE WITNESS:  The -- the NEA gives JetBlue

15   substantial increase in LaGuardia, which we know is a

16   desirable airport for those customers traveling to New York

17   within the perimeter of LaGuardia flights.

18           And so that would have been -- the NEA gives

19   JetBlue that benefit.  JFK is still, like Newark, an airport

20   that appeals to the New York origin, as well as beyond

21   perimeter flyers.  So if JetBlue had a substantial increase

22   in slots at JFK, then they could have become incrementally

23   more attractive, versus other airlines at JFK, depending on

24   how many they got and kind of what they offered within that.

25

BY MR. WIENER:

**Q.**  And if instead of JetBlue obtaining slots at JFK in lieu
of the NEA JetBlue would have obtained slots at LaGuardia,
would that have made JetBlue a more attractive airline?

THE COURT:  If instead of the slots they got at JFK
from the NEA, they didn't have the NEA and they got those
same number of slots at LaGuardia?  Is that the question?

MR. WIENER:  If JetBlue is able to increase its
slots at LaGuardia instead of entering the NEA, would JetBlue
have been --

THE COURT:  Just if -- if they could just --
without entering the NEA, just increase their slots at
LaGuardia?

MR. WIENER:  Yes, Your Honor.

THE COURT:  Would that what?

MR. WIENER:  Make JetBlue's network more
attractive.

THE WITNESS:  For a New York-based airline, they
don't have very many LaGuardia slots.  So additional
LaGuardia slots would have improved their network, yes.

BY MR. WIENER:

**Q.**  Does an airline have to use all of its slots?

**A.**  Yes.  There are -- due to rules called "use or lose,"
where you have to use a certain percentage of the -- of the
slots each slot season -- there's two slot seasons per a

1    year -- in order to maintain your slot holding.

2    **Q.**   And what happens -- and under these "use or lose" rules,

3    if you don't use them, you lose them?

4    **A.**   Theoretically, yes.  In practice, I -- it seems to be

5    waived a considerable amount of times.

6    **Q.**   Okay.  Do you know whether or not American Airlines used

7    all of its slots at LaGuardia and JFK prior to the NEA?

8    **A.**   During COVID, there was a substantial decrease in usage

9    of slots and for which the FAA gave a waiver for airlines not

10   to use those slots during COVID times, which would have

11   included the pre-NEA time.

12   **Q.**   Prior to COVID -- if we were talking about the time

13   period prior to COVID, would that change your answer?

14           THE COURT:  2019?

15           THE WITNESS:  2019?  I have not measured their slot

16   usage; however, I can say that you don't have to use

17   100 percent of your slot time.  You just have to use

18   approximately 80 percent.  So you could theoretically

19   underutilize your slots and not lose them.

20   BY MR. WIENER:

21   **Q.**   Could you also underutilize your slots by flying smaller

22   aircraft?

23   **A.**   It's been Southwest's view that there are many small

24   aircraft at LaGuardia using the -- and DCA -- using the

25   slots, and so one could take the point of view, as we have,

1    that you're underutilizing the slot by flying a smaller

2    aircraft.

3            THE COURT:  But this slot regulation that

4    authorizes -- or the rules that award the slot don't

5    necessarily say what size plane you have to use, although

6    sometimes they might?

7            THE WITNESS:  With regards to aircraft size, I do

8    not believe there's any restriction for the slot usage.

9    There are -- in the case of DCA, there would be particular

10   slots that require that slot be used to fly to a certain city

11   or a certain type of city in order to be a valid flight.

12           THE COURT:  And those are rules imposed by

13   Congress?

14           THE WITNESS:  Yes, sir.

15           THE COURT:  When they expanded those slots that are

16   then subject to the requirement?

17           THE WITNESS:  Yes, sir.

18           THE COURT:  Got it.  Go ahead.

19   BY MR. WIENER:

20   **Q.**  Do you know whether some of the slots American

21   transferred to JetBlue were slots that American could have

22   flown with a larger plane but did not?

23   **A.**  Since I -- since I'm unaware of any restriction on the

24   size of aircraft, then, yes, American could have flown larger

25   aircraft for the slots they transferred.

1          THE COURT:  In the sense that there was no legal

2    restriction on it, as far as no -- no prohibition on them

3    flying a bigger plane in that slot?

4          THE WITNESS:  There's no -- yes, sir, no

5    prohibition from flying it.  And they have plenty of larger

6    aircraft, so I imagine there could have found a solution to

7    fly larger aircraft if they wanted.

8    BY MR. WIENER:

9    **Q.**  If a partnership between two airlines includes routes

10   where the two airlines were the only two airlines offering

11   service, can that partnership affect price on that route?

12   **A.**  The --

13         MR. WALL:  Objection.  Foundation.

14         THE COURT:  Ask the question again.

15   BY MR. WIENER:

16   **Q.**  If a partnership between two airlines includes routes

17   where those two airlines were the only two airlines offering

18   service, can that partnership affect price on that route?

19         MR. WALL:  Your Honor, it seems to ask for some

20   kind of, like, expert opinion, and there's no foundation that

21   he would have any --

22         THE COURT:  I'm not sure of whether you're asking

23   whether the partnership could affect the price, or whether

24   each of the airlines could affect the price.

25         MR. WIENER:  If Mr. Watterson thinks that there's a

1    distinction, I would be happy to hear the distinction,

2    Your Honor.

3              THE COURT:  I just want to know what the question

4    is.

5              MR. WIENER:  Ah.  I'm asking Mr. Watterson whether

6    or not, if there were two airlines to form a partnership, and

7    prior to the partnership they were the only two airlines on

8    that route, whether that partnership can affect the price on

9    the route after the partnership was entered.

10             THE COURT:  And the fact that they entered into the

11   partnership?

12             MR. WIENER:  Yes, Your Honor.

13             THE COURT:  You can answer that question.

14             THE WITNESS:  If the partnership allows for you --

15   bless you -- if the partnership allows for you to coordinate

16   capacity, then, yes.  For -- changing supply in the face of

17   constant demand will generally change the pricing in that

18   route.

19   BY MR. WIENER:

20   **Q.**  And if -- would your answer change if -- I'm sorry.

21   Would this possibility change if the airlines offered more

22   frequencies on that route?

23   **A.**  Once again, a change of capacity, whether it's up or

24   down, will affect the price in that route.  So increased

25   capacity could -- should lead to lower prices and vice versa.

1   **Q.**  But if these were the only two airlines on that route,
2   might it be a little different?
3              MR. WALL:  Objection.  Argumentative.
4              THE COURT:  Sustained.
5              I think one of the issues, at least for me here,
6   just in thinking about this, just to be up-front with all of
7   you, in thinking about this, is while you haven't stumped him
8   with these questions, for me, some of the answers to these
9   questions seem, like, they depend on, like, what the terms of
10  the partnership is.
11             And I assume that he hasn't read the partnership
12  agreements.  My understanding is that those are confidential.
13  And I wouldn't imagine they were necessarily FedExed over to
14  Southwest, United, and Delta.
15             And so I don't know how -- like, I don't know how
16  helpful -- putting aside evidentiary kind of objections
17  Mr. Wall is making, I'm just not sure how helpful his opinion
18  is about that or his thoughts about that.  I understand that,
19  as to what his or Southwest's perception of it is for
20  purposes of their evaluating the competitive landscape, I see
21  the value of that in terms of identifying that's, you know,
22  the competition.
23             But in terms, of like, as a general proposition,
24  whether two airlines that form a partnership, whether that
25  agreement can affect price on a given route, it seems to me

1    it would turn a lot on the terms of the deal, and he doesn't

2    know the terms of the deal.

3              So I'm not -- putting aside whether it's

4    admissible, I'm just not sure how helpful it is to me in

5    figuring out the answers to these questions.

6              MR. WIENER:  I'll move on, Your Honor.

7              THE COURT:  Okay.  Thank you.

8    BY MR. WIENER:

9    **Q.**  Now, Mr. Watterson, earlier, you were shown an exhibit,

10   Defendants' Exhibit 501.

11   **A.**  Yes, sir.

12   **Q.**  Do you recall the sources of information for this

13   document?

14   **A.**  This was a document put together by one of our teams in

15   networking planning I mentioned earlier that's in charge of

16   reviewing other airlines, and so they looked at the other

17   airlines' file schedules and public statements to develop a

18   kind of synthesis of what the NEA was, to brief myself and

19   other executives.

20   **Q.**  Does this reflect Southwest's own view of the

21   partnership?

22   **A.**  No.  This is what either the analysts -- either what was

23   said by the -- by the airlines or was some commentary, every

24   once in a while, from the analyst that was putting it

25   together, as I mentioned earlier, sometimes mistakenly so.

1    **Q.**  Could you please turn to page -- the page ending in 0010,

2    page 10?

3    **A.**  Yes, sir.

4    **Q.**  Do you see the map on the left-hand side of the page?

5    **A.**  Yes, I do.

6    **Q.**  Do you see that --

7              THE COURT:  0010?

8              MR. WIENER:  Yes, Your Honor.

9              THE COURT:  Just has one map, right?

10             MR. WIENER:  I'm sorry.  Yes, just that one map.

11             THE COURT:  Okay.

12             MR. WIENER:  It's sort of on the left.

13             THE COURT:  Yes.

14   BY MR. WIENER:

15   **Q.**  Do you see that it has, in, I guess, a gold color,

16   overlap routes?

17   **A.**  Yes, sir.

