1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3       _____

4       UNITED STATES OF AMERICA, et al.

5            Plaintiffs,                        Civil Action No.
                                                1:21-cv-11558-LTS
6            v.

7       AMERICAN AIRLINES GROUP, INC.,
        et al.,
8
              Defendants.
9

10      _____

11

12          BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                           BENCH TRIAL
                               Day 3

15

16

17                    Thursday, September 29, 2022
                            8:58 a.m.

18

19

20      John J. Moakley United States Courthouse
        Courtroom 13
21      One Courthouse Way
        Boston, Massachusetts
22

23      Rachel M. Lopez, CRR
        Official Court Reporter
24      raeufp@gmail.com

25

1                         **A P P E A R A N C E S**

2

3       On behalf of the Plaintiff United States of America:

4           UNITED STATES DEPARTMENT OF JUSTICE
            BY:  WILLIAM H. JONES, III; JOHN STAIGE DAVIS; AND
            PATRICIA L. SINDEL
5           450 Fifth Street, Northwest
            Suite 8000
6           Washington, D.C.  20530
            (202) 514-0230
7           bill.jones2@usdoj.gov
            john.davis10@usdoj.gov
8           patricia.sindel@usdoj.gov

9

10      On behalf of the Plaintiff Commonwealth of Massachusetts:

11          ATTORNEY GENERAL'S OFFICE
            BY:  DANIEL H. LEFF AND WILLIAM T. MATLACK
12          One Ashburton Place, 18th Floor
            Boston, Massachusetts  02108
13          (617) 727-2613
            daniel.leff@mass.gov
14          william.matlack@mass.gov

15

16      On behalf of the Defendant American Airlines Group, Inc.:

17          LATHAM & WATKINS, LLP
            BY:  DANIEL M. WALL
18          505 Montgomery Street
            Suite 2000
19          San Francisco, California  04111
            (415) 391-0600
20          dan.wall@lw.com

21

22

23

24

25

1                    **A P P E A R A N C E S ,   C o n t.**

2

On behalf of the Defendant JetBlue Airways Corporation:

3

        SHEARMAN & STERLING LLP
4        BY:  RICHARD F. SCHWED; RYAN LESKE; AND MATTHEW L. CRANER
        599 Lexington Avenue
5        New York, New York  10022
        (212) 848-4000
6        richard.schwed@shearman.com
        matthew.craner@shearman.com
7        ryan.leske@shearman.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**TABLE OF CONTENTS**

**TRIAL WITNESSES**

On behalf of the Plaintiffs:                                    Page

BARRY McMENAMIN

      By Mr. Leff                                          5

      By Mr. Craner                                        9

      By Mr. Leff                                         23

EVAN JARASHOW

      By Ms. Sindel                                       29

      By Mr. Craner                                       88

JOHN KIRBY

      By Mr. Davis                                       103

      By Mr. Wall                                        167

**EXHIBITS**

On behalf of the Plaintiffs:                                Admitted

 Number page 158, line 23, to page 159, line 4            78

 Number 892                                               146

```
1                          P R O C E E D I N G S

2                  (In open court at 8:58 a.m.)

3                  THE COURT:  Ready to resume?

4                  MR. MATLACK:  Yes.

5                  THE COURT:  The witness?  If you'll come forward.

6       I remind you, you remain under oath.

7                  And you can continue your --

8                  Be seated.

9                  And you can continue your examination.

10                 MR. LEFF:  Thank you, Your Honor.

11                 THE COURT:  You're welcome.

12                           BARRY McMENAMIN

13                 having been duly sworn, testified as follows:

14         CONTINUED DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS

15      BY MR. LEFF:

16      Q.  Good morning, Mr. McMenamin.

17                 Mr. McMenamin, do you recall yesterday testifying

18      about the Boston-LaGuardia route?

19      A.  I remember, yes, talking about it.  Yes.

20      Q.  Okay.  And in particular, we talked about how American

21      Airlines had exited that route under the NEA, correct?

22      A.  They have stopped flying it with their own planes, and

23      it's just JetBlue metal on that route now that they sell.

24      Q.  And was your testimony that American and JetBlue continue

25      to compete on price on that JetBlue metal on the
```

1   Boston-LaGuardia route?

2   **A.**   My understanding is we continue to compete everywhere,

3   including that route, so, like, everything is priced

4   independently by JetBlue teams and American teams.

5   **Q.**   Mr. McMenamin, are you familiar with the terms of the

6   Northeast Alliance agreements?

7   **A.**   I have a familiarity with the amendment document that I

8   extend to my clients and a high-level understanding of what

9   the NEA is, but I don't know the mechanics behind the NEA.

10   **Q.**   Let's take a look at Exhibit, Plaintiffs' Exhibit 1C,

11   which is a codeshare agreement.  And I don't believe that's

12   in your binder.  It should be on the screen.

13                  MR. LEFF:  Do we have copies?

14                  May we approach with copies for the witness,

15   Your Honor?

16                  THE COURT:  Yes.

17   BY MR. LEFF:

18   **Q.**   And I'd like you to look in particular at page 5,

19   Section 4.3A.  Do you see that section, 4.3A, Mr. McMenamin?

20   **A.**   Yes.

21   **Q.**   Okay.  And that says, "For routes served by only one

22   party or its authorized affiliates, fares and fare rules

23   filed by the marketing carrier for codeshare itineraries will

24   match those of the operating carrier."

25                  Do you see that?

1    **A.**   I do see that.

2    **Q.**   Okay.  And so that means that, on routes where only one

3    carrier flies, the other carrier is selling tickets on the

4    second carrier's metal -- in this case, American, selling

5    tickets on JetBlue -- needs to match the fares that JetBlue

6    has on that metal; isn't that right?

7    **A.**   I'm not as familiar with the -- this is what we call one

8    of the terms of the MSA, the master service agreement that

9    our legal team put in place.  So I'm not as familiar with

10   this section.

11   **Q.**   In the case of Boston-LaGuardia, the operating carrier is

12   JetBlue, right?

13   **A.**   The operating carrier for LaGuardia flights is JetBlue,

14   correct.

15   **Q.**   Okay.  And American can be a marketing carrier for that

16   route, right?

17   **A.**   They are a marketing carrier.

18   **Q.**   Right.

19   **A.**   They're selling fares on that route.

20   **Q.**   Okay.  And this says that for routes served by only one

21   party, fares and fare rules filed by the marketing carrier

22   for codeshare itineraries will match those of the operating

23   carrier, right?

24   **A.**   That's what this says, yes.

25   **Q.**   Okay.  Please turn to Plaintiffs' Exhibit 793 in your

1    binder.  And there's one customer name in here that's been

2    redacted.  So just caution you again not to say it out loud,

3    although we won't be focusing on that part of the document.

4    Okay?

5              MR. LEFF:  And this is in evidence, Your Honor.

6    BY MR. LEFF:

7    **Q.**  So this is an e-mail, at the bottom, sent to you and the

8    entire JetBlue sales team, right?

9    **A.**  Correct.

10   **Q.**  Okay.  And it's sent by Daryll Newman?

11   **A.**  Yes.

12   **Q.**  And he's also a JetBlue corporate sales manager; is that

13   right?

14   **A.**  Correct.  Daryll looks after the New York market.

15   **Q.**  Okay.  And he's sending some NEA terms to help the

16   corporate sales team here, right?

17   **A.**  Yes.

18   **Q.**  Okay.  I'd like you to focus on the bottom bullet point,

19   please.  Do you see where it says "metal neutral"?

20   **A.**  Yes.

21   **Q.**  All right.  And that reads, "Metal neutral -- the

22   philosophy that offering a customer choice is the guiding

23   principle and letting them choose JetBlue or American is in

24   the overall best interest as we'd rather offer the customer

25   an option between JetBlue and American than have them choose

1  another airline or set of airlines."

2          Is that what it says?

3  **A.**  That's what it says.

4  **Q.**  So in other words, "metal neutral" means JetBlue's

5  indifferent as to whether the customer gives its business to

6  JetBlue or American, right?

7  **A.**  We're not indifferent.  We would always want our

8  customers booking JetBlue; but if that option doesn't exist,

9  booking with a partner is preferred over a nonpartner.  And I

10 think that's what it says at the end, or have them choose

11 another airline or set of airlines.

12          MR. LEFF:  No further direct, Your Honor.

13          THE COURT:  All right.

14          Cross?

15          MR. CRANER:  Thank you, Your Honor.

16          THE COURT:  You're welcome.

17          MR. CRANER:  Good morning.  May I proceed?

18          THE COURT:  Go right ahead.

19          MR. CRANER:  Thank you.

20          **CROSS-EXAMINATION BY COUNSEL FOR JETBLUE**

21 BY MR. CRANER:

22 **Q.**  Good morning, Mr. McMenamin.

23 **A.**  Good morning.

24          MR. CRANER:  First, let's hand out the binder to

25 counsel and to the Court.

1          Your Honor, may I proceed?

2          THE COURT:  You may.  Sorry.

3   BY MR. CRANER:

4   **Q.**  Good morning.  Mr. McMenamin, Mr. Leff went through some

5   of your background yesterday, so I have just a few follow-up

6   questions at the outset.  Can you briefly describe your

7   professional background before you joined JetBlue in 2017?

8   **A.**  Yes.  I worked for just about ten years in the Boston

9   market supporting corporate partners on the hotel side.

10  **Q.**  Okay.  And what are your current responsibilities as a

11  corporate sales representative?

12  **A.**  So our primary goal is to support contracted partners in

13  the corporate segment and also offer new opportunities from

14  that same segment.

15  **Q.**  Okay.  And can you briefly describe what groups with

16  JetBlue you interact with on your -- as part of your job?

17  **A.**  I regularly, daily, work with our sales managers, the

18  other team members, sales operations, who support us, our

19  B-to-B team, who are -- our customer service center,

20  sometimes network planning, if I needed information on a

21  frequency, if it was coming back, or the revenue team for a

22  fare approval; airport operations, if I wanted to highlight a

23  customer; and then our fare-filing team if we were

24  trouble-shooting something for a client.

25  **Q.**  Okay.  And is the corporate sales team responsible for

1   setting JetBlue's pricing?

2   **A.**   No.

3   **Q.**   And is the sales team responsible for determining

4   JetBlue's flight schedule?

5   **A.**   No.

6   **Q.**   Okay.  In your role as a corporate sales manager, do you

7   have any responsibilities with regard to the NEA?

8   **A.**   The only thing I took with the NEA was extending the

9   option of opting into the NEA amendment document to clients

10  who wish to opt in to extending contractive discounts to

11  codeshare flights.  And, you know, we asked our customers if

12  they wanted to opt in or not, and we processed that on the

13  back end.

14  **Q.**   Okay.  Mr. Leff asked you several questions about

15  competition in Boston, and I want to explore that a bit

16  further.  How would you generally describe the market in

17  which JetBlue competes in Boston?

18  **A.**   Boston is very competitive.  It's got a tremendous number

19  of corporations, high educational companies, healthcare

20  companies; and for this -- the size of our city, there's a

21  tremendous number.  And it's just an incredible amount of

22  competition in the market, especially with new carriers

23  entering or new routes being added, or from the international

24  carriers that have come in the last ten years, it seems it's

25  just been -- the competition just increased a lot.

1  **Q.**   Okay.  And you mentioned that Boston plays an important

2  role in JetBlue's corporate sales program.  Can you explain

3  why that is?

4  **A.**   JetBlue's truly loved up in New England and the --

5        THE COURT:  Is truly what?

6        THE WITNESS:  Loved.  As a brand, the brand is --

7  it's -- when I speak to my colleagues in other focus

8  cities -- Boston would be one of our focus cities, and so

9  high-value geography where JetBlue operates.  And it's not

10  the same.  Like, when I tell about my customer feedback or my

11  engagement with customers, it's always stronger from the

12  Boston market.  And the corporate community here truly

13  supports their programs.

14  BY MR. CRANER:

15  **Q.**   And prior to the NEA, do you believe that JetBlue had

16  advantages when competing for corporate customers in Boston?

17  **A.**   We did, and we do.

18  **Q.**   Can you describe those?

19  **A.**   So the airport operation, the presecurity area of

20  terminal C, it's that customer experience.  Our colleagues

21  and crew members are constantly recognized as a breath of

22  fresh air as -- or customers who are engaging with them.

23        The fact that we have one of the only consistent

24  products on offer in the air -- so when any of our customers

25  are flying with JetBlue, they get the same consistent

1    experience every single time, and that truly matters when

2    there are such consistencies from other offerings.

3              But every one of our customers get to enjoy the

4    free back-of-seat entertainment, free Wi-Fi, snacks and

5    beverages.  And that's just consistent across every flight

6    our customers will take, and that's definitely a huge

7    positive for us.

8    **Q.**  And prior to the NEA, you believed that JetBlue had

9    challenges with regard to corporate customers in Boston?

10   **A.**  Yes.

11   **Q.**  Can you describe those?

12   **A.**  So as much as the brand was loved, we still have

13   limitations to what we could offer compared to carriers

14   with -- you know, what we would call "legacy carriers" or

15   larger carriers.  There were definitely things we couldn't

16   offer.

17             We didn't have the global loyalty program.  We

18   didn't have the same global offering in the network,

19   amenities like a lounge or something at the airport that

20   legacy carriers offered at their terminals that they operated

21   that we didn't have.  So we definitely had challenges

22   compared to what else was on offer.

23   **Q.**  And you mentioned global offerings from legacies.  Can

24   you describe how a global offering is important to corporate

25   travelers in Boston?

**A.**   We play a very -- so JetBlue has a very strong part in travel programs if you're in Boston, and we -- up and down the East Coast and transcontinental.

But the corporations that are based in the New England market, and New York, obviously, have global programs.  They're going to Europe.  They're going to Asia.  They're going to destinations where we had limited partnerships to help them get there.

So we were probably less relevant in certain programs, or we didn't play the strong role we wanted to, even though we got great share.  There were many markets where we couldn't compete and we didn't have the same offering.

**Q.**   And you mentioned some international markets.  Does that impact domestic markets, as well?

**A.**   Yes.  It definitely does.  When you look at the dots on the map that JetBlue has, you know, a lot on the East Coast, transcontinental are very, very strong, but there's a lot that we don't cover as well.  And the other carriers have much larger networks when you compare both side by side.

**Q.**   Okay.  And as part of your job, do you monitor what your competitors are doing in Boston?

**A.**   Yes.

**Q.**   And why do you do that?

**A.**   It makes me a good salesperson to know -- and a good --

1    not just a good salesperson, but a good supporter for my

2    partners to know what's going on in the market, keeping my

3    ear to the ground and seeing relevant changes from any

4    impacting factor.  I like to -- I just like to keep my finger

5    on the pulse.

6    **Q.**  And which competitors do you monitor?

7    **A.**  Anything that impacts the market, so all competitors.

8    **Q.**  Including a list of competitors you mentioned yesterday

9    in response to Mr. Leff's questions?

10   **A.**  Including Delta, American, United, Southwest, British

11   Airways now that we're going to London.  So just whatever

12   relevant impacts I see, I try to keep my ear to the ground.

13   **Q.**  And in terms of monitoring competitors, has that changed

14   in any way since the implementation of the NEA?

15   **A.**  No.

16   **Q.**  Okay.  I'd like to shift gears.  You testified that

17   JetBlue currently competes with American for corporate

18   customers in Boston.  Do you currently try to win corporate

19   business from American?

20   **A.**  Yes.

21   **Q.**  And has that changed in any way since the NEA?

22   **A.**  No.

23   **Q.**  And do you consider any airline to be JetBlue's biggest

24   competitor in Boston?

25   **A.**  The biggest competitor by far in the Boston market would

1    be Delta.

2    **Q.**   And why is that?

3    **A.**   I joined JetBlue five years ago.  And since I joined,

4    I've just seen a number of steps that Delta has taken more

5    aggressively in the market compared to other competitors from

6    growing at their terminal A when they took back their gate

7    space to strong market -- marketing and billboards locally in

8    New England, routes that were popping up constantly on their

9    press releases that seemed to really come after JetBlue

10   routes, new frequencies, circulating new airplanes in the

11   market, tons of credit card marketing in the market.

12           And I would go to meetings, and I would hear

13   executives talk about how they wanted to be more like JetBlue

14   in the market.  Like, they knew we were loved, and that was

15   something they were trying to aspire to be as well.

16   **Q.**   And do you have a sense of how the size of Delta's

17   marketing and sales team compares to JetBlue's in Boston?

18   **A.**   Vastly greater.  Probably, if it's not equivalent to the

19   entire size of JetBlue's sales team, it's bigger.  We only

20   have seven sales managers, and they have huge resources in

21   their entire network, but in New England, they have huge

22   resources.

23   **Q.**   And you've been at JetBlue since 2017.  At what point in

24   time did Delta become the biggest competitor to JetBlue?

25   **A.**   I think shortly after I joined, we were just -- we

1    heard -- we started to see movements.  They were trying to be

2    the region's number one carrier, and then when that metric

3    didn't go quick enough, they rebranded themselves to the

4    largest global carrier, New England's largest global carrier.

5    So there's different metrics that people use to label

6    themselves the largest, but they started to rebrand

7    themselves as New England's largest global carrier right

8    before COVID, I believe.

9    **Q.**  And did they make any changes to their scheduling?

10   **A.**  It seemed to -- there were new routes being launched

11   globally, new routes being launched domestically, stronger

12   frequencies into markets.

13   **Q.**  And prior to the NEA, did JetBlue develop any strategies

14   to deal with Delta's ascending growth in Boston?

15   **A.**  There were a couple of projects that I'm aware of, yes.

16   **Q.**  And can you describe those?

17   **A.**  One was called Boston 200, which was our aspirations to

18   get to 200 daily flights from Boston-Logan, and then I think

19   that eventually became Project Revere, which was another

20   strategy internally at JetBlue to deal with Delta's growth

21   and our own want to protect our share.

22   **Q.**  Okay.  Can we just take a look at Exhibit DX 310?  It's

23   in your binder.

24            MR. CRANER:  It's in evidence, Your Honor.  It's a

25   redacted copy.

1    BY MR. CRANER:

2    **Q.**   Do you have that in front of you?

3    **A.**   I do.

4    **Q.**   This is a document dated February 22, 2019, and it's

5    titled "Project Revere Overview For Corporate Sales."  Are

6    you familiar with this document?

7    **A.**   Yes, I am.

8    **Q.**   And what is this document?

9    **A.**   It's JetBlue's strategy to deal with Delta's accelerated

10   growth in the New England market and the team's action plans

11   to counter that.

12   **Q.**   And who prepared this document?

13   **A.**   I believe it was Dave Clark or his team.  I believe so.

14   **Q.**   And can you explain which team Mr. Clark is a part of?

15   **A.**   At the time, it would have been revenue and sales, vice

16   president of revenue and sales.

17   **Q.**   And was this presentation to the corporate sales team?

18   **A.**   Yes.

19   **Q.**   Okay.  Was there a meeting involved with this

20   presentation?

21   **A.**   This was -- this was presented to us at one of our

22   monthly sales meetings in New York City.

23   **Q.**   Okay.  Can you please turn to page 2?

24   **A.**   Yes.

25   **Q.**   Can you see where it says "Executive Summary"?

**A.**   Yes.

**Q.**   It says, "Delta's growth in Boston continues and is accelerating in 2019."  Do you see that?

**A.**   I see that.

**Q.**   And is that consistent with your understanding of what the purpose of Project Revere is?

**A.**   Yes.

**Q.**   And do you see in the plan objective, it says, "Ensure Boston remains solidly profitable and growing for JetBlue while also defending our market share."  Do you see that?

**A.**   I see that.

**Q.**   And in this context, what does "defending our market share" mean?

**A.**   Well, we had a position in the market.  We were one of the region's number one carriers and the competitors coming in -- growing aggressively and accelerating in 2019, so it was really just how do we protect the current share that we were seeing from the market and not to lose any to a competitor.

**Q.**   Okay.  And since you've been at JetBlue through 2017, has JetBlue implemented any strategy, similar strategy related to American?

**A.**   Similar to American, like the current NEA?

**Q.**   That's a good question.  You testified this relates to Delta --

1    **A.**   Yes.

2    **Q.**   -- Project Revere, correct?

3    **A.**   Correct.

4    **Q.**   And my question is did JetBlue implement another strategy

5    related to competing with American?

6    **A.**   Not to my knowledge.

7    **Q.**   Okay.  Mr. McMenamin, do you believe that the NEA

8    addresses the challenges that Delta poses to JetBlue in

9    Boston?

10   **A.**   It definitely does more to help us than we could ever

11   achieve on our own.

12   **Q.**   And were these things that helped JetBlue in a way that

13   Project Revere couldn't?

14   **A.**   Definitely.  Project Revere was a very JetBlue-focused

15   thing.  We were investigating, could we work with

16   international partners?  Could we roll out, you know, four or

17   five corporate strategies?  But it was really doing the best

18   with what we had in our toolbox, in JetBlue's toolbox, and

19   there was a number of things that it couldn't address.

20   **Q.**   And, specifically, what things couldn't it address?

21   **A.**   Really, the global relevance and having a true global

22   network.  It was filling more dots around the country, adding

23   more domestic locations, getting across the border into

24   Canada.

25            Like the number one travel international route that

1    doesn't cross water from the New England area is Toronto, and
2    with the NEA, we now offer flights to Toronto and Vancouver.
3    And we've launched a lot more domestic locations purely due
4    to the NEA.
5             The loyalty piece, which is huge -- we had a great
6    a program if you're based in New England and you fly on
7    JetBlue anywhere in our focus cities, but it truly couldn't
8    compete with the legacy carrier loyalty programs.  And now
9    that we have this reciprocal what we call an "earn and burn"
10   loyalty program with American and -- it's just a great thing
11   for all of our customers to enjoy in the program that they
12   choose.
13            And there's more relevance having -- being aligned
14   with a partner like American in the airports in Boston and
15   New York gives us more relevance as we try and go after
16   customers that may not have believed JetBlue to play a strong
17   part in their program.  They would look at our network and
18   say, "Well, we don't think there's room for you."  Now, that
19   we have this partnership with American, it just gives us more
20   relevance.
21   **Q.**  And has that impacted you and your team's ability to
22   compete in Boston?
23   **A.**  It has definitely helped us.  We're still in a weird
24   space where we haven't been able to fully offer as much as we
25   would like because we're still in this kind of post-COVID

1    world where things are getting back to normal.  I fully

2    expect next year, as we're doing renewals and seeing regular

3    opportunities coming to the team, that it's going to be much

4    more helpful.

5    **Q.**   And in terms of current partners, in your view, does the

6    NEA help JetBlue secure primary positions where it couldn't

7    before?

8    **A.**   It's definitely -- it's definitely given us more

9    relevance, and people who may not have looked at JetBlue on

10   their own are definitely giving us a second look.

11   **Q.**   And as part of the NEA, do JetBlue's partners have the

12   ability to sign any NEA amendments?

13   **A.**   So -- yes.  This is something they opt in for.  If they

14   wish to keep their contracted discounts just to

15   JetBlue-marketed-and-operated flights, that's fine.  They

16   also have the option to extend those same discounts to

17   codeshare flights operated by American but sold as JetBlue.

18   So that is something they can opt in for.

19   **Q.**   And do you know within JetBlue which geographic region

20   has had the highest percentage of partners who have opted

21   into the NEA?

22   **A.**   Definitely New England.

23             MR. CRANER:  Thank you, Your Honor.

24             No further questions.

25             THE COURT:  Any redirect?

1          MR. LEFF:  Yes, Your Honor.  Just a moment, please.

2          THE COURT:  Sure.

3    **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS**

4    BY MR. LEFF:

5    **Q.**  Mr. McMenamin, you testified, both yesterday and today,

6    didn't you, that Southwest was becoming one of your major

7    competitors for corporate customers in Boston; is that right?

8    **A.**  Southwest has just become a bigger player than they were

9    due to them entering into certain GPS -- GDS tools.

10   **Q.**  Okay.  And Southwest doesn't have a global network, does

11   it?

12   **A.**  I don't believe so.  I think they're just domestic US.

13   **Q.**  And they don't have lounges either?

14   **A.**  I don't know for sure.

15   **Q.**  All right.  You talked a bit about Project Revere.

16   You're not involved in network planning, right?

17   **A.**  No.

18   **Q.**  And network planning determines the number of flights out

19   of Boston; is that right?

20   **A.**  I believe so.

21   **Q.**  Okay.  So you don't know why JetBlue sought to go up to

22   200 departures out of Boston, do you?

23   **A.**  I know behind the scenes it was, what destinations are we

24   not serving?  What destinations are we serving with a limited

25   schedule?  What needed more support?  So I don't -- I don't

1    know the decisions -- which decisions were made, but I have

2    the understanding of what was on the table to be decided on.

3    **Q.**   Because you're not involved in those decisions, correct?

4    **A.**   I'm not, but at pocket sessions that leadership would

5    speak to us on, they may share some kind of understanding of,

6    you know, what we were aspiring to get to.  So they may share

7    some snippets of, you know, the future of JetBlue and the

8    region.

9    **Q.**   Mr. McMenamin, you mentioned the NEA amendment, right?

10   **A.**   Yes.

11   **Q.**   And that allows your corporate customers to opt in to

12   certain reciprocity that they get with American?

13   **A.**   So not -- so it's not -- so it's not something that

14   American gives them.  It's like their codeshare flights.  So

15   they're marketed by JetBlue, sold as JetBlue.  They are

16   operated by American, but they're sold as JetBlue flights.

17   So the NEA document just extends what they have contracted

18   with JetBlue to a codeshare flight.

19        And if American is offering them something from

20   their side, that's something separately American would do.

21   **Q.**   Okay.  But it doesn't allow those customers to stop

22   JetBlue and American from coordinating scheduling or

23   capacity, does it?

24   **A.**   I don't believe so.  I think that's fully separate.

25   **Q.**   All right.  Mr. McMenamin, you mentioned consistency is

1    one of JetBlue's major benefits for corporate customers; is

2    that right?

3    **A.**   I believe the consistency of our product in the air is a

4    benefit.

5    **Q.**   And that means, when a corporate traveler travels on

6    JetBlue, they know they're getting the same great product

7    each time that they fly on a JetBlue flight; is that right?

8    **A.**   Any customer, corporate or leisure, absolutely.

