UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA, et al.

     Plaintiffs,                        Civil Action No.
                                          1:21-cv-11558-LTS

     v.

AMERICAN AIRLINES GROUP, INC.,
et al.,

     Defendants.

_____

BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

BENCH TRIAL
Day 4

Friday, September 30, 2022
9:00 a.m.

John J. Moakley United States Courthouse
Courtroom 13
One Courthouse Way
Boston, Massachusetts

Rachel M. Lopez, CRR
Official Court Reporter
raeufp@gmail.com

```
 1                      A P P E A R A N C E S

 2

     On behalf of the Plaintiff United States of America:
 3
         UNITED STATES DEPARTMENT OF JUSTICE
 4       BY:  WILLIAM H. JONES, III; JOHN STAIGE DAVIS; BONNY E.
         SWEENEY; AND JAMES H. CONGDON
 5       450 Fifth Street, Northwest
         Suite 8000
 6       Washington, D.C.  20530
         (202) 514-0230
 7       bill.jones2@usdoj.gov
         john.davis10@usdoj.gov
 8       bonny.sweeney@usdoj.gov
         james.congdon@usdoj.gov
 9

10
     On behalf of the Defendant American Airlines Group, Inc.:
11
         LATHAM & WATKINS, LLP
12       BY:  DANIEL M. WALL AND SEUGN WAN PAIK
         505 Montgomery Street
13       Suite 2000
         San Francisco, California  04111
14       (415) 391-0600
         dan.wall@lw.com
15       seung.paik@lw.com

16

17   On behalf of the Defendant JetBlue Airways Corporation:

18       SHEARMAN & STERLING LLP
         BY:  RICHARD F. SCHWED
19       599 Lexington Avenue
         New York, New York  10022
20       (212) 848-4000
         richard.schwed@shearman.com
21

22

23

24

25
```

1

## **<u>TABLE OF CONTENTS</u>**

2

3

## **TRIAL WITNESSES**

4

5   On behalf of the Plaintiffs:                                    <u>Page</u>

6   JOHN KIRBY

7          By Mr. Wall                                                 5

8          By Mr. Davis                                               47

9          By Mr. Wall                                                63

10  VASU RAJA

11         By Ms. Sweeney                                             68

12         By Mr. Wall                                               177

13

14

15                             **EXHIBITS**

16

17  On behalf of the Plaintiffs:                                <u>Admitted</u>

18   Number 64                                                      123

19   Number 247                                                     147

20

21  On behalf of the Defendants:                                <u>Admitted</u>

22   Number DX89-A, B, and C                                        168

23

24

25

```
 1                    P R O C E E D I N G S
 2              (In open court at 9:00 a.m.)
 3              THE DEPUTY CLERK:  The United States District Court
 4      for the District of Massachusetts is now in session, the
 5      Honorable Leo T. Sorokin presiding.
 6              THE COURT:  Please be seated.
 7              So just for the benefit of the court reporter, one
 8      little adjustment, when a new lawyer starts to examine a
 9      witness, like as a lawyer who hasn't examined before, not one
10      of the three of you, just because I think she knows the three
11      of you -- the court reporters know the three of you more
12      easily, just pause for a minute, until the court reporter
13      says they're ready, that will just enable a better record for
14      all of you.  So okay.
15              Yes?
16              MR. JONES:  Your Honor, just one brief
17      administrative note for the Court, the plaintiffs' side has
18      had a problem with this trial director that we're trying to
19      resolve, but not sure if we're going to quite get it
20      resolved.  So defendants have agreed to call up our
21      documents, and thanks to them for that.
22              THE COURT:  Good.
23              MR. JONES:  But our presentation, because, you
24      know, using their trial director instead of --
25              THE COURT:  May be a little bit more less smooth.
```

1          MR. JONES:  Yes.

2          THE COURT:  That's totally fine and I understand,

3     and kudos to all of you for agreeing to do that, that's the

4     right thing to do.

5          MR. WALL:  We actually did not agree to put up the

6     right documents.  We obtained a curation right.

7          MR. JONES:  Thank you, Your Honor.

8          THE COURT:  Okay.  You have something else, or are

9     you just ready to go?

10          MR. WALL:  No.

11          THE COURT:  Where is Mr. Kirby?

12          MR. DAVIS:  I'll call him.

13          THE COURT:  Go ahead, Mr. Wall.

14          MR. WALL:  Thank you, Your Honor.

15          Good morning, Mr. Kirby.

16          THE WITNESS:  Good morning.

17                          **JOHN KIRBY**

18       having been previously duly sworn, testified as follows:

19              **CROSS-EXAMINATION BY COUNSEL FOR**

20              **DEFENDANT AMERICAN AIRLINES, Cont.**

21     BY MR. WALL:

22     **Q.**  Yesterday I asked you to explain a statement that you had

23     made to a colleague on the day that the NEA was announced

24     about potential S-curve effects.  Do you recall that?

25     **A.**  Yes.

1    **Q.**  And in particular, I asked you to address what it was

2    that you had indicated that a greater S-curve effect was

3    likely at the New York airports than at the Logan airports.

4    And in that context, you testified that your recollection was

5    that American had been making public statements about

6    stepping up their competition at Logan just prior to the

7    announcement of the NEA, right?

8    **A.**  Yes.

9    **Q.**  Okay.  And in fact, what you said was that just before

10   the NEA, American -- I think I'll miss the quote exactly, but

11   the head of revenues, the chief -- the transcript says

12   coordinating officer.  It should say commercial officer --

13   Vasu Raja, said, you know, take out the bats, we're going to

14   war-type thing.  Do you remember that testimony?

15   **A.**  Yes.

16   **Q.**  Okay.  And you said that that statement indicated that

17   American was going to become more aggressive in Logan and

18   that you had -- and that you had seen that just prior to the

19   NEA, right?

20   **A.**  Yes.

21   **Q.**  Okay.  Now, a challenge to you about that, suggesting you

22   read those statements in the government's complaint.  Do you

23   remember that?

24   **A.**  Yes.

25   **Q.**  And you said, "No, no.  This is what I observed in doing

1    my job," and then you went on to say that you received an

2    e-mail from someone who forwarded to you a statement that

3    Vasu Raja had made at a conference.  Do you recall that?

4    **A.**  Yes.

5    **Q.**  Now, overnight, were you able to remember more about that

6    and maybe find the e-mail?

7    **A.**  No.

8    **Q.**  Okay.  Let me show you, sir, what is in evidence as

9    Plaintiffs' Exhibit 64, which is an internal e-mail from

10   Vasu Raja to Jim Carter.

11   **A.**  Uh-huh.

12   **Q.**  In which Mr. Raja writes to Mr. Carter alone, "Awesome.

13   Gird your loins.  Time to swing the bat in Boston."

14            Do you see that?

15   **A.**  Yes.

16   **Q.**  Now, you've never seen that internal e-mail, have you?

17   **A.**  No.

18   **Q.**  Okay.  Let me show you the complaint in this case, at

19   paragraph 55.  That should be popping up right now?

20            MR. DAVIS:  For the record, the Exhibit number,

21   please.

22            MR. WALL:  It's the complaint.  I don't think we

23   have the exhibit number on the complaint.

24            THE COURT:  It's docket number one.

25   BY MR. WALL:

**Q.**  Paragraph 55 of the complaint states, picking up at the
middle of the paragraph, "In September of 2019, American
Senior Vice President for network strategy rallied his team,
'We are not done in Boston and we are going to fight like
hell in Boston if I have anything to do with it.'  In January
of 2020, the same executive commanded, 'gird your loans.
Time to swing the bat in Boston.'"

      Do you see that?

**A.**  Yes.

**Q.**  Now, you had read the complaint before prior to your
testimony yesterday, right?

**A.**  Yes.

**Q.**  So when I asked you questions about the S-curve in
Boston, you weaved into your answer one of the documents that
DOJ has cited in support of their case about American growth
in Boston, correct?

**A.**  Yes.

**Q.**  And then you attributed that language to an e-mail from a
third party that you don't have, right?

**A.**  Yes.

**Q.**  Okay.  Now, Mr. Kirby, you also had a discussion
yesterday with Mr. Davis about destinations that Spirit
serves from both Newark and LaGuardia airports, right?

**A.**  Yes.

**Q.**  And you testified that Spirit serves Fort Lauderdale,

1   Orlando, and Mytle Beach, from both LaGuardia and Newark,

2   right?

3   **A.**  Yes.

4           MR. DAVIS:  Objection, misstates the testimony.  I

5   thought he said Fort Lauderdale and Mytle Beach, not Orlando.

6           THE WITNESS:  No, I also said Orlando, John.

7           MR. DAVIS:  Withdrawn.

8           THE COURT:  Overruled.

9   BY MR. WALL:

10  **Q.**  You also mentioned Houston, in fact, right?

11  **A.**  Houston, which is recent, but yes.

12  **Q.**  When did Spirit enter Houston?

13  **A.**  Well, we announced it, but we haven't started service

14  yet.

15  **Q.**  Okay.  All right.  Okay.  So in terms of industry data

16  that might be available about your pricing, it would exist

17  for Fort Lauderdale, Orlando, and Myrtle Beach, but not

18  Houston?

19  **A.**  Yes.

20  **Q.**  So when Mr. Davis asked you whether the routes to those

21  destinations from Newark and LaGuardia had the same pricing,

22  you responded no and that prices can vary greatly, correct?

23  **A.**  Yes.

24          MR. WALL:  Okay.  Your Honor, I want to hand up,

25  and I've already given to opposing counsel, a copy of a

1    compilation that we prepared last night, based upon industry

2    DB1B data, that is admitted into evidence as Defendants'

3    Exhibits 745 and 1070.  So this particular compilation, based

4    upon the DB1B data shows Spirit's average round trip fares

5    from LaGuardia and Newark airports to Fort Lauderdale,

6    Orlando, and Myrtle Beach.  Okay?

7              MR. DAVIS:  Your Honor, the government objects.

8    This is a demonstrative and will be used substantively.  We

9    were just handed it minutes ago.  It was due under the

10   pretrial scheduling yesterday at 9 o'clock, and we object to

11   its use so late.

12             MR. WALL:  It's a little hard to understand.

13             THE COURT:  Hold on.  You object to its use, what?

14   I didn't catch the last one.

15             MR. DAVIS:  The objection is it's in violation of

16   the Court's order about exchanging demonstrative exhibits

17   before the testimony.

18             THE COURT:  Because the -- under the order which I

19   confess I don't have -- one of the things that I don't have

20   in front of me at the moment, says that you should --

21   before -- on the day of -- a witness is called, you should

22   exchange, by 9:00 a.m., the demonstratives for the direct and

23   cross?

24             MR. WALL:  It's actually in advance of it, but it's

25   impossible to do in this circumstance, because we didn't hear

1    this claim or this testimony until yesterday afternoon.

2            THE COURT:  All right.  Since this seems to be

3    responsive to something that wasn't in the -- was this in his

4    deposition?

5            MS. RIGGS:  Your Honor, we wouldn't have objected

6    if they had told us last evening that they were preparing

7    this, but we literally got it one minute before you took the

8    bench.

9            THE COURT:  I think what I'm going to do is I'm

10   going to let them use it, but if you want to respond to it

11   later, even after you -- I'm not going to hold the witness,

12   but if you want to respond to it, you can.  If we need to, we

13   could get the witness on video for ten minutes if there was

14   something else to respond to, and I'd be prepared to have

15   that happen and no problem.

16           Go ahead.

17           MR. WALL:  Thank you, Your Honor.

18           THE COURT:  And I think generally, if you're going

19   to prepare it, you should give it to them the night before.

20           MR. WALL:  Well, Your Honor, I guarantee you, we

21   would have had this not come up for the first time yesterday

22   afternoon.

23           THE COURT:  No, no, but you prepared it last night,

24   probably.

25           MR. WALL:  It's actually -- I think the copy that

1    you're looking at arrived here in the middle of the night

2    last night and we gave it to them first thing this morning.

3              THE COURT:  Right.  But there is e-mail.

4              All right.  Go ahead.

5    BY MR. WALL:

6    **Q.**  All right.  Mr. Kirby, I'm showing you first a graph.

7              First of all, could you explain to the Court what

8    DB1B data is?

9    **A.**  Yeah.  I actually referenced it yesterday at a high

10   level.  That is the data that is provided by carriers to the

11   DOT and then is compiled and put into that database.

12   **Q.**  All right.  And it's regularly used in the industry to

13   make fare comparisons on routes between carriers and so

14   forth?

15   **A.**  Yeah, it's used for a number of reasons, but that's some

16   of them.

17   **Q.**  All right.  So this first graph, Mr. Kirby, is entitled

18   "Spirit round-trip nonstop fares between LaGuardia/Newark and

19   Fort Lauderdale."  And this is one of the routes when you

20   said that Spirit's prices are not the same and they can vary

21   greatly, correct?

22   **A.**  I said they can vary, yes.

23   **Q.**  Do you have any reason, based upon your understanding of

24   Spirit's pricing, to think that the pattern of movements of

25   Spirit's prices between LaGuardia and Newark on the one hand

1    and Fort Lauderdale on the other hand are substantially

2    different than what's depicted here in this chart?

3    **A.**   No.  But I would say, though, if you recall yesterday,

4    one of the things I did mention was because they are similar

5    stage lengths, that the pricing wouldn't be too out -- too

6    different.  So -- and you can see, even if we look at second

7    quarter '18, there actually is a pretty significant

8    difference in certain periods, and other periods, it's close.

9    So again, it indicates that because of the state, what the

10   cost of operating that length is similar, that the pricing

11   would be similar, but again, not exact.

12   **Q.**   Okay.  Let's move on to the next one, then, which is

13   Spirit's round trip nonstop fares between LaGuardia and

14   Newark on the one hand and MCO -- that's Orlando, right?

15   **A.**   Correct.

16   **Q.**   And you see these lines are pretty tightly aligned.

17   Would you agree?

18   **A.**   Yes.

19   **Q.**   Okay.  So do you have any reason to believe that that

20   inaccurately portrays a comparison between Spirit's pricing

21   between Orlando and the two New York airport fares?

22   **A.**   No, but --

23            MR. DAVIS:  Objection to the question.  Reason to

24   believe, that doesn't establish foundation, Your Honor.  As I

25   understand it, this chart is based on defense exhibits that

1    are not in evidence.

2            MR. WALL:  That's not true.  It's based upon

3    defense exhibits that are in evidence.

4            MR. DAVIS:  All right.  My understanding is they

5    are not evidence.  I may be wrong.  This is 745 and 1070?

6            MR. WALL:  DB1B data was stipulated to be in

7    evidence.

8            MR. DAVIS:  Is there a relationship with DX 745 and

9    DX 1070.

10           MR. WALL:  Those are DB1B data.

11           MR. DAVIS:  All right.  Well, the objection is to

12   personal knowledge of these -- it's based on documents he's

13   not seen right now.

14           MR. WALL:  I didn't.  I asked him if he had any

15   knowledge that was contrary to what's being portrayed.

16           THE COURT:  He has familiarity -- I mean, on his

17   testimony, it seems to me he understands he's not -- I don't

18   think he's -- I think he's responsible for network

19   operations, right?

20           THE WITNESS:  Network planning.

21           THE COURT:  Which is the product, which is the

22   schedule.

23           THE WITNESS:  Correct.

24           THE COURT:  And that touches, in my understanding,

25   I'll just tell you, and if I'm wrong, you can all fix it with

1    the witness, but my understanding is he's not specifically

2    responsible for pricing, but he's familiar with pricing, and

3    that that obviously effects schedule in some way.  There's

4    interaction and intercommunication, so I think he would have

5    some understanding of this, even if he hasn't read all of

6    that, and he's talked about being up on the industry

7    generally.  So I don't remember the -- what's the exact --

8    what's the question, again, just in terms of the wording?

9            MR. WALL:  I'll rephrase it.

10   BY MR. WALL:

11   **Q.**  Do you have any reason to believe that Spirit's pricing,

12   to which you testified yesterday, between LaGuardia and

13   Newark on the one hand and Orlando on the other hand is any

14   different or more varied than what is depicted on this chart?

15   **A.**  I'll just --

16           THE COURT:  So, wait, just.

17           MR. DAVIS:  So the objection is just improper

18   authentication.  This witness is being used to authenticate a

19   document being admitted substantively, but he's never seen --

20           THE COURT:  Well, he hasn't offered this -- he

21   hasn't offered the document.

22           MR. DAVIS:  Yes.

23           THE COURT:  Right?

24           MR. WALL:  No, I haven't.

25           THE COURT:  So I think he can -- that's overruled,

1    because what I understand reason to believe is not to

2    authenticate the document, but is a way of using words to ask

3    him whether he has knowledge or information in his brain,

4    based on his experience, that is different than what's in

5    this demonstrative.

6                    MR. WALL:  Exactly, Your Honor.

7                    THE COURT:  You can answer.

8                    THE WITNESS:  Can you state the question again?

9                    MR. WALL:  Well, his question was better than mine.

10                   THE WITNESS:  Well, Your Honor -- no.

11                   THE COURT:  Do you know anything -- well, it's not

12   clear that whether it's better -- it's actually better or

13   it's just because I'm the judge -- whether that opinion holds

14   when you go back to the hotel, I don't know, but my question

15   was simply:  Do you know, based on your work, and what you

16   know in your head, anything that -- anything at all that

17   suggests that -- that suggests something other, smally or

18   greatly, than what you see depicted here.

19                   THE WITNESS:  Yeah, the thing I would say,

20   Your Honor, is that -- we had talked about this yesterday, as

21   well, that pricing in 2020 and 2021 was not normal.  And as I

22   mentioned, stage length, generally the pricing for a Spirit,

23   which is a low cost carrier that really is trying to offer

24   lowest fares possible is largely driven by the cost of

25   operating that service.  So it's not surprising to me that

1  two more or less equally staged routes end up with similar

2  pricing.  But I really thought the question that Mr. Wall

3  asked yesterday was does our pricing department start with

4  the same prices in both markets, and I don't believe that to

5  be true.

6        Now, through yield management techniques, the fares

7  end up being similar.  That's clear.  I have no reason, as

8  you asked, to dispute this data.  But I don't believe our

9  pricing people look at that and say, well, if this is the

10  price in Newark, this is the price at LaGuardia.

11  BY MR. WALL:

12  **Q.**  Okay.  Why don't we then just move on.

13        THE COURT:  So just pause for a second.

14        So one -- stage length is the distance.

15        THE WITNESS:  Correct.

16        THE COURT:  So if it's 1,200 miles, making that --

17  just guessing, from generally, Newark or LaGuardia, either

18  way, to Orlando, then the stage length, that factor is the

19  same whether it's Newark to LaGuardia to Orlando, or some

20  other City to Orlando that's 1,200 miles.

21        THE WITNESS:  Correct.

22        THE COURT:  But part of the stage length would

23  encompass other costs beyond sort of the cost of flying the

24  plane, which would be the -- I assume the real estate costs

25  in New York City are greater than the real estate costs in

 1    certain other cities.

 2              THE WITNESS:  Absolutely.

 3              THE COURT:  So that's when the -- there must be

 4    fees related to landing, and the like, and those kinds of

 5    things would be baked into the pricing department's thoughts,

 6    whether or not they actually adjusted for that, that doesn't

 7    mean that's the only factor, but they would at least be

 8    considering that.

 9              THE WITNESS:  They -- pricing generally doesn't

10    consider the absolute cost, or in certain, the nuances, but

11    that can come into play, as well.  But generally --

12              THE COURT:  But you indicated that the stage

13    length, you would think things of a similar stage length

14    would be similarly priced.

15              THE WITNESS:  Yeah, I believe if we were looking --

16    if we picked any Spirit markets that were similarly staged, I

17    think the pricing would probably be fairly similar

18    ultimately.

19              THE COURT:  And that would be because the costs are

20    similar.

21              THE WITNESS:  Yeah.  Generally, the bulk of the

22    cost is from the -- operating the aircraft.

23              THE COURT:  Not the --

24              THE WITNESS:  Well, the real estate can come into

25    play, so for example, in the case of Newark and LaGuardia,

1    they are both some of the most expensive airports that we

2    operate in.  So if you say --

3              THE COURT:  In terms of labor costs, in terms of

4    fees, in terms of real estate, all the related things that

5    have to happen at the airport, each of them is more

6    expensive.

7              THE WITNESS:  In general, the New York airports are

8    much more expensive than most airports in our system.

9              THE COURT:  Okay.  I got it.

10   BY MR. WALL:

11   Q.  Just so we put a pin on that, I think you made some

12   reference of it yesterday, but explain again the cost per

13   enplanement.

14   A.  So that's using an industry standard metric.  We

15   usually -- I say CPE, but it's the cost of operating -- of

16   basically one passenger -- transporting one passenger from

17   that facility.

18   Q.  And the CPE at all the New York airports is much higher

19   than it is normally throughout the United States?

20   A.  Some of the highest in the United States, yes.

21   Q.  Okay.  All right.  Mr. Kirby, let's go back to where we

22   left off yesterday, which was plaintiffs' Exhibit 892.  And

23   as a reminder, you were sending around an article published

24   by Skift.com -- actually, excuse me, a colleague was sending

25   around an article, and you had commented in a cover e-mail,

1     "Not great, he found a bunch of people who say this is good

2     news."  Do you recall that?

3     **A.**   Yes.

4     **Q.**   And we were walking through the article yesterday, and

5     when we ended the court day, we were on page 19 of the pdf,

6     ending in the Bates number 734.  And one of the things that

7     you found was not great was a quotation in the second full

8     paragraph from a director at the UC Berkely Haas School of

9     Business and College Engineering, who studies the airline

10    industry, right?

11    **A.**   Well, you're making a little bit of a leap, right?  I

12    made a general statement that they found people that thought

13    this was a good thing, and now you're saying that I believe

14    that this specific individual, but I'll say yes.

15    **Q.**   Okay.  All right.

16              THE COURT:  You're saying yes to which question.

17    I'm a little confused.

18              THE WITNESS:  Well --

19              MR. WALL:  Yeah, he made a fair point.  I put a

20    couple links in there that I think he fairly is pointing out

21    that he didn't make.  That's fine.

22              THE COURT:  Okay.

23    BY MR. WALL:

24    **Q.**   In the article that was circulated, one of the quotations

25    is from someone named Saikat Chaudhuri who is identified as a

1  director at UC Berkeley's Haas School of Business and College

2  of Engineering, and it says that Mr. Chaudhuri studies the

3  airline industry, correct?

4  **A.**  Yes.

5  **Q.**  And his quotation in the article was "I think this is a

6  brilliant partnership.  The alliance addresses strategic

7  shortcomings at both American and JetBlue while doing so

8  without the challenges of a merger."

9  That's what he said, correct?

10  **A.**  Yes.

11  **Q.**  And you thought that Mr. Chaudhuri was correct about

12  that?

13  **A.**  No, actually, in fact, I would agree that the alliance is

14  great for American and JetBlue, and it does not -- it does

15  allow them to operate similar to a merger without being

16  merged, so I would agree with that statement.  But I think

17  overall, I was really thinking about broadly competition is

18  harmed by this combination.

19  **Q.**  Right, but Mr. Chaudhuri references that, as well, below,

20  right?  There's another part of the article below where the

21  author actually asked him about Southwest and Spirit's

22  concerns, and Chaudhuri said he does not see the partnership

23  creating, "De facto monopoly positions."  He cited robust

24  competition in both Boston and New York, Delta has hubs in

25  both cities, and United and New York hub at Newark Liberty

1    airport.  And then he goes on to make another comment about

2    the slot divestments, correct?

3    **A.**   Yeah, he -- that's his opinion.

4    **Q.**   Okay.  But in your advocacy against the NEA, since the

5    day that it -- that it was announced, you've had to deal

6    repeatedly with third parties who were expressing opinions

7    contrary to Spirit's, haven't you?

8    **A.**   Well, again, I read -- I read opinions that were in --

9    you know, diametrically opposed to our opinion.  Yes.

10   **Q.**   Well, let's go back to a document you covered yesterday

11   with Mr. Davis.  Take a look at -- it is -- it's already been

12   admitted as Defendants' Exhibit 489.

13            Do you recall this deck?

14   **A.**   I do recall the deck.

15   **Q.**   Yeah.  So this is a -- this is a deck that was prepared

16   for Spirit and sent to the DOT in August of 2020 to complain

17   about the Northeast Alliance, right?

18   **A.**   It was a deck that was prepared at our behest by

19   Campbell-Hill and yes, we did share that with the Department

20   of Transportation.

21   **Q.**   Campbell-Hill is an aviation consultancy?

22   **A.**   They are.

23   **Q.**   Okay.  And let's turn to slide five.  And what's included

24   in this is a statement about a *Washington Post* article that

25   accurately summarized the unusual nature of the AA/B6

1    strategic partnership, do you see that?

2    **A.**  Yes.

3    **Q.**  So Spirit seems to be providing a summary of the summary

4    from the *Washington Post* here, and the first bullet says,

5    "For JetBlue, the alliance would help it grow at LaGuardia

6    and Newark airports, it's home New York market and bolster

7    it's position at Boston-Logan Airport."

8            Do you see that?

9    **A.**  Yes.

10   **Q.**  And you told the DOT that that was accurate, right?

11   **A.**  Yes.

12   **Q.**  And it is accurate, right?

13   **A.**  Yes.

14   **Q.**  Okay.  The second bullet says, "Regulators could block

15   further mergers of major US airlines, so the carriers are

16   turning to" -- and there's an ellipsis there, "partnerships

17   that still might generate new revenue."

18           Do you see that?

19   **A.**  Yes.

20   **Q.**  Do you recall the words that you omitted with the

21   ellipsis?

22   **A.**  No.  Again, I was not the author of this document.

23   **Q.**  Okay.  Do you know that the words were, quote, more

24   modest, end quote?

25           MR. DAVIS:  Objection.  Hearsay.

1          MR. WALL:  Okay.  Let's display the *Washington Post*
2    article and --
3          MR. DAVIS:  Objection, hearsay.
4          MR. WALL:  It's not for the truth.
5          THE COURT:  What are you offering it for?
6          MR. WALL:  I'm offering it for the -- the fact that
7    the deck that they put in evidence --
8          THE COURT:  This was the deck they presented to
9    whom?
10         MR. WALL:  To the Department of Transportation.  It
11   was part of the --
12         THE COURT:  Their pitch to DOT to block it or
13   modify it in some way.
14         MR. WALL:  Exactly.
15         THE COURT:  All right.  Not for the truth, but
16   overruled.
17         MR. WALL:  Okay.
18   BY MR. WALL:
19   **Q.**  Let's display the actual *Washington Post* article on which
20   this is based and the relevant line.  It states, "Regulators
21   could block further mergers of major US airlines, so the
22   carriers are turning to more modest partnerships that still
23   might generate new revenue.  This is even more critical now
24   with travel and airline revenue plummeting during the
25   coronavirus pandemic."

1            Okay.  You didn't provide the full quote to the

2    DOT, did you, sir?

3    **A.**   Again, I was not the author of the document.

4    **Q.**   That's fine.  So let's go back to this subject matter of

5    slots that took up a lot of time yesterday, and I think that

6    we can be pretty quick about this.  So you testified

7    yesterday that Spirit has been interested in slots at JFK

8    Airport for more than a decade, right?

9    **A.**   Yes.

10   **Q.**   At LaGuardia, as well, right?

11   **A.**   Yes.

12   **Q.**   And -- but as you testified, there are these slot

13   constraints, and it's difficult, if not impossible, to

14   acquire slots, right?

15   **A.**   Yes.

16   **Q.**   And realistically, that situation with the slots sort of

17   locks in the -- the take off and landing positions that

18   carriers have at these airports, right?

19   **A.**   Yes.

20   **Q.**   Let's take a look at PX 893 that you discussed with

21   Mr. Davis yesterday.  And take a look at page 18 of the pdf,

22   which ends in Bates number 50.

23            Do you remember this one, sir?

24   **A.**   I do.

25   **Q.**   And so Mr. Davis walked you through the fact that United

1    is by far the largest at Newark in terms of take off and

2    landing rights, correct?

3    **A.**   Yes.

4    **Q.**   And Delta is the largest at LaGuardia?

5    **A.**   Yes.

6    **Q.**   And Delta is the largest at JFK?

7    **A.**   Yes.

8    **Q.**   Right.  And on this chart, in this document, there's no

9    logo for American anywhere on the slide, right?

10   **A.**   Yes.

11   **Q.**   There's no logo for JetBlue anywhere on the slide?

12   **A.**   No.

13   **Q.**   Because the fact of the matter is, is that United

14   controls over two-thirds of the take off and landing rights

15   at Newark, right?

16   **A.**   Approximately two-thirds, right.

17   **Q.**   A little more than that, actually, right?

18   **A.**   Yeah.  Yeah.  At this metric, it's another seven points

19   above two-thirds.

20   **Q.**   And the number of take offs and landings, and therefore

21   routes and frequencies, and so forth, that United is able to

22   offer in the New York metropolitan region is a function of

23   having all of those take off and landing rights, correct?

24   **A.**   At Newark, yes.

25   **Q.**   And with respect to Delta, it controls almost half of the

1    slots, the combined slots at LaGuardia and JFK, right?

2    **A.**   Yes.

3    **Q.**   And so once again, Delta's ability to offer all of those

4    frequencies and routes and so forth is a function of it

5    having that very large slot portfolios that these two

6    airports from which it primarily serves New York, right?

7    **A.**   Yes.

8    **Q.**   Okay.  And American and JetBlue are among the airlines

9    that have to get by with some share of the rest, right?

10   **A.**   Some large share of the rest, yes.

11   **Q.**   Well, in the case of LaGuardia, it is not true that

12   JetBlue has -- had, on its own, a large share of the rest, is

13   it, sir?

14   **A.**   Well, again, it depends on your definition of large, but

15   yes.  You are correct, American is the second largest

16   carrier, but JetBlue operated somewhere around 17 or 18

17   flights a day, prior to the NEA.

18   **Q.**   Right.  And I'm going to show you a document in a moment

19   that has a little more detail on that, but neither American

20   nor JetBlue has any organic ability to catch up with United

21   or Delta by matching or even coming close to matching the

22   take offs and landings that those airlines can offer by

23   virtue of their superior control over slots or takeoff and

24   landing rights, correct?

25   **A.**   Well, again, you're characterizing them as

1    interchangeable, which I don't believe they are.

2    **Q.**  Well, answer my question, anyway.

3    **A.**  United has a larger position at Newark than the combined

4    NEA carriers enjoy at either JFK or LaGuardia.

5    **Q.**  Right.  And there's nothing that American could do on its

6    own to get take off or landing rights in the New York area

7    that are equivalent to the ones that United has, is there?

8    **A.**  I can't answer that question.

9    **Q.**  Can you think of anything that they could do to get take

10   off or landing rights equivalent to what United has?

11            MR. DAVIS:  Objection.  Calls for speculation.

12            THE COURT:  Overruled.

13            You can answer.

14            THE WITNESS:  Okay.  What I would say is

15   American Airlines is the world's largest airline, and it has

16   substantially more wherewithal that I may not be aware of

17   that they may be able to accomplish something that I would

18   consider to be very difficult.  So if you say that looking at

19   it as an outsider looking in, that it would be challenging

20   for American to realize a position as great as Delta's, I

21   would say, yes, it would be challenging, but I don't know the

22   capabilities of American Airlines' ability to get more

23   capacity.

24   **Q.**  Can you think of anything that American Airlines could do

25   on its own to catch up with Delta in New York in terms of

1    take off and landing rights or slots?

2    **A.**   Again, I would answer it the same way, that the world's

3    largest airline has more wherewithal than any carrier that

4    I've worked at, so they may be able to accomplish some things

5    that I wouldn't be able to.  But, yes, it would -- I presume

6    it would be very challenging, as an observer looking at it,

7    to realize a position as large as Delta's.

8    **Q.**   Mr. Kirby, let's go back to Plaintiffs' Exhibit 890 that

9    you discussed with Mr. Davis.

10               THE COURT:  I'm sorry, one question just before we

11   get there, Mr. Wall.

12               Airlines, I take it, are entitled to sell the slots

13   to another airline if they want, or does that have to go

14   through DOT?

15               THE WITNESS:  Generally, it depends on the

16   magnitude.  But typically, they have to go through DOT.  And

17   the interesting thing about slots, Your Honor, is that

18   technically they're owned by the government.  In fact, back

19   in the early part of my career, carriers would even try to

20   trade, because they had a slot number associated with it in

21   terms of what would be withdrawn first of the government.

22   They were to withdraw the position.  So carriers would

23   actually send money in equal amounts of slots to get higher

24   numbers to avoid the withdrawing.

25               Over time, it's evolved into something that's

1  considered a piece of equity for the carrier.  So they do buy

2  and sell them, but typically anything more than a couple

3  slots probably would have some kind of regulatory oversight.

4          THE COURT:  For the same reason mergers and

5  alliances and the like have regulatory approvals.

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.  Go ahead.

8  BY MR. WALL:

9  **Q.**  Okay.  Mr. Kirby, let's go to Plaintiffs' Exhibit 890

10  that you discussed with plaintiffs.  And this is a

11  presentation that was actually made to the DOJ by the Paul

12  Weiss firm.  Correct?

13  **A.**  Yes.

14  **Q.**  And the -- a substantial amount of the content in this

15  particular presentation is about slots and issues related to

16  slots that you think arise from the NEA, right?

17  **A.**  I'd like to review the document.

18  **Q.**  Of course.  You should have a binder up there --

19  **A.**  Yup.

20  **Q.**  -- that has 890 in it.  And if you ever think you need to

21  review a document to answer my questions, you are more than

22  welcome to do so, sir.

23  **A.**  Yeah, this is the first time that I mean -- I've been

24  working with the screen until now.  So 890?

25  **Q.**  890, sir.

**A.**   Okay.  Mr. Wall, your question is does this document

discuss slots?

**Q.**   Among other topics.

**A.**   Sure.  Yes, then.

**Q.**   Okay.  Why don't we pull up the overview slide.  I think

it's the second slide in the PowerPoint.  And if -- if I

understand correctly, the third bullet is directed to a

discussion of, "Slot portfolios," among other things,

correct?

**A.**   Yes.

**Q.**   And the last -- under the last major bullet

of, "Potential competitive concerns," there are three

sub-bullets, and then a sub sub-bullet at the end that are

all about slots, right?

**A.**   The last three and the sub-bullet, yes.

**Q.**   Okay.  So turn, if you would, to slide 7.  And slide 7 is

one of two slots -- excuse me, two slides in which you

present certain data about slot holdings and slot operations

on the next slide at various airports, right?

**A.**   Yes.

**Q.**   And in -- could you explain what the difference is

between the slot holdings that are depicted on slide 7, and

the slot operators and the associated percentages that are on

slide 8?

**A.**   Yeah.  Well, I'll go into it and try to keep it concise.

1  Carriers operate -- or rather, have slot holdings that's

2  managed by the FAA.  But in any given environment, we're

3  talking about this a little bit yesterday, they may not be

4  operating all of them.  They may have another carrier

5  operating them.  So there's -- there's different ways that

6  they operate.  They may be operated by a regional affiliate,

7  which may cause some variance.  So it's generally what they

8  hold is the document on the left.  That's Document 131, the

9  ones that they actually have some ownership to.  And then in

10 any given slot season, different carriers may be operating

11 that portfolio.

12 **Q.**  So you would expect to see a little bit of variation

13 between the holdings and the operations.

14 **A.**  Yeah, especially for the larger carriers.

15 **Q.**  Okay.  But what you're depicting here, starting with the

16 slot holdings slide, is that Delta holds by these metrics,

17 44.8 percent of the LaGuardia slots, right?

18 **A.**  Yes.

19 **Q.**  So that's -- that's about 56 percent more slots than

20 American, right?

21 **A.**  I'll trust your math.

