1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3

4        _____

5    UNITED STATES OF AMERICA, et al.

6            Plaintiffs,                    Civil Action No.
                                            1:21-cv-11558-LTS
7        v.

8    AMERICAN AIRLINES GROUP, INC.,
     et al.,
9
             Defendants.
10
     _____
11

12        BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                           BENCH TRIAL
                               Day 5
15

16
                        Monday, October 3, 2022
17                           9:00 a.m.

18

19

20
     John J. Moakley United States Courthouse
21   Courtroom 13
     One Courthouse Way
22   Boston, Massachusetts

23
     Rachel M. Lopez, CRR
24   Official Court Reporter
     raeufp@gmail.com
25

1                    **A P P E A R A N C E S**

2

On behalf of the Plaintiff United States of America:

3

     UNITED STATES DEPARTMENT OF JUSTICE
4    BY:  WILLIAM H. JONES, III; AND KATE RIGGS
     450 Fifth Street, Northwest
5    Suite 8000
     Washington, D.C.  20530
6    (202) 514-0230
     bill.jones2@usdoj.gov
7    kate.riggs@usdoj.gov

8

9   On behalf of the Defendant American Airlines Group, Inc.:

10       LATHAM & WATKINS, LLP
         BY:  DANIEL M. WALL
11       505 Montgomery Street
         Suite 2000
12       San Francisco, California  04111
         (415) 391-0600
13       dan.wall@lw.com

14

15  On behalf of the Defendant JetBlue Airways Corporation:

16       SHEARMAN & STERLING LLP
         BY:  RICHARD F. SCHWED
17       599 Lexington Avenue
         New York, New York  10022
18       (212) 848-4000
         richard.schwed@shearman.com
19

20

21

22

23

24

25

**TABLE OF CONTENTS**

**TRIAL WITNESSES**

On behalf of the Plaintiff:                                    Page

ROBERT ISOM

       By Mr. Jones                                   6

       By Mr. Wall                                    49

       By Mr. Jones                                   85

SCOTT LAURENCE

       By Ms. Riggs                                   99

       By Mr. Schwed                                  221

**EXHIBITS**

On behalf of the Plaintiffs:                              Admitted

Number PX0014                                             15

Number PX99                                              38

Deposition of Scott Laurence, page 160, lines 13          24

to 15

Number 452                                              171

Number 844 and 844A                                     215

Number 845A                                             165

Number 2000                                             183

| | |
|---|---|
| Deposition of Scott Laurence, June 2021, page 149, line 23 to page 150, line 1 | 117 |
| Deposition of Scott Laurence, June 2021, page 150, lines 3 to 11 | 119 |
| Deposition of Scott Laurence, June 2021, pages 143, line 12, to page 146, line 25 | 140 |
| Deposition of Scott Laurence, June 2022, page 115, line 20 to page 116, line 3 | 194 |

On behalf of the Defendant JetBlue:                Admitted

Number 284 and 285B                                      222

Number 1075A                                              76

PROCEEDINGS

1
2          (In open court at 9:00 a.m.)
3          THE DEPUTY CLERK:  The United State District Court
4   for the district of approximate Massachusetts is now in
5   session, the Honorable Leo T. Sorokin presiding.
6          THE COURT:  Please be seated.
7          Everybody have a good weekend?
8          MR. WALL:  We did, Your Honor.
9          THE COURT:  All right.  We ready to go?
10         MR. JONES:  Yes, sir, we are.
11         THE COURT:  All right.  Who's next?
12         MR. JONES:  Plaintiffs' call Robert Isom of
13   American Airlines.
14         THE COURT:  All right.  Mr. Isom, if you'd come
15   forward, remain standing for Ms. Belmont to administer the
16   oath.
17         (The witness was duly sworn.)
18         THE DEPUTY CLERK:  Can you please state your name
19   and spell your last name for the record.
20         THE WITNESS:  Robert Isom, I-s-o-m.
21         THE COURT:  And if you have a seat right there.
22         THE WITNESS:  Thank you.
23         MR. JONES:  Your Honor, if we may approach with
24   binders?
25         THE COURT:  Of course.  You don't need to ask.  You

1    can just do that with each witness.

2              MR. JONES:  May I proceed, Your Honor?

3              THE COURT:  Yes, go right ahead.

4                    **ROBERT ISOM**

5         having been duly sworn, testified as follows:

6      **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

7    BY MR. JONES:

8    **Q.**  Good morning, Mr. Isom.  I'm Bill Jones, one of the

9    attorneys for the United States in this matter.  We met

10   previously at your deposition.

11             You are the CEO of American Airlines; is that

12   right?

13   **A.**  Yes.

14   **Q.**  And you've been in that job since March of this year; is

15   that right?

16   **A.**  Yes.

17   **Q.**  And before that, you were the president of

18   American Airlines, right?

19   **A.**  Yes.

20   **Q.**  And you replaced Doug Parker as the CEO of American; is

21   that right?

22   **A.**  That's correct.

23   **Q.**  Do you ever refer to Mr. Parker as the godfather of

24   consolidation?

25   **A.**  No.

1  **Q.**  Have you heard of him referred to as the godfather of

2  consolidation?

3  **A.**  I have.

4  **Q.**  By others within American?

5  **A.**  No.

6  **Q.**  Outside the company?

7  **A.**  Yes.

8  **Q.**  Okay.  Now, prior to the US Airways/American Airlines

9  merger, you were the chief operating officer of US Airways;

10  is that right?

11  **A.**  Yes.

12  **Q.**  And the US Airways/American Airlines merger closed in

13  2014; is that right?

14  **A.**  Correct.

15  **Q.**  And it was announced in 2013, right?

16  **A.**  Announced in 2013, yes.

17  **Q.**  Now, as the chief operating officer of US Airways, you

18  recommended that US Airways pursue the transaction with

19  American Airlines; is that right?

20  **A.**  That's -- that's correct.  I was the chief operating

21  officer and I was not in charge of all commercial activities.

22  I was not the lead in terms of pursuing the merger.

23  **Q.**  But you did recommend the company pursue the merger with

24  American; is that right?

25  **A.**  Yes.

1    **Q.** And one basis for that recommendation was that combining

2    US Air and American would create a comparable network to

3    Delta and United; is that correct?

4    **A.** Yes.

5    **Q.** And the US Air/American merger was successful in that

6    goal; was that right?

7    **A.** It's been successful, yes.

8    **Q.** Successful in the goal of creating a comparable network

9    to Delta and United, right?

10   **A.** Yes, US Airways, where I was the chief operating officer,

11   it was a limited carrier in terms of -- in terms of reach and

12   the number of cities it served.  American not much larger,

13   but Delta and United, much larger than that, combining the

14   two has done a nice job of creating a really viable

15   competitor and a strong foundation.

16   **Q.** Would you agree, Mr. Isom, that now one of American's

17   rationals for the Northeast Alliance is to create a network

18   comparable to Delta and United?

19   **A.** American is a global hub-and-spoke airline, just like

20   Delta and United, and we look for opportunities to expand by

21   adding different aspects of service, really, new destinations

22   that can actually, you know, help expand, and that does make

23   us stronger versus Delta and United network, yes.

24   **Q.** And you would agree that one of the rationales now for

25   American to enter the Northeast Alliance was to create a

1    network comparable to Delta and United.  Is that fair?

2    **A.**   Well, specifically to the network at American, you know,

3    for years, we've been looking at where American hasn't been

4    able to serve the customers that we would really like to.

5    And in New York, that has been something that has been

6    problematic over time.  There has been other places in the

7    world and so the opportunity to create the Northeast Alliance

8    is absolutely an opportunity to make American stronger in a

9    place that we have been historically weak.

10   **Q.**   Stronger in the sense of being comparable to Delta/United

11   in those areas.  Is that fair?

12   **A.**   In order to be able to offer the customers in the

13   northeast, the specifically New York, the same type of

14   opportunities that they would be able to get with either

15   United or with Delta.

16   **Q.**   So you would agree with me, wouldn't you, that American

17   did not need to enter the Northeast Alliance to create a

18   comparable network to Delta and United out of Boston, right?

19   **A.**   American -- I would tell you that in terms of order of

20   priorities, the biggest -- one of the biggest issue that

21   we've had with our network is, you know, deficiencies out of

22   JFK.

23        Boston was a different scenario, where historically

24   American has been a lesser player there.  Both Delta and

25   JetBlue have had larger networks than we have, and Delta has

1    made it a point to say that they're going to establish a much

2    larger operation, almost a hub there.  And so this created an

3    opportunity, the Northeast Alliance created an opportunity

4    for us to make sure that we were as viable a competitor in

5    Boston as we possibly could be.

6    **Q.**  So just to get back to my question, it wasn't one of

7    American's rationales for entering the Northeast Alliance to

8    create a comparable network out of Boston to Delta and

9    United?

10   **A.**  Again, we focus on global hub-and-spoke carrier, adding

11   as many destinations to that network, right, creates a

12   multiplicative effect in creating new opportunities for

13   people to fly back and forth.  We've never been as strong in

14   Boston as Delta, and it enables us to do more, to be more

15   relevant to the local marketplace.

16   **Q.**  Well, you would agree with me, wouldn't you, Mr. Isom,

17   that the US Airways merger and the Northeast Alliance do

18   separate transactions, separated by years, have similar

19   rationales for your company; is that right?

20   **A.**  I would agree with that.  And that is, again, to make it

21   as strong and robust of a network as possible, being more

22   relevant in different marketplaces is certainly something

23   that adds to that.  Boston is a place that we're made

24   stronger with the Northeast Alliance.  And of course JFK was,

25   you know, a place that I've described as being a place that

1    we've been historically weak and really have never been able

2    to make a profit.

3    **Q.**   Well, just to be clear, though, it's not just to be as

4    strong and relevant as possible, it's to be as strong and

5    relevant as possible as compared to Delta and United; is that

6    right?

7    **A.**   We have a network that is really formed by the hubs that

8    we serve, you know.  And whether it's Dallas-Fort Worth or

9    Chicago or Miami or Philadelphia or Phoenix or any one of our

10   hubs, we use those.  Those are our core assets that we then

11   try to build and create connections and opportunities for

12   customers to fly from points connecting one of our hubs and

13   then go off to other points.  We are able to serve, you know,

14   tens of thousands of different O&Ds.  So we compete certainly

15   with Delta.  They're trying to do a similar thing, but they

16   have strengths in different places and we have strengths in

17   different places.  Overall, though, my goal is to make

18   American as strong as possible to the customers we serve and

19   as profitable as possible over the long run.  So Delta is a

20   big competitor, but we take actions to really to make sure

21   American is as strong as possible.

22   **Q.**   Well, just to try to be focused and clear here, Mr. Isom,

23   did a rationale of matching Delta or United's network play a

24   role in your decision to form the Northeast Alliance?

25   **A.**   It -- it's an opportunity to certainly improve American's

1    product versus -- versus those two.  So absolutely, we're

2    competitive, and we want to be as strong as possible, and we

3    want to make sure that we can serve customers anywhere in the

4    United States, anywhere in the world, in a fashion that is --

5    you know, that is best for American.

6    **Q.**  So since the US Airways/American merger closed in 2014,

7    Delta hasn't grown its network by acquiring another domestic

8    airline in the US; is that right?

9    **A.**  That's correct.

10   **Q.**  And since the US Airways/American transaction closed in

11   2014, United hasn't grown its network by acquiring another

12   domestic airline in the US; is that right?

13   **A.**  I believe that's correct.

14   **Q.**  But since that 2014 transaction between US Airways and

15   American, American now needs to form the Northeast Alliance

16   to create a comparable network to those two competitors?

17   **A.**  No.  We -- again, we take a look globally at

18   opportunities.  And so whether it's the Northeast Alliance or

19   whether it's the West Coast International Alliance with

20   Alaska, we've tried to make -- tried to take a look at where

21   our network really has deficiencies and opportunities for

22   growth.

23           And to that, whether it's in the United States or

24   in South America, with GOL, or with Qatar or strengthening

25   our relationship over the transatlantic with BA, all of those

1    are opportunities to expand and enhance what we do.

2              So again, the Northeast Alliance is an opportunity

3    to expand in an area or to improve in an area where we've

4    been historically weak, and of course that is something that

5    we want to -- to pursue.  We become more relevant, not just

6    with leisure customers, but also with business customers, as

7    well, that really want a network that can get their customers

8    everywhere that they can go when they want to go.

9    Q.  So Mr. Isom, just to -- I thank you for that.  Just to

10   get back to -- just to get back to my question here, American

11   is seeking to engage in a -- has engaged in a second

12   transaction, the Northeast Alliance, to match two competitors

13   that have not had domestic transactions with other airlines

14   in terms of acquisitions since 2014, right?

15   A.  Again, we're -- we do everything possible to make sure

16   that we can offer our customers the best network possible.  I

17   respect that United and Delta have not acquired other

18   competitors, American hasn't acquired anyone.  And we have a

19   new great relationship with the Northeast Alliance that

20   allows us to offer our customers something that we couldn't

21   have done before.

22   Q.  Well, Mr. Isom, you're not aware, are you, of Delta or

23   United engaging in joint ventures like the Northeast Alliance

24   since 2014, either, correct?

25   A.  I'm not aware of anything that United or Delta have done

1    and I'm not aware of their plans.

2    Q.   Let me ask you to take a look at Plaintiffs' Exhibit 14.

3         MR. JONES:  And please don't publish this.  There

4    are objections to this document, Your Honor, so I'd ask it

5    not to be published yet.

6         THE COURT:  All right.

7         MR. JONES:  Let me know when you are there in your

8    book, Mr. Isom.

9         THE WITNESS:  I've got PX0014.

10        MR. JONES:  Yes, sir.

11   BY MR. JONES:

12   Q.   Now, are you familiar with US Airways' evaluations at the

13   time of possibly merging with American, before that

14   transaction actually took place?

15   A.   I was aware of our plans.  Again, I was the chief

16   operating officer at US Airways, responsible for the

17   operations of the airline, largely, you know, overseeing

18   planes flying and customer service and that kind of thing,

19   but absolutely aware of what was going on.

20   Q.   And was "Project Tetris" one of the names for that

21   evaluation?

22   A.   It's been a long time, but Project Tetris was a project

23   that we had evaluated, a combination between American and US

24   Airways, yes.

25        MR. JONES:  Your Honor, I move to admit PX0014.

```
 1              MR. WALL:  Your Honor, this is falling within the
 2    category of the older documents as to which we have -- is
 3    sort of broad relevance concerns.  At the level of a single
 4    document in this context, there's no objection.
 5              THE COURT:  All right.  Admitted.
 6              (Plaintiff Exhibit No. PX0014 admitted into
 7              evidence.)
 8              MR. JONES:  We can publish PX0014, please.
 9    BY MR. JONES:
10    Q.  So you see here on the cover of the exhibit, Mr. Isom,
11    it's entitled "Project Tetris," correct?
12    A.  Yes.
13    Q.  Now, let me ask you to turn to page 10, which is the page
14    ending in 9805, and it will come up on your screen, as well,
15    if you prefer -- if you prefer that.
16              Now, if you look at the top of the page, the title
17    of this slide reads, "Future:  New AA would be number one
18    carrier in the east and central regions."
19              Do you see that?
20    A.  I do.
21    Q.  And below, there's a -- there's a map of the United
22    States with the old icon of American and the old icon of US
23    Air above the map, right?
24    A.  I see that, yes.
25    Q.  And the map and the title at the top are indicating that
```

1    US Air was projecting that its merger with American -- a

2    merger with American would create the number one airline in

3    the east of the United States.  Is that fair?

4    **A.**   I see -- in the document, yeah, that is fair.  Yes.

5    **Q.**   And that was US Air's assessment at the time, right?

6    **A.**   Yes.  And I'd like to note, again, a draft -- a draft

7    document, so I don't know how this, you know, finished off,

8    but the number one, you know, in the central, and the number

9    one in the east is throughout those regions, yes.

10   **Q.**   Now, let me ask you to turn to the next page, page 11,

11   ending in 9806.  And here, again, the title reads:  "Number 1

12   East Coast position created by complimentary strengths."  Do

13   you see that at the top?

14   **A.**   I see that.

15   **Q.**   And there's a -- there are three columns, one for New

16   York City, one for South Florida, and one for all other

17   northeast.  And then there are three rows.  The bottom row

18   is -- shows the old American symbol and the old US Air

19   symbol, right?

20   **A.**   I see that, yes.

21   **Q.**   And that bottom row showing the combined US and American,

22   and the New York City column, it's shaded and there's a

23   checkmark, right?

24   **A.**   Yes.

25   **Q.**   And that's indicating, according to the slide here, that

1    the combined American/US Air would have good market presence

2    in New York City; is that right?

3    **A.**  It doesn't say that.  It says, "Throughout the

4    northeast."

5    **Q.**  Well, if you look in the New York City column and look

6    down --

7    **A.**  Oh, yeah, I see that.  Yes, it says good -- good market

8    presence, yes.

9    **Q.**  Okay.  And that was US Air's assessment at the time; is

10   that right?

11   **A.**  Yes.

12   **Q.**  And that was actually a result that came about as a

13   result of the merger; is that right?

14   **A.**  Absolutely.  When American and US Airways combined, it

15   created a network that had strength on the East Coast and

16   Midwest, and stronger, even, on the West Coast.

17   **Q.**  And had good market presence in New York City, right?

18   **A.**  And had good market presence in New York City, yes.

19   **Q.**  Let me ask you to turn to page 23 and it's the one ending

20   in 2918.  Now, here at the top of the page, the title

21   is, "Boston:  AA plus US a strong and sustainable second."

22          Do you see that?

23   **A.**  I see that.

24   **Q.**  And here, this slide is forecasting that a merged US

25   Air/American would be strong and sustainable second place in

1   Boston.  Is that fair?

2   **A.**  Mr. Jones, would you repeat the question?

3          What I would tell you, again, as chief operating

4   officer at the time of this, I am absolutely aware of large

5   scale rationale of the merger.  But in terms of speaking, you

6   know, to this specific, you know, draft slide, there might be

7   some others that are better than me.

8          So one more time, would you repeat the question?

9   **Q.**  Well, just, I'm asking you if it's fair to say that this

10  slide created by US Air, evaluating a potential merger with

11  American as part of this broader deck, is showing that US Air

12  at the time forecast that a combined US Air/American would be

13  a strong sustainable second in Boston?

14  **A.**  That's what this slide says.  And again, my ability to

15  explain it is limited, at best.

16  **Q.**  So that was US Air's assessment at the time, though,

17  correct?

18  **A.**  Again, Mr. Jones, the -- as chief operating officer, I'm

19  aware of the largest rationales.  Boston, from where I sat,

20  was never, you know, a primary rationale for pursuing the

21  merger.

22  **Q.**  Well, you would agree, wouldn't you, that the US

23  Air/American merger gave the combined company a good market

24  presence in New York City and made it a strong sustainable

25  second in Boston.  Is that fair?

1   **A.**  It's fair to say.  And again, as shown in this deck, that

2   the combination of American and US Airways had not only

3   improved presence in Boston, but it improved presence in

4   every city that we served.  So any city that US Airways and

5   American jointly served, by combining the networks, it

6   dramatically improved connectivity of all cities.  And it's

7   not just Boston, but it's, you know, every minor city, like

8   Buffalo and Richmond, and any city that both US Airways and

9   American served.

10  **Q.**  And at the time, US Airways also forecasts that the

11  combined company's position in Boston would be sustainable;

12  is that right?

13  **A.**  I can't -- I can't speak to that.  What I can tell you is

14  is that anywhere that US Airways and American served would

15  absolutely be enhanced and improved over all.

16          And then in terms of sustainability, the merger was

17  absolutely something that, you know, spoke to US Airway's

18  inadequacies and American's inadequacies, in terms of

19  competition against others that had more developed networks.

20  And from that perspective, the cities that we served all

21  improved in terms of their sustainability.

22  **Q.**  Would -- well, you mentioned being the chief operating

23  officer at the time that others within the company might

24  better be able to speak to some of the topics that I'm

25  touching on with you; is that right?

1    **A.**  From 2011, that's correct.  Yes.

2    **Q.**  Would Doug Parker be one of those folks?

3    **A.**  Doug will certainly, you know, have thoughts on this,

4    too.  Yeah.

5    **Q.**  Let me ask you -- you can close that document.  Let me

6    ask you to turn to PX0098.

7              MR. JONES:  And this -- this has been admitted into

8    evidence, Your Honor.

9              THE COURT:  Okay.

10             MR. JONES:  May we publish?

11             THE COURT:  Yeah.

12   BY MR. JONES:

13   **Q.**  And it's in your book, but also on your screen, Mr. Isom.

14   **A.**  Uh-huh.

15   **Q.**  PX0098 is an e-mail from Don Casey to you, right?

16   **A.**  It is.

17   **Q.**  And it's dated December 13, 2019, correct?

18   **A.**  Correct.

19   **Q.**  Mr. Casey was senior vice president for revenue at

20   American Airlines at the time he sent this e-mail to you,

21   right?

22   **A.**  Yes.

23   **Q.**  Now, if you look in the second paragraph of his e-mail,

24   in the second sentence there, Mr. Casey writes that, "With

25   industry capacity growth the next year, WN" -- that's

1    Southwest, correct?

2    **A.**   Yes.

3    **Q.**   "With the industry capacity growth next year, Southwest

4    in particular, it will be difficult to move fares up."

5            Do you see that?

6    **A.**   I do.

7    **Q.**   And there, Mr. Casey is informing you that in particular,

8    Southwest is set to increase capacity in the next year, in

9    2020; is that right?

10   **A.**   I don't know exactly what Southwest was planning to do,

11   but that's what Mr. Casey is suggesting, yes.

12   **Q.**   And it's fair to say, as well, isn't it, that Mr. Casey

13   is tying a difficulty in moving fares up, in raising fares,

14   to capacity growing.  Is that fair?

15   **A.**   Well, I think what this refers to -- it's the revenue

16   plan for 2020.  So we're talking about, you know, December of

17   2019.  And it's a planning document that then informs us in

18   terms of how we're going to set the airline up for the next

19   year.  So in other words, to assess how much and where and

20   how we fly, we take an estimate of, you know, overall

21   economic growth within the country, and certainly an idea of

22   how much capacity is going to come into the industry.

23            At the end of the day, you know, we're a supply and

24   demand business.  So from a macro perspective, going into

25   each year, we try to take a look at what is happening in the

1    overall economic environment.  And again, based on supply and

2    demand, if more demand is coming in, what Don is saying, I

3    believe, is that hey, it's going to be harder in this coming

4    year to produce more revenue, so use that to inform what kind

5    of expense that we're going to put into the airline in the

6    coming year.

7          So everything from people and compensation

8    increases to where we invest capital would be, you know, out

9    of this.  So what Don is suggesting is, hey, there's not

10   going to be as much revenue in the plan, based on on my macro

11   assessment, but, again, it's supply, it's demand.  It's at

12   high level.  And I think that's where that comes from.

13   **Q.**  And it's fair to say that Mr. Casey is tying a difficulty

14   in raising fares to growing capacity, right?

15   **A.**  At a macro level.  Again, you know, the airline business

16   is one of supply and demand.  The more supply that's out

17   there, the more likely, you know, that revenues are on a unit

18   basis are going to be tougher to achieve, and the less

19   capacity out there.  All else equal, you know, the greater

20   the chance that there's more revenue.  So again, more

21   capacity coming in.  All else equal in terms of what we

22   anticipate for economic growth, GDP.  That would be a correct

23   statement.

24   **Q.**  You said a lot there, Mr. Isom.

25   **A.**  Yeah.

**Q.**  But is the answer, yes, that it's more difficult to raise
fares when capacity is growing?

**A.**  Again, it's a lot of variables there.  So what we're
looking at here, in terms of a planning document, again, is
our 2020 revenue plan.  And that's generally based on taking
a look at a number of macro factors, you know, where growth
is occurring, are we headed into a recessionary environment,
or not.  And then also, question yes, how much capacity is
coming into the industry.  We have a pretty good idea of
aircraft deliveries and things like that.  And what Don is
suggesting here is that based on his assessment, especially,
you know, Southwest, which is in many, many of our markets
that there's going to be more capacity, all else equal, that
would make it difficult to increase fares and ultimately
increase revenue for the plan.  And that's what he's guiding
on it.

And then the regression impact would be he's giving
an assessment of the revenue plan, again, all else equal,
would be, you know, $160 million of revenue that either can't
be gained or is lost.

**Q.**  Mr. Isom, you recall that I deposed you back in May down
in Dallas, right?

**A.**  I do.

**Q.**  And you were under oath in that deposition, right?

**A.**  Yes.

1   **Q.**  And let me ask you to turn in your binder to your

2   deposition.  It's the first tab, page 160, and I'm going to

3   direct you to line -- lines 13 through 15.

4   **A.**  Yes.

5   **Q.**  "QUESTION:  And is it fair to say that Mr. Casey is tying

6   a difficulty in raising fares to growing capacity?

7             "ANSWER:  Yes."

8             And that was your answer under oath in your

9   deposition, right?

10  **A.**  Yes.

11            MR. JONES:  Your Honor, I move to admit that as

12  impeachment and also as a statement of party opponent.

13            MR. WALL:  I never heard of moving it in as

14  impeachment, but if they want it in evidence, that's fine.

15            THE COURT:  I'll admit it as substantive evidence.

16            (Plaintiff Exhibit No. Deposition of Scott

17            Laurence, page 160, lines 13 to 15 admitted into

18            evidence.)

19  BY MR. JONES:

20  **Q.**  You would agree, wouldn't you, Mr. Isom, that JetBlue has

21  historically grown its capacity each year since its founding;

22  is that right?

23  **A.**  I can't speak specifically, but I believe that's the

24  case.

25  **Q.**  Let me ask you to turn to DX31 and DX32 in your binder.

1              And Your Honor, these have been admitted into

2      evidence, but there are redactions, so we would ask that we

3      be able to publish the redacted versions.

4              THE COURT:  Yes.

5              Whenever there's redactions in an admitted exhibit,

6      you just all have permission to publish the redacted version.

7      You can just say we're publishing the redacted version

8      because of the redactions agreed to, but there's no

9      objection, and just go forward.

10             MR. JONES:  Yes, Your Honor.

11     BY MR. JONES:

12     **Q.**  And lets me know when you've found it.  It's also on the

13     screen.  And I'll start with DX31, which is just a cover

14     e-mail from Matthew Sebastian to you, right?

15     **A.**  Yes.

16     **Q.**  And it's a cover e-mail attaching a deck, which if you

17     turn to DX 32, the deck is titled "October board strategy

18     session;" is that right?

19     **A.**  Yes.

20     **Q.**  And this was a deck being prepared for American's board,

21     correct?

22     **A.**  Yes.

23     **Q.**  Let me ask you to turn to the page ending 1718.  Let me

24     know when you're there.

25     **A.**  1718.  Yes.

1    **Q.**  And the top of that page reads, "AA has grown below GDP,

2    while other airlines has grown in excess."

3            Do you see that?

4    **A.**  I do.

5    **Q.**  And it says "OA," but that's other airlines, right?

6    **A.**  Other airlines, right.

7    **Q.**  Now, you would agree with me that there's generally a

8    correlation between GDP, between gross domestic product, and

9    airline passenger and revenue growth, right?

10   **A.**  There is generally -- a correlation between GDP and

11   airline industry revenues.

12   **Q.**  And this slide is conveying that American grew below the

13   rate of GDP growth in the years depicted in the chart below

14   the title, right?

15   **A.**  Yes.

16   **Q.**  And that's being measured by available seat miles,

17   correct?

18   **A.**  Correct.

19   **Q.**  And that's true, looking at the chart for each year, 2014

20   to 2018, American grew at or below the rate of GDP growth for

21   each of those years, right?

22   **A.**  That's correct.

23            THE COURT:  Do you think there's a correlation

24   between GDP and growth of average seat miles, as well as --

25   let me break that apart.

```
 1              You indicated that there is a correlation between
 2   GDP and airline revenue.
 3              THE WITNESS:  Right.
 4              THE COURT:  Is there also a correlation between GDP
 5   and average seat miles?
 6              THE WITNESS:  Your Honor, what we use for planning
 7   is we forecast into the future years is GDP tied to airline
 8   industry revenues.  That usually informs the growth that then
 9   we will pursue, and we will try to put the kind of growth in
10   that we can think we can make a profit off of.  So I have not
11   gone and personally gone back and taken a look at the
12   correlation of ASMs and GDP.
13              THE COURT:  So is ASMs -- how do ASM's growth
14   figure in planning?
15              THE WITNESS:  So if -- you would take a look at
16   what your projected growth in GDP is for the coming year, and
17   that would give a correlation to revenues, historically, and
18   then you would go ahead and plan what kind of capacity, then.
19   So if there was a one or two percent growth in GDP, there
20   should be some sense of, oh, that kind of revenue is going to
21   flow into the air industry, and I should go get my fare share
22   or I deploy capacity that I think I can make a margin on.
23              THE COURT:  I see.  Okay.
24              Go ahead, Mr. Jones.
25   BY MR. JONES:
```

**Q.**   Let me ask you to turn next to the page ending in 1719.
It's just the next page.

If you look down to the fourth bullet point on that
page, it reads, "Our RASM has remained relatively flat in
many of these spokes; although we have maintained capacity
discipline, UA and DL have been able to grow substantially
taking share in many of our most profitable markets."

And that's referring there to Delta and United
growing substantially and taking share from American in many
of its most profitable markets; is that right?

**A.**   Yes.

**Q.**   And that's indicating that -- that Delta and United chose
to grow, while American chose to maintain capacity
discipline, right?

**A.**   I believe what that is referring to is that we took a
conservative approach, and during that period, United and
Delta did something different.   They grew and they were able
to take share from us.

**Q.**   And now is it fair to say that through the Northeast
Alliance, American is trying to -- to catch up because Delta
and United grew while American maintained capacity
discipline?

**A.**   No.   I think that -- my feeling is, is that, you know, we
deploy capacity in the way that we think is most profitable,
beneficial for the airline as a whole.   During this period of

1    time, American was finishing off the integration between US

2    Airways and American, and there were significant --

3    significant incursions by United and Delta.

4              And so in regard to the NEA, again, the rationale

5    for that is we've had a historically weaker New York, and

6    this is an opportunity for us to prove that and prove it

7    quickly.

8    **Q.**  Kind of a shortcut, right?

9    **A.**  No, I don't agree at all.  I think it's a really smart

10   move in taking a look at historically weaker, you know,

11   American Airlines and unable to really figure out a way to

12   generate profits, and a JetBlue that saw the world closing in

13   around it.  And a lot of constraints that didn't allow us to

14   address the shortfalls in the New York region on our own, and

15   looking for a way to do something different, to actually be a

16   really viable competitor, versus Delta and United that are

17   entrenched and will be entrenched in because of United's

18   competition in New York, and Delta's position at both JFK and

19   LaGuardia.  So this -- again, I don't think it's a shortcut,

20   overall.  I think it's something that is a really smart move.

21   It allows us to do it in a capital light fashion, and create

22   in a really, really timely -- on, I believe, a really, really

23   timely basis, a very strong competitor.

24   **Q.**  When you say a "capital light" basis, that means without

25   American investing in its own aircraft to build out its

1   network; is that right?

2   **A.**   Capital light meaning using our assets in the best way

3   that we can possibly use them.  So whether it's gates,

4   whether it's people, whether it's aircraft, all of that fits

5   into that.

6   **Q.**   It's fair to say, isn't it, Mr. Isom, that American is

7   the largest carrier in the United States, domestically,

8   right?

9   **A.**   The largest carrier, depending on the metrics, but in

10  general, yes.

11  **Q.**   Let me -- let me ask you to turn to PX69, 0069.  And this

12  has been admitted into evidence.

13          Now, if you look at the top page -- let me know

14  when you've found it, by the way, Mr. Isom.

15  **A.**   I'm on it.  Thank you.

16  **Q.**   Okay.  PX69, at the top of the first page, is an e-mail

17  from you to Mr. Raja, describing a call that you had with

18  a Richard Anderson; is that right?

19  **A.**   Correct.

20  **Q.**   And Mr. Anderson is a former CEO of Delta, right?

21  **A.**   Correct.

22  **Q.**   And you write to Mr. Raja in this e-mail, in March of

23  2020, "Thanks.  And between you and me, spent a long time on

24  phone last night with Richard Anderson.  General agreement,

25  the industry is going to have to shed a tremendous amount of

1    capacity.  Turning the dial back five years as a guide to

2    what 2021 looks like.  It might be an 18 month slope to that

3    point, once people get traveling.  Let's not question.  Let's

4    go there fast and hard, and your AS/B6 ideas will help

5    facilitate."

6              Now, there your reference to AS/B6 ideas are

7    referring to potential alliances with Alaska Airlines and

8    JetBlue, right?

9    **A.**   That's correct.

10   **Q.**   And you're writing to Mr. Raja, saying that you and

11   Mr. Anderson were in general agreement that the airline

12   industry would have to shed a tremendous amount of capacity,

13   right?

14   **A.**   So -- Mr. Jones, and I know we've covered this, but

15   Richard is a long time mentor of mine.  He had left Delta,

16   you know, back in, I think, 2016.  I think he was working at

17   Amtrak at this time.  Rich and I worked together back in 9/11

18   and the SARS crisis.  And what we were dealing with is with

19   the pandemic, so that the first wave of COVID going through,

20   revenues, you know, prior to this, had just fallen off by

21   90 percent.  And we were looking at American Airlines

22   potentially burning almost, you know, $100 million a day in

23   terms of cash, cash that we had to refund, and losses that we

24   would incur on our flights.  We had, I think, about 7 or

25   $8 billion of cash on hand.  And so I considered COVID to be

1    a mortal threat and I reached out to Richard and others, too,

2    just about anybody I could, to kind of say, hey, what are we

3    looking at in terms of, you know, this crisis.

4           So the discussion with Richard was really, okay,

5    here's what's happening with COVID right now, revenues had

6    fallen off to nothing.  How long -- you know, let's go back

7    and take a look at 9-11, what does that mean?  And you know,

8    my assessment was that we could be looking at something that

9    could take five years to overcome.  And so the discussions or

10   the notes to Mr. Raja, it's not just on this, but everything,

11   we were going to cut capacity and pull the airline down, and

12   anything that we could do, I felt that would still allow us

13   to provide service to those that really needed it, that still

14   have to get around, I think would be beneficial, not just

15   during the time of the pandemic, which we were just in the

16   early stages of, but also in the long run.

