1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3

4    _____

5    UNITED STATES OF AMERICA, et al.

6          Plaintiffs,                    Civil Action No.
                                          1:21-cv-11558-LTS
7       v.

8    AMERICAN AIRLINES GROUP, INC.,
     et al.,
9
          Defendants.
10
11   _____

12      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                      BENCH TRIAL
                          Day 6
15

16
                   Tuesday, October 4, 2022
17                       8:30 a.m.

18

19

20
     John J. Moakley United States Courthouse
21   Courtroom 13
     One Courthouse Way
22   Boston, Massachusetts

23
     Rachel M. Lopez, CRR
24   Official Court Reporter
     raeufp@gmail.com
25

```
 1                   A P P E A R A N C E S

 2

 3   On behalf of the Plaintiff United States of America:

 4       UNITED STATES DEPARTMENT OF JUSTICE
         BY:  WILLIAM H. JONES, III; KATE RIGGS;
         AND JOHN R. DOIDGE
 5       450 Fifth Street, Northwest
         Suite 8000
 6       Washington, D.C.  20530
         (202) 514-0230
 7       bill.jones2@usdoj.gov
         kate.riggs@usdoj.gov
 8       dick.doidge@usdoj.gov

 9

10   On behalf of the Defendant American Airlines Group, Inc.:

11       LATHAM & WATKINS, LLP
         BY:  DANIEL M. WALL AND MARGUERITE M. SULLIVAN
12       505 Montgomery Street
         Suite 2000
13       San Francisco, California  04111
         (415) 391-0600
14       dan.wall@lw.com
         marguerite.sullivan@lw.com
15

16

17   On behalf of the Defendant JetBlue Airways Corporation:

         SHEARMAN & STERLING LLP
18       BY:  RICHARD F. SCHWED
         599 Lexington Avenue
19       New York, New York  10022
         (212) 848-4000
20       richard.schwed@shearman.com

21

22

23

24

25
```

1  **TABLE OF CONTENTS**

2

3  **TRIAL WITNESSES**

4

5  On behalf of the Plaintiffs:                                <u>Page</u>

6   SCOTT LAURENCE

7          By Mr. Schwed                                         8

8          By Ms. Riggs                                         21

9          By Mr. Schwed                                        25

10  WILLIAM DOUGLAS PARKER

11          By Mr. Doidge                                       27

12          By Ms. Sullivan                                     91

13          By Mr. Doidge                                      101

14

15

16  **EXHIBITS**

17

18  On behalf of the Plaintiffs:                            <u>Admitted</u>

19  Number 8                                                   34

20  Number 20                                                  43

21  Number 39                                                  54

22  Deposition of William D. Parker, page 210, line          105

23  23, to page 213, line 2

24  Number 349                                                 51

25

**P R O C E E D I N G S**

1

2          (In open court at 8:30 a.m.)

3          THE DEPUTY CLERK:  The United State District Court

4    for the District of Massachusetts is now in session, the

5    Honorable Leo T. Sorokin presiding.

6          THE COURT:  Please be seated.

7          Ms. Belmont said that you had a question about

8    excusing local counsel, that's totally fine, if you don't

9    want to have Mr. MacKinlay sit here every day of the trial.

10   I'm perfectly fine to have him go.  No problem.

11         MR. MACKINLAY:  Thank you.

12         THE COURT:  And I don't know if that's the same

13   situation or not, Mr. Wall?

14         MR. WALL:  No, it's not.

15         THE COURT:  So no problem.

16         MR. SCHWED:  Thank you, Your Honor.

17         THE COURT:  No problem at all.

18         Ready to --

19         MR. WALL:  Just one quick question, Your Honor, we

20   were just wondering whether you came to any decision about

21   what the schedule was going to be.

22         THE COURT:  All right.  Yeah.  I'm sorry.  Hold on

23   one second.

24         So I'm happy -- I wanted to give you time, first,

25   to make up for the breaks and I wanted to give you time --

1  how long do you want for the closing arguments?  You wanted

2  to do closing arguments at the end of the evidence, separate

3  and apart from any hearing I might have after I receive the

4  briefs and digest them.

5          MR. JONES:  That is plaintiffs' position,

6  Your Honor.

7          THE COURT:  That's fine.  No problem.

8          MR. WALL:  That's fine.

9          THE COURT:  How long do you think I should allow?

10          MR. JONES:  Your Honor, I think an hour each at the

11  close of evidence, maybe a little more, but an hour each is

12  sufficient, from our standpoint.

13          THE COURT:  Okay.

14          MR. WALL:  I was going to say an hour and a half

15  each, but something --

16          THE COURT:  Something in that order.  So we need a

17  morning to add in the breaks or a morning or an afternoon.

18          So I'm fine to do -- I'm available Monday, the

19  24th, if you want, and Tuesday the 25th.  But -- how is that?

20          MR. WALL:  Yeah, I think maybe Tuesday, the 25th,

21  Your Honor, if that works out.

22          THE COURT:  Sure.

23          MR. WALL:  No, I do believe, I'm just guessing,

24  given the pace that were going on, I believe there's probably

25  going to be a little bit of testimony that's not going to get

1    in by the 17th.  I'm just -- we are at a point now where

2    we've been working with the government very closely on this,

3    and at this point, they're not going to get their experts on

4    until the beginning of next week.  So that's essentially

5    Tuesday.

6                    THE COURT:  Okay.

7                    MR. WALL:  And then our case is probably not going

8    to get in in just Wednesday, Thursday, Friday, Monday.  So --

9    and if it does, there would be no room for their -- their

10   rebuttal case.  So we're -- we're probably looking at the

11   need to have a -- a full day, part of which would be the

12   closing, and part of which would be some --

13                   THE COURT:  Why don't we do this.  Tuesday -- the

14   truth is, there's not a deeply thought out theory behind why

15   this trial is three weeks from my perspective, and I mean,

16   you all proposed three weeks way back when, or thereabouts,

17   and it just came about to be three weeks.  I take it, the

18   point that you made, Mr. Wall, that if I gave you six, you'd

19   fill it, and if I gave you 12, you'd probably fill that, too,

20   all of you.

21                   I'm not -- how about this.  We'll have trial the

22   25th from 9:00 to 1:00, I can't give you time that day in --

23   not enough time to be worth it for you in the afternoon.  I

24   can give you time on the 26th, from, if you want -- do you

25   want me to do it those two days?

```
 1              MR. SCHWED:  So Your Honor --

 2              MR. JONES:  Your Honor, perhaps we can see where we

 3    are.  We may actually need that time.  But we also -- we also

 4    have been working together to try to map out how this will

 5    all unfold.  But I think we may need to consult, also, to see

 6    how much of that time we will need in that week.

 7              MR. WALL:  I just think it would be helpful if you

 8    just set some time apart and let us work on it for a few more

 9    days.

10              THE COURT:  Sure.  So I'll do this, I will block

11    out for you Tuesday, the 25th, from 9:00 to 1:00, and

12    Wednesday, the 26th from 9:00 to 1:00.  And it's -- and I

13    don't -- and we'll see where we are.  And I think if you need

14    more time than that, we can talk about it.  It's an important

15    case for all of you, but six weeks seems like too much.

16              MR. WALL:  I think you will find that we all agree

17    on that.

18              THE COURT:  On the other hand, you know, if -- if

19    to do it right or do something, we need a little more time

20    here or there, I'll work with you on that.  And so I'm not

21    rigidly and sort of religiously limit -- like this is three

22    weeks and you have that amount time, and when you're done,

23    you're done, and that's it.

24              So why don't you work on that, we'll see where we

25    are, and we can talk about that.  If nothing else, we'll have
```

1    a little extra time because of the breaks and you'll have

2    that -- we'll have that time for closing arguments, and if we

3    do it and we finish a little early, because it's only an

4    hour, instead of an hour and a half, or what have you, that's

5    fine.

6              MR. JONES:  Thank you.

7              MR. WALL:  Thank you, Your Honor.

8              THE COURT:  No problem.

9              Anything else before we resume with Mr. Laurence?

10             MR. SCHWED:  Thank you, Your Honor.

11             THE COURT:  I remind you, you remain under oath.

12             THE WITNESS:  Yes, sir.

13                         **SCOTT LAURENCE**

14        having been previously duly sworn, testified as follows:

15   **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT JET BLUE, Continued**

16   BY MR. SCHWED:

17   **Q.**  I want to shift gears from where I ended yesterday and

18   talk about the actual NEA and the negotiations of the NEA.

19   Just -- I think this is clear, but just which side, as

20   between American and JetBlue, initiated the discussions that

21   ended up with the Northeast Alliance?

22   **A.**  American initiated the discussions.

23   **Q.**  And just who at American initiated those, from your

24   perspective?

25   **A.**  I'm sorry, Mr. Raja.

1  **Q.**  And what was your reaction when Mr. Raja first broached

2  the topic of an alliance with you?

3  **A.**  I was very pleased to hear that.  I jumped at the concept

4  and the opportunity, based upon the -- the last discussions

5  we had had.  I saw it as an opportunity to potentially grow

6  in New York and utilize American's slots.

7  **Q.**  And just broadly speaking, did you view the potential

8  alliance as affecting JetBlue's overall ability to grow?

9  **A.**  Yes.  I -- in what it turned into, I saw that.  But at

10  the time, I saw it as an opportunity not only to operate

11  slots, but if there was more than a slot agreement there,

12  something that involved a frequent traveler programs,

13  codesharing, anything that I thought could turbo charge our

14  growth, I was excited about.

15  **Q.**  And did you view the, say, for example, the schedule

16  coordination and optimization and route optimization as

17  adding to that, or being neutral?

18  **A.**  So I think as we worked through the discussion, and it

19  became clear to me what the NEA could become, I saw that as a

20  key to growth engine for us, largely because we could

21  coordinate so that we could connect more customers, but also

22  just the -- again, that the opportunities that were there to

23  utilize a pool of slots.

24  **Q.**  How far along were the discussions when COVID hit?

25  **A.**  Well, I think the first piece of this is that COVID, for

1    the airline industry, wasn't a binary thing.  It didn't just

2    happen.  We sort of gradually saw a -- a -- the booking start

3    to deteriorate just a little bit at the end of January of

4    2020.  We weren't sure, actually, what was happening.  And

5    that, then, went through February, we actually started seeing

6    the bookings fall off, and of course the world really shut

7    down, and we saw everything fall off a cliff.

8              So the discussions as we moved from the sort of

9    first discussion about the NEA at the end of November of

10   2019, as we moved into that period of booking softness, and

11   then in February it was clear it was COVID, things were

12   moving along, we had a pretty good idea of what the NEA would

13   look like, but, you know, we were still in the conceptual

14   mode.

15   **Q.**   Did COVID change your views one way or the other about

16   the NEA?

17   **A.**   Absolutely.

18   **Q.**   In what way?

19   **A.**   I saw it as a -- a path to recover -- recover quickly and

20   recover faster than other airlines.  I mean, JetBlue had a

21   history of growing out of a crisis.  And again, I had assumed

22   a more linear recovery than we actually experienced, but I

23   saw the NEA as a path to really turbo charge JetBlue's growth

24   out of COVID.

25   **Q.**   You were asked a number of questions by Ms. Riggs about

1    partnerships that JetBlue had with other airlines before the

2    NEA and before the NEA negotiations.  How did the NEA

3    codesharing aspect compare to the other partnerships you had,

4    JetBlue had, prior to the NEA?

5    **A.**   The NEA, in the agreement with American, is far more

6    robust than the other agreements that we had, not just in

7    terms of scope with codesharing and the footprint and the

8    relevance that we were driving with it, but also the concept

9    of things like frequent flyer relevance and reciprocity.  So,

10   for example, we had the ability to earn and redeem miles with

11   only one partner, with Hawaiian.  And with American, we had

12   that capability that, again, drives a level of maturity into

13   JetBlue's frequent traveler program that didn't exist with

14   any of the other relationships that we had with other

15   airlines.

16   **Q.**   Was there frequent flyer reciprocity with any

17   international carrier before the NEA?

18   **A.**   No.  There were plans and sort of -- we had looked at the

19   potential to do that.  There was the concept of other

20   airlines earning miles for flying on JetBlue.  And as we

21   looked at partners like Emirates, we had sort of rudimentary

22   plans moving forward, but there was nothing like the scope of

23   what the NEA brought.

24   **Q.**   During your testimony from -- your questioning from

25   Ms. Riggs, there were -- the phrase "metal neutral" came up a

1    lot and you were asked questions about what metal neutrality

2    meant and incentives.  I just want to ask a very simple

3    question which is -- I want to focus when you were at JetBlue

4    at the time.

5    **A.**   Yes.

6    **Q.**   Did you care about whether passengers flew JetBlue metal,

7    JetBlue planes, or American planes, within the NEA?

8    **A.**   Within the NEA I wanted customers on the JetBlue

9    airplanes, when possible.

10   **Q.**   Why?

11   **A.**   So at JetBlue, what we found was that customers, when

12   they flew on JetBlue, they actually had a greater

13   appreciation of the attributes of the product that we

14   offered, more so than they did if they had never flown

15   JetBlue.  So we surveyed customers who hadn't flown JetBlue

16   and we talked about the product attributes like leg room, or

17   free internet, or live TV.  What the customers who had not

18   flown JetBlue tended to say was that those products were not

19   particularly important to them, but when we surveyed

20   customers who had flown on JetBlue, they actually told us

21   that those attributes were important.

22         And so we were eager to have customers trying our

23   product, in part because they might fly on an NEA route on a

24   Monday, from say Boston to Miami, and two weeks later, might

25   fly JetBlue between Miami and Los Angeles.  You know, we were

1    eager, you know, to not only have customers on the airplane

2    in the NEA, but we thought they were more likely to come back

3    to us in places where we might be competing.

4            THE COURT:  Is that because the customers who were

5    appreciating the attributes were one who cared about those

6    attributes and thus they chose JetBlue, or is that because,

7    having experienced the attributes, they decided they liked

8    them?

9            THE WITNESS:  So we felt strongly and the data

10   suggested that the customers, once they tried JetBlue, were

11   likely to come back, and they thought those attributes were

12   important.

13           THE COURT:  That wasn't just a self-selecting mix,

14   it was that once they experienced it, they liked it better

15   than -- and then you thought that would cause them to want to

16   prefer a JetBlue flight?

17           THE WITNESS:  Yes.

18           THE COURT:  Okay.  Go ahead.

19   BY MR. SCHWED:

20   Q.  You were also asked questions about the clean team

21   process?

22   A.  Yes.

23   Q.  And there were references to the clean team schedule.  Do

24   you recall that?

25   A.  I do, yes.

1   **Q.**  Was the clean team schedule -- withdrawn.

2        Was the schedule that the clean team developed the

3   schedule that American and JetBlue ultimately implemented

4   when the Northeast Alliance went live?

5   **A.**  No.

6   **Q.**  Do you know whether it was used in formulating that

7   schedule?

8   **A.**  It was.  You know, the clean team, the concept was to

9   make sure that we could actually work together.  So we took

10  people who were familiar, but it wasn't actually their day

11  job.  And they worked with the data and created something

12  that I would sort of say was close enough to know that we had

13  something we could work with.  And in that world of close

14  enough, we refined it and made changes with the people that

15  actually worked on schedule planning as their day job.  So

16  that refinement was important to us, but there was not a

17  massive difference between the clean team schedule and what

18  we actually flew.

19  **Q.**  If you could turn to Defendants' Exhibit 381 in your

20  book?

21        MR. SCHWED:  And please don't display this.

22  There's an objection.

23  BY MR. SCHWED:

24  **Q.**  Do you have it in front of you, Mr. Laurence?

25  **A.**  I do.

