1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3

4    _____

5    UNITED STATES OF AMERICA, et al.

6          Plaintiffs,                    Civil Action No.
                                          1:21-cv-11558-LTS
7       v.

8    AMERICAN AIRLINES GROUP, INC.,
     et al.,
9
          Defendants.
10
11   _____

12      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14              BENCH TRIAL
                   Day 7

15

16              Thursday, October 6, 2022
17                 9:00 a.m.

18

19

20
     John J. Moakley United States Courthouse
21   Courtroom 13
     One Courthouse Way
22   Boston, Massachusetts

23
     Rachel M. Lopez, CRR
24   Official Court Reporter
     raeufp@gmail.com
25

1                         **A P P E A R A N C E S**

2

3     On behalf of the Plaintiff United States of America:

4         UNITED STATES DEPARTMENT OF JUSTICE
          BY:  WILLIAM H. JONES, III; BONNY E. SWEENEY
5         450 Fifth Street, Northwest
          Suite 8000
6         Washington, D.C.  20530
          (202) 514-0230
7         bill.jones2@usdoj.gov
          bonny.sweeney@usdoj.gov

8

9     On behalf of the Defendant American Airlines Group, Inc.:

10        LATHAM & WATKINS, LLP
          BY:  DANIEL M. WALL AND MARGUERITE M. SULLIVAN
11        505 Montgomery Street
          Suite 2000
12        San Francisco, California  04111
          (415) 391-0600
13        dan.wall@lw.com
          marguerite.sullivan@lw.com

14

15    On behalf of the Defendant JetBlue Airways Corporation:

16        SHEARMAN & STERLING LLP
17        BY:  RICHARD F. SCHWED
          599 Lexington Avenue
18        New York, New York  10022
          (212) 848-4000
19        richard.schwed@shearman.com

20

21

22

23

24

25

1                    __TABLE OF CONTENTS__

2

3                      **TRIAL WITNESSES**

4

5    On behalf of the Plaintiffs:                    <u>Page</u>

6    ANDREW HARRISON

7            By Ms. Sullivan                          8

8            By Ms. Sweeney                          51

9            By Ms. Sullivan                         77

10           By Ms. Sweeney                          79

11   VASU RAJA

12           By Mr. Wall                             81

13           By Ms. Sweeney                         146

14           By Mr. Wall                            175

15

16

17                      **EXHIBITS**

18

19   On behalf of the Plaintiffs:                <u>Admitted</u>

20    Number 394 and 397                             64

21

22   On behalf of the Defendants:                <u>Admitted</u>

23    Number 221                                     45

24    Number 225                                     42

25

1          **P R O C E E D I N G S**

2               (In open court.)

3               THE DEPUTY CLERK:  The United States District Court

4     for the District of Massachusetts is now in session, the

5     Honorable Leo T. Sorokin presiding.

6               THE COURT:  Please be seated.

7               So just a couple of housekeeping matters.

8               First, I received your e-mail about somebody on the

9     plaintiffs' side who got COVID, and I hope they're not too

10    sick, and I wish them a speedy recovery.

11              I think what I would suggest, you caused me to look

12    more carefully at the Court's policy than I have looked in

13    awhile and I realized that the -- so I -- so my suggestion to

14    all of you is if you've had a close contact, whether it's the

15    person on the trial team or any of you, if you have a close

16    contact with somebody who turns out to test positive for

17    COVID, I recommend strongly you follow the CDC protocol which

18    is more extensive than the Court's general order 22-2, which

19    would say you mask for ten days.  I can speak from personal

20    experience over the last ten days, that it's not fun to have

21    to mask for ten days as you sit here all day in court, but

22    it's the CDC's protocol, and the reason I suggest you all do

23    it is because we really want to keep going, and that's the

24    best way to keep going.  And so we haven't had to have --

25    like except for one brief -- we haven't had to have any

1    sidebars, but my thought would be if we have to have

2    sidebars, we probably will just do it with the whisper

3    technology either from your seats and then we can show you

4    how it works, it's not that complicated, and we'll just do

5    that.  And it just -- this has come up in other cases, and

6    it's just -- otherwise, the risk of, like, running rampant,

7    and suddenly nine of you are out, and then it makes it really

8    hard to proceed, or some of us are out, or all of us or

9    whatever.

10          So it looks like that's what you're doing and so

11   good.

12          All right.  And in terms of the schedule that you

13   laid out, who's coming in, that's fine, and that works for

14   me.

15          And I had one other thought just to -- that

16   occurred to me, that might -- you can think about whether

17   this is helpful or not.  So part of what's happening with

18   witnesses is you're, you know, highlighting, obviously, and

19   appropriately, with witnesses, certain documents, right, and

20   having them talk about it.  So one thing, if you think this

21   is a useful thing, you can do the following.  I'm not

22   ordering you to do it, it just occurred to me, which is that

23   you might want to, at the end of each day, tell me what

24   things in the witness binders, what we're doing is giving

25   back to you one set and keeping one set, if there's

1    something -- if there's -- you know, if what you're about to
2    say in this little filing I'm suggesting is just read
3    everything in the binder, you don't need to tell me that.
4    But if -- I get -- that message I've gotten.  But if there's
5    particular things you want to say, you know, Judge, we
6    suggest you read these pages of these exhibits, and you each
7    give me just a little list of the things that you think are
8    really important to look at, relevant -- and you could do
9    it -- if you want to do it before the witness testifies, the
10   day before, you can, but then you would have to give me the
11   binders.  It would be helpful to have the binders the day
12   before, or -- we'll I'll come to that in a minute.  So you
13   could give it to me afterwards.  And it's not useful to tell
14   me to read the whole binder, because there's a certain amount
15   of trailing reading that's likely to occur here, but if there
16   are particular pages that you think are useful and --
17          What I don't want it to turn into is like a
18   strategic back and forth like you each file a piece of paper,
19   and then the next day you each file rebuttal pieces of paper,
20   well -- so you know, just show each other what it's going to
21   be, and like it is what it is.  Like the documents are going
22   to be in.  And so if that makes you think that the government
23   is submitting these three pages, you know, I should also look
24   at those three, show it to them before you give it to me, and
25   if you want to add those three pages, fine.  And you can do

1   two separate pieces of paper, one, here's what the government

2   suggests, and whatever you want.

3           I'm just thinking if there's pages that you want me

4   to look at, the best time for me to look at them for focused

5   pieces is right after or right before the witness testifies.

6   So if that's helpful to you, you can do that.  If you don't

7   think it -- you don't have to do it every day.  Do whenever

8   you think it -- you should -- whenever you think it would be

9   helpful for me to understand things.  Do that.

10          And you could also reference things that aren't in

11  that witness's binder.  If you think it's useful, in light of

12  that witness's testimony, to look at some other exhibit

13  that's in evidence.

14          The second thing that reminds me of is just in the

15  briefing that you do later, it would be really helpful in

16  this case to hot link to the exhibits.  And so there is a way

17  to do that on ECF, if the exhibits get filed first, before

18  the memos, if they're on the docket, so you can cite to them.

19          You could also potentially just give me a disc or

20  something that hot linked within a folder or something like

21  that, but that would be really helpful when you do the later

22  filings.

23          And to the extent -- well, okay.  That's enough.

24  So anyway.  Fine.  I'm ready -- is there anything any of you

25  want to bring up?

1          MR. JONES:  Nothing from plaintiffs, Your Honor.

2          MS. SULLIVAN:  Nothing from defendants.

3          THE COURT:  Well, I hope all of you who didn't have

4    to suffer yesterday had a good break.  And I'm pure,

5    cleansed, and ready to go.

6          MS. SULLIVAN:  Good morning, Your Honor, defendants

7    call Andrew Harrison.

8          THE COURT:  All right.  Right there if you take the

9    witness stand and remain sustaining for Ms. Belmont to

10   administer the oath.

11          (The witness was duly sworn.)

12          THE COURT:  Please be seated.

13          Go ahead, Ms. Sullivan.

14                    **ANDREW HARRISON**

15       having been duly sworn, testified as follows:

16       **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

17   BY MS. SULLIVAN:

18   **Q.**  Good morning, Mr. Harrison.

19   **A.**  Good morning.

20   **Q.**  I'd like to start with a little bit of your background.

21   How many years of experience do you have in the airline

22   industry?

23   **A.**  19.

24   **Q.**  Where are you currently employed?

25   **A.**  Alaska Airlines.

1    **Q.**  And how long have you worked at Alaska?

2    **A.**  19 years.

3    **Q.**  Could you describe the positions that you've held at

4    Alaska and your responsibilities over time?

5    **A.**  Yeah, I came to Alaska, and started in the internal audit

6    group.  I did that for a few years and then I took on the

7    financial planning and analysis team doing the budgets and

8    forecasts and that type of thing.  And then I took on the

9    network which is sort of where we fly, how often we fly, the

10   type of airplanes we fly, and then I took on the revenue

11   management, which is all the ticket pricing, and everything

12   like that.  And then I was given marketing, which has a broad

13   amount of responsibilities, including our loyalty program and

14   credit card, just general marketing, and all that good stuff.

15   And then I took on airport affairs, our real estate at the

16   airports, and the relationships there with the airport.  And

17   then innovation and technology, Alaskaair.com.  So

18   essentially, all the revenue producing functions, and today

19   I'm their chief commercial officer.

20             THE COURT:  So the only thing you haven't done is

21   fly?

22             THE WITNESS:  Correct.

23   BY MS. SULLIVAN:

24   **Q.**  When did you become the chief commercial officer?

25   **A.**  2015.

1   **Q.**   Could you tell us a little bit about Alaska Airlines?

2   What type of airline is it?

3   **A.**   Alaska Airlines, we're primarily based on the West Coast.

4   We started in Anchorage, we're 90 years old, and our largest

5   city is Seattle, but essentially we serve the West Coast, and

6   from Seattle we have 100 destinations.  So we pretty much

7   serve a lot of the country and then we have, you know, major

8   operations in California, as well.  We're the fifth largest

9   airline in the United States.

10   **Q.**   What are your major airports, other than Seattle?

11   **A.**   So it would be Anchorage, Alaska, and Portland in Oregon,

12   San Francisco, and Los Angeles.

13   **Q.**   And you said that you fly 100 destinations out of

14   Seattle, I believe; is that right?

15   **A.**   That's correct.

16   **Q.**   Do you service only the United States, or also do you

17   have international?

18   **A.**   We have what I'm going to call mini international, which

19   is basically Canada, Mexico, and Belize and Costa Rica, but

20   mostly domestic.

21   **Q.**   So no long-haul, international flying?

22   **A.**   Correct.

23   **Q.**   And what types of customers does Alaska cater to?

24   **A.**   We cater to everybody, just like most airlines.  But we

25   buy a small into leisure travel, about prepandemic 30 percent

1    of our travelers were business, 70 percent were leisure.

2    Over time, I think we've been able to get a bit more business

3    travel.

4    **Q.**  You mentioned that Alaska is the fifth largest airline,

5    can you give us a sense of what that means in terms of

6    revenues?  Let's say in 2019, what were Alaska's revenues?

7    **A.**  Yeah, we were about 9, 9 and a half billion dollars in

8    revenues.

9    **Q.**  And how would you cay that compares to airlines like

10   Delta or United, for example?

11   **A.**  We're significant smaller.  These other guys are 40 to

12   $50 billion in revenues.

13   **Q.**  So we're going to talk in a minute about the West Coast

14   International Alliance, but before we do, has Alaska tried to

15   expand its network by partnering with other airlines in the

16   past?

17   **A.**  Yes, we have.

18                MS. SWEENEY:  Objection.  Leading.

19                THE COURT:  Overruled.

20   BY MS. SULLIVAN:

21   **Q.**  With which airlines?

22   **A.**  We've had international partners for a long, long time,

23   but the most significant relationships we've had is with

24   Delta Air Lines, and obviously American Airlines, as well.

25   **Q.**  So can you tell us a little bit about your partnership

1   with Delta?

2   **A.**   Yeah, Delta Air Lines, that was a relationship, where,

3   again, given our size, we needed a partner to help get people

4   across the country and across the world, we entered into a

5   partnership with Delta Air Lines.  They were also building up

6   their international hub in Seattle and needed feed and

7   connectivity, and so that's how that relationship started.

8           It was good in the early days, and then it became

9   more and more strained as Delta Air Lines began to be very

10   clear that they really only wanted us to partner with them,

11   and the partners that they wanted us to partner with, which

12   means that essentially we would lose a lot of the unique

13   partnerships that we had that made us special and made us

14   different.  And so that got increasingly strained over time,

15   until one day they just basically launched a massive attack

16   on our hub in Seattle, and then went from 37 flights a day to

17   160 flights a day, over a matter of a few years, blanketed

18   70 percent of our network, and ultimately that relationship

19   ended.

20   **Q.**   When did it end?

21   **A.**   It ended with the Virgin/America acquisition, when

22   Delta Air Lines severed the relationship.

23   **Q.**   Do you have a sense of when that was?

24   **A.**   2016, early -- probably 2017.

25           THE COURT:  What were the partnerships -- you said

1    they didn't like partnerships you had.  What were they?

2              THE WITNESS:  So we work with other airlines like

3    British Airways, Icelandair, which is a small carrier that

4    serves Iceland, Emirates, a middle eastern carrier.  And they

5    weren't part of Delta Air Lines sky team alliance, and so

6    they wanted us to put all the traffic and all the connections

7    on their partners, and we refused to do that.

8              THE COURT:  I see.  They essentially wanted you to

9    join their network of relationships.

10             THE WITNESS:  Correct.

11             THE COURT:  I see.

12             THE WITNESS:  And given their size, it would have

13   meant that our brand and our loyalty would have shrunk, and

14   I'm not sure we would have survived a lot longer had we done

15   that.

16             THE COURT:  And when they -- you say they attacked

17   you, that was by competing head to head with flights in and

18   out of Seattle, to many of the destinations that you had?

19             THE WITNESS:  Yeah.  Exactly right.

20             THE COURT:  I see.

21             Okay.  Go ahead.  Thanks.

22   BY MS. SULLIVAN:

23   Q.  You also mentioned that Alaska had a prior partnership

24   with American Airlines?

25   A.  That's correct.

1    **Q.**  Can you tell us about that?

2    **A.**  Yeah, we've long had a relationship with

3    American Airlines for a long time, and then American Airlines

4    had their challenges.  There was bankruptcies and

5    acquisitions along the way.  So it was a good relationship,

6    but it wasn't as close as the Delta relationship.

7            Then we -- when we acquired Virgin America, that

8    put the relationship a little bit under strain, especially as

9    there was new management running American Airlines from US

10   Airways, but really what put the nail in the coffin is when

11   we acquired Virgin America, and the Department of Justice

12   forced us to basically not partner with them on overlap

13   routes, and essentially, the relationship unwound after that.

14   **Q.**  And when you say "not partner with them," who are you

15   referring to?

16   **A.**  With American Airlines.

17   **Q.**  What impact did that have on Alaska?

18   **A.**  What that meant was we just -- we lost a lot of

19   connections over their hubs, because a lot of the code was

20   removed.  There was issues with our loyalty members, and so

21   essentially the partnership started to unravel, and all the

22   benefits that we had enjoyed to help us compete and reach the

23   rest of the United States and the world started to unravel.

24   **Q.**  Okay.  So let's talk about the attack on Alaska in

25   Seattle that you mentioned.

1              Can you describe that in a little more detail?

2    What happened?

3    **A.**  So essentially, when Alaska was not willing to make

4    adjustments to our partnership and how we operated --

5              THE COURT:  This is the partnership with Delta?

6              THE WITNESS:  That's correct, Your Honor.

7              THE COURT:  Okay.

8              THE WITNESS:  So what Delta Air Lines then did was,

9    again, they had 37 flights a day, and then they just started

10   pulsing in flight after flight after flight, blanketing our

11   network, even very small communities in the state of Alaska,

12   and across our network.  And so it became highly competitive,

13   and then in many cases, the markets had too many seats in

14   them, and fares collapsed.

15   BY MS. SULLIVAN:

16   **Q.**  What impact did it have on Alaska to have Delta

17   blanketing the network?

18   **A.**  It put a huge strain, obviously, on our ability to

19   generate revenues, it put a huge strain on our loyalty and

20   our corporate accounts, and resulted in us losing business.

21   **Q.**  Why did it have that impact?

22   **A.**  It had that impact because, well, essentially, you know,

23   the partnership which we relied on to get our folks across

24   the country and the world -- that part of it started to

25   collapse, and then with the increased competition and

1    frequency that Delta provided, you know, airlines live and

2    die by supply and demand, and there was just too many seats

3    in the marketplace.

4    **Q.**   Is there something about Delta's network in particular

5    that made it particularly challenging for Alaska?

6    **A.**   Just that Delta's, you know, an extremely large airline,

7    they have massive resources, and with them flying especially

8    in our Seattle hub, which is our primary hub, with them

9    flying in all of our markets, it very much weakened us

10   economically.

11   **Q.**   Does Delta actually have a physical presence in Seattle?

12   **A.**   They do.

13   **Q.**   When did that occur?

14   **A.**   When you say physical presence, could you expand on that,

15   please.

16   **Q.**   Do they have a hangar?  Do they have a building?  Are

17   they physically located there?

18   **A.**   Yes, they have power bases, they have a massive hangar.

19   **Q.**   And when did they move into Seattle?

20   **A.**   Northwest was always in Seattle back in the days.  They

21   used to do Hawaii.  But really in 2013, that's when

22   Delta Air Lines really ramped up and increased their

23   presence.

24   **Q.**   And was that something that Alaska noticed?

25   **A.**   Oh, absolutely.

1          THE COURT:  And in 2013, what was the status of

2     your partnership with Delta, yours being Alaska's?

3     **A.**  Yeah, so that was -- that was good and that was the time

4     when they started pressuring us to make changes to our

5     relationships.  And so what happened starting in 2013, they

6     started putting in flights on some of our very significant

7     network, and just starting pulsing the pressure.

8          THE COURT:  I see.  But at that point, and while

9     that was occurring, you were still partnering with them in

10    the sense of feeding them passengers for international

11    flights or what have you?

12         THE WITNESS:  That's correct, Your Honor.  I think

13    the relationship was probably 2008, something like that.  And

14    so we had been in partnership for a number of years, and we

15    were fully, you know, had a good, strong, relationship with

16    them up until that point.

17    **Q.**  What were the features or terms of the partnership?

18    **A.**  The relationship was a lot of the traditional type

19    airline relationships, where -- so we had our loyalty

20    program, which means that our flyers could earn Alaska miles

21    and redeem Alaska miles on Delta's network, and vice versa.

22    We shared lounges, each other's lounges, and actually handled

23    this in about 10 or 12 different stations in our network, to

24    help us with economies of scale.

25         THE COURT:  What about did you adjust your schedule

1    or they adjust theirs to match like the flight coming in from

2    Anchorage to Seattle, so people could get on the flight

3    from -- Delta flight to Japan or London, or what have you?

4            THE WITNESS:  We would occasionally have, you know,

5    small adjustments in the timing of our flights, just, like,

6    for instance, we would see if they had a lot of people coming

7    into Seattle to go to Narita, and we knew that they were

8    coming from Anchorage or Canada, and we could move our

9    flights around to make sure we maximize the amount of people

10   we could bring into Seattle on those flights.

11           THE COURT:  I see.  Okay.  Thank you.

12   BY MS. SULLIVAN:

13   Q.  When Delta increased its presence out of the West Coast,

14   did Alaska have international partners that would help it

15   compete against Delta's move?

16   A.  Yes, we did.

17   Q.  And were they sufficient?

18   A.  I wouldn't say sufficient, but one of the challenges we

19   had was that, unlike where we are today, we had these

20   relationships with international carriers, like British

21   Airways, like Qantas, but they weren't fully integrated.

22   They were not anything close to the seamless and best

23   practice of connecting to international carriers, like the

24   big, global alliances had.

25   Q.  Could you just have built your own bigger global network

1    to compete?

2    **A.**   No.  For two reasons.  The cost of that would have been

3    prohibitive, and we've struggled to get slots at JFK over the

4    years, let alone, you know, slots in London Heathrow.

5    **Q.**   Before we move on to another topic, have you observed

6    Delta making any similar type moves in other geographic areas

7    in the United States?

8    **A.**   You know, the two very prominent areas that Delta have

9    made very significant pushes on were Seattle and here in

10   Boston.

11   **Q.**   Okay.  So let's shift gears now, Mr. Harrison, and talk

12   about the West Coast International Alliance.  I'm going to

13   call it the WCIA, if that's okay.

14        What is the WCIA?

15   **A.**   The West Coast International Alliance is sort of an

16   umbrella term for a fairly robust and comprehensive

17   relationship.  There's probably four key elements, I suppose,

18   I would say.  The first one is that -- came into this was we

19   were able to join as a member of one world, usually

20   important.  There's also, we're able to joint contract with

21   American, with big corporate contracts, to help us be more

22   expansive.  And then you sort of have the loyalty side, the

23   loyalty program, and then the codeshare side of things as

24   well.

25   **Q.**   Okay.  I'll address each of those in a minute.  But when

1    did Alaska enter into the WCIA?

2    **A.**   I believe it was in early 2020, right before the

3    pandemic.

4    **Q.**   And why did you enter into it?

5    **A.**   We needed to -- we had a very serious problem, because,

6    essentially, you know, the Delta relationship was gone and

7    ended.  The American relationship was basically wound down to

8    nothing.  And so we had, really, two very significant issues.

9    Number one, to compete with Delta in the Pacific Northwest,

10   where we didn't fly everywhere.  With our arrival to connect

11   people over their hubs at all times day and night, that was a

12   real challenge for us, and we were losing corporate accounts.

13   And secondly, internationally.  We had international

14   partners, but they were nothing close to as integrated that

15   Delta had, and they came to Seattle basically saying they

16   were Seattle's global airline.

17   **Q.**   And what was your understanding about why

18   American Airlines entered into the WCIA?

19            THE WITNESS:  I'm sorry, could you repeat that

20   question?

21            MS. SWEENEY:  Objection.  Foundation.

22            THE COURT:  Overruled.  You can lay a little

23   foundational, but I assume since --

24            Did you have anything to do with negotiating the

25   deal with American?

```
1              THE WITNESS:  Yes, I did.
2              THE COURT:  Were you the lead person with -- were
3     you part of the team for Alaska?
4              THE WITNESS:  Yes, I was.
5              THE COURT:  All right.  Go ahead.
6     BY MS. SULLIVAN:
7     Q.  Did you get an understanding of why American entered into
8     the WCIA?
9     A.  I did.  I believe so.
10    Q.  What was that understanding?
11    A.  My understanding is that American Airlines really needed
12    to build up their international network on the West Coast.
13    They were hugely struggling in Los Angeles and United had a
14    very large network internationally out of San Francisco, and
15    Delta had built one out of Seattle.  And so what we could
16    help them with is to build and feed and bring our guests to
17    help fill their international flights as they sought to grow
18    that.
19    Q.  Okay.  Thank you.
20             All right.  So let's walk through the four features
21    that you've described.  The first thing you mentioned was the
22    Oneworld relationship, or Oneworld membership.  Can you
23    explain what that is?
24    A.  Oneworld is -- there's sort of three global, you know, I
25    would say, partnerships, clubs, if you want to call them
```

1    that, Star, Sky, and Oneworld.  So Oneworld, what was really
2    important for us is that firstly, we had to be invited into
3    one world.  Unfortunately, you just can't apply and get in.
4    You need to be sponsored in and American Airlines being a
5    founding member and so significant, we really needed them to
6    invite us into Oneworld, which they did.
7            Once we were in Oneworld, it opened a huge amount
8    of exciting opportunities.  Number one, obviously, we can
9    build more seamless and deeper relationships with these
10   international carriers, so that if you have an elite status
11   on Alaska Airlines, if you're a frequent flier with us, and
12   we give you special privileges, those privileges transfer to
13   all the Oneworld international carriers.
14           The other really important part is that for years,
15   we had tried to expand our relationships with these
16   international carriers in Oneworld, but because we were not
17   in Oneworld, they would not do that.  Since we've joined
18   Oneworld, they've agreed to do a lot more code and
19   connections and they've agreed to let us sell them on
20   alaskaair.com, so that we can be more of an international
21   distribution for flights.
22   Q.  So how does that work?  How do you sell those flights on
23   Alaska.com?
24   A.  Well, essentially, we put our code on those -- we market
25   those international flights and you go to AlaskaAirlines.com,

1    and you can see Delta's Seattle-London Heathrow, for

2    instance.  And then so -- guests start to view us more as a

3    bigger, more competitive brand.

4    **Q.**  Did you just say that you can see Delta's London

5    Healthrow flight?

6    **A.**  If I said that, that was a very gross error of mine.  You

7    would not see Delta's flight on our website.  Sorry.

8    **Q.**  Okay.  So let's move on to the second point --

9              THE COURT:  Before you do.

10             So years back, Delta was pressuring you to join

11   their network, right?

12             THE WITNESS:  No, Your Honor, there was no talk of

13   us joining the SkyTeam.  It was more specifically working

14   with them and then us not really using our other

15   international partners.

16             THE COURT:  I see.  So they just went -- they're --

17   they're obviously not in one world.  There's is which one?

18             THE WITNESS:  They're the SkyTeam.

19             THE COURT:  SkyTeam, which is one of the

20   competitors to Oneworld.

21             THE WITNESS: Correct.  Correct.

22             THE COURT:  So they wanted you not to join -- they

23   weren't saying join SkyTeam?

24             THE WITNESS:  Correct.

25             THE COURT:  Is this, too, like a private club, you

1    need to be sponsored.

2            THE WITNESS:  Absolutely.  Members only can invite

3    you in.

4            THE COURT:  Okay.  So they were not inviting you

5    in?

6            THE WITNESS:  No.  I mean, I vaguely recall it was

7    talked about, but there was no move or no real desire to do

8    that.  Because if -- a lot of our members were actually

9    Oneworld partners, so we knew that if we went into the

10   SkyTeam, we would have a big issue with that.

11           THE COURT:  I see.  Thank you.

12           Go ahead.

13   BY MS. SULLIVAN:

14   **Q.**  So another feature of the WCIA that you mentioned was

15   codesharing?

16   **A.**  Yes.

17   **Q.**  What is the scope of the codesharing, under the WCIA?

18   **A.**  The scope of the codesharing is essentially, for us, it's

19   mostly putting our code on flights that go behind Chicago and

20   Dallas, which is American's network.  We were significantly

21   restricted by the Department of Justice on how we were to

22   codeshare with American Airlines after we did the Virgin

23   America acquisition.

24   **Q.**  And do they -- does American put its code on any of your

25   flights?

1    **A.**  Yes, they do.

2    **Q.**  How does that work?

3    **A.**  It's sort of dissimilar.  We can't put code on each other

4    on nonstop overlap routes, but for instance, if

5    American Airlines flies into Seattle, and they have code on

6    our Anchorage flights, and so their passengers can connect on

7    to us and seamlessly go to Anchorage.

8    **Q.**  And why can't you put code on nonstop overlap routes?

9    **A.**  As part of a consent decree for us to be able to actually

10   get the Virgin/America deal done, we were required to agree

11   to these terms.

12   **Q.**  You mentioned loyalty.  Can you elaborate on that?

13           THE COURT:  Before you get there, just so I

14   understand the codeshare, so you don't fly Seattle to Dallas

15   Fort Worth?

16           THE WITNESS:  We do, actually.

17           THE COURT:  You do.  So that would be a nonstop

18   overlap --

19           THE WITNESS:  Correct.

20           THE COURT:  So that, if I go to AA -- if I go to

21   AA.com --

22           THE WITNESS:  Correct.

23           THE COURT:  -- I can't buy tickets on Alaska's

24   flight.

