<pre>
 1                    UNITED STATES DISTRICT COURT

 2                     DISTRICT OF MASSACHUSETTS

 3

 4   _____

 5   UNITED STATES OF AMERICA, et al.

 6         Plaintiffs,                      Civil Action No.
                                            1:21-cv-11558-LTS
 7        v.

 8   AMERICAN AIRLINES GROUP, INC.,
     et al.,
 9
           Defendants.
10
11   _____

12       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                          BENCH TRIAL
                              Day 8
15

16
                        Friday, October 7, 2022
17                           9:00 a.m.

18

19

20
     John J. Moakley United States Courthouse
21   Courtroom 13
     One Courthouse Way
22   Boston, Massachusetts

23
     Rachel M. Lopez, CRR
24   Official Court Reporter
     raeufp@gmail.com
25
</pre>

1                          **A P P E A R A N C E S**

2

3      On behalf of the Plaintiff United States of America:

4          UNITED STATES DEPARTMENT OF JUSTICE
           BY:  WILLIAM H. JONES, III; MAISIE A. BALDWIN; JAMES
           MOORE, III;  SARAH P. MCDONOUGH; AND JOHN R. DOIDGE
5          450 Fifth Street, Northwest
           Suite 8000
6          Washington, D.C.  20530
           (202) 514-0230
7          bill.jones2@usdoj.gov
           maisie.baldwin@usdoj.gov
8          james.moore4@usdoj.gov
           sarah.mcdonough@usdoj.gov
9          dick.doidge@usdoj.gov

10

11     On behalf of the Defendant American Airlines Group, Inc.:

12         LATHAM & WATKINS, LLP
           BY:  DANIEL M. WALL AND ALLYSON M. MALTAS
13         505 Montgomery Street
           Suite 2000
14         San Francisco, California  04111
           (415) 391-0600
15         dan.wall@lw.com
           allyson.maltas@lw.com
16

17

       On behalf of the Defendant JetBlue Airways Corporation:
18
           SHEARMAN & STERLING LLP
19         BY:  RICHARD F. SCHWED AND MATTHEW L. CRANER
           599 Lexington Avenue
20         New York, New York  10022
           (212) 848-4000
21         richard.schwed@shearman.com
           matthew.craner@shearman.com
22

23

24

25

## <u>TABLE OF CONTENTS</u>

## **TRIAL WITNESSES**

On behalf of the Plaintiffs:                          <u>Page</u>

PAUL SWARTZ

      By Ms. Baldwin                              6

      By Ms. Maltas                              34

      By Ms. Baldwin                             52

      By Ms. Maltas                              59

      By Ms. Baldwin                             60

DAVID FINTZEN

      By Mr. Congdon                             62

      By Mr. Craner                             128

      By Mr. Congdon                            144

      By Mr. Craner                             150

JORDAN PACK

      By Mr. Moore                              153

      By Ms. Maltas                             218

      By Mr. Moore                              250

      By Ms. Maltas                             261

ERIC FRIEDMAN

      By Ms. Mcdonough                          262

      By Mr. Schwed                             306

| | | |
|---|---|---|
| 1 | **EXHIBITS** | |
| 2 | | |
| 3 | On behalf of the Plaintiffs: | <u>Admitted</u> |
| 4 | Number Deposition of David Fintzen, May 4, 2022, | 120 |
| 5 | page 146, line 22, through page 147, line 7, | |
| 6 | Number Excerpt form Jordan Pack's CID deposition | 167 |
| 7 | on page 9 | |
| 8 | Number 173 | 13 |
| 9 | Number CID deposition of Mr. Pack, page 228, | 256 |
| 10 | lines 12 to 23 | |
| 11 | Number page 244:24 through 245:9 from | 278 |
| 12 | Mr. Friedman's December 21, 2020, deposition | |
| 13 | Number 333 | 30 |
| 14 | | |
| 15 | On behalf of the Defendants: | <u>Admitted</u> |
| 16 | Number 49 | 47 |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

```
 1                    P R O C E E D I N G S
 2              (In open court.)
 3              THE COURT:  Ready to go?
 4              MR. JONES:  Yes, sir, we are.  The plaintiffs call
 5    Paul Swartz of American Airlines.
 6              THE COURT:  All right.
 7              MR. JONES:  And Maisie Baldwin of the Department of
 8    Justice will conduct the examination.
 9              THE COURT:  All right.
10              MS. BALDWIN:  Your Honor, the Court should have two
11    copies of the binder for Mr. Swartz already.
12              THE COURT:  Yes.  I think so.
13              THE DEPUTY CLERK:  Sir, if you could raise your
14    right hand.
15              (Witness duly sworn.)
16              THE DEPUTY CLERK:  And can you please state your
17    name for the record.
18              THE WITNESS:  Paul Swartz.
19              THE COURT:  Ms. Baldwin, right?
20              MS. BALDWIN:  Yes.
21              THE COURT:  Go right ahead.
22
23
24
25
```

**PAUL SWARTZ**

1

2          having been duly sworn, testified as follows:

3      **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS**

4  BY MS. BALDWIN:

5  **Q.**  Good morning, Mr. Swartz.  You should have just received

6  a binder that has some tabbed documents inside.  Throughout

7  the course of your examination, I'll let you know when to

8  open the binder and where to turn.  You'll also see documents

9  displayed on your screen.  Does that make sense?

10 **A.**  Yes.

11          THE COURT:  They'll probably be in both places, in

12 other words.  They'll be in both places.  They'll be in

13 paper, the whole thing; and the screen only has one page,

14 typically, at a time.

15          THE WITNESS:  Okay.  Thank you.

16 BY MS. BALDWIN:

17 **Q.**  The screen will also be the redacted version, since it

18 will be pubically facing, so you may see words on your

19 version of exhibit that are not on the screen, and I would

20 just caution you not to reveal any of that redacted

21 information.  Okay?

22 **A.**  Sure.

23 **Q.**  Mr. Swartz, you're currently employed by American

24 Airlines as the regional sales manager for the greater

25 Washington, DC, and New England areas; is that right?

1    **A.**   I am the regional sales director.

2    **Q.**   Is that a title you've held since July of 2020?

3    **A.**   No.  I was recently promoted to regional sales director

4    in the last 60 days.

5    **Q.**   Congratulations.

6    **A.**   Thank you.

7    **Q.**   From September of 2017 until July of 2020, were you the

8    district sales manager for Boston at American?

9    **A.**   I was.

10   **Q.**   And you're aware of the Northeast Alliance agreement

11   between American and JetBlue?

12   **A.**   Yes, I am.

13   **Q.**   And the Northeast Alliance permits American and JetBlue

14   to jointly contract with its corporate customers; is that

15   right?

16   **A.**   Yes.

17   **Q.**   Meaning that, instead of having one contract for American

18   and a separate contract for JetBlue, corporate customers can

19   have one single contract for both carriers, right?

20   **A.**   That is one of the options, correct.

21   **Q.**   I'd like to discuss some competition between American and

22   JetBlue on specific routes, starting with Boston and DCA.  If

23   you would, please turn in your binder to Plaintiffs'

24   Exhibit 202?

25              MS. BALDWIN:  Your Honor, 202 has been admitted

1    into evidence.  It does not contain redactions.

2              THE COURT:  Okay.

3    BY MS. BALDWIN:

4    **Q.**  Are you there, Mr. Swartz?

5    **A.**  I am.

6    **Q.**  And this is an e-mail thread describing competitive

7    changes in the airline industry?

8    **A.**  Yes.

9    **Q.**  And this is dated in December of 2018?

10   **A.**  It is.

11   **Q.**  Let's start at the third page of this document.  You'll

12   see an e-mail from a Mr. Mike Domagala.  Am I pronouncing

13   that correctly, Mr. Swartz?

14   **A.**  Yes.

15   **Q.**  And Mr. Domagala at the time was a senior network analyst

16   for American?

17   **A.**  I'm not sure of his position.

18   **Q.**  Did Mr. Domagala send these types of e-mails to you or

19   any members of your team?

20   **A.**  He did.  Actually, he sent it to me.  I'm not sure -- I

21   don't think the rest of my team received these.  I would

22   forward them out to my team.

23   **Q.**  Okay.  It looks like the title of his e-mail is "Industry

24   Highlights."  Do you see that?

25   **A.**  I do.

1   **Q.**  And if go down to the second main heading, you'll see

2   "Delta published service on three new Boston routes and

3   announced a fourth, reducing DCA frequencies to balance slot

4   levels."  Do you see that?

5   **A.**  I do.

6   **Q.**  Here Mr. Domagala is reporting that Delta added service

7   between Boston and DCA?

8   **A.**  Yes.

9   **Q.**  And that was six daily flights on that route?

10  **A.**  Correct.

11  **Q.**  Let's go to the e-mail at the bottom of the first page of

12  this exhibit.  It has a time stamp, 2:31 p.m.?

13  **A.**  Okay.

14  **Q.**  Do you see that?

15  **A.**  I do.  Is this the e-mail that I wrote?

16  **Q.**  Yes, sir.

17  **A.**  Okay.  Uh-huh.

18  **Q.**  In this part of the e-mail thread, you and a number of

19  your colleagues at American were talking specifically about

20  the Boston-DCA route?

21  **A.**  Yes.

22  **Q.**  And you wrote that at the time, Boston DCA was already a

23  highly competitive shuttle route; is that right?

24  **A.**  That's what I wrote, yes.

25  **Q.**  And in the second sentence of this e-mail, you write

1   that, "Although Delta is entering the market, American's big

2   competition is JetBlue"; is that right?

3   **A.**   Yes.

4   **Q.**   And you described JetBlue as having very low pricing with

5   tons of flexibility, including fares as low as a hundred

6   dollars between Boston and DCA?

7   **A.**   I wrote that as well as Delta was getting aggressive in

8   that marketplace.

9   **Q.**   Well, in fact, you wrote that you weren't sure if Delta

10  would get as aggressive at JetBlue; is that right?

11  **A.**   I don't see where I wrote -- I wrote that.  Sorry.

12          Oh, yes, I do see that.  Okay.

13  **Q.**   All right.  You can put that document aside, Mr. Swartz.

14  And if you would please turn to PX253 and we'll talk a bit

15  more about Boston-DCA.

16  **A.**   I see that document.

17          MS. BALDWIN:  Your Honor, PX253 has been admitted

18  into evidence and we will publish a redacted version.

19          THE COURT:  Fine.

20  BY MS. BALDWIN:

21  **Q.**   This is an e-mail thread from July of 2019; is that

22  right?

23  **A.**   Yes.

24  **Q.**   Let's go to the first in time e-mail, with a time stamp

25  of 4:41 p.m.  This is an e-mail from a Mr. Steven Gilman; is

1    that right?

2    **A.**   Correct.

3    **Q.**   And at the time of this e-mail, Mr. Gilman was the

4    manager of sales planning for American Airlines?

5    **A.**   That is correct.

6    **Q.**   Here, Mr. Gilman is writing to you and somebody named

7    Ricki.  Would that be Ms. Reichard?

8    **A.**   Yes, correct.

9    **Q.**   And at the time of this e-mail, was Ms. Reichard the

10   regional sales director for Boston and Philadelphia?

11   **A.**   Yes.

12   **Q.**   Did you report to Ms. Reichard?

13   **A.**   I did.

14   **Q.**   Here Mr. Gilman is writing to you and Ms. Reichard that

15   Boston-DCA was a point of concern in a recent network

16   planning meeting?

17   **A.**   Yes.

18   **Q.**   And Mr. Gilman writes that Boston-DCA was a point of

19   concern, because Boston-DCA was the poorest performing market

20   in DC based on profitability?

21   **A.**   That's what he wrote.

22   **Q.**   Let's go to your response, which you sent at 4:02.  Here,

23   you write, "The problem is JetBlue going to 15 flights a day

24   and offering our corps a $99 Y-up fare."  Do you see that?

25   **A.**   I do.

1  **Q.**  The "corps" here being American's corporate customers?

2  **A.**  That is correct.

3  **Q.**  So from your e-mail, I gather JetBlue increased its

4  frequencies on Boston-DCA to 15 daily flights?

5  **A.**  Yes.

6  **Q.**  And you identified this increase in frequency by JetBlue

7  as a problem for American?

8  **A.**  Yes.

9  **Q.**  You also wrote that JetBlue started offering American's

10  corporate customers a $99 Y-up fare; is that right?

11  **A.**  That is correct.

12  **Q.**  And a Y-up fare is one of American's fully -- sorry, one

13  of JetBlue's fully refundable fares?

14  **A.**  Yes, correct.

15  **Q.**  And you identified JetBlue's $99 Y-up fare between Boston

16  and DCA as another problem for American.  Is that right?

17  **A.**  Sorry.  Repeat that again.

18  **Q.**  You identified JetBlue's $99 Y-up fare between Boston and

19  DCA as a problem for American?

20  **A.**  Yes.

21  **Q.**  You can put that document aside, Mr. Swartz.

22        I'd like to talk about a different route, the

23  Boston-Rochester route.  So if you would please turn to

24  Plaintiffs' Exhibit 173.

25        MS. BALDWIN:  Your Honor, this document has not yet

1    been admitted into evidence.  I understand there's an

2    outstanding 805 objection.  In conversations with defendants,

3    we've agreed the third-party statements in this document will

4    not be offered for the truth.  And with that limitation in

5    mind, we move to admit it into evidence.

6              MS. MALTAS:  No objection, Your Honor.

7              THE COURT:  All right.  Admitted with that

8    limitation.

9              (Plaintiffs' Exhibit 173 admitted into evidence.)

10             MS. BALDWIN:  Thank you, Your Honor.  And, again,

11   this document contains redactions.

12   BY MS. BALDWIN:

13   Q.  So, again, Mr. Swartz, on this, I would caution you not

14   to read any of the information out loud that appears in the

15   black boxes on the screen.

16   A.  I understand.

17   Q.  The subject line of this e-mail thread, Mr. Swartz, is

18   "ROC-BOS"?

19   A.  Correct.

20   Q.  And that refers to the route between Boston and

21   Rochester, New York?

22   A.  Yes, correct.

23   Q.  Let's look at the first in time e-mail that you sent on

24   this thread.  It's on the fourth page.  This is an e-mail

25   that you sent to the EASE planning team and your boss,

1    Ms. Reichard?  Is that right?

2    **A.**   Just give me a sec.  So that's the last page.  Okay.

3    Yes.

4    **Q.**   And the EASE planning team was American's eastern sales

5    division planning team?

6    **A.**   That is correct.

7    **Q.**   And this is an e-mail you sent on March 19, 2019?

8    **A.**   Correct.

9    **Q.**   And you wrote to your team and Ms. Reichard, "Please pull

10   a list of our top corporate customers flying to

11   Rochester-Boston.  We are not doing well since JetBlue

12   entered the market."  Is that right?

13   **A.**   I did write that, yes.

14   **Q.**   And JetBlue entered the Boston-Rochester market in

15   January of 2019?

16   **A.**   I forget, honestly.  I don't remember that.

17   **Q.**   That's all right.  Let's look at the bottom of the second

18   page and the top of the third.  There's an e-mail that you

19   wrote on March 22, 2019, at 9:11 a.m.  On the left, you'll

20   see the address block, but the substance of the e-mail is on

21   the third page.  Do you see that?

22   **A.**   What is the time on that?  That's from me to the --

23   **Q.**   To a number of folks at 9:11 a.m. on March 22, 2019?

24   **A.**   Okay.  I see now.  All right.  Yes.

25   **Q.**   And it starts with "team"?

1   **A.**   Yes.

2   **Q.**   Sure.  So if we can show the body of that e-mail.  In the

3   first sentence of this e-mail, you wrote, "JetBlue started in

4   the Rochester-Boston market in Jan."

5            Is it safe to assume that "Jan" means January?

6   **A.**   Yes, you are correct.

7   **Q.**   So that would be approximately three months before the

8   time you wrote this e-mail?

9   **A.**   Yes.

10  **Q.**   In the second sentence, you write, "We have had a

11  couple" -- sorry.  "We have had a couple of rough months

12  since JetBlue entered the market."  Is that right?

13  **A.**   Yes.  I wrote that.

14  **Q.**   So the impact of JetBlue starting to fly between Boston

15  and Rochester was already concerning you less than three

16  months after JetBlue started service?

17  **A.**   Yes.

18  **Q.**   You can put that document aside, Mr. Swartz.

19           And if you would, please, now turn to Plaintiffs'

20  Exhibit 195.

21           MS. BALDWIN:  Your Honor, this document has been

22  admitted into evidence and does not contain redactions.

23  BY MS. BALDWIN:

24  **Q.**   Are you there, Mr. Swartz?

25  **A.**   I am.

1   **Q.**  And this is a three-page e-mail thread from August of

2   2019; is that right?

3   **A.**  Yes.

4   **Q.**  Let's go to the first in time e-mail of this thread,

5   which is at the bottom of the second page.  This is an e-mail

6   that you sent to Mr. Gilman and Ms. Reichard; is that right?

7   **A.**  Yes.  I sent to it to Steven Gilman and copied Ricki.

8   **Q.**  And this is from August of 2019?

9   **A.**  It is, correct.

10  **Q.**  And in your e-mail, you asked Mr. Gilman and Ms. Reichard

11  whether they have any suggestions on reporting that shows the

12  importance of Boston to American's network?

13  **A.**  I did, yes.

14  **Q.**  Let's go to Mr. Gilman's response to your question.

15          And if you turn to about the third line down of

16  this e-mail, Mr. Gilman writes to you, "The fact is,

17  unfortunately, Boston does not perform as well from a

18  profitability perspective as other cities, largely due to the

19  fare destruction JetBlue have wrought."

20          Do you see that?

21  **A.**  I do.

22  **Q.**  So Mr. Gilman is informing you that Boston is not as

23  profitable as other cities are for American?

24  **A.**  I don't know what Steven's -- why he responded like that.

25  My biggest concern, the reason I reached out to network

1    planning, was trying to make a case for more flights out of

2    Boston.  It was about building a bigger network, not -- I

3    don't know why he responded about profitability.

4    **Q.**  Do you have any reason to doubt the statement in

5    Mr. Milligan's e-mail that Boston at the time was not

6    performing as well, from a profitability perspective, as

7    other cities for American?

8    **A.**  I can't say yes and no.  I'm assuming, you know, that was

9    his opinion.  Again, my -- the reason I initiated this e-mail

10   was about our network, not profitability.

11   **Q.**  Okay.  But you understood Mr. Gilman to be expressing

12   that Boston did not perform as well as other cities for

13   American from a profitability perspective, right?

14   **A.**  That was his opinion.

15   **Q.**  Okay.  And at the time of his e-mail, JetBlue was the

16   largest airline in Boston?

17   **A.**  Yes.

18   **Q.**  And Mr. Gilman blames American's low profitability in

19   Boston on JetBlue's fare destruction, right?

20   **A.**  That was Steven's opinion.

21   **Q.**  And fare destruction would mean lower fares offered to

22   consumers?

23   **A.**  I'm assuming that's what Steven meant.

24   **Q.**  Let's go to your response to Mr. Gilman's e-mail.

25   **A.**  And what time was that?  At 2:12.

1   **Q.**  At 2:12 p.m., yes, sir.

2   **A.**  Okay.  Sure.

3   **Q.**  If you go to the second sentence of your e-mail, you

4   write, "There's a good chance we fall to tertiary status or

5   even fall out of contracts, losing to Delta and JetBlue."  Do

6   you see that?

7   **A.**  Yes.

8   **Q.**  So here, you're worried that if American did not take

9   some sort of action in Boston, American may fall to third

10  place behind Delta and JetBlue?

11  **A.**  My biggest concern, again, was about our lack of network

12  size in Boston.  That's why I initiated this whole e-mail.

13  And, yes, any competition in Boston, I was very nervous

14  about, because we had been downsizing our network.  So I was

15  trying to build a case to network planning to say we need

16  help, or we're going to quickly be pushed out.

17          So, again, our biggest competition, Delta, but you

18  know, B6 at the time, regional player, yes, I was worried

19  about as a salesperson.  My job was to -- at this point in

20  Boston, was not only to win business, but to dig into the

21  trenches and try to hold what we had.

22          So I was very worried about losing business to

23  anyone out there that was a competitor.  But mostly in this

24  case, it was Delta.

25  **Q.**  Okay.  So let's -- let's return to the text of your

1  e-mail.  You're expressing there's a chance that American

2  could fall to third place in Boston, right?

3  **A.**  Correct.  Tertiary, yes.

4  **Q.**  So fair to say that, in order to fall to third place,

5  American would have had to be number one or number two in

6  August of 2019?

7  **A.**  It would all depend on what corporate customer you're

8  talking about.  Every corporate customer we have, we're in a

9  position with them depending on the network fit.  When we go

10  head to head with airlines, it's really American -- it's

11  against the other legacy players that are global footprint,

12  such as Delta or United.

13  **Q.**  But in this e-mail, you called out both Delta and

14  JetBlue, right?

15  **A.**  I did.

16  **Q.**  Okay.  You're also --

17  **A.**  I think the reason I did that is because Steven had

18  mentioned JetBlue, so I was just responding.  But, again, my

19  original e-mail was based on network, how do we dig in, how

20  do we expand?  I need to build a case.  And, again, it was

21  really against Delta and United.

22  **Q.**  Okay.  You're also expressing concern that if American

23  did not take action in Boston, American may fall out of

24  corporate contracts altogether?

25  **A.**  There's always that possibility.  I mean, I am a

1     salesperson.  My job is to drive sales.  So without lack of

2     network size, it becomes very hard for us to compete against

3     the other airlines.

4     **Q.**  Okay.  Thank you.

5           Let's now turn to the e-mail at the top of this

6     first page.  This is an e-mail from Ms. Reichard at

7     11:11 a.m.  Do you see that?

8     **A.**  I do.

9     **Q.**  And in responding to this thread, Ms. Reichard writes, if

10    you look at the bottom paragraph in the second sentence,

11    "Obviously, the yield per seg is less due to JetBlue

12    pricing," right?  That's what she wrote?

13    **A.**  I'm sorry.  What -- this is Ricki to Steven and me, and

14    you're talking about the second -- okay.  Obviously the

15    yield --

16    **Q.**  So she writes, "Obviously, the yield per seg is less due

17    to JetBlue pricing," right?

18    **A.**  Yes.  That's what she wrote.

19    **Q.**  And "yield per seg" is a measure of price?  Is that what

20    you understand it to be?

21    **A.**  Yes.

22    **Q.**  And Ms. Reichard is stating that American's yield per

23    segment is lower because of JetBlue's pricing in Boston,

24    right?

25    **A.**  That was her opinion.

1    **Q.**   Both hers and Mr. Gilman's?

2    **A.**   I -- in this particular sentence, it's Ricki's opinion.

3    **Q.**   If we look at the e-mail earlier in the thread, that's

4    also the sentiment Mr. Gilman expressed to you?

5    **A.**   Yes, it was.

6    **Q.**   Okay.  You can put that document aside, Mr. Swartz.

7              I'd like to now talk a bit about American's network

8    plans prior to entering the Northeast Alliance.  So if you

9    would please turn to PX89 in your bind?

10             MS. BALDWIN:  And, Your Honor, PX89 has been

11   admitted into evidence and does not contain redactions.

12             THE COURT:  Okay.  Thank you.

13   BY MS. BALDWIN:

14   **Q.**   Mr. Swartz, the subject line of this e-mail is "2020

15   strategy:  What do we need to do to fill plus 7 percent more

16   capacity?"  Is that right?

17   **A.**   Yes.

18   **Q.**   And this e-mail thread was sent to you by a Mr. Jim

19   Carter?

20   **A.**   Correct.

21   **Q.**   And at the time of this e-mail, Mr. Carter was the

22   managing director for the eastern sales division in American?

23   **A.**   Yes.

24   **Q.**   And the date of this e-mail thread is October 2019?

25   **A.**   That is correct.

1    **Q.** Prior to the NEA, right?

2    **A.** Yes.

3    **Q.** Okay.  Let's go to the third page.  Actually, let's start

4    with the second.

5    **A.** Okay.

6    **Q.** Might help give a little bit more context to what we're

7    looking at on page 3.  So if you look here, this is an e-mail

8    describing the table on the third page, right?

9    **A.** Are you talking about the Brett Berman e-mail?

10   **Q.** Yes, sir.

11   **A.** Yes.

12   **Q.** And he writes that, "Below is a March 2020 versus

13   March 2019 domestic schedule compare by station for what is

14   currently loaded," right?

15   **A.** Yes.

16   **Q.** And so the table that appears on page 3 has March 2019

17   flying, which has already happened, right?

18   **A.** Yes.

19   **Q.** And it will compare March 2020 flights which are

20   currently loaded in American's sales system, right?

21   **A.** Correct.

22   **Q.** Okay.  Let's turn to the table now, with that

23   understanding.  And broadly speaking, this table shows data

24   related to a number of flights out of a series of airports

25   listed on the left, right?

1    **A.**   Correct.

2    **Q.**   It shows both the number of flights as well as the number

3    of seats?

4    **A.**   Yes.

5    **Q.**   Let's look at the two columns on the far right.  The

6    headings read "diff" and "percent diff."  Do you see those?

7    **A.**   Yes.

8    **Q.**   The diff column provides the difference between

9    American's March 2020 plan schedule and what it flew in

10   March 2019?

11   **A.**   Correct.

12   **Q.**   And in the total row, which is enlarged on your screen

13   for ease of viewing, it shows there are 6,900 additional

14   total flights for American in 2020 compared to 2019?

15   **A.**   Yes.

16   **Q.**   And more than 1.7 million additional seats, right?

17   **A.**   Correct.

18   **Q.**   And the column on the far right shows these differences

19   in terms of percentages, right?

20   **A.**   Yes.

21   **Q.**   Showing an increase in flights of 9.1 percent?

22   **A.**   Yes.

23   **Q.**   And an increase in seats of 8.6 percent?

24   **A.**   That is correct.

25   **Q.**   Let's go down to some of the specific airports that are

1    listed in this table.  There's actually, thankfully, a

2    cluster of LaGuardia, Boston, and JFK all together.  So if we

3    can display that.

4              Do you see those, Mr. Swartz?

5    **A.**  I do.

6    **Q.**  So starting with the row labeled "LaGuardia," you'll see

7    a 6.8 percent increase in flights between March 2019 and

8    March 2020?

9    **A.**  Correct.

10   **Q.**  And an 8.8 increase in seats?

11   **A.**  Yes.

12   **Q.**  And, again, this e-mail is from October 2019 prior to

13   American entering the Northeast Alliance?

14   **A.**  Yes.

15   **Q.**  Let's go to the next row down, which is labeled "Boston."

16   This shows a 13.8 percent increase in flights out of Boston?

17   **A.**  Yes.

18   **Q.**  And a 14 percent increase in seats?

19   **A.**  Correct.

20   **Q.**  And finally on the row labeled "JFK," we'll see a

21   25.9 percent increase in American's flights, right?

22   **A.**  Yes.

23   **Q.**  And a 13 percent increase in seats?

24   **A.**  Correct.

25   **Q.**  Let's go to the e-mail on the first page now.  The e-mail

1  from Mr. Carter to you and a number of other folks.  Do you

2  see that?

3  **A.**  I do.

4  **Q.**  And Mr. Carter's commentary about this table is that

5  Boston, JFK, and Raleigh-Durham are big winners for 2020; is

6  that right?

7  **A.**  It is.

8  **Q.**  You can set that document aside, Mr. Swartz.

9         I'd now like to talk about one of the routes that

10  American added service to prior to the Northeast Alliance.

11  So if you would -- actually, before you turn to a document,

12  Mr. Swartz, in December of 2019, did American announce it

13  would start offering service between Boston and Austin?

14  **A.**  It did.

15  **Q.**  And at the time of that announcement, did JetBlue offer

16  service between Boston and Austin?

17  **A.**  I don't remember.

18  **Q.**  All right.  Well, with that in mind, let's turn to the

19  documents.  If you would turn to PX193?

20  **A.**  Okay.

21         MS. BALDWIN:  And, Your Honor, this is in evidence,

22  and there are no redactions.

23         THE COURT:  Thank you.

24  BY MS. BALDWIN:

25  **Q.**  Let's start with the e-mail at the bottom of the first

1    page on December 11th at 11:15 a.m.  This is an e-mail from

2    the JetBlue sales team; is that right?  Is that what it

3    appears to be, I should say, based on the e-mail address?

4    **A.**   December 11th at 11:24?

5    **Q.**   At 11:15 a.m. --

6    **A.**   Oh, I'm sorry.

7    **Q.**   The bottom of the first page.  No problem.  It's zoomed

8    on the screen, if that's easier for you, Mr. Swartz.

9    **A.**   Oh, yes.  I see it.  Thank you.

10   **Q.**   And so this appears to be an e-mail from the JetBlue

11   sales team, right?

12   **A.**   Yes.

13   **Q.**   And the subject here is "More JetBlue Growth in Boston"?

14   **A.**   Correct.

15   **Q.**   And the JetBlue sales team sent this to a man with the

16   name Dale Peak?

17   **A.**   Yes.

18   **Q.**   And Mr. Peak was a global travel manager at Analog?

19   **A.**   Yes.

20   **Q.**   And if we look at the next e-mail, Mr. Peak forwards

21   JetBlue sales team's e-mail to both you and a Ms. Lynor

22   Carroll?

23   **A.**   Correct.

24   **Q.**   And Ms. Carroll, at the time, was a corporate account

25   sales manager for American?

1    **A.**  Yes.

2    **Q.**  In his e-mail to you-all, Mr. Peak writes, "Didn't take

3    them very long to add more Boston-Austin"; is that right?

4    **A.**  Yes.

5    **Q.**  And would December 11th be around the time that American

6    made the announcement that it was entering Boston-Austin?

7    **A.**  Yes.

8    **Q.**  So here, Mr. Peak is indicating JetBlue adding additional

9    flights between Boston and Austin, right?

10   **A.**  I don't know what he meant, but I'm assuming that's what

11   it implies, yes.

12   **Q.**  Okay.  Let's go to the e-mail that you sent at

13   December 11th, 2019, at 2:19 p.m.

14   **A.**  Okay.

15   **Q.**  The very top of the page.  Do you see that, Mr. Swartz?

16   **A.**  I do.

17   **Q.**  You forwarded Mr. Peak's e-mail on to a number of members

18   at American's -- at American's sales team; is that right?

19   **A.**  Yes.

20   **Q.**  And you wrote in this e-mail that JetBlue sounded

21   threatened by American's new flight on Boston-Austin?

22   **A.**  I did write that.

23   **Q.**  So you were acknowledging that JetBlue increased its

24   number of flights between Boston and Austin?

25   **A.**  Yes.

1   **Q.**  And that that was a response to American introducing

2   service on that route, right?

3   **A.**  That's how I saw it.

4   **Q.**  Okay.  A few sentences later, on the second line of this

5   e-mail, you write, "The fight begins.  This is definitely war

6   that we can win."  Do you see that?

7   **A.**  I do.

8   **Q.**  And by "fight," you're referring to American fighting for

9   customers between Boston and Austin?

10  **A.**  Yes, just like we do against all customers.  My job is to

11  inspire my sales team.  Every competitor out there, that's

12  what my job is, to defend, win business.

13  **Q.**  And you saw at the time of this e-mail, you saw JetBlue

14  as a competitor?

15  **A.**  Anyone that competes on a route against us that's not

16  part of our alliance is a competitor.

17  **Q.**  But now JetBlue is a part of the alliance, right?

18  **A.**  They are part of the alliance now, correct.

19  **Q.**  So you no longer compete with JetBlue?

20  **A.**  On that specific -- yes.

21  **Q.**  Okay.  You also say that American can win this war

22  against JetBlue, right?

23  **A.**  I was trying to inspire my team as a great sales leader.

24  **Q.**  At the very end of this e-mail, you write that "Boston is

25  back," right?

1    **A.**   I need to inspire my team.  I was excited about the one

2    or two flights that we received after many years of

3    downgrading Boston and eliminating lift.  I was very excited

4    as a salesperson.  It just gave us one or two additional

5    destinations to go out and sell against corporate customers.

6    **Q.**   Well, Mr. Swartz, in PX89 that we just looked at, it

7    wasn't just one or two flights being added to Boston, right?

8    **A.**   Destinations, not flights.

9    **Q.**   We saw an increase in Boston of 13.8 percent?

10   **A.**   That's frequency of flights, not new destinations.  I was

11   excited about the one or two new flights that we announced

12   after -- my explanation is after years of losing flights and

13   only flying to our hubs, I was extremely excited to get some

14   new tools in the toolbox to fight against the competition,

15   mainly Delta.

16   **Q.**   All right.  You can put that document aside, Mr. Swartz.

17          I'd like to now talk about one quick issue after

18   the Northeast Alliance was entered by the parties.  So if you

19   would please turn to Plaintiffs' Exhibit 333.

20          MS. BALDWIN:  And, Your Honor, PX333 has not yet

21   been admitted into evidence.  It has that same outstanding

22   805 objection, as I understand it, from defendants.  And we

23   would move it into evidence with the stipulation we will not

24   be offering the third-party statements contained in the

25   document for the truth of the matter.

1          MS. MALTAS:  No objection, Your Honor.

2          THE COURT:  All right.  Admitted with that

3     limitation.

4          (Plaintiffs' Exhibit 333 admitted into evidence.)

5          MS. BALDWIN:  And this document does contain

6     redactions.

7     BY MS. BALDWIN:

8     **Q.**  Mr. Swartz, I will once again caution you not to read the

9     redacted portions out loud?

10    **A.**  I don't see that in mine --

11    **Q.**  PX33 should be toward the end of your binder.  It's

12    actually a handwritten tab.

13    **A.**  Oh, I see it.

14    **Q.**  I apologize for that.

15    **A.**  No problem.  Okay.  Yes.

16    **Q.**  Okay.  So let's start with the e-mail at 12:00 p.m.,

17    which is at the very top of the first page.  Here, Mr. Carter

18    is forwarding you some information about some of American's

19    corporate customers, right?

20    **A.**  Yes.  Sorry.

21    **Q.**  And at the time, again, you were reporting to Mr. Carter?

22    **A.**  I -- I still am, yes.

23    **Q.**  Mr. Carter also forwarded this information about some

24    corporate customers to other members of American's corporate

25    sales team?

1    **A.**  Yes, he did.

2    **Q.**  And the time stamp is November 2021.  Do you see that?

3    **A.**  Yes, I do.

4    **Q.**  This is after the NEA was being implemented?  Is that

5    your understanding?

6    **A.**  Yes.

7    **Q.**  Let's turn to the first in time e-mail on the very last

8    page of this exhibit.  And you'll see it starts on the fourth

9    page and spills on to the fifth.

10   **A.**  Okay.  Yes.

11   **Q.**  This is an e-mail that a Mr. Colin Goss sent on

12   November 17, 2021?

13   **A.**  Yes.  I see that.

14   **Q.**  And Mr. Goss had just spoken to travel managers for one

15   of American's large corporate customers?

16   **A.**  Yes, it sounds like that.

17   **Q.**  And this is more than a year and a half after the COVID

18   pandemic started in earnest in March of 2020, right?

19   **A.**  Yes.

20   **Q.**  And Mr. Goss reported that the corporate customer was

21   raising concerns about American not operating between Boston

22   and LGA?

23   **A.**  Yes.

24   **Q.**  And that's because, pursuant to the Northeast Alliance,

25   JetBlue is flying all of the Boston-LGA frequencies, right?

1    **A.**  I'm assuming that's what it's about, yes.

2    **Q.**  I want you to look at the name of the corporate customer

3    in this e-mail, but again, do not say it out loud.  It should

4    be printed in your book.

5    **A.**  Okay.  Yes.

6    **Q.**  Mr. Swartz, is it your understanding that this corporate

7    customer could afford a Zoom subscription?

8            MS. MALTAS:  Objection.

9            THE WITNESS:  I don't --

10           THE COURT:  I think I can take judicial notice.

11           MS. BALDWIN:  Thank you, Your Honor.

12   BY MS. BALDWIN:

13   **Q.**  Mr. Goss is reporting that the customer is concerned

14   about American not flying Boston-LaGuardia, right?

15   **A.**  Yes, that's what it says.

16   **Q.**  Even in the height of the pandemic or months after the

17   pandemic is started, right?

18   **A.**  Yes.  I guess that's what it implies here.

19   **Q.**  Let's go to Noel O'Connell's response at 6:37 p.m.

20   It's about halfway down the page.

21           THE COURT:  What is AirPass?

22           THE WITNESS:  AirPass is a corporate product or --

23   anyone can buy it.  It's a prepaid pass.

24           THE COURT:  And is it just prepaid for a certain

25   amount of flights, or is it sort of you prepay and you get --

1          THE WITNESS:  You prepay a dollar amount, and

2     you're debited as you fly.

3          THE COURT:  I see.  So if you flew an expensive

4     flight, there would be a bigger debit and --

5          THE WITNESS:  Correct.

6          THE COURT:  I see.  And it comes, I presume, with

7     some sort of corporate discounts, or what have you, depending

8     on the deal.

9          THE WITNESS:  It comes with a bunch of premium

10    services and perks.

11         THE COURT:  I see.

12         THE WITNESS:  And it gives you the ultimate

13    flexibility and service, yeah.

14         THE COURT:  Okay.  Go ahead.

15         MS. BALDWIN:  Thank you, Your Honor.

16    BY MS. BALDWIN:

17    **Q.**  Mr. O'Connell at the time was the managing director of

18    sales for American?

19    **A.**  I'm sorry; what did you say his title was?

20    **Q.**  Managing director of sales for American.

21    **A.**  Noel held a position.  I'm not sure at the time what his

22    position was, but I don't think it was director of sales.

23    **Q.**  Would he have been involved in corporate customers sales

24    and contracting?

25    **A.**  He would be involved in the contracting side of the

1    business, yes.

2    **Q.**   Okay.  If you look at the second paragraph on the second

3    line, Mr. O'Connell writes, "Equally, the NEA has a lot to

4    fix on the customer and airport delivery seamless

5    proposition"; is that right?

6    **A.**   That's what he wrote.

7    **Q.**   So in response to complaints from multiple corporate

8    customers, Mr. O'Connell was expressing that the NEA was not

9    delivering on its promise of a seamless customer experience?

10   **A.**   I guess that's what his opinion was in this e-mail.

11   **Q.**   And this is approximately ten months after the parties

12   starting implementing the NEA; is that right?

13   **A.**   Yes.

14             MS. BALDWIN:  You can put that document aside.

15             At this time, Your Honor, plaintiffs pass the

16   witness.

17             THE COURT:  Okay.  Cross-examination?

18             Go ahead.

19             MS. MALTAS:  Thank you, Your Honor.

20   **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT AMERICAN AIRLINES**

21   BY MS. MALTAS:

22   **Q.**   Good morning, Mr. Swartz.

23             Before we get started, just a couple of background

24   questions about your responsibilities.  First of all, is your

25   team corporate sales in Boston responsible for determining

1  pricing?

2  **A.**  No.

3  **Q.**  Are you responsible for approving discounts?

4  **A.**  No.

5  **Q.**  Is your team responsible for determining schedules?

6  **A.**  No.

7  **Q.**  So plaintiffs asked you a number of questions about

8  competition in Boston, and we'll start there.  So thinking

9  about the period when you've been responsible for corporate

10  sales in Boston, who have been American's primary competitors

11  for corporate sales accounts?

12  **A.**  So when we contract with -- my team manages some of the

13  larger corporations in each of these regions.  And I cover

14  New England, greater Washington, and Pennsylvania now.  But

15  specifically in Boston, it's some of these largest

16  corporations.  And we go head-to-head into these contracts.

17         Our biggest competitors are the legacy airlines,

18  like United and Delta, because most of these corporations

19  have global footprints.  They might be headquartered here in

20  Boston and they might have a lot of travelers out of Boston,

21  but they also have offices around the world.  So when we go

22  head-to-head in corporate accounts, it's the -- it's the

23  Deltas of the world, the Uniteds that we're up against,

24  fighting for primary and secondary positions because we have

25  the -- or they have, as well as us, the international and

1    domestic routes that these -- that can service their business

2    customers.

3    **Q.**   So plaintiffs focused a lot on JetBlue.  Do you consider

4    JetBlue to be a competitor for corporate accounts?

5    **A.**   Again, anyone that competes --

6              THE COURT:  Now, or back in 2019?

7              MS. MALTAS:  Back in 2019.

8              THE COURT:  Okay.

9              THE WITNESS:  I consider, again, on the corporate

10   routes, JetBlue's a great regional airline.  They fly

11   domestically here in Boston.  They're well known.  But,

12   again, when we go up against these big corporate companies

13   and fight for a travel position in there, it's the Deltas and

14   Uniteds of the world that we're up against.  I mean, if

15   you're comparing apples to apples, that's who we're going

16   after.

17   BY MS. MALTAS:

18   **Q.**   As between Delta and United, who do you consider to be

19   your largest competitor in Boston?

20   **A.**   By far, it's Delta.

21   **Q.**   And in your experience, what makes Delta a formidable

22   competitor for corporate customers, specifically in Boston?

23   **A.**   They just have a bigger network, both internationally and

24   domestic.  And, again, I've been with American for 13 years.

25   Since I started at American, Boston became a less competitive

1    hub for us because we're only flying into our hubs.  And we

2    had very few point-to-point destinations outside of those

3    hubs, compared to a Delta, that had an extensive network,

4    both internationally and domestically.  So it was very hard

5    to compete against them for local Boston accounts that were

6    headquartered here.

7    **Q.**  And during this period that you mentioned American had

8    few point-to-points and was mainly flying to the hubs, what

9    was Delta doing?

10   **A.**  You know, they had long since put a stake in the ground

11   here in Boston and were significantly increasing their

12   network.  It was well publicized.  They put a tremendous

13   amount of press out there about it, and they backed it up

14   with a lot of new additional international and domestic

15   flights.

16   **Q.**  And how was American fairing in this competition against

17   a growing Delta?

18   **A.**  We were, again, like -- my job became more of not trying

19   to win new business and grow it; it became about how do we

20   put a -- jump into the trenches and keep from losing

21   business.

22   **Q.**  There were a few questions about how contracting worked,

23   and particularly there was a mention to a tertiary position

24   in the contract.  Can you just explain the concept of

25   positions on the contract?

1   **A.**   Sure.  So when we compete in a contract account,

2   typically these corporations will have a couple primary

3   carriers.  They'll have some secondary, and then tertiary

4   would be kind of the regional, smaller, that can fill some of

5   the niche point-to-point destinations that might be a local

6   need or, you know, an ability to help fill out their network

7   for their corporate travelers.

8   **Q.**   Could you please turn in your binder, and we'll go ahead

9   and introduce DX47, which should already be in evidence.

10   **A.**   Yes.

11   **Q.**   And, Mr. Swartz, we already looked earlier at a

12   competitive change report.  Generally, what are competitive

13   change reports?

14   **A.**   It's internally our team puts out just some latest

15   updates, not only what we're doing, adding, decreasing,

16   adding frequency, but also the competition.  Just kind of a

17   consolidated update.  I figure it's biweekly.

18   **Q.**   And I think this might actually be a different offshoot

19   of the same competitive change report that plaintiffs already

20   showed you.  Could we look at industry -- under the industry,

21   highlights, "DL published service on three new Boston routes

22   and announced a fourth."  Do you see that?

23   **A.**   I do.

24   **Q.**   And let's go ahead and look at your response to this

25   e-mail.

**A.**   Okay.

**Q.**   You respond, "Team, no surprises with recent
announcements.  DL adding flights in Boston.  We need to stay
close to our customers."  What did you mean by that?

**A.**   Again, you know, as a sales team leader, I was, you know,
another example of Delta adding frequency in the market just
becoming harder and harder to compete against.  And the one
thing that really separated us, I felt, in the marketplace
was our customer service and support to our traveler
managers.  And I was trying to emphasize, hey, stay close to
your customers.  Anything we can provide in value with
support might separate us & help keep us in the game versus
it's hard to compete when a competitor just continues to grow
and grow.

**Q.**   And were you concerned at all about this growth by Delta?

**A.**   I was.  As a sales leader, a manager, it just becomes
harder and harder to compete if the network is much bigger or
greater than what you're offering customers.

**Q.**   Let's take a look now in your binder at DX21, which
should also be in evidence.  And, Mr. Swartz, I would like to
draw your attention to your e-mail on the first page, which
is in the middle.

**A.**   Okay.

**Q.**   And what's the date of this e-mail?

**A.**   It is April 22, 2019.

1    **Q.**  And in here in this part that's highlighted, you write,

2    "In short term, we're in for a dog fight in transatlantic,

3    the DL/VS.  Our smaller footprint in DOM market will make it

4    a harder sell and to keep our current position in BOS-LHR

5    market."  So just to start, what do you mean by "DL/VS"?

6    **A.**  That is Delta/Virgin.

7    **Q.**  Okay.  And what is "DOM"?

8    **A.**  Domestic market, or domestic flights.

9    **Q.**  And what did you mean with your statement that the

10   smaller footprint in the domestic market will make it a

11   harder sale to compete against Delta and Virgin?

12   **A.**  So again, Delta-Virgin is an alliance similar to what we

13   have with British Airways and American.  But with Delta

14   building up and having a significant advantage with us

15   domestically out of Boston, you know, we had a strong

16   competitive offering with American and British Airways, but

17   if we continue to fall behind domestically, it just made the

18   Delta proposition to corporate customers so much greater,

19   because they could serve them well both transatlantic, as

20   well as domestic.

21   **Q.**  And the paragraph continues, "Long-term, expect our

22   overall market share to slip in Boston over the next few

23   years if we keep same domestic footprint and BOS-LHR becomes

24   more competitive.  We'll be fighting to keep AA at a

25   secondary or even tertiary position.  The reality of Boston."

1                And what did you mean by this?

2    **A.**   Mitch Goodman is network planning.  I was pleading

3    regularly to network planning to help us in the Boston market

4    to create more point-to-point destinations, beef up our

5    network.  We were becoming uncompetitive compared to Delta,

6    who, again, is our major competitor in this marketplace when

7    going against corporate customers.

8    **Q.**   And, Mr. Swartz, we've heard throughout this trial that

9    American is the largest airline in the world and has a

10   massive global network.  Why can't you just sell to Boston

11   corporates with that global network?

12   **A.**   I mean, it is a fact we are the largest network out

13   there; but unfortunately, specifically in Boston, we weren't.

14   And it just becomes harder when we go against these big --

15   big -- going -- you know, trying to win business against

16   corporate accounts, specifically those headquartered here in

17   Boston, that have a lot -- a lot of corporate travelers that

18   are based here in Boston.

19             It's about the network.  Business travelers want to

20   fly direct.  They don't want to connect.  And Delta, when you

21   compare apples to apples, had the same premium product, had

22   the same clubs we do in the airport, but they had the direct

23   flights.  And it just was becoming harder and harder for my

24   team to compete without the direct, or without the network.

25   **Q.**   So plaintiffs showed you a number of e-mails about

1    JetBlue and I just want to be clear.  Do you have any

2    customers where you are only concerned about competition from

3    JetBlue?

4    **A.**   No.

5    **Q.**   Plaintiffs also asked you about the Boston to Rochester

6    route.  Just generally, how important is the Boston to

7    Rochester route in terms of your sales to corporate

8    customers?

9    **A.**   Hey, we -- in Boston, we -- we wanted every piece of

10   business we could.  I mean, that's my job as a salesman.  But

11   if I had to pick and choose, Rochester-Boston would probably

12   be very low on the totem pole as far as size and scope.  I

13   mean, it's a -- we fly there.  We flew it on a very small

14   regional.  We were looking for much bigger routes.

15   **Q.**   So plaintiffs also asked you a few questions about the

16   point-to-point routes that American announced in Boston prior

17   to COVID.  And I -- you described this pretty eloquently, I

18   think, but were you excited about American's decision to add

19   those routes from Boston?

20   **A.**   I was excited about any new route that came into Boston,

21   and I tried to, you know, relay it to the team.  It was a

22   sign that, you know, it wasn't a 20, 30 flights I wanted, but

23   any new flight was just another flight that we could go out

24   and sell.  And so -- and I don't know if network planning

25   just was throwing me a flight to appease me for my multiple

1   reachouts to network planning for new flights.

2   **Q.**  And did you really think at this point, when American

3   added those few point-to-point flights, that Boston was back?

4                    MS. BALDWIN:  Objection, Your Honor.  Leading.

5                    THE COURT:  Overruled.

6                    THE WITNESS:  So -- I'm sorry?

7                    THE COURT:  You can answer the question.

8                    THE WITNESS:  Can you repeat the question again?

9   BY MS. MALTAS:

10  **Q.**  Sure.  Did you really feel that when you received these

11  few point-to-point routes in Boston, that Boston was back?

12  **A.**  I did not.  I thought we were happy to get those two and

13  make them successful, and that was that.

14  **Q.**  In your view, were these new point-to-point routes

15  sufficient to allow American to compete with Delta's network

16  in Boston?

17  **A.**  Not at all.

18  **Q.**  And was Delta still growing, too, during this time?

19  **A.**  Without a doubt.

20  **Q.**  Were you aware at this time of any concrete plans to

21  expand in Boston beyond these few point-to-point routes?

22  **A.**  No.

23  **Q.**  All right.  Let's take a look at DX76, please.

24  **A.**  Okay.

25  **Q.**  Let's give it a second to pull up.

**A.**   Okay.

**Q.**   And just generally, what is this document?

**A.**   Is this the one that says "Austin Intel"?

**Q.**   This is called "Austin Intel," that's right.

**A.**   Correct.  This was an e-mail from Esther Maldonado, who was a managing director covering the Southwest for American.

**Q.**   And what is Mrs. Maldonado reporting to you?

**A.**   She said that we learned this morning Delta has been in contact with corporate customers in Austin and requesting letters of support to start SJC, BOS, SAN, NYC, and RDU, Portland and LA Basin.

**Q.**   And let's take a look at your response, please, to Mrs. Maldonado.

**A.**   Yeah.  I reply, "Thank you for the market intelligence. Delta is getting very aggressive with new domestic growth."

**Q.**   Were you surprised that Delta was also considering announcing a new Boston to Austin route?

**A.**   No, not at all.  I felt like they were going to match us. Anything we announced, they were going to match the same.

**Q.**   And what did you mean by Delta is getting very aggressive with new domestic growth?

**A.**   They continued to grow their footprint in Boston and from everything I saw, published they had -- they wanted to make it a major hub.

**Q.**   So we've been talking about competition between American

1    and its competitors before the NEA.  So let's focus on the

2    NEA now.

3                In your experience, how has the NEA affected

4    American's ability to compete for corporate customers in

5    Boston, if at all?

6    **A.**   I think it's helped tremendously.  It just gives more

7    direct-direct, point-to-point destinations, bigger network.

8    It allowed us to compete or at least offer some alternatives

9    and a bigger network when we go out to fight for a position

10   with our corporate customers.  It's made a big difference.

11   **Q.**   With regard to that bigger network, has American added

12   more flights out of Boston to more destinations because of

13   the NEA?

14   **A.**   Yes.

15   **Q.**   And how, if at all, has that helped you compete in

16   Boston?

17   **A.**   The network is key.  Network is key.  When people want to

18   fly these days, people want to fly direct.  And it's even

19   more so with the corporate business traveler.  They don't

20   have time to connect.  They much prefer to fly direct.  So it

21   just gives more direct destinations that we can offer with

22   our combined Northeast Alliance.

23   **Q.**   And how did these new routes that have been announced

24   since the NEA compare to the handful of point-to-points that

25   were announced in 2019?

1    **A.**   Significant difference.

2    **Q.**   Has the NEA had any effect on American's transcontinental

3    product out of Boston?

4    **A.**   No.

5    **Q.**   The trans-con?

6    **A.**   The trans-con, correct -- oh the trans-con?  Yes.  The

7    trans-con -- so trans-con is basically considered Boston to

8    LAX.  And so my personal opinion, it has been a superior

9    product to our competitors out there, so it's been a real

10   boost.  So now our corporate customers can either fly on our

11   321T, which is an incredible aircraft, three cabin; or they

12   have the alternative to fly on JetBlue's Mint product.  So I

13   feel like it's a real competitive advantage for us, compared

14   to the competition.

15   **Q.**   Do you include the NEA in your messaging to customers?

16   **A.**   I'm sorry?

17   **Q.**   Do you include the NEA in your messaging to customers?

18   **A.**   Yes.  Of course.

19   **Q.**   And what's your sales pitch to corporate customers about

20   the NEA?

21   **A.**   It's -- we can offer your corporate customers a lot more

22   point-to-point destinations whether you fly on us or

23   American.  It's significantly -- we can add to our network

24   out of Boston.  We can get you where you need to be and

25   direct.

1  **Q.**  Did you conduct any outreach to corporate customers as

2  the NEA was announced and implemented?

3  **A.**  Sure.  We were excited to reach out to customers.

4  **Q.**  And why is it important for American to reach out to

5  corporate customers about the NEA?

6  **A.**  It gave them a whole -- it gave us a much bigger network

7  that we could really promote to corporate customers,

8  something that we hadn't seen for years, and we were really

9  excited, especially everyone on the sales team.

10  **Q.**  Let's take a look now at DX49, which is in your binder

11  and will be up on the screen.

12            MS. MALTAS:  Oh, actually, don't put it up on the

13  screen.  This has an 805 objection.  But I understand that,

14  pursuant to our prior discussions, that this can be admitted

15  without the truth of the matter asserted for the customer

16  comments.

17            MS. BALDWIN:  Correct, Your Honor, as long as the

18  third-party statements are not offered for the truth, that

19  resolves our --

20            THE COURT:  Admitted with that limitation.

21            (Defendants' Exhibit No. 49 admitted into

22            evidence.)

23            THE COURT:  What's the exhibit number again?

24            MS. MALTAS:  DX49.

25

BY MS. MALTAS:

Q.   And, Mr. Swartz, this is one where the customer name has been redacted.  So, again, I'll caution you not to reveal that name.

A.   Uh-huh.

Q.   So without referring at all to the customer name in talking about this e-mail, what's the date of this e-mail?

A.   8/24/21.

Q.   Okay.  And this is an e-mail we'll focus from Lynor Carroll.  Who is Ms. Carroll?

A.   She has a -- she is an account manager that manages some corporate accounts on my team based out of Boston.

Q.   And if we can focus our attention on the fourth bullet, please, from Ms. Carroll.

A.   Yes.

Q.   Again, not saying the customer name, but the customer "truly values our partnership.  The overall offering was enhanced by adding all global POS and most especially with our JetBlue partnership.  AA-JB/B6 now covers all of our travel needs.  It's the perfect fit."

         What did you understand Ms. Carroll to mean by that?

A.   That this particular corporate customer was very excited that we had a larger network out of Boston to meet all their corporate traveler needs.

1   **Q.**  And did American win this opportunity with this corporate

2   customer?

3   **A.**  We did.

4   **Q.**  In your opinion, did the NEA help American win this

5   opportunity?

6   **A.**  Yes, of course.

7   **Q.**  Plaintiffs' counsel also --

8            MS. MALTAS:  You can take this down.

9   BY MS. MALTAS:

10  **Q.**  Plaintiffs' counsel also asked you about seamlessness.

11  And as someone who is responsible for selling the NEA to

12  corporate customers, is seamlessness a priority for you?

13  **A.**  Yes.

14  **Q.**  And what are you doing in terms of your selling and your

15  communications regarding seamlessness?

16  **A.**  So, to be perfectly honest, it is -- seamlessness

17  where -- it's not 100 percent perfect, but with the size of

18  this alliance, I can tell you, 100 percent, we are dedicated

19  to making it seamless.  It is night and day from when we

20  first rolled this out, and we're spending a lot of time,

21  energy, and money on it, but it takes time.

22            Systems have to be combined.  You're talking about

23  two different airlines.  I'm hearing from the corporate

24  customers that they feel it's getting better every day, and

25  we have made substantial progress, and eventually we will

1    make it seamless.

2    **Q.**  Finally, in your experience, have you seen any reaction

3    from Delta here in Boston from the NEA?

4    **A.**  I --

5              MS. BALDWIN:  Objection, Your Honor.  Foundation.

6              THE COURT:  Overruled.

7              THE WITNESS:  I think they continue to add new

8    flights.  You know, they continue to -- I think they've

9    become more aggressive since the Northeast Alliance and see

10   us as a true competitor now, where I don't believe they

11   thought that in the past.

12   BY MS. MALTAS:

13   **Q.**  And let's take a look at DX77, which I believe has

14   already been introduced into evidence.  And this one, I

15   apologize, is very hard to read, just because of how it was

16   produced.  So if we could just take a look at this e-mail

17   that's from Martin Schneider to you, Mr. Swartz.

18   **A.**  Let me get out my magnifying glass.

19   **Q.**  Yes.  Sorry.

20   **A.**  I see it on the screen better here.  Okay.  Yes.

21   **Q.**  All right.  And could we actually -- if you can just flip

22   through that and just tell us what Mr. Schneider had sent to

23   you?

24   **A.**  So he's talking about flights that Delta had announced

25   with direct flights out of Boston to Tel Aviv and Athens,

1    Greece.

2    **Q.**   And turning to your response, you say, "I believe it's a

3    direct response to our NEA announcement.  It's proof that the

4    NEA is creating more choices and options for customers."  And

5    what were you referring to?

6    **A.**   So I was referring to -- we are offer -- had announced

7    and already put into the market prior to that direct flights

8    out of JFK to Tel Aviv and Athens.  And the premise of the

9    Northeast Alliance was to help funnel traffic both from

10   American and JetBlue into JFK to help support our two new

11   flights.

12           So I saw that as Delta, again, seeing that and

13   one-upping us in Boston and implementing direct flights out

14   of Boston to those two new destinations.  I didn't -- it was

15   my personal opinion that those didn't come out of the blue,

16   and that was a direct response to our JFK and more

17   specifically our Northeast Alliance on how JetBlue would

18   funnel passengers into JFK to support our international

19   flights to those two destinations.

20           MS. MALTAS:  Thank you so much, Mr. Swartz.

21           I pass the witness.

22           THE COURT:  Any redirect?

23           MS. BALDWIN:  Yes, Your Honor.

24

25

**REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS**

BY MS. BALDWIN:

Q.  Mr. Swartz, I want to start with the discussion you had
with Ms. Maltas about corporate customers.  During your
tenure at American, are you aware of American having any
customers whose only other corporate contract was with
JetBlue?

A.  I would say -- I couldn't name the customer, and if there
was, it would be a fraction of a percent.

Q.  All right.  Well, let's turn to PX0194?

        MS. BALDWIN:  Your Honor, this has been admitted
into evidence and contains redactions.

        THE COURT:  All right.  What's the number again?

        MS. BALDWIN:  194.

        THE COURT:  194.  Thank you.

        MS. BALDWIN:  Yes, Your Honor.

BY MS. BALDWIN:

Q.  And this is an e-mail, if you look at the very top, from
a Ms. Brenda Whalen to you and Ms. Reichard, right?

A.  Yes.

Q.  And you're discussing shuttle markets regarding a
corporate customer whose name has been redacted, right?

A.  Correct.

Q.  And in the very first line of her e-mail, Ms. Whalen
writes that "It's American and JetBlue today," right?

1   **A.**   Yes.

2   **Q.**   And, in fact, if you go to Ms. Reichard's prior e-mail,

3   Ms. Reichard writes that if the manager for this corporate

4   customer -- sorry -- with the redactions, it's a bit

5   difficult.  How -- whether it's just American and JetBlue

6   will compare to how -- to what would happen if Delta was

7   added back into that corporate customer's contract, right?

8   **A.**   Yes.

9   **Q.**   Okay.  Let's now turn to PX197.

10          MS. BALDWIN:  And, Your Honor, this is in evidence

11   and contains redaction.

12          THE COURT:  Okay.

13   BY MS. BALDWIN:

14   **Q.**   And here you're talking with your colleagues at American

15   about how to prevent that same corporate customer from adding

16   Delta back into its corporate contract, right?

17   **A.**   Yes.

18   **Q.**   And this is a pretty large Boston-based corporate

19   customer, right?

20   **A.**   There -- they're a corporate customer.

21   **Q.**   Okay.  Let's go to the e-mail from you on the bottom of

22   the first page at 6:44 a.m.  Do you see that?

23   **A.**   The bottom of the first page?  Yes, I do.

24   **Q.**   And the second sentence of your e-mail, you write that

25   JetBlue is going to 230 daily flights in the next 12 months,

1    and Delta was announcing Boston as its new hub, right?

2    **A.**   Correct.

3    **Q.**   And you call this "unfortunate effects of the new Boston

4    market," right?

5    **A.**   Yes.  That's what I said.

6    **Q.**   So fair to say that you are concerned about JetBlue

7    getting share of your corporate customer contracts prior to

8    the NEA?

9    **A.**   Again, any competitor is -- anyone that's flying routes

10   that we're flying against and competing in a contract is a

11   competitor.

12   **Q.**   And following the industry of the NEA, JetBlue will no

13   longer be a competitor, right?

14   **A.**   No, that -- the Northeast Alliance is where we work

15   together.

16   **Q.**   Right.  So for Boston-based markets, JetBlue will no

17   longer compete for corporate customers, right?

18   **A.**   We will be -- yes.  It's an alliance.

19   **Q.**   So no longer competing, right?

20   **A.**   That is not correct.  We do compete internationally and

21   as well as with corporate customers that might be based in

22   Boston that fly outside of the Northeast Alliance.  So it's

23   really unique that we work together on -- with this alliance

24   with -- and then outside the alliance, we're archenemies.

25   **Q.**   Okay.  I'd like to turn back to DX21 that Ms. Maltas

1    asked you about earlier.

2           MS. BALDWIN:  Do we have that?  21?

3    BY MS. BALDWIN:

4    Q.  Do you recall speaking about this e-mail, Mr. Swartz?

5    A.  I'm sorry.  You're going to have to give me a minute.

6    It's PX21?

7           THE COURT:  DX.

8    BY MS. BALDWIN:

9    Q.  DX21.

10   A.  DX.

11   Q.  D for Delta, maybe?

12   A.  I need to switch my binder.

13   Q.  I apologize.

14   A.  That's all right.

15          DX21.  I have it.  Thank you.

16   Q.  Let's go to the very first in time e-mail in this thread.

17   You sent it to Mr. Mitchell Goodman and cc'd Ms. Reichard at

18   6:47 a.m.?

19   A.  Yes.  I see that.

20   Q.  And if you go to the second line, you're talking about

21   competition between Boston and London-Heathrow, right?

22   A.  Correct.

23   Q.  And you say that Boston-London Heathrow has become highly

24   competitive with Delta and Virgin and especially now with

25   JetBlue's recent announcement of flying Boston to London in

1  2020/2021, right?

2  **A.**  That's what I wrote.

3  **Q.**  Okay.

4  **A.**  And that transatlantic piece, Boston to London, is not in

5  the Northeast Alliance.

6  **Q.**  Well, it is for the American side, right?

7  **A.**  Yes.

8  **Q.**  Okay.  Let's go to the first page, this document.

9  There's an e-mail that you sent at 8:27 a.m. in the middle of

10  the page to Mr. Goodman, Ms. Reichard, and it looks like you

11  also cc'd yourself.  Do you see that?

12  **A.**  8:27?

13  **Q.**  Also displayed on the screen if that's easier.

14  **A.**  Yes, I see that.  It's easier for me to read it out of

15  the binder.  Sorry.

16  **Q.**  That's totally fine.

17        The second sentence of your e-mail, you write that

18  transatlantic competition was growing and was expected to get

19  worst -- I imagine you meant worse there -- with JetBlue

20  coming into the market in 2020/2021, right?

21  **A.**  Yes.

22  **Q.**  And you added that Delta, Virgin, and JetBlue's overall

23  footprint was growing both domestically and internationally

24  in Boston, right?

25  **A.**  Yes.

1    **Q.**  And then you added that the American-British

2    Airways-Boston international stronghold is going away, and

3    that that stronghold had kept American in a dominant Boston

4    position, right?

5    **A.**  Where are you reading that?  Sorry.  Okay.  I see that,

6    yes.

7    **Q.**  Okay.  And this is April of 2019?

8    **A.**  It is.

9    **Q.**  Mr. Swartz, only if you know, is your alliance with the

10   Atlantic joint business -- do you know what percentage that

11   encompasses of the London market, Boston-London market?

12   **A.**  I don't know.

13   **Q.**  Okay.  And so here, in addition to being concerned about

14   JetBlue, you're also ringing the alarm of it about Delta's

15   presence between Boston and Heathrow; is that right?

16   **A.**  That is correct.

17   **Q.**  And Delta did this without any sort of domestic alliance,

18   right?

19   **A.**  Yes.  They had a bigger footprint all along and

20   continuing to grow in Boston.

21   **Q.**  And that growth was organic?

22   **A.**  Yes, as well as I think they announced some additional

23   flights with some partners out of Boston, as well.

24   **Q.**  International partners, right, Mr. Swartz?

25   **A.**  That is correct.

1   **Q.**  So here it's not that American couldn't compete; it's

2   just that American would need to invest in organic growth

3   like Delta did, right?

4            MS. MALTAS:  Objection.  Lacks foundation.

5            THE COURT:  Overruled.

6            THE WITNESS:  Could you repeat the question?

7   Sorry.

8   BY MS. BALDWIN:

9   **Q.**  Sure.  So what we're seeing here is that it's not that

10  American is unable to compete, it's just that competing in

11  Boston would mean American needs to invest in organic growth

12  in Boston, right?  Like Delta did?

13  **A.**  We would have to add new flights, yes, I guess.

14  **Q.**  And American could do that organically on its own, right?

15           MS. MALTAS:  Objection.  Lacks foundation.

16           THE COURT:  Sustained.

17  BY MS. BALDWIN:

18  **Q.**  We saw in fall of 2019 that American had plans in Boston

19  to grow?

20  **A.**  Are you referring to the Austin flight?

21  **Q.**  I'm referring to PX89, which showed a large increase, I

22  believe 13 to 14 percent of the number of flights out of

23  Boston.  Do you recall that?

24  **A.**  So you're referring to flights, not point-to-point

25  destinations.

1    **Q.**   So let's turn back to PX89.

2    **A.**   Okay.

3    **Q.**   Once again, this is a year-over-year growth plan,

4    comparing what American flew in March of 2019 to what it had

5    loaded in the scheduling system for March of 2020, right?

6    **A.**   Yes.

7    **Q.**   And it's prior to entry of the Northeast Alliance?

8    **A.**   Yes.

9    **Q.**   And if you look at the Boston row, you'll see that

10   there's an increase in flights of 13.8 percent, right?

11   **A.**   Oh, the Boston row.  Yes.

12   **Q.**   And an increase of 14 percent in the number of seats

13   flying out of Boston for American, right?

14   **A.**   Correct.  So your -- more frequency, more seats, yes.

15           MS. BALDWIN:  Okay.  No further questions,

16   Your Honor.

17           THE WITNESS:  And I think that -- sorry.

18           THE COURT:  Go ahead.

19           MS. MALTAS:  Just briefly, Your Honor.

20   **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT AMERICAN AIRLINES**

21   BY MS. MALTAS:

22   **Q.**   Mr. Swartz, why do you draw a distinction in terms of

23   your sales between flights and destinations?

24   **A.**   So from a salesperson's point of view in our team,

25   point-to-point destination is much more critical.  That is

1    another, you know, destination in our toolbox that we can

2    offer corporate customers.

3           Adding additional flights is great.  And I think,

4    you know, based on what we just talked about, about the

5    LaGuardia, I mean, we didn't have a lot of flights, so it

6    doesn't take that many more to make a bigger mark in the

7    percentage.

8           So frequency is great, but at the end of the day,

9    what the customer wants, and our corporate traveler, is the

10   ability to fly direct.  That's the most critical thing for me

11   as a salesperson and my team going out to these corporate

12   customers.

13          MS. MALTAS:  Thank you so much.

14          MS. BALDWIN:  Briefly?

15          THE COURT:  Yep.  Go ahead.

16   **FURTHER REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS**

17   BY MS. BALDWIN:

18   **Q.**  Mr. Swartz, earlier --

19          THE COURT:  Whoa, wait.  Ordinarily, it's just one

20   two, one, two.  So I'm just --

21          MS. BALDWIN:  That's okay, then.

22          THE COURT:  Okay.  You're done, right?

23          MS. MALTAS:  Yes, Your Honor.

24          THE COURT:  All right.  Thank you very much.

25   You're excused.

```
1              THE WITNESS:  All right.  Thank you.

2              THE COURT:  Have a good day.

3              Next?

4              Only because, otherwise, Ms. Baldwin, I think we

5    would be here a long time.

6              MS. BALDWIN:  No problem.  Understood, Your Honor.

7              THE COURT:  If there's something, like -- I will

8    say to all of you, you know, if there's anything unusual on a

9    particular witness, one unusual circumstance, I might think

10   about it.  But, otherwise, it's just the two rounds.  But

11   kudos for trying.

12             MS. BALDWIN:  You miss 100 percent of the shots you

13   don't take, right?

14             MR. JONES:  Your Honor, plaintiffs next call David

15   Fintzen of JetBlue.

16             THE COURT:  All right.

17             MR. JONES:  And my colleague, Mr. Congdon, will be

18   conducting the examination for the Department of Justice.

19             THE COURT:  Mr. Congdon?

20             MR. CONGDON:  Congdon, C-o-n-g-d-o-n.

21             THE COURT:  I remember you.  You were the one

22   worried Mr. Jones was going to claw back something you said.

23             MR. CONGDON:  Hopeful.  Hopefully, he would not

24   have to.

25             THE DEPUTY CLERK:  Mr. Fintzen, if you could please
```

1    stand and raise your right hand.

2              (Witness duly sworn.)

3              THE DEPUTY CLERK:  And can you please state your

4    name for the record.

5              THE WITNESS:  David Fintzen, F-i-n-t-z-e-n.

6              THE COURT:  All right.  Go ahead.

7              MR. CONGDON:  Thank you, Your Honor.

8                          **DAVID FINTZEN**

9         having been duly sworn, testified as follows:

10        **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS**

11   BY MR. CONGDON:

12   **Q.**  Good morning, Mr. Fintzen.

13   **A.**  Good morning.

14   **Q.**  Jack Congdon on behalf of the United States for

15   plaintiffs.

16             Mr. Fintzen, you should have a binder in front of

17   you, which we will refer to during your examination, and I'll

18   let you know where and when to turn to that.  Okay?

19             Mr. Fintzen, you're currently the vice president

20   for the Northeast Alliance at JetBlue; is that right?

21   **A.**  That's correct.

22   **Q.**  And when did you become vice president of the Northeast

23   Alliance at JetBlue?

24   **A.**  I became vice president of the Northeast Alliance in

25   April of 2021.

1    **Q.**   Okay.  And prior to this position, you were the vice

2    president for investor relations at JetBlue; is that right?

3    **A.**   Yeah, that's correct.

4    **Q.**   Can you describe your role as -- your responsibilities as

5    vice president of investor relations, please?

6    **A.**   As vice president of investor relations, I oversaw the

7    sort of day-to-day interaction that we had, that JetBlue had

8    as a public -- publicly traded company with the investment

9    community -- so our investors, our owners, potential

10   investors, equity research analysts, sort of the whole

11   community at large.

12   **Q.**   And you worked in investor relations from the time you

13   joined JetBlue in 2016 until April of 2021; is that right?

14   **A.**   That's correct.

15   **Q.**   And prior to joining JetBlue, you worked as an analyst at

16   Barclays; is that right?

17   **A.**   That's correct.

18   **Q.**   And in that role, you covered the airline industry,

19   correct?

20   **A.**   Correct.  That was an equity research analyst covering

21   primarily the US airline industry.

22   **Q.**   Thank you.

23         Mr. Fintzen, you were involved in JetBlue's

24   evaluation of the Northeast Alliance, correct?

25   **A.**   That's correct.

1    **Q.**  And just in terms of timing, that began while you were

2    still vice president of investor relations; is that right?

3    **A.**  Yeah, that began around April of 2020, when a group of us

4    were kind of brought out of our day-to-day role and brought

5    to work on "Project Connie," as it was called.

6    **Q.**  Okay.  And are you referring to the creation of the clean

7    team there, Mr. Fintzen?

8    **A.**  Yeah, the clean team that would evaluate what became

9    known as the Northeast Alliance.

10   **Q.**  And you led that clean team for JetBlue, correct?

11   **A.**  That's correct.

12   **Q.**  And in that role, you sometimes referred to it as the

13   "working lead for the clean team"; is that right?

14   **A.**  I think in sort of some of the governance setup, that

15   might have been the terminology.

16   **Q.**  And you directed the work of other clean team members,

17   correct?

18   **A.**  Correct.

19   **Q.**  Now, none of the members of the clean team, including

20   yourself, were part of JetBlue's network planning department,

21   correct?

22   **A.**  No.  We were -- we were -- we came from other parts of

23   the organization.

24   **Q.**  And that was part of the purpose, right, to keep the

25   network planners separate because you would be interacting

1   with American, correct?

2   **A.**   Correct.  We would -- we brought the team, including

3   myself, of five individuals.  We could be dedicated, really,

4   to the work of Project Connie, separated from our -- sort of

5   brought out of our day-to-day responsibilities, and then

6   brought sort of a mix of commercial and strategy backgrounds

7   to do that work -- but we could work with proprietary

8   information when necessary with American's clean team.

9   **Q.**   And as working lead for the clean team, you reported to

10  Scott Laurence; is that right?

11  **A.**   Scott Laurence was the -- sort of the lead governance.

12  Yes.

13  **Q.**   Now, you mentioned it I think, but American had its own

14  clean team, correct?

15  **A.**   Correct.

16  **Q.**   And you worked with those members of American's clean

17  team?

18  **A.**   Yes.  We -- in the clean team portions, we were engaged

19  in discussing and doing with the American folks.

20  **Q.**   And the clean team at JetBlue worked to construct the

21  nature of what ultimately became the Northeast Alliance,

22  correct?

23  **A.**   Yeah, I mean, our -- our responsibility or the work we

24  were doing was to take sort of a concept of what became known

25  as the Northeast Alliance and sort of start to really flesh

1      it out and sort of see how it could work.

2              So it was kind of that, you know, due diligence,

3      however you want to describe it, but kind of working through

4      the different components and understanding them, to some

5      degree.

6      **Q.**  Okay.  And you've described it as due diligence, correct?

7      **A.**  Yeah, that's one way to think about it.

8      **Q.**  And as part of that due diligence, the clean team needed

9      to make sure the Northeast Alliance was commercially viable

10     and fit JetBlue's strategic goals, correct?

11     **A.**  Well, that decision ultimately was what the senior

12     leadership team and the board would ultimately decide.  Our

13     role was to help sort of do the work and be an input to that

14     business, that business decision process.

15     **Q.**  But you understood that your work would be one of the

16     inputs to that decision, correct?

17     **A.**  That work would be one of the inputs, correct.

18     **Q.**  Now, as part of its evaluation of the Northeast Alliance,

19     your clean team developed a joint network schedule, correct?

20     **A.**  Correct.  One of the parts of the NEA we needed to at

21     least sort of directionally understand is what could a --

22     what could a network sort of potentially look like.  So that

23     was one of the things we did in the clean team.

24     **Q.**  That was part of the due diligence process?

25     **A.**  Yeah.

1    **Q.**  And this joint network schedule identified routes that

2    would make sense for JetBlue and American to fly within the

3    Northeast Alliance, correct?

4    **A.**  Correct.  You had to understand sort of how a network

5    could look sort of in whole and compete in whole.  You did

6    have to have individual routes as a part of that.

7    **Q.**  And the jet -- joint network schedule also identified the

8    frequencies with which American and JetBlue might serve those

9    routes within the Northeast Alliance, correct?

10    **A.**  You certainly had to have sort of a preliminary start in

11    what frequencies could look like.  I mean, that -- to sort of

12    see the network in its entirety and how it would compete, you

13    had to make some -- you had to have some working assumption

14    around frequencies.

15    **Q.**  But it was just an assumption, correct?

16    **A.**  Well, it was just sort of a preliminary workaround.  It

17    wasn't an implementation exercise.  It was really about

18    developing an understanding, sort of the potential that could

19    be there.

20    **Q.**  Okay.  And you used the joint network schedule to model

21    the revenue that might be generated under the Northeast

22    Alliance, correct?

23    **A.**  Yeah, we used that for a number of purposes, but one of

24    the things we were doing was understanding directionally sort

25    of how the revenue forecast could look.

1   **Q.**  And when you were working with the joint network

2   schedule, the clean team assumed that joint network would be

3   implemented in 2023, correct?

4   **A.**  Well, implementation is a little bit of a different

5   topic, for the work we were doing in the clean team, and mind

6   you, this was sort of in the midst of COVID, you had to be

7   able to look out sort of far enough where you'd have some of

8   that implementation work, so we settled on 2023 as sort of

9   the broad way to think about it.  But to do our work and

10  understand the Northeast Alliance, that wasn't sort -- that

11  was just one sort of assumption.

12  **Q.**  Okay.  And you are familiar with the term "steady state,"

13  correct?

14  **A.**  Correct.

15  **Q.**  Okay.  And you understood the steady state -- you were

16  assuming that would be 2023, correct?

17  **A.**  Yeah, in terms of kind of practically, you had to -- had

18  to sort of have at least some understanding of timeline, so

19  you needed sort of a little bit of a year to work off of,

20  yes.

21  **Q.**  And in constructing a joint network schedule meant to be

22  implemented in 2023, you assumed JetBlue would be able to use

23  the fleet it was expecting to have in 2023, correct?

24  **A.**  One of the things in understanding the NEA in general,

25  you want to make sure that you didn't sort of -- you didn't

1    go and sort of model things that wouldn't have any

2    resemblance to reality, whether that was fleet or gates or

3    things like that.  So you wanted to understand at least some

4    scope of the reality you'd be operating in.

5    **Q.**   And the fleet you were expecting to have in 2023 had more

6    planes than the fleet you actually had in 2020, correct?

7    **A.**   We had an order book that we were using to help sort

8    of -- help with that assumption.

9    **Q.**   And you were using that order book to assume more planes,

10   correct?

11   **A.**   And that gave us a sense of kind of that resource that we

12   would have access to.

13              THE COURT:  So does that mean, yes, that when

14   you're doing the modelling in 2020 about 2023, you were

15   modelling with the expectation, for 2023, you would have

16   those planes that were in the order book?

17              THE WITNESS:  Yeah, we didn't want to -- yeah,

18   exactly.  We don't want to model a set of outcomes where we

19   were building sort of financial analysis on orders that may

20   not exist in 2023, or we wouldn't -- we wouldn't be able to

21   get.  I think -- I think you kind of think back to that

22   period, one of the things that was definitely on my mind was

23   a lot of aircraft delivery delays.  So kind of that practical

24   reality of uncertainty around can an air bus deliver an

25   airplane?  You had to make sure you weren't going to sort of

1  senior leaders with a revenue forecast or an earnings sort of

2  analysis that was completely isolated from reality, so you

3  had to take that into account.

4  　　　　THE COURT:  So you were sort of relying on it, but

5  you wanted to discount it because of the sort of

6  uncertainties of deliveries?

7  　　　　THE WITNESS:  You wanted to make sure that you

8  weren't completely operating in a sort of -- a world that

9  would be totally different than reality.  You wanted to have

10  some degree of reality or baseline to reality.

11  　　　　THE COURT:  Okay.

12  BY MR. CONGDON:

13  **Q.**  In your analysis that you mentioned, you also set a

14  baseline, correct?

15  **A.**  Yeah, correct.

16  **Q.**  And that baseline was based on American and JetBlue's

17  actual flying from September of 2019; is that right?

18  **A.**  That was -- that was the starting point for the baseline.

19  **Q.**  Okay.  And just to be clear, to follow up on the

20  questions, when you were constructing the potential joint

21  network schedule, you did assume you would have more planes

22  than you actually had in the baseline in September of 2019,

23  correct?

24  **A.**  Correct.

25  **Q.**  Okay.  And part of the purpose of having the baseline was

1    that you could then compare the joint network schedule to

2    that baseline, correct?

3    **A.**   Correct.  We wanted to understand the various components

4    of network growth, the ability to compete for more customers,

5    things like codeshare, how that would operate through what

6    became known as the MGIA.  So you had to have that sort of

7    A-versus-B analysis to sort of flesh that out.

8    **Q.**   And you also wanted to model the financial implications

9    of what became the MGIA, correct?

10   **A.**   We wanted to make sure that the financial due diligence

11   was there, that senior leaders and the board could make a

12   decision off of.

13   **Q.**   Okay.  Now, there came a point in time, Mr. Fintzen, when

14   you asked JetBlue's network planning team to see if some of

15   the revenue that the clean team was projecting seemed

16   reasonable to them, correct?

17   **A.**   Correct.  We were thinking of it as cross-checking some

18   of the analysis that we could do, obviously without giving

19   them the full context of the -- of the work we were doing

20   inside of the clean team.

21   **Q.**   You showed them JetBlue's side of the model, correct?

22   **A.**   Correct.

23   **Q.**   You didn't show them American's side, right?

24   **A.**   No, I don't believe we did.

25   **Q.**   Okay.  Let's take a look at a document.  Mr. Fintzen, if

1    you could turn to your in binder what's been marked PX751.  I

2    think it says it on the tabs.

3              MR. CONGDON:  Your Honor, this has been admitted

4    into evidence.

5              THE COURT:  Okay.

6    BY MR. CONGDON:

7    **Q.**  And I'd like, if you could, to turn to the first in time

8    e-mail.  So later in the document, I think it starts on the

9    bottom of page 4 and goes on to page 5.  It's also on the

10   screen --

11   **A.**  This is -- sorry.  Getting kind of used to getting my lay

12   of the land here.

13   **Q.**  Whatever is easier for you, Mr. Fintzen.

14   **A.**  Okay.

15   **Q.**  Okay.  And you see at the bottom of page 4, there's an

16   e-mail from Eric Friedman sent on Wednesday, June 3, 2020, at

17   2:31 p.m.?

18   **A.**  I do.

19   **Q.**  Okay.  And it looks like he sends it to Mr. Laurence,

20   Mr. Lusso, yourself, and then it looks like the other members

21   of the clean team at JetBlue; is that right?

22   **A.**  That looks to be correct.

23   **Q.**  Okay.  And the subject is "Connie compare."  Do you see

24   that?

25   **A.**  Correct.

1    **Q.**  And you mentioned before -- I know everyone knows this,

2    but Project Connie was the term for the Northeast Alliance,

3    correct?

4    **A.**  Correct.

5    **Q.**  Now, Mr. Friedman was a manager in the network planning

6    group at that time, correct?

7    **A.**  Yes.  He was a manager at that time.

8    **Q.**  Okay.  And Mr. Lusso, who is in the first line of the

9    "to" line, was his boss, correct?

10    **A.**  Yes.  Mr. Lusso was, at that point, the vice president of

11    network planning.

12    **Q.**  Got it.  And he reported to Mr. Laurence, who we already

13    talked about, correct?

14    **A.**  That's correct.

15    **Q.**  Okay.  And if you look at Mr. Friedman's e-mail, in the

16    first couple of sentences, he writes, "Thanks for your

17    patience.  We forecasted the arrangement and overall our

18    numbers align."

19                Do you see that?

20    **A.**  I do.

21    **Q.**  Okay.  And when he says "forecasted the arrangement," you

22    understood he's referring to the network planning team

23    looking at the revenue that the clean team had been modelling

24    for the Northeast Alliance, correct?

25                MR. CRANER:  Objection.  Calls for speculation.

1          MR. CONGDON:  I asked what he understood.

2          THE COURT:  Overruled.  You can answer.

3          If you want to ask it again.

4          THE WITNESS:  Yeah.  Can you just repeat it?

5    Sorry.

6    BY MR. CONGDON:

7    **Q.**  Sure.  When Mr. Friedman says "forecasted the

8    arrangement," you understood that he -- he's referring to the

9    network planning team looking at what the clean team had been

10   modelling for the Northeast Alliance, correct?

11   **A.**  He would have been -- we would have been -- through the

12   protocols of the clean team, we would have been providing him

13   what information we could.  So he would have been actually

14   seeing a portion of what the clean team was doing, but what

15   we were asking was for him to run the JetBlue network

16   planning and model.

17   **Q.**  Okay.  And take a look and see what you --

18          THE COURT:  Off the schedule that you had

19   identified?

20          THE WITNESS:  Off a portion of -- the JetBlue --

21          THE COURT:  The portion that you could share.

22          THE WITNESS:  Yeah.

23   BY MR. CONGDON:

24   **Q.**  The JetBlue side of the schedule, correct?

25   **A.**  Correct.

1  **Q.**  And in the last two sentences of his e-mail, Mr. Friedman

2  writes, "That said, while the high-level revenue numbers

3  align, there are discrepancies at the route level.  I know we

4  should not focus on those at the moment, but I would like to

5  highlight some specific examples and some other concerns that

6  need to be addressed."  Do you see that?

7  **A.**  I do.

8  **Q.**  And then you see, under that, Mr. Friedman has a list of

9  items that he numbers 1 through 7.  Do you see that?

10  **A.**  I do.

11  **Q.**  Okay.  And we'll come back to this, but I want to skip

12  ahead to your response quickly.  So if you turn two pages

13  forward, I think it's on page 2, it looks like you respond to

14  Mr. Friedman on that same day, June 3, 2020, at 6:48 p.m.?

15  **A.**  Okay.  I see that.

16  **Q.**  Okay.  And you write, "Hi, Eric.  Thanks for this.  Super

17  helpful."  Is that correct?

18  **A.**  Correct.

19  **Q.**  And then in the third paragraph, you write, "On the more

20  specific stuff in this list for those in the weeds," correct?

21  **A.**  Correct.

22  **Q.**  Okay.  And then you respond to Mr. Friedman's, the seven

23  items that he identified, and you organized a response under

24  the headings in bold and underlined, correct?

25  **A.**  Correct.

1  **Q.**  So here, if you look at the next page, on page 3, you've

2  got a heading that starts "On Number 5."  Do you see that?

3  **A.**  I do.

4  **Q.**  And you understand that corresponds to you responding to

5  Mr. Friedman's fifth item that he identified in his original

6  e-mail?

7  **A.**  Yes.

8  **Q.**  Okay.  So we're going to come back to this paragraph, but

9  you can see there's different shades of gray, so I want to

10  establish who is writing what in this paragraph.

11        So if you go back to the -- to the next e-mail, if

12  you go to the bottom of the first page, next e-mail in time,

13  it looks like at the very bottom of the first page,

14  Mr. Friedman writes back to you, that same night, June 3,

15  2020, at 7:32 p.m., correct?

16  **A.**  Correct.

17  **Q.**  And in the middle of his response, he writes, "Below are

18  my, 'stream of consciousness responses.'"  Do you see that?

19  **A.**  Correct.

20  **Q.**  And so you understand that what he did is he then

21  imbedded his response to your e-mail into the body of the

22  e-mail you had sent, correct?

23  **A.**  Correct.

24  **Q.**  Okay.  And finally, if we take a look at your e-mail on

25  the first page, again, that same night, June 3, 2020, at

1    9:41 p.m., and you write in the second sentence, "Some

2    quick-ish thoughts below."  Do you see that?

3    **A.**   Correct.

4    **Q.**   And so what you did is you also imbedded your response to

5    Mr. Friedman in this body of that same e-mail you had

6    originally sent, correct?

7    **A.**   Correct.

8    **Q.**   A little bit tricky, but that sometimes happens with

9    e-mail, right?  Okay.

10            So sort of putting it altogether, if we go back to

11   your response on page 4, under the heading "On Number 5," if

12   we pull that up, you see that there's sort of different

13   shades of gray in the text here?

14   **A.**   Yeah.  It probably was colors at the time.  I see.

15   **Q.**   Yep.  And so the first, though, the darkest bold gray

16   represents your original e-mail, the middle shade of gray

17   represents Mr. Friedman's response, and then the lightest

18   shade of gray is your reply to that?  Do you understand that?

19   **A.**   Yes, I do.

20            MR. CONGDON:  Okay.  To try to make it a little bit

21   easier to read and not see, we have created a demonstrative

22   that just identifies Mr. Friedman's original fifth point and

23   then these three responses all separated out so it's a little

24   easier to read.  I don't know -- we gave it to defendants --

25   I think there was an objection, but I think we've resolved

1    it, so -- it's in the binder.

2              MR. CRANER:  Your Honor --

3              THE COURT:  It's in the binder?

4              MR. CONGDON:  Very front of --

5              THE COURT:  PX751.

6              MR. CRANER:  Your Honor, can you give us just one

7    moment?

8              THE COURT:  Yes.

9              MR. CRANER:  Your Honor, the only issue we had is

10   with the demonstrative.  It doesn't reflect all the

11   recipients in the e-mail, and as long as that's understood

12   that --

13             THE COURT:  Yeah, it's just who was writing in that

14   little paragraph.

15             MR. CRANER:  Correct.  Other than that, with the

16   addition that the plaintiffs made at the top of this

17   demonstrative, we have no objection.

18             THE COURT:  Fine.  You can go ahead and use it.

19             MR. CONGDON:  Thank you, Your Honor.

20             If we can publish that.

21   BY MR. CONGDON:

22   Q.  Okay.  So you see all we've done here, Mr. Fintzen, is

23   put Mr. Friedman's original fifth item from his e-mail and

24   then the three responses we just discussed?

25   A.  I do.

1  **Q.**  Okay.  So starting with Mr. Friedman's original e-mail,

2  when he says under number 5 is, "We still believe that we are

3  including value here that would have been generated anyway;

4  i.e., BUR Mint.  It would be more appropriate to identify the

5  incremental value of the partnership as it pertains to this

6  and any other markets we intended to serve as part of our

7  five-year plan."

8          Do you see that?

9  **A.**  I do.

10          THE COURT:  What's BUR?  Burbank?

11          THE WITNESS:  Burbank, yes.

12  BY MR. CONGDON:

13  **Q.**  And you understood when he said "i.e., BUR Mint," he's

14  giving you an example, correct?

15  **A.**  Correct.

16  **Q.**  And are you familiar with -- he references five-year plan

17  at the end.  Are you familiar with JetBlue's five-year plans?

18  **A.**  I'm certainly -- the concept and the business process,

19  yes.

20  **Q.**  And those are created by the network planning group,

21  correct?

22  **A.**  Portions of it are, correct.

23  **Q.**  And that would be Mr. Friedman's responsibility?

24  **A.**  We -- would be the network planning department's

25  responsibility.  That's how they sort of break that up, it

1    would be -- you would have to ask network planning.

2    **Q.**  Sure.

3         Moving down to your response, what you said is,

4    "Since we put all this flying through a revenue share model

5    in what is intended to be a metal neutral JV, we need to have

6    route level forecasts to ensure we get the RSA right."

7         Do you see that?

8    **A.**  Yes.

9    **Q.**  And RSA is revenue sharing, correct?

10   **A.**  Yeah.  That's a shorthand we were using for what is now

11   the MGIA.

12   **Q.**  Thank you.  Got my next question.

13        And when you write, "what was intended to be a

14   metal neutral JV," you're referring to what became the

15   Northeast Alliance, correct?

16   **A.**  Yeah, as we were working sort of through Project Connie

17   and the Northeast Alliance.

18   **Q.**  And so just finishing your response here, you write, "I'm

19   actually more interested in how revenue share changes if

20   reflects different routes, but we need a starting point.  In

21   every route for both airlines that is in scope impacts the

22   RSA economics."

23        Do you see that?

24   **A.**  I do.

25   **Q.**  And so, for purposes of valuating the economics of the

1    RSA, what became the MGIA, you had to look at all of the

2    flying regardless of if it was something JetBlue would have

3    been doing anyway, correct?

4    **A.**   We needed to look -- we needed to do a holistic analysis.

5    **Q.**   So it didn't matter for that purpose whether it was

6    something JetBlue would have flown anyway, correct?

7    **A.**   Well, I wouldn't -- I wouldn't describe it that way.

8    **Q.**   Okay.

9         THE COURT:  Are you saying you wanted to know how

10   each route played out in terms of the revenue sharing

11   formula, so what that would mean in terms of what the route

12   would do to the revenue you would get?

13        THE WITNESS:  One of -- one of the things we really

14   wanted to understand is that, let's say we had flown a route

15   for many, many years.  By virtue of having access to this

16   bigger, broader network, we could actually be selling another

17   customer into a route that already existed.  We would have

18   codeshare as an example of connections that linked different

19   routes.

20        So you weren't just thinking about the new routes

21   and the specific growth that was added.  That would have sort

22   of a network effect on all of the routes within the NEA,

23   because we would really be competing to fill more seats with

24   more customers.  That would be new customers to the -- all of

25   what JetBlue was doing.  And that was sort of the -- a bit of

1    the context I was trying but couldn't really fully at that

2    point give to Eric.

3              THE COURT:  So you were looking more at the overall

4    rather than any individual route?

5              THE WITNESS:  To get to the overall, you kind of

6    had to have the individual routes, because you couldn't

7    totally separate, but the purpose was to understand the

8    interaction of different routes, less than, really,

9    isolating, making more of a implementation decision around

10   individual routes, is -- way ahead of -- way down the road at

11   that point.

12             THE COURT:  Go ahead.

13   BY MR. CONGDON:

14   Q.   But on a given route, you were projecting a certain

15   amount of flying, correct, under the joint network schedule?

16   A.   Well, the way these models have to work is they have to

17   work sort of bottoms up and so you do have to have some of

18   those route-level dynamics right.

19   Q.   Right.  And when you were projecting a certain amount of

20   flying out to 2023 under the NEA, you weren't necessarily

21   taking into account whether that flying would have been

22   happening anyway without the Northeast Alliance, correct?

23   You were just projecting out?

24   A.   Well, what we were trying to understand was the kind of

25   opportunities and sort of the -- the impact the NEA could

1   have on our ability to compete sort of holistically and
2   overall.
3            So, you know, an example of the Burbank route
4   specifically, what Mr. Friedman wouldn't see was some of the
5   new growth we were looking at for American, but American was
6   looking at to place, like, Orange County.  And that would
7   actually have an impact of putting a much better schedule in
8   front of, say, a corporate traveler from New York to the
9   LA Basin.
10           And so what we were trying to understand -- and you
11  couldn't be too -- at a point, you become granular to the
12  point it sort of got in the way of the analysis, but we were
13  trying to understand that kind of holistic customer impact
14  and customer potential.  And that's, obviously, the -- the
15  pieces that Mr. Friedman didn't have the context or the
16  visibility into.
17  **Q.**  Sure.  He couldn't see what you were projecting on the
18  American side, right?
19  **A.**  More than that, he couldn't see sort of how the network
20  relevance was being developed in conjunction with individual
21  route decisions.
22  **Q.**  So with respect to Burbank Mint, for instance, you're
23  saying it could have been the case that there was actually
24  more revenue for JetBlue because of the network effects in
25  the Northeast Alliance than Mr. Friedman was saying, right?

**A.**   In my mind, in my mind using that example, I wanted to
test if the Northeast Alliance and the ability to compete for
more customers could actually mean even more frequencies than
we otherwise would have.  So it's not just the existence of a
route, but it's the opportunity to actually fly that route
better.

In transconference, it's to put a JetBlue schedule
that's more robust for both sides of the market.  So there's
a lot of interesting, probably more specific than they needed
to be, examples; but they captured that notion of how our
customer base could benefit and be grown by having access to
this much -- this much better network product.

**Q.**   Okay.  But it wasn't your position, Mr. Fintzen, that
JetBlue wouldn't have flown Burbank Mint at all without the
Northeast Alliance, is it?

**A.**   That really wasn't -- that wasn't germane to the analysis
we were doing.

**Q.**   Okay.  Looking at Mr. Friedman's response to you, he
writes, "I'm a bit confused on this.  Forgive me if I'm being
dense, but my point is just that we intend to fly BUR Mint
and other five-year plan markets regardless of Connie."

Do you see that?

**A.**   I do.

**Q.**   And he continues, "The current valuation of Connie
includes all of the market revenue.  We would have generated

1    most of that revenue anyway, so what portion of the revenue

2    was 'enhanced revenue driven by the JV'?"

3              Do you see that?

4    **A.**  I do.

5    **Q.**  And then he writes, "If we're looking at this from a

6    'What does JetBlue look like with Connie versus without?'

7    we're currently attributing a lot of revenue to Connie that

8    would have already existed."

9              Do you see that?

10   **A.**  I do.

11   **Q.**  And then he asks you, "Does that make sense," right?

12   **A.**  I see that.

13   **Q.**  Okay.  And, again, you understood Mr. Friedman to be

14   saying that, when trying to calculate the incremental value

15   of the Northeast Alliance, you shouldn't count value that

16   would have been generated anyway based on JetBlue's plans to

17   grow prior to the Northeast Alliance, correct?

18   **A.**  The challenge here was Mr. Friedman did not have access

19   to see the analysis we were actually doing.  So his -- he

20   didn't have -- he was -- he might have -- he's suggesting

21   sort of how he might do the analysis, but he was doing that

22   without actually being in the -- without in -- without the

23   virtue -- without that -- being in the clean team, where he

24   saw the actual work we were doing and what we were trying to

25   analyze.

1  **Q.**  Sure.  But you understood what he was saying was that

2  when trying to calculate the incremental value of the NEA,

3  you shouldn't count value that would have been generated

4  anyway based on the pre-Northeast Alliance plans to grow,

5  correct?

6  **A.**  I --

7  **Q.**  That's what you understood him to be saying?

8  **A.**  I understood him to be suggesting sort of an analytical

9  mechanism or an analytical exercise.

10  **Q.**  Okay.  And you responded, "Yes, totally, and we need

11  that, too."  Do you see that?

12  **A.**  I do.

13  **Q.**  And there, you were saying you understood his point, the

14  point that he was making that we just discussed, correct?

15  **A.**  Yeah.  And in this exchange -- and I can't recall how

16  much time Eric Friedman had actually been involved in,

17  notionally, the Project Connie.  I don't remember if he had

18  much, if any, context.

19          So I was sort of -- I understood that he was a

20  manager sort of being asked a bunch of questions to run some

21  models -- didn't really have that context.  So I'm sort of --

22  I'm helping along through that, that process, and kind of

23  being patient with that.

24  **Q.**  Sure.

25          THE COURT:  Well, you didn't want to go to

1   Mr. Laurence and say this would generate X amount of revenue

2   if you do the joint venture and have that number be the same

3   or less than what the five-year plan said JetBlue would

4   generate without the joint venture and simultaneously say it

5   seems like, from the clean team's perspective, it's a good

6   idea.

7           THE WITNESS:  Yeah, that's kind of the -- I mean,

8   better way to say what I was saying before.  You wanted to

9   find where you could kind of draw in new customers --

10          THE COURT:  Right.

11          THE WITNESS:  -- that would turn into that revenue.

12  You can say --

13          THE COURT:  And make more money than you otherwise

14  would have made?

15          THE WITNESS:  Right.  And sort of have that growth

16  in the customer base that would be kind of unlocked and sort

17  of turbocharged.

18          THE COURT:  Right.  Okay.  Go ahead.

19  BY MR. CONGDON:

20  **Q.**  And when you say -- Mr. Fintzen, when you say, "We need

21  that, too," do you see that?

22  **A.**  Sure.

23  **Q.**  Right.  You're referencing that what Mr. Friedman was

24  advocating was something else you needed to do.  It just

25  wasn't what you were doing, right?

1    **A.**   Right.   Yeah, I'm being patient that he doesn't have the

2    context, so I was -- it wasn't something on our to-do list or

3    something that the clean team really felt was going to help

4    make that business -- help inform that business decision.

5              Also, to the extent he needed to do some work with

6    the five-year model, I wouldn't have known what that was, so

7    I similarly wouldn't have had context to any work he would

8    need to do.  So I'm just acknowledging that point and

9    honestly trying to move us on.

10   **Q.**   Okay.  But you agree, at least in theory, that when

11   measuring the incremental value generated by the Northeast

12   Alliance, you shouldn't count value that would have been

13   generated even in the absence of the Northeast Alliance,

14   correct?

15   **A.**   My responsibility and my -- my work here was to help

16   determine and help business leaders make a business decision.

17   And I -- I don't know that that would have -- that analysis

18   would have helped us with that effort.  So, no, it wasn't

19   something we -- was in the clean team -- we were going to

20   focus on.

21   **Q.**   Okay.  Let's take a look --

22              THE COURT:  It wasn't focused on whether you would

23   make more money with it than without it?

24              THE WITNESS:  Well, in that sense, right, you --

25              THE COURT:  I mean, isn't that the bottom line?

1              THE WITNESS:  The bottom line, but to do that, you

2    didn't need to sort of go through and really sort of parse

3    out the base and the different components.  You needed to

4    look at sort of the starting point and kind of have this sort

5    of preliminary sort of directional vision of the network, and

6    then look at the two.  And that would actually answer the

7    important question you're raising, which is does this make

8    our revenue higher and our margins stronger?

9              And so you didn't need to do the level of analysis

10   that's being suggested --

11             THE COURT:  I see.

12             THE WITNESS:  -- to answer that question.

13   BY MR. CONGDON:

14   **Q.**  But, Mr. Fintzen, when you do that exercise starting with

15   the baseline in 2019 and compare to what the pre -- the joint

16   network schedule meant to be implemented in 2023 shows,

17   you're missing what growth JetBlue might have done in

18   between, correct?

19   **A.**  We -- we did a process to -- you know, we were sitting in

20   April of 2020.  We used a September 2019 base.  There were a

21   set of routes that had been announced and put in the market

22   in that interim period.  So, of course, we adjusted the

23   analysis to sort of bring that in.  We dealt with things like

24   seasonality.

25             There's a lot of things that -- you have to get

1   directionally right, sort of small inputs, just to have

2   confidence that the overall -- the overall revenue result

3   we're talking about was -- would at least give you the

4   insight you needed.

5   Q.  Well, let me ask this, Mr. Fintzen:  Is it your position

6   that, without the Northeast Alliance, JetBlue wouldn't have

7   grown at all to 2023?

8   A.  The purpose and intent -- the strategy with the Northeast

9   Alliance was to -- to add to, enhance, and turbocharge that

10  growth.  So --

11  Q.  So that wasn't my question.  My question was, is it your

12  position, Mr. Fintzen, that absent a Northeast Alliance,

13  JetBlue would not have grown at all to 2023?

14  A.  So my role in the clean team was not to worry about --

15  about those decisions.  There's -- that was -- there's a

16  fleet team, an FMA [*sic*] team, a network planning team --

17              THE COURT REPORTER:  I'm sorry; say that acronym

18  again.

19              THE WITNESS:  Which?  FP&A, financial planning and

20  analysis.  Sorry.

21              So there's a whole host of teams that their

22  day-to-day responsibility is to do the work and make that

23  decision you're talking about.  Our job was to focus on what

24  is the opportunity uniquely that the NEA provides.

25

BY MR. CONGDON:

**Q.**   And one of those people would have been Mr. Friedman,
correct, as part of the network planning group?

**A.**   Sure.  Correct.

**Q.**   Okay.  So your answer, though, is you don't know whether
JetBlue would have grown at all absent the NEA to 2023?

**A.**   My answer is -- my answer is we historically talked about
a mid to high-single digit growth rate.  We had an order
book.  In terms of managing that growth, that's never been my
day-to-day responsibility at JetBlue and that's not the task
I had at that time --

**Q.**   Right.

**A.**   -- on the clean team.

**Q.**   That responsibility rests with Mr. Laurence and network
planning, correct?

**A.**   Network planning, finance, senior leadership.

**Q.**   Now, if you wanted to identify the single type of
incremental value that Mr. Friedman is talking about, one way
would have been to compare the joint network schedule you
were projecting for 2023 with JetBlue's growth plans without
the NEA for 2023, correct?

**A.**   I'm not sure that would have been the most effective way
to do it.

**Q.**   Would have been an apples-to-apples comparison, right?

**A.**   No, because you needed to understand two sort of

1    relatively simple metrics.  You needed to understand revenue

2    growth and margin in sort of the pre-NEA, sort of 2019,

3    pre-COVID era, and kind of what that margin enhancement would

4    be and that revenue growth would be and they all sort of

5    interact with each other.  So I -- I don't know -- I don't

6    think going about it that way would answer that question.

7    **Q.**  Well, in fact, you had considered doing that sort of

8    exercise, didn't you?

9    **A.**  Well, you're going to consider a variety of different

10   ways.  I felt really good about the approach that we used in

11   terms of having the finance -- bear in mind, my background is

12   coming from the finance side of the business.  I was -- it

13   was very much how I felt the right financial analysis would

14   be, to look at that 2019 starting point and that sort of

15   Connie sort of NEA world in, you know, 2023.

16   **Q.**  You were looking at it as a financial analysis?

17   **A.**  Well, I'm helping frame inputs to business decisions.  My

18   background is finance, so I'm going to have a bit of that

19   perspective, but I thought that was a helpful framework for

20   business leaders to make a strategic decision up to and

21   including the board.

22   **Q.**  All right.  Well, let's turn in your binder to a document

23   that's been marked PX707.

24           MR. CONGDON:  And this is in evidence, and we've

25   just got a demonstrative that I understand defendants have no

1    objection to that just identifies the sender and recipient of

2    the message and redacts the phone numbers.

3            THE COURT:  Fine.

4    BY MR. CONGDON:

5    Q.   Mr. Fintzen, this is a text message that you sent on

6    May 29, 2020, at 1:30 p.m., correct?

7    A.   Correct.

8    Q.   And that's just five days before the exchange on June 3rd

9    we were just looking at, correct?

10   A.   Correct.

11   Q.   I have to remember whether May is 30 or 31 days.

12   A.   Yeah.

13   Q.   And you sent this to Steve Priest, correct?

14   A.   Correct.

15   Q.   Mr. Priest was the chief financial officer at JetBlue at

16   the time?

17   A.   Correct.

18   Q.   And you write in the message, "BTW" -- I assume that

19   means, "by the way"?

20   A.   Yes.

21   Q.   You write, "Some of the ask on out-year fleet for Urs is

22   from Connie Project and things we expect DOJ to ask for in

23   June."  Do you see that?

24   A.   I do.

25   Q.   And "Urs" refers to Ms. Ursula Hurley at JetBlue; is that

1    right?

2    **A.**   Correct.

3    **Q.**   She was the treasurer at JetBlue at the time?

4    **A.**   She would have been -- at that point, she was treasurer,

5    as well as had fleet and sourcing.

6    **Q.**   Got it.  And you reference an ask for out-year fleet.  Do

7    you see that?

8    **A.**   Correct.

9    **Q.**   What does that mean?

10   **A.**   Don't exactly recall, but that period -- that period,

11   there would have been a few things going on.  And Steve also

12   was my boss at the time.  The clean team would have been

13   seeking more and more inputs from teams throughout JetBlue,

14   most of which, similar to Mr. Friedman, didn't necessarily

15   have context of what we were working on, because five or so

16   of us were dedicated to Connie.

17          Everyone else was dedicated and focused, almost

18   24/7 -- I mean, it's not quite an exaggeration -- to survival

19   of JetBlue.  And so at that point, the -- things like the

20   five-year plan or things like the business plans would have

21   been changing by those teams responsible for it.  And so I

22   think we would have been asking for different inputs and

23   probably adding work to really strain teams at the time.  And

24   I -- looks like I would have been flagging that these were

25   requests so Steve knew, so that he made sure that teams were

1    going to, you know, turn information to us.

2    **Q.**   Because you reference Connie project and DOJ.  You wanted

3    to emphasize that this was pretty important, right?

4    **A.**   Yeah, these were -- if teams hadn't asked and we were

5    gathering informing, it was easy for something at that point,

6    when teams were under so much day-to-day pressure that, you

7    know, an e-mail might get lost or get stuck.

8    **Q.**   Okay.  You were emphasizing this was important to

9    collect, right?

10                MR. CRANER:  Objection.  Misstates the document.

11                THE COURT:  So the question again?

12                MR. CONGDON:  I'm asking Mr. Fintzen if he was

13    sending this to his boss and referencing Connie project and

14    DOJ to emphasize that the request was important.

15                THE COURT:  Overruled.

16                You can answer that question.

17                THE WITNESS:  I would have been -- I mean,

18    everything those teams were doing all day, every day at that

19    point was important.  It's just making sure that the teams

20    were aware of the request so they didn't get lost.  That's --

21    it's an easy thing to do and happen in normal times.  It was

22    exceptionally common in that period.

23    BY MR. CONGDON:

24    **Q.**   Okay.  And when you say "things we expect DOJ to ask for

25    in June," you're referencing the regulatory review you were

1    expecting from the Department of Justice relating to the

2    Northeast Alliance?

3    **A.**   Yeah, I wouldn't -- we would have been starting to, you

4    know -- starting to prepare for that or potentially gather

5    information.  I don't know specifically what pieces of

6    that --

7    **Q.**   You expected to receive scrutiny from the Department of

8    Justice, correct?

9    **A.**   Sure.  Typically, relationships in the airline industry

10   get scrutiny.

11   **Q.**   And then you write in the last sentence, "It's all for

12   the counterfactual argument on what we probably look like in

13   terms of fleet and capacity by 2023 if there isn't a JV."

14           Do you see that?

15   **A.**   I do.

16   **Q.**   Okay.  And that counterfactual you're referring to is

17   comparing what JetBlue would look like in 2023 with the

18   Northeast Alliance against what it would look like in terms

19   of fleet and capacity by 2023 without the Northeast Alliance,

20   right?

21   **A.**   I don't think I'm referencing that analysis, no.

22   **Q.**   Well, that's what you say when you reference a

23   counterfactual argument, right, is "what we would probably

24   look like in terms of fleet and capacity by 2023 if there

25   isn't a JV," right?

**A.**   Right.  But remember, we were, from the conversation
earlier, talking about the fleet in the order book and what
we would have to work with and making sure our analysis had
some -- some resemblance to reality.  That reality would have
been potentially very quickly changing because of COVID.  And
so, obviously, I wouldn't have been working with those teams,
and I would have wanted to make sure that, as decisions
are in fleet types or order books were being made, that there
was at least some awareness or understanding on both sides
that this work was going on.

**Q.**   You were expected to have to make a counterfactual
argument to the Department of Justice comparing what you
looked like in 2023 with the Northeast Alliance versus what
you would have looked like without, right?

**A.**   Sure.  But that would have related to the business
decisions that different teams were making about how to
manage COVID.

**Q.**   And that counterfactual is similar to what Mr. Friedman
was suggesting just a few days later, correct?

**A.**   I don't know that I draw that line, no.

**Q.**   Well, he phrased it as, in his e-mail, "What does JetBlue
look like with Connie versus without," correct?

**A.**   Sure.  I suppose he wrote that, but I don't -- I don't
read my own language here as tying that together.

**Q.**   Okay.  You don't view that as a similar concept to what

1    you were expressing in this e-mail -- in this text message to

2    Mr. Priest here?

3    **A.**   No, I don't.

4    **Q.**   Let's turn back to PX751.

5           THE COURT:  What's counterfactual about this?

6    Before you turn back, what's counterfactual?

7           THE WITNESS:  I think here, it would have been

8    anything that was changing in the order book or any decision,

9    so, for instance, exit suddenly the E190.  Any change in that

10   fleet plan that would have been contemplated or moving around

11   potentially at that time.  The -- kind of the world we were

12   operating in was so volatile.

13          THE COURT:  So is what you're saying there and here

14   that you couldn't easily separate it.  You couldn't easily do

15   this what would JetBlue look like with a joint venture versus

16   what would JetBlue look like without the joint venture

17   because the fleet and the capacity and all these other

18   business decisions are being made for survival purposes in

19   the middle of COVID also affect all that.  So it's not like

20   the -- it's not the same as when, in 2016, the five-year plan

21   might have been reasonably on target for where you were in

22   2019?

23          THE WITNESS:  Oh, that was definitely a component.

24   I think still going back and looking at the 2019, sort of --

25          THE COURT:  Sure.

1          THE WITNESS:  -- margin and growth and sort of

2    incremental margin, but, yes, the environment we were

3    operating in was changing by the day in terms of what the

4    fleet would look like and kind of what the -- whatever the,

5    quote/unquote, stand-alone or sort of business plan was going

6    to look like was incredibly uncertain at that point, and

7    even, you know, in the months that followed.

8          THE COURT:  So -- and it's counterfactual -- what

9    you were anticipating from DOJ that was counterfactual I

10   still don't quite understand.

11         THE WITNESS:  I think it would have been what

12   does -- what -- sort of what is the sort of post-COVID plans

13   for how JetBlue is going to run the business.  It's that

14   notion of what you were mentioning.

15         THE COURT:  I see.

16         THE WITNESS:  You need a stability in any plan at

17   that time.  So kind of what was going on elsewhere in the

18   business was changing in a way that I certainly never

19   experienced in my -- in my -- in my time in the industry.

20         THE COURT:  I see okay.

21         Go ahead.

22   BY MR. CONGDON:

23   Q.  Just one last question following up on that.  I mean, you

24   say counterfactual argument.  I mean, you say what you

25   expected it to be, right?  "What we probably look like in

1  terms of fleet and capacity by 2023 if there isn't a JV,"

2  right?

3  **A.**  Right.  And that goes to that volatility and what was

4  going on for the folks that were trying to manage the

5  business through COVID.

6  **Q.**  Okay.  Turning back quickly to PX751.  And I'm going to

7  point you to page 2.  And pull up the first response you

8  actually give to Mr. Friedman on a different topic under the

9  heading Number 4 and Number 1, "Actually something of a

10  subset."  Do you see that?

11  **A.**  Can you -- sorry.  Can you highlight it like you were

12  doing?

13         Oh, I see.  Yeah.  Yeah, sorry.  I was looking too

14  much in the text.

15  **Q.**  Okay.  And let's focus on the second paragraph of your

16  response, if we could.  And I just -- looking at the first

17  sentence there, do you understand you're responding to

18  Mr. Friedman, who had identified some concerns with the way

19  the clean team was modelling frequencies on the shuttle

20  routes?

21  **A.**  Yes.

22  **Q.**  Okay.

23  **A.**  Correct.

24  **Q.**  And in the second sentence of the second paragraph, you

25  wrote, "Once deal is done, it's you guys doing joint planning

1    work; and I'm sure there is the not so small issue of

2    business travel recovery and phasing that will go into

3    finding the right frequency year by year."

4            Do you see that?

5    **A.**   I do.

6    **Q.**   When you say, "It's you guys doing joint planning work,"

7    you're referencing that it would actually be the network

8    planning group that would actually implement the schedule,

9    correct?

10   **A.**   Yes.  This is -- our work was -- there -- the

11   implementation work would ultimately fall to the business

12   teams that were doing that, have the day-to-day

13   responsibilities.

14   **Q.**   They could change the schedule from what you guys were

15   putting together on the clean team, right?

16   **A.**   Yeah, the purpose of the clean team schedule is not to

17   make granular route decisions.  It was to get a directional

18   understanding of what was possible.

19   **Q.**   And, in fact, sitting here today, the network is --

20   network schedule is different than what you guys had

21   predicted on the clean team, right?

22   **A.**   I -- I would imagine, yes.  I haven't done any

23   reconciliation.

24   **Q.**   And then you wrote in the next sentence, "But for purpose

25   of getting deal constructed, understanding the revenue share

1    agreement and the deal through DOJ using 2023 as steady state

2    year, I think we are at a workable place."

3            Do you see that?

4    **A.**  I do.

5    **Q.**  And, again, the reference is to 2023 as the steady state

6    year, right?

7    **A.**  Yeah.  That was the kind of the moment in time we were

8    marking that was sufficiently post-COVID.

9    **Q.**  Okay.

10   **A.**  Or we thought might be sufficiently post-COVID.

11   **Q.**  We'll see, right?

12   **A.**  We'll see.

13   **Q.**  And, again, the reference to DOJ -- while JetBlue and

14   American were constructing this schedule as part of the clean

15   team, you knew regulatory scrutiny was coming from the

16   Department of Justice, correct?

17   **A.**  Sure.

18           MR. CONGDON:  Your Honor, we're going to switch to

19   something else.  I don't know if --

20           THE COURT:  If you are.  This is a good time for

21   the break.  We'll take the morning break now.  Stand in

22   recess.

23           (Court in recess at 11:01 a.m.

24           and reconvened at 11:13 a.m.)

25           THE COURT:  Go ahead.

1    MR. CONGDON:  Thank you, Your Honor.

2    BY MR. CONGDON:

3    **Q.**  Mr. Fintzen, just a couple of follow-up questions.  We

4    were talking about the counterfactual that you had referenced

5    in your text to Mr. Priest.  Do you recall that?

6    **A.**  I -- I do.

7    **Q.**  And do you -- you represented that there would have been

8    uncertainties in trying to predict the fleet and capacity

9    plans going out in time due to COVID, correct?

10   **A.**  You said uncertainties?

11   **Q.**  Yes.

12   **A.**  Yeah.  It was an extremely volatile period.

13   **Q.**  Well, those same uncertainties also would have impacted

14   your ability to create the joint network schedule you were

15   working on with the clean team, correct?

16   **A.**  So correct, but we were making a long-term decision where

17   you needed to look to a period where you can be comfortable

18   that you were kind of beyond those uncertainties.  That was

19   kind of the point of the steady state concept and looking out

20   to the -- not that we could, but looking out kind of into

21   that post-COVID landscape.

22   **Q.**  And any five-year plan that JetBlue was creating in 2020

23   would have been doing the same thing, correct?

24   **A.**  I don't know if there was a five-year plan in 2020.

25   **Q.**  Okay.  But at least at the time you were predicting that

1    2023 would be the time when you would be potentially back

2    from COVID, correct?  That was the idea of the steady state?

3    **A.**  Well, the idea is you're entering in a long-term

4    commercial agreement.  It's not about 2023.  You're about

5    understanding the -- is that a good strategic decision for

6    JetBlue?  So it's -- it's less about the precise timeline and

7    more directionally about the business decision of this

8    relationship.

9    **Q.**  Right.  But in that process, you were assuming 2023 --

10   you were predicting, but you were predicting that 2023 was

11   the time when COVID might subside and you would be back to

12   somewhat normal, correct?

13   **A.**  I mean, yes and no.  You had to mark a moment in time.

14   If it was '24, '25 -- or '22 would have been better.  You

15   just had to get sort of the -- get beyond that volatility,

16   because, again, you're analyzing modelling, a long-term

17   decision on sort of how you can turbocharge your growth and

18   bring in more customers and do all of those things.  It's not

19   about a specific point in time, but you have to make some

20   basic assumptions around that and some modelling.

21   **Q.**  Correct.  And the basic assumption you made was 2023,

22   right?

23   **A.**  That was the assumption that we used, correct.

24   **Q.**  Okay.  And if JetBlue were creating five-year plans in

25   2020, that would have also included 2023, correct?

1   **A.**   Again, if there were such plans.

2   **Q.**   Okay.  And I just want to make sure I understand, is it

3   your testimony that you did not consider a 2023 standalone

4   plan as a counterfactual to the joint network schedule?

5   **A.**   What we were looking at would have been the fleet plan

6   for 2023.  The analysis we were doing was, like I had

7   mentioned, kind of that revenue growth potential, that

8   incremental operating margin potential, all of the work that

9   we thought would best inform the business decision.

10  **Q.**   So is the answer yes or no?  I'm just trying to

11  understand.  Did you or did not consider comparing a

12  standalone 2023 growth plan to the 2023 joint network

13  schedule?

14  **A.**   I don't believe -- the way we would have thought about

15  that, to try to help answer your question, is we would have

16  thought about what are the incremental opportunities we could

17  find and create to add opportunity for JetBlue to grow.  That

18  would have been kind of the theme of that.

19  **Q.**   Mr. Fintzen, it's a yes-or-no question.  Did you or did

20  you not consider a counterfactual comparing a 2023 standalone

21  growth plant to your 2023 joint network schedule under the

22  Northeast Alliance?

23  **A.**   So just to understand your question, are you talking

24  about sort of a year -- taking a year of the five-year plan?

25  Is that what you're --

1          THE COURT:  Did you do that comparison?

2          THE WITNESS:  No, I don't recall doing that

3    comparison.

4    BY MR. CONGDON:

5    **Q.**  Did you consider doing that comparison?

6    **A.**  Again, at that point, I don't know -- I don't know

7    what -- in the period of COVID, I don't -- I don't know what

8    we would have compared it to.

9    **Q.**  That's my question -- my question is simply did you

10   consider doing that comparison?  Yes or no?

11   **A.**  If we did, I didn't -- I don't think that would have

12   helped the sort of incremental growth and incremental margin

13   we were trying to analyze.

14   **Q.**  That wasn't the question, Mr. Fintzen.  For the third

15   time, yes or no, did you or did you not consider it?

16   **A.**  Not that I recall.

17   **Q.**  Mr. Fintzen, if you can turn to tab PX297 of your binder,

18   I want to talk about another counterfactual you did consider.

19   **A.**  I'm sorry.  297?

20   **Q.**  Yeah, PX297.

21          MR. CONGDON:  And, Your Honor, this has already

22   been admitted into evidence, so we can go ahead and publish.

23          THE COURT:  All right.

24   BY MR. CONGDON:

25   **Q.**  Mr. Fintzen, do you have the document in front of you?

1    **A.**  I do and on the screen.

2    **Q.**  All right.  And this is an e-mail chain between yourself,

3    others at JetBlue, and others at American, correct?

4    **A.**  Correct.  Looks like clean team and others.

5    **Q.**  So members of the clean team at JetBlue and members of

6    the clean team at American?

7    **A.**  Correct.

8    **Q.**  If you take a look at the e-mail in the middle of the

9    second page, an e-mail from Jordan Pack dated Thursday,

10   May 21, 2020, at 5:06 p.m. do you see that?

11   **A.**  I do.

12   **Q.**  Jordan Pack was one of the American members of the clean

13   team, correct?

14   **A.**  Correct.

15   **Q.**  And if you look down into the text of his message, he

16   writes, "Hi, all -- following up on the v4 schedule."  Do you

17   see that?

18   **A.**  I do.

19   **Q.**  Do you recall what the v4 schedule was?

20   **A.**  V4 I believe was an input American -- you see Jordan --

21   it was an input they asked us for.  I believe that explains

22   sort of the construct of the input, and then we provided the

23   American output, but --

24   **Q.**  Okay.  So let's take a look, then, at what he says.  He

25   writes, "This schedule" -- and you understand he's referring

1    to the v4 schedule from the sentence before?

2    **A.**  Yes.

3    **Q.**  Okay.  He writes, "This schedule serves as our best guess

4    as to what would have happened in 2019 if American and

5    JetBlue had the partnership we are jointly proposing."  Do

6    you see that?

7    **A.**  I do.

8    **Q.**  And then he writes, "The key difference with this,

9    compared to v2 is that we have to fund aircraft and keep

10   resources neutral."

11           Do you see that?

12   **A.**  I do.

13   **Q.**  Okay.  And so the v4 schedule he's referring to is a

14   joint network schedule that uses the fleet constraints that

15   JetBlue had in September of 2019, correct?

16   **A.**  Correct.

17   **Q.**  And that's different from the joint network schedule we

18   were talking about before, where you were able to assume the

19   fleet JetBlue had in 2023, correct?

20   **A.**  Correct.  Our analysis was all working off -- I think it

21   was called v2.

22   **Q.**  Okay.  So the v2 schedule is the one we were talking

23   about before with the 2023 fleet?

24   **A.**  Correct.

25   **Q.**  And the v4 schedule kept the 2019 fleet constant,

1    correct?

2    **A.**   Correct.  From the inputs they were asking for.

3    **Q.**   Okay.  And so the 2019 fleet, keeping it constant,

4    required moving planes from other parts of JetBlue's network

5    to fund any growth within the Northeast Alliance part of the

6    network, correct?

7    **A.**   That would have been the resource constraint that they

8    were asking for in the input.

9    **Q.**   Okay.  Well, and if you put together that v4 schedule,

10   that's what would happen, right?  You would have to pull

11   funding from outside the NEA network to fund the growth

12   inside the NEA network, correct?

13   **A.**   Yeah, correct.

14   **Q.**   Okay.  And that meant that flying outside of the

15   Northeast Alliance in this version of the schedule went down,

16   compared to flying inside the Northeast Alliance, correct?

17   Sorry strike that.

18          It meant that flying outside the Northeast Alliance

19   went down in this schedule compared to the base schedule,

20   correct?

21   **A.**   What it says --

22          Repeat that.

23   **Q.**   Sure.  Under the v4 schedule, you had to keep the fleet

24   constant under 2019 constraints.  Flying outside of the

25   Northeast Alliance went down in that schedule as compared to

1    the baseline, correct?

2    **A.**   The v4 schedule, as I recall, just marked the 2019 fleet.

3    It -- it was hard for us to exactly -- it wasn't the

4    analysis -- it wasn't an analysis we were doing, so it was

5    hard for us to understand really what -- what the purpose of

6    what it was.  So it was just kind of imposing a constraint in

7    an analysis that we didn't believe was useful and moving

8    things around.

9    **Q.**   Sure.  My question is, given that constraint, in order to

10   fund flying within the Northeast Alliance, under the v4

11   schedule, flying outside of the Northeast Alliance went down

12   as compared to the baseline, correct?

13   **A.**   Yeah.  Because you -- you're almost -- your starting

14   point was as if all else was held constant, which seemed to

15   be the starting point they wanted for some analysis.

16   **Q.**   So the answer was yes?

17   **A.**   Yeah.

18   **Q.**   Now, let's go to your response to Mr. Pack on the first

19   page of the e-mail, on the document, beginning on the very

20   bottom of the first page, and then it goes on to the second

21   page.

22            Do you see you responded on Friday, May 29, 2020,

23   at 7:56 a.m.?

24   **A.**   Correct.

25   **Q.**   Okay.  And that's eight days after Mr. Pack's e-mail on

1   May 21st?

2   **A.**   Correct.

3   **Q.**   And you write, "Our v4 data pack with adjusted

4   frequencies and aircraft types is posted up in the shared

5   folder."

6            Is that right?

7   **A.**   Correct.

8   **Q.**   That represents you did put together a v4 data pack,

9   correct?

10  **A.**   We -- I remember we -- we tried the best we could to

11  provide the input they were asking for.  It was not something

12  we really -- I remember not really understanding exactly what

13  they were going after.  So we gave them what we could based

14  on the inputs as best we understood.

15  **Q.**   You gave them what you referred to here as the v4 data

16  pack with adjusted frequencies in aircraft --

17  **A.**   We created a matrix for them, I think, was the

18  deliverable or the input.

19  **Q.**   Okay.  And you posted that in the shared folder for

20  American to receive, correct?

21  **A.**   Correct.

22  **Q.**   Mr. Fintzen, you're familiar with Compass Lexecon,

23  correct?

24  **A.**   I am.

25  **Q.**   They're an economic consulting firm engaged by JetBlue

1    and American in connection with the Northeast Alliance?

2    **A.**   I'm -- I'm not sure who engaged them, but I know they

3    worked on the Northeast Alliance.

4    **Q.**   As part of the clean team, you worked with members of

5    Compass Lexecon?

6    **A.**   Not extensively.  I think we had some limited

7    interaction.

8    **Q.**   Okay.  And are you aware that Compass Lexecon relied on

9    the work of the clean team as part of its analysis of the

10   Northeast Alliance?

11            MR. CRANER:  Your Honor, we have an objection on

12   privilege grounds.  Compass Lexecon was retained by counsel

13   and did work through the advice of legal counsel from JetBlue

14   and American.  This position would be consistent with their

15   depositions.  So we have a concern about Mr. Fintzen

16   disclosing those types of privileged communications.

17            MR. CONGDON:  Your Honor -- sorry.

18            THE COURT:  Go ahead.

19            MR. CONGDON:  Your Honor, first of all, the work of

20   the clean team is extensively relied on by Dr. Israel of

21   Compass Lexecon, his expert report in this case is part of

22   his expert testimony.

23            THE COURT:  He's your -- defendants' expert?

24            MR. CRANER:  Correct.

25            MR. CONGDON:  Including discussing work that he did

1    with the clean team and discussing aspects of the clean team

2    did, without any citation to documents or anything, which can

3    only be from his interactions with them.  I don't think they

4    can hide that work behind privilege.

5            MR. CRANER:  Your Honor, to the extent that this is

6    a discussion for the experts, that issue can be deferred.

7    But for this witness and his communications, which was guided

8    by counsel, we do have a concern about that being privileged.

9            MR. CONGDON:  Your Honor --

10           THE COURT:  I think it depends on the question.

11           MR. CRANER:  Okay.

12           THE COURT:  So as to what he's aware of, that

13   doesn't strike me as --

14           MR. CRANER:  Understood.  We just wanted to

15   preserve that potential objection.

16           MR. CONGDON:  Your Honor, to be clear, it's our

17   position that privilege has been waived by work of

18   Dr. Israel, but --

19           THE COURT:  I'm, at the moment, deciding the least

20   amount I have to decide, so one question at a time.

21           So overruled as to that question.

22           MR. CRANER:  Thank you, Your Honor.

23           Fair enough.

24   BY MR. CONGDON:

25   Q.  Mr. Fintzen, are you aware that Compass Lexecon relied on

1   the work of the clean team as part of its analysis on the

2   Northeast Alliance?

3   **A.**  On the overall work, correct.  I understand that.

4   **Q.**  And you're aware that Compass Lexecon submitted that

5   analysis to the Department of Justice as part of its

6   antitrust review of the Northeast Alliance?

7   **A.**  I'm aware something was submitted, yes.

8   **Q.**  Well, you participated in the presentation to the

9   Department of Justice in its review of the Northeast

10   Alliance, correct?

11   **A.**  Components of it.

12   **Q.**  And where Compass Lexecon was present during those

13   presentations, correct?

14   **A.**  Of the one I recall was walking through the MGIA -- I --

15   I don't know if they were there.  They might have.

16   **Q.**  Okay.  You know Dr. Israel is one of the economists from

17   Compass Lexecon?

18   **A.**  Yes.

19   **Q.**  And are you aware that in the benefits analysis that he

20   submitted to the Department of Justice, Dr. Israel compared

21   the 2019 base schedule to a joint network schedule using the

22   2023 fleet?

23   **A.**  I'm -- I've never seen his analysis.

24   **Q.**  Okay.  To your knowledge, did Dr. Israel ever submit any

25   analysis comparing the 2019 base schedule with the v4

1    schedule using 2019 fleet constraints?

2    **A.**   I don't know what analysis he did.

3    **Q.**   Okay.  So you don't know if Dr. Israel ever submitted any

4    analysis comparing a base schedule, incorporating JetBlue's

5    2023 standalone growth plans to the joint network scheduling

6    using the 2023 fleet?

7              MR. CRANER:  Your Honor, I believe this is asked

8    and answered.  The witness says he doesn't know of any

9    analysis.

10             THE COURT:  I'll overrule it as to this one, but I

11   think it's sort of the last one --

12             MR. CONGDON:  I have no more after this,

13   Your Honor.

14             THE WITNESS:  Sorry.  Can you repeat the question?

15   BY MR. CONGDON:

16   **Q.**   Sure.  To your knowledge, did Dr. Israel ever submit any

17   analysis comparing JetBlue's 2023 standalone growth plans to

18   the joint network schedule the clean team created using the

19   2023 fleet?

20   **A.**   I have no knowledge of what he was doing.

21   **Q.**   Okay.  All right.  Let's shift topics, Mr. Fintzen.

22   Mr. Fintzen, American and JetBlue coordinate on capacity

23   decisions for routes within the scope of the Northeast

24   Alliance, correct?

25   **A.**   There's a -- kind of a protocol or a coordination

1  process, I think is what we defined it as.

2  **Q.**  All right.  Let's take a look at that process.  If we

3  could look at in your binder a document marked PX782.

4  **A.**  782.

5  **Q.**  And this has already been admitted into evidence.  And

6  this is an e-mail that you sent to Scott Laurence on March 4,

7  2021, correct?

8  **A.**  Scott Laurence and others.  Correct.

9  **Q.**  Okay.  And this was just after implementation of the

10  Northeast Alliance began, correct?

11  **A.**  Yeah, this would have been -- yeah, this would have

12  been -- would have been around that time, yeah.

13  **Q.**  Okay.  And you wrote to Mr. Laurence, "Hey Scott, here's

14  what Claire put together for a one-pager for Joanna for her

15  reference."  Do you see that?

16  **A.**  I do.

17  **Q.**  Okay.  And "Joanna" refers to Joanna Geraghty, the

18  president and chief operating officer of JetBlue?

19  **A.**  Yes.

20  **Q.**  And if we go to the attachment, it looks like the same

21  document has been attached twice, once as a PowerPoint and

22  one as a PDF.  I like the third page which is colored and you

23  can choose.  And you see the slide is titled "NEA Capacity

24  Coordination Process"?

25  **A.**  Yes.

1    **Q.**   Okay.  And this chart on the right summarizes the

2    capacity coordination process under the Northeast Alliance,

3    correct?

4    **A.**   Yeah, it gives Joanna a sense of how the teams were

5    working.

6    **Q.**   Let's look at step number 3.

7    **A.**   Okay.

8    **Q.**   It says, "Network reps convene on proposals to determine

9    consensus."  Do you see that?

10   **A.**   Sure.

11   **Q.**   And "network reps" refers to network planning

12   representatives from American and JetBlue?

13   **A.**   Yeah, network planning or schedule planning.

14   **Q.**   Okay.  And that's the process in place today, correct,

15   that network reps from American and JetBlue convene to

16   determine consensus?

17   **A.**   Yeah, they sit sort of, from time to time, as necessary,

18   to publish schedules, correct.

19   **Q.**   Now, prior to Northeast Alliance, JetBlue's network

20   planning team didn't seek consensus with any other airline on

21   their proposals, correct?

22   **A.**   There wasn't -- there wasn't a process like this in

23   place, no.

24   **Q.**   Okay.  And you see the fourth step in the process?  It

25   says "plans, including unresolved" --

1   **A.**   Number four?  Yeah.

2   **Q.**   Yeah.  "Plans, including unresolved differences,

3   presented to senior planning team."  Do you see that?

4   **A.**   I do.

5   **Q.**   Okay.  And you were deposed in this case on May 4, 2022,

6   correct?

7   **A.**   Sounds right.

8   **Q.**   And as of that date, you couldn't identify a single

9   instance where American and JetBlue had to even invoke the

10  process on resolving unresolved differences as laid out here,

11  correct?

12  **A.**   Well, the process -- just to be clear, the process laid

13  out here is reading out the plans and sort of the direction,

14  after we've -- in the process -- in step number 1, we're sort

15  of setting a high level vision of the strategy.  The teams

16  are then working through.  They're sort of reading out in

17  sort of corporate jargon where the plan's at.

18          So the working teams are making those -- are doing

19  that work.  Each team would very, very clearly steer them.

20  Each team is independent, maybe has final decision authority

21  about what they want to do.  And then the step number 4 is

22  really about how are we going to keep track, some progress of

23  how they're broadly tracking.

24          So this wasn't -- you know, that -- unresolved

25  differences, that's really the working team's working amongst

1    themselves and even getting to the point where I suppose they

2    could agree to disagree.  That's the process that's

3    established.

4    **Q.**  Okay.  If we can take a look at your deposition, it's the

5    second tab in your binder.

6    **A.**  Sure.

7    **Q.**  And this is your May 4, 2022, deposition.

8    **A.**  Second tab.  So -- depo?

9    **Q.**  Depo, correct.

10             THE COURT:  What page?

11             MR. CONGDON:  Page 147 of the deposition.

12             I'm sorry, let's go to 146, please.

13             THE WITNESS:  Sorry 146?

14   BY MR. CONGDON:

15   **Q.**  Yeah, apologies.  Starting on lines 22.

16             And you were asked, "So you can't think of an

17   instance where American and JetBlue's network reps were not

18   able to determine consensus on proposed schedules?"

19             And you said, "I can't remember an instance where

20   we sort of invoked the sort of -- this governance process and

21   said this is a -- you know, we talk about plans, including

22   unresolved differences.  And those unresolved differences

23   were sort of escalated in that process.  I can't really

24   remember anything like that."

25             Do you see that?  Did I read that correctly?

 1  **A.**  I'm sorry.  I lost where you were.  Sorry.

 2          THE COURT:  146.

 3          THE WITNESS:  146.

 4          THE COURT:  Very bottom of the page, line 22.  See

 5  the line numbers?

 6          THE WITNESS:  Okay.  Yes.  Thank you.

 7          THE COURT:  From there to 147, line 7.  And his

 8  first question is did he read it correctly.

 9          THE WITNESS:  Thank you.  Okay.  I see where you

10  are now.  Thank you.

11  BY MR. CONGDON:

12  **Q.**  And did I read that correctly?

13  **A.**  Yes.

14          MR. CONGDON:  Okay.  Your Honor, I move to admit

15  page 146, the May 4, 2022, deposition, beginning at line 22,

16  through page 147, line 7, as a party admission.

17          MR. CRANER:  Your Honor, we have no objection to

18  admitting the transcript, that portion.  We don't believe

19  there's any inconsistency, but we have no objection.

20          THE COURT:  Fine.  Admitted.

21          (Plaintiffs' Exhibit Deposition of David Fintzen,

22          May 4, 2022, page 146, line 22, through page 147,

23          line 7, admitted into evidence.)

24  BY MR. CONGDON:

25  **Q.**  Mr. Fintzen, I would like to switch to another topic.

1    And we'll be hopefully brief on this.  I know the Court has

2    heard about it.

3              Mr. Fintzen, the Mutual Growth Incentive Agreement,

4    the MGIA, became effective on April 1, 2021, correct?

5    **A.**  Correct.

6    **Q.**  And you were involved in negotiating the MGIA, correct?

7    **A.**  Yeah.  As part of the team that did that, correct.

8    **Q.**  And the MGIA was negotiated while COVID was going on,

9    correct?

10   **A.**  Correct.

11   **Q.**  Okay.  And as you earlier testified, the clean team was

12   assuming a steady state might return around 2023?

13   **A.**  Clean team needed to do their best to separate COVID to

14   making any long-term strategic decision; so similar, you had

15   to do the same in the MGIA.

16   **Q.**  And that assumed -- you assumed demand would return to

17   something like 2019 levels around -- by 2023, correct?

18   **A.**  For the purposes of developing and thinking through a

19   network, for the purposes of the MGIA, you actually wanted to

20   think much longer term than that.

21   **Q.**  Okay.  Well, just for purposes of developing a network,

22   you were thinking demand might return to 2019 levels around

23   2023, right?

24   **A.**  I mean, nobody had anything close to a crystal ball.

25   Like, you had to take a -- just put your finger in the wind.

**Q.**  Sure.  The MGIA didn't incorporate any sort of adjustment
in the first couple of years to account for that, correct?

**A.**  No specific adjustment, no.

**Q.**  Okay.  Now, there came a time later in 2021, when you
learned that JetBlue would owe a fairly significant amount in
incentive payments to American under the MGIA, correct?

**A.**  Yeah.  As we launched the MGIA and started to implement
the MGIA, it was in the midst of still a pretty extreme
environment from COVID.

**Q.**  And that amount, by the end of 2021, was in the hundreds
of millions, correct?

**A.**  Correct.

**Q.**  I think in your deposition you estimated somewhere in the
lower 200 millions.  Does that sound right?

**A.**  Yeah, that sounds right.

**Q.**  That sounds right that that's what the amount was,
correct?

**A.**  Correct.

**Q.**  Now, ultimately, as we know, JetBlue and American came to
an agreement over how much transfer payment JetBlue actually
paid to American, correct?

**A.**  Correct.

**Q.**  Okay.  Let's go ahead and look at that agreement, if we
could.  And --

THE COURT:  One question about the transfer

1   payments.  Are they trued up once a year?

2                  THE WITNESS:  It's --

3                  THE COURT:  Is it a once-a-year accounting and then

4   somebody pay somebody the transfer payment, or is it done --

5   is it -- are the payments made more every month or every week

6   or every quarter?

7                  THE WITNESS:  Every quarter, sort of a very

8   preliminary process.  The true, sort of, true-up and audit

9   process to sort of determine that sort of number for the

10  year, that's done after the end of that calendar year.

11                 THE COURT:  But in terms of cash going one way or

12  the other way, it doesn't happen until the end of the year?

13                 THE WITNESS:  And there's a mechanism where you can

14  either make estimates or you might -- you might have some

15  cash if you feel comfortable with the estimates along the

16  way, but it's really built around what's kind of that full

17  year number.

18                 THE COURT:  Okay.  Go ahead.

19  BY MR. CONGDON:

20  **Q.**   Okay.  We're just going to pull up a document marked

21  DX437.  And this is a defense exhibit that's in evidence.

22  Probably in the back of the binder.  We put the defense

23  exhibits back there, but it's also on the screen if that's

24  easier, Mr. Fintzen.

25  **A.**   Thank you.

**Q.**  And, now, Mr. Fintzen, this is a letter to you dated
January 6, 2022, correct?

**A.**  Correct.

**Q.**  Okay.  And it's sent and signed by Mr. Anmol Bhargava at
American?

**A.**  Correct.

**Q.**  And you're familiar with Mr. Bhargava, correct?

**A.**  I am.

**Q.**  He's sort of your counterpart at American with respect to
the Northeast Alliance?

**A.**  Correct.

**Q.**  And on the second page, that's your signature, correct?

**A.**  Correct.

**Q.**  It says "acknowledged and agreed," and has your name and
signature?

**A.**  Correct.

**Q.**  And if we just go to the first big paragraph in the
letter, it reads, starting sort of at the end of the second
sentence, "Given the variability and the currently available
data and the continued effects of COVID-19 on revenue
performance, which led to unexpected outputs from the MGIA
model, the parties have mutually agreed to cap the periodic
mutual growth incentive payments and the final mutual growth
incentive payments (collectively, the MGIPs) at $27 million
for the twelve months ending March 31, 2022," correct?

1    **A.**   Correct.

2    **Q.**   And this reflects that American and JetBlue agreed that

3    JetBlue would pay American no more than $27 million for the

4    12 months ending March 31, 2022, correct?

5    **A.**   Correct.

6    **Q.**   And this letter refers to unexpected outputs from the

7    MGIA model.  Do you see that?

8    **A.**   Yes, I do.

9    **Q.**   And is that what we were talking about before that led to

10   the hundreds of millions of dollars?

11   **A.**   That was the extreme operating environment from COVID

12   that we were still living in, you see referenced in the

13   sentence before.

14   **Q.**   Yeah, exactly.  Those unexpected outputs, it wasn't error

15   in data entry or something, was it?

16   **A.**   That we're referencing here?  No.

17   **Q.**   Okay.  It reflected actual flying that took place in

18   2021, correct?

19   **A.**   Correct.

20   **Q.**   And going forward, you didn't change the MGIA model in

21   any way, correct?

22   **A.**   The -- the mathematical equations?

23   **Q.**   Correct.

24   **A.**   No.

25   **Q.**   In fact, it says that in the third paragraph of this

1    letter, right, that you weren't going to change the MGIA

2    model in any way?

3    **A.**   The math, no.

4    **Q.**   Okay.  American and JetBlue simply agreed that the actual

5    flying that took place between April 1, 2021, and March 31,

6    2022, was not reflective of the spirit of the MGIA, correct?

7    **A.**   Correct.

8            MR. CONGDON:  Thank you, Your Honor.  No further

9    questions.  I pass the witness.

10           THE COURT:  All right.  Cross-examination.

11           MR. CRANER:  Thank you.  Just one sec to get set

12   up.

13           THE COURT:  Sure.

14           MR. CRANER:  I'll hand out a binder to Your Honor

15   and the witness.

16           THE COURT:  Sure.

17           Before you get started, I just have a question, a

18   further question on DX437.  The one you were just --

19           THE WITNESS:  The one we were just looking at?

20           THE COURT:  Yeah.

21           THE WITNESS:  That was 437?

22           THE COURT:  437, exactly.

23           THE WITNESS:  Sure.

24           THE COURT:  So the sentence that counsel asked you

25   about capped the -- thank you -- capped the transfer payment

1   for the period March -- ending -- for the year ending

2   March 31, 2022, at 27 million.  Right?  That's the sentence

3   you just discussed with him.

4            THE WITNESS:  Yes.

5            THE COURT:  The next sentence says, "The parties

6   mutually agree to cap for the nine months ending December 31,

7   2021, at 20 million."  So that's a subset period of the prior

8   period.

9            THE WITNESS:  Yes, correct.

10            THE COURT:  Is that -- just explain that to me.

11            THE WITNESS:  Because you -- as you're accruing or

12   sort of recognizing the revenue liability, or the contra

13   revenue, technically, it does happen on a quarterly basis.

14   So that meant, of the 27, 20 million would be booked in the

15   fourth quarter and 7 million would be booked in the first

16   quarter.  So it was really just to help our revenue

17   accounting team kind of know how to -- where to put the 27

18   million kind of in our overall financial statement.

19            THE COURT:  I see.  Okay.  It didn't have other

20   significance in terms of, like, if the loss were bigger, if

21   the transfers were bigger during the first nine months capped

22   at 20 million, but in the -- that other quarter, it was less

23   than 7 million, you could end up paying less than 27 million?

24            THE WITNESS:  It could have.  It could have had --

25   you know, because we were sitting in January, so you wouldn't

1    have had --

2              THE COURT:  Wouldn't know.

3              THE WITNESS:  -- full visibility into the first

4    quarter.

5              THE COURT:  Right.

6              THE WITNESS:  So it could have, but I think --

7              THE COURT:  It was more an accounting --

8              THE WITNESS:  It was more of an accounting thing

9    and less about --

10             THE COURT:  Whether those --

11             THE WITNESS:  -- getting that precise with that

12   sort of exact allocation.

13             THE COURT:  I see.  Okay.

14             Give me one other minute.

15             Oh, I see.  In any event, you accounted for that in

16   the next sentence, or next clause, with a proportional

17   increase in the 20 million if it were less than 7?

18             THE WITNESS:  Yeah.

19             THE COURT:  Okay.  Got it.  Thank you.

20             MR. CRANER:  May I proceed, Your Honor?

21             THE COURT:  Yes.

22             MR. CRANER:  Thank you.

23        **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT JETBLUE**

24   BY MR. CRANER:

25   **Q.**  Good morning, Mr. Fintzen.

1    **A.**   Good morning.

2    **Q.**   Mr. Congdon asked you some background questions.  I just

3    have a few follow-up background questions.  In your role as

4    the vice president of the Northeast Alliance, can you tell us

5    what your job responsibilities are?

6    **A.**   Sure.  So I really -- I oversee the implementation of the

7    Northeast Alliance.  So it's really a cross-functional role,

8    working with teams throughout JetBlue.  I'm really to deliver

9    what we call the seamless customer experience for our

10   customers within the NEA.

11   **Q.**   And can you describe for the Court the different groups

12   and teams at JetBlue that you work with in implementing the

13   NEA?

14   **A.**   Sure we rely -- we add work to a whole number of teams

15   throughout the company, and then work with them.  So kind of

16   working through the different teams.  In the commercial area,

17   work extensively with our partnerships team.  We work with

18   our network planning team.  We work with our corporate sales

19   team, our marketing and our brand team, our loyalty team --

20   that's our frequent flyer program.

21          We spend a lot of time with our IT team.  They play

22   a really important role in implementation.  In the finance

23   side, revenue accounting, which we just kind of touched on,

24   financial planning analysis, which I mentioned before.

25          Then in the operation, it's a number of different

1    teams.  It's -- where we need to -- our flight operations, so

2    kind of the people who sort of train and manage our pilots.

3    The airport, spend a lot of time with our airport teams.  Our

4    systems operation control are managing the operation,

5    day-to-day handling customers that may get disrupted.

6    Customer support, which is our reservation agents.

7            There's probably more I'm forgetting, but it's a --

8    it's a highly cross-functional sort of matrixed role to sort

9    of bring all of this work together to ensure that all of

10   these teams, which have very busy, very challenging day jobs,

11   are coordinated in a way that we can actually deliver these

12   customer benefits and make it easy for a customer to buy a

13   codeshare flight and get on an American plane if they're not

14   on a JetBlue plane.

15   **Q.**  Can you give some examples who you and your team help

16   with implementation process across those different teams?

17   **A.**  Just an example of the work we're doing?

18   **Q.**  Just an example for the Court.

19   **A.**  So with our IT team, we have a whole number of projects

20   we've worked with them to develop in terms of changes to our

21   information technology that help expand and improve the

22   seamlessness of the product.  So it can be working with the

23   team that manages the website and how we can sell codeshare.

24   To make that really obvious to a customer, what exactly

25   they're buying, versus JetBlue -- we're really proud of the

1   experience you get on JetBlue, we want to make it clear on

2   American, what you're getting.  So that's the part of the IT

3   team.

4            There's a lot of technology you have to work with,

5   with Sabre, which is our -- which is a business partner, to

6   make sure that the technology works so that a customer, when

7   they check in, they get a confirmation code; they put it in a

8   system, that it will work.  So there's a lot of effort that

9   has to go to coordinate and sort of make sure all of that

10  works in a way that customers -- and this is a multiyear

11  effort -- don't have to think about it, and it just kind of

12  naturally -- it's a very natural sort of process, to move

13  from, you know, buying a JetBlue flight to buying a codeshare

14  flight and walking onto an American airplane.

15  Q.  And as part of your work helping to implement the NEA, do

16  you interact with the American team?

17  A.  We do.

18  Q.  And can you describe the scope of that interaction?

19  A.  Yeah.  The lion share, the mass majority of your time is

20  with their team that similarly is developing their parts of

21  the customer -- the seamless customer experience.

22  Q.  And is there an expected time frame to complete the NEA's

23  implementation?

24  A.  In 2021, we sort of laid out our road map.  It was about

25  a three-year plan that we're working through.  19 months made

1    a lot of progress on that plan.  So that's kind of the way we

2    thought about it.

3            That said, it's not like we hit that first three

4    years, and we're done.  There's always going to be things

5    that we're going to be looking at to make better, but that

6    first three years is where we want to get the experience to

7    sort of where it can work in the market and will work in the

8    market.

9    **Q.**  Can you approximate how much of the NEA has been

10   implemented at this point?

11   **A.**  I would say, as we're tracking to the end of this year --

12   it's always hard to measure this precisely, but probably --

13   certainly majority, maybe 80 percent.

14   **Q.**  Okay.  Thank you.

15           Just want to move on to cover a couple of topics

16   that Mr. Congdon raised with you.  First, starting with the

17   MGIA, Mr. Congdon asked you a question about potential

18   adjustments being in the agreement.  Is there an opportunity

19   in the agreement to make any adjustments relating to the --

20   the MGIA base period?

21   **A.**  Yes, there are.

22   **Q.**  And can you please explain that to the Court?

23   **A.**  Yeah.  One of the challenges in negotiating the MGIA was

24   future-proofing for COVID.  And the way we thought about that

25   and approached that was you had -- you need to bring the base

1    period, that base period you set, into the post-COVID world.

2            So rather than trying to -- rather than try to

3    believe we could properly guess how to do that in spring of

4    2020, we actually set trigger points, one of which was set on

5    time, which was December 2020.  We were too optimistic about

6    timing.  But the second was set on an event.  And that's the

7    one we always thought would be more useful.

8            That event was industry -- domestic industry

9    revenue recovering to 2019 levels.  And so that's the kind

10   of -- the mechanism we approached to review and adjust --

11   review and, you know, enter into commercial negotiation on

12   the base period.

13   Q.   Okay.  And sticking with the MGIA transfer payment, has

14   that transfer payment impacted JetBlue's implementation of

15   the NEA in any way?

16   A.   No.

17   Q.   And has anyone told you that JetBlue plans to change its

18   business strategy because of the transfer payments in the

19   NEA?

20   A.   No.

21   Q.   Thank you.  I just want to move on.  Mr. Congdon showed

22   you a document and asked you a question about the concept of

23   metal neutrality.  Do you remember that?

24   A.   Yes.

25   Q.   Okay.  You don't need to look at the document.

1    **A.**   Okay.

2    **Q.**   To be clear, do you believe that the MGIA makes JetBlue

3    metal neutral?

4    **A.**   No.

5    **Q.**   And can you explain why you believe that?

6    **A.**   We -- we absolutely want and need customers on JetBlue

7    planes experiencing JetBlue.

8    **Q.**   And why is that?

9    **A.**   Two reasons, among others, but first, if you think about

10   it, JetBlue is a -- we're a little bit of a different animal

11   in the industry.  We have a different value proposition.  We

12   can market that.  We can advertise that, but if customers

13   don't know us, the best way for them to understand and learn

14   what we are is to get on the airplane to see why it's

15   different.  It's fun to see when that happens and I've seen

16   it.

17           So trial is what we call that, but there's a second

18   reason, and as you -- you know, what you want to do is you

19   want to grow your customer base, kind of your ecosystem, as

20   you might call it.  And that goes beyond just an individual

21   flight.  That's ensuring we grow our customers.  We bring

22   them to our website.  They're joining our loyalty program.

23   They're getting our co-brand credit card.

24           We've made an enormous amount of initiatives around

25   what we call JetBlue travel products, so selling a hotel, a

1    car, trip insurance.  So all of that -- all of that is really
2    important to sort of JetBlue's growth and JetBlue's strategy
3    in the industry.  So, no, we're -- we want customers to sort
4    of experience and live in that ecosystem.
5    **Q.**  Thank you.
6            And when the term "metal neutral" was used in the
7    capacity of the clean team, what did you understand that to
8    mean?
9    **A.**  I can speak to kind of how I was thinking about it,
10   because we were trying to get at the network sort of
11   relevance benefits that the NEA would bring, that ability to
12   grow the JetBlue customer base.  It's that notion of
13   seamlessness, there would -- that same customer to realize
14   the value of the network would need to be also flying,
15   arguably, through codeshare on an American Airlines plane.
16           So if you don't have that sense of seamlessness,
17   you can't really -- you can't really deliver the benefit to
18   the customer of this broader, deeper, bigger network that is
19   something that many customers really need and want.
20   **Q.**  Okay.  And we'll cover seamlessness in a bit.
21           You were asked some questions about putting
22   together a proposed joint network plan.  I think you
23   described it as being directionally useful and not a final
24   plan.  Can you just describe in your own words what the
25   purpose of that exercise was?

**A.**   Yeah, it was -- you can call it sort of due diligence or
directional.  The starting point for the clean team and the
work was kind of a thumbnail sketch of what Project Connie
could look like.  The network itself is, obviously, a key
component.  That's what helps us compete with United and
Delta more and more effectively.  So we needed to do enough
work to kind of see the opportunity and the growth
opportunity, the customer benefits.  But we didn't need it to
be so precise and so granular.  That's implementation work.

So that -- you know, it wasn't clear we would
proceed with Project Connie at that point -- that would turn
then to the implementation work.  So we just need to get kind
of close enough or, directionally close enough to make a
business decision.

**Q.**   Okay.  Thank you.

And you mentioned the concept of seamlessness and
that's been --

THE COURT:  I'm sorry, before you jump to
seamlessness, one more question about metal neutrality.  So
on the one hand, I understand what you're saying is you want
customers on JetBlue planes because then they get the JetBlue
experience, right?  That's one reason.  Isn't it?

THE WITNESS:  Yeah, absolutely.

THE COURT:  Then that's more likely -- the theory
is that the experience is positive and so that will cause

1    them to, like, decide they prefer JetBlue credit card over

2    any other credit card, be it an American credit card or an

3    American Express or whatever else.

4              THE WITNESS:  Exactly.

5              THE COURT:  And then with the credit card,

6    there's -- that's revenue for JetBlue.  And then they might

7    do travel plans, and they might go to your website and your

8    loyalty program, and all those other things generate

9    potential revenue and profitability.

10             THE WITNESS:  Yes.

11             THE COURT:  And so that's why you want them in your

12   ecosystem, and the benefit, then, of the network is -- the

13   benefit of the NEA is bigger network, more likely to draw

14   people, right?

15             THE WITNESS:  Absolutely.

16             THE COURT:  So then the flip side, though, is that,

17   in terms of constructing the schedule, it's metal neutral in

18   the sense that you're trying to create the -- trying to pool

19   the two sets of -- in the areas that you're coordinating,

20   trying to pull pool the two sets of metal to get the best

21   network, right?

22             THE WITNESS:  Yeah, absolutely.

23             THE COURT:  And -- and so in that sense, it might

24   be better for the network to put this JetBlue plane on XYZ

25   route because, overall, that leads to the best network

1    outcome, right?

2              THE WITNESS:  Yeah, or there may be routes that

3    just wouldn't really fit JetBlue, but we know some -- that

4    sort of that relevance, that network relevance, you want to

5    have that route sort of in the broader portfolio.  So having

6    access to -- if it requires a different fleet type, a --

7    Athens or Tel Aviv, you know, these are, you know, 5,000 mile

8    routes that are important routes.  We don't have a fleet that

9    could actually do that.

10             So there's going to be those examples where you can

11   kind of better use of the slots by having these two different

12   business models with strengths and weaknesses.

13             THE COURT:  Sure.  But the routes, say, that you

14   wouldn't ordinarily fly or would be less important but

15   there's a value and a network relevance, it may be that you

16   put a JetBlue plane on that flight, on that route?  Depending

17   on how the network schedule works out, because the network

18   people are trying to optimize it with metal neutrality in

19   mind?

20             THE WITNESS:  Yeah, you may -- they would be --

21   that's the work.  We're in the implementation.  They are kind

22   of going through, how does that turn into which slot, which

23   aircraft, right?  That's how you practically get to a

24   schedule where you can sort of have that agreement and maybe

25   you don't always agree on -- you certainly don't agree on

1    everything.  Then they have to make those sort of -- they

2    would make those decisions.

3         THE COURT:  But there's a way in which you would --

4    in a perfect world, you would prefer all JetBlue planes to be

5    on sort of, for lack of a better term, the best routes or --

6    or routes that would draw -- routes -- best in the sense it

7    would draw in the most -- serve your existing base and draw

8    in the most new people to your ecosystem?

9         THE WITNESS:  I think there's some things that

10   JetBlue does really well or we would -- that would be natural

11   to us.  I think the challenge, though, is there's a --

12   there's a set of customers that just kind of show up every

13   five years and just kind of buy a schedule or a price.

14   There's a subset of customers that are really buying a

15   network.

16        And so you want to make sure, through sort of

17   JetBlue or access to American, you're sort of presenting them

18   that network so that they can kind of come in and join that

19   loyalty program and be a part of that.  So you're kind of

20   looking at different types of customers in making those

21   decisions.

22        THE COURT:  Right.  I guess my question is, is

23   there any tension between maximizing network relevance and

24   maximizing people in your ecosystem?

25             THE WITNESS:  Well, the tension would be that

1    you -- you have to really be involved as JetBlue and be out

2    sort of growing JetBlue and investing from a JetBlue

3    standpoint to sort of realize the full benefit for JetBlue

4    customers.

5               THE COURT:  All right.  Go ahead.

6               MR. CRANER:  Thank you, Your Honor.

7    BY MR. CRANER:

8    Q.  And up on that point, does the NEA in any way change the

9    fact that JetBlue has discretion over the flights and routes

10   that it flies?

11   A.  No.

12   Q.  And does it -- does it change in any way the overall

13   business strategy?

14   A.  Oh, no.

15   Q.  Thank you.  I did want to turn to the issue of

16   seamlessness, which you described earlier.

17              MR. CONGDON:  Your Honor, I'd just like to object

18   to the line of questioning.  It's outside the scope of my

19   direct.  Mr. Fintzen is not on defendants' witness list and

20   therefore, their cross has to be limited.  I don't think I

21   asked him any questions about seamlessness.  Obviously, I'm

22   fine with all the background, but I just want to put an

23   objection of outside the scope of my exam.

24              MR. CRANER:  Your Honor, the witness testified what

25   his job responsibilities are, and we've had the discussion of

1    seamlessness, so I do think it's within scope.

2            MR. CONGDON:  He testified to that under

3    Mr. Crane's questioning.

4            THE COURT:  That's true.  He did testify about

5    that -- his job responsibilities in your questioning.  I

6    think some amount of seamlessness is within the scope of the

7    direct.  How far you can go, given the objection -- it's a

8    fair objection given the limitations, but at least for the

9    moment, you can ask.

10           MR. CRANER:  Thank you, Your Honor.  I will be

11   short.

12   BY MR. CRANER:

13   **Q.**  What does seamless customer experience mean in the

14   context of the NEA?

15   **A.**  Yeah, so what it means in the context of the NEA is that

16   we have a -- kind of a framework we use at JetBlue called the

17   travel ribbon, so it maps out kind of from when you're

18   shopping to managing your reservation, getting on the

19   airplane, moving through an airport, all the things that

20   happen after the flight.

21           The concept of seamlessness is systemically looking

22   through that travel ribbon with an eye towards the NEA and

23   making it convenient and easy for a customer to move through

24   that travel ribbon.  So in that sense, seamlessness is a lot

25   of somewhat little things, some occasionally a big thing,

1 that sort of add up to making sure that the customer doesn't

2 have to really sit and think how do I -- how do I get on a

3 codeshare flight.

4 **Q.** And can you give a couple of examples how that might

5 work?

6 **A.** Sure, so a few -- through that travel ribbon shopping, I

7 think I mentioned that earlier.  You want to make sure that

8 you set the right expectation, that the customer knows what

9 they're buying when they're getting a JetBlue experience and

10 when they're buying American through codeshare.

11   So there's been a lot of work on the website, more

12 to come, to make that sort of merchandising clear that's in

13 our IT team.

14   Customer communication has been a huge area of

15 focus.  So I mentioned that sort of needing two different

16 confirmation codes.  It's really thinking about how do we

17 communicate with the customer working with our market team,

18 our brand team, things like confirmation e-mails, directing

19 you to the right system so that you know where to go.

20   In the airport, this gets a little bit away from

21 IT, I suppose.  Let's say you have a connecting customer who

22 is flying into JFK.  They need to move from T5 to T8.  It's

23 investing in and having a bus that will move between the

24 terminals, behind security, so you don't have to come out of

25 security, go on the train, and come back.

1                    In many of these airports, it's something as simple

2       as, if you're connecting and showing up, making sure the bag

3       you checked moves from airplane A to airplane B and you never

4       have a customer have to worry about it.

5                    And then in the reciprocal loyalty benefits, on the

6       airplane, the last piece -- and in a way, it's IT, but it's

7       our customer insights team.  We do an enormous amount of

8       customer surveying work.  NPS is the metric we use.

9                    We've actually evolved and improved that survey, so

10      we're actually getting that customer feedback and scoring in

11      what we call verbatims and comments so we can then come back

12      and kick the tires on the plan and constantly improve what

13      we're doing to deliver a seamless customer experience.

14                   MR. CRANER:  Thank you, Mr. Fintzen.

15                   Your Honor, I have no further questions for now.  I

16      pass the witness.

17                   THE COURT:  Okay.

18                   Anything else?

19                   MR. CONGDON:  Yes.  Do you mind if I take the mask

20      off?

21                   THE COURT:  No, go ahead.

22                   MR. CONGDON:  Just a few questions, Mr. Fintzen.

23                   THE COURT:  The problem is Mr. Jones and the person

24      sitting next to you is thinking more about the being unmasked

25      then me.  And I'm fine with you staying there.  I'm just

1    kidding.

2              MR. CONGDON:  No, I know, but I'll actually use the

3    podium anyway.

4              THE COURT:  All right.

5              **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS**

6    BY MR. CONGDON:

7    **Q.**  Mr. Fintzen, I just wanted to pick up on that last point

8    real quickly.  You mentioned customer surveys.  Did I hear

9    that right?

10   **A.**  Correct.

11   **Q.**  Okay.  So when you want to know what your customers want,

12   you ask them?

13   **A.**  Yes.

14   **Q.**  And you do that through a survey?

15   **A.**  Among other ways, yes.

16   **Q.**  Mr. Fintzen, you just discussed a couple of moments ago

17   with Mr. Craner the idea that JetBlue wants to keep its

18   customers within its loyalty program, correct?

19   **A.**  Correct.

20   **Q.**  That's important for JetBlue?

21   **A.**  Absolutely.

22   **Q.**  During the evaluation of the Northeast Alliance, you and

23   folks within JetBlue expressed concern that the Northeast

24   Alliance might actually negatively impact JetBlue's loyalty

25   program, correct?

1    **A.**   During that -- during that period, our job was to

2    identify risks and think about what they are, often put some

3    sizing around it, and then think about how do you manage,

4    mitigate, or get comfortable with that risk.

5    **Q.**   And one of the risks was that if you have reciprocal

6    frequent flyer benefits with American, some customers might

7    simply choose to only enroll in American's loyalty program,

8    not JetBlue's, because they can still redeem their miles on

9    JetBlue flights, correct?

10   **A.**   I believe that was one of the risks we identified.

11   **Q.**   Okay.  Can you take a look at PX819?  I believe it's in

12   your binder.

13   **A.**   All right.

14           MR. CONGDON:  And I believe this is in evidence,

15   Your Honor.  We can go ahead and publish it.

16           THE COURT:  Okay.

17   BY MR. CONGDON:

18   **Q.**   Are you there, Mr. Fintzen?

19   **A.**   Yep.

20   **Q.**   And okay.  And you see this is an e-mail from someone

21   named Don Uselmann on October 1, 2020.

22   **A.**   Yes.

23   **Q.**   And who is Mr. Uselmann?

24   **A.**   At this point, he was the vice president of loyalty.

25   **Q.**   And he was sending it to Joanna Geraghty, Jane O'Brien,

1    Scott Laurence, yourself, and some others at JetBlue?

2    **A.**   Correct.  A number of folks at JetBlue.

3    **Q.**   Okay.  And the subject is "Connie loyalty update"?  Do

4    you see that?

5    **A.**   Yes.

6    **Q.**   Okay.  And he writes "All consistent with the Connie

7    governance process, I have attached the materials for today's

8    discussion"?

9    **A.**   Correct.

10   **Q.**   Fair to say that you were having a discussion about

11   loyalty under the Northeast Alliance on this day?

12   **A.**   Yeah.

13   **Q.**   If you turn to slide 9 of the attachment --

14   **A.**   Slide -- slide 9.

15   **Q.**   -- it's very small on the right-hand corner, it's got a

16   little graph with an orange, green, and blue line.  Do you

17   see that?

18   **A.**   You're talking about the text to the right, or the box

19   underneath?

20   **Q.**   The slide 9 has got the title:  "Through road map

21   prioritization and redemption subsidies, we can mitigate the

22   risk until TrueBlue value profit matures."  Do you see that?

23   **A.**   Yes.

24   **Q.**   And the risk referred to here is the risk we were just

25   discussing about the risk to JetBlue's loyalty program from

1    entering the Northeast Alliance?

2    **A.**   Yeah.

3    **Q.**   Okay.  And if you look at the graph, do you see there's

4    an orange line, a green line, and -- I'm going to guess gray?

5    **A.**   I think it's blue.

6    **Q.**   We'll go with blue.  Your eyes might be better than mine.

7    And do you see the orange line is the highest in terms of

8    annual revenue?

9    **A.**   Correct.

10   **Q.**   Okay.  And that says "planned trajectory," correct?

11   **A.**   Correct.

12   **Q.**   And it says, "absent AA/FFP deal, existing 20 percent

13   growth rate."  Do you see that?

14   **A.**   Yep.

15   **Q.**   And then the blue line, at the bottom, is the lowest,

16   correct?

17   **A.**   Correct.

18   **Q.**   And that says "no mitigation"?

19   **A.**   Correct.

20   **Q.**   And that says, "current AA/FFP deal without mitigation,"

21   correct?

22   **A.**   Correct.

23   **Q.**   And then the green line, in the middle, is titled

24   "mitigation plan," right?

25   **A.**   Correct.

1    **Q.**  And that's current AA/FFP deal with road map

2    prioritization and redemption subsidization?

3    **A.**  Correct.

4    **Q.**  And that was the plan that Mr. Uselmann and the loyalty

5    team were recommending JetBlue go down in that meeting?

6    **A.**  That was the iteration of that plan at that point,

7    correct.

8    **Q.**  Okay.  And that shows less growth than the trajectory,

9    absent the AA/FFP deal, correct?

10   **A.**  That's what the chart for loyalty shows it says.

11   **Q.**  If we could now go back to PX751, if we can go to the

12   second page, and pull up the language on Number 4 and

13   Number 1 -- actually, something of a subset?

14   **A.**  Okay.

15   **Q.**  Actually, I'm sorry; let's go back -- it's actually under

16   Number 5.  I'm sorry.

17   **A.**  That's later, right?  Yeah.

18   **Q.**  So you remember you were asked some questions about what

19   "metal neutral" meant in the context of this document?

20   **A.**  Sure.

21   **Q.**  Okay.  And when you wrote here what is intended to be a

22   metal neutral JV, you followed that by saying, "We need to

23   have route level forecasts to ensure we get the RSA right."

24   Do you see that?

25   **A.**  I do.

1    **Q.**  So when you were talking about metal neutral in this

2    context, you were talking about the economics of the revenue

3    share agreement, not customer seamlessness, correct?

4    **A.**  Well, relevance from a network perspective, which is

5    what's driving the -- in the parlance of the NEA, net

6    incremental revenue, is a by-product of seamlessness.

7    They -- one can't exist without the other.

8    **Q.**  Okay.  But here, you were talking about the revenue

9    sharing agreement, correct?

10   **A.**  Right, the MGIA.

11   **Q.**  Okay.  And then now, if we go back to, on Number 4 and

12   Number 1, please, and this time, if you go down to the third

13   paragraph --

14   **A.**  The -- "on Number 1"?

15   **Q.**  Yeah, the third paragraph under the Heading Number 4 and

16   Number 1 -- yeah, starting on "Number 1," exactly.  And

17   there, again, you're talking about potential alternatives and

18   how to schedule the shuttle routes, correct?

19   **A.**  Looks like it.

20   **Q.**  And in your second sentence, you write, "Let's all kick

21   the tires, though, and see what is best overall JV solution,

22   as that is what drives the economics."

23           Correct?

24   **A.**  Best overall JV solution, as that is what drives the

25   economics.

1   **Q.**  All right.  And by "best overall JV solution" there,

2   you're talking about what's best for the Northeast Alliance

3   as a whole, correct?

4   **A.**  Well, it's kind of getting to that -- that other question

5   around what puts the best network in front of customers so

6   that we can compete against United and Delta.

7   **Q.**  The best joint network between JetBlue and American

8   combined, correct?

9   **A.**  Right.  Well, and our customer base can access.

10  **Q.**  And that's what drives the economics?

11  **A.**  Yes, because that's what -- that's what allow us to grow

12  and allows us to grow our customer base and drive incremental

13  margin.

14          MR. CONGDON:  No further questions, Your Honor.

15          MR. CRANER:  Your Honor, I have very briefly just

16  on the topic of the frequent fliers that was just raised.

17          THE COURT:  Sure.

18      **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT JETBLUE**

19  BY MR. CRANER:

20  **Q.**  Mr. Fintzen, Mr. Congdon showed you two documents from

21  2020, and I want to talk about how the frequent flyer program

22  is going now.  Does JetBlue's TrueBlue program continue to

23  compete with the American Advantage program?

24  **A.**  Yes, it does.

25  **Q.**  And there was some discussion about risks, an analysis of

```
 1    risks.  Has the NEA eliminated competitive risks to JetBlue's
 2    frequent flyer program?
 3              MR. CONGDON:  Your Honor, if I could just object.
 4    I believe Ms. Swartz [sic] -- I believe we had him as 111 the
 5    other time, and I think Mr. Craner is now trying to do what
 6    Ms. Swartz was trying to do before.
 7              MR. CRANER:  This is a subject they did not raise
 8    in their direct, so it's a very brief questioning.  I can
 9    limit it to --
10              THE COURT:  I'm sorry.  No.  You asked the
11    questions.  He did his cross.  You did your redirect.  He's
12    doing his recross.
13              MR. CONGDON:  Correct.
14              THE COURT:  It's just the second round.
15              MR. CONGDON:  Okay.
16              THE COURT:  You're objecting to the question or to
17    his -- as to him standing up, we're just to the second round,
18    so he can do that.
19              MR. CONGDON:  Okay.  That's all right.  Your Honor.
20              MR. CRANER:  Your Honor, I just have one last
21    question.
22    BY MR. CRANER:
23    Q.  First of all, has JetBlue mitigated those risks?
24    A.  I believe so, yes.
25    Q.  And how so?
```

1   **A.**   A number of different ways.  One, we -- we -- I think I

2   mentioned the value proposition.  So we've added benefits,

3   something we called Mosaic+, we rolled out not long after

4   that presentation.  It adds another set of benefits to some

5   of our most loyal customers.  It's particularly things around

6   upgrades into -- into Mint.  So that's one example.

7           Another place is sort of -- we've been very

8   diligent and very thoughtful about how we roll out reciprocal

9   benefits and ensuring that -- that an Advantage member may

10  get an benefit on American Airlines.  If that benefit is not

11  offered to a TrueBlue member on JetBlue Airlines, that we

12  would never offer that to an Advantage member.

13          So it's kind of making sure that you can't -- one

14  program can't undercut the other to mitigate that risk, so

15  it's kind of an improve the value prop and then make sure you

16  sort of reinforce the value prop.

17  **Q.**   And what has been the growth trend for JetBlue's co-brand

18  credit card portfolio?

19  **A.**   It's been continuing to grow at a healthy rate.

20  **Q.**   Is that a result of the NEA?

21  **A.**   I -- I believe so.  The growth of the co-brand portfolio

22  inside of the NEA is outpacing the non-NEA geography.

23          MR. CRANER:  Thank you.  No further questions.

24          THE COURT:  All right.  Thank you very much.

25  You're excused.

1          MR. JONES:  Your Honor, plaintiffs call Jordan Pack

2     of American Airlines.

3          THE COURT:  What was the last name?

4          MR. JONES:  Pack, P-a-c K.  And Jimmy Moore with

5     the Department of Justice will conduct the examination.

6          THE COURT:  All right.

7          (Witness duly sworn.)

8          THE DEPUTY CLERK:  Can you please state your name

9     for the record?

10         THE WITNESS:  Jordan Pack.

11         THE COURT:  You can sit down.

12         Go ahead, Mr. Moore.

13                      **JORDAN PACK**

14         having been duly sworn, testified as follows:

15       **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS**

16    BY MR. MOORE:

17    **Q.**  Good afternoon, Mr. Pack.

18    **A.**  Hello.

19    **Q.**  You've been given a binder of exhibits that we may be

20    using during your examination today.  You can set it to the

21    side for now and I'll let you know when we need to look at

22    that binder.

23    **A.**  Okay.

24    **Q.**  You currently work for American Airlines; is that right,

25    Mr. Pack?

1    **A.**  Yes.

2    **Q.**  And you've worked for American Airlines since you

3    graduated from college in May 2017?

4    **A.**  Yes.

5    **Q.**  And your current position at American is senior manager

6    for commercial planning and analysis; is that right?

7    **A.**  Yes.

8    **Q.**  One of your current responsibilities at American is to

9    prepare American's five-year plan; is that right?

10   **A.**  To facilitate the five-year plan process, yes.

11   **Q.**  And just to be clear, the five-year plan is a goal post

12   for the network planning team at American; is that right?

13   **A.**  Yes.

14   **Q.**  If you could turn in your binder to PX378.

15           MR. MOORE:  And, Your Honor, this exhibit is

16   already in evidence.  We'll be publishing a redacted version.

17   BY MR. MOORE:

18   **Q.**  Just let me know when you get there, Mr. Pack.

19           THE COURT:  It's also on the screen, if you prefer.

20           THE WITNESS:  Oh.  Okay.

21   BY MR. MOORE:

22   **Q.**  And, Mr. Pack, this document contains certain redacted

23   information from your counsel, so the version in your binder

24   is the complete, unredacted version, the original, and then

25   the one you see on the screen is going to have redactions.

1    So I just ask that you not read the information that's

2    blacked out on the screen.

3    **A.**   Okay.

4    **Q.**   Mr. Pack, this is a November 15, 2021, e-mail from

5    yourself with the subject line "Monthly Growth Coordination";

6    is that right?

7    **A.**   Yes.

8    **Q.**   And the e-mail has an attachment entitled "five-year plan

9    growth coordination."  Do you see that?

10   **A.**   Yes.

11   **Q.**   Let's turn to the attachment.  I'm going to be looking at

12   the table that starts about midway down the page.

13   **A.**   Uh-huh.

14   **Q.**   Mr. Pack, this a table showing different network

15   initiatives at American Airlines; is that right?

16   **A.**   Yes.

17   **Q.**   And they're ranked in order of priority; is that correct?

18   **A.**   Yes.

19   **Q.**   And priority here, that means the order in which the

20   initiatives would be completed by American Airlines; is that

21   right?

22   **A.**   Based on the different scenarios, yes.

23   **Q.**   And you were given this priority order by your boss,

24   Mr. Brian Znotins; is that right?

25   **A.**   He's not my boss, but yes.

1    **Q.**  So you received this priority order from Mr. Znotins?

2    **A.**  Yes.

3    **Q.**  Looking at this priority list, it lists NEA/DCA first; is

4    that right?

5    **A.**  Yes.

6    **Q.**  Meaning that the NEA and DCA would be the first places

7    that American would try to invest its fleet; is that right?

8    **A.**  Yes.

9    **Q.**  And then if we look now down to prior 8, it's labeled

10   PHL.  Do you see that?

11   **A.**  Yes.

12   **Q.**  And that refers to Philadelphia's International Airport,

13   correct?

14   **A.**  Yes.

15   **Q.**  And we've heard some testimony already about American's

16   plans for Philadelphia already during this trial, but looking

17   at this document, the initiative here is to restore

18   Philadelphia to its 2019 level of departures; is that right?

19   **A.**  Yes.

20   **Q.**  So according to this priority list from Mr. Znotins,

21   American is going to prioritize sending fleet to the

22   Northeast Alliance over sending fleet to Philadelphia,

23   correct?

24   **A.**  Yes.

25   **Q.**  And just to be clear, Mr. Znotins, he's vice president of

1   network planning over at American Airlines; is that right?

2   **A.**  Yes.

3   **Q.**  So he's in charge of making network decisions for

4   American?

5   **A.**  He does have bosses, but yes.

6   **Q.**  Let's turn now to the next page.  And, again, I'm going

7   to be looking at the table in the middle of this page.  So

8   this table is showing us the aircraft that would be allocated

9   to certain hubs and spokes in American Airlines' network; is

10   that right?

11   **A.**  Yes.

12   **Q.**  And I realize there's a lot of redactions, so you may

13   need to look at your paper copy to answer some of these

14   questions.

15         So this table is comparing the allocation of

16   aircraft in the summer 2024 season to the summer 2019 season;

17   is that right?

18   **A.**  Yes.

19   **Q.**  And, again, looking at the redacted, you'll have to look

20   at your binder to answer this next question.  In each these

21   plans presented on this page, the number of aircraft allotted

22   to Philadelphia is less in 2024 than it was in 2019; is that

23   right?

24   **A.**  Yes.

25   **Q.**  But prior to 2020 and prior to the Northeast Alliance,

1     American had been planning to continue to grow in

2     Philadelphia; is that right?

3     **A.**   I'm not sure without looking at a document.

4     **Q.**   Let's turn in your binder to the tab labeled PX372.  And,

5     Mr. Pack, this is a series of text messages.  They've all

6     been produced originally by your counsel on individual pages

7     and to make it easier to follow, we prepared a demonstrative

8     that puts them all into one single table, and that's 372A in

9     your binder?

10            MR. MOORE:  And, Your Honor, we understand that

11    defendants do not object to using 372A for demonstrative

12    purposes.

13            THE COURT:  Fine.  Go ahead.

14    BY MR. MOORE:

15    **Q.**   Are you there at 372A, Mr. Pack?

16    **A.**   Yeah.

17    **Q.**   This is a series of text messages between Mr. Chad

18    Schweinzger and Mr. Anmol Bhargava and yourself; is that

19    right?

20    **A.**   Yes.

21    **Q.**   And all of you are employees of American Airlines?

22    **A.**   Yes.

23    **Q.**   Let's go to the first test message from Mr. Schweinzger

24    to you and Anmol Bhargava at 4:38 p.m.  Do you see that?

25    **A.**   Yes.

1    **Q.**  And Mr. Schweinzger is telling you about a conversation

2    that he had with Vasu Raja; is that right?

3    **A.**  Yes.

4    **Q.**  He says we were going to fly the XLRs and PHL, but now

5    we're going to fly them in JFK.  Do you see that?

6    **A.**  Yes.

7    **Q.**  And XLR refers to a type of airplane; is that right?

8    **A.**  Yes.

9    **Q.**  So in this text message, Mr. Schweinzger is referring to

10    moving the XLRs from Philadelphia to JFK; is that right?

11    **A.**  I think he's referring to at least some, maybe not all of

12    them, but yes.

13    **Q.**  And American was previously going to put these assets in

14    Philadelphia for transatlantic flying; is that right?

15    **A.**  Based on his text message, that's what me implies, yes.

16    **Q.**  But now, because of the Northeast Alliance, these XLRs

17    will be put into JFK instead of Philadelphia; is that right?

18    **A.**  In his text message, he's saying that could be a

19    scenario, yeah.

20    **Q.**  And that scenario would happen because of the Northeast

21    Alliance; is that right?

22    **A.**  It definitely enabled us to launch new markets in JFK

23    with that airplane.

24    **Q.**  And he would not be flying markets from Philadelphia as a

25    result of that; is that right?

1    **A.**  Not necessarily.

2    **Q.**  Well, the plane would be moved from markets where it

3    might have been flown before to new markets in JFK; is that

4    right?

5    **A.**  It could be, but we have other airplanes that we could

6    use.  It doesn't talk necessarily about, like, market exits

7    or something.

8    **Q.**  Understand.  But the XLR, what he's describing here is it

9    would have been in Philadelphia before and now it's going to

10   be in JFK?

11   **A.**  In this example, yeah, he's saying we have some, but he

12   would want to move to New York.

13   **Q.**  I want to go to his message at 4:39 p.m.  Mr. Schweinzger

14   says that Mr. Raja told him that he wanted the revenue

15   forecast for where the planes were going to fly in

16   Philadelphia as well as the forecasts for new flying in JFK;

17   is that right?

18   **A.**  That's what it says, yeah.

19   **Q.**  And now we're going to go to the second page of the

20   demonstrative, to Mr. Schweinzger's message at 8:25 p.m.

21   **A.**  At what time?

22   **Q.**  8:25, and it should be on your screen shortly.

23           In this message, Mr. Schweinzger is referring to an

24   opportunity cost in Philadelphia.  Do you see that?

25   **A.**  Yes.

1  **Q.**  And that means the opportunity cost of no longer flying

2  the XLRs in Philadelphia; is that right?

3  **A.**  Yes.

4  **Q.**  Meaning the revenue that would be lost from no longer

5  flying those planes in Philadelphia, right?

6  **A.**  The profitability, yeah.

7  **Q.**  You can put that document to the side, Mr. Pack.

8          So we've just been talking about Philadelphia.  I

9  want to talk briefly about American's plans for New York and

10  JFK in particular, as well.  In the fall of 2019, American

11  was planning to grow in JFK; is that right?

12  **A.**  Not to my knowledge.

13  **Q.**  Would a document help refresh your recollection on that?

14  **A.**  Yeah.

15  **Q.**  So this document is not in the binder.  We're going to

16  need to pass it out.  And it's not on the exhibit list, but

17  we're just going to be using it for purposes of refreshing

18  recollection, not moving to enter it at this time.

19          THE COURT:  Want to read all of it, or a certain

20  portion?

21          MR. MOORE:  Only the first three, 2½ pages or so.

22          So take a moment to look at the document, Mr. Pack.

23          THE COURT:  So just read that to yourself.

24  BY MR. MOORE:

25  **Q.**  Have you finished reading the document, Mr. Pack?

1   **A.**   Yeah.

2   **Q.**   And you received one of the e-mails in this chain that

3   was forwarded to you?  You can see that on the first page; is

4   that right?

5   **A.**   Yep.

6   **Q.**   Does that refresh your recollection that American was

7   poised to grow in JFK, was planning to grow in JFK as of the

8   fall of 2019?

9   **A.**   Yeah, it says the JFK slot waiver due to the MAX

10   grounding would be coming back, restarting in April of that

11   year, so it would have led to growth in versus the pace

12   period.

13   **Q.**   Right.  So American was planning to grow in part because

14   the MAX was going to be come back online?  It was no longer

15   going to be grounded; is that your understanding?

16   **A.**   Yes.

17   **Q.**   And another reason is because the slot waivers would no

18   longer be in place; is that right?

19   **A.**   That's what it says, yes.

20   **Q.**   Including slot waivers relating to construction in the

21   JFK; is that right?

22   **A.**   I'm not sure about that.  It only talks about the MAX.

23   **Q.**   But regardless, slot waivers would be expiring, right?

24   **A.**   Yes.

25   **Q.**   And that would result in growth at JFK; is that right?

1    **A.**  Yeah, versus this specific time period.

2    **Q.**  And that was also part of American's 2020 revenue plan at

3    that point, right?

4    **A.**  I don't know.

5    **Q.**  Well, I have another document -- same, to refresh your

6    recollection only.  We'll pass it out.  It's not in your

7    binder.

8            MS. MALTAS:  Your Honor, we would just request if

9    you could instruct the witness as to what it means to have

10   your recollection refreshed.  We don't believe that that did.

11           THE COURT:  Just read the document with the portion

12   that Mr. Moore directs you to, and then you can put it to the

13   side.  And then the question is, do you have -- has that

14   jogged your memory in some way that you have something else

15   to say to him in response to the question, not read what's

16   there or interpret it.

17           THE WITNESS:  Okay.

18           THE COURT:  No problem.

19           Do you want to read the whole thing?  Yeah, it's

20   pretty short.

21           MR. MOORE:  It's pretty brief, so --

22           THE COURT:  Yes.

23   BY MR. MOORE:

24   **Q.**  You can focus on the first page, and then there's a chart

25   on the second.  And just look at it briefly.

1        MS. MALTAS:  And, Your Honor, we would request that

2   Mr. Pack have the time that he needs --

3        THE COURT:  Yes.

4        MS. MALTAS:  -- given that they're asking him to

5   refresh his recollection.

6        THE COURT:  Just take as much time as you need,

7   Mr. Pack, to read it.

8        THE WITNESS:  Okay.

9        MR. MOORE:  As the Court instructed, you can put

10  that to the side once you're done reading.

11       THE COURT:  What's the question?

12  BY MR. MOORE:

13  **Q.**  So does that refresh your recollection that American was

14  intending to grow in JFK as of 2019, even in its 2020 revenue

15  plan?

16  **A.**  Yeah, versus the previous base year, because they would

17  have sent them the OD file, which would basically say how

18  many departures and where we were going to fly in JFK.

19  **Q.**  So, just to be clear, we're talking about growth in 2020

20  versus what American had been doing in 2019?

21  **A.**  Yes.

22  **Q.**  I'm going to switch topics now and go back in time to

23  March 2020 -- not a great time for many of us to recall, but

24  we'll try and get through it.

25       So in March 2020, you were asked to join an

1    internal working group at American that was considering

2    potential options for the partnership with JetBlue; is that

3    right?

4    **A.**   Yeah.

5    **Q.**   And about a month later, you were asked to join the clean

6    team that was analyzing this potential partnership; is that

7    right?

8    **A.**   Yes.

9    **Q.**   And we've heard a bit about the clean team already in

10   this trial, so I'm not going to go over all of the background

11   of the clean team's work; but just to set the table, you were

12   asked to join the clean team because of your network

13   scheduling experience; is that right?

14   **A.**   I don't know the full reason, but I would like to think

15   so.

16   **Q.**   But you were told, right, that one reason was because you

17   had network scheduling experience prior to working on the

18   clean team, right?

19   **A.**   Yeah, I think so.

20   **Q.**   And, in fact, you were the only clean team member from

21   either American or JetBlue that had prior network scheduling

22   experience, to your knowledge; is that right?

23   **A.**   I think Dave did, but at a different airline.

24   **Q.**   You were the -- do you recall giving a deposition in this

25   litigation -- actually, two depositions?

1    **A.**  Yes.

2    **Q.**  If you could turn to the first tab in your binder, CID

3    deposition.  And you're going to be going to page 109.

4    **A.**  What page did you say?

5          THE COURT:  109.

6    BY MR. MOORE:

7    **Q.**  And I'm going to be looking at lines 20 to line 9 on the

8    next page.  So the question was:

9          "And just trying to understand the process, how

10   much of the scheduling did you do at the American team and

11   then bring to the clean team with JetBlue, or how much was

12   created together?"

13         Your answer was, "So I made the schedule together

14   with v6 because it was clean team, so no one outside the

15   clean team, like, helped build the schedule.  Unfortunately,

16   I was the only person on the clean team both -- from both

17   sides that had scheduling experience, so I built the schedule

18   according -- according -- like, with JetBlue all along the

19   way."

20         Do you see that?

21   **A.**  Yes.

22   **Q.**  Did I read that correctly?

23   **A.**  Yes.

24         MR. MOORE:  Your Honor, we move to admit that as a

25   party admission.

1          MS. MALTAS:  No objection.

2          THE COURT:  Admitted.

3          (Plaintiffs' Exhibit Excerpt form Jordan Pack's CID

4          deposition on page 9 admitted into evidence.)

5    BY MR. MOORE:

6    **Q.**  Mr. Pack, I want to discuss some of the potential

7    structures for the partnership with JetBlue that American

8    considered before the clean team even began its work.  So if

9    you could turn to PX185.

10         MR. MOORE:  And, Your Honor, this is already in

11   evidence.

12   BY MR. MOORE:

13   **Q.**  And, Mr. Pack, just to orient you, this document was

14   produced to us as an Excel.  So the first page has some file

15   information, like the name and where it was found, and then

16   the following pages are a PDF reproduction of the

17   spreadsheet.  Does that make sense?

18   **A.**  Uh-huh.

19   **Q.**  So looking towards the top of the first page, the last

20   line says, "Garland Options."  Do you see that?

21   **A.**  What page, did you say?

22   **Q.**  The very first page.

23   **A.**  Oh.

24   **Q.**  And it's on your screen, as well.

25   **A.**  Oh.  The file name.  Yes.

1    **Q.**  So the file name is "Garland Options."  Do you see that?

2    **A.**  Yes.

3    **Q.**  And "Garland" refers to the Northeast Alliance?

4    **A.**  Yes.

5    **Q.**  And you were involved in the creation of this document;

6    is that right?

7    **A.**  Yes.

8    **Q.**  And it was created early on in the process of evaluating

9    the different options for the partnership; is that right?

10   **A.**  I think so, yeah.

11   **Q.**  And it was an internal discussion document for American;

12   is that right?

13   **A.**  Yes.

14   **Q.**  Let's turn to this second page, which is labeled

15   "Options" on the bottom right-hand corner.  Let me know when

16   you're there.

17   **A.**  Uh-huh.

18   **Q.**  So the table on this page is showing us five possible

19   options for partnership structures between American and

20   JetBlue; is that right?

21   **A.**  Yeah.  They were different scenarios that we were

22   throwing around.

23   **Q.**  And they're labeled A, B, C, D, and E in column B; is

24   that right?

25   **A.**  Yes.

1    **Q.**  And column C in this table is labeled "Headline."  Do you

2    see that?

3    **A.**  Yes.

4    **Q.**  And that provides a brief description of the five

5    scenarios or options that we were looking at in this table?

6    **A.**  I think so, yeah.

7    **Q.**  And then moving one column further to the right, it's

8    labeled "ATI."  Do you see, that?

9    **A.**  Yes.

10   **Q.**  And your understanding is "ATI" stands for "antitrust

11   immunity"?

12   **A.**  Yeah.  It's a formal definition.

13   **Q.**  But here your team was using "ATI" to mean options that

14   would include some form of network coordination between

15   American and JetBlue; is that right?

16   **A.**  I think so.  I don't know if it was just that or other

17   things.

18   **Q.**  Sorry, what was the end of your answer?

19   **A.**  I think so.  I just don't know if it was just network

20   coordination or other things.

21   **Q.**  But some form of coordination --

22   **A.**  Yeah.

23   **Q.**  -- between the two companies, correct?

24   **A.**  Uh-huh.

25   **Q.**  And your team used the term "ATI" because you were

1    relying on your experience with American's international

2    joint ventures that due involve network coordination; is that

3    right?

4    **A.**   Yeah, we had been familiar with the term "ATI" in that

5    regard.

6    **Q.**   And "that regard" being American's international joint

7    ventures; is that right?

8    **A.**   Yes.

9    **Q.**   So the first time options in this table are labeled with

10   "yes" under the ATI column.  Do you see that?

11   **A.**   Yes.

12   **Q.**   And that means that there would be some form of

13   coordination between American and JetBlue in these options;

14   is that right?

15   **A.**   I think so, yeah.

16   **Q.**   And then the last three options, option C, D, and E, say

17   "no" in the ATI column; is that right?

18   **A.**   Yes.

19   **Q.**   That means that in these options, American and JetBlue

20   would not be coordinating their networks; is that right?

21   **A.**   I don't know, because that's not what it's labeled as.

22   **Q.**   Well, as we were discussing ATI earlier, "ATI" means

23   coordination, right?

24   **A.**   Yeah.

25   **Q.**   And when it says "no," that means no coordination, right?

1   **A.**  I guess so.

2   **Q.**  Let's go to the headline for option D, and we'll zoom in

3   on the screen.  The headline for option D says "Absent ATI,

4   trade JetBlue, five Boston gates for approximately 25

5   additional JFK slots."  Do you see that?

6   **A.**  Yes.

7   **Q.**  So this option is contemplating that JetBlue would give

8   25 of its slots at JFK to American; is that right?

9   **A.**  Yeah, that's what it says.  Yes.

10  **Q.**  And in exchange, American would give JetBlue five of its

11  gates in Boston; is that right?

12  **A.**  Yes.  That's what it says.

13  **Q.**  And then the headline goes on to say, "Fully utilize to

14  build organic TA connectivity."  Do you see that?

15  **A.**  That's what it says, yes.

16  **Q.**  And "TA" refers to transatlantic; is that right?

17  **A.**  Yes.

18  **Q.**  And "organic" refers to American flying on its own

19  planes; is that right?

20  **A.**  Yes.

21  **Q.**  So this option is contemplating more transatlantic flying

22  by American out of JFK on its own planes; is that right?

23  **A.**  Yes.

24  **Q.**  And to do that additional flying on its own planes,

25  American would be using the slots that it obtained from

1   JetBlue; is that right?

2   **A.**   It could be an enabler of that, yes.

3   **Q.**   American would do that additional flying on its own

4   planes without network coordination; is that right?

5   **A.**   It doesn't say "network coordination" here, so I don't

6   know.

7   **Q.**   Well, it says "absent ATI," right?

8   **A.**   Yes.

9   **Q.**   And as we've established, that means some form of

10  coordination, correct?

11  **A.**   Yes.

12  **Q.**   So it would be doing this additional flying without

13  coordination; is that right?

14  **A.**   Based on here, yeah.

15  **Q.**   And let's go to the headline for option E now.  That's

16  described as a slot swap.  Do you see that?

17  **A.**   Uh-huh.

18  **Q.**   And in this option, American would trade some of its

19  LaGuardia slots in exchange for JetBlue's JFK slots; is that

20  correct?

21  **A.**   Yes.

22  **Q.**   But this option, again, does not contemplate capacity

23  coordination or network coordination in order to have the

24  slot swap, right?

25  **A.**   It says no ATI.

1   **Q.**  And it also says in the headline, but "without

2   coordination," right?

3   **A.**  Yes.

4   **Q.**  And it's generally true that capacity coordination,

5   network coordination, like the -- like American and JetBlue

6   have in the NEA, that's not required in order to have a slot

7   swap; is that right?

8   **A.**  Technically not, no.

9   **Q.**  I want to look now at the notes comments column for the

10  two options we've just been discussing.  It's all the way on

11  the right-hand side of the page.  And we're going to be

12  looking at options D and E.

13  **A.**  Which ones did you say?

14         THE COURT:  D and E.

15  BY MR. MOORE:

16  **Q.**  D and E, last two options.  In both of these options, it

17  says, "Absent ATI, there's a likelihood of AA-B6 overlap."

18  Do you see that?

19  **A.**  Yes.

20  **Q.**  The AA-B6 overlap there is referring to routes where

21  American and JetBlue would be competing against each other,

22  right?

23  **A.**  That's what I take it to mean, yes.

24  **Q.**  And it's saying that American and JetBlue would be

25  competing against each other on these routes absent network

1  coordination; is that right?

2  **A.**  It doesn't say competing.  It could mean we just have --

3  we were flying similar markets as before.  We have the

4  frequency of the same time.

5  **Q.**  Well, you just said that the AA-B6 overlap refers to the

6  airlines competing against each other, right?

7  **A.**  Yes.

8  **Q.**  And it's saying that, absent network coordination, they

9  would be competing against each other, right?

10  **A.**  Yes.

11       MS. MALTAS:  Objection.  Misstates testimony.

12       THE COURT:  Overruled.  You can answer.

13  BY MR. MOORE:

14  **Q.**  So just to ask the question, make sure we get the answer,

15  this is saying that, absent network coordination, American

16  and JetBlue would be competing against each other, right?

17  **A.**  Based on what's written, yes.

18  **Q.**  Let's turn now in your binder to PX268.

19       MR. MOORE:  And, Your Honor, this document is also

20  already in evidence.  We'll be publishing a redacted version.

21       THE COURT:  Who came up with the name "Garland"?

22       THE WITNESS:  I think Vasu, but I'm not totally

23  sure.

24       THE COURT:  And do you know why?

25       THE WITNESS:  It's a suburb of Dallas that is in

1    the northeast.

2            MR. MOORE:  I just learned something I didn't know,

3    so . . .

4    BY MR. MOORE:

5    **Q.**  Mr. Pack, this is a slide deck titled "Project Garland --

6    Overview and Status Update."  Do you see that?

7    **A.**  Yeah.

8    **Q.**  And you made this deck as part of American's evaluation

9    of different scenarios related to the Northeast Alliance,

10   correct?

11   **A.**  Yeah, I made components of it.

12   **Q.**  Let's turn to slide 5.  So this slide is showing us

13   different scenarios for potential partnerships between

14   American and JetBlue; is that right?

15   **A.**  Yes.

16   **Q.**  I want to focus on scenarios 0 and 2 for our discussion

17   today.  So let's start with scenario 2, which is the third

18   row, bottom of the table, and labeled "East Coast

19   International Alliance."  Do you see that?

20   **A.**  Yes.

21   **Q.**  And this scenario is referred to as a "fallback

22   scenario."  Do you see that?

23   **A.**  Yes.

24   **Q.**  And one column over to the right, "Partnership

25   Structure," it describes this as an Alaska structure on the

1    East Coast.  Do you see that?

2    **A.**  Yes.

3    **Q.**  And it also says "codeshare, West Coast International

4    Alliance structure," right?

5    **A.**  Yes.

6    **Q.**  So in this scenario, American would have a similar

7    partnership with JetBlue as it does with Alaska Airlines; is

8    that right?

9    **A.**  It doesn't list the full structure.  It has, like, growth

10   incentive and other things, so I'm not entirely sure.  But

11   it's listed as it would be similar to that, yeah.

12   **Q.**  And this scenario also lists the growth structure, right,

13   in the third bullet?

14   **A.**  Yes.

15   **Q.**  And that's also included in the Alaska partnership?

16   **A.**  That, I don't know.

17   **Q.**  Nevertheless, this scenario shares -- is described as

18   being similar to the American and Alaska partnership,

19   correct?

20   **A.**  Yes.

21   **Q.**  Let's go to the first row now, scenario 0, which is

22   labeled "East Coast JV."  Do you see that?

23   **A.**  Yes.

24   **Q.**  And it's referred to as a focus; is that right?

25   **A.**  Yes.

1   **Q.**  And this partnership structure is described as a combined

2   carrier joint venture with geography scope restrictions.  Do

3   you see that?

4   **A.**  Yes.

5   **Q.**  And it's also described as having an RSA plus capacity

6   governance; is that right?

7   **A.**  Yes.

8   **Q.**  And "RSA" stands for "revenue sharing agreement"; is that

9   right?

10  **A.**  Yes.

11  **Q.**  And "capacity governance" refers to capacity

12  coordination?

13  **A.**  Yes.

14  **Q.**  Scenario 0, what we're seeing in this row, is describing

15  what ultimately became the Northeast Alliance; is that right?

16  **A.**  To the best of my knowledge, yeah.

17  **Q.**  I want to walk through a few differences between

18  scenario 0 and scenario 2 that we've just been discussing,

19  and let's start with the network scope column.  So looking at

20  scenario 2 first, according to this column, scenario 2 would

21  only include American's international network; is that right?

22  **A.**  That's what's listed, yes.

23  **Q.**  Meaning American's domestic network would be excluded

24  from this partnership scenario?

25  **A.**  Yes.

1  **Q.**  So the domestic overlap routes where American and JetBlue

2  offer overlapping service, those would not be included in

3  this scenario; is that right?

4  **A.**  Yeah, it's no code on overlapping nonstop ODs.

5  **Q.**  But looking now at scenario 0, unlike scenario 2, that

6  scenario would include both American's and JetBlue's domestic

7  networks; is that right?

8  **A.**  Yes, with the exception of JetBlue transatlantic.

9  **Q.**  So both of the domestic networks, that would be included?

10  **A.**  Yes.

11  **Q.**  And unlike scenario 2, this proposal would then include

12  the domestic overlapping routes between American and JetBlue;

13  is that right?

14  **A.**  Yes.

15  **Q.**  Let's look now one column further to the right, which is

16  labeled "Restrictions."  Do you see that?

17  **A.**  Yes.

18  **Q.**  According to this column, scenario 2 would involve no

19  codesharing on overlapping nonstop routes; is that right?

20  **A.**  Yes.

21  **Q.**  But scenario 0 does not contain that same restriction; is

22  that right?

23  **A.**  It does not.

24  **Q.**  And let's go back now to the partnership structure

25  column.  And looking at scenario 0, as we mentioned earlier,

1    this scenario has revenue sharing and capacity coordination,

2    right?

3    **A.**   Yes.

4    **Q.**   But scenario 2, the East Coast international alliance,

5    that does not have capacity coordination, correct?

6    **A.**   Correct.

7    **Q.**   And as we've discussed, the Northeast Alliance, like

8    scenario 0, has both capacity coordination and revenue

9    sharing; is that right?

10   **A.**   Can you say that one more time?

11   **Q.**   The Northeast Alliance has revenue sharing and capacity

12   coordination like scenario 0; is that right?

13   **A.**   Yes.

14   **Q.**   And you're not personally aware of any partnerships

15   between two domestic airlines that involve both revenue

16   sharing and capacity coordination -- is that right? -- other

17   than the Northeast Alliance?

18   **A.**   Not in the United States, no.

19   **Q.**   Let's look now all the way over to the right again, the

20   initial value range column.  Do you see that?

21   **A.**   Yes.

22   **Q.**   So this column, it's not reflecting consumer savings that

23   would be generated by the partnership, right?

24   **A.**   No.

25   **Q.**   It's showing us the profits that will be generated by

1    both American and JetBlue, both individually and together as

2    part of the scenarios that are presented on this slide; is

3    that right?

4    **A.**   I don't think it's profitability.  I think it's revenue.

5    **Q.**   Thank you for that clarification.  So this is showing us

6    the revenues that would be generated by both American and

7    JetBlue individually and together in each of the scenarios

8    described on the slide?

9    **A.**   That's my impression, yeah.

10   **Q.**   And the projected revenues for scenario 0, the East Coast

11   JV, are higher than scenario 2, the ECIA; is that right?

12   **A.**   Yes.

13   **Q.**   You can put that document to the side.

14           I want to switch gears now and talk about what the

15   clean team did once you decided on the structure that

16   eventually became the Northeast Alliance.  So to evaluate the

17   business case for the Northeast Alliance, the clean team put

18   together a schedule for the combined networks of American and

19   JetBlue; is that right?

20   **A.**   Yes.

21   **Q.**   And to put together that schedule, the clean team started

22   with a baseline, which was each airline's actual schedule in

23   September of 2019; is that right?

24   **A.**   Yes.

25   **Q.**   And then using that September 2019 schedule, the clean

1  team went market by market to construct this combined

2  schedule; is that right?

3  **A.**  Yes.

4  **Q.**  And the year 2023 was chosen as the goal post for the

5  completion of this combined schedule; is that right?

6  **A.**  To represent steady state, yeah.

7  **Q.**  And the clean team named this combined schedule for 2023

8  the v2 schedule; is that right?

9  **A.**  Yes.

10         MR. MOORE:  And just for the court reporter, that's

11  a "v," as in "Victor," so "v2."

12  BY MR. MOORE:

13  **Q.**  The purpose of this v2 schedule was to evaluate the

14  business case for the partnership with JetBlue; is that

15  right?

16  **A.**  Yes.

17  **Q.**  And then after creating the schedule, the clean team ran

18  the schedule for a forecasting model called "Raven"; is that

19  right?

20  **A.**  Yes.

21  **Q.**  And Raven is a tool that's used in order to generate

22  forecasts based on a particular schedule input; is that

23  right?

24  **A.**  Yes.

25  **Q.**  And American uses -- uses Raven today in order to produce

1    business decisions; is that right?

2    **A.**  Yes.

3    **Q.**  And in the case of the clean team, the Raven outputs for

4    the v2 schedule, those were used to evaluate the business

5    case for the Northeast Alliance; is that right?

6    **A.**  Yes.

7    **Q.**  But the Raven outputs, in addition to being used for the

8    business case, were also provided to the economists who were

9    working for American and JetBlue in this litigation, Compass

10   Lexecon; is that right?

11   **A.**  Yes.

12   **Q.**  And it's your understanding that the economists used

13   these Raven outputs from the 2023 v2 schedule to calculate

14   the potential consumer benefits from the Northeast Alliance;

15   is that right?

16              MS. MALTAS:  Objection.  Lacks foundation.

17              THE COURT:  Sustained.

18   BY MR. MOORE:

19   **Q.**  Mr. Pack, you had several meetings with the economists

20   from Compass Lexecon; is that right?

21   **A.**  Yes.

22   **Q.**  And you spoke with them about the v2 schedule; is that

23   right?

24   **A.**  Yes.

25   **Q.**  And you spoke with them about the inputs that went into

1  the schedule; is that right?

2  **A.**  What do you mean "inputs"?

3  **Q.**  You explained the schedule file that was provided and put

4  into Raven; is that right?

5  **A.**  Yeah.

6  **Q.**  And the choices that were made in putting together that

7  schedule file, right?

8  **A.**  I don't remember telling them why we did certain things.

9  **Q.**  Well, if they had questions about why something happened

10  or something looked wrong, you would answer that question,

11  right?

12  **A.**  Yeah.  For the schedule, yes.

13  **Q.**  And as part of those discussions, is it your

14  understanding that the economists were using these Raven

15  outputs to calculate consumer benefits as part of the

16  Northeast Alliance?

17  **A.**  Yes.

18  **Q.**  I want to talk now about what's included in this v2

19  schedule.  So the combined schedule specifies the number of

20  times that American or JetBlue would be flying in a

21  particular market; is that right?

22  **A.**  Yes.

23  **Q.**  And it also specifies what times the airplanes would be

24  flying; is that right?

25  **A.**  Yes.

1  **Q.**  And what airplanes would be used for that flying; is that

2  right?

3  **A.**  Yes.

4  **Q.**  And it also shows us which airline American or JetBlue

5  would be flying in that market; is that right?

6  **A.**  Yes.

7  **Q.**  Let's turn in your binder to PX284.

8          MR. MOORE:  And, Your Honor, this document is

9  already in evidence.

10          THE COURT:  Okay.

11  BY MR. MOORE:

12  **Q.**  I want to turn to -- well, actually, let's start on the

13  first page first.  Mr. Pack, this is a schedule fact pack

14  that you produced from the schedule that was created by the

15  clean team; is that right?  You have it zoomed in on your

16  screen there.

17  **A.**  Yes.

18  **Q.**  So the schedule fact pack provides a summary of the clean

19  team's schedule; is that right?

20  **A.**  Yes.

21  **Q.**  Let's turn now to the second page.  And I'm going to be

22  looking at the table on the far right-hand side, around the

23  middle of the page.  It's labeled "Market Transfers, 2 to 1."

24  Do you see that?

25  **A.**  Yes.

1   **Q.**   So this is showing us markets where both carriers were

2   competing against each other on routes prior to the Northeast

3   Alliance; is that right?

4   **A.**   Yes.

5   **Q.**   But after implementation of the Northeast Alliance, only

6   one airline would be flying on these routes, according to the

7   clean team's schedule; is that right?

8   **A.**   Yes.

9   **Q.**   So, for example, before the Northeast Alliance, American

10  and JetBlue competed against each other on the route between

11  JFK and San Francisco; is that right?

12  **A.**   Yes.

13  **Q.**   But now in the 2023 v2 schedule, only JetBlue would be

14  flying that route; is that right?

15  **A.**   Yeah, they would be the only nonstop carrier.

16  **Q.**   And the same thing for JFK to Las Vegas, as well, right?

17  **A.**   Yes.

18  **Q.**   And according to this table, both American and JetBlue

19  flew the route between JFK and Phoenix as well prior to

20  Northeast Alliance; is that right?

21  **A.**   Yes.

22  **Q.**   And Phoenix, that's one of American's hubs; is that

23  right?

24  **A.**   Yep.

25  **Q.**   But in the v2 schedule, only American would be flying

1  that route; is that right?

2  **A.**  Yes.

3  **Q.**  All right.  You can put that document to the side.

4           I want to talk a bit about the mechanics of how the

5  clean team put the v2 schedule together.  So in creating the

6  schedule, the number of available gates at the NEA airports

7  from American and JetBlue, that was an important input; is

8  that right?

9  **A.**  Yes.

10  **Q.**  Because you can't schedule more departures or arrivals

11  than you have gates to park at, right?

12  **A.**  Yes.

13  **Q.**  And when you were constructing the 2023 v2 schedule, the

14  clean team used the same number of gates as the airlines

15  actually had in 2019; is that right?

16  **A.**  I don't remember if it was the -- looking backwards in

17  2019, or if it was a future infrastructure projection.

18  **Q.**  So you don't know whether you looked in the future or

19  not?

20  **A.**  I just don't remember what sheet I used for the number of

21  gates.

22  **Q.**  Can you explain what you mean by what sheet?

23  **A.**  Like, we have a document that would say this date, we

24  have this number of gates; and this date, we have this number

25  of gates.

1    **Q.**  But you didn't use gates the airlines didn't have, right?

2    **A.**  Yes.

3    **Q.**  And you weren't working with American's outside

4    scheduling team in order to figure out if you had more gates

5    in the future, right?

6    **A.**  They did provide inputs of, like -- I went and asked them

7    how many gates we would have on certain dates.

8    **Q.**  And so you just don't know one way or the other whether

9    in the v2 schedule you used the gates that you had in 2019?

10   **A.**  Yeah, I don't know which document I referred to to say we

11   had this number of gates specifically on what gate.

12   **Q.**  Number of slots, that was also an input into the

13   schedule, is that right?

14   **A.**  Yes.

15   **Q.**  And it's, again, important because you can't schedule

16   more arrivals or departures than you have slots; is that

17   right?

18   **A.**  Yes.

19   **Q.**  At least during slot constrained times of the day,

20   correct?

21   **A.**  Correct.

22   **Q.**  And in constructing the 2023 v2 schedule, the clean team

23   assumed that American and JetBlue would have the same number

24   of slots as they did in 2019, right?

25   **A.**  To my knowledge, yes.

1  **Q.**  And the number of airplanes, that was another important

2  input into the schedule, correct?

3  **A.**  Yes.

4  **Q.**  But unlike the slots, we know slots, you said they were

5  the same in 2019 and possibly gates, the clean team did not

6  use the exact same fleet as the airlines had in 2019 when

7  they were constructing this 2023 v2 schedule; is that right?

8  **A.**  Correct.

9  **Q.**  The clean team also included aircraft that would be

10  delivered in the future when putting together the schedule;

11  is that right?

12  **A.**  Yes, and by 2023.

13  **Q.**  The clean team, for example, assumed that American would

14  have the 321XLR, right?

15  **A.**  Yes.

16  **Q.**  And that was something that you didn't have in 2019?

17  **A.**  Correct.

18  **Q.**  I want to take a look now at the 2023 v2 schedule, and

19  it's going to be PX288 in your binder.

20          MR. MOORE:  And, Your Honor, this exhibit is also

21  already in evidence.

22          THE COURT:  All right.  A demonstrative or the

23  original?

24          MR. MOORE:  This is just the originally produced

25  document.  For now, at least.  We might need to use the

1    demonstrative.

2    BY MR. MOORE:

3    **Q.**   Mr. Pack, this is a similar spreadsheet as -- similar to

4    the spreadsheet as we showed before, so the first page

5    contains the file name and the location of the file, and then

6    the following pages are a PDF reproduction of the

7    spreadsheet.  Does that make sense?

8    **A.**   Yes.

9    **Q.**   So looking again at the first page, the top is labeled

10   "v2 optimized schedule data pack-clean team-20 May."  Do you

11   see that?

12   **A.**   Yes.

13   **Q.**   Let's turn to the tab labeled "v2 resources," and it's

14   page 22 if you're looking in your hard copy, but we'll put it

15   on the screen, as well.

16          Are you there?

17   **A.**   Yes.

18   **Q.**   So looking at the top left-hand corner, this says "block

19   hours/aircraft usage."  Do you see that?

20   **A.**   Yes.

21   **Q.**   And a block hour refers to the amount of time that an

22   airplane is on use in a particular route; is that right?

23   **A.**   Yes.

24   **Q.**   So it includes all the time from when the airplane pushes

25   back from the gate until it arrives at the gate at its

1  arrival airport; is that right?

2  **A.**  Right.

3  **Q.**  So "more block hours" generally means you need more

4  fleet; is that right?

5  **A.**  Yes.

6  **Q.**  So let's look at column E in the spreadsheet, which is

7  showing the block hours for airplanes that touched NEA

8  airports in the baseline schedule in September of 2019.  Is

9  that right?

10  **A.**  Yes.

11  **Q.**  Meaning the block hours that were actually used by

12  American and JetBlue in 2019; is that right?

13  **A.**  Yes.

14  **Q.**  And then looking over at column C, this is showing the

15  block hours for airplanes that would be touching NEA airports

16  in the 2023 v2 schedule; is that right?

17  **A.**  Yes.

18  **Q.**  And for American and JetBlue together, the block hours

19  are more than the 2023 v2 schedule than in the 2019 baseline;

20  is that right?

21  **A.**  They aren't summed here, but I know collectively they

22  are, yes.

23  **Q.**  Collectively, they're greater for the v2 schedule than in

24  the September 2019 baseline; is that right?

25  **A.**  Yes.

1   **Q.**  So the fleet being relied on in the 2023 v2 schedule is

2   larger than the fleet in the base 2019 schedule; is that

3   right?

4   **A.**  Yes.

5   **Q.**  And just stepping back for a moment, when constructing

6   this v2 2023 schedule, the clean team was looking at the NEA

7   footprint in isolation; is that right?

8   **A.**  Do you mean in terms of how we're building the schedule?

9   **Q.**  I mean, when looking at -- and creating the schedule, you

10  were constructing only -- you were only looking at the NEA

11  routes.  You were not looking outside of the NEA routes to

12  construct the schedule; is that right?

13  **A.**  Correct.

14  **Q.**  So the clean team, for the purposes of this schedule, was

15  not checking to see whether they needed to take airplanes

16  from elsewhere in the network in order to fly this v2

17  schedule; is that right?

18  **A.**  I can only speak for American's perspective, which for

19  us, there was a neutral or close to neutral fleet impact and

20  we instead relied on airplanes like the XLR that would enable

21  some of these markets to happen.

22  **Q.**  But that was a new airplane, right?

23  **A.**  Yes.

24  **Q.**  And you didn't check to see whether creating with this --

25  creating this NEA schedule would have impacts outside of the

1    NEA footprint for purposes of the v2 schedule, right?

2    **A.**   No.

3              MR. MOORE:  Your Honor, I'm about to switch topics

4    and seeing it's about one o'clock, would now be a good time

5    to break?

6              THE COURT:  All right.  Then we'll start a little

7    bit before 2:00 when we resume.

8              We'll take the -- lunch break now.  I'll see you a

9    couple minutes before two.

10             Thanks.

11             (Court in recess at 1:00 p.m.)

12             (The following reported by Rachel Lopez).

13             (Court in session at 1:56 p.m.)

14             THE COURT:  Ready to resume?

15             MR. MOORE:  Yes, Your Honor.

16             THE COURT:  Go ahead.

17   BY MR. MOORE:

18   **Q.**   Welcome back, Mr. Pack.

19             So before the lunch break, we were talking about

20   two schedules, the 2019 baseline schedule and the v2

21   schedule.  Do you recall that?

22   **A.**   Yes.

23   **Q.**   I just want to talk about one more schedule now.  The

24   clean team at one point produced a schedule called the v4

25   schedule; is that right?

1   **A.**   Yes.

2   **Q.**   And that v4 schedule showed what the world would have

3   looked like if the NEA were in place in 2019; is that right?

4   **A.**   Yeah.  That's our best guess.

5   **Q.**   So like the v2 schedule, the v4 schedule was using the

6   same number of slots as the airlines had in 2019, right?

7   **A.**   Yes.

8   **Q.**   And it was also keeping the gates consistent with 2019,

9   right?

10  **A.**   Yes.

11  **Q.**   But unlike the v2 schedule, the v4 schedule did also keep

12  the fleet of the two airlines the same, as well; is that

13  right?

14  **A.**   Yes.

15  **Q.**   So unlike the v2 schedule, the v4 schedule did not look

16  at the Northeast Alliance footprint in isolation; is that

17  right?

18  **A.**   Correct.

19  **Q.**   You were looking at the full network to see what effects

20  would happen on other places in the network, when making

21  changes within the Northeast Alliance footprint, correct?

22  **A.**   We did include the network as to see their impacts, but

23  we had to keep the fleet in constant, so we needed to fund it

24  from somewhere.

25  **Q.**   So you were funding it from outside the Northeast

1    Alliance footprint, correct?

2    **A.**   From American's perspective, we kept it roughly the same

3    by moving airplanes from other hubs, for example.

4    **Q.**   Let's turn in your binder to PX297.

5             MR. MOORE:  And Your Honor, this document is in

6    evidence.

7             THE COURT:  Okay.

8    BY MR. MOORE:

9    **Q.**   Are you there, Mr. Pack?

10   **A.**   Yes.

11   **Q.**   So this is an e-mail chain with the subject

12   line, "Project Garland clean team call;" is that right?

13   **A.**   Yes.

14   **Q.**   I want to turn to your e-mail on Thursday, May 21, 2020,

15   at 5:06 p.m.  It appears on the second page of the document.

16             Are you there?

17   **A.**   Yes.

18   **Q.**   So in this e-mail, you're discussing a v4 schedule,

19   correct?

20   **A.**   Yes.

21   **Q.**   And you write, "Following up on the v4 schedule.  This

22   schedule serves as our best guess as to what would have

23   happened in 2019 if American and JetBlue had the partnership

24   we are jointly proposing.  The key difference with this v4

25   compared to v2 is that we have to fund aircraft and resources

1   neutral."  Do you see that?

2   **A.**  Yes.

3   **Q.**  So that's what we were talking about earlier, right,

4   having to fund the aircrafts and keeping the fleet the same

5   as it was in 2019; is that right?

6   **A.**  Yes.

7   **Q.**  So v4 is different from v2 because you're not using the

8   airplanes that American or JetBlue expected to have in your

9   future, right?

10  **A.**  Yes.

11  **Q.**  You're using what they actually had in 2019?

12  **A.**  Yes.

13  **Q.**  And by keeping the fleet constant, you can then compare

14  the September 2019 baseline schedule with the 2019 NEA

15  schedule, right?

16  **A.**  Yes.

17  **Q.**  And that would be an apples to apples comparison, right?

18          MR. JONES:  Objection.  Misstates everything.

19  Testimony.

20          THE COURT:  Overruled.

21  BY MR. MOORE:

22  **Q.**  So comparing that 2019 baseline schedule with the 2019

23  NEA schedule, that would give you an apples-to-apples

24  comparison, right?

25  **A.**  Of what?

1   **Q.**  Well, it would let you look at what the network was

2   without the NEA, and with the NEA, at the same point in time,

3   right?

4   **A.**  It would allow you to see, you know, if we -- what we

5   thought if we had done this in 2019, what we would have been

6   able to do in the Northeast, like what American would have

7   done, what we wouldn't have been able to do, for example.

8   **Q.**  So you can look at -- forgive the word, the delta between

9   the stand-alone case in 2019, and the NEA in 2019 footprint;

10  is that right?

11  **A.**  When you say the stand-alone case in 2019, say what you

12  mean?

13  **Q.**  Fair enough.  So you can compare the American and

14  JetBlue, what they actually did in 2019, and what they could

15  have done with the NEA in place in 2019, right?  And you can

16  look at the delta between those two?

17  **A.**  It was a guess of what we did.  For American's

18  perspective, we basically just moved airplanes from our hubs

19  to the NEA, or actually moved airplanes out of the NEA and to

20  other hubs.

21  **Q.**  But to be clear, if you compare those two schedules?

22              THE COURT:  In v4.

23              THE WITNESS:  Yes.

24              THE COURT:  Go ahead.

25  BY MR. MOORE:

1    **Q.**  But to be clear, when you compare those two schedules,

2    you can see what the change is, what the potential growth is

3    that's attributable to the NEA, right?

4    **A.**  I don't think so, because it doesn't show like what the

5    NEA actually came to be, and what we defined the NEA to be

6    as, we designed it in the clean team.

7    **Q.**  And you designed it for 2023, right, not 2019?

8    **A.**  Yeah, we designed it for what we thought the future would

9    be, post-COVID.

10   **Q.**  Let's go your sentence starting with, "I have uploaded."

11   Do you see that?

12   **A.**  Yes.

13   **Q.**  It's midway through the paragraph.  And I actually want

14   to start on the next line with, "We can chat."  Do you see

15   that?

16   **A.**  Yes.

17   **Q.**  So you write, "We can chat about what I get ideas you

18   guys might have to fund increased flying on the B6 side or

19   what 2023 increased flying wouldn't have happened in 2019."

20              Do you see that?

21   **A.**  Yes.

22   **Q.**  So you're presenting two alternatives in this sentence;

23   is that right?

24   **A.**  Yes.

25   **Q.**  And the first is fund increase flying on the B6 side.

1    And by that you mean JetBlue moving aircraft around from

2    outside of the NEA into the NEA in order to support that

3    flying; is that right?

4    **A.**   Moving it wherever they fund it from, yes.

5    **Q.**   But whatever you need to do in order to keep the

6    footprint neutral, the aircraft fleet neutral, but have the

7    NEA in place, right?

8    **A.**   Yes.

9    **Q.**   And then the second part of the sentence you say, "What

10   2023 increased flying wouldn't have happened in 2019?"  Do

11   you see that?

12   **A.**   Yes.

13   **Q.**   And when you say what increased flying in the 2023 -- or

14   rather, strike that, let me start again.

15          When you say that, what you mean is what increased

16   flying in the 2023 v2 schedule would not have occurred, or

17   that JetBlue would have had to cancel in the 2019 v4

18   schedule; is that right?

19   **A.**   Are you asking within the NEA?

20   **Q.**   More generally.  The network, more generally.

21   **A.**   You can compare versus like 2023.  So for example, like,

22   on American, we would have had the XLR be delivered.  So in

23   this case, we couldn't have launched a lot of the new markets

24   that we did in the v2 schedule.

25   **Q.**   And same for JetBlue, right?  They have -- what you're

1    saying here is they would have to cancel some routes that

2    were projected in the 2023 v2 schedule, because you're

3    keeping the fleet constant; is that right?

4    **A.**  I don't know if it's cancelling, but not flying something

5    that wouldn't have happened in 2019, yeah.

6    **Q.**  I want to go to the e-mail from Mr. Fintzen, on Friday,

7    May 29th, at 7:56 a.m.

8             So it starts on the first page of the document and

9    then spills over to the second page.  That's where the meat

10   of the e-mail is.

11            Do you see that?

12   **A.**  Yes.

13   **Q.**  So this is eight days after your request for JetBlue to

14   provide data for the v4 schedule; is that right?

15   **A.**  Yes.

16   **Q.**  And Mr. Fintzen, we've heard from him already during this

17   trial, but he was a JetBlue employee, who was a clean team

18   member; is that right?

19   **A.**  Yes.

20   **Q.**  And he says our v4 data pack with adjusted frequencies

21   and aircraft types is posted up in the shared folder.  Do you

22   see that?

23   **A.**  Yes.

24   **Q.**  So he's providing you here with the updated v4 file with

25   the JetBlue data included; is that right?

| | |
|---|---|
| 1 | **A.**  Yes. |
| 2 | **Q.**  I want you to go to PX340 now. |
| 3 | MR. MOORE:  And Your Honor, this document is also |
| 4 | already in evidence. |
| 5 | THE COURT:  Okay. |
| 6 | BY MR. MOORE: |
| 7 | **Q.**  So this is another one of those spreadsheets that has the |
| 8 | first page with the file name and file location, and then the |
| 9 | spreadsheet is reproduced after the first page. |
| 10 | So if you look at the top of the first page, it |
| 11 | says the file name is, "2019 restrained-optimized data |
| 12 | pack-clean team-20 May-B6-vf." |
| 13 | Do you see that? |
| 14 | **A.**  Yes. |
| 15 | **Q.**  So this document is a copy of the v4 schedule?  Is that |
| 16 | right? |
| 17 | **A.**  It's not the schedule, it's the frequency matrix for the |
| 18 | schedule.  Yeah. |
| 19 | **Q.**  But for the v4 schedule, it's the frequency matrix? |
| 20 | **A.**  Yes. |
| 21 | **Q.**  Let's turn to the tab labeled "v4 resources," and it's |
| 22 | all the way towards the end, page 82 of your hard copy, but |
| 23 | again, we'll have it on the screen, as well. |
| 24 | Are you there? |
| 25 | **A.**  Yeah. |

1  **Q.**  So this tab is showing us block hours for American and

2  JetBlue and the 2019 baseline schedule, the 2019 v4 schedule,

3  and the 2023 v2 schedule; is that right?

4  **A.**  Yeah -- can you say that one more time?

5  **Q.**  So it's showing us the data for all three of the

6  schedules that we've just been discussing, the baseline

7  schedule, the v2 schedule, and the v4 schedule; is that

8  right?

9  **A.**  Oh.  Yes.

10  **Q.**  And the table on the left-hand side, that's data from

11  American; is that right?

12  **A.**  Yes.

13  **Q.**  And then the tables on the right-hand side, those are

14  tables from JetBlue that include the data you've received

15  from Mr. Fintzen; is that right?

16  **A.**  Yes.

17  **Q.**  And the top table on the right, that is for the v4

18  schedule; is that right?

19  **A.**  It's not labeled, but because the block hours are within

20  1 percent, I think so.

21  **Q.**  And 1 percent, that's keeping it relatively similar to

22  what the airlines flew in 2019.  That's what you're

23  referencing?

24  **A.**  Yes.

25  **Q.**  And this table, it's showing us JetBlue's flying both

1    within and outside the Northeast Alliance, in both the

2    September 2019 baseline, as well as in the v4 schedule; is

3    that right?

4    **A.**   Yes.

5    **Q.**   And if you look at -- let's look at cells J and I think

6    that's row 11, so the 2,292, and column L, row 11, 2,459.  Do

7    you see that?

8    **A.**   Yes.

9    **Q.**   If you compare each of those to the flying outside the

10   Northeast Alliance -- actually, let me back up.  When it says

11   "JV scope," that's referring to the footprint of the

12   Northeast Alliance; is that right?

13   **A.**   Yes.

14   **Q.**   And if you compare that to the outside the Northeast

15   Alliance, in both of these cases, the block hours are roughly

16   two to three times -- or three to four times, rather, the

17   size of the flying that's outside of the scope of the

18   Northeast Alliance; is that right?

19          MS. MALTAS:  Objection, Your Honor.  I'm just going

20   to object to foundation, because this is the information that

21   was provided by B6, so I know that it was sent to Mr. Pack,

22   but I'm not sure what foundation that he has to talk about

23   how JetBlue put together their schedule.

24          THE COURT:  Fair point.

25          MR. MOORE:  Your Honor, I'm not asking what

1    decisions they made on specific routes.  I'm just asking him

2    this information.  He was responsible for putting together

3    the schedule.

4            THE COURT:  You can ask him about what it says,

5    yeah.

6    BY MR. MOORE:

7    Q.  So again, Mr. Pack, just looking at what we see here in

8    this spreadsheet, the flying is roughly three to four times

9    larger within the JV scope, than outside the JV scope, in

10   both the base and the v4 schedule; is that right?

11   A.  Yes, that's what's here.

12   Q.  If we look now at column K, row 11, this was showing the

13   flying that JetBlue was doing in the baseline schedule

14   outside of Northeast Alliance.  Is that your understanding?

15   A.  To my knowledge, and based on the label, yeah.

16   Q.  If we look at column M, row 11, this shows us the flying

17   that the JetBlue would be doing outside the Northeast

18   Alliance and the v4 schedule; is that right?

19   A.  Based on my knowledge and the label, yes.

20   Q.  And column M, that shows -- column M, as in Mary.  So

21   comparing these two columns, column M is showing more than

22   100 fewer block hours allocated to flying outside the

23   Northeast Alliance in the v4 schedule; is that right?

24   A.  Yes, that's what was here.

25   Q.  Meaning that JetBlue would be doing less flying outside

1   of the Northeast Alliance in order to fund the flying within

2   the Northeast Alliance; is that right?

3   **A.**   Yeah.  Based on this document, they've moved that flying.

4   **Q.**   And you have to do that, right, because it's a zero sum

5   game.  If you're adding in one place, you have to take it

6   away from the other; is that right?

7           MS. MALTAS:  Objection.  I think this is outside

8   his foundation.

9           THE COURT:  Well, I think -- no, that's not about

10  this chart, per se.  That's generally about network

11  scheduling.  That's what you do, right?

12          THE WITNESS:  Yeah.  If the fleet is constrained,

13  you definitely have to -- you can only put it in so many

14  places.

15          THE COURT:  Or you could be more efficient?

16          THE WITNESS:  You could be more efficient, yes,

17  which we sometimes try.

18          THE COURT:  Go ahead.

19  BY MR. MOORE:

20  **Q.**   Just to make sure I understand, so it's correct that this

21  is essentially a zero sum game, you have to take from one

22  spot in order to add in another spot in this exercise; is

23  that right?

24  **A.**   Based on here, that's what it looks like they did.

25          THE COURT:  Just so you're all clear, so generally,

1    I view it as -- and maybe my understanding is wrong, and
2    that's what I'm telling you this.  So I don't view it as
3    completely a zero sum game, because if the fleet is
4    constrained and you want to add more hours in one place, then
5    one option is to take it away from somewhere else, but one
6    option is to run the planes longer.  And that might not work
7    in terms of the network scheduling, but that might.  That is
8    a answer.  So I don't understand the evidence to be that it's
9    conclusive that the only way, when the fleet is constrained,
10   to get hours in one place is to move aircraft at play.
11   Like -- and I'm not saying that is what this chart is, but
12   just sort of as a general -- since the question was general
13   and not specific to this, that's how I understand the
14   evidence to date.
15              MR. MOORE:  Understood, Your Honor.
16              THE COURT:  And that's what I understand about how
17   that works.  And I tell you all that, because I'm not finding
18   anything about that at the moment, but then you all can -- if
19   that's wrong, you should -- have plenty of opportunity to
20   correct it.
21   BY MR. MOORE:
22   Q.  And just to be clear with my question, so I was just
23   talking about the exercise that you were doing here, and in
24   this case, the exercise that you're doing, if you're taking
25   from one spot, you have to add it.  If you're adding from one

1    spot, you have to take from another; is that right?

2    **A.**   Yes.  In this exercise, we said that we would have a goal

3    of basically keeping the block hours of around 1 percent

4    change.

5    **Q.**   And just to follow-up on a few --

6               THE COURT:  That would limit more utilization, or

7    no?

8               THE WITNESS:  What did you say?

9               THE COURT:  That, in some way, limits more

10   utilization.

11              THE WITNESS:  Yeah, it basically would keep it at

12   the exact same.

13              THE COURT:  Same.  Right.

14   BY MR. MOORE:

15   **Q.**   And actually, just to go follow-up on the Court's

16   questions, if we go to the utilization column, or rather it's

17   titled "Util," do you understand that to be utilization?

18   **A.**   Generally, yes, but I did not make these columns.

19   **Q.**   Okay.  So you don't know what's reflected in these

20   columns?

21   **A.**   I don't know -- I know Util generally stands for

22   utilization, but I don't know what the numbers are

23   reflecting.

24   **Q.**   Okay and just looking at this document, you see that it

25   indicates --

1          THE COURT:  Well, you read the chart before, right?

2          THE WITNESS:  Yeah, but like the formulas for

3     the --

4          THE COURT:  Oh, the underlying formulas, yes.

5     BY MR. MOORE:

6     **Q.**  And so looking at this chart, the utilization in column Q

7     is 13.33, do you see that?

8     **A.**  Yes.

9     **Q.**  And that's the same in column T, as well?

10    **A.**  Yes.

11    **Q.**  And do you have any understanding of what affects higher

12    utilization rates for a particular plane would have on that

13    plane's performance?

14    **A.**  Like, what do you mean by "performance"?

15    **Q.**  If you use the plane more, does it have any effects on

16    the plane's ability to fly, long term usage of the plane,

17    anything like that?  Do you have any knowledge about that?

18    **A.**  Only generally that if the -- if you fly the airplane

19    harder, then it could age out quicker.

20    **Q.**  Let's turn back to tab 372A, which we looked at at the

21    beginning of our discussion today?

22    **A.**  You said 382?

23    **Q.**  372A.  Again, these are text messages between Mr. Chad

24    Schweinzger and Mr. Anmol Bhargava and yourself.  Is that

25    right?

1    **A.**  Yes.

2    **Q.**  And all three of you are members of the clean team for

3    American Airlines; is that right?

4    **A.**  Yes.

5    **Q.**  And these texts are all dated May 29th of 2020; is that

6    right?

7    **A.**  Yes.

8    **Q.**  And that's the same day that you received the v4 data

9    from JetBlue; is that right?

10   **A.**  Yes.

11   **Q.**  Let's turn to your text message with the time stamp of

12   8:22 p.m.  It's on the second page of the document that

13   you're looking at.  So in this message you write, "Slightly

14   scared that when we run v4 through Raven, B6 may not be rev

15   positive."  Do you see that?

16   **A.**  Yes.

17   **Q.**  And when you say "v4," you're referring to the v4

18   schedule we've been discussing?

19   **A.**  Yes.

20   **Q.**  And "Raven," you're referring to the forecasting tool we

21   were discussing earlier?

22   **A.**  Yes.

23   **Q.**  And when you say "rev," that's referring to revenue?

24   **A.**  Yes.

25   **Q.**  And then Mr. Schweinzger responds to you.  And we'll pull

1    that up on the screen.

2              He says, "Can you get a quick summary of adds and

3    cancels, we have the 2019 base revenue in the current Raven

4    runs, so we can get a sense for how much they are

5    cancelling."  Do you see that?

6    **A.**  Yes.

7    **Q.**  And when he says how much they are cancelling, you

8    understand they to be referring to JetBlue.  Is that your

9    understanding?

10   **A.**  Yes.

11   **Q.**  So he's asking you to get a sense of how much JetBlue is

12   cancelling in the v4 schedule; is that right?

13   **A.**  Yes.

14   **Q.**  And you liked Mr. Schweinzger's message at 8:26 p.m.; is

15   that right?

16   **A.**  Yes.  But the -- from my recollection, the -- this was

17   actually earlier in the day, not at 8:26 p.m.

18   **Q.**  So you don't think it was -- the time stamp is correct on

19   this?

20   **A.**  No.

21   **Q.**  Why don't we look back at PX372, which are the original

22   documents as they were produced?

23              THE COURT:  Is it the sequence that you're

24   wondering about or the actual time of day?

25              THE WITNESS:  No, after my last deposition, I

1    talked to counsel and went back and looked at the calendar,

2    and we think -- or I know that these times are not actually

3    the times they had.  I think they're in UTC time, not

4    Central/Dallas Time.

5            THE COURT:  Oh, I see.  So the sequence of the

6    texts is correct.

7            THE WITNESS:  Yes.

8            THE COURT:  It's just it wasn't 8:23, it might have

9    been whatever adjustment there would be between UTC and

10   Central Time.

11           THE WITNESS:  Exactly.

12           THE COURT:  Okay.  Do you care?

13           MR. MOORE:  I think the sequence is the most

14   important part, so if that's understood to be correct, then I

15   think we can proceed with that.

16           Let's go back to 372A, then.

17   BY MR. MOORE:

18   Q.  And Mr. Pack, just to clarify, as well, while we get this

19   back up on the screen, I think you testified to this, but

20   that's an understanding that you only came to understand

21   after your deposition in this litigation; is that right?

22   A.  Yes.

23   Q.  And after both of your depositions, both during the

24   investigation phase and during the litigation; is that right?

25   A.  Yes.

1    **Q.**  All right.  Great.  And I think at least what's indicated

2    here, 8:26 p.m., and I'm just going to use those times in

3    order to orient us on this chart here, but you liked

4    Mr. Schweinzger's message; is that right?

5    **A.**  Yes.

6    **Q.**  And so at that point, you put together a quick estimate

7    of JetBlue's adds and cancels in the v4 schedule; is that

8    right?

9    **A.**  Not that I remember, no.

10   **Q.**  But you know that Mr. Schweinzger asked you to do it,

11   right?

12   **A.**  Yes.

13   **Q.**  And you probably did it if he asked you, right?

14   **A.**  Not necessarily.

15   **Q.**  Do you recall your deposition from earlier in this

16   litigation?

17   **A.**  Yes.

18   **Q.**  And as we discussed, you understood that you were under

19   oath when you gave that deposition?

20   **A.**  Yes.

21   **Q.**  If we can go to page 137.  It's in the tab labeled, "LIT

22   depo."

23   **A.**  What tab?  Sorry.

24   **Q.**  It's LIT depot, L-I-T depot.  It's the second tab in your

25   binder.

```
 1              And are you there?

 2   A.   What page?

 3   Q.   Page 138?

 4   A.   I'm sorry.

 5   Q.   No worries?

 6   A.   138.

 7   Q.   138, 1-3-8.

 8   A.   I'm there.

 9   Q.   And just looking at the first three lines, lines 1 to 3.

10   There's this question, "Do you think that you would -- if

11   Mr. Schweinzger asked you to do it, that you probably did

12   it?"

13              And your answer was, "I probably did it."

14              Is that right?

15   A.   Yes.

16              MR. MOORE:  Your Honor, we move to admit as a party

17   admission.

18              THE COURT:  Any objection?

19              MS. MALTAS:  No objection.

20              THE COURT:  Admitted.

21   BY MR. MOORE:

22   Q.   And I want to go back for just a moment to our discussion

23   about --

24              THE COURT REPORTER:  Was there a number?

25              THE COURT:  I haven't been giving numbers to the
```

1    deposition.  I suppose I should -- you think I should be

2    numbering the -- I don't think I need to number as exhibits

3    the excerpts from the depositions that are admitted, unless

4    anyone thinks otherwise.

5            MR. JONES:  No, Your Honor.  I think as long as we

6    have the deposition, the page number, and the line number.

7            THE COURT:  All right.  So I just admitted

8    Mr. Pack's litigation deposition, page 138, lines one, two,

9    and three.

10           Go ahead.

11   BY MR. MOORE:

12   Q.   All right.  Let's flip to the next page of the

13   demonstrative.  I want to go to Mr. Schweinzger's message

14   that's indicated here, at least, to be 10.02 p.m.

15   A.   What is the exhibit number that's on?

16           THE COURT:  Same exhibit that you've been looking

17   at.

18           MR. MOORE:  372A.

19   BY MR. MOORE:

20   Q.   So we're at Mr. Schweinzger's message at 10:02 p.m.,

21   right?

22   A.   Yes.

23   Q.   And that's less than two hours after you liked his

24   message requesting the summary adds and cancels?

25   A.   Yes.

1   **Q.**   And in this message, Mr. Schweinzger writes, "I'm

2   completely out of ideas."   Do you see that?

3   **A.**   Yes.

4   **Q.**   And if you look at his next two messages, he says --

5   we'll wait for them to come up on the screen.   So

6   Mr. Schweinzger is writing here, "So if we show full network

7   results, no bueno."   Do you see that?

8   **A.**   Yes.

9   **Q.**   And you understand "no bueno" to mean not good?

10  **A.**   Yes.

11  **Q.**   And you responded to this message.   Do you see that?

12  **A.**   Yes.

13  **Q.**   You said, "Yeah;" is that right?

14  **A.**   Yes.

15  **Q.**   I want to go to Mr. Schweinzger's next message now.   So

16  here Mr. Schweinzger writes at 10:03 p.m., "Based on what I'm

17  hearing here, if I was DOJ, I could easily kill any deal . .

18  . Any deal."   Do you see that?

19  **A.**   Yes.

20  **Q.**   And then in his next two messages he writes, "No deal

21  positive.   Ever."   Do you see that?

22  **A.**   Yes.

23  **Q.**   And when he says "deal," it's your understanding is that

24  he was referring to the Northeast Alliance; is that right?

25  **A.**   Yes.

1    **Q.**  I want to go to your message now at 10:27 p.m.

2             MR. WALL:  Could we just have some convention for

3    record that you'll say 10:27 p.m., but note that it's

4    incorrect and UTC Time is actually --

5             THE COURT:  I'm happy to note.  I think the record

6    is already clear, because we discussed it, but all of the

7    times in this are not -- are stipulated, as I understand, to

8    be correct in sequence, and as to the date to be correct, but

9    that the time stamp which we're going to use, which is on the

10   exhibit, which comes from the demonstrative, which comes from

11   the underlying exhibit, there may not -- it's not a

12   stipulation whether the time is correct, but it's not

13   determined that it isn't correct, so far in the record, but

14   the time which is reflected here might be UTC, rather than

15   Central Time.  And so that's what the record is.  And if

16   anybody wants, thinks it's material as to which time it is,

17   then they can submit evidence.

18             Is that enough?

19             MR. WALL:  I missed the part right after, "I think

20   it's understood."

21             THE COURT:  Go ahead.

22   BY MR. MOORE:

23   **Q.**  And Mr. Pack, do you have any understanding of whether

24   UTC, that's earlier or later in the evening?

25   **A.**  I think it's minus five, so like I think it's five hours

1    before.

2    **Q.**  Five hours before or five hours later?

3    **A.**  Sorry, like earlier in the day.  So like if this is 10:00

4    p.m., it would be like 5:00 p.m. in Dallas.

5    **Q.**  Okay.  So I'm now looking at your message at 10:27 p.m.

6    Do you see that?

7    **A.**  Yes.

8    **Q.**  You write, "I think that the regulatory case for this

9    domestic JV with ATI doesn't exist."

10                Do you see that?

11   **A.**  Yes.

12   **Q.**  And when you say, "This domestic JV with ATI," you were

13   talking about the Northeast Alliance, right?

14   **A.**  Yes.

15   **Q.**  And then your message at 10:27 p.m. -- or rather,

16   Mr. Schweinzger's message at 10:27 p.m.  So same minute,

17   same, both at 10:27 p.m., he agrees with you.  Do you see

18   that?

19   **A.**  Yes.  He "arees."

20   **Q.**  And you understood that to mean he's agreeing with you?

21   **A.**  Yes.

22   **Q.**  And then he goes on to say, "On network alone, it does

23   not exist."  Do you see that?

24   **A.**  Yes.

25   **Q.**  Let's go to your message at 10:29 p.m.  So in your

1   message at 10:29 p.m., you write, "It's going to be a
2   constant uphill battle, and we're not going to convince DOJ."
3   Do you see that?
4   **A.**  Yes.
5   **Q.**  And DOJ refers to the Department of Justice; is that
6   right?
7   **A.**  Yes.
8   **Q.**  And ultimately, the clean team provided the economists at
9   Compass Lexecon with the Raven outputs from the v2 schedule;
10  is that right?
11  **A.**  Yes.
12  **Q.**  But the clean team did not provide the outputs for the
13  2019 v4 schedule; is that right?
14  **A.**  I don't think that was done in Raven.
15  **Q.**  So you didn't provide them.  Obviously, if it wasn't done
16  in Raven, you didn't provide them to the economists, right?
17  **A.**  Correct.
18  **Q.**  And is it your understanding that the NEA was signed in
19  July of 2020; is that right?
20  **A.**  I think so, but I don't know for sure.
21  **Q.**  Summer of 2020.  Does that sound about right?
22  **A.**  Yes, summer.
23  **Q.**  So about a month or so after these text messages we've
24  just been reading; is that right?
25  **A.**  Yes.

1          MR. MOORE:  Your Honor, I have no further questions

2     at this time.  I pass the witness.

3          THE COURT:  All right.  Cross-examination.

4          MS. MALTAS:  We all squared away?  All right.

5          THE COURT:  Yes.

6          MS. MALTAS:  Thank you, Your Honor.

7     **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT AMERICAN AIRLINES**

8     BY MS. MALTAS:

9     **Q.**  Mr. Pack, when you started working with the clean time

10    team, how long had you been with American?

11    **A.**  Three years.

12    **Q.**  Did you join American out of college?

13    **A.**  Yes.

14    **Q.**  And what was your position in the spring of 2020.

15    **A.**  I was a senior analyst and long-range planning.

16    **Q.**  And who did you report to?

17    **A.**  Joe Santilli.

18    **Q.**  And what is your current position at American?

19    **A.**  I'm a senior manager in a commercial planning and

20    analysis group.

21    **Q.**  And who do you report to now?

22    **A.**  Also now Joe Santilli.

23    **Q.**  In their opening statement in this case, plaintiffs

24    described you to the Court as an executive at

25    American Airlines; is that correct?

1    **A.**  I think so.

2    **Q.**  Have you ever been an executive at American Airlines?

3    **A.**  No.

4          MR. MOORE:  Your Honor, objection.  That misstates

5    the statement, opening statement.

6          THE COURT:  Well, the record is whatever it is in

7    the opening statement.  So to that extent, I'll overrule it.

8          MS. MALTAS:  We're happy to rely on the record.

9    BY MS. MALTAS:

10   **Q.**  Mr. Pack, why was it called the clean team?

11   **A.**  Because we were supposed to be on an island not talking

12   or interacting with other people that would be at our

13   company.

14   **Q.**  And what do you mean by being on an island?

15   **A.**  Because like we were isolated, we could exchange

16   confidential information with each other and work together.

17   **Q.**  And who else from American was on the clean team?

18   **A.**  Anmol Bhargava and Chad Schweinzger.

19   **Q.**  Do you recall who was on the clean team for JetBlue?

20   **A.**  Dave Fintzen and Derek Klinka.  There were two Michelles,

21   but I don't know their last names, and a Clare.

22   **Q.**  Did anyone else other than representatives of American

23   and JetBlue attend clean team meetings?

24   **A.**  Yes.

25   **Q.**  And who else attended?

1    **A.**  Counsel.

2    **Q.**  And what was counsel's participation like on the clean

3    team meetings?

4    **A.**  They made sure that we stayed on topic and weren't

5    violating any laws or talking about things we weren't

6    supposed to talk about.

7    **Q.**  Did representatives from Compass Lexecon attend clean

8    team meetings?

9    **A.**  Not that I'm aware of.

10   **Q.**  Did counsel give you direction or instructions on the

11   clean team's work?

12   **A.**  No.

13   **Q.**  Did Compass Lexecon give you direction or instructions on

14   the clean team's work?

15   **A.**  No.

16   **Q.**  So I'd like to focus on the v2 optimized schedule that

17   the clean team made and that you talked about with Mr. Moore.

18          So just generally, what was the process that you

19   went through to evaluate the partnership and come to this

20   optimized schedule?

21   **A.**  Well, we started at a really high level.  And because the

22   project was very gray when we -- at least when I joined the

23   team, so we started from what first -- what would a

24   partnership look like, what would we actually do.  And then

25   we moved into a little bit more granular on the network side,

1  and we're like okay, what principles, what do we want to

2  accomplish?  What goals do we want to seek out and execute on

3  in the NEA.

4  **Q.**  So let's go ahead and look at DX37, which is also PX68,

5  but we'll be using the color version on DX37, and I believe

6  this is already entered into evidence.

7  And we'll just cover this briefly, Mr. Pack, but

8  what is this document?

9  **A.**  This is an internal document that we used to communicate

10  with our executives.

11  **Q.**  And did you contribute to the making of this document?

12  **A.**  Yes.

13  **Q.**  So if you could please turn to slide 2.  The title of

14  this slide is, "Project Garland is focused on creating a

15  post-COVID position in NYC/BOS that generates competitive

16  consumer benefits compared to DL and UA."

17  What did you mean with this title?

18  **A.**  It's super high level, but it basically means that we

19  want to have a position in the Northeast that is basically

20  the same or rivals our competitors that are there.

21  **Q.**  And there are three goals that are listed.  Address AA/B6

22  incomplete customer proposition relative to DL, UA, and NYC,

23  maximize customer value and connectivity in JFK, LGA, and

24  Boston, improve overall customer relevance, competitiveness

25  in the Northeast region.

1          And what did you mean with these goals?

2   **A.**   Those are maybe a little bit more three technical or more

3   in detailed goals based on the title.

4   **Q.**   And how did these compare with the goals and the

5   strategies that you utilized in the clean team?

6   **A.**   They were basically the same.

7   **Q.**   So in the next sentence, there is, "Approach."  The slide

8   reads, "Small AA/B6 clean team evaluating a 'metal neutral'

9   agreement that incentivizes a more robust network and

10  customer experience."

11          What did you mean there?

12  **A.**   Well, metal neutral basically means that you have

13  American's airplanes and you have JetBlue's airplanes.  And

14  we were putting together, at least in the clean team, this

15  schedule that didn't really pay attention to who was

16  operating what.  We wanted to basically say this airplane

17  would be best served in this market, or this carrier could

18  best serve that market, based on like their airplane

19  configurations, their brand, things like that.

20  **Q.**   And is this consistent with your understanding of what

21  you were trying to accomplish with the clean team?

22  **A.**   Yes.

23  **Q.**   Finally, the last section is, "Output."  And it

24  says, "Move quickly to create a joint proposal that optimizes

25  our joint network, and contains revenue sharing and capacity

1    governance to ensure mutual benefit for the carriers and

2    enhanced experience for our customers."

3              And what did you mean there?

4    **A.**   Well, the first part was we were under a lot of stress to

5    do something quickly, because we were in COVID.  So we were,

6    I think, maybe two months until we were done with the clean

7    team work, and we wanted to do something very quick.  And

8    basically, so that post-COVID, we could go execute and

9    implement the alliance, such that we would be ready when

10   demand did return.

11   **Q.**   Let's turn to slide 7, please.  So the title here is, "To

12   create customer benefit, the clean team optimized the

13   combined network, maximizing connectivity, and unlocking

14   value," and what does that mean?

15   **A.**   Basically like this is a little bit more detail of what

16   it actually meant on the airport level, like what did the

17   network actually do.  And we wanted to make sure that the

18   combined network would basically be very similar to Delta and

19   United and their networks in the Northeast, and that we would

20   be able to hopefully convince people to fly on us and create

21   new O&Ds through connectivity.

22   **Q.**   And how did the clean team go and actually build the

23   optimized schedule?

24   **A.**   So we took those principles and goals that we talked

25   about before, basically, and then we sat down, and literally

1    looked at all markets that we serve from those two markets,

2    and what other airlines did.  We talked about, you know, how

3    we would go find new markets, what markets we should be in

4    and what our competitors are in.  And what our frequencies

5    should look like in all of those markets together.

6    **Q.**  And turning back to slide 7, what's reflected on this

7    chart?

8    **A.**  This is three airports.

9    **Q.**  Okay.  And what is provided about the three airports?

10   **A.**  Basically, like some key features, what we did -- what we

11   thought the customer benefit was especially against the

12   competitor, and then basically how much more capacity we

13   would be able to put into the -- into the NEA and also how

14   much revenue we'd get.

15   **Q.**  So let's start with LaGuardia.  What are the key features

16   and considerations that you took into account in building the

17   optimized schedule for LaGuardia?

18   **A.**  They are really like two, big things, I would say.  The

19   first one is in LaGuardia, we were very smaller than other

20   carriers, mainly Delta.  So we said, okay, what markets do we

21   need to serve that they are serving.  And we had slots at

22   American that, you know, we're flying on regional jets,

23   they're flying to small cities, which are great, but kind of

24   underutilized as a slot, a little bit.  So we basically

25   wanted to take those slots, bring JetBlue in, JetBlue could

1    go fly those slots on big airplanes, and they could go launch

2    new markets like New Orleans or something like that, where

3    they're a much bigger airplane and they could do so

4    profitably, whereas we couldn't.

5           And then the second thing was that those regional

6    jets that we talked about, the ones that were remaining for

7    us, we would at least make sure that they were all flying on

8    a dual cabin, which means that we would have a first class on

9    there, too.

10   **Q.**   And how did that unlock value for LaGuardia?

11   **A.**   Oh, it definitely increased capacity.

12   **Q.**   So let's take a look next at JFK.  What were the key

13   features in considerations that you took into account in

14   building the optimized schedule for JFK?

15   **A.**   JFK is a little different than LaGuardia, because it

16   doesn't have the slot -- not slot, but perimeter rule, so we

17   could fly transcons.  So things like transcons are way more

18   important to JFK.  So together we wanted to make sure that we

19   had a combined schedule like to the West Coast, we would have

20   lie-flat seats, we would have high frequency, and those

21   frequencies wouldn't be on top of each other.  They would be

22   structured such that the American has a flight at 7:00, and

23   JetBlue has a flight at 8:00, and American has another flight

24   at 9:00.  And so we wanted to make sure that all of those

25   patterns were really good and that we were present in all of

1    those markets and we were offering a cohesive product.

2              But then for American, another thing that we tried

3    to do at JFK is increase domestic connectivity, because we

4    struggled to launch long-haul flights from JFK, so we could

5    utilize JetBlue's domestic network to create connectivity and

6    take passengers from smaller cities on to long-haul.

7    Q.  And finally Boston, what were the key features and

8    considerations that you took into account in building the

9    optimized schedule in Boston?

10   A.  A lot of it was from JetBlue.  They -- during the clean

11   team, they were asking us to -- they wanted access, they

12   wanted to say, hey, we've got these plans, but we cannot

13   execute them.  They wanted to go fly all of the cities that

14   delta was launching, and so they liked that we could give

15   them gates, but also they could tap into cities where we were

16   strong, like small, Midwest, mid market cities, where

17   American has a strong presence, so it would allow us to serve

18   Boston, but then it would also allow JetBlue to increase

19   Boston considerably.

20   Q.  And you spoke with Mr. Moore about using September 2019

21   as the baseline for the v2 optimized schedule.  How did you

22   pick September 2019?

23   A.  It wasn't too high and it wasn't too low.  Like if we

24   would have used July, it would have been a bit crazy, because

25   that would have been a lot of demand, there would have been a

1    lot of capacity, and revenue would be really, really high.

2    So we chose September, we thought, because it was more

3    conservative, demand isn't really high in September and

4    revenue isn't really high in September, and that's what we

5    used to represent the full year.

6    **Q.**  And why 2019?

7    **A.**  Because we were doing this in spring of 2020, and it was

8    like the most recent comfort that we had of a schedule.

9            MS. MALTAS:  You can take this down.

10   BY MS. MALTAS:

11   **Q.**  All right.  You also spoke with Mr. Moore about the

12   inputs that you used to create the optimized schedule that is

13   v2, and one of those inputs is fleet.

14           So why did you use new planes or assume new planes

15   in putting together the v2 optimized schedule?

16   **A.**  Well, for American they enable a lot of things, like

17   using the XLR, you would be able to go launch a lot of

18   flights that wouldn't have otherwise been profitable on a

19   different airplane, for example, and this is during COVID.

20   And from 2019, I can only speak for American, but we retired

21   a lot of airplanes, basically in this month that we were

22   doing this, we lost like the 330, 75, and 767.  So the

23   present day fleet also isn't representative.  So we knew it

24   was going to happen postCOVID in the future.  So we wanted to

25   make sure to use the fleet that we knew we were going to have

1    in the future.

2    **Q.**   So if you had used the 2019 fleet in v2, would you be

3    using planes that American no longer possessed?

4    **A.**   Yes.

5    **Q.**   All right.  Mr. Moore also asked you about the v4,

6    another schedule that the clean team worked on, and what is

7    v4?

8    **A.**   V4 is a schedule where we said, hey, let's just keep

9    everything to 2019 fleet block out.  It's really the number

10   of block hours that we keep constant.

11   **Q.**   And how is v4 different than v2?

12   **A.**   Basically that the block hours are the same, but the

13   fleet is different, because we have airplanes that we no

14   longer have.  And market presences were -- as they were in

15   2019, not as they were necessarily how we thought in the

16   future.

17   **Q.**   Okay.  Was v4 intended or designed to replace v2 as an

18   optimized schedule?

19   **A.**   No.

20   **Q.**   Why not?

21   **A.**   Because it doesn't represent what we designed the NEA to

22   be.

23   **Q.**   And what do you mean by that?

24   **A.**   Like we designed the NEA to utilize things that we knew

25   we were going to have; be a postCOVID player and take

1    advantage of things that we knew were going to happen

2    postCOVID.

3    **Q.**   Could v4 and does v4 show what the NEA could do in the

4    future?

5    **A.**   No.

6    **Q.**   Why not?

7    **A.**   Because it's constrained to a historical fleet.

8    **Q.**   So let's take a look at PX297 that plaintiff showed you,

9    and we'll turn to your e-mail on page 2.  And when you

10   said -- and this is something that Mr. Moore showed you, as

11   well, and we'll talk about it in more detail.  You

12   wrote, "Following up on the v4 schedule, the schedule serves

13   as our best guess as to what could have happened in 2019 if

14   AA/B6 had the partnership that we are jointly proposing."

15            And what did you mean by this?

16   **A.**   Basically, if we would have tried to go back in time,

17   maybe we were curious to see like what it would look like.

18   So we kept those block hours the same and we guessed, hey,

19   what would we maybe do, what would we not be able to do, and

20   how could it be different.

21   **Q.**   And you also say, "The key difference with this compared

22   to B2 is we have to fund aircraft and keep resources

23   neutral."

24            And what did you mean there?

25   **A.**   Just that the block hours would be the same.

1    **Q.**  And is this that a realistic way to model the NEA?

2    **A.**  No.

3    **Q.**  And so why did you do it?

4    **A.**  I think for me it was a thought exercise and curious.

5    And also it was what I was most familiar with.  It was hard

6    to predict.  We were in the middle of COVID.  So for me, it

7    was like a thought exercise in curiosity.

8    **Q.**  Let's turn to PX397.  And again, we'll use the

9    demonstrative that plaintiffs had used.

10          372.  Sorry.

11   **A.**  I don't know if I have that.

12   **Q.**  It's in the other binder.

13   **A.**  Oh.

14   **Q.**  And it will be just the demonstrative that's at the front

15   of the exhibit.

16          All right.  If we look at the first text message

17   which Mr. Moore showed you, before we went to lunch, it is

18   dated here as 4:38, but we now know that to be 11:38 a.m.

19          What was going on when you were receiving and

20   sending these text -- these first text messages in the 11:38

21   time?

22   **A.**  We were -- oh, the meeting we were in was an all hands,

23   which is like a department-wide meeting that we have for

24   network.

25   **Q.**  And why were you texting while you were in all hands

1   meeting?

2   **A.**   Because we were working on, basically, all stuff for

3   Garland that day and that week, because there was a meeting

4   on Monday that Vasu had to prepare for.  So in this case, I

5   was making the profitability estimate of the NEA for him.

6   **Q.**   And was it common for you and Chad and Anmol to talk or

7   text when you were on phone calls?

8   **A.**   Yes.

9   **Q.**   If you can turn to the first text message that Mr. Moore

10  showed you after lunch, and that one is dated here 8:22 p.m.,

11  but we know that to be 3:22 p.m.?

12          MR. MOORE:  Your Honor, I will just object to the

13  extent that he didn't testify to that prior to this trial.

14  He testified differently at his deposition and also this is

15  information that counsel never raised to us.  They never told

16  us that this was, in fact, incorrect.  This is exactly how it

17  was produced to us.  So I would object to this continued --

18          THE COURT:  Explain this to me, again, Ms. Maltas.

19          MS. MALTAS:  Excuse me?

20          THE COURT:  Explain it again.

21          MS. MALTAS:  So when you take a cell phone and you

22  process it, it was collected from the various custodians with

23  the phones being in their Central Time.  However, our vendor

24  when they processed the cell phones and produced the text

25  messages to the DOJ, produced them in UTC.  So it's

```
 1   simply that's actually a common way to do a text message
 2   productions.
 3            THE COURT:  So is the dispute just about the
 4   difference in the hours?
 5            MS. MALTAS:  Yes.  It's just five hours -- when you
 6   look at the text message --
 7            THE COURT:  Is there any material significance,
 8   since everyone agrees to the sequence?
 9            MR. MOORE:  Well, Your Honor, as originally
10   produced to us by their counsel, these were text messages
11   that were occurring late at night during a frenzied meeting.
12   And that's how Mr. Pack testified to it during his
13   deposition.
14            We were never told about this change.
15            THE COURT:  I can't believe he said 8:00 p.m. was
16   late at night.  He's probably younger than that.
17            MR. MOORE:  Well, Friday night, 10:00 p.m.
18            THE COURT:  It's not late at night for me.
19            MR. MOORE:  Fair.  But it continued after
20   10:00 p.m.  But regardless, we didn't learned, weren't told
21   about this by counsel until today.  We learned about it at
22   trial.
23            MS. MALTAS:  And we do understand that.  Honestly,
24   it was something that just was not --
25            THE COURT:  The part you just learned about -- the
```

1  only -- I'm still -- the significance is evading me, other

2  than what this means is that he was texting during a meeting.

3        MS. MALTAS:  There really is no significance to the

4  time, except for as, you know, Mr. Pack will testify to, they

5  were working during the workday.  They were texting during a

6  variety of phone calls.  And some of the context and what

7  they're actually talking about in the text messages is

8  informed by the phone calls they were on, which we know to

9  happen because we know what time it was occurring.

10        MR. WALL:  That's the point, Your Honor.  The

11  representations have been made about this being late at night

12  with executives and everything like that, but it's the

13  relationship between they actually --

14        THE COURT:  Who said it was late at night?

15        MR. WALL:  Mr. Jones in his opening statement said

16  frenzied texts late at night by high-level executives, or

17  something like that.  And the point is, it has become

18  apparent, this happening in the middle of the workday, and it

19  is in relation to meetings that Ms. Maltas is going to talk

20  about and the subject matter of those meetings.

21        MR. JONES:  Your Honor, relying on the date stamps

22  as produced to us, as we understood --

23        THE COURT:  This is the way I look at it.  (A),

24  there's nothing wrong with your reliance, on what you relied

25  on.  I don't see there is anything wrong with that.  It was

1    fine.

2              I would be stunned if my judgment turned on whether

3    these texts were during the frenzied, early evening meeting

4    at 8:22 p.m., or a late morning meeting at 11:00 a.m., or

5    that they -- whatever you said about a frenzied meeting in

6    the opening is gone because it wasn't a frenzied late night

7    meeting.

8              So they learned it.  I think you can go ahead.

9              Like an observation that I will make, you've all

10   done a great job of preparing this case.  It's a very well

11   prepared case.  And I know it's a civil case, but even in a

12   civil case, in fact, there are things -- like, a trial is not

13   just a presentation of excerpts from the discovery, and

14   things happen.  People learn things and things change, and

15   it's a live event.

16             And so this -- and whether they should have told

17   you about it when they learned about or it or when they

18   learned about it or the significance of that, I don't know.

19   But I don't see at the moment any significance.

20             So to the extent that you're objecting to -- and I

21   do think that I should be getting the facts right, even a

22   minor fact like this, so I think you can go forward as it's

23   happened.

24             And if you think there's something that you want to

25   do at some point because of you just learned about it, that's

1     perfectly fine and you can bring that up whenever.

2               So go ahead.

3               MS. MALTAS:  Thank you, Your Honor.

4               I'm not exactly sure what my last question was,

5     but --

6     BY MS. MALTAS:

7     **Q.**  If you could take a look, Mr. Pack, at your text message

8     that starts, "Slightly scared."

9     **A.**  Yeah.

10    **Q.**  And you say, "Slightly scared that when we run v4 through

11    Raven, B6 may not be rev positive because they are cancelling

12    a lot of existing markets, LGB, MCO for which it is using

13    good data, and trading for new markets which haven't been on

14    B6 metal.  Raven might screw that up because it can't stim

15    well."

16               What did you mean by that text message?

17    **A.**  Yeah.  Well, so, first, "stim" means stimulate.  And then

18    basically what we're doing in v4, is B6 had moved flying, as

19    I talked about earlier, from parts of New York to other parts

20    of New York, like the NEA, and they were exchanging the

21    markets that they had flown.  And we get -- Raven gets all of

22    its data from public sources like DOT, so it can see how many

23    people were on the market, what were they paying.  And so

24    that's how the forecaster works.

25               When you put a new market in, Raven isn't so good

1  at trying to figure out what's going to be there, because

2  there isn't a lot of good data, especially if it's a new

3  nonstop market.  So it usually requires manual intervention

4  to go in --

5        Like if we were forecasting a new market, for

6  example, we would run Raven, and then the planner would go.

7  And then we would say, "We have this O&D, and I think we can

8  get more people," and so forth.

9        We didn't do that in this case because there were a

10  ton of new markets, but also because these were B6 markets

11  and not Americans'.  So I didn't want to mess with their

12  data.

13  **Q.**  So does Raven overinflate revenue ever?

14  **A.**  Not that I'm aware of.

15  **Q.**  So it's just a question of undercounting the revenue?

16  **A.**  Yes.  In this case, Raven is pretty conservative, because

17  it can't see data.

18  **Q.**  So the next text that Mr. Moore showed you is from

19  Mr. Schweinzger, where he asked you to run a summary of adds

20  and cancels.  And did you actually do that summary of adds

21  and cancels?

22  **A.**  I don't remember.  And after my last deposition, I cannot

23  find that I sent him it.

24  **Q.**  All right.  If you can look to, again --

25        THE COURT:  I don't know, Mr. Pack, you're not

1    doing what the boss says, and you're texting during the

2    meetings.

3                THE WITNESS:  Yeah, I know.  I learned my lesson.

4                THE COURT:  Redemption is important.

5    BY MS. MALTAS:

6    **Q.**  And then as Mr. Moore showed you, Mr. Schweinzger

7    responded in a later text message, which occurred an hour and

8    a half later, "I'm completely out of ideas."  So if we show

9    full network results -- no bueno -- yeah.

10               "And then based on what I'm hearing here if I was

11   DOJ, I could easily kill any deal, any deal."

12               So the first question is, is this a continuation of

13   the same conversation you were having before?

14   **A.**  No.

15   **Q.**  And what was happening during this conversation?

16   **A.**  We were in a meeting with Latham and Compass.

17   **Q.**  Okay.  And how do you know -- is there anything about

18   this text message that you can tell you were on a call?

19   **A.**  Yeah, because Anmol goes on and he talks about he had to

20   drop and constantly asks if the call is over or if it keep

21   son going.

22   **Q.**  Without revealing anything privileged, what generally

23   were you discussing on this call?

24               MR. MOORE:  Objection, Your Honor, counsel has

25   withheld significant amounts of information about the

1    privilege -- claimed privilege overall these conversations

2    with compass repeatedly during discovery.  It's been an

3    ongoing dispute.  And now she's attempting to elicit some

4    information from the meeting which they've withheld

5    throughout discovery, so we object to now introducing this

6    information that we can't probe through discovery.

7         MS. MALTAS:  Your Honor, we have not withheld

8    anything about v4, currently, through discovery, and we have

9    not withheld anything about the work that the clean team did

10   in its regular course of business.

11        THE COURT:  How about this conversation?

12        MS. MALTAS:  About this conversation, this is the

13   beginning, as Mr. Pack will say, of the regulatory process,

14   where he is turning over the v2 information to Compass and

15   Latham to start working with.  At that point, it does become

16   privileged.  This is starting to work on the regulatory

17   process --

18        THE COURT:  But the conversation is a privileged

19   conversation.

20        MS. MALTAS:  The conversation is privileged.  It's

21   only important because of how they've attempted to

22   contextualize these text messages and claim what they mean

23   and he's going to explain what they actually mean.

24        THE COURT:  But you can ask him what the text

25   means, but if you ask him what the subject -- what was the

1  topic of discussion with the lawyers, then isn't that

2  privileged?

3       MS. MALTAS:  I don't think that he has to say any

4  advice or information that he learned on a call that's

5  actually privileged to just say what he was providing, which

6  Mr. Moore has already asked, did you provide v2 to Compass?

7  Yes, this is the call.

8       THE COURT:  So what's the exact question?

9  BY MS. MALTAS:

10 Q.  The exact question is, what was the general topic of the

11 call?

12      MR. MOORE:  And Your Honor, I would just add that

13 we actually have a meeting -- we have a dispute with counsel

14 about where they claw back a portion of the subject line that

15 stripped it of its meaning, and that's the type of privilege

16 claims they've been asserting during discovery and that's why

17 we're here.  I mean, if they want to produce all of those

18 documents, we're happy to take that in the alternative, but

19 we've been denied that up until now.

20      MS. MALTAS:  Your Honor, that disputed calendar

21 invite is in evidence as a PX right now, as it was produced

22 by JetBlue.  So it's --

23      MR. MOORE:  The redacted version is in evidence

24 right now.

25      MR. DOIDGE:  Your Honor, if I may dispute that

1    briefly.  That's actually not accurate.  There were two

2    meetings that day.  There was one meeting at JetBlue between

3    Compass.  There was another meeting between American and

4    Compass.  JetBlue has an asserted privilege with respect to

5    the meeting between Compass and JetBlue, and that meeting has

6    a subject line that says "counterfactual."  The separate

7    meeting that Mr. Pack attended, on the same day, but at a

8    different time, has been withheld.  We have the meeting

9    invite, but as Mr. Moore indicated, the subject matter has

10   been redacted.

11             THE COURT:  The subject line.

12             MR. DOIDGE:  Yes.

13             THE COURT:  What about that?  If they get the

14   subject of the meeting, how can you get the topic of the

15   discussion.

16             MR. WALL:  Just one point.  This is weird.  Among

17   other things, Dr. Israel, who is a part of this call,

18   testified at his deposition about what the general subject

19   matter was, and that it dealt with counterfactuals that could

20   come up in the regulatory process, so --

21             MR. DOIDGE:  If I could speak to that, Your Honor.

22   That has been our position all along, that Dr. Israel did

23   rely on these things, and that they should be producing, in

24   total, the communications that the clean team was having with

25   Compass.

1          MR. WALL:  Dr. Israel --

2          MR. DOIDGE:  They are now selectively attempting to

3     elicit some information that was exchanged between Dr. Israel

4     and members of the clean team, while continuing to withhold

5     other aspects.

6          MR. WALL:  Dr. Israel testified that the purpose of

7     this analysis and the only reason that B4 comes into it, from

8     our perspective, is to anticipate an argument, correctly, I

9     might add, that the DOJ would make, that you had to hold the

10    fleet constant as a counterfactual.  And --

11         THE COURT:  But did Dr. Israel testify about the

12    meeting.

13         MR. WALL:  Well, we are not planning on having --

14         THE COURT:  Not that you were planning on, but did

15    he testify?

16         MR. WALL:  Yes.

17         THE COURT:  He talked about the discussion in this

18    very meeting that we are discussing?

19         MR. WALL:  Yes, he was asked at his deposition,

20    what was this about?  And he testified that it was about

21    this -- I don't want to go on to characterize what he said,

22    because he's going to testify, they can ask him what he

23    testified.

24         THE COURT:  Sure.

25         MR. WALL:  But he did reveal --

```
 1              THE COURT:  What he viewed to be the topic of the
 2   meeting.
 3              MR. WALL:  Yes.  Yes.
 4              MR. DOIDGE:  And Your Honor, if I can just speak to
 5   that.  This is a classic sword versus shield.  Yes,
 6   Dr. Israel testified to some degree about conversations he
 7   had.  And Dr. Israel gave his impression of those
 8   conversations.  We are permitted, or we should be permitted,
 9   to test the veracity of his descriptions of those meetings,
10   especially since he's so heavily relying on his
11   characterizations of what the clean team told.
12              MR. MOORE:  Your Honor --
13              MS. MALTAS:  And I do think that this has gotten
14   rather far afield, and I do think it's also a sword versus
15   shield issue.  Mr. Moore got up and put a series of text
16   messages in front of Mr. Pack.  He read them into the record,
17   did not ask him any questions, did not elicit any testimony,
18   and tried to draw inferences about --
19              THE COURT:  Why don't you just ask him about what
20   these things mean to him, and leave it at that --
21              MS. MALTAS:  Okay.
22              THE COURT:  -- without getting into the meeting?
23              MS. MALTAS:  It is going to require him to say
24   something that they were talking about from a meeting.  So it
25   is -- there's an element of unfairness to say that they can
```

1 misconstrue text messages, and then we can't defend it

2 ourselves.

3   Because what was happening is he was in a meeting

4 with Compass, and the problem is, is that then that

5 misconception just stays on the record or they're threatening

6 subject matter waiver if we try to explain it.

7   MR. MOORE:  And Your Honor, just to be clear, we

8 were trying to ask Mr. Pack about his conversations with

9 Compass during his deposition, and he was instructed not to

10 answer on the basis of privilege.  So I think that now they

11 can't get into this discussion about what his conversation

12 with Compass is.  They have refused to allow us to probe that

13 prior to trial.

14   THE COURT:  I think you can ask him what he thinks

15 these things mean, but if you -- the privilege is for you.

16 Right?  You have the privilege.  Whatever privilege you have,

17 you have.  And you can choose to assert the privilege or not

18 assert the privilege.  It sounds like you've asserted the

19 privilege.

20   MS. MALTAS:  Right.

21   THE COURT:  So if he goes into the -- if you elicit

22 the privileged information, if, in fact, it's privileged

23 information, they can argue it stands for whatever that

24 stands for and it goes as far as it goes.  But I don't --

25   As to whether they're misconstruing the text or

1    what the texts are about, you can ask him what they were

2    about and he can just deal with that.  And if he goes beyond

3    that, we'll cross that bridge when you get there.  But I

4    think for the moment, you should stay away from what the

5    topic of the meeting is.

6            MS. MALTAS:  That's excellent, Your Honor.  I

7    personally do not think that Mr. Pack need to reveal anything

8    privileged in order to provide this contextualization and

9    explanation of the text message.  My warning to him was only

10   to actually warn him to please not go outside of that.

11           THE COURT:  Do you have an objection -- I guess

12   what I'm wondering is, if he's simply explaining his view,

13   what's the privilege issue?  I understand you might have an

14   ongoing issue with that issue that you can bring to me or

15   not, but as to these questions --

16           MR. MOORE:  Well, at this time, she's trying to

17   introduce -- elicit testimony.

18           THE COURT:  Well, she's not asking that question

19   anymore.  She's going to ask a different question.

20           MR. MOORE:  Okay.  I'll hear the next question, and

21   then maybe object.

22           THE COURT:  There you go.  Fine.

23           Go ahead.

24   BY MS. MALTAS:

25   Q.  All right.  So first thing's first.  When you're looking

1    at Mr. Schweinzger's text to you, was he responding, to your

2    recollection, to anything that had to do with v4?

3    **A.**  I don't think so, no.

4    **Q.**  Was he responding in any way to any work or analysis that

5    you had sent him?

6           MR. MOORE:  Objection, Your Honor.  Calls for

7    speculation.

8           THE COURT:  As you understood it.

9           THE WITNESS:  Yeah, you'll have to ask him to make

10    sure, but not as I understood it, no.

11    BY MS. MALTAS:

12    **Q.**  What did you understand him to be saying in these text

13    messages?

14    **A.**  That he is frustrated and because of the call we were on.

15    **Q.**  And generally what -- did you share his frustration?

16    **A.**  Yes.

17    **Q.**  And generally, what were you all frustrated about?

18    **A.**  We had been working on this project for a while.  This

19    was the meeting that was set up to basically ship everything

20    off and basically say it's done, to you guys and to Compass.

21    And on the call, we were hearing that --

22           MR. MOORE:  Your Honor, I think this is about to

23    get into the same issue that we were just discussing.

24           THE COURT:  It's up to you whether you want him to

25    keep going.

1          MS. MALTAS:  Go ahead.

2          THE WITNESS:  We were hearing that this -- we were

3     basically going to be attacked by DOJ.  This was going to be

4     very, very, very hard on to get across and for people to

5     understand.

6     BY MS. MALTAS:

7     **Q.**  All right.  So let's take a look at your next text

8     message that Mr. Moore showed you.  And plaintiffs' ask you

9     about the first sentence, where you said, "I think that the

10    regulatory case for this domestic JV with ATI doesn't exist."

11         Just to start with, at this point in May 2020, what

12    experience did you have with making a regulatory case to the

13    Department of Justice for a deal?

14    **A.**  None.

15    **Q.**  At this point, were you personally engaged in trying to

16    make a regulatory case for the NEA?

17    **A.**  Other than providing documents, no.

18    **Q.**  And I want to be very clear for the Court.  When you were

19    saying that there was no regulatory case, were you saying

20    that there was no benefits provided by the NEA?

21    **A.**  No, that's not what I meant.

22    **Q.**  Were you saying that there's no way to quantify the

23    consumer benefits provided by the NEA?

24         MR. MOORE:  Objection, Your Honor, these questions

25    are leading.

1          THE COURT:  Sustained as to the form.

2    BY MS. MALTAS:

3    **Q.**  What were you saying?

4    **A.**  Basically that this was so novel, it's so gray.  And on

5    this call, we were basically being hounded that we are going

6    to get attacked.  How can this be explained?  What is this

7    thing?  And that was going to be really, really hard to get

8    across, and the DOJ is not going to like it.  And so for me,

9    it was easier, like, you might as well merge with somebody,

10   because the counterfactual and the simplicity of what the

11   deal is is you either merge or you don't merge.

12   **Q.**  And what did you mean with your reference to an IAG

13   America's merger, that it's easier to measure consumer

14   benefits and can promise LCC benefits and the counterfactual,

15   we don't merge?

16   **A.**  Because IAG, which is International Airlines Group, which

17   is a European holding company of airlines, they own a couple

18   of different airlines and they don't necessarily merge their

19   brand, but they are all part of the same company, so it would

20   be easier to merge and say this is what it is, rather than

21   have this NEA gray area.

22   **Q.**  And let's turn to the next text message in time, please.

23   You say, "These people don't even know how to handle this,

24   imagine how people at DOJ are going to think."  And what did

25   you mean?

1    **A.**   Well, on the call, it was just hard to -- we were being

2    constantly hounded that this was hard to understand and

3    people aren't getting it, and they're asking lots of

4    questions about what this is and what we did.  And I think I

5    felt, while our team doesn't get it, I'm pretty sure it's

6    going to be hard for outsiders to understand.

7            MS. MALTAS:  And you can take this down.

8    BY MS. MALTAS:

9    **Q.**   At that point, what did -- how did you feel about what

10   you had accomplished with v2 and with this project?

11   **A.**   Personally, I was so excited, because it was like two

12   months of work that I thought was pretty cool, and I got to

13   leave my day job to go do it.  And there was a lot of work

14   and it was super, super novel.  Like I wanted to make my

15   colleagues at other airlines jealous that we did this thing,

16   and it was so creative, and we had finally found a solution

17   to how to make the Northeast be profitable and to compete,

18   because it's been rubbed in our faces for so long that we had

19   nothing, and we had a really hard time against Delta and

20   United, so I felt great.

21   **Q.**   And just turning briefly to one last topic that Mr. Moore

22   talked about with you, and that's Philadelphia.

23           So with regard to Philadelphia, what is your

24   understanding of American's current plan for Philadelphia?

25   **A.**   That it be a hub.

1   **Q.**  And what is -- what role does Philadelphia serve in

2   American's network?

3   **A.**  I would say two.  One is that it allows us to connect

4   like all of these small dots in New England really well,

5   which are -- have high population density.  And then the

6   second is it can act as a transatlantic gateway to a lot of

7   smaller cities that we have in the Midwest.  And midAtlantic

8   states, many of which we don't fly from, from other places or

9   other hubs that we have.

10  **Q.**  To your knowledge, is American planning to reduce it's

11  flying to Philadelphia long term because of the NEA?

12  **A.**  Not to my knowledge.

13  **Q.**  To the extent there were any network plans that plaintiff

14  showed you showed decreased flying in Philadelphia, why is

15  that happening?

16  **A.**  I would say a couple of reasons.  If it's -- especially

17  in the next couple years, it's probably likely due to a

18  regional pilot shortage, and it could also be because we

19  don't have slots there.

20          MR. MOORE:  Objection, Your Honor.  I move to

21  strike that answer.  He just said I think.  He sounded like

22  he was speculating about as to the reasons.

23          THE COURT:  I don't think that's speculation by him

24  saying, "I think."  I think that it's clear that this witness

25  has some insight into network scheduling, and it's clear that

1    he's not the person who constructs the network schedule, and

2    wouldn't have authority or potentially complete insight into

3    the whole scope, so that goes to the weight of what he would

4    say, but I don't think it's speculation.  So overruled.

5            Go ahead.

6            MR. SCHWED:  I have no further questions.  I'll

7    pass the witness.

8            THE COURT:  Anything else?  Or redirect?

9            MR. MOORE:  Yes, Your Honor.

10           May I proceed, Your Honor?

11           THE COURT:  Yes, of course.

12   **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

13   BY MR. MOORE:

14   **Q.**  Mr. Pack, I want to go back to DX37, which you just

15   discussed with Ms. Maltas.  Let's go to slide 7.

16           So one of the things that you were discussing with

17   Ms. Maltas on this page is that the NEA might enable the --

18   you, American, and JetBlue to exchange slots in order to

19   increase flying; is that right?

20   **A.**  Yes.

21   **Q.**  But let's flip back to page 5 of this deck, and looking

22   at scenario 2, East Coast International Alliance.  Do you see

23   that row?

24   **A.**  Yes.

25   **Q.**  Do you recall that we discussed that earlier?

1   **A.**   Yes.

2   **Q.**   If we look at the considerations column, the first bullet

3   says JFK, LGA/BOS slot swap possible," right?

4   **A.**   That's what it says.

5   **Q.**   So a slot swap was possible even without having revenue

6   sharing and capacity coordination, right?

7   **A.**   As listed here, it is possible, and it says there's no --

8   in this case, there's no capacity governance, then possible,

9   yes.

10  **Q.**   And so you could give those slots to JetBlue, or lease

11  those slots to JetBlue, so that they could increase the

12  flying without having to have capacity coordination and

13  revenue sharing, right?

14  **A.**   Well, it may not necessarily benefit American, or in the

15  way of -- how we have built the NEA, that would just be their

16  slots.

17  **Q.**   So you're leasing to JetBlue in order to benefit American

18  in the NEA?

19  **A.**   Are you asking, are we leasing them slots in the NEA?

20  **Q.**   You're leasing to JetBlue in order to benefit American?

21  **A.**   Not necessarily, if there's no capacity, scheduling, or

22  anything like that.

23  **Q.**   But there is capacity, scheduling in the NEA, right?

24  **A.**   Oh, yeah.   In this -- in the NEA, yes.

25  **Q.**   So you're leasing to JetBlue in order to benefit American

1   in the NEA; is that right?

2   **A.**  I think it benefits the NEA.  I don't know if we get paid

3   for them or anything.

4           MR. MOORE:  And we can take this slide down.

5   BY MR. MOORE:

6   **Q.**  You also talked about the planes that will be available

7   in 2023 and what was available in 2019.  Do you recall that?

8   **A.**  Yes.

9   **Q.**  Well, the XLRs, for example, that was a plane that you

10  were going to order anyhow anyway, regardless of the NEA,

11  right?  And when I say "you," I mean American.

12  **A.**  American ordered the airplane not -- before 2019.  I

13  don't know what year.

14  **Q.**  Okay.  So prior to the NEA, though?

15  **A.**  Yes.

16  **Q.**  And there's nothing preventing American from buying other

17  planes in the future, right?

18  **A.**  Other than manufacturers being able to make airplanes and

19  skyline production, no.

20  **Q.**  So American and JetBlue could have bought airplanes in

21  the future without the Northeast Alliance, right?

22  **A.**  Yeah, any airline could buy airplanes.

23  **Q.**  And you spoke a bit with Ms. Maltas about the Raven

24  model.  Do you recall that?

25  **A.**  Yes.

1    **Q.**  And these Raven outputs, as we've discussed, they were

2    used and provided to the economist in this litigation; is

3    that right?

4    **A.**  As far as I'm aware, yes.

5    **Q.**  But your first time working with Raven in these results

6    was during the clean team's work on the Northeast Alliance;

7    is that right?

8    **A.**  Yes.  This is the first big project that I had.

9    **Q.**  And to the best of your knowledge, Raven was not used at

10   American until late 2019 or early 2020; is that right?

11   **A.**  I did not use it, and I just know of testing and it being

12   used on some other projects.  But I don't know of it being

13   used beyond that, no.

14   **Q.**  I want to turn to a new exhibit in your binder, which is

15   PX294?

16           MR. MOORE:  And Your Honor, this is already in

17   evidence.

18   BY MR. MOORE:

19   **Q.**  And I want to focus, for the most part, on the first

20   e-mail on the thread from Mr. McElfresh.  It's towards the

21   end of the document, earliest in timing, though.  And just

22   let me know when you get there.

23   **A.**  You said it's the last page?

24   **Q.**  Correct.

25   **A.**  Okay.

1    **Q.**  And it's on your screen now, as well.

2          Are you there?

3    **A.**  Yup.

4    **Q.**  So this is an e-mail from Mr. McElfresh; is that right?

5    **A.**  Yes.

6    **Q.**  And Mr. McElfresh, he was responsible for running Raven

7    as part of the clean team's work; is that right?

8    **A.**  Yes.

9    **Q.**  So in this e-mail, Mr. McElfresh is summarizing the

10   results of a comparison between a "Base Case" and a

11   "Scenario 1"; is that right?

12   **A.**  Yes.

13   **Q.**  And Scenario 1, if we look under the bolded and

14   underlined topic heading, it describes it as a, "Fully

15   reciprocal, interlining codeshare across American's and

16   JetBlue's entire networks"; is that right?

17   **A.**  That's what it says, yes.

18   **Q.**  And if we look under "Initial Results," he says, "This

19   results in revenue synergies in 1.8 billion per year"; is

20   that right?

21   **A.**  That's what it says, yes.

22   **Q.**  And he says, "It's more than any airline merger in

23   history since Delta/Northwest"; is that right?

24   **A.**  That's what it says, yes.

25   **Q.**  And in the next sentence he goes on to say, "Because the

1    historical data on domestic codeshare relationships is

2    relatively small and based on flights that have been at least

3    partially optimized for network fit, Raven is likely biased

4    to overvalue these types of broad domestic codeshare

5    relationships."

6              Do you see that?

7    **A.**  Yes.

8    **Q.**  And your understanding of this is that Raven was not

9    really built to analyze this type of relationship, right?

10   **A.**  I don't know.

11             THE COURT:  Is Raven proprietary to

12   American Airlines?

13             THE WITNESS:  Yes.

14             THE COURT:  Somebody built it within American or

15   with the help of consultants?

16             THE WITNESS:  Yeah.  There we had an operations

17   research team build it.

18             THE COURT:  Okay.  Go ahead.

19   BY MR. MOORE:

20   **Q.**  Mr. Pack, do you recall -- I think we discussed it

21   already -- you gave a couple depositions in this

22   investigation litigation?

23   **A.**  Yes.

24   **Q.**  If we go to your CID deposition, which is page 227.  It's

25   the first tab in your binder.

1    **A.**  220 -- what page?

2            THE COURT:  228.

3    BY MR. MOORE:

4    **Q.**  Are you there?

5    **A.**  Yes.

6    **Q.**  So I'm going to be looking at lines 12 to 23.  It says,

7            "QUESTION:  So the next sentence, because of

8    historical data on domestic codeshare relationships is

9    relatively small and based on flights that have been at least

10   partially optimized for network fit, Raven is likely biased

11   to overvalue these types of broad domestic codeshare

12   relationships.  What does that mean?"

13           Your answer there was, "I take that to mean that he

14   is saying that Raven was not really built to kind of analyze

15   this type of relationship from the get-go.  There isn't a lot

16   of data that it has to analyze, and we haven't quite used

17   Raven on a partnership like this yet."

18           Did I read that correctly?

19   **A.**  Yes.

20           MR. MOORE:  Your Honor, we move to admit that as a

21   party admission.

22           MS. MALTAS:  No objection.

23           THE COURT:  Admitted.  CID deposition of Mr. Pack,

24   page 228, lines 12 to 23.

25           (Plaintiffs' Exhibit CID deposition of Mr. Pack,

1            page 228, lines 12 to 23 admitted into evidence.)

2            MR. MOORE:  And you can put that document aside.

3    BY MR. MOORE:

4    Q.  Mr. Pack, you also discussed the v4 schedule with

5    Ms. Maltas.  Do you recall that?

6    A.  Yes.

7    Q.  And it's your understanding that Mr. Vasu Raja was the

8    leader of the negotiations regarding the Northeast Alliance

9    for the American side; is that right?

10   A.  Yes.

11   Q.  Did you ever tell him about the concerns that we

12   discussed today in the text messages that you and

13   Mr. Schweinzger exchanged on May 29th?

14            THE COURT:  Which?  The ones about DOJ killing the

15   deal?

16            MR. MOORE:  Correct.  Yes, Your Honor.

17            THE COURT:  Okay.  Go ahead.

18            THE WITNESS:  Did I tell him that I had concerns

19   about -- is that what you're asking?

20   BY MR. MOORE:

21   Q.  Yes, did you ever tell him about the concerns that you

22   expressed to Mr. Schweinzger on May 29th?

23   A.  Not that I can remember.

24            MS. MALTAS:  Also, objection to form.  What

25   concerns?

1          THE COURT:  The ones identified in those decks.

2          Go ahead, overruled.

3          MR. MOORE:  So let's actually just pull up 372A, so

4     we're all talking about the same thing.

5          THE COURT:  We are.  That's why I asked you the

6     question.

7          MR. MOORE:  I just want to make sure that he's

8     looking at it, as well, so he's looking at the document,

9     understands what we're talking about.

10          I think we're on page 2.

11          Actually, let's go to page 3.

12     BY MR. MOORE:

13     Q.  So let's highlight the messages from 10:02 p.m.  yeah,

14     all at 10:02 p.m.  So those concerns about showing full

15     network results, and full network results being no bueno, did

16     you ever express those concerns to Mr. Raja?

17     A.  Well, they were Chad's concerns that I said yes to, but I

18     don't remember talking to Vasu.

19     Q.  So you don't remember discussing Mr. Schweinzger's

20     concerns with Mr. Raja?

21          THE COURT:  Whether these were concerns, ideas, or

22     merely the statement of words in the text message, the

23     question was did you ever communicate to Mr. Raja the things

24     and ideas and words that were communicated in those texts

25     that are there highlighted?

1            THE WITNESS:  Sitting here now nothing comes to

2    mind that I communicated, I can't think of a time in which I

3    talked to him about it.

4            THE COURT:  Okay.  Go ahead.

5            MR. MOORE:  You can take that document down.

6            Actually, sorry, pull it back up.  Apologies for

7    that.  I want to go to the text message that I believe is on

8    page 3 of the demonstrative, and let's go to

9    Mr. Schweinzger's message at 10:03 p.m.

10   BY MR. MOORE:

11   Q.  So we discussed this earlier, but Mr. Schweinzger's

12   writing,  "Based on what I am hearing here, if I was DOJ, I

13   could easily kill any deal."  That message, do you see that?

14   A.  Yes.

15   Q.  And when he says here, was it your testimony that he was

16   talking about a meeting that was ongoing with Compass Lexecon

17   at the time?

18   A.  Yes.

19   Q.  So your understanding is he's saying, based on what I'm

20   hearing in this meeting with Compass Lexecon, DOJ could

21   easily kill any deal?

22   A.  Basically his frustration and taking out because we were

23   constantly being asked a lot of questions and basically being

24   interrogated on the phone from Compass and Latham about what

25   we found, and I think, at least to me, I felt that oh my god,

1    everything that you're asking was like, well, nothing was

2    ever possible.  Like we couldn't do anything.

3    **Q.**   That was the impression you were getting from counsel and

4    Compass Lexecon on the call, that you couldn't do anything.

5    **A.**   Just because they were so overwhelming, they were

6    hounding us.  Yes.

7    **Q.**   Having you come up with some benefits for the alliance,

8    right?

9    **A.**   No.

10   **Q.**   What were they hounding you about?

11   **A.**   Basically saying like how does it work and what's going

12   on, and what are you doing?

13   **Q.**   I want to go to the message if we can pull that out.

14   Zoom in.

15          Let's go to the next page, yeah, thank you.  I want

16   to go to the message at 10:29 p.m., it starts with, "These

17   people."

18   BY MR. MOORE:

19   **Q.**   So I think you testified on your examination with

20   Ms. Maltas that, "These people," this message was occurring

21   during the meeting with Compass Lexecon; is that right?

22   **A.**   And Latham, yes.

23   **Q.**   Okay.  So is these people, does that refer to Compass

24   Lexecon and Latham?

25   **A.**   I think so, yes.

1    **Q.**  Okay.

2           MR. MOORE:  Your Honor, I don't have any further

3    questions at this time.

4           THE COURT:  All right.  Any redirect -- or recross,

5    rather?

6           MS. MALTAS:  Just a few brief things, Your Honor.

7    **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT AMERICAN AIRLINES**

8    BY MS. MALTAS:

9    **Q.**  So at this time, had Mr. Raja already seen v2?

10   **A.**  I showed him decks about the alliance.  I don't know if

11   he saw the v2 schedule or not.

12   **Q.**  But he was aware of the alliance, and you had provided

13   him updates about the alliance?

14   **A.**  Yes.  And we went over the principles and the goals and

15   what we were doing in the network, yes.

16   **Q.**  And were you preparing for a meeting -- you mentioned

17   that you were preparing for a meeting that was supposed to

18   happen on Monday.  Do you recall that testimony?

19   **A.**  Yes.

20   **Q.**  And what meeting was that?

21   **A.**  It was an officer staff meeting.

22   **Q.**  And who was going to present about v2 in the officer

23   staff meeting?

24   **A.**  I think Vasu.

25           MS. MALTAS:  Thank you.  I have no further

1    questions.

2              MR. MOORE:  Nothing further, Your Honor.

3              THE COURT:  All right.  You're excused.  Thank you

4    very much.  Have a nice day.

5              Next witness.

6              MR. JONES:  Your Honor, the plaintiffs call Eric

7    Friedman, and Sarah McDonough of the Department of Justice

8    will conduct the examination.

9              THE COURT:  Okay.

10             THE DEPUTY CLERK:  Mr. Friedman, if you could

11   please raise your right hand.

12             (The witness was duly sworn.)

13             THE DEPUTY CLERK:  Can you please state your name

14   for the record.

15             THE WITNESS:  My name is Eric Friedman.

16             THE COURT:  Go ahead.  Whenever you're ready.

17             MS. MCDONOUGH:  Good afternoon, Your Honor.

18             Good afternoon, Mr. Friedman.

19             THE WITNESS:  Good afternoon.

20             MS. MCDONOUGH:  Sarah McDonough for the United

21   States and plaintiffs.

22                         **ERIC FRIEDMAN**

23             having been duly sworn, testified as follows:

24        **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

25   BY MS. MCDONOUGH:

1    **Q.**  Mr. Friedman, we've handed you a binder.  We'll likely

2    refer to the binders during your examination.  I'll let you

3    know when to turn to that and where to direct your attention.

4             Mr. Freidman, you've worked at JetBlue since 2011;

5    is that correct?

6    **A.**  That is correct.

7    **Q.**  You're the director of route planning?

8    **A.**  Yes.

9    **Q.**  You've held that job since April of 2021?

10   **A.**  In function, yes; officially May 2021.

11   **Q.**  Before this role, you were manager of route planning?

12   **A.**  Yes.

13   **Q.**  You held that role between July 2017 and April 2021?

14   **A.**  Yes, that's correct.

15   **Q.**  Route planning is part of the network planning

16   department, correct?

17   **A.**  Yes.

18   **Q.**  Your supervisor from May 2017, until June 2022 was Andrea

19   Lusso?

20   **A.**  Yes, that's correct.

21   **Q.**  He was the vice president of network planning?

22   **A.**  First director and then vice president, yes.

23   **Q.**  One of your responsibilities as the director of route

24   planning is overseeing the long-term planning process of

25   JetBlue's network, correct?

 1    **A.**   There are multiple functions, and that is one of them,

 2    yes.

 3    **Q.**   Mr. Freidman, I'd like to ask some questions first about

 4    JetBlue in Boston before the Northeast Alliance.

 5    **A.**   Sure.

 6    **Q.**   Boston is an important focus city for JetBlue, correct?

 7    **A.**   Yes, absolutely.

 8    **Q.**   JetBlue had grown significantly in Boston between 2010

 9    and 2019?

10    **A.**   Yes.

11    **Q.**   Let's take a look at PX643 in your binder.

12            MS. MCDONOUGH:  This exhibit is in evidence,

13    Your Honor.

14            THE COURT:  Okay.

15    BY MS. MCDONOUGH:

16    **Q.**   PX643 is an e-mail chain between you, Steve Kennington,

17    and Andrea Lusso?

18            Excuse me, are you there?

19    **A.**   Yes.

20            THE COURT:  It's also on your screen if you like

21    that better.

22            THE WITNESS:  Thank you, Your Honor.

23            THE COURT:  Sure.

24            Go ahead.

25    BY MS. MCDONOUGH:

1   **Q.**   PX643 is an e-mail between you, Steve Kennington, and

2   Andrea Lusso, from May 31, 2019, correct?

3   **A.**   Yes.

4   **Q.**   And Steve Kennington was the director of strategy and

5   business development at the time?

6   **A.**   Yes.

7   **Q.**   In the attachment line of the header of the e-mail, it

8   says that there's an attachment called, "Board book 2019

9   Addendum v6," Correct?

10   **A.**   Yes, I see that.

11   **Q.**   A board book is reading material created for a board of

12   directors offsight each year at JetBlue?

13   **A.**   This time frame would be for the board of directors

14   offsight, yes.

15   **Q.**   And this thread and the attachment reflect a section of

16   the board book that the network planning team was

17   contributing?

18   **A.**   Yes, it appears so.

19   **Q.**   Let's take a look at page 8, which is the first page of

20   the attachment.  It ends in 4031.

21            Looking at the second paragraph, it

22   reads, "JetBlue's focus on Boston has resulted in JetBlue

23   growing from just 18 percent market share in 2010 to

24   29 percent by the end of 2019."

25            Is that what you wrote?

1     **A.**  I'm not sure if I wrote this specifically, but that is

2     what's stated.

3     **Q.**  That's an 11-point seat share increase?

4     **A.**  Yes, that is.

5     **Q.**  An 11-point seat share increase is a nice win?

6     **A.**  Where does that -- where do we say that?

7          THE COURT:  She's just asking you that, I think.

8          THE WITNESS:  Oh.

9          It's a -- it's certainly a good improvement.

10    BY MS. MCDONOUGH:

11    **Q.**  Let's take a look at the second-to-last paragraph on this

12    page, which begins with "Striking."  Are you there?

13    **A.**  Yes.

14    **Q.**  The document says, "Striking the right balance of growth

15    in Boston moving forward involves adding frequency to

16    business markets like Charlotte, Dallas, Washington, D.C.,

17    and Denver, et cetera."

18          Do you see that?

19    **A.**  Yes.

20    **Q.**  And that sentence is referring to JetBlue growth in

21    business markets from Boston, correct?

22    **A.**  To business markets like Charlotte, Dallas, Washington,

23    D.C., and Denver.

24    **Q.**  One of those business markets was Boston to Charlotte,

25    North Carolina, correct?

1    **A.**   Yes.

2    **Q.**   And Charlotte is an American hub?

3    **A.**   Charlotte is an American hub.

4    **Q.**   Another one of those business markets was Boston to

5    Dallas, Texas, correct?

6    **A.**   Correct.

7    **Q.**   Dallas is an American hub?

8    **A.**   Yes.

9    **Q.**   Another one of those business markets was Boston to

10   Washington, D.C., correct?

11   **A.**   That is correct.

12   **Q.**   Reagan National Airport in Washington, D.C., is an

13   American hub, correct?

14   **A.**   That is correct.

15   **Q.**   The next part of this sentence says, "Solidifying our

16   Mint offering in Los Angeles and San Francisco and offering

17   day-time service on some of our redeye-only service, like

18   Phoenix."

19            Do you see that?

20   **A.**   Yes, I do.

21   **Q.**   This part of the sentence is discussing growth in Boston

22   by solidifying Mint service in transcontinental markets such

23   as Boston to Los Angeles?

24   **A.**   Yes.

25   **Q.**   Los Angeles is an American hub?

1   **A.**  Yes.

2   **Q.**  And the sentence also discusses offering daytime service

3   on some of JetBlue's redeye-only routes, such as Boston to

4   Phoenix; is that right?

5   **A.**  Yes.

6   **Q.**  And Phoenix is an American hub?

7   **A.**  Yes.

8   **Q.**  Before the Northeast Alliance, Mr. Freidman, JetBlue was

9   planning to grow out of Boston by adding additional capacity

10  to these markets into American hubs, correct?

11  **A.**  Yes.  And we have continued to do so after the

12  implementation, as well.

13  **Q.**  I'd like to switch gears to talk about transatlantic

14  routes.  Please take a look at PX672 in your binder.  Let me

15  know when you're there.

16  **A.**  Yes.

17  **Q.**  This is an e-mail from your colleague, Nicholas Han, and

18  you're copied, correct?

19  **A.**  Yes, I am.

20  **Q.**  And it's from August 2018?

21  **A.**  Yes.

22  **Q.**  And the e-mail on the attached deck are about the impact

23  of joint ventures on transatlantic fares, correct?

24  **A.**  That is what it appears to be, yes.

25  **Q.**  Let's take a look at the page that ends with 040.  It's

1   Sebastian White's e-mail on August 15th, 2018.

2   **A.**   2040?

3   **Q.**   Yes.

4   **A.**   Okay.

5   **Q.**   Mr. White was a director of corporate communications,

6   correct?

7   **A.**   Yes.  Still is.

8   **Q.**   And he had reached out to several people, including your

9   boss, Mr. Lusso, looking for good data for a speaking

10  engagement for Mr. Hayes; is that right?

11  **A.**   Yes, I believe so.

12  **Q.**   In particular, looking at the e-mail, Mr. White was

13  looking for good data we can arm him with related to the

14  impact of industry consolidation."  Do you see that?

15  **A.**   Yes.

16  **Q.**   Let's take a look at the e-mail on the page that ends in

17  039.  It's an e-mail about a third of the way down the second

18  page, where your boss, Mr. Lusso, responds.  Do you see that?

19  **A.**   Yes.

20  **Q.**   Mr. Lusso writes, "I'm happy to get started on updating

21  the JV work we've done in the past.  We've looked at market

22  dynamics a few times and should be able to update a good

23  story on how competition benefits the traveling public."  Do

24  you see that?

25  **A.**   Yes.

1   **Q.**  Take a look at the page that ends in 038.  It's Mr. Han's

2   e-mail on the first page.  Are you there?

3   **A.**  Yes.

4   **Q.**  Take a look at the second paragraph, which is above the

5   line.  Mr. Han says that he's including a summary of the

6   attached slide deck to this cover e-mail.  Do you see that?

7   **A.**  Yes.

8   **Q.**  Okay.  Let's look at his summary.  In the first paragraph

9   below the line, Mr. Han lists the current transatlantic joint

10  ventures.  Do you see that?  That's current as of 2018?

11  **A.**  Yes, American, British Airways, Iberia, Thin Air, Delta.

12  Yeah.

13  **Q.**  American and British Airways entered into a joint venture

14  in 2010, correct?

15  **A.**  I don't recall the exact year, but they are in a joint

16  venture.

17  **Q.**  Let's take a look at the third paragraph of Mr. Han's

18  e-mail below the line.  Here Mr. Han is looking at American

19  and British Airways's joint ventures as an example.  Do you

20  see that?

21  **A.**  Yes.  In 2010.

22  **Q.**  Okay.  And the time period that this paragraph discusses

23  is between 2009 and 2012.  So the period immediately before

24  and two years after American and British Airways entered that

25  joint venture, correct?

1   **A.**   Yes.  And I believe this joint ventures had antitrust

2   immunity and pricing coordination attached with it, so just

3   fundamentally different, but yes.

4   **Q.**   Under the joint ventures, American and British Airways

5   could also coordinate capacity, correct?

6   **A.**   As well as pricing.

7   **Q.**   And they could also coordinate schedules, correct?

8   **A.**   And pricing.

9   **Q.**   And they could also share revenue, correct?

10  **A.**   Yes.

11  **Q.**   And if you look at the rest of this paragraph, Mr. Han

12  writes that, "In that time period between 2009 and 2012,

13  American and British Airways' fares rose 21 percent, while

14  capacity rose only 6 percent."  Correct?

15  **A.**   The ability to coordinate on pricing had a

16  disproportionate effect on fares.

17  **Q.**   Let me repeat my question.  In the paragraph here,

18  Mr. Han states that, in the time period between 2009 and

19  2012, so the period immediately before and immediately after

20  that joint venture, American and British Airways fares rose

21  21 percent while capacity rose only 6 percent.  Do you see

22  that?

23  **A.**   Yes.  Despite capacity going up, fares also went up.

24  **Q.**   And fares rose 21 percent while capacity rose six

25  percent.  Is that what you see?

1    **A.**  Yes, I do see that.

2    **Q.**  If you look at the last sentence of this paragraph, it

3    says that American exited Boston to London in 2013 and only

4    some of its capacity shifted to British Airways.  Do you see

5    that?

6    **A.**  Yes.

7    **Q.**  And that all -- overall capacity on the route went down

8    by 16 percent.  Do you see that?

9    **A.**  I do.

10   **Q.**  Let's take a look at the second paragraph.  This

11   paragraph says that after the Delta and Virgin Atlantic joint

12   ventures in 2013, fares increased in New York to London

13   relative to other transatlantic markets.  Do you see that?

14   **A.**  I do.  I believe that joint venture also has pricing

15   coordination built in.

16   **Q.**  Does that joint venture -- is it your understanding that

17   that joint venture also allows those two carriers to

18   coordinate capacity?

19   **A.**  Yes.

20   **Q.**  And to coordinate schedules?

21   **A.**  And pricing.

22   **Q.**  Was that a yes to the question whether it allows them to

23   coordinate schedules?

24   **A.**  Yes to all three.

25   **Q.**  And it allows them to share revenue, correct?

**A.**   Yes.

**Q.**   The next sentence in that paragraph says, "And as of 2018, fares were 8 percent higher than they were before the Delta-Virgin joint venture"; do you see that?

**A.**   Yes, I do.

**Q.**   And the last sentence says, "A similar effect happened in Boston to London when comparing 2014 versus 2012 in which Delta and Virgin fares were up 13 percent with their capacity down 7 percent."

Do you see that?

**A.**   Yes.

**Q.**   Let's turn back to Mr. Han's first paragraph.  In the last sentence, he summarizes and says, "In general, joint ventures create less competition and higher fares."  Do you see that?

**A.**   Yes.

**Q.**   Let's take a look at PX525 in your binder.

MS. MCDONOUGH:  Your Honor, this exhibit is in evidence.  JetBlue has generated certain redactions to this exhibit.

BY MS. MCDONOUGH:

**Q.**   So Mr. Freidman, I'll caution you not to reveal any redacted information.  Do you understand?

**A.**   Yes.

THE COURT:  So the redacted --

 1              You can put it up on the screen.

 2              The blacked-out redacted portions on the screen are

 3    redacted.  You can look at the entire document.  She doesn't

 4    want you to read from the document or refer to the things in

 5    the document that are redacted.

 6              THE WITNESS:  Thank you, Your Honor.

 7              THE COURT:  Go ahead.

 8              MS. MCDONOUGH:  Thank you, Your Honor.

 9              THE WITNESS:  I'm sorry.  525, this is?

10              MS. MCDONOUGH:  Correct.  Yes.

11              THE WITNESS:  Okay.

12    BY MS. MCDONOUGH:

13    Q.   PX525 is an e-mail between you -- excuse me -- is an

14    e-mail from you to Andrea Lusso and Nicholas Han on July 15,

15    2020; is that right?

16    A.   Yes.

17    Q.   In July -- in July 2020, the COVID-19 pandemic had

18    already begun, correct?

19    A.   Yes.

20    Q.   Nicholas Han -- who we were discussing in the previous

21    exhibit -- is a manager of route planning at JetBlue?

22    A.   Yes, that's correct.

23    Q.   And this e-mail has the subject "Five-Year Plan,"

24    correct?

25    A.   Yes.

1  **Q.**  There's an attachment listed called "Five-Year Plan

2  Forecast, Version 10"?

3  **A.**  Yes, one of many.

4  **Q.**  To be clear, that is the attachment listed on this

5  e-mail, correct?

6  **A.**  Yes.

7  **Q.**  If you look at your first paragraph, you're sending

8  Mr. Lusso a five-year plan forecast that had been updated by

9  two of your colleagues, correct?

10  **A.**  Yes, that's correct.

11  **Q.**  Looking at the second line, you say, "Attached is the

12  five-year plan.  No Connie, network fleet ask."  That's what

13  you wrote?

14  **A.**  Yes.

15  **Q.**  "No Connie" means that this is the five-year plan as of

16  July 2020 without the Northeast Alliance factored in,

17  correct?

18  **A.**  I would not characterize it as such, no.  This is a

19  desired route planning plan, not necessarily the five-year

20  plan of JetBlue officially in the eyes of executive

21  leadership.

22          THE COURT:  So was it a -- it's a five-year -- a

23  five-year plan for senior people to consider, but it's a plan

24  that doesn't factor in the Northeast Alliance?  It's just not

25  necessarily one that was endorsed?

```
 1              THE WITNESS:  Correct.  Around this time, there
 2    were multiple -- correct, Your Honor.  There were multiple
 3    recovery scenarios that we were modeling, things like a
 4    V-shaped recovery or U-shaped recovery, L-shaped recovery.
 5    So this assumed one of those types of recoveries.  I can't
 6    remember offhand which one.
 7              This was after a fleet deferral that occurred
 8    earlier that -- that spring or summer, as well.  So this was
 9    one plan that we wanted to pursue but certainly didn't have
10    full executive leadership buy-in on moving forward.
11              THE COURT:  Go ahead.
12    BY MS. MCDONOUGH:
13    Q.  Mr. Friedman, do you see, before this description that
14    we've highlighted, it says, "Attached is the five-year plan,
15    no Connie network fleet ask?"
16    A.  Yeah, the five-year plan that you asked for.
17    Q.  Let's turn to the middle of this page, to the
18    "methodology" section.  Taking a look at the third bullet
19    point you say, "Network expansion to prioritize contractual
20    agreements."  That's what you wrote?
21    A.  Yes.  We absolutely have to honor contractual agreements.
22    Q.  And the first bullet point under that heading
23    says, "Cover JFK slots attained through AA deal (not
24    Connie)," correct?
25    A.  Correct.  That's what it states.
```

1   **Q.**  And that refers to the 37 slots that JetBlue leased from

2   American before the Northeast Alliance, correct?

3   **A.**  So I'm not sure of the details of slot lease proposal.  I

4   know it was told to us to include them.  I don't know if it

5   was ever executed or if we ever flew those slots.  But they

6   were asked to be included.

7   **Q.**  Mr. Friedman, you've given two depositions in this

8   matter; is that right?

9   **A.**  Yes.

10  **Q.**  And on both of those occasions, you were under oath, just

11  as you are today?

12  **A.**  Yes.

13  **Q.**  Please take a note at Tab 1 of your binder, which is the

14  transcript from December 21st, 2020.  If you could please

15  turn to page 244.

16          THE COURT:  244?

17          MS. MCDONOUGH:  Yes, Your Honor.

18  BY MS. MCDONOUGH:

19  **Q.**  I'd like to direct your attention to page 244, line 24,

20  through page 245, line 9.  The question was, "Let's turn to

21  the Methodology section.  In the fourth bullet point, you

22  wrote, 'Cover JFK slots attained through AA deal (not

23  Connie.)'  Did I read that correctly?"

24          "ANSWER:  Yes.

25          "QUESTION:  That refers to the slot that JetBlue

1  negotiated with American, with AA, before the Northeast

2  Alliance, right?

3          "ANSWER:  Yes."

4          That was your sworn testimony?

5  **A.**  Yes.  I'm not sure if we actually executed it, took

6  possession of them.  I'm not sure what happened.

7  **Q.**  But that was your sworn testimony?

8  **A.**  Yes.

9          MS. MCDONOUGH:  Your Honor, plaintiffs move to

10  admit page 244:24 through 245:9 from Mr. Friedman's

11  December 21, 2020, deposition into evidence as a party

12  admission.

13          MR. SCHWED:  No objection.

14          THE COURT:  Admitted.

15          (Plaintiffs' Exhibit page 244:24 through 245:9 from

16          Mr. Friedman's December 21, 2020, deposition

17          admitted into evidence.)

18  BY MS. MCDONOUGH:

19  **Q.**  So, Mr. Freidman, turning back to the document --

20  **A.**  I apologize.  What tab was it?

21  **Q.**  PX525.

22  **A.**  Okay.

23  **Q.**  So when you refer to "cover JFK slots obtained through AA

24  deal (not Connie)" you're incorporating those slots into

25  JetBlue's stand-alone, five-year plan, correct?

1   **A.**   In this version of the five-year plan.

2   **Q.**   The version of the five-year plan that didn't include the

3   Northeast Alliance, correct?

4   **A.**   Correct.

5   **Q.**   Let's take a look at the bottom of the first page, at the

6   "result" section.  There's a chart that shows max departures

7   and average departures.  Do you see that?

8   **A.**   Yes.

9   **Q.**   And I'll caution you not to reveal any information that

10  JetBlue has redacted in those outer years.  Okay?

11  **A.**   Sure.

12  **Q.**   Taking a look at the max departures, do you see the row

13  that says "JFK"?

14  **A.**   Yes.

15  **Q.**   Max departures at JFK as of 2019 were 174, correct?

16  **A.**   That is correct.

17  **Q.**   Max departures at JFK as of 2022 were projected to be

18  191, correct?

19  **A.**   Yes, that's correct.

20  **Q.**   Max departures in Boston in 2019 were 178, correct?

21  **A.**   That is correct.

22  **Q.**   And max departures at Boston in 2022 were 185, correct?

23  **A.**   That is correct.

24  **Q.**   And please don't reveal the specific numbers, because

25  you're counsel has redacted them, but the max departures in

1    Boston for 2023 continue to grow, correct?

2    **A.**  Yes.

3    **Q.**  And the departure count continues to grow through 2026,

4    correct?

5    **A.**  I'm sorry; for which city?

6    **Q.**  Boston.

7    **A.**  They grow through -- I guess it's redacted, but their --

8    it doesn't.

9            MR. SCHWED:  You can just say maybe the growth

10   pattern without revealing the numbers, so -- whether it's the

11   same or greater or whatever.

12           THE WITNESS:  It does not grow through 2026.

13   BY MS. MCDONOUGH:

14   **Q.**  Excuse me.  It continues to grow through 2025; is that

15   correct?

16   **A.**  Yes.

17   **Q.**  And the departures for 2026 are greater than the

18   departures from 2019, correct?

19   **A.**  Yes, that's correct.

20   **Q.**  And, Mr. Freidman, all of the projected growth in this

21   table is independent of the Northeast Alliance, correct?

22   **A.**  This is a potential plan that was put forward with

23   certain opportunities.  I guess the JFK slots attained

24   through the AA deal, not Connie, that those ultimately did

25   not happen, and we did not fly them.

1          So this -- this plan was not the plan that we
2   ultimately went with in the summer of 2020, during COVID.
3   This was one of multiple plans being considered.  This was
4   one iteration of a plan without Connie.  I'm not aware of the
5   details around the AA slot deal, but I wouldn't characterize
6   this as the plan without Connie, period, right?
7          There were -- remember where we were in June of
8   2020.  We had just all come out of our homes for the first
9   time out of quarantine.  There were multiple plans that were
10  put forward.
11  **Q.**  Maybe you misunderstood my question.  I asked all of the
12  projected growth in this table was independent from the
13  Northeast Alliance; is that correct, Mr. Freidman?
14  **A.**  In this iteration of the plan, this growth, yeah.  Yes.
15  **Q.**  So in this iteration of the plan, without the Northeast
16  Alliance, JetBlue was planning to grow at JFK, correct?
17  **A.**  In this iteration of the plan, that was the plan.
18  **Q.**  That was a yes?
19  **A.**  Yes.
20  **Q.**  And in this iteration of the plan, without the Northeast
21  Alliance, JetBlue was planning to grow at Boston, correct?
22  **A.**  Yes.
23  **Q.**  Let's take a look at the middle of the second page, at
24  the, "Conclusion."
25          In the conclusion you write, "This exercise makes

1    extremely clear that regardless of Connie, JetBlue will have

2    to find a way to preserve and likely grow the order book,

3    whether through new aircraft, old aircraft keeping E90s,

4    purchasing or leasing."

5            Did I read that right?

6    **A.**   Yes.  So this plan was created after the deferral of the

7    initial 30 to 40 aircraft that happened as a result of COVID.

8    This plan never accounted for those aircraft leaving.

9            So if we as the company wanted to maintain the

10   pre-COVID growth rates, we would have had to have done so by

11   getting more aircraft.  And with Connie, we would have needed

12   even more aircraft.  We ultimately put the business cases

13   forward over the next year and a half, two years.

14   **Q.**   You continue in that paragraph, "As of now, we risk

15   Boston and Fort Lauderdale for JFK, Los Angeles, Orlando, and

16   operational flexibility," correct?

17   **A.**   Yes, I see that.

18   **Q.**   And, again, those risks existed regardless of the --

19   regardless of Connie, correct?

20   **A.**   Those risks are there, one, for operational flexibility,

21   and that was essentially modeling aircraft utilization

22   5 percent below 2019 levels.  That risk was there because we

23   had just deferred 30 to 40 aircraft.  And because of the

24   financial situation of COVID, we had to get rid of those

25   aircraft.  And by definition, those focus cities' growth

1    would be at risk.

2    **Q.**   Maybe my question wasn't clear.  Those risks existed

3    regardless of Connie, correct?

4    **A.**   Those risks existed because of the fleet deferral that

5    occurred due to COVID.

6    **Q.**   And taking a look at your first sentence in this

7    paragraph, you say, "This exercise makes extremely clear that

8    regardless of Connie, JetBlue will have to find a way to

9    observe and grow the current order book."

10             Do you see that?

11   **A.**   Yes.  Connie always required more aircraft, and we were

12   ultimately successful in getting more aircraft specifically

13   for the NEA.

14   **Q.**   And the risks that you're listing in this paragraph

15   you're saying exist regardless of Connie, correct?

16   **A.**   Correct.  Connie always required more aircraft regardless

17   of the situation.  We always needed more aircraft.  We put

18   business cases for -- for those aircraft and were actually

19   successful in obtaining the aircraft for the NEA.

20   **Q.**   In the last sentence of this paragraph, you write, "If

21   the fleet can't grow, something has to go."  Do you see that?

22   **A.**   Yes.  I see that.  That's a direct result of the fleet

23   deferrals, getting rid of 30 to 40 aircraft due to COVID.

24   **Q.**   I'd like to switch gears to talk about your interactions

25   with JetBlue's clean team that was working on the Northeast

1    Alliance.  You were not a member of the clean team?

2    **A.**  No, I was not.

3    **Q.**  Your supervisor, Andrea Lusso, was also not a member of

4    the clean team, correct?

5    **A.**  No, he was not.

6    **Q.**  In fact, no one from the JetBlue network planning team

7    was on the clean team, correct?

8    **A.**  That's correct.  To my knowledge, we were not legally

9    allowed to be part of the clean team.

10   **Q.**  But members of the clean team did ask you to compare

11   their forecast of the Northeast Alliance with the network

12   planning team's forecast for JetBlue, correct?

13   **A.**  Yes, that's correct.

14   **Q.**  I'd like to take a look first at PX553 in your binder.

15            MS. MCDONOUGH:  Your Honor, this exhibit is already

16   in evidence.

17            THE COURT:  553, did you say?

18            MS. MCDONOUGH:  553, yes, Your Honor.

19            THE COURT:  Okay.  Go ahead.

20   BY MS. MCDONOUGH:

21   **Q.**  And I'd like to take a look at the very bottom of the

22   page that ends in 631, on to the top of the page that ends in

23   632.  Excuse me.  I'd just like to look at the page that ends

24   in 632.  It's the first in time e-mail that's in this exhibit

25   from June 2nd.

1          Are you there?

2    **A.**  632?

3    **Q.**  Yes.

4    **A.**  627 is on the screen, I believe.

5          Okay.  Yeah.

6    **Q.**  You write in this e-mail, "Attached is a file that models

7    out the full Connie plan put forward by SBD last night,

8    inclusive of JFK, LaGuardia, and Boston moves, and compares

9    the results to our forecasts on the assumptions tab."

10         That's what you wrote?

11   **A.**  Yes.

12   **Q.**  Okay.  Let's take a look at the first page of this

13   exhibit, which ends in 627.  Let's take a look at your e-mail

14   to your boss, Mr. Lusso, at 2:05 p.m.  Do you see that?

15   **A.**  Yes.  On 627, yup, draft below.  Yup.

16   **Q.**  You say, "Draft below, let me know your thoughts and if I

17   should send," correct?

18   **A.**  Yes.

19   **Q.**  And you've included a list of discrepancies between your

20   analysis of the SBD work and the clean team's plan, correct?

21   **A.**  Yes.

22   **Q.**  And I should have said at the beginning, the subject of

23   this e-mail is "Connie Compare," correct?

24   **A.**  Yes.

25   **Q.**  The fifth concern on this e-mail says, "We still believe

1  that we are including value here that would have been

2  generated anyway, i.e., BUR Mint.  It would be more

3  appropriate to identify the incremental value of the

4  partnership as it pertains to this and any other markets we

5  intend to serve as part of our five-year plan."

6          That's what you wrote?

7  **A.**  That is what I wrote.  I think what we were trying to get

8  at was more of a -- an incremental evaluation of the NEA as

9  opposed to a full P&L output of what the NEA would produce.

10          So if you think about it from an overlap

11  perspective, you know, I would say, if you think about it

12  from Boston, right, we had 180 flights a day in Boston

13  beforehand.  This file had 240 flights.

14          The first 180 flights, right, we already know the

15  valuation of those.  We were planning to go from 180 to 200.

16  We know the valuation of those.  What I really wanted to know

17  is not the overlap between the two plans, but what was the

18  incremental 20 flights into Boston as a result of the NEA

19  going to be valued at.

20  **Q.**  I'll ask you more questions about that as we go.  For

21  now, you write in your e-mail to Mr. Lusso, "Draft below.

22  Let me know your thoughts below and if I should send."  Do

23  you see that?

24  **A.**  Yes.

25  **Q.**  And Mr. Lusso responds to the e-mail at the very top of

1  this page, and he says, "Good by me, please send back to them

2  around 3:00 p.m., and copy me/Scott."  Do you see that?

3  **A.**  Yes.

4  **Q.**  And "send back to them" means send to the clean team,

5  correct?

6  **A.**  I imagine, yes.

7  **Q.**  And did you understand Scott here to mean Scott Laurence?

8  **A.**  Yes.

9  **Q.**  And you did send those concerns on to the clean team

10  shortly after this e-mail on that day, correct?

11  **A.**  I don't know if it was exactly that day, but, yes, I did

12  send it.

13  **Q.**  You sent it to Mr. Fintzen; is that right?

14  **A.**  Yes.

15  **Q.**  Okay.  You can put that exhibit to the side.

16         I'd like to take a look at PX1124, which is in

17  evidence.  We will publish a redacted version.

18         PX1124 is an instant message chat between you and

19  Derek Klinka on June 3, 2020, correct?

20  **A.**  Yes, it appears so.

21  **Q.**  Derek Klinka was a member of the JetBlue's clean team?

22  **A.**  Yes.

23  **Q.**  Let's take a look at the third page, which ends in 432.

24  Halfway down the page is a chat from you to Mr. Klinka at

25  1:14 p.m.  Do you see that?  It's at the top of the

1  extraction that we've blown up.

2  **A.**  Yes.

3  **Q.**  You ask Mr. Klinka to send over the latest slot matrix in

4  Excel form, right?

5  **A.**  Yes.

6  **Q.**  And the slot matrix is the optimized schedule that the

7  clean team had prepared for 2023, correct?

8  **A.**  I'm sorry; say that question again.

9  **Q.**  The latest slot matrix that you're asking Mr. Klinka for

10  is the optimized schedule that the clean team had prepared

11  for 2023, correct?

12  **A.**  I believe so.

13  **Q.**  And Mr. Klinka responds, "I have it for us."  Do you see

14  that?

15  **A.**  Yes.

16  **Q.**  And "us" -- did you understand "us" to mean JetBlue?

17  **A.**  The clean team at JetBlue, yes.

18  **Q.**  He writes, "I have it for us, but I don't have it in

19  Excel for Connie."  Do you see that?

20  **A.**  Yes.

21  **Q.**  And you respond that you just need the latest B6, JFK,

22  LaGuardia, and Boston numbers to add on to your five-year

23  model, correct?

24  **A.**  Correct.

25  **Q.**  Mr. Klinka responds, "Wait, why does the matrix matter,

1    or is it separate from the regulatory exercise we're asking

2    for?"  Do you see that?

3    **A.**   I do see that.

4    **Q.**   And you respond.  Now we're at 1:21.  You say, "No, it's

5    for the regulatory exercise, you want pre-COVID 2023,

6    post-COVID 2023 with Connie, and post-without Connie, right?

7    We need the latest frequency route counts for post-COVID 2023

8    with Connie."  Correct?

9    **A.**   Yes, that's what's written.

10   **Q.**   The clean team had asked you to work on a project related

11   to a regulatory exercise, right?

12   **A.**   I don't recall what the regulatory exercise was.

13   **Q.**   Let's keep looking at the document.  Mr. Klinka responds,

14   "I don't think you need post-COVID with Connie."  Do you see

15   that?

16   **A.**   Yes.

17   **Q.**   And you respond, "Of course we do.  We need to show

18   Justice the difference between the size of our airline with

19   Connie or without."  Right?

20   **A.**   Yes.

21   **Q.**   "Justice" is the Department of Justice?

22   **A.**   Yes, I believe so, in this context.

23   **Q.**   The regulatory process that you referred to earlier

24   involved the Justice Department; is that right?

25   **A.**   I believe we were trying to show the additional growth of

1    the NEA in New York City, in Boston, to -- I don't know if we

2    were trying to -- if there was a request from Justice.  I

3    don't know if this was an exercise to prepare for that.  But

4    we -- ultimately, we wanted to put something together that

5    showed the growth of the NEA in New York City and in Boston.

6    Q.  You understood that, as part of the process to seek

7    approval from the Justice Department to go forward with the

8    Northeast Alliance, you would need to show the Justice

9    Department a forecast of what JetBlue would look like in 2023

10   with the Northeast Alliance versus what JetBlue would look

11   like in 2023 without the Northeast Alliance, correct?

12              MR. SCHWED:  Objection.  Foundation.  He has no

13   involvement in the regulatory process.

14              THE COURT:  I think she's just asking him --

15              MR. SCHWED:  To the extent he does, it would be

16   based on legal advice.

17              THE COURT:  I think she's asking what he understood

18   from this, not what was happening.

19              Right?

20              MS. MCDONOUGH:  That's right.  Thank you,

21   Your Honor.

22              THE COURT:  So for that, I overrule it.

23              THE WITNESS:  I acknowledge I was involved in some

24   sort of regulatory process exercise.  I don't believe we went

25   through this document during my depositions, and I'm having

1    difficulty recalling the full context of what we were working

2    on here.

3    BY MS. MCDONOUGH:

4    **Q.**   Mr. Friedman, I'm trying to unpack the last line of the

5    chat that we just discussed, where you say, "We need to show

6    Justice the difference between the size of our airline with

7    Connie or without."  Do you see that?

8    **A.**   Yes.

9    **Q.**   So I'm asking -- you understood that, as part of this

10   regulatory exercise, that you would need to show the Justice

11   Department the difference between what JetBlue would look

12   like with the Northeast Alliance in 2023 versus what JetBlue

13   would look like without the Northeast Alliance in 2023,

14   correct?

15   **A.**   I -- I don't know if we needed to show the Justice

16   Department because we were asked or just, philosophically, I

17   was thinking that.

18   **Q.**   But you agree that --

19           THE COURT:  But she's just asking what you were

20   thinking, not, in fact, what the Justice Department wanted.

21   In other words, you wrote that, right?

22           THE WITNESS:  I did write that.

23           THE COURT:  And so she's just asking, what did you

24   mean when you wrote it?  I think.

25           MS. MCDONOUGH:  Thank you, Your Honor.

1          THE WITNESS:  Understood.  I honestly can't

2     remember the context of the conversation, but we needed data

3     to show the difference between before and after.

4     BY MS. MCDONOUGH:

5     **Q.**   You needed data to show the difference between what

6     JetBlue would look like with the Northeast Alliance versus

7     what JetBlue would look like without the Northeast Alliance,

8     correct?

9     **A.**   Correct.

10    **Q.**   Okay.  And for your part in this, the clean team had

11    asked you to put together the part of that analysis that

12    would show what JetBlue would look like in 2023 without the

13    Northeast Alliance, correct?

14    **A.**   I apologize.  Can you ask the question again?

15    **Q.**   For your part in this, the clean team had asked you to

16    put together an analysis that would show what JetBlue would

17    look like in 2023 without the Northeast Alliance, correct?

18    **A.**   I'm -- where does the clean team ask me for that?

19    **Q.**   I'm asking you whether that's correct, that that was

20    your --

21    **A.**   I believe I'm asking the clean team for the plan with

22    Connie so we can compare it to the plan that the network team

23    put together without Connie.

24    **Q.**   So the network planning team had put together a plan for

25    JetBlue without Connie, correct?

1    **A.**   Yes.  We -- as mentioned earlier, we put together

2    multiple plans.

3    **Q.**   And you understood that comparing that network planning

4    team plan to the clean team's plan with Connie would be an

5    apples-to-apples comparison of what JetBlue would look like

6    with the Northeast Alliance versus what JetBlue would look

7    like without the Northeast Alliance, correct?

8    **A.**   I don't know if I would characterize it as an

9    apples-to-apples comparison, given the sheer number of

10   different possibilities that we were looking at, but we knew

11   that we needed to at least have the vision of the clean team

12   to compare against some sort of baseline or a combination of

13   potential baselines to see what the growth would look like.

14   **Q.**   And that baseline would be JetBlue in 2023, without the

15   Northeast Alliance, correct?

16   **A.**   Yes.  Certainly without -- without the Northeast

17   Alliance.

18   **Q.**   You weren't involved in the final presentation to the

19   Justice Department, correct?

20   **A.**   No.

21   **Q.**   So you may not be the right person to tell us what

22   happened to these comparisons at the end of the day, correct?

23   **A.**   So this was for the Justice Department?  I didn't even

24   know that this was referring to a presentation for the

25   Justice Department.

1    **Q.**  I'll move on.

2    **A.**  Okay.

3    **Q.**  Let's take a look at PX535, which is in evidence.  PX535

4    is an e-mail chain between you and Andrea Lusso, from

5    June 8th and 9th, 2020, correct?

6    **A.**  Yes, it appears so.

7    **Q.**  Please take a look at the second half of the first page,

8    which is your e-mail to Mr. Lusso, on June 8th, 2020, at

9    5:26 p.m.  Are you with me?

10   **A.**  Yes.

11   **Q.**  On the second page of this e-mail, you send a list of

12   things for the two of you to discuss, correct?

13   **A.**  Yes.

14   **Q.**  And the fourth bullet point says "SBD work."  Do you see

15   that?

16   **A.**  Yes.

17   **Q.**  "SBD work" here is shorthand for JetBlue's clean team?

18   **A.**  Yes.  Strategy and business development.

19   **Q.**  And was that a shorthand in this e-mail for JetBlue's

20   clean team?

21   **A.**  Yes.

22   **Q.**  You wrote, "SBD work:  At first from a revenue

23   perspective, I was worried we were giving credit to new

24   routes we were considering anyway."

25            That's what you wrote?

1    **A.**   Yes.   This goes back to what we were just discussing

2    about the incrementality of the NEA.

3    **Q.**   And you were concerned that in calculating the benefits

4    of the Northeast Alliance, the clean team was including

5    benefits that JetBlue was already planning to achieve,

6    correct?

7    **A.**   My concern was that what I was looking at was a P&L

8    output of the full NEA, most of which has been already

9    implemented through JetBlue, right?   There's an incremental

10   20 flights a day out of Boston.   There's an incremental 36

11   flights out of LaGuardia, and incremental 20 flights out of

12   JFK.   But the vast majority has already been implemented.   So

13   I wanted to make sure that we were looking at the pure

14   incrementality contribution of the NEA, not just the overall

15   P&L of the NEA.

16   **Q.**   And you were concerned that the clean team was including

17   benefits that JetBlue was already planning to achieve,

18   correct?

19   **A.**   In -- I wouldn't characterize it as that, despite how

20   it's written.   I was worried that while we were always

21   planning, for example, in Boston, to go from 180 to 200, we

22   know that benefit, that was being calculated in the SBD

23   calculations.   I wasn't concerned about that.   We already

24   knew that benefit.   We were on our way to doing that

25   beforehand.   We didn't have the planes to do it because we

1    deferred them.  But we knew what that benefit was.

2           I wanted to know the incremental benefit of the

3    next 20 that we were adding as part of the NEA.

4    Q.  I think I understand what you were looking for,

5    Mr. Freidman.  I'm asking, you were concerned that the clean

6    team wasn't looking at that incremental benefit because the

7    clean team was considering benefits that JetBlue was already

8    planning to achieve, correct?

9    A.  They had not -- they would needed -- they would have

10   needed that baseline, which is very difficult to create, and

11   the NEA, P&L modeled the two P&Ls together and showed the

12   incremental difference.  That's what they would have needed

13   to provide.

14   Q.  And was that a yes to my question, that the clean team --

15   you were concerned that the clean team was including benefits

16   that JetBlue was already planning to achieve?

17   A.  I was concerned that we weren't getting the clear NEA

18   incremental benefit, and they were -- yeah, no, I'll leave it

19   at that.

20   Q.  Was that a yes?

21           MR. SCHWED:  Objection.  Asked and answered.

22           THE COURT:  Sustained.

23   BY MS. MCDONOUGH:

24   Q.  As we discussed -- well, sorry.

25           In your e-mail to Mr. Lusso, you write that, "The

1    five-year plan confirmed that there were a number of markets

2    in the clean team analysis that JetBlue was going to enter

3    anyway," correct?

4    **A.**   Right.  This goes back to having been at 180 flights a

5    day, getting to 220.  We were going to get to 200.  So there

6    was an element of markets that were going to happen

7    regardless on our path from 180 to 220, that we were trying

8    to get to 200 before then.

9    **Q.**   And in the last sentence you write, "The plans we sent

10   show that we were planning to enter many markets anyway,"

11   right?

12   **A.**   That is what's written and corresponds to what I said.

13   **Q.**   You said that there were many markets in your five-year

14   plan that were also part of the Northeast Alliance, correct?

15   **A.**   By definition, they would have had to have been, right?

16   It's the NEA facilitates incremental growth, so the growth

17   that we had already planned would be part of the NEA, and

18   then there would be more to the NEA.

19   **Q.**   And you're telling this to Mr. Lusso, because you want

20   him to know that what the clean team is doing is not an

21   apples to apples comparison, correct?

22   **A.**   I just wanted to know the incremental difference of the

23   NEA.  That's the calculation I was really looking for.

24   **Q.**   Okay.  Let's take a look at PX527 in your binder.

25   Your Honor, this is in evidence.  The attachment is sealed,

1    but we'll just be looking at the cover e-mail.

2    BY MS. MCDONOUGH:

3    Q.   The top e-mail on this chain is an e-mail between you and

4    Nicholas Han, on June 23, 2020; is that right?

5    A.   Yes.

6    Q.   And the subject is, "Re: Five-Year Plan Summaries"?

7    A.   Yes.

8    Q.   And the attachment is "five-year plan, 6/23/2020,"

9    correct?

10   A.   Yes.  Which I think was different from the previous

11   five-year plan that we looked at before, correct?

12   Q.   Is that --

13   A.   Sorry, I just -- okay.

14   Q.   Okay.  Let's take a look at the very bottom of the second

15   page, and on to the third page, at your e-mail to Mr. Lusso,

16   at 10:06 p.m.  Do you see that?

17   A.   Beginning with, "I have another question."

18   Q.   Most of the e-mail is on the third page, we'll pull it

19   up.  The very top of the header is on the bottom of the

20   second page.  If you look at the body of the e-mail, I'll

21   point you to it, if you look at the body of your e-mail to

22   Mr. Lusso, you and Mr. Lusso had had a one on one meeting

23   that day, correct?

24   A.   Yes.

25   Q.   Mr. Lusso had asked you for slides outlining five-year

1    plan growth?

2    **A.**  Yes.

3    **Q.**  Let's take a look at the bottom of the second page to

4    Mr. Lusso's response to you.  Mr. Lusso asked you to compare

5    the five-year plan with Connie and without Connie.  Do you

6    see that?

7    **A.**  Yes.

8    **Q.**  And with the current delivery plan for JetBlue's aircraft

9    versus with the network plan -- with the network planning

10   team's proposed delivery plan.  Do you see that?

11   **A.**  Yes, as you can see, there's multiple branchs of this

12   planning process now.

13   **Q.**  Looking up at the same page at your response to Mr. Lusso

14   on June 19th at 9:29 a.m. --

15          MS. MCDONOUGH:  Thank you.

16   BY MS. MCDONOUGH:

17   **Q.**  In the first paragraph, you write "I have another

18   question on this and it relates back to the JFK slot pair

19   question."  Correct?

20   **A.**  Yes.

21   **Q.**  You write, "In our five-year plan, we built in additional

22   JFK slot pairs, assuming we'd get them.  Now that these plans

23   are being evaluated by the board/senior leadership team, I

24   think it would be confusing to show both Connie and nonConnie

25   five year plans with the same-ish number of JFK departures ."

1          That's what you wrote?

2    **A.**   Yes, so as I discussed, there's multiple iterations of

3    this plan.  These plans have, in some ways, been aspirational

4    over time, and one of the things that we've always built into

5    these five year plans was growth into JFK.  It was never

6    really clear how that growth into JFK would actually

7    manifest.  Right? Just the other day, United exited JFK

8    routes because they couldn't get more slots.  It's extremely

9    difficult to grow at JFK, but we was always built it into our

10   plan because that was our aspiration to do so.  I thought it

11   would be confusing to show JFK growth because of our

12   aspiration to grow at JFK, and then to compare it to a plan

13   that actually had growth at JFK.  I think we needed to show

14   people that, actually, this is our shot to grow at JFK, the

15   NEA.

16   **Q.**   The network planning team's five-year plan, without the

17   Northeast Alliance, built in additional slots at JFK,

18   assuming you'd get them, correct?

19   **A.**   That was one iteration of a -- of the plan that was of

20   many, and that ultimately didn't manifest.

21   **Q.**   Mr. Freidman, please take a look at tab one of your

22   binder, which is the transcript from December 21, 2020.

23   Please turn to page 220.  I'd like to direct your attention

24   to page 220, line 7 to 13.  The question was:

25          "QUESTION:  So the network planning team's

1    five-year plan built in additional JFK slot pairs, assuming

2    that JFK would get them somehow; is that right.

3            "ANSWER:  Yes, it was building in an optimistic or

4    reasonable amount of slot pairs, assuming we were always on

5    the hunt for them."

6            That was your sworn testimony?

7            THE WITNESS:  Yes.

8            MS. MCDONOUGH:  Your Honor, plaintiffs move to

9    admit page 220, line 7 through 13, as a party admission.

10           MR. SCHWED:  Your Honor, I have no objection to the

11   admission, but I do want to point out that this is at least

12   the second time they've read something into the record that's

13   not at all inconsistent with his testimony and I just want to

14   be on the record with that.

15           THE COURT:  I'll admit it and yes -- not everything

16   that has been admitted has been inconsistent.

17   BY MS. MCDONOUGH:

18   Q.  Mr. Freidman, here you thought it would be confusing to

19   show the board with the five-year plan with those additional

20   JFK departures that you assumed you would get because that

21   plan would look very similar to the plan with the Northeast

22   Alliance, correct?

23   A.  As I mentioned earlier, the aspirational nature of some

24   of the plans that we put into the five-year plan file, in

25   route planning, always assumed somehow we would try -- we

1    would be successful in gaining slots, right?  We have been

2    successful through the NEA, United as of last week was

3    unsuccessful.  They exited JFK, LAX, and San Francisco.

4             THE COURT:  Oh, they exited the JFK to San

5    Francisco route.

6             THE WITNESS:  Correct, yes.

7             MR. SCHWED:  I think he said JFK-LAX and JFK-San

8    Francisco.

9             THE WITNESS:  Yes, Your Honor.

10            THE COURT:  I see.

11            THE WITNESS:  Two different routes, from JFK-LAX

12   and JFK-San Francisco.

13            THE COURT:  Okay.

14            THE WITNESS:  I apologize, I lost my train of

15   thought.  But --

16            Can you ask the question again?  I apologize.

17            MS. MCDONOUGH:  I'll move on.  I think we've

18   covered it.

19            THE WITNESS:  Okay.

20   BY MS. MCDONOUGH:

21   **Q.**  Let's look at Mr. Lusso's e-mail, above this one, to you

22   at 11:33 a.m.  Do you see that?

23   **A.**  Yes.

24   **Q.**  Mr. Lusso writes, "I'm okay with this.  Base, no Connie,

25   includes the 16 pairs from AA."

1           Do you see that?

2    **A.**  Yes, I see that.

3    **Q.**  Those are the 16 pairs of JFK slots that JetBlue had

4    leased from American, before the Northeast Alliance, correct?

5           MR. SCHWED:  Objection.  He's already testified as

6    to a lack of foundation as to the status of that lease.

7           THE COURT:  He testified to this e-mail before?

8           MR. SCHWED:  No, but, Your Honor, he's already

9    testified that he was not involved in the negotiations, and

10   he knew there was some discussions but he didn't know the

11   legal status of that.

12          THE COURT:  Okay.

13          MR. SCHWED:  Of that discussion.

14          THE COURT:  Okay.  Sustained.

15   BY MS. MCDONOUGH:

16   **Q.**  Mr. Freidman, did you understand Mr. Lusso's e-mail to

17   mean that the 16 pairs from AA that he refers to should be a

18   part of the base, no Connie plan that he had asked for?

19   **A.**   In the e-mail chain that we had just discussed, though,

20   we had agreed that the baseline foundation was without this

21   deal, which ultimately never had manifest.  So I'm a bit

22   unclear on the discrepancy.  But ultimately, the next

23   iteration of the plan did not have these built in, and to my

24   knowledge, these were not executed.  We did not fly them.  We

25   did not -- I actually don't know what happened to these

1    16 pairs or this deal.

2    **Q.**  Let's turn back to Mr. Lusso's e-mail earlier in time,

3    where he asks -- Mr. Lusso asks for a comparison of with

4    Connie network plan, and without Connie.  Do you see that?

5    **A.**  Yes.

6    **Q.**  Okay.  Now let's turn back to Mr. Lusso's other e-mail.

7    Do you understand this instruction to you in his e-mail to

8    mean that the 16 pairs from AA should go into the nonConnie

9    version of that comparison?

10   **A.**  At that point in time, I guess that's what he's asking me

11   to do.  At a different point in time, maybe the deal had come

12   undone, and we -- the plan changed again.

13   **Q.**  Here Mr. Lusso is agreeing with you that the 16 pairs

14   from American should be part of the base, no Connie,

15   stand-alone plans, correct?

16   **A.**  At this point in time.  But I believe we just went over

17   the different e-mail where the plan had changed, and I'm not

18   sure that this was ever executed upon.

19   **Q.**  At this point in time, Mr. Lusso and you agreed that --

20   or you -- excuse me.

21            At this point in time, you understood that those

22   16 pairs from American would not be incremental growth

23   attributable to the Northeast Alliance, correct?

24            MR. SCHWED:  Objection.  Misstates.

25            MS. MCDONOUGH:  I'm not asking anything about the

1    document.

2              THE COURT:  I'm overruling the objection because

3    he's not -- he can answer, if that's what he understands.

4              THE WITNESS:  During this -- during this time, for

5    the five-year plan attachment that was referenced the first

6    time, we did action this request.  And then in the second

7    file, which was a different file, we changed the plan, and it

8    no longer included the 16 pairs from AA because I don't think

9    they were on the table.  I don't know what happened.

10   BY MS. MCDONOUGH:

11   **Q.**  Mr. Freidman, you -- we spoke earlier about how you were

12   looking for incremental growth -- that you were trying to

13   understand the incremental growth that the Northeast Alliance

14   might provide, correct?

15   **A.**  Yes.

16   **Q.**  You wanted that incremental growth, but the clean team

17   didn't provide it, correct?

18   **A.**  Let me just rephrase my answer.  The -- I wanted the

19   incremental value of the growth of the NEA.  The clean team

20   did provide the incremental growth.  They provided a growth

21   plan, and we could compare it against.  We wanted the

22   incremental value of that growth plan, not necessarily the

23   incremental growth.

24   **Q.**  Let me ask it that way.  You wanted that incremental

25   value, but the clean team didn't provide it, correct?

1    **A.**   Correct.  I don't think we ever got that precisely from

2    them.

3              MS. MCDONOUGH:  Okay.  I pass the witness.

4              THE COURT:  All right.

5         **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT JETBLUE**

6    BY MR. SCHWED:

7    **Q.**   Mr. Freidman, you were just asked a question about what

8    the clean team did or did not provide with respect to

9    incremental value.  Do you recall that?

10   **A.**   Yes.

11   **Q.**   Were you answering with respect to what they provided to

12   you personally or to anybody else?

13   **A.**   I believe, in that e-mail chain, or in an e-mail chain,

14   Dave Fintzen says "We'll eventually have to get to that."

15   And then that was eventually provided.

16   **Q.**   But when you said they didn't provide it, were you just

17   saying they didn't provide it to you?

18   **A.**   Correct.

19   **Q.**   You don't know what they provided to anyone else.

20   **A.**   I know that they provided other figures to executive

21   leaders and kept people in the know for sure, yes.

22   **Q.**   Can you describe your role, if any, in the implementation

23   of the Northeast Alliance?

24   **A.**   Sure.  So I lead a team that works directly with

25   American's network team, route planners, and schedulers to

1    implement the Northeast Alliance.  Specifically, coming up

2    with which routes to fly, how many frequencies per day,

3    discussing with American Airlines which -- which airline

4    should fly which route.  And in some instances, we would fly

5    both routes, which aircraft type, how many times a day,

6    things of that nature, the ultimate goal being to create the

7    most competitive network in New York City and Boston, as

8    possible.  Certainly to compete better against Delta and

9    United.

10   **Q.**  Are you the lead person from JetBlue, from a day-to-day

11   basis, in that effort?

12   **A.**  I'd say I'm one of the lead people.  There's folks

13   underneath me that are also working the day-to-day, as well.

14   **Q.**  People who work for you within the route planning group?

15   **A.**  Yes.

16   **Q.**  And can you generally describe the process that you

17   undertake for this exercise of optimizing the network?

18   **A.**  Sure.  So about every one to two months, the teams get

19   together to work on what we call the steady state plan.

20   We're looking at the largest markets served from both New

21   York City and Boston, seeing which ones we serve, which ones

22   we don't, and constantly analyzing how we can change those

23   routes and those frequency levels accordingly.

24   **Q.**  You mentioned something called the "steady state plan."

25   Can you describe what that is?

1    **A.**   Yes, the steady state plan is an ever involving document,

2    which represents where we want the NEA to be from a route

3    perspective, frequency level perspective, into perpetuity,

4    right?  Two or three years for now into the future.

5    **Q.**   And is that something you're trying to achieve?

6    **A.**   Yes.  Absolutely.

7    **Q.**   In your meetings with American, do you discuss the routes

8    within the NEA on a route by route basis?

9    **A.**   Yes, we do.

10   **Q.**   And putting aside carve-outs, do you discuss all routes

11   within the Northeast Alliance with American?

12   **A.**   Within the Northeast Alliance, Boston to New York City,

13   excluding the carve-outs, yes.

14   **Q.**   And do you have an ultimate objective in this process?

15   **A.**   Yes.  So the objective is to create the most competitive

16   network possible in New York City and in Boston, which have

17   been historically very constrained for two different reasons.

18   Slot constraints in New York City and gate and ground

19   constraints in Boston.

20   **Q.**   And there's been -- going back to the steady state,

21   there's been a lot of discussion about a clean team schedule.

22   Do you recall that?

23   **A.**   Yes.

24   **Q.**   Does the steady state that you've described have any

25   relationship to the clean team schedule?

1    **A.**   The only relationship that exists is when we began the --

2    our own organic steady state planning process.  We had the

3    clean team plan to compare against.  But ultimately the two

4    plans are different, some similarities, but also very

5    different.

6    **Q.**   And which team within JetBlue is responsible for the

7    steady state and achieving it?

8    **A.**   There are multiple teams involved in executing the NEA,

9    but route planning and schedule planning between American and

10   JetBlue ultimately work together to create that steady state

11   document.

12   **Q.**   Now, you mentioned that one of the -- one of the things

13   that you're trying to assess for a given route is which of

14   the two airlines flies that route or which combination.  What

15   factors go into that decision?

16   **A.**   Yeah, so there are quite a few different factors, one

17   would be the customer type, the point of sales strength on

18   that route, the competitive environment for that particular

19   route.  Is that route require regional aircraft, or a main

20   line aircraft, regional being the smaller aircraft, mainline

21   being the larger aircraft, multiple different factors that

22   could go into it, and we discuss them all.

23   **Q.**   Another thing you mentioned is that you're trying to

24   optimize the schedule.  And what do you mean by that?

25   **A.**   Yeah.  We -- in terms of optimizing the schedule, there's

1  two different things that we do there.  One would be

2  optimizing connectivity between the two carriers, and also

3  ensuring that on overlap routes that we both serve, we stay

4  away from what we call the wing tips, which is having one

5  departure basically be on top of another departure.  So

6  working together, we can ensure that the schedule is spread

7  throughout the day, that we don't have the same departure

8  times.  We're offering as much customer choice throughout the

9  day as possible.  And then getting back to the connectivity

10  piece, we work together to optimize the slot portfolios to

11  ensure that JetBlue's network, as well as America's network

12  can connect into the long-haul network offering that American

13  has out of JFK.

14          We've had a significant number of partners at

15  JetBlue, but the global presence that American can provide on

16  top of that helps us better compete, and the NEA, as a whole,

17  compete better against Delta and United's global reach out of

18  New York City, as well.

19  **Q.**  Well, why does JetBlue need to coordinate with American

20  to increase connectivity with its international network.

21  Isn't -- can't JetBlue for example just adjust its schedule

22  to known schedules of American?

23  **A.**  So one, I think we have to work together to optimize

24  which markets connect in to American Airlines's bank, and we

25  also have to work around one of the larger constraints about

1    slots.  Right?  The NEA is allowing us to grow our slot

2    portfolio, but it's also allowing us to optimize within the

3    existing slot portfolio, to ensure that when we want a

4    certain origin blue city to connect to the JFK transatlantic

5    bank, or into Athens, or Delhi, that it can do so.  And if we

6    don't have the right slot time, we can work with American to

7    ensure that we have that slot time.

8    **Q.**  You used a few pieces of terminology and --

9               THE COURT:  Last question, okay.

10              MR. SCHWED:  A lot of terminology.  But

11   "transatlantic bank," I believe is the word you used?

12   **A.**  Yeah, so American has a large number of departures

13   leaving relatively, you know, over the course of one to two

14   hours, maybe three hours, all kind of grouped together.  So

15   when you want -- you're trying to get, for example, Nashville

16   customers to maximize choice to transatlantic destinations,

17   you'd want a JetBlue national flight to fly into JFK at a

18   certain time to hit that departure window, where all of those

19   American departures are set to fly.

20   **Q.**  And before the NEA, did JetBlue have adequate slots to do

21   that, even if it knew exactly what time every flight was

22   leaving?

23   **A.**  If we did have a connection, it would have been

24   coincidental, and it could easily have been disrupted without

25   the ability to optimize together.

1  **Q.**  And how is JetBlue's slot portfolio during the peak times

2  for making connections?

3  **A.**  As you can imagine, JFK, being an international airport,

4  it is a fairly constrained time period to acquire slots.

5  **Q.**  And at one point you mentioned the phrase "blue city."

6  What is that?

7  **A.**  Blue city is our term for a city that is not a focus

8  city.  Other carriers would refer to it as a spoke.

9  **Q.**  But it's a city where JetBlue has a presence?

10  **A.**  Yes.

11  **Q.**  And then I think you said something like you want to know

12  which markets are best to connect, or something like that.

13  What are you trying to do there?

14  **A.**  Which origin points.  So let's take New Delhi as an

15  example.  There's obviously a lot of demand from New York to

16  go to India.  But we -- we can also look at public data that

17  shows us what other origins across the United States have the

18  most demand to India, as well.  So we wanted to ensure that

19  we are providing enough service and enough connectivity to

20  those main demand centers over New York City to help the NEA.

21          THE COURT:  I think we've got to adjourn for the

22  day here.

23          All right.  Have a great weekend.  I'll see you --

24  do you know Monday is a federal holiday?  I'll see you

25  Tuesday morning, 9:00 a.m.  Have a nice weekend.

1          (Court in recess at 4:34 p.m.)

2

3                **C E R T I F I C A T I O N**

4

5     I certify that the foregoing is a correct transcript of the

6   record of proceedings in the above-entitled matter to the best

7                    of my skill and ability.

8

9

10

11   /s/ Rachel M. Lopez                 October 6, 2022

12   /s/ Robert W. Paschal

13

14

15   _____          _____

16   Rachel M. Lopez, CRR             Date

17   Robert W. Paschal, RMR, CRR

18   Official Court Reporters

19

20

21

22

23

24

25