1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3

4    _____

5    UNITED STATES OF AMERICA, et al.

6          Plaintiffs,                    Civil Action No.
                                          1:21-cv-11558-LTS
7       v.

8    AMERICAN AIRLINES GROUP, INC.,
     et al.,
9
           Defendants.
10
11   _____

12      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                      BENCH TRIAL
                          Day 9

15

16                 Tuesday, October 11, 2022
17                      8:58 a.m.

18

19

20
     John J. Moakley United States Courthouse
21   Courtroom 13
     One Courthouse Way
22   Boston, Massachusetts

23
     Rachel M. Lopez, CRR
24   Official Court Reporter
     raeufp@gmail.com
25

1                          **A P P E A R A N C E S**

2

    On behalf of the Plaintiff United States of America:

3

        UNITED STATES DEPARTMENT OF JUSTICE
4       BY:  WILLIAM H. JONES, III; SARAH P. MCDONOUGH; AND
        JUSTIN T. HEIPP
5       450 Fifth Street, Northwest
        Suite 8000
6       Washington, D.C.  20530
        (202) 514-0230
7       bill.jones2@usdoj.gov
        sarah.mcdonough@usdoj.gov
8       justin.heipp@usdoj.gov

9

10  On behalf of the Defendant American Airlines Group, Inc.:

11      LATHAM & WATKINS, LLP
        BY:  DANIEL M. WALL
12      505 Montgomery Street
        Suite 2000
13      San Francisco, California  04111
        (415) 391-0600
14      dan.wall@lw.com

15

16  On behalf of the Defendant JetBlue Airways Corporation:

17      SHEARMAN & STERLING LLP
        BY:  RICHARD F. SCHWED
18      599 Lexington Avenue
        New York, New York  10022
19      (212) 848-4000
        richard.schwed@shearman.com

20

21

22

23

24

25

1        **TABLE OF CONTENTS**

2

3        **TRIAL WITNESSES**

4

5    On behalf of the Plaintiffs:                                    Page

6     ERIC FRIEDMAN

7            By Mr. Schwed                                              5

8            By Ms. McDonough                                          46

9     ROBERT J. TOWN, Ph.D.

10           By Mr. Heipp                                              63

11           By Mr. Schwed                                            114

12           By Mr. Heipp                                             213

13           By Mr. Schwed                                            225

14

15

16                        **EXHIBITS**

17

18                         None

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2              (In open court.)

3              THE DEPUTY CLERK:  The United States District Court

4       for the District of Massachusetts is now in session, the

5       Honorable Leo T. Sorokin presiding.

6              THE COURT:  Please be seated.

7              One issue about minor scheduling little issue that

8       I just want to tell you about.  Today in the afternoon, we're

9       scheduled for 2:00 to 3:30.  I can give you an hour and a

10      half today, if you want, but I have to figure it a little,

11      because of something, a court meeting that I have to go to.

12      So I can start at 3:00 and I can give you 3:00 to 5:00, minus

13      a half hour when I have another hearing that I have to do.

14      So you can have an hour and a half today, just scheduled like

15      that, or I can give you 3:00 to 4:00 today, and I can add the

16      half hour tomorrow afternoon.  I'm indifferent.  I'm happy

17      to -- both work for me.  It doesn't really --

18             MR. WALL:  I mean, I think our preference would be

19      to keep the time today.

20             THE COURT:  Today.

21             MR. WALL:  And we'll just navigate around the

22      hearing.  It's not a big deal.

23             MR. JONES:  That's fine with us, Your Honor.

24             THE COURT:  So that's what we'll do.  So we'll go

25      until 1 o'clock today.  We'll break from 1:00 to 3:00 for

1  this court meeting that I have to go to.  And then we'll

2  resume at 3:00 --

3           Is this other one at 4 o'clock?

4           THE DEPUTY CLERK:  Yup.

5           THE COURT:  We'll go 3:00 to 4:00, we'll break at

6  4:00.  It's hopefully another short hearing in another case,

7  and then we'll resume for another half hour whenever that's

8  done.

9           Okay.  All right.  Mr. Freidman, I remind you, you

10  remain under oath.  I hope you all had a nice, long, holiday

11  weekend and we're ready to go.

12           MR. SCHWED:  Thank you, Your Honor, just before I

13  start, we handed a binder up to Mr. Friedman, to the clerks,

14  and the plaintiffs with the exhibits, and we also advised, at

15  the request of the plaintiffs, the contents of the binder

16  over the weekend, since it was not handed out on Friday.

17           THE COURT:  Okay.

18                         **ERIC FRIEDMAN**

19    having been previously duly sworn, testified as follows:

20  **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT JETBLUE, Continued**

21  BY MR. SCHWED:

22  **Q.**  Mr. Friedman, when we broke on Friday, we were talking

23  about the schedule optimization process and the capacity

24  optimization process that you undergo with American.  Do you

25  recall that?

1   **A.**   Yes.

2   **Q.**   And what happens when JetBlue and American teams, in that

3   process, have a different view as to which airline should fly

4   a route within the Northeast Alliance?

5   **A.**   It's happened a few times, but there is usually a hearty

6   debate.  It's very civil.  And we go back and forth on the

7   facts and then ultimately either airline will deal with

8   what's ultimately in the best interest of that airline.

9   **Q.**   And has that happened in actuality or is that

10  theoretical?

11  **A.**   It has happened.

12  **Q.**   And can you give me an example?

13  **A.**   Yeah.  So JetBlue, for example, serving Miami from JFK,

14  Boston, and New York.  Originally, there was discussion on

15  American serving that route only --

16          THE COURT:  The route being JFK or Miami or the

17  route being Newark to Miami?

18          THE WITNESS:  All three.  Boston, Newark, and JFK.

19          THE COURT:  Boston, JFK, and Newark.  All three of

20  those to Miami.

21          THE WITNESS:  Correct.

22          THE COURT REPORTER:  Are you saying New York or

23  Newark?

24          THE WITNESS:  Newark and then JFK in New York.

25          MR. SCHWED:  Would it be helpful if he moved the

1    microphone closer to him?

2              THE COURT REPORTER:  Yes.

3    BY MR. SCHWED:

4    **Q.**  And then what ended up happening with those routes?

5    **A.**  Ultimately, JetBlue, especially with the South Florida,

6    focusing the strategy, felt that we absolutely should be

7    serving Miami, it was probably the most obvious city that we

8    had not served, and then as a result we served it, and we

9    continued to serve it, and we will continue to serve it.

10   **Q.**  And did that --

11             THE COURT:  At all three of those airports?

12             THE WITNESS:  All three.

13             THE COURT:  I see.  So you didn't have it before.

14   Prior to the NEA, you weren't flying that route.

15             THE WITNESS:  We had launched it during COVID, so

16   just a little bit before the NEA.

17             THE COURT:  I see.  And so the debate was over

18   whether JetBlue should continue to fly that route or not.

19             THE WITNESS:  Correct.  And we definitely wanted to

20   stay in the Miami market.

21             THE COURT:  I see.  Okay.  Thank you.

22             Go ahead.

23   BY MR. SCHWED:

24   **Q.**  Did that end up getting elevated to any committee or

25   senior team?

1    **A.**  I don't think so.

2    **Q.**  In the meetings with American, do you ever discuss

3    pricing?

4    **A.**  Absolutely not.  We're not allowed to.

5    **Q.**  Are you responsible for pricing?

6    **A.**  I am not responsible for pricing.

7    **Q.**  Is anybody on your team that's in the meeting with

8    American responsible for pricing?

9    **A.**  No, absolutely not.

10   **Q.**  Do you ever discuss routes outside the Northeast Alliance

11   with American?

12   **A.**  Absolutely not.

13   **Q.**  And do you ever discuss capacity outside the Northeast

14   Alliance with American?

15   **A.**  Absolutely not.

16   **Q.**  You -- you were asked some questions and you have heard

17   about, I'm sure, the Mutual Growth Incentive Agreement, or

18   MGIA?

19   **A.**  Yes, I've heard it.

20   **Q.**  Do you know how it works?

21   **A.**  No.

22   **Q.**  When -- have you or your team taken the MGIA into account

23   when making route planning decisions?

24   **A.**  No, we've simply been told, "Go and create the best

25   competitive networks you can in New York and Boston against

1    Delta and United.  Leave the MGIA math to the other teams,

2    don't worry about it, just go create the network.  It will

3    take care of itself."

4    **Q.**  And is that what you, in fact, have done?

5    **A.**  Yes.

6    **Q.**  Can you open your binder to DX388?  And this is in

7    evidence, so it can be published, and is not confidential.

8    But there are redactions, so the redacted version will be put

9    up.  I don't believe there are redactions on any of the pages

10   that we will be using.

11           Can you tell the Court what this document is?

12   **A.**  This is a presentation that we made to Vasu and Scott

13   Laurence in December of 2021.  It represents a major

14   milestone of a large chunk of the NEA optimization going out

15   into the public, in public schedules.  So we wanted to

16   present it to Scott and Vasu, essentially take a victory lap

17   for all the good work that the analysts did, and ultimately,

18   we were very proud of this going out for sale.

19   **Q.**  And at the time, Scott Laurence was still with JetBlue?

20   **A.**  Yes, he was with JetBlue.

21   **Q.**  And who prepared this document?

22   **A.**  This document was prepared by both route planning and

23   schedule planning teams from American and JetBlue.

24   Ultimately, it was finalized in the JetBlue offices with both

25   teams present.

1   **Q.**  Did you review it -- were you part of that process?

2   **A.**  Yes, absolutely.

3   **Q.**  Were you part of the presentation -- was this -- well,

4   let me withdraw.

5          Was this actually presented to Mr. Laurence and

6   Mr. Raja?

7   **A.**  Yes.

8   **Q.**  Were you part of that presentation?

9   **A.**  Yes.

10          THE COURT:  Before you just turned to that, one

11   question back on the Miami routes.

12          THE WITNESS:  Yes, sir.

13          THE COURT:  Did American Airlines fly those routes?

14          THE WITNESS:  Yes, from all three airports.

15          THE COURT:  All right.  So that was the source of

16   the back and forth?

17          THE WITNESS:  Yes.

18          THE COURT:  They wanted to fly -- they flew those

19   routes, correct?  They wanted to continue to fly those

20   routes.

21          THE WITNESS:  Yes.  So one of the -- I think one of

22   the things with the NEA is we're always looking to figure out

23   which airline would be best to serve a certain route.  Right?

24   So if you take a regional aircraft, for example, it would be

25   best served for a high yielding, but low customer count

1  business market.

2         When you get into some of the leisure and

3  hub-to-hub routes, there's legitimate debate about which

4  carrier should serve which route.  Ultimately, in the case of

5  Miami, because of our South Florida focus of the strategy,

6  and obviously they have a hub in Miami, we made the decision

7  that both carriers should serve it, even though American

8  disagreed.

9         THE COURT:  I see.  So the end result was you both

10  served those three routes?

11         THE WITNESS:  Correct.

12         THE COURT:  And -- though American didn't want you

13  to serve those routes.

14         THE WITNESS:  Correct.  They didn't want to, but

15  JetBlue did what we wanted to do in the end.

16         THE COURT:  Right.  I see.  And within the

17  situation -- I take it that's an exemplar situation.  It's

18  not the only one that's ever happened.

19         THE WITNESS:  That -- I'm trying to think.  That's

20  the main one.  I'd say the most impactful one that I can

21  remember offhand.

22  BY MR. SCHWED:

23  Q.  And so then in that situation, do you try to optimize or

24  coordinate or whatever word you want to use, the times of the

25  various flights?

```
 1              THE WITNESS:  Yes.  Absolutely.  So that's actually
 2    covered partially in this deck, but we are making -- while we
 3    are making the decisions to fly the route, once we've made
 4    those decisions, we can optimize schedules accordingly, and
 5    make sure that we're not creating what we call wing tips,
 6    which is a departure --
 7              THE COURT:  Two 5:00 p.m. departures.
 8              THE WITNESS:  Precisely, Your Honor.
 9              THE COURT:  I see.
10              Go ahead.  Thank you.
11    BY MR. SCHWED:
12    Q.  Can you turn to slide five of this presentation?  I think
13    the easiest way to find the slide numbers is in the bottom
14    right-hand corner.  There's a "-005"?  I think it's easier
15    than reading it on the slide, itself.
16              THE COURT:  They're also on your screen.
17              MR. SCHWED:  It is also on your screen.
18              THE WITNESS:  Yes.
19    BY MR. SCHWED:
20    Q.  Can you describe what this slide is?
21    A.  Yeah.  So this is showing the major accomplishment
22    between the two teams of what the optimized NEA LaGuardia
23    footprint looks like.  This was presented the first week of
24    December and we were ultimately looking for permission to go
25    out for sale with this on December 19th.
```

1    **Q.**   What does the phrase "go out for sale" mean?

2    **A.**   Simply put, we work on a schedule for multiple months and

3    then we have to release it to the public and actually, you

4    know, put it out for sale and have customers be able to

5    purchase what we put on the schedule.  So this was a fully

6    built schedule that wasn't public yet and then we made it

7    public on December 19th for purchase.

8    **Q.**   Did the schedule that's reflected in this slide actually

9    go out for sale a few weeks later, on December 19th?

10   **A.**   Yes.

11   **Q.**   And can you just, at a high level, explain the map that's

12   on the right side right there, this is LGA summer 2022 versus

13   2019?

14   **A.**   Yes, so this represents the combined route network of

15   JetBlue and American, essentially the NEA network.  It serves

16   40 of the top 50 largest O&Ds.  The blue routes are the ones

17   that existed before the NEA.  The yellow routes are the new

18   routes that American launched as part of the NEA, and the

19   green routes are the new routes that JetBlue launched as a

20   result of the NEA.

21   **Q.**   And when you're saying "new," are they all from before

22   COVID, compared to before COVID?

23   **A.**   Yes.

24   **Q.**   And had JetBlue had any plans to enter any of the green

25   routes before the Northeast Alliance?

**A.**   We fundamentally couldn't do it.  At the end of the day,
we've taken 36 slot pairs to optimize the NEA and increase
the network relevance against Delta and United.  Without the
NEA, we would be left with 16 slot pairs like we were always
at and we wouldn't be able to grow at LaGuardia.

**Q.**   Can you look on the left side of the page, towards the
bottom, there's a bar chart that says, "NEA peak day
seats-LGA."  Do you see that?

**A.**   Yes.

**Q.**   Can you explain what that chart means?

**A.**   Yes.  So at LaGuardia is an interesting airport.  It's
slotted Monday through Friday.  It is not slotted on
Saturday, and then it is slotted for roughly half the day
Sunday.  So we took the Monday through Friday peak days when
it's fully slotted, and we looked at the seat counts in 2019,
and the seat counts in 2022.  Despite the fact that the same
number of slots existed between the two airlines in 2019 and
2022, we were actually able to increase the number of seats,
despite not increasing the number of departures by
20 percent.

**Q.**   And how did the Northeast Alliance increase the number of
seats without having more slots total?

**A.**   JetBlue typically flies higher gauge aircraft, aircraft
with more seats on them than American would.  And then also,
as part of the NEA in its recommitment to New York, American

1  also added aircraft with slightly more seats as well.

2  **Q.**  And the date -- this presentation, you said, was December

3  of 2021?

4  **A.**  Yes, that's correct.

5  **Q.**  And is the -- would this chart still be accurate as of

6  today in terms of the change in capacity compared to 2019?

7  **A.**  Yes, it is still accurate today.

8  **Q.**  And could you turn to slide 12, please, and it's also on

9  your screen.

10       Can you describe what slide 12 shows?

11  **A.**  Slide 12 is very similar to the LaGuardia slide, except

12  this is for JFK.  We did have the major increase, the JetBlue

13  major increase in LaGuardia flying.  We also took ten slot

14  pairs from American to help optimize the NEA, as well, at

15  JFK.  And this is showing the combined network, what we're

16  prioritizing, as well as some of the connectivity

17  enhancements, as well.

18  **Q.**  And if you look at the title of the page, it

19  says, "JetBlue will go out for sale with JFK Phase 1."  What

20  is "JFK phase 1"?

21  **A.**  So JFK growth has been split into three phases to

22  accommodate some of the constraints around the airline.  The

23  first phase was the first ten slot pairs that we would take

24  from American to optimize the NEA.  The second phase would be

25  the next ten slot pairs, and then the ultimate phase would

1  be, as new aircraft came in, we would optimize the trans-con

2  networks, as well.

3  **Q.**  And did the flying that's listed on this page actually go

4  out for sale on December 19, 2021?

5  **A.**  Yes, absolutely.

6  **Q.**  And is -- on the right side, you have a very similar map.

7  Is it set up in terms of the colors and the graphic the same

8  way as the LaGuardia map?

9  **A.**  Yes.

10  **Q.**  And then if you look at the left side; what new American

11  routes does this show?

12  **A.**  It shows New Delhi, Tel Aviv, Athens, Bogota, Cali,

13  Santiago, Medellin, and John Wayne in LA.

14  **Q.**  And how about for JetBlue?

15  **A.**  It shows Boise, Bozeman, Detroit, Key West, Glacier

16  National Park is FCA, Georgetown Guyana, Guatemala City,

17  Kansas City, Milwaukee, Minneapolis, Puerto Vallarta, Cabo,

18  San Jose, Costa Rica, and Vancouver.

19  **Q.**  Are all the new routes new compared to preCOVID?

20  **A.**  Yes, these are all new.

21  **Q.**  And you said that everything listed on the left side of

22  the page, did it all go out for sale on December 19th?

23  **A.**  It all went out for sale on December 19th.

24  **Q.**  And is JetBlue still flying all of the new routes listed

25  on this page as of today?

1   **A.**   On this particular page, there are a few markets that we

2   are no longer flying, mostly due to operational issues and

3   pilot error issues, pilot efficiency issues, but the vast

4   majority of them, we still are.

5   **Q.**   Which ones is JetBlue not flying?

6   **A.**   So Boise and Kalispell, Glacier National Park FCA, we are

7   not flying at the moment.

8   **Q.**   And is JetBlue flying everything else listed in the

9   entered category?

10  **A.**   Yes, we are still flying everything, except, apologies,

11  St. Thomas.

12  **Q.**   And then at the bottom, you say, "Pattern optimization,

13  see appendix" and then there are about eight airport codes

14  listed.   What do you mean by "pattern optimization"?

15  **A.**   This is what we were talking about before in ensuring

16  that on any overlap routes that we both serve, we wanted to

17  make sure that we didn't have wing tips, we wanted to make

18  sure that we had good coverage throughout the day for all

19  customers, corporate, leisure, essentially good pattern

20  health is what we referred to it, in the industry.

21  **Q.**   And was the pattern optimization accomplished as of this

22  December 19th, when the -- let me rephrase that.

23            When the schedule went out for sale on

24  December 19th, would that have included pattern optimization

25  for the routes listed here?

1    **A.**   Yes.

2    **Q.**   And I noticed that this page, if you just look at the

3    whole page, there is no bar chart similar to the one we saw

4    in LaGuardia.  Why is that?

5    **A.**   This was just a matter of what we wanted to present on

6    this page.  But looking back, we increased capacity about

7    15 percent, again, on the same number of slots relative to

8    2018 and 20 percent relative to 2019.

9    **Q.**   I'm sorry, you said -- I missed the numbers.

10   **A.**   15 percent relative to 2018 and then 20 percent increase

11   relative to 2019.

12            THE COURT:  As seats?

13            THE WITNESS:  In seats.

14   BY MR. SCHWED:

15   **Q.**   And as of today, have those numbers changed from JFK?

16   **A.**   They remain the same.

17   **Q.**   Now, I'm not going to make you look through the whole

18   deck, but is there a Newark slide in this deck?

19   **A.**   No, there was not a Newark slide on this deck.  At the

20   time, we had reached our peak departures at Newark, and due

21   to multiple operational issues, we had started scaling back

22   from our peak.  So this deck was mostly focused on growth and

23   positive storytelling for Vasu and Scott.  So Newark, there

24   was not a slide on there due to the operational issues

25   causing us to decline our frequency.

1    **Q.**  Can you describe the operational issues that JetBlue was

2    facing at that time?

3    **A.**  Yes.  So originally, when we had started flying our -- I

4    think roughly peak 65 daily departures at Newark, there was

5    limited flying at the airport.  Over time, as the slot

6    policies came back and slot enforcement came back, the

7    airport became much more congested, as to be expected.  But

8    then due to the new terminal A that's currently being built,

9    unexpectedly, the old terminal A, one of the satellites --

10   there's three satellites there, was -- had to be demolished

11   to finish completion.  So everyone was flying the same

12   frequency levels.  JetBlue was up as a result, or as a result

13   of our growth.  But then we were all kind of condensed into

14   two of three banjos, or satellites, instead of having the

15   normal three.

16          Beyond that, there's no customs in the terminal A

17   infrastructure at New York, so we had to run a split

18   operation between terminal A and terminal B.  So amongst all

19   that, alongside the ATC staffing shortages, the decision was

20   made to slowly find where we could operate Newark more

21   efficiently.

22   **Q.**  You used a couple of terms, satellite or banjo.  What is

23   that?

24   **A.**  Yeah, if you look at the old Terminal A at Newark,

25   birds's eye view, you'll essentially see a main terminal

1    building and then what looks like three satellites jutting

2    out, the end of which is a circle, and connected by a long

3    rectangle where security is, so it kind of looks like a

4    banjo.  You can call it a satellite, as well.

5    **Q.**   How is it relevant -- within terminal A, how many

6    different banjos or satellites did JetBlue have its gates

7    spread out?

8    **A.**   I believe we had it across all three.

9    **Q.**   And what is the significance of that from an operational

10   perspective?

11   **A.**   Unlike in Boston, now, where you can connect across

12   terminals behind security, at Newark, once you were -- each

13   banjo, despite all being part of terminal A, once you went

14   into each satellite; there was one security station for each.

15   So from an operational perspective, if you're flight -- if

16   you want to gate swap a flight, you have to do it, and you're

17   limited to the satellite in which you're in, because all of

18   your customers are already post-security.

19   **Q.**   And then I think you said something along the lines of

20   when you started the flying in Newark or something like that,

21   there was limited flying.  What did you mean by that?

22   **A.**   So we were pretty agile during the pandemic, and while

23   United had reduced a significant portion of their flying, we

24   went in and actually added a significant amount of flying,

25   peaking at 65 daily departures.  We're able to do that more

1    easily at the beginning, simply because there was less flying

2    at the airport.

3    Q.  And then when the -- when the flying returned, began to

4    return, did that effect the operational issues in any way?

5    A.  Absolutely.  It made things more congested.  Newark is --

6    it's not a level 3 slotted airport.  It's a level two sort of

7    slotted airport.  There's some FAA take off authorizations

8    and landing authorizations that are involved.  But as a

9    result of those enforcements coming back into play, most

10   airlines added back the capacity, the airport got very

11   congested.  Layer that on with the ATC staffing issues, there

12   was a lot of operational duress at work.

13   Q.  And you used the phrase "ATC staffing issues."  What are

14   you referring to there?

15   A.  So to my knowledge, there's been a ATC --

16   Q.  Let me interrupt.  ATC stands for?

17   A.  Air traffic control.

18   Q.  Thank you.  Okay.  Keep going.

19   A.  So air traffic control staffing issues.  Similar to many

20   industries, after COVID, there have been staffing issues as a

21   result.  They would space out the aircraft more and more,

22   they would implement ground delay programs at Newark more

23   frequently, despite the fact that Newark was already the

24   highest -- had the highest rate of ground delay programs.  So

25   when you add on top of that the operational duress, you would

1    just have delay cascading into delay cascading into delay,

2    which is ultimately not good for our customers.

3    **Q.**  Does JetBlue still plan to grow at Newark in the future?

4    **A.**  Yeah.  We are going to continue to look for sustainable

5    ways to grow at Newark in the future, absolutely.

6    **Q.**  Can you turn now -- I just want to go back to the slide

7    deck and turn to page 2 --

8                  THE COURT:  When does the new terminal open at

9    Newark?

10                  THE WITNESS:  I believe it's next month.  That's

11   the latest I know, but it has been moving.

12                  THE COURT:  Does that change the congestion issues?

13                  THE WITNESS:  It will make it easier, but the

14   ground delay programs are still in effect.  And then

15   ultimately, there's a take off and landing authorization

16   issue with the FAA that we have to work through.

17   BY MR. SCHWED:

18   **Q.**  And have there been delays in the projected date for the

19   new terminal?

20   **A.**  Yes.  Absolutely.

21   **Q.**  All right.  So do you have slide 21 in front of you?

22   **A.**  Yes.  It's on the screen.

23   **Q.**  Can you describe this slide?

24   **A.**  It's very similar to JFK and LaGuardia.  This is showing

25   the incremental growth for Boston that we were going up for

1    sale with.  Particularly of interest to me on this slide is

2    just the network that American added into Boston as a result

3    of the NEA, into places that have historically been

4    challenging for us from a forecast perspective, really,

5    really targeting that regional aircraft niche and adding the

6    frequency into those markets.

7    **Q.**  And the color scheme is the same on this page?

8    **A.**  Yes.

9    **Q.**  And then there's a phrase here that says, on the left

10   side that says, "added main line."  Do you see that under "AA

11   prioritizing"?

12   **A.**  Yes.

13   **Q.**  Can you explain what that means?

14   **A.**  So in this instance, there would have been regional

15   aircraft, smaller aircraft with a fewer number of seats, but

16   as a result of the NEA, they up-gauged these aircraft to main

17   line aircraft, typically the Boeing 737 with more seats for

18   the customers.

19   **Q.**  And if you look under the entered for JetBlue, "B6

20   prioritizing" entered, we'll just -- again, because there are

21   a lot of codes there, can you, again, just quickly say what

22   those codes are?

23   **A.**  Yeah.  Asheville, Bozeman, Key West, Kansas City,

24   Milwaukee, San Antonio, and Vancouver.

25   **Q.**  Is JetBlue still flying all of these routes?

1    **A.**   Yes.  Vancouver, we were unable to launch last year.  We

2    did re-accom all the customers on to the JFK-Vancouver, which

3    was a result of the NEA, but we intend to fly

4    Boston-Vancouver as of now this summer.

5    **Q.**   So Boston-Vancouver did not go out for sale for summer of

6    2022?

7    **A.**   It originally did and then we had to make an adjustment

8    and pull it down for -- mainly due to pilot operational

9    issues.

10   **Q.**   And then so it didn't actually fly?

11   **A.**   Correct, it did not actually fly.

12   **Q.**   And now, you anticipate flying it next summer?

13   **A.**   Correct.

14   **Q.**   How about all the other routes listed as entered?

15   **A.**   All of those still exist, San Antonio being the largest

16   unserved market from Boston.

17   **Q.**   Could you -- what is the bar chart at the bottom show?

18   **A.**   Yeah, so this one can be a little confusing, just because

19   there are multiple Boston carve-out markets that we're not

20   allowed to discuss with the NEA.  So here we're only showing

21   Boston total departures that exclude the carve-out markets.

22   So what this is showing is that the NEA, ex-carve-out markets

23   is essentially -- went out for sale with slightly more

24   departures than previously existed in 2019.

25   **Q.**   So the carve-outs are exhibited in both the left bar and

1  the right bar?  Is that --

2  **A.**  Yes, that's correct.

3  **Q.**  And did -- did JetBlue actually fly the 203 flights in

4  the summer of 2022?

5  **A.**  Unfortunately, we ran into some pretty hairy operational

6  issues in April.  As a result, we had to make a, roughly,

7  10 percent capacity reduction to the summer.  So the 203

8  number came down to about 190, but overall, still a pretty

9  good performance.

10  **Q.**  When you made this presentation in December, did you know

11  those operational issues were coming up?

12  **A.**  No, we did not.

13  **Q.**  Now, again, you mentioned before there's a -- the

14  carve-outs and maybe -- and if you could just call up the

15  footnote at the bottom, which is kind of hard to read.

16  **A.**  Boston to Dallas, Phoenix, Philadelphia, Charlotte,

17  Syracuse, and Rochester.

18  **Q.**  And then also what's the last thing, "B6 transatlantic"?

19  **A.**  Yes.  We just recently launched our service to London and

20  we're now about to coordinate on our European traffic.

21  **Q.**  Does your team discuss the carve-out routes with

22  American?

23  **A.**  Absolutely not.

24  **Q.**  What -- if you could leave that up, Andy.  One of the

25  routes listed here is ROC.  What is ROC?

**A.**   That's Rochester.

**Q.**   Has -- there's been some testimony about JetBlue's Boston-Rochester flying.  Has JetBlue exited the Boston-Rochester route?

**A.**   No.

**Q.**   What has it done?

**A.**   We have temporarily suspended Boston-Rochester.  It's currently set to resume service in May.

**Q.**   Why was it suspended?

**A.**   So you've heard me talking a little bit about pilot operational issues, pilot hours, pilot efficiency. Rochester, for us, Boston to Rochester is a RON market.  It's served late at night from Boston to Rochester with a late arrival into Rochester.  The plane remains overnight.  A RON, remains overnight in Rochester.

THE COURT:  What's that called?

THE WITNESS:  It's called a RON, Your Honor, it's spelled R-O-N, and it stands for remains overnight.  It's essentially a parking spot for a plane overnight.

BY MR. SCHWED:

**Q.**   And why would you have a -- why do you refer to it as a RON market?

**A.**   It is a market that we fly out of Boston, late at night. Boston is typically heavily RON constrained.  So if we wanted to leave a plane overnight in Boston, it's very congested.

1    There's not a lot of space.  So by flying this route, it

2    provides connectivity into Boston.  It also gets a plane out

3    of Boston late at night.

4    **Q.**   And then when does it come back?

5    **A.**   It comes back very early in the morning, before the crew

6    rest hours are met for the crew.  So it has to be -- the crew

7    that flies Boston to Rochester cannot be the same crew that

8    flies Rochester back to Boston, because the crew rest hours

9    haven't been met and in the --

10           THE COURT:  It's the amount of time in between is

11   too short.

12           THE WITNESS:  Correct, Your Honor.

13   BY MR. SCHWED:

14   **Q.**   So what are the implications of that timing?

15   **A.**   So the implications would be that in a -- in an

16   environment where we reduce capacity quickly as a result of

17   the April operational issues, which were driven in part by

18   pilot efficiency issues, what ended up was there was limited

19   service from Rochester to begin with, because of the demand,

20   customer demand.  What ended up happening is we'd have the

21   cry fly out to Rochester late at night, and they would spend

22   the entire day, plus more, more than 24 hours in Rochester

23   waiting to return the next day's flight.  It was a waste of

24   pilot efficiency when pilot efficiency was a major issue.  So

25   we suspended the route until we could add more frequency back

1    into the market and demand justified it.

2    **Q.**   So if the crew flew out late at night Tuesday, you said

3    to have it -- just the next day.  I just want to make sure we

4    have the days right.  They fly out late at night Tuesday,

5    they spend Wednesday in Rochester, and come back early

6    Thursday morning?

7    **A.**   Let's say they arrive into Rochester 11:00 p.m. Tuesday

8    evening, the Wednesday morning flight is at 6:00 a.m.,

9    there's not enough crew rest, so they miss that flight.  No

10   other flights to take.  So they spend the entire day

11   Wednesday in Rochester, go to sleep again, and then wake up

12   for their 6:00 a.m. on Thursday.  The crew ended up being --

13   would be paid for the entire day and they would be credited

14   for not flying.  And we were limited on the amount of credits

15   we could actually schedule.  So we wanted to take that

16   inefficiency out of the network as a result.

17   **Q.**   Were there any other inefficiencies created by the fact

18   that this -- the flight from Boston to Rochester left late at

19   night?

20   **A.**   As you can probably imagine, during the pandemic, there

21   was less flying, so PTO balances probably increased rather

22   rapidly.

23   **Q.**   Slow down.  PTO balances?

24   **A.**   Paid time off.  So you accrue the amount of time you can

25   take off from work.  So as a result, imagine, you know, being

1    a pilot and seeing that you have to leave Boston at 10:00

2    p.m., you'll fly for one hour to Rochester, more or less,

3    then you'll spend the entire day in Rochester, and then

4    you'll wake up at 6:00 a.m. two days later and fly back.

5    There's a high incentive there to just call out.  And then

6    again, when you're dealing with operational issues, you know,

7    we wanted to get rid of markets that had a higher propensity

8    for pilots to call out.  So this was one of which, which,

9    again, we temporarily suspended.

10          THE COURT:  So more people got sick when they were

11   flying Boston-Rochester than they were flying other routes

12   according to the data.

13          THE WITNESS:  No comment, Your Honor.

14          THE COURT:  Okay.

15   BY MR. SCHWED:

16   **Q.**  Did you discuss the decision to suspend Boston-Rochester

17   with American in advance?

18   **A.**  No.  We were not legally allowed to do so.

19          THE COURT:  Are there benefits to pilots -- you

20   said if they did that, spend a day in Rochester route, they

21   get credited for the day as a nonflying day?

22          THE WITNESS:  My understanding is they get the

23   minimum credit allocated to them by the contract.

24          THE COURT:  But they would be -- they're better off

25   with more flight time credit?  In some way?

