1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3

4      _____

5      UNITED STATES OF AMERICA, et al.

6            Plaintiffs,                    Civil Action No.
                                            1:21-cv-11558-LTS
7         v.

8      AMERICAN AIRLINES GROUP, INC.,
       et al.,
9
             Defendants.
10
       _____
11

12        BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                          BENCH TRIAL
                             Day 10
15

16
                     Wednesday, October 12, 2022
17                          9:00 a.m.

18

19

20
       John J. Moakley United States Courthouse
21     Courtroom 13
       One Courthouse Way
22     Boston, Massachusetts

23
       Rachel M. Lopez, CRR
24     Official Court Reporter
       raeufp@gmail.com
25

1                     **A P P E A R A N C E S**

2

   On behalf of the Plaintiff United States of America:

3

      UNITED STATES DEPARTMENT OF JUSTICE
4     BY:  WILLIAM H. JONES, III; JAMES H. CONGDON; MICHAEL
      DERITA; AND JOHN R. DOIDGE
5     450 Fifth Street, Northwest
      Suite 8000
6     Washington, D.C.  20530
      (202) 514-0230
7     bill.jones2@usdoj.gov
      james.congdon@usdoj.gov
8     michael.derita@usdoj.gov
      dick.doidge@usdoj.gov

9

10

   On behalf of the Defendant American Airlines Group, Inc.:

11

      LATHAM & WATKINS, LLP
12    BY:  DANIEL M. WALL AND MARGUERITE M. SULLIVAN
      505 Montgomery Street
13    Suite 2000
      San Francisco, California  04111
14    (415) 391-0600
      dan.wall@lw.com
15    marguerite.sullivan@lw.com

16

17   On behalf of the Defendant JetBlue Airways Corporation:

18      SHEARMAN & STERLING LLP
      BY:  RICHARD F. SCHWED AND MATTHEW L. CRANER
19    599 Lexington Avenue
      New York, New York  10022
20    (212) 848-4000
      richard.schwed@shearman.com
21    matthew.craner@shearman.com

22

23

24

25

## <u>**TABLE OF CONTENTS**</u>

**TRIAL WITNESSES**

On behalf of the Plaintiff:                                    <u>Page</u>

DAVID CLARK

       By Mr. Congdon                                    5

       By Mr. Craner                                    41

       By Mr. Congdon                                   77

NATHAN MILLER

       By Mr. DeRita                                    88

       By Mr. Wall                                      210

**EXHIBIT**

None

**P R O C E E D I N G S**

1

2          (In open court.)

3          (The following reported by Robert Paschal.)

4          (In open court at 9:00 a.m.)

5     THE COURT:  So you guys were busy last night?

6          I read the motion.  As to the schedule, you wanted

7     to expedite the privilege motion to have an opposition.  Was

8     it today?  Tomorrow.  Opposition tomorrow and then a ruling

9     by Friday?

10         Is that schedule fine with you?

11    MS. SULLIVAN:  Yes, Your Honor.

12    MR. WALL:  Yes, it is.

13    THE COURT:  All right.  Fine.  So we'll do that.

14    I'm not absolutely guaranteeing a ruling by Friday, but I'll

15    do my best.  And I have this thing on Friday from 9:00 to

16    1:00 and 2:00 to 4:00, and so it does interfere a little bit

17    with rendering decisions on other things, but --

18    MR. WALL:  Your Honor, if you want to cancel that,

19    I mean . . .

20    THE COURT:  You're happy with that, right?  Put it

21    all off for about three years?  Well, ask me to put it off

22    for three years, Mr. Jones, so I don't have to decide that.

23         All right.  So -- and the other one, the schedule

24    by next Friday -- was it next Friday?  By the 20th -- or the

25    18th.  That's fine.  All right.

```
1              So who is up first?
2              MR. JONES:  Your Honor, plaintiffs call David Clark
3     of JetBlue -- a little bit of a change in schedule to
4     accommodate witness schedule, but we call David Clark of
5     JetBlue.  My colleague Mr. Congdon will be conducting the
6     examination.
7              THE COURT:  Okay.  Mr. Clark, you come forward.
8     Raise your right hand.
9              (Witness duly sworn.)
10             THE DEPUTY CLERK:  Thank you.  You may be seated.
11             THE WITNESS:  Thank you.  Good morning.
12             THE COURT:  Good morning.
13             Go ahead.
14             MR. CONGDON:  Thank you.
15                           DAVID CLARK
16           having been duly sworn, testified as follows:
17         DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS
18    BY MR. CONGDON:
19    Q.  Good morning, Mr. Clark.
20    A.  Good morning.
21             MR. CONGDON:  And, Your Honor, Jack Congdon for the
22    United States on behalf of the plaintiffs.
23             One minor housekeeping item just before we start
24    the examination -- we're likely to use an exhibit that has
25    been sealed in its entirety by JetBlue because it contains
```

1    forward-looking information.

2              We've spoken with JetBlue's counsel and we're

3    agreed -- and we spoke with Ms. Belmont, and I think we can

4    publish it so it doesn't show up to the gallery and it

5    doesn't show up on Zoom.  So it will only be on the witness

6    screen, my screen, and your screen and, obviously, counsel's.

7              THE COURT:  Just so -- and maybe you've already

8    worked this out with Ms. Belmont who understands this system

9    better than I, but will it be on the lawyers' screens or no?

10             MR. CONGDON:  That's my understanding.

11             THE COURT:  It will be?  So the one thing you all,

12   I just advise you about, for all of you, when it's on your

13   screens, you -- your screens are facing rearward.

14             I don't know who all these people are.  The one

15   conclusion I am drawing the inference from is almost everyone

16   in the courtroom is a lawyer working for the Department of

17   Justice, American, and JetBlue, but it may be that some of

18   these people actually aren't.  I don't know.  So that's up to

19   you to think about what exposure occurs, if any, from those

20   screens.  I just tell you that because --

21             MR. CONGDON:  Sure.  And I think --

22             THE COURT:  But that procedure is fine with me.

23             MR. CONGDON:  Okay.  And I think it's fine with

24   them.  If they have -- if Mr. Craner or JetBlue's counsel has

25   an issue, then we can discuss and we can potentially close

1    the courtroom or -- we're just trying to avoid that.

2              THE COURT:  Just fold the screens down.

3              MR. CRANER:  If there's an issue, Your Honor, we'll

4    let you know.

5              THE COURT:  Yeah.  I'm just telling you that so

6    you're not suddenly surprised.

7              MR. SCHWED:  It may make sense, Your Honor, for

8    those of us in the back row, which I think is more visible,

9    to turn our screens -- I don't know if you can turn it

10   off from the front or --

11             THE COURT:  I don't think we can turn them off

12   individually.

13             MR. SCHWED:  Turn them around?

14             THE COURT:  I think you can just turn them around

15   or put them face down or put a pad over them.  Just lean a

16   pad against them.

17             MR. CONGDON:  I think if you turn it this way, I

18   think everyone over here is covered, but --

19             THE COURT:  Fine.  There you go.

20             MR. CONGDON:  But we will be -- to be clear, we

21   will be using the screen, because it's a spreadsheet, and

22   that's --

23             THE COURT:  Sure.  That's fine.  Sounds good.  Go

24   ahead.

25             MR. CONGDON:  Thank you.

BY MR. CONGDON:

Q.   Mr. Clark, you should have a binder in front of you which contains your deposition transcript and some other documents, and we'll likely refer to that during your examination.  I'll let you know where and when to turn in that binder.  Okay?

A.   Thank you.

Q.   Mr. Clark, you're currently the head of revenue and planning at JetBlue, correct?

A.   Correct.

Q.   And you were promoted to that role in January of this year, correct?

A.   Yes.

Q.   You took over for Mr. Scott Laurence, correct?

A.   Yes.

Q.   When he left JetBlue?

A.   Correct.

Q.   Prior to that, you were vice president for sales and revenue management, correct?

A.   Yes.

Q.   And you served in that role from 2017 until January of this year, correct?

A.   Correct.

Q.   And you've worked at JetBlue overall since 2009, correct?

A.   Yes.

Q.   Now, in your role as vice president for sales and revenue

1    management, you were not involved in JetBlue's decision

2    whether to enter into the Northeast Alliance, correct?

3    **A.**   That is correct.

4              THE COURT:  What does revenue -- when you're a VP

5    of revenue and sales management, what does that mean?

6              THE WITNESS:  Sales and revenue management -- so I

7    oversaw JetBlue's small sales team, as well as our

8    distribution teams which decides where we sell the fares,

9    onto travel agents, things like that.  And the main role was

10   the revenue management team that sets the pricing of the

11   fares and decides which fares to sell on which flight.

12             THE COURT:  So someone gives you the product of the

13   schedule, and then you decide how much to charge on a

14   Boston-Miami or whatever and how to adjust the tiers of

15   fares, whether to do a spring sale or not do a spring sale,

16   or what have you.

17             THE WITNESS:  Correct.  And the team also decides

18   what comes with the fare, what you can buy to add onto it,

19   the cost of those add-ons.  Things like that.

20             THE COURT:  All right.  Go ahead.

21   BY MR. CONGDON:

22   **Q.**   So the Court heard earlier from Mr. Evan Jarashow about

23   pricing, and he reported up to you as head of sales and

24   revenue management, correct?

25   **A.**   Correct.  There was a director between us, but he was

1    part of my team.

2    **Q.**   Okay.  Thank you.

3          Mr. Clark, I want to talk about Boston for a

4    minute.  Boston is a focus city for JetBlue, correct?

5    **A.**   Yes.

6    **Q.**   And approximately two-thirds of JetBlue flights touch

7    either Boston or New York; is that right?

8    **A.**   Approximately, yes.

9    **Q.**   And JetBlue began serving Boston around 2004; is that

10   right?

11   **A.**   I believe so.  It was before my time at JetBlue.

12   **Q.**   And by 2019, before COVID and before the Northeast

13   Alliance, JetBlue had grown to become the largest carrier in

14   Boston, correct?

15   **A.**   Yes.

16   **Q.**   And as to that same time period, the end of 2019,

17   American was the third largest airline in Boston, correct?

18   **A.**   That sounds about right.

19   **Q.**   Okay.  And Delta was the second?

20   **A.**   Yes, I believe so.

21   **Q.**   Okay.  And fair to say that currently, sitting here

22   today, you view Delta as your main competitor in Boston?

23   **A.**   Absolutely.  They've been our main competitor there for

24   many years.

25   **Q.**   You're familiar with "Project Revere," correct?

**A.**   Yes.

**Q.**   And that was a plan for JetBlue to compete in Boston, correct?

**A.**   It was one of several series of plans to better compete in Boston given how competitive the market was.

**Q.**   And this was a plan you had prior to entering into the Northeast Alliance, correct?

**A.**   Correct.

**Q.**   And prior to entering into the Northeast Alliance, it was JetBlue's goal to compete as hard as possible against Delta, correct?

**A.**   We competed as hard as possible against a number of competitors in Boston.  There was probably at least five that we were competing against, including Delta.

**Q.**   And including American, correct?

**A.**   Correct.

**Q.**   Now, prior to entering into the Northeast Alliance, JetBlue didn't have plans to pull back in Boston, did it?

**A.**   No.  I mean, we -- we have never had plans to hold back in Boston.  We were forced to due to the pandemic when air travel plummeted, but we've been consistently growing Boston for over a decade now.

**Q.**   So maybe I should have been more clear.  Prior to the Northeast Alliance and prior to COVID, JetBlue had no plans to pull back in Boston, correct?

1    **A.**   Correct.

2    **Q.**   In fact, it had plans to continue to grow in Boston,

3    correct?

4    **A.**   Correct.

5    **Q.**   And prior to the Northeast Alliance, JetBlue competed

6    against other airlines for business customers in Boston,

7    correct?

8    **A.**   Yes.

9    **Q.**   And that included American?

10   **A.**   Yes.

11   **Q.**   Turn to topics for a second.  Mr. Clark, you're familiar

12   with the term "available seat miles" in the context of the

13   airlines industry, correct?

14   **A.**   Yes, I am.

15   **Q.**   ASMs?

16   **A.**   Yes.

17   **Q.**   And that simply reflects the number of seats available

18   for sale on a given flight, multiplied by the miles on that

19   flight, correct?

20   **A.**   Correct.

21   **Q.**   And that's the most common metric used to measure

22   capacity in the airline industry, in your experience?

23   **A.**   There's several metrics, but that's probably the most

24   common, yes.

25   **Q.**   Another metric would be seats?

**A.**   Seats, departure count.

**Q.**   Seats, departures, ASMs, those are all metrics to measure

capacity, correct?

**A.**   Correct.

**Q.**   And JetBlue tracks capacity using available seat miles,

correct?

**A.**   That's the one we use most often, I would say.

**Q.**   Now, Mr. Clark, I'd like you to turn in your binder to

what's been marked PX816.  I think it's towards the back and

it's a document that's been admitted into evidence?

         MR. CONGDON:  And so, for everyone's reference,

this is a document that's been sealed in its entirety.  It's

an e-mail and a spreadsheet that's been attached.

BY MR. CONGDON:

**Q.**   Mr. Clark, we've printed out the spreadsheet in the

binder, but I would like to walk through it on the screen

since it's a native file and we need to look at the formulas

that are inside the spreadsheet.  So it will be up on your

screen.

**A.**   Thank you.

**Q.**   And to be clear, I may -- should have said this at the

beginning, I'm going to try and ask you questions without

referencing specific numbers in the spreadsheet because I

think that's what's been identified as sensitive.  And so I'd

ask if you can answer without giving specific numbers.  If

1    you feel like you need to, then let me know, and we can

2    discuss, but I think we can try and do it without that.

3    **A.**   Sounds good.

4              MR. CONGDON:  So I don't know if we're able to --

5              THE COURT:  Kellyann?

6              THE DEPUTY CLERK:  It should be coming up.

7              MR. CONGDON:  Looks like it worked.  Thank you.

8    BY MR. CONGDON:

9    **Q.**   Mr. Clark, the first page of this exhibit is an e-mail

10   from Richard Johns to you, dated July 21, 2021; is that

11   right?

12   **A.**   Yes.

13   **Q.**   And at the time of this e-mail, Mr. Johns was one of your

14   director reports, correct?

15   **A.**   Correct.

16   **Q.**   And he was the director of revenue analysis and ancillary

17   strategy; is that right?

18   **A.**   That's correct.

19   **Q.**   And he was responsible for revenue forecasting?

20   **A.**   That was one of his responsibilities, yes.

21   **Q.**   And as vice president of sales and revenue management,

22   ultimately, you were responsible for revenue forecasts for

23   the company, correct?

24   **A.**   Correct.

25   **Q.**   And that included revenue forecasts that went into

1    JetBlue's five-year plans, correct?

2    **A.**  Yes.

3    **Q.**  And at the time of this e-mail, in the summer of 2021,

4    JetBlue was putting together a five-year plan, correct?

5    **A.**  Yes.

6    **Q.**  And, in fact, if you recall, JetBlue had presented its

7    five-year plan to the board of directors in June of 2021,

8    correct?

9    **A.**  We do every June.  It's an annual -- it's an annual plan.

10   **Q.**  Okay.  And you were involved in that plan that went to

11   the board of directors in June of 2021, correct?

12   **A.**  I was involved in the creation of it.  I was not at the

13   meeting.

14   **Q.**  Okay.  And the subject line of this e-mail is "Copy of

15   five-year plan, revenue and status for BOD v4," correct?

16   **A.**  Correct.

17   **Q.**  And it looks like Mr. Johns attaches a spreadsheet that

18   has the same name, correct?

19   **A.**  Yes.

20   **Q.**  And "BOD" in that -- both the subject and the attachment

21   refers to board of directors, correct?

22   **A.**  I believe so, yes.

23   **Q.**  And "five-year plan" refers to the five-year plan we were

24   just talking about?

25   **A.**  Yes.

1    **Q.**   Okay.  And I guess just to be clear, Mr. Johns was also

2    involved in creating that five-year plan that went to the

3    board of directors, correct?

4    **A.**   Correct.  He, as I recall, was the primary author of it,

5    of the calculations and the forecasting.

6    **Q.**   And he reported directly to you, correct?

7    **A.**   Correct.

8    **Q.**   You would have overseen his work before it went to the

9    board of directors, correct?

10   **A.**   Um, yes.  He would have reviewed it with me before we

11   finalized it.

12   **Q.**   Okay.  Now as of July 2021 when this e-mail was sent,

13   JetBlue had already entered into and begun implementing the

14   Northeast Alliance, correct?

15   **A.**   Yes.  That's correct.

16   **Q.**   And you see, Mr. Johns he writes in the body of the

17   e-mail, "the real number is in line 49."  Do you see that?

18   **A.**   I do.

19   **Q.**   And it says, "You'll see the building blocks up to that

20   number within this, as well."  Is that right?

21   **A.**   Yes, that's what the e-mail says.

22   **Q.**   So what I would like to do now is pull up the actual --

23   the attachment, the spreadsheet onto the screen.

24              MR. CONGDON:  Just so counsel is aware and

25   Your Honor is aware, this includes visible -- all of the rows

1    and all of the tabs in the spreadsheet.

2    BY MR. CONGDON:

3    **Q.**   So I would like to start where Mr. Johns did, if we

4    could, down in Row 49.  You see in Row 49 there is a --

5    there's a cell on A49 that says "keep E90 with NEA"?

6    **A.**   Yes, I see that.

7    **Q.**   And then the rest of Row 49 is highlighted in yellow,

8    correct?

9    **A.**   Yes.

10   **Q.**   And then in cell G49, in bold and italics, it says "to

11   the board," right?

12   **A.**   Correct.

13   **Q.**   And so you understand that these were revenue figures

14   that were presented to the board of directors as part of

15   JetBlue's five-year plan?

16   **A.**   This e-mail is about a month and a half before the board

17   meeting.  So as of this time in the preparation process, this

18   is the number we were using.  I don't recall if that number

19   changed or if the final number was different.  The next board

20   meeting wasn't until September of that year.

21   **Q.**   But you had presented the five-year plan to the board of

22   directors in June before this e-mail, correct?

23   **A.**   Correct.

24   **Q.**   Okay.  And so do you see in rows 47 through 50 there are,

25   in column A, there are four different scenarios?

1    **A.**  I do.

2    **Q.**  Okay.  And do you see the top two scenarios in rows 47

3    and 48 say "base"?

4    **A.**  Yes.

5    **Q.**  And the scenarios in 49 and 50 say "keep E90."  Do you

6    see that?

7    **A.**  I do.

8    **Q.**  Okay.  And do you understand the difference between

9    "base" and "keep E90" to be whether JetBlue kept E190

10   aircraft in its fleet?

11   **A.**  Correct.  We had announced a retirement plan, a

12   retirement schedule for the E190s, and we were -- we were

13   planning to extend the life of those E190s to allow us

14   additional aircraft to fly the growth opportunities that the

15   NEA presented.  So it was to keep them longer to fund growth

16   objectively related to the NEA.

17   **Q.**  Okay.  And so the base scenarios here in 47 and 48 don't

18   include keeping the E190 aircraft, correct?

19   **A.**  Correct.

20   **Q.**  And the scenarios in 49 and 50 that say "keep E90"

21   involve keeping the E190 aircraft, correct?

22   **A.**  Correct.

23   **Q.**  And then do you see in rows 47 and 50, the scenarios say

24   "no NEA," correct?

25   **A.**  Yes, correct.

1    **Q.**  And we're going to do our best to go through these

2    scenarios.  In Rows 48 and 49, the scenarios say "with NEA,"

3    correct?

4    **A.**  Correct.

5    **Q.**  And so the difference there between no NEA and with NEA

6    is projections based on whether JetBlue would enter the

7    Northeast Alliance or had not, correct?

8    **A.**  Correct.  We were doing various scenarios.  And one of

9    the factors in the scenarios was, over the five-year period,

10   if we were in the NEA or if we were not.

11   **Q.**  Okay.  So just to sort of sum up and be clear, Row 47,

12   base, no NEA, means do not keep the E190 aircraft and do not

13   enter the Northeast Alliance, correct?

14   **A.**  Correct.

15   **Q.**  Okay.  And Row 48, base with NEA, reflects not keeping

16   the E190 aircraft but entering the Northeast Alliance,

17   correct?

18   **A.**  Correct.

19   **Q.**  And Row 49, keep E90 with NEA, and that's what went to

20   the board of the directors, that's keeping the E190 aircraft

21   and entering the Northeast Alliance, correct?

22   **A.**  Correct.

23   **Q.**  And Row 50, keep E90, no NEA, is if you had kept the E190

24   aircraft, but did not enter the Northeast Alliance, correct?

25   **A.**  Yes, but that was a somewhat moot scenario.  We would

1    only keep the E190 because of the NEA.  So while that fourth

2    scenario is on the page, it was not one that was seriously

3    under consideration.

4    **Q.**  But you had at least, someone had at least projected that

5    out, correct?

6    **A.**  I think, for completeness, there's two factors, so

7    therefore four scenarios; but as I recall, the real options

8    were 47 and 48 and 49.

9    **Q.**  Okay.

10            THE COURT:  Just ask the question -- it seems not

11   accurate for the -- for 48F and 49F to be identical.

12            THE WITNESS:  The E190s were still to be retired,

13   just at a slower schedule.  So I believe the reason they're

14   identical in 2026 is that, under both scenarios, the E190s

15   would be out of fleet by then.  So "keep E190s" is a

16   shorthand.  It's a bit of a misnomer.  It just means you

17   retire them a few years later.

18            THE COURT:  So by that date, the fleet sizes are

19   the same under 48 or 49?

20            THE WITNESS:  Correct.

21            THE COURT:  I see.  Okay.

22            Go ahead.

23   BY MR. CONGDON:

24   **Q.**  That's your understanding, right, Mr. Clark?

25   **A.**  Yes, that's my understanding.

**Q.**   Now, if we look at rows 52 through 54, you see it says
"diff" in cell A52?

**A.**   I do.

**Q.**   And then cell A53 says, "keep E90, with NEA," right?

**A.**   Yes.

**Q.**   And if we move over to cell B53, there's a number in that
cell.  I don't want you to read it out loud, but there's a
number, correct?

**A.**   Yes.

**Q.**   And if you look up at the formula bar at the top of
Excel, you're familiar with that, right, Mr. Clark?

**A.**   Uh-huh, yes.

**Q.**   You see there's a formula and it says B49 minus B48,
correct?

**A.**   I do, yes.  Correct.

**Q.**   And if we look back up to B49 and B48, B49 is the
projected revenue in the keep E90 with NEA scenario.  And
you're subtracting from that in B48 the projected revenue
from the base with NEA scenario, correct?

**A.**   Sorry.  Can you repeat that once more?

**Q.**   Yeah.  No problem.

         So if you -- the formula is B49 minus B48, correct?

**A.**   Correct.

**Q.**   And B49 is the revenue in the keep E90/with NEA scenario,
correct?

**A.**  Yes.

**Q.**  And B48 is the base with NEA scenario, correct?

**A.**  Correct.

**Q.**  And so when you subtract B49 -- when you subtract B48 from B49, what you're measuring is the difference that keeping E90 makes in the scenario where you enter the NEA in both instances, correct?

**A.**  That's correct, yes.

**Q.**  Okay.  And, again, I don't want you to read it out loud, but there's a number in that cell based on that formula, correct?

**A.**  There is, yes.

**Q.**  And if we go down a cell to B54, this is the keep E90/no NEA, correct?

**A.**  Yes, that's correct.

**Q.**  And there's a formula in this cell, as well, correct?

**A.**  Yes.

**Q.**  And that's B50 minus B47?

**A.**  Correct.

**Q.**  And so here, B50 is the keep E9/no NEA scenario and B47 is the base no NEA scenario, correct?

**A.**  Correct.

**Q.**  Okay.  So that formula represents taking the revenue from the keep E90/no NEA scenario and subtracting the revenues from the base no NEA scenario, right?

1    **A.**   Correct.

2    **Q.**   So what you're measuring there is the difference in

3    revenue attributable to keeping the E190s, keeping constant

4    in both scenarios that you didn't enter the Northeast

5    Alliance, correct?

6    **A.**   Correct.   But, again, this is a theoretical calculation,

7    because there was no intention at all to keep the E190s

8    unless we were in the NEA.

9    **Q.**   Well, I understand, but the calculations were put on the

10   spreadsheet, correct?

11   **A.**   Yes.

12   **Q.**   Okay.   And there's a figure that comes out of that

13   formula in B54, correct?

14   **A.**   Correct.

15   **Q.**   Okay.   And the figure in B54 is higher than the figure in

16   B53, correct?

17   **A.**   Correct.

18   **Q.**   Okay.   And that reflects that the difference that keeping

19   the E190 fleet aircraft in JetBlue's fleet is making in terms

20   of revenue is larger in a scenario without the Northeast

21   Alliance than with the Northeast Alliance, correct?

22   **A.**   So in this hypothetical scenario that we weren't

23   considering, the revenue difference is higher because we

24   would deploy the fleet differently, hypothetically, without

25   the NEA.

1           The NEA drives many more business routes, which

2  tend to be shorter haul.  So you have lower revenue and you

3  have lower costs when you fly aircrafts shorter haul.  So

4  this is -- we're seeing half the formula, just the revenue

5  side.  And, again, it's on a scenario we weren't seriously

6  considering.

7  **Q.**  Okay.  But you were considering it in this spreadsheet,

8  correct?

9  **A.**  The math is done on the spreadsheet, yes.

10  **Q.**  And someone had projected out five years in that

11  scenario, correct?

12  **A.**  Correct.  All the rows go up five years, yes.

13  **Q.**  Okay.  And so your testimony, Mr. Clark, is that you

14  agree the revenue in this, in B54, is higher than the revenue

15  in B53, correct?

16  **A.**  The spreadsheet shows the number in B54 is higher than

17  the number in B53; but, again, it's -- B54 is a hypothetical

18  scenario that was never under serious consideration.  There

19  was no way we were going to keep the E190s if we weren't in

20  the NEA.  We already announced the retirement plan for them

21  before the NEA was conceived.

22  **Q.**  Is it your testimony that just because the revenue is

23  higher, it's possible your profit margin might be higher

24  under the Northeast Alliance, and that would be different?

25  **A.**  Profits is not directly related to revenue.  If you have

1    lower cost because of more short-haul flying, the costs can

2    be lower and you can have higher profits even on a lower

3    revenue base.

4    **Q.**   And just to be clear, moving across the spreadsheet, the

5    figures in Row 54 are higher than the figures in Row 53, all

6    the way through column E, 2025, correct?

7    **A.**   Correct.  That difference in stage length persists

8    throughout all five years.

9    **Q.**   If we could take a look up at -- I want to go up a little

10   bit on the spreadsheet to rows 25 through 29.

11   **A.**   Yes.  I see them.

12   **Q.**   And you see that references, "loyalty revenue"?

13   **A.**   I do.

14   **Q.**   And if you look at I guess cell A28, or row 28, this is

15   projected loyalty revenue in the keep E90/with NEA scenario,

16   correct?

17   **A.**   Correct.

18   **Q.**   And Row 29 is projected loyalty revenue in the keep E90,

19   no NEA scenario, correct?

20   **A.**   That's correct.

21   **Q.**   Okay.  And just looking across the figures from columns B

22   through F, so 2022 through 2026, in each of the years, the

23   projected loyalty revenue is higher in the keep E90/no NEA

24   scenario than the keep E90/with NEA scenario, correct?

25   **A.**   It's very slightly higher, by less than 1 percent.

1   **Q.**   But it's higher each of those years, correct?

2   **A.**   On the spreadsheet.  That's correct.  Our projection at

3   the time were to be slightly higher.

4   **Q.**   And, Mr. Clark, I don't want you to, again, say any of

5   the figures, but just looking at the magnitude of these

6   figures and loyalty revenue, do you understand that this

7   would include JetBlue's co-brand credit card revenue?

8   **A.**   Correct, yes.

9   **Q.**   Okay.  We can move down to rows 62 through 66.

10  **A.**   Is it helpful to discuss why or that -- in actuality, the

11  numbers have come up different than the projections?  There's

12  a lot of color here.

13  **Q.**   I'm sure your counsel will be happy to ask you questions

14  about that.

15  **A.**   All right.  Thank you.

16          THE COURT:  That's the hard part about being a

17  witness.  You only get to answer the questions they ask, but

18  there's a lot of people representing JetBlue.  I'm sure -- if

19  they weren't going to ask you those questions before, I

20  guarantee they're going to ask you those questions now.

21          THE WITNESS:  Thank you.  I appreciate it.

22          MR. CONGDON:  I had an idea that they might.

23  BY MR. CONGDON:

24  **Q.**   Rows 62, column A62, says "ASMs," correct?

25  **A.**   Yes, correct.

**Q.**  And that's the measure of capacity we talked about
before, right?

**A.**  Correct.

**Q.**  And rows 63 through 66, they have the same four scenarios
that we've been discussing, correct?

**A.**  Correct.

**Q.**  And you see Row 65, this is the keep E90/with NEA
scenario, right?

**A.**  Yes.

**Q.**  Highlighted in yellow and again in row -- in column G, it
says "to the board" in bold and italics, right?

**A.**  Correct.

**Q.**  And you understand that these capacity figures for the
keep E90/with NEA scenario were presented to JetBlue's board
of directors?

**A.**  I believe so.  They're at least the numbers we're using
at the time, yes.

**Q.**  And cell B -- 65, if we can go back to it -- has a
figure.  Again, I don't want you to say the number out loud.
And that number represents JetBlue's projected available seat
miles in 2022 under the keep E90, with NEA scenario, correct?

**A.**  Correct.

**Q.**  And just below it, cell B66, that is a number that
represents ASMs, JetBlue's projected available seat miles in
2022 in the keep E90/no NEA scenario, correct?

1    **A.**   Correct.

2    **Q.**   And the figure in cell B66, the no NEA scenario, is

3    higher than the figure in cell B65 with NEA, correct?

4    **A.**   It's about 1 percent higher due to that stage length

5    issue that we -- that I mentioned before.

6    **Q.**   Okay.  And that's true across all of the years in the

7    five-year plan going out to 2026, correct?

8    **A.**   Yes.  Consistent all five years.

9    **Q.**   Okay.  So, Mr. Clark, as of July of 2021, JetBlue was

10   projecting more available seat miles in this -- across its

11   network in the scenario where it kept the E190 aircraft and

12   did not enter the Northeast Alliance than the scenario where

13   it kept the E190 aircraft and entered the Northeast Alliance,

14   correct?

15   **A.**   Correct.  Due to shorter stage length, due to serving

16   more business markets.

17   **Q.**   Can you explain what you mean by shorter stage length?

18   **A.**   Sure.  The distance on average that a plane flies is what

19   we call the "stage length."  So Boston-LaGuardia is about

20   175 miles.

21           A plane that's flying a shorter haul will do more

22   departures during a day, but will go fewer total seat miles

23   because of all the time, you know, at the gate, turning the

24   aircraft, taxiing in from the runway, taxiing out to the

25   runway.  So a plane would fly many more ASMs flying to

1    Florida twice a day than flying between Boston and New York

2    four or five times a day.

3    **Q.**   Okay.  And so what you're explaining here is ASMs are a

4    function of two inputs, right?  Seats and miles?

5    **A.**   Correct.

6    **Q.**   And what you're explaining is that the reason that ASMs

7    might be lower here is because of the second part of that

8    function, the miles, right?

9    **A.**   Correct.

10   **Q.**   And so what your testimony is that departures -- your

11   understanding is departures would be up in this scenario even

12   though miles are down?

13   **A.**   Absolutely, yes.

14   **Q.**   By a significant amount?

15   **A.**   Yes.  Because we'd added -- we'd expanded our fleet

16   because of the NEA.  We delayed the retirement of the E190s.

17   We then added 30 A220s to the order book.  We were flying

18   many more departures in this scenario with the NEA and

19   keeping the E190s.

20   **Q.**   And seats would be up, too, right?

21   **A.**   Correct.  ASMs would be the only capacity metric that

22   would be down.

23   **Q.**   And that's just because of the mileage input, correct?

24   **A.**   Correct.

25   **Q.**   If you looked at seats, you would expect it to be up a

1    significant amount?

2    **A.**  Yeah, so if you take a plane, let's say with 100 seats,

3    flying between Boston and New York, it's about 1,200 miles.

4    It can go back and forth two round trips, so that plane is

5    going to fly 4,800 miles in a day.

6           If you then put it between Boston and New York, it

7    can fly maybe six times a day, but 175 miles.  That's only

8    1,200 miles.  So it went from flying 4,800 miles in a day to

9    only 1,200.  It's flying a quarter as many ASMs as before,

10   but now has more departures, more seats, and more low fares

11   for customers.

12   **Q.**  Okay.  Let's take a look at one of the other tabs in this

13   spreadsheet.  If you go --

14          THE COURT:  The 4,800 -- times two times the number

15   of seats for the ASMs?

16          THE WITNESS:  Right.

17          THE COURT:  And then six times 1,200?

18          THE WITNESS:  So I was just short-handing it.  The

19   4,800 would be the miles.

20          THE COURT:  Sure.

21          THE WITNESS:  If you did two round trips from the

22   Northeast to Florida, you would then multiply it by 100 seats

23   on the aircraft if we're discussing the E190s.  So that would

24   go from 4,800 to 480,000, whereas the ASMs, when you put it

25   between New York and Boston, would only be about 120,000.  So

1    ASMs have shrunk by three quarters on that plane for that

2    day, yet seats have increased.  Customers have increased.

3                   THE COURT:  Okay.  Go ahead.

4    BY MR. CONGDON:

5    **Q.**  So, Mr. Clark, let's just -- you've referenced the

6    potential number of seat miles, available seat miles, can be

7    very high, right?

8    **A.**  It -- they're large numbers, yes.  These are in the --

9    you know, millions.

10   **Q.**  I was going to ask, actually, is the numbers that we're

11   looking at here, those are in the thousands, correct?

12   **A.**  I believe you would -- correct.  The actual numbers is a

13   thousand times more than what's on the spreadsheet.  It's

14   just been simplified for visual purposes.

15   **Q.**  Thank you.  Appreciate that.

16                   So let's look at another tab on this spreadsheet.

17   If we can go to the keep E90/no NEA tab here.  Do you see

18   that, Mr. Clark?

19   **A.**  I do.

20   **Q.**  Okay.  And this is now detailed information.  It looks

21   like by aircraft type of various different metrics in the

22   "keep E90, no NEA" scenario, right?

23   **A.**  Correct.

24   **Q.**  And if we go down to the bottom, there's a table starting

25   at Row 93, and it says "system in A93."  Do you see that?

1    **A.**  I do.

2    **Q.**  And you understand this table to be -- if you put all of

3    the fleet together, this is the systemwide metrics in this

4    scenario?

5    **A.**  I believe so.  If you highlighted one of the cells, we

6    can maybe see the formula, if it's a formula, but that seems

7    to be what we're seeing here, is a summation of all different

8    fleet types.

9    **Q.**  Okay.  Now, if we go to cell I96, you see there's a

10   figure in that cell?

11   **A.**  I do.

12   **Q.**  And you see it's in the column that says 2022?

13   **A.**  Yes.

14   **Q.**  And you see it's in the row that says "seats"?

15   **A.**  Yes.

16   **Q.**  Okay.  And so this is JetBlue's projected seats in 2022

17   under the keep E90/no NEA scenario?

18   **A.**  Correct.  This is that hypothetical scenario we -- I

19   think we created it in order to be able to measure the value

20   of keeping the E190s.  I had mentioned before sort of it's a

21   baseline.  So even though we weren't considering it, it was

22   helpful to be able to communicate how valuable keeping the

23   E190s were.

24   **Q.**  Got it.  Understood.  So that figure in cell I96, do you

25   see that?

