1                      UNITED STATES DISTRICT COURT

2                        DISTRICT OF MASSACHUSETTS

3

4        _____

5        UNITED STATES OF AMERICA, et al.

6               Plaintiffs,                      Civil Action No.
                                                 1:21-cv-11558-LTS
7            v.

8        AMERICAN AIRLINES GROUP, INC.,
         et al.,
9
                Defendants.
10
         _____
11

12          BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                              BENCH TRIAL
                                  Day 11
15

16
                            Thursday, October 13, 2022
17                              9:00 a.m.

18

19

20
         John J. Moakley United States Courthouse
21       Courtroom 13
         One Courthouse Way
22       Boston, Massachusetts

23
         Rachel M. Lopez, CRR
24       Official Court Reporter
         raeufp@gmail.com
25

1                       **A P P E A R A N C E S**

2

      On behalf of the Plaintiff United States of America:

3
          United STATES DEPARTMENT OF JUSTICE
4         BY:  WILLIAM H. JONES, III; MICHAEL DERITA;
          AND JOHN R. DOIDGE
5         450 Fifth Street, Northwest
          Suite 8000
6         Washington, D.C.  20530
          (202) 514-0230
7         bill.jones2@usdoj.gov
          michael.derita@usdoj.gov
8         dick.doidge@usdoj.gov

9

10    On behalf of the Defendant American Airlines Group, Inc.:

11        LATHAM & WATKINS, LLP
          BY:  DANIEL M. WALL; ELISE NELSON; AND FARRELL J. MALONE
12        505 Montgomery Street
          Suite 2000
13        San Francisco, California  04111
          (415) 391-0600
14        dan.wall@lw.com
          elise.nelson@lw.com
15        farrell.malone@lw.com

16

17    On behalf of the Defendant JetBlue Airways Corporation:

18        SHEARMAN & STERLING LLP
          BY:  RICHARD F. SCHWED
19        599 Lexington Avenue
          New York, New York  10022
20        (212) 848-4000
          richard.schwed@shearman.com
21

22

23

24

25

1              **TABLE OF CONTENTS**

2

3                **TRIAL WITNESSES**

4

5   On behalf of the Plaintiffs:                      <u>Page</u>

6    NATHAN H. MILLER, Ph.D.

7          By Mr. Wall                                  8

8          By Mr. DeRita                               145

9

10

11                  **EXHIBITS**

12

13                    None

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2        (In open court.)

3        THE DEPUTY CLERK:  The United State District Court

4   for the District of Massachusetts is now in session.

5        THE COURT:  Please be seated.

6        A couple things before we begin.  One was that at

7   the end of the day, there was a question about motion to

8   strike one answer, the last answer of the witness.  So let me

9   just explain, I'm not going to -- I'm denying the motion to

10  strike.  I'm not going to strike the answer, but I think

11  there's a couple practical things to think about as you go

12  forward.  One is that -- you don't -- you don't need -- I

13  understand the testimony, and I will not forget it, it's been

14  stated a number of times, that your opinion is that Newark is

15  not sufficient draw to constrain what you've described at

16  LaGuardia and Newark.  So if Mr. Wall asks you a question --

17  so one, I don't need you to repeat it.  It's -- I got it.

18  And if he asks you is somebody a substantial competitor or a

19  well competitor, or whatever, if you can't answer that -- if

20  it's framed as a yes/no question, and you can't answer it as

21  a yes/no question, because, in your view, you don't

22  understand the meaning of well or effective or strong, you

23  can say that, I can't answer it as a yes or no, because I

24  don't know what that means.  And then Mr. Wall can decide how

25  he wants to proceed with that.  And, but, this sort of going

1    on -- you just answer the question.

2           I'm not saying this, like -- this comes up a lot

3    with witnesses.  The hard part about witnesses is you just

4    get to answer the questions posed.  And the government's

5    lawyers will well -- anything that they want you to explain,

6    they get another crack and they will ask you on anything they

7    want you to elaborate on, or why, and tell us about that, or

8    whatever you want to ask, and then you'll get the chance, if

9    they want to elicit that if they want to do that, so don't

10   worry about that.

11          All right.  Second thing I just wanted to --

12   there's a couple of things that I was thinking about.  I was

13   saying at sort of the end of the day yesterday, so I thought

14   I'd just tell you now.  Here is three things that I'm -- that

15   are just in my mind that I'm, like, interested in.  And one

16   is, it seems to me that one thing that seems to be in dispute

17   between you is, essentially, how big the fleets were.  All of

18   this relates to what was available to do or not to do.  And I

19   don't have a -- it may be clear in all of the evidence.  I

20   don't know, because I haven't read all the exhibits yet, but

21   to the extent you can, at some point, point me to -- or

22   either in your statement of facts that you give me or in some

23   other submission or chronology or something, that shows like

24   what were the state of the fleets at the relevant times like,

25   from preNEA and early to mid 2019 through, I don't know,

1    2022, or something like that, of how many planes, how big,

2    what was added and subtracted and retired, as well as at

3    those different moments, what the state of anticipation was.

4    Because all of these different points, people are making

5    decisions not retrospectively like me, but prospectively.  So

6    on this given date in time, when they had this state of

7    fleet, what was in the queue, what had been ordered, and what

8    had been retired, what had been unretired, and where were

9    they in terms of those things, that would be, I think, just

10   helpful to figure that out.

11             And so the second would be the same kind of thing

12   with respect to routes, because there also seems to be a

13   disagreement between the two sides over, like, did -- is

14   there more?  Is there more and is the more because of the

15   NEA?  So it might be helpful to see for the four NEA

16   airports, again, like starting in early mid 2019, some kind

17   of description of the routes flown in and out, the routes

18   that have been eliminated or added, that -- the quantity of

19   seats, or if there are other -- if you want to measure it

20   just beyond routes, quantity of seats, ASMs, departures,

21   O&Ds, some things like that which would be metrics or

22   different forms of metrics for that.  And whether on that the

23   vagaries -- like what was eliminated -- like how many

24   snapshots.  I'm not sure I need a weekly snapshot of that

25   over this entire period of time.  So in the first instance, I

1  would defer to all of you what's a reasonable period,

2  snapshots along that timeline.  Because I would imagine that

3  between March of 2020 and July of 2020, there had to be huge

4  swings -- maybe not swings, but maybe just cratering, but in

5  any event, that.

6          The third point is, which we sort of talked about,

7  but just to -- at some point, I would like to have a back and

8  forth about the -- some of the key provisions of the NEA to

9  make sure that I understand them and the questions that I

10 have -- that you can tell me, each of your respective

11 understandings of them, that might just be a back and forth

12 with the lawyers.  But -- and so that if I have questions

13 about it, I can ask them, and you can tell me, you know, no,

14 that's -- that's the wrong interpretation, because there's

15 this or that, or whatever.  So I don't go down some -- I at

16 least have the benefit of everything, and you all think about

17 it.

18          At the moment, those are the other topics that come

19 to mind.  If there are others, I'll bring them up.

20          Okay.  Ready to proceed?

21          MR. WALL:  Yes, Your Honor.  Thank you.

22          THE COURT:  Thank you.

23                    **NATHAN H. MILLER, Ph.D.**

24     having been duly sworn, testified as follows:

25               **CROSS-EXAMINATION BY COUNSEL FOR**

1          **DEFENDANT AMERICAN AIRLINES, Continued**

2     BY MR. WALL:

3     **Q.**  Good morning, Dr. Miller.

4     **A.**  Good morning.

5     **Q.**  So yesterday you talked a lot about the Hypothetical

6     Monopolist Test and your application of it.  I take it you

7     are aware that in a world of antitrust law and economics,

8     there are other standards or tests for defining geographic

9     markets?

10    **A.**  I've implemented -- I'm not aware of the others that

11    would apply in this instance.

12    **Q.**  Okay.  Well, let me suggest a couple, and we'll talk

13    through them.

14          The first one, it actually comes from a court case,

15    the Supreme Court decision in the *Tampa Electric* case, and

16    I'll put it up on the screen here.  It says that, "The

17    geographic market in an antitrust case is the area in which

18    the seller operates into which the purchaser can practically

19    turn for supplies."  Do you see that?

20    **A.**  Yes, I do see that.

21    **Q.**  Are you familiar with that standard?

22    **A.**  It sounds an awful lot like what I've implemented.

23    **Q.**  Okay.  So have you analyzed geographic market definition

24    pursuant to that standard?

25    **A.**  I've used the Hypothetical Monopolist Test, but my

1    interpretation of this sentence is that it's -- it reads

2    pretty similar to the Hypothetical Monopolist Test.

3    **Q.**   Okay.  Let's just, for the sake of this discussion, take

4    the Hypothetical Monopolist Test out of it, and just talk

5    about the -- the two concepts that are in -- on the screen,

6    the area in which the seller operates and then the area to

7    which the purchaser can practically turn for supplies.  Now,

8    with that in mind and, again, putting aside your Hypothetical

9    Monopolist Test for now, do you dispute that United Airlines

10   tries to sell its services to New Yorkers, and in that sense

11   operates in New York?

12           MR. DOIDGE:  Your Honor, if I can just object to

13   the extent we're putting aside the Hypothetical Monopolist

14   Test, which is embedded in anything that Mr. Wall is about to

15   ask the witness, since it is the core concept that relates to

16   how markets are defined, as articulated by the courts, by the

17   *Horizontal Merger Guidelines*, by the FTC, by the DOJ.  It's

18   not quite clear to me what the contrast Mr. Wall is trying to

19   make here, and I don't exactly see how the witness could make

20   the contrast, either.

21           THE COURT:  I think he's entitled to say to the

22   witness, I want you to -- here's this quote, which I assume,

23   on the representation from Mr. Wall, comes from a Supreme

24   Court case.  I think he's entitled to ask the witness, like

25   parse this and apply -- and the witness's understanding as an

1    expert, apply these words to sort of facts and see what the

2    witness says.  So in the sense that he's -- what I understand

3    the -- not part of the question, put aside the hypothetical

4    monopolist, what he wants him to do is focus on this, right?

5    And that's, like -- he's saying -- I think what he's asking

6    is the area in which the seller operates, is that for United,

7    New York City?  Or the metropolitan New York may be framed a

8    little bit differently.  The metropolitan New York area.  I

9    think he's -- why isn't he entitled to do that?

10            MR. DOIDGE:  All right.

11   BY MR. WALL:

12   Q.  Okay.  Let's just go with that question as Judge Sorokin

13   framed it.  Do you dispute that the area in which

14   United Airlines sells its services to New Yorkers, and in

15   that sense operates in New York, is the New York metropolitan

16   area?

17   A.  No, I believe it targets customers throughout the New

18   York metropolitan area.

19   Q.  Okay.  And likewise, with other airlines that are

20   operating from Newark, do you agree that they also operate in

21   the larger New York metropolitan area, in the sense that they

22   try to sell their services to consumers that are located

23   there?

24   A.  I do.  I don't see why that's relevant for the

25   interpretation of the first clause here.

1   **Q.**  That's fine.  Your counsel can explore that with you.

2   But likewise, I assume that you would agree with me that all

3   airlines also sell or try to sell their services to consumers

4   that are located on both sides of a route?

5   **A.**  Can you clarify by what you mean by both sides of the

6   route.

7   **Q.**  Sure.  Take it hypothetically.  You don't have to take

8   this as a hypothetical.  Take service between Los Angeles and

9   New York.  Airlines that serve that try to sell those

10  services both to people who live in Los Angeles and are

11  traveling inbound to New York, and then returning home.  And

12  people in New York, who are flying outbound to Los Angeles

13  and then returning home?

14  **A.**  Yes, that's correct.

15  **Q.**  Okay.  And so the area which sellers operate with respect

16  to any flight is actually the sources of demand on both ends

17  of the flight, correct?

18  **A.**  That's confusing to me.

19  **Q.**  I'll rephrase.  If it's confusing, it's my job to fix it.

20  You don't have to fix the question.  What I'm asking you is,

21  do you agree with me, that with respect to any flight, there

22  is some amount of the demand for that flight that is one end

23  of the service, and some amount of a flight that is at the

24  other end of that service?

25  **A.**  Yes, I agree with that.

1    **Q.**   Okay.  And the airlines that are operating on that route

2    are attempting to sell that service to people at either end.

3    **A.**   So people going, in your example, from LA to New York and

4    back.

5    **Q.**   Yes.

6    **A.**   Or New York to LA and back.

7    **Q.**   Yes.

8    **A.**   Yes, that seems right to me.

9    **Q.**   So they're not just operating on one end, they're

10   operating on both ends, right?

11   **A.**   That's correct.

12   **Q.**   That's the nature of the transportation product, right?

13   **A.**   That's correct.

14   **Q.**   Okay.  And so did you hear or read the testimony of

15   Mr. Watterson from Southwest that Newark airport, in his

16   words, quote, "skews towards customers who originate their

17   journey in New York City," end quote.

18   **A.**   Do you have the transcript for that?

19   **Q.**   I do, sir.  It's on day two of the trial, transcript.  I

20   can put it up on the screen, I believe.  This is part of it.

21   I'm asking a question.  "You can see that, in fact, Southwest

22   ceased operations at Newark-Liberty Airport in part because

23   Newark, as you put it, skews towards customers who originate

24   their journey in New York City and Southwest was unable to

25   generate that kind of local customer base, right?"

1          And he answers, "Yes, sir," and goes on after that.

2          Do you recall that testimony?

3   **A.**   Yeah.  You don't have a paper copy, do you?  I'm just

4   curious whether there's more context around this.

5          THE COURT:  You can flash -- you can give him a

6   paper copy, or get rid of the blowup.

7          MR. WALL:  Give rid of the blowup.

8          THE COURT:  And when you're ready, you want to go

9   to the next page or the previous page, tell them.

10         MR. WALL:  You can definitely go to the next page

11  for some more context.

12         THE WITNESS:  (Witness reviews document.)  Can you

13  go to the next page, please?

14         MR. WALL:  Uh-huh.  It's up now.

15         THE WITNESS:  Oh, yes.

16  BY MR. WALL:

17  **Q.**   Okay.  So I presume you would agree that airlines

18  operating from an airport that skews towards customers who

19  originate their journey in New York City are operating in the

20  greater New York metropolitan area, correct?

21  **A.**   I think that's what my analysis is -- has looked at.

22  **Q.**   Okay.  So we agree that the airport -- that the airlines

23  that are operating from Newark are operating in New York?

24  **A.**   They tend to sell tickets from Newark to all sorts of

25  consumers, I imagine.

1    **Q.**  Great.  So let's go back and talk about the second part

2    of the *Tampa Electric* standard, which is the -- to which the

3    customer could practically turn.  Now, as we said, there are

4    broadly speaking, two classes of customers, the inbound

5    customers who don't live in a region at all, and the outbound

6    passengers who live in a region and are flying out and back,

7    right?

8    **A.**  That's right.

9    **Q.**  And you don't dispute, do you, that inbound passengers to

10   New York are not constrained or influenced in their choice of

11   airports by living particularly close to Newark-Liberty

12   Airport, LaGuardia Airport, or JFK Airport?

13   **A.**  I would disagree with that.  I think that comes through

14   the demand model and it also shows up in the taxi data that I

15   analyzed.

16   **Q.**  Okay.  So let me see if I get this right.  You are saying

17   that someone like me, that lives in San Francisco and flies

18   to New York, business or pleasure, will be constrained in my

19   choices by where I live?  That was my question.

20   **A.**  No, in Los Angeles?

21   **Q.**  In San Francisco, East Bay, actually, but a little closer

22   to all those airports?

23   **A.**  I lived in East Bay, actually, it's nice.

24          No, I wouldn't think where you lived in San

25   Francisco was particularly relevant for your choice of

1    airports.  What might depend more is where you want to go in

2    New York City when you get there.

3    **Q.**  Indeed, and if I were going to Manhattan, and I don't

4    want to fly connecting, so I want to take a nonstop flight,

5    my choices are Newark and JFK, right?

6    **A.**  Wherever you go, you can choose from those three

7    airports.

8    **Q.**  Yeah, that wasn't my question, sir.

9    **A.**  Including in Manhattan.

10   **Q.**  Yeah.  What I was saying, sir, is that flying beyond the

11   perimeter rule of transcontinentally, if I want to fly

12   nonstop, I have two choices.  I can go to Newark or I can go

13   to JFK, right?

14   **A.**  Or potentially LaGuardia on Saturdays.

15   **Q.**  But nobody actually offers that service, do they, sir?

16   **A.**  Oh, nonstop.  Okay.  That's right.

17   **Q.**  Okay.  And you have not seen any evidence that inbound

18   passengers have a significant preference for JFK versus

19   Newark, have you?

20   **A.**  No, I think I have.  And I explained yesterday that the

21   taxi data includes -- logically includes folks that are both

22   outbound and inbound.

23   **Q.**  You testified at your deposition that you weren't able to

24   isolate that phenomenon, right?

25   **A.**  Yeah, the taxi data puts both of those together in one,

1    but it ends up being consistent with the other sources of

2    data.

3    Q.   Okay.  Let's look at what you actually said in your

4    deposition.  You should have it in front of you, and we're

5    going to pull up page 248, lines 8 through 248, line 16.

6    A.   Of the deposition.

7             Wait, I'm sorry, which page?

8    Q.   248.  So line 8, are you there?

9    A.   Yes.

10   Q.   "QUESTION:  What about passenger who don't live in New

11   York at all that are flying into New York.  Do you have any

12   evidence that they have a significant preference for JFK

13   versus Newark?"

14            And if you go down a little bit after the words

15   "The witness," it says, "I would have to look in the report.

16   In terms of the data analysis, I don't recall being able to

17   isolate that beyond what comes through the demand estimation

18   results."  Right?

19   A.   Yeah, that's consistent with what I've just said.

20   Q.   Okay, so what about -- I'll just ask you, what about your

21   demand estimation results tells you whether inbound

22   passengers have a preference for JFK flights -- JFK

23   transcontinental flights versus Newark transcontinental

24   flights?

25   A.   Well, when I estimate the model, I estimate separately

1   the routes that go from San Francisco to New York and back,

2   and there's a different model that goes from New York to San

3   Francisco and back.  And I implemented it that way, because I

4   wanted to take into account that a presence of a hub might

5   effect demand on the originating side.  And so in that sort

6   of sense, when I test the market specifically for San

7   Francisco to New York and back, it passes.  And just as it

8   passes if you start from New York to San Francisco and back.

9   **Q.**  But the fact is that, in that demand model, flights to

10  Newark are just part of the composite that you call the

11  outside good, correct?

12  **A.**  That is correct.

13  **Q.**  So in the case of someone like myself traveling from San

14  Francisco, the option to go to Newark Airport is no different

15  econometrically than the option of taking a flight to Los

16  Angeles and then driving to New York, correct?

17  **A.**  They have that option, it includes all of that, but it's

18  even more substitution between them specifically.

19  **Q.**  Right.  There's no distinction between driving to Los

20  Angeles -- flying to Los Angeles and driving to New York, or

21  taking a nonstop United Airlines flight from San Francisco to

22  Newark, correct?

23  **A.**  Yeah, from a modeling perspective, that distinction

24  doesn't need to be made.

25  **Q.**  Okay.  And so roughly speaking, the inbound traffic on

1   any route is going to be close to half of the demand that, as

2   it interacts with supply, determines prices, right?

3   **A.**   I don't want to -- I haven't looked at particular routes

4   to know if it's half or more than half.  So I shouldn't opine

5   on that.

6   **Q.**   Okay.  We discussed that at your deposition and you said

7   you thought that that was probably correct as an

8   approximation, right?

9   **A.**   Yeah, I would think that -- I don't know if it applies

10   specifically to New York, but as an approximation, it seems

11   like half is -- who can argue with half.

12   **Q.**   Right.  You have your deposition in front of you.  You

13   can look at page 249, line 14, to 249, line 18.

14           "QUESTION:  Okay.  So on these New York routes,

15   half, approximately, of the demand elasticity is coming from

16   passengers who don't live in New York at all; right?

17           "ANSWER:  To an approximation."

18           You gave that testimony, right?

19   **A.**   Yes, I do.

20   **Q.**   Okay.  Now, you do understand that published fares for

21   domestic airline service are bidirectional, meaning that

22   airlines publish the same fare in either direction, right?

23   **A.**   Yes, I do.

24   **Q.**   Okay.

25   **A.**   Now, by fare, though, do you mean the fares that come

1    through ATPCO, or do you mean the fares that are available to

2    consumers at a particular point in time?

3    **Q.**   I mean the published fares.  You know what a published

4    fare is, right?

5    **A.**   Is this the fare on ATPCO?

6    **Q.**   Yes.  That's the published fare.

7    **A.**   Okay.  So is that also the price that's available to the

8    consumers?

9    **Q.**   Do you know?

10   **A.**   You know, network, the details of do I know, I think I

11   know, I don't want to testify to something that I'm not

12   100 percent sure to.

13   **Q.**   Well, go ahead and take a shot at it.  What do you know?

14   **A.**   I don't want to opine on something when I'm under oath,

15   when I'm not 10 on 30 percent sure.

16          THE COURT:  You're not opining here.  You're just

17   stating --

18          THE WITNESS:  What I know.

19          THE COURT:  -- what you know.

20          THE WITNESS:  Okay.  So my impression, what I

21   recollect is that there's a list of prices that go on ATPCO,

22   and the ones that are available to consumers at a particular

23   point in time will depend on certain demand conditions and so

24   it's possible that, for example, there might be a set of

25   fares that goes one direction, and a set of fares that goes

1    the other direction, and these are the same set of fares that

2    are available in both directions, but the ones that they make

3    available to consumers at a particular point in time can

4    differ just based on how fast the plane is filling up and

5    other considerations.  So this is why I'm asking whether, you

6    know, we're talking about the fares that are on ATPCO or the

7    prices that are available to consumers.  And I do have the

8    understanding that, as Mr. Wall suggests, that the prices

9    that are posted on ATPCO are the same both ways, but also

10   that the prices that are available to consumers at any point

11   in time might differ, but this is -- you know, that is --

12   like I said, that's my understanding.

13   BY MR. WALL:

14   **Q.**  But in terms of the way that your simulation model

15   predicts pricing behavior, it's talking about the published

16   fares, correct?

17   **A.**  It's talking about the average prices that are available

18   to consumers.

19   **Q.**  Yeah, which begins with a decision by the airlines

20   internalizing diversion and all of that, which we will

21   discuss, to establish a new and different published fare,

22   correct?

23   **A.**  No, there's no linkage between the average prices that I

24   look at and the particular fares that are on ATPCO.

25   **Q.**  Okay.  In all events, getting back to this

1    bidirectionality, it is your expectation that a rational

2    actor, in setting the published fare, is going to try to

3    account for the elasticity of the demand that is coming from

4    passengers traveling in both directions, correct?

5    **A.**   There's some nuance there, because there's another set of

6    considerations when you post a set of fares that can be made

7    available in both directions.  But when I think about the

8    prices that arise, that are available to consumers, I would

9    agree that that would incorporate information on consumer

10   willingness to pay, and demand elasticities, along with other

11   considerations.

12   **Q.**   And the elasticities are coming from passengers traveling

13   in both directions, correct?

14   **A.**   No, the relevant elasticity would be the elasticity of

15   demand going in one direction.

16   **Q.**   Okay.  Let's take a look at your deposition on page 249,

17   line 7, through 249, line 13.

18           "QUESTION:  Okay.  So would you expect, then, a

19   rational actor in setting the published fares is going to try

20   to account for the elasticity of demand that is coming from

21   passengers traveling in both directions?

22           "ANSWER:  Yes, that would -- that would be my

23   expectation."

24           You gave that testimony, did you not, sir?

25   **A.**   Yes.  And that's consistent with --

1    **Q.**   That's fine.  That's the extent of the question.

2    **A.**   Okay.

3    **Q.**   So let's talk about the New York originating side of a

4    route.  It is on that New York side of the customer set that

5    some people live close to one New York City airport or

6    another, right?

