1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3

4    _____

5    UNITED STATES OF AMERICA, et al.

6          Plaintiffs,                    Civil Action No.
                                          1:21-cv-11558-LTS
7        v.

8    AMERICAN AIRLINES GROUP, INC.,
     et al.,
9
            Defendants.
10
     _____
11

12       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                         BENCH TRIAL
                             Day 12

15

16
                       Friday, October 14, 2022
17                         9:00 a.m.

18

19

20
     John J. Moakley United States Courthouse
21   Courtroom 13
     One Courthouse Way
22   Boston, Massachusetts

23
     Rachel M. Lopez, CRR
24   Official Court Reporter
     raeufp@gmail.com
25

1                        **A P P E A R A N C E S**

2

    On behalf of the Plaintiff United States of America:

3

        United STATES DEPARTMENT OF JUSTICE
4       BY:  WILLIAM H. JONES, III; MICHAEL DERITA; EDWARD W.
        DUFFY; JAMES MOORE, III; MAISIE A. BALDWIN;
5       AND GRANT A. BERMANN
        450 Fifth Street, Northwest
6       Suite 8000
        Washington, D.C.  20530
7       (202) 514-0230
        bill.jones2@usdoj.gov
8       michael.derita@usdoj.gov
        edward.duffy@usdoj.gov
9       james.moore4@usdoj.gov
        maisie.baldwin@usdoj.gov
10      grant.bermann@usdoj.gov

11

12  On behalf of the Defendant American Airlines Group, Inc.:

13      LATHAM & WATKINS, LLP
        BY:  DANIEL M. WALL; MARGUERITE M. SULLIVAN;
14      MICHAEL G. EGGE; ALLYSON M. MALTAS; AND SEUNG WAN PAIK
        505 Montgomery Street
15      Suite 2000
        San Francisco, California  04111
16      (415) 391-0600
        dan.wall@lw.com
17      marguerite.sullivan@lw.com
        michael.egge@lw.com
18      allyson.maltas@lw.com
        seung.paik@lw.com
19

20  On behalf of the Defendant JetBlue Airways Corporation:

21
        SHEARMAN & STERLING LLP
22      BY:  RICHARD F. SCHWED
        599 Lexington Avenue
23      New York, New York  10022
        (212) 848-4000
24      richard.schwed@shearman.com

25

**TABLE OF CONTENTS**

**TRIAL WITNESSES**

On behalf of the Plaintiffs:                                    Page

 NATHAN H. MILLER, Ph.D.

        By Mr. DeRita                                         22

        By Mr. Wall                                          28


On behalf of the Defendants:                                    Page

 DARIN LEE, Ph.D.

        By Mr. Egge                                          42

        By Mr. Duffy                                        119

        By Mr. Egge                                         184

 JIM CARTER

        By Ms. Sullivan                                     186

        By Mr. Bermann                                      214

 CHAD SCHWEINZGER

        By Mr. Wall                                         238

1                          **EXHIBITS**

2

3    On behalf of the Plaintiffs:                    Admitted

4     Deposition designations by the plaintiff of        36

5     Goodman's deposition and defendants' responses

6     to the requests for admission

7     Number 36                                         143

8     Number 88                                         216

9

10   On behalf of the Defendants:                    Admitted

11    Number 56                                        212

12    Number 1086                                      201

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1
2 (In open court.)
3 THE DEPUTY CLERK:  The United States District Court
4  for the District of Massachusetts is now in session, the
5  Honorable Leo T. Sorokin presiding.
6 THE COURT:  Please be seated.
7 Good morning, everyone.  I understand there's
8  something you wanted to address, Mr. Jones.
9 MR. JONES:  Yes, sir, Your Honor.  Earlier this
10  week, I mentioned that the plaintiffs may come to the Court
11  to ask for some additional time, so I am coming to ask for
12  additional time.
13 THE COURT:  All right.
14 MR. JONES:  The plaintiffs would request four
15  additional hours of trial time for plaintiffs' side and I
16  understand that the defendants do not consent to this
17  request.
18 THE COURT:  So just so -- so help me a little bit
19  to understand the request.  Do you want four hours -- well, I
20  guess these questions.  One, where are you right now?  Like
21  how much time do you have left?
22 MR. JONES:  So right now the count is six hours and
23  one minute for us.
24 THE COURT:  Left.
25 MR. JONES:  Yeah.  Yes, sir.

```
 1              THE COURT:  And you anticipate using -- this is
 2    your last witness, or no?
 3              MR. JONES:  Other than the rebuttal case, in which
 4    we anticipate a few witnesses in rebuttal.
 5              THE COURT:  So in terms of your case-in-chief,
 6    what's left is the completion of the redirect.
 7              MR. JONES:  For our case-in-chief, that is correct.
 8              THE COURT:  And just give me an idea about how
 9    long -- about how long would that be?
10              MR. JONES:  So rebuttal case, we're --
11              THE COURT:  No, the rest of the redirect.
12              MR. DERITA:  About 15 to 20 minutes, Your Honor.
13              THE COURT:  Okay.  So you're at somewhere like at
14    five and three-quarter hours.
15              MR. JONES:  Yes, sir.
16              THE COURT:  When you're done with your
17    case-in-chief.  But then with their case, your cross of their
18    witnesses would use some of that time.
19              MR. JONES:  Yes, sir.  Primarily, the experts is
20    sort of what we're thinking, making sure we have sufficient
21    ability to cross their experts.
22              THE COURT:  Okay.  And so what you want is four
23    more hours, and you essentially want it for two reasons, one
24    is -- and if I'm not right about this, tell me.  There could
25    be different or other reasons.  But one reason is to be ample
```

1    time to do the cross on their witnesses, which you're going

2    to have about five and three-quarter hours, and then there

3    are -- you're anticipating, given who you think -- what you

4    think they're going to do with their case, is you might want

5    some rebuttal witnesses.

6            MR. JONES:  Yes, sir.  Those are the reasons why we

7    are seeking the additional time.

8            THE COURT:  Okay.  And you're seeking four hours

9    for you.

10           MR. JONES:  Yes, sir.

11           THE COURT:  Which, if I followed the same split we

12   were doing, would be almost four more hours for them, or

13   less.

14           MR. JONES:  Your Honor, by the calculation, we did

15   three hours and 15 minutes.

16           THE COURT:  For them.

17           MR. JONES:  Yes.  Keeping with the --

18           THE COURT:  The same ratio.

19           MR. JONES:  Yes, sir.

20           THE COURT:  I got it.  So it's really like seven

21   hours and 15.  Because I am anticipating you want to pose,

22   but too, if I allowed it, you want the three hours and 15

23   minutes.  Would that be fair?

24           MR. SCHWED:  Yes, Your Honor.  We both do oppose

25   it.  And if you do allow it, we -- I think it's -- we

1    calculated at 3:30.  But we're in that ballpark, yes,

2    Your Honor.  Whatever 55/45 works out to be.

3           MR. JONES:  Your Honor, we probably should have had

4    the economists do that for us, get the accurate number.

5           THE COURT:  All other things being equal, you would

6    be better off having the economist do the math than either of

7    you.

8           MR. JONES:  Yes, sir.

9           THE COURT:  Okay.  All right.  And so one last

10   question.  What do you -- well, just for all of you first, I

11   know the things you want to say about the opposition, but

12   just so I understand the framework, it would be helpful to

13   me.  Who are you -- like when we're done with this witness,

14   then you're going to start calling your witnesses.  And who

15   are you anticipating calling right now?

16          MR. SCHWED:  Maybe, Mr. Wall, you want to address

17   the witnesses, and then I'll --

18          MR. WALL:  Sure.  So our first witness will be our

19   airline industry expert economist, Darin Lee.  That will be

20   followed today by Jim Carter from American Airlines.  It's

21   fairly narrow.  It's on the dynamics of corporate selling,

22   but that's what that's about.  And then that will be followed

23   by Chad Schweinzger, from American Airlines, who was actually

24   the member of the clean team, and is also in charge of some

25   of the analytics that are used to measure the performance of

1   the NEA.  And hopefully we'll get through all of that today.

2   We'll see.

3             And then on Monday, we'll put on Dr. Israel, Mark

4   Israel, one of the principle economic experts that we have in

5   this case.  I don't imagine that anything else will get done.

6   It's a short day, so I don't imagine anything else will get

7   done then.

8             And then when we come back, we're still trying to

9   deal with some of these scheduling issues that we were

10  talking about there, the witnesses that we have left are

11  Dr. Bruckner, a very short examination, Dr. Bruckner some

12  years ago did a market definition article about -- that

13  includes New York.  He updated.  He's going to present the

14  results of that, it's going to be very discrete.  Dr. Carlton

15  who's a competitive effects expert witness for us, and then

16  Brian Znotins, who is the head of network planning for

17  American Airlines and is basically coming in to deal with a

18  few of the questions that Your Honor raised.

19            THE COURT:  Oh, I see.  Okay.  All right.

20            And so right now you're not asking for more time to

21  accomplish all of that?

22            MR. WALL:  We have put ourselves on -- on the diet,

23  on the budget to accomplish that within, what, nine hours?

24            MR. SCHWED:  Nine hours and 15 minutes, roughly.

25            THE COURT:  Okay.  All right.

```
 1              All right.  So I'll hear you on whatever your view
 2      is about their request.
 3              MR. SCHWED:  Yeah, so, Your Honor, as I'm sure
 4      Your Honor recalls, the plaintiff started the case with
 5      20 percent more time than we have.  We were at 30 and a half,
 6      and they were at 37 even.
 7              THE COURT:  Well, I thought it was 55/45.
 8              MR. SCHWED:  Yes.  Which ends up being 20 percent
 9      more time, if you add six and a half hours on top of 30.  So
10      it's a significant advantage they had.  And one of the
11      explicit reasons was the rebuttal case, that was one of the
12      things they highlighted, among others, in their papers.  And
13      as Mr. Wall noted, we have very carefully budgeted our time.
14      Every single day we go back, we see how we are doing against
15      the clock and we -- obviously, we've been just exchanging
16      time with the plaintiffs every day, so everyone knows where
17      they are.  And every day, we cut, we narrow the -- we limit
18      the scope of what we do.  And to now, on day 12, the end of
19      the third week, to go back and say, okay, well, if they get
20      four hours, we get, I think -- I just got a slight adjustment
21      from Mr. Craner, it's three hours 20 minutes, we can't go
22      back and allocate those three hours and 20 minutes.  We can't
23      go back and allocate those three hours and 20 minutes and ask
24      all the witnesses who have come in the last three weeks the
25      questions we cut out.  You know, we've budgeted our time.
```

1    We've been very careful and we've made the hard choices that,

2    perhaps, the Department of Justice made different choices.

3    And I think we have to live -- we should all live with the

4    calendar that was set, because we can't go back in time and

5    redo this.  To us, it's as simple as that.  There was a very

6    clear amount of time allocated at the beginning of the case,

7    and we've been -- we've targeted that and adjusted our entire

8    strategy based on that.

9           THE COURT:  Okay.  Anything that you want to add,

10   Mr. Wall?

11          MR. WALL:  No.  I mean, to me the biggest point is

12   what Mr. Schwed made, which is, you know, the equity rule

13   depends on when you impose it.  And when you impose after

14   there's been reliance on the earlier rule, it's different.

15          THE COURT:  Right.  Anything more you want to add,

16   Mr. Jones, in light of that?

17          MR. JONES:  Your Honor, just very quickly,

18   certainly we've made choices as well.  We've cut witnesses,

19   we've narrowed examinations, we've also faced the headwinds

20   of adverse directs, where, you know, we're asking targeted --

21   mostly targeted questions of their witnesses.  Yes yes-or-no

22   questions often getting essay answers in response to yes

23   yes-or-no questions that has the effect of burning our time,

24   as well, and I would just note that as part of why we are

25   where we are.

1          MR. SCHWED:  Your Honor, if I may just briefly

2     respond to that.

3          THE COURT:  Yeah.

4          MR. SCHWED:  I think two points.  One is, we

5     obviously disagree that there was anything wrong with the way

6     our witnesses behaved.  They answered the questions they were

7     asked.  And I think more importantly, going back to what

8     Mr. Wall said, if they thought that there was a problem with

9     that, that that was delaying the case, the time to deal with

10    that was when it was happening.  And the other point I want

11    to make is what we just heard from Mr. Jones is exactly the

12    same thing they said in their submission, justifying the

13    extra time they got, the 55/45.  They said they have the

14    burden, but then they also highlighted that their case will

15    be proved through adverse and hostile witnesses, namely

16    defendants, employees who may be less forthcoming during

17    plaintiffs' examinations than during defendants'

18    examinations.

19          So these witnesses are unlikely to be cooperative

20    and such a posture often requires additional time at trial to

21    develop evidence for the Court, and then they also pointed

22    out the rebuttal case.  So that's why they got the time in

23    the first place.  And again, going back to it, if they

24    thought there was something wrong with the way the

25    examinations were going, the time to deal with that was when

1      the examinations were happening, not on the last day of the

2      third week of trial.

3              MR. JONES:  Your Honor, I probably should have

4      written in the paper, instead of not forthcoming, I should

5      have probably said very not forthcoming, or some adverb there

6      to really express what we've seen here.  But we certainly --

7      we certainly did put in the language that Mr. Schwed read,

8      and it's proven to be true, even more so than we predicted.

9              THE COURT:  Your calculation is right now you're --

10     what did you say?  Oh, 5:45 roughly when you're done with

11     this witness.  And you have what's left, the cross of all of

12     these witnesses.  And what are you -- given what's outlined,

13     what do you think your rebuttal case looks like?

14             MR. JONES:  So Your Honor, right now, depending on

15     what we see in defendants' case, we would anticipate

16     probably -- probably the two experts for our side coming

17     back, maybe a fact witness, but certainly the two experts

18     coming back, and probably somewhere, just for us, thinking an

19     hour, hour and a half each for those two, maybe -- maybe not

20     quite allocated evenly, but that's kind of our thinking right

21     now, all dependent, of course, upon the case that --

22             THE COURT:  So right now, given what Mr. Wall has

23     outlined as who the witnesses are, what you'd say you're

24     anticipating for rebuttal case is something like three hours

25     of testimony from the two experts, not necessarily 50/50, and

```
 1    possibly 30 more minutes, something, or -- and now you're
 2    sort of in your mind, maybe reserving an hour of like other
 3    fact witnesses, depending on how it all shakes out.  But
 4    something in the -- something in the order of four hours
 5    for -- your portion of the rebuttal case.
 6              MR. JONES:  Something like that, Your Honor.
 7    Probably a little bit less.  Probably the shorter time for
 8    any fact witness, if any, at this point as we're thinking
 9    about it.
10              MR. WALL:  Your Honor, may I just ask, for purposes
11    of this discussion, if they have any particular intentions of
12    calling a fact witness, who that might be, so we can at least
13    weigh in on whether that should be a factor on this or not?
14              THE COURT:  I'm not -- I guess -- well, sure,
15    who -- do you know who it might be?
16              MR. JONES:  Your Honor, we haven't decided.  Part
17    of it depends on --
18              THE COURT:  What they say.
19              MR. JONES:  -- what they hear from defendants.  But
20    certainly some of the issues surrounding Mr. Pack's
21    testimony, which you heard I think last week, and potentially
22    what Mr. Schweinzger may say, as he was part of the text
23    conversation with Mr. Pack that we had the back and forth
24    about.  So depending on what we hear, for example, from
25    Mr. Schweinzger, that may necessitate asking Mr. Pack to come
```

1    back.  That is a potential fact witness.

2              Again, Your Honor, no decisions, and it depends on

3    what we hear.

4              THE COURT:  Sure.  And just to clarify, Mr. Wall

5    and Mr. Schwed, you both view what you have left, about 9:15.

6    And from your perspective, is sufficient for you to, with a

7    scrupulous diet, finish your recross of this witness, do your

8    directs of the witnesses you identify, and do whatever cross

9    you want to do of whomever they call in their case.  And then

10   that will be fair?

11             MR. SCHWED:  Yes, Your Honor, if they're limited to

12   the time they have.

13             THE COURT:  At the hours that we have all have --

14             MR. SCHWED:  Yes.

15             THE COURT:  -- and where we are now.

16             MR. SCHWED:  Yes.

17             THE COURT:  For sure.  And I understand.  There's

18   not a world in which I'm going to give the government four

19   more fours and zero time for you.  That wouldn't be fair.  I

20   wouldn't do that.  And so not -- they're not asking for that

21   and I wouldn't do that anyway.  The choice is really do I

22   leave you where you are, or do I give you both additional

23   time.

24             MR. SCHWED:  Yes.

25             MR. WALL:  Right.  And if I may, I think the -- the

1    problem with this -- I mean, this sounds a little bit like

2    the congressional budget request, where you ask for so much

3    money, hoping you get half of it.  But I don't think there's

4    a justification here for two more hours.  We -- we had it --

5    a budget.  We were supposed to stick to it.  And the honest

6    answer to your question is we'll meet our time commitment by

7    cutting things out that we would otherwise do, which is what

8    I've done in every trial that I've ever been with in this

9    sort of recent era where you're always on clocks.  I mean,

10   it's just what you do.  It's not unusual here.  There's

11   nothing unusual about this.

12           THE COURT:  So this is what I'm going to do.  I

13   want to think about this a little bit.  I'll resolve it

14   today, I think, because I know you all need to have it

15   resolved.  And I might even resolve it before the end of the

16   day, but I want to think about it, puzzle over it a little

17   bit.  And I don't think that -- it's not going to effect what

18   you do in the -- how you spend your time on the rest of the

19   cross, it doesn't sound like.

20           And then the next witness's direct, that's on your

21   side.  And let me think about it a little bit, and I'll

22   resolve it either after lunch or after the end of the day, or

23   after the morning break, but I want to think about it a

24   little bit and just weigh the different considerations.

25           Anything else on that before I --

1              MR. WALL:  No.

2              MR. JONES:  Nothing from plaintiffs, Your Honor,

3    thank you.

4              THE COURT:  All right.  So just with respect to the

5    privilege motion, I've reviewed all of that.  I have a couple

6    of questions.

7              The first is, in the response, Mr. Wall, you said

8    that you have downgraded, as you put it, certain documents,

9    and they are -- will be available.  And I guess my questions

10   were, first, I don't know what those documents are.  And

11   unless I missed it, it's quite possible, it's an abbreviated

12   amount of time for all of us, but I didn't see which they

13   were.  So I'm not clear, whether, for example, they're

14   seeking 30 documents.  Like I assume they're not all

15   downgraded because then -- right.

16             MR. WALL:  No.

17             THE COURT:  But I didn't know if it's like one or

18   29, or which ones.

19             MR. WALL:  I don't know what the exact count was.

20             MS. MALTAS:  About 10.

21             MR. WALL:  About 10.

22             MR. PAIK:  16.

23             MS. MALTAS:  16.

24             MR. WALL:  16.  Which is about ten, if you're not

25   an economist.

```
1           THE COURT:  All right.  So -- and is it possible to
2     get a list, as compared to like --
3           MR. WALL:  Of course.
4           THE COURT:  Like I assume that they're all on that
5     29.  So all the ones you downgraded are within the 29.  So
6     just then like a list of what they were, or something so I
7     can compare.  And then to help me -- and that will be
8     helpful.  The second question related to that is are -- I
9     guess the -- well, I need to see that.  But that's helpful to
10    figure out what the scope -- if there is any sort of waiver,
11    that will help me think about it.  Because that obviously
12    changes the playing field, meaningfully, that you turned over
13    a bunch of documents.
14          Are there any documents now withheld, forgetting
15    about -- you know, where we are today, where the claim for
16    privilege or withholding is solely -- solely because the
17    document, the content of the document is a description or
18    summary of the discussion of that May 29th meeting?
19          MR. WALL:  We're going to do solely because of
20    that.  Mr. Paik, if you could come up and address it.  It's
21    probably better to have someone who knows the answer.
22          MR. PAIK:  Good morning, Your Honor, Andrew Paik
23    from Latham & Watkins on behalf of American Airlines.
24          THE COURT:  Good morning.
25          MR. PAIK:  No, Your Honor, we've -- there was one
```

1     communication from, I believe, Mr. Schweinzger, sending some

2     output with regard to that call on May 29th, that we have

3     subsequently discovered and have downgraded and provided.

4     We -- there's nothing that we continue to withhold that is

5     directly relevant to that discussion or documents that were

6     provided in context of that discussion.

7           THE COURT:  I'm not asking about relevance as much

8     as whether the privilege is solely because the content of the

9     document contains a description or summary of the discussion.

10          MR. PAIK:  We have provided -- there's nothing that

11    we are withholding that provides a description of that call,

12    Your Honor.

13          THE COURT:  Okay.  All right.

14          MR. MOORE:  And Your Honor, Jimmy Moore from the

15    United States.  If I can just add a little bit on that, and

16    why we still think that there is a dispute that's

17    outstanding, even with the production that they made.  As we

18    heard during Mr. Pack's examination, there was an exhibit

19    that he showed where he sent a request for information on the

20    21st.  The information was provided on May 29th from JetBlue,

21    and that's what triggered the conversation that we then see

22    in the text messages that were the subject of this dispute.

23    So we see those two as related.  They still are withholding a

24    large number of documents from the 20th and the 21st, that we

25    think are all related and interwoven with that discussion

1    that ultimately occurred on the 29th about the counterfactual

2    scenario.

3              MR. PAIK:  Your Honor, if I may, I don't think

4    that's a correct characterization of what happened.  The

5    May 29th call is not related specifically to some kind of

6    output that was produced.  It was actually -- I think what

7    Mr. Moore is talking about is this v4 exercise that you've

8    heard about.  And defendants have produced the v4 schedule.

9    We've provided communications around the v4 schedule.  You

10   have heard about those communications.  We have not withheld

11   any of those documents.  What we continue to withhold are

12   privileged communications containing legal advice from

13   outside counsel regarding the regulatory proceedings that

14   were happening.

15             THE COURT:  So this is what I want to do -- I want

16   to see the list of which things -- you could give me a list

17   of -- you could just tell me that you could refer to theirs

18   and say -- you know, the 29 they're saying, and say like one,

19   three, five, eight, whichever ones you gave, or you can give

20   me a separate list that maps that, so that I can -- then I

21   know what's left and I can read the log, and that might

22   answer the rest of my questions.  And if it doesn't, then

23   I'll talk to you again.  And with respect to this, to the

24   extent it's not resolved when you're ready to be done, it

25   will remain a open issue so that your resting won't effect

1    that.  Number one.

2              And number two, I take it this is particularly

3    significant for you for the cross of Dr. Israel.

4              MR. MOORE:  Yes, Your Honor, it's going to be

5    relevant both to the cross of Mr. Schweinzger, who Mr. Wall

6    has mentioned, as well, because he was in part of the

7    conversation that's woven into this.  He was in the text

8    messages that we looked at last week with Mr. Pack.  So it

9    will effect his examination possibly today, as well as

10   Dr. Israel's examination next week.

11             THE COURT:  Okay.  So I'll certainly have it done

12   by Israel's and if you -- the sooner you can get me a list, I

13   can look at it at the break or by lunch, if you can get it to

14   me by either of those times.

15             MR. PAIK:  Yes, Your Honor.

16             THE COURT:  Okay.  All right.  Anything else before

17   we return to testimony?

18             MR. JONES:  Nothing from plaintiff, Your Honor.

19             THE COURT:  Okay.

20             MR. WALL:  Nothing from us.

21             THE COURT:  I will say that, you know, I read a lot

22   of -- more than I wish, sometimes of letters between lawyers

23   and also about discovery disputes, and -- because, right,

24   everyone always attaches that communication when there's a

25   discovery dispute before the Court.  And so I've read a lot

1   of them over the years.  And I will say what was notable

2   about the exchange between you, Mr. Moore, and I think it was

3   with a different lawyer from Latham, it was, but I don't --

4   I'm not going to attempt to mispronounce the lawyer's name,

5   but it was notable -- it was notable -- it was just like a

6   pleasure to read the communication, because it was devoid of

7   all the invective and adjectives that are usually mar all of

8   those exchanges, and it was like, just like here's what the

9   issues are, and laid it all out, and it was both a pleasure

10  and helpful to read.  So I credit the two of you for that and

11  for what it also reflects, I suppose, about the people for

12  whom you're working, that they're creating that culture.

13          All right.  So we're back with your redirect of the

14  witness.

15          Go ahead.

16          MR. DERITA:  Thank you, Your Honor.

17                     **NATHAN H. MILLER, Ph.D.**

18    having been previously duly sworn, testified as follows:

19    **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF USA, Continued**

20  BY MR. DERITA:

21  **Q.**  Dr. Miller, in relation to the DOT commitments, Mr. Wall

22  asked you some questions about -- where he asked you to

23  assume JetBlue and American would grow proportionally by

24  15 percent.  Do you recall that?

25  **A.**  I do recall that.  And specifically proportionally across

1    all the routes coming out of New York City.

2              THE COURT REPORTER:  Will you pull the microphone

3    closer to you?

4              THE WITNESS:  Sure.  Is that okay?

5              THE COURT REPORTER:  Yeah.  Thank you.

6              THE COURT:  And just repeat that answer, I couldn't

7    hear it.

8              THE WITNESS:  The answer is the hypothetical posed

9    on cross related to an expansion of capacity coming out of

10   New York City that would be implemented by pushing capacity

11   on to all of the routes proportionally.  So each route gets

12   capacity expansion by the same amount, in some manner.

13   BY MR. DERITA:

14   **Q.**  Do you understand that the commitments Mr. Wall was

15   referring to don't -- do not place any obligation on the

16   defendants to add capacity on any particular route?

17   **A.**  Yes, I do.

18   **Q.**  Would you expect the defendants to meet those growth

19   commitments by placing capacity on nonstop overlap routes?

20   **A.**  No, I do not, and I could explain if you like.

21   **Q.**  Yes, please.

22   **A.**  The -- along the nonstop overlaps, there is competition

23   between American and JetBlue that lowers price.  The revenue

24   sharing provides an avenue in which is becomes profitable to

25   raise price.  As price goes up, fewer tickets will be sold.

```
 1    This creates, all else equal, a reduced incentive to fly
 2    capacity on those routes.  This is just connecting the dots
 3    in terms of economic incentives, but it also comes through
 4    the model.  And so to the extent that there is capacity
 5    expansion in New York City, my analysis indicates that the
 6    incentives for American and JetBlue were to be -- were to
 7    place that capacity on routes other than the nonstop overlap
 8    routes that I've identified.
 9              THE COURT:  Just pause for one second.
10              You can stop the clock if you want.  This occurs to
11    me a question just related to the time question.
12              When I ask questions, how are you all accounting --
13    are you accounting for it if I ask questions on the
14    government's side, if it comes out of the government's side,
15    and if I add it on the defense side, it comes out of the
16    defense side.
17              MR. JONES:  Yes, sir.  That's how I've been
18    accounting for that.
19              THE COURT:  Okay.  That's what I thought.  Just to
20    clarify.
21              Go ahead.
22    BY MR. DERITA:
23    Q.  Okay.  I'd like to move on to a document that you were
24    shown by Mr. Wall, DX 515.  And it's in one of your binders.
25    I can't recall which one at this point.
```

1    **A.**   Okay.  We don't have it on the screen?

2    **Q.**   We will.

3    **A.**   Okay.  That's fine.

4    **Q.**   And if we can turn to page 0027.  And when I'm referring

5    to the page, I mean the DX hyphen, not page 27.  It just

6    doesn't line up exact.

7            Do you remember Mr. Wall pointing in this chart in

8    the context -- you point out the chart in the context of

9    questions about whether Newark should be included within a

10   JFK/LaGuardia relevant market?

11   **A.**   Yes, I do.

12   **Q.**   What does the reference to Philadelphia on the right

13   column mean?

14   **A.**   It looks like this slide places Newark and is comparing

15   Newark to offerings at LaGuardia, JFK, and also Philadelphia.

16   **Q.**   Have you seen any evidence that Philadelphia is in the

17   same market as JFK and LaGuardia?

18   **A.**   No, I have not.

19   **Q.**   Have you seen any evidence that Philadelphia is in the

20   same market as Newark?

21   **A.**   No, I have not.

22           MR. DERITA:  Okay.  We can pull that document down.

23   BY MR. DERITA:

24   **Q.**   Next I'd like to turn to a demonstrative of flight

25   schedules that you were presented yesterday.  I think it's in

1    the front flap of one of your binders?

2    **A.**   Thank you.  I can see it on the screen.

3    **Q.**   Great.  Do you see United flight 1190 that departs Newark

4    for Los Angeles at 18:30?

5    **A.**   Yes.  It's third from the bottom.  I do see that.

6    **Q.**   And do you also see United flight 517 that departs JFK

7    for Los Angeles at 18:35?

8    **A.**   Yes, I do.

9    **Q.**   Okay.  Do you see the JetBlue flight 2073 that departs

10   Newark for Los Angeles at 19:10?

11   **A.**   Not at the moment.  It's blown up on United.

12   **Q.**   Sure.  It might be easier to follow along with the paper

13   concurrently.  There might be a little bit of a lag with the

14   highlighting.

15          Do you see it now on your screen?

16   **A.**   Yes, I do.

17   **Q.**   And do you also see JetBlue flight 823 that departs JFK

18   for Los Angeles at 1915?

19   **A.**   Yes, I do.

20   **Q.**   And we're almost done with the exercise of do you see.

21   And moving on to New York and San Francisco flight timings,

22   do you see the United flight 1496 that departs New York for

23   San Francisco at 6:30?

24   **A.**   Yes, I do.

25   **Q.**   Do you also see United flight 512 that departs JFK for

1    San Francisco at 6:30?

2    **A.**  Yes, I do.

3    **Q.**  Does the closeness of these flight timings suggest

4    anything to you about market definition?

5    **A.**  I'm always cautious to read too much into one document

6    like this, especially without the context surrounding it, but

7    it's consistent with the notion that one -- that these

8    airlines might gain a benefit from flying out of two

9    different locations because those different locations are

10   going to be attractive to different customer bases.

11   **Q.**  We can pull that document down.

12          Mr. Wall asked you some questions about your model

13   and was implying that there was something unusual about the

14   fact that Newark is one of the many things in the outside

15   good.  Is it possible that including Newark in the outside

16   good, together with all the other outside good, hides the

17   ability that Newark, alone, would have to constrain a SSNIP

18   at JFK/LaGuardia?

19   **A.**  No, it's not.  I can explain.  The exercise of -- that I

20   conducted with the simulation model in support of the

21   Hypothetical Monopolist Test indicates that the entire

22   outside good, substitution to the entire outside good is

23   insufficient to constrain a small but significant price

24   increase on products at JFK and LaGuardia.  And given that --

25   because that's the case, it follows that substitution to

1    Newark alone is insufficient to constrain the same price

2    increase.  Another way to say it is that, in the context of

3    an outside good, as we model it, one component cannot be

4    bigger than the sum of the parts.

5    Q.  Thank you, Dr. Miller.  That's all I have.  And I pass

6    the witness.

7            THE COURT:  All right.  Any recross?

8            MR. WALL:  Yes.

9    **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT AMERICAN AIRLINES**

10   BY MR. WALL:

11   Q.  Just a couple of things.  First of all, on this last

12   point, notwithstanding what you say, when you rerun your

13   model where JFK, LaGuardia, and Newark are all in the

14   presumed market, and Newark is not relegated to the outside

15   good, you get different results as we discussed yesterday,

16   correct?

17   A.  Yes.  The results would change.

18   Q.  Thank you, sir.  With respect to what counsel just talked

19   to you about at United flights that are going to JFK, do you

20   know when United commenced that service?

21   A.  This is the demonstrative?  Could you put it on the

22   screen so I can see?

23            MR. WALL:  Sure.  Can somebody do that?

24   BY MR. WALL:

25   Q.  I mean, do you need to see it to know when United added

1    that service?

2    **A.**   I just want to make sure I understand the question.  So

3    which route is it?

4    **Q.**   This was Los Angeles.  And you were just taken through a

5    bunch of questions about the fact that United has some

6    flights not just from Newark, but from JFK.  Do you remember?

7    **A.**   No, I don't know when United added that service.

8    **Q.**   Okay.  So would it surprise you to learn that it was

9    during COVID?

10   **A.**   This is not a question that I've looked into before, so

11   I'm neither surprised or unsurprised.

12   **Q.**   Would it surprise you to know that Mr. Nocella, the chief

13   commercial officer of United, testified at his deposition in

14   his case that those flights were added because slots were

15   available during COVID, and he thought it was a good

16   opportunity to test out that flight and let consumers sample

17   the United product?

18   **A.**   Do you have the deposition testimony for context.

19   **Q.**   No, I don't have it with me.  Are you aware of that

20   testimony?

21   **A.**   I have not reviewed that testimony.

22   **Q.**   Okay.  Are you aware, sir, that about two or three weeks

23   ago, United canceled those flights?

24   **A.**   No, this is not something I'm aware of.

25   **Q.**   Are you aware that at the time that they canceled those

1  flights, they said that they had to because the resumption of

2  flying after COVID was going to mean that they weren't going

3  to be able to have enough slots to offer that service?

4  **A.**  To the extent that's a representation of what they said,

5  I haven't seen that.

6  **Q.**  Well, do you think that at the time that United canceled

7  those four flights, the entirety of their service from JFK,

8  they once again abandoned the New York market and put

9  themselves in a noncompetitive position in Newark?

10  **A.**  That has a lot of words that I don't want -- that I don't

11  think are sort of economic in nature, so I don't know how to

12  answer the question.

13  **Q.**  Okay.  Sir, yesterday in the beginning of your redirect,

14  you wanted to talk about the antitrust division's year in

15  review article from 2013 to 2014.

16         MR. WALL:  Maybe we can pull that up.

17         And I imagine you still have it up there somewhere.

18  BY MR. WALL:

19  **Q.**  So first of all, this article says nothing about

20  revisiting the methodology established in the Delta/Northwest

21  merger of comparing potential harms on nonstop overlaps

22  against system-wide benefits, does it?

23  **A.**  I don't recall that specifically.

24  **Q.**  Let's go to Footnote 7, which your counsel highlighted.

25  That's a footnote in which the division says that the QSI

1    methodology -- do you know what QSI is?

2    **A.**   I used to.  You mean the acronym?

3    **Q.**   Yeah.

4    **A.**   No, I do not know.

5    **Q.**   Okay.  It's quality of service index.  So the quality of

6    service index methodology compares "forecasted demand for the

7    merged carrier under predicted post-merger schedules to that

8    under no-merger schedules to generate estimates of consumer

9    benefit."  And then it says, "In retrospect it can be shown

10   that this methodology is inadequate for a merger evaluation,

11   in part because there is no reliable way to predict

12   post-merger schedules.  Actual post-merger schedules were

13   significantly different from what was predicted."

14          Right?  That's what it says?

15   **A.**   Correct.

16   **Q.**   That's what you highlighted, right?

17   **A.**   I did not highlight that.

18   **Q.**   Your counsel highlighted that?

19   **A.**   That's correct.

20   **Q.**   So if -- that's a problem in a merger, right, because you

21   have to make predictions, because you're challenging the

22   merger before it actually takes place?

23   **A.**   I don't see it that way.  I disagree with you.

24   **Q.**   But if a transaction isn't a merger, you have the option

25   to wait and see what the schedules actually turn out to be,

1    right?

2    **A.**   Are you asking me if I have the option?

3    **Q.**   Anyone has the option.  An analyst has an option.

4    **A.**   There's always an option to weigh it.

5    **Q.**   And there aren't hypothetical NEA schedules.  There are

6    actual NEA schedules in the world today, right?

7    **A.**   Yes.

8    **Q.**   And you have not analyzed them to determine whether there

9    are any anticompetitive reductions of output, have you, sir?

10   **A.**   I have not analyzed those schedules.

11   **Q.**   Okay.  Now, while we're on the subject of this article,

12   much of this article is defending the remedy that led to the

13   settlement of the DOJ challenge to the US

14   Airways/American Airlines merger, right?

15   **A.**   I don't recall specifically.

16   **Q.**   Well, the article makes the point on page 383, that with

17   regard to New York, the parties had to divest 34 slots at

18   LaGuardia.  About 3 percent of LaGuardia's slots.  Do you see

19   that?

20   **A.**   Yes, I do.

21   **Q.**   34 slots is a 17 slot pair, right?

22   **A.**   It may be.  I don't that -- whether that will hold in

23   this context, but it could be.

24   **Q.**   And 17 pair is exactly equal to the 7 slot pair that

25   American and JetBlue are now in the process of divesting as a

1    result of the DOT agreement, plus the number of JFK slots

2    that they will need to divest in the future, if they do not

3    meet the DOT growth commitments, right?

