1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3

4    _____

5    UNITED STATES OF AMERICA, et al.

6           Plaintiffs,                    Civil Action No.
                                           1:21-cv-11558-LTS
7        v.

8    AMERICAN AIRLINES GROUP, INC.,
     et al.,

9
            Defendants.
10

11   _____

12      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                          BENCH TRIAL
                             Day 13

15

16                    Monday, October 17, 2022
17                          8:59 a.m.

18

19

20

21   John J. Moakley United States Courthouse
     Courtroom 13
22   One Courthouse Way
     Boston, Massachusetts

23

24   Rachel M. Lopez, CRR
     Official Court Reporter
     raeufp@gmail.com
25

**A P P E A R A N C E S**

On behalf of the Plaintiff United States of America:

    United STATES DEPARTMENT OF JUSTICE
    BY:  WILLIAM H. JONES, III; JOHN R. DOIDGE; MAISIE A.
    BALDWIN; AND GRANT A. BERMANN
    450 Fifth Street, Northwest
    Suite 8000
    Washington, D.C.  20530
    (202) 514-0230
    bill.jones2@usdoj.gov
    dick.doidge@usdoj.gov
    maisie.baldwin@usdoj.gov
    grant.bermann@usdoj.gov


On behalf of the Defendant American Airlines Group, Inc.:

    LATHAM & WATKINS, LLP
    BY:  DANIEL M. WALL
    505 Montgomery Street
    Suite 2000
    San Francisco, California  04111
    (415) 391-0600
    dan.wall@lw.com


On behalf of the Defendant JetBlue Airways Corporation:

    SHEARMAN & STERLING LLP
    BY:  RICHARD F. SCHWED
    599 Lexington Avenue
    New York, New York  10022
    (212) 848-4000
    richard.s`chwed@shearman.com

**<u>TABLE OF CONTENTS</u>**

**TRIAL WITNESSES**

On behalf of the Defendants:                                    <u>Page</u>

CHAD SCHWEINZGER

      By Mr. Wall                                    23

      By Mr. Bermann                                 72

      By Mr. Wall                                    99

MARK ISRAEL, Ph.D.

      By Mr. Wall                                   101

**EXHIBITS**

On behalf of the Plaintiffs:                               <u>Admitted</u>

 Number PX1144                                            93

On behalf of the Defendants:                               <u>Admitted</u>

 Number DX956                                             47

**P R O C E E D I N G S**

1                  (The following reported by Robert Paschal.)

2                  (In open court at 8:59 a.m.)

3                  THE COURT:  Good morning.

4                  MR. WALL:  Good morning, Your Honor.

5                  THE COURT:  So one, in terms of scheduling Monday, I understand from Ms. Belmont, you want to have Monday, the 9:00 to 1:00, that's fine.  I had reserved for you all those days I said before, so as we go, that's fine.  Second, I had raised with Ms. Belmont to raise with you on this privilege question.  I saw the government's reply of whether -- not whether I was thinking -- I was interested in looking at the -- I think it's eleven that remain for sort of in camera review.  But I think she indicated you had some thoughts about that, so I'm happy to hear you, Mr. Wall.

                  MR. WALL:  Yeah, thank you, Your Honor.

                  So, unfortunately, we had the situation here, of course, where you are both the trier of fact and the person who will decide whether they're privileged.  And So if you look at the in camera -- if you look at the documents in camera, the same brain that is going to decide this case is going to see the material that is -- that is privileged.  And so I want to just make a couple of comments.

                  I just want to put something on the record so that it's very clear.  On May 22, 2020, --

1          THE COURT:  Just to orient me for a second, is that

2   the day of those text messages --

3          MR. WALL:  That's one week before.

4          THE COURT:  One week before.  Okay.  Thank you.

5          MR. WALL:  On May 22, 2020, my partner Farrell

6   Malone, who is sitting over here, sent out an e-mail to a

7   number of people saying that, in substance, there's some work

8   we want to do for the regulatory case.  And that's the

9   setting of all of this stuff.

10          There was subsequently a set of calls -- I was on

11   one myself on May 26th -- in talking about what we call the

12   "counterfactuals."  And there's a long history here.  The

13   consumer benefits type of calculation that Dr. Israel is

14   going to put on has been done in antitrust immunity

15   applications, and it had been done with respect to the West

16   Coast International Alliance.  It's been done with respect to

17   airline mergers for years.  It's sort of a known entity that

18   people understand.

19          And experience had taught us all that what happens

20   whenever this is done is that the folks on the other side,

21   the department of justice here, might be the DOT in an

22   antitrust immunity application, will ask whether you have the

23   proper but-for world.  That's just something --

24          THE COURT:  The proper what?

25          MR. WALL:  The but-for world, the counterfactual.

1    Right?  And it's not a tough prediction to make.  It's
2    just -- it literally happens all the time.
3              THE COURT:  Sure.
4              MR. WALL:  And you can imagine there's great
5    prospect for gaming.  If you're on our side of it, you want
6    to set the baseline high.  If you're on their side of it, you
7    want to set that -- wait.  I said that wrong.  If you're on
8    our side of it, you want to set the baseline low.  If you're
9    on their side of it, you want to set the baseline high, and
10   so there's a lot of potential for just arguing about it.
11             And we anticipated that correctly, that that's one
12   of the things that the Department of Justice would argue.  So
13   a process begins on that point, at that point in time.  And
14   there's a lot of e-mail that is generated, and many, if not
15   most -- or most, if not all, rather, of the e-mails that they
16   want you to look at are generated from that process, involve
17   members of my team, involve members of the Sherman team
18   that's representing JetBlue, of all the economists, but also
19   involve people who were in the clean team process because of
20   the expertise that they would have in providing experts to
21   that.  Okay?
22             That's what all of this is.  And the call, the
23   May 29th call, as you'll actually hear today, was about
24   that -- that process.  And so this representation that is
25   being made here that, no, this is actually what is going to

1    unlock the secret real business case of the NEA that doesn't

2    have any growth involved in it or anything like that, it's

3    just -- it's utterly false and it's utterly unfounded in

4    anything other than speculation about the contents of

5    privileged documents.

6         And if you look at those documents, you will -- the

7    main thing that you will see is the back-and-forth between

8    lawyers and their clients thinking about these issues.

9    That's what you're going to see.  You're going to see people

10   like Mr. Malone saying, I think that we might want to do it

11   three different ways.  I think the justice department might

12   want to do this.  And people saying, well, we could do that

13   or we couldn't do that or -- that's what you're going to see.

14        That's 100 percent of that content.  And in our

15   view, the justice department has not made out any baseline

16   case at all that that content wouldn't be privileged.

17   Instead, what they're saying, what their argument is now, and

18   the only reason this is alive anymore, is that Jordan Pack's

19   testimony waived that privilege.  Well, you don't need to

20   look at those documents to decide whether Jordan Pack's

21   testimony waived the privilege.  You heard Jordan Pack's

22   testimony.

23        And in our view, this is very simple.  There's a

24   long-standing rule that you never waive a privilege by

25   revealing as much as you need to reveal to establish the

1    privilege.  That's -- otherwise you're in a catch-22

2    situation.  So for someone to say, yeah, the subject matter

3    of this was a discussion about the regulatory issues, that's

4    not only not a waiver, it's something we need to say to

5    establish the privilege.

6            So they put this in issue now and are trying to set

7    this up so, in a way, that even if you agree with us that

8    this was entirely privileged, which they don't really

9    contest, because their argument is waiver, you'll see it all

10   anyway, and I don't think that's appropriate.  And I -- you

11   know, I'll respect however Your Honor wants to do it, but it

12   just seems to me that this has been set up in a way that they

13   have their cake and eat it, too, because even if they -- if

14   you agree with this, you've still seen all of the privileged

15   material.

16           THE COURT:  So let me tell you a couple thoughts

17   about that, then.  One is, just so the way I've been -- the

18   two different issues that you're talking about, I think.  One

19   is how the determination is made by the Court with respect to

20   privilege, and the second is the substance of the privilege

21   issue.

22           So as to the second, talking about the second

23   first, do I have -- the way I thought about this is you

24   designated certain things as privileged.  They're just

25   privileged because no one brought it to me.  I don't -- I

have -- and I don't mean this in any way.  Just this is how I
think about all the privileged questions.  If you designate
something privileged and they don't object, to me, it's
privileged, right?  Whether you're right or you're wrong,
like, in any way, shape, or form.

MR. WALL:  Understood.

THE COURT:  But that's where -- because it's not
something that the Court ever engaged with, and I'm perfectly
happy not to have engaged with all the other privileged
questions and -- like, but they then brought it here, and
Pack said what he said.  I don't need to look at the
documents to determine what Pack said and the significance or
lack thereof of what he said.

What I understand the government to be arguing is
this:  one, that Pack made a waiver, and as a result of his
waiver, he waived not just the documents that were discussed
in the -- I don't have the date right --

MR. WALL:  May 29th.

THE COURT:  -- the 5/29 meeting, but he waived the
whole subject.

MR. WALL:  Our whole regulatory strategy.

THE COURT:  The whole regulatory subject.

MR. WALL:  Yeah.

THE COURT:  Yeah.  And I will -- I'm not so sure
that -- while I think -- I think Pack probably said more than

1    merely, "I received legal advice on the topic of regulatory

2    discussion, or regulatory approval," I'm not so sure he

3    waived the whole regulatory subject.

4          The second argument I understand the government to

5    be making off his statements is that, well, on -- they seem

6    to be saying that there's a certain amount of sort of branch

7    of privilege waiver that encompasses, like, fairness.  If

8    there's a certain amount of waiver -- you get enough to

9    fairly engage with the issue and they're saying that's where

10   we get these two weeks.  And that's what -- the second, sort

11   of analytically, the way I understand them to be arguing it.

12         Then separate from that, to be candid of all of

13   your arguments, I sort of think that what they're really

14   arguing is they don't really agree with you on privilege at

15   all, and this is just now they're bringing up a privilege

16   question because of what Pack did, but it's really about the

17   underlying, not so much waiver, but just whether they agree

18   with you on -- whether this is privileged or not.

19         So --

20         MR. WALL:  And in that, Your Honor, if I may, was

21   an issue that they raised in June.

22         THE COURT:  Sure.  I understand that --

23         MR. WALL:  June --

24         THE COURT:  -- there was back-and-forth with you

25   for a long time.

1           And so I'm trying to figure out -- and what I --
2    what underlies it factually, as I understand it, is I don't
3    understand them to be all that interested in what -- if you
4    were on the 5/29 call or whatever lawyers on the call -- what
5    those lawyers said.  What I understand them to be more
6    interested in is, in some -- is how and why what baselines
7    were picked and weren't picked.

8           And to some -- that's what I think they're
9    interested in.  And I think that, to the extent that
10   baselines were picked and not -- to the -- what the fact
11   witness's views of that and what the expert relied upon in
12   making those, certainly, what the fact witnesses just --
13   views are, we did this or did that, they can ask all that.
14   And that's not --

15           MR. WALL:  And that will come up today.

16           THE COURT:  Right.

17           MR. WALL:  That's going to come up right now,
18   actually.

19           THE COURT:  Right.  And that doesn't strike me as
20   impacted by, per se, the privilege.  What I understand them
21   to say saying is they want these things in order to do a
22   better job at that maybe.

23           So all of that is to say that's what I understand
24   the issues to be are, and I re-read -- after I read the
25   reply, I re-read your -- the privilege log about the ones

1   that are still at issue.  And it's not clear to me from

2   the -- like, the privilege log describes it in a way that

3   makes me think they're privileged because, of course, that's

4   what the purpose of the privilege log is.  And so as to

5   the -- so in thinking about resolving it, to be honest with

6   you, I just thought, like, I can't really figure out all

7   these questions unless I look at the documents.  I will tell

8   you that it occurred to me, that, huh, I'm the fact finder.

9   And, for example, I already excluded a document not

10  privileged but there was the document I thought about, and I

11  know what it says and I excluded it and I'm not going to rely

12  upon it.

13          And I understand there is this general principle --

14  judges are superhuman and they can put aside all the things

15  they know and everything.  But, obviously, privilege is a

16  little bit different and there's more.  And so you haven't

17  asked for this, and I'm not sure what I think about it, but

18  we're being so pretty -- we're spending a lot of time in this

19  case anyway.  I mean, it's not inconceivable to me -- I'm not

20  saying I would do it for sure, but I'm at least happy to

21  discuss it of whether maybe I should have those, like, eleven

22  documents, like, looked at by, like, another judge.  I could

23  get a magistrate judge to look at it, and then I could -- I'm

24  deciding the legal questions.  I could just say to them,

25  These are the things I'm thinking about.  Is it -- don't tell

```
 1   me what it is, but does it -- you know, if here's the sort of
 2   framework and then --
 3           MR. WALL:  That would resolve this in a heartbeat,
 4   frankly.
 5           THE COURT:  And then the -- so that's a possibility
 6   of doing it that way.  And then that limits -- you know, I
 7   will tell you, if I do that, it takes a little bit more time,
 8   because it occurred to me the eleven documents they could
 9   probably look at in 15 minutes, I suspect.
10           MR. WALL:  No, I understand.  I would also tell
11   Your Honor another way to do it is to just consider doing it
12   iteratively.  If you look at the documents that is on the
13   privilege log --
14           THE COURT:  Hold on one second.  Let me get the
15   log.
16           What page are you on the log?
17           MR. WALL:  It's -- well, in my printout, it's one
18   of five.  It's the bottom entry, 5/22/20 from Farrell Malone
19   to various people, privileged 11167.
20           If you look at that document, frankly, it has a lot
21   of lawyer thought and analysis and reasoning and so forth in
22   it.  But it's going to definitively end the inquiry as to
23   whether these were legal discussions and considerations or
24   not.
25           MR. JONES:  Your Honor, it certainly may for that
```

 1    individual document.  The question is the whole set of the

 2    eleven.

 3              And I would also point out, Your Honor,

 4    certainly --

 5              THE COURT:  I'm sorry, just say that again for one

 6    second.

 7              MR. JONES:  I'm sorry.

 8              THE COURT:  It's not your fault.

 9              MR. JONES:  Looking at the one document would

10    resolve the one document, but there'd still be the other --

11    the other ten and it's not necessarily clear that it would

12    follow that if that one document Mr. Wall is pointing to

13    actually is privileged, that all of the others in the set are

14    as well.

15              MS. BALDWIN:  And, Your Honor, Maisie Baldwin for

16    the United States.

17              That same e-mail thread appears to only implicate

18    four of the total eleven.  So that would still leave us with

19    seven additional documents.

20              MR. WALL:  But that's not true, because what that

21    e-mail thread is is Mr. Malone initiating the process of

22    considering counterfactual scenarios.

23              MS. BALDWIN:  Well, Your Honor --

24              MR. WALL:  And this entire thing -- excuse me.

25              This entire thing is about the internal

1    consideration for regulatory purposes only of counterfactual

2    scenarios.

3          THE COURT:  Go ahead, Ms. Baldwin.

4          MR. JONES:  Your Honor, just taking a step back, we

5    are here after a long process in which we had come to, if not

6    quite a resolution, a détente on these documents, and then

7    Mr. Pack testifies.  And so really why we're back here now on

8    this issue is simply that they opened the door.  They're

9    using Mr. Pack's testimony to talk about some aspects of

10   this, but not the full view.  And that's all we're --

11         THE COURT:  But in a way, like, to me, maybe I'm

12   missing something here, but in some ways, Mr. Pack's

13   testimony, it strikes me maybe as more waiver than the

14   defendants want to concede and also more red herring than --

15   like in other words, before Mr. Pack testified, you had these

16   text messages.

17         The text messages, if I gave it all of the

18   inferences you could get for the government from it, where

19   some people for American said, "Oh, my God, DOJ could kill

20   this in a heartbeat," right?  That's essentially what they

21   said.

22         All right.  Like to be honest with you, does that

23   really matter?  Like, what is the significance of those

24   people saying that?  I'm going to make -- I can't defer to

25   that, right?  That would be wrong.  I have to make an

```
 1    independent decision about whether the evidence and the law

 2    warrants it, which is what I'm going to do.  Is it evidence

 3    about what their opinion is?  Yes.  Do I care what -- what is

 4    the weight of opinion that -- Mr. Pack was an excellent in

 5    many respects witness, obviously, a smart person, but his

 6    opinion of antitrust law to the NEA, what is the

 7    likelihood -- or rephrased is this is Mr. Wall's view

 8    expressed through Mr. Pack of what the -- Mr. Wall's real

 9    view is.

10            MR. WALL:  I wasn't on the call.  Don't lay it on

11    me.

12            THE COURT:  Whomever, all right?  You're the person

13    who knows more about antitrust law than -- except possibly

14    Vasu, right?

15            MR. WALL:  No way.

16            THE COURT:  So even if it's Mr. Wall's opinion, so

17    to speak, coming through Mr. Pack, what difference -- like,

18    so the way I really see it, like, so those things, it strikes

19    me more as it's either just -- it's just I'm thinking about

20    it, okay, he said what he said.  It's whatever level of

21    waiver it is and where does it go?  And is it just this?  Is

22    it fairness?  Is it subject matter?  It's an opportunity

23    which I don't quarrel with for you to open up an issue that

24    hadn't been opened up.

25            But in terms of the particular text messages, it's
```

1    eluding me as to how weighty -- why those text messages are

2    all that weighty.  You can tell me why.  That's why I'm

3    telling you all this, but --

4           MR. JONES:  Well, Your Honor, I would start by

5    saying certainly it's not their opinion, the opinion of

6    Mr. Pack or Mr. Schweinzger.  It's not just the opinion, kind

7    of the ultimate question opinion.  It's their review of the

8    full network results.

9           So as they were looking at how the -- the NEA would

10   be measured, looking at full network results, their analysis

11   of that and their conclusion or one of their conclusions that

12   it was "*no bueno*."  So it's sort of that, Your Honor.  It's

13   not the ultimate question.

14          I certainly agree that the views of the fact

15   witnesses on antitrust law don't --

16          THE COURT:  Right, but so it's their view on the

17   ultimate question of whether there's benefits for doing this

18   or not.  Just -- whether they get something or not.

19          MR. WALL:  Your Honor, if I may, this is getting --

20          THE COURT:  But what does that have to do with the

21   privilege?

22          MR. JONES:  Well, Your Honor, it certainly --

23   again, it's the -- using these witnesses in two ways.  So

24   wanting the Court to take kind of -- credit their views and

25   the views of their work that went to Dr. Israel as an input

 1    to his work, but then on the other hand, wanting to shield

 2    from consideration here those views as they analyzed the full

 3    network results.

 4             MR. WALL:  I just have to respond to this, because

 5    we're just now in complete make believe at this point.  They

 6    will find out in a few moments from the testimony of

 7    Mr. Schweinzger that the subject of "no bueno" is them, it's

 8    their way of thinking.  That's what was no bueno:  them.

 9    This is --

10             THE COURT:  Which them?

11             MR. WALL:  The Department of Justice.

12             THE COURT:  Oh, I see.

13             MR. WALL:  Wasn't saying the NEA was no bueno.  He

14    was saying if you look at it the way that they are going to

15    look at it, nothing would ever be okay, and that's what "no

16    bueno" is.

17             The v4 schedule that they make so much of was never

18    run through Raven, was never part of a business case, was

19    never relied upon by any of the decision makers.  They didn't

20    even know about it.  Nothing about that.  This is a sideshow

21    that's trying to suggest that you shouldn't believe the

22    predictions of consumer benefits that come out of the actual

23    business case that was -- that was -- that was run.

24             And that's all this is about.  There's -- this

25    doesn't reveal our thinking about the NEA.  It reveals our

1      thinking about what they're going to try to argue about the

2      NEA.  And, by the way, we were spot on.  And that's what this

3      is about, exclusively.

4              MS. BALDWIN:  Well, Your Honor, we haven't had the

5      opportunity to pressure test any of Mr. Wall's claims because

6      the documents have been withheld.

7              MR. JONES:  I --

8              MR. WALL:  And we would never have brought this up

9      if they didn't put it in the opening statement.

10              MR. JONES:  -- relied on the factual claims about

11      what the clean team did, so it also comes into play in that

12      matter -- in that manner as well.

13              MR. WALL:  I just don't want to hear this narrative

14      that we injected this into this case.  Mr. Jones put this in

15      his opening statement, late night frenzied text of senior

16      executives saying that this was no bueno.

17              It was actually the main theme of the press reports

18      that were picked up on the first day of trial.  We never

19      would have gone into that on our own.  They injected this

20      into this case.  So if you want to talk about swords and

21      shields, they're the ones that are trying to get away with

22      swords and shields here.

23              THE COURT:  Okay.  So let me make one more

24      observation and then we should get going.

25              I think the following is correct and your -- I'm

1    confident one or both of you will disagree with me if I'm

2    wrong, that all of the fact witnesses can be asked what

3    comparisons they did and what were the pros and cons of those

4    comparisons, what comparisons that they didn't do, posed like

5    you could have done this, you could have done that, and what

6    would be the pros and cons of those comparisons.

7          And you can ask -- and I think you can ask what

8    comparisons weren't done and what the pros and cons -- and

9    you can ask the reasons why.  The only conceivable reason

10   that would be an off-limits reason is if somebody was,

11   like -- if someone didn't do a comparison or did a comparison

12   because a lawyer said, for preparation for legal reasons, we

13   want you to do this or not do this.  Then that's where there

14   would be an objection to privilege as to that part of the

15   answer before it was given and, other than that kind of

16   privilege issue, those witnesses can give all the factual

17   testimony, which is the foundation, I think, of what was

18   done, what wasn't done, historically, and what -- and the

19   factual foundation for evaluating it.

20         With Dr. Israel, who is the expert, it seems to me

21   it's fair game to ask him what he did and didn't consider,

22   why he did what he did, why he didn't do what he didn't do or

23   why he didn't consider some alternative comparison.  And

24   that, I think, is all fair game and not -- without regard to

25   what I resolve on this motion.  I think that's right as to

1    the scope of inquiry of those witnesses.

2                Does that make sense?

3                MR. WALL:  Agreed.

4                MR. JONES:  Yes, sir, Your Honor.

5                THE COURT:  Okay.  So what this inquiry is about,

6    then, is some additional information -- so then it seems to

7    me this is a privileged inquiry.  I'm going to look at it.  I

8    guess the question really circles back -- I haven't resolved

9    it yet -- the question really comes down to should I have

10   somebody else look at it because I'm the fact finder.

11               And it doesn't offend me.  I'm not offended if

12   anybody asks me that.  Like, I don't -- that makes no

13   difference to me.  I think if I look at it, it's -- the

14   upside is it's a faster resolution probably just because you

15   can probably -- I imagine you could give them to me some time

16   between a minute from now and 15 minutes from now, and I

17   could probably look at them pretty quickly and take a quick

18   break.

19               On the other hand, I'm sure -- I have no doubt I

20   could get another judge, probably a magistrate judge, to look

21   at this within today for sure, maybe this -- probably this

22   morning, but I'd have to take five minutes to find somebody.

23   And then there would be a little discussion for me to

24   understand the legal context and they be -- and then I

25   would -- the purpose of that would be for not -- for that

1   person not to report to me the substance of what's in those

2   documents.

3          MR. WALL:  Your Honor, at this point, we've spent

4   so much more time on this than it deserves, but whatever you

5   choose to do is fine with us.

6          MR. JONES:  As with us, as well, Your Honor.

7          THE COURT:  Well, then, I'm probably just going to

8   look at them for efficiency sake, because it's -- I'm not

9   adverse to giving it to someone else, but if it's no

10  difference to you --

11         MR. WALL:  Again, I suggest that you start with the

12  document I mentioned.  It's the first in the sequence and

13  decide how much more you need to look at, but we leave it

14  entirely in your hands, Your Honor.

15         THE COURT:  Okay.  All right.  Then why don't you

16  give me the whole pile with that one first, and when you

17  have -- we'll start.  When you have the pile, I'll stop and

18  I'll take a look.

19         MR. WALL:  Great.

20         MR. JONES:  Thank you, Your Honor.

21         THE COURT:  Okay.  All right.  We have the --

22  how -- I'm not going to say his name.