18   **Q.**  Are these -- do you understand these routes to be overlap

19   routes covered by the NEA?

20   **A.**  Some of them, yes.  The ones that are going to and from

21   Boston should be considered by the NEA.  The two -- I'm not

22   terribly familiar with the difference between Martha's

23   Vineyard and which one's which on the Cape, but the ones that

24   are going from the Cape would not be part of the NEA.

25   **Q.**  Okay.  How did the overlap routes as of this document's

1    creation in February of 2021 compare to the current NEA
2    overlap routes?
3    **A.**   The Boston to Syracuse and Boston to Rochester, those
4    yellow lines are -- no longer overlap.  It's just one -- one
5    airline that operates.  I think JetBlue stopped serving.
6    It's just American now.
7    **Q.**   You can put that document aside, Mr. Watterson --
8    **A.**   Thank you.
9    **Q.**   -- and take a look at DX 503, please.  Turn to slide 5,
10   please.
11   **A.**   Yes, sir.
12   **Q.**   I believe, earlier, you testified that this -- that the
13   source of this information was investor material and carrier
14   commentary.  Do you recall that testimony?
15   **A.**   Yes, sir.
16   **Q.**   That's the same -- is this the same sources as DX 501
17   that -- same kinds of sources as DX 501, the document you
18   looked at previously?
19   **A.**   Yes, the same sources.  It's a more evolved draft of it.
20   **Q.**   Okay.  Does this reflect Southwest's view of the -- of
21   the NEA, this slide?
22   **A.**   No, sir.  It's just the reporting out what the carrier
23   said.
24   **Q.**   Okay.  And so where it says on this page "growth
25   opportunities and complimentary networks," are those American

1   and/or JetBlue's own statements?

2   **A.**   My understanding is this is what the analysts thought

3   that JetBlue and -- was saying when they announced the

4   partnership.

5   **Q.**   These aren't Southwest's words?

6   **A.**   It's not our assessment, no.

7   **Q.**   Okay.  If you could please turn to slides 19 and 20.

8   **A.**   Yes.

9   **Q.**   Okay.  Now, this -- this document is also from February

10   of 2021, correct?

11   **A.**   That's correct.

12   **Q.**   And the NEA started to be implemented in January of 2021;

13   is that correct?

14   **A.**   I don't know the exact start date.  I apologize.

15   **Q.**   Is it around that time period?

16   **A.**   Yes.

17   **Q.**   Based on your network-planning experience, how far in

18   advance would -- the growth described in the right-hand

19   charts on these two slides, how far in advance would that

20   have been planned?

21   **A.**   The problem with -- this is during COVID.  So, normally,

22   an airline will have -- most airlines, not Southwest -- most

23   airlines will have a schedule valid out to, like, 360 days.

24   It would kind of be a roll in addition to that, and then they

25   firm it up or change it as you get closer in.  And so there

1    will be, you know, a few months out, three or four months

2    out, where they firm it up, normally.  In COVID times, that's

3    come in maybe just a couple months out.

4            So these -- June '21 -- if they were part of the

5    normal kind of gradual extension of the -- of their schedules

6    through time, it would just reflect what was already out

7    there, so to speak.  If it -- once you get closer in, you

8    start making changes to that and firming it up.  And so I

9    don't know -- they ultimately did not operate this, so I

10   don't know where this was in their planning horizon, if this

11   is pre or post adjustments for, you know, reality, so to

12   speak.

13   Q.  And the reality is COVID and, like, winter and spring of

14   2021?

15   A.  Yes, sir.

16   Q.  But could the Delta figures on slide 19 reflect Delta's

17   organic growth in Boston?

18   A.  Most certainly reflected what Delta was going to do

19   organically.

20   Q.  Okay.  And if you look at slide 20, United's growth at

21   Newark, would these growth figures reflect United's organic

22   growth at Newark?

23   A.  Since it's domestic, yes.  Undoubtedly, this was organic

24   growth.

25   Q.  Do you know if either airline partnered at either Boston

1    or Newark to achieve this growth?

2    **A.**   To where?

3    **Q.**   Do you know if either airline had partnered at either

4    Newark or Boston to achieve this growth?

5    **A.**   Since this is domestic, I do believe it would be -- no

6    partnerships involved.  International, they have partnerships

7    at these airports; but domestic, I believe it to be only

8    themselves.

9    **Q.**   And the time frame on these charts -- time frame

10   comparison is June 2019 versus June 2021.  Do you see that?

11   **A.**   Yes, sir.

12   **Q.**   Do these figures take into account the execution of

13   pre-COVID plans that may have been paused during COVID?

14              MR. WALL:  Objection.  No foundation.

15              THE COURT:  Sustained.

16              MR. WIENER:  I'll move on.

17   BY MR. WIENER:

18   **Q.**   Mr. Watterson, you -- you testified earlier regarding

19   hometown status and critical mass.  Do you recall that

20   testimony?

21   **A.**   Yes, sir.

22   **Q.**   Does Southwest have operations at Hartsfield-Jackson

23   Airport in Atlanta?

24   **A.**   Yes, we do.

25   **Q.**   Who is the largest carrier in Atlanta?

1    **A.**   Delta is.

2    **Q.**   Do you have a sense of how much larger Delta is than

3    Southwest in Atlanta?

4    **A.**   I'm not sure their current, but kind of pre-COVID, I

5    believe there were maybe around 1,100 flights a day, and we

6    were around 125 flights a day.

7    **Q.**   Order of magnitude?

8    **A.**   Yes, sir.

9    **Q.**   Can you describe Southwest's performance out of Atlanta?

10   **A.**   We're -- it's a profitable operation.  We're far from the

11   hometown carrier.  Delta obviously is, but we have a critical

12   mass operation there.

13   **Q.**   And you have critical mass, despite Delta's size in

14   Atlanta?

15   **A.**   Yes, sir.

16            MR. WIENER:  Thank you, Mr. Watterson.

17            No further questions, Your Honor.

18            THE COURT:  Any cross?

19            MR. WALL:  Just a few things.

20       **RECROSS-EXAMINATION BY COUNSEL FOR AMERICAN AIRLINES**

21   BY MR. WALL:

22   **Q.**   Mr. Watterson, just because we're trying to compile our

23   glossary of airline terms, do you -- you mentioned in one of

24   your answers the "perimeter rule" at LaGuardia.

25   **A.**   Yes, sir.

1    **Q.**  Can you just define that for the Court, please?

2    **A.**  The perimeter rule, which I believe is established by the

3    port authority of New York and New Jersey, limits the

4    distance from which you may have scheduled flights from

5    LaGuardia to 1,500 miles, airports within 1,500 miles, with a

6    grandfather clause for Denver.

7             And so that --

8             THE COURT:  You can't fly further than 1,500 miles

9    from LaGuardia?

10            THE WITNESS:  That is correct.  Except for

11   Saturdays.  Saturdays does not apply.  So you can fly

12   wherever you like on Saturday, but it's 1,500, except for

13   Denver.

14            MR. WALL:  I can't help wonder who the congressman

15   of Denver was at that point in time.

16   BY MR. WALL:

17   **Q.**  In all events, does that mean that, for transcontinental

18   flying to and from New York, the airport choices are Kennedy

19   and Newark?

20   **A.**  So if you want to fly from the New York region to beyond

21   that perimeter, you must fly from one of the other airports

22   in the region, yes.

23   **Q.**  Nonstop, of course?

24   **A.**  Say again?

25   **Q.**  In order to go nonstop?

1    **A.**   Yes, sir.

2    **Q.**   Okay.  So -- and the way that happens to be organized

3    right now in the New York market is that United Airlines

4    offers its transcontinental service to and from New York from

5    Newark, right?

6    **A.**   They also have a handful of flights from JFK.

7    **Q.**   Actually, they just announced recently, correct?

8    **A.**   They started flying them during COVID, but since they had

9    given up their JFK slots to Delta pre-COVID, they don't

10   have -- they are trying to get more slots to fly there, but

11   according to their press announcements, they are uncertain if

12   they will.

13   **Q.**   Right.  And American offers its transcontinental service

14   to and from New York from JFK, right?

15   **A.**   They fly from JFK transcontinental.  Yes, sir.

16   **Q.**   JetBlue offers its transcontinental service from both

17   Newark and JFK?

18   **A.**   They offer from JFK and Newark.  They've recently pulled

19   down Newark with some of the staffing problems, but I can't

20   recall which routes.  I imagine they're still offering

21   transconts.

22   **Q.**   And Alaska Airlines offers its transcontinental service

23   both from Newark and JFK, correct?

24   **A.**   I believe that's correct.  Pre-COVID, they definitely

25   did.  And now I'm sure they still do to JFK, but at Newark,

1    I'm not 100 percent sure, but they did pre-COVID.

2    **Q.**   And finally Delta, how do they offer their New York

3    transcontinental service?

4    **A.**   From JFK for sure, and I can't recall on Newark.   I

5    apologize.

6    **Q.**   Okay.   Thank you, sir.

7          Now, you've said -- counsel took you through some

8    of these documents that we're analyzing, the NEA, and was

9    making the point that some of these statements were based

10   upon what -- what analysts said.

11         If we take a quick look at exhibit -- let's see --

12   excuse me one second -- 501, which is this February 2021

13   American Expanded Partnership Review, you testified not only

14   that -- to where the data from -- on these slides came from,

15   but that you agreed with the evaluation of the NEA, did you

16   not?