9    **Q.**   But you've received several complaints about the

10   consistency of flying under the NEA and the codeshare; isn't

11   that right?

12          MR. CRANER:  Objection.  Lacks foundation.

13   BY MR. LEFF:

14   **Q.**   Please turn to Plaintiffs' Exhibit 833.

15          MR. CRANER:  Your Honor, and we have a hearsay

16   objection to this document.

17          MR. LEFF:  Your Honor, I'm not offering this -- the

18   plaintiffs' aren't offering this for the truth of the matter

19   asserted in the complaints, but just the fact of the

20   complaint and Mr. McMenamin's response.

21          THE COURT:  Let me just take a look at it.

22          The hearsay objection is overruled if it's just

23   offered for the effect on the listener.

24          Go ahead.

25

1    BY MR. LEFF:

2    **Q.**   Mr. McMenamin, this is an e-mail exchange between you and

3    a corporate customer; is that right?  And I'd again caution

4    you not to divulge the name of the corporate customer.

5    **A.**   Yes.

6    **Q.**   Okay.  And this is post-NEA, right?

7    **A.**   This is post-NEA.

8    **Q.**   Okay.  And the corporate customer conveyed some

9    complaints about the experience of buying a ticket on JetBlue

10   and ending up on an American flight, right?

11   **A.**   Yes.  But there's also some discrepancies in her e-mail,

12   so -- but yes.

13   **Q.**   So that's a yes?  Okay.  And if you look at your

14   response, I'd like you to look at the first paragraph in the

15   middle.  You write, "You are right.  There are growing pains.

16   It's definitely been anything but seamless."  Is that right?

17   **A.**   I wrote that, yes.

18   **Q.**   Yeah, and then you describe some improvements that

19   JetBlue's making, right?

20   **A.**   To deal with the rollout of the IT integration, yes.

21   **Q.**   IT issues, right?

22   **A.**   Uh-huh.

23   **Q.**   But not the quality of the American planes themselves,

24   right?

25   **A.**   No.

1   **Q.**   Okay.  And then if you look at the second to last full

2   paragraph of your e-mail, you write "We do appreciate the

3   feedback, and we have heard the same from multiple partners,"

4   right?

5   **A.**   We heard a lot about the IT issues at the very start

6   because we had two very complex systems integrating for the

7   very first time.  So we did have a lot of feedback on that,

8   and we had a very strong IT road map to address them.

9         And then their client, their client who ended up on

10  the American flight, unfortunately -- that's a great benefit

11  for us when it comes the other way, when the American

12  customer books a JetBlue flight inadvertently, because I

13  think we have a better product, and we have more chance to

14  win their customers, too.  And -- so we got better at this.

15  They weren't aware it was an American flight.

16        Since then, we've rolled out many things.  We've

17  updated our map to be more clear, highlighting who the

18  operating carrier is going to be.  They'll get a preflight

19  e-mail addressing them and which terminal they've got to go

20  to.

21        So, yes, this was one of the unfortunate feedback

22  at the very beginning, which we did see some, but we've

23  addressed.

24  **Q.**   And this was in -- sent in a -- just a moment.

25        THE COURT:  November 3rd.

1    BY MR. LEFF:

2    **Q.**  November 3, 2021, right?

3    **A.**  Yes.

4    **Q.**  And that's a year and a half after the NEA was signed,

5    right?

6    **A.**  I don't know when the NEA was signed.  I know it rolled

7    out in 2020.  My corporate amendment documents went out in

8    August of 2021, July and August.  And I know this client did

9    not sign the NEA amendment document.  So this -- however this

10   populated in their tool, this client did not avail of the

11   amendment document and still has not.

12   **Q.**  Okay.  And none of that changes the inconsistent

13   experience on an American airplane, right?

14   **A.**  No.

15              MR. LEFF:  Okay.  No further questions.

16              Thank you, Mr. McMenamin.

17              THE COURT:  Any recross?

18              MR. CRANER:  No, Your Honor.

19              THE COURT:  All right.  Thank you very much, sir.

20   You are excused.  You can step down.  You can leave all that

21   where it is.  They'll take care of it.

22              Next witness.

23              MR. JONES:  Yes, Your Honor.  Plaintiffs call Evan

24   Jarashow of JetBlue, and my colleague Patricia Sindel will be

25   conducting the examination.

1          MS. SINDEL:  Good morning, Your Honor.  Patricia

2     Sindel for the United States and on behalf of the plaintiffs.

3     The plaintiffs are calling Evan Jarashow as an adverse party

4     witness.  Mr. Jarashow is an employee of JetBlue.  He's on

5     plaintiffs' witness list, but not defendants'.

6          THE COURT:  Okay.  If you would come forward, sir

7     and remain standing in the witness box while Ms. Belmont

8     administers the oath.

9          (Witness duly sworn.)

10         THE DEPUTY CLERK:  Can you please state your name

11    and spell your last name for the record?

12         THE WITNESS:  Sure.  It's Evan Jarashow,

13    J-a-r-a-s-h-o-w.

14         THE DEPUTY CLERK:  Thank you.  You may be seated.

15         THE COURT:  Go ahead.

16         MS. SINDEL:  Your Honor, may we approach with the

17    witness binders?

18         THE COURT:  Oh, yes.

19         I'll trade you.

20         MS. SINDEL:  Your Honor, may I proceed?

21         THE COURT:  Of course.  Sorry.

22                         **EVAN JARASHOW**

23         having been duly sworn, testified as follows:

24         **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS**

25    BY MS. SINDEL:

1   **Q.**   Good morning, Mr. Jarashow.

2   **A.**   Good morning.

3   **Q.**   My name is Patricia Sindel.  I'm going to be asking you

4   some questions this morning on behalf of the plaintiffs.

5   Okay?

6   **A.**   All right.

7   **Q.**   And we've just handed you a binder that we're going to

8   refer to throughout the examination.  I'll let you know when

9   to look at that and where to direct your attention.  Okay?

10  **A.**   All right.

11  **Q.**   Mr. Jarashow, where do you work?

12  **A.**   I work at JetBlue.

13  **Q.**   And how long have you worked at JetBlue?

14  **A.**   Since November 2011.

15  **Q.**   In 2018, you became a pricing manager at JetBlue; is that

16  right?

17  **A.**   That's correct.

18  **Q.**   And in that position, you oversaw pricing for both

19  domestic and international markets for JetBlue; is that

20  right?

21  **A.**   That's correct.

22  **Q.**   And in that role, you supervised a team of pricing

23  analysts?

24  **A.**   Yes, that's right.

25  **Q.**   But last year, in 2021, your role changed, and now you

1   manage just the international pricing team instead of both

2   the domestic and international teams; is that right?

3   **A.**   That's correct.  A second manager was brought into the

4   team, and my scope shifted slightly.

5   **Q.**   Now, before you became manager of the pricing team in

6   2018, you were a manager in the inventory management group at

7   JetBlue; is that correct?

8   **A.**   Yes, that's right.

9   **Q.**   And you held that position for about three years from

10  2015 to 2018?

11  **A.**   Yes, that's about right.

12  **Q.**   The inventory management team and the pricing team are

13  both part of the revenue-management group at JetBlue, right?

14  **A.**   Yes, that's right.

15  **Q.**   And in the airline industry, it's typical that revenue

16  management encompasses both a pricing function and an

17  inventory-management function, right?

18  **A.**   Yes, that's right.  It's also sometimes called "yield

19  management."  That's right.

20  **Q.**   Great.  Thank you.

21          Now, Mr. Jarashow, I'm going to ask you about both

22  of those functions of revenue management, pricing and

23  inventory.  This may be a little bit technical, but I want to

24  make sure the Court has an accurate picture of how pricing

25  works in the industry.  Okay?

1    **A.**  I understand.

2    **Q.**  So let's begin with the pricing function.  Now, the

3    pricing function involves establishing a menu of fares for

4    the markets in an airline's network; is that fair?

5    **A.**  I -- yes, that's right.  Menu of fares, the associated

6    rules and attributes that go along with them.

7    **Q.**  And airline fares are organized into booking classes?

8    **A.**  Again, and rules, attributes, if fares get filed and

9    they're made available into certain inventory classes or

10   booking classes.

11   **Q.**  Now, each booking class is designated by a letter of the

12   alphabet, such as P or Z; is that correct?

13   **A.**  Yes, that's correct.  Yes.

14   **Q.**  And fares are also organized by how far in advance a

15   consumer purchases a ticket before the day of a flight's

16   departure; is that right?

17   **A.**  That is one of the attributes that goes along with fares,

18   sometimes called the "advance purchase requirement."

19   **Q.**  All right.  And so an advanced purchase requirement could

20   be zero days in advance, three days in advance, and so on, up

21   to 30 days in advance?

22   **A.**  Could be even longer, but there are various deadlines,

23   yes.

24   **Q.**  A zero-day advanced purchase fare is also known as a

25   "walkup fare"?

1  **A.**   That's correct, yes.

2  **Q.**   And a walkup fare is available to purchase the day of a

3  flight's departure?

4  **A.**   Assuming that the class of service or the booking class

5  is available, that's correct.  There's no -- there's no

6  advanced purchase deadline associated with it.

7  **Q.**   So in general, fares with longer advanced purchase

8  requirements, 30-day AP fares, will be lower than fares with

9  shorter advance purchase requirements like walkup fares.  Is

10 that fair?

11 **A.**   Fares tend to be lower the further in advance, but

12 there's not a hard rule that they must always be.  They can

13 be anything.

14 **Q.**   I think we've probably all experienced that phenomenon

15 that the longer you wait to book, the more you're probably

16 going to pay?

17 **A.**   Well, there's two functions that go into determining what

18 you end up paying:  the filed fare itself as well as the

19 availability on a particular flight.

20 **Q.**   All right.  Thank you.

21        So now I want to ask about the other piece of

22 revenue management that we mentioned a moment ago, the

23 inventory management function.  And I think you said

24 inventory management is sometimes called "yield management"?

25 **A.**   It is.

1  **Q.**  Now, inventory management involves determining how many

2  seats to sell on a given flight at any given time, right?

3  **A.**  Number of seats to sell in the inventory classes.  That's

4  right.

5  **Q.**  And the inventory --

6         THE COURT:  Let me -- hold on.  Let me just ask one

7  question.  Would that mean, if there's 100 seats on a plane,

8  you mean how many to -- putting aside different classes or

9  services, such as Even More Space or Mint or what have you,

10  but would it mean how many are allocated for different levels

11  of service, like advanced purchase or basic, or what have

12  you?

13         THE WITNESS:  Your Honor, it would mean determining

14  the number of seats to make available in each booking class

15  within a cabin, not necessarily at each advanced purchase,

16  because that can vary by booking class or by fare.

17         THE COURT:  I see.  Okay.  So an example of the

18  different classes that you would make available like that?

19         THE WITNESS:  An example of it?

20         THE COURT:  Yeah.

21         THE WITNESS:  Sure.  You might, say, have ten seats

22  available in the lowest class of service and then an

23  additional ten seats in the class immediately above that, ten

24  seats above that, and so on.

25         THE COURT:  So that might be ten on Blue Basic, ten

1    on Blue, ten on Even More -- so forth, like that?

2              THE WITNESS:  Not quite, Your Honor.  It would be

3    each booking class.  We tend to have all of our products

4    available in each booking class, so Blue Basic, Blue Extra.

5              THE COURT:  What are the booking classes, then?

6              THE WITNESS:  The -- there's often called RBDs,

7    booking classes, but it's part of a nested hierarchy or a

8    booking class structure.  So we'll have 14 booking classes in

9    what we call our Core, our economy cabin, starting with the

10   highest classes, usually Y, and then working each of the 13

11   letters that go below it, ending with U, S, and P, are the

12   three lowest for us.

13             We'll have a certain number of seats available in

14   each of the booking classes --

15             THE COURT:  And each of those classes will have

16   certain rules or attributes?

17             THE WITNESS:  Not necessarily that.

18             THE COURT:  What distinguishes each class?

19             THE WITNESS:  The number of seats available, and

20   the authorization levels determine the number of seats

21   available in each.

22             THE COURT:  Authorization levels?

23             THE WITNESS:  The -- it's -- often you see it

24   referred to as an "AU level," but it's essentially the number

25   of seats you're willing to sell on each.

1          So if you have 100 seats on a plane, let's say you

2     may have an authorization level that's lower than that in

3     each of the classes of service.  Subtracting one from the --

4     from the other, you determine that's how many unique seats

5     are available in each booking class.

6               THE COURT:  I see.  Okay.

7               Go ahead.

8     BY MS. SINDEL:

9     Q.  But just to follow up on that a little bit, for the

10    booking classes, the inventory management team can open and

11    close booking classes.  Is that generally correct?

12    A.  That's accurate.

13    Q.  Okay.  And when a booking class is open, that would mean

14    a consumer can purchase a fare in that booking class?

15    A.  If there's a fare filed that's available in that booking

16    class on that flight, yes.

17    Q.  Okay.  And conversely, if the booking class is closed,

18    that fare would not be available for sale for that consumer,

19    right?

20    A.  That's accurate.  A class must be available in order for

21    a fare to be purchased in that booking class.

22    Q.  And opening and closing booking classes can effectively

23    adjust JetBlue's selling prices with that inventory

24    adjustment; is that fair?

25    A.  That's an accurate description.

1   **Q.**   It might cause selling prices to go up, or it might cause

2   them to go down?

3   **A.**   That's accurate.

4   **Q.**   Okay.  So, for example, opening a booking class with a

5   lower fare, all else being equal, could cause selling prices

6   to go down?

7   **A.**   All else being equal, it could.  Again, it's a function

8   of the prices or the fares that are available in that booking

9   class, as well.

10   **Q.**   And then, just to round it out, all else being equal,

11   closing a low fare booking class would tend to adjust selling

12   prices upward?

13   **A.**   It could.  Again, it's a function of the pricing group as

14   well, so depending on the fare that's available in that

15   class.

16   **Q.**   And at times, JetBlue uses these types of inventory

17   adjustments, opening and closing classes, to adjust selling

18   prices in response to what a competitor may be selling for a

19   similar flight; is that correct?

20   **A.**   Among many factors that we consider when determining how

21   many seats to make available, what other carriers are

22   charging is one of those factors.

23   **Q.**   Okay.  So we've discussed the pricing function.  We've

24   discussed the inventory-management function.  You mentioned a

25   couple of times filing fares.  So let me ask you about that.

1    JetBlue files its menu of fares through something called

2    "ATPCO," right?

3    **A.**   That's correct.

4    **Q.**   Okay.  And can you explain what ATPCO stands for?

5    **A.**   Its stands for the Airline Tariff Publishing Company.

6    It's the industry clearinghouse for airfares.

7    **Q.**   And for domestic markets, airlines will file updated

8    fares on ATPCO four times each weekday; is that right?

9    **A.**   That's correct.

10   **Q.**   And what are those four times?

11   **A.**   It's at 10 a.m., 1 p.m., 4 p.m., and 8 p.m.

12   **Q.**   Now, a fare that's publicly available on ATPCO can be

13   observed by anyone who has an ATPCO subscription, correct?

14   **A.**   I believe that's accurate.

15   **Q.**   So that would include other airlines?

16   **A.**   Anyone with a data subscription.

17   **Q.**   And as far as you know, all domestic airlines have a

18   subscription to ATPCO?

19   **A.**   I believe that's accurate.

20   **Q.**   So that means other airlines can see JetBlue's menu of

21   publicly filed fares, correct?

22   **A.**   That's accurate.

23   **Q.**   And JetBlue can see other airline's menu of publicly

24   filed fares?

25   **A.**   Yes, that's accurate.

1  **Q.**  Mr. Jarashow, the pricing team at JetBlue uses a number

2  of different tools to evaluate the competitive landscape; is

3  that fair?

4  **A.**  Yes.  We use a number of tools.

5  **Q.**  And so, for example, JetBlue uses a tool called "air

6  price" to evaluate changes that other airlines make to their

7  publicly filed fares in ATPCO?

8  **A.**  That's one of the tools we use.  We will also use ATPCO.

9  Air price is our primary fares management tool.

10  **Q.**  Now, it's true that just because a competitor's fare is

11  publicly filed in ATPCO doesn't necessarily mean that fare is

12  available for somebody to buy if they're shopping on the

13  competitor's website; is that right?

14  **A.**  That's accurate.  Again, it's a function of some of the

15  rules and attributes that would govern a fare's validity as

16  well as the inventory controls that another airline may have

17  in place.

18  **Q.**  And so for that reason, JetBlue also uses a web-scraping

19  tool that will monitor the fares that are actually selling on

20  your competitor's websites, right?

21  **A.**  Competitors websites, external websites, yes.  We gather

22  data from various sources.

23  **Q.**  And that's because looking at both the publicly filed

24  fares in ATPCO and the actual selling fares on a competitor's

25  website is necessary to get a holistic view of what

1   competitors are selling and what's available for the general

2   public to buy; is that right?

3   **A.**   Yes.  I think that's -- it's accurate.  Again, there's --

4   fares that are filed may not always be selling.  We like to

5   keep track of not only what's filed, but what it is actually

6   selling on flights at any given time.

7   **Q.**   All right.  So let's put it all together and talk about

8   revenue management as a whole.  Now, it's fair to say that

9   the pricing team and the inventory management team at JetBlue

10  collaborate, right?

11  **A.**   Yes, we do.  We work together frequently.

12  **Q.**   So, for example, if there's a change in market

13  conditions, the pricing team and the inventory management

14  team would collaborate to determine what actions JetBlue

15  should take in response?

16  **A.**   We work together to assess route performance and

17  determine appropriate steps for JetBlue and make our -- take

18  our actions from there.

19  **Q.**   So, for example, if JetBlue had a different selling price

20  than a competitor, you might make an adjustment to the

21  inventory setup.  Is that fair?

22  **A.**   We may or we may not.  Again, we assess performance,

23  bookings, booking trends, historical data, among many factors

24  we consider at any given time, including what other carriers

25  may be charging.

1  **Q.**  And also, for example, if the inventory management group

2  found that, say, customer demand was different than what you

3  expected to see, you might make a change to the menu of

4  fares; is that fair?

5  **A.**  We could.  There's a number of steps or no steps that may

6  be taken.

7  **Q.**  Mr. Jarashow, you're familiar with the term RASM, meaning

8  revenue per available seat mile?

9  **A.**  Yes.  It's a measurement or unit revenue in the airline

10  industry.

11  **Q.**  Now, when JetBlue is evaluating the job performance of

12  your pricing analysts, you look at a variety of different

13  benchmarks and measures to assess performance; is that right?

14  **A.**  Yes, we do.

15  **Q.**  Including both qualitative and quantitative measures?

16  **A.**  That's correct.

17  **Q.**  And one of the quantitative measures that you use to

18  determine whether your pricing analysts are doing a good job

19  relates to the revenue performance of the routes in the

20  analyst's portfolio, right?

21  **A.**  One of them, yes.

22  **Q.**  And broadly speaking, the revenue performance metric that

23  you use is year-over-year RASM performance, right?

24  **A.**  That's one that we tend to look at frequently.

25  **Q.**  And so part of a pricing analyst's job is to improve

1    revenue performance, or RASM, year over year on the routes

2    within their portfolio?

3    **A.**   Yes, that's generally right.  Ultimately, we need to have

4    a menu of fares that is appropriate and that makes sense for

5    the demand that we're seeing at the time.

6    **Q.**   And so, similarly, part of the inventory management

7    team's job is also to improve revenue performance year over

8    year, right?

9    **A.**   Again, it's one of the factors we look at.  There are

10   many factors that are out of our control, as well.

11   **Q.**   And so putting that together, one goal of revenue

12   management as a whole is to improve JetBlue's revenue

13   performance year over year, correct?

14   **A.**   To maximize revenue, that's one of the metrics we look

15   at, yes.

16   **Q.**   All right.  Thank you, Mr. Jarashow.

17           So now I want to ask you about a different topic,

18   and I want to ask you specifically about JetBlue's prices in

19   the New York City area.  JetBlue serves some of the same

20   destinations from JFK, LaGuardia, and Newark Liberty

21   airports, correct?

22   **A.**   I -- yes, we serve several markets from all three

23   New York area airports.

24   **Q.**   And it's true that JetBlue's prices for JFK and LaGuardia

25   are often the same, right?

1    **A.**   They can be, and there are times when they are not.

2    **Q.**   But often they are?

3    **A.**   They can be.

4    **Q.**   Now, JetBlue's prices for Newark often are not the same

5    as its prices for JFK and LaGuardia; is that right?

6    **A.**   Sometimes they are.  Sometimes they are not.

7    **Q.**   Well, let me ask about a specific example.  So on the

8    Boston to JFK and Boston to LaGuardia routes, JetBlue's

9    prices are often the same for those two routes.  Is that

10   fair?

11   **A.**   I believe that's generally accurate.

12   **Q.**   And it's also accurate to say that JetBlue's prices for

13   Boston to Newark are not always the same as its prices for

14   Boston to LaGuardia and JFK, correct?

15   **A.**   Not always.  Sometimes they are.

16   **Q.**   But they're not always the same?

17   **A.**   I believe that's accurate.

18   **Q.**   All right.  Why don't we take a look at a document.

19   Mr. Jarashow, you can open your exhibit binder now, and if

20   you'd please turn to PX 608 in your binder.  We're also going

21   to put it up on the screen for you if that's easier.

22             MS. SINDEL:  Your Honor, this exhibit is in

23   evidence, and there's no confidentiality redactions.

24             THE COURT:  All right.

25

BY MS. SINDEL:

**Q.**   Now, Mr. Jarashow, if you would please look at the first page of this document.  You'll see there's a number ending in 884 in the lower right corner.  And just looking at the top, this is an e-mail from you to Jonathan Weiner on August 17, 2020, at 11:42 a.m.; right?

**A.**   That's correct.

**Q.**   And Mr. Weiner is the director of revenue management at JetBlue at this time?

**A.**   He was at the time.  He's since been promoted.  His new position is vice president.

**Q.**   And at that time, he would have been your boss?

**A.**   Yeah.  We say "crew leader" at JetBlue, but yes, my immediate.  I reported to him.

**Q.**   And you're trying to be -- you try to be accurate when you're providing information to your crew leader, right?

**A.**   Certainly try to get things right.

**Q.**   Now, the subject of this e-mail is "Pricing Strategies Document," and you've attached to it a file that's titled "Pricing Strategies 17AUG20."

        Do you see that?

**A.**   Yes, I do.

**Q.**   Okay.  And if you look at the first sentence of your e-mail, you write that you're providing Mr. Weiner with the current market level pricing strategy document for JetBlue;

1   is that right?

2   **A.**   That's what I see there, yes.

3   **Q.**   Okay.  And then you go on to say that you've taken some

4   data that's normally stored in three different files

5   extracted from air price and you've consolidated them into

6   one file for Mr. Weiner?

7   **A.**   Yes, that's right.  I put them all in one place.

8   **Q.**   That file would have been an Excel workbook?

9   **A.**   That's the file for the -- that sounds right.

10  **Q.**   And you're presenting that workbook to Mr. Weiner as

11  JetBlue's current market-level pricing strategy as of

12  August 17, 2020, right?

13  **A.**   That looks right.

14  **Q.**   Okay.  And this document would have been meant to be a

15  one-stop shop so that you could identify how JetBlue was

16  pricing in a market at this time?

17  **A.**   Generally, yeah, that sounds accurate; but it would have

18  been meant to form or at least provide some high-level

19  guidance on how -- on how we were approaching markets at --

20  or routes at that time.

21  **Q.**   And you also provide a glossary to help interpret the

22  acronyms that are in this workbook, Excel workbook; is that

23  right?

24  **A.**   That looks correct to me.

25  **Q.**   If you'd please turn to the next page.  Now, this page

1    just identifies that the attachment was produced to us in a

2    native format, which means the actual Excel workbook.  And if

3    you look at the pages that follow, that's a printout of the

4    Excel workbook.  Do you understand that?

5    **A.**  I do.

6    **Q.**  Okay.  So if you would please turn to the next page.  So

7    you can see from the number in the lower right corner that

8    this is a printout of the glossary from the Excel workbook;

9    is that right?

10   **A.**  That's what it looks like, yes.

11   **Q.**  Now, this glossary is explaining how to read the pages

12   that follow?

13   **A.**  I believe it is.

14   **Q.**  Okay.  If you would please look at Row 3, there's a

15   situation called "match XX carrier."  Do you see that?

16   **A.**  I do.

17   **Q.**  And that refers to JetBlue matching another airline's

18   pricing, right?

19   **A.**  That's accurate, and that's the way it's described.

20   **Q.**  And that would be abbreviated as MA followed by the

21   airline code?

22   **A.**  That looks right.

23   **Q.**  So now if you'd look at Row 9, you see a situation called

24   "carrier service start date."  Do you see that?

25   **A.**  I do.

1  **Q.**  And the abbreviation for carrier service start date is

2  SS?

3  **A.**  That's what I see there, yes.

4  **Q.**  And SS refers to when an airline started service on a

5  route, correct?

6  **A.**  That looks right.

7  **Q.**  So now if you'd please turn to the next page.  And as you

8  can see from the number in the lower right corner, this is a

9  printout of the domestic tab from your Excel workbook, right?

10  **A.**  It looks like, yes.

11  **Q.**  Now, if you would please focus on Row 2.  And I know it's

12  very small, so Ms. Bairey is going to try to bring it up so

13  you can see it better.  Now, this reflects JetBlue's pricing

14  strategy for the Boston to Newark route; is that correct?

15  **A.**  At that time.

16  **Q.**  And if you look at Column I in the notes, it says

17  "MA/UA/DL."  Do you see that?

18  **A.**  I do, yes.

19  **Q.**  And you understand that to mean that JetBlue's pricing

20  strategy from Boston to Newark was to match United and Delta,

21  correct?

22  **A.**  I -- yes, that's right.  How I mean -- how I interpret

23  that, the word "match" is -- it's kind of a shorthand for

24  just saying that we actively benchmark those carriers at that

25  time.

1    **Q.**  And you actively benchmark against United and Delta for

2    the Boston to Newark route?

3    **A.**  At that time, yes.

4    **Q.**  Now, please look at Rows 44 and 45.  And, again, we'll

5    pull them up on the screen so they're easier to see.