22 **Q.**  And it's many times, I think it's over 16 times as many

23 slots as JetBlue has at LaGuardia, right?

24 **A.**  Yes.

25 **Q.**  And even if you add American and JetBlue together, Delta

 1   still has over 40 percent more slots at LaGuardia, right?

 2   **A.**   Yes.

 3   **Q.**   Now, at JFK, Delta has, by this measure, exactly twice as

 4   many slots as American, right?

 5   **A.**   Yes.

 6   **Q.**   And 25 percent more than JetBlue, right?

 7   **A.**   Yes.

 8   **Q.**   And, as we've discussed, as a practical matter, those

 9   shares of slots are fixed, right?

10   **A.**   Again, the holdings, yes.

11   **Q.**   Okay.  You can put that down.

12          Now, the reason why ULCCs have a small share of the

13   slots at the New York City airports is because of the way

14   that slots are regulated by the FAA and the DOT, right?

15   **A.**   That's a broad -- I would say the reason the large

16   carriers have is they were around longer and secured those

17   positions before many of the LCCs were in existence.

18   **Q.**   Right.  And what I'm getting in particular is, for all

19   intents and purposes, slots are kept by their owners unless

20   they fail to utilize them sufficiently, right?

21   **A.**   Yeah.  But I would -- or they're forced to divest those

22   assets as part of some either merger or some slot deal.

23   **Q.**   Right.  And that's a key point is the one significant

24   exception, the one significant avenue for smaller carriers to

25   get slots is through the divestitures that might fall out of

1    some legal or regulatory proceeding, right?

2    **A.**   Yes.  And there were some in '21, back at the -- back at

3    the beginning of this millennium, that also allowed for more

4    -- some slot positions were expanded and then you also had

5    beyond perimeter.  So there are some exceptions that allow

6    other carriers to get more capacity, as well.  But in

7    general, your statement is accurate.

8    **Q.**   Okay.  And one of the concerns that Spirit has had is

9    that the so called 80/20 use it or lose it rule is too easy

10   for the legacy carriers to meet.  Right?

11   **A.**   If you're a large slot holder, yes, you can use that rule

12   to not operate these valuable or really consumer -- or

13   benefit the traveling public.  Valuable assets is really what

14   I'm trying to say.

15   **Q.**   And one of the things that Spirit has complained about

16   over the years about the FAA policies is that it tolerates

17   carriers flying smaller planes on slots in order to meet the

18   utilization requirements, right?

19   **A.**   Yeah.  It's our position that these are constrained

20   assets they should be used to the greatest public benefit.

21   And by flying very small-gauge aircraft short distances just

22   to hang on to that capacity is somewhat disingenuous, but as

23   I've said before, not illegal.

24   **Q.**   Right.  And I mean that's kind of what I'm leading up to.

25   The reality is that the criticisms that Spirit has about the

1    slot system are really criticisms about the policies not

2    being in what you regard to be the consumer's best interest,

3    right?

4    **A.**   I think that's fair.

5    **Q.**   Okay.  Now, to the extent that, as a result of this or

6    any other legal proceeding, American Airlines were to lose

7    slots, that would actually exacerbate its slot disadvantage

8    relative to Delta, right?

9    **A.**   Versus Delta, yes.

10   **Q.**   Okay.  When the NEA was announced in July 2020, among

11   your first thoughts was is this an opportunity to obtain some

12   slot divestitures, right?

13   **A.**   No.

14   **Q.**   No?  Okay.  Let's take a look at another e-mail from that

15   day.  It's already been admitted into evidence as Defendants'

16   Exhibit 481.  I don't think you need to go to your binder on

17   this one.  It's a -- we'll show you what you need to, but

18   you're welcome to.

19          This is an e-mail exchange between you and a number

20   of colleagues at Spirit, right?

21   **A.**   Yes.

22   **Q.**   Could you identify Chip Sandifer and Nick Bartolotta?

23   **A.**   Yeah.  Chip Sandifer is our vice president of corporate

24   real estate.  Nick Bartolotta was, at the time, my senior

25   director of network planning.

1    **Q.**  Of network planning?

2    **A.**  Yes.

3    **Q.**  Okay.  And corporate real estate refers to things like

4    slots, gates, and other infrastructure needs for the airport,

5    right?

6    **A.**  Not slots.

7    **Q.**  Not slots?

8    **A.**  Infrastructure, so other -- basically airport real

9    estate, but not slots.

10   **Q.**  Okay.  But part of Mr. Sandifer's responsibilities is to

11   help secure infrastructure at airports, right?

12   **A.**  Yes.

13   **Q.**  And he's e-mailing you just hours after the NEA is

14   announced, and he is saying, "One topic for tomorrow is New

15   York, with the B6/AA announcement, I think we should talk

16   about our objectives and potential opportunities at

17   LaGuardia, Newark, JFK.  Since their deals need approval, is

18   there a window to force our way into JFK slots, additional

19   LGA slots."

20            Do you see that?

21   **A.**  Yes.

22   **Q.**  And you respond, "Yes on JFK," which I gather just means

23   yes, let's put it on the agenda to talk about?

24   **A.**  Yes.

25   **Q.**  Okay.  And that day, Spirit contacted its DOT counsel at

1    the law firm of Christie and Young in Washington, D.C., they

2    get to work on issues relating to the NEA, right?

3    **A.**   Yes.

4    **Q.**   And that day, Spirit reached out to the Campbell-Hill

5    consultancy to get to work on issues relating to the NEA,

6    right?

7    **A.**   Do you have that document?  Again, I don't doubt you as

8    much as my memory wasn't -- I'm not sure if we did it the

9    same day or the next day.  Maybe that's not material.

10   **Q.**   It's not material.

11   **A.**   Okay.  Okay.

12   **Q.**   Now, let's take a look at Plaintiffs' Exhibit 894.  This

13   is a letter from Spirit's outside counsel to the deputy

14   secretary of the DOT, and the assistant attorney general for

15   antitrust at the DOJ that is attached to an e-mail that you

16   are sending to various people.  Right?

17   **A.**   Yeah, primarily in this e-mail, it's the corporate

18   communication department.

19   **Q.**   Right.  And what you're saying is that, "The issue we

20   shared on our last call was accelerated and we've seen this

21   letter to DOT and DOJ," right?

22   **A.**   Yes.

23   **Q.**   Okay.  And looking at the letter, that's dated July 20th,

24   right?

25   **A.**   Yes.

1    **Q.**  The NEA was announced on Thursday, July 16th, and you

2    have a letter in front of the DOJ and the DOT on Monday,

3    July 20th, right?

4    **A.**  Yes.

5    **Q.**  Okay.  And much of the messaging in this letter is about

6    slots and the idea that if the NEA is allowed, there needs to

7    be slot divestitures to ULCCs like Spirit, right?

8    **A.**  Again, I'd like to look at the document.

9    **Q.**  It's in your binder.  It's in the Plaintiffs'

10   Exhibit binder, the one that Mr. Davis was using, which is

11   Exhibit 894.

12          THE COURT:  Coming to the conclusion, Mr. Wall,

13   that in the private practice of law, there are no weekends.

14   There's just no boundary to the workday.

15          MR. WALL:  The audience to which you have just

16   directed that comment knows it so well right now.

17          THE WITNESS:  Okay.  What I would say, though,

18   there is mention to the remedy potentially being a slot

19   divestiture, but it is not the dominant -- the sort of, I'd

20   say, position of this paper.

21          Again, one of the things that we have to remember

22   with this is we didn't -- we didn't know everything about

23   the -- in fact, we still don't know everything about the NEA.

24   At the time, we knew it was a co-chair.  And so we're looking

25   at this, really, with fresh eyes, saying -- and again, the

1  e-mail that we looked at yesterday, that I think you also

2  pulled up, my first response was, "I think this is bad."  But

3  part of due diligence process is you have to look at all the

4  possibilities.  At the time, we were thinking this was a

5  codeshare.  You have to consider that there may be

6  divestitures, and while that wasn't the first thing that I

7  thought of, you have to at least do the due diligence, but

8  since we've learned more about the level of coordination,

9  corporation, and revenue sharing of this document, we have

10 stopped working on any kind of remedy.  We've stopped working

11 on any analysis of the divestitures.  We think this is a bad

12 thing.

13 **Q.**  Mr. Kirby?

14 **A.**  Yeah.

15 **Q.**  Throughout the entire process of the DOT, you were

16 arguing that there should be slot divestitures, weren't you?

17 **A.**  I was not.  Our attorneys suggested that that was -- that

18 was -- that could be a potential remedy.

19 **Q.**  Spirit was arguing, throughout the entire process, that

20 there needed to be slot divestitures, weren't there?

21 **A.**  They were arguing that that could be a potential remedy,

22 but they -- the strongest argument that we put forth was

23 transparency.  This process was very different than any other

24 codeshare review done by the DOT to my knowledge.

25 **Q.**  Since you are suggesting that this was sort of an

```
 1    evolution of thinking, why don't we just move on to a little
 2    later in the chronology?
 3                MR. DAVIS:  Objection to counsel testifying.
 4                THE COURT:  Sustained.
 5    BY MR. WALL:
 6    Q.  Spirit found out that there were likely to be slot
 7    divestitures as a result of a DOT agreement, before that
 8    agreement was publically announced, right?
 9    A.  Before it was publically announced?
10    Q.  Yes.
11    A.  Well, when was it publically announced?  When we filed --
12    if we're talking about the January 6th, would that be
13    public -- I don't recall it being publically denounced.
14    Q.  When the agreement was -- you recall the date.  You
15    recall the event, right?
16    A.  Maybe I'm -- maybe I'm misunderstanding what
17    publically --
18                MR. WALL:  Okay.
19                THE COURT:  Is your question did Spirit learn that
20    there would be slot divestitures before DOT -- or JetBlue and
21    American pubically announced that?
22                MR. WALL:  Yes.
23                THE WITNESS:  Oh, did you say publically announced?
24    BY MR. WALL:
25    Q.  Right.  You had a heads up through your counsel --
```

1  **A.**  Before it was approved.

2  **Q.**  -- before it was approved.

3  **A.**  Okay.  Sorry, I misheard you, I thought you said it was

4  publically de -- yes, we were aware that there could be

5  divestitures prior to the approval.

6  **Q.**  Okay.  And what you did was you ended up filing a formal

7  complaint against the NEA just on the eve of the announcement

8  of the DOT agreement, right?

9  **A.**  We filed the complaint on, I believe, Jan 6th or 7th.

10  **Q.**  Right.  And let's pull that up that was discussed

11  yesterday.  It's Plaintiffs' Exhibit 895, and this is another

12  e-mail that you're sending to the Corp communications team at

13  Spirit, right?

14  **A.**  Yes.

15  **Q.**  And then it references -- you're giving them a heads up

16  on the filing that you're making at the DOT, right?

17  **A.**  Yes.

18  **Q.**  And you're saying it's a public filing, right?

19  **A.**  Yes.

20  **Q.**  Okay.  And the filing asks for investigation -- a formal

21  investigation of the NEA, right?

22  **A.**  Yes.

23  **Q.**  And the date that you filed that request is January 7,

24  2021, right?

25  **A.**  Yes.

1  **Q.** And that's almost six months after the NEA was announced,

2  right?

3  **A.** The agreement was announced publically, yes, but before

4  it was approved.

5  **Q.** And in your complaint, you come right out and state very

6  specifically that more slot divestitures are required to

7  remedy what you see as the effects of the NEA, correct?

8  **A.** Again, I've got to look at that document.

9  **Q.** It's paragraph 4, sir, we'll put it up on the screen.

10  **A.** Okay.  That will be great.

11  **Q.** And you can see the last sentence of paragraph 4

12  states, "At a minimum, significant slot divestitures in the

13  range of 16 slot pairs at each of the affected New York

14  airports and DCA would be required."

15         Right?

16  **A.** Yes.  I see that statement.

17  **Q.** Okay.  Now, today, the department has not granted

18  Spirit's request for that new formal investigation, right?

19  **A.** No.

20  **Q.** But you keep trying, right?

21  **A.** We keep trying.

22  **Q.** You keep trying to get the DOT to take action, right?

23  **A.** Well, this was -- my understanding is this is our last

24  filing before the deal was announced and we had not filed

25  anything subsequently to that, subsequent to that.

1    **Q.**  Let's talk about the effects of the NEA.  I -- I asked

2    you at your deposition whether you were aware of any ordinary

3    course internal analysis within Spirit that shows that

4    JetBlue has changed its pricing philosophy as a result of the

5    NEA.  Do you remember that?

6    **A.**  Yes.

7            MR. DAVIS:  Objection.  Hearsay, improper

8    impeachment, counsel is reading from a deposition without any

9    foundation.

10           MR. WALL:  I'm just going to ask him whether he has

11   anything more recent.

12           THE COURT:  Overruled.

13   BY MR. WALL:

14   **Q.**  Okay.  So given the time that's passed, have you come

15   across any ordinarily course internal analysis within Spirit

16   that shows that JetBlue has changed its pricing philosophy as

17   a result of the NEA?

18   **A.**  As I said before, I believe they are on their best

19   behavior, and no, I have not.

20   **Q.**  On the other hand, you have observed JetBlue taking

21   aggressive competitive actions against American in nonNEA

22   airports like Miami, right?

23   **A.**  I wouldn't characterize it as aggressive.

24   **Q.**  Would you characterize it as borderline reckless?

25   **A.**  Well, at the statement I made, I was talking very

1    broadly, because I know what e-mail you're talking about.  I

2    was talking about a broad amount of new markets that they had

3    added at that time, I believe, in that e-mail.

4    **Q.**   Let's pull up Defendant's Exhibit 464.  Can you identify

5    for the Court what this e-mail is and what caused it to come

6    about?

7    **A.**   Yeah, JetBlue made a fairly substantial service expansion

8    announcement.

9    **Q.**   In South Florida?

10   **A.**   My understanding was if you keep scrolling down, there's

11   services that are not included, that are not -- do not touch

12   Miami.  I think they were --

13   **Q.**   I'm sorry.  You're right.  I'm sorry.  I didn't mean to

14   suggest otherwise, but you're particularly focused on the

15   service adds that affected South Florida, where Spirit is

16   based, right?

17   **A.**   No, this statement was based on really the broad amount

18   of capacity that they were adding at that time.

19   **Q.**   What happened -- what happens in this e-mail is Tim

20   Archer e-mails you and Mr. Bartolotta, stating, "So B6 is

21   taking on AA and UA in Miami?"

22          Right?

23   **A.**   Yes.

24   **Q.**   And you respond, "Yes, I would call this route expansion

25   borderline reckless."

1          Yes?

2    **A.**   Yes, I said that.  But again, I don't explicitly cite

3    Miami.  I say "route expansion," and I really was talking

4    broadly in this document.

5    **Q.**   Now, one thing that you do not believe about the NEA,

6    Mr. Kirby, is that it is going to be the cause of changing

7    JetBlue from what you regard as a true low cost carrier into

8    something else, right?

9    **A.**   I'm sorry.  Say that again?

10   **Q.**   Let me put it this way.  You have taken the position,

11   personally, and your company has taken the position for some

12   time that JetBlue wasn't a low cost carrier by the time that

13   it entered into the NEA, right?

14   **A.**   What I would say is that, yes, we have used that in some

15   documentation.  And what I also said with -- previously was

16   that they still have lower cost than the legacy carriers.

17   **Q.**   Indeed and Spirit has consistently been arguing in the

18   last few years to the DOT that because it doesn't qualify as

19   what you regard as a true low cost carrier, it shouldn't

20   be -- have the privileges with respect to things like slots

21   that are afforded to low cost carriers, right?

22   **A.**   Yeah, and I think you'd have to show me that, because

23   that's a very broad statement that we've been making.

24   **Q.**   Well, happily.  So let's go to Defendants' Exhibit 491,

25   which is that letter that we've already talked about, that

1    Spirit sent regarding the NEA days after the announcement in

2    July of 2020.  And on the third page of the letter, and the

3    third full paragraph, an assertion is made, quote, "The

4    carriers that generate lower fares are Southwest and the

5    ultra low cost carriers, ULCCs."  Do you see that?

6    **A.**  Yes.

7    **Q.**  You left out JetBlue, right?

8    **A.**  Well, yes.  But I also think that in this document, we

9    were, again, responding to -- so we were leaving JetBlue out

10   because it was part of the NEA, as well.  But I'll be fair to

11   you, I know in the Campbell-Hill document, there is a chart

12   that talks about that JetBlue is moving away from the LCC

13   model.  So I will say that what I've observed is they do --

14   they are moving away from a traditional LCC model and moving

15   towards more of a legacy type model.

16   **Q.**  Right.  You have taken the position that overtime JetBlue

17   has been losing any claim to low cost carrier status, right?

18   **A.**  Again, where --

19   **Q.**  It's a different document, sir.  Let's pull up --

20   **A.**  Yeah, if you could just pull it up.  It's not that I'm

21   doubting you, but it's helpful for me to see it in print.

22   **Q.**  Okay.  Defendants' Exhibit 492, which is one of these

23   letters that was written to the Department of Justice in

24   early August.  Third page of the letter, top paragraph.

25    "Over time, JetBlue has been losing any claim to low cost

1   carrier status."

2   **A.**  Sorry, I'm not quite -- I'm on page 2.  It looks like you

3   need to go one more page.  Okay.

4          We're still not quite there.

5   **Q.**  Hold on.  Give us a second.

6   **A.**  Okay.  So again, that statement is that it has been

7   losing, not lost, and we're saying that this agreement, we

8   think, will likely exacerbate, not -- and we do agree with

9   that.

10   **Q.**  Okay.  But just to finish it out, in the context of -- of

11   advocating in favor of a merger with Frontier, Spirit went so

12   far as to refer to JetBlue as a high cost, high fare carrier,

13   right?

14   **A.**  Yes.  Relative to Spirit.  If you want to show me the

15   statement, I don't know if that was the one that -- if it's

16   in the broad document, or if it's attributed to our CEO.

17         MR. WALL:  Thank you, Mr. Kirby.  I have no further

18   questions.

19         THE COURT:  Redirect.

20         MR. DAVIS:  Thank you, Your Honor.

21      **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

22   BY MR. DAVIS:

23   **Q.**  So, Mr. Kirby, starting with the last point, Mr. Wall was

24   asking you whether JetBlue, over time, had been observed

25   losing some claim to LCC status, right?

**A.**   Yes.

**Q.**   And some of that trend you observed before the NEA, correct?

**A.**   Yes.

**Q.**   What did the NEA do to that trend?

**A.**   Well, again, if you play through what's likely to happen, really you're talking about a duopoly at JFK and LaGuardia, and we've talked about the various (G8) studies that say legacy carriers really don't compete on price.  We also know that part of the NEA is reciprocity with an earn and burn loyalty program.  And we know that American enjoys the largest loyalty program in the world, as well, and that JetBlue's cost will have to go up, one way or the other, because of the earn and burn -- well, let me say -- let me back up a little bit.

         MR. WALL:  Objection, Your Honor.  This is getting way into speculation and there's no foundation for it at all.

         THE COURT:  I think it might be beyond the scope of the question at this point.

         MR. DAVIS:  I'm sorry, Your Honor.

         THE COURT:  I think it might be beyond the scope of the question.

         MR. DAVIS:  I'll narrow it.

BY MR. DAVIS:

**Q.**   In your opinion, does the NEA hasten JetBlue's movement

1    toward being a higher cost carrier?

2    **A.**   In my opinion, yes.

3    **Q.**   And that their cost structure will go up as a result of

4    the NEA?

5                MR. WALL:  Objection.

6                MR. SCHWED:  Objection, speculation and leading.

7                THE COURT:  Sustained as to the form.

8    BY MR. DAVIS:

9    **Q.**   What's your opinion about the effect of the NEA on

10   JetBlue's cost structure?

11               MR. SCHWED:  Objection, foundation and speculation.

12               THE COURT:  I'm going to let him answer it and then

13   you've got to ask him a follow-up question as to what's the

14   basis for that and then we'll see.  Overruled.

15               THE WITNESS:  There's two things that I think of.

16   The larger footprint, we talked about this a little earlier,

17   LaGuardia and JFK are some of the more expensive airports.

18   So to the extent that JetBlue has more service in and out of

19   LaGuardia and JFK, their costs are likely to go up.

20               And then, as I was starting to talk about a little

21   bit, the frequent traveler program is the other element that

22   can come into play, as Mosaic travel members on JetBlue use

23   American Airlines to redeem their points, the JetBlue, then,

24   would have to purchase, at least that's usually what happens,

25   American Advantage miles at some cost.  And the likelihood is

1    that that purchase would lead to higher costs from JetBlue,

2    again, not knowing the full extent of the NEA agreement, for

3    all I know, maybe American is giving them for free, but then

4    American would have that liability.

5    **Q.**   So Mr. Kirby, what's the foundation for the answer you

6    just gave?

7    **A.**   The combination of the likely cost to JetBlue of the

8    loyalty program coupled with the higher cost concentration at

9    airports that they serve.

10            THE COURT:  Can I just -- so you say one reason the

11   cost would be more is because they have more service at these

12   expensive airports.

13            THE WITNESS:  Yes.

14            THE COURT:  But the cost -- but that would be

15   spread across more flights.

16            THE WITNESS:  Yes.  But the absolute cost of

17   operating at these very expensive airports is still going to

18   raise their overall cost.  And Your Honor, my point, really,

19   is that --

20            THE COURT:  But how does that change -- I mean,

21   that's just -- if you have flights there -- you're an ultra

22   low cost carrier, right?

23            THE WITNESS:  Yes.

24            THE COURT:  And you would like to have flights at

25   JFK and LaGuardia, right?

```
 1                THE WITNESS:  Yes.

 2                THE COURT:  And assuming you get a critical mass,

 3      or what have you, right?  But then that increases your cost

 4      structure.

 5                THE WITNESS:  Yes.

 6                THE COURT:  But that's spread across flights in New

 7      York, where that's presumably baked in, to some degree.

 8                THE WITNESS:  Yes, but really the point is -- and

 9      I'll just -- if 50 percent of your flights are in LaGuardia

10      and Newark versus 25, your overall costs have to go up.  Now,

11      you're doing that because you believe serving the New York

12      area airports, you're also able to get higher revenue, as

13      well.  So it's that tradeoff.

14                THE COURT:  But everybody has higher costs in New

15      York.

16                THE WITNESS:  Yes.

17                THE COURT:  That seems -- okay.

18                THE WITNESS:  Really, again, it's just a higher

19      percentage.  The more flights you operate out of New York

20      airport, the percentage of your overall service levels, your

21      costs are going to go up.

22                THE COURT:  But that seems like a different cost

23      factor than say running five flights a day out of one gate

24      versus ten flights a day out of one gate.

25                THE WITNESS:  You can lower your cost by --
```

1          THE COURT:  By doing that, but one is how you

2     operate, and one is where you operate.  Someone is operating

3     in New York.

4          THE WITNESS:  Yes.

5          THE COURT:  Okay.  I understand.  Go ahead.

6     BY MR. DAVIS:

7     Q.  All right.  Mr. Kirby, you were asked about --

8          MR. SCHWED:  Based on the foundation, I would move

9     to strike his testimony on the frequent flyer benefits.  He

10    has no basis.  He doesn't know what the agreement is, and I

11    would move to strike that.

12         THE COURT:  You got a point.

13    BY MR. DAVIS:

14    Q.  Mr. Kirby, have you worked at airlines that have frequent

15    flyer plans?

16    A.  Yes.

17    Q.  And are you familiar with the costs associated with

18    servicing those plans?

19    A.  Not intimately the exact cost, but again, obviously

20    Spirit has a frequent traveler program, and prior airlines I

21    work with have frequent traveler programs.

22         THE COURT:  Here's what I'm going to do with the

23    objection.  I'm going to overrule the objection, but I'll

24    just tell all of you, I don't know how much weight -- that

25    strikes me as a possible issue, but it depends on what the

1    contract says and it depends on how the contract works.  If
2    the contract works the way he says it works, that would be
3    something that might have -- I don't know how much weight,
4    but something, if the contract works differently than that,
5    then I mean, I'll be honest with you, I won't pay any
6    attention to that, because it's not what the contract
7    provides.
8            I will say one thing that just -- this reminds me
9    of something that I've been thinking about, because I've been
10   reviewing, going through the contracts.  The relevant
11   portions or the key portions of the contract, I assume
12   somebody is going to be digging into that at some point in
13   testimony, and that would be, like, something I'll be
14   thinking about, because I think, obviously, a lot of this --
15   a lot of things that people referred to depend on the
16   significance, import, and provisions of particular portions
17   of the contract, like, for example, this.  Not the only one,
18   but it just comes up right here.  So I assume you're probably
19   all thinking about that, but I just wanted to raise it,
20   because it's occurred to me.  Go ahead.
21           MR. DAVIS:  Thank you, Your Honor.
22   BY MR. DAVIS:
23   Q.  Mr. Kirby, you were asked about the DOT proceeding
24   regarding the NEA in which Spirit filed a complaint, right?
25   A.  Yes.

1  **Q.**  And you were asked about DOT's approval of the NEA.  Do

2  you recall that?

3  **A.**  I was asked about the -- the timing of the approval that

4  was close to the complaint, yes.

5  **Q.**  Is it your understanding that DOT approved the NEA?

6  **A.**  Well, they're allowing it to go forward, yes.

7  **Q.**  They did allow it to go forward, but on what terms?  Do

8  you know?

9  **A.**  No, I don't specifically know the terms.

10  **Q.**  And Mr. Kirby, you filed a complaint, as you said, Jan

11  7th, '21, Spirit Airlines, right?

12  **A.**  Yes.

13  **Q.**  And do you know whether other entities filed in support

14  of your complaint?

15  **A.**  My recollection was that Southwest Airlines also filed.

16  **Q.**  Right.  And do you know the present, formal status of

17  that complaint at the DOT?

18  **A.**  I do not.

19         THE COURT:  The Southwest complaint or the Spirit?

20         MR. DAVIS:  I'm sorry, Spirit's complaint,

21  Your Honor.

22         THE WITNESS:  Yeah, subsequently, Your Honor,

23  Southwest also.

24         THE COURT:  Right.  And you don't know the status

25  of the complaint.

```
 1                    THE WITNESS:  I do not.
 2    BY MR. DAVIS:
 3    Q.  So you don't know whether DOT stayed resolution of that
 4    complaint, pending the outcome of this lawsuit?
 5    A.  I do not.
 6    Q.  All right.  Now, counsel asked you, in your
 7    cross-examination, to imagine ways that American Airlines
 8    could get more slots at LaGuardia and JFK.  Do you recall
 9    that?
10    A.  Yes.
11    Q.  He was asking you to come up with some way that you could
12    think of that American Airlines could reach even higher and
13    get a higher level of slots at those slot constrained
14    airports, right?
15    A.  Yes.
16    Q.  But you've also testified that American Airlines already
17    has slots at JFK, right?
18    A.  They do.  They're the second largest carrier there.
19    Q.  And American Airlines already has slots at LaGuardia,
20    right?
21    A.  Yes.
22    Q.  And actually, before the NEA, they had more slots than
23    they do now, because of their transaction with JetBlue,
24    right?
25    A.  Well, that goes to the sort of whole versus operate.  So
```

what I've observed is that JetBlue has grown dramatically.
In LaGuardia, especially, they're up about almost 200 percent
in departures at LaGuardia, and up about just under
20 percent at JFK.

Q.   Right.  So before the NEA, did American need more slots
at LGA and JFK?

A.   I don't think I can answer that question.

Q.   All right.  Do you know whether they were efficiently
using the slots they already had?

A.   Well, what I would mention -- and this is --

THE COURT:  Efficiently or maximally?

MR. DAVIS:  Sorry?

THE COURT:  Efficiently or maximally?

MR. DAVIS:  Maximally.

THE WITNESS:  Yeah.  What I would say is what I
observed is that American at JFK asked for slot waivers from
the FAA in the summer 2018 season and also in the winter 2018
season -- or sorry, '19 winter -- Summer 2019, Winter 2019
slot season.  In the summer season, they proactively
approached the FAA and volunteered to operate about 20 slot
pairs less than they held to help with construction.  And
subsequently, they used -- in the wintertime, they blame the
MAX aircraft and asked FAA to give them a waiver for
approximately that same number, 20 slot pairs for the winter
season.

1   **Q.**  So was there any sign before the NEA that American was

2   bursting at the seems with a need for more slots in order to

3   compete with Delta?

4   **A.**  Certainly not at JFK.

5   **Q.**  Now, what does the NEA allow American to do with its not

6   maximally used slots at JFK and LaGuardia?

7   **A.**  I believe they call it pooling and so they pool their

8   slots with JetBlue and American, and then they discuss and

9   optimize who should you fly and what capacity.

10   **Q.**  And as you say, JetBlue is now doing a lot of that flying

11   out of LaGuardia, right?

12   **A.**  Yeah.  It definitely appears that JetBlue is prioritized

13   flying the NEA capacity over some of the previous

14   initiatives.

15   **Q.**  All right.  And does -- you already testified that Spirit

16   wants slots at LaGuardia, right?

17   **A.**  Yes.

18   **Q.**  And potentially at JFK, right?

19   **A.**  If we should achieve critical mass, yes.

20   **Q.**  If Spirit could do that, would Spirit underutilize those

21   slots?

22   **A.**  Well, I would say history says the answer is no.

23   **Q.**  And why is that?

24   **A.**  Because Spirit is a high -- every slot that Spirit has is

25   highly utilized.

**Q.**  All right.  Let's talk -- you were asked by Mr. Wall at
the beginning of your testimony about benefits to consumers
from the frequent flyer plan expansion.  Do you recall that?

**A.**  Yes.

**Q.**  Now, a more expanded frequent flyer plan is more expanded
by definition, right?  It's bigger for consumers?

**A.**  Yes.  It provides benefits to the frequent travelers of
those -- the carrier.

**Q.**  All right.  But Mr. Wall didn't ask you about the cost of
an expanded frequent flyer plan, did he?

**A.**  No.

**Q.**  And would you agree that to evaluate whether an expanded
frequent flyer plan is actually better, you have to consider
the cost?

**A.**  I just want to make -- can you clarify that a little bit?
In other words, are you talking about the cost of the program
or the cost to the consumer?

**Q.**  Both.  They're costs associated with a frequent flyer
plan, right?

**A.**  Certainly the more passengers that are members, the more
liability raises the cost.  I think in one of the documents,
the American Airlines liability is greater than JetBlue's
total revenue, annual revenue.  So certainly as the program
gets bigger, the liability would get larger.

          And you know, in terms of cost to the passenger,

1    certainly a larger program could make, say, benefits harder

2    to achieve.  So in theory, it could take more miles or points

3    to achieve something that -- a vacation that maybe they could

4    achieve previously for a lower number.

5    **Q.**  Now, you understand further that a frequent flyer

6    agreement is only one part of the NEA, right?

7    **A.**  Yes.

8    **Q.**  And that the NEA also involves capacity coordination and

9    revenue sharing, right?

10   **A.**  Yes.

11   **Q.**  So the NEA comes along with -- coming along in the NEA

12   with a frequent flyer plan that's bigger is capacity

13   coordination and revenue sharing, right?

14   **A.**  Yes.

15   **Q.**  All right.  And are there costs to that?

16           MR. SCHWED:  Objection, Your Honor.  He's

17   speculating about costs I assume of JetBlue and American,

18   under agreements that he hasn't seen.

19           THE COURT:  Sustained.

20   BY MR. DAVIS:

21   **Q.**  Let me ask it this way, Mr. Kirby.  Is there any reason

22   why, to get an expanded frequent flyer plan, you have to have

23   capacity coordination along with it?

24           MR. SCHWED:  Objection, Your Honor.

25           THE COURT:  To be honest with you, Mr. Davis, I

1    understand that there's a lot of feature to these agreements,

2    right?  Capacity, coordination, frequent flyer program, and I

3    would assume in the free market, they can -- putting aside

4    whatever -- the approvals required or the antitrust review,

5    other than that, they could make a deal with any sort of

6    combination of features.  They could do a -- no one is

7    arguing that you can't make a deal with frequent flyer

8    without more.  And we've already heard evidence of

9    international alliances where there might be a frequent flyer

10   relationship and not much else.  I think I understand that.

11   If that's your point.

12            MR. DAVIS:  And can I follow-up just on that point,

13   Your Honor?

14            THE COURT:  Sure.

15   BY MR. DAVIS:

16   **Q.**  Mr. Kirby, do airlines regularly have reciprocal frequent

17   flyer agreements between themselves?

18   **A.**  Again, that's sort of broad, but you know, there

19   certainly is -- there are carriers that have reciprocal

20   agreements.

21   **Q.**  And again, you can do that without coordinating capacity

22   with that other airline at the same time, right?

23            MR. WALL:  Objection.  The leading, it's just

24   constant at this point, Your Honor.

25            THE COURT:  Sustained as to the form.

1    BY MR. DAVIS:

2    **Q.**   Is it necessary to have capacity coordination in order to

3    have a reciprocal frequent flyer plan agreement?

4    **A.**   No.

5    **Q.**   All right.  And is it necessary to have revenue sharing

6    in order to have a reciprocal frequent flyer agreement?

7    **A.**   No.

8    **Q.**   Let's just look quickly at Defense Exhibit 489, which is

9    that analysis of AA/B6 strategic partnership.  And again,

10   this is prepared by Spirit in August of 2020?

11   **A.**   Yes.

12   **Q.**   And turning to page 21, please, ending in 499.  Would you

13   just read the banner up there at the top, please, Mr. Kirby?

14   **A.**   "The strategic partnership is likely to harm consumers."

15   **Q.**   And then the sentence under it?

16          MR. WALL:  Objection, Your Honor.  This is a --

17   there's no foundation that he has any idea at all about these

18   facts and figures, the numbers, the claimed harms that are

19   here.

20          MR. DAVIS:  Your Honor, this is in evidence --

21          THE COURT:  Overruled.

22          MR. DAVIS:  Yeah.  Thank you.

23   BY MR. DAVIS:

24   **Q.**   Can you read that sentence, please, Mr. Kirby?

25   **A.**   "A five percent fare benefit from the Advantage program

1    is likely.  It would result in a $383 million in higher costs

2    for air travelers and increased fares would price 2.7 million

3    origination and destination passengers out of the air travel

4    market."

5    **Q.**  All right.  Let's go to page 22, the next page.  And can

6    you read the top there, please?

7    **A.**  "Impact of higher fares on consumer prices."

8    **Q.**  All right.  And can you read the two sentences underneath

9    the black line?

10   **A.**  "Given JetBlue's recent fare trends, it is likely that

11   the strategic partnership will increase fares in the range of

12   5 percent or more.  Each 1 percent increase will raise the

13   cost to consumers by roughly 80 million annually."

14   **Q.**  All right.  And finally, page 23, ending in 501, what

15   does that say at the top?

16   **A.**  "Impact of higher fares on consumer demand."

17   **Q.**  And can you read the sentence under the bar, the two

18   sentences?

19   **A.**  "As prices increase, more passengers will be priced out

20   of the market.  For each 1 percent increase in price,

21   slightly more than half a million travelers will be lost; the

22   impact of the strategic partnership will negatively impact

23   over 2.5 million."

24   **Q.**  And so the bottom bullet, finally, Mr. Kirby, would you

25   read that, please?

1    **A.**   "The displaced demand of higher fares would normally

2    present an opportunity for more efficient competitors to

3    enter the market and satisfy that demand.  But congestion at

4    these airports limit effective new entry."

5    **Q.**   And as we've been talking about LaGuardia, JFK, Newark,

6    and Boston are congested airports; is that fair?

7    **A.**   Yes.

8    **Q.**   So is --

9            THE COURT:  Well, is Boston -- Boston is not slot

10   controlled?

11           THE WITNESS:  It is not, Your Honor, but it has

12   very limited available capacity for growth.