17          You know, I'd always viewed that we'd come out of

18   the pandemic, and it would be fantastic to actually have

19   things like the West Coast International Alliance, and this

20   budding idea of the Northeast Alliance in position as we came

21   out, so we would be stronger than when we actually went in.

22   Q.   So Mr. Isom, you were talking with Mr. Anderson about the

23   need for the industry to shed a tremendous amount of

24   capacity.  Not just American, right?

25   A.   Well, again, American is one of the largest carriers, and

1   as I said before, it's a supply and demand business, and the

2   supply side is capacity, and the revenue that is available

3   that, you know, we can go after and try to handle on a -- and

4   try to make a profit on, was going to be a lot less.  And so,

5   yeah, this is a projection that the -- that the industry as a

6   whole, American, was going to have to do something to resize

7   itself, otherwise, we would all be out of business.

8   Q.  Well, you weren't just talking to Mr. Anderson about what

9   American needed, though, right?  You were talking about what

10  the industry needed to do and that shed a lot of capacity,

11  correct?

12  A.  No.  I was absolutely talking to Mr. Anderson in regard

13  to implications for American Airlines.

14  Q.  You even put a -- a measure on what tremendous amount of

15  capacity means here, which is turning the dial back five

16  years, right?

17  A.  But my view at the time, with capacity, that, again, it

18  happened over the course of two months, where, you know, we

19  were flying along, and no pun intended, you know, January,

20  and looking forward to a good year.  Everything vanished.

21  We're a fixed cost business.  I've got planes.  I've got

22  airports.  I've got 30, 40 percent -- 30 percent of my

23  operating expense is people.  I didn't have any revenue

24  coming in.  I had cash that was flying out the door and I was

25  absolutely looking at all of this in context of what has to

1    happen to American so that we don't go out of business.

2    **Q.**   And so your rough measure for the amount of capacity the

3    industry needed to shed was roughly turning the dial back

4    five years.  That's what you tell Mr. Raja in your e-mail,

5    right?

6    **A.**   And by that, I'm referring to getting back to some state

7    of equilibrium, where we can potentially make a profit at

8    American.  My view was demand was going to be hurt so much,

9    that we would actually have to take a look at the industry as

10   if it was, you know, five years prior.

11   **Q.**   So the industry, not just American.

12   **A.**   Again, American operates as part of the industry, and

13   we're competitors against, you know, everybody that's in it.

14   So when I speak to the industry, it's not with, you know,

15   some sense of, hey, I'm talking to Richard Anderson, who's

16   not associated with Delta and my discussion is -- is really

17   limited to, okay, what do we do with this information about

18   how bad it might get?

19   **Q.**   So let me -- let me point you to your last two sentences,

20   the last line in the first paragraph, you write to

21   Mr. Raja, "Let's not question.  Let's go there fast and hard.

22   And your Alaska/JetBlue ideas will help facilitate."

23            Do you see that?

24   **A.**   I do.

25   **Q.**   And so there, you're -- in describing your conversation

1    with Mr. Anderson, you're telling Mr. Raja that his ideas

2    about an alliance with Alaska and with JetBlue are a way to

3    help the industry shed capacity.  Is that fair?

4    **A.**   No.  The relationship with Alaska and JetBlue, West Coast

5    International Alliance and the Northeast Alliance, it's

6    helpful in both cases.  If we're going to be pulling back

7    capacity, to try to get back to profitability, I want to

8    absolutely maintain as much presence as I can, and to do that

9    in a way where I'm not going to lose even more money.  So the

10   reference to go there hard and fast is, hey, look, don't

11   question this.  You know, we're losing, you know, hundreds of

12   millions of dollars a day at the time, or $100 million a day

13   at the time.  Don't waste a lot of time, because we're going

14   to lose more money.

15          And then in terms of the Alaska and JetBlue ideas,

16   they're great ideas.  So why wait?  We've got time.  We're

17   going to be pulling the schedule down, let's go see if we can

18   get something in place.

19   **Q.**   Well, is it fair to say, then, that you're telling

20   Mr. Raja that his Alaska and JetBlue ideas will help

21   facilitate American shedding capacity?

22   **A.**   No.  Again, I believe it is -- these are ideas that they

23   were absolutely helpful during a downturn, which you're

24   experiencing, but also things that we wanted to get in place

25   as we grew back.

1    **Q.**  So I don't think I fully understand here, Mr. Isom.  Is

2    it your testimony here that your sentence and your AS/B6

3    ideas will help facilitate don't relate to American shedding

4    capacity?

5    **A.**  They do.  But, again, I'm just asking that there's an

6    understanding of the context in which we're dealing, which is

7    the business is hemorrhaging cash, our business is

8    hemorrhaging cash.  I've got the wherewithal of the company

9    in our hands, and if we don't take action fast, it's going to

10   be difficult.  And these ideas absolutely will help us in a

11   downturn.  They help us maintain presence.  And I'm just

12   making the point, as well, I've always thought these were

13   really good ideas.

14   **Q.**  Helping in the downturn and helping American itself,

15   during this time period, shed capacity?

16   **A.**  Helping American, yes.

17   **Q.**  Now, at the -- at the beginning of your e-mail to

18   Mr. Raja, you wrote, "Between you and me," that meant that

19   you didn't want Mr. Raja to share the note you sent to him

20   describing the details of that conversation with

21   Mr. Anderson; is that right?

22   **A.**  Mr. Anderson is a long time mentor of mine and, you know,

23   the kind of conversations that I have with him regarding

24   this, on a personal level, you know, I -- I wanted to let

25   Vasu know that I've done a little bit of homework, and I

1    wanted to keep that private, just like I would with any type

2    of conversation that I've had with somebody that I was close

3    with and wanted to keep between us.

4    **Q.**   And now there's nothing confidential or personal in the

5    e-mail that you sent to Mr. Raja describing the conversation

6    with Mr. Anderson, right?

7    **A.**   It's a personal relationship with Mr. Anderson.

8    **Q.**   But nothing confidential or private, right?  It's about

9    the industry and about the business, correct?

10   **A.**   It was, again, a conversation that I had with Richard,

11   and asked his opinion, again, based on the work that we had

12   done years and years ago, during other crises, which this was

13   the biggest crisis that I had ever faced.

14   **Q.**   Let me -- you can close that document.  Let me ask you to

15   turn to PX99.

16          And please don't publish that.

17          MR. JONES:  There is an objection to this exhibit,

18   Your Honor.

19          But if he can turn to PX99, please.

20   BY MR. JONES:

21   **Q.**   And let me know when you're there.

22   **A.**   I am.  I am there, yes.

23   **Q.**   And the exhibit has a cover e-mail from Mr. Casey to you,

24   dated March 4, 2019; is that right?

25   **A.**   That's correct.

1    **Q.**  And it's actually a cover e-mail to you and Mr. Parker

2    and others, correct?

3    **A.**  It is.

4            MR. JONES:  Your Honor, plaintiffs move for the

5    admission of PX99.

6            MR. WALL:  Your Honor, we object to the attachment

7    of the note from Citibank for the truth of the matter

8    asserted.  And I'm not quite sure what relevance it's going

9    to have, other than the truth of the matter asserted.  But

10   it's a third-party report with lots of factual assertions.

11           MR. JONES:  Your Honor, we are not seeking to admit

12   the Citi report for the truth of the matter asserted, and, in

13   fact, will not examine Mr. Isom on the report, just on the

14   cover e-mail.

15           THE COURT:  Does that resolve your objection?

16           MR. WALL:  I think it does.

17           THE COURT:  Yes.  All right.  So admitted on that

18   basis.

19           (Plaintiff Exhibit No. PX99 admitted into

20           evidence.)

21           MR. JONES:  Thank you, Your Honor.

22   BY MR. JONES:

23   **Q.**  So if you take a look at the cover e-mail here at the

24   top, again, from Mr. Casey to you, Mr. Parker, and others,

25   Mr. Casey reports that American is seeing, "Yield softeness

1    in coach for JFK-LAX, Dulles-LAX, and JFK-Seattle; is that

2    right?

3    **A.**   That's correct.

4    **Q.**   And you would agree, wouldn't you, that as of the date of

5    Mr. Casey's e-mail, American and JetBlue competed on JFK-LAX,

6    right?

7    **A.**   Yes.

8    **Q.**   And you would agree, as well, wouldn't you, that as of

9    the date of Mr. Casey's e-mail, American and JetBlue competed

10   on JFK-Seattle, right?

11   **A.**   Yes.

12   **Q.**   Now, he mentions yield.  What is yield here?

13   **A.**   That's basically the ticket price is.  It's a unit.  A

14   unit revenue measure.  A unit is the price you charge for --

15   the cents you earn per mile flown.

16   **Q.**   Now, after reporting the yield softness for JFK-LAX,

17   Dulles-LAX, and JFK-Seattle, Mr. Casey here notes that

18   JetBlue and Alaska have been reducing prices and the industry

19   has matched.

20           Do you see that?

21   **A.**   I do.  Uh-huh.

22   **Q.**   And now that you're in the Northeast Alliance with

23   JetBlue, if JetBlue were to reduce prices for JFK-LAX or

24   JFK-Seattle, American would get a share of the revenue of any

25   customers JetBlue won from American to travel with JetBlue

1    instead of on American flights, right?

2    **A.**   Oh, we don't -- we don't cooperate in pricing, but the

3    way the Northeast Alliance works is that there's a capacity

4    target that -- a baseline that's set and there's revenues

5    that are shared.  I don't have all the details, but it is

6    something that ultimately means that we're trying to spark

7    growth.  And to the extent that there's growth and additional

8    revenue in the Northeast Alliance, that's a good thing.

9    **Q.**   When you say you don't have all the details, you just

10   mean you're not the person to testify about the -- how the

11   revenue sharing works; is that right?

12   **A.**   Exactly.  Yes.

13   **Q.**   But you would agree with me that, under the Northeast

14   Alliance, if JetBlue were to reduce prices in JFK-LAX or

15   JFK-Seattle, and when some customers from American --

16   American would still get some revenue as a result of JetBlue

17   winning those customers from American, right?

18   **A.**   Well, again, this is -- the way that the Northeast

19   Alliance works, it's not set on an individual passenger

20   basis.  And JetBlue is -- absolutely manages their own

21   pricing.  This is something that we look at on a whole, on a

22   market basis.  So again, I can't speak to an individual

23   passenger.

24   **Q.**   American would not lose out completely if customers

25   migrated to JetBlue in response to JetBlue lowering prices in

1    those markets, though, right?

2    **A.**   There's a lot of -- a lot of factors that go into it.

3    Again, the basis for the Northeast Alliance is, you know, to

4    work together to make sure that we're flying to the right

5    places and that passengers want to go.  And in regard to

6    pricing decisions, that is a matter for each carrier.

7    **Q.**   Well -- well, I'll move on.

8    **A.**   Okay.

9    **Q.**   You can turn -- you can close that document.

10           Let me ask you to open your binder to PX320?

11           MR. JONES:  And this has been admitted into

12   evidence.

13   BY MR. JONES:

14   **Q.**   And let me know when you're there, Mr. Isom, and it's

15   also on the screen.  And I would ask you, when you're there,

16   to focus on the middle of the page, the e-mail from --

17           MR. JONES:  Well, let's take that off real quick,

18   if you don't mind, please.

19           THE WITNESS:  Okay.

20   BY MR. JONES:

21   **Q.**   I'm going to just ask you to look at your binder here?

22   **A.**   Uh-huh.

23   **Q.**   If that's okay, Mr. Isom?

24   **A.**   Certainly.  To look at which?

25   **Q.**   Your binder with PX320?

1   **A.**  320, yes.

2   **Q.**  And I'm going to direct you to the middle of the page,

3   from Mr. Embler (phonetic spelling) to you.

4   **A.**  Yes.

5   **Q.**  On October 6, 2020?

6           THE COURT:  I'm sorry.  What number is the exhibit?

7           MR. JONES:  I'm sorry, it's PX320.

8           THE COURT:  320.  Oh.  Thank you.  Sorry.  Got it.

9           Go ahead.

10  BY MR. JONES:

11  **Q.**  Okay.  So do you see that e-mail from Mr. Embler to you?

12  **A.**  I do.

13  **Q.**  And Mr. Embler is a member of the American board of

14  directors, correct?

15  **A.**  He's a member of the board of directors, yes.

16  **Q.**  If you look at the second sentence in the first paragraph

17  in Mr. Embler's e-mail to you, it reads, "As you can probably

18  tell from my questions, I am deeply concerned about our

19  ability to compete longer term as a global hub-and-spoke

20  carrier, without critical mass in the two largest markets in

21  the country."

22  **A.**  Uh-huh.

23  **Q.**  Do you see that?

24  **A.**  I do.

25  **Q.**  And you would agree with me, wouldn't you, Mr. Isom, that

1    Mr. Embler is expressing concern about American's ability to

2    compete longer term as a global hub airline without a

3    critical mass in New York City and Los Angeles, right?

4    **A.**   Yes.  This was a subject matter of a board meeting, so

5    this is not a new statement that Mr. Embler had raised

6    concerns in a board meeting.

7    **Q.**   Now, if you look at Mr. Embler's last sentence in the

8    first paragraph of his e-mail to you, he writes, "And I am

9    skeptical about the ability of JVs, et cetera, to provide a

10   seamless experience to replace a robust AA presence."

11          Do you see that?

12   **A.**   I do.

13   **Q.**   So it's fair to say there, isn't it, that Mr. Embler is

14   expressing skepticism about an American joint venture with

15   JetBlue providing a seamless experience to replace a robust

16   American Airlines presence in New York, right?

17   **A.**   That's true.

18   **Q.**   Now you can close that if you want, Mr. Isom.

19          Now, before American and JetBlue formed the

20   Northeast Alliance, were you aware of any domestic

21   arrangements between airlines, similar to the Northeast

22   Alliance, that occurred before you formed that JV?

23   **A.**   No.

24   **Q.**   All right.  Well, let me -- let me ask you to -- let me

25   ask you to turn to PX283.  This is already in evidence and

1    let me know when you're there.

2                Have you located it?

3    **A.**   Yes, I see it, yes.  I see it.  I understand.

4    **Q.**   Okay.  So PX283 is a cover e-mail, dated September 4,

5    2019, and it has an attachment, right?

6    **A.**   It does.

7    **Q.**   And that attachment is to prepare you for a trip here, to

8    Boston, right?

9    **A.**   To Boston, yes.  Uh-huh.

10   **Q.**   And that was for a station visit here to Logan, right?

11   **A.**   It's for a station visit, yes.

12   **Q.**   If you look at the first page of the attachment, it's the

13   page ending in 5833, there's a section heading,

14   titled, "Talking points."

15               Do you see that?

16   **A.**   I do, yes.

17   **Q.**   And this was for talking points that were prepared for

18   you to be able to answer questions for -- of Boston area

19   American employees, right?

20   **A.**   Yes.  The nature of this is, you know, a number of

21   meetings, a director's meeting, but then also to visit with

22   the team members.  So whether it's, you know, mechanics and

23   pilots or gate agents and, you know, our team members in

24   Boston.

25   **Q.**   Now, let me ask you to look over to the next page, ending

1    in 834, and there you'll see there's a section titled, "Hot

2    topics."  "Boston hot topics," right?

3    **A.**   Yes.

4    **Q.**   And then there's a subsection below that, that's labeled

5    "network planning/fleet."  Are you with me?

6    **A.**   I am.

7    **Q.**   Okay.  So now, in that section, let me direct you to the

8    fourth bullet point, and that goes over and starts on the

9    next page.  That bullet point says, "Why is Boston losing the

10   A321T and do we have a shot to get it back and compete with

11   JetBlue?"

12              Do you see that?

13   **A.**   I do.

14   **Q.**   And the A321T refers to an aircraft that American was

15   getting from Airbus that had a three class configuration,

16   with a lie flat class, a business class, and a coach product,

17   right?

18   **A.**   Yes.

19   **Q.**   And you are aware as well at this time that JetBlue had a

20   Mint product with a lie flat class, as well, right?

21   **A.**   Although, let me -- let me take a step back.  You know,

22   321 T is --

23   **Q.**   Well, Mr. Isom, you asked --

24   **A.**   You asked about lie flat, I've never flown the Mint

25   product.  I don't know if it's a lie flat product?

```
 1              THE COURT:  You don't know whether Mint is lie
 2      flat?
 3              THE WITNESS:  The Mint compared to the 321T is an
 4      international first class lie flat experience.  It's not a
 5      domestic -- it's a domestic lie flat that's equal to our
 6      flagship product.  And so I just want to make sure that
 7      there's a distinction drawn between anything that is -- is
 8      brought up between the 321T.  It's a special aircraft with
 9      just 100 -- and just slightly over 100 seats on it, three
10      classes which is all lie flat, a business class, and a very
11      small coach section.  American only has 17 of them.
12      BY MR. JONES:
13      Q.  So my question was just whether you were aware that at
14      this time that JetBlue's Mint product had a lie flat class?
15      A.  I am aware that Mint has a domestic first class product.
16      And again, I can't speak to all of the -- the amenities that
17      they include.
18      Q.  So here, in the fourth bullet point that I was pointing
19      to, you're being prepared to field questions from Boston area
20      American personnel about whether Boston will be getting back
21      an A321T to compete with JetBlue, right?
22      A.  Yes.
23      Q.  Let me -- let me ask you to look down to the next bullet
24      point.  That bullet point reads, "Delta is going up to 200
25      flights in Boston and has named Boston a hub.  JetBlue will
```

1    be at 180 flights.  Both are increasingly going after our

2    markets like DCA and ORD and our premium customers -- and our

3    premium customers while American has maintained or reduced

4    flying in Boston.  Boston has one of the fastest growing

5    airport traffic in the country.  Do you have any plans to

6    grow and strengthen our position in Boston?"

7         Do you see that?

8    **A.**   I do.

9    **Q.**   And ORD there is Chicago O'Hare, right?

10   **A.**   Yes.

11   **Q.**   So there you're being prepared to answer questions from

12   Boston area American employees about plans to strengthen

13   American in Boston to compete with Delta and JetBlue, right?

14   **A.**   Yes.

15   **Q.**   And the talking point there, also, is noting that Delta

16   and JetBlue are trying to go after American's premium

17   customers; is that right?

18   **A.**   Again, these are questions that, as you said, are sourced

19   from our team members that are -- that I'm getting ready for.

20   And so the question that was written in is this and I'm

21   preparing for that, yes.

22   **Q.**   When you say your team members, you mean your team

23   members down on the ground in Boston, right?

24   **A.**   Team members in Boston, right.

25   **Q.**   So they put in a question saying Delta and JetBlue were

1    increasingly going after American's markets and premium

2    customers, right?

3    **A.**   That's what our team members have said, yes.

4    **Q.**   So at this point, with the NEA in place, you don't really

5    have to worry anymore about JetBlue going after your premium

6    customers here in Boston anymore, right?

7    **A.**   Again, what we're able to do is use both of our networks,

8    both of our aircraft types, all of our product to form a

9    great relationship that enables our customers to go where

10   they want, on a greater frequency, and more destinations than

11   they would have been able to otherwise.

12   **Q.**   So with the NEA in place, you don't have to worry about

13   JetBlue increasingly going after American's markets or its

14   premium customers, right?

15   **A.**   The -- Boston is going to be something that we're

16   interested in.  It's not one of our biggest focuses, as I've

17   said.  The NEA, I know with Delta, pursuing a hub-like

18   strategy, this is something that is really important to

19   JetBlue, and it's a way that we can partner with JetBlue to

20   make them stronger and also us, as well.

21   **Q.**   And because of that partnership, they're not going after

22   your premium customers anymore, right?  In Boston?

23   **A.**   I think that we're all -- both JetBlue and American are

24   going to go after all premium customers.

25   **Q.**   Even in the NEA airports, right, Mr. Isom?

1    **A.**   That's the intent, that we can offer a product and

2    services and frequencies that make us a really formidable

3    competitor and something that will definitely compete well

4    against Delta's intent to create a hub.

5    **Q.**   Well, I'm not asking about Delta here, I'm just asking

6    about JetBlue.  That competition for premium customers here

7    in Boston is over because of the partnership, right?

8    **A.**   Well, we would partner with JetBlue to make sure, again,

9    that we are the best relationship to -- to attract all

10   premium customers.

11          MR. JONES:  Your Honor, I pass the witness.

12          THE COURT:  All right.  Cross-examination,

13   Mr. Wall?

14          MR. WALL:  Yes, Your Honor.  Can I just have a

15   second to get set up here?

16          THE COURT:  Of course.

17   **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT AMERICAN AIRLINES**

18   BY MR. WALL:

19   **Q.**   Good morning, Mr. Isom.  I want to begin back at the

20   discussion that you had with Mr. Jones about your

21   conversation with Richard Anderson, and your subsequent

22   e-mail with Vasu Raja, okay?  So let's go back and pull up

23   the document that was Plaintiffs' Exhibit 68, I believe -- or

24   69.  I'm sorry, 69.

25   **A.**   I have it.

1    **Q.**   Okay.  If we zoom in on the top of that, you see that the

2    date is March 28, 2020, right?

3    **A.**   March 28th, 2020.  Yes.  Right.

4    **Q.**   On March 28, 2020, did you have Richard Anderson or

5    anybody else tell you that the airline industry was likely to

6    be shedding a lot of capacity?

7    **A.**   No.

8    **Q.**   Let's take a look at a document from the prior day,

9    Defendants' Exhibit 34.

10            MR. WALL:  Would you put that up, please.

11   BY MR. WALL:

12   **Q.**   Do you recognize defendants' Exhibit 34, Mr. Isom?

13   **A.**   I do.

14   **Q.**   What is it?

15   **A.**   It's a document that details what we pulled from ANNIS

16   reports -- ANNIS reports and public statements about what

17   United and Delta were going to do in terms of adjusting their

18   schedules to react to COVID and the collapse of demand.

19   **Q.**   And where does this come from within your organization?

20   **A.**   It would come from our revenue analysis, or Vasu Raja's

21   organization.

22   **Q.**   And the date of this in the upper right hand corner is

23   what?

24   **A.**   Is March 27th.

25   **Q.**   So this actually is the same day that you spoke with

1   Mr. Anderson, right?

2   **A.**  Correct.

3            THE COURT:  Day before -- or same day you speak to

4   him.

5   BY MR. WALL:

6   **Q.**  And it's the day before you sent the e-mail to Mr. Raja

7   telling him of your conversation with Mr. Anderson?

8   **A.**  Correct.

9   **Q.**  And would Mr. Raja have also been a recipient of the same

10  industry commentary that we see here on PX34?

11  **A.**  Yes, his group would have created it, and we would have

12  reviewed this.

13  **Q.**  So let's focus in on United, and it states that, under

14  April, it says, "95 percent international capacity reduction

15  through April.  No additional guidance related to domestic

16  system wide reductions."  Right?

17  **A.**  Yes.

18  **Q.**  And the next bullet is "cancelling all international

19  flights through April," with some exceptions that are listed

20  there, right?

21  **A.**  Yes.

22  **Q.**  We go over to Delta, April, "70 percent capacity

23  reduction system wide, 80 percent international."

24            Did I read that correctly?

25  **A.**  Yes.

1   **Q.**  And the third bullet is, "Reducing April schedule by

2   85,000-plus flights"?

3   **A.**  85,000 flights, right.

4   **Q.**  And it also indicates -- there's a column for American,

5   right?

6   **A.**  Right.

7   **Q.**  So these would be things that American had already said

8   publically?

9   **A.**  Yes.

10  **Q.**  And so under April, "Reducing April capacity by

11  60 percent year or year, 60 to 70 percent domestic, 80 to

12  90 percent international."

13          Had you already announced that publically as of

14  March 27, 2020?

15  **A.**  Yes, and had reduced the schedule, or were in the process

16  of reducing the schedule.

17  **Q.**  By 55,000-plus flights?

18  **A.**  By 55,000-flights, yes.

19  **Q.**  Is that a normal day in the office?

20  **A.**  On no.  On a given day we fly 6,000 flights.  So this is

21  a very, very large number of flights.

22  **Q.**  Is there anything about your subsequent e-mail with

23  Mr. Raja, PX69, that is fairly read as indicating that on a

24  long-term, sustainable basis, the West Coast International

25  Alliance, or the Northeast Alliance would be a way for

1    American Airlines to reduce capacity?

2         MR. JONES:  Objection.  Leading.

3         THE COURT:  Sustained as to the form.

4         MR. WALL:  Okay.

5    BY MR. WALL:

6    **Q.**  Well, why don't we just go back to -- to the document,

7    and where you say, "The industry is going to have to shed a

8    tremendous amount of capacity, turning the dial back five

9    years as a guide to what 2021 looks like, and it might be an

10   18-month slope to that point, once people get traveling

11   again.  Let's not question.  Let's go there hard and fast."

12        Just taking that particular language, without any

13   of the reference to the ideas about Alaska or JetBlue, does

14   that language have anything to do with the Northeast

15   Alliance?

16   **A.**  No.

17   **Q.**  What were you directing Mr. Raja to do?

18   **A.**  Again, we were in the midst of the largest crisis that

19   I'd ever seen in the airline industry, one that was, you

20   know, potentially, you know, threatening the viability of

21   American.  And every day that we waited, we were losing tens

22   of millions, if not $100 million in a given day.  We only had

23   7 billion -- or $8 billion of cash on hand, and projections

24   of this were such that we could run out of cash and become

25   insolvent over a fairly short period of time.  And so this

1    was a direction from me, as the president of American at that

2    time, that we didn't have time to wait and think.  Every day

3    was something that could be a day that we couldn't get back

4    and could be -- have a critical impact on our future

5    viability.

6    **Q.**  Thank you, sir.

7            When you spoke to Mr. Anderson -- at the time, he

8    was employed by Amtrak, right?

9    **A.**  Yes.

10   **Q.**  Okay.  Did he tell you, in that conversation, anything

11   that he knew from private sources about what Delta or any

12   other airline were planning on doing?

13   **A.**  No.  Absolutely not.  Again, I was calling Richard as

14   having worked with him back at the time of 9/11 and SARS, I

15   was in charge of operations or a portion of operations back

16   then.  And I had never seen anything like this, and I wanted

17   to get some advice from somebody that I had trusted, who had

18   been through some serious battles, and wanted to get a sense

19   of where this might all lead.  And his was a good opinion to

20   have.

21   **Q.**  Did you have any conversations in this period of time

22   with anyone from Delta, United, or any other domestic or

23   international airline for that matter, as to capacity

24   reductions that would be made?

25   **A.**  Absolutely not.

1    **Q.**   Okay.  I want to go back to the document that you were

2    just talking to Mr. Jones about, PX283.  Could you put that

3    back up, please?  And this is about the station visit here in

4    Boston?

5    **A.**   Uh-huh.

6    **Q.**   And if I understand your testimony, you were saying is

7    you get a briefing document with questions that the local

8    people think you might be asked?

9    **A.**   Anything that might possibly come up, yes.

10   **Q.**   Okay.  And then for a lot of these, there is a -- there

11   is a -- something underneath the question, denominated a, or

12   I guess in one case b.  What are those?

13   **A.**   Those are some -- some -- some ideas for answers for the

14   questions.

15   **Q.**   Okay.  So for example, in the question, "What is the plan

16   for E-190 retirement and how will that impact the shuttle

17   flying?"  The proposed answer or talking point is, "We are

18   looking at the E-190 extension," et cetera?

19   **A.**   Yes.

20   **Q.**   Okay.  Now, Mr. Jones mentioned to you this bullet point

21   that talks about Delta going up to 200 flights in Boston,

22   JetBlue be it 180, et cetera.

23             Could you read what the proposed talking point is?

24   **A.**   "More to come on this soon."

25   **Q.**   Is that an answer to the question?

1    **A.**  No.

2    **Q.**  Did you have any plans at this time to try to challenge

3    that Delta or JetBlue position at Boston?

4    **A.**  We didn't.  You know, our efforts were focused on other

5    areas.

6    **Q.**  I want to go back next to what was Plaintiffs' 320, and

7    Mr. Jones showed you slide 33.

8         In a second, I'll let you catch up with that.

9    **A.**  Sir, I'm on PX320.

10        MR. WALL:  It's got a lot of different numbers on

11   it, actually, but yes.

12   **A.**  Okay.  I'm on the one that's on the screen.

13   **Q.**  Okay.  I'm sorry.  It's my bad.  I apologize.  Please put

14   up DX32.  I got that.  Wrong.  Sorry about that.

15   **A.**  DX32.  Yes.

16   **Q.**  So Mr. Jones showed you that this slide, slide 33, which

17   is -- has the title "AA has grown below GDP, while OA has

18   grown in excess," right?

19   **A.**  Yes.

20   **Q.**  Okay.  To the best of your recollection, was this being

21   reported to you as good news?

22   **A.**  No.

23   **Q.**  What was the intention of having this slide in the board

24   deck?

25   **A.**  That American, overall, had been growing less than

1   competitors.  And this is something that is obviously

2   concerning from a perspective of, you know, the future and

3   being able to offer a network that customers want and to fly

4   and our ability to be a viable competitor in the marketplace.

5   **Q.**  Let me ask you to turn back to slide three, or a section,

6   actually, that begins on slide 3, which has the

7   title, "Relative performance since the merger," right?  Do

8   you see that?

9   **A.**  I see that, yes.

10  **Q.**  Okay.  And then flip over to slide 4, it has

11  an, "Introduction."  And could you read the first bullet into

12  the record?

13  **A.**  "Since merging in 2013 the company has been focused on

14  accomplishing" --

15          THE COURT REPORTER:  Sorry.  If you could slow

16  down.

17          THE WITNESS:  Sorry about that.  I have a tendency

18  to go quick here.  Okay.

19          "Since merging in 2013, the company has been

20  focussed on accomplishing major integration milestones (i.e.

21  reservation systems, JCBAs, IT systems, et cetera).  While we

22  have had significant integration successes in the last five

23  years, our competitors (who merged earlier) have been able to

24  focus on optimizing their core business and growing margins."

25  **Q.**  Thank you.  Could you just explain to the Court what that

1    means, and not only what some of the acronym means, but

2    what's the message?

3    **A.**   The message is this, is that American Airlines and US

4    Airways merged, announced a merger in 2013, merged in 2014,

5    and started an integration process that really launched, you

6    know, work that only finished up at the start of the

7    pandemic, in terms of combining the two airlines.  So

8    reservation systems are, you know, how customers interact

9    with you to buy tickets, reservations systems, joint

10   collective bargaining agreements, JCBAs, are the agreements

11   under which our team members operate.  American Airlines and

12   US Airways had separate unions that all had -- the people all

13   had to come together, technology systems are everything from

14   those reservation systems, but also they are the systems that

15   we use to track maintenance and to handle dispatch and weight

16   and balance and everything that you can imagine in terms of

17   keeping track of airlines and aircraft movement and our

18   people.  All of those have to be brought together.  And that

19   was something that took an inordinate amount of management

20   time and attention to bring 100,000-plus people together, a

21   fleet of almost 1,500 aircraft together, airports together,

22   common livery and branding and everything that goes with

23   that.

24          It's a regulated process.  It's one that you have

25   to get a single operating certificate.

1    **Q.**   What does that mean?

2    **A.**   A single operating certificate is an FAA designation that

3    allows you to bring your operations together.  So all

4    airlines operate under an operating certificate that's

5    approved by the FAA, but it is unique to the airline.  Those

6    have to be brought together.  Planes all have to be brought

7    into the same, not just systems, but they actually have to be

8    brought into the same maintenance program.  Mechanics all

9    have to be trained, pilots all have to be trained, flight

10   attendants all have to be trained before you can truly

11   operate as one carrier.

12            Our merger was the largest and the most complex

13   because of our systems' differences that had ever been taken

14   on.  And so for about five years, all the way until the end

15   of -- or all the way until the beginning of 2020, when our

16   mechanics, our mechanics, and it's a group of about 14,000

17   people, until they came together, that was the final step.

18   And so it was a five, six year process that took the majority

19   of the time and attention that we had.

20            And as well, on top of that, there are also

21   aircraft, a 320 aircraft, or a 321.  US Airways had a

22   different number of seats on it than did American.  All of

23   those aircraft had to be put through a reconfiguration to get

24   them to be the same size.  It's a really complex process, one

25   that takes an inordinate amount of time and attention.

1   **Q.**   Thank you, sir.  And if you go to the next slide, there's

2   a slide here that it's part of series, that is

3   entitled, "Profitability trends since the AA merger."  And

4   what is this showing with respect to American Airlines

5   profitability during this period of time relative to that of

6   Delta and United?

7   **A.**   It is showing that our profitability on a margin basis

8   had fallen in comparison to Delta and United.

9   **Q.**   And if you go to the next page, there appears to be a

10  version of this, which is "ex-hedges."  What does ex-hedges

11  mean?

12  **A.**   So hedges are instruments that are put in place to --

13  for, in this case, to advance purchase fuel or put in place

14  financial instruments to reduce the variability of fuel costs

15  or to potentially speculate on the price of fuel costs.  And

16  all it's done here is adjusting for that, so that you take

17  that out of the calculation, and again, it still shows that

18  American's margins are declined.

19  **Q.**   And the next one appears to add both hedges and labor to

20  the analysis.  How does that work?

21  **A.**   So, yes.  At the time of the merger, American and US

22  Airways, American Airlines coming out of bankruptcy, and US

23  Airways, a smaller carrier, on a combined basis, we went and

24  negotiated new collective bargaining agreements with our team

25  members.  And so post the merger, one of the merger benefits

1    was that all of our team members, top to bottom, received

2    more than double-digit pay increases coming out of the

3    merger, that made them -- and once we had those accomplished,

4    they were paid more in line, if not in some cases, equal to

5    or better than Delta and United.  So that -- it's being

6    adjusted here so that you don't look at 2014 and 2015

7    profitability with the sense that you could have a labor cost

8    advantage.

9    **Q.**  And just generally, when you look at this, let's go back

10   to slide 5, which is just the reported pretax margins.

11             So that if I understand this correctly, just the

12   high water mark that you had here was 2015, what looks to be

13   a pretax margin of around 15 percent; is that right?

14   **A.**  That's correct.

15   **Q.**  And then at all other times, it's below that, right?

16   **A.**  When it -- yes.  On a run rate basis and certainly

17   adjusted.

18             THE COURT:  Okay.  What accounts for Delta's --

19   Delta there?

20   **A.**  Well, Delta has done a really nice job of running a

21   network airline.  And based on my assessment, they have

22   actually accomplished their merger with Northwest probably

23   five years, six years prior to ours.  So they got through all

24   of the integration work, and they've done a really nice job

25   of actually growing and making sure that their network serves

1    customers on a basis that allows them to achieve a higher

2    level of profitability.