1    **Q.**   What is defendants' Exhibit 381?

2    **A.**   It is a e-mail from JetBlue's corporate communications

3    team, under my signature to all JetBlue crew members.

4    **Q.**   Did you review this e-mail before it was sent?

5    **A.**   I did, yes.

6    **Q.**   Did you authorize it to be sent on your behalf?

7    **A.**   I did and I believe I made some edits, as well.

8    **Q.**   Why was this e-mail sent?

9    **A.**   I'm sorry?

10   **Q.**   Why did you send this Network News, as it was called?

11   **A.**   We sent it because we were getting a lot of questions

12   from our crew members, our employees, about what the NEA

13   meant.  The other part of this was in February of 2021.  We

14   would quite often do what we called pocket sessions, virtual

15   pocket sessions, employee meetings.  And the questions that

16   would come were people that were concerned about their jobs,

17   about what this meant.  And we were attempting to show them

18   that our intention was to grow out of COVID.  We wanted to

19   set people at ease.  We wanted to set the record straight on

20   what we were doing.  And so in addition to those pocket

21   sessions, we wanted to have a very clear communication about

22   what our intentions were and to highlight the benefits to

23   JetBlue of the NEA.  And we wanted to sort of shut down

24   rumors about it, as well.

25              And so we utilized one of the products we have in

1   terms of communicating, and not just the pocket sessions, but

2   then sort of something like this e-mail, so that our crew

3   members had something to reference and actually hold in their

4   hands and read and hold us to it at some point in the future.

5           MR. SCHWED:  Your Honor, I move to admit DX381 into

6   evidence.

7           MS. RIGGS:  And Your Honor, we do have a 403

8   objection I think because we felt it is a self-serving

9   advocacy piece to the parties, but I believe that goes more

10  to weight, so we withdraw the objections.

11          THE COURT:  All right.  Admitted.

12          MR. SCHWED:  So Andy, if you can put it up on the

13  screen.  Thank you.

14          And highlight the first paragraph below "Dear

15  crewmembers."

16  BY MR. SCHWED:

17  **Q.**  And I think the first sentence reflects what you've

18  already testified to as to why you sent this; is that

19  correct?

20  **A.**  Yes.

21  **Q.**  And then if you go on to answer, is that something that

22  you mentioned, I think you said "pocket sessions"?

23  **A.**  Yes.

24  **Q.**  Is that what you referred to them as?  Just describe what

25  a pocket session is?

1    **A.**  So prior to COVID, pocket sessions would have been any

2    sort of town hall meeting.  If we were at an airport as

3    leaders, we would gather everybody together in a break room.

4    If we had a larger venue, we would invite all of our crew

5    members or employees.

6           During COVID, we did these virtually every two

7    weeks.  And we would have in attendance of -- I mean, in some

8    cases over a couple thousand crew members, some cases more, I

9    believe, where we would talk about items and have Q&A, and

10    again, maybe sure that we were doing our best to set people

11    at ease, so they could focus on their work.

12    **Q.**  And after the first sentence, there's something that

13    says, "the answer:"  And it says "smart and profitable growth

14    that will super charge our recovery."

15           Was that something that you had discussed with crew

16    members at pocket sessions?

17    **A.**  At pocket sessions, on airplanes, in break rooms, and

18    individual e-mails from crew members, phone calls.  I think

19    JetBlue very much has an open door policy where leaders are

20    accessible and people -- crew members are comfortable

21    questioning leaders about this, and this was something that

22    certainly got people's attention, so it became a big part of

23    my -- my role, to make sure that we were talking through it.

24    **Q.**  Now, I think we discussed yesterday, at the very end,

25    that we established that the NEA agreement was signed in July

1    of 2020.  Does that sound right?

2    **A.**  Yes.

3    **Q.**  And that you're also shown the agreement with the

4    Department of Transportation, which was dated early January

5    2021.

6    **A.**  Yes.

7    **Q.**  And then just with those dates in mind, when did JetBlue

8    and American begin implementing the Northeast Alliance?

9    **A.**  We began implementation during the first quarter of 2021.

10   **Q.**  After or before the Department of Transportation

11   agreement was signed?

12   **A.**  After.

13   **Q.**  Do you think it was January or February?  First quarter

14   goes all the way to the end of March.  So if you have a

15   recollection that's more precise, when did the process begin,

16   at least?

17   **A.**  You know, the process began after we signed the agreement

18   with the Department of Transportation, but I think the first

19   sort of moves we really saw coincided in the beginning of

20   February.  We started announcing things.  So sort of late

21   January, early February, right around the time of the e-mail

22   that we were just talking about.

23   **Q.**  Was the Northeast Alliance fully implemented, all the

24   aspects of it, all at once?

25   **A.**  No.

1    **Q.**   How -- well, why not?

2    **A.**   There's quite a bit.  It's a heavy lift, especially from

3    an IT perspective.  Everything from the codesharing to some

4    of the seamless aspects of the customer experience.  There's

5    still things that JetBlue and American continue to work

6    today.  But things take a lot longer than, I think, a lot of

7    commercial people would be comfortable with, so things like a

8    seat assignment if you're a JetBlue customer on an American

9    flight, or vice versa, or the ability to use a check-in

10   kiosk, a JetBlue check-in kiosk if you were an American

11   customer.  We implemented the things that were a bit I should

12   say easier, making sure that we transferred bags seamlessly,

13   moving customers between terminals, with IT being what I

14   would term a fast follower, but, again, it's not been as fast

15   as I think we'd like, because we're still working on it.

16   **Q.**   In your view, between the time where implementation

17   began, and when you left roughly eleven months or so later,

18   was progress being made on the IT front?

19   **A.**   Progress was certainly being made.  I'm sure that I

20   would -- you know, as a commercial person, I would have liked

21   to have seen it gone more quickly.  I think I joined every

22   commercial person in the industry saying that about IT, but

23   we were making significant progress.

24   **Q.**   And as progress was made, would you, on a periodic basis,

25   add to the -- sort of the features that were implemented?

**A.**  Yes.

**Q.**  And so when you left, at the time of your departure, just

overall, not focused just on IT, but just sort of your

overall view on how the Northeast -- what was your overall

view as to how the Northeast Alliance implementation was

going?

**A.**  I felt it was going well.  I felt that it was far enough

along that I was comfortable with sort of knowing that it was

something I was responsible for.  I was actually comfortable

leaving JetBlue knowing that it was, again, my

responsibility.  I felt like it was far enough along that it

would continue to proceed and it was working well.

**Q.**  Had you seen any benefits from the JetBlue perspective or

the JetBlue customer perspective by the time you left?

**A.**  Yes.

**Q.**  What types of benefits?

**A.**  Things like the frequent traveler, the ability for

customers to connect globally on American.  You know,

JetBlue's ability to actually grow in LaGuardia.  You know,

tripling service there, I think that was particularly

important.  Again, the ability to see Newark at 70 flights a

day, the growth in the afternoon at JFK.  Again, it was

something that I walked away from looking at and being very

proud of.

**Q.**  We talked a lot yesterday about slots and slot access.

1    Was JetBlue, at the time you left, taking advantage of the

2    additional slot access it had obtained under the Northeast

3    Alliance?

4    **A.**   Yes.

5    **Q.**   At JFK?

6    **A.**   Yes.

7    **Q.**   At LaGuardia?

8    **A.**   Yes.

9            MR. SCHWED:  No further questions.

10           THE COURT:  Any redirect?

11           MR. SCHWED:  Do you want this?

12           MS. RIGGS:  I'm fine.  Thank you.

13        **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

14   BY MS. RIGGS:

15   **Q.**   If I may, we just talked about this "Network News" to

16   crew members, DX381, that announcement to crew members at

17   JetBlue does not mention revenue sharing at all anywhere in

18   the net, correct?

19   **A.**   I don't believe so, no.

20   **Q.**   And the press release refers to JetBlue remaining a

21   competitor on flights to London, but isn't it true that

22   American flights from JFK and Boston to London are included

23   in the revenue share?

24   **A.**   Yes.

25   **Q.**   And next, Mr. Laurence, your counsel spoke to you

1    yesterday about DX285B in your binder.  This is a first

2    quarter 2019 Q&R, and it had a map on page 28 of additional

3    opportunities for JetBlue to add profitable growth at JFK if

4    it could get slots.  Do you remember that?

5    **A.**   I do.

6    **Q.**   And JetBlue recognized, in the first quarter of 2019,

7    that it had plenty of growth potential at JFK, if it could

8    just get the slots, correct?

9    **A.**   Both slots and aircraft.

10   **Q.**   And if we could turn now in plaintiffs' binder from

11   yesterday.

12            Actually, this isn't in your binder.

13            MS. RIGGS:  If we could hand out PX493, which is in

14   evidence.

15   BY MS. RIGGS:

16   **Q.**   And this is a June 2, 2020, e-mail chain, with the top

17   e-mail from Mr. Lusso, JetBlue's vice president of network

18   planning, to Mr. Hayes and Ms. Geraghty, copying you on

19   June 2nd, 2020, correct?

20   **A.**   Yes.

21   **Q.**   And Mr. Lusso wrote at the top, "No way we're forgetting

22   those."  Do you see that?

23   **A.**   I do.

24   **Q.**   And that's in reference to the JFK slots JetBlue had

25   leased from American prior to the Northeast Alliance,

1  correct?

2  **A.**  Ah, yes.

3  **Q.**  And specifically, in the paragraph that's labeled

4  to, "RH," that's Robin Hayes, right?

5  **A.**  Yes, I believe so.

6  **Q.**  And Mr. Lusso wrote, "In terms of the increase, you can

7  assume that most of those 37 slots are included in the

8  organic baseline (in steady state)."

9         Did I read that correctly?

10  **A.**  Yes.

11  **Q.**  And "organic baseline" refers to JetBlue's organic growth

12  plan without the Northeast Alliance?

13  **A.**  My assumption, or the way I understood it was Mr. Lusso

14  was sort of talking about the organic as the sort of the call

15  it preNEA.

16  **Q.**  And in addition, if you look at the last line, Mr. Lusso

17  notes that these are -- include industry valuable and JetBlue

18  valuable slots; is that right?

19  **A.**  Yes.

20  **Q.**  So some of these slots would have been in the peak time

21  period where JetBlue would desire slots in the afternoon?

22  **A.**  Yes.  But as I previously testified, those were also, at

23  the time, preNEA, temporary.

24  **Q.**  They are temporary, but you agree that Mr. Lusso here is

25  saying they're included in the organic growth plan?

1    **A.**   I'm saying that I believe Mr. Lusso was highlighting they

2    were in the organic plan, but they're definitely, preNEA,

3    were temporary.  One or two slot season, 6 or 12 months.

4           MS. RIGGS:  And you can set that aside.

5    **Q.**   Yesterday, your counsel raised with you a proposed slot

6    swap with American that was brought to the DOJ, where JetBlue

7    would receive slots at JFK in exchange for providing slots at

8    DCA.  Do you remember that?

9    **A.**   I do.

10   **Q.**   And you testified DOJ did not approve this slot swap,

11   correct?

12   **A.**   I think I testified they made it clear that they would

13   not approve.  I can't remember exactly what I said, but I

14   think it was made clear to us that DOJ was -- that it would

15   not approve of that.

16   **Q.**   And you're aware, aren't you, that JetBlue received DCA

17   slots as part of the divestiture to protect competition in

18   the American/US Airways merger, right?

19   **A.**   Over a series of divestitures.  So there were sort of

20   multiple auctions that took place.

21   **Q.**   And you understand, Mr. Laurence, that there is a consent

22   decree in that case prohibiting American Airlines from

23   reacquiring DCA slots it divested to JetBlue?

24   **A.**   I don't recall if I was aware of that -- I don't recall

25   that consent decree, but it does not sound like something

1    that would be out of the question.

2            MS. RIGGS:  No further questions, Your Honor.

3            THE COURT:  All right.  Any recross?

4            MR. SCHWED:  I have just a couple of quick

5    questions.

6        **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT JETBLUE**

7    BY MR. SCHWED:

8    **Q.**  If you just look at PX493, which is not in the binder, it

9    is a loose document that was handed to you a minute ago?

10   **A.**  All right.

11   **Q.**  And in Mr. Lusso's e-mail, there's something that says

12   "JG."  Do you see that?

13   **A.**  Yes.

14   **Q.**  And that's a reference to Ms. Geraghty?

15   **A.**  Yes.

16   **Q.**  And then it says, "We secured them" and is the "them" a

17   slot, the American slots?

18   **A.**  Yes.

19   **Q.**  And "for the summer season and we're in a holding pattern

20   to sign and secure them for the winter season."

21            Do you see that?

22   **A.**  I do.

23   **Q.**  Was that an accurate statement about the status of those

24   slots?

25   **A.**  Yes.

1   **Q.**  PreNEA?

2   **A.**  PreNEA.

3   **Q.**  And then you were also asked -- there was a question

4   about -- when you're talking about -- and you don't need to

5   pull it out, DX285, and Ms. Riggs asked you if JetBlue had

6   plenty of growth opportunities, if it could get the slots at

7   JFK.  Do you remember that?

8   **A.**  Yes.

9   **Q.**  Did JetBlue have as many growth opportunities with just

10  those slots as it did under the Northeast Alliance?

11  **A.**  No.  The Northeast Alliance increased the growth

12  opportunities that we would -- that JetBlue would have, in

13  addition to those that were noted in that quarterly network

14  review.

15          MR. SCHWED:  Thank you.  No further questions.

16          THE COURT:  All right.  Thank you very much,

17  Mr. Laurence, you're excused.

18          THE WITNESS:  Thank you, Your Honor.

19          THE COURT:  Have a nice day.

20          Next witness.

21          MR. JONES:  Your Honor, the -- excuse me, the

22  plaintiffs call Doug Parker of American Airlines.

23          THE COURT:  All right.

24          Just remain standing.  We have to let the court

25  reporter get ready.

```
1              Swear in the witness.
2              THE DEPUTY CLERK:  Could you please raise your
3       right hand.
4              (The witness was duly sworn.)
5              THE DEPUTY CLERK:  Can you please state your name
6       for the record?
7              THE WITNESS:  William Douglas Parker.
8              THE COURT:  Have a seat.
9              Go ahead, Mr. Doidge.
10             MR. DOIDGE:  Thank you, Your Honor.
11                   WILLIAM DOUGLAS PARKER
12          having been duly sworn, testified as follows:
13          DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA
14      BY MR. DOIDGE:
15      Q.   Mr. Parker, good morning.
16      A.   Good morning.  How are you?
17      Q.   I'm good.
18      A.   Great.
19      Q.   We've handed you two binders.  You may refer to them
20      during your examination.  One of them has documents with
21      exhibits, and the other have prior testimony that you've
22      given in various matters.
23      A.   Okay.
24      Q.   And Mr. Parker, you're the chairman of the board of
25      directors for American Airlines, right?
```

1   **A.**   Yes, sir.

2   **Q.**   And among your friends and colleagues, you use the name

3   Doug?

4   **A.**   I'm sorry?

5   **Q.**   You use the name Doug?

6   **A.**   Yes, I go by my middle name, yes.

7   **Q.**   So we'll see that on the e-mails, perhaps.

8   **A.**   Yes.  And you can call me Doug.

9   **Q.**   And you previously served as the chief executive of

10   American, right?

11   **A.**   Yes.

12   **Q.**   And you retired from that position in March of this year?

13   **A.**   Yes.

14   **Q.**   And the NEA was signed while you were the CEO, correct?

15   **A.**   It was.

16   **Q.**   And you had served as CEO of American since its merger

17   with US Airways in late 2013, right?

18   **A.**   Yes.

19   **Q.**   And prior to that, you were the CEO of US Airways,

20   correct?