25           THE WITNESS:  Correct.

```
 1              THE COURT:  And if I go to Alaska's, I can't buy it
 2      on American's.
 3              THE WITNESS:  Correct.
 4              THE COURT:  But in any event, you don't fly -- they
 5      fly Seattle to Tokyo?
 6              THE WITNESS:  They don't today.
 7              THE COURT:  All right.  So Seattle to London they
 8      fly?
 9              THE WITNESS:  Yeah, for instance, yes.
10              THE COURT:  And you don't -- you do that because of
11      Virgin, or you don't?
12              THE WITNESS:  So we don't fly -- that's an
13      international flight.  One of the things with the Virgin
14      America acquisition is anything that Virgin America used to
15      fly, which is domestic, really, we weren't committed to code
16      with American on those routes.
17              THE COURT:  So the routes that you don't overlap,
18      whatever --
19              THE WITNESS:  Correct.
20              THE COURT:  Like they don't fly to Alaska.
21              THE WITNESS:  Correct.
22              THE COURT:  And they don't fly -- not in Anchorage,
23      but if you want to go to on to some smaller destination, that
24      you might fly to from Anchorage, American doesn't have those
25      flights.
```

1          THE WITNESS:  That's right.

2          THE COURT:  And I could buy those on AA.com.

3          THE WITNESS:  That's right.

4          THE COURT:  All right.  Are the the overlap routes,

5    just one specified from some sort of settlement with DOJ, or

6    does that -- is it a principle that applies more generally?

7          THE WITNESS:  No, it's specific to the settlement

8    with the Department of Justice.

9          THE COURT:  I see.  So nothing in -- if American

10   decided it wanted to fly to Anchorage, that would then be an

11   overlap -- it would become an overlap route, but nothing

12   would prohibit codesharing.

13         THE WITNESS:  I believe if they started flying

14   Seattle-Anchorage, under the rule, we wouldn't be able to put

15   our code on that flight.

16         THE COURT:  Oh, on the existing rule.  All right.

17   Go ahead.

18         THE WITNESS:  Correct.  Essentially before the

19   acquisition, we used to have codes on each other's flights

20   between cities like Dallas and Seattle and that type of

21   thing.  And the reason that's important is because, when you

22   have code on each other's flights, they display more

23   prominently and corporate travelers can see all the offering,

24   and so that's why it was important.

25         THE COURT:  I see.  Okay.

1             Go ahead.

2    BY MS. SULLIVAN:

3    Q.  And just so that we're sure that everyone's on the same

4    page, can you explain who is connecting to whose flights?

5    A.  With relation to American?

6    Q.  Yes.  Within the WCIA.

7    A.  Yeah.  So, well, American's guests are connection from

8    their international flights into the cities that we serve,

9    and then connect on us to get somewhere else, or for

10   instance, we can send our passengers to some of American's

11   hubs on us, and then our passengers will connect on to

12   American's flights to cities that we can't fly to or don't

13   fly to.

14   Q.  And do all of American's international flights in and out

15   of the hubs that you serve fall within the scope of the WCIA?

16   A.  All West Coast flights, correct.

17   Q.  So another feature of the WCIA that you mentioned is

18   loyalty.  Can you elaborate on that?

19   A.  Yeah, loyalty is one of the most important aspects, I

20   think, especially for an airline.  People ask me often, how

21   does Alaska still exist today, after what's been said is one

22   of the largest hub build up in history with Delta, and I

23   would say loyalty.  Our guests were just absolutely loyal to

24   Alaska.  They've been with us forever.  But loyalty, you

25   know, only goes so far.  And at the end of the day, if you're

1    not able to provide the services, and in the airline

2    industry, destinations that your members want, I mean,

3    they're going to have to go find it somewhere else.

4              And so the loyalty part of this agreement allows

5    Alaska to tap into the breadth and global depth of

6    American Airlines's network, so that we can get our customers

7    to places that we can't fly to.

8    **Q.**   And then you mentioned joint contracting for corporate

9    customers?

10   **A.**   Yes.

11   **Q.**   Can you explain that feature?

12   **A.**   That's a new feature.  And we actually had done it in the

13   past, but essentially what happens is big, corporate

14   accounts, they invite Alaska and American in, and we get to

15   provide a joint proposal for their company and their

16   employees for travel and discounts and benefits.  And so the

17   employees get to enjoy sort of the benefits that both bring

18   in.  So together, we're much bigger than we are separately.

19   **Q.**   I'm going to return to that in a minute?

20   **A.**   Okay.

21   **Q.**   But before I do, is there a Mutual Growth Incentive

22   Agreement in the WCIA?

23   **A.**   Yes, there is.

24   **Q.**   At a high level, how does that work?

25   **A.**   At a high level, the mutual growth incentive, it's

1    essentially just like anything in business, what tends to get

2    people's attention and commitment is a financial element of

3    an agreement.  And it's not huge, but it's a really important

4    part.  And essentially, what that does is that if

5    American Airlines is able to grow its international network

6    and get goodness from that, we share in some of that

7    goodness, and then if Alaska Airlines is able to grow and get

8    stronger, American Airlines shares in a small portion of

9    that, as well.  And that's called the mutual growth incentive

10    payment.  And if you're not able to grow and you're not able

11    to perform, that payment becomes an expense.

12    **Q.**   Why do you have that agreement?

13    **A.**   Simply put, that agreement, essentially, makes sure that

14    both carriers has skin in the game, and no better way to do

15    that than through financial measures.

16    **Q.**   When was the WCIA implemented?

17    **A.**   Early in 2020.

18    **Q.**   And thus far, has it met Alaska's goals?

19    **A.**   Yes.  On the international side, it's been very difficult

20    with COVID and international travel until, you know,

21    basically this past summer has not been very strong.  That

22    said, and as we mentioned on our last earnings call, that now

23    8 percent of Alaska's revenues come from partnerships.  And

24    that's grown two points and that's all because of the WCIA.

25    **Q.**   All right.  Please take a look, Mr. Harrison, at

1    defendants' --

2            THE COURT:  Are you about to turn to a different

3    topic?

4            MS. SULLIVAN:  Document.

5            THE COURT:  About this or a different topic?

6            MS. SULLIVAN:  About this, but go ahead.

7            THE COURT:  Okay.  So how is growth, or if no

8    growth, measured in some way?

9            THE WITNESS:  Growth is measured essentially by the

10   financial piece that's measured essentially by what we call

11   yield, or I'm going to say the average ticket price.  And so

12   as -- we measure Alaska's total network, and we measure

13   American Airlines's international West Coast network, and as

14   we implement this agreement, if the profitability and the

15   strength of the revenues get stronger through this

16   arrangement, the difference in those revenues from a baseline

17   is what the calculation of the growth incentive is.

18           THE COURT:  So it's run off the revenues.

19           THE WITNESS:  I'm sorry?

20           THE COURT:  It's run off the revenues.

21           THE WITNESS:  It's run off the revenues and

22   capacity, correct.

23           There's also a capacity element which it's very

24   complicated, I know, but it's -- the capacity element is part

25   of how you allocate how much of those revenues, but

1    essentially, you're right, it's driven by the fares and the

2    revenue.

3            THE COURT:  I see.  And so it's American Airlines,

4    not large, but American Airlines -- essentially, what you and

5    American have defined are the things that Alaska would be

6    feeding them.

7            THE WITNESS:  Correct.

8            THE COURT:  So that would be their international

9    flights from the West Coast cities.

10           THE WITNESS:  That's correct.

11           THE COURT:  And then so an increase in American

12   international flights from Dallas or Miami, that isn't going

13   to help you.

14           THE WITNESS:  That's correct.

15           THE COURT:  And for you, on the flip side, it's an

16   increase in all of your domestic flying.

17           THE WITNESS:  That's right.  Because it's really

18   West Coast centric, yes.

19           THE COURT:  Okay.  All right.  Go ahead.

20   BY MS. SULLIVAN:

21   **Q.**  Mr. Harrison, I understand that the calculation and the

22   formulas are all very complicated, but the capacity element

23   of it, could you just describe it at a high level?

24   **A.**  Yeah, at a high level, it's based on -- of the -- when we

25   talk about capacity, we define it through what's called

1   available seat miles, which is essentially how many miles did

2   each seat fly in this total agreement.  And so when we work

3   out the change in revenues, you take the capacity of

4   American's as the big West Coast international pie, and you

5   take the capacity of Alaska's pie, and you allocate it that

6   way.

7         And I think American Airlines's capacity shares

8   about 20, percent, and Alaska's is about 80 percent.

9   **Q.**  So does that encourage each airline to try to add

10  capacity each year to increase their share?

11  **A.**  Yes, it does.

12        THE COURT:  So all of the things being equal, if

13  your revenue went up 10 percent, and your capacity, let's say

14  it stayed the same, and say their capacity stayed the same in

15  all respects, except they added one 747 and 350 seats, and it

16  turned out it was like empty, you know, so it didn't really

17  affect their revenue, but their seats go up, does that change

18  the split from 80/20 to -- I understand one plane doesn't

19  make a huge difference, but --

20        THE WITNESS:  Yes, the capacity very much changes

21  the allocation in that split.

22        THE COURT:  So in that split, there is an incentive

23  to increase capacity, even if you can't increase revenue.

24        THE WITNESS:  Well, I think the other element that

25  balances that out is that, if you increase capacity, as I

1   shared earlier, this incentive payment is made as a baseline,

2   and so if you put in an empty 747 that's actually going to be

3   bad for revenue and actually hurt it.  So that's where we'll

4   get some losses.

5           THE COURT:  Well, to increase your cost.

6           THE WITNESS:  Yes.  And the model doesn't take into

7   account cost, but if there's sort of no one on the plane who

8   has available seat miles, essentially generated no revenue

9   and no yield, and that's negative.

10          THE COURT:  So it's not a total revenue.  It's a

11  revenue related to seat miles.

12          THE WITNESS:  Yes.  That's correct.

13          THE COURT:  I see.  Okay.

14  BY MS. SULLIVAN:

15  Q.  And does that make it that much more important that

16  you're helping each other get people in those seats?

17  A.  That's absolutely true.

18  Q.  So take a look at Defendants' Exhibit 223, please.  We're

19  going to put a redacted version on the screen, because there

20  is some confidentiality concerns?

21          MS. SULLIVAN:  This document has already been

22  admitted into evidence.

23          THE COURT:  What exhibit number again?

24          MS. SULLIVAN:  223, Your Honor.

25          THE COURT:  Thank you.

BY MS. SULLIVAN:

**Q.**  This is a February 5, 2020, memo from you to the Alaska board of directors regarding the WCIA; is that right?

**A.**  That is correct.

**Q.**  What was the purpose of this memo?

**A.**  The purpose of this memo, given we were about to enter into a very significant and large long-term agreement with American Airlines, was just to make sure that our board of directors understood what it was that we were doing.

**Q.**  So let's just focus in on a few parts on the memo.  In the first page, under the objective heading, there's a subheading that says "Seattle."  Do you see that?

**A.**  Yes.

**Q.**  And it says, "Delta has created a domestic hub in Seattle that replicates 70 percent of our revenue producing network, resulting in a substitute network for Seattlites.  We are losing relevance to high value corporate travelers and frequent flyers based in the Pacific Northwest, since Delta's expansion, and we will continue to do so without a compelling global offering."

Is that basically what you were describing earlier about Delta's growth in Seattle?

**A.**  That's correct.

**Q.**  We've talked a fair amount during the course of this trial about relevance.  Could you tell us what relevance

1    means to Alaska?

2    **A.**   You know, relevance, really simply put, is if you're an

3    individual who needs to travel somewhere, you need to, number

4    one, fly where they want to go; number two, you need to be

5    able to fly there at the times they want to go; and of

6    course, you need to be able to fly there at a price that's

7    reasonable.

8    **Q.**   How do you measure relevance for any particular location?

9    **A.**   We -- well, we use the term "utility," if you will.  And

10   so the way -- I'll just say, for Seattle, for instance, is

11   you look at what percentage of all the people flying out of

12   Seattle, where are they going?  And so if -- just say there

13   was only two cities, and you would then measure -- Boston

14   might be one city and Los Angeles might be the other, and so

15   you might say all of Seattle, 70 percent of people are going

16   to Boston, and 30 percent of people are going to Los Angeles.

17   And we didn't serve Boston, we'd only be relevant to

18   30 percent of the people.

19   **Q.**   To what extent is relevance important to Alaska's ability

20   to compete?

21   **A.**   Essentially, if you're not relevant, you're going to have

22   a very, very difficult time competing.  You're going to have

23   a very difficult time getting loyalty members, and of course,

24   holding your credit card, which is another really important

25   part of our program.

1    **Q.**   How does the WCIA improve Alaska's relevance?

2    **A.**   Well, one of the biggest challenges we've always had,

3    well, Seattle, we serve 100 destinations nonstop.  Many of

4    those are only one flight a day, and of course, there's

5    hundreds and hundreds of cities we don't serve.  And so what

6    this allows us to do with the West Coast international, is,

7    on the domestic level, be able to connect into American's

8    hubs and get them anywhere they want to go domestically, and

9    then importantly, internationally, as well.  And even though

10   the West Coast International Alliance really only

11   contemplates the actual economics of it on the West Coast, we

12   can still fly somebody to New York and connect them on

13   American Airlines somewhere.  So we can use their entire

14   international network to get people around.

15   **Q.**   Let's take a look at the top of the next page of DX223.

16   There's a section on California.

17           Do you see that?

18   **A.**   Yes, I do.

19   **Q.**   Can you explain what Alaska's concern was about

20   California and how the WCIA addressed it?

21   **A.**   So one of the things, part of the reason we acquired

22   Virgin America, or a lot of the reason we acquired Virgin

23   America in 2016/'17 was we needed to expand our footprint and

24   we could not get infrastructure out of San Francisco and Los

25   Angeles.  So once we did the acquisition of Virgin America,

1    that was great, we had infrastructure, but we were very

2    small, and this utility I talked to you about earlier was

3    very small, 15, 17 percent.  And so the WCIA really did,

4    again, two things, to a more limited extent, because of the

5    justice restrictions, but we were able to use American's hubs

6    over Chicago to get people moved around, and jointly with

7    their loyalty program, and again, of course, international.

8    Like San Francisco, United is the king of international out

9    of San Francisco, but a lot of Oneworld partners fly into San

10   Francisco, and so again, being a part of American and

11   Oneworld helped us there.

12   **Q.**  Please take a look at page 3, the second paragraph starts

13   with, "AA has a difficult path to building relevance on the

14   West Coast."  Do you see that?

15   **A.**  I've got it on the screen here.  I can't see it on the

16   book.  Okay.  Yes.

17   **Q.**  And then halfway down that paragraph, you wrote, "In many

18   ways, an expanded relationship with AS looks to be the only

19   rational path to offering true utility to American's guests

20   in the West Coast market, and supplying the connections

21   needed to help American's international route succeed."

22           Can you explain what that means?

23   **A.**  Yeah.  Essentially American Airlines has a bit of a gap

24   in their network, even though they're the largest carrier in

25   the world, and all of that.  On the West Coast, they have

1   holes.  And so, really, the elegance of this relationship and
2   to help be more competitive for them is that, you know, the
3   infrastructure, as I shared earlier, is very limited.  So
4   what Alaska is able to provide is a more robust, you know,
5   well connected west coast network that American's guests can
6   connect into, and then internationally from there on.
7          Also, American is in a lot of joint business
8   arrangements with British Airways and with Qantas, and so
9   they partner in their success, and again, Alaska is able to
10  bring a strong domestic network to help partner with all of
11  the Oneworld international carriers.
12  **Q.**  On page 8 of the same document, there's a summary
13  section.  Do you see that?  And the last line, a portion of
14  it reads that, "The WCIA levels the playing field for us with
15  Delta and is a major step in securing our future."
16          Why was the WCIA important to securing Alaska's
17  future?
18  **A.**  Fundamentally, the WCIA provided absolutely critical
19  elements of utility that we could not do on our own, and
20  that, essentially, was our ability to connect globally for
21  our guests, our ability to connect throughout the United
22  States for our guests, and to help us be more of a player
23  with large corporate accounts.
24  **Q.**  All right.  So let's talk about corporate accounts.
25  Please take a look at Defendants' Exhibit 222.

```
 1              MS. SULLIVAN:  This has also already been admitted.
 2   BY MS. SULLIVAN:
 3   Q.  Mr. Harrison, do you recognize this document?
 4   A.  Yes, I do.
 5   Q.  What is it?
 6   A.  This looks to be sort of a briefing.  We get together our
 7   leaders, if you will, periodically.  This is the managing
 8   director and officer meeting and was giving the group an
 9   update on our alliances and the WCIA.
10   Q.  Please take a look at slide 6.  It has the number
11   DX0222-0007.  And on the screen, we have a heavily redacted
12   version.  But in your binder, you should be able to see the
13   entire document.  Do you see that?
14   A.  Yes.
15   Q.  The title of this slide is why a seamless global offering
16   is critical to our future, DL seizing our market share and
17   demanding "most preferred status."
18              Without identifying the customer, can you describe
19   what this slide is showing and why it's included in the deck?
20   A.  This slide is a large customer in Seattle and we'll leave
21   it at that, but what it shows is that the share of this large
22   customer's business that we would get, in the routes that we
23   flew, and what it actually shows is, you know, once our
24   relationship ended and then with Delta and their build up of
25   international flying, you can see that our share starts to
```

1    rapidly erode.

2    **Q.**  All right.  Let's take a look at another document.  This

3    is Defendants' Exhibit 224.  And this has also already been

4    admitted.  This is a presentation entitled "West Coast

5    International Alliance and it's dated February 2020.  Was

6    that around the time that the WCIA was announced?

7    **A.**  Yes, it was.

8    **Q.**  If you could turn to slides 15 through 17, they are very

9    similar.  Again, they are heavily redacted on the screen, but

10   you should be able to see them in your book.  The title of

11   all three of these slides reads, "This global utility will

12   allow us to aggressively compete for corporates."

13              Can you explain what these slides are conveying?

14   **A.**  Yes.  These slides convey some very large corporations in

15   Seattle, and it shows how much of their travel and how much

16   of their spend is on international travel.  And it's very

17   significant.  So what this slide goes on to show is how the

18   WCIA with Alaska and then American in the global network, how

19   more relevant Alaska is now, and that Alaska can provide,

20   through a partnership, a lot of utility that these customers

21   need for international.  And what that translates to is that

22   these employees of these companies are more willing to stay

23   with Alaska Airlines and our loyalty program when they fly

24   domestically, because they can use our network through

25   American and our partners internationally, and they stay in

1    the family.

2    **Q.**   And do they stay in the family for leisure travel, as

3    well, has that been your experience?

4    **A.**   That's correct.  If you lose them for business, you could

5    be at risk for losing them for leisure, because they join a

6    competitor's program.

7    **Q.**   How have corporate customers responded to the WCIA?

8    **A.**   You know, we -- when we went out to market, we met with

9    all of these customers, and I suppose the best and most

10   objective way to share with you how they felt about it is

11   that over 90 percent of them said, yes, we want to do this

12   joint contracting, and invited us in and signed contracts, so

13   that we could work together to provide their travel needs.

14   **Q.**   So let's take a look at Defendants' Exhibit 225?

15            MS. SULLIVAN:  Your Honor, my understanding is that

16   there were some objections to this exhibit but that they have

17   been withdrawn, and so I'd like to move to admit this into

18   evidence.

19            THE COURT:  All right.  Any objection?

20            MS. SWEENEY:  No, Your Honor.

21            THE COURT:  All right.  Admitted.

22            (Defendants' Exhibit No. 225 admitted into

23            evidence.)

24   BY MS. SULLIVAN:

25   **Q.**   Mr. Harrison, the title of this document is "alliances

1    update, delivering Oneworld and the WCIA."  Do you see that?

2    **A.**   I do.

3    **Q.**   And it's dated May 2021?

4    **A.**   Correct.

5    **Q.**   So at this point, how long had the WCIA been in place?

6    **A.**   Probably about 14 months or so.

7    **Q.**   And what was the purpose of this presentation?

8    **A.**   The purpose of this presentation was just to update the

9    status of how things are going, and specifically to some of

10   the corporate agreements and joint corporate agreements.

11   **Q.**   Please turn to the slide that has 0006 on the bottom.

12   This is another heavily redacted slide, but you should be

13   able to see it.

14   **A.**   Okay.

15   **Q.**   And the title of this slide is "The WCIA Has Opened the

16   Door to Joint Contracting With AA and [redacted] of Our

17   Largest Accounts Have Embraced This."

18                  Can you explain this slide?

19   **A.**   So this slide, essentially, we took the -- one of our

20   objectives was to look at our largest customers and we

21   quantify them in here, as Your Honor can see.  And we just

22   providing a status report of how things are moving along.

23   And you can see here, they're moving through the pipeline.

24   First they have to invite us in, then we talk to them, and

25   then we sign agreements.  But you can see here that a very

```
 1    high percentage, as I've shared earlier, over 90 percent, are
 2    embraced and are moving through the process.
 3    Q.   And this slide was created in May of 2021?
 4    A.   Yes.
 5    Q.   And it's been more than a year since then.  Have these
 6    numbers changed?
 7    A.   Yes, they have.  We've now moved on to another batch of
 8    accounts, sort of the next largest, and we keep moving
 9    through those, and we've had equal success with those.
10    Q.   From Alaska's perspective, how have corporate customers
11    benefitted from the ability to be able to jointly contact
12    with American and Alaska?
13    A.   They are able to jointly benefit, because it matters not
14    which airline they fly, they fly what meets their needs the
15    best, but they can choose, you know, which loyalty program
16    they want to be in.  American's Advantage or Alaska, and they
17    still earn their miles, they get elite status on each of the
18    various carriers, so they feel like they have a lot more
19    choice, and then can be rewarded with that choice.
20    Q.   Thank you.  All right.  Mr. Harrison, let's shift gears a
21    little bit and talk very briefly about the Northeast
22    Alliance.  You're familiar with it?
23    A.   Yes.  High level, yes.
24    Q.   From a network planning perspective, what is your take on
25    the NEA?
```

**A.**   The Northeast Alliance, my understanding, at a high

level, looks to do many of the things that American was able

to do with Alaska on the West Coast, but I think it's more

narrower in scope.

**Q.**   I'd like to show you Defendants' Exhibit 221.  And

Your Honor, again, I believe there were some objections to

this document, but they have been withdrawn, so I'd like to

move it into evidence?

            THE COURT:  Any objection?

            MS. SWEENEY:  No, Your Honor.

            THE COURT:  Admitted.

            (Defendants' Exhibit No. 221 admitted into

            evidence.)

BY MS. SULLIVAN:

**Q.**   Mr. Harrison, what is this document?

**A.**   This is a document that the team put together to try to

understand from just public information of what we knew about

the differences between the Northeast Alliance that American

was standing up with JetBlue, and the alliance that we had

with American Airlines, the WCIA.

**Q.**   Why did you prepare this memo?

**A.**   Because -- well, it was obviously it was a surprise to us

when this came out, and we needed to understand what it meant

with our single largest partner now having a partnership with

a carrier on the East Coast, what that meant to us, and was

1  that going to be problematic or not?

2  **Q.**  And has it turned out to be problematic from your

3  perspective?

4  **A.**  I think, you know, we've -- in some cases, a lot of focus

5  and attention, and we're here today, has been taken away from

6  the relationship of working the WCIA together, and I think

7  also, as it stands today, we, Alaska, are not permitted to do

8  certain things with American Airlines on key markets out of

9  California, whereas this alliance, because of the Department

10  of Justice's consent decree, whereas JetBlue and American are

11  free to do as they wish.

12  **Q.**  In the first page, on the first -- I'm sorry, in the

13  first paragraph on the first page?

14            THE COURT:  That part you don't like.

15            THE WITNESS:  I'm sorry, Your Honor?

16            THE COURT:  That part you don't like.  They get to

17  do things that you view is similar to what you are unable to

18  do.

19            THE WITNESS:  It's because we can't code on those

20  overlap markets, we can't be as competitive.  So it's sort of

21  Los Angeles, you know, to JFK is an example.

22            THE COURT:  That's a flight both American runs and

23  you run.

24            THE WITNESS:  We used to run it.  We don't anymore,

25  but it's a flight that both American and JetBlue fly, and

1    they can partner together on that.  American and Alaska used

2    to both fly that route and we couldn't partner together on

3    that.

4              THE COURT:  I see.  Okay.

5    BY MS. SULLIVAN:

6    Q.  In the first paragraph on the first page, you wrote, "For

7    JetBlue, the partnership facilitates the potential for

8    further growth in New York City, via slots from AA, while

9    fortifying their strategic position in Boston versus

10   Delta Air Lines."

11             Do you agree with that?

12             MS. SWEENEY:  Objection.  Foundation.

13             THE WITNESS:  I do.

14             THE COURT:  Foundation?  Overruled.

15             You can answer.

16   BY MS. SULLIVAN:

17   Q.  And why?

18   A.  So the question was, do I agree with this?

19   Q.  Yes.  And why?

20   A.  Yeah.  I think again, as I shared earlier, Boston, not

21   that much different from Seattle, and again, I suppose, if

22   you're JetBlue and you're trying to build out Boston, and you

23   don't have the international network, they've started some

24   very small, you know, English and London work, but in the

25   scheme of things, it's very small.  So I think, you know,

1  with partnership with American is going to help them give

2  their members much more choice and the ability to compete.

3  **Q.**  The next sentence says, "For American, the deal

4  creatively addresses strategic weaknesses in the Northeast

5  where they have had a long history, but have struggled to

6  compete over the past decade."

7        Can you explain what they meant by that?

8  **A.**  Yeah, I think especially in New York City, there's like

9  three airports.  The total -- there's like 1,600 flights a

10  day out of the New York City greater area.  By far, United

11  and Delta are the largest and strongest.  And then, you know,

12  American and JetBlue are much more distant to that.  So I

13  think, again, for American Airlines, for them to compete more

14  effectively and stronger against United and Delta, forming

15  this partnership is going to allow them to give their guests

16  a lot more choice and utility than they would have on their

17  own.

18  **Q.**  Looking at page 2 of the memo, the third paragraph from

19  the bottom, do you see that?  It's heavily redacted, but that

20  paragraph is not.  And you wrote, "From a broader industry

21  perspective, a stronger competitive proposition in the

22  Northeast will likely necessitate a response from both Delta

23  and United."

24        Why did you think the NEA would necessitate a

25  response from Delta and United?

1    **A.**   You know, I think just my history in this business, if

2    there's a pool of customers, and in this particular instance,

3    that by working in a partnership that JetBlue and American

4    can produce a much more compelling proposition for folks,

5    there's -- those passengers are going to come from somewhere.

6    They don't just get born from nowhere.  So they're either

7    going to come off of Delta and United.  And so my thesis here

8    is like all airlines, you're going to be very protective of

9    your loyal members and your network and your customers and so

10   you're going to do what you need to do to hang on to them and

11   to keep them.  So I would think, just Delta and United

12   would -- and there's all sorts of actions that you can take,

13   but at the end of the day, you don't just sit there and watch

14   it and do nothing.

15         THE COURT:  Like what?

16         THE WITNESS:  You can spoil up your marketing

17   initiatives, you can spend more money on marketing, you can

18   offer richer benefits for your elites and give them more

19   bonus miles, you can start new routes and new services to

20   make yourself look even more attractive than you were before.

21   A lot of different tools there.  Pricing levers, capacity

22   levers, loyalty levers, marketing levers, lot of levers.  All

23   cost money, by the way.

24         MS. SULLIVAN:  Thank you, Mr. Harrison.  I pass the

25   witness.

```
 1                   THE COURT:  Okay.  One question before you start.
 2                   Would you -- how would you characterize Alaska
 3     Airlines in the scheme of legacy, low cost carrier, ultra low
 4     cost carrier, or something else?
 5                   THE WITNESS:  Yeah, that's an interesting question.
 6     We sort of, you know, don't fit into any of those categories,
 7     I suppose.  We -- we've always viewed ourselves -- we've been
 8     around 90 years, but we don't have these big hub networks.
 9     So we view ourself as a small, more niche carrier, that just
10     likes to provide good value.  They're normally categorized,
11     you're right, into legacy and into ULCC and LCC, and we don't
12     fall into any of those categories.
13                   THE COURT:  Okay.
14                   THE WITNESS:  I'd argue JetBlue is somewhat the
15     same.
16                   THE COURT:  Ms. Sullivan, did you have anything to
17     ask him in light of me asking that?
18                   MS. SULLIVAN:  No, Your Honor.
19                   THE COURT:  Okay.  Go ahead.
20                   MS. SWEENEY:  Good morning, Mr. Harrison.
21                   Good morning, Your Honor.  Bonnie Sweeney for the
22     United States on behalf of the plaintiffs.
23                   THE COURT:  Thank you.
24                   MS. SWEENEY:  We have some binders that we're
25     delivering.
```

1          THE COURT:  Yes.

2          **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

3    BY MS. SWEENEY:

4    **Q.**  Mr. Harrison, I'm going to start with a follow-up --

5          MS. SWEENEY:  I'm going to take my mask off if

6    that's okay.  I'm far away.