1          THE WITNESS:  I think -- I can't really speak for

2     the pilots, but I think they generally prefer to fly and

3     they'd like to make more than what the minimum credit --

4          THE COURT:  They make more if they're flying?

5          THE WITNESS:  Right.

6          THE COURT:  Okay.  Got it.  Go ahead.

7     BY MR. SCHWED:

8     Q.  There's "SYR" is also listed there, and right before

9     Rochester in footnote one.  What airport is SYR?

10    A.  That's Syracuse.

11    Q.  There's also been some testimony about the

12    Boston-Syracuse route.  Has JetBlue exited Boston-Syracuse?

13    A.  This is the exact same story as Rochester.

14    Q.  Meaning that was it suspended?

15    A.  It was temporarily suspended, set to resume in May as of

16    now.

17          THE COURT:  May of 2023?

18          THE WITNESS:  Correct.

19    BY MR. SCHWED:

20    Q.  And is Rochester also set to resume in May of 2023, did

21    you say?

22    A.  Yes, both are selling in May of 2023.

23    Q.  And why was Boston-Syracuse suspended?

24    A.  Rochester and Syracuse are very similar cities, same type

25    of RON dynamics that existed between the two.  I would

1    characterize them as mirror images of each other.

2    **Q.**   Same flight pattern?

3    **A.**   Yes.  Both RONs.

4    **Q.**   And did you discuss Syracuse-Boston with American in

5    advance?

6    **A.**   Absolutely not.

7    **Q.**   Can you turn to slide 34, please.  Can you describe this

8    slide?

9    **A.**   Yes.  So one of the -- the major benefits of the NEA and

10   being able to optimize a network together, is American has

11   access to slots and the aircraft to fly a heavy transatlantic

12   network.  JetBlue now has the ability to connect its

13   customers from other blue cities, other spokes of a JetBlue

14   network, into JFK's transatlantic -- I'm sorry, American's

15   JFK transatlantic network.  Working together, we can optimize

16   a slot portfolio.  It's not just about adding to the slot

17   portfolio, but also switching slots and times in them, to

18   make sure we have good timing for both the nonstop customer,

19   but also to create connectivity into the transatlantic

20   markets when they otherwise couldn't exist before.

21   **Q.**   What does -- what do the blue lines on this page

22   represent?

23   **A.**   These lines represent either American or JetBlue

24   connectivity into JFK, and the green lines represent the

25   transatlantic network.

1  Q.  And does this mean that all the blue lines connect with

2  all the green lines, or are the blue lines connecting with

3  only some of the green lines?

4  A.  So in this particular example, all of the blue lines are

5  connecting with all of the green lines.  It's part of what we

6  call the transatlantic bank for American.

7  Q.  And again, the transatlantic bank means?

8  A.  So American will schedule most of its transatlantic

9  flying within a certain hour window; typically, it's a two-

10  to three-hour window, so ensuring that all of these cities

11  have a flight that arrive into JFK that connect -- that

12  provide at least 90 minutes of connection time, and no more

13  than three hours of connection time into that one connection

14  bank window.

15  Q.  And does the Northeast Alliance enable the connectivity

16  on this slide, or you said it did.  How?

17  A.  Yes, absolutely.  I think, you know, one, JetBlue, while

18  we're mainly a point-to-point carrier, we'll make sure that

19  our patterns and schedule health are good for the nonstop

20  customer, but being able to also just slightly retime these

21  flights and tap into the slot pool that American has, allows

22  us to both serve the nonstop customer, and create

23  connectivity from places like Atlanta into -- or Raleigh, as

24  well, into JFK, when otherwise JetBlue customers wouldn't be

25  able to connect on to American's network.

1   **Q.**  So if you're JetBlue and you're flying into JFK to try to

2   connect, what time of day do you want your plane to land?

3   **A.**  I'd say we want the plane to land some time around, let's

4   say, 3:00 p.m.  And then the transatlantic bank would begin,

5   let's say, more like 4:00, 4:30, and then the transatlantic

6   bank would begin around 6:00 p.m.

7   **Q.**  And how was -- before the NEA, how was JetBlue's

8   available slot portfolio around that time in the late

9   afternoon?

10  **A.**  As you can imagine, with JFK being a major international

11  airport, those slots are highly constrained.

12  **Q.**  And did JetBlue get access to additional slots in that

13  time period, as part of the Northeast Alliance?

14  **A.**  Yes.

15  **Q.**  And is that what it was using for all of these blue

16  lines?

17  **A.**  For some of these blue lines.  Some of them were from

18  American, but, yes, absolutely, those conversations and

19  optimizing accordingly, helped all of these blue lines

20  connect to the green lines.

21  **Q.**  And then just the bottom, there's a blue box that

22  says, "The NEA will enable RT connectivity to 60 percent of

23  total connecting demand for combined TATL."?

24  **A.**  Yes.

25  **Q.**  Can you please explain what that means?

1    **A.**   So if you look at the entire US and the demand to all of

2    these destinations in Europe, our network is able to

3    accommodate or to touch 60 percent of where that demand

4    exists.  So we're able to accommodate over half the demand of

5    the country to Europe as a result of our connectivity.

6                   THE COURT:  Does that mean half the -- when you say

7    "half the country," what do you mean by that?

8                   THE WITNESS:  So if we think -- if we mapped out

9    where all the demand for transatlantic travel is across the

10   United States, our destinations cover 60 percent of that

11   total demand.

12                   THE COURT:  I see.

13                   THE WITNESS:  And we're able to connect that to

14   Europe as a result of the NEA.

15   BY MR. SCHWED:

16   **Q.**   And then above that, there's -- I don't know if it's

17   called a footnote, there's something that begins, "MCT less

18   than."  Do you see that?  "Connection window less than MCT

19   plus 90."  Can you describe what that means?

20   **A.**   Yeah.  MCT stands for minimum connection time.  I believe

21   the minimum connection time is about two hours, somewhere

22   close to that.  So what we're saying here is that all of

23   these connections exist within the minimum connection time

24   window, and no more than 90 minutes more than the minimum

25   connection time.  So said otherwise, these are very

1    reasonable connection times and connection itineraries.

2    **Q.**  And does the --

3              THE COURT:  I'm sorry, 60 percent of demand is

4    served to JFK?  Or is this somewhere.

5              THE WITNESS:  60 percent of US demand to Europe.

6              THE COURT:  Is served by JetBlue to JFK.

7              THE WITNESS:  We can serve the cities that

8    represent 60 percent of the demand to Europe from the United

9    States.

10             THE COURT:  Not necessarily bringing them through

11   JFK.

12             THE WITNESS:  Correct.  I -- we're not bringing

13   60 percent of the demand through JFK.

14             THE COURT:  No, that 60 percent of the demand, the

15   way you serve it is through JFK.

16             THE WITNESS:  Correct.  That's correct, Your Honor.

17             THE COURT:  Okay.

18   BY MR. SCHWED:

19   **Q.**  And when you say the 60 percent, is that actually served

20   through JFK within these connection windows?

21   **A.**  Yes.  It all references these connection guidelines.

22   **Q.**  So if there's some -- some city where you can bring them

23   to JFK, but it doesn't match up with one of these European

24   flights, that doesn't count within your 60 percent?

25   **A.**  Correct.

1    **Q.**  Back to the footnote, just one other question is, does

2    the minimum connection type vary by flight?

3    **A.**  It will -- it will vary by origin and destination type.

4    So if it's what we called a D to I connection or an I to D

5    connection --

6    **Q.**  Slow down.  D to I?

7    **A.**  That's domestic to international, or if you're coming the

8    other way, international to a domestic connection.  I don't

9    recall the exact connection times offhand.

10           THE COURT:  You need more time to come into the

11   country than leave.

12           THE WITNESS:  Correct.  You need to go through

13   customs and then reclear security.

14   BY MR. SCHWED:

15   **Q.**  Can you turn to the next slide, which is probably still

16   open on your book, if you have double-sided, slide 35.  Can

17   you describe what the chart on the bottom shows?

18   **A.**  Yes.  So this is showing an example of pattern

19   optimization across JFK/LAX.  I think the idea here is

20   previous -- previous to the NEA, we normally have four to

21   five wing tips across JetBlue and American departing at the

22   same time.  There are time windows that have more demand than

23   other time windows, so it's reasonable to have a half hourly

24   schedule during some parts of the day and hourly during other

25   parts of the day.  But here, you know, the goal of what we're

1    trying to show is there would be no wing tips.  Ultimately, I

2    think we ended up having one wing tip just as a result of a

3    slot utilization issue, but significantly improved from the

4    four to five that we had before.

5    Q.  And by "before," you mean preNEA, preCOVID?

6    A.  Correct.

7    Q.  Now, had you seen any changes in service by competitors

8    following implementation of the NEA?

9    A.  Yes.  Absolutely.

10   Q.  And can you describe those?

11   A.  I think some of the more elegant ones, more impactful

12   ones would be Delta entering Boston to Athens, Boston to

13   Tel Aviv, I think this was a direct response to the NEA's

14   emphasis on JFK-Athens and JFK-Tel Aviv.  PostNEA

15   implementation, Delta also entered Boston-Charlotte and

16   Boston-Dallas Fort Worth.  These were -- these are obviously

17   American hubs, so it's pretty evident that they were adding

18   flying into American hubs.

19            And then lastly, Delta recently rolled out their

20   new domestic first class product on their new aircraft type,

21   the A321 Neo in Boston.  I think a direct response to

22   JetBlue's Mint and growing Mint fleet, made possible by the

23   NEA, as well.  So multiple different market entrances, as

24   well as product enhancements along the way.

25   Q.  And have you seen anything from United?

1    **A.**  So United, interestingly, added Boston to Heathrow

2    recently.  They also had a press release about adding all

3    regional aircraft with premium seats out of Newark, and they

4    also discussed more Newark-Boston and Newark-Washington

5    services as a result.

6    **Q.**  Now, if you recall your testimony from the government

7    questioning on Friday, you made a distinction between what

8    you referred to as draft network team growth plans and final

9    JetBlue approved growth plans.  Why did you make that

10   distinction?

11   **A.**  I think it's important for everyone to understand the

12   context in which we were dealing with during -- during COVID,

13   in, you know, specifically April, May, June of 2020, all the

14   way through.  There are multiple -- we had a fairly

15   reasonable growth plan preCOVID that aligned with our -- with

16   our fleet footprint, and I think during COVID, it became much

17   more of an exercise of what kind of growth opportunities were

18   out there, how many aircraft would it take, and we started

19   using the tools a bit more as a measurement tool than

20   anything else.

21   **Q.**  And were there changes to the JetBlue order book

22   immediately after COVID?

23   **A.**  Yes, absolutely.  We -- right around when COVID started,

24   our executive leadership took very quick action to start the

25   process of deferring 30 to 40 aircraft.

1   **Q.**   Now, when you did network plans, draft network plans that

2   you referred to, after those deferrals, did you reduce the

3   growth plans to account for those deferrals?

4   **A.**   No.  We did not.  This goes back to what I was referring

5   to as a measurement tool.  We, in route planning, did not

6   want to give up on the preCOVID route growth plan.  We wanted

7   to -- we kind of looked at it as a call to arms, if you will,

8   to go fight for incremental aircraft, to go reclaim those

9   aircraft, and to go fight for incremental aircraft for the

10  NEA.  So we never really updated those plans to account for

11  the 30 to 40 aircraft deferral, we just continuously fought

12  for those aircraft.

13  **Q.**   And without the NEA, was that fight ever successful?

14  **A.**   We fought for both the 30 to 40 aircraft we deferred, and

15  the 30 to 40 aircraft that the NEA represented.  We were

16  successful with the NEA aircraft and adding to the fleet

17  plan, and eventually the order book for the NEA.

18  **Q.**   Was there -- did --

19          THE COURT:  Let me make sure I understand that.

20          MR. SCHWED:  Yeah.

21          THE COURT:  You're distinguishing the deferral and

22  30 to 40 planes for the NEA.  What's the difference?

23          THE WITNESS:  So the way that I would think about

24  it, Your Honor, is the 30 to 40 aircraft that we deferred

25  were going into a growth plan that was essentially

1    preapproved preCOVID.  So the 30 to 40 aircraft that came out

2    as a result of that deferral, that, by definition, would have

3    come out from focused city growth.

4            Then there's the 30 to 40 incremental aircraft that

5    the NEA would demand, more flying out of JFK, LaGuardia,

6    Boston, more Mint flying.  So in the route planning mindset,

7    we were fighting for the 30 to 40 aircraft that we had

8    deferred.  We wanted to do that growth.  We weren't really

9    involved in the deferral decision, it was one of the few

10   times that we weren't involved in the fleet decision in route

11   planning.  So we wanted to fight for those aircraft, and in

12   addition to those aircraft, to maintain our focus city growth

13   commitments preCOVID, we wanted to fight for even more

14   aircraft, 30 to 40 for the NEA.

15           THE COURT:  So if you matched -- if COVID hadn't

16   ever happened, then the 30 to 40 would have come, and you

17   still would have needed -- those 30 to 40 wouldn't have been

18   able to fill the NEA, because assuming you followed the plan,

19   and they all worked out, they were going somewhere else.

20           THE WITNESS:  Yeah, the NEA always required

21   incremental aircraft.

22           THE COURT:  I see.  So what came out of all of

23   this, you're saying is the 30 to 40 for the growth in the

24   preCOVID growth plan, which were targeted on the focus

25   cities, didn't -- those planes didn't -- haven't yet

1    materialized.

2              THE WITNESS:  That's correct.  But the -- sorry.

3              THE COURT:  But the 30 to 40 that you need for the

4    NEA did, in the sense that they were added to the fleet by

5    more purchases?

6              THE WITNESS:  First, we decided to delay the

7    retirement of the owned E190s.  So they were set to retire.

8    There was 30 of them.  We originally, route planning

9    originally asked for those aircraft to be A220s because of

10   the financial environment, and the uncertainty around COVID,

11   we said -- you know, we were told no, but go ahead and delay

12   the E190s after a very, vigorous business case.

13             THE COURT:  Delay the retirement.

14             THE WITNESS:  To delay the retirement of the E190s.

15   Eventually, earlier this year, our original wish was granted,

16   and we are going -- we exercised A220 options and accelerated

17   them into the order book.  So right now, we are --

18   originally, it came in the form of delayed E190s, it will

19   ultimately end up in incremental A220s, if that makes sense.

20             THE COURT:  For the NEA or for the focus cities.

21             THE WITNESS:  For the NEA specifically.

22             THE COURT:  And the focus cities are Fort

23   Lauderdale and where else?

24             THE WITNESS:  We have six of them.  So Boston, New

25   York, Orlando, Fort Lauderdale, San Juan, and LA.

1              THE COURT:  So some of the 30 to 40 in the original

2      growth would have then gone to Boston and New York?

3              THE WITNESS:  New York would have been slotted.  So

4      we wouldn't have been able to add to New York.  But in

5      Boston, we had a -- plans to originally get to about 200 and

6      now we have plans to get to roughly 220.

7              THE COURT:  I see.  Okay.

8              Go ahead.  Sorry.

9      BY MR. SCHWED:

10     **Q.**  Did senior leadership ever approve the delayed retirement

11     of the E190s, absent the NEA?

12     **A.**  No.

13     **Q.**  So just to be clear, why were you prepared -- if you knew

14     you didn't have the aircraft in the order book, why were you

15     continuing to prepare plans that showed -- that were the same

16     plans when you actually -- before all the COVID deferrals?

17     **A.**  Because ultimately, as route planners, we're always

18     looking to grow, we're aspirational, and we don't want to

19     give up.  Those -- we didn't know what the recovery would

20     look like.  We wanted to keep them in our growth plan.  They

21     were in the growth plan before, we wanted to keep fighting

22     for those planes.

23     **Q.**  Just more generally, like absent -- not even just

24     focusing on this moment in time, let's say even before COVID.

25     How did the process for fleet planning work?

1    **A.**   So at the highest level, I think there would be multiple

2    growth scenarios that route planning would put together.  We

3    would then, more or less, pitch those scenarios to our

4    finance group, you know, a combination of the fleet strategy

5    team, FPNA, treasury, and we would all collectively look at

6    it from a comprehensive business case perspective, focused on

7    the margin, but also other metrics that route planning is not

8    really involved in, cash flow, balance sheet metrics, things

9    are a bit beyond me.

10   **Q.**   And how often would the network planning team pitch the

11   need for more aircraft?

12   **A.**   Certainly during COVID, we're doing it all the time,

13   throughout multiple presentations.  And then preCOVID, you

14   know, we would do it quite frequently.

15   **Q.**   And who ultimately makes the decision on whether JetBlue

16   will acquire more aircraft?

17   **A.**   Ultimately, I think it's a call between or among Robin,

18   Joanna, and Ursula, or CFO.

19   **Q.**   And just Robin is Robin Hayes?

20   **A.**   Robin Hayes, CEO.

21   **Q.**   Joanna?

22   **A.**   Joanna Geraghty, president and CEO.

23   **Q.**   And Ursula?

24   **A.**   Ursula Hurley, CFO.

25   **Q.**   So I think you testified that as a result of the NEA, at

1    first the 30 owned E190s were delayed retirement, correct?

2    **A.**   Yes, that's correct.

3    **Q.**   And then you mentioned that there were 30 options

4    accelerated for A220s?

5    **A.**   They were exercised and accelerated.

6    **Q.**   And those ultimately, when they come in, they will

7    replace the E190s?

8    **A.**   Yes, I like to use the term "re-replace."

9    **Q.**   All right.  And so what's the net result going to be out

10   of that -- those two decisions?

11   **A.**   We will have 30 incremental aircraft, period, as a result

12   of the NEA.

13   **Q.**   And what about the -- is there any difference between

14   having an A220 and an E190?

15   **A.**   Yes, so now when we have 30 incremental aircraft as a

16   result of the NEA, but now, with those aircraft, we'll have

17   40 percent more seats on them relative to the E190.

18   **Q.**   And how did the NEA make those decisions possible?

19   **A.**   At the end of the day, the NEA creates a unique

20   opportunity for JetBlue and American to better compete for

21   its customers against Delta and United, to create a third

22   competitor.  New York has always -- JetBlue has always been

23   good to its customers in New York.  New York has always been

24   good for JetBlue.  Boston, as well.  So we've always wanted

25   to grow in these geographies, even beyond what we've done

1    thus far.  The NEA allows us the slot opportunity in New York

2    and the commercial incentive and the operational flexibility

3    in Boston to continue to grow.  So financially, it makes a

4    lot of sense, and it was -- it justified the intense capital

5    spend to delay the E190 retirements and then ultimately to

6    exercise the A220 options.

7    Q.  Are there plans for future orders due to the NEA, in

8    addition to what you already -- the A220s and the other, and

9    what already was in the order book?

10   A.  We have, as I mentioned as part of JFK phase 3, as well

11   as some Boston trans-con flying, we have consistently been

12   discussing incremental Mint aircraft.  We became very, very

13   close to executing a lease agreement.  Unfortunately, the

14   seat supplier went bankrupt as a result of COVID supply chain

15   issues, so that deal has not manifested as of yet.

16   Q.  Is that still under consideration?

17   A.  Yes, it's still under consideration.

18   Q.  And do you believe that the NEA puts JetBlue in a

19   greater -- a better financial position to continue to expand

20   its fleet in the future, beyond what's in the current order

21   book?

22   A.  Ultimately, the NEA makes us competitively stronger, it

23   provides a better solution for customers, and it will

24   increase the financial health of JetBlue.  And when the

25   financial health of JetBlue increases, that means there's a

1   higher likelihood of additional growth in the future.

2             MR. SCHWED:  I have no further questions.

3             THE COURT:  All right.  Go ahead.

4             MS. MCDONOUGH:  Good morning, Your Honor.

5             Good morning, Mr. Friedman.

6        **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

7   BY MS. MCDONOUGH:

8   **Q.**  I'd like to start by looking at slide 5 of the

9   presentation that your counsel was just discussing, which is

10  DX88.

11            Mr. Friedman, the growth shown on this slide,

12  American could have achieved that growth without the

13  Northeast Alliance by flying larger aircraft with the slots

14  that they had; is that correct?

15  **A.**  For decades, they chose to fly what they flew out of

16  LaGuardia.  What I know is that, as a result of the NEA, we

17  have -- JetBlue has been able to grow at LaGuardia with

18  higher gauge aircraft, with more seats on them.  I can't

19  really comment on what American was thinking before LaGuardia

20  or not.

21  **Q.**  JetBlue could have achieved this growth if American had

22  leased the slots at LaGuardia to JetBlue, correct?

23  **A.**  I'm not aware of any lease deals, but technically, if

24  American had agreed to lease us these slots, we could have

25  flown the slots.

1    **Q.**  Let's take a look at slide 12.

2              THE COURT:  I'm sorry, just go back to that slide

3    for a second.  Sorry.  If you don't mind, slide 5.

4              So some of this growth comes from, like, the seat

5    capacity.  There's the same number of slots before and after

6    between the two, right?

7              THE WITNESS:  Correct.

8              THE COURT:  So the more seats comes from bigger

9    planes.

10             THE WITNESS:  Correct.  So I think one example

11   would be LaGuardia to West Palm Beach.  American has

12   historically flown that on a 76 seater regional jet.  That is

13   a really large market, both out of New York and Boston.  That

14   market should be on, you know, at least 100 seats, 162 seats

15   on JetBlue's E190s, A320s, if not an A321 with 200 seats.

16             THE COURT:  So some of this here, the seat capacity

17   growth comes from something like that, flying a bigger plane.

18             THE WITNESS:  Correct.

19             THE COURT:  And some of these new routes come from

20   coordinated redeployment between the two of you?

21             THE WITNESS:  Yes.  So ultimately, we -- one of our

22   benchmarks was the 50 domestic O&Ds served from LaGuardia, so

23   we wanted to ensure that we served as many of those markets

24   as possible, as many of those routes as possible, with enough

25   frequency to be competitive against Delta and United at

1    Newark and LaGuardia.  So we could always serve a market with

2    one frequency, and serve all 50 O&Ds, but ultimately, we felt

3    the right balance of frequency health and route to breadth,

4    if you will, route coverage, was the top 40 of the 50.

5    BY MS. MCDONOUGH:

6    **Q.**  And you get those additional routes at sufficient -- at

7    what you viewed as sufficient frequency out of the

8    preexisting slot portfolio, the two of you, by coordinating

9    among all the routes.

10   **A.**  Yes, we are optimizing the entire slot portfolio, and

11   along the way, we -- you know, there could be optimization on

12   one route, there could be a frequency reduction, and then by

13   definition, because of the slot rules, that frequency

14   reduction would have to go into a frequency add somewhere

15   else, or potentially a new market.

16              THE COURT:  Okay.  I see.  I understand.

17              Thank you.  Go ahead.

18   BY MS. MCDONOUGH:

19   **Q.**  The slots that American uses at LaGuardia to serve new

20   routes come in part from American exiting Boston-LaGuardia,

21   correct?

22   **A.**  American has exited Boston-LaGuardia.  We have added to

23   Boston-LaGuardia, and ultimately, when all the E190s become

24   A220s, with the 40 percent more seats, we will eventually

25   have roughly the same capacity that existed in the market

1   beforehand.

2           THE COURT:   When does that happen?

3           THE WITNESS:   The E190s are set to exit by 2025, so

4   some time between now and 2025, so likely in between.

5   BY MS. MCDONOUGH:

6   Q.   Mr. Friedman, JetBlue is not adding as many frequencies

7   as American is removing; is that right?

8   A.   So previous to the NEA, I think we were at six, and

9   American was at close to 17, resulting in about 24

10  frequencies.

11          THE COURT:   Boston to LaGuardia.

12          THE WITNESS:   Boston to LaGuardia.

13          So the need for that much frequency is probably not

14  needed when you can effectively serve the market

15  competitively, on hourly service throughout the core parts of

16  the day, you know, 6:00 a.m. to 9:00 p.m., 6:00 a.m. to 10:00

17  p.m.   You don't need 24 frequencies.   So we can actually have

18  those frequencies, enough competitive frequency, with larger

19  gauge aircraft, and maintain the same amount of capacity in

20  the market and steady state.

21  BY MS. MCDONOUGH:

22  Q.   Before the Northeast Alliance, JetBlue had a plan to

23  increase its frequencies on Boston-LaGuardia to ten per day,

24  correct?

25  A.   That would have come at the expense of Florida frequency,

1    but it was a plan that we were considering.  I believe it --

2    we might have even had it out for sale, but at the expense of

3    Florida frequencies.

4    **Q.**  Let's take a look at slide 12.  This slide is about JFK.

5    At JFK, American could have achieved growth without the

6    Northeast Alliance by flying larger aircraft with their

7    slots, correct?

8    **A.**  We could always up-gauge aircraft.  In fact, that's been

9    a strategy of ours to make an A320 into an A321.  We can add

10   seats to JFK as a result of that.

11   **Q.**  American also could have flown larger aircraft using

12   their slots, correct?

13              MR. SCHWED:  Objection.  Foundation.

14              THE COURT:  Sustained.  To the form.

15   BY MS. MCDONOUGH:

16   **Q.**  JetBlue could have achieved growth if American had leased

17   its slots at JFK to JetBlue, correct?

18   **A.**  I think at the most basic level, if a lease deal was

19   done, we would have to decide if it was worth it, very well

20   could have been worth it, but the NEA is more than just the

21   slot transfer, right?  It's the loyalty benefits, it's the

22   codeshare.  It's the full comprehensive competitive --

23   creating a third comprehensive competitor by combining

24   corporate sales, marketing efforts, loyalty programs.  So

25   it's much more.  It takes much more than just a lease to

1   create a third viable competitor in New York.

2   **Q.**  JetBlue could have achieved growth at JFK, if American

3   had simply leased slots to JetBlue, correct?

4   **A.**  We could have grown, but the ultimate customer benefit

5   would have been less without the full NEA.

6   **Q.**  JetBlue could have achieved some of the growth listed on

7   this slide by flying the 37 slots that American leased to

8   JetBlue before the Northeast Alliance, correct?

9   **A.**  As I mentioned last week, I'm not aware that we actually

10  executed the agreement or took possession of those slots.  If

11  we had and we did and we flew those incremental 16 round

12  trips, again, I think the competitive force against Delta and

13  United would have been much more diminished than what the

14  overall NEA offers as a third viable competitor.

15  **Q.**  Mr. Friedman, you're aware in the summer of 2020 of the

16  37 slots, so that you built them into a five year stand-alone

17  growth plan, correct?

18  **A.**  There was one iteration of that plan, maybe potentially

19  even multiple iterations of that plan, that had those slots

20  built in.  Along the way, they did come out.  And to my

21  knowledge, I don't think we ever actually flew those slot

22  pairs.

23  **Q.**  But those slot pairs were built into a stand-alone five

24  year growth plan in the summer of 2020, correct?

25  **A.**  Yes.  But, you know, as mentioned earlier, the -- those

1    plans had many kinks in them, one of which was that they had

2    more flying tied to the actual network.  So whether we would

3    have pursued those slots without the NEA and all the other

4    commercial benefits I think, was still very much a

5    discussion, at least in my view.

6    **Q.**  Mr. Friedman, I've asked you a simple yes or no question.

7    Those 37 JFK slots were built into a stand-alone five year

8    growth plan in the summer of 2020, correct?

9         MR. SCHWED:  Objection.  Asked and answered.

10   Twice.

11        THE COURT:  I think he's already -- sustained.  I

12   think he already said it was.  He said more than it was, but

13   he did say it was.

14   BY MS. MCDONOUGH:

15   **Q.**  Let's take a look at slide 21.  Mr. Friedman, this slide

16   compares 2022 flying to 2019 flying, correct?

17   **A.**  Yes, the graph at the bottom of the slide.

18   **Q.**  It doesn't adjust for stand-alone plans that JetBlue had

19   for 2022, correct?

20   **A.**  No.  I don't think we've adjusted -- we're not showing

21   what the plan would have been without the NEA on this slide.

22   **Q.**  Your counsel asked you a few questions about the Boston

23   to Rochester route.  Do you remember that?

24   **A.**  Yes.

25   **Q.**  When JetBlue initially exited Boston to Rochester,

1    JetBlue planned to return in January of 2023, correct?

2    **A.**   I can't recall the exact intended return to service.  As

3    of now, it remains May of 2023.

4    **Q.**   You also mentioned certain operational issues at JetBlue.

5    Do you remember that?

6    **A.**   Yes.

7    **Q.**   And before the Northeast Alliance, JetBlue also had

8    operational issues, correct?

9    **A.**   Before the NEA?  The operational issues that we're

10   experiencing now, postCOVID, are severe and quite different

11   from the way the operation was run preCOVID.

12   **Q.**   And I should have clarified, that is specific to Boston

13   to Rochester, JetBlue had operational issues on Boston to

14   Rochester about the overnight flying before the Northeast

15   Alliance, correct?

16   **A.**   Yes.  The same.  Boston-Rochester was a RON and those

17   same considerations applied.  I think the difference

18   postCOVID and preCOVID was the state of the pilot workforce.

19   That was a clear difference in our thinking.

20   **Q.**   Without -- excuse me.

21          Now, with the Northeast Alliance, JetBlue can still

22   market American's service on Boston to Rochester, correct?

23   **A.**   To my knowledge, we do not have a marketing code on

24   American's metal on Boston-Rochester.

25   **Q.**   Let's take a look at slide 34.  Americans -- if you look

```
 1     at the blue lines, these blue cities that connect to JFK,
 2     American --
 3                 THE COURT:  I'm sorry, hold on.
 4                 Why wouldn't there be?  If -- American flies Boston
 5     to Rochester?
 6                 THE WITNESS:  So the codeshare -- on which routes
 7     we put a JetBlue code on American metal operated flights,
 8     it's handled by a different team.
 9                 THE COURT:  I see.
10                 THE WITNESS:  My team can't discuss with American
11     Boston-Rochester.
12                 THE COURT:  Because it's a carve-out?
13                 THE WITNESS:  It's a carve-out route.
14                 THE COURT:  I see.  So that's why there wouldn't
15     be.
16                 THE WITNESS:  Correct.  And then the actual
17     application of code is done through the partnerships and the
18     NEA team.
19                 THE COURT:  Other than carve-outs, would you have
20     any reason to think that if Boston to somewhere route flown
21     by American wouldn't have a JetBlue code?
22                 THE WITNESS:  There are limitations on how many
23     routes we'd want to put code on and how many flight numbers
24     that would be used.  But generally speaking, you know,
25     putting code, putting JetBlue's code on more flights is a
```

1    good thing.  But there's -- to be candid, I'm not really the

2    expert on codeshare strategy, but there's mainly benefits,

3    but some considerations that have to be taken into account.

4              THE COURT:  I see.

5              I'm sorry.  Go ahead.

6    BY MS. MCDONOUGH:

7    Q.  Taking a look at the blue lines on this map, American can

8    serve many of these blue cities over its own hubs, correct?

9              MR. SCHWED:  Objection.  Foundation.

10             THE COURT:  Overruled -- well, maybe rephrase it.

11   I'm not sure what you mean by its own hubs.

12   BY MS. MCDONOUGH:

13   Q.  American can serve --

14             THE COURT:  Oh, American.  Okay.  Go ahead.

15   BY MS. MCDONOUGH:

16   Q.  American can serve these blue cities -- well,

17   Mr. Friedman, are you aware of American Airlines's hubs in

18   the United States?

19   A.  Yes.

20   Q.  And a number of the blue cities listed on this map are

21   American Airlines hubs, correct?

22   A.  Some of them are, yes.

23   Q.  So for example, Phoenix is an American hub, correct?

24   A.  Yes, Phoenix is an American hub.

25   Q.  So American can serve Phoenix to Madrid, for example,

1   connecting over its own hub?

2   **A.**   If they prioritized their slot times accordingly, they

3   would be able to do that.

4          Would they be able to do all of this connectivity

5   on their own?  I don't think they would have the slot

6   portfolio to do that.

7   **Q.**   American could, for example, connect from Phoenix over

8   one of its other hubs, such as Chicago or Philadelphia, to

9   reach Madrid, correct?

10              MR. SCHWED:  Objection.  Foundation.

11              THE COURT:  Overruled.

12              You can answer, if you know.

13              THE WITNESS:  If these markets are being served

14   from Philadelphia or Chicago, they are -- they would be able

15   to serve an American customer over those hubs, to those

16   cities.

17   BY MS. MCDONOUGH:

18   **Q.**   Iberia is a joint venture partner of American's, correct?

19   **A.**   Yes, I believe they are a joint venture partner.

20   **Q.**   Iberia is a Spanish airline, correct?

21   **A.**   Yes.

22   **Q.**   So American could connect with its partner, Iberia,

23   between Phoenix over one of its hubs to Madrid, correct?

24              MR. SCHWED:  Objection.  Foundation.

25              THE COURT:  Sustained as to --

BY MS. MCDONOUGH:

**Q.**  Mr. Friedman --

      MS. MCDONOUGH:  You can take that down.  I'll switch gears.

BY MS. MCDONOUGH:

**Q.**  Mr. Friedman, your counsel asked you several questions about JetBlue expanding its order book after September of 2021, correct?

**A.**  Yes.  I'm not sure -- I can't remember the exact time frame, but yes.

**Q.**  Let's take a look at PX791, which is in evidence.  This is a quarterly network review from August of 2021.  Let's take a look at slide 14, which ends in 096.  This slide is entitled, "NEA requires significant shell investment; particularly in Mint."  Do you see that?

**A.**  Yes.

**Q.**  And if you look at the right-hand side, in the second bullet, it also says, "By 2022, including keeping the 30 owned E190s, we still need 18 Mint aircraft and 34 All-Core aircraft."  Do you see that?

**A.**  Yes.  I believe this is referring to the 30 to 40 deferrals of 2020 that we would still need, and then also the additional Mint aircraft to fulfill the NEA vision, as well as I think JetBlue's ambition, as well.