1  **A.**  Yes.

2  **Q.**  Okay.  Now we're going to flip to the keep E90/with NEA

3  tab, and we'll go down to that same cell, I96 for 2022.  And

4  we can flip back and forth to make it a little bit easier,

5  but you see that number is higher in the keep E90/with NEA

6  tab, correct?

7  **A.**  Correct.  There's more seats in the keep E190/with NEA

8  than in the keep E90/no NEA.

9  **Q.**  Right.  But that be difference is pretty small, isn't it?

10  **A.**  It's about a percent more.  I mean, it's in the same

11  range of all the differences we've been point out in the

12  spreadsheet.

13  **Q.**  It's less than 1 percent, correct?

14  **A.**  Yeah, a bit less than 1 percent.  Yes.

15  **Q.**  Okay.  So at this time, in the summer of 2021, JetBlue

16  was projecting a less than 1 percent difference in seats in a

17  scenario in which it kept the E190 fleet and entered the

18  Northeast Alliance than a scenario where it kept the E190

19  fleet and did not enter the Northeast Alliance, correct?

20  **A.**  For that year, but I would believe, as years went on, we

21  would have retired more E190s, that number likely grows in

22  the following years.

23  **Q.**  Okay.  Let's take a look at 2025, then.  You see the

24  number there in I -- or sorry -- L96?

25  **A.**  I do.

1  **Q.**  And that's the projected seats -- we're in the keep

2  E90/no NEA tab, right?  That's the projected seats in the

3  keep E90/no NEA scenario in 2025?

4  **A.**  Yes.

5  **Q.**  And, again, it's a little hard to do without reading the

6  figures out loud, but we'll flip back now, keep E90/with NEA

7  scenario.  Do you see that same cell, L96?

8  **A.**  I do.

9  **Q.**  Okay.  And again, we can flip back and forth to give you

10  the numbers, but, again, that's less than 1 percent

11  difference, right?

12  **A.**  It is.  But it looks like in 2023, the number has grown

13  because, keep in mind, it was just delaying the retirement.

14  So by 2025, we're retiring the E190s even in the keep E190

15  scenario.  So -- and we recall in 2026 they became equal

16  because in both scenarios, we retired all of them.

17          So it looked like the seat increase peaks around

18  2023, 2024 where you get the most differential aircraft

19  between the two scenarios.

20  **Q.**  Okay.  And even in 2023, the difference is only around

21  1 percent, right?

22  **A.**  Correct, about 1 percent more seats in the keep NEA, in

23  the keep E190/with NEA scenario.

24  **Q.**  Okay.  And you mentioned departures as well, correct?

25  **A.**  That's another metric of capacity, yes.

1    **Q.**  And you thought departures would be significantly up

2    with -- in a scenario with the Northeast Alliance as opposed

3    to without the Northeast Alliance, right?

4    **A.**  Yes, likely higher.

5    **Q.**  Well, if we look just a row up, 95, and again, if we go

6    to cell I95, it's 2022, you see there's a figure there in the

7    keep E90/no NEA scenario?

8    **A.**  I do.

9    **Q.**  Okay.  And if we flip to that same cell in the keep

10   E90/with NEA scenario, you see, again, it is slightly higher,

11   right?

12   **A.**  Correct.

13   **Q.**  But, again, by less than 1 percent?

14   **A.**  In that year it's less than 1 percent.  The next year, it

15   looks like it's more than 1 percent.

16   **Q.**  Okay.  Let's look out to 2025.

17   **A.**  Yeah, back below 1 percent in 2025.

18   **Q.**  So even in the highest differential year, 2023, JetBlue

19   was only projecting a 1 percent difference in seats and

20   departure in a scenario where it kept the E190 fleet and

21   entered the Northeast Alliance, as opposed to a scenario

22   where it kept the E190 fleet and did not enter the Northeast

23   Alliance, correct?

24   **A.**  Yes, but again, it's a completely moot scenario.  The

25   numbers we should really be comparing are keep E190s with the

1   NEA and base without the E190s.  There was never a scenario

2   where we would keep the E190s and not to the NEA.  What we're

3   comparing it to is an unrealistic scenario.  That was never

4   under consideration.

5            So we should compare keep E190s/with NEA to base/no

6   NEA in order to see the growth that was projected, and that's

7   where we'll see the benefits of the 30 additional aircraft we

8   ordered and delaying the retirement of the E190s.

9   **Q.**  Well, you just testified that it was useful to have the

10  keep E190/no NEA scenario as a baseline to compare against,

11  right?

12  **A.**  But not for these purposes.  If you compare the two, keep

13  E190/with NEA, keep E190/no NEA, that actually shows the

14  difference in the revenues with or without the NEA.  I

15  misspoke before.  I said it was the difference with or

16  without E190s.  It's actually the different with or without

17  the NEA between those two scenarios.

18  **Q.**  Okay.  But just using the figures that were compiled here

19  as part of JetBlue's five-year plan in 2021, JetBlue compared

20  the keep E90/no NEA scenario to the keep E90/with NEA

21  scenario and showed less than 1 percent difference in seats

22  and departures in those two scenarios, correct?

23  **A.**  We just did the math ourselves clicking between the

24  formulas.  I didn't see anywhere where we had calculated the

25  difference in seats or departures between those two

1    scenarios.

2    **Q.**   Okay.  But you don't dispute the math that we just did,

3    correct?

4    **A.**   Correct.

5           THE COURT:  So the purpose of these two tabs is to

6    compare the value of the NEA controlled for no shift in the

7    number of planes, right?  Because your -- the scenario is

8    imagining keeping the E190s -- these two compare keeping the

9    E190s either way, right?  That's what these two tabs are that

10   we've just been looking at?

11          THE WITNESS:  Correct.  And I'm not sure why we

12   created the keep E190/no NEA tab, because it wasn't a

13   scenario under consideration.  My best guess is we did it

14   just for completeness, sort of two variables would lead to

15   four scenarios, but only three of those scenarios were really

16   under consideration.

17          THE COURT:  Why wouldn't this scenario been under

18   consideration?

19          THE WITNESS:  We had already announced the

20   retirement of the E190s.  They were exiting the fleet.  It

21   was only after the NEA was announced and all the growth

22   opportunities that it created that we realized we needed more

23   aircraft in order to fulfill those opportunities.  So the

24   keep E190 scenario only existed within that NEA --

25          THE COURT:  Came about because of the NEA.

1           THE WITNESS:  It came about because of the NEA,

2    correct.

3           THE COURT:  So it didn't occur to anybody pre-NEA

4    why don't we just grow by keeping the E190s longer.

5           THE WITNESS:  Correct.  Quite the opposite.  We had

6    decided before the NEA was conceived to retire the E190s

7    because we were -- we were modernizing our fleet.  We were

8    upgrading to a more higher fuel efficient, better customer

9    experience fleet.

10           We still are, but we needed to slow the growth in

11   order to have more aircraft in the short-term to take

12   advantage of the growth opportunities from the NEA.

13           THE COURT:  You need to slow the growth?

14           THE WITNESS:  Excuse me.  We need to slow the

15   retirement --

16           THE COURT:  Slow the retirement.

17           THE WITNESS:  -- in order to have more airplanes to

18   fulfill the growth opportunities that NEA created.

19           THE COURT:  I see.  Okay.

20           Go ahead, Mr. Congdon.

21   BY MR. CONGDON:

22   Q.  Well, just to follow up on that, if you didn't have the

23   Northeast Alliance, JetBlue would still at least consider

24   whether to keep the E190s, right?

25   A.  We had done analysis on whether or not to keep the E190s

1    before the NEA existed, correct.

2              THE COURT:  Pre or post-COVID?

3              THE WITNESS:  Pre.  As I recall, we had announced

4    the retirement of E190s before COVID.

5    BY MR. CONGDON:

6    Q.  And just to be clear, in the mid scenario tab that we

7    looked at, the revenue differential was higher in the

8    scenario where you did not enter the Northeast Alliance,

9    correct?  That was rows 53 and 54?

10   A.  Right, only because of the longer stage length and the

11   more ASMs that got driven from the longer stage length that

12   we would have flown without the NEA, more leisure flying.

13   Q.  And you mentioned that the decision to retire the E190

14   fleet was made prior to COVID, correct?

15   A.  That's my recollection, yes.

16   Q.  It's entirely possible that COVID, given how much it

17   changed, would have caused you to reconsider that decision

18   even regardless of the Northeast Alliance, correct?

19   A.  Definitely not.  COVID was extremely destructive for

20   demand.  We had hundreds of aircraft parked in the desert.

21   It would not have caused us to keep airplanes.  It was kind

22   of quite the opposite effect.

23             THE COURT:  Hundreds of planes unrelated to the

24   E190 in the desert?

25             THE WITNESS:  Correct.  We had -- we parked

1    roughly --

2              THE COURT:  This was during COVID or --

3              THE WITNESS:  During COVID.  That summer -- spring

4    and summer of 2022, we parked I want to say roughly

5    two-thirds of our fleet, more than half, in the desert.  And

6    we had parked all fleet types.  We had parked some of the

7    E190s, some of the A320s, some of the A321s.

8              THE COURT:  I see.  Okay.  Go ahead.

9    BY MR. CONGDON:

10   Q.  But, again, just to be clear, rows 53 and 54 show higher

11   revenue attributable to keeping the E190s without the

12   Northeast Alliance than with, correct?

13   A.  It's what the spreadsheet says, but it doesn't really

14   mean anything.  It's comparing a real scenario to a -- a

15   scenario we were never considering.

16   Q.  But a scenario that had been mapped out for five years in

17   2021, correct?

18   A.  We had mechanically done it in the spreadsheet, yes.  It

19   was -- the numbers were there.

20   Q.  Okay.  And you don't have any reason to dispute the

21   numbers that were mapped out, correct?

22   A.  That's correct.

23             MR. CONGDON:  I pass the witness, Your Honor.

24             THE COURT:  Okay.

25             MR. CRANER:  Thank you, Your Honor.

1          THE COURT:  Cross-examination.

2          MR. CRANER:  Thank you.  Just one sec to set up,

3     Your Honor.

4     **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT JETBLUE AIRWAYS**

5     BY MR. CRANER:

6     **Q.**  Good morning, Mr. Clark.

7     **A.**  Good morning.

8     **Q.**  I just want to pick up on the line of questioning from

9     Mr. Congdon.  First of all, can you explain what the purpose

10    of this exercise was that was done in July of 2021?

11    **A.**  Sure.  Every year, we refresh our five-year plan.  So it

12    helps us project into the future what our capacity will be,

13    our revenue, our growth, our profits.  It helps us plan for

14    the longer term.

15             And often, when you go that far in the future,

16    there's uncertainty, and you need to do multiple scenarios

17    that take into account the different scenarios that may be

18    actually in place in a few years time.

19    **Q.**  Okay.  And what assumptions about the overall fleet were

20    made as part of this exercise?

21    **A.**  So I don't recall exactly, but I know at a high level,

22    the NEA was creating a lot of growth opportunities.  And we

23    were thinking hard as a company about how to have more

24    capacity to fulfill those growth opportunities.  So the

25    immediate thing we did was said, well, let's retire to E190s

1    more slowly because not -- not retiring the planes gives us

2    more aircraft and we can therefore do more flying.  So that

3    was the initial, I would say, short-term fix.

4              But we certainly were attracted by the A220

5    aircraft, which was the replacement for the E190s.  And we

6    feel that's a better experience for customers, and it's a

7    more fuel efficient and overall efficient aircraft.  So as a

8    second step, we ordered an additional 30 A220s so that we

9    could retire the E190s and give our customers, you know, one,

10   40 additional seats and, two, a better customer experience.

11             So step one, delaying the retirements, gave us 30

12   extra airplanes; and step two, ordering the A220s, made those

13   30 extra airplanes even bigger and more sort of customer

14   friendly.

15   Q.   Okay.  And at the time you did this exercise, had the

16   A220s been ordered or accelerated?

17   A.   I don't recall specifically.

18   Q.   Is the A220s factored into this analysis?

19   A.   The initial order absolutely would have been.  I don't

20   quite recall the timing of the additional 30 A220 orders, and

21   if it was before or after this, but the initial order would

22   have absolutely been included.

23   Q.   Okay.  Is there anything in the spreadsheet or the

24   columns that reference the A220s?

25   A.   I do think I saw on the detailed tab in the back where it

1  had it by fleet.  I do think there was a block in there for

2  the A220s.

3  **Q.**  But the cells that you were looking at that talk about

4  E -- E190s, retired not retired, NEA/no NEA, did that factor

5  in the A220s, or is that looking just at the E190s?

6  **A.**  I think the only difference between those scenarios was

7  the E190 retirement schedule.  I think the A220 plan would

8  have been identical in both scenarios.

9  **Q.**  And you mentioned before that there was no realistic

10  scenario where there would be no NEA, but the -- still using

11  the E190s.  Can you explain that a little further, why?

12  **A.**  Correct.  We had already made the decision to retire the

13  E190s.  We had already set a decision timeline, so that was

14  going to happen.  The only reason we revisited that decision

15  and decided to delay the retirement in the E190s was because

16  of the NEA and because of the growth opportunities it

17  provided.

18        There was never a consideration of extending the

19  E190s without the NEA.  We had actually just made that

20  decision prior to COVID, and nothing about COVID made us want

21  to change that decision.

22  **Q.**  Okay.  And just to be clear, the fleet size, how can you

23  compare it with regard to the NEA's?  Was the fleet size

24  bigger with the NEA or smaller?

25  **A.**  Absolutely bigger.

1    **Q.**  And can you explain why that is?

2    **A.**  Sure.  Roughly, it would be 30 aircraft bigger with the

3    NEA because we very specifically ordered 30 additional A220s

4    to help fulfill those growth opportunities.

5            It certainly could end up being even larger than

6    that over time as success from the NEA fuels more growth

7    opportunities and, therefore, allows us to order incremental

8    airplanes in order to capture those additional growth

9    opportunities.  But it's at least 30 sort of clear from that

10   previous order.

11   **Q.**  Okay.  So it's a larger fleet.

12           You mentioned the A220s before and some of the

13   benefits it may have.  Can you explain the differences from a

14   cost perspective of the A19- -- the E190s and A220s?

15   **A.**  Sure.  The A220 is far more fuel efficient -- I want say,

16   offhand, 30 to 40 percent more fuel efficient.  And then if

17   you think about things such as pilots, right, you only need

18   two pilots for both, even though the A220 has 40 additional

19   seats.

20           When you look at the two, the departure --

21           THE COURT:  Does the E190 have more seats -- more

22   pilots?

23           THE WITNESS:  Both aircraft would only have two

24   pilots --

25           THE COURT:  I see, but one of them would --

1          THE WITNESS:  But one has 40 percent more seats.

2          When you sum up all the costs, the departure costs

3    of the A220 is in the same ballpark.  I think it's slightly

4    higher, but in the same ballpark as the departure cost of the

5    E190, despite having 40 additional seats.

6    BY MR. CRANER:

7    **Q.**   Okay.  And this is a revenue analysis, right?

8    **A.**   Correct.  This had only revenue in it.  Not profit or

9    cost.

10   **Q.**   So is revenue the only factor to consider when deciding

11   what planes to fly?

12   **A.**   Absolutely not.  It's --

13   **Q.**   You mentioned costs, for example.  How would costs impact

14   this?

15   **A.**   So the longer your flight is, the more costs you incur,

16   right?  The more crew time you have to pay for, the more fuel

17   you burn.  So the longer a flight, the higher the cost.

18          So revenue is only one piece of the picture.  We're

19   optimizing profits, right?  That's sort of the lifeblood of

20   the company.  And we would need to look at both revenue and

21   costs in order to determine the profits and, therefore, if a

22   scenario is -- is worth pursuing.

23   **Q.**   And you mentioned, in terms of variables going to cost, I

24   think you said that the assumption was that the E190s would

25   do short-haul flying; is that right?

1   **A.**   Correct.  In the NEA scenario, it would do even more

2   short-haul flying because it allows us to better compete for

3   business customers, and they tend to fly shorter haul routes.

4   So we would do even more in the NEA.

5          And then in general, the E190 aircraft is

6   reasonably efficient at shorter hauls, at a shorter haul

7   flight.  The longer the stage length becomes, the less

8   efficient it becomes versus other aircrafts.  So we try to

9   keep the E190 generally on shorter haul flights to sort of

10  make best use of its cost profile.

11  **Q.**  And I think you explained why short-haul flying can lead

12  to lower capacity.  What does short-haul flying mean in terms

13  of cost?

14  **A.**   It would lead to lower costs as well.  As mentioned,

15  there's less crew time to pay for, there's less fuel to burn.

16  **Q.**  And to be clear, does this analysis analyze cost?

17  **A.**   No.  I saw no cost figures at all in that analysis.

18  **Q.**  And you mentioned another factor that goes into deciding

19  what planes to fly was profitability.  Was this analysis

20  designed to measure profitability at all?

21  **A.**   Not all at all.  This was purely a revenue analysis,

22  which is what my team was responsible for.  The finance team

23  would have been doing is some more cost analysis and you

24  would put those two together to get the profitability of each

25  scenario.

1   **Q.**  Okay.  And --

2          THE COURT:  So your team doesn't do costs?  It's

3   projecting the -- someone gives you the schedule and then you

4   figure out how to maximize the revenue under that schedule?

5          THE WITNESS:  Correct.  So there would be one set

6   of sort of capacity numbers with the forecasts for

7   departures, ASMs, seats.  Based on that set of capacity

8   status, my revenue management team would have forecasted the

9   revenue off of it.  The finance team would have forecasted

10  the cost off of it and then those would go together into one

11  model that would show the profits, cash flows, and things

12  like that.

13         THE COURT:  So is the schedule being formed without

14  the participation of the cost side and the revenue side?

15         THE WITNESS:  They all work closely together.

16  Under my current responsibility, I have a responsibility for

17  both the team, the network team that builds the schedule and

18  determines the capacity stats, as well as the revenue team.

19  They sit next to each other.  They work very closely

20  together.  And they also work collaboratively, so the network

21  team knows roughly the revenues and costs of deploying

22  certain flights.  They have high-level models, but then those

23  specialized teams would come up with the exact calculation.

24         THE COURT:  I see.  Okay.

25  BY MR. CRANER:

1  **Q.**  And you mentioned that cost was not a factor at all in

2  this analysis.  What about profitability?

3  **A.**  No. This was purely revenue, no costs, no profitability.

4  **Q.**  Okay.  And just to be clear, what is your understanding

5  about the status of the E190s?  Are they being replaced by

6  the A220s?

7  **A.**  So we are still planning to retire the E190s.  We had

8  delayed the retirement schedule a bit to provide extra

9  capacity.  When we ordered the 30 additional A220s, we were

10  able to sort of reset the E190 retirement timeline.  So my

11  understanding is, as of today, they'll be gone in roughly

12  three years' time.  And those 60 E1090s will have been

13  replaced by now 90 A220s, the original 60 that were ordered

14  for replacement, as well as the 30 additional growth A220s

15  that are fulfilling growth opportunities in the NEA.

16  **Q.**  And can you just remind us of the seat difference between

17  the --

18        THE COURT:  40.

19        THE WITNESS:  40.  So the A220s have 140 seats.  So

20  not only do you have 50 percent more aircraft, 90 versus 60,

21  but you have 40 percent more seats per aircraft.  So we're

22  getting quite a large -- you know, closing in on double the

23  number of seats.

24  BY MR. CRANER:

25  **Q.**  Thank you.  And you mentioned earlier in response to

1    Mr. Congdon about the frequent flyer assumptions, you had

2    said that there was ran why the numbers might be what they

3    are.  Can you explain?

4    **A.**   Sure.  In the projections at this time, the frequent

5    flyer revenue in the NEA was slightly lower.  It was about

6    half a percent lower than without the NEA.

7              And at the time, our loyalty team worried that

8    customers may choose American's frequent flyer program over

9    ours if they're able to enroll in American's frequent flyer

10   program but still earn flights -- excuse me -- earn points

11   when flying JetBlue, redeem miles on JetBlue, you know, be

12   treated as an elite frequent flyer if they flew JetBlue.  So

13   there was some worry that that might cause some customers to

14   choose American instead.

15             We've actually seen the exact opposite.  Our

16   frequent flyer program and revenue have flourished since we

17   announced the NEA, and it's actually growing most quickly in

18   New York and Boston.  So the NEA appears to be helping our

19   frequent flyer acquisition and increasing our frequent flyer

20   revenues, which is quite the opposite of what the team had

21   projected when they were concerned that it might dampen the

22   revenues a bit.

23   **Q.**   And does JetBlue currently compete with American for

24   frequent flyer customers?

25   **A.**   Absolutely.  Heavily, yes.

1    **Q.**   Okay.  I wanted to shift topics and discuss pricing that

2    was briefly mentioned.  Can you explain how pricing is done

3    at JetBlue?

4    **A.**   Sure.  At a highest level, there's a few principles,

5    right?  We price independently.  We make our own decisions.

6    We look to stimulate demand so that we have more customers

7    filling our seats.  In general, we're targeting high-load

8    factors.  Our average system load factor is in the mid to

9    high 80s.

10           And then we also want to have seats available

11   throughout the entire booking curve, right?  We want to have

12   seats for sale whether someone is booking nine, ten, eleven

13   months in the future or whether they're booking a couple days

14   before departure.

15   **Q.**   And can you explain which group at JetBlue sets the

16   pricing?

17   **A.**   So the revenue management team sets the pricing.  And

18   within that, there's sort of two subteams.  There's the

19   pricing team as well as the yield management team.  The

20   pricing team determines the exact dollar amount to put in

21   each of our 14 fare classes that we sell.  So any given route

22   will actually have 14 price points available to it.

23           And then we have a yield management team, which

24   we've called inventory management at times in the past, that

25   works with our software to determine for each flight which of

1   those 14 price points is selling at any given moment.

2   **Q.**   Okay.  And you mentioned the different fare classes.  Can

3   you explain a little bit more about how JetBlue structures

4   those?

5   **A.**   Sure.  So as mentioned, for the core cabin, which is what

6   we call economy, there will be 14 price points.  At the

7   bottom, you know, we call it the P fares, the letter you see

8   at the bottom, is promotional, tends to be fare sales.  It's

9   your lowest price.  It's the kind of thing you would sell

10  during a sale, or you might only sale midweek during the fall

11  trough, which is a really slow demand period for a lot of

12  markets.

13         And then as you go up the structure, the priors

14  generally go up.  And at the top, you'll have the letter Y,

15  which is a fairly consistently used letter at the top of your

16  core cabin or economy cabin across the industry, and that's

17  where your highest price will be.  That's where, if you only

18  have a couple seats left, that might be the fare that's

19  selling.  Or maybe for an extreme peak day, like January 2nd

20  when everyone is returning home from their New Year's

21  holidays, that may be the price that's selling that day.

22  **Q.**   And you mentioned that's something that the yield

23  management group has responsibility over?

24  **A.**   So yield management's primary responsibility is to

25  optimize which of those 14 fares is selling for each flight

1  in any given time.  They work with a software program that

2  provide inputs into and help train to do that.  Because we're

3  selling, you know, a quarter million flights at a time, or

4  so.  It's a heavily technology-aided process.

5  **Q.**  Okay.  And you've described generally the pricing

6  strategy.  Can you list some of the factors that JetBlue

7  considers when setting prices?

8  **A.**  Sure.  So I mentioned our sort of guiding principles

9  before.  Then within that, when you look at a certain market,

10  supply and demand is obviously a very big -- it impacts

11  pricing.  So we're looking at what's the demand, customers in

12  that market, how many seats are being offered?  What are the

13  other option available to customers?  So is this a market

14  that can be served by train?  Is this a market that's driven,

15  you know, by car or bus?

16         What are the different customer segments that would

17  be looking to fly?  Are there leisure customers who are

18  booking further out or maybe business customers booking close

19  in?  What do we see as they're willingness to pay?

20         So there are a lot of factors that go in.  And for

21  each market it's sort of a unique, custom pricing structure

22  that's set based on the factors of that market.

23  **Q.**  How does a competitor's pricing in JetBlue's routes

24  factor into pricing?

25  **A.**  It's definitely an input.  We need to look at all the,

1    you know, substitute options that a customer can be choosing

2    between, and air travel on another airline is certainly one

3    of those.  So we're constantly monitoring competitors' prices

4    and factoring that into our decision.

5    **Q.**  Are there any set rules about how JetBlue responds when a

6    competitor increases prices on a route that JetBlue flies?

7    **A.**  So on a price increase, no.  We -- we look at each price

8    increase, if another carrier would increase prices, on a

9    case-by-case basis.  And if we think that the pricing

10   structure they've put in place is better than the one we

11   have, we may move to that, as well.  But that's the minority

12   of times.  Most often we will keep our pricing where it is.

13   **Q.**  And has JetBlue's pricing strategy changed in any way

14   since the implementation of the NEA?

15   **A.**  No, not at all.

16   **Q.**  And for the revenue management team, both the pricing and

17   yield management team, do they consider, in any way, the MGIA

18   when making their decisions about pricing and setting fares?

19   **A.**  Not at all.  They look at American just as every other

20   competitor that we have out there.  We want those customers

21   on our plane.  I want them experiencing the JetBlue

22   experience.  I want them becoming loyal to us.  I want them

23   booking on JetBlue.com and buying hotels and rental cars and

24   ground activities from us.

25              So the pricing team and the revenue management team

1    doesn't consider the NEA at all, and they're competing

2    against American just as hard for those customers as they

3    were before the NEA.

4    **Q.**  Thank you.

5          I wanted to move on to the topic of Boston, which

6    Mr. Congdon asked you about briefly.  To begin with, can you

7    briefly describe the role Boston plays in JetBlue's overall

8    strategy?

9    **A.**  Sure.  Boston is a very important city for us.  It's the

10   second largest city in our network.  Over the course of my

11   13 years at JetBlue, it's been the fastest growing network.

12   So we've been allocating a large number of resources here, a

13   large number of aircraft.  We've been growing rapidly, hiring

14   staff at the airports, crew bases.

15         So it's an extremely important and strategic

16   market, not only for its size, but it's also where we've had

17   the highest mix of business customers and where we've

18   generally gone after business customers the most and been

19   best able to compete for business customers.

20   **Q.**  I think you mentioned earlier that Boston has been a

21   priority since you've been at the company since 2009.  Prior

22   to the NEA, do you believe JetBlue had competitive advantages

23   in Boston?

24   **A.**  We had some competitive advantages.

25   **Q.**  Can you describe those?

1    **A.**   We had the best product and onboard experience in the

2    industry.  We have award winning service.  For the routes

3    that our fleet can reach, for the destinations within range

4    of our fleet, we had a strong network and schedule.  So given

5    the tools that we had, we had a number of competitive

6    advantages.

7    **Q.**   Okay.  And which carriers does JetBlue compete with in

8    Boston?

9    **A.**   So Boston is very competitive.  For the last seven or

10   eight years, Delta's been sort of the largest, most

11   aggressive competitor, but we also compete against American,

12   United, Southwest.  And then there's some smaller, Spirit and

13   Frontier, Alaska have a presence here.  But it's largely been

14   the three big legacies, Southwest, and ourselves.

15   **Q.**   And has that list of competitors changed since the NEA?

16   **A.**   No, it hasn't.

17   **Q.**   You mentioned Delta and the competition from Delta.  Can

18   you describe for us, from JetBlue's perspective, what not

19   having a global network means in terms of competing with

20   Delta?

21   **A.**   Yeah.  It's -- so Delta is a fierce competitor, and they

22   have a lot of tools we don't.  And one of them is a global

23   network.  And for some customers, that global network is

24   extremely important.  And a customer can be a person, it can

25   be an individual, or it can be a large company that has

1    thousands of, you know, employees who travel.  And if that
2    customer wants to fly globally, if they need to go to Europe
3    and Asia, or if they're visiting small towns in the Midwest,
4    those are all markets that our simple fleet can't serve very
5    well, but Delta's very, sort of, broad fleet could.  So we
6    struggled to compete for those customers.
7    **Q.**  And in terms of the global network, are you referring
8    just to the national or domestic or both?
9    **A.**  So both.  So they had advantage to us on the long haul.
10   So Delta has a wide-body aircraft that can reach deep into
11   Europe, Asia, you know, deep South America.  We don't have
12   those capabilities.  So they can serve many markets nonstop.
13   Or with their patterns, like KLM and Air France, they could
14   serve just about any destination in Europe.
15            And then likewise, domestically in the
16   United States, they had regional jets that could serve
17   destinations like Indianapolis, Cincinnati, some of the
18   smaller markets, which our fleet was, frankly, too large to
19   serve on our own -- too large in terms of number of seats on
20   the aircraft.
21   **Q.**  Thank you.
22            And is there a point in time when JetBlue first
23   became concerned that Delta was going to threaten its market
24   position in Boston?
25   **A.**  Yes.  It was about the middle of last decade.  So about

1    seven years ago, Delta both started growing aggressively in

2    Boston and then started using very, I would say, aggressive

3    rhetoric, sort of talking about the city differently and

4    started calling it a hub, started saying they wanted to be

5    the number one global carrier in Boston.

6    **Q.**   And what is the significance of Delta calling Boston a

7    hub?

8    **A.**   It's very important.  Your hubs are where you put your

9    resources.  It's where you pay the most attention and compete

10    the hardest.  So not only were they adding these flights,

11    which may just be a temporary thing or they add a little and

12    stop, but once they started calling it a hub, we knew this

13    was a long-term strategic priority for them and that they

14    would keep growing.

15           And their announcements reflected that.  First they

16    talked about growing Boston to 100 flights a day, and then

17    they talked about 150, then they talked 200.  It was --

18           THE COURT REPORTER:  I'm sorry.  If you can try and

19    slow down.

20           THE WITNESS:  Sure.  Excuse me.  But they were --

21    there were sort of consistently, continuously over the years

22    communicating larger growth visions for Boston that were --

23    that was growing overtime.

24    BY MR. CRANER:

25    **Q.**   And did JetBlue develop a strategy to deal with this,

1  this threat from Delta?

2  **A.**  We developed multiple strategies.  We spent a lot of time

3  the last five, six, seven years thinking about how to compete

4  more effectively against Delta.

5  **Q.**  Okay.  I'd like to take a look now at DX395.  It's in

6  your binder.

7        MR. CRANER:  Your Honor, this has some

8  confidentiality redactions, none of which I'm going to show

9  Mr. Clark and I would like to publish it.  I understood

10  there's no objections.

11        THE COURT:  All right.  Go ahead.

12  BY MR. CRANER:

13  **Q.**  Mr. Clark, do you have it in front of you?

14  **A.**  I do.

15  **Q.**  Okay.  Do you recognize this document?

16  **A.**  Yes.

17  **Q.**  And what is it?

18  **A.**  It's a quarterly network review from April of 2017.  So

19  four times a year, once a quarter, we would sit down with

20  senior leadership of JetBlue and discuss the latest network,

21  performance, plans, things like that.

22  **Q.**  Okay.  And who prepared this network review, if you know?

23  **A.**  So it's generally prepared by the network planning team.

24  Often the director of route planning would have the lead.

25  This was a few months after I'd moved off the network team to

1    the sales and revenue management team, so I wasn't directly

2    involved in creating this.  I'm not precisely sure who would

3    have created it, but it would have been a leader on the team.

4    And I would have attended the meeting.

5    **Q.**  Okay.  And I'd ask you, please, to turn to page 10 of

6    this exhibit.

7    **A.**  Yes.

8    **Q.**  It says here, under "growth programs update," it says

9    "Boston 200."  Can you tell us what the "Boston 200" means?

10   **A.**  Sure.  Boston 200 was a growth program that we had that

11   was setting the whole company's vision to having 200 flights

12   a day in Boston and growth of that size takes a lot of

13   coordination.  You need to think about aircraft deployment.

14   You need to have enough gates at the airport.  You know,

15   parking spots.  You need to hire a lot.

16          So what we would tend to do is we would set a

17   five-year growth vision.  In this example, it was Boston 200,

18   but we already done a Boston 100 and 150 campaign and this

19   had the whole company sort of focused on, okay, by a certain

20   year we need to have enough infrastructure and resources in

21   place to have 200 flights a day.

22   **Q.**  And at the time this document was created in 2017, do you

23   know roughly how many daily flights JetBlue had out of

24   Boston?

25   **A.**  I believe around 150.

1  **Q.**   Okay.  And the five-year target under the Boston 200 was

2  to go to 200?

3  **A.**   Correct.

4  **Q.**   And from your experience working at JetBlue, how

5  ambitious of a target is that?

6  **A.**   It's quite ambitious.  I mean, it was a large chunk of

7  our aircraft deliveries during this time.  And --

8             THE COURT:  Chunk of what?

9             THE WITNESS:  A large percentage of our aircraft

10 deliveries.  So of the planes we were getting each year, the

11 new aircraft, a strong portion of them were going to Boston.

12 It was also -- it is the main focus.  It was the city in our

13 network that was growing the fastest at that time.

14 BY MR. CRANER:

15 **Q.**   And were you one of the leaders of the Boston 200

16 initiative?

17 **A.**   I was at times.  Especially when there would be Delta

18 competitive threats that flared up, I would often be one of

19 the leaders or the main leader of the team that was assembled

20 to sort of try to combat those threats and compete even more

21 effectively.

22 **Q.**   Okay.  And please turn to page 13.

23 **A.**   Yes.

24 **Q.**   This slide says, "Delta more than tripled network overlap

25 with JetBlue in Boston in past five years and plans to get to

1    150 daily flights."  There's a chart on the upper left-hand

2    corner, "DL growth in Boston."  Can you explain what this is

3    trying to show?

4    **A.**  So this is showing how rapidly Delta is growing in Boston

5    and that, between 2013 and 2017, the number of destinations

6    they served nonstop had grown to 65 percent.  Their peak day

7    flights had grown by 34 percent to over 100.  So this shows

8    backward looking what they had already been doing, which is

9    growing quite rapidly.

10   **Q.**  Okay.  And then there's a blue shaded box on the right.

11   Can you tell us what's being conveyed here?  I think you

12   mentioned earlier about comments from Delta, but what was the

13   purpose of including this in the slide?

14   **A.**  Sure.  This is Delta's CEO Ed Bastian saying, "This

15   summer we'll have 100 flights a day, and I would like to get

16   150 flights a day."

17          So this is the CEO, the most senior person saying

18   how important Boston growth is and that they plan to grow

19   their flights by 50 percent in the short-term.

20   **Q.**  Okay.  And there's a mention about Boston now showing --

21   Delta now showing Boston as a hub in the route map.  Was that

22   new information at the time?

23   **A.**  Correct.  So a couple of other pieces that were really

24   interesting here is, one, they started indicating Boston as a

25   hub on the route map, which, again, reflects their strategic

1    intent there.  And the second quote, also, Boston is --

2    excuse me -- Delta is stating a goal of becoming the only US

3    global carrier to offer first class seating on every flight

4    to and from Boston.

5           So here they're advertising their strengths and

6    tools that we don't have.  They talk about being a global

7    airline because their fleets allows that.  They talk about

8    having first class seating on the flight.  My reading is

9    they're intentionally pointing out the strengths they have

10   and the gaps or weaknesses that JetBlue has in our model.

11   **Q.**  Okay.  Thank you.  You can put this aside.  Let's take a

12   look at another document.

13          MR. CRANER:  Can we please pull up DX389?

14   BY MR. CRANER:

15   **Q.**  That's also in your binder, Mr. Clark.

16   **A.**  I'm there.