7    **A.**   I'm sorry, I just lost focus.  Could you restate the

8    question?  My apologies.

9    **Q.**   Sure.  I'm focusing now on the New York side of a route,

10   of a route with a New York end point.  Okay?

11   **A.**   Uh-huh.

12   **Q.**   Now, that's a side of the route in which you might see

13   this phenomenon of some people living particularly close to

14   one New York airport or another?

15   **A.**   That's right.

16   **Q.**   Okay.  And within the greater New York region, what

17   you're going to have is a mix of people who live particularly

18   close to one airport, and those that don't live particularly

19   close to -- or closer to any one airport, right?

20   **A.**   That is correct.

21   **Q.**   Okay.  But putting aside anything that you might say is

22   inherently accounted for in your simulation, you made no

23   effort to quantify the portion of the New York side demand

24   elasticity that is coming from passengers who can practically

25   turn to any of the three New York metropolitan airports, did

1    you?

2    **A.**   The question is asking me to -- whether I sought to

3    quantify it in any way, other than the way I sought to

4    quantify it?

5    **Q.**   Other than your demand model?

6    **A.**   That's how I quantified it.

7    **Q.**   You did indeed.  Thank you, sir.  We'll move on.

8            So you are not in a position here today to testify

9    about what portion of the New York side demand pool can or

10   cannot practically turn to Newark, JFK, or LaGuardia

11   airports, are you, sir?

12   **A.**   No, that would be incorrect.

13   **Q.**   Okay.  So do you have any data to which you can point to,

14   which says what percentage of the New York side demand pool

15   can practically turn to Newark?

16   **A.**   Again, "practically" is an adjective that I don't have a

17   particular meaning for.  Instead I'm looking to understand

18   substitution patterns.

19   **Q.**   Okay.  Then let's change it.  What data do you have that

20   can tell us what percentage of the New York side demand pool

21   is presently utilizing flights from Newark?

22   **A.**   In any capacity?  The taxi data suggests that people

23   choose Newark from all over the place, as do the frequent

24   flyer data and the JetBlue data.  The question is how often

25   does that occur.  The demand analysis speaks to this, as

1  well.

2  **Q.**  Okay.  Well, let's go back to that question.  How often

3  does it occur?  Did you present data on how often it occurs

4  that people who live in the New York metropolitan area choose

5  flights from Newark?

6  **A.**  Yes.  And I've done so with four different data sets.

7  **Q.**  Which is the data set that, in your view, most clearly

8  speaks to the question of what percentage of the New York

9  side demand pool chooses Newark?

10  **A.**  I imagine the data that would be most comprehensive for

11  analyzing that question would be the DB1B data that's

12  published by the Department of Transportation.

13  **Q.**  So you could just look at consumption patterns based upon

14  DB1B data, is you're saying?

15  **A.**  Yeah, but you could do better than that, as well.  That's

16  what I tried to do.

17  **Q.**  Okay.  So where in your report is there an analysis of

18  the DB1B data that shows how many New Yorkers choose to fly

19  out of Newark?

20  **A.**  That comes through the demand model as I've studied the

21  choices that consumers make.

22  **Q.**  Right.  And in -- in which the choice to make of going to

23  Newark is lumped into the outside option with everything

24  under the sun?

25  **A.**  Yes, but I don't --

1    **Q.**  Okay.  Let's move on to the next question, then, sir,

2    which is aside from your demand model, where in your report

3    do you present any analysis of the DB1B data indicating what

4    percentage of the New York side demand pool chooses Newark?

5    **A.**  Well, the demand model is what uses the DB1 data, the

6    DB1B data.  As I said, there are others sources of data that

7    I've used that are consistent with the conclusions I reached

8    based on the DB1B.

9    **Q.**  Indeed, but to be clear, you just said that the most --

10   that best data available for this would be the DB1B data.

11   And besides what you say is found in your demand model, you

12   didn't present an analysis of the DB1B data showing what

13   percentage of the New York demand pool chooses Newark, did

14   you?  Yes or no?

15   **A.**  Well, I think you're maybe mischaracterizing what you

16   said.  I tend to say the most comprehensive source would be

17   the DB1B, and that's because it's got all of the ticket sales

18   in it.  I don't know if it's the best.  You know, the

19   frequent flyer --

20   **Q.**  I'll go with comprehensive.  I'm fine with comprehensive,

21   if that's the issue here.

22   **A.**  Okay.

23   **Q.**  Okay.  So again, putting aside what you say is inherently

24   accounted for in your demand model, where in your report did

25   you present an analysis of the DB1B data to show what

1    percentage of the New York side demand pool elects to buy

2    service from airlines operating out of Newark?

3    **A.**   I may be misremembering, but I think that my analysis of

4    the DB1B comes through the demand model and doesn't show it

5    elsewhere.

6    **Q.**   Okay.  Thank you, sir.

7           Now let's get a little more granular, and for this,

8    we'll put up your slide 60.

9    **A.**   Oh.  I'm sorry, I think I do remember something now, in

10   response to your last question.

11   **Q.**   Go ahead.

12   **A.**   I believe there are figures at the end of the report that

13   break down shares in New York City using the DB1B data.  It

14   might be in my reply report.  So a complete answer would

15   probably include that.

16   **Q.**   Right.  So these are the shares that would include Newark

17   in the New York end points.

18   **A.**   Yeah, I can check, if you'd like me to.

19   **Q.**   No, we'll be getting to those, so we can talk about them

20   at that time.

21           Okay.  Slide 60.  This is your simulation results

22   for New York City.  And by the way, just to make sure there's

23   no confusion about this, when this says in the

24   title, "Results for New York City and Newark nonstop

25   overlaps," Newark is in there only because of the very last

1    entry, which is a distinct and separate entry for flights

2    from Newark to Miami, correct?

3    **A.**   That's correct.

4    **Q.**   Okay.  Otherwise, everything here excludes flights from

5    Newark, correct?

6    **A.**   It includes the flights from Newark as a competitive

7    option for consumers.

8    **Q.**   That's part of the outside good?

9    **A.**   That's correct.

10   **Q.**   Okay.  Got it.

11            All right.  So the second entry here is that Los

12   Angeles one, which, again, would be that group of LA basin

13   airports on the West Coast, and your New York side markets.

14   And on that one, you're predicting $54 million of harm.  So

15   focusing on that, is it your testimony that right now,

16   without regard to some attempted future price elevation,

17   United and other airlines flying Newark to LAX are not

18   competing for both inbound and outbound passengers and

19   against the LaGuardia -- well, it wouldn't be a LaGuardia,

20   but against the JFK nonstop options?

21   **A.**   I want to make sure I get -- I think the answer is no and

22   I just want to make sure I understand the question.  The

23   model incorporates the competition from Newark for those

24   passengers and I do believe they compete for those

25   passengers.

1   **Q.**   Okay.  Again, in the outside good, not distinctly, in the
2   way that JFK and LaGuardia are distinct, right?
3   **A.**   That's correct.
4   **Q.**   Okay.  So Los Angeles would be a route beyond the
5   perimeter rule, right?
6   **A.**   That would be right.
7   **Q.**   So there are no nonstop service from LaGuardia, right?
8   **A.**   I would want to confirm that, but if you tell me that's
9   the case, I can go with it.
10  **Q.**   You can go with it.
11  **A.**   Okay.
12  **Q.**   And that means that, to utilize LaGuardia, a consumer
13  would have to connect somewhere, right?
14  **A.**   That's right.
15  **Q.**   And that would add, on average, about two hours to a six
16  hour flight, assuming that everything is on time, right?
17  **A.**   I don't know.
18  **Q.**   Okay.  And you testified yesterday that, because of the
19  extra time and hassle of -- traffic tends not to be very
20  popular, right?
21  **A.**   On average, less popular than the nonstop traffic.
22  **Q.**   Right.  But you put LaGuardia connecting service in your
23  New York side relevant markets, while excluding Newark
24  nonstop service from your New York relevant markets, correct?
25  **A.**   Yes, that's correct.

1  **Q.**  Okay.  Do you know which airlines provide nonstop service

2  between New York and Los Angeles?

3  **A.**  Not off the top of my head.

4  **Q.**  Okay.  Well, the day before yesterday, we sent plaintiffs

5  a demonstrative that compiles official airline guide to data

6  that is in the record that identifies who offers nonstop

7  service between New York and LA.

8           Did you get a chance to review that?

9  **A.**  No, I've been told not to look at what's in here,

10  whatever is in this --

11  **Q.**  No, it was sent a couple of days ago.  If you didn't, you

12  didn't.  That's fine?

13  **A.**  I don't know exactly.  I did review a little thing.  I

14  don't know if that's what you're referring to.

15           Oh, I know, yeah.  Okay.  I know what you're

16  referring to now.

17  **Q.**  Okay.  Let's put the little thing up.

18           THE COURT:  Is that what you looked at?

19           THE WITNESS:  Yeah.

20  BY MR. WALL:

21  **Q.**  So what you see here is this is a compilation of an OAG

22  data.  It's been marked as DX06736.  The data is DX0736 and

23  is admitted --

24           THE COURT:  Just before you ask that question, I

25  want to make sure I understand the last little exchange

1   before that.  You -- I'm not sure I totally understand this,

2   so I want you to explain it to me.  You excluded Newark

3   nonstop flights from the relevant market, but included --

4   just explain -- included LaGuardia change?

5   **A.**   Anything from LaGuardia to JFK is in my market.

6           THE COURT:  So within -- I see, so within your

7   market as a distinct option, is JFK flights and LaGuardia

8   flights, whether they're nonstop or connect.

9           THE WITNESS:  Connect.

10          THE COURT:  Then there is a category called other

11  and other is everything else.

12          THE WITNESS:  Everything else.

13          THE COURT:  And that would encompass Newark nonstop

14  flights, Newark connecting flights, or Mr. Wall's preferred

15  method, which would be to fly to LA and drive.

16          THE WITNESS:  Or not travel.

17          THE COURT:  Or not travel at all.  Or take the

18  train.

19          THE WITNESS:  Yeah.  That's right.

20          THE COURT:  Okay.

21  BY MR. WALL:

22  **Q.**   So which has less social utility, flying to LA and

23  driving or not flying at all -- never mind.

24  **A.**   I'm trying to do the admissions calculation.

25          THE COURT:  It depends on your social utility of

1    your arrival in New York.

2    BY MR. WALL:

3    **Q.**   Okay.  So anyway, getting back to work here, the

4    demonstratives that is up on the screen shows you, does it

5    not, that United Airlines services New York to Los Angeles

6    from both Newark and JFK?

7    **A.**   Yes, I see that.

8    **Q.**   Okay.  It also shows you that spirit, NK, serves

9    Newark/Los Angeles from Newark, right?

10   **A.**   Yes.

11   **Q.**   It shows you that Delta offers quite a bit of service on

12   New York/Los Angeles from JFK, right?

13   **A.**   I do see that.

14   **Q.**   And if we go forward -- okay.  So B6 is JetBlue and you

15   can see that JetBlue serves New York/Los Angeles from both

16   Newark and JFK, right?

17   **A.**   JetBlue -- I was able to look into why they did that --

18   **Q.**   We'll get to that later on.  Let's just stick with my

19   questions for now.

20   **A.**   Okay.

21   **Q.**   So -- and then Alaska serves New York/Los Angeles from

22   Newark, right?

23   **A.**   That's right.

24   **Q.**   And then finally, American serves it from JFK, right?

25   **A.**   That's correct.

1   **Q.**  So in your market definition, the United, Spirit,

2   JetBlue, and Alaska service from Newark falls outside the

3   relevant market, correct?

4   **A.**  That's correct.

5   **Q.**  But everyone's connecting service to or from LaGuardia is

6   in the relevant market, correct?

7   **A.**  That's correct.

8   **Q.**  Now, if I live in Los Angeles and I want to fly to New

9   York for a business meeting or maybe to see a Broadway show,

10  both airlines operating to Newark and operating to JFK

11  provide service to which I can turn to meet my needs, right?

12  **A.**  They have flights that you can take nonstop.

13  **Q.**  Nonstop?

14  **A.**  Nonstop flights, yes.

15  **Q.**  Yes.  So in other words, I can choose to fly to Newark on

16  Alaska, Spirit, United, or JetBlue, or I can choose to fly to

17  JFK on American, JetBlue, or Delta, right?

18  **A.**  Yes, I think that's right.

19  **Q.**  I have both sets of choices, not one or the other, right?

20  **A.**  You have those choices available.

21  **Q.**  Okay.  So let's go on, then, to New York City to San

22  Francisco.  Now, you are aware, are you not, that United is

23  by far the largest legacy airline operator in San Francisco?

24  **A.**  Yeah, I'm aware they have a hub there.

25  **Q.**  Right.  And we put up another part of the demonstrative

1    here that has OAG data on San Francisco, and in what you can

2    see here is that United offers eight flights a day from

3    Newark, seven of which are Boeing 737s, and the eighth is a

4    757.  Right?

5    **A.**  Yes, I do see that.

6    **Q.**  Okay.  But none of that United Airlines capacity makes it

7    into your relevant market for New York City to San Francisco,

8    right?

9    **A.**  Yes.  I exclude flights from New York from the LaGuardia

10   JFK markets.

11   **Q.**  Right.  And again, San Francisco is beyond the perimeter

12   rule, right?

13   **A.**  That's true.

14   **Q.**  And so in your market definition, the nonstop United

15   Airlines triple 7 service from Newark falls outside the

16   relevant market, but everyone's connecting service to and

17   from LaGuardia is in your relevant markets, right?

18   **A.**  That's correct.

19   **Q.**  Okay.  You're aware of the fact that in 2015,

20   United Airlines consolidated its New York metropolitan area

21   operations at Newark-Liberty Airport, right?

22   **A.**  I'm not aware of that particular fact.

23   **Q.**  Okay.  Well, accept my representation that they did.  I

24   mean, are you aware of the fact that, prior to the United

25   Continental merger, Newark was a large continental hub?

1    **A.**   No.

2    **Q.**   Okay.  Well, let me just put it to you this way, if it's

3    true that United consolidated its New York City operations

4    from a combination of -- of JFK and Newark operations to

5    primarily New York operations --

6              THE COURT REPORTER:  I'm sorry.  Are you saying

7    Newark?  What are you saying?

8              MR. WALL:  Yeah.  Newark and New York.  Sorry about

9    that.  Yeah.  Let me try it again.

10             If you want to make an objection before I start, go

11   ahead.

12             MR. DOIDGE:  I just would ask for a clarification.

13   You're not suggesting that United no longer serves LaGuardia

14   Airport, are you?

15             MR. WALL:  No, of course not.

16             MR. DOIDGE:  But you're saying that they

17   consolidated only to Newark in 2015.

18             MR. WALL:  Fair enough.

19   BY MR. WALL:

20   **Q.**   Okay.  For these purposes, let's assume that the word

21   "consolidation" means to put 95 percent of your operations at

22   one airport.  Okay?

23   **A.**   Okay.

24   **Q.**   Now, in -- assume that in 2015, United, which was at that

25   time, operating from both JFK and Newark, in addition to

1    whatever operations it had at LaGuardia, consolidated its

2    operations at Newark, so that it had 95 percent of its

3    service from Newark, okay?

4    **A.**   Okay.

5    **Q.**   Okay.  Are you suggesting that by making that move,

6    United Airlines abandoned the largest business travel market

7    in the United States, New York City?

8    **A.**   I don't know precisely what the term "abandoned" means in

9    this context and I can imagine that you might -- that they

10   might have done that for a number of reasons, but I haven't

11   studied their motivations in -- in my economic work here.

12   **Q.**   Yeah, but what you are saying is that by making that

13   move, they changed their competitive significance from that

14   of an airline that is the equal to American and Delta and

15   others that are -- are flying from Newark, to that of an

16   airline that is too weak of a competitor to constrain the

17   exercise of market power, right?

18            MR. DERITA:  Objection.  It mischaracterizes the

19   witness's testimony.

20            THE COURT:  Overruled.

21            THE WITNESS:  I would say instead that the choice

22   of which airline you fly has implications for the types of

23   consumers that are going to find the product attractive.

24   BY MR. WALL:

25   **Q.**   Okay.  All right.  Let's go forward here.  Let me ask you

1   about another way to look at geographic market definition,

2   which is the way that is outlined in the *Horizontal Merger*

3   *Guidelines*.  Okay?

4   **A.**  Okay.  Let's start with Section 4.2 of the 2010

5   *Horizontal Merger Guidelines* that is entitled "Geographic

6   Market Definition."  And I've put it up on the screen and I

7   think you should have a copy in your binder if you need to

8   refer to it.

9   **Q.**  Can you tell me where it is in the binder?

10          MS. NELSON:  It's in the last tab.

11  BY MR. WALL:

12  **Q.**  Okay.  All right.  Let's just blow up the first paragraph

13  of Section 4.2 on geographic market definition.  The first

14  thing it says is, quote, "The arena of competition affected

15  by the merger may be geographically bounded if geography

16  limits some customer's willingness or ability to substitute

17  some products or some supplier's willingness or ability to

18  serve some customers," end quote.

19          You agree with that principle, right?

20  **A.**  Yes, this is correct.

21  **Q.**  Okay.  So what we're looking for is the arena of

22  competition affected by the transaction under scrutiny,

23  correct?

24  **A.**  No, I think -- I think the better way to think about it

25  is normally with market definition, you start with the

1    products of the merging firms, and we look at that

2    competition, and then ask sort of around those firms, what --

3    where do they compete, and what's the relevant geographic

4    market around those firms.  So in this context, it would be

5    you start with the question of where does American fly, and

6    where does JetBlue fly, and you build out the analysis from

7    that starting point.

8    **Q.**  So then, like, in Los Angeles, for example, then, you

9    would start with Newark and JFK, because both JetBlue and

10   American offer service to Los Angeles from those airports.

11   **A.**  You would -- you mean JFK -- the products they sell are

12   distinct in the locations that the starting points.  And New

13   York is a different location than JFK and LaGuardia.  And so

14   I try to understand the types of customers that buy those

15   products, and for those customers that buy the products, what

16   are -- what are the available substitutes, and understand

17   those substitution patterns.  So that's what the guidelines

18   is asking me to do.

19   **Q.**  Are you seriously going to try to tell us that you think

20   that the JetBlue service from Newark and the JetBlue service

21   from JFK is more distinct than the JetBlue service from JFK

22   and Southwest connecting service through Nashville?

23   **A.**  That's not a particular substitution that I've measured

24   in my report, but I don't think it's particularly relevant to

25   the question at hand.

1   **Q.**   Okay.  Let me just go on and ask you, is it your position

2   that United and other airlines operating from Newark are

3   outside the arena of competition affected by the NEA?

4   **A.**   Well, I do look at some Newark routes, the Newark to

5   Miami route, and I think that that is affected, and I find

6   that as an antitrust market that the NEA impacts.  But with

7   respect to the other overlap markets coming out of New York

8   City, the JFK and LaGuardia markets, what I've been able to

9   determine -- I've already said it.  I've --

10   **Q.**   Right.  You have.  So let's throw the one Newark to Miami

11   flight out of the question.  My bad.  Other than that one, is

12   it your position that United and the other airlines operating

13   from Newark are outside the arena of competition affected by

14   the NEA?

15   **A.**   Yes, the guidelines give us a framework for thinking

16   about what the arena of competition is, and I've applied that

17   framework.

18   **Q.**   Okay.  Now, in fact, what the guidelines next to in the

19   process of section four, is they make a distinction between

20   two types of geographic markets, those defined by the

21   location of suppliers, and those defined by the locations of

22   customers, right?

23   **A.**   Yes, they do.

24   **Q.**   Okay.  Let's look at the third paragraph of Section 4.2.

25   It states -- the guidelines state, "In the absence of price

1    discrimination based on customer location, the agencies

2    normally define geographic markets based on the location of

3    suppliers, as explained in subsection 4.2.1."  Correct?

4    **A.**   That's correct.

5    **Q.**   And the reference to price discrimination is that the

6    guidelines have an alternative market definition rule for a

7    scenario in which sellers charge different prices to

8    customers, based upon information about where the customer

9    lives, right?

10   **A.**   That's correct.

11   **Q.**   Okay.  Those markets are formally called geographic

12   markets based on the location of customers, and sometimes

13   informally called price discrimination markets, correct?

14   **A.**   That's correct.

15   **Q.**   Okay.  And applied to this case, that would mean that

16   airlines are charging different prices to people on the same

17   flight, depending on if they lived close to one airport or

18   farther away, right?

19   **A.**   Yes.

20   **Q.**   Okay.  But you don't have any evidence that airlines do

21   that, do you, sir?

22   **A.**   No.  I haven't seen any.

23   **Q.**   Okay.  So Section 4.21 is the section applicable to this

24   case, correct?

25   **A.**   That's been my approach, yes.

1   **Q.**   Okay.  So let's look at Section 4.21.  It

2   begins, "Geographic markets based on the locations of

3   suppliers encompass the region from which sales are made."

4   Right?  That's the first principle?

5   **A.**   That's correct.

6   **Q.**   Okay.  The next sentence says, "Geographic markets of

7   this type often apply when customers receive goods or

8   services at supplier's locations," right?

9   **A.**   That's correct.

10  **Q.**   And that's the case with airlines, right, customers go to

11  the airlines locations at airports to receive the service?

12  **A.**   That's correct.

13  **Q.**   Right.  And then it says, "Competitors in the market are

14  firms with relevant production, sales, or service facilities

15  in that region," correct?

16  **A.**   That's right.

17  **Q.**   Which is another way of saying that the seller operates

18  in the region as with the *Tampa Electric* standards, right?

19  **A.**   No, I think, you know, my interpretation of relevant, and

20  this is clarified in the guidelines is options that consumers

21  could turn to in sufficient degree to constrain the exercise

22  of market power.  This is --

23  **Q.**   Fair enough.  Okay.  That's fine.

24          THE COURT:  Could or do?

25          THE WITNESS:  Excuse me?

1              THE COURT:  Could or do?

2              THE WITNESS:  Do.

3      BY MR. WALL:

4      **Q.**   Okay.  So let's keep going, then.  So you go down a few

5      lines past the example.  The guidelines state, quote, "When

6      the geographic market is defined based upon supplier

7      locations, sales made by suppliers located in the geographic

8      market are counted, regardless of the location of the

9      customer making the purchase."  That's the rule, correct?

10     **A.**   I think this may be describing a somewhat different

11     situation.  And I can try to parse the words, if you'd like

12     me to.

13     **Q.**   Well, let's just work with that standard.  Okay?  Are you

14     going to dispute that there are relevant production, sales,

15     or service facilities for air passenger travel to and from

16     New York at all three major airports, including Newark?

17     **A.**   So setting aside the quote on the screen, which I believe

18     we're no longer talking about, I've already described in my

19     last answer the way I interpret relevance, which is through

20     the framework that's in the merger guidelines, and that's

21     what my analysis does.

22     **Q.**   So the answer is no?

23     **A.**   Let's just be clear about the question, then.

24     **Q.**   I'll reread it.  Are you going to dispute -- well, let me

25     say it a different way.

1          Are you going to dispute that there are, within the

2     meaning of the guidelines, of the sentence of the guidelines

3     that I read a moment ago that says competitors in the market

4     are firms with relevant production sales or service

5     facilities in the region, that there are relevant production

6     sales or service facilities in the region at Newark Airport?

7          MR. DOIDGE:  Objection, Your Honor.  As the witness

8     has testified, the meaning of that sentence requires --

9          MR. WALL:  Excuse me.  He cannot give testimony in

10    the guise of an objection.  And furthermore, I don't

11    understand why Mr. Doidge is standing up.  Mr. DeRita handled

12    the witness.