4    **A.**   Yes.  My impression is that -- well, I don't want to --

5    the DOT commitments are not something I've studied in detail,

6    so I'm probably the wrong person to ask about the particular

7    DOT commitments.

8    **Q.**   Okay.  Let me just finish on one point that you made

9    yesterday.  And that is about this idea that litigation risk

10   prevents you from being able to conduct a meaningful study of

11   post-implementation data and activity.  Now, what your

12   reasoning, right, is because American and JetBlue are

13   presently in litigation with the plaintiffs, the Department

14   of Justice and the States, and there is a risk that they

15   would lose -- that they may refrain from the predicted fare

16   hikes, right?

17   **A.**   Yes, that's more or less the line of thinking.

18   **Q.**   Okay.  But the reality is that, in this context, the risk

19   of litigation doesn't end with this case, does it, sir?

20   **A.**   I believe the risk of litigation would continue.

21   **Q.**   And that is because the DOJ could bring an enforcement

22   action in the future and a private plaintiff could bring a

23   lawsuit next year or the year after or the year after that,

24   challenging the NEA, right?

25   **A.**   I think that constraint would be -- likely to be weaker,

1    but, yes, I think these are possibilities that could occur.

2    **Q.**   But regardless of whether it's stronger or weaker, at the

3    time that you made the decision not to study the

4    postimplementation data, you weren't aware that there was a

5    treble damages action available for violations of the

6    antitrust laws that may occur on account of the NEA, correct?

7              MR. DERITA:   Objection.   It's calling for a legal

8    conclusion.

9              THE COURT:   Overruled.

10             THE WITNESS:   I got turned around in deposition,

11   because when you were asking me the question, it was in the

12   context, initially, of class action lawsuits.   I haven't done

13   a lot of work with Section 1, so I'm aware there can be

14   litigation like that.   But I got thrown for a loop with class

15   action which I haven't worked with and don't have much

16   understanding for.

17   **Q.**   Let's reviewed your deposition.   I've prepared a video

18   clip.   That is page 71, line 5, to 72, line 15 of your

19   deposition.

20             (Video plays.)

21   BY MR. WALL:

22   **Q.**   That was your testimony, sir, right?

23   **A.**   Yeah, but you cut off the part that explains why -- you

24   cut off relevant testimony that was the next line, but that

25   was my testimony, yes.

```
 1              MR. WALL:  No further questions, sir.
 2              THE COURT:  I just have one question.  So the
 3    model -- does the model build into it the possibility of
 4    antitrust litigation?
 5              THE WITNESS:  No.
 6              THE COURT:  Okay.  So the model is just modeling
 7    the economic attributes that you described before, at that --
 8    in 2019?
 9              THE WITNESS:  Yes, that's correct.
10              THE COURT:  Okay.  I see.  Okay.
11              That doesn't occasion either of you to have any
12    other questions, does it?
13              MR. DERITA:  No, Your Honor.
14              THE COURT:  All right.  Thank you very much.
15    You're excused.
16              MR. JONES:  Your Honor, we would like to move in
17    defendants' responses to request for admission, and then also
18    we had deposition designations from Mr. Goodman that we would
19    like to submit to the Court, as well.
20              THE COURT:  All right.  And is anybody objecting to
21    that?
22              MR. CRANER:  No objection by defendants.
23              THE COURT:  Okay.  So fine.  So I'm admitting -- is
24    it a written list of --
25              MR. JONES:  Yes, sir.  We are submitting it.
```

1          THE COURT:  Fine.  Tell me when you're ready.

2          (Plaintiffs Exhibit Deposition designations by the

3          plaintiff of Goodman's deposition and defendants'

4          responses to the requests for admission admitted

5          into evidence.)

6          MR. WALL:  Your Honor -- I don't know if --

7          THE COURT:  So just for the record, so I've

8   admitted the deposition -- without objection, the deposition

9   designations by the plaintiff of Goodman's deposition and

10  the -- which answers of the defendants' interrogatories?

11         MR. JONES:  Their responses to the requests for

12  admission.

13         THE COURT:  Their responses to request for

14  admission and those are admitted without objection.  And

15  subject to what I do about the privilege issue, which I've

16  reserved on, is there anything else, or do you rest?

17         MR. JONES:  Your Honor, subject to that privilege

18  issue you mentioned, and also reserving rebuttal rights,

19  plaintiffs rest their case.

20         THE COURT:  All right.

21         MR. WALL:  A couple items on our end.  First of

22  all, I want to renew for the record our *Daubert* motion, with

23  respect to Dr. Miller, both on the fitting reliability issues

24  that we raised before, but I would add to that also on the

25  failure to model, in any way, shape, or form, the capacity

1    effects of the NEA, which, of course, we covered extensively

2    yesterday and a little bit this morning.  I'm certain you'll

3    take that under advisement and don't want to hear anything

4    more about it now, but just for --

5              THE COURT:  Right.  I am taking it under

6    advisement, but yes.

7              MR. WALL:  And now, since --

8              THE COURT:  You're making that for both defendants?

9              MR. WALL:  Yes, absolutely.  Yes.

10             THE COURT:  Just -- I'm assuming that each one when

11   one of you speaks is for both, unless you say otherwise.

12             MR. SCHWED:  Yes, Your Honor.

13             THE COURT:  Okay.  Good.

14             MR. WALL:  Second, we move at this time for

15   judgement as a matter of law, under FRCP 52(c), on two

16   grounds.  First, no evidence has been presented that there

17   have been any adverse effects from the NEA.  If I may just

18   address that very briefly, because it's no longer a

19   theoretical issue on the pleadings.  Plaintiffs' case is in

20   and 100 percent of the competitive effects proof they have

21   put on consists of predictions of future harm and none of

22   that is even falling in the category of indirect, inferential

23   proof of present adverse harm.

24             But in addition to that, we're now in a posture

25   where it -- there is Dr. Miller's theoretical predictions

1    about what might happen in the future, but there is a record
2    of what has already happened to date that has come in, and
3    that record is unambiguously about output expansion and
4    downward pressure on price.  And absolutely not at all on any
5    output reductions that have led to any consumer harm.  And as
6    a result of that, the plaintiffs have failed to meet their
7    first step burden.
8         The second point is that there's been a complete
9    default on the plaintiffs' third step burden of showing
10   practical less restrictive ways to accomplish all of the
11   NEA's procompetitive objectives.  I suspect, from what we
12   heard at the beginning of Dr. Town's testimony, that
13   plaintiffs are approaching this as if they had no burden to
14   meet that element in their case-in-chief and can address it
15   in their rebuttal case as if it was an affirmative defense,
16   but that's just wrong as a matter of law.  A burden shifting
17   test does not alter the nature of the prima facie case.  It
18   determines how the prima facie case is established.
19        And, you know, there's lots of burden shifting
20   tests under the law in constitutional cases, and in Title VII
21   cases, lots of different things and the rule that comes out
22   of it consistently is that it doesn't change the nature of
23   the plaintiffs' burden of proof as if there wasn't an
24   affirmative defense.  And what the government has actually
25   done here is they have followed the -- the burdens of proof

1    that exist in merger law, which is it's quite different, in

2    which efficiencies are actually a defense that has to be put

3    on.  The government doesn't have any burden whatsoever to

4    show the absence of efficiencies.  And that is entirely

5    something that the defendants have to do.

6            But in addition to that, in addition to the fact

7    that they just didn't address it in their case.  They can't,

8    under any circumstances, meet their burden of proof under the

9    third step in the sort of abstract, nebulous way that they've

10   put on, where they just throw a bunch of things up against

11   the wall that we might have done.  We might have done some

12   codesharing, we might have done something like the West Coast

13   international alliance.  We might have grown some more, we

14   might have done this or that.

15           The legal requirements under the third step are

16   fairly exacting.  They require the identification of what the

17   alternative is, showing that it's something that the parties

18   would have done, that they would have been profitable for

19   them to do that, not just something that is made up.  And

20   then the most important and most exacting part of it is that

21   one needs to establish that all of the legitimate objectives

22   of the challenged conduct, qualitatively and quantitatively,

23   can be met by that alternative.  And they haven't even tried

24   to put on any evidence here that the -- that the relevance

25   benefits of the NEA, that the expanded flying of the NEA,

1  that the better utilization of slots under the NEA, that

2  the -- you know, that the international flights under the

3  NEA, that these things that are accomplished by the NEA and

4  fully established in the record could be done through any or

5  all combinations of these things that have been -- that have

6  been thrown up.  And there is just no case in the modern era

7  that has accepted any kind of less restrictive alternative

8  argument, like -- that is available to plaintiffs, based upon

9  the proofs that they have put on in their case-in-chief.

10      Now, I fully understand -- Rule 52 is

11  interesting -- that it gives you the option simply to decline

12  to issue a ruling, and the minute I call my first witness,

13  that ceases to have any consequence in the future for

14  appellate purposes or otherwise.  But I do think that what

15  you are faced with here is something unusual.  This is

16  essentially a summary judgment record.  This is a record upon

17  which there's really no reasonable dispute that the record

18  that has been established doesn't meet these two elements of

19  their burden of proof.  And on that basis, we do move for

20  judgement as a matter of law.

21      THE COURT:  All right.  So your supposition about

22  how I might proceed is correct.  I think that, without

23  suggesting a resolution of the legal and factual issues that

24  you raise, I think that I'm, essentially, reserving or

25  deferring judgement on those questions for a number of

1     different reasons, but prudentially a prudential

2     consideration, which is this is a significant case for the

3     defendant and a significant case for each of your two

4     clients.  And one, I'm not going to -- and it's not what

5     you're inviting, but I'm not going to obviously resolve this

6     case in an oral resolution that consists of, like, a 30

7     second recitation of, like, reasoning.  And I think that

8     would be not proper.  I know that's not what you're really

9     asking me to do.  But it requires a careful sorting through

10    of the law and the facts in this case to resolve all the

11    issues which is what I intend to do.  But given that, I just

12    don't see how I can -- sort of pausing to do that in a serial

13    fashion.  So I'm deferring resolution on that for now and

14    your rights, whatever they are, are saved.  And the issues

15    that you raise strike me as likely ones that I have -- all of

16    which I have to likely resolve at whatever point I resolve it

17    all.

18            Okay.  And that applies not only to the rule --

19    just so the record is clear, not only to the Rule 52(c)

20    motion that you make on two grounds that I'm reserving on,

21    but also the motion you renew with respect to Dr. Miller.

22    I'm also reserving on that.

23              All right.  Anything else that you want to address?

24              MR. WALL:  No.  We're ready to move forward.

25              THE COURT:  Okay.  All right.  Go ahead.  Call your

1    first witness.

2              MR. WALL:  Our first witness will be Dr. Darin Lee.

3    And Mike Egge will put on the witness for the --

4              THE COURT:  How do you say your name again?

5              MR. EGGE:  Egge.

6              THE COURT:  Egge.

7              MR. EGGE:  Good morning, Your Honor.

8              THE COURT:  Good morning.  If you would step

9    forward and remain standing for a moment while Ms. Belmont

10   administers the oath.

11             (The witness was duly sworn.)

12             MR. EGGE:  Your Honor, before we get started,

13   Dr. Lee has prepared a set of demonstrative slides and we

14   would publish them on the gallery screen.  With the exception

15   of the very last slide has one of those confidential

16   information that we just would not put on the gallery screen,

17   but I'll remind the Court when we get there.

18             THE COURT:  Okay.  Thank you.

19                         **DARIN LEE, Ph.D.**

20             having been duly sworn, testified as follows:

21   **DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT AMERICAN AIRLINES**

22   BY MR. EGGE:

23   **Q.**  Dr. Lee, could you state your full name for the record?

24   **A.**  Darin Lee.

25   **Q.**  And where do you live?

1   **A.**   Since 1999, I have lived in Boston.

2   **Q.**   And can you briefly summarize for the Court your

3   educational background?

4   **A.**   Sure.   I received a PhD in Economics from Brown

5   University in 1998, and before that, I received a master's in

6   economics from the Queen's University in Ontario in 1993, and

7   also a bachelor of science in economics from the University

8   of Victoria in 1991.

9   **Q.**   And can you please describe your professional background?

10   **A.**   Yes, I'm currently a executive vice president in the

11   Boston office of Compass Lexecon, which is an economics

12   consulting firm.   I've been there since 2011.   Prior to that,

13   I worked at another economic consulting firm called LECG,

14   which I joined in 1998.   And I have spent the majority of my

15   professional career, which is now 24 years, studying various

16   aspects of airline industry.

17   **Q.**   I want to come back to your airline industry work in a

18   moment, but first I'd like to ask you about your scholarship

19   as an economist.

20         Are you published?

21   **A.**   Yes, I am.

22   **Q.**   And how often have you been published and where?

23   **A.**   I have 18 peer-reviewed articles, 15 of which are on

24   various topics of the airline industry.   The airline articles

25   are published in journals such as the *Journal of Law and*

1    *Economics*, the *Journal of Labor Economics*, *Economics of*
2    *Transportation*, and other journals, as well.
3            In addition to that, I'm also the editor of the
4    first two volumes of the *Advances in Economics* book series,
5    which is a collection of scholarly work on the airline
6    industry.
7    **Q.**  And Dr. Lee, what types of issues have you written about
8    in the 15 airline industry articles that you've published?
9    **A.**  It's a pretty wide range of topics.  I would say some of
10   my work has focused on studying competition amongst different
11   business models in the airline industry and the effects that
12   that has on pricing.  I've also written some papers on the
13   impact of shocks, external shocks, such as September 11th, on
14   the airline industry.  And I've written papers, as well, on
15   the growth and expansion of low cost carriers, and
16   particularly on Southwest.  I mean, I -- you know, as I've
17   said, I've been doing this for about 24 years, it's been a
18   period of massive change in the industry.  So it's given me a
19   lot to -- a lot to write about.
20   **Q.**  Thank you, Dr. Lee.  Have you written any peer-reviewed
21   articles addressing airport groupings and market definition?
22   **A.**  I have.  Yeah, there's one of the papers that I've
23   published in 2014, it's called -- I think if I get the name
24   right, it's something like airport pairs versus city pairs, a
25   methodology for a market definition in the airline industry.

1  That was published in *The Review of the Industrial*
2  *Organization*, with Professor Jane Bruckner and Dr. Ethan
3  Singer, who were my co-authors.
4  **Q.**  Okay.  Aside from your publications, can you give the
5  Court a thumbnail sketch of the type of airline industry
6  related companies that you've worked with?
7  **A.**  Yeah, over the course of my career, I've worked with
8  pretty much every type of airline you can imagine, including
9  virtually all of the low cost or ultra low cost carriers,
10 carriers like Spirit, Southwest, Allegiant, JetBlue.  I've
11 worked for most of the regional carriers in the United
12 States, carriers such as SkyWest, Envoy, Pinnacle.  I've
13 worked for what I will refer to as kind of the lower cost
14 regional network carriers, carriers like Alaska and Hawaiian.
15 I've worked for each of what I refer to as the global network
16 carriers, American, Delta and United, and I've also worked
17 for a variety of foreign and international carriers, industry
18 trade associations, and even aircraft and aerospace
19 manufacturing companies.
20 **Q.**  So out of the airlines in that group, what types of work
21 have you done for airlines?
22 **A.**  Well, it's -- again, it's over the course of my career,
23 it's been a very broad set of topics, but I would say
24 generally what I have looked at is how fundamental changes in
25 the industry have impacted supply, demand, and competition.

You know, I spent a large portion of my career, almost ten
years, working on various airline bankruptcies, and I've
worked on every single airline bankruptcy that has occurred
since 2002.  And those engagements, I would say more than
any, have provided me with, you know, a really unique window
into every aspect of the airline industry.  You know, over
the course of my career, I would say I've pretty much worked
on anything of economic or business importance to the airline
industry.

**Q.**  And have you served in any expert role regarding airline
industry matters before the United States government?  And if
so, before what agencies?

**A.**  Sure.  I have -- yes, I have.  I've served in expert
roles in matters before the Justice Department, the
Department of Transportation, the Commerce Department, the
Treasury Department, and even the State Department.

**Q.**  And have you ever been qualified as an expert witness in
federal court litigation involving the airline industry?

**A.**  I have, on several occasions, most recently, about a
month ago, just down the hall, in Judge Burroughs' courtroom,
in the case that was mentioned in the opening.

**Q.**  Have you served as an expert on airline merger matters?

**A.**  I have.  I have served as an expert in the
United/Continental merger, in fact, presented the results of
some of my empirical work to the Justice Department there.  I

1    have served as an expert for Air Canada and Air Transat and

2    their proposed merger up in Canada.  I was an expert for

3    Alaska Airlines in a private antitrust matter involving their

4    merger with Virgin America, and I also served as a consulting

5    expert to American in their merger with US Airways.

6    **Q.**   Have you served as an expert on airline joint ventures?

7    **A.**   I have on numerous occasions.  I've served as an expert

8    for United in their joint venture with both A&A, which is the

9    Japanese carrier, their transpacific joint venture, with Air

10   Canada and their transport joint venture, and I'm currently

11   consulting as an expert with Allegiant in their joint -- sort

12   of their proposed joint venture with Viva Aerobus to Mexico.

13   **Q.**   Thank you, Dr. Lee.  Were you asked to prepare an expert

14   report in this case?

15   **A.**   Yes, I was.

16   **Q.**   What were you asked to do?

17   **A.**   Principally, two things.  The first thing was to put

18   the -- the competitive landscape of the US airline industry,

19   including its competitive dynamics and the history of

20   consolidation into context, so that the Court could assess

21   the NEA.  And as part of that, the second thing that I was

22   asked to do was to comment on and analyze, you know,

23   plaintiffs' experts, characterization of both the present

24   day, as well as the historical airline industry.

25   **Q.**   Thank you, Dr. Lee.

1            MR. WALL:  Your Honor, we offer Dr. Lee as an

2    expert on airline industry, competitive dynamics, and

3    economics.

4            MR. DUFFY:  No objection.

5            THE COURT:  All right.  I find him so qualified.

6            MR. EGGE:  Thank you, Your Honor.

7    BY MR. EGGE:

8    **Q.**  Dr. Lee, did you prepare slides to illustrate your work

9    and opinions in this case?

10   **A.**  I did, yes.

11   **Q.**  Okay.  And I think we have here the first one.  Dr. Lee,

12   is this a summary of your conclusions that you prepared for

13   trial?

14   **A.**  Yes, this is a high level summary.

15   **Q.**  Okay.  We're going to cover each of these conclusions in

16   detail, but just to start, can you summarize briefly for the

17   Court your conclusions?

18   **A.**  Yeah, I think it's really important, when looking at this

19   particular dispute, to put into context, you know, as a

20   student of this industry for the last 24 years, I think the

21   industry context is really important, and I particularly

22   think a history is very important, particularly given that

23   some of the claims start back in what was going on in 2009.

24   And so what I've done here is I've summarized my primary

25   opinions into three main opinions.

1           The first is that if we look at where we are today,

2     in the airline industry, what I can confidently say is that

3     the industry has evolved into this incredibly competitive and

4     dynamic industry, with multiple different business models,

5     multiple carriers competing using different business models,

6     and it has really resulted in what I believe is the most

7     competitive industry we have seen, ever, in the United States

8     in terms of airline competition.

9           Prices in 2019 were at their lowest level in

10    history and there's just more choices.  The consumer has more

11    choices between and among different airline business models

12    than they've ever had.

13          And if you look at the NEA in that context, what it

14    really is is it's part of the constant evolution of this

15    industry.

16          The second main opinion that I have is that when

17    you -- when you correct for the fact that Dr. Town, what

18    he -- he really ignores all of this history.  He ignores the

19    tectonic shifts that were going on in this industry over the

20    last several decades, including what I think is arguably the

21    most important thing that has occurred in this industry,

22    which is the dramatic rise of low cost carriers and the

23    impact that that rise of low cost carriers had on the legacy

24    network carriers.

25          When you correct for that -- those market facts,

1    what you find is that not only does Dr. Town's whole theory
2    of capacity discipline kind of unravel, it makes no sense,
3    but econometrically when you address it in his models, all of
4    his results just fall apart.

5            And then finally, with regards to Dr. Miller, you
6    know, the way I see his opinions with regards to his
7    catchment area analysis, it's really nothing but an attempt
8    to gerrymander the New York City market definition.  In fact,
9    I think he just fails to address the fact that Manhattan is
10   the focal point of travel demand to and from New York City.
11   And even when you do his catchment analysis for Newark, which
12   he didn't do, in my view, it clearly shows that Newark is
13   part of the relevant market.

14   **Q.**  Thank you, Dr. Lee.  I want to start by asking a few
15   questions about the state of competition in the industry
16   today, and then I'd like you to help us understand how we got
17   there.

18           Dr. Lee, can you tell us -- if we can put up the
19   next slide, please.  Can you tell us what this work that
20   you've prepared tells us about the -- about airline
21   competition today?

22   **A.**  Sure, Your Honor, this is how I kind of think of the
23   taxonomy of the industry today.  There are currently four
24   distinct business models in the industry, each of which has
25   multiple competitors within it.  And this is really an

1   indication of how dynamic the industry has become and how

2   it's evolved.

3           And so the way I kind of think about looking at

4   this from a very high conceptual level, is that these

5   business models are aligned or arrayed across, you know, a

6   couple different primary characteristics.  On the horizontal

7   axis what I'm measuring here is network, scope, and product

8   differentiation, and the associated benefits to travelers

9   that come with that network scope.  And then on the vertical

10  axis, it's the operational complexity and the cost associated

11  with providing that.

12  **Q.**   Thank you, Dr. Lee.  Mindful that the Court's already

13  heard about some features of these models over the course of

14  trial, can you please unpack this taxonomy, focusing on how

15  each of these models interact in competition with the others.

16  And just start in the upper right, if you would, with the

17  global network carriers?

18  **A.**   Sure.  So if you think about the global network carriers.

19  American, Delta, United.  These are carriers who's business

20  models is predicated on network breadth, network scope, the

21  ability to take passengers from anywhere to everywhere.  And

22  so they want to be able to take people not only from, you

23  know, Boston to Los Angeles, but also to be able to take

24  people from Portland, Maine, to Shanghai, or Charlottesville,

25  Virginia, to New Delhi.  And that requires a business model

1    that revolves around large hub-and-spoke networks, that

2    aggregate demand from multiple end points connects them

3    through a hub, and brings them from all over the world, and

4    all across the country.  And that requires a complex network

5    that has a lot of cost and complexity associated with it.

6    And, you know, for example, the general -- the GNCs, as I

7    refer to them, they operate multiple fleet types, and we'll

8    talk about them in more detail with some numbers behind them

9    a little bit later.

10        Now, all of the other carriers fall into a kind of

11    group of what I've referred to as the lower cost carriers.

12    And there's different flavors of the lower cost business

13    model.  There's carriers that also use the hub-and-spoke

14    network like Alaska and Hawaiian, but do so on a much smaller

15    regional basis.  There's carriers like JetBlue and Southwest,

16    which are kind of the more prototypical low cost carrier,

17    that focus instead on -- instead of on a hub-and-spoke

18    network, but on a point-to-point network, that is really

19    driven on keeping costs low, focusing on dense markets with a

20    simpler business model, and where low cost and low fares, in

21    particular, are part of the brand equity of those -- of those

22    carriers.

23        And then on the bottom, on the bottom left,

24    Your Honor, we have what are known as the ultra low cost

25    carriers, which are the fastest growing segment of the

1   industry.  There's six of these carriers, two of which

2   actually just entered the industry in 2021.  And these are

3   carriers that kind of take the low cost model, and take it

4   kind of to the extreme, by unbundling and trying to drive

5   down cost and drive down fares to even lower levels.

6   **Q.**  Dr. Lee, do all of these carriers compete with one

7   another?

8   **A.**  Oh, absolutely.  I think the easiest way to see that is

9   if you take carriers at the opposite ends of the spectrum,

10   the GNCs and the ULCCs, the GNCs all introduced an entirely

11   new almost class of service called basic economy --

12           THE COURT REPORTER:  I'm sorry, almost what?

13           THE WITNESS:  A new class of service, which was

14   called basic economy which was intended specifically to

15   compete against the threat of these growing low cost

16   carriers, which were growing very rapidly.

17   **Q.**  If we can pull up the next slide.  Dr. Lee, can you

18   please describe for the Court what the data points you've

19   prepared for this slide tell us about these different

20   business models?

21   **A.**  Sure.  The previous slide was kind of a conceptual slide.

22   I think it's also really important just to kind of look at

23   the numbers, and it helps really to kind of bring these

24   different business models to life.  So what I've done here --

25   and this is data taken from my report, is compare three of

1    the business models, the GNC business model, the low cost

2    carrier business model, and the ultra low cost carrier

3    business model, with three examples.

4              And Your Honor, if you look at American Airlines,

5    American Airlines offers service with its own aircraft to 329

6    destinations across the world, of which 107 are small

7    communities in the United States.  Now, that amount of

8    connectivity and network breadth means that in 2019, American

9    carried passengers domestically on over 23,000 city pairs.

10   And in order to do that, they needed to use seven different

11   fleet types.

12             So you need an aircraft that can serve small

13   communities, it might be a 50-seat regional jet, maybe 76

14   seat regional jet, okay, that serve places like Bangor, Maine

15   or Lubbock, Texas.  But you also need long-haul wide-body

16   aircraft that can reach places like Sydney, Australia and New

17   Delhi, and you need kind of everything in between, and that

18   adds a lot of cost and complexity to American Airlines's

19   network.

20             Now, if you compare that to Southwest, okay.

21   Southwest, if you look at this passenger column, they are

22   actually the largest domestic carrier today.  They carry more

23   domestic passengers in 2019 than American did.  But

24   remarkably, they did it by taking passengers on only around

25   3,100 city pairs, about one eighth of the number that

1    American did.  And the reason they can do that is because of

2    their point-to-point network that focuses on dense routes

3    between large, generally large cities.  And you can see that,

4    compared to American, which serves 107 small communities,

5    Southwest only serves six.  And that simplicity of

6    Southwest's network, focusing on this point-to-point network,

7    serving dense routes, allows them to use a single fleet type.

8    And the results of that is they have a cost structure, which,

9    as you can see, roughly a third lower than that of

10   American Airlines, 10.35 cents per mile, as opposed to 14.76

11   cents for American.

12            Finally, when you look at Spirit, the ultra low

13   cost carrier, I think the most salient point from them is

14   simply that their cost structure is even, yet, almost

15   25 percent lower than that of Southwest, at 7.6 cents per

16   mile, which is almost half that of American Airlines.  Again,

17   they are driving their cost even lower by focusing on very

18   dense routes and a simple fleet structure.

19   **Q.**   And Dr. Lee, what is it that's driving that 14.76 cents

20   per seat mile for American?

21   **A.**   Well, it's a lot of things.  It's the cost and complexity

22   of operating a large hub-and-spoke network, which requires

23   multiple fleet types, small regional jets, large, wide

24   bodies.  You have to have different mechanics trained on

25   different aircraft, different pilots trained on different

1   aircraft.  Southwest, by having a single fleet type, has

2   every single employee can work on every single aircraft.

3   Every single pilot can fly any single aircraft in its fleet,

4   and as well as the nature of hub-and-spoke networks, you

5   know, one of the things they do, because they require

6   connectivity at the hubs is that the aircraft tend to sit on

7   the ground a little bit longer, as they're waiting for

8   flights from all of these folks to come in from maybe 200

9   different places and connect them onward to their final

10   destination.  You know, carriers like Southwest and Spirit,

11   with a point-to-point network, they land, they unload

12   passengers and bags, they pick up passengers, and they just

13   take off.  They don't worry about connectivity in the same

14   way.

15   **Q.**   Dr. Lee, I want to stop for a second while we have this

16   slide up and ask you something further about Southwest.

17   Plaintiffs contend that the industry is today dominated by

18   four large airlines accounting for 80 percent of the market.

19   And in saying that, they include Southwest with the three

20   legacy airlines.  Given your experience studying the airline

21   industry, do you think it's appropriate to group Southwest

22   with the GNCs?

23   **A.**   No, that makes no sense whatsoever.  I've studied

24   Southwest, I've written about Southwest, but I've also worked

25   for Southwest on multiple occasions.  And I can tell you that

1    aside from the fact that they have been incredibly successful

2    at growing to the largest domestic carrier, there's nothing

3    in common between them and the GNCs.  I've also written

4    about -- I've studied Southwest in terms of their effect on

5    prices.  I've published a study in 2013 that actually looked

6    at this impact.

7            Your Honor, you've heard a lot about the JetBlue

8    effect.  The JetBlue effect is actually named after something

9    much earlier, which is the Southwest effect.  And in my

10   report, in this matter, I've updated the analysis from my

11   previous published study and demonstrated that Southwest is

12   very much the low cost maverick that it has always been.  The

13   Southwest effect is very much alive and well.

14   Q.  Yeah, I think we have a slide on that, if we can please

15   put it up here.

16           Why don't you describe for the Court your work

17   here?

18   A.  Sure, this comes from my report.  And again, it's

19   updating a previous published study.  And what I've done

20   here, each set of bars shows the impact on GNC fares when one

21   of these carriers is present on the route, by present, I mean

22   offers nonstop service on the route, and has done it at two

23   different points in time, 2016, as well as 2019.  And as you

24   can see, the Southwest, when they're present on a route, the

25   fares of the GNCs tend to be 17 percent lower than when

1    Southwest isn't present on the route.  And Southwest fare

2    effect is, you know, approximately the same as JetBlue's,

3    which is 18 percent.

4    **Q.**  So just to be clear, the blue bar is 2019?

5    **A.**  The blue bar is 2019.

6    **Q.**  And the gray bar is 2016?

7    **A.**  That is correct.

8    **Q.**  Right.  So you're comparing Southwest with JetBlue's blue

9    bar?

10   **A.**  Yes, I am.  '17 versus '18.

11   **Q.**  Thank you, Dr. Lee.

12            THE COURT:  So is the decline because the GNCs, as

13   you've put it, have already come down on price, so there's

14   less room -- sort of overall, there's less room for them to

15   reduce price, or is it because the low cost -- the lower cost

16   carriers are more moving up?

17            THE WITNESS:  No, this is -- so your question,

18   Your Honor, is why it's come down?

19            THE COURT:  Yeah because what you see, putting

20   aside Allegiant, there's a lower effect, if you will.

21            THE WITNESS:  Yes.  Yeah.  It's overall prices, as

22   I'll testify later, Your Honor, have been steadily declining

23   over time.

24            THE COURT:  I see.  Plus room for --

25            THE WITNESS:  Yeah, exactly.  They're compressing

 1    fares all the time.

 2              THE COURT:  Okay.  Go ahead.

 3              MR. EGGE:  Thank you.

 4    BY MR. EGGE:

 5    **Q.**  Dr. Lee, what's your definition of a maverick?

 6    **A.**  A maverick is a carrier that uses its lower cost

 7    structure to disrupt fares and gain share.

 8    **Q.**  So which of the seven airlines on this slide would you

 9    regard as a maverick?

10    **A.**  I think all of these carriers are mavericks, and I would

11    also mention that there is two additional markets that just

12    entered the industry in 2021, Breeze and Avelo, and because

13    they're so new to the industry, I don't have yet the data to

14    estimate their fare effect.

15    **Q.**  Okay.  If we can go to the next slide, please.

16              Dr. Lee, what does this slide tell us about the

17    growth of the firm that you've described as mavericks in the

18    market today?

19    **A.**  Well, focusing on the right-hand side, Your Honor, which

20    is an exhibit from my expert report, this shows all of those

21    carriers, and it shows of the -- really, the spectacular

22    growth in capacity of each of them over the last ten years.

23    And you'll recall -- you may recall that Dr. Town showed

24    similar data to this.  I think he started in 2009.  So this

25    is just -- mine happened to start a year later.  And he

1     actually, I believe, only showed the GNCs, Southwest and

2     JetBlue and was, you know, remarking at how quickly JetBlue

3     had grown.

4            They have grown.  It's been very impressive.  But I

5     think equally impressive is the fact that the carriers that

6     he excluded from this chart, many of them were growing much

7     faster than JetBlue over the same time period.  You can see

8     Spirit, Sun Country, Allegiant, Frontier, and Alaska all

9     growing faster than JetBlue over this period of time.

10    Q.   Thank you, Dr. Lee.  Turning back to the taxonomy slide

11    that we were previously discussing, how does the taxonomy of

12    business models today compare to the taxonomy of business

13    models in, say, 1980, right after deregulation?

14    A.   It bears no resemblance.  You know, firstly, I would say

15    that all of these carriers in the ULCC grouping, none of them

16    existed in the time of deregulation.  JetBlue didn't exist.

17    Southwest existed.  It's actually a pre-deregulation carrier.

18    But before deregulation, it actually could only fly within

19    the State of Texas.  So its impact was limited to that.  And

20    then there were no global network carriers.  You did have

21    American and Delta and United Airlines and some others, but

22    they were not global network carriers.  They were emerging

23    trunk carriers of the deregulatory period that all offered

24    pretty fragmented, very limited, incomplete networks.  And

25    then, likewise, Alaska and Hawaiian hadn't really pivoted

1    into the lower cost network model at that junket.  So there's

2    really no similarity whatsoever.

3    **Q.**  So apart from Southwest operating in Texas as an LCC,

4    none of these business models existed in their current form?

5    **A.**  That's correct.

6    **Q.**  Okay.  Dr. Lee, I want to shift now and ask you a few

7    questions about how the airline industry has evolved to get

8    us to this place.  I'd like to start by asking you to briefly

9    describe, at a high level, how deregulation impacted

10   competition in the airline industry?

11   **A.**  Well, it really did it in two ways.  Deregulation, what

12   it did is the carriers that were known then as the trunk

13   carriers, what they did when deregulation came is that they

14   understood that the competitive landscape was about to

15   dramatically change, and they knew that in order for them to

16   better compete in this new deregulated environment, what they

17   were going to have to do was build better networks.  You

18   know, you think of American Airlines today and you think of

19   this carrier that is a large carrier that serves, you know,

20   most places, in -- and at the time of deregulation, many

21   people don't really understand that American only served

22   about half of the US states.  They didn't serve Florida.

23   They had no service to Washington state, no service to

24   Colorado.  They served only about 25 US states.  And what

25   they did, right after deregulation, is they moved their

1   headquarters from New York to Dallas.  And the reason that

2   they did that is that they knew, for them to compete in this

3   new environment, they were going to have to have a network

4   that could connect more people to more places.  And Texas,

5   Dallas-Fort Worth in particular, was a much better place to

6   do that, because it was centrally located and it could

7   connect people from more places to more places in the

8   country.  They did that, other legacy network carriers did

9   the same.  They all raced to build more complete nationwide

10  networks.

11          The other main thing that happened after

12  deregulation was it opened the door for a whole new breed of

13  carriers that could use a low cost structure to price below

14  and take market share, and it kicked off what the DOT has

15  referred to as the low cost carrier revolution.

16  **Q.**  And was Southwest that airline that started that low cost

17  carrier revolution?

18  **A.**  It is, yes.

19  **Q.**  How did Southwest do that?

20  **A.**  Well, as I mentioned, prior to deregulation, Southwest

21  was restricted to flying only within the state of Texas, and

22  it doesn't -- and it had done so for a few years quite

23  successfully.  But when deregulation occurred, they could

24  begin to kind of take that model, that point to point low

25  cost model and take it nationwide.  And others, also, others

1    followed in their footsteps.

2    **Q.**  So what happened next?

3    **A.**  Well, they proliferated and, you know, over the course of

4    time, different carriers, you know, tweaked their -- tweaked

5    the business model, but they proliferated and spread across

6    the country.

7    **Q.**  Can we pull up the next slide, please?

8           Dr. Lee, can you describe what these bars tell us

9    on this slide?

10   **A.**  Yes, this shows the percentage of domestic passengers

11   every year that are carried on lower cost carriers.  And as

12   you can see, in 1993, only about 15 percent of passengers

13   traveled on lower cost carriers, and today it's almost

14   50 percent.

15   **Q.**  And does this fully capture the competitive impact of

16   lower cost carriers' growth over the past decades?

17   **A.**  No, in my view, this actually understates the impact.

18   And the reason for that is that you don't need to fly on a

19   lower cost carrier to actually receive the competitive

20   benefit of it, for the reasons that I showed you earlier,

21   Your Honor, is that their very presence on a route puts

22   downward pressure on the fares of all the carriers.

23   **Q.**  Could we put up the next slide.

24          Dr. Lee, is this what you're talking about in terms

25   of the low cost carrier option?

**A.**   Yeah.  This really shows -- what I've done here,
Your Honor, instead of measuring market share of lower cost
carriers, I'm looking at the same period of time and I'm
showing the percentage of domestic passengers each year that
have the option of flying on a low cost carrier.  So all of
the people where there's a low cost carrier competing.  And
as you can see, in 1993, a low cost carrier is only about one
in three people traveling had the option of flying on a lower
cost carrier.  And today, it's nearly nine in ten people.

        THE COURT:  So this is -- if there's New York to --
do not pick New York.  Boston to LAX, then if there's -- if
ten percent of all of the -- is this passengers or origin and
destination.

        THE WITNESS:  This is O&D passengers.