23         MR. WALL:  Schweinzger.

24         THE COURT:  Mr. Schweinzger, yes.  If you would

25  come forward and sit in the witness box.  I remind you you

1    remain under oath.

2                           **CHAD SCHWEINZGER**

3          having been duly sworn, testified as follows:

4     **CONTINUED DIRECT EXAMINATION BY COUNSEL FOR AMERICAN AIRLINES**

5     BY MR. WALL:

6     **Q.**  I suspect that this happens to you a lot in your life,

7     but how do you pronounce your last name again?

8     **A.**  Well, it depends on who you ask, but I say *Swinez-ger*.

9                THE COURT:  You would seem like to be the oracle on

10    this question.

11               THE WITNESS:  Different members of my family say it

12    differently.

13    BY MR. WALL:

14    **Q.**  Yeah.  The follow-up question is how often do you have to

15    spell your last name to other people?

16    **A.**  All the time, which is why I just say --

17    **Q.**  Okay.  Thank you, sir.

18               All right.  So when we broke, in our last session,

19    we were talking about Defendants' Exhibit 1075A, which of

20    course is a document that's put up here and it's pretty well

21    known in this case so far.  The Project Garland overview and

22    status update.

23               And I think you already testified to this, but just

24    to set the table, remind us again of over what period of time

25    was this deck prepared.

1   **A.**   Yeah, so this document would have been created after we

2   had finalized the -- the Raven runs to -- with the optimized

3   schedule as a presentation for Vasu and then ultimately

4   turned into a status update for our senior leadership team,

5   so that would have been somewhere between the 22nd of May and

6   probably the 26th or 27th.

7   **Q.**   So when were the Raven runs done on the v2 optimized

8   schedule?

9   **A.**   They would have needed to be completed prior to that or

10  during that time period, so between --

11  **Q.**   Okay.  And so we're not going to spend a lot of time with

12  this, but I do want to pull up slide 8 for a moment.  And

13  this one is -- "the East Coast JV creates more value for

14  customers than a simple codeshare."  There's just a lot of

15  numbers on the two tables there.  Do you see those?

16  **A.**   I -- I do.

17  **Q.**   Okay.  The only question that I -- that I want to ask you

18  at this time is do -- do those numbers have any relationship

19  to what we've heard referred to as the "v2 optimized

20  schedule?"

21  **A.**   Yes.

22  **Q.**   What's that relationship?

23  **A.**   These, I believe, were the outputs of the Raven run using

24  the v2 optimized schedule that we were -- we were using to

25  create the business case for the NEA.

1    **Q.**   Okay.  Thank you, sir.

2              THE COURT:  And just so I can keep it straight

3    between v2 and v -- v2 is the schedule joined together, the

4    optimized schedule of JetBlue and American in the Northeast

5    in 2023, or is it in 2019?

6              THE WITNESS:  It would have been based -- the

7    schedule itself is not -- doesn't have a defined time period

8    to it, but it would been what the clean team worked on, the

9    output of the clean team product, which is the v2 schedule,

10   which is what we used to run the Raven results to determine

11   the --

12             THE COURT:  And based on fleets that existed in

13   2019, or based on projected fleets for 2023, or something

14   different?

15             THE WITNESS:  I recall from -- I believe -- and I

16   can't speak to the JetBlue side, but from the American

17   Airlines side, it would have been what we had and what we had

18   on order.  We weren't -- we didn't have a business case in

19   here that I recall that required us to buy new airplanes or

20   do anything different than we were already planning to do.

21             THE COURT:  So -- but it would have been what you

22   had in 2019, or what you had in 20 -- what you had in the

23   queue for -- like, if you looked at some future date, what

24   you had in the -- obviously, in the future, there's, like,

25   planes coming in and --

 1             THE WITNESS:  Yeah.

 2             THE COURT:  -- potentially planes going out.

 3             THE WITNESS:  It would have been the latter.  So we

 4     had planes come in.  I think we talk about the XLRs in here.

 5     Those were the planes we had on order at the time.

 6             THE COURT:  Okay.

 7     BY MR. WALL:

 8     Q.  Let me just follow up a little bit on that.  Is there a

 9     fleet constraint built into the v2 schedule?  In other words,

10     that you can't add planes?

11     A.  No.

12             MR. BERMANN:  Objection.  Leading.

13             MR. WALL:  Not a leading question.

14             THE COURT:  Overruled.

15             THE WITNESS:  No.  No.  That's -- there's no fleet

16     constraint, no assumption that we wouldn't get the planes we

17     had on order or anything like that.  We wouldn't have built

18     that in.

19     BY MR. WALL:

20     Q.  So more broadly, in the process of coming up with a

21     business case for the NEA, do you recall there ever being

22     consideration of a scenario in which the airlines wouldn't,

23     one way or the other, create -- or find the aircraft to

24     support the demand that you were -- you were projecting?

25     A.  No.

1  **Q.**  Okay.  Okay.  All right.  So in -- as you've heard,

2  there's a lot of attention that is being paid to this meeting

3  on the 29th of May.  Let me just ask you as a foundation for

4  that, do you -- do you recall from your own experience in

5  working on the NEA where there came a time when you got

6  involved in discussions with counsel and with consulting

7  economists about regulatory issues?

8  **A.**  Yes.

9  **Q.**  And generally speaking, do you remember when that process

10  occurred relative to the work that you had done in creating

11  the optimized schedule and figuring out the benefits from the

12  optimized schedule?

13  **A.**  Yes.  As I recall, we were completing the internal

14  business case for American Airlines, and at that point in

15  time, you know, we started to work on the regulatory case as

16  well.

17  **Q.**  Okay.  So I want to pull up Plaintiffs' Exhibit -- what

18  is a demonstrative -- 37 -- 372A, which is a collection of

19  texts from May 29th.  And I want to focus on texts that

20  involve you and Jordan Pack that occur towards the latter

21  part of this demonstrative.

22         But before I do that, just -- so I wanted to nail

23  this down again:  as of May 29, 2020, what was the state of

24  your evaluation of the business case for the NEA?

25  **A.**  Yeah, so it was largely complete.  So this document was

1   the -- sort of the foundation for moving the business case

2   forward and that was --

3   **Q.**   The Exhibit 1075?

4   **A.**   Yes, that's correct.  That's what we were taking -- I

5   believe, that very next Monday, to the senior leadership

6   team.

7   **Q.**   Okay.  Were you still trying to figure out what the

8   optimized schedule would be?

9   **A.**   No, I don't believe so.

10  **Q.**   Okay.  All right.  So this is one of the things that

11  witnesses in our case have to deal with, do you have a

12  recollection of a conference call on May 29 with a bunch of

13  lawyers and economists?

14  **A.**   I do.

15  **Q.**   Okay.  And do you know at approximately what time in your

16  workday -- first of all, you work in Dallas, right?

17  **A.**   That's correct.

18  **Q.**   Okay.  About what time in the Dallas workday did that

19  occur?

20  **A.**   It was in the late afternoon.

21  **Q.**   Okay.  So there's a text here that has a -- a time stamp

22  on it.  It's the text ending 046, if we can highlight that.

23  And on this, it has you saying to Mr. Pack, "I'm completely

24  out of ideas," and the time stamp is at 10:02 p.m.  So is

25  that time stamp correct as a matter of Central Time?

1    **A.**   No, I don't believe so.

2    **Q.**   Okay.  Now, there are three texts that you actually

3    appear to have written within the same minute that is -- that

4    is denominated here as 10:02.  Do you see that?

5    **A.**   I do.

6    **Q.**   And it first says, "I'm completely out of ideas.

7    So . . .  And if we show full network results . . . no

8    bueno."

9            Okay.  Without getting into the details of the

10   conversation that you were having with counsel at this -- at

11   this time, what is the subject of those comments?  What are

12   you referring to when you -- when you are making those

13   comments?

14   **A.**   As we were having a discussion, I recall in this

15   particular call, we were being asked to create one or more

16   sort of counterfactuals, or but-for cases, as you described

17   them, and I was sort of frustrated with that request and

18   didn't understand sort of the -- some of the asks that were

19   being made to be legitimate or relevant for the work that I

20   was doing at the time.

21   **Q.**   Had you -- without getting into exactly what you said,

22   had you expressed to the people on the call any of your

23   frustrations about that?

24   **A.**   Yes, many times.

25   **Q.**   Okay.  Does the -- does the text that says "I'm

1    completely out of ideas" have any relationship to what you

2    had been saying on the call in terms of expressing your

3    frustration?

4    **A.**   Yes.  I recall explaining several different reasons why I

5    didn't want to do what was being asked and was being told to

6    do it anyway, and that's what that text I believe was in

7    reference to, "I'm out of ideas."

8    **Q.**   There's a phrase, the third one that's gotten so much

9    attention about -- it says, "If we show full network

10   results . . . no bueno" -- "no bueno," not good, of course.

11   What was the subject that was being discussed on the call

12   that you were saying is not good?

13   **A.**   This was, I believe, in reference to what was being asked

14   of us from a counterfactual measure, not only for what we

15   were being asked to create, but certainly the significance or

16   the amount of work that would be required to do so.

17   **Q.**   Okay.  Thank you, sir.

18           Now, if we go on a couple texts later, the one

19   that's denominated -- that ends with the Bates 051, you once

20   again have two texts within the same minute.  The first one

21   says, "Based on what I'm hearing, if I was DOJ, I could kill

22   any deal . . . any deal."  And then the next one reads, "No

23   deal positive."

24           What did you mean by "no deal positive"?

25   **A.**   Again, this is frustration and certainly a lot of

1    sarcasm, but my basic premise was if this is how or the

2    counterfactual that we were being -- we were talking about

3    and was being explained as to why we needed to run it, this

4    is how, like, the deals in general were going to be

5    considered.  I didn't see or didn't make sense to me how any

6    deal of any magnitude or -- could be possibly approved.

7    **Q.**  So are any of these texts between you and Mr. Pack

8    related to the business case for the NEA?

9    **A.**  No.

10   **Q.**  Is it -- in writing these texts, are you at any point

11   addressing whether the NEA would have business or consumer

12   benefits?

13   **A.**  No.  I'm addressing the request that was -- that was

14   being asked of us at the time.

15   **Q.**  Okay.  Thank you, sir.  We can move on from that.

16            So let's just go forward in time a bit.  The clean

17   team -- it's established this structure, the NEA, and

18   reported up to management.  In terms of your own involvement

19   in the NEA, what came next?

20   **A.**  After we had shared what we believed was going to be the

21   business case for the NEA, we then moved into creating

22   agreements with JetBlue, trying to get to an agreement for

23   the partnership, as well as working further in the regulatory

24   case, which I believe was what's -- with the DOT next.

25   **Q.**  Right.  So we've heard testimony in this case about the

1    agreement that JetBlue and American Airlines entered into

2    with the Department of Transportation in January 2021.  Did

3    you have any responsibilities related to that agreement?

4    **A.**   I would have supported Anmol in the analytical sort of

5    work required for that agreement, but not direct negotiation.

6    **Q.**   Okay.  And was part of that analytical work regarding the

7    growth commitment?

8    **A.**   Yes, it was.

9    **Q.**   Okay.  So I think you prepared a set of demonstratives to

10   talk about the DOT growth commitments; is that right?

11   **A.**   Yes.  Yes, I have.

12   **Q.**   Go ahead and -- we'll pull that up here.  Let me just ask

13   you to begin by just providing the Court with an overview of

14   what you've done on this chart.

15   **A.**   Yes.  So this is a chart that sort of explains sort of

16   the growth commitment as we agreed to it with the DOT and

17   sort of it's net results for the partnership.

18   **Q.**   Okay.  Let's go down.  First of all, the vertical axis

19   there, it's 2020 flow actual, et cetera.  Can you explain

20   what each of those entries in that column mean?

21   **A.**   Yeah, so that first column is the seats for JFK and

22   LaGuardia as reported from the DOT 200 database.  So the 2020

23   flown actuals is the seat count for AA and JetBlue at JFK and

24   LaGuardia.  Same for 2019.  That's what we actually flew in

25   2019.

1        And then as you go down further, we start talking

2   about the baselines and the adjustments to the baseline.

3   Q.   So hybrid, it says "2018/2019"?  What is that and where

4   did it come from?

5   A.   The hybrid model or the hybrid baseline was a result of

6   the discussion with the DOT addressing some concerns I

7   believe that they had related to the slot waivers that were

8   in place in JFK in 2019 for American Airlines, and so the

9   hybrid model was using 2019 for JetBlue and JFK and

10  LaGuardia, 2019 for American and LaGuardia, but then using

11  2018 for American and JFK.

12        And what you see there is what that new baseline is

13  and it's sort of -- its effect on what we had planned on with

14  the growth commitments, which was a 2019 baseline, the real

15  flown.

16  Q.   Okay.  So that results in a figure here of 37.8 million

17  seats, right?

18  A.   Yes.

19  Q.   Okay.  And then there's -- it looks like there's a

20  deduction that occurs in the next column.  It says, "less

21  AA/B6 slots at 2019-gauge."  What does that mean?

22  A.   Yeah, so that -- as part of the agreement with the DOT,

23  we were to divest seven slot pairs or 14 slots.  And this is

24  the -- sort of the credit we were given for those

25  divestitures in the model, which was at, I believe, AA's

1    minimum gauge at that time and JetBlue's minimum gauge at

2    that time.

3    **Q.**   Okay.  And so then that results in the yellow row in the

4    new baseline of roughly 37.5 million seats, right?

5    **A.**   That's correct.

6    **Q.**   Okay.  And in the next -- I guess it would be the third

7    column of the chart, it says "baseline versus 2019."  What

8    are you showing there?

9    **A.**   Yeah, so the next columns over represent the growth

10   commitment with the DOT, which was 105 percent in 2022 --

11   **Q.**   I'm sorry.  I'm talking about the -- one of lines called

12   "Baseline Versus 2019" --

13              THE COURT:  The column.

14              THE WITNESS:  Oh, I'm sorry.  Yes.  So that second

15   column there -- I apologize -- is just the net effective

16   growth relative to our baseline.

17              So for the hybrid model, the 102.4 percent is

18   essentially saying that what we had planned on or actually

19   flown in 2019, the new baseline was, you know, 102.4 percent

20   or 2.4 percent larger than that.

21              MR. WALL:  Okay.  Understand.  Okay.  So --

22              THE COURT:  Let me -- in Column 1, 2019 flown was

23   what was actually flown by JetBlue and American at JFK and

24   LaGuardia.

25              THE WITNESS:  That's correct.

1          THE COURT:  And then the hybrid is, basically,

2     since there were slot waivers, presumably DOT was saying

3     you -- there's really not a fair basis to do the slot

4     waivers, so we're going to up you to -- we're going to look

5     at 2018 when you had no slot waivers, and that's why that

6     hybrid number is higher?

7          THE WITNESS:  That's correct.

8          THE COURT:  And then the reduction is what would

9     those slots fly -- what did they fly in 2019 at your minimum

10    gauge?

11         THE WITNESS:  That's -- that's, essentially,

12    correct.

13         THE COURT:  Essentially, so --

14         MR. WALL:  The seven divested.

15         THE WITNESS:  Yeah.  The ones that we were getting

16    rid of, we needed a credit for on this line.

17         THE COURT:  Right.  So, then, that's why the new

18    baseline -- then, as it turns out, the new baseline was

19    higher than the actual 2019 baseline because that has to do

20    with the difference in the waivers and the ones you're giving

21    up?

22         THE WITNESS:  Yeah, and what's -- that's right.

23         THE COURT:  Okay.  Got it.  Go ahead.

24    BY MR. WALL:

25    Q.   Okay.  So now we go into the next sort of two columns

1    that are sort of in the middle, 2022 at 105 percent and 2022

2    versus 2019.  What are you showing there?

3    **A.**   So in the -- the -- again, it's the 5 percent commitment

4    based on the 2019 flown actuals, and then the net effect of

5    the hybrid baseline, which is the 107.5 percent.  And then

6    that less the reduction in slots, which is the new baseline

7    of 106.7 percent.

8             So what we had originally, I think, talked about

9    was the 105 percent, that the effective increase relative to

10   19 was 107.5 percent.  And then if you net out the slots that

11   we were -- we were -- we were divesting, it's 106.7 percent.

12   **Q.**   And the DOT has an interim growth commitment of 5 percent

13   in 2022?

14   **A.**   That's correct.

15   **Q.**   Okay.  And so then the next two columns that sort of

16   begin 2023/2024 --

17             THE COURT:  So wait.  So the hybrid -- the plus you

18   get in the hybrid in the first column -- in other words, the

19   difference between the flown actual and the hybrid is a plus

20   based on the difference between the slots waivers and what

21   you did the year before at JFK?

22             THE WITNESS:  That's right.  It's just the --

23             THE COURT:  So that year plus just gets added all

24   the way across.

25             THE WITNESS:  Yeah.  And it's because it's an

1   increase of the baseline, as you add a percent increase, it

2   gets a little bit bigger as you get up.

3           THE COURT:  Right.  And then -- I see.  Okay.  And

4   it's a slightly smaller plot because of the net average and

5   then just add it all way across?

6           THE WITNESS:  That's correct.

7           THE COURT:  Okay.  Go ahead.

8   BY MR. WALL:

9   Q.  Okay.  All right.  So the DOT agreement then sets

10  110 percent baseline for a later period, right?

11  A.  Yes, for 2024.

12  Q.  And that's what you're dealing with here in these next

13  two columns?

14  A.  That's correct.

15  Q.  Okay.  So explain that.

16  A.  So the 105 percent stepped up -- in 2022 -- stepped up to

17  110 percent in 2023 and then was maintained in 2024 as well,

18  so 110 percent targets in '23 and 2024.  And, again, the

19  second column in that section is the net effect of growth

20  versus 2019.

21  Q.  Okay.  Actually, I think I misspoke.  So the -- the

22  10 percent, that's the growth that you have to hit to avoid

23  any further slot waivers?

24  A.  That's correct.

25  Q.  Okay.  And then -- so the 15 percent that is the growth

1  that you have to hit to keep all ten of the slots that are at

2  issue?

3  **A.**   The 15 percent is the growth commitment for 2025.

4  **Q.**   Right.

5  **A.**   So it went 5, 10, 10, 15.

6  **Q.**   Okay.  So what is that then show about the overall growth

7  commitment that you're taking on here?

8  **A.**   So the growth commitment prior to the divestiture of

9  slots was effectively 117.7 percent of what we actually flew

10 in 2019 and then adjusted for -- for the seven slot

11 divestitures would have been 116.8 percent of what we flew in

12 2019 in 2025, the requirement to avoid any other conditional

13 divestitures by 2025.

14 **Q.**   Great.  Thank you, sir.

15         Let's go on to the next demonstrative.  This is

16 entitled "DOT required capacity increases" bar chart.  What

17 are you showing here?

18 **A.**   Yeah, so this is 2020 and 2021 actual seats, and then

19 what we had committed to growing to, in 2022, 2023, 2024, and

20 2025.

21 **Q.**   Okay.  And so you're -- you're dating the agreement there

22 at January 10, 2021, which is -- that's a period of COVID

23 recovery, right?

24 **A.**   That's right.  It was a very aggressive, or for me at

25 least, a pretty scary commitment to grow that fast that

1    quickly in the middle of COVID.

2    **Q.**   And what is that red dotted line?

3    **A.**   I think that line represents, you know, the highest sort

4    of seats flown between the two carriers in JFK and LaGuardia

5    in the past ten years.  So we were committing in 2022 to

6    exceed what we had done historically and then growing from

7    there.

8    **Q.**   Thank you, sir.

9             So let's go to the next chart.  It's called

10   required growth -- seats 2018/2019 hybrid.  What are you

11   doing here?

12   **A.**   This charts a chart that sort of explains our model, that

13   explains what happens if you -- to calculate what would

14   happen if you didn't meet your commitments or to explain

15   what's required to meet your commitments.

16   **Q.**   So just take us through the math that's reflected here

17   over the --

18   **A.**   Yeah.

19   **Q.**   -- the different years.

20   **A.**   I used the letters on the right-hand side of the first

21   column there to sort of point out the calculations.  So the

22   first column is the hybrid baseline.  It's the same baseline

23   you saw earlier, and it's the number of slots we had between

24   the two carriers, or what I believe we had between the two

25   carriers at the time.  And then if you go down where it says,

1    "D = A + C/B" that's the seat per slot pair.  So if you

2    divide the seats by the total slot sheet, it's seats per slot

3    pair.

4            If you move to the right, 2022 was our first

5    commitment.  And what I'm showing there is the seat growth

6    commitment and the total slots by which you would evaluate

7    that other, which remove the seven slots that were

8    divested -- that were divested as part of the agreement, plus

9    an additional -- at the time we were planning had just set

10   aside six slots for JetBlue transatlantic flying.  Basically,

11   as a -- as a placeholder, the growth that JetBlue had in the

12   transatlantic which required them to use slots at JFK in this

13   instance was -- would not count towards our growth commitment

14   as per our agreement with the DOT.

15           So those slots were removed from the calculation,

16   so the 452 goes to 439; and the difference there is the 13

17   slots, the seven divested plus the six at the time we had set

18   aside for JetBlue transatlantic flying.

19           In this column at the bottom where it says, "slot

20   pair divestitures" says "zero" because what I'm reflecting is

21   that we meet the 5 percent growth in 2022.

22           THE COURT:  Is the target December 31st,

23   January 1st of 2022, or somewhere in between?

24           THE WITNESS:  It's full year, so it's full year

25   actual flown.  You measure it in, I think, January, the very

1    beginning of the next year, and determine what the result

2    was.

3                THE COURT:  I see.  Okay.

4    BY MR. WALL:

5    **Q.**  Okay.  So what are you showing there in that -- in that

6    column that has the yellow in the top row?

7    **A.**  Yeah, so I'm giving an example of what happens if you

8    don't perform to your commitment.  So this chart illustrates

9    making the 5 percent commitment in 2022 and the 10 percent

10   commitment in both 2023 and 2024, and then the yellow column

11   there that's highlighted shows what would happen if we didn't

12   make it all the way to 15 percent in 2025.

13   **Q.**  15 percent of above which baseline?

14   **A.**  This is the true seat commitment.  So this would be the

15   15 percent of the adjusted baseline.

16   **Q.**  Right.

17   **A.**  So this is the nominal seats at the top; it's the actual

18   commitment.

19                And what I'm showing here is that, you know, let's

20   say we grew by 12 percent instead of 15 percent, which would

21   be a pretty large number, what would happen here is if you go

22   down to column -- which says F, which is equals E minus

23   seats, the second to bottom row, the way that the commitment

24   works is you take the number of seats you missed by, so this

25   was a 1.1 million, which reflects 12 percent growth instead

1   of 15 percent growth, and you would then divide that by D,

2   which is seats per slot pair that you actually flew, and that

3   would determine the number of conditional slots you would

4   have to divest because of your miss.

5           And in this instance, just growing at 12 percent,

6   instead of 15 percent, would have reflected divesting all the

7   slots that we had agreed to divest all 10 slot pairs.

8   **Q.**  So you could actually have 12 percent growth above an

9   adjusted baseline and you'd still lose all 10?

10  **A.**  That's correct.

11          THE COURT:  Explain that formula again.

12          THE WITNESS:  Yeah, so you basically look at what

13  you committed to grow by in terms of total seats.  So --

14          THE COURT:  5.6 million here?

15          THE WITNESS:  Yes, that's correct.

16          THE COURT:  All right.

17          THE WITNESS:  And you say I'm simulating, if you

18  look in the first row there, it says 42 million.  If you look

19  to the right, 43 million reflects the 5.6.  The 42 million is

20  saying 12 percent growth instead of 15 percent growth.

21          THE COURT:  All right.

22          THE WITNESS:  That delta is in the lowest, the

23  second to bottom column.  That's missing our growth movement

24  by 1.1 million seats.

25          THE COURT:  Right.

1          THE WITNESS:  And then to determine how many slots

2     you would divest, you take that 1.1 million seats, and you

3     divide it by what you -- how many seats you actually flew per

4     slot, which is the 95,694, and that determines how many slots

5     you would divest.