17   **A.**   For some particular statements, I said I agree.   I don't

18   recall if I agreed to the whole document.

19   **Q.**   Right.   You agreed with a statement that American was

20   enhancing its network advantage with partnerships, right?

21   **A.**   I recall the agreement of the bottom left one, the -- the

22   bottom left, dashed, "AA's partnership with JetBlue

23   strengthens it's Northeast network and north/south routes

24   along the Eastern Seaboard," was one you asked me about, and

25   I recall agreeing to that one.

1    **Q.**  Great.  Do you recall that at your deposition I asked you

2    whether there was any statement on this page that --

3            MR. WIENER:  Objection.  Improper impeachment.

4            THE COURT:  Well, he's got to ask the question

5    first.

6    BY MR. WALL:

7    **Q.**  Do you recall testifying at your deposition -- my asking

8    you at your deposition whether there was any statement on

9    this page that you disagreed with and that you answered that

10   you couldn't think of any?

11   **A.**  I would like --

12           MR. WIENER:  Objection, Your Honor.  Improper

13   impeachment.

14           MR. WALL:  I don't know why --

15           MR. WIENER:  He should cite -- if he's talking

16   about Mr. Watterson's deposition testimony, he can give

17   Mr. Watterson a citation from the deposition.

18           MR. WALL:  I could do that, Your Honor, but this is

19   another way of doing it.

20           THE COURT:  Overruled for now.

21           If you don't know, you don't know.  You can answer

22   if you can.

23           THE WITNESS:  I --

24           THE COURT:  Can you ask -- you're going to ask him

25   whether he agreed to that in his deposition?

1              MR. WALL:  Yeah.

2              THE WITNESS:  I can't recall my deposition.  So if

3      I can refer to the deposition, I can give you the answer.

4      BY MR. WALL:

5      **Q.**  Sure.  Why don't you take a look at page 98 of your

6      deposition.

7      **A.**  Okay.  May I have a chance to read it?

8              THE COURT:  Yes, of course.  Read it to yourself.

9      Take your time.

10             I think the page number referenced on line 5 is a

11     different page sequencing number, but it is the same page as

12     you both have been looking at as in Exhibit 501, page

13     number 2.  You also see the other page numbers on that page.

14             THE WITNESS:  Yes, I see my response, and I think

15     it's consistent where I say, "I would say that I generally

16     agree with those statements.  I don't find any to be false.

17     Perhaps some can be incomplete, or you could do a better job,

18     but nothing strikes me as being incorrect."

19     BY MR. WALL:

20     **Q.**  Is that still your testimony today?

21     **A.**  Say again?

22     **Q.**  Is it still your testimony today?

23     **A.**  Yes.

24     **Q.**  Okay.  So finally, sir, counsel asked you about the

25     expanded output of Delta and United at Boston and Newark

1    respectively.  Now, one factor that would affect their

2    ability, that would affect the ability of any legacy airline,

3    to add capacity or expand output in a market is the degree to

4    which they're getting feeder traffic from their networks,

5    correct?

6    **A.**   Some markets -- some flights you can fill up with just

7    point-to-point demand.  Some flights you need connecting

8    demand to fill up, is -- would be, I think, a true statement.

9    **Q.**   And Delta, with respect to Boston, obtains feeder traffic

10   from its international alliance partners, does it not?

11   **A.**   I believe their alliance, their -- United's alliance with

12   European carriers does cover Boston, but I don't know the

13   extent -- the volume at which they get feeder traffic.  I'm

14   sure some exists, but I don't know the magnitude.

15   **Q.**   And United, with respect to Newark, gets feeder traffic

16   from its Star Alliance partners, correct?

17   **A.**   United is also covered by their alliance and I imagine,

18   if they're -- I don't know the volume of their feeder traffic

19   it -- from alliance partners at Newark.  They also have

20   substantial operations themselves to, quote, "feed

21   themselves," I think, is the large -- the large majority of

22   their feed, in Newark.

23   **Q.**   Right.  They're getting feed from both their own large

24   domestic network and their international alliance partners at

25   Newark, correct?

1    **A.**   They are getting feed.  I don't know the magnitude, but

2    there is feed happening, undoubtedly.

3              MR. WALL:  Thank you, sir.

4              Nothing further.

5              THE COURT:  Thank you, sir.  You are excused.

6              THE WITNESS:  Thank you, sir.  Have a good rest of

7    the day.

8              THE COURT:  You too.  Good luck on Saturday.

9              THE WITNESS:  Thank you, sir.  Got a hurricane to

10   deal with.

11             MR. JONES:  Your Honor, the plaintiffs call next

12   Barry McMenamin of JetBlue.  And my colleague from the

13   Massachusetts Attorney General's Office, Mr. Dan Leff, will

14   be conducting that examination.

15             THE COURT:  All right.

16             MR. LEFF:  Good morning, Your Honor -- or good

17   afternoon, Your Honor.

18             MS. MALTAS:  Your Honor, I just -- Allyson Maltas

19   for American Airlines.

20             I just had a request from plaintiffs.  I understand

21   that we're going to be ending today at 3:30; is that correct?

22             THE COURT:  Yes.

23             MS. MALTAS:  Do we have any expectation from

24   plaintiffs that we'll actually be calling Mr. Paul Swartz?

25   Because he has a meeting across town at 3:30 that he would

1    love to make if there's no chance he'll be called today.

2            THE COURT:  Any idea how long you'll be on direct

3    of this witness?

4            MS. MALTAS:  It's 2:45 right now, so there's about

5    45 minutes.

6            MR. LEFF:  Your Honor, I expect it will be about

7    40 minutes on direct.

8            THE COURT:  So I think that --

9            MS. MALTAS:  Okay.  Unless you feel like you

10   would --

11           THE COURT:  If he -- if you have literally no

12   examination of this witness, I would let -- I would be

13   willing to end five minutes early so he can go to his

14   meeting.  I don't see the point of, like, calling -- making

15   them call another witness at this point today for five

16   minutes.  So I'm not saying I'm always going to follow that

17   practice, but -- so you -- you can let him go.

18           Because I'm assuming, also, you're likely to have

19   questions of him.

20           MR. CRANER:  We are.  Yes, Your Honor.

21           MS. MALTAS:  Thank you so much.  I'll let him know.

22           THE COURT:  No problem.

23           MR. LEFF:  And, Your Honor, just to be clear,

24   because we're not sure that this was the case with the

25   previous two witnesses, Mr. McMenamin is on plaintiffs'

```
 1    witness list, but I believe he is not on the defense witness

 2    list.

 3                 THE COURT:  Okay.  Is he here?

 4                 There you are.  If you could come forward, sir, and

 5    take the witness stand.  Remain standing for Ms. Belmont to

 6    administer the oath.

 7                 (Witness duly sworn.)

 8                 THE DEPUTY CLERK:  Can you please state your name

 9    for the record?

10                 THE WITNESS:  Barry McMenamin.

11                 THE COURT:  Can you just spell it for the court

12    reporter?

13                 THE WITNESS:  Yeah, it's B-a-r-r --

14                 THE COURT:  No, no.  Just the last name.

15                 THE WITNESS:  M-c-M-e-n-a-m-i-n.

16                 THE COURT:  Great.  You can be seated.

17                 THE WITNESS:  Thank you, Your Honor.

18                 THE COURT:  The significance of that is what?

19                 MR. LEFF:  I believe, for witnesses who are on both

20    sides' witness list --

21                 THE COURT:  They're going to --

22                 MR. LEFF:  -- the cross can go in any direction.

23                 THE COURT:  So -- okay.

24                 MR. LEFF:  Exactly.

25                 And, Your Honor, Mr. McMenamin is here as a JetBlue
```

1    employee.  May I treat him as an adverse witness?

2          THE COURT:  Yes.  You can administer him as if he's

3    a hostile witness.

4                      **BARRY McMENAMIN**

5          having been duly sworn, testified as follows:

6    **DIRECT EXAMINATION BY COUNSEL FOR THE GOVERNMENT**

7    BY MR. LEFF:

8    **Q.**  Mr. McMenamin, you have a binder in front of you with

9    some exhibits.  So when the time comes, I will direct you to

10   those exhibits.  All right.  And good morning or -- second

11   time around -- good afternoon, Mr. McMenamin.

12   **A.**  Good afternoon.

13   **Q.**  Mr. McMenamin, who do you currently work for?

14   **A.**  I currently work for JetBlue.

15   **Q.**  And what is your position at JetBlue?

16   **A.**  I'm a corporate sales manager based in the New England

17   area.

18   **Q.**  And as a corporate sales manager for the New England

19   area, your customers typically fly primarily out of

20   Boston-Logan Airport; is that right?

21   **A.**  Correct.  The majority of my customers are centered

22   around the New England area.

23   **Q.**  Okay.  And you've been in that role since August of 2017;

24   is that right?

25   **A.**  That is right.

1    **Q.**   So, Mr. McMenamin, "corporate sales" means selling

2    JetBlue to businesses as opposed to individual travelers; is

3    that correct?

4    **A.**   That's right.  We work to get in corporate's travel

5    programs to feature as an option when they're booking travel.

6    **Q.**   And in your role as a corporate sales manager, you have

7    various responsibilities, right?

8    **A.**   Various, but all centered around the sales process.

9    **Q.**   Okay.  So one of those responsibilities is identifying

10   new potential corporate customers, correct?

11   **A.**   Correct, looking for opportunities.