6    Starting with Row 44, this reflects JetBlue's pricing

7    strategy for Boston to JFK; is that right?

8    **A.**  That's what I see there, yes.

9    **Q.**  And, again, if you look at the notes column, JetBlue's

10   pricing strategy for Boston to JFK is to match or benchmark

11   against American and Delta, right?

12   **A.**  That's what I see there.

13   **Q.**  And the same if you look at the next row, 45, Boston to

14   LaGuardia, we see that JetBlue's pricing strategy is to match

15   American and Delta, correct?

16   **A.**  At that time, that looks accurate.

17   **Q.**  And American and Delta both provided nonstop service from

18   Boston to JFK and LaGuardia; is that right?

19   **A.**  I believe they did.

20   **Q.**  Okay.  Now, based on Rows 44 and 45, we can see that

21   JetBlue's pricing strategy for Boston to LaGuardia and Boston

22   to JFK is the same, correct?

23   **A.**  They look the same.

24   **Q.**  And that's different than JetBlue's pricing strategy for

25   Boston to Newark, which we see in Row 2, correct?

1    **A.**   That looks accurate at that time.

2    **Q.**   So this would be an example of a route where JetBlue's

3    pricing strategy for JFK and LaGuardia does not match its

4    pricing strategy for Newark, right?

5    **A.**   At that time, that looks accurate.  It's not always that

6    case, but. . .

7    **Q.**   And this isn't the only example of that, right?

8    **A.**   There may be others.

9    **Q.**   All right.  You can put that document aside.

10           Mr. Jarashow, I want to talk a little bit about how

11   JetBlue competed on price.  Now, JetBlue at times files a

12   type of fare that's called a "tactical fare," right?

13   **A.**   Yes, we do.

14   **Q.**   Tactical fares are temporary fares that have a limited or

15   a specific date range in which they're valid for travel?

16   **A.**   That's accurate.

17   **Q.**   And, for example, a tactical fare could be filed with a

18   first travel date and a last travel date, meaning that fare

19   is only valid for flights within that travel window?

20   **A.**   That sounds accurate.

21   **Q.**   And a tactical fare might also have a first ticket date

22   and a last ticket date, meaning it's only valid for flights

23   booked in that ticket window?

24   **A.**   Well, it may have a last ticket.  First ticket -- fares

25   are always available immediately for purchase.

1  **Q.**  So if it has a last ticket date, though, it's restricted

2  to fares booked before the last ticket date?

3  **A.**  A fare must be purchased before the last ticket date.

4  **Q.**  And a tactical fare could also have day of the week

5  restrictions, so meaning it's only valid for certain days of

6  the week?

7  **A.**  Well, any fare can have a day of the week restriction as

8  well as a time of day restriction.  There may be other

9  restrictions that you would see from time to time.  Tactical

10  fares can or they cannot have day of week restrictions

11  associated with them.  Sometimes they do.  Sometimes they

12  don't.

13  **Q.**  Now, when you file a tactical fare in ATPCO, typically

14  that would be associated with a footnote that would identify

15  the restrictions; is that correct?

16  **A.**  Sometimes.

17  **Q.**  Most of the time?

18  **A.**  Generally.

19  **Q.**  And when JetBlue monitors the submissions of other

20  airlines on ATPCO, one of the things that involves is also

21  monitoring the footnotes, right?

22  **A.**  It is.  We're looking at the last travel dates that may

23  affect a validity, among other things.

24  **Q.**  Okay.  So we're going to take a look at a few examples of

25  how price competition works in this industry.  And I'd like

1    you to turn to PX 615 in your binder.

2              MS. SINDEL:  Your Honor, this exhibit's already

3    been admitted, and there's no confidentiality redactions.

4              THE COURT:  Thank you.

5    BY MS. SINDEL:

6    **Q.**  All right.  So looking at PX 615, we're going to start

7    with the e-mail that begins at the bottom of page 1, which is

8    an e-mail from you on February 18, 2019, at 7:03 p.m., and

9    then that continues over on to the second page.  Do you see

10   that?

11   **A.**  Yes, I do.

12   **Q.**  And this e-mail is to Mr. Andrew Parker, who was director

13   of revenue management at this time; is that right?

14   **A.**  That's correct.

15   **Q.**  And does that mean he would have been your crew leader at

16   this time?

17   **A.**  Yes, that's right.

18   **Q.**  Okay.  So at Mr. Parker's request, you're preparing a

19   draft of an e-mail that's going to be sent to Marty

20   St. George, who was the chief commercial officer of JetBlue

21   at this time, right?

22   **A.**  Yes, that's right.

23   **Q.**  Okay.  If we look at the first sentence of your e-mail,

24   you write that you're providing a recap and detailed timeline

25   regarding the 0AP tactical fares that we've seen on JetBlue

1    and American recently, right?

2    **A.**   Yes, that's what I see there.

3    **Q.**   Okay.  And then if you look under the headline

4    "High-Level Summary of Domestic OAP Fare Activity," there you

5    write that you've observed increased American tactical

6    activity at the walkup level since mid-January, and this is

7    2019, right?

8    **A.**   Yes, that's what I see there.

9    **Q.**   And you go on to say that fares are not limited to any

10   specific set of markets but can be found in both nonstops and

11   connections across American's network, right?

12   **A.**   That's what I see there, yes.

13   **Q.**   "Connections" refers to fares for connecting flights?

14   So, for example, a flight from Boston to LAX that connects

15   through JFK?

16   **A.**   That would be an example, yes.

17   **Q.**   Now, below this, you provide a detailed timeline and

18   history of this tactical fare activity; is that right?

19   **A.**   I tried to, yes.

20   **Q.**   So I'm not going to ask you about every bullet point on

21   this page, but it's fair to say that this timeline and

22   history recounts the tactical fare activity that you observed

23   between January 2, 2019, and February the 18, 2019, the end

24   of the document; is that right?

25   **A.**   That looks generally accurate.

1   **Q.**   Okay.  So please take a look at the third bullet, which

2   is the entry for January 28th.

3   **A.**   All right.

4   **Q.**   And you report that JetBlue filed some walkup tactical

5   fares in -- more, TCON markets.  Now, "TCON" means

6   transcontinental markets; is that right?

7   **A.**   That's accurate.

8   **Q.**   And in the second sentence of this bullet, you report

9   that the lowest walkup fares were -- in JFK to LAX and JFK to

10  San Francisco -- were $149 all-in, right?

11  **A.**   That's what I see there, yes.

12  **Q.**   Okay.  Now, I want to compare this to the second --

13  second to last bullet on this page, which is the entry for

14  February 7th.  Do you see that?

15  **A.**   I do.

16  **Q.**   Okay.  And there you report that JetBlue canceled the

17  $149 tactical fare for JFK to LAX, right?

18  **A.**   That's what I see there, yes.

19  **Q.**   Okay.  And then American also canceled that $149 fare,

20  right?

21  **A.**   That's right.  I'd also note Alaska and Delta are also

22  there, yes.

23  **Q.**   And then after that, American refiled the $149 fare the

24  following day?

25  **A.**   That's what I see there, yes.

**Q.**   And JetBlue matched that fare action by American, right?

**A.**   That's what I see there.

**Q.**   So both American and JetBlue would have kept the $149

tactical fare in the JFK to LAX market as a result?

**A.**   That seems right.

**Q.**   So let's look at one more example on this document.  And

if you'd look at the fourth bullet point, that's the entry

for January 31st.  Do you see that?

**A.**   I do.

**Q.**   Okay.  So looking at the last sentence of this bullet

point, and here you report that American initiated a

$5 systemwide price increase, right?

**A.**   I do.

**Q.**   And that price increase was matched by Delta, United, and

Southwest, which is identified as "WN"?

**A.**   Correct.

**Q.**   But not by JetBlue?

**A.**   Correct.

**Q.**   And after JetBlue didn't match, one day later, American

and the other airlines rescinded that systemwide price

increase, right?

**A.**   That's what I see there.

**Q.**   So, in other words, the price increase didn't stick?  It

was rescinded by the other airlines after JetBlue failed to

match?

1    **A.**  Well, I don't know why they would or wouldn't have

2    canceled their fares or rescinded the increase, but it does

3    look like the increase didn't stick, to use the term that you

4    just used.

5    **Q.**  All right.  You can put that document aside.

6              Now, we've been discussing tactical fares, and I'd

7    like to ask you about something called a "cross-market" --

8              THE COURT:  Can I just ask one thing?  Why is it

9    called "tactical"?

10             THE WITNESS:  It's a term that we would use.  I

11   don't know if there's, like, a definition for it.  I think we

12   refer to it as "tactical" because it's a temporary fare meant

13   to sort of target an acute period of weakness or booking

14   softness, but that's just sort of a jargon term that we would

15   use.

16             THE COURT:  Okay.

17             THE WITNESS:  Temporary fare, Your Honor.

18   BY MS. SINDEL:

19   **Q.**  All right.  Mr. Jarashow, you're familiar with the

20   concept of a cross-market initiative or CMI?

21   **A.**  I've heard it before.

22   **Q.**  And a cross-market initiative refers to when one airline

23   files a low fare in one market that causes another airline to

24   respond by filing a low fare in a different market, right?

25   **A.**  I don't know if that's the definition for it.  I don't

1  know if there is a definition for it, but that sounds

2  consistent with my understanding.

3  **Q.**  And you're aware that cross-market initiatives occur in

4  the airline industry?

5  **A.**  I believe that they've happened.

6  **Q.**  It's something you've observed happen in the airline

7  industry?

8  **A.**  At some point, I believe I've seen activity that is

9  somewhat consistent with it.

10  **Q.**  Well, let's take a look at an example.  If you'll please

11  look at PX 612 in your binder.

12          MS. SINDEL:  And, Your Honor, this exhibit is in

13  evidence and there are no confidentiality redactions.

14          THE COURT:  Thank you.

15  BY MS. SINDEL:

16  **Q.**  So, Mr. Jarashow, looking at the first page of PX 612,

17  this is an e-mail from you on April 8, 2019, at 10:16 a.m.

18  Do you see that?

19  **A.**  Yes, I do.

20  **Q.**  And here, you're attaching a document to your e-mail

21  that's titled "Weekly Pricing Summary"?

22  **A.**  That looks right.

23  **Q.**  All right.  So if we look at the next page, this is the

24  attachment to your e-mail.  Does that look right?

25  **A.**  That looks accurate.

1  **Q.**  Okay.  And the attachment is a summary of weekly

2  competitive pricing activity, right?

3  **A.**  Yes, that's right.

4  **Q.**  Okay.  And these pricing summaries were prepared and sent

5  to Mr. Andrew Parker, who was your crew leader, and as well

6  as Mr. Dave Clark at the time; is that right?

7  **A.**  I believe that's right.

8  **Q.**  Okay.  So if you'd look in this attachment, I want to

9  look at the weekly pricing summary for the week that's ending

10  in February 22, 2019.  Now, this is a number ending in 997 in

11  the lower right corner.

12  **A.**  All right.

13  **Q.**  And take a look at the fourth bullet point that begins

14  with, "TCON."  Again, that's transcontinental, right?

15  **A.**  It is.

16  **Q.**  It says, "Transcontinental markets remained active

17  throughout the week with a focus on 0AP or walkup fares in

18  Boston to SFO and LAX and JFK to SFO and LAX."

19        Do you see that?

20  **A.**  I do.

21  **Q.**  "SFO" is San Francisco?

22  **A.**  The airport code for San Francisco, yes.

23  **Q.**  "LAX" is Los Angeles?

24  **A.**  It is.

25  **Q.**  So in the second sub-bullet under that, it gives some

1   more detail about the fare activity in these TCON markets

2   that you observed throughout this week in February; is that

3   right?

4   **A.**   That looks right.

5   **Q.**   And it says that by the 200 [*sic*] subs -- and that's a

6   reference to the 8 p.m. ATPCO submission.  Did I get that

7   right?

8   **A.**   The -- correct.  The APM domestic, ATPCO submission time.

9   **Q.**   So by the 200 subs on Friday --

10          THE COURT:  200 or 2,000?

11          MS. SINDEL:  I meant twenty hundred, 2,000, yes.

12   Sorry.  Your Honor.

13          THE COURT:  Okay.  Go ahead.

14   BY MS. SINDEL:

15   **Q.**   "By the 2000 subs on Friday, 0AP fares in Boston to LAX

16   remained low at $139."

17          Do you see that?

18   **A.**   I do.

19   **Q.**   And then it goes on to say that American did not follow

20   the other airlines neither to increase or to cancel, correct?

21   **A.**   That's what I see there, yes.

22   **Q.**   And so this bullet point would be conveying that during

23   this week in February of 2019, American had maintained a low

24   fare of $139 in the Boston to LAX market, right?

25   **A.**   That looks accurate.

1   **Q.**  Okay.  Boston is a JetBlue focus city, right?

2   **A.**  It is.

3   **Q.**  So if we look at the very next bullet, it states, on

4   Friday at the 1,000 or 1,000 subs -- now, that's the 10 a.m.

5   ATPCO submission?

6   **A.**  It is.

7   **Q.**  Okay.  JetBlue filed $139 walkup fares with last travel

8   February 28th and March 31st in the following markets and

9   then there's a list of five markets, right?

10  **A.**  That looks right.

11  **Q.**  And so this is identifying markets where JetBlue had

12  filed some tactical fares?

13  **A.**  I believe that's right.

14  **Q.**  Okay.  And the fare that JetBlue filed in these markets

15  is $139, which is the same amount as the American fare in the

16  previous bullet point, right?

17  **A.**  That's the number I see there.

18  **Q.**  And if we look at the markets where JetBlue filed these

19  tactical fares, the five markets, can you tell the Court

20  which markets are represented by those -- that list of five

21  airport codes?

22  **A.**  Boston to Washington, Boston to Dallas, Fort Lauderdale

23  to Philadelphia, Jacksonville to Washington, and Chicago to

24  Fort Lauderdale.

25  **Q.**  Now, Washington Reagan National Airport, DCA,

1    Dallas/Fort Worth, Philadelphia, and Chicago O'Hare are all

2    airports where American Airlines has a hub, correct?

3    **A.**   I believe that's accurate.

4    **Q.**   And so for each of these five markets listed, American

5    has a hub at one end, correct?

6    **A.**   That seems accurate.  I don't know if Washington DCA is

7    considered a hub or a focus city, but --

8    **Q.**   It generally seems correct?

9    **A.**   Generally.

10   **Q.**   And JetBlue filed these $139 tactical fares in these

11   routes to American's hubs because you were trying to offset a

12   potential loss of traffic in some other TCON markets that

13   were discussed in the previous bullet points such as Boston

14   to LAX; is that right?

15            MR. CRANER:  Objection.  Lacks foundation.

16            THE COURT:  Overruled.

17   BY MS. SINDEL:

18   **Q.**   You can answer.

19   **A.**   Would you mind repeating the question?

20   **Q.**   Sure.  So here JetBlue filed the $139 tactical fares in

21   these routes to American's hubs because you were trying to

22   offset a loss of traffic in the TCON markets as discussed in

23   the prior bullet points, including Boston to LAX, right?

24   **A.**   That seems generally right.

25   **Q.**   And that's another way of describing a cross-market

1  initiative, right?

2  **A.**  I suppose there's some similarities with the cross-market

3  initiative.

4  **Q.**  And one reason for filing these $139 tactical fares in

5  these markets was to get American's attention, right?

6  **A.**  I don't know that I would say that.  We don't communicate

7  with other carriers.  We don't try to get their attention.

8  **Q.**  Well, you picked five markets, each that had an American

9  hub at one end, right?

10  **A.**  That looks accurate.

11  **Q.**  And the fare that you filed was $139, the same as

12  American's fare in Boston to LAX, right?

13  **A.**  That's accurate.

14  **Q.**  Okay.  And by choosing those markets and that same fare

15  amount, you wanted American to take notice, right?

16  **A.**  Well, again, I don't know that we were trying to get

17  American to take notice.

18  **Q.**  Well, you were hoping that American might, you know, get

19  rid of that $139 fare to JetBlue's focus city in Boston and

20  once American saw JetBlue was fighting back with these $139

21  fares in American's hubs, right?

22  **A.**  I mean, I think we were, as I said before, trying to

23  offset losses in traffic.  Again, I don't know that we wanted

24  American to do anything.

25  **Q.**  You were trying to offset the loss in traffic, though?

1    **A.**   We were competing.

2    **Q.**   You can put that aside.  And we're going to take a look

3    at a few more examples of pre-NEA price competitions, so I

4    would like you to turn PX 520 in your binder, please.

5              MS. SINDEL:  Your Honor, this exhibit is in

6    evidence, but there is one part of this document that JetBlue

7    has redacted because it contains a personal phone number.  So

8    permission to publish the redacted version on the screen.

9              THE COURT:  Yes.

10   BY MS. SINDEL:

11   **Q.**   Mr. Jarashow, if you would please look at the second page

12   of this document.  It has a number ending in 802, and we're

13   going to look at the e-mail in the middle of this page.  So

14   there's an e-mail here from Michael Hillyard on November 16,

15   2018, at 10:24 p.m.  Do you see that?

16   **A.**   Yes, I do.

17   **Q.**   Mr. Hillyard is a pricing analyst at JetBlue?

18   **A.**   That's correct.  His new position, just recently, is

19   actually manager of the team.  He was recently promoted.

20   **Q.**   Great.  And at this time he was a pricing analyst in the

21   domestic team?

22   **A.**   I believe that's correct.

23   **Q.**   So looking at the first bullet point here under sales,

24   Mr. Hillyard writes that JetBlue launched a regional sale

25   between its focus cities in Boston, JFK, and Fort Lauderdale

1    to certain destinations in the southeast United States,

2    right?

3    **A.**   That's correct.  It looks like a regional promotion.

4    **Q.**   And then if you look at the next bullet point under the

5    table, Mr. Hillyard reports that American matched JetBlue's

6    sale in the 10 a.m. ATPCO submission?

7    **A.**   That's correct.  I would also note that there are reports

8    about other carriers matching that sale, as well, shortly

9    after.

10   **Q.**   Delta matched and United matched, right?

11   **A.**   Correct.

12   **Q.**   And Southwest did not?

13   **A.**   That's what I see there, yes.

14   **Q.**   And then in the last bullet point, Mr. Hillyard reports

15   that American updated its match to JetBlue's sale in the ATM

16   ATPCO submission?

17   **A.**   That's what I see there.

18   **Q.**   And American extended the last ticket date of that sale

19   to November 17th?

20   **A.**   That looks right.

21   **Q.**   And American also expanded the days of the week that the

22   sale applied to?  That's what "DOW pattern" means?

23   **A.**   Yes.  That's the shorthand for DOW.

24   **Q.**   Which meant American would have been undercutting

25   JetBlue's prices at least at this time?  Is that correct?

1    **A.**   Tough to say if they would have been undercutting it.  I
2    don't know that you can say that from here, but they extended
3    the sales such that it has a longer last ticketing than we
4    did at that time.
5    **Q.**   So Mr. Hillyard provides a market list below and then a
6    list of markets; is that right?
7    **A.**   Yes, that looks right.
8    **Q.**   And you understand this to be each of the markets where
9    American took this fare action of expanding the JetBlue sale,
10   right?
11   **A.**   That seems accurate.
12   **Q.**   Okay.  So now if we'd look at the e-mail at the very top
13   of this page.
14   **A.**   Would you mind providing the time stamp?
15   **Q.**   Sure.  This is an e-mail from Mr. Clark, November 17,
16   2018, at 7:28 a.m.
17   **A.**   Thank you.
18   **Q.**   Okay?
19   **A.**   Yes, I see that.
20   **Q.**   And so Mr. Clark at this time was vice president of
21   revenue management?
22   **A.**   And sales.
23   **Q.**   And sales.  Mr. Clark writes, "Andy and Evan, let's
24   please be sure we get competitive on these routes and travel
25   dates as soon as possible."

1          Now, "Evan" is you?

2  **A.**  It is.

3  **Q.**  Yeah, okay.  And "Andy" is Andrew Parker, who would have

4  been your crew leader?

5  **A.**  Correct.

6  **Q.**  And Mr. Clark would have been his direct supervisor at

7  that time?

8  **A.**  Correct.

9  **Q.**  Okay.  Now, here, Mr. Clark's expressing that JetBlue

10  needed to get competitive with American as soon as possible,

11  right?

12  **A.**  That's what I see there, yes.

13  **Q.**  Okay.  Now we're going to take a look back at the first

14  page of this ending in 801, and there's an e-mail in the

15  middle of this page that's another e-mail from Mr. Hillyard

16  on November 17, 2018, at 7:51 a.m.  Do you see that?

17  **A.**  I do.

18  **Q.**  Now, in the second sentence of his e-mail, Mr. Hillyard

19  writes, "Andy followed up with me to match, so I have matched

20  American's fare action for 5 p.m. Saturday."

21          Do you see that?

22  **A.**  I do.

23  **Q.**  And Mr. Hillyard here is reporting that JetBlue matched

24  American's fare action in the 5 p.m. ATPCO submission for

25  that Saturday, right?

1    **A.**   That's correct.

2    **Q.**   And then in the next sentence, Mr. Hillyard says that

3    he's provided a list at the end of his e-mail of the markets

4    where he's matched American, right?

5    **A.**   That looks right.

6    **Q.**   Okay.  And all but two of the markets in that table are

7    shaded?

8    **A.**   I see that, yes.

9    **Q.**   And you understand it to mean that the markets where

10   Mr. Hillyard says he matched American's fare are the ones

11   that are shaded, right?

12   **A.**   I believe that's accurate.

13   **Q.**   Okay.  So looking at the list of markets on the left-hand

14   side of the table, starting with the third one listed, the

15   markets where JetBlue matched American's fare action include

16   Austin to JFK, Charleston to LaGuardia, LaGuardia to

17   Savannah, LaGuardia to Raleigh-Durham, Boston to Charlotte,

18   and JFK to Raleigh-Durham.  Did I get that all right?

19   **A.**   That's what I see there.  Yes.

20   **Q.**   So if we go back to Mr. Hillyard's e-mail, in the last

21   sentence of his e-mail, he writes, "No other airline took a

22   similar fare action.  So we will be competitive with American

23   once these fares go into effect this evening on days of the

24   week and last ticket date."

25           Correct?

1    **A.**  That looks accurate.  And also, to back up for one

2    second, I believe Charleston-Miami is also on that list as

3    shaded.

4    **Q.**  Correct.  Charleston-Miami is also a market where JetBlue

5    matched American, right?

6    **A.**  Correct.

7    **Q.**  So here Mr. Hillyard is reporting that JetBlue was the

8    only airline that took this action to match American's

9    expanded fare sale in these markets; is that right?

10   **A.**  That seems accurate.

11   **Q.**  All right.  You can put that one aside.  Now I'd like to

12   look at PX 606.

13          MS. SINDEL:  And, Your Honor, again, this exhibit

14   is in evidence, and this one has no confidentiality issues.

15          THE COURT:  Thank you.

16   BY MS. SINDEL:

17   **Q.**  Mr. Jarashow, we're going to look at the second page.  It

18   has a number ending in 819.  And at the top of that page is

19   an e-mail from Catterina Yanez on January 28, 2020, at

20   12:45 p.m.  Do you see that?

21   **A.**  I do.

22   **Q.**  And it says the subject line "BOS to RDU," which is

23   Boston to Raleigh-Durham, right?

24   **A.**  Yes, that's right.

25   **Q.**  Ms. Yanez was a pricing analyst at JetBlue at this time?

1    **A.**   Yes.

2    **Q.**   And in the first sentence of her e-mail, Ms. Yanez

3    reports that "Delta has increased its walkup fare for Boston

4    to Raleigh-Durham by $20 from $224 to $244," right?

5    **A.**   That's what I see there.  Yes.

6    **Q.**   And she wants to know if JetBlue should match that fare

7    increase, right?

8    **A.**   That was her question there, yes.

9    **Q.**   So now we're going to look back at the first page of this

10   e-mail.  It has a number ending in 818.  We'll look at the

11   very bottom, which is an e-mail from you at 1 p.m.  Do you

12   see that?

13   **A.**   I do.

14   **Q.**   And you say you'd lean toward not matching Delta's fare

15   increase, right?

16   **A.**   That is what I said.

17   **Q.**   Okay.  And then the next e-mail above this is at 2 p.m.

18   Jonah Rosen agrees with you, and he says, "Let's not match,

19   please."

20            Do you see that?

21   **A.**   I do see that.

22   **Q.**   Mr. Rosen would have been an inventory analyst at this

23   time at JetBlue?

24   **A.**   He was.

25   **Q.**   Okay.  And Mr. Rosen lists some reasons why he doesn't

1  think that JetBlue should match Delta's fare increase for

2  Boston to Raleigh-Durham, right?

3  **A.**   He does.

4  **Q.**   Now, looking at the third reason he gives for why JetBlue

5  should not match Delta's fare increase, he says, because of

6  American's imminent entrance into the Boston to

7  Raleigh-Durham market, correct?

8  **A.**   He does say that.

9  **Q.**   Okay.

10  **A.**   That's one of the reasons he gave, yes.

11  **Q.**   And Mr. Rosen went on to express that JetBlue should try

12  to "hold on to whatever market share we have now before

13  American enters," right?

14  **A.**   Yes.   That's one of the reasons he gave.

15  **Q.**   Because he was concerned that when American entered the

16  Boston to Raleigh-Durham market, JetBlue could lose some

17  market share, right?

18  **A.**   It was one of his concerns, among others.

19  **Q.**   Okay.  And keeping JetBlue's prices low was a way for

20  JetBlue to mitigate that possibility?

21  **A.**   That seems generally accurate.  Again, he gives -- has a

22  couple of considerations, it looks like, he's working

23  through.

24  **Q.**   And that's the -- one of the considerations he was

25  working through, right?

1    **A.**   That seems generally right.

2    **Q.**   Okay.  You can put that one aside.  Going to take a look

3    at another document.  This one is PX 583.

4             MS. SINDEL:  And Your Honor, this exhibit has been

5    admitted, and there's no confidentiality issues.

6             THE COURT:  Thank you.

7    BY MS. SINDEL:

8    **Q.**   Mr. Jarashow, we're going to look at the -- towards the

9    middle of page 1.  And this is the third e-mail from the top

10   of the page, which is from Jeremy Blechman on June 6, 2019,

11   at 4:05 p.m.  Do you see that?