13   BY MR. DAVIS:

14   **Q.**   All right.  So Mr. Kirby, is an expanded frequent flyer

15   plan benefit to consumers, does that come without cost?

16   **A.**   Typically, there is a cost associated.  I do recall, I

17   think it was a few earnings calls ago, that JetBlue mentioned

18   that they -- increase that they showed in their cost for that

19   quarter was associated with divestments made for the NEA.

20           MR. DAVIS:  No further questions.  Thank you.

21           THE COURT:  Any recross?

22           MR. WALL:  Just a couple of things.

23   **RECROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF AMERICAN AIRLINES**

24   BY MR. WALL:

25   **Q.**   Just a clarification.  In the questioning about waivers,

1    you made a passing reference to the MAX, do you want to tell

2    the Court what the MAX waivers were about?

3    **A.**   Sure.  The 737 is a Boeing aircraft.  The 737 MAX, it had

4    a couple of well publicized tragic accidents and that fleet

5    was shut down.  American was the one of the carriers that

6    were receiving deliveries of the aircraft, and so because

7    they weren't getting more aircraft, they used that as the

8    reason that they could not operate the JFK capacity.

9    **Q.**   American and Southwest were the largest US carriers that

10   were presently flying the MAX at the time of those crashes,

11   right?

12   **A.**   Yes.

13   **Q.**   So they had substantial parts of their fleets grounded by

14   the FAA, right?

15   **A.**   Well, the entire MAX fleet, right?

16   **Q.**   Right.  In fact, the MAX was essentially grounded

17   worldwide through a combination of jurisdictions, right?

18   **A.**   Yes.

19   **Q.**   Okay.  And the MAX waivers that you raised were strictly

20   in reference to the fact that some carriers, including

21   American, were reliant on MAX aircraft to meet their slot

22   flying requirements, right?

23   **A.**   I wouldn't say specifically the slot requirements, but

24   let's say their growth ambitions.  Because at the same time

25   that American didn't operate those to capacity, they added

1    approximately 120 flights from Charlotte to Dallas.  So they

2    still could have shifted passing ground, but I would still

3    say that's something that they didn't plan on and they didn't

4    receive.

5    **Q.**  Right.  And in all events, there's no question that that

6    was the rationale for the waivers was the grounding of the

7    MAX fleet?

8    **A.**  That was the basis for their ask.  That's right.

9    **Q.**  And that grounding ended up lasting quite a bit longer

10   than anyone had originally expected, right?

11   **A.**  Well, yeah, I think so.  I would say that's fair.

12   **Q.**  And as a result of that, the waivers were extended on

13   more than one occasion by the FAA, right?

14   **A.**  What waivers?

15   **Q.**  The slot waivers?

16   **A.**  Well, no.  What happened -- they were waived for one

17   season for the MAX, for that situation.  And then I think we

18   talked about yesterday, the next season, my understanding was

19   that American did not get a waiver for that subsequent

20   season.

21   **Q.**  You testified yesterday that there was an occasion in

22   which American called up Spirit and tried to get it to cover

23   some -- some slots at JFK, right?

24   **A.**  Yeah, they asked us if we were interested for that

25   subsequent season.

1   **Q.**  Right.  And that approach was related to dynamics around

2   the -- around the MAX, as well, wasn't it?

3   **A.**  I can't say that American's ambition was -- or their --

4   the catalyst for that ask was the MAX, but it certainly could

5   have been.

6   **Q.**  Okay.  One last point.  Counsel shows you some of the

7   advocacy that you put in around the potential effects of the

8   NEA, and your most aggressive advocacy that you put in

9   through this entire process, did you ever claim that the

10  effect of the Northeast Alliance was going to be increase air

11  fares by 30, 50, even 90 percent?

12  **A.**  Not to my recollection.

13          MR. WALL:  Thank you, sir.  No more questions.

14          MR. DAVIS:  No questions.

15          THE COURT:  Thank you very much, Mr. Kirby.  You're

16  excused.

17          THE WITNESS:  Thank you, Your Honor.

18          THE COURT:  Who is the next witness?

19          MR. JONES:  Your Honor, may I request a very brief

20  break to check on our technology issues before the next

21  witness?

22          THE COURT:  Sure.  Yeah.  All right.

23          Who's going to -- just for the court reporter,

24  who's going to examine the next witness.  That will help her.

25          MR. JONES:  The next witness will be examined by

1    Bonny Sweeney -- Ms. Sweeney is the person at the podium.

2         THE COURT:  I'm beginning to think the DOJ has a

3    bigger army than the defendants.

4         MR. JONES:  Just deployed differently, Your Honor.

5         THE COURT:  All right.  We'll take a brief break.

6         (Court in recess at 10:27 a.m.

7         and reconvened at 10:41 a.m.)

8         THE WITNESS:  The United State District Court for

9    the District of Massachusetts is now in session, then

10   Honorable Leo T. Sorokin --

11        THE COURT:  Please be seated.

12        I understand you're ready with defendants'

13   assistance.

14        MR. JONES:  Yes, sir.

15        And plaintiffs call Mr. Vasu Raja of

16   American Airlines.

17        THE COURT:  All right.

18        MR. JONES:  And Ms. Sweeney will be conducting the

19   examination.

20        THE COURT:  Great.  If you come forward, and just

21   remain standing in the witness box, for Ms. Belmont to

22   administer the oath.

23        (The witness was duly sworn.)

24        THE DEPUTY CLERK:  Can you please state your name

25   and spell your last name for the record.

1          THE WITNESS:  Vasu Raja.  My last name is spelled

2     R-a-j-a.

3          THE DEPUTY CLERK:  Thank you.  You may be seated.

4          THE WITNESS:  Sure.

5          THE COURT:  Go ahead.

6          MS. SWEENEY:  Good morning, Your Honor, Bonny

7     Sweeney for the United States, representing the plaintiffs.

8          And Mr. Raja is the chief commercial officer for

9     American Airlines, so we will be examining him as an adverse

10    witness.

11         THE COURT:  That's fine.  Go ahead.

12                           **VASU RAJA**

13         having been duly sworn, testified as follows:

14    **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

15    BY MS. SWEENEY:

16    **Q.**  Some of them we'll have to look at in the binders because

17    they are confidential.  They have a lot of redactions.  Or

18    you may want to look at them on the screen, which will be

19    easier for some of them.

20         So you currently serve as American Airlines chief

21    commercial officer, correct?

22    **A.**  Correct.

23    **Q.**  And how long have you held that position?

24    **A.**  Since roughly November of last year.

25    **Q.**  And in that role, are you in charge of network planning?

1    **A.**   I am.

2    **Q.**   And that's for international and domestic?

3    **A.**   That's correct.

4    **Q.**   And how about alliances and partnerships?  What's your

5    role with respect to alliances and relationships?

6    **A.**   That division reports to me, also.

7    **Q.**   And although you've only been in this position for a

8    short time, since 2019, you have had responsibility for

9    alliances and partnerships, correct?

10   **A.**   That is correct.

11   **Q.**   When you were vice president of strategy?

12   **A.**   SVP of strategy, but not to quibble, yes.

13   **Q.**   And you were also in charge of network planning; is that

14   right?

15   **A.**   That's also true.

16   **Q.**   Okay.  And in 2019, did you have any particular

17   initiatives that you were focusing on?

18   **A.**   Certainly.  Several.

19   **Q.**   And one of them was to grow American more aggressively?

20   **A.**   Absolutely.

21   **Q.**   And another one was to assess and evaluate American's

22   alliances and partnerships; is that right?

23   **A.**   Also true.

24   **Q.**   Now, so you were senior vice president of strategy until

25   June of 2020, right?

1    **A.**   That's correct.

2    **Q.**   And then at that time, you became the chief revenue

3    officer?

4    **A.**   That's correct.

5    **Q.**   And you served in that role until you became the CCO of

6    American, right?

7    **A.**   Also true.

8    **Q.**   And in all of those positions, you have had

9    responsibility for network planning and for partnerships and

10   alliances?

11   **A.**   That's correct.

12   **Q.**   Okay.  So let me start by asking you some background

13   questions about American Airlines.  First of all, American

14   has the largest network in the world; is that right?

15   **A.**   That is true.

16   **Q.**   Okay.  And it serves around 370 destinations?

17   **A.**   Off the top of my head, that sounds correct.

18   **Q.**   It's got ten hubs?

19   **A.**   Off the top of -- yes, yes.  That's how we would count

20   it, yes.

21   **Q.**   And let's look at one of defendants' exhibits.

22           Mr. Klein, this is DX89.

23           This is a redacted exhibit which has already been

24   admitted into evidence.

25           MR. WALL:  I don't think it's in the binder, right?

```
 1                    THE COURT:  It is.
 2                    MR. WALL:  Oh, it is?
 3                    THE COURT:  Near the back.  Last one, I think.
 4                    MR. WALL:  Okay.  Thank you.
 5                    MS. SWEENEY:  May we publish the redacted version,
 6        Your Honor?
 7                    THE COURT:  Yes.
 8                    THE WITNESS:  Okay.  I'm there.
 9                    MR. KLEIN:  Counsel, you said DX89?
10                    MS. SWEENEY:  DX89.  Thank you very much.
11        BY MS. SWEENEY:
12        Q.  So looking at the first page of that exhibit, Mr. Raja,
13        or you can page through it if you like, but would you agree
14        that this is a document, an exhibit consisting of an e-mail,
15        a cover e-mail, along with two slide decks?
16        A.  Yes, I see the e-mail.  I certainly see the one slide
17        deck.  Yes.  Okay.  Yeah, I see the two slide decks.
18        Q.  And were these slide decks prepared for a board of
19        directors meeting at American in July of 2021?
20        A.  Yes.
21        Q.  And you helped prepare those slides; is that right?
22        A.  I did.
23        Q.  And you also presented this material to the board of
24        directors?
25        A.  Also correct.
```

1    **Q.**  Okay.  So let's turn to slide 16 in DX89, and that would

2    be DX89-8.

3              MS. SWEENEY:  And can we show that slide?  Thank

4    you.

5    BY MS. SWEENEY:

6    **Q.**  We can start with this one on the screen.  This is DX-8.

7    And this is a map, sort of, of the world, with American's

8    hubs, its ASMs, and its ODs, right?

9    **A.**  That's correct.

10   **Q.**  Okay.  And ASMs are available seat miles?

11   **A.**  Correct.

12   **Q.**  And ODs are origins and destinations?

13   **A.**  That's correct, too.

14   **Q.**  So this just confirms what you testified to a moment ago

15   about the number of destinations served and the number of

16   hubs, right?

17   **A.**  Correct.

18   **Q.**  Okay.  So can we turn now to DX89-16.  And this slide

19   shows American's position in relationship with Delta, United,

20   and Southwest, correct?

21   **A.**  It does.

22   **Q.**  On a number of dimensions?

23   **A.**  True.

24   **Q.**  And the first one is ASMs, right?

25   **A.**  Yes.

1    **Q.**  And the first one it shows that American has more ASMs

2    than any of the other three big airlines, correct?

3    **A.**  Correct.

4    **Q.**  And the next column is seats.  And here again, American

5    has more seats than any of those other big airlines; is that

6    right?

7    **A.**  Correct.

8    **Q.**  And how about origins and destinations?  Does American

9    have the most?

10   **A.**  It does.  Of note, this is also our domestic system only.

11   It would look slightly different if you included

12   international.

13   **Q.**  Okay.

14   **A.**  But the general directionality of it is the same.

15   **Q.**  Okay.  Thank you for that clarification.  Let's turn to

16   slide 18?

17             THE COURT:  What do the letters mean at the top?

18   BM&K?

19   **A.**  Billion, million, and thousand.

20             THE COURT:  Okay.  Thank you.

21             Go ahead.

22   BY MS. SWEENEY:

23   **Q.**  Slide 18, can we please look at that one.

24             Okay.  And this slide refers to single carrier

25   American Airlines origins and destinations, right?

**A.**   That is correct.

**Q.**   And what are single carrier destinations?

**A.**   Those are ones where we operate the entirety of the itinerary.  There's not a partner, like, for example, British Airways flying one leg of the itinerary.

**Q.**   Okay.  And here again, American Airlines has more single carrier ODs, origins and destinations, than United and Delta, correct?

**A.**   That's correct.

**Q.**   Okay.  Now, would you agree that American has achieved its position as the largest global network in the world by entering into joint ventures with partners?

**A.**   I'm sorry, will you say that last part again?  I didn't --

**Q.**   Sure.  So you agree that American has the largest network in the world, right?

**A.**   Yes.

**Q.**   And it's achieved that position, in part through its partnerships and alliances, right?

**A.**   In part, true.

**Q.**   We can take the slide down, by the way.

            THE COURT:  When you say the largest network, are you referring to the network as encompassing just what American flies or what American flies with its partners.

            THE WITNESS:  That's an excellent question.  When

1    we think of the network, we think of the network that we

2    offer to our customers, what we call the market network, and

3    that is, indeed, the biggest.  We also offer, at least until

4    COVID times, the largest operated network, which is what

5    these slides have been showing.  But when we think about our

6    business commercially, really, it's the marketed business.

7                 THE COURT:  The market.

8                 THE WITNESS:  That's what a customer can actually

9    buy.

10                THE COURT:  But those slides are referring to what

11   you operate, in the sense that they're American planes,

12   American pilots.

13                THE WITNESS:  Exactly.  Because so much of this

14   deck at the time was talking about this is what we can do as

15   an operating carrier, which is American Airlines.  This is

16   what we can do, as we expand our aperture, think about this

17   from the customer's perspective.  As a marketing carrier,

18   we're something much larger than that.

19                THE COURT:  Okay.  Thank you.

20                Go ahead.

21                MS. SWEENEY:  Thank you, Your Honor.

22   BY MS. SWEENEY:

23   Q.  So now you mentioned that part of what's helped you

24   achieve that size is through partnerships, and this includes

25   with international partners, correct?

1    **A.**   That is correct.

2    **Q.**   And also domestic partners?

3    **A.**   Yes.  For the time period of this, that would be true.

4    **Q.**   Okay.  And then in the last couple of years, American has

5    entered into two domestic partnerships, correct?

6    **A.**   True.

7    **Q.**   And one was with Alaska, right?

8    **A.**   That's correct.

9    **Q.**   And the other is the Northeast Alliance with JetBlue?

10   **A.**   Yes, correct.

11   **Q.**   And you negotiated both of those agreements.  Is that

12   fair?

13   **A.**   In large part.  Yes, true.

14   **Q.**   Okay.  And the American/Alaska agreement is called the

15   West Coast International Alliance, right?

16   **A.**   That's right.

17   **Q.**   And that was signed in 2020?

18   **A.**   That's correct.

19   **Q.**   Just like the NEA?

20   **A.**   Yes.  That's right.

21   **Q.**   In the sense that they were both signed in 2020?

22   **A.**   They were both signed in 2020, correct.

23   **Q.**   All right.  Thank you.

24              Now, at American, you sometimes talk about

25   inorganic growth as compared to organic growth, right?

1    **A.**  True.

2    **Q.**  And organic growth is when American grows its network

3    through its own flying, on its own planes, right?

4    **A.**  Yeah.  Not to be over-technical about it, but we think of

5    it as organic is when we take the capital assets of

6    American Airlines and we devote it to buying airplanes and

7    real estate and growing.  Inorganic is through a partnership

8    we can sell something bigger to the customer.

9    **Q.**  So when you're working through a partnership and you're

10   growing your network through the partnership, then you don't

11   have to invest those capital resources.  Is that it?

12   **A.**  No, not necessarily.  Indeed, what we say very often is

13   partnership means growth for us.  The point of the

14   partnership is there's some things that we just can't

15   credibly do, from a regulatory standpoint we can't fly it.

16   And in other cases, it's just not profitable for us.  There's

17   not infrastructure available.  But the beauty of the

18   partnership is that they facilitate the growth.  Almost every

19   partnership that we've had, we've actually used it to go

20   drive more growth.

21   **Q.**  Now, let me focus on something that you said there.  But

22   it's true, isn't it, that when you're growing the network

23   through inorganic growth, you're using someone else's plane,

24   right?

25   **A.**  Yeah.  Sure.

1   **Q.**   Yeah.  So you don't have to purchase those planes and fly

2   those routes yourself, right?

3   **A.**   No.  If, for example, you mean that there are partnership

4   with British Airways, they have an airplane that flies from

5   London to Geneva, we don't need to purchase that airplane.

6   That's very true.

7   **Q.**   Now, inorganic growth is sometimes called synthetic

8   growth, right?

9   **A.**   Yeah, sometimes we've used that word, too.

10   **Q.**   And sometimes you've used the expressions "build and

11   borrow"?

12   **A.**   Yes.  Yeah.  Yes, we've used that, too.

13   **Q.**   Build versus borrow, I should say, right?

14   **A.**   Correct.

15   **Q.**   And "build" means organic growth, correct?

16   **A.**   That's right.

17   **Q.**   And "borrow" means inorganic growth?

18   **A.**   Correct.

19   **Q.**   Let's turn to another slide in that same deck.  This is

20   DX89.  I think it might be DX89-C.  It's at the very end of

21   the deck.  It's the second deck, actually.  And if we could

22   turn to slide 5 in this second deck.

23        Let me know when you're there, Mr. Raja.

24   **A.**   I'm there.

25   **Q.**   And again, this second deck was something that -- it was

1  a summary that was circulated to upper management in

2  connection with that July 2021 board of directors meeting,

3  correct?

4  **A.**  Yes.  True.

5  **Q.**  So this was after you guys entered into the NEA?

6  **A.**  Correct.

7  **Q.**  So let's focus about halfway down the page.  There are

8  two little pictures on the left-hand side, and they're kind

9  of hard to see.

10       MS. SWEENEY:  If you could just expand that middle

11  area there.

12  BY MS. SWEENEY:

13  **Q.**  Do you see where there's a little picture of a wrench,

14  and next to it the words "Build"?

15  **A.**  Indeed.

16  **Q.**  So that's what we've just been talking about, building

17  means growing capacity organically, as opposed to

18  inorganically, correct?

19  **A.**  Correct.

20  **Q.**  And then below that, it says "Borrow," and it says -- and

21  there's also a picture of a handshake, right?

22  **A.**  Correct.

23  **Q.**  And it says, "Develop mutually beneficial partnerships

24  via actions ranging from codeshare agreements to equity

25  partnerships resulting in varying levels of influence.  For

1   example, innovative partnerships with Alaska and JetBlue."

2           Did I read that correctly?

3   **A.**   Yes.

4   **Q.**   So through the Northeast Alliance, American has grown its

5   network by borrowing, right?

6   **A.**   Yes, we have.

7   **Q.**   Now, I'd like to ask you about one of the phrases in this

8   second section here, under Borrow.  It says, "Resulting in

9   varying levels of influence."  So that means that you can

10  have a partnership with another airline that is -- that

11  contains more or less entanglement between the two airlines,

12  correct?

13  **A.**   That's true.

14  **Q.**   And so, for example, there is something

15  called, "interline"; is that right?

16  **A.**   That's correct.

17  **Q.**   And would you describe that as a minimal amount of

18  entanglement between the two airlines?

19  **A.**   Yes.

20  **Q.**   And what is interlining?

21  **A.**   Effectively, interlining is really so that you can sell

22  an itinerary from one operating carrier, call it

23  American Airlines, to another operating carrier, whomever it

24  might be, Delta Air Lines, British Airways, anybody.  It's

25  primarily there to facilitate operational issues.  A flight

1   stranded somewhere, you can go and rebook a customer on

2   someone else.

3   **Q.**   So if there's a flight cancellation, American can put

4   that passenger on somebody else's flight.  Is that it?

5   **A.**   Correct.

6   **Q.**   And American has a lot of interline agreements with other

7   airlines, right?

8   **A.**   True.  Including many of our domestic competitors.  So,

9   for example, with the hurricane that's going on in Florida,

10   every airline in Florida is rebooking customers on one

11   another, and the interline facilitates that.

12            THE COURT:  The interline.

13            THE WITNESS:  The interline.

14            THE COURT:  And would interlining lead to --

15   suppose American flies from Houston to Santiago, Chile, and

16   somebody wants to go to a further destination in Chile that

17   you don't fly to.  Would interlining let you book them all

18   the way through on some local airline that might go to that

19   destination, if there's no other partnership?

20            THE WITNESS:  No.  This is where the technical

21   limitations leave off.  So you need to tell me if I'm getting

22   too technical here.  But if what you're saying is could we

23   sell somebody flying Houston to Santiago on United Airlines

24   and then they connect on LATAM, Santiago to Patagonia, no.

25            THE COURT:  If the first leg were on American,

 1    could you sell them -- like American, if you --

 2              THE WITNESS:  Oh, if we flew.  Yeah.  Dallas,

 3    Santiago, yes, interline could do it, so long as we had an

 4    interline relationship that's there.

 5              And then another case is, too, well, the interline,

 6    of course, is not free.  We have to go and pay for the space.

 7    So in a number of case, we have what we call "operational

 8    interlines," which are primarily there if situations like

 9    Hurricane Ian happened.  But they're really expensive to both

10    carriers, so it may not be commercially viable for us to sell

11    it.

12              THE COURT:  Okay.  Go ahead.

13              MS. SWEENEY:  Thank you.

14    BY MS. SWEENEY:

15    **Q.**  Mr. Raja, another option for collaborations with other

16    airlines is through codeshare, correct?

17    **A.**  True.

18    **Q.**  And codeshare means that you can market your flight and

19    then that passenger can fly it on another airline, right?

20    **A.**  That is correct.

21    **Q.**  And it's often reciprocal, correct?

22    **A.**  It can be and it can't be, but, yes, usually it is.

23    **Q.**  Okay.  And you can have a codeshare agreement without a

24    revenue sharing, right?

25    **A.**  True.

1    **Q.**  And you can have a codeshare agreement without capacity

2    planning, right?

3    **A.**  Absolutely.

4    **Q.**  And in fact, American had a codeshare agreement with

5    Alaska Airlines, correct?

6    **A.**  We did.

7    **Q.**  All right.  And that -- and I'm speaking of the preWCIA

8    period, and that codeshare agreement didn't come along with

9    any revenue sharing, right?

10   **A.**  True.

11   **Q.**  And didn't come along with any -- any coordination of

12   capacity, right?

13   **A.**  True.

14   **Q.**  Okay.  And then you can also have relationships with

15   other airlines that includes both a codeshare and a frequent

16   flyer benefit, right?

17   **A.**  That's true.

18   **Q.**  And, in fact, prior to, I think, late 2019,

19   American Airlines and Alaska had such a relationship, right?

20   **A.**  That's true.

21   **Q.**  So you had both a codeshare agreement, which allowed

22   passengers to purchase on one airline and fly the other,

23   right?

24   **A.**  Correct.

25   **Q.**  And you had a -- excuse me, reciprocal frequent flyer

1   benefit, right?

2   **A.**   True.

3   **Q.**   Okay.  And again, this was preWCIA, so there was no

4   revenue sharing, no capacity coordination?

5   **A.**   Correct.

6   **Q.**   Okay.

7          THE COURT:  When you say reciprocal frequent flyer

8   benefit, you mean that not only could someone fly on a flight

9   operated by one of the airlines, but get frequent flyer

10  credit on the other airlines' program.

11         THE WITNESS:  That's correct.

12         THE COURT:  But also they could use their frequent

13  flyer points on either program to buy a trip on the other

14  airlines.

15         THE WITNESS:  Yeah.  We call it redemption.  That's

16  correct.  That's right.

17         THE COURT:  Thank you.

18  BY MS. SWEENEY:

19  **Q.**   So I think of it as a continuum, would you agree with me

20  that the first option we talked about, interline, includes

21  less collaboration than codeshare?

22  **A.**   True.

23  **Q.**   And codeshare is less a collaboration than codeshare plus

24  frequent flyer benefits?

25  **A.**   This isn't to parse the word "collaboration."  It's --

1    for the customer, you get a lot more out of codeshare plus

2    frequent flyer, because you can earn frequent flyer benefits,

3    but it's a technical thing.  In fact, very often if we do

4    codeshare, we do frequent flyer, because so much of the value

5    of codeshare is to enable frequent flyer.  I'm not trying to

6    parse the words.

7    **Q.**  No, that's helpful.  Thank you.  And then sort of at the

8    other end of the continuum, you have something called joint

9    business agreements, right?

10   **A.**  True.

11   **Q.**  And those are agreements with international carriers?

12   **A.**  Yeah, that's right.  I don't -- I don't know if I'd call

13   it a continuum, because I don't know what the continuity is,

14   but another tool for partnership is, indeed, joint venture.

15   **Q.**  Okay.  And those joint ventures, and we're talking about

16   the international arena now, those -- well, first let me ask

17   you, do you have some of these joint business arrangements

18   now?

19   **A.**  Indeed.

20   **Q.**  And with whom?

21   **A.**  As of today, IAG Group, the owner of British Airways,

22   Qantas, JAL.

23   **Q.**  What was the last one?

24          THE COURT:  What was the last one?

25          THE WITNESS:  JAL, Japan Airlines.

1    BY MS. SWEENEY:

2    **Q.**   And these agreements require approval by regulatory

3    authorities, right?

4    **A.**   True.

5    **Q.**   And that's called antitrust immunity?

6    **A.**   Yes.

7    **Q.**   And each of these three joint business arrangements that

8    you just identified, they all have antitrust immunities; is

9    that right?

10   **A.**   They do.

11   **Q.**   Okay.  And then so would you agree that the Northeast

12   Alliance is situated somewhere above codeshare plus frequent

13   flyer benefits and the joint business arrangements?

14   **A.**   Yeah, it -- I don't know where you're locating the word

15   "above," but yeah --

16   **Q.**   Between would be better.  I'm sorry to interrupt you, but

17   I think I misspoke.  Would you situate that agreement between

18   a relationship that involved codeshare plus frequent flyer

19   benefits and one that involved antitrust immunity?

20   **A.**   Yeah, look, for us, the value of it is much greater,

21   because we can do so much more for the customer, because we

22   can coordinate schedules and things like that.  But it

23   doesn't mean that every partnership is optimized if we deploy

24   it as a JV or as the kind of partnership that we have with

25   JetBlue.

1    **Q.**  I'm not sure my question was very clear.  So what I'm

2    getting at is the arrangement that American now has with

3    JetBlue requires a lot more collaboration and coordination

4    than a simple codeshare plus --

5    **A.**  That's true.

6    **Q.**  -- frequent flyer benefit, right?

7    **A.**  That's true.

8    **Q.**  Now, would you agree that one of American's objectives in

9    entering into these partnerships is to create value without

10   deploying American metal?

11   **A.**  Yes, in some cases, because we really can't, but yes.

12   **Q.**  And by metal, that means aircraft, right?

13   **A.**  Yeah.

14   **Q.**  Okay.  And let's turn to -- I'm still in the second deck

15   of DX 89, if we could turn to slide 9, which is very near the

16   end.  Thank you.

17           And I just want to refer you to the top of the

18   page, there's a bunch of arrows, and the third one down

19   says, "Use partnerships to create value without deploying

20   American Airlines metal," right?

21   **A.**  Correct.

22   **Q.**  Okay.  Okay.  Now I want to go back to the first deck in

23   this exhibit and turn to slide 17.  So this is DX 89-17.

24   **A.**  Okay, I'm there.

25   **Q.**  You there?

**A.**   Yeah.

**Q.**   Okay.  And at the top of the page, it says, "We classify our origins and destinations based on type of competition" right?

**A.**   True.

**Q.**   Okay.  And then if you look at the chart below, on the left hand side, it says, "OD type" and then below that it says, there are three rows, right, "American Airlines only, legacy only, and LCC/ULCC."  Right?

**A.**   True.

**Q.**   So does this reflect that American Airlines classifies competition based on who American is competing with?

**A.**   Yes.  Meaning that we separate network carriers like Delta and United from other carriers like Southwest or Spirit?  True.

**Q.**   Okay.  And so for example, "AA only" means there's no competition on that particular OD, right?

**A.**   Correct.

**Q.**   And if you look over at the right-hand side, there's a picture of American's symbol, right?

**A.**   That's right.

**Q.**   And legacy only means that American is only competing against United and/or Delta?

**A.**   True.

**Q.**   And then if you look at the right-hand side, there's

1    their symbols, right?

2    **A.**   True.

3    **Q.**   And LCC/ULCC, that would include JetBlue, correct?

4    **A.**   Yes.

5    **Q.**   And it also includes ultra low cost carriers like Spirit?

6    **A.**   True.

7    **Q.**   Okay.  Now, let's turn two pages forward in this deck to

8    slide 19.  Okay.  And this slide is about varying margins

9    that are generated at American across different types of

10   origins and destinations, right?

11   **A.**   Yes.  When we do margins -- and it's called indicative

12   margin range and not to be too detailed about it, but we call

13   it that because we tend -- we look at route profitability on

14   a segment level, and so there's a little bit of estimation

15   going on here, but that's correct --

16   **Q.**   Understood.

17   **A.**   -- directionally.

18   **Q.**   And I'm not going to ask you just yet about indicative

19   margin range, but I want to focus on the left-hand column

20   where it's talking about yield.  Do you see that?

21   **A.**   I do.

22   **Q.**   And this is for the third quarter of 2019, right?

23   **A.**   Correct.

24   **Q.**   And cents/R PM.  What does that refer to?

25   **A.**   It's cents per revenue passenger mile, it's a means of

1    gauging how much a customer paid for the seat.

2    **Q.**   Okay.  And then if you look at the different types of --

3              THE COURT:  Per revenue mile?

4              THE WITNESS:  I'm sorry.  Say that again, Judge?

5              THE COURT:  You said per revenue mile?

6              THE WITNESS:  Revenue passenger mile.  So it's --

7    maybe the simplest way to think of it is like a metric like

8    average ticket value, where we just take revenue and divide

9    it over passengers.  We at the airlines tend to look at it as

10   our passenger miles because, you know, if you fly from

11   Charlotte to --

12             THE COURT:  So why does the bottom include -- if

13   the top is cents, cents is the amount of like cents per each

14   passenger mile, what's the revenue mean in the bottom?

15             THE WITNESS:  The revenue in RPM?

16             THE COURT:  Yes.

17             THE WITNESS:  Is just somebody who actually

18   purchased a seat.

19             THE COURT:  Oh, as opposed to somebody who's flying

20   for free.

21             THE WITNESS:  Yeah, as opposed to the other metric

22   we'll use, which is cents per ASM, RASM, revenue over all the

23   available seats, but the mileage thing is important because,

24   you know, we'll fly a flight 150 miles and a flight 1500

25   miles and it's a means of being able to equate that.

1      THE COURT:  Sure.  Okay.  Go ahead.  Thank you.
2  BY MS. SWEENEY:
3  Q.  And the -- on the screen, the numbers are blacked out,
4  but would you agree that --
5      THE COURT:  I'm sorry, so this bakes in a little
6  bit the yield.  In other words, if you have planes that are
7  always 100 percent full, your cents per revenue -- you don't
8  have that many people flying for free.
9      MS. RIGGS:  Correct.
10      THE COURT:  So those days are over when you work
11  for the airline, you get to fly for free, right?
12      THE WITNESS:  You still can, but the planes are
13  more full than they once were, which is actually a good
14  thing.
15      THE COURT:  But if the planes were at half load,
16  then that's going to effect this equation, because -- or it's
17  going to -- as compared to the ASMs.
18      THE WITNESS:  Yeah.  Exactly.  This is the RASM
19  calculation, so if you take this yield times what you just
20  said was load factor, so you're flying a 50 percent load
21  factor, so and -- you would half that number.  If you were
22  100 percent, then that would be your RASM.  Exactly right.
23      THE COURT:  Okay.  Got it.
24  BY MS. SWEENEY:
25  Q.  So looking at that first column there under "AA yield."

1    You can see that American earns the highest yield on

2    American Airlines only flights, right?

3    **A.**   True.

4    **Q.**   And those are flights where American faces no

5    competition, correct?

6    **A.**   Yes.

7    **Q.**   And the second highest yield is from legacy only routes,

8    right?

9    **A.**   Correct.  And this isn't to quibble, but these aren't

10   looking at segment route; these are origin and destinations.

11   **Q.**   Thank you very much.  Yes.

12          THE COURT:  What's the difference?

13          THE WITNESS:  So an AA only route are truly things

14   that are only constructed by us.  Every network carrier has

15   them.  And it would be New Bern, North Carolina, to

16   Knoxville, Tennessee.  We're the only ones who fly there.

17   Stillwater, Oklahoma, to São Paulo.  We're the only ones who

18   go and connect it, because one of those two things we're the

19   only ones that fly.

20          And that's a unique thing that exists for network

21   airlines, because we drive connection.  Legacy only are

22   markets where one or both of our principal network

23   competitors offer it, too.  So think Birmingham to

24   Los Angeles.

25          THE COURT:  So the first often have changes or

1    connections?

2              THE WITNESS:  Correct.

3              THE COURT:  The AA only.

4              THE WITNESS:  The AA only is -- yes.  All of these

5    account for connections.  And so even in markets like

6    LCCU/LCC, a market like Orlando to Nashville, Southwest will

7    fly that market.  We don't fly it nonstop.  But when we go to

8    classify our O and Ds, Nashville to Charlotte to Orlando

9    would be considered an LCC competitive O and D.

10             THE COURT:  I see.

11             I'm sorry, go ahead.

12             So just so I get it right, though.  So the segment

13   is like Nashville to Charlotte, and the origin destination is

14   Nashville to Orlando or whatever.

15             THE WITNESS:  Exactly.

16             THE COURT:  And these are segment numbers -- no,

17   these are origin and destination numbers right here.

18             THE WITNESS:  That's right.  That's exactly right.

19   So that's why, for this, the cents per RPM becomes really

20   important, too, because we're taking the mileage over the

21   entirety of that itinerary, Nashville to Orlando, with

22   Charlotte in between.  We take all the revenue over all the

23   mileage that's there.

24             THE COURT:  I see.

25             THE WITNESS:  That's where I say, it's not quite --

1    the indicative margin range is, I believe, indicative for

2    that.

3    BY MS. SWEENEY:

4    **Q.**  Now, focusing on what you were just referencing with

5    respect to the American Airlines only O and Ds, isn't it also

6    true -- you talked about these segments that no other airline

7    is in.  But it's also true, isn't it, that you can have a

8    nonstop route between an origin and a destination where there

9    are more competitors than just American.  And say there's two

10   competitors in the market, if that second competitor leaves

11   the market, then it becomes an AA-only O and D, correct?

12   **A.**  I think so.  Could you give me a for example?  I think I

13   follow you, but just so I --

14   **Q.**  Sure.  Let's say the Boston to LaGuardia route, if

15   American Airlines was in that route; and JetBlue were in that

16   route and JetBlue left that route, that would then become an

17   American Airlines only route -- excuse me, O and D.  I thank

18   you for that correction.

19   **A.**  Well, in that route, Delta and United are both in it.

20   But as a core example, if there were only two carriers, yes.

21   I'll follow your example.  I'm sorry.  Yes.

22   **Q.**  That was a bad example.

23   **A.**  No, no, I get you.  I get you.  All is fine.

24   **Q.**  And again, so what this chart shows is that the O and Ds

25   where American faces competition from LCCs and ULCCs have the

1  lowest yield, correct?

2  **A.**  Correct.

3  **Q.**  Okay.  We can put that document aside.  Now I'd like to

4  turn to another topic, which is the role that you played in

5  negotiating and implementing the Northeast Alliance.

6  So you were the lead point of contact at American

7  in negotiating the Northeast Alliance with JetBlue; is that

8  right?

9  **A.**  True.  I was.

10  **Q.**  And you actually initiated the idea.  Is that fair?

11  **A.**  I did.  That probably gives me a lot more credit than I

12  deserve, but I'll take it, yes.

13  **Q.**  And you started negotiations in January of 2020?