3              There's some cost elements to it, as well, in my

4    opinion.  They have a real nice hub in Atlanta that's low

5    cost and it's the primary -- you know, it's the biggest chunk

6    of their operation.  But they've run a nice, reliable

7    airline, and they've gotten through their integration, and

8    it's something that we're making sure our network and our

9    operation, that we, you know, get back to where we can be,

10   and at some point in time matching it and beat Delta.

11             THE COURT:  So they have a cost advantage, to some

12   degree, in terms of where some of their hubs are,

13   particularly Atlanta, and they've been able to build --

14   they've had this period of time, you're saying 2015 forward,

15   then they're building on their merger, as opposed to doing

16   their merger.

17   **A.**  They're merger was all the way back in 2000 -- I think,

18   '08 or '09.

19             THE COURT:  I see.  Interesting.

20   BY MR. WALL:

21   **Q.**  Just one more fact on that, can you compare

22   American Airlines's unionization with Delta's?

23   **A.**  So that's -- American Airlines is the most unionized of

24   any carrier, 85 percent of our team members are unionized.

25   It's something we're very proud of, but it's almost I think

1   80,000 team members.  Delta has their pilots that are
2   unionized, which is a much smaller group.  A group I think
3   that is, you know, 10 or 15,000 team members for United.  I
4   can't speak to it specifically, but the rest of their groups
5   are not unionized.
6   **Q.**   Okay.  All right, Mr. Isom.  Let's just sort of pick up a
7   little bit on the business model.  Could you try to explain
8   to the Court how the hub-and-spoke model that we've heard
9   about allows American Airlines to provide service and make a
10  profit?
11  **A.**   So we're a global hub-and-spoke carrier.  And what that
12  means is we use -- we use these hubs that we created in
13  Dallas, Fort Worth, and Chicago, and Philadelphia and Miami
14  and Charlotte to bring customers from all over the world into
15  one of our hubs and allow them to potentially connect or just
16  fly on that local service and what it does is it creates
17  great utility.  So on any given flight, you know, just let's
18  pick from DFW to Los Angeles.  We may have customers that are
19  coming from a few hundred different potential origins and
20  destinations because they are able to connect.  So the way
21  that we work is trying to offer utility and the more places
22  that we can serve in a hub, it's just multiplicative.  One
23  more destination that we can tack onto a hub means that we
24  can fly to every other place in that hub and create a new O&D
25  pair.

1          And so for us, what we offer that no other

2     carriers, outside of the other global hub-and-spoke carriers,

3     can offer is a tremendous amount of origins and destinations

4     facilitated by connections within hubs.  So for American,

5     that is something that is, I think, prior to pandemic, it was

6     almost 35,000 O&Ds, and then adding in our partners, it grew

7     to almost 50,000 origins and destinations.

8          Now, doing that is hard, because you have to

9     facilitate connections and it means that you have to have

10    infrastructure, like a big hub airport, where your gates are

11    used throughout the day in big banks.  Everything comes in

12    and everything goes out.  It's not a smooth process.  And

13    what that means, then, is that you need to have more gates,

14    more people, more resources to actually run that kind of

15    operation than you would if you were a point-to-point

16    carrier, where you're just flying from one point to another,

17    and you don't need things like baggage handling systems,

18    other than to get the bags off of a plane.  We need baggage

19    handling systems to connect between planes.  We need carts

20    and team and technology that actually can facilitate those

21    transfers of bags.  We operate 24 hours a day, seven days a

22    week throughout the world.

23    Q.  So does that result in American having higher cost

24    structure than what we've heard of as the low-cost carriers

25    and the ultra low-cost carriers?

1    **A.**   So it's a much higher cost structure, and again, it's

2    required, because we're not just flying point-to-point, we're

3    bringing passengers in, allowing them to connect, and we

4    facilitate that.

5              On top of that, being a full service carrier, and

6    again, one that is trying to attract customers from all

7    aspects of demand, we have things like lounges, and we offer

8    services to customers that are -- we call five star services,

9    where we help customers through airports and on to planes and

10   sometimes transfer, you know, even on the tarmac.  We're a

11   full service carrier and then also we have to do things to

12   make sure that we're catering to customers that want just the

13   lowest fares, as well.  But in any event, it's a high cost

14   operation.  It requires us to appeal to every aspect of

15   demand, and do so in a way that we can still make a profit.

16   **Q.**   Do you compete for the same kind of customer that the

17   ULCC, like a Spirit, would compete for?

18   **A.**   We absolutely do.  So on our planes, as I said, whether

19   it's just the local market passenger, or those passengers

20   that are connecting in our hubs, and whether they're the

21   customers that are sitting up front on our -- domestic, first

22   class seat, or on our flagship services on our 787 aircraft

23   that are flying throughout the world, or our premium economy,

24   we serve customers that are the highest yielding and want to

25   pay for those kind of amenities, all the way to those that

1    want no frill service and want to just get a seat on a plane.

2    **Q.**   We've heard a little bit about the mergers and how they

3    contributed to what the network is today.  Just from your

4    perspective, could you just briefly summarize for the Court

5    how the series of airline mergers that occurred between 2008

6    and 2013 changed the network offerings of the three major

7    airlines?

8    **A.**   Well, again, I've worked at US Airways and America West.

9    I've worked at Northwest Airlines, as well.  There was --

10   after Delta and Northwest merged, Delta and Northwest created

11   the largest airline in the world, and with their network and

12   with their partnerships, they could offer many, many more

13   origins and destinations.  They could appeal to customers

14   that were no frills, all the way up to the most premium, and

15   they could do so in a way that was far superior to anything

16   that, again, at the time that I was working at US Airways,

17   that we could offer.  That happened first.

18            A couple years later, or a few years later, United

19   and continental got together.  And then American and US

20   Airways had a chance to get together after American's

21   bankruptcy in the 2013/2014 time frame.  Each one of those

22   moves was to create a network that was competitive and that

23   was able to offer something on a scale that would attract

24   customers and allow you to make a margin and it did what you

25   were doing.

**Q.**  So put yourself back in the time when you were at US

Airways and Delta and Northwest have merged and United and

Continental have merged.  From that perspective at that time,

did you believe that US Airways would be viable in the long

run without a merger that would change its network offering?

**A.**  No, not in the long run.  We were a middle sized

hub-and-spoke carrier, so it had all the costs that a

Delta/Northwest merged carrier would have, but we just didn't

have nearly the scale, the number of frequencies to offer.

So whether it was, you know, going into a corporate customer

and competing against Delta for a deal, in terms of a

corporation's travel, or even your presence in terms of just

leisure business, we couldn't get people where they wanted to

go.  We had an inferior product.  We had a cost structure

that wasn't materially less and it was something that we had

to remedy.  And fortunately, the merger has worked out well.

It's given us a network that is very, very competitive.

**Q.**  So let's pick up then with that net work.  Did you just

stand pat after that, or have you tried to build out the

network that you inherited from the time of the merger?

**A.**  So once we've really tried to put all the pieces

together, finding out how to expand that network has been a

great challenge, and it's what we try to work on every day.

We -- as I mentioned, the dynamics of a hub-and-spoke system

are the bigger the hub that you can create, the more

1    destinations that you can add, the more appealing it is

2    overall.  So we've been spending a tremendous amount of time

3    on making sure that we can take advantage of our biggest

4    engines of, you know, connections, and that really is Dallas

5    Fort Worth.  And Charlotte, prior to the merger, we had grown

6    DFW by I think almost 100-plus additional departures, and

7    Charlotte wasn't too different, as well, and so we've spent a

8    lot of time in those areas.

9              But as well, you know, we've done some things even

10   on a spoke level, as well.  So our focus in Austin, for

11   example.  And there's many cities throughout the United

12   States where our presence has grown materially.

13   Q.  I mean, the suggestion has been made in this case that,

14   since the merger, American Airlines hasn't been interested in

15   growth; is that correct?

16   A.  No, that's not true at all.

17             MR. JONES:  Objection, leading.

18             THE COURT:  Sustained as to the form.

19   BY MR. WALL:

20   Q.  Since the merger, is American Airlines interested in

21   growth?

22   A.  We're absolutely interested in growth and we're

23   interested in growth that can improve profitability and our

24   offering to our customers.

25   Q.  Okay.  We also heard a lot about infrastructure

1    limitations in various parts of the country, right?

2    **A.**  Yes.

3    **Q.**  How does infrastructure limitations affect American

4    strategies with respect to growth?

5    **A.**  Well, throughout the world, you just can't grow where you

6    want to.  You have to take into account, you know, all sorts

7    of limitations.  So it can be everything from air space, it

8    can be gates.  It can be slots.  It can be government

9    relations and agreements that have to be worked between

10   different countries, so we have to take all of those into

11   account.  And there are many places, you know, throughout the

12   world, in which, you know, you just simply -- you just simply

13   can't grow.

14   **Q.**  So let's take the New York region.

15   **A.**  Right.

16   **Q.**  What kind of limitations do you have on what organic

17   growth aspirations you might have?

18   **A.**  So New York has been historically problematic, because

19   they're slot controlled and space controlled, air space

20   controlled airports.  And in this case, I'm speaking

21   specifically of JFK and LaGuardia.  American has a slot

22   portfolio, basically round trips, that we can utilize within

23   JFK of 105 trips, basically.  And in LaGuardia of 163.  And

24   although it sounds like a lot of flights in the scheme of

25   things, it's not when you're going up against competitors

1    that in a case like JFK, where Delta would have, you know,

2    double the number of flights, or in the case of like

3    LaGuardia, 50 percent more of the flights, and United

4    operating in New York at about the same level overall as

5    Delta.  It puts us at a great disadvantage.

6           And there's really not much that you can do other

7    than utilize what you have there as best as possible.  Maybe

8    you can do some up-gauging, which is trying to put larger

9    planes on flights, but even that has limitations.  And it has

10   limitations because, you know, even in a place like

11   LaGuardia, you know, there's a maximum size of plane that you

12   can put in.

13   Q.  So we've heard a lot about this concept of relevance --

14          THE COURT:  How big a plane can you send into

15   LaGuardia.  That's separate from the perimeter limitation.

16          THE WITNESS:  It's separate from the perimeter.  We

17   basically are capped out at a 321, which is about 190 seat

18   aircraft.

19          THE COURT:  So no wide bodies.

20          THE WITNESS:  No wide bodies, the gates don't allow

21   for wide bodies in a place like LaGuardia.

22          THE COURT:  Because the buildings can't accommodate

23   it or --

24          THE WITNESS:  It's not set up for it.  And I'm sure

25   there are other, you know, runway, and also air space issues

1    that play into that, as well.  But for the most part, our

2    gates are configured to accommodate a maximum of about a 321

3    aircraft.

4              THE COURT:  I see.  Okay.

5              Go ahead.

6              MR. WALL:  Thank you, Your Honor.

7    BY MR. WALL:

8    Q.  So we've heard a lot about this idea of local relevance.

9    What is the slot disadvantage that you have relative to Delta

10   due to your ability to try to compete with Delta in -- for

11   local passengers in New York?

12             MR. JONES:  Objection, Your Honor, to counsel

13   testifying and characterizing the evidence as a predicate to

14   the question.

15             MR. WALL:  All I said is we'd heard about it.

16             THE COURT:  Overruled for now.

17             Shorter questions are usually better, though.

18             THE WITNESS:  Repeat the question.  Sorry.

19   BY MR. WALL:

20   Q.  So the slot situation that you just talked about, the

21   disadvantage, what, if any, effect does that have on your

22   ability to try to build local relevance in New York?

23   A.  Well, for us, in a place like JFK and LaGuardia, and

24   because of the limitations and what we can fly, we largely

25   bring passengers from the rest of our network to New York.

1            From a local perspective, we just don't have the

2    number of frequencies and the number of cities to be as

3    attractive to the local customers as would be a Delta or a

4    United.  And for that reason, you know, we generally, you

5    know, operate at a pretty big disadvantage when it comes to

6    going and trying to land a corporate customer or appeal to

7    the frequent flyer that flies to a lots of different places

8    in the New York -- in the local New York area.

9    **Q.**  Thank you, sir.  Vasu Raja was here on Friday, and at

10   that time, he described partnership strategies of various

11   kinds.  Are you familiar with American Airlines partnerships

12   strategies since Mr. Raja took over?

13   **A.**  Yes, I am.

14   **Q.**  Okay.  So can you state your understanding of the

15   partnership strategies that Mr. Raja has been advocating for

16   since he took over that strategy position in 2019?

17   **A.**  Sure.  You know, since I took on as president of

18   American, we have been working through our strategy with the

19   intent of trying to create more relevance and put more points

20   on the map that we can offer to our customers.  Again, that's

21   the nature of the hub-and-spoke and global network airline

22   business model.  And to that end, as we've said, you know,

23   we've tried to do things with our -- our hubs and trying to

24   maximize what we can do there, but in terms of partnerships,

25   we have a long history of successful relationships

1    internationally, which have allowed us to use a concept of,

2    you know, a joint business or alliance in a way that can take

3    care of deficiencies in our network map.

4              And so over time, I've been working with Vasu on

5    making sure that those areas that we've been historically

6    weak, whether it's New York or up in the Northwest and also

7    in many international locations, that we're taking the steps

8    necessary to build partnerships where we -- where it's

9    impractical for us to do it on our own.

10   **Q.**  Are these partnerships intended to be some way for

11   American Airlines to avoid investments?

12             MR. JONES:  Objection.  Leading.

13             THE COURT:  Sustained as to the form.

14   BY MR. WALL:

15   **Q.**  Does American have some concept of what justifies

16   investments in organic growth?

17   **A.**  We do.

18   **Q.**  What is it?

19   **A.**  So, look, we look to invest where we can produce a

20   return.  Absolutely.  And in terms of investments, you know,

21   overall, American has invested more in our business than any

22   other airline over the last five, six years, since the

23   merger, in every respect.  So if you want to talk about

24   aircraft, American has put, you know, $25 billion-plus in our

25   fleet.  If you want to talk about modifications of aircraft,

1    older aircraft, you know, it's similarly a large -- not quite

2    of the same magnitude, but a very large number.

3              We've put billions into airports, into lounges and,

4    you know, we've spent where we think we need to invest for

5    the long run.

6    **Q.**   Does demand, anticipated demand, have any role in the

7    investment calculus?

8    **A.**   Absolutely.  It's part of making the case, as we do with

9    all investments, of determining what kind of expenditures you

10   have to make now from a capital perspective, what kind of

11   operating expenses you'll have in the future, and what kind

12   of revenues that that will generate.  And having investments

13   that generate revenues that are in excess of the expenses is

14   all -- is the business we're in.

15   **Q.**   Is there any relationship between partnerships and

16   creating demand for your services?

17   **A.**   Absolutely.  Again, from the business model perspective,

18   in and of itself, it's the more points that we can add on to

19   the map, the better off that our network operates.  We're

20   making use of investments that are already in place when we

21   have a big hub that we can connect into.  And so when we can

22   add into our overall network with relationships, like we've

23   done internationally, it means good things for American.

24   **Q.**   All else equal, if a partnership helps you increase

25   demand for your services, what effect is that going to have

1    on the likelihood that you will invest in that area?

2    **A.**   That's the -- that's the predicate.  We absolutely have

3    to have a business case that says, if you're going to add a

4    service, you know, that it will produce a return.  So we're

5    constantly on the hunt for opportunities to grow ourselves or

6    to create relationships that will bring more opportunities to

7    tap into customer pools and add destinations to the overall

8    network.

9    **Q.**   When did you first hear about the possibility of the

10   relationship with JetBlue that became the NEA?

11   **A.**   Shortly before the -- the pandemic.  So end of 2019.

12   **Q.**   And from whom did you hear about it?

13   **A.**   From Vasu.

14   **Q.**   And what was your reaction to the idea?

15   **A.**   Sounded really intriguing.  You know, as he laid it out,

16   it was an opportunity to potentially take a -- again, a sub

17   par performing aspect of American's network and to turn it

18   into something that could be, you know, really, really

19   interesting.

20   **Q.**   Did he subsequently come back to you with more

21   information about an analysis of it?

22   **A.**   Yeah, of course and it's not something that -- like it

23   hadn't been done before, so it's a new and interesting idea.

24   But that is something that required analysis and just an

25   assessment of is it even practical?  Can we pull it off?  How

1    do you do it?  What goes into it?  And ultimately, what are

2    the costs?

3    **Q.**   Let's pull up Defense Exhibit 1075A, which is --

4               MR. WALL:  Did he move this into evidence?

5               It was subject to an objection that's been

6    resolved.  It was a completeness of objection sort of thing,

7    so I think this goes in without objection at this point,

8    right?

9               THE COURT:  Admitted.

10              MR. JONES:  Yes, Your Honor.

11              THE COURT:  All right.  Admitted.

12              (Defendant Exhibit No. 1075A admitted into

13              evidence.)

14   BY MR. WALL:

15   **Q.**   All right.  Are you familiar with this deck, Mr. Isom?

16   **A.**   I am.

17   **Q.**   Is -- and Project Garland, as we all know, is code name

18   for the NEA, right?

19   **A.**   It is.

20   **Q.**   Okay.  And so is this a deck that Mr. Raja presented to

21   you?

22   **A.**   It is a deck that he presented to me.

23   **Q.**   All right.  Why don't we pull up what is slide 7 in this

24   version?

25              MR. WALL:  Your Honor, just as a point of

1  information, when Mr. Raja testified, it was a slightly

2  different deck, it happened to be slide 9.  It was the same

3  content, but it was a slightly different slide number.

4  BY MR. WALL:

5  **Q.**  Do you recall this slide, which is entitled, "A combined

6  network creates a new ability to compete with DL and UA"?

7  **A.**  I do recall this, yes.

8  **Q.**  And what was your reaction to this slide upon seeing it?

9  **A.**  It was a tremendous amount of excitement.  It was -- for

10  me, it was a light bulb, aha.  When you take a look at having

11  American and JetBlue that can offer services that would be on

12  par with and, you know, really, really competitive with Delta

13  and United, it was -- it was a fantastic moment.  Because we

14  had been struggling for a long time figuring out how do we

15  change our relevancy in the New York area.

16  **Q.**  So what is the investment that is required by American to

17  make that happen?

18  **A.**  Really, it's one of, you know, a will between American

19  and JetBlue.  But ultimately, it's creating a seamless

20  experience.  You can't -- you can put on paper and say, hey,

21  here's nonstop markets from one and the other, and here's the

22  number of seats and it all looks good on paper.  But if you

23  can't do something that then, you know, makes a compelling

24  product, where a customer says, oh, I really want to fly on

25  you and I don't view a lot of -- I don't view a hassle in

1    terms of working between you, then that is something that is,

2    you know, real.  But that seamlessness is -- you know, it's

3    hard to bring about.  You can't have, you know, long

4    connections.  You can't have, you know, customers that are

5    confused about how to use the product.  You have to make sure

6    technology is linked together.

7              So it's hard, but it's not something that is

8    impossible.  It doesn't cost, you know, billions of dollars

9    to bring about.

10   **Q.**   How does it compare to the cost of a merger?

11   **A.**   Oh, well, there's no comparison at all.  A merger, as we

12   talked a little bit earlier, is one in which you're spending

13   hundreds of millions of dollars, if not billions of dollars

14   to bring things together.  And as I said, it's everything

15   from creating dispatch centers to putting your people on

16   joint contracts to changing branding, even putting employees

17   in the same uniforms.  It's -- there's -- it's not the same

18   magnitude.  It's not the same scale.

19   **Q.**   Did you ultimately make a decision about whether

20   American Airlines should go forward with the NEA?

21   **A.**   We did.  And again, on the basis that for the -- because

22   of the alignment of interests and because of the fact that we

23   can pull this off.  And if we get the seamlessness right,

24   this is something that is truly a competitor to Delta and

25   United, and strengthens American overall.

1    **Q.**  Do you believe that a simple codesharing relationship

2    with JetBlue could have achieved the benefits of the

3    Northeast Alliance?

4    **A.**  No, it wouldn't.  And look, I've been in the airline

5    business a long time, going back all the way to the '90s, and

6    I've been involved in codeshares at America West, Northwest,

7    US Airways, and it's not even the same -- the same realm.

8    Codeshares can provide some benefit, but it's randomness.

9           You know, in this case, the real key is --

10   **Q.**  What do you mean by randomness?

11   **A.**  Well, you take a look at a schedule, even on this chart,

12   you take a look at a schedule on a codeshare basis, you may

13   be able to provide a connection, or you may not be able to.

14   You may not actually working together to put together a

15   schedule, where you're trying to serve different markets and

16   allow different connections to be made.

17          So in the NEA, what we're doing is we're working

18   together on scheduling to make sure that we're able to offer

19   services to places where people want to go in a timely

20   fashion, not just, hey, it may happen on a random basis or

21   you may get lucky.  This is one where we sit down and say,

22   you know what, we can have a schedule to Austin in this case

23   that really appeals to a business customer.  They can go out

24   in the morning, and they can get back at night or they have a

25   flight to get back midday.

1          Internationally, working together on scheduling

2     allows us to create a connection to, you know, a place like

3     Amsterdam, where, you know, if you didn't have -- if you

4     weren't able to work on scheduling together, you may be able

5     to get somebody from JFK or a connecting point in -- or

6     rather, a connecting point in, but you may have to make them

7     wait for an inordinate amount of time to be able to actually

8     pull that off, which means you wouldn't be competitive with a

9     Delta or United.

10    Q.   So you make the decision to go forward with the NEA.

11    What has been your involvement in the NEA implementations?

12    A.   Well, it's just -- at this time, I was president of the

13    company, but overseeing commercial and operations aspects.

14    So you know, it's definitely giving support, enthusiasm, and

15    approving investments where required, but the biggest thing

16    is here, you know, for us, is can you operate it?  Can you

17    make it seamless?  And can you actually, for the customer,

18    give them a product that they value and that they view as

19    competitive with what Delta or United offers.  And in that

20    case, it's been to make sure that that happens.

21    Q.   You've been involved in some of the implementation side

22    of it, you're saying?

23    A.   I have been, yes.

24    Q.   So Mr. Jones talked to you earlier about a document.  I

25    don't recall the number right off, but it doesn't matter,

1    where a board member wanted to talk to you about some

2    questions about whether the NEA was going to work.  Do you

3    recall that?

4    **A.**  I do.

5    **Q.**  And in that e-mail, you make a reference that you're

6    about to visit New York.  Do you recall that?

7    **A.**  I do.

8    **Q.**  Do you remember why you were going to visit New York on

9    that occasion?

10   **A.**  Well, it's my own feeling about the NEA is that it works

11   based on, you know, the seamlessness of the service.  Our

12   board absolutely amplified that concern, and so my interest

13   was going -- my interest is actually from a hands-on

14   perspective, making sure that that's actually something that

15   happens, and that the teams are aligned between American and

16   JetBlue, and that we're working on creating a product that

17   customers view as very, very easy to use.

18   **Q.**  You came up from the operations side of the business,

19   right?

20   **A.**  I did, yes.

21   **Q.**  Okay.  So what happened when you went to New York on that

22   occasion with respect to the NEA?

23   **A.**  Well, again, it's not just about checking in and seeing

24   how things are progressing.  It's actually going and, for me,

25   getting a feel of how things are working.  So I wanted to go

1    and see JFK.  I wanted to actually walk the airport, walk the

2    baggage systems, walk the connections that the customers

3    would have to take.  And that's exactly what I did.

4           Again, I've been in the airline business a long

5    time, so you wanted to understand how the check-in process

6    for a customer would work, how it would work for a customer

7    to clear security, how it would work for customers to pick up

8    their bags, how it would work for customers to transfer

9    between American and JetBlue.

10          And one of the things you find is that we're

11   operating out of different terminals, and it's something

12   that, you know, at least based on my view, would have been --

13   would be really problematic.  And so I asked for a number of

14   things, namely a secure side of the airport bus to be put in

15   place that would create a connecting experience that would be

16   similar to any other carrier or any other place in our

17   system.

18   **Q.**   So the bus came from you?

19   **A.**   The bus came from me, because -- well, the connecting

20   opportunity without a bus in JFK would have been actually

21   exiting RT 8 and then having to catch a train to JFK, go to

22   JetBlue's facility outside of security, clear security, go

23   in.  And what you would ultimately end up with is a

24   connecting time that would be, you know, 40 minutes-plus in

25   terms of just getting from one point in the airport to where

1    you want to connect to.  And what that does, though, is it

2    adds time to the overall itinerary, and ultimately makes an

3    experience that customers say, well, this is a hassle, so I

4    just won't do it.

5           And in seeing that, I asked the team if there are

6    other ways.  You know, clearly, you can't walk it, but are

7    there ways that we can keep the passengers on the secure side

8    of the airport, so they don't have to leave security and then

9    come back through, and actually make it to a connecting point

10   with JetBlue in a timely fashion.  A bus was rumored to have

11   been a hard thing to accomplish, but we found a way to be

12   able to do it, in a way that's very comfortable, it's

13   branded, and it allows customers to make a connection or get

14   from one place to another in a reasonable amount of time.

15   **Q.**   Have there been other seam issues with the NEA?

16   **A.**   There have been.  It's -- look, trying to make all

17   products, you know, exactly the same is hard.  And we'll

18   probably never get through all of the seams.  But the vast

19   majority of them, like connections, like being recognized as

20   a frequent flyer, you know, things like, you know, upgrades

21   and the experience that you get, both during the travel and

22   after the travel experience, those are things that we're

23   working on, and I know that that's where our attention is,

24   and I know that we're going to address the vast majority of

25   them.

1    **Q.**  Now, having said that, is there any part of the NEA that

2    requires JetBlue to change its business model or hard product

3    or overall business philosophies?

4    **A.**  No.  JetBlue operates the aircraft that they want to

5    operate, we operate the aircraft that we want, we operate the

6    configurations that we want.  We put the aircraft and the

7    amenities that we have to work.  You know, JetBlue has a

8    different philosophy when it comes to in-flight entertainment

9    than we do.  You know, they're overall product and product

10   experience is different.  We have lounges in our business

11   model, but we don't require them to do any of that.  What is

12   important is having a schedule and an experience as you

13   travel that is, again, easy to use, and that's where we spend

14   our time and attention.

15           MR. WALL:  Thank you, sir.  No more questions.

16           THE COURT:  I think we'll take a break now.  Do you

17   have -- what do you have?

18           MR. JONES:  Your Honor, I will have some redirect,

19   so I think now is a great time for a break.

20           THE COURT:  Okay.  We'll break now.  Stand in

21   recess.

22           (Court in recess at 11:09 a.m.

23           and reconvened at 11:24 a.m.)

24           THE COURT:  Please be seated.  Ready to go,

25   Mr. Jones?

1          MR. JONES:  Yes, sir, I am.

2          THE COURT:  Go ahead.

3          **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

4     BY MR. JONES:

5     **Q.**  Mr. Isom, in your testimony with Mr. Wall, you claim that

6     the integration from the US Airways/American merger, for

7     approximately five years, adversely affected the airline's

8     ability to grow.  Do you recall that?

9     **A.**  I recall that we spent a lot of time and attention to

10    integrate and that had an impact on other -- other

11    priorities.

12    **Q.**  For about five years after the merger, right?

13    **A.**  Yes.

14    **Q.**  Is it fair to say that US Airways, at the actual time of

15    the US Airways/American merger claimed that it would be able

16    to grow immediately upon completing that merger?

17    **A.**  I don't recall.

18    **Q.**  Is it fair to say that US Airways claimed that the merger

19    would promote growth upon its completion?

20    **A.**  I know that, at the time of the merger, we talked about

21    putting our networks together, and that that would facilitate

22    many, many more opportunities for customers to fly.  And that

23    that would ultimately enable us to create a foundation on

24    which to grow.

25    **Q.**  But you don't recall, do you, any claims by US Airways

1    that it would take five years before the combined company

2    could begin any significant growth after the merger, right?

3    **A.**   No, I don't recall that.

4    **Q.**   Now, you testified in your conversation with Mr. Wall

5    that the company needed to obtain a single operating

6    certificate to have the two airlines operate together under a

7    single brand.  Do you recall that?

8    **A.**   Yes, I do.

9    **Q.**   But it's fair to say, isn't it, that you didn't need a

10   single operating certificate to continue to grow the combined

11   airline, though, right?

12   **A.**   Again, the merger facilitated putting the networks

13   together, but there is the ability to actually take advantage

14   of, you know, being able to schedule aircraft all as part of

15   one network, to use team members all as part of one network

16   requires a lot of steps to get through that.  So yes, you can

17   operate as two quasi distinct airlines, but until you get

18   reservation systems, until you get single operating

19   certificate, until you get your team members all on the same

20   team, all on the same contracts and work policies and

21   procedures, you're operating in a very inefficient manner.

22   **Q.**   But it's true, isn't it, that you didn't need a single

23   operating certificate to continue to grow the airline after

24   you consummated the merger, right?

25   **A.**   Well, it would have been really hard.  You could have

1    done that in pieces, but it would have been suboptimal,

2    because what has to happen is, you know, in the case of US

3    Airways, we had US Airways planes.  US Airways planes could

4    only be flown by US Airways team members.  American planes

5    can only be flown by American's airlines team members.  Even

6    in the airports, the people that handled the planes for US

7    Airways could only handle US Airways planes and vice versa.

8    So to actually take advantage of the gates being put

9    together, having fleets that you wanted to actually route on

10   each other's networks, it took all of that to be done before

11   you could really do it.  So the answer is, yes, you could

12   have continued to operate as two separate airlines, but the

13   real value comes in in bringing those together, not just from

14   a marketing perspective and, you know, adding, you know,

15   points on a map, but actually putting them together in a

16   schedule that you can operate in a fashion that's efficient

17   and that allows for, you know, a lot of customer benefit that

18   comes from that.

19   Q.  And you could have grown without a single operating

20   certificate, right?

21            MR. WALL:  Asked and answered, Your Honor.

22            THE COURT:  Sustained.

23            MR. JONES:  I'll move on.

24            THE COURT:  You could do -- I understand the point

25   and you've described well the complications of coming

1    together.

2              THE WITNESS:  Right.

3              THE COURT:  But the day after the merger, you could

4    take the two teams that were separate, the American Airlines

5    schedule team and the US Air schedule team, and even though

6    the planes were going to be operated differently and all of

7    that, those two people could get together the day after and

8    optimize the schedule, to the extent they could within all

9    the other constraints that are limiting them.

10             THE WITNESS:  That's absolutely right.  And it

11   would have largely looked at like two distinct airlines that

12   were cooperating on pricing and scheduling.

13             THE COURT:  But that would lead to potential --

14   like you could not have a US Air flight fee to international

15   long-haul route that American flew --

16             THE WITNESS:  You can change that schedule.  You

17   may be located at a different part of the airport here in

18   Boston, for example.  We operate at a different --

19             THE COURT:  So you might have security connections,

20   because even if you could time it, or the timing might not be

21   so great because of those issues.

22             THE WITNESS:  Exactly.

23             THE COURT:  I see.  Okay.

24             Go ahead.

25   BY MR. JONES:

1    **Q.**  Let me turn to a different topic, Mr. Isom.

2              Now, you testified in your conversation with

3    Mr. Wall, that American competes for all the customers that

4    ULCCs compete for; is that right?

5    **A.**  That -- we offer a product that is competitive in all

6    respects, yes.

7    **Q.**  Isn't it the case, though, that ULCCs don't actually

8    compete for all the customers that American actually serves,

9    right?

10   **A.**  Well, I can't -- I can't speak to the ULCCs, but I do

11   know that just their product with, you know, not offering a

12   first class or not being able to fly internationally or not

13   offering lounges, I know they have product limitations that

14   get in the way with that, and they don't have the network

15   that we do to compete in the same way.

16   **Q.**  So, for example, you would agree, wouldn't you, that

17   ULCCs generally don't compete for business travelers, right?

18   **A.**  It -- it -- it depends.  And in terms of drawing

19   distinctions between business and leisure passengers,

20   business passengers are leisure passengers, too.  And so, you

21   know, I have an interest and I know ULCCs do, too, as well,

22   is to attract and retain that kind of loyalty from whoever

23   they're pursuing.  So I like to -- I like to create loyalty

24   among American Airlines customers no matter where they want

25   to fly, leisure, business, low cost -- cheaper tickets or

1    more expensive.

2    **Q.**  Let me ask it a different way to get at what I think

3    you're saying here.  ULCCs generally don't compete for

4    travelers traveling for business; is that right?

5    **A.**  I can't say that.

6    **Q.**  ULCCs generally don't compete for passengers who want to

7    fly first class; is that right?

8    **A.**  They don't have a first class product.

9    **Q.**  So they're not competing for those folks, right?

10   **A.**  They may be competing for those folks in terms of

11   flying -- customers fly for all sorts of reasons and I'll

12   just state this --

13              THE COURT:  I think he means for the customers who

14   are flying a flight where they want to fly first class, are

15   the ULCCs competing with you on that flight?

16              THE WITNESS:  The answer is --

17              THE COURT:  Like the finance people who want to fly

18   LA from New York, and they want to lie flat.

19              THE WITNESS:  Your Honor, if they were only

20   choosing to fly lie flat, but if they're flying based on,

21   hey, I need to be there at a certain point of day, okay, or

22   you know, I have to fly to a specific city, then we're

23   absolutely all competing for the same.  I think it's really

24   hard to draw distinction to say that a business traveler is

25   only flying for that lie flat seat, but absolutely, if that's

1    the only distinguishing factor, that they don't have that

2    product to offer.

3    BY MR. JONES:

4    **Q.**  And to be clear, Mr. Isom, I'm asking -- or I was asking

5    in the last question about passengers who want to travel

6    first class.  Those aren't passengers you are competing

7    against the ULCCs for, correct?

8    **A.**  Passengers that only have a desire to fly first class, I

9    would agree with you on that.

10   **Q.**  Now, JetBlue, though, does compete for all of those

11   categories of customers that ULCCs actually compete for; is

12   that right?

13   **A.**  I can't speak to JetBlue's strategies, but JetBlue I know

14   is -- I believe that JetBlue is competing for any business

15   that they can get, as well.

16   **Q.**  Now, in your -- in your testimony with Mr. Wall, you

17   described your airline's historic cost structures.  Do you

18   recall that, generally?

19   **A.**  I do.  Yes.

20   **Q.**  Now, part of that testimony related to the creating of

21   connectivity banks at your hubs, right?