21   **A.**   Correct.

22   **Q.**   And you had served in that position since US Airways

23   merger with America West Airlines in 2005, right?

24   **A.**   Yes.

25   **Q.**   And prior to that, you were the CEO of America West

1  Airlines from roughly 2001 to 2005?

2  **A.**   Yeah.  From September 1, 2001.

3  **Q.**   And Mr. Parker, you have been a leading proponent of

4  airline industry consolidation, correct?

5  **A.**   I am.  Consolidation as, if you will, defined by me, as

6  taking seven hub-and-spoke carriers that existed back in

7  2004, 2005 and consolidating them into three hub-and-spoke

8  carriers that consisted of stronger hub-and-spoke airlines.

9  So anyway, when I talk about consolidations, that's what's

10  I'm talking about.  There's -- it's a subset of the industry,

11  not the entire industry or anything close to it, and a

12  shrinking part of the industry, as well.

13  **Q.**   So when you've used the term "consolidation" in the past,

14  you had in mind that reduction from seven legacy carriers to

15  only three today, that occurred from roughly 2005 to 2013,

16  right?

17  **A.**   Yeah.  The consolidation of seven into three, not a

18  reduction.  More capacity then we had then of those seven

19  airlines that are now three.

20  **Q.**   But a reduction in the number of carriers, right?

21  **A.**   Reduction of the number of carriers and an increased

22  number of flights and ASMs.  Yes.

23  **Q.**   And it was your view that prior to this period of

24  consolidation, the hub-and-spoke airlines had been attempting

25  to grow their networks, right?

1    **A.**   Which period are we talking about?

2    **Q.**   Well, let's just take the time period, say, before the

3    Northwest/Delta merger.  Fair to say that you had observed

4    Northwest attempting to expand its network to each parts of

5    the United States that it hadn't previously served, right?

6    **A.**   That's not my recollection, Northwest Airlines filed

7    bankruptcy in 2005 as an independent airline, and during

8    bankruptcy, reduced their capacity.  It was reducing their

9    capacity prior to the merger with Delta, is my recollection.

10   **Q.**   Well, Mr. Parker, fair to say that you observed

11   airlines -- well, let me -- let's just skip forward.  If I

12   can ask you to turn to Plaintiffs' Exhibit 8.

13             THE COURT:  In the book or on the screen?

14             MR. DOIDGE:  In the book with the exhibits,

15   Your Honor.  Thank you.

16             THE WITNESS:  I'm sorry, which exhibit?

17             MR. DOIDGE:  8.

18             THE COURT:  First one, number 8.

19             THE WITNESS:  Yes, sir.  Thank you.

20   BY MR. DOIDGE:

21   **Q.**   So Mr. Parker, fair to say that you understood that you

22   observed, after the United/Continental merger, that the

23   Cleveland hub was eliminated as a hub, right?

24   **A.**   I -- that happened at some point after the merger, yes.

25             THE COURT:  I'm sorry, after which merger?

1           THE WITNESS:  The merger of United and Continental.

2           THE COURT:  Thank you.

3    BY MR. DOIDGE:

4    **Q.**  And it was your view, as an industry observer, that the

5    merged firm didn't need a hub in Cleveland, given its Newark

6    and Chicago hubs, right?

7    **A.**  Well, Newark was a Continental hub.  It was my view, I

8    don't think it's a personal view, I think it's a wildly held

9    view by industry observers that when you combine two

10   hub-and-spoke networks like United and Continental had, that

11   the Cleveland hub that was part of Continental's network, I

12   think it struggled for them, but it was an effort to have

13   some Midwest connectivity was redundant with United's very

14   large Chicago hub.  So one of the results of that merger was

15   making the two -- the two airlines into one, more efficient,

16   and being able to serve that connectivity through the Midwest

17   largely in Chicago, rather than Cleveland.

18   **Q.**  And when you say redundant, Mr. Parker, you have in mind

19   that there were markets that were being served by connecting

20   passengers over that hub that could now be served by

21   connecting the passengers over the other hubs that were

22   combined as part of the merger, right?

23   **A.**  Yeah, more efficiently.  Chicago is a bigger hub and had

24   many more connections and much more connectivity than the

25   Cleveland hub had for Continental.

 1   **Q.**  That also meant pulling down routes that Continental had

 2   been serving out of Cleveland to various smaller markets in

 3   the Northeast and elsewhere, right?

 4   **A.**  I'm sure it did.  It may have been redeployed elsewhere.

 5   I'm not sure exactly what they did with the aircraft.  But,

 6   yeah, the Cleveland hub itself became largely a spoke in that

 7   network, instead of a hub.

 8   **Q.**  And focusing on Plaintiffs' Exhibit 8, Mr. Parker, that's

 9   an e-mail that you participated in on June 18, 2010, right?

10   **A.**  Yes.

11          MR. DOIDGE:  Just one moment, Your Honor.

12   BY MR. DOIDGE:

13   **Q.**  And excluding Mr. Howlett, the other recipients on the

14   e-mail were all senior officers of US Airways, correct?

15   **A.**  Yes.  I imagine Mr. Howlett was, as well, but I'm not

16   sure.

17   **Q.**  At the bottom of the e-mail, there's attached a post that

18   reflects testimony of Bill Swelbar before the house judiciary

19   committee on June 16, 2010, correct?

20   **A.**  Yes.

21          MR. DOIDGE:  Your Honor, plaintiff moves that PX8

22   be admitted into evidence and I understand there's an

23   objection on elements.  I'll let counsel speak to it.

24          MS. SULLIVAN:  Your Honor, we object based on

25   relevance, it's not clear to us at all how this document from

1   2010 is at all relevant to this litigation.

2           MR. DOIDGE:  Your Honor, the complaint alleges that

3   consolidation to the mergers of legacy carriers have resulted

4   in the elimination of hubs, as well as resulting in the

5   coordination of capacity among the legacy carriers, something

6   that is often referred to as capacity discipline.

7   Plaintiffs' expert, Robert Town, will be speaking to this,

8   and defendants' experts have disputed both the relevance of

9   the consolidation to the creation of the capacity discipline,

10  as well as the existence of capacity discipline.

11          THE COURT:  Other than establishing that -- which

12  he testified to already, that the hub went away, what does

13  this speak to about this?  Is it part of the testimonial?

14          MR. DOIDGE:  Your Honor, no.  We won't be

15  offering -- we won't be offering it with respect 0to

16  Mr. Swellbars, the truth of Mr. Swellbar's testimony,

17  Your Honor.  We're only offering it to the statements that

18  Mr. Parker made in reaction to that, to Mr. Swellbar's

19  statements.

20          MS. SULLIVAN:  Your Honor, may I respond?

21          THE COURT:  Yes, of course.

22          MS. SULLIVAN:  With respect to the overall

23  relevance issue.  We understand that the plaintiffs have

24  alleged that these events that occurred in 2006, 2010, 2011,

25  that they are relevant to this litigation, but they have yet

1    to establish that.  We've been here for more than a week and

2    have yet to see any evidence in the record that would draw a

3    connection between what happened back in those years, more

4    than a dozen years ago, and what's happening today.

5              MR. DOIDGE:  And Your Honor, I would just speak

6    that this is the beginning of exactly that process.

7              THE COURT:  Okay.  I'm going to overrule the

8    objection.  I'm not conclusively deciding that all of this

9    material is actually relevant and weighty, but I'm going to

10   take it, and then I'll figure out, as we go forward, how much

11   weight it has and whether it's relevant or not.

12             MR. DOIDGE:  Thank you, Your Honor.

13             Will you publish Plaintiffs' Exhibit 8, please.

14             (Plaintiffs' Exhibit No. 8 admitted into evidence.)

15             THE COURT:  Except that the portion that includes

16   the testimony of Mr. Swelbar is not admitted for the truth of

17   the matter asserted, but just for the fact that they read it.

18   BY MR. DOIDGE:

19   Q.   Mr. Parker, let me ask you to turn to the page that --

20   the page of the e-mail that ends in Bates number 712.  It's

21   three pages in, I believe.

22   A.   Yes.

23   Q.   And this is a portion of Mr. Swelbar's testimony, and

24   again I'm just going to ask you to read it so we have an

25   understanding of your reaction on the first page.  So if we

1    look at that portion of Mr. Swelbar's statement, he says --

2    he writes, "In the case of this merger" --

3              THE COURT:  This is the third paragraph from the

4    top?

5              MR. DOIDGE:  Yes, Your Honor.

6              THE COURT:  Do you see it?

7              THE WITNESS:  Thank you.  Yes, sir.

8              THE COURT:  Go ahead.

9    BY MR. DOIDGE:

10   Q.  "In the case of this merger, there has been much

11   speculation about the future of Continental's Cleveland hub.

12   There is nothing that I can see from this merger that would

13   make Cleveland redundant."

14             Do you see that?

15   A.  I do.

16   Q.  And you understood Mr. Swelbar to be saying that he

17   believe the Cleveland hub would not be downsized after the

18   United/Continental merger, right?

19   A.  That's what this says.

20   Q.  All right.  Now, if you can turn to the first page of

21   plaintiff's exhibit --

22             THE COURT:  Can you just tell me who Mr. Swelbar

23   was at that time?

24             THE WITNESS:  I'll do my best, sir.

25             THE COURT:  Or what your understanding was of who

1    he was?

2              THE WITNESS:  I can read it here, he says he's a

3    research engineer with MIT's International Center for Air

4    Transportation.

5              I know Bill a little bit.  He's an industry pundit,

6    sometimes hired to give advice.  I don't know much more than

7    that, sir.

8              THE COURT:  Okay.  That's fine.

9              Go ahead.

10   BY MR. DOIDGE:

11   Q.  So now turning to the first page of Plaintiffs'

12   Exhibit 8, Mr. Parker.

13   A.  Yes.

14   Q.  Your e-mail is reacting to that statement we just read

15   from Mr. Swelbar, right?

16   A.  Yes.

17   Q.  So if we turn to the top of that first page, you write,

18   quote, "Surely these guys aren't really planning to keep

19   Cleveland open.  I'm hopeful they're just saying what they

20   need to, including to Bill, to get the approval."

21              Did I read that correctly?

22   A.  You do.

23   Q.  And by "these guys," you mean the executives of the

24   merged firm, right?

25   A.  Yes.

1   **Q.**  And you were hopeful that one of the things United would
2   do is reduce the Cleveland hub, right?
3   **A.**  Well, that's not what I said.  I said surely they aren't
4   planning to keep Cleveland open, not that I was hopeful that
5   they close it.  That didn't have a particularly impactful --
6   that wouldn't be really impactful to -- where were we at this
7   point?  2010, to US Airways whether or not they chose to keep
8   Cleveland or close.  It wasn't material to us in a large way.

9           What I was saying and thinking was, my goodness,
10  we've gone through some much in this industry, we've worked
11  so hard to get it to be -- through things like consolidation,
12  to be more efficient, to save jobs, to be more efficient for
13  our customers, to get this industry well, and if you go
14  through something as difficult as a merger, and you don't go
15  do things to actually make it as efficient as you can, yeah,
16  it doesn't -- it didn't have a huge impact -- as I said on US
17  Airways so much, but, my gosh, we should -- we should use
18  these opportunities to get the industry well.  And reading
19  that there was a possibility -- it turns out Bill was wrong,
20  they didn't keep it open.  But reading an analysis from Bill
21  that said they were planning to do that, yeah, I was hoping
22  that he was wrong and he was.
23  **Q.**  And you were hoping that the executives of United were
24  telling regulators what needed to get the matter approved,
25  right?

1    **A.**  Yeah.  You can just look down in the e-mail.  I had

2    written first, "This is nicely done," in regard to Bill's

3    testimony.  But then I said, "I hope he is wrong about

4    Cleveland, though," for the reasons I just stated.

5          My colleague, Steve Johnson, then opines, "Very

6    unlikely, Swelbar, to go out on a limb like that without

7    inside info."  So Steve is implying, based on what he

8    thinks -- what he knows about Bill, I guess, that Bill must

9    have said that because he's heard that from the

10   United/Continental executives.  So I don't know if that was

11   true or not, but my point is I say -- I know, that's what I'm

12   worried about.  That is, that they actually really are --

13   that Bill does have inside information and they really aren't

14   planning to make the difficult decisions to be efficient.  So

15   I said, yeah, that's what I'm worried about.  But that --

16   anyway, that's what I was worried about.  And I was --

17         Oh, I'm sorry, you're asking if I'm hopeful -- so

18   therefore, I can clear that with I'm hopeful they're saying

19   what they need to, including to Bill, to get his approval.

20   That's the only thing I could -- that sounds like a better

21   alternative than them actually not making the hard decisions

22   and doing what they needed to be done to make the industry

23   more efficient.

24   **Q.**  And getting back to my question, Mr. Parker, that

25   included the United -- your hope that the United executives

1    were just telling regulators what they needed to tell them to

2    get the matter approved, right?

3    **A.**   I would just paraphrase that as, if, indeed, Steve was

4    right and if indeed Bill Swelbar had insider information, and

5    therefore the United executive were telling someone that,

6    which I didn't -- I don't know that to be true or not.  That

7    if all of that is true, I'm hopeful they were just saying

8    that.  That's what it meant.

9    **Q.**   Thank you.

10   **A.**   Thank you.

11   **Q.**   And just quickly, with respect to the Delta/Northwest

12   merger.

13           Mr. Parker, you can put that one aside.

14   **A.**   Sure.

15   **Q.**   It was your view that, as a result of that merger, a

16   Northwest hub at Memphis was reduced, right?

17   **A.**   I believe it's a fact, not my view.

18   **Q.**   All right.  And it was your view, as an observer, that

19   Northwest Memphis hub carried connecting traffic that was

20   redundant to Delta's Atlanta hub, right?  In the same way you

21   described a moment ago?

22   **A.**   And I'm happy to describe it further, if you'd like.

23   **Q.**   I don't think you need to, you just need to answer the

24   question.

25   **A.**   Yeah, Memphis is very close to Atlanta, Atlanta is

1    larger.  It meant the much smaller, struggling Memphis hub

2    wasn't required as a hub once Delta and Northwest merged.

3    **Q.**  And similarly, it was your view that Delta's Cincinnati

4    hub was redundant to Northwest, Detroit, and Minneapolis hub,

5    right?

6    **A.**  Yes.

7    **Q.**  And after the Delta and Northwest merger, Delta and

8    Cincinnati hub was also reduced, right?

9    **A.**  It certainly went away at some point.  I believe it was

10   after the merger.

11   **Q.**  And fair to say that it was your view at the time, kind

12   of leading up -- you know, prior to this period of

13   consolidation, that there was excess supply in the industry

14   relative to demand.  Is that fair?

15   **A.**  I'm sorry.  What period are we in again?

16   **Q.**  We're prior to this period of consolidation that you

17   described.  So leading up to, I would say, the Northwest and

18   Continental merger in 2008?

19   **A.**  If I can back up a little bit, the first merger was 2005,

20   America West and US Airways, and I would note that in 2005,

21   over half of the capacity of the US industry was in

22   bankruptcy.  That there -- United Airlines was in bankruptcy,

23   Northwest Airlines, Delta Air Lines was in bankruptcy, and US

24   Airways was in its second bankruptcy in just two years.  So

25   that, I believe, is much more the driver of what you're

1    getting at as to where capacity goes away, rather than

2    consolidation.  So clearly in 2005, when over half the

3    capacity of the US airline industry is in default, there was

4    more supply than demand, absolutely.  So through

5    bankruptcies, primarily.  The industry addressed that.  And

6    that through consolidation, we made ourselves more efficient.

7    **Q.**  So the short answer to my question is yes, right,

8    Mr. Parker?

9    **A.**  Can you rephrase?