7          THE COURT:  Yes.

8    BY MS. SWEENEY:

9    **Q.**  I'll start with a few questions following up on Ms.

10   Sullivan's question.  So you talked a lot about how in

11   Seattle, Alaska's main hub, you felt attacked by Delta.  And

12   one of the things you said was Delta is a very large airline,

13   right?

14   **A.**  Correct.

15   **Q.**  It has a lot of resources, and so you at Alaska felt that

16   you couldn't compete against Delta, right?

17   **A.**  It was going to be very difficult for us to compete

18   because of the things they could offer and their size.  Yes.

19   **Q.**  And you would agree, wouldn't you, that American Airlines

20   is the largest carrier in the world?

21   **A.**  Yes, I would.

22   **Q.**  Okay.  And now you've entered into an alliance with

23   American Airlines, right?

24   **A.**  Correct.

25   **Q.**  You also talked about the WCIA and I'd like to focus on a

1   few provisions in that agreement.  So you mentioned that

2   there's a codeshare provision, right?

3   **A.**  Correct.

4   **Q.**  And a loyalty provision.

5   **A.**  Correct.

6   **Q.**  And that includes both frequent flyer benefits and a

7   lounge reciprocity?

8   **A.**  Yes.

9   **Q.**  And entry into Oneworld?

10   **A.**  Yes.

11   **Q.**  Now, under the WCIA, do American Airlines and Alaska

12   coordinate capacity on domestic flights?

13   **A.**  We do not.

14   **Q.**  There's no coordination of capacity on domestic flights

15   under the WCIA; is that right?

16   **A.**  That's correct.

17   **Q.**  Okay.  So that means that you don't jointly decide which

18   airline is going to cover a particular domestic route?

19   **A.**  That's correct.

20   **Q.**  And you don't jointly schedule flights in the domestic

21   market?

22   **A.**  That's correct.

23   **Q.**  And you don't jointly decide what size aircraft you're

24   going to fly on a particular route?

25   **A.**  That is correct.

1    **Q.**   Now, the WCIA contains, as you said, a revenue sharing

2    provision, right?

3    **A.**   It contains a mutual growth incentive that is based on

4    our unit revenue performance, so, yes.

5    **Q.**   And that revenue sharing agreement does not permit the

6    parties to share revenue on overlapping, nonstop -- or on

7    overlapping domestic markets, right?

8    **A.**   Our -- the provisions in our agreement are not route

9    specific, at all.  As I explained earlier, it's all of

10   American's international West Coast network, and it's all of

11   Alaska's domestic network.  So inside of that big pool are

12   overlap routes, but there is no calculation specifically on

13   those routes.

14   **Q.**   Okay.  Let me ask a couple follow-up questions.  So the

15   American Airlines portion of the revenue that goes into the

16   pool, all comes from those international flights that

17   American Airlines flies from the Alaska West Coast gateway

18   cities, right?

19   **A.**   That's correct.

20   **Q.**   And these are these long-haul flights to far away places

21   that typically require these wide body airplanes, right?

22   **A.**   Yes.

23   **Q.**   And Alaska Airlines has a very limited international

24   presence on its own, right?

25   **A.**   Correct.

**Q.**   It flies to Canada, Mexico, and a couple other places in
Central America; is that right?

**A.**   Yes.  That's correct.  It's debatable whether I'd even
call that international, but yes.

**Q.**   And you don't fly any of these transpacific flights,
correct?

**A.**   That's correct.

**Q.**   And you don't fly any service from the West Coast to
Europe; is that right?

**A.**   That is correct.

**Q.**   And you don't own any wide body airplanes, right?

**A.**   That is correct.

**Q.**   And at this time, you don't have any plans to compete in
that particular market, right?

**A.**   That's right.

**Q.**   That "market" being international, long-haul flights from
the West Coast that require a jet -- a wide body jet, right?

**A.**   That is correct.

**Q.**   Okay.  And so now let's turn to the contribution to the
revenue pool that's made by Alaska Airlines.  That does come
from domestic routes, right?

**A.**   Correct.

**Q.**   And so when you look at the -- these two sources of
contribution to the revenue pool, those are routes on which
American Airlines and Alaska Airlines do not compete.  Is

1    that fair?

2    **A.**  I think it's certainly on the international side, that's

3    true.  But as I shared earlier, when you look at Alaska's

4    network, it's comprised of routes like Seattle, Dallas, that

5    we do compete with American.  So there is a portion of that

6    pool that is on overlap routes, but the majority of it is

7    not.

8    **Q.**  When you say there's a portion of that pool that's on

9    overlap routes, you're not suggesting, are you, that any

10   portion of the American Airlines contribution to the revenue

11   pool comes from domestic routes?

12   **A.**  Correct.  American does not, no.

13          THE COURT:  I think what you're saying is the

14   overlap is that on some -- you're contributing revenue from

15   all of your domestic flights?

16          THE WITNESS:  Correct.

17          THE COURT:  And some of your domestic flights

18   overlap or compete with American flights?

19          THE WITNESS:  That's correct, Your Honor.

20          THE COURT:  And that revenue on your side is

21   contributed to the pool.

22          THE WITNESS:  That's correct.  Perfectly said.

23          THE COURT:  Go ahead.

24   BY MS. SWEENEY:

25   **Q.**  So under the WCIA, do American Airlines and Alaska

1   allocate markets between them?

2   **A.**   We do not.

3   **Q.**   And you testified that the WCIA has benefitted Alaska,

4   right?

5   **A.**   Yes, that's correct.

6   **Q.**   And you testified that that agreement has helped Alaska

7   compete, right?

8   **A.**   Yes.

9   **Q.**   And it's done that, even though American and Alaska don't

10  coordinate capacity, right?

11  **A.**   That's correct.

12  **Q.**   And it's benefitted Alaska, even though you don't

13  coordinate on a scheduling of domestic flights, right?

14  **A.**   Yes, that is correct.

15  **Q.**   And so despite the absence of these domestic features,

16  such as scheduling coordination, capacity coordination,

17  market allocation, or substantial reciprocal domestic revenue

18  sharing, it's been beneficial to Alaska, right?

19  **A.**   That's correct.

20  **Q.**   Now, given how you testified that this relationship is

21  very valuable, Alaska Airlines would not want to do anything

22  to jeopardize that valuable relationship with American,

23  right?

24  **A.**   It all depends.  I mean, we operate in our own interests,

25  and if we -- like Delta, for instance, we did something that

1    destroyed the relationship.  So on the whole, we want to make

2    sure the relationship is healthy, yes, but not at all costs.

3    Q.  Right.  So you would agree that sometimes, in order to

4    advance Alaska's interests, it makes sense to make a

5    concession that furthers the interest of the alliance, right?

6    A.  That's correct.

7    Q.  And you would also agree that alliance partners have the

8    ability to influence their partner's commercial decisions.

9    Would you agree with that?

10   A.  I would agree with that.

11   Q.  Now, before Alaska and American Airlines entered into the

12   WCIA, Alaska had flown a route between JFK in New York and

13   LAX in Los Angeles, right?

14   A.  Yes.

15   Q.  And that's one of the most traveled, most demanded routes

16   in the country?

17   A.  That's correct.

18   Q.  And then since then, in around June of 2021, Alaska

19   exited that market; is that correct?

20   A.  That sounds about right, yes.

21   Q.  And to date, Alaska has not reentered that market; is

22   that right?

23   A.  That's correct.

24   Q.  And one of the reasons for exiting that market was

25   because of Alaska's alliance with American, correct?

1   **A.**   Yes.

2            THE COURT:  Is the alliance growth formula

3   incentivized for you, "you" being Alaska, growth on

4   nonoverlap routes as a practical matter?  Or not necessarily?

5            THE WITNESS:  Not necessarily.  Because the formula

6   is all based on here is our average fare for the whole pool;

7   and then as we grew, did that average fare get better or not

8   on the pool.  So you can grow in an overlap or a nonoverlap,

9   but if you do a lot of them and it drags down the pool,

10  that's a bad thing.  If that makes sense.

11           THE COURT:  If it drags down -- if all you're doing

12  is moving customers from American to Alaska on some overlap

13  route.

14           THE WITNESS:  I mean, that would show growth, if we

15  did that.  But it would need to turn into revenues.

16           THE COURT:  Right.

17           THE WITNESS:  Good unit revenues, yes.

18           THE COURT:  And if it turned into good revenues for

19  you, that would be positive.

20           THE WITNESS:  Yes, it would.

21           THE COURT:  And I suppose their allocation would go

22  down because they're losing.

23           THE WITNESS:  It depends on how many seats they

24  would do on the international side.

25           THE COURT:  I mean all being equal.

1          THE WITNESS:  But begin, because of the

2     relationship and partnership, if our revenues got stronger,

3     they do share in a portion of that.

4          THE COURT:  Sure.  So there's a certain interest to

5     try to expand somewhere else.

6          THE WITNESS:  Yes, because by expanding somewhere

7     else, Alaska increases its utility and relevance, and you

8     know, you can -- and the whole pool gets better.  Yes.  Can

9     get better.

10          THE COURT:  Okay.  Go ahead, Ms. Sweeney.

11     BY MS. SWEENEY:

12     **Q.**  All right.  Thank you.  Now we talked -- with Ms.

13     Sullivan, you talked about the codeshare agreement in the

14     WCIA, right?

15     **A.**  Yes.

16     **Q.**  And you testified that there is no codesharing on the

17     nonstop overlap markets, correct?

18     **A.**  That's correct.

19     **Q.**  And I understand that you have only a very high level

20     understanding of the NEA, but is it your understanding that,

21     in the NEA, there can be codesharing on nonstop overlap

22     routes?

23     **A.**  That is my high level understanding.

24     **Q.**  Okay.  Now, so before American Airlines and Alaska

25     entered into the WCIA, there had been this codeshare

1    relationship, as you testified, right?

2    **A.**   Correct.

3          MS. SWEENEY:  And can we look at plaintiffs'

4    Exhibit 22.  This document is in evidence and there are no

5    redactions, so we can publish.

6          THE COURT:  Who was the number again?

7          MS. SWEENEY:  22.

8    BY MS. SWEENEY:

9    **Q.**   And Mr. Harrison, this is an e-mail string between you

10   and the then CEO of Alaska and others, dating from 2015,

11   right?

12   **A.**   Yes.

13   **Q.**   Okay.  And the subject of this e-mail is Alaska's

14   position on an issue pertaining to the ability of airlines to

15   do business in foreign countries, right?

16   **A.**   Correct.

17   **Q.**   And it's called, "The open skies agreement"?

18   **A.**   Yes.

19   **Q.**   And initially, Alaska had been part of a coalition of

20   airlines that was advocating a position that was contrary to

21   the position taken by the legacy airlines, including

22   American, correct?

23   **A.**   Yes.

24   **Q.**   And this was while you were in that codeshare and loyalty

25   relationship with American, right?

1    **A.**   That's correct.

2    **Q.**   Now, let's look at the bottom half of the first page --

3              THE COURT:   Just so I'm clear, at the moment, the

4    codeshare and loyalty relationship was codesharing on certain

5    flights between American and Alaska, and if I were an Alaska

6    frequent flyer, I would get points if I flew on one of those.

7              THE WITNESS:   Yes.

8              THE COURT:   Not any American flight, but one I

9    purchased through Alaska.

10   **A.**   Yes, it was pretty much the same as the WCIA at that base

11   level, but didn't obviously include all the Oneworld and all

12   the other elements in it.   But at its basic core, if you're

13   an Alaska Airlines mileage plan member, you could earn miles

14   on American, or you could get a free ticket.

15             THE COURT:   Even if I just went to

16   American's website and purchased flight -- on their flight,

17   could I just pick Alaska frequent flyer, instead of --

18             THE WITNESS:   You could, yes.

19             THE COURT:   Okay.   Go ahead.   Thank you.

20   BY MS. SWEENEY:

21   **Q.**   So let's turn to the bottom half of the first page of

22   this exhibit.   And this is an e-mail from you, right?

23   **A.**   From me to -- yes.   Correct.

24   **Q.**   Okay.   And in -- let's see.   And you say in this -- I'm

25   not sure the right -- this is the right bit.   This is the --

1          MS. SWEENEY:  Can we turn to the bottom half of

2   this page?  And do you see where it says, "Having personally

3   spoken with Kurt"?

4   BY MS. SWEENEY:

5   **Q.**  This is the second sentence in the first paragraph that's

6   on the screen now?

7   **A.**  Yes, I see that.  Yes.

8   **Q.**  Okay.  And you say, "Having personally spoken with Kurt,

9   I can tell you this will put a strain on our

10  American Airlines relationship."

11          Did I read that correctly?

12  **A.**  Yes.

13  **Q.**  And so what you're saying here is that Alaska's position

14  on this advocacy with respect to the open skies agreement, if

15  it continues in that vein, will put a strain on the

16  relationship with American Airlines, right?

17  **A.**  Correct.

18  **Q.**  And then in the next paragraph, you say, "From an

19  alliance perspective, I would request that we back down from

20  this group and take this back a few notches."  Right?

21  **A.**  Yes.

22  **Q.**  Okay.  And so this reflects your concern about upsetting

23  the alliance with American Airlines, right?

24  **A.**  Yes.

25  **Q.**  And by the way, who is Kurt?

1    **A.**   Kurt was -- he was, essentially, headed up the alliances

2    for American Airlines at the time, and who I worked with at

3    the time.

4    **Q.**  Can we look at two exhibits -- actually, I'd ask you to

5    look at them, Mr. Harrison.  These are not yet admitted into

6    evidence.  But this is Plaintiffs' Exhibit 397 and 394.

7    These are in your binder.  These are a couple of e-mails.

8            Have you had a chance to look at those,

9    Mr. Harrison?

10           MS. SULLIVAN:  Your Honor, we have objections to

11   both of these exhibits, because they contain hearsay within

12   hearsay.

13           THE COURT:  Okay.  Let me read them.

14           You can -- why don't you give me a minute to look

15   at them, just so I understand what they are.

16           (The Court reviews the documents.)

17           THE COURT:  Okay.  Go ahead, Ms. Sweeney.  I think

18   I'll wait to rule.  They haven't offered it yet.

19           MS. SWEENEY:  Okay.  Thank you, Your Honor.

20   BY MS. SWEENEY:

21   **Q.**  So are you familiar with these e-mails, Mr. Harrison?

22   **A.**   Yes, I am.

23   **Q.**  And these e-mails are from April of 2021, right?

24   **A.**   Correct.

25   **Q.**  And the e-mail conversation that is contained in these

1  two documents started in response to a stock analyst report

2  on JetBlue, correct?

3  **A.**  Correct.

4          MS. SWEENEY:  Your Honor, the stock analyst report,

5  we're not seeking to admit that for its truth, so I believe

6  that resolves the hearsay objection.

7          THE COURT:  Does it?

8          MS. SULLIVAN:  Yes, Your Honor.

9          THE COURT:  All right.  Well, then, I admit the

10  PX394 and 397 with the analyst report, just for the effect on

11  the listener, but not the truth.

12          MS. SWEENEY:  Thank you, Your Honor.

13          (Plaintiffs' Exhibit Nos. 394 and 397 admitted into

14          evidence.)

15  BY MS. SWEENEY:

16  **Q.**  So in this report, this was a Raymond James analyst who

17  follows the airline industry and issued a report on JetBlue,

18  correct?

19  **A.**  That's correct.

20  **Q.**  And the review was very positive, right?

21  **A.**  Yes.

22  **Q.**  And the analyst forwards this report to the

23  Mr. Minicucci --

24          Did I say that right?

25  **A.**  Yes, you did.

1    **Q.**   And what was his position at Alaska at that time?

2    **A.**   What was he?  We had a transition 2021 -- yes, he had

3    just become the CEO.

4    **Q.**   Okay.  Thank you.  And the analyst predicts a bigger

5    revenue improvement for JetBlue than for Alaska, right?

6    **A.**   Yes.

7    **Q.**   So Mr. Minicucci wants to know what's going on, and he

8    forwards it to you and others, and then you respond to him.

9    Is that how this works in this e-mail chain?

10   **A.**   That's correct.

11   **Q.**   So let's turn to the first page of Plaintiffs'

12   Exhibit 397.  Do you see that?

13   **A.**   I do.

14   **Q.**   And at the top of that page is an e-mail from Nat Pieper?

15   **A.**   You're two for two, yes.

16   **Q.**   And what's Mr. Pieper's role at Alasksa, this time?

17   **A.**   He obviously was our fleet and treasury, but importantly

18   for this case, he heads up the alliances for me.

19   **Q.**   Okay.  Now, in the e-mail at the top of this page, which

20   ends in the number 2908, the unredacted part of the screen

21   here, Mr. Pieper says, "Think it's hard to compare Savi's

22   1.8 percent benefit for JetBlue directly with our

23   1.5 percent, as JetBlue and American Airlines can coordinate

24   capacity planning and allocation in JFK and Boston, and we

25   cannot."

```
 1              Do you see that?
 2   A.   I do.
 3   Q.   And do you agree with Mr. Pieper that JetBlue and
 4   American Airlines, at least for your understanding of the
 5   NEA, can do that under the NEA?
 6   A.   Yes.
 7   Q.   And you agree that Alaska cannot?
 8   A.   That's correct.
 9   Q.   Okay.  And then Mr. Pieper goes on to say, "Capacity
10   coordination is a big driver of revenue and profit."
11              Do you see that?
12   A.   I do.
13   Q.   And do you agree with that statement?
14   A.   It can be, yes.
15   Q.   Now, let's turn to the related exhibit.  This is
16   Plaintiffs' Exhibit 394.  And this is part of that same
17   e-mail discussion, only a different thread.
18              Do you have that in front of you?
19   A.   I do.
20   Q.   And so I'd like to focus your attention on the bottom
21   half of the first page of this exhibit.  It ends with the
22   Bates number 1951.
23   A.   Yes.
24   Q.   Do you see that?
25   A.   I do.
```

1   **Q.**  And at the bottom half of the first page, it's an e-mail

2   from you, after you read this subsequent, related report,

3   right?

4   **A.**  Are you referring to the -- there's an e-mail on April 6,

5   2021, at 14:39, where I write to Ben, and then copy work done

6   by my analyst underneath.  Is that the e-mail that you're

7   referring to?

8   **Q.**  Yes, that's right?

9   **A.**  Okay.  I've got that.

10  **Q.**  And you conclude that the analyst report, you say, it's

11  not a very robust analysis, right?

12  **A.**  Correct.

13  **Q.**  And then I just want to focus your attention on the

14  responses that you received from Nat Pieper and Brett Catlin.

15  In the e-mail response in the middle of the page, Mr. Pieper

16  writes a question mark and says, "JetBlue percentage has

17  nothing to do with Alaska percentage."

18          Do you see that?

19  **A.**  I do.

20  **Q.**  And then Mr. Catlin responds, "Yes, it's because they can

21  coordinate capacity, and we can't.  As simple as that.  Just

22  look at DCA/Boston."

23          And that refers to the Washington airport, DCA, and

24  Boston, do you see that?

25  **A.**  Yes.  I wasn't on this e-mail, by the looks of it, but

1    that's what I would read, yes.

2    **Q.**   And then he goes on to say, "You effectively have one

3    competitor now instead of two, and they've pulled/aligned

4    shuttle capacity."

5           Now, do you agree with what Mr. Catlin says the NEA

6    allows American Airlines and JetBlue to do in the East Coast?

7    **A.**   I have no reason to believe what Brett is saying is not

8    true.  He's very good at his job.  I personally don't know

9    the terms and conditions, but I have no reason to doubt what

10   he's saying.

11   **Q.**   Okay.  But do you agree that what American and JetBlue

12   have done with respect to capacity coordination is different

13   from what you have done under the WCIA?

14   **A.**   Yes.

15   **Q.**   And do you believe that some of the provisions in the NEA

16   are unprecedented for domestic airlines?

17   **A.**   From a domestic airline perspective, yes.  International,

18   it's more routine.

19   **Q.**   Right.  And in the international context, let me ask you

20   a few questions about that, since you bring that up.  So

21   isn't it true, Mr. Harrison, that foreign carriers cannot

22   have a route in the United States, in the domestic US, that

23   starts and ends in the US?

24   **A.**   Yes, I believe that to be true.

25   **Q.**   So the kinds of provisions that you see in these joint

1    ventures with foreign carriers, there aren't any domestic

2    overlap markets, right?

3    **A.**   That's right.

4    **Q.**   All right.  So I was asking you before about the

5    unprecedented nature of the NEA.  Would you also say that the

6    provision allowing the two carriers to coordinate capacity

7    domestically is unprecedented?

8    **A.**   I'm personally not aware of that ever occurring,

9    certainly in my career.

10   **Q.**   Okay.  And would you also agree that sharing revenue on

11   overlap routes is unprecedented in the domestic market?

12   **A.**   Again, I've never seen that in my career.

13   **Q.**   Okay.  And how about allocating markets between them?  Is

14   that unprecedented in a domestic airline industry?

15   **A.**   In my tenure of knowledge, yes.

16   **Q.**   Okay.  Thank you.

17           Now, earlier, when you were speaking with

18   Ms. Sullivan, you were talking about how the WCIA works to

19   feed these international flights, right?

20   **A.**   Correct.

21   **Q.**   So American Airlines is able to take advantage of

22   Alaska's great domestic network on the West Coast to feed its

23   international flights, right?

24   **A.**   That's correct.

25   **Q.**   And would you agree that that's been quite successful?

1    **A.**   Yes, to the extent we've started seeing international

2    travel pick up.  That's correct.

3    **Q.**   Right.  And once things get more back to normal, you

4    expect there will be new routes to places in Asia, correct?

5    **A.**   We expect to see that and hope to see that, yes.

6    **Q.**   Okay.

7              THE COURT:  To getting back to normal or the new

8    routes.

9              THE WITNESS:  The new -- well, both, actually.  I

10   think the normal is starting to come and then certainly the

11   new routes.

12             MS. SWEENEY:  One second.

13             I'd like to turn to an exhibit that Ms. Sullivan

14   showed you, but I don't believe we, in our computer, have the

15   redacted version of the defendant's exhibit, but we have a

16   plaintiff version, which the defense Exhibit is it 21, and I

17   believe the --

18             THE WITNESS:  Go back to the other binder?

19             MS. SWEENEY:  Yes, please, go back to defendant's.

20   I'm sorry, we do have the redacted version, so we can publish

21   that, the redacted version.

22   BY MS. SWEENEY:

23   **Q.**   Now, I recall Ms. Sullivan asking you some questions

24   about this memo that you assisted in preparing on July 29,

25   2020, right?

1    **A.**   Yes.

2    **Q.**   And that was just really days after American Airlines and

3    JetBlue announced the NEA, right?

4    **A.**   I don't remember exactly how long, but very shortly

5    after, yes.

6    **Q.**   Okay.  And at that point in time, you didn't know very

7    much about that agreement, right?

8    **A.**   Correct.

9    **Q.**   You hadn't read the agreement, right?

10   **A.**   I have never read the agreement.

11   **Q.**   Okay.  And it's true, isn't it, that at the point in time

12   when you helped prepare this memo, you didn't know that the

13   agreement included capacity coordination, right?

14   **A.**   Correct.

15   **Q.**   And you didn't know that it included codesharing on

16   nonstop overlaps?

17   **A.**   The reason why I pause, I'm not -- again, at the time,

18   this was done based on publically available information, and

19   the team putting together what they believed to be the

20   differences between our two agreements.  So codeshare, it

21   says "yes within partnership scope."  So we weren't aware of

22   any restrictions that were special to us, so I would agree,

23   yes.

24   **Q.**   Okay.  And how about the revenue sharing provision in the

25   NEA?  You weren't aware at the time that this memo was

1   prepared that that provision allows reciprocal revenue

2   sharing on overlap routes?

3   **A.**   I don't believe I and the team were, and to this day, I

4   don't have knowledge as to how their mechanisms work.

5   **Q.**   Okay.  Thank you.  And when you said in this memo, and I

6   think you maybe testified about this, too, you said it's

7   narrower than the WCIA.  What you were referring to there is

8   that it doesn't include a membership in Oneworld, right?

9   **A.**   I think certainly that would be one aspect.  And then

10  there's a lot of focus on New York City and Boston, whereas

11  our partnership is across everything.

12  **Q.**   Okay.  And I'd like to turn your attention to the second

13  page of this exhibit, the top paragraph, which starts, "The

14  implications --" it's all redacted.

15          So I would just like you to read that first

16  paragraph to yourself, focusing particularly with the --

17  beginning with the second sentence, which starts, "Across."

18  **A.**   (Witness complies.)  Okay.

19  **Q.**   Okay.  And would you agree that because of the large

20  market share that JetBlue and American Airlines have as a

21  result of entering into the NEA, this makes it harder for

22  Alaska to compete in the important California to the

23  Northeast corridor?

24          MS. SULLIVAN:  Objection, Your Honor.

25          THE COURT:  What's the objection?

```
 1              MS. SULLIVAN:  Mischaracterizes the paragraph.
 2              THE COURT:  I don't think she's asking about
 3     specific to the paragraph.  Overruled.
 4              I think she's just asking whether, as I understand
 5     the question, whether the NEA makes it more difficult for
 6     Alaska to compete in the California to Northeast corridor
 7     market.  She just had him read that for context.
 8              MS. SWEENEY:  Thank you, Your Honor.
 9              So if she's not asking what it says there.
10              THE WITNESS:  Okay.
11              THE COURT:  She wants you to read what it says
12     there.  But she's just asking you whether you think the NEA
13     makes it more difficult for Alaska to compete in the
14     California --
15              LAX or the California markets to the Northeast
16     corridor?  Which was it, Ms. Sweeney?
17              MS. SWEENEY:  California.
18              THE WITNESS:  Yeah, this -- we don't serve the
19     other side, so it would be California, I think -- because of
20     this agreement and the fact that we can't partner with
21     American, that leaves JetBlue to be able to partner with
22     American, so it's going to make it more difficult for us to
23     compete.
24              MS. SWEENEY:  Thank you.
25     BY MS. SWEENEY:
```

1    **Q.**  Now, you testified that Alaska entered into a settlement

2    with the Department of Justice when it purchased Virgin

3    American, right?

4    **A.**  Correct.

5    **Q.**  And you understand that that -- the Department of Justice

6    required that settlement because the investigation of that

7    merger uncovered evidence that Alaska was likely to compete

8    less vigorously with American than Virgin had, right?

9    **A.**  That was the Department of Justice's opinion, which I

10   utterly did not agree with.

11   **Q.**  But that was the basis for the consent decree?

12   **A.**  That's my understanding, yes.

13          THE COURT:  The DOJ thought Alaska would compete

14   less vigorously with American?

15          THE WITNESS:  Yes.  If we had this relationship, we

16   wouldn't compete as aggressively.

17          THE COURT:  And that's why, in your understanding,

18   they imposed the various limitations that they imposed?

19          THE WITNESS:  Yeah.  My view is they were imposed

20   more to hurt American than Alaska; but nonetheless, it hurt

21   our position in California.  And ultimately the relationship

22   ended after this.

23          THE COURT:  Which relationship?

24          THE WITNESS:  The American and Alaska relationship

25   was basically on its way to extinction because of the order

1    from the Department of Justice that so stifled our ability to

2    work.

3                    THE COURT:  Not the WCIA?

4                    THE WITNESS:  Correct.  So we had --

5                    THE COURT:  The prior relationship.

6                    THE WITNESS:  So we originally had a normal

7    codeshare marketing relationship with them.  We acquired

8    Virgin America, which put a strain on it, obviously, because

9    there was some more overlap, but then the Department of

10   Justice put all of these rules on top of us, that no one else

11   had to follow, as it relates to our relationship with

12   American, and it basically fell apart.

13                   THE COURT:  I see.  When you bought Virgin?

14                   THE WITNESS:  That's right.

15                   THE COURT:  Got it.

16                   THE WITNESS:  That's right.

17                   THE COURT:  So you were saying DOJ thought that

18   your acquisition of Virgin would make it less likely for you

19   to compete with American?

20                   THE WITNESS:  Yes.

21                   THE COURT:  And your perspective, these

22   restrictions, you thought, hurt you, but were really imposed

23   to hurt American more.

24                   THE WITNESS:  It's my personal opinion.

25                   THE COURT:  Yes.  Sure.

BY MS. SWEENEY:

**Q.**  Just a couple more questions, Mr. Harrison.

So going back to your testimony about Delta's inroads into Alaska's key hubs, now, you said that Delta entered into new routes in competition with Alaska, right?