      THE COURT:  What are the core aircraft?

1          THE WITNESS:  Those are -- in JetBlue, we don't use

2     the word "coach" we use the word "core."  So it's the all

3     coach aircraft, or all core aircraft.

4     BY MS. MCDONOUGH:

5     Q.  And in looking at the third bullet, the third bullet

6     says, "The steady state would be unachievable until 2026 or

7     2027."  Do you see that?

8     A.  Yes.

9     Q.  And the fourth bullet indicates that, under this plan,

10    there would still be limited growth in other focus cities,

11    such as Los Angeles, Fort Lauderdale, and Orlando, correct?

12    A.  Yes, this would be -- and it states that, again, because

13    of the 30 to 40 aircraft deferrals, without getting those

14    back, it would be difficult to grow LAX, Fort Lauderdale, and

15    MCO.

16    Q.  Let's take a look at PX949, which is a board of directors

17    deck in evidence.

18          MR. SCHWED:  I don't believe this is in the book.

19          MS. MCDONOUGH:  We will hand out copies.  Thank

20    you.

21    BY MS. MCDONOUGH:

22    Q.  Mr. Friedman, this is a board of directors deck from

23    February of 2022, correct?

24    A.  It appears so.

25    Q.  Okay.  Let's take a look at slide 36.  According to this

1    slide, JetBlue advanced 30 A220 options in the winter of

2    2022, correct?

3    **A.**   Yes, that's correct.

4    **Q.**   If you look at the bullet point, it starts with, "Our

5    agreement."  It says that "Exercising the option for 30 A220s

6    advanced JetBlue's deliveries" from -- to 2022 through 2026,

7    correct?

8    **A.**   That's correct.

9    **Q.**   Let's take a look at the bullet point immediately below.

10   This says, "These deliveries will allow us to set new

11   retirement dates for the owned E190s.  They will exit 1 for

12   one for each of these A220 options, with the last exiting in

13   2026."  Do you see that?

14   **A.**   Yes, when we originally delayed the E190 retirements,

15   that provided -- those aircraft were set to retire.  By not

16   retiring them, they created incremental aircraft.  We then

17   said, for example, an aircraft that was going to retire in

18   2024, but now would retire never, or on a delayed basis,

19   without an end date, an A220 would now come in in 2024 and

20   replace that E190 as a result, with 40 additional seats.

21   **Q.**   With every delivery of an A220, JetBlue would retire one

22   E190, correct?

23   **A.**   Technically, for these E190s, there's two A220s coming in

24   for each one of the 30 owned E190s.  This has to deal with

25   the rereplacing term that I mentioned earlier, originally,

1    all 60 E190s were going to be retired and replaced with an

2    A220.  All of those original 60 A220s were coming, we then

3    delayed the 30 owned E190 retirements, so we'd still get the

4    60 A220s, keep the 30 E190s for a little 90 aircraft.  Now we

5    would have 90 A220s replacing those 60 E190s.  If that makes

6    sense.  I know it's a little confusing.

7    **Q.**  So to make sure I understand, your understanding is

8    different from what is indicated on this board of directors

9    deck, correct, which says that the E190s would exit one for

10   one, for each of the A220 options?

11   **A.**  They would exit one for one on the delayed E190

12   retirements.  Those original E190 retirements had an A220

13   associated with each one of those beforehand that were also

14   coming in.  So net new, I think, at the simplest level, it's

15   30 incremental A220s as a direct result of the NEA.  Before

16   the NEA, we had 70 A220s on order.  Now we have 100.

17   **Q.**  Let's take a look at the chart at the bottom of this

18   slide, looking at the road that says, "New accelerated A220

19   options."  Do you see that?

20   **A.**  Sorry, what row -- yes.

21   **Q.**  And this is referring to the 30 A220 options that we've

22   been discussing, correct?

23   **A.**  Yes.

24   **Q.**  And this slide indicates that the A220s would not be

25   delivered -- would be delivered, excuse me, between 2022 and

1    2026, correct?

2    **A.**   That's correct.

3    **Q.**   With eight of the A220s not being delivered until 2025?

4    **A.**   But in the meantime, the E190s that were set to retire

5    would have been delayed, so the E190 in this time frame, up

6    until 2025, would be the incremental aircraft, and then in

7    2025, it would be replaced with an A220.

8    **Q.**   And 13 A220s would not be delivered until 2026, correct?

9    **A.**   Correct.  But there would have been 13 E190s delayed

10   until 2026, then, to be replaced by the A220s in 2026.

11           MS. MCDONOUGH:  Would you give us a moment,

12   Your Honor?

13           THE COURT:  Yes.

14           (Counsel confers.)

15   BY MS. MCDONOUGH:

16   **Q.**   Returning to our discussion about the 30 A220s being net

17   new, that depends on your assumption that the delayed E190s

18   would not be justified absent the Northeast Alliance,

19   correct?

20   **A.**   We had put together a few different business cases with a

21   few different growth ideas from route planning.  The one

22   business case that actually got the job done and that those

23   E190s have been allocated for and that these A220s have been

24   allocated for was solely the NEA.

25   **Q.**   There were business cases that considered delaying the

1    retirement of the E190s that didn't consider the Northeast

2    Alliance, correct?

3    **A.**   There were a few models that we had put together, but the

4    seriousness of which they were analyzed paled in comparison

5    to what was the ultimate business case that got it through.

6    **Q.**   But some of those business cases did exist, correct, that

7    didn't have the Northeast Alliance and did consider the

8    delaying the retirement of the E190s?

9    **A.**   They existed in route planning files, they were not

10   presented to executive leadership for cause to delay the

11   E190s.

12             MS. MCDONOUGH:   I have no questions.

13             THE COURT:   Any recross?

14             MR. SCHWED:   No questions, Your Honor.

15             THE COURT:   All right.   Thank you very much,

16   Mr. Friedman, you're excused.

17             THE WITNESS:   Thank you, Your Honor.

18             THE COURT:   Next witness?

19             MR. JONES:   Your Honor, the plaintiffs call

20   Dr. Robert Town.

21             THE COURT:   Last name?

22             MR. JONES:   Town?

23             THE COURT:   T-o-w-n?

24             MR. JONES:   Yes, sir.   And my colleague, Mr. Heipp,

25   will conduct the examination for the plaintiffs.

```
 1              MR. HEIPP:  Good morning, Your Honor.
 2              THE COURT:  Good morning.
 3              (The witness was duly sworn.)
 4              MR. HEIPP:  Good morning, Your Honor, Justin Heipp
 5      for the United States.  Professor Town has prepared a set of
 6      demonstrative slides.  May we publish those on the gallery
 7      screens?
 8              THE COURT:  Yes.
 9              MR. HEIPP:  And those slides are also in the
10      binders.
11                          ROBERT J. TOWN, Ph.D.
12              having been duly sworn, testified as follows:
13          DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA
14      BY MR. HEIPP:
15      Q.   Good morning, Dr. Town?
16      A.   Good morning.
17      Q.   Could you please state your name for the record?
18      A.   Robert James Town.
19      Q.   What do you do for the living?
20      A.   I'm the James L. and Nancy Powell Centennial professor of
21      economic principles in the Department of Economics at the
22      University of Texas at Austin.
23      Q.   And you've been retained by the plaintiffs to provide
24      expert testimony in this case?
25      A.   Yes, I have.
```

1    **Q.**  So we'll get into more details, of course, on this in a

2    moment, but first, can you briefly describe what you were

3    asked to do?

4    **A.**  Sure.  I was asked to do two sets of tasks, one is to

5    apply the lessons from the past airline consolidation to

6    evaluate the NEA's impact on industry capacity, and assess

7    American and JetBlue's claims that the NEA will generate

8    consumer benefits that would otherwise not occur.

9    **Q.**  And you're prepared to testify today about your results

10    of analysis of consolidation?

11    **A.**  I am.

12    **Q.**  And you're prepared to testify today about some of the

13    defendants' trial testimony so far about the claimed benefits

14    of the NEA?

15    **A.**  I am.

16    **Q.**  So before we get into that substance, I would like to

17    just first ask you a few basic questions about your

18    qualifications.

19            Could you briefly describe your academic

20    background?

21    **A.**  Sure.  I got my Ph.D. and Master's degree in economics

22    from the University of Wisconsin-Madison.  And I got my

23    bachelor's degree in economics from the University of

24    Washington in Seattle.

25    **Q.**  So before you started teaching at Texas, what academic

1  positions did you hold?

2  **A.**   Prior to joining the faculty at Texas, I was a chaired

3  professor in the Wharton school at the University of

4  Pennsylvania.  And before then, I was a chaired professor in

5  the school of public health at the University of Minnesota.

6  And then prior to that, I was a professor in the Graduate

7  School of Management at the University of California, Irvine.

8  **Q.**   Apart from your teaching positions, do you hold any other

9  positions currently?

10  **A.**   I do.  I'm a research affiliate at the University of

11  Texas Population Center, and I'm a research associate at the

12  National Bureau of Economic Research, which is located in

13  Cambridge, and they're best known for dating recessions.

14  **Q.**   Have you also done work for private companies?

15  **A.**   I have.  I worked three years, four years for Amazon, in

16  several different roles, including Amazon scholar, senior

17  principle economists, and consultant.

18  **Q.**   Have you done academic work related to the airline

19  industry?

20  **A.**   Most of my work focuses on the healthcare sector, but I

21  have published some work in the airline industry.  I have a

22  paper with Steve Olley that examines -- it's a case study of

23  the American/US Air merger.  It's published in a book called

24  *The Antitrust Revolution*.

25  **Q.**   Have you been retained as an expert witness in the past?

1    **A.**   Yes, I have.

2    **Q.**   Can you say what cases you've been asked to testify as an

3    expert?

4    **A.**   I have been asked to examine several airline industry

5    matters, going back to the physical United/US Air proposed

6    merger around 2000.  I worked on Delta/Northwest.  I worked

7    on Continental/United.  I worked on American/US Airways.  And

8    then I also worked on the slot deal that was occurring

9    between United and Delta at Newark.

10   **Q.**   Does your work as an economist involve econometrics?

11   **A.**   It does.

12   **Q.**   And can you briefly define that term?

13   **A.**   Econometrics is basically studying statistical

14   relationships that are relevant for economic principles or

15   understandings.

16   **Q.**   Has a court ever excluded you from testifying as an

17   expert?

18   **A.**   No, they have not.

19          MR. HEIPP:  Your Honor, at this time, plaintiffs

20   offer Dr. Town as an expert in the field of economics and

21   econometrics.

22          MR. SCHWED:  No objection.

23          THE COURT:  All right.  I find him qualified, so

24   qualified.

25          MR. HEIPP:  Thank you, Your Honor.

BY MR. HEIPP:

**Q.**  Dr. Town, I'd like to first ask you about your opinions relating to some of the claims about benefits that have been the subject of testimony so far in this trial.

Do you have an initial opinion about some of the defendants' claims about benefits?

**A.**  Yes, I do.

**Q.**  And after the defendants put in the rest of their case and their experts testify, are you prepared to come back at a later point to testify about those additional details?

**A.**  I am.

**Q.**  Have you heard the testimony at the trial about the NEA enabling American and JetBlue to fly new and different routes?

**A.**  I have.

**Q.**  And have you heard the discussion of what's been called schedule optimization across a broader pool of slots and gates?

**A.**  I have.

**Q.**  So what sort of analysis would you have wanted to evaluate those effects?

**A.**  To evaluate the impact of the NEA, you want to perform an apples to apples comparison.  You want to isolate the impact of the NEA from what would have occurred otherwise.  So by apples to apples, you want to examine what the world would

1    have looked like without the NEA, compared to the world with

2    the NEA.

3    **Q.**   So what would you need to account for to ensure that

4    you're making an apples to apples comparison?

5    **A.**   You would want to account for the resources that were

6    available to the airlines in each of those scenarios.

7    **Q.**   And why was that important?

8    **A.**   Because if you don't kind of attribute the right set of

9    resources to the relevant apples-to-apples comparison, you

10   risk attributing benefits to, in this case, the NEA, that

11   otherwise would not have -- otherwise would have occurred.

12   **Q.**   So can you explain at a high level what the table on this

13   slide is depicting?

14   **A.**   Sure.  It's depicting a couple of different ways one

15   could do a apples-to-apples comparison.  In the first row,

16   the apples are the green colors.  On the first row, you could

17   compare the schedule in 2019 to a schedule that would have

18   occurred under the NEA in 2019, holding the resources that

19   were available constant.

20   **Q.**   Did the defendants create a schedule based on 2019 that

21   combined and optimized their networks?

22   **A.**   They did.  That was the v4 schedule that we heard

23   Mr. Pack testify about.

24   **Q.**   And what did the comparison in the first row based on the

25   v4 schedule show based on the benefits of the NEA?

1    **A.**   I don't know.   They never presented those results to the

2    DOJ.

3    **Q.**   Have the defendants committed an analysis based on that

4    comparison in the litigation?

5    **A.**   Not to my knowledge.

6    **Q.**   So what is the second potential apples-to-apples

7    comparison that's listed on the table?

8    **A.**   So another approach one could take would be to look at

9    what the airlines would be like individually in 2023, for

10   example, pick that year, and compare it to a 2023 schedule

11   that would have occurred under the NEA that's optimized, and

12   so forth.

13   **Q.**   Did the defendants consider doing something like that?

14   **A.**   I believe there's testimony that they considered

15   constructing a 2023 stand-alone schedule.

16   **Q.**   To your knowledge, did they ever complete that analysis

17   and submit it as part of litigation?

18   **A.**   I don't believe they did.

19   **Q.**   So what did the defendants present as their benefits

20   analysis?

21   **A.**   What they did do was compare the 2019 schedule to the

22   2023 NEA schedule, which is a mixing and matching.   It's not

23   an apples-to-apples comparison.

24   **Q.**   Is that what the defendants are relying on for the

25   quantification of the benefits of the NEA?

1    **A.**   Yes, they are.

2    **Q.**   And how exactly did they try to quantify the benefits,

3    based on that comparison in the third row?

4    **A.**   My understanding is they took the schedules that arise in

5    each of these columns and run it through a program, an

6    optimization -- or it's actually a passenger traffic

7    prediction program called Raven, which generates predictions

8    of the amount of passenger traffic that would occur with each

9    of these different schedules.

10   **Q.**   So these schedules are inputs into Raven; is that

11   correct?

12   **A.**   That's correct.

13   **Q.**   And what is the output from Raven?

14   **A.**   There are a number of different outputs, but one of the

15   important pieces of output is a predicted number of

16   passengers that would fly.

17   **Q.**   Did you use Raven to quantify the benefits of the NEA?

18   **A.**   No, I did not.

19   **Q.**   Why not?

20   **A.**   I don't have access to Raven.

21   **Q.**   So can you give an example to illustrate why the

22   defendants' comparison in the third row of the table is not

23   apples to apples?

24   **A.**   Sure.  So I'll come up with a very simple hypothetical.

25   Suppose that the NEA increased the number of flights that

1    were going to occur by 15, but the number of flights that

2    would have occurred absent the NEA would have increased by

3    ten.  So if you use the old schedule, you would attribute the

4    15 flights to the NEA, when, in actually, the NEA is

5    responsible for an increase of five flights.

6    Q.  And so what if, under the NEA schedule, the increase in

7    flights was eight, say, instead of 15.

8    A.  In that case, you would attribute the increase of flights

9    to the NEA when, actually, it reduced it by two.

10   Q.  So looking at the defendants' exercise that they did on

11   the third row of the table, did that allow you to assess the

12   impact of combining and optimizing the two airline's

13   networks?

14   A.  No, it does not, because it doesn't perform the

15   apples-to-apples comparison that you need.

16   Q.  Does the comparison tend to look at the full networks of

17   American and JetBlue?

18   A.  No, it does not, it just looks at the networks in the

19   Northeast.

20   Q.  Is it important to look at the full networks?

21   A.  Yes, because the impact of the NEA can stretch across the

22   entire network.

23   Q.  So the defendants have claimed that at least some of the

24   capacity growth in the 2023 NEA schedule is actually, in

25   fact, attributable to the NEA.  What's your response to that?

**A.**   Well, my analysis shows that the NEA increases the risk
that capacity will grow more slowly.

**Q.**   That's the analysis that we'll talk about shortly?

**A.**   Yes.

**Q.**   So shifting gears a little bit.  Have you heard testimony
that the NEA has been at least partly modeled on the
international joint ventures?

**A.**   I have.

**Q.**   Did you look at how the NEA compares to those
international alliances?

**A.**   I have.

**Q.**   So we're going to look at a couple of bar charts, but
what's your high level of conclusion from your comparison to
NEA to those international JVs?

**A.**   Compared to those international JVs, the NEA has much
less complementarities between the two carriers, relative to
the international alliances, and they bring a much greater
risk to competition because of the high degree of overlap on
nonstop routes.

**Q.**   So let's dig into that a little bit.  So can you explain
what the three bars on the left side of this graph on the
slide are predicting?

**A.**   Yes.  So each of those three bars represents a different
joint venture.  The first one is American/British Airways,
the second one is Delta/Air France, third one

1  United/Lufthansa.  And the vertical axis is the number of new

2  airports the joint ventures grants access to American on the

3  first bar, in that case.  And American is going to get access

4  to new airports under these joint ventures because they can

5  now tap into British Airways and move passengers from the

6  United States to, say, medium or small sized cities in

7  Europe, where, prior to the joint venture they couldn't do

8  that.

9  **Q.**  And what are the two bars on the right side of the graph?

10  **A.**  The two bars on the right side are the same calculation,

11  but for the NEA.  So the first bar is the American to

12  JetBlue, the increase in the number of airports that American

13  attains through the NEA, and the fifth bar is the number of

14  airports that JetBlue attains through the NEA.

15  **Q.**  So about how many airports does JetBlue serve that

16  American does not currently serve?

17  **A.**  About four.

18  **Q.**  And how many of those are in the Continental United

19  States?

20  **A.**  One of those.  One.  Cape Cod.

21  **Q.**  And about how many airports does American serve that

22  JetBlue does not currently serve?

23  **A.**  About 43.

24  **Q.**  So you said a moment ago that you also looked at the

25  extent to which American and JetBlue's networks overlap?

```
 1              THE COURT:  I'm sorry.  Wait.  Wait.  JetBlue
 2    serves -- just the last one, I'm trying to get them straight
 3    in my head, which one goes which way.  The lower number, the
 4    four, is that everywhere JetBlue goes, American goes, except
 5    four places.
 6              THE WITNESS:  That's correct, yeah.
 7              THE COURT:  I see.  And -- and then JetBlue goes
 8    everywhere American goes, except for 43 places.
 9              THE WITNESS:  That's right.  Within the NEA.
10              Within the context of the NEA.
11              THE COURT:  Those two are just within the context
12    of the NEA?
13              THE WITNESS:  Yeah.
14              THE COURT:  Okay.  Got it.  Go ahead.
15    BY MR. HEIPP:
16    Q.  Let's turn to the next slide.
17              Did you also look, Dr. Town, at the extent to which
18    American and JetBlue's networks overlap compared to the
19    international JVs?
20    A.  I did.  And here you can see that, in the three
21    international alliances, there's very little overlap in
22    nonstop routes.  Well, for American and JetBlue, there's a
23    much much higher degree of nonstop overlaps.  For American,
24    it's about 30 percent, and for JetBlue, it's about
25    27 percent.
```

**Q.**   So what do you conclude about the relative degree of overlap compared to the complimentary that you looked at on the prior slide?

**A.**   Yeah.  So in the context of the international alliances, the NEA poses a much greater threat to competition, relative to its impact on the complimentary benefits that would be attained through the NEA.

**Q.**   So in addition to being complimentary, have you also heard testimony about a claimed benefit of the NEA that's been referred to as relevance?

**A.**   I have.

**Q.**   What's your understanding of the term "relevance" as it's used in the context of airlines?

**A.**   My understanding is it has to do with this idea of economics which is called airport presence, which is the kind of size of the airline at a given airport or on a particular route.

**Q.**   So is there an economics literature about the impact of airport presence or relevance on fares?

**A.**   There is.  And that literature shows that an increase in airport presence is associated with an increase in fares on all routes from that airport by that airline.

**Q.**   Did you also study the impact of airport presence as part of your work on this case?

**A.**   Yeah, I did.  I updated the literature on airport

1    presence and its effects and with more recent data, and I

2    find that a ten percentage point increase in an airline's

3    airport presence is associated with an increase in fares of

4    about one percent across all routes that that airline serves

5    at that airport.

6    Q.  And is that effect part of, or is it on top of any

7    effects of higher shares or concentration at the route level?

8    A.  Yeah.  It would be on top of because this analysis kind

9    of controls for those factors.

10   Q.  So you've also heard testimony in the trial about the

11   NEA's claimed benefits for frequent flyer programs?

12   A.  I have.

13   Q.  Like the relevance point, is there an economics

14   literature about frequent flyer programs?

15   A.  There is.  And that literature shows that the frequent

16   flyer programs have ambiguous effects on consumer welfare.

17   They're not unambiguously positive.  There are some down

18   sides to frequent flyer programs for consumers.

19   Q.  Can you explain why that is, according to the literature?

20   A.  Sure.  So first of all, it's important to recognize that

21   frequent flyer programs are costly to provide.  Airlines have

22   to fly passengers who redeem points.  And in so far those

23   costs are passed on to consumers, to some degree, which one

24   would think they would be, that that also will have a

25   downside for those consumers.  But also frequent flyers

1    programs soften competition between the airlines, and they do

2    that because they induce switching costs for those power

3    travelers we've heard about.  Power travelers have an

4    incentive to concentrate their points with one carrier, and

5    so they become less sensitive to prices, because they're

6    worried about concentrating their points.

7              And third, there's a morale hazard problem.

8    Frequent flyer programs incentivize business travelers to

9    choose less cost effective flights because they get the

10   points, but they're not paying for the fares themselves.

11   **Q.**  So what are the overall effects on consumers of frequent

12   flyer programs, according to the literature?

13   **A.**  According to the literature, it's ambiguous.

14   **Q.**  And can you explain how it balances out?

15   **A.**  It's -- you know, there's clearly some benefit the

16   consumers get from joining a frequent flyer program, but

17   there's going to be downside costs.

18             Now for the airlines's perspective, the frequent

19   flyer programs are good, but it's unclear what their impact

20   is on consumers.

21   **Q.**  Thank you, Dr. Town.  Let's move on to another topic now.

22   To the first assignment that you described at the very

23   beginning.

24             So could you describe at a high level your opinions

25   about airline consolidation and the effects of the Northeast

1   Alliance on industry capacity?

2   **A.**   Sure.  So the airline industry consolidated through

3   several large mergers starting around 2009, which facilitated

4   a period of capacity discipline.  That capacity discipline

5   weakened in the mid 2010s and the NEA enhances the risk that

6   capacity discipline will be restored.

7   **Q.**   So let's first talk about the first one of those.  There

8   has been a lot of testimony in the trial about capacity

9   coordination between American and JetBlue, but just to make

10  sure the terms are clear, I want to talk to you about a

11  slightly different concept of coordination among other lines

12  in the industry.

13          So from an economist perspective, can you explain

14  what coordination is?

15  **A.**   Sure.  There are a number of different definitions of

16  coordinated behavior amongst firms.  Here is kind of a

17  relatively concise one from the horizontal merger guidelines,

18  and it's, you know, "coordinated interactions involves

19  conduct by multiple firms that is profitable for each of them

20  only as a result of the accommodating reactions of the

21  other."  And the key part of this sentence is the profitable

22  for each other only as a result of the accommodating

23  reactions of the others.

24  **Q.**   So picking up on that point, does coordination require an

25  explicit agreement or expressed communications among the

1    firms?

2    **A.**   No, it does not.  It could, but the coordinated conduct

3    could be tacit, for example, and the firms have an

4    understanding that each will accommodate the other.

5    **Q.**   So what effect does that sort of tacit coordination have

6    on consumers?

7    **A.**   Well, it -- if firms are tacitly coordinating, then

8    that's reducing the intensity of competition.  And insofar as

9    consumers gain from that intense competition, they would be

10   harmed.

11   **Q.**   Are certain markets or certain industries more

12   susceptible to coordination than others?

13   **A.**   They are.

14   **Q.**   Can you explain why that is?

15   **A.**   Well, there's a tension.  So if I firms are coordinating,

16   there's going to be an incentive for a firm to deviate from

17   that understanding and earn greater profits from that

18   deviation.  But if they do that, there's a greater risk they

19   are detected, and the other firms will no longer be

20   accommodating, and then they'll kind of revert to a more

21   competitive environment going forward.

22          So there's a benefit of deviating and earning

23   profits, versus the benefit of maintaining cohesion in the

24   agreement and earning, you know, higher profits for the group

25   as a whole over a longer period of time.

1 **Q.** And do the characteristics of particular industries

2 impact how that tension plays out?

3 **A.** They do.

4 **Q.** So focusing on the airline industry, can you describe how

5 that dynamic that you just described, the tension, how that

6 would play out?

7 **A.** Sure.  So in the airline industry, that tension can play

8 out in the following way.  If airlines are coordinating on

9 capacity and agreeing to -- in some way, to reduce their

10 growth of capacity, then there will be an incentive for an

11 individual airline to deviate from that understanding and go

12 more rapidly.  But if they do so, then they risk getting a

13 competitive response from the other airlines which would undo

14 the whole capacity discipline framework.

15 **Q.** So have you identified characteristics of the airline

16 industry that make it susceptible to this kind of

17 coordination?

18 **A.** I have.

19 **Q.** What's the first characteristic that you've identified?

20 **A.** So -- and these characteristics, the reason they are

21 characteristics that facilitate coordinating behavior is

22 because they tip that balance of the tension I was describing

23 between the benefits of coordination versus the benefits of

24 deviating.  So one of the characteristics that the airline

25 has that facilitates, tips that balance towards coordination

1    is it has a small number of major industry participants.

2    Now, the reason that has a role in facilitating corporation

3    is that, with a few number of major participants, there are

4    fewer firms to monitor and track, and also the gains from

5    coordination are greater and split amongst fewer people --

6    firms.

7    **Q.**   What's the second characteristic of the airline industry

8    that you identified?

9    **A.**   The second characteristic is the ability to monitor

10   pricing and capacity decisions of rivals.  The airlines have

11   a couple of different platforms that allows them to assess

12   what the pricing decisions are of the rivals and what their

13   capacity decisions of their rivals are making.

14   **Q.**   Is it your understanding that airline prices are posted a

15   number of times every day?

16   **A.**   That is my understanding, yes.

17   **Q.**   What's the third characteristic that you identified?

18   **A.**   So a third characteristic is a high level of multimarket

19   contact.  What multimarket contact here means is that the

20   airlines are competing against each other across multiple

21   markets.  That means that the benefits of adhering to the

22   contract is -- or the understanding is greater because they

23   are across multiple markets.  And also the cost of deviation

24   from the understanding is also higher because it's across --

25   and the consequences could be felt across multiple markets.

1   **Q.**  And finally, what's the fourth characteristic that you

2   identified?

3   **A.**  Small, infrequent transactions.

4          So again, back to the dynamic I was talking about

5   earlier, that there's a potential gain from deviating,

6   relative to the benefits of future corporation, so if

7   transactions are small and infrequent, the gain from

8   deviation will be small relative to the future potential

9   benefits from -- of corporation.

10  **Q.**  So in addition to these characteristics that you've

11  talked about, is there anything else that economists look to

12  when trying to determine if a particular industry is

13  susceptible to coordination?

14  **A.**  Yeah, an important piece of evidence that economists will

15  look to is evidence of previous coordination, and the reason

16  that that's relevant is it suggests that -- it indicates that

17  that tension that I described earlier has been resolved

18  towards cooperation.

19  **Q.**  So let's turn to concentration in the airline industry?

20          THE COURT:  And just before you do, wouldn't

21  barriers to entry be a critical factor in this evaluation?

22          THE WITNESS:  Oh, yeah, yeah.  And barrier to entry

23  would mean --

24          THE COURT:  But if the entry barriers were zero,

25  what difference would one, two, three, and four make?

```
1              THE WITNESS:  Well, if the barrier entries were
2       zero then it's unlikely they would --
3              THE COURT:  Even with these other characteristics.
4              THE WITNESS:  Yeah, even with these -- but you
5       wouldn't have one.
6              THE COURT:  You likely wouldn't have one if you
7       had --
8              THE WITNESS:  Yeah.  If there was easy entry, you
9       wouldn't have one.
10             THE COURT:  I see.  Okay.  Go ahead.
11      BY MR. HEIPP:
12      Q.  So following up on the small number of industry
13      participants, Dr. Town, have you looked at how concentration
14      and the number of airlines has changed over time?
15      A.  I have.  And you can see a graph of it right here.  So
16      the horizontal access is time.  It starts in 2002 and
17      stretches to 2020.  And the blue line is a measure of
18      capacity concentration in the industry over time.  And then
19      the gray, kind of, big, gray bar there is the 2008 financial
20      crisis.  And then the dash lines denote the different mergers
21      that occurred over this time frame, starting with
22      Delta/Northwest in 2008, and then United/Continental in 2010,
23      Southwest/AirTran in 2011, and then US Airways/American in
24      2013.  And you can see that with each of these mergers, there
25      was a large increase in industry capacity concentration, and
```

1    it peaked around 2013, after the US/American merger at 1700,

2    a little over 1700.

3    **Q.**   And this is measured in terms of HHIs?

4    **A.**   Yes.  So I should have mentioned it.  The vertical access

5    is measuring the Herfindahl-Hirschman index, which is a

6    standard measure of concentration.

7              THE COURT:  Why is that declining.

8              THE WITNESS:  Most of that decline, I think, is

9    attributable to LCCs and ULCCs expanding their presence.

10             THE COURT:  So who would be expanding presence?

11             THE WITNESS:  JetBlue.

12             THE COURT:  Oh, I see.  Got it.

13             THE WITNESS:  Yeah.

14   BY MR. HEIPP:

15   **Q.**   Any other carriers that you think would have been

16   expanding over the last -- the period since the American/US

17   Airways merger, besides JetBlue?

18   **A.**   Besides JetBlue, Spirit would be another carrier that's

19   been expanding over that time period.

20   **Q.**   So how did the mergers that are depicted on this slide

21   change the number of legacy hub-and-spoke carriers in the

22   country?

23   **A.**   Yeah, prior to 2008, there was six legacy carriers, and

24   after 2013, we were down to three.

25   **Q.**   So did the consolidation over this time period have an

1    effect on industry capacity in your opinion?

2    **A.**   It did.  It facilitated time where the airlines could

3    grow their capacity more slowly than they would otherwise.

4    And, in fact, more slowly or at or below GDP.

5    **Q.**   And the industry's term for that is capacity discipline?

6    **A.**   It is.

7    **Q.**   Did you look to determine whether capacity discipline

8    occurred?

9    **A.**   Yes, I did.

10   **Q.**   What evidence did you consider to assess whether capacity

11   discipline occurred?

12   **A.**   I looked at two sorts of evidence, evidence from the

13   record and empirical analysis that I performed.

14   **Q.**   The first category there that you listed on the slide and

15   that you just mentioned is evidence from the record.  Can you

16   explain the significance of that sort of evidence to your

17   work as an economist?

18   **A.**   Sure.  So evidence from the record serves two purposes.

19   The first, it provides a basis for hypothesis that can be

20   taken to the data.  And second, it provides context to

21   interpret the results of the empirical analysis.

22   **Q.**   So let's first talk about some of the business documents

23   that you looked at for those purposes.  Do the documents

24   describe how the airlines define the term "capacity

25   discipline"?

1    **A.**   They do.  So here's a quote from a United Airlines

2    presentation, which basically defines capacity discipline in

3    the same way that I just defined it before.

4    **Q.**   And is this document from United typical of other

5    documents that define capacity discipline?

6    **A.**   Yeah.  You see this kind of notion of capacity discipline

7    in many of the documents.

8    **Q.**   Is capacity discipline about reducing overall capacity?

9    **A.**   No.  It's about restraining the growth of capacity.  You

10   keep it at a benchmark.  And typically they use GDP.  So they

11   keep it at or below GDP.

12   **Q.**   Did the airlines documents identify the time period in

13   which they thought capacity discipline took place?

14   **A.**   They do.  So this is another United Airlines

15   presentation, and it has this graph here.  And so the box

16   defines the capacity discipline period, according to this

17   presentation, starting at about 2009 and continuing through

18   2014.  So this document is from 2015, so just because it's a

19   box, it doesn't imply that it actually -- it ended by then.

20          And so starting at the top, the orange line is the

21   number of passengers that are being carried.  The black line

22   is GDP, and the blue line is capacity.  And so here you can

23   see, prior to the capacity discipline period, capacity was

24   growing something over two percent.  And then the recession

25   hits and you see the downturn.  And then you enter into the

1    capacity discipline, as defined by the box, where capacity

2    growth is less than GDP growth, but the passenger traffic is

3    about the same as GDP growth.  So that's going to imply that

4    load factors are going to go up during the capacity

5    discipline period.

6    **Q.**  So just to be clear, Dr. Town, the box there that in this

7    document that says capacity discipline, that's not your box,

8    that was in the document?

9    **A.**  That was in the document.  It's not my box.

10   **Q.**  And are there documents from American Airlines that

11   identify the time period during which discipline took place?

12   **A.**  They do.  So here's an American Airlines presentation

13   that's relatively recent, and it breaks up the last decade

14   into several, three different groups.  And it notes that,

15   from 2009 to 2013, that industry remained flat capacity

16   growth as a consequence of both the economic downturn and

17   mergers.