17          MR. CRANER:  Your Honor, there are no objections,

18   so I would like to publish, if it's okay.

19          THE COURT:  Go ahead.

20          MR. CRANER:  Thank you.

21   BY MR. CRANER:

22   **Q.**  Mr. Clark, do you recognize this document?

23   **A.**  Yes, I do.

24   **Q.**  And do you see the date of it?  It's e-mails, three

25   pages, but what's the date?

1   **A.**   May 9th, at 9:22 in the evening, from 2017.

2   **Q.**   So this e-mail is a couple weeks after the QNR we just

3   looked at?

4   **A.**   Correct.

5   **Q.**   And can you explain the context of this e-mail?  And you

6   can start with the first e-mail on page 3, the latest in

7   time?

8   **A.**   Yep.  So in that quarterly network review, we discussed

9   about Delta's planned aggressive growth in Boston, and this

10  e-mail thread is a follow-up to that.  And it starts with a

11  meeting invite from Norbert Strissel, who is JetBlue's

12  director of Boston at the time.

13          And Norbert sends a pretty senior audience -- these

14  are mostly directors -- a meeting invite for a two-hour

15  meeting on May 9th to discuss, you know, Delta's recent

16  announcement to grow Boston to 150 flights and sort of our

17  strategy to defend against that.

18          As we go through the thread here, my e-mail comes

19  from the evening of May 9th.  So the meeting has now taken

20  place, and I'm sort of documenting everything that we've

21  discussed and the next steps.  And you can see it was a very

22  sort of thorough e-mail that I went, you know, to 9 p.m. in

23  the night writing and talking about 15 different work streams

24  here.

25          So a lot of work is going to happen.  Each of the

1    work streams are led often by a leader or a director in a

2    wide variety of areas.  We talk about having weekly -- weekly

3    meetings going forward and how in two months' time, we are

4    going to present a plan to compete more effectively against

5    Delta to our senior leadership team.

6              So this is a start of a very robust body of work

7    that had the attention of senior leadership at JetBlue.

8    Q.  In your view, why was it important for this group to meet

9    weekly?

10   A.  The threat from Boston -- the threat from Delta in Boston

11   was extremely large.  It was, as mentioned, our second

12   largest focus city.  It was a threat to our profitability and

13   our financial stability.  So strategically and financially,

14   it was important that we competed hard here and did

15   everything we could to compete effectively against Delta.

16   Q.  And the e-mail references, and you just mentioned, the

17   different work streams.  Were you overseeing these different

18   work streams at the time?

19   A.  I was.  So there was individual leaders over each of the

20   work streams, but I was -- Norbert and I were in partnership

21   leading the overall efforts.  As mentioned, Norbert was our

22   director in Boston, so he was the local leader.  I was

23   leading this from our Long Island City support center, so

24   with the support center staff.

25   Q.  I want to take a look at one of the attachments to this

1    e-mail.  It's DX390, which is also in evidence.  Can you turn

2    to that, please, Mr. Clark.

3    **A.**   I'm there.

4           MR. CRANER:  And we can publish.

5           The way this document is produced, Your Honor, it's

6    two versions of the same document.  So page 10 is the larger

7    version.

8           THE COURT:  Sure.

9           MR. CRANER:  But we can please start there, if

10   that's okay.

11   BY MR. CRANER:

12   **Q.**   And Mr. Clark, if you can please turn to page 10.

13   **A.**   Yeah, I'm there.

14   **Q.**   And do you recognize this document?

15   **A.**   I do.

16   **Q.**   And I know it's an attachment to the e-mail we just

17   looked at, but what is the purpose of this document?

18   **A.**   I believe this is materials that were created, I think by

19   Norbert and his team in Boston, to use at that first meeting

20   on May 9th, where we sort of are kicking off this work stream

21   or this large effort.

22   **Q.**   Okay.  And can we just turn to page 17 of this exhibit.

23   **A.**   I see it.

24   **Q.**   Can you see the map here?  This is Delta and Boston.

25   This is from 2017, right?

1    **A.**   Correct.  It says as after of April 25, 2017.

2    **Q.**   Is this consistent with what you discussed earlier about

3    Delta's global network?

4    **A.**   Absolutely.  So this is their nonstop network out of

5    Boston.  So only places they fly to nonstop.  But even on a

6    nonstop basis, they have a lot of advantages that we don't.

7    We see the five destinations here in Europe, all beyond

8    JetBlue's fleet at the time.  We see the smaller destinations

9    in the middle of the country, Columbus, Cincinnati,

10   Indianapolis, and Kansas City.  We looked at adding all of

11   those but found them unfeasible with our hundred-seat

12   aircraft.

13            And, again, this is just nonstop.  Keep in mind

14   that over at their other hubs, in Atlanta, New York, or

15   through their partners in Paris and Amsterdam, they could

16   reach hundreds and hundreds of markets globally.  So we knew

17   that their network was a big advantage of theirs and a

18   weakness of ours.

19   **Q.**   Okay.  And you described the work streams and the work

20   that was being done to deal with Delta as a threat.  Can you

21   just describe the progress that JetBlue made on the Boston

22   200 initiative, the 2017 and '18 time period?

23   **A.**   Sure.  So we worked quite heavily on it, and we made that

24   presentation to senior leadership in that summer, in July.

25   We implemented about 50 initiatives over the time now.  These

1    were good, solid incremental improvements, but we only had

2    the tools we had.  So we could do things like add an extra

3    spare aircraft in Boston to make our operation more reliable.

4    We could increase hiring.  We could do, say, more frequent

5    flyer promotions in Boston.

6            But, unfortunately, it wasn't addressing some of

7    the real fundamental gaps we had, such as the ability to

8    compete with Delta's global network.

9    Q.  I want to now turn to Project Revere.  I know Mr. Congdon

10   asked you about that.  And I'm referring to the end of 2018.

11   Can you tell us what Project Revere is?

12   A.  Sure.  So Project Revere was sort of conceived at the end

13   of 2018.  Delta had just made yet another major growth

14   announcement in Boston.  So we decided we needed to, again,

15   pull together a cross-functional team, and, again, try to

16   compete even harder against Delta in Boston.  Because while

17   we had done a lot of good, incremental progress with that

18   first Boston 200 plan, we hadn't slowed their growth.  We

19   hadn't sort of changed the major weaknesses we had at the

20   time.

21   Q.  And is there a connection between Project Revere and

22   Boston 200?

23   A.  Yes.  They're extremely related.  Boston 200 would still

24   be going on, because we were still growing our infrastructure

25   and our resources to be able to support 200 flights a day.

1    Project Revere was focused very specifically on the Delta
2    competitive threat and sort of the attack from Delta in
3    Boston.  So it was -- it was all geared on competing as
4    effectively as possible against Delta in Boston.
5    **Q.**   And do you know why it was named Project Revere?
6    **A.**   I do.  We named it.
7    **Q.**   Can you explain what it is?
8    **A.**   Sure.  It's named after Paul Revere, the revolutionary
9    war hero from Boston who warned everyone of, you know,
10   oncoming attack.  We were very much under attack from Delta
11   at the time.
12          And I remember, you know, in the old days, it was
13   "one if by land, two if by sea."  We used to joke about
14   naming the project "three if by air" because the attack was
15   coming from the skies in that case.
16   **Q.**   And what was your role in connection with Project Revere?
17   **A.**   It was structured very similarly to the one a couple
18   years prior.  So I was, again, leading it from the support
19   center standpoint.  I was partnered with Norbert Strissel,
20   who was still, at the beginning of the project, the director
21   of Boston at the time.  So it had a relatively similar
22   structure with Norbert and I leading.
23   **Q.**   Thank you.
24          I would like to take now a look at DX290, which is
25   also in evidence.  Do you have that in front of you?

1   **A.**   I do.

2   **Q.**   Okay.  Do you recognize this document?

3   **A.**   I do.  I recognize the document, remember the meeting.

4   **Q.**   And were you involved in preparing this document?

5   **A.**   I was.  There was a lot of contributors, but as one of

6   the two main sort of leaders, I would have brought it

7   together.  I think I likely authored the executive summary at

8   the front.  So while I didn't write every slide, I had a

9   relatively big hand in compiling and packaging everything.

10  **Q.**   Okay.  Can we turn to slide 4, please.  This is a slide

11  that says, "Delta continues to grow aggressively in Boston."

12  Can you describe some of the ways that Delta had done that in

13  the 2016 to 2018 time frame?

14  **A.**   Sure.  And this is a good sort of outline or timeline of

15  all the growth announcements they'd had, whether they were

16  starting to call it, you know, a hub announcing growth or

17  several growth announcements here.  We see 22 percent growth

18  in August of 2016 and March of 2017, you know, communicating

19  the desire to go to 150 daily flights.  You know, another big

20  announcement in summer of 2018 that continued.  They

21  announced a major expansion and the plan to go to 152 daily

22  flights.  So there's a steady drum beat over time from Delta.

23         And we also interspersed in here some of things we

24  were doing.  For example, we see in the second half of 2017

25  presenting the Boston 200 plan --

1          THE COURT REPORTER:  Sorry.  If you could say that

2    again, slower.

3          THE WITNESS:  Sure.  We also show some of the

4    actions that JetBlue was taking to compete against Delta at

5    the time, so that line that says "2H," or second half of

6    2017, it references the Boston 200 plan to SLT, that was what

7    we were just talking prior, the presentation in the summer of

8    2017 and how we implemented 50 initiatives, which, again,

9    made good incremental progress but hadn't solved the big gaps

10   and disadvantages we had against Delta.

11   BY MR. CRANER:

12   Q.   And can we turn to slide 8, please.  And some of this is

13   redacted, but we're going to ask you about the nonredacted

14   portion.  This is a slide that says, "Delta's growth is

15   impacting JetBlue's profitability in Boston."

16          There's a chart on the left column.  Can you just

17   walk us through what this is intending to convey?

18   A.   Sure.  It's plotting the number of flights per day for

19   both JetBlue and Delta over a four-year period here.  And we

20   see that the Delta line at the bottom is growing much more

21   quickly at 88 percent.  And that the two lines are becoming

22   closer together.  And we see at the end that big step up that

23   Delta had been accelerating its growth, its planned growth

24   for 2019, as well.

25   Q.   And just looking at JetBlue's growth here.  What does

1    this number say to you, this 35 percent increase?

2    **A.**   So a 35 percent increase over this time period, which

3    is -- is pretty robust.  It's pretty steady, roughly double

4    digits per year.  And you can see that we're very sort of

5    consistently, over time, growing.  There's a little

6    seasonality, which is why the line wiggles as we go from, you

7    know, through the seasons of the year.  But it's certainly an

8    upward march for JetBlue, but not nearly as quickly as

9    Delta's increase is.

10   **Q.**   Okay.  And I'd like to now look at the back of this

11   document, slide 29.  Let us know when you're there.

12   **A.**   Yes, I'm there.

13   **Q.**   It says, "detailed SWOT analysis."  First, can you

14   generally describe what a SWOT analysis is?

15   **A.**   Sure it's a way of sort of comparing a couple of things.

16   In this case, we're comparing JetBlue versus Delta and we're

17   looking at -- you know, S is for strengths, weaknesses,

18   opportunities and threats.  So it's laying out the major

19   differences between the two companies and what opportunities

20   that creates for us and also what threats that creates for us

21   based on those differences.

22   **Q.**   And did you prepare this analysis?

23   **A.**   I would have been heavily involved, yes.

24   **Q.**   And can you describe for us what some of the identified

25   weaknesses are here?

**A.**  Sure.  So in the upper right here, we list the weaknesses

against -- that JetBlue has versus Delta and some of these

are really fundamental and very difficult to solve

weaknesses.  So, for example, lack of a global route network

and we've talked about how they could get their customers

nearly anywhere in the world to far destinations, as well as

in the US to small destinations.

Frequent flyer redemption program options -- we're

not in an alliance.  We have fairly limited redemption

options -- certainly at this time, we did -- whereas Delta

was part of the SkyTeam and you could redeem on many carriers

throughout the world.

We also didn't have first class products on most of

our fleets.  So for our customer who is really interested in

first class, or getting free upgrades, we couldn't do that.

We don't have lounges at a terminal.  So these were all

things that some customers found very important and it was

difficult for us to compete for those customers in Boston,

given these weaknesses, versus Delta who could fulfill those

needs.

**Q.**  Okay.  I know this is a document from January of 2019.  I

want to move now --

THE COURT:  Just before you do, what's the revenue

functionality in the third from the bottom bullet?

THE WITNESS:  Revenue functionality?  I believe --

1    and this is sort of a hazy memory, but the ability to do

2    things like maybe buy upgrades on the app, to switch between

3    flights sort of seamlessly.  So their self-service technology

4    is about being able to self-serve the mechanics, and I think

5    the revenue functionality was able to gain revenue while

6    doing that by selling them additional products or collecting

7    fees automatically.

8              THE COURT:  Sorry.  Go ahead.

9              MR. CRANER:  Thank you, Your Honor.

10   BY MR. CRANER:

11   **Q.**  I wanted to move ahead to later in 2019 and take a look

12   at DX282.  It's also in your binder.

13   **A.**  Yes.

14   **Q.**  And this is a document from September 23, 2019.  Do you

15   know what this document is?

16   **A.**  I do, yes.  This is a Project Revere update that occurred

17   about eight months later.

18   **Q.**  And was this going to senior leadership?

19   **A.**  Correct.  SLT is the senior leadership team at JetBlue,

20   so we're updating the senior leadership on our progress.

21   **Q.**  And were you involved in preparing this document?

22   **A.**  Yes, I would have been.

23   **Q.**  Okay.  I'd like to take a look at slide 4, please.  This

24   is an executive summary.

25              At this time, what was the status of JetBlue's

1    growth in Boston in relation to the Delta threat?

2    **A.**   So we were still planning to grow and it mentions here at

3    the third -- excuse me -- we were still growing.  It mentions

4    at the third bullet from the bottom that we were planning to

5    reach 200 departures per day in 2020.  So we're still

6    growing, but it mentions that Delta is still growing rapidly

7    as well in the first bullet.  And it talks about that they're

8    not only growing strongly and charging 200 flights per a day,

9    but they're making investments in their sales team, their

10   marketing efforts, their facilities at the airports.

11   **Q.**   And I want to focus you on the last bullet on this page.

12   It says, "Timing is right to refresh Boston strategic plans

13   and consider additional enhancements to facilitate 200

14   JetBlue flights per day with strong profit margins."  Why was

15   it necessary to refresh the Boston strategic plan at this

16   time?

17   **A.**   Sure.  And Project Revere had been going for about eight

18   months at this time.  As you can see in the second to bottom

19   bullet, we had, you know, delivered on the objectives.  We'd

20   implemented a number of initiatives.  We were, again, doing

21   incremental things to serve customers in Boston even better.

22   But, again, these were relatively small things that we could

23   do with the tools we have.  We were not addressing the

24   fundamental issues, the big gaps around the global network,

25   the first class product, the lounges in the airport, the

1    redemption options for the loyalty program.

2            So we're sort of acknowledging here that we've now

3    twice in the last three or four years done everything we

4    could with the tools we had, but it wasn't quite enough.

5    It -- we needed new tools.

6    **Q.**  So with all the work and effort going in, did you have a

7    view about whether Project Revere was sufficient to deal with

8    the Delta threat?

9    **A.**  I was proud of the work we did.  We made real meaningful

10   incremental improvements, but it wasn't sufficient.  It was

11   not -- it was not resolving the big gaps we had, the big

12   weaknesses, and we were sort of still stuck with those major

13   weaknesses versus Delta.

14   **Q.**  Okay.  Mr. Clark, I want to just turn now to the NEA.

15   Has the NEA impacted JetBlue's ability to compete with Delta

16   and Boston?

17   **A.**  Absolutely.

18   **Q.**  And can you explain for the Court why that is?

19   **A.**  Sure.  When we look at some of those weaknesses we have,

20   right, our customers now have access to American's global

21   network and they can -- they get their loyalty benefits, they

22   do that, so a customer in Boston can now travel around the

23   world in American.  They can earn JetBlue TrueBlue points.

24   They can be treated, you know, if they're a Mosaic, they get

25   Mosaic benefits and recognition when they travel.

1           This has also allowed us, both JetBlue and Delta,

2    to add a lot of flying in middle of the country.  We now

3    serve Kansas City and Milwaukee.  American now serves

4    Cincinnati, Toronto.  These were all markets we wanted to

5    serve before.  The numbers never penciled out when it was

6    just JetBlue trying to do it ourselves, but in partnership

7    with American, we could get the numbers to work.

8           And then for customers of ours who really value

9    things like a first class product on all the flights, who

10   really want a lounge in the airport, those customers can now

11   buy a fare on a Delta -- excuse me -- on an American

12   airplane.  They can buy it with the JetBlue codeshare.  They

13   can get all of their TrueBlue recognition and they can sit in

14   first class on all those flights and they can use the

15   American lounge if they bought that product.  So this has now

16   fulfilled all those major gaps and weakness that we were

17   unable to do on our own, and it's allowed us to compete for

18   these customers that historically we couldn't win because of

19   our lack of tools that we now can really compete for.  So

20   there's a second option for these corporations and these

21   individuals who have global needs.

22   **Q.**  And were these some of the weaknesses and gaps that we

23   saw on the SWOT analysis weaknesses?

24   **A.**  Absolutely.  It clears the major gaps that we were unable

25   to clear on our own from that SWOT analysis.

1   **Q.**   Okay.  And in your view, could these weaknesses been
2   addressed without the NEA?
3   **A.**   No, not realistically.  I mean, these are such big
4   things.  Building a global network takes decades and decades
5   and, you know, billions and billions of capital investment.
6   We could not have, with any global feasibility, done these by
7   ourselves in any reasonable amount of time.
8           MR. CRANER:  Thank you, Mr. Clark.
9           I have no further questions for now.  I pass the
10  witness.
11          THE COURT:  All right.  Redirect?
12          MR. CONGDON:  A few, Your Honor.
13          **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS**
14  BY MR. CONGDON:
15  **Q.**   Mr. Clark, I would like to start where Mr. Craner left
16  off in terms of Boston.  If we're able to pull back up DX282,
17  the document you were just looking at?
18  **A.**   Okay.
19  **Q.**   And if you could turn to slide 19, please.
20  **A.**   I'm there on the binder.  The monitor is there, too.
21  **Q.**   On the screen.  Perfect.  You see the headline that says,
22  "Delta is continuing aggressive growth in Boston while
23  American is increasing growth in 2020, other carriers are
24  falling back."  Do you see that?
25  **A.**   I do.

1    **Q.**   Okay.  And if you look at the chart on the left, it shows

2    average daily Boston departures, right?

3    **A.**   Yes.

4    **Q.**   Okay.  And it shows -- the bottom line shows American,

5    after going down in 2018 and '19, actually increasing its

6    flights in Boston in early 2020, correct?

7    **A.**   Yes.  I believe it indicates 7 percent growth for

8    American that year.

9    **Q.**   Okay.  And now JetBlue on this slide, that you, I take

10   it, helped put together and were in charge of, you only chose

11   to list JetBlue, Delta, and American, correct?  And you

12   lumped in all other carriers?

13   **A.**   That's correct, for the purposes of this slide, that's

14   what was done.

15   **Q.**   Okay.  And if you see in bottom barrier -- the bottom

16   banner, the second line says "American is growing all" --

17   "American is growing all multi-frequency markets in Q1 2020."

18            Do you see that?

19   **A.**   I do.

20   **Q.**   And it says, "Largest growth in DFW, JFK, ORD," which is

21   Chicago, right?

22   **A.**   Correct.

23   **Q.**   And Phoenix?

24   **A.**   Yes.  I see that.

25   **Q.**   Okay.  And those were all routes which JetBlue also

1  served out of Boston, correct?

2  **A.**  That's correct, yes.

3  **Q.**  You can put that to the side.  And if we could pull back

4  up DX290, which is also another slide deck that Mr. Craner

5  showed you.

6  **A.**  Yes, I have it.

7  **Q.**  And if we go back to that slide that he showed you, I

8  think it was slide 8 --

9  **A.**  Yes.

10  **Q.**  -- okay.  Now, you talked a lot about Delta growing

11  88 percent here on this chart, right?

12  **A.**  Yes.

13  **Q.**  Okay.  JetBlue was still growing itself, correct?

14  **A.**  Correct.

15  **Q.**  In fact, throughout this entire time period, when Delta

16  was growing, 2017 to 2020, JetBlue also continued to grow,

17  correct?

18  **A.**  Correct.

19  **Q.**  And you two were the -- JetBlue and Delta were the two

20  largest carriers in Boston, correct?

21  **A.**  Yes.  Certainly during the back half of the chart and

22  potentially also the beginning of the chart, as well.

23  **Q.**  Well, in the beginning of the chart, who do you think

24  would have been, if not JetBlue?

25  **A.**  JetBlue was number one in 2015, as I recall.  It was

1    likely JetBlue one and Delta two for the full duration of the
2    chart.  I just don't remember specifically.
3    **Q.**  Prior to that time, American would have been bigger,
4    correct?
5    **A.**  Yes.  At one point early last decade, American was
6    bigger.  US Air was reserving at the time.  I don't recall
7    how big United was at the time or how big Delta was sort of
8    before their big growth started.
9    **Q.**  And American chose to pull back in Boston during that
10   time period when you and Delta were growing, correct?
11             MR. CRANER:  Objection.  Calls for speculation.
12             MR. CONGDON:  To the extent you know.
13             THE COURT:  Go ahead and answer.
14             THE WITNESS:  I can't speak for American.  I don't
15   remember.  I don't know, offhand, their exact growth
16   trajectory during this time period.
17   BY MR. CONGDON:
18   **Q.**  But you did see them pull back from Boston during that
19   time period, correct?
20   **A.**  I don't recall.  We were focused on Delta, as the slide
21   indicates.
22   **Q.**  Now, again, so in this -- this slide, it shows both
23   JetBlue and Delta consistently growing from 2015 to the end
24   of 2019, correct?
25   **A.**  Correct.

1   Q.   Okay.  And during that time, prior to 2020, neither of

2   them entered into a domestic joint venture involving Boston,

3   correct?

4   A.   Certainly correct on our side.  I think likely correct on

5   theirs, but I don't recall specifically.

6   Q.   You're no aware of any domestic joint ventures involving

7   Boston that Delta entered into between 2015 and 2020,

8   correct?

9   A.   That's correct.

10  Q.   Now, Mr. Clark, you discussed the topic of pricing a

11  little bit with Mr. Craner, correct?

12  A.   Yes.

13  Q.   And it was a responsibility of the pricing department

14  within your revenue management group to set the price for

15  JetBlue flights, right?

16  A.   From 2017 to the end of 2021.  Correct.

17  Q.   Okay.  But you still oversee the group now, correct?

18  A.   True.  Yes.

19  Q.   And you mentioned the price that JetBlue charges for

20  flights is affected by supply and demand, correct?

21  A.   Yes.  That's one of the many factors that go into the

22  price setting.

23  Q.   And as a matter of basic economics, Mr. Clark, if demand

24  arises and supplies stays constant, that will push fares

25  upward, correct?

**A.**   That would provide upward pressure on fares, yes.

**Q.**   And to put it another way, if demand were to stay constant but supply were to reduce, that would also put upward pricing pressure on fares, correct?

**A.**   Correct.

**Q.**   And the way to think about supply in the airline industry is capacity, right?

**A.**   Yes.

**Q.**   And am I right that JetBlue uses software to help its revenue management respond to supply and demand factors in pricing?

**A.**   To a degree.  The software helps us determine which fare to be selling at any given time.  Certainly, customer demand and the number of seats remaining for sale are important inputs to that.

**Q.**   And is another input in the software seats available across the route, including other competitors?

**A.**   For our base model, no, it does not -- it's not aware of competitor availability.  We're working towards I'd say more intelligent software that would factor that in.  But most of our routes don't have that.

**Q.**   So once you have that more intelligent software, that would take into account competitor availability and capacity in recommending prices?

**A.**   We wouldn't know how many seats they have left for sale,

1   just sort of how many seats they have scheduled in market, so

2   that would be the input potentially is seats scheduled by the

3   other carrier.

4   **Q.**   And so if it -- if seats scheduled by the other carriers

5   declined, that would cause upward pricing pressure, correct?

6   **A.**   It might.  We're sort of speculating about a future

7   scenario, but based on the laws of supply and demand,

8   generally, constant demand decreasing supply would lead to

9   upward pressure on fares.

10   **Q.**   And that would happen regardless if you were coordinating

11   your pricing with any other airline, correct?

12   **A.**   Correct.  In a completely independent world, that would

13   still be the natural pressure.

14   **Q.**   And under the Northeast Alliance, JetBlue and American

15   have the ability to coordinate on capacity, correct?

16   **A.**   On capacity for markets within the scope of the NEA, yes.

17   **Q.**   Including on markets they both serve and compete directly

18   with each other on, correct?

19   **A.**   Correct, as long as there's sufficient competition from

20   other carriers on those routes, as well.

21   **Q.**   And, Mr. Clark, just to return to Boston for a second, to

22   be clear, notwithstanding all of Delta's growth from 2015 and

23   2019, JetBlue at the end of 2019 was still the largest

24   carrier in Boston, correct?

25   **A.**   I believe so, yes.

1    **Q.**  And you mentioned competition from other carriers such as

2    United and Southwest, right?

3    **A.**  Correct.

4    **Q.**  And you mentioned the importance of having a hub and how

5    that affects competitive dynamics, correct?

6    **A.**  I don't recall stating that.  I recall saying that --

7    naming a city a hub sort of as a strategic indicator that

8    they intend to allocate a lot of resources there and continue

9    growing it.

10   **Q.**  Okay.  United does not have a hub in Boston, correct?

11   **A.**  That's correct.

12   **Q.**  Southwest does not have a hub in Boston, correct?

13   **A.**  Correct.

14   **Q.**  The only two carriers with hubs in Boston are JetBlue and

15   Delta, correct?

16   **A.**  Correct.

17   **Q.**  You talked a little bit at the beginning with Mr. Craner

18   about costs.  Do you recall that?

19   **A.**  Yes.

20   **Q.**  And regardless of mileage, every flight has a cost,

21   correct?

22   **A.**  Correct.  Every flight generates cost, yes.

23   **Q.**  Okay.  And so if the number of flights goes up in the

24   Northeast Alliance, your costs will go up as well, correct?

25   **A.**  It depends.  Departure count is one of the factors that

1    drives count cost, but length of the flights is also a very

2    important factor in -- that drives cost.

3    **Q.**   Okay.  There are some costs, though, that go up

4    regardless of the mileage, right?

5    **A.**   I'm sorry, regardless of --

6    **Q.**   Again, there are some costs associated with the

7    flights regardless of stage length, correct?

8    **A.**   Correct.  Like landing fees, for instance, are constant

9    regardless of the length of the flight.

10   **Q.**   And JetBlue's costs --

11            THE COURT:  They vary based on the size of the

12   plane?

13            THE WITNESS:  Yes.  They vary on the size of the

14   aircraft but no how far that aircraft is flown.

15   BY MR. DeRITA:

16   **Q.**   So when you -- is it right, then, that if you up-gauge

17   your planes, you're generating higher costs in terms of

18   landing fees, as well?

19   **A.**   Correct.

20   **Q.**   And JetBlue's costs, in fact, have gone up in the last

21   year, correct?

22   **A.**   Yes.  The costs throughout the world have gone up.

23   There's been a period of high inflation in the past year.

24   **Q.**   In fact, in 2022, JetBlue announced record revenues, but

25   didn't turn a profit because of its increased cost, correct?

 1    **A.**   In the second quarter, correct, record revenues, but made

 2    a loss for the quarter.

 3              MR. CONGDON:  Your Honor, I pass the witness.

 4              THE COURT:  All right.  Recross?

 5              MR. CRANER:  No further questions, Your Honor.

 6              THE COURT:  All right.  Thank you very much.

 7    You're excused.  Have a nice day.

 8              THE WITNESS:  Thank you.

 9              THE COURT:  Next witness, Mr. Jones?

10              MR. JONES:  Yes, sir.  Your Honor, plaintiffs call

11    Dr. Nathan Miller.

12              THE COURT:  All right.

13              MR. JONES:  And my colleague Mr. DeRita, Mike

14    DeRita, will be conducting the examination.

15              THE COURT:  All right.

16              THE DEPUTY CLERK:  Sir, if you can please raise

17    your right hand.

18              (Witness duly sworn)

19              THE DEPUTY CLERK:  Thank you.

20              THE COURT:  You can be seated.

21              MR. DeRITA:  Good morning, Your Honor.

22              THE COURT:  Good morning.

23              MR. DeRITA:  I'm Mike DeRita.  I'm from -- with the

24    United States.

25              THE COURT:  Did you say -- DeRita?

 1          MR. DeRITA:  DeRita.  D-e-R-i-t-a.

 2          THE COURT:  DeRita.  Sorry.  Go ahead.

 3          MR. DeRITA:  Before we start, I just wanted to,

 4   like my colleague did, just raise an issue that there are

 5   some slides that are going to have redactions.  I'm going to

 6   do it decidedly more old school.  You have a printed copy in

 7   front of you, so when we get to those slides, I'll just give

 8   you a heads-up that those slides that you'll have will be

 9   unredacted but --

10          THE COURT:  They'll be in the binder.

11          MR. DeRITA:  Yes.  The gallery will see unredacted

12   copies.

13          THE COURT:  So most things, Dr. Miller, will be on

14   the binder and in the screen.  You can see either.  You can

15   look at either one when one of the lawyers is asking you.

16          THE WITNESS:  Fantastic.

17          THE COURT:  But sometimes they won't be on the

18   screen and then you'll have to --

19          THE WITNESS:  Is this the binder --

20          THE COURT:  Exactly.  That's the binder.  All

21   tabbed.

22          MR. DeRITA:  It's only three slides and they're

23   tightly --

24          THE WITNESS:  Okay.

25

1                                **NATHAN MILLER**

2              having been duly sworn, testified as follows:

3         **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS**

4   BY MR. DeRITA:

5   **Q.**  Good morning, Dr. Miller.

6   **A.**  Good morning.  How are you?

7   **Q.**  Good.  How are you?  Could you please introduce yourself

8   to the Court?

9   **A.**  My name is Nathan Hemmer Miller.  I'm a professor at

10   Georgetown University.

11   **Q.**  You were retained by plaintiffs in relation to this

12   matter, right?

13   **A.**  Yes, I was.

14   **Q.**  What was your assignment?

15   **A.**  My assignment was to analyze the likely competitive

16   effects of the NEA.

17   **Q.**  What's your educational background?

18   **A.**  I received a doctorate in economics at the University of

19   California Berkeley in 2008, and prior to that, I did my

20   undergraduate studies at the University of Virginia,

21   graduating in 2000.

22   **Q.**  What's your academic work experience?

23   **A.**  I joined Georgetown University in 2013, and I've been

24   employed there since.  I started as an assistant professor

25   and have just advanced along the normal path.  So I was

1  promoted to associate professor in 2017.

2         Along the way, I was recognized as the Saleh Romeih

3  chair associate professor and then the provost distinguished

4  associate professor.  And this year, I was promoted to full

5  professor.  I've started in the business school, but my

6  current role is joint between the business school and the

7  department of economics.

8  **Q.**  Have you taught anywhere other than Georgetown?

9  **A.**  My -- my teaching has been at Georgetown University.

10  **Q.**  What are your fields of research?

11  **A.**  I study industrial organization.  Industrial organization

12  is a field in economics that looks at markets and outcomes

13  and markets, when market power is at play.

14  **Q.**  Do you have any other affiliations or positions that you

15  currently hold?

16  **A.**  I'm affiliated with Cornerstone Research.  That's a

17  consultant company that helps me do analysis for

18  investigations such as this.  I also hold a role at the

19  *Journal of the Law and Economics*, which is a leading general

20  interest economics journal.  And I'm an editor there.

21         I'm also an associate editor at the *International*

22  *Journal of Industrial Organization*, which is a field journal

23  in industrial organization.  And I'm on the editorial board

24  of *The Review of Industrial Organization*, which is another

25  journal that focuses on industrial organization.

1   **Q.**   Have you published articles in peer-reviewed journals?

2   **A.**   Yes, I have.  I've published a number of articles -- 20,

3   by my count, including in journals such as the *American*

4   *Economic Review* and *Econometrica*, which are two of our top

5   journals.

6   **Q.**   Have you ever worked in the government before?

7   **A.**   Yes, I have.  I started my career after graduate school

8   by spending five years at the Department of Justice where I

9   worked as a staff economist between 2008 and 2013.

10   **Q.**   What did you do in your role as a staff economist?

11   **A.**   My job entailed looking at mergers, analyzing the

12   competitive effects of mergers, and also analyzing in some

13   instances nonmergers, supporting the economic analysis in

14   nonmerger investigations.

15   **Q.**   Do you recall roughly how many mergers you evaluated in

16   that role?

17   **A.**   Roughly, I wasn't keeping track of the time, but I'd put

18   it between 20 and 25 over those five years.

19   **Q.**   What are some of the higher profile public transactions

20   that you worked on?

21   **A.**   I could list Delta/Northwest, AT&T/T-Mobile, which was in

22   the cell phone space or the wireless telephone communication

23   space, Ticketmaster/Live Nation.

24              THE COURT:  These are all while at DOJ?

25              THE WITNESS:  These are all at DOJ.  And the last

1  one -- the last one went to trial, and that was

2  PowerReviews/Bazaarvoice, although I left DOJ before it could

3  reach trial.  I left for Georgetown.

4  BY MR. DeRITA:

5  **Q.**  Have you previously testified as an economic expert?

6  **A.**  I've done so twice in front of the competition bureau in

7  Canada.

8  **Q.**  Have you been retained as an expert but not qualified in

9  relation to other transactions?

10  **A.**  No.  Excuse me.  Could you restate the question?

11  **Q.**  Yeah.  Have you been retained as an expert to analyze a

12  transaction, but didn't actually end up testifying?

13  **A.**  Yes, I have.

14  **Q.**  You mentioned that you've done work with the DOJ.  In

15  your non- -- in your non-DOJ work as a consultant and

16  otherwise, who has retained you as an expert?

17  **A.**  I've been retained by the Department of Justice on a

18  couple of other occasions, by the federal trade commission in

19  two or three instances, by the Canadian competition bureau,

20  and also by merging firms.

21  **Q.**  Has any court excluded you from testifying as an expert?

22  **A.**  No, they have not.

23          MR. DeRITA:  I would like to offer Dr. Miller as an

24  expert in economics and industrial organization.

25          MR. WALL:  No objection.

1          THE COURT:  All right.  I find him so qualified.

2    BY MR. DeRITA:

3    **Q.**  Have you submitted any expert reports in this matter?

4    **A.**  Yes.  I've submitted two reports.  An initial report and

5    then a reply report.

6    **Q.**  And it likes you've prepared a slide deck in relation to

7    your testimony; is that right?

8    **A.**  Yes, I have.

9    **Q.**  Okay.  So the binder you have in front of you -- I know

10   we've already discussed it -- but it has a copy of that slide

11   deck and also has copies of your reports, and did you submit

12   an additional supplemental report, too?  Is that right?

13   **A.**  I submitted a declaration as well as a document that

14   describes supplementary analyses.

15   **Q.**  So we already talked about your assignment.  Did you

16   reach any opinions about the likely competitive effects of

17   the NEA?

18   **A.**  Yes, I did.  I determined that the NEA would be likely to

19   substantially lessen competition and harm consumers in many

20   relevant antitrust markets.  And NEA markets where both

21   defenders -- defendants offer nonstop service -- I'll call

22   these markets NEA nonstop overlap markets, are the most

23   significant source of harm.