13         MR. DOIDGE:  It's been the practice so far that

14    both you and Mr. Schwed at various points in time have made

15    objection --

16         MR. WALL:  We have different clients.

17         MR. DOIDGE:  -- regardless of who the witness is.

18         THE COURT:  So I guess there are several different

19    things.  I'm not going to rigidly enforce the one lawyer

20    rule.  I understand your point, Mr. Wall, and I've noted it

21    before this.  But putting it aside whether -- it is different

22    to have different clients and that is a meaningful

23    distinction, but nonetheless, I'm not feeling -- the fact

24    that Mr. Doidge is standing up is not making me feel anymore

25    double teamed than I otherwise feel by the vast array of all

1   of you out there.

2          MR. WALL:  Well, in that case, I'm going to ask

3   most of these people to leave.

4          THE COURT:  I'm not going to prohibit -- and they

5   haven't been going back and forth.  It's just been Mr. Doidge

6   has objecting to the cross, and that's fine.

7          Mr. Doidge, you shouldn't be -- the objection

8   should be what's the basis without repeating the testimony.

9   From my perspective, maybe you could just restate the

10  question, because like I think you can clarify.  You had on

11  there one sentence, but I don't think -- which you took down.

12  I don't think that's the sentence you're asking about.

13  You're asking about --

14         MR. WALL:  Fair enough.  So let's put up the

15  previous one, the one on this competitor's -- one up.  Take

16  your time.

17         THE COURT:  Is the question, are you disputing

18  whether flights from Newark are relevant production within

19  the meaning of that sentence?

20         MR. WALL:  More or less.  I'll rephrase it just to

21  be clear.

22  BY MR. WALL:

23  Q.  So the sentence in the guidelines on Section 4.2.1 says,

24  quote, "Competitors in the market are firms with relevant

25  production, sales, or service facilities in that region."

1            Are you disputing that airlines operating from

2     Newark are firms with relevant production, sales, or service

3     facilities with respect to air passenger transport between

4     the New York metropolitan area and other points?

5     **A.**  Now, that question is not quite relevant.  The market

6     here is based on JFK and LaGuardia, and so almost by

7     definition, if the market is based on JFK and LaGuardia, then

8     firms that are operating out of Newark don't have production,

9     sales, or services in JFK and LaGuardia, and so the answer is

10    pretty clearly that they don't, given that we're looking at

11    JFK and LaGuardia.

12            Now, I would include any competitor that does have

13    relevant production, sales, and service facilities in JFK and

14    LaGuardia.

15    **Q.**  Right.  But, I mean, let's just break it down.  There are

16    airplanes and gates and runways and ticket counter and

17    airline personnel in Newark, right?

18    **A.**  That's correct.

19    **Q.**  And they're there to serve demand to and from New York,

20    right?

21    **A.**  That's right.

22    **Q.**  Now, in arguing against the inclusion of Newark in the

23    relevant markets, you rely in part on a catchment analysis,

24    right?

25    **A.**  That's correct.

1    **Q.**  But a catchment analysis is fundamentally an argument

2    based on the location of customers, right?

3    **A.**  I think that's an incomplete characterization of the

4    catchment analysis.

5    **Q.**  Well, your catchment analysis is explicitly about

6    determining consumer preferences for one airport as compared

7    to another as a function of their residential addresses,

8    correct?

9    **A.**  That's correct.

10   **Q.**  All right.  And, in fact, let's put up slide 84 that you

11   talked about yesterday.

12            MS. NELSON:  Don't publish this.

13            MR. WALL:  We can't publish this.  This has some

14   confidential information.  It's in your slide there.  You

15   should have it there.

16            THE WITNESS:  Can you show me where it is?

17            MS. NELSON:  It's in the plaintiffs' binder in the

18   first tab.

19            THE COURT:  Thank you.

20            THE WITNESS:  And slide 84, you said?

21            MR. WALL:  Yes.

22            THE WITNESS:  Yes, I see.

23            THE COURT:  Hold on one minute.  I want to get

24   there, too.

25            Okay.  I'm there.

1          MR. WALL:  Sorry about the confidentiality issues

2     messing us up for a second.

3     BY MR. WALL:

4     Q.   In all events, what you put on this, right above the

5     table that's in the lower right hand quadrant is airport

6     choice by residential location, right?

7     A.   Yes, that's right.

8     Q.   And then the vertical axis on the chart below is

9     residential location, right?

10    A.   Yes, that's correct.

11    Q.   And so these catchment analyses are plainly focused on

12    the location of the customer making the purchase, right?

13    A.   That would be an incomplete characterization.

14    Q.   I didn't ask whether it was complete or incomplete.  It

15    is plainly focused on that, correct?

16    A.   No, I disagree.

17    Q.   Okay.  But Section 4.2.1 of the guidelines says that the

18    location of the customer making the purchase should not be

19    used to narrow a market based upon the location of the

20    suppliers, correct?

21    A.   Could you put the quote back up on the screen?  I'd love

22    to.

23    Q.   "When the geographic market is defined based upon

24    supplier locations, sales made by suppliers located in the

25    geographic market are counted, regardless of the location of

1    the customer making the purchase."  Did I read that

2    correctly?

3    **A.**  Yes, that's how I've implemented it.

4    **Q.**  You've implemented with a catchment analysis that turns

5    on the residential address of the customer?

6    **A.**  No, I don't think this is what this statement -- I can

7    explain this to you if you like.

8    **Q.**  Your counselor can have you explain it.

9    **A.**  Okay.

10   **Q.**  Before we turn to what you say of your hypothetical

11   monopolist tests, let's look at another part of

12   Section 4.2.1, which is the last part.  And you see it on the

13   screen.  It says, "In considering likely reactions of

14   customers to price increases for the relevant products

15   imposed in a candidate geographic market, the agencies

16   considered any reasonably available and reliable evidence,"

17   and there's a list of bullet points.  Do you see that?

18   **A.**  Yes, I do.

19   **Q.**  Okay.  And the first one is how customers have shifted

20   purchases in the past between geographic locations in

21   response to relative changes in price or other terms and

22   conditions.

23   **A.**  Yes, I do see that.

24   **Q.**  Okay.  Now, that is referring to what we call diversion,

25   right?

1  **A.**  Yes.

2  **Q.**  And in this case, diversion among geographies, instead of

3  potentially diversion among products, right?

4  **A.**  That's right.

5  **Q.**  Okay.  Now, you did not conduct any stand-alone study of

6  how customers have shifted purchases in the past between

7  LaGuardia and JFK, on the one hand, and Newark, on the other,

8  in response to relative changes in price or other terms and

9  conditions at those airports, did you?

10  **A.**  That would be incorrect.

11  **Q.**  What did you do in the way of a stand-alone study of how

12  customers have shifted purchases in the past, between those

13  airlines?

14  **A.**  Well, when I looked at the decisions that customers made

15  between 2015 and 2019, within four quarters of each of those

16  years and, you know, with that backstop, analyzing the

17  decisions that they actually made in response to price

18  charges in the market, determined that substitution towards

19  Newark or other sources, other options outside of JFK would

20  be insufficient to constrain the exercise of market power at

21  JFK and LaGuardia.

22  **Q.**  Indeed.  And you're back to your simulation, right?

23  **A.**  Well, the quantification of the diversion comes through

24  the demand model.

25  **Q.**  And with, once, again, Newark lumped into the outside

1    good, right?

2    **A.**   Which is as appropriate, yes.

3    **Q.**   Right.  I'm asking you something more specific, sir.  Put

4    aside your demand model where Newark is part of the outside

5    good.  You did not conduct a stand-alone study of how

6    customers had ever, in the past, shifted purchases between

7    LaGuardia and JFK on the one hand, and Newark on the other,

8    in response to relative changes in price or other terms and

9    conditions at those airports, true?

10             MR. DERITA:  Objection.  That mischaracterizes what

11   he just testified to.

12             THE COURT:  Overruled.

13             THE WITNESS:  The answer is that the only source of

14   specifically estimated diversion information comes through

15   the demand model.

16   BY MR. WALL:

17   **Q.**   Well, even in your analysis of the 737 MAX grounding, you

18   didn't try to measure diversion from JFK or LaGuardia to

19   Newark, right?

20   **A.**   My understanding is that some of the routes that were

21   affected by the 737 MAX grounding, American and JetBlue

22   served them both out of JFK, so it wouldn't be informative on

23   that point.  And I think one of the routes on which you saw

24   the price increase, I believe JetBlue operated out of JFK and

25   American operated out of LaGuardia, but I don't remember the

1  details of that.

2  **Q.**  My question was a little bit more specific than that.

3  When you did that analysis?

4  **A.**  Uh-huh.

5  **Q.**  Which you said was informative of a lot of things in this

6  case, you didn't try to determine whether the prices or other

7  terms and condition of service on flights from Newark had

8  changed or not changed at the same time, did you, sir?

9  **A.**  My understanding is that the flights that -- that prices

10  of the flights at Newark did increase.

11  **Q.**  I'm not asking you what you understand, I'm asking you

12  what you did in your study.  You didn't study it, did you,

13  sir?  It's not in your 737 MAX study?

14  **A.**  The 737 MAX study is focused on the price of JFK after

15  the grounding happened.

16  **Q.**  So the answer to my question is that, no, there is

17  nothing in your demand -- in your 737 MAX study that

18  separately considered and identified whether there were also

19  changes at Newark, true?

20  **A.**  That's true.

21  **Q.**  And the problem that you were dealing with is that the M

22  AX wasn't just grounded at JFK, but throughout the United

23  States, right?

24  **A.**  I don't see why this is a problem, as you're

25  characterizing it.

1   **Q.**  The MAX was grounded throughout the United States,

2   correct?

3   **A.**  Yes, that's my understanding.

4   **Q.**  American Airlines was not the only airline flying the MAX

5   at the time, correct?

6   **A.**  That's true.

7   **Q.**  Southwest was flying the MAX at the time, right?

8   **A.**  That's true.

9   **Q.**  Southwest was the largest MAX operator in the United

10  States at the time, right?

11  **A.**  I don't know the answer to that.

12  **Q.**  Southwest had to pull down service at Newark because of

13  the MAX grounding, correct?

14  **A.**  That's my understanding.

15  **Q.**  Let's go back to Section 4.2.1, the next bullet that is

16  here is, "The cost and difficulty of a customer traveling to

17  a seller's location in relation to its price."  You did not

18  study that, either, did you?

19  **A.**  I think this comes through the choice behavior of the

20  customers as I observed in making choices with a number of

21  the different datasets that I've looked at.

22  **Q.**  In fact, as we've discussed in your deposition, you

23  present results from your merger simulation and your

24  hypothetical monopolist tests that predict price increases

25  far greater than the cost to an individual, let alone a

1    family, of getting in a cab or an Uber to take a Newark

2    flight, rather than a more expensive LaGuardia or JFK flight,

3    correct?

4    **A.**   I haven't analyzed the price of a taxi or an Uber from

5    one airport to the other.

6    **Q.**   Right.  But the cost and difficulty of a customer

7    traveling to a seller's location in relation to price in this

8    industry is fundamentally about how much time and money it

9    would cost you to get to an airport that maybe is a little

10   further away, right?

11   **A.**   Well, I think that would -- you're focused on cost, but

12   we can also think about difficulty and what that entails in

13   terms of how consumers make decisions, and there's a host of

14   considerations are gonna -- we can just conceptualize of

15   driving customer choice here, but it would include the cost

16   of a taxi, but also the opportunity cost of time, and also

17   preferences for airports for other reasons, or particularly

18   there are carriers that operate out of particular airlines

19   for one reason or another.  So all of that I think is bundled

20   up in this notion of cost and difficulty, and that shows up

21   in the choices the passengers make that I've been able to

22   analyze in the data.

23   **Q.**   Okay.  For example, one of the things that could

24   influence them is what their loyalty is to different

25   airlines, right?

1    **A.**   That's possible.

2    **Q.**   So if I am out there in San Francisco and I have to

3    choose between Newark and JFK, I might choose to fly to

4    Newark because I'm a member of the United loyalty program,

5    right?

6    **A.**   Yes, you might.

7    **Q.**   Or I might decide to fly to JFK because I'm a member of

8    the JetBlue TrueBlue program, right?

9    **A.**   That's a possibility, yes.

10   **Q.**   In all events, let's just assume that a consumer -- let's

11   take a New York consumer, and assume they live in Tribeca.

12   And I will represent to you that an Uber to JFK costs about

13   $63 from Tribeca and an Uber to Newark costs about $65.  So

14   the incremental cost to get from Newark to JFK is about $2.

15   Can you make that assumption for me?

16   **A.**   Okay.  I don't know where Tribeca is, but I don't think I

17   need to for this example.

18   **Q.**   Okay.  It's in Manhattan.

19           Okay.  And let's say in this particular case we're

20   talking about a family of five that want to fly to Los

21   Angeles to visit relatives and maybe go to Disneyland.  Okay?

22   **A.**   Okay.

23   **Q.**   Now, let's pull up PX1018, which is in Exhibit 14 from

24   your report, on hypothetical monopolist tests for NEA nonstop

25   overlap markets.  Right?

1    **A.**   Yes, that's right.

2    **Q.**   And if we go down to the line, marked below there,

3     "Markets with New York endpoint" and get down to where LA

4    is.  You're saying that the hypothetical monopolist would

5    raise ticket prices by 63 to 76 percent if American was the

6    hypothetical monopolist and 97 to 131 percent if JetBlue was,

7    right?

8    **A.**   That doesn't seem right to me.

9    **Q.**   Let me say it again here.  I think I actually misspoke.

10   I'm sorry.

11           You're saying that the range of increases would be

12   63 to 76 percent on American Airlines products, and 97 to

13   131 percent on JetBlue products, right?

14   **A.**   I don't see the column headers, but I don't have reason

15   to think that's incorrect.

16   **Q.**   Okay.  So that would be hundreds of dollars per ticket,

17   right?

18   **A.**   I haven't looked at the -- the price on those flights.

19   **Q.**   Well, assume it is.

20   **A.**   Yeah, that's right.  If it's $200, we're arguably there,

21   so that seems -- that seems accurate.

22   **Q.**   Okay.  So what you're asking Judge Sorokin to believe is

23   that your hypothetical monopolist could actually do that,

24   even though for millions of New Yorkers, the incremental cost

25   of flying out of Newark, if any, is a fraction of the

1  predicted price increase?

2  **A.**  You know, as I've already mentioned, when you have such

3  an extreme loss of competition, the interpretation of the

4  model is somewhat stressed, and in this particular instance,

5  we're losing the competition between Delta and JetBlue.

6  **Q.**  Fair point.

7  **A.**  And American.  You know, everybody who flies out of JFK

8  and LaGuardia.  And quantifying the substitution patterns and

9  accounting for folks that switch to Newark, the loss of that

10  competition is important.  Now, when you get price tags that

11  are this big, I don't want to testify that this is exactly

12  what will happen, what I can say is that this is a

13  substantial loss of competition.  And compared to the

14  thresholds that are set up in the merger guidelines, which

15  are 5 to 10 percent for a SSNIP, it easily exceeds that

16  level.

17  **Q.**  Do you think it would at least be a reasonable test to

18  see whether the same dynamic applies to your predicted price

19  increases based upon the simulation?

20  **A.**  And what do you mean by that?

21  **Q.**  Yeah, if you're predicting, let's say $100 increase in

22  price from your simulation on your route, and the incremental

23  cost to get to Newark was five dollars, would you think that

24  that was a sustainable competitive equilibrium?

25  **A.**  I don't think the relative cost per Uber in a particular

1    place in Manhattan is relevant for the question of demand

2    estimation and the results that I obtained from that, and the

3    reason is that it's focusing on one particular location and

4    the model accounts for consumers that are all over.  And

5    further more, you're focused on one component of how

6    customers might make their decision, rather than all the

7    things that might matter for customers.  And that's what my

8    analysis does.

9    **Q.**  But --

10           MR. DERITA:  Objection, he's interrupting the

11   witness.

12           MR. WALL:  I thought he was done.  Sorry.

13   BY MR. WALL:

14   **Q.**  But to be fair, sir, the one factor that we're talking

15   about is the factor that the Department of Justice

16   specifically called out in Section 4.2.1 of the guidelines,

17   the cost and difficulty of a customer traveling to a seller's

18   location in relation to its price, right?

19   **A.**  Well, the cost, but then I think difficulty is much

20   broader on that.

21   **Q.**  One more bullet on 4.2.1 I want to cover.  That's the one

22   that says, "Evidence on whether sellers base business

23   decisions on the prospect of customers switching between

24   geographic locations in response to relative changes in price

25   or other competitive variables."  Do you see that one?

**A.**   Yes, I do.

**Q.**   Now, you've certainly seen evidence about that one, haven't you?

**A.**   Yeah, I reported some on it yesterday, and I described more ON the report that I could described, if you'd like.

**Q.**   Right.  Well, one piece of evidence is that the Northeast Alliance is, itself, based on the prospect of customers switching between United's services at Newark, in response to the increase in New York relevance that JetBlue and American can obtain through the NEA, right?

**A.**   I don't want to testify as to why American and JetBlue are doing NEA.  That seems beyond the scope.

**Q.**   Well, let's take a look at defense Exhibit 41.  You're familiar with this document, aren't you?

**A.**   I've read a lot of documents.  I don't recall all of them.

**Q.**   Well, then I'll just represent to you that these were slides that were presented to the board of directors of American Airlines having to do with the NEA, and I'm going to ask to have page 65 put up here.  Even though I know you read a lot of documents, do you at least remember this one?

**A.**   Yeah, I think it may have even come up in testimony earlier.

**Q.**   Yes.  And it states, "A combined network creates a new ability to compete with Delta and United," correct?

1    **A.**   That's the title of the slide.

2    **Q.**   Right.  And the data for United that are presented in the

3    slide are data that can only be true if you're counting the

4    United operations at Newark, correct?

5    **A.**   The -- um -- it does say that it's counting New York

6    City, it's included New York, JFK, and LaGuardia together in

7    the top left.

8    **Q.**   Right.  And so this would be an example, then, of what

9    the guidelines call evidence on whether sellers base business

10   decisions on the prospect of customers switching between

11   geographic locations in response to relative changes in price

12   or other competitive variables, right?

13   **A.**   That's not obvious to me.  I don't see an analysis of how

14   customers make decisions on this slide.

15   **Q.**   No, this is an analysis about how sellers think that they

16   can obtain more business, right?

17   **A.**   What I see in this slide is just a summary of how many

18   routes that are going to fly out of the New York metropolitan

19   area.

20   **Q.**   Look at the title, a combined New York -- excuse me, a

21   combined network creates a new ability to compete with Delta

22   and United.  Do you see that?

23   **A.**   Yes, I do.

24   **Q.**   Now, compete for customers, right?  That's what they

25   compete for.

1  **A.**   That makes sense to me.

2  **Q.**   Okay.  All right.  So you place the most emphasis on your

3  Hypothetical Monopolist Test, let's turn to that.

4         In fact, you haven't done a Hypothetical Monopolist

5  Test as envisioned by the *Horizontal Merger Guidelines*, have

6  you, sir?

7  **A.**   I think that's correct.  And also I think you

8  mischaracterized what I put the most emphasis.  I think I

9  provided you with -- provided a range of analyses that are

10 all consistent with each other.

11 **Q.**   Okay.  Sorry about that.  I'll withdraw that statement.

12 But you agree, it's correct that you haven't done a

13 Hypothetical Monopolist Test as envisioned by the *Horizontal*

14 *Merger Guidelines*?

15 **A.**   No, I think that would be incorrect.

16 **Q.**   Well, the transcript, just, we should note, it was taken

17 down that you said that's correct, but you've clarified, so

18 we can move on.

19         Now, the hypothetical --

20         THE COURT:  Just the question.

21         THE WITNESS:  Maybe I got turned around on the

22 question.  Can you say the question so that I can --

23         MR. WALL:  I think it's clear now.  I think you

24 cleared it up.  But when you first answered my question, you

25 said I think that's correct.

1              THE WITNESS:  Well, let's make sure I got the

2    answer right, if I answered two different ways.

3              What's the question?

4    BY MR. WALL:

5    **Q.**  You haven't done a Hypothetical Monopolist Test as

6    envisioned by the *Horizontal Merger Guidelines*, have you?

7    **A.**  That's incorrect.  I have done a Hypothetical Monopolist

8    Test as envisioned by the *Horizontal Merger Guidelines*.

9    **Q.**  Okay.  So the Hypothetical Monopolist Test is an exercise

10   by -- where one assumes that the hypothetical profit

11   maximizing firm that was the only present and future producer

12   of the relevant product located in the region imposes

13   something called a small but significant nontransitory

14   increase in price, right?

15   **A.**  That's correct.

16   **Q.**  Okay.  And a typical SSNIP, as you just mentioned, is

17   usually on the order of 5 to 10 percent, right?

18   **A.**  That's correct.

19   **Q.**  And the guidelines state, in Section 4.2.1 that, quote,

20   "In this exercise, the terms of sale for all products

21   produced elsewhere are held constant," end quote, right?

22   **A.**  That's correct.

23   **Q.**  Okay.  Now, the starting point for the Hypothetical

24   Monopolist Test is the areas in which the merging firms

25   compete, respecting each relevant product, correct?

1    **A.**   It's where the products are offered.  So this would be

2    JFK and LaGuardia in this instance.

3    **Q.**   But this is a market that is based upon the location of

4    suppliers in which it is presumed that customers will travel

5    to where the supply is offered, correct?

6    **A.**   Yes, the location of the suppliers in my candidate market

7    are in JFK and LaGuardia.

8    **Q.**   And their customers are based throughout the New York

9    metropolitan region, right?

10   **A.**   That's right.

11   **Q.**   Okay.  And so are you familiar with the publication by

12   the Federal Trade Commission and the Department of Justice

13   called "Commentary on the *Horizontal Merger Guidelines* 2006"?

14   **A.**   Yes, I am.

15   **Q.**   Okay.  I want to put up something from that which is in

16   the section that discusses geographic market definition.  And

17   it says, quote, "Thus, for geographic market definition, the

18   agencies begin with the areas in which the merging firms

19   compete, respecting each relevant product, and extend the

20   boundaries of those areas until an area is determined within

21   which a hypothetical monopolist would raise prices by at

22   least a small but significant and nontransitory amount."

23   You're familiar with that rule?

24   **A.**   I would not characterize it as a rule, and in fact, I

25   think the language on this is updated in the 2010 *Horizontal*

1   *Merger Guidelines*, and hard to to get away from the strictly

2   algorithmic approach, which would lead to sort of confusing

3   and unhelpful conclusions.

4   **Q.**  Well, thank you for mentioning that because what actually

5   happened is that, after 28 years in which the Hypothetical

6   Monopolist Test was described this way, where the -- that the

7   SSNIP test would extend the boundaries of a market that were

8   defined by where firms were competing, the 2010 guidelines

9   changed that, so you could actually narrow the market

10  relative to whether -- where firms were actually competing,

11  correct?

12  **A.**  I don't know --

13          MR. DERITA:  Objection.  He's testifying.

14          MR. WALL:  If he is an expert on this.

15          THE COURT:  Overruled.

16          MR. WALL:  He is entitled to it.

17          THE WITNESS:  Your question asked me to opine why

18  the 2010 guidelines were revised.  I think --

19          THE COURT:  No, not why.  How.  I know he asked

20  why.

21          THE WITNESS:  No, he said why.  That's why I'm

22  pointing this out.  I don't know why.  He said that they did

23  this in order to do this.  That was the question.

24  BY MR. WALL:

25  **Q.**  I didn't mean purpose.  I meant to facilitate, in a

1    manner that permits one to narrow the market relative to the

2    area in which firms are competing?

3    **A.**   No, it's whether you use the strict algorithm that's here

4    on the screen, or whether one uses the approach of the 2010

5    guidelines, it's not obvious that's -- which would lead to

6    more narrow or more broad markets, but the revisions of

7    the 2010 guidelines were meant to align market definition

8    with --

9              THE COURT:   I guess I'm not interested in what

10   they're meant to do, but what they do do.