        THE COURT:  So if ten percent of all the passengers
flying in the United States flew Boston to LAX, just to make
the math easy, and if there was a low cost carrier option
just on Boston to LAX and nowhere else, then this number
would be ten percent?

        THE WITNESS:  That's correct.  There's at least one
and often, there's actually more than one option, but that's
correct, Your Honor.

        THE COURT:  Okay.  Go ahead.

BY MR. EGGE:

**Q.**   Thank you.  Dr. Lee, what are the data that you've shown

1    us on these last two slides tell us about barriers to entry

2    and expansion in the airline industry?

3    **A.**  It shows -- and clearly -- that the barriers to entry are

4    quite low in this industry, very low.  And I fully

5    acknowledge that there are certain places in New York, in

6    particular, other slot constrained airports, where entry is

7    more difficult for all carriers, but, you know, this type of

8    growth clearly shows, in my view, that barriers to entry have

9    not been -- constrained them in any way.  And, in fact, you

10   know, if you were to look at the low cost carrier order book

11   of new aircraft on order, they have 1,500 new aircraft on

12   order, about half of which, I think, are scheduled to be

13   delivered in the next three years.  I don't think they would

14   be putting that much of their capital at stake if they didn't

15   feel that they had ample places to deploy it.

16   **Q.**  Thank you, Dr. Lee.  Coming back to the history lesson

17   you're giving us here, what did the growth and spread of

18   the --

19             THE COURT:  I'm sorry.  How many -- now you've made

20   me interested.  How many did the global network carriers have

21   on order, if you know?

22             THE WITNESS:  Oh, gosh, I would have to go back and

23   check it.  The difference, I would say -- they do have a lot,

24   and even today, Your Honor, I read that United is

25   contemplating a new order for up to 100 new wide bodies.  So

1    they have aircraft on order, as well.  The one thing I would

2    either point to when you compare the order books is -- for

3    lower cost carriers, particularly the ultra low cost

4    carriers, they have very young fleets.  So Frontier, for

5    example, their average fleet age is four years.  Spirit's

6    average fleet age is about seven years.  Okay.  So when

7    you're ordering new aircraft, you're doing it for a couple

8    reasons.  One is for growth and one is for replacement of

9    aircraft that are kind of reaching their --

10           THE COURT:  When they're buying, they're buying to

11   expand.

12           THE WITNESS:  They are clearly -- when you're

13   average fleet age is four and seven years, you know, most of

14   these airplanes will fly to 15 or 20 years, they are

15   definitely targeted for growth.  Not to say that the legacy

16   carriers or the global network carriers -- I mean, they're

17   also growing.  Again, they're going to grow, as well, but

18   they have, you know, average fleet ages around 15 years.

19           THE COURT:  So you have to titrate to the --

20           THE WITNESS:  You do have to, yeah.  Yeah.

21           THE COURT:  Okay.  Go ahead.

22   BY MR. EGGE:

23   Q.  Dr. Lee, what do the growth and spread of the low cost

24   carriers do to the legacy airlines?

25   A.  It put them under enormous pressure.  In looking at this

1    slide, you know, in 2002, one of the things that one of

2    the -- an executive from continental airlines at the time

3    actually had said, looking at the penetration of lower cost

4    carriers, you know, when you look at this growth in 1993 of

5    33 percent, and like over the course of a decade it doubled

6    to 70 percent, one of -- as I point out in my report, one of

7    the executives from Continental Airlines said that the

8    penetration had reached the point, or it could be fatal to

9    the legacy carrier business model.

10   Q.   So you mentioned pressure.  What exactly do you mean?

11   A.   Well, what I mean is low cost carriers being able to use

12   their lower cost to come in to more and more markets across

13   city pairs, across the country, and profitably take market

14   share away.

15        What that did is it saddled the legacy network

16   carriers that weren't really used to -- you know, keep in

17   mind, they weren't used to dealing with this type of

18   competition.  It saddled them with too much high cost

19   capacity, and not enough customers that were willing to pay

20   prices that would cover their cost.  And so when combined

21   with industry shocks, it eventually drove them all into

22   bankruptcy, and it forced them to reduce their capacity to

23   stay solvent.

24   Q.   So I want to stop you there for a moment and talk about

25   what you just said about the legacy airlines reducing

1  capacity.

2       Plaintiffs allege that the legacy mergers were

3  followed by substantial reductions in legacy airline

4  capacity.  Did legacy carriers reduce capacity as a result of

5  their mergers?

6  **A.**  No, that's just not what happened.  I worked, as I

7  mentioned, on each of the legacy carrier bankruptcies.  What

8  I can tell you that -- and I show this in my report, is the

9  vast majority of capacity that was taken out by the legacy

10  network carriers came because of the fact that they were

11  uncompetitive.  They had a cost structure that was

12  fundamentally at odds with what was going on in the

13  marketplace, and they needed to take out capacity to stay

14  afloat and hopefully kind of, you know, get back into a

15  position where they could compete.  Eventually, they all,

16  actually, had to go into bankruptcy.  And roughly three

17  quarters of all the capacity that legacy carriers eliminated

18  came out prior to each of their mergers.

19  **Q.**  I think we have a slide on this where you've done some

20  work.  Could you walk us through this in terms of the

21  relative move in capacity for legacy airlines, as well as the

22  low cost carriers?

23  **A.**  Sure.  What this slide shows, Your Honor, is the domestic

24  capacity of the legacy network carriers on the bottom.

25  They're kind of the dark crimson color.  And then on the top,

the orange color, is the low cost carriers.

So the peak of capacity occurred in 2000.  So you can see that the legacy carriers were offering 616 billion domestic ASMs.

As you can see, by the time 2008 comes, it had fallen down to 485 billion.  And 2008, as you'll recall, Your Honor, is the date of the first of the legacy network carriers that Dr. Town alleges kind of kicked off this capacity discipline period that he -- that he thinks occurs.

And as you can see, Your Honor, you know, the vast majority of capacity had already been removed by the time of that merger.  You know, along the way in 2002, both United and US Airways declared bankruptcy.  US Airways actually declared a second bankruptcy in 2004.  Delta and Northwest both declared bankruptcy in 2005.  You know, American's bankruptcy actually comes in a little bit later in 2000 -- at the end of 2011.  And as you can see, you know, most of that capacity has been already eliminated because of these competitive pressures, and a little bit comes out during the Great Recession and the after effects of that, which is hardly surprising.

**Q.**  And what about low cost carrier capacity throughout this period?

**A.**  Well, they -- what this shows, clearly, is that they just have been growing constantly throughout this period.  It does

1  show, not surprisingly, that during the Great Recession,

2  which was a really, really bad time, they slowed their

3  capacity growth, as would be expected, because demand was so

4  bad, but they have been growing like a weed ever since.

5  **Q.**  You mentioned shocks earlier, like 9/11, which presumably

6  affected both low cost carriers and the legacy airlines.  How

7  did it -- pardon me, how did those shocks effect the low cost

8  carriers?

9  **A.**  Well, the shocks, as you mentioned, 9/11, the fuel shock

10  of 2008.  I mean, these are the things that are common to all

11  carriers, but as a group, lower cost carriers because of that

12  lower cost structure, which gives you so much advantage when

13  industry demand gets hit, because it's like the low cost

14  player is going to be the one that's going to be left

15  standing, they, as a group, actually remained profitable

16  throughout all of these shocks.

17  **Q.**  Let's pull up the next slide, please.  And if you can

18  just take us through what these two graphs show.

19  **A.**  Sure.  This shows, Your Honor, the net profits, net

20  income profit or loss by business model, where I've got the

21  legacy network carriers on the top, and I've got the lower

22  costs carriers on the bottom.  It's each of these bars.  If

23  it's blue, it's a profit that year; if it's red, it's a loss

24  that year.  On the top, I also call out a variety of the

25  shocks that hit the industry.  And I don't put those same

1    shocks on the bottom, clearly they apply to both carriers,

2    but as to kind of keep the visual a little cleaner.  As you

3    can see, starting in 2000, it's kind of a sea of red for the

4    legacy network carriers.  Over this period of time, from 2000

5    to 2009, the lower cost -- sorry, the legacy network carriers

6    lost collectively $70 billion.  And you can see that from

7    looking at the black line, which in 2000 stood at around 20

8    billion.  That's the cumulative amount of profit that the

9    industry had made, or this group of carriers had made since

10   deregulation.  So by 2000, they had collectively earned about

11   $20 billion.  By 2009, they were in the hole by $50 billion.

12   So that's a $70 billion swing, and it clearly indicates this

13   is why they were all in bankruptcy.

14   **Q.**   And then just going to the lower half of that slide.

15   **A.**   Yeah, this shows the same for the lower cost carriers.

16   And you know, while there was a couple of years where they

17   didn't turn a profit as a group, over the same period of time

18   that the legacy network carriers lost $70 billion, the lower

19   cost carriers because of their low cost structure, they

20   actually made money.  They went from, roughly, four something

21   up to, you know, over $8 billion.  So they actually remained

22   profitable as a group over this time.

23   **Q.**   Thank you, Dr. Lee.  So given your experience working on

24   each legacy airline bankruptcy and also with the lower cost

25   carriers, what is your conclusion as to why each legacy

1  airline went bankrupt?

2  **A.**   Well, while shocks such as 9/11 no doubt played a role in

3  the timing of the bankruptcies, there was no doubt in my mind

4  that it was the continual growth of lower cost carriers and

5  the pressure that they put on airlines with higher cost

6  structures that forced each and every one of them into

7  bankruptcy.

8  **Q.**   So what did the legacy carriers do in response, in the

9  wake of lower cost carrier growth and these bankruptcies?

10  **A.**   Well, so bankruptcy allowed these network carriers to

11  kind of clean up their balance sheet, to get some new

12  flexibility to do different things within the contracts that

13  they had.  But it still left them at a competitive

14  disadvantage versus lower cost carriers, which were far more

15  nimble, and still even after bankruptcy had substantially

16  lower costs.

17          So as I mentioned earlier, Your Honor, the main

18  draw of a legacy carrier is its network.  It's ability to

19  take people to more places throughout the country.  That

20  network breadth is really their secret sauce.  And so what

21  they did was they doubled-down that to build more complete

22  networks, because even after they came up, went through

23  bankruptcy, they were still, each and every one of them

24  didn't have a complete network, both nationwide or globally.

25  And so they felt that in order to better compete against

1    lower cost carriers, they needed to double-down on their most

2    important attribute, which is the scope of their network and

3    build more complete networks, and they did that through

4    merging.

5    **Q.**  Okay.  Let's pull up your next slide here.  And can you

6    describe your work for the Court?

7    **A.**  Sure.  So this, Your Honor, shows, using maps, the

8    network kind of presence of each of the legacy network

9    carriers, kind of before and after their merger, starting at

10   the top with the Delta/Northwest merger.  And what I've done

11   here is I've highlighted in color each of the states where

12   the pre or the postmerger carrier had at least a ten percent

13   share of passengers traveling to, from, or within that state.

14   And so you can just -- if you look at the Delta/Northwest

15   merger, for example, which occurred in 2007-'08 period, what

16   you can see is, prior to the merger, Delta had kind of

17   regional strength in the Southeast, where it had its Atlanta

18   hub, it had regional strength in the mountain west because of

19   the Salt Lake City hub.  And the Northwest had strength in

20   the upper Midwest, that's always kind of been the area

21   because of Minneapolis and Detroit, where it had its

22   strengths.

23          And what you really see is almost like a jigsaw

24   puzzle.  Right?  It's that these networks were really

25   complimentary in terms of their geographic presence.  And by

1    putting them together with the merger, you can see that Delta

2    emerges, in 2009, by kind of combining the complimentary

3    networks of Delta/Northwest with a much more complete network

4    that has presence in almost every state.  Not every state,

5    but almost every state.

6              United and Continental is really the same story,

7    you can see kind of, pre and postmerger, highly complimentary

8    networks emerge from their merger with a much more complete

9    network.  And then finally, in response to now facing, you

10   know, too much improved networks, American and US Airways,

11   again, with that very complimentary network where US Airways

12   was strong in the east, American was strong in the central

13   part of the country, they, too, were able to merge, and

14   emerge with a much more complete nationwide network.  So this

15   is really the rationale behind each of these mergers.

16   **Q.**   Thank you, Dr. Lee.  What was the impact of these mergers

17   for the legacy airlines?

18   **A.**   It positioned them to grow again.

19   **Q.**   And did they grow?

20   **A.**   Yes.  I mean, not instantly.  Keep in mind that a couple

21   of these mergers of Delta is occurring in the midst of the

22   Great Recession.  So there's some time to integrate.  There's

23   some time to combine the airlines, but after they got through

24   that, they absolutely began growing, each and every one of

25   them.

1    **Q.**   And are they growing now?

2    **A.**   Yes, they are.  They are growing quite strongly now.

3    **Q.**   Okay.  And then what about the low cost carriers, do you

4    expect them to continue growing?

5    **A.**   Yeah.  The lower cost carriers, in my view, will

6    absolutely continue to grow.  They really have cracked the

7    code, so to speak.  They found that at least a few different

8    business models that really work well.  And what this history

9    has shown, Your Honor, is that in this industry, low costs

10   win.

11          And one of the other reasons why they will continue

12   growing, is because growth is, in fact, part of their DNA.

13   Right?  You need, as a low cost carrier, to maintain a low

14   cost structure that allows you to go into more and more

15   markets and use your lower cost structure that allows you to

16   price lower in order to continue to take market share.  And

17   one of the ways that low cost carriers keep their costs low

18   is by growing.  So when you grow as an airline, you're adding

19   people on the bottom of your seniority list.  It's known as

20   the genority (phonetic) effect, and it keeps the price -- I'm

21   sorry, it keeps downward pressure on your cost.  So this is

22   referred to, often, you know, amongst low cost carriers as

23   the virtuous growth cycle.  Right?  It's the growth that puts

24   the downward pressure on your cost, that allows you to

25   continue to price low, and then it creates this as virtuous

1    cycle of growth.

2          And then as I mentioned, Your Honor, I mean, the

3    data clearly shows that the consumers are drawn to the low

4    cost business model.  Their share is grown up to nearly 50

5    percent, and as we've discussed, they've got 1500 aircraft on

6    order.  So yes, there's no reason that I think this growth

7    will stop.

8    Q.  Let's talk about consumers.  As an economics matter, what

9    does the state of current competition in the airline industry

10   today mean for consumers?

11   A.  It means that consumers today have more choices of

12   business models than they've ever had.  And it means that

13   consumers today are enjoying some of the lowest prices of air

14   travel ever.  2019, Your Honor, was the lowest point in

15   inflation adjusted affairs in history.

16   Q.  And I don't want to interrupt you, but I think we have a

17   slide to that -- on that, as well.

18   A.  I just have one more point that I would like to make,

19   which is that when you actually look the number of

20   competitors per -- that a consumer has today, versus, say, in

21   1993, it's actually gone up.  So the average consumer today

22   has 3.5 choices on average between different carriers, and in

23   1993, that was a 3.2.  So the number of choices have gone up.

24   Q.  And let's talk about the fares, then, as well?

25   A.  Yeah, so this is what I was mentioning before,

1    Your Honor, is the fares.  So this is the growth of the low

2    cost carriers and the bars that we saw earlier.  And all I've

3    done here is put on the fares, and I'm measuring the fares

4    here on a price per mile basis that's been adjusted for

5    inflation.  And as you can see, since 1993, average domestic

6    price per mile has fallen by around 40 percent.

7           If I took this back to 1978, it would show that it

8    had gone down by around 50 percent.  And that -- the

9    difference between these two lines, Your Honor, the green

10   line adds in change in bag fees.  And so you can see

11   regardless of whether it is with or without bag fees, the

12   fare trends are the same.

13          When I look at this as an economist, when I see new

14   entrant carriers continually expanding share and fares

15   continually going down, that, to me, is really the sign of a

16   highly competitive industry.

17   **Q.**  Thank you, Dr. Lee.  We've been discussing airline

18   competition broadly on a national level.

19          Can you describe for the Court the competitive

20   dynamics in the Northeast?

21   **A.**  Sure.  You know, I think the trends in which we've looked

22   at nationally, are really mirrored in the Northeast.  The

23   growth of low cost carriers, the downward trend in prices.

24   The difference in the Northeast, I think, is that, you know,

25   particularly because of New York, network competition amongst

1    the global network carriers is more intense.  Right?  So you

2    know, New York City is by far and away, the largest source of

3    airline demand in the country.  It's actually probably ranks

4    one or two in the world.  And because of that, each of the

5    global network carriers really wants to have -- they all want

6    to claim that their number one in New York, clearly.  It's

7    also a really important international gateway, right?  So New

8    York City, in particular, because of its geographic location,

9    because it's also the hub of business, is really an important

10   international gateway.

11   **Q.**  And how do you view the NEA in light of the competitive

12   landscaped in the Northeast?

13   **A.**  Well, I view it really as a competitive response.  You

14   know, for American, for example, in New York, it is really an

15   attempt to close what has become a widening competitive gap,

16   versus Delta and United, which are much larger, roughly twice

17   as large as American and New York.  And for JetBlue, you

18   know, this is -- New York is a constrained -- a constrained

19   market, in terms of -- because of the slots, and it, for

20   them, is a path to continue growing in New York.

21   **Q.**  So that is New York.  What about Boston?

22   **A.**  Well, Boston is a little different.  Boston, as

23   Your Honor is no doubt aware, has been a real success story

24   for JetBlue.  They grew to become the largest carrier over

25   the last several years, but what's happened recently is that

1    Delta has made Boston its newest hub.  They clearly have a

2    bulls eye on the back of JetBlue, and they are really

3    attempting to unseat them as the leading carrier in Boston.

4    So for JetBlue, the NEA is really about helping to, you know,

5    content with this new, competitive threat.

6    **Q.**   And Dr. Lee, does Delta have something that JetBlue does

7    not?

8    **A.**   Yeah, they've got a massive global and national network.

9    **Q.**   And how does that put JetBlue, relative to -- in

10   competition to Delta, where does that leave JetBlue?

11   **A.**   Well, it leaves them in a -- in a more precarious

12   position than before Delta decided to make it a hub.  You

13   know, they can compete with this network, particularly for

14   business passengers, for passengers that want to be able to

15   get anywhere, that want to be able to travel internationally,

16   they just have this huge network.  And so that's where, for

17   American, for the parties that the NEA kind of comes into

18   play.

19   **Q.**   And then how is the NEA a competitive response for

20   American in Boston?

21   **A.**   Well, you know, American has really struggled in Boston

22   ever since I've lived here.  You know, unfortunately, it's

23   just kind of shrunk and shrunk and shrunk.  And now that

24   Delta has established a hub here in Boston, in my view,

25   there's really no realistic path for growth for American.  It

1    certainly is in terms of being able to build another hub.
2    There's only really three cities, Your Honor, in the entirety
3    of the United States, that can support two global network
4    carrier hubs, two or more, New York City, Chicago, and Los
5    Angeles.  No other cities in the country could have kind of
6    the amount of travel enough to support two major global
7    network carrier hubs.  As much as we like Boston, Your Honor,
8    it's just not going to happen.
9           THE COURT:  Mr. Schwed is so happy that you said
10   that.  He has just been waiting for that.
11   BY MR. EGGE:
12   Q.  Dr. Lee, did you hear plaintiffs in their opening
13   statement contend that JetBlue will be co-opted by American
14   and quit behaving like a low cost carrier?
15   A.  I did, yes.
16   Q.  And given what you've told us about the different
17   business models present in the market today, how plausible is
18   that contention in your view?
19   A.  Well, there's -- it's completely unplausible.  I mean,
20   these are radically different business models.  You know, you
21   can't -- as a low cost carrier, your entire brand equity,
22   your DNA is built around a low cost structure and low fares,
23   and that is what JetBlue has as its primary competitive
24   advantage in the marketplace, and there's no reason I can
25   envision why they would ever want to cede what is their most

1    important advantage, and really their secret to growth.

2    Right?  So for them, their low cost structure and their low

3    fares, they've built their entire brand around them, for them

4    to all of a sudden do a 180 and stop acting like the carrier

5    that allowed them to be so successful, it makes no sense in

6    my view.

7    **Q.**  Thank you, Dr. Lee.

8         On Tuesday, Dr. Town testified that relevance or

9    airport presence is associated with higher fares.  As you

10   know, the parties seek to enhance their relevance in New York

11   and Boston.  What is your reaction to Dr. Town on relevance?

12   **A.**  Well, I think as consumers, we should be really happy

13   about relevance, Your Honor.  I mean, Boston is the perfect

14   example.  When you think of what JetBlue has done here in

15   Boston, Your Honor, in 2007, I think they operated maybe

16   around 37 flights a day.  This past summer they were

17   operating around 140.  So they've tripled in size over the

18   last, what is it?  15 years or so.  And they've really

19   tripled their relevance.

20        And as far as I'm concerned, Your Honor, that has

21   provided enormous benefits to those of us who live and travel

22   from here.  I mean, if you think about JetBlue and what

23   they've done, we have new nonstop service to places that we

24   used to have to connect to, San Antonio, Sacramento,

25   Asheville, North Carolina.  Destinations in the Caribbean.

1    Like this, to me, we should be happy about this.  And to the

2    extent that there is, as I think Dr. Town found, maybe a one

3    percent fare increase because of a 10 percent increase in

4    relevance, I mean, that, to me, shows investment.  It shows

5    better product quality.  It shows that they are becoming

6    better at attracting more and more passengers, some of them

7    who are certainly happy to pay a little bit more to fly

8    nonstop than to make a connection.

9    **Q.**  Thank you, Dr. Lee.  We're going to move to a new topic

10   now, and discuss Dr. Town's theory that the legacy airline

11   mergers facilitated capacity discipline.  Have you assessed

12   those allegations and the evidence proffered by Dr. Town?

13   **A.**  I have, yes.

14   **Q.**  Okay.  I want to start with a few questions about the

15   words "capacity discipline."  What do those words mean to you

16   as an economist?

17   **A.**  To me, as an economist, capacity discipline means

18   aligning supply and demand for your product.  Right?  Making

19   sure that you're putting the right amount of your product

20   into the marketplace, with the hopes of -- that there's going

21   to be enough consumers out there to purchase it at prices

22   that will cover your cost.  And this is a -- a decision that

23   companies in every single business and every single industry

24   make every day.

25              And you know, if you -- if you happen to supply not

enough, then you run the risk of leaving profits on the table.  But if you put too much capacity into the marketplace, you run the risk of there not being enough customers for your product.  You run the risk of having to dispose of it at fire sale prices or building up in warehouses or just going bad, spoiling.  And so to me, this is just business 101 is aligning supply and demand for your product.

**Q.**  Okay.  So how does the exercise of matching supply with demand work in the airline industry?

**A.**  Well, it's complicated.  I mean, you start off with making sure you have enough aircraft.  Aircraft are essentially the flying factories that produce capacity for airlines.  And, you know, it's very tricky in the airline industry, because airline seats, Your Honor, are arguably one of the most perishable products around.  Like once a plane takes off with seats empty, that capacity is lost forever, and there's no chance of ever making any money on it.

So you know, for legacy carriers in particular with higher costs, capacity is trying to decide how much capacity to put in is even I think a harder task, because if you get it wrong, given that you got other carriers out there with costs that may be a third or a half of those of yours, if you get that capacity decision wrong, you know it's really pretty problematic.  And you know, each of the legacy carriers,

1   unfortunately, over this period of time, say from, you know,

2   2000 to 2012, they got it wrong, unfortunately.  And that,

3   ultimately, caused them to lose $70 billion and drove each

4   and every one of them into bankruptcy.  So it's a tricky -- a

5   tricky thing.

6   **Q.**  So let's swish now to Dr. Town's use of the words

7   "capacity discipline."

8           What is your understanding of how Dr. Town uses

9   those words?

10  **A.**  Well, he thinks of it quite differently than I do.  As

11  far as I can understand, what Dr. Town views as capacity

12  discipline is it's some type of coordinated behavior of

13  either tacit collusion or parallel accommodating behavior,

14  and it was facilitated somehow through -- through these

15  legacy mergers, through consolidation facilitated that, to

16  somehow produce, ratchet back your supply to less than what

17  you otherwise would have done.

18  **Q.**  You heard Dr. Town's testimony on Tuesday, did you?

19  **A.**  I did, yes.

20  **Q.**  And is the use of the words "capacity discipline" in the

21  documents Dr. Town discussed in his testimony remarkable to

22  you?

23  **A.**  No.  I think they're completely unremarkable.  I mean,

24  what -- you know, I've seen these documents and, to me, in

25  the wake of these legacy network carriers being so wrong on

1    capacity over this period of time of increased competition

2    from lower cost carriers, the fact that they use the term

3    "capacity discipline," having lost $70 billion and being

4    driven into bankruptcy is completely, completely unremarkable

5    to me.

6    **Q.**   So Dr. Lee, what did Dr. Town do to test his theory?

7    **A.**   He ran a simple, really kind of two families or two main

8    econometric regression models.  And what he did is he

9    essentially attempts to predict capacity for legacy carriers,

10   on the one hand, or industry wide capacity on the other hand.

11   And he tries to predict what they should have supplied,

12   really, based off three things, based off GDP, fuel prices,

13   and these recession dummy variables.  And you know, he uses

14   these annual dummy variables starting in 2009 going up to

15   2019, and basically any deviation from what his model

16   predicts, starting in 2009, is what he deems to be capacity

17   discipline facilitated by legacy consolidation.

18   **Q.**   And Dr. Lee, at a high level, what's your reaction to

19   Dr. Town's work?

20   **A.**   Well, I mean, I like regression analysis as much as any

21   economist, but where I always like to start, Your Honor, is I

22   just want to look at the data.  Right?  I want to look at the

23   data.  And when I look at the data, the patterns of growth

24   for each of these legacy carriers that were allegedly

25   accommodating each other or coordinating with each other, I

1    don't see any evidence at all that there's any of that type

2    of behavior, so before you kind of dive into the regression,

3    I think, you know, as an economist, what you should start

4    with is just looking at the plain data and seeing if it

5    supports your theory.  I don't think it does.

6            The second main reaction I have to Dr. Town's is,

7    you know, he provides these two models, the industry model

8    and the legacy model, and in my view, the only model that has

9    any relevant whatsoever is the legacy model.  Because he's

10   not alleging, as far as I know, that any kind of industry

11   wide coordination or accommodation.  It's squarely legacy

12   carrier facilitated -- I'm sorry, it's clearly accommodating

13   behavior by the legacy carriers because of their mergers.  So

14   I don't even really quite understand why he's so kind of

15   fixated on this industry model.  And then finally, both

16   models, regardless of which one you look at, they both suffer

17   from severe omitted variable bias.

18           MR. EGGE:  So Your Honor, I'm mindful that we're

19   just at the 11 o'clock break.

20           THE COURT:  You're about to move to something else?

21           MR. EGGE:  No, no, we're going to go through the

22   models, but it's going to take some time.  If you wanted a

23   break, it will take probably another 20, 30 minutes.

24           THE COURT:  So why don't we break now, then.

25           MR. EGGE:  Okay.

1           (Court in recess at 11:02 a.m.

2           and reconvened at 11:18 a.m.)

3           THE COURT:  Two things.  On the time, the time

4    request, so I've thought about that a little bit.  I'm going

5    to allow the government's request.  I'm going to give you the

6    four more hours, but here's the thing.  You get the four, but

7    you don't get one minute more.  Like that's it.  And absent,

8    like, all of you getting run over by a truck on the way to

9    the courthouse, god forbid, then you would certainly, you

10   know, something might have to give.  But short of something

11   like that, you get the four hours, but no more.

12           And you'll get the split, whatever the math is, you

13   get that.

14           But you've got to -- the thing about, like -- I'm

15   not -- I don't -- I mean, time limits aren't usually what I

16   impose in cases and this evolved into time limits when it

17   made sense, partly because given the volume of evidence, if

18   we didn't use time limits as I think Mr. Wall candidly said,

19   it would be six weeks, if I said six, and if I offered 12, it

20   would be 12.  And so there is -- has to be some boundaries

21   somewhere, so that's a boundary.

22           So I accept it, I'll give you the four.  You get

23   the 45 percent.  I'm not discounting your argument,

24   Mr. Schwed.  It's a really good argument and it's a very fair

25   point.  And it's one of the reasons I wanted to think about

1       it.  Because like they're living with the same thing you're

2       living with, and you make decisions, and I know there's a

3       million factors and the witness is taking too long, and you

4       can -- there's a million kind of issues that you can add up

5       and think about it, but they have their own constraints, too,

6       and so --

7               But bottom line, I'm going to allow the request,

8       I'll give you the four more hours, I haven't figured out --

9       I'll have to figure out what -- the schedule a little more

10      and I'll talk to you about that today or Monday, and talk to

11      you about some other times, but that's it.  Like I mean that.

12      As like, if you come back to me and want five minutes, the

13      answer is no.  And you have to manage your time within that.

14      And manage it with that -- so you get that four more and

15      that's it.  Okay?

16              MR. JONES:  Thank you, Your Honor.

17              THE COURT:  All right.  With respect to the

18      privilege issue, when you give me the list -- I don't know,

19      you may have already filed it on ECF.  I have no idea.  But

20      once you give it, if you tell me it's on -- so let me know

21      it's on ECF or hand up a copy, and I can turn back, whenever

22      that happens.

23              Okay.  Go ahead.

24              MR. EGGE:  Thank you, Your Honor.

25      BY MR. EGGE:

**Q.**   On the screen is Exhibit 11 from Dr. Town's report,
showing what each legacy carrier did with respect to
capacity.

Dr. Lee, is the behavior of each of the three
airlines shown here consistent with Dr. Town's theory, that
legacy carriers were coordinating or accommodating one
another in parallel?

**A.**   No, I think this actually shows the opposite.

And Your Honor, all I've done here is I've taken
Exhibit 11 from Professor Town's report and I've highlighted
the years in which one of the GNCs was growing their domestic
capacity year over year, in excess of GDP, which, you know,
Dr. Town views as a proxy, I think, for demand growth.

You know, as you can see, there's really no
meaningful pattern at all of any type of coordinated or
accommodating behavior.  And in fact -- and I think you
really have to, Your Honor, you know, the first couple years,
or the first few years of this, you know, the Great
Recession, the fact that you're growing less than GDP in the
midst of, you know, the worst recession to hit the US economy
since the Great Depression is not at all surprising.  But, in
fact, what you even see in some years, like 2011, American is
growing faster than GDP, while Delta and United are both
shrinking.  So that to me is no sign of any kind of
accommodating behavior.  You see the same thing going on in

1    2013, in fact, where American is grown faster than GDP, while

2    United is shrinking.  That, to me, doesn't seem like

3    accommodating behavior.

4         And then what you also see is, starting in 2014,

5    Delta goes on a multiyear run of growing in excess of GDP,

6    sometimes out of multiples, like 2016, they're growing two

7    and a half times as fast as GDP.  United starts doing that in

8    2016.

9         I think, 2015, to me, Your Honor, is probably the

10   most interesting year here because -- at least from my

11   perspective, so if you were to look at Dr. Town's regression

12   analysis, 2015 is when, using his legacy carrier model,

13   capacity discipline is at its peak.  He finds the largest

14   effect of capacity discipline by the legacy carriers in 2015,

15   but what do you see going on in 2015?  You see Delta growing

16   twice as fast as American.  You see them growing six times as

17   fast as United.  You know, how is that -- I can't fathom how

18   that's accommodative behavior, and when I look at this as a

19   whole, I see some going up, some going down.  I see some

20   growing at multiples of the other.  I mean, these are the

21   worst group of accommodating airlines I think I've ever seen.

22        THE COURT:  Why is Delta either choosing to or able

23   to embark on this multiyear, sort of, meaningful growth every

24   year percentage as compared to the other two, and United is

25   not doing it as -- quite as aggressively, but doing it, and

1    American seems to be forming a very different path?

2            THE WITNESS:  Yeah, it's a great question,

3    Your Honor.  So Delta was the first carrier to go into

4    bankruptcy and come out -- sorry, I apologize.  To merge and

5    come out the other side with a integrated network.  They

6    went -- their merger was completed in 2008.  They actually

7    got the integration of these two carriers done very quickly.

8    Part of that stems from the fact that Delta is a principally

9    nonunion carrier.  The only groups that Delta that are

10   unionized are their pilots and their dispatchers, but their

11   flight attendants, their mechanics -- Your Honor, merging two

12   carriers is complicated, and I have done so much work -- you

13   know, working for airlines on merger integration issues,

14   where unions are battling over the joint collective

15   bargaining agreement, and it can take years.

16           Delta got it done really quickly, largely due to

17   the fact that, (a), they did their merger first.  And then

18   (b), because Delta is a largely nonunion carrier, they were

19   able to get it done much, much more quickly.  And that

20   positioned them to have, for that moment in time, the one

21   carrier in 2008, '09 '11, you know, going forward, they had,

22   in some sense, a first mover advantage of a truly global

23   network, a network that was more comprehensive than any of

24   the carriers, in terms of national coverage, as well, and

25   that gave them a leg up, quite honestly.  It was a really big

1    advantage for those years.

2         And then, you know, United came in a little bit

3    later.  They did their merger in 2010.  I think their merger

4    was not quite as smooth as the Delta/Northwest merger.  There

5    was a little more contention in getting what's known as the

6    joint collective bargaining agreement with their pilots and

7    flight attendants.  And you really can't realize a lot of

8    these merger synergies until your work groups are integrated.

9    Because until they are, the pilots from one premerged

10   carrier, they can't -- they can't fly the aircraft of the

11   other, they can't bid for a schedule, the joint schedule.

12   There's all sorts of things that are essentially these fences

13   that, until you have the joint collective bargaining

14   agreements, American is actually the perfect example.  They

15   actually didn't get a joint collective bargaining agreement

16   with their mechanics until 2019, even though their merger was

17   completed in 2013, it was a really tough battle.  And

18   Your Honor, I actually -- I testified in federal court in

19   Dallas about a -- regarding a slow down that American had

20   because of the animosity between the two groups of mechanics

21   at American Airlines, and it went on for years.  And, you

22   know, that takes a toll on growth.  You can't really turn on

23   the growth spigot until you can integrate.  And you know,

24   just different airlines have had slightly different

25   experiences with that.

1    BY MR. EGGE:

2    **Q.**  Thank you, Dr. Lee.  On Tuesday, Dr. Town testified that

3    coordinated capacity discipline includes a firm growing

4    capacity in line with GDP growth.  I'm not talking about

5    below, I'm just talking about in line with GDP growth.

6            As an economist, is there anything anomalous or

7    suspicious about a firm growing in sync with a demand

8    benchmark like GDP?

9    **A.**  No.  Quite honestly, to the extent that GDP is a relevant

10   proxy for demand at the market level, no, I think growing at

11   demand is a very natural thing to want to do.

12           But keep in mind that each carrier has its own kind

13   of demand.  Right?  So -- and especially when you think -- if

14   you think, for example, that the overall industry is growing

15   at GDP, and then you've got a subset of carriers, the ultra

16   low cost carriers, for example, growing at five times GDP, I

17   mean, the basic math tells you that in order for the industry

18   to kind of be meeting overall demand, some carriers may not

19   be able to grow at GDP when you've got other carriers that

20   are growing at multiples of GDP.

21           As you saw in that previous chart, Your Honor,

22   Spirit was growing at like 20 percent per year over that

23   decade.  Other carriers were growing, as well, of multiples

24   of GDP.

25           So, no, I don't think it's at all unusual that

1    carriers would be growing at GDP.

2    **Q.**   Dr. Lee, is it your point, then, that lower cost carriers

3    are absorbing that growth in demand?

4    **A.**   Well, I'm saying that as they grow at a multiple of GDP,

5    and to the extent that's a proxy for demand, it does crowd

6    out some of the potential growth that higher cost carriers

7    can do, yes, so absolutely.

8    **Q.**   So Dr. Lee, you testified that Dr. Town's legacy model

9    suffers from omitted variable bias.  What do you believe

10   Dr. Town's legacy model is missing?

11   **A.**   Well, it's missing a lot, but what I would say the most

12   important thing that Dr. Town's legacy model is missing is he

13   has completely neglected what is arguably -- not even

14   arguably, it is definitely the most important -- the most

15   important factor that has happened in the evolution of this

16   industry since deregulation, which is the growth of low cost

17   carriers.  He just excludes it entirely.  And what he has

18   essentially done, Your Honor, by doing that, is he is just

19   assuming that the legacy network carriers would make capacity

20   decisions using the same old play book that got them into so

21   much trouble that forced them each into bankruptcy, and

22   saddled them with $70 billion of losses.  It makes no sense

23   whatsoever.

24   **Q.**   And as an econometric matter, what's the implication of

25   not considering lower cost carrier competition?

1    **A.**   It's what economists refer to as omitted variable bias.

2    It's a fatal flaw in my view and I kind of think of it; like,

3    Your Honor, that suppose Dr. Town was estimating a model to

4    try to predict the number of video rental stores that there

5    are in the country.  Okay?  You know, where we used to go

6    like on Friday night and spend an hour.