6          The math is not perfect.  I think it actually comes

7     out to more than 10, closer to 12, but the 10 was the

8     agreement for the conditional slot divestitures.

9          THE COURT:  Okay.  Got it.

10    BY MR. WALL:

11    **Q.**  Okay.  Thank you.  We can put that down.

12          So from your perspective, how would you describe

13    the pressure to grow that that commitment puts on American?

14    **A.**  It was --

15          MR. BERMANN:  Objection.  Leading.

16          THE COURT:  Overruled.

17          THE WITNESS:  It was quite aggressive in my

18    opinion.  I mean, in the middle of COVID, growing to

19    something in just a year later -- I mean, we knew there was

20    no way we could get there in 2021 regardless of recovery

21    period.  But being 5 percent greater than you were in 2019

22    and then adjusting that to 7, almost 7½ percent was an

23    incredible growth commitment.  And then, you know,

24    maintaining that out into the future to be something that's

25    closer to, like, 15 to 17 percent growth was really high.

1    That was my opinion.

2    BY MR. WALL:

3    **Q.**   So how are you doing in terms of progressing towards

4    meeting those growth commitments?

5    **A.**   I haven't looked at the exact numbers, but I understand

6    we're on track to make our 2022 commitments.

7    **Q.**   Okay.  New subject matter.  Thank you.

8              We've heard a lot in the trial about seamlessness.

9    Are you involved in the seamlessness initiatives at American

10   Airlines?

11   **A.**   I am.

12   **Q.**   Okay.  Just generally, what is your role and what has

13   been your role and responsibilities with respect to

14   seamlessness?

15   **A.**   Yes, so my job, historically and through the time period

16   here when we were rolling out and launching the NEA, I was

17   responsible for, you know, the codeshare implementation and

18   then making sure that we move forward with many of the key

19   categories on seamlessness, working with JetBlue to help

20   prioritize the work and making sure it got done.

21   **Q.**   Thank you, sir.

22             So I want to pull up Plaintiffs' Exhibit 369, which

23   the Court has seen before in Mr. Raja's testimony.  You're

24   familiar with this presentation, are you, sir?

25   **A.**   I am.

1  **Q.**  Okay.  And let's navigate to slide 61, please.  And I
2  think that we talked with Mr. Raja a little bit about this,
3  but just to orient our discussion, can you explain what this
4  chart is indicating and its relevance to seamlessness?
5  **A.**  Yes, so this is looking sort of holistically at the
6  customer journey, the end-to-end journey.  And the point of
7  seamlessness is we need to be able to deliver a cohesive, you
8  know, experience across the entire journey, not just on one
9  individual stage, not just when you fly or when you shop, but
10  holistically across the journey.  And it's broken into these
11  separate categories that we consider and look at while we're
12  evaluating and implementing seamlessness.
13  **Q.**  And are those, in fact, categories that you have
14  considered with respect to the NEA?
15  **A.**  Yes.
16  **Q.**  Okay.  Let's go to slide 62.  In this slide, which I
17  don't think we've seen in court before, we have a specific
18  example, some examples of seamlessness.  I want to direct
19  your attention to the middle box that has the JetBlue logo on
20  there.  And you see that there's an icon, picture, whatever
21  you want to call it, of a bus there, right?
22  **A.**  Yes.
23  **Q.**  We've all heard about the bus.  Did you have something to
24  do with the bus?
25  **A.**  Yes.  No, we did work on the work to get the bus off the

1    ground between Terminal 5 and Terminal 8.

2    **Q.**  How did that come about?

3    **A.**  Well, the bus was a solution to something.  We knew that

4    AA and JetBlue in JFK could never really live in the same

5    terminal.  There's too many slots and too many departures and

6    not enough gates in one given terminal, so connecting

7    customers between Terminal 5 and Terminal 8 was going to be a

8    challenge that we needed to solve.

9          The bus is a great example of that.  This really

10   came to life, I think, when we had a walk-through of the --

11   JFK with -- at one of our steering committee meetings with

12   Robert and Joanna.

13   **Q.**  Robert Isom and Joanna --

14   **A.**  -- Geraghty, JetBlue's president.  And we looked at the

15   customer experience and we had to go out and walk around and

16   then we looked at what a solution might be which is a sterile

17   side secure bus connector.

18   **Q.**  What do you mean by "sterile side"?

19   **A.**  Make sure that customers don't have to exit security and

20   come back.  Any time we can prevent that, that's a much

21   better customer experience than having to go out and then go

22   back through security and creates less variability, things

23   like that, in the time it takes.

24          And so we went out and we understood, I think, in

25   late March, early April, what it would take to get the bus in

1    place, and it sort of became a requirement to go do so.

2    **Q.**  And you've commissioned a video of that bus solution,

3    right?

4    **A.**  Yes.

5          MR. WALL:  Your Honor, we have a video.  It's

6    Defendants' Exhibit 956.  It's -- the Department of Justice

7    has had a look at it already.  It's not admitted into

8    evidence.  I would move it into evidence.  There are no

9    objections.

10          THE COURT:  All right.  No objections, it's

11   admitted.

12          (Defendants' Exhibit DX956 admitted into evidence.)

13   BY MR. WALL:

14   **Q.**  Okay.  What I would like you to do if you could for me

15   is, as we play the video, you get to be the color commentator

16   on the game.  Just go ahead and narrate for us what -- what's

17   being shown in the two different sides of the video.

18          Go ahead, please.

19   **A.**  Okay.  I'll do my best, as it moves pretty quickly, but

20   it's a side by side with the pre-NEA experience on the

21   left-hand side, which is the AirTrain, and post on the right.

22   And here the same person is exiting Gate 20 on Terminal 5,

23   the JetBlue side, and here they're going down towards the

24   security exit.

25          On the left-hand side, they'll actuality exit

1      security, which will be towards the AirTrain.  On the

2      right-hand side, the NEA experience, you go back up those

3      steps and to the right.  It takes about four minutes to get

4      there to the shuttle bus.  On the left, you're walking

5      through baggage claim over to the AirTrain.  On the right,

6      you're going to be riding on the bus, which you'll see here

7      as this goes through.

8              The bus goes around Terminal 5 all the way out and

9      around, as you're going watch here, and then parks at

10     Terminal 8 at the American Airlines side.  And on the left,

11     we're walking here toward the AirTrain.  And the AirTrain

12     does this outside of the terminal.  So we've exited security

13     and they're now getting on the AirTrain.  The right-hand

14     side, the bus is now going across the airport.

15             And we'll add that four-minute time block that you

16     saw at the end.  We wanted to keep the cameras synced up here

17     on the counter.

18             So now they're exiting the bus on the right-hand

19     and exiting the AirTrain on the left-hand side.  Of course,

20     on the bus, on the right-hand side, you're on the secure

21     side.  So they're walking to the gate on the AA side.

22             And on the right -- the left-hand side, after using

23     the AirTrain, you then come to security.  And then depending

24     on how long the security wait is -- this average from the

25     website here is 22 minutes.  You then get through security

1   and now do that same journey where you walk toward the gate

2   and are seated.

3          THE COURT:  So the biggest difference in time is

4   eliminating security?

5          THE WITNESS:  Yeah, and it's a lot less walking, of

6   course, right?  And so any time you can sort of reduce that

7   time -- it's also reduces variability across that as well.

8   Where.

9          THE COURT:  Interesting.

10  BY MR. WALL:

11  **Q.**  Thank you, sir.

12         Okay.  I want to turn next to another demonstrative

13  that you've put together with respect to seamlessness.  This

14  has to do with some of the various tasks you've taken on as

15  far as the seamlessness initiatives of the NEA; is that

16  correct?

17  **A.**  That's correct.

18         MR. WALL:  Why don't we pull these up here.  And

19  before -- let's pull up the first one.  Okay.  Before we get

20  started here, I just --

21         Andy, if you can just cycle through the next four

22  together just to show that what's going on --

23         And, Your Honor, this is one long timeline.  If you

24  look at the bottom as we cycle through things, you're going

25  to see a succession of periods of time.  So -- they don't

1    make a screen this wide.

2            All right.  So you can go back, Andy, to the first

3    one, which is in May 2020.

4    BY MR. WALL:

5    **Q.**  And the first question is, could you just kind of tell us

6    about the construction of this timeline, what you've done and

7    what these different color categories with the dots at the

8    top of the chart are?

9    **A.**  Yeah.  So this is, as you just described, the timeline of

10   what I call or what we have here are some of the key seamless

11   events that have occurred as part of implementing the NEA and

12   seamlessness within the NEA.  We've tried to categorize them

13   into different sort of groups that are responsible for the

14   categories.  So codesharing availability is separate from

15   customer notifications, separate from, like, the digital

16   customer experience that's CX and immersion, or how we

17   provide the view of the product to the customer, which is

18   separate from our marketing and external communications.

19           There's a category in here for what we're doing for

20   our operations teams at the airport and our corporate real

21   estate teams there, a category for sales, and then one for

22   status member benefits, the things that the customers really

23   care about, their benefits with the respective airlines.

24   **Q.**  Okay.  Thank you.

25           Now, I certainly don't want to go through each and

every one of these, but on this first page, which is the
period from May 2021 to September 2021, can you highlight for
the Court some of the main milestones in achieving
seamlessness?

**A.**   Yes.   Thanks.   The first thing I'd point out is --
perhaps, it's not on here -- which is we launched a codeshare
in February of 2021.   That was the codeshare launch.   And so
coming up to the summer, we had worked very quickly on a
couple of things.

One, we knew that we were going to be launching the
two new routes that were part of the NEA:   JFK Tel Aviv and
JFK Athens.   And we had spent a lot of time and effort on
making sure that those routes not only were being sold by
both carriers, which is where you see codeshare phase 2
implementation, but that we were able to communicate with the
customers and connect those passengers who were going to be
connecting onto those flights, you know, as -- as well as
possible.

So prior to the bus in May, we had invested in
way-finders, which are -- and signage so people and signs to
help get customers from Terminal 5 to Terminal 8 and vice
versa.   And then once we, obviously, launched the bus in
June, that would create a better -- a better proposition for
customers.

Also, in May, one of the first things we rolled out

1   for the NEA is the all important ability for our customers to

2   accrue their points and miles.  So if you were flying on a

3   JetBlue flight, regardless of whether or not you booked it

4   through American, or if you booked it through JetBlue and you

5   wanted to earn advantage miles, you were able to do that very

6   early on.  It's important to our customers that when they're

7   traveling with our partners, that they can earn their miles

8   and vice versa for JetBlue; when their customers are

9   traveling on American, they can earn their points.

10          As we move through the summer, you'll see a lot of

11  these bars and indicators are about communicating with the

12  customer.  We did everything we could.  We were sending

13  ad hoc e-mails to make sure that -- a lot of our customers

14  here hadn't been traveling through COVID, and -- you know, so

15  realizing that JetBlue's in Terminal 5 at JFK instead of

16  Terminal 8 is not something that -- you know, we felt like we

17  could help by sending some ad hoc e-mails to make sure they

18  went to the right terminals for their flights.

19          We also started exposing both the record locaters,

20  we call them "PNRs," so you could understand what the

21  confirmation code was and manage your reservation with the

22  respective airline through that confirmation --

23  Q.   That's what's above July of 2021, where it says "AA PNR

24  and B6 e-mails"?

25  A.   That's right.  And then, as you go down, the check-in

1    e-mails, as well.  That's correct, Dan.

2              We had established in July a data-sharing platform.

3    Some reporting for our operations team in JFK has been -- is

4    being rolled out in Boston and LaGuardia as well to notify

5    inbound connections to the outbound flights to make sure that

6    both teams knew how many customers were coming on, how many

7    bags needed to be transferred, et cetera, and trying to make

8    sure that we were making that process move as smoothly as

9    possible.

10             And then you'll see on the right-hand side of the

11   chart if I skip -- skip over a few, you know, we were

12   starting to do everything we could in terms of boarding

13   passes, in terms of check-in moving from e-mails, PNR

14   visibility, to deep links in the app, deep links on the

15   dot-com, etc.

16   **Q.**  Okay.  Let's go to the --

17             THE COURT:  Before you do, just -- so this time

18   frame, there's two -- from -- two new routes added one JFK to

19   Tel Aviv, one JFK to Athens.

20             THE WITNESS:  They're two long-haul routes that

21   we're talking about.

22             THE COURT:  Right.  Long-haul routes.  Right.  And

23   those -- that means that there wasn't, prior to this,

24   American Airlines service to those two cities from JFK?

25             THE WITNESS:  I don't believe so, no.

 1          THE COURT:  Okay.  And does that mean there was no

 2     service by American Airlines from anywhere in the US to those

 3     cities?

 4          THE WITNESS:  I -- I do not recall if we ever

 5     served Athens and I don't recall -- I believe we served

 6     Tel Aviv perhaps from Philly or from Miami.  We do from Miami

 7     now.

 8          THE COURT:  Okay.  Thanks.

 9          Go ahead.

10     BY MR. WALL:

11     Q.  You had something you wanted to add, or are you going on

12     to the next slide?

13     A.  No.  I just wanted to point out these were -- these

14     were -- the reason they're on here is because they're big new

15     route launches, and we wanted to make sure we had codeshare

16     and connectivity.

17          THE COURT:  Yes.  No, I understand.  Definitely

18     routes are added, and that's part of the NEA, is to add these

19     routes.

20          THE WITNESS:  Yeah.

21          THE COURT:  Yeah.

22     BY MR. WALL:

23     Q.  Okay.  So the second in the sequence is October 2021 to

24     February 2022.  What are some of the notable seamlessness

25     accomplishments during that period?

1   **A.**   Yeah.  So a lot of the work really from the beginning of

2   the NEA, but from the -- you know, heavy work over the summer

3   to get benefits out to customers, the next big thing here was

4   to make -- making sure that JetBlue Mosaic customers and

5   American Airlines Advantage customers received their benefits

6   while traveling, so we got the points and the miles thing

7   figured out, but we needed to make sure we were delivering

8   customers their -- you know, their priority access screening,

9   their bag tags, the ability to board the airplane with a

10   priority, et cetera.  And this had been accomplished with

11   other partners through what we would call the Oneworld rails

12   or --

13   **Q.**   What?

14   **A.**   Oneworld rails.

15   **Q.**   Rails?

16   **A.**   It's a term that I won't admit to know exactly what it

17   means, but the idea is, you know, in Oneworld, we have

18   technology sort of to take care of the entirety of Oneworld.

19   JetBlue is not in Oneworld.  So these were custom sort of

20   solutions to be able to create this ability for customers to

21   receive their benefits while traveling on the partner

22   airline.

23           We had also --

24           THE COURT:  This doesn't -- the NEA doesn't put

25   them in Oneworld?

1          THE WITNESS:  No.

2          THE COURT:  Do I have a copy of this?

3          THE WITNESS:  I'm sorry?

4          THE COURT:  Do I have a copy of this?

5          MR. WALL:  I guess not, but we -- as of this

6   moment, people are working on it.

7          THE COURT:  Okay.  I think it would be helpful.  As

8   to all of the demonstratives, when used with the witness,

9   generally, I think some of them already have, but I think

10  it's helpful for me to have them.

11         THE WITNESS:  So the other thing we did is we

12  started to roll the codeshare markets into our -- into

13  American's unilateral corporate deals to make sure that our

14  corporate customers had access to the NEA, as well, with

15  their programs in place.

16         And then the second reciprocal benefit to accruing

17  miles was the ability to redeem miles, and that was done in

18  the fourth quarter as well in 2021.

19  BY MR. WALL:

20  **Q.**  Okay.  If we go on to the next one, and now the period is

21  February 2022, we're into this year, through June.  What are

22  some of the significant seamlessness accomplishments during

23  that period of time?

24  **A.**  Yeah.  So you'll see this again, continuing to roll out

25  codeshare throughout this process, as more markets came

1    online and there was capability to do so and regulatory

2    approval for it, but we continued to try and move things and

3    we were doing ad hoc e-mails up into either AA.com or

4    JetBlue.com or to the apps.  And we rolled out what we're

5    calling I guess phase 1, 1B, and phase 2 status benefits

6    here, which is beyond just, you know, your priority access

7    and your priority screening, but having access to extra leg

8    room seats, the ability to do same-day flight changes you'll

9    see go throughout here, the ability to move from flight to

10   flight which is particularly important to our customers in

11   the high frequency markets, and had changed some of our other

12   policies at AA.

13          So, for instance, we were now allowing Admiral's

14   Club members traveling on a JetBlue ticket to access the

15   lounge, which we hadn't been doing before, and making sure

16   that we were syncing up our communications with JetBlue, and

17   then you'll see in the next slide, holistically throughout

18   all of our partners, to make sure that we knew when we were

19   talking to customers and they knew when they were talking to

20   customers, making sure customers get one e-mail and it was

21   consistent.

22   **Q.**  Okay.  And then finally the last slide is the period from

23   May 2022 up to September 2022.  What have been the

24   significant accomplishments during this period?

25   **A.**  Well, you know, one of the main ones is, as JetBlue has

1    been, I believe, rewriting or implementing a brand-new

2    website, one of the key things that they had done in there is

3    made it possible to sell American Airlines business class and

4    first class.

5            On the website, they hadn't historically had a need

6    to say anything other than Mint, and we needed a column that

7    would set business and first so they could expose those fares

8    or those opportunities for their customers.  So they did that

9    this summer.

10           And then as you move to the right --

11           THE COURT:  That's to sell AA premium?

12           THE WITNESS:  That's correct.

13           And then as you move to the right, the Boston

14   secure corridor at Boston between B and C, the ability,

15   again, to walk inside of security from the American gates to

16   JetBlue gates, as well as the full code location, which isn't

17   directly called out here, of JetBlue into LaGuardia at

18   Terminal B occurred.  And I think just recently, and perhaps

19   in the past couple of weeks, we started to sell connections

20   in those airports, as well.

21   BY MR. WALL:

22   Q.  And the line that says "codeshare expansion B6/*AA on

23   DOH/EZE," what does that mean?

24   A.  Yeah.  So that's JetBlue adding codeshare to some more of

25   the international routes that are coming online as part of

1    the NEA.  So these were routes that either hadn't launched or

2    we didn't have regulatory approval and we now do and we're

3    now adding codeshare for those markets.

4    **Q.**  Okay.  Thank you, sir.

5          So do you make efforts to track how your

6    partnerships are performing with respect to seamlessness and

7    other metrics?

8    **A.**  Yes.

9    **Q.**  And what form does that performance tracking take?

10   **A.**  These -- the form would be in monthly score cards that

11   we -- that we produce for partnerships in general and then

12   key partnerships like this one, as well?

13   **Q.**  So the NEA is part of a broader score card?

14   **A.**  That's correct.

15   **Q.**  Okay.  And how long have you been tracking the NEA's

16   performance?

17   **A.**  We've been tracking some metrics from the very beginning,

18   and then as the score card evolves, we add those metrics in,

19   as well, for the NEA.

20   **Q.**  Okay.  Let's take a look at one of those score cards.

21         MR. WALL:  Your Honor, we're going to pull up

22   Defendants' Exhibit 149.  This is a document that has been

23   sealed in full and it should not be published.  It has been

24   admitted into evidence.  We're going to put up -- the -- the

25   font on this is extremely small and so we're going to put it

1    up on the screens, but we would ask that it not be published

2    to --

3              THE COURT:  Put it on the lawyers, witness, and the

4    court, but not the public or the Zoom.

5              MR. WALL:  Right.

6              THE COURT:  Can we do that, Kellyann?

7              THE DEPUTY CLERK:  Yes.

8              THE COURT:  Okay.

9    BY MR. WALL:

10   **Q.**  And now, Mr. Schweinzger, because of this, we have to

11   have a -- a bit of a cramped conversation about this where I

12   may ask you some questions just to identify what our data

13   point is and verify it, but don't say it out loud.

14   **A.**  Okay.

15   **Q.**  Okay?  Good.  Okay.

16             So first of all, do you recognize this document

17   that is been marked as DX149?

18   **A.**  I do.

19   **Q.**  And just what is it?

20   **A.**  This is a -- what's referred to internally as the F4

21   meeting, but what it is is the -- sort of our alliances and

22   partnerships and seamless partnerships score card, the

23   monthly report that we provide.

24   **Q.**  Okay.  And, again, this is -- this will have information

25   about lots of different airline partners, that's correct, not

1    just NEA?

2    **A.**   That's correct.

3    **Q.**   So let's navigate to page 31 and we've been discussing

4    seamlessness, so I'll begin with that.  On the top right-hand

5    corner that's -- there are some rows under a heading that's

6    called "customer journeys."  Do you see that?

7    **A.**   I do.

8    **Q.**   And what does customer journeys mean and what's -- what

9    is shown below?

10   **A.**   So customer journeys is what you showed sort of in

11   that -- in the previous partnerships, 2.0 document, is our

12   sort of measure or as you're seeing here, seamless score for

13   American, customers traveling on a partner and for partners'

14   customers traveling on American, which are the next two rows.

15        That score is a combination of -- I think it's 250

16   plus different touch points on the journey, that we ran a

17   survey for and sort of created seamless scores that we can

18   evaluate not only the NEA, but all partners consistently on

19   our path to seamlessness.

20   **Q.**   Okay.  And you can see that there's two different --

21   there's a distinction that's made between AA on partner and

22   then partner on AA.  What's the point of that?

23   **A.**   Well, as, you know, for various reasons -- technology

24   agreements, et cetera -- you want to measure both how our

25   customers are being treated on partner airlines and then,

1    reciprocally, how our partners' customers are being treated

2    on American Airlines.  And we measure both scores so that we

3    can keep track of how we're doing.

4    **Q.**  So in the grand scheme of things, what's a good grade,

5    what's a good seamless score?

6    **A.**  I -- you know, anywhere in the, I think, 60 to 65 percent

7    range would be pretty strong.  It starts to get incrementally

8    more difficult after that.  I think -- perhaps our -- one of

9    our longer standing partners is at this point in time in the

10   70, 71, low 70s.

11   **Q.**  Okay.  So what we're seeing in the column that's labeled

12   "Q2 22" are the seamlessness scores for, respectively,

13   American Airlines on JetBlue and JetBlue on American?

14   **A.**  That's correct.

15   **Q.**  Okay.  Thank you.  Thank you, sir.

16           Now, I think that, partly to deal with some of

17   these confidentiality issues, you've prepared a demonstrative

18   to summarize the NEA progress on seamlessness; is that right?

19   **A.**  That's right.

20   **Q.**  Okay.  Why don't we pull the document down and pull that

21   up.  We'll come back for the document a little bit later.

22           What is this?  What are you showing here?

23   **A.**  This is the scores we just looked at trended over time

24   for the -- for our partnership with JetBlue or the NEA

25   seamlessness scores.

1   **Q.**  And is this based upon a standard business methodology

2   that you have for all partnerships?

3   **A.**  That's correct.  We have this score for all of our

4   partners just like this -- for many of them, I should say,

5   not every last one of them, but for nearly all of them.

6   **Q.**  And so how do you read it?  What do you see there with

7   the blue line and with the dotted red line?

8   **A.**  Yeah.  So the dark blue or the solid line is, as we

9   looked at in the last column, American on JetBlue or

10  American's customers traveling on JetBlue.  And the dotted

11  line is JetBlue customers traveling on American.

12          And it just shows the ramp-up and progress, to

13  date, of implementing seamless initiatives.  And then it

14  shows, beyond that, where we think where we'll be or where we

15  have a line of sight to, and then what our plan is for 2023

16  or at least through mid year of 2023.

17  **Q.**  So it would appear from this that your target for

18  seamlessness in the NEA is somewhere up in the mid 80s.  Am I

19  reading that correctly?

20  **A.**  Yes.  That's what it says.

21  **Q.**  So you're targeting a number higher than the highest

22  partner has achieved to date?

23  **A.**  Yes.  To date, this would be above what we -- I believe

24  we currently have in place, or at least as of this July

25  metric, with one of our longest-standing partners.

1    **Q.**   Okay.  Thank you, sir.

2              MR. WALL:  You can take that down.

3              THE COURT:  One question.  So the way this is done,

4    so take the bus, right, or take Logan.  There was a period of

5    time in this chart where the connection did not exist inside

6    security between terminals and B and C?