12   **Q.**   And another responsibility is then getting into those

13   potential corporate customers' corporate travel programs,

14   right?

15   **A.**   Yes.

16   **Q.**   And the significance of getting into a business's

17   corporate travel program is that that business's employees

18   can then select JetBlue for their corporate business-related

19   travel; is that right?

20   **A.**   Correct.  We say it's getting on the shelf as an option

21   for them to book.

22   **Q.**   Understood.  And getting into a corporate travel program

23   is a competitive process, is it not?

24   **A.**   It can be.  It's not always, but it can be.

25   **Q.**   Okay.  But, in other words, typically, a given

1    corporation doesn't allow every single airline into it's
2    corporate travel program, right?
3    **A.**   It depends how big they are, and I don't manage the
4    programs, but I have to assume the biggest programs may
5    feature a large number of partners; and then smaller programs
6    will have a smaller number of partners.  And then depending
7    on how strict and regimented the program is, like it's not
8    one kind of -- there's not one program for every company.
9    **Q.**   Understood.  But for a particular route, typically, with
10   the customers that you deal with as a corporate sales manager
11   for JetBlue, those corporations have a limited number of
12   airlines in their corporate travel program that are, as you
13   put it, on the shelf for their travelers; is that right?
14   **A.**   It's hard to explain it because they will put in
15   qualified partners that they feel best support their travel
16   needs.  So if they have a very limited number of travel
17   needs, they have a very small number of partners.  But if
18   it's a global program, they could have partners in every
19   corner of the world and then also consultants and travel
20   managers and international offices across the world.
21          So it's -- truly -- it's like no program is the
22   same.
23   **Q.**   Okay.  Another responsibility of yours, Mr. McMenamin, is
24   protecting the market share that you already have from your
25   corporate customers; is that right?

1  **A.**  Absolutely, yes.

2  **Q.**  Okay.  And then, additionally, another responsibility is

3  to grow that market share that you currently have from your

4  corporate customers; is that right?

5  **A.**  Not always the case.  We -- they may be overperforming,

6  for certain reasons.  You always want to protect what you

7  have.  But there may be reasons why you are overperforming on

8  a certain route, and that won't replicate next year.  You

9  always want to protect what you have and grow if there's the

10  opportunity to grow.

11        But it's about doing your due diligence and

12  recognizing, does that opportunity present itself for the

13  renewal process, or are we going to protect and maintain

14  pattern for some of our partners?  So we always want to grow.

15  **Q.**  Sorry to interrupt.  So to make sure I understand, in

16  some cases, JetBlue may have corporate customers that are

17  overperforming for JetBlue?  In other words, giving more than

18  what you think you could rightfully expect in terms of share

19  to JetBlue, right?

20  **A.**  More than what our fair market share would show that we

21  should be getting on a particular route.  If we have three

22  flights out of ten and two are timed for travel, corporate

23  travel, should we get 20 percent, we would like to -- we need

24  a metric to shoot for, and that would be the metric we use.

25        Sometimes you just have people who love JetBlue and

1    they overperform on that route because either we have the

2    best schedule, or from the New England area, we tend to see a

3    lot of support from all segments, so we may perform better on

4    that route compared to maybe partners in the New York area.

5    **Q.**  And from other customers that aren't overperforming, one

6    of your responsibilities would be to try to ramp up their

7    performance or to increase the share from JetBlue for that

8    particular customer; is that right?

9    **A.**  Correct, or to understand why they're not performing to

10   the expected level.

11              THE COURT:  So just so I understand your meaning,

12   you have, like, three flights on a particular route.  Two of

13   them are timed for business travel.  You have a business

14   corporate travel program.  So you're tracking what they buy,

15   and you would expect them -- 20 percent -- you would expect

16   to get -- since you have 20 percent of the business flights,

17   if you will, on that route, you're expecting to get

18   20 percent of their flights on that route?

19              THE WITNESS:  We'd like to --

20              THE COURT:  That's, like, the metric you're

21   shooting for?

22              THE WITNESS:  Exactly.  And sometimes that one

23   flight that we know we're not going to get strong support

24   might be a redeye.  So from the corporate segment, they tend

25   to never buy a redeye flight, so traveling overnight between

```
 1    two destinations --
 2             THE COURT:  It's so much more efficient.
 3             THE WITNESS:  I know.  I like redeyes, but the
 4    corporate community, not so much.
 5             THE COURT:  And so if you were at 25 percent, you
 6    would view yourself as overperforming in that example?
 7             THE WITNESS:  In that example, if the metric was
 8    20 percent that we were aspiring to get and they were at
 9    25 percent, yes, we would think we were overperforming.
10             THE COURT:  Understood.
11             Go ahead.
12    BY MR. LEFF:
13    Q.  So to follow-up on that, Mr. McMenamin, when you look at
14    your fair market share, you mentioned you may not take into
15    account certain flights that aren't timed for business
16    travel, right?
17    A.  Correct.
18    Q.  And you also don't take into account certain airlines
19    that are not typically selected by business customers, right?
20    A.  That's right.  Yeah, there are a lot of airlines in the
21    domestic US that are conducive for business travel, and the
22    tools we use are on a lot that are not.
23    Q.  So you're familiar with the term "ultra low cost
24    carrier," or ULCC?
25    A.  Yes.
```

1    **Q.**  And those would be the sort of airlines that you don't

2    typically consider relevant competitors for corporate

3    accounts; is that right?

4    **A.**  We can't track their data, so they're -- not that that

5    they're not relevant, but they're not selling the tools we

6    need them to sell to monitor our performance versus their

7    performance with clients.

8            For us, we need our clients to be booking the

9    corporate travel in specific tools called the "GDS."  So it

10   could be a concurrent booking tool powered by the GDS, or it

11   could be a travel agency using the GDS and --

12           THE COURT:  What's the GDS?

13           THE WITNESS:  A global distribution system.  So

14   it's the things that power the tools on the back end, the

15   coding.  And the ultra low cost carriers don't typically

16   engage in those tools because there can be a cost involved,

17   or maybe it's not a segment they're going after.

18           So it's not that they're not relevant.  They're

19   just not using the tools that we would need to kind of

20   monitor our performance versus them.  Sorry.

21   BY MR. LEFF:

22   **Q.**  Sorry to interrupt.

23           So I think I understand why they're difficult for

24   you to monitor.  But the question is, do you, when you're

25   trying to sell to a corporate customer, consider those ultra

1    low cost carries as strong competitors for their corporate

2    customers?

3    **A.**   No, not typically, because they're also not using the

4    GDS.  So the corporate clients can't allow the travelers to

5    make those bookings, because you make your booking.  You're

6    using the GDS.  It pulls into reporting, and then you can see

7    where your travelers are going.

8              I don't think bigger carriers use those tools, but

9    the ultra low cost carriers tend to not be in those tools, so

10   they don't feature in the same travel programs that we would

11   be selling to.

12   **Q.**   And some examples of ultra low cost carriers would be

13   Frontier Airlines; is that right?

14   **A.**   Frontier, Allegiant, Spirit.

15   **Q.**   Sun Country?

16   **A.**   Yes, but they're -- they're, like, leisure for

17   Minneapolis.  They're a charter for Amazon Prime.  They're,

18   like -- I don't even know what Sun Country is anymore.

19   **Q.**   And what about Southwest?  You don't typically consider

20   their competing offerings when you're selling to corporate

21   customers in Boston, do you?

22   **A.**   We do.  Southwest is the largest domestic US carrier.

23   The number of flights they have is just enormous, and I

24   didn't realize until I got to this side.  And they had just

25   started participating in the GDS tools that our partners need

1    them to participate in, in, like, the last three years, I

2    want to say, so they feature more.

3            And then from the Boston area, they -- they are

4    very strong in the higher education market that we are also

5    playing in, because certain benefits they offer, like bags

6    for free and things, so, like, it's more liked by that

7    segment.

8    Q.  So to make sure I understand, in the last three years or

9    so, they've begun -- began -- begun to become more of a

10   relevant competitor for corporate accounts; is that right?

11   A.  To my understanding, yes.  They play more in the GDS in

12   the last three years.  I don't know how far into the GDS

13   they're playing prior to that, but they really started

14   heavily promoting their business product about three years

15   ago.  I think I'm correct on that timeline.

16   Q.  And prior to that, Mr. McMenamin, you didn't typically

17   consider them when you were looking at the competition for

18   corporate customers; is that right?

19   A.  I wouldn't say we weren't looking at them.  We just

20   didn't have the ability to see their data either.  I don't

21   know if my ops team looked at their performance.  I -- I

22   personally didn't, but now we know that they're featuring

23   these tools, and they are more business friendly.

24   Q.  So when you're looking at competition for corporate

25   customers, you do take into account competition from Delta,

1    right?

2    **A.**  Yes.

3    **Q.**  United?

4    **A.**  Yes.

5    **Q.**  And American, right?

6    **A.**  And American.  And from this area, Southwest, too.  They

7    would be the fourth biggest player up here.

8    **Q.**  Okay.  Mr. McMenamin, to succeed in corporate sales, it's

9    important that your pricing is competitive, wouldn't you say?

10   **A.**  Pricing is one part.  It's an important part, most

11   definitely, but it's only one part.

12   **Q.**  Well, you would say, wouldn't you, that price is, in

13   fact, the key factor, wouldn't you?

14   **A.**  It's also the travel experience.  You could have the best

15   price in the market and have a horrible traveler experience.