12   **A.**   I do.

13   **Q.**   Okay.  It has the subject line "JFK-SAN market summary"?

14   **A.**   It does.

15   **Q.**   "JFK-SAN" is the JFK to San Diego route?

16   **A.**   Correct.

17   **Q.**   Mr. Blechman -- I'm hoping I'm saying that right -- is a

18   manager in the inventory management group?

19   **A.**   That's correct.

20   **Q.**   Okay.  Now, the body of Mr. Blechman's e-mail contains a

21   pricing summary for JFK to San Diego, right?

22   **A.**   Correct.  It contains a draft of it.

23   **Q.**   So in the paragraph that begins with pricing, in the

24   first sentence, it says, "American has suspended service in

25   JFK to San Diego until 8/20 due to the 737 Max groundings."

1    Do you see that?

2    **A.**   I do.

3    **Q.**   And the 737 Max is a type of aircraft that had been

4    grounded at this time?

5    **A.**   Correct.  I believe it had recently been unexpectedly

6    suspended from not -- and not allowed to operate.

7    **Q.**   And as a result of the 737 Max grounding, American had

8    temporarily exited the JFK to San Diego route?

9    **A.**   That's accurate.  I'd also note that Alaska -- or,

10   sorry -- Southwest also canceled and temporarily suspended

11   their route from New York to San Diego.

12   **Q.**   So at this time, JetBlue was not competing with American

13   in the JFK to San Diego route because American had suspended

14   service, right?

15   **A.**   Well, we were competing with them.  They had temporarily

16   and unexpectedly canceled their service due to the 737 Max

17   groundings, so they were not operating it.  We were

18   competing.

19   **Q.**   They were not operating it at this time.  They weren't

20   flying this route at the time, right?

21   **A.**   Correct.  I believe their schedule was canceled

22   unexpectedly at the very last minute.

23   **Q.**   So take a look at the very next sentence, and it says,

24   "JetBlue is ignoring American's pricing until it becomes

25   clear they will reenter the market," right?

1    **A.**   That's what I see there.

2    **Q.**   Okay.  And then if you take a look at the fourth sentence

3    in this paragraph, it goes on to say that, "On 4/23" --

4    April 23rd -- "JetBlue down-bucketed its entire fare

5    structure in JFK to San Diego.  With the exception of its

6    lowest P class fare, this effectively increased fares by $20

7    to $40 throughout the structure."

8              Did I read that correctly?

9    **A.**   You did.

10   **Q.**   And, Mr. Jarashow, do you see that there's a sentence

11   immediately after the one that I just read that's been

12   highlighted in the original version of this document?

13   **A.**   I believe it was highlighted.  It's a little bit

14   difficult to make out.  It's shaded here, but I see that.

15   **Q.**   Sure.  Are you able to read the sentence there?

16   **A.**   Very slowly and carefully.

17   **Q.**   All right.  I can represent that this is how JetBlue

18   produced the document to us; however, we have prepared a

19   demonstrative that makes this part of the document a little

20   bit easier to read, which has been previously provided to

21   defense counsel, and I don't believe there are any objections

22   to it.

23             MR. CRANER:  There's no objection.

24             THE COURT:  Go right ahead.

25             MS. SINDEL:  May we approach the witness with the

 1   demonstrative, Your Honor?

 2          THE COURT:  Yes.

 3          I think you can just use it on the -- isn't that it

 4   on the screen?

 5          MS. SINDEL:  We have it on the screen.  We'll pull

 6   it up here.

 7          THE WITNESS:  I'm able to read it on the screen.

 8   BY MS. SINDEL:

 9   Q.  All right.  Mr. Jarashow, looking at the paragraph we

10   were just focusing on, are you now able to read the

11   highlighted sentence?

12   A.  I am.

13   Q.  Okay.  And could you please read that sentence aloud for

14   the Court.

15   A.  Sure.  "This was in response to very strong summer

16   demand, fueled in part by the AA cancellations.  This is now

17   one of the highest fare trans-con markets in the system."

18   Q.  Thank you.  And then it goes on to say that the lowest

19   fare is currently $150, including taxes, right?

20   A.  That's what I see there, yes.

21   Q.  So according to this pricing summary in whole, JetBlue's

22   decision to down-bucket its fares on the JFK to San Diego

23   route effectively increased fares by $20 to $40 throughout

24   the structure, correct?

25   A.  That's generally accurate.  It was an adjustment, really,

1    to a demand scenario that resulted from the 737 Max

2    groundings.  It was more of an inventory adjustment that

3    resulted in fares being slightly higher -- the fares being

4    charged were slightly higher.

5    **Q.**   So the inventory adjustment resulted in the fares being

6    higher by $20 to $40?

7    **A.**   The settling fares.

8    **Q.**   And JetBlue took this action of down-bucketing its fares

9    in response to very strong summer demand fueled by American's

10   cancellations, right?

11           MR. CRANER:  Objection.  Misstates the document.

12           THE COURT:  Repeat the question.

13   BY MS. SINDEL:

14   **Q.**   JetBlue took this action of down-bucketing its fares in

15   response to very strong summer demand fueled in part by the

16   American cancellations?

17           THE COURT:  Overruled.  You can answer.

18           THE WITNESS:  I believe there was an adjustment to

19   our inventory setup that resulted from an increase in our

20   demand expectations related to the last-minute cancellations

21   and temporary suspensions of American and, I'd also note,

22   Southwest cancellations due to the 737 Max grounding.

23   BY MS. SINDEL:

24   **Q.**   So, in part, it was the American cancellations that

25   fueled this action, right?

1    **A.**   In part.  I would also point out that it said a very

2    strong summer demand period, to begin with.

3    **Q.**   All right, Mr. Jarashow.  You can put that document

4    aside.

5              Now, earlier, we discussed that tactical fares are

6    associated with footnotes often when they're filed in ATPCO.

7    Do you remember that?

8    **A.**   I do.

9    **Q.**   Now, sometimes an airline will flash another airline in

10   the footnotes in an effort to highlight a fare change in

11   ATPCO; is that right?

12   **A.**   I don't know that the effort is to highlight the change.

13   **Q.**   Are you familiar with --

14             THE COURT:  What does "flash" mean?

15   BY MS. SINDEL:

16   **Q.**   Are you familiar with the use of the term "flash" to

17   describe an effort to highlight a fare change in ATPCO?

18   **A.**   I don't know that I'd describe it as an effort to

19   highlight.  I have -- I mean, I don't know if there's a

20   definition for it.

21             THE COURT:  What do you understand it to mean?

22             THE WITNESS:  A change to a fare.

23             THE COURT:  Why are some changes called "flashes"?

24             THE WITNESS:  I wouldn't know.  I don't know.

25             THE COURT:  Why do you think -- why -- do you ever

1   refer to a change as a "flash"?

2           THE WITNESS:  I'm aware of one instance in which a

3   change was referred to as a "flash."

4           THE COURT:  Why?

5           THE WITNESS:  I don't know why the word itself was

6   used.

7           THE COURT:  What did it mean to you, as opposed to

8   just calling it a change?  In other words, people -- you have

9   heard the term "flash" before she asked?

10          THE WITNESS:  It came up in an earlier discussion.

11          THE COURT:  I'm just wondering what people are --

12  what's the understanding of people in your role when that

13  word is used.

14          THE WITNESS:  I don't know that --

15          THE COURT:  Or what your understanding is, if you

16  can't speak to a common understanding.

17          THE WITNESS:  My general understanding was that it

18  related to a change, not an effort to highlight.

19          THE COURT:  Okay.  Go ahead.

20  BY MS. SINDEL:

21  **Q.**  Mr. Jarashow, do you recall being deposed in this matter?

22  **A.**  I do.

23  **Q.**  In fact, you were deposed twice, right?

24  **A.**  I was.

25  **Q.**  Okay.  Now, in your CID deposition, you were deposed by

1   my colleague Mr. Doidge.  Do you recall that?

2   **A.**  I do, and I believe that's right.

3   **Q.**  And you recall discussing this topic of flashing with my

4   colleague Mr. Doidge in that deposition?

5   **A.**  I believe we discussed it.

6   **Q.**  Okay.  And do you recall testifying there that you're

7   familiar with the use of the term "flash" to describe an

8   effort to highlight a fare change to another carrier?

9   **A.**  I believe I had said that I heard it before.

10  **Q.**  All right.  So just so the record is straight, you have

11  heard the term "flash" used to describe an effort to

12  highlight a fare change to another carrier, right?

13  **A.**  Well, again, I don't know that I -- I believe the word

14  "highlight" -- I don't know about that, but -- and I

15  understand it to mean a change.

16  **Q.**  Okay.  Well, let's take a look at your CID deposition

17  testimony.  And I'm reading -- and you can turn to it in your

18  binder, if you'd like.  I'm reading from page 158, line 23,

19  your CID deposition, and reading to page 159, line 4:

20          "QUESTION:  Okay.  Now, I just want to make sure I

21  understand your testimony, Mr. Jarashow.  So let's just step

22  back and let me ask just a general question.  Are you

23  familiar at all with the use of the term 'flash' to describe

24  an effort to highlight a fare change to another carrier?

25          "ANSWER:  I have heard it before, yes."

1          Do you see that?

2          THE COURT:  I'm sorry; page 158, which line?

3          MR. SINDEL:  Page 158, line 23, Your Honor.

4          THE COURT:  Going down to 159?

5          MS. SINDEL:  Yes, Your Honor.

6          THE COURT:  Thank you.

7   BY MS. SINDEL:

8   **Q.**  Did I read that correctly, Mr. Jarashow?

9   **A.**  I believe you've read it correctly.

10         MS. SINDEL:  Your Honor, I'd like to admit

11  page 158, line 23, to page 159, line 4, of Mr. Jarashow's CID

12  deposition for the truth of the matter asserted.

13         THE COURT:  Admitted.

14         (Plaintiffs' Exhibit page 158, line 23, to page

15         159, line 4 admitted into evidence.)

16         MS. SINDEL:  Thank you, Your Honor.

17  BY MS. SINDEL:

18  **Q.**  Let's take a look at an example.  Mr. Jarashow, can you

19  please turn to PX 616 in your binder?

20         MS. SINDEL:  And, Your Honor, this exhibit is in

21  evidence, and there are no confidentiality redactions.

22         THE COURT:  Thank you.

23  BY MS. SINDEL:

24  **Q.**  So, Mr. Jarashow, we're going to look at the e-mail at

25  the bottom of this page from Mr. Blechman on February 10,

1    2020, at 12:43 p.m.  Do you see that?

2    **A.**  I do.

3    **Q.**  And Mr. Blechman sends this e-mail to Ms. Yanez and

4    Mr. Rosen, and he copies you and Mr. Parker, correct?

5    **A.**  Correct.

6    **Q.**  And the subject of the e-mail is the Boston to

7    Philadelphia route?

8    **A.**  That looks right.

9            THE COURT:  "TOD" is time of day, and "OA" is

10   walkup fares?

11           THE WITNESS:  "OA" is a reference to other

12   airlines, Your Honor.

13           THE COURT:  Other airlines.  Okay.  Thank you.

14   BY MS. SINDEL:

15   **Q.**  0AP would be a reference to walkup fares, right?

16   **A.**  That's correct.

17           THE COURT:  Thank you.

18   BY MS. SINDEL:

19   **Q.**  So looking in the second sentence, it says, "I see

20   American selling the $44 all-in outside of our timeband."  Do

21   you see that?

22   **A.**  I do.

23   **Q.**  And can you explain what "outside of our timeband" means

24   there?

25   **A.**  I interpret it to mean that the fare was selling -- there

1    is no time restrictions on it.  It was selling at all times

2    of day.

3    **Q.**  And so that would mean that JetBlue would have been

4    uncompetitive because American was selling the $44 fare

5    outside the timeband, meaning on -- on more flights than

6    JetBlue was selling it?  Is that a fair characterization?

7    **A.**  Possibly, yes.

8    **Q.**  And then Mr. Blechman asks, "Any actions needed?"  Right?

9    **A.**  He did.

10   **Q.**  Okay.  So now please look at the e-mail at the top of

11   this page, which is a response by Ms. Yanez at 1:33 p.m.  Do

12   you see that?

13   **A.**  I do.

14   **Q.**  All right.  And in the first sentence of her e-mail,

15   Ms. Yanez writes, "Jonah and I discussed it with Evan."  Evan

16   is you?

17   **A.**  It is.

18   **Q.**  "Jonah and I discussed it with Evan, and for the 4 p.m.

19   subs, I'll do and ADD/CXL to try to flash American, and if it

20   doesn't work, then we'll discuss further actions.  "Did I

21   read that correctly?

22   **A.**  You did.

23   **Q.**  The "4 p.m. subs" is a reference to the 4 p.m. ATPCO

24   submission?

25   **A.**  It would be.

**Q.**   And the abbreviation "ADD/CXL" means add/cancel?

**A.**   I believe it does.

**Q.**   Okay.  And you understand the reference to add/cancel to mean the action of canceling a fare and then refiling it on the same ATPCO submission, right?

**A.**   That's correct, mechanically change part of the fare; but, yes, I intend it to mean add/cancel.

**Q.**   So the very same ATPCO submission, you cancel the fare and then refile the same fare, same submission, right?

**A.**   Generally, again, you have to change an attribute or something about the fare on the same submission.

**Q.**   Ms. Yanez describes this as trying to flash American, right?

**A.**   I see that's what she said, yeah.

**Q.**   That she was trying to draw American's attention to the add/cancel of this particular fare?

**A.**   I'm not sure exactly what she meant by that.  That's what I see on the screen.

**Q.**   And one reason to do that would be to try to encourage American to change its fare so it would be within JetBlue's timeband, right?

**A.**   I suppose it could be a reason.  Again, I don't know exactly what she's -- what she meant by that.

**Q.**   And this --

THE COURT:  Make who understand?

1          THE WITNESS:  I think that's a reasonable

2    interpretation of it.  I --

3          THE COURT:  That's not how you interpreted it when

4    you got it?

5          THE WITNESS:  I interpreted it.  I don't know if I

6    really thought about it at the time.  I interpreted it to

7    mean change an attribute of the fare.

8    BY MS. SINDEL:

9    Q.  Mr. Jarashow, this is an action -- this flashing action,

10   was something Ms. Yanez said she would do after having

11   discussed it with you, right?

12   A.  I see that she suggested that.

13   Q.  Do you remember discussing this with her?

14   A.  Not really.

15   Q.  But she did say she had discussed it with you, correct?

16   A.  I see that's what she has said.

17   Q.  You can put this document aside.

18          So, Mr. Jarashow, so far we've been focusing on

19   pricing for the economy cabin, but JetBlue also offers a

20   premium product called Mint?

21   A.  That's accurate.  We do.

22   Q.  And Mint would be similar to a business class cabin that

23   a legacy airline such as American might offer?

24   A.  And Delta.  It's a premium product with a lie-flat bed.

25   Q.  And it's priced separately from JetBlue's economy cabin?

1    **A.**  That's correct.  It is.

2    **Q.**  And when you look at competitors to Mint, you're

3    primarily looking at business class fares that are offered by

4    legacy airlines, right?

5    **A.**  Generally, that's one of the comparisons we would use.

6    **Q.**  Because you try to compare apples to apples?

7    **A.**  We try to.

8    **Q.**  Let's look at document PX 544.

9            MS. SINDEL:  And, Your Honor, this exhibit is in

10   evidence, and there's no confidentiality issues.

11           THE COURT:  Thank you.

12           THE WITNESS:  Mind repeating the number again?

13   BY MS. SINDEL:

14   **Q.**  Sure.  It's PX 544.

15   **A.**  544.  Thank you.

16   **Q.**  And we're going to start on page 5 when you get there.

17   **A.**  Page 5?

18   **Q.**  Uh-huh, which has a number ending in 675 at the bottom of

19   the page.  And there's an e-mail from Sebastian White on

20   August 15, 2018, at 12:21 p.m.  Do you see that?

21   **A.**  I do.

22   **Q.**  White is JetBlue's director of corporate communications?

23   **A.**  I believe that was his title.

24   **Q.**  And if you look at the first sentence of his e-mail,

25   Mr. White writes that he met with Robin yesterday.  So that's

1    referring to Robin Hayes, the CEO of JetBlue?

2    **A.**   I believe that's right.

3    **Q.**   And Mr. White is helping to prepare Mr. Hayes for his

4    upcoming speaking engagements.  Do you see that?

5    **A.**   Yes, that's right.

6    **Q.**   And he's seeking to get some good data we can arm him

7    with related to the impact of industry consolidation,

8    correct?

9    **A.**   That's what I see there, yes.

10   **Q.**   And the next sentence, towards the end of the next

11   sentence, Mr. White identifies the success of Mint and the

12   importance of small carriers in disciplining legacy behavior

13   as two of the topics for which he needs data, correct?

14   **A.**   That's what I see there.

15   **Q.**   Okay.  And this kind of request wasn't out of the

16   ordinary for you as a pricing manager at JetBlue to receive

17   data requests like this, right?

18   **A.**   It happens from time to time.  It doesn't happen

19   frequently, but when it does come in, it does come through

20   me, yes.

21   **Q.**   So now let's turn back to page 1 of this document, which

22   has a number ending in 671 at the bottom.  And we see an

23   e-mail from you at the very bottom of this page that then

24   carries over onto the second page.  The e-mail from you is on

25   August 27, 2018, at 12:58 p.m.  Do you see that?

1    **A.**   I do.

2    **Q.**   Okay.  So we're going to look at your e-mail on the

3    second page.  And in the first sentence of your e-mail you

4    say that you're providing some data that shows the evolution

5    of publicly available business class fares for the JFK to LAX

6    market on American, Delta, and JetBlue.  Do you see that?

7    **A.**   I do.

8    **Q.**   And then you also go on to provide some bullet points

9    that have some commentary on the data?

10   **A.**   That's correct.

11   **Q.**   And you wanted to provide Mr. Hayes, the CEO of JetBlue,

12   with accurate informing that he could rely on, right?

13   **A.**   We try to get things right, yeah.

14   **Q.**   You didn't want him to go and make public speeches where

15   he was making inaccurate statements because you didn't

16   correctly evaluate the data, right?

17   **A.**   We try to get the information right.

18   **Q.**   So let's look at the first bullet point.  And here you

19   report that, before Mint, American and Delta had only two

20   business class fares for JFK to LAX:  a nonrefundable fare

21   and a refundable fare, right?

22   **A.**   That's what I report.  It's a reference to publicly

23   available fares.

24   **Q.**   Understood.  Now, Mint launched in June of 2014; is that

25   right?

1    **A.**   The timeline sounds about right.

2    **Q.**   So looking at your second bullet point, there you report

3    that by August of 2016 -- so this is two years after Mint's

4    launch -- both American and Delta had introduced additional

5    publicly available business class fares, right?

6    **A.**   That's what I see there, yes.

7    **Q.**   And you report that American and Delta had also lowered

8    their fares to match JetBlue?

9    **A.**   That's accurate.

10   **Q.**   Okay.  So now looking at the first sub-bullet where you

11   write "zero day AP refundable fares decreased 65 percent,"

12   now, that sub-bullet corresponds to the data in the first row

13   of the table labeled "refundable"; is that right?

14   **A.**   Yes, that looks right.

15   **Q.**   And what you're reporting here is that publicly available

16   walkup, refundable business class fares decreased by

17   65 percent after JetBlue's Mint entry into the JFK to LAX

18   market, right?

19   **A.**   That's what I see there.

20   **Q.**   Okay.  Now, the second sub-bullet, that corresponds to

21   the second row of your table; is that right?

22   **A.**   It does.

23   **Q.**   Okay.  And in that second sub-bullet, you're reporting

24   that zero day, AP, nonrefundable -- so -- so walkup,

25   nonrefundable, publicly available business class fares --

1    decreased by 49 percent after Mint's entry into the JFK to
2    LAX market; is that right?
3    **A.**   That looks right.
4    **Q.**   Okay.  And the fourth sub-bullet -- sorry the third
5    sub-bullet, that corresponds to the fourth row of your table,
6    right?
7    **A.**   I believe it does.
8    **Q.**   Okay.  And that third sub-bullet is about the 30-day
9    nonrefundable fares, right?
10   **A.**   Yes.
11   **Q.**   Okay.  And if we look at the fourth row of your table, we
12   see that there aren't any fares listed for American and Delta
13   in the 2013 column for the 30 AP row, right?
14   **A.**   That's correct.
15   **Q.**   Okay.  And so that supports the bullet point that we just
16   looked at where you said that both American and Delta had
17   introduced additional publicly available business class
18   fares, the new fare being the 30-day AP nonrefundable fare,
19   right?
20   **A.**   That's correct.
21   **Q.**   And in that third sub-bullet, you're reporting that
22   publicly available, 30-day, advanced purchase, nonrefundable
23   business class fares decreased by 79 percent after JetBlue's
24   Mint entry into the JFK to LAX market; is that right?
25   **A.**   I believe that's right.

1 **Q.** And you provided this before Mint versus after Mint

2 comparison to demonstrate the success of Mint?

3 **A.** That's right.

4 **Q.** Okay. And one success was that business class fares went

5 down?

6 **A.** They did.

7 **Q.** And another success was that legacy airlines American and

8 Delta added more fare options for business class travelers

9 between JFK and LAX?

10 **A.** That's what we observed.

11 **Q.** And you provided this information in response to

12 Mr. White's request for some good data that Mr. Hayes could

13 rely on to show the importance of small airlines, like

14 JetBlue, in disciplining legacy behavior, right?

15 **A.** I believe that was his request. I was showing the

16 changes over time, yes.

17 　　　　MS. SINDEL: Thank you, Mr. Jarashow.

18 　　　　I have no further questions at this time, and I

19 pass the witness.

20 　　　　THE COURT: All right. Cross-examination.

21 　　　　MR. CRANER: Thank you, Your Honor.

22 　　　　**CROSS-EXAMINATION BY COUNSEL FOR JETBLUE**

23 BY MR. CRANER:

24 **Q.** Mr. Jarashow, I believe Ms. Sindel covered some

25 background with you in the questions. I just had a few

1   follow-up questions.

2           In your position, do you have any responsibilities

3   related to the NEA?

4   **A.**   Well, there aren't really ongoing responsibilities

5   related to the NEA.  In -- there were some initial

6   responsibilities to help implement or set up initially.

7   **Q.**   Okay.  Mr. Jarashow, I know you were asked questions

8   about JetBlue's pricing strategy.  How would you generally

9   describe JetBlue's pricing strategy?

10   **A.**   Yeah, to try to put it simply, it's -- our pricing

11   strategy is to stimulate demand by lowering fares for a great

12   product and trying to get people onboard our planes.

13   **Q.**   And what factors does JetBlue consider when pricing its

14   fares?

15   **A.**   There's lots of factors that would go into the fare that

16   someone might see when they're shopping, let's say.  You

17   know, some of the factors that -- again, between the pricing

18   team and the yield management team together, we would -- we

19   would set fares by having a menu of prices, a menu of fares

20   that are filed within ATPCO, and then determining how many

21   seats to make available and what class of services to make

22   available for each of those price points.

23           So some of the factors we would look at along the

24   way might be historical data, recent trends, bookings that

25   have already come in, our booking volume relative to where we

1   sort of expected to be at a point in time before a departure.

2   We might look at what other carriers are charging, what they

3   have filed, what they're selling, might look at the age of a

4   market, so whether a market -- a route is new for JetBlue,

5   whether it just entered or whether it's mature.

6           You know, I -- I guess I would kind of describe it

7   as like -- as an art more than a science, but it's always

8   moving as well.  So it's -- we were getting new data all the

9   time, and it's changing.  So inventory can change at a

10  moment's notice.  Prices can change several times a day, as

11  well, in terms of what's filed in ATPCO.  Those are some of

12  the factors among many we would consider.

13  Q.  And you mentioned fares changing several times a day -- I

14  think you mentioned earlier four times day.  Is there a

15  difference in terms of international fares in terms of how

16  often those are changed?

17  A.  Yes.  Those can change hourly.

18  Q.  So fair to say that fares are fluid and they aren't

19  really set at any point in time?

20  A.  I think that's right.  I wouldn't say they're ever really

21  set.  It's changing all the time.  It's dynamic.

22  Q.  And you listed several factors.  Are there any rules or

23  set formulas that JetBlue uses for its pricing?

24  A.  No.  Again, I would probably go back to the -- it's not

25  formulaic.  It's, really -- it's art more than it is science.

1    There's some data that we look at, but it's not a formula.

2    It's not a "this equals that."  That's not really how it

3    works.  We -- it's changing all the time.

4    Q.  And the pricing strategy overall that you described, has

5    that been consistent during your time as a manager in the

6    group?

7    A.  It has.

8    Q.  And Ms. Sindel showed you a document, a pricing strategy

9    document from 2020, August 2020.  Was the strategy in place

10   at that time?

11   A.  Yes.  It hasn't really changed.

12   Q.  But that document showed specific fares and specific

13   flights.  Would you say that that's static, or is it the

14   fares that are changing?

15   A.  Well, that was a snapshot in time.  The strategies that

16   we may have in place on a route-by -- I probably should have

17   added this, that we really take a route-by-route approach;

18   and that can change, really, as market -- around dynamics,

19   competitive factors change as well, what our own

20   supply/demand -- what does the capacity environment look

21   like?

22          So what we saw before was one snapshot in time.  I

23   believe it was August 2020.  On a route-by-route basis, that

24   may have changed.  The high-level strategy, though, has been

25   the same, which there are route-by-route differences that are

1   changing all the time.

2   **Q.**  So the pricing strategy remains the same.  The specific

3   routes can change hour by hour, day by hour?  Is that

4   possible?

5            MS. SINDEL:  Objection.  Leading.

6            THE COURT:  Sustained as to the form.

7            MR. CRANER:  Okay.  I'll move on, Your Honor.

8   BY MR. CRANER:

9   **Q.**  You were shown some documents relating to pricing

10  pre-NEA.  I would like to just go back to one of the

11  documents that you were shown, PX 544, if you can pull it up.

12  It's in your binder as well.

13           Mr. Jarashow, do you remember looking and

14  discussing this document a few minutes ago?

15  **A.**  I do.