14  **A.**  We did, yes.

15  **Q.**  And those negotiations continued through the spring and

16  summer, right?

17  **A.**  Yes.  Yes.  I think they were largely concluded by the

18  summer, but, yes.

19  **Q.**  The agreement was signed in mid July; is that right?

20  **A.**  True.

21  **Q.**  And pubically announced the day or so after it was

22  signed, right?

23  **A.**  That's right.

24  **Q.**  And you continue to have a role in overseeing the NEA,

25  right?

**A.**  I do.

**Q.**  And as part of that oversight role, you meet regularly

with JetBlue executives?

**A.**  True.

**Q.**  In fact, you meet quite regularly with American's chief

operating officer; is that right?

**A.**  Well, I meet a lot with American's chief operating

officer.  He's six feet away from me.

        But I meet with JetBlue's chief operating officer a

lot, too.

**Q.**  Okay.  Thank you.  So you meet a lot with JetBlue's chief

operating officer?

**A.**  Yeah.

**Q.**  And how about other executives on JetBlue's team?

**A.**  I meet with them regularly, too, but not the same

frequency as I meet with her.

**Q.**  Okay.  Now, let's turn now to the features of the

Northeast Alliance.

        So to start with, the Northeast Alliance includes a

reciprocal codeshare agreement, right?

**A.**  Yes.

**Q.**  And we've already talked about that a little bit.  And

that codeshare agreement applies to all domestic O and Ds?

**A.**  As I recall it, no, not to all domestic O and Ds.

**Q.**  Just those that arrive in or depart from the northeast

1    airlines -- I'm sorry, Northeast Alliance airports, right?

2    **A.**   That is correct.

3    **Q.**   Can we call those the NEA airports?

4    **A.**   Sure.

5    **Q.**   So that's what the codeshare covers, is all flights that

6    touch those four airports, right?

7    **A.**   Yes.

8    **Q.**   Okay.  And that includes?

9            THE COURT:  So the codeshare doesn't cover American

10   operations from Dallas, say, to South America or Europe?

11           THE WITNESS:  Yeah, what it very much doesn't cover

12   is, for example, Fort Lauderdale to Caribbean, where they're

13   a competitor.

14           THE COURT:  Right.  Got it.

15   BY MS. SWEENEY:

16   **Q.**   So the codesharing agreement also includes nonstop

17   flights served by both JetBlue and American Airlines, right?

18   **A.**   In those four airports that you're talking about,

19   correct.

20   **Q.**   Okay.  So if a flight touches one of the four NEA

21   airports, the codeshare is included even for those flights

22   that are nonstop overlaps, right?

23   **A.**   Correct.

24   **Q.**   And when I say "nonstop overlaps," you understand me to

25   mean a nonstop flight where there's overlapping service by

1  JetBlue and American, right?

2  **A.**  Yes.  For example, New York to Raleigh Durham.  We both

3  fly it, we both codeshare.  If that's what you mean, then

4  yes.

5  **Q.**  And we already talked about this, but just to confirm,

6  the NEA also includes a frequent flyer program benefit?

7  **A.**  True.

8  **Q.**  Okay.  And it also includes a joint marketing agreement,

9  right?

10  **A.**  It does.

11  **Q.**  And this enables JetBlue and American Airlines to jointly

12  approach potential corporate customers, right?

13  **A.**  Correct.

14  **Q.**  And make joint bids to those customers; is that right?

15  **A.**  Correct.

16  **Q.**  Now, under the NEA, American and JetBlue coordinate on

17  all aspects of network planning for domestic flights to and

18  from the NEA airports, right?

19  **A.**  I don't know if I would say all aspects of it, but we

20  coordinate network planning, especially in the four NEA

21  airports that you mentioned, yes.

22          THE COURT:  Why especially, as opposed to only?

23          THE WITNESS:  Well, I'm sorry, only in the four

24  airports that are there.  But sorry, I was thrown by all,

25  because there's a lot of technical things that both network

1    planning teams work through that we don't coordinate on,

2    maintenance routes and things like that.  But we coordinate

3    our schedule pattern and JFK to Raleigh and what kind of

4    equipment we fly and things like that.

5    BY MS. SWEENEY:

6    **Q.**  Okay.  So why don't we break down coordination part.  So

7    there's really several pieces to it.  Would you agree with

8    that?

9    **A.**  Yes, I would.

10   **Q.**  Okay.  And I think of it in terms of who, what, where,

11   when, and how many.  So let's start with who.

12   **A.**  Okay.

13   **Q.**  Okay.  So to coordinate their flying in and out of the

14   NEA airports, American and JetBlue discuss who will fly each

15   route?

16   **A.**  True.

17   **Q.**  And for the what, the airlines also discuss what aircraft

18   should be flown on which routes, correct?

19   **A.**  We do.

20   **Q.**  Okay.  Another what.  They also discuss what slots they

21   will use in those airports that are slot constrained,

22   correct?

23   **A.**  Correct.

24   **Q.**  And American and JetBlue also coordinate on what gates

25   will be used, correct?

1    **A.**  Yes.  Correct.

2    **Q.**  Okay.  And the which is, and then they also coordinate on

3    which aircraft will fly those routes, right?

4    **A.**  Yes.

5    **Q.**  Okay.  And then they -- American Airlines and JetBlue

6    also discuss how many flights they will fly to each origin

7    and destination, right?

8    **A.**  Yes.  That's right.  Each city pair.

9    **Q.**  Each city pair.  Thank you.

10          And would you agree that, under the NEA, American

11   and JetBlue now coordinate on O and Ds where they previously

12   competed?

13   **A.**  Yes.  In some cases.  In many others, we've carved them

14   out, too.  I wouldn't say at large like that, but there are

15   cases where that's true.

16   **Q.**  Well, there are routes that -- for which American and

17   JetBlue previously offered competing service, correct?

18   **A.**  Yeah, that's true.

19   **Q.**  And those routes, some of those routes are included under

20   the NEA, right?

21   **A.**  That's true, yeah.

22   **Q.**  Now, the NEA also includes a revenue sharing agreement,

23   right?

24   **A.**  It does.

25   **Q.**  And that's contained in the Mutual Growth Incentive

1     Agreement?

2     **A.**  Correct.

3     **Q.**  And can we refer to that as MGIA?

4     **A.**  Yeah, we can.  Sure.

5     **Q.**  Okay.  Now, the MGIA applies to all domestic routes,

6     except a handful, correct?

7     **A.**  That's true.

8     **Q.**  And the handful are these so called care-out routes,

9     correct?

10    **A.**  That's correct.

11           THE COURT:  When you say all domestic routes, all

12    domestic routes in and out of the four.

13           THE WITNESS:  Of the four, correct.

14    BY MS. SWEENEY:

15    **Q.**  Now, so that includes, again, some routes on which

16    American and JetBlue provide nonstop service, right?

17    **A.**  That's right.

18    **Q.**  These nonstop overlaps, correct?

19    **A.**  Correct.

20    **Q.**  And would you agree that the purpose of the revenue

21    sharing agreement is to align American's and JetBlue's

22    incentives?

23    **A.**  Yeah, they are very much to align our incentives to get

24    people away from Delta.

25    **Q.**  And are you familiar with the expression "metal

1    neutrality"?

2    **A.**   I am.

3    **Q.**   Okay.  And what does that mean?

4    **A.**   For me, what metal neutrality means is that AA and

5    JetBlue work together to go and get customers away from

6    Delta.  It doesn't mean we're necessarily trying to be the

7    same metal, though.

8    **Q.**   Metal neutrality means that American Airlines will be

9    indifferent as to whether a passenger chooses JetBlue or

10   American on those NEA routes?

11   **A.**   Yeah, certainly.  On a transactional basis, we want a

12   transaction to come to us, not to Delta.  On the customer

13   basis, the lens changes a little bit.  But you're right in

14   what you're saying.

15   **Q.**   So it doesn't matter to you whether a customer flies on

16   American or JetBlue, on a flight between Boston and New York

17   City, right?

18   **A.**   Yeah, it's important to think of, now that you're asking,

19   both in the transactional lens and the life of the customer.

20   On the transaction, no, it doesn't.  We want the customer

21   coming away from them to come to us.

22              THE COURT:  "Us" in that case being JetBlue and

23   American.

24              THE WITNESS:  JetBlue and American.

25              But what we very much want is that the customer --

1    the value of doing that is that the customer keeps flying

2    American Airlines, right?  One of the things that we've seen

3    on JFK-Tel-Aviv is a number of the customers who are on

4    JFK-Tel-Aviv weren't our customers before.  They were flying

5    on JetBlue.  They got introduced to American through them,

6    and now they're flying us on JFK-Tel-Aviv.  We want them

7    transactionally to come away from delta on JFK-Raleigh, but

8    we want the customer to go and fly American Airlines to

9    Tel-Aviv.

10   BY MS. SWEENEY:

11   **Q.**  So earlier you said it doesn't matter -- the agreement

12   makes American Airlines and JetBlue indifferent to whether

13   they fly American or JetBlue, and the reason that it doesn't

14   matter is because your economic interests are aligned.  Is

15   that fair?

16   **A.**  Yes, our economic interests are aligned.  True.

17   **Q.**  Now, does American Airlines have any other domestic

18   airline alliance where you jointly plan daily schedules for

19   nonstop overlaps?

20   **A.**  No.

21   **Q.**  And for example, there's an agreement between

22   American Airlines and Alaska, which we referenced earlier,

23   called the WCIA, right?

24   **A.**  Correct.

25   **Q.**  And that agreement does not have that provision, correct?

1   **A.**   It does not.

2   **Q.**   How about where two airlines coordinate on how many

3   flights each will offer on overlap routes?  Does American

4   have any other domestic alliance where that occurs?

5   **A.**   Not domestically, no.

6   **Q.**   And that's not part of the Alaska/American WCIA, right?

7   **A.**   No.

8   **Q.**   And you said not domestically, because you were

9   referencing these international agreements where there is

10   antitrust immunity where that occurs, correct?

11   **A.**   That's true.

12   **Q.**   What about pooling of slots and gates?  Does American

13   have any domestic airline alliance in which airlines pool

14   slots and gates and then jointly decide who's going to use

15   them?

16   **A.**   No, but it's not really necessary anywhere.

17   **Q.**   That's not part of the WCIA with Alaska, is it?

18   **A.**   No, it's not.  It wouldn't need to be.  There's no slots

19   there.

20   **Q.**   Oh.  Correct.  Thank you.

21            How about gates?

22   **A.**   Gates are there, but it's a little bit of a different

23   situation there than what it is in the northeast.

24   **Q.**   Got it.  Okay.  So how about deciding -- how about the

25   joint decision about which domestic routes each airline will

1    fly?  Do you have that in any other domestic partnership?

2    **A.**   No.

3    **Q.**   And it's not part of the WCIA, correct?

4    **A.**   It is not.

5    **Q.**   And how about coordination on what size airplane each

6    will fly?  Is that part of the WCIA?

7    **A.**   It is not.

8    **Q.**   How about reciprocal revenue sharing on overlap routes?

9    Is that part of the WCIA?

10   **A.**   Reciprocal revenue sharing on overlap routes is not part

11   of the WCIA, no.

12   **Q.**   Now, some of these provisions are contained in these

13   immunized arrangements that American Airlines has with

14   foreign partners, correct?

15   **A.**   True.

16   **Q.**   Okay.  So one of the benefits to American and the

17   Northeast Alliance is that it allows American to deploy

18   airplanes to markets that have more value to American.  You

19   would agree with that?

20   **A.**   Yes.

21   **Q.**   And a high margin route is a high value route for

22   American, right?

23   **A.**   Typically speaking, yeah.  If it's high in margins, it's

24   high in value to us, yeah.

25   **Q.**   Okay.  Let's go back to DX89.  And this is slide 19.

1          THE COURT:  Is that what they're called, "gang of

2   McKinseyites?"

3          THE WITNESS:  That's what we call them sometimes.

4          THE COURT:  Do they have markings?

5          THE WITNESS:  Not that I've checked.

6   BY MS. SWEENEY:

7   **Q.**  So let's look at slide 19 in this first deck, in this

8   exhibit.

9          And we talked about this slide earlier, but now I

10  want to focus on the column in the right-hand side.  And this

11  is "Indicative Margin Range" right?

12  **A.**  Sure.

13  **Q.**  And again, American generates the highest indicative

14  margin on flights that only American Airlines flies, right?

15  On O and Ds that only American flies?

16  **A.**  Correct.

17  **Q.**  And that's -- even -- you could see the numbers there,

18  right?  They're blacked out in the redacted version, but you

19  can see them in the document, correct?

20  **A.**  Indeed.

21  **Q.**  And American earns the second highest indicative margin

22  on legacy-only O and Ds, right?

23  **A.**  True.

24  **Q.**  And those are flights, again, where American faces

25  competition, but only from United and/or Delta, right?

1    **A.**   True.

2    **Q.**   And American receives the lowest indicative margin on

3    those flights where American faces competition by LCC or a

4    ULCC, correct?

5    **A.**   True.

6    **Q.**   Okay.  We can put this document away.

7              Now I'd like to turn to the specific markets that

8    are covered by the Northeast Alliance and start with Boston.

9    So Boston is a -- a very important market in the domestic

10   airline industry, would you agree with that?

11   **A.**   I would.

12   **Q.**   And it's an important market for American?

13   **A.**   It is.

14   **Q.**   In part because of its size and demographics?

15   **A.**   True.

16   **Q.**   And also in part because of its high percentage of

17   business travelers?

18   **A.**   Also true.

19   **Q.**   So if American had not entered into the Northeast

20   Alliance, it would continue to try to compete in Boston,

21   right?

22   **A.**   It would try to compete in Boston, whether it would be

23   successful competing in Boston would be a different issue.

24   **Q.**   And in 2019, American was planning to grow in Boston,

25   right?

1  **A.**   Yeah.  That's right.  We were going to add a few flights.

2  **Q.**   Okay.  Let's turn to Plaintiffs' Exhibit 66.  Let me know

3  when you've had a chance to look at that.

4  **A.**   I'm on 66.

5  **Q.**   Okay.  This is an e-mail chain between you and Mr. Puech

6  at American Airlines, right?  In which he reported on

7  highlights and schedule changes made that week by several

8  airlines, right?

9  **A.**   Correct.

10  **Q.**   And he reported on schedule changes by Delta, United,

11  Southwest, and JetBlue, right?

12  **A.**   Correct.

13  **Q.**   And Mr. Puech, at least at that time, was the director of

14  domestic planning?

15  **A.**   I don't know if he was the director of domestic planning

16  or not then, but he, effectively, was coordinating our

17  domestic planning function, sure.

18  **Q.**   And this was in December of 2019, before the NEA, right?

19  **A.**   True.

20  **Q.**   Okay.  Let's look at the bottom of the page, where there

21  is a paragraph that starts with "B6."  Do you see that?

22  **A.**   I do.

23  **Q.**   And Mr. Push writes, "B6, add an extra Austin-Boston."

24         Do you see that?

25  **A.**   I do.

1   **Q.**  And that means that that week JetBlue added another

2   Austin-Boston route?

3   **A.**  Correct.

4   **Q.**  And that was right around the time that American

5   announced its new nonstop service between Boston and Austin?

6   **A.**  That's right.

7   **Q.**  So in this time period, in December of 2019, American and

8   JetBlue were competing on that route, correct?

9   **A.**  True.

10  **Q.**  And then he goes on to say, in the second carat below

11  B6, "added extra Boston frequency to a dozen of places

12  including Chicago O'Hare, Charlotte, Phoenix, and LAX,"

13  right?

14  **A.**  Right.

15  **Q.**  And this means that JetBlue added extra frequencies to

16  all of those places, right?

17  **A.**  That is correct.

18  **Q.**  All of those airports?

19  **A.**  Yup.

20  **Q.**  And all of those airports that are indicated there, those

21  are all American hubs, right?

22  **A.**  True.

23  **Q.**  So fair to say that, in this time period, December 2019,

24  JetBlue and American were competing for service between

25  cities -- between Boston, in particular, and American hub

1    cities?

2    **A.**   Yeah, they were competing with us.  I suspect that's

3    probably in retaliation to us starting Austin-Boston, but

4    yeah, that's fine.  We were competing.

5    **Q.**   We can put this exhibit aside and turn to, please,

6    Plaintiffs' Exhibit 122.  This is admitted into evidence, but

7    it is redacted.  So I request permission to display the

8    confidential, redacted version.

9            THE COURT:  Yes.

10   BY MS. SWEENEY:

11   **Q.**   All right.  Do you recognize this e-mail, Mr. Raja?

12   **A.**   Indeed I do.

13   **Q.**   Okay.  This is an e-mail conversation between you and the

14   vice chair of the American Pilots Association in Boston,

15   correct?

16   **A.**   Yes.

17   **Q.**   And it's from late September of 2019?

18   **A.**   That's right.

19   **Q.**   So, again, before the NEA?

20   **A.**   Correct.

21   **Q.**   And in this e-mail, he is asking you about American's

22   plans for growth in Boston, right?

23   **A.**   Yes.

24   **Q.**   Okay.  And if you look at the bottom of the paragraph,

25   the very bottom paragraph on this page, in the middle of

1    that, he says, "I am reaching out to you to find out when

2    we're going to step up our game here in Boston.  As you know,

3    our gate utilization at just over three is not quite where we

4    would like it to be, and our lone wide-bodied gate often sees

5    a commuter on it going to Rochester, New York."

6            Do you see that?

7    **A.**  I do.

8    **Q.**  And so you respond the next day, right?  So let's look up

9    at the middle of the page to find your first response.  And

10   you say, "We are not done in Boston, we are going to kick ass

11   globally, even if it kills me, including Boston."  Did you

12   say that?

13   **A.**  I did.

14   **Q.**  And then below that you say, "Don't take my word for it,

15   when the metal comes then you take my word for it, but I

16   don't BS about these thing, and I am done [expletive]

17   around."

18   **A.**  That is what it says.  I was wondering if you would read

19   all those words.  You didn't redact that.

20           THE COURT:  You can actually say those words in

21   court, including to me.

22           MS. SWEENEY:  Okay.  Thank you, Your Honor.

23   BY MS. SWEENEY:

24   **Q.**  Okay.  Mr. Raja, other than the omission of the salty

25   language, did I read that correctly?

1    **A.**   Correct.

2    **Q.**   Okay.  So and then looking at the top, he thanks you for

3    your response, and then you respond again, right?  And so

4    looking at the very top, you respond, "No doubt.  In 2021, we

5    can get more gates there and we plan to do it."

6             And so this is referring to getting more gates in

7    Boston, right?

8    **A.**   True.

9    **Q.**   Because as vice chair the American Pilot's Association

10   pointed out at that point in time, American was not fully

11   utilizing its gates in Boston.  Is that fair?

12   **A.**   That's correct.

13   **Q.**   And then you also go on to say, "In one hour, we will

14   announce the return of flight 108/109, 777 200, Boston.

15   London-Heathrow starts 2020."

16            And in fact, American Airlines did launch that

17   flight to London-Heathrow, right?

18   **A.**   Correct.

19   **Q.**   So here you're expressing your intention both to get more

20   gates, right?

21   **A.**   Correct.

22   **Q.**   And to utilize your gates more fully, right?

23   **A.**   Also true.

24   **Q.**   That's something that you said in this e-mail to -- and I

25   can't say his name, but the vice chair of the American Pilots

1   Association?

2   **A.**   Yeah.

3   **Q.**   And you also referenced an intention to add service,

4   right?

5   **A.**   Yes.

6   **Q.**   And then let's look at the last paragraph of your

7   response.  It starts, "It may take us a bit of time and a lot

8   of change," and then you go on to say, "but we are going to

9   fight like hell in Boston if I have anything to do with it."

10  **A.**   Correct.

11  **Q.**   Did I read that correctly?

12  **A.**   Yes, you did.

13  **Q.**   Okay.  We can put this exhibit aside.

14          And then can we turn please to Plaintiffs'

15  Exhibit 119.  This is a document that's in evidence.  And

16  there are no redactions.

17          Now, this is an e-mail conversation that you had

18  with someone at American Airlines in late 2019, just a couple

19  months after you had that conversation with the APA vice

20  chair, right?

21  **A.**   Yes.

22  **Q.**   And that was with Jim Butler, correct?

23  **A.**   Yes.

24  **Q.**   And he, at that time, was the senior vice president of

25  airports?

1    **A.**   That's right.

2    **Q.**   And in this e-mail, Mr. Butler --

3              THE COURT:  For American Airlines?

4              THE WITNESS:  For American Airlines, yes.

5              MS. SWEENEY:  Thank you, Your Honor.

6    BY MS. SWEENEY:

7    **Q.**   In this e-mail, Mr. Butler is thinking about how to

8    structure his team and wants to understand American's plans

9    for growth in the northeast, correct?

10   **A.**   Correct.

11   **Q.**   Okay.  And you respond to Mr. Butler on December 1?

12   **A.**   I do.

13   **Q.**   And you have several responses.  You talk about New York

14   first and JFK and then LaGuardia, and then you talk about

15   Boston.  I want to focus for the moment on Boston.

16   **A.**   Sure.

17   **Q.**   And you write, "Boston is and will be the largest nonhub

18   mainline operation."

19   **A.**   Yes, it says that.  I wrote that.

20   **Q.**   And "mainline operation," that refers to a situation

21   where you're flying American planes as opposed to planes of

22   regional carriers with whom you have an agreement?

23   **A.**   Yeah.  Technically.  Any of our jets with more than 100

24   seats are mainline; anything less are regional.

25   **Q.**   Okay.  So here you're expressing that it's going to be

1    the largest nonhub operation where you're flying the big

2    jets, correct?

3    **A.**  Yes.

4    **Q.**  And you go on to say, "So much so I don't know why we

5    call New York City a hub, but not Boston."  Did I read that

6    correctly?

7    **A.**  You do.  Or you did.

8    **Q.**  And then you go on to say, "Assume we are at least 120

9    daily flights from 2025, up from 90 or so today," right?

10   **A.**  Yes.

11   **Q.**  And so that reflected your understanding at the time,

12   correct?

13   **A.**  It reflects my understanding.

14           A really important thing, though, is actually part

15   of the New York thing.  Butler in this is trying to staff his

16   team.  We're having -- outside of this, we're having a long

17   conversation about this, because operationally, in New York,

18   the size on a departure basis is similar to Boston.  Now, in

19   the weird world of how we go and build our airport staffing,

20   whether you call something a hub denotes the titles of the

21   people who are there, which is on his mind.

22           What I'm trying to convey to him in this is, look,

23   in New York, it's a relatively -- though there's a similar

24   level of departures, there's a lot less going on in New York

25   at this point in time, than what's going to be going on in

1    Boston.  You have to get somebody who is a lot better than

2    what we've historically had in Boston.

3    **Q.**  Mr. Raja, I'm not sure you that you understood my

4    question, which simply asks for a yes or no answer.

5    **A.**  I'm sorry.

6    **Q.**  I'm asking whether what you say here in this e-mail to

7    your colleague, who is senior vice president of airports, I

8    guess --

9    **A.**  Yes.

10   **Q.**  -- you say, "Assume we are at least 120 daily flights by

11   2025, up from 90 or so today."

12   **A.**  Yes, I did say that.

13   **Q.**  And my question is, that reflected your understanding at

14   the time; is that correct?

15   **A.**  Correct.  And for purposes of him preparing the

16   staffing -- like this is a -- we call this our max output

17   schedule, and yes, that was my -- certainly the understanding

18   that I wish to convey.

19   **Q.**  Okay.  We can put this exhibit aside.

20        And can we have a look at Plaintiffs' Exhibit 65,

21   which is in evidence, and does not contain any redactions.

22        Okay.  This is an early January 2020 e-mail chain,

23   that starts with an e-mail from Jhonatan Ma teus to you,

24   correct?

25   **A.**  Correct.

1    **Q.**  And looking about two-thirds of the way down the page,

2    he's writing about the rationale for point-to-point additions

3    for 2020, correct?

4            THE COURT:  I'm sorry, what date was this?  I just

5    missed that.  The e-mail.

6    BY MS. SWEENEY:

7    **Q.**  This is from early January, Mr. Raja?

8    **A.**  Correct.

9            THE COURT:  2020.

10            THE WITNESS:  2020.

11            THE COURT:  Thank you.

12    BY MS. SWEENEY:

13    **Q.**  Am I right that Mr. Mateus, at least at that time, was a

14    manager of the team responsible for fleet and infrastructure

15    strategy?

16    **A.**  That's true.

17    **Q.**  And he reported to Massimo Mancini, correct?

18    **A.**  He did.

19    **Q.**  And Mr. Mancini, during this time period, reported

20    directly to you, right?

21    **A.**  Yes.

22    **Q.**  And let's look at the next-to-last bullet point on the

23    bottom of the page.  Do you see that?

24    **A.**  Yes.

25    **Q.**  It starts with Boston?

1    **A.**   Yes.

2    **Q.**   "Planning on going from 96 to 104 peak day departures by

3    summer of 2020, to start incremental growth towards a 2024

4    peak date departures around 140."

5          Do you see that?

6    **A.**   I do.

7    **Q.**   So at this point in time, before the NEA, American had

8    plans to increase its Boston peak day departures from 96 to

9    at least 104, correct?

10   **A.**   Correct.

11   **Q.**   And it's true, also, that at this point in time, preNEA,

12   American's goal or aspiration was to increase peak day

13   departures in Boston to around 140, correct?

14   **A.**   Aspiration is a good characterization, yes.

15   **Q.**   That was the intention expressed in this document,

16   correct?

17   **A.**   Yeah.  That was exactly the aspiration expressed.

18   **Q.**   Okay.  And then Mr. Mateus goes on in that same

19   paragraph, "tentative adds are Austin 2, Raleigh-Durham 4,

20   Indianapolis 2."  Right?

21   **A.**   Correct.

22   **Q.**   And what he's saying there is that American, at this

23   point in time, January 2020, is planning on adding two daily

24   flights from Boston to Austin, right?

25   **A.**   Yes.

1    Q.   And four daily flights between Boston and Raleigh-Durham.

2    A.   Also correct.

3    Q.   And two daily flights between Boston and Indianapolis?

4    A.   That's right.

5    Q.   And then Mr. Mateus goes on in that same paragraph to

6    talk about American's underutilization of its gates in

7    Boston, correct?

8    A.   Yes.

9    Q.   Okay.  And he says, "We need to get to that level of

10   departures, because our utilization lags that of our

11   competitors.  In 2021, '22, we need to have a high gate

12   utilization to try to claim the three Air Canada gates" -- is

13   that what AC stands for there?

14   A.   It is.

15   Q.   "To claim the three air Canada gates.  Also in 2023, when

16   our lease expires, we will be at risk of losing more gates if

17   we do not have a good utilization."

18            Now, let me stop there for a second.  So at this

19   time, American Airlines was aiming to get three additional

20   gates in Boston, right?

21   A.   We were -- this was part of the aspiration, there's three

22   things going on.  We needed to go drive more utilization on

23   what we have, and then by doing so, to enter the pool for the

24   three Air Canada gates.

25   Q.   Okay.  So you were going to enter the pool for the three

1    Air Canada gates; is that right?

2    **A.**   We hadn't yet.   This is -- like I said, the important

3    thing is this is an aspirational sense, like the whole

4    context of this e-mail is he's trying to build a rationale

5    around doing more of what we call point to point flying,

6    flying that doesn't touch one of our hubs.

7    **Q.**   And so -- and he also says, "if we do not have good

8    utilization."   So American Airlines was not fully utilizing

9    its gates in Boston at the time; is that right?

10   **A.**   We were not.

11   **Q.**   Okay.   And then he goes on to say, "We already lost four

12   gates in recent years.   We went from 22 to 19.   In 2019, we

13   had less than five departures per gate."

14           Correct?

15   **A.**   Yes.   22 to 18, but yes.   You're right.   That's right.

16   **Q.**   Okay.   And so -- and five departures per gate is not

17   fully utilizing that gate, right?

18   **A.**   Sort of.   It depends on what airport you're in.   In

19   Boston, utilization is measured relative to how other people

20   are using the gates.   That's why the next sentence is there.

21   If other people are utilizing it more, than whoever utilizes

22   the gates the most, gets the gates.

23   **Q.**   And in Boston, is it fair to say that there are gate

24   utilization requirements?

25   **A.**   True, there are.

1   **Q.**  And so if you don't utilize your gates, you can lose

2   them, right?

3   **A.**  Absolutely.

4   **Q.**  And we can put this exhibit aside.  Let's turn now to

5   Plaintiffs' Exhibit --

6           THE COURT:  Is that not true at other airports?

7           THE WITNESS:  I'm sorry.

8           THE COURT:  Is that not true at other airports?

9           THE WITNESS:  It depends on the airport.  So some

10  airports have an abundance of real estate, and the gate

11  utilization requirements are very, very low.  Others have a

12  high degree, but one carrier uses a lot of the gates.  Think

13  Atlanta.  And then there's a lot of markets and there's an

14  increasing number of them, like Boston, where the number of

15  gates is restricted, and as you can see from the airport, you

16  can't easily go and build more.  And in those cities, there's

17  usually a utilization metric, where you have to use the

18  gates -- it's measured against everybody who's otherwise

19  using the gates.  So the people who use the gate the most get

20  the capacity.

21          Where it becomes a really important thing for us,

22  though, is -- and indeed what part of the rationale in Boston

23  at this time is that we saw this happen to us in New York.

24  In our business, when you lose access to the infrastructure,

25  you lose the access.  It's hard oftentimes to make more

1    gates, more runway, and even if you can do that, you can't

2    make more air space.  So in New York, overtime, because we

3    weren't --

4              THE COURT:  Airspace is different than slots?

5              THE WITNESS:  Yeah, but they serve a similar thing.

6    Effectively, it's different choke points on the same thing,

7    right?  The first thing is gate capacity, how much physical

8    airplanes you can hang on things.  Slots are really designed

9    to measure airspace capacity, the number of takeoffs and

10   landings that you can do.  But depending on your airports,

11   either or both can be an issue.  In the New York City

12   airports, both are an issue.  In Boston, gates are the issue.

13             THE COURT:  In New York, do they do the

14   prioritization of the gates the way they do here?

15             THE WITNESS:  Not necessarily.  New York -- nothing

16   is particularly straightforward.  In LaGuardia, it's

17   allocated.  In -- Newark has a different mechanism.  JFK is a

18   completely unique airport where the different terminals are

19   actually owned by either the carriers or the consortia who

20   operate out of there.

21             THE COURT:  But airspace is not -- with a slot,

22   there isn't another choke point of airspace separate from the

23   slot.  If you have a slot and you can get the plane off the

24   ground, assuming you can get people on and off at the gate,

25   you're good to go.

```
 1              THE WITNESS:  That's correct.  Certainly for
 2    commercial aviation, that's correct.
 3              THE COURT:  Okay.  Go ahead.  Thank you.
 4    BY MS. SWEENEY:
 5    Q.  Let's turn now to Plaintiffs' Exhibit 64.  This
 6    Exhibit is not in evidence, so please don't publish it.
 7              THE COURT:  Which one?  What number?
 8              MS. RIGGS:  64.  So that's in your binder,
 9    Mr. Raja.
10              THE WITNESS:  Yes.
11    BY MS. SWEENEY:
12    Q.  This is an e-mail exchange that you had on January 18,
13    2020, right?
14    A.  It is.
15              MR. WALL:  Your Honor, we don't have any problem
16    with this going into evidence and being displayed.
17              MS. SWEENEY:  Okay.
18              MR. WALL:  This is actually a document that we
19    talked about in court today.
20              MS. SWEENEY:  I just want to ask one question of
21    the Court.  I move to admit it into evidence.
22              THE COURT:  Allowed.  Admitted.
23              (Plaintiff Exhibit No. 64 admitted into evidence.)
24              MS. SWEENEY:  Because defendants had previously
25    objected, we don't have a redacted version.  But there are
```

1    third-party names in this exhibit, so I'm not sure whether we

2    should publish or not.

3            MR. PAIK:  Your Honor, I believe the name here

4    isn't necessarily a customer, so I think we had agreed that

5    we don't actually need to redact this particular name here.

6    So I think you should be able to publish it.

7            And this is Andrew Paik from Latham & Watkins.

8            THE COURT:  Fine.

9            MS. SWEENEY:  It's published.

10           THE COURT:  And there's no phone number or

11   anything, so it seems fine.

12           MS. SWEENEY:  No, Your Honor.

13           THE COURT:  Go ahead.

14           MR. WALL:  There's a phone number on the second

15   page, but I don't think she's going to be using --

16           THE COURT:  Yes, getting to that page.

17           MS. SWEENEY:  I am not.

18   BY MS. SWEENEY:

19   Q.   Okay.  So this is an e-mail chain between you and someone

20   who has a business who wants to enter into kind of a

21   marketing arrangement with American Airlines, right?

22   A.   Yes.

23   Q.   And he starts off the e-mail to you, and that's at the

24   bottom of the first page of this exhibit, right?

25   A.   That's right.

1    **Q.**  And he's congratulating you on some -- American Airlines,

2    on some new service, some new routes between Boston and a

3    couple other cities, correct?

4    **A.**  That's correct.

5    **Q.**  And in fact, he's talking about three different cities

6    where American Airlines had just announced new service

7    between Boston and those cities?

8    **A.**  That's right.

9    **Q.**  And in your response, you thank him.  And then you add

10   Jim Carter, who leads American's sales and marketing efforts

11   in Boston, right?

12   **A.**  Correct.

13   **Q.**  And you tell the author of this e-mail that Mr. Carter,

14   because of his position, can respond, correct?

15   **A.**  Yes.

16   **Q.**  And then you have an e-mail exchange with Mr. Carter,

17   correct?

18   **A.**  Yes.

19   **Q.**  And Mr. Carter writes -- and then I'm looking now at

20   the -- near the top of the first page of the exhibit.  And

21   Mr. Carter, on January 18th, says, "Hey, man, I think I've

22   gotten a dozen of these since the announcements.  Working

23   closely with our team in Boston on ensuring these flights

24   work now."

25              Do you see that?

1  **A.**  I do.

2  **Q.**  So he's saying he's gotten a lot of inquiries since

3  American Airlines announced those new routes from Boston,

4  right?

5  **A.**  True.

6  **Q.**  Okay.  And then your response is up there at the top.

7  And you say, "Awesome.  Gird your loins.  Time to swing the

8  bat in Boston."

9  **A.**  Yes, I did write that.

10  **Q.**  So that was my next question.  Did I read that correctly?

11  **A.**  Yeah.

12  **Q.**  Okay.

13  **A.**  I see you didn't redact that, either.

14      Yes, I wrote that.

15  **Q.**  Okay.  We can set that exhibit aside.

16      Let's turn now to New York, which is another part

17  of the Northeast Alliance.  And just like for Boston, New

18  York is an important city for American Airlines, right?

19  **A.**  It is.

20  **Q.**  And probably the biggest city aviation-wise in the world?

21  **A.**  Yes.

22  **Q.**  Okay.  And even if American had not entered into the

23  Northeast Alliance, it would have continued to compete in New

24  York?

25  **A.**  Yeah.  The effectiveness of its competition is a --

1    something that I would probably take issue with, but it would

2    have stayed in New York, absolutely.

3    **Q.**   Now, before American Airlines and JetBlue entered into

4    the Northeast Alliance, you and others at American had

5    discussed ways in which American could expand its capacity in

6    New York, right?

7    **A.**   Yes.

8    **Q.**   And one way to expand capacity is to use planes with more

9    seats; is that right?

10   **A.**   True.

11   **Q.**   And in, say, mid 2019, American had a number of small,

12   regional jets flying out of JFK; is that right?

13   **A.**   That's right.

14   **Q.**   And there were around 25 of them; is that right?

15   **A.**   I don't know if that's what the aircraft count was, but

16   yeah, a large part of our schedule was out of Kennedy.