22   **A.**  Yes.

23   **Q.**  And you have higher cost because of the connectivity

24   banks at your hubs.  Is that fair?

25   **A.**  It's because we have -- we offer a complex product; it's

1    because we pay our people, generally, more; and it's because

2    we don't have as great a utilization of our assets on, kind

3    of, a per-flight basis.  And many other factors, as well.

4    **Q.**  Well, let me -- let me put it another way.  You have

5    higher costs because of your connectivity banks than, say, a

6    point-to-point carrier.  Is that fair?

7    **A.**  That is fair.  It takes more to create a connecting hub

8    than it does to put just a single point-to-point flight in.

9    **Q.**  And it's also fair to say, isn't it, that part of the

10   goal of the NEA is to have JetBlue coordinate with American's

11   connectivity banks, right?

12   **A.**  That's true.

13   **Q.**  That's the schedule optimization you were talking about,

14   right?

15   **A.**  Yes.

16   **Q.**  Now, that will also have the effect of raising JetBlue's

17   costs, won't it?

18           MR. SCHWED:  Objection.  Foundation.

19           MR. JONES:  Your Honor, they're business partners.

20   They talk about the schedule optimization.  So this is just a

21   question going to the potential impact of that.

22           MR. SCHWED:  He's asking about JetBlue's costs.

23   There have been plenty of JetBlue witnesses that they could

24   ask about JetBlue costs.

25           THE COURT:  Yeah.  I'm not sure -- he does know a

1   lot about the airline industry, but I think you need at least

2   a foundation question related to him in that or what you

3   mean.

4           MR. JONES:  Yes, sir.

5   BY MR. JONES:

6   Q.  So you've already testified, right, Mr. Isom, that your

7   costs are higher than point-to-point carriers, in part

8   because of the connectivity banks, right?

9   A.  Yes.  Uh-huh.

10  Q.  And before the NEA, you would characterize JetBlue -- you

11  would have characterized JetBlue as a point-to-point carrier;

12  is that right?

13  A.  They're a low cost carrier.  They -- again, I can't speak

14  to JetBlue and JetBlue's strategy, but they run

15  point-to-point operations I know and they have I know

16  connecting operations that they have, as well.

17  Q.  So isn't it fair to say that one point of the NEA is to

18  have that -- that connectivity with American's flights,

19  right?

20  A.  That's important, yes.

21  Q.  And that's going to move more of JetBlue's operations

22  from the point-to-point category to the -- to the hub

23  category, right?

24  A.  I can't speak to that.

25          MR. SCHWED:  Objection, foundation.

```
 1              THE COURT:  Overruled.  He's answered, anyway.
 2              THE WITNESS:  I can't speak to it.  I don't know
 3   how, you know, ultimately, in JetBlue's broad network, I
 4   don't know how specific movements are going to, you know,
 5   potentially impact their cost structure.  And I can't speak
 6   to if that means that they have to -- I know that they can't
 7   add gates and I know that they can't -- it is difficult for
 8   me to be able to speak on impact to their cost structure.
 9   BY MR. JONES:
10   Q.  Well, let me ask you, then, Mr. Isom, do you have an
11   understanding of whether any point-to-point carrier, moving
12   from that model to a connecting hub model, would have its
13   cost raised by making that type of move?
14   A.  I -- it's -- we're talking --
15              THE COURT:  I'm not sure I -- I'm sorry.
16              THE WITNESS:  I'm sorry, Your Honor.
17              THE COURT:  That's okay.  But they're not -- I
18   think the answer -- if you're asking the question if JetBlue
19   changed from a point to a point model, to JetBlue operating
20   on a hub-and-spoke model akin to what American, Delta, and
21   United seem to operate, I think his answer, from what I
22   already hear, he'd likely say that does increase the cost
23   structure, because he's already testified that hub-and-spoke
24   is more, but this is not exactly the same as that.
25              MR. JONES:  It's not, Your Honor, and I can move
```

1    on.  I'm just trying to get an answer as to what effect, if

2    any, he sees on JetBlue's costs by moving to that model

3    closer to American by engaging in the schedule optimization.

4            THE COURT:  But I think it would have to be

5    tailored to sort of how they did the joint venture, not more

6    generally the difference between a cost structure of a

7    point-to-point versus a hub and spoke.

8            MR. JONES:  I can move on, Your Honor.

9            THE COURT:  All right.

10   BY MR. JONES:

11   **Q.**  Let me -- let me ask you, Mr. Isom, if you can turn in

12   your binder back to -- sorry, somewhere here.  Let me ask you

13   to turn back to PX320.

14   **A.**  Got it.

15   **Q.**  And let me know when you've found that.

16   **A.**  PX320.  I have it.

17   **Q.**  Okay.

18           MR. JONES:  Oops, I'm sorry, not -- let's take down

19   320, actually.

20   BY MR. JONES:

21   **Q.**  You were asked about American -- American's competitors

22   growing faster than American and you testified that you were

23   upset about that fact.  Is that a fair characterization?

24   **A.**  I don't know if I said upset about it.  I know that it's

25   a factor that is definitely worth considering, as we take a

1    look at, you know, the longer term competitiveness of

2    American Airlines.

3    Q.   Now, that was a factor worth considering because your

4    competitors were growing faster, while American exercised

5    capacity discipline; is that right?

6    A.   It's -- it is true that our competitors were growing

7    faster.  Yes.

8    Q.   While American was exercising capacity discipline, right?

9    A.   While American was being mindful of where we placed our

10   resources.

11            Are you speaking of a specific document?

12   Q.   I'm asking generally right now, sir.

13   A.   Generally, American, we put our time and attention

14   towards those things that are most important to American at

15   that time, and our competition was outgrowing us.  And that

16   is something that is a factor that we take into account as we

17   look forward and something that I'm concerned about because I

18   want to make sure that American is competitive.

19   Q.   Now, you -- you testified during Mr. Wall's examination

20   about the importance of seamlessness.

21   A.   Yes.

22   Q.   Do you recall that?

23   A.   I do.

24   Q.   Now, is it fair to say that seamlessness is similar to

25   JetBlue and American operating like a single airline in the

1  NEA airports?

2  **A.**  It's being able to offer an experience that's very easy

3  to use and for the kind of points that are most important to

4  customers, very easy to use.

5         So an example would be when an American, you know,

6  customer is flying on a JetBlue service, you know, they would

7  expect the potential to be upgraded or to choose their seat

8  or to be potentially recognized from a frequent flyer

9  perspective.  Those are things that are important to

10  American's customers and those are things that we talked to

11  JetBlue about in making sure that we can deliver as part of

12  the NEA.

13  **Q.**  So that's looking to that customer, like a single

14  airline, at least in those four airports; is that right?

15  **A.**  Again, JetBlue is going to price differently.  They are

16  going to offer a product in many respects that is different.

17  But in terms of when you're an American customer and you get

18  the benefits of, you know, the admiral's club lounges, you'll

19  continue to get those when you fly through JFK and you

20  transfer, that there's an easy connection.  When you get on

21  to a JetBlue plane, you know how you're going to be treated

22  in terms of upgrades and recognition.  And you also know that

23  in terms of loyalty and the points that you earn and loyalty

24  programs, those are all the things that I think are

25  important.  So it really is, you know, the amenities and the

1  service itself, as opposed to anything else.

2  **Q.**  And the amenities and services themselves appearing for

3  that customer, like JetBlue, and American, are a single

4  airline in those four airports, right, Mr. Isom?

5  **A.**  No, that's not true.  We have our own gates, we have our

6  own planes.  Again, we have our own services that make us

7  distinct, but for those American customers that are flying on

8  JetBlue, they know what kind of service that they're going to

9  get, and on those most important aspects, again, those things

10  that, you know, are ease of use, and you know, quality of

11  service, those are things that our customers going to

12  receive.  It doesn't mean every single last element.  We're

13  clearly not trying to merge our carriers or trying to make,

14  you know, JetBlue identical to American.

15  **Q.**  You spoke with Mr. Wall a bit about JFK and using your

16  assets efficiently at JFK.  Do you recall that testimony

17  generally?

18  **A.**  I do.

19  **Q.**  One aspect of using your assets efficiently at JFK would

20  be using your slots efficiently, right, Mr. Isom?

21  **A.**  Absolutely.  Right.

22  **Q.**  And one way to use your slots efficiently would be to

23  keep an accurate track count of the slots you had at JFK,

24  right?

25  **A.**  We -- yes.

```
 1              MR. JONES:  I pass the witness, Your Honor.
 2              THE COURT:  All right.
 3              MR. WALL:  Nothing further, Your Honor.
 4              THE COURT:  All right.  Thank you very much,
 5    Mr. Isom, you're excused.
 6              THE WITNESS:  I appreciate it.
 7              THE COURT:  Have a good day.
 8              Next witness.
 9              MR. JONES:  Next witness, Your Honor, is Scott
10    Laurence of American Airlines.  And Ms. Riggs will do the
11    examination for the Department of Justice.
12              THE COURT:  All right.  Thank you.
13              Mr. Laurence, if you just remain standing for a
14    minute while the clerk administers the oath.
15              (The witness was duly sworn.)
16              THE COURT:  Please be seated.
17                         SCOTT LAURENCE
18         having been duly sworn, testified as follows:
19         DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA
20    BY MS. RIGGS:
21    Q.  Good morning, Mr. Laurence.
22    A.  Good morning.
23    Q.  Mr. Laurence, you currently work at American Airlines?
24    A.  I do.
25              THE COURT:  Ms. Riggs, can you pull one of the
```

1   microphones to you?  That will help.

2                MS. RIGGS:  Yes.

3                THE COURT:  Thank you.

4   BY MS. RIGGS:

5   **Q.**  And you are the senior vice president of partnership

6   strategy since March 2022?

7   **A.**  Yes.

8   **Q.**  You report to Mr. Vasu Raja, the chief commercial officer

9   at American?

10  **A.**  Yes.

11  **Q.**  But during the time that American and JetBlue were

12  negotiating the Northeast Alliance, you were employed by

13  JetBlue, correct?

14  **A.**  Yes, that's correct.

15  **Q.**  And you joined JetBlue in 2008?

16  **A.**  Yes.

17  **Q.**  You worked in the network planning department?

18  **A.**  When I joined, yes.  That's correct.

19  **Q.**  And network planning refers to development of the routes

20  and schedules that JetBlue flies?

21  **A.**  Yes.

22  **Q.**  Your last position at JetBlue was head of revenue and

23  planning?

24  **A.**  Yes.

25  **Q.**  And as head of revenue and planning, you were responsible

1    for network planning?

2    **A.**   Yes.

3    **Q.**   And revenue management?

4    **A.**   Yes.

5    **Q.**   And partnerships with other airlines?

6    **A.**   Yes.

7    **Q.**   And you interacted daily with JetBlue's CEO, Robin Hayes,

8    right?

9    **A.**   Yes.

10   **Q.**   And you were prominently involved in the Northeast

11   Alliance from its conception?

12   **A.**   Yes.

13   **Q.**   You were JetBlue's lead negotiator for the NEA?

14   **A.**   Yes.

15   **Q.**   And you negotiated directly with Vasu Raja from

16   American Airlines?

17   **A.**   Vasu and others.

18   **Q.**   You signed the Northeast Alliance agreements for JetBlue?

19   **A.**   Yes.

20   **Q.**   And you were responsible for JetBlue's implementation of

21   the NEA until you left?

22   **A.**   Yes.

23   **Q.**   And just briefly, David Fintzen is the vice president of

24   Northeast Alliance for JetBlue?

25            THE COURT:  I'm sorry, what was that name?

1    David --

2              MS. RIGGS:  Fintzen.

3              THE WITNESS:  I'm sorry, David Fintzen.

4    BY MS. RIGGS:

5    **Q.**  Mr. Fintzen reported to you?

6    **A.**  Yes.

7    **Q.**  And then you resigned from JetBlue in January of 2022?

8    **A.**  That's correct, yes.

9    **Q.**  And you joined Delta?

10   **A.**  Yes, Delta Air Lines.

11   **Q.**  At Delta, you were the vice president of network

12   planning?

13   **A.**  Yes.

14   **Q.**  And you reported to Joe Esposito?

15   **A.**  Yes.

16   **Q.**  Your responsibilities included working on Delta's network

17   plan for 2030?

18   **A.**  Yes.

19   **Q.**  And just backing up for a moment, when you resigned from

20   JetBlue, you also spoke with Mr. Raja at American Airlines,

21   correct?

22   **A.**  After I had resigned from JetBlue, before that

23   information was public, I did speak to Mr. Raja.

24             THE COURT:  I'm sorry, when did you resign from

25   JetBlue?

1          THE WITNESS:  In January of 2021 -- I'm sorry,

2     2022.  Excuse me.

3     BY MS. RIGGS:

4     **Q.**  And you spoke to Mr. Raja by phone within 24 hours of

5     your resignation?

6     **A.**  That sounds right.  It might have been 48 hours, but it

7     was --

8     **Q.**  Mr. Raja told you in that conversation that there would

9     always be a position for you at American?

10    **A.**  I don't remember exactly how he put it, but he did

11    indicate that there would be a position at American.  I think

12    he -- the term he used was consider it a standing offer.

13    **Q.**  And in fact, you resigned from Delta after working there

14    for about a month, correct?

15    **A.**  That's correct.  About four weeks.

16    **Q.**  And you joined Mr. Raja at American Airlines?

17    **A.**  I resigned from Delta, and then there was a period of

18    time, and then I joined American.

19    **Q.**  And you didn't have to interview for your job at

20    American, correct?

21    **A.**  I spoke to a number of people at American:  Mr. Raja,

22    Mr. Kerr, Mr. Isom, Ms. Brown.

23    **Q.**  I guess, let me rephrase.  There was no formal interview

24    process for your job at American?

25    **A.**  I think each of those conversations I considered to be

1    similar to an interview.

2    **Q.**  And Mr. Laurence, you took a deposition in this case in

3    2022, correct?

4    **A.**  Yes.

5    **Q.**  And you were under oath at the time?

6    **A.**  Yes.

7    **Q.**  If you could turn in your binder, there's a separate

8    deposition transcript binder on top, to the June 2022

9    deposition, to page 60.  And I'll just read from lines 2 to

10   3.  Question --

11              THE COURT:  Hold on.

12              MS. RIGGS:  Are you there?

13              THE WITNESS:  I'm sorry, which lines?

14   BY MS. RIGGS:

15   **Q.**  It's page 60, lines 2 to 3.

16   **A.**  Okay.

17   **Q.**  "And did you interview at American?

18              "ANSWER:  No."

19              And that was your testimony at the time, correct?

20   **A.**  I'm sorry, I'm just looking for the --

21   **Q.**  We're at the 2022 deposition.

22   **A.**  I'm sorry?

23              THE COURT:  Second tab.

24              THE WITNESS:  Second tab.

25              THE COURT:  In the deposition binder.

```
1              THE WITNESS:  Sorry.

2              THE COURT:  That's all right.

3              THE WITNESS:  Page?

4              THE COURT:  60.

5    BY MS. RIGGS:

6    Q.  Are you there?

7    A.  Yes.

8    Q.  And so lines 2 to 3 read.

9              "QUESTION:  And did you interview at American?

10             "ANSWER:  No."

11             And that was your testimony at the time?

12   A.  It was, but my testimony also continues similar to what I

13   just testified to; that I spoke to Ms. Brown, Mr. Kerr, and

14   Mr. Isom about that.  So as we go from 2 to 3, the context is

15   actually there in lines 6 and 7.

16   Q.  All right.  And as senior vice president of partnership

17   strategy, you have responsibility for American Airlines's

18   alliances with other airlines, right?

19   A.  Yes.

20             Are we done with the --

21   Q.  Yes.  You can set that aside.

22             The NEA is part of your responsibilities at

23   American Airlines?

24   A.  It is.

25   Q.  But you don't currently engage with JetBlue outwardly on
```

1    the Northeast Alliance, correct?

2    **A.**  That's correct.

3    **Q.**  But you do plan to later this year; is that right?

4    **A.**  That was the plan, that as I left JetBlue, it was a bit

5    awkward.  And we talked about the potential for me to join.

6    We talked later in the year, maybe the fall, to be the

7    outward facing person.  We really haven't discussed it, given

8    all of the -- all of the work around the trial.

9    **Q.**  And Mr. Laurence, I'll shift topics now to discussing

10   your time at JetBlue, before the Northeast Alliance was

11   established.

12           As head of revenue and planning at JetBlue, you

13   were involved in deciding which airports JetBlue should

14   serve?

15   **A.**  Yes.

16   **Q.**  And you would have been involved in what routes JetBlue

17   should serve from those airports?

18   **A.**  Yes.

19   **Q.**  And JetBlue grew substantially from your time in 2008 to

20   2022 when you left, correct?

21   **A.**  Yes.

22   **Q.**  And you played an integral role in that growth, right?

23   **A.**  I mean, I guess JetBlue's a growth company.  I was able

24   to take part in that.

25   **Q.**  And at the end of 2019, JetBlue pubically announced

1    planned capacity growth of five-and-a-half to

2    seven-and-a-half percent for 2022 -- or 2020, sorry?

3    **A.**   I'm sorry, the dates again?  2019.  We talked about 2020

4    being five-and-a-half to seven-and-a-half, is that your --

5    **Q.**   Yes.

6    **A.**   That sounds correct.

7    **Q.**   And Boston is one of the cities JetBlue grew

8    substantially in during your tenure at JetBlue?

9    **A.**   Yes.

10   **Q.**   You're familiar with the term "Boston 200"?

11   **A.**   Yes.

12   **Q.**   And Boston 200 was a JetBlue goal to reach 200 flights a

13   day operating at Boston-Logan Airport?

14   **A.**   200 peak flights during the year, yes.

15   **Q.**   And Boston 200 was a publically announced goal prior to

16   JetBlue ever considering the Northeast Alliance, right?

17   **A.**   Yes.

18   **Q.**   So if we could turn now to the creation of the --

19          THE COURT:  I'm sorry, 200 peak flights in a day?

20   What does that mean?

21          THE WITNESS:  So what it means, sir, is during the

22   year, the flight schedule would go up and down.  And so 200

23   would be the peak of the peak.  So if it were a Wednesday in

24   February, we hit 200 flights day, our goal would be

25   associated with the most flights that we flew during the

1   year, so it would be get to a peak of 200.

2          THE COURT:  On the busiest day, 200 in that day?

3          THE WITNESS:  That's correct.

4          THE COURT:  All right.  Got it.

5          Go ahead.

6   BY MS. RIGGS:

7   **Q.**  I'd like to turn now to focus on the creation of the

8   Northeast Alliance, and the initial discussions over American

9   and JetBlue entering into a potential alliance, were between

10  you and Mr. Raja at American Airlines, correct?

11  **A.**  Yes, that's correct.

12  **Q.**  And then in April of 2020, American and JetBlue decided

13  to form a clean team?

14  **A.**  We did decide to form a clean team.  The date sounds

15  correct to me.

16  **Q.**  And briefly, what is a clean team?

17  **A.**  The clean team was a concept that our legal departments

18  proposed to us that would allow a more detailed examination

19  of some of the concepts that we were talking about, to be

20  performed by people who were familiar with the strategy, but

21  did not have sort of a day job within network planning.

22  **Q.**  And the clean team was tasked with --

23  **A.**  I'm sorry and just -- and then the goal was then to have

24  sort of a more detailed build-out of what the strategy would

25  look like, and then have those people return to their day

1    jobs where they could otherwise sort of not affect planning,

2    if the information that was exchanged -- you know, they had

3    information about American that probably American would not

4    want to know, and would not want them, our network planning

5    team to know, and vice versa.

6    Q.   And that's because American and JetBlue network planners

7    wouldn't share information of their competitor teams with

8    each other, right?

9    A.   I don't think it would be in our interest to share that

10   type of information with American.

11   Q.   You're talking about the time that you were at JetBlue,

12   that was the context of your answer, right?  You said we --

13   A.   Yes, I apologize.  I think as we were talking about the

14   clean team, so the context of that time, that period of time.

15   Q.   Thank you.  And the clean team was tasked with putting

16   together a comprehensive plan for what a JetBlue American

17   partnership would look like under the Northeast Alliance?

18   A.   I'm not sure I would term it a comprehensive plan.  It

19   was a plan that was more detailed than, again, the concepts

20   that were being discussed, so we're talking about concepts,

21   the clean team would bring data to those concepts and attempt

22   to analyze, perform analysis around that.

23   Q.   The clean team created a joint network schedule?

24   A.   Yes.

25   Q.   And the joint network schedule included what routes to

1  fly?

2  **A.**  Yes, by its nature it would.

3  **Q.**  And it would have included how many flights for each

4  route?

5  **A.**  Yes.

6  **Q.**  The joint network schedule included what size airplanes

7  would fly?

8  **A.**  I don't think it was a fully fleeted schedule.  In other

9  words, the complexity of fleeting a schedule, so I think they

10  approximated the aircraft that would fly.

11  **Q.**  They approximated aircraft gauge to go into the schedule?

12  **A.**  Yes.

13  **Q.**  And the purpose of the joint network schedule was to

14  identify routes that JetBlue and American could serve for the

15  Northeast Alliance, correct?

16  **A.**  Well, I think it was correct, but it was also to make

17  sure that, again, the concepts would fit together once we had

18  the detailed information.

19  **Q.**  Okay.  And you provided guidance to the clean team for

20  JetBlue, correct?

21  **A.**  I provided them sort of general guidance, sort of a

22  vision of what I thought the NEA could look like and asked

23  them to work and analyze based upon sort of those very

24  general guidelines.

25  **Q.**  And let's turn in your binder, the big one underneath the

1    transcripts, to PX752.  And this is in evidence already.

2              MS. RIGGS:  You can also pull it up on the screen.

3    BY MS. RIGGS:

4    **Q.**  This is an e-mail that David Fintzen sent to Tracy Lawlor

5    and you, dated April 23, 2020?

6    **A.**  Yes, I'm on the CC of the e-mail.

7    **Q.**  And Ms. Lawlor was then the chief strategy business

8    development officer at JetBlue?

9    **A.**  Yes.

10   **Q.**  Mr. Fintzen is attaching a Project Connie scope document?

11   I'm just looking at the attachment.

12   **A.**  I'm sorry.  It notes it's a page in the e-mail, but I see

13   a document here attached.

14   **Q.**  And Project Connie is JetBlue's code name for the

15   Northeast Alliance?

16   **A.**  Yes.

17   **Q.**  So the attachment is provided first in black and white,

18   and then the native Powerpoint in color.  I think it's easier

19   to look at the color version, so if you could turn to page 5

20   of the color version, which is entitled "Project Connie

21   Initial Proposal Review."  Do you see that?

22   **A.**  I'm sorry.  I'm just getting the color version.

23             THE COURT:  You can also look at the screen, if you

24   prefer.

25             THE WITNESS:  Thank you.

1          I'm sorry, can you ask the question again?

2    BY MS. RIGGS:

3    **Q.**  Just you see that it's titled "Project Connie Initial

4    Proposal Review"?

5    **A.**  Yes, I do.

6    **Q.**  And this slide outlines American's initial proposal to

7    JetBlue for Project Connie, right?

8    **A.**  I would not characterize it as American's proposal.  I

9    think it was the joint sort of outcome or proposal.  So I

10   think when it's referencing a proposal, it's the proposal

11   from the joint clean team.

12   **Q.**  Okay.  I'm just going off of the second line, which

13   is, "JetBlue clean team received an initial proposal with the

14   below terms outlined for review."

15          Do you see that?

16   **A.**  I do.

17   **Q.**  And the first bullet reads, "Includes all AA and B6

18   flying into/out of JFK, LaGuardia, and Boston airports."

19          Do you see that?

20   **A.**  I do.

21   **Q.**  And so the initial proposal does not include Newark

22   airport, correct?

23   **A.**  The initial clean team proposal does not.

24   **Q.**  And the fourth bullet down reads, "Metal neutral revenue

25   share based on proportionate share of capacity (determined at

1    city-level.)"

2          A metal physical neutral revenue share means that

3    American would sell a JetBlue flight as if it were an

4    American flight and vice versa?

5    A.   Um, in effect, yes.

6    Q.   And if we skip ahead two slides to page 7, this is

7    entitled, "Project Connie value drivers for the network."

8          Do you see that?

9    A.   I do.

10   Q.   And there are four types of markets listed in the column

11   on this page.  The left-most column is titled "Overlap

12   Markets," and underneath, for example, it reads, "Markets

13   which directly overlap, for example, JFK-San Francisco and

14   Boston-Los Angeles"; is that correct?

15   A.   Yes, I read that, as well.

16   Q.   And these are markets where both American and JetBlue fly

17   nonstop?

18   A.   Yes.

19   Q.   And the slide says there are 40 such routes?

20   A.   Yes.

21   Q.   And if you look at the bottom row to estimated value for

22   American and JetBlue's overlap markets, it says "TBD," and

23   then in parenthesis "Likely highest."  You agree with that,

24   correct?

25   A.   Um, I'm not sure if I agree with it or not.  I don't have

1   enough to -- I don't think there's enough on this page to

2   sort of be able to agree with that.

3   **Q.**   Would you -- would your memory be refreshed if we turn to

4   your deposition transcript?

5   **A.**   Sure.

6   **Q.**   This is the June 2021 deposition.  So it should be the

7   first tab in your binder.

8                THE COURT:  First tab.

9                MS. RIGGS:  And we'll go to page 147.

10               THE WITNESS:  147?

11               MS. RIGGS:  Yes.

12  BY MS. RIGGS:

13  **Q.**   And if you want to just read silently to yourself lines

14  20, to page 148, line 2.

15  **A.**   Okay.

16  **Q.**   Does that refresh your recollection, Mr. Laurence?

17  **A.**   It does.

18  **Q.**   And so the estimated value for American and JetBlue's

19  overlap markets says "Likely highest."  Do you agree with

20  that?

21  **A.**   I do.  Although, again, I would sort of highlight the

22  context in the following portion of my response in the

23  deposition, where I talk about the relevance being there and

24  the enhanced relevance.

25  **Q.**   And that's fine.  Your counsel will be able to cover more

1    in their examination.

2    **A.**   Sure.

3    **Q.**   But the answer to my question is just "yes," right?

4    **A.**   The answer to your question is --

5    **Q.**   You agree that the value is likely highest for JetBlue

6    and American's overlap markets, as presented on this slide?

7    **A.**   Yes.

8    **Q.**   And if you look at the third column over,

9    entitled, "Standalone routes," the slide says, "The value is

10   TBD, but likely limited."

11            Do you see that?

12   **A.**   I do.

13   **Q.**   So even though there are 179 standalone routes, they're

14   viewed as less valuable than the 40 nonstop overlap routes on

15   this slide?

16   **A.**   As noted, they're viewed as less valuable, because

17   there's limited connectivity.  The customers aren't likely to

18   connect between the airlines on these standalone routes.

19   **Q.**   And compared to the value of the overlap markets, markets

20   where American and JetBlue directly overlap, the value is

21   much less, correct?

22   **A.**   Again, the value is much less, based upon the concept

23   that the standalone groups tend to be point to point.  So

24   someone flying from -- the example is actually there, from

25   LaGuardia to, say, Memphis, where their customers are less

1    likely to connect between the airlines, versus the overlap

2    routes from Boston to Los Angeles.  Customers are very likely

3    to connect on to that from -- because of the size of, say,

4    JetBlue in Boston or American in Los Angeles.

5    **Q.**   And if we can turn ahead to page 11, titled "Project

6    Connie Likely Goals."  On this slide, the clean team is

7    identifying "JetBlue Primary Goals, "Common Areas of

8    Interest," and "American Believed Primary Goals."

9             Do you see that?

10   **A.**   I see that.

11   **Q.**   And under "American Believed Primary Goals," one of the

12   goals in orange reads, "Protect existing infrastructure

13   assets during retrenchment."

14            Do you see that?

15   **A.**   Yes.

16   **Q.**   And that refers to American needing coverage so it

17   wouldn't lose its slots in New York under usage requirements?

18   **A.**   Amongst other things, I think.

19   **Q.**   And when you were at JetBlue, you understood that

20   American may retrench into core hubs with the Northeast

21   Alliance?

22            MR. SCHWED:  Objection.

23            THE WITNESS:  No.

24   BY MS. RIGGS:

25   **Q.**   Well, if we could turn to your deposition, again, from

1    June 2021, to page 149.  And I'll read lines 23 to --

2              THE WITNESS:  149?

3              MS. RIGGS:  Yes.

4              THE COURT:  In the first deposition?

5              MS. RIGGS:  Yes.

6    BY MS. RIGGS:

7    **Q.**  I asked you a question, "Do you agree that American may

8    retrench into core hubs with the Northeast Alliance?"

9              "ANSWER:  Yes.

10             And that was your testimony at the time?

11   **A.**  Yes.

12             MS. RIGGS:  Your Honor, I would move to admit

13   page 149, line 23, to page 150, line 1, as a party admission

14   and an impeachment.

15             MR. SCHWED:  Again, I have no problem admitting the

16   testimony.  I disagree with the impeachment characterization,

17   but I have no problem admitting the question.

18             THE COURT:  Admitted.

19             (Plaintiff Exhibit No. Deposition of Scott

20             Laurence, June 2021, page 149, line 23 to page 150,

21             line 1 admitted into evidence.)

22   BY MS. RIGGS:

23   **Q.**  And that retrenchment, as it's called, that contemplates

24   a capacity pulled-down for American in New York, correct?

25   **A.**  It doesn't necessarily mean a capacity reduction.

1    Remember that, as an airline, you generate capacity by flying

2    seats a certain number of miles.  So if American were to add

3    a large airplane, flying a long distance, or, for example,

4    from New York to Athens, with a 300-seat airplane, and it

5    were replacing a plane that was flying from New York to

6    Charlottesville with 50 seats, then you have a dramatic

7    capacity increase, but the potential for fewer departures.

8    So you can have more capacity with fewer departures.

9    **Q.**  So I'll ask again, because I'm not sure what your answer

10   was, but at the time, you understood that this contemplates a

11   pull-down in capacity for American in New York?

12   **A.**  So I would say it would contemplate a reduction in

13   departures, not necessarily capacity.

14   **Q.**  Well, let's turn, again, to your June 2021 deposition, on

15   page 150, line 3.

16        "QUESTION:  And do you think that contemplates a

17   pull-down in capacity for American?

18        "ANSWER:  Well, in the Northeast Alliance cities,

19   because they're -- it's kind of a zero sum game for slots,

20   there's got to be some level of pull-down, at least in term

21   of departures, for JetBlue to be able to grow in those

22   points.  So yes.

23        MR. SCHWED:  Objection, Your Honor.  This is

24   100 percent consistent with what he just said.  She's just

25   reading into the record.

```
 1    BY MS. RIGGS:
 2    Q.  Do you agree that your testimony contemplates a pull-down
 3    of --
 4            THE COURT:  I'm going to overrule it, because if
 5    it's totally consistent, what's the harm?
 6            Go ahead.
 7    BY MS. RIGGS:
 8    Q.  Do you think that contemplates a pull-down in capacity
 9    for American?
10    A.  No.
11            MS. RIGGS:  And Your Honor, I move to admit
12    page 150, line 3 to 11 as a party admission.
13            THE COURT:  I just admitted it already.
14            (Plaintiff Exhibit No. Deposition of Scott
15            Laurence, June 2021, page 150, lines 3 to 11
16            admitted into evidence.)
17            THE WITNESS:  I think the issue here is one of
18    capacity.  Again, you're talking about capacity versus
19    departures.  Departures might be reduced, but capacity can
20    easily increase.
21            MS. RIGGS:  I'll move on.
22    BY MS. RIGGS:
23    Q.  At JetBlue, prior to the Northeast Alliance, you observed
24    that American sits on its slots to suppress competition,
25    correct?
```

1    **A.**  I think that all airlines, from time to time, have

2    situations where they can't cover some of their slot

3    obligations.

4    **Q.**  And if you could turn to PX550.

5           MS. RIGGS:  This is in evidence, so we can publish

6    it.

7    BY MS. RIGGS:

8    **Q.**  This is an e-mail chain, with the top e-mail from Andrea

9    Lusso to you and Michael Quiello, dated April 2, 2019?

10   **A.**  I'm sorry, PX550?

11   **Q.**  Yes.  It might be easier to just look on the screen for

12   this.

13   **A.**  (Witness complies.)

14   **Q.**  I'm sorry, the question is just this is an e-mail with

15   the top e-mail from Mr. Lusso to you and Michael Quiello,

16   dated April 2, 2019; is that correct?

17   **A.**  I'm sorry, yes.

18   **Q.**  Mr. Lusso was JetBlue's vice president of network

19   planning at the time?

20   **A.**  Yes.

21   **Q.**  And Mr. Quiello is the chief of staff for JetBlue's

22   president, Joanna Geraghty?

23   **A.**  Yes.

24   **Q.**  So let's turn to the original e-mail from Mr. Quiello

25   that spills onto the second page, ending in 654.  Mr. Quiello

1  is asking for any data points or updates from Ms. Geraghty,

2  in connection with her meeting with the Metropolitan

3  Washington Airport Authority, right?

4  **A.**  Yes.

5  **Q.**  And if you look back at your response, on the first page,

6  ending in 653, the fourth short paragraph, you wrote, "I

7  would urge her to highlight that American continue to sit on

8  DCA slots with regional aircraft in order to suppress

9  competition."

10         Do you see that?

11 **A.**  I do.

12 **Q.**  And you were saying that American Airline flies smaller,

13 regional aircraft to sit on its slots, correct?

14 **A.**  I was highlighting that American was utilizing their DCA

15 slots with smaller planes, and I was noting that Rob Land

16 might have comments about that, because we talked about the

17 concept of those slots being utilized with smaller planes was

18 somewhat inefficient.

19 **Q.**  And that suppresses competition, because it uses slots

20 that would otherwise be available to other carriers?

21 **A.**  So I don't think it's a slot issue that I'm talking about

22 in terms of it being available to other carriers, but how

23 American was utilizing that slot.  So they were utilizing the

24 slot with a smaller aircraft.  At JetBlue, we'd want to

25 highlight the fact that we would be utilizing the slot with

1    larger aircraft.

2    **Q.**   And here you're encouraging Ms. Geraghty to report

3    American continuing to sit on DCA slots with regional

4    aircraft in order to suppress competition.   Correct?

5    **A.**   Again, I think what I was highlighting was that American

6    was flying smaller planes than they otherwise could.   And we

7    wanted to highlight the fact that we wanted the ability to

8    compete in DCA.