10   **Q.**  That it was your view at the time that there was too much

11   supply in the industry, relative to the current, existing

12   demand?

13             THE COURT:  The time being 2008?

14             MR. DOIDGE:  Yes, Your Honor.

15             THE WITNESS:  By 2008, I really don't know.  I'm

16   not positive at that point.  I think -- at that point --

17   here, again, if I may, 2005, clearly too much.  Bankruptcies

18   occur.  We, as -- we brought US Airways out of bankruptcy.

19   They were about to liquidate, by the way, so we saved that

20   airline through consolidation, so we saved that capacity, it

21   clearly would have gone away, with a merger with America West

22   in '05, so if you're asking me by '08 what had happened, my

23   recollection is those -- all those airlines that had gone to

24   bankruptcy, the five that I mentioned, as they came out, they

25   had less capacity.  By the time mergers started in '08, I

1    think we -- yeah, my recollection is capacity declined

2    slightly through that period.  I mean, for example,

3    American Airlines never consolidated.  It dropped more

4    capacity that period than the consolidating airlines.  So

5    anyway, '08 to '10 or '11, yeah, there probably would have

6    gone to capacity.  So long way of me saying, in '08, we

7    probably were a little high in terms of capacity versus

8    demand at that time.

9    Q.   So Mr. Parker, you would agree that holding everything

10   else constant, as supply goes down, prices go up.

11   A.   Holding everything else down, it's a key of that.  Yes.

12   Economics 101.

13   Q.   Mr. Parker, let me ask you to turn to Plaintiffs'

14   Exhibit 20 in your binder.  Exhibit 20 is a slide deck used

15   at the 2012 annual leadership conference of US Airways; is

16   that right?

17   A.   That appears to be the case, yes.

18   Q.   And the annual leadership conference was an annual

19   meeting involving everyone who managed someone at US Airways,

20   right?

21   A.   Yes.

22   Q.   And if you turn to the page that has the Bates ending in

23   221.  I'll give you a moment to get there.

24   A.   Yes.

25   Q.   That begins a section where you were presenting, right?

1    **A.**   Yes.

2    **Q.**   Okay.

3           MR. DOIDGE:  Your Honor, plaintiff moves that PX20

4    be admitted into evidence.  I understand that there's the

5    same relevance objection that was just lodged.

6           THE COURT:  Same objection?

7           MS. SULLIVAN:  Yes, Your Honor.

8           THE COURT:  Okay.  Admitted.

9           (Plaintiffs' Exhibit No. 20 admitted into

10          evidence.)

11          MR. DOIDGE:  Thank you.  If we could publish,

12   please.

13   BY MR. DOIDGE:

14   **Q.**   So Mr. Parker, what I would like you to do is if you want

15   to look at the binder, you may, but you may want to look at

16   the screen.  The way it was produced to us is that we have

17   Bates numbers on black and white copies, but if you go to the

18   end of the exhibit, you see that there are color slides that

19   are going to be easier to read?

20   **A.**   Okay.

21   **Q.**   So if you could turn to slide 36 of the color version.

22   **A.**   Okay.

23   **Q.**   And Mr. Parker, you understand that this slide reflects

24   the beginning of the portion of the presentation that was

25   being made by Derek Kerr, right?

1    **A.**  Yes.

2    **Q.**  And Derek Kerr at the time was the chief financial

3    officer of US Airways, right?

4    **A.**  Yes.

5    **Q.**  And after the American/US Airways merger, he became the

6    chief financial officer at American, right?

7    **A.**  Yes, he did.

8    **Q.**  And served in that capacity until very recently?

9    **A.**  He's still chief financial officer at American Airlines.

10   Yes.

11   **Q.**  And if you turn to slide 46, part of Mr. Kerr's

12   presentation.  And the title of that slide is that "The

13   Fundamentals Have Changed."  Right?

14   **A.**  Yes.

15   **Q.**  And below that, you see the bullet that says, "The

16   Airline Industry Has Changed," right?

17   **A.**  Yes.

18   **Q.**  And below that, there are three changes identified,

19    "Consolidation, capacity discipline, and ancillary

20   revenues," correct?

21   **A.**  Yes, that's what it says.

22   **Q.**  Now, if you turn to slide 48, which is two slides ahead,

23   you'll see that slide is titled, "Maintaining capacity

24   discipline."  Do you see that?

25   **A.**  I do.

1   **Q.**  And that slide shows percentage changes in ASMs indexed

2   to the fourth quarter of 2005, correct?

3   **A.**  I believe so.  I'm not sure about the indexing point, but

4   they're all starting at the same dot, so that would appear to

5   be what this is doing, yes.

6   **Q.**  And the graph depicts a separate line for US Airways in

7   red, right?

8   **A.**  Yes.

9   **Q.**  And that line shows US Airways ASMs had declined relative

10  to the fourth quarter in 2005, right?

11  **A.**  Yes.

12  **Q.**  And it also indicates that that decline occurred

13  immediately after the merger with -- between America West and

14  US Airways, correct?

15  **A.**  Well, not exactly.  It's -- up in the title, it

16  says, "LTM," which stands for "last 12 months."  So that

17  index data point of zero -- of "0405" is really the full year

18  '05.  And we merged US Airways and American at the tail end

19  of '05.  So there's several points in that data point that

20  includes US Airways being in bankruptcy, where I know they

21  were cutting capacity.  So at any rate -- just for -- so

22  anyway, I can't tell from this chart, but if you're asking if

23  we reduced capacity at US Airways even post the merger, I

24  believe we did a small amount, but this overstates it.

25  **Q.**  But you can see that decline, even as we go out over

1    further years.  That red line continues to go down, right?

2    **A.**  Yeah.  Not as much as the other lines, but go ahead.

3    **Q.**  And just to be clear, that red line goes down even before

4    we hit the period where the great recession happens, right?

5    **A.**  Yes.

6    **Q.**  And the graph also depicts a line for legacy carriers in

7    purple, I believe is the color.

8            Do you see that?

9    **A.**  Yes.

10   **Q.**  And that shows that legacy carrier ASMs had declined

11   slightly by 2011, relative to the fourth quarter of 2005,

12   right?

13   **A.**  Yes.

14   **Q.**  And it's shown -- and then there's also a blue line that

15   shows that, over that same period, LCCs had grown, correct?

16   **A.**  Yes.  Significantly, yes.

17   **Q.**  And there's also a green line that shows total industry

18   capacity, right?

19   **A.**  Yes.

20   **Q.**  And that line indicates that, notwithstanding some of the

21   growth that the LCCs had experienced, that by 2011, total

22   industry capacity was still lower than in 2011, than it had

23   been in fourth quarter 2005, right?

24   **A.**  The 12 months into the fourth quarter of '05, yes.

25   **Q.**  So now, Mr. Parker, let me ask you to turn to slide 52.

1   **A.**   Okay.

2   **Q.**   And slide 52 highlights that now we're going to look --

3   "be looking forward, 2012 outlook," right?

4   **A.**   Yes.   Sorry.

5   **Q.**   And if you turn to the next page, slide 53, that slide is

6   titled, "Maintain capacity discipline," right?

7   **A.**   It is.

8   **Q.**   And that slide is depicting forecasted growth for certain

9   airlines based on the company guidance that they had issued

10   at that time, right?

11   **A.**   Yes, that's what the footnote says.

12   **Q.**   And for each of the legacy carriers identified on the

13   slide, their forecasted growth is at 1 percent or less,

14   right?

15   **A.**   For the legacy carriers, US Airways, American, United,

16   Delta, yes.

17   **Q.**   And in contrast, it shows JetBlue growth at six and a

18   half percent, right?

19   **A.**   Yes.   And Alaska at 6 and Southwest at zero.

20   **Q.**   You can put Plaintiffs' Exhibit 20 aside.   Thank you.

21         I'm going to ask you to turn now -- keep the binder

22   with you, because I'm going to ask you to turn to Plaintiffs'

23   Exhibit 349.

24   **A.**   Okay.

25   **Q.**   And Plaintiffs' Exhibit 349 is an e-mail, dated

1   September 28, 2012, from Michael Britman, to Kristen Healy

2   and Andrew Nocella, correct?

3   **A.**   Yes.

4   **Q.**   And at this time, Mr. Nocella was the senior vice

5   president of network planning for US Airways, correct?

6   **A.**   I believe so.

7   **Q.**   And Mr. Britman reported to him, right?

8   **A.**   I believe so.

9   **Q.**   And Ms. Heely was with Barclays, correct?

10   **A.**   She was.

11   **Q.**   And Barclays was advising US Airways in connection with

12   US Airways' efforts to merge with American, right?

13   **A.**   Yes.

14   **Q.**   And I don't want to go into too much history, but fair to

15   say that at this point in time, American was seeking to

16   emerge from bankruptcy with a -- on its own, in a stand-alone

17   stand-alone way, and US Airways was attempting to persuade

18   American's creditors in the bankruptcy proceeding to instead

19   sponsor US Airways' efforts to merge with American, right?

20   **A.**   Yes, I believe so.  What I know is this,

21   American Airlines filed bankruptcy in late 2011, and we at US

22   Airways believed that the best way for American to emerge

23   from bankruptcy was through a merger with US Airways.  So

24   that was our plan that we proposed to the creditors,

25   American Airlines had proposed a stand-alone plan, where they

1    would emerge stand-alone, without a merger.  And over a

2    period -- again, I'm not exactly sure where we were at this

3    point in time, but I know that from that period, they filed

4    bankruptcy in late 2011, until we announced the merger in

5    February of 2013.  There was a lot of back and forth between

6    the US Airways plan for emergence to the creditors versus the

7    American Airlines stand-alone plan.  Eventually we resolved

8    that and they emerged through a merger with US Airways in

9    2013.

10   **Q.**  Okay.  Thanks for the history.

11   **A.**  You're welcome.

12            MR. DOIDGE:  So at this point, Your Honor,

13   plaintiffs' would move to admit Plaintiffs' Exhibit 349 into

14   evidence.  And I understand again there is the same relevance

15   objection.

16            MS. SULLIVAN:  We do have a relevance objection for

17   the same reason.  And also, Your Honor, I don't believe the

18   foundation has been laid for this document with this witness.

19            MR. DOIDGE:  Your Honor, there was no foundation

20   objection that had been made prior to just now.

21            MS. SULLIVAN:  No, we preserved all of our

22   foundation objections.  We waived authenticity, but we

23   preserved the right to object based on foundation.

24            THE COURT:  Do you want to ask any foundation?

25            MR. DOIDGE:  I can lay more foundation if you'd

1   like, Your Honor.

2             THE COURT:  Sure.

3   BY MR. DOIDGE:

4   **Q.**  Mr. Parker, again, you understand that Mr. Nocella was

5   indeed the senior vice president of network planning at US

6   Airways, correct?

7   **A.**  I believe that was the case at this time, yes.

8   **Q.**  And you looked to Mr. Nocella frequently for guidance in

9   terms of considering what steps American should take with

10  respect to its network plans, right?

11  **A.**  I didn't personally do that, no.  Mr. Nocella reported a

12  couple levels below me, so I wouldn't say it that way.  I

13  didn't personally rely on Mr. Nocella.  The company did at

14  times.

15  **Q.**  The company did?

16  **A.**  He was a member of the company.  He was an executive of

17  the company.

18  **Q.**  And Mr. Nocella also engaged in analyses with respect to

19  other potential mergers and acquisitions that US Airways

20  considered during this time period, right?

21  **A.**  Um.

22            THE COURT:  You relied on the people that Nocella

23  reported to?

24            THE WITNESS:  I'm sorry?

25            THE COURT:  You relied on the people that Nocella

1   reported to.

2               THE WITNESS:  Yes, sir.

3               THE COURT:  I will admit the document subject to

4   the same ruling as before.

5               (Plaintiffs' Exhibit No. 349 admitted into

6               evidence.)

7               THE WITNESS:  I will just point out, though, that

8   this document is not from Andrew Nocella.  It's from Michael

9   Britman who reports to Andrew Nocella, further yet down the

10  chain.

11              MR. DOIDGE:  Thank you, Your Honor.  May we

12  publish?

13              THE COURT:  Yes.

14  BY MR. DOIDGE:

15  **Q.**  So Mr. Parker, I would like you to take a look at slide

16  16 of the deck that had been prepared.  Are you there?

17  **A.**  I see it on the screen, yes.

18  **Q.**  Okay.  And there the title of the slide is, quote, "AMR's

19  growth plan will reverse industry capacity trends."  Correct?

20  **A.**  Yes.

21  **Q.**  And "AMR" there refers to American Airlines, right?

22  **A.**  Yes.

23  **Q.**  And the first bullet reads, "The industry has

24  rationalized capacity since 2005, AMR's plan will disrupt

25  that momentum."  Correct?

1   **A.**  That's what it says.

2   **Q.**  And if you turn to the third bullet, the third bullet

3   reads, "Other may react to AMR's plans with their own

4   enhanced growth plans destabilizing the industry," correct?

5   **A.**  You read it correctly, yes.

6   **Q.**  And below those bullets, there's a graph, right?

7   **A.**  There is.

8   **Q.**  And one of the captions embedded in the graph

9   reads, "Industry mergers and capacity discipline expand

10   margins" right?  That's what it says?

11   **A.**  It does.

12   **Q.**  And at the bottom of the slide, it reads, "Even before

13   any competitive actions, AMR's growth will undue much of the

14   recent capacity discipline and put pressure on RASM."

15          Did I read that correctly?

16   **A.**  Yes.  With undo spelled u-n-d-u-e.  It's clearly a draft.

17   **Q.**  And RASM there refers to revenue per available seat mile,

18   right?

19   **A.**  Correct.

20   **Q.**  Put that exhibit aside, Mr. Parker.

21          THE WITNESS:  Let me just point out, I disagree

22   with all of that.

23          MR. DOIDGE:  I'm sure you'll have an opportunity to

24   talk with your --

25          THE COURT:  The hard part about this is you only

1    get to answer the questions.

2            THE WITNESS:  Okay.  You read it properly.  I

3    disagree with the document.

4            THE COURT:  That part is struck, because there's no

5    question.

6            THE WITNESS:  Okay.  I'm sorry, sir.  I couldn't

7    help myself.

8            THE COURT:  I'm confident you have a whole army of

9    lawyers here, which are costing you, no doubt, a small

10   treasury, I would say.

11           MR. WALL:  Object to the characterization of small.

12           THE COURT:  They will ask you all sorts of

13   questions.

14           THE WITNESS:  Okay.  Duly noted.  Thank you.  I

15   appreciate the advice.

16           THE COURT:  Go ahead.

17           MR. DOIDGE:  Thank you, Your Honor.

18   BY MR. DOIDGE:

19   **Q.**  Mr. Parker, I'd like you to turn now to Plaintiffs'

20   Exhibit 39 in the binder.

21           Are you there?

22   **A.**  Yes.

23   **Q.**  Plaintiffs' Exhibit 39 is an e-mail from you to

24   American's board of directors on May 20, 2015; is that right?

25   **A.**  Yes.

1   **Q.**  And your e-mail refers to some public statements that you

2   and Scott Kirby had made the day before, right?

3   **A.**  That's correct.

4       MR. DOIDGE:  And Your Honor, plaintiff moves that

5   Plaintiffs' Exhibit 39 be admitted into evidence.  Again, I

6   understand there's the same relevance objection.

7       THE COURT:  Same ruling.  Admitted.

8       (Plaintiff Exhibits' No. 39 admitted into

9       evidence.)

10       MR. DOIDGE:  Thank you, Your Honor.  So we may put

11   it up on the screen.  Thank you.