**A.**  Correct.

**Q.**  And you testified that the number of routes went up, and fares went down, right?

**A.**  I think what I testified is when -- yeah, you put a lot more seats in your market can have the effect of fares coming down.  In that case, in many places, it did.

**Q.**  And isn't that a benefit to consumers to have more options and also lower fares?

**A.**  Certainly a benefit to consumers to have more options.  I think it's not in the long-term interests of consumers to have fares that are unsustainable and airlines go out of business or bankrupt.

**Q.**  But lower fares and more choices are good for consumers, you would agree with that, right?

**A.**  Yes.  In the short term, yes.

MS. SWEENEY:  Okay.  No further questions at this time, Your Honor.

THE COURT:  All right.  Any redirect?

MS. SULLIVAN:  I have just have a few questions.

**REDIRECT EXAMINATION BY COUNSEL**

1                          **FOR DEFENDANT AMERICAN AIRLINES**

2       BY MS. SULLIVAN:

3       **Q.**   Mr. Mr. Harrison, can you take a look at PX22.  This is a

4       document that plaintiffs' counsel showed you.

5                    THE COURT:  DX or PX?

6                    MS. SULLIVAN:  PX22.

7                    THE WITNESS:  Okay.

8       BY MS. SULLIVAN:

9       **Q.**   This is an e-mail exchange from 2015; is that right?

10      **A.**   Yes.  Yes.

11      **Q.**   Do you recall what position Alaska took pubically on this

12      issue at that time?

13      **A.**   As I recall -- and this really will stem because we had a

14      relationship with Emirates, a Middle Eastern carrier, and

15      without them, we couldn't get anyone to the Middle East and

16      Africa, a very important partner of ours.  So I think

17      publically our position was we were not taking the position

18      that we were against these Middle Eastern carriers coming to

19      the United States, because we needed them.

20      **Q.**   In what form did the position that Alaska took, take?

21      **A.**   I'm a little hazy on the details.  I do believe there

22      was, I think, some letter signed by a number of the more --

23      the smaller carriers, I would say, nonlegacy, to say,

24      basically, we need their carriers and they're important to

25      us.

1    **Q.**  Was Alaska's position consistent with the position that
2    American Airlines was taking at the time?
3    **A.**  No.
4    **Q.**  Under the WCIA, can you describe a time when American has
5    ever exerted pressure on Alaska to do anything?
6    **A.**  Under the WCIA?
7    **Q.**  Yes.
8    **A.**  I mean, nothing's coming to mind as far as exerting
9    pressure.  I think we're trying to implement what we both
10   feel is a really good agreement.  So there hasn't been any
11   significant issues that I'm aware of.
12   **Q.**  And if American Airlines were to exert pressure, did I
13   hear you correctly earlier in saying that Alaska would always
14   do what's in its best interest?
15   **A.**  We will always do what's in Alaska's best interest for
16   its shareholders and its employees.
17   **Q.**  Plaintiffs' counsel asked you some questions about
18   exiting JFK/LAX.  Do you remember those?
19   **A.**  Yes.
20   **Q.**  Was American Airlines involved in that decision?
21   **A.**  No.
22   **Q.**  You said that the decision was based in part on Alaska
23   Airlines' involvement in the WCIA.  What did you mean by
24   that?
25   **A.**  What I mean by -- the primary reason we left JFK/LAX is

1    because we were bleeding money and couldn't make it work.

2    And also, we still served Newark, so LA/Newark, which is

3    still part of New York City.  And our guests would still be

4    able to fly, at least on American, and earn Alaska miles and

5    redeem Alaska miles on American.  So all of these things

6    considered, we made the difficult choice to leave that market

7    and redeploy the capacity.  We still flew to New York City,

8    but we were just flying from another West Coast gateway.

9    **Q.**   And that was an Alaska Airlines unilateral decision?

10   **A.**   Absolutely.

11             MS. SULLIVAN:  Thank you, Your Honor.  No further

12   questions.

13             THE COURT:  All right.  Any recross?

14             MS. SWEENEY:  Just a couple.

15         **RECROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

16   BY MS. SWEENEY:

17   **Q.**   So just to be -- finish this off, Mr. Harrison.  Alaska

18   did decline to sign the letter about the open skies

19   agreement.  In other words, it didn't sign the letter that

20   was advocated by these smaller airlines, correct?

21   **A.**   I honestly don't recall where it got to.  I vaguely

22   remember letters, but I - what I can testify to you is that

23   we did not publically support or internally support a

24   position that the big three were taking against these

25   carriers, but I apologize, I don't specifically remember what

1    we ended up on that.

2    **Q.**  Thank you.  And then you also testified that you were --

3    that Delta put a lot of pressure on American Airlines, even

4    though there was just a codeshare relationship -- excuse me,

5    Alaska Airlines, even though it was just a codeshare

6    relationship?

7              MS. SULLIVAN:  Your Honor, this is beyond the scope

8    to a redirect.

9              MS. SWEENEY:  It's a preclude to another question

10   that's well within the scope.

11             THE COURT:  All right.  I'll overrule it for now.

12   You can answer.

13             THE WITNESS:  I can answer?

14             Can you repeat the question, please?

15   BY MS. SWEENEY:

16   **Q.**  Yeah, sure.  Even though the relationship that you

17   described between Delta and Alaska was not nearly as much of

18   an entanglement as the WCIA is, Delta was able to exert a lot

19   of pressure on Alaska, correct?

20   **A.**  Yes.

21   **Q.**  Okay.  And you would agree that American Airlines is as

22   big and powerful as Delta?

23   **A.**  Yes.

24             MS. SWEENEY:  Okay.  Thank you.  No further

25   questions.

```
 1              THE COURT:  All right.  You're excused.  Thank you
 2     very much.
 3              THE WITNESS:  Thank you, Your Honor.
 4              THE COURT:  Have a good day.
 5              THE WITNESS:  You, too.
 6              THE COURT:  Next?
 7              MR. JONES:  Your Honor, Mr. Raja is here to finish
 8     his testimony.  And I believe we are within Mr. Wall's
 9     examination of Mr. Raja, and then we will do our redirect
10     after that.
11              THE COURT:  Fine.
12              Give me one moment.  He can come in.
13              (Court in recess at 10:41 a.m.
14              and reconvened at 10:42 a.m.)
15              THE COURT:  I'm ready when you are, Mr. Wall.
16              MR. WALL:  Thank you, Your Honor.
17              THE COURT:  Mr. Raja, I just remind you -- you can
18     be seated.  I remind you you're under oath from before.
19                            VASU RAJA
20         having been previously duly sworn, testified as follows:
21              CROSS-EXAMINATION BY COUNSEL
22              FOR DEFENDANT AMERICAN AIRLINES, Continued
23     BY MR. WALL:
24     Q.  Welcome back, Mr. Raja.
25     A.  Hey, thank you.
```

1    **Q.**  And have you --

2    **A.**  Good to be back.

3    **Q.**  Have you ever heard of the principle that if a lawyer has

4    a six-day break between parts of a direct examination, the

5    direct examination gets longer?

6    **A.**  You didn't tell me that before.

7    **Q.**  Well, you're about to experience that.  Let's start --

8            THE COURT:  You must have experienced the other

9    principle that the longer lawyers have, the longer it takes.

10           THE WITNESS:  No kidding.  I can see they struggle

11   to behave.  Anyways.  Sorry.

12   BY MR. WALL:

13   **Q.**  So the first thing that I want to do this morning,

14   Mr. Raja, is I want to go back to the discussion that you had

15   with Ms. Sweeney on the topic of American Airlines losing

16   slots at JFK from an early FAA determination.  Do you recall

17   that?

18   **A.**  Yes.

19   **Q.**  Okay.  And there's some questioning after the lunch break

20   about whether you thought you had more slots and you really

21   had less, or thought you had less when you really had more.

22   Do you remember that?

23   **A.**  Yes, I misspoke.

24   **Q.**  Was there something about that that you would like to

25   clarify?

1  **A.**   Yeah.  That's right.  I think I transposed it whenever I

2  was speaking, and also in the e-mail, too.  We thought that

3  we had a different number of slots than we we actually had.

4  We thought that we had the 216, we only had the 200 -- I'm

5  sorry.

6  **Q.**   Try it again, Mr. Raja.

7  **A.**   I did it again.  We thought we had the 200 and not the

8  216.

9  **Q.**   So when Ms. Sweeney showed you the letter from DOT,

10  that's the correct reference between how many you had and how

11  many you were --

12  **A.**   Correct.  And that's why we had to give back the seven

13  pair.

14         THE COURT:  So just wait.  Now I'm confused.  So

15  you actually had how many?

16         THE WITNESS:  We actually had the two -- we

17  thought -- we had the 200, we thought we had the 216.

18         MR. WALL:  Hold on.  Let's pull up PX298.  Let's

19  get that up.  PX298.  And let's go to the e-mail that

20  Ms. Sweeney was talking to you about, right in the middle of

21  the page.  In the middle of the page.  Okay.

22  BY MR. WALL:

23  **Q.**   And you say, "One important thing.  We thought 216.  They

24  thought 200."

25  **A.**   Yes.

1    **Q.**   Is that correct, or is that backwards?

2    **A.**   That is backwards.  It's backwards in my e-mail and I

3    misspoke to that, too.  We thought we had 200, we were

4    planning an airline of 200, we had 216, and they said there's

5    all these slots that you guys aren't using, and that's

6    where --

7    **Q.**   Great.  Thank you, sir.

8                THE COURT:  So you thought you had 200.

9                THE WITNESS:  Correct.

10               THE COURT:  And they thought you had 216.

11               THE WITNESS:  Correct.  And hence, we were

12   underutilizing.

13   BY MR. WALL:

14   **Q.**   And it turns out what they thought is what rules?

15   **A.**   That's absolutely true.

16   **Q.**   Okay.  All right.  Let's go back and just --

17               THE COURT:  So wait.  So then you had to give back

18   seven pairs.

19               THE WITNESS:  Pairs.

20               THE COURT:  And that was in the course of which

21   transaction?

22               MR. WALL:  That was not a transaction at all.

23               THE COURT:  Oh.  That was just because of the

24   underutilization.

25               THE WITNESS:  Correct.

1              THE COURT:  Got it.  Okay.

2      BY MR. WALL:

3      **Q.**   Okay.  Mr. Raja, we talked a little bit about revenue

4      sharing in the last session and walked through some of the

5      provisions of the MGIA.  Since then, I want to show you -- I

6      want to show you a document that since then was used in

7      Mr. Laurence's testimony.  It's Plaintiffs' Exhibit 756.

8      It's already in evidence.

9              I don't think there's any confidentiality

10     designations on this.

11             And if you take a look at that cover e-mail, do you

12     recognize this as an e-mail that you sent to Mr. Laurence in

13     February 2020?

14     **A.**   Yes.

15     **Q.**   Okay.  And in, I believe, the testimony, this is just an

16     overview of how American does revenue sharing, correct?

17     **A.**   Correct.

18     **Q.**   Okay.  And do you know who prepared the slides that

19     are -- that are attached to this?

20     **A.**   Yeah.  Anmol Bhargava, who was on my team at the time,

21     our head of alliances.

22     **Q.**   Okay.  And there was a significant amount of questioning

23     about whether the revenue sharing terms of the NEA are in

24     some sense derivative of the revenue sharing terms that AA

25     had used in international alliances.  So let me just ask you,

1    from your perspective, are they derivative?

2    **A.**   Yes, they share similar structure.

3    **Q.**   And do you testify about that in your earlier session?

4    **A.**   I did.

5    **Q.**   Okay.  So let me turn to the slide 2 of this deck that

6    was sent to JetBlue.  And it has this page that is talking

7    about "Why share benefits?"  Do you have that?

8    **A.**   I do.

9    **Q.**   Okay.  Could you describe for the Court generally what

10   this slide is intended to communicate to JetBlue in this

11   context?

12   **A.**   It's the slide that -- it's there to clarify this concept

13   of metal neutrality, where essentially we play for the team,

14   that what we're trying -- that the idea behind this team is

15   to create the incentive so that we go and win customers to

16   our partnership, but not that we go and, you know, obligate

17   people to do something, which is not in their financial

18   interests or, in, frankly, the customer's best interest.

19   **Q.**   So I want to focus on the major bullet, where it

20   says, "To achieve metal neutrality, the economic incentives

21   of the parties need to become aligned towards supporting the

22   overall success of the joint business."  In that sentence,

23   what does the phrase "towards supporting the overall success

24   of the joint business" mean?

25   **A.**   It means exactly that.  As we like to say it maybe more

1    simply, we want to take customers away from the other
2    airlines and bring it to our team.
3    **Q.**   Could you briefly walk us through the first sub bullet,
4    which is this "incentive to sell all joint business services,
5    regardless of metal."  What is that conveying?
6    **A.**   Precisely that.  What we want to be able to do is either
7    carrier who is in the partnership has full incentive to go
8    and support the other carrier who was in the partnership, by
9    whatever tools and means they've got commercially available
10   to them.
11   **Q.**   Okay.  If we go down to the following bullet, it
12   says, "Each party to share risks/rewards of the joint
13   business."  What is that intended to convey?
14   **A.**   Similarly, that we prosper economically together, and
15   also we share the same risks.  So we're motivated in the same
16   way.  It can't be that one side is bearing all the risk, and
17   the other side is benefitting with all the rewards.  When you
18   do it in that way, you create better economic outcomes.
19   **Q.**   And just a little while ago in this courtroom, Andrew
20   Harrison from Alaska was testifying, and he phrased that as
21   both sides having "skin in the game."  Does that capture it?
22   **A.**   Yeah, that's right.  That's often the way we describe it,
23   too.
24   **Q.**   Have you had other occasions, besides this document, to
25   write up your thinking on how partnerships work and why they

1    create benefits?

2    **A.**   Absolutely.

3    **Q.**   Is one such occasion in connection with something called

4    "Partnership 2.0"?

5    **A.**   Yes, that is correct.

6    **Q.**   What is Partnership 2.0?

7    **A.**   Our evolving view that if we can create a truly seamless

8    customer experience, we can create, like, outside economic

9    benefits for us, and win customers away from the other team.

10   **Q.**   Okay.  Let me show you what's in evidence as plaintiffs'

11   Exhibit 369.  And we're going to be -- publish the redacted

12   version.

13           MR. WALL:  Your Honor, I would just note in light

14   of the comments you made before we got started this morning,

15   that this would make any list of things for you to take home

16   and read.

17           THE COURT:  Okay.  Say again the exhibit number?

18           MR. WALL:  Plaintiffs' Exhibit 369.

19           THE COURT:  Thank you.

20   BY MR. WALL:

21   **Q.**   So what is this, Mr. Raja?

22   **A.**   This is our Partnership 2.0 document.  This is prepared

23   for our senior leadership team at the time and eventually

24   something that we were going to share more broadly across the

25   organization, and with our board.  And it's designed to go

1    and effectively describe how we see our partnerships

2    evolving, very consistent with the stuff we talked about the

3    last time I was here.

4    **Q.**   Now, dare I ask, did the McKinseyites have any role in

5    this?

6    **A.**   Yeah, they did a lot of slide fabrication.  All of the

7    ideas, the content, things like that, came from

8    American Airlines.  But nobody makes the pictures prettier

9    than McKinsey does.

10   **Q.**   Okay.  Thank you.  Let's show the agenda slide -- this is

11   the agenda for the meeting with the senior staff.  It's the

12   next page.

13              And so this has you speaking to certain parts of

14   the deck, correct?

15   **A.**   Correct.

16   **Q.**   And those are on, "The Foundational Elements of the

17   Partnership Strategy," "Maximizing the Value Created By

18   Partnership," and "Organizing to Build and Support

19   Partnership 2.0," right?

20   **A.**   That's correct.

21   **Q.**   And if we could turn over to slide 7.  Now, slide 7 is

22   part of a table of contents, right?  And I just want to focus

23   on the last part here, "What are the partnerships of the

24   future?" and the "Overview."  Can you summarize the messaging

25   that you're going to be -- that you delivered to the senior

1    staff on these topics, some of which we'll go over in some

2    more detail.

3    **A.**   Yeah, sure.  It was very simply that the best way we go

4    and capture all the benefits of a partnership is to start

5    developing a seamless experience.  And what this is, this is

6    designed to do -- it really fits in the intellectual context

7    as so much we talked about this last time around, which is we

8    can go and create a much better network for us and for our

9    customers through these partnerships as a legitimate

10   alternative to how we've thought about network expansion in

11   this business.  And so what this is all talking to, this is

12   basically a frame-up for the rest of the deck in which we go

13   through exactly that.

14   **Q.**   Okay.  Let's turn to slide 7, if we could -- and -- oh,

15   sorry, that is slide 7.  Slide 10.  My bad.  Let's go to

16   slide 10, which is up.  They're ahead of me.

17          And could you take the Court through this one,

18   again, much as you would have taken the senior leadership

19   team through it?

20   **A.**   Yeah.  Look, this is -- I'll do a bit of context before I

21   do that, which is this is, first, for our senior team, but

22   also it's a bit of board prep, too.  So what it starts with

23   is just a little bit of level setting context, which is what

24   the stuff on the left is, or sort of our widely held truths.

25   That we are a US based carrier.  This core asset, sometimes

1    we call it our privileged asset, our advantaged asset is this

2    hub-and-spoke model, where you add flights linearly.  You

3    create connections geometrically, and because of that, we can

4    offer a lot of choices to our customers.  What it also does

5    is we develop our international network in a capital

6    efficient manner.

7          It's also speaking to something that all of these

8    insiders will know, which is that for American Airlines, we

9    have a -- domestically we create a lot of connections.

10   Internationally our P&L has always struggled, and so much of

11   how we think about international is how we build off of

12   domestic connectivity, and, frankly, build it through

13   partnership.

14         And then last but not least, what the context gives

15   is that -- I think I had mentioned this the last time I was

16   here.  The network, as we think of it as like the home screen

17   for the airline, it brings customers in.  But where they

18   really stay, what we want is the frequently flying customer

19   who then joins our loyalty program, participates in other

20   levels of, as we call it, engagement with the airline.

21         The left is all to set in a context, to make the

22   point on the right, which is, as it says, "Our Network

23   Objective."  We want to go and maximize the value of American

24   Airlines, and the way we do it is really through growth.  We

25   want to have a big network that then feeds the loyalty

1    program, which then feeds the network, and it's as depicted

2    there, a virtuous cycle, by the McKinseyites.

3    **Q.**   Is there anything in here, or, really, any other part of

4    your network strategies, about using partnerships to reduce

5    capacity as a way of increasing revenues and profits?

6    **A.**   No.  No.  That's the opposite of this.

7    **Q.**   Let's take a look at slide 14, which is entitled, "Why do

8    partnerships exist?"  This is a title page for a new section,

9    right?

10   **A.**   Correct.

11   **Q.**   And then flip, then, over to slide 15.  And there's a

12   McKenseyite diagram in the middle of the page and a bunch of

13   text around it.  Can you explain this slide and what it's

14   showing?

15   **A.**   Yeah.  Um --

16          MS. SWEENEY:  Your Honor, may I object to these

17   questions that are asking for a narrative?

18          THE COURT:  Why?

19          Just asking him to explain what's on the slide.

20          MS. SWEENEY:  Well, Mr. Wall could ask more focused

21   questions, but instead he's saying, "Just explain this slide

22   to us," and it's a narrative.  And I think that Mr. Raja can

23   answer more focused questions.

24          MR. WALL:  I mean, Your Honor, after what we saw

25   with Mr. Kirby, I'm surprised by the objection.  But

1    regardless --

2           THE COURT:  I think it's sufficiently focused.

3    He's not asking him just to explain partnerships generally,

4    and he's not going on for 20 minutes or 30.  So I think it's

5    sufficiently focused.

6           MS. SWEENEY:  Thank you.

7           THE COURT:  Overruled.

8    BY MR. WALL:

9    **Q.**  Back to the slide, sir.  Again, could you convey the

10   messaging to the Court, much the same way as you did to the

11   senior staff?

12   **A.**  Sure.  And again, the context is important.  This is

13   about the leadership team and maybe even in industry, where

14   we thought of network expansion through the lens of

15   consolidation, right?  And I realize, I mentioned this last

16   time, but it's an important bit of context.  Because we're

17   saying here, "Look, if there's a threshold question, why do

18   you need a partnership?"  And we need a partnership because

19   there are things we can't do.  We don't have airplanes that

20   can fly to all places.  In some cases, there's demand that we

21   can't go and attract.  Infrastructure cost.

22          I mean, things like cabotage and national ownership

23   may be less pertinent for this case.  But it is a

24   comprehensive list of things that we can't do everything on

25   our own, no matter how much we would otherwise like to.

1    **Q.**  Thank you, sir.  We'll flip to slide 35 at this point,

2    which may relate to just what you were saying.  But there's

3    some kind of a diagram that's across the page.  Can you

4    explain what the point of this slide is?

5    **A.**  Yeah.  This is actually, to recap for people, the sort

6    of -- as we call it the intellectual journey of partnership

7    strategy.  So 25 years ago, there were things like global

8    alliances.  And what the global alliances were trying to get

9    at is exactly that earlier point.  There's things that

10   everybody cannot do alone for any number of those reasons.

11   Let's put these things together.

12          Well, lo and behold, in that, you can go and drive

13   connectivity, but people didn't have any ability to -- as you

14   had mentioned, there's no skin in the game.  Like one carrier

15   benefitted disproportionally, the other one didn't, and it

16   was limited.  That led to partnership 1.0, where people

17   started availing themselves of bigger, like more complex

18   structures, things like joint ventures, seeking international

19   antitrust immunity, things like that, in order to align those

20   motives.

21          But even partnership 1.0 was limited.  I mean, as I

22   like to describe it, though we are economically motivated at

23   the same thing, a customer checking in for a BA flight on

24   AA.com can't print a boarding pass.  Like it's not credible

25   until you can actually deliver a seamless, as we call it,

1    service for the customers.  Like you got to be able to print

2    their boarding pass, and so what Partnership 2.0 is, is

3    really focused at --

4              THE COURT:  Print their boarding pass or put it in

5    their phone.

6              THE WITNESS:  I'm sorry.

7              THE COURT:  Print their boarding pass or put it in

8    their phone?

9              THE WITNESS:  Both, I'm embarrassed to say, but

10   like the -- what so much of what it was focused on,

11   historically, were things like how two carriers can go and

12   actually exchange bags and exchange selling information,

13   but -- in global codeshares right now, if you go and check in

14   on name your carrier, British Airways, but it's an

15   American Airlines flight, and you want to select your seat,

16   that can't be done from BA.com, it can't be done from AA.com,

17   it can't be done from Delta.com or anything else.  And so if

18   you think about it, like we -- through these last 20ish years

19   of partnerships, through partnership 1.0, we got to a place

20   where there's an economic incentive for us to work together,

21   but the thing that we hadn't done was actually position it

22   from the perspective of the customer.  Like why would a

23   customer not fly on -- why would a customer choose a

24   partnership over a wholly, as we call it, organic itinerary

25   on someone else.  So the ideas -- look, we have to actually

1    make this seamless for the customer for us to really go and

2    benefit.  And that's what -- you know, whether it's a big

3    idea or the most obvious thing in the world can be your

4    adjustment, but that's what Partnership 2.0 is.

5    BY MR. WALL:

6    **Q.**  Okay.  Great.  So with that, I want to flip forward to a

7    sequence of slides 55, 56, and 57.  So let's start on 55,

8    which has the airplane there and some text on the left.  Can

9    you tell the Court what this is and what the message is that

10   you're seeking to convey?

11   **A.**  Yeah, this is probably a more eloquent more way of saying

12   more or less of what I just said, which is that in order for

13   us to basically go and get the financial value out of a

14   partnership, we have to actually create a truly seamless

15   customer experience.  And when I see that, it's got to be

16   that as a customer, you would choose in this case, an AA

17   JetBlue itinerary, over an entirely Delta Air Lines

18   itinerary.  It has to be that good of an experience.  And

19   what these next several slides in this document starts to

20   unpack is, okay, what does that actually mean.  That's a

21   great concept.  How do we go and start executing that?

22           THE COURT:  Mr. Wall, I'm going to pause you here

23   so we can break and the reporters can switch.

24           MR. WALL:  All right.

25           THE COURT:  Take the morning break now.

1          MR. WALL:  Thank you, Your Honor.

2          (Court in recess at 11:02 a.m.)

3          (The following reported by Robert Paschal.)

4          (In open court at 11:15 a.m.)

5          THE COURT:  Go ahead, Mr. Wall.

6          MR. WALL:  Thank you, Your Honor.

7    BY MR. WALL:

8    **Q.**  So, Mr. Raja, we were just about to turn to slide 56 in

9    PX 369.  Do you have that up on the screen now?

10   **A.**  I do, yes.

11   **Q.**  Okay.  So once again, can you explain for the Court what

12   the point of this slide is and how you presented it to the

13   senior staff?

14   **A.**  Yeah.  It's very visual, but the idea behind this is to

15   effectively convey that, just as important as network

16   extension and synergies are in a partnership, so too is

17   seamlessness that critical.  So the idea here is the way you

18   read this chart is strategic alignment is having, like, the

19   same goals, being able to codify that into an economic

20   structure that works.  But the way this comes about is you've

21   got to have a network that attracts customers and you've got

22   to make it seamless for them, and that's how it actually

23   creates value.  That's what 2.0 is.

24          And then the -- the thing below it, this idea of

25   partnership toolkit is really -- you know, before -- the way

1    we described this at the time was along the way, we talked

2    about different structures, codeshare, JV, things like that.

3    Those are just tools to effect an end.  That's like different

4    gauges of airplanes or the timing of the schedule, that,

5    really, we should think of whatever it might be, revenue

6    sharing, ATI, whatever the case is, codesharing, as really a

7    means of facilitating network extension and seamlessness.

8    **Q.**   Okay.  So this circle on the left, "network extension and

9    synergies, establishing complimentary networks," explain

10   that, please.

11   **A.**   It's exactly that.  It takes one of two forms.  First, we

12   fly to a market, somebody else extends it, so I think we fly

13   to London Heathrow, British Airways flies to Geneva, that's

14   an extension of the network.  But there's also a synergistic

15   thing where on JFK to Heathrow, we can go and, you know, sort

16   into having a flight every hour.

17          In the case of the NEA, it's not just that we fly

18   to Raleigh once or twice day and they fly to Raleigh once or

19   twice a day.  We can put together a schedule, and now we have

20   an hourly pattern to Raleigh.  We're not connecting somebody

21   beyond it, but we have greatly enhanced the utility of our

22   schedule for a high-value or frequently flying customer.

23   **Q.**   And the seamless experience is -- what role does that

24   play in it?

25   **A.**   Oh, it's critical.  Look, and we -- we sought

1    firsthand -- so take AA-BA.  For years, we've had a schedule

2    pattern at JFK-Heathrow.  It's almost like every other flight

3    is AA or BA.  It looks great on paper.  There's only one

4    problem:  Because we never invested in seamlessness, if

5    you're on the BA flight and you show up to the airport early,

6    you can't actually switch onto the American Airlines flight.

7    I mean, how simple is that for us to do?

8            And so a big thing -- and we found, actually, that

9    though we flew a lot of capacity at JFK-Heathrow, we -- our

10   market share wasn't keeping up with our capacity share

11   because we weren't as seamless as what Delta and Virgin were.

12   So as we looked through all these partnerships, we realized

13   that that is every bit as critical as extending the network.

14   You can't just put out a good schedule.  You have to make it

15   seamless for the customer.

16   **Q.**  Thank you, sir.  If you go on to the next page, slide 57,

17   entitled "Strategic Alignment Provides Mutual Understanding

18   of a Partnership's Value Drivers and Unlocks Its Full

19   Potential."  What kind of strategic alignment are you looking

20   for in a Partnership 2.0?

21   **A.**  Well, look, this first paragraph is a great way of

22   describing it.  They succeed when there's common commitment

23   to increasing network value and identifying further

24   opportunities to go and put our assets together to make

25   better schedules.

1          And that -- I mean, you can expand upon that to see

2     things that just JFK-Raleigh, like how do we go and build an

3     actual schedule pattern, but also how do we make it so the

4     customer can go and consume that effectively, all the way out

5     to -- I'll go there again, things like the bus, how do we

6     actually make it easy for a customer to go and use these

7     network services that we've put together.