18   **Q.**  And let's go to the next slide.  And Dr. Town, there's a

19   bit of redaction on this slide.  You have an unredacted

20   version on paper, as do you, Your Honor.  So I just caution

21   you not to read that section out loud.

22           Are there documents that draw a connection between

23   consolidation and capacity discipline?

24   **A.**  There are.  There's three of them here.  The first two

25   from -- the first one from American Airlines directly states

1    capacity discipline due to consolidation, and then the Delta

2    presentation says future mergers will likely lead to more

3    capacity discipline.  And then the bottom quote explicitly

4    ties capacity -- the mergers to tacitly coordinating behavior

5    by the airlines.

6    **Q.**  Is it your opinion that capacity discipline was a

7    coordinated effort by the airlines?

8    **A.**  Yes.

9    **Q.**  Why is that your opinion?

10   **A.**  Well, the documents are clear that the airlines were

11   attempting to coordinate capacity and to signal to each other

12   that they were coordinating capacity.

13   **Q.**  And does the evidence indicate that the airlines were in

14   direct communication with each other?

15   **A.**  I don't think it says that they were in direct

16   communication with each other, but they would signal each

17   other through other means.

18   **Q.**  Are there other documents from American Airlines that

19   make this connection between consolidation and discipline?

20   **A.**  There are.  So here's a couple of quotes from American

21   executives.  The first one saying the ability to take out

22   capacity by "consolidation" and the second quote kind of is

23   concerned about the increase in capacity by its competitors,

24   American's competitors in this case.  And they're concerned

25   that this increase in capacity by the competitors will lead

1    to lower margins and revenue.

2    **Q.**  Did American Airlines executives speak out publically

3    about the need for the industry to maintain discipline?

4    **A.**  They did.  Here are a couple of -- the first quote is

5    from an American Airlines e-mail saying that Mr. Kirby was

6    making statements at a Phoenix symposium, and he said that

7    industry growth this year and in '16 is "not consistent with

8    capacity discipline."

9          And the second e-mail is from an investor who had

10   apparently had drinks with Mr. Kirby and said that Mr. Kirby

11   told him that part of the reason that he was so vocal about

12   it, about capacity discipline and capacity growth, was to

13   encourage investors to push the other carriers on capacity

14   growth.

15   **Q.**  And at this time, Scott Kirby was the president of

16   American Airlines?

17   **A.**  Oh, that, yes.

18   **Q.**  So did you also look at documents that discussed the

19   relationship between capacity discipline on the one hand and

20   capacity growth on the other?

21   **A.**  I did.  And here's an example.  This is a US Airways

22   presentation, this is prior to their merger with American,

23   and there's several things on this slide that are of note.

24   First, looking at the graph, it notes that industry mergers

25   and capacity discipline, so tying those two things together,

1    expanded margins.  And then the second thing of note is that

2    it's -- this slide is expressing concern that American had

3    plans to grow and that growth would disrupt that new dynamic.

4    So that, again, it gets back to this point that I had

5    earlier, about the tension between coordinating and the

6    tension between deviating and upset the coordinated behavior.

7         The box below the graph notes that -- that

8    American's growth will undue much of the recent capacity

9    discipline, and put pressure on revenue.

10        MS. MCDONOUGH:  Your Honor, I see it's 11 o'clock,

11   I'm happy to break whenever you like.

12        THE COURT:  All right.  That's break.  We'll take

13   the morning break now.  We'll stand in recess.

14        (Court in recess at 11:01 a.m.

15        and reconvened at 11:15 a.m.)

16        THE COURT:  You may continue.

17        MR. SCHWED:  Your Honor, before the examination, I

18   just want to raise one issue, it's actually highlighted by

19   the -- what's on the screen right now.  There are a number of

20   slides that are entitled documents from the record, and I

21   just want to be clear that a number of the documents there

22   are from the discovery record, but are not necessarily

23   admitted exhibits.  And given that Dr. Town is an expert, he

24   is -- we acknowledge that he's allowed to rely on documents

25   that are not admitted into evidence or maybe even not

admissible, but we do just want to note that and obviously we

don't --

       THE COURT:  They're not coming into evidence by

virtue of the PowerPoints demonstrative.

       MR. SCHWED:  Exactly.  And for the truth of the

matter.

       THE COURT:  I understand.  That's fine to note.

       MR. HEIPP:  And just for the Court's reference, the

PX numbers are on the bottom, if you ever want to look at

them.

BY MR. HEIPP:

**Q.**  Dr. Town, before you break, you had just finished

describing the ordinary course business documents that you

reviewed for your analysis.  Were there any other sources

that you reviewed for your analysis, other than your

empirical work, which we'll talk about?

**A.**  I did.  I turned to the academic work on this topic.  And

there's two notable studies that are worth discussing.  The

first one is a quote from a leading airline industry

textbook, the co-authors -- the authors.  There's three

authors to this book, but they are MIT professors, and they

note that the mergers led to a strategy of capacity

discipline, and that allowed the competitors to increase

their load factors and yields, that is, through fares.

       And then the second study that's, I think, pretty

1    interesting, is a paper entitled "Coordinated Capacity

2    Reductions and Public Communications in the Airline

3    Industry," so the title of the paper kind of tells you what

4    it's about.  And as I was mentioning earlier, there was some

5    evidence that the airlines were signaling about their

6    capacity intentions through investors, and this study

7    examined that question specifically, by looking at earnings

8    calls and seeing how many times during the earnings call they

9    mentioned the word "capacity discipline," and relating it to

10   other whether the carriers were using that terminology, and

11   when both carriers, legacy carriers, were using the word

12   "capacity discipline" during their earnings calls there was a

13   subsequent decline in capacity.  And in this paper, they

14   conclude that that subsequent decline in capacity suggests

15   that the -- that that was economically significant and it

16   most likely harmed consumers.

17   **Q.**  Thank you, Dr. Town, a moment ago you said both legacy

18   carriers, I think?  Did you mean --

19   **A.**  The set of legacy carriers, I'm sorry.

20   **Q.**  So let's turn now to your empirical analysis.  Can you

21   describe that analysis at a high level?

22   **A.**  Sure.  So in this empirical analysis, what I'm doing is

23   trying to assess the patterns and capacity data and how they

24   are consistent with the documentary record regarding capacity

25   discipline.

**Q.**   So what kind of empirical analysis did you conduct?

**A.**   I conducted a regression analysis, which is a common tool used in economics and cross-disciplines to analyze the statistical relationship between multiple variables.  So in a regression analysis, there's going to be an outcome variable, and that outcome variable is going to be explained by explanatory variables.  Some of those variables will be the variables of interest, and there will be the other explanatory variables included in the analysis.

**Q.**   And we'll talk in more details about those variables in a minute.  But just at a basic level, can you explain why you used the regression to address the question that you wanted to answer?

**A.**   Sure.  So a regression analysis allows me to assess the impact of capacity discipline, holding other factors kind of following their historical pattern, and to assess kind of the impact and timing of capacity discipline.

**Q.**   So let's dive in.  And can you explain the regression equation that you used?

**A.**   Yeah.  So it's on the screen here.  So let me start from -- and the regression equation is the equation on the screen.  Let me start on the left-hand side.  So the explanatory, the outcome variable is the logarithm of available seat miles.  So that is the measure of capacity here.  This will be at a quarterly frequency.  So I have data

1    every quarter on the amount of capacity that was available in

2    the industry.

3    **Q.**  Can I disrupt you, Dr. Town, just to ask you what

4    logarithm is?

5    **A.**  Sure.  Logarithm is a common transformation that

6    economists use to make the coefficients easier to interpret.

7    So the coefficients become sort of a percentage change, and

8    they have a percentage change interpretation.

9    **Q.**  And it makes them more easily comparable?

10   **A.**  It makes them easily comparable and easy to interpret.

11   **Q.**  So on the right-hand side of the equation, can you

12   explain what the annual indicators are?

13   **A.**  Yeah.  So the annual indicators are very important here.

14   They are going to measure the deviation of capacity from its

15   historical patterns during the capacity discipline period.

16   So an annual indicator was one that would take a value of

17   one, in, say, 2009, a value of one in 2010 and so on.  So

18   it's denoting the various years.  And those annual indicators

19   go from 2009 to 2019.

20          And then the other explanatory variables in this

21   regression is the logarithm of GDP and the logarithm of fuel

22   prices.

23   **Q.**  And we'll talk more about those variables in just a

24   moment.  But first, does your regression equation make any

25   assumptions about whether or when capacity discipline

1    occurred?

2    **A.**   No, it does not.  It lets the data speak to that

3    question.  The data will tell -- basically the data tells the

4    beta coefficients whether there was capacity discipline or

5    not.

6              And how I use this equation to assess whether

7    there's capacity discipline, I essentially turn off the

8    impacts of capacity discipline, that's those beta

9    coefficients, and predict what capacity would have been, if

10   capacity discipline had not occurred.

11   **Q.**   The beta coefficients that you referred to, those are the

12   annual indicators that you described?

13   **A.**   Yeah.  Those are on the annual indicators that will pick

14   up the affects of capacity discipline.

15   **Q.**   So when you turn those indicators off, what is the

16   capacity on the left-hand side?

17   **A.**   It's the predicted -- it becomes the capacity without

18   capacity discipline, as it's related to its historical -- as

19   its historical relationship between GDP and fuel prices.

20   **Q.**   So let's talk about those variables.  So the first

21   explanatory variable that you chose is GDP; is that right?

22   **A.**   Yes, it is.

23   **Q.**   Can you explain why you used GDP?

24   **A.**   Sure.  There's documents in the record that specifically

25   call out as capacity as being related to GDP.  And here's

1    three quotes.  And one of the quotes is from this trial, in

2    fact.

3    **Q.**  Does this focus by the airlines on GDP make sense to you

4    as an economist?

5    **A.**  It does.  When GDP goes up, the demand for air travel is

6    going to go up, and capacity will expand to accommodate that

7    increase in demand.

8    **Q.**  So the second variable that you described a moment ago

9    was jet fuel prices.  Why did you choose that as an

10   explanatory variable?

11   **A.**  Well, it's important to consider costs.  They're going to

12   affect capacity.  And the document specifically mentioned

13   fuel prices as affecting capacity.

14   **Q.**  And finally, the third variable in the equation was

15   "Recession Effects."  Can you explain what that is?

16   **A.**  Sure.  So I included recession effects to allow more

17   flexibility into the model.  Capacity may respond differently

18   to GDP during expansions relative to contractions.  And so by

19   including the recession effects, I'm incorporating some more

20   flexibility.

21   **Q.**  Was that particularly important to you for this analysis?

22   **A.**  It -- it was.  Because we saw in the documents that

23   capacity discipline started around 2009, and that's

24   concurrent with the Great Recession.  And you don't want to

25   confound those two things.

1  **Q.**  Can you explain how the recession effects work, how they

2  account for the effects of the recession?

3  **A.**  Sure.  So they account for the effects of the recession

4  by changing the relationship, allowing the data to have a

5  different relationship to GDP during recessions, versus when

6  the economy is not in a recession.  So it just allows a

7  flexible pattern there.

8  **Q.**  Have the defendants' experts criticized your analysis for

9  not including other explanatory variables?

10  **A.**  They have.

11  **Q.**  And what do they say you should have included?

12  **A.**  They say I should have included load factor and

13  unemployment.

14  **Q.**  Taking the first one first, did you consider including

15  load factor as an explanatory variable?

16  **A.**  No.

17  **Q.**  Why not?

18  **A.**  Load factor is endogenous in this -- in that equation,

19  which means that it is actually determined by the equation

20  and you can't include kind of endogenous variables in your

21  analysis, otherwise that will lead to incorrect statistical

22  inference.

23  **Q.**  So what is the definition of load factor as you have it

24  here on this slide?

25  **A.**  Sure.  So load factor is revenue passenger miles divided

1    by available seat miles.  So it's the amount of passengers

2    that were flown, given the capacity that was available.

3    **Q.**  And so why is -- or why would be, why would load factor

4    be endogenous in your regression equation?

5    **A.**  So, it's going to be endogenous here.  You can see in the

6    equation, I included load factor, and you can see that load

7    factor, which contains ASMs in it by definition, but that's

8    the thing that we're trying to explain is ASMs.  So you're

9    trying to explain the thing with the thing that you're using,

10   trying to explain.  So that's endogeneity.  So what will that

11   do in this system, in this equation, will confound the

12   effects of capacity discipline, because you have capacity

13   being discipline effecting capacity, but in this frame work,

14   capacity discipline is to be picked up by those annual

15   indicators, and so you'll confound those two effects and

16   you'll lead to incorrect differences.  You'll be attributing

17   capacity discipline to the load factor, instead of two the

18   annual indicators.

19   **Q.**  And moving on to unemployment.  Did you consider using

20   unemployment as a variable?

21   **A.**  I considered it.  And ultimately did not include it in my

22   model, because the documentary evidence suggests that

23   airlines don't consider unemployment, to the same degree that

24   they do GDP.  In capacity decisions.

25   **Q.**  Does adding unemployment to your regression change your

1    conclusions about capacity discipline?

2    **A.**   No, they don't change whether capacity discipline

3    existed, and whether it was an economically meaningful event.

4    **Q.**   What do you mean by an economically meaningful event?

5    **A.**   It had a large impact on capacity.

6    **Q.**   So after you ran your equation and came up with your

7    results, can you explain what you found?

8    **A.**   Sure.  So this graph depicts the results.  So the blue

9    line is the actual capacity that materialized in the industry

10   from 1992 to 2020.  And then the green line is the

11   predictions from the regression model, taking out the effects

12   of capacity discipline.  So this is removing capacity

13   discipline and saying what capacity would have materialized

14   in the market based on capacity's historical relationship

15   between GDP and fuel prices.  And so you can see that the

16   green line and blue line track each other very closely, up to

17   about 2008, 2009, which is concurrent with the

18   Delta/Northwest merger.  Then you see a divergence between

19   the two lines, where the actual capacity is less than what

20   would be predicted by the model, removing capacity

21   discipline.  And it -- the gap continues and then closes by

22   the end of the decade.

23   **Q.**   About how much lower was capacity during this period

24   represented by the deviation in the two lines, on average?

25   **A.**   It was about 9.5 percent lower.

1   **Q.**   Now, that's per quarter?

2   **A.**   Per quarter, yeah.

3   **Q.**   This is a small thing, but can you explain why the lines

4   on the graph go up and down?

5   **A.**   Yeah, the saw tooth pattern there is a consequence of

6   seasonality, air travel demand is higher in the summer, so

7   capacity responds to that demand by expanding.

8   **Q.**   You're aware, Dr. Town, that there was some turmoil in

9   the airline industry, including a number of bankruptcies

10   during part of this period.

11            Does your analysis account for that?

12   **A.**   It does.  First of all, almost all of those bankruptcies,

13   except American, occurred prior to the capacity discipline

14   period.  And then in a robustness model, I allowed those

15   annual indicators to extend backwards.  So I had annual

16   indicators from 2002 onward, which would pick up the effects

17   of bankruptcy in the same way that my base model is picking

18   up the impacts of capacity discipline.  And that model

19   looks -- the results from that model look very similar to the

20   one in front of you, indicating that those bankruptcies

21   really did not disrupt the relationship between GDP, fuel

22   prices, and capacity.

23   **Q.**   So that robustness model that you mentioned was intended

24   specifically to capture any effects of the bankruptcies on

25   capacity?

1    **A.**  I'm sorry, can you repeat that now?

2    **Q.**  The robustness model that you just described, that was

3    intended to pick up any effects of the bankruptcy?

4              MR. SCHWED:  Objection, leading.

5              MR. HEIPP:  Can you -- I'll rephrase, Your Honor.

6    BY MR. HEIPP:

7    **Q.**  Can you explain again your robustness model and exactly

8    how it worked to account for the effects of the bankruptcies?

9    **A.**  Sure.  So the robustness model accounted for the effects

10   of the bankruptcies by extending the annual indicators, which

11   in the base model are from 2009 onwards.  They extended those

12   backwards in time.  So it started in 2002, all the way

13   through 2020.  And so any impact on the bankruptcies on

14   capacity would show up in that analysis in the same way that

15   capacity discipline shows up here.  In that analysis shows

16   that those bankruptcies did not have a meaningful impact on

17   this relationship that is -- the results from that model look

18   very similar to this model.

19   **Q.**  Can you determine -- or did you determine from the data

20   which airlines were most responsible for the divergence

21   between preticketed and actual capacity?

22   **A.**  I did.  So here's the same model, but just focusing on

23   legacy carrier capacity.  So this is -- just the data for

24   this model is just the legacy carriers, so you can see that

25   the divergence between what actually occurred and what was

1    predicted, that is the capacity discipline effect, was very

2    pronounced for the legacy carriers and extended, in a similar

3    pattern, to what we saw before, through the end of the decade

4    or so.

5    **Q.**   Did you also look at the nonlegacy carriers?

6    **A.**   Yeah.  So here I did the same analysis, but then focusing

7    on the nonlegacy carriers.  And here you see a very different

8    pattern.  You see the actual and predicted, again, track each

9    other very closely, up until the Delta/Northwest merger.  And

10   then you see a divergence, but it's the reverse of the

11   divergence that we saw before.  Here you see that, actually,

12   the actual is higher than the predicted.  So what that is

13   suggesting is that during the capacity discipline period, the

14   nonlegacy carriers were actually expanding a little bit of

15   capacity, or expanding a meaningful amount of capacity,

16   during that period; which makes sense, because since the

17   legacy carriers are growing more slowly, the nonlegacy

18   carriers are kind of filling in some of that reduced capacity

19   with their own expanded capacity.

20   **Q.**   Did that growth by the nonlegacy carriers offset the

21   growth -- the slower growth by the legacy carriers?

22   **A.**   No, it did not.  And you can see that in the original

23   figure that I showed, which showed all carriers, which

24   included the LCCs and the ULCCs, and you saw that there was a

25   gap there, which would have included any kind of expansion by

1    the LCCs or ULCCs during this period.

2    **Q.**  Did JetBlue exercise capacity discipline during this

3    period?

4    **A.**  No, they did not.  The evidence suggests that they did

5    not.

6    **Q.**  Can you explain what these graphs are depicting here on

7    this slide?

8    **A.**  So this is figures of capacity for the four large

9    carriers and JetBlue, focused on Northeast routes.  And I

10   focused on Northeast routes because 87 percent of JetBlue's

11   capacity is devoted to Northeast routes.  So a Northeast

12   route here, under this definition, it has an originating or

13   ending point in the Northeast.  So Boston to LAX is in this

14   route, is in this data, and Boston to DCA is in this data.

15          And you can see that JetBlue, which is the blue

16   line, because they're blue, they're growing the far -- I

17   should say the far-left graph is depicting the percentage

18   change over time, so the cumulative percentage change over

19   time in capacity in the Northeast for these five carriers.

20   And you can see, starting from a base in 2009, by 2019,

21   JetBlue was about 70 percent larger than it was in 2009.

22          And then on -- but JetBlue is a smaller carrier, so

23   the percentage change might overstate its impact, so on the

24   right side is the cumulative change in total capacity by each

25   of the carriers.  And you can see JetBlue, even though it's a

1    smaller carrier, they grew faster than all the other
2    carriers, until the very end, where Delta/Northwest was about
3    tied with JetBlue.
4    **Q.**  Did you also look at JetBlue's growth across the whole
5    country?
6    **A.**  I did.  And those results are depicted in this figure.
7    So again, it's broken out in the same way, where on the
8    left-hand side, we have the percentage change in capacity,
9    and the right-hand side, we have the level change.  And as a
10   percentage change, JetBlue is growing faster than any of
11   these carriers on -- over this decade.  And it's close to
12   70 percent, which is not surprising, given we saw 70 percent
13   on the previous figure, and that's where most of JetBlue's
14   capacity resides.
15          And then on the far-right graph, we see the
16   absolute change in capacity over this time period.  And you
17   can see, at least over the early parts of the decade, JetBlue
18   added more capacity than US, American, and Delta and
19   Continental -- or US Air/Continental.  But even by the end of
20   the decade, they had added more capacity than
21   United/Continental.  And JetBlue was a much smaller airline.
22   **Q.**  So turning to the next slide, did your analysis show that
23   capacity discipline weakened at some point in time?
24   **A.**  It does.  And so here's the original figure I showed, and
25   you can see -- and I mentioned this earlier -- that around

1    2015/2016, the distance between the green and blue line is

2    shrinking, and that's indicating that the capacity discipline

3    period is unwinding over that period, because the deviation

4    is smaller.  And then by 2018, the lines come back together,

5    again, suggesting that by this time, the capacity discipline

6    had completely unwound.

7            And that is consistent with the documentary

8    evidence that shows that around 2014, 2015, 2016, capacity

9    discipline started to unwind.

10   **Q.**  Do you know why capacity discipline unwound around that

11   time?

12   **A.**  I can't say exactly where it unwound, but going back to

13   that earlier discussion about the tension between the

14   benefits of cooperating versus the benefits of not

15   cooperating, this suggests that those benefits tilted towards

16   not cooperating during the late part of -- middle to late

17   part of the decade.

18           And I think it's also worth noting that in 2015, it

19   became public that the Department of Justice was

20   investigating the airlines for capacity discipline.

21   **Q.**  So let's turn now to your evaluation of the Northeast

22   Alliance and its impact on capacity discipline.  But just at

23   a basic level, can you explain why this historical event of

24   capacity discipline is relevant to us in 2022?

25   **A.**  Sure.  So the previous period of capacity discipline

1    initiated after a Great Recession, and also the consolidation

2    of airlines.  Today, we have a lot of capacity that's been

3    taken out because of the pandemic, and we have consolidation

4    in the form of the NEA in the industry.

5    Q.   Does the recovery from the pandemic present an

6    opportunity?

7    A.   It does.  It's an opportunity for the airlines to

8    restrain capacity growth.

9    Q.   A moment ago you talked about how capacity discipline

10   weakened because Delta and United started to grow more

11   aggressively.  Did American recognize that?

12   A.   They did.  So here's another figure from a presentation

13   deck from American, from 2019.  First of all, this figure

14   from 2019 aligns with the capacity discipline figures I have

15   been presenting that shows that the legacy carriers were

16   growing less than GDP, up until 2015/'16, where they started

17   growing more aggressively.  And the deck notes that American

18   is going to need to grow consistently with the other

19   airlines.

20   Q.   So what, if anything, did American do in response to

21   that?

22   A.   So this is a figure from a deck that was presented at an

23   American board line -- board meeting, and it's showing that

24   by adding the JetBlue's network through the NEA, they forego

25   that organic growth and are able to borrow JetBlue's network

1    to grow synthetically, instead of organically.

2    **Q.**   So what is the connection between American not growing

3    organically and industry capacity?

4    **A.**   By American not growing organically, since they're a

5    large carrier, they're not adding their capacity to the

6    industry by not growing organically.  And second, they don't

7    risk engendering a competitive response from the other

8    carriers by growing more aggressively.

9    **Q.**   Can you explain what a competitive response is?

10   **A.**   Well, a competitive response would be the other carriers

11   recognizing that American is growing and that they would

12   accelerate their growth.

13   **Q.**   And what effect would that have on industry capacity?

14   **A.**   And that would also, by not inducing that growth by the

15   competitors through the competitive response, it reduces

16   industry capacity.

17           THE COURT:  Why wouldn't a competitor respond to an

18   alliance?  Why wouldn't they view it as American expanding in

19   some way and want to respond?  You're suggesting that if

20   American had bought a whole bunch of planes and put them in

21   on all these routes where either Alaska is or JetBlue is,

22   that would invite a competitive response from Delta or

23   United, right?

24           THE WITNESS:  Yes.

25           THE COURT:  Why wouldn't it invite a competitive

1    response if -- I recognize they haven't added more planes to

2    the total number of planes that they owned at that one

3    moment, but why wouldn't it invite a competitive response in

4    some form?

5            THE WITNESS:  It certainly could, but I think

6    they're already -- they're not changing the capacity that's

7    available.

8            THE COURT:  In the sense of the overall.

9            THE WITNESS:  In the sense of the overall capacity,

10    and so that's an important difference between those two

11    scenarios.

12            THE COURT:  Wouldn't it give them a different

13    negotiating conversation with the -- with the -- whoever is

14    financing the planes?  That's how they add capacity, right?

15    They buy planes or lease planes.

16            THE WITNESS:  Yeah, that's how they add capacity.

17    That's correct.  Yeah.

18            THE COURT:  And presumably, they have to do that

19    either with cash.

20            THE WITNESS:  Yeah.

21            THE COURT:  Or with financing of some form or

22    another?

23            THE WITNESS:  Yeah.

24            THE COURT:  And even if it's with cash, it's a

25    financial decision, then, with their shareholders.  It's a

1    financial analysis either way.

2              THE WITNESS:  It is, yeah.

3              THE COURT:  At least there is some suggestion, why

4    wouldn't they invite a competitive response.  They would be

5    looking at it and say, wow, they can add all of these, they

6    can do these different things, assuming Delta and United care

7    about what they're -- view this as threatening them in some

8    way, and they're doing it potentially more cheaply.

9              THE WITNESS:  Yeah.  Well, I think the different is

10   that adding capacity organically, that is actually expanding

11   the available capacity, and I think that has a bigger direct

12   impact on the competitive response.  By growing

13   synthetically, there's no physical expansion of capacity, and

14   that's a meaningful difference between the two.

15             THE COURT:  So your view is you're more likely to

16   get a competitive response from an organic growth than a

17   synthetic growth.

18             THE WITNESS:  Yeah, I think that's true.

19             THE COURT:  I see.  Okay.  Why is that?

20             THE WITNESS:  Because there's more seats to fill in

21   the industry, and so there's going to be more, you know,

22   response to those seats being available, relative to if

23   they're growing synthetically.

24             THE COURT:  Okay.  Thank you.  Go ahead.

25   BY MR. HEIPP:

1    **Q.**   And Dr. Town, how would you expect the airlines to

2    compete to fill those extra seats if those extra seats were

3    available?

4    **A.**   So the more seats that were available, and I think

5    there's been testimony on this at trial, that the fares have

6    to go down in order to fill those seats.

7    **Q.**   Did you consider evidence in the record from Delta and

8    United about whether they have responded to the NEA?

9    **A.**   I did.

10   **Q.**   What did you consider?

11   **A.**   I considered some deposition testimony that they had made

12   on this point.

13   **Q.**   What specifically are you thinking about?

14   **A.**   The --

15   **Q.**   What did they say?

16   **A.**   Oh, what did they say.  They said that the NEA was not,

17   you know, engendering a significant competitive response.

18   **Q.**   Is it your opinion that American and JetBlue will reduce

19   their capacity at the NEA airports?

20   **A.**   Not necessarily.  Capacity discipline is about growing

21   more slowly than some benchmark like GDP.  And so they may

22   grow at NEA airports in absolute level, but less than they

23   would, otherwise.

24        And additionally, growth at NEA airports has an

25   opportunity cost, particularly for JetBlue, because it's

1   fleet constrained.  And so by growing at the NEA, at the NEA

2   airports, they have to borrow from some other parts of their

3   network to fund that.

4   **Q.**  So let's talk specifically about JetBlue.  Can you

5   explain a little more about what you were just saying about

6   how JetBlue factors into the NEA's impact on capacity

7   discipline?

8   **A.**  Sure.  So JetBlue is a maverick.  It was growing much

9   faster than the other carriers during the capacity

10  discipline, and it was mitigating the impact of the capacity

11  discipline period by growing faster.  The NEA aligns

12  JetBlue's incentives with American.  And by prioritizing

13  growth in the Northeast, it compromises growth elsewhere.

14  **Q.**  So can you explain how all of these factors that you

15  you've just discussed lead to your conclusion about the NEA

16  restoring capacity discipline?

17          THE COURT:  Can you just pause on that -- wait,

18  before you answer that question.  Sorry.

19          The NEA prioritizes growth in the Northeast, so

20  that compromises growth elsewhere.

21          THE WITNESS:  Correct.

22          THE COURT:  That is because there's a fixed pool of

23  planes.

24          THE WITNESS:  Correct.

25          THE COURT:  So NEA minus one day, there's a certain

1    number of planes and seats.

2                THE WITNESS:  Yeah.

3                THE COURT:  NEA plus one day, same number of

4    planes, can't get -- unless there happened to be a plane

5    delivered on that day, can't get new planes in one day.

6                THE WITNESS:  That's correct.

7                THE COURT:  And probably can't even reconfigure the

8    plane with more seats or different configuration of seats in

9    that narrow window of time.

10               THE WITNESS:  In that narrow window of time,

11   correct.

12               THE COURT:  But over time -- I guess my question

13   is, is there some effect that you perceive or don't perceive

14   from the NEA with respect to the ability to, like,

15   essentially get more planes or expand?

16               THE WITNESS:  There may be, right?  But to make

17   that assessment, it goes back to my apples-to-apples chart,

18   that you have to make the right comparison.

19               THE COURT:  Right.

20               THE WITNESS:  You have to know exactly what is the

21   set of resources that would be available under the NEA,

22   compared to the set of resources that would be available

23   without the NEA, in kind of an apples-to-apples way.

24               THE COURT:  Right.  Okay.  Got it.  Thank you.  Go

25   ahead.

1    BY MR. HEIPP:

2    **Q.**  So Dr. Town, can you just describe how the factors that

3    you've been describing about American and JetBlue and the

4    NEA, how those lead to your ultimate conclusion about

5    capacity discipline and the NEA?

6    **A.**  Sure.  So going back to the point that I made earlier

7    about these times being similar in important ways to the

8    beginning of the capacity discipline period, that we have

9    seen consolidation in 2009 that facilitated capacity

10   discipline, and today we have the NEA, which is a form of

11   consolidation.

12           Second, there was a lot of industry capacity was

13   shed during the Great Recession.  So around 2009, there was

14   much less capacity in the industry than there was prior

15   because of the Great Recession.  Here we have a lot less

16   capacity in the industry because of the pandemic.  So the

17   ground is kind of fertile, in some ways, for the same sort of

18   capacity discipline to arise.

19           MS. MCDONOUGH:  Thank you, Dr. Town.

20           I can pass the witness, Your Honor.

21           THE COURT:  All right.  Cross-examination.

22           MR. SCHWED:  Thank you.  We'll hand out some

23   binders with exhibits and transcripts.

24           THE COURT:  Okay.

25           THE DEPUTY CLERK:  Can I just get one more set?

1    Sorry.  Thank you.

2              THE COURT:  Go ahead, whenever you're ready.

3              MR. SCHWED:  Thank you, Your Honor.

4         **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT JETBLUE**

5    BY MR. SCHWED:

6    **Q.**  Good morning, Dr. Town.

7    **A.**  Good morning.

8    **Q.**  Let's start by talking about your experience.  It's fair

9    to say that you specialized in health economics.  Is that

10   fair?

11   **A.**  I think that's fair, yeah.

12   **Q.**  And in the last ten years, you published more than 20

13   peer-review articles, all of which relate to health

14   economics?

15   **A.**  I do, yeah.

16   **Q.**  And you haven't published in the last ten years, or ever,

17   a peer-review article related to the airline industry,

18   correct?

19   **A.**  I've published in a nonpeer-reviewed setting, yeah.

20   **Q.**  Let's see, you published one article in a

21   nonpeer-reviewed setting while you were a grad student,

22   right?

23   **A.**  That's correct.

24   **Q.**  And then you published one article related to airlines in

25   2018, in a book chapter that you testified about already,

1  right?

2  **A.**   That is correct.

3  **Q.**   That is the entirety of your publications in the airline

4  industry?

5  **A.**   Publications but not experience.  That's correct?

6  **Q.**   And you've never had a peer-reviewed article in the

7  airline industry or any transportation sector?

8  **A.**   No, I have not.

9  **Q.**   And then your CV, which is attached to your report,

10  includes a list of about 35 presentations and speeches and

11  things like that, that you've made, correct?

12  **A.**   Yeah, I'm sure it's true.

13  **Q.**   And most of those are healthcare related?

14  **A.**   I'm sure most of them are.

15  **Q.**   Maybe some oil and gas in there?

16  **A.**   Yeah, I have -- yeah.

17  **Q.**   And nothing related to the airline industry, correct?

18  **A.**   I'd have to go view, but it wouldn't surprise me, no.

19  **Q.**   And you're affiliated with a company -- when you were

20  listing all of your affiliations, you did mention, you are

21  affiliated with Charles River Associates?

22  **A.**   Yeah, I am affiliated.

23  **Q.**   You're a senior consultant, I think?

24  **A.**   Yeah, I am.

25  **Q.**   And their website says your work concentrates on the

1    "intersection of government policy and provider and insurance

2    competition in healthcare industries," right?

3    **A.**   I'm sorry, can you repeat that question?

4    **Q.**   Yeah.  Their website says that your work concentrates on

5    the "intersection of government policy and provider and

6    insurance competition in healthcare industries."  Is that an

7    accurate statement of your concentration?

8    **A.**   It is of my concentration, but, of course, concentration

9    is not the only thing I do.

10   **Q.**   But Charles River Associates website doesn't say anything

11   about airlines for you, does it?

12   **A.**   I would have to check, but it probably doesn't.

13   **Q.**   And then during the course of your career, you've done

14   consulting for healthcare companies, hospitals, things like

15   that, right?

16   **A.**   I have.

17   **Q.**   You've never consulted for any airline, correct?

18   **A.**   For an airline?