24   **Q.**  What do you mean by "harm"?

25   **A.**  Well, what I mean is that consumers are likely to pay

1    higher prices for flights that they could have obtained at

2    lower prices initially.  Prior to the NEA, American and

3    JetBlue competed on many important routes that touched Boston

4    and JFK, LaGuardia, Newark.  These were the NEA reports.  And

5    competition generates incentives for firms to offer better

6    service and lower prices.  The NEA removes competition

7    between the defendants on NEA routes and it does through --

8    does so through two mechanisms that I'll describe, in

9    particular capacity -- by allowing them to coordinate their

10   capacity decisions and by implementing a revenue sharing

11   agreement that will affect pricing incentives.

12           Looking specifically at the overlap routes, I

13   quantify annual harm as $696 million.  And this represents

14   the additional amount of money that consumers would have to

15   pay in a given year to make the same choices it would have

16   made without the NEA along the overlap routes -- along the

17   overlap routes.

18   **Q.**  How did you reach those conclusions?

19   **A.**  Well, I've done a number of things that I'll outline.

20   I've looked at the industry context in which the NEA is

21   arising.  I looked at the terms of the NEA themselves to

22   understand how the NEA operates and the economic incentives

23   it creates and the economic incentives, you know, that maybe

24   it doesn't create.

25           I've looked at the competitive effects as they're

1    likely to arise in domestic NEA overlap markets.  Part of

2    that is an understanding of what a relevant market is, and so

3    I've thought about the appropriate way to define markets for

4    the purposes of merger review, a merger review of the NEA.

5           Then I've also looked at competition between routes

6    that connect the -- the United States and London.  I've

7    looked at a risk of increased coordination that would -- that

8    would be among the defendants, as well as other airlines.

9           And I've examined mitigating factors, like whether

10   entry or efficiencies might mitigate the competitive effects

11   that I estimate.

12   **Q.**  Let's start with your review of the industry context.

13   What did that entail?

14   **A.**  A number of things, but what's on -- we can start with

15   some market shares and I've put a -- in the slide deck, a

16   graphic that shows you the 2019 revenue share of American in

17   red and JetBlue in blue, along the nonstop overlap routes

18   that touch Boston.

19          And, for example, the chart shows that, between

20   Boston and Charlotte, American and JetBlue as of 2019 had a

21   combined revenue share of 96 percent.  Boston to DCA, that

22   number is 88 percent.  And you can go down.  Chicago -- the

23   combined shares is 49 percent.

24          I've shown -- I've created a similar graphic for

25   New York City and that's on the following slide.  It's a

1     little bit more busy because there's more nonstop overlaps

2     out of New York City and Newark.  But we can see at the top

3     that American and JetBlue account for 97 percent of the

4     revenue share and 97 percent of the revenue in 2019 to

5     Nantucket, 92 percent to Martha's Vineyard.

6            And then you go down, you can see Raleigh-Durham is

7     48 percent, Atlanta is much less.  It's 16 percent.

8            THE COURT:  I'm sorry, just so I understand, these

9     two slides are both percentages of the overall revenue from

10    that route?

11           THE WITNESS:  On the route.  That's correct.

12           THE COURT:  Okay.  Not flights or seats, just --

13           THE WITNESS:  It's just revenue, yeah.

14           THE COURT:  Okay.

15    BY MR. DeRITA:

16    Q.  Are any of these market shares a cause for concern?

17    A.  Well, as an economist, yes.  So let me -- let me just

18    give you an example.  Raleigh-Durham has a 48 percent

19    combined revenue share.  You know, we can infer that

20    52 percent of revenue is accounted for by other airlines.

21           But economic theory will tell us that the

22    competition between two carriers that combined have market

23    shares of 48 percent can be important for consumers.  And so

24    the loss of competition between American and JetBlue in a

25    route where they've got 48 percent is potentially a cause for

1   concern.  And we see combined shares at that level for a

2   number of routes.

3   **Q.**  Did you do anything else in your review of industry

4   context?

5   **A.**  Yes, I have.  So, I mean, one thing I noticed is -- is

6   the JetBlue effect, which I think is important in this

7   context.  The particular slide shows two figures.  They were

8   in a submission that JetBlue made to the competition markets

9   authority in the UK.  And they just sort of document a couple

10  of examples of the JetBlue effect, but it points out that

11  when JetBlue entered the Boston to LaGuardia shuttle market,

12  the walkup fares decreased by 69 percent, that when JetBlue

13  entered the Boston to DCA shuttle market, the walkup fare

14  decreased by 65 percent.

15          And then the graphic on the right considers

16  Minneapolis-St. Paul to Boston, in which case the average

17  price fell by 38 percent.  So these are three examples of the

18  JetBlue effect in action.

19          But I've also looked to see whether it generalizes

20  more broadly or, you know, how broad this might be, and I've

21  prepared an exhibit on that as well.

22  **Q.**  Before we turn to that exhibit, just quickly, what do you

23  mean by walkup fare?

24  **A.**  My understanding is that a walkup fare would be the price

25  of a ticket that you could purchase just sort of walking up

1    to the counter maybe the day of, the day of the flight.

2    **Q.**  And you mentioned you prepared something else.

3    **A.**  Yeah.  That would be the next slide.

4         The next slide is going to do two things.  I'm

5    going to start with the dark bars on the left.  The dark bars

6    on the left are -- represent the magnitude of a JetBlue

7    effect as it's estimated by JetBlue in the ordinary course

8    and it looks at a number of routes.  And so we can see, for

9    example, on the left -- oh, I should say that some of these

10   were exits, where JetBlue exited the market, and they look to

11   see whether prices went up.  And sometimes it's -- the

12   JetBlue effect occurs when JetBlue enters a market and prices

13   come down.  And so you see it both ways.

14        But the first bar on the left is a situation in

15   which JetBlue exited JFK to Pittsburgh and prices went up by

16   75 percent.  The second bar is another exit.  It's JFK to

17   Richmond and prices went up 65 percent.  And then we get our

18   first entry, which is Boston to Cleveland, where prices went

19   down by 53 percent.

20        But you can see a range, you know, the range of the

21   JetBlue effect from 75 on the left bar down to the smallest

22   one is a 14 percent, it's just consistent with my general

23   understanding that pricing dynamics will vary in different

24   markets depending on the local supply and demand conditions.

25   So we do see a heterogeneity in the impact.

1          Over on the right, in the light blue are estimates

2     of the JetBlue effect that were submitted by the defendants

3     and economists during the course of the Department of

4     Justice's investigation.  And the purposes of the regression

5     is to try to estimate the average, the average of the JetBlue

6     effect, the average magnitude of the JetBlue effect over --

7     any time that JetBlue kind of comes into a market or is there

8     or is not there.  And the results of that analysis was that

9     on average JetBlue lowers prices by 20 percent or 21 percent

10    depending on the methodology employed.

11    Q.   Did you conduct any econometric analysis to evaluate the

12    role of competition in the airline industry?

13    A.   Yes, I did.  And in particular, I wanted to investigate

14    the role of legacy competition in affecting prices, and I did

15    two studies to establish that.  The first looks at routes

16    across the country.  Sometimes I call this a "hub structure

17    regression," and I'll go into more details later.

18         But in that analysis, I establish the routes that

19    have more legacy competitors, tend to have lower prices.  And

20    furthermore, I'm able to do this in a way that establishes a

21    causal -- allows for causality to be inferred; in other

22    words, an increase in the legacy competition decreases prices

23    and a reduction in legacy competition raises prices.  That's

24    the first analysis.

25         The second analysis focuses more specifically on

1    the 737 Max grounding.  And what it shows is that when

2    American withdrew capacity from New York City markets as the

3    737 MAX grounded, JetBlue was able to raise its price.

4    **Q.**  So if I understand this correctly, the 737 MAX analysis

5    found that JetBlue prices were higher after American grounded

6    its 737 MAX.  How does that square with the JetBlue effect?

7    **A.**  Well, I think it means a couple of things.  I mean, I

8    think what we learned is that the JetBlue effect is at risk,

9    that JetBlue responds to supply and demand like other

10   carriers do.  And so we need -- I think it gives me concern

11   that, you know, lost competition will result in higher

12   JetBlue prices.

13   **Q.**  Did you review any of the defendants' documents to inform

14   your assessment of industry context?

15   **A.**  Yes, I did.  And a number of them are in my report.  And

16   I'll just try to -- I've put four on this slide.  The ones in

17   red are from American and the ones in blue are from JetBlue.

18          For example, the top left is talking about

19   Boston-DCA.  And it states, "Our big competition in

20   Boston-DCA is JetBlue" -- "B6" is going to be JetBlue --

21   "with very low pricing and tons of flexibility."

22          And each of the documents references a different

23   route.  So we have Boston to DCA on the top left, New York

24   City to San Francisco in the top right, Boston-Philly bottom

25   left, and then Boston to Rochester in 2019, Boston-Rochester

1    in the bottom right.

2           So putting the documents together with the evidence

3    of the JetBlue effect and my econometric analyses and the

4    market shares, I walk away with serious concerns about the

5    potential for competitive harm as a result being -- if we did

6    lose competition between American and JetBlue.

7           THE COURT:  I'm going to pause you here.  We'll

8    take the morning break now.

9           (Court in recess at 11:02 a.m.

10          and reconvened at 11:16 a.m.)

11          THE COURT:  Go ahead, Mr. DeRita.

12          MR. DeRITA:  Thank you, Your Honor.

13   BY MR. DeRITA:

14   Q.  So I'd like to shift topics and talk about the NEA.  Did

15   you review the NEA agreement and related agreements?

16   A.  Yes, I did.

17   Q.  When you reviewed those, what elements were most

18   important to you?

19   A.  Well, I wanted to understand both just mechanically how

20   the agreements work, but then also how they may affect

21   decision-making in the industry.  And with respect to the

22   latter, I determined that the terms of the NEA affect

23   capacity planning and they're also going to affect pricing.

24          Capacity planning, we know that each airline is

25   going to set a schedule.  It will set the routes that it

1    flies, the capacity or the airplanes, and the frequencies

2    with which those airplanes fly.  And the change due to the

3    NEA is that American and JetBlue are going to coordinate

4    rather than compete on their capacity and scheduling on the

5    routes that are touching the NEA airports.

6           With respect to pricing, each airline sets prices

7    to maximize the profitability of their schedule.  And the

8    change due to the NEA is that revenue sharing is going to

9    align the pricing incentives of American and JetBlue, and

10   that has economic implications that I'll draw out.

11   **Q.**  So you mentioned the two key factors that you looked at,

12   coordination instead of competition and capacity -- upward

13   capacity and aligned pricing incentives.  You just said there

14   would be some economic implications.  What are those?

15   **A.**  Well, together, putting the capacity result and the

16   pricing together, my interpretation is that the NEA

17   effectively ends competition between American and JetBlue on

18   routes that touch NEA airports.  And as I'll develop, that

19   will create incentives for American and JetBlue to increase

20   price and reduce output in overlap markets, and that'll be

21   particularly true in the nonstop overlap markets.

22   **Q.**  You mentioned that revenue sharing gives the defendants

23   change pricing incentives.  Why is that?

24   **A.**  It's due to something that, in the academic literature,

25   is called "upward pricing pressure."  Okay?  This is a

1    standard effect that arises in mergers.  Okay?  It will apply

2    here in the NEA.  And I think the language on the slide maybe

3    understates it a little bit.

4         For different mergers involving different shaded

5    products, upward pricing pressure is one of the main problems

6    that arises -- in fact, the main problem that arises.  And if

7    you were to open up the horizontal merger guidelines, you

8    would find a whole subsection devoted to it.  It would be

9    Section 6.1, is largely the economics.  So this is a major

10   consideration with horizontal mergers working with different

11   shaded products.

12        Now, as I said, it applies to the NEA.  Here's why.

13   In the context of the NEA, the defendants are going to each

14   set their own price, but the shared financial interest that

15   they obtain in each other's products creates this upward

16   pricing pressure.  And I'll -- I've got a couple of slides to

17   walk through the intuition, but just on this, to give you a

18   sketch, we normally think that higher prices cause some

19   customers to substitute to other products.  And without

20   revenue sharing, the revenue from those customers is simply

21   lost.

22        But with revenue sharing, some of those customers

23   can be recaptured with a product that's, in this case, in the

24   partnership.  And that creates incentives to rise price all

25   else equal.  So this is the concept of upward pricing

1    pressure.

2              I can compare it to the sorts of economics that can

3    come out of a merger.  I'll use an acquisition just to -- you

4    know, for -- it'll make the language easier.  The acquiring

5    firm can increase the price on its product and recapture some

6    of the lost consumers on the product of the acquired product.

7    And because it can recapture consumers with the acquired

8    product, to some degree, a pricing increase that would not

9    have been profitable before the merger could be profitable

10   after the merger.

11   **Q.**  And I know you mentioned you had some slides.  Just

12   quickly before we get to those, what do you mean by

13   differentiated products?

14   **A.**  A differentiated product is a product where a consumers

15   might have preferences for the product of one firm versus the

16   product of another firm that are -- that are not only due to

17   a price.

18             So, for example, my kids might like Lucky Charms,

19   you know, and I might be -- today I had my Wheaties, okay.

20   Something like that.  Where there's sort of brand preferences

21   or other things that might affect consumer decisions,

22   airlines would be considered a different shade of product

23   because there's a whole host of things that would matter for

24   consumers.

25   **Q.**  Okay.  Let's turn to those slides you mentioned.  Can you

1    walk us through those?

2    **A.**   I did.  And this is just -- it's an illustrative example,

3    but on the slide what I'm trying to depict is a market in

4    which consumers can choose between a JetBlue flight, an

5    American flight, a Delta flight, or maybe they don't fly at

6    all.  Okay?  And I'm going to focus on JetBlue and I've got

7    five passengers and I'll just ask the question whether it

8    makes sense for JetBlue to raise price.

9              And, you know, if a firm raises price, some of the

10   customers will choose other options.  And in this particular

11   example, I've just assumed that four customers, the ones that

12   are sort of shaded in darker blue, are going to choose other

13   options if prices go up.

14             And so that's the next slide.  I've just allowed

15   two of the customers to go to American, one to go to Delta,

16   and one might choose not to fly, and again, this is just for

17   illustration.  In this instance, economists would call this

18   switching behavior "diversion."  And we would infer that the

19   diversion to American is 50 percent, because of the four

20   customers that switched, two of them picked American.  The

21   diversion to Delta is 25 percent because of the four, one

22   picked Delta.

23             So this is a notion of diversion.  It's a notion of

24   where -- when consumers switch, where do they go?  And so if

25   JetBlue is going to evaluate a price increase, you know,

1    what's relevant is, you know, what does it gain from the

2    price increase in terms of its margin compared to how many

3    customers does it lose because it raised price, and that's

4    what balances the pricing incentive for JetBlue.

5            Now, this will change with revenue sharing.  And

6    the reason it changes with revenue sharing is that -- is that

7    the two customers that switch to American are no longer lost

8    revenue from JetBlue, that JetBlue actually benefits from

9    customers that choose the American product.  And so if we

10   think about the pricing incentives as sort of balancing what

11   you gain from a price increase versus what you lose from a

12   price increase, the ability to recapture consumers on either,

13   you know, acquired product in the case of a merger or via

14   revenue sharing tilts the balance towards higher prices.

15   **Q.**  And I realize this is just an example, but if you had

16   switched American for JetBlue in your example, would this

17   change at all?

18   **A.**  No.  It would be the symmetric analysis for American.

19   Upward pricing pressure would be created for JetBlue products

20   because some of the products -- some of the consumers that

21   would leave believe JetBlue would be recaptured by American

22   in the same way that American -- a price increase for

23   American may be profitable with revenue sharing that would

24   not be profitable without revenue sharing because some of the

25   customers are recaptured by JetBlue.

1    **Q.**   The example discusses revenue sharing.  Would the pricing

2    incentives be different if profits were shared instead of

3    revenue?

4    **A.**   Subtly so.  With profit sharing, again, we have this

5    recaptured logic, but profit sharing actually induces

6    somewhat smaller upward pricing pressure than does revenue

7    sharing.  In other words, revenue sharing generates greater

8    upward pricing pressure than profit sharing or a full merger

9    would.

10            And the reason is that when JetBlue, in our case,

11   in our example, in this illustrative example, if JetBlue

12   raises the price, it recaptures revenue from American, but it

13   doesn't internalize that American has to incur the cost of

14   supplying those customers.

15            In other words, it's able to shift, but by raising

16   price and shifting the cost to American, it realizes the

17   benefit of the revenue, but no longer has to pay the cost

18   associated with flying that customer.  And so there's an

19   extra benefit to pricing increases with revenue sharing that

20   does not exist with profit sharing.

21   **Q.**   Would your example change if JetBlue or American had high

22   market shares?

23   **A.**   Well, you know, what really matter here is diversion.

24   That'll explain the amount of recapture you get.  And the

25   more the recapture, the greater the incentive is to raise

1    price.

2              But all else equal, a product that has a large

3    market share is -- we can think of it as being the market

4    shares as evidence as popular with consumers.  And so a

5    product all else equal that has market share, I would have

6    greater suspicion that diversion to that product would be

7    large.

8              And so that's why this -- you know, putting this

9    together with the market shares that I showed you on the

10   initial slides give me reason to think, just like sanity,

11   that upward pricing pressure here might be pronounced.

12   **Q.**  So let's move from your example to something a little bit

13   more real world.  Does the NEA revenue sharing create upward

14   pricing pressure on NEA routes?

15   **A.**  Yes, it does, and I've got some slides here.  I know

16   they're a little bit busy, but I want to do two things.  I

17   want to explain why upward pricing pressure exists, but I

18   also want to walk through the mechanics of how this deal

19   works, somewhat in light of the testimony that I don't know

20   if it's already been given, and I hope it's helpful.

21             So the mutual growth incentive agreement, MGIA, is

22   a sub-agreement that exists in the broader context of the

23   NEA.  And the MGIA is the part of the NEA agreement that

24   dictates how revenues are going to be shared.  Okay?

25             The MGIA formula, yeah, is going to determine how

1    money is allocated between defendants.  The payments that are

2    obtained from American and JetBlue from the NEA are

3    determined by two things.  There's going to be a base payment

4    in each -- and then each airline is going to get its share of

5    incremental revenue.  So these are the two components that

6    constitute the money that American and JetBlue gain from the

7    right -- the routes that are flown in the context of the NEA.

8         And I've just sort of tried to put some of the

9    actual language from the document on there so you -- so it's

10   available to the Court.

11   **Q.**  How are base payments calculated?

12   **A.**  Well, the base payments are calculated as the product of

13   three objects.  And even this is a little bit too simple,

14   because there's one base payment for sort of domestic travel

15   and another for international, but this will be good enough

16   for understanding, I think.

17        The base payment is going to be equal to the

18   pre-NEA unit revenue, which is the 2019 RESM, all right,

19   multiplied by the current capacity of the airline, multiplied

20   by something that's called the "stage-length adjuster."

21        Now, an implication of the way the base payments

22   are made is that the base payment is not simply some number

23   that's held fixed over time.  But the base payment can change

24   if an airline increases or decreases its capacity, and it can

25   change if an airline flies routes that are longer or shorter.

1    Okay?  In general, the base payment will go up if -- all else
2    equal, if a carrier flies with more capacity, and it -- they
3    will go up if the airline flies shorter routes.
4            So those are the two ways the base payment can
5    change over time.
6    **Q.**  Are current prices factored into the base payment?
7    **A.**  No.  No, they're not.  They're base -- the base payment
8    is based on the 2019 RESM, which would be factoring in
9    prices, okay.  But not current prices.
10   **Q.**  How is incremental revenue calculated?
11   **A.**  Incremental revenue is simply total revenue --
12           THE COURT:  Can you just pause for one second?  I
13   just want to look back at this provision here.
14           Okay.  I'm sorry.  Ask the question again.  Go
15   ahead, Mr. DeRita.
16           MR. DeRITA:  Sure.
17   BY MR. DeRITA:
18   **Q.**  How is incremental revenue calculated?
19   **A.**  Incremental revenue equals total revenue minus base
20   payments.  And let me pause on that for a moment, because it
21   may be intuitive to think that incremental revenue is simply
22   the increase in revenue sort of before the NEA to after the
23   NEA, but that's not the case.  Okay?  And the reason is
24   because the base payments are changing as well.  All right?
25           And, in particular, if you're thinking about how

1    it's going to change, we have to think about the effect of a

2    decision both on the -- on the base payment and on total

3    revenue.  So there are two ways in particular that

4    incremental revenue can be negative.  And I'll just -- to try

5    to keep it simple, we can start with sort of the schedule as

6    it is in 2019.  If an airline adds a flight that's a

7    particularly low flight -- a short, a short flight, that has

8    the same sort of average RESM as all the other flights, its

9    base payment goes up, and the base payment is going to go up

10   by more than total revenue.  And so in that -- in that

11   instance, the incremental revenue is negative.

12            THE COURT:  Say that again.  Why?  You're saying

13   2019 is the base.  And then in 2020, it's exactly the same as

14   2019?

15            THE WITNESS:  Yeah, just hold -- hold -- exactly.

16            THE COURT:  And then you add one flight.

17            THE WITNESS:  One flight.

18            THE COURT:  One flight on top of all the other

19   flights.

20            THE WITNESS:  Just the hold -- the prices --

21            THE COURT:  Wait.  So you're adding one flight on

22   2020 is 2019, all the same as 2019, plus one additional

23   flight?

24            THE WITNESS:  Yeah, that's right.

25            THE COURT:  Okay.  Go ahead.

 1              THE WITNESS:  And, also, we'll suppose that that

 2      flight has the same RESM as the other flights on average.

 3              THE COURT:  All right.

 4              THE WITNESS:  Okay.  In that case, if the flight

 5      has -- is short, if it's a short flight, then the base

 6      payment will go up by more than total revenue goes up.

 7              THE COURT:  Because under the formula -- why, under

 8      the formula?

 9              THE WITNESS:  So if we go to the formula -- first

10      of all, total revenue will go up by the RESM of the new

11      flight times one new flight.  Okay?  However --

12              THE COURT:  2.5 now?

13              THE WITNESS:  I'm sorry?

14              THE COURT:  Are we referring to section --

15      provision 2.5?

16              THE WITNESS:  Exactly.  So the -- just as -- let me

17      do some economics here and then go to 2.5.  Okay?  The total

18      increase in revenue will be the new RESM --

19              THE COURT:  Times --

20              THE WITNESS:  -- times one unit of capacity.

21      That's an increase in total revenue.  So the only thing we

22      have to answer, then, is does the base payment go up by more

23      than that?  Okay.  And now on the slide, I've got the formula

24      for the base payment.  And we can see that the base payment

25      is going to be equal to the pre-NEA unit revenue that's the

1    same number, right, just -- in our simple example, we're

2    saying that's the same as the flight we added times the

3    current capacity.

4              So, so far in this formula, it looks the same as

5    the change in total revenue, but when you add --

6              THE COURT:  Capacity is a little bit more because

7    we added a flight.

8              THE WITNESS:  Exactly.  So the base payment -- so

9    the base payment goes up by pre-NEA unit revenue, which is

10   the same as, you know, what -- total revenue goes up by,

11   except then the base payment is also affected by the stage

12   length adjuster.  And that rewards -- that provides a bigger

13   base payment for shorter flights.

14             And so if you add a short flight to the system, the

15   base payment will go up by more than total revenue will go

16   up.

17             THE COURT:  Say that last part again?  If you add

18   what?

19             THE WITNESS:  If you add a short flight that --

20   where the price -- the RESM on that flight is the same as the

21   average RESM for 2019 --

22             THE COURT:  I see.  Because of the benefit -- the

23   adjustment for a shorter flight?

24             THE WITNESS:  That's right.

25             THE COURT:  I see.

1          THE WITNESS:  That's right.

2          THE COURT:  So then your base payment has gone up

3     by more than RESM and then --

4          THE WITNESS:  The base payment has gone up by more

5     than total revenue.

6          THE COURT:  Total revenue.  I see.

7          THE WITNESS:  And that drives incremental revenue

8     to be a negative number.  Okay?  That's one of two reasons

9     that incremental revenue can be negative, or one of two

10    simple reasons.

11          Another example is -- another thought experiment is

12    sort the same thing.  We can hold 2019 fixed and had just add

13    one flight.  This time the flight isn't going to change the

14    length of the -- so the length is unaffected, but the price

15    is lower on the new flight compared to the average -- the

16    average revenue in 2019.

17          In that case, the base payment is going to go up at

18    a rate that's determined by the 2019 RESM, but total revenue

19    will go up at rate that's determined by the -- the RESM of --

20    the flight that's been added, right?  That will, again, push

21    incremental revenue to be negative.

22          Now, these are two examples, but I wanted to

23    provide them because in the worked example of how this plays

24    out at the end of the MGIA, you'll see that that includes

25    actually making incremental revenue.  And so that's how that

1    can arise.

2              Now, incremental revenue is shared in proportion to

3    current capacity.  So if incremental revenue is a positive

4    number, then the airline that has, you know, the greater

5    share of capacity gets more of incremental revenue.  If it's

6    a negative number, the firm that has the larger capacity

7    receives more of the loss.  And that's just the way the

8    mechanics dictate out.

9              I don't think whether incremental revenue is

10   positive or negative really drives the economics for upward

11   pricing pressure for reasons that I can explain, but it

12   does -- it does tell me that it's important to think hard

13   about what these terms are and sort of where the incentives

14   are, and that's what I've tried to do in my analysis.

15   BY MR. DeRITA:

16   **Q.**  Does price impact the NEA payments?

17   **A.**  Prices do -- do impact the NEA payments.  And I -- and as

18   a result, it will create upward pricing pressure, and I'll

19   sort of explain why.

20             The first observation is that setting a higher or a

21   lower price sort of in a price-making decision on this

22   particular route -- I can be a little bit higher or I can be

23   a little bit lower -- it doesn't affect the base payment, and

24   it doesn't affect the division of incremental revenue because

25   both of those are independent capacity decisions that have

1    already been made at the time the pricing decision is being

2    made.

3              So as an economist, we would say that's sort of a

4    sunk decision.  Like when you sell a ticket on a plane --

5              THE COURT:  But doesn't the price affect the RESM?

6              THE WITNESS:  Yes, it does.  It does affect RESM.

7    But in base payment, the RESM that enters that is the 2019

8    RESM, not the current RESM.

9              THE COURT:  But the price will affect the RESM

10   on -- if this is added flights as you pointed out, and that

11   will affect the base payment, the total base payment.

12             THE WITNESS:  Well, I don't want to think about --

13   I want to come back to the capacity decision, like, does it

14   make sense to fly a flight?  And right now what I want to do

15   is thinking about pricing incentives.

16             So take the schedule, because when airlines sell a

17   ticket, they sell you a ticket on a flight that's already

18   been scheduled.  And so, as a matter of the economics, it's

19   appropriate to think of the scheduling decision as sunk at

20   that point.  And what the airline is going to try to is

21   maximize the profits it can get on that flight by, you know,

22   considering prices that can be higher or lower and working in

23   its interest to maximize what it can get.

24             And so in that set -- in that sense, if you set a

25   higher or lower price, it doesn't affect the base payment

1    because the base payment is based on the schedule, which was

2    already set at the time you considered your pricing stage.

3    And the base payment then also depends on the RESM, but the

4    RESM for 2019, which isn't affected by what you do today.

5             THE COURT:  Right.  But even if the capacity is set

6    and the RESM is set, it's going to affect -- that pricing

7    decision, as you point out, will determine how much revenue

8    you get out of that flight.

9             THE WITNESS:  I completely agree.  And -- but I

10   want to -- I want to put this into context of where it

11   enters, the incentive, where it -- where the price and change

12   moves through the MGIA.

13            And what I can tell you is that it doesn't affect

14   the base payment, and it doesn't affect the division of the

15   incremental revenue.  And the reason it doesn't affect the

16   division of the incremental revenue is because that's just

17   based on the share of capacity, which, again, has already

18   been set.  Okay?

19            So where it does matter is through the magnitude of

20   incremental revenue.  That's the one remaining term.  And,

21   you know, consistent with intuition, if you set a

22   higher/lower price, total revenue does change, and it's got

23   to load somewhere.  That's where it loads.  Okay?

24            The prices that maximize revenue are going to be

25   the same prices that maximize revenue minus any fixed amount.

1    All right?  You -- you know, you then have some sort of sense

2    of, you know -- I want to say like a math -- math -- this is

3    almost just like a mathematical property.  Like, if you're

4    maximizing some function, you know, this is the spot that

5    maximizes it.  The function comes down, right?  You just

6    subtract some fixed amount.  You maximize it at the same

7    point.  Okay?

8            And what that means is the prices that maximize

9    revenue are the same -- are the same prices that maximize

10   incremental revenue, because incremental revenue is just

11   total revenue minus some payment, the base payments, which at

12   the point -- at that point in time are fixed or sunk when

13   prices -- when prices are set.

14           As a result, when we think about price setting in

15   the NEA, we get this same sort of upward pricing pressure

16   that you would get with just a normal revenue sharing

17   agreement, despite sort of all the complications of the terms

18   and how they affect things.

19   BY MR. DeRITA:

20   Q.  So how would you expect, if at all, upward pricing

21   pressure would impact the defendants' pricing incentives on

22   NEA routes?

23   A.  The revenue sharing in the NEA creates incentives to

24   raise price.  Those incentives are similar to the upward

25   pricing pressure incentives created by a horizontal merger

1    involving a different shade of products.

2         And this is going to be true even if JetBlue and

3    American are setting prices independently because it's about

4    their own -- you know, how they each gain from, you know, the

5    prices that they set.  And it's also true if there's no

6    change in control, and I think there's a simple intuition for

7    why control doesn't matter here.

8         Control -- control might matter if incentives are

9    not aligned because then you've got to figure out -- one

10   company wants to do one thing.  The other company has to do

11   another thing.  And, you know, who has control, right, at

12   that point matters to determine where the company goes.

13        But if pricing incentives are aligned the way that

14   revenue sharing aligns the pricing incentives, then you could

15   ask what JetBlue what prices should be and you could ask

16   American what prices should be, and the same prices are going

17   to work well for both of them.  And this is sort of my

18   intuition for why economic theory tells us that the

19   incentives here are the key thing to understand, not the

20   control of prices.

21        THE COURT:  Go ahead.

22        THE WITNESS:  The third -- the third thing, just to

23   observe, is that revenue is shared as specified under the

24   NEA.  If revenue is shared as specified under the NEA, as far

25   as stated, we get the upward pricing pressure.

1    BY MR. DeRITA:

2    **Q.**  So when we started talking about the NEA, you also had

3    mentioned capacity coordination.  How does the NEA facilitate

4    capacity coordination between American and JetBlue?

5    **A.**  Well, the NEA creates a framework under which the

6    defendants can meet to plan their capacity along the NEA

7    routes.  So -- so this allow competitive capacity choices to

8    be replaced by coordinated capacity choices.  It allows

9    American and JetBlue to raise their combined profits to the

10   benefits of both.

11           And this is consistent with my understanding of how

12   American and JetBlue understand the NEA.  And I've just put,

13   you know, two -- I guess they would be documents -- on the

14   board.  You know, the first one, for example, says in

15   thinking about capacity decision, JetBlue -- this is one

16   particular episode, but they were instructed to consider

17   what's in the best overall joint venture solution, as that's

18   what drives the economics.  Okay?

19           So this notion that capacity planning can be used

20   to drive joint benefit for American and JetBlue is how I

21   interpret the capacity coordination.  I think it's consistent

22   with how American and JetBlue are interpreting it as well, at

23   least there's evidence on the record that that's the case.

24           So the defendants can coordinate capacities on

25   their NEA routes.  If they're doing that to their mutual best

1    interest, along this respect, it's as if -- as if you had a

2    merger.

3    **Q.**  So you've probably heard the defendants have claimed that

4    the NEA will give them the incentives to grow capacity.

5    What's your reaction to that?

6    **A.**  Well, I've thought a lot about this.  And it is the case

7    that the MGIA, which is the particular revenue-sharing

8    agreement, if you considered it in isolation outside of the

9    context of the rest of the NEA, it can create what I'll call

10   "unilateral incentives" to expand capacity above levels that

11   would maximize joint profit.

12           And, you know, I say "unilateral incentives," and

13   what I mean by that is an incentive for American working in

14   its own best interest rather than in the joint interest of

15   the alliance or JetBlue acting in its own interest rather

16   than in the interest of the alliance.  So it can create these

17   unilateral incentives.

18           But my analysis is that acting on those incentives

19   would exploit the partner in a way that I'll explain, who is,

20   essentially, subsidizing capacity growth that is otherwise

21   unprofitable in a way that reduces joint profit.  And that's

22   what the -- that's what the graphic is meant to illustrate.

23   In the graphic, I've considered what I'll call "capacity

24   coordination" in the first bar.  And the red is the American

25   profits it can get, and blue is the JetBlue profits.

1          And then I'll consider a decision by American to

2     increase its capacity in a way that is to its own unilateral

3     benefit that, in some way, runs contrary to the benefits of

4     the group overall.  And in this sort of setting, it's

5     possible that American's profit goes up because JetBlue is

6     funding capacity growth through the terms of the MGIA.  But

7     total profit is down, so we know that JetBlue actually does

8     worse in this scenario.

9          And so you might think, well, why would JetBlue

10    agree to this sort of outcome?  And they wouldn't.  And if in

11    the context of -- you know, I really wouldn't expect this

12    scenario to arise because in the context of capacity

13    coordination, if JetBlue doesn't agree, it doesn't happen.

14    Or if it does happen, American is sort of cheating on the

15    arrangement, to some extent, and cooperation would unwind.

16    So that's what might happen if American sort of pursues its

17    own unilateral interest outside of the collective good for

18    American and JetBlue.

19          The same with -- the next bar down considers the

20    same situation for JetBlue.  It's just the flip.  You know,

21    JetBlue may be able to expand capacity in a way that, due to

22    terms of the MGIA, makes unprofitable growth profitable, but

23    then American is just subsidizing that.  So American's profit

24    goes down.

25          And the last bar considers a scenario in which

1    they're both acting in their own unilateral interest, and

2    there the split of profit might be similar to the capacity

3    coordination, but the size of the pie is smaller.  And so

4    this is potentially a problem for the companies.

5    **Q.**  So given all the incentives you've just described, what

6    do you suggest is the correct way to look at the MGIA -- or

7    the NEA?

8    **A.**  I think it's helpful to think about three different kinds

9    of capacity changes that could arise, and I'll put those into

10   buckets for you.  One type of capacity change is a capacity

11   change that would occur without the NEA, and it'll occur with

12   the NEA.

13          And, you know, that sort of capacity change is not

14   one that I view as relevant to understanding the competitive

15   effects of the NEA because it would happen in either case.

16          A second kind of capacity change is one in which

17   American or JetBlue might make a decision in its own

18   unilateral best interest in a way that departs from what's

19   best for the alliance overall.  And this category of change

20   is along the lines of what I've just described.

21          Those changes would exploit the partner, and if

22   they're implemented -- I don't believe they would be agreed

23   to.  If they were -- if they weren't agreed to and they were

24   implemented, it would -- my interpretation is that it

25   would -- it would make it difficult to cooperate going

1    forward.  So I don't think those sorts of changes are likely

2    to be relevant for understanding the competitive effects of

3    the NEA.

4            And then that brings us to the third bucket.  In

5    the third bucket of capacity changes are capacity changes

6    that are made because they're profitable to make for the

7    alliance overall.  In other words, they are capacity changes

8    that are in the interest of American and JetBlue together.