11             THE WITNESS:   What they do do is they align the

12   concept of market definition with the economic forces that

13   matter for suppliers.   And so that, you know, I align my

14   analysis quite precisely with the 2010 guidelines, which is,

15   you know, the most recent set of guidelines provided by the

16   Department of Justice, and the Federal Trade Commission.

17   BY MR. WALL:

18   **Q.**   Indeed, and for that reason, you do not align your

19   analysis with the principle that's on the screen from the

20   2006 commentary that one begins with the areas in which the

21   merging firms compete and extend the boundaries of those

22   areas, based upon the SSNIP test.

23   **A.**   Well, it's not quite accurate.   I did start with

24   LaGuardia and JFK, and then I conducted the SSNIP test, and I

25   determined that they're -- you know, if you lost all the

1    competition that existed at LaGuardia and JFK, including

2    Delta and American and JetBlue and everybody else, that in

3    the local markets that we're looking at, the overlap markets,

4    you would pass the SSNIP test.  And so in that sense, this is

5    consistent with my approach.

6    **Q.**  But you're starting point for your SSNIP test already

7    presumes that there isn't competition from flights at Newark,

8    correct?

9    **A.**  No, that's incorrect.  That's the purpose of the test is

10   to determine how important that competition is.

11   **Q.**  I didn't ask you how important it is, what I'm asking you

12   is whether it exists.  The language here is:  "The agencies

13   began with the areas in which the merging firms compete."  It

14   doesn't say anything more than that.  Does it?

15   **A.**  Right.  So I'm starting with JFK and LaGuardia.

16   **Q.**  But they compete for more than just JFK and LaGuardia, do

17   they not?

18   **A.**  Those are the products, are JFK and LaGuardia.

19   **Q.**  And --

20            MR. DERITA:  Objection, Your Honor.

21            THE COURT:  What's the objection?

22            MR. DERITA:  He keeps interrupting the witness.

23            THE COURT:  Are you finished?

24            THE WITNESS:  No, I'm trying to explain that the

25   products that American and JetBlue offer, predominantly, are

1    out of LaGuardia and JFK, and so as I define a candidate
2    market, I start there.  And then I ask the question, I want
3    to test whether this candidate market is -- satisfies the
4    Hypothetical Monopolist Test.  In other words, when they ask
5    that question, we ask, are options outside of this market
6    sufficiently good substitutes to constrain the exercise of
7    the market power.  So you start with a candidate market based
8    on the location of competition between American and JetBlue.
9    That's why I've done this based on JFK and LaGuardia, and
10   then I test whether other options are sufficiently good for
11   customers.
12   Q.   Well, let's be clear, if you run the Hypothetical
13   Monopolist Test, based upon this standard, beginning with the
14   areas in which the merging firms compete, and that includes
15   Newark, it also passes the Hypothetical Monopolist Test,
16   right?
17   A.   Yeah.  And I mentioned this on direct.  Actually, did I
18   run that test?  It would pass.  It would pass.  If you also
19   reduce competition out of Newark, the price elevations would
20   be even higher than what I report in my analysis.  So I
21   agree, that if you did all three together, it would also pass
22   the Hypothetical Monopolist Test.
23   Q.   In fact, for the vast majority of routes, LaGuardia alone
24   passes the Hypothetical Monopolist Test, doesn't it?
25   A.   I put in a declaration or either a supplemental statement

1    on that.  If you have it, I could review.

2    Q.  I actually don't want to take the time to do that, but

3    it's fair to say that what you did is you responded to

4    analysis by Dr. Israel showing that on the vast majority of

5    routes, LaGuardia would pass the Hypothetical Monopolist Test

6    by itself?

7    A.  I would want to look at the analysis to -- so I don't

8    mischaracterize Dr. Israel, I don't think it would be

9    appropriate to define a market based only on LaGuardia.

10   Q.  Okay.  But the point is is that the Hypothetical

11   Monopolist Test can't tell us that the two airport market is

12   the only right market, because the three airport market also

13   passes the Hypothetical Monopolist Test?

14   A.  The guidelines give us a way for thinking about which

15   market to choose when multiple markets pass the Hypothetical

16   Monopolist Test, and that's something I went over in my

17   direct.

18   Q.  Right.  And what that standard is that at that point the

19   tiebreaker is which market best illuminates the competitive

20   effects of the transaction, right?

21   A.  That's correct.

22   Q.  So your argument is that in choosing the relevant market

23   that most illuminates the competitor effects of the Northeast

24   Alliance, Judge Sorokin should disregard competition from

25   United at Newark.

1    **A.**   I think it's important to understand that the competition

2    from United to Newark exists and my model accounts for that.

3    For the purposes of market definition and market share, it's

4    not sufficient to constrain at JFK and LaGuardia.  Therefore,

5    it does not belong in the relevant market.

6    **Q.**   Okay.  I want to finish our discussion on market

7    definition by addressing some of the things you said about

8    whether this matters or not.

9            You wrote 40 pages in your original report on

10   market definition, right?

11   **A.**   I don't remember the precise number.

12   **Q.**   You wrote another 18 pages in your reply report, right?

13   **A.**   I don't know the number.

14   **Q.**   And let's take a look at an exhibit that you've seen

15   before in your deposition, that is a side by side comparison

16   of Exhibit 16 from your report, which is PX1020, and

17   Defendants' Exhibit 1040 from Dr. Israel's supplemental

18   submission.  You're familiar with this, right?

19   **A.**   Yeah, I vaguely remember it.

20   **Q.**   Okay.  And you see that it compares your analysis of HHIs

21   and modified HHIs without Newark, to an updated analysis of

22   concentration that includes Newark, right?

23   **A.**   That's correct.

24   **Q.**   Okay.  So let's just look at what happens to market

25   shares.  For San Francisco, a claimed 45.7 percent combined

1    market share drops to 24.9 percent, right?

2    **A.**   That's correct.

3    **Q.**   That's a 45 percent reduction in the combined share,

4    right?

5    **A.**   I don't know.

6    **Q.**   There is a 40 percent reduction of market share on the

7    Las Vegas route, right?

8    **A.**   The numbers go from 46.5 to 27.9 on this sheet.

9    **Q.**   There's a 28.5 percent reduction in the combined shares

10   on LAX, right?

11   **A.**   You're asking me to do math in my head that I'm not

12   prepared to do, but I do see a reduction from 57 to 40.

13   **Q.**   For all but six routes with a New York -- with New York

14   City as an endpoint, the change in the HHIs for both the

15   standard and the modified versions of the HHIs is now below

16   500.  Right?

17   **A.**   Yes, I don't know why 500 is a relevant metric here.

18   **Q.**   Well, I'll just ask you, when was the last time that you

19   were aware of that either the antitrust division or the

20   Federal Trade Commission challenged any merger where the

21   highest change in the HHI for any relevant market was less

22   than 500?

23   **A.**   I'm just going by what the guidelines say.  I don't

24   follow, actually, litigation that the Department of Justice

25   and the Federal Trade Commission do on a routine basis.

1   **Q.**  The contours of the geographic markets in New York, and

2   particularly where Newark flights are included, directly

3   effects the HHIs and the modified HHIs by which you infer a

4   likelihood of adverse effects, correct?

5   **A.**  I'm sorry.  Say this again?

6   **Q.**  Well, let me put it this way, in your simulation, when

7   you're modeling this recapture effect, diversion is

8   proportional to market share, right?

9   **A.**  No, that's not true.

10   **Q.**  How is that not true?

11   **A.**  The -- I use nests, again, to allow for diversion of the

12   outside good, to relax the substitution patterns there, in a

13   way that makes sense, allows for flexibility.  I also allow

14   for different preferences for nonstop and connect, and all of

15   this -- all of this captures the -- helps me capture the real

16   decision that customers are making, and summarize it in a

17   useful way.

18         Now, it is the case that the diversion I get is

19   going to correlate with market shares, but that should also

20   be consistent with expectation for reasons that I outlined

21   yesterday on direct.

22   **Q.**  Okay.  Let's just go, then, with diversion is going to

23   correlate with market shares.

24         So if the market shares change, it's going to

25   change the results of the model, right?

**A.**   Not necessarily.  What matters is the choices that people
make, and the model will pick up the choices that people
make.

**Q.**   Okay.  Let's take a look at this document related to your
Exhibit 25, you've seen at your deposition, also.  It's based
on plaintiffs' Exhibit 1029 and the back up material that you
provided us specifically, "Work paper 4" from your reply
report.  And you recall this, right?

**A.**   Not specifically.

**Q.**   Okay.  But it's showing how your predicted price
increases change when Newark is included in the relevant
markets, right?

**A.**   That's -- there's nuance and one has to be careful with
the interpretation of this.  Because if we put Newark into
the market without accounting for what I observe, which is
that Newark is a relatively distant substitute, if we don't
allow the model to -- if we just assume, essentially, that
Newark products are equally as good as all the other
products, then this is what will come out.

**Q.**   Okay.  Fair enough.

**A.**   That's a very strong assumption that's actually
inconsistent with the sorts of evidence that I've been able
to provide.

**Q.**   Okay.  But going with that, what -- the effect of doing
this is that the predicted price increases decline

1   substantially, right?

2   **A.**   I don't want to use the adjective --

3   **Q.**   Fair enough.

4   **A.**   -- but if you were to incorrectly include Newark as an

5   equal competitor for the same customers that normally do

6   JetBlue or American, mechanically the price effect is going

7   to go down.

8   **Q.**   Okay.  So let's look at Miami, first one.  The -- the

9   price increase that your model predicts for all products is

10  10.2 percent, right?

11  **A.**   That's correct.

12  **Q.**   If you don't count Newark.  If you count Newark,

13  mechanically, however you want to put it, it drops to

14  6.5 percent, right?

15  **A.**   In -- again, this makes sense mechanically, yes.

16  **Q.**   Okay.  So it drops almost 37 percent, once we account for

17  Newark competition, right?

18          THE COURT:  And the difference in those two is in

19  the second, the 6.5 percent, Newark is assumed to be an equal

20  or so-called perfect substitute for JFK and LaGuardia?

21          THE WITNESS:  There's two things going on.  One is

22  that with overstating -- I'll just say it, with more

23  diversion flowing to the United products out of Newark,

24  which, because they're an equal competitor, it will just put

25  in a lot of diversion that goes to United, that will tend to

1    reduce upward pricing pressure, so that the magnitude of --

2            THE COURT:  Sure.  But the thing that changes

3    between these two outcomes is the assumption that Newark is

4    an equal substitute.

5            THE WITNESS:  There's one other change, which is

6    that -- I explained yesterday that the price -- the prices of

7    firms, other than American and JetBlue, are allowed to

8    increase, with the NEA, but that that effect tends to be much

9    smaller than the price elevations that you see on JFK and

10   American.  And so here, when you're going for all products,

11   not only do you reduce the price effect of JFK -- of American

12   and JetBlue, but you also add in United and so bigger -- you

13   know, the United is going to have the smaller price

14   elevation, because it's not one of those firms.  It's not --

15   and so we're adding in sort of a small number.  So the

16   average across all products comes down for both of those

17   reasons.

18   BY MR. WALL:

19   Q.   Right.  So overall, we did go through the specifics of

20   this in briefing or what have you, but overall, what occurs

21   on the New York routes is that the predicted harm on the New

22   York routes drops 30 percent once flights from Newark are

23   treated the same way in the model as flights from LaGuardia

24   and JFK.

25   A.   Yeah, I think -- and that's the 70 million number that I

1    showed yesterday.

2    **Q.**  Right.  And in that 30 percent drop in the estimated harm

3    occurs even though the volume of traffic captured in your

4    simulation, once you treat Newark as part of the market,

5    increases by over 80 percent, right?

6    **A.**  I don't understand why the volume of traffic is relevant

7    to this.  70 million is the same number, either way.

8    **Q.**  The volume -- you said it yesterday in your testimony,

9    that your estimates of overcharge are sensitive to the volume

10    of traffic affected, right?

11    **A.**  If you'd like me to take a stab at explaining, I can.

12    **Q.**  Never mind.  But do you -- regardless of whether you

13    think it matters or not, do you dispute the fact that once

14    you put in all of that capacity, and all of that flying from

15    Newark, the size of the relevant market -- relevant markets,

16    in the aggregate, increases by over 80 percent?

17    **A.**  That's not a number that I've looked into.  But

18    mechanically it would go up, because you're adding in traffic

19    from United and other carriers outside, out of Newark.

20    **Q.**  Okay.  And in all events, Dr. Miller, what you do with

21    your market shares is you try to apply the presumptive

22    illegality of the *Horizontal Merger Guidelines* to them,

23    right?

24    **A.**  I don't apply that.  I just analyze the numbers.

25    **Q.**  Okay.  Well, let's just then look at your slide 72, and

1   the lower bullet.  And it says, "Collaboration guidelines

2   explain that measures of market shares and concentration are

3   relevant to assessing a collaboration."  Under that it says,

4   "Herfindahl-Hirschman Index, HHI, is the standard of measure

5   of concentration," and under that, you say, "*Horizontal*

6   *Merger Guidelines* for markets with post-merger HHI greater

7   than 2,500 and a change in HHI greater than 200, a merger

8   will be presumed to be likely to enhance market power."

9   Right?  You put that in your slide?

10  **A.**  Yeah.  To be clear, I'm clarifying the instances in which

11  the guidelines state and the Justice Department and the

12  Federal Trade Commission will presume a likelihood of

13  enhanced market power.

14  **Q.**  Right.

15  **A.**  To clarify what I said earlier, you know, I don't

16  necessarily presume that.  I try to look at a full analysis,

17  but I'm just characterizing what's in the merger guidelines.

18  **Q.**  Okay.  That's a merger standard from the *Horizontal*

19  *Merger Guidelines*, right?

20  **A.**  That is correct.

21  **Q.**  There is no presumption of illegality or an

22  anti-competitor effect based on market shares in the

23  collaboration guidelines, is there?

24  **A.**  The collaboration guidelines?

25  **Q.**  Answer my question, yes or no.

1    **A.**  It is not a yes or no question.

2    **Q.**  Yes it is a yes or no question.  Please answer it yes or

3    no.  Is it there or is it not?

4    **A.**  It depends on the --

5            THE COURT:  Well, he can either answer it yes or

6    no, or say he can't.

7            THE WITNESS:  Okay.  I can't answer that question.

8    BY MR. WALL:

9    **Q.**  Okay.  In fact, the collaboration guidelines are very

10   clear on the degree to which merger analysis applies and does

11   not apply with respect to collaborations, are they not?

12   **A.**  They provide -- are they not?  Are they very clear?  They

13   provide a discussion of situations under which a

14   collaboration is appropriate to analyze as a merger.

15   **Q.**  Let's look at Section 3.3 of the collaboration

16   guidelines.  "In evaluating the significance of market share

17   and market concentration data, and interpreting the range of

18   market share as ascribed to the collaboration, the agencies

19   also examine factors beyond those set forth in the *Horizontal*

20   *Merger Guidelines*."

21           You're familiar with that principle?

22   **A.**  Yes, I've read these guidelines.

23   **Q.**  Okay.  And the first factor mentioned in Section 3.3.4,

24   we can put that up, is --

25   **A.**  Do you actually have this in the binder, by the way?  Can

1   I look at it?

2           MS. NELSON:  It's the second to the last tab in the

3   big binder.

4           THE WITNESS:  I'm sorry to interrupt.

5           Okay.  Sorry.

6   **Q.**  Okay.  Section 3.3.4?

7   **A.**  Uh-huh.

8   **Q.**  "Competitor collaborations sometimes do not end

9   competition among the participants in a collaboration.

10  Participants may continue to compete against each other and

11  their collaboration, either through separate independent

12  business operations or through membership and other

13  collaborations."  It goes on a little later, "Control over

14  key on competitive variables may remain outside the

15  collaboration, such as where the participants independently

16  market and set prices for the collaborations output."  That's

17  what the guidelines state, right?

18  **A.**  Yes, I do read this.

19  **Q.**  And this is just making a point that you just can't use

20  concentration data as if there's a merger when the

21  collaboration preserves some ability to compete

22  independently, right?

23  **A.**  Yes.  And I think that the following paragraph contains

24  some lists of things that matter for this.

25  **Q.**  And we'll come to them.  Thank you.

1          Furthermore, you are aware, are you not,

2    Dr. Miller, that merger analysis, under Section 7 of the

3    Clayton Act occurs subject to a legal rule called the

4    *Philadelphia National Bank* that creates an presumption of

5    anticompetitive effects from a substantial increase in

6    concentration?

7    **A.**   I'm not aware of the case law.

8    **Q.**   Okay.  Now, in a case of a collaboration, the market

9    shares by the terms of the collaboration guidelines are

10   relevant to the question of whether the participants to the

11   collaboration will have enough control of supply in the

12   market to raise prices by restricting their own output,

13   correct?

14   **A.**   Are you asking me to endorse a quote from the

15   collaboration guidelines, or just --

16   **Q.**   Just pull it up.  Let's pull up collaboration guidelines

17   3.3.  It says, "Other things being equal, market share

18   affects the extent to which participants or the collaboration

19   must restrict their own output in order to achieve

20   anticompetitive effects in a relevant market.  The smaller

21   the percentage of total supply that a firm controls, the more

22   severely it must restrict its own output, in order to produce

23   a given price increase, and the less likely it is that an

24   output restriction will be profitable."

25          Do you agree with that statement?

1    **A.**   Yes, I think if this were being written out, it would be

2    worded a little differently, but I do agree that the market

3    share is relevant for understanding the potential market

4    power.

5    **Q.**   But in your analysis in this case, you never reported on

6    any findings about whether the NEA would give American and

7    JetBlue sufficient market share to restrict their own output

8    in order to produce a price increase, did you?

9    **A.**   No, I disagree with that statement.  I have done this.

10   This is part of the language that I think would be updated,

11   because this is sort of done in the context of a commodity

12   market where you can reduce your output and retain a higher

13   price.  But with differentiated products, it's more as if

14   there's a question of can you raise price and not lose output

15   to such an extent to make the price increase unprofitable,

16   and that's what I've explored.  It's sort of the analog to

17   this statement.

18   **Q.**   But the way that you approached market power in this case

19   was by presenting, in your report, and in your slides

20   yesterday, an analysis of HHIs and modified HH Is relating

21   them to the threshold for presumptive illegality under the

22   *Horizontal Merger Guidelines*, right?

23   **A.**   I've done a lot to look at the implications of the NEA

24   for market power, and one of the exercises that I've done was

25   an analysis of the Herfindahl-Hirschman Index.

1   **Q.**  And in your testimony, you focused on a minority of the

2   markets in which American and JetBlue happened to have the

3   highest market shares of all of the routes that are within

4   the scope of the NEA, right?

5   **A.**  In the sense that I focused on the nonstop overlap

6   routes?

7   **Q.**  No, you focused on a minority of the nonstop overlap

8   routes, a small minority of the nonstop overlap routes,

9   correct?

10  **A.**  Maybe you can refresh my memory on that.

11  **Q.**  Well, let me just ask you this.  Let's put up slide 43

12  from my opening statement.  Do you remember this slide?

13  **A.**  Not specifically.

14  **Q.**  Well, the first point is that of the 64 destinations with

15  nonstop service by the parties at the time of the NEA to and

16  from Boston, only 12 were nonstop overlaps.  Are you aware of

17  that?

18  **A.**  Is this characterizing overlaps as they existed in 2019?

19  I believe I have analyzed all the overlaps as they existed in

20  2019.

21  **Q.**  Indeed you did.  So is it the case, then, sir -- can

22  you -- do you have any basis to disagree with this assertion?

23  **A.**  I don't know what this -- precisely, what this assertion

24  is.

25  **Q.**  Of the 64 destinations with nonstop service by the

1  parties to and from Boston prior to the NEA, only 12 were

2  nonstop overlaps?

3  **A.**   I don't recall the -- no, I don't have a particular

4  reason to disagree.

5  **Q.**   Okay.  And you do know that six of the 12 Boston nonstop

6  overlaps are the carve-out routes, right?

7  **A.**   Yes, that's correct.

8  **Q.**   On which there is no revenue sharing or capacity

9  coordination, right?

10  **A.**   Yes, that's correct.

11  **Q.**   Okay.  And you do know that among the remaining Boston

12  overlaps are the Miami, Los Angeles, and Chicago routes,

13  right?

14  **A.**   I believe that's the case.

15  **Q.**   Okay.  Now, let's put up slide 54 from my opening that

16  talked about the position of United and Delta on New York

17  routes.

18         Are you familiar with this slide?

19  **A.**   Not specifically.

20  **Q.**   Well, do you have any reason to dispute that on the

21  routes that are listed here, the predominant market shares

22  come from some combination of United and Delta?

23  **A.**   That seems right.  I just want to point out that on my

24  slides, that look similar to this, blue would be JetBlue, and

25  red would be American, and here I see United in blue and

1    Delta in red, so just I don't want to have any confusion on

2    that point.

3    **Q.**   Okay.  And do you recall that in my opening statement, I

4    made the point that on 81 of the 99 New York City nonstop

5    routes served prior to the NEA by either American or JetBlue,

6    American and JetBlue did not have competing nonstop service?

7    **A.**   I don't remember your opening statement.

8    **Q.**   All right.  Do you have any reason to doubt that on 81 of

9    99 of the New York City nonstop routes served by -- prior to

10   the NEA by either American or JetBlue, they weren't even

11   competitors, nonstop competitors?

12   **A.**   The assertion is that they fly a lot of nonstop routes on

13   which they're not competitors.

14   **Q.**   Yeah.

15   **A.**   That sounds right to me.

16   **Q.**   Okay.  All right.  So if we're going to treat the NEA

17   like a merger analysis, the 2010 merger guidelines would

18   spell out what you should consider, right?

19   **A.**   Yes, it does.

20   **Q.**   Okay.  And, in fact, yesterday you cited Section 6.1 of

21   the merger guidelines as a basis for the simulation that you

22   ran, right?

23   **A.**   Yeah.  6.1 explains upward pricing pressure.  It doesn't

24   use that term, but it's the economics behind it.

25   **Q.**   Right, but it also mentions the possibility of using a

1  merger simulation in an analysis of a differentiated products

2  merger, right?

3  **A.**   It does mention that possibility.

4  **Q.**   Okay.  Now, if we were going to go down the path of

5  analyzing the NEA like a merger, the guidelines would tell us

6  to look at different kinds of evidence, right?  Not just HHIs

7  and market shares and things like that.

8  **A.**   I think the guideline points out that the types of

9  evidence that are available in investigation are myriad, and

10  provides some ideas for which information might be

11  informative.  And in that context, the answer would be yes.

12  **Q.**   Okay.  So let's look at Section 2.1.1 of the 2010

13  guidelines, which is entitled, "Actual effects observed in

14  consummated mergers."  And it states, "When evaluating a

15  consummated merger, the ultimate issue is not only whether

16  adverse competitive effects have already resulted from the

17  merger, but also whether such effects are likely to arise in

18  the future, and then evidence of observed post-merger price

19  increases or other changes adverse to customers is given

20  substantial weight."

21          Do you see that?

22  **A.**   I do see that.

23  **Q.**   Okay.  You provided no analysis of observed postNEA price

24  increases or other changes adverse to customers, did you?

25  **A.**   That's correct.

1   **Q.**   Okay.  Now, let's look at Section 2.1.2, which is direct
2   comparisons based on experience.  You're familiar with that?
3   **A.**   Yes.
4   **Q.**   And this reads, "The agencies will look for historical
5   events or natural experiments that are informative regarding
6   the competitive effects of the merger.  For example, the
7   agencies may examine the impact of recent mergers, entry,
8   expansion, or exit in the relevant markets.  Effects of
9   analogous events in similar markets may also be informative."
10  Right?
11  **A.**   Yes.
12  **Q.**   Okay.  And one of the things that you could have done in
13  this case to inform the analysis of the NEA is look at what
14  the economic literature or what your own study might have
15  found with respect to the consumer welfare effects of
16  international airline alliances, right?  That's a similar
17  kind of transaction.
18  **A.**   Well, it's not one that I had looked into much.  And
19  Professor Town highlighted a number of reasons to think that
20  this is actually not very comparable.  So I'm not sure that
21  that would be informative for the economic effects of the
22  NEA.
23  **Q.**   Well, they are different in the sense that the
24  international alliances coordinate prices and have full
25  antitrust immunity, right?