7              THE COURT:  I know.

8              THE WITNESS:  You know.  So it's like he's done a

9    model for that which controls for GDP, the recession, and

10   maybe the real estate rental prices, okay, instead of fuel

11   prices, and totally excludes the entry and emergence of

12   Netflix.  I mean, it's just -- it's remarkable, in my view.

13   **Q.**   Dr. Lee, what did you do to show the impact of Dr. Town's

14   omitted variable bias on his results?

15   **A.**   Well, I controlled for the growth of low cost carrier --

16   the shared growth of low cost carriers by adding one

17   variable.

18   **Q.**   And what was the effect of adding that one variable?

19   **A.**   When you add that one variable in his legacy carrier

20   model, the capacity discipline effects vanish.

21   **Q.**   Okay.  So let's go to your results and start with that

22   one variable.

23             MR. EGGE:  If we can blow this slide up so it's

24   legible.

25   BY MR. EGGE:

1    **Q.**  So Dr. Lee, why don't you walk us through these

2    regression results?

3    **A.**  Yeah.  So this -- and I don't think Dr. Town actually

4    discussed his actual regression results.  So this is his

5    results in column one, Your Honor.  And the way that

6    economists will display the results of a regression model is

7    in this way.  They have, along the left-hand side are what

8    are known as all the control variables.  The independent

9    variables.  Here is his legacy carrier model.  And his main

10   variables of interest are these year dummy variables that he

11   spoke of, the 2009 to 2019.  There is other control variables

12   for fuel and recessions and so forth.

13          I will draw your attention, Your Honor, to this

14   yellow row, which is the low cost carrier RPM share.  As you

15   can see, it is blank under the Town exhibit 3 model because

16   he didn't include it.  I actually did include it and you can

17   see, when you do that, it's the -- the estimated co-efficient

18   for that is negative, as you would expect, as low cost

19   carriers are gaining share, it's crowding out capacity of the

20   lower -- of the legacy network carriers.

21          Now, focusing in on --

22   BY MR. EGGE:

23   **Q.**  Dr. Lee, let me just stop you for a second and ask you,

24   what are the three stars next to that negative 2.052

25   co-efficient for lower cost carrier share?

1    **A.**   Yes, the standard convention when you're showing

2    regression results is to indicate whether or not a variable

3    is statistically significant.  Okay?  And three stars means

4    it's statistically significant at the 99 percent confidence

5    level.

6          So now turning back to Dr. Town's model, what you

7    can see is that in each of the years from 2009, all the way

8    to 2019, the estimated coefficients on these dummy

9    variables -- and he interprets these dummy variables as the

10   amount of capacity that legacy network carriers do

11   consolidation work, kind of withholding from the marketplace,

12   they're each negative and significant at the 99 percent

13   level.  That's why they each have three stars.  And then it

14   actually, in the 2019, it actually goes down to one star,

15   meaning it's only significant at the 90 percent level.  And

16   as I mentioned before, you can see that 2015 is that 16.2,

17   the largest amount of capacity discipline in that year.

18         So then I would just draw your attention,

19   Your Honor, to the corrective model.  So I've done nothing

20   other than add one variable, which is the low cost carrier

21   share of domestic RPMs, revenue passenger miles.  And as you

22   see, when you do that, all of his estimated coefficients in

23   his year dummy variables, which are his capacity discipline

24   effect, they go away.  The stars go away, and the estimated

25   coefficients basically are zero or close to zero.  The only

1    years where there are stars, I would actually draw your

2    attention, is to 2018 and '19.  You can see that those are

3    actually statistically significant.  But, Your Honor, note

4    that the sign has changed.  Instead of being negative, it's

5    positive, which actually suggests that legacy network

6    carriers which have been growing dramatically or rapidly in

7    this period arguably were actually adding a little bit more

8    capacity than the model might suggest.

9              The other thing I would just draw your attention to

10   is the bottom row, which is the "adjusted R-squared."

11             Adjusted R-squared in regression is a standard that

12   economists include, it's a measure of the goodness of fit of

13   the regression.  It is essentially telling you what

14   percentage of the variation and the dependent variable here

15   in the legacy carrier capacity is being explained by the

16   independent variables.  And as you can see, when you add in

17   the omitted variable, the low cost carrier share, it goes

18   up -- the adjusted R-squared goes up from .811 to .894.

19   **Q.**  And Dr. Lee, why did you use revenue passenger miles as

20   opposed to available seat miles in that coefficient that you

21   added for low cost carrier share?

22   **A.**  Because revenue passenger miles are capturing the

23   competitive interplay between the legacy network carriers and

24   the lower cost carriers.  It's showing how many people are

25   actually traveling on the lower cost carriers.

1  **Q.**  Okay.  So if we could go to the next slide, what does
2  this depict?
3  **A.**  This is the -- actually the slides that Dr. Town did
4  show, which is the kind of the visual interpretation of his
5  regression results.  And as you'll recall, when he described
6  it, the -- the green line was his predicted capacity for the
7  legacy network carriers, the blue line is the actual.  And he
8  referred to that gap that emerges in 2009 as the capacity
9  discipline amount.
10         As you can see, all I've done here is I've used the
11  corrected model and put in the predicted -- I'm sorry, the
12  corrected predicted amount, which is in red.  And as you can
13  see, that red line now is largely on top of.  It's one and
14  the same with the actual amount, which means the capacity
15  discipline effect just goes away.  The gap disappears.
16  **Q.**  Thank you, Dr. Lee.  Dr. Town's response to what you just
17  showed us is that the foundation of this capacity discipline
18  analysis was actually a different regression altogether,
19  showing that aggregate domestic industry capacity was lower
20  than what his model predicted.  What is your reaction to that
21  position?
22  **A.**  Well, I was puzzled actually when I saw that.  Because as
23  far as I understood his theory, it was that legacy network
24  carrier consolidation had facilitated coordination to ratchet
25  back capacity by those carriers.  I certainly wasn't aware of

1       any theory that he posits that somehow all of these rapidly

2       expanding lower cost carriers were part of this coordinated

3       behavior, as well.  So the only model that makes any sense,

4       that fits his theory is the legacy network carrier model,

5       nothing else works.  It just misses the mark entirely.

6       **Q.**  So notwithstanding this failure of fit to theory, have

7       you also analyzed Dr. Town's industry wide capacity

8       regression?

9       **A.**  I have, yes.

10      **Q.**  And in looking at that regression, what explanatory

11      variables did Dr. Town use to predict capacity?

12      **A.**  He uses the same three explanatory variables as he does

13      in the legacy model, GDP, fuel prices, and recessions.

14      **Q.**  And in your view, are those variables sufficient to

15      adequately predict what industry wide capacity should have

16      been during Dr. Town's selected capacity discipline period?

17      **A.**  No.  No, they're woefully inadequate.  And in particular,

18      the recession variable is, you know -- not all recessions are

19      created equally.  I think we can all understand that.  And

20      you know, as you can just see by this slide that's currently

21      up, the recession in 2009, the Great Recession, it was unlike

22      any recession that this economy had seen in, you know, six

23      decades, or whatever it was, since the Great Depression.

24              And in particular, as I think everyone can recall,

25      the unemployment shot up to 10 percent, and it took an awful

1    long time after the recession had been deemed over by our

2    friends at the MVR, that unemployment remained at really high

3    levels for years after.  And it's why that recession was, you

4    know, referred to as the jobless recovery.

5            And what I'm showing here, Your Honor, is, again,

6    this time period that Dr. Town's looking at, the red line on

7    this is showing GDP.  The gray stripes are the recession

8    periods that he's controlling for in his regression.  And

9    this one that spans 2008 and goes halfway into 2009, that's

10   the Great Recession.  Okay.  So you can see it ends.  That's

11   his dummy variable.  When his gray is on and when it's white,

12   he turns off the impact of the recession.

13           So the other line that I've added in here,

14   Your Honor, which is kind of this grayish, brownish color, or

15   whatever, is the unemployment rate.  And as you can see,

16   after the Great Recession was deemed over by the MBR, GDP

17   does start to increase, that's probably why they deemed it

18   over, but unemployment was at 10 percent.  And it remained at

19   these stubbornly high levels and actually didn't get down to

20   6 percent until nearly 2015.  And the reason why I think six

21   percent is a relevant number, Your Honor, is that 6 percent

22   was the high watermark of unemployment from the previous

23   recession.  So it was two-thousand -- you know, the recession

24   is over, according to Dr. Town's model, in the second quarter

25   of 2009.  And it's 2010, '11, '12, '13, and mostly through

1    '14, where unemployment is still at 6 percent, and so his

2    model just does not capture that.

3    **Q.**  Dr. Lee, Dr. Town claims that unemployment does not have

4    a true economic relationship with how much capacity airlines

5    want to supply.

6           Do you agree with that?

7    **A.**  I think that's absurd.  I mean, you know, you don't need

8    a Ph.D. in economics to know that if you just lost your job,

9    maybe you've lost your house, if the labor market is -- no

10   one is hiring, you're not very likely to -- you're far less

11   likely to travel than if you were employed.  I find that

12   completely -- I find that completely absurd.

13   **Q.**  But I'm sure you have heard Dr. Town say that the

14   documentary evidence suggests the airlines don't consider

15   unemployment.

16          In your experience working on economics problems

17   for airlines, what is your response to that?

18   **A.**  They absolutely consider unemployment.  And, you know,

19   he's, I think, tied up a little bit in the fact that if he

20   doesn't see unemployment in a document, that somehow means

21   that airlines don't consider unemployment.  (a), they do

22   consider unemployment.  But (b), airlines have the most

23   precise window into what demand actually is through forward

24   bookings, right?  People book travel every day, every minute,

25   and airlines monitor these forward bookings like crazy.  And

1    so they can tell if demand is soft.  They don't need to look

2    at the unemployment reports that are being put out by the

3    Bureau of Labor Statistics.  They see it in actual real life

4    demand, in realtime, every day by seeing how many people are

5    booking flights.  Because they're booking flights as many as

6    330 days out in the future.

7    **Q.**  Thank you, Dr. Lee.  Other than unemployment, are there

8    other important explanatory variables that Dr. Town's

9    industry-wide capacity regression fails to capture?

10   **A.**  Yeah, he also misses a really important development in

11   the industry, Your Honor, which is the trend of increasing

12   load factors.  And over time -- and this is not unique to the

13   US airline industry.  It's a global phenomenon.  It's not

14   specific to any airline business model, it's every business

15   model.  Low cost carrier, ultra low cost carrier, net work

16   carrier, international carrier, anywhere you look.  There has

17   been an increasing -- there's a trend in this entire airline

18   industry of increasing load factors over time.  And the

19   reason why this is going on is that airlines have figured out

20   how to become more efficient at utilizing their capacity.

21          They harness all sorts of technological tools that

22   didn't exist before to better predict demand.  They have ways

23   now to -- and unfortunately, as a traveler, which is not

24   great, you know, they can now eliminate double bookings, and

25   it used to be the case -- and I'm guilty of this myself, if I

1    had a business meeting and it was supposed to finish at

2    4 o'clock, you know, maybe I actually booked a 6:00 p.m.

3    flight, and then also an 8:00 p.m. flight, you know, just in

4    case my meeting ran late.  And maybe I saw that it was sold

5    out or getting close to sold, I would actually book two

6    tickets, so bad on me for that.  But now airlines have the

7    ability, because of technology to scrape through the data in

8    realtime all the time and remove those passengers.  It's not

9    just that, though.  But it is a whole host of technology that

10   airlines have been able to utilize to make more efficient use

11   of their capacity and essentially be able to serve the same

12   amount of demand, with less capacity, just by having higher

13   load factors.  And so he hasn't taken that into account.

14   **Q.**  So did you prepare a model that corrects for just these

15   two issues?

16   **A.**  I did, yes.

17   **Q.**  Okay.  So what -- and in the interest of time, if you

18   would focus, please, on the yellow row, and then just

19   summarize your results.

20   **A.**  Yeah, I included these two factors, unemployment and load

21   factor, which are the two omitted variables.  And when you do

22   that, at the industry level regression, what you find is that

23   the evidence of capacity discipline essentially goes away.

24   Or -- it essentially just goes away.

25   **Q.**  So let's just take a look, then, at the next slide, which

1   is the graphical depiction of those results.  Can you just

2   briefly describe what they show?

3   **A.**   Yeah, it's a visualization of the same thing we looked at

4   before with the legacy model.  And as you can see, the new,

5   predicted values when you control for the two omitted

6   variables, they show that the red line now is more or less on

7   top of the blue line, with the exception of there's a little

8   bit of space in two of the years.  So the gap closes.

9   **Q.**   Okay.  Dr. Lee, did you hear on Tuesday Dr. Town testify

10  that he performed a robustness test that controls for the

11  impact of legacy carrier bankruptcies, and that when he does

12  that, it doesn't change his capacity discipline findings?

13  **A.**   I heard that, yes.

14  **Q.**   And does the robustness test that Dr. Town performed --

15  that he performed, pardon me, adequately account for the

16  impact of legacy carrier bankruptcies, and the factors that

17  cause those bankruptcies?

18  **A.**   No, all he's done -- it really does nothing of the sort.

19  All he's done in that model, Your Honor, is he's added in

20  some additional year dummy variables, from 2000 up to 2008.

21  And what that does is it helps to -- or in those years, it

22  shows how much legacy capacity was lower than his predicted

23  amount.  And so he's kind of characterizing that as

24  controlling for bankruptcies.  What it doesn't address in any

25  way, shape, or form, however, Your Honor, is the root cause

1    of what drove these carriers to bankruptcy, which is the rise

2    of lower cost carriers.  It continues with or without his new

3    dummy variables.  It continues to assume that the legacy

4    network carriers would have continued to use the same old

5    playbook that they were using in all of the previous years

6    that just got them into so much trouble and pushed them into

7    bankruptcy.

8    **Q.**   Dr. Lee.  Dr. Town says that both your legacy and your

9    industry-wide capacity corrections to his regressions are

10   invalid, because the additional variables you introduce are

11   endogenous.  Can you explain, in layman's terms, what it

12   means to be endogenous?

13   **A.**   Yeah, endogeneity is when you have a situation where

14   there's some potential for feedback, essentially, between

15   your dependent and independent variable.  And when that

16   occurs in regression, it complicates the -- kind of the

17   causality, the directional causality, and it also can lead to

18   bias coefficients.

19   **Q.**   Okay.  Thank you.  How do you respond to Dr. Town's

20   criticism?

21   **A.**   Well, I mean, I did a bunch of things, actually.  The

22   standard things that economists always do when there is the

23   potential for endogeneity, I lagged the potentially

24   endogenous variables, which is a standard technique.  I also

25   used what's known as instrumental variables estimation, which

1    is the standard technique to fix, if you have endogeneity, if

2    it even exists.  What those results show is that neither of

3    these rationals that Dr. Town is concerned with have

4    endogeneity.  Okay?

5           So given that, (a), I've addressed any concerns of

6    potential endogeneity, through a couple of different means,

7    which are the standard methods, and the magnitude of the

8    hugely important omitted variable biases -- I mean, the way I

9    kind of think about this is Dr. Town is -- like a passenger

10   that's complaining about the overhead reading light being out

11   when the aircraft has just lost air pressure, cabin pressure.

12   Sorry.

13   **Q.**  Thank you, Dr. Lee.  I'd like to switch gears now and

14   talk about market definition.  Dr. Lee, what was your role

15   with respect to market definition in this case, in assessing

16   market definition in this case?

17   **A.**  Well, my role with regards to market definition, as I

18   mentioned earlier, was to assess Dr. Miller's catchment area

19   analysis, and to -- you know, to assess whether or not that

20   is a reasoned basis for excluding a Newark airport from

21   consideration of the competitive effects of the Northeast

22   Alliance in New York City, but I would say more broadly, what

23   I was asked to do was to kind of bring my, you know,

24   knowledge and experience from working with pretty much every

25   airline, US airline that serves the New York City area.  And

1    also, you know, I've written about market definition before.

2    You know, it is -- I am strongly of the view that Newark is a

3    part of the New York City market.

4    **Q.**   And have you prepared any new econometric analysis of

5    your own in this case?

6    **A.**   No, I haven't done that here.  It's my understanding that

7    Professor Bruckner has, but I haven't done that here.  I

8    wasn't asked to do that.

9    **Q.**   Have you used before what's commonly called and I think

10   we've heard here in court, the SSNIP test as a methodology

11   for defining markets around airport groupings?

12   **A.**   No, I haven't performed a SSNIP test before.  But you

13   know, the paper that I described, Your Honor, earlier that I

14   published with professor Bruckner and Dr. Singer, I mean, it

15   captures the same essence of what a SSNIP test is doing.

16   It's capturing whether or not there's sufficient amounts of

17   people that would substitute and then fly out of Newark --

18   and then fly out of a different airport if prices were to go

19   up.  So I don't -- I don't personally view --

20           You know, I think what's really important when

21   you're looking at market definition is to consider all

22   available evidence, the work that I've done, I think,

23   captures the essence of the SSNIP test, but it's not a formal

24   SSNIP test, but I think it captures the essence of it.  And I

25   would just add that the -- at least the recommended groupings

1    that come out of our analysis have been adopted by -- by

2    other economists and even -- even by, you know, other

3    government agencies at times.

4    **Q.**   So your other published work relating to a market

5    definition methodology has been recognized and used?

6    **A.**   It has.  And in fact, it's cited in both -- in papers

7    that Dr. Town -- or Professor Town and Professor Miller both

8    cite in their report.  It's actually cited.

9    **Q.**   Okay.  Dr. Lee, why do you believe that airline service

10   to and from Newark-Liberty airport should be included in the

11   relevant market for analyzing the NEA?

12   **A.**   Well, really for two reasons, and the first of which is

13   United Airlines operates what is the single largest kind of

14   unified hub-and-spoke network in all of the New York City

15   metro area out of Neward.  93 percent of all of United's

16   capacity is out of Newark airport.  And that, to me, is a

17   huge factor.

18            The other factor, of course, is that when I think

19   of New York, what I really think of -- think of New York

20   market definition, what I really think of is Manhattan.

21   Manhattan, if you were to kind of look at an overhead view of

22   the New York City metro area, it is smack dab in the middle

23   of all three New York City airports.

24   **Q.**   I think you prepared a slide for this that we've got now

25   on the screen.

1          Can you just walk us through what the significance

2     is of Manhattan being the focal point in New York City in

3     your view as to market definition?

4     **A.**   Sure.  Well, when you think about demand to New York

5     City, there's really two sides of the demand.  Right?

6     There's people coming from outside of New York, from the rest

7     of the country, as well as the rest of the world into New

8     York, and I think there really is no debate over the fact

9     that Manhattan is the focal point of New York City demand.

10    It's the global financial capital of the world.  It's the

11    headquarters of tons and tons of major corporations.  It's a

12    major tourist destination.  It is really the principled

13    destination of inbound traffic.

14          And then in terms of outbound traffic from New York

15    City, Manhattan is the single most densely populated part of

16    the entire country.  There is within this 35-square mile

17    area, there's 1.7 million people that live there.  That

18    swells up to close to 4 million, including all the people who

19    come into Manhattan and work there.  And you know, you can't,

20    as an airline that wants to be a serious competitor in the

21    New York City marketplace, ignore that.  I mean, it is the

22    focal point of demand.

23    **Q.**   And is the last box here, Dr. Lee, because of the

24    perimeter rule?

25    **A.**   Yeah, Your Honor, you certainly heard about the perimeter

1    rule.  I know you've asked questions about it.  The one point

2    I would want to add, because I think you understand well what

3    the perimeter rule is, is roughly 30 percent of all travel

4    domestically to and from New York is to outside the

5    perimeter, okay.  Los Angeles and San Francisco, and Seattle,

6    and other places outside of 1,500 miles.  And for those

7    travelers, the only options for nonstop travel to the New

8    York City metro area is JFK or Newark.  And so it makes no

9    sense to me whatsoever, that you could somehow include

10   connecting flights from LaGuardia as part of the market, but

11   exclude nonstop flights.  I think any of us who have actually

12   flown to New York would appreciate that.

13   Q.  Dr. Lee, can you tell the Court what else you did to

14   inform your opinion that Newark should not be excluded from

15   the relevant market analysis here?

16   A.  Well, I analyzed and I looked through a whole -- a whole

17   source of -- a whole array of information, all of which

18   points in the direction of -- clearly of Newark being part of

19   the New York City market definition.  I mean, I would start

20   with the fact that the DOT, every quarter, puts out a fair

21   report to kind of help inform consumers of fares.  And ever

22   since it's done that, which it's been doing for years and

23   years, it treats Newark as part of the New York City market.

24           If you look at port authority documents, which I

25   cite in my report, they actually show that at Newark airport,

1    New York county, which is Manhattan, is the single largest

2    source by county of demand of passengers traveling from

3    Newark airport.  So number one is Manhattan.

4         The fifth largest county is actually Kings County,

5    which is Brooklyn, and then you've got, you know, three

6    counties in New Jersey, which are two, three, and four.  But

7    number one in five counties of people flying out of Newark

8    are in New York City.

9         THE COURT:  Who are coming in and out of the port

10   authority?

11        THE WITNESS:  Well, the port authority -- so the

12   port authority of New York and New Jersey is the -- kind of

13   the quasi governmental organization that operates -- oversees

14   the operation of all.

15        THE COURT:  The airports, too.

16        THE WITNESS:  So they can publish studies where

17   they are surveying passengers, okay, where did you originate,

18   for people at Newark.  And they did a survey and found that

19   at Newark airport, the number one county that produced the

20   most number of travelers out of Newark was New York County,

21   Manhattan.  Number five was Brooklyn.  Okay.

22        You know, if you look at any airline website or any

23   online travel agency, when you search for travel, New York

24   City, including Newark, LaGuardia, and JFK, is a unified

25   search term.

1          I've reviewed many company documents that point to
2    them treating, you know, Alaska, Delta, United, all three New
3    York City airports as a unified market.  And even, you know,
4    I would point out that Dr. Town himself, in his report in
5    2013, I suppose it was, that he did on behalf of the Justice
6    Department, opposing the US Airways/American merger treated
7    Newark as part of the New York City market definition, and
8    even in his 2021 merger retrospective paper, he continues to
9    do that.  And so there's a whole host of data, all of which,
10   in my view, points towards the obvious, which is that Newark
11   should be treated as part of the New York City market.
12   BY MR. EGGE:
13   **Q.**  Let's talk about data, given your focus on Manhattan,
14   have you -- what data have you assessed to determine whether
15   Manhattan customers use all three airports?
16   **A.**  You know, I actually looked at the same data that
17   Dr. Miller did, which is the taxi and high-volume vehicle,
18   kind of the Uber/Lyft data that he did.  And I looked at the
19   same American frequent flyer, JetBlue ticket data that he
20   did.
21   **Q.**  So let's start with the taxi and for-hire vehicle data
22   and the slide that you prepared on this that.  This is
23   Exhibit 33 from your report.  Can you walk us through what
24   this shows?
25   **A.**  Sure.  This uses the same data -- the thing that I will

1    point out in Dr. Miller's versions of these slides, he

2    actually failed to include eleven -- so this is 2019 data.

3    Taxi is part of the data, and then FHV, for-hire vehicle, is

4    the other part of the data.  That's kind of the Uber, Lyft,

5    and the other for-hire vehicles.  He only included one month

6    of the for-hire vehicle data.  And he actual even

7    acknowledged that in his deposition, that something kind of

8    fell through the cracks there.

9            So this data shows the 2019 data.  It shows the

10   pick-up locations in Manhattan for passengers and taxis and

11   for-hire vehicles that are going to one of the three New York

12   City airports.  The intensity of the coloring indicates the

13   numbers of passengers.  And as you can see, across all of

14   Manhattan, particularly Midtown, Lower Manhattan, but really

15   all of Manhattan, people go to all three airports.  And in

16   fact, in lower Manhattan, 24.8 percent of the taxi and

17   for-hire vehicle pick-ups went to Newark.  And for Manhattan,

18   generally it was 18, close to 18 percent.

19           This, to me, clearly shows that passengers

20   throughout Manhattan substitute amongst the three New York

21   City airports.

22   Q.   And that's for taxi and hired vehicle data.

23           You said also you looked at Dr. Miller's catchment

24   area data, as well.  Let's talk about that analysis.

25           What is your reaction to Dr. Miller's catchment

1    area analysis?

2    **A.**  Well, I've got three main reactions.  I mean, the first,

3    which is -- it just seems kind of bizarre to me that he

4    treats LaGuardia and JFK as if they were a single airport

5    when he does his catchment area analysis.  That, to me, I

6    don't quite understand that.  That doesn't really make sense

7    to me; they're different airports.

8            But putting that aside, what I also found really

9    interesting, or puzzling, I suppose, is that his dataset is

10   so limited.  He looks at only American and JetBlue data.  He

11   actually only looks at it for a small, handful of routes,

12   maybe like half a dozen JetBlue and half a dozen American

13   routes.  And if I was actually interested in understanding

14   what the catchment area of Newark was, I would actually want

15   to use data from airlines that actually focus their

16   operations at Newark.  Because American and JetBlue

17   predominantly serve the New York City market from JFK and

18   LaGuardia.  And really, in my view, the best source of data

19   for trying to understand kind of what the Newark catchment

20   area would be, would be from an airline that actually has a

21   substantial presence there.  So to me, it was puzzling that

22   there's no attempt at analysis of any kind of United data.

23           And then, finally, you know, for all of what he

24   says about the catchment area analysis and conclusions that

25   he draws, it's actually kind of shocking that he didn't even

1    compute a Newark catchment area.

2    **Q.**  So let's pull up the next slide.  And my question for you

3    is:  What is the significance Dr. Miller not studying

4    Newark's catchment area?

5    **A.**  Well, this is just a quote from Professor Miller's

6    report.  And what he says is, "Airports with significant

7    overlap in the catchment areas are more likely to be closest

8    substitutes for more consumers than airports with nondistinct

9    overlapping catchment areas."  So when I saw this, I was

10   expecting to maybe turn the page of his report and see a

11   catchment area for JFK, one for LaGuardia, and one for

12   Newark, and to show that -- to compare them.

13           And what I discovered was that he only computed the

14   catchment area for this combined JFK/LaGuardia, and he

15   never -- he never even computed the catchment area for

16   Newark.  So it's kind of like Professor Miller has written a

17   homework assignment, but only turned half of it in.  So that

18   just seemed really strange to me.

19   **Q.**  But Dr. Lee, do you agree in principle with that

20   statement that Dr. Miller has there?

21   **A.**  I think it's a sensible approach for looking at the

22   portion of the demand which is originating in the New York

23   City area.  It doesn't really speak to the other half of

24   demand, which is the people coming from outside of the New

25   York City area.  But for -- for the originating passengers, I

1    think it's a sensible thing to look at, yes.

2    **Q.**  So notwithstanding the limited dataset, did you complete

3    Dr. Miller's homework and use that data to prepare a

4    catchment area for Newark?

5    **A.**  I did, yeah.  I actually took his exact same data; I

6    computed -- as you said, I completed the part of the homework

7    assignment that he didn't do; and I computed the catchment

8    area with that limited set of data for Newark.  And what that

9    shows -- I think it's hopefully coming up soon -- oh, wait.

10             MR. EGGE:  I'm sorry, Your Honor, this is the one

11   slide -- it's our last, I will say.

12             THE WITNESS:  Is it in the --

13             MR. EGGE:  It's confidential, so we're just going

14   to show it.  It's in the binder.  If we could just --

15             THE COURT:  It's the last slide in the binder?

16             MR. EGGE:  It's the last slide in the binder, yes.

17             THE COURT:  Okay.  I have it.

18             THE WITNESS:  So what I did was I used the exact

19   same data that Professor Miller used.  I used the exact same

20   methodology that Professor Miller used, and as you can see,

21   Your Honor, when you compute that 90 percent draw area, which

22   he refers to as the catchment area, what it shows is using

23   both the American data and both the JetBlue data, it shows

24   that Manhattan, the focal point of demand for both inbound

25   and outbound travel is squarely in the catchment area for

1    both carriers, all of Lower Manhattan, all of Midtown

2    Manhattan, and all of the Upper West Side, or most of the

3    Upper West Side.  And to me, that definitely supports the

4    conclusion, in my view, that Newark must be included in the

5    New York City market definition.

6            THE COURT:  Does this data distinguish between

7    domestic and international travel?

8            THE WITNESS:  So what Dr. Miller used was a handful

9    of routes.  And it was, for American, if I recall, it was to

10   Dallas, Chicago, Charlotte, Washington, and maybe -- there

11   may be one that's escaping me.

12   BY MR. EGGE:

13   **Q.**   Is it possibly San Juan?

14   **A.**   Possibly San Juan.

15           For JetBlue, it included a handful, as well, it was

16   like Orlando and Miami.  They're listed in my report, but,

17   no, it's principally a handful of routes.  There may have

18   been -- I can't remember if there was one international, but

19   I think they were predominantly domestic routes.  It's just a

20   pretty small subset.

21   **Q.**   And thank you, Dr. Lee.  One more question, a bit off --

22   certainly off this topic.  Do you recall Dr. Town saying on

23   Tuesday that he didn't attempt to quantify the benefits of

24   the NEA, because he didn't have a network planning team to

25   construct schedules?

1   **A.**   I heard him say that, yes.

2   **Q.**   In your experience, are there third-party firms that

3   can -- that you can contract with to construct -- to

4   construct schedules and do the work of a network planning

5   team and model benefits?

6   **A.**   Oh, absolutely, yeah.  I mean, a couple come to mind, but

7   Seabury Group, for example, which is a collection of a whole

8   bunch of former airline executives, employees.  I've worked

9   with them on a number of bankruptcy matters.  And this is

10  exactly in their -- in their strike zone.  This is what they

11  do, one of the things they do.  I think even Saber has a

12  consulting arm that could do that, as well.  So, yeah,

13  absolutely.

14          MR. EGGE:  Your Honor, I have no further questions

15  at this time.

16          THE COURT:  All right.  Thank you.

17          Cross-examination?

18          MR. DUFFY:  Yes, Your Honor, Ed Duffy for the US

19  Department of Justice on behalf of plaintiffs.  If you give

20  us just a moment to prepare here.

21          THE COURT:  Sure.

22          **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

23  BY MR. DUFFY:

24  **Q.**   Good morning, Dr. Lee -- or I guess good afternoon.

25  **A.**   Good afternoon.

1   Q.  You should have a binder in front of you, two binders.

2   One of your deposition transcript and another with some

3   exhibits and other materials that we'll be referencing.  We

4   met back in August, here in Boston for your deposition,

5   right, Dr. Lee?

6   A.  I -- I recall that, yes.  Yes.

7   Q.  And you had been deposed a number of times before this

8   case, right?

9   A.  In other cases, yes.

10   Q.  Right.  And many of those depositions were in cases where

11   you were retained by an airline, right?

12   A.  Yes, many of them were, yeah.

13   Q.  In fact, over 75 percent of your work as an economist

14   over the last ten years has been for airlines, right?

15   A.  Yeah, I'm an airline industry specialist and as a result

16   I do a lot of my work for airlines, yes.

17   Q.  And over the last 20 years, you have received over

18   $10 million for your work on behalf of airlines, right,

19   Dr. Lee?

20   A.  Yes, over the past 20 years, I think that sounds about

21   right.

22   Q.  And in your entire history as a testifying witness, you

23   have never testified adverse to a legacy carrier, correct?

24   A.  I've never been in -- I've never been asked to do that,

25   but, yeah, that's correct, yeah.

**Q.**  And you're a consultant for Compass Lexecon; is that
right, Dr. Lee?

**A.**  I'm actually an employee consultant of Compass Lexecon.

**Q.**  An employee of Compass, right.  And in addition to your
work as an expert, you've also received funding from airline
for papers that you have written, right?

**A.**  There -- I think maybe the three or so of the papers have
been -- I've received funding for, yes, that's correct.

**Q.**  It is also true that in the past you have made changes to
some of those research papers based on comments received from
airlines counsel, correct?

**A.**  I don't know if I would call them changes.  No, I don't
necessarily think I've made any changes to a paper because of
comments.  Maybe we've received feedback, but I don't -- if
you're thinking of changing a result or something like that,
no.

**Q.**  I'm just asking, have you made revisions to papers that
you have published, based on comments you had received from
airline's counsel?

**A.**  You know, I get comments on papers, and I think -- and I
think is important to incorporate feedback, and sometimes if
a person tells me that, you know, this is not very clearly
written, I'm open -- I'm open to that, yes.  Sure, I'm open
to always improving the exposition of my papers based off of
feedback that I might receive.

1   **Q.**   Right.  If you turn to a paper in your binder entitled

2   "Product Unbundling in the Travel Industry"?

3   **A.**   Which tab, sir?

4   **Q.**   It should be a tab at -- let me see.  The second tab in

5   the binder.

6   **A.**   The second tab in the binder.

7   **Q.**   It's up on the screen.  And I'm just going to make

8   reference to the paper without going into any detail?

9   **A.**   Okay.  Sure.

10   **Q.**   This paper, in particular, do you recall making changes

11   at the request of Delta's counsel, making revisions to this

12   paper?

13   **A.**   I don't recall changes.  What I recall -- and this

14   paper -- part of the paper -- what came out of some work in

15   an expert report that I was doing, and while the litigation

16   was pending, counsel wanted us not to put the paper out for

17   publication.  So the -- they didn't ask us to change the

18   paper.  What I recall -- at least the best of my recollection

19   as I sit here today, was they didn't necessarily want the

20   paper to be submitted for publication until a decision had

21   been reached in the litigation, because they thought that it

22   might kind of cause an issue.

23   **Q.**   Two additional questions, Dr. Lee.  First, is it your

24   testimony that you were concerned how the implications of

25   this paper might affect your work as an expert in ongoing

1    litigation?

2    **A.**  I wasn't concerned, no.  I think the econometric results

3    were actually in my report.  So there was nothing that I

4    would have been concerned with at all.  I think it was

5    just -- I can't speak for why the outside counsel wanted to

6    be cautious.  That's kind of a -- I think a legal strategy

7    decision.  I wasn't involved in that.

8    **Q.**  And I want to ask you a specific question.  You've talked

9    about the request to delay the paper.  Is it your testimony

10   that you were not asked to make changes to that paper at the

11   request of airline's counsel, Delta Air Lines' counsel?  Yes

12   or no, or do you not recall one way or the other?

13   **A.**  Certainly I don't recall any changes of substance.  What

14   I would say is what I just testified earlier is that I'm

15   always open to feedback about my papers.  Right?  I mean, I

16   think just as a scholar, you want to be receptive to

17   feedback.

18            THE COURT:  He's just asking if you made changes or

19   not.

20            THE WITNESS:  Yeah, I don't recall making any

21   changes to the paper, no.

22   BY MR. DUFFY:

23   **Q.**  Okay.  So you don't recall, if Professor Bruckner were to

24   testify that the lawyers for Delta and AirTran read that

25   airline bag paper and wanted changes in it, are you saying

1   Professor Bruckner is wrong, or do you simply not recall?

2   **A.**   No, I'm saying that my recollection of this was that

3   their concern was that they didn't want the paper to be

4   published until there had been a resolution in the

5   litigation, for whatever reasons they had.  And you know, I

6   don't -- that's my recollection.

7   **Q.**   Is it your sworn testimony that you were not asked to

8   make changes to that paper?  Yes or no?

9   **A.**   Yeah, beyond -- as I said, feedback on exposition, I

10  don't recall, as I sit here right now.  But this paper was

11  written in -- what was it?  The paper was from 2015.  I think

12  this was happening when we were writing the paper was, gosh,

13  many, many years before that, because this was a very

14  prolonged litigation.  I don't recall them asking us to make

15  any changes.

16  **Q.**   And my question is very specific, Dr. Lee, and it has a

17  yes or no answer.  Can you state under oath right now, that

18  you were not asked to make changes to that paper by Delta's

19  counsel?

20          MR. EGGE:  Your Honor, objection.  That's asked and

21  answered a few times now.

22          THE COURT:  Overruled.  That's framed a little

23  differently.

24          THE WITNESS:  Yeah, as I said, they -- people

25  provide feedback, and they provide feedback on writing and

1    exposition, and they very well may have given us comments

2    about how to -- this is a little unclear or something like

3    that, but I don't recall making any substantial changes.  No,

4    I don't recall that.

5    **Q.**   Is that a yes or a no, Dr. Lee?

6    **A.**   I don't recall making any changes at the request of

7    Delta.  No.

8    **Q.**   So if I understand you correctly, your testimony is no, I

9    cannot state under oath that I was not asked to make changes

10   to this paper?

11   **A.**   I don't recall making any changes in this paper, other

12   than delay, as I sit here right now.  I don't think that

13   happened.

14              MR. DUFFY:  Objection.  Nonresponsive.

15              THE COURT:  Overruled.

16              Are you asking me -- well, I don't know what that

17   means.  You're asking me to strike that?