7              THE WITNESS:  Yes.

8              THE COURT:  And so that would lower the seamless

9    score because it's -- assuming whether you could transfer

10   without going through security is a factor in the score, then

11   that would have been not adding points to the score prior and

12   then it would be adding points after the connection?

13             THE WITNESS:  That's correct.

14             THE COURT:  And so it's identifying various things

15   like that that have been predetermined that are across all

16   the partnerships, presumably, that are -- promote

17   seamlessness or go into the score?

18             THE WITNESS:  Yeah, that's exactly right.  And then

19   the score is weighted so there are some things that are just

20   absolutely critical and some things that are nice to have,

21   things that are critical --

22             THE COURT:  But it's an attribute score, not a --

23   not like based on surveys.

24             THE WITNESS:  It's an attribute score, but the

25   attributes, themselves, are weighted based on initial an

 1   survey.

 2               THE COURT:  On initial.  But the fact that somebody

 3   took the bus and didn't like it or whatever is --

 4               THE WITNESS:  Exactly.  No, it's a measure of how

 5   well we've done, not how well it's liked.

 6               THE COURT:  Okay.  Got it.  Thanks.

 7   BY MR. WALL:

 8   **Q.**  Just to follow up on that.  Are there still seams?

 9   **A.**  Yes.

10   **Q.**  And do you get complaints about seams?

11   **A.**  I'm sure we do.

12   **Q.**  Have you gotten any today?

13   **A.**  Yeah.

14   **Q.**  From whom?

15   **A.**  From you.

16   **Q.**  Okay.  Are you working on it?

17   **A.**  I am.

18   **Q.**  You're under oath, right?

19   **A.**  We --

20   **Q.**  You're going to get that fixed, right?

21   **A.**  We will get it fixed.

22   **Q.**  All right.  Thank you, sir.

23               Okay.  Let's go back to Defendants' Exhibit 149,

24   again, with the same -- publish to the lawyers but not to

25   gallery.  And we'll go back in this instance to page 18.

1    BY MR. WALL:

2    Q.   Okay.  So besides seamlessness, are there other metrics

3    on which you measure the success of partnerships, including

4    in the NEA?

5    A.   Yes.

6    Q.   And what are -- what are the kinds of things that you

7    look at generally?

8    A.   What we look at, in both flown and future bookings, how

9    much codeshare is being utilized, connectivity, things like

10   that.  And then, of course, something like this, which is

11   sort of a measure of our performance relative to the

12   industry.

13   Q.   Okay.  So what we have up here on page 18 is entitled

14   "NEA QSI Gap Report," in this instance, April to June.

15              I think the Court has heard a little bit about QSI,

16   but what is "QSI"?

17   A.   QSI is the -- it stands for "quality of service index,"

18   and it is essentially a metric that the industry -- the

19   industry internally released a metric that the industry uses

20   to sort of measure the desirability of a schedule in a given

21   origin and destination or a group of origins and

22   destinations.

23   Q.   And how is it -- how is it created?

24   A.   In this particular instance, the QSI output is from

25   Raven, our model.  But it's created based on a set of

1    characteristics of a given schedule or a schedule pattern,

2    and it's then calibrated versus real -- real bookings to see

3    how they actually flew across the schedule.

4    **Q.**   Okay.  We have a demonstrative on QSI that we can put up.

5    And on the less -- excuse me -- on the left, it has some

6    features defining market share, and on the right is

7    calibration.  Can you explain what's going on here and how

8    these criteria are used to determine a QSI score?

9    **A.**   Yeah, so the left-hand side, like I said, is a set of

10   features of a given -- a given schedule or network.  There

11   are more than this.  There are several features, a dozen plus

12   features that the -- that the model uses.  And then it uses,

13   on the right-hand side, real observed behavior, how traffic

14   fell across the network based on these -- these features to

15   determine sort of -- to calibrate the model, to determine the

16   quality of service index for a given carrier relative to

17   other carriers in a given origin and destination.

18   **Q.**   So how do you -- when you get a QSI output, what is --

19   what is the output?  What do you get?

20   **A.**   Yeah, it's sort of like your expected -- it's your

21   benchmark.  It's where you should perform, all things equal.

22   **Q.**   Okay.  And what does a QSI gap mean?

23   **A.**   The gap would be either positive negative, what you

24   actually did, So your market share relative to your benchmark

25   QSI.  So the QSI share gap is your market share relative to

1   your QSI share.

2   **Q.**   Okay.  So what does it tell you if you are above or below

3   the benchmark?

4   **A.**   It would essentially say if you're overpunching or

5   underpunching your weight relative to your network strength.

6   **Q.**   Network strength as measured by these --

7   **A.**   By QSI.

8   **Q.**   -- by these criteria?  Okay.

9          MR. WALL:  So let's go back to page 18 of DX149 and

10  give us -- got to turn the monitors back off again.  Sorry.

11          Great.  Thank you.

12  BY MR. WALL:

13  **Q.**   So what is on the left side of the page?

14  **A.**   So these are market classifications or groupings within

15  the NEA.

16  **Q.**   So, you know, for example, AA and B- -- at B6NS, what

17  does that mean?

18  **A.**   Yeah, so if you're looking at the top there, you're

19  looking at Boston AA and JetBlue nonstop.  So these would be

20  overlapping nonstops in Boston.

21  **Q.**   Okay.  So this is just indicating that you do the

22  analysis based upon a variety of --

23  **A.**   Yep, it's a series of filters.

24  **Q.**   Okay.  And there's a reference there to PDEWs.  What does

25  that mean?

1    **A.**   It's a -- in general, you can think of it as a market

2    size.  I think it stands for passengers per day each way, so

3    it's number of passengers and kind of helps us scale which

4    markets are bigger and are smaller.

5    **Q.**   Okay.  If we info to the right-hand side of the page,

6    there are a lot of numbers, some of which are red and some of

7    which are black.  Can you tell us how one reads these

8    results?

9    **A.**   Yeah.  Like, many things in this case, you want more

10   black than red, and the idea is that this is looking at your

11   market share relative to your QSI, that gap, and looking at

12   how that gap changes over time.

13           So it's not saying that if you were above or below

14   a certain point that you should have been above it or below

15   it.  It's just saying that here's where you were and here's

16   where you are and how did it change?  That's what this

17   represents, the change in share gap.

18           And, you know, the way you read it is, I think, you

19   know, I'll just -- if you go to the bottom line, what you

20   want to see is that your market share gap performance, or at

21   least as part of the NEA where we were growing and trying to

22   become a credible third or great alternative for customers,

23   that you're drawing more demand than you deserve relative to

24   where you were, which is showing a positive share gap.  And

25   here you see that at the bottom.

1    **Q.**   Okay.  And so can you summarize what the results -- what

2    these results are showing about your QSI performance after

3    the NEA?

4    **A.**   Yeah.  What this shows at the bottom is -- that our share

5    gap for both American and JetBlue has improved relative to

6    the 2019 baseline.

7    **Q.**   Okay.  We have a demonstrative to summarize some of these

8    data, which is "Called Share Gap Improvement."  We'll put

9    that up.  What does this show?

10   **A.**   This is a graphical view of what we just looked at, at

11   the bottom row, which shows that AA -- American Airlines'

12   share gap relative to 2019 in these NEA markets is 1.3 points

13   positive, and JetBlue's is 0.5 points positive.

14           And because you're looking at, you know, share gap,

15   you -- this is a zero sum game.  So here you would indicate

16   it's coming largely from the largest competitors who we're

17   trying to built a network to compete with, which is Delta and

18   United.

19   **Q.**   Okay.  So relative to the QSI predictions based upon

20   those criteria that you mentioned, American and JetBlue have

21   improved, and the cohort of Delta and United are down?

22   **A.**   Yes.  That improvement is coming from them.

23   **Q.**   Okay.

24           THE COURT:  So this -- so their decline is greater

25   than your improvement?

1           THE WITNESS:  There's a -- there will be another

2    category of other carriers.

3           THE COURT:  Other carriers?

4           THE WITNESS:  Yeah.

5           THE COURT:  I see.  Okay.

6    BY MR. WALL:

7    **Q.**  So --

8           THE COURT:  It should all add up to zero?

9           THE WITNESS:  Right.  It's a change in gap, so it

10   has to add up to zero.

11   BY MR. WALL:

12   **Q.**  And if we went back to the source document, you would see

13   the other airline category and these things would reconcile,

14   right?

15   **A.**  That's right.

16   **Q.**  Okay.  All right.  Thank you, sir.

17          So taking everything that we just talked about

18   together, what does this analysis tell you about the way the

19   consumers are reacting to the NEA?

20   **A.**  This is what we would have wanted to see, that consumers

21   are selecting AA and JetBlue relative to our largest

22   competitors when you adjust for the changes in schedule.

23          So it needs to be -- zero would have been good,

24   meaning that we are -- like, the schedule we put in place is,

25   you know -- is driving enough traffic to satisfy that; but

1    any positive gap is exactly what we're looking for, that

2    customers are picking AA and JetBlue over our competitors in

3    these markets.  It's a positive thing.

4              MR. WALL:  Thank you, sir.

5              Pass the witness.

6              MR. BERMANN:  Good morning, Your Honor.  Grant

7    Bermann, again, for the United States, on behalf of

8    plaintiffs.

9              THE COURT:  Good morning.

10             **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFFS**

11   BY MR. BERMANN:

12   **Q.**  Good morning, Mr. Schweinzger.

13   **A.**  Good morning.

14   **Q.**  You testified about a number of topics today, so I'm

15   going to cover some of them with you.

16             MR. BERMANN:  Could we put back up the

17   demonstrative Mr. Schweinzger testified about?  I'd like to

18   turn to page 2 of the demonstrative.

19   BY MR. BERMANN:

20   **Q.**  Mr. Schweinzger, you testified about the DOT agreement,

21   correct?

22   **A.**  That's correct.

23   **Q.**  And the DOT agreement does not reference or address

24   Boston in any way, correct?

25   **A.**  It does not reference the slot constrained airports.

1  **Q.** The DOT agreement does not require any divestitures in

2  Boston, correct?

3  **A.** It does not.

4  **Q.** The DOT agreement does not have any capacity requirements

5  in Boston, correct?

6  **A.** No.

7  MR. BERMANN: Let's turn to the next slide.

8  BY MR. BERMANN:

9  **Q.** Mr. Schweinzger, the DOT capacity commitments in New York

10  don't last beyond 2025, correct?

11  **A.** I believe that the end of the commitment is in 2025.

12  That's correct.

13  **Q.** One way that American and JetBlue may try to meet the DOT

14  capacity commitment in New York is by JetBlue flying bigger

15  planes than American had been flying beforehand, correct?

16  **A.** I believe that would -- yes, that would be a way to grow

17  on a defined set of assets.

18  **Q.** And that's something American and JetBlue could have done

19  even without the NEA, correct?

20  **A.** I'm not sure.

21  **Q.** Let's turn to PX301.

22  MR. BERMANN: Your Honor, the Exhibit has already

23  been admitted. There are no reactions.

24  THE COURT: All right.

25  MR. BERMANN: If we could display 301, that would

1    be great.

2    BY MR. BERMANN:

3    Q.  Mr. Schweinzger, this is an e-mail you received from

4    Ms. Nichelle Barrett in January of 2021, correct?

5    A.  Yes.  I recognize this from my deposition.

6    Q.  In her e-mail of 2:18 p.m., which is at the bottom half

7    of the first page, Ms. Barrett asked you questions about

8    upgauging aircraft in New York, correct?  I'd like you to

9    focus on the language that begins "Does this mean."  Do you

10   see that?

11   A.  She's asking if they'll be utilizing some of our slots.

12   I'm looking for the upgauging.

13   Q.  And you answered Ms. Barrett's questions, correct?

14   A.  I don't recall this exchange.  I see it says where I

15   wrote, "Hi, Nichelle.  My first pass below."  So to be

16   honest, I don't recall.  It appears that I may have, yes.

17   Q.  Okay.  Would it help if I showed you some documents to

18   refresh your recollection?

19   A.  I'm not sure.

20          MR. BERMANN:  Your Honor, may we present the

21   witness with two documents to refresh his recollection as

22   to --

23          THE COURT:  Sure.

24          MR. BERMANN:  -- this text -- this exchange?

25          Your Honor, may my colleague approach?

```
 1                THE COURT:  Of course.
 2                MR. WALL:  What are the documents?
 3                MR. BERMANN:  I'm handing out two documents, one --
 4                THE COURT:  I think he's -- right?
 5                MR. BERMANN:  -- AA-NEA-01528593.  That's the
 6      e-mail that Ms. Barrett sent to the witness.  And then I'm
 7      also handing out AA-NEA-01528603.  That is Mr. Schweinzger's
 8      response to Ms. Barrett's e-mail.
 9                THE COURT:  So he just wants you to read these
10      documents to yourself, to see -- when you're done, he'll
11      return to the question.
12      BY MR. BERMANN:
13      Q.  So, Mr. Schweinzger, we've handed you two documents.  The
14      first one has a Bates number on the bottom right ending
15      in 593.
16      A.  Yep, I see that.
17      Q.  Do you see that?  And that's an e-mail from Ms. Barrett
18      to you, correct?
19      A.  Yes.  She's on top there, yes.
20      Q.  And she asked you questions in her e-mail, correct?
21      A.  Yes.
22      Q.  And there are no answers to her questions yet, correct?
23      A.  I don't see anything below the questions she asked, no.
24      Q.  So let's look at the other document you were handed.  It
25      has a Bates number ending in 603.
```

```
 1              MR. WALL:  Your Honor, just to -- I'm just going to
 2   object to the way this is being done.  It's supposed to -- if
 3   this --
 4              THE COURT:  Yeah, if you want him to refresh his
 5   recollection, you just have to have him read the documents
 6   himself.  Then once he's done reading --
 7              Why don't you read the documents yourself.
 8              And when you're [sic] done, just ask him the
 9   question you asked him before you showed him the documents.
10              MR. BERMANN:  Sure.
11              THE WITNESS:  Okay.
12              MR. WALL:  Can we have the document taken down off
13   the screen?
14              THE WITNESS:  I see this.
15   BY MR. BERMANN:
16   Q.  And you see that you responded to Ms. Barrett's --
17   A.  Yes.
18   Q.  -- questions, correct?
19   A.  It does appear that, when I respond, the answers that you
20   showed previously are below here.
21   Q.  Okay.  So let's turn back to the exhibit we were talking
22   about --
23   A.  Okay.
24   Q.  -- now that you've refreshed your recollection.
25              MR. WALL:  Wait, wait, wait.
```

1          THE COURT:  Is that a question?

2          MR. WALL:  You haven't asked him that yet.

3          MR. BERMANN:  Sorry.

4    BY MR. BERMANN:

5    **Q.**  Does that refresh your recollection as to whether you

6    answered Ms. Barrett's questions?

7    **A.**  I don't recall this specific exchange, other than from my

8    deposition, what you've shown me here, but I see that after

9    here, clearly, there were no answers and now there are

10   answers.  So I -- it would appear to me that, clearly, these

11   are things that I would have written.

12   **Q.**  Okay.  Thank you.

13          Let's turn back to PX301.

14          THE COURT:  301 is the one that ends in Bates stamp

15   603?  Or no.  I see.  It's a different version of the

16   exhibit.  Okay.  Go ahead.

17   BY MR. BERMANN:

18   **Q.**  In your e-mail of 2:18 p.m., Ms. Barrett asked you

19   whether JetBlue will be using some of American's slots to

20   expand, correct?

21   **A.**  Yes.

22   **Q.**  And she asked you also whether the NEA allows American

23   and JetBlue to move slots between the two carriers, correct?

24   **A.**  Yes.

25   **Q.**  And you answered that American and JetBlue do plan to

1    lease slots back and forth, correct?

2    **A.**   Yes.  That's what it says, yes.

3    **Q.**   And then below that, you wrote, "The NEA doesn't

4    specifically create that ability.  We could have always done

5    that."  Did I read that correctly?

6    **A.**   That is what it says and it says, "But we do plan to do

7    this as part of the NEA?" with a question mark.

8    **Q.**   And this was a fact check for immediate inquiry, right?

9    **A.**   She was asking for facts for immediate inquiry.  That's

10   correct.

11   **Q.**   And you try to be truthful when you respond to colleagues

12   that are doing fact checks for the public, correct?

13   **A.**   Yes.

14   **Q.**   I'd like to turn to another topic.  Mr. Schweinzger, you

15   testified about how the NEA is being implemented, correct?

16   **A.**   Yes.

17   **Q.**   Let's look at an internal American Airlines presentation

18   about the implementation of the NEA that you were on.

19           MR. BERMANN:  Could we pull up PX1121?  This

20   exhibit has already been admitted.

21   BY MR. BERMANN:

22   **Q.**   This has an e-mail you received on March 22, 2021,

23   correct?

24   **A.**   Yes.  I recognize this from my deposition as well.

25           MR. WALL:  I object to this.  This is beyond the

1    scope.  He didn't talk about anything having to do with the

2    subject of revenue management.

3              THE COURT:  The subject of what?

4              MR. WALL:  Revenue management.  RM is what's on the

5    cover of this.

6              THE COURT:  Give me one second.

7              MR. BERMANN:  Your Honor, the witness has testified

8    in his direct testimony about implementation of the NEA, and

9    I'm asking him about an internal American presentation about

10   the implementation of the NEA that the witness received and

11   that he discussed with a colleague.

12             MR. WALL:  That's literally not responsive to the

13   question of whether it's within the scope of his -- of his

14   direct.

15             THE COURT:  He didn't talk about revenue

16   management, did he?

17             MR. BERMANN:  He did not talk about revenue

18   management specifically.  We talked about how the NEA was

19   being implemented and I have some questions for him on that

20   same subject matter.

21             THE COURT:  Well, I'll overrule the objection for

22   now, but it seems like what he testified about was

23   seamlessness and the gap and -- so we'll see.  You can ask

24   the first question.

25

BY MR. BERMANN:

**Q.**   And, Mr. Schweinzger, the way seamlessness --
quote/unquote -- is created by the NEA is through metal
neutrality, correct?

**A.**   I think metal neutrality is an important part of
seamlessness, but seamlessness itself means that you're
getting your benefits or you're offering a customer a
cohesive experience, and it applies to all partnerships for
American Airlines, not just those with metal neutrality.

**Q.**   So this is an e-mail -- turning to the exhibit -- that
you received on March 22, 2021, correct?

**A.**   Yes, I'm on the "To" line.

**Q.**   And as of March 2021, the NEA was being implemented,
correct?

**A.**   Yeah.  We were just starting to implement it.

**Q.**   And when you received this presentation that Ms. Colvin
sent you, you sent an e-mail to Mr. Bhargava, your boss on
the clean team, right?

**A.**   I believe that I recall that from my deposition, yes.

**Q.**   Let's take a quick look at that e-mail.  Let's turn to
PX325.

         I'd like you to focus on your e-mail in the middle
of the page.  You wrote to Mr. Bhargava, "We've not done this
ourselves for multiple reasons that become obvious reading
this deck," correct?

1          MR. WALL:  I renew the objection.

2          MR. BERMANN:  Your Honor, the witness has just

3     testified that metal neutrality is an important part of

4     seamlessness.

5          THE COURT:  But he didn't testify about metal

6     neutrality or revenue management.  It seems like it's beyond

7     the scope.  I don't know what this document is about.  I

8     haven't read it yet.  But he talked about the customer

9     experience.  He didn't talk about -- I don't recall him

10    talking anything about the money.

11          I don't think every -- by talking about

12    seamlessness, I mean, every single aspect of implementation

13    is within the scope.

14          MR. BERMANN:  I can move on, Your Honor.

15          THE COURT:  All right.

16    BY MR. BERMANN:

17    **Q.**  Mr. Schweinzger, in your direct testimony, you testified

18    about the text message exchanges you sent to Mr. Pack in

19    May 2020, correct?

20    **A.**  Yes.

21    **Q.**  And, Mr. Schweinzger, were you in the courtroom this

22    morning when the Court heard arguments over the privileged

23    documents?

24    **A.**  If that's what we were doing this morning, then, yes,

25    that's exactly -- I was sitting right there.

1    **Q.**  So you heard Mr. Wall's description of the "no bueno"

2    text during that argument, correct?

3    **A.**  I don't recall what he said, but I know he referenced it.

4    **Q.**  So, Mr. Schweinzger, the Court has already heard

5    testimony about the text messages, so I don't want to rehash

6    the entire background for the sake of efficiency, but I do

7    have some quick questions to set up the context, so we can

8    understand the text message exchanges.

9           You, Mr. Pack, and Mr. Bhargava were members of

10   American's clean team, correct?

11   **A.**  That's correct.

12   **Q.**  And as part of its work, the American clean team used the

13   tool Raven, right?

14   **A.**  Can you say that again?  I'm sorry.

15   **Q.**  As part of its work, the American clean team used the

16   tool called Raven?

17   **A.**  Yes.

18   **Q.**  Raven is a network forecasting tool?

19   **A.**  Yes.

20   **Q.**  Raven forecasts traffic generated by a particular

21   schedule?

22   **A.**  Yes.

23   **Q.**  And the clean team gave outputs from Raven to an economic

24   consulting firm called Compass Lexecon, correct?

25   **A.**  I believe that the outputs of the clean team work, which

1    would have been the -- the scheduled file run through Raven

2    were provided to our regulatory team, yes.

3    **Q.**  And you understand that Compass Lexecon analyzed the

4    benefits of the NEA, correct?

5    **A.**  I do believe so.

6    **Q.**  So let's focus on what was happening in May 2020.  In

7    May 2020, the American clean team requested the v4 schedule

8    from JetBlue, correct?

9    **A.**  I -- I don't recall that, but I understand if that is the

10   case.  I know that there was some conversation around that.

11   **Q.**  And you understand that the v4 schedule was a schedule

12   that projected what would have happened in 2019 if the NEA

13   were in effect at that time, correct?

14   **A.**  My recollection through -- through reading some of these

15   documents is that that schedule would have been something

16   that was a request to constrain ourselves from an asset

17   perspective to what we had in 2019.

18   **Q.**  American received the upload of JetBlue's data for the v4

19   schedule on May 29th, correct?

20   **A.**  I --

21             MR. WALL:  Excuse me?  A vague -- what data are you

22   talking about?

23             MR. BERMANN:  Sure.  We can pull up an exhibit to

24   help the witness.

25             Let's pull up PX0297.  Your Honor, the exhibit is

1    already in evidence.

2             THE COURT:  All right.

3    BY MR. BERMANN:

4    Q.  At the bottom of this e-mail chain of the -- on the first

5    page, there's an e-mail from David Fintzen at 7:56 a.m.  Do

6    you see that at the bottom of the first page?

7    A.  I do.

8    Q.  Mr. Fintzen was on the JetBlue clean team, correct?

9    A.  That's correct.

10   Q.  And he wrote on May 29th, "Our v4 data pack with adjusted

11   frequencies and aircraft types is posted up in the shared

12   folder."  Correct?

13   A.  I do see that, yes.

14   Q.  Okay.  So let's look at what you wrote the day you

15   received the v4 schedule data from JetBlue.  Let's turn to

16   demonstrative 372A.

17            MR. BERMANN:  Your Honor, this demonstrative has

18   already been provided to defendants and defense counsel used

19   it during the direct examination.

20            THE COURT:  Okay.

21   BY MR. BERMANN:

22   Q.  I'd like you to focus, Mr. Schweinzger, on the third page

23   of the text messages.  And I'd like you to look at the fifth

24   text message on that page.

25   A.  Yes.

**Q.**  Do you see that?  Later, on May 29th, after you received the v4 schedule data from JetBlue, you wrote, "I'm completely out of ideas.  So . . . If we show the full network results . . . no bueno."  Correct?

**A.**  I did write that in the afternoon of May 29th.

**Q.**  And then a minute later, if you look down the text messages, you wrote, "Based on what I'm hearing here, if I was DOJ, I could easily kill any deal . . . any deal.  No deal positive.  Ever."  Correct?