16   And what we have learned over the last two years is you need

17   to make sure that you have a product that treats your

18   employees well.

19          Like if they were traveling for your own business,

20   it's not just about price.  It's about the experience and

21   making sure your employees have the best experience when they

22   are taking their personal time and traveling for work.  So

23   price is important, don't get me wrong, but it's not the only

24   benefit.

25   **Q.**  Mr. McMenamin, you recall being deposed in this matter,

1    don't you?

2    **A.**   I remember -- yes.  In this case, yes.

3    **Q.**   Okay.  And behind Tab 1 in your binder, you'll find a

4    transcript -- or the first tab -- I don't know if it's

5    numbered -- of your deposition.  I'd like you to turn to

6    page 64, please.

7    **A.**   I'm sorry; is it this binder or --

8    **Q.**   Yeah, I believe so.  Does that have your name on it?

9    **A.**   Yes.  This is Andrew Watterson.

10   **Q.**   I think you can put that one aside, unless you've had a

11   name change.

12            MR. JONES:  Your Honor, may we approach to

13   retrieve --

14            THE COURT:  Yes, go ahead.

15            MR. JONES:  Yeah.  Thank you.

16   BY MR. LEFF:

17   **Q.**   All right.  So page 64.  Have you located that?

18   **A.**   64.  Yes.

19   **Q.**   Okay.  And starting at line 19, you said, "I don't think

20   it's fair to say that.  Obviously, it's important, but it's

21   not the only important part of your place in a travel program

22   and when in business."

23            And then I asked you, "So what are the other

24   important parts?"

25            And you answered, "You got to make sure that the

1    executive teams that are traveling are happy with their

2    options.  You have to make sure that your pricing is

3    competitive.  You have to ensure that your schedule is good

4    on those routes.  You have to ensure that the agencies are

5    happy with your support."

6            MR. LEFF:  And I apologize, Your Honor.  I actually

7    had -- not the page that I was looking for.

8    BY MR. LEFF:

9    **Q.**  So could I ask you, Mr. McMenamin, to turn to page 68.

10   Do you see that?

11   **A.**  Yes, sir.

12   **Q.**  All right.  And at line 3, I asked you:  "JetBlue aims to

13   offer lower prices than the competition; is that right?"

14           And you answered, "I want to make sure that we're

15   competitive to shift share.  We want to make sure we are the

16   choice that is selected.  And a primary driver of that for

17   our corporate partners is price.  It's not all price, but

18   price is key."

19           Is that what you said?

20   **A.**  That is what I said.

21           MR. LEFF:  And, Your Honor, I offer page 68,

22   lines 3 through 10, into evidence.

23           MR. CRANER:  Your Honor, we don't believe this is

24   impeaching at all.

25           THE COURT:  I'm not sure whether -- I don't know

1    that I would go so far as to say it isn't impeaching at all,

2    but I -- if you're objecting, I'll overrule the objection.

3    I'll take it into evidence --

4                    MR. CRANER:  Thank you, Your Honor.

5                    THE COURT:  -- for whatever weight it has.

6                    (Plaintiff Exhibit page 68, lines 3 through 10

7                    admitted into evidence.)

8    BY MR. LEFF:

9    **Q.**  All right.  Mr. McMenamin, in order to win and grow

10   business from your corporate customers, JetBlue offers what

11   are called "systemwide discounts"; is that right?

12   **A.**  That's one of the offers we have, yes, for corporate

13   clients.

14   **Q.**  Okay.  And a systemwide discount is a percentage discount

15   that's applied to JetBlue's published fares; is that correct?

16   **A.**  That is correct.

17   **Q.**  And what is a published fare?

18   **A.**  A published fare could be any fare that you could find on

19   JetBlue.com or other distribution channels that we're selling

20   to the public.

21   **Q.**  Understood.  So a systemwide discount is a way for

22   JetBlue to win business from corporate customers in the face

23   of competition from other airlines; is that right?

24   **A.**  It's a way to get in their program and to kind of drive

25   share from their travelers.  And there may be other

1   competitors in that program that you're fighting for that

2   same share from.

3   Q.   Okay.  And in addition to the systemwide discounts,

4   JetBlue also offers some corporate customers what are called

5   "flat fares," right?

6   A.   Yes.  That's another tool we have.

7   Q.   Another tool to try to win share from JetBlue, right?

8   A.   To -- yes, to get share from their corporate travelers.

9   Q.   Okay.  And a flat fare is a fixed price that JetBlue

10  gives a corporate customer on a specific airport pair for the

11  life of a contract; is that right?

12  A.   Yes.  Most airlines offer this and hotels too.  You might

13  have, like, a flat rate that you paid a hotel as well.  So

14  it's something that suppliers will use and offer to their

15  clients.

16  Q.   And that flat fare is generally discounted from the

17  published fare, right?  In other words, it's lower than what

18  a member of the public would pay on that route.

19  A.   It should be competitively priced.  It's not always going

20  to be the lowest fare.  Like in times of COVID, when there

21  was nobody traveling, I might have a client with a $100 flat

22  fare on a route, and next thing, there's no travelers.  So

23  our published shares drop below that and they settle on,

24  like, $90.

25          But we also offer the systemwide discounts, so

1    they'll always get a percentage discount on whatever we're

2    selling, which will be lower than the published fare.  So you

3    want your flat fares to be competitive.  There are certain

4    scenarios where they are not always the lowest.

5    **Q.**   And flat fares are generally for refundable tickets; is

6    that right?

7    **A.**   They do come with additional benefits, and some of the

8    flat fares are refundable as long as the traveler stays

9    within the fare parameter.  So they need to cancel before

10   time of our scheduled departure, which I think is different

11   than other airlines.

12   **Q.**   Okay.  And another benefit of flat fares is that they

13   offer some predictability to corporate customers; is that

14   right?

15   **A.**   Yes.  You will never pay more than one of the flat fares

16   on offers.  So say a client gets an N fare and a Y fare, the

17   client knows that they'll never -- so we offer flat fares in

18   two categories, and one of the categories comes with an

19   additional benefit of last seat availability.  So as long as

20   we're selling a seat on the plane, that flat fare is on offer

21   to the traveler.

22   **Q.**   Mr. McMenamin, in exchange for the systemwide discounts

23   and the flat fares that JetBlue offers your corporate

24   customers, you ask those customers to commit to certain

25   percentages of their travel on specific routes; is that

1  right?

2  **A.**  We set targets together, ourselves and the partner, on

3  offer for any of the corporate discounts.  So if it's

4  systemwide or flat fares, you want -- if you're extending a

5  special offer to them, there is a commitment from the partner

6  which can entail share commitments on their top travel

7  routes.

8        We work with the partner to put in place realistic

9  goals together and then, through the year, monitor to see,

10  you know, their performance on those routes to what they have

11  committed to delivering.

12  **Q.**  All right.  Let's turn now to JetBlue's performance with

13  corporate customers in Boston before the NEA.  So,

14  Mr. McMenamin, JetBlue, would you agree, is one of the

15  leading airlines in Boston overall?

16  **A.**  I would agree with that, yes.

17  **Q.**  Okay.  And New England is the most important region for

18  JetBlue in terms of corporate sales; is that right?

19  **A.**  New England sees very strong support from the corporate

20  community, and I believe it's the strongest support from any

21  of our focus cities, the cities that we operate.

22  **Q.**  And it's important to JetBlue that you have success in

23  the corporate market here in New England; is that right?

24  **A.**  I think the corporate market here in the New England area

25  is very important to JetBlue, yes.

1  **Q.**  And, Mr. McMenamin, you've been successful in your time

2  as corporate sales manager here in New England; isn't that

3  right?

4  **A.**  I like to think so.

5  **Q.**  And you've been successful in Boston in growing share

6  from current corporate customers, right?

7  **A.**  Yes.

8  **Q.**  And bringing on new corporate customers, correct?

9  **A.**  Correct.

10 **Q.**  And since you started in your role in 2017, isn't it

11 correct that no New England-based corporate customer has told

12 you that they're leaving JetBlue in favor of Delta?

13 **A.**  We haven't -- you never typically see a customer leave

14 you to let you know it was for one particular carrier.  They

15 might leave you because you don't fill a role in their

16 program anymore, and we might be the only carrier or one of

17 two or three options that fly between certain markets, so

18 they have to work with us.  So I haven't heard anyone say

19 they have left us for Delta, but I have had three or four

20 partners leave me for other reasons.

21 **Q.**  In your time at JetBlue --

22         THE COURT:  What other reasons?

23         THE WITNESS:  One of the partners moved their

24 office from New York further down south.  They felt they

25 weren't going to be traveling in the New England area as much

1   anymore.

2          Another partner said we didn't play a strong

3   primary role in their program.  You're typically a primary

4   role if you're global, secondary role if it's domestic.

5   Maybe, like the East Coast, up and down the East Coast, we

6   would play a very strong primary role.  And they just didn't

7   feel we played as strong a role as they needed, and they

8   decided to come back to us in a few years.

9          THE COURT:  And "partners" is your word for

10  corporate customers?

11          THE WITNESS:  Yes.

12          THE COURT:  Okay.  Go ahead.

13          THE WITNESS:  Thank you.

14  BY MR. LEFF:

15  **Q.**  Now, Mr. McMenamin, in your deposition you testified that

16  you weren't aware of having lost significant share for any

17  corporate customer to another airline.  Would you still agree

18  with that?