16  **Q.**  And this is a document from 2008 discussing JetBlue's

17  launch of its Mint product on the JFK-LAX route from 2014; is

18  that right?

19           MS. SINDEL:  Objection.  Mischaracterizes the

20  document.  It's 2018, not 2008.

21           MR. CRANER:  Right.  The document is from 2018.

22  It's referring to JetBlue's launch in 2014.

23           THE COURT:  Still objecting?

24           MS. SINDEL:  I believe he said 2008, not 2018.

25           MR. CRANER:  I said 2018.

1          MS. SINDEL:  Okay.

2          THE COURT:  All right.  Go ahead.

3          THE WITNESS:  Yes, that looks light.

4     BY MR. CRANER:

5     **Q.**   And does JetBlue still fly the route from JFK to LAX?

6     **A.**   We do.

7     **Q.**   And does JetBlue still offer Mint on that product?

8     **A.**   We do.

9     **Q.**   And after the NEA was implemented, did JetBlue change its

10    pricing strategy on that route?

11         MS. SINDEL:  Objection, Your Honor.  Outside the

12    scope of direct and, also, Mr. Jarashow -- lack of

13    foundation.  He's testified he doesn't have responsibility

14    for NEA pricing for domestic routes.

15         MR. CRANER:  This was a document from 2018 when

16    Mr. Jarashow did have responsibility, so I think he can

17    answer.  And it's within the scope of this document,

18    Your Honor.

19         THE COURT:  Overruled.

20         THE WITNESS:  Would you remind repeating the

21    question?

22    BY MR. CRANER:

23    **Q.**   Sure.  After the NEA was implemented, did JetBlue change

24    its pricing strategy on this route?

25    **A.**   We did not.

1    **Q.**  Okay.  Mr. Jarashow, I know that's an example of pricing

2    pre-NEA.  I want to turn to pricing more recently.

3              THE COURT:  Just so I understand -- wait.  I'm

4    sorry.  When you use the term "pricing strategy," you mean

5    the way you -- the overarching goal, which is to stimulate

6    demand, fill your seats, and -- at low prices and the various

7    cons- -- the approach, that is the very constellation of

8    factors that you think about in setting a particular price on

9    a particular route for a particular class or service?

10             So, in other words, the approach is the same; the

11   strat- -- that's what the strategy is?

12             THE WITNESS:  Correct.

13             THE COURT:  That could yield that -- that same

14   strategy could yield different prices for the same thing on

15   the same day?

16             THE WITNESS:  That's correct, Your Honor.  They're,

17   again, sort of two components, both the pricing as well the

18   yield or inventory management.  Both of those work together

19   to determine what's actually selling upon a given flight at a

20   time, at any given time.

21             THE COURT:  You can probably put only one seat

22   available at that price, or you could have that price with a

23   lot of seats available?

24             THE WITNESS:  You can have that price with a lot of

25   seats available or one.

```
 1              THE COURT:  Okay.  Go ahead.
 2    BY MR. CRANER:
 3    Q.  Mr. Jarashow, I'd like to pull up DX 384.  It's in
 4    evidence?
 5              MR. LESKE:  Your Honor, I have copies for the --
 6    may I approach?
 7              THE COURT:  Go ahead.
 8              THE WITNESS:  384?
 9              MR. CRANER:  Yes, please.
10              THE WITNESS:  Thank you.
11              MR. CRANER:  Are you there?
12    BY MR. CRANER:
13    Q.  This document says LON, which is for London, pricing
14    overview, and it's dated May 2021.  Do you see that?
15    A.  I do see that.
16    Q.  And have you seen this document before?
17    A.  Yes, I have.
18    Q.  If you can please take a look at the front page and just
19    describe what this document is.
20    A.  Sure.  This document was prepared by my team as part of a
21    presentation or a discussion with our senior leadership
22    around our initial set of pricing principles and our approach
23    as we began to get -- to prepare for our own sales of flights
24    to London.
25    Q.  And were you involved in preparing this document?
```

1    **A.**   Yes.  My team prepared it.

2    **Q.**   Okay.  And were you involved in the discussion about

3    pricing for JetBlue's London routes?

4    **A.**   Yes, I was.

5    **Q.**   And how does JetBlue's pricing strategy for its

6    transatlantic routes compare to its pricing strategy for

7    domestic routes?

8    **A.**   I'd say it's very, very similar.  It's the same.  We

9    attempted to disrupt the marketplace to bring low fares and a

10   great product to just a new route in our network.

11   **Q.**   Okay.  If we can please turn to the second page, slide 2.

12   Mr. Jarashow, you can see this; it lists JetBlue's

13   transatlantic pricing principles.  Do you see that?

14   **A.**   I do.

15   **Q.**   And can you please describe what this slide is attempting

16   to convey?

17   **A.**   Sure.  It's attempting to convey our, again, sort of

18   approach to the way we're reviewing and the way we wanted to

19   approach our initial set of fares, pricing for both Mint and

20   for Core, as well as some of the details that went into

21   our -- well, what we would -- I would probably say high-level

22   talking points that are sort of key considerations.

23   **Q.**   Okay.  If you see underneath Mint, it reads "Powerful

24   Disruption."  Do you see that?

25   **A.**   I do.

1  **Q.**  What is this column attempting to convey?

2  **A.**  The way in which we saw ourselves and our position of

3  disrupting the pricing landscape, but also just the

4  marketplace for business class between New York and London.

5  **Q.**  And if you look at this column, can you see what price

6  JetBlue was planning to offer for its premium cabin

7  round-trip ticket?

8  **A.**  I see 2,000 round trip.  All-in was our lead-in price.

9  **Q.**  Can you see -- a little bit further down, can you see

10  what the lowest structured fare for a legacy competitor that

11  it was offering at the time?

12  **A.**  I believe that would have been 3,200, so 2,000 plus

13  1,200.

14          THE COURT:  What's a structured fare?

15          THE WITNESS:  An annual fare, one that's valid for

16  travel all year-round.

17          THE COURT:  Thank you.

18  BY MR. CRANER:

19  **Q.**  And do you know when JetBlue launched its transatlantic

20  service?

21  **A.**  Yes.  It would have been in August of 2021.

22  **Q.**  And this document is from a few months earlier in May of

23  2021; is that right?

24  **A.**  That's correct.

25          THE COURT:  One last question.  This is -- and

1    what's the other airline tactical fare?

2              THE WITNESS:  That would have been, well, $2,500.

3    Are you asking about the reference, Your Honor?

4              THE COURT:  No, no.  I understand the math.  I

5    mean, so it's lower than -- a structured fare is one that's

6    available from other airlines, good for the whole year,

7    right?  What's a tactical fare?

8              THE WITNESS:  Well, it's similar to what we spoke

9    about earlier.  It would be a temporary fare valid for maybe

10   a specific travel period of the year.  I think the reference

11   here was to say that our -- our entry or lead-in price would

12   have been lower than either the structure annual fare or the

13   tactical temporary fare that we saw in the market at the

14   time.

15             THE COURT:  So some people were offering temporary

16   fares on New York to London for their business class service

17   that was cheaper than their structured fare, but still $500

18   more than what you were planning to target, your lead-in

19   all-year price?

20             THE WITNESS:  That's an accurate assessment.

21             THE COURT:  Thank you.

22             Go ahead.

23   BY MR. CRANER:

24   Q.  And, Mr. Jarashow, were American's fares considered in

25   determining what JetBlue would charge?

1  **A.**  Sure.  American's fares, Delta's fares, Virgin's -- we

2  looked at the broad market set, the broad competitive set.

3  **Q.**  Okay.  And you testified that this document was prepared

4  in May of 2021.  Do you know if it was prepared before or

5  after the NEA was implemented?

6  **A.**  That would be after the NEA was implemented.

7  **Q.**  Okay.  I want to shift topics.  We discussed the many

8  factors JetBlue considers in pricing strategy.  I think you

9  just mentioned looking at competitors on a route when setting

10  fares.  Can you describe what happens generally when a

11  competitor increases its fares on a route that JetBlue flies?

12  Are there any rules related to that?

13  **A.**  Well, there's no set rule about what would or wouldn't

14  happen when a competitor removes capacity or suspends service

15  in a route.

16        But we would see a schedule change come through.

17  We might be aware that a carrier is changing their capacity

18  or the level of service in a route.  We take generally a

19  wait-and-see approach.  We'll note -- certainly be aware of

20  it.  And we're constantly aware of what's happening around

21  us.

22        But we'll general take no action.  We'll wait and

23  see how booking trends materialize and how the demand

24  environment evolves over time.  There's many factors that we

25  consider.  Really, it's no action immediately.

1  **Q.**  Okay.  And earlier you discussed the concept of matching.

2  Is there a standard practice that JetBlue uses in terms of

3  deciding when to match another competitor's fares?

4  **A.**  Not -- I wouldn't say there's a standard practice.  It

5  really varies route to route.  I would probably describe it

6  as what we would consider to be reasonable alternatives for

7  the individual routes that we serve.  And, again, by "match,"

8  I'd also probably just say active benchmarking is -- "match"

9  is sort of a shorthand, but it's really active benchmarking.

10  **Q.**  Okay.  I wanted to move on.  If you remember, you were

11  shown a document, PX 583A.  It was a demonstrative document.

12  If you can please turn to that.

13  **A.**  That's in the other binder?

14  **Q.**  It's in the -- it's -- yes.  You can look at it on the

15  screen here as well.

16          THE COURT:  Let's pause here for one second.  How

17  much longer do you have?

18          MR. CRANER:  Probably 20 minutes.

19          THE COURT:  Okay.  Fine.  Then we're going to take

20  the break now so the court reporters can switch.  All right?

21          We'll stand in recess, and we'll resume at 11:15.

22          (Court in recess at 11:02 a.m.)

23          (The following reported by Rachel Lopez.)

24          (Court reconvened at 11:18 a.m.)

25          THE DEPUTY CLERK:  United State District Court for

1  the District of Massachusetts is now in session, the

2  Honorable Leo T. Sorokin presiding.

3          THE COURT:  Please be seated.

4          You can proceed.

5  BY MR. CRANER:

6  **Q.**  Mr. Jarashow, the government asked you several questions

7  about pricing, you know, preNEA, and pricing generally, and

8  my question is has the NEA changed JetBlue's pricing strategy

9  in any way?

10          MS. SINDEL:  Objection, Your Honor, outside the

11  scope, and again, lack of foundation.  He has said he doesn't

12  have pricing responsibility for domestic routes under the

13  NEA.

14          MR. CRANER:  Mr. Jarashow had a responsibility when

15  the NEA was implemented and he also has a role in the

16  international role, and I think he can explain his

17  understanding of that.

18          THE COURT:  I think he can explain it, caveated to

19  the time periods he was involved with pricing.  It seems --

20  since the pricing strategy was talked about on direct, I

21  think it's within the scope.

22          MR. CRANER:  Thank you, Your Honor.

23          THE WITNESS:  No, JetBlue's pricing strategy has

24  not changed with respect to the NEA.  There's no

25  consideration given to the NEA.

1   BY MR. CRANER:

2   **Q.**  And are there any differences in how JetBlue prices or

3   its pricing strategy for routes in the NEA, compared to those

4   outside the NEA?

5               THE COURT:  I'm sorry.  Can you just repeat that?

6   I just couldn't hear it.

7               MR. CRANER:  Sure.  Is there any differences in how

8   JetBlue prices or its pricing strategy for routes in the NEA

9   compared to routes outside the NEA?

10              THE WITNESS:  No, there's no difference and there's

11  not consideration given to the NEA with respect to our

12  pricing strategies.

13  BY MR. CRANER:

14  **Q.**  And has anyone at JetBlue given you any reason to believe

15  that JetBlue will change its pricing strategy because of the

16  NEA?

17  **A.**  No, they have not.

18              MR. CRANER:  No further questions, Your Honor.

19              MS. SINDEL:  No further questions, Your Honor.

20              THE COURT:  All right.  Thank you very much.

21  You're excused.

22              Next witness?

23              MR. JONES:  Yes, Your Honor, the plaintiffs call

24  John Kirby of Spirit Airlines.  And my colleague, Mr. Davis,

25  will conduct the examination from the Department of Justice.

 1          THE COURT:  For your own planning purposes about

 2     binders, I'm going to -- the two sets is helpful, but I'm

 3     going to -- after a witness is done, generally I'm going to

 4     return one set and we'll keep one set.

 5          Where is Mr. Kirby?  Are you Mr. Kirby?

 6          THE WITNESS:  Yes.

 7          THE COURT:  Go ahead right over there.

 8          THE WITNESS:  Okay.

 9          THE COURT:  No problem.  And if you just remain

10     standing for Ms. Belmont to administer the oath.

11          (The witness was duly sworn.)

12          THE DEPUTY CLERK:  Can you please state your name

13     for the record?

14          THE WITNESS:  Sure.  John Patrick Kirby.

15          THE COURT:  Great.  Have a seat.

16          Mr. Davis, whenever you're ready, you can proceed.

17                          **JOHN KIRBY**

18          having been duly sworn, testified as follows:

19     **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

20     BY MR. DAVIS:

21     **Q.**   Good morning, Mr. Kirby.

22     **A.**   Good morning, John.

23     **Q.**   How are you employed?

24     **A.**   I'm employed by Spirit Airlines which is headquartered in

25     Miramar, Florida.

1   **Q.**   And what is your position with Spirit Airlines?

2   **A.**   Vice president of network planning.

3   **Q.**   How long have you been vice president of network planning

4   at spirit?

5   **A.**   Nearly four years.  It will be four years November 1st.

6   **Q.**   All right.  How long have you worked in the airline

7   industry, Mr. Kirby?

8   **A.**   All right.  I started in September of 1983, so it's been

9   39 years.

10  **Q.**   Almost 40?

11  **A.**   Almost 40, yes.

12  **Q.**   And could you briefly state the various airlines you've

13  worked for in your career?

14  **A.**   Sure.  I started with a company called People Express

15  that was based in Newark, New Jersey, working as part of

16  their sales associate program when I was still in college.

17  After college, I worked for a company called Holiday Airlines

18  which was also based in Newark, New Jersey.  In both of those

19  airlines I was in more operational roles.  I joined Northwest

20  Airlines in 1989 in network planning, and I've been network

21  planning ever since.  I worked there three years, joined US

22  Air in 1992, stayed there through almost the end of '99,

23  joined AirTran Airways in 1999, and that was the first time I

24  was head of network at a company.  AirTran was eventually

25  acquired in May of 2011 by Southwest Airlines, and I was

1    asked to stay on and lead initially the transition of AirTran

2    integration, as well as starting up their international

3    division, and subsequently put in charge of domestic and

4    international planning.  And then I joined Alaska Airlines

5    in -- at the beginning of 2015, was there through Halloween

6    of 2018, and then, again, joined Spirit November 1st of 2018.

7    **Q.**   And as vice president of network planning now at Spirit,

8    what do you do every day?

9    **A.**   Well, I read a lot.  But basically I study the industry.

10   I study what's going on.  I've reviewed trends, economics.

11   And I've developed strategies, as well as long term

12   ambitions, plans for the company.

13   **Q.**   Do you have --

14   **A.**   Also I'll just add, we produce, in essence, the product

15   of the company.  So ultimately my team will manage for the

16   product which is the schedule for the airline.

17   **Q.**   So you view the product of the company as its schedule?

18   **A.**   Yes, because that's what we are selling to the consumer.

19   **Q.**   All right.  Do you have a team that reports to you?

20   **A.**   Yes.

21   **Q.**   And how large is that team?

22   **A.**   It's about a dozen people.

23   **Q.**   And part of what you do, obviously, is plan Spirit's

24   network?

25   **A.**   Yes.

1   **Q.**  Do you also study the networks of competitors in the
2   industry?
3   **A.**  Yes.
4   **Q.**  And do you study pricing and other competitive actions in
5   the industry?
6   **A.**  I would say less pricing, but certainly competitive
7   actions.  Pricing is very dynamic, so large pricing changes,
8   I might be aware of, but not the day-to-day, four times a day
9   changes as much.
10  **Q.**  To what extent in the deregulated airline industry is
11  data available from different carriers?
12  **A.**  It's readily available.  It's one of the things I often
13  talk about is the fact that even though we are a deregulated
14  industry, we have all the trappings of regulation.  So each
15  carrier has to submit their ONDs; their average fares in
16  those ONDs; T-100, which is their onboard data; Form 41
17  financial data; and so on.  So a lot is known about the
18  airline industry, and that information is disseminated by the
19  Department of Transportation.
20  **Q.**  Let's talk briefly about Spirit.  What year was it
21  founded?
22  **A.**  Spirit Airlines was founded, I believe, in -- in 1981, I
23  believe, as Express One, and then about a decade later, it
24  became Spirit Airlines.
25  **Q.**  And you said it was headquartered in Miramar, Florida.

1   **A.**  Correct.

2   **Q.**  Is that near Fort Lauderdale?

3   **A.**  Yes, relatively close.

4   **Q.**  And is Spirit a ULCC?  Is that fair?

5   **A.**  Yes, spirit was actually the -- the first ULCC and they

6   coined that phrase.

7   **Q.**  All right.  And that, of course, stands for what?

8   **A.**  Ultra low cost carrier.

9   **Q.**  And what is the approximate percentage of current

10  capacity among ULCCs that Spirit has?

11  **A.**  Among ULCCs, probably about 40 percent, I think ballpark.

12  **Q.**  All right.  And is it -- what size is Spirit among all

13  domestic US carriers?

14  **A.**  Among all domestic?  It's the seventh largest carrier.

15  **Q.**  Behind JetBlue?

16  **A.**  Behind JetBlue, yes.

17  **Q.**  And in front of who?

18  **A.**  Frontier.

19  **Q.**  And where does Spirit rank in terms of rate of growth

20  among domestic airlines?

21  **A.**  Typically, we're one of the fastest growing airlines in

22  the industry.  So for example, in 2018, we were the fastest

23  growing carrier among the US majors, if you exclude the fact

24  that Alaska Airlines purchased Virgin America.

25  **Q.**  All right.  All right.  Let's talk about does Spirit

1    serve New York City and Newark?

2    **A.**   Yes.  We serve LaGuardia in New York City, and then also

3    we serve Liberty Newark International Airport.

4    **Q.**   So Newark, LaGuardia, but not JFK, right?

5    **A.**   Correct.

6    **Q.**   Let's look at plaintiff Exhibit 893, which I believe is

7    in evidence.  And do you have your notebook, Mr. Kirby?

8    **A.**   I did not bring it, but I can see it on the screen now.

9              THE COURT:  You mean the notebook that you provided

10   him?

11             MR. DAVIS:  Yes, Your Honor.

12             THE COURT:  So you can look at it on the screen, or

13   it's in the binder.

14             THE WITNESS:  I think the screen is fine.  Okay.  I

15   can see that.

16   BY MR. DAVIS:

17   **Q.**   All right.  And you see the date of this is

18   September 2019?

19   **A.**   Yes.

20   **Q.**   And the attachments are labeled -- can you read that

21   there?  What does that say at the top?  PANY?  What is that?

22   **A.**   Okay, I'm sorry, yes, PANY/NJ, so that stands for Port

23   Authority New York/New Jersey, and September 6th meeting.

24   **Q.**   All right.  And so why would you be meeting with the Port

25   Authority of New York/New Jersey in September of 2019?

1    **A.**   I generally meet with the folks at the Port Authority at

2    least a couple of times a year, so just sort of normal

3    business practice, I do that with a number of larger

4    airports, as well.

5    **Q.**   Okay.  So let's look at a few of the slides in the

6    attached deck.  First can we start with just the title slide.

7    So you brought this deck with you; is that right?

8    **A.**   Oh.

9            THE COURT:  He doesn't see the deck on the screen.

10           MR. DAVIS:  Yes, so, I think it's coming.

11           THE WITNESS:  Okay.  Very good.  Yes, now I see it.

12   BY MR. DAVIS:

13   **Q.**   And that says Spirit Airlines of New York?

14   **A.**   Correct.

15   **Q.**   And let's go to the page -- the next page ends in 036.

16   And can you read the title of that slide?

17   **A.**   Sure.  "Spirit, the largest ULCC in the Americas."

18   **Q.**   All right.  And you can see the various routes as of fall

19   of 2019 in the map, right?

20   **A.**   Yes.

21   **Q.**   All right.  And showing you now the next slide, 038-- I'm

22   sorry, 037, that's my bad.  037 is next.

23   **A.**   I can see that now.

24   **Q.**   And what does that slide say?

25   **A.**   "Built for low cost."

1    **Q.**   And can you read the next line under that?

2    **A.**   "Growth contributes, but the primary source of our cost

3    advantage comes from being built for low cost."

4    **Q.**   All right.  And there's a chart in there that says,

5    "adjusted CASM ex-fuel," and it goes between the years 2012

6    and 2019.  Do you see that?

7    **A.**   Yes.

8    **Q.**   Can you explain briefly what that chart is depicting?

9    **A.**   So the -- you can see on the vertical column, there's

10   numerics.  Basically it's looking at what is our cost per ASM

11   and it's demonstrating the variants per year.  But I think

12   the important thing on that chart is that you can see that

13   our cost per ASM continues to go down over multiple years, so

14   we're actually gaining lower cost rather than losing.

15   **Q.**   All right.  And when it says ex-fuel, what does that mean

16   and why do you have it as ex-fuel?

17   **A.**   One, it's a typical measure, because fuel is a sort of an

18   somewhat uncontrollable variable.  So most carriers exclude

19   fuel when they talk about their cost per ASM.

20   **Q.**   All right.  And how does Spirit's CASM compare, in

21   general, say, to legacy airline's CASM?

22   **A.**   It's significantly lower, in some cases half.

23   **Q.**   And the bottom bullet, do you see under, "Keeping it

24   Simple," can you read that quickly?  What do those points

25   show?

1   **A.**  "No premium classes service, no specialty clubs, no

2   special services/amenities that drive costs without an

3   associated revenue benefit."

4   **Q.**  So basically no frills or you pay for them, right?

5   **A.**  No frills, or if there are frills, they are frills that

6   we've identified that produce revenue.

7   **Q.**  All right.

8         THE COURT:  What would be an example of that?

9         THE WITNESS:  Let's say our -- we have a product

10  that's not a different class of service, but we have a seat

11  that's larger at the front of the cabin, we call the big

12  front seat.  So it's about the same size as a domestic first

13  class seat, but you don't get free drinks and so on, you're

14  just really paying for a little more width and a little more

15  leg space.  That would be an example, but we can monetize

16  that, we can charge more for that product than we can for a

17  different seat.  That's an example.

18        THE COURT:  Okay.  Go ahead.

19  BY MR. DAVIS:

20  **Q.**  Next slide is 038.  Do you see that, Mr. Kirby, once that

21  comes up?

22  **A.**  Yup.

23  **Q.**  And what does that say at the top?

24  **A.**  "Spirits relative cost advantage has grown."

25  **Q.**  And can you summarize what the chart there shows, that's

1  labeled "SL adjusted CASM ex-fuel."  And then percentage

2  higher than Spirit.  What is that showing?

3  **A.**  Sure.  So SL stands for stage length adjusted, to make it

4  apples to apple comparison, but it's showing the -- again,

5  the differential of our cost versus some of our competitors.

6  **Q.**  And each of these competitors has a percentage higher

7  than Spirit's cost -- or Spirit has a cost advantage over

8  each of those airlines, right?

9  **A.**  Yes.  Just to use the example, back in full year, so FY,

10  full year 2012, we enjoyed a 15 percent cost advantage versus

11  Southwest, by the full year '18, it had grown to a 43 percent

12  cost advantage.

13  **Q.**  All right.  And the cost advantage over JetBlue, what

14  does that show?

15  **A.**  At full year 2018, it was 63 percent higher.

16  **Q.**  Right.  And then the cost advantage --

17  **A.**  Sorry.  Or rather, JetBlue's was 63 percent higher than

18  ours.

19  **Q.**  Okay.  And cost advantage over the legacies, Delta,

20  American, and United, what does that show?

21  **A.**  Over 100 percent.  So as I said earlier, it can be more

22  than half.  So let's use Delta, it's 115 percent, so

23  something greater than twice of what our cost is.

24  **Q.**  All right.  Let's go to slide 042.  And can you read the

25  top?

1   A.   "We are planning to continue our fast growth."

2   Q.   All right.  And what does that slide show in terms of

3   capacity growth in 2018?

4   A.   In 2018, we grew capacity at 23 percent.

5   Q.   And the expectation for 2019 was what?

6   A.   15 percent.

7   Q.   And do you know what it ended up being for 2019?

8   A.   Yes.  It ended up being 14.1.

9   Q.   All right.  And again, relative to the industry, where

10  does that rank?

11  A.   It was the second fastest after Sun Country.

12  Q.   All right.  Let's go to 044 is the next slide.  All

13  right.  Can you read the top of that?

14  A.   "Spirit has rapidly expanded in NYC, New York City area

15  since entering Newark."

16  Q.   And the next line there, average daily departures?

17  A.   "Average daily departures for Spirit in New York City."

18  Q.   All right.  And the two airports here again are which?

19  A.   LaGuardia on the left and Newark on the right.

20  Q.   And that's because there's no JFK presence, right?

21  A.   Correct.

22  Q.   All right.  And the bottom, the LaGuardia bar, what do

23  you see there, and what does it show, and how does it

24  change -- I'm sorry, that's a lot of questions.  Explain --

25  explain, if you will, the LaGuardia bar at the bottom.

1  **A.**   Yeah, it shows that we -- we are operating 11 flights a

2  day, and that has not changed between first quarter 2015 and

3  third quarter 2016.

4  **Q.**   And how many gates were used to do those approximately 11

5  flights at LaGuardia?

6  **A.**   A single gate.

7  **Q.**   All right.  And is that a relatively efficient use of the

8  gate or not?

9  **A.**   Most would consider it especially efficient at a facility

10  like LaGuardia.  I would say it was airport leading.

11  **Q.**   And is efficiency of use of slots and gates something

12  that Spirit is proud of?

13  **A.**   Yeah.  It's -- again, it's part of the -- you know, a few

14  slides ago, it's part of the business model.  So if you

15  highly utilize assets, you can keep your overall cost lower.

16  **Q.**   Okay and --

17          THE COURT:  Because you're paying rent for the

18  gate?