17   **Q.**   Okay.  A large part of your schedule was using those

18   small, regional jets?

19   **A.**   True.

20   **Q.**   And how many of those passengers can be seated on one of

21   those small, regional jets?

22   **A.**   It depends on the jet, but between 50 and 76.

23   **Q.**   And do these jets have more than one class of service?

24   **A.**   They can.

25   **Q.**   You're talking about the small, regional jets that

1   American Airlines was flying from JFK in mid 2019?

2   **A.**   At the time in JFK, we were -- as I recall it, all 50

3   seaters.  Maybe we had a flight or two on the 75 seater.  The

4   50 seaters are single class, the 75 seaters have a first

5   class and an economy class.

6   **Q.**   Okay.  Well, let me go back then, in 2019, at JFK,

7   American was only flying -- when you're talking about these

8   regional jets, it was only flying the 50 seaters?

9   **A.**   Yeah, disproportionally, yes.

10  **Q.**   Okay.  And those 50 seaters do not have two classes of

11  service, right?

12  **A.**   Also true.

13  **Q.**   And what your plan was at that point in time, 2019, was

14  to replace all of those small, regional jets, with larger,

15  regional jets?

16          MR. JONES:  Yeah, that's been our plan across our

17  system.

18  **Q.**   Okay.  And so those larger regional jets were the ones

19  that you were just talking about a moment ago, which seat 65

20  to 75 passengers, correct?

21  **A.**   Correct.

22  **Q.**   And those larger regional jets also have two classes of

23  service, correct?

24  **A.**   Also correct.

25  **Q.**   Now, if American had all two class jets, regional jets

1    flying from New York City, it could better compete for

2    corporate customers, correct?

3    **A.**   Ideally, it could.   Whenever we tried them in New York,

4    we weren't very successful in getting them for corporate

5    customers.

6    **Q.**   Let's focus for a moment on JFK.   So in 2019, at JFK, you

7    only had the smaller jets that did not have two classes of

8    service, right?

9    **A.**   Correct.

10   **Q.**   Okay.   And shifting from small regional jets to these

11   larger regional jets that you just described, you sometimes

12   call that up-gauging?

13   **A.**   That's true.

14           THE COURT:   The larger regional jets are the 76

15   seaters with two classes?

16           THE WITNESS:   Correct.

17           THE COURT:   Go ahead.

18   BY MS. SWEENEY:

19   **Q.**   So another way to expand capacity, besides up-gauging, is

20   to add flights to more destinations, correct?

21   **A.**   That is true.

22   **Q.**   And another way to expand capacity is by adding frequency

23   to existing destinations?

24   **A.**   Yes.

25   **Q.**   Okay.   Let's look at Plaintiffs' Exhibit 105 and this is

1    in evidence.

2            So Mr. Raja, this consists of a May 2019 e-mail

3    Mr. Goodman sent to you, and he CCs Jason Reisinger,

4    attaching a document he calls a "one-pager on New York City

5    strategy," right?

6    **Q.**  And at this point in time, in May of 2019, Mr. Goodman

7    was in network planning; is that right?

8    **A.**  He was.

9    **Q.**  And what about Mr. Reisinger?

10   **A.**  Yeah.  He was our head of capacity planning, determining

11   where the airline flies, what schedule pattern, where.

12   **Q.**  Okay.  And this was several months before you started

13   negotiating the Northeast Alliance, correct?

14   **A.**  Yes.

15   **Q.**  And on the first page of the attachment, if you could

16   turn to that, please, this is the one pager strategy that is

17   described in the cover e-mail, right?

18   **A.**  Yes.

19   **Q.**  And I hope you can read it.  It's a little small.  But if

20   you look at the first page, around two-thirds of the way down

21   the page, under the black header title, "Objective:  Fly a

22   competitive products in all markets," did you see that?

23   **A.**  I do.

24   **Q.**  Okay.  And then below that, it says, "Develop plan to

25   have all single class RJs out of New York City."  And what

1    this refers to is what you just spoke about a moment ago,

2    right?  That American Airlines planned in 2019 to switch out

3    all of the single class regional jets from New York City,

4    right?

5    **A.**   Not to quarrel with the word, but we tend to use the word

6    "plan" a lot, but our plans change like every week.  So this

7    is -- like some of these things, it's really more of a

8    proposal of what we can do.  We didn't have a plan as yet.

9    What we were searching for through all of this stuff was some

10   means of being more competitive in New York.

11   **Q.**   And this was part of your New York City strategy,

12   correct?

13   **A.**   Yeah, it was -- I'd say it was an attempt at a New York

14   strategy.  In the 18 years I've been at the company, we've

15   had at least that many different New York City strategies

16   until the NEA came along.

17   **Q.**   And that's what the document is called, New York City

18   strategy, right?

19   **A.**   Yeah.  This is one of the documents on New York City

20   strategy.

21   **Q.**   Okay.  And then I'm reading along where I was a moment

22   ago.  "Develop future narrow body with lie-flat business

23   class that can fly all TCON markets, not just LAX and SFO."

24           Do you see that?

25   **A.**   I do.

1   **Q.**  Now, that lie-flat transcontinental service, that's

2   something that was started by JetBlue; is that right?

3   **A.**  No.  It was started by American Airlines.

4   **Q.**  It was started by American Airlines on these two routes;

5   is that right?

6   **A.**  Yes.

7   **Q.**  Okay.  And then later on, American Airlines expanded

8   that, as indicated here, correct?

9   **A.**  No.

10  **Q.**  You never expanded transcontinental lies-flats?

11  **A.**  No.  We've only flown it on LA and San Francisco.

12  **Q.**  Okay.

13  **A.**  Oh, and the NEA, we started flying in Orange County, too.

14  **Q.**  Okay.  I'll move on, then.

15         Now, let's look at the top of the document under

16  "Objective.  Serve Box 2.0 markets with schedule depth."

17         Do you see that?

18  **A.**  I do.

19  **Q.**  First of all, what is Box 2.0?

20  **A.**  In the particular geography of the American Airlines hub

21  network, if you think about the geography of Chicago,

22  Philadelphia, Washington, D.C., Charlotte and Miami and DFW,

23  it creates a sort of a box.  And just because of the

24  geography, we can serve cities in those box more economically

25  than what our competitors can.  If we -- if you just draw a

1   line from, pick something in the middle, Lexington, Kentucky,

2   we spend less airplanes than if you were to go to draw the

3   connection over Houston or Minneapolis or something.  So it's

4   ten percent less airplane, ten percent less crew, ten percent

5   less fuel.  So we tend to have a lot of flying in those

6   markets.  They tend to do really well and drive a lot of

7   connectivity.

8          So the idea -- what this is really saying is that

9   in New York, we can't really win a New York City customer.

10  But we're great in Lexington.  Let's figure out how we get

11  more customers from inside of the country to New York.

12  **Q.**  So Mr. Raja, the e-mail says to -- well, it says

13  "schedule depth."  Does that refer to frequency?

14  **A.**  Yeah.  So what he's referring to is -- so take a market

15  like, at the time, if I recall right, they were looking at

16  like northwest, Arkansas, Bentonville, Arkansas.  We don't

17  have as many slots as what Delta has in Kennedy.  We have

18  what's called 150 -- I'm rounding it.  Fewer than --

19  **Q.**  I'm sorry to interrupt.  I think maybe you misunderstood

20  my question or I asked a poor one, so let me --

21          MR. WALL:  No, I think he was answering the

22  question.  She should not interrupt.

23          MS. SWEENEY:  And I apologize.  But we're on a --

24          THE COURT:  So I think let him go on a little bit,

25  because I'm not really clear.

1          MS. SWEENEY:  Okay.  Go ahead, Mr. Raja.

2          THE WITNESS:  So because we don't have as many

3    slots as what Delta has, we can't offer a competitive

4    schedule in all the same markets they have.  They have 150

5    more, or something.  So we have to figure out, when we have

6    less access to the infrastructure of New York, how can we

7    credibly go and compete when customers buy on network?

8          And what we found is that if Delta flies -- I'll

9    make it up -- 30 cities, and they fly them all five times a

10   day, we can't match the same thing.  We don't have the slots.

11   So what this is, we're not doing particularly well for the

12   New York-originating customer, but we do great with a

13   northwest Arkansas originating customer.  Let's really focus

14   on having a depth of schedule in northwest Arkansas to New

15   York.  We're going to be a carrier that gets people to New

16   York, as it's commonly described.

17         And then Delta may match us frequency for

18   frequency, but there's just going to be some markets that we

19   don't compete in as much or as hard.

20   Q.  Okay.  So here Mr. Goodman is proposing adding new

21   service between New York and cities like "CAE."  Is that

22   Columbia, South Carolina?

23   A.  That's correct.  That would be one of those cities.

24   Q.  And Charleston, South Carolina, is that "CHS"?

25   A.  Correct.

1    **Q.**  And how about EYS?  What's that?

2             THE COURT:  E or T?

3             THE WITNESS:  Oh.  "TYS."  Thanks Knoxville.

4             MS. SWEENEY:  Okay.  Thank you.

5    BY MS. SWEENEY:

6    **Q.**  And then for "Future," he's proposing adding frequencies

7    and another O and D, right?  He goes on to say, "Continue to

8    add frequency in strong box 2.0 markets.  Austin" --

9             And what's SAI?

10   **A.**  That's "SAT," San Antonio, Texas.

11   **Q.**  Okay.  Thank you.

12            So in this time period, it's fair to say that

13   Mr. Goodman, together with Mr. Reisinger, were proposing

14   adding these markets for the New York based flights, correct?

15   **A.**  Yeah, they were proposing them.  The irony of this New

16   York strategy is it's actually not a New York strategy; it's

17   a rest-of-the-country strategy.  And yeah, they were

18   proposing those things, things that didn't come to

19   materialize because Austin and San Antonio are, in the world

20   of the airline, more expensive than Knoxville.  Because

21   they're further away, it consumes more airplanes.  So that's

22   why that's a future thing to do, because it's a very

23   expensive thing.  And we know that if we are going to Austin,

24   it probably wouldn't be performing as well for us.

25   **Q.**  But these were strategies -- so in other words, your

1   answer is, yes, they were proposing adding these new flights,

2   correct?

3   **A.**   They were proposing it.  And as you can tell, it was a

4   pretty -- as I assessed at the time, a pretty marginal

5   strategy to go.  It's making the best of a bad situation is

6   really what it is.

7   **Q.**   Let's turn to Plaintiffs' Exhibit 128.  And this exhibit

8   is in evidence, but it has redactions, so we'll need to

9   publish the redacted version.

10          So this is a June 15, 2019, e-mail exchange that

11   you had with the pilot, correct?

12   **A.**   Yes.

13   **Q.**   Okay.  And this was -- this was around the time that you

14   received that New York -- this was maybe a month after you

15   received that New York strategy one-pager; is that right?

16   **A.**   Correct.

17   **Q.**   Okay.  Now, and so in this e-mail that is Plaintiffs'

18   Exhibit 128, the pilot is asking you about American's plans

19   to expand its capacity in New York City, right?

20   **A.**   Correct.

21   **Q.**   And you respond -- let's look at the first paragraph of

22   your response.  And in the fourth line down, you say -- and

23   this starts near the end of that -- yeah, fourth line.

24   "Over" is the first word.  You say, "Over time, the little

25   RJs will slowly get up-gauged," right?

1  **A.**  Yes.

2  **Q.**  And that's what we were talking about before, American

3  had this plan to replace those single class, small regional

4  jets with larger, two-class regional jets, right?

5  **A.**  Yes.

6  For what it's worth, that's kind of across our

7  system at this time.  But, yes, true.

8  **Q.**  Okay.  Thank you.

9  And then below that, in the second paragraph, you

10 say, "We are looking at MCO again?"

11 What is that?

12 **A.**  Orlando.

13 **Q.**  Orlando.  "In fact, we are rethinking a lot of New York

14 City to sunshine markets as winter comes."

15 Right?

16 **A.**  Correct.

17 **Q.**  And those other sunshine markets that you're referring to

18 there are Florida, the Caribbean, and South America; is that

19 right?

20 **A.**  Yeah, we oftentimes -- when we talk about the sunshine,

21 it's pretty much anything in the Southwest or the southeast,

22 so that includes things like DFW, Phoenix, other stuff.

23 **Q.**  Thank you.  Let's turn -- we can put this aside and let's

24 turn to Plaintiffs' Exhibit 119.  And again, this is in

25 evidence.  It's one that we already looked at today.  And

1    earlier when we looked at this Exhibit, it was in connection

2    with Boston and now I want to focus on New York.  And in

3    particular, the paragraph that starts "NLGA," under the

4    numbered paragraph 1.  Do you see that?

5    **A.**  I do.

6    **Q.**  Okay.  In this e-mail, he says, "Total flights and NML/RJ

7    slit is unlikely to change."

8            And that's a reference to mainline regional jet?

9    **A.**  Correct.

10   **Q.**  So you'll have the same number of mainline jets and

11   regional jets, but then he goes on to say, "But all RJ are

12   two class."  Right?

13   **A.**  Correct.

14   **Q.**  And here, again, what he's referring to is this

15   up-gauging that we've been talking about.  American was going

16   to replace all of those regional jets with two class larger

17   regional jets, right?

18   **A.**  Yeah, this is me saying it, though, not him.

19   **Q.**  Oh, I'm sorry.  Thank you very much for that

20   clarification.  Okay.  We can put that exhibit aside.

21           Now, you mentioned a couple times that the three

22   slot constrained airports?

23   **A.**  Yes.

24   **Q.**  Right?  And at JFK, American has, what, around 200 slots;

25   is that fair?

1    **A.**   Individual slots, yes, we usually count them in pairs, so

2    we call it 100 pairs, but --

3    **Q.**   And then at LaGuardia, American has around 170?

4    **A.**   Ballpark, yes.

5    **Q.**   Okay.  And would you agree that slots are a scarce

6    resource in those airports?

7    **A.**   Certainly.

8    **Q.**   And would you agree that they're a valuable resource?

9    **A.**   I do.  I would.

10   **Q.**   And would you agree that there is high demand for those

11   slots or slot pairs, as you call them?

12   **A.**   There's a lot of demand, but oftentimes from very few

13   carriers, yes.

14   **Q.**   And in those airports, if you don't use your slots, you

15   can lose them; is that right?

16   **A.**   Certainly.

17   **Q.**   And it's also true, isn't it, that some airlines don't

18   have any slots at LaGuardia and JFK?

19   **A.**   Yes, that's true.

20   **Q.**   And is it also true that there are some airlines that

21   have tried to get slots at those airports and couldn't?

22   **A.**   I suspect that's true, yes.

23   **Q.**   And at JFK, for example, there are no ultra low cost

24   carriers that have slots, correct?

25   **A.**   Not to my knowledge right now.

1   **Q.**   So your answer is correct, there's no ULCC that has a

2   slot at JFK?

3   **A.**   Correct.  And I'm not trying to be too cute by half, but

4   the way these slots work, sometimes people own slots but they

5   lease out the slots and things like that.  I don't know the

6   entirety of everyone else's slot holds, other than what gets

7   publically filed.

8   **Q.**   Okay.  And how about at LaGuardia?  At LaGuardia only a

9   tiny percentage of the slot pairs are held by ultra low cost

10   carriers, correct?

11   **A.**   Yeah, I don't know how tiny tiny is, but yes.  A smaller

12   percentage than there are for us and Delta.  That's for sure.

13   **Q.**   And going back to the use it or lose it issue, so if you

14   don't use your slot, then the FAA can recall that slot,

15   right?

16   **A.**   True.

17   **Q.**   And then the FAA can auction it off; is that right?

18   **A.**   Whatever the FAA deems is -- the FAA has jurisdiction

19   over the slots.  They can grant them, they can auction them,

20   they can do whatever they think is right.

21   **Q.**   So the FAA can give that slot or sell that slot to one

22   American Airlines's competitors; is that right?

23   **A.**   True.

24   **Q.**   Is your answer yes?  I'm sorry.  I don't mean to speak

25   over you.

1  **A.**  Yes.  No.  No, you're fine.

2  **Q.**  And that would include the ULCCs?

3  **A.**  It would.

4  **Q.**  Now, it's also true, isn't it, that some slots are leased

5  by airlines to other airlines, right?

6  **A.**  That's also true.

7  **Q.**  And in that case, if you lease your slot to another

8  airline for, say, a short period of time, you get that slot

9  back at the end of that period of time, right?

10  **A.**  When the lease expires, yes.

11  **Q.**  Okay.  And if, say, American Airlines had leased a slot

12  to Delta, during that period of time when that slot was

13  leased, it would not be available to any other bidder, say a

14  low cost -- an ultra low cost carrier, right?

15  **A.**  Yeah, because Delta would be using it.

16  **Q.**  Let's turn to Plaintiffs' Exhibit 298.  This is in

17  evidence.

18         This is a February 5th, 2019 e-mail regarding

19  updates to American Airlines' JFK slot portfolio.  And

20  there's several different e-mails here, and I want to focus

21  on Brent Alex, he's the manager of Global Access; is that

22  right?

23  **A.**  Correct.  At the time he was, yes.

24  **Q.**  So this is a couple of different e-mails and it starts

25  out -- Brent Alex writes to his colleagues at American, not

1    including you, and I'm looking at the paragraph -- I think

2    it's on the second page.

3    **A.**   Yes.

4    **Q.**   And he says "We've been in talks."  Do you see that?

5    "We've been in talks with the FAA?"

6    **A.**   Yes.

7    **Q.**   So he says, "We've been in talks with the FAA regarding

8    American Airlines' utilization of our JFK portfolio, dating

9    back to at least the time of the merger."

10             Do you see that?

11   **A.**   Yes.

12   **Q.**   Now, when he says dating back to at least the time of the

13   merger, is he talking about the American Airlines/US Airways

14   merger?

15   **A.**   He is.

16   **Q.**   And what year did that occur?

17   **A.**   That close date was 2014.

18   **Q.**   Okay.  And then Mr. Alex goes on to say, "Since then,

19   American Airlines has not utilized our full portfolio."

20             Do you see that?

21   **A.**   Yes.

22   **Q.**   And then later, I'm not sure if it's in the same

23   paragraph, he says, "We've been advised that slot utilization

24   at JFK/LaGuardia will be under stricter scrutiny going

25   forward.  In summary, we came to an agreement with the FAA to

1    give back seven permanent slots."

2                 Did I read that correctly?

3    **A.**  Yes.  Yes.

4    **Q.**  Okay.  So American Airlines had to give back seven

5    permanent slots at JFK because it was not fully utilizing

6    those slots; is that right?

7    **A.**  That's correct.

8    **Q.**  Okay.  And then you respond -- there's a step in the

9    middle here which is that e-mail gets forwarded to you by

10   someone else, right?

11   **A.**  Yup.

12   **Q.**  Okay.  And you respond to that e-mail.  You say, "One

13   important thing.  Don't cast this that we lost slots.  We

14   didn't use all of our slots for years, to the point that no

15   one knew our true baseline.  We thought 216.  They thought

16   200."

17                 Did you write that?

18   **A.**  I did.

19   **Q.**  Okay.  So you're saying here that American Airlines

20   didn't use all of your slots for years.  Right?

21   **A.**  Yeah.  And we didn't for the worst of reasons.  When we

22   put together the merger, our process for accounting for slots

23   was extremely manual, and we had the wrong count.  I was

24   saying don't cast this that we lost slots because I was

25   beside myself that we had.  So my advice to Glenn Martin, who

1   was the director of this group at the time, is that I am

2   going to handle the explanation of this that our post-merger

3   accounting for these slots was poor, and this is what's

4   happened.

5   **Q.**  But you would agree that there was an underutilization

6   for years, right?

7   **A.**  An unintentional one for the worst of reasons because we

8   didn't count right.

9   **Q.**  Mr. Raja, let's turn to another exhibit.  Can you put --

10  let's look at Plaintiffs' Exhibit --

11              THE COURT:  So what you're saying is there were

12  slots you didn't use.

13              THE WITNESS:  Correct.

14              THE COURT:  And you say that the reason that you

15  didn't use them was because you didn't realize you had them.

16              THE WITNESS:  That's exactly right.

17              THE COURT:  Okay.

18              THE WITNESS:  Which -- before I make everybody

19  sound completely ridiculous in this, AMR had slots,

20  US Airways had slots, and these slots are denominated at

21  different times through the year and there's a process by

22  which we track them.  Whenever we put these two things

23  together, effectively, in that merge, we lost tracking of

24  this number of slots and the unique slot IDs that go with

25  them.  And along the way in the merger -- there's no good

1    reason for it, but, yes.  And as you can tell, I'm still

2    probably a little beside myself that that happened.

3    BY MS. SWEENEY:

4    Q.  I would like to turn now to Plaintiff's Exhibit --

5              THE COURT:  I'm sorry, one more question.

6              MS. SWEENEY:  I'm sorry.

7              THE COURT:  The underutilization, one aspect of

8    underutilization is whether there were these slots that you

9    didn't use, right?

10             THE WITNESS:  Correct.

11             THE COURT:  As to the slots that you did use, were

12   those underutilized?  Was this referring to that, also, or

13   no?

14             THE WITNESS:  This, as I recall it -- and I'm going

15   off of memory here.  This is really recalling the fact that

16   we weren't using the slots, because effectively, the FAA

17   thought that we had 16-ish slots more than what we -- they

18   were counting us as having more than what we did.  So when

19   you take all of our operations divided by slots, it looks

20   like that.

21             THE COURT:  Were you underutilizing the slots that

22   you knew you had?

23             THE WITNESS:  We were not endeavoring to

24   underutilize the slots at all.

25             THE COURT:  Not endeavoring, but that fact.

1          THE WITNESS:  There were periods along the way

2    where we had, sure.  But unfortunately, for the worst of

3    reasons, as we were putting the airline together, the

4    actual -- the schedule processes of these two things were not

5    always very lined up.

6          I mean, there's a lot of things in our institution

7    at that time that was not great business processes, and that

8    drove a lot more of the underutilization than anything else.

9    So yes, there were definitely periods along the way where we

10   did, true.

11         THE COURT:  Go ahead.

12   BY MS. SWEENEY:

13   Q.  Can you turn to Plaintiffs' Exhibit 257.  This is not in

14   evidence.  This is a December 8, 2019, e-mailing -- e-mail

15   updating Mr. Raja on the FAA position before -- before your

16   formal meeting with the FAA.  Is that right, Mr. Raja?

17   A.  Correct.

18   Q.  And this is an e-mail that you received on or around that

19   date, correct?

20   A.  That's correct.

21         MS. SWEENEY:  Okay.  Plaintiffs' move for the

22   admission of Plaintiffs' Exhibit 257.

23         MR. WALL:  Your Honor, this issue is this is

24   hearsay.  There's a hearsay issue, but it may not have

25   anything to do with what she's asking about.  I don't know.

1    There's a reporting here of what third-parties are saying.

2    And again, if it's not offered for the truth, it's fine.

3            MS. SWEENEY:  We're not offering the third-party

4    statements for the truth, Your Honor.

5            THE COURT:  All right.  Fine.  Then I admit it with

6    that caveat.

7            (Plaintiff Exhibit No. 247 admitted into evidence.)

8            THE COURT:  Go ahead.  You can display it.

9            MS. SWEENEY:  Thank you.

10           Now, I apologize for my slowness, but I'm looking

11   for it in the documents.

12           THE COURT:  That's fine.  You're not slow.

13           MS. SWEENEY:  And it says FAA may not look -- I

14   can't find it in the document, though, so that's what I'm

15   struggling with.  I'm trying to direct the trial director.

16           THE COURT:  What are you looking for?

17           MR. DAVIS:  It starts out, "FAA may not look as

18   favorably."

19           Top of page 2.  Thank you very much.

20   BY MS. SWEENEY:

21   **Q.**  The top of page 2 it says, "FAA may not look as favorably

22   upon an S20 MAX waiver request as it has."

23           Now, S20 refers to the summer of 2020, right?

24   **A.**  Correct.

25   **Q.**  And so the slots pairs come in seasons of winter or

1    summer; is that right?

2    **A.**   That's right.

3    **Q.**   And the MAX waiver is a waiver that American Airlines

4    received to underutilizing the slot below the 80 percent

5    threshold because of the grounding of the MAX jet, correct?

6    **A.**   That's correct.

7    **Q.**   Okay.  And it goes on to say, "Where FAA may not look as

8    favorably upon a waiver request, particularly with a large

9    number of slots we're not planning to use at JFK."

10   **A.**   Correct.

11   **Q.**   And then it goes on to say, "Demand for JFK is high, so

12   sitting on unused capacity is not good."

13   **A.**   That's correct.

14   **Q.**   Okay.  So it's true that during this time period, demand

15   for slots at JFK was high, right?

16   **A.**   True.

17   **Q.**   And here is it -- it looks as if American Airlines was

18   sitting on unused capacity, right?

19   **A.**   Not by our choice.  It was because the 737 MAX wasn't

20   flying; otherwise, it would not have been underutilized.

21   **Q.**   Well, but that's only true for a certain period of time

22   that you had that MAX waiver, correct?

23   **A.**   That's correct.  The summer of '19 and winter of '19

24   season was when the MAX was down.

25   **Q.**   And at some point, the FAA refused to renew the request

1   for a waiver for the grounding of the MAX, correct?

2   **A.**   Yes.   Indeed.   What this is the precursor to is a meeting

3   that I took with some senior officials at the FAA, in which

4   they were -- though they were very sympathetic about the

5   MAX -- and at the time, we didn't know when the MAX would be

6   back up and flying.   They said, "Before we go and do any

7   further waivers, we want to know that you and American are

8   doing all that you can to go and get other people to go cover

9   slots for you, until such time that the MAX is back."

10  **Q.**   We can put this exhibit aside.

11          And ultimately, you entered into some lease

12  agreements; is that right?

13  **A.**   We did.   We tried to enter into a lot of these

14  agreements.

15  **Q.**   And you leased five to Delta; is that right?

16  **A.**   I should say this.   We started entering into those lease

17  agreements shortly after that.   A few weeks before the start

18  of the summer '20 season, COVID happened, so nobody was

19  flying any of the slots at that point in time.   A little bit

20  of this became moot.

21  **Q.**   Understood.   But ultimately, you leased the bulk of those

22  slots that you couldn't use or weren't utilizing at that time

23  to JetBlue; is that right?

24  **A.**   We -- I mean, ultimately the agreement was moot, but we

25  had a deal in principle, yes.   A deal in principle to do so,

```
1    true.
2              MS. SWEENEY:  Okay.  Let's look at one of those
3    documents.  Let's look at Plaintiffs' Exhibit 267.  This is
4    in evidence.  It has some redactions.
5              THE COURT:  Go ahead.
6              MS. SWEENEY:  And this is a demonstrative for
7    Plaintiffs' Exhibit 267.  And I don't believe there's any
8    objections to the use of this demonstrative.
9              THE COURT:  Okay.  It's fine.  No objection.
10   BY MS. SWEENEY:
11   Q.  Okay.  This is a series of text messages between you and
12   Brent Alex, right?
13   A.  It is.
14   Q.  And this is in early January of 2020?
15   A.  True.
16   Q.  And in the first text, Mr. Alex writes, "B6 taking up to
17   27 of 40 slots.  The other day they said 11 slots.  Holy
18   smokes, jackpot," right?
19   A.  Yes.
20   Q.  And you respond by saying, "Just saw it and had the same
21   reaction"?
22   A.  Yes.
23   Q.  So both of you are expressing relief and excitement that
24   those slots are being released, correct?
25   A.  Absolutely.  And the context of this document is very
```

1    important.  So coming out of my meeting with the FAA, they

2    told us, "Look, we're very sympathetic about the MAX, but we

3    don't know how long this is going to be down in the future.

4    In summer of 2020, we have a lot of demand for slots.  You,

5    American Airlines, we don't care if you have to hold your

6    nose and do deals with Delta or Spirit Airlines or JetBlue or

7    anybody else, go try to cover as many slots as you possibly

8    can on your own.  Then if you're unable to cover them and the

9    MAX is still down, come back to us and let's talk."

10           So this is now January.  In April, the summer of

11   2020 season starts, so people are in the final throes of

12   actually building their schedules.  So we're basically going

13   as beggars to our competitors trying to get them to cover

14   these things, or we would lose them.

15           So we called everybody:  JetBlue, Delta, Spirit.

16   And everyone recognized the relative amounts of leverage that

17   they had on us.  JetBlue saw it as a sign to go and get more.

18   Delta Air Lines reached out to me, and Esposito, when we

19   actually did talk, what he wanted to say was he just wanted

20   to buy up all of our New York slots, which that conversation

21   didn't go any further.  Spirit Airlines we had talked to, but

22   there was some issue because they didn't want to be hosted by

23   us in our terminal, forget the particulars.

24           And so what ended up happening was the people who

25   ended up -- the first ones to the party were JetBlue, and so

1    we were reacting, holy smokes, jackpot, because in this thing

2    where we literally thought we would have 14 days to go and

3    move these slots, we were able to move a material number of

4    them.

5              And we were also reaching out to international

6    carriers.  I think we reached out to cargo carriers along the

7    way.  It was a uniquely crazy period brought purely by the

8    MAX.

9    Q.  Mr. Raja.  Thank you for that answer.  I just want to

10   request that you answer -- the questions that can be answered

11   with a yes or no with a yes or no.  I understand you want to

12   explain, but your counsel will have an opportunity to ask you

13   questions after I sit down, and we are operating on a clock.

14   Is that okay?

15   A.  Sure.  Sorry.

16   Q.  Okay.  I'd like to introduce -- I'd like to look at

17   Plaintiffs' Exhibit 51.  And I don't think this is in your

18   binder, so I'm going to hand out some copies.

19             My mistake, it's in the binder.

20             THE COURT:  What exhibit number did you say?

21             MS. SWEENEY:  Plaintiffs' Exhibit 51.

22             THE COURT:  Thank you.

23             MS. SWEENEY:  This is in evidence, it's an e-mail

24   from Mitchell Goodman to you, dated October 8, 2019.  And

25   your response.  Correct?

1   **A.**  Yes.

2   **Q.**  Okay.  It actually starts out at the bottom with an

3   e-mail from Margaret Muir, correct?

4   **A.**  I'm catching up, but yes.  That looks right.

5   **Q.**  Okay.  And what was Ms. Muir's position at that point in

6   time?

7   **A.**  She was a manager in our domestic route planning team.

8   **Q.**  Okay.  And her e-mail is about highlights of this week's

9   OFS changes.  What are OFS changes?

10  **A.**  OFS is a shorthand for out force sale, the schedule that

11  customers can actually purchase and see we refer in shorthand

12  as OFS, out for sale.

13  **Q.**  Okay.  And then looking at -- okay.  Let's turn now to

14  the response to her e-mail from Mr. Goodman.  And he asked a

15  question about LGA, which is LaGuardia, right?

16  **A.**  Yes.

17  **Q.**  Okay.  And then I believe you're on the next e-mail -- or

18  the answer is not the season, and then there's an e-mail from

19  you above that.  This is dated October 8, 2019, at 6:13 p.m.

20  And you say, "Roger that, keep pushing it."  And then you

21  say, "Related, when we start flying our New York City slots,

22  what if we actually flew some JFK we liked and take the RJs

23  out?"  Right?

24  **A.**  Yes.

25  **Q.**  This is what we were talking about before, this was

1   replacing the small regional jets with larger regional jets,

2   right?

3   **A.**   This is actually trying to compare it with the scale of

4   cost at Kennedy.  The challenging with the larger regional

5   jet at JFK, is it's still -- the beauty of JFK is you can fly

6   outside of the LaGuardia perimeter.  So the reference to what

7   if we were to take something out is me kind of pushing that

8   like could we actually do something bigger or bolder with

9   Kennedy?

10  **Q.**   And then above that, you have a response from

11  Mr. Goodman, right?

12  **A.**   Right.

13  **Q.**   And the third paragraph down, he says, "The long term

14  plan for JFK still involves some regional jet flying so we

15  can have the best spoke patterns to New York City."  And then

16  he goes on to say, "And RJs, regional jets, are good to fly

17  slots we may want for international growth in the next few

18  years."

19          Did I read that correctly?

20  **A.**   You did.

21  **Q.**   So here what Mr. Goodman is alluding to is that sometimes

22  American has sat on slots in order to hold on to them in case

23  they wanted them in the future, right?

24  **A.**   No, he's actually referring to something -- a unique

25  contrivance in the schedule.  Like people want to be able to

1    go from -- I'll make it up, JFK to Raleigh Durham at 8:00

2    a.m. and come back at 5:00 p.m., but in order to go and make

3    the aircraft rotation work efficiently, something's got to

4    fly at 2:00 p.m. or 4:00 p.m..  Those slots are not

5    particularly valuable when you do them domestically, not a

6    lot of people go places at 2:00 p.m.  Internationally, those

7    things start to become much more valuable.  Those start to

8    come in arrivals when European flights can come in.  So what

9    he's trying to say -- I'm trying to push like how can we do

10   something bigger in New York and he's saying, effectively, in

11   Kennedy, we still have some RJ flying, because once -- like

12   if we ever are going to do the international stuff, we're

13   going to need to keep a schedule pattern to places like

14   Raleigh-Durham or what have you, whatever he was thinking at

15   the time.

16   **Q.**  Let me ask a follow-up question on that.

17           He says, "And RJs are good to fly slots we may want

18   for international growth in the next few years."  So let me

19   ask you about this.  When you have a regional jet flying a

20   slot, say it's a small regional jet, it doesn't seat very

21   many passengers, that fulfills your obligation to use it or

22   lose it, right?

23   **A.**  Oh, sure, if it fills the obligation.  But that's not

24   actually the thing he's -- I didn't read it as that's what he

25   intended here.

1    **Q.**  So if you fly a small jet, it doesn't matter the size of

2    the jet, as long as you're using that slot to fly an airplane

3    somewhere with some passengers, correct?

4    **A.**  Yeah.  Once you're flying something on the slot, you get

5    to use the slot.  But he's talking here, the spoke patterns

6    is the keyword there.

7    **Q.**  Mr. Raja, would you agree that American thinks that

8    further consolidation of the domestic airline industry is a

9    good thing?

10   **A.**  I -- when you put it like that, I wouldn't say it exactly

11   like that.  Consolidation has been good for us.  What

12   consolidation looks in the future, we don't know.  We're open

13   to it, certainly.  But we think there's a lot of ways that we

14   can go do it, like go create value for the customers is what

15   I mean.

16   **Q.**  Let's look at Plaintiffs' Exhibit 306.  This is in

17   evidence.  It's redacted, so we'll display a redacted

18   version.

19            Do you have that in front of you?

20   **A.**  I do.  I do.  Sorry.  I didn't know you were waiting on

21   me.

22   **Q.**  And I'd like you to take a look at the page -- this is --

23   it's an e-mail chain between you and Mr. Mancini; correct?

24   **A.**  That's correct.

25   **Q.**  And it's May 16, 2021?

1    **A.**  Correct.

2    **Q.**  And these are some slides that you prepared in advance of

3    the July board of directors meeting?

4    **A.**  That's right.

5    **Q.**  And then if you could turn to the page that has the

6    footer on it that says, "What is our strategy?"  This is in

7    the attachment.

8              Do you have that?

9    **A.**  I do have the attachment.  I'm sorry, was there someplace

10   that I should be looking right now?

11   **Q.**  Yeah, there are footers at the bottom, and one of them

12   says, "What is our strategy?"  There's a number there, it is

13   called a Bates number, and it ends in 1238.  And we can

14   display that on the screen -- we can, but it is completely

15   redacted.

16   **A.**  Oh, yeah.  Fair enough.

17            MR. WALL:  Just for clarification, are you talking

18   about a slide?