9    **Q.**   You can set that aside, Mr. Laurence.

10          At JFK, American had a slot waiver for the MAX

11   grounding in 2019, right?

12   **A.**   That is my understand.

13   **Q.**   And a slot waiver is an exemption from having to meet

14   useage requirements by the Federal Aviation Administration?

15   **A.**   That's also my understanding.

16   **Q.**   You don't have to follow the 80/20 rule if you get a slot

17   waiver?

18   **A.**   I think the slot waiver can be somewhat informal.   So in

19   general, it means that you're not going to need to follow the

20   80/20, but I don't know what American and the FAA had

21   arranged in terms of their exact coverage requirements.

22   **Q.**   And American had a slot waiver for runway construction at

23   JFK, right?

24   **A.**   Well, the industry had a waiver -- or I should say the

25   domestic US industry had a waiver, yes.

1    **Q.**  And at JFK airport, airlines can retain their slots, but

2    hand slots back on a temporary basis to the FAA, right?

3    **A.**  There was an informal process with the FAA, where you

4    could hand back slot, then the FAA would attempt to

5    reallocate them, and an airline would gain -- not gain, but

6    retain the historical rights to that slot.

7    **Q.**  And that's sometimes called a giveback?

8    **A.**  Sure, you can term it like that.

9    **Q.**  American has done this -- or sorry, JetBlue, has done

10   this itself, correct?

11   **A.**  Yes.

12   **Q.**  Handed back slots to the FAA on a temporary basis, rather

13   than meet useage requirements?

14   **A.**  In certain situations, with certain slots, in certain

15   seasons, and, actually, up to certain days of the week, we

16   would hand those slots back to FAA so they could be

17   reallocated, and we would retain historical rights to those

18   slots.

19   **Q.**  But in late 2019, the FAA was set to end this informal

20   process, correct?

21   **A.**  It had certainly been discussed.  I did not speak

22   directly with the FAA, but my team continued to come back to

23   me after conversations and note that the FAA was formalizing

24   the process and making JFK similar to other slotted airports,

25   or was likely to.

1   **Q.**   So airlines would have had to meet the usage requirements

2   or risk losing historic or permanent rights to their slots?

3   **A.**   Well, from time to time, situations come up.  So you

4   mentioned the runway construction, where the FAA would then

5   allow the airlines some leeway and slot usage, because the

6   airport capacity would have been lower than -- was

7   anticipated when the slots were allocated.

8   **Q.**   So my question is, would the FAA set to end the practice

9   of informal givebacks that would mean that airlines would

10  have to do more flying or risk losing slots on a permanent

11  basis, correct?

12  **A.**   There are other mitigants to that.  But in general, yes,

13  the slots, one way or another, would need to be operated, but

14  airlines will exchange slots through trades or temporary

15  coverage.  It's a bit of an industry practice.

16  **Q.**   And JetBlue would participate in this practice of trading

17  or sliding slots at JFK?

18  **A.**   Yes.

19  **Q.**   If you could turn to PX507.

20          MS. RIGGS:  This is also in evidence, so we can

21  publish it.

22  BY MS. RIGGS:

23  **Q.**   The top e-mail in this chain is from you; to the vice

24  president of network planning, Mr. Lusso; on January 3, 2020.

25  Do you see that?

1    **A.**   Yes.

2    **Q.**   And this is an e-mail chain related to JetBlue leasing

3    JFK slots from American, before the Northeast Alliance,

4    correct?

5    **A.**   This was during the period of time when we were

6    discussing and negotiating around --

7            I'm sorry, it is before the Northeast Alliance.

8    You're correct.

9    **Q.**   And if you turn to the page 427, to the first in time

10   e-mail in this chain, this is from Vasu Raja at American, to

11   Brent Alex and Jason Reisinger, also at American Airlines,

12   copying you on December 23, 2019.  Do you see that?

13   **A.**   I do.

14   **Q.**   And at the top of the page ending in 428, Mr. Raja

15   wrote, "I just spoke with Scott L. at B6."

16           And that's referring to you?

17   **A.**   Yes.

18   **Q.**   Mr. Raja then wrote in the next paragraph that, "American

19   is looking to lease as many as 18 to 20 slot pairs to

20   JetBlue," right?

21   **A.**   Yes, I see that.

22   **Q.**   And in the last paragraph, Mr. Raja wrote that, "Time is

23   short, and the FAA is looking for closure."

24           Do you see that?  In the first sentence?

25   **A.**   Yes.  And also -- I'm sorry, I just want to refer back to

1    the date.  I want to make sure I have the dates correct.  The

2    exhibit is -- or if we can go back one on the --

3              THE COURT:  Blow it up, then he can see the date.

4    BY MS. RIGGS:

5    **Q.**  So Mr. Raja's e-mail was sent Monday, December 23, 2019.

6    **A.**  Okay.  And -- and I apologize as I was looking at that.

7              So Mr. Raja and I started discussing the Northeast

8    Alliance in late November of 2019.  So as we were having this

9    discussion, the Northeast Alliance was also sort of being

10   considered, which I confused in my initial testimony.

11   **Q.**  And then you received the initial proposal for the

12   Northeast Alliance in April 2020?

13   **A.**  No.  We began the discussions, Mr. Raja and I, in

14   November of 2019.  Then that went through -- you know, all

15   the way through the concept of signing the agreement in July

16   of 2020.

17   **Q.**  And the clean team, when was that formed?

18   **A.**  I think, as you just noted, I believe in April of 2020.

19   **Q.**  So if we turn back to the last paragraph in Mr. Raja's

20   e-mail, you understood him to mean that getting this deal

21   done was time sensitive, right?

22   **A.**  Yes.  As he notes here, that it is time sensitive, and

23   the FAA was looking for closure right after the holidays.

24   And again, this is on December 23rd.

25   **Q.**  And you understand that American was reaching out to

1    JetBlue because they weren't meeting the usage requirements

2    to cover their slots at JFK, right?

3    **A.**   I made that assumption that American had some sort of an

4    issue.  I did not know what the issue was between FAA and

5    American.

6    **Q.**   But you understood that they either weren't covering them

7    or didn't have a path to cover their slots at JFK?

8    **A.**   Well, I knew the slots were available, and I was very

9    interested in operating them, particularly the slots in the

10   peak afternoon period.

11   **Q.**   So we can turn to the second page of PX507, which ends in

12   424.  And this is a reply from Mr. Lusso to the e-mail chain

13   on January 2nd.  Do you see that?

14   **A.**   I do.

15   **Q.**   So Mr. Lusso was sending American a list of slots that

16   JetBlue was interested in leasing from American at the time?

17   **A.**   Can we go back one -- or go -- just so I can see the

18   whole e-mail.  Thank you.

19            (Witness reviews document.)

20            Okay.  I'm sorry, if you could ask your question

21   again.

22   **Q.**   So Mr. Lusso is sending American a list of slots that

23   JetBlue was interested in leasing from American at the time?

24   **A.**   I see that he's -- his e-mail of 9:50 a.m. on January 2,

25   noting that they're looking at each hour.

1    **Q.**   So the image is not reproduced, but I'm looking at the

2    2129 e-mail, where he writes, "Below is a high level view on

3    where we stand today?

4    **A.**   Can we pull that?  I can't find that in the hard copy

5    here.  I just want to -- thank you.

6    **Q.**   Mr. Lusso is conveying that JetBlue is interested in

7    lesioning certain slots from American in this e-mail?

8    **A.**   Yes.

9    **Q.**   So then you wrote in response, looking up the page, "I

10   think we need to grab more of these."

11             Do you see that?

12   **A.**   I do, yes.

13   **Q.**   And you wanted to lease more slots from American at JFK,

14   correct?

15   **A.**   Again, I was very eager to grow at JFK, so when I saw the

16   opportunity, I wanted to try to grab those slots.

17   **Q.**   So Mr. Lusso replied again at the very top of page 2, and

18   he wrote, "Are you willing to fund three to five shells of

19   flying into JFK next year?  They need to come from somewhere"

20   and that refers to how, in order to fly more at JFK, JetBlue

21   would need to use planes currently flying elsewhere in its

22   network, correct?

23   **A.**   I think what Mr. Lusso was referring to was there needed

24   to be three or four planes flying elsewhere in the network,

25   and what I read was he was conveying a concern that the slots

1    that were on offer were likely there temporarily, and I think

2    there was a discussion about how many slot seasons they would

3    be available for.  So I think, yeah, he was concerned, as was

4    I, about pulling three to five shells of flying, so aircraft

5    flying temporarily from JFK from other points.

6    **Q.**  And if we look at the first page to your reply, you

7    wrote -- sorry, we're going to give it a moment to catch up.

8     "If we don't fly these, they're going to Spirit.  Full

9    stop."

10              Do you see that?

11   **A.**  I do.

12   **Q.**  And you thought Spirit with would get American's JFK

13   slots had JetBlue not agreed to cover them?

14   **A.**  I suspected they would go to Spirit and I very much

15   wanted them and so what I was conveying in my e-mail was we

16   need to fly these, someone else will.  It wasn't like they

17   were just an asset that would just go and lie foul.

18   **Q.**  And Mr. Laurence, you were concerned that if JetBlue lost

19   these slots to Spirit, JetBlue wouldn't be able to get them

20   back in the long term, correct?

21   **A.**  I felt that if we lost the slots, we'd have a hard

22   time -- or if we did not try to grab those slots, we would

23   have a hard time getting those, whether they went to Spirit

24   or elsewhere.

25   **Q.**  And JetBlue wanted to use those in the long term,

1    correct?

2    **A.**   Well, we were willing to take the risk in the short term,

3    and we were eager to operate those slots, in part because I

4    felt strongly that once we were operating them, it was likely

5    that American might not want them back.

6    **Q.**   And that's what you mean in the next paragraph, where you

7    wrote, "I'm also confident that American isn't going to want

8    them back from us once we're flying them"?

9    **A.**   Yes.

10   **Q.**   And ultimately, American and JetBlue agreed that JetBlue

11   would lease 37 slots at JFK, correct?

12   **A.**   I think we agreed on 27.  The timing was very short on

13   this.  And then there was a request from American to cover --

14   or to add an additional ten slots.  And as we were discussing

15   that, the world turned upside down with COVID, and this all

16   sort of disappeared into the ether because there was a slot

17   waiver based upon COVID.

18          So we had agreed on, I think, the 27.  I can't -- I

19   don't recall if we -- I think we were discussing the other

20   ten, but the timing was very questionable if we could operate

21   those slots or not.  It would have been a big lift for us

22   operationally, given the timeline involved.  And, like I

23   said, I suppose that the timing, it may be the one positive

24   that came out of COVID was that we were able to figure

25   something out on timing on that.

1    **Q.**  You can set that aside.

2           And Mr. Laurence, I want to turn now to focus on

3    some of the specifics of the Northeast Alliance.  If we could

4    turn in your binder to PX1A.

5           MS. RIGGS:  And this is in evidence.  You can

6    publish it.

7    BY MS. RIGGS:

8    **Q.**  This is a copy of the "Northeast Alliance Agreement"

9    between American and JetBlue, dated July 15, 2020?

10   **A.**  Yes.  I think the date is correct.  I'm just

11   double-checking.  But, yes.  I see it dated July 27, 2021,

12   with a signature.

13   **Q.**  That might be for the amendment.

14   **A.**  Oh.  Okay.

15   **Q.**  If you look at page 18, I think the execution page

16   follows.

17          MR. SCHWED:  Ms. Riggs, I just want to confirm that

18   what's on the slide, screen will be the redacted version?

19          MS. RIGGS:  Yes.

20          MR. SCHWED:  Okay.  Thank you.

21          THE WITNESS:  I don't see the date.  The date

22   sounds correct.

23   BY MS. RIGGS:

24   **Q.**  All right.  If we could just turn to page 3, to the

25   bottom.  This is entitled -- I'll wait for the screen to

1  catch up.  "Network Growth and Consultation, 3.1."

2          Do you see that?

3  **A.**  I do.

4  **Q.**  And Section 3.1.1 reads, "The parties agree to use

5  commercially reasonable efforts to coordinate the NEA

6  services."

7          Do you see that sentence?

8  **A.**  I do.

9  **Q.**  And whether a flight is profitable is a commercial

10  consideration, correct?

11  **A.**  I mean, I suppose it's part of the considerations, yeah.

12  **Q.**  And if we turn to page 4, to Section 3.1.2.1, here the

13  agreement states that the parties will, quote, "Endeavor in

14  good-faith to optimize their respective individual network

15  plans regarding the NEA services throughout the term of this

16  agreement, after due consultation on all aspects of its

17  network plans related to the NEA services, including with

18  respect to each party's usage of terminal facilities."

19          Did I read that correctly?

20  **A.**  Yes.

21  **Q.**  So the agreement requires American and JetBlue, in

22  good-faith, to consult on all aspects of their network plans

23  for NEA routes, right?

24  **A.**  Yes.

25  **Q.**  At the time JetBlue entered the Northeast Alliance, it

1   was encompassing two-thirds of --

2   **A.**   I'm sorry, just one piece.  The network plans that were

3   there, we talked about sort of our network plans to

4   facilities.  But what is not in this Section 3.1.2.1 is that

5   we do not, nor do we ever discuss, pricing.

6   **Q.**   That's -- that's fine.

7           At the time JetBlue entered the Northeast Alliance,

8   the Northeast Alliance encompassed two-thirds of JetBlue's

9   network, correct?

10  **A.**   Approximately, yes.

11  **Q.**   And the routes in the Northeast Alliance encompassed

12  about 75 percent of JetBlue's revenue, correct?

13  **A.**   I'm sorry.  Can you ask me the revenue portion again?  I

14  just want to make sure that I --

15  **Q.**   The routes within the Northeast Alliance comprise about

16  75 percent of JetBlue's revenues, right?

17  **A.**   I don't know the exact number.  I think, you know,

18  directionally, it's probably greater than the capacity share.

19  The revenue share is probably higher than the capacity share

20  of that.  So I don't have any reason to disagree, but I don't

21  know if that's correct.

22  **Q.**   Then let's turn to Section 4.1.3 at the bottom of page 6.

23  And this is a section that discusses the management committee

24  for the Northeast Alliance, and the management committee

25  includes executives from both JetBlue and American, correct?

A.   Yes.

Q.   Section little ii tasks the management committee to be responsible for, "Measure and report on the success of the NEA in achieving significant consumer benefits and the other commercial benefits (including financial) the parties reasonably expect to achieve from this agreement and the related agreements."

So the management committee is tasked with continuing to measure and report not only on the consumer benefits but also the financial benefits to the parties, correct?

A.   Yes.

Q.   And if we look at section little iv, the management committee also will, "Resolve or escalate any disputes between the parties related to this agreement and the related agreements" right?

A.   Yes.

Q.   And as of June 2022, there had been no disputes between the parties, correct?

A.   I mean, there have certainly been discussions and disagreements.

Q.   Are you on the management committee?

A.   Currently?

Q.   Yes.

A.   No.

1   **Q.**   Were you on the management committee when you were at

2   JetBlue?

3   **A.**   No.   I mean, I think the management committee, we talked

4   about this being substantially equivalent to a vice

5   president.   I likely would have been the party that it was

6   sort of escalated to at JetBlue.

7           At American I suspect the party that it would be

8   escalated to would be Mr. Raja.

9   **Q.**   And at the time of your deposition in June of 2022, you

10  weren't aware of any disputes between the parties that were

11  elevated to the management committee, correct?

12  **A.**   In areas where we disagreed, I think it had become a sort

13  of less formal, and we didn't formally convene a management

14  committee, because we sort of -- we were urging the teams to

15  be able to work through disagreements.

16  **Q.**   So rather than the process here, the parties were

17  resolving disputes informally?

18  **A.**   Again, I think the -- the disputes that were there sort

19  of rarely took the form of a management committee meeting.

20  If there were disputes, the teams would attempt to

21  de-conflict and work through things.

22          I don't know if I'd characterize that as informal.

23  It's informal compared to sort of a formal management

24  committee meeting, but the teams took that responsibility

25  very seriously.

1    **Q.**  And we can set this aside.  I'd like to turn in your

2    binder to PX1B.  This is also in evidence and we will publish

3    a redacted version.

4    This is a copy of one of the Northeast Alliance

5    related agreements called the Mutual Growth Incentive

6    Agreement?

7    **A.**  Yes.

8    **Q.**  And this is also referred to as the MGIA?

9    **A.**  Yes.

10   **Q.**  You signed this agreement on behalf of JetBlue?

11   **A.**  I'm sure that I did.  I just want to find the page.  Yes.

12   **Q.**  If we could turn to page 3, to Section 2.1.  This is

13   discussing the payment arrangements under the MGIA, and it

14   states that the MGIA payments are calculated, quote, "based

15   on certain of each parties revenues and costs, as set forth

16   in this article 2, and will reflect adjustments based on each

17   party's incremental revenue and incremental costs, attributed

18   to the NEA, as compared against each party's base period

19   data."

20   Did I read that correctly?

21   **A.**  Yes.

22   **Q.**  And this is revenue sharing, correct?

23   **A.**  This is the mechanism that we had around the revenue

24   sharing and the growth incentive.

25   **Q.**  And Mr. Laurence, the revenue sharing component of the

1    Northeast Alliance means that it makes more sense for JetBlue

2    to cooperate with American, rather than compete on NEA

3    routes, right?

4    **A.**   Again, it -- JetBlue, I think, we looked at the potential

5    for cooperation, but we also wanted customers on our

6    airplanes.  And you know, how we cooperated depended on how

7    we were competing, if we were competing with Delta or United

8    or others on long-haul or short-haul.

9           So the cooperation that was there took a -- sort of

10   a number of forms, depending on what we were attempting to

11   do.

12   **Q.**   So is the answer to my question, no, that the revenue

13   sharing component of the NEA means it makes more sense for

14   JetBlue to cooperate with American, rather than compete?

15   **A.**   Well, I think that there's a lot of context that comes

16   with that.  So, you know, overall, it made sense for us to

17   cooperate.  But again, I think there is a great deal of

18   detail that comes with each sort of individual decision.

19   **Q.**   And if you turn to your June 2021 deposition.

20   **A.**   Yes.

21   **Q.**   To page 146.  I'll read lines 18 to 25.

22          "QUESTION:  I want to set aside the component of

23   the but/for if you don't enter the NEA.  And just ask, with

24   the NEA in place, do you agree that the revenue sharing

25   component means that it makes more sense to cooperate with

1    American, rather than compete for NEA routes?

2              "ANSWER:  For NEA routes, yes."

3              And that was your testimony at the time?

4    **A.**   That was my testimony at the time, with the context for

5    the prior two pages --

6              THE COURT:  Which page are you on?

7              THE WITNESS:  I'm sorry, sir?

8              MS. RIGGS:  146.

9              THE COURT:  Oh, June 7th.

10             MS. RIGGS:  June 2021.

11             THE COURT:  Oh, sorry.  Give me one moment.

12             Okay.  Go ahead.

13             THE WITNESS:  So -- I'm sorry -- so that was my

14   testimony.  At the same time, I think the context that was

15   being set in the prior pages, two pages, three pages, looks

16   very similar to my testimony just now.

17             So to directly answer your question, yes, with a

18   lot of context that was here.

19             MS. RIGGS:  And Your Honor --

20   BY MS. RIGGS:

21   **Q.**   And the prior context that you're referring to is our

22   discussion of the but/for if you don't enter into the

23   Northeast Alliance, correct?

24   **A.**   So I -- as I look at this, if we go to page 144, at

25   line 25, the question -- there's a question about metal

1   neutrality with American, and it's sort of American and the

2   Northeast Alliance, rather than compete with American.  I

3   respond that it's sort of the -- I suppose, yes, there is the

4   but/for that's there, but, again, with a great deal of

5   context here.

6   **Q.**  So the prior testimony that you're referring to is about

7   the but/for world if you don't enter the Northeast Alliance,

8   correct?

9   **A.**  I think that's actually about metal neutrality.  The

10  questions were leading up to a question about the but/for

11  that's here.

12          MS. RIGGS:  Your Honor, I would move to admit

13  page 146, lines 18 to 25, as a party admission and for

14  impeachment.

15          MR. SCHWED:  Your Honor, I have no objection to the

16  admission of those pages, but I believe Mr. Laurence has said

17  that those -- the specific question and answer needs to be

18  read in the context of the preceding two pages, beginning,

19  say, in the middle of page 143, with the question on line 12,

20  and I would just move to, for completeness, admit that as

21  well, since he has identified those questions as relevant to

22  his answer.

23          THE COURT:  Do you object to that?

24          MS. RIGGS:  No, Your Honor.

25          THE COURT:  I'll admit all of it.

1                (Plaintiff Exhibit No. Deposition of Scott

2                Laurence, June 2021, pages 143, line 12, to page

3                146, line 25 admitted into evidence.)

4  BY MS. RIGGS:

5  **Q.**  Mr. Laurence, you can set that aside.

6          You're aware from your time at JetBlue that

7  Mr. Hayes has been critical of international joint ventures,

8  correct?

9  **A.**  Yes.

10  **Q.**  And the revenue sharing under the MGIA is modeled after

11  American's revenue sharing agreements with its international

12  joint ventures, right?

13  **A.**  In a very broad sense, I believe that that's what was

14  communicated to me.

15  **Q.**  Let's turn in your binder to PX756.

16          MS. RIGGS:  And this is already in evidence, and it

17  has no redactions.  If we could publish.  Thank you.

18  BY MS. RIGGS:

19  **Q.**  This is an e-mail chain that begins with an e-mail from

20  Vasu Raja, to you, on February 3, 2020?

21  **A.**  Yes.

22  **Q.**  And this is about five to six months prior to JetBlue

23  entering the Northeast Alliance?

24  **A.**  It was in the midst of the negotiation, and we did sign

25  the Northeast Alliance agreement in July, so, approximately,

1    yes.

2    **Q.**  Mr. Raja is sending you a deck that gives an overview of

3    how American Airlines does revenue sharing with its

4    international joint venture partners?

5    **A.**  I think it's a sort of -- how they do revenue sharing.

6    I'm not sure if it notes that it's --

7    **Q.**  Well, at the time, American Airlines only did revenue

8    sharing with their international joint venture partners,

9    correct?

10   **A.**  Honestly, I did not know what American and Alaska were

11   doing.  You know, I know that they were talking -- I didn't

12   just -- I wasn't sure that the scope of this.  You know, what

13   was explained to me was that American, this was sort of their

14   revenue sharing model.  So it certainly would have

15   encompassed what they were doing with their long-haul sort of

16   international partners.

17   **Q.**  And if you turn to slide 702 of the deck, the top bullet

18   there.

19   **A.**  Yup.

20   **Q.**  702.

21   **A.**  Sorry.

22   **Q.**  Under "Principles Behind Revenue Sharing Model," the top

23   line says, "American participates in three joint businesses

24   sharing net revenue."  Do you see that?

25   **A.**  I do.

1    **Q.**  And so you agree that this overview of the revenue

2    sharing model is related to American's three international

3    joint businesses, correct?

4    **A.**  I read it to be the case, because I didn't think whatever

5    they were doing domestically was this robust.

6    **Q.**  And if we could turn back to the cover e-mail.  On

7    February 4th, 2020, you forwarded this deck to JetBlue's CEO,

8    Robin Hayes, and its president, Joanna Geraghty?

9    **A.**  I did.

10   **Q.**  Then sorry for flipping around, the page ending 701 in

11   the attachment, if we could flip there.

12   **A.**  Yes.

13   **Q.**  And this is entitled, "Why share benefits?"  Do you see

14   that?

15   **A.**  I do.

16   **Q.**  The first reason in the bullet there says, "To achieve

17   metal neutrality, the economic incentives of the parties need

18   to become aligned towards supporting the overall success of

19   the joint business."

20            And so the reason to enter a revenue share

21   according to that statement, is to align the economic

22   incentives of the parties?  That's what revenue sharing does?

23   **A.**  So in this proposal, I think, you know, what the --

24   what's being proposed here is that the parties are

25   incentivized to support the joint business, via metal

1  neutrality.

2  **Q.**  And that refers to the second sub bullet, "be

3  incentivized to sell all joint business services, regardless

4  of metal"?

5  **A.**  I see that, yes.

6  **Q.**  And that helps achieve metal neutrality?

7  **A.**  As I read that, I think that the point here is that the

8  joint businesses also would -- you would be seeking some sort

9  of a seamless customer experience where the benefits were

10  provided to customers.  And the airlines were aligned in

11  terms of supporting the success of the business.

12  **Q.**  And I'd like to you keep this handy, but we're going to

13  skip to a different tab in your binder, to PX450.

14          MS. RIGGS:  Your Honor, this next section might

15  take more than ten minutes, but only slightly more, so for

16  me, it makes sense to go ahead.

17          THE COURT:  Go right ahead.

18  BY MS. RIGGS:

19  **Q.**  This is a presentation --

20          MS. RIGGS:  Sorry, it's in evidence, so we can have

21  it published.

22  BY MS. RIGGS:

23  **Q.**  This is a presentation that American and JetBlue made to

24  the Department of Justice on July 21, 2020.

25  **A.**  Yes.

1    **Q.**  And you attended this meeting on behalf of your

2    then-employer JetBlue?

3    **A.**  I did.  The meeting, if I recall, was virtual, but I did

4    attend, yes.

5    **Q.**  If we could turn to the page ending in 016.  The third

6    bullet on this slide says, "The MGIA is designed to make each

7    carrier indifferent as to which carrier an incremental

8    passenger flies."

9           And that's also describing metal neutrality,

10   correct?

11   **A.**  Yes.

12   **Q.**  So I'd like to walk through a couple of the slides from

13   PX450, as compared to the prior Exhibit PX756.  So the

14   easiest way we're going to do this is to split the screen.

15   We have PX756 on the left, which is the revenue sharing

16   overview from American Airlines in the joint venture context,

17   and JetBlue/American's presentation to the antitrust division

18   on the right, PX450.

19           Does that make sense to you?

20   **A.**  Yes.

21   **Q.**  Now, let's go to page 5, which is "Revenue Sharing

22   Mechanics"?

23           MR. WALL:  Of what?

24           MS. RIGGS:  Of the deck on the left.

25   BY MS. RIGGS:

1    **Q.**  And so this is slide 704 in the deck, where -- American

2    revenue sharing overview with its international joint venture

3    partners.

4                  Do you see that?

5    **A.**  Um --

6    **Q.**  The top line -- you're on Revenue Sharing Mechanics?

7    **A.**  Yes, I see it.

8    **Q.**  The top line reads, "Each carrier's net revenue is

9    contributed to a shared pool, from which each carrier

10   recovers a base or protected amount of revenue based on the

11   capacity it operates."

12                  Did I read that correctly?

13   **A.**  Yes.

14   **Q.**  And if we could turn to page 5 of the American and

15   JetBlue presentation to DOJ, please on the right.

16                  That's titled "MGIA Mechanics"?

17   **A.**  Yes.

18   **Q.**  And the top line says, "Each carriers net revenue is

19   contributed to a total net revenue pool from which each

20   carrier recovers, one, its base amount of revenue, based on

21   the capacity to operate, adjusted for current capacity."

22   Correct?

23   **A.**  Yes.

24   **Q.**  And both of these decks are saying that net revenue is

25   pooled, and each carrier recovers a base, based on the

1    capacity it operates.

2    **A.**  Yes.

3    **Q.**  So now, if you look on the right, on the DOJ presentation

4    deck, number 2 states, "Its share of incremental revenue,

5    which is the additional revenue or loss after base revenue is

6    subtracted from the total net revenue pool."  Right?

7    **A.**  Yes.

8    **Q.**  And if we could turn ahead a slide on the American deck

9    on how it does revenue sharing with its joint ventures, the

10   top bullet there says, "Incremental revenue is the sum of all

11   residual revenue or loss after base revenue is subtracted

12   from the shared net revenue pool."

13          Do you see that?

14   **A.**  I do.

15   **Q.**  And underneath, on the left, there are two sub bullets

16   that read, "Incremental revenue is split between the carriers

17   based on attributed share.  An attributed share equals each

18   party percent of current period capacity," in parenthesis,

19   "ESKs."  Correct?

20   **A.**  Yes.

21   **Q.**  And ESKs there refers to equivalent seat kilometers?

22   **A.**  I'm assuming that's the case.

23   **Q.**  And now if we go ahead a page on the right, on the DOJ

24   presentation deck, to slide 6.

25          The first two bullets there read, "Incremental

1    revenue is split between the carriers based on attributed

2    share.  Attributed share equals each carrier's share of

3    current period capacity in ESMs."

4              And so the attributed shares are split between --

5    sorry, I skipped ahead.

6              And there the first two bullets say the same thing,

7    except it's in miles instead of kilometers?

8    **A.**  Um, I don't have any way to know if that's the case.  I

9    think so.  But the concept of the ESM is, I think, far

10   different, as is the sort of JetBlue/American agreement to

11   what was initially proposed by American.

12   **Q.**  We can keep looking.  If we look at the formula on the

13   left, it says, "Shared net revenue, minus base revenue,

14   equals incremental revenue?"  Correct?

15   **A.**  I see that.

16   **Q.**  And then it shows attributed share divided by

17   American Airlines and a partner carrier?

18   **A.**  Uh-huh.

19   **Q.**  And on the right, we have the same graphic?

20   **A.**  Yes.

21   **Q.**  But the attributed share is split between

22   American Airlines and JetBlue in that box?

23   **A.**  I see that.

24   **Q.**  So if we could turn ahead one page on both decks now.  In

25   the American revenue sharing deck, the top line states, "A

148

1    carrier's retained revenue for a given time period is equal

2    to its base revenue, plus it's attributed share of

3    incremental revenue."

4              Do you see that?

5    **A.**  I do.

6    **Q.**  And on the presentation that the parties made to the DOJ

7    about the Northeast Alliance, the first bullet states the

8    exact same thing, correct?

9    **A.**  Yes.

10   **Q.**  And the formulas on the slides, even though one is

11   horizontal and the other one is vertical, they both show base

12   revenue plus attributed share or incremental revenue equals

13   retained revenue, right?

14   **A.**  I see that, but I want to go back to this concept of the

15   ESKs versus the ESMs.  So we're looking at American's initial

16   proposal to JetBlue on the left and then we're comparing it

17   to what came through.  And the ESMs and the ESKs, you know, I

18   don't know what makes up the ESKs on the left, but the ESMs,

19   we had to make a number of adjustments to American's formula

20   to account for things in the NEA that were unlike what we

21   assumed to be a relationship between American and another

22   long-haul partner.  So we had to adjust for the fact that the

23   left-hand side assumed that it would be two airlines flying

24   long-haul trips.  So, you know, intercontinental trips with a

25   300 seat airplane, where both airlines have about the same

1    number of seats flying the same distance.

2         With the ESMs that we talk about in the reference

3    on the right-hand side, we had to adjust to account for the

4    fact that American was adding long-haul flights with large

5    airplanes.  So adding a flight from New York to Athens with a

6    250 or 300 seat airplane, and JetBlue would be adding a

7    flight from, say, New York to Charleston with a 100-seat

8    airplane.  And so the incremental flying was very different.

9    We had to make that adjustment.  We also had to push,

10   frankly, very hard for some of the other things that came

11   into the revenue share.  So things like cost of sale, we

12   included, but we did not include other costs.  So my

13   assumption was that in American's other agreements there were

14   other cost elements that were added.  So we had to make a

15   number of adjustments and talk through and negotiate and work

16   through this.  So the note of ESKs to ESMs is more

17   significant, even if it's sort of laid out in the text to

18   make this as simple as possible.  I think it was an attempt

19   to not have the sausage making come through in a presentation

20   where we were trying to be as sort of straightforward as

21   possible.

22   Q.  So your testimony is there were adjustments made to stage

23   length in ESMs and ESKs, as between the two?

24   A.  So again, I don't know what constitutes ESKs.  If there's

25   something in the background that was happening in American's

1    agreements, I wasn't aware of them.

2    **Q.**   Well, you are American today, correct?  You know what

3    ESKs are today as the senior vice president of partnership

4    and strategy?

5    **A.**   So I haven't broken in and read the agreements.  I'm

6    responsible for the relationships with other airlines, but I

7    haven't gone through and read the contracts.

8            At a broad level, I know that there's these

9    equivalent seat miles that are there.  I don't know what

10   actually, in the relationship between American and say,

11   Qantas, I don't know what actually makes up that agreement.

12   I am assuming there are slightly different things in each

13   one, but it is a level of detail that I haven't jumped into

14   yet.

15   **Q.**   But you know it's different when there are ESMs in this

16   deck, you don't know how, but it is different?

17   **A.**   So the ESMs, again, I know the ESMs are different because

18   I negotiated and we negotiated with American, to drive out

19   the differences from their initial proposal to where we

20   actually landed.

21   **Q.**   Okay.  But you can set aside the differences of ESMs

22   versus ESKs as an input and just look at the graphic on this

23   page and I believe my question was, the formulas on these

24   slides, although one is horizontal and one is vertical, they

25   are the same formula?

1 **A.** The formula is the same, but, again, the inputs are

2 different.

3 **Q.** Sure.  Let's turn ahead one page on both decks again.

4 And this is a slide called transfer payments on both decks.

5    Do you see that?

6 **A.** I do.

7 **Q.** And on the left, on how American does revenue sharing,

8 the text reads, "A transfer payment is required when a

9 parties' collected net revenue is more/less than its

10 calculated retained revenue."

11    Did I read that correctly?

12 **A.** Yes.

13 **Q.** And on the right, the first bullet says, "A transfer

14 payment is required when a carrier's collected net revenue is

15 more/less than its calculated retained revenue."

16    And again, this top line is identical in defining

17 the transfer payment, correct?

18 **A.** Yes.

19 **Q.** And if you look at the graphic across these two pages,

20 showing how transfer payments are determined on each of these

21 slides, that is also identical, except one is in black and

22 white, and the other is in color?

23 **A.** So they're identical, but, again, they're illustrative.

24 So, for example, there's numbers in them, as well, but

25 there's numbers in them that are illustrative.  But they are,

1    in fact, the same.

2    **Q.**    The numbers are identical in both examples, correct?

3    **A.**    The illustrative numbers in both are the same.

4    **Q.**    So Mr. Laurence, what American and JetBlue presented to

5    the DOJ on how the MGIA works, matches the mechanics from how

6    the American joint ventures operate revenue sharing, correct?

7    **A.**    No.

8    **Q.**    You can set that aside.