12   BY MR. DOIDGE:

13   **Q.**  So Mr. Parker, turning to the first page of Plaintiffs'

14   Exhibit 39, you begin by noting that airline stocks had

15   traded off big that day, correct?

16   **A.**  It says traded off pretty big that day, yes.

17   **Q.**  And if we go to the third sentence, you write that "The

18   selloff is being attributed to a number of factors, including

19   comments made by Scott and me yesterday in New York."

20   Correct?

21   **A.**  Correct.

22   **Q.**  And the reference to Scott there is to Scott Kirby,

23   right?

24   **A.**  Yes.

25   **Q.**  And he was the president of American Airlines at the

1    time?

2    **A.**   He was.

3    **Q.**   And he's currently the CEO of United Airlines, right?

4    **A.**   Yes.

5    **Q.**   And if you, again, skip one sentence, there's a sentence

6    that begins, "Scott and I," do you see that?

7    **A.**   Yes.

8    **Q.**   And there you write to the board, "Scott and I separately

9    but consistently describe the current revenue outlook as

10   troubling due to projected industry capacity additions that

11   exceeded any forecast of demand growth."

12           Did I read that correctly?

13   **A.**   Yes.

14   **Q.**   And then in the next sentence, you explain that those

15   capacity announcements were already public.  Right?

16   **A.**   Correct.

17   **Q.**   And you refer, as an example, to Southwest's projections

18   for its 2016 growth, right?

19   **A.**   Yes.

20   **Q.**   And then you write, "Yet, the market hasn't seemed to

21   make the connection that supply greater than demand equals

22   falling RASM, and that falling RASM equals lower margins,

23   unless there is some corresponding decline in CASM ."  And

24   then you continue, "which no one foresees, fuel is forecast

25   to be higher."  Did I read that right?

1    **A.**  Yes.

2    **Q.**  And there you're explaining to the board that even though

3    there had been public announcements about capacity increases,

4    it was your perception that the market hadn't seemed to make

5    the connection that the increased capacity would result in

6    lower RASM for the airlines, right?

7    **A.**  Yeah, I'm expressing some surprise that the market

8    responded the way it did, given that the information was

9    already public.

10    **Q.**  And if we continue, you continue to write, "We each also

11    made the corollary point that capacity coming on in excess of

12    demand led to lower prices and that American would match

13    those lower prices."  Correct?

14    **A.**  Correct.

15    **Q.**  And the "we" in that sentence again refers to both you

16    and Scott Kirby, right?

17    **A.**  Yes.

18    **Q.**  You can put aside Plaintiffs' Exhibit 39.

19           THE COURT:  At that point, you're at American.

20           THE WITNESS:  Yes, sir.  This is 2015.

21           THE COURT:  And Scott Kirby was then at United.

22           THE WITNESS:  No.

23           THE COURT:  Or then he was at American?

24           THE WITNESS:  He was working for me.

25           THE COURT:  He was working for you and later went

1    to United.

2           THE WITNESS:  Yeah, he went to United in 2016, late

3    2016.

4           THE COURT:  Got it.  Thank you.

5           Go ahead.

6           MR. DOIDGE:  Thank you, Your Honor.

7    BY MR. DOIDGE:

8    **Q.**  So Mr. Parker, I wanted to switch topics a little bit and

9    I wanted to talk a little bit about the relationship that

10   American Airlines had with the South American carrier named

11   LATAM.  So fair to say prior to 2019, American had had an

12   international codeshare relationship with LATAM Airlines, is

13   that right?

14   **A.**  Yeah, codeshare, we had -- there was some antitrust

15   immunity involved in that relationship, as well, but yeah

16   codeshare and frequent flyer relationship, and the ability to

17   core down price.

18   **Q.**  And with respect to the antitrust immunity, you had

19   applied for it, but hadn't received it, right?

20   **A.**  No, we had applied for a joint venture and approval of a

21   joint venture, but, again, prior to getting a joint venture,

22   the partnership had antitrust immunity to discuss pricing.

23   **Q.**  Okay.  Thanks for that clarification.

24   **A.**  Uh-huh.

25   **Q.**  And just to make sure we all understand, LATAM is a South

1    American airline, right?

2    **A.**  Yes.

3    **Q.**  And LATAM flies nonstop from certain South American

4    cities to certain US cities, right?

5    **A.**  Yes, very much, and a lot of flights inside South

6    America.  Which is the reason that we wanted the

7    relationship.

8    **Q.**  You beat me to my next question.

9    **A.**  Okay.

10   **Q.**  So right around September of 2019, LATAM announced that

11   it would -- instead of continuing the partnership of

12   American, LATAM had decided to enter into a partnership with

13   Delta Air Lines, right?

14   **A.**  Yes.

15   **Q.**  And at that time, some members of American's board of

16   directors expressed concerns about the loss of LATAM as a

17   partner, right?

18   **A.**  One of them did, I remember, yes.

19   **Q.**  And in response to that member's concerns, you explained

20   to members of the American's board that there was a benefit

21   to the partnership ending, because American had foregone

22   revenue opportunities, in deference to LATAM, right?

23   **A.**  Can we look at the exhibit, or you don't want to do that?

24   **Q.**  No, we can do that.  Sure.  Go ahead.  It's there for

25   you.  It's Plaintiffs' Exhibit 242?

 1           MR. DOIDGE:  And Your Honor, this is already in
 2   evidence, I believe, and so we'll publish.
 3           THE COURT:  Okay.  Do you want to point him to a
 4   particular page at this point?
 5           MR. DOIDGE:  Yeah, well, let's begin, if we could
 6   just --
 7   BY MR. DOIDGE:
 8   **Q.**  Mr. Parker, if you could take a look at the bottom of the
 9   second page.
10   **A.**  Yes.
11   **Q.**  You'll see that there is an e-mail from Denise O'Leary,
12   right?
13   **A.**  Correct.
14           THE COURT:  Is this 240?
15           MR. DOIDGE:  We're on 242, Your Honor.
16           THE COURT:  Oh, 242.  My mistake.  I got it.  Go
17   ahead.
18   BY MR. DOIDGE:
19   **Q.**  So there's an e-mail from Denise O'Leary and Denise
20   O'Leary was a board member for American Airlines, right?
21   **A.**  Yes, she still is.
22   **Q.**  And there Ms. O'Leary is expressing her disappointment
23   with that announcement that LATAM will be entering into a
24   partnership with Delta, right?
25   **A.**  Yes.

1    **Q.**   And she states a concern that American seems to have been

2    completely outmaneuvered here, right?

3    **A.**   She acknowledges that it may be an unfair view, but

4    that's her view, yes.

5    **Q.**   And then if we turn to the very -- the very bottom of the

6    first page, we'll see the beginning of an e-mail from you

7    responding.   Is that right?

8    **A.**   Yes.

9    **Q.**   All right.   And so turning back to the second page, so we

10   can see the actual text that you sent, this is an e-mail that

11   you're sending to the full board of directors.   Right?   You

12   didn't just limit your response to Ms. O'Leary?

13   **A.**   Correct.   She said the whole board needs to hear from me

14   on this one, so I said, "Copying the full board, as you

15   suggest."

16   **Q.**   And now turning to the second full paragraph in your

17   e-mail, it begins, "We estimate."   Do you see that?

18   **A.**   Yes.

19   **Q.**   And there you write, "We estimate the current partnership

20   generates less than 20 million of contribution today, and in

21   reality, it is less than that, because we do a lot of things

22   in the spirit of partnership (putting many more of our

23   customers on their metal than vice versa, not matching

24   competitive one stop fares where LATAM has a nonstop, et

25   cetera) that help LATAM at the expense of revenue

1  maximization for AA".

2          Did I read that correctly, Mr. Parker?

3  **A.**  You did.

4  **Q.**  And let me focus on one of the examples you identify of

5  American acting in the spirit of partnership.  So let's focus

6  on the one about not matching competitive one-stop fares

7  where LATAM has a nonstop.  Okay?  And so by that, you had in

8  mind that there were markets where LATAM flew nonstop, say

9  Los Angeles to Santiago, Chile, where American did not have

10  nonstop service, but did have connecting service over, say,

11  for example, Miami, right?

12  **A.**  That would be an example of that, I guess, yes.

13  **Q.**  And absent the partnership with LATAM, American might

14  offer a lower fare for that connecting passenger than the

15  LATAM nonstop fare, right?

16  **A.**  On yeah, it -- if I may --

17  **Q.**  Well, actually, I'd prefer if you just answer my

18  question, Mr. Parker.

19  **A.**  Well, it's hard for me to do without some context.

20          So I will just note, the partnership is in quotes.

21  This was a partnership that we were having some difficulty

22  with.  That's why it was in quotes.  The paragraph above that

23  talks about why that is.  We were working with LATAM to get

24  into a JV together.  That was going to be lucrative, we

25  think, for both carriers.  Unfortunately, we did not get

1   approval from the Chilean government, which was very

2   difficult for the LATAM team.  So we were still working with

3   our partners to try to convince them to work with us on that,

4   and they eventually decided that they would go work with

5   Delta, because with Delta, they could get the Chilean

6   approval.  So that's what happened; that's what transpired.

7   So it's relevant, because I put "partnership" in quotes for

8   that reason.  This was a struggling partnership, the board

9   knew it.  As it existed in that form, it wasn't particularly

10  lucrative.  What we wanted was the JV.  This wasn't

11  particularly lucrative.  So I pointed that out to the board,

12  it was $20 million a contribution.  I note that, in reality,

13  it's less than that, but I don't think materially less, but

14  nonetheless, it was less than that.  And I did mention, as

15  you said, not matching one-stop fares when LATAM has a

16  nonstop.  So now we --

17  Q.  Now, let's see if you can answer my question, Mr. Parker.

18  This was actually pretty simple.  I was just trying to make

19  sure we understood the point that you've made to the board.

20  My question is, absent the partnership of LATAM, American

21  might offer a lower fare for that connecting service, a lower

22  fare than what LATAM offered on its nonstop flights, right?

23  A.  Right.

24  Q.  That's what you were talking about in the e-mail?

25  A.  Right.  That's where I was.  And so --

1    **Q.**   That was the question, Mr. Parker?

2    **A.**   On your example, they may have a nonstop flight from

3    Santiago, Chile to LA, and in some cases, I don't know,

4    American might choose, for a lesser service, to take someone

5    all the way over to Miami to LA to have a lower fare.  And

6    our team, with pricing immunity, with immunity -- the ability

7    to talk about pricing, might have decided, in the spirit of

8    partnership, trying to get this larger transaction done, if

9    that really upsets LATAM, we try to be good partners, and

10   while that may have some modest impact on the number of

11   people who would actually be willing to fly for a lesser fare

12   over Miami, that we wouldn't upset our partners by putting

13   that lesser fare, that lower fare in.  But, again, I don't

14   know much more than that.  I don't know how pervasive it was,

15   but that's what that talks about.

16   **Q.**   And the reason why it might upset LATAM if you did that

17   is because LATAM might perceive that you were stealing some

18   of the -- some of their market share, right?

19   **A.**   Well, not stealing.

20   **Q.**   Well, you would be taking some of the share that they

21   might otherwise capture, right?

22   **A.**   They viewed us as partners and they would view that as

23   not -- again, I don't know -- I don't know how they would

24   view it, to tell you the truth.  What I think the result

25   would be, as you're sitting talking about pricing for the

1   joint venture in the future, you're talking about pricing in

2   this case for the partnership, they look at that and think

3   why -- why are you doing that to us, it's, you know, going to

4   funnel off one or two passengers a day, why are you doing

5   that.  Other airlines are doing that already.  Those fares

6   exist.

7          I wasn't in those conversations.  I just know that,

8   to the extent that existed, I'm certain that's what the teams

9   decided, which were, you know, in the spirit of partnership,

10  we're not going to -- you know, they're upset about it.  We

11  can talk about pricing with them.  They're telling us they

12  don't like that price in the market and we didn't put the

13  price in the market.

14  **Q.**  And Mr. Parker, we were together this summer at a

15  deposition, right?

16  **A.**  Yes.

17  **Q.**  Your deposition?  And I'm going to try to forego a full

18  impeachment here, but just tell me if this sounds familiar,

19  during your deposition, you said, "But in the spirit -- but

20  in the spirit of partnership, we didn't put a fare in the

21  market that was lower than LATAM's fare, apparently for fear

22  of angering them, that we were going to steal some of their

23  share on the nonstop.  So we chose not to put that price in

24  and we lost customers as a result."  Does that sound like a

25  fair description of what was going on at the time?

1  **A.**  Yeah, and that seems entirely consistent with what I just

2  said.  Again, I wish -- the word steal is not a word that I

3  would consider, anyway, but I said it, so.  --

4  **Q.**  And Mr. Parker, it's fair to say that some customers lost

5  a lower priced option that they might have preferred by that

6  lower connecting fare not existing in the marketplace, right?

7  **A.**  I think the fare was still in the marketplace.  There are

8  other airlines that fly one-stop Santiago to Los Angeles that

9  would have had a lower fare on the market.

10  **Q.**  But it wasn't a fare that American was providing.  You

11  couldn't fly at that fare on American metal, right?

12  **A.**  In this example, that would be the case.

13  **Q.**  Now, Mr. Parker, let me ask you to turn to the very

14  bottom of your e-mail to the board?

15  **A.**  Yes.

16  **Q.**  Do you see there that you tell the board, "In the

17  immediate term, we are discontinuing all of the unbalanced

18  codesharing and pricing that have been in effect."

19       Did I read that right?

20  **A.**  Yes.

21  **Q.**  And by the unbalanced pricing, that's a reference to

22  American not undercutting LATAM nonstops, right?

23  **A.**  I believe so.

24  **Q.**  And more broadly there, you're telling the board that

25  whatever it is that American was doing in terms of pricing

1    that had had a negative impact on American, but that you were

2    doing because you didn't want to anger LATAM, that would have

3    been eliminated.  Right?  That's what you're telling the

4    board.

5    **A.**  What I said is exactly what I said.  We discontinued the

6    unbalanced codesharing, which by the way, we were a much

7    larger airline, so it was largely unbalanced, so we

8    discontinued the codesharing and the unbalanced pricing

9    that's been in effect.  That's what it says.

10   **Q.**  All right.  And then in the next sentence, you tell the

11   board that American will announce additional flights from

12   Miami to Santiago, Lima, and Sao Paolo, right?

13   **A.**  Yes.

14   **Q.**  And those were all routes where LATAM had nonstop

15   service, right?

16   **A.**  I believe so.

17   **Q.**  And there you're telling the board that, with the end of

18   the partnership, you will be increasing capacity in those

19   nonstop overlaps with LATAM, right?

20   **A.**  That's what it's saying, yes.  They're now -- they're

21   going to be Delta's partner.  We're going to compete with

22   them.

23   **Q.**  All right.  You can set aside Plaintiffs' Exhibit 242.

24           Mr. Parker, you keep the binder handy, but we're

25   not going to refer to a document just yet.

1          You recall that in 2011, US Airways executed a slot
2     swap with Delta, right?
3     **A.**   I'm going to need you to refresh my memory.
4     **Q.**   All right.  So there was -- do you recall that in roughly
5     2011 --
6     **A.**   US Airways.
7     **Q.**   US Airways, yes.  You're still the CEO of US Airways,
8     right?
9     **A.**   Yes.
10    **Q.**   And there was a swap that US Airways agreed to with
11    Delta, where US Airways gave approximately 265 LaGuardia
12    slots to Delta, right?
13    **A.**   In exchange for some DCA slots, correct.
14    **Q.**   In exchange for about 84 DCA slots, right?
15    **A.**   I remember that.  I thought it was earlier than that, but
16    okay.
17    **Q.**   And then you mentioned now -- well, let me step back.  Is
18    it fair to say, Mr. Parker, that Delta's enhanced position in
19    New York City that you've been describing in this litigation
20    today, is partly the result of US Airways giving Delta those
21    LaGuardia -- 265 LaGuardia slots?
22    **A.**   Sure.  That's a good piece of why Delta has more capacity
23    in New York than in the combined American/US Airways.
24    **Q.**   And again, a couple years after this US Airways merged
25    with American, right?