8     **Q.**   Do you need strategic alignment on business models?

9     **A.**   Meaning like the business models of each of the carriers?

10    **Q.**   LCC versus a --

11    **A.**   Not at all.

12    **Q.**   Okay.  Do you need strategic alignment in terms of the

13    amount of seat room there is or the other amenities on the

14    airplane?

15    **A.**   Far from the it.  In fact, I would say there's really

16    utility in having those things not be the same.

17    **Q.**   Do you have other revenue-sharing partnerships with low

18    cost carriers?

19    **A.**   True.  Aer Lingus.

20    **Q.**   Excuse me?

21    **A.**   Aer Lingus.  They're owned by the IAG group.  They

22    effecting like an international version of JetBlue.  They fly

23    out of Dublin.

24    **Q.**   And how long have been they been associated with --

25    associated with the IAG group?

1    **A.**   Oh, I think they -- I want to say, prior to COVID -- for

2    quite some time.  They have been part our joint venture for

3    quite some time, too.

4    **Q.**   Are they part of the Atlantic joint venture?

5    **A.**   The Atlantic joint venture, sorry.

6    **Q.**   Has association with IAG and the Atlantic joint

7    venture -- joint business, rather, changed Aer Lingus's

8    business model in any way that's evident to you?

9    **A.**   No, not at all.

10   **Q.**   Okay.  PX369 has a number of slides on seamlessness, and

11   I want to touch on a couple of those, starting with slide 60.

12   So there's two boxes of what seamlessness is, what

13   seamlessness isn't.  Can you describe for the Court the

14   purpose of this slide and what was conveyed?

15   **A.**   Yeah, this is kind of consistent with the -- with this

16   deck, this is starting to unpack -- it's easy to get

17   seamlessness in concept.  Yet it should with that a customer

18   would willing choose AA or JetBlue over Delta, but what does

19   that actually start to mean?  And this is designed to do

20   that.

21            I would start add, every one of these things which

22   it is not is born out of actual experiences, some that we are

23   not necessarily proud that we have done, but we wanted to

24   make it really clear for ourselves, like, what is this thing

25   that we are talking about, how do we start to measure and it

1    imagine it and deliver upon it the way we would any other

2    part of our business.

3    **Q.**   Let me just skip to the bottom of the list.  On the

4    left-hand side on what seamlessness is, it says, "leveraging

5    the unique competitive advantage offered by each partner,"

6    and on the right, on what seamlessness is not, "disrupting

7    the business model of each partner."

8           Do you see that?

9    **A.**   Absolutely.

10   **Q.**   Is that relevant to the NEA?

11   **A.**   Absolutely.  It's 100 percent relevant to the NEA.

12   **Q.**   How so?

13   **A.**   Well, the idea here, and we always used to say the goal

14   isn't -- JetBlue should be more like JetBlue, American should

15   be more like American, that, actually, we should lean into

16   the fact that we're really different.

17          I'll do a "for example."  Like, JetBlue's website

18   is able to go and do things and sell things that we don't.  I

19   mean, they have wholly owned vacation -- things like that.

20   We found when we started the Tel Aviv flight, like almost

21   overnight we got 3 percent of our sales just from

22   JetBlue.com.  They were selling JFK -- these were people we

23   had never even seen before.  So it was like a whole new sales

24   channel had just opened up there.  Well, we don't want to go

25   change their website to go make it like a dot-com, why would

1   we?  Our dot-com.  Sorry.  Whatever is working there, have it

2   go be working there.

3          And similarly, for American Airlines, like, we're

4   not taking first class seats off of any airplanes.  In fact,

5   one of the major things with the NEA is how do we put more

6   first class seats into New York.  So far from it.

7          We -- the idea is we are going to be different

8   carriers.  How do we actually use that to win customers away

9   from the other people, which then creates a very interesting

10  question, which is then, all right, what -- what do those

11  really important customer touch points where it needs to be

12  similar and which are the ones that are just frivolous.

13  **Q.**  Okay.  And in that regard, let's turn to slide 61, and

14  McKinseyites have been active on this one.  So what is going

15  on with this end-to-end journey diagram, and what is this

16  showing?

17  **A.**  Yeah.  Well, look, I'm not sufficiently a visual learner

18  to explain the end-to-end diagram, but I can explain the

19  concept because this is one that I was personally very, very

20  partial to.

21         Everything here is written from the perspective of

22  the customer, not from the perspective of the airline.

23  There's not one thing on here, because what we kept pressure

24  testing is okay.  You're a customer going through the

25  journey.  We cannot be in this world where we have told

1    ourselves that because we've done a really great deal and put

2    two airline schedules together, we have now made it hard for

3    you to figure out how you check in for a flight, or where you

4    go to pick up your bag.

5         Like, there are some things that are there, and we

6    have our -- we call it our customer journey within all of

7    American Airlines, just like for every step that a customer

8    interacts with us, how do we examine it and evaluate it.

9         And we just expanded that here, everything from the

10   perspective of the customer.  So if you're the customer, what

11   are you looking for when you're shopping and buying?  When

12   you're getting rewarded, what does that mean?  You know, it's

13   got to be things -- you can see that I'm shopping.  I get to

14   earn miles.  If I'm an executive platinum or highest tier of

15   loyalty, that means something whether I'm flying on JetBlue

16   or on American, you know?

17        So it led us to go and prioritize some pretty

18   simple things, some of which had real technological

19   consequences behind them, but it should be that if an

20   American Airlines Executive Platinum, who booked first on AA

21   is on a JetBlue flight, for us to go and keep their business

22   in a place like New York, they need to be able to board

23   first.  For a JetBlue status customer, they need to be able

24   to board first on American Airlines.

25   Q.  Does American Airlines do anything to actually try to

1  measure the degree of seamlessness?

2  **A.**  A hundred percent.  That's the whole idea of this is -- I

3  know it's cliché, but if it gets measured, it gets managed.

4  And this is so important, we should have the same level of

5  metrics and tracking and managerial visibility that we have

6  on things like schedule design.

7  **Q.**  Okay.  I think we're going to have another witness on

8  that later on in the trial, so I'll skip past that for now.

9  Can you tell us generally how your seamlessness initiatives

10  are going with respect to the Northeast Alliance?

11  **A.**  Well, they're going -- I'll describe it like this.

12  They're going very well in that everything is being measured

13  and managed, but there -- like, there's a lot of, like, long

14  standing technological issues that we've got to go work

15  through, but this is our top IT project to go and get this

16  thing right, and we see progress on it all the time.

17  **Q.**  Okay.  I'm going to skip to another subject.  So after

18  the NEA was -- agreements were executed and announced, were

19  you involved to some degree in the process by which the

20  Department of Transportation reviewed the NEA?

21  **A.**  Yes, I was.

22  **Q.**  Okay.  And how were you involved?

23  **A.**  Ultimately, to discuss the deal, to help determine what

24  the slot divestitures would be, how -- and, importantly,

25  what -- I had to decide what the growth commitment would be.

1    **Q.**   Okay.  And did you have some sign-off role with respect

2    to the agreement that was actually entered into that --

3    **A.**   Yes.

4    **Q.**   -- with the DOT?

5    **A.**   Yes.

6    **Q.**   Okay.  Let's take a look at what's already been admitted

7    as Defendants' Exhibit 63, which is the DOT agreement.  I'm

8    not going to go through much of this, but I do want to cover

9    that one topic that you just mentioned about the -- about the

10   divestitures.  So please put up here Section III.E.2, which

11   is the conditional divestitures provision, starting on

12   page 5.

13          You're familiar with those commitments, Mr. Raja?

14   **A.**   Yes, I am.

15   **Q.**   Okay.  Can you just, in your words, describe what

16   American Airlines and JetBlue agreed to with respect to

17   growth commitments?

18   **A.**   Yeah.  We effectively said that we would grow as much as

19   15 percent over what our base would be over the period that's

20   noted here.

21   **Q.**   Okay.  And what are the consequences if you do not grow

22   your position?

23   **A.**   Well, look, first -- the first consequence of just

24   signing this agreement was the divestiture of seven slot

25   pairs, even though we were going to go.  But if we don't hit

1    our growth commitments, we divest even more slot pairs.

2    **Q.**   Okay.  Thank you, sir.  So can you, for the Court, just

3    put in perspective what it means to have to grow between 10

4    and 15 percent, given your prior history in New York?

5    **A.**   Well, I mean, it's a historical growth.  We've never --

6    growing 15 percent in New York, certainly for American

7    Airlines, was not in the cards.  We never had that level of

8    growth in New York.  And so, you know, in order to go and do

9    this, it is effectively committing that the total level of

10   capacity growth that the clean team put together, like, we

11   were going to do it.

12   **Q.**   So take a look at the last page of the document, which --

13   page 11, which lists various slot pairs that are forward

14   divestiture.  Were you involved in the process of identifying

15   the particular slot pairs that were going to be divested?

16   **A.**   Yes.

17   **Q.**   Was there some principle behind the identification of

18   those slot pairs?

19   **A.**   Yes.  This was done so that you could actually -- a

20   carrier, and ostensibly, a point to point low cost carrier

21   could come in and build what we call a full line.  A full

22   line is you can take an airplane and have an efficient

23   scheduling that go to and from New York through the course of

24   the day.

25   **Q.**   It was suggested earlier by another witness that the slot

1  pairs that are to be divested aren't valuable because they

2  require overnights for aircrafts?

3  **A.**  Seriously?

4  **Q.**  Yes.  What is your reaction to that?

5  **A.**  Well, if they don't want them, we'll take them back.

6  But -- not to be flippant, but like, this is the world's

7  largest originating airport.

8  **Q.**  What do you mean by that?

9  **A.**  This is where -- I mean, it's what everybody wants about

10  New York.  So many people -- it's one of the most populous

11  cities on earth, it's a huge business travel market.  People

12  originate out of New York.  I mean, the whole of American

13  Airlines for 20 years has been trying to figure out how we

14  originate more customers in New York City.

15  **Q.**  So what is the connection between overnight and

16  originating travel?

17  **A.**  Well, in New York, and I'm not encouraging anybody to go

18  to JFK airport before 0900 in the morning, anything with

19  wings is moving, because the idea is that people are waking

20  up in New York.  They're getting onto an airplane, and

21  they're flying to somewhere.

22          Usually, they fly to what we call the "sunshine,"

23  the West Coast.  They want to get to the Caribbean Islands

24  before noon, things like that.  But the only way an airline

25  is able to go and serve an 0800 departure is you have to sit

1    the airplane overnight to do so.  But that's the whole point

2    of this, that you can sit the airplane overnight.  You wake

3    it up in the morning, and if you have the lowest cost

4    structure in the most valuable time channel that's there, I

5    mean, you can't go wrong.

6                 And then you end up with a whole efficient line of

7    flying.  I get it.  You have to go and overnight an airplane,

8    but you know, the whole idea was you set up a line

9    maintenance station there and you -- you go.  Like, I mean,

10    it's --

11    **Q.**  Do other airlines overnight at JFK?

12    **A.**  I think every -- any airline that operates at JFK, in the

13    morning window, overnights at JFK.  Everybody has got a line

14    of maintenance operation there.

15    **Q.**  Is there any way to operate the early morning window

16    other than by overnighting?

17    **A.**  No.  You've got to have some means of getting an airplane

18    physically there.

19    **Q.**  All right.  Mr. Raja --

20                 THE COURT:  Just in terms of overnighting, the

21    planes aren't running 24/7.

22                 THE WITNESS:  No, absolutely not.  So the overnight

23    is actually a really important thing in the world, actually,

24    of airline schedule planning, because wherever you go cluster

25    a lot of overnights is where you, as we call it, naturally

1    want to put your maintenance, right?  Because you're not

2    flying them at night for any demand slots, whatever the case

3    might be, so everybody has got a big line maintenance

4    operation in New York.

5            Indeed, so much of our challenge around the MAX

6    earlier is that one of our big 737 line maintenance stations

7    is New York City and for precisely this reason.  You know, we

8    want to be able to wake up airplanes.

9            THE COURT:  So someone who gets these slots needs

10   to have the infrastructure at JFK and LaGuardia to do that

11   maintenance?

12           THE WITNESS:  Well, they don't have to do the

13   maintenance.

14           THE COURT:  But that would be --

15           THE WITNESS:  Yeah, the way you get an economy of

16   scale is you do the maintenance.  But usually, when you set

17   up maintenance, like you plan to be there for a while.  Like,

18   you don't do that and then change your mind overnight.

19           So this was designed that whoever comes in is going

20   to come in and stay for a while.  Now, you don't have to.

21   There's plenty of stations around the world where we have an

22   airplane that overnights, but we don't do maintenance on it

23   because it's -- there may only be two airplanes and for us,

24   we're big enough where we have, you know -- I'll make it

25   up -- ten airplanes overnighting in Atlanta or New York or

1    something like that, and so we'll set it up there.

2            But for the most part, if you're overnighting

3    airplanes, you want to be able to do maintenance there.  And

4    for a carrier -- if you've got 100 airplanes or 200

5    airplanes, two of them is a material number and, you know,

6    New York is a good place to do line maintenance.

7            THE COURT:  Why?

8            MR. WALL:  Mr. Raja, when you --

9            THE COURT:  Why is New York a good place?

10           THE WITNESS:  Well, just through years and years,

11   there's tons of certified line maintenance professionals.

12           THE COURT:  Just a big pool of skilled workers?

13           THE WITNESS:  Absolutely.  Some of the most senior

14   mechanics in the American Airlines system are all based in

15   New York because for years and years since the day of

16   Idlewild Airport and things like that, like it's just --

17   there have been a surprising number of aircraft technicians.

18   And maybe this is more detail than everyone needs, but

19   maintenance technicians are actually hard to come by in the

20   US these days.

21           THE COURT:  Go ahead.

22   BY MR. WALL:

23   Q.  So in the discussions with the DOT, did they also ask you

24   to provide, in the divested slots, late-night arrivals?

25   A.  Yes.

1    **Q.**  And is that somehow related to the issue of overnights?

2    **A.**  Yeah.  This -- this whole thing is done so that

3    effectively you can get, like, a full LCC days worth of

4    utilization and I'll explain what I mean by that.

5           For American Airlines, because we try to drive a

6    lot of connections and things like an airplane for us may get

7    utilized -- a 737 or a 320 may get utilized ten hours a day.

8    For an LCC, you want to be able to utilize that airplane from

9    0800 'till 2300 at night.

10          And so we built it so that you can get -- like, an

11   LCC could come in, actually set up shop in JFK, utilize an

12   airplane for a full day in two efficient lines.  If we didn't

13   meet our growth commitment, that could be, like, four or five

14   efficient lines depending where they're going and flying to.

15   **Q.**  Meaning, if you had to divest --

16   **A.**  If we didn't -- yeah.  If we didn't hit our growth

17   commitments and we had to go divest the full amount, then,

18   you know, it was going to make a pretty big and lasting home

19   that's there.

20   **Q.**  Great.  Thank you, sir.

21          So let's discuss how the NEA has affected your

22   customer offering --

23          THE COURT:  Before you turn to that.  So there's a

24   pool of slots that are called for by the DOT agreement to be

25   divested?

1           THE WITNESS:  Correct.

2           THE COURT:  Period.

3           THE WITNESS:  Correct.

4           THE COURT:  And a second pool that is sort of the

5     diamond necklace hanging over you if you don't fly.

6           THE WITNESS:  That's correct.

7           THE COURT:  And as to the first pool, what's the

8     status of those?

9           THE WITNESS:  So they're in a process of being

10    divested, although, not to be tongue and cheek about it, but

11    if anybody didn't want them, we would willing trade 0800 for

12    1,000 slots in the morning.  But they are to be utilized, and

13    the DOT is going to handle that process.

14          THE COURT:  So DOT is doing that process?

15          THE WITNESS:  Correct.

16          THE COURT:  And you still have them, or can you

17    still use them until DOT finishes or not?

18          THE WITNESS:  We are not using them -- so DOT that

19    has these slot IDs and they're going off and using them.

20          Now, a little bit of this has been moot just

21    because of COVID and things like that.  The DOT has

22    imposed -- like, JFK isn't operating at its full limit, so I

23    think it's more of a technicality than anything else.

24          THE COURT:  Okay.

25          MR. WALL:  Your Honor, we can address this in some

1   way, but we understand that the auction is about to go

2   forward pretty soon, but --

3              THE COURT:  Okay.

4              MR. WALL:  I don't think Mr. Raja would have any

5   knowledge about the particulars of that.

6              THE COURT:  Sure.

7   BY MR. WALL:

8   **Q.**  Okay Mr. Raja, did you prepare a demonstrative to assist

9   your testimony regarding the impact of the NEA on America's

10  customer offering?

11  **A.**  Yes, I did.

12  **Q.**  Okay.  Now a copy of that is in the front of the trial

13  exhibit binder in front of you.  And we'll also pull the

14  demonstrative up on the screen.

15             MR. WALL:  Your Honor, there has been some

16  objections to this.  I believe that they were resolved, but I

17  just want to make sure that there's -- that everything is

18  okay.

19             THE COURT:  Is that correct?

20             MS. SWEENEY:  That's correct, Your Honor.

21             THE COURT:  All right.  So admitted, if it's not.

22             What's the number again?

23             MR. WALL:  I don't know that it has a number, so I

24  think we just have to put a -- whatever next in order it --

25             THE COURT:  2001?

1          MS. SWEENEY:  I don't believe we agreed to their

2     admission as evidence.  We just agree to them using them.

3          MR. WALL:  Can we just mark it for identification,

4     then.  That's fine.

5          THE COURT:  So we'll call it Defendants' 2001 for

6     identification, just because --

7     BY MR. WALL:

8     Q.   Okay.  So the first section here is "New American Route

9     Options."  Can you explain what this section will cover?

10    A.   Yeah.  This talks about what we've added since we've

11    started the NEA.

12    Q.   Okay.  Let's take a look at slide 2.  And it's entitled

13    "New American Routes in Boston."  And a lot of pretty

14    graphics have just come up.  Can you describe to the Court

15    what this is showing?

16    A.   Yeah.  This is what we call our "selling schedule."

17    That's everything from quarter three 2022 to quarter 2 2023,

18    that a customer can go out and purchase.  It's everything

19    that's out there for sale which we plan to go and operate in

20    that window.

21         Importantly, what it does to -- it shows the growth

22    in that period.  So what we do is we take away everything

23    from January '19 to January '21, the period prior to the NEA.

24    We endeavor to be conservative in doing this.  We took away

25    what we called COVID opportunistic flying.  We took away

1    routes that we started and that we cut out along the way.

2         So effectively, that sort of pre-NEA base is gone.

3    This is the true growth in, in this case, Boston and our

4    selling schedule going forward.

5    **Q.**   Okay.  Now, is this based upon something -- the Court has

6    heard about this term before, something called "OAG

7    scheduling data"?

8    **A.**   Yeah.

9    **Q.**   And what is OAG scheduling dates?

10   **A.**   Official airlines guide scheduling data.  Effectively,

11   it's the -- it's a public repository in which all airlines go

12   and file their schedules.  It's often accessed through a tool

13   called DIIO or DIIO.  That's --

14   **Q.**   That's D-I-I-O?

15   **A.**   D-I-I-O.  That is the user interface through which one

16   accesses the mountains of data that are in OAG.  Both of

17   which are pretty conventional things anybody can go and

18   subscribe to.  It's all publicly available stuff.

19   **Q.**   Okay.  So we've heard a lot in this case about relevance,

20   local relevance.  Is there any relationship between

21   American's ability to add these routes and change in its

22   relevance that comes about through the NEA?

23   **A.**   Absolutely.

24   **Q.**   Can you explain?

25   **A.**   Yeah.  I mean, a ton of these things.  Cincinnati,

1    Lexington, Columbus, these were all markets which became more

2    legitimate because JetBlue is helping to sell us from Boston.

3              I mentioned when I was here last that there's a ton

4    of markets in this -- call it the heartland of the US.  It's

5    inside the perimeter of DFW, Chicago, Philadelphia,

6    Charlotte, Miami.  In those cities, we tend to do really,

7    really well with customers.  Unsurprisingly, many of those

8    customers want nonstop service to places like Boston and

9    New York, we've struggled to do it.  And what we're able to

10   do through the NEA is because of JetBlue's relevance with the

11   Boston-originating customer, now suddenly we can go and make

12   things like Columbus or Indi or Memphis work, that we

13   wouldn't have otherwise thought to do.

14   Q.   Okay.  Let's go to the next slide, "New American Routes

15   in JFK."  And what is this one showing?

16   A.   The exact same thing for JFK.  So this is the growth

17   versus our pre-NEA base in New York City.

18   Q.   Same methodology?

19   A.   Same methodology.

20   Q.   Okay.

21   A.   I'm sorry, JFK, not New York City.

22   Q.   Right.  So can you, again, explain how the NEA helped in

23   enabling those routes?

24   A.   Yeah.  In a few different ways.  Very importantly, it's

25   just, again, the originating demand out of JFK.  I mentioned

1     Tel Aviv before.  Like, I remain surprised at how much
2     JetBlue.com is a -- simply a sales channel in and of itself,
3     which is a thing we've not seen with other partners'
4     websites.  So it helped us go and win originating customers
5     out of there.  And later in the demonstrative, I'll show this
6     to, it's helped drive connectivity into a lot of these
7     international -- long-haul international flights that we
8     wouldn't have had without the NEA.
9     **Q.**  Okay.  If we go to the next slide.  And this is just same
10    thing for LaGuardia?
11    **A.**  Absolutely.  Exact same thing for LaGuardia.  These are
12    the new routes that we've added since the time of the NEA.
13    **Q.**  So let's focus on a couple of routes.  Are there any
14    routes on this slide that involve previously nonexistent
15    nonstop service from LaGuardia to some other city?  I mean,
16    that -- not just that you weren't offering it, but no airline
17    was offering it?
18    **A.**  Yeah, Little Rock and Tulsa.
19    **Q.**  And --
20          THE COURT:  Excuse me.
21    BY MR. WALL:
22    **Q.**  How did the NEA permit you or allow you or facilitate you
23    to -- to start those routes?
24    **A.**  Well, look, in a number of these cases, what the NEA has
25    enabled us to do is, frankly, as we say, play a lot more

1    offense than defense.  Before, we were just trying to figure

2    out how we can stay in the game in places like New York.  But

3    take a market like Little Rock, I mean, it's, for us, a big

4    city in Arkansas.  There's no -- there is no nonstop to

5    New York City.

6            So, like, New York is a weird market.  There's more

7    flights a day to Reykjavik than they are to Little Rock.  But

8    now, thought this, what we're doing is we know that we have a

9    big customer base in Little Rock.  We know that they're

10   connecting over hubs to get there.  Now what we're starting

11   to experiment with New York is, like, let's go and connect

12   things in there that nobody has done before.

13   Q.  Can you just address the -- to follow up on something you

14   just said there, can you address the importance to the

15   New York originating passenger in particular of nonstop

16   versus connecting service?

17   A.  Yeah, I mean, New Yorkers don't connect.  I'm not -- it's

18   just -- when you're in New York, you have -- I mean, this is

19   a market where there's more flights a day to Paris than there

20   are to Austin, right?  New Yorkers have their choice of

21   everywhere to go nonstop.  People who are in our loyalty

22   program are in Delta's.  If you fly more than one time a

23   year, you fly on more than one carrier, in all likelihood.

24   And if someone can get you there nonstop, you fly them.

25           And so the value of being able to have nonstops,

1    indeed, what we're testing and pressing in New York is, okay,

2    let's add more of these nonstops.  We know people in

3    Little Rock would love to go nonstop to New York because we

4    see them connecting on our airplanes today.  What does this

5    mean for customers in New York?  I mean, Little Rock is a

6    state capital.

7    **Q.**  So do you know the percentage of local originating

8    New York traffic domestically.  That is, nonstop as opposed

9    to connect?

10   **A.**  Oh, this -- meaning -- how much of New York originating

11   flies nonstop versus taking a connection --

12   **Q.**  To a domestic route?

13   **A.**  Off the top of my head, I don't know, but it is a -- it's

14   a pretty material number.  Look, it's a practicality of the

15   whole thing, right?  Yes, we can -- like, we'll often do

16   things where we've said in the past; we can serve a ton of

17   the O&Ds out of New York, absolutely.  We can fly New York

18   and Detroit with a connection over in Philadelphia.

19         At a peak time, there can be 12 New York to Detroit

20   nonstops.  No -- no frequently flying New Yorker is going to

21   go and take a connection over to Philadelphia.  So just as a

22   matter of practicality, you know, if you can look at the

23   schedule, I mean, there could be 17 flights a day between JFK

24   and de Gaulle.

25   **Q.**  Understood.  If we go on to the next slide or the next

1    section entitled "Flying Larger Aircraft in LaGuardia," this

2    is -- this is, essentially, upgauging, right?

3    **A.**   Correct.

4    **Q.**   Okay.  So let's go on to the first one, which is "Average

5    Gauge in LaGuardia."  So let me just begin by asking you how

6    you prepared the slide.  Where does the information on

7    average gauge come from?

8    **A.**   Same source.  The official airlines guide, and we use the

9    DIIO tool to extract it.

10   **Q.**   Okay.  So what, then, is slide 6 showing?

11   **A.**   Gauge is our shorthand for average seats per operation.

12   So here, you see JetBlue really only has two fleet types.  So

13   their average gauge doesn't change very much.  Their system

14   average gauge is somewhere between 134 and 135.

15          For us, what you see is the effect of dropping

16   50-seaters and upgauging not just to 76-seaters, but also

17   putting in more long-haulers, 300-seaters.  So you see a very

18   material upgauge in American Airlines, and therefore, the NEA

19   goes from an average of 101 seats per operation pre-NEA to

20   117 post.

21   **Q.**   Thank you, sir.

22          How did the NEA enable --

23          THE COURT:  I'm sorry.  Is that because of the

24   relative proportion of -- this is seats?

25          THE WITNESS:  This is seats.  It's not passenger

1    weighted.

2              THE COURT:  Right.  So the number of -- as a

3    percentage, the number of seats you had out of LaGuardia and

4    have must be more than JetBlue because this increase almost

5    matches the percentage increase of your increase?

6              THE WITNESS:  Yeah, you're actually ahead of us by

7    a couple of slides right now.  We will talk about how

8    total -- total seat -- actual seat capacity has changed in

9    LaGuardia.

10             THE COURT:  Okay.  Go ahead.

11   BY MR. WALL:

12   **Q.**  All right.  So just to finish on this one, so the gauge

13   increase from the NEA by these numbers is just a little under

14   17 percent for the NEA, right?

15   **A.**  That's correct.

16   **Q.**  Okay.  So now we'll turn then to the next one?

17             THE COURT:  17 percent?  It looked like -- it's 101

18   to 117.

19             MR. WALL:  Yeah, I said a little under --

20             THE COURT:  Wouldn't that be more like 11 percent?

21             MR. WALL:  Oh, you know?  You have better math

22   skills than I do.  Actually -- well, regardless, because I

23   don't do math --

24             THE COURT:  Okay.  It is -- the percentage is what

25   it is.  All right.

```
 1              MR. WALL:  This is how we make career choices in
 2    life.
 3              THE COURT:  I'm just thinking this is how I review
 4    CJA vouchers.  I'm wondering who is reviewing those bills.
 5              Go ahead.
 6              MR. WALL:  Okay.  Let's go to the next slide that
 7    does not involve math projects.
 8    BY MR. WALL:
 9    Q.  So average departures in LaGuardia, what's this showing?
10    A.  Precisely that.  The number of departures on -- daily
11    departures on average from the pre-NEA to post-NEA period.
12    Q.  And so the increase is, essentially, JetBlue taking over
13    a certain amount of American flying, right?
14    A.  Correct.
15    Q.  But the -- but it doesn't zero out, right?  The NEA slide
16    there, there's a difference.  168 to 173.  What accounts for
17    that?
18    A.  We're utilizing the slots harder than we ever had before.
19              THE COURT:  Harder, did you say?
20              THE WITNESS:  Harder, yeah.  The way slots work,
21    you need to use them effectively a certain percentage of
22    time, 80 percent of the time.  And one of the things that we
23    and other airlines would do, for example, is cut the schedule
24    down harder on Saturdays, when there was less originating
25    demand.  Now, a lot of those things are turning into flying
```

1    to Kalispell and Florida and markets like that.  So

2    effectively we're putting more departures into LaGuardia.