19   **Q.**   For an airline.

20   **A.**   I've been approached, but, no, I haven't for an airline.

21   **Q.**   You mentioned some analysis that you did on mergers.

22   That was all for the Department of Justice?

23   **A.**   All of the -- yeah, all of the work that I have done from

24   the airlines is with the Department of Justice.

25   **Q.**   And in fact, when I asked you about your experience

1    working for an airline, the closest thing that you were able

2    to identify was your work for Amazon, which owns some cargo

3    planes, right?

4    **A.**  It does.  But I'm not sure -- I was kind of joking a

5    little bit.

6    **Q.**  Okay.  Went over my head.

7              Let's turn to your opinion that the Northeast

8    Alliance?

9              THE COURT:  So you didn't -- you didn't consult

10   with Amazon about --

11             THE WITNESS:  No, I didn't --

12             THE COURT:  Not with respect to their air fleet.

13             THE WITNESS:  Or they're not an airline.  I was

14   joking that they're not an airline.

15             THE COURT:  Not yet.

16             THE WITNESS:  Which was my joke, which apparently

17   didn't go over very well.

18             THE COURT:  Just wear a black robe, you'll become a

19   lot funnier.

20   BY MR. SCHWED:

21   **Q.**  Let's turn to your opinion that the NEA increases your

22   risk that the capacity discipline will return to the

23   industry.  And again, you defined capacity discipline to

24   refer to legacy carrier decision, sometimes coordinated to

25   grow capacity more slowly than they otherwise would, correct?

1    **A.**   That's sounds correct.

2    **Q.**   Okay.  And so in your opinion is that the large carriers

3    engaged in capacity discipline beginning in 2019 -- 2009

4    until at least 2016?

5    **A.**   I don't think I said at least, I think it's, you know, in

6    that period.

7    **Q.**   In that -- well, you said it began to unravel around

8    2016?

9    **A.**   2000 -- well, it depends on which set of, you know,

10   information you want to look at.  But the documents suggest

11   around 2014 onwards and the data analysis suggests around

12   2015 onwards.

13   **Q.**   Just to be clear, the opinion in your report was -- and

14   when you testified at deposition, was that it began to

15   unravel in 2016, right?

16   **A.**   I have to look at my report, but it's in that time frame.

17   **Q.**   You don't remember when you -- you don't remember your

18   conclusion as to when capacity discipline began to unravel?

19   Wasn't that kind of the heart of your work?

20   **A.**   Well, I do remember it began to unravel around 2015/2016.

21   I mean, the reason there's not one firm date is because the

22   lines are coming together during that period, but there's

23   also some noise around that.  And so you know, there's going

24   to be a statistical noise around which -- as the lines

25   come -- you know, are moving.  And so that's going to make,

1    you know, specifically identifying a point in time not

2    possible.

3    **Q.**  But your report was that it was around 2016, correct?

4    **A.**  Yeah, I think that's right.

5    **Q.**  Okay.  Now, your view is that there was sometimes

6    coordination, at least tacitly, correct?  In the period.

7    **A.**  Yes.

8    **Q.**  And so there were also periods between 2009 and '16 where

9    there was capacity discipline that was not coordinated,

10   right?

11   **A.**  I don't think I said that.

12   **Q.**  Okay.  Can you open your transcript to page 104.  And

13   then beginning on line 16, "But there could be periods when

14   you find capacity discipline, but there was no coordination?

15   I guess I could, I don't know" --

16                THE COURT REPORTER:  I'm sorry.  Can you say -- I

17   can't tell where the question and answer is.

18                MR. SCHWED:  Okay.

19                "QUESTION:  But there could be periods when you

20   find capacity discipline, but there is no coordination?

21                "ANSWER:  I guess I could, I don't know.  I mean, I

22   think, you know, if it's understood that you're in capacity

23   discipline.  Then even though you're not coordinating

24   directly, you're kind of coordinating.

25                "QUESTION:  So do you mean -- are you saying that

1    whenever you say there's capacity discipline, there is at a

2    minimum tacit conclusion?

3             "ANSWER:  I'm not saying that at all."

4             That was your testimony, right?

5             THE WITNESS:  That's what it says.

6             THE COURT:  Okay.  Well, that's what it says, or

7    that's what your testimony.  He's asking -- we all know what

8    it says.

9             THE WITNESS:  Yeah.

10            THE COURT:  But he's asking you, is that your

11   testimony?

12            THE WITNESS:  Well, it's my -- yeah, it's my

13   testimony, but, you know, during the capacity discipline, you

14   know, were they communicating, were they completely in

15   coordination in every moment of every -- during that period?

16   Impossible to say.  But what we can say is that the data is

17   consistent with them coordinating over that entire period.

18   BY MR. SCHWED:

19   Q.  But you're not saying that there was tacit collusion,

20   even tacit collusion during the entire capacity discipline.

21   Are you or are you not?  Just what's your testimony?

22   A.  My testimony is that they engaged in capacity discipline,

23   which is an arrangement wherein they were accommodating each

24   other's behavior.  Now, that could be tacit collusion, it

25   could be just some softening of competition, there is kind

1    of -- there's not an exact precise way in which it might

2    manifest.  But with how it does manifest is growing more

3    slowly capacity than GDP.

4    **Q.**  It could be unilateral conduct, right?

5    **A.**  I think there's evidence that it's not.

6    **Q.**  So is it now your testimony, because it wasn't your

7    testimony when you were deposed, that you have ruled out

8    that, during the entire period, any of the capacity

9    discipline was a result of unilateral conduct?

10            MR. HEIPP:  Objection.  Misstates his testimony,

11   both here and in his deposition.

12            THE COURT:  Well, overruled.  It's

13   cross-examination.  He's just asking him.

14            THE WITNESS:  Can you repeat the question again?

15   BY MR. SCHWED:

16   **Q.**  Yeah, is it now your testimony, contrasting to what you

17   said in your deposition, that you have ruled out that any,

18   what you called capacity discipline, was the result of

19   unilateral conduct during the period?

20   **A.**  Could some units of capacity had been added that didn't

21   fall exactly under the purview of capacity discipline, sure.

22   But that academic article that I referred to studied that

23   exactly question and looked at whether the -- when the

24   carriers announced capacity discipline and no one else did,

25   did it lead to a unilateral increase, and the answer was no.

1    Q.  I'm not asking for the academic literature.  I'm asking

2    for your opinion.  Is it your opinion that the -- what you

3    call capacity discipline -- let me start there.

4            Would you call capacity discipline could be

5    unilateral or could be collusive, right?  You've defined it

6    as sometimes.  Correct?

7    A.  Sometimes coordinated.

8    Q.  So it could be uncoordinated, right?

9    A.  Coordinated or understood.  I mean, if they're

10   accommodating, I think that's capacity discipline.  It might

11   not be coordinated.

12   Q.  So you've changed from your original testimony.  It is

13   now your position that all capacity discipline during the

14   entire period was at least the result of tacit coordination?

15   A.  I don't think I said that.

16   Q.  Well, just answer one way or the other.  Was it all the

17   result of at least tacit coordination or not all the result

18   of at least tacit coordination?  Just tell me one way or the

19   other.  Pick a position, right now.

20           THE COURT:  Well, just a question, not --

21           MR. SCHWED:  Please pick a position.

22           MR. HEIPP:  Objection.  Asked and answered.

23           THE COURT:  That's not a question.

24   BY MR. SCHWED:

25   Q.  Could you please let me know --

1        MR. SCHWED:  Thank you, Your Honor.

2    BY MR. SCHWED:

3    **Q.**  Could you please let me know, one way or the other, what

4    your current opinion is.  Was all alleged capacity

5    coordination the result of at least tacit coordination during

6    the period that you identified?

7    **A.**  Across all carriers?  No.

8    **Q.**  Okay.  Let me rephrase it.

9        Was all alleged capacity discipline, among the

10   three legacy carriers, at least the result of tacit

11   coordination during the period that you've identified tacit

12   collusion?

13   **A.**  It could be more aggressive.  It could be actual

14   collusion.  It could have been more accommodating conduct and

15   understanding.  So there -- you know, with those all fall

16   under the purview of capacity discipline, that is, growing

17   more slowly than GDP, sometimes coordinated, I think my

18   definition is pretty clear.

19   **Q.**  And therefore, sometimes uncoordinated?

20   **A.**  It doesn't say "sometimes."  It could be all the time.

21   **Q.**  Well, do you have an opinion, one way or the other,

22   whether sometimes is all the time or not?  That is my

23   question?

24   **A.**  It is at least sometimes.

25   **Q.**  And you don't know whether it is always, always?

1    **A.**   Well, I mean, that's a -- you know, was one seat in one

2    place added because of a unilateral decision?  You know,

3    that's possible.

4    **Q.**   You're aware that a number of airlines filed for

5    bankruptcy protection in the years leading up to the alleged

6    capacity discipline period?

7    **A.**   I am.

8    **Q.**   And you didn't even mention that in your moving report,

9    did you, in your opening report?

10   **A.**   I didn't mention it in my opening report, but I did

11   mention it in my reply report.

12   **Q.**   You mentioned it in your reply reports after opposition

13   reports called you out for that, correct?

14   **A.**   I wouldn't say called me out.  I think they made that

15   point, and my reply report showed that that actually wasn't

16   relevant for the analysis, that it didn't impact it at all.

17   **Q.**   But you hadn't thought it was worth mentioning in your

18   initial report?

19   **A.**   No, because, one, those capacity -- those bankruptcies

20   occurred prior to the capacity discipline period; and two,

21   bankruptcies are renegotiations of contracts.  That's one of

22   the things that occurs with them.  So, you know, that's --

23   it's not that they're going out of business, per se, but

24   they're restructuring.

25   **Q.**   And part of restructuring is to attempt to fix the

1    problems that got you into bankruptcy in the first place,

2    right?

3    **A.**  I -- presumably.

4    **Q.**  And you didn't study what the problems were that got the

5    airlines into bankruptcy in the first place, correct?

6    **A.**  No, that wasn't particularly directly relevant for my

7    analysis.  But what I did do was examine the impact of those

8    bankruptcies that you referred to on my analysis and show

9    that they have no impact on my conclusions.

10   **Q.**  Right.  But you haven't attempted to understand why any

11   airline went into bankruptcy, correct?

12   **A.**  Oh, I've looked at it, but it wasn't particularly

13   relevant for my analysis for the two reasons that I just

14   listed.

15   **Q.**  You don't have an opinion as to why any airline went into

16   bankruptcy, correct?

17   **A.**  I haven't been asked to form an opinion about why they

18   went into bankruptcy.

19   **Q.**  Well, let me just direct you to page 124 of your

20   testimony, line 12.

21           "Question:  Do you have any understanding as you

22   sit here today" -- and the question is about what caused

23   those -- well, let me just read the -- I'll start with

24   line 9.

25           "Do you have any question" -- "do you have any

1   understanding of what caused" --

2         THE COURT:  I'm sorry, what line are you on?

3         MR. SCHWED:  Line 9, Your Honor, page 124.

4         THE COURT:  You should just say question and

5   answer, too.  That will help the court reporter.

6   BY MR. SCHWED:

7   **Q.**  "QUESTION:  Do you have an understanding of what caused

8   those bankruptcies?

9         "ANSWER:  I think they're complicated.

10        "QUESTION:  Do you have any understanding, as you

11  sit here today?

12        "ANSWER:  Well, I haven't analyzed it, so I don't

13  want to venture an opinion without kind of going into

14  analysis of those bankruptcies."

15        That was your testimony, right?

16  **A.**  That was, yeah.

17  **Q.**  And you have not attempted to determine whether any

18  airline could have stayed in business following bankruptcy,

19  without reducing capacity as compared to GDP, correct?

20  **A.**  I haven't looked at that specific question, but it's, you

21  know, unclear how that would matter.

22  **Q.**  You would agree that it could be rational for a company

23  coming out of bankruptcy to unilaterally limit capacity

24  growth?

25  **A.**  It could be.

1    **Q.**  But you never studied whether that was something that was

2    necessary for any company -- any airline company coming out

3    of bankruptcy, correct?

4    **A.**  Was it necessary?  I haven't studied whether it was

5    necessary, because it didn't seem very on point.

6    **Q.**  Now, it's your opinion that at least some of the legacy

7    carriers were involved in capacity discipline beginning in

8    2009, correct?

9    **A.**  Yes.

10   **Q.**  At the time of your deposition, you were not sure whether

11   all of the legacy carriers were involved from the start,

12   correct?

13   **A.**  I don't recall that, but --

14   **Q.**  As you sit here today, do you know, were all of the

15   legacy carriers involved in capacity discipline beginning in

16   2009?

17   **A.**  I'm not sure they all simultaneously moved in 2009, but

18   certainly, you know, shortly after, they were all

19   participating.

20   **Q.**  Do you have an opinion as to when they all started

21   participating?

22   **A.**  Somewhere in that time period.

23   **Q.**  What time period?

24   **A.**  The from 2009 onward time period.

25   **Q.**  Well, 2009 onward includes today.  So can we just narrow

1    it a little bit?

2    **A.**   In the early part of the 2010s, by that time.

3    **Q.**   So sometime between 2009 and 2010 is when --

4    **A.**   10s, plural.  10s.

5    **Q.**   Okay.  So everyone -- all three legacy carriers started

6    participating some time around 2009 into the 2010s?

7    **A.**   Yeah, I'd have to go look at exactly the data to give the

8    date that you're looking for, but yeah.

9    **Q.**   Could it be 2012, is that part of the 2010s?

10   **A.**   I think unlikely.

11   **Q.**   Do you know?

12   **A.**   I'd have to go back and double-check, but it would be

13   easy to do so.

14   **Q.**   And when you define legacy carriers, you don't include

15   Southwest?

16   **A.**   No, I do not.

17   **Q.**   If Southwest has approximately an 22 percent domestic

18   market share measured by O&D; is that right?

19   **A.**   They do.

20   **Q.**   And you just haven't formed an opinion, one way or the

21   other, whether Southwest was participating in capacity

22   coordination, correct?

23   **A.**   I said it was ambiguous and there was some documents that

24   suggest, but some data that suggests not.

25   **Q.**   So you just don't have an opinion yes or no?  You don't

1   know.

2   **A.**   I think it's ambiguous.

3   **Q.**   And you have no opinion on whether the Southwest AirTran

4   merger facilitated capacity discipline at all, do you?

5   **A.**   I think there are some documents that suggest that, but

6   it's ambiguous.  Certainly it didn't unfacilitate it.

7   **Q.**   And you also haven't looked at the question of whether

8   there was some times during the alleged capacity discipline

9   period where one airline stopped participated and the other

10   airlines continued to participate in capacity discipline;

11   isn't that correct?

12   **A.**   Can you ask that question again.

13   **Q.**   Yeah.  You have not looked at whether there were times

14   during the alleged capacity discipline period, when one

15   airline stopped participating in the capacity discipline, and

16   other airlines continued to participate in the capacity

17   discipline; isn't that correct?

18   **A.**   That is not correct.  I think I just said in my testimony

19   here that Delta started unwinding earlier, followed by

20   United, and that's the beginning of the end of the capacity

21   discipline period.

22   **Q.**   Okay.  So what years did United participate in capacity

23   discipline?

24   **A.**   I'd have to go back and look at the data, but roughly,

25   you know, beginning parts of the decade through the -- near

1   the end -- middle to the end of the decade.

2   **Q.**  And do you know if any other airlines stopped earlier

3   than any other airline other than Delta, you're saying?

4   **A.**  Well, the documents that I talked to talk about Delta

5   starting to grow, then United, and the data is consistent

6   with that.

7   **Q.**  I just want to read a question to you and see if this

8   is -- if you're changing your testimony?

9          MR. HEIPP:  Objection, Your Honor, he's just

10  reading testimony into the record.

11         MR. SCHWED:  It's inconsistent with an answer two

12  answers ago -- so I'll ask the question again.

13  BY MR. SCHWED:

14  **Q.**  You also did not look at whether there were times during

15  the alleged capacity discipline period, when one airline

16  stopped participating and other airlines continued to

17  participate in capacity discipline, correct?

18  **A.**  No, that's incorrect.  I have the anatomy of how the

19  capacity discipline unwound.  Delta started growing quickly,

20  and then followed by United.

21  **Q.**  So I asked you this question.

22         "QUESTION:"  -- we're on page 112, line 21, if you

23  want to turn to it.

24         THE COURT:  Of his.

25         MR. SCHWED:  Of his deposition, yes.

```
 1                  THE WITNESS:  At what line?
 2                  MR. SCHWED:  21.
 3      BY MR. SCHWED:
 4      Q.  Was there ever a question, was there ever a point in
 5      time --
 6                  THE COURT:  Page 112, line 21.
 7                  MR. SCHWED:  Yes.
 8                  "QUESTION:  Is it your testimony, was there ever a
 9      point in time when one airline stopped participating and
10      other airlines continued participating in a coordinated
11      effort in capacity discipline?"
12                  Line 25.
13                  "ANSWER:  I don't know if I specifically looked at
14      that question."
15                  Was that your testimony?
16                  THE WITNESS:  Yeah, but I'd also point you to the
17      question at line 13, which I answered there exactly how I
18      answered today.
19      BY MR. SCHWED:
20      Q.  But line 13 was before that question and answer, and then
21      I asked this question, and you gave that answer, correct?
22      A.  I gave you that answer, but I also was pretty clear in my
23      testimony in deposition and how it's consistent with what I'm
24      saying today.
25      Q.  Now, is it your opinion that the Delta and Northwest
```

1    merger increased industry concentration, which facilitated

2    coordinated efforts among legacy carriers to constrain

3    capacity growth?

4    **A.**  Yeah, it was the first merger that began the process that

5    facilitated capacity discipline.

6    **Q.**  Industry concentration, as you refer to it, means overall

7    concentration, not limited to specific routes or geographies?

8    **A.**  No, it's aggregate.

9    **Q.**  And you've identified the HHI as one measure of

10   concentration?

11   **A.**  Uh-huh.

12   **Q.**  And the other measure that you've mentioned was the

13   number of competitors, correct?

14   **A.**  That is a measure.

15   **Q.**  And you mentioned that as one of the measures that you

16   looked at.  Together with HHI, correct?

17   **A.**  It's informative.

18   **Q.**  And when you are talking about the number of competitors,

19   are you talking only about legacy competitors or all

20   competitors?

21   **A.**  Well, both can be informative, but in this case, it was

22   the reduction of legacy carriers.

23   **Q.**  And after the merger of Delta and Northwest, there were

24   five legacy competitors; is that correct?

25   **A.**  There were.

1    **Q.**  I'm sorry, I didn't hear?

2    **A.**  I'm sorry, there were.

3    **Q.**  And after the Delta/Northwest merger, the HHI was about

4    1300; is that right?

5    **A.**  Can look at my -- do you have that?

6              MR. SCHWED:  Maybe could you just call up slide 11

7    from the opening slide deck.  Do you have that?

8    BY MR. SCHWED:

9    **Q.**  Do you have that in front of you?

10   **A.**  Yes, I do.

11   **Q.**  So my question was, after the Delta/Northwest merger in

12   2009, the HHI was about 1300?

13   **A.**  Approximately.

14   **Q.**  And according to the merger guidelines, that's considered

15   unconcentrated, right?

16   **A.**  It would, if this was analysis of the market.  So this is

17   analysis of the industry as a whole.  This is -- it's not the

18   same metric that you would use.  You don't recall an industry

19   moderately, whatever the merger guidelines are referring to.

20   This is just a benchmark of concentration.

21   **Q.**  And you -- you said that capacity discipline began to

22   unwind around 2016, correct?

23   **A.**  Approximately.

24   **Q.**  And that it was over by 2018?

25   **A.**  Approximately.

1    **Q.**   And in 2016, capacity discipline was about 1650, correct?

2    **A.**   I'm sorry, can you --

3    **Q.**   I'm sorry -- in 2016, HHI was about 1650, correct?

4    **A.**   Approximately.  It had fallen from about 1740, down to --

5    it's hard to eyeball that, but, you know, 1640 looks a little

6    higher than that, but --

7    **Q.**   But somewhere in that range?

8    **A.**   In that range.

9    **Q.**   About 1600.

10   **A.**   Above 1600.

11   **Q.**   And in 2018, when you say it fell apart completely, HHI

12   was also in the 1600-something range, right?

13   **A.**   Yeah.

14   **Q.**   So and in 2016 and 2018, there were a total of three

15   legacy airlines?

16   **A.**   There were three legacy airlines, yes.

17   **Q.**   And so by both measures, HHI and the number of

18   competitors, the industry was less concentrated when the

19   capacity discipline began than when it ended, correct?

20   **A.**   Yeah.  Capacity discipline was falling over that period,

21   which aligns with my results where I showed that the legacy

22   carriers were actually expanding capacity during the capacity

23   discipline period, which would cause this effect that you're

24   just pointing to.

25   **Q.**   But just -- I just want an answer to my question.

1    Industry -- by your measures of concentration, the industry

2    was less concentrated when capacity discipline began than it

3    was when it ended, correct?

4    **A.**   That is true.

5    **Q.**   Okay.  And so you would agree that there was no positive

6    correlation between concentration and capacity discipline,

7    correct?

8    **A.**   I would not conclude that from my --

9    **Q.**   Well, at least during the period that you studied, 2009

10   to 2016, there was no positive correlation between industry

11   concentration and capacity discipline?

12   **A.**   You have two points in time, and so I don't think you

13   would draw inferences of correlation from two data points.

14   **Q.**   Is it your testimony that there was a positive

15   correlation between 2009 and 2016, between concentration and

16   capacity discipline?

17   **A.**   No, it's my testimony that the capacity discipline period

18   was facilitated by the mergers and unwound as the benefits of

19   cooperating were outstripped by the benefits of not

20   cooperating.

21   **Q.**   But your testimony was that the reason that the mergers

22   facilitated capacity discipline was because they increased

23   concentration, right?

24   **A.**   That was one of the factors, but there are other factors.

25   **Q.**   You don't find it at all odd that if increased

1    concentration made capacity discipline easier in 2009, that

2    as the industry got more and more concentrated by 2016,

3    that's when it fell apart?

4    **A.**   No, I don't find that odd at all.  In the documents,

5    there was a specific note to one of the reasons that capacity

6    discipline might unwind, and that is the decline of jet fuel

7    prices, which is what is occurring during this period.  The

8    fracking boom is going, jet fuel prices are going down, and

9    the document I pointed to in my presentation notes that that

10   is actually a threat to capacity discipline.

11   **Q.**   So is it your testimony now that capacity discipline

12   ended because jet fuel prices rose?

13   **A.**   No.  I'm just saying that's a possible explanation of it.

14   **Q.**   You don't know why capacity discipline ended, correct?

15   That was your testimony at your deposition.

16   **A.**   I said I don't know the exact factors that caused it to

17   stop, but other than that the benefits of cooperating were

18   exceeded by the benefits of not cooperating.

19   **Q.**   But you have no way of measuring what those benefits of

20   cooperating were or how to assess whether the benefits of

21   cooperating had increased or decreased, do you?

22   **A.**   No, no, we -- you know, there's not really good tools to

23   do that in this context.

24   **Q.**   And I just want to be clear, you do not know what caused

25   the capacity discipline to begin to unwind, correct?

1   **A.**   I can't point to a specific event, but I pointed to some
2   possibilities.
3   **Q.**   And just I'm going to read -- but you're not offering an
4   opinion as to why capacity discipline ended, are you?
5   **A.**   No, I am not.
6   **Q.**   Now, you've talked about the role that documents played
7   in forming your opinion, correct?  You testified about that?
8   **A.**   Correct.
9   **Q.**   And you would agree that you couldn't have offered the
10   opinion that the legacy airlines were coordinating to
11   suppress their capacity without the review of the documents?
12   **A.**   Can you repeat that question again?
13   **Q.**   Yeah.  You would have not have been able to offer the
14   opinion that the legacy airlines were coordinating to
15   suppress capacity, or grow capacity more slowly than GDP,
16   without a review of the documents, correct?
17   **A.**   I don't think I would have made that.
18   **Q.**   So if you had never reviewed a document, would you have
19   been comfortable, based solely on the data, offering the
20   opinion that the legacy airlines were coordinating capacity?
21   **A.**   There's other evidence out there, I mentioned the two
22   academic papers, for example, those studies do not have
23   access to the document, and is making the conclusion that
24   capacity discipline occurred, and was effective in removing
25   capacity.

1    **Q.**  I'm not asking about the literature.  I'm asking about

2    would you have been comfortable, just based on your

3    regression, opining that there was coordination?

4    **A.**  In the hypothetical, where I have access to no documents,

5    I would have taken a different approach and so it's -- it's

6    not -- that but for world is not the world -- it wouldn't be

7    just my report without the documents.  I would have done a

8    different analysis.

9    **Q.**  Now, you didn't -- when you talk about the documents, you

10   haven't seen any documents where the airlines were talking

11   directly to each other, correct?

12   **A.**  I haven't seen any documents that they were talking to

13   each other.  I haven't seen any documents that they weren't,

14   but I don't know.

15   **Q.**  You've had access to a lot of documents, right?

16   **A.**  I've had access to a lot of documents.  That is true.

17   **Q.**  And the types of documents you're talking about are

18   things like investor presentations that mention capacity

19   discipline, right?

20   **A.**  That's one class.

21   **Q.**  And you've agreed that -- let's assume for the moment

22   that an airline was coming out of bankruptcy, and

23   unilaterally determined to limit capacity growth below GDP.

24   Okay?

25           Can you work with me on that assumption?

1  **A.**  It's an assumption.

2  **Q.**  And it's possible that that happened, right?

3  **A.**  I mean, the evidence suggests that there was capacity

4  discipline going on that's otherwise, but --

5  **Q.**  Do you know one way or the other whether any airline

6  coming out of bankruptcy had the strategy unilaterally to

7  reduce capacity because of what caused them to go into

8  bankruptcy?

9  **A.**  I saw -- we saw documents of American planning to come

10  out of bankruptcy and actually planning to grow more

11  aggressively and that causing concern at US Airways.  So that

12  is almost the opposite of the hypothetical that you're

13  posing.

14  **Q.**  I'm asking about the bankruptcies that actually preceded

15  the capacity discipline period.  Do you have any idea as to

16  whether any of those airlines unilaterally decided to not

17  grow capacity as fast as they had done previously because

18  they had driven them into bankruptcy?

19  **A.**  They may have.

20  **Q.**  And let's assume that if one of those airlines did that,

21  would it -- is it your position that if they had done so, it

22  would be wrong of the airline to inform their investors of

23  that decision?

24  **A.**  It wouldn't have been wrong to inform them of that

25  decision.

1    **Q.**  And to inform them in a public way, right?  You have to

2    inform investors publically.

3    **A.**  Sure.

4    **Q.**  Now, so you've testified that capacity discipline began

5    to unwind around 2016, correct?

6    **A.**  In that time frame, yes.

7    **Q.**  And can we call up PX0967, please.

8            While this is -- well, why don't you --

9            This is -- you see it says Exhibit 11, do you

10   recognize this as an exhibit from your expert report?

11   **A.**  I do.

12   **Q.**  And what it's showing is, by year, percent change in

13   capacity for each of the three legacies airlines; is that

14   correct?

15   **A.**  That is correct.

16   **Q.**  And then it shows GDP in the right hand column, percent

17   change in GDP?

18   **A.**  It does.

19   **Q.**  And the reason you're showing percent change in GDP is

20   because, roughly speaking, I think you had it in one of your

21   slides, capacity discipline means growth less than GDP,

22   correct?

23   **A.**  I think I said at or less.

24   **Q.**  Okay.  At or less -- well, is it capacity discipline to

25   grow -- if GD P is an estimate of demand, is it capacity

1   discipline to grow at the level of demand?

2   **A.**   I think the document suggests that that's the benchmark

3   they're using to assess capacity discipline adherence.

4   **Q.**   So I guess I just want your opinion, is it -- would you

5   consider it to be capacity discipline to grow at the level of

6   demand?

7   **A.**   At or -- is that -- that's how they defined it.

8   **Q.**   I'm not asking how they defined it.  I'm asking you,

9   you're the expert.  Tell me your definition, one way or the

10   other?

11        MR. HEIPP:  Asked and answered, Your Honor.  He's

12   answering the question.

13        THE COURT:  Overruled.

14        THE WITNESS:  Can you repeat the question, please?

15        MR. SCHWED:  Yeah.

16   BY MR. SCHWED:

17   **Q.**   Is it your opinion that it is exercising capacity

18   discipline to grow at GDP?

19   **A.**   That is the benchmark that they used under capacity

20   discipline.

21   **Q.**   But I'm just asking -- well, you're an economist, do you

22   find it anticompetitive if an airline grows at GDP?

23   **A.**   I find it anticompetitive if an airline is adhering to

24   capacity discipline whereby they are growing less than they

25   would otherwise.  I think consumers are harmed by that.

1   **Q.**  Growing less than they would otherwise due to collusive

2   behavior?

3   **A.**  To do accommodating conduct.

4   **Q.**  Is that okay in your opinion, is that anticompetitive?

5   **A.**  If they grow -- if they are behaving in a unilateral way

6   that is makes sense from them from a profitability

7   standpoint -- now I lost my thought -- so that such the other

8   firms are -- the anticipation of the -- the question is how

9   are the other firms responding to that growth.  And what is

10   their expectation about how the other firms would respond to

11   that growth.

12   **Q.**  But just standing by itself, a unilateral decision to

13   grow less than or equal to GDP is not anticompetitive, is it?

14   **A.**  Well, it depends on what the unilateral -- are they

15   expecting accommodating conduct or not?  And I think that's

16   the key part of coordinated behavior, is their views about

17   the accommodating conduct.

18   **Q.**  Is it anticompetitive if they anticipate a competitor's

19   reaction to their own unilateral decisions?

20   **A.**  In and of itself, no.  But it's the nature of that

21   response:  Is it accommodating or not?

22   **Q.**  Is it anticompetitive if a competitor responds as one

23   competitor anticipates, without any preexisting agreement?

24   **A.**  It depends on if it's accommodating or not.

25   **Q.**  If you're a competitor economist, testifying witness

1    raises prices and you hear about it, and you say, "Hey, I'm
2    going to raise prices," is that anticompetitive?
3    **A.**   It depends on if we have an understanding.
4    **Q.**   If you don't have any understanding, but he predicts --
5    he, your competitor, predicts that you're going to do it and
6    says, "I know that Town is going to raise his price if I
7    raise mine."  And he raises his price, thinking that's
8    probably what's going to happen.
9           And you see him raise his price and say, "Hey,
10   that's a great opportunity.  I'll do it."
11          Is that anticompetitive?
12   **A.**   It starts to get suspicious.
13   **Q.**   Okay.  Let's turn back to the chart.  I want to look at
14   2013.  Capacity discipline hadn't started to unwind yet,
15   right?
16   **A.**   That's correct.
17   **Q.**   Okay.  So you -- during 2013, GDP grew at 2.13 percent,
18   correct?
19   **A.**   Correct.
20   **Q.**   AA expanded by 2.61 percent, correct?
21   **A.**   That's correct.
22   **Q.**   So they were not exercising capacity discipline?
23   **A.**   But also the year prior, they grew negative.  And the
24   year -- the following year, they grew below GDP.  So in my
25   analysis, it kind of takes into account all of these factors.

1    And so the fact that US Air grew a bit over GDP is

2    incorporated in my model and the identification of capacity

3    discipline.

4    **Q.** All right.  Simple question.  Was US Air/American

5    exercising capacity discipline in 2013, when they were

6    growing at a rate higher than GDP?

7    **A.** They were -- yes.

8    **Q.** Even though -- so you can exercise capacity discipline,

9    even though you are growing greater than GDP?

10   **A.** It's a benchmark, yeah.

11   **Q.** And then in 2014, Delta also was growing greater than

12   GDP, correct?

13   **A.** Very slightly.  And it's important to recognize that, you

14   know, when they're making capacity discipline decisions and

15   when GDP numbers come in, they're at a little bit different

16   times.  So their expectation about what GDP is going to be

17   when they make their capacity discipline decisions in fact

18   may be different than how GDP actually comes in.

19   **Q.** So you don't know one way or the other whether Delta was

20   exercising capacity discipline in 2014?

21             THE COURT:  Wouldn't that require tracking GDP?

22             THE WITNESS:  I'm sorry?

23             THE COURT:  I understand that assumption, right,

24   because you don't know what next year's GDP is this year.

25             THE WITNESS:  Yeah.

1          THE COURT:  And you're predicting your growth,

2     you're planning for growth, or not, next year, this year.

3     But then wouldn't you really want to match the bar graphs,

4     the line graphs?

5          THE WITNESS:  Yeah.  In that one diagram --

6          THE COURT:  By offsetting, in other words, wouldn't

7     you really be looking -- wouldn't you need to be looking, to

8     some degree, at what -- the growth in 2014 was presumably

9     locked in before then, and be looking at what predicted GDP

10    was at the time they were making the decision so they could

11    do the analysis correctly?

12         THE WITNESS:  Yes, that's correct.  And you saw

13    that in the document that I displayed earlier, where they

14    had -- they had the capacity discipline box and they had GDP

15    growth and they had capacity growth.  And then they had a

16    dotted line for forecasts about capacity.  So that document

17    made that exact point.

18         THE COURT:  I see.  Okay.

19         Go ahead, Mr. Schwed.  Sorry.

20    BY MR. SCHWED:

21    Q.   And then in 2015, Delta was, again, above GDP, right?

22    A.   By .07 percentage point.

23    Q.   So two out of the three years here, '13, '14, and '15,

24    Delta was above, correct?  And one out of the three, American

25    was above?