9            And for those types of changes, there's a mechanism

10   in place to realize those changes through capacity

11   coordination.  And the particular terms of the MGIA and the

12   unilateral incentives that could be created aren't really

13   needed to realize mutual gains because they can just talk

14   about what they want to do and implement it.

15           And that's why when I look at the route, you know,

16   in the analysis of this, I view sort of this -- the MGIA

17   specifically and any unilateral incentives it creates to

18   expand capacity as a little bit of a sideshow.  But, really,

19   what we have to understand is what are the economic

20   implications of having American and JetBlue plan capacity

21   together along the -- you know, along the -- in the NEA

22   network.

23           And so that's -- that's where I think it makes

24   sense to focus the analysis.

25   Q.  So going back to your third bucket where you said the

1   airlines would maximize joint profit, would that have any

2   consequences for consumers?

3   **A.**   It can have consequences for consumers because what's in

4   the interest of two firms that are competing with each other

5   can be very different than what's in the interest of the

6   customers to whom they sell their product.

7   **Q.**   So you've talked a lot about how you've analyzed the NEA,

8   but have you seen any evidence from the NEA partners that

9   they identified the same risk of unilateral exploitation that

10  you've identified?

11  **A.**   I have.  On this slide, I have a document from JetBlue

12  that evaluated Connie, and "Connie" is the term that JetBlue

13  uses to refer to the NEA in this context.

14          And there's a -- on the left is a set of risks.  On

15  the right is at set of potential alleviations.  And the first

16  item on the risks is that Connie utilizes a payment model to

17  fund a loss-making capacity.  And I interpret that as being

18  consistent with my analysis of the MGIA that can provide

19  unilateral incentives for American and for JetBlue to expand

20  capacity in a way that works against the interests of the

21  alliance.

22          The slide also gives the alleviation, and the

23  alleviation is that the contract calls for concurrence

24  capacity deployment, which is what I call "capacity

25  coordination."  In other words, the solution is that American

1    and JetBlue coordinate their capacity together, and because

2    they're making joint decisions and agreeing on things,

3    exploitation is unlikely or the unilateral incentives that

4    come out of the MGIA are unlikely to predominant in the joint

5    decision.

6    **Q.**  Are you familiar with Mr. Friedman's testimony that was

7    given to the Court yesterday?

8    **A.**  Yes.  I was able to listen in person to some of it.  Some

9    of it, I read, I read this morning.

10   **Q.**  So he mentioned that he doesn't take the MGIA into

11   account when making route-planning decisions.  Do you have

12   any reaction to that?

13   **A.**  It makes sense to me given the way I understand the MGIA

14   and given way I understand the NEA, because, again, you know,

15   my interpretation is that, for capacity decisions, the

16   particular incentives introduced by the MGIA are unlikely to

17   predominate in capacity decisions because those are made

18   jointly.

19           And if you're making decisions jointly to maximize

20   the profitability of a network, the -- the particular terms,

21   the unilateral incentives of the MGIA aren't likely to

22   predominant in that setting.

23   **Q.**  So this document you pointed out is a JetBlue document.

24   Have you seen any evidence from American that they believe

25   the risk for exploitation exists?

1    **A.**   I believe I have.  And I've put on the deck some

2    quotations from Vasu Raja's, Mr. Raja's, testimony last week.

3    And I just point out that he brings up this motion of

4    cheating on the pool, which to me is consistent with the idea

5    that it's -- there's this potential for the NEA to introduce

6    sort of unilateral incentives that don't work in the interest

7    of the alliance overall.

8           Mr. Raja points out that growth can harm the

9    partnership if it doesn't -- you know, if it -- if it doesn't

10   expand the incremental pool.  And so to me, the language is

11   consistent with the analysis that I've already provided.

12          And I'll note that, also, you know, the thing we

13   can think about this is that he knows the decisions that are

14   made.  The MGIA formula really has nothing to do with

15   profitability.  You know, there's -- you can expand capacity

16   on a route and receive a higher payment even if that route is

17   sort of unprofitable to fly.

18          And so this is sort of consistent with the

19   unilateral incentives being created by the MGIA.  If we're to

20   take them seriously, it would lead to economic outcomes that

21   really aren't in the best interest of American or JetBlue.

22   **Q.**   So just to clarify, you interpret "cheating on the pool"

23   as this -- a similar concept to what you described as

24   exploitation?

25   **A.**   Yes.  That's my interpretation.

1   **Q.**  So given everything you've told us, how do you expect the

2   defendants will make capacity decisions with respect to NEA

3   routes?

4   **A.**  Well, capacity coordination allows the defendants to set

5   capacities in a way that maximizes joint -- joint benefit,

6   the joint benefit to them.  I think the MGIA, considered in

7   isolation outside of the rest of the NEA, can create

8   unilateral incentives to expand capacity, but acting on

9   unilateral incentives in that way would exploit the partner

10  and lose joint benefit.  And capacity coordination is the

11  mechanism that avoids that sort of outcome.

12  **Q.**  So to take us back to where we started at the beginning

13  of this section, why is it you believe the NEA will

14  effectively end competition on NEA routes?

15  **A.**  Well, it affects two key parts of competition, right?

16  With respect to capacity planning, you have coordination

17  through the NEA.  So you're replacing competition to expand

18  service with cooperation to achieve jointly optimal levels of

19  capacity for American and JetBlue, which is just exactly what

20  a merger does.

21          And then with respect to price setting, there's

22  revenue sharing, and so you have -- you've replaced

23  incentives to compete in price to gain customers with -- with

24  an incentive to increase price due to upward pricing

25  pressure.  And, again, that's -- that's a force that arises

1    in mergers with differentiated products as well.

2              And that's why I conclude that the NEA effectively

3    eliminates American and JetBlue competition along the NEA

4    routes.  It creates merger-like effects that can be analyzed

5    using standard analytical tools such as those described in

6    the horizontal merger guidelines.  And this is consistent

7    with the collaboration guidelines as well.

8    **Q.**  Early you had mentioned that you concluded consumer harms

9    would result from the NEA.  How did you determine that the

10   NEA would result in consumer harms?

11   **A.**  Well, I've done a number of things.  I've looked at

12   documents that show competition between American and JetBlue,

13   and I've highlighted some of those.  I won't give you more,

14   but there's a number in the report.  I've conducted analyses

15   that show that JetBlue competition matters, and that will be

16   the JetBlue effect.  And I'll give you just a little bit more

17   on that and show why it's useful to get into that a little

18   bit more.

19             The -- I've done econometric analyses that show

20   that American competition against JetBlue matters.  I've

21   looked at the market shares as they arise in the overlap

22   routes and the market concentration.  And then I've also

23   developed a simulation model of the NEA that quantifies harm

24   in overlap markets, and it can succeed in isolating the

25   effect of the NEA apart from other -- other changes that may

1    be happening.

2         These sources of evidence together indicate to me

3    that the NEA reduces competition and will likely harm

4    consumers along these overlap markets.

5    **Q.**   So you mentioned that you used the model, but the NEA has

6    been in effect for some time.  Why didn't you just do a

7    comparison of prices from before and after implementation of

8    the NEA?

9    **A.**   I considered it and didn't think that analysis would be

10   informative about the likely competitive effects, and I can

11   provide three reasons.  The first is -- is that, as we know,

12   the NEA was implemented in the context of a major disruption

13   to the industry caused by COVID.  And that makes prices

14   before the NEA difficult to compare to prices after the NEA.

15   And the normal sorts of techniques we have to try to tease

16   out causality -- what is the effect of X on Y? -- are even

17   more difficult to implement in that context.

18        Second, this is an agreement that has been

19   implemented in the context of antitrust review and in the

20   context of litigation.  And I'm generally skeptical about

21   interpreting business decisions that are made in -- you know,

22   in the shadow of litigation.

23        And then the third I'll point out is that -- is

24   that, for much of the period of data we have, the NEA has

25   only partially been in place just because the rollout has

1    been -- has been gradual overtime.

2          So those three reasons led me to conclude that

3    simply looking at the price effects and changes in prices

4    over time would not likely be informative of the competitive

5    effects of the NEA.  And I looked for other ways to learn

6    about likely competitive effects.

7    **Q.**  So let's dive into your model a little bit.  How does the

8    model work?

9    **A.**  The basic idea with model-based evidence is that we can

10   combine economic theory -- I can combine economic theory with

11   data on the way decisions are made in order to understand how

12   markets work.

13         And, you know, in my setting, there will be a model

14   of demand which will answer questions, like how do consumers

15   make the choices -- why do consumers make the choices that

16   they make?  And there's a model of supply, which is about how

17   airlines compete.  And what I'm going to try to do is get a

18   reasonable representation of the industry as it existed in

19   2019 using data, you know, before COVID, before the NEA.

20         And with that in place, I can -- I can incorporate

21   the change in incentives for pricing that the NEA creates

22   that I've already explained to you.  And in the context of

23   the model, I can see how those changed price incentives play

24   out in markets.  And so that -- that's sort of the thought

25   exercise here, is we try to get -- I try to make a model

1    that's a reasonable representation of the industry.  And

2    then, within the context of the model, I simulate the prices

3    and quantities that would arise with a different set of

4    pricing incentives.

5           So the model is a model of -- as I'll show you --

6    is a model of price competition.  That's the way competition

7    flows in the context of the model.  And the price changes

8    that I see from the model, you know, my interpretation is

9    they captured impetus to compete less aggressively.

10          So, you know, the model is one thing, but the

11   impetus that I get through the model could manifest in other

12   ways.  So, for example, you know, if the model predicts

13   higher prices, that could manifest as exactly the model

14   prediction or it could be lower service quality or some

15   combination of higher prices and lower quality or in -- it

16   could also be just a loss of service, like the withdrawal of

17   a product.

18          So all these things are possible as it manifests in

19   markets, but the model itself is designed to give us sort of

20   a good measure of the impetus to compete less aggressively.

21   **Q.**  So let's start with the demand side of the model.  What

22   function does the demand model serve in your simulation?

23   **A.**  Airline behavior depends on consumer behavior.  Okay?

24   And so there are questions that are relevant to understanding

25   the decisions that airlines make.

1       For example, it's important to know how willing are
2   consumers to change products when prices change.  And we want
3   to know -- I want to know which products are closer
4   substitutes as well.  And so this is the sort of thing I'm
5   going to try to use the demand model to summarize.
6       I observe data on the products that are available
7   to consumers and the choices that consumers make, and I look
8   at tens of thousands of routes over five years of data from
9   2015 to 2019.  And then I'll just use the demand model to
10  summarize all of that consumer behavior.  And so the
11  objective of looking at so much data here is we can -- we can
12  ground the model of demand in a wealth of data that are based
13  on decisions that consumers actually made.
14  **Q.**  How did you estimate the demand model?
15  **A.**  Well, I can -- I'm going to walk through a simplified
16  version of the model I -- just illustrate, and then I'll talk
17  about the -- sort of where my model departs from this
18  simplified example.
19      I'll use the case of linear demand, and I'll focus
20  on the question of how price sensitive are consumers.  And on
21  the left, I've got a simple economics graph.  The vertical
22  axis is price.  The horizontal axis is quantity, which is --
23  we can think of as the tickets that are sold.
24      The blue line here is going to be a demand curve,
25  and the demand curve slopes down because of the normal

1    intuition that if you set a lower price, you sell more

2    tickets.  All right?  And we can just start with two points:

3    P naught at Q naught that will provide a basis for

4    comparison.

5            So can we go to the next slide.

6            If we want to know how price sensitive customers

7    are, the idea is that we can look and see what customers do

8    if prices go up.  And so I've got one example here.  If

9    prices go up for some reason, like, you know, the costs have

10   gone up and so prices go up, we can look and see how

11   customers respond.

12           In this particular instance, if we have a change in

13   quantity sold, that's the delta Q, you can see we now have

14   two points on the line that we can infer the slope of the

15   demand curve.

16           Now, we could see in response to the same price

17   increase, you know, a bigger or smaller change in the ticket

18   sales.

19           And so can we do the next slide?

20           Here I've got a bigger -- a bigger change in

21   quantity in response to the same change in price, and you can

22   see we -- you know, in this scenario, the demand curve would

23   be inferred to be somewhat flatter.  Okay?  So consumers are

24   going to be more price sensitive.

25           Now, in the data, I don't focus on just one price

1    change and one quantity change.  I've got data on tens of

2    thousands of routes, so over four years.  And in each year,

3    I've got four quarters.  So there's a lot of data there.

4         And so if we go -- if we go forward one slide

5    again, this is more the thought exercise, is that sometimes

6    we see prices are low, and sometimes we see prices are high.

7    And we can look and see how tickets -- quantity changes

8    there.  So this -- you know, what I've shown is trying to

9    pick a demand curve that makes sense of the data.

10        Next slide, please.

11        Now, my implementation will depart from the

12   simplified version for, really, two reasons.  One is that the

13   model will incorporate a number of consumer decisions, not

14   only, you know, the responsiveness to price, but also how

15   they view different options available in the market and how

16   they substitute between options that are available from one

17   airline to the other, for example, and that will be important

18   to understand upward pricing pressure.  That's the diversion

19   I've already explained.

20        And then the second way the implementation departs

21   is that in the econometrics, I'll -- I do work to try to

22   isolate the causal effect of price on tickets sold.  And that

23   allows me to avoid conflating correlation with causation,

24   because I want to know, if price goes up, what's the effect

25   on quantity?

1          To isolate the causal effect on price and other

2     changes, I'll use a technique that's called "instrumental

3     variable regression"; and it's just the standard approach

4     that's used in the literature, and my implementation of it is

5     standard, as well.

6     **Q.**   What market did you model demand for?

7     **A.**   Well, I'm looking at air travel between pairs of end

8     points.  So, for example, might be Boston to Miami and that's

9     the picture on the right.

10          Next slide.

11          Most end points in the model are Department of

12    Transportation metropolitan areas, such as Cleveland or

13    Miami.  Some metropolitan areas defined by the Department of

14    Transportation have more than one airport.  And so you can

15    see that, with respect to Miami, it has both Miami

16    International Airport and also Fort Lauderdale.

17          I've also looked at whether it makes sense to apply

18    the Department of Transportation metro areas as end points

19    sort of throughout the system.  And I've determined that,

20    just as a matter of the economics, in some cases, it can make

21    sense to define more narrow end points.  And I'll do that for

22    Boston, for DCA, for LaGuardia, and JFK, and for Newark.

23          And the way that plays out for Boston is on the

24    screen.  You can see that I've -- I've put separate boxes

25    around Providence and Boston and Manchester.  The Department

1    of Transportation will put all those airports together in

2    sort of one metropolitan area.  But my analysis shows that

3    consumers are unlikely to do something like start in Boston

4    and drive to Manchester to get a flight, and so I've

5    separated out these airports.  And I'll come to market

6    definition later.

7              One more slide?

8              So what this means is that in the model, we'll be

9    looking at markets that would go from Florida, from Miami, to

10   Manchester, from Miami to and from Boston, and Miami to and

11   from Providence.  And these are the markets that are -- that

12   are in the analysis.

13   **Q.**  What products did your model demand for?

14   **A.**  The products in the model are what I'll call "carrier

15   itinerary combinations."  And to illustrate what that means,

16   I've got an example on the right, and the example on the

17   right, to be clear, is an illustration of the sorts of

18   choices a consumer can make from Boston to Miami, and I don't

19   represent it to include all the options that are available to

20   consumers on their route.  In fact, there are some that I

21   haven't shown, so just to be clear about that point.

22             But what you can see on the illustration is that a

23   customer can fly from Boston to Miami nonstop on American.

24   It can fly nonstop on Spirit, and it can fly nonstop on

25   JetBlue.  It could also fly nonstop on American with a

1    layover in Chicago.  And the model will treat the connect

2    route with a stop in Chicago as being a different choice from

3    the nonstop route.

4           And I'll -- all of these are options for consumers

5    in the model.

6    **Q.**  Do you include any products other than air travel?

7    **A.**  I do.  I allow consumers to select something that, in the

8    economics literature, is called the "outside option."  And

9    the outside option includes a number of possibilities.  It

10   includes the possibility that a consumer might drive to

11   another airport and take a flight from a different airport.

12   It could include the option for the -- for consumers to take

13   another mode of transportation, for example, the train or

14   driving.

15          And it can also include a decision not to travel,

16   which could be something like holding a business meeting on

17   Zoom, or it could be a family deciding not to take a vacation

18   or to take a different vacation and just avoid -- avoid

19   flying.

20   **Q.**  What characteristics of those products did you include in

21   your model?

22   **A.**  Well, I looked at price and allowed consumers to consider

23   the price that are available to them on all the routes for

24   which -- that are options.  And I've also looked at other

25   factors that explain the choices that consumers make.  There

1    are a number of those.  They include the identity of the

2    carrier so that -- so that consumers may, you know, for

3    example, particularly like flying on JetBlue, I've included

4    whether or not the carrier has a hub in the origination

5    airport, whether the product has nonstop, things like that,

6    the frequency with which the route is flown, so all these

7    things help me explain the choices that consumers make.

8    **Q.**   Does the model account for the closeness or assistance of

9    substitutes?

10   **A.**   It does.  I've used something that in economics

11   literature would be called a "nested logit" model.  And this

12   just adds a greater ability of the model to measure diversion

13   reliably -- in other words, figure out which products a

14   consumer might switch to if they are exposed to a higher

15   price for the product they prefer.

16           And in particular, using the nested logit

17   structure, I will allow for customers to be more likely to

18   switch from one plane to another plane than to pick the

19   outside option.  And that's a good thing to do, because we

20   might have an intuition that that's actually the way

21   consumers make decisions.  Like you might be more likely to

22   just change your carrier than to stop flying altogether.

23           And I don't impose that in the model, but I allow

24   for that sort of preference to emerge.

25           I also distinguish between nonstop and connect

1    flights.  That allows for consumers to sort of view one

2    nonstop flight as a closer substitute to another nonstop

3    flight than it is to a connect flight.  So both of these are

4    in the model.

5    **Q.**   What did you mean by "nested logit"?

6    **A.**   A nested logit model is simply a -- it's a standard

7    economic model that economists use to summarize the consumer

8    patterns that arise in data.

9    **Q.**   What data did you use to model demand?

10   **A.**   I looked at the DOT's DB1B datasets and T100 datasets.

11   And those two datasets have information on the tickets that

12   are sold, the seats that are flown, the frequency with which

13   departures occur.

14        Overall, there's millions of observations on -- on

15   the choices that customers made between the carrier and the

16   itinerary they picked.  You know, cost four quarters in each

17   of five years.  And so there's a detailed history of actual

18   consumer decisions that ground the model in actual data.

19   These data have been used by dozens of academic papers to

20   estimate airline industry models.

21   **Q.**   What results did you obtain from your demand estimation?

22   **A.**   Well, a number of results.  I'll summarize two on this

23   slide.  One is -- is that -- relates to the sensitivity of

24   consumers to price.  And the -- that I will measure with

25   something I called the product elasticity of demand, and you

1    can see the value for NEA nonstop overlap markets is 2.5.

2    This represents an average across all the routes in the --

3    all the products that are in the -- in the NEA nonstop

4    overlap markets.

5         The interpretation of the 2.5 is that, if a product

6    increases its price by 1 percent, then 2 point -- then the

7    quantity of the tickets that it sells goes down by

8    2.5 percent.  So that's the interpretation of an elasticity.

9         Now, is 2.5 reasonable?  You know, the model's not

10   perfect.  I've tried to make the model good and informative.

11   What I can say is that the elasticity estimates align with

12   the economic intuition and they're consistent with the range

13   of economic estimates that have been obtained in the academic

14   literature elsewhere, so I interpret this as broadly

15   consistent with the decisions that consumers make as

16   estimated with -- by my own work, but also as estimated by a

17   number of other economists in other contexts.

18   **Q.**  So --

19   **A.**  The second -- the second point on the table is called

20   diversion to the outside good and you can se the value that

21   takes is 0.2.  What that means is that if the price of a

22   product goes up, then on average, across the products that

23   are in the NEA nonstop --

24            THE COURT:  Goes up by how much?  1 percent?

25            THE WITNESS:  Excuse me?

```
 1              THE COURT:  How much does the price go up?
 2              THE WITNESS:  It actually doesn't matter by the
 3     magnitude.
 4              THE COURT:  Any price?
 5              THE WITNESS:  So if -- because remember with
 6     diversion, prices go up and then what I want to do
 7     is summarize not how many consumers leave, I guess the -- the
 8     product -- the product of -- sorry.  I start talking about
 9     economics and I get excited.
10              THE COURT:  More excited about that than Lucky
11     Charms.
12              THE WITNESS:  I know.
13              The product elasticity will tell you how many
14     customers are lost in response to a price change.  So
15     that's -- if you raise the price 1 percent, you lose
16     2.5 percent of customers on a product.  So that's what, you
17     know, what you asked for is going to be given by the product
18     of elasticity.
19              Now, we are going to ask a different question,
20     which is, those customers that switch away, where do they go?
21     Okay?  And the diversion, where they go is going to -- it'll
22     matter for the recapture incentives.
23              But what the model tells us is that -- is that
24     roughly 20 percent of the folks that switch in response to a
25     price increase choose the outside good.  Okay?  You can
```

1    restate that and say that 80 percent of the individuals that

2    switch on average choose another flight.  Okay?  So the

3    outside good here, again, is sort of going to another airport

4    or taking the train or just not traveling.

5    BY MR. DeRITA:

6    **Q.**  So let's shift focus to supply.  How did you model

7    supply?

8    **A.**  Well, the goal of the supply model is to explain airline

9    choices within the context of the consumer decisions and the

10   demand model that I've already estimated.  I use a model of

11   price setting behavior, so it focuses on the prices that are

12   set.  In the economics literature, sometimes this is called a

13   Bertrand Model.  This particular modelling choice does not

14   drive my competitive effects analysis and I'll show you that

15   later.  But I've picked this particular model because it's

16   standard in the academic literature for modelling airline

17   competition, and I think there's a good reason for that which

18   has to do with just the observation of prices matter for

19   consumers, consumers see prices and they make decisions and

20   the airlines set those prices.  So this is -- this is a

21   reasonable approach to -- towards modelling to supply side

22   behavior in the industry.

23          Now, within the model, airlines are going to set

24   those prices to maximize their profit.  They'll consider all

25   of the products they have in the market and so internalize --

1    you know, some -- some carriers might just have one product

2    and others might have two products or three products.  And

3    that's incorporated in the profit maximization.

4           With a model in hand, we can infer markups from

5    consumer substitution patterns.  Okay?  And this is just the

6    standard approach in industrial organization litter

7    literature.

8           So, for example, if consumers are less price

9    sensitive, then it makes sense for the firms to set higher

10   markups because they don't lose as much business when they do

11   that.  If products are more attractive to consumers, then

12   they've got a higher quality product, and they can support a

13   higher price, and so the markups are higher.

14          And in the same way, if a firm has multiple

15   products in a market, then if it raises price, it can

16   recapture some of those sales on its other products.  And so

17   all else equal, if a firm has more products than a market, it

18   can support higher markups as well, and this is comes through

19   the modelling of the supply side.

20   **Q.**  Do marginal costs play any role in your model?

21   **A.**  Marginal costs play a role.  Let me describe how I

22   obtained the marginal cost.  Marginal costs are imputed,

23   which is a fancy word, economics word, that just means we --

24   you have revenues and you subtract the markups, and what's

25   left over is marginal cost.  Okay?  Because there's --

1    there's just an equivalence there.

2         Now, I bring this up on the slide, and I have a

3    whole slide on this because -- because there's a difficulty

4    in the airlines industry that not all revenues are in the

5    data that I have.  Okay?  And if you don't see all the

6    revenues, then when you subtract off the markup, you end up

7    with a cost that appears lower than it may actually be just

8    mechanically.  Okay?

9         This can result in marginal costs that appear

10   negative.  That will happen in my model and -- but it doesn't

11   really affect the economics of the model.  And the reason is

12   the economics of the model depends on markups, not the

13   marginal cast.

14        And the reason it depends on markups is that -- is

15   that when you -- we think about the value of recapture, what

16   matters when you recapture a customer with the partner, you

17   know, what you get back is a function of the profit that

18   comes from that customer.  And so that depends on the

19   markups.

20        Now, let me -- let me talk a little bit about why

21   not all revenues are observed in the data.  I mean, the basic

22   reason is that the DB1B data on which I build my analysis

23   incorporates ticket prices.  Okay?  But there's a set of

24   other considerations that can matter for airlines.  I account

25   for this in the econometrics of the demand side, so it's fine

1    there.  But the -- this would include the badge fees that

2    airlines obtain, seat fees, change fees, I don't -- the data

3    don't include revenues from in-flight services.

4            And then, also, the data don't include things that

5    I call "indirect profit opportunities," things that may

6    derive from credit cards or network benefits of flying

7    passengers through a hub or the benefits of keeping a

8    customer loyal to your network.  So all of these things are

9    sources of revenues that don't show up in the ticket prices.

10           When I look at the marginal costs that I obtained

11   for the products in NEA nonstop overlap markets, the median

12   marginal cost is $189.  88 percent of them are positive, and

13   you can infer that 12 percent are negative.

14   **Q.**  Does your model incorporate revenue sharing?

15   **A.**  Yes.  So I just talked about how we learned --

16           THE COURT:  I'm sorry.  Go back.  That marginal

17   cost analysis did not include those other indirect benefits

18   that you don't have data for?

19           THE WITNESS:  That's correct.  You know, I do have

20   some information on the magnitude of some of the fees, but

21   it's limited in various ways.  So there's only so much I can

22   do.  And the numbers I've reported don't have any

23   adjustments.

24           THE COURT:  Right.  Back up.  Just wanted to be

25   clear.

1          Go ahead.

2     BY MR. DeRITA:

3     **Q.**  Yeah, so the question was, does your model incorporate

4     revenue sharing?

5     **A.**  Yes.  And let me just pause for a moment, because I've

6     talked a lot about how we estimate demand and how we infer

7     markups.  Okay?  And that's sort of the first step.  Let's

8     construct a model.  It's not going to be perfect, but it's a

9     reasonable representation of the industry.  Once we have the

10    model in place, we can think about how the incentives of the

11    NEA might play out.

12          And so with a model in place, what I can do is

13    suppose the profit maximizing decision of American and

14    JetBlue incorporates the revenue sharing that's created

15    through the NEA, and then I can simulate in the context of

16    the model what that means for prices.

17          And that allows me to isolate very specifically the

18    effect of the NEA.  I'll do so in 2019, and so what the model

19    gets me is the effect of the NEA on prices, you know,

20    given -- you know, as if the NEA were in effect in 2019 and

21    isolating it from any changes in demand or anything COVID --

22    anything like that.  So that's the intellectual exercise.

23          The -- when I implement the NEA in the model to

24    simulate it, I allow price setting to reflect the defendants'

25    incentives and the upward pricing pressure that I've already

described to you.  So defendants will set prices that
maximize their own profit, but they'll take into account that
if -- if they drive a customer to -- if JetBlue, for example,
raises its price and some of those customers choose American,
it benefits from that, to some degree.  So we account for
that.

The model -- in the model, the defendants each set
their own prices, so the model doesn't assume any change in
control.  That won't really be so relevant because, on many
of these routes, including the routes that have the greatest
harm, the incentives are aligned.  And so control doesn't
matter so much and I can come back to that again.

The particular revenue sharing split I will use is
based on the 2019 capacities, which for American was
43 percent of the NEA capacity, as I've measured it, and
JetBlue I've measured it at 57 percent capacity.  And, again,
for a reason that I'll explain in a moment, this is not an
important modelling assumption.

So the model is a model of price-setting behavior.
All right?  And it's not a model of capacity.  Capacity is
not explicitly modeled, but we can use the model to say
something about capacity.  But, you know, just -- just to
keep something in mind, there's a difference between the
quantity that arises on a particular route and the relevant
notion of capacity in the airline markets.

1          And the reason is that you serve a route by flying

2     an airplane, and that airplane has a certain number of seats

3     in it.  And those number of seats, we could call that sort of

4     a relevant notion of capacity.  But on that airplane are

5     going to be some customers that are -- that are flying the

6     route under consideration, the market that's under

7     consideration, but other passengers will be flying other

8     routes.  They might be connecting to another stop or, you

9     know, connecting other various different ways.  And so the

10     capacity that arises that exists sort of in a particular

11     airplane is somewhat loosely connected to the quantity that

12     can be served on a particular market as I've defined it.

13          So I won't model the capacity decisions.  That --

14     you know, doing so in a way that respects all competition

15     between different airlines and allows for the pricing

16     incentives is beyond my capabilities and I believe sort of

17     beyond the capabilities of the field in general.

18          But I've said that the model can tell us something

19     about capacity and the reason is that in the model what we

20     see is an incentive to raise price and fewer passengers buy

21     tickets along, you know -- in response to those price

22     increases.

23          Now, the way that would play out for a capacity

24     decision would depend on the load factors.  It would depend

25     on the ability to back fill lost customers with connect

1    traffic, but it still can be reasonable to sort of sign the

2    effect.  If you have fewer customers on the plane,

3    directionally, we can infer that along the nonstop overlaps

4    that is really a lot of the focus of my analysis, there's an

5    incentive to reduce capacity.  How that plays out, the model

6    doesn't tell us.

7    **Q.**  How does your model incorporate the specific terms of the

8    NEA's revenue split?

9    **A.**  Well, let me -- let me put on my -- put on the board, if

10   you will, a footnote that's in my report and I believe was --

11   may have appeared in the -- one of the opening statements and

12   so I'll just explain what this footnote means sentence by

13   sentence.

14              Can I go to the next slide?

15              So the footnote says that, as a mechanical matter,

16   the defendants jointly set capacity and share revenues

17   according to the dynamic revenue-sharing formula in the NEA.

18   What I mean by that is that it makes sense to me that the

19   defendants collect revenue and they make transfer payments as

20   specified by the MGIA.

21              In fact, the MGIA terms make some sense, I mean, to

22   the extent that a -- one carrier is going to fly more of the

23   capacity.  The MGIA payments give that carrier more money,

24   you know, arguably to compensate it for the costs that go

25   along with that.  So the structure of the MGIA makes sense to

1    me in -- as just mechanically splitting up money in a way

2    that makes sense.  So that's the first statement.

3            Let's go to the second statement.  It says they

4    behave as though they share profit.  So what this assumption

5    says is that defendants respond to the pricing incentives

6    generated by the NEA.  And you can also see what I view as

7    sort of the biggest departure from the specific terms of the

8    MGIA here, which is I assume that they share profit rather

9    than assuming that they share revenue.

10           Now, I think that's a reasonable assumption because

11   I generally think that firms have -- find ways to try to

12   maximize profit.  But I also think -- I also point out that

13   this is a conservative assumption because sharing profit

14   generates less upward pricing pressure than sharing revenue.

15           And so by implementing it in this way, I actually

16   reduce the upward pricing pressure and the price increases

17   that I've obtained from the model compared to a little

18   implementation of revenue sharing itself.

19           The next sentence says that profits are shared

20   according to a static formula.  This is my economic

21   interpretation of the pricing incentives that are introduced

22   by the NEA and the reason is that when setting a price, the

23   airline sets a price on capacity that's already been decided

24   to fly in the market.  And because of that, the capacity

25   decision is sunk, and from an economics standpoint, it

1    shouldn't bear directly on the pricing decision.

2            And then the last statement says that I used the

3    split according to fixed proportions in accordance with the

4    defendants' 2019 shares of NEA capacity.  It turns out that

5    for nonstop overlap markets, the -- the -- the particular

6    share that goes into the model doesn't matter because if

7    you're trying to maximize, for example, joint revenue or

8    joint profit, if you're going to get 19 percent of that,

9    you're still maximizing the same thing.  The prices to

10   maximize 19 percent of some object are the same as the prices

11   that maximize 30 percent of the object, which are the same as

12   the prices that maximize 80 percent of the object.

13           And so for nonstop overlap routes, which are the

14   vast majority of commerce, is within this scope of the NEA,

15   the proportions that I use, the model that will actually be

16   quite insensitive, if, in fact, everything is nonstop and

17   there are no connect flights along -- because you can have

18   the nonstop overlap that still has the connect traffic.  They

19   don't account much traffic.  But hypothetically, if you had

20   only nonstops, then you can put in any number there, and it

21   doesn't affect the analysis.

22           So the only way that this matters is potentially

23   for some connect routes where there's some more complicated

24   incentives, but I still think it's a reasonable approach for

25   those just based on the data.

1    **Q.**  I want to circle back to the point you made about profits

2    as opposed to revenue.  In the opening, there was a statement

3    made that this is a revenue-sharing agreement, not a

4    profit-sharing agreement.  And for some reason, that would be

5    less impactful.  So just to clarify, you modeled profit

6    sharing, not revenue sharing, right?

7    **A.**  In the model, that's correct.

8    **Q.**  How would that affect the results you have from the

9    model?

10   **A.**  It will decrease the inferences about the implications of

11   loss competition.  If -- had I modeled revenue sharing, I

12   would obtain greater price effects due -- greater overcharges

13   as well due -- due to the NEA.

14   **Q.**  So your approach is more conservative?

15   **A.**  Yes.  That's what I've stated.  That's accurate.

16   **Q.**  Okay.  Let's turn to the actual application of the model.

17   Which markets did you apply the simulation to?

18   **A.**  Well, I looked at all the markets, but there's really --

19   there's three on which -- three types of markets that the NEA

20   creates incentives that are -- that are meaningful.  And I

21   bucketed -- I bucketed each of those groups here.

22            On the first class of markets is something I call

23   nonstop -- NEA nonstop overlap markets.  And these involve

24   NEA end points in which both American and JetBlue serve them

25   nonstop.  An example would be Boston to DCA.

1          On these routes, almost all traffic is fully in

2   scope.  And so the effect of the NEA here is almost identical

3   to a full merger between the defendants.

4          The second class of markets is what I call the NEA

5   "mixed overlap markets."  And these involve NEA -- involves

6   an NEA end point from which American or JetBlue serves

7   nonstop with the other serving connect.  Okay.  So an example

8   would be Boston to Savannah, in which JetBlue serves the

9   route nonstop, and American provides connect service that

10  goes through Charlotte, Philly, DCA, LaGuardia, and Miami, so

11  different itineraries of connect there.

12          Now, in NEA mixed overlap markets, the nonstop

13  traffic is fully in the scope.  The connecting traffic is

14  partly in scope of the NEA.

15          The third category are connect overlaps.  With a

16  connect overlaps, there is no American or JetBlue nonstop

17  product in scope.  An example might be Philadelphia to

18  Nantucket.  Now, American serves that route connecting

19  through LaGuardia, and JetBlue serves that route connecting

20  through Boston.  And so in this instance, those connect legs

21  are in scope.  So it -- with a connect overlaps, the

22  connecting traffic is at least partly in scope of the NEA and

23  so the NEA affects the incentives on those routes.

24  Q.  You mentioned on nonstop overlaps that almost all traffic

25  is in scope.  Why is anything out of scope on a NEA nonstop

1  overlap?

2  **A.**  The reason is that some NEA nonstop overlaps are also

3  served by connect routes.  And so while the nonstop routes on

4  those markets tend to attract the bulk of customers in

5  consumer traffic and revenue, there are connect options that

6  are available to consumers, and the connect options are only

7  the first leg is within scope of the NEA, and the second leg

8  along a connect product is not in scope of the NEA.

9       And so that -- that creates nuances about the

10  incentives as they arise.  With respect to the NEA nonstop

11  overlaps, you know, that nuance is -- is not very important

12  because the connect traffic tends to not be very popular

13  among consumers.