**A.**   That's my understanding -- I believe that's the case.
They can coordinate on prices.

**Q.**   Okay.  So you'd have to make some adjustment for the fact
that the NEA doesn't have price coordination or antitrust
immunity if you would try to apply those lessons here, right?

**A.**   Those aren't the differences that may be most relevant.

**Q.**   But they all involve revenue sharing, right?

**A.**   That's true.  I think.  -- I shouldn't, actually -- I
shouldn't testify to that fact.  My understanding is that
they do.

**Q.**   Well, you're aware of the fact that to get antitrust
immunity from the Department of Justice, an international
alliance has got to have revenue sharing or some other
similar profit sharing function?

**A.**   It's a regulatory detail that I haven't looked into.

**Q.**   In your -- wait.  In your analysis of the incentive
effects of revenue sharing, you never looked at what the DOT
has done on that issue in the past?

**A.**   That's not what I am saying.  I'm aware that the DOT
approves alliances in this context, but you asked me a
question about whether there's a particular thing that is
needed for approval and that's not something that I should
testify to.

**Q.**   Okay.  Are you aware, then, of the fact that there's a
substantial body of DOT decisions approving ATI applications

1    that talks about the consumer welfare effects of revenue

2    sharing?

3    **A.**   Yes.  I -- no, I'm not aware of that.

4    **Q.**   Okay.  All right.  Another thing that the *Horizontal*

5    *Merger Guidelines* tell you to consider are the conclusions

6    of, "Well informed and sophisticated customers on the likely

7    impact of the merger," right?  That's on Section 2.2.2 on

8    your screen?

9    **A.**   Yes, I do see it.

10   **Q.**   But you don't say a word in your report about the

11   reaction of customers to the NEA, do you?

12   **A.**   I haven't studied -- compared predisposed NEA behavior,

13   because I don't think it would be appropriate to do so.  Is

14   that the question?

15   **Q.**   I'm just saying do it like a merger, where prior to

16   making a decision on the merger, you go out and you ask

17   customers how they are reacting to the proposed transaction.

18   You didn't do anything like that, did you?

19   **A.**   No, I don't think that would be helpful in this instance.

20   **Q.**   In fact --

21           THE COURT:  No, he's just asking whether you did

22   it.

23           THE WITNESS:  I didn't do it, no.  Okay.  Thank

24   you.

25   BY MR. WALL:

1  **Q.**  And, in fact, the government didn't call any customers to

2  testify against the NEA, did it?

3             MR. DERITA:  Objection.  Calls for speculation.

4             MR. WALL:  What?

5             MR. DERITA:  And he doesn't have a foundation for

6  this.

7             THE COURT:  Well, he was here.  Based on his

8  testimony, I understand him to have been here for much, maybe

9  not all of the trial, but he's heard some --

10             THE WITNESS:  Half a day.

11             THE COURT:  -- he's testified having heard various

12  portions of the trial.

13             MR. DERITA:  I believe the question was broader

14  than whether we called anyone as in, like, did we talk to

15  anyone in the --

16             THE COURT:  No, I understand called to be called at

17  trial as witnesses.

18             THE WITNESS:  To my knowledge --

19             THE COURT:  Overruled.

20             THE WITNESS:  -- there were no customers called to

21  testify, but I could be mistaken, because I've only been here

22  for one day.

23             THE COURT:  Oh.  All right.

24             MR. WALL:  Okay.  Your Honor, I'm just about to go

25  to another subject.  I can start for three minutes, or I can

1    -- we can take the break.  It's up to you.

2           THE COURT:  Why don't you go a little longer?

3           MR. WALL:  Okay.  Great.

4    BY MR. WALL:

5    **Q.**  So let's turn to the way the government has traditionally

6    analyzed airline mergers in particular.  Now, you personally

7    worked as a DOJ staff economist on the first of the three big

8    legacy airline mergers, the Delta/Northwest merger, right?

9    **A.**  I did, yes, that's correct.

10   **Q.**  And that is a merger that the Department of Justice

11   permitted to go forward without remedies and without any

12   challenge, right?

13   **A.**  Yes, that's correct.

14   **Q.**  And afterwards, as you alluded to in your testimony

15   yesterday, three Department of Justice economists wrote an

16   article on the economic approach that the Department of

17   Justice took in that matter, right?

18   **A.**  They did.

19   **Q.**  Okay.  Let's take a look at Defendants' Exhibit 1068.

20   This is an article entitled, "The Year in Review:  Economics

21   at the Antitrust Division, 2008-2009," correct?

22   **A.**  Yes.

23   **Q.**  And just for context, this has been a practice of the

24   antitrust division over the year, which is to publish some

25   kind of an article that reflects on the economic analysis

1      that had occurred on various matters in the division in the

2      preceding year, right?

3      **A.**   That is correct.

4      **Q.**   Okay.  And the authors here are Ken Heyer, Carl Shapiro,

5      and Jeffrey Wilder, who were all division economists at the

6      time, right?

7      **A.**   That is correct.

8      **Q.**   And in fact, Dr. Shapiro was the deputy assistant

9      attorney general for economics at the antitrust division at

10     the time?

11     **A.**   That's correct.

12     **Q.**   Okay.  And there is a write-up on this article on the

13     economic analysis that was done with respect to

14     Delta/Northwest, right?

15     **A.**   Yes, I believe that's the case.

16     **Q.**   Okay.  So let's put up a piece of that, which is -- I

17     think you have the article in front of you --

18              MR. WALL:  But I don't have a page cite.

19              MS. NELSON:  Page 8.

20              MR. WALL:  Page 8, I am told.

21     BY MR. WALL:

22     **Q.**   So it says here, in terms of the way that that merger was

23     analyzed, is that the DOJ, it says, "Using demand elasticity

24     estimates that are consistent with the empirical literature

25     on the airline industry, along with some neutral assumptions

1    about the nature of consumer demand, our economists were able

2    to calculate the change in consumer welfare implied by the

3    predicted traffic changes for each hypothetical post-merger

4    schedule."

5             Do you see that?

6    **A.**   Yes, I do see that sentence.

7    **Q.**   Did you personally work on that exercise?

8    **A.**   No, I did not.

9    **Q.**   Okay.  But you understand that what happened in that

10   merger is that the parties had provided the division with

11   predictions of the -- of traffic changes that would occur as

12   a result of the merger, right?

13   **A.**   Yes.

14   **Q.**   Okay.  And the division economists didn't just take those

15   at face value.  They did their own analysis of what they

16   thought was realistic and what was not realistic, right?

17   **A.**   No, I disagree with that.  It was an incomplete

18   characterization.

19   **Q.**   It's a what?

20   **A.**   It's an incomplete characterization.

21   **Q.**   Okay.  Whether it is incomplete or not, was at least

22   partially, what I said, accurate?

23   **A.**   Maybe I should just clarify.

24             I'm trying to give short answers now.

25             The Department of Justice took as given the

1    schedules produced by the parties and tried to analyze the

2    implications of those.  Some context is actually in the

3    subsequent article from the following year.

4    **Q.**  Okay.  I didn't think we needed to do this, but let me

5    just get the article out for a second.

6              Okay.  I am reading from --

7    **A.**  Do you have a copy of it, by the way?

8    **Q.**  It's actually, if it you just --

9              If you actually just go down to the next paragraph

10   on the page, that's the one?

11             MR. MALONE:  It's 1967, page 8.

12             THE WITNESS:  Thank you.

13   BY MR. WALL:

14   **Q.**  Okay.  What it says here in the next paragraph, "It's

15   worth noting that our methods for estimating merger specific

16   benefits produced figures that were far below those claimed

17   by the parties.  One major reason for this was that the model

18   used by the parties experts' employed a measure of

19   convenience" -- I'll skip that parenthetical -- "that

20   generated predictions about future traffic flows that were

21   wildly inconsistent by the predictions made by the model that

22   Northwest uses in the ordinary course of business ."

23             So what it is saying here is that you received what

24   the parties said, but you put it to your own analysis and

25   came to the DOJ's conclusions based upon benefits that were

1  lower than those claimed by the parties, right?

2  **A.**  Again, I think there's sort of important context here

3  that's missing.  But it's consistent with my previous

4  statement, and I can explain, if you'd like.

5  **Q.**  And then the conclusion of that analysis is stated in the

6  paragraph that begins above that, "Our best estimates."  And

7  it says, "Our best estimates are the likely increases in

8  consumer welfare, significantly exceeded the feared harm to

9  consumers in the overlap routes served by the two carriers.

10  On this basis, we concluded that the merger was likely

11  procompetitive and ought not be challenged."

12          I read that correctly, right?

13  **A.**  You read that correctly.

14  **Q.**  So what happened in that analysis is the department

15  simultaneously created an estimate of harm on the overlap

16  routes served by the two carriers and benefits on a

17  system-wide basis, and on that basis concluded that the

18  merger was likely procompetitive, right?

19  **A.**  No, I think that's not precisely what happened.  And I

20  can explain why, if you'd like.

21  **Q.**  But Dr. Miller, in your testimony here, you didn't do

22  anything like this, where you actually created your own

23  estimate of both the benefits and the harms and compared them

24  to one another, did you?

25  **A.**  Well, I've looked at the efficiencies's claims, and

1    I've -- you know, I don't see that there is compelling

2    evidence of significant and agreement-specific efficiencies

3    from this transaction at the level that would be comparable

4    to the antitrust harm.  And so, I mean, ultimately I rely on

5    Professor Town for much of that, but I did consider the

6    efficiencies.

7    **Q.**  But let's be clear, you're the last witness in the

8    plaintiffs' case-in-chief.  Do you understand that?

9    **A.**  Yes, I do.

10   **Q.**  Okay.  You have literally one sentence on page 99 of your

11   slide deck about efficiencies, right?

12   **A.**  That's true.

13   **Q.**  You did not quantify efficiencies in any way, shape, or

14   form yourself, did you, sir?

15   **A.**  I have not quantified efficiencies.

16   **Q.**  Professor Town, when he was here yesterday, did not

17   quantify efficiencies in any way, shape, or form, did he?

18   **A.**  I don't want to characterize his testimony, but that's

19   consistent with my understanding.

20   **Q.**  Okay.  So you aren't doing here what you and your

21   colleagues did in the Delta/Northwest merger, which is to

22   create and quantify efficiencies and compare them to harms,

23   right?

24              MR. DERITA:  Objection --

25              THE COURT:  What's the --

1          MR. DERITA:  -- assumes facts not in evidence.

2          THE COURT:  Overruled.

3          THE WITNESS:  I would disagree with that assertion

4     and, again, for the same reason that I've said there's

5     important context here that's missing, and I can explain, if

6     you'd like.

7          Dr. Miller:  Take a break now, Your Honor?

8          THE COURT:  Yes.  We'll stand in recess.

9          (Court in recess at 11:05 a.m.

10         and reconvened at 11:20 a.m.)

11         THE COURT:  Go ahead, Dr. Miller.

12         Dr. Miller:  Thank you, Your Honor.

13    BY Dr. Miller:

14    **Q.**  Dr. Miller, I want to turn to your rationale for using a

15    merger simulation in this case.  And for purposes of this

16    discussion, I'll just focus on the nonstop overlap routes,

17    and if we put up slide 57 from Dr. Miller's examination, from

18    his presentation, you recall that you had these different

19    kinds of overlap routes, and you state in here that with

20    respect to the NEA nonstop overlap, it's almost all the

21    traffic and scope, and the effect is almost identical to a

22    full merger between defendants, right?

23    **A.**  I do see that.  And in your question, you characterize

24    this as a merger simulation, but I view it as a simulation of

25    the NEA.

1    **Q.**   I understand.   You called it a merger simulation five

2    times in your original report, right?

3    **A.**   As you -- in my initial report?

4    **Q.**   Yes?

5    **A.**   I don't know the answer to that.

6    **Q.**   Okay.   We can move on.

7            So what you have done for the NEA, nonstop overlap

8    markets, is model it like a unilateral products merger in

9    which there's a one-shop change in something called a Nash

10   Bertrand equilibrium, right?

11   **A.**   Yes, that's correct.

12   **Q.**   Okay.   And what drives the changes between the observed

13   2019 preNEA prices and the predicted postNEA prices is this

14   ability to internalize diversion between American and

15   JetBlue, and how it leads to a new Nash Bertrand equilibrium,

16   right?

17   **A.**   That's correct.

18   **Q.**   Okay.   That's -- put up slide 17.   This is where you

19   say, "Revenue sharing raises prices because of the recapture

20   incentive."   And that's substantially the logic of the point

21   that I just made, right?

22   **A.**   That's correct.

23   **Q.**   Okay.   Now -- and there are mathematics in your

24   simulation, which capture this -- this recapture incentive,

25   right?

1   **A.**  Yes.

2   **Q.**  Okay.

3   **A.**  Economics, maybe, but yes.

4   **Q.**  Right.  So now the mathematics in your simulation are not

5   about some increase in legacy carrier capacity discipline,

6   are they?

7   **A.**  That's correct.

8   **Q.**  They are not about some thesis that you have established

9   and reduced to mathematics, whereby JetBlue is no longer

10  behaving like an LCC, right?

11  **A.**  That's not a yes or no question, because behave like an

12  LCC is --

13  **Q.**  Let me rephrase it.  Sorry.  It may be a bad question.

14  Sorry.

15          The mathematics in your simulation are not about

16  some thesis that you established and reduced to mathematics,

17  whereby there's a fundamental change in the JetBlue business

18  model and it's presentation of itself to the world as a low

19  cost carrier?

20  **A.**  These are terms that don't come naturally to me, what I

21  model is the change in the pricing incentives.

22  **Q.**  Pricing incentives, based upon recapture?

23  **A.**  Yes, that's correct.

24  **Q.**  Okay.  Now, I'll put up a slide that I used in the

25  opening, defense opening slide 61.  I'm sure you've seen

1   this.  And this, I'm sure, won't take long, but you're not

2   contending that the NEA is, in fact, a merger, right?

3   **A.**   That's correct.

4   **Q.**   It's a set of bilateral contracts, right?

5   **A.**   Yes.

6   **Q.**   And the NEA has no impact on the parties' brands, right?

7   **A.**   Not to my knowledge.

8   **Q.**   It doesn't affect any control of assets, right?

9   **A.**   That's correct.

10  **Q.**   There's no permanent transfer of assets through the NEA,

11  right?

12  **A.**   That's right.

13  **Q.**   American can't use JetBlue planes and vice versa,

14  correct?

15  **A.**   That's my understanding.

16  **Q.**   Okay.  And American and JetBlue have retained the ability

17  to compete with each other, in some respects, within the NEA

18  territories, right?

19  **A.**   The ability to compete, yes, they maintained the ability

20  to compete.

21  **Q.**   Right.  There's no pricing coordination in the NEA,

22  right?

23  **A.**   The NEA does not -- that is correct.

24  **Q.**   Okay.  And so if JetBlue wants to keep charging JetBlue

25  prices, it can do so, right?

1    **A.**   It has that option.

2    **Q.**   Okay.  So and the NEA also has a term, and can end,

3    unlike a merger, right?

4    **A.**   Yes, I believe that is the case, that there's a

5    termination -- there are conditions under which it can be

6    terminated.

7    **Q.**   Right.  So based on those points on which we can agree,

8    the DOJ collaboration guidelines would not analyze the NEA

9    like a merger, correct?

10   **A.**   No, I think that's incorrect.

11   **Q.**   Let's pull up Section 1.3 of the collaboration

12   guidelines.  All right?  This reads, "The competitive effects

13   from competitor collaborations may differ from those of

14   mergers due to a number of factors.  Most mergers completely

15   end competition between the merging parties and the relevant

16   markets.  By contrast, most competitor collaborations

17   preserve some form of competition among the participants."

18            I correctly read that, right?

19   **A.**   Yes, that's right.

20   **Q.**   And it goes on to say that, "The potential for future

21   competition between participants in a collaboration requires

22   antitrust scrutiny different from that required for mergers."

23            Do you see that?

24   **A.**   I do.

25   **Q.**   But -- let's put up your slide 14 from your presentation.

1    Right?  What you told the Court yesterday is, quote, "The NEA

2    effectively ends competition between American and JetBlue on

3    routes that touch the NEA airports."

4              Right?

5    **A.**  Yes, that's my testimony.

6    **Q.**  Okay.  Now, let's go back to the guidelines.  The

7    guidelines outline four elements that, if met, allow the

8    agencies to treat a competitor collaboration like a merger.

9    Correct?

10   **A.**  That's consistent with my recollection, but I'd want to

11   refer.

12   **Q.**  Well, that's fine.  Let's go to page 9 of the

13   collaboration guidelines, and we'll put that up here.

14   **A.**  And this is page 5, not page 9.

15   **Q.**  It's on your screen.  It says, "Nonetheless"?

16   **A.**  It's not on the page.

17   **Q.**  I may have it wrong.

18             MS. NELSON:  Yes, it's page 5.

19             MR. WALL:  Sorry, page 5.

20   BY MR. WALL:

21   **Q.**  It says, "The agencies treat a competitor collaboration

22   as a horizontal merger in a relevant market and analyze the

23   collaboration pursuant to the *Horizontal Merger Guidelines,*

24   if appropriate, which ordinarily is when certain factors

25   listed are present," right?

1    **A.**   That's what it says.

2    **Q.**   And the factor "(c)" that's listed and has been

3    highlighted now says, "The integration eliminates all

4    competition among the participants in the relevant market."

5    Correct?

6    **A.**   Yes, that's right.

7    **Q.**   And then factor "(d)" is that, "The collaboration does

8    not terminate within a sufficiently limited period by its own

9    and express terms."  Right?

10   **A.**   Yes, that's right.

11   **Q.**   So essentially, unless the Court were to find that the

12   NEA eliminates all competition among American and JetBlue in

13   the relevant market, by the terms of the collaboration

14   guidelines it should not be analyzed as a horizontal merger,

15   correct?

16           MR. DERITA:  Objection.  Calls for a legal

17   conclusion.

18           THE COURT:  As to his understanding.

19           THE WITNESS:  My understanding is that the NEA

20   effectively eliminates competition.  And if there's something

21   around the edge that's not within the scope of the NEA, it's

22   not important enough to interpret this as saying that you

23   wouldn't analyze it like a merger.

24   BY MR. WALL:

25   **Q.**   Now, you developed a theory of your own, which is not

1  found in the collaboration guidelines, for treating a

2  collaboration like a merger, correct?

3  **A.**  Excuse me?

4  **Q.**  Your theory, based upon revenue sharing and capacity

5  coordination having merger-like incentives is not found in

6  the collaboration guidelines, is it?

7  **A.**  No, that's false.

8  **Q.**  Where is it?  Point it out, please.

9  **A.**  The collaboration guidelines specify that one impact of a

10  collaboration can be creating a financial stake in the other

11  partner, and that's what the NEA does.

12  **Q.**  Okay.  But they don't lay out any logic relating to the

13  combination of revenue sharing or capacity coordination to a

14  conclusion that you treat something like a merger, do they?

15  **A.**  I don't want to testify to that.  I think that to discuss

16  the financial stake and the implications that they can have

17  for agreements and how -- I think how it may link into the

18  mergers, but that's straining my memory.

19  **Q.**  Okay.  But your theory that incentives, irrespective of

20  control, can lead to treating revenue sharing or a

21  collaboration like a merger is not found in any published

22  economic literature, is it?

23  **A.**  No, that would be false.

24  **Q.**  What literature is it in?

25  **A.**  The -- for example, it's -- the partial ownership stakes

1    have a rich literature.

2    **Q.**   Such as the O'Brien and Salop article?

3    **A.**   As one of many.

4    **Q.**   Okay.  Let's pull up the Salop and O'Brien article.

5    **A.**   That's right.

6    **Q.**   This is "Competitive Effects of Partial Ownership:

7    Financial Interest in Corporate Control," by Steven Salop and

8    Daniel O'Brien, right?

9    **A.**   That's correct.

10   **Q.**   And let's go to page 562.  And they write, "The

11   competitive effects of partial ownership depend critically on

12   two separate and distinct elements:  financial interest and

13   corporate control.  This distinction is absent in merger

14   analysis, which assumes that the acquiring firm or person

15   automatically controls the acquired entity after the merger."

16             Did I read that correctly?

17   **A.**   You read it correctly.  This is consistent with my

18   testimony yesterday, as well.

19   **Q.**   And here, American and JetBlue are two separately

20   controlled companies, neither which owns any equity of the

21   other, correct?

22   **A.**   Correct.

23   **Q.**   Okay.  So let's go through your reasoning.  Section 4 of

24   your initial report is entitled, "The Economic Incentives

25   Created by the Northeast Alliance are Those Created by a

1    Merger," correct?

2    **A.**   Yeah, I don't remember the title of that section.

3    **Q.**   Okay.  There it is on the screen.

4    **A.**   Thank you.

5    **Q.**   And it begins in paragraph 27:

6              "In this section, I explain that collaborations

7    with features like the NEA, including revenue sharing and

8    capacity coordination provisions, function like an

9    acquisition of ownership."

10             Right?  That's what you do in your report?

11   **A.**   That's the statement of the -- that's the sentence.

12   **Q.**   Okay.  And then on page 20, paragraph 29, you purport to

13   explain why the NEA should be analyzed, quote, "using

14   standard merger tools," right?

15   **A.**   Yes, I do.

16   **Q.**   Okay.  And you say you proceed in three steps, which are

17   shown on the next page, or down below, rather, I guess, and

18   the first one, point, is you say, "I show that a

19   collaboration like the NEA affects economic incentives

20   through the same mechanism as a merger."  Right?

21   **A.**   Yes.

22   **Q.**   Now, further down, there is Section 4.1 on page 20, and

23   that is entitled, "An agreement to share revenue or profit

24   creates similar incentives to exercise market power as a full

25   horizontal merger," correct?

1    **A.**  Yes, that's what it says.

2    **Q.**  And it's in this statement, in this section, rather,

3    where you -- you state that, "In this section I show that a

4    profit sharing agreement typically creates similar incentives

5    to raise prices.  This follows because it is the profit

6    sharing feature of a horizontal merger, not coordination or

7    control, that creates such an incentive."

8              I read that correctly?

9    **A.**  Yes, you did.

10   **Q.**  Okay.  So let's put up defense opening slide 63.  And so

11   I was correct that, in the flow of your argument in your

12   initial report, the first part of your argument, the first

13   point you made in support of using merger tools was about

14   revenue sharing and the point that an agreement to share

15   revenue or profit creates similar incentives as a full

16   horizontal merger, right?

17   **A.**  Yes, I discussed that in the report.

18   **Q.**  Okay.  And then, further down your report, in

19   Section 4.2, you go on to argue that specific differences

20   between the NEA and a merger do not change the outcome,

21   right?

22   **A.**  Yeah, unlikelihood.  I read the sentence,  "Specific

23   differences between the NEA agreement and a merger do not

24   create clear distinctions in the types of economic incentives

25   that are likely to arise."

1    **Q.**   Right.  And it is in this section of this report that you
2    raise and address various points the that defendants had
3    made about how the NEA is not a merger, right?
4    **A.**   Yes.  I believe that's at least part of what that section
5    does.
6    **Q.**   And in paragraph 41, you introduce the idea that "The NEA
7    has additional mechanisms in place that allow defendants to
8    avoid exploitation and achieve mutually more profitable
9    outcomes, including the ability to coordinate their capacity
10   and to negotiate side payments to ensure mutually agreeable
11   NEA outcomes," right?
12   **A.**   And this is part of my analysis, yes.
13   **Q.**   Okay.  So let's again put up the slide that I used in the
14   opening, slide 63.  And I correctly identified capacity
15   coordination and side payments in the flow of your argument
16   as a -- in a secondary position behind revenue sharing,
17   right?
18   **A.**   This is -- I see on the slide, this is what you've
19   labeled it, primary and secondary.  That's factually correct.
20   **Q.**   Now, let's put on slide 13 from your direct examination.
21   Now, in this slide, you flip the order and you put capacity
22   planning ahead of revenue sharing, right?
23   **A.**   Yes.
24   **Q.**   And yesterday, you called the debate of over whether
25   revenue sharing is first, or capacity sharing is first,

1    quote, "A little bit of a sideshow," end quote, right?