18              MR. DUFFY:  I'm asking you to strike the answer.

19              THE COURT:  Well, that's a different objective.

20              No, I'm not going to strike the answer.

21   BY MR. DUFFY:

22   **Q.**   Moving on, Dr. Lee.  It is correct in this case, you were

23   not asked to render a formal market definition opinion,

24   correct?

25              THE COURT:  It's not clear to me how it would help

1    you if I struck the answer, how it would change.

2              MR. DUFFY:  Fair enough.

3              THE COURT:  But the request to strike it is denied.

4              Go ahead.

5              THE WITNESS:  Yes, as I state in my report, and I

6    think as we discussed at my deposition, I was not asked to

7    render a formal market definition opinion.

8    BY MR. DUFFY:

9    **Q.**  We discussed this issue to some length, if you recall,

10   right, Dr. Lee?

11   **A.**  Yes, several hours.

12   **Q.**  Probably.  It took a while to determine what exactly it

13   was you did with respect to market definition, right?

14   **A.**  Well, actually, I think I was pretty clear what I did.

15   Your Honor, I was asked to respond to Dr. Miller, his

16   catchment area analysis, and I presented a whole, wide range

17   of information that I thought pertained to market definition.

18   I did not do any new econometric analysis, and I said, as I

19   recall, that had I been asked to do a formal market

20   definition analysis, which I wasn't, I would have done some

21   additional econometric analysis, perhaps like what Professor

22   Bruckner had done.

23   **Q.**  You didn't do any econometric analysis, did you?

24   **A.**  I didn't conduct any new econometric analysis as part of

25   my work here, no.

1    **Q.**  All right.  And you also did not participate in

2    Dr. Bruckner's work in this case, right?

3    **A.**  I did not, no.  Right.

4    **Q.**  Instead of offering a formal market definition opinion,

5    what you did --

6              THE COURT:  Dr. Bruckner's work in this case?  I

7    think Bruckner was the person who wrote that article?

8              MR. DUFFY.  He's testifying, as well.

9              THE COURT:  Oh, he's testifying, too.  Okay.  I got

10   it.  Sorry.  Go ahead.

11   BY MR. DUFFY:

12   **Q.**  So instead of offering a formal market definition

13   opinion, you presented information that you said bears on the

14   question of market definition, right?

15   **A.**  Yeah, as I think I testified, then and now, I was asked

16   to kind of bring my perspective as an airline industry

17   expert, from someone who's worked with a large number of

18   carriers, including United, on market -- on definition

19   issues, just to kind of bring that to the table.

20   **Q.**  Do you agree with Dr. Miller that the geographic market

21   for airline passenger travel to and from the New York

22   metropolitan area includes LaGuardia and JFK?

23   **A.**  I would agree that LaGuardia and JFK are part of the New

24   York City market.

25   **Q.**  So your only area of disagreement is whether Newark

1    should be included in that same market with LaGuardia and

2    JFK, right?

3    **A.**   That's correct, yes.

4    **Q.**   All right.  And so you agree, the appropriate question is

5    to consider whether LaGuardia and JFK together is too narrow

6    of a market, without Newark being included.  Is that fair to

7    say?

8    **A.**   Yeah, I think that's fair to say.

9    **Q.**   And market definition considers whether there are

10   alternatives outside the proposed relevant market, right?

11   **A.**   Yes.

12   **Q.**   And whether those alternatives are sufficiently close

13   substitutes to make a price increase unprofitable, right?

14   **A.**   I agree with that.

15   **Q.**   And if there are such substitutes, then the proposed

16   market is too narrow, correct?

17   **A.**   I agree with that.

18   **Q.**   But in your work on this case, you have not identified

19   any quantitative threshold as to how many passengers would

20   need to be at the margin between Newark, on the one hand, and

21   LaGuardia and JFK on the other, for Newark to be grouped with

22   JFK and LaGuardia, correct?

23   **A.**   Yeah, I said that --

24   **Q.**   Is that a yes, Dr. Lee?

25   **A.**   I said that I don't have a particular number.  What I can

1    say is that Manhattan is smack dab in the middle of these

2    three airports.  It's the nexus of travel demand, both

3    inbound and outbound, from New York City.  And gosh, I kind

4    of think that there's a lot of marginal passengers in there.

5    **Q.**  And you have not identified any quantitative thresholds

6    in response to that question, right?

7    **A.**  I haven't identified a quantitative threshold.  I mean,

8    to me, it just seems so obvious that with Manhattan, you

9    know, it's smack dab in the middle, equal distance, in fact,

10   closer, sometimes, from parts of Manhattan, that it belongs

11   there.  And you know, I'm not the only one who thinks this

12   way.  In fact, Dr. Town seems to, as well.

13   **Q.**  You also acknowledge, you did not address the

14   Hypothetical Monopolist Test performed by Dr. Miller in this

15   case, correct?

16   **A.**  As I testified in my deposition, I wasn't asked to dig

17   into them.  I looked at some of the results.  I commented, I

18   think, at my deposition that I thought the max HMT was not

19   really adequate, because it didn't hold -- it doesn't look at

20   what was going on at prices at Newark, so that to me seemed a

21   little weird.  And as I testified at my deposition, I wasn't

22   asked to dig into the merger sim.  I understand that that's

23   something that's being covered in great detail by Dr. Israel.

24          But as I testified at my deposition, I looked at

25   Exhibit 14 of Professor Town's merger sim part of his report,

1    and I saw those price increases.  And they just seemed way

2    out of whack with what I kind of would think would be

3    plausible.

4    **Q.**  Doctor, when I ask you a yes or no question, or to answer

5    yes or no question -- to answer yes or no if my question

6    calls for a yes or no answer.

7              Is that fair?

8    **A.**  I will try my best.

9    **Q.**  Fair to say that your opinions related to market

10   definition focus on passengers leaving from or arriving in

11   Manhattan.  Is that fair to say?

12   **A.**  I think Manhattan is important.  But I think Brooklyn is

13   important.  As I mentioned in my direct, that Brooklyn is the

14   county that produces the fifth largest amount of passengers

15   at Newark.  So I think Brooklyn is important.

16   **Q.**  Well, let's -- and I caution there's confidentiality

17   issue with this exhibit.  But if you can look at DX891 in

18   your binder, which is at tab 10, I believe.

19              This is from your expert report, Dr. Lee?

20   **A.**  DX?

21              THE COURT:  891.

22              MR. DUFFY:  891.

23              THE WITNESS:  Okay.

24   BY MR. DUFFY:

25   **Q.**  And this is zoomed in on Dr. Miller's map, showing

1    predominantly Manhattan, but also parts of Brooklyn, Queens

2    and New Jersey, right?

3    **A.**   That's correct.

4    **Q.**   And this is showing me the catchment maps for American

5    and JetBlue frequent flyers, correct?

6    **A.**   Well, bear in mind, this is a -- a very small portion of

7    American and JetBlue.  It's -- as I testified on direct, it's

8    like a handful of routes, and it's only those that have, on

9    the one hand, American frequent flyer people flying to this

10   handful of routes that have their -- the ZIP code of their

11   frequent flyer program in this area; and for JetBlue, I think

12   it's, as I heard Dr. Miller say, it's like all the people who

13   purchased on JetBlue.com.  But, again, it's a pretty small

14   portion of their passengers.

15   **Q.**   Right.  And for this dataset, you agree with me that this

16   is showing that a very large majority of passengers in

17   Brooklyn and Queens are flying out of JFK and LaGuardia with

18   a very small portion going to Newark.  Would you agree with

19   that?

20   **A.**   Well, I don't know.  I look at some of these ZIP codes,

21   you know, in Lower Manhattan for JetBlue --

22            THE COURT:  He asked about Brooklyn and Queens.

23            THE WITNESS:  Sorry?

24            THE COURT:  He asked about Brooklyn and Queens.

25            THE WITNESS:  Oh.  Brooklyn and Queens.

BY MR. DUFFY:

**Q.**  Right.  Recognizing you're only seeing certain areas there, would you agree that as to the parts of Brooklyn and Queens, you see very few of those passengers are going to Newark?

**A.**  There's not a lot.  But keep in mind that --

**Q.**  As to this dataset, Doctor.

**A.**  Yeah, as to this dataset.

But also, keep in mind, of course, that JetBlue and American in New York, they focus their operations at those airports, at LaGuardia and JFK.  So the amount of service that's being offered is also an important consideration here. So it's not surprising that you would see that, given where they focus their service.

**Q.**  And you also agree with me that even for parts of Manhattan, in particular the Upper East Side here, that is showing for parts of Manhattan, as to this dataset, the vast majority of passengers included are going to JFK and LaGuardia, with very few to Newark, right?

**A.**  Yeah, I would agree with that.  That's where the service is for these carriers.

**Q.**  And if you would also just look in your binder, the very last page of your demonstrative slides?

MR. DUFFY:  And again, there's confidentiality restrictions here.

1          THE COURT:  Same exhibit?

2          MR. DUFFY:  The exhibit is DX894, but it is in the

3    direct examination binder, probably the easiest way to get to

4    it.

5          THE COURT:  It's the next one in your binder.

6    Either way.

7    BY MR. DUFFY:

8    **Q.**  So this is -- you characterize this as completing

9    Dr. Miller's homework, right?

10   **A.**  I --

11   **Q.**  Looking at the New York catchment area, right?

12   **A.**  Correct.

13   **Q.**  And you agree with me that for the entirety of Manhattan,

14   for both JetBlue and American, this is shaded in yellow or

15   green colors, indicating Newark shares in the teens to the

16   mid 20s.  Would you agree with that rough approximation?

17   **A.**  Yeah, it's a little hard to tell, because of where the --

18   you know, where these key maps are always a little tricky,

19   because some of them look like they're getting potentially a

20   little bit higher, but that's generally --

21   **Q.**  Right.  Generally, you agree with that?

22   **A.**  Yeah, but again, keeping in mind that for these carriers,

23   the bulk of their services to these destinations is from

24   LaGuardia and JFK.

25   **Q.**  And I want to talk to you about another dataset in taxi

1   and for-hire vehicle data specifically?

2   **A.**   Okay.

3   **Q.**   And one thing, the routes that are included here, in the

4   catchment maps, both the ones you did for Newark, and the

5   ones that Dr. Miller did for JFK and LaGuardia, would you

6   agree that the routes included are those that have service at

7   all three airports?

8   **A.**   I think some of them might only have service to two, but

9   I think that's how he chose his routes was that there was

10  some commonality.  And I think maybe there was a couple that

11  might have only had it to two, if I recall.  But, yeah, I

12  think that's generally --

13  **Q.**   Right.  So by choosing the routes that were generally

14  offered at all three airports, Dr. Miller and you, with the

15  Newark catchment were able to do the better comparison as to

16  the choices that were available for that set of passengers,

17  right?

18  **A.**   Well, I'm not -- better -- but it was -- yeah, I don't

19  disagree that to make a more meaningful comparison, you

20  definitely want to have airports, destinations that are

21  served from all three.  But I think where we just have to

22  also really, really take a step back and consider is that for

23  some of these destinations like Chicago on American, you

24  know, American from LaGuardia offers -- I don't know, I have

25  the number in my report, but something like 14 flights a day,

1    or something like that.  That's where the service is, from

2    Newark, they offer substantially less.

3    Q.   All right.  Let's turn to another dataset that you

4    referenced and specifically taxis and for-hire vehicles,

5    where they go.  If we can go to PX1012, pull that up on the

6    screen.  And then if you go back to the large binder, PX12

7    should be at --

8    A.   PX.

9    Q.   Actually, I think -- if you just look on the screen?

10   A.   I can see it.  I can see it.

11   Q.   Right.  So this is in Dr. Miller's report, and you

12   acknowledge that this is showing where taxis and for-hire

13   vehicles, to the extent that was included in the dataset,

14   what airports those taxis go to, right?

15   A.   Yes.  But just bearing in mind that his failure to

16   include the vast majority of the for-hire vehicle data, which

17   he acknowledged at his deposition.

18   Q.   But you included that when you did your analysis, right?

19   A.   I -- Dr. Miller only used one month of for-hire vehicle,

20   I included the whole year.

21   Q.   Right.  And you found when you included all this data,

22   that only 17.7 percent of taxis and for-hire vehicles going

23   to airports leaving from Manhattan, only 17.7 percent of

24   those taxis went to Newark, correct?

25   A.   I found that, yeah, again for Manhattan as a whole, yes,

1     and for Lower Manhattan, closer to 25 percent.

2     **Q.**   And this is capturing both inbound and outbound traffic,

3     right?

4     **A.**   No.

5     **Q.**   You disagree with that?

6     **A.**   I do disagree with that.  I know that Dr. Miller

7     testified that the data included that.  And but in terms --

8     and I've looked at his analysis, in terms of the pickup,

9     these were pickups in -- in these areas that were going to

10    the three airports.

11    **Q.**   Going to the three airports.  But my point, Dr. Lee, is

12    that that will include both passengers who are returning home

13    from New York City and passengers who live in New York City

14    or work in Manhattan who are leaving to go somewhere else.

15    You agree this data will pick up both types of passengers?

16    **A.**   Okay.  Yes, I would agree with that.

17    **Q.**   Right.  So you're getting the full mix of passengers that

18    are traveling to and from Manhattan and using taxis to get to

19    the airport in this dataset, right?

20    **A.**   Taxis and.

21    **Q.**   Ubers?

22    **A.**   The limited amount of for hire that he has in here.

23    **Q.**   Right.  And this is showing that over 80 percent of those

24    passengers are going to JFK or LaGuardia, right?

25    **A.**   Again, it's a little hard to tell, because he doesn't

1    actually put numbers to it with his shading.

2    **Q.**  Well, apologies here, I'm talking about your calculation,

3    Dr. Lee, of 17.7 percent?

4    **A.**  Oh, in mine.  In mine.  Yeah.  Sorry.

5    **Q.**  And you found over 80 percent of those taxis going to

6    airports in New York are going to JFK or LaGuardia, right?

7    **A.**  Yes, that's correct.

8    **Q.**  Right.  Okay.  So generally speaking, your results are

9    consistent with what is displayed on PX1012, right?

10   **A.**  Well, again, I can't say that they're consistent, because

11   he's only using a small amount of the for-hire vehicle data.

12   **Q.**  Okay.  But you have no basis to disagree that the vast

13   majority of taxis leaving Manhattan are going to JFK and

14   LaGuardia?

15   **A.**  I think I'm clear in my exhibit when I tell you what the

16   numbers are.

17   **Q.**  All right.  Let's pivot to a new topic, Dr. Lee.  At your

18   deposition we discussed the issue of capacity discipline.  Do

19   you recall that?

20   **A.**  I do, yes.

21   **Q.**  And you testified on direct examination your observations

22   about Dr. Town's definition of capacity discipline, right?

23   **A.**  Yes.

24   **Q.**  And so is it fair to say that Dr. Town defines capacity

25   discipline as carriers accommodating each other's behavior in

1    order to constrain capacity growth?  Is that a fair

2    characterization of his definition?

3    **A.**   You know, I think he's gone on kind of a lot of different

4    directions, but that would be certainly one of the things

5    that he characterizes.

6    **Q.**   All right.  And is it fair to say that with respect to

7    capacity discipline, as Dr. Town defines it, your

8    disagreement with Dr. Town is not whether it's theoretically

9    possible for airlines to engage in capacity discipline as he

10   describes it, but whether, in fact, they have engaged in it?

11   **A.**   Well, I'm not so sure about that.  I think we are at a --

12   maybe a fundamental disagreement as to what capacity

13   discipline is.  So he, as I testified, uses it to define, you

14   know, this type of accommodating or coordinated behavior.  To

15   me, like, capacity discipline means matching supply and

16   demand.  I mean, like as a producer of goods and services,

17   why -- what would you -- I don't understand why capacity

18   discipline has this tarnished view when, to me, what I think

19   is what I view it as, is that it's putting the right amount

20   of your product into the marketplace, such that you have a

21   reasonable -- a reasonable chance that there's going to be

22   enough people willing to buy your product at prices that

23   you're going to be able to recoup your cost.  It's about

24   aligning supply and demand.

25   **Q.**   Well, let me ask you a question.  Let's not get caught up

1　on the label.  Let me just ask you, do you agree that it is

2　possible for carriers to engage in accommodating each other's

3　capacity decisions, in order to constrain growth and maximize

4　joint profits?

5　**A.**  Yeah, everything that I've seen about this industry is

6　that, like --

7　**Q.**  My question is whether it's possible, not whether, in

8　your opinion, it happens.  Right now it is just whether it's

9　possible.

10　**A.**  As a theoretical proposition, are you asking me -- as a

11　theoretical proposition, could they do that.  Is that what

12　you're saying?

13　**Q.**  Yes, that's what I'm asking.

14　**A.**  As a theoretical proposition, sure.

15　**Q.**  Okay.  Very good.  And you have seen evidence in which

16　legacy airlines themselves define capacity discipline as

17　growing slower than GDP, correct?

18　**A.**  I've seen documents where they refer to that, yes.

19　**Q.**  All right.  And as I understand it, Dr. Lee, you disagree

20　that carriers coordinate on capacity discipline or

21　accommodate each other's capacity decisions?

22　**A.**  Yeah, I think, as I testified on direct, when you look at

23　Dr. Town's Exhibit 11 -- well, I don't see any evidence of

24　accommodating behavior there.  I see one growing six times as

25　fast as the other.  I see one going up, while the other is

1    going down.  How is that -- how is that accommodating?

2    **Q.**  So it's your testimony that you have seen no evidence in

3    this case showing carriers coordinating on capacity

4    decisions?

5    **A.**  What I see evidence of is carriers trying to do the best

6    they can to -- in the case of the legacy network carriers, to

7    not repeat the same mistakes that got them all into

8    bankruptcy, that caused them to lose -- to layoff 160,000 of

9    their employees, and that made them lose $70 billion.  That's

10   what I see.

11   **Q.**  Have you seen documents showing executives of carriers

12   discussing capacity decisions with each other?

13   **A.**  I don't -- I've seen them discussing it in conference

14   calls with investment analysts.  I don't think I've seen a

15   document where -- I mean, I don't think so.  I don't recall

16   seeing a document which shows two carriers talking to each

17   other, if that's what you're saying.

18   **Q.**  Have you -- would that change your opinions in this case

19   as to whether or not carriers coordinate with each other on

20   capacity discipline?

21             THE COURT:  When?

22             MR. DUFFY:  If there are carriers communicating

23   with each other in the same room about capacity decisions.

24             THE COURT:  Would it change his opinion as opinions

25   about whether they coordinated at the time of those

1    discussions?

2              MR. DUFFY:  Yes, Your Honor.

3              THE WITNESS:  You're saying that if there was a

4    document that said, "Let's agree to do this" --

5              MR. DUFFY:  No, no, not "let's agree."  We're going

6    to discuss capacity in the same room as each other.

7              THE WITNESS:  Listen, they were discussing capacity

8    openly.  These carriers -- I mean, you have to put this into

9    context.  These carriers --

10   BY MR. DUFFY:

11   Q.  Dr. Lee, would that change your opinions, yes or no, if

12   you saw documents to that effect?

13   A.  If I saw documents that carriers were openly talking

14   about aligning supply and demand so that they didn't go back

15   into bankruptcy after losing $70 billion and having to

16   furlough 160,000 of their employees, I mean I wouldn't find

17   that -- I would find that pretty unremarkable.

18   Q.  You don't see any problem with two competitors getting in

19   a room and deciding how much capacity they should each offer?

20   A.  Well, again, I think --

21   Q.  That's a yes or no question, Dr. Lee.  Is that

22   problematic to you?

23   A.  I'm sorry, what's the question again?

24   Q.  Would you be troubled if you saw two competitors in a

25   room discussing their own capacity decisions with each other?

1    **A.**  You know, capacity isn't a secret in this industry.

2    **Q.**  Yes or no, Dr. Lee?

3    **A.**  Would it be troubling if I saw a document that had two

4    airline people discussing what their capacity was?  Like, for

5    example, at an investment conference, where two airlines, one

6    will present at 9 o'clock, and the other presents at

7    10 o'clock, and they say, "Here's our projection for what

8    we're going to do next year"?  I mean, this is not, to me --

9    that's something that airlines often present at these

10   conferences.  And they'll say, "Here's what we're doing," and

11   I don't think -- they make their decisions based off of

12   what's best for their own business.

13   **Q.**  Right.  Those types of events would make it easier for

14   them to coordinate with each other, wouldn't it?

15   **A.**  I don't think you need that event.  They publish their

16   schedules.  This is -- I can log into a computer right now

17   and tell you what each carrier in the United States has

18   planned for capacity for next year, because it's a matter

19   of -- airlines publish their schedules.  It's not a --

20            MR. DUFFY:  Let's pull up PX36.  And this has not

21   yet been admitted into evidence.  This is an

22   American Airlines-produced document.  We would like to move

23   it into evidence.

24            THE COURT:  It's PX --

25            MR. DUFFY:  PX36, Your Honor.  It's at tab --

```
 1            THE COURT:  I found it.
 2            MR. DUFFY:  You found it.  Okay.  Thank you.
 3            So I don't know if there's an objection to our
 4   moving this into evidence.
 5            MR. WALL:  Your Honor, this is one of the -- this
 6   is a 2015 document.  This is one of the ones that was subject
 7   to the 402 objection previously.  It still is.
 8            THE COURT:  So I'm admitting it, subject to the
 9   same ruling I already made for the same reasons.
10            (Plaintiffs' Exhibit No. 36 admitted into
11            evidence.)
12            THE COURT:  You mean the objection at that time
13   period was just not relevant?
14            MR. WALL:  Yes, Your Honor.
15            THE COURT:  Same ruling.  Same objection.
16   BY MR. DUFFY:
17   Q.  All right.  Take a moment to look at this document,
18   Dr. Lee.  Have you seen this document as part of your work in
19   this case?
20   A.  I don't recall seeing this document, no.
21   Q.  All right.  This is an e-mail from Jim Parker to Charles
22   Schubert.  And if you scroll to the end, you'll see, the
23   first e-mail in the chain, but the top e-mail is from May of
24   2015, right?
25   A.  I'm sorry, the last e-mail, April -- I see an e-mail on
```

1    April of 2015 as the last; is that right?

2    **Q.**  These are e-mails from April and May of 2015, correct?

3    **A.**  I just need to take a moment to review this.

4            THE COURT:  I can read it.  You don't need the

5    witness to testify to what it says.

6    BY MR. DUFFY:

7    **Q.**  Are you aware Mr. Schubert was the vice president of

8    network planning at American before Mr. Raja assumed that

9    position?

10   **A.**  You know, I've -- I've encountered Mr. Schubert in other

11   things, that -- that sounds like it could be right, but I'll

12   take your representation of that.

13   **Q.**  Right.  And if you go to page four, you'll see that

14   Mr. Parker is moderating a panel with Mr. Schubert and

15   others, including the then CCO of JetBlue, Marty St. George,

16   correct?

17   **A.**  Let me read this.

18           THE COURT:  It's on the screen, if you want.

19           THE WITNESS:  Oh, thank you.  Yes.  Just working

20   backwards on these --

21           So moderating the panel.  I see that there's a

22   panel, yes.

23   BY MR. DUFFY:

24   **Q.**  Right.  And so there's a panel discussion with both of

25   those two individuals slated to speak, right?

1  **A.**   And these here are the speakers below.  So it has Chuck

2  Schubert, Marty St. George, Bill Frankie, who is Indigo

3  Partners -- yes.  I see that, yes.

4  **Q.**   And if we go to page 1 to 2, if we just scroll up there,

5  looking at the e-mail starting at the bottom of page 1, and

6  then moving it over to page 2, you'll see a list of topics

7  that are proposed for discussion at the symposium.  Do you

8  see that list of topics?

9  **A.**   Aircraft technology, network trends, where are the new

10  entrants -- well, we know the answer to that.

11  **Q.**   And I want to ask you about the bullet at the bottom of

12  page two specifically.  You see a heading that says, "US

13  Airlines is a Case Study For the Benefits of Industry

14  Rationalization"?

15  **A.**   I see that, yes.

16  **Q.**   And the first bullet below that says, "Industry

17  consolidation has made capacity discipline much easier

18  because there are fewer cats to herd."  Correct?

19  **A.**   I see that.

20  **Q.**   And below that it goes on to say, "Probably not done,

21  still launched small midsize airlines with growth who could

22  benefit from merging with similar sized carriers.  They

23  include Alaska, JetBlue, Virgin American, and Hawaiian."

24          Do you see that there?

25  **A.**   I do.

1    **Q.**  It's true that since then, Alaska has acquired Virgin

2    America, right?

3    **A.**  Let me try to see, the date of this was May 6, 2005.

4    **Q.**  '15.

5    **A.**  Oh, sorry.  2015.  And Alaska did merge with Virgin

6    America.  That is correct.

7    **Q.**  And Alaska has also entered the WCIA with American,

8    right?

9    **A.**  It has, yes.

10   **Q.**  And American now has currently the NEA with JetBlue,

11   right?

12   **A.**  It does, yes.

13   **Q.**  And if you go forward, Mr. Schubert on the next page

14   responds to this e-mail, and he says, "He found particularly

15   interesting the benefits of industry consolidation and that

16   he highlighted a few of his favorites," right?

17   **A.**  So I see, now you go to page one?  Is that what you're

18   saying?

19   **Q.**  Yes.  The e-mail from Mr. Schubert here to Jim Parker?

20   **A.**  Okay.  I just want to read it.  This begins, "Sorry to

21   just be getting back to you."?

22   **Q.**  Yes.  Take a moment to read.

23   **A.**  Yeah, I see these are all very interesting topics, yeah.

24   **Q.**  And he says, "Specifically, I highlighted a few of my

25   favorites below."  You see that note "specifically"?

1   **A.**   Oh, yes, I see that.

2   **Q.**   And the document was produced in this way, but if we go

3   back to the second page, would you agree with me that one of

4   the topics that Mr. Schubert, the American VP of network

5   planning had highlighted was the note "industry consolidation

6   has made capacity discipline much easier because there are

7   fewer cats to herd."?

8   **A.**   I see that's highlighted, yes.

9   **Q.**   And so I take it you disagree, Dr. Lee, you disagree with

10  American's former vice president for network planning that

11  consolidation made capacity discipline easier?

12  **A.**   Well, again, I don't know what -- they're not saying how

13  they're defining capacity discipline.

14  **Q.**   You don't think that --

15          MR. EGGE:  Objection.

16          THE COURT:  Let him finish the answer.

17          THE WITNESS:  I was just making the point that at

18  least I haven't seen in this document what they mean by

19  capacity discipline.

20  BY MR. DUFFY:

21  **Q.**   You don't think fewer cats to herd means fewer parties

22  would need to accommodate each other's capacity decisions?

23  **A.**   Again, I can't tell you what James Parker was thinking

24  when he wrote that and I certainly can't tell you whether or

25  not Mr. Schubert -- maybe he was highlighting it because he

1    disagreed and wanted to have a debate about what that meant.

2    I mean, I just don't -- I can't comment on what they were

3    saying.

4    **Q.**   Right.  And again, this is items for discussion at a

5    forum in which American's competitor JetBlue is going to be

6    one of the other panelists on the panel, and who knows who

7    else is in the audience, right, from the industry?

8    **A.**   Sure, yeah.

9    **Q.**   So this is a situation not where there's two separate

10   panels with American and JetBlue at different times talking

11   about capacity.  Here they are in the same room at the same

12   time, right?

13   **A.**   Yeah, they're going to be on a panel, and they're going

14   to discuss a whole bunch of pretty interesting topics.

15   **Q.**   Right.  Including fewer cats to herd, right?

16   **A.**   Well, I don't know if they actually talked about that.  I

17   just see it as a list of a whole bunch of things.  I don't

18   know what was actually discussed.

19   **Q.**   All right.  Let's turn now to some of the more technical

20   econometric issues, Dr. Lee.

21         Before we get there, is it fair to say that you

22   believe growth of low cost carriers contributed to reductions

23   in legacy carrier capacity?  Is that fair to say?  Slower

24   growth of legacy carrier capacity.

25   **A.**   Sorry.  The growth of low cost carriers was one of the

1    driving forces behind the lack of profitability that forced

2    lower cost carriers to downsize, yeah, I think that's --

3              THE COURT:  No, not lower cost carriers to

4    downsize.  That forced global legacy carriers to downsize.  I

5    think that's what you meant.

6              THE WITNESS:  That the growth of lower cost

7    carriers, them taking market share away left the global

8    network carriers with a smaller piece of the pie.

9    BY MR. DUFFY:

10   Q.  Would you agree that capacity discipline by legacy

11   carriers, growing at less than GDP, would encourage LCCs to

12   expand and gain share?

13   A.  I think the lower cost carriers were -- they were growing

14   regardless.  They were -- these guys were -- they had a cost

15   structure, a nimbleness that allowed them to profitably

16   expand, irrespective of -- when you have that kind of cost

17   advantage, I mean, you can expand irrespective of what

18   they're doing.

19   Q.  It's true that Professor Town ran a regression for

20   industry-wide capacity, right?  That was included in his

21   first report?

22   A.  Yes.  Yes.

23   Q.  If we can pull up PX695 -- sorry, PX965 to show that.

24   That's showing the industry-wide capacity?

25   A.  Well, this is --

1    **Q.**  Sorry, next slide, 964.  I apologize.

2    **A.**  964.

3    **Q.**  Right.  So this is industry-wide capacity, right?

4    **A.**  Well, this is not the regression.  This is the result of

5    the predicted values and the actual -- so, yeah, this is not

6    the regression, per se.  I looked at the regression, per se,

7    in my direct exam.  This is the kind of visualization of the

8    forecast versus actual, yes.

9    **Q.**  And this is showing industry-wide capacity.  And it's

10   correct that this is including LCC capacity, as well, right?

11   **A.**  It is including lower cost carrier capacity industry

12   wide, yes.

13   **Q.**  So even though it's your opinion that LCC growth caused

14   legacy capacity to decrease, here you're saying that industry

15   wide, Dr. Town's predicted capacity is greater than the

16   industry-wide actual capacity, right?

17           MR. EGGE:  Objection, Your Honor.  I think that

18   misstates his testimony.

19           THE COURT:  I'm confused by that, I'd say.  I

20   thought this chart, that the green line -- the green line --

21   the green line is what was -- what he predicted for the

22   legacy carriers to do based on his economic analysis?

23           MR. DUFFY:  Let me clarify, Your Honor.

24   BY MR. DUFFY:

25   **Q.**  So Dr. Town ran two separate regressions, correct?

1    **A.**   He actually ran more than just two.

2    **Q.**   Right.  And let's just, for clarification, pull up 965 at

3    the same time, so we can discuss the differences.

4           The one here labeled "Exhibit 8" is showing

5    industry-wide capacity, right?

6    **A.**   That is correct.

7    **Q.**   So it is showing the difference between actual and

8    predicted capacity across all carriers, including LCCs,

9    right?

10   **A.**   That is correct.

11   **Q.**   And "Exhibit 9" is showing actual and predicted capacity

12   just for the legacy carriers, right?

13   **A.**   That is correct.

14   **Q.**   So LCCs are not in Exhibit 9, but their capacity is

15   included in Exhibit 8?

16   **A.**   That is correct.

17   **Q.**   So on Exhibit 8, or I should say PX964, there is still a

18   shortfall between actual and predicted capacity in Dr. Town's

19   model, right?

20   **A.**   Well, that's because he doesn't have a specified model.

21   He doesn't control for the lasting impacts of the Great

22   Recession and the impact on employment.

23   **Q.**   Well, Dr. Lee, in your first report, your claim was that

24   adding the LCC RP M share variable would eliminate the

25   discrepancy, the difference between actual and predicted

1    capacity as to the legacy carriers, right?

2    **A.**   Yeah.  When I did my first report, to me the only model

3    that made any sense to look at was the legacy carrier model.

4    Because as I understood Dr. Town, what he was doing is he was

5    alleging that legacy carrier consolidation had caused those

6    carriers or had facilitated amongst those carriers capacity

7    discipline.

8            And he also had a separate chart that -- another

9    regression that looked at lower cost capacity, to see what

10   was going on with them.  And in that chart, he shows that

11   they outperformed.

12           So if they're growing faster than his model

13   predicts, the only one that makes sense to look at,

14   Your Honor, if you're alleging capacity discipline

15   facilitated by legacy carrier mergers amongst the legacy --

16   he's not alleging that Spirit and JetBlue are part of this.

17   So that is why I focused on that model.  That's the only

18   model that fits his theory.

19           And then his reply report, I see that he says, "Oh,

20   this is the foundation of my analysis."  I was like, That was

21   kind of a surprise to me, because it doesn't fit his theory.

22   **Q.**   Dr. Lee, on direct examination, you testified, I believe,

23   that the growth of low cost carrier was a key variable to

24   consider, correct?

25   **A.**   It is a key variable to consider in the legacy carrier

1    capacity.

2    **Q.**   And my question is simply, even adding in the LCC

3    capacity growth, even adding that in, there is a shortfall

4    between actual and predicted capacity in Dr. Town's model,

5    correct?

6    **A.**   Which model are you on?

7    **Q.**   The industry-wide model?

8    **A.**   So even adding in -- you're saying in his industry

9    model --

10   **Q.**   Which includes LCC capacity.

11   **A.**   Well.  That doesn't make any sense to me.  That model --

12              THE COURT:  Well, he's just asking you whether or

13   not there is a difference, right?

14              MR. DERITA:  Right.

15              THE WITNESS:  Yeah, I don't recall what he did on

16   that, quite honestly, but it just wouldn't make any sense to

17   me to do that model, to do it that way.

18   BY MR. DUFFY:

19   **Q.**   And if we can go to DX875?

20              THE COURT:  You said DX?

21              MR. DUFFY:  DX875.  This is tab 21.

22   BY MR. DUFFY:

23   **Q.**   Right.  So this is showing in part the growth of LCCs,

24   right?

25   **A.**   Yeah.  This is the growth of lower cost carriers as a --

1    yes.

2    **Q.**  Going all the way back to 1993, right?

3    **A.**  Correct.

4    **Q.**  So this share is growing pretty steadily from 1993 into

5    the 2015, or so?

6    **A.**  It grows steadily into 2015.  It grows -- '16 is higher.

7    It takes a dip down in 2019.  The reason for that is, really,

8    I think, the MAX grounding.  Southwest was the largest MAX

9    operator in the country and that aircraft was grounded by the

10   FAA in March of 2019, and so it had a disproportionate effect

11   on them.

12   **Q.**  And my question is the growth was fairly steady until at

13   least 2015?  Do you agree with that?

14   **A.**  Well, I would certainly agree that there was steady

15   growth until 2015.  And I would say it actually -- you know,

16   in 2020, it actually went up to 40 percent.  So there's

17   continued growth.

18   **Q.**  So an LCC owning these shares is growing both before and

19   during the capacity discipline period in Dr. Town's model,

20   correct?

21   **A.**  There has been low cost carrier growth across this entire

22   period of time.

23   **Q.**  Right.  Before and after Dr. Town's capacity discipline

24   period, right?

25   **A.**  Yes, this both before and during, and even in 2020, which

1    is outside of his, yes.

2    Q.   Right.  And then there isn't a significant short fall

3    between predicted and actual capacity, up until 2009, in

4    Dr. Town's model, right?  Despite this LCC growth?

5    A.   Well, as I mentioned.

6    Q.   I'm asking you just yes or no.  You agree with that.

7    There is no discrepancy between actual and predicted capacity

8    in either model that Dr. Town puts forward, until the

9    capacity discipline period begins despite this growth from

10   1993 through the capacity discipline period?

11   A.   Yeah, his models are flawed.  So yeah.  That's what his

12   flawed models show, that's correct.

13   Q.   It's your opinion that they're flawed.  My question is

14   simply you agree, the LCC growth phenomenon that you say was

15   so severe that it had been omitted is present from 1993

16   through 2015, right?

17   A.   I would agree that LCCs grew over that period.

18   Q.   Right.  Turning now to the variables that you introduced

19   into your models.  You testified earlier that you believe

20   Dr. Town's model suffers from omitted variable bias, correct?

21   A.   Yes.  I said that both of his legacy and his industry

22   suffer from that, yes.

23   Q.   Right.  You thought that if you added LCC to RPM share to

24   Dr. Town's legacy carrier regression, that that would

25   eliminate the shortfall between actual and predicted

1  capacity, correct?

2  **A.**  Well, what I said was that -- that he's not controlling

3  for low cost carriers and if I added that -- you know, and

4  there's a whole -- there's -- there's a whole bunch of things

5  that are probably wrong with his model, but it is so fragile

6  that if I just add in one variable, yeah, that variable low

7  cost carrier share, yeah.  The results just go away.

8  **Q.**  And I want to talk about that invariable.  You very

9  briefly talked about endogeneity, right?

10 **A.**  Yes, I talked about endogeneity.

11 **Q.**  Is it your testimony that the LCC-RPM share variable that

12 you include, does that have endogeneity with the defendant

13 variable in Dr. Town's model?