**A.**  Yes.

**Q.**  That's what you wrote the day you received the v4 schedule data from JetBlue, correct?

**A.**  That the v4 schedule data from JetBlue is uploaded into the clean team file.  I don't recall looking at or seeing the v4 schedule data from JetBlue.

THE COURT:  Is that the first time you ever got that v4 data, as far as you know?

THE WITNESS:  Again, I don't know what was -- frankly what was in it.  I think that was, like, largely a scheduling effort.  That would have been handled by Jordan and that team, but yes, that's -- to my knowledge, based on reading these, and these e-mails would have been when they uploaded it the first time we had it.

THE COURT:  When it uploaded is the first time you had it.  My question is -- I understand that, because that's

1    how you shared things, right?

2              THE WITNESS:  Right.

3              THE COURT:  They would upload something, and that's

4    how you got it?

5              THE WITNESS:  Yeah.

6              THE COURT:  Was that the first time, if you know,

7    that it was uploaded?

8              THE WITNESS:  I don't.  I believe so.  I have no

9    idea frankly, but I believe so based on that e-mail exchange

10   we just had.

11             THE COURT:  Go ahead.

12   BY MR. BERMANN:

13   **Q.**  Mr. Schweinzger, you provided testimony today about the

14   context and meaning of those text messages we just saw,

15   correct?

16   **A.**  Yes, I did.

17   **Q.**  But you were deposed earlier in this litigation, correct?

18   **A.**  That's correct.

19   **Q.**  And that deposition took place in April of 2022?

20   **A.**  Yes.

21   **Q.**  And at that deposition, you were asked about the text

22   messages?  Correct?

23   **A.**  That's correct.

24   **Q.**  And at your deposition, you testified that you did not

25   recall the text messages?

1    **A.**   That's correct.

2    **Q.**   You testified multiple times that you did not recall the

3    text messages?

4    **A.**   That is correct.

5         MR. BERMANN:  Your Honor --

6    BY MR. BERMANN:

7    **Q.**   Mr. Schweinzger, when between April and today did you

8    recover your recollection of the text messages?

9    **A.**   Well, let's see.  So they were a big part of my

10   deposition, so when I understood that we were coming to trial

11   and that I was going to be here, I started trying to review

12   some of the timelines here.  This was several years ago, so I

13   could understand what some of these things that I had been

14   asked about meant or were about.  So it would have been last

15   several weeks.  Maybe a little bit longer than that, that I

16   went through my notes.

17   **Q.**   What caused you to investigate the context of the text

18   messages?

19   **A.**   Let's see.  It would have been in preparation for today,

20   or for trial, and understanding what happened on that day,

21   what the meetings were, et cetera, and trying to place some

22   of these different files, which I wasn't necessarily certain

23   of when or where or things like that, where they came from,

24   would have been why I wanted to go back through there before

25   I got here today.

1    **Q.**  Were you with counsel when you recovered your

2    recollection of the text messages?

3    **A.**  I don't -- I don't recall my first review of any of this

4    information to be when I was with counsel.

5    **Q.**  Did you discuss your recollection of the text messages

6    with counsel?

7    **A.**  Yes.

8    **Q.**  And so today, having done that investigation, your

9    testimony now is that you were participating in a call at the

10   time you wrote the May 29th text messages we discussed,

11   correct?

12   **A.**  That's correct.  I looked at my calendar.  There was call

13   with -- with the -- with the regulatory team at the same time

14   that these text messages were being exchanged.

15          That's when I recall the dialogue around the

16   but-for scenarios and all the significant lift and effort

17   that would have been required to do that.  It's also when I

18   recall sort of finalizing and, per the e-mails, right, and

19   the documents, our internal case for the NEA.

20   **Q.**  Was Latham & Watkins on that call that you had on

21   May 29th?

22   **A.**  I believe so, that they were, yes.

23   **Q.**  Was Compass Lexecon on the call on May 29th?

24   **A.**  Yes, I believe so.

25   **Q.**  Was Dr. Israel on the call from Compass Lexecon on

May 29th?

**A.**   I don't recall specifically if he was, but it's more than likely that he would have been, as he joined those calls.

**Q.**   At the end of the call, did you understand that you were not to run the v4 schedule through Raven?

**A.**   I don't recall that to be the case.  I was advocating that we not do any more work related to Raven.  That's all I recall from that.

**Q.**   So your testimony today is that you were on a call discussing the NEA with antitrust counsel and antitrust economists when you concluded, quote, "If we show full network results . . . no bueno."  Correct?

**A.**   Again, my -- what I believe I said and what my knowledge is or my recollection of this is that we were being asked to do additional incremental work to support a but-for sort of world that I was not in support of nor did I want to do, which is where these came from.

          And that was in preparation for what I think our regulatory team was saying a likely case would be and things we need to prepare for, things that we should study and look for.  And that is probably a poor choice of words, but certainly sarcasm, because what they were explaining to us, I recall, believing how in the world can this be the case?  Nothing could ever get -- get approved.

**Q.**   Okay.  Mr. Schweinzger, your counsel will have an

1    opportunity to ask you questions --

2    **A.**   Okay.

3    **Q.**   -- in redirect.  But for now, I just ask you that you

4    focus on the question --

5    **A.**   Yes, sir.

6    **Q.**   -- I'm asking.

7             So my question was your testimony today is that you

8    were on a call discussing the NEA with antitrust counsel and

9    antitrust economists when you concluded, quote, "If we show

10   full network results . . . no bueno."  Correct?

11   **A.**   I believe I was on a call when I wrote that text, yes.

12   **Q.**   And that call was with antitrust counsel and antitrust

13   economists, correct?

14   **A.**   Yes, our regulatory team.

15   **Q.**   You discussed with me a bit earlier in my questioning how

16   you received the v4 data pack from JetBlue on May 29th,

17   correct?

18   **A.**   Yeah.  I was just making a clarification.  I don't

19   believe we sent documents as addressing, I believe, what the

20   judge said.  I think we just uploaded them.

21   **Q.**   You asked Mr. Pack to do back-of-the-envelope

22   calculations on the v4 schedule that you received from

23   JetBlue, correct?

24   **A.**   I don't -- I don't recall.  Sorry.  Is that here?

25   **Q.**   I may return to that in a moment.

1    **A.**   Okay.

2    **Q.**   Let's talk about what happened after you wrote the

3    May 29th text messages.  Please turn to Demonstrative 374A.

4           MR. BERMANN:  Your Honor, this is a demonstrative

5    we've previously given to defendants, and we understand there

6    are no objections.

7           THE COURT:  All right.

8    BY MR. BERMANN:

9    **Q.**   These are text messages between you and Mr. Bhargava on

10   June 2, 2020, correct?

11   **A.**   Yes.  That's what it appears to be.

12   **Q.**   So that's a few days after the May 29th text messages,

13   correct?

14   **A.**   Yes.

15   **Q.**   I'd like you to focus on the fourth text.  Do you see

16   that?

17   **A.**   I do.

18   **Q.**   In that text, you wrote that American was going to have

19   an internal call with Compass Lexecon the following day,

20   correct?

21   **A.**   I believe so.  I mean, yes, that's what it says.

22   **Q.**   And that call occurred, correct?

23   **A.**   That, I don't -- I'm not sure.  I believe it would have

24   if it was -- if it was scheduled, but many of these calls

25   were moved.

1    **Q.**  Let's look further down to the language five texts down

2    that begins "that they."  Do you see that?

3    **A.**  Yes.

4    **Q.**  And there you're saying that Compass needs to make the

5    regulatory case for the NEA, correct?

6    **A.**  I'm sorry; I don't know if I'm speaking specifically

7    about Compass here.  This is a little bit of a confusing

8    string.

9    **Q.**  But you are talking about making a regulatory case,

10   right?

11   **A.**  I think we're talking about -- it looks like scheduling,

12   like trying to get the schedule, correct.  And what I'm

13   trying to just -- if you give me just a second.

14   **Q.**  Sure.  And my question isn't right now about the call

15   that happened with compass.  I'm asking you about the second

16   text that we're reviewing here, the one that refers to making

17   the regulatory case.

18   **A.**  Uh-huh.

19   **Q.**  Do you see that?

20   **A.**  I do.

21   **Q.**  Focusing on that text, you're saying there that Compass

22   Lexecon needs to make the regulatory case for the NEA,

23   correct?

24   **A.**  I'm just saying they.  I don't know what "they" is in

25   reference to here.

1  **Q.**  Someone needs to make the regulatory case for the NEA,

2  correct?

3  **A.**  I think we need -- that's what it says, that they need to

4  make the regulatory case.

5  **Q.**  Let's look where at the call that happened the following

6  day.

7          MR. BERMANN:  Let's put up PX1144.

8          Your Honor, this exhibit has not yet been admitted.

9  It's a document that defendants withheld as privileged for

10  several months but produced on Thursday in response to our

11  motion to compel.  I'd like to move PX1144 into evidence.

12          MR. WALL:  I'd like to see it first.

13          No objection.

14          THE COURT:  Admitted.

15          (Plaintiffs' Exhibit PX1144 admitted into

16          evidence.)

17  BY MR. BERMANN:

18  **Q.**  This is a calendar invitation sent by Mr. Paik at

19  Latham & Watkins, correct?

20  **A.**  Yes.

21  **Q.**  And the American clean team received the invitation for

22  the call, correct?

23  **A.**  Yes.

24  **Q.**  Dr. Israel from Compass Lexecon was on the calendar

25  invitation, correct?

1    **A.**  Yes.

2    **Q.**  And the subject of your call with Latham & Watkins and

3    Dr. Israel was "Garland" -- that refers to the NEA, correct?

4    **A.**  Yes.  That was the -- yes.

5    **Q.**  "Counterfactual," correct?

6    **A.**  That's correct.

7    **Q.**  So a few days after you wrote that if you show the full

8    network results no bueno, you had a call with Compass about a

9    counterfactual in connection with the NEA, correct?

10   **A.**  That's what this shows, yes.

11   **Q.**  The clean team was trying to find a counterfactual that

12   would allow it to make the regulatory case for the NEA,

13   right?

14           MR. WALL:  Objection, Your Honor.  Not just on the

15   privilege grounds, but at this point on 403 grounds.  This is

16   a monumental waste of time.

17           MR. BERMANN:  Your Honor, we have before us --

18           THE COURT:  What's the question again?

19           MR. BERMANN:  The question was the clean team was

20   trying to find a counterfactual that would allow it to make

21   the regulatory case for the NEA.

22           MR. WALL:  I mean, to begin with --

23           THE COURT:  Sustained as to that question.

24           I mean, the whole point of the regulatory -- of

25   lawyers going to the government is to persuade the government

1    to approve whatever it is their client wants.  So that's just

2    what -- that's why they're hired.  I would -- there is no

3    counterfactual to that.  I've never seen a case where counsel

4    or a client hired lawyers to persuade the government to

5    disapprove what the client wanted to do.  So of course they

6    were trying to figure out how to best position this.  I mean,

7    I'm -- I can't imagine how I wouldn't conclude that was the

8    entire purpose of the -- not the entire purpose, but a huge

9    purpose for legal counsel in review.

10   BY MR. BERMANN:

11   **Q.**  This call about the counterfactual with Compass and

12   Latham & Watkins occurred a few days after you received the

13   v4 date schedule data from JetBlue, correct?

14   **A.**  Yes.

15         MR. BERMANN:  And, Your Honor, I realize we're at

16   eleven o'clock.  I do have some additional questions, but

17   can --

18         THE COURT:  How much?

19         MR. BERMANN:  I imagine five minutes, ten minutes.

20         THE COURT:  Why don't you keep going for now.

21   BY MR. BERMANN:

22   **Q.**  Mr. Schweinzger, the American clean team never provided

23   any Raven outputs from the v4 schedule to Compass Lexecon,

24   correct?

25   **A.**  I don't recall ever seeing any Raven outputs from any v4

1  schedule for -- for the clean team.

2  **Q.**  And you're not anywhere of anyone else on the American

3  clean team sending Raven outputs from the v4 schedule to

4  Compass Lexecon, correct?

5  **A.**  If it wasn't Anmol, myself, Jordan, or Matt -- Matt

6  McElfresh, who was --

7        THE COURT:  You don't recall seeing them at all?

8        THE WITNESS:  I do not.

9        THE COURT:  Never mind whether or not they were

10  sent to Compass?

11        THE WITNESS:  I don't.

12  BY MR. BERMANN:

13  **Q.**  Mr. Schweinzger, earlier the judge ask you some questions

14  about the v4 schedule.  Do you recall that?

15  **A.**  The question about how it was uploaded?

16  **Q.**  He asked you about the fleet constraints in the v2 and v4

17  schedule?

18  **A.**  I didn't know that was about the v4 schedule.  He asked

19  me about whether or not we planned for fleet constraints.

20  That's correct.

21  **Q.**  And you talked about the differences between the v2 and

22  v4 schedule?

23  **A.**  I don't believe so, no.

24  **Q.**  Mr. Schweinzger, earlier I asked you about whether you

25  had asked Mr. Pack to do back-of-the-envelope calculations

1    with respect to the v4 schedule data you received from

2    JetBlue on May 29th, correct?

3    **A.**  Yes, you did.

4    **Q.**  I'd like to go back to 372A, page 2.  And if we could

5    just highlight there the relevant language.  You received a

6    message from Mr. Pack at what's marked as 8:22 p.m., correct?

7    **A.**  Here, yes.

8    **Q.**  And you wrote, "Slightly scared that when we run v4

9    through Raven, B6 may not be rev positive," correct?

10   **A.**  That's what it says Jordan wrote.

11   **Q.**  And then you asked Mr. Pack, "Can you get a quick summary

12   of adds and cancels?  We have the 2019 base revenue in the

13   current Raven runs so we can get a sense for how much they

14   are canceling."

15   **A.**  I do see that.

16   **Q.**  So you agree that -- and Mr. Pack liked that message that

17   you sent to him, correct?

18   **A.**  I do -- I do see that.

19   **Q.**  So when you wrote, "Can you get a quick summary of adds

20   and cancels," you were referring to having Mr. Pack do some

21   back-of-the-envelope math, correct?

22   **A.**  I am referring to him -- asking him to do some quick

23   math.  That's correct.

24            THE COURT:  You mean not just list what flights are

25   being added and canceled, but based on the 2019 base revenue

1    that you already had in Ravin, what those would do to

2    revenue?

3              THE WITNESS:  Yeah, I'm guessing I'm trying to

4    figure out what the net impact of whatever this is is going

5    to be before we look at it.  I don't know if he ever did that

6    or if I ever -- again, I'm not sure that I ever saw it.

7    BY MR. BERMANN:

8    Q.  Did you ever have conversations with Mr. Pack about that

9    math that you asked him to do?

10   A.  I don't recall any, no.

11   Q.  But after you received the v4 schedule, you're not aware

12   of yourself or anyone else at American sending outputs from

13   Raven for the v4 schedule to Compass Lexecon, correct?

14   A.  I don't believe so, no.  I'm not aware of any.

15   Q.  And the NEA was signed in July 2020, correct?

16   A.  I believe that's correct.

17   Q.  So that's about a month and a half --

18   A.  I'm sorry.  I think it was announced in July of 2020.

19   I'm not certain when it was signed.

20   Q.  And so that's about a month and after these text

21   messages, correct?

22   A.  Yes.

23              MR. BERMANN:  No further questions at this time,

24   Your Honor.

25              THE COURT:  Any redirect?

1          MR. WALL:  Just one question.

2     **REDIRECT EXAMINATION BY COUNSEL FOR AMERICAN AIRLINES**

3     BY MR. WALL:

4     **Q.**  Of your personal knowledge, do you have any basis to

5     believe that the v4 schedule was ever run through Raven?

6     **A.**  I do not.

7          MR. WALL:  Thank you, sir.  Nothing further.

8          THE COURT:  All right.  Thank you very much.

9     You're excused.  We'll take the morning break now.

10         (Court in recess at 11:06 a.m.)

11         (The following reported by Rachel Lopez.)

12         (Court reconvened at 11:24 a.m.)

13         THE COURT:  Okay.  So I changed my mind.  I decided

14    I don't want to read these.  I thought about it a little bit,

15    and I decided in the first instance, I don't think I should

16    read them first.  I understand it would be more efficient if

17    I read them.  That's why I was going to do it, but it

18    contains privileged information, which is different than like

19    exhibits in some way, and that -- where I'm ruling on

20    admissibility or not, I read the exhibits and decide and then

21    decide it's excluded.  So I have not opened these, and I'm

22    going to give them back.  And what I've done is this.

23         I talked to Magistrate Judge Robertson, who's --

24    sits in Springfield, but one of the magistrate judges here.

25    I explained the issue I'm going to -- I'm going to ask that

1    you, Mr. Wall, can have somebody e-mail Ms. Belmont.  It

2    doesn't make a difference to me.  You can certainly e-mail

3    Ms. Belmont, and I think it would be the simplest thing and

4    she will forward it on.  I'm not going to look at them.  And

5    when this is all done, we're going to put them on the docket

6    as some sort of sealed exhibit, or we'll put it on paper.

7    Maybe we'll just put one of those notebooks in an envelope

8    and put it in the paper file, just so it's preserved for the

9    record.  And I've asked Judge Robertson, she to look at it.

10   I've explained the context.  I'm also going to give her the

11   text messages, just so that she understands what we're

12   talking about here.  And then I'm going to ask -- then I'm

13   going to talk to her about it after -- and I'm thinking that

14   I resolve the legal -- so I'll resolve the legal issues, but

15   I've explained it to her, and I'm gonna -- and in the first

16   instance, ask her to sort of weigh in for me, having read the

17   documents, without telling me what's in the documents, how

18   they bear on my view of the different issues that I aligned

19   for you before.

20          What would be helpful to also e-mail, since we

21   don't have a copy of it, is a demonstrative of the text

22   messages, because that's really much more useful than the

23   exhibit.  So if you can e-mail Ms. Belmont the demonstrative

24   of the text messages and then the exhibits that were in the

25   notebook.  Then I just think -- at least it's a little

1    slower, I understand, it's a little more step by step, but I

2    think it's better to be careful on a privilege issue like

3    that.  So that's why I didn't look at it and I haven't.

4              Okay.  Next witness?

5              MR. WALL:  Yes.

6              THE COURT:  I'm hoping I'll have it resolved -- or

7    at least I'll have something more to tell you by 2 o'clock.

8              MR. WALL:  Okay.  So the defendants call Dr. Mark

9    Israel.

10             (The witness was duly sworn.)

11             THE COURT:  So I may have more to tell you by

12   2 o'clock, but that doesn't mean we're sitting this afternoon

13   at 2 o'clock.  Just a reminder, unless you inferred it

14   incorrectly from that statement.

15             MR. WALL:  Well, actually, we have a little time

16   after today, so it's not as big of a rush as it might have

17   been under other circumstances.

18             THE COURT:  Right.

19                        **MARK ISRAEL, Ph.D.**

20             having been duly sworn, testified as follows:

21   **DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT AMERICAN AIRLINES**

22   BY MR. WALL:

23   **Q.**  Good morning, Dr. Israel.

24   **A.**  Good morning.

25   **Q.**  What is your occupation, sir?

1    **A.**   I'm an economist.  I do competition economics.  I'm a

2    senior managing director at Compass Lexecon.

3    **Q.**   And there have been a lot of references to Compass

4    Lexecon.   What is Compass Lexecon?

5    **A.**   It's an economic consulting firm, largely does issues in

6    competition economics, but more broadly sort of any economics

7    topics, people who do labor economics and public economics,

8    it's an economics consulting firm.  My role there, as the

9    senior managing director, I oversee the north American

10   antitrust business.

11   **Q.**   Okay.  And could you please describe briefly your

12   educational background?

13   **A.**   Sure.  I have a Ph.D. in economics from Stanford

14   University in 2001.  I was there from '95 to 2001,

15   specializing in industrial organization and competition

16   economics, I taught classes while I was there in those

17   topics, and econometrics, and game theory.

18   **Q.**   What did you do after you left Stanford?

19   **A.**   I went to teach at Northwestern University outside of

20   Chicago, so I was part of the business school there, Kellogg

21   School of Management, full time until 2006.  So I was in the

22   business strategy department, which is sort of used what I

23   had learned in economics, but also transitioned it more into

24   studying and teaching competition questions, but from a

25   business strategy point of view, so focusing on how firms

1    compete, and how firms are able to find business models to

2    maintain profitability in the face of competition.

3    **Q.**   And you joined Compass Lexecon after that?

4    **A.**   Correct.  In 2006.

5    **Q.**   Okay.  Do you have any concentration on any industries?

6    **A.**   I mean, not explicitly.  I work on competition in

7    antitrust issues across the board, sort of overtime, growing

8    out of my teaching, and so on, I think I'm known for doing a

9    lot of work in airlines and in transportation generally, and

10   also in telecommunications.

11   **Q.**   Have you published any papers relating to the airline

12   industry?

13   **A.**   I have.  I have three papers on the airline industry that

14   have been published in peer-reviewed journals.

15   **Q.**   Can you just run us through those?

16   **A.**   Sure.  And they are -- I mean, they are very much topical

17   to things we've been discussing, so maybe I'll just mention

18   briefly what the topics were.

19          So in 2013, myself and a few co-authors published a

20   paper in the review of network economics.  I'll forget the

21   exact title, but basically it's something like airline

22   networks and consumer welfare.  It's also on a topic that's

23   come up, I've been listening to the whole trial, mostly by

24   the Zoom, but I know there was a discussion from Dr. Town

25   about this issue that better airline networks, better airline

1    presence is a benefit, but can also lead to higher prices

2    under some circumstances.  That paper was studying those --

3    bringing those effects together, and seeing which wins.  And

4    we found that the -- you know, that the quality effects

5    dominate any price effects that there's growth in, output,

6    and consumers benefit from larger airline networks.

7            Then in 2017, I believe, a couple co-authors,

8    again, and myself, published a paper on international airline

9    alliances.  So very topical here.  That was in the *Journal of*

10   *Competition Law and Economics*.  That paper found that -- did

11   a full historical study of all the international alliances

12   that have occurred.  And found that they have been

13   overwhemingly procompetitive, leading to lower fares and

14   increased capacity, including on the nonstop overlaps, where

15   the alliance partners previously competed, as well as on the

16   broader connecting network.

17           And then in 2019, again, some co-authors and myself

18   published a paper in the *International Journal of Industrial*

19   *Organization*.  It was a retrospective on the three big legacy

20   airline mergers that I know have been discussed,

21   Northwest/Delta, United/Continental, and American/US.  Again,

22   studying the -- what had happened on those mergers,

23   particularly on the nonstop overlaps, and found that across

24   the board on the nonstop overlaps, capacity had gone up, and

25   prices had gone down.

1   **Q.**  Have you also published on topics related to

2   econometrics?

3   **A.**  Yes, I do a lot of work in econometrics and so myself and

4   two authors at Compass Lexecon, are the authors -- there's

5   a -- the ABA has a treatise called "Proving Antitrust

6   Damages," and there is a chapter in there about econometrics

7   and regression analysis, and myself and two of my colleagues

8   are the authors of that chapter.

9   **Q.**  What is your experience analyzing the competitive effects

10  of airline industry transactions?

11  **A.**  I've been working in airlines for a long time, as I said,

12  it was something that I taught and had started researching

13  while I was still at Northwestern.  And so I got involved in

14  it when I was doing more day-to-day antitrust work.  So I was

15  involved in the private litigation part of the

16  Northwest/Delta case.  It was a private lawsuit about that

17  case I was involved in.  I worked on the United/Continental

18  merger.  I was one of the leading economists on the American/

19  US Airways merger.  I've worked on the US Airways/Delta slot

20  swap and a variety of international alliances.  That's kind

21  of been a focus for the last several years.  I worked on --

22  let me see if I remember them.  Delta, Virgin, Blue, Hawaiian

23  Airlines, and JAL, Japan airlines, and various things on the

24  American Atlantic Joint Business.

25  **Q.**  And are those essentially antitrust immunity proceedings

1   that you're talking about?