19  **A.**  I remember saying that; and at the time, I couldn't

20  recall, but I have lost share to other carriers.

21  **Q.**  All right.  In a moment I'm going to ask you to turn to

22  one of the documents in your binder.  I'm just going to

23  caution you:  JetBlue's counsel has requested that we keep

24  certain information in these documents confidential.  So in

25  your binder, you will find an unredacted version of the

1    document.  On your screen, you will see a redacted version of

2    the document, and I ask that you not divulge the redacted

3    material.  Understood?

4    **A.**  Understood.

5    **Q.**  And I'm going to try to speak in general terms when it

6    comes to the redacted material so that I also do the same;

7    but if you have clarifying questions about what I'm asking

8    you, please let me know.

9    **A.**  Okay.

10   **Q.**  All right.  So I would like to turn to Plaintiffs'

11   Exhibit 649.

12        MR. LEFF:  And this is in evidence, Your Honor.

13   And, Your Honor, I don't believe there are any disputes about

14   the redactions, so may we publish redacted versions to the

15   gallery of the documents that we're going through?

16        THE COURT:  That's fine.

17        MR. LEFF:  Okay.  Thank you.

18   BY MR. LEFF:

19   **Q.**  So please look at Plaintiffs' Exhibit 649.  And have you

20   located that, Mr. McMenamin?

21   **A.**  Yes, sir.

22   **Q.**  All right.  So in this exhibit, you were e-mailing with

23   the representative of a potential corporate customer; is that

24   right?

25   **A.**  Yes.  This was a qualifying lead that came in to us from

1    one of our team members.

2    **Q.**   "Qualifying lead" means?

3    **A.**   So sometimes corporations will reach out to us looking to

4    see are there ways for them to work with -- closer with the

5    corporate sales team and maybe avail of a discount program.

6             So part of our job is to make sure that any of the

7    offers that are extended are qualified.  Do they have the

8    volume?  Do they have the booking tools?  That's the big

9    thing.  If they don't have the booking tools and use the GDS,

10   then we can't work with them, unfortunately, my team, anyway.

11   So we qualify first so that we're not wasting their time, as

12   much as not wasting our own.

13   **Q.**   Understood.  So this exchange took place prior to the

14   NEA, right?

15   **A.**   Yes.  This exchange is 2019.

16   **Q.**   Okay.  I'd like you to direct your attention first to the

17   bottom of page 3 of this exhibit and, in particular, to your

18   e-mail of August 29, 2019, at 1:23 p.m.

19   **A.**   Yes.

20   **Q.**   Do you see that?

21   **A.**   Yes, sir.

22   **Q.**   All right.  So in this e-mail, is it fair to say you were

23   introducing yourself to this potential corporate customer and

24   also introducing the JetBlue corporate sales team?

25   **A.**   I was introducing myself to this client, yes.

1   **Q.**  And now looking at the second sentence of the second

2   paragraph, you wrote, "Most people think of JetBlue as

3   primarily a leisure airline, which is correct, but Boston is

4   home to our largest corporate partner base, and as such, a

5   lot of what we focus on is based on their needs."

6              Is that what you wrote, Mr. McMenamin?

7   **A.**  I wrote that, yes.

8   **Q.**  And by that, you meant a lot of what JetBlue, in general,

9   does in Boston is focused on the corporate partner base; is

10  that right?

11  **A.**  That is what I meant, yes.

12  **Q.**  Okay.  Now, I'd like you to look at the potential

13  customer's response, which you can find starting at the

14  bottom of page 2, continuing on to page 3.  Do you see that?

15  **A.**  Yes.

16  **Q.**  I'd like you to focus on the second paragraph, beginning

17  with "traditionally speaking."  Do you see that?

18  **A.**  Uh-huh, yes.

19  **Q.**  All right.  And the potential customer writes to you that

20  his company's travelers have traditionally flown a lot on

21  American Airlines, right?

22  **A.**  That's what they wrote, yes.

23  **Q.**  And he specifically mentions flying AA between Boston and

24  Washington National; is that right?

25  **A.**  Yes.  DCA.

1   **Q.**   DCA.  Is it all right if we refer to that airport

2   interchangeably, DCA --

3   **A.**   Absolutely.

4   **Q.**   -- and Washington National?

5   **A.**   Absolutely.

6   **Q.**   Okay.  And it also mentions flying between Boston and

7   Philadelphia, right?

8   **A.**   They said teams flying into the Philadelphia and

9   LaGuardia areas.

10  **Q.**   Okay.  And this is a Boston-based company, correct?

11  **A.**   That is correct.

12  **Q.**   So is it your understanding he's talking about flying

13  between Boston and those two airports?

14  **A.**   I would have to assume, based on where they were --

15  **Q.**   Okay.

16  **A.**   -- traveling, yes.

17  **Q.**   And prior to the NEA, JetBlue competed with American

18  Airlines on each of those routes, right?

19  **A.**   Prior to the NEA, we did compete with American on these

20  routes, and we still compete with them; but also, I believe,

21  Delta is on all three of these routes, too, at least

22  LaGuardia.

23  **Q.**   Your belief is that you still compete with American on

24  all three of these routes?

25  **A.**   Absolutely, yes.

1  **Q.**  Not on Boston-LaGuardia, though, right?

2  **A.**  We still compete with them on Boston-LaGuardia.  Even

3  though we don't have -- they don't have their metal on the

4  flights, we price that completely separate.  Like, we price

5  our side.  They price theirs.  So there are still two options

6  on offer for corporations.

7         It's -- I know it sounds strange because, like,

8  they're not flying their own planes, but for all intents and

9  purposes, in a booking tool, you still have -- if American

10  and JetBlue feature in somebody's corporate travel program,

11  you still have two independently priced offers for the same

12  product in that tool.  So I would still say we compete with

13  them on that route.

14  **Q.**  When you say "not their metal," you mean American doesn't

15  actually fly planes between those two airports, right?

16  **A.**  Not currently.  It is -- they are JetBlue planes, but we

17  sell and price that inventory completely independent.

18  **Q.**  So looking back at this e-mail, in the same paragraph,

19  the customer adds that, due to various issues at American

20  Airlines, many of this potential customer's travelers have

21  shifted over to JetBlue; is that right?

22  **A.**  That's what he writes.

23  **Q.**  Okay.  Now, let's look at your response just above on the

24  same page, please, and I'd like you to focus on the first

25  bullet point.  Do you see that?

1    **A.**  Yes.

2    **Q.**  And there, you highlight JetBlue's plan to increase

3    frequency on the Boston-Philadelphia and Boston-DCA route on

4    peak business travel days; is that right?

5    **A.**  That's correct.

6    **Q.**  Okay.  And that's an example of how JetBlue focuses on

7    your corporate customers, right?

8    **A.**  This was -- these were city pairs that were highly

9    trafficked by the business travel community.  So, yes,

10   increasing those frequencies, especially on weekdays, is

11   primarily targeting our corporate travel.

12   **Q.**  And so that's a way for JetBlue to try to win share on

13   the Boston-DCA and Boston-Philadelphia routes, correct?

14   **A.**  That is a way, yes.  We probably increase frequencies to

15   compete with whatever else is out there and to offer a good

16   schedule through the day for customers to select.

17   **Q.**  All right.  I would like to focus a little more on

18   JetBlue's pre-NEA competition with American Airlines for

19   corporate customers.  Okay?  So before the NEA,

20   Mr. McMenamin, would you agree that American was one of

21   JetBlue's primary competitors for corporate customers in

22   Boston?

23   **A.**  Before the NEA, yes, and they continue to be one of the

24   primary competitors.

25   **Q.**  All right.  Please turn to Plaintiffs' Exhibit 650.

1    MR. LEFF:  This is in evidence, Your Honor.

2   BY MR. LEFF:

3   **Q.**  And I just repeat my caution about the redacted material

4   and not divulging it, please.

5    This is an e-mail exchange that you had, I guess,

6   both with and then about a corporate customer; is that right?

7   **A.**  That is correct.

8   **Q.**  Okay.  And this also took place prior to the NEA?

9   **A.**  April 2019, yes.

10  **Q.**  Okay.  And this corporate customer is based in Boston; is

11  that right?

12  **A.**  At this time -- and they still are based in Boston, yes.

13  **Q.**  Okay.  So I'd like to focus your attention on your e-mail

14  of April 16, 2019, at 11:41 a.m., and that starts at the

15  bottom of page 1 and then continues on to page 2.  Do you see

16  that?

17  **A.**  Yes.

18  **Q.**  All right.  So this is an e-mail you sent to JetBlue's

19  system operations directors; is that right?

20  **A.**  Yes.

21  **Q.**  And the system operations directors are the people at

22  JetBlue responsible for moving -- or for managing airplane

23  activities and movements across JetBlue's network; is that

24  right?

25  **A.**  Yes.  That's one of their functions.

1  **Q.**  Okay.  And in this particular e-mail, you were asking

2  them for special attention to a flight between Philadelphia

3  and Boston on which this corporate customer's CEO was then

4  traveling; is that right?

5  **A.**  Yes.  I'm highlighting this flight to the system office

6  team.

7  **Q.**  And at that time, Mr. McMenamin, that route,

8  Boston-Philadelphia, was flown by both JetBlue and American;

9  is that right?

10  **A.**  At least JetBlue and American.  I'm not sure if anyone

11  else is on the route, but yes, at least JetBlue and American.

12  **Q.**  All right.  I'd like you to focus on the second to last

13  paragraph of that same e-mail, please.