19          THE WITNESS:  Yeah, you're leasing a gate.  So if

20  you think about it, the cost has sunk.  So if you fly five

21  times a day, the cost is divided by five, it's ten, it's

22  divided by ten, so your costs go down.

23          THE COURT:  I see it.

24          Go ahead.

25  BY MR. DAVIS:

1   **Q.**   And why is the size of the LaGuardia bar the same from
2   2015 to 2019?
3   **A.**   We weren't able to secure anymore slots at LaGuardia.
4   **Q.**   Was that the result you wanted at LaGuardia?
5   **A.**   We certainly wanted to grow at LaGuardia.
6   **Q.**   All right.  But were you able to?
7   **A.**   No, we weren't able to.  Really, it was two constraints.
8   Certainly not getting any additional slots, but also because
9   we were already operating 11 flights on one gate and that's
10  all we had access to.  You really couldn't fit anymore
11  flights on one gate.
12  **Q.**   All right.  And briefly, what is the rest of the sideshow
13  about Newark?
14  **A.**   In Newark, we were able to grow.  A big part of the
15  growth was getting access to a second gate.  So we were able
16  to add flying in off-peak times.
17  **Q.**   All right.  And the chart shows the acquisition of that
18  second gate in late 2016?
19  **A.**   Yes.
20  **Q.**   At or --
21  **A.**   I'm sorry, first gate was in 2016, and then a second
22  gate, yes, in 2019.
23  **Q.**   All right.  And so what was the growth in Newark that we
24  see here from 2016 to '19?
25  **A.**   It looks like we went from about around 11 flights a

1    day -- I'm sorry, actually looking at this, it looks like

2    about five flights a day to about 25 flights a day.

3    Q.  And again, for this chart, that's all at about one or two

4    gates at Newark, right?

5    A.  Yes.

6    Q.  Would you have liked to have had more gates?

7    A.  Eventually, we actually have secured a third gate.

8    Q.  All right.  Since 2019, right?

9    A.  Since 2019, correct.

10   Q.  All right.  So let's go to slide 50.  Just a few more of

11   these slides.  Can you read the top of that, please?

12   A.  "Today Newark has the most departures controlled by one

13   airline in New York City."

14   Q.  All right.  And the next line in smaller print below?

15   A.  "Domestic departure share of NYC airport."

16   Q.  All right.  And so those three bars show Newark,

17   LaGuardia, and JFK?

18   A.  Correct.

19   Q.  And the largest, the other airlines, and then the ULCC

20   airlines, right?

21   A.  Yes.

22   Q.  And for Newark, what does that show in terms of the

23   largest?

24   A.  The largest is United at a 73 percent share.

25   Q.  All right.  The other airlines have how much?

1   **A.**   Sans the ultra low cost, it's 23 percent.

2   **Q.**   All right.  And with -- the ultra low cost at Newark is a

3   total of what?

4   **A.**   3 percent.

5   **Q.**   Okay.  And quickly, at LaGuardia, what does that show?

6   **A.**   It shows that Delta airlines is the largest carrier with

7   48 percent.  Other carriers, excluding ULCCs are 49, and a

8   similar 3 percent share at LaGuardia for ULCCs.

9   **Q.**   All right.  And finally, JFK?

10   **A.**   Again, Delta at a 48 percent, and all other carriers at

11   52 percent.  No ULCC presence.

12   **Q.**   And is that true that, as of 2019, JFK airport had zero

13   ULCC presence?

14   **A.**   Yes.

15   **Q.**   All right.  Let's go to 51, the next slide.  Can you read

16   that at the top?

17   **A.**   "Ten of Spirit's 11 New York markets broke up monopolies

18   or duopolies."

19   **Q.**   Okay.  And monopoly or duopoly means what?

20   **A.**   A monoploy means that only a single carrier serves the

21   market.  A duopoly means only two carriers serve the market.

22   **Q.**   And so what's different about Orlando market from Newark

23   here on the slide?

24   **A.**   Orlando had a third competitor.

25   **Q.**   But all the rest had either one or two, right?

1   **A.**   Yes.

2   **Q.**   And the number one in each was what?

3   **A.**   United Airlines.

4   **Q.**   All right.  And when you showed this, why did you include

5   JFK and LaGuardia flights to those places when you're saying

6   whether it's a monopoly or a duopoly.

7   **A.**   We focused on Newark as an independent airline --

8   airport, rather.

9   **Q.**   Okay.  Let's go to slide number 58, near the end.  And

10  this shows what?

11  **A.**   It shows a summary of Spirit's New York City aspirations.

12  **Q.**   Okay.  And the second slide, your preference, could you

13  read that, please?

14  **A.**   "Our preference would be to grow at LaGuardia, but due to

15  consolidation, LaGuardia slots are increasingly concentrated

16  in the hands of the four largest carriers."

17  **Q.**   And the next bullet, please.

18  **A.**   "Of the nearly 600 scheduled LaGuardia departures, more

19  than 90 percent are operated by American Airlines, Delta

20  Airlines, United Airlines, or Southwest Airlines."

21  **Q.**   Otherwise known as the big four, right?

22  **A.**   Yes.

23  **Q.**   And then the next slide is about -- I'm sorry, the next

24  bullet is about size of aircraft, right?

25  **A.**   Yes.

1   **Q.**  I'm sorry, before you go, the next bullet I meant.  I'm

2   sorry.

3   **A.**  Yeah.  Okay.

4   **Q.**  The fourth bullet, can you read that, please?

5   **A.**  "Of the 90 percent plus operated by the big four

6   carriers, more than 50 percent are operated by aircraft in 76

7   seats or less."

8   **Q.**  All right.  And what is the smallest number of seats on a

9   Spirit aircraft as of 2019?

10  **A.**  In 2019, we did have a fleet of 319s that had 145 seats.

11  However, in the New York area airports, we primarily offered

12  only 320 and 321, so the smallest gauge would be 182 seats.

13  **Q.**  So 182 is more than twice the 76 seat or less that are

14  used half the time, right?  In that bullet?

15  **A.**  Yes.  It's more than twice, yes.

16  **Q.**  All right.  Let's go to 59, the last slide.  Can you read

17  the top bullet?

18  **A.**  Its Spirit New York City aspirations continue.

19  **Q.**  All right.  And the bullet, what does that say?

20  **A.**  The first one?

21  **Q.**  Yeah.

22  **A.**  "JFK could be an alternative but is constrained for much

23  of the afternoon/evening, and facilities are difficult to

24  secure."

25  **Q.**  All right.  And you had a pending request, is that right?

1    For the FAA, for the 16 slot pairs?

2    **A.**   Yes, we've been putting that request in for several years

3    now.

4    **Q.**   All right.  And below that, you make an assertion to

5    serve JFK and bring competition.  Can you read that, please?

6    **A.**   Sure.  "To serve JFK and bring material competition to

7    the marketplace, it is necessary to have a critical mass of

8    slots that allow operations across the day.  Including times

9    that are preferred by passengers."

10   **Q.**   Critical mass of slots, right?  What do you mean by that?

11   **A.**   Enough to be an efficient operator and also to have

12   enough mass that we can withstand the anticipated

13   competition.

14   **Q.**   All right.  And could you read the last bullet, please?

15   **A.**   "A piecemeal approach, which would be prohibitively

16   expensive, it would place Spirit at a competitive

17   disadvantage, would be nearly impossible to overcome."

18   **Q.**   Okay.  And what's an example of a piecemeal approach to

19   entry at JFK, what do you mean by that?

20   **A.**   Sometimes you can get a small amount of capacity at an

21   airport that is otherwise constrained.  And if you felt that

22   you could successfully, let's say, get a toe hold in the

23   marketplace, you might go in with a smaller number -- a

24   smaller amount of service, and then try to go over time.

25           The challenge with JFK is it's, I'd say, almost

1    inarguably the most expensive airport to operate in the US.

2    It's cost per passenger is CPE, it's about the same as

3    Newark's, but because they're private terminals, the cost to

4    operate the facilities are usually pretty expensive.

5    **Q.**  All right.  And so how long has Spirit been interested in

6    slots at JFK airport?

7    **A.**  Well, again, I'll just say that I have been with the

8    company nearly four years.  So it's at least the four years

9    that I've been, and in conversations with other executives,

10   we've been interested probably for more than a decade.

11   **Q.**  All right.  Have you ever been able to obtain a critical

12   mass of slots at JFK?

13   **A.**  In my career or --

14   **Q.**  At Spirit.

15   **A.**  At Spirit?  No.

16   **Q.**  All right.  Did JetBlue have a critical mass of slots at

17   JFK before the NEA?

18   **A.**  Yes.

19   **Q.**  And the NEA is, of course, the Northeast Alliance,

20   announced in July of 2020?

21   **A.**  Yes, July 16, 2020.

22   **Q.**  And did American Airlines have a critical mass of slots

23   at JFK before the NEA?

24   **A.**  Yes.

25   **Q.**  All right.  Are you familiar with the concept of

1    relevance in the airline industry?

2    **A.**  Yes.

3    **Q.**  Did JetBlue -- well, how would you define relevance?

4    **A.**  I -- I often use the analogy of a supermarket.  You think

5    about if you're a full service provider, you have every

6    product you could possibly want.  That means that your

7    customers are more interested in going there because it's a

8    one-stop shop.  If you have very small service level, let's

9    say you only serve bread, then I think it narrows the amount

10   of people that would consider you.

11           So that's really what relevance is is do you serve

12   the markets that are important to customers that want to fly

13   out of that airport?  And I think the more relevance you

14   have, the more likely you're in the consideration set for

15   their business.

16   **Q.**  Okay.  Did JetBlue have relevance in New York before the

17   NEA was signed?

18           MR. WALL:  Objection, no foundation.

19           THE WITNESS:  Based on my definition, yes.

20           THE COURT:  Who had relevance?

21           MR. WALL:  JetBlue.

22           THE COURT:  JetBlue?  Overruled.  The answer

23   stands.

24   BY MR. DAVIS:

25   **Q.**  Did JetBlue have relevance?

1    **A.**   Yes.  Based on my definition, yes.

2    **Q.**   And did American have relevance?

3    **A.**   Yes.

4    **Q.**   And what about in Boston?  Did JetBlue have relevance in

5    Boston before the NEA?

6    **A.**   Yes, JetBlue was the largest carrier in Boston before the

7    NEA.

8    **Q.**   And did American have relevance in Boston before the NEA?

9    **A.**   Yes.

10   **Q.**   All right.  And just to update the Court, what is

11   Spirit's current status at LaGuardia?

12   **A.**   At LaGuardia, we had been -- we've been able to move from

13   our single gate operation on terminal C to have a lease for

14   the Marine Air terminal, which allows us to -- the marine --

15   often referred to as the MAT.  So we have now access to five

16   gates at LaGuardia.

17   **Q.**   And status at Newark for Spirit Airlines now?

18   **A.**   We have three gates in Newark and we anticipate once the

19   concourse -- the new terminal A is completed, that we'll be

20   able to secure a fourth gate.

21   **Q.**   All right.  And United's stature at Newark is still

22   approximately what?

23   **A.**   About 70 to 75 percent of the market.

24   **Q.**   All right.  Do you have any plans to enter JFK?

25   **A.**   Not unless we can secure a critical mass position.

1    **Q.**   Okay.  Are you expecting additional slots at New York as

2    a result of the Southwest exit?

3    **A.**   We've already secured those additional positions.  It's a

4    level two, so technically, it's not slots.  So it's called

5    landing rights, but we're already operating those.

6    **Q.**   All right.  So you've already started that operation at

7    Newark, right?

8    **A.**   Yes.

9    **Q.**   So you've definitely grown at Newark some, correct?

10   **A.**   Yes.

11   **Q.**   All right.  What is the current estimated -- well, what

12   is the current approximate capacity in the New York City

13   area, controlled by the three legacies, Southwest, and their

14   partners?

15   **A.**   About 90 percent.

16   **Q.**   90 percent?

17   **A.**   Yes.  Yes.

18   **Q.**   And the rest of the airlines are the other ten?

19   **A.**   Yes.

20   **Q.**   All right.  Talk about constraints at airports briefly.

21   Do you have, in your experience, observations about whether

22   large cities have constrained airports in general?

23   **A.**   Yes.

24   **Q.**   What are those?

25   **A.**   Well, I think, in general, what you're finding is that

1   most large city airports are constrained.  While there's the

2   ability to get maybe a few more flights in, generally there

3   aren't gates available at most of the largest cities in the

4   United States, whether it's Dallas, Chicago, obviously New

5   York, Los Angeles, and so on.

6   **Q.**  All right.  And do you have views on what is the currency

7   in the consolidated airline industry today?

8   **A.**  Well, this I have to be fair is a John Kirby ^ - ^ for

9   clarityism, not an industry, but for over the decade, I've

10  been calling it real estate is the new currency in the

11  industry, not money.  So if you have the gates, if you have

12  the ticket counters, then you can grow.  And if you don't,

13  then your -- it's much more difficult.

14  **Q.**  And to what extent is it readily doable to obtain real

15  estate that is held by legacy airlines?

16  **A.**  Yeah, it's more challenging.  What I would say briefly is

17  that the consolidation of the big six becoming the big three,

18  I found that they are less likely to give real estate back

19  than they were when they were the big six, but it's a

20  challenge.

21  **Q.**  All right.  And real estate, again, just to be precise,

22  what do you mean by real estate there?

23  **A.**  Infrastructure needed to support operations at airports.

24  So that would be anything from gates, it could be even break

25  rooms, storage rooms, as well as ticket counters, lobby

1    space.

2    **Q.**  All right.  So Mr. Kirby, do you recall when the

3    Northeast Alliance was announced by JetBlue and American?

4    **A.**  Yes.

5    **Q.**  And do you recall your reaction?

6    **A.**  Yeah, my initial reaction was I was concerned.  I thought

7    it would be a bad thing for competition.

8    **Q.**  All right.  And so let's look at plaintiff Exhibit 894,

9    which is an e-mail and a letter.  And the letter is dated

10   July 20 of 2020.  Do you see the e-mail now in front of you,

11   Mr. Kirby?

12   **A.**  Yes.

13            MR. DAVIS:  And this is in evidence, Your Honor.

14   BY MR. DAVIS:

15   **Q.**  And this is an e-mail from you, right?

16   **A.**  Yes.

17   **Q.**  And what is the subject of the attachment?

18   **A.**  The attachment is "antitrust issues raised by AA,

19   American Airlines, JetBlue co-chair agreements."

20   **Q.**  All right.  And you write a short message to your

21   marketing and corporate communications team?

22   **A.**  Yes.

23   **Q.**  All right.  And can you read what you wrote, starting at

24   "the long and short of"?  Do you see that?

25   **A.**  Yes.   "The long and short of it is we are seeking to

1   block the approval of the proposed American Airlines and

2   JetBlue co-chair, because we believe it will be harmful for

3   competition, further consolidates limited resources,

4   especially in the New York area, and reeks of antitrust

5   collusion with back room deals made on LaGuardia and JFK

6   slots, as well as Los Angeles gates."

7   **Q.**   All right.  So you wrote this to your team at Spirit,

8   this is now five days after the announcement, right?

9   **A.**   Yes.

10   **Q.**   All right.  Let's go to the letter that was sent -- is

11   this letter from a firm engaged by Spirit?

12   **A.**   Yes.  ^ Kirstein & Young Kirstein Young is our DC -- our

13   Washington, D.C. representatives.

14   **Q.**   All right.  And what's the purpose of sending this letter

15   to Steven Bradbury at DOT and Makan Delrahim at Department of

16   Justice, antitrust?

17   **A.**   At a very high level, what we're doing is we're

18   expressing our concerns about what we know at that point,

19   because we didn't do a lot, and asking them that they

20   carefully review the anticompetitive potential of this

21   combination.

22   **Q.**   All right.  Let's go to page 2 of the letter, fifth

23   paragraph.  Starting, "Significantly."  Do you see that?

24   **A.**   Yup.

25   **Q.**   All right.  And in that paragraph, what do you say about

1    the situation in JFK and LaGuardia?

2    **A.**   Okay.  And I'll just clarify.  So this was written by our

3    attorneys.  I will -- I validate that I did review it and

4    gave comments on it, but just to be -- I didn't specifically

5    say this.

6    **Q.**   All right.  But this is what Spirit sent?

7    **A.**   Yes.  This is Spirit.  I just wanted to make sure it was

8    me -- it attributes directly to me.  Do you want me to read

9    it or just basically --

10   **Q.**   Please, what does it say about the code share?

11   **A.**   So it says that it will basically create a virtual

12   duopoly at both of the large New York City airports between

13   Delta and the NEA and the American Airlines partner airlines.

14   **Q.**   All right.  And it gives some statistics about flights

15   about those airlines, right?

16   **A.**   Yes, they'll have, again -- it says 84 percent of the JFK

17   slots and it doesn't -- and it looks like it's -- yeah, it's

18   just JFK.  I was looking for LaGuardia in there, but it's

19   84 percent of JFK slots between the three carriers.

20   **Q.**   Okay.  So that's Delta and then American and JetBlue,

21   right?

22   **A.**   Delta and the NEA carriers.

23   **Q.**   Okay.  Let's go to the next paragraph.  And this is about

24   LaGuardia?  Do you see that?

25   **A.**   Yes.

**Q.**  And would you read it, please?

**A.**  "At LaGuardia, Delta operated 555 flights, and American/JetBlue combined operate 368, out of a total of 1,141 or 81 percent."

**Q.**  All right.  And then you went on about Newark, right?

**A.**  Yup.  "At Newark, American and JetBlue combined would have over 100 authorizations making them second behind United."

**Q.**  All right.  And then you make an assertion in bold and underlined, right?

**A.**  Yes.

**Q.**  And what do you say?

**A.**  That there is no opportunity for carriers to grow at those three airports.

**Q.**  And what's your final sentence there, "if American is allowed"?

**A.**  "The three largest carriers and their partners would be operating all 91 percent of all New York departures."

**Q.**  All right.  Let's go to page 3 of the letter, second full paragraph.  And the first sentence there is what, when you get that blown up?

**A.**  "The potential for tactic" -- "tactic anticompetitive behavior at the New York airports is far greater than the potential for the code share partners to aggressively lower prices in competition with Delta or United."

1    **Q.**  Are you familiar with competition among legacy airlines,

2    when legacy airlines are the only carriers in a route?

3    **A.**  Yeah, I would say what I've observed in my career is --

4          MR. WALL:  Objection, Your Honor.  Could we have a

5    little more foundation before he launches into that?  I

6    realize he said yes, but he's talking about a very broad

7    topic.

8          THE COURT:  All right.  Why don't you lay a little

9    more foundation.

10   BY MR. DAVIS:

11   **Q.**  As part of your job as network planner, do you view

12   routes around the country where legacy airlines fly?

13   **A.**  Yes.

14   **Q.**  And do you make note -- in doing that, do you make note

15   of the general affairs status in those markets from time to

16   time?

17   **A.**  Yes.  Tip -- go ahead.

18   **Q.**  And do you also study markets where nonlegacy carriers

19   are flying with legacies?

20   **A.**  Yes.

21   **Q.**  And have you made observations in the course of your job

22   about the general state of affairs in those markets where

23   it's only legacies competing with each other?

24   **A.**  Yes.  In general when legacies are only --

25          MR. WALL:  Renew the objection, Your Honor.  This

1   is not a sufficient foundation for what I gather is intended
2   to be expert opinion testimony about the -- the operation of
3   markets of various combinations of legacy and other carriers.
4           THE COURT:  I'll overrule it.  He can state what
5   he's observed from his years of experience.  The rest goes to
6   the weight.
7           Go ahead.
8           THE WITNESS:  I observed, in general, legacy
9   competition, the fares are generally higher.  And I would
10  say, though that that phenomenon has been reviewed over time
11  by the general accounting office many times, and they've come
12  to the same conclusion.
13  BY MR. DAVIS:
14  **Q.**  And you've actually worked at a legacy carrier, right?
15  **A.**  Yes.
16  **Q.**  And have you -- if the legacy carriers are not competing
17  on price, how are they competing?
18  **A.**  My observation is they tend to compete on product.
19  **Q.**  All right.  Explain that briefly.
20  **A.**  So it's a frequent traveler program offering.  It's the
21  service level that they offer, again, that relevance.  It's
22  upgrades, it's awards, and so on.  So it's really more about
23  the value that they bring and less about the price.
24  **Q.**  All right.  And what is needed in a market where only
25  legacies fly to actually bring fares down, price down?

1    **A.**  Well, again, I would say competition.

2    **Q.**  And what does that come from in today's domestic market?

3    **A.**  Typically from the ULCCs and the LCCs.

4    **Q.**  The low fare carriers, right?

5    **A.**  Low cost carriers, yeah.

6    **Q.**  Now, as part of your -- well, one other question about

7    this letter.  Let's go to page 4 of the letter, which is the

8    last page, the first full paragraph.  And could you read

9    beginning, "In every proceeding"?  Do you see that sentence?

10   **A.**  "In every proceeding regarding alliances, JetBlue has

11   been the first to object and claim that they are

12   anticompetitive."

13   **Q.**  All right.  And then continue.

14   **A.**  "It opposed the recent Delta/WestJet joint venture and

15   the Alaska/Virgin merger."

16   **Q.**  And then finally?

17   **A.**  "Today it comes with American to essentially join the

18   club at the codeshare entry level."

19   **Q.**  All right.  Now, as part of Spirit's work, did Spirit

20   actually file a complaint with the Department of

21   Transportation regarding the JetBlue/American Airlines

22   proposal for the Northeast Alliance?

23   **A.**  Yes.

24   **Q.**  And was that complaint filed in approximately January of

25   '21?

1    **A.**   Yeah, I believe it was January 6th of 2021.

2    **Q.**   All right.  We'll look at that in one minute.

3           Did you also have communications with both

4    Department of Transportation and Department of Justice?

5    **A.**   Yes.  We had -- oh, wait.  I should say, rather, during

6    that time period, just to clarify, I believe that our CEO and

7    general counsel did meet with -- with DOT at that time.

8    **Q.**   All right.  So let me show you, just briefly, Plaintiff

9    Exhibit 890.  All right.  And this is dated -- do you see

10   that, Mr. Kirby?

11   **A.**   Yeah.  It's dated August 18, 2020.

12   **Q.**   All right.  So this is a month after the announcement of

13   the NEA; is that right?

14   **A.**   Yes.

15   **Q.**   And this is a Spirit Airlines deck, prior to meeting with

16   DOJ?

17   **A.**   Correct.

18   **Q.**   All right.  Let's just go briefly to page 14 of the deck,

19   which is bottom number 138.  And would you read the top

20   slide, please?

21   **A.**   "Potential competitive concerns for US travelers."

22   **Q.**   Okay.  There is a -- can you read the bullet under that,

23   please.

24   **A.**   Yes.  "Overall, numerous entanglements from the series of

25   agreements likely increase incentives for American Airlines

1    and JetBlue to pull competitive punches with each other."

2    **Q.**   And what does "pull competitive punches" mean in the

3    context of airlines alliances?  What does that mean?

4    **A.**   It would mean not compete aggressively or not add

5    capacity or enter each other's markets.

6    **Q.**   And you see the alliance is referred to as

7    "unconventional"?

8    **A.**   Yes.

9    **Q.**   In the scope of agreements that are part of it, right?

10   **A.**   Yes.

11   **Q.**   You also -- in the slide, Spirit talks about what on the

12   bullet starting "Financial Aspects"?

13   **A.**   "Financial aspects of arrangements could lead to

14   incentive to increase pricing relative to 'but for' world."

15   **Q.**   And the last bullet says what?

16   **A.**   "Potential for punishment could lead to incentive to

17   compete less aggressively relative to 'but for' world."

18   **Q.**   And what does "punishment" mean in this context,

19   Mr. Kirby?

20   **A.**   I believe that what we were saying here was that the

21   assets that would be shared or pooled between the two

22   carriers could be either given or taken away, based on the

23   other's behavior.

24   **Q.**   All right.  And the only other slide on this is the next

25   page, which should end in 139.  And could you read the top

1    bullet, please.

2    **A.**   Top bullet, "Apparent slot transfers and concentration

3    raise several potential concerns, including."

4    **Q.**   All right.  And what's the first of those?

5    **A.**   "Reduce competition on nonstop overlaps between American

6    and JetBlue."

7    **Q.**   And the next?

8    **A.**   "Chilling of competition between American and JetBlue for

9    fear of upsetting each other and related reprisals."

10   **Q.**   And could you read the bullet starting with "insulation"?

11   **A.**   "Insulation from more aggressive competitors by reserving

12   slots with a collaborator, thereby gerrymandering competition

13   at key airports and obstructing the highest and best use of

14   the slots."

15   **Q.**   And what does that mean "gerrymandering competition at

16   key airports"?

17   **A.**   It's not a term that I use a lot, but basically it's

18   holding on to the assets so they can't be used by a

19   competitor.

20   **Q.**   All right.  So you also -- Spirit filed a complaint with

21   the DOT, you've already testified, right?

22   **A.**   Yes.

23   **Q.**   And showing you now Plaintiff Exhibit 895, the -- in

24   evidence.  That's the complaint filed January 7th of '21.

25   That's attached to an e-mail.  Do you see that, Mr. Kirby?

1  **A.**  Yes.

2  **Q.**  And can we see the first page of the complaint?  All

3  right.  And you can see it's dated January 7th, '21, correct?

4  **A.**  Yes.

5  **Q.**  And that's filed with the DOT in Washington, right?

6  **A.**  Yes.

7  **Q.**  And can we go to page 6, paragraph 14, numbered

8  paragraph.  And that starts, "For literally decades."  Do you

9  see that, Mr. Kirby?

10  **A.**  Yes.

11  **Q.**  Could you read that and on to the next page, please?

12  **A.**   "For literally decades, American has underutilized its

13  slots at LaGuardia and JFK by operating small aircraft and

14  obtaining waivers from the FAA to further avoid compliance

15  with 80/20 use it or lose it rule.  Apparently American and

16  JetBlue now plan for American to lease some unknown number of

17  slots at these airports to JetBlue, so American can

18  effectively maintain control of the slots while outsourcing

19  substantial domestic flying to JetBlue in a cozy co-chair

20  relationship, and abandon operating its own flights in many

21  markets.