19            THE WITNESS:  Oh, yeah.  I see it now.  I'm sorry,

20   I find it.

21            MS. SWEENEY:  I believe it's an Excel sheet.

22            THE WITNESS:  Yeah, I got you.  It is.

23   BY MS. SWEENEY:

24   **Q.**  Now, because American has redacted this page, I'm going

25   to ask you not to read it aloud.  But looking at the column

1    B, the second column to the right, at the very top, starting

2    with the word "given," can you please read that silently?

3    **A.**   (Witness reads document.)  Okay.  I've read it.

4    **Q.**   And this reflects your thinking at the time that you

5    prepared these slides in May of 2019.  Is that fair?

6    **A.**   Yes, that's what I was thinking at the time.

7            THE COURT:  Can you just direct me?  Which page

8    again?

9            MS. SWEENEY:  It has Bates number that ends in

10   1238, and it has the words, "What is our strategy," in the

11   bottom, right-hand corner.  And I apologize, it's hard to

12   read.

13           THE COURT:  I have 1238.  It says, "How to create

14   value," in the bottom, right corner.

15           MR. WALL:  Your Honor, every page here ends with

16   1238, and then they have different words after it.

17           THE COURT:  Oh, I see.

18           THE WITNESS:  It's the second to the last page.

19           MR. CONGDON:  I believe it's the fourth page.

20           THE COURT:  I thought it was --

21           THE WITNESS:  Ouch.

22           THE COURT:  Okay.  Go ahead.  Got it.

23   BY MS. SWEENEY:

24   **Q.**   So in May of 2019, this sentence at the top of this

25   redacted section reflects your thinking at the time, right?

1    **A.**  Yes.

2    **Q.**  Okay.  Let's put that exhibit aside.

3         And can we look at Plaintiffs' Exhibit 125.  This

4    also is in evidence and is redacted.

5         And this e-mail is a cover e-mail containing some

6    slides, right?

7    **A.**  Yes.

8    **Q.**  And you prepared the draft of some of these slides, which

9    is reflected in the text of the e-mail itself, below your

10   e-mail, dated October 9, 2019, correct?

11   **A.**  Yes.  That looks like it, yes.

12   **Q.**  Okay.  So let's look at the very first page of this

13   exhibit, and in the left-hand column, the first row is

14   JetBlue, right?

15   **A.**  Yes.

16   **Q.**  And at the time, you did not have any kind of a

17   partnership with JetBlue, right?

18   **A.**  Correct.

19   **Q.**  And then reading across that first row, in the third

20   column, under the heading of "Potential Value," there are

21   several bullet points.  Do you see that?

22   **A.**  Yes.

23   **Q.**  And the very first bullet point says, "Further domestic

24   consolidation," right?

25   **A.**  Correct.

1   **Q.**  So this was, what?  Three months before you started

2   discussing with JetBlue the partnership that ultimately

3   became the Northeast Alliance?

4   **A.**  That's correct.

5   **Q.**  Okay.  Let's look at another Exhibit.  This is

6   Plaintiffs' Exhibit 161.  And again, this is in evidence, but

7   it has some redactions.

8         This is an e-mail thread between you and Robert

9   Isom and Sue Sanders from February of 2020, regarding an

10  agenda, correct?

11  **A.**  I'm sorry, I'm not on the same page.  Will you tell me

12  again what number it was?

13  **Q.**  It's Plaintiffs' Exhibit 161, and I'm looking at the

14  first page, which is a cover e-mail?

15         MR. WALL:  I don't think we have that.

16         MS. SWEENEY:  Okay.  I'm sorry, let me look here.

17  I have it here.

18         THE COURT:  It's not in my binder, either.

19         MS. SWEENEY:  Okay.  We'll move on to another

20  exhibit, Your Honor.  Let's turn to Plaintiffs' Exhibit 74.

21  And this is in evidence.

22  BY MS. SWEENEY:

23  **Q.**  So Mr. Raja, are these some materials that were prepared

24  for a meeting that you were going to have with Robert Isom?

25  **A.**  Yes.

1    **Q.**   And this is in February of 2020?

2    **A.**   That's right.

3    **Q.**   And if you could turn to the third slide in the

4    attachment, the title is, "Partnership post Big 3"?

5    **A.**   Sure.

6    **Q.**   Do you see that?

7    **A.**   Yes.

8    **Q.**   And a lot of this is redacted, but the questions that I'm

9    going to ask you right now aren't part of the redacted part.

10            But "Partnership Priorities post Big 3," now Big 3

11   there is referring to the partnerships that American

12   established -- strike that.

13            Two of the big three partnerships that are being

14   referred to there are the WCIA and the NEA, right?

15   **A.**   I don't actually recall, but I -- I believe that to be

16   the case.

17   **Q.**   Okay.  And then if you look at about two-thirds of the

18   way down the slide, just below that redaction, there's a

19   bullet point that says, "Continue what we started in the

20   Americas."

21            Do you see that?

22   **A.**   Yes.

23   **Q.**   And then there's a bullet point there, and the part

24   that's not redacted refers to JetBlue, correct?

25   **A.**   Yes.

1   **Q.**  So the plan was to continue to develop these

2   partnerships, correct?

3   **A.**  Correct.

4   **Q.**  And then if you go to the next page of this -- the next

5   slide in this deck --

6   **A.**  Yes.

7   **Q.**  Here you are assigning roles; is that right?

8   **A.**  Yes.

9   **Q.**  And the first box says, "Parker," right?

10  **A.**  That's right.

11  **Q.**  And Doug Parker, is that who that's referring to?

12  **A.**  Yes.

13  **Q.**  And at that time, was he then the CEO of American

14  Airlines?

15  **A.**  Yes, he was.

16  **Q.**  And in this slide that you helped prepare, why don't you

17  read the role that you assigned to Mr. Parker in the second

18  column?

19  **A.**  "Godfather of consolidation, involved only at deal

20  closing or for true M and A."

21  **Q.**  So you referred to the then CEO of American Airlines as

22  the godfather of consolidation; is that right?

23  **A.**  That's how we tease him, because others in the media have

24  referred to him in that fashion.

25  **Q.**  And that's how you refer to him yourself, right?

1    **A.**   More pulling his leg.  His personality is anything but

2    what it would be like in that movie.  That's why we got such

3    a rise out of it.

4         MS. SWEENEY:  I'm sorry.  I'm looking for that

5    missing exhibit.  It will just take me one second.

6         THE COURT:  Take your time.

7         MS. SWEENEY:  Your Honor, I appreciate that it's

8    early; would you mind if we broke for lunch now, and I could

9    find that exhibit?

10        THE COURT:  Sure.

11        MS. SWEENEY:  Thank you very much.  I appreciate

12   it.

13        THE COURT:  We'll break now.

14        So I have a 2 o'clock hearing in another case, so

15   I'm fine.  What we'll do is we'll break, we'll resume --

16        What time are we resuming today.

17        THE DEPUTY CLERK:  2:45.

18        THE COURT:  2:45.  I'll make sure we're done by

19   2:45, and I'll just add 15 minutes at the end of the day.

20        MR. JONES:  Thank you, Your Honor.

21        MS. SWEENEY:  Thank you, Your Honor.

22        THE COURT:  We stand in recess.

23        (Court in recess at 12:47 p.m.

24        and reconvened at 2:50 p.m.)

25        THE COURT:  Everybody ready to go?

1          MS. SWEENEY:  Yes, Your Honor.

2          THE COURT:  All right.  Go ahead.

3    BY MS. SWEENEY:

4    Q.  Mr. Raja, before the break, I -- I was trying to find a

5    particular document, and I think we finally found it.  This

6    is Plaintiffs' Exhibit 161, which is in evidence.  It has

7    some redactions, but we can publish the redacted version,

8    Your Honor?

9          THE COURT:  Yes.

10         MS. SWEENEY:  Okay.

11   BY MS. SWEENEY:

12   Q.  Have you had a chance to look at that, Mr. Raja?

13   A.  Yes, I'm just reading it now.

14         Okay.  All good.

15   Q.  Okay.  Thank you.

16         So this is an e-mail that you sent to Devon May

17   in -- on October 6th, 2019; is that right?

18   A.  Correct.

19   Q.  And the subject is transition and there's an attachment

20   called "partner priorities thoughts," right?

21   A.  Yes.

22   Q.  So this was around the time that you transitioned to the

23   position of -- where you were in charge of the strategy

24   for -- the network strategy; is that right?

25   A.  Correct.

1    **Q.**  Okay.  And this is some ideas that you had; is that fair?

2    **A.**  Yes.  It sounds like it.  I think it's really about

3    transitioning, because a lot of this stuff was reporting to

4    him.  It was going to come report to me.

5    **Q.**  Okay.  So let's look at the -- I think it's actually the

6    second page of the exhibit, but the first page of the

7    attachment -- or -- strike that.

8    So on the first page, you say, "Here's a list of

9    transition thoughts."  And then -- so let's go back to the

10    first page.  My apologies.  And you say, "I made a list of

11    what I think are near-term projects and long-term projects"?

12    **A.**  Correct.

13    **Q.**  Okay.  And then -- I'm trying to figure out what parts

14    are redacted, which is most of it.  Let's see.  Let's go to

15    the next page of this exhibit.

16    Okay.  So because these -- these bullet points are

17    redacted, I'm not going to ask you any questions about the

18    first couple of bullets, but I'd like you to go to the next

19    page.

20    THE COURT:  I only have two pages.

21    MR. WALL:  Yeah, we only have two pages.

22    MS. SWEENEY:  We're --

23    THE WITNESS:  Front and back?  You mean the back?

24    BY MS. SWEENEY:

25    **Q.**  Yeah, just front and back.  So let's look at the back.

1   It's the second page.  I'm sorry.  And at the top, it says,

2   "Next six months' projects.  All are concurrent."

3          Do you see that?

4   **A.**  I do.

5   **Q.**  And then it says, "secure the homeland," right?

6   **A.**  Yes.

7   **Q.**  And underneath, that it says, "B6, develop Boston

8   codeshare, slot swap, too."

9          Is that right?

10  **A.**  It does.

11  **Q.**  And that's something that you ultimately didn't pursue

12  with JetBlue, right?

13  **A.**  This is the formulation of a lot of things which turned

14  into the NEA.

15  **Q.**  Okay.  And then below that it says, "Alaska Airlines

16  rebuild with new baseline, develop a Pacific northwest

17  presence," right?

18  **A.**  Correct.

19  **Q.**  And that ultimately ended up being the WCIA; is that

20  right?

21  **A.**  That's right.

22  **Q.**  Now, there's a third bullet point, and I'd like you do

23  read that to yourself because American has redacted that

24  information.  Do you see it?

25  **A.**  I'm sorry.  The one right under Alaska?  Because there

1    are a couple --

2              THE COURT:  Yes.  Read it to yourself.  It's

3    redacted.

4              THE WITNESS:  Okay.  I've read it.

5    BY MS. SWEENEY:

6    **Q.**  It -- and is it fair that this was a part of your

7    thinking at the time about developing partnerships for

8    American Airlines?

9    **A.**  Yeah, although to put it by analogy, it's a bit like

10   throwing darts at the dart board.  I mean, there are some

11   things on here which, you know -- we were -- we were working

12   on a lot of things.  Most of the things on this list never

13   came to be and some of these things were -- like, the

14   documents.  It's just there for us to discuss.

15   **Q.**  Okay.  And I want to make sure -- my question was

16   probably a little unclear because it's hard with all the

17   redactions to see, but on the left, there are bullet points,

18   right?  And then there are sub-bullet points.  So what I

19   wanted you the look at is, after the fourth left-hand bullet

20   point and then the third sub-bullet point, right?  Do you see

21   that?

22   **A.**  Got it.

23   **Q.**  Okay.  And that's one of your transition thoughts, right?

24   **A.**  Yeah, for discussion --

25             THE COURT:  I'm not sure I got it.

1          MS. SWEENEY:  Sure.

2          THE COURT:  The fourth what?

3          MS. SWEENEY:  So it's the fourth-most left bullet

4    point, and then within that paragraph, it's the third bullet

5    point down.

6          MR. WALL:  Your Honor, just to take the mystery out

7    of it, it's the one that says "domestic consolidations."  I

8    think we can all talk about that.

9          THE COURT:  I got it.  Okay.  Fine.

10          MS. SWEENEY:  Okay.  Thank you.  We can set that

11    aside.

12          And, Your Honor, I'd like to -- I -- my colleagues

13    reminded me that I forgot to move into evidence DX89, which

14    is a Defense Exhibit.  There are no objections.  It's,

15    actually, I believe, DX89-A, B, and C.

16          MR. WALL:  No objection.

17          THE COURT:  There's no objection.  It's admitted.

18          (Defendant Exhibit No. DX89-A, B, and C admitted

19          into evidence.)

20          MS. SWEENEY:  Thank you.

21          Now, Mr. Raja, I'd like to return to Plaintiffs'

22    Exhibit 298, which we talked about earlier this morning.

23    That document is in evidence.

24          Can we put that on the screen, please.

25    BY MS SWEENEY:

1    Q.   And you were -- in your testimony you gave an explanation

2    about American's underutilization of its JFK slots, right?

3    A.   Correct.

4    Q.   So turning to the exhibit, let's look at the top of the

5    page.  And you wrote this on February 5, 2019; is that right?

6    A.   Correct.  This is the one on the screen?

7              THE COURT:  Yes.

8              THE WITNESS:  Yes.

9              Yes.

10   BY MS. SWEENEY:

11   Q.   Okay.  Thank you.  And you write, "We didn't use all of

12   our slots for years to the point that no one knew our true

13   baseline," right?

14   A.   Correct.

15   Q.   And then after that, you say, "We thought 216, they

16   thought 200."  Right?

17   A.   Correct.

18   Q.   And then the "we" here refers to American Airlines,

19   correct?

20   A.   Correct.

21   Q.   So American thought that it had 216 JFK slots, right?

22   A.   Correct.

23   Q.   And then the second half of that sentence says, "They

24   thought 200."  Do you see that?

25   A.   Correct.

1    **Q.**  And "they" is referring to the FAA, right?

2    **A.**  Yes.

3    **Q.**  Okay.  You can set that exhibit aside.

4         MS. MALTAS:  Now, I have a new exhibit which is not

5    in the binders.  This is Plaintiffs' Exhibit 282.  And this

6    is in evidence.

7         May we publish, Your Honor?

8         THE COURT:  Yes.

9    BY MS. SWEENEY:

10   **Q.**  Mr. Raja, Plaintiffs' Exhibit 282 is a letter from the

11   FAA to American Airlines dated February 26, 2020; is that

12   correct?

13   **A.**  Yes.  That's what it looks like.  Yep.

14   **Q.**  Okay.  Can you please turn to the fourth page of this

15   exhibit?

16   **A.**  I'm there.  Sorry.

17   **Q.**  Okay.  And if you look at the first full paragraph on

18   page 4, the letter states, "American's request with respect

19   to JFK notably seeks waivers for slots for which American had

20   not planned in the first instance to operate MAX aircraft."

21        Did I read that correctly?

22   **A.**  You did.

23   **Q.**  Now, please look at the second sentence where it says,

24   "FAA is not aware of instances where the MAX was scheduled by

25   American to be operated at JFK, nor has American asserted

1  otherwise."

2          Did I read that correctly?

3  **A.**  You read it correctly.

4  **Q.**  Okay.  Let's turn to the third sentence, which says,

5  "This aspect of American's request" -- and this is the FAA,

6  right? -- "is intentioned with a general expectation that a

7  slotholder seeking to retain its slots bears responsibility

8  to prioritize usage of its slots over other operations."

9          Do you see that?

10 **A.**  I do.

11 **Q.**  Now, in this letter, Mr. Raja, the FAA did grant

12 American's prior request for the MAX waiver for the

13 summer '19 -- summer 2019 season, right?

14 **A.**  Correct.

15 **Q.**  And it also granted the extension of the waiver for

16 winter 2019/2020, right?

17 **A.**  Correct.

18 **Q.**  But you understood, didn't you, Mr. Raja, that this

19 letter was plainly signaling that the FAA would not grant the

20 extension for the season summer 2020, right?

21 **A.**  Correct.

22 **Q.**  And -- and one of the reasons the FAA would not provide

23 the waiver for summer of 2020 was because American was not

24 actually using the MAX at JFK prior to the waiver; is that

25 right?

1   **A.**   This actually was the entirety of the nature of our

2   debate with FAA, because you see the thing with the 737 MAX,

3   which this is actually probably a very important technical

4   issue, the 737 MAX and how we operated and a 737 standard is

5   the same scheduled airplane.  So pilots can interchangeably

6   go between the two.

7           For American Airlines, one of our big 737 bases is

8   New York.  The other big base is in Miami.  The MAX was an

9   airplane which we had set to go into those two places.

10  Before we took delivery, the way the schedule resembled it,

11  it showed as an old 738, which in our scheduling code would

12  be a 38D.  The 73 MAX or 73M had not yet been introduced.  We

13  needed to take delivery of the airplane.

14          So though that sounds really technical, as the FAA

15  looked at it, they looked at the world and said, well, you

16  had 737s flying there, and you had other things that were

17  there.  It doesn't look like the MAX was in place.  For us,

18  those airplanes were going to fall out, and the MAX were

19  going to come in.

20          So this was exactly the nature of the whole thing.

21  The FAA would have to talk about their decision-making

22  process through it.  But for us, so much of the airplane, its

23  support, its line maintenance, everything was based out of

24  New York.  So as long as we weren't taking the MAX --

25  especially -- we were finding out when the crew schedule was

1   built that we had to go put the -- as we called it, the pain

2   of the MAX disproportionately into New York and Miami.  So --

3   sorry.

4   **Q.**  I'm sorry.  I didn't mean to interrupt you.  Are you

5   done?

6   **A.**  I was just going to say, so that's why they granted the

7   thing in arrears because nobody knew that the MAX was coming.

8           And, yeah -- and so indeed when you went back and

9   looked at it, it would say okay.  Well, we had the 737s.  The

10  MAX wasn't necessarily flying there.  That's true.  But

11  that's also why I said, but going forward, you know, you've

12  got to go and find your own sources for figuring out how you

13  go and manage slots.  That's why in the -- probably

14  concurrent with this thing, that's when we were going out and

15  trying to lease slots to -- especially Kennedy slots to

16  anybody we otherwise could.

17  **Q.**  And --

18  **A.**  Three weeks after this COVID came along, though.

19  **Q.**  And the FAA also concluded that what was initially a

20  highly unusual and unpredictable condition became a

21  foreseeable condition once the grounding went on in time,

22  correct?

23  **A.**  Correct.  And we concurred with it.  That's why we were

24  trying to find leaseholders or lessees.

25  **Q.**  Okay.  We can put that exhibit aside.

1          And can we turn, please, back to Plaintiffs'

2     Exhibit 282, which we looked at earlier today and is in

3     evidence.  I'm sorry; I -- DX89-B, which is the first slide

4     deck in the -- the slide deck that we looked at, number of

5     slides at, this morning.

6     **A.**  Got it.  I'm there.

7     **Q.**  Okay.  Thank you.

8          MS. SWEENEY:  And can we put that on the screen,

9     please?

10    BY MS. SWEENEY:

11    **Q.**  Let's turn to slide 93 in DX89.  And, again, that's the

12    first slide deck in this composite exhibit.

13         Okay.  And I guess what I was going to ask you

14    about is -- is redacted.

15         So I'm not going to talk about the numbers.  So I'm

16    just going to talk about the concepts in this chart, if

17    that's okay.  And we see a graph depicting the ASMs of

18    American, JetBlue, and Alaska together, right?

19    **A.**  Correct.

20    **Q.**  And below that line, we see United ASMs, right, right --

21    **A.**  Correct.

22    **Q.**  -- and Delta ASMs?  So in this exhibit, what's happening

23    is you're comparing the American marketing network, including

24    JetBlue and Alaska by virtue of the WCIA and the NEA to the

25    other airlines' networks; is that right?

1   **A.**   Correct.

2   **Q.**   Thank you.  We can put that exhibit aside.

3         MS. SWEENEY:  Now I'd like to turn to Plaintiffs'

4   Exhibit 917.  And this is not in your binder, so we're going

5   to distribute that.

6   BY MS. SWEENEY:

7   **Q.**   Do you have that in front of you, Mr. Raja?

8   **A.**   I do.

9   **Q.**   Okay.  And the first page indicates that this is an

10  e-mail from Devon May to you and to Jason Reisinger, right?

11  **A.**   Yes.

12  **Q.**   From March of 2019, correct?

13  **A.**   Correct.

14  **Q.**   And it's -- let's turn to the attachment, which is titled

15  "JFK slot waiver stat sheet."  Do you see that?

16  **A.**   Yes.

17  **Q.**   Okay.  And I'm just going to read the first paragraph

18  there, which says, "Historically, the FAA has tracked slot

19  usage through a very time-consuming manual process.  However,

20  they have recently introduced technology allowing them to

21  track slot usage in a more precise realtime manner.  As a

22  result, American Airlines will need to build and operate a

23  larger schedule to maintain slot compliance, which would

24  result in approximately eight to twelve more daily departures

25  than what we operated in the summer of 2018."

1          Did I read that correctly?

2     **A.**   You did.

3     **Q.**   So in this time period, then, in 2019, you were

4     anticipating operating a larger schedule so that you could

5     maintain these slots, right?

6     **A.**   True.  Correct.  Yes.

7     **Q.**   Okay.  And then it goes on to say -- it talks about the

8     construction that's about to occur at JFK, right?

9     **A.**   Correct.

10    **Q.**   And then -- and then the FAA granted American Airlines'

11    request for a slot waiver because of that construction; is

12    that right?

13    **A.**   That's correct.

14    **Q.**   And then it goes on to say, "The waiver suspends the

15    80 percent usage requirement for these 53 slots during the

16    construction period."

17          And then I want to read the -- I'm sorry; did I

18    read that correctly?

19    **A.**   You did.

20    **Q.**   Okay.  And then the last sentence says, "This will lessen

21    overall capacity in JFK thereby improving the operational

22    performance of the airport during construction.  It also

23    allows American Airlines to reduce capacity in

24    poor-performing markets and redeploy 7 aircraft to other hubs

25    during the summer 2019 schedule."

1          Did I read that correctly?

2     **A.**  You did.

3          MS. SWEENEY:  Your Honor, at this time I have no

4     further questions for the witness.

5          THE COURT:  All right.

6          MS. SWEENEY:  Thank you, Mr. Raja.

7          THE COURT:  Cross-examination.

8          MR. WALL:  Yes, Your Honor.  Thank you.

9          We'll distribute the binders here.

10         THE COURT:  Sure.

11    **CROSS-EXAMINATION BY COUNSEL FOR AMERICAN AIRLINES**

12    BY MR. WALL:

13    **Q.**  Good afternoon, Mr. Raja.

14    **A.**  Good afternoon.

15    **Q.**  We've got a lot we want to talk about, but before we get

16    to sort of what we had planned, let me ask you just a couple

17    quick questions to follow up on Ms. Sweeney's examination.

18         Mr. Raja, if you wanted to know what American

19    Airlines' growth plans were for a particular region or route,

20    is there something in the nature of a periodic network plan

21    that you could consult?

22    **A.**  Yes, there is.  For better or worse, in our business, it

23    changes with great frequency.

24    **Q.**  But there's something formalized out there?

25    **A.**  Yes.

**Q.** You wouldn't have to search your e-mails for what you
might have said to a pilot about that, would you?

**A.** No.

**Q.** Or an exchange with an airport operations person about
staffing levels?

**A.** No.  None of that is official.

**Q.** Or an e-mail telling your head of northeast corporate
sales to swing the bat?

**A.** Yeah, correct.

**Q.** Is American's growth plan for any market normally
characterized a "bat swinging"?

**A.** No.

**Q.** Okay.  Do you know, sir, of any regular course American
Airlines network planning documents that, in the year or two
prior to the onset of COVID, established a plan to grow
Boston to 140 departures over any time period?

**A.** No.

**Q.** Over 120?

**A.** There were documents, but they never became a plan.  We
might have gotten close, somewhere out there, to try to
figure out how we qualify for gates.

**Q.** When you actually come up with a network plan, do you
prepare some sort of evaluation of the resources required to
make it a reality?

**A.** Absolutely.

1    **Q.**  Okay.

2    **A.**  And the financial viability of those resources too.

3    **Q.**  Okay.  Do you know of any regular course American

4    network -- American Airlines network planning documents that,

5    in the year or two prior to the onset of COVID, establish a

6    plan to grow New York by more than whatever the capacity

7    increase is that you get by swapping out the 50-seat regional

8    jets with 65- or 76-seat regional jets?

9    **A.**  No.

10   **Q.**  Do you think that swapping out 50-seat regional jets with

11   65- to 76-seat regional jets would have any material impact

12   on your relevance issues in New York?

13   **A.**  Not at all.  That's why we did the NEA.

14   **Q.**  Do you think that adding five to ten new departures out

15   of Boston would have any material impact on your relevance

16   issues in Boston?

17   **A.**  None at all.  That's exactly why we did the NEA.

18   **Q.**  Let's pull up the document that counsel has been talking

19   about quite a bit, which is DX89-B.  And if you could, when

20   you get that up, please go to slide 17, which is the one that

21   has the Bates stamp that ends in 1663.

22   **A.**  I'm there.

23   **Q.**  Okay.  So this was discussed with Ms. Sweeney, and it has

24   this three-part classification of the OD types according to

25   AA only, legacy only, and LCC/ULCC, right?

1   **A.**   Correct.

2   **Q.**   Now, looking at the AA-only line, I notice that it says

3   that that constitutes 33 percent of ODs, but 13 percent of

4   passengers.  Do you see that?

5   **A.**   Correct.

6   **Q.**   And the three examples all involve a hub in a smaller

7   city.  Do you see that?

8   **A.**   Correct, yes.

9   **Q.**   Is that typical of the markets that are AA only?

10  **A.**   Yeah, almost categorically.  One of those two things is,

11  typically, one of the smaller cities in the country.

12  **Q.**   And do -- and are those typically markets, then, that

13  either connect to or at least through one of your hubs?

14  **A.**   Almost every single time.

15  **Q.**   Okay.  Now, if we go down to the next category, which is

16  the legacy only, that is 58 percent of domestic ODs, but

17  19 percent of passengers, right?

18  **A.**   Correct.

19  **Q.**   Okay.  Now, is there any way that you can characterize

20  for the Court the O&Ds that tend to fall in this category?

21  **A.**   Yeah, they're usually -- one side or the other is usually

22  a large city like New York City or Atlanta or something like

23  that.  And the other side of the city is a meaningfully

24  populous US city, but not as big -- Birmingham, Santa Fe,

25  Pittsburgh, Rochester -- a different scale of population,

1   economic growth, things like that, than Fayetteville,

2   Arkansas, or, you know, Stillwater, Oklahoma.

3   **Q.**  But the definition of that is that more than one legacy

4   carrier -- possibly all legacy carriers -- has decided to

5   serve that route?

6   **A.**  Correct.

7              MS. SWEENEY:  Objection.  Leading.

8              THE COURT:  You can do it, but not too much because

9   he's sort of -- is your witness.  It's cross, so there's some

10  latitude, but -- I'm not going to sustain the objection,

11  but --

12             MR. WALL:  Okay.

13             THE COURT:  Plus he knows more about the airline

14  industry than you.

15             MR. WALL:  I take that very personally, Your Honor.

16             THE COURT:  Well, let's put it this way.

17             THE WITNESS:  I take it as job security.

18             MR. WALL:  Thank you.

19  BY MR. WALL:

20  **Q.**  Okay.  Let's go to the last category, the LCCs and the

21  ULCCs.  And so -- so what's going on there where you have

22  9 percent of ODs and 68 percent of the passengers?  What's

23  the phenomenon that explains that?

24  **A.**  Well, these are simply the largest markets in the

25  country -- Denver to Los Angeles, Chicago to New York, things

1    like that -- that they don't -- we don't -- they don't

2    constitute a very large number of O&Ds, but that's where

3    everybody lives or everybody wants to go.

4    **Q.**   Is -- have you made any observations in the course of

5    your career about what LCCs and ULCCs do in terms of the

6    kinds of routes that they target for --

7    **A.**   Absolutely.  They go to the absolute biggest markets that

8    are there.  In places like Lawton, Oklahoma, there's just not

9    that much demand.  And what the customer in Lawton, Oklahoma,

10   values is connectivity to a lot of places.  In Lawton, we

11   compete with the amount of money it costs them to drive to

12   DFW or Oklahoma City or whatever the next biggest airport is.

13           But in these places -- Denver to LA, Boston to

14   Las Vegas, what have you -- they're huge markets.  And at

15   peak times, there's a lot of demand, and if you're a carrier

16   that's one of these that flies primarily point to point,

17   that's how you make a living.

18   **Q.**   In this chart, as counsel pointed out earlier, JetBlue is

19   listed in the LCC/ULCC row, right?

20   **A.**   Correct.

21   **Q.**   Okay.  So in that -- would that imply that the nonstop

22   overlap routes that the Department of Justice is focusing on

23   in this case would also be in that same categorization?

24   **A.**   I would say it depends, but -- some of them potentially

25   could, but many of those we've carved out, otherwise.

1   **Q.**  Well, but take, for example, something like Boston to

2   Los Angeles.  Who are the competitors on Boston to

3   Los Angeles?

4   **A.**  Oh, everybody in America is a competitor on Boston to LA.

5   **Q.**  But the names the ones --

6   **A.**  Delta.  United is a competitor in Boston-LA, even when

7   they connected over one of their hubs.  Southwest will be a

8   competitor.  They can connect at one of their hubs.

9   Literally every carrier in America make Boston-LA.  We

10  compete with all of them.

11  **Q.**  JetBlue?

12  **A.**  JetBlue does to in Boston-LA.

13  **Q.**  So that route would then fall within that third row?

14  **A.**  Absolutely, it would.  Yes.

15  **Q.**  Okay.  Thank you, sir.

16          Now, I want to back up a bit to this time that you

17  were promoted to the position of senior vice president of

18  strategy in October of 2019.  And Ms. Sweeney talked to you

19  about that.  Did you have a predecessor in that role?

20  **A.**  Not quite.  It was a role that was -- that was pieced

21  together from other things.  The closest person who did it

22  before was Devon May, but he had some different duties too.

23  **Q.**  How did you end up in that role with that set of

24  responsibilities?

25  **A.**  I advocated for it.

1  **Q.**  Why?

2  **A.**  Well, look, so much of the strategy of the what are the

3  now the three network airlines -- AA, Delta, United -- was

4  based on building big networks, building big, national

5  networks that --

6  **Q.**  Doing what?  I'm sorry.  Say that again.  I couldn't --

7  **A.**  So much of the strategy of the three big network

8  carriers -- Delta, American, United -- was building big

9  national networks through mergers from much smaller ones.

10  And what happened after the AMR-US Airways merger

11  it that our company -- that we had completed a merger.  We

12  had been falling behind on every objective measure, right?

13  We -- our margin growth was not keeping pace with the other

14  ones.  Our customer satisfaction scores were behind.  Our

15  revenue performance wasn't growing at the same rate.  And I

16  felt it was time that we needed to have what we call a

17  "postmerger vision" for the airline.

18  And it was really a pretty simple one, which is the

19  north star's -- figure out what our customers want and then

20  how do we go and engineer ourselves around that?  And if we

21  can do that really well, indeed, that could be -- it could

22  improve our financial performance.

23  **Q.**  Okay.  I want to show you Plaintiffs' Exhibit 120.

24  Again, this is a version that's been redacted for

25  confidentiality.  You were shown this earlier.  And I think

1   you'll -- as you'll see, there's a cover e-mail asking for a

2   copy of a board deck, and then the rest is -- is a board deck

3   that we've seen earlier.

4   **A.**   Correct.

5   **Q.**   Okay.  Now, how was it that you came to present a board

6   strategy deck in October of 2019?

7   **A.**   Well, I'd just been promoted to do a job to lead the

8   company's strategy, and the board wand to hear my thoughts,

9   and I wanted to share them.

10  **Q.**   And did you prepare the presentation here to do so?

11  **A.**   Correct.

12  **Q.**   Okay.

13  **A.**   That's right.

14  **Q.**   So why don't we go ahead and first show up the title page

15  of the -- of the -- of the slide.  "The Future is Now:

16  Growing Our Global Advantage."  What are you referring to by

17  the phase "the global advantage"?

18  **A.**   To expand the utility of our network to make it more

19  comprehensive for our customers.

20          MR. WALL:  Can we just -- page 4, to the next

21  slide, please.  And blow that up a little bit more, if you

22  could.  Nope, nope.  You had it.  And just blow that up so

23  it's more visible on the screen.

24  BY MR. WALL:

25  **Q.**   Okay.  This slide, if you could just read this slide out

1    loud, not the speaker's notes, but slide itself?

2    **A.**   Sure.  "When we make more and are better O&Ds" --

3    origin/destinations -- "than our competition, we create

4    unique value for our customers.  Our strategy is to offer a

5    global network that creates increasing value to customers."

6    **Q.**   Can you explain what you were intending to convey, to the

7    Court, with those thoughts?

8    **A.**   Yeah.  The more origin and destination markets we make

9    for our customers, the more they like us and fly us.

10   **Q.**   Why do both bullets incorporate the idea of customer

11   value?

12   **A.**   Because that's the north star.  This -- this, as much as

13   anything, was certainly what I was behind and trying to

14   advocate for the role and what I wanted to make really clear

15   to everyone that -- because this is our north star for

16   everything that we do.

17         And then it's a -- what we still do to this day.

18   Our -- for us to work, customers have to actually go and

19   value this big network that we've built.  And we compete by

20   offering a ton of O&Ds that are out there.  What the rest of

21   this starts to get into is how do we go and create more

22   utility for customers, sometimes in place where our network

23   can't touch on its own?

24   **Q.**   Okay.  In the speaker's notes, there is a reference there

25   to "expanding our domestic advantage through consolidation

1    and partnerships."  What's the distinction that's drawn there

2    been consolidation and partnerships?

3    **A.**  Well, actually -- the operative word here is actually the

4    "and."  For us, keep in mind for where we've been.  We've

5    thought of all network development as a series of

6    consolidations.  And what so much of this document is, in

7    fact, so much of what we covered earlier too, is this thing

8    that is partnership can create the utility for the customer

9    of consolidation.

10           What we've got to figure out is how do we actually

11   make that work?  What does that look like for us?  And so

12   this is actually -- the key thing is through consolidation

13   and partnerships, the emphasis being the "and," as much as

14   anything.

15   **Q.**  Okay.  And then the final bullet in the speaker's note

16   has using partnership -- partnerships -- excuse me -- in

17   consolidation to complete the "white spaces" of our global

18   network.  What's that phrase "white spaces" mean?

19   **A.**  Those are places that we don't fly to at all -- Southeast

20   Asia, things like that.

21   **Q.**  Okay.  Now, if we can turn to slide 37.  This is the one

22   that's titled "Domestic Partnership Opportunities."

23           Okay.  So can -- some parts of this that don't deal

24   with the United States have been redacted for

25   confidentiality, but can you just describe for the Court how

1    you use this slide with the board and what you were trying to

2    convey.

3    **A.**   Yeah.  The slide is, frankly, trying to convey a lot of

4    things.  Its titling is very important.  These are domestic

5    partnership opportunities that are there.  And the -- I'll go

6    left to right.

7         In the case of Alaska, it's to just simply convey,

8    first of all, the value that's associated with it and then to

9    give some outline of what the risks are, primarily as a means

10   of teasing out a conversation, which is there's real utility.

11        American Airlines -- we have very little overlap

12   with Alaska Airlines up and down the West Coast.  There's a

13   lot of utility to the customer if we can go and offer that to

14   them.  We need to figure out how.

15   **Q.**   Under both the Alaska and JetBlue entries, there's a

16   reference here to "further domestic consolidation."  What

17   does that mean, and why is it in here?