9            THE COURT:  How much more do you have?

10           MS. RIGGS:  That's a good time to take a break if

11   Your Honor wants.

12           THE COURT:  Okay.  Fine.  We'll take the morning

13   recess, lunch break, and I'll see you at 2:30 today.  We

14   stand in recess.

15           (Court in recess at 1:03 p.m.)

16           (The following reported by Robert Paschal.)

17           (In open court at 2:29 p.m.)

18           THE COURT:  Two things before -- I thought of just

19   before you resume -- minor.

20           One is we're keeping track as best as we can of the

21   deposition excerpts that are admitted, that has happened here

22   and there with different witnesses, little snippets.  To the

23   extent that you're able to keep track of that and have a list

24   at the end, that would be helpful.

25           And the other is, like, if you know the witnesses

1    who are coming on a particular day, if you know at the end of

2    the day, tell me for the next day.  And if you have the

3    binders before 9:00, even if it's just at 8:45 or whatever,

4    give them to us, or at least the binders for the first

5    witness.

6              Okay.  Ready to resume?

7              MS. RIGGS:  Yes.

8              THE COURT:  Go right ahead.

9              MS. RIGGS:  Thank you, Your Honor.

10   BY MS. RIGGS:

11   **Q.**  Mr. Laurence, before we left for lunch, we were talking

12   about the revenue sharing that American Airlines does with

13   its international joint ventures and the MGIA.  And what you

14   were pointing out about the ESM stage adjustments, I would

15   just like to follow up and ask the ESM stage adjustments are

16   to fairly attribute revenue as between American and JetBlue,

17   correct?

18   **A.**  I would say, yes, fairly and equitably.  Again, the issue

19   there is the complexity of matching up an airline who has

20   incremental capacity is by and large long-haul flying with

21   large airplanes, vis-à-vis JetBlue's incremental capacity to

22   short-haul capacity with smaller airplanes.

23   **Q.**  I understand.  I just want to be clear the reason you are

24   making those adjustments is in the apportionment, right, of

25   how you are attributing revenue to each of the partner

1    carriers.

2    **A.**   It is the sort of formula that drives out the

3    apportionment of the incremental revenue.

4    **Q.**   Okay.

5    **A.**   Divided by the incremental capacity for both airlines,

6    yes.  I think we're agreeing.

7    **Q.**   So the difference you described doesn't affect the

8    similarities between international joint ventures and the

9    MGIA on aligning incentives of the partners?

10   **A.**   I can't really speak to the international joint ventures,

11   especially in my capacity at JetBlue when we worked through

12   this because I was not aware of exactly what that entailed,

13   it's what I would have read publicly or assumed.

14           So what I would say is that the formula,

15   incentivizes both airlines to grow and apportions the -- I

16   think as it's put there, sort of the kept revenue between the

17   airlines, yes.

18   **Q.**   And so -- sorry.  I'll try again.  The economic -- the

19   incentive to align the underlying economic incentives -- I

20   said incentive twice -- the MGIA aligns the economic

21   incentives of the parties, correct?

22   **A.**   I'm not sure if I would characterize it that way.  What I

23   would say is the MGIA incentivizes both parties to grow and

24   then serves as a mechanism for the transfer of revenue

25   between the parties based upon their unit revenue performance

1    for incremental flying above a base period.

2    **Q.**  And so the ESM stage adjustments are about that second

3    step of attributing incremental revenue between JetBlue and

4    American?

5    **A.**  Yes, I think I'm following you.  I think I agree, yes.

6    **Q.**  Okay.  We're going to jump back to the split screen, if I

7    may, just quickly.  And so we'll put up again PX 756 on the

8    left and PX 450 on the right.  We'll turn to page ending in

9    703 for PX 756.  And on the right, it's page 4.

10           So here, if you look at the bottom line on the

11   slide on the left ending in 703, there's a phrase written

12   "essentially, it's passenger-related revenues, less passenger

13   variable costs."

14           Do you see that?

15   **A.**  I do.

16   **Q.**  And if we look page 4 on the bottom line for the deck

17   presented to DOJ about the MGIA, the bottom line reads "net

18   revenue is essentially passenger-related revenues less

19   selling expenses," correct?

20   **A.**  Yes.

21   **Q.**  And so just a couple more points on this slide.  Under

22   included revenues for the MGIA on the right, number 3 is net

23   frequent flyer revenue, correct?

24   **A.**  Yes.  I'm sorry, on the right.  I apologize.  I was

25   looking at the left.  Thank you for the highlight.

1  **Q.**  It's on the left, too.  They're both number 3?

2  **A.**  Yes.  I see.

3  **Q.**  And looking at "included expenses" on the right, things

4  like fuel and in-flight catering are not included as expenses

5  in the MGIA, right?

6  **A.**  So on the right-hand side in the MGIA, the only expenses

7  we included were those directly related to the cost of sale.

8  **Q.**  So fuel and in flight catering and the like are not

9  included?

10  **A.**  Correct.

11  **Q.**  And if JetBlue grows under the MGIA, American doesn't

12  share in these in-flight costs associated with that growth,

13  correct?

14  **A.**  In terms of the cost that you're referencing, like fuel

15  as an example, no.

16  **Q.**  So it's fair to say today that your testimony is the

17  inputs are different between how American does revenue

18  sharing in the international JVs and the MGIA, but the

19  underlying formula is the same, correct?

20       MR. SCHWED:  Objection, Your Honor.  He's already

21  testified extensively that he doesn't know all the terms of

22  the international JVs, and she's trying to encapsulate about

23  half an hour of testimony into a single answer than -- is

24  not -- in a fair way.

25       THE COURT:  What's the question again?

1    BY MS. RIGGS:

2    **Q.**  So it's fair to say, right, that the inputs are different

3    in between -- as to American doing joint venture revenue

4    sharing and the MGIA, but the underlying formula, that box we

5    saw on the final page, the mechanics of how the revenue share

6    works, is the same?

7                THE COURT:  As described on these two slides?

8                MS. RIGGS:  As described on these two slides.

9                THE COURT:  With that, the objection is overruled.

10   You can answer.

11               THE WITNESS:  So what I would highlight is that, as

12   displayed on the slides, there are a multitude of things that

13   are different on the expense side.  And the first point I

14   would make there is that each one of those changes in terms

15   of a negotiation is a point and is sort of laboriously

16   discussed.

17               The second piece that I would highlight is that on

18   the left-hand side, if you sort of look at the included

19   revenues, right, there are differences that are there.  Each

20   of those differences are laboriously discussed as well.  And

21   then the sort of ESM versus -- I think it was ESK formula is

22   very different.

23               So if you look at sort of all of those together,

24   it's very difficult for me to first of all say what was in

25   the international joint ventures that American had at the

1    time.  We were presented with a concept that we negotiated

2    and worked through and made a series of changes to that we --

3    both parties agreed to.

4            So I think similar to your last question, and I

5    want to make sure I answer it properly, I don't believe I

6    agree with the characterization that it's the same, but there

7    are a series of similarities in some of the inner workings.

8            Does that make sense?

9    BY MS. RIGGS:

10   **Q.**   Okay.  And just to clarify, the inputs into that formula

11   we agree are sometimes different --

12   **A.**   Right.

13   **Q.**   -- like on this slide, but the underlying formula, that

14   box that was identical in black and white color, that's the

15   same?

16   **A.**   So, again --

17            MR. SCHWED:  Objection.  Asked and answered.

18            THE COURT:  Sustained.

19            MS. RIGGS:  We can move on.

20   BY MS. RIGGS:

21   **Q.**   Mr. Laurence, you're familiar with the agreement between

22   American, JetBlue, and the US Department of Transportation

23   regarding the Northeast Alliance, correct?

24   **A.**   Yes.

25   **Q.**   And that agreement was signed January 10, 2021?

1   **A.**   Yes.

2   **Q.**   You signed this agreement on behalf of JetBlue?

3   **A.**   Yes.

4   **Q.**   And you were involved in the negotiations over this

5   agreement?

6   **A.**   I was involved in the discussions and negotiations, I

7   would say, if I had to guess, about half of the discussions

8   that took place, maybe a little bit more than half.

9   **Q.**   Let's turn to tab PX447 in your binder and this is in

10  evidence with no redactions, so we can publish.  And this is

11  the agreement with the US Department of Transportation,

12  correct?

13  **A.**   Just give me a second.  447.

14          Yes.

15  **Q.**   At the bottom of page 1, ending in 940, commitment A

16  refers to JetBlue agreeing not to exit any nonseasonal,

17  nonstop JFK route it served as of February 2020 other than

18  JFK-Long Beach, JFK-Oakland, and JFK-Worcester; is that

19  right?

20  **A.**   Yes, with a -- there is an annotation, as well.

21  **Q.**   I'm sorry.  I didn't hear that.

22  **A.**   I'm sorry.  There's an annotation at the bottom, the

23  Number 1 noted there.  I just want to make sure that we --

24  that that makes sense.

25  **Q.**   Sure.  It looks like the footnote clarifies that it's

1    closing its stations at Long Beach, Oakland, and Worcester;

2    is that right?

3    **A.**  I see.  Yes.  And it has to do with the CARES Act and the

4    COVID relief bill.  Okay.  Yes.

5    **Q.**  And so looking at the commitment A, JetBlue could reduce

6    capacity on any particular route down to a single flight and

7    not violate this provision, correct?

8              MR. WALL:  Objection.  Calls for a legal

9    conclusion.

10             THE COURT:  Overruled as to his understanding.

11   BY MS. RIGGS:

12   **Q.**  Do you understand that, under commitment A, JetBlue could

13   reduce capacity on a particular route down to a single flight

14   and not violate this provision?

15   **A.**  Yes.

16   **Q.**  And American can still exit any JFK route and not violate

17   this provision, right?

18   **A.**  Yes.

19   **Q.**  And American has exited JFK to San Diego, correct?

20   **A.**  That sounds correct.  I don't recall if they've exited

21   that or not, but I wouldn't dispute it.

22   **Q.**  And if we turn to the bottom of page 942, to section E,

23   this refers to slot divestitures.  Do you see that?

24   **A.**  I do.

25   **Q.**  And so as part of this agreement, American and JetBlue

1    divested -- agreed to divest seven slot pairs at JFK?

2    **A.**   Yes.

3    **Q.**   JetBlue is the number two slot-holder at JFK, correct?

4    **A.**   I believe that to be the case, yes.

5    **Q.**   JetBlue holds 334 slots at JFK?

6    **A.**   Again, I don't know the exact number, but that sounds

7    correct to me for slots.

8            Just to be clear, slots versus slot pairs.  We're

9    talking about single slots, correct?

10   **Q.**   Correct.

11   **A.**   Yes, that number sounds like it's probably correct.

12   **Q.**   And American is the number-three slot-holder at JFK?

13   **A.**   I believe that to be the case, yes.

14   **Q.**   American holds 210 slots at JFK?

15   **A.**   I don't know.  But, again, I wouldn't dispute that

16   number.

17   **Q.**   Okay.  Combined -- well, you wouldn't know the combined

18   number, then.

19           Fair to say it sounds like American and JetBlue

20   likely have more than 500 slots at JFK?

21   **A.**   I think if we used the two numbers that I didn't object

22   to, I believe those exceed 500.

23   **Q.**   544 slots at JFK sound about right?

24   **A.**   I believe so.

25   **Q.**   And the agreement calls for diverting 14 of the 544 slots

1    the parties have?

2    **A.**   Yes.  Since it's seven pairs, 14 slots.

3    **Q.**   Additionally the agreement calls for divesting six slot

4    pairs at DCA, right?

5    **A.**   Yes.

6    **Q.**   But you understood those divestments were temporary,

7    correct?

8    **A.**   I think that is what's noted in the agreement.  I just --

9    I don't -- I don't recall the dates that were associated with

10   the DCA slots.  I'm just looking here.

11   **Q.**   The slot divestitures end when the Northeast Alliance

12   ends.  Does that sound familiar?

13   **A.**   It does.

14   **Q.**   American is the largest slot-holder at DCA, correct?

15   **A.**   Yes.

16   **Q.**   American has 357 slots at DCA?

17   **A.**   I don't know how many slots American has at DCA.

18   **Q.**   But it's the number one slot holder at DCA?

19   **A.**   I believe that to be the case, yes.

20   **Q.**   And under Section 2 in this agreement, if we could move

21   to the page ending in 944.

22   **A.**   Yes.

23   **Q.**   There, American and JetBlue pledge to grow a certain

24   amount across JFK and LaGuardia combined.  Do you see that?

25   **A.**   I do.

1    **Q.**   But that growth, again, it's not route-specific, correct?

2    **A.**   I believe it's based on seats.

3    **Q.**   Uh-huh.  Across all of the routes at JFK and LaGuardia

4    that American and JetBlue fly?

5    **A.**   Yes.

6    **Q.**   So nothing prevents the parties from decreasing capacity

7    on nonstop overlap routes while growing elsewhere?

8    **A.**   I'm sorry; you -- can you just ask the question one more

9    time.

10   **Q.**   Yep.  Nothing prevents the parties in this agreement from

11   decreasing capacity on nonstop overlap routes while growing

12   elsewhere?

13   **A.**   That would be the case unless it resulted in JetBlue

14   exiting a JFK market.

15   **Q.**   And it's pretty easy to grow if you've been sitting on

16   slots, right?

17   **A.**   Well, again, I think growth is something that requires

18   either a larger airplane, a longer stage length flight, or an

19   available slot in which to grow.

20   **Q.**   Mr. Laurence, the agreement here does not reference or

21   address Boston in any way in the agreement terms itself, does

22   it?

23   **A.**   It does not.

24   **Q.**   All right.  You can put that aside.

25            I'd like to shift now to talking about the routes

1  that the parties decided to carve out from the Northeast

2  Alliance.  You're familiar with those?

3  **A.**  Yes.

4  **Q.**  And in those routes, American and JetBlue committed not

5  to coordinate on capacity and scheduling, nor share revenues;

6  is that right?

7  **A.**  In that tranche of routes, yes, although codesharing was

8  not prohibited from those.

9  **Q.**  And these carve-outs don't appear anywhere in the

10  agreement with the US Department of Transportation, correct?

11  **A.**  I don't recall if it's in the agreement.

12  **Q.**  If you want to flip through today --

13  **A.**  Sure.  --

14  **Q.**  -- and see, I don't believe you'll find the carve-out

15  routes anywhere within that agreement.

16  **A.**  Okay.  Again, I --

17           THE COURT:  I don't think -- are the defendants

18  contending that it is in the carve-out -- in the agreement

19  with DOT?

20           MR. WALL:  We stipulate to that, Your Honor.

21           MR. SCHWED:  We do not, Your Honor.

22           MS. RIGGS:  Let's turn now to PX845 in your binder.

23  And this has been admitted into evidence already and has

24  redacted phone numbers.  Plaintiffs have prepared a

25  demonstrative, PX845A which contains the same redactions and

1  reproduces the text messages in a table for ease of use.

2         We understand the defendants have no objection.  I

3  would move to publish PX845A.

4              THE COURT:  All right.

5              MR. SCHWED:  No objection to that.

6              THE COURT:  Admitted.

7              MR. SCHWED:  As redacted.

8              THE COURT:  As redacted.

9              (Plaintiffs' Exhibit No. 845A admitted into

10             evidence.)

11             MS. RIGGS:  Thank you.

12  BY MS. RIGGS:

13  **Q.**  This is a series of text messages between you and Robin

14  Hayes on January 7, 2021?

15  **A.**  Yes.

16  **Q.**  And if we could zoom in on the first text message,

17  because they're very small -- thank you -- looking at the

18  first text message at 3:54 p.m., you wrote to Mr. Hayes, "Can

19  we chat AA this evening with Rob"?

20  **A.**  Yes.

21  **Q.**  And Rob there is referring to Robert Land, JetBlue's

22  senior vice president of government affairs?

23  **A.**  Yes and associate counsel.

24  **Q.**  And Mr. Land was heavily involved in negotiating the

25  agreement between American, JetBlue, and the DOT?

1    **A.**   Yes.

2    **Q.**   If you turn to your second message, you wrote, "Rob

3    rightfully livid that American is playing games with the sec

4    on the way out the door, and Spirit has just submitted a

5    50-page objection to the deal."

6              And "sec" in that refers to the Secretary of

7    Transportation at the time?

8    **A.**   Yes.

9    **Q.**   You understood Mr. Land to be livid about something

10   American was trying to negotiate into the DOT agreement?

11   **A.**   I was characterizing Mr. Land, who was upset because we

12   had gone through a lengthy process.  You know, the date on

13   this is the 7th of January.  We had been negotiating with the

14   Department of Transportation since mid-November through the

15   holidays.  And we felt like we were in a good place, and then

16   I think American -- the American contingent was refining some

17   language and I think that upset Mr. Land.

18   **Q.**   And that's when you wrote that he is rightfully livid?

19   **A.**   I felt strongly that we were very close to an agreement.

20   I was quite frustrated, too.  And so I wanted to ensure that

21   Mr. Hayes knew that I was supportive of Mr. Land's opinion or

22   feeling.

23   **Q.**   And the agreement was signed three days after this text

24   exchange, is that right, on January 10th?

25   **A.**   Yes.

1    **Q.**  And you testified in your deposition that the clock was

2    ticketing to get this agreement signed; is that right?

3    **A.**  That sounds like something I would have said.

4    **Q.**  And, in fact, let's just turn to your deposition, if you

5    could, to the June 2022 tab.  It's at page 357.

6    **A.**  357?

7    **Q.**  Yes.  And I'll just start reading at line 21 there:

8              "QUESTION:  Okay.  And why was the clock ticking?

9              "ANSWER:  We had been negotiating with the

10   Department of Transportation, and we were nearing the -- both

11   the end of the administration's time before inauguration,

12   additionally I believe the secretary of transportation had

13   resigned right around this time, effective a day prior to the

14   inauguration."

15             You agree with your testimony sitting here today?

16   **A.**  I do.  I'm a little bit fuzzy about the dates of the

17   secretary's effective date of resignation, but, yes, I agree

18   with that.

19   **Q.**  And if you could look at the next question, starting on

20   page 358, at line 6.  It says:

21             "QUESTION:  And you wanted to get the agreement

22   finished before the effective date of that resignation?

23             "ANSWER:  As I recall, we had been negotiating with

24   the department, and it was unclear if the department's

25   position would somehow change if the secretary resigned."

1          Do you agree with your testimony at that time?

2     **A.**   I do.  The department's position had changed multiple

3     times through the negotiation.  We thought we had a deal, and

4     then something would change.  We would move forward, make

5     other changes to the agreement, and then there would be other

6     changes.

7          We would also find that the people with whom we

8     were working at the Department of Transportation, we would be

9     working with someone we thought was a decision maker, and

10    then that person would either appeal up the line, or we were

11    also, at the time, unfortunately encountering a number of

12    people who would be COVID positive and then would be out of

13    the discussion.

14         And so it was very difficult to nail down the exact

15    baseline and then the defined terms of the agreement, and

16    what exactly would be necessary to gain the department's

17    agreement and signature on a document.

18    **Q.**   And I just want to look back to your answer at the time

19    in your deposition.  It was unclear if the department's

20    position would somehow change if the secretary resigns.  That

21    was -- you agree with that testimony?

22    **A.**   Again, I do.  It was one more sort of moving part that we

23    were encountering.

24    **Q.**   And, Mr. Laurence, you understand that the Department of

25    Transportation subsequently issued a clarification of its

1  position on the Northeast Alliance, correct?

2  **A.**  I believe the department has submitted some things to the

3  press, but I haven't been following them closely.

4  **Q.**  And I'd like to turn to PX452.

5  **A.**  452?  Is that a 2016 deposition?  Am I on the right

6  document?

7  **Q.**  No.  PX452 should be a Department of Transportation

8  notice published in the Federal Register.

9            THE COURT:  Not page 452, PX.

10           MS. RIGGS:  Sorry.  It's the exhibits binder.

11           MR. SCHWED:  It looks like he might be in the

12  deposition binder rather than the exhibit binder.

13           THE WITNESS:  My apologies.  Thank you.

14           Okay.  I do have the exhibit.

15  BY MS. RIGGS:

16  **Q.**  PX452 is a Department of Transportation notice, published

17  in the Federal Register in September 2021; is that correct?

18  **A.**  Yes.  September of 2021, yes.

19  **Q.**  And on the first page --

20           MR. SCHWED:  Your Honor, may I just -- we have an

21  objection to this exhibit.  It's pure hearsay.  And so we

22  object to it being read into the record.

23           THE COURT:  What is it?

24           MS. RIGGS:  Your Honor, this -- the defense

25  counsel, in their opening, discussed the Department of

1    Transportation agreement, and we feel the record is

2    incomplete without the clarifying statement that DOT issued.

3            I believe this is the signer of the DOT agreement.

4    I would like to ask him his understanding of that agreement

5    with the clarification.  This easily meets the public records

6    exception to the hearsay rule under 803(8).  It clearly sets

7    out DOT's activities under 803(8)(a)(1), and it also sets out

8    factual findings from a legally authorized investigation

9    under 803(8)(a)(3).

10           MR. SCHWED:  Your Honor, this is a document that

11   the Department of Transportation, not coincidentally, I'm

12   sure, issued simultaneously with the Department of Justice

13   filing this suit.  It is not an ordinary course statement by

14   the Department of Transportation.  It's part of a Department

15   of Justice litigation tactic, and it shouldn't be admitted.

16           MR. WALL:  The only other comment I would like to

17   make, Your Honor, is if the Court admits this, I would like

18   the Court to order a production of the records -- all

19   contacts between the Department of Justice and the Department

20   of Transportation in the days leading up to this statement.

21           MS. RIGGS:  Your Honor, I would also just note that

22   this is published in the Federal Register.  It is not just

23   something issued to the public or as a press release.  It is

24   a business record.

25           THE COURT:  I'm going to take it for now.  For now,

1    I'm going to overrule the objections, if for no other reason

2    to read it since it was in federal register.  I don't think I

3    can appreciate all the objections until I read it.  So for

4    now, I'm taking it subject to further consideration of the

5    nature of the objections after I've reviewed it, and the

6    request to order discovery now is overruled.

7            You can answer the question if you remember what it

8    is.

9            THE WITNESS:  No, sir, I don't.

10   BY MS. RIGGS:

11   **Q.**  Under the heading "Department of Transportation Office of

12   the Secretary," it says, "Clarification of departmental

13   position on American Airlines-JetBlue Airways' Northeast

14   joint venture."

15           Do you see that?

16   **A.**  I do.

17   **Q.**  And on the bottom of page 2, if we could publish now, is

18   it in evidence?

19           THE COURT:  Yes, it's in evidence.  You can publish

20   it.

21           (Plaintiff Exhibit No. 452 admitted into evidence.)

22   BY MS. RIGGS:

23   **Q.**  We turn to the bottom of page 2 ending in 119.  There's a

24   sentence at the bottom paragraph that says, "Consistent with

25   past precedent, the department chose to conduct the review of

1    the NEA informally and without establishing a docketed

2    proceeding."  And Mr. Laurence, you understand the department

3    review of the Northeast Alliance was conducted informally?

4    **A.**   Honestly, I don't know what that means.  It seemed like a

5    pretty formal process, but I don't actually know what that

6    means.

7    **Q.**   Are you aware of an open docketed proceeding in reviewing

8    the Northeast Alliance?

9    **A.**   No.

10   **Q.**   We can turn to page 3, which ends in 120 --

11   **A.**   Yes.

12   **Q.**   -- to the last paragraph.  And the first sentence there

13   states, "In this context, DOT's review of the Northeast

14   Alliance under Section 41720 was not designed to approve or

15   disapprove the alliance."

16           And, Mr. Laurence, you understand don't you that

17   DOT did not approve the Northeast Alliance?

18           MR. WALL:  Objection, calls for a legal conclusion.

19           MR. SCHWED:  Yes, Your Honor, Mr. Laurence --

20           THE COURT:  Sustained as to that.

21           MR. SCHWED:  Thank you.

22   BY MS. RIGGS:

23   **Q.**   If you look further down that same page, the last line

24   states, "The DOT agreement did not address all of the

25   department's concerns resulting from the Northeast Alliance's

1    impacts on competition, but instead sought concessions from

2    the carriers that were intended to mitigate some of the

3    anticompetitive harm while providing a means for monitoring

4    the NEA's implementation."  Did I read that correctly?

5    **A.**   You did.

6    **Q.**   And as mentioned before, for example, the carve-out

7    routes, that you may still codeshare on nonstop overlap

8    markets, correct?

9    **A.**   Yes.

10   **Q.**   You understand that the DOT agreement with JetBlue and

11   American did not address all of DOT's concerns about the

12   impact on competition?

13   **A.**   I think it's very difficult for me to understand what all

14   of DOT's concerns were.  As we negotiated with them, they

15   brought us their concerns and we offered remedies and we

16   continued to do that through the process.  So when we had

17   completed the negotiation, it was my assumption that we had

18   addressed each one of their concerns and mitigated it in the

19   agreement, otherwise they wouldn't have signed it.

20   **Q.**   Do you understand that the sentence here says the DOT

21   agreement did not address all of the department's concerns?

22   **A.**   I see that.

23   **Q.**   If you look at the fifth page ending in 122, under the

24   heading DOJ litigation, it reads, "On September 21, 2021,

25   after completing an extended review of the NEA, DOJ announced

1    its determination that the NEA violates the antitrust laws

2    and that the agency has initiated action to enjoin the

3    agreements.  DOJ has shared with the department its

4    significant concerns with respect to the effect of the NEA on

5    competition.  The department notes that the DOT agreement

6    does not, nor was it intended to, wholly address these

7    concerns."

8            Did I read that correctly?

9    **A.**  You did.

10   **Q.**  And you understand the DOT agreement does not nor was

11   intended to wholly address the concerns with respect to the

12   effect of the Northeast Alliance on competition?

13            MR. SCHWED:  Objection.  Asked and answered.

14            THE COURT:  Whose concerns?

15   BY MS. RIGGS:

16   **Q.**  Do you understand that the DOT agreement does not nor was

17   intended to wholly address DOT's concerns with respect to the

18   effect of the Northeast Alliance on --

19            THE COURT:  That, he's answered.

20            MR. SCHWED:  Thank you, Your Honor.

21   BY MS. RIGGS:

22   **Q.**  And if we look at the last sentence on the page ending in

23   123 -- sorry --

24            THE COURT:  Someone might explain to him when.

25            MS. RIGGS:  Sorry?

```
 1              THE COURT:  When, when -- the concerns DOT had
 2    might differ at different times.
 3              MS. RIGGS:  Thank you, Your Honor.
 4              THE COURT:  But he did answer the question before.
 5    BY MS. RIGGS:
 6    Q.  On the last page ending in 123, in the middle of the
 7    paragraph there, there's a sentence that reads, "However, the
 8    department intends to defer to DOJ as the primary enforcer of
 9    the federal antitrust laws to resolve antitrust concerns with
10    respect to the Northeast Alliance."
11              And do you agree that deferring to the DOJ is not
12    the same as approval by the DOT?
13              MR. SCHWED:  Objection, Your Honor.  Calls for a
14    legal conclusion.
15              THE COURT:  Sustained.
16    BY MS. RIGGS:
17    Q.  Mr. Laurence, are you aware that Spirit's complaints are
18    still pending before the DOT?
19    A.  I'm aware of a Spirit complaint.  I didn't know how it
20    was -- how it was proceeding.
21    Q.  Let's move on.  We can take that down.
22              I'd like to turn now to the implementation of the
23    Northeast Alliance.
24    A.  I'm sorry; the implementation?
25    Q.  Yes.
```

1    **A.**   Okay.

2    **Q.**   So American and JetBlue began implementing the NEA in

3    early 2021; is that correct?

4    **A.**   We began the implementation process during the first

5    quarter of 2021.

6    **Q.**   And approximately how many planes were in JetBlue's fleet

7    at the time?

8    **A.**   Around 280, give or take, about 10, I think.

9    **Q.**   In constructing a network, the number of routes that

10   JetBlue can fly is limited by the number of planes it has,

11   correct?

12   **A.**   By and large, yes.

13   **Q.**   And the same is true for pilots?  You have to have a

14   specific number of pilots in order to fly the planes?

15   **A.**   Yes.

16   **Q.**   And if you've committed to flying particular routes, that

17   limits your options as to other routes you can fly, right?

18   **A.**   Again, it's a bit more complicated than that, but

19   ultimately, you are -- there's a restraint based on the

20   number of aircraft and the aircraft time available and the

21   number of pilot hours that are available.

22          But in terms of characterizing that by routes, it

23   depends how long the routes are, the stage length between the

24   routes and how quickly the aircraft are turned around and

25   what times of the day that you actually fly.  But overall,

1    conceptually, I agree that those are the main constraints.

2    **Q.**   Thank you.

3         If we could turn in your binder to PX791, and this

4    is in evidence with no redactions, so we can have it

5    published.  And this is an e-mail from Mr. Lusso to Johanna

6    Geraghty, copying you, Eric Friedman, and Michael Quiello on

7    August 6, 2021, with the subject "QNR"?

8    **A.**   Yes.

9    **Q.**   And Mr. Lusso was sending Ms. Geraghty the current draft

10   of JetBlue's quarterly network review?

11   **A.**   Yes.

12   **Q.**   Quarterly network reviews are quarterly meetings where

13   the network team would present developments to JetBlue's

14   senior leadership team?

15   **A.**   Yes.

16   **Q.**   And you and Mr. Lusso presented the quarterly network

17   review to Ms. Geraghty and JetBlue's CEO, Mr. Hayes?

18   **A.**   Amongst others of the senior leadership team, I believe.

19   **Q.**   And let's turn to the QNR, to page 084.

20        And here we can see you're listed as a presenter

21   along with the network planning team, correct?

22   **A.**   Yes, in general, to present to the senior leadership

23   team, the presenters would need to include a member of the --

24   of that senior leadership team.

25   **Q.**   And if we look at the meeting objectives on this slide,

1    the second one is listed as, quote, "Discuss fleet

2    requirements to support steady state NEA vision and other

3    growth."  Correct?

4    **A.**  Yes.

5    **Q.**  And at the bottom of the slide, under "Next Steps," the

6    first next step is quote, "Continue to execute NEA vision

7    while managing aircraft and pilot hour constraints in 2022."

8           Is it fair to say JetBlue was experiencing fleet

9    and pilot hour constraints at the time?

10   **A.**  I would say from a network planning perspective, there

11   are always aircraft and fleet constraints.  I think the

12   network planning teams are kind of known as the people that

13   want to grow the airline all the time.  So it was, I think,

14   on the dates that are involved here, August 2021, probably

15   particularly.

16   **Q.**  And if we could turn to the sixth page, which ends in

17   088, this is titled "However, there is urgency to invest in

18   specific areas of our pre-COVID network as well as the NEA,

19   likely at the expense of recent initiatives."

20          And so according to the title of this slide,

21   investing in NEA growth likely meant abandoning or scaling

22   back other JetBlue initiatives?

23   **A.**  What I would -- yes.  But the note here which is recent

24   initiatives, so during COVID, the market for us changed

25   massively overnight.  And so as we were first experienced

1    lockdown and pulled the airline down, we then brought the

2    airline back as quickly as we could.

3         But what we found was that the only traffic that

4    was available to us was leisure oriented.  And so we were

5    eager get the aircraft flying, so we worked a number of

6    projects that were characterized under project reach, which

7    were attempts at reworking our network so we could appeal to

8    the COVID normal that included flying from places that we had

9    sort of never intended in our pre-COVID incumbent plan, a

10   series of markets that tended to be more leisure heavy were

11   markets that were otherwise unserved that it had previously

12   had service.

13        And so when we launched those, we had anticipated

14   that some would work.  We hoped they would.  But a number of

15   them, we also assumed would probably have to be reworked into

16   the network and be canceled.

17   **Q.**   And, Mr. Laurence, I don't want to cut you off, but I do

18   have a limited amount of time, so some of this your counsel

19   can cover.  I would ask if I ask you a yes-or-no question, if

20   we can just stick to yes or no where possible?

21   **A.**   Where possible, sure.

22   **Q.**   But if we could look, actually, at this slide, if you

23   look at the chart on the bottom, the airports shaded gray on

24   the chart are designated for scaled back or slower growth,

25   correct?

1   **A.**   Yes.

2   **Q.**   And on this slide, that includes Orlando,

3   Fort Lauderdale, San Juan, Richmond, and Raleigh-Durham?

4   **A.**   Yes.

5   **Q.**   And, actually, Orlando, Fort Lauderdale, and San Juan are

6   focus cities for JetBlue, correct?

7   **A.**   Correct.

8   **Q.**   Predating Project Reach and the Northeast Alliance?

9   **A.**   Predating Project Reach, but a number of the markets in

10  Project Reach were destined for those cities.  Again, if you

11  think about those three cities, they're heavily

12  leisure-oriented, and so we had reworked our fleet to be able

13  to fly more into those cities.

14  **Q.**   And none of the airports on this slide are designated for

15  scaled back or slower growth within the NEA, correct?

16  **A.**   That's correct.

17  **Q.**   And the left-hand axis of this slide depicts the variable

18  margin at these airports in June 2021, right?

19  **A.**   Yes.  So the question is June 2021.  I don't know the

20  exact period.  I think it was just the monthly variable P&L,

21  or profit and loss.

22  **Q.**   And all five of the gray markets designated for scaled

23  back and slower growth performed above 20 percent variable

24  margin at this time?

25  **A.**   Yes.

1  **Q.**  So fair to say they're financially successful airports

2  for JetBlue?

3  **A.**  No.

4  **Q.**  Let's turn to slide 13 ending in 095.  This is titled

5  "Pilot hours are limiting capacity growth in 2020."  Correct?

6  **A.**  Yes.

7  **Q.**  And so fair to say pilot hours were still constraining

8  JetBlue's capacity at this time?

9  **A.**  Yes.

10  **Q.**  And --

11           THE COURT:  How does usage go down in September?

12           THE WITNESS:  So the -- you're only seeing one year

13  here, and so the capacity moves seasonally.  And so if you

14  think of the year --

15           THE COURT:  So September is typically a slow

16  season?

17           THE WITNESS:  Right after Labor Day, you see a deep

18  trough and then a trough through the fall, and then you can

19  see it build back up for the December holidays.

20           THE COURT:  Go ahead.

21  BY MS. RIGGS:

22  **Q.**  If you can turn to the next slide ending in 96, this is

23  titled "NEA requires a significant shell investment,

24  particularly in Mint."  And "shells" here refers to

25  airplanes?