1  **A.**  Correct.

2  **Q.**  And so fair to say that what you're now describing is

3  American's diminished position in New York is a result of US

4  Airways relinquishing LaGuardia slots to Delta.

5  **A.**  We combined two airlines, American and US Airways.

6  Having combined them, we have a very nice network, we have a

7  disadvantage in New York and Boston having done that, and

8  those are the facts.

9  **Q.**  Well, fair to say that disadvantage is greater by virtue

10  of the fact that US Airways transferred 265 LaGuardia slots

11  to Delta in 2011, right?

12  **A.**  Prior to the merger, yes.

13  **Q.**  There was a proceeding before the Department of

14  Transportation relating to this slot transfer, right?

15  **A.**  I'm sorry, there was a what?

16  **Q.**  There was a proceeding before the Department of

17  Transportation related to the slot swap agreement?

18  **A.**  I believe that to be the case.

19  **Q.**  And is it fair to say, Mr. Parker, that during that

20  proceeding, US Airways did not claim that it would be unable

21  to continue to compete in New York City if it transferred the

22  slots to Delta?

23  **A.**  I don't know.

24  **Q.**  Do you recall any such statement being made by US Airways

25  in that proceeding?

1   **A.**   I don't recall the proceeding.

2   **Q.**   All right.  Let me ask you now to then to turn to

3   Plaintiffs' Exhibit 950.

4          MR. DOIDGE:  And Your Honor, this is in evidence,

5   so we'll go ahead and put it up on the screen.

6   BY MR. DOIDGE:

7   **Q.**   And Mr. Parker, Plaintiffs' Exhibit 950 is a joint filing

8   by UA Airways and Delta Air Lines in the DOT slot swap

9   proceeding, correct?

10          MS. SULLIVAN:  Objection, Your Honor.  Lacks

11   foundation.

12          MR. DOIDGE:  Your Honor, he's already testified

13   that he's aware of the slot swap transaction.

14          MS. SULLIVAN:  He just said he doesn't recall this

15   proceeding.

16          THE COURT:  Overruled as to this question.

17   BY MR. DOIDGE:

18   **Q.**   So again, Mr. Parker, the question is Exhibit 950 is a

19   joint filing by US Airways and Delta Air Lines in the DOT

20   slot swap proceeding, correct?

21   **A.**   I believe that to be the case.  It says, "Petition for

22   waiver of the terms of the order of limiting the scheduled

23   operations at LaGuardia airport."  I can read that.

24   **Q.**   So let me ask you to turn to page 3 at the filing?

25   **A.**   Yes.

1  **Q.**  You can look at the top of page 3?

2  **A.**  Yes.

3  **Q.**  There it reads, "Delta and US Airways will continue to

4  compete with each other. . .at both airports," right?

5  **A.**  Right.

6  **Q.**  And we can go back and do the ellipsis, too, if you

7  want --

8  **A.**  I got it.

9  **Q.**  -- but just to read it clearly, "Delta and US Airways

10  will continue to compete with each other. . .at both

11  airports," right?

12  **A.**  Correct.

13  **Q.**  And then if you can turn to page 4.  And at page 4 it

14  reads that US Airways is claiming that the slot swap will be

15  enhancing competition between Delta and US Airways, right?

16         MS. SULLIVAN:  Your Honor, objection.  Mr. Doidge

17  is picking out portions of sentences and reading them into

18  the record.  I'm not sure what we're accomplishing here.

19         THE COURT:  The document is in evidence.

20         MR. DOIDGE:  Yes, Your Honor.

21         THE COURT:  Just to have him read it.

22         MR. DOIDGE:  All right.  I'll withdraw that one

23  question.  But if I can just ask you to look at one more.

24  And we'll give the full sentence, since counsel seems

25  concerned.

1    BY MR. DOIDGE:

2    **Q.**  Let me ask you to turn to page 5.  And do you see -- see

3    where it begins, "For its part."

4            MR. DOIDGE:  Can you highlight that, please.

5    BY MR. DOIDGE:

6    **Q.**  And that reads, "For its part, immediately after the

7    transaction, US Airways will continue to have a robust

8    presence at LaGuardia, including shuttle service to DCA and

9    Boston Logan International, service to US Airways hubs in

10   Philadelphia and Charlotte Douglas International Airport and

11   service to Pittsburgh International Airport."

12           Did I read that right?

13           MS. SULLIVAN:  Same objection.

14           THE WITNESS:  You read it correctly.

15           THE COURT:  You did read that right.  And the

16   question is what's he going to add to it.

17           MR. DOIDGE:  All right.  I'll move on, Your Honor.

18   BY MR. DOIDGE:

19   **Q.**  Mr. Parker, the slot swap also gave US Airways a leading

20   position at Reagan National Airport, DCA, right?

21   **A.**  I believe we already had a leading position.  I think it

22   made our position -- it enhanced our position.

23   **Q.**  Fair enough.  And American currently has more slots at

24   Reagan National than all other airlines combined, right?

25   **A.**  I'm not certain of that.

1   **Q.**   Okay.  You don't have any reason to disagree with that?

2   **A.**   No, I don't.

3   **Q.**   And fair to say, DCA is one of American's higher margin

4   hubs, right?

5   **A.**   That is true.

6   **Q.**   And so you effectively gave Delta a leading position at

7   LaGuardia in exchange for getting a leading position at DCA,

8   right?

9        MS. SULLIVAN:  Your Honor, objection to the line

10   of questioning regarding DCA as irrelevant.

11        THE COURT:  Overruled.

12        THE WITNESS:  Yeah, I would describe it as -- this

13   is the value of networks.  And the DCA hub for US Airways, we

14   couldn't really connect -- it wasn't large enough to be a

15   real hub.  So by doing this transaction, as painful as it

16   was, to give up slots at LaGuardia, we certainly didn't have

17   a presence at LaGuardia that was anything meaningful.  So we

18   were underutilizing those.  So the result of this was Delta

19   was able to take their LaGuardia operation, which at the time

20   I believe was smaller than they would like for connecting

21   service and allow them to have -- be more efficient.  And we

22   could use the DCA slots much more efficiently.  Bring a lot

23   of people into DC, let them connect, and get on to other

24   parts of the United States.  So that's my recollection of the

25   transaction and why it made sense and how it worked.  It was

1    two parts of individual airline networks that were

2    undersized, and by doing this swap, we made each parts of our

3    network more efficient and better for customers.

4    **Q.**  All right.  So fair to say that you gave Delta a leading

5    position at LaGuardia and you enhanced your leading position

6    at DCA, right?

7    **A.**  Again, I'm not sure we gave Delta a leading position into

8    LaGuardia.  We had an undersized position.  Again, this is

9    premerger.  This is US Airways struggling to do what we could

10   with the network that we had.  And yeah, anyway, I'll

11   describe it just as I just did.  We were able to -- we had a

12   stronger asset in DC, but not strong enough to really provide

13   the utility of that our customers wanted and we had a

14   lesser -- a much lesser hub -- or not even a hub, a much

15   lesser set of assets in LaGuardia, slots that had been

16   acquired over time.  And we chose to exchange those to where

17   we could use them more efficiently and Delta could use the

18   LaGuardia slots more efficiently.

19   **Q.**  Well, Mr. Parker, you would agree with me that

20   Washington, D.C., is an important region with respect to air

21   travel?

22   **A.**  Yes.

23   **Q.**  And that a lot of business traffic travels through the

24   D.C. -- the Reagan National Airport, right?

25   **A.**  Yes.

**Q.**  And today Delta has a relatively small position at Reagan

National, right?  Certainly relative to American?

**A.**  We're the largest carrier in D.C.  In DCA.  In Dulles,

United is larger than us.

**Q.**  There are other major cities, say Chicago, let's take an

example, where Delta has -- where Delta is relatively small

compared to American, right?

**A.**  Yes.  Where we have a hub, they're going to be smaller

than us.  Where they have a hub, we'll be smaller than them.

**Q.**  All right.  But it's not your view, is it, that Delta

needs to enter into a capacity coordination and revenue

sharing agreement with another airline in Chicago to compete

with American at that airport, is it?

**A.**  No.  They fly Chicago as a spoke, much like we fly

Atlanta as a spoke.  They connect people.  In the case of --

you know, the way they compete with Chicago is with their

Detroit hub, their Minneapolis hub, and indeed their Atlanta

hub, so no, they don't need -- they fly Chicago to all those

hubs, but they don't fly a lot of nonstop flights other than

to hubs from Chicago.  Just as we don't fly a lot of flights

outside of -- to Atlanta, other than to the hubs.  That's the

way the hub and spoke system works.

**Q.**  And in Boston, you fly from Boston, prior to the NEA, to

your hubs, right?  In the same way that Delta flies to its

hubs outside of Chicago?

1    **A.**   We fly from Boston, largely to spoke, correct.

2    **Q.**   All right.  You can put that document aside, Mr. Parker.

3    Let me just ask you a few questions about the rationale that

4    you provided with respect to the American/US Airways merger.

5    And you talked about that a little earlier already.  So fair

6    to say that in 2013, prior to that merger, you viewed

7    American as strategically flawed versus Delta and United

8    network, right?

9    **A.**   They were certainly much -- they were much smaller.

10   Strategically flawed may be a stretch, but yes, they're much

11   smaller.  They had gotten themselves in a position where

12   Delta and United had much larger networks.

13   **Q.**   And you would agree with the term "strategically flawed"

14   as a description of that, right?

15   **A.**   Yes.

16   **Q.**   You'd used it before?

17   **A.**   Sounds like something that I might have said, but it's

18   accurate.

19   **Q.**   And it was your view that the American/US Airways merger

20   would create a strong network alternative to United and

21   Delta?

22   **A.**   Yeah, a third network that can get people to most

23   everywhere they want to get to.

24   **Q.**   And so you provided that basic rationale to American's

25   creditors in the bankruptcy proceeding, right?

1   **A.**   Yes, I believe so.

2   **Q.**   And you provided that rationale in defending against the

3   United States government's action that was brought against

4   the merger, right?

5   **A.**   Correct.

6   **Q.**   And you also testified to that effect before a federal

7   bankruptcy court as recently as March 2019, right?

8   **A.**   Again, if you're asking me if I testified about the

9   benefits of the merger, absolutely.

10  **Q.**   Okay.  And that was -- I mean, I get it, it's been a

11  little bit, but still relatively recent; you provided that

12  testimony in March of 2019, right?

13  **A.**   It's still true.

14  **Q.**   Okay.  And you also believe that American and US Airways,

15  you believe that American -- excuse me.  Let me strike that,

16  and let me start again.

17          Prior to the American and US Airways merger, you

18  believe that American had a hole in its network in East Coast

19  region of the United States, right?

20  **A.**   Up and down the entire East Coast, yes.

21  **Q.**   American didn't have a way to conveniently serve the

22  millions of passengers looking to travel, as you just said,

23  up and down the East Coast, right?

24  **A.**   Correct.  American had a hub -- American had a hub in

25  Miami, but indeed, the Miami hub was much more for flying to

1    the Caribbean, to Latin America.  So in general, if you

2    wanted to be an American customer and fly up and down the

3    East Coast, the next closest, you know, to the East was

4    Chicago or Dallas.  So you'd find yourself having to fly

5    really circuitous routing to get -- say from Buffalo to

6    Fort Lauderdale, you would have toll fly to Dallas or

7    Chicago.  That doesn't bode well for most customers.

8    **Q.**  All right.  And in your view, the merger with US Airways

9    was a perfect solution for America's lack of East Coast

10   presence, right?

11   **A.**  Yeah.  We called it Project Tetris.  The two networks fit

12   together really well like the game Tetris.  The pieces fit in

13   really well.  American, as I said, had hubs in Miami and

14   Dallas and Chicago; and US Airways had hubs in Phoenix, but

15   also more importantly, in Philadelphia, Charlotte, and

16   Washington, D.C.  So US Airways had a network that carried

17   people well up and down the East Coast; didn't carry people

18   well to the middle parts of America, because there was

19   nothing -- besides the East Coast, there was nothing in the

20   US Airways network as hub west of Charlotte, and there was

21   nothing -- I'm sorry, other than Phoenix, until you get all

22   the way to Phoenix.  And then the American hub, with the

23   American network, with large presence in Dallas and Chicago,

24   those, they fit together extremely well.

25   **Q.**  So I appreciate the detail, Mr. Parker, but short version

1   is "yes" to my question, right?

2   **A.**   If you can repeat it?

3   **Q.**   Sure.

4           The merger with US Airways was the perfect solution

5   for American's lack in East Coast presence, right?  That was

6   your view?

7   **A.**   It was the best.  I didn't say "perfect."  We still lack

8   a presence in a lot of areas.

9   **Q.**   I think you might have told the federal bankruptcy

10  court -- the federal bankruptcy court that it was perfect,

11  the perfect solution?

12  **A.**   The perfect solution, if it's the only solution.  But

13  nothing's perfect, of course.

14          We ended up with, you know -- while we loved the

15  network once we got it put together, it still lacked some

16  coverage in the Northwest, for example.  It still lacks

17  coverage in New York and Boston.

18  **Q.**   Well, Mr. Parker, let me ask you to turn, if you could,

19  not to the exhibits binder, but you have another binder that

20  has transcripts and prior testimony.  And you should see

21  there, I believe, there's a tab that should be marked PX346.

22  Is it indicated that way?

23          And Mr. Parker, do you recall that during that

24  federal bankruptcy trial, Mr. Wall submitted in evidence a

25  written statement by you as part of your testimony?

1    **A.**  I do.  I do.  Sorry.

2    **Q.**  Okay.  And if you could turn to paragraph 26.  And if you

3    want to just read paragraph 26 to yourself, that's fine,

4    Mr. Parker.  And let me know when you're done.

5    **A.**  (Witness reviews document.)

6            I read it.

7    **Q.**  And fair to say, Mr. Parker, that you told the federal

8    bankruptcy court that US Airways was, "A perfect solution for

9    American's lack of East Coast presence"?

10   **A.**  Again, and because there was no other solution.  It

11   was --

12           THE COURT:  He just asked if that's what you said.

13           THE WITNESS:  Yes, that's what it says.

14           THE COURT:  What you said.

15           THE WITNESS:  I'm sorry?

16           THE COURT:  He's asking whether that's what you

17   said.

18           THE WITNESS:  This is my statement, so yes.

19           THE COURT:  Yes.

20   BY MR. DOIDGE:

21   **Q.**  And Mr. Parker, one of the reasons that the merger would

22   create a strong network up and down the East Coast was

23   because it would connect passengers through, as you've

24   already described at a broad level, five East Coast hubs,

25   right?

1   **A.**  Um --

2   **Q.**  If you're looking for that, you need to go to

3   paragraph 27, Mr. Parker.

4   **A.**  Yeah, well --

5   **Q.**  You'd agree with that, right, Mr. Parker?

6   **A.**  No.  That's why I'm --

7        "By connecting to five East Coast hubs," yes,

8   that's what it says.

9   **Q.**  And that gave American a way to provide viable

10  connections between the Northeast and the Southeast, correct?

11  And I don't know that those words are specifically there, but

12  I can turn you to your oral testimony, if you need it, need

13  refreshing.

14  **A.**  Yeah, Philadelphia is the Northeast, correct.

15  **Q.**  And you served -- from Philadelphia, you serve other

16  cities, small and large, from Philadelphia that are in the

17  Northeast, right?

18  **A.**  Yes.