3    We're really just using the slot portfolio harder than we

4    ever have.

5    BY MR. WALL:

6    **Q.**  Okay.  Great.  Thank you, sir.

7          So why don't we jump forward, then, to slide 8.

8    And total average seats in LaGuardia.  So what's -- what is

9    the metric on this one?

10   **A.**  Well, it's seats.  And to the judge's earlier point, I

11   mean, it is effectively average seats per day times the

12   departures per day, gets you to these numbers.  And so here

13   you see just how much seat capacity has grown within

14   New York-LaGuardia.

15         So in the case of JetBlue, you see, because they're

16   operating more departures at the same gauge, a lot more seats

17   that are coming in.  You see a smaller increase for American

18   Airlines because we've increased gauge, but decreased

19   departures; but for the NEA your order of magnitude, 3,000

20   seats more per day in LaGuardia.

21         The other way that we kind of describe this to

22   ourselves is it's not just that the American Airlines

23   50-seaters came out and are now turning into bigger American

24   Airlines airplanes, they're turning into bigger JetBlue

25   airplanes.

1    **Q.**   Thank you, sir.

2           So just to put a pin on that, the American Airlines

3    bar, which shows a modest increase in seats, is taking place

4    because of a larger gauge on less -- on less departures,

5    correct?

6    **A.**   Correct.

7    **Q.**   Okay.  So to focus on the JetBlue entry there, that's --

8    you know, I can do the math.  That's over a doubling of their

9    seat at LaGuardia.  How did they accomplish that?

10   **A.**   Well, they effectively took over slots that we were

11   otherwise flying and they put in their -- you know, like I

12   say, they only have effectively one fleet type and the

13   combination of more departures at 134½, 135 seats per

14   departure gets you that material level of growth.

15   **Q.**   Okay.  Thank you.

16           And then the next section of this is entitled

17   "schedule optimization, connections to international

18   flights."

19   **A.**   Yes.

20   **Q.**   Let me go -- so what is -- what's this going to cover?

21   **A.**   This is going to cover how, in effect, we've built an

22   international network at JFK through the power of the NEA.

23   **Q.**   Okay.  Let me go to that next slide.  So this is a series

24   of slides that are related.  Why don't you introduce the set

25   first by explaining kind of how you're going to use these to

1    make -- make a point.

2    **A.**   Yeah, what we'll do is we'll use JFK-Tel Aviv as a bit of

3    a case study here, as how through the NEA we have effectively

4    supported this flight and made this flight work through our

5    flights, through schedule optimization, through all the

6    partnership that the NEA is.

7    **Q.**   Okay.  Great.  So on this one, you're just showing the

8    flight itself and the legend says, "No connections from

9    JFK-Tel Aviv to JetBlue flights, absent a codesharing

10   relationship."

11   **A.**   Correct.  So this is -- so JFK-Tel Aviv is one of the

12   largest O&D, originating and destination, markets out of

13   New York.  All of our competitors but us fly this thing, and

14   El Al flies it, as well.  But if we were to start, prior to

15   this, it would be New York to Tel Aviv plus a little bit of

16   domestic connectivity, but this kind of establishes that as

17   the baseline.

18   **Q.**   I mean, prior to the NEA, did you have this?

19   **A.**   We did not.  We wouldn't have dared to even think about

20   something like this.

21   **Q.**   Okay.  Why don't we go to the next slide, then?

22              THE COURT:  But if so many of these people are

23   originating in New York, why wouldn't you have?

24              THE WITNESS:  Well, because -- well, for two

25   reasons.  One, what we find in heavy New York originating

1    markets is that those customers tend to go with the other
2    guy.  It's the earlier point, right?  If you're flying Delta
3    to --
4              THE COURT:  The stickiness of --
5              THE WITNESS:  The stickiness.  So what we end up
6    being -- and we've tried this many times, JFK to Tokyo, any
7    number of markets that were there, we end up being what we
8    call a spill carrier, right?  Whenever the other people are
9    too full, they come to us.  And when -- and that level of
10   demand frankly is not enough to go and make money on the
11   operation.
12             THE COURT:  Okay.
13   BY MR. WALL:
14   Q.  Great.  Okay.  So we've moved forward to the next slide,
15   which is entitled "codesharing only:  Tel Aviv-JFK."  Can you
16   describe what's going on here?
17   A.  Yeah, so, look, a really important thing that sounds
18   technical is like what this is, is what our connections would
19   be in New York if we only did codeshare and we did not
20   do schedule --
21   Q.  Codesharing with JetBlue?
22   A.  Codesharing with JetBlue, without scheduling
23   optimization.  When we do that, the technical part of this is
24   this, is that we assume a legitimate connection is something
25   that has 1½ hours minimum and is no more than 3½ hours

1    maximum.  This is because, in order to be able to traverse

2    JFK airport, we operate with a 1.5 hours minimum connecting

3    time or MCT, I'll refer to it as, along the way.

4            And then once you cross 3.5 hours, you kind of

5    enter this realm of impracticality, that if someone going to

6    take a 3½ hour connect, they're going to find an easier way

7    to do it.  You can connect to Tel Aviv over just about any

8    market in this, Toronto, London, de Gaulle, whatever the case

9    might be.  So after 3.5 hours, it just starts becoming an

10   impractical connection.

11           But inside of that is a sweet spot.  With that

12   context, what you see here is, if we were to just do

13   codeshare, these are the markets that would be viable

14   connections in just a pure codeshare un-optimized schedule

15   world.

16   **Q.**  So that -- I mean, putting aside whether you entered into

17   that relationship, if you did, but the folks in Seattle and

18   San Francisco and Los Angeles and the other named cities on

19   this would have JetBlue flights within the window of the

20   American --

21   **A.**  That's correct.

22   **Q.**  -- Tel Aviv flight?

23   **A.**  That's correct.

24   **Q.**  Okay.  All right.  Let's go on to the next one.

25           Now, what is this showing?  It's entitled "Schedule

1    Optimization:  Tel Aviv-JFK."

2    **A.**  Yes.  This is what scheduling optimization with JetBlue

3    has enabled, so through the NEA, we're both incentivized to

4    go and create as much connectivity for the Tel Aviv flight.

5    So these are all of the -- the connections that were made

6    possible through coordinating the schedule.

7            So suddenly things like Minneapolis, Atlanta, we --

8    Houston, effectively our competitor's hubs start becoming

9    legitimate connections for us, too.

10           THE COURT:  What happens -- some of the blue lines

11   disappeared?

12           THE WITNESS:  Yeah, so what -- what we did along

13   the way is -- what -- we retimed a couple of things so

14   that -- because some of those blue lines can be served in the

15   American Airlines network, which we'll show on a subsequent

16   page; but, also, what it was is, how do we go and start

17   creating more -- a total volume of connectivity, right?

18           Like, for us, we're --

19           THE COURT:  That means Seattle might have gone a

20   different way?  That's why it's not on this page?

21           THE WITNESS:  Correct.  That's correct.

22   BY MR. WALL:

23   **Q.**  Right.  So just to follow up on that, so there's costs

24   and benefits of the schedule optimization?

25   **A.**  Absolutely.

1    **Q.**  Okay.  So in this instance, I mean, if we go back to the

2    last slide for a second here, so without the optimization, it

3    happened that you would have the connectivity to Seattle, but

4    on the other hand, the total number of viable connections is

5    just 12, right?

6    **A.**  That's right.

7    **Q.**  Okay.  And now we go forward.  Now, Seattle has dropped

8    out for the moment, but the total number of viable

9    connections has increased?

10   **A.**  Correct, to 20.  And, like, to the judge's point, too,

11   there's -- what you also notice, right, is the things that

12   have kind of fallen off have been the West Coast in favor of

13   being able to get more things in what we call the interiors

14   of the country, the mid-con.

15            And the reason for that is when you're on the West

16   Coast, to go international, especially to go transatlantic,

17   you have a ton of different connecting options that are

18   there.  But for many of these markets that are here, New York

19   is a really, really viable connecting market.  And some of

20   these cases, Phoenix, Nashville, Charleston, we have a big

21   customer base that's there.

22            So you see that kind of reoptimization in order to

23   go and play to a customer set that suddenly we can go play

24   in.  12 becomes 20.

25   **Q.**  Move on to the last in the sequence here.  Next slide

1    is -- it's got the same title, but suddenly a bunch of red

2    lines have popped on.  What is this showing?

3    **A.**   Right.  Now, this layers on the viable American Airlines

4    connections, as well.

5    **Q.**   After the optimization?

6    **A.**   After the optimization.  Now, some of these things would

7    have been legitimate before, like, for example, Miami, but

8    Miami to New York flies almost in an hourly pattern.  That

9    would have connected before.

10           So in some cases, these things are retimed, but in

11   other cases, for example, Cincinnati and Orange County, we

12   add a whole new market.  So like New York-Orange County is a

13   flatbed airplane, which nobody had a flatbed in prior to

14   this.

15           So when you look at this whole thing together,

16   right, this is now 28 routes that are feeding JFK-Tel Aviv.

17   Because we like to say this, I mean, what the NEA did was we

18   built another hub, we spent billions trying to do this.  And

19   I'll admit -- I will confess this is like the bus for me.  We

20   have a product that you can't hold in your hand, but to be

21   able to do that, like all of our competitors took note when

22   this thing happened because now there's a level of

23   connectivity in New York that nobody thought American

24   Airlines and JetBlue could ever have.

25   **Q.**   What does that do for the financial case for having the

1    Tel Aviv-JFK flight?

2    **A.**   Well, it's the difference between having the Tel Aviv

3    flight and the Doha flight and the India flight and all of

4    those because, look, for us -- I think I mentioned this last

5    time I was here, too, like international at American Airlines

6    is somewhere between a negative 5 and a 5 percent fully

7    allocated profit margin.

8            In these flights, JetBlue is -- they're between 10

9    and 15 percent.  Doha is the high end.  Tel Aviv is at the

10   low end of, like, 12 percent of our on-board revenue, right?

11   So --

12   **Q.**   You mean it's derived from JetBlue in some way?

13   **A.**   Correct.  Derived from JetBlue in some way, through their

14   connectivity, through them selling us on their website,

15   whatever the case might be, but that's material.  I mean,

16   that's whether or not -- like, 12 percent of the revenue,

17   when you're expecting a zero percent margin flight, that's a

18   difference between whether the route is viable or not.

19   **Q.**   Okay.  And we've been talking about this in the

20   particular case of JFK-Tel Aviv, but would the -- would the

21   same principles apply to other international flights that

22   have been added through the NEA?

23   **A.**   Absolutely.  Absolutely.  Kennedy-Doha, Kennedy-Delhi.

24   All of those -- if you look at the clean team's work, like,

25   at the time, we were imagining going and adding more services

1    to Europe, but suddenly we're seeing the opportunity to do

2    India and the Middle East and markets like that out of it.

3    Many of which, we started this stuff.  I mean, this is like

4    January 2021 when we're starting and planning for routes like

5    this.  Like the marketplace still isn't even recovered and we

6    continue to see the signs of growth out there.

7    **Q.**  Okay.  There's one final section of this, which is

8    called, "Schedule Optimization on Nonstop o&d Coverage."

9            What is this one about?

10   **A.**  Precisely that.  This is how well we've covered some of

11   the largest markets out of the New York area.

12   **Q.**  Okay.  So let's go to the next slide.  This is slide 14

13   entitled the -- is this the right one?  Yeah.  Nonstop -- no.

14   This is --

15   **A.**  Slide 15 is --

16   **Q.**  I'm sorry.  14.  My bad.  I knew something was wrong

17   there.  Okay.  Slide 15.  Sorry.

18           So this one is "Number of Top 50 NYC Origin and

19   Destinations Served August 2019."

20           What is this showing?

21   **A.**  So this is the amount of the top 50 markets out of

22   New York City that we serve.  So we served 31 of the 50 in

23   August of 2019.  Delta, 50.  United, 50.  But, importantly,

24   this is actually important for the question that the Judge

25   was asking a moment ago, because when you're in 31 of the top

1    50, you aren't relevant in a ton of these markets.  So you go

2    fly a flight to Tel Aviv or -- like, it becomes hard to add

3    any of the ones on the list without adding all of the ones.

4    Like, you can have a material number of these flights on the

5    list, otherwise, people just don't have the same attraction.

6    Like, they can get an upgrade on Delta to Tel Aviv.  Why

7    would they fly you?

8    **Q.**   So we have a pop-out here that talks about -- it's

9    entitled "American lacked nonstop coverage," et cetera.  And

10   what is this list?

11   **A.**   These are the -- these are the 19 routes which we did not

12   have a nonstop and our competitors did.

13   **Q.**   Okay.  And if we further the animation a bit, what's

14   being shown now in the blue, purple, and green lines?

15   **A.**   So the blue are, effectively, what JetBlue adds just

16   through -- through the code.  The green is what American

17   Airlines has added since the time of the NEA on the strength

18   of all the points I just made, and then purple is what we

19   have added domestically since the NEA has started.

20   **Q.**   Okay.  Thank you very much.

21           So if we go forward, the next slide is about

22   nonstop origin and destination coverage and this is just the

23   end state where you're now at 47 and -- against the 50 and 50

24   for Delta and United respectively?

25   **A.**   That's correct.

1   **Q.**  Okay.

2   **A.**  And we're working for our Mex City slots.  We want

3   Amsterdam slots, and we are prepared to go into Dublin, too.

4   **Q.**  Okay.  Let's go on into the next one.

5          MR. WALL:  Okay.  We don't have a next one.  Thank

6   you for that.  So -- all right.  One of the -- the last thing

7   I want to do, I want to pull up Defendants' Exhibit 135, if

8   we can do that.  This is in evidence, Your Honor, and this

9   is -- it's a nonconfidential document.

10  BY MR. WALL:

11  **Q.**  So what is Defendants' Exhibit 135, Mr. Raja?

12  **A.**  So this is an update that actually the AA network team

13  prepared for me.  I was getting ready to go do a number of

14  different things, town hall, earnings calls, things like

15  that.  And this was just the stats of what have we done with

16  six months of the NEA.

17  **Q.**  Okay.  So as we -- as we -- given the time, I'm just

18  going to cover a couple of things here.  Why don't we just

19  show slide 5 for a second.  This relates to your point about

20  the lie-flat service that you mentioned earlier, right?

21  **A.**  Yes.

22  **Q.**  And what's -- and what is the accomplishment here?

23  **A.**  A lie-flat in every market.  So American Airlines used to

24  only have lie-flats in JFK and San Francisco, and JetBlue has

25  lie-flats.  We're not actually timed to go and drive

1    customers from New York.  Now, we are the only ones who have

2    all lie-flat.  Like we have lie-flat in every one of those

3    markets.  Like this --

4    **Q.**   So every one of those markets, meaning the list of

5    JFK-LAX, Boston-LAX, et cetera, et cetera?

6    **A.**   Yes.  And when we -- like, this was the day that I knew

7    that Delta was taking it seriously, because they had taken

8    flat beds out of Boston-LA.  And we went to all flat beds;

9    they went and put one back in a few weeks later.

10   **Q.**   Okay.  Why don't we go on to slide 7 and what -- what

11   does it mean by a high-frequency business market?

12   **A.**   So a major amount of LaGuardia flies what we call

13   "high-frequency markets."  These are -- we call it almost

14   hourly-service markets inside of a short perimeter around

15   LaGuardia.  And they're primarily there to serve a kind of

16   demand where people would wake up in the morning, do a day

17   trip to the market, come back at night.  You can almost think

18   of these, like Boston-LaGuardia or DC, as almost being a

19   competitor of the train.

20   **Q.**   Okay.  And so what is --

21             THE COURT:  Are there other threats on those

22   shorter routes, other than the train?

23             THE WITNESS:  I'm sorry; say that again?

24             THE COURT:  Are there other threats other than the

25   train?

1          THE WITNESS:  In the Northeast, not really.  It's
2    pretty much the plane or the train, but in other parts of our
3    system, it's the car.  And DFW to Austin, it's the car.
4          THE COURT:  Some people may just choose to drive?
5          THE WITNESS:  Absolutely.
6          THE COURT:  All right.  Okay.
7    BY MR. WALL:
8    **Q.**  Okay.  So -- so what did the NEA do for you in terms of
9    your ability to compete in the high-frequency business
10   markets?
11   **A.**  Oh, look, it greatly improved our ability to go and
12   compete.  You see the scheduling improvement in Boston-DCA,
13   again, pre-NEA, you see at those peak time trips we're
14   basically on top of one another.  So in these markets,
15   unsurprisingly, when the business day is done, four o'clock,
16   five o'clock, seven o'clock, there's demand effectively.
17   That's where we're flying.  Now, post-NEA, it's a nice hourly
18   pattern.  You can get on any flight you want.
19   **Q.**  I do want to mention one thing, though, that's on this
20   slide, however, there's an empty box under the
21   LaGuardia-Boston service, under the American Airlines icon.
22   Do you see that?
23   **A.**  I do.
24   **Q.**  What's going on there?  What's that about?
25   **A.**  Yeah, that was probably the hardest decision of the whole

1    of the NEA and one that -- I don't usually ring my hands over
2    such things, but I rang my hands over a lot.  Look,
3    Boston-LaGuardia is probably the -- it is the big
4    high-frequency business market for -- there's a lot of demand
5    that's there.  Indeed, there's a lot of competition,
6    whatever, but it's a really unique thing for American
7    Airlines, for a very nonobvious reason.
8            American Airlines has this unique provision in its
9    pilot contract where 65 percent of our operations in that --
10   if we're to fly Boston-LaGuardia at all, 65 percent of our
11   operations have to be on a mainline jet.
12   Q.   What is a mainline jet?
13   A.   A mainline jet is like a A319 or a A320, a jet with more
14   than a 100 seats on it versus one with less than a 100 seats.
15   That is actually really material because once you cross that
16   100 seats, the trip cost of every one of those jets goes up
17   very materially.
18           In this market, as you can imagine, think about the
19   type of customer that's there, you're doing it as a day trip.
20   There's very little demand through the body of the day, and
21   there's tons of demand on the ends of the business day, so --
22   Q.   You're getting ahead of us.  Those are other terms.
23   What's the body of the day versus the --
24   A.   Sorry.  Think of it as the business day, right?  Anything
25   before -- let's call it 9 a.m. before people start showing up

1    at work is the morning of the day.  And the body of the day,

2    as we call it, is between 9 a.m. and about 4 or 5 p.m. when

3    people tend to leave work.  That becomes really important in

4    high-frequency markets such as this, because people want

5    to -- at one time, they would wake up early in morning, they

6    would want to go to Boston or New York, they would come home

7    when the workday was done.

8              For us, we have 130-seat A319s, which are much more

9    uneconomical than, say, Delta's regional jets that are there.

10   But for us -- and we've said this.  It's in any number of

11   documents.  Though we haven't covered it here, the NEA is not

12   just growth for our customers.  It's growth for our team.

13   Like, our team has never seen growth in New York like this

14   before.

15   **Q.**  By your team, you mean pilots and --

16   **A.**  Our pilots, our flight attendants, things like that.  And

17   so where we really struggle with this one -- and, frankly,

18   where I really struggled with this one -- is, yeah, it was

19   tough taking the flight out, but it's also, what do we go and

20   do with it?  And --

21   **Q.**  Well, let's not get ahead of ourselves.  So a decision

22   was made to -- for American Airlines to discontinue its

23   service between LaGuardia and Boston?

24   **A.**  Correct.

25   **Q.**  Okay.  And so what is the NEA's solution to the travel

1    needs?

2    **A.**  Well, so we had JetBlue operate it 12 times a day, and

3    they can get a very efficient use of the slots that are

4    there.  We were able to bring them into LaGuardia.  We

5    co-located them into terminal B from the marine air terminal,

6    which is -- not as nice of a terminal, into the new nice

7    LaGuardia facility.

8               And they are 12 flights a day in Boston-LaGuardia,

9    but American took its metal out.

10   **Q.**  Okay.  So let me just --

11              THE COURT:  They're flying mainline jets?

12              THE WITNESS:  Correct.  They only have mainline

13   jets.  They only have jets over a 100 seats.  That's correct.

14   BY MR. WALL:

15   **Q.**  So do you --

16              THE COURT:  Different contract, presumably?

17              THE WITNESS:  Only in that they don't have any

18   provisions for flying less than 100 seats.  I mean, ours is

19   from a bygone time.

20              THE COURT:  Yours is if you fly this route, then

21   you must fly certain size planes?

22              THE WITNESS:  Correct.

23              THE COURT:  I see.  Okay.

24   BY MR. WALL:

25   **Q.**  Okay.  So how did the pandemic effect the potential

1    profitability of American Airlines of actually operating on

2    this route?

3    **A.**   Oh, it's -- it's changed the market dynamics of

4    Boston-LaGuardia, but all of these high-frequency business

5    markets.

6    **Q.**   How so?

7    **A.**   Look, it used to be that about three -- roughly

8    3 percent, order of magnitude, 3 percent of our business

9    demand was we called it same day travel.  You wake up early

10   in the morning, you go fly to some place -- you wake up early

11   in the morning, for example, in Boston, you fly to New York,

12   you have a day of meetings, you fly back in that evening.

13          Right now, that's less than 1 percent and trended

14   down -- the -- the -- you know, maybe the way I should have

15   actually answered the Judge's question earlier is that what

16   we're starting to square ourselves up to is the reality that

17   our true competitor in this market, the true substitute

18   product is not the train, but the Zoom call.

19   **Q.**   Do you know how much demand for the Boston-LaGuardia

20   product is down since the pandemic?

21   **A.**   Order of magnitude, 30 percent.

22   **Q.**   Do you have any expectation of whether that's going to

23   come back?

24   **A.**   It -- look, it seems pretty unlikely that it comes back

25   right now.  We -- as you can tell from my comments here,

1    like, we spent a lot of time looking at this very thing.

2    But, certainly, in the Northeast especially, high-frequency

3    business travel, same day stuff has changed a lot.

4              THE COURT:  Because of Zoom?

5              THE WITNESS:  Because of Zoom.

6              THE COURT:  The adoption of Zoom during COVID?

7              THE WITNESS:  Correct.  Correct.

8    BY MR. WALL:

9    **Q.**  Okay.

10             THE COURT:  So that's the substitute?

11             THE WITNESS:  Increasingly, its seems that way.  I

12   mean, we're -- some of this stuff -- I mean, we're still

13   processing a lot of it, but, you know, we had -- the summer

14   had been the case; we thought that -- normally, demand starts

15   to pick up after Labor Day when people go back to school and

16   business travel returns, but we haven't seen it in September

17   and we're not seeing it as October builds either.

18   BY MR. WALL:

19   **Q.**  So presumably when you took down the service, you had to

20   redeploy some aircraft, right?

21   **A.**  Yes.

22   **Q.**  What happened to them?

23   **A.**  Yeah, look, that -- this was how certainly I made peace

24   with the whole thing.  Little Rock and Tulsa are born because

25   American Airlines took its metal out of Boston to LaGuardia,

1    right?  We still utilized those slots in the portfolio.  You

2    know, in Boston, we had growth, too, sorry.  Memphis,

3    St. Louis, you know, we decided to go after Southwest in

4    St. Louis, which we had never really done out of the

5    Northeast before.

6              And so what it netted to -- or at least how I made

7    my peace with it -- and I think it's in this deck, as well --

8    we end up with, like, 12½ percent block-hour growth in

9    New York.

10   Q.  And can you explain block hours?

11   A.  Yeah, so for our team, our team isn't actually -- pilots

12   and flight attendants aren't paid in departures.  They're

13   paid in hours.  So taking an airplane and flying it for

14   14 hours to India is the most lucrative pay versus flying it

15   for two hours total time in New York to Boston.

16             THE COURT:  For the employees?

17             THE WITNESS:  For the employees.  We call that

18   block time.  And that's because it's measured from the time

19   the airplane is off the blocks till it's back on the blocks

20   at the next airport.  That's when they're paid.

21             And so, you know, taking this route away, like,

22   this has been hard for our customers, for many of our team,

23   but, also, we've had more growth in New York and Boston, and

24   indeed I remember because I had to go do a LaGuardia town

25   hall about this very thing and, like, I -- I think we were

1    up, like, 12, 13 percent in block hours in New York, which

2    is, like, an unprecedented level of block hour growth for our

3    mainline, our above 100 seat employees, so --

4    BY MR. WALL:

5    **Q.**   So just see if I get the connection, then.  If you're up

6    10, 11, 12 percent block hours, whatever it is -- that

7    means --

8    **A.**   There's more jobs and people get paid more.

9    **Q.**   Thank you.  Okay.

10              All right.  I'll just wrap up.

11              MR. WALL:  Can we go to slide 2, the summary of --

12   in this deck?

13   BY MR. WALL:

14   **Q.**   So we don't need to go through this, but slide 2 has a

15   number of points about the NEA and what you were

16   experiencing, but it's also July 2021.  It's now

17   October 2022.  Can you tell us what -- what the latest is,

18   what is the -- your most recent observation on what effect

19   the NEA has had on American Airlines's ability to compete in

20   the Northeast?

21   **A.**   Yeah, look, I think the -- the best way to see it is in

22   our schedule data.  We built New York back faster than

23   anybody else.  We've kept, at a time when -- look, in the

24   rest of the American Airlines system, we're waiting for 13

25   wide-body airplanes to deliver from Boeing.  That's a

1   material number.  That's, like, 10 percent of our wide-body

2   fleet.

3            We've kept all of New York going.  Like, the only

4   thing we've had to go and temporarily suspend was Chile,

5   because we couldn't figure out how to make the aircraft

6   rotation work, and that's still not even a permanent thing.

7            So for us, I mean, we have kept this thing going.

8   And, look, the best thing of all about those prior slides is

9   that's not me telling anyone to do it.  Like, it's actually

10  bearing its fruit in how we're performing financially, but

11  best of all, what we're seeing in customers.

12           So we're on a path right now where we will

13  actually -- like, if we continue at this rate, for the first

14  time in our history, our advantage enrollments, our loyalty

15  programs enrollments in New York will be the number one in

16  the system -- bigger than Dallas.  And we have almost, like,

17  900 flights a day in DFW.  And what that is, is people are --

18  we're finally speaking to the customers who would have flown

19  Delta and United and things like that, and they're coming to

20  us.

21           So as we see it, this is the start of something

22  which is opening our eyes to things.  You know, I know it's

23  a -- I don't mean for it to be hyperbolic, but we built a

24  hub.  Like in our business, the hubs were built through

25  billions of dollars and years of turmoil and consolidation

1    and bankruptcy, and it happened.  I mean, that's what

2    JFK-Tel Aviv was, and customers are telling us that because

3    they're behaving in ways that benefit our other hubs, they're

4    enrolling in our program, people are -- they want to go and

5    consume things like first class from us.

6            So this is going to take us to a lot of places, but

7    very importantly for us, what it doubles down on, and it's

8    why I say it's our number one IT project, but we have to be

9    seamless.

10           Look, I flew JetBlue the other night.  I checked in

11   on the AA app, but I had to get my boarding pass from

12   JetBlue.  A lot of that is just the vestiges of airline

13   technology, but once that is up and running, I mean, we're

14   going to -- we're going to be a force in the Northeast

15   together.

16           MR. WALL:  Thank you, Mr. Raja.  Appreciate it.

17           Pass the witness.

18           THE COURT:  Cross-exam -- or redirect, I guess.

19           MS. SWEENEY:  Yes, Your Honor.

20           Apologies for all the paper, Your Honor.

21           THE COURT:  That's quite all right.  I'm ready when

22   you are.

23        **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS**

24   BY MS. SWEENEY:

25   **Q.**  Okay.  Hello, Mr. Raja.  Welcome back.

1    **A.**  Hey, thank you.

2    **Q.**  So I'd like to start where Mr. Wall started today, and

3    that is on the -- the slots, the lost slots.  Do you remember

4    that?

5    **A.**  Yeah, sure.

6         MS. SWEENEY:  And can we pull up that particular

7    exhibit that was the subject of that testimony?

8    BY MS. SWEENEY:

9    **Q.**  Thank you.  Now, I won't spend a lot of time on this,

10   there's already been a lot of time spent on it, but I just

11   want to make sure I understand your testimony, Mr. Raja.

12        So initially, you read this as saying we -- "We

13   thought 216, they thought 200."  The "we" being American

14   Airlines, "they" being FAA, correct?

15   **A.**  Correct.

16   **Q.**  And then subsequently, you changed your testimony and

17   then you also testified today that you believe you transposed

18   that in this particular e-mail, right?