1    **A.**   Yeah.  And about 2014, again, consistent with the

2    documents and that discussion that we had, that Delta started

3    to unwind its capacity.  You can see it here, that Delta is

4    starting to unwind its participation in the capacity

5    discipline period.  You can see it.  It's, you know, 2.7, and

6    then it jumps up to 3.68.  Those are you roughly in line with

7    GDP.  And then suddenly in 2016, you see it growing much

8    faster than GDP.

9              So you can see the anatomy of the capacity

10   discipline period unwinding in this chart.  You can see Delta

11   moving, growing at 4.18.  And then you see United follow in

12   the following year, growing at roughly five percent.  So you

13   can see the unwinding of the capacity discipline right from

14   this chart.

15   **Q.**   So is it now your testimony that capacity discipline

16   began to unwind in 2014?

17   **A.**   No, that's -- I said that some of the documents suggested

18   in around 2014, and the data that I analyzed suggested around

19   the middle of the decade it started to unwind.  And you can

20   see it right here.

21   **Q.**   Just one way or the other, was, in your opinion, as the

22   expert testifying today, was capacity discipline beginning to

23   unravel as of 2014 when Delta exceeded GDP?  Yes or no?

24   **A.**   Likely not.  I think you're seeing them grow at roughly

25   GDP in '14 and in '15.  And in '16, they're growing much more

1   rapidly.  That's exactly the unwinding that I've been

2   describing.

3   **Q.**  And meanwhile, according to you, there was this

4   agreement, a tacit agreement between the three airlines, and

5   United just sat there and watched Delta, beginning in 2014,

6   start to meet GDP.  And they continued to abide by the

7   agreement, even though Delta was exceeding GDP growth?

8   **A.**  I don't -- you know, Delta, I wasn't at Delta.  But I can

9   imagine that looking at these numbers, assuming that they had

10  these numbers, and saying, "They're growing at about GDP,

11  what do we do?  Are they participating?"  Yeah, they are.

12  **Q.**  And you say assuming they had these -- these numbers --

13  you even testified to this, that one of the things that makes

14  capacity discipline work in the airline industry is these

15  numbers -- everybody knows these numbers, right?

16  **A.**  They're available to them.

17  **Q.**  Yeah.  And presumably, if you're engaged in coordinated

18  capacity discipline as an economist, you would agree with me,

19  you would be monitoring what your competitors are doing very

20  closely, wouldn't you?

21  **A.**  You would pay attention.

22  **Q.**  And it's your testimony that United was paying attention,

23  saw Delta year after year exceeding it, and they just kept

24  going with their capacity discipline, that even though

25  they're alleged conspirator wasn't doing it?

**A.**   Well, you're asking me to put myself in United's place,
but if I were, I would have looked at this and said Delta is
growing at about GDP and that's consistent with capacity
discipline.

**Q.**   And you think they -- they had some sort of coordinated
agreement that said we, United, are going to have negative
growth, and you're allowed to grow slightly above GDP, and
that's consistent with some sort of agreement that you've
imagined?

**A.**   I think it's consistent with some sort of understanding
they had.

**Q.**   Can you define what the understanding was?

**A.**   I defined what capacity discipline was.  It was growing
at or below GDP in a coordinated -- and was sometimes
coordinated.

**Q.**   And by your own definition, Delta was not abiding by that
agreement or understanding, as early as 2014, yet the two
other airlines just continued to sit around and watch them do
that for at least two more years.  And American, for three
more years, right?

**A.**   They were growing roughly GDP, a few percentage points
different -- or tenths of a percentage points different, not
a full percentage.  And so this is perfectly consistent with
what I'm saying.

**Q.**   Now, let's talk about the end of capacity discipline.

1    You don't claim that JetBlue capacity discipline to unravel

2    or end, did you?

3    **A.**   They did not facilitate it and they mitigated the impact

4    of it.

5    **Q.**   But you don't -- it is not your opinion that they caused

6    it to end, correct?

7    **A.**   They may have.

8    **Q.**   You don't know?

9    **A.**   It's possible.  That could be a factor that the growth of

10   JetBlue caused during capacity discipline to unwind.  It's

11   possible.

12   **Q.**   It's possible, but it's the not your opinion, correct?

13   **A.**   I can't attribute causally that JetBlue's growth caused

14   the unwinding specifically.

15   **Q.**   And you haven't identified anything, for example, that

16   JetBlue did around 2016 that would have caused the alleged

17   capacity discipline to begin to unravel, have you?

18   **A.**   I haven't specifically identified a particular JetBlue

19   event that caused capacity discipline to unwind.

20   **Q.**   Or any change to JetBlue that would have caused -- around

21   2016 that potentially would have caused capacity discipline

22   to end?

23   **A.**   I haven't identified -- as I testified earlier, I haven't

24   identified a specific cause.

25   **Q.**   And you don't claim that any other low cost carrier

1    caused capacity discipline to unravel or end, do you?

2    **A.**   I think the expansion of low cost carriers, you saw it in

3    the chart, that they were expanding during the capacity

4    discipline period, filling in some of the capacity that was

5    not produced by the carriers, certainly mitigated the impact

6    of capacity discipline.

7    **Q.**   But I'm asking a different question, not about whether it

8    mitigated the impact, but whether something happened in 2016,

9    with JetBlue, another low cost carrier, an ultra low cost

10   carrier, that caused this to unravel?

11   **A.**   I haven't identified a specific event that caused it and

12   I don't think one could.

13   **Q.**   And it is your opinion that something in the market must

14   have changed for capacity discipline to have ended, correct?

15   **A.**   Well, it could have been multiple things.

16   **Q.**   But at least something must have changed for capacity

17   discipline to have ended?

18   **A.**   Likely, but things are changing all the time.

19   **Q.**   But you haven't identified what that thing or things are,

20   right?

21   **A.**   I haven't identified a specific thing, but I've pointed

22   to, in this testimony, some possibilities.

23   **Q.**   Now, let's turn to your opinion that there's a risk that

24   the alleged capacity discipline will return to the industry

25   as a result of the NEA, okay?

1   **A.**  Uh-huh.

2   **Q.**  And that begins roughly on page 35 of your slide deck.

3   **A.**  Yes.

4   **Q.**  And basically the next three pages are where you cover

5   it?

6   **A.**  I would have to go review, but that sounds approximately

7   correct.

8   **Q.**  So you basically, of your entire slide deck, you devote

9   three pages to explaining your ultimate conclusion that

10  capacity discipline will return.  That's it?

11  **A.**  Three slides.  Well, yeah, it's summarizing the impact.

12  But the whole deck is building up the evidence that points to

13  that conclusion.

14  **Q.**  The rest of the deck is building up the evidence that it

15  existed, right?

16  **A.**  And when it started and when it unwound, and the impact

17  of LCCs to that, and JetBlue's impact on the capacity

18  discipline.  So all of those things.  It's not just those

19  three slides.  It's the whole deck.

20  **Q.**  Just to be clear, you have not identified any impact that

21  JetBlue -- any LCC or any ULCC has had on whether it started

22  or ended, correct?

23  **A.**  Not on the starting or ended, but certainly mitigated its

24  impact.

25  **Q.**  Now, you haven't offered any economic methodology to

1  assess whether a hypothetical or potential transaction

2  increases the risk that the legacy airlines will engage in

3  capacity discipline, correct?

4  **A.**  Will you ask that question again?

5  **Q.**  Yeah, you have not offered up a methodology, an economic

6  methodology, to assess whether a potential transaction

7  increases the risk that the legacy airlines will suppress

8  their capacity, right?

9  **A.**  I mean, analyzing the documents and the data analysis I

10 do is a methodology for assessing that impact.

11 **Q.**  Here's my question for you.  Let's just say somebody

12 comes to you and says, "Somebody's thinking about a

13 transaction.  Is that going to increase the risk of capacity

14 discipline?"  Okay?  Are you with me?

15 **A.**  I'm with you.

16 **Q.**  And they say to you, "Well, how do I assess whether it's

17 going to increase?  Is there a test?"  In other words, it

18 increases concentration a certain amount, or it reduces this

19 or that.  Is there a test that you've identified that has to

20 be satisfied for you to conclude that capacity discipline is

21 becoming more likely?

22 **A.**  In that case that you described, what you would do is

23 what I did here.  You would assess the documents in the

24 record.  You would assess whether there was coordinated

25 behavior in the past.  And you would assess who was a

1    participant, who the merging parties were.  And so all of

2    that would be done in the same way as I've done here.

3    **Q.**  You know it when you see it.

4    **A.**  Well, you examine the evidence and assess it.

5    **Q.**  But there's no test that you can apply, right, no

6    methodology that says these are the requirements?  These are

7    the economic conditions that are needed to increase the risk

8    of capacity coordination returning?

9    **A.**  I think I outlined a methodology.  I did it here and

10   applied it here.

11   **Q.**  Is it your view that any transaction, a merger and

12   alliance of any kind, involving any legacy carrier, would

13   increase the risk of capacity discipline returning?

14   **A.**  So you're saying if American merged with United?

15   **Q.**  Any -- can you come up with any alliance that any legacy

16   carrier could enter that you wouldn't conclude increase the

17   risk of capacity discipline returning?

18   **A.**  Well, that's not been my assignment, but I could look at

19   it and examine it.  But that's a hypothetical that I have not

20   examined, for good reason:  It's not particularly relevant.

21   **Q.**  Well, it's your view that even before the Northeast

22   Alliance, there was a risk of capacity coordination

23   returning?

24   **A.**  There certainly was a risk.

25   **Q.**  And you've testified that that risk is increased due to

1   the Northeast Alliance, correct?

2   **A.**   That is correct.

3   **Q.**   But you -- and you have not attempted to assess or

4   determine the amount by which the risk of capacity

5   coordination has increased, have you?

6   **A.**   It increases, but the exact percentage, is that what

7   you're looking for?

8   **Q.**   Even an estimated percentage?

9   **A.**   No.   The tools to do that don't exist, and the merger

10  guidelines recognize that in their coordinated effects

11  section.   It specifically calls out that assessing the impact

12  of a merger on coordinated effects is not susceptible to

13  quantification.

14  **Q.**   Just so I understand, this is not a merger.   Or are you

15  testifying that this is a merger?

16  **A.**   It's a consolidation.

17  **Q.**   It's an alliance, right?

18  **A.**   It is a consolidation that has many of the effects,

19  incentive effects of a merger.

20  **Q.**   That is not your opinion; that is Dr. Miller's opinion.

21  **A.**   That is Dr. Miller's opinion, but I agree with him.

22  **Q.**   You have not studied that question, have you?

23  **A.**   That was not my scope, but I agree with Dr. Miller on

24  that point.

25  **Q.**   Are you offering that as your own opinion today?

1    **A.**   No.  I am offering it as I agree with Mr. Miller.

2    **Q.**   And you admit, as you sit here today, that you have not

3    seen any evidence that any legacy airline has done anything

4    to coordinate or suppress capacity since the NEA was

5    implemented more than 18 months ago?

6    **A.**   I haven't seen any such evidence, but, of course, the NEA

7    was implemented during a pandemic.  And so it's going to

8    be -- I don't think there would be the ability to see such

9    evidence because the impact of the pandemic would overwhelm

10   everything.

11   **Q.**   You haven't done any studies to assess whether any legacy

12   airline has actually engaged in capacity discipline since the

13   Northeast Alliance was implemented, have you?

14   **A.**   No.  And again, such an analysis would be fruitless,

15   because you're going to confound any impact with the

16   pandemic.  It's distorted everything.

17   **Q.**   So it's just impossible to ever tell?

18   **A.**   I did not say that.  I was asking -- your question was

19   about since the NEA.

20   **Q.**   Well, economists are paid to come up with models and

21   figure complicated things out, aren't they?

22   **A.**   And they're often unpaid to do that, too.

23   **Q.**   But you have not attempted to do that?

24   **A.**   In this case?

25   **Q.**   In this case.

1    **A.**   In this case -- I'm sorry.

2    **Q.**   You have not attempted to assess whether there has been

3    any capacity discipline following the implementation of the

4    NEA?

5    **A.**   No, I haven't, because you couldn't make a conclusion

6    about whether it did or not because of the effects of the

7    pandemic.

8    **Q.**   Well, one thing you could do is review documents, right?

9    **A.**   You could.

10   **Q.**   Because you reviewed a lot of documents to form your

11   opinion that there was capacity discipline, correct?

12   **A.**   Yeah, I did.

13   **Q.**   And deciding that there was a risk that capacity

14   discipline would return, you didn't review a single United or

15   Delta document to see what they were saying about it; isn't

16   that correct?

17   **A.**   I don't think that's exactly correct, but I didn't see

18   anything in the documentary record that suggested that it was

19   returning.  But I wouldn't expect to, because we have a

20   pandemic.

21   **Q.**   Is it your testimony that you -- before preparing your

22   report, you reviewed United and Delta documents?

23   **A.**   Well, I reviewed a lot of documents.

24   **Q.**   But did you review, before preparing your report, United

25   and Delta documents produced in this case?

1    **A.**   I reviewed documents that were from United that were

2    produced in this case.  I don't know if you want to call them

3    "United documents," but they were reviewed.  And I cited to

4    them in my --

5    **Q.**   Isn't it a fact that every document you cited to in your

6    report from United and Delta long predated the Northeast

7    Alliance?

8    **A.**   I think some of them come up to 2015, I would have to go

9    back and look at the dates, but I don't know if that's long

10   for you, but it's at least 2015.

11   **Q.**   So that's six years?  2015 is six years before the

12   Northeast Alliance was implemented?

13   **A.**   That's right.

14   **Q.**   You did not review -- in forming your opinion that

15   capacity discipline would return, you did not review a single

16   United or Delta document until after the date the Northeast

17   Alliance was announced, correct?

18   **A.**   I don't know if I did review them.  I may have.  There's

19   a lot of documents out there.  So if you're asking me to do

20   an inventory of all the documents that I looked at and I

21   looked at a lot.

22   **Q.**   Well, let me -- can you turn to page 58 of your

23   deposition, line 16.  Let me know when you're with me.

24           "QUESTION:  Did you make an effort to review Delta

25   and United documents to assess their competitive response.

1          "ANSWER:  No.  It really wasn't within the scope of

2     my assignment."

3               Is that accurate?

4     **A.**   That's what I said.

5     **Q.**   Do you have any reason to disagree with it today?

6     **A.**   I don't know if I have a reason to disagree with it

7     today, but I have -- on the competitive response to the NEA,

8     certainly I've reviewed the deposition testimony.

9     **Q.**   Well, that's interesting.  Let me ask you -- let me --

10    why don't you read the next -- I'm going to read the next

11    line, beginning line 58 -- page 58, line 20.

12              "QUESTION:  Did you review any depositions of any

13    Delta or United witnesses to assess their competitive

14    response to the Northeast Alliance?

15              "ANSWER:  No.  And again, it wasn't really in my

16    scope."

17              Is that accurate?

18    **A.**   That is accurate and I reviewed those deposition

19    testimony since my -- or that deposition testimony since this

20    deposition.

21    **Q.**   So when you wrote both of your reports and you formed the

22    opinion, you did not review any Delta or United documents or

23    deposition testimony, correct?

24    **A.**   I did not, but I looked at the -- the reports of the --

25    your expects on that point and didn't find them very

1    compelling.

2    **Q.**   And just to be clear, when you formed your opinion about

3    the historical capacity coordination and discipline, you rely

4    heavily on documents, they provided, I think you said the

5    framework for your entire analysis, right?

6    **A.**   They provided part of the framework.

7    **Q.**   But yet you didn't bother to review a single Delta

8    deposition or document in forming your opinion?

9    **A.**   Well, I don't recall reviewing them, no.

10   **Q.**   And as you're sitting here today, you do not know one way

11   or the other whether documents produced by United and Delta

12   show that they viewed the NEA as a reason to increase the

13   capacity, the documents, do you?

14   **A.**   The documents, no, of course, but there's the deposition

15   testimony.

16   **Q.**   And do you also -- have you had access to American and

17   JetBlue documents produced in this case?

18   **A.**   I have.

19   **Q.**   And also have not seen any document from American,

20   JetBlue, or any other airline saying that the NEA provides an

21   opportunity for the return of capacity discipline, have you?

22   **A.**   I haven't seen a document like that, but I would find

23   that extraordinary, if it were that they would admit that

24   that was a motivation for the NEA.

25   **Q.**   Now, can you turn to page 38 of your slide deck.  At your

1    deposition, you said that the NEA increases the risk of the

2    return of capacity discipline because JetBlue and American

3    coordinate capacity.

4            Do you recall that?

5    **A.**   I do.

6    **Q.**   Is that reflected on this slide anywhere?

7    **A.**   It's a -- yeah, I mean, it's on the second bullet.

8    **Q.**   That's what you mean by aligning the incentives?

9    **A.**   Yeah.

10   **Q.**   Okay.  Now, your theory of capacity discipline is that

11   the legacy airlines coordinate on the aggregate capacity,

12   correct?

13   **A.**   That is one of the benchmarks they're looking to, sure.

14   **Q.**   In other words, you don't have a region by region

15   analysis that they're coordinating region by region, right?

16   **A.**   In my analysis, it was aggregate, across all of the US.

17   **Q.**   And you're aware that, under the NEA, American and

18   JetBlue do not coordinate or even discuss the aggregate

19   capacity, aren't you?

20   **A.**   No, but they discuss capacity that is about 75 percent of

21   JetBlue's capacity.  So the vast majority of JetBlue's

22   capacity falls under the purview of capacity discipline, or

23   capacity coordination.  Sorry.

24   **Q.**   And they're not discussing the vast majority of

25   American's capacity, right?

1    **A.**   That is true.

2    **Q.**   And they're not discussing any of the capacity outside of

3    the Northeast Alliance, correct?

4    **A.**   That is my understanding, but, of course, you know,

5    capacity discussions within a certain region can affect

6    capacity deployment in other parts.

7    **Q.**   Are you aware, as you sit here today, that American and

8    JetBlue don't coordinate on overall fleet size?

9    **A.**   Directly they do not coordinate on fleet size.

10   **Q.**   They don't discuss it, right?

11   **A.**   That's what the agreement says.

12   **Q.**   Now, at your deposition, you said that, "The NEA

13   increases the risk of the return to capacity discipline

14   because JetBlue played a disruptive role."

15           Do you recall that?

16   **A.**   I do.  And I said the same thing here.

17   **Q.**   Is that what you mean by "maverick"?

18   **A.**   Yes.

19   **Q.**   And what you mean by disruptive role, you mean growing

20   capacity quickly, correct?

21   **A.**   More quickly, yeah.

22   **Q.**   And if you could pull up the slide again.

23           And that's what you meant by the first bullet here,

24   the maverick point?

25   **A.**   Yes.

1    **Q.**  You haven't done any independent assessment of whether

2    the NEA incentivizes JetBlue to grow capacity, correct?

3    **A.**  I have focused on its impact on facilitating capacity

4    discipline.

5    **Q.**  You have not seen a single document or heard or read

6    testimony saying that JetBlue plans to stop being a disruptor

7    or a maverick now that it's entered the NEA, have you?

8    **A.**  I have not seen an admission that they're going to stop

9    being a maverick.

10   **Q.**  And you've seen a single document or heard or read

11   anything that says that JetBlue plans to grow in the

12   aggregate more slowly now that's in the Northeast Alliance?

13   **A.**  I certainly have seen documents that suggest that

14   JetBlue's capacity constrained and what growth in the

15   Northeast is going to be funded by declining growth

16   elsewhere.

17   **Q.**  Well, how about if it's funded by an increased fleet

18   size?

19   **A.**  But that's -- these documents point to that their

20   capacity constrained today.  So they're going to have to fund

21   any additional growth today, through removing flights from

22   other parts of their another network.

23   **Q.**  How about they fund capacity growth today by increasing

24   their fleet size today?

25   **A.**  Then the question becomes:  What would they have done

1    otherwise?

2    **Q.**  Well, let's assume for the moment JetBlue would have had

3    a smaller fleet, but for the NEA.  What does that do to your

4    view about their growth?

5    **A.**  It depends upon how much growth and what is attributable

6    to the NEA and versus not.

7    **Q.**  Let's assume they have 30 planes more than they would

8    have, but for the NEA.  What does that do to your view about

9    them being an disruptor?

10   **A.**  It depends upon what the baseline is.

11   **Q.**  The baseline is but for the NEA?

12   **A.**  Yeah.

13   **Q.**  You're familiar with the but-for world, right?

14   **A.**  I am.

15   **Q.**  Okay.  The baseline is, but for the NEA, JetBlue would

16   have 30 fewer planes?

17   **A.**  Right.

18   **Q.**  What does that do to your view that they are no longer

19   going to be a disruptor that grows?

20   **A.**  Well, it depends upon how it interacts with what American

21   does.  So they're aligning interest.  And just because

22   JetBlue grows, doesn't mean that American is also growing.

23   So that growth could be offset by what American does because

24   they're now in this alliance.

25   **Q.**  Have you seen any evidence that American is going to

1    decrease the size of its fleet due to the NEA?

2    **A.**   No.  But in your hypothetical, how -- under your

3    hypothetical, how am I to play out?  That is how it might

4    play out with capacity discipline.

5    **Q.**   Now, your first bullet is about JetBlue having an

6    incentive not to be a disruptor anymore, right?

7    **A.**   Their interests are aligned, to a significant degree,

8    with American.

9    **Q.**   Meaning, what you're trying to say by that is it's your

10    view that they will not be a disruptor or a maverick?

11    **A.**   I think their -- their incentives are more aligned with

12    American now than they were prior to the NEA.

13    **Q.**   And is it your testimony that the fact that they will

14    have 34 more -- 30 more planes than they would have had but

15    for the NEA, that doesn't change your view as to whether

16    JetBlue is going to be a growing airline and a disruptor?

17    **A.**   It -- I think it matters that their incentives are

18    aligned.

19    **Q.**   Have you heard Mr. Hayes's testimony that he views the

20    NEA as allowing JetBlue to be a bigger disruptor?

21    **A.**   I heard him say that.

22    **Q.**   And have you heard or heard his testimony that views the

23    NEA as turbo charging JetBlue's growth?

24    **A.**   I've heard him say that.

25    **Q.**   Are you just discounting that?

1    **A.**  I haven't discounted it, but I think he has a unique

2    perspective on it.

3    **Q.**  He has the perspective of the CEO of the airline that

4    you're saying is no longer going to be a disruptor.  That's a

5    pretty important perspective, isn't it?

6    **A.**  He is also a CEO of a company that stands to benefit from

7    the NEA and having it pass regulatory review.

8    **Q.**  He is also the CEO that stands to benefit from a growing

9    JetBlue that's turbo charged, right?

10   **A.**  Could he?  Perhaps.  But, I think you have to look at the

11   whole lens.

12   **Q.**  And have you seen documents that that's exactly how

13   JetBlue presented this transaction to their board, as an

14   opportunity to grow?

15   **A.**  I have seen documents that say that.

16   **Q.**  Okay.  And are you basing your conclusion on having to

17   disbelieve that Mr. Hayes -- Mr. Hayes's testimony about

18   JetBlue being an disruptor?

19   **A.**  I don't think it's about disbelieving.  I think it's

20   about taking the evidence in totality.

21   **Q.**  And you have not seen a single piece of evidence, of any

22   kind, document, deposition testimony, witness testimony, that

23   says that JetBlue is going to stop being a maverick, have

24   you?

25              MR. HEIPP:  Objection, Your Honor.  This is the

1    third or fourth time.

2              THE COURT:  Sustained.

3    BY MR. SCHWED:

4    Q.  Now, the last reason you have on this slide is,

5    "Prioritizing growth in the Northeast compromises JetBlue's

6    growth elsewhere."  Do you see that? ?

7    A.  I do.

8    Q.  Now, again, you -- the issue really is totality of

9    growth, right?  For your capacity discipline theory?

10   A.  It's --

11   Q.  Aggregate.

12   A.  It's about the entire network.

13   Q.  And if JetBlue increases the size of its fleet, the size

14   of its entire network can grow, right?

15   A.  Under your hypothetical, yes.

16   Q.  And can you turn back to page 35 of the slide deck.  And

17   then go one -- I'm sorry, page 36.

18              Just to be clear, this document you cited, this is

19   one of your three pages on your opinion as to why the NEA is

20   going to increase the risk of capacity discipline.  This page

21   doesn't say that American is not going to grow because of the

22   NEA, correct?

23   A.  This is prior to the NEA.

24   Q.  But it is actually saying that American wants to grow,

25   correct?

1    **A.**   It is saying it's concerned about growing, yeah.

2    **Q.**   That it needs to grow.

3    **A.**   That it needs to grow, and it's planning to.

4    **Q.**   And if you go to the next page -- this is the other page

5    that you cite -- this one is basically explaining why

6    American might have difficulty growing organically and why

7    "borrowing," is the phase that's used, is a way to achieve

8    that growth, correct?

9    **A.**   It limits their ability to gain -- I mean, it seems --

10   it's perfectly consistent with this idea that organic growth

11   is hard and costly.  Synthetic growth is much easier, because

12   already the network is there and it doesn't risk this

13   competitive response.  And so --

14   **Q.**   Have you heard the testimony in this case that American

15   was not able to achieve organically, in terms of the amount

16   of growth, what it achieved through the Northeast Alliance?

17   **A.**   I have heard testimony on that point, but I think the key

18   point is what they would have done competitively, absent the

19   NEA, by trying to grow organically, and how that would have

20   impacted consumers.

21   **Q.**   And you don't know what they would have done, absent the

22   NEA, in terms of overall growth, compared to what they did

23   under the NEA, correct?

24   **A.**   Well, there is -- they did have plans for growth outside

25   of the NEA.

**Q.**  Did you hear Mr. Raja's testimony that the NEA allowed,
made financially viable, an increase of American's fleet
size, compared to the but-for world?

**A.**  I heard him testify to that.

**Q.**  Are you just discounting that?

**A.**  No.  Again, you have to take into the entirety of the
evidence that is available.

**Q.**  And you haven't seen any evidence, whatsoever, that
American views the NEA as a way to impose capacity
discipline, have you?

**A.**  No, I haven't seen any direct documents that points that
out specifically.  But, again, the incentives are that
JetBlue is aligned with the incentives of American.

          MR. SCHWED:  I'd like to turn to another topic,
Your Honor.  I noticed the time.  So I'm happy to start, but
I --

          THE COURT:  I mean, I'm willing to go three more
minutes, but at 1:00 I have to stop.  So if you're going to
have to redo it, then let's stop.

          MR. SCHWED:  Maybe we should stop, Your Honor.

          THE COURT:  Okay.  I'll stop.  I'll see you at
3:00.  We'll stand in recess.

          (Court in recess at 12:59 p.m.)

          (The following reported by Robert Paschal.)

          (In open court at 3:05 p.m.)

```
1              THE COURT:  So regarding expert reports, I don't --
2    we have a copy, so I don't need another copy.  You don't have
3    to give them to me.
4              MR. SCHWED:  Thank you, Your Honor.
5              THE COURT:  And you can go ahead.
6              MR. SCHWED:  Thank you.
7    BY MR. SCHWED:
8    Q.  Dr. Town, before the break, I know I said I was going
9    move to a different topic, but -- I apologize, but I have one
10   or two more questions on the old topic, which is I want you
11   to assume for a moment that an airline acting unilaterally --
12   and by that, I mean without any explicit or tacit agreement
13   with another airline -- sets capacity growth equal to
14   expected GDP growth.  Are you following me?
15   A.  I am.
16   Q.  In your view, is that anticompetitive?
17   A.  Just with that piece of information, no.
18   Q.  Okay.  And just generally -- withdrawn.
19             Now, I want to turn a little bit to your benefits
20   analysis or your -- the benefits part of your opinion.  You
21   do not offer the opinion that there are no benefits from the
22   NEA, correct?
23   A.  I did not offer that opinion.
24   Q.  And you have not attempted to quantify the benefits of
25   the NEA, correct?
```

1    **A.**   No.  To do that, I would want to compare apples to

2    apples, compare the v2 schedule to the right, you know,

3    comparison, 2023 or the 2019 schedule to the v4 schedule.

4            I don't have access to a network planning

5    department to construct schedules in order to perform that

6    analysis, and so, no, I did not quantify that analysis for

7    that reason.

8    **Q.**   Did you consider --

9    **A.**   But --

10   **Q.**   Go ahead.

11   **A.**   But I did examine, as I -- I described in my direct, that

12   I compared the NEA to the international alliances, and that

13   provides some benchmarks about the expected benefits relative

14   to the impact on competition.

15   **Q.**   But just to be clear, you're not offering an opinion as

16   to a -- whatever the value is of the NEA, correct?

17   **A.**   I did not quantify it, for the reasons I just explained.

18   **Q.**   And did you attempt -- did you attempt to quantify it and

19   find yourself unable to?  Did you actually, like, try to come

20   up with a model, or you just did not view that as within your

21   scope?

22   **A.**   It was not within my scope because I don't have a network

23   planning department to construct the schedules to do that

24   analysis.

25   **Q.**   Did you do anything to try to, on your own, based on the

1    existing documents, create a but-for world?

2    **A.**  I didn't, for the reasons I just said.  I don't have

3    access to a network planning department, which would be

4    necessary to that.

5    **Q.**  Now, you're also not offering the opinion that the

6    Northeast Alliance has caused consumer harm, correct?

7    **A.**  Has caused?

8    **Q.**  Yes.

9    **A.**  I don't offer a view on that because I think it would be

10   difficult to assess, given the current circumstances.  You

11   wouldn't be able to disentangle COVID from the other fact- --

12   from this other factor.

13   **Q.**  And I believe you testified at your deposition that you

14   weren't sure if you would ever be able to disentangle COVID;

15   is that correct?  Given --

16   **A.**  I'm sorry.  I don't --

17   **Q.**  Yeah.  Like, in other words, say five years from now, you

18   still might not be able to disentangle COVID, in your

19   opinion?

20   **A.**  I don't think I would offer that opinion.  I would offer

21   the opinion it might be difficult for others reasons, but --

22   **Q.**  You would agree that, all else being equal, if there's an

23   increase in capacity, then average consumer welfare will

24   increase?

25   **A.**  Typically, yes, all else equal.

1    Q.  Yes.  And you also agree that, all else equal, if there's

2    an increase in capacity, then average fares will decrease,

3    correct?

4    A.  On average, typically.  I think that's in the documents.

5    You see the CEOs and executives make that claim.

6    Q.  And you don't dispute that position?

7    A.  Well, I don't, but it's -- it's complicated because --

8    and the reason it's complicated is that airlines have, you

9    know, complicated price schedules.  And so assessing kind of

10   effects on a given fare can be difficult because they can

11   alter some parts and lower other parts.  And so it's a

12   complicated --

13   Q.  But if you look at the average, on average, you would

14   expect fares to go down as capacity is going up?

15   A.  On average?  Yeah, but it's -- you have to be careful.

16          MR. SCHWED:  And can you put up PX1069?

17   BY MR. SCHWED:

18   Q.  This is Plaintiffs' Exhibit 1069, which is in evidence,

19   and this is exhibit -- do you recognize this as Exhibit 22 to

20   one of your reports, your reply report?

21   A.  I do recognize it, yes.

22   Q.  And just so I make sure I understand this right, this

23   shows that JetBlue and American have outgrown their

24   competitors in the Northeast compared to -- you start this at

25   2018, correct?

1    **A.**   That is correct.

2    **Q.**   Okay.

3    **A.**   But I would note the purpose of this graph was to address

4    Dr. Israel's statement about the -- a large gap between the

5    two where he picked an earlier period.  And so here, this

6    graph is showing that, near the end of this period, the gap

7    has been shrinking.

8    **Q.**   But just even -- at every point since the NEA was

9    implemented, JetBlue and American have outgrown their

10   competitors in the Northeast, correct?

11   **A.**   No, I don't think that's true, not every point in time.

12   There's a point in time where the other competitors are

13   growing faster as the lines are getting closer together.

14   **Q.**   Let me just ask a better question.  Compared to the

15   starting point you've picked, you said -- withdrawn.

16        The starting point you've picked is September 2018?

17   **A.**   That is correct.

18   **Q.**   And compared to September 2018, at all points since the

19   NEA was implemented, the total capacity growth of JetBlue and

20   American have exceeded the competitors?

21   **A.**   In the NEA, at airports; but if you take a more global

22   view, you would get a different conclusion.

23   **Q.**   It's still exceeded them -- actually, if you take the

24   global view, the entire country, it's still exceeding them,

25   but by not quite as much, correct?

1    **A.**   I don't think that's necessarily true.   They're very --

2    they're more or less the same.

3    **Q.**   Okay.   We can get to that in a minute.   But this, you do

4    agree with me, that at least for the Northeast Alliance, at

5    all points, the growth of JetBlue and American are greater

6    than the competitors compared to -- your starting point is

7    September 2018.

8    **A.**   There -- they're higher, but declining.   The differential

9    is declining.   And, of course, COVID is happening during this

10   period of time.   So I think the evidence suggests that Delta

11   and United are coming back more slowly from COVID, and so

12   that is likely explaining why they're catching up.

13   **Q.**   And you don't have an opinion one way or the other how

14   much the NEA has enabled JetBlue and American to come back

15   from COVID faster than any of their competitors, correct?

16   **A.**   I don't know of any evidence on that point.