14  **Q.**  What were the results of the simulation?

15  **A.**  I've summarized the results in this table.  Of course,

16  you know, I've got the highlight, which is the NEA results

17  and the substantial loss of competition and harm to

18  consumers, but let me just show you what the numbers are.

19       If we focus on -- each of the row -- each of the

20  row is going to give you sort of results for different

21  classes.  With the NEA nonstop overlap markets, the

22  overcharge -- and, again, that's the -- the extra money that

23  consumers would have to pay to fly the same flights they fly

24  without the NEA -- the cumulative overcharge along the NEA

25  nonstop overlap markets is $640 million if the NEA were

1    implemented in 2019.

2            Within the NEA nonstop overlaps, the American and

3    JetBlue product average price increases by 16.2 percent.  And

4    the average price of all products increases by 9 percent.

5            Now, the NEA nonstop overlaps include some routes

6    that have been carved out of the NEA.  And I provided numbers

7    for the NEA nonstop overlaps that exclude the carved-out

8    routes and you can see that the -- the total overcharge

9    excluding carve-out routes is $437 million.

10           So moving down the table, the NEA mixed overlap

11   markets contribute $38 million to the overcharge.  The

12   average price effect in the NEA mixed overlap routes is

13   1.3 percent for American and JetBlue.  And that's a much

14   smaller number than exists on the nonstop overlaps, but

15   there's also a fair amount of heterogeneity within these

16   markets where sometimes the price effect is larger than 1.3

17   and other times where it's lower.

18           On the connect overlap routes, there's an

19   additional 9 million of overcharge.  With connect overlaps,

20   the price effect is smaller.  Yet, again, there's

21   heterogeneity, so some of them are a little bit larger, but

22   the typical price increase is -- well, the average is 0.1.

23   And then there's a set of other markets that aren't actually

24   overlap markets where the NEA distorts pricing incentives in

25   a way that the model is able to capture, but we end with a

1   relatively small number there.

2          And adding up across the columns, we attain the 696

3   million number that I highlighted at the beginning of my

4   testimony.

5   **Q.**  Does your model predict any harm on nonstop overlaps that

6   touch Boston?

7   **A.**  It does.  This slide predicts or shows you some of the

8   results along particular routes.  So the total overcharge for

9   routes that touch Boston is 428.  The biggest contributor to

10  that is Boston to DCA, which comes in at 108 million.

11         In general, the total overcharge will depend on two

12  things.  It'll depend on the magnitude of the price change,

13  and it will depend on the overall volume of commerce.  And

14  if, you know, bigger markets will produce larger overcharges.

15         We can see with Charlotte, for example, the total

16  overcharge is 70 million.  The price change is 90 percent.

17  That's a large price change.  This is Charlotte in particular

18  is --

19         THE COURT:  You mean it turns on the size of the

20  market as distinct from the percentage share?

21         THE WITNESS:  That's correct.  And the reason is

22  that the model incorporates the change in price that

23  consumers would face to make the choices that they already

24  make.  And that will include, for example, that when American

25  and JetBlue raise price, some of their customers will switch

1    to competing airlines.  That drives demand up for those

2    competing airlines and those airlines are able to support

3    higher prices in turn.

4              Okay.  So, you know, in effect, you know, those --

5    those sort of -- third-party competitor price increases in

6    the model economic theory tells us they're going to be a lot

7    smaller than the pricing increases that we realized at

8    American and JetBlue, but they're not zero either, and the

9    model incorporates that.

10             So we see a range of price effects.  Los Angeles is

11   a good example where we have a price effect of 10 percent,

12   but we still have 39 million in overcharge and my

13   interpretation is that's because Boston-Los Angeles is

14   just -- it's a large market.

15   BY MR. DeRITA:

16   **Q.**  Just to clarify one thing that you just discussed about

17   the -- the overcharge turning on the size of the market,

18   shares matter in some way to the total overcharge, right?

19   **A.**  Yeah.  Well, what's really going to matter is in this

20   sense is the amount of recapture between American and

21   JetBlue.  But it tends to be the case that when -- where

22   American and JetBlue are large, there's a lot of recapture.

23   And so that's why -- that's why it's sort of the upward

24   pricing pressure is going to tend to be larger in markets

25   where the shares are bigger because when they're big -- like

1   take Charlotte, for example.  In Charlotte, the combined

2   revenue share of American and JetBlue in 2019 is 96 percent.

3   Okay?

4            If the combined market shares is 96 percent and

5   say -- say American raises price on that route, you know,

6   just intuition suggests the vast majority of those consumers,

7   if they choose a different option, are going to pick JetBlue.

8   And so that doesn't have to be the case, but often it is the

9   case.  And the model is trying to capture those -- you know,

10  that recapture incentive, and so in response to the question,

11  do market shares matter, they matter to the extent they

12  drive -- you know, they're an indicator that consumers view a

13  product as being a good -- as a good option, a product has a

14  big market share, more consumers are, you know, likely to

15  switch to it because it's a popular product.  It might be

16  their next best choice.  If a product has a very small market

17  share, that's an indicator that it's less popular among

18  consumers and you wouldn't expect to see the same amount of

19  recapture.

20           And, again, the model is going to try to do some

21  things that tie that recapture to the data, but there is a

22  connection to market shares.

23  Q.  How should someone interpret these price changes?

24  A.  Well, I mean, as I said, the model is a model of price.

25  And the way I interpret the model, though, is providing a

1    measure of the impetus to change outcomes for consumers.  And
2    so this could manifest quite literally as the model predicts
3    for LA, as, you know, a 10 percent price increase.

4         But there are other ways it can manifest as well.
5    For example, it could become profitable to, you know, put
6    more seats on a plane or something like this.  There can be
7    aspects of service quality that deteriorate, some
8    combination.

9         And you can also have scenarios in which a large
10   price increase can be implemented or can be telling us that
11   what's really likely to happen is -- or one possible outcome
12   of a scenario like this is that American or JetBlue will
13   simply withdraw its service from the market.  And I'll show
14   you an example of something where that might be the -- the
15   one reasonable inference.

16   **Q.**  How much of the harm that you predicted is attributable
17   to overlaps that touch New York?

18   **A.**  This is the same plot for New York.  The total amount of
19   overcharge with New York is 234 million.  The largest
20   contributor is Miami at 64 million.

21        I -- you know, in coming out of New York, the price
22   effects on average are a little bit smaller than those coming
23   out of Boston, and I think this highlights that the model is
24   able to identify heterogeneity markets, and there are times
25   where there's going to be larger price effects and there are

1    times where they're likely to be smaller price effects, and

2    the model picks both of those up.

3            An example would be Atlanta.  This is -- you know,

4    if you think back to the revenue shares I showed you at the

5    very -- showed at the very outset, Atlanta is the route along

6    which American and JetBlue have the smallest combined share

7    of revenue in 2019.

8            And in Atlanta, we predict -- the model predicts an

9    increase in price of 0.9 percent.  And so the model is

10   picking up situations where the loss of competition may

11   create large effects and situations where the loss of

12   competition may increase smaller effects, as well.

13   **Q.**  Earlier you mentioned you chose a specific type of supply

14   model called the Bertrand model.  Did you consider

15   alternative modeled produced by Dr. Israel?

16   **A.**  I think I have.  Dr. Israel introduced a number of

17   different supply models, I think trying to recast the

18   economic narrative in terms -- more in terms of capacity.

19           And so he introduced the notion that -- that

20   perhaps it's better to model airlines as setting quantities

21   rather than prices, and the typical model for that is called

22   the Cournot model.  And so Dr. Israel proposed that the

23   Cournot model might be a better fit for the airlines industry

24   than the Bertrand model.

25           And Mr. Israel also analyzed a variant of Cournot

1    that we call a Stackelberg model, which just allows one firm

2    to go first, to chose its quantity first, and then other

3    airlines choose their quantity second.  All right?  So it's

4    still a quantity model, and that introduces sort of a host of

5    other considerations.

6              But when looking at these models, each of these

7    models imply that competition benefits consumers and in each

8    of these models a loss of competition results in higher

9    prices.  All else equal.

10             I prefer the Bertrand model because it's more

11   standard in the academic literature for airlines, and I think

12   there's a reason for that.  I think it's a better fit for

13   airlines that airlines choose price and prices matter, and

14   consumers see prices and make choices.

15             But, ultimately, when you're thinking about the

16   competitive effects of a -- of an agreement like the NEA or a

17   merger in another context, the economic incentives that flow

18   through those are going to be similar in a Cournot model to a

19   Bertrand model, which is why I don't -- I don't think the

20   particular modelling choice is what drives my results.

21   Q.   Did you do any econometric analysis with other models?

22   A.   I looked a little bit at Dr. Israel's Cournot model.  And

23   so let me just describe it for you.  In the Cournot model,

24   airlines set quantity to maximize profit.  It's just instead

25   of setting pricing, you set quantity, okay, so you set

1    quantity to maximize profit.

2              In the context of that model, revenue sharing

3    creates incentives to reduce quantity, for the same reasons

4    that -- for similar reasons that the revenue sharing increase

5    incentive is to raise price.  Okay.  So Dr. Israel calibrates

6    the model on -- you know, based on my demand model and using

7    pre-NEA data much the way I calibrated a Bertrand model.

8              But then what I can do from there is simulate the

9    NEA using -- using the Cournot model, using that Cournot

10   model same -- the same I simulate the NEA using the Bertrand

11   model.  When I simulate it, I find an overcharge of 989

12   million just for the NEA nonstop overlaps, and so the, again,

13   this is sort of consistent with -- with the NEA raising

14   prices and lowering quantities and the reason that happens is

15   that it aligns the incentives of two competitors.

16             And, you know, the -- that is going to play out

17   whether one uses Cournot or Bertrand, which is why I don't

18   say the particular modelling choice drives my results.

19   **Q.**  So I just want to clarify, you said Dr. Israel calibrates

20   the model, but you didn't actually mention any result that he

21   obtained.  Did he obtain one, as far as you're aware?

22   **A.**  Dr. Israel calibrated the Cournot model and assuming the

23   competition was Cournot in doing so, and then he conducted an

24   analysis in which he switched the model of competition to

25   Stackelberg competition and analyzed some potential effects

1    using, you know, under the assumption that competition

2    switches from Cournot to Stackelberg.

3    **Q.**  So he didn't carry out the last step of actually running

4    the simulation after calibration?

5    **A.**  To my knowledge, he -- Dr. Israel did not simulate the

6    Cournot model.

7    **Q.**  Okay.  I want to talk about some of the additional

8    evidence that you had mentioned earlier while you were

9    analyzing the NEA.  What other types of evidence did you

10   review?

11   **A.**  I looked at a number of things.  I looked at documents

12   showing competition between American and JetBlue.  You know,

13   my interpretation of the NEA is that the competition between

14   American and JetBlue would be lost along those NEA routes,

15   and I'm not going to put more up on the screen.  I'll focus

16   on the other parts.

17           I've done analyses of the JetBlue effect, which

18   shows that JetBlue competition matters.  I'll highlight that

19   the magnitude of the JetBlue effect is consistent with the

20   results that have I obtained from the simulation.

21           I will show you econometric analyses that

22   demonstrate the competition from American and from legacy

23   carriers matters for the outcomes that arise in markets that

24   reduce competition from American, would result in higher

25   prices, including higher JetBlue prices.  I will also compare

1   the results of those analyses to the simulation.

2           And so together, these second and third bullet

3   points give me a chance to conduct what you might think of as

4   a sanity check on the simulation model to see if the price

5   effects I get from the simulation model are consistent with

6   the price effects of competition as they arise in markets as

7   we can observe it.

8           And then the last bullet point is -- states that

9   I've looked at market shares and I've looked at

10  concentrations and evaluated those at -- and, you know, the

11  results of that are consistent with the idea that the NEA is

12  likely to enhance market power in many of these NEA overlap

13  markets.

14  **Q.**   You've mentioned the JetBlue effect a few times today.

15  Can you give a little bit more color on what you mean by

16  that?

17  **A.**   I can.  And I want to start with the case of Boston-DCA.

18  Before 2010, JetBlue did not compete along this route.  But

19  when it entered in 2010, JetBlue analysis shows that average

20  fares fell by 29 percent.  Okay?  But I want to flip that

21  around a little bit and ask how much higher were fares when

22  JetBlue was not a competitor.  Okay?

23          And the reason I care about this is the percentages

24  going up and down are different.  Like, if you start at a

25  value of 100 and you go, you know, a 50 percent reduction,

1     you get to 50.  But then it takes a 100 percent increase to

2     get back to 100.  Okay?

3              And so an average -- if you average prices fall by

4     29 percent, that's -- implies that fares were 40 percent

5     higher before entry, just mathematically.

6              I can compare that to the model.  In the model, I'm

7     able to simulate effects when we lose JetBlue as an

8     independent competitor, independent here means its incentives

9     are now aligned.  And what the model tells me is that average

10    prices of all carriers increased by 55 percent.

11             And so the model is not intended to be exact and

12    some things have changed between 2010 and 2019.  But I

13    interpret the 40 and the 55 percent as being comparable

14    numbers.

15             I've looked at -- I've extended this analysis out

16    to all of the routes that I showed you before that highlight

17    the JetBlue effect that were done in the ordinary course by

18    JetBlue employees.  And I've -- I've -- however, I've

19    recalculated the numbers, so they all correspond to exits.

20    So, you know, some of these are entry events, like

21    Boston-DCA, but I'm going to give you the percentage that

22    serve how much higher prices -- how much higher without

23    JetBlue in the market just to rescale.

24             And so you can see with Boston-Cleveland, prices

25    are 114 percent higher without JetBlue than they were with

1    JetBlue.  With Boston-Newark, they're 92 percent higher

2    without JetBlue than with JetBlue.

3         And there's a range of effects just like there were

4    before.  Sometimes these prices are higher.  Price effects

5    are higher.  Sometimes they're lower.  And now -- what I've

6    added to the slide on the right is the average price effects

7    that come out of the model.  I've shown you these before,

8    but -- but along the nonstop overlap markets, the average

9    price for American and JetBlue is 16 percent, and the average

10   price of all products increase is 9 percent.  The

11   9 percent --

12        So the average effect is comparable to the average

13   effect that the defendants' economists obtained for the

14   JetBlue effect, which is 20 and 21 percent -- actually, it's

15   less than that.  It's half of it, not comparing the 9 to the

16   20 and 21 percent.

17        But also, we -- you know, I've shown within --

18   within my 9 percent is a heterogeneity effect.  Some routes,

19   there's a big effect.  Some routes, there's a small effect.

20   And even when I find a big effect, the magnitude of that

21   effect is within the range of the effects we see on the

22   JetBlue shown on the bars on the left.

23   Q.  How might a larger predictive price increase manifest

24   itself?

25   A.  Well, I -- let me use New York City to Nantucket as one

1    example.  This is -- the simulation results are summarized in

2    the graph on the left.  And what the model indicates is that

3    prices of American increased by 152 percent and the prices of

4    JetBlue increased by 19 percent.  Okay?  And you might ask

5    why is that asymmetry arise?  And part of the answer is on

6    the right.  This particular market, American had a market

7    share of 6 percent.  And JetBlue had a market share of

8    91 percent.  So JetBlue has the more popular product on this

9    route.

10           And in context like this, a large price effect from

11   American can make sense.  I mean, American is the one

12   that's -- can be interpreted as providing the price

13   competition along this route.  When American increases its

14   price by 152 percent, its quantity goes down by 91 percent.

15   All right?  It loses 90 percent of the quantity it sells into

16   that market.

17           And because it does so, JetBlue is able to increase

18   its price by 19 percent and only lose 5 percent of the

19   traffic.  So, you know, a price effect like this, taking the

20   model seriously, I mean --

21           THE COURT:  5 percent of its traffic or total

22   traffic?

23           THE WITNESS:  Its traffic.  JetBlue's only goes

24   down 5 percent, right, even though its raised price is 19.

25   And the reason is that, as the main competition, American has

1    this very large price effect of 152.

2             So applying the model to a market that looks like

3    this where there's -- you know, the combined shares are

4    97 percent sort of stresses the model to the extreme, and

5    it's doing the best it can.  I don't normally interpret the

6    152 as being a precise measure.  It could be higher.  It

7    could be lower.

8             I think, you know, one interpretation of the model

9    is actually that this is consistent with American just not

10   flying in this market, withdrawing its service from the

11   market due to the incentives that are created by the NEA,

12   which would leave JetBlue -- well, there are some other

13   options -- I mean, their combined shares, I think, 97 percent

14   of this market -- but there's not much of an another option.

15   BY MR. DeRITA:

16   Q.   Is American flying New York to Nantucket?

17   A.   I --

18             THE COURT:  Post-NEA?

19             MR. DeRITA:  Yeah.

20             THE WITNESS:  I'm -- I don't know the answer.

21   BY MR. DeRITA:

22   Q.   Let's talk about something you mentioned about sanity

23   checks.  You mentioned some econometrics that you did as a

24   sanity check.  What were those?

25   A.   Two things.  And, again, I think that the work I've done

1    does provide a check on the model, but I also interpret it as

2    informative of competitive effects more broadly and I want to

3    hold both of those purposes in mind.

4             But on the next slide, I can summarize some of the

5    econometric analysis that I have developed.

6    **Q.**   So let's start with the hub analysis.  How did you do

7    that?

8    **A.**   The idea is to look at the routes as they exist in the

9    United States and determine whether routes that are exposed

10   to more competition among legacy carriers have lower prices.

11   And, indeed, that's the case.  What I do is I focus on

12   250,000 observations that are -- that are the prices on

13   particular routes over four years of data from 2016 to 2019.

14            And I compare routes that have more legacy

15   competitors to routes that have fewer legacy competitors.

16   And in doing so, I've -- I've -- you know, I apply

17   statistical analysis, regression analysis, and I -- I control

18   for some things that -- I control for distance the identity

19   of the carriers involved, the number of LCCs, the identity of

20   the airports, seasonality, trends, things like this, in

21   order -- I want to know what the effect is from legacy

22   competition above and beyond all that other stuff.  And I

23   just use the standard technique to control for those.  Okay?

24            But then there are some other things that I don't

25   observe in the data.  And to really get a causality so I can

1    focus on the direct effect of legacy competition on prices, I
2    use -- again, turn to a technique called "instrumental
3    variables," and I implement that in a standard way, and that
4    allows me to isolate a causal effect of competition.

5              The results of that analysis indicate that adding a
6    legacy carrier decreases average prices by 13 percent, on
7    average, across the routes that I'm looking at.  Again, we
8    can sort of flip this around and say, what if you lose a
9    legacy carrier?  If you lose a legacy carrier, average prices
10   go up by 15 percent.  And that 15 percent is comparable to
11   the simulation results for the NEA nonstop overlaps where we
12   have an increase of 9 percent for all products and 16 percent
13   for all American and JetBlue products.

14   Q.  The defendants have made some arguments that entry will
15   keep prices competitive.  Does the hub analysis inform
16   whether that's correct?

17   A.  Well, if it were correct, I wouldn't be seeing the
18   results that I see.  You know, what I see is that in markets
19   that have more legacy carriers, prices are lower.  In other
20   words, it's -- it's the actual competition in the route
21   that's having an effect on prices.

22             And sort of the mere threat of entry by some other
23   carrier doesn't appear to prevent the exercise of market
24   power along these routes.

25   Q.  You also mentioned the 737 MAX analysis.  How did you

1    perform that?

2    **A.**   I looked at how JetBlue prices responded to a reduced

3    competition from American.  And in particular, I looked at

4    what happened when American reduced the seats it flew outside

5    of -- out of New York City due to the 737 MAX grounding.

6            I focused on eight markets in which American

7    reduced nonstop seats by 10 percent, in which total seats

8    fell.  And I imposed a couple of other screens.  I looked for

9    markets where American had a big presence, things like this.

10   And I look in those markets, and I determine how prices

11   changed in response to sort of this reduced competitive

12   presence of American.

13   **Q.**   What did you find?

14   **A.**   What I found is that -- is that, across these routes,

15   JetBlue increased price by an average of 7.8 percent.  I

16   interpreted that to be consistent with the idea that some

17   consumers were switching from American to JetBlue in response

18   to American having a -- you know, a less-good option.

19            And there's testimony from Mr. Jarashow that I

20   think puts this in perspective, and I actually really like it

21   because Mr. Jarashow allows me to explain sort of connections

22   between notions of all the price competition and the

23   recapture with sort connections of sort of supply and demand

24   analysis.

25            So the question that Mr. Jarashow was asked is,

1    "According to this pricing summary in whole, JetBlue's

2    decision to down-bucket its fares on the JFK to San Diego

3    route effectively increased fares by $20 to $40 throughout

4    the structure, correct?"

5             And the answer is, "That's generally accurate.  It

6    was an adjustment, really, to a demand scenario that resulted

7    from the 737 MAX groundings."

8             So let's unpack that answer.  The 737 MAX grounding

9    happened.  Okay?  It created a demand scenario in which

10   consumers left American.  They diverted to JetBlue.  And

11   with -- with greater demand, American was able to support

12   higher prices.  This is precisely the sort of notion of

13   recapture diversion that underlies the model that I use and

14   underlines the economic theory about how we think about

15   pricing among different shaded product competitors.

16            I'll also note that the price effect of 7.8 percent

17   that I obtained from this analysis is comparable to the

18   simulation results for New York City nonstop overlaps where

19   the average increase in New York was 4.6 percent for all

20   products and 8.5 percent for American and JetBlue products.

21   Q.  I just want to clarify, you meant JetBlue was able to

22   change prices?  Not American, right?

23   A.  That's correct.

24   Q.  So yesterday --

25            THE COURT:  I'm going stop you here for the lunch

1    break.

2              All right.  We'll resume at two o'clock.

3              (Court in recess at 1:02 p.m.)

4              (The following reported by Rachel Lopez.)

5              (Court reconvened at 2:01 p.m.)

6              THE DEPUTY CLERK:  The United States District Court

7    for the District of Massachusetts is now in session, the

8    Honorable Leo T. Sorokin presiding.

9              THE COURT:  Please be seated.

10             Go ahead.

11             MR. DERITA:  Thank you, Your Honor.

12   BY MR. DERITA:

13   **Q.**  Before we turn back to your slides, Dr. Miller, there's

14   just a couple of questions that I wanted to ask you.  First,

15   when you were talking about the overcharges that your

16   simulation results found earlier, what time period is that?

17   Is that, like, yearly?  One time?

18   **A.**  It would be annual.

19   **Q.**  Is loyalty accounted for in your simulation model?

20   **A.**  Yes, loyalty is accounted for.  If airlines benefit from

21   selling to a customer, in part because the customer is likely

22   to continue to purchase on the airline, that's a form of

23   revenue that would be above and beyond the ticket price.  So

24   this is one of the -- one of the aspects that is included in

25   the model.  It will show up in the model as a cost that's --

1    that is decreased relative to what the cost would otherwise

2    be because of the missing revenue above and beyond the ticket

3    price.

4    **Q.**  Yesterday, during Dr. Town's testimony, there was some

5    questions from defense counsel that had implied that your

6    results from your model are much higher than what's been seen

7    in academic literature.  How would you react to that?

8    **A.**  I think maybe specifically the academic literature

9    examining mergers was the question.  And I have a couple of

10   reactions.  One is that I have looked at the literature

11   surrounding the mergers of the legacy carriers, and I don't

12   see those events as being directly comparable to those of the

13   NEA.

14          And to give a sense for why, the American and --

15   American/US Air was cleared by the Department of Justice,

16   subject to divestitures that were intended to ameliorate any

17   competitive problems.  United/Continental, similarly, was

18   cleared by the Department of Justice, subject to remedies

19   intended to ameliorate competitive problems.  Delta/Northwest

20   is a merger that, in a review article, members of the

21   Department of Justice stated did not raise a significant

22   competitive concern.  And so looking across those mergers, I

23   didn't see something that to me looked comparable in terms of

24   the price effect you would expect to see on something like

25   this, where my analysis suggests there's a good basis for

1    concern.

2         Now, it's also not the case that if you look across

3    the entire literature on mergers, that all of them show small

4    price effects.  And there's one article that was mentioned by

5    Professor Town, it was written by Dr. Craig Peters, and it

6    looked at mergers in the 1980s.  And the subject of the

7    conversation yesterday had to do with one of those mergers,

8    the merger of Continental and People's Express that

9    Mr. Peters, Dr. Peters, documented or estimated to have an

10   average effect of 29 percent.

11        But Dr. Peters actually looks at five mergers that

12   occurred in the mid to late '80s that he explains look at

13   sort of a variety of different sorts of mergers.  And

14   Professor Town picked out the People's Express/Continental

15   because it involved a legacy and an LCC of some sort.

16        Some of the other mergers are also comparable to

17   this in some ways.  Two of the mergers involved airlines that

18   shared hubs.  And those mergers generated, according to

19   Dr. Peters' estimates, price increases of 7 percent and

20   16 percent on average, which is comparable to my average of

21   9 percent.

22        The other two mergers that Dr. Peters examined,

23   aside from People's Express, introduced price effects of

24   11 percent and 16 percent.

25        And so his analysis looked at five different

mergers, in a variety of different contexts, and found that they all raised price at levels that are comparable to the average price effects that I get from the model.

THE COURT:  How many years out was he looking at the price effect?

THE WITNESS:  I don't recall exactly right.  My apologies.

THE COURT:  That's okay.

THE WITNESS:  The -- now, I mean, granted, that's 35 years ago, which is why I wasn't -- it's not the focus of the way that I validated the model.  I tried to find more contemporaneous, competitive events that are more in line with sort of what I would think of as being current, competitive alternatives.  So to me it's salient that my average price effects match up with the average effect of adding a legacy to a route or what we see when American withdraws capacity.

What we see with the average JetBlue effect, you add a JetBlue flight, take it away, and that one we get a notion, not only of average; like I can compare my 9 percent average price effect to the average JetBlue price effect of 20 percent, as estimated by the defendants' economists.  But with the JetBlue effect, I also have information on the heterogeneity across routes.  So there we can look and see whether on some routes you generate some price effects that,

1    for example, are substantially larger.  And of course you see

2    that with the JetBlue effect, just as you see that with the

3    model.

4            So overall, I view the best available evidence we

5    have to validate the model is the evidence that I've already

6    shown you, and that's the way I think about establishing the

7    reasonableness of the predictability.

8    BY MR. DERITA:

9    Q.  Do you have any opinion on the methodology used in those

10   retrospectives?

11   A.  I mean, look, the retrospectives, trying to ascertain the

12   effect of a merger on particular routes is a challenging

13   endeavor.  And the reason is that an event takes place, other

14   things can change at the other time -- at the same time.  And

15   the literature has techniques that are designed to try to

16   assist with that, and econometrically I generally view that,

17   you know, everything -- methodologically speaking, everything

18   has challenges.  But the literature on merger retrospectives

19   also has challenges.  So the retrospective studies I would

20   normally treat with some caution.

21   Q.  Let's turn back to where we had left off.  So earlier

22   today, you had mentioned market shares.  How did you analyze

23   the defendants' market shares?

24   A.  Well, I looked at what they were and what they imply for

25   market concentration and what they imply for changes in

1    concentration if we think about the combination of

2    incentives.  This is a standard way to assess market power

3    and likely competitive effects.  Just going down the list:

4            "Concentration helps us assess whether markets are

5    prone to the exercise of market power."

6            "The market shares of defendants can inform the

7    extent of market power."

8            And the changes in concentration that would arise,

9    implied changes in concentration that would arise due to the

10   NEA can inform the increase in market power.

11           Now, the collaboration guidelines explain that

12   measures of markets shares, the concentration of relevant to

13   assessing a collaboration.  I'll focus on the

14   Herfindahl-Hirschman Index.  It's -- sometimes the acronym

15   will be HHI, which is just the standard measure of

16   concentration.  And the Horizontal Merger Guidelines say that

17   for markets with a post-merger HHI above 2,500 and a change

18   in the HHI above 200, a merger would be presumed to likely

19   enhance market power.

20           And I'll take those thresholds as informative here,

21   because the NEA introduces incentives that are similar to

22   those of a merger, along numerous dimensions.

23   Q.  What are the "collaboration guidelines" that you

24   mentioned?

25   A.  The collaboration guidelines are guidelines that are

1    issued by the Department of Justice and the Federal Trade

2    Commission that explain how the economic effects of

3    agreements, such as the NEA, would be evaluated.

4    **Q.**  How did you calculate concentration for the NEA?

5    **A.**  I used a measure that I've taken from the academic

6    literature that I'll call the modified HHI.  And it accounts

7    for the specific features of an agreement, like NEA.  So for

8    example, it will account for the extent of control change,

9    which in the NEA is none.  And it will also account for the

10   extent of financial interest, which in the NEA is implemented

11   through revenue sharing on segments that touch NEA airports.

12         Now, for NEA nonstop overlaps, the modified

13   Herfindahl-Hirschman Index is almost identical to a standard

14   Herfindahl-Hirschman Index, and that's because the vast

15   majority of defendants' products are fully subject to revenue

16   sharing, and in that sort of setting, where incentives are

17   aligned, control doesn't matter so much.  So the NEA creates

18   similar incentives as a full merger, even without the change

19   in control.

20   **Q.**  What conclusions did you draw from analyzing

21   concentration in Boston?

22   **A.**  Well, I've tried to summarize my conclusions with a

23   scatter plot here.  This focuses on routes that touch Boston.

24   And what I show you is that for all of the routes that

25   connect to -- for all the markets that I'm looking at that

1    connect to Boston, that the modified Herfindahl Index is

2    above 2,500.

3            I want to make clear, these are the nonstop

4    overlaps.  The modified Herfindahl Index is above 2,500, and

5    the change in the Herfindahl Index is above 200.  So this

6    meets the threshold under which the Department of Justice or

7    the Federal Trade Commission would presume an increase in

8    market power.

9    **Q.**  What conclusions did you draw from analyzing

10   concentration in New York?

11   **A.**  I can create the same graph for New York, and the results

12   are on the slide.  With New York, actually, two dots are

13   excluded.  New York to Nantucket and New York to Martha's

14   Vineyard are sort of up to the right.  I sort of took them

15   off to help with the scale.  But all but one of these routes

16   is -- all but one of these markets has a modified HHI above

17   2,500, and then the change in the HHI is above 200.  The

18   exception here is Atlanta, which we can see is highly

19   concentrated, but the NEA doesn't effectively increase the

20   implications of that concentration.

21           Again, if we can think back, I showed you already

22   that Atlanta has smaller combined revenue shares for American

23   and JetBlue.

24   **Q.**  And Nantucket and Martha's Vineyard don't appear on this

25   chart for what reason?

1    **A.**   Just to help with the scale.  We can see that the --

2              THE COURT:  They're off the chart, so to speak?

3              THE WITNESS:  Yeah, they're off the chart.

4    BY MR. DERITA:

5    **Q.**   Is there any connection between concentration and your

6    simulation results?

7    **A.**   There is.  On this, I've plotted, on the vertical access,

8    the overcharge per passenger.  So this is sort of the average

9    price increase a passenger is exposed to.  And on the

10   horizontal access is the change in the modified HHI.  And

11   each of these dots represents the effect in one particular

12   nonstop overlap market.

13             And you can see that just as the general pattern is

14   that where you see bigger changes in concentration and

15   implied concentration due to the NEA, you get bigger price

16   effects.  And that just -- that reflects the underlying

17   economics.  That is where both -- both American and JetBlue

18   have a large presence, is where that recapture is going to be

19   largest in the model.  And so this aligns with the economics.

20             THE COURT:  What's the significance of the size of

21   the dot?

22             THE WITNESS:  The markets that are larger have more

23   passengers, get bigger dots.  So, for example, a very small

24   route, like New York to Nantucket might show up as one of

25   these little dots.  And a very big route --

1          THE COURT:  Because the total amount of revenue.

2          THE WITNESS:  Because not many people fly.  Right.

3          THE COURT:  So the size of the dot correlates to

4     the dollars or to the number of people?

5          THE WITNESS:  I don't recall.  I could look at the

6     report and tell you.

7          THE COURT:  No, that's all right.

8          Go ahead.

9     BY MR. DERITA:

10    Q.   So you've used the term "market" today.  Why did you do a

11    market definition analysis?

12    A.   Well, by defining markets, I can do the sort of market

13    share and market concentration analysis I already showed you,

14    and it's also an input of other sorts of analysis that I

15    conduct, like the simulation model.  But when we think about

16    market definition, the idea is to identify a set of products

17    in the geography, over which it would be possible to exercise

18    additional market power and that's the objective.  Okay?

19          So exercising additional market power is possible

20    if not enough customers would switch away at other

21    alternatives if prices go up.  So just think about it like --

22    when you think about in Boston, tomorrow if you had a

23    monopolist of white dress shirts in Boston, would that

24    monopolist be able to raise price?  And you might think the

25    answer could depend on whether folks are just perfectly

1    willing to buy a blue dress shirt instead, and if they are,

2    that price increase wouldn't be profitable.  But if they're

3    not, then maybe the price increase is profitable.  And so the

4    defining question is how do consumers respond to price

5    elevations above the existing level and would enough

6    customers switch away in response to sort of the actions of

7    the price increase.

8           And so the way the merger guidelines state it, is

9    that it's the ability of -- customer's ability and

10   willingness to substitute away from one product to another in

11   response to a price increase -- actually, it doesn't have to

12   be a price increase, it could be something else like a

13   quality deterioration, and the guidelines say that, too.  But

14   something like that.  Okay?  And so the evidence that bears

15   on market definition is evidence about consumer choices and

16   substitution patterns and how consumers would respond to

17   price increases and where they go.

18   **Q.**  Looking around the courtroom, it looks like blue and

19   white shirts is a pretty good example.

20          How do you determine if there are enough customers

21   switching to alternatives in the defining market?

22   **A.**  The horizontal merger guidelines provide a framework for

23   the thought exercise of how much substitution is enough and

24   the framework is called the hypothetical monopolist test.

25   The idea is that we're going to, we're going to conceptualize

1    a hypothetical monopolist of some set of products, for

2    example, the white dress shirt.  And suppose that

3    hypothetical monopolist imposes a price increase, a small

4    price increase, and then the question is, would enough

5    consumers switch away from the candidate market to products

6    outside the candidate market, such that the price increase is

7    not profitable.  And the guidelines clarify that, by small,

8    they mean a small, but significant non-transitory increase in

9    price, or what's often known as a SSNIP in merger review.  So

10   multiple markets can pass the hypothetical monopolist test,

11   and again, we can go back to the white shirt example.  It

12   could be the case that a monopolist of white shirts in

13   Boston, would find it profitable to raise price, because

14   substitution to blue shirts is just insufficient, okay.  But

15   then we could ask the question, well, would a hypothetical

16   monopolist --

17          THE COURT:  Insufficient because of the

18   availability, or insufficient because people want the white

19   shirts?

20          THE WITNESS:  Because people want white shirts.

21   Yes, so we think about the demand side, not supply side.  You

22   know, folks don't view blue shirts as being a good enough

23   substitute.  But if that's the case, then a hypothetical

24   monopolist that has both white shirts and blue shirts would

25   also find it profitable to raise price.  And so you -- we've

1    just defined two markets that both satisfy a hypothetical

2    monopolist test, one would be, you know, white, one would be

3    white and blue.  So in that situation, what the merger

4    guidelines tell us to do is to select the market with the

5    goal of illuminating the likely competitive effects of the

6    merger and acquisition under investigation, or here, the

7    likely competitive effects of the NEA.