2    **A.**  No, I don't believe -- I think that's not the context in

3    which I made that statement.

4    **Q.**  Okay.  But the fact is that the role of capacity

5    coordination and side payments in your report is to say that

6    they can and will be used to negate an incentive for

7    unilateral capacity expansion that is found in the MGIA,

8    right?

9    **A.**  That's one of the roles for capacity coordination and

10   that's consistent with my testimony yesterday.

11   **Q.**  Okay.  So essentially, the argument is that no one should

12   believe that the parties will behave consistent with that

13   capacity expansion incentive because, as you put it in your

14   initial report, on paragraph 41, those characteristics of the

15   NEA revenue sharing highlighted by the defendants actually,

16   if taken in isolation, create an incentive to exploit the

17   partner airline, i.e., profit at the partner's expense?

18   **A.**  That's the report says.

19   **Q.**  Right.  And the characteristics that you're talking about

20   are the terms of the MGIA that create unilateral incentives

21   to expand capacity, right?

22   **A.**  Particularly create incentives to expand capacity in a

23   way that departs from what would be jointly profitable for

24   the two firms.

25   **Q.**  Right.  So we'll pause on that phrase "jointly

1    profitable."  What you mean is jointly profitable in the

2    sense that being either merged, or economists also sometimes

3    use the term "perfect cartel," would create an incentive to

4    restrict output to raise price?

5    A.   In this part of my testimony, I'm not characterizing

6    particular effects of what joint profit maximization would

7    imply for the level of output.  I'll analyze that later in

8    the report.  In this section of the report, I'll just focus

9    on the question of would they maximize their joint profit and

10   come to the determination that they would.

11   Q.   Okay.  So with respect to the revenue sharing, you

12   certainly agree with me that the revenue sharing terms, the

13   parties actually adopted in the MGIA are dynamic rather than

14   static, right?

15   A.   If by dynamic we mean that the payments change over time

16   as capacity changes, then that would be a reasonable

17   characterization.

18   Q.   Okay.  And in fact, the carriers shared with NEA capacity

19   is not fixed at the 2019 level, right?

20   A.   The base payments, for example, change, yes, that's

21   correct.  Base payments change with capacity.

22   Q.   And that's what we mean by dynamic, the share of

23   incremental revenue is going to change from year to year?

24   A.   It's also true with share of incremental revenue.  It

25   will depend on the relative capacity.

1   **Q.**  But you do not simulate at all changes in capacity over

2   time with your model, do you?

3   **A.**  No.  My model focuses on 2019.

4   **Q.**  Right.  You can't.  Because the nature of your model is

5   it's this one shot change in the Nash Bertrand equilibrium,

6   right?

7   **A.**  Yes, the model focuses on 2019 and the implications of

8   the pricing incentives in 2019.

9   **Q.**  Okay.  Now, under the MGIA, the parties also pool and

10   share revenues, rather than profits, right?

11   **A.**  That's correct.

12   **Q.**  So you have argument in your report and you talked about

13   yesterday, that a profit sharing agreement typically creates

14   similar incentives as mergers to raise prices.  Right?

15   **A.**  Yes.

16   **Q.**  And you state on paragraph 32 of your report, "This

17   follows because it is the profit-sharing feature of a

18   horizontal merger, not the coordination or control that

19   creates such an incentive." End quote.  Right?

20   **A.**  Can you put the slide up for me?

21          Yes, that's in the report.

22   **Q.**  Okay.  Let's put up slide 25 from your presentation

23   yesterday.  Okay.  So the title of this is defendants argue

24   the MGIA creates incentive to expand capacity, right?

25   **A.**  Yes.

1    **Q.**  But you agree that the terms of the MGIA create

2    unilateral incentives to expand capacity, right?

3    **A.**  It's nuanced and I didn't get into it just for the sake

4    of it, but the slide says it can create unilateral

5    incentives.  It can also create incentives to expand less

6    quickly, and it depends on the particular details of the

7    route in question.

8    **Q.**  On the what?

9    **A.**  It depends on the details of the route, actually, for the

10   unilateral incentive.

11   **Q.**  Okay.  So what you're saying is you might get different

12   outcomes from route to route?

13   **A.**  I'm saying, on some routes, there might be a unilateral

14   incentive to expand capacity.  On other routes, the --

15   creates unilateral incentives to reduce capacity, and I

16   didn't get into any of that nuance, because I didn't think it

17   was relevant to the conclusion that acting on those

18   incentives would exploit the partner, whether it's above or

19   below, and that they're more likely to focus on what

20   maximizes joint profit.

21   **Q.**  Right.  So let's just put up your slide -- sorry, it is

22   already up here.

23       What you have here is you say, "The MGIA, in

24   isolation, can create unilateral incentives to expand

25   capacity that" -- "above levels that would joint maximize --

1   "that would maximize joint profit."  Right?

2   **A.**   That's correct.

3   **Q.**   Okay.  So one take away, from the start, is that these

4   parties negotiated an agreement between them that can create

5   unilateral incentives to expand capacity.  Right?

6   **A.**   Yes, that's true.

7   **Q.**   Okay.  And they're -- to use a phrase that you used

8   yesterday, their revealed preference was for an agreement

9   that can create unilateral incentives to expand capacity,

10  right?

11  **A.**   No, I don't think those -- I think that mischaracterizes

12  my testimony.  I agree that they're using this formula, but I

13  don't have any evidence to think they're using this formula

14  because of incentives that it creates.  I think it's useful

15  for other ways that I testified to yesterday.

16  **Q.**   But the normal intuition in economics is that the terms

17  of a contract that parties enter is the revealed preference

18  for the way that they wish to behave under the course of the

19  contractual relationship, right?

20  **A.**   Without characterizing what's in the literature, it makes

21  sense that they want to do the NEA.  And if you look at the

22  NEA as a whole, that both of them perceive that they'll be

23  better off with the NEA than without the NEA.

24  **Q.**   On these terms?

25  **A.**   Yes.  And also analyzing these terms in the context of

1    the broader agreement.

2    **Q.**  So the MGIA also subsidizes capacity growth, right?

3    **A.**  No.

4    **Q.**  Let's pull up slide 25.

5            MS. NELSON:  It's up.

6            MR. WALL:  I'm sorry, I thought it was a different

7    slide.

8    BY MR. WALL:

9    **Q.**  So second bullet: "Acting on those incentives would

10   exploit the partner who is subsidizing capacity growth that

11   reduces joint profit."

12           Those are your words, right?

13   **A.**  Right.  So it's the partner who is subsidizing the

14   growth, not the NEA.

15   **Q.**  Okay.  Each partner to the NEA subsidizes the growth of

16   the other, right?

17   **A.**  Yes, that can happen.

18   **Q.**  Okay.  It didn't -- it can happen, it does happen.  It's

19   in the math, right?

20   **A.**  No, it's not necessarily, because as I said the MGIA also

21   can create incentives to reduce capacity.  I don't think it's

22   a helpful discussion to go to the nuance, although we could,

23   because I think the structure is in place for them to work in

24   their joint interest.

25   **Q.**  Right.  And that is your point in the now famous

1    Footnote 68.  So let's put up slide 54 from your presentation
2    yesterday.  You actually had a series of slides on this one,
3    but we picked up the one that highlights the word, "Behave."
4    And in Footnote 68 of your initial report, you make this
5    statement that, "In my analysis, I assume it is a mechanical
6    matter.  The defendants jointly set capacity and then share
7    revenues according to the dynamic revenue sharing formula in
8    the NEA, but behave as though they share profits according to
9    a static formula based on their pre-NEA capacities."
10            Right?
11   **A.**  Yes.
12   **Q.**  And so you're saying your analysis is predicated on the
13   idea that there will be behavior contrary to the terms of the
14   MGIA, taken in isolation.  Right?
15   **A.**  I disagree with that.  It's not a predicate.  It's my
16   analysis of the economic incentives.  It's my conclusion.
17   **Q.**  Right.  So -- fine.  Your conclusion is behavior will
18   depart from the terms of the MGIA taken in isolation.
19   **A.**  That's -- you know, the terms of the MGIA have
20   complicated nuances that can point in different directions,
21   including to joint profit maximization, so whether or not
22   this actually departs from the unilateral incentives in the
23   MGIA is an uncertain thing, but what I'm modeling is joint
24   profit maximization.
25   **Q.**  Right, but -- and what you're saying is that you believe

1   that there is a more profitable course for JetBlue and

2   American than following the literal terms of the MGIA, and

3   that is to act like a jointly profit maximizing firm,

4   correct?

5   **A.**   With respect to capacity coordination, yes.

6   **Q.**   And with respect to the prices they set.

7   **A.**   With respect to the pricing incentives, I've modeled this

8   as profit sharing, which I've explained actually understate

9   price changes relative to revenue sharing.

10  **Q.**   But Doctor, your model is a model of pricing, not

11  capacity, right?

12  **A.**   It's a model of pricing, yes.

13  **Q.**   You didn't model capacity, correct?

14  **A.**   I held capacity fixed at 2019 levels.

15  **Q.**   But you said yesterday when you were here, "Mine is not a

16  model of the capacity decision," correct?

17  **A.**   That's true.

18  **Q.**   Okay, but you agree that the airline industry can be

19  conceptualized as involving two decisions, one capacity, and

20  then pricing, right?

21  **A.**   Yes, I think that's a fair characterization.

22  **Q.**   And you would agree that, as an economic matter, an

23  increase in capacity, with all else equal, lead to downward

24  pricing pressure and a decrease in prices, correct?

25  **A.**   I don't know what "all else equals" means in this

1    context.  You're allowing prices to float.

2    **Q.**  Would that make you the only economist in the world that

3    doesn't know what "all else equals" means?

4    **A.**  Well, you changed prices as well.

5    **Q.**  Let's go on, Dr. Miller.

6            Look, a principal point of Dr. Town's testimony was

7    that more capacity in the industry puts downward pressure on

8    the fares, right?

9    **A.**  As a general matter, I think that's correct.

10   **Q.**  Okay.  But despite that, you have not modeled the MGIA or

11   NEA's effects on American's JetBlue capacity setting

12   decisions, have you?

13   **A.**  Well, I've looked at the implications of the model.

14   **Q.**  Now, I'm asking you about your model, sir.  In your

15   model, you hold capacity constant at 2019 levels, correct?

16   **A.**  Yes, I do.

17   **Q.**  Okay.  You do not consider any force that might lead to

18   there being more or less capacity that existed at that moment

19   in time in 2019, correct?

20   **A.**  That would be false.

21   **Q.**  How is that false?

22   **A.**  As I explained before, the results of the model inform

23   along the nonstop overlap routes the direction of the

24   pressure on capacity.

25   **Q.**  Well, exactly.  What you're saying, though, is that your

1   model, when it predicts a price increase, has got to account

2   for it by a corresponding reduction in capacity on that

3   route, right?

4   **A.**   No, I didn't testify to that.

5   **Q.**   I didn't ask you whether you testified to that.  I'm

6   asking you, isn't it a fact that if we were actually to look

7   at the -- at the results of your predictions, that every time

8   we see a predicted price increase by American or JetBlue,

9   that is accompanied by a prediction of a capacity reduction

10   by American or JetBlue respectively?

11   **A.**   What I lay out is that there creates an incentive to

12   reduce capacity along the nonstop overlaps where we see

13   substantial price elevations on many of them.  And as I

14   explained the other -- yesterday, how that would manifest in

15   capacity reductions depends on a number of considerations

16   that are outside the model.

17   **Q.**   Right.  But the point is here is that you haven't modeled

18   the capacity setting decision, it's just that, in the logic

19   of your simulation, if prices go up, capacity has to come

20   down, right?

21   **A.**   No, I'm not talking about changes in the capacity.  I'm

22   saying that, if you're people on a plane, there's an

23   incentive to reduce capacity.  Whether or not capacity

24   actually goes down will depend on a host of other

25   considerations.

1    **Q.**   Right.  The model takes capacity as a given, correct?

2    **A.**   The model is estimated and simulated using 2019

3    capacities.

4    **Q.**   Okay.  So for example, if American Airlines and JetBlue

5    grow in New York to meet the 15 percent growth commitment to

6    the Department of Transportation, the downward pricing

7    pressure that would result from that is not accounted for in

8    the model, is it?

9    **A.**   It's not clear -- are you saying are they going to grow

10   on particular nonstop overlaps that I'm looking at?

11   **Q.**   You can't answer the question the way I phrased it?

12   **A.**   It's not a question that I can answer, because I've

13   analyzed competition on particular markets and your question

14   is about capacity as exists sort of nebulously outside of New

15   York City.

16   **Q.**   Okay.  Let me take that problem away for you.

17         So assume that when American and JetBlue grow to

18   meet their 15 percent growth commitment to the DOT on flights

19   from LaGuardia and JFK, they do so proportionally to the

20   number of routes served.  Okay?  Okay.

21         Now, so by that hypothesis, every route has some

22   amount of increased capacity, okay?

23   **A.**   Okay.

24   **Q.**   Okay.  The downward pricing pressure that would result

25   from that increased capacity is not accounted for in your

1   model, is it?

2   **A.**  That's correct.

3   **Q.**  Okay.  The downward pricing pressure from 30 net -- new

4   JetBlue aircraft is not in your simulation, correct?

5   **A.**  I don't want to endorse that there's 30 additional

6   aircraft that arise due to the NEA.  That's not a question

7   that I've studied, but I do the model as of 2019 and the

8   capacities that are in 2019.

9   **Q.**  Right.  So whether the number of new aircraft are 30 or

10   50 or 100, whatever it is, the downward pressure from new

11   aircraft are not going to be accounted for in your model,

12   correct?

13   **A.**  That's correct.

14   **Q.**  The downward pricing pressure from an increase in block

15   hours, to which Vasu Raja testified, will not be accounted

16   for in your simulation, correct?

17   **A.**  Could you -- could you remind me what his testimony was?

18   **Q.**  Well, I don't recall the specifics exactly, but just --

19   **A.**  I think it's the same answer.

20   **Q.**  It is the same answer.

21   **A.**  I'm just trying to be careful as to what I testified to.

22   **Q.**  So if the evidence at trial would indicate that there's

23   going to be a ten percent increase in block hours above a

24   preNEA benchmark, the downward pricing pressure from that

25   increase in block hours would not be accounted for in that

1    model, correct?

2    **A.**   I'm not sure what block pricing is in this context.

3    That's why I wanted to --

4    **Q.**   Block hours?

5    **A.**   Right.  Block hours in this context.  That's why I wanted

6    to look at the transcript.

7    **Q.**   It's flying.

8    **A.**   It's flying?

9    **Q.**   Yeah.

10   **A.**   Oh.  Then I think the same answer.  I'm holding the

11   capacity as fixed at 2019.

12   **Q.**   And generally, if you're assumption about behavior is

13   incorrect and both American and JetBlue take advantage of the

14   capacity expansion incentives in the MGIA and grow, that is

15   not accounted for in your model, correct?

16   **A.**   I disagree with some parts of the question.  First of

17   all, it's not -- it's not taking advantage of.  I think it's

18   actually a negative when we think about where that takes them

19   in terms of their profitability.  And my models is focused on

20   the pricing incentives as of the 2019.  So this is what I've

21   said repeatedly.

22   **Q.**   And just indulge me, then, in the assumption that there

23   might be a world in which both American and JetBlue take

24   advantage of the capacity expansion incentives in the MGIA

25   and grow.  If that happens, the growth and the downward

1    pricing pressure from it are not accounted for in your model,

2    correct?

3    **A.**   That's right.  The model is based on 2019 capacities.

4    **Q.**   Okay.  I want to talk to you about some of the things

5    that you said yesterday about -- about capacity coordination.

6              First of all, you understand, don't you, that when

7    Dr. Town put on all that testimony about capacity discipline,

8    that was all directed at decisions that airlines make about

9    their aggregate industry capacity, right?

10   **A.**   I -- I'm cautious to characterize his testimony, but

11   that's the -- that's what I recall at the moment.

12   **Q.**   Okay.  You understand that the NEA doesn't involve any

13   coordination or even discussion of American and JetBlue's

14   aggregate industry capacity, right?

15   **A.**   I believe that's correct.

16   **Q.**   There's only joint network planning relating to NEA

17   routes, correct?

18   **A.**   That's my understanding of the contract.

19   **Q.**   Okay.  Let's put up your slide 24 from yesterday.  This

20   one is entitled "Defendants will coordinate capacity under

21   the NEA."  And you remember you gave some testimony yesterday

22   about what you thought the implications were for these points

23   on the NEA.

24   **A.**   I'm sorry, did you ask a question?

25   **Q.**   No, just you remember that you discussed this yesterday,

1   right?

2   **A.**  Yes, I do.

3   **Q.**  And in it, you make the statement, "Defendants indicate

4   they plan to maximize joint profit."  Right?

5   **A.**  Yes, I do.

6   **Q.**  Define for me precisely what you mean by "maximize joint

7   profit."

8   **A.**  I expect them to make the route decisions that make sense

9   for both of them together so that American and JetBlue both

10  benefit from the decisions that are made.

11  **Q.**  And how will those capacity decisions change in relation

12  to the sum of the individual capacity decisions that they

13  would make?  Would there be more capacity, less capacity, or

14  the same amount of capacity?

15  **A.**  Along the nonstop overlaps my economic analysis indicates

16  that there's an incentive to reduce capacity.

17  **Q.**  Right.  And so in this usage, maximized joint profit is

18  essentially synonymous with make capacity decisions that

19  reduce capacity, right?

20  **A.**  Along the particular nonstop overlaps, the model

21  indicates that there may be an incentive to reduce capacity.

22  **Q.**  Okay.  And when you decided to choose evidence in favor

23  of that point to highlight to Judge Sorokin, you cite some

24  documents here that are footnoted there in the lower right

25  hand part of the page, right?

1    **A.**   Yes, I believe so.

2    **Q.**   Okay.  Let's look at the first of those, which is

3    Plaintiffs' Exhibit 286.  And of course you're familiar with

4    this.  This is an American -- AA and B6 Project Garland

5    proposal from April of 2020, right?

6    **A.**   Yes, I do.

7    **Q.**   And let's go to the next page, please, and highlight the

8    top statement and the bullets underneath it.  Okay.  So what

9    we have here is it says, "Objective/proposal" and there's a

10   number of bullets.  The first is, "Maximize customer value

11   and connectivity in JFK, LaGuardia, and Boston."

12          Is that synonymous with reducing capacity as part

13   of joint profit maximization?

14   **A.**   No, I think this is a different statement than that.

15   **Q.**   Okay.  The next one is, "Improve overall relevance and

16   competitiveness in the Northeast region."  That's not

17   reducing capacity by virtue of joint profit maximization, is

18   it?

19   **A.**   No, this is different.

20   **Q.**   Okay.  The next one is, "To accomplish this, American and

21   JetBlue would enter into a metal neutrality agreement that

22   incentives both carriers to provide a better and robust

23   network and customer experience."

24          Providing a better and robust network and customer

25   experience is not capacity reduction as part of the joint

1   profit maximization, is it?

2   **A.**   Well, the point of metal neutral sort of leans into this

3   idea that they're working together.  And that's what I'm

4   focused on is the implication of American and JetBlue working

5   together and cooperating, rather than competing.  The rest of

6   the statement is different than particularly reducing

7   capacity.

8   **Q.**   Right.  But if the outcome of that metal neutrality is

9   providing a better and robust network and customer

10  experience, that's not reducing capacity to raise prices, is

11  it, sir?

12  **A.**   Well, if you increase quality, it has implications for

13  prices, of course.

14  **Q.**   Right.  Because without any loss of consumer surplus, you

15  get paid more for the higher value you're providing, right?

16  **A.**   The two go hand-in-hand.

17  **Q.**   So the answer to my question is yes?

18  **A.**   I think -- I think yes is a reasonable approximation, at

19  least.

20  **Q.**   Okay.  So in fact, every one of the benefits -- excuse

21  me.  Every one of the objectives that are outlined in the

22  document that you cited is consistent with a plan to actually

23  enhance consumer welfare through more output, better quality

24  networks, and more competitive product positioning, right?

25  **A.**   They could be interpreted that way.

1   Q.  Let's go back to -- let's go to PX456, which you -- you

2   highlighted.

3           Now, you quote this document for a statement that,

4   "The defendants will engage in network planning as if their

5   Northeast assets were a single airline."

6           Do you remember that?

7   A.  Yes, I see it on this second sentence here.

8   Q.  Right.  And you presented that in your earlier slide as

9   an indication that the parties would attempt to engage in

10  joint profit maximization, in the sense of reducing capacity

11  to increase prices, right?

12  A.  I'm sorry, could you --

13  Q.  Let's go back to the slide.  We'll take it one step at a

14  time.  It's fair enough.  Let's go back to the slide.

15          Okay.  The big bullet in the middle, "Defendants

16  indicate they plan to maximize joint profit."  Do you see

17  that?

18  A.  Yes, I do.

19  Q.  The second minor bullet, Defendants will, quote, "engage

20  in network planning as if their Northeast assets were in a

21  single airline."  End quote.  Do you see that?

22  A.  Yes, I do.

23  Q.  Okay.  And so you cited PX456.  Do you think that that

24  document that you cited and highlighted to Judge Sorokin

25  gives an accurate impression of the NEA?

1    **A.**   I wouldn't want to characterize it that way.  I'm

2    pointing out here that the document states that they will --

3    are likely to maximize joint benefit of the NEA, which is

4    consistent with my analysis of how they use capacity

5    coordination.

6    **Q.**   Okay.  Well, let's go back to what the document that you

7    quoted and presented actually says.  So go back to PX456.

8            Do you notice who the author of this document is?

9    **A.**   It's hard to read.  Is that you?

10   **Q.**   It is me.  It is me.

11           As an economist, what do you think that the odds

12   are that I would say something that would indicate that the

13   NEA is consistent with joint profit maximization?

14   **A.**   I don't know how to answer that question.

15   **Q.**   Let's just look at what it says under, "Coordination"

16   here.

17           "The agreement between the parties anticipates that

18   they will jointly discuss the best utilization of slots,

19   gates, and aircraft at Boston and New York City airports.  In

20   essence, they will engage in network planning as if their

21   Northeast assets were in a single airline, looking for

22   opportunities to expand network coverage, ensure the right

23   aircraft is in the right market, expand connectivity, and get

24   the most productivity out of their assets."

25           That's not a statement about what firm seeking

1    joint profit maximization through reduced capacity would do,

2    is it, sir?

3    **A.**   Well, I think the fact that I take out of this, or one of

4    the salient facts is that they're going to combine assets as

5    if they're a single airline, and that's how I've bottled it,

6    and now I've tried to look at the economic incentives that

7    that creates and that's what I've explored along the overlap

8    routes.

9    **Q.**   And you've explored it and you've made your predictions,

10   but Dr. Miller, you would agree with me that it's at least

11   possible that on some of these routes, JetBlue and American

12   could decide to increase capacity?

13   **A.**   They could.  But I think that would be contrary to their

14   incentives.

15   **Q.**   Okay.  And it's possible that on some routes they would

16   decide to reduce capacity, right?

17   **A.**   It's possible, as well.

18   **Q.**   And whether the capacity decisions create upward pricing

19   pressure or downward pricing pressure depends on what

20   decisions they make, right?

21   **A.**   It's not clear the extent to which a capacity increase on

22   a nonstop overlap creates downward pricing pressure because,

23   of course, you're aligning the revenue sharing at the same

24   time.  And that has implications for how this plays out in

25   the market.