14 **A.**  With the legacy ASMs?

15 **Q.**  Yes.

16 **A.**  No, I've shown that when you performed instrumental

17 variables estimation, Your Honor, that that demonstrates that

18 it's not.

19 **Q.**  So it's your opinion here that there is no endogeneity

20 between those two variables.  In other words, you don't

21 believe legacy carrier RPM share is endogenous with legacy

22 capacity ASMs?

23 **A.**  Yeah.  I don't believe they're endogenous, but even if

24 they were --

25 **Q.**  My question is --

1          THE COURT:  I think he meant LCC RPMs with legacy
2     ASMs because that's what he added.
3          THE WITNESS:  Yeah.  I added the share of low cost
4     carrier RPMs as an additional explanatory variable in the
5     model where the dependent variable is legacy carrier ASMs,
6     and I've conducted a testing, the standard test that
7     economists use to test for endogeneity, and they show that
8     it's not endogenous.  But even if it were, I run the
9     instrumental variables that corrects for it.
10    **Q.**  You didn't include any instrumental variables in the time
11    of your first report, right?
12    **A.**  No, I lagged it at the time of my initial report.  I
13    mean, it was so obvious to me that it wasn't endogenous.  And
14    I kind of get it.  Like I mean, I followed this industry for
15    the last 24 years, and sometimes I take for granted some of
16    the things that maybe Dr. Town doesn't and -- so I get that.
17    So I saw his concerns about endogeneity, and I took them head
18    on in my supplemental exhibits or my supplemental
19    demonstratives or whatever they were, to take that question
20    head on.  And so I fully addressed it.
21    **Q.**  And you wrote in your report that there was potential for
22    endogeneity, correct?  You included that language in your
23    report?
24    **A.**  I certainly acknowledged that there was the potential,
25    and I addressed that through the lagging -- which is, again,

1    another way of dealing with potential endogeneity, yes.

2    **Q.**   Right.   So you thought that by lagging the LCC-RPM share

3    variable by one year, you could address potential endogeneity

4    over a seven to eight year time period.   Is that your

5    testimony?

6    **A.**   Yeah, I gave it -- lagging is the traditional way, or a

7    traditional way that you deal with potential endogeneity.

8    And again, I saw like he comes up with this other thing.

9    But, I mean, what we have now is we have the instrumental

10   variables, and that removes any doubt that there is any

11   endogeneity.   Because the instrumental variables, it shows

12   that there isn't endogeneity.

13   **Q.**   You would agree that if you had, instead of using --

14   let's see LCC RPM share, that's a fraction.   Right?   That's

15   legacy carrier, revenue passenger miles is you numerator.

16   And the denominator is the revenue passenger miles across the

17   domestic airline industry, right?

18   **A.**   That's correct.   It is a fraction.   It's a share

19   variable.

20   **Q.**   And so that variable actually includes legacy carrier

21   RPMs in it, right?

22   **A.**   It is a component --

23   **Q.**   Right.

24   **A.**   -- of the share calculation, RPMs, legacy carrier RPMs.

25   Not ASMs, but RMPs.

1  **Q.**  And is it correct, at your deposition you actually

2  testified you would have a much more severe endogeneity issue

3  if you had used a LCC ASM share instead of RPM share as your

4  additional variable, right?

5  **A.**  Yeah, I didn't -- I didn't do it, but I would be more

6  concerned -- yeah, I think that's fair to say.  But I didn't

7  do that.  I used RPMs.

8  **Q.**  And you refused at your deposition to acknowledge a

9  positive correlation between revenue passenger miles and

10 available seat miles, right?

11 **A.**  Well, I -- I think we had a -- a spirited discussion over

12 this, and I think the words -- I don't recall.  This is

13 August.  But I think you were saying "determined by" is the

14 thing that you mentioned.  And I said, hey, there are some

15 times where they could be correlated, but that doesn't mean

16 their endogenous.

17 **Q.**  Well, what you actually said in your deposition, Dr. Lee,

18 you agreed that ASMs is one of the factors that determines

19 RPMs, right?  It has to.

20 **A.**  Well, I said that in order for there to be RPMs, you need

21 to have ASMs.  You can't produce an RPM without flying an

22 airplane.

23 **Q.**  Right.  You have to have seats before you have passengers

24 in the seat?

25 **A.**  That is -- I -- yes.

1    **Q.**  So I want to understand, is it your position, testifying

2    here today, that there is not a positive correlation between

3    available seat miles and revenue passenger miles?

4    **A.**  I mean, there can be at times.  I mean, there's --

5    **Q.**  At times?

6                 MR. EGGE:  Objection.

7                 THE COURT:  Yeah, you got to let him finish the

8    answer.

9                 MR. DUFFY:  Okay.  Apologies.

10                THE WITNESS:  Yeah, there are times where you

11   increase ASMs, and your RPMs go up.  There are times where

12   you increase ASMs and maybe you got it wrong.  You thought

13   there was going to be demand on that route, and it's like,

14   no, actually, it wasn't -- it didn't turn out quite as well

15   as you planned it would.

16                There's times where you might reduce your ASMs, and

17   your RPMs can go up.  I'm not disputing that there is a

18   relationship.  But, again, there's not this causal

19   determination, the way that you're thinking about it, that

20   creates this endogeneity problem.  And even if there was, I

21   have fully dealt with it using the instrumental variables

22   estimation.  So I don't -- I kind of understand why you're

23   asking these questions, but I think it's been fully

24   addressed.

25                MR. DUFFY:  I'm about to turn to a new topic --

```
 1              THE COURT:  Take the lunch break now.  See you all
 2      in an hour.
 3              MR. PAIK:  Your Honor, I have --
 4              THE COURT:  Perfect.  You have the list?
 5              MR. PAIK:  Yeah.
 6              THE COURT:  I'll take a copy.
 7              Do you have a copy for the government?
 8              MR. PAIK:  They already have it.
 9              MR. MOORE:  We received a copy, and we don't have
10      any objections to that document.
11              I just want to provide one document, it's already
12      in evidence, that I think could be relevant in consideration
13      of it.  It's PX297.  I have a paper copy.
14              THE COURT:  Sure, I'll take a paper copy.  I don't
15      have enough paper, anyway.
16              Okay.  See you in a bit.  Thanks.  We stand in
17      recess.
18              (Court in recess at 1:04 p.m.)
19              (The following reported by Robert Paschal.)
20              (In open court at 2:04 p.m.)
21              THE COURT:  So, two things, first --
22              I'll get to the schedule in a second.  I know you
23      all want to talk about that.
24              First, just about the privilege motion, I think --
25      was it Mr. Moore?  Whoever is doing it for the government.
```

1          MR. JONES:  It is Mr. Moore.

2          THE COURT:  All right.  Mr. Moore.  I think, at

3     this point, if you, like, want more -- you should -- I'm not

4     saying you're not entitled to more.  I'm not ruling at all.

5     I'm simply saying that you should file a reply.  They've

6     given you -- I'm not -- my math is probably wrong, and I'm

7     not an economist, either, so I don't know if they've given

8     you 10 of 30 or 16 of 30 or 17 of 31 or however you count it

9     up.  I'm not really sure.

10          And -- but tell me why, given what they've given

11    you, in light of what happened, you're still entitled to the

12    other things you want, or you're not.  Or you're entitled to

13    some, but not others, or whatever it is you want to say.  And

14    you file a reply, and then I'll see where we are.  I think

15    that makes more sense than me trying to -- this is helpful,

16    but not enough for me to decipher it.

17          MR. MOORE:  Sounds great, Your Honor.  Thank you.

18          THE COURT:  All right.  Maybe explain -- what

19    eludes me a little bit is why you gave me this particular

20    exhibit as it relates to privilege and to the particular

21    documents.  You can -- if you think -- obviously, you think

22    it's relevant, or you wouldn't have given it to me.  But in

23    reading it, I understand it's generally connected to these

24    events in some way, but I don't understand the connection

25    specifically to the documents you seek.

1          MR. MOORE:  Understood.

2          THE COURT:  With respect to the schedule, what I

3    was thinking about was -- and tell me if this makes -- what I

4    was thinking about is, in terms of evidence, 9:00 to 1:00,

5    Tuesday, Wednesday, Thursday, of -- not next week but the

6    week after.  We had talked about Tuesday -- and the way I was

7    thinking about this, but tell me if this works in the math,

8    you all are keeping track of that, I promised you one block

9    of time to make up for the breaks.  Because when we

10   calculated it, we didn't calculate for the breaks.  That

11   would be one of those mornings pretty much does that.

12          And then the amount of time that I -- additional

13   time that I've granted to the government, and then you in

14   response, comes out to about two mornings, I think, 9:00 to

15   1:00, the two days.  That's eight hours, but minus the breaks

16   it's seven and a half hours.  So that's, like, pretty close,

17   I think.  If we're short a couple of minutes, or something, I

18   can add -- you know --

19          And then that, I think, would do all of the

20   evidence.  And then I know, Mr. Jones, you wanted to do

21   closing arguments sort of at the end of the evidence.  And

22   then later, after you file your posttrial briefs and I've

23   digested that, I'm sure I'm going to want to have you back to

24   talk to you, like, for argument.

25          But then I need to find a time to do that closing

1  argument.  I haven't figured out exactly when I can fit you

2  in for that, to be perfectly honest, because I start

3  another -- I start a criminal trial on the 31st.  And so --

4  but I understand you want to do that, and I will try to -- I

5  just haven't figured out when.

6          So I don't know if that works in terms of

7  scheduling for the lawyers or for the witnesses?

8          MR. WALL:  So, to be honest, the answer is I don't

9  know right now, because we just have this cascading issue

10 through our witness list, with more time to cross and people

11 now falling on different days, some of which they have

12 availability issues.

13         THE COURT:  Sure.

14         MR. WALL:  And I -- it might help us, if it works

15 with Your Honor's schedule, if we had some time on Friday,

16 because I have a feeling --

17         THE COURT:  Which Friday?

18         MR. WALL:  The Friday when we come back.

19         THE COURT:  Friday, the 28th?

20         MR. WALL:  The 28th, I guess, it is, yeah.  I don't

21 know if that's possible.  But the reason I'm saying that is,

22 is right now at this moment, I don't think I can put

23 Dr. Carlton on before the Thursday of that week.  And then

24 they're going to want to put their rebuttal case after he

25 testifies, so --

1          THE COURT:  So I guess I'll tell you two things.
2    On Friday the -- one is I'm also open to -- I may regret
3    this, but -- open to, like, instead of, like, doing three
4    blocks of time, you know, doing smaller chunks, if that -- if
5    that makes sense, in terms of witnesses and stuff, over
6    different periods of time.  But, obviously, it's easier
7    sometimes to give you a smaller chunk of time.  So just --
8    you can think about that for your own -- as you figure it
9    out, you shouldn't be uncomfortable, if you think that works
10   in some way.
11         In terms of Friday, the 28th, I can't -- I can't
12   give you very much time because I have a sentencing at
13   ten o'clock that I don't reasonably think I can fairly move
14   that I think it will take at least an hour.  And I have to
15   leave here -- I'm going to something -- I have to go to
16   something in DC for the afternoon, so I have to leave for
17   that.
18         The good news is there are a lot of flights to DC.
19         MR. WALL:  Yes, there are.  And they're cheap.
20         MR. JONES:  Not as many choices, Your Honor.
21         THE COURT:  Not as many choices, but I do notice
22   that the government corporate fare is very low.  It was in
23   my -- I don't track this on paper, but it was very low before
24   the NEA.  I can't say I've noticed a difference in the price
25   either way, or necessarily a difference in the number of

1    flights.  And I'm not going to take judicial notice of those

2    flights to DC in resolving this.

3            But -- so the most I could probably give you on

4    Friday if you -- is, like, an hour.  I don't know if that's

5    really helpful.  I could maybe give you two -- I don't

6    know -- I might be able to give you two hours split around --

7    like, if you wanted to do nine to ten, and maybe I could give

8    you eleven to twelve.  I could think about that.  I could

9    maybe check with the lawyers and, like, get a little better

10   idea about the sentencing.  There's a couple of things that

11   will, to some extent, affect how long it will run that I

12   could probably find out from the lawyers that I don't have

13   control of.

14           MR. WALL:  We'll have more information ourselves

15   after we've had a chance to digest this a little bit.  And

16   we'll just send an e-mail in to kind of let you know what our

17   thinking is about this.

18           THE COURT:  One thing that -- you know, I'm -- I

19   don't think this is -- it's probably obvious, but maybe it

20   isn't obvious, is, like, I'm not likely to rule from the

21   bench in this case.  And -- at the end of the closing

22   arguments, and I'm likely to -- I'm planning I'm going to

23   write a decision, an opinion, whatever I do.  And I don't

24   know -- I haven't, by any means, like, resolved this case in

25   my mind.  And I'm really trying to digest the evidence.

1        And so there's a lot of things that I need to
2   digest in terms of evidence that you've given me.  So in that
3   sense, I think there's a value to get all the trial done and
4   all the evidence in.  I don't want that to drag on and on.
5        And -- but it doesn't necessarily -- like, I'm
6   turning to, like, going through exhibits and things like that
7   and that process isn't delayed if, like, the -- one of these
8   days get pushed a little bit.  If that's -- if -- my
9   preference would be to get it all done that week if we can,
10  but that's just -- in terms of, like, where it all goes and
11  resolution, that's -- doesn't necessarily change the end
12  point.
13       MR. SCHWED:  Your Honor, the only other thing I
14  would add is, I think just based on my -- our calculations, I
15  think when you add up all the breaks plus time like this, we
16  probably will not -- we will need more than 9:00 to 1:00
17  on --
18       THE COURT:  On those three days?
19       MR. SCHWED:  Yes.  In other words, yeah.  We
20  probably need six hours, is my rough guess, of time to make
21  up for the breaks, et cetera.
22       THE COURT:  9:00 to 1:00 doesn't quite make up for
23  the breaks.
24       MR. SCHWED:  Yeah, one day of 9:00 to 1:00 will not
25  get us through the break time.  It's probably six hours, is

```
1    my rough guess -- obviously, it depends on how today and
2    Monday go, but --
3              THE COURT:  Sure.
4              And so -- okay.  And then -- and does two 9:00 to
5    1:00s pretty much do the extra time I added, about?
6              MR. SCHWED:  Yeah, I think so.  Because it's
7    somewhere between 7:15 and 7:30, so you add in the breaks,
8    that comes pretty close.
9              THE COURT:  So -- okay.  So I will try to figure
10   out -- well, I didn't -- I have available, but I didn't offer
11   you Monday the 24th because I wasn't -- I hadn't been
12   thinking you wanted any time then.
13             MR. JONES:  We would -- we would certainly -- we're
14   flexible with whatever Your Honor can --
15             THE COURT:  I have Monday, 9:00 to 1:00, like if
16   you want that time or a portion of that time, if that's
17   helpful in terms of scheduling.  So I'm not -- I guess you
18   don't have to decide right now.
19             MR. WALL:  Yeah.
20             THE COURT:  I'm not going to schedule something
21   else Monday 9:00 to 1:00 either way.  So you can think about
22   it.
23             I basically -- Monday, Tuesday, Wednesday,
24   Thursday, the 24th, the 27th, I've already reserved in my
25   calendar, 9:00 to 1:00.  I'm not scheduling -- well, to the
```

1    extent I've got something else, I'm going to move it to

2    accommodate.  So 9:00 to 1:00, you can do those four days I

3    have.  That would be enough, if we can do those four days, to

4    give you more than enough for all of that.

5              If you have a scheduling issue for somebody that

6    doesn't fit into those four days, I'm happy to work with you

7    to find -- tell me how long it would be, like, for the

8    whole -- to do that person, and I'll see then, and tell me

9    what kind of times you're looking at.  I'll try to find

10   another time to do it.

11             MR. WALL:  Understood, Your Honor.  Thank you.

12             MR. JONES:  Thank you, Your Honor.

13             MR. SCHWED:  Thank you.

14             THE COURT:  All right.  Okay.

15             Hold on one minute.  I forgot one thing.  Take me

16   one second.

17             Okay.  Go ahead.

18             MR. DUFFY:  Thank you, Your Honor.

19             Can we pull up slide 18 from the demonstratives for

20   direct?

21   BY MR. DUFFY:

22   Q.  All right.  Dr. Lee, you were talking about patterns and

23   capacity changes among the different airlines, and you

24   referenced this slide in your direct testimony.  Do you

25   recall that?

1   **A.**  Yes, I do.

2   **Q.**  All right.  And if we can turn -- and this is showing the

3   capacity changes year over year for carriers on an individual

4   basis, right?

5   **A.**  That's correct.

6   **Q.**  And if we can go to slide 11, please, from your deck,

7   this is showing -- just one second.  If you have binder --

8   **A.**  I do, yeah.

9   **Q.**  Yeah.  We'll go from that.  So this is showing capacity

10  of both domestic -- showing domestic capacity of both legacy

11  carriers and low cost carriers, right, Dr. Lee?

12  **A.**  That is correct.

13  **Q.**  On an aggregated basis for each of them?

14  **A.**  That is correct.

15  **Q.**  And so would you agree, Dr. Lee, that from 2009 to 2016,

16  there is an increase in ASMs of only 20 billion ASMs -- 22

17  billion ASMs?

18  **A.**  Are you referring to the legacy --

19  **Q.**  Of legacies.

20  **A.**  Oh.  From 2009 to 2015?

21  **Q.**  Yes.

22  **A.**  Well, if I do that subtraction, I think I get ten, right?

23  **Q.**  Ten.

24  **A.**  Right.

25  **Q.**  From 2009 to 2015.  From 2009 to 2016 --

1      THE COURT:  That just proves that point about only

2   the economists apparently can do the math.

3      MR. DUFFY:  That's very true.  Very true, your

4   Honor.

5   BY MR. DUFFY:

6   **Q.**  So from 2009 tot 2016, you have a difference of only 22

7   billion ASMs, correct?

8   **A.**  That's correct.

9   **Q.**  That's about 0.5 percent in that entire -- year over year

10  in that entire period.  Do you agree with that?

11  **A.**  If you've done the math, I'll -- that's fine.

12  **Q.**  So it's a growth of only 0.5 percent, right?  You agree

13  with that?

14  **A.**  Are you talking about a cumulative average or a total?

15  **Q.**  Cumulative, yes.

16  **A.**  Sorry.  Compound average or -- just -- what calculation

17  are you doing?  I just want to make sure.

18  **Q.**  Just between 2009 and 2016, there is only a growth of 20

19  billion ASMs even though there was 450 billion ASMs in 2009,

20  right?

21  **A.**  Yeah.  That -- that's correct.  Yep.

22  **Q.**  Right.  So very slow growth.  Less than 1 percent each

23  year.

24  **A.**  Yeah.  This was coming out of the Great Recession.  I

25  mean, this was the worse recession in five decades since the

1    Great Depression.  It was -- unemployment was at, you know --

2              THE COURT:  He's just asking whether it was small.

3              THE WITNESS:  Yeah.

4    BY MR. DUFFY:

5    **Q.**  Okay.  And if we can go to slide 23.  I want to get back

6    to your modification of Dr. Town's regression model.  This is

7    the regression that you did in your supplemental report,

8    right?

9    **A.**  Yes.  It was one of them, yes.

10   **Q.**  Right.  You produced this after you read Dr. Town's reply

11   report in which he critiqued your use of the LCC RPM share

12   variable, right?

13   **A.**  Well, wait.  So --

14   **Q.**  I understand it's a different regression.

15   **A.**  Different regression, yeah.

16   **Q.**  But it was after you had had a chance to review his reply

17   report that you produced this additional regression, right?

18   **A.**  That is correct.

19   **Q.**  And it was after you been deposed in this case that you

20   produced this supplemental regression, right?

21   **A.**  Yeah.  I think I mentioned in our deposition that I had

22   had been working on some additional things, but yes.  I

23   submitted this after the depo.

24   **Q.**  And unlike the first modification you made to Dr. Town's

25   regression, this one you were looking at the industrywide

1  capacity regression that Dr. Town did, correct?

2  **A.**  Exactly, yes.

3  **Q.**  And here, you added two additional explanatory variables,

4  right?

5  **A.**  Correct.

6  **Q.**  Load factor and the unemployment rate, correct?

7  **A.**  That's correct.

8  **Q.**  And it's true, Dr. Lee, that the -- the difference

9  between predicted capacity and actual capacity is eliminated

10  only when you had both of these independent variables, right?

11  **A.**  That's correct.

12  **Q.**  Right.  And let's talk about load factor in particular.

13  Now, we were talking before about the relationship between

14  revenue passenger miles and available seat miles in your

15  other modifications.  Do you recall that?

16  **A.**  I recall we discussed something along those lines, yes.

17  **Q.**  Right.  So there, in that regression, you had a variable

18  using revenue passenger miles on one side of the equation and

19  available seat miles on the other side of the equation,

20  right?

21  **A.**  Which regression are we talking about?  The industry

22  or --

23  **Q.**  The first regression -- --

24  **A.**  The legacy?

25  **Q.**  Yes.

1    **A.**   Well, I had legacy ASMs as the dependent variable, which

2    is Dr. Town's construct, and then on the additional variable

3    is a variable that's the -- kind of the composite.  There's a

4    lot of things in it.  There's both legacy RPMs, low cost

5    RPMs, other RPMs, and they're combined together to --

6    **Q.**   Thank you for that.  So the legacy RPMs are included as

7    part of that explanatory variable in the first modification

8    you did, right?

9    **A.**   They are included in a -- in a formula of share, yes.

10   **Q.**   Now here, talking about this regression that's on the

11   screen right now, here load factor is defined as revenue

12   passenger miles divided by available seat miles, right?

13   **A.**   That is correct.

14   **Q.**   So it's showing kind of approximately how full the planes

15   are.  Is that a good way to describe it?

16   **A.**   That's one way to describe it, yes.

17   **Q.**   Right.  And so here, because load factor is divided by --

18   is revenue passenger miles divided by available seat miles,

19   you have that as your independent variable; you have

20   available seat miles as your dependent variable, right?

21   **A.**   That's correct.

22   **Q.**   So you actually have available seat miles on both sides

23   of the equation here, right?

24   **A.**   Yeah, but one is in a -- a ratio.  So it's -- yeah, but

25   that's fine.

1    **Q.**  Right.  So is it -- is your expert opinion that there is

2    not an endogenous relationship between load factor and

3    capacity?

4    **A.**  Yeah, as I think I testified, I -- I did a bunch of

5    things to -- to check that and to address that, even if there

6    were, I've lagged the variable, and I've done instrumental

7    variables estimation and that shows that load factor is

8    not endogenous.

9    **Q.**  Well, okay, so that's your testimony is that load factor

10   is not endogenous with capacity?

11   **A.**  That's correct.

12   **Q.**  All right.  Do you agree with me that a change in

13   capacity causes a change in load factor, all else being

14   equal?

15   **A.**  That the change in capacity -- a change -- so if you held

16   everything else fixed and all you did was you keep the same

17   number of people on the plane and you put a bigger plane,

18   that would change the load factor.

19              But keep in mind that --

20              THE COURT:  That's all he's asking you.

21              THE WITNESS:  Okay.  Yeah.

22   BY MR. DUFFY:

23   **Q.**  That's all I need, Dr. Lee.

24              Pivoting to a new topic, I'm glad to say we're

25   leaving the world of regressions and moving on to some other

1    topics.  It's your opinion, Dr. Lee, that low cost carriers

2    have played an important role in lowering airfares and

3    growing capacity; is that fair to say?

4    **A.**  Absolutely.

5         MR. DUFFY:  If we could pull up DX876, please.

6    BY MR. DUFFY:

7    **Q.**  This is an exhibit from your report.  You highlighted the

8    role of ultra low cost carriers in particular in lowering

9    fares, right?

10   **A.**  I did, yes, all carriers, but low cost -- ultra low cost

11   as well, yes.

12   **Q.**  Right.  So here you're showing a 35 percent decline in

13   the tenth percentile fares between 2014 and 2019, right?

14   **A.**  Yes, I am.  Yes.

15   **Q.**  Right.  And it's your opinion that the growth of ULCCs in

16   particular was an important part of this, this fare reduction

17   that we're seeing in this graph?

18   **A.**  Yeah, it's -- particularly highlighting at that bottom

19   end of the fare distribution.

20   **Q.**  Right.

21   **A.**  Yeah.  That they had a particular large effect there.

22   **Q.**  Right.  Now, as an aside, you don't specifically

23   reference here in that 35 percent reduction, the 2020 or the

24   2021 years, right?

25   **A.**  Well, they're on the -- on the chart, but I don't

1  specifically reference them, no.

2  **Q.**  Right.  They're on the chart, but you're not kind of

3  counting them as part of the 35 percent reduction that you

4  see?

5  **A.**  Well, no.  The 35 is computed as the drop from the 128 to

6  the A- -- I mean, it goes down more, obviously.

7  **Q.**  Right.  Fair to say that in 2020 and 2021, COVID likely

8  had a big role in those fares dropping even lower?

9  **A.**  COVID had a role and, you know, continued expansion of

10  ultra low cost carriers had a role.  Yeah.

11  **Q.**  And so would you agree that, as a result of COVID-19,

12  traveler patterns in 2020 and 2021 were severely distorted?

13  **A.**  Well, I think 2020, you know, particularly prevaccine,

14  you know, that was -- that was -- 2020 was a pretty -- pretty

15  rotten year for the airline industry.

16          You know, by 2021, you know, with vaccines

17  available, people started to travel again.  And I'm not

18  saying at a COVID didn't have an impact, but -- but more

19  people -- you know, the summer of 2021, pretty strong demand

20  by leisure travel particularly.

21  **Q.**  You wrote in your expert report, did you not, that for

22  2020 and '21, traveler patterns in those two years were

23  severely distorted by the impact of the COVID-19 pandemic.

24  **A.**  The traveler patterns were distorted, yes.

25  **Q.**  Right.  For 2020 and 2021, right?

**A.**   Yeah, there's -- there's -- you know, COVID is not --
wasn't over, but by 2021, vaccines were about; and, you know,
international traveler, particularly because of continued
border closures and testing requirements and things that made
international travel particularly cumbersome, that certainly
had a bigger role than it did domestically.

**Q.**   Right.  And would you agree that comparing data relating
to the airline industry from 2019 to data from 2020 and 2021
will be affected because of the effect of COVID?

**A.**   Well, again, I think -- I think 2020 is a -- that's a
particular year that's, you know, not -- I don't think super
informative.  2020 in the midst of the pandemic, no vaccines,
that's certainly an issue.

          2021, again, once vaccines became widely available
and distributed, again, domestically, when you didn't have to
deal with all of the testing requirements, you know,
traveling internationally was kind of a pain.  I think we've
probably all done that in that 2021 period.  International
was not so great.

          But domestically, particularly by the summer, you
know, there was a pretty strong domestic demand in 2021,
so --

**Q.**   So --

**A.**   -- impact --

**Q.**   So your testimony is that travel in 2021 was not

1    distorted because of COVID; is that correct?

2    **A.**   I don't think I said that.  I said international travel

3    particularly because of continued testing, quarantine, you

4    know, that was bad, right?  That's a pain.  You know, you

5    still can't travel to China because of the zero COVID policy

6    today.  Australia, you know, those things were really bad.

7    **Q.**   But domestically?

8    **A.**   Domestically, I think by the time you got past the

9    Omicron wave in the -- you know, early part of that year, by

10   the summer of 2021 --

11           THE COURT:  Omicron wave at the end of --

12           THE WITNESS:  Sorry.  So many variants.  Sorry.

13   Wrong variant.  I apologize.

14           But by the summer of 2021, when vaccines were

15   widely available and adopted, when, you know, people started

16   traveling again, the summer of 2021 had pretty robust

17   domestic demand.

18   BY MR. DUFFY:

19   **Q.**   All right.  I just want to understand, do you disagree

20   that revenue passenger miles were lower in 2021 than in 2019?

21   **A.**   No, no.  Revenue passenger miles were lower in 2021 than

22   in 2019.

23   **Q.**   Considerably lower, right?

24   **A.**   Yeah, they were -- I mean, they were lower.  I don't

25   recall exactly the percent decline, but they were lower,

1    yeah.

2    **Q.**  All right.  Let's pull up slide 7 from the presentation,

3    please.

4            You agree that Spirit is the fastest-growing ULCC,

5    right?

6    **A.**  Over this period of time, Spirit has been the fastest

7    growing lower cost carrier.

8    **Q.**  Back since 2014, Spirit has been the fastest growing.

9    And it's growing considerably faster than all the other ULCCs

10   that you list in that graph here, right?

11   **A.**  You said 2014?

12   **Q.**  Yes.

13   **A.**  Well, I'd have to actually -- if we were to do that

14   calculation, I would need to reindex that 2014.  And Frontier

15   has also kind of -- as you can see, in 2014, kind of

16   inflected up after -- you know, that's when they really

17   pivoted to the ultra low cost model under Indigo leadership.

18           And then, you know, as you can even see, Sun

19   Country, which also made a similar transition to ultra low

20   cost carrier, they kind of -- once they did that, they kind

21   of hockey-sticked up.  But I think Spirit is -- over this

22   period of time, is the fastest growing ultra low cost

23   carrier.

24   **Q.**  And Spirit is not only the fastest growing ultra low cost

25   carrier, it's also the largest right now, right?

1    **A.**  I think that is correct.  It's always kind of a race

2    between them and Frontier.  And I -- but I think that Spirit

3    is the largest at this moment in time, I think.

4    **Q.**  And JetBlue is currently in the process of attempting to

5    acquire Spirit, right, Dr. Lee?

6    **A.**  That's my understanding, yes.

7    **Q.**  And so if that deal went through, then the largest ultra

8    low cost carrier would no longer be an independent airline,

9    right?

10   **A.**  Well, I haven't -- I haven't looked at that.  But if,

11   hypothetically, that were to go through -- and I just haven't

12   studied what the plans are for a hypothetical

13   post-integration, but -- but, you know, under your -- I guess

14   if you said if it were to occur --

15          Sorry, what was your question?  I'm sorry.

16   **Q.**  My question was simply, you know, if that deal went

17   through, the largest ULCC would be no longer an independent

18   airline.

19          MR. SCHWED:  Objection, Your Honor.  Both -- it has

20   nothing to do with his report, and he's already testified he

21   hasn't studied that.

22          THE COURT:  Sustained.

23   BY MR. DUFFY:

24   **Q.**  Pivoting to another topic -- if we can go to DX861,

25   please -- this is showing -- and a similar slide was included

1    in your direct examination.  This is showing the fare effects

2    of different LCCs on legacy fares; is that right?

3    **A.**   That is correct.

4    **Q.**   And you agree that JetBlue has a greater downward fare

5    effect on GNC fares than any other LLC, right?

6    **A.**   Yeah.  It's a close tie between them and Southwest.

7    **Q.**   Somewhere between 18 and 25 percent, depending on the

8    time, right?

9    **A.**   Yeah.  In '18, in 2019, and then back in 2016, it was 25,

10   yeah.  And then in 2016, you know, JetBlue and Alaska were

11   neck and neck.

12   **Q.**   Right.  And you heard or read Mr. Hayes's testimony about

13   how JetBlue strives to offer both low fares and high quality

14   service, right?

15   **A.**   I heard that, yes.

16   **Q.**   And those factors help JetBlue compete for a mix of

17   cost-conscious travelers and, you know, power travelers, as

18   Mr. Raja called them, right?

19   **A.**   Yeah, I think they compete for -- they're competing for

20   every passenger they can get.

21   **Q.**   Right.  You mentioned earlier that Frontier shifted to a

22   ULCC business model, right?

23   **A.**   They did, yes.

24   **Q.**   Southwest has also somewhat changed its business model to

25   focus more on business class -- business travelers.  Would

1   you agree with that?

2   **A.**   They have certainly become more active in trying to

3   attract business passengers, yes.  And they've been doing

4   that for quite some time now.  But I think they're gaining

5   traction in that area, yes.

6   **Q.**   So you mentioned that JetBlue's DNA earlier in your

7   direct testimony, right?

8   **A.**   I did, yes.

9   **Q.**   But you agree that airlines respond to economic

10  incentives and the changing environments in which they

11  operate, don't you?

12  **A.**   Yeah.  This is a very dynamic industry.  I agree with

13  that.

14  **Q.**   And would you agree that if JetBlue's interests are

15  aligned with American Airline's interests, then JetBlue's

16  business practices may change?

17  **A.**   No, I just don't think that JetBlue would ever abandon

18  its low cost, low fare model.  That's its primary competitive

19  advantage, and to stop doing that would be changing its

20  entire business model.

21          They're very different business models, and I just

22  don't see JetBlue wanting to stop doing what has made it so

23  successful as an airline.

24  **Q.**   Are you aware of any other, you know, alliance like this

25  in your study of the industry in which the incentives of a

1     low cost carrier like JetBlue are aligned with the interest

2     of American in the same way as the Northeast Alliance?

3     **A.**  Are you talking about domestically?

4     **Q.**  Yes.

5     **A.**  No, I think this is -- I think the Northeast Alliance

6     is -- is unique because of its creativity.

7              MR. DUFFY:  Pass the witness.  No further

8     questions.

9              THE COURT:  Any redirect?

10             MR. EGGE:  Yes, Your Honor.  Just a -- just a quick

11    topic here.

12        **REDIRECT EXAMINATION BY COUNSEL FOR AMERICAN AIRLINES**

13    BY MR. EGGE:

14    **Q.**  Dr. Lee, do you remember the slide that plaintiffs showed

15    you, PX0036 -- I'm sorry, it's an e-mail.  And you don't need

16    to look at it unless you feel you need to.  I just want to

17    ask you quickly, do you remember that exchange about the

18    topics to be discussed --

19    **A.**  This is the Chuck Schubert e-mail?

20    **Q.**  Yes.

21    **A.**  Yes, I remember that.  Yeah.

22    **Q.**  I can represent to you that PX0036 was a document that

23    DOJ produced to the parties, notwithstanding the fact that

24    this is an American Airlines document --

25             MR. DUFFY:  Objection.  Counsel is testifying.

1           THE COURT:  Overruled for now.  See what the

2    question is.

3           MR. EGGE:  It's a document that's been produced to

4    the parties --

5           THE COURT:  I understand.

6           MR. EGGE:  -- as part of an investigative file and

7    it's part of discovery in this case.

8    BY MR. EGGE:

9    **Q.**  And my question for you, Dr. Lee, is are you aware that

10   DOJ brought an investigation regarding capacity coordination

11   in the airline industries that was closed without any claims

12   brought against any party?

13   **A.**  Yes, I'm aware of that.

14          MR. EGGE:  No further questions, Your Honor.

15          THE COURT:  Any redirect, recross?

16          MR. DUFFY:  No, Your Honor.

17          THE COURT:  All right.  Thank you very much.

18   You're excused.

19          THE WITNESS:  Thank you, Your Honor.  Have a good

20   weekend.

21          THE COURT:  Who's next?

22          MR. WALL:  Your Honor, we call Jim Carter.  And

23   Maggie Sullivan will conduct the examination.

24          THE DEPUTY CLERK:  Mr. Carter, if you could please

25   raise your right hand.

| | |
|---|---|
| 1 | (Witness duly sworn.) |
| 2 | THE DEPUTY CLERK:  Thank you.  You may be seated. |
| 3 | THE COURT:  Go ahead, Ms. Sullivan. |
| 4 | **JIM CARTER** |
| 5 | having been duly sworn, testified as follows: |
| 6 | **DIRECT EXAMINATION BY COUNSEL FOR AMERICAN AIRLINES** |
| 7 | BY MS. SULLIVAN: |
| 8 | **Q.**  Good afternoon, Mr. Carter. |
| 9 | **A.**  Good afternoon. |
| 10 | **Q.**  Okay.  I'd like to start with your background.  How long |
| 11 | have you worked in the airline industry? |
| 12 | **A.**  Actually, this week is my 43rd year in the industry. |
| 13 | **Q.**  For how long -- |
| 14 | THE COURT:  Congratulations. |
| 15 | THE WITNESS:  Thank you. |
| 16 | BY MS. SULLIVAN: |
| 17 | **Q.**  For how long have you worked at American? |
| 18 | **A.**  Believe it or not, all 43 of those years with American |
| 19 | Airlines. |
| 20 | **Q.**  What is your current position at American? |
| 21 | **A.**  My current position is managing director of American's |
| 22 | eastern sales division. |
| 23 | **Q.**  And what are your responsibilities as the managing |
| 24 | director of American's eastern sales division? |
| 25 | **A.**  First, foremost, is the -- I have the privilege of |

1    leading and caring for a team of about 50 sales professionals

2    up and down the East Coast.

3            Our primary mission, however, is to create

4    compelling partnerships in two very important channels at

5    American.  One is the -- we call the "managed-corporate

6    channel" -- think about the big companies in Boston or

7    New York, for example -- and then the travel agency business

8    community as well are our responsibility.