2   **A.**  All of the international alliance cases have been

3   antitrust immunity cases, so they have been cases about the

4   alliances seeking grants of antitrust immunity.  In the case

5   of the American ones, there was an initial grant of antitrust

6   immunity and then it ultimately was reviewed again by the CMA

7   in London, as a result of Brexit, I think, the UK got some

8   authority to review it, and so there was a long proceeding

9   related to that.

10   **Q.**  Okay.  And as part of the antitrust immunity

11   applications, is there some occasion to undertake what are

12   known as consumer benefit studies?

13   **A.**  Yeah, it did take different forms in different cases, but

14   generally, on all those cases, there's an exercise in which,

15   you know, there are plans about how the -- how the alliance

16   will run, or there are models that have been done about how

17   the alliance will run, and benefit studies are done based on

18   what the effect of the alliance will be on things like

19   capacity and output.

20   **Q.**  Have you given testimony in courts or in regulatory

21   proceedings?

22   **A.**  Lots of times.  So I've been in federal court on several

23   merger trials, for the most part, but some other antitrust

24   cases.  I've testified in state courts, courts in Canada,

25   several arbitration proceedings, regulatory matters, probably

1   well into the 20s, by now.

2   **Q.**  Have you given testimony on behalf of government

3   agencies?

4   **A.**  Yes, for the federal trade commission, so the other

5   antitrust agency.  I testified on behalf of the FTC in

6   opposition to the Sysco/US Food distribution merger that was

7   blocked by the Court.  I've been hired a couple of other

8   times by the FTC to do expert reports.  Those cases didn't

9   ultimately go to trial.

10          MR. WALL:  Okay.  Your Honor, we would proffer

11   Dr. Israel as an expert in economics, including industrial

12   organization and econometrics.

13          MR. DOIDGE:  No objection.

14          THE COURT:  Okay.  I find him so qualified.

15   BY MR. WALL:

16   **Q.**  Dr. Isreal, could you please describe for your roles with

17   respect to the NEA, including when you first got involved?

18   **A.**  So I first got involved with the NEA in the spring of

19   2020.  I think it was April of 2020.  I always remember it

20   because I had a close COVID contact early in COVID and so I

21   was holed up in a corner of my house, so I can picture when I

22   first started working on it.  And early on, I got involved

23   with American and started to learn about the deal, and

24   started to learn about -- you know, study the competitive

25   setting of the deal and so on.

1    **Q.**   Were you involved in the DOT and DOJ investigations?

2    **A.**   Yeah, particularly with DOJ, somewhat with DOT, but I've

3    certainly -- you know, as I started to do work on the topics

4    that I'll talk about today on the competitive setting, on the

5    nature of the NEA contracts, on the effects of the NEA on

6    output and consumer benefits and so on, I -- you know, I

7    talked to DOJ about those topics.  I was on multiple

8    conference, you know, Zooms I think they mostly were at the

9    time, to talk about the NEA with the DOJ.

10   **Q.**   Okay.  And in turning to the litigation, what is the

11   scope of your testimony in the litigation?

12   **A.**   So it -- I mean, I think of it in three buckets, so one

13   is the competitive settings, New York City and Boston as, you

14   know, airline markets or the airline industry in those two

15   cities and what that competitive setting can tell me about an

16   assessment of the NEA's possible or likely effects.

17          Bucket two is a deep dive into the NEA itself, what

18   are the contracts?  And as an economist, how do I think about

19   the nature of those contracts.  They're, you know, a

20   carefully tailored set of contracts from an alliance between

21   the partners, and I think about what those can tell me as an

22   economist.

23          And then, third, you know, what would have been the

24   effects in terms of what's happened to capacity, what's

25   happened to output?  What are the implications on consumers?

1          I should note, it's just a couple of other things

2     as I think about this.  As part of that, I've certainly been

3     asked to comment on the work done by Dr. Town and Dr. Miller,

4     so I'll do that.  And the way that I think about it in my

5     head, I know I think when we come back, Professor Carlton

6     will also be testifying.  And so when I think about my role,

7     what you'll hear from me is more about the output effects of

8     the NEA, and the consumer benefits, whereas I think Professor

9     Carlton will talk more about price effects.

10    **Q.**  Okay.  Thank you, sir.  So we've exchanged some

11    demonstratives and let's --

12          MR. WALL:  And I think they're in the front of the

13    binder, Your Honor.

14    BY MR. WALL:

15    **Q.**  But let's put up on the first slide which states "a

16    summary of conclusions" and is this something that you've

17    prepared for that purpose?

18    **A.**  Yes.

19    **Q.**  Can you take us through it, please?

20    **A.**  Yeah.  It might take a couple of minutes, but I'll do my

21    best.

22          So these were really the buckets that I just talked

23    about, the three buckets at the top.  So the first conclusion

24    and the first area that I'd like to talk about is New York

25    City and Boston as airline markets, or as collections of

airline markets if you think about routes as markets.  I
mean, I've been studying these a long time.  I think it's
safe to say that they are two of the most competitive airline
regions in the world.  I think it's worth talking about them
separately for a second.

So New York City is certainly, in my experience, an
airline that's recognized as one of the if not the most
competitive airline markets in the world.  That largely grows
out of the fact that it has two strong hub carriers who
operate hubs there.  And Delta and United, very few -- I
think I heard Dr. Elise say that as well, very few cities can
support two hub carriers.  When you have two hub carriers --
two legacy hubs in direct competition, it's just a very
competitive market.  And the other thing that does in New
York, is New York is also crowded and concentrated with air
flights not in the market, but it's concentrated, so it's got
a lot of flights, and the other issue in New York is other
carriers, you know, struggling to figure out how to compete
with Delta and United, because there just aren't that many
assets left.  There aren't many slots.  Delta and United
control a lot of the productive assets, and so other carriers
have to try to figure out how to deal with that.

Boston is a different story, but also competitive
and increasingly very competitive.  And as we've heard, Delta
has now made Boston into a hub as of a few years ago, so we

1   now again we have a city with a hub carrier.  A city of

2   Boston's size would almost certainly not have two hub

3   carriers.  So then the question -- the airline question

4   becomes how does someone compete with that?  And to me,

5   that's -- for purposes of this deal, it's important to -- I

6   see a lot of it as JetBlue, together with American, trying to

7   figure out how to compete with Delta's position in Boston.

8          So that's bucket number one, that those competitive

9   settings, the hub carriers, and thinking about the NEA as an

10  attempt to compete with those hub carriers.

11         So then bucket two is what is the NEA itself?  And

12  diving into that in some detail.  And the NEA -- so just high

13  level, because I think it's useful to set up what I'll say

14  about that -- as I said, I've spent a long time working on

15  international airline alliances.  And so I think a little

16  context is helpful.

17         So international airline alliances grew out of the

18  fact that carriers from different countries, regulatorially,

19  can't merge with each other, but they still have network

20  issues, network connectivity, seamlessness issues to solve.

21  So it grew to this case where they were granted antitrust

22  immunity, they would share revenues, they would plan networks

23  together, in order to be able to, say, bring together the

24  British Airways network and the American Airlines network,

25  for example.  So that was sort of an alliance -- that was

1    seen in the world as there's mergers here, there's the

2    international alliances.

3            The NEA is fascinating to me as someone who studies

4    airlines.  It's one step down in terms of integration.  I see

5    it as an attempt to capture what I think of as the core

6    productive part of the JV, work together to plan a

7    competitive network in these markets, have revenue sharing

8    that means that both parties are incentivized to develop the

9    best network that they can, but otherwise, nothing is

10   integrated.  There's no pricing integration like in an

11   international alliance, there's no capacity coordination

12   beyond the route planning there.  So it's one step further

13   down in the rung.  And so I think about -- and I'll talk a

14   lot about what that says and how that leads to a better

15   network, better utilization of scarce assets, and so on.

16   **Q.**  Okay.  And then the third topic?

17   **A.**  Topic three is really following up on the first two.

18   It's the NEA as a way to compete in these markets, so what's

19   happened.  Right?  We've heard a lot of testimony and I've

20   read a lot of documents, where the goal of the NEA or the

21   structure of the NEA was to facilitate growth and to

22   facilitate competition.  So the third topic will be as that

23   actually -- you know, what was planned and what has happened.

24   And what I find is the plans were all about growth, growing

25   capacity, growing output, and it's working so far.  Output is

1    growing in that way, and it's working in terms of creating

2    competition in these two markets.

3              You know, JetBlue is now a stronger competitor for

4    Delta and Boston, by having, you know, more gates and access

5    to the American network.  So that gives a real chance to put

6    competitive pressure on the hub carrier, which is hard to do.

7    You know, New York now has JetBlue as a stronger competitor

8    at LaGuardia, in particular.  American has really developed a

9    third true long-haul hub in New York.  So New York was

10   already competitive with two and now it becomes a very rare

11   city that seems to have three competing hubs.  So it's

12   really -- it seems to be working.

13   **Q.**  And the last point seems a little different.  What's

14   that?

15   **A.**  Yes, well, I had my three main buckets of my conclusions,

16   and the last point, as I said, my -- the other part of my job

17   is to review what's been done by plaintiffs, by DOJ, and by

18   experts.  And what I find is that nothing that I'm saying

19   above has been refuted, in the sense that, you know, on the

20   first bucket, on the airline markets, you know, what I've

21   seen is sort of an attempt to eliminate United as a

22   competitor by taking Newark out of the market, by not paying

23   enough attention to the intense competition from Delta in

24   Boston.  So I'm not really grappling with how much

25   competition there is in those two markets.  Not analyzing --

1        As I said, the NEA is really two steps down in the

2   history from a merger, but I've seen analysis of the NEA as

3   though it's a merger, when sort of my work and many others,

4   the focus is that alliances are distinctly different from

5   mergers and need to be analyzed as such.  And then, you know,

6   it's working so far and it's generating capacity growth and

7   traffic growth and better competition.  And yet I've

8   explosively heard from plaintiffs that they're not looking at

9   those current effects.  So to me, that's the most troubling

10  part, because I see this as an innovation, and interesting

11  and -- I think procompetitive, but an intriguing attempt to

12  bring more competition to these markets, to take the alliance

13  idea and apply it in a competitive way.  And it seems to me

14  to be working very well, but I haven't heard plaintiffs take

15  on what's actually happening.

16  Q.  Okay.  Let's turn to your first point about the market

17  setting in which the NEA takes place.  And just ground us in

18  why is it important to take the market setting into account.

19  A.  I mean, it's what we do as competition economists, as

20  antitrust economists.  It all starts with the market setting.

21  So you need to -- I mean, we're going to ask questions like

22  can the NEA create market power that you need to understand

23  the competitors.  We're going to ask questions like what is

24  the NEA doing to competition?  You need to understand the

25  position -- who is in the market, who is being competed with,

1    and the relative positions of the players in order to do that

2    competition analysis.

3    **Q.**   So what do you mean by market power in the present

4    conference?

5    **A.**   I believe I've heard others testify and I agree with the

6    other economists at the high level.  Economists just define

7    "market power" as the ability to raise price above -- for

8    profitably raise price about the competitive level.  What is

9    the competitive level?  It can be a long discussion,

10   economists think about it as basically pricing and economic

11   costs.  But generally it's the ability to raise price above

12   the competitive level.  In the present context, I think it's

13   important to -- what does that mean?  You know, you've heard

14   a lot in here about the importance of capacity in airline

15   markets.  It certainly is the main driver of competition, how

16   much supply is there.  So the market power here I would

17   define is the ability for a carrier or carriers to pull back

18   capacity, to pull back supply, to restrict output with the

19   effect of raising price.

20   **Q.**   Can we put up your next demonstrative on market power.

21   What's being shown here both in the top half and the lower

22   half of the chart?

23   **A.**   So the top half is a quote from the FTC and DOJ

24   collaboration guidelines.  That's just -- my focus, really,

25   is the sort of the flowchart there at the bottom for how I

1   think about market power and how I approach it here or would

2   in any case.  So I start -- as it says on the left, I would

3   start with competitive conditions at the start of the NEA, so

4   what did competition look like in Boston and New York.  And

5   then the hypothesis on the table, which is a hypothesis one

6   can state is, you know, we're asking could American and

7   JetBlue collaborate to restrict capacity?  Can they pull back

8   on output, create scarcity, and drive up prices.  Right?  And

9   then it sort of splits into two potential answers.  One is,

10  you know, if they have a large share of the capacity, if they

11  don't face a lot of competitive constraints, if their rivals

12  are limited in the ability to respond, then perhaps they have

13  the ability to do that profitably.  But if -- and where I

14  come out here and I'm previewing what I said before, if

15  there's a -- if they have a modest share of capacity, a

16  weaker position, there are strong competitive constraints

17  from others, if rivals can expand, and quickly expand into

18  markets, then they don't have that power.  And the key thing

19  here is in that bottom bucket, if American and JetBlue try to

20  pull back on output, that's just going to cede share to their

21  rivals, it's not going to result in a profitable ability to

22  raise price.

23  Q.  Of course, the plaintiffs say that American and JetBlue

24  will be able to exercise market power because of the NEA.

25  What is your answer to that?

1    **A.**   Well, I strongly disagree in these markets.  And again,

2    to your earlier question, this is why it's so important to

3    put yourself in the market setting.  And I think it's very

4    important to take a minute and think about what I think is

5    the key feature of these markets, and I emphasized earlier,

6    as someone who studies airlines, it's that these markets have

7    two strong hub carriers in the case of New York and an

8    increasingly strong hub carrier in the case of Boston.  So

9    why does that matter to me so much?  Hubs -- for legacy

10   carriers, hubs are the way they operate.  Right?  Hubs are

11   the epicenter, where they bring all of the demand for every

12   city through the hub and back out of the hub.  So if you're a

13   hub carrier, you have -- you have this epicenter in New York

14   or Boston for the hub carriers, where they can run spokes out

15   to most any city they want, and they have the benefit of, if

16   they're going to go serve in Omaha, they bring all of the

17   demand from everywhere else through the hub, and then take it

18   back out to Omaha.  So it gives them this ability to serve

19   almost any route that they choose and it makes them very

20   strong in those markets.

21          And honestly, if I was going to summarize much of

22   the economic literature on airline over the last many years,

23   it would be -- the question is how does somebody else compete

24   with the hub carrier?  I've never seen it be some

25   ^ nonhub ^ ONE WORD BELOW/BE CONSISTENT non-hub carrier

1    potentially having market power.  I've seen it be what can we
2    do to try to compete with that hub position?  Now, in New
3    York, they have the benefit of two hubs, they compete with
4    each other.  But in Boston, the question is what can you do
5    to compete with Delta's hub now.  But in no case, given what
6    those hub carriers can do, can I imagine a non-hub carrier
7    having the ability to pull back out, though, without ceding
8    share to the hub carrier.
9    **Q.**  Okay.  Now, you mentioned United Airlines is one of the
10   hub carriers in New York City, but of course, plaintiffs
11   claim that United's hub in Newark is not in the relevant
12   market.  What is your response to that?
13   **A.**  I don't understand that argument at all.  I mean, again,
14   the defining feature of New York as an airline or a set of
15   airline markets in New York to me is that it has competition
16   between strong hub carriers.  All right.  So again, sometimes
17   when we do antitrust market, who obviously is in the market
18   can be a fairly obvious answer.  Sometimes it's complicated
19   on the edges.  But for the question of who -- you know, who's
20   in the market in New York, you know, I just -- given the way
21   airline competition works and what I just said, you just
22   can't leave out United's hub in Newark.  And I think an issue
23   where I just disagree with the approach that, you know, that
24   Dr. Miller and others have used, is it's not an abstract
25   question regarding complicated tests about is Newark

1   generically in the market?  Right?

2            The core question is, is United's hub in Newark in

3   the market.  Can we analyze competition in New York and leave

4   out United's hub?  And to me, that's obviously not doable.

5   You're leaving out one of the two most important competitors

6   in the marketplace.

7   **Q.**  So Dr. Miller keeps saying that you need to go through

8   this exercise of imagining a price increase at LaGuardia and

9   JFK, and asking whether competition from airlines at Newark

10  would constrain it.  Is that right?

11  **A.**  Well, I don't see why you need to do that to decide that

12  one of the two hub carriers is in the market.  I mean,

13  sometimes we economists can make things more complicated than

14  we need to be.  I mean, I don't have to run a test to know

15  that Pepsi and Coke compete in the soft drink market.  I

16  think two hub carriers in New York is a very similar

17  question.  The guidelines clearly describe a hypothetical

18  monopolist test, and I'm not objecting to that as a frame

19  work that we use to think about market definition.  And

20  sometimes if you have a case on the edge, you have to go

21  through and do that test.  In airlines, we have this world of

22  data, of competition happening every day, people reacting to

23  each other every day, assessing the market every day.  And

24  again, if you have a hub carrier at Newark, they're part of

25  the market.  I would never define market -- if I went through

1  a complicated method that told me a hub carrier in New York

2  was not part of the market, I would be certain my method was

3  wrong.

4  **Q.**  Okay.  So if we go forward to the next part of the

5  demonstrative, this is a collection of some documents that

6  Judge Sorokin has seen over the last few weeks.  That are

7  American and NEA planning documents.  What significance do

8  these have with respect to market definition?

9  **A.**  So for me, the whole time that I'm doing market

10  definition, and again, thinking about the merger guidelines,

11  all the tests -- the question that we're trying to get to is

12  who do we have to think about for the answer of whether

13  there's market power, or what -- what competitors do we have

14  to include that are importantly constraining the behavior

15  that we're studying in the case?  So here, it's what

16  competitors do we have to think about who are the important

17  competitive constraints on what the NEA will do.  Right?

18  We're all here to talk about will the NEA create growth?

19  Will it create harm?  To answer that question, we have to

20  decide who is the important competitors for the NEA.  One

21  way -- perhaps to me, is the most important way to do that is

22  to go to the documents and see who the NEA carriers think are

23  the important competitors?  What's driving them to grow and

24  to compete effectively with the NEA?  There's a whole long

25  history of documents in the record about American in

1    particular, both carriers, but certainly American being very

2    focused on competing with United.  There's a long history of

3    those.  Those are a few documents that were done, you know,

4    leading up to the NEA itself, where the focus is, in the

5    titles and beyond is -- -- it's a question that I asked

6    earlier, how do we figure out how to compete with these two

7    hub carriers?  And so that tells me that the answer to how is

8    the NEA going to compete?  Is it going to compete more or is

9    it going to try to restrict output?  That has to include the

10   two hub carriers who are the focus of the competitive effort.

11   **Q.**   Okay.  Without taking a lot of time to go through them,

12   there have been various other documents in the record that

13   talk about the reactions of other airlines to the NEA, which

14   make various references to United.  What do those indicate to

15   you with respect to market definition?

16   **A.**   I mean, I think they all reach the same place, which

17   is -- I've been trying to go through the record carefully and

18   listen carefully, and every assessment that I've seen from

19   other carriers says this is -- the NEA is an attempt, they

20   have various views on how successful it will be, maybe, but

21   an attempt by American and JetBlue to compete more

22   effectively with Delta and United.  And it seems to me,

23   again, the universal reaction that this is, in large part,

24   competition with United in Newark.

25   **Q.**   Dr. Miller says that he has conducted Hypothetical

1    Monopolist Tests that show a New York City market that

2    exclude Newark.  How does such tests fit into your overall --

3    how does his so-called Hypothetical Monopolist Tests fit into

4    your overall assessment of the relevant markets in this case?

5    **A.**   They don't affect it -- they don't change my view.  But

6    that's because I don't -- in my view, he has not done a

7    Hypothetical Monopolist Test of any reliability or validity.

8    And I want to make this point clear is that I don't want to,

9    you know, express to Your Honor that there's my view versus

10   the Hypothetical Monopolist Test and you sort of have to

11   decide between Israel's view and the Hypothetical Monopolist

12   Test.  To me, those come out in the same place about what a

13   hypothetical monopolist can do.  So I'm not saying reject the

14   Hypothetical Monopolist Test as a construct, I'm saying that

15   here the market definition is pretty obvious and the tests

16   that Dr. Miller has put up against it are just flawed tests.

17   **Q.**   Well, the first one that he says is a Hypothetical

18   Monopolist Test is his analysis of the effects after the

19   grounding of the 737 MAX fleet.  And as you know, the

20   argument is that prices increased at JFK and LaGuardia.  What

21   is your response to that with regard to market definition?

22   **A.**   Yeah, I don't see how it's a market definition test,

23   certainly, a JFK and LaGuardia market definition test at all.

24   Just, if we take a step back, the question was, when the 737

25   MAX was grounded, did -- and they took some capacity out of

1   the market, did prices go up?  The answer is obviously yes,

2   when capacity come out of the market, prices go up.  But I

3   don't -- it doesn't tell me anything about what the contours

4   of that market are.  It just tells me when capacity comes out

5   of some market, then prices go up.

6   **Q.**  Is there a principle within the Hypothetical Monopolist

7   Test of holding prices outside the candidate market constant?

8   **A.**  Yes.  So that's getting into it in a little more detail.

9   The really fundamental problem with that as a Hypothetical

10  Monopolist Test is if the 737 MAX capacity came out, prices

11  went up at JFK and LaGuardia.  All right.  If you try to turn

12  that into a Hypothetical Monopolist Test, the only way you

13  can even try is if prices were constant at Newark.  Because

14  then you might say, well, prices came up at JFK and

15  LaGuardia, prices didn't move at Newark, maybe that tells me

16  Newark is a separate market.  But, in fact, when the MAX was

17  grounded, prices came up at Newark every bit as much or more

18  than it came up at JFK and LaGuardia.  In fact those

19  prices -- route by route, those prices moved together.  Some

20  of that is probably because Southwest -- I think you've heard

21  some of this, Southwest Airlines was flying out of Newark at

22  the time and Southwest Airlines had the largest 737 MAX fleet

23  in the country, so it also affected Newark.  But bottom

24  lines, the merger guidelines tell you if you're going to do a

25  Hypothetical Monopolist Test, you have to hold prices

1    constant outside the market you're testing.  This test did

2    anything but.

3    **Q.**  So what is your answer to the merger simulation version

4    of what Dr. Miller calls a Hypothetical Monopolist Test?

5    **A.**  So I think he spent a lot more time on that one.  And

6    ultimately, what does he show?  The merger simulation doesn't

7    test substitution between the airports directly.  The merger

8    simulation effectively does what he's saying its name is.  It

9    simulates merging together all of the services at JFK and

10   LaGuardia, and then it asks:  Does the model find that prices

11   go up by at least five or ten percent?

12          Now, we sort of knew the answer to that coming in,

13   right?  Because we see that that model generates enormous

14   price predictions just from a merger of JetBlue and American.

15   Unbelievably large ones in my view.  So of course it was

16   going to find a more than five percent price increaser if you

17   merged everything together at those airports.  Right?  But

18   that's a statement of the unreasonableness of the price

19   predictions that come out of that model.  It just gets very

20   large price predictions.

21          I even noticed Professor Miller eventually said

22   those price predictions, maybe don't take them exactly

23   seriously -- I don't want to put words in his mouth -- but

24   something like they're directional.  But if now we're just

25   saying they're directional, they can't tell me whether

1    they'll be a SSNIP or not.  We're seeing that the model can't

2    accurately predict price increases.

3    **Q.**  Now, you have conducted an analysis of applying

4    Dr. Miller's simulation model to the previous United -- US

5    Airways/American Airlines merger, right?

6    **A.**  Yes.

7    **Q.**  Let's look at demonstrative slide 4.  Can you take the

8    Court through what you've done here?

9    **A.**  This takes Professor Miller's model, takes the data back

10   to the time of the USA Airways/American merger, and it says

11   if you had used his model and tried to predict the outcomes

12   of that merger, what would you have predicted for prices on

13   the overlaps.

14        So the list on the left-hand side here is the

15   nonstop overlaps in that merger, and then the first column

16   here tells you what Professor Miller's model would have

17   predicted for fares.  So all double-digit fare increases,

18   some of them well into the 30 percents.  And then the right

19   hand, the final column tells you they would have predicted

20   enormous declines in passengers.

21        So if you would just have taken the same tool, gone

22   back in time, applied it to that merger, you would have come

23   here and said it's going to lead too double-digit, up to 37

24   percent, fare increases on the overlaps.