14       THE COURT:  What were you hoping they'd do with

15  this notice?

16       THE WITNESS:  I'm sorry, sir?

17       THE COURT:  What were you hoping they would do with

18  this notice?

19       THE WITNESS:  So on very special times, if -- if

20  our system ops team has information on a flight, and say a

21  storm is coming or catering didn't have enough supplies for

22  the majority of the flights or there was some issue that

23  known to system operations that was going to impact a

24  stations performance, they welcome any information from us to

25  highlight a flight, like, Okay.  If I can't make a decision

1   on these ten flights that are getting out, then we just

2   random -- which one can get out.

3           But if I can give them some information, highlight

4   a flight is important to us, they will keep their eyes on all

5   the elements that go into getting a flight out on time.

6           THE COURT:  I see.  Increases the chance that one

7   gets out if there's only one --

8           THE WITNESS:  Exactly.  That's something we don't

9   do a lot because system operations is highly, like, complex;

10  but for certain occasions, if a request came in.

11          THE COURT:  I see.  I understand.

12          Go ahead.

13  BY MR. LEFF:

14  **Q.**  So, Mr. McMenamin, in this e-mail to the systems

15  operations directors, you noted that you considered this

16  customer very important for Boston's success; is that right?

17  **A.**  This customer, ██████, this travel manager, yes.

18  **Q.**  Just right now -- sorry.  I'd ask you just not to speak

19  the customer's name.

20  **A.**  Oh.  I apologize.  Yes.

21  **Q.**  And you also wrote about the customer in the same e-mail,

22  "They kicked Delta out of their program a few years ago, so

23  their travelers typically only use ourselves and American."

24          Is that what you wrote?

25  **A.**  That is what I wrote.

1   **Q.**   Okay.  So at that time, you knew that this customer used

2   JetBlue and American Airlines for their travel, right?

3   **A.**   Domestically, yes.  I was aware of both ourselves and

4   American and their program.

5   **Q.**   Okay.  And you're aware that they did not use at that

6   time Delta in their program; is that --

7   **A.**   At this time, correct.

8   **Q.**   Okay.  You may put that exhibit aside, Mr. McMenamin, and

9   let's pull up or turn to -- or, actually, don't pull up yet,

10   but you can turn to Plaintiffs' Exhibit 662.

11         MR. LEFF:  And, Your Honor, I believe this is not

12   in evidence yet.

13         THE COURT:  All right.

14   BY MR. LEFF:

15   **Q.**   And, again, there's redacted material, and I'd just ask

16   that you try to keep that confidential.

17         Mr. McMenamin, is this a February 2018 e-mail

18   exchange between you and Robbie Mehoke about a potential --

19   about a customer?

20   **A.**   662 -- yes, it is.

21         MR. LEFF:  Okay.  And, Your Honor, plaintiffs offer

22   this into evidence as Plaintiffs' Exhibit 662.

23         THE COURT:  What's the objection?  Other than

24   redacting the name of the customer.

25         MR. CRANER:  Yes, and other redactions that we have

1   agreed to with the plaintiffs.  Other than that, we -- no

2   objection.

3           THE COURT:  Admitted, subject to the redactions of

4   the name of the customers and the other redactions to which

5   you have agreed.  Just ask that you redact the copy, if you

6   would.

7           (Plaintiff Exhibit No. 662 admitted into evidence.)

8           THE COURT:  You can display the redacted --

9           MR. CRANER:  Your Honor, I apologize.  We do have a

10  hearsay objection here.

11          THE COURT:  Lets' see.  To which part?

12          MR. CRANER:  I believe -- well, I would be

13  interested if counsel is not admitting this for the truth of

14  the matter asserted.  But I believe, on the top of the second

15  page, there's a mention -- "She did not mention," starting

16  with that sentence," which we believe is hearsay.

17          THE COURT:  That sentence, I'll take just for their

18  state of mind, rather than for the --

19          MR. CRANER:  Thank you, Your Honor.

20          MR. LEFF:  Yes, Your Honor.  This is just for fact

21  of what that -- the fact they heard this and their response

22  thereto.

23          THE COURT:  Okay.  Go ahead.

24          MR. LEFF:  Thank you.

25

BY MR. LEFF:

**Q.**  I just mentioned Ms. Mehoke.  Am I pronouncing that correctly, Mr. McMenamin?

**A.**  Mehoke.

**Q.**  Mehoke.  Okay.  Sorry.  She's your --

**A.**  She's my director, yes.

**Q.**  Okay.  And she's JetBlue's national director of sales; is that right?

**A.**  So we only have a director of sales.  We're a very small team, so she's just director of sales.

**Q.**  Okay.  So you're writing her about a customer, right?  And, again, I'd ask you not to say the customer's name.

**A.**  Correct.

**Q.**  And at the time of this e-mail, this company -- sorry this exchange also took place prior to the NEA, correct?

**A.**  Correct.  February 2018.

**Q.**  Okay.  And so turning your attention to your first e-mail, which starts at the bottom of page 1, please --

**A.**  Yes, sir.

**Q.**  -- and I'd actually like you to focus at the top of page 2.  Do you see that paragraph, beginning with, "She did mention"?

**A.**  Yes.

**Q.**  All right.  So do you know that -- your understanding, at least, is the customer is unhappy with American, right?

1    **A.**   At this time, they were primarily traveling into

2    LaGuardia, which was undergoing a complete renovation.  So

3    the -- the existing terminal was being ripped down while

4    still being allowed to operate.  So there were challenges at

5    that airport.

6    **Q.**   So your understanding was that this customer was unhappy

7    with American at that time?

8    **A.**   That's what I wrote, yes.

9    **Q.**   Okay.

10   **A.**   I think that was what she had said to me.

11   **Q.**   And "she" refers to the travel manager for this company;

12   is that right?

13   **A.**   I'm sorry; could you repeat that?

14   **Q.**   When you say "she" --

15   **A.**   Oh, I'm sorry.

16   **Q.**   -- are you referring to a representative of this

17   customer?

18   **A.**   This is the person that I'm exchanging with, the primary

19   travel contact.

20   **Q.**   Okay.  All right.  So in the same paragraph, you wrote,

21   "There is a chance she will start to shift business off

22   American, and in that event, they would need another partner

23   to service all the needs of her travelers."  And then you

24   mention a route that I'm not going to speak out loud.  Okay?

25             "Delta wouldn't be able to handled the volume, so

1    we may very well see an increase in share naturally through

2    their own challenge in their travel program."  Is that what

3    you wrote, Mr. McMenamin?

4    **A.**   That is what I wrote.

5    **Q.**   Okay.  So you thought there was a possibility that this

6    customer's travelers would shift from American Airlines to

7    JetBlue, right?

8    **A.**   That was a potential yes.

9    **Q.**   Okay.  Because if the customer shifted share off of

10   American, Delta alone wouldn't be a sufficient option for

11   those travelers, right?

12   **A.**   Not with the number of segments they had.  There were an

13   incredible number of segments.  So if they're unhappy with

14   one supplier, there was just such a vast volume of segments,

15   I don't think the other supplier could handle it on their

16   own.

17   **Q.**   Okay.  Let's look now at the next paragraph down, please.

18   And I'd like you to focus at the last sentence of that

19   paragraph.  So there, you can -- you suggest to Ms. Mehoke

20   that JetBlue continue to offer the customer a discount,

21   right, in the hope that they phase American out of their

22   program and shift to JetBlue, right?

23   **A.**   I was saying, yes, we wanted to monitor their performance

24   for the next six months closely and see if it presented an

25   opportunity for us to grow naturally.

1    **Q.**  Right.  And you note that they currently have a discount;

2    is that right?

3    **A.**  Yes, I noted that they had a current discount.

4    **Q.**  Okay.  And that that presents an opportunity for JetBlue

5    to grow your share of this business if they continue phasing

6    American out, right?

7    **A.**  If they continued to be unhappy with their own supplier

8    and we were a preferred supplier on that same route, I would

9    expect to see a larger share of shift if that bad experience

10   continued.

11   **Q.**  Okay.  You can put that exhibit aside, Mr. McMenamin.

12   And I'd ask that you turn to Plaintiffs' Exhibit 663.

13          MR. LEFF:  And this is in evidence, Your Honor.

14          THE COURT:  The same reminder:  You don't mention

15   the things that are redacted.

16          THE WITNESS:  Thank you, Your Honor.

17          MR. LEFF:  Thank you, Your Honor.

18   BY MR. LEFF:

19   **Q.**  So this is an e-mail exchange that you had with others at

20   JetBlue about a corporate customer contract renewal; is that

21   right?

22   **A.**  Correct.

23   **Q.**  And as with the other exhibits that we've looked at so

24   far, this took place prior to the NEA, correct?

25   **A.**  Correct.  This is January of 2020.

1    **Q.** All right.  And at the time that these e-mails were

2    written, this was one of our top-performing customers in

3    Boston, right?

4    **A.** This would have been a top partner of mine, yes.

5    **Q.** Okay.  Please, focus on your earliest e-mail in this

6    exchange, which you can find at page 5, the bottom half of

7    page 5.  Do you see that?

8    **A.** Yes.

9    **Q.** Okay.  This, Mr. McMenamin, is an e-mail that you sent to

10    your supervisor, Ms. Mehoke, right?

11    **A.** Yes.

12    **Q.** Okay.  And you're providing her with your proposal for

13    this customer's upcoming new contract; is that right?