22          "Scott Laurence, JetBlue's head of revenue and

23  planning, stated a response to a question on slots in the

24  proposed agreements, 'And as we look at slots and we look at

25  how we move forward, American has talked about things like

1    LaGuardia, where they are going to be removing 50-seat

2    aircraft or airplanes that create some room for JetBlue as

3    LaGuardia's slots are freed up.'"

4    **Q.**  Let's talk a little bit about slots.  Are you familiar

5    with the phrase "hiding slots"?

6    **A.**  Yes.

7    **Q.**  What does that refer to briefly?

8    **A.**  It refers to, in essence, finding a mechanism to not

9    operate slots, whether it's having another carrier operate

10   them, or operate them with a smaller gauge aircraft or use

11   the 80/20 rule to not operate slots at all.

12   **Q.**  And in the industry, why would an airline not want to

13   operate its own slots?

14   **A.**  They may view it as financially unsustainable.

15   **Q.**  But why not just give the slot back to the FAA?

16   **A.**  Probably the value of not operating versus the value of

17   not having a competitor compete with you is -- the competitor

18   is a less attractive alternative.

19   **Q.**  All right.  The 80/20 rule, can you summarize that

20   briefly and how that is relevant here?

21   **A.**  Yeah.  The slot office requires you to operate at least

22   80 percent of your slots in order to retain ownership of

23   those.  So if you -- if you operate less than that,

24   theoretically, the FAA could withdraw slots.

25   **Q.**  All right.

1    **A.**   So if you think about it, if you got a lot -- 100 slots,

2    you really only have to operate something more than 80 of

3    them at any given period in order to not lose that capacity.

4    **Q.**   All right.  And you referred to using smaller gauge

5    aircraft to cover slots; is that right?

6    **A.**   Smaller gauge, yes.  Using equipment and flying very

7    short-haul --

8            Let me make a clarifying statement on the 80/20.

9    **Q.**   Sure.

10   **A.**   It is window specific.  But if you have a large number of

11   slots in that window, you can -- it's not slot specific.  So

12   for a carrier like Spirit, it's a little harder when you have

13   the smaller portfolio to make sure you don't violate the

14   80/20 versus a carrier that has a very large portfolio.

15   **Q.**   Okay.  And talk again briefly about -- why would you want

16   to use smaller aircraft to cover slots?

17   **A.**   Because the absolute cost is less.

18   **Q.**   All right.  Reduce cost, right?

19   **A.**   Yeah.  And what you'll see is carriers that if they don't

20   want to operate the capacity, but they can't find someone

21   else to operate and they're worried about the 80/20

22   potential, they'll take the smallest gauge airplane they

23   operate, and they'll fly the very short distance.

24   **Q.**   All right.

25   **A.**   And that's something that is observed over and over

1  again.  Most recently, Delta decided to fly four roundtrips

2  between LaGuardia and Dulles for the winter season this year.

3  **Q.**  Okay.  Are there also transactions among carriers about

4  slots?

5  **A.**  There are times where carriers will approach other

6  operators and ask them to -- the term we usually use is

7  "cover."

8  **Q.**  Cover?

9  **A.**  So yeah, cover the slots.  So they'll say can you cover,

10  can you operate these slots at least 80 percent of the time

11  for us for that slot season.

12  **Q.**  All right.  And the slot season lasts how long?

13  **A.**  Approximately six months.  It runs late October through

14  late March, for the winter season, and then obviously late

15  March through late October for the summer season.

16  **Q.**  So that lease is just temporary?

17  **A.**  Yeah, it's -- like I said, it's roughly six months.

18  **Q.**  And does operating those slots for that six month period,

19  does that help a small carrier amass a critical mass to make

20  an entry?

21  **A.**  No, it's a temporary measure, but if a carrier has a

22  portfolio in that airport, they could choose to operate that

23  additional capacity, even if it's only for a limited six

24  month window to maybe test out new markets.

25  **Q.**  Okay.  And in fact, has Spirit recently been the

1    beneficiary of a short-term lease offer --

2    **A.**  Yes.

3    **Q.**  -- at a slotted airport?

4    **A.**  Yes.

5    **Q.**  And can you describe that briefly?

6    **A.**  Yeah.  About two weeks ago, United Airlines approached us

7    and asked us to cover four slot pairs at LaGuardia for the

8    winter 2022 season, and we said yes.

9    **Q.**  All right.  And Spirit took them up on that?

10   **A.**  Yes.

11   **Q.**  So what's going to happen?

12   **A.**  Well, we'll operate those four flights, so we'll be able

13   to operate more capacity at LaGuardia for that winter season,

14   but then we have no way of knowing whether those slots will

15   be retained past that date.

16   **Q.**  All right.  Directing your attention to the weeks before

17   July of 2020, was your department at Spirit contacted by

18   American Airlines?

19   **A.**  Yeah, it was actually a little longer, a little longer.

20   It was actually in December of the previous year, 2019.  We

21   were approached by American Airlines to cover 20 slot pairs

22   for the winter -- it would have been the winter of 2020

23   season.

24   **Q.**  All right.  And what happened in that exchange?

25            MR. WALL:  Objection.  No foundation.  It might be

1  hearsay, Your Honor.

2  BY MR. DAVIS:

3  **Q.**  I'll ask this.  What direction did you give about this

4  situation?

5  **A.**  Well, I directed my -- my head of scheduling, who

6  received the call, and then subsequent e-mail from American

7  Airlines.

8  **Q.**  All right.

9  **A.**  To reply that a six month window at JFK, because we did

10  not serve that airport, wasn't viable, but that if they were

11  open to a conversation about a longer term, we would be happy

12  to have that conversation with them.

13  **Q.**  All right.  And you directed that that e-mail be sent?

14  **A.**  Yes.

15  **Q.**  And was any reply ever obtained?

16  **A.**  There was initial response that they were open to having

17  a discussion.

18          MR. WALL:  Objection.  Calls for hearsay.

19          THE WITNESS:  We have an e-mail response.

20          THE COURT:  Overruled.

21          THE WITNESS:  We have an e-mail response from

22  American Airlines saying that they were initially open to

23  having a discussion, and then we never heard back from them

24  again.

25  BY MR. DAVIS:

1    **Q.**  So that ended up going nowhere?

2    **A.**  Going nowhere, yeah.

3    **Q.**  And then in July of that year, the NEA was announced,

4    correct?

5    **A.**  Yes.

6    **Q.**  All right.  And just one other question about slots, one

7    or two.  Are you familiar with past slot divestitures that

8    have been ordered in previous cases about airline

9    combinations and partnerships and mergers?

10   **A.**  Yes, I'm familiar with them.

11   **Q.**  And have you observed -- have you made any observations

12   about whether the slots involved in the NEA divestitures of

13   slots are related to prior divestitures?

14   **A.**  Yeah, so I would say typically what I've observed through

15   my career is divestitures are generally permanent.  They're

16   in multiples of eight, and they're generally spread evenly

17   throughout the day so that a carrier could operate all eight

18   departures on a single gate.  That's what I've observed

19   historically.  With the divestitures in the current case, in

20   the case of Reagan, they're not permanent.  They are not

21   spread evenly through the day and they require at least two

22   overnights.

23   **Q.**  All right.  And so --

24              THE COURT:  What do you mean require two

25   overnights?

```
 1              THE WITNESS:  The slot times are very early in the
 2       morning and very late in the evening.
 3              THE COURT:  Oh, so fly in at night and then --
 4              THE WITNESS:  So you have to have at least two
 5       planes apart overnight.  Our term is RON, or remain
 6       overnight.  It's an industry term.
 7       BY MR. DAVIS:
 8       Q.  And just to be clear, which airports are we talking about
 9       where these slot divestitures are being ordered as a result
10       of the NEA?
11       A.  The nonpermanent divestitures at Reagan Airport, and the
12       permanent divestitures at JFK Airport.
13       Q.  All right.  And what is your view as to the relative
14       quality of the slot divestitures that are available as a
15       result of the NEA?
16       A.  Yeah, I -- for a new entry and I don't think they are
17       economically viable.
18       Q.  And can you explain that?
19       A.  Yeah.  Because they don't cover the day evenly, they
20       don't offer peak slot capacity.  For example, my recollection
21       is there is no departure at Reagan between 14:00 and 19:00.
22       In the case of Reagan, there's also two 06:00 originators,
23       which is not conducive to service at Reagan.  Reagan is not
24       an early morning departing airport, it's an inbound market.
25       And JFK, I believe, three and a half of the seven slots are
```

1    probably available today from the FA if they were requested.

2    **Q.**   So what action, if any, did Spirit Airlines decide to

3    take about the divested slots as part of the NEA?

4    **A.**   Well, when initially when this came out and there was

5    talk about potential divestitures, we did our due diligence

6    and thought about what we might consider doing and bidding.

7    But once the actual slot times came out, I recommended to our

8    executive team that they weren't worth bidding on.

9    **Q.**   And in general, of course, is Spirit interested in slots

10   at Reagan and at JFK?

11   **A.**   Yes.  Certainly Reagan.  We would be open to if we had

12   attractive slots, a piecemeal type of approach -- I used that

13   term earlier.  But I do maintain at JFK, we would need a

14   higher number of slots that are available with this will

15   divestiture to consider entry.

16   **Q.**   And what was wrong with the slot times in general?

17   **A.**   They're poor times for competing services.

18   **Q.**   Okay.  So in --

19   **A.**   And I'll just add one other thing is that they require,

20   again, two aircraft.  You really -- again, Spirit's model

21   being efficient, you really just want to be able to use one

22   gate all day long, and not worrying about finding a second

23   parking spot and having to tow aircraft up.

24   **Q.**   So will Spirit Airlines be there using the slots that are

25   part of the divestitures that are part of the NEA?

1    **A.**   I don't believe we were planning to bid on them.

2    **Q.**   Okay.  And Spirit Airlines, at least, is not going to be

3    there to ensure that low cares come about flying out of those

4    slots, right?

5    **A.**   Yes.  There's no potential to get into Reagan or JFK

6    otherwise.

7    **Q.**   Has -- has Spirit ever said that it views the

8    divestitures that are part of the NEA as adequate?

9    **A.**   No.

10   **Q.**   All right.  And what is your view?

11   **A.**   My view, after really learning more about the NEA,

12   although I -- I assume I don't know everything about it, is

13   that they would take a massive amount of divestitures to

14   remedy what I think is a very difficult competitive

15   environment.

16   **Q.**   All right.  Just to -- let's talk a little more about the

17   NEA and capacity coordination.  I'm showing you now PX892,

18   which is not in evidence so should not be published.  You

19   can -- can you see that?

20   **A.**   Not yet.

21   **Q.**   All right.  Could you look it up in your notebook,

22   please.

23   **A.**   Sure.

24   **Q.**   It's Plaintiff Exhibit 892.

25   **A.**   892.  Okay.

 1            MR. WALL:  Your Honor, just --

 2            MR. DAVIS:  Is there an objection?

 3            MR. WALL:  Our objection is a hearsay within

 4    hearsay issue.  If they want to use it and display it, other

 5    than for the truth of the matter asserted, that's fine.

 6            MR. DAVIS:  That's fine, Your Honor.

 7            THE COURT:  All right.  Fine.

 8            Go ahead, you can publish it.

 9            MR. DAVIS:  We'd offer it for Spirit's state of

10    mind at the time.

11            THE COURT:  And I'll accept it for that.

12            MR. DAVIS:  Thank you.

13            (Plaintiff Exhibit No. 892 admitted into evidence.)

14    BY MR. DAVIS:

15    **Q.**  So 892 is -- do you see it's dated January 19, 2021?

16    **A.**  Yes.

17    **Q.**  And the e-mail is from you, John Kirby, right?

18    **A.**  Yes.

19    **Q.**  And this is about a half year into the NEA -- or a half

20    year since the announcement, right?

21    **A.**  It looks like it's -- it is right after it was approved,

22    I believe.

23    **Q.**  Okay.

24    **A.**  Again, I'm just trying to remember the exact dates.  I

25    know we filed on the January 7th, and I think subsequently it

1    was approved somewhere around a week, ten days later.  So

2    this is probably right after it was approved.

3    Q.  All right.  And are these comments on an article that is

4    entitled, "When a Co-Chair Becomes a Pseudo-Merger"?

5    A.  Yes.

6    Q.  All right.  And can you just read what you wrote to other

7    people at Spirit on January 19th of '21?

8    A.  Yes.  "Not great.  He found a bunch of people who say

9    this is good news.  Their perspective is this is good news

10   for American and JetBlue, which it is.  They lack the

11   perspective of the impact on the larger industry.  Allowing

12   carrier to coordinate is like opening Pandora's box.  Look

13   for Delta or United to see who they can coordinate with

14   next."

15   Q.  So allowing -- did you mean "carrier" or "carriers"?

16   A.  Yeah, it probably was supposed to be "carriers."  I must

17   have made -- I made a typo.

18   Q.  So, "Allowing carriers to coordinate is like opening a

19   Pandora's box," what do you mean by that, Mr. Kirby?

20   A.  The industry is not dissimilar to the NFL in that when

21   things happen, there seems to be sort of copying.

22           I kind of go back to after the 9/11, when many

23   Northwest, Delta, and Continental were allowed to have a

24   domestic co-chair.  They learned about the value of size and,

25   again, relevance.  And I think that was the precursor to the

1    mergers that we saw in the later part of that decade.

2           So when I view this as opening Pandora's box, if

3    the NEA is allowed to go forward, I see two things happening.

4    I see it expanding to more geographies, and I also see United

5    and Delta looking for their own NEA or NEA equivalent

6    partners that they can use and offer frequent traveler as

7    well as slot and facilities to basically bring into alliance

8    with them.

9    **Q.**  All right.  So let's talk a little bit about coordinating

10   capacity.  You say Spirit is based at Fort Lauderdale; is

11   that right?

12   **A.**  We're based in Miramar, but our largest operation, at

13   least at that time, is Fort Lauderdale.  We actually have

14   three cities that are about the same size, Fort Lauderdale,

15   Orlando, and Las Vegas, in terms of capacity.

16   **Q.**  And was Fort Lauderdale also a focus city for JetBlue?

17   **A.**  Yes.

18   **Q.**  And as of 2019, what was the relative shares of the

19   flying out of Fort Lauderdale as between Spirit and JetBlue?

20   **A.**  At that time, we were -- we were almost about the same

21   size.

22   **Q.**  All right.  And were there any carriers that had a larger

23   presence at Fort Lauderdale?

24   **A.**  No, I think at that moment in time, Spirit was probably

25   the largest, and then JetBlue and Southwest were two and

1    three and on a relative scale and similar in size.

2    **Q.**  And again, Spirit and JetBlue were essentially equal?

3    **A.**  And Southwest.  The three carriers were roughly the same

4    size.

5    **Q.**  All right.  And what have you observed at Fort Lauderdale

6    in terms of the size of JetBlue's presence at Fort Lauderdale

7    since the NEA?

8    **A.**  Yeah.  Well, coming out of the pandemic, JetBlue has not

9    brought back the capacity that they previously had at

10   Fort Lauderdale.  If we just pick sort of a next month,

11   October of 2022 capacity versus October of 2019, they're down

12   about 40 percent in seats -- I'm sorry, 40 percent in

13   departures and somewhere in the high 30s in seats.

14   **Q.**  All right.  And is -- is Spirit similarly down that much

15   at Fort Lauderdale?

16   **A.**  No.  Spirit is slightly larger than they were a few years

17   ago.

18   **Q.**  So Spirit is actually bigger over 2019, correct?

19   **A.**  Yes.

20   **Q.**  And JetBlue is down 40 percent?

21   **A.**  40 percent in departures, yes.

22   **Q.**  All right.  And what about at Orlando, another city that

23   you mentioned in Florida where Spirit is?

24   **A.**  Yeah, at Orlando, JetBlue is down about 20 percent in

25   departures.

1    **Q.**   Since the NEA?

2    **A.**   Again, if you use that same comparison of October '22

3    versus October 2019, they're down about 20 percent in

4    departures.

5    **Q.**   All right.  So today at Fort Lauderdale, what's Spirit's

6    relative share, roughly, of Fort Lauderdale flying?

7    **A.**   Yes.  We usually don't talk about shares.  "Share" is

8    actually a dirty word in -- at Spirit, but I would say we're

9    probably somewhere around in the 30 percent range.

10   **Q.**   All right.  And what about JetBlue?

11   **A.**   Again, that's one thing I don't really focus on as much.

12   My guess is they're probably in 20-ish percent range.  Maybe

13   the low 20s.

14   **Q.**   Well, I won't ask you to guess, but you've observed

15   JetBlue is significantly down in Fort Lauderdale, right?

16   **A.**   Yes.  Down in Fort Lauderdale and Orlando.  And again, I

17   really look at it more in terms of the departures, rather

18   than percentages.

19   **Q.**   All right.  Now, in general, does capacity coordination

20   permit certain anticompetitive actions among airlines?

21              MR. WALL:  Objection.  No foundation.  Calls for

22   improper opinion testimony.

23              THE COURT:  Overruled.

24              THE WITNESS:  I think -- that is a sort of a broad

25   question, but what I would say is this, is that coordination

1    among carriers in the United States about schedules is really

2    unheard of.  The only coordination I'm aware of in the US is

3    in the regional carrier arena, where those carriers are paid

4    to operate for a larger entity.  Otherwise, I don't -- I'm

5    not aware of a relationship like the NEA in the industry.

6    BY MR. DAVIS:

7    **Q.**  All right.  You're also aware, aren't you, Mr. Kirby,

8    that the NEA does not include coordination on price, right?

9    **A.**  Yes.

10   **Q.**  Does that matter?

11   **A.**  I think that when you can coordinate capacity, who

12   operates, times of day, I think that effectively allows you

13   to coordinate pricing without actually coordinate pricing.

14   **Q.**  And can you explain that?

15   **A.**  Well, it's basic economics.

16            MR. WALL:  Your Honor, I'm going to renew my

17   objection.  We are getting so far into speculation and

18   quasi-expert testimony here without the slightest bit of

19   foundation.  He hasn't studied the NEA agreements, he knows

20   nothing about the NEA agreements in particular.  And we

21   already sat through 20 minutes of him reading their advocacy,

22   and he is now just giving opinions that he has no basis to

23   offer.

24            MR. SCHWED:  If I may add one thing, the answer to

25   the first question was I actually have no experience with any

1    capacity coordination, because it doesn't exist.  He's

2    actually testified he has no foundation.

3            THE COURT:  What do you say about that?

4            MR. DAVIS:  Could I ask if he has experience in

5    capacity planning and whether he has seen the effects on

6    fares.

7            THE COURT:  Why don't you break that apart.  You

8    can ask that one by one.

9    BY MR. DAVIS:

10   Q.  Mr. Kirby, as part of your experience in the airline

11   industry, have you experience in capacity planning?

12   A.  Yes.

13   Q.  And have you seen effects on fares that follow from

14   capacity planning decisions?

15   A.  Yes.  I've seen markets grow and shrink depending on the

16   pricing actions.

17   Q.  All right.  And so I ask you again, do you need to

18   coordinate on price in order to effect price through capacity

19   coordination?

20           MR. WALL:  Same objection.

21           THE COURT:  That's a different question.  So that's

22   sustained.

23           MR. DAVIS:  All right.

24           THE COURT:  I think you could ask him if -- well,

25   you already did.  Capacity coordination can influence.  I

1    mean -- price.  That's a little bit different than the way

2    you asked it, I think.

3            MR. DAVIS:  Yeah.

4    BY MR. DAVIS:

5    **Q.**  Mr. Kirby, can capacity coordination influence price?

6    **A.**  Yes.

7    **Q.**  All right.  And how?

8            MR. WALL:  Same objections, Your Honor.

9            THE COURT:  Overruled.

10           THE WITNESS:  By offering less or more capacity,

11   you know, if you offer more -- less supply than demand,

12   typically prices will go up, or can go up.

13   BY MR. DAVIS:

14   **Q.**  All right.  In the northeast today, American is certainly

15   competing with Delta Airlines at LaGuardia and JFK, correct?

16   **A.**  Yes.

17   **Q.**  Does one competition from Delta keep American Airlines in

18   check?

19   **A.**  We've talked about --

20           MR. WALL:  Objection.  No foundation.

21           THE COURT:  Sustained.

22   BY MR. DAVIS:

23   **Q.**  Will legacy -- you've already testified that legacy

24   airlines don't compete on price, right?

25   **A.**  Yes.

1  **Q.**  In your view, is legacy airline competition at JFK and
2  LaGuardia sufficient to keep fares in check?
3           MR. WALL:  Same objection.
4           THE COURT:  Sustained quite as to the form.  I
5  think the keep in check, I understand what you're driving at,
6  but that's a little broader than his -- maybe his experience
7  as distinct from effecting price.
8  BY MR. DAVIS:
9  **Q.**  In your experience as a network planner, Mr. Kirby, is
10  the presence of legacy airlines in the northeast sufficient
11  to constrain higher fares that could be charged by
12  American Airlines?
13           MR. WALL:  Same objection.
14           THE COURT:  I think sustained.  I don't think
15  he's -- on what's sufficient to keep it in check, I'm not
16  sure he can offer an expert opinion on, or you can tell me
17  why he can.  I think you could ask him what you've sort of
18  already gotten at, which is whether legacy airlines compete
19  with each other on price or whether -- and whether -- or
20  whether their competition has effects other than price
21  effects.
22  BY MR. DAVIS:
23  **Q.**  All right.  You've already testified that legacies don't
24  compete on price, correct?
25  **A.**  That is my observation, and I think that there's also GAO

1    studies that validate that, as well.

2    **Q.**   Okay.  Well, let's move on.

3         I want to ask you about COVID and the pandemic a

4    little bit.  Is it fair to say that in the airline industry,

5    the times during COVID were unusual?

6    **A.**   Yes.

7    **Q.**   And did a lot of weird things happen?

8    **A.**   A lot of strange decisions were made, yes.

9    **Q.**   All right.  And can you explain that?

10   **A.**   Well, I would just say every carrier didn't know what

11   they were coming into or out of, and so depending upon your

12   geographies, where you had your strengths, you maybe made

13   decisions to try things that in the normal course of business

14   you wouldn't have tried.

15   **Q.**   All right.  Are you familiar with an expression "noise in

16   the data"?

17   **A.**   Noise, yeah.  A little bit.

18   **Q.**   Does that apply here?

19   **A.**   Yeah, I think so.  You know, when we look at 2020 and,

20   really, 2021, even, we kind of view those as lost years, that

21   the data really isn't relevant for the future.  And in fact,

22   you see that a lot with both carriers and with Wall Street

23   investor analysts, as well.  Everyone compares 2022 to 2019.

24   I think eventually, I think coming out of this year, it's

25   likely that we'll see '23 compared to '22, but right now

1   people don't really view '20 and '21 as really relevant.

2   **Q.**  So do you view COVID era data in the airline industry as

3   showing actual competitive conditions for the long term?

4   **A.**  No.

5   **Q.**  All right.  And again why?

6   **A.**  Because carriers were scrambling to survive.  You had

7   carriers going out of their niche.  I'd say pricing, in many

8   ways, was led by legacy carriers, particularly American, in

9   most instances, versus the ULCCs.  People were just trying to

10  put people on the -- get passengers on the airplane and

11  generate what revenue they could.

12  **Q.**  All right.  And earlier this year, there was a proposed

13  merger between Spirit and Frontier; is that right?

14  **A.**  Yes.

15  **Q.**  And in April of this year, JetBlue made an attempt to buy

16  Spirit in the midst of that negotiation; is that right?

17  **A.**  Yes.

18  **Q.**  And what was Spirit and Frontier's initial reaction to

19  JetBlue's effort to buy?

20  **A.**  It --

21          MR. SCHWED:  Objection, Your Honor.  My

22  understanding is this witness does not have any foundation

23  and had no involvement in the transaction.

24          MR. DAVIS:  And I'm not going to ask any details

25  about it, Your Honor.  I just want to set the time.

```
 1              THE COURT:  I think I know from the other witnesses
 2    what happened, so --
 3              MR. DAVIS:  I'll move on.
 4    BY MR. DAVIS:
 5    Q.  So let's just go to Defense Exhibit 557, which is in
 6    evidence.
 7              And just to follow-up, to be clear, Mr. Kirby, were
 8    you directly involved in working on the merger with Frontier?
 9    A.  No.
10    Q.  And have you been directly involved in working on the
11    acquisition by JetBlue?
12    A.  No.
13    Q.  What have you been doing?
14    A.  My CEO told me, "Keep running the airline."
15    Q.  So that's what you've been doing, right?
16    A.  Yes.
17    Q.  This deck is dated May 25th of '22.  Do you see that?
18    A.  Yes.
19    Q.  And at this point, Spirit and Frontier were opposing
20    JetBlue's attempt to acquire, correct?
21    A.  Yes.
22    Q.  All right.  I just want to ask you about page 20 of the
23    deck.  Can we go to that, please.
24              All right.  Can you read the top line, please?
25    A.  "The NEA - JetBlue's first prize."
```

```
 1              MR. SCHWED:  Your Honor, again, I'm not sure -- he

 2   just testified he had no personal knowledge of any of this.

 3              MR. DAVIS:  And I'm only asking him just to read

 4   it.

 5              THE COURT:  The document is in evidence?

 6              MR. DAVIS:  Yes, Your Honor.

 7              THE COURT:  He can read it.

 8              MR. WALL:  To be clear, on the state of these

 9   documents, we did not object to these documents under this

10   business record stipulation that we had.  These should not be

11   coming in for the truth of the matter asserted.  They are all

12   advocacy at various times, as is their DOT filings and their

13   DOJ presentations.  So that's the state of them.

14              THE COURT:  Well, either way, he can read it.

15              MR. WALL:  He can read it.  That's fine.

16              THE WITNESS:  Okay.  "The NEA, JetBlue's first

17   prize, is already opposed on grounds it is anticompetitive."

18              MR. DAVIS:  And Your Honor, just to be clear, this

19   is defense exhibit, and it's in evidence by court order.

20   BY MR. DAVIS:

21   Q.  All right.  And do you see at the top at the left, the

22   question "what is it?" is asked, right?

23   A.  Yes.

24   Q.  And the short of it, can you read that?

25   A.  "Anticompetitive de facto merger."
```

1   **Q.**  All right.  And last question on the bottom, do you see

2   the question how could DOJ approve a Spirit acquisition?  Do

3   you see that?