18   **A.**   Well, quite frankly, it's on there because if that wasn't

19   on there, that would be the first question anybody on the

20   board would ask about.  I mean, we've spent 20 years doing

21   different forms of mergers and things like that.  So it's on

22   there to say, yeah, one of the options that could be out

23   there is domestic consolidation.

24        What's also -- though one can say it, though, part

25   of what we were talking about is consolidation is an easy

1     thing to envision, but you've got to have money.  The other

2     person has got to want to take your money.  Other people can

3     go pay more money, and on top of that, there's got to be a

4     regulatory process.

5              So some of that is addressed also in that risk

6     column below.  But if we didn't write it, it wouldn't be

7     complete; but there are also a bunch of other things that are

8     on here too that are all potential -- they can be together,

9     and they can be apart on how we think about this.

10    Q.  Since the time that you prepared this and presented it to

11    the American Airlines board, have you made any efforts at all

12    to try to acquire Alaska Airlines?

13    A.  None.

14    Q.  Have you made any efforts at all to try to acquire

15    JetBlue?

16    A.  None.

17              MR. WALL:  Let's turn to slide 48, please.  And if

18    we can just bump that one up again, please.  There we go.

19    BY MR. WALL:

20    Q.  So this one is entitled "Partnership Approaches."  And

21    there's a set of categories of partnerships on the left-hand

22    side.  Can you please explain what this is showing and how

23    you explained it to the board?

24    A.  Yeah.  This is an education about our partnerships.

25    Again, so much of what this deck is, is, indeed, what can

1  partnerships be.  And this is educating the partnerships that

2  we have today as a means of starting to talk about what they

3  can be in the future.

4  **Q.**  Can you briefly explain the various kinds of partnerships

5  that are depicted?

6  **A.**  Yeah.  I'll go top bottom.  Bilateral partnerships are

7  just two airlines coming together.  And to my earlier

8  comments, it can be codeshare.  That's what marketing one

9  another's flights are.  It can also involve frequent flyer

10  reciprocity, but there's no pricing or scheduling

11  coordination.  That is a thing that adds a certain level of

12  value.

13          The next thing is a multilateral alliance, which

14  is -- essentially, this is Oneworld or SkyTeam, where a lot

15  of different carriers engage in a series of bilateral

16  partnerships together.

17          And there's some, as much as anything, back-office

18  elegance, that you agree to have similar systems.  It makes

19  it easier to link frequent flyer programs and things like

20  that.

21          The final thing is the joint business.  And there,

22  there's a means of coordinating, scheduling, pricing.  It's

23  usually -- and certainly in all cases of American Airlines

24  that we know of -- combined with some form of revenue sharing

25  or gain sharing among the airlines so people are incentivized

1    to go and grow.

2    **Q.**   All right.  Are these -- is that the type of joint

3    business arrangement that is typically at issue in these ATI

4    applications?

5    **A.**   That is what's being described here.  Correct.

6    **Q.**   Okay.  So those are the ones that DOT and other

7    regulators look at?

8    **A.**   That's right.

9    **Q.**   Okay.  Now, it is -- is that what you do with the

10   Northeast Alliance?

11   **A.**   It is not.

12   **Q.**   How does it differ?

13   **A.**   We do not coordinate pricing, and we've never made a

14   joint investment decision together other than buying a couple

15   of buses for JFK.

16   **Q.**   We'll get to the buss at JFK later.  Thank you.

17           So in -- and there's no application for antitrust

18   immunity with respect to the NEA, is there?

19   **A.**   There's not.

20   **Q.**   Okay.  Now, what impact --

21           THE COURT:  I was wondering why you don't get them

22   immunity.  Then you wouldn't be here.

23           MR. WALL:  It would be so much easier, now and in

24   the future.

25

1   BY MR. WALL:

2   **Q.**   What impact on competition have you observed from these

3   joint venture-like, immunized partnerships around the world?

4   **A.**   Everyone drives competition.

5   **Q.**   Can you explain that?

6   **A.**   It changes in different forms and fashion.  I can explain

7   it in maybe a couple ways.  First, the transatlantic joint

8   ventures -- ourselves, Delta, United -- each have a

9   transatlantic joint venture.  Since the time of those joint

10  ventures, there's probably been a greater proliferation of

11  long-haul, low-cast carriers -- take Norwegian Airlines,

12  premium airlines, alternative business models, different

13  routings, such as using Canada as a transit point for going

14  to Europe.  The nature of the competition changed.

15          Similarly, we did a partnership with Qatar.  A few

16  years later, United did one with Emirates.  Almost every

17  response, it just changes the nature of the competition

18  that's there.

19  **Q.**   Thank you, Mr. Raja.

20          Now, after this October board meaning in 2019, did

21  you thereafter go about trying to see if you could create

22  some of these domestic partnerships?

23  **A.**   Yes.

24  **Q.**   And Alaska was the first one, right?

25  **A.**   Correct.

1   **Q.**  Can you describe what the West Coast International

2   Alliance is?

3   **A.**  Maybe the simplest way to think of it is it's a version

4   of one of these international-style joint ventures, only

5   instead of its demarcation point being the Atlantic ocean,

6   it's Seattle.

7   **Q.**  It's Seattle, you said?

8   **A.**  It's Seattle.  So it's our international -- we wanted to

9   fly an international network from the West Coast.  We've

10  always struggled with that.  Alaska wants to have an

11  international network.  They don't even known the airplanes

12  to be able to do it.

13          And so the idea is how do we create a mutual

14  incentive for us to work together so that we can access the

15  connectivity of their domestic system, they can get the

16  benefits of an international system?

17  **Q.**  So at the time that you took over as the senior vice

18  president of strategy, did American Airlines have any kind of

19  partnership arrangement with Alaska?

20  **A.**  We did, but we were winding it down.  It's -- it was in

21  its final days.

22  **Q.**  What -- what was it that you were winding down?

23  **A.**  It was a codeshare and a frequent flyer program.

24  **Q.**  Did it have any revenue sharing?

25  **A.**  None whatsoever.

1  **Q.**  Okay.  And why were you winding it down?

2  **A.**  Well, frankly, for a set of reasons which I certainly no

3  longer subscribe to, but there wasn't really a lot of

4  incentive.  It's true there wasn't a lot of incentive for

5  these two companies to go and work together.

6  But there was a lot of thinking where we were

7  trying to figure out just simply how we take more passengers

8  going to the West Coast instead of first thinking about,

9  like, what does the customer want, and then how should we

10  arrange a partnership that makes so much sense since we --

11  we're small on the West Coast.  We want to fly long-haul, and

12  they have a domestic network that can handle it.

13  **Q.**  So if this thing was winding down, why did you decide to

14  try to reestablish some form of partnership with Alaska

15  Airlines?

16  **A.**  Because it makes customer sense.  I mean, you look at the

17  West Coast, there's -- the -- Delta and United both have a

18  much larger presence than us there.  Delta has grown in

19  Seattle.  Even Southwest Airlines, intra-California, in many

20  cases, is bigger than what Alaska is.

21  And so instead of looking at this as seeing

22  everybody there as a competitor, it's really, hey, if we

23  could go and work with Alaska Airlines, we can be together a

24  much better competitor, much like what we see in the

25  transatlantic JVs.  We can put real competition on people

1    like United and Southwest.

2    **Q.**  Could we please take a look at Defendants' Exhibit 22?

3    It's already been admitted into evidence.  Do you recognize

4    this document, Mr. Raja?

5    **A.**  Yes, I do.

6    **Q.**  And the date of the document is November 24, 2019.  What

7    is this?

8    **A.**  This -- this is my note to the -- our working team about

9    how to both conceive of our work with Alaska and to start to

10   actually go about the modelling and analyzing of what we were

11   trying to do.

12   **Q.**  Who are the various people to whom you sent this?

13   **A.**  Sure.  Henning Greiser was in charge of our international

14   route planning.  Don De Bona and Neil Watson both did joint

15   venture analyses.  And the three people on the copy line were

16   all our managing directors in our alliance system at the

17   time.

18   **Q.**  Now, at the top of the e-mail, it says, "Do not forward."

19   What's -- what's that about?

20   **A.**  It was, frankly, about where we were culturally at the

21   time.  The idea of -- we were winding down Alaska.  People at

22   American didn't want to go and do Alaska, and we were all --

23   this group needs to conceive of this thing differently than

24   how we've thought of things before.

25           So I didn't, frankly, want these people to go and

1    send this around; otherwise, the idea would never get off the

2    ground.

3    **Q.**   So it says here, "As a reminder, the objective is to

4    create a domestic/international West Coast network that is

5    seamless for customers in which we are both financially

6    incentivized to grow.  Just like a JV, this should result in

7    more new services, a more competitive network versus Delta

8    and better choices for customers," end quote.

9    **A.**   Exactly.

10   **Q.**   Why did you say that?  In other words, why were those the

11   objectives?

12   **A.**   Because we've realized that every time we do that, when

13   we build a better network for customers, it works for us.  As

14   we like to say, the network is the product.  What customers

15   fundamentally buy is a more comprehensive network; and when

16   we're able to deliver that to them, it really works.

17           And in these other JVs that we have, look, in the

18   transatlantic joint venture, that's a place where we had a

19   codeshare with BA before it; but after we had -- after we

20   started thinking of it in a JV where we could do capacity

21   coordination and then revenue sharing, our services grew.

22           We were flying to places like Austin to Heathrow

23   that we had never thought before.  Our customers liked it a

24   whole lot more.  We were having more people sign up for our

25   loyalty program.  We enrolled more corporate accounts, and we

1    made money.

2         But in other cases where we had code, we didn't.

3    In the case of Alaska before, it wasn't like that.  And so it

4    was, look, the idea of being seamless for our customer and

5    having a financial incentive to grow has to be the same thing

6    in how we think about this.

7    **Q.**  Okay.  Thank you.

8         Let's take a look next at Defendants' Exhibit 35,

9    which has already been admitted.  This is another one that's

10   been redacted for confidentiality, and we'll put the redacted

11   version up on the screen.

12        Do you recognize this document, sir?

13   **A.**  I do.

14   **Q.**  At least you will once it's up -- I guess you have it in

15   your book.

16   **A.**  "Our network strategy" is in front of me in this right

17   now.

18   **Q.**  Okay.  So this is a deck that is -- it is not just about

19   the WCIA, but it references the WCIA among other

20   partnerships, right?

21   **A.**  Yes.

22   **Q.**  And did you present this deck?

23   **A.**  I did.

24   **Q.**  Okay.  Please take a look at slide 4.  Now, this is very

25   similar to something we saw earlier.  And it has the

1      potential domestic alliances.  And I noticed that the --

2      the -- on both, under the Alaska and JetBlue columns, the

3      phrase about "further domestic consolidations" is no longer

4      there, right?

5      **A.**  Correct.

6      **Q.**  Why not?

7      **A.**  Because our thinking had evolved.  You know, before, we

8      were trying to think about how could a partnership create --

9      I lost it on the screen -- how could it create that kind of

10     utility.  And at this point, we were starting to zero in on

11     something where a partnership can go produce that -- that

12     kind of benefit.

13     **Q.**  All right.  Let's take a look at slide 5, if you could.

14     And this is a description of what's called the "Alaska

15     partnership construct," right?

16     **A.**  Yes.

17     **Q.**  Can you please just walk us through each of the steps in

18     the slide and explain the relationship that they have to

19     what's labeled as customer benefit on the right-hand side?

20     **A.**  Yeah.  Absolutely.  The idea that we were going through

21     with Alaska was, okay, how do we envision this thing

22     differently, knowing that we couldn't -- this was -- build it

23     all at once.

24             And so the first step was -- all right.  We call it

25     "rehabbing the relationship."  Let's start doing codesharing.

1    Let's make sure the economics make sense, but as much as

2    anything, design it in such a way where let's think, how do

3    we make the customer have the benefits of a bigger network?

4    And if that's our north star and not how we go and split the

5    money, what does that turn into?

6            Step two is then create the -- what would later be

7    the West Coast International Alliance.  And this idea is, all

8    right, we take AA international flights into the major cities

9    in the West Coast.  Somehow we put in the Alaska domestic

10   flights.  We share the revenue so that they're incentivized

11   to go help our long hauls.  we're incentivized to go help

12   their domestic system.

13           And then step three of it is, okay, now the real --

14   once you have that, you have a compelling customer network on

15   the West Coast, international, domestic, like that becomes

16   the best West Coast network.

17           So, now, how do we go and start thinking about

18   frequent flyer benefits, corporate dealing, things like that,

19   when we've actually got a good product?

20   **Q.**  Okay.  Why revenue sharing?  Why do you have to have

21   revenue sharing to make that particular partner construct

22   work?

23   **A.**  So that our incentives get aligned.

24   **Q.**  Right.  Explain that.

25   **A.**  Well, look, without something like a revenue share in

1    West Coast international, our flights are going, but they

2    have no real -- like, they want to make their domestic

3    flights work, but that doesn't necessarily mean they'll make

4    the international flights work.

5            So it could lead to simple things where, you know,

6    you'll time flights out of Seattle for people who go to and

7    from Seattle, not people connecting to China or Asia or

8    things like that.  But when they have a financial incentive,

9    they -- like, Alaska spends as much time, and you can see it

10   in their schedules, thinking about how they go and connect to

11   our Seattle-Heathrow flight as they connect into their own

12   Seattle hub.

13           Similarly for us, we want to go and make sure that

14   the West Coast network is strong.  So, like, we've deployed

15   more resources in our sales team there, more people signing

16   up for the credit card program, the frequent flyer program,

17   because we both have the incentive to work together to get a

18   customer away from Delta/United.

19   Q.  Now, the point has been made by the plaintiffs that there

20   is no revenue sharing on domestic overlap routes in the West

21   Coast International Alliance.  Are there any overlap routes

22   at all in the West Coast?

23   A.  Well, we don't fly to most of those places.  I mean,

24   DFW-Seattle, Phoenix-Seattle.  There's not that many routes

25   that overlap.

**Q.**   Right.  And some of the overlaps there might be are
subject to a consent decree?

**A.**   Indeed.

**Q.**   From a prior merger?

**A.**   From Alaska's prior merger, correct.  There's a few
routes that overlap, for example, out of Los Angeles, but
we're not allowed to partner on them.

**Q.**   Okay.  Now, the two columns here, "Key Features" and then
"Customer Benefit," are those supposed to be linked in
somehow -- somehow?

**A.**   Absolutely.

**Q.**   And what is the linkage, as you see it, between revenue
sharing and consumer benefit?

**A.**   Well, look, the whole idea is the more in which we share,
the more we create a more comprehensive network for our
customers.  It isn't to be pedantic about it or anything, but
it is as simple as it sounds.  Our system is best when we
offer more O&Ds for customers because they value it.  They
can get to more places.  And so the way that we do that
financially with one another is through revenue sharing.

**Q.**   Thank you, sir.

         Is the West Coast International Alliance in
operation today?

**A.**   It is.  Thriving.

**Q.**   How is it going?  How is it going?

1    **A.**  Great.

2    **Q.**  Can you elaborate?

3    **A.**  Yeah, absolutely.  In fact, it's -- it's surprised me in

4    very positive ways.  Even though COVID happened -- we

5    originally had a plan to be able to fly to Bangalore, a city

6    in Asia, and London Heathrow.  COVID changed a lot of those

7    plans.

8              But we still have the Heathrow route.  Alaska is

9    now a 35 percent of our Seattle Heathrow on boards, and, you

10   know, for -- the benefit of people here, you know, in our

11   system, a long-haul flight is negative 5 to 5 percent fully

12   allocated margins.  So --

13   **Q.**  Say that again, please?

14   **A.**  A long-haul flight is negative 5 to 5 percent fully

15   allocated margins.

16   **Q.**  So negative 5 to positive 5?

17   **A.**  Positive 5.  So these guys are -- the last time I looked

18   at it, 34½ percent of our on boards on Seattle-Heathrow --

19   these guys, Alaska -- so that flight wouldn't exist

20   without -- without Alaska.

21             But we've also seen its benefits in domestic, like,

22   in cities like Austin.  By doing things, like, thinking about

23   it through the lens of how do we go create, like, the biggest

24   consumer product that we can, it's opened our eyes to a lot

25   of different things.

1          The only city -- like, we expanded codeshare --

2     I'll elaborate on that, having said it.  So one of the things

3     we did early on is we codeshared on Austin to Alaska's West

4     Coast services and that might not sound like a very big deal,

5     but for American Airlines, in the traditional way of

6     thinking, that's huge, because historically Austin to DFW is

7     the largest flow markets in -- in the DFW hub and people fly

8     that and they connect on to Asia Pacific.

9          And historically, we never codeshared with Alaska

10    on Austin to the West Coast because we were worried that

11    happen people would come off of Austin to DFW to Asia and fly

12    Austin to Seattle and now that they were in one world, on

13    another carrier to Asia, but we put our code on all of those.

14         The four routes that we have are -- or four of our

15    five biggest codeshares markets on Alaska but what we also

16    found was then a second order benefit which was huge, too,

17    because when we did that, indeed, they came off of Austin to

18    DFW.

19         But we were able to go and fill Austin to DFW with

20    other customers.  Austin to DFW is still one of our most

21    profitable markets out of Austin and Dallas.  So in effect,

22    we grew DFW, without having to build another gate or do

23    anything in an infrastructure challenge business.

24         The third order benefit was it got so good that,

25    for the first time, certainly in the last 10, 15 years that

1    I've been around, we started flying point-to-point flights

2    out of Austin.  So we fly Austin-Memphis, Austin-Vale,

3    Austin-Nashville, Austin-Costa Rica.  We're the largest -- we

4    market the largest airline network in Austin, Texas, today.

5    And that was all the through that.

6            Like, when we started the WCIA, if you had told me

7    that we would be doing that, I wouldn't have believed it, but

8    we see more opportunities for that.

9    **Q.**  Thank you, Mr. Raja.

10           THE COURT:  Is that -- is it WCIA?

11           THE WITNESS:  Correct.

12           THE COURT:  How much of that is Austin is a

13   different place today than it was 15 years ago?

14           THE WITNESS:  Oh, a lot of it is.  But that's the

15   thing; there's more and more of those cities that are out

16   there and without saying --

17           THE COURT:  So the market is changing, and you're

18   changing with it?

19           THE WITNESS:  Absolutely.  And for us, right -- so

20   take a hub like DFW; like, infrastructure for us is a real

21   thing.  We didn't actually shove another flight into DFW in

22   the peak times.  We can go and build more facility there;

23   well, that facility won't come online until 2027, or

24   something like that, if we do it.

25           So right now there's a real opportunity.  We can't

1    go and grow, but through things like this, it's opening our

2    eyes to different ways where we can go and do growth.

3              So we -- we say it colloquially that partnerships

4    mean growth for us, because it always starts -- it's a

5    network business.  And we can always find a way, once we

6    create more connections, to go and add more flights.

7              THE COURT:  So those Austin to Seattle long-haul

8    flights are people connecting in Seattle to your flights

9    overseas?

10             THE WITNESS:  Or in some cases, to other Oneworld

11   partners.  So a lot of Austin-Seattle is people just flying

12   Austin-Seattle.  In some cases, it's people flying Austin to

13   Seattle on to Seoul.

14             THE COURT:  In another codesharing --

15             THE WITNESS:  On another codeshare to Tokyo-Narita,

16   to one of those plays, too, which is fine because they're all

17   part of the Oneworld alliance.

18             And what's happened to us, is those customers

19   have all become --

20             THE COURT:  You want them in the ecosystem.

21             THE WITNESS:  Correct.  They all join our frequent

22   flyer program.  And what we find is once you join our

23   frequent flyer program, our relationship with you changes

24   materially.

25             So -- you know, so this -- and the NEA, too, for

1    that matter, has opened our eyes to different ways of

2    thinking about it.  But that's where I say we're strident in

3    this belief.  And I know it's super simple that if you give

4    people a bigger network, they have a reason to come fly you.

5    BY MR. WALL:

6    **Q.**  Thank you, sir.

7           Let's switch over to the Northeast.  So as sort of

8    a transition, did the arrangement that you were able to work

9    out with Alaska have any influence on your thinking about

10   what you might be able to do in the Northeast?

11   **A.**  Very much so.

12   **Q.**  So let's talk about how they came about.  You -- what was

13   your role in the formation of the NEA?

14   **A.**  I started to conceive of it.  I -- I started to pitch the

15   idea to Scott Laurence, and he developed it from there.  So

16   I'll call it one of its progenitors and then its lead

17   negotiators later on.

18   **Q.**  And Scott Laurence was at JetBlue at that time?

19   **A.**  That's correct.

20   **Q.**  Okay.  Now, let's talk about New York first.  The Court

21   has already heard quite a bit of testimony about the

22   competitive conditions in New York, so I want to truncate

23   this.  And I would just ask you to very briefly summarize

24   your perspective from this -- from this late 2019/early 2020

25   pre-COVID perspective about the competitive environment in

1    New York and American's place in it.

2    **A.**   Sure.  I'll touch on some of the things that came up

3    earlier, of course, but for us in New York, I mean, the way I

4    described it in times past is we were too small to succeed

5    and too big to exit it.  Because we were 300 departures, 400

6    departures smaller than United at Newark.  We're more than a

7    100 departures smaller than each of JetBlue and Delta at

8    Kennedy, and let's call it 150-ish flights smaller than Delta

9    at LaGuardia.  So we were just shifting for -- at least my

10   almost 20 years at the company, 18 years at the company, from

11   one marginal New York strategy to the other.  And I would

12   describe none of them as getting us better.  They were just

13   sort of getting by, whether it was upgauge out of the RJs or

14   focusing on places to New York.

15        Now, New York -- I say all of this because it begs

16   the very obvious statement:  Well, why don't you just go grow

17   in New York?  We would love to be able to go grow in

18   New York.  The reality is it's limited.  The biggest

19   limitation, its critical path, is slots.  You just can't get

20   any more slots.

21        Newark, too, it's not easy to go get any more

22   gates.  There's -- not very many people have been able to go

23   and operate out of Newark for that reason, either.

24        So we realized that until we can do something

25   different and think about this problem differently, we

1    couldn't credibly compete with Delta and United.  And

2    frankly, Delta and United didn't have to work too hard to

3    compete with us.

4             But we realized we weren't alone.  JetBlue had a

5    version of the same problem.

6    **Q.**  So we'll get to that in a second, but there's just one

7    thing I just need to cover, is the suggestion has been made

8    in this case that you don't actually compete with the

9    New York flights that United Airlines offers from Newark.  Is

10   that true?

11   **A.**  Absolutely -- that's false.  We absolutely compete with

12   United Airlines at Newark.

13   **Q.**  Why do you say that?

14   **A.**  If they lower a price, we match their price and they

15   compete with us, too.  It's just we're at much less level of

16   scale, but we compete for corporate accounts.  We compete for

17   frequent fliers.  We compete for -- on pricing.  We compete

18   for -- you know, even for gates at Newark Airport isn't easy

19   to get ahold on to.  We compete with them in every possible

20   way we can at Newark.

21   **Q.**  So how were United and Delta able to achieve the larger

22   scale that they had at Newark?

23   **A.**  The strange history of the airline business, which isn't

24   to be flippant in my answer, but it's that through the legacy

25   of consolidation mergers, things like that, United ended up

1    with a massive hub in Newark.  In the post 9/11 era, Delta

2    was able to grow at a time when New York was kind of lightly

3    slotted.

4    Q.  And what's the significance of growing when it was

5    -- what did you say?

6    A.  It was -- after.

7    Q.  When it was lightly slotted?

8    A.  Yeah, after 9/11 happened, there wasn't -- say a lot of

9    flight capacity going into New York, and I'll call about the

10   2005 era, both JetBlue and Delta grew.  American Airlines did

11   not.

12          They added more slots in JFK.  Later on Delta

13   Air Lines and US Airways group did a transaction, and Delta

14   got a lot bigger in LaGuardia.  The US Airways group got a

15   lot bigger in DCA, and now here we are, the products of all

16   of that.

17   Q.  Okay.  There's been some -- some testimony already in

18   this case about an airline industry concept called

19   "relevance."  Are you familiar with that?

20   A.  Sure.

21   Q.  Can you give us your perspective on what that means?

22   A.  Yeah.  I would -- I guess I would say it pretty simply,

23   that you can have the very best product in New York to

24   Las Angeles, but if you can't fly somebody to Toronto or

25   Paris or Raleigh, at some point, they stop flying you to

1  Los Angeles.  And that's what we lacked in New York, right?

2  **Q.**  And why didn't you just become more relevant?

3  **A.**  We couldn't.

4  **Q.**  Why?

5  **A.**  Well, the only way to get the slots were from the others.

6  We couldn't go and do that.  We couldn't organically grow.

7  We've done that in places like DFW or Miami or Phoenix, but

8  we just simply can't do that in New York.

9  **Q.**  Wouldn't it be a solution to just fly bigger planes than

10  you fly?

11  **A.**  Well, bigger planes don't expand our relevance, right?

12  For example, this was what I was mentioning earlier in

13  northwest Arkansas.  We can put it all on 75-seat airplanes

14  and fly it three times a day.  That's great.  That means

15  something else is not going to fly as much.  It's not going

16  to fly as competitively as the Delta Air Lines network.  So

17  bigger airplanes, yeah, you can have more seats on a given

18  market, but you're not adding more markets.

19        When we -- through these decks, if we use this word

20  "comprehensiveness," it really means, on the one hand,

21  breadth -- I'm sorry -- being able to fly to more places, and

22  depth, having a lot of different -- a service pattern, a

23  number of flights within a market.  Relevance or

24  comprehensiveness is those two things, and we lack that in

25  New York.

1    **Q.**   Okay.  Sir.

2            THE COURT:  When you say -- one question about

3    this.

4            MR. WALL:  Yeah.

5            THE COURT:  When you say that, you know, somebody

6    in New York -- you don't fly, say, New York to Toronto, and

7    they fly New York to LA and New York to Toronto, and

8    eventually they give up on you on New York to LA.  Is that

9    because -- why is that?  Or does that depend on the kind of

10   customer they are?

11           THE WITNESS:  Well, it can depend on the type of

12   customer they are, but the customers whom we're most after --

13   and I'm talking about, like, the actual -- the flying human,

14   not the transaction -- is somebody who is a power traveler.

15   They fly us for business.  They fly us for leisure.  They

16   join our loyalty program.  They want to --

17           Because once you join our loyalty program, it's an

18   indication that you want to travel.  You're more likely to

19   buy business class when you fly to Rome.  You're more likely

20   to want to earn miles or spend on our credit card, buy access

21   to our lounges and things like that.

22           So we consciously have a high-end product tailored

23   to a power user of it.  So if we can't offer more product

24   more network --

25           THE COURT:  And speaking of the frequent flyer,

1    they're going to skip you for LA?

2            THE WITNESS:  Correct.

3            THE COURT:  The frequent -- is -- so not people in

4    your program, but people who fly a lot, who will then

5    become --

6            THE WITNESS:  Exactly.  That's exactly the right

7    way to think of it.  And so for that reason, like what we

8    found in New York was --

9            THE COURT:  But the New York to LA market must be

10   filed with a lot of people besides -- I mean, you have more

11   nonbusiness class seats than business class seats.

12           THE WITNESS:  Yes.  Yes.  Now, this is a concept

13   that we call being a "spill carrier."  So earlier when Dan

14   was asking about these LCC markets, that O&D grouping,

15   there's a ton of markets, especially in New York, which are

16   really big.

17           And if you fly seven times a day from New York to

18   Raleigh-Durham, you capture a lot of those higher end

19   customers, because a lot of those higher end customers

20   realize that I can get to the airport early.  I want to take

21   the five o'clock, not the seven o'clock.  But the spill

22   carriers want to disproportionately fly at 8 a.m. or 6 p.m.

23   because that's when all the demand is.

24           And, really, it's -- you know, if Delta Air Lines

25   has seven of those flights, they still only have 150 seats on

1    the 6 o'clock, and so if you fly at the 6 o'clock, you can

2    capture whatever is left over.

3         Well, what's left over is not the customer you just

4    described, a frequent traveler, but a more marginal traveler.

5    Somebody who is doing it once a year, twice a year.  And for

6    us, like, a huge amount of the success and profitability of

7    our company is attracting the power user of our product, less

8    so the marginal user of our product.

9         So that's why relevance matters so much.  And

10   indeed in New York, we find this, you'll see it in the

11   documents, like, we would -- no matter how much we might go

12   and give more genius frequent flyer benefits, we've spent

13   billions on lounges and on products and on things like that,

14   nothing made up for the network deficiency.  So . . .

15            THE COURT:  For those kind of customers.

16            THE WITNESS:  For those -- for that target

17   customer.

18            THE COURT:  All right.

19            THE WITNESS:  And for us, I mean, so much of our

20   cost structure, everything, is built around that.

21            THE COURT:  Go ahead.  Thank you.

22            MR. WALL:  Sure.  Thank you.

23   BY MR. WALL:

24   Q.  Okay.  Let's -- hold on just one second here.

25            Okay.  I'm just going to ask you this, this same

1    basic question now with respect to Boston, because, again, by

2    Friday, we've heard a lot about it.  But can you just give us

3    sort of a succinct view of your perspective about the Boston

4    competitive landscape and American's position in it?

5    **A.**   Certainly.  And I'll do it in that order.

6            Look, in Boston the critical path is not slots;

7    it's gates.  And in Boston it's uniquely impacted because

8    when you think about the airport, you can't simply build more

9    gates.  That makes it a really unique thing.

10           So it's a really big market.  Its gate constraints

11   effectively act as form of slot constrain.  The only

12   difference is there's a mechanism where if you're not -- a

13   redistribution mechanism if you don't use it enough.

14           Which brings me to our perspective on this.  What

15   you see and what you saw on all of those documents and my

16   inquisitions about Boston or my, you know, colorful language

17   about describing it, is that I've seen this movie before in

18   New York.  The way New York went about was in the post-9/11

19   era, American Airlines didn't grow in New York at the rates

20   competitors did, and it got left behind.  And it got left

21   behind to a point where it was condemned to its position, to

22   a weak position, because it didn't keep up with the growth

23   that was there.

24           And in Boston, I saw the same thing happening.

25   Like, we were losing gates.  Delta was getting the gates.

1    And Delta and JetBlue were continuing to grow there, while we

2    were continuing to lose gates.  So at a very minimum, it was

3    defensive.  We have to go -- at the time, we were thinking --

4    and we have to go and be -- hold on to what we've got.  We

5    need to figure out how we can get ahead.

6            But, you know, none of my responses was I thrilled

7    with the idea of whatever it was, 120 or 140 flights in

8    Boston, because, really, all that was going to start to get

9    us to was the same marginal spot we were in in LaGuardia;

10   that what we really needed to think about is, okay, much like

11   the WCIA, how do we approach this in a way where we have a

12   real relevance, a broad and deep network for customers both

13   in New York and Boston?  And that's how we go and compete.

14   **Q.**  So there's been some testimony about Delta in Boston and

15   having declared it first a focus city and then a hub.  How

16   did that affect your perspective on Boston?

17   **A.**  For me, it was seeing the past repeat itself.  That's --

18   that is exactly what happened in New York.  In 2005 I

19   remember them doing that.  And they grew -- they added a ton

20   of markets, and American didn't keep pace.  We added Atlanta

21   and Minneapolis to LaGuardia, and it wasn't enough.  And the

22   more Delta was calling it a hub and all of those things, it

23   was putting pressure on us.

24           But what I also noticed is it puts pressure on

25   JetBlue.  Because what Delta was also doing, much like what

1    they did in Seattle with Alaska, is they were flying

2    international.  So for that frequent traveler, they are

3    actually becoming more relevant with them.  They are

4    consciously going and flying the biggest markets that were

5    there.  So if you are a frequent traveler in Boston, they

6    were getting to a place where it's better to be on Delta, in

7    many cases, than to be on JetBlue.

8    **Q.**  Thank you, sir.

9         So we've heard some testimony that talks about the

10   NEA started serving the January and February 2020 time frame,

11   right?

12   **A.**  Correct.

13   **Q.**  And as we can all remember, it was approximately

14   March 2020 that the COVID-19 pandemic really started hitting

15   hard, right?

16   **A.**  That's right.

17   **Q.**  At a high level, can you describe how the confluence of

18   those two events, the discussions about the NEA and then the

19   spread of COVID-19, affected your thinking about the network

20   strategy and whether you wanted to do a deal with JetBlue?

21   **A.**  Sure.  Well, we were already, as you mentioned, talking

22   about the NEA, and both sides were interested in it.

23   COVID-19 probably accelerated it a lot.  Because I think

24   what -- maybe what everybody in the industry recognized, but

25   certainly what we recognized at American is, you know, when

1    you wake up and suddenly you've lost 90 percent of your

2    revenue, but you have 100 percent of your expenses, you've

3    got to think differently, like, that day.

4    **Q.**   Is that what happened?

5    **A.**   Yeah.  That's -- in COVID, we lost 90 percent of our

6    passenger revenue.  We kept all of our expenses, and what we

7    needed to be able to do was -- you know, things like the NEA

8    took on a different kind of interest for us.  We wanted to

9    make sure that we could still -- like, we were still

10   interested in how do we go and create a broad and deep

11   customer network, but it wasn't just going to be doing it the

12   way we already did it okay.

13   **Q.**   Okay, sir.  Let's take a look at what's been previously

14   marked as Defendants' Exhibit 7.  It's in evidence.  It's

15   also redacted for confidentiality.  And this is a network

16   update with a date of 24 March 2020.  Do you see that?

17   **A.**   Yes.

18   **Q.**   And so something that you put together?

19   **A.**   Yes.

20   **Q.**   And what is the -- you know, given the timing there,

21   what's the purpose of this particular network update?

22   **A.**   It's, quite frankly, to process where we were.  I mean,

23   the 24th of March was a pretty bleak time, maybe for the

24   world all over, but uniquely bleak when you work at a

25   passenger airline.  And so we were trying to think about how

1    do we go and run the network to, frankly, keep the company

2    alive.

3    **Q.**  So turn to the fifth page, if you could.  There's a --

4    there's a slide here that's called "The New American."  And

5    it has various elements in the table.  But the one that I

6    want to focus on is the second row that begins with

7    "leverage."  Right?  Could you just read that aloud and

8    explain to the Court what you were thinking about the value

9    of synthetic hubs in this particular environment?

10   **A.**  Yes.  Leverage partnerships to create synthetic hubs,"

11   what we were thinking about is for where we were, we were

12   going to probably have to shrink.  Like, we couldn't have

13   100 percent of our expense base if revenues were going to be

14   smaller and smaller for a long period of time.  So it really

15   made us start thinking, like, how can we use markets -- use

16   partners in markets to help provide the same thing with --

17   frankly with less of the historical approach that we would

18   have otherwise had, you know?

19          So what it led to was exactly what it said in the

20   key actions, right?  You know, it made us want to think about

21   we've got to go really execute in Alaska and then in the case

22   of JetBlue, there's a partnership that we're really going to

23   need to think about here.

24   **Q.**  So how did developing a partnership with JetBlue play

25   into that strategy?

1    **A.**   Well, because we knew that, absent that, I mean, New York

2    was suddenly an unsustainable place for us.  Boston, too.

3    You know, if we were -- we knew it was going to be a big air

4    travel market, but we couldn't be a marginal player in

5    places.  Like, we have to have real consumer relevance

6    wherever we operate.

7    **Q.**   Thank you, sir.

8         So -- so how did you go about evaluating the

9    opportunity of a partnership with JetBlue?

10   **A.**   We con instructed a clean team.

11   **Q.**   Can you explain what that means?

12   **A.**   Yeah.  Look, the challenge in AA/JetBlue is the --

13   conceptually, both of us are smaller than Delta and United

14   because of the nature of slots and real estate and things

15   like that.  You have to figure out how you actually put the

16   schedules of these airlines together.