1    **A.**   Yes.

2    **Q.**   If you look at the right-hand side of this slide, the

3    second bullet which is bold and underlined reads, "By 2022,

4    including keeping the 30 owned E190s, we still need 18 Mint

5    aircraft and 34 All-Core aircraft," correct?

6    **A.**   Yes.

7    **Q.**   And the third below, below that says "Steady state

8    unachievable until 2026-2027," right?

9    **A.**   Yes.

10   **Q.**   And, finally, the last bullet says, "This also assumes

11   limited growth in other focus cities, such as Los Angeles,

12   Fort Lauderdale, and Orlando," right?

13   **A.**   That is what we put together and, again, in doing so

14   making sure that the senior leadership team understood that

15   we needed to be acquiring aircraft.

16   **Q.**   And these bullets are conveying that, due to fleet

17   constraints, not only will the steady state not be achievable

18   until 2026 or 2027, but the growth would also have to be

19   scaled back in non-NEA focused cities?

20   **A.**   So, again, as this was presented, we laid out exactly

21   what you are noting and then highlighted the need to either

22   keep aircraft that were slated to retire or acquire aircraft

23   that were new to JetBlue.

24          MS. RIGGS:  And let's pause here.  I have a

25   document that I'd like to distribute.

```
 1              If you could hand out copies.
 2   BY MS. RIGGS:
 3   Q.  Mr. Laurence, you're being handed a public press release
 4   by JetBlue in February 2022; is that correct?
 5   A.  Yes.
 6              MS. RIGGS:  I would move to admit this into
 7   evidence.  It does not have a PX number.
 8              THE COURT:  Any objection?
 9              MR. SCHWED:  Yeah, I mean, I do note that it hasn't
10   been previously marked as an exhibit or provided to us, but I
11   don't have any objection other than I would request that, in
12   the future, if you're adding new exhibits, we get notice of
13   them.
14              THE COURT:  Admitted.  And I agree.
15              (Plaintiffs' Exhibit No. 2000 admitted into
16              evidence.)
17              THE COURT:  Do we have a number?
18              MS. RIGGS:  Let's assign it PX 2000?  Can we do
19   that?
20              THE COURT:  All right.  PX 2000.  Let's hope we
21   don't fill up from 1,000 to 2,000.
22              MS. RIGGS:  I hope not.
23   BY MS. RIGGS:
24   Q.  This is an announcement of JetBlue of exercising an
25   option to get 30 new A220s by 2026; is that right?
```

1    **A.**   That appears to be the case.

2    **Q.**   And do you agree that, at the same time as JetBlue

3    publicly announced this aircraft order, JetBlue also

4    announced it would retire the E190s in connection with the

5    A220 order?

6            MR. SCHWED:  Objection, Your Honor.  Just from a

7    foundational point of view, I don't know if she's asking him

8    to read this document, but by the date of it, he was no

9    longer at JetBlue.  So I'm not sure he has foundation beyond

10   reading the document.  And Mr. Hayes, who was here, of

11   course, was present at the time of this announcement.

12           THE COURT:  Do you know beyond reading the -- other

13   than reading the document?

14           THE WITNESS:  I mean, I was aware that JetBlue had

15   announced the order of aircraft, but I don't follow the

16   JetBlue fleet as closely as I used to.

17   BY MS. RIGGS:

18   **Q.**   I would just ask, if I could, if you could turn to the

19   fourth paragraph, the sentence that starts, "In 2018."  If

20   you want to read that silently to yourself.

21           THE WITNESS:  I'm sorry.  I just want to make sure.

22           THE COURT:  Second page, top paragraph.

23           THE WITNESS:  Yes.

24   BY MS. RIGGS:

25   **Q.**   And, Mr. Laurence, do you understand that JetBlue's

1    announcement that it would retire the E190s is in connection

2    with this A220 aircraft order?

3              MR. SCHWED:  Again, objection if she's talking

4    about this announcement in -- trying to interpret this

5    announcement from February 2020.  Obviously, I have no

6    objection to questions about 2018, which is what the

7    paragraph refers to, but --

8              THE COURT:  He can -- I can read it.  It's in

9    evidence.  I know what it says.  But I don't know how he

10   can -- he wasn't --

11             You left in January --

12             THE WITNESS:  Yes, sir.

13             THE COURT:  -- of 2022?

14             THE WITNESS:  Yes, sir.

15             MS. RIGGS:  I can move on, Your Honor.

16             THE COURT:  Unless he -- establish a foundation he

17   knew about it.

18   BY MS. RIGGS:

19   Q.  Turning back to the exhibit on the screen, if we could

20   turn to slide 126, and this -- the heading reads here, "For

21   the next five years, aircraft availability presents a

22   challenge in growing non-NEA focus cities."  Do you see that?

23             MR. SCHWED:  Your Honor, if I may just ask, I see

24   he's still turning pages.

25             So maybe you can just re-ask the question, because

1    you are reading, and you asked --

2              MS. RIGGS:  Sorry.  I followed the screen.  I'm not

3    used to paper.

4              THE WITNESS:  I just want to be able to look at

5    both.

6              Go ahead.

7    BY MS. RIGGS:

8    **Q.**  So this slide, the heading reads, "For the next five

9    years, aircraft availability presents a challenge in growing

10   non-NEA focus cities," correct?

11   **A.**  Yes.

12   **Q.**  And it's comparing peak daily departures in 2019, 2025

13   realistic, and 2025 desired?

14   **A.**  Yes.

15   **Q.**  The only focus city where 2025 realistic and 2025 desired

16   are equal is in New York City?

17   **A.**  Yes.

18   **Q.**  And the bottom bullet or the bottom banner reads, "With

19   current aircraft constraints, fulfilling the NEA vision

20   remains a challenge in Boston, while Los Angeles, South

21   Florida, Orlando, and San Juan all see limited to no growth."

22   Do you see that?

23   **A.**  I do.

24   **Q.**  You can set that aside.

25   **A.**  On this slide, again, what we were trying to convey to

1    the leadership team was an alarm bell that we had a number of

2    opportunities.  And so as we called out each one of those

3    opportunities, our attempt was to ensure that they understood

4    and that we understood as a leadership team that we needed

5    aircraft.

6    Q.  Are you aware of any changes to the JetBlue fleet plan

7    since your leaving JetBlue, other than what is in PX 2000?

8              MR. SCHWED:  Objection.  Foundation.

9              MS. RIGGS:  He works on airline alliances,

10   including the Northeast Alliance.

11             MR. SCHWED:  They don't share overall fleet plans

12   as part of the Northeast Alliance.  I think we've established

13   that.  I'm fine if she asks, I guess, what's been publicly

14   available, but he obviously would not have confidential

15   information.

16             THE COURT:  I assume he doesn't, but he'd be

17   answering as somebody who knows.  It's clear everybody in

18   this industry, understandably, follows what's going on in the

19   industry closely, so if you know.

20             THE WITNESS:  So with the exception of this

21   document that was provided to me, I don't know of other

22   changes.

23   BY MS. RIGGS:

24   Q.  I'd like to switch gears now and talk a little bit about

25   New York.  And first, Mr. Laurence, you're familiar with the

1  term "catchment area"?

2  **A.**  Yes.

3  **Q.**  A catchment area refers to an area that a specific

4  airport draws its customers from?

5  **A.**  Yes.

6  **Q.**  And while you were at JetBlue, you would observe that

7  JetBlue's JFK and Newark flights served different catchment

8  areas, correct?

9  **A.**  They served different catchment areas, and they also had

10 a great deal of overlap.

11 **Q.**  And let me ask you this:  Prior to this litigation today,

12 you were deposed in a litigation involving a slot swap at

13 Newark airport, right?

14 **A.**  Would that be in 2016?

15 **Q.**  Yes.

16 **A.**  Yes.

17 **Q.**  And JetBlue was not a party to that litigation?

18 **A.**  No.

19 **Q.**  You would have testified truthfully under oath in that

20 litigation?

21 **A.**  Yes.

22 **Q.**  And I'd like to turn to your deposition in the Newark

23 slots litigation, which is in the depo transcript binder.

24 **A.**  It's at the back?

25 **Q.**  Yes.

1    **A.**  Okay.

2    **Q.**  And I'll direct your attention to page 27.

3         MR. SCHWED:  Your Honor, I'm not sure the basis of

4    introducing a deposition from a prior case in this matter, or

5    reading that into the record.  It's not an exhibit.

6         MS. RIGGS:  Your Honor, this is a litigation

7    deposition involving market definition and whether Newark is

8    included in the market in New York City, and Mr. Laurence's

9    testimony was refreshed at his recent deposition and I

10   believe is instructive to the market definition issues in our

11   case.

12        THE COURT:  Are you impeaching him, or are you

13   offering it?  Or is this just foundation for something

14   further?

15        MS. RIGGS:  It's foundation.  Unfortunately, I have

16   to get a couple of questions before I get to the recent

17   deposition testimony.

18        THE COURT:  All right.  I'll overrule it for now.

19   Go ahead.

20   BY MS. RIGGS:

21   **Q.**  If I could just turn to page 27, lines 20, to page 28,

22   line 3?

23        THE COURT:  Which one -- oh, I see.  27, line 20,

24   to page 28, line 3?

25        MS. RIGGS:  Correct.

1        MR. WALL:  Your Honor, I just -- I also just want
2    to rise to say I think we have a hearsay objection to this
3    that was previously lodged.  You know, it -- from our
4    perspective, it's a deposition in a case that American has
5    nothing to do with.
6        THE COURT:  Well, she hasn't offered it yet.  I
7    hear what you're saying, that you might have a hearsay
8    objection, but right now, all she's asking him is to look at
9    it.
10        MR. WALL:  It seems to me an awful lot like what
11    counsel was objecting to the other day, except more extreme,
12    just reading the deposition as if it were a question.  But in
13    this case, it's not the deposition from this case.  It's from
14    an entirely different case.
15    BY MS. RIGGS:
16    Q.  Well, Mr. Laurence, you worked at JetBlue at the time of
17    this deposition, correct?
18    A.  Yes.
19    Q.  And you were testifying as an executive of JetBlue at the
20    time?
21    A.  Yes.
22        THE COURT:  What's the question as to the
23    transcript?  I take it you've looked at those couple lines
24    now?  27, line 20, to 28, line 3?
25        THE WITNESS:  Okay.

BY MS. RIGGS:

Q.   And, Mr. Laurence, JetBlue served JFK and Newark because
JetBlue saw a different catchment area in Newark than at JFK,
correct?

A.   As I noted here that there was a different catchment area
based upon, in this case, ZIP code data from customers.  What
I didn't note here, and what I would likely note is, that
there is also a great deal of overlap, for example, in lower
Manhattan.

Q.   And you also testified -- you also understood from your
time at JetBlue that customers that fly from JFK tend to live
east of the Hudson River and customers who fly from Newark
tend to live west of the Hudson River, correct?

A.   Yes.  That was my testimony.

Q.   And while you were at JetBlue, your team had done an
analysis of the catchment areas of the New York City
airports, correct?

A.   Yes, a number of times.

Q.   And you also observed from that catchment analysis and
your time at JetBlue that LaGuardia's catchment operates
similarly to JFK, correct?

A.   I did, although what I would note here, since 2016, some
of the things that had taken place -- I'll give an example --
when we saw for the first time the fares really dropping at
one of the airports -- so, for example, when Spirit entered

1    Newark, and we saw a great deal of competition, we saw fares

2    drop in Newark and customers actually coming from points that

3    weren't traditionally in the Newark catchment, so this

4    happened in sort of 2018.

5              And so the result from the industry was actually to

6    match the very low Newark fares at JFK and LaGuardia, because

7    the catchment for -- the traditional catchment for those

8    airports was drawn in by the lower fares at Newark.  And,

9    again, what we observed was, when the fares would move around

10   the different airports, the customers tended to move and

11   utilize the airports a bit differently than we had seen

12   previously.

13   **Q.**  And understanding that there might be specific examples

14   that differ, my question is if you agree that, in your

15   experience, there's less of an interaction with Newark than

16   there is an interaction between JFK and LaGuardia?

17   **A.**  Yes, I agree with that.

18   **Q.**  You can set that testimony aside.

19             Mr. Laurence, you're familiar with the term

20   "monopoly market," correct?

21   **A.**  Yes.

22   **Q.**  A monopoly market is a market that is only served by one

23   airline?

24   **A.**  So I would lay out a monopoly route, as opposed to

25   monopoly market.  There's a -- it's a bit wonkish, but the

1    example being a market that is served by one airline versus a

2    route, so --

3    **Q.**   Well, let's turn to your June 2022, deposition, please.

4    **A.**   June?

5    **Q.**   2022.  And I would like to turn to page 115.  And I'll

6    read starting at line 20.  Are you there?

7    **A.**   Yes.

8    **Q.**   "QUESTION:  Okay.  Mr. Laurence, are you familiar" --

9            MR. SCHWED:  Can I just object?  Your Honor, I

10   don't understand the basis of just reading in deposition

11   testimony.  Obviously, if this is a prior inconsistent

12   statement --

13           MS. RIGGS:  This is for impeachment.

14           MR. SCHWED:  -- then that's one thing.

15           THE COURT:  I can she's --

16           MR. SCHWED:  But they're regularly reading in

17   deposition testimony, if I may.

18           THE COURT:  I think she's only been reading in

19   deposition testimony to impeach him.

20           MS. RIGGS:  Your Honor, I intend to offer this

21   question if I'm allowed to say it for impeachment purposes.

22           THE COURT:  Go ahead.

23   BY MS. RIGGS:

24   **Q.**       "QUESTION:  Okay.  Mr. Laurence are you familiar

25   with the term 'monopoly market'?

1           "ANSWER:  Yes.

2           "QUESTION:  Okay.  What's" --

3           THE COURT:  What line?

4           MS. RIGGS:  Starting at line 20 on page 115.

5           THE COURT:  Oh, there I am.  Thank you.  Sorry.  Go

6    ahead.

7    BY MS. RIGGS:

8    Q.      "QUESTION:  What's your understanding of what that

9    term means in the context of the airline industry?

10          "ANSWER:  Within the airline industry, I would take

11   that to mean a market that is only served by one airline."

12          MR. SCHWED:  Your Honor, I object to the attempt to

13   use something that's not inconsistent for impeachment.

14          MS. RIGGS:  You know, I move to admit.

15          THE COURT:  Overruled.  Admitted.

16          (Plaintiff Exhibit No. Deposition of Scott

17          Laurence, June 2022, page 115, line 20 to page 116,

18          line 3 admitted into evidence.)

19   BY MS. RIGGS:

20   Q.   And this is page 115, line 20, through page 116, line 3.

21          In this litigation, JetBlue and American have been

22   claiming that Newark is part of the New York market, correct?

23   A.   Yes.  I mean, we've spoken to it as if it were part of

24   the New York market, yes.

25   Q.   And that flights from Newark compete with flights at JFK

1    and LaGuardia?

2    **A.**   Yes.  And I think that, even in the prior deposition, I

3    talked about the use of JetBlue's brand strength across the

4    New York area to attract customers was there.  That was

5    actually in the 2016 deposition right before the question

6    that came up that was my prior response.

7    **Q.**   But in general, you serve flights from New York and

8    flights from LaGuardia or JFK to the same destination because

9    you find that they don't cannibalize from each other,

10   correct?

11   **A.**   That can be true depending on the demand set that's

12   there.  As more capacity comes in, I -- it is possible that

13   you will cannibalize from these markets, particularly between

14   JFK and LaGuardia.

15   **Q.**   And I apologize; I may have misspoke.  I'm asking you

16   whether flights from LaGuardia and JFK tend not to

17   cannibalize from flights at New Jersey Newark airport.

18             THE COURT:  When they're all going to the --

19             MS. RIGGS:  When they're all going to the same

20   destination.

21             THE WITNESS:  So I think the example that I just

22   testified to, it is highly variable and depends on the fares.

23   So the example I cited of Spirit's entry in -- or Spirit's

24   growth when they had the ability to grow in Newark meant that

25   the markets were sort of cannibalizing off of each other,

1    which is why I believe the industry responded by matching

2    Newark fares at JFK and LaGuardia.

3            And given that our market set at JetBlue tended to

4    be more leisure-oriented markets -- I don't tell like to give

5    an answer like "it depends," but it does very much depend on

6    the competitive set and the fares that are involved.  And it

7    is dynamic.  It changes all the time because these airports,

8    while it's not easy to get around New York City, you're

9    talking about airports that are 10 or 12 miles apart.

10   BY MS. RIGGS:

11   Q.  Let's turn in your binder to PX 446, which is in

12   evidence.  And this is a September 27, 2021, submission from

13   JetBlue to the Department of Transportation.  Do you see

14   that?

15   A.  Just give me a second.  446?

16            THE COURT:  Yes.

17   BY MS. RIGGS:

18   Q.  446.

19   A.  Okay.  I'm sorry.  Go ahead.

20   Q.  This is a September 27, 2021, submission from JetBlue to

21   the Department of Transportation, correct?

22   A.  That appears to be the case, yes.

23   Q.  And JetBlue was seeking to receive 16 runway timings at

24   Newark airport?

25            MR. SCHWED:  Your Honor, I may just request that

1    she lay a foundation before questioning this witness on this

2    document, given that he's not the signatory.

3    BY MS. RIGGS:

4    **Q.**   Mr. Laurence, as head of revenue and planning for JetBlue

5    you would have assisted in the project to receive runway

6    timings at Newark airport, correct?

7    **A.**   I would have worked on the project, yes.

8    **Q.**   And this document is a regulatory submission involving

9    JetBlue seeking runway timings at Newark airport?

10   **A.**   It is.  I don't know -- this is not the kind of document

11   that I would have normally -- I may have gotten a copy of it.

12   I probably would not have edited it.  Mr. Land would likely

13   have sent this to me, but it's the kind of thing I would have

14   briefly glanced at unless he called something specific to my

15   attention.

16   **Q.**   Let's just see if you can verify some of the statements

17   that JetBlue is making in -- within this submission within

18   your knowledge as head of revenue and planning.  Okay?

19   **A.**   Uh-huh, yes.

20   **Q.**   JetBlue is making the case that it should receive these

21   runway timings at Newark Airport, right?

22   **A.**   That appears to be the case, yes.

23   **Q.**   And if you look at the bottom paragraph on page 1, under

24   "background," would you agree JetBlue is discussing its

25   expansion at Newark airport from 2016 to 2019?

```
 1              MR. SCHWED:  Again, Your Honor, I just object to
 2    her asking him to interpret this document, given what he's
 3    testified to about his knowledge of it.
 4              MS. RIGGS:  Mr. Laurence --
 5              THE COURT:  Overruled.
 6    BY MS. RIGGS:
 7    Q.  -- as head of revenue and planning, were you involved in
 8    the expansion of Newark airport at JetBlue from 2016 to 2019?
 9    A.  Yes.
10    Q.  And if you turn to page 2 ending in 936 --
11    A.  I'm sorry.
12    Q.  If you turned to page 2 ending in 936 --
13    A.  Yes.
14    Q.  -- in the middle of the top paragraph, there's a sentence
15    that reads, "Fifteen of the 29 new JetBlue destinations were
16    previously monopoly markets that only United served from
17    Newark and which have benefited the most from new, much
18    needed low-fare competition."
19              Do you see that?
20    A.  I do.
21    Q.  And here JetBlue is saying that United routes at Newark
22    were monopoly markets?
23              MR. SCHWED:  Objection.  She's trying to equate
24    this to a very important legal term in this case, and it's
25    being used in a very different context and obviously not an
```

1    antitrust context, and especially with a witness that did not

2    write this document and has no knowledge of it.

3             MS. RIGGS:  I believe his prior testimony is in

4    evidence for the truth of the matter about his understanding.

5             THE COURT:  Overruled.  The equivalency is not

6    necessarily established, but you can ask the questions, of

7    course, and get him to answer them.

8    BY MS. RIGGS:

9    **Q.**   Mr. Laurence, you previously testified as to your

10   understanding of a monopoly market, correct?

11   **A.**   Yes.  Monopoly markets versus monopoly routes.  I think

12   the difference here is that this document appears to me to be

13   advocacy.  You know, it's the concept of advocating for

14   something, so it's highlighting this in the best possible

15   light, I'm assuming.

16   **Q.**   Well, Mr. Laurence, JetBlue would want to be truthful in

17   submissions to regulatory authorities, correct?

18   **A.**   So, again, I think, when advocating, you, I believe, put

19   your best foot forward in terms of the case that can be made.

20   **Q.**   Okay.  So on September 27, 2021, JetBlue's advocacy to

21   the Department of Transportation was that these are routes

22   that United served as monopoly markets from Newark, correct?

23   **A.**   That is what I'm reading, yes.

24   **Q.**   And if we look at footnote 3 down at the bottom of the

25   page, this identifies the 15 routes that United served from

1    Newark prior to JetBlue's entry, right?

2    **A.**  Yes.

3    **Q.**  And JetBlue introduced new, much-needed, low-fare

4    competition on these 15 routes, right?

5    **A.**  Yes.

6    **Q.**  And the routes listed in footnote 3, JetBlue already

7    served some of these routes from JFK or LaGuardia, correct?

8    **A.**  Yes.

9    **Q.**  You can set that aside.

10           I'd like to shift gears to another topic that

11   Mr. Wall touched upon earlier with Mr. Raja, which is a

12   little bit about American's West Coast alliance with Alaska.

13   So if we can turn to PX 500.  This is in evidence with no

14   redactions.  It's in the very back of your binder.  It's not

15   in order.

16   **A.**  I'm sorry.  PX?

17   **Q.**  500.  It's in the very back of the binder.

18           MR. SCHWED:  It's out of order.  It's the very

19   last --

20           THE WITNESS:  I've got it.

21   BY MS. RIGGS:

22   **Q.**  This is an e-mail exchange between you and Reese Davidson

23   on May 28, 2020, with updates about two regulatory matters;

24   is that right?

25   **A.**  Yes.

1    **Q.**  And one of those matters is DOT allowing the

2    Alaska-American alliance to go forward?

3    **A.**  That appears to be the case, yes.

4    **Q.**  And if you look towards the end of Mr. Davidson's

5    original e-mail, he wrote, "There was apparently some

6    emphasis placed on the fact that Alaska only operates to

7    Canada, Mexico, and Costa Rica, and doesn't compete with

8    American in the vast majority of international markets.  I

9    take that to mean that Alaska' placing its code on

10   American-operated international flights doesn't present any

11   competition concerns because Alaska isn't a competitor in

12   those markets.  But that would obviously be different for

13   us."

14           Did I read that correctly?

15   **A.**  Yes.

16   **Q.**  And you understood there that Mr. Davidson meant there's

17   more overlap in American-JetBlue international networks than

18   in American-Alaska international networks, correct?

19   **A.**  I'm not sure what Mr. Davidson meant.  There was some

20   overlap between JetBlue and American, but it was quite

21   limited when compared to JetBlue's overlap with other

22   airlines.

23   **Q.**  Do you agree with the statement that Mr. Davidson wrote?

24   **A.**  I mean, I -- I don't know.  This concept of apparently

25   emphasis placed on Alaska operating things, I don't know

1    where that emphasis came from.  And, again, my take was that

2    JetBlue and American had very limited international overlap

3    in the NEA.  There were a few markets.  Some markets on

4    American operated on weekends, but I did not consider them to

5    be a primary competitor in international routes from New York

6    and Boston.

7    **Q.**  Would it help your memory to refresh your recollection

8    with your June 2021 deposition transcript?

9    **A.**  Sure.

10   **Q.**  Let's turn to that June 2021 transcript, to page 218.

11   **A.**  218?

12   **Q.**  Yes.

13   **A.**  Okay.

14   **Q.**  And I'd like you to read to yourself lines 12 through 22.

15   **A.**  Go ahead.

16   **Q.**  Does that refresh your recollection that you agree that

17   there's more overlap in the American-JetBlue relationship

18   than in the American-Alaska relationship?

19            MR. WALL:  That's a different question, Your Honor.

20   That's a different question than what he addressed before.

21            MR. SCHWED:  And, in fact, I don't believe he said

22   he didn't have a recollection, which is what you need to

23   refresh a recollection.

24            THE COURT:  Well, why don't you just ask about

25   that, and we won't have to worry about what's refreshed or

1   not?  I thought that's what you were asking about before,

2   although he answered about something a little different.  But

3   your issue is about whether there is overlap or not, right?

4           MS. RIGGS:  Your Honor, I believe I just prefer to

5   read the testimony and offer it as a party admission.

6           MR. SCHWED:  Your Honor, I just object to the

7   reading of testimony and offering it as a party admission.

8   There's --

9           THE COURT:  Ask him whether he thinks that there's

10  more overlap between American and JetBlue than American and

11  Alaska.  Isn't that --

12  BY MS. RIGGS:

13  Q.  Mr. Laurence, do you agree that there's more overlap in

14  the American-JetBlue relationship than in American-Alaska

15  relationship?

16          THE COURT:  At that time.

17          THE WITNESS:  Yes, I believe that is the case.

18  Yes.

19          THE COURT:  And that's what you understood

20  Mr. Davidson to be describing there?

21          THE WITNESS:  So I think Mr. Davidson had

22  highlighted there was very limited Alaska-American

23  international cooperation.

24          As I look at the question that's here, it's

25  noted --

```
1              THE COURT:  Not the question.
2              THE WITNESS:  Sorry.
3              THE COURT:  Just asking.
4              THE WITNESS:  So with Mr. Davidson, I -- my take
5     was that he was highlighting there's very limited
6     Alaska-American overlap internationally and that we --
7     JetBlue had more overlap than that.
8              THE COURT:  That's what he means by -- that's what
9     you understood him to mean about "that obviously would be
10    different for us."
11             THE WITNESS:  Yes.  The question that's bouncing
12    around here is the inclusion of JetBlue flying to London.
13             THE COURT:  Oh.  All right.
14             THE WITNESS:  It's just what I'm --
15             THE COURT:  I don't know that.  You could be right.
16             THE WITNESS:  I'm not sure -- as I look at the
17    deposition -- I'm sorry.  If I look at these two things, if I
18    look at this today and I read it, I read it for what's on the
19    page, which is, right, there's Alaska Airlines flying to
20    Canada, Mexico and Costa Rica.
21             I know that JetBlue and American likely had more
22    overlap than that, but it's not something that I considered
23    at the time to be significant.  As I look at that now and
24    think, there were a few markets that overlap, markets like
25    Antigua or a Saturday flight from Boston --
```

1          THE COURT:  You think London was underlying this.

2          THE WITNESS:  London wasn't flying yet.  As I

3   looked at this in May of 2020, late May of 2020, I think that

4   what Mr. Davidson, as I look at, this may have been

5   referencing was the concept that JetBlue and American could

6   be competing in London.  Because Mr. Davidson was likely

7   working on those matters on a regulatory side or with the CMA

8   in the UK.

9          THE COURT:  Okay.  I'm not sure where that leaves

10  you.

11  BY MS. RIGGS:

12  Q.  Let's try setting this aside and taking it down.

13  Mr. Laurence, do you agree there's more overlap in the

14  American-JetBlue domestic flying than there is in the

15  American-Alaska alliance?

16  A.  I think that's likely, yes.

17  Q.  And do you also agree that, under the West Coast

18  alliance, one of the purposes of that alliance is for Alaska

19  domestic passengers to feed American international flights?

20  A.  As the alliance -- as I understand the alliance was

21  envisioned, yes.

22  Q.  And the equivalent of that in the Northeast Alliance

23  would be JetBlue feeding domestic passengers to American

24  international flights, correct?

25  A.  Correct.

1    Q.  And specifically, the international destinations that

2    JetBlue doesn't serve, like Tel-Aviv?

3    A.  So in comparison of American and Alaska, because of

4    COVID, American has very limited international flying in

5    Seattle to work with Alaska Airlines.

6            But through the NEA, American had added -- sort of

7    dramatically added long-haul capacity that JetBlue feeds

8    through JFK.  So markets like Tel-Aviv or Delhi or Santiago,

9    or the transatlantic flying.

10   Q.  And that's one of the benefits of the Northeast Alliance,

11   according to the parties, right?

12   A.  Yes.

13   Q.  Except JetBlue did serve Tel-Aviv, right, via its

14   partnership with El Al Israel Airlines?

15   A.  So JetBlue did have a relationship with El Al that

16   provided service to Tel-Aviv on a connecting basis.

17   Q.  And JetBlue served other international destinations like

18   Dubai and Athens via a partnership with Emirates?

19   A.  Correct.

20   Q.  And overall, before the Northeast Alliance, JetBlue had

21   over a dozen codesharing agreements with various other

22   airlines, right?

23   A.  Yes.

24   Q.  South African Airways?

25   A.  Yes.

1    **Q.**   Japan Airlines?

2    **A.**   Yes.

3    **Q.**   And also Icelandair, Aer Lingus, Azul, Royal Air Maroc,

4    Etihad, Turkish Airlines, Tap Portugal, Singapore Airlines.

5    It's a long list, right?

6    **A.**   It is, but there's not codesharing with each of those

7    carriers.  There's a differential with some cases it's

8    unilateral or bilateral codeshare, where the code rides both

9    airlines, and in some cases, it's unilateral code, and in

10   some cases these are interlying agreements between the

11   airlines.

12   **Q.**   And JetBlue also had domestic codeshare agreements with

13   Cape Air and Hawaiian?

14   **A.**   Yes.  With Cape Air, yes, a code.  With Hawaiian, I don't

15   remember if it was an airline agreement or a codeshare.

16   **Q.**   Specifically, the Hawaiian Airlines codeshare connects

17   JetBlue passengers to Hawaii, right?

18   **A.**   Yes.  JetBlue and Hawaii cooperate.  I just don't

19   remember if it was -- I believe it's codeshare, but it may

20   just be an interline agreement that allows customers to

21   connect between two flight numbers.  I just don't recall if

22   it was an interline or codeshare.

23   **Q.**   So it would be incorrect to assert that JetBlue needs the

24   Northeast Alliance in order to connect passengers to Hawaii?

25   **A.**   I'm sorry, it would be -- you're just -- your phrasing.

1    **Q.**   It would be incorrect to assert that JetBlue needs the

2    Northeast Alliance to connect its passengers to Hawaii?

3    **A.**   So JetBlue had the capability of connecting customers to

4    Hawaii on a limited basis from Hawaiian's gateways in

5    New York, Boston, and Los Angeles.

6    **Q.**   I'd like to turn now and ask a little bit about the early

7    days of Project Reach, which I think you touched upon

8    earlier.

9    **A.**   Yes.

10   **Q.**   And you recall JetBlue's planned expansion to take

11   advantage of opportunities to launch new routes under COVID,

12   right?

13   **A.**   Yes.

14   **Q.**   And specifically, you recall that JetBlue announced 30

15   new routes on June 18, 2020, as part of JetBlue's Project

16   Reach?

17   **A.**   The date sounds correct.

18   **Q.**   And JetBlue announced new routes to and from Newark

19   Airport in June 2020, correct?

20   **A.**   Yes.

21   **Q.**   And I'm not trying to quiz you.  There's an exhibit if it

22   would refresh your recollection --

23   **A.**   It would.

24   **Q.**   -- it's PX640.

25   **A.**   Thank you.

1              Okay.

2    **Q.**  And JetBlue announced new routes to Newark Airport in

3    June -- on June 18, 2020, correct?

4    **A.**  Yes.

5    **Q.**  And JetBlue also announced Mint service on Newark to

6    Los Angeles and Newark to San Francisco?

7    **A.**  Yes.

8    **Q.**  And this JetBlue announcement involved many nonstop

9    routes that competed against American, correct?

10   **A.**  Yes.

11   **Q.**  JetBlue announced these 30 new routes prior to

12   announcement of the Northeast Alliance?

13   **A.**  We made this announcement prior to the signing of the

14   Northeast Alliance, but we announced these in anticipation of

15   the Northeast Alliance, in cases where there was -- the

16   Newark flying was involved.

17   **Q.**  Would you turn in your binder to PX738, and this is in

18   evidence, but has redacted phone numbers.  And, again,

19   plaintiffs -- it's a series of text messages, so plaintiffs

20   have prepared a demonstrative, PX738A, which contains the

21   same redactions but reproduces the text messages in a table.

22   May we --

23              THE COURT:  Yes.

24              MS. RIGGS:  Move to use PX738A?

25              THE COURT:  Yes.

1    BY MS. RIGGS:

2    **Q.**   This is a series of consecutive text messages between you

3    and Michael Quiello, on June 18, 2020?

4    **A.**   Yes.

5    **Q.**   And Mr. Quiello is chief of staff for JetBlue's

6    president, Joanna Geraghty?

7    **A.**   Yes.

8    **Q.**   And these text messages are on June 18th, the same day as

9    JetBlue's new group announcement?

10   **A.**   Yes.

11   **Q.**   And looking at the first text, Mr. Quiello is asking you

12   to look at a slide for him?

13   **A.**   Yes.

14   **Q.**   You made three replies, starting at 2:12 p.m.  You wrote,

15   "I can't touch it today.  Go to Lusso," and then, "Slammed

16   with media and Connie blowback."

17          Do you see that?

18   **A.**   I do.

19   **Q.**   And "Connie blowback" refers to Mr. Raja at American

20   Airlines expressing concerns about JetBlue's new route

21   announcement, correct?

22   **A.**   Well, Mr. Raja expressed concern about the intentions.  I

23   don't think he specifically called out JetBlue's intentions.

24   I don't think he specifically called out the route

25   announcements when we spoke.

1  **Q.**  And you reported that concern up to your bosses,
2  Mr. Hayes and Ms. Geraghty?
3  **A.**  I think I spoke to Mr. Hayes about it.  I can't remember
4  if I spoke to Ms. Geraghty.
5  **Q.**  These routes that JetBlue entered, JetBlue independently
6  planned to enter these routes without consulting with
7  American first, correct?
8  **A.**  That's correct.
9  **Q.**  But now if JetBlue plans to add new routes within the
10 Northeast Alliance, JetBlue would consult with you and
11 American Airlines first, correct?
12 **A.**  The -- within the Northeast Alliance, outside of the
13 carve-out routes, these are things that we would likely have
14 discussed.
15 **Q.**  And you can set that aside.
16         I'd like to turn to PX846.  This document is also
17 already admitted and has agreed-upon redactions and
18 plaintiffs have prepared a demonstrative, which I would move
19 to use?
20         THE COURT:  Yes.
21 BY MS. RIGGS:
22 **Q.**  This is a chain of text messages between you and Warren
23 Christie, on August 30, 2021, right?
24 **A.**  Yes.
25 **Q.**  Mr. Christie was the head of operations at JetBlue at the

1    time?