19  **Q.**  And Philadelphia allows you to take passengers from those

20  small cities and bring them down to the Southeast, right?

21  **A.**  Yes.

22  **Q.**  And -- and, Mr. Parker, you also told the federal

23  bankruptcy court that the merger provided American with

24  service to destinations that it did not previously serve,

25  right?

1              And if you need help, go to paragraph 38.

2   **A.**   I'm not certain I said that.  I'm sorry, what --

3   **Q.**   38.

4   **A.**   Yes.

5   **Q.**   And you further describe that US Airways serves 62 cities

6   that American did not previously serve, right?

7   **A.**   That's what it says.

8   **Q.**   And Mr. Parker, how many domestic cities were served by

9   JetBlue that American did not serve in 2019?

10  **A.**   I don't know.

11  **Q.**   It is possible that the answer is zero?

12  **A.**   It's possible.

13  **Q.**   You don't have any reason to disagree with that, right?

14  **A.**   I don't.

15  **Q.**   Okay.  Fair to say, Mr. Parker, that the merger created

16  the world's largest loyalty program, right?

17              THE COURT:  Which merger?

18              THE WITNESS:  I'm sorry.

19  BY MR. DOIDGE:

20  **Q.**   The American/US Airways merger created the world's

21  largest loyalty program, right?

22  **A.**   Yes.

23  **Q.**   And with the American/US Airways merger, American became

24  the world's largest airline, right?

25  **A.**   Yes.  Slightly larger than United and Delta, yes.

1    **Q.**  All right.  And fair to say that, Mr. Parker, that now

2    with the NEA, American is even bigger, right?

3    **A.**  No, certainly not in the metric we're talking about.

4    When I think of size of the airline, it's what we fly.  It's

5    what American flies.

6    **Q.**  It's also, isn't it fair to say, Mr. Parker, that you

7    view it -- you view the size of the American as related to

8    the size of the area that American can market, right?

9    **A.**  Again, when you ask me about the world's largest airline,

10   that I think about, and everyone thinks about as what

11   actually American Airlines flies on our own metal.  But

12   certainly, when I think of the network, I think of the

13   ability to take customers to places they want to go, and the

14   JetBlue relationship allows us to get people to places that

15   we wouldn't be able to get them to, absent the relationship,

16   as do all of our codeshare arrangements.

17              MR. DOIDGE:  Your Honor, if I can just have one

18   moment?

19              THE COURT:  Yes.

20              (Counsel confers.)

21              MR. DOIDGE:  Your Honor, if we could take just a --

22   if now would be a convenient time for the morning break,

23   we'll take the morning break and we'll finish up quickly with

24   Mr. Parker's direct as -- right after break.

25              THE COURT:  You need to confer with each other?

1    I'm just thinking it's a little early to -- how much do you

2    have left?

3              MR. DOIDGE:  Very little, Your Honor, but it would

4    be helpful to have just a moment.

5              THE COURT:  You want to just take a five minute

6    break?

7              MR. DOIDGE:  That would be fine, Your Honor.

8              THE COURT:  All right.  We'll stand in recess for

9    five minutes.

10             (Court in recess at 10:20 a.m.

11             and reconvened at 10:27 a.m.)

12             THE COURT:  Please be seated.

13   BY MR. DOIDGE:

14   **Q.**  Mr. Parker, if I could ask you to please turn to

15   Plaintiffs' Exhibit 108.

16             MR. DOIDGE:  Plaintiffs' Exhibit 108, Your Honor,

17   is already in evidence.  So may we publish?

18             THE COURT:  Go right ahead.

19   BY MR. DOIDGE:

20   **Q.**  And Mr. Parker, there are lots of attachments, but just

21   looking at the first page, Plaintiffs' Exhibit 108 is an

22   e-mail dated July 22, 2019.  Is that right?

23   **A.**  I'm sorry.  Let me get there.  I had the wrong book.

24             Okay, I'm here now.  What's the question?

25   **Q.**  The exhibit is an e-mail dated July 22, 2019, right?

1    **A.**   Yes.

2    **Q.**   And it's attaching, among other things, you see at the

3    very last -- last attachment, there's an attachment for "2019

4    October BOD deck."  Do you see that?

5    **A.**   I see that.

6    **Q.**   Okay.  And so that's the deck that I want to ask a few

7    questions about right now?

8              THE COURT:  2019 or 2017.

9              MR. DOIDGE:  2019, Your Honor.  So I'll -- let me

10   help clarify, Your Honor.

11             THE COURT:  Oh, I see, I'm sorry.  The last one.

12   Got it.

13   BY MR. DOIDGE:

14   **Q.**   So Mr. Parker, just to help clarify things, there are

15   many decks that are attached that were used from the previous

16   2017 strategy session with the board, right?

17   **A.**   Right.

18   **Q.**   And then at the very last attachment is a draft deck

19   that's planned to be used for the October 2019 board meeting,

20   right?

21   **A.**   Correct.  This is July, so it's probably a very early

22   draft, but yes.

23   **Q.**   All right.  So if you could turn to the October -- the

24   draft for the October 2019 board strategy meeting, and you'd

25   need to turn to the Bates number that ends in 256.

1  **A.**  Thank you.

2  **Q.**  It will be way at the back.

3  **A.**  I'm there.

4  **Q.**  All right.  Now, if we turn a couple of pages to the page

5  that ends in 258, you'll see an agenda.  Do you see that?

6  **A.**  I do.

7  **Q.**  And one of the items on the agenda are "Strategic

8  Initiatives"?

9  **A.**  I see that.

10 **Q.**  And one of the items under Strategic Initiatives

11 is, "Growth plan," right?

12 **A.**  I see that, as well.  Yes.

13 **Q.**  Now, if you could turn forward to slide 30, which is the

14 one ending in the last three digits of 285.

15 **A.**  Okay.

16 **Q.**  And this is the portion of the deck that

17 begins, "Discussion of the growth plan"; is that right?

18 **A.**  That appears to be the case, yes.

19 **Q.**  So now if you would please turn again forward a few pages

20 to slide 35, that's the one that ends in 290.  Are you there?

21 **A.**  I am.

22 **Q.**  All right.  And this slide depicts year-over-year ASM

23 growth from 2014 to 2018 for American, right?

24 **A.**  And for other airlines.  Yes.

25 **Q.**  Fair enough.

1          And it also depicts change in GDP for each of those

2     years, right?

3     **A.**  It does.

4     **Q.**  And you'd agree with me that American's percentage ASM

5     growth is equal to or less than a percentage change in GDP

6     for each of those years, correct?

7     **A.**  Yes.  It's close, but equal to or less than modestly.

8     **Q.**  So now let me ask you to turn back a page to slide 34,

9     the one ending in 289.  And that page depicts percentage

10    growth for certain airlines in three distinct periods, right?

11    **A.**  Yes.  I just note that the last column has to be a

12    forecast, because we're 2017, it ends in 2018.  So it's two

13    distinct periods and one forecast period.

14    **Q.**  Well, just a reminder, Mr. Parker, this deck is prepared

15    in July of 2019, right?

16    **A.**  Oh, I'm sorry.  I stand corrected.  Yes, three distinct

17    periods.

18    **Q.**  And if we focus on the table that's on the right-hand

19    side of the page --

20    **A.**  Yes.

21    **Q.**  -- that one focuses on domestic ASM growth, right?

22    **A.**  It does.

23    **Q.**  And if we focus on the 2009 to 2013 time period, fair to

24    say that American, Delta, and United all grow at or less than

25    one percent from 2009 to 2013?

1    **A.**   That's what it says.

2    **Q.**   And now if we focus on the time period 2013 to 2016, fair

3    to say that American, Delta, and United all grow at less --

4    at or less than 4 percent, right?

5    **A.**   That's correct.

6    **Q.**   But if you look at the 2016 to 2018 time period, Delta

7    and United are growing at greater than 4 percent, right?

8    **A.**   They are.

9    **Q.**   And during that period, American was only growing at

10   1.8 percent, right?

11   **A.**   That's what it says.

12   **Q.**   Now, if you could please turn to slide 36.  And if you

13   focus your attention on the second bullet?

14   **A.**   Okay.

15   **Q.**   The second bullet on that slide highlights that Delta and

16   United have grown -- since 2016, that Delta and United had

17   grown at 4.7 percent and 4.1 percent domestically, right?

18   **A.**   I think it says 5.7 percent, but yes.

19   **Q.**   And if we turn to the fourth bullet on the page, the

20   fourth bullet notes that while American has maintained

21   capacity discipline during that latter period, United and

22   Delta have grown, right?

23   **A.**   That's what it says.  Yes.

24   **Q.**   Right.  And if you could now turn to slide 41.  And if we

25   could focus attention on the graph that's on the table that's

1   on the left side of the page?

2   **A.**   Okay.

3   **Q.**   That table depicts a high growth scenario, as compared to

4   a current plan for American, with respect to ASM growth for

5   2020 through 2022, right?

6   **A.**   That's what it appears to be doing, yes.

7   **Q.**   And at that point in time, the current plan reflects

8   growth rate over that period for American of 1.9 percent,

9   right?  That's what you see if you look at the -- on the

10   far -- the far right-hand.  That's a summary of those three

11   years, right?

12   **A.**   Yeah.  Again, I would -- it says "Current Plan of

13   Record."  I don't know exactly what that means.  Generally

14   what that means is if we do nothing with our fleet plan,

15   that's about what we're going to grow.  We don't generally

16   have, like, concrete plans for growth two, three years in

17   advance.  We build five year plans, but they may change.

18          But I take this to read that based on our current

19   fleet plan, if we don't do anything else, we will be growing

20   at 1.9 percent for the next three years.

21   **Q.**   And Mr. Parker, generally American has something it calls

22   a plan of record that forecasts over a certain period of

23   time?

24   **A.**   Yeah.  And this is the first time that I remember seeing

25   the term "plan of record," but fair enough, in this case.

1          What I know is we generally have -- we always have

2    a fleet plan that has some flexibility to either -- if demand

3    turns out to be higher than we think it's going to be, then

4    we can expand, usually through options or utilization of the

5    fleet.  Or it can be lower than that by less utilization or

6    retirement of some aircraft that are on lease.  Things like

7    that.  So we have a plan, but that plan has the ability to go

8    up or down, depending on what we see in demand.

9    **Q.**  Fair to say, again, focusing on just this portion of the

10   slide, it's suggesting an alternative to the current plan of

11   a high growth plan at 4.8 percent, right?

12   **A.**  Yeah, I'm sorry, I really don't know what this is doing,

13   but it shows -- what it says is:  Here's the current plan of

14   record.  And here is -- and it says:  And a high growth

15   scenario.

16   **Q.**  And that high growth scenario would reflect organic

17   growth by American, right?

18   **A.**  It would.

19   **Q.**  And if we, you know, zoom away from just the one table,

20   is it fair to say that part of what's being discussed in this

21   portion of the deck is whether American needed to grow

22   organically to better compete with Delta and United?

23   **A.**  I think you're reading a little too much into it.  This

24   is, again, it's a --

25   **Q.**  Well, turn a couple of pages forward.

1   **A.**   Okay.  Thank you.  A couple pages forward?

2         MR. DOIDGE:  If I can just have a moment,

3   Your Honor.

4   BY MR. DOIDGE:

5   **Q.**   Mr. Parker, if I could ask you to turn to page -- the

6   slide that's 45.  And that ends in Bates number 300.

7   **A.**   Okay.

8   **Q.**   And if you look at the fourth bullet down.

9   **A.**   Yes.

10  **Q.**   That bullet reads, quote, "Growing at a lower rate than

11  Delta and United is not sustainable in a network business.

12  Their growth impacts American directly."

13         Did I read that correctly?

14  **A.**   Yes.

15  **Q.**   And so, again, my general question, fair to say that at

16  this point in time, American was considering growing

17  organically at a greater rate than it initially planned, to

18  more effectively compete with Delta and United?

19  **A.**   I'm not trying to be argumentative.  This was a

20  recommendation for the team that we should grow faster than

21  the plan of record, is what I take it to read.

22         I'd also note this is 2019 and the COVID pandemic

23  came not much later, and none of that happened.

24  **Q.**   Okay.  So fair enough.  I'll take that correction,

25  Mr. Parker.

1              So your team, your network planning team, was

2     recommending this growth, right?

3     **A.**   They were recommending some growth, yes, over and above

4     the plan of record.

5     **Q.**   And that growth was organic growth, right?

6     **A.**   Yes.

7     **Q.**   And fair to say, Mr. Parker, that now with the NEA, you

8     can borrow, rather than grow, organically in Boston, right?

9     **A.**   No, I don't think that's fair to say.  None of this talks

10    about how much of this was going to be in Boston.  I don't

11    think that -- again, I'm not certain, but I certainly don't

12    remember by talking about the need or the ability of us to

13    grow organically in Boston.  When I look at these planned

14    growth rates, they're much more about growing in and out of

15    our hubs, expanding our hubs, expanding internationally out

16    of our hubs.  We -- nothing of this talks about us going into

17    spoke cities in a big way.

18              MR. DOIDGE:  All right, Mr. Parker.  I'll pass the

19    witness.

20    **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT AMERICAN AIRLINES**

21    BY MS. SULLIVAN:

22    **Q.**   Good morning, Mr. Parker.

23    **A.**   Hi.

24    **Q.**   Would you say that all growth in a fleet plan is organic

25    by definition?

1    **A.**  All growth in -- again, the way we talk about growth in

2    our fleet plan, we talk about our fleet, so yes.

3    **Q.**  Let's take a look at PX349 that Mr. Doidge asked you

4    about.

5    **A.**  Yes.

6    **Q.**  And specifically slide 16.

7    **A.**  Okay.

8    **Q.**  This was a document that was prepared in 2012; is that

9    right?

10   **A.**  Yes.

11   **Q.**  And could you just help Judge Sorokin understand what was

12   going on in the country and in the airline industry in

13   particular prior to 2012?

14   **A.**  Sure.  Are we on page -- or are we on slide 16?

15   **Q.**  Yes.

16   **A.**  Okay, because this helps.

17          Anyway, this starts in 2005, and it shows ASMs, but

18   also -- anyway, it's -- anyway, it doesn't help as much as

19   I'd hoped, but we have other charts that we can, but

20   nonetheless.  Yeah I mean, starting in 2005, as I've already

21   testified, half of the capacity of the US airline industry

22   was in bankruptcy.  It didn't just end up in bankruptcy in

23   2005.  That was the result of some extraordinarily difficult

24   times.  September 11th, of course, the startup of a number of

25   low cost and ultra low cost carriers, the global financial

1    crisis, SARS, all of these things that effect our industry.

2    But the losses were extraordinarily large throughout all of

3    this period, and again resulting, culminating in 2005,

4    bankruptcies, four, United Airlines, Northwest Airlines,

5    Delta Air Lines, and US Airways in that second bankruptcy and

6    facing liquidation, absent a merger with America West.  So in

7    turmoil -- it's hard to overstate the level of turmoil that

8    existed in our business up until -- and again, I say in our

9    business, but almost entirely in the legacy carriers, in the

10   hub-and-spoke carriers.  The other airlines were doing --

11   Southwest was doing well, other airlines were doing well,

12   those of us who had hub-and-spoke airlines and were built

13   around connecting people were struggling, because of all the

14   reasons I stated and because we just hadn't gotten that part

15   of the business to be what customers wanted which was a few

16   airlines that compete against each other and take you

17   anywhere, as opposed to just having one airline that takes me

18   up and down the East Coast and another airline that takes me

19   to the West Coast.