19   **A.**  Correct.

20   **Q.**  And you recall that you were deposed in this case a

21   couple times?

22   **A.**  Yes, I do.

23   **Q.**  And at your first deposition, this exhibit was used at

24   that deposition, and you didn't recall at that time that you

25   had transposed that information, correct?

1    **A.**   No, because there's a lot about this that I don't have

2    very fond memories of.

3    **Q.**   Now, you've said in your testimony today and last week

4    that slot constraints are a key driver of this particular

5    alliance, the NEA alliance, right?

6    **A.**   Sure.

7    **Q.**   Yeah, because they affect your ability to grow at JFK and

8    LaGuardia?

9    **A.**   Most certainly.

10   **Q.**   So whether you thought you had 200 slots or 216 slots or

11   vice versa, you still, at the end of the day, didn't know how

12   many slots you had, correct?

13   **A.**   We did not.

14   **Q.**   Okay.  Let's now turn to the slides that Mr. Wall went

15   through.

16            I'm not going to go through all of these.  Let's

17   look first at slide 2, which is entitled "New American Routes

18   in Boston."  And you described these as new routes, right?

19   **A.**   Correct.

20   **Q.**   Now, we talked about this last week, but American had

21   already publicly announced before entering into the NEA its

22   plans to enter some of these markets, right?

23   **A.**   Yeah.  Unfortunately, that was also the time before

24   COVID.

25   **Q.**   Right.  But you had announced the plans to enter into

1    these markets; is that correct?

2    **A.**   Correct.  A few of them, yeah.  Indianapolis --

3    **Q.**   Boston to Austin?

4    **A.**   Correct.

5    **Q.**   Boston-London Heathrow?

6    **A.**   Correct.

7    **Q.**   Boston-Indianapolis?

8    **A.**   That's correct.

9    **Q.**   And Boston to Wilmington?

10   **A.**   Yes, which I believe was Saturdays only.  That's correct.

11   **Q.**   Okay.  And then as we talked about last week, American

12   had also announced entering Boston-Raleigh-Durham in that

13   time period, correct?

14   **A.**   Also correct.

15   **Q.**   And that entry would have competed with JetBlue's service

16   on that route?

17   **A.**   Boston-Raleigh?

18   **Q.**   Yeah.

19   **A.**   Yes.

20   **Q.**   And so we don't see it on this map here, do we?

21   **A.**   No, we don't, because I believe it might have been

22   outside how we pulled the window, but yes.  Boston-Raleigh,

23   you're right.

24   **Q.**   Okay.  Let's turn to slide 3, which is titled "New

25   American Routes in JFK."  And this slide shows new

1      international service from JFK; is that right?

2      **A.**  It does.

3      **Q.**  All of these flights are to international destinations

4      except for the one to Santa Ana; is that right?

5      **A.**  And Lauderdale and --

6      **Q.**  Thank you.

7      **A.**  -- the ORH, Norfolk.

8      **Q.**  Now, and the relevant -- the period of time that

9      you're -- I'm sorry.

10             THE COURT:  Is that -- where is ORH?  I see it on

11     the map, but Norfolk?

12             THE WITNESS:  Oh, sorry.  ORF is Norfolk.  ORH --

13             THE COURT:  Is that --

14             THE WITNESS:  I'm sorry; I actually forgot what ORH

15     is, the city code, but yes, I believe JetBlue was a Saturday

16     only flight for us.

17             THE COURT:  Those are the three US destinations?

18             THE WITNESS:  Correct.

19     BY MS. SWEENEY:

20     **Q.**  Now, let's -- I just want to focus on the

21     comparison periods --

22             THE COURT:  Clearly, we're not out of the central

23     division in this court, because they would be unhappy.

24             THE WITNESS:  No kidding.

25             THE COURT:  Go ahead.

1    BY MS. SWEENEY:

2    **Q.**   The comparison period here is for routes operating and/or

3    selling in third quarter 2022 to second quarter 2023,

4    compared to routes operated by American in the period

5    January 2019 through January 2021, right?

6    **A.**   That's correct.

7    **Q.**   And so during that earlier period, the comparison period,

8    American was not utilizing all of its slots at JFK, right?

9    **A.**   True.

10   **Q.**   It had a slot waiver then; is that right?

11   **A.**   For periods of that time.

12   **Q.**   Okay.  Thank you.

13             And isn't it also true that American was able to

14   add this JFK international service because it shifted

15   capacity from its Philadelphia hub?

16   **A.**   No, that is not true, necessarily.

17             MS. SWEENEY:  Can we pull up Plaintiffs'

18   Exhibit 275, please?

19             This is in evidence, Your Honor.

20             THE COURT:  All right.

21   BY MS. SWEENEY:

22   **Q.**   And this is very similar to a slide that you went over

23   with Mr. Wall, except this one has some speaker notes.

24   **A.**   Sure.

25             MS. SWEENEY:  Can we turn to slide 66, which ends

1    with Bates number 798?

2             THE WITNESS:  I'm sorry.  I don't have it in front

3    of me.

4    BY MS. SWEENEY:

5    **Q.**  Can you see that okay?

6    **A.**  Absolutely.

7    **Q.**  I'm sorry; this is the wrong slide, so I'm going to have

8    to come back to this.

9             MS. SWEENEY:  Can we take this off the screen,

10   please?  All right.

11   BY MS. SWEENEY:

12   **Q.**  Let's go back to the demonstratives that you went through

13   with Mr. Wall and let's turn to -- let's turn to slide 4.

14   Okay.  So these are described as new American routes in

15   LaGuardia, right?

16   **A.**  Correct.

17   **Q.**  Now, American hasn't obtained any additional slots at

18   LaGuardia, has it?

19   **A.**  No, we have not.

20   **Q.**  And, in fact, under the NEA, you're flying fewer slots

21   than you were before the NEA, right?

22   **A.**  Correct.  JetBlue is flying them.

23   **Q.**  So the addition of these routes required American to

24   reduce frequencies from LaGuardia to other markets, right?

25   **A.**  That is correct.

1    **Q.**  Okay.  Now, let's turn to slide 7, which is titled

2    "Average Departures in LaGuardia."  And American and JetBlue

3    haven't gained any additional slots at LaGuardia, right?

4    **A.**  We have not.

5    **Q.**  So the increase that's depicted in this slide reflects,

6    in part, American more fully utilizing its slots there,

7    right?

8    **A.**  It reflects the NEA fully utilizing its slots more.

9    **Q.**  Right.  It also shows that JetBlue is flying American

10   slots, right?

11   **A.**  It does.

12   **Q.**  And American could have leased slots to JetBlue, correct?

13   **A.**  Not at -- we could, but we couldn't have achieved the

14   same purposes of the NEA, if we did.

15   **Q.**  But you could have leased them, right?

16   **A.**  Oh, we could have leased them to Spirit or Delta

17   Air Lines for that matter.

18   **Q.**  Okay.  Let's turn to slide 6.  I'm sorry I'm going out of

19   order here.  This one is titled "Average Gauge in LaGuardia."

20   **A.**  Correct.

21   **Q.**  And, now, you testified earlier about American's plans

22   before the NEA to upgauge the regional jets it flew out of

23   LaGuardia, right?

24   **A.**  Yes.

25   **Q.**  Okay.  And, in fact, I think you testified that since

1    2019, American has upgauged those regional jets, right?

2    **A.**  Yes.  Much of which is made exactly what you're seeing

3    here.

4    **Q.**  Okay.  So that's something that you had planned to do

5    before the NEA and you could have done before the NEA, but

6    you chose to do it as part of the NEA; is that right?

7    **A.**  Maybe I'm not following the nuance of the -- of the

8    question here.

9             Look, could we have upgauged?  Sure we could have.

10   What the NEA made legitimate is frankly the financial desire

11   to go and upgauge.  Like the best place to go stick a bigger

12   airplane in your system was not in New York.  It was in DFW,

13   Charlotte, anywhere else.  This made it come to the front of

14   the pack.

15   **Q.**  And it's true that since -- since you didn't upgauge in

16   2019, but you delayed the upgauge, that now you can count

17   that new growth, so-called, as part of the NEA, right?

18   **A.**  Well, so, look, the way we did the DOT growth commitment,

19   I mean, the typical thing, right, is -- and I encourage

20   everybody to go see the base.  The base isn't 2019.  The base

21   is AA's scheduling peak, which is 2018 and JetBlue in 2019.

22            And then on top of that, the reason why it's 10 and

23   15 percent, and it goes from 5, to 10, to 15 percent, is that

24   we -- if you do the math, we didn't get a lot of credit in

25   that growth commitment for upgauging.  Effectively, there was

1    a foregone conclusion that there would be upgauging from

2    50-seaters to 76-seaters.  We had to produce growth in

3    New York in excess of that to go fulfill that growth

4    commitment.

5            So it is true, like, going from 50 to 76 seats

6    drove an upgauge.  Mathematically, it's 100 percent correct.

7    Our growth is beyond that, though.

8    Q.  Let's turn to Plaintiffs' Exhibit 271.

9            MS. SWEENEY:  And, Your Honor, we did -- this is a

10   series of text messages, and we did prepare a demonstrative.

11   We got it to defense counsel last night.  It was late.  It

12   was my fault.  I apologize for that.  So I just want to know

13   if there's any objections to using that demonstrative.

14           MR. WALL:  There's no objections.

15           THE COURT:  Okay.  Go ahead.  Use it.

16           MS. SWEENEY:  So let's use the demonstrative, which

17   is 271A.

18           THE WITNESS:  I'm sorry; can someone expand the --

19           THE COURT:  Yeah.

20           MS. SWEENEY:  Please.

21           THE WITNESS:  -- screen?

22           MS. SWEENEY:  Thank you.

23           THE WITNESS:  Thank you.

24   BY MS. SWEENEY:

25   Q.  All right.  This is a June 18, 2020, text exchange

1    between you and Mr. Bhargava, correct?

2    **A.**  Yes.

3    **Q.**  Let's start with the top one, and it says JetBlue -- this

4    is from Mr. Bhargava to you -- it says, "JetBlue just

5    allowanced new routes.  Were you aware of the announcement?

6    Not the specifics, but just the announcement."  Do you see

7    that?

8    **A.**  I do.

9    **Q.**  Okay.  And then just below that, you say, "No, idea, but

10   they can't talk about that stuff with us yet."  Do you see

11   that?

12   **A.**  I do.

13   **Q.**  And then Mr. Bhargava responds, "Agree, but just

14   wondering if they could have waited for the announcement

15   until the week of July 6th," right?

16   **A.**  Uh-huh.

17   **Q.**  And, in fact, that was coming upon the very close to date

18   of when American Airlines and JetBlue publicly announced the

19   NEA, right?

20   **A.**  That's correct.

21   **Q.**  Okay.  And your response is, "No shit."  So --

22           MS. SWEENEY:  I'm sorry, Your Honor; I didn't mean

23   to --

24           THE WITNESS:  That's okay.  There's been a

25   revolution since the last time we did this.

1          MR. WALL:  That wasn't redacted either, Your Honor.

2          THE WITNESS:  I would have put more colorful

3     language if I knew I could get a reaction like that.

4     BY MS. SWEENEY:

5     **Q.**  So that was our response, right?

6     **A.**  It was, yes.

7     **Q.**  And you also were unhappy that they announced those new

8     routes instead of waiting until July 6th, right?

9     **A.**  For very important reason.  So, look, this to me is

10    exactly the example of, like, JetBlue is still a free agent

11    and can go do whatever it wants whenever it wants to.

12         But what was unnerving about it is, like, in this

13    buildup to it, what we have to do, especially what I have to

14    do, is explain to people like our pilots union.  We're going

15    to go do a deal.  It's not an outsourcing deal.  It's a

16    growth deal for our team, like, to the earlier thing; it's

17    got to result in block-hour growth for us.

18         And then these guys, I remember this now that you

19    show it.  They loaded a bunch of flights just in advance of

20    that whole thing while we've got to figure out how to explain

21    to this our team.

22         So, yeah, we are frustrated about it, but I mean --

23    and honestly, there's nothing to stop JetBlue from doing this

24    exact same thing and announcing new routes tomorrow too.

25    But, yeah, it was -- we were in the final throws of putting a

1    deal together.  And, like, I was needing to explain it to a

2    lot of different constituencies, and lo and behold, they did

3    that.

4    **Q.**  Can -- we found the right portion of that slide I was

5    trying to show you earlier.  This is Plaintiffs' Exhibit 275,

6    and this has to do with shifting planes from Philadelphia to

7    JFK.  If we could look at slide 66, and I want to look at the

8    speaker notes --

9    **A.**  Sure.

10   **Q.**  -- on slide 66.

11           Okay.  Look at the middle note there, which --

12   "PHL-TA opportunity cost."  And that means Philadelphia

13   transatlantic opportunity cost, right?

14   **A.**  Correct.

15   **Q.**  Okay.

16   **A.**  That's the abbreviation.

17   **Q.**  Thank you.

18           And below that, it says "lost revenue of

19   $550 million on foregone flying," right?

20   **A.**  It says that.

21   **Q.**  And that's reflecting, isn't it, the shift of some of the

22   flying that had originally been planned to go out of

23   Philadelphia, which is one of American's hubs, to New York as

24   part of the NEA, right?

25   **A.**  No, it is not that.  What this is -- the two people it

1   went to were very important.  Massimo was sending this to our

2   finance team, because what I knew is, in our business, like I

3   said last time, you know, your assets are constrained.  If

4   you're going to go start something new, it's got to come from

5   somewhere.  And so there's two way to do it:  You buy new

6   airplanes or you take it.

7            For purposes of calculating the numbers, what I

8   told the number is, look, we're going to get asked where this

9   come from.  Just presume for now, because let's not go -- we

10  don't need to go and assume an aircraft deal because that

11  would be -- you know, that's its own project to go and work

12  on.  Just assume that the airplanes come out of Philadelphia.

13  That will be our opportunity cost.

14           Unsurprisingly, in the time since then, like, if

15  we've got a project that can produce $600 million, you buy

16  airplanes for it, which is -- you know, so while this is

17  going on, during the middle of COVID, we actually -- instead

18  of going and canceling 787s, we kept taking them all.

19           Indeed, we've lamented very publicly in our

20  earnings calls that the airplanes haven't yet delivered to

21  us.  So we very much want to have New York and very much want

22  to put back Philadelphia.  This is just purely an analytical

23  thing so that we can go and put the numbers together.  It's a

24  way better deal to go buy airplanes than to do that.

25  Q.  Let me change topics.  You were asked a number of

1    questions about the DOT agreement.  Do you remember that?

2    **A.**  Sure.

3    **Q.**  Okay.  And you said that, historically, American Airlines

4    has struggled to grow 15 percent in New York City, right?

5    **A.**  Yes.

6    **Q.**  And -- but the DOT agreement requires American Airlines

7    and JetBlue together to grow 15 percent combined between 2019

8    and 2025, right?

9    **A.**  Correct.

10    **Q.**  Okay.  And those growth commitments don't last forever,

11    right?

12    **A.**  No, they don't.

13    **Q.**  They expire in 2025, right?

14    **A.**  They do.

15    **Q.**  Okay.  And, also, there's no requirements in the DOT

16    agreement pertaining to Boston; is that right?

17    **A.**  Meaning Boston growth?

18    **Q.**  The divestitures that you talked about at length, there's

19    no slot constraints in Boston.  There's no constraints like

20    those for the Boston market, right?

21    **A.**  That's correct.  There's not slot constraints there.

22    **Q.**  And nothing in the DOT agreement is similar to the

23    divestitures required in the other markets, right?

24    **A.**  Yeah, correct, because there's not a mechanism such as

25    slots there to divest.

1   **Q.**  Okay.  Now, I'm going to quickly go back to some of the

2   questioning that you had last week with Mr. Wall.  And

3   Mr. Wall asked you some questions about nonstop overlaps.  Do

4   you recall that exchange?

5   **A.**  Somewhat, yes.  Some of last week is still a little foggy

6   for me.

7   **Q.**  Okay.  Well, I'll try to remind you as we go.

8              MS. SWEENEY:  Can we have a look, please, at one of

9   the slides from the government's opening statement?

10  BY MS. SWEENEY:

11  **Q.**  And this shows the combined post-NEA American

12  Airlines-JetBlue revenue share for 12 nonstop overlap routes

13  from Boston.  Do you see that?

14  **A.**  I do.

15             MR. WALL:  Your Honor, just as a point of order, I

16  don't know if it's a big deal, but this will would fall

17  within the demonstrative rule, and it wasn't provided to us.

18  I suppose the argument will be that it's in the opening

19  statement, but it wasn't -- it should have been provided to

20  us.

21             THE COURT:  Noted, but I'm not worried about your

22  ability to respond.

23             Go ahead.

24  BY MS. SWEENEY:

25  **Q.**  So if you can look at this, are those -- do you agree

1    that those are 12 nonstop overlaps from Boston?

2    **A.**   Yes, correct.  And I think a number of those are also

3    what we call carve-out routes.

4    **Q.**   Okay.  Let me ask you about that.  So you mentioned these

5    so-called carve-out routes, and the first one on the list

6    here is Boston-Charlotte, right?

7    **A.**   Sure.

8    **Q.**   And that's one of the carve-out routes?

9    **A.**   Correct.

10   **Q.**   And then the other carve -- well, first, let me ask you,

11   and then there's a combined revenue share to the right-hand

12   side there.

13   **A.**   Yes.

14   **Q.**   And without asking you to agree, you know, to the decimal

15   point, would you agree roughly that that's correct in terms

16   of identifying the combined market share or -- by revenue?

17   **A.**   I don't know the revenue share, and I'm loath to go and

18   guess as to these things.  But, yes, Boston-Charlotte is a

19   mutual overlap route.

20   **Q.**   Okay.  So let me ask you a few questions about the

21   carve-out.  So on this particular slide, there are six city

22   pairs that -- six airport pairs where there are supposedly

23   these carve-outs, right?

24   **A.**   Correct.

25   **Q.**   And that would be Boston-Charlotte,

1   Boston-Dallas/Fort Worth, Boston-Philadelphia -- excuse me --
2   Boston-Phoenix, Rochester, and Syracuse, right?
3   **A.**  Correct.
4   **Q.**  Now, those carve-outs --
5           THE COURT:  That's only five.
6           MS. SWEENEY:  Did I only count five?  What am I
7   missing here?
8           THE COURT:  Was Philadelphia also one?  I thought
9   you said -- you corrected Philadelphia to Phoenix.
10          MS. SWEENEY:  Oh.
11  BY MS. SWEENEY:
12  **Q.**  Is Philadelphia one of the carve-out routes?
13  **A.**  Yes, as I recall it.
14          THE COURT:  Okay.  So that's six.
15          MS. SWEENEY:  Okay.  Thank you.
16  BY MS. SWEENEY:
17  **Q.**  So, now, these so-called carve-outs came as a result of
18  two amendments that the parties signed regarding the NEA and
19  the MGIA, right?
20  **A.**  Correct.
21  **Q.**  Okay.  And they those proposed those carve-outs in late
22  2020; is that right?
23  **A.**  That's correct.
24  **Q.**  And at the time, the department of jus- -- or -- and they
25  signed the amendments in January of 2021, correct?

1  **A.**   Also correct.  That sounds right.

2  **Q.**   And at that time, the Department of Justice was

3  investigating the alliance, right?

4  **A.**   That sounds right.

5  **Q.**   Okay.  And these were voluntary?  They were entered into

6  voluntarily by the two parties; is that right?

7  **A.**   That -- meaning the AA and JetBlue -- like, we -- we

8  agreed to do the deal.  I mean, we weren't necessarily

9  excited to have to go do it.

10 **Q.**   Excuse me.  You didn't have to do the carve-outs.  You

11 entered into these carve-out agreements voluntarily, right?

12 **A.**   We -- yes, we entered into the carve-out agreements, yes.

13 **Q.**   Okay.

14         THE COURT:  You mean voluntarily in the sense that

15 neither the Court -- no court nor federal agency ordered them

16 to do it, correct?

17         THE WITNESS:  Correct.

18         MS. SWEENEY:  Thank you.

19         THE WITNESS:  Correct.  That's right, what you

20 said.

21 BY MS. SWEENEY:

22 **Q.**   Now, I just want to ask a few questions about what

23 exactly is carved out.  So those two amendments that I

24 mentioned, they have a provision that excludes -- currently

25 it's these particular pairs from the revenue-sharing

1    agreement; is that correct?

2    **A.**   Correct.

3    **Q.**   And they're also excluded from capacity coordination,

4    correct?

5    **A.**   That's correct.

6    **Q.**   But they're not excluded from any of the other provisions

7    of the NEA; is that right?

8    **A.**   For example, such as frequent flyer, earn and burn,

9    things like that?

10   **Q.**   Correct.

11   **A.**   That's correct.

12   **Q.**   And they're not excluded from codesharing, correct?

13   **A.**   That's correct.

14   **Q.**   And they're also still included in the ability to jointly

15   pitch potential corporate customers, right?

16   **A.**   Absolutely.

17            THE COURT:  Not excluded?

18            THE WITNESS:  I'm sorry?

19            THE COURT:  Not excluded from that?

20            THE WITNESS:  They're not excluded from that.

21   BY MS. SWEENEY:

22   **Q.**   Okay.  And there's nothing that prevents American and

23   JetBlue from rescinding or modifying the agreement to exclude

24   certain routes from revenue sharing, right?

25   **A.**   I suppose not.

1  **Q.**  Or from capacity coordination, right?

2  **A.**  I suppose not.

3  **Q.**  Okay.  Now, let's look at a couple other of these.  Also,

4  you were asked about these carve-outs last week by Mr. Wall,

5  and you said -- you were asked about the overlaps -- excuse

6  me -- and you said, yes, there are some, but many of them are

7  carved out.  So let's look at the carve-out routes.

8           First of all, they are only in Boston, right?

9  There aren't any from New York?

10  **A.**  That's correct.

11  **Q.**  Yeah, just Boston.  So just these six.  And we talked

12  about Charlotte.  Let's look at Boston-Rochester.  JetBlue

13  exited the Boston-Rochester market, correct?

14  **A.**  Yes, they did.

15  **Q.**  And Boston-Syracuse is another one.  JetBlue exited the

16  Boston-Syracuse market, as well, right?

17  **A.**  Yes.

18  **Q.**  So there's just four, to be clear?  There's just four?

19  **A.**  I believe there are now.  But, look, why JetBlue exited?

20  I don't know.  We don't cooperate on those routes.  And my

21  guess, it has something to do more with their operational

22  struggles this summer than anything else, but that's probably

23  a better question for JetBlue.

24           MS. SWEENEY:  We can put this -- these slides away.

25  Thank you.

1    BY MS. SWEENEY:

2    **Q.**  Now, last week, during Mr. Wall's examination, you

3    testified that "New York is too small to succeed and too big

4    to exit."  Do you remember that testimony?

5    **A.**  Correct.

6    **Q.**  And, in fact, the phrase you often use is "too small to

7    win, but too big to quit," right?

8    **A.**  Oh, yeah, I mean, the two words somewhat interchangeably.

9    **Q.**  And you used that phrase to describe American's

10   situation, both Boston and New York, right?

11   **A.**  True.

12   **Q.**  So when you say you aren't big enough to win, you mean

13   you can't generate the same kinds of margins that you can

14   generate in other airports, right?

15   **A.**  Not necessarily.  We can't create the same kind of

16   network.  You know, it was the -- the Kennedy-Tel Aviv

17   problem.  It was -- you know, we're in 31 of 50 markets.

18   Look, we're not even at the -- at the threshold where we can

19   go and legitimately compete, let alone start contemplating

20   how we can go and make money there.

21          So the first criteria for the success -- actually,

22   it was like the seamless deck -- we have to go and offer a

23   network that people can go and compete with, and then we have

24   to go deliver it seamlessly.  And part of what we see is

25   margins, but the margins come because customers like it.

1          Said differently, we can be a high-margin carrier

2    in New York by flying a whole lot less, but that isn't what

3    we're trying to do for our customers.

4    **Q.**   Mr. Raja, you've mentioned seamlessness a couple of

5    times, and I wanted to ask you -- and then you mentioned in

6    particular in connection with this -- the Tel Aviv routes,

7    right?

8    **A.**   Yeah.

9    **Q.**   And that's connecting between domestic locations/origins

10   and Tel Aviv, right?  Okay.

11   **A.**   Correct.

12   **Q.**   Now -- and you testified that one of the things, one of

13   the ways that the NEA helps make that process seamless is

14   through the schedule optimization, right?

15   **A.**   Yes.

16   **Q.**   Okay.  And -- but that's also one of the benefits,

17   wouldn't you agree, of the West Coast International Alliance

18   with Alaska?

19   **A.**   Yeah, but it's a little bit of apples and oranges,

20   because in the case of Seattle, they -- there aren't slots.

21   There isn't that constrained resource that's there.  And we

22   don't have anywhere near a domestic system.

23          It's not as simple -- like there, we can go and put

24   the flight in, and just through the revenue sharing, as

25   somebody quoted Andrew was saying, everybody's got skin in

1    the game to go and support it.

2             If we just put the JFK-Tel Aviv flight in without

3    the schedule optimization, nobody could, unless we actually

4    maneuver the slots around, it's hard to go and create that

5    effect.  I'd say it's impossible to go and create that

6    effect, because we've tried it.

7    **Q.**  I'm sorry.  I didn't quite understand your answer, and

8    maybe I asked a poor question.  Let me ask again.

9    **A.**  Sure.

10   **Q.**  So I'm asking you about schedule optimization.  Now, when

11   it comes to the WCIA, there is some schedule optimization

12   that goes on between -- well, first of all, let me ask you.

13   So one of the purposes of that agreement is so that Alaska

14   can feed domestic customers into American's long-haul

15   international service from the West Coast, right?

16   **A.**  True.

17   **Q.**  And one of the ways it does that is through schedule

18   optimization, right?

19   **A.**  Yes.  But we're using the same word in kind of different

20   context.  It's a way different thing in Seattle than it is in

21   New York.

22   **Q.**  Well, let me ask you this.  So -- and I just wanted to

23   make sure I understand this.  But one big difference between

24   the WCIA and the NEA is there's no coordination of schedules

25   for domestic flights, correct?

1    **A.**  Correct.  That's right.  That's right.

2    **Q.**  And so -- and there's also no reciprocal revenue sharing

3    under the WCIA, right?

4    **A.**  Can you explain what you mean by "reciprocal revenue

5    sharing"?

6    **Q.**  Sure.  There -- under the WCIA, just like under the NEA,

7    there is a revenue that is put into a pool to be shared

8    between the two parties to the agreement, correct?

9    **A.**  Correct.

10   **Q.**  And in the case of the NEA, it's -- the revenue is

11   created by -- through overlapping routes, competing routes,

12   right?

13   **A.**  Yes.  The -- I think I understand what you're going for

14   now.  In the NEA, it's all of the flights that touch those

15   four airports like we talked about the last time.  And the

16   WCIA, it's just the AA international flights that touch the

17   city -- the four cities on the West Coast and the Alaska

18   domestic system, which is -- because they don't fly

19   international.

20   **Q.**  And the -- the contribution by American Airlines only

21   comes from its long-haul international flights from the

22   West Coast gateway?

23   **A.**  That's correct.

24   **Q.**  Okay.  And so there's no overlap, that's no competition,

25   between those two sources for the revenue-sharing pool,

1    right?

2    **A.**  That's -- that's true.  Correct.

3    **Q.**  Okay.  Thank you.

4         Let's -- I'd like to ask a few questions about one

5    of the decks that Mr. Wall took you through, and this is

6    Plaintiffs' Exhibit 369.  And if we could turn to slide 5 in

7    this deck, please.

8    **A.**  I'm on it.

9    **Q.**  Yeah, I'm sorry.  I have the wrong -- I think I got the

10   wrong cite here, so I'm going to move on.

11        MS. SWEENEY:  Let's try -- DX 35 -- or, excuse

12   me --

13        THE WITNESS:  I'm sorry to ask this, but while

14   you're searching can I --

15        MS. SWEENEY:  I'm not sure you're allowed to ask

16   questions, Mr. Raja, but --

17        THE WITNESS:  Sorry.

18        THE COURT:  Unless it's something you didn't

19   understand or -- what do you want to ask a question about?

20        THE WITNESS:  If I can use the restroom.

21        THE COURT:  Oh.  Of course you can ask that

22   question.  Yes, of course.  Why don't we take a two-minute

23   break so you can go do that.