17   **Q.**   Okay.   And you would agree that, again, compared to the

18   September 2018 period, JetBlue and American's market shares

19   in the Northeast have also increased relative to their

20   competitors, correct?

21   **A.**   They went up, and then they went back down.   And, again,

22   it's the -- consistent with the COVID effect that Delta and

23   United came back more slowly from COVID.

24          THE COURT:   Are these month-to-month percentages in

25   this document --

```
 1                    THE WITNESS:  It's --
 2                    THE COURT:  -- compared to the prior month or
 3       prepared to the base?
 4                    THE WITNESS:  Compared to the base.  So compared to
 5       September 2018.
 6                    THE COURT:  I see.  So if -- the March 2019 to the
 7       dot for June 2019 is what was the percent increase in the
 8       prior 30 days as compared to the base at September 2018?
 9                    THE WITNESS:  Compared to the base at 2018.  So you
10       can see the big drop in COVID in capacity is almost entirely
11       taken out in, you know, March and June, and then you can see
12       the slow recovery from it.
13                    THE COURT:  All right.  Okay.  Thank you.
14                    Go ahead.
15       BY MR. SCHWED:
16       Q.  And just to make sure we have this right, so if at any
17       point the blue line is above the other lines, JetBlue's
18       relative capacity compared to its competitors, compared to
19       September 2018, is higher than -- it's a competitors'
20       capacity, correct?  That's what that means?
21       A.  It does mean that, but that differential is modest.
22       Q.  And have you analyzed whether the change from '21 to '22,
23       for example, is a result of a competitive response from Delta
24       or United to the Northeast Alliance?
25       A.  Not directly, but I've examined the deposition testimony.
```

1   **Q.**  Now, you don't dispute that, because of the Northeast

2   Alliance, American's and JetBlue's customers have more

3   options for earning and redeeming frequent flyer points or

4   miles?

5   **A.**  By "options" -- can you clarify what you mean by

6   "options"?

7   **Q.**  Sure.  American frequent flyer customers can earn miles

8   on both American and JetBlue flights, correct?

9   **A.**  Yes, they can.

10  **Q.**  And the same is true for JetBlue TrueBlue members?

11  **A.**  It's reciprocal.

12  **Q.**  And both can redeem their miles or points on flights on

13  both airlines?

14  **A.**  I believe that's true.

15  **Q.**  And is it your opinion that, for those frequent flyer

16  members, people who are already a part of one of the

17  programs, that that is not a benefit to them?

18  **A.**  No, I didn't say that at all.

19  **Q.**  Okay.

20  **A.**  In fact, I claim that there is a benefit for that.  The

21  question is, how is that benefit offset by the fare impacts

22  that occur because of the softening of competition?  And so

23  you have to weigh those things in this case.  You have to

24  weigh the benefits relative to the cost.

25  **Q.**  And you -- and just to be clear, you haven't tried to

1    quantify any benefits associated with frequent flyer

2    reciprocity under the NEA, correct?

3    **A.**   I have not, but neither have the defendants.  I was

4    responding to the defendants' claim that this relevance was a

5    benefit, unquestionably; and my point is, no, it's not

6    unquestionably a benefit.  There are costs to it.

7    **Q.**   If we could just pull up slide 6 of your presentation

8    from this morning, and just focusing on the bottom half, the

9    frequent flyer parts, when you say that frequent flyer

10   programs have ambiguous net consumer welfare effects, that

11   means that they could be beneficial or could be harmful, in

12   your opinion?

13   **A.**   That is the definition of "ambiguous."

14   **Q.**   And you -- just to be clear, you have not done any

15   analysis to determine whether the frequent flyer reciprocity

16   in the NEA creates any harm, correct?

17   **A.**   I haven't assessed that, but one should be cautious.

18   **Q.**   And you haven't studied whether the frequent flyer

19   reciprocity in the NEA makes JetBlue, for example, more

20   competitive with Delta or United, have you?

21   **A.**   No, I've not analyzed that, but you would have to analyze

22   that in the context of its total effect in total.  How does

23   it affect the softening of competition?  How does it affect

24   switching costs?  How -- what's the impact on moral hazard?

25   Those all have to be considered.

1    **Q.**  All else being equal, if JetBlue and American are more

2    competitive in New York, for example, with United and Delta,

3    would you agree with me that that's good for consumer

4    welfare?

5    **A.**  I don't know what you mean by pro -- more competitive.

6    **Q.**  They create a more competitive option for a large number

7    of consumers.  Do you consider that to be good for consumer

8    welfare?

9    **A.**  Not necessarily, no.

10   **Q.**  Have you studied whether -- have you -- do you have an

11   opinion whether JetBlue and American together, under the NEA,

12   with the offering they can make, is more competitive -- are

13   more competitive with United and Delta in New York or Boston?

14   **A.**  No, I haven't assessed that because that was not part of

15   my assignment.

16   **Q.**  Now, have you heard the testimony from a number of

17   witnesses on multiple airlines about the benefits of frequent

18   flyer reciprocity?

19   **A.**  I've heard that they believe it's good for them, yes.

20   **Q.**  Have you heard them say they believe it is good for

21   consumers?

22   **A.**  I do, but I haven't heard them consider these other

23   consequences of it.

24   **Q.**  And just to be clear, you've talked about some literature

25   on frequent flyer programs.  None of that literature that

1    you've cited involves reciprocity under joint venture

2    agreements, does it?

3    **A.**   I think, actually, it does.  I think there's a paper by

4    Lederman that actually looks at the combining of frequent

5    flyer programs that's similar to what's under the joint

6    venture.  And she finds, I think, a 5 percent impact on fares

7    from that combination.

8    **Q.**   And was that combining the third and fourth largest

9    competitors in a marketplace?

10   **A.**   I would have to go back and look exactly at the details

11   of the paper, but she does note that combining of frequent

12   flyer programs led to an increase in fares.

13   **Q.**   Now, you -- you've heard testimony, I assume, that the

14   Northeast Alliance, in addition to the frequent flyer

15   benefits, provides more frequencies, better schedules, newer

16   routes, and improved connections?  Have you heard that

17   testimony?

18   **A.**   I have heard that.

19   **Q.**   Were you in the courtroom today when Mr. Friedman

20   testified?

21   **A.**   I was.

22   **Q.**   Okay.  And have you also heard, for example, some --

23   Mr. Raja's testimony?

24   **A.**   I did.

25   **Q.**   Okay.  And you have not assessed whether any of those

1    changes, individually or in combination, have increased

2    consumer welfare for -- in the Northeast, have you?

3    **A.**   What I did was I assessed the impact of airport presence,

4    so something akin to what you're talking about, on fares on

5    average, and increasing relevance increases airfares; and I'm

6    not sure -- this analysis, again, was responding to the

7    defendants' claim that relevance is just good and there's no

8    ambiguity to it.

9    **Q.**   When you --

10   **A.**   The point of this analysis is to show there is ambiguity,

11   that you need to do more work in order to claim that those

12   things are beneficial.  You need to kind of disentangle them.

13   **Q.**   When you say you assessed the effect of airport presence,

14   you reviewed the literature on that?  Is that what you mean?

15   **A.**   I did more than that.

16   **Q.**   Did you do any study of the effect of the Northeast

17   Alliance's change on airport presence and what that means for

18   consumer welfare?

19   **A.**   I didn't directly assess that.  What I did do is assess

20   the impact of airport presence on fares using recent data,

21   and that shows that airport presence -- an increase in

22   airport presence, increases airfares.

23   **Q.**   In that assessment, you did didn't look at any of the

24   airports in the Northeast Alliance, correct?

25   **A.**   It includes every airport.

1   **Q.**  Did you separately look at the individual airports within

2   the Northeast Alliance?

3   **A.**  Not separately, because that would be a biased sample of

4   it, a sample of the entire United States.

5   **Q.**  And are you aware of any study that looks at the change

6   in airport presence in New York?

7   **A.**  Individually --

8   **Q.**  Yes.

9   **A.**  -- in New York?  No, but that would be kind of weird.

10  **Q.**  And you have heard, I assume, testimony from multiple

11  airline witnesses -- American, JetBlue, Southwest, and

12  Spirit, for example -- that they view increased relevance as

13  allowing an airline to offer a more attractive product,

14  correct?

15  **A.**  I heard them say that, but that, again, ties into why the

16  fares might be going up.

17  **Q.**  And just to be clear, if -- if a supplier in any industry

18  offers a more attractive product and prices go up because

19  it's a more attractive product, that's not a net loss in

20  consumer harm, is it?

21  **A.**  It could be, but it also depends on other factors that

22  are associated with airport presence.  So a lot of the

23  airport presence effect is tied to this frequent flyer

24  program, right?  And we just kind of went over what the

25  impacts of the frequent flyer program are.

1                  And so in that case, it's not -- it's a better

2      product, but it has -- it's a better product for consumers,

3      but it comes with this downside that's associated with it

4      that you need to take into account.

5      **Q.**   And you haven't attempted to measure or quantify any

6      airport presence impact in the Northeast Alliance, correct?

7      **A.**   No, because it's COVID, and you wouldn't get a clean

8      picture of what would happen once we get out of COVID.

9      **Q.**   And one way that fares sometimes go -- average fares

10     sometimes go up is if you have more business travelers,

11     correct?

12     **A.**   It can, yes.

13     **Q.**   And because, typically, business travelers pay -- book

14     last minute and pay higher fares, correct?

15     **A.**   Yeah, I think, typically.

16     **Q.**   And it's often business travelers who are more willing to

17     maybe pay a higher fare for a more relevant carrier?

18     **A.**   I guess it depends on what -- why the relevance matters

19     to them.  And I think the frequent flyer programs are a

20     component of that.

21     **Q.**   And how about if the relevance is increased depth of

22     schedule?  Business travelers may be willing to pay a higher

23     fare for an airline that provides more depth of schedule,

24     correct?

25     **A.**   They might.

1   **Q.**  And it's not a negative if an airline raises their

2   average fare by attracting more business customers.  Is that

3   fair?

4   **A.**  It depends what the underlying reason was that they're

5   attracting more business.

6   **Q.**  Well, let's --

7   **A.**  You have to sort out the effects, so that -- you have to

8   disentangle what's going on.

9   **Q.**  But let's say an airline attracts more business customers

10  because it offers more frequencies on a route, more depth.

11  **A.**  Okay.

12  **Q.**  And those business customers on average pay higher fares

13  than leisure travelers.  So their average -- that airline's

14  average fare will go up, right?

15  **A.**  Under your hypothetical, yeah.

16  **Q.**  And that's not a consumer -- a net consumer harm, is it?

17  **A.**  It depends.  It depends on what the increase in fares are

18  and who is now locked out of flying.  I mean, it's not just

19  one directional.  You have to assess the impacts across

20  everybody.

21  **Q.**  And to be clear, you have not attempted to do that with

22  respect to the Northeast Alliance?

23  **A.**  No, because -- for the reasons I've mentioned.  It's --

24  that inference wouldn't be valid because of the impacts of

25  COVID.

1    Q.   And when you talk about studies that have studied airport

2    relevance and the effect on fares, those studies have

3    actually found that the reason average fares go up are

4    because the -- the airline that has increased relevance is

5    more attractive particularly to business customers, right?

6    A.   No, I don't think -- they've often found that the high

7    rel- -- the high-presence carriers have control over airport

8    facilities, which can limit the amount of entry.  I think

9    those are the studies, I think, that have focused on that.

10   So it has this impact on competition at the airport.

11   Q.   What percentage of an airport does a carrier have to have

12   to have control over the facilities?

13   A.   I don't know if there's a magic number.

14   Q.   Have you ever seen a case where an airline that has less

15   than 50 percent is -- has control over an airport, airport

16   facilities?

17   A.   I've not -- don't know there's a magic number, but that's

18   what the literature shows.  It shows that carriers that have

19   a large presence have ability to influence access to those

20   airport resources for other carriers.

21   Q.   You're not contending that the Northeast Alliance gives

22   either American or JetBlue the ability to influence LaGuardia

23   Airport, are you?

24   A.   I'm not contending that, but I'm responding to your

25   question about what the cause of the airport presence premium

1  was.  And I was rejecting your premise and pointing to what

2  the literature finds.

3  **Q.**  Well, we'll get to the literature thing.  But to the

4  extent that the literature finds that the reason for -- that

5  increased airport presence causes fares to go up is increased

6  carrier control over the airport or carriers can control the

7  airport, that does not apply to the Northeast Alliance, does

8  it?

9  **A.**  I don't know if it does or not.

10  **Q.**  What percentage of flying out of Newark do JetBlue and

11  American combined have under the Northeast Alliance?

12  **A.**  I think it's relatively modest.  I've looked at the

13  number.  It escapes me right now.

14  **Q.**  How about out of LaGuardia?

15  **A.**  LaGuardia, again, it's relatively modest, but --

16  **Q.**  And JFK?

17  **A.**  JFK, JetBlue has about 30, and American has a little

18  north of 15.  And then out of Boston -- I'm going to

19  anticipate your question -- it's about the same.

20  **Q.**  Have you seen any study that shows -- that even if you

21  can treat JetBlue and American together, that 45 percent of

22  an airport causes that -- if an airline has 45 percent of an

23  airport, it causes fares to go up?

24  **A.**  I think that's the kind of range that they're finding.

25  That kind of increase in airport presence actually has an

1  meaningful impact on fares.

2  **Q.**  Not a 45 percent increase.  I'm talking about 45 percent

3  total.

4  **A.**  Yeah, I'm talking about that, that margin we're talking

5  about here.

6  **Q.**  What study found that?

7  **A.**  The Ciliberto and Williams.  I think there's -- and maybe

8  another.  Ciliberto and Williams.

9  **Q.**  And what airports were they looking at?

10  **A.**  I think they were looking at -- there's a couple of

11  different papers, but they were looking at papers -- or

12  airports -- I'd have to go back, but there were some

13  regulatory changes, and so they were leveraging changes in

14  presence driven by these regulatory changes.

15  **Q.**  And none of them looked at airports comparable to JFK or

16  Boston, correct?

17  **A.**  I'd have to go back and look, but I would assume they

18  would include all airports.

19        THE COURT:  A good New Yorker could never concede

20  that anywhere is comparable to New York.

21        MR. SCHWED:  Maybe not in a positive way.

22  BY MR. SCHWED:

23  **Q.**  And just going back to these studies, one of the things

24  they found is that a reason for fares going up when there's

25  increased relevance is increased attractiveness to customers.

1    I know you've pointed to other reasons you claim, but that is

2    a reason.

3    **A.**   That is one of the potential reasons, yes.  That's the

4    source of the ambiguity, because if -- all the reasons we've

5    been talking about.  If that was the only reason, there would

6    be no ambiguity to it; but there's some benefits that could

7    potentially go on to customers, which makes it ambiguous.

8    **Q.**   And you have made no attempt to measure or assess those

9    benefits with respect to the Northeast Alliance, correct?

10   **A.**   Again, we're in COVID.

11   **Q.**   I want to talk a little bit -- if there's more

12   capacity -- you would agree that if there's more capacity in

13   the Northeast because of the Northeast Alliance, consumers in

14   the Northeast would benefit, correct?

15   **A.**   It depends where that capacity came from and how it got

16   there.

17   **Q.**   I'm just -- I want to focus on the Northeast for a

18   moment, consumers in the Northeast and capacity in the

19   Northeast -- okay? -- the four airports that are covered by

20   this case.  Are you with me?

21   **A.**   I'm with you.

22   **Q.**   If there's more capacity within the Northeast Alliance,

23   then consumers within the Northeast Alliance are benefitting,

24   correct?

25   **A.**   It depends relative to the but-for world of no NEA.

1  **Q.**  Relative to the but-for world?

2  **A.**  Potentially, but you need to assess kind of the benefits

3  across the entire system to understand its total -- in total.

4  **Q.**  Right.  We'll get there in second, but you just -- you

5  will agree with me that just looking at the consumers in the

6  Northeast, they're better off?

7  **A.**  Under your hypothetical, likely.

8  **Q.**  And you haven't --

9        THE COURT:  Why wouldn't they be better off?

10       THE WITNESS:  Pardon?

11       THE COURT:  Why wouldn't they be better off?  It

12  might hurt somebody from Texas, because they might have

13  pulled capacity from Texas, but that's not his question.  His

14  question is just consumers in the Northeast.  So if they add

15  capacity in the Northeast, all other things being equal, why

16  wouldn't they be better off?

17       THE WITNESS:  Well, there could be harm.  They

18  could be paying more for it, so the net impact could be

19  higher fares, for example, which would undo that potential

20  benefit.  So that's one example for why --

21       THE COURT:  Wouldn't -- wouldn't capacity

22  ordinarily -- more capacity correlate to lower fares?

23       THE WITNESS:  Yeah, but there's also the -- the

24  joint venture has other components to it that lead to --

25  potentially lead to higher fares.  So you'd have to net out

1    all of those effects, which is, I think, one of my points

2    here, is that you need to account for everything, not just

3    one thing.  And you need to make the right comparison with

4    the NEA --

5             THE COURT:  So with consumers in the Northeast, you

6    would need to know not just is there increased capacity, but

7    then you're saying you'd want to know -- well, I guess the

8    question is, what's the question?  If the question is just:

9    Is increased capacity better for consumers in the Northeast,

10   period, what's the answer to that?

11            THE WITNESS:  It -- so if nothing else changes?

12            THE COURT:  With nothing else changing.

13            THE WITNESS:  Then, it probably would tilt towards

14   they were better off.  However, if once you allow for other

15   things to change --

16            THE COURT:  With all other things being equal, why

17   wouldn't it just be better?

18            THE WITNESS:  It depends on how that capacity is

19   allocated.  There might be people who are worse off because

20   of the things like --

21            THE COURT:  Overall, so there could be winners and

22   losers?

23            THE WITNESS:  Exactly.  And so you would have to --

24            THE COURT:  So overall -- I see.  So you would want

25   to know that to make overall net benefit for all consumers?

```
 1                THE WITNESS:  Exactly.  Yes.
 2                THE COURT:  And then if you're changing from --
 3      then you want to know what are -- how did you get the
 4      capacity and what were the pros and cons of however you got
 5      it to evaluate it, even if you're just looking at the
 6      consumers in the Northeast?
 7                THE WITNESS:  That's correct.
 8                THE COURT:  Okay.  I see.
 9                Go ahead.  Sorry.
10      BY MR. SCHWED:
11      Q.  And if -- if you want to broaden this to take the example
12      of somebody in Texas, let's just take hypothetically, if a
13      plane were taken from Texas.  In order to know the net
14      benefit, you need to know where that plane came from, right?
15      A.  Am I on that plane?  I'm sorry.  Can you ask me the
16      question again?
17      Q.  Yeah.  If you took a plane from Texas, as the judge gave
18      an example, in order to assess whether the benefit in the
19      Northeast from increased capacity was offset by some harm in
20      Texas, you'd need to know the dynamics of where that plane
21      was taken from?
22      A.  That would be one of the factors that you would have to
23      consider.
24      Q.  And that's -- and potentially could, right -- moving
25      plane from one route to another route or one geography to
```

1    another geography potentially could, just by itself, if you

2    looked only at that, that could lead to a net increase in

3    consumer welfare, correct?

4    **A.**   It could, but it also could decline -- decrease it.

5    **Q.**   You'd have to know a lot about the two different markets,

6    correct --

7    **A.**   You would have to assess kind of the impact on -- on

8    everybody.

9    **Q.**   -- right.

10   **A.**   And get it right.

11   **Q.**   And that's something you haven't done in this case,

12   correct?

13   **A.**   No.  Again, to do that you would need to do the schedule

14   and be able to --

15              THE COURT:  He just asked you if you did it.

16              THE WITNESS:  Yeah.

17              THE COURT:  No, you didn't?

18              THE WITNESS:  I didn't.

19   BY MR. SCHWED:

20   **Q.**   And, again, that issue would not be -- or -- withdrawn.

21              That calculus would not even be relevant if there

22   was an increase in planes compared to the but-for world and

23   the new flying in the Northeast was not taken from -- taking

24   a plane from somewhere else, but just adding a new plane to

25   the fleet that was adding capacity to the Northeast?  Is that

1    fair?

2    **A.**   So just adding capacity from -- just drops in from --

3    **Q.**   Say you delay retirement of a plane.

4    **A.**   It depends -- again, you would need to compare to the

5    but-for world.

6    **Q.**   Yeah.  Compared to the but-for world.

7    **A.**   But-for world, if there's capacity, there's probably some

8    benefit.

9    **Q.**   And just to be clear, what I'm talking about is in the

10   but-for world, a plane was going to be retired -- okay,

11   you're following me?

12   **A.**   Yeah.

13   **Q.**   In the actual world, that plane was not retired and was

14   flown in the Northeast.  Increasing capacity -- just -- let's

15   call it one plane at a time -- that's on average going to

16   help consumer welfare?

17   **A.**   I don't know about -- I mean, again, you have to do the

18   whole analysis.  I think that's not enough information, in

19   and of itself.

20   **Q.**   Unless -- all else being equal, that's going to help

21   consumer welfare?

22   **A.**   Again, you need to do more.

23   **Q.**   You do agree with me -- and this is straight from your

24   report, "An increase in capacity in the absence of a

25   corresponding increase in demand for air traveler raises the

1    competitive intensity of the airline industry."

2              You agree with that, right?

3    **A.**   That was -- again, I said that in my report.  Sure.

4    **Q.**   Okay.  Now, we talked earlier about -- very briefly about

5    your publications.

6    **A.**   Uh-huh.

7    **Q.**   And you testified that you had one airline-related

8    publication since grad school that actually got published,

9    correct?

10   **A.**   That is correct.

11   **Q.**   And that is a chapter in a book?

12   **A.**   It is.

13   **Q.**   And among other things, that chapter or the primary

14   purpose of that chapter is discussing the US Air-American

15   merger?

16   **A.**   It's a case study of that.

17   **Q.**   Of the US Air-American merger?

18   **A.**   Yes.

19   **Q.**   And one of the things that you do in that case study is

20   look at airline -- look at merger retrospectives of that

21   merger, correct?

22   **A.**   Yeah.

23   **Q.**   Okay.  And then until the time you were retained on this

24   case, you were actually working on another paper, correct?

25   **A.**   I was, yeah.

1   **Q.**  And that paper also was looking at retrospectives of
2   airline mergers?
3   **A.**  It was -- that was kind of the purpose of doing that,
4   yeah.
5   **Q.**  And that included the US Air-American merger?
6   **A.**  That was -- it was in the dataset that we were going to
7   look at.
8   **Q.**  And that's the most recent large merger in the airline
9   industry?
10  **A.**  It is.
11  **Q.**  And a merger retrospective is an attempt to assess the
12  effects of a merger after the fact, correct?
13  **A.**  Yes.
14  **Q.**  And it does that by looking at actual postmerger data?
15  **A.**  That's what they tried to do.  They tried to look at what
16  happened in the merger, because of the merger.
17  **Q.**  And they have a long history.  Mergers retrospectives
18  have a long history in the field of industrial organization?
19  **A.**  They do.
20  **Q.**  And, in fact, the FDC has started a merger retrospective
21  program to start looking at mergers, correct?
22  **A.**  That is correct.
23  **Q.**  Okay.  Now, you testified -- excuse me.  You testified
24  that you reviewed Dr. Miller's reports in this case, correct?
25  **A.**  That is correct.

1   **Q.**  And you rely on them for certain conclusions?

2   **A.**  I do.

3   **Q.**  And in Dr. Miller's analysis in the -- in this case, are

4   you aware that 92 percent of the harm he predicts with his

5   merger simulation relates to what's called nonstop, overlap

6   routes?

7   **A.**  I don't recall that specifically, but --

8   **Q.**  Does it sound directionally right?

9   **A.**  It seems about right.

10  **Q.**  And just to be clear, a nonstop overlap, right, that's a

11  common thing that gets looked at in airline mergers.  Is that

12  fair?

13  **A.**  Yeah, I think that's often the case.

14  **Q.**  And it's commonly analyzed in merger retrospectives?

15  **A.**  Yes.

16  **Q.**  And that's a route where both parties to a transaction,

17  whatever the transaction is, flew on a nonstop basis before

18  the transaction.

19  **A.**  That is -- that is correct.

20  **Q.**  And Dr. Miller --

21          THE COURT:  Hold on.  I think there's an objection.

22          MR. HEIPP:  I'm just going to object to this whole

23  line as outside of the scope of the direct.  We didn't talk

24  about retrospectives or anything like that.

25          MR. SCHWED:  Dr. Town opined on this in his

1   reports.  He relied on Dr. Miller's reports explicitly in his
2   reports and in his testimony.
3           THE COURT:  Let me ask you first just one question
4   for both of you, since this is the first expert, are you
5   reviewing the reports as before me in the entirety, or just
6   the expert's testimony?
7           MR. SCHWED:  Just the expert's testimony.
8           THE COURT:  Right.  Just the expert's testimony.
9           MR. JONES:  Your Honor, if it would be helpful to
10  you, we'd certainly -- would -- would --
11          THE COURT:  I don't know.  I mean, like, to be
12  clear, there's a lot of paper here and a lot for me to read.
13  So I'm not asking -- at the moment, I'm not asking whether
14  you all agree to let me review all the reports.  I'm asking
15  whether your view of how all of you have decided to try this
16  case is one in which what is being given to me is the
17  testimony of the experts and not, as evidence, the whole
18  report.
19          I will tell you, as to this question and to
20  anything else, since I'm the fact finder, if I think I'm
21  interested in something, or think it's helpful to me, which
22  might come more at the end, after I've digested more, I might
23  say to you, "I want this.  What about this?"  And then I
24  would be inviting all of you to tell me, "Judge, you don't
25  want to find out about that.  That's not -- we object to

1    that," or whatever, and that's fine.

2            And -- but I'd be engaging in a discussion with it.

3    So I'm not asking -- that's not what I'm asking you right

4    now.  I'm just -- as a point of my own clarification, were

5    you thinking -- and I think what you're telling me is you

6    were thinking, all of you, that all I would have before me

7    was the testimony, but I don't want to put words in your

8    mouth.

9            MR. JONES:  Your Honor, actually, on our exhibit

10   list, the plaintiffs proposed putting all the expert reports

11   in or marking ours.  The defendants proposed marking just the

12   exhibits from the expert reports.

13           So we didn't really have a meeting of the minds on

14   that.

15           THE COURT:  I see.

16           MR. SCHWED:  And we would object to the

17   introductions of the expert reports.  We can address why if

18   you want to now or save for a later day.

19           THE COURT:  A later day, I think.

20           MR. SCHWED:  Okay.

21           THE COURT:  But in terms of the objection, then --

22   okay.  So for the moment, it may be that reports are before

23   me or maybe not.  That's an unresolved question.

24           MR. SCHWED:  And I think this line of questioning

25   is appropriate regardless of whether the reports are in front

1    of -- in part because Dr. Town relied on Dr. Miller's report,

2    and I'm allowed to test whether that's a legitimate,

3    reasonable reliance in part because, just in general, even if

4    he had not mentioned it at all in his reports, which he has,

5    if one expert has written something in the academic

6    literature that directly undermines another expert in the

7    case, it would seem bizarre not to allow me to ask that

8    expert about the literature and his findings, and

9    particularly when it's part of their affirmative --

10              THE COURT:  So I don't get lost in the different

11   experts, you are saying --

12              MR. SCHWED:  Dr. Town --

13              THE COURT:  -- has written something --

14              MR. SCHWED:  -- that directly undermines exactly

15   what Dr. Miller has opined on.  And I think it's certainly

16   fair game --

17              THE COURT:  So you want to impeach Dr. Miller

18   with --

19              MR. SCHWED:  Yes.  Absolutely, Your Honor.

20              THE COURT:  And do any of the things upon which

21   Dr. Town relied on Dr. Miller relate to the opinions he's

22   offered on his direct?

23              MR. SCHWED:  He doesn't rely on the specific

24   numbers.  He relies on the underlying concepts that have gone

25   into Dr. Miller's numbers.

1          MR. WALL:  I just want to make a broader point, is

2     that both sides -- this actually works on -- both ways --

3     divided up work in some ways, even though the issues are

4     highly intertwined and complementary.  And so this is not

5     going to be a one-time thing.  There are things that

6     Dr. Carlton says that somebody might want to ask Dr. Miller

7     about or Dr. Israel about or vice versa or whatever.  We've

8     been doing that in the depositions, and so to suddenly put

9     everybody in a silo is a little surprising.

10         THE COURT:  Anything you want to add?

11         MR. HEIPP:  So I think this emphasizes the tension

12    that the defendants have put themselves in by objecting to

13    the introduction of the entire reports.  If they want to be

14    able to ask questions of any of the experts based on anything

15    that's in their reports, then those reports should be in

16    evidence.

17         And otherwise, there's no reason to deviate from

18    the normal principle that the process is limited by the scope

19    of the direct.  They can ask Dr. Miller about Dr. Miller's

20    opinions, but Dr. Town has not offered any opinions on direct

21    about what he's being asked about.

22         MR. SCHWED:  But --

23         THE COURT:  Well --

24         Go ahead.

25         MR. SCHWED:  Your Honor, just to be clear, this is

1    beyond the fact that it's in his report.  It's part of his

2    publications.

3           And I would also add that we have agreed that all

4    the exhibits get in and that the parties can cross on

5    anything related to the exhibits, and this is touched on in

6    some of his exhibits where he actually has some graphs that

7    are criticizing Dr. Carlton, which is one of the things he's

8    written about in his -- in his writings.

9           THE COURT:  I'm not ruling on the reports now,

10   whether they're admissible or not admissible or whether I'm

11   going to take them or not.  But I am going to overrule the

12   objection.  You can do this.  Go ahead.

13          MR. SCHWED:  Now, if we could -- let me find where

14   I was, Your Honor.

15   BY MR. SCHWED:

16   **Q.**   So Dr. Miller's average predicted price increase on

17   Boston nonstop overlaps is 28.7 percent.  Does that sound

18   right?

19   **A.**   I'd have to review it.  I don't recall it directly.

20   **Q.**   Does it sound directionally right?

21   **A.**   That detail, I would have to go look.

22   **Q.**   Let's assume for the moment that's right.  And then do

23   you recall that, on several of the nonstop overlaps, he

24   predicts price increases of more than 60 percent and even as

25   high as 94 percent?

1    **A.**   I'd have to go look at his report.

2    **Q.**   Isn't it a fact that, in your studying of merger

3    retrospectives assessing any airline merger, you've never

4    found one that has found average price increases on nonstop

5    overlaps that's anywhere close to 60 or 90 percent?

6    **A.**   In the article we're talking about that I wrote, I was

7    focused on -- only on American-US Air and the impacts of the

8    American-US Air merger.  There's a much larger -- evaluating

9    airline mergers that goes back quite a ways that finds very

10   big price increases.

11            In some of those -- a paper by Greg Peters looks

12   at -- it's an old merger, but it's kind of relevant for what

13   we're talking about today, which was a merger with People

14   Express -- it might have been Continental that merged with

15   People Express -- so People Express was kind of the LCC of

16   its time, merging with a legacy carrier.  And in that work,

17   he found very large price increases, I want to say, on the

18   order of 30 percent.

19   **Q.**   Dr. Town, can you turn to page 193 of your transcript, on

20   line 9.  Let me know when you get there.

21            THE COURT:  193?

22            MR. SCHWED:  193, yes, Your Honor.

23   BY MR. SCHWED:

24   **Q.**   Are you with me?

25   **A.**   Yeah.

1    **Q.**      "QUESTION:  Let me re-ask the question.  Are you

2    aware of any merger retrospective on any airline merger

3    showing price increases anywhere near 16.6 percent on nonstop

4    overlap routes?

5              "ANSWER:  I'm unaware, but there certainly may well

6    be."

7              So at the time of your deposition, you weren't

8    aware of anything, correct?

9    **A.**  Well, that was a very specific question about a very

10   specific aspect of a merger, so that would be -- require

11   strange recall.  But as I answer my question, there very well

12   may be; and there, in fact, is.

13   **Q.**  Just to be clear, you understood, when I said anywhere

14   near 16.6 percent, to mean 16.6 percent or greater or even

15   close to 16.6 percent, didn't you?

16   **A.**  I understood that to be your question.

17   **Q.**  Yes.  And so at the time of your deposition, you were not

18   aware of a single merger retrospective that had anything

19   close to even to 16 percent, not to mention the 28 percent

20   that Dr. Miller found?

21   **A.**  Well, again, you're talking about nonstop overlaps.

22   **Q.**  Yes.

23   **A.**  And you were asking me to kind of do an instant recall of

24   the entire literature on airline merger, which I didn't have

25   on the top of my head at the time.  As I say, I'm unaware.

1    But there certainly well may be, and that is the case.

2    **Q.**  Let's turn to your book chapter, which is Exhibit 1063.

3           Before I get there, in your report, you did do a

4    study -- in your reply report here, you did discuss a number

5    of merger retrospectives, right?

6    **A.**  All related to American-US Airways.

7    **Q.**  And your conclusion were these papers generally find low,

8    single-digit impacts on price, one way or another?

9    **A.**  I think that sounds like what I said, for the

10   American-US Airways merger.  I also note in my report, there

11   are reasons to be skeptical of that estimate as a causal

12   impact of that merger.

13   **Q.**  We'll get to that.

14          MR. SCHWED:  Just -- if you can call up, Andy,

15   1063.

16   BY MR. SCHWED:

17   **Q.**  This is your book chapter.  And this is the chapter we've

18   been talking about?

19   **A.**  Yes.

20   **Q.**  From 2018?

21   **A.**  Yes.