8            Here's what I mean by that.  First of all, you

9    don't have to include all of the substitutes to which

10   consumers substitute -- might choose.  It's just a -- you

11   have to pick enough that a price increase is elevated.  But

12   the guidelines specified that you want to include in the

13   market meaningful competition between the two parties to an

14   agreement or a merger.  Okay.  So we want to include

15   meaningful competition, but also it can make sense to exclude

16   distant substitutes that are sort of only weakly, you know,

17   consumers could pick them, but they don't pick them with a

18   high probability.  And so an example might be -- it could be

19   that you have a market that's white and blue dress shirts but

20   you would exclude polo shirts.  We could wear a polo shirt to

21   court, but it doesn't fulfill the same purpose.  Okay?  So

22   those are some of the principles that are laid out in the

23   horizontal merger guidelines.

24   BY MR. DERITA:

25   Q.  What relevant markets did you use to assess the NEA?

**A.**   The product market is scheduled airline air passenger
service.  And I've done some work in different ways to
conclude that Amtrak and driving are not close enough
substitutes to the markets that we're examining, to include
in the relevant market.  And I can talk about that if it
becomes necessary.

For the geographic markets, I'll consider travel
between an origin and a destination, or an endpoint pair.

You know, most of the end points are going to be
the airports serving a metropolitan area, and I showed you
Miami earlier, but also something like Cleveland would be an
example.  And my analysis, my economic analysis indicates
that it's appropriate to find several narrower markets that
would take Boston Logan and consider that separately from
Manchester and from Providence, for example, and also to look
at DCA in Washington, D.C., LaGuardia/JFK in New York, and
Newark in the Newark metropolitan area separately.

Now, almost all of my market definition conclusions
are uncontested by the defendants' economists, but they argue
that Newark should be included along with LaGuardia and JFK.
And so I have a number of slides that walk through my
analysis on that point.

**Q.**   Does your analysis depend on treating JFK and LaGuardia
separately from Newark?

**A.**   Well, it matters some.  But even if you put Newark in

1    together with New York City, my analysis still demonstrates

2    substantial harm to competition from the NEA.  And if you --

3    if you go back to the modified Herfindahl Index numbers,

4    those exceed the guidelines threshold in almost all of the

5    NEA nonstop overlaps, even if we lump in Newark.  I believe

6    that a set of one falling outside of the threshold's three

7    routes that were outside the threshold, I can simulate the

8    model, incorporate Newark into JFK and LaGuardia.  When I do

9    that, I obtain annual harm of 627 million.  So that can be

10   compared against the baseline number of 696 million.

11          So including Newark does matter and that makes

12   sense, because you're bringing in extra competition from

13   Newark, but my analysis -- but it doesn't move the needle too

14   much.  But my economic analysis, at the end of the day,

15   supports treating JFK and LaGuardia and Newark as separate

16   end points.  And I'll explain that's consistent with the

17   principle that market definition should be done to illuminate

18   the likely competitive effects of the NEA.

19   **Q.**  So to kind of think about this in the more practical

20   sense, does treating Newark separate from JFK and LaGuardia

21   mean that nobody who flies out of JFK and LaGuardia flies out

22   of Newark?

23   **A.**  No.  If we -- if, in the model, we treat Newark and JFK

24   and LaGuardia as separate end points, the model accounts for

25   substitution from JFK/LaGuardia toward Newark.  And it does

1  so through the outside good.  It gives consumers another

2  option above and beyond flying out of the end points in

3  question.

4  **Q.**  What evidence did you review in assessing the New York

5  market definition?

6  **A.**  I looked at different sources of evidence.  I looked at

7  how consumers choose between airports in the New York

8  metropolitan area.

9       I'll show you a number of what are called

10  "catchment maps," which are basically just analyses of the

11  location of customers that choose one airport.  And I'll base

12  that on frequent flyer data from American, on ticket data

13  from JetBlue, as well as taxi data from New York itself.

14       I've also looked at documentary evidence, which

15  I'll explain is consistent with my analysis of the catchment

16  maps.  And I've used the model itself, which allows for a

17  quantitative implementation of the hypothetical monopolist

18  test.  It allows me to test for the geographic and the

19  product market at the same time.

20       MR. DERITA:  Your Honor, this is the section where

21  the redacted slides are going to come up, for slides 83 and

22  84.  So if you just turn to --

23       THE COURT:  83 and 84?

24       MR. DERITA:  83 and 84, and then later, it's also

25  going to be 88.

1              THE COURT:  Okay.

2              MR. DERITA:  But if you can just follow along on

3       paper for those slides.

4              THE COURT:  Yes.

5              MR. DERITA:  And same, Dr. Miller.

6       BY MR. DERITA:

7       **Q.**  Dr. Miller, were you able to draw any conclusions from

8       the catchment maps?

9       **A.**  I was.  And I have a number of catchment maps.  The first

10      one that I'm going to show you is produced with data obtained

11      from American on the location of the residences of its

12      frequent flyers as they make decisions.  And what I've done

13      is looked in that data and picked a selection of routes that

14      American flies from JFK/LaGuardia on one hand, but also from

15      Newark.  And so these frequent flyers have a choice to go to

16      Newark or other airports, or they could choose to go to JFK

17      and LaGuardia.

18              Now, in the data, I see the residence, the location

19      of the frequent flyer's residence.  And in particular, I see

20      the zip code.  And so for each ZIP code, I can plot the

21      fraction of customers that choose JFK and LaGuardia, instead

22      of another airport.  And that's what the map shows.

23              Zip codes on the map in which zero percent of

24      frequent flyers choose LaGuardia/JFK are shaded in a very

25      light yellow.  And zip codes in which 100 percent of

1    customers choose LaGuardia/JFK would have this very deep

2    purple.  And the range of the colors scales the percentage or

3    the fraction of customers by zip code that choose JFK and

4    LaGuardia.

5            And what you can see is that there are regions

6    where you have this bluish/purple, and there are other

7    regions that are yellow.  And what that tells me is that

8    there's a set of customers for whom JFK and LaGuardia is

9    something of a distinct choice.  They would rather go to

10   JFK/LaGuardia, or they've demonstrated that they prefer

11   flying out of JFK and LaGuardia, just based on sort of where

12   they are.  And there's sort of this intense local pressure,

13   local preference.

14           Now, I want to make that a little more quantitative

15   for you.  And so what I've done is considered something that

16   would be called a 90 percent draw area of JFK and LaGuardia.

17   And at 90 percent draw area is going to include the zip codes

18   that account for 90 percent of the business of traffic

19   through JFK and LaGuardia, according to these data.

20           Now, if you look at that draw area --

21           THE COURT:  That's slide 84?

22           THE WITNESS:  I'm still on 83.  I haven't moved.

23   But you see there's a table on slide 83?

24           THE COURT:  Yes.

25           THE WITNESS:  Okay.  So I want to walk you through

1   that table.  Okay.

2          What that table shows you is that if you look at

3   inside JFK/LaGuardia's draw area, 88.9 percent of customers

4   choose JFK/LaGuardia, and not some other airport.  Okay.

5   Only 11 percent go somewhere else.  So for the vast bulk of

6   JFK/LaGuardia's business, most -- most frequent flyers that

7   have demonstrated preference for JFK/LaGuardia.

8          Now, I can do the same question.  I can ask, well,

9   what about folks that are outside of the draw area?  And

10  that's the second row.  For frequent flyers that are outside

11  of the draw area, only 22 select JFK/LaGuardia.  77 percent

12  select other airports.  And so, again, this is consistent

13  with there being an area around JFK and LaGuardia where the

14  folks may reside there, have a strong -- or I should say --

15  not that, but they have a -- they've demonstrated that they

16  prefer JFK and LaGuardia and that that's what the maps show.

17         So this is the frequent flyer data for American,

18  and it's reasonable to have questions about whether frequent

19  flyers are different from other flyers or whether there's

20  something special about American that's causing this pattern.

21         And I've done another analysis that will be on the

22  next slide, that sort of corroborates some of these points.

23  These are catchment maps -- a catchment map that's made with

24  JetBlue ticket data, and these data are tickets that are sold

25  on JetBlue.com.  So these are also selected, but they're

1    selected in a different way.  And again, I'm focusing on

2    flights that are available on -- from JFK/LaGuardia, but also

3    other airports.

4            And we can see that, again, there's sort of this

5    sort of pocket of deep purple, where consumers tend to prefer

6    JFK and LaGuardia over other airports.  And we can break down

7    the numbers the same way.  So within the draw area of JFK and

8    LaGuardia, the consumers that live inside that draw area

9    are -- 86.7 of them choose JFK/LaGuardia over the other New

10   York City airports.  Among those that live outside of the

11   draw area, only 14 percent choose JFK/LaGuardia.

12           These numbers are inconsistent with the notion that

13   location doesn't matter here.  Instead we see sort of a

14   locational preference with consumers that live near

15   JFK/LaGuardia, choosing those airports.

16           Again, there can be concerns about selection.  This

17   is JetBlue.  And specifically, JetBlue.com sales.  I've done

18   one more analysis on this and that will be on the next slide.

19   This is a catchment analysis using New York City taxi data.

20   And so this will include information for anybody who caught a

21   taxi and went to either Newark or LaGuardia or JFK.  So, for

22   instance, it will incorporate information for consumers that

23   are flying American, JetBlue, Delta, United.  It will include

24   consumers that are flying out of New York City, but also

25   include consumers that are flying to New York City, and then

1    are getting the taxi back to the airport on the way home.  So

2    all of that is in this.  And what you see is that there's

3    sort of this purple area on the right, in which there's a

4    preference for JFK/LaGuardia, and it's very different to --

5    actually, we have Staten Island on the left, where there's a

6    preference for Newark.  And so all of this, putting this

7    together tells me that the customers that are near JFK and

8    LaGuardia, have a -- demonstrated that they preferred those

9    airports over to Newark, and the substitution between them is

10   likely to be higher than the substitution to Newark.

11   Q.  I want to go back to the question that you posed, or the

12   exercise that you mentioned earlier, which is how customers

13   respond to a SSNIP.  Why are catchment maps relevant to that

14   analysis and that question?

15   A.  Well, I would say that these are choices that consumers

16   are actually making.  They are consistent with -- consistent

17   with preferences for JFK and LaGuardia.  It does not prove

18   that, you know, about consumer substitution patterns in

19   response to a price.  That's not contained in here, in the

20   analysis.  However, it's strongly suggestive that

21   substitution patterns here are sufficient, that JFK and

22   LaGuardia are reasonably treated as a single market.

23   Q.  What documents did you review with respect to New York

24   market definition?

25   A.  I looked at a number of documents.  They're summarized in

1    my report.  But I put on my screen a couple of different

2    ones.  The one on the left is testimony of Mr. Laurence in

3    which he said the customers flying out of JFK tend to live

4    east of the Hudson River, and customers that operate from

5    Newark tend to live west of the Hudson River, which is

6    consistent with the catchment maps I've shown you.

7    Mr. Laurence also says that LaGuardia tends to operate

8    similarly to JFK in terms of catchment.

9            Then over on the right are summaries of pricing

10   documents that explain that, for example, JetBlue typically

11   ignores United Airlines pricing out of Newark-Liberty when

12   assessed prices, in New York City markets, which are JFK and

13   LaGuardia.  To me, that's consistent with a lower amount of

14   diversion to Newark.  You know, where it's a stronger amount

15   of diversion between LaGuardia and JFK.  And then something

16   similar for American.  And there's always exceptions here,

17   but these are sort of typically what's observed.

18   **Q.**  How did you use your model to inform your analysis of the

19   market definition?

20   **A.**  With the model, I can implement the hypothetical

21   monopolist test, using the demand of supply relationships

22   that I've estimated.  And so, for example, I can assume that

23   all products in the proposed market are owned by the same

24   firm, by a monopolist.  And I can then simulate profit

25   maximizing prices.  Now, this accounts for diversion to

1    Newark, for example, because the model allows for
2    substitution outside of the market.  The hypothetical
3    monopolist test passes, if the prices are either defendants'
4    products or are larger than a SSNIP.  When I do this for NEA
5    nonstop overlap markets, with the JFK/LaGuardia endpoint, all
6    of them pass.  And this is true whether I use a 5 percent
7    SSNIP or a 10 percent SSNIP, those being the most standard
8    numbers to use, and they pass in each quarter of 2019.  So I
9    can run this in first quarter, second quarter, third quarter,
10   fourth quarter.
11           If we expand the scope to consider all of the JFK
12   LaGuardia markets flown by American or JetBlue, 99.9 percent
13   of those pass with a 5 percent SSNIP, and 99.7 percent pass
14   with a 10 percent SSNIP across all quarters of 2019.
15   **Q.**  Shifting gears to DCA, why did you include that market?
16   **A.**  Well, I did the same sort of analysis for Boston and for
17   New York and for Washington, D.C., and so with respect to
18   Washington, D.C., I presented -- I analyzed catchment maps.
19   I looked at documentary evidence, and I also looked at
20   simulation-based hypothetical monopolist tests.  And those
21   three sources of evidence are consistent with it being
22   appropriate to treat DCA as a separate endpoint in
23   Washington, D.C.
24   **Q.**  Earlier when you were talking about concentration?
25           THE COURT:  Just pause one second.

1          In Washington, there's -- LaGuardia has that

2   perimeter limitation of 1,500 miles.  There's not an

3   equivalent perimeter limitation on Reagan, or is there?

4          THE WITNESS:  The Reagan is a funny one, as I

5   understand it, but I don't know the details.  So I'm not the

6   right person to ask about that particular limitation.

7          THE COURT:  I mean, you can just -- if you know.

8          MR. DOIDGE:  If I can represent, Your Honor, there

9   is a perimeter rule, I don't know the exact definition, but

10  there are also some slots that are specifically designed to

11  allow for a waiver for the perimeter.  There are some flights

12  that might go to, say, Los Angeles or San Diego out of DCA,

13  but largely there is a perimeter rule that governs most of

14  the flights out of DCA.

15         THE COURT:  So some people in another branch of

16  government are forced to go to Dulles, but some people are

17  able to fly without going to Dulles.

18         MR. DOIDGE:  I think it's a very limited set of

19  market.  There's probably only like -- I don't want to

20  represent, but I think it's a very small number.

21         THE COURT:  The small number where there are

22  long-haul -- I don't know if they're long-haul --

23  quote/unquote, long-haul, but outside the perimeter flights.

24         MR. DOIDGE:  Yes.

25         THE COURT:  That was my sense that there were only

1    shorter distance flights out of Reagan.

2              Does that square generally?

3              MR. WALL:  That's basically fair and interesting

4    political history behind that, but, as you might imagine.

5              THE COURT:  All right.  I got it.  Thank you.  Go

6    ahead.

7    BY MR. DERITA:

8    **Q.**  So when discussing concentration measures earlier, you

9    used the term "market power."  What did you mean by that?

10   **A.**  Market power, as an economist conceptualizes it, is the

11   ability to raise price above marginal cost.

12   **Q.**  Okay.  That's all I have on domestic routes.

13             Earlier you mentioned harm in US/London.  What does

14   the competitive landscape look like for US/London?

15   **A.**  Well, let me speak specifically about flights that go

16   from the United States to Heathrow.  And I've put a plot

17   of -- with respect to US/Heathrow routes.  And the table

18   analyzes, first, overall in the United States, and then looks

19   at each of the 30 largest US origin destinations in the

20   subsequent columns.  And in these columns are the share of

21   Atlantic Joint Business, the AJB, in green; and then the Star

22   Alliance in red; and then the Air France/KLM group in blue.

23   These are passenger shares as of, I believe, 2019.

24             And the main stylized fact that comes out of this,

25   is that these three alliances account for all of the

1    passenger share from Heathrow into the 30 largest US origin

2    destinations.

3    **Q.**   Does the NEA impact competition for US/London service?

4    **A.**   It can.  American's revenue from transatlantic flying is

5    subject to sharing.  And this reduces -- this reduces

6    JetBlue's incentive to compete, as I understand it, through

7    the lens of economic theory.

8           Now, this is a one-sided change, okay, because

9    JetBlue's transatlantic revenue is not shared.  But aside

10   from that, it's the -- it's the same upward pricing pressure

11   logic that I walked through earlier in the context of

12   domestic overlap routes.  The NEA creates incentives for

13   JetBlue to set higher prices on routes that go from the

14   United States to London than they otherwise would.  Because

15   if they set a low price, they potentially force American to

16   respond in part.  And if that reduces American revenues, then

17   JetBlue does not benefit as much by those.

18          So this is my theoretical analysis.  I put a

19   document on the slide that is consistent with the way I'm

20   conceptualizing this.  This is a statement by Mr. Klinka who

21   says that, "If we come into Boston/Heathrow or New York

22   City/Heathrow and screw up fares, American pull out pricing,

23   and we pay a transfer payment.  So we are our own worst

24   enemy."

25          So my interpretation of that statement is that it

1    can be understood through the context of a one-sided upward

2    pricing pressure.

3    **Q.**   So you mentioned how incentives might change with the

4    NEA.  Does the NEA impact JetBlue's ability to compete for

5    London service?

6    **A.**   Well, you know, if you're going to compete into

7    London-Heathrow, an important asset that is necessary is a

8    slot.  As I understand it, before the NEA, JetBlue was likely

9    to obtain Heathrow slots used by AJB via a reallocation of

10   slots that was going to be orchestrated by the CMA.  With the

11   NEA in place, JetBlue lost access to those slots because the

12   CMA recognized that the NEA reduced JetBlue's incentives to

13   compete with American.  This was the perception of the CMA.

14   Without those slots, JetBlue's ability to compete on

15   US/London routes is constrained.

16   **Q.**   Let's switch gears.

17           Sorry, I just want to circle back to the slots we

18   were talking about with the CMA.  Were those slots used by

19   AJB?

20   **A.**   Um --

21           (Counsel confers.)

22   BY MR. DERITA:

23   **Q.**   Were they used before the AJB was created?

24   **A.**   I don't know when the AJB was created.

25           (Counsel confers.)

1    BY MR. DERITA:

2    **Q.**   Do you have any understanding as to whether those slots

3    originally were divested as part of a prior review of the

4    AJB?

5    **A.**   That's consistent with my understanding, but I don't know

6    the details of it.

7    **Q.**   Okay.  So let's turn to coordination.  Earlier you had

8    mentioned that the NEA increases the likelihood of

9    coordination in the airline industry.  Why is that?

10   **A.**   Well, I considered two different possibilities, through

11   which the analysis of potential effects goes beyond what is

12   captured in the simulation model and with the concentration

13   analysis.  And the first involves what would be called a

14   spirit of partnership between American and JetBlue that could

15   harm consumers beyond the immediate scope of the NEA, and the

16   second involves an industry wide capacity discipline or other

17   coordination that could become more likely among American and

18   JetBlue and other airlines, as well.

19   **Q.**   Why do you believe the NEA creates this spirit of

20   partnership issue that you mentioned?

21   **A.**   Well, I observed that American has a history of acting in

22   the spirit of partnership with its partners or its partners

23   acting like that with American, and I put two examples on the

24   slide.  One is an analysis American did in a decision not to

25   undercut LATAM's prices, LATAM being the partner, and that

1    helped LATAM with the expense of revenue maximization for

2    American.  And that is discussed, for example, in

3    Mr. Parker's testimony.

4            Another instance that is consistent with the spirit

5    of partnership of merging is that Alaska voided network

6    expansion that would have increased competition with

7    American.  And there's documentary support around that in my

8    report.

9            I can also point out --

10           MR. WALL:  Your Honor, I'll object to the idea of

11   him testifying to anything based upon it being in his report,

12   if it's not in evidence.

13           THE COURT:  So I'm going to sustain the objection

14   on the following way.  There's an open question that I

15   haven't resolved about whether the report comes into

16   evidence.  And if the report comes into evidence, then the

17   report is in evidence, obviously; and if it doesn't, it

18   doesn't.

19           But with respect to the testimony, the reason that

20   I sustain it, is it is more helpful -- it's not helpful to me

21   just to refer to the report.

22           And in one sense, I have just, as an overarching

23   comment, is that there is more evidence than you are

24   presenting live in court, and so the utility of the courtroom

25   live testimony is to explain it to me.  So whether or not on

1    an evidentiary basis it should be sustained or not, I'm

2    sustaining it because it's just not that helpful.  I'm not

3    reading along with the report and referencing that right now.

4            And even if I admit the report into evidence, the

5    likelihood -- sorry -- that I specifically recall this

6    particular interchange in the course of drafting the opinion

7    and find the particular spot that's referenced from the

8    transcript here as to where in the --

9            192 pages was it?  Or whatever it was.

10           THE WITNESS:  I don't count that high.

11           THE COURT:  All right.  Well, whichever, maybe that

12   was a different report.  I'll never find that.  So it's just

13   not helpful.  So like if you want to say what it is, you can

14   say what it is.  That's fine.  And then you can object if

15   there's an objection to what he says.  But the reference to

16   the report, like that's just not -- it's just, as a practical

17   matter, not helpful, whether or not the report comes into

18   evidence.

19           You can ask again, if you wish.

20   BY MR. DERITA:

21   Q.  Did you want me to pick back up on the question?

22   A.  It's up to you.

23   Q.  Yeah, I'll pick back up.

24           Why do you believe the NEA creates the spirit of

25   partnership?

1   **A.**  I think that --

2          THE COURT:  I think the point was, if you want to

3   amplify on it.

4          And you're free to object to this, Mr. Wall, I'm

5   not -- it's not a question for me, but you said that there

6   were things that supported -- I think what you said is that

7   there were things that were documented that point in your

8   report that supported the point that you have in the slide

9   that Alaska avoided a network expansion to increase -- I

10  think that was the point?  Maybe I've lost it.

11         MR. DOIDGE:  No, I agree, Your Honor.  I think

12  there's some question as to whether there are documents that

13  are still in dispute with respect to being -- coming into

14  evidence that would relate to some of what Dr. Miller is

15  referring to with respect to Alaska.

16         MR. WALL:  Can we just -- from a utility

17  standpoint, it would be just -- it would be nice if they

18  would actually just specify what they're talking about.

19         THE COURT:  So I don't know.  Like I think the

20  answer -- in terms of the witness, the question would simply

21  be or what I would -- okay, what?  Right?  And then he can

22  say what.  If he says things that Mr. Wall objects to,

23  Mr. Wall will object to, and he will say, well, okay, but he

24  can rely on inadmissible evidence, he's an expect.  He can

25  rely on inadmissible evidence.  So the fact that the

1    documents don't come in, if they don't come in, I don't
2    know -- unless it's the kind of thing that is the kind of
3    thing -- unless Mr. Wall is the objection that it's not the
4    kind of thing this type of expert can rely on, what's the
5    difference if it's admissible?  For this question.
6              MR. WALL:  Look, there's a separate question in
7    whether he has any expertise in assessing a spirit of
8    partnership as an economist.  But regardless, I'll just --
9    I'll withdraw, we'll go forward, and we'll figure it out as
10   time goes on.
11             (Counsel confers.)
12   BY MR. DERITA:
13   Q.  Can you specifically recall any Alaska documents or other
14   pieces of evidence that support the points on this slide
15   about spirit of partnership?
16   A.  Yes, I do.  I recall a document in which Alaska avoided
17   network expansion that would have increased competition from
18   American, and it did so because it wanted to improve its
19   relationship with American, I believe in the context of
20   potentially joining an alliance to gain access to
21   intercontinental flights.
22   Q.  And I'm not sure if you had gotten to this, but can you
23   explain what the significance of the deferred transfer
24   payment is?
25   A.  I can.  I observed that already American and JetBlue are

1   willing to act in something that seems akin to a spirit of

2   partnership to preserve the mutual benefit of the NEA.  An

3   example that I've got on slide is that American agreed to

4   have JetBlue pay a smaller amount than was owed in the

5   context of the MGIA.  And I interpret that as evidence that

6   American wants to maintain a good relationship with JetBlue

7   going forward.  And that's sort of -- you know, the -- a

8   little bit of deference in cooperation is the sort of thing

9   that is consistent with the spirit of partnership of merging.

10  **Q.**  Have you quantified any effects that might result from

11  the spirit of partnership?

12  **A.**  I have.  The effects of it I have are intended as a

13  measure of the potential harm at the maximum level, if

14  American and JetBlue were to act in the spirit of partnership

15  beyond the immediate scope of the NEA.  And to get that sort

16  of upward bound, what I've done is assumed full coordination

17  between American and JetBlue across all of their routes.  The

18  table presents the results.  The baseline numbers that is the

19  number you've already seen, which is revenue sharing within

20  NEA scope, that's where we have the 696 million.  If we

21  extend out to full coordination across all the overlap

22  markets in which they compete, the number moves to

23  $1.2 billion each year.

24  **Q.**  You had also mentioned some effects on the ability or

25  incentives to coordinate with other airlines.  That might

1    change because of the NEA.  Why would that be?

2    **A.**  Well, sure.  Just as a matter of the economics,

3    coordination and accommodating conduct can reduce competition

4    and harm consumers beyond what measure might assume

5    simulation, which focuses on the loss of competition between

6    JetBlue and American specifically.  When we think about this

7    sort of -- potential for coordinated effect, it can be a

8    range of behavior that need not be an explicit arrangement,

9    although it could.  And in this particular context, one of

10    the things that is salient is the possibility that the NEA

11    would facilitate capacity discipline.  And I know you've

12    heard testimony from Professor Town on this, to some degree,

13    but it makes no sense in this context, as I understand it,

14    because the NEA allows American to grow in places like

15    Boston, without putting new capacity into the market in a way

16    that would be inconsistent with capacity discipline, it

17    reduces JetBlue's incentive and ability to grow along the

18    lines, the sort of the point-to-point competition that it

19    normally does, and potentially changes the way it's going to

20    think about its network.

21         And then when I look at the airline industry

22    overall, I see a number of factors that give me concern that

23    it's vulnerable to coordination.  And I just pulled these

24    factors from the merger guidelines that point out that

25    markets can be vulnerable to coordination, if there's

1    previous coordination, that can be an indicator, you said

2    that if there's transparency in competitive choices, because

3    then you can see if your competitors have fallen along with

4    whatever this coordinated arrangement is, if sales are small

5    and frequent, because then you can catch deviation and

6    respond quickly.  And then if there's multimarket contact,

7    because that allows you to target a punishment or target a

8    response easier, and better maintain coordination.

9           And so in the airline industry, we have a history

10   of capacity discipline that Professor Town has documented.

11   We have transparent choices because you had investor

12   communications and prices are actually listed on ATPCO.

13   Ticket sales are small and frequent and airlines compete in

14   many markets.  And so if you just go across the list, to me,

15   this is consistent with the notion that the airline industry

16   could be vulnerable to coordination.

17   **Q.**  When you gave your overview at the beginning of your

18   slide deck, you had mentioned that you had analyzed whether

19   any mitigating factors were present.  What did you find?

20   **A.**  I looked at entry and efficiencies, and I tried to assess

21   whether the process of entry and efficiencies might be likely

22   enough and sufficient enough to offset the competitive

23   effects that I've estimated.

24          With respect to entry, I can observe that there are

25   barriers that make new entry into NEA markets difficult, and

1    these barriers include slot constraints at JFK, LaGuardia,
2    and DCA; gate constraints at Boston; and then schedule
3    facilitation at Newark.
4            I see that there's additional frictions that are
5    associated with repositioning aircraft carriers, even for
6    carriers that have slots or gates at NEA airports.  And, you
7    know, the most reasonable intuition there is that if a flight
8    is simply going to be transferred into a new market, there is
9    an opportunity cost associated with that, and that the plane,
10   you know, by revealed preference had been flying a more
11   profitable route, and moving it into a new route forgoes
12   those profits.
13           I observed that prices are different across
14   markets.  Prices are different across markets because of
15   competitive conditions, as I've explained to you, I explain
16   in the context of my testimony.  And that's consistent with
17   barriers to entry creating frictions for entry and
18   repositioning.
19           We see that the JetBlue effect occurs in NEA
20   markets.  And one thing about the JetBlue effect it that it
21   typically implies that prices are high for a while and then
22   nobody comes into the market, and then JetBlue comes in.  And
23   so we have to ask the two questions:  Why do prices stay high
24   for so long?  What does that mean?  And then also, if it's
25   not JetBlue, who is it going to be?

1          And looking at JetBlue, it's got this unusual

2     combination of low costs and high quality that allows it to

3     provide a point-to-point service and compete with the legacy

4     carriers and be compelling in that context.  And just looking

5     at the structure of the airline industry, I don't see an

6     obvious replacement for JetBlue.

7          And then lastly, turning to efficiencies, I haven't

8     seen credible evidence that the NEA creates -- is likely to

9     create significant agreement -- agreement-specific consumer

10    benefits of the sort that are claimed by the defendants.

11         And as a result, I think that the net effect of the

12    NEA is likely to be consumer harm along these nonstop

13    overlaps and the other overlap markets that I've analyzed.

14    **Q.**  So you've been on the stand for quite awhile.  Just one

15    last question.  Could you just provide a summary of your

16    findings on the competitive effects of the NEA?

17    **A.**  I can.  In conclusion, I think the NEA effectively ends

18    competition between American and JetBlue on the routes that

19    touch the NEA airports.  It does so by creating a mechanism

20    or a vehicle for capacity coordination and by aligning

21    pricing incentives through revenue sharing.  And the

22    combination of these factors gives JetBlue and American an

23    incentive to increase price and lose output in these overlap

24    markets, especially in the nonstop overlap markets.

25         And a quantification that focuses specifically on

1   the domestic overlap markets attains estimated annual harm of

2   $696 million.

3            MR. DERITA:  That's all I have.  I'll pass the

4   witness.

5            THE COURT:  Okay.

6   **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT AMERICAN AIRLINES**

7   BY MR. WALL:

8   **Q.**  Good afternoon, Dr. Miller.

9   **A.**  Good afternoon.  How are you?

10  **Q.**  Good.  Very good.  Thanks for asking.

11            You've been working on this matter for about two

12  years, right?

13  **A.**  Yes, I believe that's right.

14  **Q.**  As you come here today, you have no evidence that the NEA

15  has led to any capacity reductions anywhere in the Northeast

16  that have resulted for higher fares for consumers, correct?

17  **A.**  That's correct.

18  **Q.**  As you come here today, you have no evidence of any fare

19  increases on any of the nonstop overlap routes that are

20  unusually higher than fare changes that may have occurred on

21  NEA nonstop overlap routes, correct?

22  **A.**  That's right.  I have not sought to develop that

23  evidence.

24  **Q.**  As you come here today, you have no evidence at all that

25  there has been any loss of the JetBlue effect, correct?

1   **A.**  Empirical evidence, perhaps not.  But I think that a lot

2   of this ties into the incentives, and the incentives I've

3   analyzed.

4   **Q.**  My question was about evidence, sir, not about theory.

5           As you come here today, after your two years of

6   study of the NEA, you do not have any evidence about any loss

7   of the JetBlue effect, correct?

8   **A.**  Well, I've analyzed the incentives that go into the

9   JetBlue effect and --

10  **Q.**  Please answer my question, sir.

11          MR. DERITA:  Objection.

12  BY MR. WALL:

13  **Q.**  Evidence of a loss of the JetBlue effect, do you have

14  any?  Yes or no?

15  **A.**  The answer is the same as I've given it.  As an

16  economist, I've analyzed incentives, and I've explained how

17  the incentives of JetBlue have changed.

18  **Q.**  Is there a distinction in economics between theory and

19  empirics?

20  **A.**  Yes, there is.

21  **Q.**  In terms of empirics, do you have any empirical evidence

22  that there has been any loss of a JetBlue effect?

23  **A.**  No, I do not.

24  **Q.**  Do you have any empirical evidence or even any anecdotal

25  evidence that JetBlue has changed its low cost carrier

1    business model as a result of the NEA?

2    **A.**   No, I do not.

3    **Q.**   Do you have any evidence or even anecdotal evidence that

4    as a result of the NEA, JetBlue and American Airlines are

5    coordinating with other airlines?

6    **A.**   No, I do not.

7    **Q.**   Do you have any evidence, empirical or otherwise, that,

8    as a result of the NEA, there has been a resurgence of

9    capacity discipline?

10   **A.**   No, I do not.

11   **Q.**   Were you here this morning during Mr. Clark's testimony?

12   **A.**   Yes, I was.

13   **Q.**   You mentioned some testimony of Mr. Friedman about not

14   considering the MGIA in the course of the capacity decisions.

15   Do you recall that?

16   **A.**   Yes, I do.

17   **Q.**   Do you recall that Mr. Clark testified this morning that

18   JetBlue is not considering the MGIA when making pricing

19   decisions?

20   **A.**   Yes, I do recall that testimony.

21   **Q.**   And the foundation of your competitive effects model is

22   the idea that, in the pricing decision, the MGIA will cause

23   firms to change their profit maximizing price by accounting

24   for recapture, correct?

25   **A.**   Yes, they have the economic incentive to do so, according

1  to economic theory.

2  **Q.**   That's right.  And according to Mr. Clark's testimony, he

3  didn't get the message, right?

4  **A.**   It is not surprising to me.

5  **Q.**   Let's talk about market definition in the time that we

6  have left here today.  Dr. Miller, as United Airlines, based

7  on its services from Newark-Liberty airport, a strong

8  competitor to American, JetBlue, Delta, and other airlines

9  that are operating from LaGuardia and JFK, with respect to

10  any of the nonstop routes with New York end points on which

11  you predict consumer harm?

12  **A.**   Economists don't have a good definition of strong.  What

13  my analysis shows me is that the diversion from LaGuardia and

14  JFK towards flights in Newark is likely to be insufficient to

15  constrain the exercise of market power as it exists in JFK

16  and LaGuardia.

17  **Q.**   That wasn't my question, sir, but I will pick up on it.

18  You actually did not conduct any analysis of diversion from

19  LaGuardia and JFK on the one hand and Newark on the other

20  hand, did you, sir?

21  **A.**   No, that would be incorrect.

22  **Q.**   Where is -- where do I find your analysis of diversion,

23  sir?

24  **A.**   I've pointed to it in multiple places in my testimony,

25  one place is the demand estimation model which looks at how

1    consumers make decisions and allows consumers to substitute

2    towards the products that are available to them.  And I show

3    in the context of the demand model, for example, giving the

4    customers the option to choose Newark instead of flights out

5    of JFK and LaGuardia, that that amount of diversion is

6    insufficient to constrain the increase in market power at

7    LaGuardia and JFK.

8    Q.  Your model has no specific parameter?

9            THE COURT:  Hold on.  Let him finish.

10           MR. DERITA:  Objection.

11           THE WITNESS:  The second area that is consistent

12   with lower diversion between La Guardia and JFK, on the one

13   hand, Newark on the other, comes with the catchment maps,

14   which shows sort of an intense local pressure for JFK and

15   LaGuardia.  And then a third point of evidence that's

16   consistent with this is the documents that I showed you in

17   which I believe it was Mr. Laurence, but sometimes I forget

18   these things, mentions that the catchment map for LaGuardia

19   and JFK are similar on the one hand, but that Newark is

20   distinct.  And so all of these points of evidence, to me,

21   looking at it, are consistent with the notion that diversion

22   from LaGuardia and JFK is to Newark, is small enough to --

23   that United flying out of Newark would be unlikely to

24   constrain exercise of market power.

25   Q.  Sir, I didn't ask you anything about what might have been

1    consistent with diversion.  You did not conduct a study

2    specifically of diversion from the airports that you say are

3    the relevant end points to Newark-Liberty, correct?

4    **A.**  No, that's, again, that would be -- that would be

5    incorrect.

6    **Q.**  Okay.  Then let me follow up on that.  Is it a fact, sir,

7    that in your demand system, Newark is lumped into what you

8    call the "outside good."  Yes or no?

9    **A.**  That's true.