1   **Q.**  It's not clear, is it, sir?

2   **A.**  It's not clear?  The upward pricing pressure is something

3   that I can quantify.  I haven't seen evidence that's --

4   quantifies capacity expansion or other efficiencies in a way

5   that would be significant.

6            THE COURT:  Why wouldn't adding capacity,

7   particularly on a nonstop route, create downward pricing

8   pressure?

9            THE WITNESS:  I think it would.  It's a measure of

10   quantifying it.  I haven't quantified it.

11            THE COURT:  I see.

12   BY MR. WALL:

13   **Q.**  But the reality is that the only way to tell whether your

14   predictions are going to be right or wrong is wait to see

15   what capacity decisions the parties make, right?

16   **A.**  No, I disagree, I can analyze the incentives, and that's

17   what I've done.

18   **Q.**  Well, you've kind of --

19            THE COURT:  Well, but how would that determine

20   whether your predictions are right or wrong?

21            THE WITNESS:  The model does well on other

22   standpoints, so I've hit various benchmarks, both relative to

23   the literature and relative to the price prediction it

24   implies, and so I have a fair confidence in the model in

25   terms of the changes and pricing and quantity that are

1    implied by the revenue sharing agreements, and what I see is

2    that fewer passengers are on the plane, flying nonstop.  So

3    now that's the connection that I'm drawing.

4           THE COURT:  That's reasons to believe that the

5    model is reliable.

6           THE WITNESS:  Yes, that's correct.

7           THE COURT:  But that doesn't mean that the -- but

8    all of what comes out of the model are predictions of the

9    future.

10          THE WITNESS:  That's right.

11          THE COURT:  All -- whether you're at 100 -- if you

12   rated the confidence of the model's predictions, you would

13   rate it somewhere not less than zero and not more than

14   100 percent, correct?

15          THE WITNESS:  Yes, that's right.

16          THE COURT:  But whether you rated it at zero or

17   100 percent or anywhere in between, that confidence level

18   would just be a gauge of how likely it is to be actually

19   accurate.

20          THE WITNESS:  That might be right.  I'm not sure --

21          THE COURT:  In the sense that if we looked forward

22   to see what happened, you could have -- let me put it another

23   way.

24          The model could be 100 percent confidence level,

25   right?

1          THE WITNESS:  Uh-huh.  I've --

2          THE COURT:  Well, it seems unlikely that it's

3   100 percent, right?  But in theory, it could be 100 percent.

4   It's somewhere between zero and 100 percent, would that be

5   fair?

6          THE WITNESS:  That's right.

7          THE COURT:  So whatever the level of confidence of

8   this model, or any model, if, in fact, that -- if we fast

9   forwarded --

10         THE WITNESS:  Yeah.

11         THE COURT:  If I stayed this case -- I'm not going

12  to do this -- but if I did, despite the temptation, if I

13  stayed this case and we went forward ten years, and you then

14  had ten years of data to look at of what actually happened,

15  and if what actually happened was different than your model,

16  than the model's predictions, that would not mean that the

17  predictions were, like, bad predictions, it just would mean

18  they weren't accurate.

19         THE WITNESS:  It depends on how you conceptualize

20  things, because other things can change, as well.  So in

21  terms of whether or not what you see --

22         THE COURT:  It might not be because there was

23  something wrong with the model.  There could have been a

24  change in the world.

25         THE WITNESS:  That's correct.

1           THE COURT:  Right.  But it still wouldn't change

2     the fact that the prediction of the model was wrong, if it

3     was wrong.

4           THE WITNESS:  Not necessarily.

5           THE COURT:  Well, suppose the model predicts a

6     $638 million increase, right?  If it turned out that that

7     increase was zero, that $638 million would be wrong.

8           THE WITNESS:  Not necessarily.  It -- and I know

9     it's sort of why would that that be, but I could explain it.

10    Because, for example, if prices would have gone down, but,

11    instead, they're unchanged, then the model could actually be

12    correct.  In other words, if you have --

13          So suppose fuel costs go down, so prices are going

14    to fall with fuel costs --

15          THE COURT:  So if all other things -- so if all

16    other things -- what you're saying is not that -- I'm saying

17    there wasn't a $638 million charge.  You're saying there

18    could have been a difference, because there's something else

19    that accounted for it, essentially something akin to the

20    opportunity clause.  I'm not saying that.  I'm saying your

21    model predicts, all the things being equal, a $638 million

22    charge.

23          THE WITNESS:  That's right.

24          THE COURT:  Right?

25          THE WITNESS:  Yes.

```
 1                    THE COURT:  I'm saying zero, that's what it turns
 2       out.
 3                    THE WITNESS:  Uh-huh.
 4                    THE COURT:  Then it turns out it's zero.
 5                    THE WITNESS:  Sure.  All things being equal, it's
 6       zero.
 7                    THE COURT:  So in that sense, you're saying that it
 8       could be that the reason -- it could be actually a
 9       $638 million cost that's masked by a decrease in fuel prices.
10       But that would still be a $638 million costs.
11                    THE WITNESS:  That's correct.
12                    THE COURT:  So that's a question of whether it's a
13       net cost as opposed to an assent, like you're netting out the
14       fuel cost.
15                    I assume that my question then assumes that then
16       netting out something like that, an actual harm -- you're
17       assuming an actual harm of 638 million.  If there's none, the
18       prediction is inaccurate, without regard to the confidence
19       level.
20                    THE WITNESS:  Okay.  I do think that's a
21       straightforward conclusion.
22                    THE COURT:  Yeah, I mean, it seems obvious.
23                    THE WITNESS:  Okay.  Yeah.  I don't want to
24       disagree with you.
25                    THE COURT:  I mean, you can.  I'm just asking.
```

1              THE WITNESS:  I just want to make sure we're on the

2       same page.

3              THE COURT:  So from my perspective, so I

4       understand, there's a difference between confidence level --

5       it could turn out that it's -- that the results it predicts

6       don't transpire.  Maybe that's a better way to put it.

7              THE WITNESS:  Uh-huh.

8              THE COURT:  And even netting out.  The reason they

9       don't transpire could be because there were external events

10      that nobody contemplated that are not factored into the

11      model, right?

12             THE WITNESS:  Yes.

13             THE COURT:  It could be because the model did not

14      accurately predict the behavior of the industry of the

15      parties.

16             THE WITNESS:  That's correct.

17             THE COURT:  And so all we -- but we have -- that

18      would be, if it all went forward -- if I stay the case,

19      maybe, ten years, then we would know.  We would know what

20      actually happened.

21             THE WITNESS:  We would know what actually happened.

22      We would have to go back and -- some of the ones that I

23      think --

24             THE COURT:  Then we would know, I would know for

25      sure, for example, whether or not there was, in fact, harm.

1    You could -- you and other economists could then look back at

2    all the actual historical data and determine or come up

3    with --

4              THE WITNESS:  Do you want me to give you my opinion

5    on that?

6              THE COURT:  Sure.

7              THE WITNESS:  I think that for some of the price

8    effects that we're seeing in the range of 10 percent, which

9    actually the average of what I get, you know, isolating the

10   fact of the NEA on prices to the degree of precision that

11   would be needed to have confidence to show you that the

12   10 percent effect happened and wasn't due to something else

13   would be difficult to accomplish.

14             THE COURT:  Because the world is too complicated.

15             THE WITNESS:  That's right.  And you can have a lot

16   of testimony --

17             THE COURT:  Right.

18             THE WITNESS:  -- about it.  So that will happen.

19             THE COURT:  But it's no less complicated

20   prospectively than retrospectively.

21             THE WITNESS:  Prospectively is also challenging.

22   So there are a whole host of things that I have to think

23   about to do a prospective analysis.

24             THE COURT:  No, I understand you're not suggesting

25   that it's 100 percent confidence.

1          THE WITNESS:  That's right.

2          THE COURT:  Okay.  I think I got it.

3          Go ahead.

4     BY MR. WALL:

5     **Q.**  Breaking the rule of never correcting the judge, your

6     model actually doesn't predict anything in the future, right?

7     It predicts a one-shot change in 2019, between two Nash

8     Bertrand equilibriums?

9     **A.**  Yeah.  I'm looking at the effect of the NEA as

10    implemented in 2019.

11    **Q.**  Right.  And that's the only data point you have for

12    talking about anything that might transpire in the future,

13    right?

14    **A.**  No, I wouldn't call that my only data point.  I've looked

15    more broadly at econometrics studies and the JetBlue effect,

16    and how JetBlue's pricing responds to --

17    **Q.**  Not my point, sir.  I'm sorry.  Bad question, maybe.

18          There was testimony yesterday that your number is

19    an annual number, right?

20    **A.**  That's correct.

21    **Q.**  It's only calculated once, right?

22    **A.**  That's right.  It's the harm that arises in 2019.

23    **Q.**  Right.  Okay.  Finishing up on the model.  Other sources

24    of downward pricing pressure, the model doesn't take into

25    consideration any efficiencies, does it?

1    **A.**   The model does not consider efficiencies.  It's the

2    measure of the adverse pricing incentives.

3    **Q.**   The model does not account for any downward pricing

4    pressure that would result from aggressive actions by

5    competitors to compete against the NEA, does it?

6    **A.**   No, it does account for the interactions of the

7    competitors.  In fact, as the model shows, the incentive of

8    competitors is actually to raise price in response to that

9    price elevations, and the model captures that.

10   **Q.**   Yeah.  Okay.  Let's look at that, then.  I was going to

11   skip that, but hold on.

12           Okay.  Let's pull up DX1056, please.

13           So Compass Lexecon, as I'm sure you know --

14           THE COURT:  He might need to see it in his book,

15   because it might be hard to read on the screen.

16           It's in the book, right?

17           MR. WALL:  Yeah.

18           THE COURT:  Just give him a minute to --

19           THE WITNESS:  Where in the book is it?

20           MR. WALL:  It's DX1056.

21           THE COURT:  A couple tabs in.

22           THE WITNESS:  I see it.  It's actually too small

23   for me to the read in the book, too.  Do you have a

24   magnifying glass?

25           THE COURT:  Do you have a phone?

1          THE WITNESS:  I don't have a phone -- I can't see
2     the whole thing here, but --
3          THE COURT:  Oh, it's blown up.  You'll probably be
4     able to see it.
5          MR. WALL:  I'll try to make sure that we blow up
6     what it is that you need to see.  Okay?
7     BY MR. WALL:
8     Q.  So as I'm sure you knew, Compass Lexecon extracted the
9     fares that lead to the results in your slides 59 and 60,
10    which were previously Exhibit 25 to your report, right?
11         THE WITNESS:  Do you mind if I take a moment to
12    look at the document?
13         THE COURT:  Yeah, go ahead.
14         MR. DERITA:  I'd just like to ask for a
15    clarification, Mr. Wall.  Does this use the updated report
16    and back up, or corrected report and back up that we
17    submitted a few weeks ago?
18         MS. NELSON:  No.  It does not.  It was the same one
19    that was used in the deposition, because we received that
20    very late and have not been able to recalculate.
21    BY MR. WALL:
22    Q.  Okay.  So it might be off a little bit, but
23    directionally, it is going to be very similar, right?
24    A.  As you know, I updated the results of the report and
25    provided that and the price effects and the updated report

1    are along particular routes is a good bit less than the price

2    effects -- the percentages are the same, but the dollar

3    amount was corrected.  And so along many routes, if I recall,

4    it's a 30 or 40 percent change, but I'd have to look at it to

5    be sure.

6    **Q.**  Okay.  But if that turns out to be an issue, your counsel

7    can deal with it on their examination or the rebuttal case.

8    I just want to point out, though, let's take the route of DCA

9    Boston.  That is one I want you to predict $180 million of

10   harm, right?

11   **A.**  Yes, that's right.

12   **Q.**  Okay.  And when you look at the actual fares that your

13   model is predicting, the simulation is predicting that

14   American raises its pre-NEA fare of $342 to $553, right?

15   **A.**  No, that's wrong.  That's the number that's updated.

16   **Q.**  Well, okay.  But the way you did it in your disclosure

17   report, that's right?

18   **A.**  The initial report that's wrong.  Yeah, these are wrong

19   numbers.

20   **Q.**  Okay, but these numbers are 342 to 553, correct?

21   **A.**  That's what this screen says.

22   **Q.**  Okay.  And that's a 61.8 percent increase, right?

23   **A.**  Are these the -- yeah, but the -- here, I believe, the

24   61.8 is not what's in my report.  I suspect this has been

25   recalculated based on incorrect numbers.

1   **Q.**   In this extraction from your backup data, JetBlue raises

2   its preNEA fare of $293 to $465, a 58.7 percent increase,

3   right?

4   **A.**   This is not a representation of what the model says.

5   **Q.**   And Delta, for some reason, raises its pre-NEA fare of

6   $284 by only 7.9 percent to $306, right?

7   **A.**   That's what's on the sheet.

8   **Q.**   And that means that you are suggesting that the Nash

9   Bertrand equilibrium is a world in which Delta underprices

10  JetBlue by almost 35 percent, right?

11  **A.**   These numbers are not accurate and don't characterize the

12  results of the model.

13  **Q.**   Okay.  But if -- do you have any reason to believe that

14  if we get your latest numbers and do exactly the same thing,

15  which we're happy to do and present them to you on the

16  rebuttal case, that that's going to be directionally any

17  different?

18  **A.**   Directionally?  Clarify what directionally --

19  **Q.**   You're still going to end up with a new Nash Bertrand

20  equilibrium in which Delta is pricing way below JetBlue,

21  right?

22  **A.**   That may have just emerged premerger, as well, but I want

23  to look at the real numbers to see.

24  **Q.**   Well, have you looked at real numbers for the route of

25  which so much has been made in this case of New

1    York-LaGuardia to Boston, on which American Airlines actually

2    exited?

3    **A.**   I think those numbers are provided in my report.

4    **Q.**   Right.  And there hasn't been -- since the NEA -- since

5    American exited, any fare increase that looks anything like

6    what you're predicting in your report, has there?

7    **A.**   I haven't looked into that, so I shouldn't testify to it.

8    **Q.**   Okay.  So let's look at some of the percentage price

9    changes that you have.  Pull up slide 59, again, the Boston

10   results.  And we'll just follow-up on the conversation that

11   you had with Judge Sorokin about the accuracy in predictions.

12           So can you name for me any published economic study

13   of prior airline mergers that found post-merger fare

14   increases, anything like the 90 percent that is found in the

15   case of Charlotte?

16   **A.**   The studies look at average price effects, and as I

17   testified before, the average price effect I obtained of

18   9 percent is well within the bounds of, for example, the work

19   in Craig Peters.

20   **Q.**   The Craig Peters' 2006 study of 1980s airline mergers,

21   right?

22   **A.**   That's correct.

23   **Q.**   Let's just keep it in this millennium.

24   **A.**   That's in this millennium.  I'm sorry.

25   **Q.**   I'm sorry, century, you're right?

```
 1                  THE WITNESS:  Sorry.
 2                  THE COURT:  I'm just not sure it is in this
 3       millennium.
 4                  MR. WALL:  So in this century --
 5                  THE COURT:  This is the millennium in which the Red
 6       Sox have won the World Series more times than the Yankees.
 7       That was the last millennium.  The Yankees were dominant in
 8       the last millennium.  I'm sorry --
 9                  MR. SCHWED:  Objection, Your Honor.  I don't know
10       what basis, but I object.
11                  THE COURT:  So we have a positive future to look
12       forward to, despite what happened this year.
13                  MR. WALL:  I think Your Honor needed to use that
14       now for sure.
15       BY MR. WALL:
16       Q.  So can you name for me any of the published economic
17       literature, since, say, 2000, of any airline mergers that
18       have occurred in that period, that found post-merger fare
19       increases of any of the percentage price changes that you
20       have in your simulation of results for Boston nonstop overlap
21       routes?
22       A.  This isn't a study that I've done specifically, because I
23       didn't think the literature was useful.  But I can't name
24       articles that point to, for example, a price increase on THE
25       average of 9 percent, due to the last three legacy mergers.
```

1    **Q.**   Let's -- give me 7.1 percent, the lowest value here.  Can

2    you name me something that came up with 7.1 percent?

3    **A.**   This is the lowest value in Boston, but it's not the

4    lowest value that's predicted by the model.

5    **Q.**   I understand that, sir, but my question is about the

6    lowest value for Boston.  Can you name for me any airline

7    retrospective study, since 2000, that has found that an

8    actual airline merger produced higher fares on nonstop

9    overlaps of 7.1 percent or greater?

10   **A.**   This is not a literature I've attempted to summarize for

11   this purpose.

12   **Q.**   So the answer to my question is, no, you can't identify

13   any such thing?

14   **A.**   That's correct.

15   **Q.**   You have reviewed Dr. Town's report in this case, right?

16   **A.**   Yes, I have.

17   **Q.**   And Dr. Town states that from his review of the

18   literature about other airline mergers, they have found low

19   single-digit impacts on price one way or the other, right?

20   **A.**   Yes, I believe that's in there.

21         You don't have a copy of his report, do you?

22   **Q.**   We do.  It's in your binder.  It's paragraph 111.

23   **A.**   Which binder?

24   **Q.**   Yes, we have it.  We have a binder here.  I'll give you

25   one.

1              All right.  Reply report.  My bad.

2    **A.**  Thank you.

3    **Q.**  Right there.

4    **A.**  Well, I do see the sentence.  I think there actually is a

5    citation that Professor Town discusses that would suggest,

6    actually, much larger price effects.  And I can show that in

7    his report, as well.

8    **Q.**  That's the Craig Peters article?

9    **A.**  No, it's not.

10   **Q.**  Which one?

11   **A.**  The Bet 2021 analysis of the American/US Air merger.

12   **Q.**  Okay.  But you are familiar with Dr. Peters' article

13   about the People's Express three-way merger in the 1980s,

14   right?

15   **A.**  Yes, I'm familiar with that article.  It's about that

16   merger and four others, as well.

17   **Q.**  Right.  And that's an article in which Dr. Peters says

18   that the 30 percent price increase he found was particularly

19   striking, but consistent with the hypothesis that financially

20   distressed carriers, such as People's Express and its

21   subsidiary Frontier Airlines, have a tendency to charge

22   unsustainably low prices, right?

23   **A.**  That was one of two hypothesis that he's considered for

24   the 30 percent.

25   **Q.**  Right.  So the point -- the logic of that is if somebody

1   is charging unsustainably low prices and just not making them

2   unsustainably low anymore might increase a substantial price

3   increase?

4   **A.**   You know, in that scenario, yes.  Dr. Peters explores

5   different reasons that could explain that price increase.

6   And I could talk about the other, if you would like.

7   **Q.**   You did a retrospective of your own on the

8   Delta/Northwest merger, right?

9   **A.**   Yes, I did.

10  **Q.**   And in that one, the highest value that you could find

11  for a price increase, after experimenting with different

12  control groups, was 6 percent on connecting routes with more

13  than 10,000 passengers, right?

14  **A.**   I think that's a misaccurate (phonetic) characterization

15  of the article, and I can explain why, if you would like.

16  **Q.**   No, your Honor counsel can have you do that.

17          But the reported -- the largest reported fare

18  increase in the article is 6 percent on connecting routes

19  with more than 10,000 passengers, right?

20  **A.**   I could look at the paper if you'd like me to confirm.

21  **Q.**   Okay.  We'll move on.

22          You know that many of the routes that are affected

23  by the NEA are associated with American Airlines hubs, right?

24  **A.**   Many of the nonstop overlaps connect to an American hub.

25  I believe that some of them do.

1    **Q.** Right.  And there have -- economists have actually

2    studied retrospectively the effect of the

3    US Airways/American Airlines merger on hub routes, or routes

4    associated with hubs, right?

5    **A.** I believe there's at least some work that does that.

6    **Q.** There's a paper on that by Huubin H. Le -- that's

7    H-u-u-b-i-n H. L-e -- entitled, "An Ex Post Analysis of the

8    US Airways/American Airlines Merger," right?

9    **A.** Yes, I --

10   **Q.** This was discussed yesterday with Dr. Town?

11   **A.** Two days ago.

12   **Q.** Two days ago, I suppose.  Yeah.  And Dr. Le found that

13   the American/US merger decreased price and significantly

14   increased output in routes associated with hubs, right?

15   **A.** I haven't reviewed this paper.

16   **Q.** Well, assume I'm correct about that.  Charlotte is an

17   American Airlines hub, but you predict a 90 percent price

18   increase, right?  From Boston?

19   **A.** A 90 percent price increase between, I believe, Boston

20   and Charlotte.

21   **Q.** So Boston and Philadelphia would be associated with an

22   American Airlines hub, but you predict a 44 percent price

23   increase, right?

24   **A.** I would want to review the slides to confirm.

25   **Q.** In fact, you have seven markets between Boston and New

1    York that are associated with American Airlines hubs on which

2    you predict substantial price increases, even though the

3    literature shows that airline mergers are associated with

4    decreased prices on routes associated with hubs, right?

5    **A.**   I don't believe the literature shows that convincingly

6    and I can talk about this, if you'd like.

7    **Q.**   Now, one of the ways that you've tried to justify this is

8    by saying that the experience with JetBlue entry and exit is

9    that -- your results are consistent with the experience of

10   JetBlue entry and exits, right?

11   **A.**   That is correct.

12   **Q.**   Let's pull up Miller Direct Demonstrative, Slide 66.

13   Now, we'll recall here that all of the bars on the left are

14   what you said were examples of the JetBlue effect taken from

15   defendants' ordinary course documents.  Right?

16   **A.**   That's correct.

17   **Q.**   And you meant JetBlue documents, right?

18   **A.**   Yes.  This is JetBlue analysis.  Yes.  A JetBlue

19   analysis.

20   **Q.**   And by ordinary course, you meant, for example, advocacy

21   by JetBlue in regulatory efforts to get airport access to

22   slots or whatever, right?

23   **A.**   This part may not be clear to me.

24   **Q.**   Okay.  Well, you cite, among other things, and you

25   mentioned yesterday that one of the data points was a letter

1    from JetBlue to the UK Competition and Markets Authority,

2    right?

3    **A.**   That is correct.  That's the basis, I think, of the

4    pre -- one of the slides previously.

5    **Q.**   Okay.  In all events, you did nothing yourself to verify

6    any of the claims underlying those blue bars, did you?

7    **A.**   No, I did not.

8    **Q.**   Okay.  It is nothing like what you did on the effect of

9    legacy competition on price and presented yesterday, right?

10   **A.**   Well, the defendants' economist did that.

11   **Q.**   But you haven't done anything to inform us of what the --

12   what the average effect is on fares when an LLC enters or

13   exits a route with one or more legacy carriers, have you?

14   **A.**   I have not done that.

15   **Q.**   No.  And the reality is that what this is showing here is

16   not the loss of independent JetBlue competition, but the

17   elimination of JetBlue capacity from the route, correct?

18   **A.**   This shows the implications of the loss of JetBlue from

19   the market, the loss of a product from the market.

20   **Q.**   The capacity?

21   **A.**   The product.  As an economist, that's the way I'll think

22   about it here.  It is no longer serving the market.

23   **Q.**   The product and its capacity, together?

24   **A.**   That would be a reasonable interpretation.

25   **Q.**   Okay.  And so did you get some impression in your study

1    of the NEA that part of the plan is to eliminate JetBlue's

2    product and capacity from the relevant markets?

3    **A.**  My understanding is that sometimes that can be the case,

4    but -- but I -- you know, in the model, I just think -- I

5    look at prices.

6            MR. WALL:  Thank you, sir.  No more questions.

7            THE COURT:  All right.  Any redirect?

8            MR. DERITA:  Yes, Your Honor.

9        **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

10   BY MR. DERITA:

11   **Q.**  Dr. Miller, I'd like to start by talking about a year in

12   review article from 2008 to 2009.  Do you remember that

13   article that you were talking about earlier?

14   **A.**  Yes, I do.