9    **Q.**  Are you responsible for pricing?

10   **A.**  No.

11   **Q.**  Are you responsible for or involved in network planning?

12   **A.**  No.

13   **Q.**  And for how long have you been in this particular role?

14   **A.**  This role, for about 13 years, based in New York.

15   **Q.**  So let's talk about the managed corporate channel that

16   you just referred to.  What types of companies qualify as

17   corporate customers for American Airlines?

18   **A.**  So we actually have quite an array of companies of all

19   different shapes and sizes, from large corporates that we

20   have programs with, all the way down to small -- what we call

21   small/median business enterprises.  Small businesses, we have

22   programs.  So it's a range of corporations.  Basically, I

23   have a program for just about anyone who wants to partner

24   with American.

25   **Q.**  And when you partner with these companies, do you have

1    contracts with them?

2    **A.**   Yes.

3    **Q.**   For how long do the contracts typically last?

4    **A.**   Typically, the contracts are either two or three years.

5    **Q.**   And why do you have a contract with a company?  Why is

6    that important?

7    **A.**   The contract's important because it represents a

8    commitment from us to provide services and discounts and

9    benefits to the corporation's travelers.  And we're also

10   looking for commitments from those corporations in exchange

11   for that value.

12   **Q.**   So could you give us a little bit of a better

13   understanding of what is covered by one of these contracts?

14   **A.**   Our network.  Our entire network.  So depending on where

15   that company flies, the network that we fly is foundational,

16   and it's the reason why many companies will select us.  But

17   it's really the -- the contract is about the network and

18   bringing value to the -- to the customers and, as I said

19   earlier, some benefits for the travelers as well.

20   **Q.**   Are you the only airline that your corporate customers

21   typically contract with?

22   **A.**   No.

23   **Q.**   Can you explain how that works?

24   **A.**   So, typically, it really depends on the company we're

25   talking to, but most companies will think about their travel

1    like they do other expenses.  So think about if they're

2    sourcing their IT needs or their communication needs or

3    cleaning needs, they think of travel the same way.  The

4    companies that we're dealing with actually manage the travel

5    expense.  So they're thinking about, usually, how an

6    airline's network will fit for their overall needs.

7             And, typically, what's the case, in our channel,

8    not one airline usually can meet all those needs, or even if

9    one airline did, there's this notion that there should be a

10   secondary or a backup carrier in case that primary carrier is

11   not available.  And in some cases, companies even have two or

12   three carriers in a program, or as many as four or five

13   carriers in the program.  It just depends on the culture of

14   the company.

15   **Q.**  Are these rankings that you're referring to, the primary

16   or secondary position, are those set in stone?

17   **A.**  They're set from the outset of the contract, so you know

18   what you're bidding on, what position you're bidding on and

19   what position you've been awarded.  But what -- in the

20   reality of the real world, the change is a lot.  Networks

21   change.  Companies -- they open up new offices, they have new

22   geographies.  The companies are always changing as well.

23            So it's a pretty dynamic situation and we typically

24   will review contracts six months or nine months or twelve

25   months in just to make sure the network fits, our programs

1    are working.  But -- in the real world, it's pretty dynamic.

2    **Q.**  And you mentioned that one of the things that the

3    companies are getting in these contracts are discounts from

4    American; is that right?

5    **A.**  Discounts.  Discounts and services and benefits for the

6    travelers.

7    **Q.**  Can you explain a little bit more about how the discounts

8    work?

9    **A.**  So the discounts, typically -- first of all we're selling

10   our network, and the discounts will typically apply to

11   different regions that they're flying.  So think about

12   domestic flights to domestic flights as kind of an entity.

13   Think about domestic -- or somewhere in the domestic flying

14   and international, there may be a discount for the

15   international.

16          There could be discounts on our alliance, our joint

17   business partners, as well, if their spin is outside of our

18   network.  But it's all about discounts, recognition for the

19   travelers, and, frankly, loyalty and services for the

20   travelers, as well.

21   **Q.**  Do you have discounts on a route-by-route basis?

22   **A.**  Very rarely.  There's exceptions, but certainly what

23   we're thinking about is providing discounts to that

24   corporation, addressing the entity or the region as opposed

25   to market-specific discounts.

1  **Q.**  So how do opportunities for corporate contracts arise for
2  American?
3  **A.**  So they typically come in three different ways.  We have
4  contracts that are coming up where we have existing
5  relationships today, and they're coming up for renewal.  So
6  it gives us an opportunity to kind of refresh the terms, the
7  pricing.  Again, if something has changed in that
8  corporation, be able to address the new -- the business needs
9  of that company.  So those are renewals -- pretty common.

10        And then there's a more formal process, called
11  "RFPs."  So as I said earlier, think about companies who are
12  sourcing other lines of their business, either telecom or
13  healthcare, what have you.  RFPs are this opportunity for us
14  to actually see formally what the company is thinking about,
15  their strategic direction, what's important to them in terms
16  of their objectives.

17        And we actually will -- we'll actually prepare a
18  response to that RFP, tying in their objectives, so if it's
19  cost savings or traveler convenience or new offices that they
20  have.  So that's the second one, RFPs.

21        And then the third is, I mentioned earlier about
22  our relationships on the travel management side.  We often
23  get leads and opportunities in that space, simply because
24  customers are changing their travel agencies all the time.
25  So having good partnerships on the travel agency sides --

1    travel agency side enables, also, to find about new

2    businesses either moving to the area, or just change of hand,

3    if you will, companies moving to different agencies.

4    **Q.**   And when American pursues these opportunities, whether

5    it's responding to an RFP or through the renewal process,

6    what is its goal?

7    **A.**   The goal is to win the contract.  The goal is to show the

8    corporation how our network will most fit their needs in

9    terms of -- again, they're trying to optimize their savings.

10   So our goal is to win the contract first, and then figure out

11   how we can also include traveler benefit to go along with

12   that, as well.

13   **Q.**   Is there relationship between the network fit that you've

14   described and the savings that the company might receive?

15   **A.**   Absolutely.  Foundational to all of this is -- is the

16   network.  Because this network fit allows us to -- it's a

17   little bit of math, but think of it as we're overlaying our

18   network on where they fly.  So we -- we kind of get this

19   glimpse into how well does American and our alliance partners

20   actually fit to that corporation's needs?

21           So network fit is hugely important.  It actually

22   tells us a little bit about our strategy going into that

23   customer.  Like, are we -- do we have a chance at a primary

24   position?  Should we be -- should our strategy be about a

25   strong secondary position?  Or maybe we just don't have a

1    good network at all for that company, and maybe we should
2    just be on the shelf and in a tertiary kind of role.  So it
3    really does depends on, kind of, that network fit.  Again,
4    it's kind of foundational to this.
5    **Q.**  And how does a better network fit translate into better
6    savings for a company?
7    **A.**  Better network fit means that company is going to have
8    more savings across more markets.  A company is focused on,
9    "How do I optimize savings?"  The ones that manage travel,
10   they're focused on optimizing their savings.  So having this
11   broader network, they will be able to apply our discounts
12   across more city pairs, more markets, thus more savings for
13   them.
14   **Q.**  Can they commit, as well, to more travel with you in
15   exchange for better discounts?
16   **A.**  That's exactly what we do.  In exchange for discounts
17   and -- in exchange for discounts, we're getting commitments
18   in return from the corporations.
19   **Q.**  So let's turn to the NEA.  What has been your involvement
20   in implementing the NEA?
21   **A.**  So probably some of the most fascinating work I've been a
22   part of in my 40 years, but my role has been to actually
23   activate the NEA in these two channels.  And when I say
24   "activate," it's bringing the value that the NEA has with
25   choices, options, new markets, bringing that to this

1    corporate travel channel.  So it's out there with individuals

2    that are enjoying the NEA today, but bringing in the

3    corporate managed space into the travel agency space, our

4    programs.

5    **Q.**   And how have you done that?

6    **A.**   How have we done that?

7    **Q.**   Yeah.  Just at a very high level.

8    **A.**   At a very high level, we've actually gone out to our

9    customers and told them about the NEA.  And, actually, since

10   we're -- and most customers were kind of, like, mid contract

11   cycle.  We actually asked for a letter of consent saying,

12   "Are you okay with us adding the NEA -- our discounts today

13   to the NEA?"  Meaning, this all new value, all new markets,

14   taking your existing discounts today with a corporation, and

15   just placing them in the NEA markets.

16   **Q.**   Okay.  Let's take a look at DX55.  This is a document

17   that's already been admitted into evidence, and it's in your

18   binder and on the screen.  What is this document?

19   **A.**   So this document, back in November, was my opportunity

20   to -- to update our global sales organization on how we were

21   going to market and how we were presenting the NEA to

22   corporations.  So I was speaking to about 1,200 American

23   Airlines sales professionals on what the NEA is and how it

24   works.

25   **Q.**   Could you take a look at slide 11, please.  What does

1    this slide convey?

2    **A.**   So this -- this slide laid out kind of the -- our

3    go-to-market strategy with corporate accounts.  And we took

4    it in phases.  There's three phases on this slide, but there

5    was actually a fourth, and if I could, I'll even share with

6    you.

7            But the first one was just let's identify the top

8    250 corporations in Boston, that are headquartered in Boston

9    and New York, and let's go add the NEA to those companies

10   first.  They would value -- they're hearing about it.  Their

11   travelers are certainly experienced.  Let's go identify those

12   top 250 corporations and apply the discounts, our discounts,

13   onto the NEA.

14           The second one was a -- after we completed these

15   250 corporate accounts, the second phase was going out to

16   contracts coming up for renewal.  I mentioned renewals was

17   one of the ways that we -- that we go to market and obtain

18   contracts.  So the renewals -- as renewals were coming up, we

19   were plugging in the Northeast Alliance into their discounts,

20   as well.

21           And then the third phase was identifying customers

22   outside of Boston and New York who are big shuttle users that

23   we wanted to make sure we had the NEA, our -- being able to

24   put our discounts on the NEA in the shuttle markets as well.

25   **Q.**   And then you mentioned that --

1   **A.**   The fourth.

2   **Q.**   -- there was a fourth phase?

3   **A.**   And the fourth is we have a segment of corporate.  You

4   mentioned about size, earlier about size of corporations.  We

5   have a segment called "small/medium enterprise."  These are

6   smaller corporations -- they still manage travel -- where we

7   have a program with them.  And we added about 1,800 accounts

8   that were added in the -- in this fourth phase, giving them

9   the value of the NEA in their deals, as well.

10  **Q.**   When you have extended the American discount through

11  renewals, or the letter of consent that you referred to

12  earlier or just automatically to the smaller companies, have

13  you asked for anything in return?

14  **A.**   No, we haven't, actually.  This is -- was a really

15  thoughtful kind of thing.  We wanted to bring to market,

16  wanted to bring amazing value to our customers to have them

17  see the benefits of the NEA.  And, typically, in

18  negotiations, if you're providing something, you would want

19  something in return.  In this case, we just added the NEA to

20  their existing terms with no additional share commitments or

21  revenue commitments.

22  **Q.**   So let's shift gears a little bit and talk about a sales

23  pitch.  Can you take a look at DX57.  This has already been

24  admitted into evidence.

25              Mr. Carter, what is this document?

1    **A.**   So internally, at American, we would refer this as our

2    pitch deck.  This is a document that helps our account

3    managers walk a customer through what is the NEA, how does it

4    work, how do the discounts work, and it gives us the

5    opportunity to kind of walk that travel manager at that

6    corporation through exactly what the NEA is.

7    **Q.**  Let's take a look at the second page.  What are you

8    showing here?

9    **A.**   So the second page is really the three compelling pieces

10   of the NEA that we want our customers to fully appreciate and

11   understand, and also make sure our account managers are

12   positioning us properly as well.

13            But as I mentioned earlier, in this channel,

14   corporate, managed business, network is everything.  Network

15   is going to drive their savings.  And as American was

16   becoming a little -- a lot more relevant in certain -- in

17   Boston and New York, we wanted to tell our customers about

18   our new network and that they could now use our discounts on

19   the NEA.  So huge upside for our customers who partner with

20   us.

21            The second piece is about the travelers themselves.

22   We want to make sure that the corporate travel managers at

23   these companies understood this wasn't just about savings and

24   coverage.  There were really meaningful traveler benefits,

25   meaning they could earn their advantage miles on American

1    flying JetBlue, or on JetBlue, they could -- if they were

2    flying American, if they were a frequent flyer with JetBlue,

3    they could earn their frequent flyer miles.  And it was about

4    recognition and benefits for travelers.

5           And then I guess this third piece is maybe a little

6    redundant from what I just said, but it's all about the

7    expansion of giving better economics for customers who

8    partner with us.  Because at the end of the day, that is how

9    customers stay with American, is this -- that they're getting

10    value and that's what the network did.

11    **Q.**  Let turn to slide 8.  This slide is titled "delivering on

12    our promise:  Progress to date."  And it's broken into three

13    sections.  Do you see that?

14    **A.**  Yes.

15    **Q.**  Can you describe for us what the "to date" section is all

16    about?

17    **A.**  Sure.  So this -- we were doing these updates to our

18    customers frequently.  And this has been a journey with the

19    NEA.  I mean, we have it in phases.  And So this particular

20    update was just to -- "to date" means here what we've done so

21    far.  This is work that's already been accomplished.  100 new

22    codeshare flights, 57 new international destinations,

23    reciprocal mileage, as I just mentioned.

24           We built a connection facility at JFK, and then

25    bringing just all of our regional service that we had into

1    New York, making sure they were all dual class.

2            Now, if I could, I just want to add a little

3    context to this "to date."  In my 40 years in the business, I

4    have never seen any airline do 57 new domestic -- I've never

5    seen any airline ever scale this fast to provide connectivity

6    and benefits so quickly.

7    **Q.**  And, Mr. Carter, you referred to the 57 new routes, and I

8    think you said 57 new international routes.  Did you mean 57

9    new domestic --

10   **A.**  Sorry, 57 new domestic and about 19 international routes.

11   **Q.**  So then, in the section on the right, titled "coming

12   soon," can you describe for us what that is?

13   **A.**  Yeah, so we knew that -- again, this has kind of been a

14   journey, and it's in stages, so we also want to tell

15   corporate customers about things we were working on, because

16   to a corporate customer, they value seamless and

17   connectivity.

18           So we wanted to talk about, hey, if -- what we have

19   coming up this fall is the ability that, if you have status

20   with JetBlue and you're flying on American, we'll know that.

21   You'll get -- you'll have priority security.  You'll have

22   priority boarding.  You'll have priority baggage, meaning if

23   today you receive free bags because of your status, you would

24   get that on JetBlue and vice versa.

25           So we wanted to tell the -- our corporate customers

1     about what was coming.  And, of course, the big one here was

2     just moving JetBlue to terminal B at LaGuardia so we could

3     all be under one roof.  They could take advantage of our

4     clubs and our facility there.

5              And then of course, the last one was just a very

6     compelling proposition that all of our trans -- all of our

7     flights from New York and Boston to the West Coast would now

8     be all lie-flat.  So that was what we were telling them was

9     coming very soon in the fall.

10    **Q.**   And where do you stand on each of those items?

11    **A.**   Those have all been done.  Those have all been completed.

12    **Q.**   So at the bottom of this page, there's a section titled

13    "What This Means For Your Travelers."  What is that about?

14    **A.**   So, again, kind of focusing this conversation about more

15    than just economic benefits for the corporations, is a real

16    focus on the travelers.  So trying -- making sure we were

17    messaging that this -- this Northeast Alliance was about the

18    traveler, as well:  more flights, more destinations, more

19    ways to earn and burn on frequent flyer programs, better

20    connectivity, and then, as I mentioned, loyalty benefits that

21    you could accrue across each other's flights.

22    **Q.**   Have you made any proposals to corporate customers to try

23    to win business since the NEA has been in place?

24    **A.**   Absolutely.

25    **Q.**   Please turn to DX1086 in your binder.

```
 1              MS. SULLIVAN:  And, Your Honor, I believe that
 2      there was an objection to this document, but it has been
 3      withdrawn.  So I would move to admit -- move to admit this
 4      into evidence.
 5              MR. BERMANN:  That's correct.
 6              THE COURT:  All right.  Admitted.
 7              (Defendants Exhibit No. 1086 admitted into
 8              evidence.)
 9      BY MS. SULLIVAN:
10      Q.  Mr. Carter without reviewing the name of the customer,
11      what is this document?
12      A.  This is actually a proposal that we were making to this
13      company during a renewal of their contract where we were
14      going to add the NEA.
15      Q.  What type of company is this customer?
16      A.  This one, I believe, is a food-service organization.
17      Q.  Let's look at slide 5, please.  What is this slide
18      showing?
19      A.  So as I mentioned, when we -- when we're in a renewal or
20      a request for proposal, we will ask a company what their
21      objectives are going into this renewal.  Has something
22      changed about the company?  Is something different about your
23      markets, where you're planning to fly, et cetera?  So we'll
24      usually take an inventory of kind of what is happening at
25      that customer.
```

1          And these were items that this particular customer

2     told us going into the renewal that they valued.  And then

3     our response is on the right.  So they wanted a stronger

4     overall proposition with us.  We weren't serving enough of

5     their needs previously.

6          They wanted to make sure the contract was easy to

7     implement and had all the various sales and support services

8     that we had.

9          Contract coverage, they just wanted, again, more

10    coverage for more savings.

11         And then network fit, I kind of described a little

12    bit.  But they wanted us to show them, also, how does

13    American fit into their plans for the future in terms of

14    travel and also their existing footprint for travel.  And

15    those were our responses on the right to each one of those

16    areas that they told us they valued.

17    **Q.**   Now turn to slide 7, please.  Can you explain this page?

18    **A.**   So most times -- and in this case, as well -- we're

19    presenting to a CFO or a senior finance person on the value

20    of our proposals.  So this is simply an executive summary for

21    that reason to kind of -- it recaps the total proposal in

22    terms of dollars, in terms of savings that that company will

23    realize.

24         And this also breaks out the commitment.  We're

25    very clear what we're looking for in return for these

1   savings.

2   **Q.**  On the left-hand side, why is the total partnership value

3   broken down into those four categories?

4   **A.**  For this particular customer, these were their -- their

5   major entities for travel, domestic -- big domestic travel

6   network.  They had a lot of travel transatlantic and also was

7   asking for a little bit more flexibility with status and with

8   recognition.  And so we have those kind of lumped into an

9   annual flex fund amount that gives them flexible use of

10  dollars, if you will, for certain aspects of our partnership

11  and annual soft dollars, as well.

12  **Q.**  Now turn to slide 13.  So what does this slide show?

13  **A.**  So this is actually the discounts for this particular

14  customer.  And you mentioned earlier, are the discounts ever

15  the same?  And this is probably a good illustration that this

16  slide is basically one of the terms in the contract that

17  shows anywhere this customer is flying from in North America

18  to any other in North America, here's the actual discounts by

19  inventory and by cabin that they fly.

20  **Q.**  So this -- these discounts that you're offering here

21  apply to all of your network across the United States?

22  **A.**  This -- this applies to our entire network, yes.

23  **Q.**  At the bottom of this page, there's a sentence there that

24  says, "Proposed discounts applicable to AA prime and AA*/B6."

25  What does that mean?

**A.**   That means that the discounts that we are proposing in this page are also applicable to the NEA.

**Q.**   So American is applying its discount to all flights that it sells across its network, including in the NEA; is that right?

**A.**   Correct.

**Q.**   And is that regardless of whether an employee flies on an American plane or a JetBlue plane?

**A.**   Regardless.  If they're -- this proposal applies to our entire network domestically, because this is North America-North America, and then on JetBlue, as well.

**Q.**   Does American have any insight into JetBlue's discounts?

**A.**   No, we don't.

**Q.**   Are you jointly contracting with JetBlue?

**A.**   We are not jointing contracting.

**Q.**   Do you develop your sales strategy for any particular corporate customer together with JetBlue?

**A.**   We do not.

**Q.**   Have you observed, since the NEA was implemented, any changes in American's discounts strategy specifically on NEA routes?

**A.**   No, we have not changed any strategy with regard to the NEA.

**Q.**   From a corporate sales perspective, is American competing against JetBlue for corporate contracts today?

1    **A.**   In this managed corporate travel segment, we compete

2    against JetBlue, yes.

3    **Q.**   Even on NEA routes?

4    **A.**   Even on NEA routes, we compete.

5    **Q.**   Why do you say that?

6    **A.**   When we're going through a proposal or an RFP, as I said

7    in the beginning, we're going to win -- we're going to -- our

8    attempt is to win the contract.  And when a bigger piece of

9    their wall- -- their business, that's -- and our -- in many

10   cases, the companies we're talking to, their travel spend is

11   much broader than the NEA.  So we're bidding on the entire

12   network.

13   **Q.**   So it's been more than 18 months now since the NEA was

14   implemented.  How has it been working out with corporate

15   customers?

16   **A.**   I'd say overwhelming positive reviews from customers.

17   Admittedly, in the very beginning, we had a little bit of

18   pushback from a few corporations who were trying it for the

19   first time.  And when I say "trying it for the first time,"

20   they were trying our codeshare for the first time.  They were

21   booking American code on JetBlue.  And we found -- and I'll

22   call them kind of "technical integration issues" that we saw

23   with -- for example, a customer books codeshare on JetBlue,

24   goes to check in on their mobile device, and they couldn't

25   check in or they couldn't assign seats.

1          So we found very early in some of the early users

2     of the NEA that we had some technical issues that we had to

3     go work on.  So those -- that was the pushback we got, but

4     overall, it's been very positive.

5     **Q.**   And what did you do to resolve those technical issues?

6     **A.**   Those have all been corrected.

7     **Q.**   So when you say it's been overwhelmingly positive, what

8     do you mean by that?  What makes you think it's been

9     overwhelmingly positive?

10    **A.**   First, our customers appreciate that, particularly in

11    New York and Boston, that we now have a network that we can

12    compete against Delta.  In New York, we now have a network we

13    can complete against Delta and United.  So we have become a

14    lot more relevant, and our customers have noticed that.

15    We're seeing it in the -- in the number of renewals that

16    we're -- that we're processing and the number of customers

17    are making sure that the NEA is part of their renewal.

18          And we're seeing it in some early data as well that

19    the NEA is beginning to move market share as well for us.

20    **Q.**   You mentioned that American sent out a letter of consent

21    asking customers whether they wanted to add the NEA to their

22    contract.  How many of your customers accepted that?

23    **A.**   So that was the initial tranche of 250 customers that we

24    already had under contract.  80-some percent came back and

25    signed it right away.

1   **Q.**  And have you received any concrete feedback from
2   customers that you consider to be positive --
3   **A.**  Yes.
4   **Q.**  -- on that?
5   **A.**  Yes.
6   **Q.**  Have you been able to improve your position with any
7   customers?
8   **A.**  Yes.
9   **Q.**  Let's take a look a DX56?
10          THE COURT:  Improve your position, would that mean
11  to go from tertiary to secondary or from secondary to
12  primary?
13          THE WITNESS:  Yes.  Or even improving our secondary
14  position, so like secondary plus.  Like we were a good,
15  secondary carrier, but the NEA will enable us to move up a
16  little further to primary.  And in some cases, even
17  co-primary.
18          THE COURT:  I see.
19          MS. SULLIVAN:  Your Honor, my understanding is that
20  plaintiffs object to the admissibility of DX56 on 805
21  grounds, but we're not offering it for the truth of the
22  matter asserted.
23          THE COURT:  I'm sorry.  What was the exhibit number
24  again?
25          MS. SULLIVAN:  This is DX56.

```
 1              THE COURT:  And what's the --
 2              MR. BERMANN:  Yes, we do object to the admission of
 3    the exhibit.  It contains double and triple hearsay.
 4              THE COURT:  Are you offering it for the truth or
 5    just for --
 6              MS. SULLIVAN:  We're not.  We're just offering it
 7    as evidence of the feedback, that they received feedback.
 8              MR. BERMANN:  Your Honor, there's no substantive
 9    consent in the e-mail besides the impermissible hearsay.
10              THE COURT:  Well, I'll let you exam and see what it
11    is and see what the questions are.
12              MS. SULLIVAN:  Thank you, Your Honor.
13    BY MS. SULLIVAN:
14    Q.  So, Mr. Carter, do you have DX56?
15    A.  I have it.  Thank you.
16    Q.  And this is an e-mail exchange between you and others at
17    American from November 12, 2021; is that right?
18    A.  Yes.
19    Q.  Without revealing the name of the customer publicly, what
20    type of customer is this that you're e-mailing about?
21    A.  This is a large New York City-based media and advertising
22    company.
23    Q.  And what was American's position with this customer
24    before the NEA?
25    A.  Before the NEA, there were a couple different positions
```

1    here.  I can -- when I first came to New York 13 years ago,

2    we were in a primary position and enjoying a primary position

3    at this -- at this customer.

4              Right before the NEA, we were dropped to tertiary

5    and eventually went out of contract with this customer, as

6    the customer did not want to renew with us because they had

7    found that United and Delta provided the best fit for them

8    out of New York.  And so they -- this company really wanted

9    to mandate and enforce policy and compliance and just wanted

10   two carriers.  So we were actually out of this contract right

11   before the NEA.

12   **Q.**  At the time of this e-mail exchange, what was your

13   position with this customer?  Do you remember?

14   **A.**  I think at the time of this e-mail, we may have been in a

15   tertiary position.  We were still in a much lesser position,

16   but still had program in place.

17   **Q.**  So they had let you back in at least somewhat?

18   **A.**  Yes, we were back in as -- mainly as a result of the NEA.

19   It allowed us to share with this travel manager how much more

20   relevant we were now going to be for the city pairs that that

21   company was flying.

22   **Q.**  So now let's take a look at the e-mail at the bottom from

23   Frank Nuovo?

24   **A.**  So Frank is one of our account managers based in

25   New York.

1   **Q.**  At the top of the second page, he says he spoke with Tony

2   today.  Who is Tony?

3                THE COURT:  Your objection is preserved.  I want to

4   hear it all to figure it out; otherwise, I can't know.

5                Go ahead.

6                THE WITNESS:  Tony is the director of travel and

7   expense at this company.

8   BY MS. SULLIVAN:

9   **Q.**  And what is Frank reporting to you about his discussion

10  with Tony?

11  **A.**  Well, Frank has given us an update first on some really

12  good news about how Tony was feeling about the NEA and even

13  some really early share improvement, some share gains at that

14  company.  Again, we're in a tertiary position, we'd basically

15  been fired, and now we're talking about seeing an improved

16  position and improved share.

17  **Q.**  All right.  So let's look at the third line down on the

18  second page.  It starts, "Granted small revenue numbers, but

19  we've gained 4.1 points of revenue share and 8 points of

20  passenger share year over year.  Apparently our friends at

21  Delta have taken notice and made a point of this to Tony.  In

22  addition, as we've suspected, they're also downplaying our

23  latest announcement:  AA is abandoned the shuttle market,

24  giving all their routes to JetBlue.  Delta is ramping up and

25  will still have the largest network, all Delta operated

1    flights, et cetera."

2           What did you understand that to be about?

3           MR. BERMANN:  Objection, Your Honor.  The

4    witness -- counsel is just reading into the record text that

5    is hearsay from a third party that we're not permitted to

6    examine at trial.

7           And the defense counsel had an ample opportunity to

8    call Delta itself as a witness in this case.  They've moved

9    the Court to compel the testimony of a Delta witness, and

10    they keep -- have that opportunity.  Instead they're seeking

11    to read into the record double and triple hearsay.

12           THE COURT:  So I am not taking this for this is

13    what Delta was saying.  I'm taking this for -- and I'm taking

14    this for this -- I take it to be an internal discussion among

15    some people at American Airlines as to what they're thinking

16    about what they think they're hearing and whether -- it's for

17    their understanding, what they're believing and thinking

18    about what their state of mind is.

19           It's not particular evidence about what -- I'm not

20    taking it for what Delta is saying.  And they're talking

21    about this is what they think.  This is their spin or

22    understanding, depending on how you look at it.

23           But I'm not -- so on that, with that caveat, and

24    I'm not taking it for the truth of the matter asserted, but

25    on that -- for that and that limited way, I'm overruling the

1    objection.  I'm not sure if you're offering it for more than

2    that.

3          MS. SULLIVAN:  I'm not, Your Honor.

4          THE COURT:  All right.  Then, to that extent, it's

5    admitted, but only to that extent.

6          Go ahead.

7          (Defendants' Exhibit No. 56 admitted into

8          evidence.)

9    BY MS. SULLIVAN:

10   **Q.**   So, Mr. Carter, what was your understanding of what

11   portion of the e-mail that I just read?

12   **A.**   That, for the first time, Delta was concerned about a

13   competitive threat at one of their customers in New York.

14   **Q.**   Now, let's look at the next paragraph.  It reads, "What

15   struck me in our conversation, however, was that Tony sensed

16   for the first time in a very long time that Delta was

17   genuinely concerned about us in New York and at" -- this

18   customer.

19         Did you understand anything different about that

20   sentence, or is that basically what you just referred to?

21   **A.**   Yeah, that's basically what I referred to.  Yes.

22   **Q.**   And now the next sentence:  "He may leverage that with

23   them moving forward, but I get the feeling the relationship

24   has changed, and we have a real shot at primary."

25         What was Frank saying there?

1    **A.**   He is saying that the markets -- the tables have changed,

2    that we now have a legitimate chance to getting back to a

3    primary position with this customer.  And he felt really

4    strongly that the NEA particularly had changed the

5    complexion, had changed the landscape at this particular

6    customer.

7            Again, when we talk about network fit, this is what

8    matters most for a customer.  How can you serve my needs?

9    And that's what, I think, Frank was really kind of honing in

10   on, is that we had a chance to engage again with this

11   customer.

12   **Q.**   And then if you look down at the final paragraph, Frank

13   wrote, "Tony has been a big endorser of the NEA from the

14   start.  He understands the benefits to his travelers, the

15   increased flight option/network, and welcomes the

16   competition.  Maybe just blowing smoke, but he's acknowledged

17   that the playing field has drastically changed in the

18   New York market and he's very happy to do it."

19           What do you understand Tony -- or Frank was

20   conveying that?

21   **A.**   That Tony is liking what he's seeing in the marketplace.

22   He's seeing that there's more competition, and he likes what

23   he's seeing from American in this proposal.

24   **Q.**   You said a few minutes ago that, just prior to this

25   e-mail, that American was in a tertiary position with this

1    customer; is that right?

2    **A.**   That's correct.

3    **Q.**   What happened after this e-mail?

4    **A.**   We -- of course, during the pandemic, most of these

5    companies have been in various stages of recovery.  So we --

6    this customer is also recovering.  It's still kind of early

7    in their recovery, but they -- we have seen good signs here.

8    What -- we're anxiously awaiting this RFP where we have a

9    new, fresh kind of opportunity to put our best foot forward

10   and win this business for American and our partners.

11   **Q.**   And has your position changed?

12   **A.**   Not yet.  Well, we're in a -- we're in this co-primary

13   position right now, which is much improved from where we

14   were, but we're hoping to be in a sole primary position when

15   this RFP gets issued.

16            MS. SULLIVAN:  Thank you, Mr. Carter.

17            I have no more questions.

18            THE COURT:  All right.  Cross-examination.

19            **CROSS-EXAMINATION BY COUNSEL FOR THE PLAINTIFFS**

20   BY MR. BERMANN:

21   **Q.**   Good afternoon, Mr. Carter.

22   **A.**   Good afternoon.

23            THE COURT:  I think you just need to say your name

24   for the record, for the court reporter and for me.

25            MR. BERMANN:  My name is Grant Bermann --

1          THE COURT:  Thank you.

2          MR. BERMANN:  -- from the US Department of Justice,

3     on behalf of plaintiffs.

4          MS. SULLIVAN:  Mr. Bermann, I'm sorry to interrupt,

5     but may I have a binder?

6          MR. BERMANN:  Sure.  My colleagues are handing them

7     out.

8     BY MR. BERMANN:

9     Q.  Mr. Carter, you have your binder in front of you?

10    A.  Yes, sir.

11    Q.  In your direct testimony, you provided testimony about

12    how the NEA affects American's ability to compete against

13    Delta, correct?

14    A.  Delta and United.

15    Q.  But as of 2020, before the NEA, JetBlue, not Delta and

16    not United, was the dominant airline in Boston, correct?

17    A.  Can you repeat that?  I just want to make sure I get my

18    years right here.

19    Q.  As of 2020 -- that's the year the NEA was signed --

20    JetBlue, not American or Delta, was the dominant airline in

21    Boston, correct?

22    A.  I don't remember in 2020 what their position was versus

23    Delta.  I know they were both growing, and Delta had

24    announced a hub in Boston, but I'm not sure who was in the

25    dominant position at that point.

1   **Q.**  Let's pull up PX88.  It's in your binder.

2        MR. BERMANN:  Your Honor, defendants have an

3   outstanding hearsay objection to this exhibit.  I move to

4   admit the exhibit, but not for the truth of the matter

5   asserted, not for the truth of the third-party statements

6   contained in the exhibit.

7        THE COURT:  Any objection, Ms. Sullivan, with that?

8        MS. SULLIVAN:  Your Honor, I don't have an

9   objection based on that representation, but I would note that

10  this line of questioning is beyond the scope of the direct

11  examination.  I limited my examination to the implementation

12  of the NEA and the reaction from corporate customers and, of

13  course, corporate sales generally.

14        I did not ask Mr. Carter about the competitive

15  landscape in Boston or New York or anywhere else prior to the

16  implementation of the NEA.

17        MR. BERMANN:  Your Honor --

18        THE COURT:  I'll admit the exhibit, then -- it's

19  not objected to -- with that caveat.

20        (Plaintiffs' Exhibit No. 88 admitted into

21        evidence.)

22        THE COURT:  And at the moment, I'm not going to

23  preclude -- it's hard to know where the cross is going to go.

24  So this question alone is not so significantly beyond the

25  scope, but it may be at some point, depending on where it all

```
 1   goes.
 2              MS. SULLIVAN:  Thank you, Your Honor.
 3              THE COURT:  Go ahead.
 4   BY MR. BERMANN:
 5   Q.  Let's turn to PX88.  You have that in front of you?
 6   A.  Yes.
 7   Q.  We'll also publish it on the screen.  There are no
 8   redactions.  This is an e-mail chain from February and
 9   March 2020, correct?
10   A.  Yes.
11   Q.  And at the bottom of the e-mail chain, there's an e-mail
12   from an employee at British Airways.  You see that?
13   A.  Yes.
14   Q.  And a British Airways employee asks what the AJB is doing
15   to win back Boston-based corporate customers from JetBlue and
16   Delta.  Do you see that?
17   A.  Yes.
18   Q.  And this British Airways employee says that American
19   Airlines has lost customers to JetBlue for almost 20 years,
20   correct?
21   A.  That's what he's saying, yes.
22   Q.  Then this e-mail is forwarded to you, correct?
23   A.  Correct.
24   Q.  I'm looking at your response, which is at the top of the
25   chain on the first page of the exhibit.  Let's look at the
```

1    bolded section that you -- that you wrote that reads "overall

2    landscape."

3              As of March 2020, JetBlue was the dominant player

4    in Boston, correct?

5    **A.**   Correct.

6    **Q.**   And you understand the NEA was signed in July 2020,

7    correct?

8    **A.**   July 2020?  I am not exactly sure when it was signed.

9    **Q.**   But you agree that JetBlue was already the dominant

10   player in Boston before the NEA was signed, correct?

11   **A.**   Yes.  Looking at this, I have JetBlue as the dominant

12   player in Boston at that time.

13   **Q.**  Let's move --

14   **A.**   I also mentioned Delta was experiencing tremendous growth

15   and making Delta a focus hub.

16   **Q.**   And Delta was growing without a domestic JV with a

17   competitor, correct?

18   **A.**   Without a JB?

19   **Q.**   Without a JV with a domestic competitor in Boston,

20   correct?

21   **A.**   Without a domestic JB?

22   **Q.**   Yes.  Delta was growing --

23              THE COURT:  JV, he's saying, not -- I think he's

24   saying JV.

25              THE WITNESS:  JV?

```
1    BY MR. BERMANN:

2    Q.   I can rephrase the question if that's helpful.

3    A.   It would be, just to make sure I have it.

4    Q.   Sure.  You said Delta was growing just now, and my

5    question is Delta was growing in Boston without having a JV

6    with a domestic competitor, correct?

7    A.   They were growing with their international JV competitor,

8    though, yes.

9    Q.   And American as an international JV?

10   A.   Correct.

11   Q.   It's called the AJB?

12   A.   Correct.

13   Q.   And it's had that since you wrote this e-mail?

14   A.   Yes.

15   Q.   Let's move down to the Boston section of your e-mail.  Do

16   you see where "Boston" is written in bold?

17   A.   Yes.

18   Q.   You were explaining in March 2020 that JetBlue was

19   ramping up frequencies in Boston-DCA and Boston-LaGuardia to

20   match American Airlines, correct?

21   A.   Yes, ramping up frequency in Boston-DCA and

22   Boston-LaGuardia.

23   Q.   And Boston-DCA and Boston-LaGuardia are two routes where

24   American and JetBlue competed against each other at the time

25   to provide nonstop service, correct?
```

1  **A.**  Yes, along with Delta.