25   **Q.**  So just looking at Charlotte/Dallas-Fort Worth, the

1    37 percent predicted fare increase is accompanied by a

2    29 percent reduction in passenger count?

3    **A.**   Right.  So going into that merger, Charlotte was a

4    US Airways hub, I think the largest US Airways hub.  Dallas

5    is the largest American hub.  It was clearly an overlap, with

6    few other competitors -- I don't remember the exact number.

7    So the model predicted this very large price increase and an

8    enormous reduction in traffic.

9    **Q.**   And that relationship between the higher fare and the

10   reduction in passengers, that's that restriction of supply to

11   create the increase in price that you were talking about?

12   **A.**   Yeah.  They're flip sides of the same coin here; prices

13   go up, and output goes down.  But, yeah, this isn't like a

14   price increase because of the higher quality.  This is

15   predicting a market power based price increase associated

16   with a reduction in output.

17   **Q.**   So what actually happened on those routes?

18   **A.**   Prices -- in my research -- and I actually think research

19   by Dr. Town and others finds the same thing about this

20   merger.  Prices went down, and output went up.  I don't think

21   it's really been abutted to any question about this merger,

22   that there was a substantial reduction in fares on the

23   overlaps and a substantial increase in output.  So this is a

24   direct test of Professor Miller's model, ability to predict

25   what happens in mergers, and it gets them completely wrong,

1    right?

2            And again, remember, the Hypothetical Monopolist

3    Test that he's running is a giant merger.  He's saying merge

4    together all of the carriers at LaGuardia and JFK.  That's

5    what he's testing.  So if his model can't predict merger

6    outcomes, it can't give you an accurate hypothetical

7    monopolist answer.

8    **Q.**  Okay.  Thank you.

9            Moving forward, there's been a lot of discussion in

10   the case about whether competition from Newark flights is

11   adequately accounted for in Dr. Miller's model, because

12   Newark is part of this thing called the outside good.

13           What is your response to that?

14   **A.**  To apologize, because I'm going to have to get technical

15   for a second.  The outside good -- I wouldn't have expected

16   to spend this much time on the outside good in a setting like

17   this.  I think it's worth stepping back.  And I've run a lot

18   of these models and asking what the outside good really is in

19   these models and in his model in particular.  Because I think

20   he's been very clear, and he was very up front that the way

21   substitution to Newark is being handled is that it's in the

22   outside good.  And he said the outside good captures Newark,

23   and more.  So obviously it captures the relevant -- in his

24   view, he thought it captured the relevant substitution

25   outside his client market.

1           There's two things that I want to point out about
2      the outside good that made -- that statement is just
3      incorrect in my view.  Number one -- and I don't think this
4      came through before.  Number one, the outside good is not
5      something -- I mean, when you talk about it that way, it
6      sounds like the outside good is another good that's somehow
7      being measured; that somehow we have data on who flies from
8      JFK, we have data on who flies from LaGuardia.  It makes it
9      sounds like we have data on who's taking the outside good.
10     But we don't know anything about who is taking the -- the
11     outside good is everyone who chose not to fly, whatever they
12     chose to do.  We don't have any idea how many people that is.
13          What his model actually does is it forms an
14     estimate of the total market size on a given route.  And that
15     estimate of the total -- so say the route is New York to
16     Charlotte, the estimate of the market size that the model
17     uses is something called the geometric mean, basically the
18     average of the population in New York and Charlotte.  He says
19     that's the total market size.  It's basically the average of
20     the two populations.
21          And then the way he computes the outside good is he
22     just takes that market size, he subtracts out how many people
23     actually flew, and he said everybody else didn't fly so
24     they're the outside good.  But he has no idea how many people
25     were thinking about flying, how many people were making any

1    sort of a decision like that.

2            So point one is you can't say you're measuring

3    substitution to a good, when you can't even measure its size.

4    It's really just a catchall/other in the model.  He has no

5    idea how many people substitute to the outside good, and thus

6    no ability to say how good a substitute it is or not.

7            And the second point, just to stay technical for a

8    minute, and I think even more telling -- and I'm not sure

9    this has come through here.  Professor Miller, he runs -- his

10   model is a national model.  It's a national model of air

11   travel.  Okay?  So it includes all airports and travel out of

12   all airports.  There's only one parameter in his model that

13   guides substitution to the outside good.  He has one

14   parameter that says how good a substitute is for the outside

15   good.  That parameter is the same parameter for Salt Lake

16   City, Utah, Kansas City, Missouri, as it is for New York.  So

17   the fact that there's no good airports around Salt Lake City

18   or Kansas City is influencing his estimate of -- maybe how

19   good the outside good is.  He has one parameter that covers

20   all airports.  So he has literally no parameter in his model

21   that tells you about substitution in and out of New York.

22           All right.  And apparently the last thing I'll say

23   here is apparently you realize that because in his report, he

24   says that he did try to run models that were specific to New

25   York and Boston.  Right?  But his report says that when he

1 tried to do that, those models failed something called the

2 weak instruments test.  They failed the econometric test that

3 meant they weren't reliable, so he doesn't use them.  So his

4 New York specific model failed this test, so he's using a

5 nationwide model, and this has literally no ability to say

6 anything specific about substitution in the New York

7 airports.

8 **Q.**  There was some testimony in the case, in Dr. Miller's

9 cross-examination, about something that you extracted from

10 one of his work papers in which he actually had treated

11 Newark the same way that he treats LaGuardia and JFK.  I want

12 to pull that up.  It is -- it was a -- actually, I'm not

13 sure -- how we are identifying this.  Exhibit 25

14 demonstrative.  Why don't you just say what's on this screen

15 and how you did this?

16 **A.**  Yeah.  Well, I mean, I literally did nothing here, except

17 put it on a page, I guess.  This is -- it came out of

18 Professor Miller's backup.  So he did run something in what

19 he's called his work paper 4, where he put Newark into the

20 New York market, as I think he should, and I think your

21 question, Mr. Wall, was right that he just -- he put in it in

22 and like he put in JFK and LaGuardia.  And so the numbers on

23 the right hand there are what he got for price increases for

24 American and JetBlue in particular, and for all products when

25 he did that.

1           What I would point out is that they are -- this is
2    now -- we're off the Hypothetical Monopolist Test, just to be
3    clear, this is for this transaction, treating it like a
4    merger, but it's just illustrating how much difference Newark
5    makes for this transaction, if you were to simulate it like a
6    merger.
7           And what you find there on the right-hand side is,
8    you know, much smaller price increases for American and
9    JetBlue and certainly overall then you get if you don't
10   include Newark.  And just to put these in a little context,
11   because you probably don't look at numbers like this, or
12   these models all the time, every merger simulation model gets
13   positive price increases.  These models are built to only
14   measure upward pricing pressure.  You can't get a negative
15   number, zero is the bottom, unless you build in some
16   efficiencies or something, which he has not done.  It's
17   pretty common in my work to think about if you're getting
18   numbers smaller than 5 percent, a lot of us use that as kind
19   of a guide, if it's below five percent, it's near zero.
20   Usually we would say that doesn't give you any concern.  It's
21   pretty commonly done.  So if you add Newark, most of these
22   are getting under the 5 percent level.  The one that's much
23   bigger is Newark-Martha's Vineyard, a seasonal route, but if
24   you look at seasonal routes, on the whole, they're below five
25   percent.

1    **Q.**   Thank you, sir.

2          MR. DOIDGE:   Your Honor -- can you just clarify

3    whether the reflects the corrected numbers or not?

4          THE WITNESS:   I mean, I can clarify in the sense

5    that the correction had no effect on percentage price

6    changes, so these would all be -- correct for the percentage

7    that -- for the --

8    BY MR. WALL:

9    **Q.**   Can you explain that, this whole bit about the corrected

10   numbers, what the correction was, and how it reflects the

11   results of things like this?

12   **A.**   I'll try.   I'm not sure I am going to get every detail

13   just right, but I'm going to give you the basics.   The

14   correction was basically if you figure out how big the price

15   change was from before and after and you figure out the

16   percentage, you have to figure out effectively what to

17   multiply that by, so what's the right base, I think, for how

18   big the total number, total dollar number would be.   And I

19   don't remember precisely.   I know there was a change from

20   what his first report was to a second report, in terms of

21   what he multiplied by, so that the total dollar number got

22   bigger.   But that did not affect either the price change in

23   dollars, in prices, or in percentages.   So all of these

24   percentages would still be correct.

25   **Q.**   So between the original and the corrected version, the

1  percentages still hold?

2  **A.**   The price changes hold.  The percentage price changes

3  hold.  It's just the total dollar value associated with those

4  percentage price changes came down.  And that's where I'm

5  just not remembering exactly what he changed, but it had no

6  effect on the percentages.

7  **Q.**   Okay.  So they -- let's be clear.  Because the changes is

8  to the column that's called, "Per pre-NEA passengers," right?

9  **A.**   I believe that's what changed as a result of the

10  correction.

11  **Q.**   But the estimate, overall harm, doesn't change, right?

12  **A.**   I believe that's correct, but there -- what I'm certain

13  of as I sit here, is that the percentage price changes, the

14  numbers that I was just talking about and that are in the

15  square there, do not change.

16  **Q.**   Okay.  All right.  So moving on from this, I want to ask

17  you about another part of the market definition principles

18  from the merger guidelines that sometimes refer to as the

19  "circle principle."  Could you explain what that is?

20  **A.**   Sure.  So this -- the way to think about the circle

21  principle, it is in the merger guidelines.  It's the

22  Hypothetical Monopolist Test is one standard.  This is an

23  additional standard.  So, again, it's not an alternative.

24  It's something else that markets should meet to be valid.

25  And basically what the circle principle -- what it says in a

1    nutshell is, if you define a market, you shouldn't skip over
2    close competitors.  So the technical way it says is if you
3    have any products included in the market, you should include
4    anything else that's a closer substitute for the parties than
5    the stuff that you include.  So let me just say that more
6    concretely for what that means in practice.
7            What that means in practice is the way that you
8    should build markets is to start with one of the products
9    that's effected, say an American flight, and then you should
10   build your market out.  You should go to the next closest
11   competitor, and then the next closest competitor, until you
12   have enough to be a market.  You shouldn't -- so if you were
13   building a market for soft drinks and to use my herbal tea as
14   an example, you might start with Coke.  You shouldn't skip
15   over Pepsi, and then go to Dr. Pepper and everything else.
16   Right?
17           If you do that, what happens, and the guidelines
18   are worried about this, you might skip over Pepsi, and merge
19   everything else together, Dr. Pepper and Orange Crush, and
20   whatever drinks there are, and you might run a merger
21   simulation and find I got a SSNIP, because I merged so many
22   things together.  Circle principle says you can't skip Pepsi.
23   Pepsi is the closest competitor.
24   Q.   Okay.  And so what would be the application of the circle
25   principle to this case?

1    **A.**   The way you would do it -- the way I would do it is I

2    would start with a product, that's what the guidelines say,

3    start with the product sold by the merging parties, so a

4    flight out of JFK, say, taking an American flight out of JFK,

5    and I would build out from there to who is the closest

6    competitor.  And what you're going to find from an American

7    flight, for sure, is the closest competitor is probably Delta

8    at LaGuardia, and the next closets competitor is United in

9    Newark.  Those are the hub carriers.  You don't skip over

10   them.  Even if you can run a model that gets a big price

11   increase, you don't skip over the closest competitor.

12           Another way to say it is, and I say it this way in

13   my report, if you think about Professor Miller's market

14   definition, it's all the flights at LaGuardia and JFK.

15   Right?  That includes connecting service, includes flights by

16   little airlines like Frontier.  It leaves out United at

17   Newark.  And so what's included in this market is including a

18   bunch of distant substitutes like a connecting product, and

19   excluding a closer substitute, thus, explosively violating

20   the circle principle.

21   **Q.**   One last question about market definition and we'll move

22   on.

23           Do Dr. Miller's results establish the cohort of

24   LaGuardia and JFK as the only New York market possibility

25   that passes the Hypothetical Monopolist Test?

1    **A.**   No.  And that's another thing that's worth noting about.

2    There's a lot of talk about the Hypothetical Monopolist Test

3    in this case as though it somehow proves the market, but it

4    doesn't.  If you run Dr. Miller's Hypothetical Monopolist

5    Test the way he ran it, it would -- for almost all routes, it

6    would say LaGuardia alone passes the test.  It would say --

7    basically, if you take those three airports and take any

8    combination of them, LaGuardia alone, LaGuardia plus JFK,

9    LaGuardia plus Newark, all three, those combinations, they

10   all pass the test.  So the Hypothetical Monopolist Test is

11   not telling us which of those market is correct, it's saying

12   they all pass the test, frankly, because the model gets giant

13   price increases, so pretty much everything passes the test.

14   **Q.**   Okay.  Let's look at the next demonstrative.  This is the

15   calculation that you did with regard to the LaGuardia routes,

16   correct?

17   **A.**   Yes.

18   **Q.**   And can you explain it to the Court?

19   **A.**   Yes.  I just took Professor Miller's model, ran the

20   Hypothetical Monopolist Test using his model, as though it

21   was just for LaGuardia.  And what you find is 92 percent at

22   the 5 percent level, 86 percent, even if you go to the

23   10 percent level, the vast, vast majority of routes pass the

24   Hypothetical Monopolist Test just for LaGuardia.

25            So again, when I see this, I say, hey, this test

1    can't distinguish between -- we're trying to decide what
2    airports are in and what airports are out.  The test is
3    literally uninformative because every airport passes.  So
4    then the decision about what you include comes down to a
5    judgement call.  Professor Miller is deciding go beyond
6    LaGuardia and include JFK.  That brings in more JetBlue
7    competition, but he's leaving out Newark, leaving out the hub
8    carrier.  The Hypothetical Monopolist Test cannot support
9    that, because the market with Newark passes.  The market
10   without JFK also passes.  It comes down to this question that
11   I was asking earlier about what's the right way to illuminate
12   the competitive effects?  Professor Miller said that, too,
13   and my conclusion is you cannot possibly eliminate the
14   competitive effects of an airline transaction in New York and
15   leave out one of the two major hub carriers by leaving out
16   Newark.
17   **Q.**  Thank you, sir.  Just as a small technical point, on the
18   slide here, we have one of our favorite acronyms in
19   antitrust, the SSNIP, S-S-N-I-P.  Could you just, for the
20   record, state what that means?
21   **A.**  Yeah, I always forget.  I think it's a small but
22   significant nontransitory increase in price.
23   **Q.**  Okay.
24   **A.**  But that's -- basically, what that just means --
25   Professor Miller said it, too.  If you merge together

1    everything in your market that you're proposing, so it's a

2    giant merger, would that hypothetical monopolist that you've

3    created, that giant new firm, would it raise prices by at

4    least five percent above the current level.

5    **Q.**   Okay.  So I want to return, then, to our evaluation of

6    the market conditions in these areas.  And we'll start with

7    New York City and then turn to Boston a little later, so

8    you've got a lot of data to present on this.  Let's start

9    with slide 6 of your demonstrative, which the Court has seen

10   before in the opening statement and otherwise.  So this is

11   something that you and your team prepared?

12   **A.**   Yeah, so this uses the Department of Transportation's

13   DB1B.  I think you've heard those letters during the trial.

14   It's just data on traffic.  These are passengers originated

15   in New York starting in 2014, and you just see the decline of

16   JetBlue and American.  So it's all relative to 2014.  So

17   relative to 2014, by 2019.  So just prior to COVID and to

18   then the NEA.  JetBlue and American had -- you know, their

19   share had fallen by two to three points, while United and

20   Delta had gone up by three to four points.

21   **Q.**   All of that being indexed to a 2014 starting point?

22   **A.**   Correct.  So zero is just where they were -- it's changes

23   relative to 2014.

24            THE COURT:  Market share changes.

25            THE WITNESS:  Market share changes.

1          THE COURT:  Of New York originating passengers at

2    one of those three New York airports.

3          THE WITNESS:  Correct.  So, you're right.  These

4    are New York originating, so people who start their journey

5    in New York.  And these data will let you compute what

6    percentage of the passengers flew on these four carriers.

7    BY MR. WALL:

8    **Q.**  Okay.  We're going to drill down a little bit deeper into

9    that in a moment.  But for now, let's go to the next chart,

10   which is entitled "New York Daily Seats Bi-Directional Total

11   in Thousands."  What have you done here?

12   **A.**  Again, these are seat data, so they come from the OAG,

13   which is the schedule data on the seats that are flown.

14   **Q.**  "OAG" is the Official Airline Guide?

15   **A.**  Correct.  You can just get all of the schedules, what

16   kind of plane was it, when did it fly, what day.  So you can

17   add up all the seats that fly.

18          And this is bi-directional, so these are daily

19   seats.  So the American says, per day, on average, American

20   had 62,000 seats from those three New York City airports.

21   JetBlue had 61,000.  This is really -- and then Delta had

22   120,000, United had 113,000.

23          This is really one version of the picture of why

24   it's hard to compete against a hub carrier, because the hub

25   carrier just has a lot more activity, a lot more going on in

1    these airports.  So JetBlue and American, just in terms of

2    the capacity that they're bringing to the market, are way

3    behind.

4           And frankly, the NEA, like, attempts to compete

5    with hub carriers generally, is an attempt to figure out how

6    do we deal with that?  Because as long as we're that much

7    smaller, we're going to lack relevance in that market.  I

8    know you've heard that term.  So, you know, how do we deal

9    with the fact that Delta and United are so far ahead of us,

10   in terms of the capacity that they bring to market.

11   **Q.**  Let's go to the next slide, which is entitled "Nonstop

12   Destinations Served."  What have you done here?

13   **A.**  Well, so there's more of looking at the same schedule

14   data.  This, to me, may be even a more clear picture of the

15   challenges of competing with hub carriers.  So this is just

16   measuring the number of places that you can go from New York

17   nonstop.  So if you choose American, you can go to 54.  If

18   you choose JetBlue, you can go to 61.  Delta gets you to 107.

19   United's strength out of Newark, without the perimeter rule,

20   with a little more capacity in Newark, they can get you even

21   more places.  They can get you to 125 places.

22          So this is -- as I think I heard Mr. Raja say,

23   which has been my experience in the industry, New Yorkers

24   sort of expect to be able to fly nonstop.  You live in New

25   York; you got three airports.  You expect to get there

1  nonstop.  And the carriers who can get you to far more places

2  nonstop are Delta and United.

3       So if you just think about yourself as a traveler,

4  potentially getting frequent flyer miles, and so on, on a

5  carrier, the hub carrier is just much more attractive because

6  of the number of places they can get you.

7  **Q.**  So moving on to the next one, "International Long-Haul

8  Markets."  What have you shown here?

9  **A.**  So this is the same basic idea, just now we're looking at

10  international long-haul markets to South America, Europe,

11  EMEA, and Asia.  So JetBlue has, basically, no international

12  presence, one long-haul market.  American has 8.  But again,

13  Delta and United are getting to 25 and 35.  And again, you

14  see the importance of the strength of United here, because

15  there's no perimeter rule around Newark, and so United's hub

16  presence at Newark lets them to take people to 35

17  international destinations.

18       So again, that's why I was saying earlier, you

19  shouldn't, in the abstract, think that Newark isn't part of

20  the market.  It's a very attractive place for people to go.

21  Because they can get on United, they can be loyal to United,

22  and they can go many places around the world.

23  **Q.**  Let's move forward.  I want to focus on now -- drill down

24  a little deeper on the local and originating shares.  You

25  showed the index chart a moment ago.  Let's look at table 2

1  of your expert report, which is also marked as Defendants'

2  Exhibit 9-1-2.  And we'll blow that up, and I'll ask you to

3  tell me what you were showing here.

4  **A.**  Thanks for the blow-up.  I was just telling someone I

5  need new glasses.  So now I can actually see it.

6          So this is diving more deeply -- so I mentioned

7  earlier, Your Honor, that the chart we looked at, the sort of

8  jaw chart of shares going in different directions was

9  originating passengers, so people who start in New York.

10  This is breaking those passenger shares down over time.  And

11  there's the total passengers, then there's the originating

12  passengers who start in New York, and then there's the

13  destination passengers who start somewhere else.

14          And so I think what's worth focusing -- the first

15  thing you see on this chart is you see that, again, American

16  and JetBlue declining, while Delta and United get stronger by

17  each of these metrics.  So that's pretty clear.  But I think

18  what gets interesting is when you look at local origin and

19  local destination and contrast them.

20          So for local origin, American is really quite weak.

21  I think there's been testimony about American's lack of

22  relevance in the New York City area means that it just really

23  struggles to attract New Yorkers.  Right.  So we've seen

24  American has declined from 16-and-a-half percent in 2014, to

25  13.1 percent in 2019.  So by 2019, American is way less than

1    half the size of Delta and United in terms of origin

2    passengers.  Right.  So this is one of the three legacy

3    carriers, but here in New York -- or in New York, it just

4    can't compete for New Yorkers at any reasonable level with

5    Delta and United.

6            For destination passengers, American does somewhat

7    better, still not as well as Delta and United.  But this is

8    what we heard in testimony, right, is that American can fight

9    for people, say, from the Midwest, people from Florida, other

10   places where it actually has a presence, some places where it

11   has a hub.  Mr. Raja talked about that box in the middle of

12   the country.  So American does okay with people outside New

13   York, very poorly with people inside New York, although it's

14   declining on both in New York.

15           The other piece to notice is that JetBlue is

16   reversed.  All right.  So JetBlue, if you look at destination

17   passengers, JetBlue does very badly.  JetBlue shares decline

18   just over 11 percent for destination passengers.  So it's not

19   doing very well at picking up people outside of New York.

20   Right?  Whereas inside New York, it does, still much smaller

21   than Delta or United but still declining, but somewhat

22   better.

23           And so there's the two points that I would make

24   from this.  One is you see the declines in all of these, but

25   two is, this really goes to what the NEA is and why it's so

1    important to dive into these number to think about the NEA.

2    Because American can do pretty well at attracting people from

3    outside of New York.  JetBlue can do pretty well at

4    attracting people from inside New York.  In the NEA -- I

5    would call those complementary assets or complementary

6    abilities.  In the NEA, you now have a network and a sales

7    position and a brand that has the ability to compete for

8    both.

9          Today, normally and Delta and United have the

10    ability to compete for both.  If you bring American and

11    JetBlue's networks together in New York and their sales

12    presence together to sell that network by codesharing in New

13    York, you now actually have this complementary network that

14    can be strong both in New York and outside.

15    **Q.**  Thank you, sir.  If we got forward, there are of course

16    routes where American and JetBlue compete and overlap out of

17    New York City today.  Can you put those in perspective for

18    us?

19    **A.**  Sure.  There is a demonstrative, it might be easier.

20    **Q.**  Indeed, there is.

21    **A.**  Bring it up.  It helps me.

22    **Q.**  Why don't we put up slide ten of your demonstrative and

23    you can tell us what you're showing here?

24    **A.**  Sure.  So there are overlaps.  You know, as you just

25    asked in your question, there certainly are nonstop routes

1    that both American and JetBlue serve.  I think the things to

2    notice from this picture are they're the minority of routes.

3    Most routes are not overlaps.  And then secondly, even those

4    routes that are overlaps tend to have multiple other

5    competitors.

6            So if you just look at the domestic picture, for

7    example, they are 54 nonoverlap domestic routes coming out of

8    these New York airports, as opposed to 20 -- if I'm doing my

9    math right there, 20 overlaps.  So most of the routes are not

10   overlaps.  Some of the overlaps are relatively heavily

11   trafficked routes so they have more of the share of

12   passengers, but because they're heavily trafficked routes

13   they also attract a lot of competition.  So you see like most

14   of them have three or more competitors.

15   **Q.**  Is that what one typically sees in the airline industry,

16   there's a relationship between the traffic and the number of

17   competitors?