14    **A.** Yeah, we're preparing the renewal, and I'm just putting

15    my thoughts down as to some past history and where I think we

16    should go with the renewal.

17    **Q.** All right.  Now, please look at the second sentence of

18    the first paragraph, and you wrote, "This is an account that

19    has performed incredibly well, and their team works hard

20    behind the scenes to promote JetBlue and limit Delta bookings

21    within their program."

22          Is that what you wrote?

23    **A.** That is what I wrote, yes.

24    **Q.** Okay.  Now, let's look below on the same e-mail, please,

25    at the bullet titled "Flat Fares."  Do you see that?

1    **A.**  Yes.

2    **Q.**  And then at the first sub-bullet beneath that.

3    **A.**  I have it.

4    **Q.**  Okay.  So this is still part of your proposal for this

5    customer's upcoming contract, right?

6    **A.**  Correct.

7    **Q.**  Yeah, so you propose including five flat fare markets,

8    right?

9    **A.**  For the renewal, yes.

10   **Q.**  All right.

11   **A.**  That's the same five, so it would just continue with the

12   current offer.

13   **Q.**  Understood.  And then you note that "Many of these fares

14   we'll be resetting to a lower fair, as fares in the market

15   have come down due to competition and the economic

16   environment."

17          Is that right?  That's what you wrote?

18   **A.**  That's what I wrote.

19   **Q.**  Okay.  And then you mention their top route, which I'm

20   not going to say out loud, and I'd ask you not to either,

21   right, but it's one of those five flat fare routes?

22   **A.**  Most definitely, yes.

23   **Q.**  Okay.  And you note that that fare is due to go up,

24   right?

25   **A.**  Yes.

1   **Q.** Okay.  Now, let's look at your e-mail just above from the

2   following day, January 15th at 6:59 a.m.  Do you see that?

3   **A.** Yes.

4   **Q.** Okay.  And there you write, "Now, with American's

5   announced entry coming to" -- and can we agree it's the same

6   route that you were talking about the fare going up on in the

7   last e-mail we looked at?

8   **A.** It was the same route, yes.

9   **Q.** Okay.  So, now, with American's announced entry come to

10  that route, perhaps --

11          THE COURT:  I think you haven't redacted everything

12  you wanted to redact.

13          MR. LEFF:  I'm not going to say --

14          MR. SCHWED:  Maybe we pull this off the screen.

15          THE COURT:  Yeah, pull it off the screen.

16  BY MR. LEFF:

17  **Q.** "Perhaps we should pull this customer's current fares

18  flat on that route for the renewal as they'll more than

19  likely decrease anyway with the added competition."

20          Is that what you wrote, Mr. McMenamin?

21  **A.** That is what I wrote.

22  **Q.** All right.  Let's turn, in the same document, please,

23  to -- Mr. McMenamin, first of all, that route that we were

24  just talking about, at that time, January 2020, only JetBlue

25  and Delta flew that route; is that right?

1  **A.**  That I'm aware of, only JetBlue and Delta were on that

2  route.

3  **Q.**  Okay.  But at some point, you became aware that American

4  was planning to start flying on that route?

5  **A.**  Yeah, there was probably just a general media

6  announcement on their website.

7  **Q.**  Okay.  And that's a -- all right.  So please look now

8  at -- or, rather, sticking with that passage we just looked

9  at, so your proposal to Ms. Mehoke was because you thought

10  American might enter that route.  Rather than increase the

11  flat fare on that route, JetBlue should maintain the flat

12  fare the same as it had been under the then-current or

13  previous contract; is that right?

14  **A.**  Due to unknown market change with a new competitor coming

15  into the market, it made better sense to hold fares.

16  **Q.**  Okay.  So please direct your attention to the exchange

17  between Ms. Mehoke and Jeremy Blechman that starts on the

18  bottom of page 1 of this exhibit and continues on to page 2.

19  Do you see that?

20  **A.**  I do.

21  **Q.**  And is it -- Mr. Blechman is in JetBlue's revenue

22  management department; is that right?

23  **A.**  Yes.

24  **Q.**  And revenue management, among other things, is

25  responsible for approving recommended dollar ranges for flat

1   fares?

2   **A.**   Yes.

3   **Q.**   Okay.  And they're also responsible for approving flat

4   fares for particular customers that fall outside of those

5   recommended dollar ranges, right?

6   **A.**   Yes.  Our process would be that if we were looking to

7   recommend something outside of approved ranges, we would go

8   to our revenue team for approval.

9   **Q.**   Okay.  And is that what Ms. Mehoke is doing in this

10   e-mail starting at the bottom of page 1 and continuing to

11   page 2?

12   **A.**   Yes.  My recommendation for this renewal was outside --

13   was outside the allowed ranges.  So I went to Robbie, got her

14   thoughts.  She agreed, went to Jeremy to get his approval.

15   **Q.**   And, again, this was the same route we were talking about

16   before that was due to go up, but you recommended keeping as

17   is, due to American's --

18   **A.**   Yes.

19   **Q.**   -- possible entry?  Okay.  And you were seeking approval

20   because the fare that you were requesting fell below the

21   recommended range; is that right?

22   **A.**   Correct.

23   **Q.**   Okay.  And if you look just above at Mr. Blechman's

24   response to Ms. Mehoke, he writes, "My only question is are

25   these fares the current flat fares?  If so, do you think we

1    should go lower given the American entrance?"

2         Did I read that correctly?

3    **A.**  You read that correct.

4    **Q.**  All right.  You may put that exhibit aside.

5         MR. LEFF:  Your Honor, I just noticed the time.

6         THE COURT:  Yes.  You can -- we'll end here.

7         All right.  So we'll adjourn for the day.  Just a

8    couple -- two points.  One I'm reminded of because of

9    Ms. Maltas' question.  The schedule I put out to you, we'll

10   follow that.  You can bank on that unless I tell you

11   otherwise, but I don't anticipate any changes in it, so that

12   will be the schedule.

13        Second, just an observation, at least so far, I

14   don't see this -- this is not like a criminal case where

15   there's a cooperating witness who much of the case turns on

16   their truthfulness, the uncorroborated truthfulness or lack

17   of truthfulness of the testimony of the witness.

18        So, like, I don't know how often -- when each of

19   you are going back and forth to the depositions, I haven't so

20   far been persuaded that -- sometimes it's a little bit of a

21   nuance or an expansion.  I understand why you're focused on

22   the nuances, and that's fine.  But I don't see it as, like,

23   changing the truthfulness or valuation of the witness.  And I

24   don't sense that, by and large, at least so far, any of you

25   are really challenging the credibility in that way of the

1    witnesses.

2         And some of the questions sometimes it seems to me

3    turn on -- like, price.  I would be stunned if price didn't

4    matter to any customers in the market.  But on the other

5    hand, the significance of price in the mix probably depends

6    on the nature of the customer and, even within a customer,

7    say with a corporate customer, I would assume -- I guess I'm

8    thinking I will bring my life experience and common sense to

9    whatever I decide.  I assume I'm supposed to do that.

10        And so the -- when the -- of a Fortune 500 company,

11   when the sea-sweep team is flying out to a business meeting

12   where they're about to acquire something else, price is

13   probably irrelevant in the trip.  I suspect they don't care

14   about the price.  Inconvenience and privacy are the number

15   one factors.

16        But when they're making a deal for the 2,000 sales

17   people, for all the flights they make around the country,

18   convenience matters, but price is also very significant.

19   And, like, the balance of all these things would depend on

20   those.  So the more nuanced some of those facts are, the

21   more, like, persuasive or relevant they might be.  That's

22   just some thoughts for whatever help it is.

23        Is there anything any of you want to address before

24   we break?

25             MR. CRANER:  Yes, Your Honor.  One housekeeping

1      matter.  I know Mr. McMenamin inadvertently mentioned a

2      corporate customer's name.  We have an agreement with the

3      parties that that will be redacted.  I just request that be

4      redacted from the court transcript.

5              THE COURT:  I'll have that redacted from the

6      transcript, but I can't order that it be redacted from the

7      minds of anyone who heard it.

8              MR. CRANER:  Fair enough.  Thank you.

9              THE COURT:  All right.  Anything else?

10             MR. JONES:  Nothing from plaintiffs, Your Honor.

11             MR. WALL:  No, Your Honor.

12             MR. CRANER:  No, thank you.

13             THE COURT:  All right.  So just in terms of -- I

14     have a 3:30 plea in a criminal case beginning now.  So it may

15     be -- so we could -- and I think --

16             Mr. POHL, is he in custody?

17             MR. POHL:  Yes, Your Honor.

18             THE COURT:  So maybe if you can pick -- it makes no

19     difference to me.  Just either move to the front tables or

20     the back tables -- it doesn't matter -- so there's one set of

21     tables.  There's only two lawyers.  And afterwards, you can

22     pick up the rest of your stuff, if you would.

23             We stand in recess.

24             (Court in recess at 3:34 p.m.)

25

1

2                    **C E R T I F I C A T I O N**

3

4          I certify that the foregoing is a correct

5   transcript of the record of proceedings in the above-entitled

6   matter to the best of my skill and ability.

7

8

9

10  /s/ Rachel M. Lopez                    September 28, 2022

11  /s/ Robert W. Paschal

12

13

14  _____        _____

15  Rachel M. Lopez, CRR            Date

16  Robert W. Paschal, RMR, CRR

17  Official Court Reporters

18

19

20

21

22

23

24

25