4   **A.**  Yes.

5   **Q.**  And can you read the sentence in -- that begins, "Spirit

6   believes"?

7   **A.**  "Spirit believes a combination of JetBlue and Spirit

8   would make the NEA even more anticompetitive than it is

9   already."

10  **Q.**  Thank you.  I want to ask you briefly about Newark and

11  the Newark market.  Do you view, as Spirit's network

12  planner -- and by the way, where were you born?

13  **A.**  Newark, New Jersey.

14  **Q.**  All right.  And did you live there for how long?

15  **A.**  First 26 years of -- well, actually, not in Newark, but

16  nearby Kearny, for the first 26 years of my life.

17  **Q.**  All right.  And based on your life and your experience as

18  a network planner, do you have a view as to whether Newark

19  airport is a distinct market from LaGuardia and JFK?

20  **A.**  Yes.

21         MR. WALL:  Objection.  That question is highly

22  compound, since relevant markets are alleged by route.  And

23  so at that level, I don't know what value it has.

24         THE COURT:  Well, at that level, I think it's more

25  weight, and so I'll overrule it, and take it for whatever

1    it's worth.

2              MR. WALL:  All right.

3              MR. DAVIS:  You can answer.

4              THE WITNESS:  Okay.  My viewpoint is that while

5    there is some overlap with the New York area, it is primarily

6    an airport used by north and central Jersey population.

7    BY MR. DAVIS:

8    **Q.**  And is that different from LaGuardia and JFK?

9    **A.**  Yes.

10   **Q.**  And how?

11   **A.**  LaGuardia airport is typically for New York City and for

12   Long Island, for domestic travel.  The nuances, it has a

13   perimeter role, so Kennedy is often used as an alternative

14   for New York travelers, when they're going beyond the

15   1,500 mile limit.

16   **Q.**  All right.  Does Spirit serve both Newark Airport and

17   LaGuardia Airport today?

18   **A.**  Yes.

19   **Q.**  And are there occasions where Spirit serves some of the

20   same routes from back Newark Airport and LaGuardia Airport?

21   **A.**  Yes.

22   **Q.**  And what are the examples of cities?

23   **A.**  Fort Lauderdale, Orlando, Myrtle Beach.  Those are the

24   primary ones.  Oh.  Houston, Texas, too.

25   **Q.**  Are those routes, one from Newark, one from LaGuardia

1    treated as the same thing in Spirit Airlines?

2    **A.**   No, we viewed them as different.

3    **Q.**   And do they have the same pricing?

4    **A.**   No.  Not necessarily.  Because of the stage, they could

5    be similar priced, but obviously we use modern yield

6    management techniques and prices can vary greatly, depending

7    on how full those flights are.

8    **Q.**   And do they have the customers that are on those flights,

9    one from Newark, one from LaGuardia, are they from the same

10   place?

11   **A.**   No, they are -- our data indicates that they are a

12   geographically isolated, when we serve both -- both -- a

13   market from both LaGuardia and Newark.

14   **Q.**   And when you say "geographically isolated," what do you

15   mean, just briefly?

16   **A.**   Yeah.  We did a study and it was after -- subsequent to

17   the deposition, because I was curious if our originating

18   customers had changed because of the pandemic.  And what we

19   found has really affirmed what I believed previously and

20   we --

21           MR. WALL:  Your Honor, I'm going to object to any

22   testimony based on a study that he just testified was done

23   after I asked him questions about this at his deposition and

24   which has not been provided to us in advance.

25   BY MR. DAVIS:

1  **Q.**  Mr. Kirby, did anyone ask you to make that study?

2  **A.**  No.

3  **Q.**  And why did you make this study?

4  **A.**  Yeah, to be fair to Mr. Wall, when he asked the question

5  at deposition, I started thinking about it and I thought

6  about the context of the -- the pandemic and I was naturally

7  curious to see if it changed from what I believed before.  So

8  that's why I did the study.  I also did -- and I did mention

9  this at the deposition, I had asked Port Authority of New

10  York and New Jersey to provide a documented that they had

11  provided previously while I was at Alaska and other carriers,

12  and they weren't able to provide it before the deposition,

13  but they subsequently did provide that document, as well.  So

14  I was able to look at those documents and the outcome was

15  really reaffirmed what I had --

16          THE COURT:  Well, does anybody -- do either of you

17  have a copy of the study?

18          MR. DAVIS:  No.

19          THE COURT:  So I'm going to sustain the objection.

20  My thought about that is the same.  If this came up in a

21  different way about new data, which the government was

22  objecting to, and I agreed with, was that there was a cut off

23  with respect to the experts I think it was on August 25th,

24  and then subsequent commercial data, like if you want to use

25  it, make a motion.

1          MR. DAVIS:  Okay.

2          THE COURT:  So to just put it in there, he

3     doesn't -- it's hard for him -- this is a civil case, so it's

4     different.  And it seems to me that if it's going to come in,

5     it's for him to fairly, or the defendants to fairly confront

6     that, they would want to see the study.  So I'm not saying --

7     I'm not ruling that you can't rely upon evidence -- that

8     evidence, but I think then you have to say, here's a -- we

9     get a copy of it, here it is, we make a motion to -- and you

10    can just offer the document.  It is what -- I presume if it

11    shows what I think he says -- where I think he's going with

12    it, I'd be able to figure it out from the document, and you

13    all can argue it.

14    BY MR. DAVIS:

15    Q.   Mr. Kirby, does anything about those studies effect your

16    testimony that you've given about the Newark market?

17    A.   No.

18    Q.   All right.  And I'll ask you not to refer to it in any

19    way or rely on it.  And I just have a couple more questions.

20    Okay?

21    A.   Okay.

22    Q.   And again, you have not provided that to the government

23    and the government didn't ask you to do it, right?

24    A.   Yes.  I have not provided it and you did not ask me to do

25    it.

1   **Q.**  All right.  And why does Spirit Airlines fly two

2   different flights, one from LaGuardia and one from Newark, to

3   the same city?

4   **A.**  Again, because we view them as having unique

5   characteristics.

6   **Q.**  All right.  Would you agree, Mr. Kirby, that

7   Spirit Airlines is in a position, potentially, to obtain

8   divestitures as a result of this legal proceeding about the

9   NEA?  It could be?

10  **A.**  I guess certainly if there's divestitures, we could

11  potentially get them, yes.

12  **Q.**  And might you potentially be quite interested in

13  obtaining them?

14  **A.**  The current divestitures on the table or some variation.

15  **Q.**  All right.  And have you actually taken steps to prepare

16  a bid plan about potential divestitures?

17  **A.**  We have.

18  **Q.**  All right.  And why did you do that?

19  **A.**  Again, it's due diligence.  We didn't have a lot of

20  information at the time, but certainly not knowing which way

21  this case might go, if it was the move forward, we certainly,

22  if we thought there was value in participating in the

23  divestitures, we might go that -- down that path.  But like I

24  said, right now, based on what we're looking at, we are not

25  planning to participate.

1  **Q.** All right.  You've already testified that within, I

2  think, hours of announcement of the NEA, you criticized it;

3  is that right?

4  **A.** Yes.

5  **Q.** And you view it as a bad thing, right?

6  **A.** Yes.

7  **Q.** Has that view changed?

8  **A.** No, not at all.

9  **Q.** And have you varied at all in your view of the NEA as

10 anticompetitive?

11 **A.** No.

12 **Q.** And over the course of learning more about the NEA, have

13 your views gotten weaker or stronger?

14 **A.** They've strengthened as I learned -- because I wasn't

15 aware of the coordination, the revenue sharing until I saw

16 the complaint.

17 **Q.** And you learned more from the complaint?

18 **A.** Yes.

19 **Q.** And what did that do to your views?

20 **A.** That made me feel even stronger that this was an

21 anticompetitive alliance that should be, really, dissolved.

22 **Q.** And what, in particular, did you learn from the complaint

23 that solidified that view?

24 **A.** Well, it's my position that JetBlue is, in essence, now a

25 feeder airline for American Airlines and will do what

1    American wants them to do, because American is giving them

2    hundreds of millions of dollars in slots, as well as access

3    to the world's largest frequent traveler program.

4    **Q.**  All right.  Does the pending acquisition of -- or the

5    applied-for acquisition of Spirit by JetBlue, does that

6    change your views?

7    **A.**  No.

8    **Q.**  And why is this?

9    **A.**  Well, to be fair, again, we've talked about this, I don't

10   have a lot of information on the merger, so I'm not an expert

11   on the value associated.  But to me it just seems that the

12   world's largest airline already having -- the sixth largest

13   airline in the United States, with a 25 percent domestic

14   share, and then also controlling the largest ULLC in the

15   industry seems like a bad --

16              MR. SCHWED:  I'm going to object to the answer,

17   Your Honor.  You know, the question was somewhat vague, as

18   sort of asked for, but now he's -- again, he's admitted that

19   he knows nothing about the acquisition, and now he's

20   speculating about it.

21              THE COURT:  Sustained.

22   BY MR. DAVIS:

23   **Q.**  Has anything changed your views, Mr. Kirby?

24   **A.**  No, my views have not changed.

25              MR. DAVIS:  All right.  If I may have just a

1    minute, Your Honor?

2            THE COURT:  Of course.

3            (Counsel confers.)

4            MR. DAVIS:  No further questions.  Thank you.

5            THE COURT:  All right.

6    **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF AMERICAN AIRLINES**

7    BY MR. WALL:

8    **Q.**  While we're getting set up, because I can't resist, could

9    anything change your views, Mr. Kirby?

10   **A.**  Anything that's reasonable, probably not.

11           THE COURT:  I'm sorry, say that again?

12           THE WITNESS:  I think the nuance here is that --

13   I'll just make something up -- if American were to give,

14   divest all of their Reagan assets, could my view change?

15           THE COURT:  Is nothing that you think is in the

16   realm of reasonably likely to occur that could change your

17   view?

18           THE WITNESS:  Yes.  That's what I was responding

19   to.

20   BY MR. WALL:

21   **Q.**  Okay.  Now, Mr. Kirby, you began your testimony by saying

22   that your first reaction to the NEA was that it was bad for

23   competition, right?

24   **A.**  Yes.

25   **Q.**  Your first reaction to the NEA was that it was bad for

1    Spirit, wasn't it?

2    **A.**   Well, Spirit and largely to the competitive industry.

3    Again, my point would be that American Airlines was already

4    the largest airline in the world.  And bringing a LCC

5    competitor like JetBlue under their thumb isn't good for

6    Spirit, but it isn't good for the industry, either.

7    **Q.**   At 10:03 a.m., on July 16, 2020, the day that the NEA was

8    announced, DeAnne Gabel from Spirit forwarded the NEA press

9    release to you and a number of colleagues and asked about the

10   NEA for, quote, "Thoughts on if this is good, bad, or

11   indifferent for us," meaning Spirit.  Correct?

12   **A.**   Yes.

13   **Q.**   Let me show what has been marked as Defendants'

14   Exhibit 1076.

15           MR. WALL:  I'm going to ask that to be displayed.

16   BY MR. WALL:

17   **Q.**   And if we can focus in on Ms. Gabel's e-mail, at

18   10:03 a.m.

19           Can you identify Ms. Gabel for the Court?

20   **A.**   Yes.  Ms. Gabel is our senior director of investor

21   relations.

22   **Q.**   She writes to you -- the subject matter of this is

23   "JetBlue and American Airlines announce strategic Partnership

24   to create more competitive options and choice for customers

25   in the northeast," and it forwards the press release that the

1   parties had issued that day, correct?

2   **A.**   Yes.

3   **Q.**   And she asks thoughts on if this is good, bad, or

4   indifferent for us, correct?

5   **A.**   Yes.

6   **Q.**   She says, "My initial thought is that it should be

7   marginally good for us if AA feeds B6 business customers,

8   because they will have less leisure seats to sell against us.

9   But it could also mean we pick up fewer pax," or passengers,

10  "who would fly us but decide to use their earned AA miles to

11  fly B6 (I'm just assuming reciprocity is part of the

12  alliance, as it says co-chair and loyalty benefits.)"

13           I read that correctly?

14  **A.**   Yes.

15  **Q.**   And then she goes on to say, "No matter what the change,

16  the street will say this is bad for Spirit, so I would

17  appreciate your thoughts."

18           Right?

19  **A.**   Yes.

20  **Q.**   You responded a little while later with the e-mail that's

21  at the top.

22           I'll ask that to be put on.

23           This is Thursday, July 16th, at 11:18 a.m.  You

24  say, "DeAnnne, I think it is bad for us, but probably better

25  to have a conversation versus a long e-mail.  At a minimum,

1    the approximate B6 Mosaic program gets a bump, and more folks

2    could be willing to pay a little more for a B6 flight knowing

3    that they could use their points on AA.  It could also have a

4    nice halo effect on B6 in South Florida.  There's likely an

5    S-curve effect in the NYC area, and to a lesser extent at

6    Logan.  While unknown at this time, there may be some slot

7    transfer trades at JFK and LaGuardia tied to this deal.

8    LaGuardia slot transfers could keep us out of the MAT,

9    limiting our LGA growth ambitions."

10           That's what you wrote, correct?

11   **A.**   Yes.

12   **Q.**   Okay.  Let's break it down.  What is the B6 Mosaic

13   program?

14   **A.**   That is the JetBlue loyalty program.

15   **Q.**   Okay.  And why would it get a bump from the NEA?

16   **A.**   Because if Mosaic travelers could basically fly on

17   American Airlines with their global reach, they would get a

18   benefit.

19   **Q.**   So this comment is related to Ms. Gabel's observation

20   about reciprocity meaning frequent flyer program

21   reciprocities?

22   **A.**   Yes.

23   **Q.**   Okay.  And so moving on, the line "more folks could be

24   willing to pay a little more for their B6 flight, knowing

25   they can use their points on AA."

1          How is that bad for Spirit?

2   **A.**   It means that JetBlue would get higher revenue per flight

3   than they get today by being aligned with the

4   American Airlines frequent flyer program.

5   **Q.**   How is that bad for Spirit?

6   **A.**   It makes them a more formidable competitor.

7   **Q.**   Okay.  But regardless of whether that's bad for Spirit,

8   the ability to use points for JetBlue frequent travelers to

9   be able to use their points on American is good for those

10   customers, right?

11   **A.**   It could be good for those consumers, yes.

12   **Q.**   Okay.  Moving on.  What is the nice halo effect for B6 in

13   South Florida that you're referring to?

14   **A.**   Yeah, if you think about it, again, American Airlines has

15   a large and dominant position in Miami.  And while again,

16   similar to the New York area airports, there are distinctive

17   qualities in both Miami and Fort Lauderdale, there is also

18   overlap.  So being in line with a very large frequent

19   traveler base that American enjoys in South Florida could

20   provide a sort of uplifting of the JetBlue program and the

21   passenger ability to get -- bring people in.

22   **Q.**   So you're saying that they could -- that JetBlue could

23   become more attractive and competitive even outside of the

24   NEA territories?

25   **A.**   Yes.  Well, I think that what we often look at the NEA

1    and talk about Boston and New York, I think it's important to

2    look at the geographies that they also fly to.

3    **Q.**   Okay.  The next line has a bit of airline jargon.

4    "There's likely an S-curve effect in the New York City area

5    and to a lesser extent to Logan."

6              First of all, can you explain to Judge Sorokin that

7    an S curve effect is?

8    **A.**   Yeah.  It's an older term that I probably should stop

9    using, but it stands for synergy.  It really is -- the best

10   way to describe it I think is the relevance that we talked

11   about earlier, so again, if you offer more products, you

12   appeal to a much broader part of the customer base is I think

13   the best way to look at it.  You're number one and number two

14   in more markets, you have more frequencies in more markets,

15   and so on.

16   **Q.**   Right.  And would you agree with me that it's the idea

17   that airlines that achieve a frequency share or breadth share

18   advantage at either the route or the airport level will tend

19   to punch above their weight, meaning their capacity?

20   **A.**   Yeah.  And certainly American is a good example of that.

21   **Q.**   And so there's a quality advantage that makes passengers

22   want to fly that airline more, which, through the interaction

23   with the yield management systems results in a revenue

24   premium of some sorts?

25   **A.**   In most cases, yes.

1    **Q.**   Okay.  And thank you for bringing back the supermarket

2    into the discussion of relevance.  I appreciate that.  That

3    was helpful to me.  So the idea behind that one there is that

4    if an airline in a local geography is offering less than its

5    rivals, it is comparatively less relevant, right?

6    **A.**   It's less relevant.  It appeals to a smaller base than

7    the larger airline, yes.

8    **Q.**   Okay.  And that you were noting was more likely to

9    happen -- this S-curve effect, excuse me, rather, was more

10   likely to happen at New York than at Logan.  Why did you make

11   that distinction?

12   **A.**   It's a good question, actually, because, I guess,

13   partially it's a -- I tend to think about New York

14   differently than I look at Boston, but certainly there is a

15   substantial benefit with JetBlue as the largest carrier at

16   Logan at that time.  And my recollection was that American

17   was stepping up their competition at Logan, so certainly the

18   combination would produce a benefit, as well.  I'm sorry, the

19   combination and not competing would produce a benefit for

20   both carriers.

21   **Q.**   I'm sorry, I'm having trouble --

22   **A.**   Let me back up again.

23         So while I pointed out that I thought the benefit

24   was larger in New York and maybe less -- something less than

25   at Boston, I do think it's also pretty substantial Boston.

1    We also just talked about it.  JetBlue is the largest airline

2    at Logan.

3    Q.  Right.  Delta is the second largest.  Prior to the

4    pandemic, you had both carriers growing rapidly.  And then

5    just before the NEA was announced, American -- I think --

6    I'll miss the quote exactly, but the head of revenues, the

7    chief coordinating officer, Vasu Raja, said, you know, take

8    out the bats, we're going to war-type thing --

9                MR. WALL:  It's --

10               MR. DAVIS:  Objection, cutting off the witness.

11               MR. WALL:  I'm sorry, go ahead.

12               THE WITNESS:  Well, basically, it indicated that

13   American was going to become more aggressive in Logan, and we

14   saw that.  They started announcing resurgence of new routes

15   at Logan just prior to the NEA.

16   BY MR. WALL:

17   Q.  Right.  Those are things you read in the complaint that

18   the Department of Justice filed, right?

19   A.  No, no, this is what I observed in doing my job.

20   Q.  You observed the statement about swinging the bat in

21   Boston?  In your job?

22   A.  Yes, I received an e-mail from someone, there was -- I

23   believe, again, my recollection was Mr. Raja was either at an

24   employee event or some conference, and he made that

25   statement, and someone did forward that statement to me.

1   **Q.**   Okay.  So you've mentioned in your testimony that Spirit

2   has wanted to grow its presence in New York for a long time,

3   right?

4   **A.**   Yes.

5   **Q.**   And you haven't ever been able to grow in JFK, right?

6   **A.**   We haven't been able to enter JFK, yes.

7   **Q.**   You've tried to get slots for a very long time at JFK,

8   right?

9   **A.**   We've tried to get critical mass of slots.

10  **Q.**   Right.  And what you've said is there's a certain number

11  of minimal slots that you might have before you try to enter

12  as a new airline at JFK, right?

13  **A.**   Yes.

14  **Q.**   And you don't have any way to accomplish that, other than

15  what might fall out of legal or regulatory proceedings,

16  right?

17  **A.**   Yeah, I think it's unlikely that that amount of slots

18  would become available, absent a larger divestiture or a

19  reauthorization of total slots at JFK.

20  **Q.**   Okay.  And indeed, you told me at your deposition that

21  you think being able to grow through getting more slots in

22  New York is hopeless, right?

23  **A.**   It's extremely difficult, yes.

24  **Q.**   But you used the word "hopeless," right?

25  **A.**   Hopeless, but, yeah, f -- but if I recall, I also talked

1    about, if that's after the NEA, before the NEA, I said it was
2    marginally better.
3    **Q.**   Okay.  But the reason it was marginally better before the
4    NEA was that you were hoping that maybe some airlines would
5    fall prey to the use or lose rule and have to revert their
6    slots to the FAA, right?
7    **A.**   Yeah.  That was certainly again, because I know we're
8    covering a period of '19 to '22.  During the depth of the
9    pandemic, the government allowed waivers on level 2 and level
10   3 airports.  There was a thought that if the government
11   didn't waive requirements, that some slots could become
12   available.
13   **Q.**   Right.  And yet, with respect to that period of time, you
14   also told me at your deposition that you really didn't think
15   it would ever happen that any airlines would actually revert
16   slots and they would become available to you that way, right?
17   **A.**   Yeah, I believed it was highly unlikely base because of
18   the -- because of the discussion that we had earlier about
19   the ability to hide slots, cover slots, operate small gauge
20   aircraft shore holds.
21            MR. WALL:  Okay.  We just have a couple moments,
22   should I just break here?  I was going to go on to another
23   subject.
24            THE COURT:  I don't mind.  It's a long trial.
25            MR. WALL:  You're the only one that matters,

 1    Your Honor.

 2               THE COURT:  I don't know that.  Might as well keep

 3    going, but we'll stop at 1:00.

 4               MR. WALL:  Could I have his binder?  Here it is.

 5    Sorry.

 6               Okay.  Could we pull up very quickly here one of

 7    documents that you spoke to Mr. Davis about -- which was

 8    Plaintiffs' Exhibit 892.

 9    BY MR. WALL:

10    Q.  And if you'll remember, this is the document that had to

11    do with this article that was published by SKIFT.com with

12    this provocative title about the pseudo merger, right?

13    A.  Yes.

14    Q.  Now, he got that phrase from you, right?

15    A.  No.  Oh, does it say that?  I'm sorry, if it was said in

16    the merger -- or in the article, I just -- my memory eludes

17    me, but if we can put it up, I'm sure you're right.

18    Q.  All right.  Let's put up the page that has the Bates

19    stamp Spirit NEA, and it ends in 10733, which is the

20    beginning of this article, "When a Co-Chair Becomes a Pseudo

21    Merger."

22               All right.  You got it?

23    A.  I do.

24    Q.  And if we go down to the fourth paragraph?

25    A.  Actually, we're scrolling through.  Sorry.  We're not

1    quite there yet.

2              Okay.  I'm there now.

3    **Q.**  "It feels like a pseudo merger, a Spirit Airlines

4    executive told *Airline Weekly*."

5              Right?

6    **A.**  Yes.

7    **Q.**  That was you, right?

8    **A.**  Yes, I was the Spirit executive.

9    **Q.**  Okay, but you were unhappy with the article, right?

10   **A.**  Yeah, I felt that it didn't represent our viewpoint.

11   **Q.**  Exactly.  You said it was not great, because he found a

12   bunch of people who say this is good news, right?

13   **A.**  For JetBlue and American, yes.

14   **Q.**  Well, not just for JetBlue and American.  Why don't we

15   take a look at the second page.  So this is Bates stamp

16   ending 734.  And at the top of the page, after making a

17   reference to what the Spirit executive had said, the article

18   goes on, "Not everyone agrees.  Unveiled amid the coronavirus

19   pandemic, the worst crisis to hit the industry in history,

20   industry experts largely view the American and JetBlue pac as

21   an innovative solution to address each carrier's competitive

22   disadvantages."

23              Right?  I read that correctly?

24   **A.**  I -- we're not there yet.  It's not before me.

25   Apologies.

 1           THE COURT:  Second full paragraph at the top.

 2           THE WITNESS:  Okay.  I'm there now.

 3           MR. WALL:  Yeah.  So I'll say it again.  "Not

 4  everyone agrees.  Unveiled amid the Coronavirus pandemic, the

 5  worst crisis to hit the industry in its history, industry

 6  experts largely agree the American and JetBlue pact" --

 7  "largely view the American and JetBlue pact as an innovative

 8  solution to address each carrier's competitive

 9  disadvantages."

10           I read that correctly?

11  **A.**   Yes.

12  **Q.**   "The former gains a much stronger competitive position in

13  the northeast where it is at a disadvantage to Delta and

14  United Airlines."

15           I read that correctly?

16  **A.**   Yes.

17  **Q.**   "The latter gains additional access to some of the most

18  sought-after airports in the country, plus broad

19  international feed at its two largest bases."

20           I read that correctly?

21  **A.**   Yes.

22  **Q.**   It goes on.

23           THE COURT:  Mr. Wall, I'm going to stop you there.

24  I know you're in the middle, but --

25           MR. WALL:  But I'm just getting to the --  "I think

1      it's brilliant."

2              THE COURT:  You think what you're going to do is

3      brilliant, or brilliant for the merger?

4              MR. WALL:  Thank you, Your Honor.  We'll see you

5      tomorrow.

6              THE COURT:  We'll stand in recess.  I'll see you

7      tomorrow at 9:00 a.m.

8              MR. SCHWED:  Your Honor, before we recess, I'm not

9      sure if Mr. Kirby's counsel is in the courtroom, but just

10     maybe you want to remind him that he's on cross, and what the

11     rules are since he's not a party.

12             THE COURT:  Mr. Kirby, is your lawyer here?

13             MR. DAVIS:  Yes, Mr. Finch, Your Honor, is here.

14             THE COURT:  Okay.  Perfect.  Well, so then I just

15     remind you that he's on cross and you can look at the order

16     and I'm sure that lawyers in the front table will explain it

17     to you as to their view about communication during this

18     period of time.

19             MR. FINCH:  Will do, Your Honor.

20             MR. WALL:  Can we just also just have one point to

21     make here.  We have now turned over a cross-examination

22     binder.  And we do want understood that there should be no

23     discussion with the witness at all about the contents of that

24     cross-examination binder.

25             THE COURT:  All right.  That's fair, right?

1          MR. JONES:  Yes, Your Honor.  We will certainly

2     not.

3          THE COURT:  Okay.  Fine.

4          MR. SCHWED:  Including his counsel.

5          THE COURT:  Fine.  Yes.  Okay.

6          Just think, you can talk about anything else.

7          THE WITNESS:  I'm sure we can find something.

8          (Court in recess at 1:02 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

     I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.


/s/ Rachel M. Lopez                    September 29, 2022
/s/ Robert W. Paschal



_____            _____

Rachel M. Lopez, CRR                   Date
Robert W. Paschal, RMR, CRR
Official Court Reporters