17        So we had the idea that the only way a partnership

18   could really work is if there was some form of organizing our

19   capacity so that we can, you know, create schedule bounds,

20   depth, so we can create international connectivity and things

21   like that.

22        So the idea was create a clean team, outside the

23   scope of typical network planning, that could go and build a

24   New York.  Let's see if something can work and if something

25   can work, okay, we can progress it, and if it doesn't, then

1    that's an answer, too.

2    **Q.**   When you say build it, you mean create a schedule?

3    **A.**   Create a schedule.

4    **Q.**   Okay.  Let's pull up Plaintiff's Exhibit 278, which is

5    entitled "Project Plan."  And are you familiar with that

6    document?

7    **A.**   Yes.

8    **Q.**   Let's turn to slide 6.  And the title is "our plan is to

9    understand market dynamics and to define two to three

10   scenarios with the smallest possible team while setting up B6

11   clean room."  What does that mean?

12   **A.**   What we wanted to do is be very definitive about putting

13   together a schedule, identify a couple of ways it could

14   credibly work, and do it in a way where the people involved

15   are not otherwise touching the day-to-day ops of the

16   business.

17   **Q.**   And it is the third row -- the row's numbered 3, develop

18   potential scenarios.  That's describing different potential

19   implementations, is it?

20   **A.**   Correct.

21   **Q.**   Okay.  And then -- and ten there's -- what's under 4,

22   "evaluate scenarios"?

23   **A.**   It's evaluating the outputs of those three scenarios

24   above in a couple of different ways.  This market share to

25   QSI gap closure is the idea that -- like, we have a lot of

1    modelling where we can kind of predict based on how network

2    relevance changes, which is something we call "QSI," a

3    quality and service index, what it does to market share.

4         And what we find is that the greater your network

5    relevance grows, it's almost like an S curve effect of market

6    share.  You're able to collect more of it.  This is exactly

7    the example I was making of if we only fly JFK-LA and they

8    fly a lot more, we get less market share.  So the first thing

9    is, if we do this -- any of these scenarios, do we actually

10   improve on that metric?

11        The second is, okay.  As we do it, are we

12   generating more revenue per equivalent seat kilometer?

13   Which, for all intents and purposes, is the same thing as an

14   available seat mile.

15        And then last but not least, this raven model runs

16   is effectively our P&L forecaster.  It -- once you put a

17   schedule together, it can go and say are you generating more

18   revenue with it than -- in absolute than what came forth.

19   Q.  Raven is a forecasting tool?

20   A.  It is.

21   Q.  And it's proprietary to American Airlines?

22   A.  It is.

23   Q.  Okay.  So let's put up Plaintiff's Exhibit 279.

24        THE COURT:  These are all people who are on this

25   team who are American Airlines employees?

1          THE WITNESS:  Yes.  Or --

2          THE COURT:  Or external consultants.

3          THE WITNESS:  No.  They're all American Airlines

4     employees, but they're outside of the day-to-day workings of

5     scheduling.

6          THE COURT:  No JetBlue people yet?

7          THE WITNESS:  Not yet.  Not named on that sheet.

8     BY MR. WALL:

9     **Q.**  There is a JetBlue component to the clean team, though,

10    right?

11    **A.**  Correct, but just the ones named on that sheet were all

12    of our AA employees.

13    **Q.**  Right.  Okay.

14          So now what we have here is Plaintiffs'

15    Exhibit 279.  Do you recognize that?

16    **A.**  Yes.

17    **Q.**  Okay.  And the -- this is a draft of a document.  Was

18    this a draft for you?

19    **A.**  I think so.  If it was an overview and status update, it

20    probably was, but my guess is it was probably used --

21    probably most prominently with me.  Maybe one or two others,

22    too.

23    **Q.**  Okay.  So let's look at slide 2 and why don't you just

24    take us through slide 2 and what's being shown here.

25    **A.**  Yes.  This is -- this is effectively the project charter

1    of what we called Project Garland, which was what later

2    turned into the NEA.  How do we go -- much like we describe

3    in that Alaska e-mail, how do we go and create a real

4    customer proposition that can go and compete, one that drives

5    connectivity that makes a bigger thing and then it charters

6    the approach of the clean team and defines what their

7    deliverable is.

8    **Q.**   Okay.  Thank you, sir.

9         Under the "Goals," the first thing that is

10   mentioned there is, "Addresses AA/B6 incomplete customer

11   proposition relative to DL/UA in NYC."  What's does that

12   mean?

13   **A.**   This is exactly the market relevance point that I have

14   been speaking to; that what we want to be able to do is, when

15   you put it together, be able to cover the largest markets

16   with a competitive schedule pattern, similar number of

17   frequencies, and be able to potentially even open new markets

18   that play to the strengths of these two respective carriers.

19   **Q.**   Okay.  Now, if we go forward later in this deck -- let's

20   pull up slide 9.  Are you familiar with this particular

21   slide?

22   **A.**   Very much so.

23   **Q.**   Why don't you describe what's going on in this slide and

24   what significance it had to you when it was presented to you.

25   **A.**   Well, look, I jokingly called it the eureka slide at the

1    time.  I'll take it apart here.

2           The -- what this shows is what the -- an abstract.

3    It shows the statistics of what a combined and optimized AA

4    plus JetBlue looks like relative to its competitors.

5           Now, you see -- I'll read it kind of right to left

6    in New York City.  So there's AA.  That's basically us in the

7    baseline for this.  JetBlue, the baseline in this.  AA plus

8    JetBlue is if you just did, effectively, codesharing, you put

9    it all together.  And then AA plus JetBlue optimized is the

10   output of the clean team.

11          Now, on the surface of it, it may even kind of look

12   similar at first, but in AA/JetBlue, you add 13 more nonstop

13   markets.  You have more daily seats.  You have better

14   coverage.  But what really gets interesting in this top thing

15   is that you have materially more long-haul international

16   markets which is just -- and again, being able to do

17   something like that is huge.

18          Then where it gets really interesting -- and this

19   was the theory we had, that these -- this team proved out, is

20   this bottom chart on the left.  It says, "New patterns

21   provide optimal customer offering."  Now, before, this is the

22   Austin schedule out of New York.  And so here what you see is

23   exactly what -- kind of what the judge was asking about

24   before.

25          So United and Delta almost have, like, this hourly

1    pattern.  If you're -- if you're a traveler that travels a
2    lot and travels a lot there, you're flying one of those two
3    guys.  Note that JetBlue and American flights are stacked up
4    on top of one another.  That evening trip is the peak time
5    trip.  That JetBlue trip in the morning is there to help go
6    make the schedule rotation go.  But you see from that, we're
7    just a spill carrier in this market.
8            Now when we're able to go and optimize the slot
9    portfolio together, look at that.  I still like looking at
10   this thing.  But we now have a competitive schedule there.
11   We didn't even have that before.
12           And then you go look at the right.  And, I mean,
13   things like that Amsterdam and Brussels, and, like, Geneva,
14   Tel-Aviv, Johannesburg, American Airlines -- it never dared
15   to even dream about market like Johannesburg or Tel-Aviv out
16   of New York before because they were so heavily New York
17   originating.
18           So I jokingly call it the eureka slide, but it
19   is -- this thing together now creates something which is
20   competitive with Delta and United.  Like this is an
21   incredible New York to go and fly on.
22           And as I recall, too, in the slides leading up to
23   it, it shows that when you create that kind of value, I mean,
24   it was a really compelling financial thing for us, too.
25   Q.  Okay.  After receiving this, did you make a

1   recommendation to management about whether it should go

2   forward with the NEA?

3   **A.**   Yes.

4   **Q.**   And what was that recommendation?

5   **A.**   Do it.

6   **Q.**   And, now, the suggestion has been made by the plaintiffs

7   in this case that you could have accomplished these kinds of

8   benefits with just a regular codesharing relationship.  Is

9   that true?

10  **A.**   By no means.  That's what the gray is.  In fact, I mean,

11  the gray is the Austin-before thing.  It doesn't really go

12  and add very much value to anybody by doing that.

13           In fact, we valued -- the difference between code

14  and the reoptimize thing was -- I mean, it was an order of

15  magnitude difference.

16  **Q.**   Let's go back to slide 6 very briefly.  So you had

17  considered the codesharing option as part of this process?

18  **A.**   Yes.

19  **Q.**   And is this the slide that's referencing that?

20  **A.**   Correct.

21  **Q.**   And what was your conclusion?

22  **A.**   Though interesting, it doesn't really produce a ton of

23  value.  And more than anything, it's just -- it doesn't do

24  anything if you're a customer.  Like, look at -- look at, you

25  know, Austin.  Look at Raleigh.  It's -- it's still not at a

1    place where you'd actually go and fly.  If you haven't -- the

2    charter of this thing was, just like the West Coast alliance,

3    was make something which is competitive with Delta and

4    United.  A customer should -- one of those high, like,

5    frequently flying customers should want to fly on us.  It

6    doesn't address that.

7    **Q.**  Okay.  Let's move on to negotiating the NEA.  You were

8    heavily involved in those negotiations?

9    **A.**  Yes.

10   **Q.**  You signed the NEA agreements for American Airlines?

11   **A.**  I did, yes.

12   **Q.**  Okay.  Let's talk about these, these agreements.  I'm

13   going to put up here first what is Plaintiffs' Exhibit 001A,

14   which is a redacted version of the NEA agreement.

15            Okay.  So the -- the -- the NEA agreement is sort

16   of the umbrella agreement that collects all of the different

17   components of the other agreement, right?

18   **A.**  Yes.

19   **Q.**  Okay.  So let's just talk about a couple of the

20   particulars of this one.  Let's look at page 3 and Section 3,

21   "Operation of the NEA," and in particular, Section 3.1,

22   "Network Growth and Consultation."  Okay?

23   **A.**  Yes.

24   **Q.**  Okay.  We'll put that up.

25            MR. WALL:  I think if you can -- if you have a way

1    of capturing the next page, that would be helpful because it

2    spills over.

3    BY MR. WALL:

4    **Q.**   While he's doing that, maybe you can just read

5    Section 3.1.1 aloud for us?

6    **A.**   "The parties agree to use commercially reasonably efforts

7    to coordinate the NEA services, particularly with regard to

8    codeshared flights, in order to minimize connecting passenger

9    waiting time and to maximize passenger convenience and

10   service, subject to the parties' prospective operational

11   constraints and commercial considerations."

12   **Q.**   That's fine for now.

13          So can you explain to the Court what you understand

14   that -- to commit the parties to do with -- with respect to

15   setting schedules?

16   **A.**   Make the best airline network for customers and get them

17   off of Delta.

18   **Q.**   Are you -- are there other elements of capacity planning

19   at airlines beyond just setting schedules in the way that

20   it's described here?

21   **A.**   Oh, sure.

22   **Q.**   Do you coordinate fleet plans under the NEA?

23   **A.**   We do not.

24   **Q.**   Do you coordinate what your overall industry-wide

25   capacity is over --

1    **A.**   Absolutely not.

2            MS. SWEENEY:  Objection.  Leading.

3            THE COURT:  Sustained as to the form.

4    BY MR. WALL:

5    **Q.**   Okay.  Let's just go on further in Section 3.1.1, it

6    says, "Notwithstanding this Article 3 or Article 4, each

7    party will continue to make independent decisions regarding

8    pricing, capacity, and network management for its scheduled

9    passenger services."

10           What do you understand that to mean?

11   **A.**   That the parties are free to go and price as they see fit

12   to determine their maintenance routings, go, you know, fly a

13   route to Timbuktu if they so choose to do it.  They're --

14   what we do is we just optimize our planning and scheduling in

15   New York for the benefit of those customers --

16   **Q.**   And when you --

17   **A.**   -- in Boston.

18   **Q.**   And when you get recommendations from the joint planning

19   teams that are envisioned here, is American Airlines bound to

20   accept those --

21   **A.**   No.

22   **Q.**   -- recommendations?

23   **A.**   We are not.

24   **Q.**   Is it any different than whether you are bound to accept

25   the network planning recommendations of your own internal

1    planning teams?

2    **A.**  No, it is not.  And those recommendations aren't always

3    accepted.

4    **Q.**  Let's just put up -- and I'll ask to direct your

5    attention to the -- page 1, recital five of the NEA

6    agreement, which reads, "Both parties acknowledge and agree

7    that each will retain full control over all aspects of their

8    respective businesses, including setting pricing for their

9    services and making decisions regarding their capacity and

10   their route networks."

11          Do you see that?

12   **A.**  I do.

13   **Q.**  Why is that there?

14   **A.**  To make it very clear to everybody that we are still two

15   independent airlines.  We're coming together just to serve a

16   very particular purpose in the NEA markets.

17   **Q.**  Let's put up Sections 3.3 and 3.4 that are on page --

18   pages 4 and 5 of the NEA agreement.

19          So Section 3.3 is entitled "Co-Location Facilities

20   and Other Operational Efficiencies."  And it says, "The

21   parties will consider opportunities to better utilize assets

22   for the NEA at the NEA Airports and other facilities to

23   obtain operational efficiencies or other benefits of the NEA

24   and for passengers using services including in the NEA,

25   including, perhaps, having co-located facilities at agreed

1    airports."

2         There's a fair amount of airport jargon in that.

3    Can you explain what your understanding of that is?

4    **A.**  Yeah.  It's simply that, in all of these airports, there

5    could be a lot of benefits to both of us to use gates more,

6    to make it more convenient for customers to be able to

7    connect from one end of Boston to the other.

8         This was what -- this was the sentiment that led to

9    things like having a bus between their T5 in Kennedy and our

10   T8, which is behind security and is the fastest way to

11   connect in New York.  Similarly in Boston, we made --

12        THE COURT:  As compared to any possible connection

13   in New York?

14        THE WITNESS:  At least compared to Delta.  It's --

15   the fastest connection is actually American Airlines T8 to

16   T8.  Not to quibble.

17   BY MR. WALL:

18   **Q.**  Well, that's come a couple of times, so why don't we just

19   pause and you can tell the story of the bus.  What bus are

20   you talking about?

21   **A.**  So the -- one of the major challenges in JFK is, though

22   it's called one airport, in some ways, it's almost like four

23   or five different ones that are -- that are based around an

24   airfield.  And for us, we own the T8 facility.  JetBlue is in

25   T5.  Delta is in varying T2 to T4.  The challenge with T5 and

1    T8 is they're not connected.  They're separated.  There's

2    open space between the two of them.

3           So the -- prior to this bus, the only way to

4    actually connect from T5 to T8 would be to leave security and

5    go through it.  So what we did is we actually made a bus that

6    goes back and forth from these two terminals and, at a peak

7    time, could run every 15 minutes or so.

8           And that is -- that facilitates connections so

9    that, if you arrive on a JetBlue flight, you can take the bus

10   over and connect to American Airlines without having to break

11   security.  And that's a faster thing than actually if you

12   have to do the same thing as a T2 domestic arrival to a T4

13   international arrival, which is what Delta did.

14          And so we -- something that maybe I'm more proud of

15   than most.  We spent lot of time timing all that stuff to

16   make sure that it's actually faster.

17          MR. WALL:  Your Honor, you'll actually see a movie

18   about the bus.

19          THE WITNESS:  I'm proud of this bus.

20          MR. WALL:  Let's go on to the next section --

21          THE COURT:  TSA on the bus?

22          THE WITNESS:  I'm sorry.

23          THE COURT:  Is TSA on the bus?

24          THE WITNESS:  TSA?

25          THE COURT:  Yeah.

1              THE WITNESS:  No, because you're clearing in the

2      one or the other.  So you can clear --

3              THE COURT:  In between it's just an American or

4      JetBlue bus driver and --

5              THE WITNESS:  Oh, yeah.  Exactly.  Yeah.  That's

6      right.

7      BY MR. WALL:

8      Q.  Okay.  So let's do Section 3.4, please.  Put that up

9      there.  And this is slot usage and maintenance, about which

10     we've heard a lot.

11             So can you just describe for us very briefly how

12     this part of the --

13             THE COURT:  Just so you all know, there's going to

14     be an announcement in a minute, because the Zoom went off and

15     whenever we reconnect to the Zoom, there's like an

16     announcement that comes out through the system.  So don't be

17     disturbed by that.  You can keep going.  Go ahead.

18             MR. WALL:  Okay.  Hi, you all.

19     BY MR. WALL:

20     Q.  So okay.  Slot usage and maintenance, we've heard a lot

21     about the slot terms of this.  Can you just describe at a

22     high level how the NEA results in slot sharing?

23     A.  Yeah.  The slots are effectively pooled.  The idea is

24     build a schedule so that we have the right kind of schedule

25     patterns that are there, and so effectively, we just transfer

1    slots back and forth for the purposes of being used in the

2    NEA, but each party still owns its slots.

3    **Q.**   And there is -- there's a reference in Section 3.4.1 to

4    the terms and conditions that are set forth in Appendix C.

5    That's just a more formalized slot lease agreement?

6    **A.**   Correct.

7    **Q.**   Now, does -- does JetBlue pay any cash remuneration for

8    the slots that it uses under the NEA?

9    **A.**   None.

10   **Q.**   How then are you compensated?

11   **A.**   We're not compensated.

12           THE COURT:  So when they lease a slot, when they

13   get a slot from you, there's a lease agreement, but no

14   payment?

15           THE WITNESS:  Correct, there's no payment, because

16   the idea is that we -- we don't want to create the

17   inefficiency that leasing slots is going to go and compromise

18   that schedule to Austin, right?  The idea is to make the

19   schedule to Austin that way.

20           And the way we all get paid is that we generate

21   more revenue into the pool, and we have mechanisms to

22   distribute that.  That's the value, not a slot deal.

23   BY MR. WALL:

24   **Q.**   Right.  In that regard, let's pick up, with some

25   trepidation, the subject of revenue sharing.  That is spelled

1   out in the separate agreement that's called the MGIA, right?

2   **A.**   True.

3   **Q.**   That's Plaintiffs' Exhibit 1B, and we'll put up the

4   redacted version of that one.

5           Now, this is a long and detailed agreement, some

6   30 pages long.  Can you just tell the Court how you came up

7   with the concepts and how it ultimately turned into what we

8   have here in the MGIA?

9   **A.**   Yeah, sure.  They're based out of things that we do in

10  international joint ventures.  They're designed -- great

11  common incentivizes us for us to be able to grow and make the

12  right capacity choices.

13  **Q.**   Okay.  So was it a particular joint business or just a

14  composite?  What's the providence of this?

15  **A.**   Look, all of our joint businesses have some form of a

16  revenue share that are in them.  And we find two things,

17  right?  The capacity coordination is necessary but not

18  sufficient to create the values you saw on that JFK Austin.

19  The next thing is people have to have a financial incentive

20  to do it because, again, that -- in that case, I forget what

21  it was -- the 7 p.m.  time slot is the peak time slot.

22          Well, in order to create the pattern we're

23  competitive they're throughout the day, someone's got to fly

24  out at 2:00.  Well, if you don't have an incentive to go fly

25  at 2:00, you're actually deoptimizing your own metal to do

1    it.

2           So the idea behind revenue share is it relaxes

3    that, right?  Now, everybody flies the best schedule.  AA and

4    JetBlue work together to fly the best schedule there.  And

5    what the revenue-sharing agreement does is it effectively

6    means that we pool all the revenue, and then we redistribute

7    in an equitable way.

8    **Q.**  Now, let's talk a little bit about the specifics of that.

9    When -- when you talk about sharing the revenue, the MGIA

10   makes a distinction between baselines and incremental

11   measures of revenue and growth, right?

12   **A.**  Correct.

13   **Q.**  Can you explain to the Court kind of just generally how

14   that works and why it works that way?

15   **A.**  Sure.  The concept behind it is, prior to us doing any

16   kind of a deal, everybody generated some kind of unitized

17   revenue performance.  And then once we go and do this deal,

18   we should generate something more, which we -- which we

19   split.

20          So that base thing is called our "base position."

21   Then after that, whatever other revenues either carrier

22   generates is put into a pool.  Everything that's over a year

23   incremental position gets apportioned based on the amount of

24   capacity you fly.

25   **Q.**  So once you've established what that incremental revenue

1   is, how do the carriers decide which -- who gets which part

2   of that?

3   **A.**   Well, it's not like a negotiation or anything.   It's a

4   set of formulas that are laid out here based on the

5   percentage of the capacity that you're flying.

6   **Q.**   So how does the relative capacity of the two carriers

7   affect the MGIA calculations?

8   **A.**   Well, the more -- it incentivizes both carriers to

9   effectively grow.

10   **Q.**   How so?

11   **A.**   Because what you want is you want to generate more

12   revenue.   So effectively what this does is it de-risks you

13   doing what we call, like, "project flying," or taking

14   experiments.

15          When we do -- if we were to just go start a route

16   like JFK-Tel-Aviv on our own, you're not guaranteed anything.

17   When we go to do this now we know that we'll be able to hit

18   our base position of revenue.   And then everything else is a

19   function of what we can do together.

20          So JetBlue wants to go and support Tel-Aviv because

21   they want the incremental pool to get big.   We want to go

22   support them when they're flying to Myrtle Beach or whatever

23   the case might be.   And so we have every incentive to go and

24   both add capacity and grow -- like, be able to grow the

25   revenue that we share from it.

1    **Q.**   Now, you mentioned that American Airlines sees a similar

2    revenue sharing in other alliances.  What has --

3             THE COURT:  How do you know you're going to hit

4    your base at Tel-Aviv if you do it this way, but you didn't

5    know that if you did it alone?

6             THE WITNESS:  That's an excellent question.  So

7    none of the -- everything --

8             THE COURT:  Nobody ever tells me I ask a bad

9    question.  I'm not trying to believe the unity and the

10   quality --

11            THE WITNESS:  Nobody ever tells me I asked a bad

12   question too, but I know I do, though.

13            But, yeah, so the -- it's not done at the route

14   level, right?  So when we start Tel-Aviv, we know that all

15   the capacity that we go, if we -- I'll make up a 100 units of

16   capacity.  We know that each of those units, whether one unit

17   goes to Tel-Aviv or one goes to Austin, will come back to us

18   at our base position.  So --

19            THE COURT:  In the contract?

20            THE WITNESS:  Correct.

21            THE COURT:  I got it.

22            THE WITNESS:  And so you want to generate something

23   above the base position.  That's why, through this thing,

24   like, there's a bunch of routes that historically we wouldn't

25   have gone into, Boston-Cincinnati and places like that, all

1    because of that construct.

2    BY MR. WALL:

3    **Q.**   You mentioned that American uses similar revenue sharing

4    in other alliances, including the immunized international

5    ones.  What has been your experience with the effects of

6    these kinds of revenue sharing terms on growth?

7    **A.**   They've been significant for us.  Look, in -- since

8    entering into our transatlantic joint venture, we've grown at

9    a greater rate than we grew before it.  Were it not for

10   COVID, the same would be true in your transpacific joint

11   ventures, that whenever we have been in one of these

12   structures, it facilities growth for ourselves and

13   partnerships.

14          And, frankly, it facilitates a growth in just

15   product innovation.  Prior to the Atlantic joint venture, we

16   didn't operate flat-bed seats in transatlantic.  We didn't

17   have a premium economy cabin.  Within, like, a year of being

18   in the transatlantic venture we were outfitting all of our

19   planes to have flat-bed seats and premium economy, and now

20   it's become a standard across the whole industry.  We learned

21   that from British Airways.

22   **Q.**   Okay.  One last agreement that I want to talk about here.

23   This is the frequent flyer agreement.

24          THE COURT:  I'm sorry; I just want to circle back

25   to the base for a minute just to make sure I understand this.

1          So whether you take that 100 -- call it one plane

2     with 180 seats.  It's -- you had it before you were flying

3     some route.  It's in your base.  You're going to get credit

4     for that whether you send that to Tel-Aviv or whether you

5     send it to Raleigh-Durham.  But then how are you expanding --

6     how does something show up as expanding capacity in the MGIA?

7          THE WITNESS:  So what you're going to be doing

8     is -- like, a lot of what we end up doing in the MGIA in our

9     actually schedules is those 50-seat regional jets in JFK

10    never turn into 75-seat jets.  They turn into 300-seat

11    international jets that are now flying to Tel-Aviv and Delhi

12    and Doha and places like that.  So the capacity --

13         THE COURT:  So the difference between those two is

14    an increase in capacity out of the NEA?

15         THE WITNESS:  Correct.

16         THE COURT:  I see.  So it's what you're flying out

17    of the NEA.  So there's an incentive for you to swap in

18    bigger planes for -- just looking at the whole universe of

19    how many seats, if it's seats, you're flying out of the NEA,

20    that you have an incentive to swap in bigger planes?

21         THE WITNESS:  Correct.  And we've upgauged the

22    entirety of New York and Boston for that reason.

23         THE COURT:  Okay.  All right.  And then that's the

24    incremental?

25         THE WITNESS:  Exactly.

1        THE COURT:  Okay.

2    BY MR. WALL:

3    **Q.**  Okay.  The last thing I wanted to talk about briefly here

4    is the frequent flyer agreement.  That's at -- that's also a

5    separate contract as part of the NEA, right?

6    **A.**  Correct.

7    **Q.**  Okay.

8    **A.**  Sorry.

9    **Q.**  And just at a very high level since it's getting late in

10   the day, can you just summarize the frequent flyer agreement

11   and its role in the overall NEA package?

12   **A.**  Sure.  This is, in some ways, the sort of final piece of

13   making a network that's attractive to that frequently flying

14   person.  In order to truly get them off of Delta and United,

15   they have to be able to earn miles.

16        In whatever program they're in -- ours is

17   advantage, JetBlue's is TrueBlue -- they should be able to

18   earn miles.  They should be able to redeem on the entirety of

19   these networks, and they should be able to have their flights

20   count towards achieving status.

21        So what the frequent flyer program or the frequent

22   flyer deal does is just set the terms for how those are --

23   that works.

24   **Q.**  Thank you, sir.

25        THE COURT:  It's a currency transaction?

```
 1                  THE WITNESS:  Correct.  That's exactly what it is.
 2      Yeah.
 3                  MR. WALL:  Thank you, sir.
 4      BY MR. WALL:
 5      Q.   Okay.  So the parties reached agreement on the terms of
 6      the NEA in July 2000.  Did it -- at some point thereafter,
 7      did you make a report to the board of directors on the NEA
 8      what you had done?
 9      A.   Yes.
10      Q.   Let me show you what's already been admitted as
11      Defendants' Exhibit 25, another one that's -- I think we saw
12      earlier.  And I believe the slides related to the NEA are
13      slides 60 to 67.  So if you could just quickly confirm that
14      for me.  Here, they're up on the screen.
15      A.   There we go.  Yep.
16      Q.   So did you deliver these slides at the meeting?
17      A.   We did.
18      Q.   Okay.
19      A.   I did.
20      Q.   So let's go first to slide 61.  Could you please explain
21      what it is that you were explaining to the board about the
22      case that led to the NEA?
23      A.   Yeah.  We're showing the -- effectively the largest
24      originating markets in the US, both in revenue, passengers
25      per day, and then also what percentage of all of contracted
```

1    corporate customer travel originates in all of those cities.

2    **Q.**   Okay.  Let's go to the next slide.  And what's going on

3    with this one that begins "separately AA and B6"?

4    **A.**   This started to illustrate how we compare -- in terms of

5    competitive capacity versus Delta and United separately and

6    then together.

7    **Q.**   Okay.  Let's go to the next one.  And if you could

8    explain what you told the board with this one.

9    **A.**   This is to describe what we do.  This is a description of

10   the outputs of the clean team.  So it's how we would

11   effectively strategize through these different groupings that

12   we have in these markets.

13         So, for example, like, one of the things that

14   certainly has always been near and dear to my heart is that

15   we have flatbeds in over transcontinental market.  So that's

16   New York and Boston to, as we call it, all of the cities

17   where you can see water in the West Coast -- so Seattle,

18   Portland, San Fran, LA, San Diego.

19         And to this day, we are the only -- the NEA is the

20   only people that have flatbeds on all of those -- have a

21   flatbed in every one of these markets.

22         Similarly, transatlantic, we get to go and fly a

23   bunch of new flights.  In LaGuardia, we can now start doing

24   different things where, you know, for JetBlue they have

25   different fleet types.  They have a 100-seat airplane in

1    the --

2              THE COURT REPORTER:  I'm sorry; say that again

3    slower.

4              THE WITNESS:  Sorry.

5              THE COURT:  A 100-seat aircraft in the --

6              THE WITNESS:  JetBlue has different fleet types

7    than we do.  For example, they have 100-seat airplanes, and

8    that enables them to serve markets more economically than we

9    can.  We have bigger jets than they do, not just wide bodies,

10   but 200-seat narrow bodies, so we could reoptimize that.

11             Of course, there's a huge upgauging component,

12   which we've talked about a lot today.

13             And then, in Boston, one of the things we found

14   after -- after the clean teams were working through it, is --

15   I described this box earlier, these midcontinental markets

16   where AA is really, really strong in.  Here, we show

17   St. Louis and Indianapolis.  And we can go fly more of those.

18   BY MR. WALL:

19   Q.   Great.  Let's go to the next slide, please.  And then

20   this is something -- this is familiar, looks like something

21   we saw earlier, but what's happening with this chart?

22   A.   This is -- this is the same thing.  We're showing how

23   we've improved the schedule patterns for everybody.  I

24   confess, maybe much like the bus, I couldn't probably spend

25   enough time talking about something like this, because in the

1    world of airline network and schedule planning, I mean,

2    frankly, I spent 18 years trying to figure out how to do this

3    in New York, and the clean team did it.  So we talked about

4    how we did that.

5              MR. WALL:  Next slide, please.

6    BY MR. WALL:

7    **Q.**  And then that's familiar -- that's -- you presented those

8    different metrics on nonstop markets, daily seats, et cetera,

9    to the board as well?

10   **A.**  Correct.

11   **Q.**  And then, finally --

12             THE COURT:  This is the presentation to the board

13   as to why they should approve this?

14             THE WITNESS:  Correct.  That's exactly right.

15   BY MR. WALL:

16   **Q.**  And the next one?  There may not be a next one.  And then

17   what's going on with this?

18   **A.**  This is us trying to explain to the board here -- here's

19   what we think the change to our P&L would be when we do this.

20   Now, very importantly in this P&L, what we do is -- this is

21   called our "after ownership contributions.

22             "  So this is -- it does not -- like, 376 and the

23   base doesn't include the cost of owning all of the airplanes

24   and the facilities that are there.  But what's very important

25   about this is this the difference between us making money in

1    these markets and us losing money in these markets.

2    **Q.**   Thank you.

3            MR. WALL:  Your Honor, I've still got enough

4    material where I'm not going to finish today.  Mr. Raja can't

5    come back on Monday.  We've already told the plaintiffs about

6    that.  So I think this would probably be a good time to

7    break, and we're going to just have to report back to you on

8    how we pick this up, probably Thursday or so of next week.

9            THE COURT:  All right with you?

10           MR. JONES:  Yes, Your Honor.  We'll work with

11   defendants to schedule the rest of Mr. Raja's time.

12           THE COURT:  Okay.  That's fine.  All right.  I

13   mean, I don't have -- as a general proposition, I don't have

14   a problem with taking people out of order, so -- to

15   accommodate people's schedules.  And though I'm willing to

16   stay for a lot longer, I'm perfectly happy to end the day.

17           MR. WALL:  Well, if you're willing to stay for a

18   lot longer --

19           THE COURT:  I don't know how much longer you want

20   to stay.

21           MR. WALL:  Well, I mean, if you're willing to stay,

22   I would love to finish and get --

23           THE COURT:  How much longer do you have?

24           MR. WALL:  I have about 15 minutes, and then they

25   have whatever they have.

```
 1              THE COURT:  How long do you --
 2              MR. JONES:  Your Honor, we think probably about
 3     30 minutes of redirect.
 4              THE COURT:  Why don't we take a two-minute recess,
 5     and I talk to the court staff, and then I'll come back out
 6     and I'll --
 7              MR. WALL:  Fantastic.
 8              MR. SCHWED:  Your Honor, just before we leave -- I
 9     assume we're definitely finishing with Mr. Raja.
10     Mr. Laurence can catch a plane?
11              THE COURT:  I'm sorry?
12              MR. SCHWED:  The next witness is not going to get
13     called now?  I just -- he needs to catch a plan.
14              THE COURT:  Yeah, no, we're not going on to --
15              MR. SCHWED:  Okay.
16              (Brief recess taken.)
17              THE COURT:  You can be seated.
18              So I think in the better course is to allow the
19     witness to prove up the network.  He can fly back here
20     another time.
21              I think -- I mean, I'm -- you know, my general view
22     is to keep on going; but I think that, in fairness to all of
23     you and to the court reporter and to the staff -- and also,
24     you know, this is an important case for you all of you, and I
25     want to do the best that I can possibly do.
```

1          And so -- well, it's just -- it is -- gets harder

2     to pay attention as the day wears on into, like, for

3     another -- we were talking about at least another hour, and

4     as a practical matter, it may be more.  So I think it makes

5     more sense -- that's my thinking about it -- it makes more

6     sense to adjourn now and work out another time for him to

7     come back.

8          I'm -- as a general proposition, that's fine with

9     me that we don't finish him today.  We can do somebody else

10    Monday, what have you, and then he can come back another

11    time.

12         MR. WALL:  Understood, Your Honor.  I think you're

13    going to find that next week, you're not going to be able to

14    tell whose case in chief you're in for much of it because of

15    this.  We have got a bunch of stuff to move around.

16         THE COURT:  That's fine.  You know, I see --

17    there's overlapping for lots of witnesses.  There's

18    overlapping things relating to both of your cases.  I get

19    that, and that's fine.

20         And so a couple of things, just -- unless you have

21    something else on any of that -- that I just wanted to --

22    anything else for any of you?

23         So just a couple of quick things to think about.

24    One is, in terms of giving you some more -- I talked about

25    giving you a little more time than I issued in that schedule

1  that I gave you originally, in part, to account for the

2  breaks and closing arguments.  I'm going to do that.  I

3  haven't figured out exactly when, but I do know when it won't

4  be.  It won't be Friday, October 21st.

5          So that week, we have some time on Monday, and

6  we'll have the time on Monday; but the rest of the week, I

7  have no -- I won't have any time for you for sure.  So in

8  terms of your own planning, it won't be Tuesday, Wednesday,

9  Thursday, Friday, and it will be the following week is when

10 I'll give you some more time.  And I'll try to look at that

11 and try to fix it if we can't figure it out early next week

12 so you know for our own planning purposes.

13         And we can do -- I owe you a couple minutes today

14 probably.  And you can add that in if you wish, and we'll --

15 the time for the breaks or whatever, a little more time and

16 also the closing arguments then.

17         The second -- to the extent you come up with,

18 either of you -- like, today happened with the

19 demonstrative -- and you get it in the meddle of night, my

20 suggestion is -- you all have e-mail -- just e-mail it right

21 away.

22         Maybe you're all -- maybe there is a time in the

23 24-hour cycle where, on both teams, there's nobody working --

24 I hope.  But in any event, you can e-mail it when you get it

25 or when it's at the point that it's, like, close enough to

1    share.  And even if that's only 20 minutes before court, it's

2    better than in courtroom, and two hours before is better than

3    that.  I understand those things come up, and so -- but

4    that's the best practice.

5            I think those are the only -- the only things I

6    have at the moment other than I wish you all a good weekend,

7    and I'll see you Monday morning.

8            I guess -- I'm going to give you back -- since

9    we're keeping one set for each witness, I don't need his set

10   for now.  You can give it back to me when he comes back.

11           Thank you.

12           (Court in recess at 4:48 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/ Rachel M. Lopez                    September 30, 2022
/s/ Robert W. Paschal

_____          _____
Rachel M. Lopez, CRR                    Date
Robert W. Paschal, RMR, CRR
Official Court Reporters