2    **A.**  Yes.

3    **Q.**  And in terms of the date, August 30, 2021, that's several

4    weeks after JetBlue's first flight to London from JFK?

5    **A.**  Yes.  I think London began at the beginning of August, if

6    I recall, maybe the middle of August.

7    **Q.**  And at a high level, without going into anything redacted

8    as confidential, this text chain is discussing where JetBlue

9    might codeshare with American under the Northeast Alliance,

10   correct?

11   **A.**  It has some -- I think Mr. Christie was asking me about

12   some specific areas of interest for him and his -- some of

13   his internal stakeholders.

14   **Q.**  If you look at the text ending in "126" in the middle of

15   the page, it's sent at 11:56 a.m., you wrote, "I request

16   suspect Robin will walk from our transatlantic before walking

17   from code on AA transatlantic."

18            "Robin" there refers to JetBlue's CEO, Robin Hayes?

19   **A.**  Yes.

20   **Q.**  And you thought Mr. Hayes felt strongly enough about the

21   ability for JetBlue to codeshare on American's transatlantic

22   flights that he might abandon JetBlue's own transatlantic

23   flights to do so?

24   **A.**  I wasn't sure.  I was actually telling Mr. Christie that

25   I wanted him to back off of this.  It was important to me and

1    that I was willing to go to Robin, and I was expressing my

2    opinion of what I thought would transpire in that discussion.

3    So it was very much a text message that was my respectful way

4    of telling Mr. Christie that I thought he was treading in the

5    wrong area.

6    **Q.**  That's what you wrote?

7    **A.**  Well, that is what I communicated.

8    **Q.**  Okay.  After -- and we can take that down.

9         After JetBlue entered the Northeast Alliance, did

10   there come a time when you understood Mr. Hayes had concerns

11   about American taking advantage of JetBlue?

12   **A.**  I think Mr. Hayes had a healthy paranoia of pretty much

13   everything that we worked on.

14   **Q.**  And you understood Mr. Hayes felt American could take

15   advantage of JetBlue as the NEA evolves?

16   **A.**  I think Mr. Hayes had expressed to me that American had,

17   in his view, nearly unlimited resources, and he felt that our

18   resources were more limited and probably less experienced

19   than's American's.  So he consistently asked me to stay in

20   the details of exchanges with American.  And that led to a

21   number of conversations between us where I would highlight

22   that our interests tend to be aligned with American, and he

23   would very rightfully ask me to ensure that I understood

24   every detail.

25   **Q.**  And let's turn to PX844 in your binder.  This is a

1    March 10, 2021, text message chain between you and a

2    third-party consultant?

3    **A.**   Yes.

4    **Q.**   And you were text messaging this third party in

5    connection with your job responsibilities at JetBlue,

6    correct?

7    **A.**   Yes.

8    **Q.**   You were conveying what you understood Mr. Hayes's

9    position to be on the Northeast Alliance at the time?

10   **A.**   No.

11             MS. RIGGS:  Your Honor, I move to admit PX844 into

12   evidence.

13             MR. SCHWED:  No objection, other than to the

14   third-party statements.  But for any statement by

15   Mr. Laurence, we have no objection.

16             THE WITNESS:  Can I -- if it's possible to -- I'm

17   sorry, is there a question come.

18             THE COURT:  There's no question at the moment.

19             THE WITNESS:  Okay.

20             THE COURT:  That's the hard part about your spot.

21   You don't get to speak unless someone asks you a questions.

22             MS. RIGGS:  For the record --

23             THE WITNESS:  I'll live, Your Honor.

24             THE COURT:  Yeah, so --

25             MS. RIGGS:  For the record, Your Honor, with that

1   limitation, we have no --

2           THE COURT:  Fine.  I'll admit 844 and 844A, but the

3   comments of the third party are not admitted for the truth of

4   the matter asserted.

5           (Plaintiffs' Exhibit No. 844 and 844A admitted into

6           evidence.)

7           MS. RIGGS:  Thank you, Your Honor.

8           THE COURT:  Okay.  Go ahead.

9           MS. RIGGS:  And if we could have it published.  We

10  have a demonstrative for this, as well.

11          THE COURT:  Yes, that's fine.

12  BY MS. RIGGS:

13  **Q.**  I'd like to direct your attention to the text message.

14  The Bates number ends in 400.  You wrote, "I think NEA is

15  dead, as Robin isn't supportive."  Do you see that?

16  **A.**  I do.

17          MR. SCHWED:  Can you just pull this off the screen

18  for one second.  Just there's a phone number at the top.

19  Maybe if you just don't -- I realized it looks like there's

20  some phone numbers.

21          MS. RIGGS:  Missing a redaction.

22          MR. WALL:  A personal cell phone that we prefer not

23  display.  If you can it in a way that does not display the

24  phone numbers that are right at the top, I have no objection.

25          THE COURT:  There you go.

1    BY MS. RIGGS:

2    **Q.**  And I believe you already answered my question.  I would

3    like to move to the reply, your further reply, ending in 407,

4    where you wrote, "My take on the discussion, he doesn't feel

5    we're in a spot American can take advantage of us, but that

6    could change as the deal evolves."  Do you see that?

7    **A.**  I do.

8    **Q.**  And you were saying there, Mr. Hayes is not supportive of

9    the NEA because the deal could evolve to a point where

10   American can take advantage of JetBlue, correct?

11   **A.**  So I think it's important to set some context.

12            THE COURT:  Hold on.  What's ZBS.

13            THE WITNESS:  So that's the context I was intending

14   to set, Your Honor.

15            THE COURT:  All right.

16            THE WITNESS:  So this exchange in March of 2021 was

17   from outside -- outside business partners from Boston

18   Consulting Group.  They were questioning two potential

19   engagements.  One of them was ZBS, which had to do with a

20   sort of scheduling technology where we enhanced aircraft

21   scheduling process, had nothing to do with the NEA.

22            The second was that they were pitching to us a

23   project, an engagement on the NEA where they would, in

24   effect, audit our work.  And so when I said that NEA is dead

25   to them, what I meant was the concept of the NEA project.  So

1  I had gone to Mr. Hayes.  I had told him there was a proposal

2  from the consulting group to audit some of our work.  I

3  actually thought it made sense to have somebody else take a

4  look at what we've done.

5          Mr. Hayes objected to that because it was expensive

6  and he thought we would have time if things didn't go forward

7  in the world of continually sort of looking at this and being

8  in the details, I don't think he was eager -- he was eager

9  for me to take that responsibility and not outsource that

10  work to a management consulting team.

11  BY MS. RIGGS:

12  **Q.**  And you wrote, "He doesn't feel we're in a spot where

13  American can take advantage of us, but that could change as

14  the deal evolves."  Correct?

15  **A.**  I did write that.

16          MS. RIGGS:  And we can set this aside.

17  BY MS. RIGGS:

18  **Q.**  So after this text exchange, JetBlue went on in 2021 to

19  accrue a large transfer payment to American under the MGIA of

20  over $1 million, correct?

21  **A.**  So because of the way that the transfer payment worked

22  and as we moved through COVID and American was adding

23  capacity in the NEA more quickly than JetBlue, it drove out a

24  very large potential transfer payment based on the formula.

25  **Q.**  So the answer to my question is yes?

1    **A.**   Yes, but we were kind of working in COVID at all times,
2    which is why we made an adjustment.
3    **Q.**   And then after that adjustment, you left JetBlue?
4    **A.**   So -- and, again, you have to help me with the timing.  I
5    did work through the first transfer payment discussion.  I
6    believe as I was leaving, there was a second discussion about
7    transfer payment that went into the second part of December,
8    and then I did leave JetBlue.
9    **Q.**   And then after you left JetBlue, you are aware that
10   JetBlue took down a bunch of capacity in spring 2022?
11   **A.**   Yes.
12   **Q.**   And in second quarter 2022, JetBlue publicly announced
13   record revenues?
14   **A.**   Yes.
15   **Q.**   But it --
16   **A.**   I believe so, yes.
17   **Q.**   But it still didn't turn a profit because its costs were
18   so high?
19   **A.**   So JetBlue's costs were driven out by the fact they
20   couldn't operate the entire fleet, and so without the ability
21   to grow, lacking resources, I believe that that led to a
22   dramatic increase in unit costs that led to a loss even on
23   record revenue.
24            MS. RIGGS:  Pass the witness, Your Honor.
25            THE COURT:  All right.  Cross-examination.

```
 1              MR. SCHWED:  Yes, Your Honor.  Just give me one
 2     second to --
 3              THE COURT:  Sure.
 4              MR. SCHWED:  -- hand out the binders.
 5              THE COURT:  While you're getting ready, just one
 6     follow-up question I have, I'm wondering about.  This sort of
 7     comes up at different times, about the transfer payment.
 8              THE WITNESS:  Yes.
 9              THE COURT:  And I understand that the first payment
10     was due in the course of the all the events in COVID and the
11     like, but the contract seems to say that payment obligations
12     aren't subject to the force majeure clause, if I read it
13     right.
14              THE WITNESS:  I believe that's the case, sir.
15              THE COURT:  So then -- and when the contract was
16     signed, it was during COVID, right?
17              THE WITNESS:  Yes.
18              THE COURT:  So then -- so then it's just -- I'm
19     wondering -- it's just a contractual obligation to pay north
20     of a hundred million dollars.
21              THE WITNESS:  Yes.  I think the thinking amongst
22     the parties was that this was a long-term agreement and that
23     the unintended consequence of COVID, of American adding a
24     great deal of long-haul capacity into JFK that didn't perform
25     as well as I think we would have expected, at JetBlue at
```

```
 1   least, if you sort of think about the recovery, the recovery
 2   was Florida and leisure first.  Long-haul international were
 3   places where you oftentimes, we'd either have COVID shutdowns
 4   or tests or things like that involved.
 5           And so as the parties looked at this, I think we
 6   both saw this as a long-term agreement and one where we
 7   wouldn't want to, at least from my perspective at JetBlue,
 8   sour things with the first payment or two, because there was
 9   a long period of time where we could jointly compete, but it
10   is a -- I mean, it was a hotly contested discussion and it
11   was a negotiation.  But there was no contractual fallback to
12   point at something and say I need relief from this.  It was a
13   literal ask for relief and I think a recognition on
14   American --
15           THE COURT:  That you want the deal to work
16   long-term.
17           THE WITNESS:  Yes.
18           THE COURT:  You need to make an adjustment here
19   because it arose out of COVID, even though the contract
20   excluded payments from the force majeure.
21           THE WITNESS:  Yes, and I think the other piece was
22   we were in COVID when we signed the agreement, but the
23   recovery was so much sort of a nonlinear.  We would think we
24   were on the road to recovery and then we would hit a variant
25   or something else would come up, and so every time we thought
```

1    we were recovering we would fall down a month later.

2              And so I think part of this was, even signing

3    during COVID, we think it was sort of how we envision travel

4    in COVID in July of 2020 versus how we saw it in July of

5    2021.

6              THE COURT:  June 2020, right?

7              THE WITNESS:  July of 2020 -- or it is June.

8    You're right.  I'm sorry.

9              THE COURT:  I think it's June.

10             THE WITNESS:  Sorry, sir.

11             THE COURT:  That's okay.

12             THE WITNESS:  Anyway, the change between June of

13   2020 and June of 2021 was massive in terms of the markets

14   that were recovering.  International came back more quickly

15   after June of 2021 and then even faster in 2022 when things

16   like testing requirements went away.

17             THE COURT:  All right.

18             THE WITNESS:  So it was just such a --

19             THE COURT:  I understand.

20             THE WITNESS:  We were all along for the ride.

21             THE COURT:  Okay.  Thanks.

22             Go ahead.

23             **CROSS-EXAMINATION BY COUNSEL FOR JETBLUE**

24   BY MR. SCHWED:

25   **Q.**  Mr. Laurence, I just want to briefly touch on your

1    background and departure from JetBlue.  I know you covered

2    that before, so I'm not going to go over it, but just, when

3    you decided to leave JetBlue, did you have a plan to go to

4    American Airlines?

5    **A.**   No.

6    **Q.**   Did you plan to stay at Delta?

7    **A.**   Yes.

8    **Q.**   Why did you leave Delta?

9    **A.**   I arrived at Delta, and the combination of the job not --

10   and the environment not being what I expected and some family

11   issues with a move to Atlanta, I think, were troublesome.

12   And at that point, American has made it clear that there was

13   an opportunity where I thought I would fit better, and I

14   hadn't moved my family yet.

15   **Q.**   Okay.

16          MR. SCHWED:  If you could, Andy, call up the

17   redacted version of 285B.

18          And just -- I'm going to move to admit into

19   evidence 284 and 285B, which I believe there was no -- there

20   was an objection.  We've resolved it.  No current objection,

21   correct?

22          MS. RIGGS:  That's correct.

23          THE COURT:  All right.  Admitted.

24          (Defendants' Exhibit No. 284 and 285B admitted into

25          evidence.)

1    BY MR. SCHWED:

2    **Q.**  Can you describe what this document is?

3    **A.**  It's a quarterly network review document that my team

4    would have presented to the senior leadership team.

5    **Q.**  And would it have been presented on or about the date of

6    January 29, 2019?

7    **A.**  Yes.

8    **Q.**  And who prepared it?

9    **A.**  It would have been prepared by the network planning team

10   led by Andrea Lusso under my review.

11   **Q.**  And did you, in fact, review this?

12   **A.**  Yes.

13   **Q.**  Can you turn to slide 28, please.  And this is --

14   **A.**  Hang on.  Let me get to --

15   **Q.**  You're going to have to open it in your book because it's

16   largely redacted.

17   **A.**  Okay.

18   **Q.**  And the reason it's redacted is because of the names of

19   some of the opportunities, so I'd like you to answer these

20   questions without identifying anything by name.

21   **A.**  Okay.

22   **Q.**  We can talk about category or something like that, but

23   just please just don't name a specific route.

24          Can you just describe for the Court what this slide

25   is showing?

**A.**   Sure.  It is a map that lays out growth potential for
profitable markets flying from JFK going forward.

**Q.**   And the bottom banner, which is not redacted, says, "Our
opportunities exceed our current ability to grow at JFK."  Do
you see that?

**A.**   I do, yes.

**Q.**   What were you trying to convey with that?

**A.**   That we lacked the slot opportunities to be able to grow
to the markets that were noted on the page, both in terms of
new markets and increased frequency.

**Q.**   Would JetBlue have been able to add flights to all of the
markets listed on the page?

**A.**   Not at the time of -- that package was published.

**Q.**   Why not?

**A.**   Some of the markets there require long-range aircraft,
and the opportunities there require those planes.  And so we
had the potential to grow into those markets, but none of
those aircraft yet.

**Q.**   And when you say long-haul aircraft, is that what's often
referred to as "long-haul markets"?

**A.**   Yes.  It would be aircraft that we operated with an A321
long range.

**Q.**   And at the time, did JetBlue actually own any of those
aircrafts?

**A.**   No.

1    **Q.**  And that would cover -- again, just without naming

2    cities, but just geographically, say by continent, where

3    would that cover that JetBlue was not able to fly at that

4    time?

5    **A.**  Europe.

6    **Q.**  Okay.  And how about within South America?

7    **A.**  With the exception of flights from New York into points

8    in South America, the incumbent fleet could fly most of that,

9    but the northern tier of South America was within reach of

10   JetBlue's incumbent fleet.

11   **Q.**  From New York?

12   **A.**  From New York, again, on a limited basis.  I think the

13   extreme northern tier of South America.

14            THE COURT:  Not Buenos Aires?

15            THE WITNESS:  No, sir.

16   BY MR. SCHWED:

17   **Q.**  Just to be clear, New York-Buenos Aires would be

18   long-haul?

19   **A.**  Indeed, yes.

20   **Q.**  And if you flip to the next slide, slide 29 --

21   **A.**  Yes.

22   **Q.**  -- and can you explain that the top line says, "Slot

23   constraints limit our ability to grow JFK."  What does that

24   mean?

25   **A.**  So this was a partner slide to the previous slide that

1     had the map of opportunities.  And what we were trying to

2     convey was that we did not have -- while there were slots

3     opened at certain times of the day, we did not have the

4     capability of doing sustained growth in a number of the

5     markets that we had listed because of our lack of slot

6     portfolio.

7     **Q.**  Can you describe what the bar chart is trying to show,

8     how it works?

9     **A.**  Sure.  So on the horizontal axis, what we have done is

10    sort of graphed out times of the day -- in this case, in

11    two-hour increments instead of the slotted one-hour

12    increment, just for the ease of presentation.

13              And then the vertical axis are the number of slots

14    or arrivals or departures within that time increment where,

15    if we're below the line, we have an underage of slots and are

16    unable to add, and if we're above the line, we would have the

17    capability of adding flights during that period.

18              THE COURT:  I'm sorry; say -- if you're above the

19    line, you can add the slots?

20              THE WITNESS:  You can add the flights.

21              THE COURT:  Because there's availability at JFK?

22              THE WITNESS:  Yes, sir.

23              THE COURT:  You could get additional --

24              THE WITNESS:  You could get slots at certain times

25    of the day at JFK from the FAA.

1          THE COURT:  And if you're below, you can't?

2          THE WITNESS:  That's correct.  Or within our

3    portfolio.  So this was our plan, but our plan, if you sort

4    of look -- you know, there are a number of cases where

5    between 10:00 and noon, there's an underage; but between noon

6    and two o'clock, there's an overage.  Those are the types of

7    things that we can work out because the bars are a similar

8    height.  Or similar size.  Excuse me.

9    BY MR. SCHWED:

10   Q.  So in other words, you can shift from one to the other?

11   A.  You can shift or make subtle adjustments to be able to

12   utilize the slide portfolio.

13   Q.  And just for what seasons are this or season or seasons

14   is this trying to show?

15   A.  So at the time we were working this, which I think was

16   early in the year, we were looking at our plan for the summer

17   peak, so I think July.

18   Q.  Of what year?

19   A.  July of --

20   Q.  I'll represent that it was -- the date on the front is

21   January 29, 2019.

22   A.  Okay.  So this would have been July of 2020.  And this

23   was constructed, I believe, pre-COVID.

24   Q.  Is this bar graph showing the situation assuming there

25   was the growth shown on the prior page or without the growth?

1    **A.**   Without the growth.

2    **Q.**   And can you explain what the orange bar represents?  All

3    the way on the left-hand side, there's an orange bar.

4    **A.**   Sure.  So what we had done and we had noted on the page

5    was that we had, in order to make our schedule operable, we

6    had already moved flights from the six to eight o'clock hour

7    into the pre-six o'clock hour because the airports is

8    unslotted during that period of time.

9              And so we turned that orange and showed it as a

10   negative, because we were taking flights and moving them to a

11   commercially less desirable time in order to make the

12   schedule operable.

13   **Q.**   And can you just explain what you mean by the airport not

14   being slotted at that time?

15   **A.**   Sure.  So between 11 p.m. and 6 a.m., there's not a lot

16   of demand for the slots.  And if you think of JFK Airport

17   being able to operate 81 operations per hour, in those

18   periods of time, there's not demand, so there's not slots

19   associated with those hours.

20   **Q.**   And I believe you had referred to the flying in that

21   period as less desirable or less commercially desirable.  Can

22   you explain that?

23   **A.**   Yes, it's the concept, if you were flying to Orlando,

24   your desired departure time was 7:30 in the morning, we would

25   operate that flight at 5:30 in the morning because we needed

1    to get the flight out before the slotted period.

2              And so the concept would be for customers who were

3    already getting up early, it's getting up really early, and

4    in a lot of cases, the leisure destinations with kids and

5    you've got customers setting their alarm before three o'clock

6    in the morning.

7    **Q.**   And then you've referenced, say, a 7:30 flight.  Can you

8    just explain what the bar that says "600 to 759" represents?

9    **A.**   So what that laid out was an underage versus our plan for

10   the period between six o'clock and 7:59.  So if nothing else

11   changed between when we created the chart and when we flew

12   the airline, we would have to move those other -- it looks

13   like three or four other flights -- into the pre-six o'clock

14   our or into the later hour at -- between 8:00 and 9:59.

15   **Q.**   So just so I understand, was that underage in addition to

16   or apart of the orange bar that was already scheduled there?

17   **A.**   So it would be in addition to the orange bar.

18   **Q.**   And then can you -- you see on the right side there

19   there's a red circle?

20   **A.**   Yes.

21   **Q.**   Can you -- or maybe an oval is a better word.  Can you

22   tell me what that signifies?

23   **A.**   Yes.  So JFK has a traditional peak during the afternoon

24   hours between about 2:00 and 8 p.m. that's centered around

25   when transatlantic flights both arrive and depart and the

1   flights that connect to them arrive and depart.  And so the

2   demand for slots during that period has consistently exceeded

3   supply for as long as I've been in the industry.

4   **Q.**  And why were you highlighting it here?

5   **A.**  It's highlighted because JetBlue's slot portfolio during

6   that period of time was extremely limited, and that time was

7   critical for us because we needed the ability to either

8   arrive or depart aircraft during that period of time in order

9   to utilize them throughout the day.

10  **Q.**  And had JetBlue tried to get slots during that time

11  period?

12  **A.**  We consistently made attempts to getting -- to get slots

13  during that time period.

14  **Q.**  And, again, does this -- is this saying a shortage, based

15  on what you're planning to fly or hoping to fly?

16  **A.**  So this was a shortage on, again, what we sort of already

17  had.  So this is what we were planning to fly, and we knew we

18  had a shortage.  The prior slide actually would have -- was

19  inoperable, which is what we noted, because we lacked slots

20  during the key parts of the day.

21  **Q.**  And did you not -- do you, to your knowledge -- do you

22  know how JetBlue's slot holdings during -- I think you

23  referred to it as the peak afternoon period -- compared to

24  American's?

25  **A.**  They are significantly less robust than American's.

1    JetBlue has a -- sort of a small holding in the afternoon.

2    An example would be in mornings when there are slots that are

3    there.  JetBlue operates a large peak in the morning with

4    departures both ends of the check-in lobby are open.  In the

5    afternoon, the departures are so limited that half of the

6    check-in lobbies actually shut down.

7    **Q.**   Half of JetBlue's?

8    **A.**   Half of JetBlue's check-in lobbies shut down.  Meanwhile,

9    American has a peak in the afternoon and traditionally has

10   held slots in peak in the afternoon associated with their

11   transatlantic and long-haul flying.

12   **Q.**   How would it compare to Delta, for example?

13   **A.**   So Delta, again, has a very large peak in the afternoon,

14   has a lot of slot holdings during that period of time to

15   support their long-haul operations.

16   **Q.**   Now, this page only talks about JFK airport.  What was

17   the slots situation at LaGuardia airport at this time?

18   **A.**   So at LaGuardia, there was no availability.  We

19   occasionally would work our way into something that operated

20   late at night or early in the morning, but there's no sort of

21   going to the FAA and saying, "I want to add a flight at a

22   specific time."  It was fully subscribed.

23   **Q.**   Now, how -- during the period of time leading up to the

24   Northeast Alliance, was JetBlue trying to get slots at JFK

25   and LaGuardia?

1    **A.**   Yes.

2    **Q.**   How?  Can you describe the effort?

3    **A.**   So first and foremost, we had a standing order with our

4    schedule planning team to be contacting other airlines and

5    simply asking if they had slots available or if they're

6    willing to work agreements or trades or sort of otherwise to

7    gain JetBlue access to slots.

8            We also participated whenever we thought there was

9    the potential for an airline either selling slots or working

10   through -- excuse me -- any issue where there might be an

11   opportunity to acquire slots, particularly in the afternoon.

12   **Q.**   If you can turn in your binder to DX 426, which we will

13   not put on the screen because anything at all relevant is

14   entirely sealed on this.  Let me know when you have it.

15   **A.**   I have it.

16   **Q.**   Can you identify -- I would say just, without

17   identifying -- withdraw that.  Without identifying the name

18   of the company, just identify generally what this document

19   is.

20   **A.**   Sure.  It was a description of a potential slot

21   acquisition at Heathrow Airport involving --

22   **Q.**   Without mentioning the name.

23   **A.**   Yeah, another airline.

24   **Q.**   Just -- that's enough.

25   **A.**   Another airline.

1   **Q.**  And the date is March 2021?  Is that an accurate date?

2   **A.**  Yes.

3   **Q.**  And who prepared this document?

4   **A.**  My team prepared the document.

5   **Q.**  And did you review it?

6   **A.**  Yes.

7   **Q.**  Can you turn to slide 11?  And let me know when you're

8   there.

9   **A.**  Yes.

10  **Q.**  And, again --

11          THE COURT:  What's the number on the bottom right?

12          MR. SCHWED:  The number on the bottom right ends in

13  6110.

14          Oh, there are two different numbers.  And there's

15  also -- our defendants' exhibits say DX-426, which is the

16  exhibit number, and then --

17          THE COURT:  Got it.

18  BY MR. SCHWED:

19  **Q.**  Can you describe -- again, don't -- this also is sealed.

20  Don't identify the names of any parties or airports, but just

21  can you broadly describe what slide 11 of this exhibit shows?

22  **A.**  Yes.  It is a ten-year history of JetBlue's both

23  successful and unsuccessful slot transactions.

24  **Q.**  What does the red text represent?

25  **A.**  The red text represents an unsuccessful attempt at a slot

1   acquisition.

2   **Q.**   And the blue text?

3   **A.**   A successful slot acquisition.

4   **Q.**   And I want to direct your attention to the last line on

5   the chart.  Without discussing the terms of the proposed

6   acquisition, can you describe why that was not -- it's listed

7   as unsuccessful -- why it was not successful?

8   **A.**   It was not successful because we had presented the

9   potential transaction to the Department of Justice antitrust

10  division, and they reacted in a way that made it clear that

11  they were not supportive of this transaction.

12  **Q.**   Did JetBlue make other attempts to obtain LaGuardia or

13  JFK slots that were not listed on this page?

14  **A.**   Yes.  Again, the standing order that we had where we

15  would talk to other airlines and ask them if they had any

16  interest on a regular basis of working in terms of slot

17  transactions with us or even if we were covering slots.  We

18  would make it clear that we were in the market for New York

19  slots whenever possible.

20  **Q.**   And just broadly speaking, how did that go?

21  **A.**   It went poorly.  I would have printed on a T-shirt that I

22  was looking for JFK slots so people would see it, and the

23  answers were roundly no every time.  I don't think our

24  competitors were interested in seeing us gain more access.

25  **Q.**   Besides acquiring more slots, did JetBlue try any other

1    ways to grow capacity at JFK and LaGuardia?

2    **A.**   We did.   Again, at JFK, we would add flying during what I

3    would describe as commercially challenged times, either

4    leaving very early in the morning -- think of a flight that

5    departs at five o'clock instead of six o'clock or

6    seven o'clock to a leisure destination.

7            We would fly late at night, so imagine a flight

8    from New York to Los Angeles that leaves at 10:30 p.m. and

9    arrives at two o'clock in the morning.   These are things we

10   would try because we were so eager to grow, but it takes a

11   lot to convince a customer that that's a time they want to

12   fly.

13          The other thing we had done was very aggressively

14   deployed our newer and larger aircraft into the New York

15   airports.   So when we took delivery of an A321 that had 200

16   seats, it almost always went to New York and replaced either

17   160-seat or 100-seat airplane or 162 or 100-seat airplane.

18   **Q.**   And is that latter practice sometimes referred to as

19   "upgauging"?

20   **A.**   Yes.

21   **Q.**   Did JetBlue's flying at unconventional times and

22   upgauging satisfy its need for slots?

23   **A.**   No.

24   **Q.**   Was it close?

25   **A.**   No.

1    **Q.**  Now, I'd like to direct your attention -- it's in the

2    binder that plaintiffs handed you before, and it's an exhibit

3    that you were shown -- Plaintiffs' Exhibit 507.  Do you

4    remember being shown this exhibit before?

5    **A.**  I do.

6    **Q.**  And this was -- this had to do with potential -- a

7    potential slot lease from American Airlines in early 2020?

8    **A.**  Yes.  Yes.

9    **Q.**  In case anyone was sleeping in the audience.

10            And what -- just -- what airport were the slots

11    that were being discussed at?

12   **A.**  At JFK.

13   **Q.**  Were there any slots for LaGuardia under discussion?

14   **A.**  No.

15   **Q.**  How long was American looking to lease these slots to

16   JetBlue?

17   **A.**  I mean, it was temporary.  We had talked about a season,

18   two seasons, something like that.  But we did not have a

19   confirmation that these would be any kind of a permanent

20   move.

21   **Q.**  And just -- can you just describe to the Court what a

22   season means in the airline industry.

23   **A.**  Sure.  The airline -- well, this is sort of broken up

24   into summer and winter season.  They're approximately six

25   months each.

1    **Q.**   So two seasons is one year?

2    **A.**   Yes.

3    **Q.**   Did JetBlue view these slot leases as an alternative to

4    the NEA?

5    **A.**   No.

6    **Q.**   Why not?

7    **A.**   Well, they were temporary and transitory in nature.  And

8    so they created the need to go out to other parts of the

9    network and source aircraft and resources for New York from

10   other points.

11         Because they were temporary and relatively short

12   term, a year, it was very difficult to go and then make an

13   argument as to why we needed to acquire more aircraft for

14   these slots, because it would take a certain period of time

15   to acquire the aircraft.

16         The other part of that is the aircraft are 25-year

17   assets.  So you think of something that lists for $100 or

18   $150 million, and I've got a good use for it for a year.

19   It's not a particular compelling argument to a CFO or a

20   treasurer.

21   **Q.**   Did these slots come with anything, any other elements of

22   the Northeast Alliance, other than the slots themselves?

23   **A.**   I'm sorry?

24   **Q.**   In other words, if you were -- the lease that you were

25   contemplating with American, did it have any other aspects of

1    the Northeast Alliance that we've heard a lot about, other

2    than -- or is it a straight slot lease?

3    **A.**   It's a straight slot lease.

4    **Q.**   And in the document that's in front of you, you were

5    asked about this line.  You said, "I am also confident that

6    American isn't going to want them back from us once we are

7    flying them. " Do you see that?

8    **A.**   I do.

9    **Q.**   So why didn't that confidence address the situation you

10   were just describing in your prior answer about, you know,

11   needing some sense of permanence?

12   **A.**   Well, my confidence for 27 slots and, therefore, the 10

13   or 12 aircraft you would need to operate those was probably

14   not sufficient to make the investment in aircraft

15   acquisitions to make a necessary case.

16   **Q.**   And when you say you were confident they would not want

17   them back, what did you mean by that?

18   **A.**   So I was confident as we were working through the NEA

19   that -- well, it was a step closer in terms of what we were

20   doing to negotiate.

21          It also was likely that we would begin flying

22   these -- these slots and that we would be able to make them

23   work and that American was in somewhat of a steady downfall

24   or a downward movement in New York and that they, you know --

25   if at some point they would utilize those slots, it would be

1    very difficult for them to do so without what became the NEA

2    with our feed, with our flights feeding their flights.

3    **Q.**   If American did not want the slots back, say, in a year,

4    would they have had alternatives other than continuing to

5    lease them to JetBlue?

6    **A.**   Yes.

7    **Q.**   What types of alternatives?

8    **A.**   Well, I was very confident there were other airlines that

9    wanted those slots.  American could have attempted to operate

10   them themselves.  And then I think there were a number of

11   parties who had extremely deep pockets, I think, in the prior

12   document, where we tended to be unsuccessful in acquiring

13   slots.  We were bidding against larger airlines who could

14   justify much larger bids on the slots.

15   **Q.**   Did anybody at American ever tell you that American would

16   not want those slots back --

17   **A.**   No.  Sorry.

18   **Q.**   -- at the end of say a one-year or two-year lease?

19   **A.**   No.

20   **Q.**   Now, did the Northeast Alliance address any of the

21   LaGuardia and JFK slot problems you have just been

22   discussing?

23   **A.**   Yes.

24   **Q.**   In what way?

25   **A.**   It enabled all of the JetBlue growth at LaGuardia from

1    about 15 to 55 flights at LaGuardia.  So our ability to grow

2    and gain real traction had a real presence at LaGuardia.  It

3    allowed us to grow at JFK, but more importantly be able to

4    grow at the critical times of the day, particularly utilizing

5    afternoon slots.

6    **Q.**  And did the -- focusing on JFK, did the Northeast

7    Alliance provide access to slots during that period you would

8    refer to as the peak period that you circled in red?

9    **A.**  Yes.

10   **Q.**  And --

11              THE COURT:  I'm going to stop you there.

12              MR. SCHWED:  Yeah.

13              THE COURT:  Unless you're --

14              MR. SCHWED:  I have one more question for him.

15   BY MR. SCHWED:

16   **Q.**  At the of entering the NEA, did JetBlue have any, like,

17   immediately immediate potential for LaGuardia slots, other

18   than the NEA?

19   **A.**  No.

20              MR. SCHWED:  Now is a good time to stop.  Thank

21   you, Your Honor.

22              THE COURT:  All right.  Just one clarifying

23   question about -- what is the date of the NEA signed?  I know

24   we've gone back and forth.

25              MR. SCHWED:  It is July, Your Honor.

1           THE COURT:  It is July.

2           MR. SCHWED:  Yes.

3           THE COURT:  Because I was looking here and I think

4   the copy I have here says July 27th or 31st.  So that's when

5   it was signed.  But there's a discussion about its public

6   announcement in June.

7           MR. SCHWED:  I believe it was publicly announced in

8   July, Your Honor.  It's in the very first --

9           MR. WALL:  So July 15th is actually the date that

10  it was signed.  And I think it was announced on July 16th, if

11  I'm --

12          MS. RIGGS:  There's no disagreement.

13          THE COURT:  Okay.  Great.  Thank you.  You're

14  right.

15          All right.  Have a good day.  We're adjourned.

16  We'll see you tomorrow.

17              (Court in recess at 4:33 p.m.)

18

19

20

21

22

23

24

25

1

2                    **C E R T I F I C A T I O N**

3

4          I certify that the foregoing is a correct

5     transcript of the record of proceedings in the above-entitled

6     matter to the best of my skill and ability.

7

8

9

10    /s/ Rachel M. Lopez                October 3, 2022

11    /s/ Robert W. Paschal

12

13

14    _____          _____

15    Rachel M. Lopez, CRR             Date

16    Robert W. Paschal, RMR, CRR

17    Official Court Reporters

18

19

20

21

22

23

24

25