20           So at any rate, it was extremely difficult, we had

21   losses that no other industry has had, and it resulted in

22   serial bankruptcy and near liquidations, and indeed, some

23   liquidations?

24   Q.  And you said that the LCCs and the ULCCs were struggling

25   less.  Why is that?

1   **A.**   They developed a model that worked in that environment,

2   they had real much lower costs.  So our model, our

3   hub-and-spoke model, is great from producing revenues, you

4   know, we take a lot of people from cities all over the United

5   States, bring them into a hub, such as Dallas.  You fly

6   Indianapolis to Dallas and then you get off and you get on an

7   airplane and it takes you to Sacramento.  That's how a

8   hub-and-spoke system works, it works well for our ability to

9   serve markets no one else will serve, no one else can serve

10  because there's not enough demand between Indianapolis and

11  Sacramento for a nonstop, so we'll only see that served

12  really by the -- over one of hubs, but also, it's really

13  costly.  We have to bring everyone in at the same time.  We

14  need a lot more gates.  We need to have a lot more people.

15  It's a piquing operation, and because we're piquing, we end

16  up with much higher cost.  Not to mention, we've been around

17  a lot longer, and, you know, our labor costs are higher.  And

18  they have the advantage of bringing in people at lower wages,

19  the bottom of the scale.  All these things.  But it's a cost

20  model.

21          So they're able to find markets with that cost

22  structure, that didn't fly in and out of hubs, for the most

23  part, and they were expanding well with them.  They have

24  been, they continued to expand well with them.

25  **Q.**   What impact, if any, did the expansion of the LCCs and

1    ULCCs during that time period have on US Airways?

2    **A.**   US Airways post-merger?

3    **Q.**   Pre-merger.

4    **A.**   Pre-merger.  US Airways in 2005 was going through -- had

5    been in bankruptcy, came out, and then within a year later, I

6    think, filed bankruptcy again and was unable to emerge from

7    bankruptcy and was going to liquidate in 2005, but for the

8    merger with America West.  We decided that it was worth the

9    risk for us to actually bring them out of bankruptcy through

10   a merger with America West, because we were concerned about

11   America West's long-term viability, as well.  And I'm glad we

12   did.  US Airways saved the jobs and created an airline that

13   could compete for a while.

14   **Q.**   And then after that merger, did the growth of LCCs and

15   ULCCs have any impact on USA Airways?

16   **A.**   Of course.  They continued to grow, as we saw in some of

17   Mr. Doidge's exhibits.  Their growth rates were much, much

18   higher.  And so the result is it's been -- it made it even

19   more important that we, hub-and-spoke carriers, get ourselves

20   well and created the networks that can compete.

21   **Q.**   All right.  Let's take a look at this slide again, slide

22   16.

23   **A.**   Yes.

24   **Q.**   You told Mr. Doidge that you disagree with this slide.

25   **A.**   I did.

1    **Q.**   Why do you disagree with this slide?

2    **A.**   I don't disagree -- I disagree that the AMR's growth plan

3    of 4.2 percent was aggressive or had potential to disrupt the

4    new dynamic.  I disagree with almost every word on this page

5    as to everything past -- as to what it means about AMR.  It

6    says, "AMR's growth plan will reverse industry capacity

7    trends."  That's not my recollection.  My recollection is

8    strong on this point.

9         This, again, was when we at US Airways were talking

10   to the creditors of American Airlines about our plan to bring

11   American out of bankruptcy was better for them than American

12   stand-alone.  And at one point, it had been suggested, we had

13   heard that American was planning to grow at 20 percent, which

14   clearly sounds in excess of any demand rates.  So we had

15   expressed some concern about that.  But then we saw, once we

16   got into diligence, that it was actually 20 percent over five

17   years, about four percent a year, which this represents,

18   which seemed completely reasonable to me, given where the

19   economy was then.

20        I don't know who wrote this.  I don't know why they

21   wrote that they thought 4 percent was too much, I certainly

22   never did.  And indeed, it wasn't.  We've combined those two

23   airlines, and we've grown them since.  And it's worked.

24   **Q.**   Do you recall any criticism that US Airways made of

25   American Airlines' stand-alone growth plans at that time?

1    **A.**  I do.

2    **Q.**  What do you recall?

3    **A.**  Again, criticism --

4              I'm sorry, their stand-alone growth plans?  No.

5    Their stand-alone plan.  We critiqued their stand-alone plan

6    as being aggressive in terms of revenue forecast, if that's

7    what you're asking about.

8    **Q.**  Can you explain that?

9    **A.**  Sure.  Well, on this growth of 4 percent, the way they

10   modeled it was that revenue would come on at an average

11   revenue per ASM, which we pointed out was an aggressive

12   assumption.  In general, when we add capacity, it doesn't

13   come in at the average of the capacity that already exists,

14   because it's marginal capacity.  It's not as good as the

15   routes we've already added, or we would have added them

16   sooner.  So we generally put it in at marginal revenue per

17   ASM.

18            It's also marginal costs per ASMs, so can be nicely

19   profitable because it is lower cost, as well, because the

20   cities already exist, the airplanes exist.

21            But yeah, we thought that was a very aggressive

22   assumption.  So we encouraged them as they were doing their

23   own diligence, to discount some of their revenue growth, but

24   not the growth itself, just how much revenue would be

25   associated with the growth.

1    **Q.**  Now, let's take a look at PX950.  This was the witness

2    statement that Mr. Doidge asked you about.

3    **A.**  Yes.

4    **Q.**  Do you recall anyone in the litigation relating to the

5    US Airways/American Airlines --

6                (Counsel confers.)

7    BY MS. SULLIVAN:

8    **Q.**  Okay.  Apologies, it's not PX950.  But it doesn't matter.

9                Do you recall the questions about the witness

10   statement that was submitted in connection with litigation

11   relating to the American Airlines/US Airways merger?

12   **A.**  I do.

13   **Q.**  Do you recall anyone in the litigation relating to that

14   merger focusing on local relevance?

15   **A.**  No.

16   **Q.**  And specifically, do you recall anyone in that litigation

17   focusing on the local relevance of the combined firm for

18   originating passengers?

19   **A.**  No, I do not.

20   **Q.**  Mr. Parker, from your perspective, what do consolidation

21   and capacity decisions in the airline industry, in the 2005

22   to 2013 time period, have to do with the NEA?

23   **A.**  Nothing.

24   **Q.**  What has your involvement been with the NEA?

25   **A.**  Well, it's largely been led, from my perspective, by Vasu

1    Raja and his team.  Vasu reported up to Robert Isom, our

2    president, who reported to me.  As the talks continued, as

3    they progressed, I would get updates primarily through

4    Robert, but not detailed.  But I knew how the talks were

5    progressing.

6            At one point we all -- we had a dinner together in

7    Dallas, where Robert and the team came in, to show them that

8    we were -- which I was involved in, just to let them know

9    that this was something that we were -- that I was actually

10   interested in.  But that was it.

11   **Q.**  Did anyone ever suggest in any of the meetings that you

12   attended regarding the NEA, either in substance or effect,

13   that the NEA was a way for American to take over and control

14   JetBlue?

15   **A.**  Absolutely not.  And if they had, I would have told them

16   that wouldn't work.

17   **Q.**  Why would you have told them that?

18   **A.**  I believe -- I know JetBlue is fiercely independent.

19   They have a very nice airline.  They're proud of that

20   airline.  They're proud of that independence.  I firmly

21   believe they would like to remain independent as long as they

22   possibly can.  And I think this transaction is designed to

23   help them do that.

24           The only reason they wouldn't remain independent is

25   because they just -- they can't get to a scale that allows

1    them to compete as well as they'd like, and they become a
2    part of someone else's network instead of building their own.
3    So as I look at JetBlue, I look at what they're doing as what
4    they know is what they have to do to remain independent.
5    They need to get -- they need the NEA.
6            I believe they're merger with Spirit is about the
7    exact same thing.  It's about JetBlue doing what they believe
8    is best for their team and their shareholders, and that's
9    remaining independent.  And the best way for them to do that
10   is to have this NEA partnership, as well as the Spirit
11   transaction.  I'm sure they have other ideas in the future.
12   **Q.**  Did anyone ever suggest to you in any of the meetings
13   that you attended regarding the NEA, that the NEA is a way
14   for American or JetBlue, or for either of them to reduce
15   capacity?
16   **A.**  No.
17           MR. DOIDGE:  Objection, Your Honor, I've let it go,
18   but leading and it's calling for hearsay.
19           THE COURT:  Overruled.
20           MS. SULLIVAN:  Thank you, Your Honor.  I have no
21   further questions.
22           THE COURT:  All right.  Do you have anything else?
23           MR. DOIDGE:  Very briefly, Your Honor.
24           THE COURT:  All right.
25       **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

1    BY MR. DOIDGE:

2    **Q.**  Mr. Parker, Ms. Sullivan asked you some questions about

3    slide 16 of the deck that related to the capacity discipline,

4    correct, with respect to American's stand-alone plan in

5    bankruptcy, right?

6    **A.**  She did.

7    **Q.**  And Mr. Parker, you volunteered that your -- you were

8    concerned about American's growth plan when you believed it

9    was on the order of 20 percent, rather than what it suggests

10   in the slide of 4 percent, right?

11   **A.**  Yeah, when I believed it was 20 percent in one year, I

12   don't think I -- again, I believed that would be not prudent

13   growth for American Airlines net alone.

14   **Q.**  And Mr. Parker, fair to say that when you believed that

15   American's stand-alone growth plan was at that higher rate,

16   you were concerned that AMR's plan would be bringing in

17   supply at a rate faster than demand was growing, and that

18   would have an impact on the industry, right?

19   **A.**  Much less about that and much more about -- if, indeed,

20   that's what they were doing, if that was their plan -- which,

21   by the way, it was not.  Our information was wrong.  But if

22   that was their plan, I didn't believe that was in their

23   creditor's best interest, so we were going to let the

24   creditors know that we had a better plan.  So -- but to

25   suggest that we would go do a merger just so someone else

1    wouldn't go and put in place growth is folly, of course.

2    It's really hard to do a merger.  It takes awhile to work, a

3    lot of effort.  So that had nothing to do with it.  We did

4    the merger, because we had two networks that were struggling

5    to compete, and putting them together, we compete much

6    better.

7    **Q.**  And Mr. Parker, you recall that you were deposed during

8    the American/US Airways litigation with the Department of

9    Justice?

10   **A.**  I do.

11   **Q.**  Let me ask you to turn -- you can find that testimony of

12   PX02, in the prior testimony binder?

13   **A.**  Okay.

14              THE COURT:  What page?

15              MR. DOIDGE:  I'm sorry, Your Honor.  Page 211.

16   Although, actually, we start at the bottom of page 210.

17              THE COURT:  Page 210 of the deposition, which would

18   be --

19              MR. DOIDGE:  Yes.

20              THE COURT:  -- 766, last three digits of the Bates

21   number?

22              MR. DOIDGE:  That's correct, Your Honor.  Thank

23   you.

24              THE WITNESS:  Thank you.

25              THE COURT:  Do you want him to read something?

```
 1          MR. DOIDGE:  I'm going to ask him a question.

 2   BY MR. DOIDGE:

 3   Q.  Are you there, Mr. Parker?

 4   A.  I am.

 5          THE COURT:  He's there.

 6   BY MR. DOIDGE:

 7   Q.  So if you want to take a moment, you can read it first,

 8   Mr. Parker.  I suggest you read from lines 23 on page 210?

 9   A.  Okay.

10   Q.  Through lines -- 213, line 2.

11   A.  Okay.

12   Q.  Mr. Parker, at line 23 of 2010, Mr. Gelfand asked you,

13   "Why would American growing by 20 percent over a short period

14   of time caused you concern as the CEO of US Airways?"

15          And your response is that, "Because, back, again,

16   to this, getting the industry at a point where supply and

17   demand is in, is in something at a level that allows us to

18   cover our cost of transportation and given all the work the

19   industry had done to get there, given all the turmoil we had

20   been through, given that in the past airlines, part of what

21   we had never been able to return in capital, is that every

22   time an airline in the industry it seems starts to do well,

23   the industry tends to add capacity to the point that, all of

24   a sudden, there's more supply than demand meets, and we can't

25   cover our costs anymore.
```

1          "Hearing things like that are generally concerning

2     to us, and that was the case here.  So here we were.

3     American's in bankruptcy.  So 2011, the industry is clearly

4     not well yet.  We're starting to do a little better, getting

5     to where we can actually make some profit, but not anything

6     like other companies make in terms of other profits.  And to

7     hear that an airline might want to grow at 20 percent over a

8     short period of time, which is in excess of any GDP forecast

9     we had seen, sounds like supply coming on at a rate faster

10    than demand is going to grow, and that could have an impact

11    on our industry, and that's concerning to us."

12          And then Mr. Gelfand asks the question, "And again,

13    I'm just trying to figure out what that last link in the

14    chain is.  Why does that have an impact on your industry?

15    Why would a 20 percent growth by American over a short period

16    of time have an --

17          THE COURT:  I don't think -- he's read it all --

18          You've read it all through the end of page 2.

19          THE WITNESS:  I have, sir.

20          THE COURT:  So he's read it.  So what's the

21    question?

22    BY MR. DOIDGE:

23    **Q.**  Mr. Parker, do you agree with the testimony that you

24    provided in your deposition in 2013?

25    **A.**  I do.  And I think it's entirely consistent with the

1    testimony I just gave you when you asked me the question.  We

2    were talking before about the --

3              THE COURT:  He just asked you if you --

4              THE WITNESS:  Okay.  Yes.

5              MR. DOIDGE:  So, Your Honor, I would move as a

6    party admission, lines -- page 210 from line 23, to page 213,

7    line 2 of Mr. Parker's deposition.

8              MS. SULLIVAN:  We have no objection, Your Honor.

9              THE COURT:  Fine.  Admitted.

10             (Plaintiffs' Exhibit No. Deposition of William D.

11             Parker, page 210, line 23, to page 213, line 2

12             admitted into evidence.)

13             MR. DOIDGE:  If I can just have one moment.

14             THE COURT:  Of course.

15             MR. DOIDGE:  Your Honor, I have no further

16   questions.

17             THE COURT:  All right.  You don't have anything

18   else, do you?

19             MS. SULLIVAN:  No, Your Honor.

20             THE COURT:  All right.  Thank you very much, sir,

21   you're excused.  Have a nice day.  We'll take the morning

22   break now.

23             MR. WALL:  Your Honor, before you go, I think

24   there's something you need to know.

25             THE COURT:  Yeah.

1               MR. JONES:  Your Honor, if I may, based on our

2     conversations with each other and the upcoming holiday, and

3     the estimates of Mr. Laurence and Mr. Parker's length, we do

4     not have another witness lined up for this morning.  So with

5     the Court's indulgence, we would ask that we adjourn for the

6     day and --

7               THE COURT:  Get a free hour and a half.

8               MR. JONES:  Get an hour and a half back for

9     everyone's time, if that's okay with Your Honor.

10              THE COURT:  That's fine.  All right.  Okay.  Well,

11    then have a nice rest of your day.  Have a nice tomorrow,

12    however you're spending tomorrow, whatever it might be, and I

13    will see you all Thursday morning at 9:00 a.m.

14              (Court in recess at 11:02 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2                          **C E R T I F I C A T I O N**

3

4            I certify that the foregoing is a correct

5       transcript of the record of proceedings in the above-entitled

6       matter to the best of my skill and ability.

7

8

9

10      /s/ Rachel M. Lopez                    October 4, 2022

11      /s/ Robert W. Paschal

12

13

14      _____           _____

15      Rachel M. Lopez, CRR               Date

16      Robert W. Paschal, RMR, CRR

17      Official Court Reporters

18

19

20

21

22

23

24

25