24        THE WITNESS:  Thank you.  Sorry, everybody.

25        THE COURT:  No problem.

```
1                While he does that, how much longer do you have?
2           MS. SWEENEY:  I don't think much longer,
3    Your Honor, but I would like a moment to consult with my
4    colleagues.
5           THE COURT:  Why don't you consult with them and
6    just give me an idea so I can -- can you consult with them --
7    like, what -- just talk to them.  I'm just wondering what you
8    have too.
9           MR. WALL:  Five minutes tops.
10          THE COURT:  Okay.
11          MR. WALL:  And, obviously, we would like to try to
12   get him --
13          THE COURT:  Done, right.
14          MS. SWEENEY:  Between five and ten minutes.
15          (Pause in proceedings.)
16          THE WITNESS:  Thank you.  Sorry.
17          THE COURT:  No problem at all.
18               Just so we're all clear for planning purposes,
19   we'll just keep going.  It sounds like there's not that much
20   longer, and we'll just go forward and finish this witness,
21   and then we'll take the break.
22          MS. SWEENEY:  Yes, Your Honor.  I don't have very
23   much more.
24          THE COURT:  No problem.  Go right ahead.
25          MS. SWEENEY:  Thank you.
```

BY MS. SWEENEY:

Q.   Now, Mr. Raja, a couple of times today and last week you talked about power travels -- excuse me -- power users or power travelers?

A.   Yeah.  Okay.  Yeah.  Sure.

Q.   And then today, you were talking about -- and I think Mr. Wall put a slide up that was talking about lie-flats in a multitude of markets, right?

A.   Yes.

Q.   Now, I just want to make sure I understand this.  So most of the seats that American flies are not in the first class, right?

A.   Well, I mean, a disproportionate amount of seats of the jet are in economy?  I might not be following your question.  Sorry.

THE COURT:  I think that's her question.

Right?

BY MS. SWEENEY:

Q.   That's my question.  The travelers that you last week referred to as marginal travelers, those make up most of the traveling public, right?

A.   Oh, not necessarily at all.  There's -- look, I'll -- for what it is for us, there is very much a critical fractile where a few of our transactions -- there are a -- a few of our customers drive a great number of our transactions in the

1    airline.  I mean, that's how we get million milers and

2    3 million milers and things like that.

3              And many of those customers, they consume a range

4    of things on the transcontinental.  The first class seat is

5    the aspirational thing, but in our transcontinental, you can

6    buy an economy seat and get upgraded into business; and other

7    cases, you can by business and get upgraded into first.  So

8    it's not quite as one to one as that.  But the math of it,

9    you're 100 percent right.  There's just more economy seats

10   than first.  True.

11   Q.   And I asked some -- excuse me -- some questions about the

12   WCIA, and I -- I think the testimony wasn't complete clear.

13   It was probably my questions, but let me ask a couple more,

14   in particular about the revenue-sharing portion.

15   A.   Sure.

16   Q.   Okay.  And this is my question earlier about reciprocal

17   revenue sharing doesn't exist under the WCIA, right?

18   A.   So I'm being thrown by the word "reciprocal."

19   Q.   Okay.  I'll take that out of my question.  I don't want

20   to confuse you.

21   A.   Revenue sharing exists.  It's just the AA international

22   flights into those markets and Alaska's domestic system --

23   Q.   Okay.

24   A.   -- which is --

25   Q.   Okay.  Perfect.  Thank you.  That's helpful.  And then I

1    just wanted to clarify that Alaska doesn't fly those

2    long-haul international flights, right?

3    **A.**   Well, they don't have the jets to do it.

4    **Q.**   They don't have the jets, right?  They don't have the

5    wide bodies, so they don't compete with American Airlines on

6    those flights, right?

7    **A.**   Sure.  Yes, that's true.

8    **Q.**   Which means that for those routes, there's no metal

9    neutrality; is that right?

10   **A.**   I guess, no.  That's probably extending this concept of

11   metal neutrality to a place I never quite conceived it

12   before, but no.  It's a network extension, is the way we

13   would call it that, kind of a codeshare.

14              MS. SWEENEY:  I have no more questions at this

15   time.

16              Thank you, Mr. Raja.

17              THE COURT:  Redirect?

18              MR. WALL:  Just a few.

19              THE COURT:  Or recross.

20              MR. WALL:  I just have four quick points I'm going

21   to make.

22        **RECROSS-EXAMINATION BY COUNSEL FOR AMERICAN AIRLINES**

23   BY MR. WALL:

24   **Q.**   First of all, with respect to filled, let me just put to

25   you out this way:  Is there anything about the NEA that is

1    going to undermine, change, or reduce the role of the

2    Philadelphia airport in American's network-to-network

3    strategy?

4    **A.**  Oh, no.

5    **Q.**  Do they -- does the Philadelphia airport in terms of its

6    international function, is it comparable to JFK?

7    **A.**  Well, it's going to have a lot of flights in it.  In that

8    way, it's comparable.  But it's going to serve different

9    things than what JFK serves.  That's why we're buying 321XLRs

10   and 787s, and without going and revealing our hand about

11   where those things go, they're going to Philly, they're going

12   to New York, and they may be going to Boston too.

13   **Q.**  I think you might have just revealed that.

14   **A.**  I didn't say -- Delta didn't get that much out of it.

15   It's nothing I wouldn't say on an earnings call.  Wait until

16   the schedule gets loaded, guys.

17   **Q.**  Okay.  So, second point, if the NEA generates demand in

18   the way that you described testimony, will you buy new planes

19   to supply --

20   **A.**  We already did.  Like, we were in COVID.  We could have

21   canceled -- the 787s were late.  We could have canceled the

22   whole order, I mean, billions of dollars in savings.  We kept

23   them going because of this.

24   **Q.**  Thank you, sir.

25            Now, next question, with respect to codesharing, if

1   there's -- if there is -- if there is ongoing codesharing, is

2   it true that I should be able to, for example, go onto AA.com

3   and see a B6 code on the so-called carve-out routes?

4   **A.**   Yes.  You can see their codeshare, yes.

5   **Q.**   Okay.  So if I do that for, say, Boston-Philadelphia, and

6   I don't see any B6 code, I only see the AA code, would that

7   be an indication that there is not codesharing on that route?

8   **A.**   No, if you only see -- no, that's not an indication that

9   there is or isn't codesharing on the route.  Maybe I'm not

10  following you.

11  **Q.**   Sure.  So you go on and you only see the operating

12  carrier's code.  Is that an indication that the -- that

13  there's not codesharing going on?

14  **A.**   Not necessarily.  But if -- depending on where you are,

15  in all likelihood, that could be the case.

16  **Q.**   Let me just ask you -- are you certain that there's

17  actually codesharing going on, on the carve-out routes?

18  **A.**   No.

19  **Q.**   Okay.

20  **A.**   I'm not.

21  **Q.**   Thank you, sir.

22          The WCIA, we talked about that.  Are you faced in

23  the WCIA with --

24          THE COURT:  You don't know whether there is or

25  isn't codesharing on the carve-out routes?

1          THE WITNESS:  This is one of our many long, shaggy

2     dogs stories in the airlines.  But, no, we consciously

3     deprioritized going and doing codeshare and doing any number

4     of things on the carve-out routes because they are carve-out

5     routes.  We did debate along the way whether we should so

6     that it's seamless for a customer going from Boston to

7     Phoenix, but we put all the -- like, everything has been

8     around prioritizing the other markets and --

9          THE COURT:  I see.  So is there anything from your

10    view about the carve-outs that would prevent you -- putting

11    aside operational priorities about which things to do first,

12    but anything about the carve-outs themselves that speak to or

13    prevent you from doing codesharing on those routes?

14         THE WITNESS:  Well, look, the philosophical issue

15    that we had with it is this.  We don't -- we're not made

16    necessarily better for it, but we don't want the customer to

17    suffer because of it either, right?

18         If you're flying from Boston to Phoenix and you're

19    an AA customer that's there, we don't -- as we like to say,

20    we don't want you to have to solve our problems for us.

21    So --

22         THE COURT:  I'm just asking, though, the IT person

23    calls you up and says, "Hey, we've written the code for

24    codesharing.  It's a switch on and off for different routes.

25    Carve-out routes should they be on or off?"  There's no work.

1    There's no implementation issues.  It's frictionless.  I know

2    that's not --

3              THE WITNESS:  No, I get --

4              THE COURT:  I'm just trying to understand what the

5    carve-out does or doesn't do from the terms of the contract.

6              THE WITNESS:  Oh, look, for us, I'll -- now you'll

7    get the -- the inside window of the debate, because this

8    is -- this is the debate that we have at American airlines,

9    and I'll give you my view on it.  I'm a biased narrator here.

10             But the debate is, okay, if we don't actually get

11   any better -- "we," American Airlines -- get better off for

12   it, but the other alternative is, if we have a huge customer

13   base in Phoenix and we're trying to build one in Boston, if

14   they have to go and figure out that I get my, for example,

15   status benefits or free bag -- so left of that, if we had --

16   if there were no technological hurdles, anything else, I am

17   of the camp that we would go and offer codeshare, but that

18   codesharing is a different thing for us.  It would just be

19   selling our flight on their website.

20             THE COURT:  Sure.  So as to any question, then, as

21   to carve-outs, you don't view the carve-out as precluding

22   that?

23             THE WITNESS:  Correct.

24             THE COURT:  Okay.

25             THE WITNESS:  Correct.

1    BY MR. WALL:

2    **Q.**  Okay.  Sorry.  Let me -- finishing up here, the WCIA --

3    so in the WCIA, given that the connection between the

4    American international and the Alaska domestic, are you faced

5    with the challenge or the opportunity, if you want to call it

6    that, of creating better schedules on routes that Alaska and

7    American overlap?

8    **A.**  Sorry.

9    **Q.**  Yes.

10   **A.**  Repeat the question.

11   **Q.**  Does the issue even arise in the WCIA, about whether you

12   should try to, through schedule coordination, to create a

13   better schedule on a nonstop overlap route?

14   **A.**  No.

15   **Q.**  It doesn't.  Okay.  Are there international alliances on

16   which the alliance partners do, in fact, engage in schedule

17   coordination on nonstop overlap routes?

18   **A.**  Yes.  In every one of our international joint ventures,

19   we do that.

20   **Q.**  So taking the AJB, for example, are there nonstop overlap

21   routes between American Airlines and British Airways?

22   **A.**  Yes, just about everyone.

23   **Q.**  Are -- in the case of Delta in its alliance with carriers

24   such as Air France, et cetera, are there nonstop overlaps in

25   that alliance?

1    **A.**   Yeah, also in quite a lot of those markets too.

2    **Q.**   In the Star Alliance, as a final example, are there

3    nonstop overlap markets between United and Lufthansa?

4    **A.**   Indeed.  Several.

5    **Q.**   And is it correct that in every one of those cases,

6    antitrust immunity has been given to those alliances by the

7    DOT even though there is schedule coordination and revenue

8    sharing on nonstop overlap routes?

9    **A.**   Absolutely so.

10            MR. WALL:  Thank you, sir.  No more questions.

11            THE COURT:  So I just have --

12            THE WITNESS:  Sure.

13            THE COURT:  -- one other question I'm going to ask,

14   and then I'll be finished.  And if it gives rise to further

15   questions that either one of you have about just this, then

16   you can ask that, because that would seem fair.

17            So my question just is, can you explain to me again

18   how in the NEA the revenue sharing works?  That's what I'm

19   trying to understand.

20            THE WITNESS:  Yes.

21            THE COURT:  It's a little opaque from --

22            THE WITNESS:  I'll --

23            THE COURT:  So the base, right, of 2019 -- and I

24   understand why it's 2019 and not the COVID years.

25            THE WITNESS:  Okay.

 1          THE COURT:  And the base is determined from -- the
 2   revenue sharing applies only to the overage of the base.
 3          THE WITNESS:  Correct.  That's correct.
 4          THE COURT:  So how is the base determined, and how
 5   is the overage determined?
 6          THE WITNESS:  The base is reported results for the
 7   markets in the geography.
 8          THE COURT:  And the geography is -- we're talking
 9   about Boston-New York flights either way, either direction?
10          THE WITNESS:  Correct, not including the carve-out
11   routes.
12          THE COURT:  Not including the carve-out routes,
13   right.
14          THE WITNESS:  Right.  So that's what we call --
15   that -- we call that the "geography."  We'll sometimes use
16   that.
17          THE COURT:  Okay.
18          THE WITNESS:  And so everybody has got their
19   revenue, and everybody has got their capacity position that's
20   there.
21          THE COURT:  Right.  So you know -- and capacity is
22   measured, for this purpose, by number of seats, number of
23   departures, ASMs?
24          THE WITNESS:  Equivalent seat miles, which is
25   probably like the nine-thousandth acronym you've heard.  The

```
 1   reason why -- we don't use available seat miles, which
 2   contemplates --
 3              THE COURT:  Which gives a premium to longer term --
 4              THE WITNESS:  For ES -- because we consciously
 5   choose to configure to have first class or business class,
 6   which means that, you know, you could put -- make it
 7   500 seats in a 777.  We choose to puts 300 seats in the 777,
 8   because we think by doing that, we can generate more end
 9   value than you could 500, right?  And so we normalize
10   everything to equivalent seat miles to adjust for the --
11              THE COURT:  So is that just adjusting for, like,
12   first class, business class --
13              THE WITNESS:  Yes.
14              THE COURT:  -- coach to make things equivalent?
15              THE WITNESS:  Correct.
16              THE COURT:  Because a first class seat is only the
17   same number of miles as a coach seat --
18              THE WITNESS:  Exactly.
19              THE COURT:  -- in air distance, but it's a lot more
20   valuable to you?
21              THE WITNESS:  Yes, that's right, and more costly,
22   too, because --
23              THE COURT:  Sure.
24              THE WITNESS:  -- four first class seats are maybe
25   as many as 9, 12, coach seats, right?
```

1          THE COURT:  Right.

2          THE WITNESS:  So exactly right.  So that's why we

3    do equivalent seat miles.  So in the base, it's revenue over

4    the equivalent seat miles, and that's everyone's base

5    position, you'll see it referred to.

6          THE COURT:  So the equivalency is only in that

7    respect, not an equivalency adjusting for the difference in a

8    Boston-LaGuardia flight and a Boston-London or

9    New York-Tel Aviv flight?

10          THE WITNESS:  Yeah, okay, now you're getting into

11    the advanced calculus of these things.  That's called a

12    "stage adjustment."

13          THE COURT:  Yeah.

14          THE WITNESS:  And in different ones of our joint

15    ventures, we can tend to have that because you're equating

16    really long flights and really short flights.  But it's

17    designed to go and normalize for some of those differences.

18          THE COURT:  So is that in this or no?

19          THE WITNESS:  That is -- I think we have the

20    rudimentary form of stage adjustment in this, which is --

21    it's like subsquare routes.  We try to normalize for distance

22    because of the extremes of Boston-LaGuardia versus New York

23    to Doha.

24          THE COURT:  Right.  Okay.  So that's -- and then --

25    and then -- is it just a total revenue?  It's a revenue per

1    unit?

2              THE WITNESS:  So it -- we calculate the -- we put

3    in total revenue, right?  And that revenue is -- it sounds

4    arcane.  It actually becomes important.  Passenger revenue

5    and, like, the frequent flyer --

6              THE COURT:  Categories of revenue?

7              THE WITNESS:  Correct.  It doesn't include the

8    revenue we generate from selling credit cards or cargo or

9    other stuff, right?  So that's the revenue that goes into the

10   pool.  That gets divided by base positions, and then you get

11   your base position revenue per equivalent seat mile.

12             THE COURT:  Okay.  And your base position is fixed

13   from --

14             THE WITNESS:  Yes.

15             THE COURT:  -- 2019?

16             THE WITNESS:  Yes.

17             THE COURT:  Which is a relative -- basically, a

18   percentage of a share of 100 percent?  In other words,

19   like --

20             THE WITNESS:  Yeah, yeah, yeah.  Because there's

21   two carriers.  That's right.  That's right.  And so you have

22   a known -- we call it "RASM" for short, revenue per

23   equivalent seat mile.  You know what your base is.

24             The concept it's trying to get at is nobody should

25   be worse off than what they are in their base.  And so

```
 1    everything we do together is designed to grow the incremental
 2    pool.  We grow incremental revenue and then split it amongst
 3    all of us who do the flying.
 4              So if you and I were in the partnership and if you
 5    did 100 percent of the flying and produced 100 percent of the
 6    incremental revenue, you're going to get that benefit
 7    because --
 8              THE COURT:  But wouldn't I split that benefit with
 9    you with respect to our base percentage?
10              THE WITNESS:  I would get my base position.  That's
11    exactly right.
12              THE COURT:  Okay.
13              THE WITNESS:  That's exactly -- and so the
14    mechanism is, then, well, look, we should never effectively
15    go as -- maybe the wrong word for it -- we call it "cheating
16    on the pool," which is, like, you don't want to -- we always
17    want to fly at a similar amount.  Like, we always want to
18    grow, but we are going to be really smart in how we think
19    about where we grow.  We want to grow in the places that make
20    the most sense for us together because that's how you expand
21    the revenue pool, right?
22              THE COURT:  That's your Tel Aviv flight?
23              THE WITNESS:  Yeah.  If we both grow, but we don't
24    expand the incremental pool, and we actually diminish
25    revenue --
```

 1            THE COURT:  So how does JetBlue adding flights that

 2    were your slots, right, with somewhat bigger planes, so their

 3    passenger load went up a little more than double, how does

 4    that play out through the pool or through the sharing?

 5            THE WITNESS:  Great question.  Great question.  So

 6    in that world, right, they've -- they've grown capacity,

 7    right, the incremental pool and presumably grown revenue too,

 8    right, because --

 9            THE COURT:  Total revenue?

10            THE WITNESS:  Total revenue, right, because of

11    instead of 50 seats, they've got 134.5 seats.

12            THE COURT:  Their total revenue or the pool's total

13    revenue?

14            THE WITNESS:  The pool's total -- the pool's total

15    revenue has grown because they have put more capacity in,

16    which produces -- so they put in a marginal --

17            THE COURT:  So there's an increment for the total

18    revenue for both of you because they have now sold more

19    seats.  Presumably, that's led to more revenue.

20            THE WITNESS:  That's correct.  That's correct.  We

21    have gone and taken a flight now flown to Tel Aviv and so

22    we've added -- I'll make it up -- 200 seats, and that

23    produces -- whatever -- $200 or something --

24            THE COURT:  Yeah, whatever.

25            THE WITNESS:  -- right?  So all of that revenue

 1    goes into the pool.  That total revenue goes into the pool,

 2    right?

 3              THE COURT:  Right.

 4              THE WITNESS:  We have our new capacity, right?  And

 5    in this new capacity, let's assume that we're flying

 6    50 percent.  They're flying 50 percent of it.  So

 7    effectively, the first thing that goes and happens, all

 8    right, is we've got all of this revenue.  Everyone settles

 9    out their base position.  We have incremental revenue over

10    the base.  Everybody first gets their base position and

11    then --

12              THE COURT:  Incremental revenue is -- the total

13    revenue is more than it was in 2019?

14              THE WITNESS:  Exactly.

15              THE COURT:  Okay.

16              THE WITNESS:  Exactly.

17              THE COURT:  So everyone pools -- gets their -- gets

18    credit for their base at their percentage --

19              THE WITNESS:  Correct.

20              THE COURT:  -- for 2019?

21              THE WITNESS:  Correct.  And now that leaves some

22    increments.  So let's say our base was 100, and now total

23    revenue is 200.  The increment is 100.  You and I just flew

24    50/50 capacity.  We each get 50.

25              THE COURT:  But if one of you -- so the -- the

1    split of this is based on how much increased capacity you

2    had?

3              THE WITNESS:  It's how much total capacity is there

4    now, right?

5              THE COURT:  As compared to the base?

6              THE WITNESS:  Yeah, because what can happen in this

7    whole thing, right, is -- frankly, it's stuff like

8    Boston-LaGuardia.  I come out of a market, but I go start

9    flying to Little Rock and to Memphis and things like that

10   too.  When you try to configure it back to the base, it's

11   not -- in the strange mechanics of airline scheduling, it's

12   not as easy to reconcile.  And in the concept of the deal,

13   it's, like, well, actually, if through this --

14             THE COURT:  So you're deciding how to split this --

15   let's call it a $100 in incremental revenue, right?  If the

16   base was 60/40 before you split your -- the base amount at

17   60/40, just the way it was split before the NEA, now you have

18   this 100 -- so that's the first $100 got split 60/40, because

19   that's how you were in 2019?

20             THE WITNESS:  In effect, yes.  Yes.  That's -- yes.

21             THE COURT:  And then -- but it's a credit, so to

22   speak, because it might -- depending on who accrued whatever.

23   And then you have the second $100, which is incremental.  And

24   how is that -- that's determined, the split, not 60/40, but

25   how much increased -- how much capacity you've added -- each

1    added?

2              THE WITNESS:  Yeah, you -- you could run our joint

3    venture finance department, actually.  That -- effectively,

4    you've got it.  I mean, there's some -- you've got the

5    concept.

6              THE COURT:  So then -- so if one of the two of you

7    added 75 percent of the new capacity, and the other one added

8    25 percent of the new capacity, the second $100 would be

9    split roughly 75/25?  Or does it also have to do with how

10   profitable --

11             THE WITNESS:  No, it has nothing to do with the

12   profitability or the capacity.  And, yes, you are -- because,

13   like, of how you did the math, effectively, that's the way it

14   would work.  The way it ends up settling -- you were speaking

15   to -- and you were kind of going to the credits of the whole

16   thing, but the simple way, the way I kind of conceptually

17   describe simply a board or others is, look, if your base --

18             THE COURT:  I'm not bored.

19             THE WITNESS:  No, sorry, I meant our board --

20             THE COURT:  Oh.  I see.

21             THE WITNESS:  -- people who are familiar with it,

22   but want to grasp the concept, is, like, if we're 60/40 in

23   our base and we grow to 50/50, then the simplest -- because

24   everything gets denominated on a unit revenue basis, and it's

25   just -- that's such a known quantity, the way you'll see us

1    describe it and it'll probably look that way in documents is,

2    okay, the first thing is in your base position, you had a

3    10-cent revenue per ESM and I had a 12-cent revenue per ESM,

4    we'll take the equivalent of that times the ESMs and pay

5    everybody.

6              THE COURT:  In terms of the base?

7              THE WITNESS:  In terms of -- and so the base gets

8    settled.

9              THE COURT:  So it's not just pure revenue?

10             THE WITNESS:  Correct.  And so -- and the way you

11   described the mathematics of it, yes, you're right.  That's

12   not how -- like, you'll never see it quite described like

13   that --

14             THE COURT:  So you'd be figuring your bases in

15   terms of that and -- but it comes out roughly the same.

16             THE WITNESS:  You'll get to the same spot however

17   you --

18             THE COURT:  It's a different distinction.

19             THE WITNESS:  Yeah, everything you'll see from us,

20   everything is always unitized to ESMs usually.

21             THE COURT:  I see.  And then when you're all done

22   with that math, how -- are -- what -- in my version, 60/40,

23   but so it's 10 and 12 cents, which would then be applied

24   toward the number of miles, which determines the base, but

25   all that yield of dollar value, when you're done with it, it

1    gets -- that's how much your share and the other share, the
2    other side's share of the base is, and that's, like -- those
3    are relative, if you will, credits.  Then you do is same
4    analysis for the second $100, in terms of capacity, same kind
5    of analysis.
6            THE WITNESS:  Yes.  Yes, yes, yes.
7            THE COURT:  And that, in the end, comes out to how
8    much is there.  And then you add those two numbers up, and
9    that's how much of the total -- that's how much your side
10   should get it and the totals the other side should get, and
11   you just see who got what and whether you need to even it up.
12           THE WITNESS:  Yeah, and that's -- I mean, I would
13   make a lot of people's hair go on fire, and that's just
14   accounting, as we like to say.  Like, that's --
15           THE COURT:  The last part is accounting.
16           THE WITNESS:  -- because you've collected money in
17   your till which actually belongs in the pot, and so there's
18   some -- there's, like, a nonzero level of accounting
19   transfers that you have to do to account for the --
20           THE COURT:  Yeah.  And so the way one side ends up
21   with more than the other is because revenue went up and one
22   side grew capacity more than the other.
23           THE WITNESS:  Exactly right.
24           THE COURT:  Okay.
25           THE WITNESS:  Exactly right.  And what you just

1    spoke to there is actually why for the most part in one of

2    our international joint ventures, you will find that our

3    pilots union is super supportive, because what they've seen

4    in every one of these things is we grow together.

5            Like in that exchange, in one of the e-mails that

6    the attorneys shared between me and Anmol, the entirety of

7    the issue is it's got to explain to our team -- it hasn't

8    featured much here -- that partnerships mean growth in the

9    same way we did the Atlantic joint venture.

10           And you -- you pilots love it because we are -- we

11   have an economic incentive that you and I are both going to

12   go and grow.  And they've seen flights go to Budapest.  It's,

13   like, the same thing occurs to New York.  But, yeah --

14           THE COURT:  More questions as a result of that?

15           MS. SWEENEY:  No, Your Honor.  Thank you.

16           THE COURT:  Anything else, Mr. Wall?

17           MR. WALL:  I wouldn't dare.  Thank you, Your Honor.

18           THE COURT:  Okay.  Thank you very much.

19           THE WITNESS:  Hey, thank you.

20           THE COURT:  Have a good day.

21           So I'll see you tomorrow at 9 a.m.

22           Anything else?

23           MR. JONES:  Yes, Your Honor, very briefly.  I

24   wanted to let the Court know that the plaintiffs plan to file

25   later this afternoon a motion to exclude a defense exhibit,

1    the transcript of some testimony of an expert for the

2    Commonwealth of Massachusetts in another case.

3              THE COURT:  In the case before Judge Burroughs?

4              MR. JONES:  Yes, sir.  We'll file that later this

5    afternoon.  We've --

6              THE COURT:  And that's -- that's excluding a

7    transcript of one of your experts?

8              MR. JONES:  No.

9              THE COURT:  It's an expert who's not even

10   testifying?

11             MR. JONES:  Not in this case, no.

12             MR. WALL:  An expert for the Commonwealth of

13   Massachusetts in another case.

14             THE COURT:  In that other case, and you're going to

15   move to exclude it.  It's offered for admission.  Okay.  So

16   you'll file that.

17             Have you figured out when --

18             MR. WALL:  We haven't, but we'll work it out.

19             THE COURT:  So it's not something I have to resolve

20   by tomorrow morning or anything like that?  No.  Fine.

21   That's great.  Sounds good.

22             MR. JONES:  Sorry, one other --

23             THE COURT:  Yep.

24             MR. JONES:  -- very quick thing.  Plaintiffs would

25   suggest to the Court that, in light of testimony earlier

195

today from Mr. Harrison, that the deposition designations of
Andrew Guenthner of Delta might be helpful for the Court to
read since there was a lot of testimony earlier about the
Delta-Alaska relationship.

THE COURT:  Okay.

MR. JONES:  And we've submitted those designations,
and so we would --

THE COURT:  So, you know, is this the in vein of,
like, the things I mentioned this morning to tell me about
things to read?

MR. JONES:  Yes, sir.

THE COURT:  Okay.  Fine.  So that's fine.  So maybe
we'll -- just to, like, make sure it hits the highest level
of, like, attention, if you could just either tell me now or
what the pages are in the exhibit numbers so I can find it,
or you could, like, submit something in writing, whatever is
easier for you.

MR. JONES:  I can tell you now, Your Honor.

THE COURT:  Okay.

MR. JONES:  In the designation submissions, it's
pages 47 to 63.

THE COURT:  47 to 63 within the designations.  And
this is which witness, again?

MR. JONES:  This is Andrew Guenthner.

THE COURT:  Guenthner?

1                 MR. JONES:  Of Delta.

2                 THE COURT:  Okay.  And I have those -- that exhibit

3      you mentioned.

4                 All right.  Sounds good.  I'll see you tomorrow

5      morning.  Have a good day.  Thanks.

6                 (Court in recess at 1:24 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T I O N**

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.


/s/ Rachel M. Lopez                    October 6, 2022
/s/ Robert W. Paschal


_____                _____
Rachel M. Lopez, CRR                   Date
Robert W. Paschal, RMR, CRR
Official Court Reporters