22   **Q.**  Can you turn to book page 467?  It's book page 467,

23   which, I believe, on the bottom right would be page 24, if I

24   have my page right.  Twenty.  Sorry.  I think.  Right?  Yes.

25   And this section that begins "Post-Mortem" is discussing the

1    retrospective analyses of the US Airways-American merger,

2    among other things, correct?

3    **A.**   Yes.  It looks at the two papers that were available to

4    study at that time.

5            I should note the purpose of this chapter is an

6    undergrad chapter, so it's for a specific audience.

7    **Q.**   But one of the articles you discuss in this chapter is a

8    report by Vikrant Vaze?

9    **A.**   Yes.  Yes, I'm sorry.

10   **Q.**   And that was a peer-reviewed article?

11   **A.**   Yes.

12   **Q.**   Published in an economics journal?

13   **A.**   I think it was a transportation journal.

14   **Q.**   Okay.  And he found that -- or they -- the authors found

15   that nonstop fares decreased after the American-US Air

16   merger, correct?

17   **A.**   They did, but they also found that that merger reduced

18   consumer welfare overall.

19   **Q.**   Very slightly, correct?

20   **A.**   A small amount, I believe, yeah.  It was a reduction.

21   **Q.**   But did not find fare increases anywhere close to what

22   Dr. Miller found, correct?

23   **A.**   In this -- for the American-Northwest, they did not -- or

24   American-US Airways, they did not.  But they did find that

25   capacity went down because of this merger, so the flight

1  frequencies, which is the reason why consumers were harmed.

2  **Q.**  There was a small decrease in fares, a small increase in

3  frequencies, and they were very close to offsetting each

4  other, correct?

5  **A.**  I think the differential was a small effect, but yeah.

6  **Q.**  And then the second retrospective you looked at in your

7  textbook was from Dr. Carlton and Dr. Israel and others,

8  correct?

9  **A.**  Correct.

10  **Q.**  And those are the same -- Professor Carlton -- doctors

11  who we'll be hearing from in this trial?

12  **A.**  It is.

13  **Q.**  And that was also a peer-reviewed publication?

14  **A.**  Not at this time.

15  **Q.**  Did it ultimately get peer reviewed and published?

16  **A.**  A version of that paper ultimately did, but not this

17  version, I think.

18  **Q.**  The version you were looking at was a draft?

19  **A.**  Yes.

20  **Q.**  And the ultimate conclusion on the effect on nonstop

21  overlap routes didn't change from the draft to the final, did

22  it?

23  **A.**  I'd have to check, but probably not.

24  **Q.**  Nothing material?

25  **A.**  I don't believe so.

1   **Q.**   Okay.  And what that found were price decreases on the

2   nonstop overlaps with the fewest number of competitors,

3   right?

4   **A.**   That's what they found.

5   **Q.**   And your book cited that article, and it didn't offer any

6   criticisms, right?

7   **A.**   No, it didn't, although that was not the point of this

8   article.  It's for an undergraduate audience, and so to do a

9   proper critique, it would be -- it wouldn't fit in that

10  journal.  I don't critique the Vaze paper either because --

11  for the same reason.

12  **Q.**   You don't offer criticisms of ether?  Just to be clear,

13  you do not offer criticisms of Vaze or Carlton, right?

14  **A.**   I'm reporting just what they find.  I'm not assessing the

15  validity of these results.  I'm just reporting what they

16  find.

17  **Q.**   I assume you wouldn't include in a textbook chapter a

18  couple of articles that you thought had no validity, would

19  you?

20  **A.**   The point of this article, this paper, was to kind of

21  provide a case study, to provide a balance view of the impact

22  of the US-American merger from both kind of the DOJ's side as

23  well as the parties' side.  And so in that spirit, I included

24  the relevant papers at that time that were out there on this.

25  And in that the spirit of kind of being fair and balanced, I

1      didn't criticize them.

2      **Q.**   Dr. Vaze, by the way, he had nothing to do with the

3      papers in the merger, did he?

4      **A.**   I'm sorry?

5      **Q.**   Dr. Vaze, who wrote one of those papers, he had nothing

6      to do with any of the parties to the merger, as far as you

7      know?

8      **A.**   Not as far as I know.

9      **Q.**   Just an academic that writes on the airline industry?

10     **A.**   That's my understanding.

11     **Q.**   Okay.  And then there have been some merger

12     retrospectives published after the two that you cite in the

13     textbook, correct?

14     **A.**   There have been.

15     **Q.**   And if you could turn to DX1061, which is not in

16     evidence.

17             MR. SCHWED:  So maybe don't put it up on the

18     screen.

19             Let me know when you have it.

20             THE COURT:  1061?

21             MR. SCHWED:  Yes, DX1061.  It should be in the book

22     that we handed out.

23             THE COURT:  Yes.

24     BY MR. SCHWED:

25     **Q.**   Let me know when you have it, Dr. Town.

1    **A.**   Oh, I'm sorry.  I was waiting for it to come up on the

2    screen.

3    **Q.**   I'm sorry; we can't put it up on the screen because it's

4    not admitted to evidence.  That's the practice -- it's should

5    be in the bigger -- I think it's the biggest of them all.

6              MR. WALL:  Your Honor, just this -- this comes up

7    once in while.  I mean, this is something like an article.

8    Nobody can possibly claim confidentiality.  Does it matter

9    whether we put it on the screen or not?

10             THE COURT:  It's fine with me.

11             MR. JONES:  No objection.

12   BY MR. SCHWED:

13   **Q.**   And this is another merger retrospective, correct?

14             THE COURT:  You'll have to decide whether you owe

15   them a copyright fee, the author.

16   BY MR. SCHWED:

17   **Q.**   You're familiar with this article?

18   **A.**   I am.

19   **Q.**   And I think you actually talked about this in one of your

20   reports, correct?  So you must be familiar?

21   **A.**   That's correct.

22   **Q.**   And this paper found that the American Airlines-US Air

23   merger tended to reduce prices and increase passenger traffic

24   on nonstop routes?

25   **A.**   Yeah.  I think you want to look at the entirety of the

1    results.  I think they found -- I think that's what they
2    find, but they also find price increases on other routes, as
3    I recall.
4    **Q.**  On overlap routes?
5    **A.**  I'd have to go back and check the tables.
6    **Q.**  On connecting routes?
7    **A.**  On connecting routes, that sounds correct.
8    **Q.**  But focusing on the nonstop overlaps that Dr. Miller
9    basis most of his damages on, this paper found that it
10   reduced prices and increased passenger traffic, correct?
11   **A.**  This paper did, but also in my report I highlight why in
12   this paper and the other paper is me inferring their causal
13   estimates, might -- is probably -- there is probably some
14   significant problems with them.
15            MR. SCHWED:  And if you can call up 1062.
16   BY MR. SCHWED:
17   **Q.**  This is another paper you've cited, correct, by Das?
18   **A.**  Yeah, again, this is on the American-US Airways merger.
19   **Q.**  And on average, prices on nonstop overlaps decreased
20   after the merger in this paper?
21   **A.**  That's what she finds, but again, this paper suffers from
22   the -- some of the issues that I highlight in my report.
23   **Q.**  And this is also a peer-reviewed economics journal?
24   **A.**  It is.
25   **Q.**  And you were working on a paper that assessed airline

1    mergers when you're -- when you were retained in this case,

2    correct?

3    **A.**   Yeah, I was beginning to work on that.

4    **Q.**   And you abandoned it around the time of this case?

5    **A.**   No, before -- before I abandoned it for --

6    **Q.**   You were hired September 2021?

7    **A.**   Yeah, maybe about the same time.  I'm trying to -- I'm

8    not sure we have a date where we said we're stopping.  We

9    just kind of --

10   **Q.**   You were hired in this case September 2021?

11   **A.**   Oh.  That sounds correct.

12   **Q.**   And you have a draft that's dated October 2021, don't

13   you?

14   **A.**   We may, yeah.

15   **Q.**   Okay.  And then you didn't do anything after that

16   October 2021 draft?

17   **A.**   I don't think we did.

18   **Q.**   Okay.  And then that paper employed a

19   difference-in-difference analysis to assess prior airline

20   mergers, correct?

21   **A.**   It was -- that was one of the things it was going to do.

22   It was going to assess kind of this -- one of the issues that

23   we've been talking about was heterogeneity in the impacts of

24   any kind of transaction.  Some people benefit; some people

25   don't.

1          And another point of the paper is that you can't

2     just look at quantity data to assess the welfare impacts of

3     mergers.  You need to make a lot of assumptions to make that

4     kind of inference, and it was developing new ways to be able

5     to assess the impact of a merger using quantity data.  And

6     the reason we abandoned it was because it was becoming clear

7     that that paper suffered from the same problem set these

8     other papers that we've been talking about would have

9     suffered.  And so we need a different way, an application

10    that avoids those problems.

11    **Q.**  When you say it suffered from the same problems, do you

12    mean that it found price decreases -- at least in the

13    draft -- it found price decreases on nonstop overlaps in the

14    American-US Air merger?

15    **A.**  No, no.  That's not the problem.  The problem is that the

16    control group is contaminated.  There's nonparallel trends.

17    There's all these issues that -- in this data that made it

18    clear, you know, we're not going to be able to do what we

19    want to do, and the identification is not clean, using the

20    economics term, to make the paper work.

21    **Q.**  But, Dr. Town, it is a fact that your draft paper found

22    price decreases on the nonstop overlaps in the US Airways-AA

23    merger, whether you think it was a valid methodology after

24    the fact, that's what it actually found at the time you were

25    hired in this case, right?

1   **A.**   That working paper, which was -- it's not a paper.  It

2   was just a draft of research that we're starting.  It wasn't

3   finalized.  It wasn't completed.  It was just the start of

4   something.

5   **Q.**   With all these caveats, the draft, blah, blah, blah, with

6   all those caveats, it found price decreases on the nonstop

7   overlaps in the American-US Airways merger, correct?

8   **A.**   I'd have to go back and look, but -- I'd have to go back

9   and look and see what the -- I don't recall.

10  **Q.**   Sitting here today, you don't remember one way or the

11  other whether it found price increases or price decreases on

12  the nonstop overlaps in the merger?

13  **A.**   Off the top of my head.  I would have to go back and

14  look.

15  **Q.**   Do you believe it found large price increases, or you

16  just have no idea?

17  **A.**   I'd have to go back and look.

18          MR. SCHWED:  I -- I see it's four o'clock.  I'll

19  pass the witness, Your Honor.

20          THE COURT:  All right.  Do you have more than

21  30 seconds?

22          MR. HEIPP:  I have more than 30 seconds.  That's

23  fair to say.

24          THE COURT:  Then we'll break here because it's a

25  sealed hearing.

1      There's not -- are they coming by Zoom?

2      THE DEPUTY CLERK:  Yes.

3      THE COURT:  It's by Zoom, so you can leave all your

4 things there.  No one is coming in, but you all have to leave

5 because it is a sealed hearing.

6      MR. WALL:  Thank you, Your Honor.

7      THE COURT:  And we'll resume as soon as it's done.

8      (Court in recess at 4:01 p.m.

9      and reconvened at 4:14 p.m.)

10      MR. HEIPP:  May I proceed, Your Honor?

11      THE COURT:  You may.

12      **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS**

13 BY MR. HEIPP:

14 **Q.**   Hello again, Dr. Town.

15      So you were asked some questions during your

16 cross-examination about the bankruptcies in the airline

17 industry starting in the mid-2000s or so?

18 **A.**   Yes.

19 **Q.**   Do you recall that?

20 **A.**   Yeah.

21 **Q.**   When did those bankruptcies occur?

22 **A.**   They occurred prior to the capacity discipline period,

23 with the exception of the American bankruptcy.

24 **Q.**   So setting aside for the moment the American bankruptcy,

25 the others occurred before 2009?

1    **A.**   Yes, that's correct.

2    **Q.**   Did you specifically test what happened to capacity

3    during the period of the bankruptcies --

4    **A.**   I did.

5    **Q.**   -- before 2009?

6    **A.**   I did.  One of my specifications allow for the

7    bankruptcies to have a differential impact on capacity during

8    that decade.  And the results of that analysis showed that

9    that original figure I had, which had the actual capacity and

10   predicted capacity, was very similar, suggesting that those

11   capacities -- those bankruptcies didn't disrupt the

12   relationship between jet fuel prices, GDP, and capacity.

13   **Q.**   Can you explain a little bit more what you changed when

14   you looked at the -- at that period of the bankruptcies?

15   **A.**   Sure.  So in my base specification, I had annual

16   indicators from 2009 onwards.  So in this analysis, I

17   extended those annual indicators from 2000 -- I think 2002

18   onwards.  And that will capture any impact of bankruptcies,

19   that the impact of bankruptcies would have on capacity in the

20   same way that my capacity discipline regressions would

21   capture the impact of capacity discipline on capacity.

22          And that showed no -- the line, the two charts

23   looked very similar.  The one I showed here and the figure

24   that results from when you include the annual indicators,

25   stretching back to 2002, I think.  They show -- they look

1    very similar, suggesting that those bankruptcies did not

2    impact the relationship between GDP and fuel prices.

3             THE COURT:  The annual indicators were what?

4             THE WITNESS:  They just take on the value for each

5    year, so there's an indicator for 2002, an indicator --

6             THE COURT:  What is it?

7             THE WITNESS:  Pardon?

8             THE COURT:  What is it?

9             THE WITNESS:  It's just a dummy variable, is often

10   what we call it.  It just takes the value of one during that

11   year, so that if the output during that year, the capacity

12   during that year is different than other years, then the

13   coefficient on that indicator variable will take on a value

14   of higher or lower depending upon if capacity is higher or

15   lower in those years relative to its historical relationship

16   between GDP and fuel prices.

17            THE COURT:  I see.  Okay.

18            Go ahead.

19   BY MR. HEIPP:

20   **Q.**  So now let's talk about American's bankruptcy.  That

21   bankruptcy, did that occur during the capacity discipline

22   period?

23   **A.**  It did.

24   **Q.**  And if we can pull up slide 20 from your demonstrative

25   deck, have you reviewed documents discussing American's

1    planned growth from when it was in bankruptcy?

2    **A.**   Yes.  This is a document that speaks to that.  This is

3    the US Airways draft and their concern that American, once it

4    exits bankruptcy, will actually grow faster and disrupt

5    capacity discipline.

6    **Q.**   So does this slide indicate that American's bankruptcy

7    made it impossible for American to grow?

8    **A.**   No.  It, in fact, suggests the opposite.  It allowed them

9    to grow.

10   **Q.**   Now, let's contrast that.

11              MR. HEIPP:  If we could pull up Exhibit 11 from

12   your report that Mr. Schwed showed you.  And this is PX0967.

13   BY MR. HEIPP:

14   **Q.**   Okay.  Do you remember talking about this a few minutes

15   ago?

16   **A.**   I do.

17   **Q.**   First of all, can you just describe, what does this table

18   show, generally?

19   **A.**   This table just shows the percentage change in capacity

20   for each of the years from 2010 to 2019 for the three large

21   legacy carriers and GDP in the far right column.

22   **Q.**   So this is just comparing capacity to GDP?

23   **A.**   Yeah, exactly.

24   **Q.**   So is this the -- is this the -- your main analysis of

25   capacity discipline or is this something else?

1    **A.**   No, it's not my main analysis, but it just highlights the

2    patterns that are consistent with capacity discipline.

3    **Q.**   Because your capacity discipline analysis also takes into

4    account jet fuel prices?

5    **A.**   Yeah.  Exactly.  This only looks at GDP and my analysis,

6    my other analysis takes into account jet fuel prices.

7    **Q.**   So what does this table indicate with respect to the

8    growth rate of American after it merged with US Air?

9    **A.**   So after it merged with US Air, its growth rate was below

10   GDP up through 2018.

11   **Q.**   And is that lower than what was reflected in American's

12   standalone plan from the bankruptcy that we just looked at?

13   **A.**   It is.

14   **Q.**   Okay.  Let's move to a different topic.

15              MR. HEIPP:  You can take that down.

16   BY MR. HEIPP:

17   **Q.**   You were asked a number of questions about whether

18   coordinated capacity discipline occurred during particular

19   time periods and not during other particular time periods,

20   and your testimony was that not every action during that

21   period was necessarily coordinated.  Did I understand you

22   correctly?

23   **A.**   Yes, that is correct.

24   **Q.**   What are some ways in which accommodating behavior can

25   arise without an agreement to limit capacity growth?

1   **A.**   It can arise simply by not growing broadly.  That would

2   be kind of the -- in accordance with GDP or below.  That's

3   how it would manifest in that case.  You're accommodating.

4   **Q.**   Does it matter if every decision to limit capacity

5   resulted from accommodating behavior?

6   **A.**   No, no.  The key is whether capacity is growing less than

7   the benchmark.  So however you're maintaining that, I think

8   that's in agreement with the agreement.

9   **Q.**   As part of your analysis and your report, did you look at

10   the capacity for the individual legacy airlines separately?

11   **A.**   I did.  I did it separately for each legacy carrier.

12   **Q.**   And what did that analysis show about each of the legacy

13   carriers and capacity discipline?

14   **A.**   For each of the legacy carriers, their pattern of

15   capacity followed that sawtooth pattern where there's a

16   divergence between -- for each of the individual carriers, it

17   was the same pattern for each carrier.

18              THE COURT:  The same seasonal --

19              THE WITNESS:  And the same seasonality because

20   their -- summer affects all carriers.  And so -- but that

21   divergence between predicted and actual occurred for each of

22   the legacy carriers.

23   BY MR. HEIPP:

24   **Q.**   So what did you conclude from that analysis, that each of

25   the legacy carriers, separately there was a divergence

1   between their actual and predicted capacity.

2   **A.**   Yeah, and it's consistent with each individual carrier

3   participating in capacity discipline.

4   **Q.**   You also testified about synthetic growth.  We looked at

5   the -- American slide, the Bill Barrows slide.

6   **A.**   Yes.

7   **Q.**   When we talk about synthetic growth, can you explain a

8   little bit more about what that means?

9   **A.**   That means that you are not adding capacity to the

10  system, but you're borrowing or leveraging potentially

11  capacity from another carrier.

12  **Q.**   So with a synthetic combination, does overall capacity go

13  up?

14  **A.**   Is unchanged.

15  **Q.**   Does it shift or repurpose capacity?

16  **A.**   That would be maybe part of the point.  Instead of

17  growing organically, you're shifting capacity around.

18  **Q.**   So can you describe the effect on competition of adding

19  overall capacity on the one hand, compared to synthetically

20  growing, so to speak, on the other?

21  **A.**   Yeah, so synthetically growing -- I would say adding

22  capacity would have a greater impact than synthetically

23  growing.

24  **Q.**   Are mergers examples of synthetic growth or synthetic

25  repurposing of capacity?

1    **A.**  Yes, they are.  Almost by definition, they're putting

2    together the two networks.

3    **Q.**  And what does your empirical analysis say, if anything,

4    about the effect of that sort of synthetic repurposing of

5    capacity on industry capacity?

6    **A.**  Yeah, as I said quite a bit into my testimony, that the

7    mergers from the 2000s and the -- 2000s to 2013 facilitated

8    capacity discipline.  And so that -- those mergers where they

9    are synthetically growing capacity facilitated the capacity

10    discipline period.

11    **Q.**  Mr. Schwed asked you some questions about whether you had

12    seen direct communications between the airlines about

13    coordinating capacity, and he referred to public statements.

14    Have you seen evidence of private communications between the

15    airlines and investors, for example?

16    **A.**  Yeah.  On one of my slides, I showed a quote where an

17    American executive was -- was -- yeah, this page -- where

18    Scott Kirby is -- tells the T. Rowe Price person that the

19    reason he's telling him about this capacity discipline, so

20    they can pass that message on to other airlines through their

21    investors.

22    **Q.**  And have you seen evidence that legacy airlines hope that

23    these private communications have an effect on the other

24    legacy airlines?

25    **A.**  Yes, I have.

1   **Q.**  Can you explain that?

2   **A.**  You can see it right here, where he's hoping -- he's

3   encouraging investors to push other carriers on capacity

4   growth, so he's -- he's hoping that this chain of

5   communication is complete.

6   **Q.**  Let's change topics.  Mr. Schwed gave you a hypothetical

7   where -- and I think it was American and JetBlue or JetBlue

8   gained 30 aircraft as a result of the Northeast Alliance.  Do

9   you remember that hypothetical?

10  **A.**  I do remember that.

11  **Q.**  And your testimony was that you would have to consider

12  what American was doing to know what the impact of that would

13  be?

14  **A.**  That's -- yes, I believe that was my testimony.

15  **Q.**  So I want to ask you more about that.  In the

16  hypothetical, what if JetBlue used the additional aircraft to

17  fly slots that American had been flying?

18  **A.**  Then American's capacity would go down in that

19  hypothetical.

20  **Q.**  Now, can you explain how that would work?

21  **A.**  Well, if JetBlue is flying those slots, if American was

22  flying those slots and JetBlue's capacity increased because

23  they got access to those slots, that means American is not

24  flying those slots.  And so it's a little bit of a zero sum

25  game in that, you know, if -- if one airline is flying a

1    slot, that means somebody else is not flying the slot.  And

2    if that slot is then flown by -- the number of slots is

3    increased by an airline, then it means another airline is not

4    flying that slot.

5    **Q.**   Did you look at any particular evidence about American

6    reducing capacity in any particular cities as a result of the

7    NEA?

8    **A.**   Yes.  They were decreasing capacity in Boston, for

9    example.

10   **Q.**   What about outside the NEA?

11   **A.**   And outside the NEA, there's evidence that they were

12   planning to reduce capacity at Philadelphia.

13   **Q.**   Now, switching topics again, just before the last break,

14   you were talking to Mr. Schwed about merger retrospectives?

15   **A.**   Yes.

16   **Q.**   In particular, the American-US Airways merger?

17   **A.**   Yes.

18   **Q.**   Was that a merger between legacy carriers?

19   **A.**   Yes, it was.

20   **Q.**   Is that comparable to the Northeast Alliance?

21   **A.**   No, that's very different.  This is a combination through

22   the NEA of a legacy carrier and a low-cost carrier.  And

23   that's a very different scenario than a merger between two

24   legacy carriers.

25   **Q.**   And you described some -- I think it was an academic

1    paper, I think you testified, that addressed somewhat of a

2    similar situation.  Can you explain that a little more?

3    **A.**   Yeah, so, you know, there's -- we don't really have

4    examples of LCCs merging with legacy carriers.  And so -- but

5    the closest thing was this merger with People Express that

6    occurred in the '80s.  And there, I believe -- and this is --

7    I have to go from memory -- that the price increases were on

8    the order 30 percent in that case.

9    **Q.**   Any other academic literature that you think is more

10   similar to what we're dealing with today than the

11   American-US Airways merger?

12   **A.**   This is a little bit different than -- not a little

13   bit -- it's a lot different than the other airline mergers

14   because it's an LCC merging with a legacy carrier.  So there

15   really is not an apples-to-apples comparison of the previous

16   mergers to this one, except maybe this Cont- -- this US -- or

17   People Express merger.

18   **Q.**   Sorry to be jumping around, but changing topics again,

19   Mr. Schwed showed you a graph from your report that showed

20   growth by American and JetBlue compared to Delta and United.

21   Do you remember that?

22   **A.**   I do.

23   **Q.**   How would you have been able to tell -- or how would you

24   be able to tell whether that growth was actually attributable

25   to the NEA or not?

1    **A.**  You wouldn't be able to tell because of COVID.

2    **Q.**  If you wanted to conduct an analysis to determine whether

3    the growth by American and JetBlue was because of the NEA or

4    because of something else, what kind of analysis would you

5    want to do?

6    **A.**  Well, you'd want to -- you'd want to have a control of

7    some sort.  You'd want to compare it more broadly, perhaps,

8    to assess the impacts across the entire network.

9    **Q.**  Have the defendants done an analysis like that for this

10   case?

11   **A.**  I think they've done some analysis along those lines.

12   **Q.**  So you said that looking at just the Northeast would

13   produce a biased sample.  Do you remember that?

14   **A.**  Yes.  It is an incomplete picture.

15   **Q.**  Can you explain that a little more?

16   **A.**  Well, as we've heard, JetBlue is capacity constrained, so

17   if it's going to increase flying in the Northeast, that means

18   it's flying less elsewhere.  And so you would want to account

19   for that, because there's this shifting of capacity around

20   the network through the NEA.  And so you would want to

21   consider what happened not only in the NEA, but in other

22   routes that JetBlue served outside of the NEA.

23   **Q.**  In response to a question, you said that it wasn't clear

24   whether more capacity would be procompetitive when looking at

25   just the Northeast.  Do you remember that?

1   **A.**  Yes.  I did.

2   **Q.**  Can you explain what else you would want to know to

3   determine whether an increase in capacity would be

4   procompetitive?

5   **A.**  Yeah.  You would want to know where that capacity came

6   from and what the opportunity cost was, like, did it reduce

7   flying elsewhere?  And you would also want to know what was

8   the impact on fares?

9   **Q.**  What impact would you expect if there was a corresponding

10  combination of airlines on nonstop overlap routes?

11  **A.**  I would expect there would be a fare increase.

12  **Q.**  And why would you expect that?

13  **A.**  Because competition is reduced.

14  **Q.**  So you would have to account for that loss of competition

15  to know whether it was procompetitive or not?

16  **A.**  That is correct.  Yes, you would.

17             MR. HEIPP:  Okay.  Nothing further, Your Honor.

18             THE COURT:  Any recross?

19             MR. SCHWED:  I have a few things, Your Honor.

20  **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT JETBLUE AIRLINES**

21  BY MR. SCHWED:

22  **Q.**  You were asked some questions about -- you said something

23  like synthetic growth doesn't -- isn't actual growth or

24  something along those lines.  Do you recall that?

25  **A.**  I think something -- I think that's not what I said,

1    but --

2    **Q.**  You know what I'm talking about?

3    **A.**  Roughly.

4    **Q.**  You would agree that synthetic growth can lead to

5    capacity growth overall.

6    **A.**  Could it?  It's not obvious to me.

7    **Q.**  For example, if American Airlines adds international

8    flights to the Northeast Alliance, that's organic growth

9    that's on top of synthetic growth, right?

10   **A.**  Well, it depends on where that the capacity is coming

11   from.

12   **Q.**  Well, that actually is a good question.  You were asked a

13   question, a hypothetical about JetBlue adding planes; and you

14   were asked, well, what if those planes are used to fly

15   American slots?  And you said, well, that's no net growth,

16   right?

17   **A.**  I don't think I said exactly that, but I think I said

18   there's a bit of a zero sum game.

19   **Q.**  But that would free up planes for American to use

20   somewhere else, right?

21   **A.**  Potentially, yeah.

22   **Q.**  And if American used those planes somewhere else, that

23   would increase capacity, right?

24   **A.**  Potentially, yeah.  You're shifting around a lot of --

25   it's a little bit of a shell game, right?  And so kind of how

1    that all shakes out is -- needs to be measured.

2    **Q.**  Well, it's not a shell game, as you phrase it, if JetBlue

3    and American both adds planes to their fleets.  That's just

4    going to increase capacity, won't it?

5    **A.**  That would increase crease capacity; but, again, it

6    depends what they would do otherwise.

7    **Q.**  Now, you mentioned the American-US Air -- you said it was

8    different because it wasn't a legacy and a low-cost carrier.

9    Was that your testimony?

10   **A.**  Yeah.

11   **Q.**  You're aware, I assume, because you studied it, that the

12   DOJ actually alleged that you -- that US Air was a maverick

13   because it offered advantage fares, correct, lower fares?

14   **A.**  Yeah, there was a coordinated-effects component of that

15   case, which is what you're talking about.  The DOJ was

16   concerned that not only were there going to be unilateral

17   effects from the merger, but also coordinated effects that

18   would affect fares in routes where there weren't overlaps.

19   There would be spillover.

20   **Q.**  And despite US Air offering maverick-type fares,

21   ultimately, the nonstop overlap routes did not end up having

22   price increases, right?

23            THE COURT:  Excuse me.

24            THE WITNESS:  I wouldn't make that conclusion.

25

1    BY MR. SCHWED:

2    **Q.**  You also were asked some questions about Philadelphia.

3    Do you remember that?

4    **A.**  I do.

5    **Q.**  You have not analyzed whether any flights to or from

6    Philadelphia were cut because of the Northeast Alliance, have

7    you?

8    **A.**  I have recently.

9    **Q.**  And what did you conclude?

10   **A.**  There's at least one flight that was -- that was

11   transferred.

12   **Q.**  Because of the Northeast Alliance?

13   **A.**  Well, I can't specifically say it was because of it, but

14   it occurred concurrently.  It was capacity added in JFK that

15   was removed from Philadelphia.

16   **Q.**  I assume, given everything you've testified, you're not

17   comfortable testifying that was because of the Northeast

18   Alliance, are you?

19   **A.**  Well, I think it's consistent with it being part of the

20   Northeast Alliance.  We heard testimony that there was

21   movement of flying of international flights from Philadelphia

22   to JFK in this alliance with that testimony.

23   **Q.**  Just like it's consistent that the E190s were not retired

24   because of the Northeast Alliance, as testified by numerous

25   executives, right?

1    **A.**  Well, I would have to go look at that.

2    **Q.**  Okay.  And then in terms of Philadelphia, did you hear

3    Mr. Raja's testimony about explaining the documents that

4    talked about Philadelphia?

5    **A.**  I heard that.

6    **Q.**  Okay.

7    **A.**  But I also heard other testimony about that, on that

8    topic.

9    **Q.**  And at one point -- you also talked about the study of

10   People Express.  Do you remember that?

11   **A.**  I do.

12   **Q.**  Just to be clear, that conclusion, that case, was based

13   on the fact that People Express was pricing at a fare that

14   was so low that People Express was losing money and being run

15   out of business, right?  Isn't that --

16   **A.**  I would have to go back.  I think, People Express was a

17   maverick, and so it was the merger of a legacy carrier with a

18   maverick, and there was estimated -- you know, the price

19   effects were quite large.

20   **Q.**  But it was a maverick that was pricing at a level that

21   was unprofitable and that's what was behind the entire

22   analysis of that paper, right?

23   **A.**  I don't think that was the conclusion in the paper or --

24   **Q.**  You don't recall that it was pricing at a level that was

25   unprofitable?

1  **A.**  I don't recall that in the paper.

2  **Q.**  And by the way, that -- that transaction combined three

3  airlines, didn't it?

4  **A.**  I'd have to go back and look.

5  **Q.**  You recall enough to bring up that merger, but you don't

6  recall if it was one -- two airlines combining or three, or

7  whether they were losing money?

8  **A.**  Well, you asked me about is there any other merger --

9  cases about mergers, and that was one that I could recall.

10  **Q.**  But you don't recall anything along the lines of whether

11  they were losing money or three or more airlines?

12           MR. HEIPP:  Asked and answered.

13           THE COURT:  Overruled.

14           THE WITNESS:  I was report what they did in their

15  retrospective merger analysis.

16           MR. SCHWED:  Nothing further.

17           THE COURT:  All right.  Thank you very much.

18  You're excused.  Have a nice day.

19           THE WITNESS:  Thank you.

20           THE COURT:  Next witness?

21           MR. JONES:  Your Honor, given the time, we have our

22  next witness here, but I would request if we would start

23  tomorrow morning with Dr. Miller.

24           THE COURT:  All right.  I mean, you want to --

25           MR. WALL:  How much time do you have for us,

1    Your Honor?  I know --

2              THE COURT:  I promised you two hours today, so that

3    would take us another 35 minutes.

4              MR. WALL:  I'd rather go forward, then, if it's

5    okay.

6              THE COURT:  Who is the witness?

7              MR. JONES:  Dr. Miller, Nathan Miller, our second

8    expert.  Our other expert.

9              THE COURT:  Never mind.  I promised you an hour and

10   a half today, not two hours.  And I gave you an hour before

11   three to four, and I've given you another half hour pretty

12   close.  So I don't -- I wouldn't -- that's enough for today.

13             So I'll see you tomorrow morning at 9:00 and we'll

14   resume then.  We stand in recess.

15             MR. JONES:  Your Honor, if I may quickly?

16             THE COURT:  Sure.

17             MR. JONES:  Just a heads-up to the Court that the

18   plaintiffs anticipate filing a motion for admission of a

19   small category of documents that we've -- we've talked about

20   with the Court, both in the pretrial conference and

21   subsequently.  So as we're getting close to the end of our

22   case, we want to kind of tee up this final set of documents

23   for consideration.

24             THE COURT:  Fine.

25             These are the Town -- the Town binders back.  I

1    don't need those anymore.

2            All right.  That's fine.  I have the other motion

3    and the opposition.  I've started to look at it, but I

4    haven't finished looking at it.  And it sounds like nobody is

5    giving me any homework for the weekend, or at least -- no

6    homework out of today as extra things.  I'm not complaining,

7    but there's plenty of other things to read in this case, but

8    just checking.

9            Okay.  Have a good night.

10           (Court in recess at 4:40 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **C E R T I F I C A T I O N**

2

3

4         I certify that the foregoing is a correct

5    transcript of the record of proceedings in the above-entitled

6    matter to the best of my skill and ability.

7

8

9

10   /s/ Rachel M. Lopez                October 11, 2022

11   /s/ Robert W. Paschal

12

13

14   _____          _____

15   Rachel M. Lopez, CRR              Date

16   Robert W. Paschal, RMR, CRR

17   Official Court Reporters

18

19

20

21

22

23

24

25