10   **Q.**  The outside good is anything and everything to which

11   consumers might switch if they decide not to buy a LaGuardia

12   or JFK flight.  True, yes or no?

13   **A.**  That's true.

14   **Q.**  It would include driving to Kansas City and taking a

15   flight from there, right?

16   **A.**  That's right.

17   **Q.**  It would include driving to Kansas City, because that's

18   your destination, right?

19   **A.**  That's true.

20   **Q.**  On the other hand, as you stated, your model does

21   specifically measure diversion between LaGuardia and JFK,

22   correct?

23   **A.**  In the sense that products are within the market, yes.

24   Yeah.  You can infer that because products exist out of JFK

25   and out of LaGuardia separately.

1    **Q.**   In everything outside the candidate market, including

2    Newark, but also including driving across country, are lumped

3    together in the outside good, correct?

4    **A.**   That's correct.

5    **Q.**   Okay.  Now, sir, back to my question.  After two years of

6    study, do you not have an opinion as to whether

7    United Airlines is an effective competitor from Newark on

8    these routes that have New York City end points?

9    **A.**   Well, again, ineffective is a term that economists aren't

10   going to have a clean definition for.  But what I can tell

11   you is that diversion to Newark is insufficient to constrain

12   the exercise of market power for JFK and LaGuardia, for the

13   reasons that I've already explained.

14   **Q.**   Okay.  So let's try it another way.  I'm going to have

15   played deposition testimony from Andrew Nocella, the chief

16   commercial officer of United, which, for the record, is from

17   page 82, line 19, to page 83, line 16 of his deposition.

18           THE WITNESS:  Is this the -- oh.

19        (Video plays.)

20   BY MR. WALL:

21   **Q.**   Now, do you dispute Mr. Nocella's opinion that United's

22   Newark services compete well with JFK flights to and from New

23   York?

24   **A.**   "Well" is another adjective and what I'm comfortable

25   saying is that the diversion from JFK and LaGuardia, measured

1    through the data that are available to us, indicate that the

2    diversion is insufficient to constrain an exercise of market

3    power at LaGuardia and JFK.

4    **Q.**  Let me show you another clip from Mr. Nocella's

5    deposition in that case.  This is from -- I actually do not

6    have the exact cite, I'm sorry, but I think it will show up

7    on your screen.

8                 (Video plays.)

9    BY MR. WALL:

10   **Q.**  Is it your opinion that Mr. Nocella is making a mistake

11   by believing that United is the number two player in the New

12   York City area, behind Delta, which, of course, would only be

13   true if United's services from Newark are in the market?

14                 MR. DERITA:  Objection.  Counsel is testifying.

15                 MR. WALL:  This is cross-examination of an expert.

16                 THE COURT:  Overruled.

17                 THE WITNESS:  Your question had two parts to it.

18   Okay?  And maybe you could break it down to me again?

19   Because you started one place and finished somewhere else.

20                 MR. WALL:  I didn't mean to.

21   BY MR. WALL:

22   **Q.**  You think that Mr. Nocella is erring by saying that

23   United is the number two player in New York City, behind

24   Delta?

25   **A.**  I assume that's a calculation that he's done.

1    **Q.**   Okay.  That would only be true if United's Newark

2    services are in the same market as Delta's JFK and LaGuardia

3    services, right?

4    **A.**   No, I don't think that's the proper conclusion.

5    **Q.**   You think that United would be number two based just upon

6    its LaGuardia and JFK services?

7    **A.**   No.  I mean what I've been able to do is show that

8    consumers that tend to pick JFK and LaGuardia reside closer

9    to JFK and LaGuardia or are picking up taxis that are closer

10   to JFK and LaGuardia; whereas customers that tend to pick

11   Newark are going to tend to reside more on the west.

12          And so the fact that you can add up shares from

13   Newark and LaGuardia and say one is -- you know, if you add

14   them up, it's 50/50, or something like that, it's not really

15   informative to what the guidelines tell us, which is

16   important, which is how do these consumers view these

17   substitutes and how do they divert from one to the another.

18   And that's what my analysis is intended to get at.

19   **Q.**   Okay.  We'll get to the guidelines and what they say.

20   Let me show you, at this point, Defendants' Exhibit 515,

21   which is admitted in evidence.  And I don't think there's any

22   redactions on what we are going to be showing.

23          We got this document from United.  It's a 2019

24   PowerPoint presentation entitled, "Newark Global Gateway -

25   2021 Revision."

1          Have you seen this before?

2     **A.**   I don't recall.  Right now I'm only looking at what

3     appears to be a title slide.

4     **Q.**   Well, you know, it's in your binder, if you want to look

5     at the whole thing.  But I'm going to turn to slide 28.

6     **A.**   Can you tell me where it is in the binder?

7     **Q.**   Yeah.  It will say "DX0515" in the tab on the right.

8               THE COURT:  Third tab.

9               THE WITNESS:  Yeah, I got you.

10              Do you mind if I just take a moment?

11              MR. WALL:  Of course.

12              THE COURT:  Go ahead if you want to look at it.

13    Take your time.

14              THE WITNESS:  So is -- this slide 28 is in the

15    section that's titled "Stale slides to be updated"?

16              MR. WALL:  It's a slide that's called "Overall EWR

17    offers advantages to other New York City alternatives."

18              THE WITNESS:  Okay.  And that comes after slide 21.

19              MR. WALL:  Usually that's how numbering works, yes.

20              THE WITNESS:  Okay.  And slide 21 says the things

21    that follow are stale slides?

22              MR. WALL:  Yeah.  That usually means that they're

23    from a prior deck that's been pulled forward.

24              THE WITNESS:  Okay.  Sure.

25    BY MR. WALL:

1   **Q.**  So you see here on this slide, it says "Overall EWR

2   offers advantages to other New York City alternatives,"

3   right?

4   **A.**  Yes, I do.

5   **Q.**  And you see that what United Airlines is doing in its

6   Newark Global Gateway PowerPoint is that it is comparing the

7   services of itself, Delta, and American Airlines from various

8   airports, correct?

9   **A.**  Yes.  I -- that seems to be what it's doing.

10  **Q.**  Okay.  And so, for example, in this analysis, it is

11  making the point that the top ten local markets can all be

12  served by United from Newark, Delta from LaGuardia or JFK,

13  and American from JFK, right?  You see that?

14  **A.**  I do.  And I think this slide is referring to -- is this

15  all international traffic?

16  **Q.**  No, sir.  It's a combination of domestic and

17  international traffic.

18  **A.**  Okay.

19  **Q.**  Okay.  And as it goes down, it talks about "Transatlantic

20  Destinations, Transpacific Nonstops, Latin Destinations,

21  Comprehensive Domestic Network."

22          Do you see that one?

23  **A.**  I do see that, yes.

24  **Q.**  "Business Traffic" at the bottom.  Do you see that?

25  **A.**  Yes, I do.

1    **Q.**  So do you think United is making a mistake in believing

2    that its services from Newark have advantages to other New

3    York City alternatives, such as LaGuardia and JFK, since, by

4    your analysis, they're not even strong enough to compete in

5    the same market?

6    **A.**  I don't see any reason to claim that they're making a

7    mistake by constructing this slide.  I don't fully know the

8    purpose for which it's constructed, and it also doesn't speak

9    particularly to how customers are making their choices.

10   **Q.**  So let's show you another document that is in evidence as

11   DX238.  We actually have to publish the redacted version, but

12   the full version is in front of you in the binder.  And I'm

13   going to be going to page 3.

14          Do you have that?

15   **A.**  Yes, I do.

16   **Q.**  Okay.  So in DX238, Delta is saying that

17   American Airlines was forced into the NEA because, quote, "AA

18   margins significantly underperformed OA," other airlines, "in

19   competitive New York City market."

20          Do you see that?

21   **A.**  Yes, I do.

22   **Q.**  Bottom of the page, right above the pie chart.  Do you

23   got that?

24   **A.**  Yes, I read it.

25   **Q.**  Okay.  And in Delta's take on American Airlines's

1    declining New York position, Delta presents market share

2    numbers that fully account for the Newark services of United

3    and other airlines, right?

4    **A.**  Yes, it does.

5    **Q.**  You wouldn't get a United 26 percent share without

6    Newark, would you?

7    **A.**  Yeah, I should be cautious, I can't endorse what they're

8    doing, but I do see that --

9            THE COURT:  He's just asking you if they could get

10   to a United 26 -- he's not asking you to endorse it.

11           THE WITNESS:  Yeah, that sounds -- that sounds

12   right to me.

13           THE COURT:  Could they get to 26 percent without --

14           THE WITNESS:  I think Delta is at something like

15   50 percent at JFK-LaGuardia, so if this is 29 percent here,

16   it is consistent with Newark being in.

17   BY MR. WALL:

18   **Q.**  Okay.  So the line graph on the lower left, you can see

19   that they've plotted changes in what they call the NY3 market

20   share over it looks like a seven-year period, right?

21   **A.**  Yeah, I do see that.

22   **Q.**  Okay.  And on that line graph, you see that

23   United Airlines is included in the blue bar, right?  Excuse

24   me, the blue line, dark blue line.

25   **A.**  That's the 26 percent at the end.

1    **Q.**  Right.  And you see the pie chart right next to it, that

2    United Airlines is included in the pie chart as well, right?

3    **A.**  I do.

4    **Q.**  And you can also see that according to this analysis by

5    Delta, that over that seven-year period, Delta and United

6    have been gaining share in NY3 while American and JetBlue

7    have been losing share in NY3, right?

8    **A.**  I believe this is, you know, a mechanical relationship

9    and is -- they're thinking about shares, a different sort of

10   market share than I would consider for purposes of antitrust

11   review.  But mechanically, that's what's going on in the

12   slide.

13   **Q.**  Okay.  Let's do another one that's a little closer to

14   home here.  Let's look at DX11.  DX11 is American Airlines's

15   New York City strategy update from September of 2018.  I'm

16   sure you've seen this one, right?

17   **A.**  I've reviewed a lot of documents.  I don't remember all

18   of them.

19             THE COURT:  You can take a look at it for a minute.

20   It's the first tab.

21             THE WITNESS:  Yeah, I've got it.

22             (Witness reviews document.)

23             THE WITNESS:  I do see it.

24   BY MR. WALL:

25   **Q.**  And so we see here on page 4, in this slide

1    entitled, "Unlike LAX, we have no organic path to secure a

2    leadership position in NYC" is a horizontal bar chart that is

3    comparing New York City peak day departures by airline.  Do

4    you see that?

5    **A.**  Yeah, I do.  I think this is consistent with my analysis.

6    **Q.**  Yeah, and once again on this one, what you see is that

7    American is comparing itself not only to Delta and other

8    airlines that operate just from LaGuardia and JFK, but also

9    to United, operating overwhelmingly from Newark, right?

10   **A.**  That seems right to me.

11   **Q.**  Okay.  One more.  Let's look at PX893.  This one comes

12   from Spirit.  Plaintiffs used this document with Mr. Kirby

13   when he was here.  And it's entitled "Spirit Airlines at New

14   York."  Have you seen that before?

15   **A.**  I don't recall specifically.

16   **Q.**  Okay.  Take a look.  I'm going to invite your attention

17   to slide 10, when you have a chance to get there.

18   **A.**  Okay.  I do see the slide.

19   **Q.**  Okay.  Now, what this is saying is that "Spirit has

20   rapidly expanded in NYC area since entering EWR."  Do you see

21   that?

22   **A.**  Yes, I do see that.

23   **Q.**  Okay.  Are you saying that Spirit erred in thinking that

24   its entry into Newark amounted to expansion in New York City?

25   **A.**  I mean, Newark is in the New York metropolitan area,

1    so --

2    **Q.**  Right.  But it's also -- it's an airport that competes

3    for the traffic of New Yorkers, right?

4    **A.**  To some degree.  And my analysis is intended to answer

5    the question to what extent does it provide an option for

6    folks that might otherwise fly out of LaGuardia and JFK.

7    **Q.**  Are you aware, sir, that the Department of

8    Transportation, as recently as July of 2022, has taken the

9    position that Newark is part of a three airport New York City

10   market?

11   **A.**  I believe that they're defining the market for a

12   different purpose than the markets that I'm defining.

13   **Q.**  Well, let's look.  That occurred in connection with its

14   decision to award 16 peak hour runway timings at

15   Newark-Liberty airport to Spirit Airlines, right?

16   **A.**  I don't know the answer to that.

17   **Q.**  Okay.  Well, take a look at defendants' Exhibit 1083,

18   which is a DOT order dated July 5, 2022, entitled "order

19   reassigning schedules."

20   **A.**  I do see that.

21   **Q.**  Okay.  And you're generally aware that earlier this year,

22   that the DOT decided to award some take-off and landing

23   rights to Spirit, rather than JetBlue, as a result of a

24   competitive analysis that it did, right?

25   **A.**  I don't remember the details of that.

1    **Q.**  Okay.  Well, take a look at page 5 of the document.  And

2    you can just look at the part that we've highlighted, if

3    that's easier.  And in the highlighted language that you see,

4    the DOT says, "JetBlue, together with its joint ventures

5    partner American, under the NEA, is the largest operator in

6    the New York area, which includes EWR."  Do you see that?

7    **A.**  I do.

8    **Q.**  And it goes on to say that the "NEA operates 32 percent

9    of service in this area, followed by United and Delta at

10    23 percent" -- "Each at 23 percent."  Do you see that?

11    **A.**  I do.

12    **Q.**  So I gather that you think that DOT is also wrong in

13    believing that Newark is part of a New York City market in

14    calculating shares that way?

15    **A.**  I don't think the DOT is defining its market to inform

16    the competitive effects of the NEA.

17    **Q.**  It was defining this market to inform the competitive

18    effects of assigning take-off and landing rights between

19    JetBlue and Spirit, right?

20    **A.**  Yes, that seems -- that seems right.

21    **Q.**  Okay.  You certainly are aware that when the Department

22    of Justice sued to block the American/US Airways merger, it

23    defined relevant markets for New York routes with the

24    combination of Newark, LaGuardia, and JFK, right?

25    **A.**  I'm aware of that.

1  Q.  That was for exactly the same purpose as we're talking
2  about here, isn't it, sir?
3  A.  The purpose for this market definition is to inform the
4  likely competitive effects of the NEA.
5  Q.  And that was for an airline merger, right?  And you claim
6  that they're the same thing.
7  A.  I've evaluated, I have observed that -- no, no, no.
8  Mergers are different.  What -- each merger is different.
9  NEA is different than other mergers may be, for NEA we
10  observe important competition between American and JetBlue
11  that occurs at LaGuardia and JFK, and the evidence is
12  consistent that the consumers would not substitute towards
13  Newark in a great enough degree to offset a loss of
14  competition among JetBlue and American.  And all of that
15  Delta share coming out of JFK and LaGuardia, too.  That's
16  meaningful competition and it gets picked up in the
17  hypothetical monopolist test.  It's really not surprising to
18  me that JFK LaGuardia would pass the hypothetical monopolist
19  test, given what we're talking about the complete loss of
20  competition with the two very large and important airports in
21  New York City.  Just looking at the economics, it's not
22  really a surprising conclusion.
23  Q.  Well, Dr. Miller, do you believe that Spirit, based upon
24  its services from Newark-Liberty airport, is a substantial
25  competitor to American, JetBlue, and Delta and other airlines

1    operating on routes that end or begin in LaGuardia/JFK?

2    **A.**   It's the same question that you've already asked, which

3    asked me to put a meaning to an adjective.  And what I can

4    say is that the data that I've analyzed indicates the

5    diversion to Spirit and other areas in New York City that

6    would be inadequate to discipline and decrease market power

7    among carriers that operate out of JFK and LaGuardia.

8    **Q.**   Are you saying that, after two years of work, you can't

9    answer the question of whether Spirit is a substantial

10   competitor in the New York markets?

11   **A.**   I've answered that question, and the answer is that the

12   diversion to all of the carriers at Newark, including Spirit

13   and including United, and in addition, diversion outside

14   of -- you know, to other options, for example, staying at

15   home, you can add all of that together, and together, that's

16   not enough to limit increase in market power out of JFK and

17   LaGuardia, which, again, is not really surprising, because

18   you're talking about a combination of American and JetBlue

19   and Delta, and everybody else is flying out of two of the

20   largest airports in the world.

21   **Q.**   Sir, I'm not asking you anything about what would happen

22   in some hypothetical world with a hypothetical monopolist and

23   a SSNIP.  I just mean today, in the real world, is Spirit a

24   substantial competitor to the airlines that are operating out

25   of LaGuardia and JFK?

1          MR. DERITA:  Objection.  It's been asked and

2    answered.

3          THE COURT:  Overruled.

4          THE WITNESS:  So I would say that the results I'm

5    giving are exactly based on the real world decisions that

6    consumers have made in the data, that I've seen it.  And that

7    comes through the frequent flyer data of American; it comes

8    from the ticket data from JetBlue; it comes from the taxi

9    data; it comes from my analysis of consumer substitution

10   patterns coming through the demand model.  And all of that is

11   consistent with LaGuardia and JFK being different and shaded

12   enough so that substitution away from those airports would

13   not be enough to constrain --

14   BY MR. WALL:

15   Q.  Sir, I told you not to go there.  I'm not talking about

16   substitution in the event of a SSNIP.  I'm just talking at

17   current pricing, without any change to current pricing at

18   all, is it your contention that Spirit is not a substantial

19   competitor to the airlines that are flying from LaGuardia and

20   JFK?

21         MR. DERITA:  Objection again.  It's been asked and

22   answered.

23         THE COURT:  So two parts.  The part about -- he

24   gets to answer the question, but you can't -- like don't go

25   there, it's up to him to decide what to testify in response

1    to the question or not.

2              If you want to move to strike something as

3    nonresponsive, you can, but that's --

4              MR. WALL:  All right.  I'll do it that way,

5    Your Honor.

6              THE COURT:  And as to the question, one more time

7    you can, but then I think I get the point.  If you want to

8    say, look, without regard to the analysis he's done, this

9    other question, you can have that question.  But then I think

10   we're done with it, one way or the other.

11   BY MR. WALL:

12   Q.   Without regard to any potential SSNIPs, and without

13   regard to what your demand model does, can you answer the

14   simple question of whether Spirit is a substantial

15   competitor, right now, at prevailing prices to the airlines

16   that are serving the same routes that it serves from Newark,

17   from their services at JFK or LaGuardia?

18   A.   You, again, are asking me to define an adjective.  But

19   now -- the analysis that I've done, which is consistent with

20   the analysis that's called for by the Horizontal Merger

21   Guidelines and is consistent with the treatment of the

22   collaboration guidelines, indicates that consumer

23   substitution from LaGuardia and JFK toward Newark is

24   insufficient to constrain market power.  And that's based on

25   real world data that comes from multiple sources and is

1    exactly the sort of data that's called for by the various

2    guidelines of the Department of Justice and the Federal Trade

3    Commission.

4    **Q.**  Okay.  Let's try it another way.  Let's pull up your

5    demonstrative slide 60.  These are your simulation results

6    for New York City.  And according to this, you predict

7    $54 million of harm, annual harm, on the route that is

8    LaGuardia/JFK on the one hand, and LAX on the other hand.

9    Right?

10   **A.**  That's correct.

11   **Q.**  Okay.  Is it your testimony --

12           THE COURT:  Just to be clear, it's not really just

13   LAX, it's all those LA airports.

14           THE WITNESS:  Yeah, LA.  Yes.  Right.

15           MR. WALL:  Fair enough.

16   BY MR. WALL:

17   **Q.**  So is it your testimony that United Airlines and other

18   airlines flying Newark to LAX are not presently substantial

19   competitors to the airlines serving that transcontinental

20   route from JFK?

21   **A.**  My testimony is that the model takes into account the

22   option for consumers to fly from any Newark flight that would

23   go to Los Angeles, and that taking into account that option,

24   the simulation indicates an incentive for American and

25   JetBlue, and other carriers coming out of JFK and LaGuardia,

1    to increase price by 4.7 percent.

2          MR. WALL:  Your Honor, I move to strike the answer

3    as nonresponsive.

4          THE COURT:  Explain to me why it's not responsive.

5          MR. WALL:  Because I just asked him whether they

6    were presently substantial competitors.  I didn't ask him

7    anything about all of that stuff having to do with --

8          THE COURT:  I'll tell you what I'm going to do on

9    that.  I'm going to pull just that one page of the transcript

10   so I can really focus on it.

11         We are at 3:28.  I have a question that I want to

12   talk to you about so I might pause you hear, instead of

13   going -- because we're just going to 3:30 today.  I have

14   something else to talk to all of you about, just where we

15   are.  It just might be a good time to do that.  And then

16   tomorrow morning, I'll rule on that.  Because you're not done

17   with your cross-examination, right?

18         MR. WALL:  God, no.

19         THE COURT:  And you can stay in the witness box, if

20   you wish, for this discussion.  It's not about your

21   testimony.  Or you can step down, whatever.

22         THE WITNESS:  How long will it be?

23         THE COURT:  Hopefully not too long.

24         THE WITNESS:  Okay.  Good.

25         THE COURT:  So I just want to talk to you all about

1    where we are.  Because if -- by my -- where I think we are in

2    just the time that I've given all of you, or what I've

3    allotted, was we have tomorrow morning -- we have tomorrow,

4    whatever I set, I can't remember at the moment.  And then we

5    have Friday, I know morning and afternoon.  We have Monday

6    morning.  And then I talked to you about giving you another

7    morning slot of 9:00 to 1:00 to make up for all the breaks

8    that we have taken, just because that wasn't really in the

9    original time period, and that would probably -- we talked

10   about doing that not next week, because I'm away next week,

11   the rest of the week, but the following week on Tuesday.  And

12   I also talked to you about another block of time, probably

13   Tuesday or Wednesday, or something like that, for closing

14   arguments, and the like.

15            But unless I'm missing something, there's a lot

16   more witnesses on the government's list, I think, and -- or

17   no?  How close are you?

18            MR. JONES:  Your Honor, Dr. Miller is the last

19   witness on our list.

20            THE COURT:  Oh.  So you rest after him.

21            MR. JONES:  Yes.  We want to move in --

22            THE COURT:  Some exhibits, but there's no more

23   witnesses.

24            MR. JONES:  Yes.

25            THE COURT:  Oh, I see.  All right.  And then how

1    many witnesses do you have?

2              MR. WALL:  Well, it remains a little bit in flux,

3    honestly.

4              THE COURT:  I guess my real question is not how

5    many witnesses do you have.  Are we on track with that

6    schedule?

7              MR. WALL:  I think it's close.  I think that it is

8    going to be -- and unfortunately, we're running also into a

9    couple of scheduling issues with some of our witnesses.

10             THE COURT:  Okay.  So it's not --

11             MR. WALL:  I don't think we're going to need any

12   meaningfully greater amount of time.  We may ask you for some

13   flexibility as to when things occur.

14             THE COURT:  I have -- so -- yes, go ahead.

15             MR. SCHWED:  Your Honor, I may be able to answer

16   because I actually asked this question to my team this

17   morning, and I don't have the numbers right in front of me,

18   but basically I said the question of if we use every minute

19   with no breaks for the rest of this week, through Monday, how

20   much time would we have left of testimony and it was

21   something just short of five hours, on the clock, how much

22   time we have left on the clock, just short of five hours.  So

23   the four hours the following week won't quite make us, get us

24   there.

25             THE COURT:  But close.

1        MR. WALL:  But I'm guessing we would be -- again --

2   an hour short, plus whatever breaks we have today through

3   Monday.

4        THE COURT:  All right.  So we're close.

5        MR. JONES:  One thing to add, Your Honor, just I

6   don't want to leave it with Dr. Miller.  We will have some

7   rebuttal, as well.

8        THE COURT:  After they're done.

9        MR. JONES:  Yes, I just want to make that clear.

10        THE COURT:  About, ballpark?  Times.

11        MR. WALL:  But that's already in the time estimate.

12        MR. SCHWED:  That's in the time estimate.  There

13   was never -- the 67 hours was everything.

14        THE COURT:  So then fine.  So in terms of -- I'm

15   happy to be flexible.  That's -- that works for me.  Right

16   now, what I'm thinking, and what I've just sort of

17   tentatively reserved, besides the time that I've told you way

18   back when, this week and Monday, is the following week that

19   begins on the 24th, I guess, the morning of the 25th, 9:00 to

20   1:00, no problem.  And you can assume that.  I'm flexible

21   about that.  But -- and let me just look at the calendar for

22   a second.  I've blocked out -- you don't have to use it, but

23   I've blocked out Wednesday the 26th in the morning, too, if

24   you want that.

25        MR. WALL:  This is where my plea for flexibility

1    may have to come in here.  We may have to ask you to allow us

2    to do something on the Wednesday, rather than the Tuesday.

3            THE COURT:  Yeah, yeah, that's fine.  So you can

4    all talk to each other.  I'm -- to fit you in a small amount

5    of time, I have some flexibility.  It may be -- I may have

6    more flexibility than all of you, since I'm a much smaller

7    team.  And so -- so fine.  You let me know.  But that's --

8    you're not looking for a lot more time.

9            MR. WALL:  No.

10           THE COURT:  That's what I was worried about.

11           MR. JONES:  Your Honor, I would ask, if we need a

12   couple of hours, I recognize there's been an allocation that

13   you've ruled on, would that be something that the Court would

14   potentially be amenable to?

15           THE COURT:  First of all, you can ask for anything

16   you want to ask for.  People ask for all sorts of things.

17           MR. JONES:  I can imagine.

18           THE COURT:  So you can ask for whatever you want,

19   and I'm not -- I'm relieved, because I was worried that you

20   were going to tell me you wanted two more weeks.

21           MR. JONES:  We do not, Your Honor.  Thank you,

22   though.

23           THE COURT:  But if, you know, if you want to ask

24   for a small amount -- the smaller the amount of time you

25   want, the more open I am to it, right?  Five minutes, I'm

1    probably not going to quibble at all, you know.  Five days,

2    that's a whole different ball game.  And so, you know, all

3    right.  So fine.

4            So the other thing -- so you'll come back to me, to

5    the extent that you want to firm up scheduling things or you

6    want more time or something, you'll ask for it.

7            The other -- I'll just say that I'm thinking about

8    and I don't have a -- I'm just putting it out there.  I don't

9    have a clear view in my mind how to do this.  But there's a

10   lot of, like -- there's a lot of material that you've given

11   me in terms of the testimony, and what is to come in terms of

12   testimony and witnesses.  And there's a lot of material that

13   you're giving me along the way or in the exhibits.  We have

14   all of the exhibits.  To your surprise, I haven't yet read

15   all thousand of the exhibits, but some -- and I know you're

16   going to do post-trial briefs that -- with proposed findings

17   of fact and I assume proposed findings of fact and

18   conclusions of law.

19           MR. JONES:  Yes, sir.

20           THE COURT:  Just one thing to just think about and

21   don't take what I'm about to say as like some court order,

22   because it's not.  I'm a little bit thinking out loud, but

23   there's certain kinds of summaries and facts and information

24   that you might be able to provide, like, that's almost in the

25   nature of, like, not disputed, potentially, or -- or maybe

1    you just give me competing versions of it, what have you.

2    But to the extent that there's -- I don't have a good

3    suggestion as to what that is at the moment, because I'm

4    still going through all of this, but the more -- I am likely

5    to be coming back to you at some point, both with questions

6    and looking to all of you to highlight or find things, to

7    some degree, in the record, and I'm not at the point of doing

8    that yet.  I want to hear your presentation of the case

9    first.  But I just tell you to think about that, because I

10   may -- I may want to do that, or I may want you to do that.

11   And so you could think about -- I guess what I'm saying to

12   you, in an inarticulate way, is you should be thinking about,

13   beyond formal findings of fact and conclusions of law, what

14   kind of information might be helpful to help set the stage,

15   clarify the issues, resolve it, and so forth because that's

16   what I'm thinking about.

17            MR. WALL:  I appreciate that, Your Honor.  One

18   thing on that, I'll just mention to you, in terms of what we

19   are going to be doing, as you know, we cut down our witness

20   list.  We're trying to just figure out what's the incremental

21   value at this point of certain things.  We're going to be

22   putting on a witness from the corporate sales function.

23   We're going to be putting on a witness from the network

24   planning function.  We're going to be putting on a witness

25   that dealt a lot with the mechanics of the NEA and the

1    seamlessness and things like that.  If there is anything in

2    those areas of subject matter that Your Honor would like us

3    to address, we would be more than happy to hear that and give

4    that some consideration.

5          THE COURT:  So certainly one thing -- I don't know

6    if this is a direct answer to that question, but one thing

7    that I think about about this case, is that the NEA

8    agreements are a central piece of the case.  Right?  If the

9    agreement said something different, this would be a

10   completely different trial, or depending on what it said.  We

11   might not have a trial, we might have a trial, but it would

12   look different.  So but the -- so to the -- to some extent

13   it's already been done by the various witnesses, but

14   understanding what those contracts mean and how -- or how

15   they affect or don't affect people or what the -- how they're

16   understood or interpreted or what have you, that's helpful.

17   Because I don't see how -- you'll tell me if this is wrong,

18   but I don't see how I analyze and understand this case

19   without understanding those agreements.

20         MR. WALL:  So I think -- I agree 100 percent with

21   that.  But I'll tell you in all candor that in terms of the

22   witnesses that are coming up, putting the experts aside, some

23   of the experts can help address those things, it might be

24   actually easier to have some sort of forum in which the

25   lawyers talk about what the agreements mean.

1          THE COURT:  So one of the things that I was going

2    to say to all of you, that this is sort of water under the

3    bridge in retrospect, but I have pretty much gotten this from

4    different witnesses, I'm not, to your surprise, prior to this

5    case, an expert in the airline industry.  And so, I mean, I

6    understand in a general way how it works, you know, and in

7    some super high level, distanced way, like -- but I don't

8    know -- in patent cases, for better or worse, what the

9    lawyers do, presuming what they presume about the judges,

10   provide a tutorial --

11          MR. WALL:  Right.

12          THE COURT:  -- about like what all the technology

13   is and an overview of all of that.

14          I don't think at this point, I would necessarily

15   ask you to do that for me.  I don't think that's necessary

16   right now, though if you -- I wouldn't -- if you thought it

17   was useful for some reason, you could tell me what you're

18   thinking about.

19          In terms of the contract, I could see that, like, a

20   forum with the lawyers would be useful, and I would be happy

21   to have a back and forth, what the government's view of what

22   these things are.  And to some extent, I've gotten in a way,

23   from the government's perspective from this witness, his

24   view.  I mean, experts work in conjunction with the lawyers,

25   of how, at least in part, the contract works.  So you can --

1          So I'm open to doing that and I will tell all of

2   you, as lawyers say, reserving your rights, I reserve my

3   right when we're done with the trial, like, to decide, as I'm

4   going through this, to want more on something.  And if I do,

5   I'm going to call you up and say, sort of speak through ECF,

6   and say like, let's have a status conference, this is what

7   I'm thinking about, and what do you think of either just a

8   forum to explain it, or what have you.

9          But I think the contract is important, and I'd be

10  interested in whether it's during the closing argument,

11  whether it's in between the end of the evidence and the

12  closing argument, or whether it's after, depending on how it

13  all plays out, back and forth about that, so I understand,

14  like, make sure that I, in fact, understand what I think I

15  understand about it.

16         And about -- and the same, to some extent, might

17  apply to evidence, and some of that is in the back and forth,

18  and the proposed findings.

19         I would say once we're on the topic of the proposed

20  findings, that there's like raw historical facts.  Like

21  nobody disagrees on the date, other than I got it wrong, the

22  date the NEA was signed, right?  And that's not really a

23  point of contention between the parties and like it says what

24  it says.  And there are lots of things that just on -- and to

25  those extents, like to the extent you can almost, like, agree

1  on, just present it once, rather than two separate

2  submissions, because the two separate submissions then we

3  have to spend a lot of time comparing them to see what the

4  difference is.  So I know -- and probably it wouldn't happen

5  in this case, but in some cases, lawyers feel the need in

6  statements of fact to inflate them with adjectives and -- to

7  the point that they're almost useless, and they're not even

8  statements of fact anymore.  And honestly, you know where

9  those mostly go?  And so, like, they're not -- they become

10  advocacy pieces, they're just not advocacy pieces that

11  advanced anything about the client's position.  They just

12  said a lot more about the lawyer's thoughtfulness.  And so,

13  to the extent, like on some of those things, you can

14  present -- then we have those things, and you'll focus in on

15  the things that there's disagreements about.

16          And like I think you both agree, if I remember

17  right from the openings, on the one, two, three, though,

18  there's a disagreement on the meaning of one, instead of one,

19  two, three.

20          MR. WALL:  I think there are a lot of disagreements

21  on the meanings of all three.

22          MR. JONES:  We disagree.

23          THE COURT:  Oh, all three, but that there are

24  three.

25          MR. WALL:  We can both count to three.

1          THE COURT:  Well, you used that with the witness.

2          So I don't have more on that, except that to the

3     extent that there's, like, you know, on the facts, they're

4     going to be plenty of facts, I get it, that you're going to

5     disagree on and that's fine.  I'm not saying that.  I'm just

6     saying on the simpler, more basic things that create the

7     context, to some degree, to the extent you can, like, provide

8     one statement on that, or something, that's just makes it

9     easier, because then there's just -- then we can spend more

10    time focusing.  I don't want to -- like you don't need --

11         Like and if you disagree on the relevance of

12    certain facts, then just agree that it is what it is, and you

13    can just separately in your legal, say 1 to 50, like I know

14    you don't agree with the relevance of the earlier history

15    that the government provided.  But you don't necessarily

16    disagree that the mergers happened on certain dates and

17    things like that.  You can just like -- it's -- those are

18    true, they're just not relevant.  And you can argue about the

19    relevance in a legal brief.  And you don't need to waste a

20    lot of time between the two of you like crafting that.

21    That's sort of what I was thinking about.

22         Any questions?  Yes?

23         MR. JONES:  Your Honor, may I ask, other than the

24    contracts, are there other areas that Your Honor would find

25    it helpful to hear from the parties on, other than the

1    contracts, as you've laid out?

2              THE COURT:  I don't -- yes and no.  Yes, in the

3    sense that I'm sure there will be, but there's nothing else

4    that right now comes to mind.  That's the most -- like it

5    requires -- like contracts typically require close reading to

6    understand.  There's lots of defined terms.  I've looked at

7    them.  I've read them some, but the testimony has informed

8    them, and I've gotten some from some of the different

9    witnesses.  And so that one I know that you all have views

10   about the contracts.  Very specific views, I'm sure.  And so

11   that will be useful back and forth.  There may be other --

12   I'm not saying there aren't other things, I'm just saying

13   there aren't other ones that at the moment that come to mind.

14             Anything else?

15             MR. JONES:  Nothing from plaintiffs, Your Honor.

16             MR. WALL:  No.  Thank you, Your Honor.

17             MR. SCHWED:  Thank you, Your Honor.

18             THE COURT:  Okay.  All right.  Then I will look at

19   that one objection issue, and I'll see you at 9 o'clock

20   tomorrow morning.

21             Have a good night.

22             (Court in recess at 3:45 p.m.)

23

24

25

1                    **C E R T I F I C A T I O N**

2

3

4          I certify that the foregoing is a correct

5     transcript of the record of proceedings in the above-entitled

6     matter to the best of my skill and ability.

7

8

9

10    /s/ Rachel M. Lopez                    October 12, 2022

11    /s/ Robert W. Paschal

12

13

14    _____          _____

15    Rachel M. Lopez, CRR                   Date

16    Robert W. Paschal, RMR, CRR

17    Official Court Reporters

18

19

20

21

22

23

24

25