15   **Q.**  You had mentioned that there was a subsequent year in

16   review article; is that right?

17   **A.**  Yes.

18   **Q.**  I pulled up a -- I pulled up a 2013 to 2014 year in

19   review article.  Is this the article that you had in mind?

20   **A.**  Yes, it is.

21   **Q.**  I have some paper copies that we'll hand you a copy

22   and --

23   **A.**  I appreciate that.

24   **Q.**  I'd like to direct you to page 383?

25   **A.**  I do see it.

1  Q.  Okay.  And let's look at the first full paragraph and I'm

2  going to read it first.  "Recent legacy airline mergers have

3  been followed by substantial reductions in service and

4  capacity on routes that were served by both carriers prior to

5  those mergers.  For example, in 2008, when Delta Air Lines

6  and Northwest Airlines proposed to merge, they claimed the

7  merger would generate consumer benefits by facilitating

8  schedule improvements by allowing for more efficient

9  allocation of aircraft across the network, and through

10  marketing synergies that could make the merged carriers

11  service more attractive to consumers.  Despite promises to

12  the contrary, the combined Delta-Northwest airline instead

13  reduced capacity post-merger including significant cuts at

14  former hubs in Cincinnati and Memphis."

15       Do you see that paragraph?

16  A.  Yes, I see it.

17  Q.  Does this paragraph relate to the point that you were

18  trying to make earlier?

19  A.  Partially.  I mentioned earlier that the defendants' --

20  that the DOJ' analysis held fixed the schedules proposed by

21  Delta and Northwest.  Those schedules ended up being

22  inaccurate.  This characterizes the actual effects.

23       The other part of the context that was -- that I

24  can provide about the DOJ investigation is that, you know, as

25  the previous article says, DOJ economists looked at the

1    likely anticompetitive effects, determined that they were not

2    significant.  We did some rule of thumb calculations about

3    what efficiencies might be.  These are not sophisticated

4    calculations that we did, but you know, modest amounts of

5    efficiencies, given the route schedules, would have been

6    likely to be larger than the anticompetitive effects that the

7    economists were analyzing.  So I think that's the context.

8    **Q.**   Can we take a look at footnote seven on that page?

9    **A.**   Yes.

10   **Q.**   Does this add any color to what you were just describing?

11   **A.**   It does.  This is the QSI methodology, the way I think

12   about it is this is the old version of Raven, although that

13   might not be exactly correct, but this is sort of the normal

14   course software that was used to forecast schedules, and the

15   benefits created by them.  And the footnote states that that

16   methodology was inadequate for a merger evaluation, but I

17   didn't work with the QSI model specifically, so I remember

18   that part of it at a high level.

19   **Q.**   Okay.  I'd like to turn back to --

20   **A.**   Oh, I should also say, when I say it's a predecessor to

21   Raven, also, these are different airlines, so it can't be --

22   you know, but it's a normal course tool that would have been

23   relevant back then.

24   **Q.**   Okay.  I'd like to turn back to you catchment -- the

25   catchment analysis slides we discussed earlier.  I'm not

1    going to put them up on the screen, because they were --

2    because they're redacted, but you have a copy in front of

3    you, it's slides 83 and 84.

4    **A.**   I've got so many binders here, I don't know which one --

5    I think it's this one.

6    **Q.**   The smallest one, I believe.

7    **A.**   Okay.  83, 84.  I have it.

8    **Q.**   When Mr. Wall was asking you questions about these, there

9    was an explanation that you offered to give, but did not give

10   about them.  Do you recall that?

11   **A.**   Can you direct me to the specific line of questioning

12   that was at stake here, so I can refresh my memory?

13   **Q.**   Using a box as a podium makes it really hard to keep

14   myself organized here.

15          I believe that the question was related to a

16   discussion of the *Horizontal Merger Guidelines* and doing

17   market analysis based on the location of customers versus

18   suppliers.

19   **A.**   Yes.

20   **Q.**   Do you remember that?

21   **A.**   Yes, I can clarify this.  And I can use the -- the maps

22   actually help.  So in the context for the guidelines and what

23   they call on you to do is to start with the competition of

24   the merging firm, the location of the supplier of the

25   products in question.  And so the products at stake in this

1    agreement are the JetBlue and American products,

2    predominantly at LaGuardia and JFK.  So we're going to focus

3    on those areas.  I'll include in the market all the

4    competitors that are competing in JFK and LaGuardia, along

5    the various routes.

6            Okay.  So in this sense, the geographic market will

7    be based on the location of the supply, JFK and LaGuardia,

8    rather than on the location of the customers.  Okay?  Now,

9    what the merger guidelines ask us to do is evaluate the

10   prospect that a loss of competition in this geographic space

11   would lead to higher prices, or could increase market power.

12   And that's the context for the Hypothetical Monopolist Test.

13   And in answering that question, you know, we're focused on

14   whether it makes sense for folks at JFK and LaGuardia to

15   raise price, and in answering that question, the decisions

16   that customers make becomes very relevant.

17           And so the purpose of the catchment maps is that it

18   shows you how the customer locations relate to the -- the

19   location of the airports, and that's why when I said that

20   these -- it will be inaccurate to characterize the maps as

21   characterizing only the customer locations is because it

22   characterizes the customer locations and the choices they

23   make relative to the airports.  And what it shows is that

24   there are customers that are located near JFK and LaGuardia

25   that have a very strong preference for those airports, where

1    if you look at sort of the draw area --

2              THE COURT:  Strong preference based on the fact

3    that they, over that period of time, went to those airports?

4              THE WITNESS:  That's right.

5              So what the maps show, for example, is that if you

6    look at the draw area that accounts for the vast bulk of the

7    business at JFK and LaGuardia, the 90 percent of those

8    customers are choosing JFK and LaGuardia.  And so the

9    decisions that these customers are making becomes informative

10   about whether a hypothetical monopolist or -- y ou know, at

11   JFK and LaGuardia might be able to increase its market power

12   above levels that are observed today.  Okay?  But that's the

13   purpose that I'm using this and that's why, you know, I find

14   it to be informative about --

15             THE COURT:  That data is not controlled -- I'm

16   sorry.  That data is not controlled for other effects during

17   that period of time.

18             THE WITNESS:  Yeah, these are -- this is a very

19   straightforward analysis, you know, where do they live.

20             THE COURT:  Where do they live and where did they

21   go.

22             THE WITNESS:  Where did they go.  That's right.

23             THE COURT:  Not further sliced or analyzed with

24   respect to what happened from the 30 day period of time if a

25   certain airline did a certain thing with respect to service

1    or price.

2                 THE WITNESS:  That's correct.  Right.  So this is

3    going to get you a broad pattern.  This is why I say it's

4    consistent with this notion of diversion, but it's not going

5    to get us all the way there.

6                 THE COURT:  Right.

7    BY MR. DERITA:

8    Q.  So while we're on the topic of the merger guidelines, I'd

9    like to revisit those for a minute.  You should still have a

10   copy of them in your binder.  I'd like to direct you to

11   page 3, Section 2.1.1.  And just let me know when you're

12   there.

13   A.  3.2.1?

14   Q.  2.1.1 on page 3.

15   A.  Okay.  Yes, I'm there.

16   Q.  So this -- this section discusses effects observed in

17   consummated mergers and you were asked a series of questions

18   about the weight of whether effects are likely to rise in

19   the -- about evidence related to whether effects were ever

20   risen or not.  I'd like to direct you to about halfway down,

21   there's a section that says, "However."  And I'll read it out

22   and we'll highlight it on the screen.

23                 "However, a consummated merger may be

24   anticompetitive even if such effects have not yet been

25   observed, perhaps because the merged firm may be aware of the

1    possibility of post-merger antitrust review and moderating

2    its conduct.  Consequently, the agencies also consider the

3    same types of evidence they consider in evaluating

4    unconsummated mergers."

5            Did you consider these types of evidence?

6    **A.**   Yeah, I considered whether it would be helpful to look at

7    consummated mergers.  And for reasons that I explained, I

8    didn't view -- oh, excuse me, I'm on the wrong track here.

9    **Q.**  Yes, I'm asking --

10   **A.**   I did contemplate and considered whether it would make

11   sense to look at price changes along overlap routes that may

12   or may not have occurred since the NEA was implemented and

13   determined that an exercise was unlikely to be helpful.  And

14   actually, for two reasons.  One is -- for three reasons.  Two

15   big ones, I think.  One is on the board, which is that

16   pricing is -- my interpretation is that it was conducted in

17   the shadow of litigation and I'm wary about interpreting firm

18   decisions in that context.

19           But the second reason that I didn't view it

20   helpful, likely to be informative to look at actual pricing

21   is that the NEA was implemented during the COVID, and COVID

22   is just -- it's a really pronounced shock, it almost

23   completely eliminated airline traffic.  And then it came

24   back -- as it's been coming back, it's differentially

25   effected routes of different types.  So like the leisure

1    traveler has -- have come back faster than the business

2    traveller for one reason or another, and so it makes these

3    effects on different routes really hard to tease out.  And so

4    we -- you know, in light of that, plus the fact the NEA was

5    implemented gradually, rather than just in one spot, I just

6    determined that it was unlikely to be helpful to pursue that

7    course of inquiry.

8    Q.  So kind of taking a step back, what's your interpretation

9    of this section of the *Horizontal Merger Guidelines* and

10   whether the evidence of future effects is informative when

11   evaluating a transaction like the NEA?

12   A.  Well, I think the guidelines, as a general principle,

13   asked economists, asked attorneys to look at all of the

14   available evidence and assess what types of evidence are most

15   likely to be probative about the likely competitive effects.

16   And that's what I've tried to put together in my report, is

17   identifying the sources of information that will illuminate

18   the likely competitive effects.

19   Q.  Let's move down to Section 2.1.2.  And let's go to the

20   first sentence there.

21        "The agencies look for historical events or natural

22   experience that are informative regarding the competitive

23   effects."

24        Did you do any natural experiments?

25   A.  I've done a lot of this.  And I've looked at the

1    competition that legacy carriers bring to markets, and I did

2    two econometric analyses of those, and I showed how the

3    competitive effects that we obtained both with, you know,

4    comparing the role of more or less legacy competitors aligns

5    with the effects of the merger.  I looked at the 737 MAX

6    grounding and showed that when American's competition was

7    reduced, JetBlue found a profit to raise price and did raise

8    price.  I provided document -- or testimony that's consistent

9    with my interpretation of that particular event.

10            And I also looked at the JetBlue experience.  The

11   JetBlue effect as it arrives in different markets.  And I can

12   explain why an entry event like JetBlue, the price effect on

13   the entry of it like JetBlue, is going to be useful in

14   providing a benchmark against which to compare the model.

15   **Q.**  And I know you had mentioned that before, but can you

16   just refresh us on why that's useful?

17   **A.**  Yeah, there's -- I think there is, in my

18   cross-examination, almost an assertion by counsel or a

19   question that might lead you -- might lead someone to think

20   that the removal of a product would lead to a bigger price

21   effect than aligning the financial interests of the product,

22   of two products in a market.  And that's not the case.  Okay?

23   So if we have -- if we think about the logic of upward

24   pricing pressure, you have a recapture story, where -- where

25   one product can raise price, and recapture some on the other,

1       and it's symmetric, and this generates price elevation.

2                   When you simply remove a product from the market,

3       there's no more upward pricing pressure on the remaining

4       product, because it can't recapture anything.  And so the

5       logic that creates the price increase is a little bit

6       different, that --

7                   THE COURT:  Why wouldn't then there be the upward

8       pricing pressure in the change of supply and demand ratio?

9                   THE WITNESS:  The reason it happens is that the

10      relevant demand, consumer demand for this product becomes

11      less elastic.  And what I mean is consumers become less price

12      sensitive, because they have fewer choices.  Okay?  And so

13      just if you do economic theory, it can be the case that, you

14      know, a removal of a product generates lower price effects

15      than merger simulation on which -- merger simulation or

16      simulation involving combined joint incentives like the NEA.

17      And I haven't done a systematic analysis of that to show

18      that, along the particular routes that's necessarily going to

19      be true, but I just -- I don't want to leave sort of the

20      assertion --

21                  THE COURT:  It would sort of depend upon the

22      elasticity and demand on the route and also --

23                  THE WITNESS:  And things like this.

24                  THE COURT:  -- the percentage of recapture?

25                  THE WITNESS:  Yes.

 1              THE COURT:  So the recapture effect depends on how
 2     much you're recapturing.
 3              THE WITNESS:  That's right, so --
 4              THE COURT:  So it might be more of a recapture
 5     effect if you're recapturing 90 percent than 1 percent.
 6              THE WITNESS:  That's definitely true.  But if you
 7     take a product out of a market, or substantially reduce its
 8     capacity, the recapture effect is actually smaller.  So it's
 9     not the case that the JetBlue effect is just sort of
10     mechanically a lot bigger than the model.  And I actually
11     view it as pretty powerful corroborating evidence, that the
12     model is getting something that is close to what we see in
13     the data.
14     BY MR. DERITA:
15     Q.  Yesterday at the end of Mr. Wall's cross, you were asked
16     a series of questions with adjectives like "strong" and
17     "significant" in the context of -- we'll use Spirit, for
18     example, provides competition from Newark.  Do you recall
19     that?
20     A.  Yes, I recall that exchange.
21     Q.  Is there a framework that you would use to assess whether
22     competition is strong or substantial enough to be included in
23     a relevant market?
24     A.  Yes, I have a framework for that.
25     Q.  What is it?

1    **A.**   It's the Hypothetical Monopolist Test.  And so the

2    important thing is whether -- whether the evidence suggests

3    that there's enough diversion flowing into Newark, or other

4    sources, to constrain the exercise of market power.  And what

5    I've got is a set of evidence that's based on direct customer

6    behavior that suggests that the answer is -- that there's --

7    the answer is no.  And that's also, actually, consistent with

8    supply side behavior that corroborates the conclusions on

9    sort of my understanding of how customers have choices.  And

10   I showed you some of that supply behavior in my slides when I

11   showed you that JetBlue tends to match prices at JFK and

12   LaGuardia, but less often for Newark, and similarly for

13   American.  And so that sort of supply side behavior is

14   consistent with -- it's consistent with consumers making

15   decisions as the way that the data tells them they need to

16   make decisions.  And there's a host of other supply side

17   decisions that firms have made that, to me, is consistent

18   with what I found.  And maybe I can summarize those for you,

19   if those -- if that's possible, if this continues, in

20   paragraph 106 and 107 of my original report.  And it's

21   focused on the reasons that JetBlue chose to expand into

22   Newark and some of the considerations that JetBlue is looking

23   at.

24           And the documents contained in those two paragraphs

25   will provide one document in particular that suggests that

1    JetBlue moved into Newark in part to gain access to a new
2    customer base, because Newark's catchment area is different.
3    Another quote would come from -- I believe it's deposition
4    testimony from Mr. Laurence, in which he considers a
5    particular route.  And I think it's to San Juan, in which he
6    says flying that route from Newark won't cannibalize our
7    business on the same route from Newark and LaGuardia and the
8    third point focuses on transcon in particular.  And in that
9    analysis, in this document, the JetBlue document states that
10   in the particular Newark to transcon -- and I think it may be
11   San Francisco and LA specifically, there's no other LCC
12   competitor in the -- in the Newark transcon market.  Whereas,
13   there may have been over in LaGuardia and JFK.  And so that
14   sort of supply side behavior, to me, makes sense given what
15   I've been able to measure about how consumers make decisions.
16   **Q.**   Why do you use that framework?
17   **A.**   Well, the framework of the Hypothetical Monopolist Test
18   is a really nice way to think about putting a merger or an
19   agreement in the context of the question of whether it's
20   likely to create harm and here's what I mean by that, is
21   that, if we can define a set of products over which we know a
22   hypothetical monopolist would be bad, we don't want a
23   monopoly over this set of products.  Then we can ask the
24   question, how much closer does the merger or the agreement
25   get us to that situation?  And so that's the framework, is we

1    identify a set of products where we know that there would be

2    a problem if there's no lost composition.  And so for me

3    that's the routes that come out of JFK and LaGuardia, where

4    you got competition from Delta and JFK and American and other

5    providers.

6              And within this framework, I used the Hypothetical

7    Monopolist Test, I identified that region as a potential

8    problem for loss of competition, and then that enables an

9    analysis of market concentration and the Hirfindahl Indices,

10   and that's -- sort of gives us information about how much --

11   how much an alliance or agreement or merger would push you in

12   that direction.  And so that's, I think, the logic of the

13   Hirfindahl Index screens.

14   **Q.**   Okay.  Yesterday you were shown a DOT document.  Do you

15   remember that document?

16   **A.**   No, I don't remember.

17   **Q.**   Okay.  Let me grab it.  If you can go to DX1083 in your

18   binder.  It would have been the binder that's like less full

19   from yesterday.

20   **A.**   I don't believe I have the binder that was given to me

21   yesterday.  I can see it on the screen, though.

22   **Q.**   Yeah.  I'm not really going to go too far into the

23   document.  I just wanted to put it on the careen, but do you

24   recall this document?

25   **A.**   Vaguely.

1  **Q.**  Do you recall -- are you aware of the context of the
2  transaction being considered by the DOT here?
3  **A.**  I was able to glean something in my interactions with
4  Mr. Wall that it had to do with the -- you know, reading the
5  title of the assignments of the schedules at Newark-Liberty
6  International Airport from 2022.
7  **Q.**  So I'd like to show you a document marked as PX433.
8        THE COURT:  PX or DX?
9        MR. DERITA:  PX, which has already been admitted
10  into evidence.  And I don't believe we have paper copies of
11  it.
12        THE COURT:  Can you put it up on the screen?
13        MR. DERITA:  Yeah, we're going to put it on the
14  screen.
15        (Counsel confers.)
16  BY MR. DERITA:
17  **Q.**  So if we can go to -- actually, we can stay here.  So
18  this document is a submission from JetBlue, in relation to
19  the same DOT matter.  I'd like to direct you to page 2.
20  **A.**  Yeah, I can see it here.
21  **Q.**  Yup.  Great.
22        So if you look at about halfway down the paragraph,
23  there's a line there that reads, "15 of the 29 new JetBlue
24  destinations were previously monopoly markets that only
25  United served from EWR and which have benefitted the most

1   from new, much needed low-fare competition."

2           How do you interpret that statement by JetBlue in

3   that submission?

4   **A.**   Well, I'm cautious to interpret the literal word

5   "market," because I think people use markets to mean

6   different things.  And I'm defining, for the purposes of my

7   analysis of market, it is meant to focus on the likely

8   competitive effects of the NEA.

9           But what is more relevant is the notion of

10  introducing competition at Newark specifically could lower

11  prices.  Because that's telling me that competition affects

12  prices along those routes, which would be inconsistent with

13  those routes being relevant markets in the context of the

14  guidelines framework.

15  **Q.**   How would you interpret "monopoly markets" in the

16  sentence?

17              MR. WALL:  Objection.  Calls for speculation.

18              THE COURT:  Sustained.

19  BY MR. DERITA:

20  **Q.**   Does the use of the term monopoly markets in the sentence

21  mean anything to you?

22  **A.**   My interpretation of --

23              MR. WALL:  Objection.

24              THE COURT:  Overruled.

25              THE WITNESS:  My interpretation of monopoly markets

1    is that along particular routes served from Newark, only -- I

2    don't know if it's only nonstop or total, but we'll just say

3    there's only one provider serving that -- serving that route.

4    That particular characterization is one that I wouldn't

5    necessarily even say this is a valid antitrust market in the

6    normal way, just because I think that people use the word

7    market to mean different things, and I don't the particular

8    context with which DOT is using it here.

9            MR. DERITA:  Okay.  We can pull that document down.

10   BY MR. DERITA:

11   **Q.**  Let's go back to the collaboration guidelines.  And you

12   have a copy of these in the binder from earlier today?

13   **A.**  Yes.

14   **Q.**  I'd like to direct you to page 5.  There was a lot of

15   discussion about the collaboration guidelines earlier today.

16   Are there any sections of the collaboration guidelines that

17   were not discussed that you relied upon to inform whether it

18   was appropriate or not to use merger tools to evaluate the

19   NEA?

20   **A.**  To be honest, I don't remember all of the cross.  But

21   I -- you know, in my report, I do explain the section of the

22   collaboration guidelines that leads me to think that it's

23   appropriate to turn to the *Horizontal Merger Guidelines*.  And

24   maybe it's here on section -- on page 5.

25   **Q.**  Yeah, so let's go back to the four factors that were

1    discussed earlier at the bottom of the third paragraph there.

2    **A.**   Yes.

3    **Q.**   So let's go to factor (a), "The participants and

4    competitors in that relevant market."  How does that factor

5    apply to the NEA?

6    **A.**   Well, my analysis indicates that American and JetBlue are

7    competitors in many relevant markets.

8    **Q.**   What markets are you referring to?

9    **A.**   All of the nonstop overlaps, but also the mixed overlaps

10   and the connect overlaps.  All of these are relevant markets

11   in which JetBlue and American compete.  And you know, the

12   number of markets is actually quite large.  I can look in the

13   report to tell you exactly how many.  But there's many, many

14   connect markets, for example, in which they compete.

15   **Q.**   Okay.  Let's go to factor (b), "The formation of the

16   collaboration involves efficiency enhancing integration of

17   economic activity in the relevant market."  What's your

18   enhancement of that for the NEA?

19   **A.**   Well, there's certainly and integration of activity, of

20   economic activity, the extent to which is efficiency

21   enhancing.  You know, above and beyond what would be obtained

22   without NEA is a conversation that, you know, many people are

23   having, but is certainly represented by the parties that this

24   would be the case.

25   **Q.**   Factors?

1    **A.**   By the defendants.

2    **Q.**   Factor (c), "Integration eliminates all competition among

3    the participants in the relevant market."

4            How would you evaluate that factor with respect to

5    the NEA?

6    **A.**   I think this is consistent with my interpretation that

7    the NEA effectively ends competition between American and

8    JetBlue, along the routes that touch NEA airports, both

9    because the NEA allows for capacity coordination, allows for

10   American and JetBlue to make those decisions in their mutual

11   best interest, and because it aligns their pricing

12   incentives.  And so my interpretation is that this is

13   consistent with my analysis.

14           THE COURT:  Are you done with this little part or

15   not yet?

16           MR. DERITA:  I was just reviewing the transcript to

17   figure out if I have a follow-up question.

18   BY MR. DERITA:

19   **Q.**   And then, (d), "The collaboration does not terminate

20   within a sufficiently limited period by its own specific and

21   express terms."

22           What is your evaluation of that with respect to the

23   NEA?

24   **A.**   My understanding of the NEA is that it automatically

25   renews each five years.  Of course, this allows for

1    termination.  But the same is actually true with a merger,

2    because a firm that has merger sometimes divests assets and

3    we see that happening, as well.  So I determined that, you

4    know, interpreting this line within the guidelines is

5    consistent with my analysis of the NEA as introducing the

6    same sorts of incentives and problems that a merger might.

7              THE COURT:  If you're done -- are you done with

8    this part or no?

9              MR. DERITA:  Yup, done with this document; I was

10   moving on to the next.

11             THE COURT:  And you have more than --

12             MR. DERITA:  Probably about a half hour.

13             THE COURT:  We'll stop here, then.

14             All right.  I'll see you tomorrow morning, 9:00

15   a.m.  We're adjourned.  Have a good day.

16             (Court in recess at 1:03 p.m.)

17

18

19

20

21

22

23

24

25

1
## CERTIFICATE OF OFFICIAL REPORTER

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5    and for the United States District Court for the District of

6    Massachusetts, do hereby certify that pursuant to Section

7    753, Title 28, United States Code, the foregoing pages

8    are a true and correct transcript of the stenographically

9    reported proceedings held in the above-entitled matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13                              Dated this 13th day of October, 2022.

14

15

16

17                    /s/ RACHEL M. LOPEZ

18

19

20          _____

            Rachel M. Lopez, CRR
21          Official Court Reporter

22

23

24

25