2  **Q.**  And in those markets, American was competing against

3  JetBlue's, quote, "extremely aggressive pricing."  Correct?

4  **A.**  Yes.  That's what I have in my notes exactly, in this

5  e-mail.

6  **Q.**  That's what you wrote --

7  **A.**  That's what I wrote.

8  **Q.**  -- in the ordinary course of business --

9  **A.**  Yes.

10  **Q.**  -- before the NEA.  But now, under the NEA, American and

11  JetBlue are coordinating capacity and sharing revenue in the

12  Boston to DCA market, correct?

13  **A.**  Correct.

14  **Q.**  And now American has exited the Boston to LaGuardia --

15          THE COURT:  So just one -- I'm not -- Ms. Sullivan

16  hasn't pressed the objection further, so I haven't done

17  anything, except --

18          MS. SULLIVAN:  I was planning on it, though.

19          THE COURT:  I mean, one, some of these things, I've

20  heard before, so it's not -- like, with that, I don't mean

21  any disrespect to Mr. Carter, but I've heard a lot about how

22  many flights are in and out of Boston and whether JetBlue is

23  dominant or second to Delta and that the competition on the

24  routes, and which routes have been withdrawn.  So I don't

25  think this is -- what you're asking about now from this

1    e-mail is not, certainly not for me, a news flash.  And it is

2    beyond the scope, I think, at this point of the direct.

3            And -- and I think to the extent you want evidence

4    of his statements, which are -- without having heard yet from

5    the defendants, strike my as probably statements of a party

6    opponent that are admissible for the truth of the matter

7    asserted -- one -- what he wrote -- one, two, three, four,

8    five, six -- you can -- it's already in evidence, but you can

9    put documents like that in evidence and point them out to me

10   and if you want to have more building blocks to further

11   strengthen points that you've made in testimony.

12           So you can keep going.

13           MR. BERMANN:  That's okay.  I can move on to a

14   different topic.

15           THE COURT:  Go ahead.

16   BY MR. BERMANN:

17   **Q.**  Mr. Carter, you talked about status, priority, and

18   loyalty in your direct testimony, correct?

19   **A.**  Yeah, I talked about some of the traveler benefits as

20   well.  Yes.

21   **Q.**  But the vast majority of people who use passenger air

22   travel in the United States are mostly concerned with getting

23   from A to B at the cheapest price, correct?

24   **A.**  I think it depends on who you're talking to.

25   **Q.**  My question --

1   **A.**   That they value that, or they value something else.

2   **Q.**   I'm not asking whether anyone --

3   **A.**   I thought that's how you phrased it, though.

4   **Q.**   Sure.  The vast majority of people who use passenger air

5   travel in the United States are mostly concerned with getting

6   from A to B at the cheapest price.

7           MS. SULLIVAN:  Asked and answered, Your Honor.

8           THE COURT:  I'm going to sustain because I don't

9   think he can answer this question.

10           MS. SULLIVAN:  And lacks foundation.

11           THE COURT:  Because I don't think he knows -- maybe

12   asked and answered, too.  I'm not sure.  But as to -- I don't

13   know -- he's been in the industry 43 years, but last 13, he's

14   sold to corporate travel markets.  I have no idea -- I'm not

15   sure there's been evidence about it and I don't know

16   independently whether those constitute the vast majority of

17   passengers or not.

18           MR. BERMANN:  Sure.  I can bring up an example to

19   help, if that's helpful.

20           I'd like to bring up DX9, which is a defense

21   exhibit.  And it's in the manila folder that my colleagues

22   handed to you and I think may be in the binder itself.

23           THE WITNESS:  PX9?

24           MR. BERMANN:  DX9.

25           THE WITNESS:  DX.

1          MS. BALDWIN:  I believe it's in the front sleeve.

2     It's a slide deck.

3          THE COURT:  I have that as DX -- oh, DX9, yes.

4     It's the inside -- yeah.  There you go.  That's it.

5          MS. BALDWIN:  That's it, Mr. Carter.

6     BY MR. BERMANN:

7     Q.   And this -- you have it in front of you?

8     A.   I do.  Thank you.

9     Q.   This is a presentation from the global sales team at

10    American Airlines, correct?

11    A.   This was a presentation from one of my team members -- or

12    two of my team members to our LaGuardia-based flight

13    attendants.

14    Q.   I'd like you to turn to slide 20 -- sorry -- slide 19 of

15    the exhibit.  And you'll notice there are two copies of the

16    presentation in the exhibit.  I'd like you to focus on the

17    version that's in the back half.

18    A.   On slide 19?

19    Q.   Slide 19.

20    A.   Okay.

21         THE COURT:  I'm sorry; can you say -- when you say

22    the version on the back half, I'm just confused.

23         MR. BERMANN:  So there's one --

24         THE COURT:  I see.  They're printed in the back,

25    yes.

```
 1              MR. BERMANN:  So there's one version without
 2    speaker notes and one version with.
 3              THE WITNESS:  Do you want me to look at the one
 4    with notes?  Is that what --
 5              MR. BERMANN:  Yes, the ones with notes on slide 19.
 6              THE COURT:  So the speaker notes, are they the
 7    following two pages.
 8              MR. BERMANN:  That's correct.
 9              THE COURT:  Got it.
10    BY MR. BERMANN:
11    Q.  So slide 19.  This is the presentation --
12              THE COURT:  Who knew you could have speaker notes
13    for PowerPoints.  When I've ever done that, I never had any.
14    I didn't have any speaker notes in the PowerPoints.  This is,
15    like, a great little lesson.
16              Go ahead.
17    BY MR. BERMANN:
18    Q.  So you testified this is an American Airlines
19    presentation to flight attendants, correct?
20    A.  Yes.
21    Q.  And the presentation that American Airlines made to
22    flight attendants shows that 85 percent of the American
23    Airlines' customers are what you call infrequent customers,
24    correct?
25              MS. SULLIVAN:  Your Honor, objection.  Lacks
```

1    foundation.

2    BY MR. BERMANN:

3    **Q.**  Mr. Carter, you work at the -- on the global sales team,

4    correct?

5    **A.**  Yes, I do.

6    **Q.**  And how long have you worked in corporate sales for

7    American Airlines?

8              THE COURT:  I'm going to overrule the foundation,

9    because these people -- the two people that did this work

10   report to you?

11             THE WITNESS:  Yes, they do.

12             THE COURT:  All right.  So overruled.

13   BY MR. BERMANN:

14   **Q.**  Mr. Carter, you see that 85 percent of American Airlines'

15   customers are what you call infrequent customers?

16   **A.**  I -- I see the reference, yes, on the slide.  Yes.

17   **Q.**  And those, quote/unquote, infrequent customers represent

18   the majority of American Airlines' revenue, correct?  That's

19   what this slide shows?

20   **A.**  Yeah, but I -- I've not seen this before and I'm not sure

21   if that's actually correct.

22   **Q.**  Let's look at the speaker notes for this presentation.

23   There's a bullet point that begins "Infrequent."  Do you see

24   that?

25   **A.**  "Infrequent customers"?

1  **Q.**  Yes.  And it says, "Infrequent customers with their one

2  flight a year are mostly concerned with getting from A to B

3  at the cheapest price," correct?

4  **A.**  That's what the note says, yes.

5  **Q.**  Now, you testified about how the NEA affects American's

6  ability to compete for corporate customers in Boston and

7  New York, correct?

8  **A.**  Yes.

9  **Q.**  I'd like to turn to PX90.  This exhibit has already been

10  admitted and defendants have made redactions, so we'll

11  publish the redacted version.

12       MS. SULLIVAN:  Your Honor, again, objection based

13  on the fact that this is beyond the scope of the direct.

14  We're back in 2019 again.

15       MR. BERMANN:  Your Honor, one of the key questions

16  in this case is whether the benefits that the witness is

17  describing, in fact, result from the NEA or whether they

18  could have been achieved without it.  I'm asking the witness

19  questions about what he's described in his direct testimony,

20  whether that could have been achieved and was, in fact,

21  planned before the NEA.

22       MS. SULLIVAN:  He --

23       THE COURT:  How could he --

24       Are you withdrawing the objection?

25       MS. SULLIVAN:  No.

1          THE COURT:  Okay.  How could he testify about

2     whether it could have been achieved?

3          MR. BERMANN:  I'm going to ask him about what the

4     plans were in the corporate sales group before the NEA.

5          THE COURT:  Overruled for now.

6     BY MR. BERMANN:

7     **Q.**  You have PX90 in front of you?

8     **A.**  Yes.

9     **Q.**  This is an e-mail you received from Ms. Reichard on

10    September 24th, 2019, correct?

11    **A.**  Correct.

12    **Q.**  And she was in the sales department at the time, correct?

13    **A.**  Correct.

14    **Q.**  And she sent you a Boston strategy presentation, correct?

15    **A.**  Yes, a draft, I believe, at the time.

16    **Q.**  And this strategy presentation is from before the NEA was

17    signed, correct?

18    **A.**  This is 2019, so yes.

19    **Q.**  I'd like you to focus on slide 4 of the presentation,

20    which has a Bates number ending in 916.  Now, you've

21    testified that Delta has been growing in Boston, correct?

22    **A.**  Correct.

23    **Q.**  And you testified that Delta has grown in Boston without

24    entering into a JV with a domestic competitor, correct?

25          THE COURT:  I'm not sure if he testified to that.

1   I might have overruled it.  But I think at this point I know

2   that there's no evidence that Delta has engaged in a joint

3   venture with anybody in this period of time in Boston other

4   than international airlines.

5   BY MR. BERMANN:

6   **Q.**  And you know that Delta achieved growth since 2018,

7   despite the fact it was roughly the same size as American in

8   Boston as of 2018, correct?

9   **A.**  Is -- I'm sorry, is that a question?  I'm --

10  **Q.**  Yes.

11  **A.**  That we're the same size in 2018?

12  **Q.**  This slide shows that American Airlines and Delta were

13  roughly the same size in 2018, correct?

14  **A.**  Yes.  But, again, this was a draft, so I'm not exactly

15  sure if all the data points are 100 percent, but that's what

16  this slide says, yes.

17  **Q.**  I'd like you to turn to the next slide.  This slide

18  describes an American Airlines strategy in Boston for 2020,

19  correct?

20  **A.**  It describes ideas.

21  **Q.**  The --

22  **A.**  Potential.

23  **Q.**  -- slide is called "Boston Strategy 2020," correct?

24  **A.**  That's correct.  But it's not a strategy yet.

25  **Q.**  But the title of the slide says "strategy," correct?

1   **A.**   It says it's a strategy, but it is not a -- these are

2   ideas for the marketplace.

3   **Q.**   And this presentation describes multiple initiatives for

4   Boston in 2020, correct?

5   **A.**   This has multiple ideas for Boston.

6   **Q.**   And one of the ideas for Boston in 2020 was increased

7   advertising, correct?

8   **A.**   That was -- that is on the slide, correct.

9   **Q.**   And another initiative was giving travelers soft dollars,

10  correct?

11  **A.**   That's on the slide as well.

12  **Q.**   And that's one of the benefits you talked about when you

13  were describing the NEA, correct?

14  **A.**   It was one of the benefits in the proposals that we do

15  for corporate-managed travel, yes.

16  **Q.**   And an example of a soft dollar is a parking allotment,

17  correct?

18  **A.**   Again, these are just ideas from the authors of this

19  document.

20  **Q.**   Is that a yes?  Parking --

21  **A.**   It's not a yes.  No.  That's an idea, it's a concept.

22  **Q.**   My question was an example of a soft dollar is a parking

23  allotment, correct?

24  **A.**   We've never done a parking allotment.

25  **Q.**   My question is an example of a soft dollar is a parking

1    allotment, correct?

2           MS. SULLIVAN:  Asked and answered, Your Honor.

3           THE COURT:  Sustained.

4    BY MR. BERMANN:

5    **Q.**  Another example of a soft dollar is a status upgrade.

6    Correct?

7           THE COURT:  What is a "soft dollar"?

8           THE WITNESS:  Soft dollars is -- as you might

9    imagine, we account for everything financially.  So there are

10    benefits for discount savings that customers see right off

11    the ticket price, and then there are other value-add services

12    that we provide that we -- we put a number to it.

13           THE COURT:  Could be a free drink on a plane?

14           THE WITNESS:  It could be Wi-Fi.  It could be -- it

15    could be status.  It could be an upgrade.  It could be things

16    that aren't coming necessarily off the price of the ticket

17    that customers value.

18           THE COURT:  That you give to them and you value.

19           THE WITNESS:  We give to them and we value, and

20    it's part of a corporate --

21           THE COURT:  Internally attribute a value?

22           THE WITNESS:  It's part of a corporate proposition

23    in exchange for revenue and share commitments in return.

24           THE COURT:  You had a pending question when I

25    interrupted, Mr. Bermann.  You can press that question, if

1    you wish.

2              MR. BERMANN:  Sure.

3    BY MR. BERMANN:

4    **Q.**  This presentation also describes promoting American's

5    international partnerships, correct?

6    **A.**  Yes.  Again, another idea to help promote Boston, yes.

7    **Q.**  And another idea that was identified as a strategy in

8    this presentation is highly competitive pricing, correct?

9    **A.**  That is on the slide as well, yes.

10   **Q.**  And in many cases, that meant being the low cost carrier

11   against JetBlue and Delta, right?

12   **A.**  Again, these are authors who are just midlevel sales

13   managers trying to come up with ideas to inspire a reaction

14   from our community in Boston.  They're ideas.

15   **Q.**  And you identified status upgrades and pricing as reasons

16   to do the NEA, correct?

17   **A.**  Again, in my testimony, I laid those out as part of a

18   proposal in corporate-managed travel.

19   **Q.**  This presentation was prepared by one of your employees,

20   Ricki Reichard, correct?

21   **A.**  She and Paul Swartz put this together.

22   **Q.**  And I'd like to move on to another document, PX45.  This

23   document has already been admitted.  There are no redactions.

24              You talked about your -- the importance of the

25   network in your direct testimony, correct?

1    **A.**   Yes.

2    **Q.**   This is an e-mail chain between you and Mr. Swartz from

3    November 2019, correct?

4            MS. SULLIVAN:  Objection, Your Honor.  Beyond the

5    scope of the direct exam.

6            THE COURT:  Overruled for now until I see what

7    it is.

8            Go ahead.

9    BY MR. BERMANN:

10   **Q.**   In this e-mail, Mr. Swartz reports on new routes that

11   American Airlines was considering launching before the NEA,

12   correct?

13   **A.**   That's correct, new routes before the NEA.

14   **Q.**   This is growth that American Airlines was considering

15   before the NEA, right?

16   **A.**   Yes.  These are three or four markets we are thinking

17   about.

18   **Q.**   In this e-mail, Mr. Swartz reports that American

19   Airlines' network planning group was strongly considering

20   flying Austin-Boston two times a day, correct?

21           MS. SULLIVAN:  Your Honor, I'm going to renew my

22   objection as beyond the scope of the direct.  I would also

23   point out that Mr. Swartz was here and was called by the

24   plaintiffs as an adverse witness, and they could have asked

25   him all of these question.  In fact, I think they did.

1          MR. BERMANN:  That is not accurate that we asked

2     these questions.  And the witness has testified in his direct

3     testimony about how the NEA enables American's network to

4     grow.  I'm asking about that same subject, network growth and

5     whether it's, in fact, made possible by the NEA or could have

6     been achieved without it.

7          THE COURT:  May I ask who -- this may be a larger

8     issue.  Suppose I sustain your objection, Ms. Sullivan.

9     Then -- and suppose they want to ask these questions, and

10    they view it as part of their rebuttal to your -- like, to

11    prove that there was a reasonable alternative.  Could they do

12    that?  Could they recall him then?

13         MS. SULLIVAN:  Yes, Your Honor.

14         THE COURT:  So these witnesses aren't, like -- the

15    witnesses -- if I remember right, there's an agreement with

16    respect to the -- in their case, American and JetBlue

17    witnesses primarily, for example -- that they weren't going

18    to get recalled, that -- that you could go beyond the scope

19    to do whatever you wanted with them, right?  That's how I was

20    thinking about it.  I think that's why there were no

21    beyond-the-scope objections.

22         MS. SULLIVAN:  Well, that's -- that's true with

23    respect to the witnesses who were called adverse by the

24    plaintiffs.  We did have that agreement.  We do not have that

25    agreement with respect to the rebuttal case.

1          THE COURT:  I see.  Okay.  Why shouldn't I, then,

2     sustain the objection?  Because, really, what this is about

3     is not growth, but this is about an alternative method of

4     getting there.  This is about whether they could do it

5     anyway, whether these are reasonable alternatives, right?

6          MR. BERMANN:  It's also about whether this is, in

7     fact, growth attributable to the NEA or whether it was

8     already planned.  In fact, it's not actually growth, whether

9     it's actually growth.

10          MS. SULLIVAN:  Your Honor, this is not the witness

11     to address that topic in, in any event.  What he testified

12     about on direct was his sales pitch and his understanding of

13     how it has improved the proposition for his corporate

14     customers.

15          He did not testify about plans before or plans

16     after or the incremental growth or the specific benefits and

17     how quantifiable they are and -- et cetera.  His testimony

18     was limited to how he is interacting with corporate customers

19     in light of the NEA.

20          THE COURT:  I'm going to sustain the objection in

21     part.  I think you can -- to the extent it's just that there

22     were plans for reasonable alternatives here, I have the

23     document in evidence, in any event, and if you want to call

24     him in rebuttal, you can.

25          To the extent you want to ask him about how this

1    plan -- if this was a plan or whatever it was -- gave them an

2    opportunity to, like -- an equivalent pitch to the NEA to

3    sort of impeach, if you will, the testimony about how the NEA

4    lets them pitch to corporate customers, that that's a

5    narrower -- that seems fair on cross-examination.

6              But in terms of more generally what they --

7    reasonable alternatives they were planning, whatever, at

8    least out of this, seems beyond the scope.  So to that

9    extent, sustained.

10             MR. BERMANN:  Sure.

11             THE COURT:  If you can even all follow that line.

12   I'm not sure it's that clear, but --

13             MR. BERMANN:  Sure.

14   BY MR. BERMANN:

15   Q.  In this e-mail, Mr. Swartz reports that network planning

16   was looking at making Boston a strategic spoke, right?

17   A.  That's -- yes, that's Paul Swartz's interpretation, yes.

18   Q.  And he said this was going to happen very fast, right?

19   A.  That's what he says.

20   Q.  And you were extremely excited about that before the NEA,

21   correct?

22   A.  As an airline guy works, we're pretty easily excited

23   about growth just in general.  That's what we do.  We -- we

24   love growth.  Our teams love it.  It's good for the pilot

25   base, the flight attendants.  We thrive on it.  So any --

1    even if it's only 11 flights more out of Boston, we love it.

2    **Q.**  And you were excited about Boston becoming a strategic

3    spoke for American Airlines, correct?

4    **A.**  Again, you're -- this is Paul Swartz's interpretation.

5    This is not an actual -- what we actually did with Boston.

6    **Q.**  And you were excited about this because you wanted to

7    pitch this growth to customers, right?

8    **A.**  When we're talking to customers, we're talking about

9    network.

10   **Q.**  Is that a yes?

11   **A.**  That we were going to pitch this to customers?

12   **Q.**  You were excited to pitch these pre-NEA growth plans to

13   customers, correct?

14   **A.**  Once they're finalized, once they're implemented, once

15   we've agreed to the flying, it will be part of the

16   proposition that we would pitch to corporate customers.

17          THE COURT:  I think he were just asking if you were

18   excited about -- not whether you were pitching it at that

19   moment, because you weren't going -- I assume you don't pitch

20   things that aren't yet available.

21          THE WITNESS:  That's correct.

22          THE COURT:  But he's just asking, at the -- were

23   you excited at the prospect of being able to pitch that

24   additional -- those additional routes described there?

25          THE WITNESS:  Absolutely.  But just kind of a full

1  disclosure on that, it's -- it's not a lot.  And it's

2  probably not going to change the competitive landscape,

3  adding 10 or 11 additional flights, when our competition is

4  making Boston into a hub or has 178 flights a day, and we're

5  still sitting around 100, whatever that number might be.

6          So I just want to keep it in perspective.  Yes,

7  we're excited about it.  It's a good thing for the base in

8  Boston.  It's good for our employees.  It's good for our

9  customers.  But it's not the answer.

10          MR. BERMANN:  I pass the witness.

11          THE COURT:  Any redirect?

12          MS. SULLIVAN:  No.  Thank you, Your Honor.

13          THE COURT:  All right.  Mr. Carter, you're excused.

14  Thank you very much.  Have a good weekend.

15          Next?

16          MR. WALL:  Your Honor, at this point, I call Chad

17  Schweinzger, and we'll try to see if we get his name right

18  when he signs in.

19          THE DEPUTY CLERK:  And, sir, if you could raise

20  your right hand.

21          (Witness duly sworn.)

22          THE DEPUTY CLERK:  And can you please state your

23  name and spell your last name for the record.

24          THE COURT:  You can sit down.

25          THE WITNESS:  Chad Schweinzger, C-h-a-d

1    S-c-h-w-e-i-n-z-g-e-r.

2                THE COURT:  Go ahead, Mr. Wall.

3                MR. WALL:  Thank you, Your Honor.

4                       **CHAD SCHWEINZGER**

5           having been duly sworn, testified as follows:

6           **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

7    BY MR. WALL:

8    **Q.**  Good afternoon, Mr. Schweinzger.  We've been working

9    together for about two years now.  I'm still going to butcher

10   your --

11   **A.**  That's okay.

12   **Q.**  I apologize.

13               Mr. Schweinzger, how many years of experience do

14   you have in the airline industry?

15   **A.**  Roughly eight years.

16   **Q.**  And -- and why did you get into the airline industry?

17   **A.**  I grew up wanting to be a pilot.  I did my undergrad in

18   professional flight and sort of wanted to be in aviation

19   since then.

20   **Q.**  What -- you have two different stints of time at

21   airlines, right?

22   **A.**  That's correct.

23   **Q.**  Okay.  Why don't we just give the little thumbnail sketch

24   of the various positions that you had at American Airlines.

25   **A.**  Sure.  So I first started at American Airlines after

1    leaving Purdue with my master's degree in aviation aerospace

2    science in yield management on the domestic side.

3            I then went to domestic pricing and then over to

4    international yield management and pricing on the

5    transatlantic team for a couple of years.  And then right

6    around the merger, I went back to domestic pricing for a

7    short stint, then a revenue-analysis role, and then

8    eventually I was promoted to be a manager on the domestic

9    yield team before I went back to business school.

10   **Q.**   And so when did you go back to business school?

11   **A.**   2015.

12   **Q.**   And you received your MBA after, what, two years or

13   something?

14   **A.**   Two years, yes.

15   **Q.**   Okay.  And did you return to American at that time?

16   **A.**   No.  I spent roughly three years as a consultant for

17   A.T. Kearney, K-e-a-r-n-e-y.

18   **Q.**   And what is A.T. Kearney?

19   **A.**   A.T. Kearney is a consultancy.  They specialize in, I

20   think, probably most namely procurement-related work.

21   **Q.**   For what?

22   **A.**   Procurement-related work.

23   **Q.**   Thank you, sir.

24           And when did you go back to American Airlines?

25   **A.**   I left A.T. Kearney and came to Americans in March of

1    2020.

2    **Q.**  Great timing to come back to an airline.

3    **A.**  Timing has never been my thing.

4    **Q.**  Okay.  And what position did you expect to have when you

5    arrived at -- back at American Airlines?

6    **A.**  I came back to be the -- the director in network

7    strategy.

8    **Q.**  And what happened when you got to American in March of

9    2020?

10   **A.**  Yeah, I think the -- the concept at the time that I had

11   discussed with Massimo coming back was that I was going to

12   help kind of bridge some of the planning gaps between or

13   perceive -- create some more benefit and planning between our

14   partners and our organic airline.  So if we change a flight

15   from Dallas to Austin, how does that affect our partnerships,

16   et cetera.

17          But that had sort of, you know, gone away with the

18   pandemic.  And so I had sort of quickly started on this

19   project.

20   **Q.**  On Project Garland?

21   **A.**  Project Garland.  That's correct.

22   **Q.**  Okay.  Just skipping forward in time a little bit, what

23   is your current role at American Airlines?

24   **A.**  I am the managing director in -- of partnerships.

25   **Q.**  So what does that mean?

1   **A.**   So I am primarily responsible for our currency-related

2   partnerships, our co-brand-related partnerships, and other

3   third-party partnerships that deal in the loyalty program.

4   **Q.**   And the co-brand, that's the credit card?

5   **A.**   Yes, sir, our co-brand.

6   **Q.**   Okay.  So let's just go back to -- when you first got

7   back to American and you pull onto the Project Garland team.

8   What were your initial responsibilities in that team?

9   **A.**   So initially I was responsible for just doing some

10  general analysis, just sort of trying to frame what the

11  partnership might look like and then trying to -- to help

12  manage and bring together sort of the work related with

13  Garland.

14  **Q.**   And who were you working for?

15  **A.**   At that point in time, I reported largely to Massimo

16  Mancini, but I largely working with Anmol on the project, I

17  believe.

18  **Q.**   With whom?

19  **A.**   With Anmol Bhargava on the project.

20  **Q.**   Anmol Bhargava.  Okay.

21          And so did you learn that there was a prospect of

22  American pursuing a partnership with JetBlue shortly after

23  you arrived?

24  **A.**   Yes.  Yes.

25  **Q.**   And were you part of both the early internal evaluation

1    and the eventual clean team evaluation of the NEA?

2    **A.**  Yes, I was.

3            MR. WALL:  Okay.  Let's put up Defendants'

4    Exhibit 38, which is already in evidence.  And, Your Honor,

5    you've seen this a couple times before.

6    BY MR. WALL:

7    **Q.**  And so this is a document that -- it has no date on it,

8    so let me just first ask you whether you know when this was

9    created.

10   **A.**  Yeah.  This -- I believe this document would have been

11   created in early May as we were -- or had started -- had

12   gotten through sort of the preliminary phases and some of the

13   work that we were doing with the -- with the clean team for

14   the NEA.

15   **Q.**  And did you have a role in creating it?

16   **A.**  I did, yes.  So this would have been the type of document

17   that I was responsible for making sure was created in working

18   with Jordan at the clean team to get to that position.

19   **Q.**  When you mention Jordan, you're talking about Jordan

20   Pack?

21   **A.**  Yes.

22   **Q.**  He who testified in this case earlier?

23   **A.**  Yes.

24   **Q.**  Okay.  Let's navigate over to slide 8, please.  And this

25   is the title slide, but it says "Network Optimization

1   Mission," and there's some language below that.  What is
2   going on in this slide?
3   A.   Yeah.  This was our -- sort of our mission statement,
4   right, was to create a combined network that would be
5   something that would be, at least on par with our competitors
6   in the Northeast, in New York and Boston.
7   Q.   And where did you get the mission statement from?  Which
8   person or persons told you that this was going to be the --
9   the objective?
10  A.   Yeah, I don't specifically remember, but something like
11  this would have been something that would have likely come
12  from Vasu.
13  Q.   Okay.  So the language here is offer New York and Boston
14  customers a combined network that is on par with the
15  competition.  How did you understand that combined network
16  might put you on par with competitors?
17  A.   Well, the goal was to work together to see if we could
18  create a network that between AA and JetBlue would be at
19  least competitive with what Delta and United were already
20  capable of offering in the Northeast.
21  Q.   Okay.  If we turn to the next slide, this is a set of
22  what's called "proposed joint network principles."  Did you
23  have say in writing these?
24  A.   Uh-huh.  Yes.
25  Q.   So why don't we just -- if you could, just briefly go

1    through the -- the five bullets and explain for the Court

2    what they mean and how they guided your work.

3    **A.**   Yeah, so if you take the -- like, the mission statement

4    from the previous slide and break it down to some of these

5    principles, this is sort of how we sort of went about our

6    work within -- within the clean team.

7            So Number 1 says to jointly create or expand our

8    network coverage in the largest New York O&Ds.  So,

9    essentially, if you look at our network and JetBlue's network

10   independently, we would identify areas that we were not

11   competitive with our largest competitors at Delta and United

12   and try to expand to have either the amount of market

13   coverage or the schedule that would be competitive with one

14   of those carriers.

15   **Q.**   There's a reference at the end of that line, "especially

16   where American and JetBlue combined are especially weak in

17   generating New York City origin passengers."  What do you

18   mean by a "New York City origin passenger"?

19   **A.**   Yes, so the New York City origin passengers -- customers

20   originating in New York City, right?  So at the time -- and

21   one of the things you see throughout this in Number 2 as

22   well -- is American had a point-of-sale challenge in New York

23   City.  We were -- we were good at getting passengers to

24   New York, but what a difficult time attracting New York

25   point-of-origin passengers.

1  **Q.**  Okay.  Go down to the second one.  It has a line about

2  playing to metal strength.  What does "playing to metal

3  strength mean"?

4  **A.**  So, in essence, if you take what I just said, that would

5  be -- American Airlines was -- had a large presence and a --

6  and a good share and call it the mid -- kind of the Midwest

7  markets, and JetBlue has a great share and a good home

8  carrier presence in New York and Boston.

9       And the idea was that we would plan on those

10  strengths, so let JetBlue be JetBlue and let American be

11  American, to create a combined opportunity or a combined

12  network that would compete with Delta and United.

13       And then the second part about the aircraft, making

14  sure the aircraft are in the right market, is if there were

15  smaller markets that could be served with smaller American

16  Airlines airplanes, that would be an opportunity.  If there

17  were large leisure markets that we were using two or three

18  airplanes to serve that JetBlue could serve on a larger

19  aircraft, that will be an opportunity.

20       You know, American Airlines had a -- you know, had,

21  you know, a lot of dual-class regional jets and mainline jets

22  that could be used to serve business-type markets, so that

23  kind of concept, playing our strengths.

24  **Q.**  Okay.  And I think we already heard a lot from Mr. Raja

25  about Number 3, but "ensure TA connectivity," that's

1    transatlantic connectivity?

2    **A.**  That's correct.

3    **Q.**  And then if we could go down to Item 4, it says, "Propose

4    new markets or opportunities where joint partnership enables

5    a market to be successful."  What does that mean?

6    **A.**  Yeah, so if you -- if you sort of think about what I had

7    said earlier, if you -- if you pair a -- a New York origin

8    like a New York or Boston with a mid -- a mid-continental

9    strength like -- pick a market -- Cincinnati or Indianapolis,

10   and you put those together, you could make something where,

11   previously, American would not have enough, you know, perhaps

12   New York or Boston presence to drive enough volume, and

13   JetBlue may not have enough Cincinnati or Indianapolis

14   presence to drive enough volume.  In this case, as partners,

15   we could do that, and it would allow us to expand into those

16   competitive markets.

17   **Q.**  And then, finally, the last one, it looks like you're

18   just evaluating the potential for how to cover Boston; is

19   that right?

20   **A.**  That's correct.

21   **Q.**  Okay.  If we go to the next slide, there's a --

22   there's -- there it is.  It says, "Action proposals,

23   Highlights and Themes."  A lot of content here.  We don't

24   need to go through it all.

25           But in reference to what's on the column on the

1    left, it says trans-cons and leisure markets, and so forth,

2    did you establish principles that were relevant to each of

3    those subject matters?

4    **A.**   Yes.  That's -- that's right.  So this is taking that

5    previous slide and then taking into it real -- like, where we

6    thought we had real opportunities in the trans-cons and

7    leisure markets, and flow, as we said on the previous one,

8    for transatlantic, et cetera.

9    **Q.**   And when you went into the clean team project and

10   actually creating a potential optimized schedule, how did

11   these kinds of principles and action proposals influence the

12   work?

13   **A.**   Yeah, so my recollection is, like, these were sort of the

14   principles we had laid out in the -- in the beginning of the

15   team team -- clean team had sort of agreed upon.  Yes, we

16   thought we could -- like, this is how we could go and create

17   an optimized schedule and then began iterating on that, you

18   know, using Jordan, who is our -- sort of our network

19   planning guy or our scheduling guy at the time and tried to

20   help create, you know, things that looked like they would

21   suit this, a schedule that would look like it would suit some

22   of these key principles.

23   **Q.**   So -- so, then, what did the clean team do?  What was the

24   work product of the clean team based upon these principles?

25   **A.**   So we eventually -- I think the ultimate work product of

1    the clean team was to create a schedule file that could --

2    like our sort of version of an optimized schedule that would

3    then feed Raven, our tool to help evaluate what we thought

4    the outcome would be from this, from the partnership.

5    **Q.**   And there's been testimony in this case about a schedule

6    file that has a reference of "v2."  Was that the schedule

7    file that had the optimized schedule?

8    **A.**   Yes.  I believe the v2 schedule file was the optimized

9    schedule.

10   **Q.**   So then what happens to it?  It goes into Raven.  What

11   happens when it goes into Raven?

12   **A.**   So Raven takes the schedule file's primary input and then

13   runs, essentially, a series of sort of demand forecasting and

14   sort of optimization algorithms to create an output file,

15   which is a prediction how that traffic will flow across the

16   new schedule in comparison to whatever the previous schedule

17   was.

18   **Q.**   Okay.  And did you then use that v2 schedule --

19           THE COURT:  Sorry.  I just have a question about

20   that.  Does Raven consider the schedules of competing

21   airlines?

22           THE WITNESS:  Yes.  So Raven is a -- is,

23   essentially, a global optimization tool.  So it takes what

24   it -- it knows you pick a period of time, and it knows what

25   is in the schedules files.

1          THE COURT:  Looks at everybody's schedules?

2          THE WITNESS:  That's right.

3          THE COURT:  Okay.  Go ahead.

4          Thanks.

5    BY MR. WALL:

6    **Q.**  Okay.  So, yeah, just to -- to be sure we've got this

7    down, so the v2 schedule is put into Raven.  The Raven

8    results come out.  And then what do you do next?

9    **A.**  So what we did with the Raven results is we then, of

10   course, analyzed them.  And then this clean team look at all

11   the changes that these -- that these results would have

12   created.  And then eventually, after we had sort of been

13   through, like, what we thought were the drivers here and, you

14   know, had thought that we had created what we thought was a

15   really good outcome for the partnership, we would have then

16   sort of reported out on it.

17   **Q.**  And in this case, "reporting out" means, on the American

18   Airlines' side, reporting to whom?

19   **A.**  To Vasu.

20   **Q.**  To Vasu.  Okay.

21          So let's pull up what's in evidence as Defendants'

22   Exhibit 1075A, which is a redacted version of this document.

23   And are you familiar with this document, sir?

24   **A.**  Yes.

25   **Q.**  Are you one of the authors of this document?

**A.**  I am.  I'm sure I worked on this, yes.

**Q.**  And there were multiple drafts of this document, and we've seen several in this courtroom already, right?

**A.**  Yes.

**Q.**  Okay.  Do you happen to know when this particular one that's been marked as Defendants' Exhibit 1075 was drafted? When -- let me put it differently.  When did the drafting start and, roughly, when did it end?

**A.**  So I believe this document was created after we had sort of had our final optimized schedule run through Raven, and that's when we had started to report on the results that we had discussed on the clean team.  So I believe that the -- the final schedule file was in early to mid May, and then this would have been in mid to late May.

**Q.**  Mid to late May.  And then there's a -- was there back-and-forth with -- with Mr. Raja about this file, this -- excuse me, not the -- this presentation --

**A.**  Yes.

**Q.**  -- after that?

**A.**  Yeah, so we would have -- at least I would have presented this to -- we would have presented this to Vasu as our findings.  And then we would have, you know, taken his -- his feedback.  And then ultimately this document, I think, was being prepared as -- as the update for our senior leadership team.

1    **Q.**  Okay.

2         THE COURT:  I'm going to stop you here, Mr. Wall.

3    It's four o'clock, I think.

4         MR. WALL:  Oh, sorry.  I was having so much fun.

5         THE COURT:  I know.  We all were.

6         All right.  Well, I will see you Monday morning,

7    right?

8         MR. WALL:  Thank you, Your Honor.

9         THE COURT:  All right.  Have a great weekend.

10   Thank you.  And we stand in recess.

11         (Court in recess at 4:02 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

1

2

3

4          I certify that the foregoing is a correct

5     transcript of the record of proceedings in the above-entitled

6     matter to the best of my skill and ability.

7

8

9

10    /s/ Rachel M. Lopez                    October 14, 2022

11    /s/ Robert W. Paschal

12

13

14    _____          _____

15    Rachel M. Lopez, CRR                    Date

16    Robert W. Paschal, RMR, CRR

17    Official Court Reporters

18

19

20

21

22

23

24

25