18   **A.**  Yeah.  I mean, absolutely.  So the routes in the airline

19   industry, where we sometimes think about there potentially

20   being market power, tend to be smaller or it's a only one hub

21   carrier serves, for example, as opposed to the big routes

22   that attract lots of competition.  So here we see, basically,

23   every single route has at least two other competitors, right,

24   and then we see that, you know, I think it's 89 percent of

25   the passengers are on routes that are either not overlaps or

1    have three or more competitors.  Right?  You see those two

2    that are listed there that have one other competitor, those

3    two routes are New York to Martha's Vineyard, and New York to

4    Nantucket, seasonal small seasonal routes that have less

5    competition, but even they're still facing one other

6    competitor.

7    **Q.**  And you're leaving out the private jet service that most

8    of those people take?

9    **A.**  Well, I guess private jets would be part of the outside

10   good in this case.

11            And one thing that I will note, internationally you

12   see it even more so, almost all nonoverlaps, JetBlue does

13   less internationally.  Almost all of the overlaps have lots

14   of competition.  One thing I would note is that there's the

15   one route here that is an international overlap with only one

16   other carrier, there's one listed, that's actually New York

17   to Antigua, which actually probably should probably be taken

18   off of this chart, because it's the one carve-out that the

19   parties have added since the NEA started.  So originally,

20   there's six carve-outs, they have a procedure that adds more

21   carve-outs that basically involves looking to see if they

22   have fewer other competitors, and that one route there, New

23   York-Antigua has been carved out.

24            THE COURT:  So there's 54 non -- I want to make

25   sure I'm reading the chart directly.  There's 54 nonoverlap

1    nonstops.

2              THE WITNESS:  Correct.

3              THE COURT:  Those are nonstop flights from New

4    York, which, at the time, the NEA -- JetBlue and American had

5    service.

6              THE WITNESS:  They're nonoverlaps, so they didn't

7    both have service.

8              THE COURT:  They didn't both have service.  So only

9    one of them served.

10             THE WITNESS:  Correct.

11             THE COURT:  And of those 54 --

12             THE WITNESS:  That's only 37 percent of the people.

13   Those tend to be smaller.

14             THE COURT:  Those are only 37 percent of the

15   people.  And on those 54, one had four other carriers, 11 had

16   three other --

17             THE WITNESS:  So you can add up all the numbers

18   here.  So the 54 are nonoverlaps, they're not overlapping

19   with each other at all.  The other ones that are above that

20   are overlaps.

21             THE COURT:  Oh.  I got it.  That's the -- so the

22   total number of routes would be the 54 plus one, plus 11,

23   plus 6, plus 2.

24             THE WITNESS:  It's 74.  It's 54 plus 20.

25             THE COURT:  Right.  I got it.

1          THE WITNESS:  So there's 54 -- the way to think

2     about it is the 54 have no overlap at all, that's no

3     competitive concern.  The one has four other carriers, the 11

4     has three other carriers.  So it's sort of moving up from not

5     an overlap at all to how many competitors there are.

6          THE COURT:  I got it.  I understand now.  Thank

7     you.

8     BY MR. WALL:

9     **Q.**  Just following up with that, Dr. Isreal, is there

10    learning in the economic literature studying the airline

11    industry about the likelihood that somebody would be able to

12    exercise market power on a route that had, as you put it in

13    this chart, three other carriers?

14    **A.**  There's been a variety of studies of sort of where we

15    might see fare increases.  There tend to be on where you

16    might see a fare increase if somebody exited, so not really a

17    reliance setting.  And different people have studied it in

18    different ways, but if there's three other carriers, plus

19    American and JetBlue, even if you counted American and

20    JetBlue as one, which I don't think you should do, but even

21    if you did, that would be four carriers.  I haven't seen

22    anything in the literature that would support a problem with

23    fares on a route that had four carriers.  Most of the

24    focus -- I don't want to overcharacterize every study, but

25    most of the focus in my life when I talk to regulators has

1    been routes that are going to end up with -- you know, two

2    carriers or one.  In a merger, those are called three to twos

3    or two to ones.  That's where the vast majority of the focus

4    is.

5              So on here, that would only be the lines that have

6    one other carrier or none.  That would take -- one other

7    carrier would mean even if you count American and JetBlue as

8    one thing, there's still two.  So those top two rows are

9    where overwhelmingly the attention has been in my career.

10   And again, you have Antigua that's been carved out and you

11   have Martha's Vineyard and Nantucket.  Those are the only

12   things in that category.

13   Q.  Thank you.  I want to switch the subject a little bit,

14   just a bit, to barriers to expansion, and what might prevent

15   other carriers from expanding their capacity as the NEA

16   carriers try to restrict capacity.  And to begin, I'd like to

17   ask you, is that realistic, with respect to the New York

18   routes, given what we've all heard about the slot

19   constraints?

20   A.  And I think, I think it's realistic for the two hub

21   carriers.  And again, this goes back to what I'm saying about

22   why the hub carriers matter so much.  I mean, in general,

23   taking it out of New York for a second, when we think about a

24   hub carrier, they've got the presence at an airport.  So

25   they're definitionally on one end, and they're in the

1    business of adding spokes out of their hub because that
2    brings in more demand to their hub.  That's what the whole
3    model is about.  So in general, hub carriers -- if you think
4    about a given route -- we generally think about a given
5    route, say New York to Charlotte as a market, even if a hub
6    carrier is not serving that route today, or is serving it
7    only a little, they're generally in a position to quickly
8    enter or expand.  The merger guidelines have a concept called
9    rapid entrance, which are a firm that can jump into the
10   market quickly without a lot of cost.  I mean, I have many
11   times taught hub carriers are a great example of that.
12          If you want to say an individual route is a market,
13   even if a hub carrier is not on it, you've got to respect
14   them as a rapid entrant.  So in general, hub carriers have
15   the ability to do that.  In New York, the other question
16   might be, you know, we've been saying, and I've been saying
17   that the slots, and so on, are constrained in New York, so
18   can they really do it in New York?  United and Delta are the
19   two firms in the position with Delta with a very large slot
20   position at LaGuardia, United at New York, which is not slot
21   constrained, it's schedule -- I forget the term now.
22   **Q.**  Facilitated?
23   **A.**  Schedule facilitated, so they have to get FAA approval,
24   but they have -- basically, they're able to maintain or add
25   to their number of flights, those are the two carriers in New

1    York that have the ability to do that, because they have

2    these large portfolios.  Even if they don't want to move a

3    slot around, they always have the ability to up-gauge.  So

4    carriers, if you just think about a hub carrier, you go to

5    Boston now, you think about what Delta is doing there, they

6    just have way more resources in that market, and the ability

7    to respond by shifting around planes and entering new routes.

8    **Q.**  We have heard about the DOT mandated slot divestitures.

9    I think you were here earlier today when Mr. Schweinzger was

10   testifying about those.  Are they relevant to your assessment

11   of the NEA partner's ability to exercise market power?

12   **A.**  Relevant.  I mean, in a sense, I guess, yes, but not

13   critical.  I mean, because if there hadn't been any slot

14   divestitures, everything else I've said today would have been

15   the same.  So these are very competitive markets and

16   certainly a very competitive market in New York in any case.

17   Slot divestitures are kind of icing on the cake, I guess.

18   There are seven slots that are being divested, or are in the

19   process, I think, of being divested.  They're being optioned.

20   The FA A is involved in that now.  So if you think about

21   market power as the ability to restrict output, that's seven

22   slots of additional output for some other carrier off the top

23   in the NEA.  And then we heard testimony, I was here earlier,

24   about if American and JetBlue don't grow enough, they have to

25   give up ten more.  And so that goes right to this question,

1  right?  If they try to pull back output to exercise market

2  power, they're going to, (a), suffer a big cost for that, ten

3  slot pairs are valuable, and (b), somebody else gets to step

4  in with those slot pairs and directly add additional

5  competition and output to the market.

6  **Q.**  There was a suggestion made earlier during Dr. Miller's

7  testimony, I think it was Dr. Miller, it might have been

8  Dr. Town, that it might be possible for American to meet its

9  growth commitment on some New York routes and still restrict

10  output and raise price on other New York routes.  Do you have

11  a reaction to that?

12  **A.**  I mean, I heard the testimony, I think it was from

13  Dr. Miller, about this idea that maybe you would not grow on

14  the nonstop overlaps, you would just grow on other routes.  I

15  mean, I guess I have a couple reactions.  One is -- I guess

16  maybe three.  One is, you know, that sort of thinking

17  about -- I'm not going to grow here and I'm going to grow

18  there, because I'm trying to somehow evade this or because of

19  some competition from the NEA, to me that's -- it's

20  inconsistent with how airline networks work.  You

21  don't add -- in airline networks you add capacity to think

22  about the quality of the overall network.  And so it's very

23  hard when planning a network to think I'm going to add on

24  this route but not that route, because I'm trying to evade

25  some competition.  Basically, you add capacity where it

1    supports the overall network.  Because every plane that you

2    add is serving hundreds of different markets because it also

3    serves connecting traffic.  And that leads to my second

4    reaction which is probably the most important, which is, in

5    my study of alliances, I mean, regulators have made this

6    claim before, sure, maybe you will add capacity, but you

7    won't add it on the nonstop overlaps.  That's just rejected

8    by the data from international alliances.  The nonstop

9    overlaps are important big routes, and when capacity gets

10   added, it gets added to those routes.

11          I mean, if you look at the American/Atlantic Joint

12   Business.  Right?  Dallas to London is a major nonstop

13   overlap between approximate American and British Airways,

14   it's gotten tons of capacity, because it's important route to

15   the network.  But it's just the idea that you don't add

16   capacity on nonstop overlaps is just flatly rejected by the

17   data.

18          And I guess the third thing I would say is, you

19   know, that's also, you know -- I'm a big believer in

20   continuing to study these things and continuing to watch the

21   data.  So if that's the behavior that occurs, that will be

22   detectable and we can see what happens -- if this case is the

23   exception to my rule, and nonstop overlaps really do stuffer,

24   then we'll see that, but that's not what I see in the data.

25   Q.   Thank you.  So based upon your overall assessment to the

1     market situation in the -- on the New York City routes, do

2     you see any reasonable prospect that the NEA carriers will be

3     able to exercise market power?

4     **A.**   No.  I mean, again, it goes back to the beginning.  We're

5     talking about two weaker, nonhub carriers exercising market

6     power against two strong hub carriers.  My entire career of

7     studying airlines, the question is how do we get these other

8     guys to inject competition?  That's what the NEA is trying to

9     do.

10    **Q.**   Other guys doing competition against the hub carriers?

11    **A.**   Correct.  It's never a -- I've just never seen it be a

12    question of when there's a hub carrier of the nonhub carrier

13    is going to exercise market power.  The question,

14    overwhelmingly in the literature, is how does the nonhub

15    carrier compete, and how do they bring more competition into

16    the market, not how do they exercise market power?

17    **Q.**   Okay.  Let's switch over to Boston.  And to begin, I'll

18    ask you to take a look at slide 11 from your demonstrative.

19    It's a bunch of squiggly lines.  What is being shown here?

20    **A.**   Should I give a better explanation of that?  I shouldn't

21    just say it's a bunch of squiggly lines.

22    **Q.**   Yeah, we need more detail.

23    **A.**   Yeah, so this is the -- these are the passenger shares,

24    the same data that we were talking about before, in Boston

25    over time.  So you see the range of carriers serving Boston.

1    And I mean, the thing -- the thing that comes most clearly

2    off the page here is Delta.  You see Delta's growth from, you

3    know, at the beginning here, roughly 15 percent share, to

4    pushing 30 percent share by 2022.  Much of that comes at the

5    expense of American.  So you basically Delta comes in, makes

6    Boston a global priority, eventually declares Boston a hub.

7    Once a legacy carrier declares a city like Boston a hub, that

8    legacy carrier becomes very strong in that city.  You see the

9    other legacy carrier, American, fading as a result.  You also

10   recently see JetBlue and Delta has competed effectively with

11   JetBlue, and JetBlue has faded.

12        I also heard Mr. Hayes testify about operational

13   difficulties that JetBlue has had, which is Boston -- because

14   New York has slot constraints, Boston is the only place that

15   JetBlue can try to address those operational difficulties, so

16   that's probably led to some of the recent decline.  But the

17   overall story is Delta's hub taking control in Boston, and

18   again, the others struggling to compete with that.

19   **Q.**   Okay.  So you've mentioned before that it's not common

20   for a city the size of Boston to have two hub carriers.  What

21   are the competitive conditions that, in your mind, are going

22   to create the most competitive intensity in Boston?

23   **A.**   I mean it's, I think, a lesson of the airline industry.

24   And Dr. Lee did some of this, so I won't spend too much time

25   on it.  The lesson is unless you're in New York and you

1   can -- or Chicago, people in those markets are blessed by

2   having multiple hubs competing with each other.  Every other

3   city in the country, the best chance is to have a strong LCC

4   come in.  I mean, that's the model.  That's been my focus in

5   the airline industry.  How do you have hub carriers

6   generating the benefits they do because they serve so many

7   markets, but still have competition with those hub carriers?

8   The answer has been LCCs with a different business model,

9   with a point to point business model are able to come in and

10  inject competition.  So in the case of Boston, to me, the

11  fundamental -- it comes down to if we want competition with

12  Delta, that's going to come from JetBlue, and JetBlue needs

13  to have the resources to do that.

14  **Q.**  Okay.  Let's just delve a little bit into what the record

15  shows about Delta's ambitions in Boston.  I want to pull up

16  DX259.

17           Your Honor, this is a document that has been marked

18  confidential by Delta.  We have received permission to

19  publish the one page that I'm going to refer to, page 7.  And

20  so that can be put up on the screen.

21           THE COURT:  Okay.

22  BY MR. WALL:

23  **Q.**  Okay.  You're familiar with this?

24  **A.**  Yes.

25  **Q.**  This is part of a Delta strategy, a broader Delta

strategy document, but this page is entitled, "Delta is
staking claim as number one global network carrier in
Boston."

What about this do you find significant with
respect to Delta's ambitions?

**A.**   I mean, at a high level, it says what I was just saying,
which is that Delta is targeting Boston.  Delta is noticing
right at the top that Boston was the largest non-hub city, so
there was an opportunity for somebody to come make it a hub,
which is what Delta has done since.  I guess that's number
one.

Number two, you see Delta sort of coming directly
after JetBlue in competition.  So you see a reference to
JetBlue's margins on the top and as a target for competition.

**Q.**   Focus right in to that part of it here and the
line, "Large Latin and Florida leisure markets."

**A.**   Right.  So there was a reference to JetBlue on the top
there referring to their margins.  There was a reference here
to saying -- Delta is saying we can go after a large Latin
and Florida leisure markets.  They were saying those are
future additions to their network and they say those are
JetBlue's main profit drivers.  So Delta could say what they
meant exactly, but when I read that, I see them saying let's
go after JetBlue where it hurts.

**Q.**   You're not saying there's anything wrong with that.  Are

1  you?

2  **A.**  No, that's competition.

3  **Q.**  And is that something that is potentially a threat to

4  JetBlue?

5  **A.**  I mean, all of this is potentially a threat to JetBlue.

6  The thing about JetBlue that's been said in here that I agree

7  with is JetBlue is sort of trying to be a somewhat unique low

8  cost carrier and that -- especially in Boston, they're able

9  to compete for the broad range of customers including

10  business travelers.  Delta is better with their network at

11  competing for business travelers, so they are a major threat

12  to JetBlue.  And on top of that, they're now saying not only

13  are they going to be better with business travelers, they're

14  going to go after JetBlue's core leisure markets.  So this

15  is -- I mean, Boston, if you read these documents and you

16  also just think about airline economics, Delta has a hub.

17  Other legacy carriers are not going to match that.  So Boston

18  sets up as a fight between JetBlue and Delta in which JetBlue

19  needs a network that enables it to have that fight.

20  **Q.**  Okay.  Let's look at a little bit more data, and we'll

21  move on to DX925, something that I believe you prepared.

22  What is this?

23  **A.**  So this is just -- these are nonstop destinations,

24  similar to some things we looked at in New York.  These are

25  nonstop destinations out of Boston.  You can see JetBlue is

1    still -- as point-to-point carrier, JetBlue has, you know,

2    basically their business is nonstop.  So they have gone from

3    59 to 72 nonstop destinations out of Boston.  But in the same

4    time period, Delta has gone from 25 to 58.  So as part of

5    this focus on Boston, and then turning it into a hub in 2019,

6    Delta has greatly increased the number of nonstop

7    destinations it has out of Boston.

8            And then the thing I would add -- just to put this

9    in perspective, remember Delta is a hub carrier, right?

10   Here, but also in, say, Atlanta.  The other thing that Delta

11   can bring to this picture is if they get you from Boston to

12   Atlanta, they can get you literally anywhere in the world.

13   So JetBlue is losing its advantage in terms of nonstop

14   destinations and having to now fight with a much larger Delta

15   network.

16   **Q.**  And these data end in 2019.  So has there been any

17   increase in the number of nonstop destinations served out of

18   Boston by Delta since then?

19   **A.**  Yeah, Delta has continued to grow these.  I don't

20   remember the exact number.  I know that as far as daily

21   flights, the last exhibit had Delta growing to something in

22   the mid hundreds.  And I know they're pushing that over 200.

23   But Delta continues to grow on all of these metrics.

24   **Q.**  Okay.  So what is the significance of that for the

25   question of whether the combination of JetBlue and American

1   can create market power on Boston routes?

2   **A.**   It's just the same story that I've been telling.  Boston

3   was a different sort of city until a couple of years ago, in

4   the sense that it was the largest domestic city that didn't

5   have a hub.  I think some of that is the location way off in

6   the far Northeast.  But Delta has now, similar to what

7   they've done in the Northwest in Seattle, in the Northeast

8   they have made Boston a hub.

9           So now we are in the situation where we have a

10  legacy hub carrier.  You're not going to have two.  The best

11  competition that's going to come is going to come from

12  JetBlue.

13          And JetBlue is not going to be in a position to

14  exercise market power.  The question is not market power for

15  anybody else.  The question is how do you constrain the

16  potential market power that Delta would have?  A stronger

17  JetBlue is the best way to constrain that market power, as

18  opposed to potentially exercising market power.

19  **Q.**   Great.  Let's talk now about the routes where American

20  and JetBlue either overlap or don't.  And I think slide 12 in

21  your demonstrative is similar to the one that we saw for New

22  York.  So could you take us through that?

23  **A.**   Yeah, sure.

24          So this is, Your Honor, what we looked at before.

25  So we counted in the same way.  The one thing that's

1    different here, I would note, is that Boston has the

2    carve-outs, so the six routes that are listed at the top.  I

3    think it's -- I'll give myself a memory test.  I think it's

4    Boston to Philadelphia, Charlotte, Phoenix, Dallas, Syracuse,

5    and Rochester --

6    **Q.**  Six out of six.

7    **A.**  -- are carved out there at the top.

8              THE COURT:  I thought it was seventh, though, now.

9              THE WITNESS:  Seventh is New York to Antigua.

10             MR. WALL:  You get extra credit.

11             THE WITNESS:  Six out of six in Boston, though.  If

12   you count that one off, I only get a B.

13             So in the bottom is the same counting of overlaps,

14   the way I did it for New York.  The thing that I would note

15   here is that it's 36 out of -- of the ones that are not

16   carved out, it's 36 out of 41, I guess, that are not overlaps

17   at all.  And then, again, similarly, the vast majority of the

18   traffic is on routes with multiple substantial competition.

19             Internationally, you know, there's not -- neither

20   American or JetBlue providing a lot of international service

21   out of Boston.  The one overlap here is Boston to Cancun, but

22   a relatively big leisure with lots of competition.

23   BY MR. WALL:

24   **Q.**  Okay.  Now, one thing about --

25             THE COURT:  So the nonoverlap, nonstops, it's

1    essentially those are places they each flew to beforehand,

2    and the other didn't fly there?

3              THE WITNESS:  Correct.

4              THE COURT:  And that's 60 percent of the traffic.

5              THE WITNESS:  Of the traffic, correct.

6    BY MR. WALL:

7    **Q.**  I have a question about that.  And it's literally a

8    question; I don't know the answer to it.  Would that number

9    also include routes that somebody offers nonstop that neither

10   American nor JetBlue fly?

11   **A.**  I believe this is only routes.  I would have to check my

12   backup, but given the accounts here, I believe this is only

13   routes that one or the other of them flies.

14             THE COURT:  And are these -- so the Boston to some

15   destination neither of them fly are not in here.

16             THE WITNESS:  Like I said, I would want to check my

17   work papers, but that's my recollection.

18             THE COURT:  And 36, one of those routes, presumably

19   somewhere American flies that JetBlue didn't, and at least

20   one is presuming that JetBlue flew that American didn't.

21             THE WITNESS:  Correct.

22             THE COURT:  Whether there's anyone else flying on

23   that route, whether there's no one else or ten other carriers

24   or anywhere in between, that's not --

25             THE WITNESS:  Correct.

1          THE COURT:  -- revealed here.

2          THE WITNESS:  That's correct.  They're not an

3     overlap, so from that point of view, there was not -- there

4     wasn't competition.

5          THE COURT:  Yes.  I understand.  Go ahead.

6          MR. WALL:  Okay.  Great.  Thank you.

7     BY MR. WALL:

8     Q.  All right.  So one last question on this.  So there are,

9     I think by this, 24 percent of the Boston domestic passengers

10    that are on routes where there's either one other carrier

11    besides American and JetBlue, or two other carriers among

12    JetBlue.  Now, just to be clear, so we understand the math

13    here, on all of those, they're both American and JetBlue are

14    present, and prior to the NEA were competing with each other

15    fully independently, correct?

16    A.  That's correct.

17    Q.  But also, I guess, by construction, if I understand it,

18    that means that all such routes have an LCC on them, namely

19    JetBlue, right?

20    A.  That's correct.

21    Q.  And so if JetBlue doesn't change its business model or

22    its pricing philosophy or anything like that, as some of the

23    witnesses have said, would you expect that the -- that the

24    NEA would lead to any reduction of pricing competition on

25    those routes?

**A.**   No.   I mean, based on everything that I've ever studied
about JetBlue, in every setting, JetBlue has the JetBlue
effect, and you would expect that to continue.

**Q.**   And if the JetBlue effect were not to continue, is that
something that you think would be observable with standard
industry data and econometric techniques?

**A.**   I don't think you'd need fancy econometrics.   I think it
would jump off the page.   The JetBlue effect is very
detectable, and if the JetBlue effect were to go away, that
would be very detectable.

          And to make one more point, most of these routes
either have or likely could have Delta on them, so beyond
just statements about business models, which are very
important, it also -- I mean, JetBlue has to compete with
Delta.   JetBlue has one business model by which it competes.
So to me the idea that JetBlue could try to compete with
Delta by being something besides what they are, doesn't make
any sense.   But if they change their model, that would leap
off the page at you.

          MR. WALL:   Thank you.

          Your Honor, I'm about to go on to a deep dive with
the NEA terms, and I see I only have about three minutes
left.

          THE COURT:   You can't do it in three?

          MR. WALL:   We're going to get into math, which I

1    think will make Your Honor very happy.

2              THE COURT:  Sure.  Then no point in starting that

3    with three minutes left.  Okay.

4              So I'll get back to you on the privilege question

5    after I talk to Judge Robertson.  And I'll see you Monday at

6    9:00 a.m.

7              MR. WALL:  Thank you very much, Your Honor.

8              THE COURT:  And so for now, I just reserve Tuesday,

9    Wednesday, Thursday, and then you'll let me know.

10             MR. WALL:  Monday, Tuesday, Wednesday, Thursday?

11             THE COURT:  Yes, Monday is reserved.

12             MR. WALL:  Okay.

13             THE COURT:  All right.  Have a nice week.  I will

14   see you next week.

15             (Court in recess at 12:57 p.m.)

16

17

18

19

20

21

22

23

24

25

1

2          **C E R T I F I C A T I O N**

3

4          I certify that the foregoing is a correct

5   transcript of the record of proceedings in the above-entitled

6   matter to the best of my skill and ability.

7

8

9

10  /s/ Rachel M. Lopez                October 17, 2022

11  /s/ Robert W. Paschal

12

13

14  _____         _____

15  Rachel M. Lopez, CRR             Date

16  Robert W. Paschal, RMR, CRR

17  Official Court Reporters

18

19

20

21

22

23

24

25