1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3

4     _____

5     UNITED STATES OF AMERICA, et al.

6            Plaintiffs,                    Civil Action No.
                                            1:21-cv-11558-LTS
7         v.

8     AMERICAN AIRLINES GROUP, INC.,
      et al.,
9
             Defendants.
10
      _____
11

12        BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                          BENCH TRIAL
                             Day 14

15

16
                        Monday, October 24, 2022
17                           9:00 a.m.

18

19

20
      John J. Moakley United States Courthouse
21    Courtroom 13
      One Courthouse Way
22    Boston, Massachusetts

23
      Rachel M. Lopez, CRR
24    Official Court Reporter
      raeufp@gmail.com
25

1                        **A P P E A R A N C E S**

2

     On behalf of the Plaintiff United States of America:
3

         United STATES DEPARTMENT OF JUSTICE
4        BY:  WILLIAM H. JONES, III; AND JOHN R. DOIDGE
         450 Fifth Street, Northwest
5        Suite 8000
         Washington, D.C.  20530
6        (202) 514-0230
         bill.jones2@usdoj.gov
7        dick.doidge@usdoj.gov

8

9    On behalf of the Defendant American Airlines Group, Inc.:

10       LATHAM & WATKINS, LLP
         BY:  DANIEL M. WALL
11       505 Montgomery Street
         Suite 2000
12       San Francisco, California  04111
         (415) 391-0600
13       dan.wall@lw.com

14

15   On behalf of the Defendant JetBlue Airways Corporation:

16       SHEARMAN & STERLING LLP
         BY:  RICHARD F. SCHWED
17       599 Lexington Avenue
         New York, New York  10022
18       (212) 848-4000
         richard.schwed@shearman.com

19

20

21

22

23

24

25

**TABLE OF CONTENTS**

**TRIAL WITNESSES**

On behalf of the Defendants:                                    Page

 MARK ISRAEL, Ph.D.

          By Mr. Wall                                           4

          By Mr. Doidge                                        91

          By Mr. Wall                                         197

          By Mr. Doidge                                       198

**EXHIBITS**

On behalf of the Plaintiffs:                               Admitted

 Number PX-1145                                               130

 Number PX-1146                                               126

**P R O C E E D I N G S**

1
2          (In open court.)
3          THE DEPUTY CLERK:  The United States District Court
4    for the District of Massachusetts is now in session, the
5    Honorable Leo T. Sorokin presiding.
6          THE COURT:  Please be seated.
7          Good morning, everyone.  Everybody ready to go?
8          MR. WALL:  We are.
9          THE COURT:  All right.
10          MR. WALL:  I'll ask Dr. Israel to come back.
11          THE COURT:  Yes, Dr. Israel, I remind you, you
12    remain under oath.
13          THE WITNESS:  Yes.  Thank you.

**MARK ISRAEL, Ph.D.**

15      having been previously duly sworn, testified as follows:
16    **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF AMERICAN AIRLINES**
17    BY MR. WALL:
18    **Q.**  So Dr. Israel, on Friday, we just finished our discussion
19    of the market context for the NEA, so let's now turn to the
20    terms of the NEA.  So in evaluating the potential competitive
21    effects of the Northeast Alliance, did you review the terms
22    of the contracts?
23    **A.**  Yes, in great detail.
24    **Q.**  And why did you do that?
25    **A.**  It's the essence of the issue.  I heard Your Honor early

in the case say if you want to evaluate the collaboration at
issue, you need to look at the actual terms of the contract.
So I paid great attention to them.

**Q.**  So cutting to the chase, at least one of the chases, when
you do that, do you find that the NEA is akin to a merger?

**A.**  Definitely not.

**Q.**  Why not?

**A.**  Well, in thinking about whether something is a merger, I
mean, I really think about three issues.  These issues are
laid out in a paper that's been mentioned in here by Dan
O'Brien, who is my colleague, and Steve Salop.  But it's
really what are the incentive effects, does it create control
like a merger would, and does it preserve competition.

And on all of those to mention, the NEA is nothing
like a merger.

**Q.**  Okay.  Let's turn to the first of those, control.  And
with respect to control, why do you say that the NEA does not
function like a merger?

**A.**  I mean, it's literally no control.  These remain entirely
separate firms with separate boards and separate management
themes implementing very distinct business models.  There's
no -- in some cases you have some cross ownership or some
cross control or influence.  There's none of that, right?
These are separate firms operating with a contract now, but
as entirely separate firms with separate managements.  And

1   we've seen that, they continue to implement their own fleet

2   plans, their own --  they have different prices in the

3   market.  They have very distinct business models.  As I said,

4   you know, from the JetBlue point of view, which has been a

5   lot of the focus, JetBlue has continued to, you know, make

6   its own decisions.  It even proposed a merger that I think

7   American found out about in the press.  It's had operational

8   issues we've heard about this year and it's dealt with them

9   entirely on its own.  So I mean -- and getting more to the

10  meat of it, as someone who studies airlines, these are

11  operating as separate airlines with a contract between them.

12  **Q.**   Okay.  Let's go on to the second point, the degree to

13  which competition is preserved, and to that end, I think we

14  have a demonstrative entitled, "Aspects of Competition."  Can

15  you describe the demonstrative and how it relates to the

16  issue of preserved competition?

17  **A.**   Sure.  So when I think about airlines in general, I think

18  about at least five that are summarized here, aspects of

19  competition, how airlines function and compete in the market.

20  So I'll run through these.  I mean, the first three are just

21  the overall business model, which matters in any industry,

22  but really matters in airlines.  I think I heard Dr. Lee talk

23  about this in some detail, network legacy carriers really

24  operate a very different business than LCCs, so one issue is

25  how do you -- what's your business model.  A second one is

1    capacity, which is really your fleet.  How do you buy your

2    fleet and how many planes do you have, when do you retire

3    your planes?  And the third one here would be pricing, which

4    I think you've heard, Your Honor, in the testimony.  The

5    pricing of airlines really has two elements, there's what

6    prices do you put in the market, and probably even more

7    important, how do you manage your buckets, your yield

8    management, what prices do you make available.

9              On all three of those dimensions, there's full

10   competition between the parties.  Right? And I have a

11   statement here from the contract itself that stresses that.

12   I won't read it.  But it says there's competition on all

13   three of these elements, so that competition is all

14   preserved.  None of that would be preserved in a merger, but

15   all of that competition is preserved.

16             Then the fourth one down is the network/route

17   planning.  So that's a fourth airline function that you'd

18   find inside an airline, is the route planning function.

19   There we have the one dimension on which there is

20   coordination, which is coming together to -- it says here to

21   work together to form a more effective network in New York

22   and Boston, combining the assets of the two carriers, but

23   it's just that.  Right?  Ultimately they maintain independent

24   control over their networks.  They're certainly everywhere

25   outside New York and Boston, but even ultimately the

1    decisions for New York and Boston.  So there's some

2    coordination there, some competition.

3            And then on element five is one I think is very

4    important in airlines that sometimes gets skipped over, which

5    is customer loyalty, attracting customers really to your

6    frequent flyer program or your corporate program.  And

7    there's -- I think we've heard testimony on this, as well.

8    There is complete competition.  They are both still

9    interested in getting people into their own loyalty programs.

10   And that's -- you know, if you get somebody to fly on your

11   plane, they join your loyalty program, then you can sell

12   credit cards to them, but more generally they're going to fly

13   your flights nationwide or globally, which is going to

14   generate more revenue.

15           And the statement on the right hand here just notes

16   that things like credit cards and loyalty and other services

17   like that are not part of the revenue sharing under the

18   MGIA --

19   **Q.**   Okay.  Thank you, sir.  If we move forward a little bit

20   and focus on the network route planning issue.  In your

21   testimony last week, you made a reference to the NEA

22   capturing parts of a production joint ventures.  What is the

23   significance of the reference you made to the production

24   joint ventures?

25   **A.**   It's really how I think about the NEA.  It's coming

1     together to form a new product, the new product being a

2     combined network in the Northeast.

3             So there's a long history in economics of studying

4     production joint ventures, generally seen as the most

5     pro-competitive forms of joint ventures because you're

6     creating a product that couldn't be created separately.  And

7     just to give one analogy, before I dive into it here, a place

8     I work on, some have seen this, is in pharmaceuticals.

9     You'll see different pharmaceutical companies come together

10    using different patents or different technology that they

11    each have to make drugs that they couldn't make separately.

12            So for example, I think we've recently all heard

13    about this.  There has been a joint venture between Pfizer

14    and BioNTech.  They each had different pieces of the IP and

15    they came together to make the COVID vaccine that Pfizer has

16    sold.  So the idea, though, is you have different assets and

17    you can create something that couldn't be created separately.

18    The creation of that thing is inherently procompetitive.

19    **Q.**  So we put up a slide entitled, "The NEA as a production

20    joint ventures."  And I suppose the first question is what is

21    "the thing," to use your phrase, that they are jointly

22    creating here?

23    **A.**  My very descriptive phrase.  They are jointly creating

24    the network, the joint network in -- out of New York and

25    Boston.  Right?  So they are -- there's a -- absent the NEA,

1       American and JetBlue have, as listed here, they have assets

2       that they -- you know, here it's not patents or

3       pharmaceutical products, but it's planes, it's slots, it's

4       gates, it's relationships with customers.  It's strength in

5       different airports, it's different connecting routes.  Those

6       are the assets they have.

7               Right?  What the NEA is doing is, out of New York

8       and Boston, it's saying if we combine our slots and our

9       gates, we jointly manage where we're going to put our planes,

10      we plan on network, the thing that come out on paper and

11      ultimately implemented is a combined network.  That's an

12      optimized schedule.  And what this slide is explaining, I

13      think it's pretty straightforward, the new product is the NEA

14      network.  Just like in any production joint venture, to

15      create that new product, you have to get together and plan

16      that product.  Right?  You have to figure out who's flying

17      where, and what planes are we putting, and what times of day

18      are we flying?  That's a joint production process.

19      **Q.**  Is that planning that goes on in that joint production

20      process the kind of capacity coordination that worries

21      economists?

22      **A.**  No.  In fact, for me, I wouldn't call that capacity

23      coordination.  So I've been somewhat confused at some of the

24      discussion that I've heard in the trial.  When I hear

25      "capacity coordination," and the kind that's been studied and

1    in the airline industry, that's about -- Dr. Town testified

2    to this, that's about what is our fleet size going to be?

3    There's been discussion of is it going to grow faster or

4    smaller than GDP, and are we jointly going to reduce the

5    amount of capacity that we have in some way.

6            To me, this is network planning, deployment of

7    capacity.  And that distinction is really important, one,

8    because this is not about overall capacity levels, but two,

9    to me, this is the opposite.  Because the logic people put

10   forward about why capacity coordination could be bad is that

11   it will reduce the amount of capacity in the industry.  That

12   means they're worried -- as an economist, they're worried it

13   will reduce output.  What this is doing is trying to get more

14   output out of the set of assets.  We're trying to figure out

15   the most efficient way to use assets.  To economists, that

16   would be called increased capacity utilization, and that goes

17   in the opposite direction.  That's output increasing not

18   output reducing.

19   **Q.**  Okay.  Before we move on, I do want to ask you one

20   follow-up question from the previous slide, and focusing on

21   pricing.  So how do you see, in the context of this case, the

22   fact that American and JetBlue retain independent authority

23   over pricing decisions?

24   **A.**  Again, it's very important to the discussion that I've

25   heard.  Because a lot of attention has been on the JetBlue

1    effect.  I know Professor Miller -- and I'll analogize some

2    of what he was finding in his model to the JetBlue effect,

3    and I've certainly studied the JetBlue effect myself.  The

4    JetBlue effect is the pricing effect that JetBlue has in

5    markets.  So the question is will that pricing effect be

6    lost?

7            And this goes to sort of the essence of why

8    business models and why pricing philosophies matter.  It's

9    not just a set of equations in this industry.  It's how you

10   set prices.  And JetBlue -- there's two big things that

11   JetBlue does that are distinct just in how they go about

12   setting prices.  One is they see their core customer as

13   people who might not otherwise have flown.  They try to grow

14   the whole market.  To do that, you have to maintain prices

15   low enough that you can attract those people who might not

16   have flown.  And two, they have a yield management system.

17   Their idea of how they keep their buckets open.  They keep

18   their buckets open, their cheap buckets open longer.  Their

19   focus is much more on trying to keep their planes full.

20   Those are business philosophies that remain, and I mean,

21   those are the essence of the JetBlue effect, the independence

22   of pricing decisions means JetBlue can continue to do that

23   and continue to put that competitive pressure in the market.

24   Q.  Okay.  Thanks.

25           Let's turn to revenue sharing.  And as you know,

1    Dr. Miller argues that NEA revenue sharing creates incentives

2    that justify treating the NEA like a merger.  Is there

3    economic theory that supports that approach?

4    **A.**  Not if applied correctly, not if to what -- not to this

5    transaction.  So -- and just to explain what I mean by that,

6    Professor Miller in his report, in his testimony, talks about

7    how, in some circumstances, if you're sharing profits or

8    maybe sharing revenues, in fixed proportions, kind of a

9    static profit sharing, that can create some of the incentive

10   effects that are like a merger.  It doesn't create the

11   control, it doesn't eliminate competition, but that form of

12   profit sharing, could create -- economists have studied that.

13   That could create effects that have some of the effects of a

14   merger.

15         But that's not this case, right?  This case is

16   revenue sharing with the MGIA as the formula.  It's dynamic,

17   it depends on how much capacity you have.  It creates

18   incentives that go the opposite direction, so the economic

19   theory tells me is that one way there is something that's

20   like a merger.  The other way there is something that is

21   really the opposite of a merger.  This case -- the

22   contract -- the parties explicitly chose the thing that's the

23   opposite of a merger.  They went this way.  And Professor

24   Miller is acting like they went this way to justify it being

25   like a merger, when, in fact, the conclusion should be the

1    reverse.

2    **Q.**  So we put up a demonstrative that was created to

3    illustrate this point.  Can you describe what you depicted

4    here and what it means for the analysis?

5    **A.**  Sure.  So there is just four boxes on the -- sort of

6    farther to the left.  So the far to the right is a merger,

7    how much is this like a merger.  And then we move over to the

8    left, we get to forms of profit or revenue sharing that are

9    less and less like a merger.  So fixed proportion profit

10   sharing is what Professor Miller talks about, for the most

11   part, in his report.  And much of his report and testimony is

12   that bottom, short arrow.  Fixed proportion and profit

13   sharing can get you something that can look similar to a

14   merger on some dimensions.  Right?  And then he argues a

15   little bit one box over, which is, well, if it's fixed

16   proportion revenue sharing, and I would say if they have

17   similar cost structures, that's a step removed.  It's not

18   profit sharing if you're only sharing revenue, but he argues

19   some for that second arrow.  But, in fact, we are all the way

20   to the left, right?  Because there are two key differences

21   that he's not talking about.

22          One is that the parties here have very different

23   cost structures.  So even under a fixed proportion revenue

24   sharing, economics tells me that when JetBlue has much lower

25   costs than American, their incentives aren't the same.

1    JetBlue wants to price aggressively, they're going to

2    continue to do that.  Professor Miller doesn't think about

3    that extra step.

4          And then the final box over is you add to that

5    dynamic revenue sharing under the MGIA with capacity

6    expansion incentives that were intentionally put in the

7    contract, now we're all the way over to left.

8          So effectively, what Professor Miller has to do is

9    jump from the box that's all the way on the left to the box

10   that's all the way on the right, even though that's not what

11   the deal is.  And so he would need to show you that full long

12   arrow, which you can't show as a matter of economics.  He

13   argues for the short one, which is really irrelevant here.

14   **Q.**  So would the MGIA and it's particular form of revenue

15   sharing be a rational choice for an alliance that was

16   intended to reduce capacity?

17   **A.**  No, it's the opposite.  And hopefully we'll get into more

18   detail on this, but they intentionally chose the contract

19   that's the box all the way on the left.  In the way I think

20   about it, there's a choice.  Firms make optimal choices.

21   They chose contract that builds in growth incentives and that

22   builds in -- let's them maintain their separate cost

23   structures.  That's an intentional choice that they made.

24   That's not a choice you would make if you were trying to

25   simulate a merger.

1    **Q.**  Okay.  Let's talk in some detail now about the MGIA and

2    how it works.

3            Preliminary question, in your view, what economic

4    functions does the MGIA serve?

5    **A.**  So the MGIA is, again, just to make sure we're all on the

6    same page, it is the revenue sharing in the NEA.  So that

7    revenue sharing has to serve two functions.  And it's really

8    making those functions work together that makes the MGIA

9    unique.  One is revenue sharing in any alliance like this,

10   the purpose of it is to create enough alignment of interests

11   on the network itself, "metal neutrality" is a term you've

12   heard that I can talk more about, such that the parties

13   are -- they have enough alignment of interest that they can

14   work together to jointly plan their network.  So that's

15   function one.

16           But function two, the parties are trying to do that

17   in a way that does not create any incentives to reduce

18   capacity, but quite the contrary, gives them incentives to

19   grow.  So we've heard that testimony, we want revenue

20   sharing, but only if it creates growth and incentives, so the

21   MGIA, I think quite creatively, is trying to combine those

22   two functions.

23   **Q.**  You mentioned metal neutrality, so let's move to that.  I

24   think you have a slide on this.  Let's put that up.  And why

25   don't you go ahead and explain what you're depicting here.

**A.**   Sure.  So this is sort of what metal neutrality -- metal

neutrality is jargon, frankly, in the airline industry.  It

gets used all the time.  It's sort of thrown around.  It

generally means that there's some form of revenue sharing

such that there's some indifference or less care -- less

difference about whose plane the people fly on.  So people in

the airline industry call planes "metal."  And sometimes I go

home now and say to my wife, what metal are we on and she

thinks I'm talking in too much jargon.  People use the word

"metal" in the airline industry, and metal neutrality has

just come to mean that we are sharing enough revenue that we

are willing to try to plant he best networks, even if it

means some people will fly your plane instead of mine.

It does not mean the things at the bottom, right?

It does not mean pricing coordination.  I will note in

international joint ventures, it generally does.  They have

antitrust immunity, so they can coordinate prices, but here

it does not mean that.  It does not mean the homogenization

of business models and it does not mean any -- and also,

importantly, as Mr. Hayes and others have testified to, it

does not mean that you're not competing for the customer.  So

you are competing for your credit cards and your loyalty, and

so on.  Just for the flight, you're not -- you're generally

indifferent about whose plane it is.

**Q.**  Are you familiar with the Department of Transportation's

1  evaluation of those international airline joint ventures?

2  **A.**   Yeah, very much so.  I've been involved in several of

3  those.  I've written the paper about the history of those.

4  **Q.**   Do those international joint ventures typically have

5  revenue sharing?

6  **A.**   Not only do they have revenue sharing.  My understanding

7  is that the Department of Transportation's view has been that

8  that revenue sharing is important enough to unlock the

9  benefits, because it creates the incentives to jointly plan

10  the network, that they see revenue sharing as a prerequisite

11  to giving antitrust immunity.  They also generally have joint

12  network planning and joint pricing.  But the revenue sharing

13  sharing is an inherent -- I think a required part of them.

14  **Q.**   So what have you observed about the impact of these

15  airline joint ventures -- international airline joint

16  ventures on competition?

17  **A.**   So I mentioned briefly in my qualifications a week ago

18  that one of my papers on airlines is a worldwide study across

19  all of the airline alliances.  These are the international

20  airline alliances that existed.  So it puts them all together

21  in one giant dataset, and it studies what's happened.  If

22  finds they've been very procompetitive.  They've expanded

23  output, they've lowered prices.  They've expanded output on

24  connecting routes, on nonstop routes generally.

25           Two things I would note just quickly that really

1   jump out of the study, and that a lot of the paper is about.

2   One is that, although, as we're hearing in this case, in many

3   of those cases there's a theory of harm that may be on

4   nonstop overlaps, where the two parties both flew before.

5   There will be a reduction in competition and a reduction in

6   capacity.

7           In fact, they've gone the other direction.  The

8   nonstop overlaps are important routes.  There's been lower

9   prices and more capacity on those routes.  They benefitted

10  the nonstop overlaps.  That's a strong finding in the paper.

11          And number two, I would say, is that American's

12  alliances in particular, which are the ones that have things

13  like the MGIA that form the basis, I'll tell you it jumps off

14  the page that American's alliances have led the way in terms

15  of lower prices and more capacity.  That is the single most

16  apparent study finding in the study.

17  **Q.**  Dr. Town argued that the lessons from the international

18  joint ventures may not apply here, because the NEA has more

19  overlap routes than the typical international alliance.  What

20  do you say to that?

21  **A.**  Yeah, I disagree, certainly, that you can't learn

22  lessons.  I mean, obviously, we're talking about this

23  alliance and it's unique characteristics, and we should.  But

24  there are important lessons from those international

25  alliances.  I would say, two, one is there is a lot of talk

1    here about nonstop overlaps and concern about potential harm

2    on nonstop overlaps.  But in the international alliance case,

3    we haven't seen it.  It hasn't come to pass.  Their nonstop

4    overlaps -- there they have antitrust immunity, so they can

5    talk about prices, yet the nonstop overlaps have seen more

6    capacity and lower prices.

7              Number two is Professor Town did something where he

8    said the airlines have more airports in common, there's more

9    overlap of their network, so maybe there's less benefit.  But

10   I actually think -- this deal, interestingly, is sort of a

11   geographic combination in similar way to the international

12   ones.  Right?  One point is that JetBlue doesn't -- you know,

13   American has a lot of international presence.  I think when

14   Professor Town did his counts of airports, he left out

15   international airports, but one thing JetBlue gets like in an

16   international alliance is a better international network.

17   JetBlue also is weak in the Midwest or outside of New York

18   and Boston, so it gets that geographic strength.  American,

19   as we've heard a lot about, is relatively weak in New York

20   and Boston.  So American gets that geographic strength.  So

21   in fact, while it might not be true of any domestic alliance,

22   this one really has a lot of those same geographic

23   components, it's strengthening JetBlue on the -- sort of two

24   ends of the barbell.  It's strengthening American in New York

25   and in Boston.

1    **Q.**  I want to move on to the particulars of the MGIA revenue

2    sharing formulas, and to do that, I'm going to start by

3    asking you to have Plaintiffs' Exhibit 450, which is in

4    evidence, put up.  And this is a presentation that was made

5    by the parties to the antitrust division back in July of

6    2020.

7            Are you familiar with this presentation?

8    **A.**  Yes, I was involved in helping to put it together.  But I

9    think it was an American -- presentation that American had

10   used, as I recall, to explain the MGIA, but I helped to sort

11   of tweak it for presentation to Justice.

12   **Q.**  Okay.  Let's pull up the slide that has -- slide 4, the

13   "MGIA agreement overview."  And just very briefly, if you can

14   describe what we're seeing here.

15   **A.**  Sure.  So this is, on the top, is stuff that you've heard

16   a lot.  So it's just the route scope.  It basically says it

17   includes all American, domestic international flying from the

18   four airports, same for JetBlue, B6 in their code, same for

19   JetBlue, except for JetBlue's transatlantic flying.  The one

20   thing that is not mentioned here, because it came later in

21   the deal, is it also looks -- it excludes the carve outs.

22   **Q.**  So I'll stop you there for a moment.  There's been some

23   discussion about the competitive implications of the fact

24   that, while JetBlue's transatlantic routes are excluded from

25   the revenue share, American's transatlantic routes are

1    included.  How do you assess that competitively?

2    **A.**  Well, I heard some sort of general discussion without

3    analysis, I think, from Dr. Miller, that maybe that could

4    create some incentive for JetBlue not to compete as

5    aggressively, because it shares in the American revenue.  I

6    haven't seen him run through any analysis of that.  I would

7    just say two things jump out to me about international

8    flying.  I mean, if I was going to think about the bigger

9    question, which is has the NEA helped or hurt international

10   flying, one is that JetBlue has entered those routes, like

11   the route to London.  And one thing I know in airline

12   economics is having a really strong network at your base is

13   really -- has to be attracting more passengers, you can

14   compete for business travelers with Delta.  That's really

15   important to being able to get people to fly internationally.

16   So a big part of the equation for JetBlue is the NEA makes

17   them stronger in Boston and New York.  They have a better

18   foundation to the house, to go build international travel.

19         The second thing is, I think, unquestionably true

20   is that American has expanded its international flying out of

21   New York, and it continues to do so.  That's substantial.  I

22   think a fair characterization is what Mr. Raja said, which is

23   American has basically built a third long-haul hub in New

24   York.  So international competition in New York seems to me

25   to be a prime beneficiary of the NEA.

1  **Q.**  Okay.  Going back to slide four, the bottom half of the
2  page is entitled, "NEA net revenue."  What do you understand
3  that to mean?
4  **A.**  I think the very phrase at the bottom there says, "Net
5  revenue is essentially passenger-related revenue less selling
6  expenses."  That's the right way to think about it.  So it's
7  the revenues associated with having a passenger on board,
8  which is, you know, passenger revenue and some fuel
9  surcharges, frequent flyers, the things that are listed
10 there.  What's subtracted from them are basically selling
11 expenses, fees associated with credit cards, fees you pay to
12 a travel agent.  GDS is a global distribution system, so the
13 fees they -- it's the services that sell the ticket and
14 global distribution systems.  I really think of that as
15 like passenger revenue minus selling expenses, so sometimes
16 that's called like contra-revenue, but it's sort of that --
17 it's ultimately just the net revenue associated with the
18 passengers.
19           I would note one thing it does not include is the
20 ancillaries, so it does not include bag fees.  It does not
21 include change fees that you pay if you change your ticket.
22 It doesn't include the fee you pay if you sign up for WiFi on
23 the plane.  It also doesn't include any fees, any sort of
24 add-ons that come from the loyalty program.  So if somebody
25 flies and signs up for your loyalty program and then flies

1   with you a lot more outside of the NEA, none of that would be

2   included.

3   **Q.**   Did Dr. Miller pick up that distinction between passenger

4   revenues and ancillaries?

5   **A.**   In his model, he did not.  So his model does not note

6   that ancillaries aren't included.  And just to pause on that

7   for a second, because it matters in the economics.

8   Dr. Miller talked a lot about recapture and he had this

9   theory that there may be -- there's some pressure to raise

10   your prices, because you can -- if American raises its

11   prices, it can recapture some revenue from JetBlue.  In his

12   model what he's assuming is recapture includes all of those

13   ancillaries, so the recapture in his model includes bag fees,

14   it includes all of the loyalty benefits that include flying

15   to other places.  So it's just mathematically incorrect, it

16   doesn't include any of that, so the recapture incentive is

17   just wrong in his model.

18   **Q.**   How is the MGIA treatment of costs different than what

19   you would find in a profit-sharing arrangement?

20   **A.**   The only costs that are included are these selling

21   expenses.  The rest of the costs of planes and running an

22   airline are not included.

23   **Q.**   Okay.  Let's turn to the next slide, please.  This one is

24   entitled "MGIA mechanics."  It's slide 5 in the exhibit.

25   Please describe what's depicted here?

1    **A.**   So this one, a few equations on the page, but this is I

2    think very important for Your Honor -- I know you've been

3    hearing a lot about this and this kind of gives you some of

4    the formulas.  And I'll actually do a numerical example of

5    this and play it later.

6                THE COURT:  Just before you get to that, just back

7    on the costs and the revenue.  So if I read this right, one

8    component -- one additional component of cost is any cost

9    driven directly -- well, do you want me to not read that?

10               MR. WALL:  No, that's fine.

11               MR. SCHWED:  From a confidentiality perspective.

12               MR. WALL:  I think that's fine for you to go ahead

13   and say that.

14               THE COURT:  "Any cost driven directly by

15   incremental passenger volume and mutually agreed to by the

16   parties."  What would qualify as something like that, a cost

17   driven directly by incremental passenger volume?

18               THE WITNESS:  I think all that's been agreed to,

19   although I'll defer to the parties if they've added anything

20   else, is selling expenses.  I suppose that would anticipate

21   something like you can talk about whether you want to include

22   food costs or something, because that would be something --

23   if you have one more passenger on -- it's not just -- a lot

24   of the costs are just associated with flying the plane.

25               THE COURT:  Sure, you own the plane, you pay for

 1    the plane.  I assume that the fuel cost isn't varying that

 2    much, at least on the bigger planes, based on how many people

 3    are on them.

 4            THE WITNESS:  Very little.  But it does vary -- it

 5    could vary how much food you serve, how many pretzels do you

 6    need to serve, how much food service do you have.  That would

 7    be an example of a passenger variable cost.  I don't think

 8    that's included here, but I think it's -- that's sort of --

 9    it's a very small percentage of the cost.

10            THE COURT:  It's a fine definition of included

11    costs, what I just read to you?

12            THE WITNESS:  Right.  I think it said agreed to by

13    the parties.

14            THE COURT:  Right.  And mutually agreed to by the

15    parties.  Correct.

16    BY MR. WALL:

17    **Q.**  Okay.  Let's get back to the --

18            THE COURT:  Sorry, go back --

19            MR. WALL:  Yeah, mechanics slide, and dive into

20    formulas, so pick up.

21            THE WITNESS:  Everybody's favorite thing to do on a

22    Monday morning.  So this is net revenue, so this is the

23    revenue that gets -- and the net revenue gets contributed to

24    the total net revenue pool.  And this slide is really the

25    heart of revenue sharing, over the next couple of slides.  So

1    the place to start is on base revenue, because I know that

2    you've heard testimony about base revenue and I want to

3    explain what base revenue is.  So base revenue is defined as

4    this multiplication on here.  So the first term is unit

5    revenue, it's baseline unit revenue.  So that is in the base

6    year of the contract, 2021, and the base year of the

7    contract.  It's defined as the unit revenue, which is revenue

8    divided by capacity.  So how much money did you make divided

9    by how many equivalent seat miles did you fly.  That gives

10   you a unit revenue.  That's defined in the baseline.

11   **Q.**   That's this idea of RESM?

12   **A.**   Yeah, that's RESM, but that's baseline RESM.  And that

13   gets multiplied by current year capacity.  So it's baseline

14   say 2021 RESM, times current year, say 2022, or whatever year

15   it is, capacity.  Right?  That's really distinct to the MGIA

16   and important to a lot of what you heard, because it has two

17   effects that matter and are different from fixed proportion

18   revenue sharing or other revenue sharing.  One of those

19   effects is that your base revenue that you take out of the

20   pool depends on your current capacity, not your starting

21   capacity.  So as you add capacity from year to year, you get

22   more baseline.  You get -- your position goes up.  So that's

23   an incentive to grow, because your base position goes up.

24   That was chosen intentionally.  That would be absent from

25   more standard revenue sharing where it's just a 50/50 split

1     here.

2              The second point that matters here is that that

3     current capacity gets multiplied by the starting RESM.

4     Right?  It gets multiplied by the RESM in 2021.  The reason

5     that matters -- the parties refer to this --

6              THE COURT:  It's 2021 or 2019.

7              THE WITNESS:  Is it 2019?

8              MR. WALL:  The base year is 2019.

9              THE WITNESS:  Sorry, I've been saying it wrong.  My

10    mistake.

11             So it's defined as 2019, the base year.  And the

12    reason that matters is -- you've heard a lot about that, it's

13    normally when you add capacity, the standard effect is that

14    shifts the supply fare route and it puts downward pressure on

15    your unit revenue.  It puts downward pressure on your price.

16    Right?  What this is doing is that -- parties call it

17    de-risking effect.  One reason that you hear all of the time

18    from airlines that they're worried about adding capacity is

19    maybe it will add capacity and it will push our RESM down to

20    the point where that capacity is not profitable.  This is

21    telling each other, no, the base position that you get is

22    starting RESM.  So it's always 2019.  So if add it and it

23    reduces your RESM, your base position is still based on 2019

24    base position.  All right.

25             The parties refer to this as de-risking.  In the

1    event that they add capacity, and it pushes that RESM down,

2    their base position does not push down accordingly, and any

3    pain from that is shared between the parties.  All right.  So

4    they refers to this as de-risking, it basically lets you add

5    capacity in a way that has less risk because you share that

6    with your partner.  So both of those effects are concurrent

7    with the fact that its RESM with capacity and the fact that

8    you get this base RESM credit for that, or are intentionally

9    chosen, and both of those give you an incentive to add

10   capacity.

11   **Q.**  Now, there is a distinction in the contract, is there

12   not, that between the RESM, depending upon short-haul and

13   long-haul flying, and we've heard about the stage length

14   adjustment.  Could you address that?

15   **A.**  Yeah.  Sure.  So the base RESM is not just one number in

16   the contract.  It's a different number for JetBlue and

17   American, for one thing.  And I'll show an example of this.

18   And it's -- so JetBlue has their starting value in 2019,

19   American has their starting value in 2019.  That's what they

20   get credit off of.  It's also distinguished by whether the

21   flight is longer than 3,000 miles, whether it's a long-haul

22   or not.  That's a different number.  Now, that only applies

23   to American.  JetBlue doesn't fly anything that goes

24   3,000 miles.  So you end up with three buckets, a short and

25   long-haul for American, and one for JetBlue.

1          You mentioned the stage length adjustment, so I'll

2     do that briefly.  I know Professor Miller mentioned the stage

3     length adjustment, but honestly, I think he got that wrong.

4     And I'll show you this in the example.  But all the stage

5     length adjustment is is you think about, within one of those

6     buckets, you could increase your capacity either by adding

7     seats or by making your flights longer.  Right?  There's two

8     ways -- you can think about it as seat miles.  You can make

9     your capacity more by doubling your seats or making your

10    average flight longer.  All the stage length adjuster does is

11    it slightly down-weights the credit that you get if you do it

12    in miles, so that it puts somewhat more emphasis on adding

13    seats rather than adding miles.  But that's all within bucket

14    and it's just putting them a little bit more emphasis on

15    seats as a source of capacity.

16    **Q.**  Dr. Miller seemed to go out of his way to say that one

17    can increase base revenue by flying shorter routes.  Is that

18    right?

19    **A.**  No.  I mean, no.  Your capacity -- you get more revenue

20    when your capacity goes up and your capacity goes up when

21    your seat miles go up.  It's just that there's a --

22          THE COURT:  Well, but all other things being equal,

23    doesn't the fact that the adjuster is the base period stage

24    length divided by the current period stage length, doesn't

25    that place -- within that part of the formula, doesn't that

1    preference shorter flights?

2    **A.**   Shorter flights still add miles, it just puts -- I'm

3    going to do a numerical example.  It's in the contract in a

4    minute, it might be easier to show how it actually works.

5    What it does is it says if you -- it preferences increasing

6    your capacity by seats, as opposed to by miles.  So if you've

7    increased your miles, it slightly down-weights the amount of

8    credit you get.  It does not mean you're better off to make

9    your flights shorter, right, because that will reduce your

10   mileage, and that's bad for capacity.  It just means that

11   if -- to the extent your mileage has gone up, you get

12   slightly less credit for that.  And I really think that will

13   be more clear in a minute when I show how it works in the

14   example.

15   **Q.**   And you're going to use an example that's actually found

16   in the MGIA itself, right?

17   **A.**   Yeah, the last page of the MGIA has a worked example and

18   I want to walk through it, because I think that will help

19   with a lot of this.

20   **Q.**   Okay.  We'll get to that in just a second.  I want to go

21   back to this slide of the MGIA mechanics and cover the lower

22   half of it of what incremental revenue is.  If you can

23   address that, please?

24   **A.**   Yes.  So incremental revenue is just --  you know, you

25   each take out your base position, and incremental revenue is

1    just how much revenue is there in the pool relative to the

2    base positions.  So the base positions, it could be positive

3    or negative, you take out your two base positions and then

4    there could be some revenue left over, or it comes up short,

5    and that's incremental revenue.

6    **Q.**  All right.  Then, if we go to the next slide, this is

7    addressing how incremental -- incremental revenue is split,

8    right?

9    **A.**  Right.  So this is the sort of punch-line to what I was

10   just saying, so if -- incremental revenue is the amount of

11   revenue above and beyond the base positions.  That gets

12   divided between the parties based on their current period

13   capacity shares.  So this is the third place where the MGIA

14   builds in a capacity expansion incentive.  Which is if you

15   talk to the parties about this, or any of their international

16   alliances, their focus, as we've heard in court, is these are

17   going to create new opportunities.  These are going to create

18   additional demand, and therefore, create additional profits.

19   So any time you talk to Mr. Raja or anyone about this, or

20   other alliances, their view is it's creating upside.  Right?

21   And so the question is, how do you divide up that upside.

22          And what they've built into the MGIA, which, again,

23   is unique to the MGIA, is that the split depends on current

24   capacity.  It doesn't depend on where I started.  It's not

25   50/50.  It depends on current capacity.  So if I want more of

1    the upside, I have to have more capacity.  Right?  So if I

2    think this is going to be good and I want my part of that, I

3    have to keep adding capacity to keep my piece of the pie big.

4    If the other guy adds capacity and I don't, his piece of the

5    pie gets bigger.  It really creates, within alliance,

6    competition on capacity to determine who gets a bigger piece

7    of the pie.

8    **Q.**  Let's pause on that point for a moment, because as you

9    know, Dr. Miller argues that there's a kind of

10   too-good-to-be-true quality to this, because of what he calls

11   incentives to exploit the partner.  What's your reaction to

12   that?

13   **A.**  Yeah.  I mean, this was -- it's intentionally what they

14   built.  So it's not too good to be true.  It is what's here

15   and it's really -- I mean, I think the parties have described

16   it well.  It is creating a "skin in the game" is a phrase

17   that I've heard them use that I kind of like.  Each partner

18   has an incentive to grow capacity in order to capture its

19   piece of the pie, and that's something that they've done on

20   purpose.  And really, it's because I think they're worried

21   about exploitation in the reverse.

22           I think the concern is if the network is really

23   good, we don't want -- both partners, I think Mr. Hayes said

24   this, they don't want the other guy just sort of free riding

25   off of that and taking their share of the profits.  They want

1    the other guy adding capacity, too.  So they're -- in essence
2    what they're doing here is saying you've got to add capacity
3    to keep getting your piece.  If you don't add capacity, your
4    piece is going to go down.  That solves this free riding
5    problem that economists worry about.  We want to make sure
6    both sides are investing into the network that's being
7    developed.
8    **Q.**   Okay.  Let's move on to the next slide, which is about
9    the carrier's retained revenue.  Can you take us through this
10   one?
11   **A.**   So this is now hopefully simple, given what we've just
12   been through, which is retained revenue is just your base
13   revenue plus your share of the incremental revenue.  That's
14   just summing up the pieces.
15   **Q.**   And then finally, there's a slide on the transfer
16   payments that may be required.  Take us through this one.
17   **A.**   Again, this is -- it's transfer payments and I think I
18   heard Your Honor get this earlier in the case and ask a
19   question.  The transfer payment are just a true up.  So you,
20   in the normal course of your business, you make some revenue,
21   you have your piece of net revenue.  What the MGIA says you
22   get is base revenue plus your share of incremental and you
23   receive a transfer payment to true up, so that you're
24   retained revenue is correct.
25   **Q.**   So the form of the sharing is a transferred payment from

1    one party to the other?

2    **A.**   Right.   So the sharing gets you to an amount you're

3    supposed to get and then the way that is implemented, the

4    form of that is just to make the payment in whichever way it

5    needs to go.

6    **Q.**   Okay.   Let's turn now to defendants' Exhibit 0093, which

7    is the MGIA, in appendix 4, at the very end.   And what's

8    entitled, "Worked examples."   What is this?

9    **A.**   So this is the example that the parties themselves

10   included in the contract to illustrate the MGIA.   If it would

11   be okay, I think it would be worth me just sort of walking

12   through this, because it implements everything I just said.

13   **Q.**   I'd like you to do that, but before you do, I want to

14   just ground it in one observation here.   So what is happening

15   to NEA capacity in revenues in this worked example?

16   **A.**   So you can see that on the first couple lines, but the

17   bottom line is capacity goes up a lot between the base period

18   and the current period.   I think 2019, 2022.   Capacity goes

19   up a lot and revenues go up a lot.

20   **Q.**   Okay.   So this is an example, then -- this is a growth

21   example where both sides to the alliance have grown in

22   varying degrees?

23   **A.**   Correct.   They've both grown and revenue has gone up.

24   But it then shows what happens when you bring in these base

25   concepts and so on, that leads to a transfer payment between

1    them based on growth.

2    **Q.**   Okay.  Go ahead and please take us through it.

3    **A.**   Okay.  So the top -- so what's labeled A and B, the first

4    two rows, those are the base period numbers, so AA has 32

5    billion ESMs in short-haul, 13 million in long-haul and for

6    45 billion total.  JetBlue has $45 billion in total, $90

7    billion in the NEA, they make $8.7 billion on that.

8            So then what happens is they both grow into the

9    current period.  And just to cut through the numbers quickly

10   to help, American grows from $45 Billion to $55 billion.  So

11   it grows to 35 plus 20.  JetBlue --

12           THE COURT:  Hold on.  Just -- oh, I see.  32 to 35,

13   and 13 to 20.  Okay.

14           THE WITNESS:  So they grow a total from 45 to 55.

15   JetBlue grows from 45 to 60.  So there's slightly more growth

16   for JetBlue, or significantly more growth, actually, for

17   JetBlue.

18           Revenues go up to a total of 10 billion.  So

19   American's different divided across long-haul and short-haul,

20   but they make 4 billion, JetBlue in this example makes 6

21   billion.

22           Okay.  So the things to note there are first what

23   Mr. Wall asked me, that their growing capacity, their growing

24   revenue.  The second thing to note is that JetBlue's capacity

25   is growing by more.  Right?  JetBlue in this worked example

1    that the parties put in is the one who has increased their
2    capacities more.
3              Okay.  So then that's simple stuff.
4              Then we move down to the next thing that
5    says, "Calculation of base period unit revenues."  So that is
6    doing this division that was on a few slides ago.  Right?  So
7    that is saying in the base period, we divide -- so in that
8    first number, we divide $3 billion, divided by $32 billion
9    ESMs, and we get a base period RESM, revenue per ESM of 9.38
10   cents.  Okay.  And then it does the same calculation 0for AA
11   long-haul and for JetBlue short-haul.
12   **Q.**  But not for the NEA as a whole?
13   **A.**  Correct.  It does it for each of them in their separate
14   categories.  That's what I talked about there really are
15   three separate numbers.  Okay.  So I want to pause here and
16   just point something out.  Which is revenue, as Mr. Wall
17   asked me, has -- actual revenue has gone up from 8.7 billion
18   to 10 billion.  Right?  But if you compare these unit
19   revenues that have just been computed to what the
20   corresponding unit revenue calculation would be in the
21   current period, as expected with capacity growth, unit
22   revenue has gone down.  And let me just give a couple numbers
23   to show what I mean.  So if we go over to the one that says
24   "B6 short-haul services," we can see that, in base period,
25   B6's revenue was $5 billion, their capacity was $45 billion.

1    So their unit revenue was 11.11 cents.

2              In the base period -- or in the current period,

3    their capacity is 60 billion, their revenue is 6 billion.  So

4    fortunately, that's easy division to do in my head.  That

5    gets you to ten cents.

6    **Q.**  Which is not shown, but you're just deriving that from

7    those numbers?

8    **A.**  Correct.  Because current period RESM isn't necessary for

9    the formula.  It plays out in terms of what happens.  But

10   so -- and that's true across all three buckets.  The parties

11   have shown an example here where you add capacity and your

12   unit RESM goes down.

13   **Q.**  So at this point, the formula is going to use the 11.1

14   cents figure, rather than the 10 cent figure.

15   **A.**  Yes.

16   **Q.**  Okay.  So then we go down to number two, which is

17   calculus.  And now we're going to calculate the base period

18   revenue amount, which, as I said, is basically it's just

19   current capacity times your base period RESM.  That's the --

20   you grow with capacity, you get your base period RESM.  It

21   doesn't go down.  So that's the first two rows that have not

22   been highlighted.  It would be you multiply those two

23   together.

24             There's actually a typo on the example.  The

25   current period capacity for JetBlue is 60 billion ESMs.  It

1    shouldn't have a dollar sign by it.

2           The -- so that's your -- that's the thing that you

3    would multiply together.  Now because Your Honor asked me a

4    question about this and I said I would come back to it.  I

5    will spend a minute on the stage length adjuster.  So that's

6    the slight wrinkle in this multiplication.  So the next

7    number down looks at what their base period stage length was

8    within each bucket, so how long within each bucket were they

9    flying on average.

10          And then if we go down -- I don't know if we can

11   show both pages on the screen at once.  It would be helpful.

12   Perfect.  I think.  No we can't, I guess.

13          So we had those base period stage lengths we were

14   just looking at.  The next line down is current period stage

15   lengths, right?  And you'll see the current period stage

16   length -- thank you -- the current period stage length has

17   gotten a little bit longer.  Okay?  So that was the question

18   you asked me about.  It got a little bit longer.  So some of

19   the increase in your ESMs was because your flights are

20   slightly longer.  So you asked this correctly, what the

21   formula then does is it divides the base period times the

22   current period -- or divides the base period divided by the

23   current period.  So in that first, for AA short-haul, that

24   would be the 1035 divided by 1058.  Right?  That gives you a

25   ratio that's slightly less than one, and then it -- now it

1    gets funky or fancy.  It takes that ratio and it raises it to

2    the power of the coefficient.  So it takes this ratio and it

3    raises it to a power that is slightly less than one, or

4    somewhat less than one.  That's just the formula they use.

5    When you do that, it takes --

6              THE COURT:  Is that how you read the language for

7    such services raised to 0.62?

8              THE WITNESS:  Raised to the 0.62.  Yes.

9              THE COURT:  So that's raising it to a power as

10   opposed to setting a floor of 0.62.

11   **A.**   Correct.  And I think part of why they put this worked

12   example in in the contract is so you could see them doing the

13   math, so it could clarify what they meant.

14              So when you raise it to that -- when you raise a

15   number that's slightly less than one to a power that's less

16   than one, it makes the number even closer to one.  Now we're

17   going back to math from a long time ago, but -- so you end up

18   with these stage length adjusters that are listed there.

19              Can we just go back to the second page now?  It's

20   easier to see.  You go to the -- you get the stage length

21   adjusters that are very, very, very close to one.  So that's

22   what I was saying earlier.  What happens is you take the base

23   period RESM times the current period capacity, and then you

24   just multiply it by this number that's slightly less than

25   one.  That's just, as I said, slightly down-weighting the

1  extra that you get, because some of it came from longer stage

2  length.

3  BY MR. WALL:

4  **Q.**  So just to nail this down here, for the three different

5  buckets, the actual adjustment turns out to be basically

6  multiplying by 0.98, 0.99, 0.99?

7  **A.**  Correct.

8  **Q.**  Okay.

9  **A.**  So then we have our base period revenue amounts.  Okay.

10  So that's the base period amount that you were entitled to,

11  right?  The rest of it gets into figuring out incremental

12  revenue.

13  **Q.**  Just -- I want to pause here just to make one point here.

14  So that if we look over in the right hand, the NEA column,

15  the adjusted base period revenue amount is 10.96 million,

16  which is larger than the actual revenue that the parties

17  earned during this period of time, right?

18  **A.**  Correct.

19  **Q.**  So this is essentially a fictitious number that is a

20  product of the formula.

21  **A.**  It's the number in the contract, it's the number that

22  captures this idea that the capacity that was added pushed

23  down RESM a little bit, but that wasn't -- the base period

24  didn't count that against you.  So even though their actual

25  revenue went up from 8.7 to 10, they say we're going to have

1    this number, 10.9, which we're going to call the base, and

2    that base is going to drive how we share revenue.

3    **Q.**   Okay.  So go ahead, please.

4    **A.**   So basically what you'll see in the next numbers down is

5    what --

6            THE COURT:  So what you're saying is that's

7    basically saying that the base -- they're sharing the base,

8    if you will, at the RESM from 2019, even though, in theory,

9    and in this example, the increase in capacity decreased

10   price.

11           THE WITNESS:  Correct.

12           THE COURT:  Okay.

13           THE WITNESS:  So you see that, what you just said,

14   in the next few numbers down, you see under the NEA column,

15   we see 10 billion, then we see 10.96 billion, and then we see

16   a difference of 960 million, basically.  And I don't know if

17   you can highlight those, but in the next three numbers down

18   under NEA.  Thanks.  So that was what you just asked.

19   They're saying we actually made more money, but because the

20   base was a little higher, into this one, the incremental

21   revenue as it's defined is negative 960.  As Mr. Wall said,

22   that's sort of a function in the way they want to share

23   revenue.  Revenue went up, but they're not taking -- they're

24   giving each other credit for base RESM, even though RESM went

25   down.

1    **Q.**  So even though revenue is going to go up, they're now
2    going to share and split a negative number?
3    **A.**  Yes.  And the way they're going to split it is they're
4    going to look at each of American and JetBlue -- or
5    basically, they're going to split it according to current
6    capacity.  All right.  So here is sort of the thing to get
7    that's a little subtle.  If you look at the JetBlue number,
8    JetBlue's actual -- if you recall this, JetBlue's actual
9    revenue in the current period was 6 billion.  JetBlue's base
10   period revenue was 6.6 billion.  So because JetBlue grew the
11   most, a lot of this negative action that's happening in this
12   negative 960, a lot of that is coming from JetBlue.  640 out
13   of the 960 is coming from JetBlue, which is what you would
14   expect, because JetBlue grew the most.  They had the most of
15   this action happening.  Right?  But the way that the formula
16   works, that doesn't -- JetBlue doesn't get docked for that
17   full 600.  It gets divided up based on their current period
18   capacity, which is basically 50/50, 52/48.
19            So row M on here, what that is doing is taking the
20   negative 960 million, dividing it up between the carriers,
21   based on their capacity, and so the JetBlue piece of that is
22   500 -- just under 500 million.  The American piece of that,
23   when added up, is slightly less than that.
24   **Q.**  I think we need to highlight the row M below that, that's
25   right after J, right?

1    **A.**   It's the same one.  The row M, it just gets repeated.  so

2    we've got -- it's also that one, that works.

3    **Q.**   Okay.

4    **A.**   It's the same as the row M above.

5    **Q.**   So take us home.  What happens here at the end?

6    **A.**   So basically now we just -- we know how much revenue --

7    so you just add up their base period and they retained

8    incremental revenue, and you get what revenue they should

9    have retained under the formula, that's the 2.9, 900, and

10   6.1.  We know what they actually retained from way above what

11   they actually made in the real world was 5, 1, and 6.

12            And so then we get to the transfer payment which is

13   JetBlue's -- the 6 billion that JetBlue actually made is

14   slightly less than the amount that JetBlue got credit for.

15   Again, because JetBlue got credit that didn't include that

16   capacity reduction effect, and so JetBlue received a transfer

17   payment.  And basically what that is doing is saying JetBlue,

18   you added more capacity, so you came up about 600 million

19   short.  If we didn't give you that price degradation, you

20   would have only come up about 500 million, so we're going to

21   pay you the extra.  We're going to -- and this is the effect

22   in this worked example of American is subsidizing JetBlue,

23   because in this example, JetBlue grew more, and JetBlue had

24   more of the associated capacity effect.

25   **Q.**   And every year, this is going to be repeated, based upon

1    different inputs of revenues and capacity?

2    **A.**  Yes.  And this, again, is an example, and every year it

3    will be done on aggregate capacity and the same math will be

4    done, and it will play out how it plays out, but there's a

5    basic logic that you do this math, you figure out what the

6    base period was relative to what happened, and then economics

7    tells me that's going to tend to result in the subsidy of the

8    guy who grew more.  That all continues.

9    **Q.**  So what is the combined effect of these terms on the NEA

10   carriers incentives to add capacity?

11   **A.**  You mean the overall MGIA terms?

12   **Q.**  Yes.

13   **A.**  I mean, it's the three things that I went through.

14   There's this -- I guess two things, there's the de-risking

15   effect that we see where, which is if you're in the sort of

16   starting world, where adding capacity reduces your RESM, then

17   this de-risks it and you get some subsidy from your partner

18   to help with that, which is growth encouraging.

19          Number two is, if you're in the world, which,

20   again, is what the parties spend most of their time talking

21   about, which is the NEA has unlocked new profit

22   possibilities, then you have to grow your share.  Your share

23   of that depends on your share of capacity, so you have to

24   grow capacity to capture that.  So there's sort of a

25   de-risking effect and an upside effect, both of which lead to

1    a capacity expansion incentive.

2    **Q.**  So do you understand Dr. Miller to disagree with anything

3    you have said about the mechanics of the MGIA and what its

4    incentives would be.

5    **A.**  I certainly don't understand him to disagree with any of

6    the math of the MGIA, and I haven't heard him in his report

7    present any analysis anywhere that would say that these

8    effects that I've just described don't exist.

9    **Q.**  In your report, did you present a formal economic proof

10   of your conclusions about incentive effects from the MGIA?

11   **A.**  Yeah.  I -- I focused the proof on the de-risking effect,

12   which is what happens in the sort of normal starting case,

13   where increasing capacity pushes down RESM.

14   **Q.**  Why did you focus on that?

15   **A.**  Well, my understanding from discussions in the

16   investigation and what I had read was that if we're in the

17   upside case, where the NEA has created new growth

18   opportunities or new profits, I don't think there's dispute

19   that that would create an incentive to go capture them.  What

20   I had heard more questions about was how does this de-risking

21   effect work, and does it really work.  And so I went and did

22   an economics proof based on this basic proposition that

23   increasing capacity decreases RESM to show that it does work.

24   **Q.**  Can we just look at that briefly and we'll put up

25   Appendix A2 to your expert report, and a couple pages on the

1    screen together, and I will be merciful and not take us

2    through that algebra, but can you just describe generally

3    what is shown here?  What you did?

4    **A.**   It's just math for this point that as long as it's true

5    that the increasing capacity reduces your RESM, then by

6    de-risking, by sharing that with your partner, your

7    incentives to increase capacity go up.

8    **Q.**   Did Mr. Miller challenge your formal proof?

9    **A.**   I have not seen any challenge of the proof.  I just

10   quickly will note the one thing that Dr. Miller has brought

11   up in his report and in here is his recapture effect that he

12   talks about.  So his point is -- what I've been stressing is

13   that your partner shares in your risk that comes from

14   expanding your own capacity.  What he's talked about is that

15   you share in your partner's revenue, so you share what your

16   partner does.  Really, what the proof is showing is just the

17   effect of your own capacity on your own price is bigger, and

18   that's your own supply curve.  That's bigger than the effect

19   it has on anybody else.  And so the de-risking effect slumps.

20   It wins over the recapture effect.  Because OM price effects

21   are bigger than effects of others, as long as that's true,

22   which we expect in economics, then this effect means even

23   incorporating the recapture effect that Dr. Miller talked

24   about, the incentives are going to grow, which puts downward

25   pressure on prices.

1  **Q.**  Okay.  I want to move forward now -- thank you for that.

2  I want to move forward to what Dr. Miller says about the use

3  of NEA capacity coordination to behave consistent with what

4  he calls joint profit maximization.  In other words, that

5  carriers will reduce capacity and raise fares.  You're aware

6  of that testimony, right?

7  **A.**  Yes.

8  **Q.**  And what is your response to that?

9  **A.**  Well, generally -- I mean, just to make sure I'm clear on

10  how I talk about it, I heard Dr. Miller say two different

11  things, two arguments he made.  One is, when it comes to

12  capacity, the parties are just going to -- they're not going

13  to pay attention to the incentives that are in the MGIA.

14  They're going to somehow get together, act more like they're

15  merged, and reduce capacity.  They -- to me that makes no

16  sense as a matter of economics.  They're not merged.  They do

17  have the MGIA.  They chose it on purpose.  It's the contract

18  that guides them.  So it's inconsistent with economics to me

19  to say they're going to ignore what they signed.  So that's

20  the first argument that I heard him make.  I'm happy to

21  explain more.

22        But the second one, though -- when he gets -- so

23  that was his argument about capacity, right?

24        When he gets to pricing and does his simulation, I

25  heard him say he's just going to take capacity out of the

1    picture.  He's going to assume capacity is sunk, I think was

2    his word.  It's already been set.  And he's going to model

3    prices abstracting from capacity.  Assuming capacity has

4    already been determined.  Right?  To me, that's even more of

5    a problem, because capacity is the most important variable in

6    the economics of airlines to determine prices.  So the

7    pricing model that leaves capacity out just cannot make

8    predictions about what price effects will be.

9    **Q.**   Okay.  I want to focus on both of those points in order.

10   Let's begin with the idea that the parties will ignore the

11   specific terms of the MGIA and behave differently.

12           Is that a normal assumption that economists make

13   about business behavior?

14   **A.**   No, that assumption doesn't make any sense to me in

15   general or here.  Let me just tell you quick and give you the

16   reasons why.  First of all is, I mean, they are separate

17   firms operating under a contract.  So his theory seems to be

18   they'll maximize joint profits as though they are merged, but

19   they're not.  They're separate firms of the contract.  I

20   guess my point, too, is they chose that contract on purpose.

21   So Professor Miller talked a lot about what you would do as a

22   profit maximizing firm.  And I agree with the economist, we

23   have some firms maximize profits, but what I take from that

24   is you assume they meant to do what they did.  So if they

25   signed a contract, that creates these incentives and it's

1    pretty intricate.  It took us a long time to go through.

2    They meant to do that.

3           Point three is I think what Professor Miller is

4    saying is inconsistent with airline markets.  Right?  You

5    want to grow in airline markets because networks are how you

6    compete.  If JetBlue and American are trying to be in this

7    production and joint venture to create a better network, they

8    benefit when the other side grows.  So they're building those

9    incentives in on purpose.  Those also help them to compete

10   more effectively with United and Delta, which I heard both

11   parties say is their goal.

12          And then finally, just quickly, because it matters

13   to me, what Professor Miller is saying, it's a theoretical

14   economics statement he's trying to make, that somehow what

15   they'll do is not what they said they'll do.  It's also not

16   consistent with what we know about economics.  There's long

17   standing economics by Nobel Prize winners that says, in a

18   market like this, where you're competing about capacity, if

19   you can sign a contract that incentivizes you to grow

20   capacity, you want to do that.  That's a beneficial thing to

21   have such a contract, if you can come up with one.

22          The parties have come up with one, and it's

23   inconsistent with economics to say they would then ignore it.

24   Q.   Okay.  I want to turn to your demonstrative again and now

25   to slide 17, which is actually something that Dr. Miller

1  presented.  Right?

2  **A.**  Yes.

3  **Q.**  Okay.  And so he discussed this contrast between -- this

4  illustrative example of capacity coordination, and then

5  unilateral capacity expansion.  Just to ground us, what was

6  he trying to show?

7  **A.**  I mean, this is an illustrative.  These are not based on

8  real numbers, but his argument basically was -- his

9  assumption in doing this picture, which I think he went

10  through pretty quickly, was that if American grows, that will

11  be bad for JetBlue.  If JetBlue grows that will be bad for

12  American.  So you have the bars where red gets bigger, blue

13  gets smaller, and vice versa.  So he said if they both grow,

14  that will be bad for both of them.  So he asserted, based on

15  this, that they can't have meant what they did under the

16  MGIA, because it would be bad for them.

17  **Q.**  And then capacity coordination and joint profit

18  maximization creates a longer bar up on top?

19  **A.**  Right, so he would say if they would get together and do

20  it jointly -- basically, if they're smaller, if they don't

21  grow and if they're smaller, they make more money under this

22  view, because he's saying each of their growth is bad for the

23  other one.

24  **Q.**  Okay.  So what do you think about that?

25  **A.**  I mean, again, it's inconsistent with airline economics.

1    It's inconsistent with a production joint venture.  I made a

2    slide to indicate how I think it should go and it helps to

3    explain the MGIA and it's consistent with the airline

4    economics.  If your network partners with each other, then

5    when American adds additional routes, segments, capacity,

6    JetBlue can sell that capacity.  That's good for the network,

7    that grows -- American grows.  JetBlue's profits go up

8    because JetBlue wants to sell that network.  Vice versa is

9    also true.

10           It's also true, as I said, that when either of them

11   grows on any route they serve, that puts more competition

12   against United and Delta, that helps them stand up to United

13   and Delta.  That's good for them.  All right.  So once you

14   recognize that they have complimentary assets that they have

15   brought together in a network, then what complimentary assets

16   mean is, if you grow, that's good for the network.  It's good

17   against the competition.  If we both grow, we do better.

18   Again, these are just illustrative, but this illustration

19   explains why they would consciously enter the MGIA, because

20   they want this network growth.  That's what they're trying to

21   unlock.

22   **Q.**  Thank you.  Going on to the second point you mentioned,

23   is it possible in the airline industry to make meaningful

24   price predictions by focusing -- by assuming that capacity is

25   held fixed?

**A.**   No.   I mean, I think this has been covered in testimony,
so -- and I don't need to -- the most important factor --
it's not the only factor, but the most important factor in
determining pricing on a given route is the capacity that's
available.   And so you cannot hold -- I mean, the effects of
a -- you cannot make price predictions that say I'm going to
extract from what's happened in capacity.

**Q.**   So let me ask you a related question on something about
Dr. Town's testimony.   As you know, he claims there was a
period of anticompetitive capacity discipline in the past,
and that the NEA threatens to bring it back.   What do the
capacity expansion incentives of the NEA indicate about that
theory?

**A.**   I mean, it's similar to what I say about Dr. Miller.   I
mean, you can't -- both these guys I think are trying to
analyze the claimed price arms that are independent of the
fact that the NEA creates capacity expansion incentive.   So,
you know, it's the opposite of Dr. Town's theory.   He said
maybe the NEA will bring back what he called capacity
discipline.   The NEA is a growth initiative.   It builds in
intentional growth inducing pieces into the contract.   It's
creating growth in the Northeast.   Those things go in the
opposite of the direction of what Dr. Town is saying.

**Q.**   Okay.   So let's turn to the evidence about the output
effects of the NEA and competitive effects generally.   So as

1    a preliminary question, is there a simple summary metric that

2    one can use to get a view on whether the NEA is likely to be

3    procompetitive or anticompetitive?

4    **A.**   I think I will sound like a broken record, but --

5    **Q.**   I'm pretty sure I know what you're going to say, but say

6    it anyway.

7    **A.**   It's the capacity effects and then especially we have

8    markets that are at issue in this case, in New York and

9    Boston, coming out of them.  If I was going to look at one

10   metric, I would look at capacity.  That's the supply curve,

11   right?  The way I think about what we study in antitrust

12   cases as economists is does the supply curve shift in because

13   something bad happened, or out because something good

14   happened?  And so if I -- it's not the only thing that anyone

15   can look at, but if I was going to look at one summary

16   measure relative to this case, it would be what's happened in

17   capacity on the routes at issue in this case.

18   **Q.**   In looking at the capacity effects, would you focus on

19   particular routes, NEA routes together, system wide routes?

20   What's the scope of the analysis?

21   **A.**   Well, I would certainly focus, first and foremost, on the

22   NEA routes, because that's what I understand to be at issue

23   in this case.  So in some sense, that's a legal decision, I

24   guess, but I understand the primary question to be has there

25   been harm on a certain set of markets.

1              I will say that I understand, as an economist,
2     there has been sort of loose that I've heard claims that I
3     sort of call robbing Peter to pay Paul, that the benefits to
4     the NEA routes are coming from other places.  So I've thought
5     about that and I think we're saying a couple of things.  One
6     is it's certainly possible as an economist that somebody
7     could actually come and show harm on some market somewhere,
8     and you think about how do I balance that harm.  I haven't
9     seen anything that comes close to the level of showing harm
10    in some other market.  And that matters to me a lot, this
11    issue matters to me, because growth and initiatives are good
12    things in the airline industry.  If you create the
13    opportunity to grow in the Northeast, that's good.  And if
14    that causes you to shift some assets to a more productive
15    use, that's good, because we're growing output.
16              And the way that usually happens in the airline
17    industry, and I think what's happening here, is in the short
18    run, when you have to move some planes around, you move them
19    from places where they're not very profitable, because
20    there's a lot of competition.  So in the short run, maybe
21    people are moving planes around.  I think about that as
22    cutting fat off the network.  That's a good thing to me,
23    because that means assets are being used more productively.
24    In the airline industry, the way I think about it, if you
25    ever get to the point where you have to cut muscle, where

1    you're cutting things that really matter elsewhere in the

2    network, what are you going to do?  You're going to go buy

3    more planes because that muscle matters to your network.  So

4    there's a short run shifting of assets, that's a good thing.

5    If the longer run of that leads to the need to go buy more

6    planes, as JetBlue has already said it's doing, that's a good

7    thing, too.

8    **Q.**  We've heard a lot in this case about the growth

9    constraints in the NEA airports, particularly in New York.

10   How does that affect your focus on capacity growth as a key

11   metric?

12   **A.**  This is why I spent a lot of time last week talking about

13   these markets.  They are markets where assets are tight,

14   assets are scare.  There are scarce slots in New York.

15   Boston is a little less tight, frankly, but it's got not a

16   lot of space at Logan.  There's scare gates.  So in any

17   airlines or anything else, as an economist, if I see scarce

18   assets, then the number one thing to me is how do you use

19   those assets effectively.  And so it makes it just even more

20   important to say the metric here should be is this

21   transaction that's building a more productive network that's

22   using those assets more effectively.

23   **Q.**  Okay.  I want to turn to a number of data points that

24   you've created for us on the growth and capacity and traffic

25   from the NEA.  And to begin that, we'll pull up Defendants'

1  Exhibit 932.  If you could describe what you have created

2  here and where you get the data to create it.

3  **A.**  Yes.  So these are -- as it says at the top, these are

4  measures of ASMs.  They are ASM growth.  They are ASM growth

5  at the NEA airports.  Those ASMs are taken from OAG, the

6  Official Airline Guide that we've talked about that gives you

7  schedules, so you can see how many seats are being flown on

8  every route.

9        And so what I have done here is I have started with

10  September 2020, which is prior to the NEA being launched as

11  the base, as zero, and measured growth relative for that.

12  And I've measured for American and JetBlue relative to all

13  other carriers.  So just American and JetBlue relative to the

14  industry on all routes from the NEA airports.

15  **Q.**  And what is the significance of the fact that the blue

16  line for the NEA partners is above the red line for all other

17  carriers?

18  **A.**  It just means American and JetBlue are growing a lot

19  more.

20        And quickly, let me say, if you look at the line

21  from September to January.  That's, you know, a bad time

22  during COVID and so on, but we see those lines staying

23  together.  They're parallel trends in the language of

24  economics.  They're tracking each other until January.

25  February is the initial launch of the NEA which takes off

1    after that into March and beyond.  Right coincident with that

2    date, you see these lines diverge, and you see the growth at

3    American and JetBlue substantially outpace the growth at the

4    NEA airports from all other carriers.

5    Q.   Okay.  Let's turn next to Defendants Exhibit 930, which

6    is another graphic based upon a chart in your report.  What

7    is this and what is its significance?

8    A.   So this is the same picture, but for nonNEA airports.

9    Q.   And why did you want to do this?

10   A.   I mean, two things.  One is -- and my starting point was

11   to say if the picture looks different for nonNEA airports, if

12   it's -- if the growth is not happening, the divergence is not

13   happening as much at nonNEA airports, then it seems to be an

14   NEA effect.  So that's one point.  It's just the lines are a

15   lot closer together.

16           Point two is we talked a minute ago about sort of

17   robbing Peter to pay Paul theories, so you can look at this

18   and say is it true that American and JetBlue are way behind

19   the other carriers at the nonNEA airports?  And the answer is

20   no.  If anything, they were a little bit ahead, it bounces

21   back and forth between the two, but these lines are very

22   similar.  So it tells me, (a), the NEA effect is a real NEA

23   effect, but (b), it's not resulting in American -- just a

24   reversal at the other airports.

25   Q.   Okay.  Let's pull up DX-935 next, and drafted based upon

1  something in your report entitled "American and JetBlue ASM

2  share increased at NEA airports post-NEA."  How did you

3  create this one and what does it mean?

4  **A.**  It's similar data, it's just looking at it slightly

5  differently.  It's NEA airports, again.

6          The first three bars are American and JetBlue's

7  share of ASMs at those airports leading into coming into

8  COVID and the NEA.  So they were slightly declining over

9  time, falling behind as we have seen from other metrics.  The

10  picture then skips 2020, the pandemic year, but compares to

11  2021.  And you'll see in 2021, with the introduction of the

12  NEA, American and JetBlue have a much higher share.  Share as

13  a typical way, as an economist, I would look at this, if it

14  sort of uses the other carriers as a benchmark again, and

15  says if we gain share, or the parties have gained share, then

16  the parties are doing better.  They've grown their capacity

17  relative to the industry.

18  **Q.**  Have you heard DOJ and its experts say that none of those

19  changes are meaningful because of COVID?

20  **A.**  I have heard that argument.  And you know, I've heard

21  arguments about 2021, you know, and I agree, it still had

22  some COVID effects.  I mean, to me, because I'm benchmarking

23  everything against the other carriers, I still think it's

24  informative.  But I've also heard Mr. Kirby, for example, and

25  others say 2022 versus 2019 is what the industry does, so

1    I've gone on and looked at that.

2    **Q.**  Have you seen any data that indicate that the NEA

3    carriers haven't gained at least some share against their

4    Northeast arrivals?

5    **A.**  No.  Nothing at all, anywhere.  I mean, they've grown by

6    every metric that I have.  I think we have a slide that was

7    based on something Dr. Town did for 2022.

8    **Q.**  Right.  I was going to ask you that Dr. Town makes an

9    argument that there's actually a decline in the market share

10   between 2020 and 2021.  How do you respond to that?

11   **A.**  Yeah.  I mean, 2020 is a pandemic year.  I would agree

12   that 2020 is a little bit crazy.  I mean, it actually grows

13   from '20 to '21, as you can see here in this picture.  But I

14   don't think that we should base the analysis strictly on

15   2020.  And ultimately, I think you should look at where they

16   stand relative to where they were before.  So I think

17   Dr. Town also made a point of that they had to decline from

18   2021 to 2022.  And I acknowledge and agree that the share

19   peaked in 2021, but what matters here is that in 2022, their

20   combined share is at 24 percent of ASMs roughly.  They had

21   been 18 and falling beforehand.

22           So I think -- as I said, I think we've heard

23   Mr. Kirby say and I've seen it all over the industry, what

24   most people are doing is just snapshoting and comparing '22

25   to '19, and '22 to '19 is a big jump for the NEA.  So I would

1    acknowledge that's a reasonable comparison and that makes the

2    same point.

3    **Q.**   There has been testimony in the case about less growth in

4    Boston and even capacity reductions in the last year or so.

5    Have you factored that into your analysis?

6    **A.**   Yeah, I have definitely thought a lot about it.  There's

7    also been testimony from JetBlue itself about operational

8    difficulties, particularly in Q3 of '22.  So those -- you

9    know, as we come into the second half of '22, JetBlue talked

10   about pilot issues that it's had and various operational

11   issues, that's affecting JetBlue's overall ASMs in the second

12   half of '22.  And I think Mr. Hayes -- I think it was, said

13   it most clearly, JetBlue has a lot of operations in New York

14   and Boston.  In New York it has slot issues.  That means it

15   can't really pull down in capacity.  So its ability to deal

16   with operational issues is pretty heavily focused on Boston.

17   So you're going to see in the second half of 2022, some --

18   you know, JetBlue dealing with that in Boston.  and -- but

19   Sorry, it doesn't affect anything about the NEA, it just says

20   there's operational issues that JetBlue is dealing with on

21   its own.

22   **Q.**   All right.  Thank you, Dr. Israel.  I want to bring up

23   the demonstrative again at this time to slide 19,

24   entitled, "NEA ASM growth."  What does this table show

25   regarding its underlying data?

1    **A.**   Same underlying data.  It's just sort of a different

2    version on what we've been talking about.  If you compare --

3    what the AS -- so the first column of numbers is just ASMs in

4    levels.  So it's just American and JetBlue versus other

5    carriers at NEA airports and the same thing at nonNEA

6    airports.  Those are just to ground you in the numbers.

7    **Q.**   So the negative numbers on the nonNEA airplanes, that's

8    indicating that people haven't reached the preCOVID level?

9    **A.**   Correct.  So I was going to say the third column is the

10   one what really matters here is the growth and what it should

11   tell us is the only place we have seen growth coming out of

12   COVID is American and JetBlue at the NEA airports.  The other

13   carriers are well below their 2019 levels.  The nonNEA

14   airports, everyone is below their nonNEA -- their preCOVID

15   levels.  Here, American and JetBlue are slightly ahead.  But

16   the point I would make is the routes at issue in this case,

17   the NEA airports served by American and JetBlue, that is the

18   one place in the industry where we've seen growth.

19   **Q.**   Growth in absolute terms relative to 2019?

20   **A.**   Correct.

21   **Q.**   Okay.  All right.  So what do you conclude from this data

22   about increased output?

23   **A.**   Everything I've seen in this case, every data I've looked

24   at says that at -- in the NEA airports, in the routes that

25   we're focused on here, American and JetBlue have grown

1    capacity.  They've grown relative to the industry, they've

2    grown relative to other carriers.  In these routes, the

3    effect to date has been capacity growth.  And as said before,

4    that metric tells me the supply curve has shifted out in a

5    good way.

6    **Q.**  Now, Dr. Town in his testimony, but also in his reply

7    report, which he hasn't presented yet, but unfortunately you

8    don't get to come back afterwards, he spends a lot of time

9    arguing that you haven't shown that the NEA is the cause of

10   the observed growth.  What is your response?

11   **A.**  I mean, I haven't heard an argument about what else the

12   cause for all of these data would be, and what -- I've tried

13   to look at it every way that I can think of.  I've looked at

14   the NEA carriers versus other carriers, I've looked at the

15   NEA years versus other years.  I've looked at the NEA

16   airports versus other airports.  It's all pointing to the

17   NEA, so it seems to be an NEA effect by every metric I can

18   think of.

19   **Q.**  Okay.  Now, you've also looked at the growth that was

20   predicted in planning for the NEA through the clean team

21   process, right?

22   **A.**  Yes.

23   **Q.**  Can you explain how you did that?

24   **A.**  Sure.  So I know there's been a lot of discussions, so

25   I'll sort of describe how I came to the process and what I

1    did.

2           So the clean team, we've heard a lot about it, and

3    I won't go through everything the clean team is.  By the time

4    I got involved in the process, the clean team had run what's

5    been called -- well, they basically had done all of their

6    business case runs.  They had prepared materials for the

7    board, I think, or were in the process of it.  They had run

8    what was called v2, which was their plan, their case for the

9    NEA.

10          What happened was I came and I wanted to look at

11   those plans to see what they said.  I do that in every

12   airline transaction that I'm involved in, if I can.  So I

13   asked questions about it, what did you do, what are the

14   plans.  And I think it's worth saying from the beginning what

15   was explained to me and how I took it and used it.  What was

16   explained to me consistently was the idea was compare NEA to

17   nonNEA in a world that has come out of COVID.  Right?  That

18   was the idea.  Reflect on that that the NEA world will grow.

19   I mean, if it does, but look at a world that comes out of

20   COVID.

21          And then the other thing that was explained to me

22   as I asked questions was the idea was how do you figure out

23   what the nonNEA world will look like as we come out of COVID.

24   That's the question, and that's the counterfactual question

25   we've heard.  That's the first question that I asked.

1            And the answer that was given to me across the

2    board was the best prediction -- in fact, a uniquely good

3    prediction that we have in this case is that the airlines

4    already went through 2019 as stand-alones, they competed in

5    an outcome in a world that didn't have COVID.  We're trying

6    to get back to 2019.  The world has been on pause

7    effectively.  So what they told me is, you know, some --

8    there will be some different planes, some will come in, some

9    will come out, some things will change, but the best

10   prediction we're every going to have of what stand-alones

11   will do, absent the NEA -- absent COVID is what they did

12   absent COVID in 2019.

13            So what they told me is the idea is take that as

14   the baseline, sort of -- we've already seen that movie, and

15   then plan an NEA against that same set of industry

16   conditions, reflecting the planes that will be available when

17   we've come out of COVID and some growth, but build an NEA

18   that will be compared to what actually happened on a

19   stand-alone basis in a world that was, you know, at the --

20   just without the COVID level.

21   **Q.**  And did you have an occasion then to prepare what's

22   called a consumer benefits study for submission to the

23   Department of Justice and the Department of Transportation?

24   **A.**  Yes.

25   **Q.**  And was that based upon the v2 optimized schedule?

**A.**   Yeah.  It took what they had done in v2, what they had
presented -- what they told me and with all my questions
understood, was their analysis of with and without NEA, and I
looked at the predictions from that and used that to figure
out the associated benefit.

**Q.**  And in connection with that, was that then run through
this Raven forecasting tool that we've heard about?

**A.**   That's correct.  So this was all, again, before I was
involved.  They do these two plans, with and without NEA.
You feed them into Raven.  Raven's a complicated model, but
it's job is to spit out passenger predictions.  Those
passenger predictions become the basis of my calculation.

         THE COURT:  So does that mean in v2 there's two
flavors, v2 output, where the schedules are separate, just
the way they ran, and then v2, where you combine them in
2019?

         THE WITNESS:  Correct.  So v2 is actually literally
the NEA world.

         THE COURT:  I see.

         THE WITNESS:  So v2 is take -- everything is given
from 2019, the demand conditions that the model knows,
everybody else's schedule, but then the clean team got
together and planned the NEA.  That's v2.

BY MR. WALL:

**Q.**  Just to be clear, v2, it is a schedule of flights and

1    frequencies?

2    **A.**  Right.

3              THE COURT:  Schedules of flights and frequencies

4    that the clean team came up with in an effort to optimize the

5    two together and then apply to 2019 circumstances.

6              THE WITNESS:  Correct.  Absolutely.  And then

7    they -- I mean, they used those demand conditions, their

8    planning was running things through Raven based on those 2019

9    conditions.  And that was compared to an actual schedule from

10   September of 2019.  That actually was flown.

11             THE COURT:  And so is v2 based on the fleets that

12   existed in 2019?  Or based on what was thought to be in the

13   future?

14             THE WITNESS:  v2 included order book, right,

15   because -- and the way that I think about this and this is

16   important to discuss, the -- and this is why I went through

17   that sort of long monologue before.  The way it was always

18   explained to me is we want to understand the world when we

19   just come out of COVID.

20             THE COURT:  All right.

21             MR. SCHWED:  So they -- and I asked this question

22   repeatedly.  They said we're using the stand-alones in

23   September of 2019, because that's the world without COVID.

24   That's what we did.  What we're going to do for the NEA is

25   look at what the NEA can do when we come out of COVID, and

1    that's going to include the planes that will be available.

2           THE COURT:  So that shifts in the sense that the

3    order book might order one or might order 50 or however many

4    planes your order book had to be rolled out by 2022, minus,

5    presumably, there's a certain amount of whatever that might

6    have to age out or --

7           THE WITNESS:  Right.  And they looked at what was

8    available based on what they had, including what they could

9    delay retirements on.  They looked at what was available.

10   But for the stand-alones, what they said is, you know, we're

11   using 2019.  When we actually get to 2022, some things will

12   have been retired, some things will have been added.  There

13   will be some changes on planes around the edges, but what we

14   actually did against those demand conditions is the best

15   guess we're going to have on what we would do if we faced

16   those same demand conditions again.

17   BY MR. WALL:

18   Q.  So just to follow-up on that, in an exercise that you're

19   doing on the consumer benefits, if you're doing that on the

20   airline industry, and you assume that the fleet is

21   constrained, how is that going to affect the outcome?

22   A.  Yeah, if you -- if you assume you have the same fleet,

23   stand-alone, versus NEA, you're going to get very small

24   passenger increases, if any.  You can squeeze a bit more out

25   of the network, but with the modern planning tools, what

they're going to find is if you have the same fleet -- if you
increase demand for your network, which is what they're
trying to do, the model actually goes through -- it doesn't
just model the demand, it models the process of can people
find a seat.  So it models what's called spill.  So you're
going to see if we increase demand, it's just going to spill
people out the other end.  So it was clear from the get-go
and through the planning that the NEA involves capacity
growth.  That's what it's built for.  If you don't have that
capacity growth, you can generate the demand, but you're just
going to spill people off full plans and you're going to see
very little, if any, uptick.

**Q.**   Is there precedent in antitrust economics for using the
plans that the businesses actually relied on?

**A.**   That's what I try to do.  I mean, so in this case, it did
come in where they had already done these plans.  But I think
the ideal is to use plans they've run, plans they have
presented to the board.  There have been earlier airline
transactions that were mentioned in here where there weren't
such planes, it was therefore harder to run the schedule.
But my practice and I think the DOJ's practice in its merger
guidelines is to try to use existing planes, if you can.

            THE COURT:  So one further just question on this.
So is the order -- the purpose of the NEA, you understand it
is, in parts, to increase demand, right?

1           THE WITNESS:  Yes.

2           THE COURT:  And so is the order book that existed

3    preNEA, or the order book that is revised in light of the

4    anticipated demand from the NEA?

5           THE WITNESS:  They just used the order book, as I

6    understand it, that existed.

7           So I think I heard Mr. Fintzen, I think it was,

8    testify and it was exactly what he had said to me, was we

9    used the order book that existed to try to ground things in

10   the reality, so we didn't -- you don't want to come in with

11   your -- to go to the board and say we're assuming you're

12   going to give us 100 more planes as a result of the NEA.  You

13   know, maybe you will and that's part of the growth that I

14   think they said they'd bought 30 more planes as a result.

15   But the way it was explained to me is we know there's going

16   to be capacity growth.  We want a reasonable way to model

17   what that might be, so we're going to see what we can take

18   out of the existing order book.

19          THE COURT:  Why doesn't -- so what you were saying

20   before is if you constrained the fleet, and you do something

21   to increase demand, you're going to get spill.  You're not

22   really going to get much of a difference.  The difference

23   that you'd mostly get is you full up the capacity that's

24   excess that you had.

25          THE WITNESS:  So what's the difference you're

1  asking me?

2          THE COURT:  Well, then -- but then, yeah.  But

3  then, isn't the fleet constrained in a different way?

4          THE WITNESS:  Yeah.  I mean, they were using what

5  the stand-alones did in 2019, which was smaller than that.

6  Right?  So what was going to happen in the meantime was some

7  planes were going to be retired, some were going to be added,

8  the stand-alone was going to fly with a smaller fleet,

9  because it wasn't going to -- it was going to let the planes

10 retire.  It wasn't going to use all of the planes that the

11 NEA was using.  So just to be clear, it's the existing order

12 book that they're using in the NEA.  They're not adding

13 additional orders.  But they are modeling full, more complete

14 utilization of that capacity as the thing that the NEA

15 unlocks.

16 **Q.**  Let me just follow up on a detail.  Were they also

17 modeling that they would delay retirements of some aircraft?

18 **A.**  The NEA -- they were given the option, so what would

19 happen in the real world relative to 2019 would be some

20 things would be retired.  People have testified to that.

21 Some would be added.  American tried to keep block hours

22 roughly the same, but things would come on and off.  They

23 acknowledged that and I asked this question repeatedly.  They

24 just said things come on and off, we don't have any model

25 today of 2023, right?  Because we're in the middle of COVID.

1   The best we can give you is we're going to let things come on

2   and off optimally, and optimally for the stand-alones is

3   going to look a lot like 2019, because we already played that

4   game.  Whereas, the NEA has the same existing planes, the

5   same order book, it's going to make different choices because

6   the model is telling us and their analysis is telling us it's

7   got more demand opportunities to --

8              THE COURT:  But wouldn't you want to know, in the

9   coming on and off -- the coming on and off is probably not

10  every single year.  Over time, there are some years where

11  more comes on and more comes off.  So if a lot was coming on,

12  hypothetically, between 2019 and 2022, that would be

13  significant in the analysis.  If nothing much were coming on

14  or off, that would also be significant.

15             THE WITNESS:  Right.  And the way that I think

16  about that, and the way I think they were thinking about

17  that, is those decisions are decisions that we have to make

18  every day.  What do we retire?  Mr. Raja talked about do we

19  delay our order book because of the COVID.

20             I asked these questions repeatedly, the

21  conversations that we've heard about, and the answer was:

22  Sitting here in 2020, 2021, we can't tell you every decision

23  we're going to make.  We're going to retire some stuff.

24  We're going to add some stuff.  Those are decisions that we

25  make every day.  And the best I can tell you today is that if

1    we're really facing 2019-like demand conditions, we're going

2    to make similar fleet decisions to what we made then.

3             In fact, it's a better predictor than I have in

4    most cases, because we've seen what decisions they make then.

5    So they were telling me -- and it makes sense to me.  The

6    best I think I can tell you about the world post-COVID and

7    what planes we'll choose and what planes we'll park and what

8    planes we won't fly, is faced with those demand conditions, a

9    similar-sized fleet will be the optimal thing that we can do.

10            And I think they would acknowledge, it's not a

11   perfect estimate.  You're trying to estimate the best you

12   can.  But given that there's retirements happening and things

13   coming on, and we've seen the decisions that we make in a

14   world that's just outside of COVID, we have a model of the

15   world outside COVID, which is the best thing that we have

16   available.  That's the logic.

17   BY MR. WALL:

18   **Q.**  So if I can, this may, at the risk of asking kind of a

19   circular question, is there any -- was there any part of

20   the -- let me strike that and start over.

21            Did the v2 optimized schedule assume, implicitly or

22   explicitly, that the parties would have the aircraft required

23   to fly it?

24   **A.**  Yes.

25            MR. DOIDGE:  Objection.  Leading.

1          THE COURT:  Overruled.

2          THE WITNESS:  Yes.  I mean, the v2 schedule put

3    together a schedule where they looked to see what aircraft --

4    you know, they would have the aircraft.  That's where the

5    order book come in.

6          And Mr. Fintzen said it to me and said it in here.

7    What he told me, and frankly, was, "We think we're going to

8    do a lot more than that."  That's in the JetBlue documents.

9    We think we're going to go buy more planes, more than what

10   the order book currently says.  But we want to try to figure

11   out what's available to us now.

12         THE COURT:  How did it do what Mr. Wall asked you?

13         THE WITNESS:  Because they only let themselves fly

14   planes that were currently --

15         THE COURT:  No.  He asked you to assume that they

16   had the planes to fly --

17         How did you put it?

18         MR. WALL:  To support the flying that was

19   scheduled.

20         THE COURT:  To support the flying that was

21   scheduled.

22         THE WITNESS:  That, in practice, they put down the

23   schedule, and the schedule is fed into Raven and they said,

24   "We have the equipment."

25         THE COURT:  That's because they can't fly a

1  schedule that they don't have planes for.

2          THE WITNESS:  Right.  That's all that means.

3          The question is how do we -- and I want to be very

4  clear with you about this, there's no doubt that the logic

5  from the beginning was -- it's the whole logic of the NEA.

6  There's going to be more planes flown in the NEA schedule

7  than stand-alone.  That is in the logic of what they're

8  doing.  That's what they're modeling.  No question about it.

9  The way they were doing that was to say, "We have a 2019

10 world.  We have a 2022 world, with 2023 --

11          THE COURT:  I mean the question that I'm wondering

12 about, though -- I understand that comparison, but the 2019

13 world they lived in in 2019 had an order book.  And an order

14 book presumes that you're going to buy planes, which means

15 that they're presuming that there's going to be some -- at

16 least some addition of capacity, because they're buying

17 planes.  And then whether it's netting out to positive or

18 negative, I don't think I know right now.  But that's what

19 I'm trying to figure out.

20          THE WITNESS:  Yeah.  And I think the answer is I

21 don't think nobody knew exactly in 2021.  I think there were

22 certainly things on the positive and things on the negative.

23 They can also accelerate the order book or slow their

24 retirements.  You're right, there's not a prediction about

25 the positive or the negative.

1          But there's no 2023 schedule.  They don't have one.

2     They can't make one during COVID.  And they're saying, "If

3     you're asking me to give you the best prediction that I can

4     of what decision -- how it's to net out, it's going to be we

5     know what happened in 2019 under those demand conditions, so

6     we think it's going to net out roughly to zero because that's

7     what we did under those demand conditions last time.

8          We have to make modeling -- since we're having

9     this -- every time you do one of these cases, you struggle

10    with this.  What's the counterfactual?  Which way should we

11    go?  And what I believe here, and what I think they believe,

12    is that we actually have a better counterfactual than we

13    usually would have, because the world got put on pause for a

14    few years.  And so at least we've seen a 2019 stand-alone.

15    At least that gives us the world as a model.

16    BY MR. WALL:

17    **Q.**   Okay.  I want to move forward and actually talk about the

18    growth that was predicted, the growth that has occurred, and

19    how you modeled consumer benefits from that.

20          So in general, can you describe for the Court how

21    an economist tries to quantify the consumer benefits from a

22    transaction like this one?

23    **A.**   Sure.  So once we have a number of -- a number of seats

24    or passengers that have been added, either from the planning

25    process or from what we've seen in the real world, benefits

1    really are just me doing fancy arithmetic.  It's just me

2    saying how much consumer benefit does that number of

3    passengers imply.

4            And the logic that goes back 50 years and has been

5    used by the DOJ and many others is that if I see more

6    passengers, some of them are flying because it's a better

7    service, some of them are flying because there's more seats,

8    some of them are flying because prices are lower.  What I can

9    do is I can ask the question, how much would price have to

10   have come down by itself, if that was the only thing that

11   changed, to generate that much more traffic?  And that price

12   reduction that would have generated the whole thing, that

13   gives me a measure of consumer benefits.

14           It's sort of an intuitive thing to say, it's sort

15   of what what's the price equivalent of that growth in

16   passengers.  But the economics work from going back to the

17   '70s proves that that works formally, that you get a measure

18   of the consumer welfare gains by mapping the passenger

19   increase into the price reduction that by itself would have

20   generated that.

21   **Q.**  Okay.  We have a bunch of slides that explain how this

22   works, I want to start off with slide 2022 and the

23   demonstrative.  And this is showing, "Total seat growth

24   predicted by the clean team of 8.7 million seats."

25           So how did that figure come about?

1   **A.**   So this is what we were just having the discussion about.

2   This is the 2019 seats versus the clean team seats.  So as I

3   said, I want to be clear, the clean team schedule has more

4   seats.  It has more capacity.  That 8.7 million seats.  If

5   you do the math, just to ground you, 8.7 million seats is

6   something like 25 planes.  So it's in the range of the sort

7   of planes that we've been hearing about that say JetBlue

8   actually went out and bought due to the NEA.  But that can

9   ground you.

10   **Q.**   Okay.  Now, we know because of load factors that seats

11   are not going to result in an equivalent number of

12   passengers.  How do you figure out the incremental number of

13   passengers?

14   **A.**   So this is the work that Raven does.  These are just

15   summarizing the number of seats.  Right?  Raven does -- you

16   feed these schedules into Raven and Raven gives you the

17   number of passengers that would be predicted that would

18   actually fly, and so I think I have a --

19   **Q.**   Yeah, go to slide 23, please?

20   **A.**   Exhibit.  Which is -- so Raven said of those 8.7 million

21   seats, we're going to fly about 5.75 million more passengers.

22   So that's a load factor in 65 percent range, that's not

23   aggressive.  If you have those extra seats, you have the

24   better network.  Raven says this is going to be the passenger

25   increase.

1    **Q.**  So what then do you do with that estimate of an

2    additional 5.75 million passengers?

3    **A.**   Yeah.  I just need to find a way to figure out how much

4    would prices have had to come down to generate that many more

5    passengers.

6    **Q.**  And an equation has popped up with the "Price elasticity

7    formula."  Can you explain this?

8    **A.**   Yea.  So the basically, I'll say it, it's 3 percent more

9    passengers.  Price elasticity is defined as the percentage

10   change in quantity divided by the percentage change in price.

11   You've heard that from Dr. Miller.  You just do a little

12   algebra on that, that tells you that you can get the implied

13   percentage change in price that would induce a 3 percent

14   increase in passengers by dividing the percentage change in

15   quantity by the price elasticity.

16   **Q.**  And so where are you going to find the price elasticity?

17   **A.**   There's economic literature on the price elasticity in

18   airlines that tells you the estimate that I use from the most

19   current estimate I have from the literature, it says that

20   elasticity is 2.1.

21   **Q.**  Okay.  Go to the next slide.  So now we've added that

22   into -- that value into the equation.  And what does that do

23   for us?

24   **A.**   So, again, this is doing it at the aggregate level, the

25   benefits model goes through and does this route by route, but

1    to give you -- this gives you all of the idea and basically

2    the exact right number.  3 percent increase in quantity,

3    divided by the price elasticity of 2.1, says you would need

4    about a 1.5 percent price reduction.  So 1.5 percent price

5    reduction, roughly double it with the price elasticity of two

6    gives you that 3 percent quantity increase.  So it's a 1.5

7    percent -- so the benefit that this says is it is like a

8    1.5 percent price reduction.

9    **Q.**  And once you have that 1.5 percent price decrease to

10   stimulate the demand, what do you do with it?

11   **A.**  Now it's literally just arithmetic, it's a 1.5 percent

12   price reduction that stimulates the demand, average fare in

13   the data -- and again, this is all done route by route in

14   practice, but average fare in the data.

15   **Q.**  Not in this, but in the demonstrative you're doing it on

16   the aggregate.  Right?

17   **A.**  Yeah.  This is just an aggregate to give you the -- and

18   it gets you very much the right number.  But on average, in

19   aggregate, it's a $229 fare.  So that's the 1.5 percent, it's

20   like a -- it's a $3.40 price decrease.  I'm then just going

21   to take that $3.40 and apply it to the 184 million people who

22   were flying, and it's $625 million.  It's just basically like

23   air fares went down by a little over three bucks, on average,

24   $625 million in benefits.

25   **Q.**  Okay.  Let's pull up, at this point, table 9 from your

1    report.  You mentioned that the illustration was using

2    aggregate numbers.  This was what you came up with using the

3    route by route analysis?

4    **A.**   Yeah.  If you go through and do the same thing, route by

5    route, literally looking at the conditions on each route, the

6    growth that predicted, the fares, the elasticity, which is

7    the 2.1, you get 635 million, so you do a lot of work, but

8    the aggregate number tells you everything that was going on.

9    There's nothing magic about it, it's just a price

10   reduction to generate that many more passengers, multiplied

11   by the number of passengers.

12            THE COURT:  Is the price elasticity different on

13   different routes?

14            THE WITNESS:  It could be and so you can do -- you

15   can get in and divide it up by the different routes.  In

16   general, what happens if you do that is you actually --

17   usually you get bigger benefits, because you have certain

18   routes with sort of the most business travelers and things

19   tend to have the lowest price elasticity.  They get a lot --

20   they fly a lot more from things like the NEA, so it tends to

21   bulk up the benefits on those routes, but here I've used the

22   2.1 everywhere to keep it simple.

23   BY MR. WALL:

24   **Q.**   Okay.  So now that number, the $634 million number,

25   that's an annual benefits number, right?

1   **A.**   Correct.  Everything that's coming out of this would be
2   analyzed.
3   **Q.**   So this is based on the Raven predictions, based on the
4   v2 optimized schedule, are there ways in which the real world
5   was different than what was predicted?
6   **A.**   Yeah.  The purpose of doing a clean team and the planning
7   and feeding it through Raven is to do this comparison.  You
8   know, to me, apples to apples, everything was 2019, they're
9   best guess with and without the NEA.  Y+ou know, in the
10  actual world, stuff happens in the meantime and things
11  change, and competitors react.
12          A couple things to fly here -- and I don't know if
13  this has been said to you before, Raven, the clean team work
14  did not include the international expansions, like to
15  Tel Aviv and Athens, because the parties didn't know for sure
16  where they would go internationally.
17  **Q.**   You mean the work that was done back in spring of 2020?
18  **A.**   Correct.  It did not include the international routes.
19  So the Raven benefits are pretty heavily -- it has some
20  international benefits due to increased frequencies, and so
21  on, but it didn't have the new international routes.  So the
22  Raven benefits are more skewed towards domestic.
23          What's happened in reality is a lot of
24  international expansion, a lot of codesharing.
25  Internationally.  A lot of the benefits to date have actually

1    been on the international routes.  The domestic benefits that

2    you see here haven't fully rolled out yet.  COVID has kind of

3    held back business travel domestically, which has held these

4    up.  So in reality, you'll see more international and less of

5    it domestic, at least thus far.

6    **Q.**  Okay.  Did you do more analysis of calculating benefits

7    based upon actuals to date?

8    **A.**  Yes.  So as another way to do this is just to go to the

9    data and see what's happened.  So remember, Raven was based

10   on how many more passengers would fly, based on the clean

11   team predictions.

12          Another thing that I could do is take the same

13   basic time periods.  So compare second half of 2019, or last

14   three quarters of 2019, to the last three quarters of 2021 as

15   actuals before and after.  And what I do is I look at that

16   for how much did American and JetBlue share go up?  So

17   everything I showed you before, they gained share.  They've

18   actually gained share.  That means they've been more

19   attractive.  They've added more passengers, more seats.  So

20   I've used those increases to do the same calculation based on

21   actuals.

22   **Q.**  Okay.  I want to turn, then, to that work.  So let's look

23   at Defendants' Exhibit 920.

24          What is this and what does it show?

25   **A.**  So this is what I was describing to you, but based on

actuals, so using the data that we've been talking about for
passengers from the DOT and from seats.  And as I said
before, I start with shares.  How much has American and
JetBlue's share gone up.

So this is showing you, in passengers and seats,
just as two different ways to look at it, how much has their
share gone up.  And you'll see, for both what I said to you a
minute ago, there's some increase from 2.3 to 2.7 percent
increase domestically, so you'll see their share has gone up
from like 35 to 38.  So they've attracted domestic
passengers.  Internationally, you see a much bigger increase,
because that's where it's been rolled out more.  But these
were the actual 2019 versus 2021 changes in shares, based on
passengers and seats.

**Q.**  And let's look at DX921, what have you done with the data
you just described in creating this table 11?

**A.**  I just mapped the shares into the number of passengers.
So for passengers, that's easy.  I take the share change, and
I multiply it times the number of passengers there were in
2019 to convert a share into a number.

For seats there's one more step involved.  I take
the percent -- the share change in seats; I map that into the
number of seats; and then I multiply the number of seats
times the average load factor to turn seats into passengers.
But both of these are just increases, just mapping shares

1    into passengers, based on the numbers that were flown in

2    2019.

3    **Q.**   So now that you have your passenger numbers and your seat

4    share numbers, are you going to convert them into the

5    consumer benefits, right?

6    **A.**   Yeah.  And that's the same method.  We don't have to go

7    through all the math again.  It goes through --

8    **Q.**   Let's just pull up Exhibit 922.

9         What's going on here?

10   **A.**   So if you do the same method that I was describing for

11   Raven, but now based on those passengers that are based on

12   the actual share increases that have occurred, you get

13   between 510 and 610 million.  So slightly smaller, because

14   the NEA not fully rolled out, the way I think about,

15   especially domestically, but similar numbers to what are

16   coming from Raven.

17   **Q.**   So something one might notice is that you're getting

18   total estimated benefits that are somewhat smaller than what

19   you did through the Raven method, but on substantially small

20   numbers of total additional passengers.  What accounts for

21   that?

22   **A.**   The benefits have largely -- as I said, the growth has

23   largely been on international routes so far.  International

24   routes have higher fares.  So an equivalent -- a smaller

25   number of incremental passengers, even a smaller percentage

1    price change is going to be a bigger dollar number when it's

2    applied to international flight.

3    **Q.**  Now, do you expect that these total estimated benefits

4    numbers will hold from year to year or will vary?  What do

5    you expect?

6    **A.**  Well, they'll certainly vary.  They will vary as the NEA

7    is rolled out more.  They will -- I will note, they will also

8    vary if other competitors come in, maybe as has happened in

9    2022, with stronger service.

10         One thing that's interesting about these benefits,

11   if other carriers come in with stronger service in response,

12   that's going to pull the share gains down.  Right?  Because

13   the other carriers have gotten better.  The American and

14   JetBlue share gain would come down.  And the benefit

15   calculation, that will make the benefits look smaller.  But

16   that's really just the way this is conservative, because that

17   response is itself a good thing.  This whole calculation is

18   done as though only American and JetBlue have gotten better.

19   So it's all based on share.

20         So I would expect to see it bounce around.  I would

21   expect to see it maybe come down as competitors respond.  But

22   that is all part of the competitive process that grows out of

23   this.

24   **Q.**  But if it comes down as competitors respond, the

25   competitor response is itself potentially creating a benefit,

1   right?

2   **A.**   Certainly, if it's a direct response and it's a quality

3   improvement, or something, yes.  It's just the methodology

4   treats American and JetBlue as the only ones that have gotten

5   better, so it misses that competitive response.

6   **Q.**   Okay.  Now, I've got to give you a chance to sort of

7   anticipate and respond to the criticisms that Dr. Town has

8   levelled against your benefits analysis in your reply report.

9   Can you just summarize those and provide the Court with some

10   thoughts and response?

11   **A.**   Yeah, I'll try.  There are -- I see them -- there's a lot

12   of pages in his reply report.  I would put them in two basic

13   categories.  One of them is sort of criticizing the whole

14   methodology as though it's something unusual or it requires

15   strong assumptions.  You know, strong demand assumptions.  To

16   that I would say, you know, this method has been used in

17   economics for 50 years.  It's been adopted by the DOJ.  The

18   DOJ papers we've heard about use it.  The follow-up DOJ

19   papers I just -- don't ever say the monetization method

20   doesn't work.  So it's a very standard method.  The economic

21   literature has shown that it holds across a broad variety of

22   demand conditions.  So I just -- I think it's just wrong to

23   say that it's somehow unusual to map things into price

24   changes.

25   **Q.**   He also makes a criticism about some of your modeling

1    assumptions as between linear demand and logit demand?

2    **A.**   Yeah.  So this one I have to apologize, I have to do

3    something slightly technical after talking for two hours.  So

4    a lot of the pages in Dr. Town's reply report, that I imagine

5    you'll hear about, are about saying that under -- if you use

6    a linear demand curve, which is a demand curve that's a

7    straight line like this, that can lead in some circumstances

8    to quite large benefits.  This is something that I know.  I

9    wrote a paper to the DOJ explaining this.  And what I said in

10   the paper to the DOJ is, when you compute benefits under the

11   linear demand curve, you basically add up two pieces.  You

12   add up what's -- again, you add up what's called the

13   rectangle and the triangle.  Again, trying to do this in

14   advance.  But if you add in the triangle piece, that can lead

15   to these large benefits.  Right?  So --

16   **Q.**   Larger than you have calculated, correct?

17   **A.**   Much larger than what I have calculated.  They correct

18   under linear demand, but they can get very large.  I told the

19   DOJ, therefore, I'm not counting the triangle.  That's not

20   part of what I'm doing, that's not in my estimates.  I'm just

21   using the rectangle.  And I told the DOJ that the rectangle,

22   just that part, a reason to do that is if you just use that

23   part, you actually get a very good approximation to what the

24   benefits would be if demand wasn't linear, but instead was

25   logit, that you've heard about, which doesn't have any of

1    these issues.

2          So a lot of what Dr. Town does is say that linear

3    gives you these problems and I know.  I wrote a paper about

4    that, and therefore, I just use the piece that corresponds to

5    logit.  And under -- the logit doesn't have any of these

6    issues that he brings us up.

7    **Q.**  Okay.  I just have two more questions for you.  First,

8    how would you sum up your views on the competitive effects of

9    the Northeast Alliance?

10    **A.**  So I would say, I guess, I mean, on my summary that I

11    gave at the beginning stands.  I think four things.  One is,

12    I think this is a creative, innovative attempt to compete in

13    very difficult markets, where there are strong hub carriers

14    and there are limited assets.  And it is an attempt to

15    preserve separate business models and separate competition

16    while making a network that can do that.  So I think it's a

17    creative innovation, above all, that I hope is given a chance

18    to succeed.

19          Number two, I think it seems to be working.  Right?

20    I mean, we should all keep watching the data, but in the

21    markets at issue, it is clearly creating growth.  I don't

22    think there's any question about that, and so that's what we

23    want.  That's beneficial.

24          I think three, the responses to it, to me, are

25    speculative.  They are based on economic theories that don't

1  fit the facts, based on redefining markets in ways that don't

2  fit the reality of the markets, and they don't grapple with

3  the growth that we've seen play out.

4         And so I guess my summary would be it's blocking

5  this at this point would be harmful to consumers in New York

6  and Boston, but also to -- what matters a lot to me is I

7  think it would be bad for airline markets because it would

8  kind of - it would kill this innovative approach before it's

9  given a chance.

10 Q.  Finally, Dr. Israel, and Your Honor, with the Court's

11 permission, over the weekend, Dr. Robert Willig, a very

12 important antitrust economist, and a mentor to Dr. Israel

13 passed away, and he asked if he could just have an

14 opportunity to put on a transcript, just a brief comment on

15 Dr. Willig's passing?

16         MR. DOIDGE:  Your Honor, as long as it doesn't

17 relate to any substantive thing, with respect to the case, we

18 have no objection.

19         THE COURT:  All right.  Go ahead.

20         THE WITNESS:  Thank you.  And it won't be -- so

21 Bobby Willig, as he's known to me, was my mentor in this

22 business, and the best economist I've ever known, and a close

23 personal friend.  And he passed away over the weekend, as

24 Mr. Wall said.  His funeral is happening now.  So I just

25 wanted the chance to say that I am sad that I can't be there,

```
 1    that he means everything to me as an economist.  He's the
 2    best economist that I've ever known and taught me everything
 3    I know in some ways about antitrust, and so I just wanted the
 4    chance to honor him in that same way.  So thank you.
 5              THE COURT:  Thank you.  Well done.  And thank you,
 6    I understand the sacrifice that means as a person, to be here
 7    rather than to not go to that, and not go to that event, so I
 8    appreciate that, and I think everybody does.
 9              THE WITNESS:  Thank you.
10              MR. WALL:  No more questions, Your Honor.
11              THE COURT:  All right.  Want to take the break now
12    and then do the cross after?
13              MR. DOIDGE:  That's fine.
14              THE COURT:  We stand in recess.
15              (Court in recess at 11:01 a.m.
16              and reconvened at 11:16 a.m.)
17              THE COURT:  Go ahead.
18              MR. DOIDGE:  Good morning, Your Honor.
19              Good morning, Dr. Israel.
20              THE WITNESS:  Good morning.
21              MR. DOIDGE:  I'd like to express my condolences to
22    the loss of Dr. Willig.
23              THE WITNESS:  Thank you.
24          CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF USA
25    BY MR. DOIDGE:
```

1    **Q.**  Dr. Israel, we've handed you some additional binders that

2    we may be referring to, so I'll let you know if and when we

3    need to look at that.

4    **A.**  Okay.

5    **Q.**  Dr. Israel, you've been retained as an economic expert

6    for legacy airlines many times, correct?

7    **A.**  That's correct.

8    **Q.**  And you're currently working -- in fact, you're currently

9    working for United Airlines in the context of a private class

10   action; is that right?

11   **A.**  That's correct.  I don't know the status of the case, but

12   as far as I know, it's ongoing.

13   **Q.**  And you've also worked on prior mergers, including for US

14   Airways in connect with the US Airways/American merger,

15   right?

16   **A.**  Yes.

17   **Q.**  And you've also worked on behalf of legacy airlines in

18   the context of regulatory matters before the Department of

19   Transportation, correct?

20   **A.**  Yes.

21   **Q.**  And, for example, you've worked on behalf of US Airways,

22   in 2011, in the matter involving US Airways giving Delta 265

23   LaGuardia slots in exchange for DCA slots, right?

24   **A.**  I don't remember the numbers, but, yes, I worked on that

25   transaction.

**Q.**  And on behalf of American, you've worked in the context
of their seeking antitrust immunity for various international
joint ventures, right?

**A.**  Yes.

**Q.**  And over the course of your career at come Compass
Lexecon, you've billed thousands of hours to legacy airlines,
correct?

**A.**  That sounds right.  I haven't -- I don't usually know my
number of hours by case, but thousands is probably correct.

**Q.**  And your current billing rate is $1,600 an hour, right?

**A.**  That's correct.

**Q.**  And in that entire career, you have never been retained
in an airline matter where you offered an opinion that was
adverse to a domestic legacy airline, correct?

**A.**  Yeah, I mean, my retentions have been for the legacy
airlines, or the airlines generally, so I think that's
correct.

**Q.**  And Dr. Israel, let me just -- let's talk a little bit
about the work that your -- about the current work that
you've been doing for United.  And in the context of that
work, that relates to an ongoing class action.  And you --
fair to say that you understand that the litigation involves
an allegation that legacy airlines and Southwest violated
Section 1 of the Sherman Act, right?

**A.**  Yeah, I understand that to be the allegation.

1    **Q.**   And the nature of the alleged violation is that those

2    airlines have engaged in a conspiracy to restrict airline

3    capacity, right?

4    **A.**   Yeah, again, I understand that to be the nature of the

5    allegation by plaintiffs.

6    **Q.**   And the period of the alleged coordination is roughly

7    from 2010 to 2015; is that right?

8    **A.**   I don't remember the dates.

9    **Q.**   Does that sound about right, Dr. Israel?

10   **A.**   I really don't remember -- it's certainly not far off, I

11   just don't remember the exact years.

12   **Q.**   Well, fair enough.  Is it fair to say that it's

13   roughly -- the period of alleged capacity coordination in

14   that case is roughly the same time period that Professor Town

15   has identified as the capacity discipline period in this

16   matter?

17   **A.**   I don't remember either dates exactly.  So when I think

18   it followed off of an investigation that DOJ did and didn't

19   bring a case with similar years, that's what I remember about

20   the United case.  I'm trying to remember -- I think

21   Dr. Town's dates were similar in the 2010 to '15 range.

22   **Q.**   And with respect to the DOJ investigation, Dr. Israel,

23   it's fair to say that you don't actually know whether or not

24   that investigation has been closed or not, correct?

25   **A.**   Yeah, I guess I just know what I said, which is that

1    there hasn't been a case brought.

2    **Q.**  Thank you.

3           And in the context of the opinion that you've

4    offered on behalf of United in that class action, you have --

5    you've stated that the airline industry is an oligopoly,

6    right?

7    **A.**  Yeah, I think we talked about this in the deposition.  So

8    I stated an oligopoly in the sense that it's not perfectly

9    competitive, which to me just means the airlines pay

10   attention to each other and react strategically.

11   **Q.**  And in the context, you've introduced a concept in that

12   litigation of something along the lines of oligopolistic

13   interaction, right?

14   **A.**  I'm not sure what you mean by introduced the concept.  I

15   think I described that the industry could be seen that way,

16   in the sense that I just said, which is that airlines

17   obviously pay attention to one another's behavior

18   strategically.

19   **Q.**  And you say that they pay attention to one another

20   strategically, what you have in mind is that the firms are

21   strategically aware of one another and in some form consider

22   reactions to one another in making their strategies, right?

23   **A.**  Yeah, I think that's a fair description of how they

24   compete.  They are aware of each other, and they consider

25   each other's actions and they compete accordingly.

1    **Q.**  And you understand that United is contending that this

2    concept of strategic interaction among oligopolists, that

3    that engagement, that form of behavior, rather than an

4    express agreement, can explain the existence of capacity

5    discipline that's been alleged in that class action, right?

6    **A.**  I don't know that I know exactly what United is claiming.

7    Again, I think we talked about this.  I certainly know that

8    my opinion has been that evidence in that case that indicates

9    the different airlines pay attention to each other and

10   monitor each other is consistent with that form of

11   competition and doesn't indicate any collusion.

12   **Q.**  It doesn't indicate collusion that would violate

13   Section 1 of the Sherman Act, right?

14   **A.**  That sounds like a legal conclusion.  My economic

15   conclusion has been that evidence that they monitor each

16   other is how they compete.  So to me as an economist, that

17   doesn't suggest collusion.

18   **Q.**  Well, fair to say that in the form of this -- that with

19   respect to this concept of strategic behavior that the

20   oligopolists may be engaging in, that an example of that

21   would be that in considering whether or not to increase

22   capacity, an airline oligopolist might consider whether its

23   rivals would respond by increasing capacity.  That's

24   something that the airline oligopolist would consider, right?

25   **A.**  I think it's fair that when they compete with each other,

1    they consider how their competitors will react on all

2    dimensions.

3    **Q.**  And fair to say that if the oligopolist use, in this

4    case, that the anticipated response of the other airlines

5    might result in them increasing capacity, that that's

6    something that that oligopolist is going to take into

7    account, right?

8    **A.**  Sorry, I don't -- I don't think I follow you.

9    **Q.**  I'll rephrase.

10           Well, you agree with me that an oligopolist

11   considering whether or not to increase capacity would take

12   into account whether it's rivals would respond by increasing

13   capacity.  That's a factor they're going to consider in this

14   model that you have in mind for the airline industry, right?

15   **A.**  Well, I think they're going to consider all competitive

16   reactions to try to figure out where -- whether the behavior

17   they're going to take is going to leave them better off or

18   not.  All right.  I've talked in this case about things that

19   the carriers here are trying to do in order to be able to

20   compete more effectively, given what their competitors do.

21   It's all part of that process.

22   **Q.**  Well, fair to say that if the oligopolist anticipates

23   that a response of its rivals would be to increase capacity,

24   that might lead the firm not to increase capacity, right?

25   **A.**  Yeah, I don't know --

1    **Q.**   There are ways in which the interaction can play out,
2    correct?
3    **A.**   I don't really know how to answer at that level of
4    generality.  They're going to consider the reactions.  The
5    more standard model of capacity competition is that --
6    **Q.**   I'm not asking you about the more standard model,
7    Dr. Israel?
8    **A.**   Okay.
9    **Q.**   I'm asking you about how the model applies with respect
10   to the testimony that you're providing in this class action.
11   All right.  So let me ask it a slightly different way.
12           Isn't it fair to say that the plaintiffs'
13   allegation in that case is that an express agreement or some
14   form of agreement has resulted -- resulted in a period in
15   which the legacy airlines and Southwest airlines engaged in a
16   form of coordinated conduct by limiting the amount of
17   capacity growth they did, right?  That's what that case is
18   about.
19   **A.**   I think that's a fair statement of plaintiffs'
20   allegations.
21   **Q.**   And you're offering -- your concept of oligopolistic
22   interaction, as an alternative explanation for why carriers
23   might not have decided to increase response -- increase
24   capacity during that period, correct?
25   **A.**   Yeah, I offer several reasons why there -- the capacity

1    decisions were consistent with the situation in the airline

2    industry.

3    **Q.**   And the fact that the airline industry functions as an

4    oligopoly is one of the reasons you offer, right?

5    **A.**   Not so directly on the question that you just asked me,

6    no.

7    **Q.**   The notion of oligopolistic interaction, as we've just

8    been describing it, that's one of the reasons you offer for

9    why, perhaps, it wasn't an express agreement that the

10   airlines were engaged in, right?

11   **A.**   I don't recall that being part of my opinion.  As I -- I

12   mean, I'm happy to explain what my opinion was, but I do not

13   recall anything in my opinion saying oligopolistic

14   interaction was the alternative explanation.

15   **Q.**   Okay.  Well, we can move on.

16          Dr. Israel, you testified on direct about your

17   estimate -- your estimate of consumer benefits based on the

18   Raven output that was provided to you by the clean team,

19   right?

20   **A.**   Yes.

21   **Q.**   And if we could pull up a slide that was part of what was

22   provided to us this morning, but you didn't actually end up

23   using.  So if you could go to slide -- I believe it was slide

24   20 of the collection of demonstratives that were provided

25   this morning.  And if you look at slide 20, you see that the

1     analysis that you did, based on the Raven output, that that's

2     the analysis based on that third row, right?

3     **A.**   Right.   This is Dr. Town's slide.   So my slide was going

4     to illustrate what I had said in my testimony about my

5     understanding of these scenarios, so I don't agree with

6     mixing and matching.   I shouldn't say those are my words.

7     But I agree, as I described, that the comparison was the 2019

8     schedule against the NEA 2023 schedule.

9              THE COURT:   Just so I understand, is this slide 20

10     or slide 19?

11              MR. WALL:   Your Honor, I skipped over this.   So

12     there's two slides.   He was going to talk about a

13     modification --

14              THE COURT:   So I just -- just so when I go back.

15              MR. DOIDGE:   I can clarify, Your Honor.   I believe

16     what's happened is that we received an additional slide this

17     morning that we don't have the electronic version of.   So we

18     have what was provided last week, so all of these page

19     numbers are going to be one off from what was actually --

20              THE COURT:   So I should look at -- this is slide

21     20.   All right.   From Dr. Israel's deck.

22              MR. DOIDGE:   Correct.

23              MR. WALL:   But again --

24              THE COURT:   He's repeating it from -- I understand

25     it's not in his words, but I'm thinking if I'm looking at

1    that transcript and want to find the document.

2            MR. WALL:  Exactly.  Sorry for the confusion, just

3    in the interest of time, we had skipped over some of them.

4            THE COURT:  Yeah.  No, it's not problem.

5            MR. WALL:  He had a series of two, the first one is

6    Dr. Miller's original -- or Dr. Town's original --

7            THE COURT:  Got it.  Go ahead.

8            MR. DOIDGE:  Thank you, Your Honor.

9    BY MR. DOIDGE:

10   **Q.**  So I think you were just saying, Dr. Israel, but I just

11   want to make sure it's clear in the record, that you don't

12   disagree with Dr. Town's characterization that for the no-NEA

13   world, you used the 2019 actual schedule, and for the NEA

14   world, you used the v2 2023 schedule, right?

15   **A.**  I agree.  As I hope I described, I used the 2019 schedule

16   from September, compared to the v2 schedule.

17   **Q.**  Okay.  And we can turn to the next slide that, again, you

18   didn't present, but was here this morning.  And here, if we

19   look at the no NEA scenario, in that bottom row, you've added

20   a description to that no-NEA scenario, stating that the 2019

21   actual is the best prediction of stand-alone 2023, where

22   demand gets back to 2019 levels, correct?

23   **A.**  Right.  That's a short rum summary of what I was trying

24   to say in my description and in my testimony.

25   **Q.**  Yeah, I think what you said earlier today, and what

1   you're reflecting here in the slide, is that it's now your

2   position that the 2019 actual schedule is the best baseline

3   for a stand-alone 2023 scenario; is that right?

4   **A.**   I think that's fair, yeah.  I mean, sometimes it gets

5   confused.  People call it 2019 or call it 2023.  But in

6   either case, it's an attempt to estimate the best baseline of

7   the stand-alones when they return to a world post-COVID.

8   **Q.**   And in reaching that opinion, you relied on what the

9   clean team told you, right?

10   **A.**   In part.  Again, I think I described this.  I talked to

11   them at length, but certainly also, you know, thought about

12   this hard from my view as an economist.

13   **Q.**   Well, during your direct testimony, I believe, there was

14   a period of time when you repeatedly referred to

15   conversations that you had with the clean team with respect

16   to this period, right?  Do you recall that testimony on

17   direct?

18   **A.**   I don't recall the specifics of what I said, just the

19   words, but certainly I described a period when I came into

20   that case and talked to the clean team about what they had

21   done.

22   **Q.**   And you testified that the clean team told you that they

23   couldn't construct any other alternative schedule for 2023

24   stand-alone, right?

25   **A.**   Not -- I think what I should have said, if I wasn't

1    clear, was not and have it be meaningful, given COVID.

2    **Q.**  Well, fair to say, Dr. Israel, that you were relying in

3    part on the purported judgment of the clean team in

4    determining the 2019 actual schedule is the best available

5    prediction for what they would do in 2023, right?

6    **A.**  Yeah, that's what I said before.  I'm certainly relying

7    in part on what they told me about what they did in their

8    business case, combined with my judgment after talking to

9    them.

10   **Q.**  And I think, as you just indicated, that characterization

11   is based on your talking to them, right?  You're talking to

12   them back in May and June of 2020, right?

13   **A.**  I mean, the part that depends on what they told me,

14   certainly, was the questions and conversations that I had

15   with them, you know, back then.

16   **Q.**  And in your expert report, you explain that part of your

17   opinion is based on, quote, your direct observation of the

18   planning process, during which you were regularly kept

19   informed of developments, right?

20   **A.**  I don't remember the exact words from my report, but

21   that's fair.  I mean, I think the way to say it is they had

22   done a planning process.  I asked questions, and there

23   certainly was back and forth as I asked those questions, and

24   they gave me answers.

25   **Q.**  All right.  And you had conversations with members of the

1    clean team -- members of American's clean team in May and

2    June of 2020, right?

3    **A.**   I'm sorry, can you repeat that?

4    **Q.**   Yeah.  You had conversations with American's clean team

5    in May and June of 2020, right?

6    **A.**   That's sounds right, yes.

7    **Q.**   And you had conversations with JetBlue's David Fintzen in

8    May and June of 2020, right?

9    **A.**   That sounds right, yes.  The dates sound right.  I think

10   that's correct.

11   **Q.**   And you didn't take any notes at all during those

12   meetings, correct?

13   **A.**   That's correct.

14   **Q.**   And you don't have access to notes that anyone else took

15   of those meetings to inform your recollection of what

16   happened in those conversations, right?

17   **A.**   That's right.  This stuff is what I do all the time so

18   it's imprinted in my brain, but I don't have any written

19   notes.

20   **Q.**   All right, Dr. Israel, I'd like you to turn to your

21   expert report.

22          We can take the slide down for a moment.

23   **A.**   Is it in the exhibits?

24   **Q.**   Yeah, it should be in --

25          MR. DOIDGE:  Is there a separate binder for the

1    report?

2              MR. WALL:  First tab.

3              MR. DOIDGE:  Thank you.  Thank you, Mr. Wall.

4    BY MR. DOIDGE:

5    **Q.**  So I'd like you to turn to page 149 and paragraph 278.

6    And are you there?

7    **A.**  Yes.

8    **Q.**  In the last sentence of that paragraph, you write that

9    the comparison of the 2019 actual schedule to the 2023 NEA

10   schedule reflects, quote, "comparing what a fully formed NEA

11   would have done, given the 2019 industry conditions, to what

12   the stand-alone carriers actually achieved given those

13   conditions."

14             Do you see that?

15   **A.**  Yes.

16   **Q.**  And then if you could turn to paragraph 85 of your

17   report.  Just let me know when you're there.  If it's

18   helpful, it's on page 50.

19   **A.**  Okay.

20   **Q.**  And at paragraph 85 of your report, you write that,

21   quote, "The clean team sought to contrast how a fully formed

22   NEA would have run the airline-including capacity choices by

23   each carrier and joint planning on capacity allocation, as

24   described above, given 2019 conditions, versus how the

25   stand-alone carriers actually ran the airlines in 2019."

1          Did I read that right?

2    **A.**  Sorry, I was catching up to the sentence, so give me one

3    second.

4    **Q.**  Okay.

5    **A.**  Yes.

6    **Q.**  So is it fair to say that in your report that you were

7    stating that the intention of the clean team was to create a

8    schedule that would have existed in 2019, if defendants had

9    had the opportunity to make fleet decisions based on the NEA

10   existing in 2019, right?

11   **A.**  I'm not -- I'm a little confused about how you're saying

12   it.  This is what I tried to clarify before.  2019 is our

13   proxy for 2023.  But it's fair to say that using that proxy,

14   I'm trying to figure out what the NEA would have done, given

15   those demand conditions.

16   **Q.**  Well, at the time of the report, you tried to express the

17   view that --

18          If we could put up slide 20 again.  Or I guess

19   it's, perhaps, actually slide 21 now, from your

20   demonstratives today.

21          If we just focus on that third row, under the NEA,

22   rather than characterizing the v2 schedule as something that

23   they were looking forward to do in 2023, in your report you

24   characterize that as something that the clean team envisioned

25   would have happened in 2019 if they had the fleet resources

1   available in 2019, right?

2   **A.**   Again, I think it's best described -- I mean, there's lot

3   of words in the report where 2019 is mentioned and 2023 is

4   mentioned, and it can lead to confusion if we're not careful

5   because of this sort of COVID reset on the world.  So you can

6   call it 2019 or call it 2023, and either way it's designed to

7   say what the NEA would have done.

8           And I used the words "fully formed NEA" to capture

9   the idea that it would be once the NEA is fully in place,

10  which would mean 2023.

11  **Q.**   So is it 2023 that is being compared -- are we comparing

12  a 2023 world to a no-NEA world, to a 2023 NEA world,

13  Dr. Israel?  Or are we comparing a 2019 NEA world to a 2019

14  no-NEA world?

15  **A.**   The goal is to compare a post-COVID world, which is

16  generally called 2023 throughout the discussions, using 2019

17  as the best estimate we have of that.  Because the world --

18  the goal of everyone in the industry has been to try to get

19  back to 2019 by 2023.

20  **Q.**   All right, Dr. Israel.  With respect to just focusing on

21  that third row, now we'll just focusing on your

22  characterization of the no-NEA world and your

23  characterization that the actual 2019 schedule is the best

24  approximation of a stand-alone world.

25  **A.**   Okay.

**Q.**  Fair to say that the actual 2019 schedule doesn't reflect what the airlines would have been doing in 2023 on a stand-alone basis, right?

**A.**  It's a prediction, so it's what it says here.  It's the best, I think, and the clean team thought we could do to try to approximate what would happen in 2023.  It's not going to be exactly the same.  The baselines never are.  You can debate about them indefinitely, but here we have an industry trying to get back to 2019 levels and we know what happened in 2019.  So that's the sense in which it's a baseline.

**Q.**  And when you say what the clean team thought, Dr. Israel, you mean what the clean team thought in May of 2020 and June of 2020, right?

**A.**  I think I mean to be clear what the clean team -- the basis for the planning exercise --

**Q.**  Which occurred in May and June of 2020, right?

**A.**  My conversations did.  I guess I don't remember -- their planning exercise was done by the time I talked to them.  So I don't remember if it was April, but it was how they explained why the planning exercise of comparing these two worlds made sense as a way to measure what the NEA could do in a postCOVID world.

**Q.**  All right.  Well, Dr. Israel, notwithstanding your characterization of what the clean team was telling you, you did heard the testimony from Mr. Friedman that the clean

1    team's 2023 schedule reflected a lot of growth that JetBlue

2    would have done by 2023, anyway, right?  You heard that

3    testimony?

4    **A.**   That's not what I heard him say.

5    **Q.**   And Dr. Israel, using the actual 2019 schedule to compare

6    to the v2 2023 schedule, fails to account for the fact that

7    when American was flying many of its -- that American wasn't

8    flying many of its JFK slots in 2019, due to a waiver from

9    the FAA, right?

10   **A.**   Yeah, there was a waiver in place.  It uses 2019 actuals

11   in the baseline.  So there was a waiver in place that would

12   be reflected in that.  And there certainly was discussion

13   between us during the investigation of the effects that that

14   could have if you were to modify what the business case was

15   to, you know, take out that waiver.

16   **Q.**   Well, your failure to -- your use of the actual 2019

17   schedule then because of this waiver is artificially lowering

18   the stand-alone 2023 NEA scenario, right?  Because those

19   slots would have been flown by American in 2023 in a

20   stand-alone, right?

21   **A.**   Again, my use of the case was just to stick to what the

22   business did in evaluating the deal.  We -- there was

23   discussion in the investigation and then in the report that

24   said if you were to deviate from what they did in the deal

25   and decide to take out those slots, that would reduce the

1    benefit estimate by 14 percent.

2    **Q.**  Right.  And Dr. Israel, when you just responded that your

3    task was to stick to what the business did, what you mean is

4    that you were going to stick to what the clean team gave you;

5    is that right?  Is that what you meant?

6    **A.**  No, I meant what I said.  I mean, that's approximately

7    right.  The clean team gave me the business case that I asked

8    them carefully was that what you're going to present to the

9    board?  Was that the basis for the deal?  And then I was

10   going to stick to the planning they did in the ordinary

11   course.

12   **Q.**  Right.  And using the actual 2019 schedule, Dr. Israel,

13   that doesn't account for American's stand-alone plans to

14   up-gauge regional jets in New York City, right?

15   **A.**  I mean, it -- I don't know exactly how to answer that,

16   just because it is the 2019 September schedule, so it does

17   not build in for the NEA for anybody growth beyond that one

18   comparison date.  It is a snapshot apples to apples

19   comparison on that date.

20   **Q.**  All right.  So in the same vein, Dr. Israel, using the

21   2019 actual schedule doesn't capture the lease of 16 JFK slot

22   pairs to JetBlue, right?

23   **A.**  It doesn't capture any lease that wasn't happening on

24   that date.  There's obviously discussion of that lease and

25   why I didn't incorporate it in my report, but it captures

1   what was happening on that date as the way to, you know,

2   analyze the baseline, based on the decisions that were made

3   on that date.

4   **Q.**   And again, in the same vein, Dr. Israel, using the actual

5   2019 schedule doesn't reflect growth announced in 2019 or in

6   late 2019 or early 2020, but wasn't operating during the week

7   of September of 2019 that you're using in the base, right?

8   **A.**   Again, it's the -- it doesn't reflect changes by

9   stand-alones or the NEA that would have occurred after that.

10   It's what was happening on that date to give me an apples to

11   apples comparison at a point in time.

12   **Q.**   And you heard -- you heard Mr. Fintzen's testimony during

13   the trial, right?  You listened to that?

14   **A.**   Yes.

15   **Q.**   And so you're aware that Mr. Fintzen testified that there

16   was a set of routes that were announced between the time of

17   the September 2019 baseline and the time he was executing his

18   analysis in the spring of 2020, right?

19   **A.**   I think we have heard discussion from various people.  I

20   think they're called Retreats (phonetic) or something, they

21   were opportunistic COVIDites.  If that's what you're

22   referring to, I recall that.

23   **Q.**   Well, you also testified about the fact that American --

24   or JetBlue, excuse me, already had plans in place to increase

25   frequencies from Boston to LaGuardia from six to ten, right?

1   **A.**  I don't recall the specific testimony, certainly I'm

2   aware that people have testified that plans have been in

3   place, and that plans have sometimes come to pass and

4   sometimes not.

5   **Q.**  Do you recall during his testimony that he explained that

6   he had actually adjusted the baseline used in his analysis to

7   account for those newly announced routes?

8   **A.**  Yeah, I don't recall the specifics.  I'm very aware of

9   Mr. Fintzen's general testimony.  It certainly is fully

10  reflected in my -- as the source of my views on the NEA and

11  the analysis of it, but I don't remember that specific

12  testimony.

13  **Q.**  And in any case, you didn't make any adjustments that

14  would account for any new routes that Mr. Fintzen was

15  describing there, right?

16  **A.**  Right.  Again, I'm not making adjustments for adds or

17  subtracts by any of the sort of three scenarios I am

18  comparing, meaning AA, JetBlue, and NEA.  I'm comparing them

19  as of the date for the purposes of clean team analysis to

20  reflect the business case.

21  **Q.**  And more generally, Dr. Israel, using the actual 2019

22  schedule doesn't reflect other stand-alone growth by JetBlue

23  and American that would have -- that would have occurred from

24  2019 to 2023, right?

25  **A.**  I mean, there's a lot in that question, so I don't really

1    know -- it doesn't reflect changes, whether they were growth

2    or whether the trend of decline continued that we've seen

3    historically.  It's a snapshot as of a date in order to let

4    me do an apples-to-apples comparison.

5    **Q.**  Are you suggesting, Dr. Israel, that JetBlue would have

6    reduced ASMs in, say, for example, Boston, between 2019 and

7    2023?

8    **A.**  I'm suggesting we don't know what would have happened

9    over that time period.  If you asked me, as an economist,

10   what's the best prediction that I have, given lots of

11   documents saying lots of different things, it would be the

12   trends that I see.  And so those tell me that the combined

13   American and JetBlue had been steadily declining in New York.

14   One had been growing, and one had been shrinking in Boston.

15   One had plateaued in Boston.  I could try to go put all of

16   those trends in place, but then we'd fight about it forever.

17   So I stuck to what the business team did to give me an

18   apples-to-apples comparison on that date.

19   **Q.**  The business team being the clean team?

20   **A.**  Yeah, the business team being the clean team and as the

21   planning process that the parties went through.

22   **Q.**  Well, Doctor, you don't deny -- or maybe you do -- that

23   JetBlue had stand-alone growth plans for Boston?

24   **A.**  I don't deny that there are plans, the growth plans at

25   JetBlue and American that sometimes come to pass and

1  sometimes don't.  Right?  All I'm denying is saying that I

2  would never just take those growth plans and make them a

3  baseline, or I would always get the baseline wrong based on

4  what happens in the industry.  So I would prefer to just use

5  a given date.

6  Q.  Well, let's focus just on JetBlue, because my answer was

7  question was just focused on JetBlue, Dr. Israel.

8           So again, you don't deny that JetBlue had

9  stand-alone growth plans in Boston, correct?  Yes or no.

10 A.  Sorry, I don't deny that there were such plans in their

11 records.

12 Q.  And again, you heard the testimony of Dr. Friedman and

13 the documents that were shown to Dr. Friedman -- to

14 Mr. Friedman, excuse me -- that reflect his view that the v2

15 schedule that was being used by the clean team was capturing

16 a lot of growth that JetBlue would have done anyway, correct?

17 A.  Again, that's not how I would summarize that testimony.

18 But I certainly heard him, and I have read all of those

19 documents repeatedly.

20 Q.  All right.  And now, thinking more broadly, not just at

21 what's happening at the NEA airports, but thinking across the

22 networks, it's fair to say that your comparison in that third

23 row, that's not going to account for any reduction in flying

24 in non-NEA airports that might be done to fund an increase in

25 flying at the NEA airports, right?

1  **A.**  I mean, that -- as I understand what the business case

2  was, and I think this was in Mr. Wall's question, too, it

3  was -- it operated under the view that JetBlue could obtain

4  those plans and did not incorporate the need to reduce flying

5  elsewhere.

6  **Q.**  Well, let me ask you my question again, and see if you

7  can just answer it directly.  Your comparison does not

8  account for any reduction in flying in non-NEA airports to

9  fund any increases in flying at the NEA airports, right?

10  **A.**  And if the answer to that is yes, I was just trying to

11  clarify that's, again, because --

12  **Q.**  You don't need to clarify.  Counsel will have plenty of

13  opportunity for you to clarify, Dr. Israel.  If you could

14  answer the questions more directly, it would make this

15  process much quicker.

16  **A.**  Okay.

17  **Q.**  And Dr. Israel, again, thinking about the broader

18  networks of the two airlines, your comparison based on that

19  third row doesn't account for any reduction in flying that

20  American might undertake at, say, Philadelphia, in light of

21  it being able to carry connecting traffic that it once

22  carried over Philadelphia, now carrying that connecting

23  traffic over New York City and Boston, right?

24  **A.**  I'm sorry, I struggle to answer that with a yes or no.

25  Because implicit is a premise is that they might do that.  I

1    certainly considered everything I could on whether that

2    premise was likely.

3    **Q.**  Your analysis doesn't allow for that, though, right?

4    **A.**  Yeah, my analysis --

5    **Q.**  To assume that there was no change, your analysis assumes

6    no change in others aspects of American's network, correct?

7    **A.**  That's not correct.  They planned a full network in the

8    clean team exercise.

9    **Q.**  In the clean team exercise, did it change the amount of

10   flying outside of Philadelphia on American's network?

11   **A.**  I would have to go look.  But they planned a full

12   network.  I know on the American's side, sort of in jargon,

13   they said they kept the block hours fixed so they wouldn't

14   need to fund the flying with other aircraft.  And then given

15   that, they planned a full network.

16   **Q.**  Well, I appreciate that, Dr. Israel, so maybe I should

17   ask more directly.

18            Is it fair to say that one reason American didn't

19   have to change the block hours is because on net, in these

20   clean team runs, American doesn't actually increase capacity

21   at the NEA airports, right?

22   **A.**  We could look at the clean team results.  I don't think

23   that's right in terms of seats.

24   **Q.**  Is it right in terms of frequencies?

25   **A.**  It may well be.  There is a fixed number of slots and

1    gates and JetBlue increased, so I would have to look.  So my

2    recollection, since you're asking me, if JetBlue increases

3    frequencies at most of the airports, there's a fixed number

4    of slots in some cases, so American comes down.  But American

5    up-guages and increases seats.

6    **Q.**  But in terms of frequencies, American actually is flying

7    less frequencies in Boston than in the comparison that you do

8    in that third row, right?

9    **A.**  Again, I want to look to remember -- what I recall is

10   American flying less and JetBlue flying more.

11   **Q.**  And the same is true for LaGuardia, right?  American is

12   flying fewer frequencies in LaGuardia in 2023 under the NEA

13   than it was flying in 2019?

14   **A.**  I think this situation is what I described in Boston.

15   **Q.**  Dr. Israel, I want to understand a bit more about how you

16   gained this understanding that the clean team believe its

17   best prediction that the stand-alone 2023 flying was the

18   actual 2019 actual schedule.  So let me start by referring

19   you to your deposition, if you would and I believe that might

20   be the second -- did we give you a separate -- that's in a

21   separate binder.  Thank you.

22   **A.**  Okay.

23   **Q.**  If you could turn to page 187 of your deposition.  And if

24   you look at line 1, there you were asked a question -- are

25   you there?

1    **A.**   Yes.

2    **Q.**   Okay.  You were asked the question: "Did you have any

3    conversations with the clean team that involved discussing

4    alternative ways of preparing counterfactuals?"

5                And if you want to just take a moment, it's a

6    little bit of a long answer, so if you want to take a moment,

7    and read that answer to yourself, and then I'll have a

8    specific question.

9                THE COURT:  What page are you on, again?

10               MR. DOIDGE:  I'm sorry, Your Honor.  We're on

11   page 187 of Dr. Israel's deposition in this matter.

12               THE COURT:  Yes.  Thank you.

13               THE WITNESS:  Okay.

14   BY MR. DOIDGE:

15   **Q.**   All right.  And what I want to focus on with respect to

16   your answer is that part of your answer where you state,

17   quote, "I don't recall any conversation that questioned this

18   idea of taking a stand-alone actual world and taking an NEA

19   world against those same conditions as the appropriate thing

20   to do."

21               Fair to say that, in that answer, you were

22   referring to your comparison that we see on the third row,

23   that your comparison of the 2019 actual schedule and the v2

24   2023 schedule, right?

25   **A.**   Right.  That's the comparison.

1    **Q.**  And so my question for you is whether or not you stand by

2    that answer today.

3    **A.**  I mean, sure.  You asked me if I had discussed

4    alternative ways of preparing counterfactuals with them and

5    what happened is what I've described.  I had a call with them

6    or more than one, where I asked them what they were doing,

7    and they explained it to me, and it made sense.  So I didn't

8    question that idea.  Instead I asked them about other things

9    we might look at to understand other possibilities that DOJ

10   would ask about.

11   **Q.**  All right.  So just -- I think this is a simple yes or

12   no.  So is it your -- sitting here today, you still stand by

13   the testimony that you did not have any conversations that

14   questioned the idea of comparing the 2019 actual schedule to

15   the 2023 v2 schedule as an appropriate way to build a

16   counterfactual?  It's a yes or no, Dr. Israel?

17   **A.**  Well, I can't answer that yes or no.

18   **Q.**  Okay.  We'll move on, then.

19          Dr. Israel, looking again at slides 20 -- or 21, I

20   guess I should be saying, from your demonstrative this

21   morning, you have heard testimony during the trial that at

22   the end of May 2020, the clean team had developed a v4

23   schedule that would allow examination of the 2019 actual base

24   with the 2019 NEA, right?

25   **A.**  I don't think I've heard v4 characterized in that way.  I

1   certainly am very similar with v4.  It's on the slide.  And

2   understand it to be a schedule in which the NEA is

3   constrained to operate effectively with the same capacity as

4   the stand-alones.

5   Q.  And doing that would allow you to compare to reflect --

6   well, we're talking about the first row in your

7   demonstrative, right?  In your demonstrative slide 21.  Right

8   now we're talking about the first row, correct?

9   A.  Right.  But the language from the first row is from

10  Dr. Town, so it's not exactly, but yes, it would compare a

11  2019 actual schedule to a schedule in which, the way I think

12  about it, the NEA was dropped on the world from above in

13  2019, so it had no ability to add capacity and had to operate

14  with the same capacity.

15  Q.  Okay.  So now you want to characterize it again as a 2019

16  versus 2019 comparison.  Are we back to your third row?  Are

17  you adjusting your third row again?

18          MR. WALL:  Objection.  Form.

19          THE WITNESS:  I don't understand the --

20          MR. DOIDGE:  I'll withdraw, Your Honor.

21  BY MR. DOIDGE:

22  Q.  And Dr. Israel, I'd like you to turn back to your expert

23  report.  And if you can go to page 49, Footnote 98.  And if

24  you look at the latter part of footnote -- well, first, let

25  me just ask, you understand Footnote 98 to be talking about

1  the v4 schedule, right?

2  **A.**  Yes.

3  **Q.**  And then in the latter part of this footnote, you

4  highlight that it was always understood that there would be

5  fleet growth, right?

6  **A.**  Yes.

7  **Q.**  And so then you characterize, at the end of the sentence,

8  that the v4 schedule exercise was an "internal check," right?

9  **A.**  That's how I understand it.

10  **Q.**  You don't provide any citation to support your

11  characterization of the clean team understanding of that in

12  that portion of your report, correct?

13  **A.**  I don't provide a separate citation here.  It would be

14  part of these same conversations.

15  **Q.**  Part of these same conversations that we're relying

16  wholly on your memory of, right?

17  **A.**  Definitely relying on my memory.  They're very imprinted

18  on me.  This is the basis of everything that I've been doing

19  for two and a half years.

20  **Q.**  All right.  And just to be clear, Dr. Israel, all of

21  those conversations were happening when counsel was present,

22  right?

23  **A.**  I expect so, but, yeah.  I imagine so.

24  **Q.**  It's a yes or no, Dr. Israel.  Those conversations

25  occurred when either in-house American counsel or outside

1    American counsel, or outside JetBlue counsel or in-house

2    JetBlue counsel, some counsel was present for every one of

3    those conversations, correct?

4    **A.**   I expect so.  I can't say that I remember who was on

5    every call, but I would imagine that counsel was on every

6    call.

7    **Q.**   All right.  We can put the footnote aside.

8              Let's go back to your demonstrative again.  Slide

9    21.  And again, it will show up as slide 20, because we're

10   using -- we have the electronic version from last week.

11             So now I want to focus on the second row,

12   Dr. Israel.  You heard testimony from Mr. Fintzen that the

13   clean team was working on a 2023 no-NEA schedule that would

14   reflect stand-alone growth from 2019 to 2023, right?

15   **A.**   I don't recall that specific testimony.  Certainly

16   Mr. Fintzen is someone I've talked with about this

17   possibility at some length.  It was one of the people who

18   told me that it was impossible to do this in a meaningful way

19   during COVID.

20   **Q.**   And notwithstanding your characterization of the

21   conversations that you had with Mr. Fintzen, you're not

22   recalling right now that he testified, here at trial, that he

23   engaged in efforts to build a 2023 no-NEA schedule that would

24   reflect growth from 2019 to 2023?

25             MR. SCHWED:  Objection.  Mischaracterizes the

1    testimony in this trial.

2              THE COURT:  Can you just ask him whether he recalls

3    Mr. Fintzen saying that?

4    BY MR. DOIDGE:

5    **Q.**  Do you recall Mr. Fintzen saying that?

6              THE COURT:  Is that what the question is?

7              MR. DOIDGE:  That's the question, Your Honor.

8              THE COURT:  Why don't you say --

9              Overruled, you can ask him what he recalls, whether

10   he recalls whatever you say it is.

11   BY MR. DOIDGE:

12   **Q.**  Do you recall Mr. Fintzen testifying at trial that he was

13   making efforts with respect to developing a 2023 no-NEA

14   schedule that would reflect stand-alone growth from 2019 to

15   2023?

16   **A.**  I don't recall him saying something in that form, no.

17   **Q.**  Do you recall documents that were presented during

18   Mr. Fintzen's direct examination that indicated

19   communications that he had, where he explained that they were

20   undertaking that exercise in late May 2020?

21   **A.**  Well, I mean, I broadly understand because I reviewed the

22   documents themselves and talked to him while it was going on.

23   I'm happy to explain that.  I don't recall --

24   **Q.**  I'm not asking you that.

25   **A.**  Okay.  I don't recall exactly what he said here.  All I

1    can explain is what I know was happening.

2    Q.  You don't recall the specific documents where, in his own

3    words -- so, for example -- and we can try to pull it up for

4    you, I don't have it handy at the moment -- where Mr. Fintzen

5    is explaining to the CFO of JetBlue that he is asked -- for

6    the regulatory case, that he is asked for the development of

7    a scenario where they are looking at what their growth would

8    be without Connie for 2019 and 2023?

9           THE COURT:  Are you asking him just whether he

10   recalls all of that?

11   BY MR. DOIDGE:

12   Q.  Do you recall all of that?

13   A.  I'm sure I recall the documents.  Because I know what

14   happened.  We were having conversation about what we needed

15   in a regulatory case, anticipating what we thought that you

16   were going to ask us at DOJ.  So I asked Mr. Fintzen, among

17   others, whether they could try that, because I expected you

18   to ask the question, and they went and tried it for a few of

19   days and they told me it was impossible to do -- I should

20   just make sure I'm clear, impossible to do in a meaningful

21   way.

22   Q.  And Dr. Israel, I want to make sure that I understand

23   your testimony.  Just to be clear, it's impossible for

24   JetBlue to have constructed a stand-alone growth plan for

25   2023.  That's your testimony?

1     **A.**   My testimony is what I said.  I was told that that

2     exercise would be meaningless in the middle of COVID.

3     **Q.**   All right.  But nonetheless it was possible for the clean

4     team to develop a 2023 schedule for the NEA.  That's your

5     testimony?

6     **A.**   By using 2019 as the proxy, by basing everything off of

7     what was happening in 2019.

8     **Q.**   Well, except they didn't do that, right?  They assumed

9     what was on the existing order book to look forward to 2023,

10    right?

11    **A.**   Everything based on 2019 conditions, just like I've

12    described, but they explicitly added capacity and used the

13    order book as the guide for what would be available.  To be

14    clear, there's no question that they added capacity to the

15    NEA.  It was all based on what they thought the two different

16    setups would optimally fly against 2019 conditions, which

17    they were using as their best proxy for what 2023 would look

18    like.

19    **Q.**   Well, we'll move on in a second, Dr. Israel.  But let me

20    just point out, again, referring to your slide 21, in that

21    third row, you are describing what the clean team did as

22    their best prediction of stand-alone 2023 for the NEA, right?

23    **A.**   Right.  That's why it goes on to put "2019 actual" in

24    parenthesis.

25    **Q.**   And in any case, Dr. Israel, you acknowledge that you

1    discussed with the clean team developing potential

2    counterfactual that are reflected in rows 1 and 2 of slide 21

3    of your demonstrative, right?

4    **A.**   Yes.  Literally whether there would be something like a

5    v4 and whether they could do a 2023 schedule; or the subject

6    of conversation explicitly telling them that those were

7    things that I thought we would need to do because DOJ would

8    ask, which led them to respond with frustration about why

9    those things didn't make sense.

10   **Q.**   All right.  And just to try to get the chronology a

11   little clearer, let me take you through some steps.  So if I

12   could ask you to turn to Plaintiffs' Exhibit 1146.  It's in

13   your binder.

14           MR. DOIDGE:  And Your Honor, Plaintiffs' Exhibit --

15   I move that -- I move for Plaintiffs' Exhibit 1146 to be

16   admitted into evidence.  This is one of the documents that

17   was produced as a result of the privilege challenge.

18           MR. WALL:  No objection.

19           THE COURT:  Admitted.

20           (Plaintiffs' Exhibit No. PX-1146 admitted into

21           evidence.)

22           MR. DOIDGE:  So if we can put that up.

23   BY MR. DOIDGE:

24   **Q.**   And, Dr. Israel, let's focus first on the middle of the

25   page.  You see that there was an invitation sent by Mr. Wark,

1  right?

2  **A.**  Yes.

3  **Q.**  And Mr. Wark is American's in-house counsel?

4  **A.**  Yes.

5  **Q.**  And he's ending an invitation for a meeting that's going

6  to occur on May 20th at 3:00 p.m., correct?  Central time?

7  **A.**  Yes.

8  **Q.**  And you're invited to the meeting, right?

9  **A.**  It looks like it, yes.

10  **Q.**  All right.  And now if we can look up to the top of the

11  page, you'll see that earlier that day, on -- earlier on the

12  day of the May 20th, Mr. Wark forwarded that invitation to

13  Mr. Pack, Mr. Bhargava, and Mr. Schweinzger, correct?

14  **A.**  It looks like it, yes.

15  **Q.**  And those are all three individuals on the American clean

16  team, right?

17  **A.**  Yes.

18  **Q.**  And fair to say, Dr. Israel, that at this point in time,

19  you had not received any Raven outputs from the v2 schedule,

20  correct?

21  **A.**  I don't know.  I don't remember the days that well.

22  **Q.**  Okay.  We'll get to it in a minute.

23      So let me ask you to turn now to Plaintiffs'

24  Exhibit 297.

25      MR. DOIDGE:  And this is already in evidence,

1   Your Honor.

2   BY MR. DOIDGE:

3   **Q.**  And if you can turn to the second page?

4   **A.**  Hang on.  I'm not there yet.

5   **Q.**  Okay.

6   **A.**  Okay.

7   **Q.**  If you could turn to the second page, you'll see that

8   Mr. Pack is sending an e-mail on May 21st, right?

9               THE COURT:  It's also on the screen, if you prefer.

10              THE WITNESS:  Okay.

11   BY MR. DOIDGE:

12   **Q.**  And so Mr. Pack is sending this invitation on May 21st,

13   and you see -- on this e-mail, on May 21st, and you see the

14   e-mail relates to requesting that JetBlue provide a response

15   to fill out the v4 schedule from the JetBlue side, right?

16   **A.**  Where is the request to JetBlue?

17   **Q.**  Well, Dr. Israel, this is an e-mail to Mr. Fintzen,

18   right?  Among others?

19   **A.**  Maybe I'm looking at the wrong thing.

20   **Q.**  It's on the screen, Dr. Israel.

21   **A.**  No, that's the one I was looking at.  I see an e-mail

22   from Jordan to a whole bunch of people, and I don't know who

23   he was directing it to.  And I don't see, in this, an

24   explicit request for anything from JetBlue.

25               Oh, here it is.  I see it.  "We can chat about what

1    ideas you guys might have."  So I see the line that says, "We

2    can chat about what idea you guys might have to fund increase

3    flying on the B6 side."

4            So I don't - it seems fair he was asking JetBlue at

5    least that much.

6    **Q.**  Well, and Mr. Pack describes the v4 schedule as "This

7    schedule serves as our best guess as to what would have

8    happened in 2019 if AA and B6 had the partnership we were

9    jointly proposing."

10           Do you see that?

11   **A.**  Yes.

12   **Q.**  And this is all occurring just one day after you had met

13   with Mr. Pack and Mr. Bhargava and Mr. Schweinzger, correct?

14   That meeting on May 20th that we were just looking at.

15   **A.**  Yes, it looks like it was one day later.

16   **Q.**  All right.  And let's go forward in time a little bit,

17   and if we go -- you stay on that document, if you look at the

18   first page of that document at the very bottom, you will see

19   that Mr. Fintzen replies on May 29th.  Right?

20   **A.**  Yes.

21   **Q.**  And he is replying at 7:56 a.m., correct?

22   **A.**  That's what it says, yeah.

23   **Q.**  And if you look at the top of the first page, you'll see

24   that, in his reply, that what he is explaining is that he has

25   provided the v4 schedule from JetBlue in the shared drive

1    that the clean team was using, right?

2    **A.**   It looks like it.  The "v4 data back with adjusted

3    frequencies," which I think would include the schedule.

4    **Q.**   All right.  And now let me ask you to turn to Plaintiffs'

5    Exhibit 1145.

6            MR. DOIDGE:  And Your Honor, while the witness is

7    locating that, Plaintiffs' Exhibit 1145, we would move to

8    admit into evidence at this time.  This was another one of

9    the documents that was produced as a result of the privilege

10   challenge.

11           MR. WALL:  No objection.

12           THE COURT:  Admitted.

13           (Plaintiffs' Exhibit No. PX-1145 admitted into

14           evidence.)

15   BY MR. DOIDGE:

16   **Q.**   And Dr. Israel, if you look about halfway down the page,

17   you'll see that there's a calendar invitation sent by

18   Mr. Paik.  Do you see that?

19   **A.**   I do.

20   **Q.**   Do you understand Mr. Paik is one of the attorneys at

21   Latham & Watkins representing American?

22   **A.**   Yes.

23   **Q.**   And he's sending this invitation on May 29th at 9:53

24   a.m., right?

25   **A.**   I see that, yes.

**Q.**  So just a couple of hours after Mr. Fintzen had loaded the v4 schedule into the shared drive, right?

**A.**  Sorry, I forget the date of that earlier one.  But if you're saying it's a couple of hours later, then I believe you.

**Q.**  Okay.  And the meeting invitation is for a meeting at 5:15, that same day, Eastern Time.  Right?  5:15 p.m.

**A.**  Yes.

**Q.**  And so that would be 4:15 p.m. central time, right?

**A.**  Yes.

**Q.**  And you heard Mr. Pack's testimony that, during the meeting that occurred later that day, that this reflects being scheduled, that that meeting on May 29th that he and Mr. Schweinzger exchanged text messages that were reacting to statements being made during the call that they were having with you, right?

**A.**  Yes.  I'm happy to give context on the call, if you'd like.

**Q.**  So Dr. Israel, I'm not going to ask you to go into a great amount of detail, but just to make sure that we're all on the same setting, that those text messages include the text messages where Mr. Schweinzger writes to the effect of, "If we show full network results, no bueno," right?  We're talking about that same set of text messages, correct?

**A.**  I recall there was some discussion from Mr. Schweinzger

1    about which text went with which call, so I don't remember

2    the specifics of that.

3    **Q.**  But you're not questioning -- I just want to make sure I

4    understand, you're not suggesting any -- you're not

5    suggesting that you disagree at all with Mr. Pack or

6    Mr. Schweinzger's testimony that those text messages were

7    written --

8            THE COURT:  How would he know?

9            MR. DOIDGE:  Well, just in terms of the -- well, he

10   was present at the meeting, Your Honor.

11           THE COURT:  Yeah, but he doesn't know -- he wasn't

12   a participant in the text thread, so how would he know, other

13   than he can read the text messages, date stamped and time

14   stamped as they are, like you and I can, but how would he

15   know whether -- and he knows what the witnesses said, to the

16   extent he heard and remembers, but how would he have any

17   other information about when they were saying it?

18           MR. DOIDGE:  And I didn't mean to be asking about

19   what they were saying, Your Honor.

20           THE COURT:  Or when.

21           MR. DOIDGE:  Other than what he may know from

22   having read the text.  All I was trying to get at was whether

23   or not he had any understanding --

24           Well, let me step back.

25   BY MR. DOIDGE:

1   **Q.**  Do you understand, Dr. Israel -- you understand that

2   Mr. Pack and Mr. Schweinzger testified -- you heard their

3   testimony that those text messages were -- occurred during a

4   meeting with you, right?

5   **A.**  Again, there were a couple different calls.  I think at

6   least some of them, I recall them testifying, occurred during

7   a meeting that I was on.

8   **Q.**  Okay.  But I just want to make sure, you don't have any

9   reason to question whether or not those text messages

10  occurred during a call with you.  You're not calling that

11  into question, right?

12  **A.**  I don't know one way or the other.  The first I ever

13  heard of the text messages was during this litigation.

14  **Q.**  And Dr. Israel, you met just a few days after May 29th,

15  after this May 29th meeting, with the American clean team,

16  correct?  You met on June 3, 2020.

17  **A.**  I don't remember the date.  If it's in -- I believe you.

18  There was a lot of work for the -- to understand what they

19  had done and prepare to talk to DOJ going on at this time,

20  but I don't remember this specific date.

21              MR. DOIDGE:  That's fine.

22              If we can pull up Plaintiffs' Exhibit 1134?

23              And Your Honor, this is already in evidence.

24              THE COURT:  Okay.

25  BY MR. DOIDGE:

1    **Q.**  So Dr. Israel, you see that this is a calendar --

2    calendar invite to you for a meeting on June 3rd at noon,

3    right?

4    **A.**  Yes, that looks correct.

5    **Q.**  And other people being invited to the meeting are

6    Mr. Pack and Mr. Schweinzger and Mr. Bhargava, right?

7    Members of American's clean team?

8    **A.**  And Matt McElfresh, who was, at the time, someone who was

9    working with them on Raven.

10   **Q.**  And Dr. Israel, the subject of this meeting is described

11   as "counterfactual."  You see that in the subject line?

12   **A.**  "Garland counterfactual" I see.

13   **Q.**  And then you see in the description that Mr. Paik

14   provides for the meeting, he explains that it's going to

15   be -- the meeting is for the counterfactual discussion,

16   right?

17   **A.**  I see that.

18   **Q.**  And if we could now turn Plaintiffs' Exhibit 374A to get

19   a little bit more context on that meeting.

20          And you're familiar with Plaintiffs' Exhibit 374A,

21   right?  This is already in evidence.  It's a series of text

22   messages between Mr. Bhargava and Mr. Schweinzger, on

23   June 2nd, right?

24   **A.**  That looks right.  Again, this is something that I think

25   I first saw from you at my deposition.  But that looks like

1    what you're describing.

2    **Q.**  Well, just to be clear, I don't know that I did show this

3    to you at your deposition.

4    **A.**  My apologies.  I saw some things that look like this at

5    my deposition.

6    **Q.**  So certainly portions were redacted, so I couldn't have

7    shown you the redacted portions.  Of that, I'm sure.

8              In any case, Dr. Israel, you see that

9    Mr. Schweinzger is identifying that there's going to be a

10   meeting the following day with Compass, right?

11   **A.**  I mean, it says, "Here we have an internal call with

12   Compass tomorrow guy."

13   **Q.**  Right.  And a little lower down, do you see where

14   Mr. Bhargava notes that it is at noon?

15   **A.**  "That's noon to 1."  I see.  I don't know what that

16   refers to.  Maybe it's the same meeting.  I have no idea.

17   **Q.**  And we look above that, immediately above that,

18   Mr. Schweinzger is writing that the meeting -- well, "At the

19   meeting we explain to Compass what they need to tell them."

20   Right?  Do you see that?

21   **A.**  This we definitely did talk about at my deposition,

22   because it's the same answer.  I can read the text, "then

23   with them after we explain to Compass what they need to tell

24   them."  Those are the words.  I don't know what they mean.

25   They are kind of hard to parse.

1    **Q.**   Okay.  And I think what we couldn't talk about at your

2    deposition, because it was redacted at the time, was if you

3    look below that, it continues, Mr. Schweinzger continues,

4    "That they need to make the regulatory case."

5             Do you see that?

6    **A.**   I see that listed here, with no time, I guess -- or

7    maybe -- but yeah, I see it.  I think we did talk about

8    that -- maybe we didn't talk about that one.  But, yes, I see

9    that text.

10   **Q.**   And Dr. Israel, you know, in thinking about -- in

11   thinking about what occurred at the meeting on June 3rd, at

12   noon, with American, is it fair to say that what occurred

13   there is that the American clean team, members of the

14   American clean team explained to you what you needed to

15   subsequently tell JetBlue with respect to developing the

16   regulatory case?

17   **A.**   Not to my recollection.  I have no memory of them telling

18   me what to tell JetBlue ever.

19   **Q.**   Well, you did meet, on June 3rd, with JetBlue's clean

20   team separately later that day, right?

21   **A.**   I don't recall if it was June 3rd.  As I think I told you

22   in my deposition, I certainly met with both clean teams.  And

23   we were in the process of asking the questions to anticipate

24   what you would ask us, to get the information that we needed

25   to meet with DOJ.

1   **Q.**  Dr. Israel, let me ask you to look at Plaintiffs'

2   Exhibit 509.  And you can see that Plaintiffs' Exhibit 509.

3   You'll see that that reflects a meeting invitation for

4   4:00 p.m. sent by Mr. Paik, correct?

5   **A.**  Yes.

6   **Q.**  And the purpose of the meeting is to discuss the

7   "Connie/Garland counterfactual issue," correct?

8   **A.**  Yes.  I mean, that's consistent with my recollection of a

9   meeting to talk about what we would need to meet with DOJ.

10   **Q.**  And again, Dr. Israel, this is going to go a lot laster

11   if you just answer my question.

12          MR. WALL:  Object to that characterization.  He's

13   making --

14          THE COURT:  Sustained.  For all of you, it would be

15   helpful if you just asked questions, and it's a general

16   proposition, not just for the current counsel, but for all of

17   you, if you just asked questions without commentary.  I

18   understand where you're transitioning to.  You don't

19   generally need commentary to transition.  And generally

20   speaking, shorter questions with shorter words are more

21   effective in my experience than longer questions with longer

22   words.

23          MR. DOIDGE:  Very good, Your Honor.

24          THE COURT:  Go ahead.

25   BY MR. DOIDGE:

1   **Q.**  So Dr. Israel, let me ask you to now turn to -- I

2   appreciate that this document doesn't necessarily have all

3   the information, so we've provided you with Plaintiffs'

4   Exhibit 509A.  509A reflects the metadata?

5   **A.**  Where is 509A?

6   **Q.**  It should be right in front of 509 on your binder.  I

7   will pull it up on the screen for you.

8   **A.**  I don't see a 509A -- oh, I think it's in the same tab.

9   Okay.

10   **Q.**  So you see in the metadata that you -- you're invited to

11   the meeting that's happening at 4:00p.m. on June 3rd?

12   **A.**  Yes.

13   **Q.**  And other invitees include Mr. Fintzen from the JetBlue

14   clean team, right?

15   **A.**  I see that, yes.

16          MR. DOIDGE:  All right.  We can take that down.

17   BY MR. DOIDGE:

18   **Q.**  And Dr. Israel, just stepping back for a moment, it's

19   fair to say that you recall discussing with the clean team a

20   counterfactual that involved comparing the actual 2019

21   schedule with the v4 schedule, right?

22   **A.**  Yeah, I recall that I asked if that was possible, because

23   I thought that you might ask for that.

24   **Q.**  All right.  And if we could put up slide 21 from your

25   demonstratives earlier today.

1          So that's the first row, again, right?

2     **A.**  Correct.

3     **Q.**  And you didn't end up --

4          THE COURT:  But v4, just so I can keep this all

5     straight, the v4 is NEA 2019 fleet compared to 2019 demand in

6     Raven.

7          THE WITNESS:  Correct.  So the two columns, no-NEA

8     and NEA, would have identical fleets.

9          THE COURT:  Right.  Go ahead.

10    BY MR. DOIDGE:

11    **Q.**  And you didn't perform a consumer benefits analysis based

12    on those two, correct?

13    **A.**  I was never given any Raven output or anything.  I mean,

14    I was told quite firmly that it didn't reflect what the NEA

15    would do.  I told them you guys would still ask so I would

16    like to see it, so I was prepared for the question.  They

17    told me that it didn't make sense and it didn't go farther.

18    **Q.**  Dr. Israel, focusing on the second row, you do also

19    recall discussing developing a stand-alone 2023 scenario that

20    reflects stand-alone growth from 2019 to 2023, correct?

21    **A.**  Yeah, I don't think I ever told them it should reflect

22    stand-alone growth.  I think I told them you guys would

23    likely ask if you planned a 2023 schedule now, what it would

24    look like, don't just use 2019, and they told me it would be

25    a meaningless exercise.

1   **Q.**  In any case, you didn't perform a consumer benefits

2   analysis based on that comparison, right?

3   **A.**  I was never given a schedule or any output.  I was told

4   it didn't make sense.

5   **Q.**  And Dr. Israel, let me ask now to turn to Plaintiffs'

6   Exhibit 454.  And this is -- Plaintiffs' Exhibit 454 are

7   American's responses to interrogatories, which are by the

8   Department of Justice in this case, and I would just like you

9   to direct your attention to page 10 and interrogatory number

10   5.

11         I'm looking at the question that the DOJ posed, DOJ

12   requested information that included information about

13   instances where Compass Lexecon discussed with one or more

14   members of the clean team actual or potential schedules or

15   adjustments to schedules or scenarios for evaluating the

16   potential relationships between American and JetBlue."

17         Do you see that?

18   **A.**  I do.

19   **Q.**  And then if we turn to page 11, which has American's

20   answer, if you go to the bottom, and there American answered

21   that "Compass Lexecon did not discuss or provide any input

22   or -- to one or more members of the clean team relating to

23   actual or potential schedules or scenarios for evaluating

24   potential relationships between American and JetBlue.

25   Discussions by a Compass Lexecon with members of the clean

1    team were limited to Compass's analysis of the outputs of the

2    clean team process."

3                Did I read that correctly?

4    **A.**   You did.

5    **Q.**   But Dr. Israel, you did discuss potential schedules with

6    the clean team, right?

7    **A.**   Well, what we've just been talking about.  I discussed

8    questions that I had about things that you might ask for.  So

9    I didn't write this, but I would characterize it as correct,

10   I didn't ask for anything to evaluate a potential

11   relationship.  I asked questions about what they had done to

12   try to anticipate what you might ask me.

13   **Q.**   Well, fair to say, Dr. Israel, you did discuss the v4

14   schedule, the potential v4 schedule with the clean team,

15   right?

16   **A.**   Yeah, I discussed v4.  Again, in my mind, it was never a

17   potential schedule.  It was a sort of sensitivity case to

18   anticipate what you might ask.

19   **Q.**   And you also discussed the possibility of putting

20   together a schedule that would reflect stand-alone American

21   and JetBlue growth between 2019 and 2023, right?

22   **A.**   With the same context, but yes, that's what we just

23   discussed, in the context of trying to understand and prepare

24   for what you might ask.

25   **Q.**   Okay.  You can put that aside.

1          Let's shift gears a little bit, Dr. Israel.  And I
2     wanted to talk to you a little bit about your discussion
3     earlier today about capacity as a summary statistic.  So I
4     take it, Dr. Israel, that you're -- it is your view that you
5     kind of use capacity as a summary statistic for the effects
6     of the transaction; is that right?
7     **A.**   I said if you could look at one thing, I think capacity
8     is important.  I mean, I think I said my summarized statistic
9     given the issues here would be what's happened to capacity in
10    New York.  But generally, I think capacity is a good summary
11    statistic of what's happening to supply.
12    **Q.**   And by that you mean that you would look at what happens
13    to capacity across the full networks of American and JetBlue
14    to assess the competitive effect of the transaction, right?
15    **A.**   I mean, again, I think it would focus on New York and
16    Boston.  I think you could look at capacity everywhere and
17    then if somebody wanted to make some -- followed that path in
18    some other place and make some argument about it, they could.
19    So a whole network could be relevant.  If somebody, you know,
20    established something about it.  But I think your focus would
21    be on capacity in New York and Boston.
22    **Q.**   Well, Dr. Israel, you would agree that if the NEA leads
23    to less capacity across the full networks of American and
24    JetBlue, that it would result in that harm, right?
25    **A.**   Yeah, I don't know the answer to that.  I mean, that's

1   why I spend a lot of time talking about markets and so on.

2   It depends on -- somebody would have to take that supply

3   shift, put it in a particular market, understand the

4   competition in that market, and do an assessment to make a

5   determination so you could do a benefits calculation like I

6   did.  So capacity would be a summary statistic, and then if

7   you wanted to trace it down for some other market, you could

8   need to do the necessary work.

9   Q.  You would need to look at each route individually?  Is

10  that what you're saying?

11  A.  I think if you want to show benefits or harms, you should

12  analyze market competition.  And that's what we've talked

13  about a lot in here and why I stressed that my benefits

14  calculation in full goes by route by route.

15  Q.  Dr. Israel, it is fair to say that simply putting

16  American and JetBlue together, as each existed in 2019, at

17  the NEA airports, doesn't reveal much benefit, right?

18  A.  Right.  That's what we're talking about, about runs.  I

19  think that was in my deposition.  So -- and I think that was

20  in my direct, too.  If you just put them together, you can

21  squeeze out a little bit from the stone.  But to really get

22  the benefits, you need to create more suits to take advantage

23  of the demand.

24  Q.  Since you referred to the deposition, do you recall that

25  during the deposition, we talked about presentation that the

1    defendants had made reflecting that if you just put the two

2    networks together, it would only generate about $50 million

3    in benefit, right?

4    **A.**  Yes, I do recall that.

5           THE COURT:  What does it mean to just put them

6    together?

7           THE WITNESS:  More like v4, put them together, but

8    don't add any extra capacity.

9           THE COURT:  So to just put them together, is that

10   just to connect them?  Or is that to optimize the schedule?

11          THE WITNESS:  Well, we were discussing it would

12   include schedule optimization, too.  So you optimize the

13   schedule.  You'll see on the runs that that creates more

14   demand, but there aren't more seats to hold those people.

15          THE COURT:  I see.

16   BY MR. DOIDGE:

17   **Q.**  And just to provide a little bit more clarify, it's fair

18   to say that the 50 million estimate didn't involve pulling

19   capacity down outside the NEA, right?

20   **A.**  Yeah, and as I think about it, I think the 50 million was

21   just a codeshare.  So I would have to go back and you'd have

22   to show me.  I think it was just turning on codeshares.

23          But in general, what I mean by just putting them

24   together would be -- could include schedule optimization, and

25   it would get to the same place.  You can't do it unless you

1   have more seats.

2   Q.   And again, just to provide a little bit more clarity to

3   that answer that you just gave, it's fair to say that how --

4   how Raven is used to estimate the benefits of the alliance,

5   you do that by turning on a functionality in Raven that

6   allowed for codesharing between the alliance partners, right?

7   A.   I think that's correct.  There are others who will know

8   every switch in Raven better than I do, but I believe you can

9   turn on codesharing.

10          Codesharing basically means we're marketing each

11  other's flights, so you can turn on codesharing to see what

12  that would do to demand.

13  Q.   And that's what's producing the passenger counts that you

14  rely on for your own consumer benefits analysis, right?

15  A.   I mean, Raven is generally.  Obviously, we did much more

16  than turn on codesharing.

17  Q.   Right.  But with respect to what -- with respect to the

18  Raven output, that's a key factor, right, is that you turned

19  on the codeshare functionality for the two carriers?

20  A.   It was turned on to reflect the NEA.  I probably wouldn't

21  say it was a key factor, because we see the schedule

22  optimization, and then the increased capacity makes more

23  difference.

24  Q.   All right.  And so Dr. Israel, getting back to that

25  $50 million estimate, just one more refinement.  That was

1   provided to the Department of Justice at a time when you were

2   using a different estimate of elasticity, right?

3   **A.**   I think that's right.  Another elasticity estimate in the

4   literature was slightly lower than 2.1.

5   **Q.**   So using the elasticity that you're now using today, that

6   would mean that that $50 million estimate of benefit would

7   actually be lower, right?

8   **A.**   Right.  I think we talked about this in my deposition,

9   and I'm not even sure it was me at Compass who responded to

10  the DOJ questions about this run.  I'm not sure I did it.  So

11  I can't speak to the exact method that was used.  But

12  assuming that it was my method that I presented today, then I

13  agree that going from 1.6 to 2.1 would reduce benefits.

14  **Q.**   And Dr. Israel, you haven't attempted to estimate how

15  much of the benefit that you calculate, how much of that

16  600-plus million that you calculate simply stems from JetBlue

17  flying American slots, right?

18  **A.**   I have not tried to break down the pieces.  I have

19  compared the two networks.

20  **Q.**   And so you haven't analyzed whether JetBlue received

21  additional slots on, its own it could profitably use them

22  either, right?  That's something else that you haven't looked

23  at?

24  **A.**   I don't think I've run JetBlue profits on -- I assume if

25  they just received slots without paying for them, it could

1    use them, but I have not done an analysis of that on its own.

2    **Q.**  And you haven't do any quantitative analysis of consumer

3    benefit that would be generated from American simply leasing

4    LaGuardia and JFK slots to JetBlue, right?

5    **A.**  I have not run just that scenario.  I mean, I think all

6    of these would generally be captured under the idea that you

7    don't get much without more capacity, but I have not

8    separately run that scenario.

9    **Q.**  But leasing the slots -- leasing American slots from

10   American to JetBlue would be a way to generate more capacity,

11   right?

12   **A.**  No.  JetBlue would have more.  American would have less.

13   **Q.**  Well, isn't part of the central premise here that JetBlue

14   flies bigger planes than American was flying in 2019, right?

15   **A.**  And, in fact, yeah, that's one of the ways that the

16   network was planned, but I even think my last answer was not

17   right.  Just leasing slots from one to the other does not

18   create additional capacity.  Capacity is about adding

19   aircraft.

20   **Q.**  It doesn't matter how many seats are on the aircraft?

21   **A.**  We're talking past each other.  Adding capacity is when I

22   compare pre and post, are there more seats in post available.

23   That's about fleet.  On a given route, how much capacity you

24   have depends on how many seats you have.  But the things that

25   unlocks the benefits here is actually having more seats

1    available to fly.

2    **Q.**  And one way that there could be more seats available to

3    fly in 2023 versus 2019, is if JetBlue were flying American

4    slots with bigger planes than American was flying in 2019,

5    right?

6    **A.**  Yeah, I don't agree with that.  If they're flying the

7    same fleet that they had.  Mr. Laurence, for example, went

8    on, and Mr. Friedman, at some length, about what the NEA has

9    done for them, has given them the business case to go to

10   their senior management and buy more aircraft.  That's what

11   increases capacity.  Transferring slots between each other,

12   codesharing, those things don't change the size of the fleet.

13   You need a business case built on growth that actually

14   generates the case to go buy more aircraft.

15   **Q.**  Well, Dr. Israel, JetBlue doesn't fly on aircraft as

16   small as the 40 and 50 and 60 and 70 seat regional jets that

17   American was operating out of New York City, right?

18   **A.**  That's correct.  I agree with you that JetBlue's planes

19   are bigger, but that doesn't change the fact that if you just

20   move slots around, you haven't created any additional

21   capacity.  You've moved capacity around.

22            THE COURT:  In other words, you might increase

23   capacity on that route, but you've just taken it from

24   somewhere else.

25            THE WITNESS:  Yes.

1  BY MR. DOIDGE:

2  **Q.**  And Dr. Israel, again, shifting gears a bit, you

3  testified on direct that pricing independence was an

4  important feature of the NEA?

5  **A.**  Yes.

6  **Q.**  Let me ask you to take a look at Plaintiffs'

7  Exhibit 1121.

8          MR. DOIDGE:  I believe this is already in evidence,

9  Your Honor.

10  BY MR. DOIDGE:

11  **Q.**  And if I can get you to focus on the slide, this is an

12  American deck relating to revenue management.  And if we can

13  have you focus on the slide ending in the last few digits --

14  **A.**  I'm sorry.  I'm just having trouble finding the --

15  **Q.**  That's okay.  Let me know when you're there and I'll give

16  you the page.

17  **A.**  It just seems to skip from 950 to 1144.

18          MR. WALL:  Mine does, too.

19          THE WITNESS:  I see 1121 farther back, after 397.

20  **Q.**  Okay.  You have it now?

21  **A.**  I found it.  Yeah, I'm not sure counsel does.

22  **Q.**  Okay, if you can turn to the page that ends in Bates

23  number 832?

24  **A.**  32?

25  **Q.**  832, yes.

1    **A.**   Okay.

2    **Q.**   And there you see, there's a discussion of revenue

3    management practices for American?

4    **A.**   Sorry, I couldn't read it because it was very small.

5    **Q.**   That's okay.  Are you there now?

6    **A.**   Yes.

7    **Q.**   There you see there's a discussion of revenue management

8    practices for American under the NEA and the WCIA, right?

9    **A.**   I don't know that -- this is an American document, but

10   I'll take your representation.  Oh, I see, "We are metal

11   neutral with B6."  Okay.  I got it.  Yes.

12   **Q.**   And so if we focus on that first bullet relating to the

13   NEA.  You see how it reads, it's stated, quote, "Within the

14   NEA, we are metal neutral with B6 since it is 100 percent

15   revenue share."  Do you see that?

16   **A.**   Yes.

17   **Q.**   And then it further explains in the next sub bullet

18   there, it explains that the revenue management strategy is

19   to, quote, "Maximize revenue between the two by evaluating

20   and combining market share for high level health."

21            Do you see that?

22   **A.**   I see that.

23   **Q.**   And if you look at the fourth sub bullet there, it

24   contrasts the revenue management strategy for NEA markets

25   with how to treat markets where American is competing outside

1    of the NEA, right?  There it reads, "Outside of the NEA, B6
2    is still a competitor in all other routes," right?
3    **A.**   It says, "B6 is still a competitor in all other routes."
4    I don't know what they're drawing from that.  That statement.
5    I agree that that statement is here.
6    **Q.**   All right.  And then if we can turn to the second bullet
7    that describes WCIA.  And there you see that it's written
8    out, "within the WCIA," and you understand that's the
9    relationship American has with Alaska, right?
10   **A.**   Yes.
11   **Q.**   "So within the WCIA, since we only receive 20 percent on
12   any growth, on an analyst level, we are not metal neutral,
13   consider Alaska, OA, in all ways."
14          Do you see that?
15   **A.**   I do.
16   **Q.**   And in suggesting on direct that pricing and independence
17   is a significant feature of the NEA, did you consider the
18   distinction that's being made here in American's revenue
19   management practices with respect to the NEA and the WCIA?
20   **A.**   Certainly, I consider all of that in my analysis.  I talk
21   at some length in direct about metal neutrality and what it
22   means, and I had a slide that explicitly broke out metal
23   neutrality separate from pricing decisions.
24   **Q.**   Well, in this case, the revenue management practice for
25   the NEA, for within the NEA, is to try to optimize with

1    respect to the two carriers combined, right?

2    **A.**   It says to maximize revenue for the two.  There's not

3    enough here for me to tell what all of this is telling them

4    about revenue management.  I think it's telling them

5    generally to try to create high market share on the American

6    side, which would be a procompetitive thing.  But beyond

7    that, I can't tell what all of this means.

8    **Q.**   All right.  Well, let me ask you about a slightly

9    different concept related to pricing, Dr. Israel.  You're

10   familiar with the concept cross-market initiatives, right?

11   **A.**   Yes.

12   **Q.**   And you understand that concept to describe a pricing

13   action in one route designed to induce a change in conduct by

14   another airline on that route or some other route, right?

15   **A.**   Generally, I think that's how the term is used.  I might

16   say a pricing initiative that airlines make on one route to

17   initiate -- to create some reaction on some other route

18   usually.

19   **Q.**   All right.  And in your experience, you've seen airline

20   documents describing airlines undertaking cross-market

21   initiatives, right?

22   **A.**   Yes.

23   **Q.**   And you recall Mr. Jarashow's -- like you're familiar

24   with Mr. Jarashow's testimony?  You looked at that in the

25   course of the trial?

1   **A.**   I listened to it on Zoom, but I don't recall it

2   particularly well.

3   **Q.**   Do you recall Mr. Jarashow testifying about JetBlue

4   filing fares to flash other airlines?

5   **A.**   I don't recall that.

6   **Q.**   Okay.  In any case, in suggesting on direct that pricing

7   independence is a significant feature of the NEA, did you

8   consider the ability of airlines to signal one another

9   through these public pricing mechanisms?

10  **A.**   I mean, I certainly considered everything that I know

11  about airline pricing.  I'm struggling to see the relevance

12  of that for the effects of the NEA.

13  **Q.**   Well, it's fair to say, Dr. Israel, that airlines don't

14  necessarily have to sit down in a room together and talk in

15  order to reach some accommodation with respect to what fare

16  should prevail in a market?

17  **A.**   I don't agree with that as you just said it.

18  **Q.**   And Dr. Israel, with respect to your discussions of the

19  MGIA, so it's your opinion that the MGIA creates an incentive

20  for defendants to expand capacity, right?

21  **A.**   Yes.

22  **Q.**   And you heard -- you heard Mr. Friedman's testimony

23  during the trial, right?

24  **A.**   Yes.

25  **Q.**   And do you recall that Mr. Friedman testified that when

1   he's engaged with his counterparts at American, and more

2   generally, when he's engaged in joint route planning

3   decisions on NEA routes, he and his team do not consider the

4   MGIA?

5   **A.**   I heard that, yeah.  I certainly considered that.

6   **Q.**   And you said that -- he said that he's been instructed to

7   leave the MGIA math out of it, right?

8   **A.**   Right.  That makes sense to me, since I would expect the

9   MGIA math to affect aggregate capacity decisions, not route

10  planning decisions.

11  **Q.**   Well, Mr. Friedman's team is making aggregate capacity

12  decisions for capacity at the NEA airports, correct?

13  **A.**   They're doing network planning and network deployment.  I

14  think he was quite clear, he's not the one deciding whether

15  they should buy more aircraft, which is the level to which I

16  would expect the MGIA to have its biggest effects.

17           THE WITNESS:  I'm sorry, is there any way that I

18  could have two minutes to go to the bathroom?

19           THE COURT:  Of course.  If you need to go to the

20  bathroom, we'll stand right here in recess.

21           Do you know where it is down the hall?

22           THE WITNESS:  Yeah.  Thank you.

23           THE COURT:  No problem.

24           MR. DOIDGE:  Your Honor, I guess while taking the

25  break, was it raised with the Court that Dr. Israel won't be

1    available tomorrow?

2              THE COURT:  Who won't be available?

3              MR. WALL:  Dr. Israel is not available tomorrow.

4              So how much more do you have, if I may ask?

5              MR. DOIDGE:  Probably we're getting somewhere in

6    the half-hour to an hour range.

7              MR. WALL:  Is there any possible way to finish it

8    today, Your Honor, if we come back at some other time of the

9    day, or anything?  To get him on his way?

10             THE COURT:  I think -- whether I can give you time

11   after my afternoon hearings, which would be starting at --

12   like whether I could give you time at 3 o'clock -- there's no

13   way I could give you time before 3:00 or 3:15 -- depends on

14   one thing that I don't know the answer to right now about

15   something that was filed, an emergency motion in another

16   case.  So I can take a look at that.  I was planning to look

17   at that at 1:00.

18             And I don't know whether it's -- there are varying

19   definitions of emergencies, as you can imagine.  So I need to

20   take a look at that, and I don't know whether that means a

21   hearing today or whether it doesn't.  So I could -- I'm happy

22   to -- Kellyann could let you know at 1:30, or something, or

23   1:15.  I have to take a quick look at it.

24             MR. WALL:  And that's fine.  If he just has a half

25   an hour, at the moment, I don't have much myself.

1          THE COURT:  Right.  So if it's just that much, I

2     would be happy, if I don't have to do this emergency hearing,

3     to come back, subject to me talking to the court reporter and

4     making sure that she's available and could do it, and then we

5     could finish him.

6          MR. DOIDGE:  And that's fine, Your Honor.  I'm

7     probably a little closer to that hour than I am to that half

8     hour, just so we all understand.

9          THE COURT:  Okay.

10          THE WITNESS:  Thank you.

11          THE COURT:  No problem.

12     BY MR. DOIDGE:

13     **Q.**  All right.  Dr. Israel, let's turn to another topic, and

14     I'd like you to take a look at Plaintiffs' Exhibit 1145.

15     **A.**  Okay.

16     **Q.**  And first we'll focus -- we've seen this earlier today.

17     This is the cover e-mail from May 29th, with the calendar

18     invitation, right?

19     **A.**  Yes.

20     **Q.**  And can we look at the top part of the e-mail now?

21     You'll see that subsequently there's -- sent to you later

22     that day, on May 29th, is the v2 schedule Raven output?

23     **A.**  Yes.

24     **Q.**  So does that help refresh your recollection that it

25     wasn't until May 29, 2020, that you received the v2 scheduled

1    Raven output?

2    **A.**   Still not really.  Pretty commonly we get more -- we get

3    more than one version, or they could be corrections and

4    things.  So I just don't know when I first received it.

5    **Q.**   Do you have any basis, just sitting there today, do you

6    have any basis to believe that you had received any kind of

7    Raven output as of the May 20 meeting that we were talking

8    about before?

9    **A.**   I just don't know.  I'm not usually the one who opens the

10   files and first pushes the buttons, and I do have reason to

11   believe we often get multiple iterations.  I just don't know.

12   **Q.**   So let me ask you what we've done is we're going to open

13   up -- we're going to open up the native file of what was

14   attached, and we're going to look at it.  In particular, a

15   particular tab that was sent.  It's the v2 segment data tab.

16   And you'll see that there is a remarkable amount of

17   information just on that one tab.  So to make this thing a

18   little easier, we're going to hide a bunch of the columns,

19   and we're going to filter on some rows to help drill down on

20   some of what the clean team gave you.

21            So what we're going to first do is pull up a

22   version that was filtered just on column A, and what we

23   filtered column A for is to identify any routes that involve

24   Boston to LaGuardia, Boston to JFK, or Boston to Newark.

25            Do you see that?

1     **A.**   Yeah, I don't know -- I'll take your word for how you

2     filtered it.  I'll see those segments as the ones that were

3     listed.

4     **Q.**   And you don't have any question that this is information

5     that the clean team provided you as part of the v2 schedule,

6     right?

7     **A.**   Yeah.  I have no reason to doubt that.  As I said, it's

8     usually people on my staff that push the buttons on this

9     level, but I don't have any reason to disagree.

10    **Q.**   All right.  And you can see that if we focus on Boston

11    LaGuardia and Boston JFK in row A, and then we look across --

12    or column A, excuse me, and then we look across to column AG,

13    there's a separate column titled "City."  Do you see that?

14    **A.**   Yes.

15    **Q.**   And for Boston-LaGuardia and Boston-JFK, the city

16    identified is Boston to NYC, right?

17    **A.**   I see that.

18    **Q.**   And now if we take a look at a similar row from Boston to

19    Newark, again, looking at column A first, you see that

20    Boston-Newark is there, it's Boston-Newark, right?

21    **A.**   I do.

22    **Q.**   And then if we look across to that city column, and we

23    see that that remains Boston-Newark, correct?

24    **A.**   I see that in the city column, yes.

25    **Q.**   And so in this clean team analysis, it's grouping JFK and

1    LaGuardia together as New York City, right?

2    **A.**   I mean, I don't know, grouping them as New York City,

3    it's certainly the city identifier says "BOSNYC" for those

4    two.

5    **Q.**   And in contrast, it's identifying Newark separately from

6    NYC, right?

7    **A.**   In the city column, I don't know what it means, but in

8    the city column, it says BOS to EWR.

9    **Q.**   Right.  And if we take a look at -- also take a look at

10   column AI, do you see how that's describing whether or not

11   the JetBlue -- whether or not there's an overlap between

12   American and JetBlue in the particular -- particular route

13   identified?

14   **A.**   I do.

15   **Q.**   And if we take a look at, again, just say Boston to

16   LaGuardia, it identifies that as an overlap, correct?

17   **A.**   Yes.

18   **Q.**   And you'd agree that both American and JetBlue offer

19   nonstop service between Boston and LaGuardia, right?

20   **A.**   Yes.

21   **Q.**   And they both offer, again -- if we look at Boston and

22   JFK, we see that, again, that's identified as an overlap, and

23   you'd agree that Boston that, in that route, both JetBlue and

24   American offers nonstop service, right?

25   **A.**   Yes.

1   **Q.**  And if we take a look at Boston-Newark, however, we see

2   that that's identified as a nonoverlap, correct?

3   **A.**  I see "No" here in this column.

4   **Q.**  And you're aware that JetBlue does provide nonstop

5   service from Boston to Newark, right?

6   **A.**  That sounds right.

7   **Q.**  And American does not provide service from Boston to

8   Newark, right?

9   **A.**  That sounds right.

10  **Q.**  All right.  And now focusing your attention on column AF,

11  you see it describes the "Type"?

12  **A.**  I do.

13  **Q.**  And you see the type, "Market transfer" is listed for

14  Boston-LaGuardia?  Do you see that?

15  **A.**  I do.

16  **Q.**  And you understand that to mean that's a market where one

17  or the other carriers are going to cede that route to the

18  other carrier, right?

19  **A.**  I honestly don't know what market transfer means here.

20  **Q.**  Well, maybe we can get a little clarification.  If you

21  focus on row -- column R and if we look down at the bottom

22  for two columns for American, you'll see that if you compare

23  column L to column M, and then see that R is the negative

24  100 percent, that indicates that American -- American is

25  pulling out all of its capacity in that route, right?

1    **A.**   Right.  I mean, I agree that under -- I didn't know what

2    market transfer meant in that column, but I agree with you,

3    under the clean team, the plan was to -- or the plan has been

4    to shift Boston-LaGuardia to entirely JetBlue service.

5    **Q.**   And now if we can pull that one down and just quickly

6    we'll try to go to the next two.  We don't need to dwell on

7    that, I don't think.  So the next one, we're going to focus

8    on the market transfer tab?

9    **A.**   Okay.

10   **Q.**   So the next one is going to show -- we're going to filter

11   on column AF from our transfers, and we're going to filter on

12   column C for B6.  And if you, again, look at column R, you'll

13   see that this is picking out markets where B6 is pulling all

14   of its capacity out of those routes, right?

15   **A.**   Yeah.  I mean, that's what is shown under the clean team

16   plan.  I don't think there have been those B6 exits in fact.

17   But, yeah, the clean team indicated -- you know, replanned

18   the network, and had cases where it was served by one or the

19   other.

20   **Q.**   All right.  And if we can turn to the next slide, you'll

21   see a similar thing.  We've now -- we filter on American in

22   column C, you'll see that there were several -- several

23   routes where the clean team envisioned American exiting that

24   were overlaps, right?

25   **A.**   Yeah.  Again, I think this is -- I think this is an

1    accurate clean team schedule.  And so, again, yes, there

2    were -- a part of the route planning for the clean team,

3    there were routes that shifted to one or the other.

4    **Q.**   Okay.  You can pull that down.

5          And Dr. Israel, in the context of antitrust, it's

6    fair to say that this notion of market transfer, we often use

7    the word -- in antitrust, we often use the word "market

8    allocation" for that, right?

9    **A.**   Yeah, I don't think that's the same thing.

10   **Q.**   So Dr. Israel, on your direct testimony, when you were

11   talking about the analysis that you did on benefits, you

12   highlighted that you looked across all -- your focus was

13   primarily on looking at all the routes out of the NEA

14   airports, right?

15   **A.**   Right.  And the benefit calculation, certainly based on

16   the actuals, was entirely routes that touch an NEA airport.

17   For the clean team, it was based on the full schedules.

18   **Q.**   And fair to say, Dr. Israel, that you were not offering

19   an opinion that there will not be harm in -- as a result of

20   the NEA, in any particular nonstop overlap, right?

21   **A.**   I think I'm offering an opinion that I don't see any

22   basis for that harm, based on my experience of what alliances

23   actually accomplish.

24   **Q.**   And Dr. Israel, you haven't focused on a route-by-route

25   analysis, though, right?  That's fair, right?

**A.**   I haven't done a route-by-route benefits analysis, but I've offered lots of other opinions about competition in these markets, about what alliances do, about what's happened to output overall, so I see no basis to conclude that there will be any harm.

**Q.**   Dr. Israel, if we could take a look at Plaintiffs' Exhibit 2003.

MR. DOIDGE:  And I see, Your Honor, I wasn't sure exactly where you need to stop.  This is actually an okay breaking point, or I can keep going.

THE COURT:  Why don't you go a little longer.

MR. DOIDGE:  Okay.  SO if you can put that exhibit back up.  And we're focused on page 2.

BY MR. DOIDGE:

**Q.**   Dr. Israel, this demonstrative depicts the Raven results that you're replying on.  And here we see the results in the Raven outputs for the 2019 actual schedule and for the v2 schedule.  Do you see that?

**A.**   Yes.

**Q.**   And this -- this is specifically related to Boston to DCA, right?

**A.**   Right.  These are clean team plans for Boston-DCA.

**Q.**   And we identified three metrics on this demonstrative. You can see departures, seats, and local passengers, right?

**A.**   Yes.

1   **Q.**  And you understand passengers to refer to passengers who

2   are actually flying between Boston and DCA, as opposed to

3   passengers who are on that segment for the purpose of

4   connecting somewhere as part of a longer itinerary, right?

5   **A.**  Yes.

6   **Q.**  And so in this example, what we see is that what the

7   clean team was envisioning was that frequencies, daily

8   frequencies would decrease by 9.7 in Boston to DCA, right?

9   **A.**  Yeah.  And the clean team schedule, there was a reduction

10   in frequencies between these two airports or these two --

11   yeah, airports.

12   **Q.**  And there was also a reduction in seats, right?

13   **A.**  Correct.

14   **Q.**  And there was also a reduction in local passengers,

15   right?

16   **A.**  No, that would come out of Raven.  But under the clean

17   team schedule, that's correct.  That's not what's happened

18   actually, but that's correct.

19   **Q.**  And Dr. Israel, you would agree that all else equal, that

20   an output decrease is reflected by that decrease in local

21   passengers; that would result in higher prices, right?

22   Again, all else equal.

23   **A.**  All else equal, a reduction in seats, if it actually

24   occurred -- I think I said it would put upward pressure on

25   the prices.  Whether it actual results in higher prices

1    depends on the market and the presence of market power that I

2    talked about at some length last week and why hub carriers on

3    the other end would cut against that.

4            But all else equal, if what actually happened was a

5    reduction in seats, holding everything else constant, that

6    would be an upward pressure on price, that you would then

7    have to trace through the actual market conditions to reach a

8    conclusion.

9    **Q.**   And just to be clear, Dr. Israel, for this particular

10   market, Delta was already serving Boston-DCA, right?

11   **A.**   I believe Delta started in 2019.

12   **Q.**   And at the other end, American is the hub carrier in DCA,

13   right?

14   **A.**   Correct.  So Delta is serving this market with a very

15   small aircraft.  So this market is a really good example I

16   almost used in my direct of a place where the hub carrier on

17   the other end could easily up-guage.

18   **Q.**   Let's turn to Plaintiffs' Exhibit 2003, and focusing on

19   page 1 now.

20           And this exhibit depicts daily seats and

21   departures --

22           THE COURT:  I think we'll stop here.  We'll stop

23   here for the break.

24           MR. DOIDGE:  Okay.

25           THE COURT:  So I will get back to you shortly

1    through Kellyann, whether I can --

2              How much longer do you think you have?

3              MR. DOIDGE:  If I could just have a second.

4              THE COURT:  Sure.  Take your time.

5              MR. DOIDGE:  I guess about 40 minutes.

6              THE COURT:  Okay.  How long do you think you have?

7              MR. WALL:  I mean, at the moment, I don't really

8    have anything.  But we'll see what 40 minutes from now, how

9    I'm feeling about that.

10             THE COURT:  Okay.  Fine.  Let me see.  I'll get

11   back to you shortly through Ms. Belmont, and whether the

12   time -- the time I would have would start between 3:00 and

13   3:15.

14             THE WITNESS:  Just so I know, is this today?

15             THE COURT:  That would be today.

16             THE WITNESS:  Because I was in the other room.

17             THE COURT:  Yes, that would be today.

18             THE WITNESS:  I appreciate that, since I can't come

19   tomorrow.

20             THE COURT:  I'll let you know shortly.

21             (Court in recess at 1:06 p.m.

22             and reconvened at 3:47 p.m.)

23   BY MR. DOIDGE:

24   **Q.**  Good afternoon.

25   **A.**  Good afternoon.

1   **Q.**  I think where we left off here, you were about to put up

2   Plaintiffs' Exhibit 2003, page 1, so if you can please turn

3   to that page.  And this depicts the daily seats and

4   departures flown on Boston-DCA on a particular peak day in

5   2019, compared to 2022.  Do you see that?

6   **A.**  I do.  I see a comparison of two days.  Yeah.

7   **Q.**  And I'll represent that we've selected the same two days

8   that I think we used earlier in some demonstratives for

9   Mr. Raja for some of our comparisons, And there you'll see

10  that for Boston to DCA, here we see that the frequencies are

11  lower in 2002, right?

12  **A.**  Frequencies are lower, sorry, in 2000?

13  **Q.**  In 2022, thank you, relative to 2019?

14  **A.**  That's what it shows for this day, yes.

15  **Q.**  And the seats are also lower in 2022 than they were in

16  2019, for the combined carriers, right?

17  **A.**  No.  I mean, that's what it shows for this day.  I've

18  actually looked at this over time and that's not true.  If

19  you look at any given month or the year, the seats are up.

20  **Q.**  All right, Dr. Israel, did you present anything in your

21  direct with respect to establishing that?

22  **A.**  No.  It wasn't part of my report or my direct, I just

23  followed the data over time and seats by the year 2022, or by

24  the most recent months are up over 2019.

25             THE COURT:  For the route.

 1              THE WITNESS:  For this route.

 2     BY MR. DOIDGE:

 3     Q.  So you're disagreeing with the representation of this as

 4     a replication of an average weekday -- weekday in Boston-DCA?

 5     A.  I don't -- I think this represents a particular Thursday.

 6     I just don't think that Thursday -- or I know that Thursday

 7     does not represent the seats on a monthly or annual basis.

 8     Q.  All right, Dr. Israel, well --

 9              THE COURT:  Is the date on the bottom correct?

10     That's the date, so 11/17/22?

11              MR. DOIDGE:  I believe those were the same dates

12     that were used for comparison.

13              THE COURT:  Those were just what was scheduled

14     rather than flown?

15              MR. DOIDGE:  That's correct, Your Honor.

16              THE COURT:  All right.  Fine.

17     BY MR. DOIDGE:

18     Q.  And Dr. Israel, is it your understanding that there are

19     only three nonstop airlines on the Boston to DCA route,

20     right?

21     A.  Correct.  I believe that's served by Delta, JetBlue, and

22     American.

23     Q.  And it's your understanding that the carve-out amendment

24     to the NEA sets out a set of criteria, right?

25     A.  I -- the way I understand the carve-out, it says certain

1    routes that are carved out, and indicates that there will be

2    a review of routes, I think there are criteria, although I

3    don't know them exactly, but it does say there will be

4    discussion about possible addition of routes, but what I

5    focused on when I discussed carve-outs was just the seven

6    routes that are currently carved out.

7    **Q.**   Well, Dr. Israel, is it fair to say that any amendments

8    don't identify specific routes, right?

9    **A.**   I guess I don't know the specific language of the

10   amendments.  So it's not something I've looked at.  I just

11   know the six, and then seven routes that are carved out.

12   **Q.**   So you don't know that -- you're not aware of the fact

13   that the way the NEA carve-out amendment is structured is

14   that a market is supposed to be carved out if there's either

15   no other airline providing nonstop service or only one other

16   airline providing nonstop service?

17   **A.**   I have heard that as a description, but I have not

18   directly reviewed the language in the amendment.  What I've

19   heard your description that you just gave, and then I'm aware

20   of the seven routes that are currently carved out.

21   **Q.**   Well, let's assume that my description is correct.  Now,

22   you'd agree that even -- you'd agree that with respect to

23   Boston to DCA, it would meet that criteria, right?  There's

24   only one other airline, in addition to American and JetBlue,

25   serving that market, right?

1          MR. WALL:  Your Honor, I object.  That

2     misrepresents the carve-out amendment language.

3          THE COURT:  Sustained as to the form, unless you

4     have the carve-out -- I just don't recall what the carve-out

5     language says specifically and he doesn't seem specifically

6     familiar with it, so unless you -- if you want me to take a

7     look at it, I would.

8          MR. DOIDGE:  Well, we can take a look if Mr. Wall

9     is going to actually make this objection.

10          THE COURT:  I think he did make that objection.

11          MR. DOIDGE:  Well, we'll take a look.

12          Can we pull up the -- if we need to go to --

13          THE COURT:  You can tell me where it is in the

14     agreements, if you want.  Is it in the NEA agreements?

15          MR. DOIDGE:  It is.  It should be an attachment,

16     Your Honor, I'm not sure I have it right here, but there's an

17     attachment to the NEA agreements.

18          THE COURT:  Would it be the May 24, 2022, -- no,

19     that's amendment 21.

20          MR. DOIDGE:  No, there should be a 2021.

21          THE COURT:  November 21st, 2021, bilateral special

22     prorate agreement?

23          MR. DOIDGE:  No, Your Honor.  It's -- if I may have

24     a moment.

25          THE COURT:  Of course.

1          MR. WALL:  It's called the "First Amendment to the

2   MGIA."

3          MR. DOIDGE:  Thank you.

4          THE COURT:  I have it right here.

5          MR. DOIDGE:  Okay.  Do you have a DX number for

6   that, Mr. Wall?

7          THE COURT:  I have it as PX-0001-b.

8          MR. DOIDGE:  Are you able to pull that up?

9          There we go.  Thank you.

10  BY MR. DOIDGE:

11  **Q.**  If you look at the bottom of the first page.  So you see

12  in the first sentence, Dr. Israel, under "A," where it refers

13  to "American and JetBlue are the only carriers that are

14  providing nonstop passenger flights city pair"?

15  **A.**  Yes, I see that.

16          THE COURT:  I've read it.

17          You can just read it.  Why don't you just read the

18  first sentence of "Excluded Service" right up to the end of

19  sub B, where it says "nonstop passenger flights for that city

20  pair."

21          And then you can ask him the question.

22  BY MR. DOIDGE:

23  **Q.**  So I can read that into the record.

24          THE COURT:  I don't think you need to read it into

25  the record.  It's an exhibit, part of the record, and I've

1    read it.  It's in the record.

2              THE WITNESS:  I'm good.

3              MR. DOIDGE:  You're good.

4    BY MR. DOIDGE:

5    **Q.**  So having seen that, is it your understanding that the

6    way the carve-out amendment is structured is that if there is

7    no other airline serving the city pair, or only one other

8    airline serving the city pair, that the route is carved out?

9    **A.**  Right.  That's what it says.  So in the case that we were

10   just talking about, the city pair would include Washington,

11   D.C., which would include Dulles in any definition that I've

12   ever seen.  So that would include United flying from Boston

13   to Dulles.  So there would be two other carriers, at least.

14   **Q.**  So I take it, Dr. Israel, that the distinction that

15   you're making is that the parties are treating Boston-DCA as

16   not subject to the carve-out, because they've taken the view

17   that city party for the Washington, D.C., area should be

18   defined to include Dulles International Airport and Boston,

19   and Baltimore/Washington International Airport, right?

20   **A.**  I honestly don't know what they're saying about

21   Baltimore, but I've never seen a definition of DCA used that

22   didn't include Dulles.  I've never seen it.  So it would

23   certainly, at least, included United flying from Boston to

24   Dulles.

25   **Q.**  You're aware of Professor Brueckner's report in this

1  matter, right?

2  **A.**  Yes.  I mean, generally.

3  **Q.**  And you're aware that Professor Brueckner has opined that

4  DCA is a distinct market from the other airports in the

5  Washington, D.C., area, right?

6  **A.**  I don't recall what his explicit DC breakdown was.  I

7  mean, he may have said that.  I've never seen a case or been

8  involved in a case where DCA and Dulles were split out as

9  separate markets.

10  **Q.**  Dr. Israel --

11       MR. DOIDGE:  We can take that down.

12  BY MR. DOIDGE:

13  **Q.**  Dr. Israel, if you can turn to paragraph 12 of your

14  expert report.

15  **A.**  Okay.

16  **Q.**  And there you write that, "The NEA is the outgrowth of

17  long-standing efforts of American and JetBlue to become

18  competitively relevant in the highly competitive New York and

19  Boston airline markets."

20       Do you see that?

21  **A.**  Not yet.  Where is it in the paragraph?

22       THE COURT:  First sentence.

23       MR. DOIDGE:  First sentence.

24       THE WITNESS:  Oh, I see.  Okay.

25       Yes.

```
 1    BY MR. DOIDGE:
 2    Q.   And then you continue that, "The NEA is attempting and
 3    largely failing to grow relative to Delta and United, each of
 4    whom continues to grow in the Northeast, with American and
 5    JetBlue struggling simply to maintain their distant third and
 6    fourth place position."
 7              Do you see that?
 8    A.   Yes.
 9    Q.   And then if we take a look at paragraph 36 of your
10    report.
11    A.   Yes.
12    Q.   And there you write that, "The American/US Airways merger
13    provided Americans some increased presence in the Northeast,
14    but that presence mostly stopped at Philadelphia, leaving
15    American well behind Delta and United further to the
16    Northeast (New York and Boston)."
17              Do you see that?
18    A.   Yes.
19    Q.   So in those two paragraphs of your report, you're
20    combining the concepts of New York City and Boston, right?
21    A.   I don't mean to be combining them.  There are two cities,
22    four airports at issue in this case, and I'm making
23    statements about those airports and those cities.  The first
24    statement that you read, as I read my report again, is
25    obvious.  The third and fourth statement is obviously correct
```

1    for New York.  Generally, what I would intend to do in this
2    case is use Northeast as a shorthand when I'm referring to
3    all four airports, but certainly the statements about
4    competition and their cities are different.
5    **Q.**  Right.  To the extent that anyone might have read that
6    report is suggesting that American and JetBlue were
7    struggling simply to maintain their distant third and fourth
8    place position in Boston, you would agree that's not correct,
9    right?
10   **A.**  I would certainly hope the report, as a whole, doesn't
11   give that impression.  I think there's lots of tables that
12   show where JetBlue is in Boston.  But that sentence, to be
13   more clear, should have said "New York."
14   **Q.**  And if we turn to Defendants' Exhibit 973 in your binder.
15          This is an exhibit from Dr. Miller's -- Professor
16   Miller's reply report?
17   **A.**  973.
18   **Q.**  It's on the screen, too.  It's easier to see.
19          In this exhibit, Professor Miller has charted
20   market share, passenger shares in Boston from 2007 to 2019,
21   for several carriers, right?
22   **A.**  Right.
23   **Q.**  And looking at -- looking at Boston, it's fair to say
24   that United has historically lagged American, JetBlue, and
25   Delta in the Boston market, right?

1    **A.**   Yeah, that's fair.  United has been a spoke carrier in

2    Boston, a relatively small one.

3    **Q.**   And focusing on the period from 2010 through 2013, we see

4    that JetBlue was the largest carrier in Boston, and actually

5    increased its share throughout that entire period, right?

6    **A.**   Yes, that's fair.

7    **Q.**   And focusing on 2014, we see that American became the

8    second largest carrier in Boston, right?

9    **A.**   Right.  The big jump.  One thing I commented on in my

10   reports is this table is a little confusing, because there's

11   merger effects here.  But, yes, American, post-merger with US

12   Airways, the combination that becomes American becomes the

13   second largest carrier.

14   **Q.**   And at that point in time in 2014, Delta occupied a third

15   place position, right?

16   **A.**   In terms of share, yes, that's what this shows.  And then

17   we've talked about what Delta has done since.

18   **Q.**   And what Delta has done since is organically grown,

19   right?

20   **A.**   I mean, that -- they have grown without a merger, if

21   that's what you mean.  They have made Boston a hub.  I talked

22   at some length in my direct about what effects that has.

23   **Q.**   And they've also grown without entering into a

24   partnership that involves capacity coordination and revenue

25   sharing, right?

1    **A.**  Yes, they've grown on their own by making Boston a hub.

2    And I talked about that at length in my direct about the

3    effects of that.

4    **Q.**  And fair to say that if we look back at 2014, and looked

5    at American, American could have made a strategic choice to

6    organically grow in Boston from 2014 to 2019, correct?

7    **A.**  I think American has had many growth plans in Boston that

8    have tended to fail.  But in the proposition is some legacy

9    carrier potentially could have made Boston a hub, and Delta

10   did, I agree with that.  Just once a legacy carrier makes

11   Boston a hub, what airline economics tells me is there's no

12   room for a second hub carrier, and so we need to find some

13   way to compete with that hub.

14   **Q.**  Well, your view, Dr. Israel, is that, in your experience,

15   the most effective form of competition that arises to

16   challenge a legacy hub is if an LCC can compete with that

17   legacy hub, right?

18   **A.**  I think stronger LCC competition with a legacy hub has

19   generally been the best form of competition against a legacy

20   hub, yes.

21   **Q.**  And where you have observed in the past other LCCs

22   effectively competing with a legacy hub, those LCCs haven't

23   been involved in a revenue sharing and capacity coordination

24   agreement with another legacy carrier, right?

25   **A.**  When they haven't been other such agreements.  Your

1    question used the word "effectively," so again, we talked

2    about this in my deposition.  Effectively has generally left

3    out business competition.  So JetBlue is trying to inject a

4    different form of competition against Delta, where they're

5    effective with business travelers, as well.

6    **Q.**  And Dr. Israel, let me ask you now --

7              MR. DOIDGE:  We can take that down.

8              Let me ask you to turn to paragraph 37 in your

9    report.

10             THE WITNESS:  Okay.

11   BY MR. DOIDGE:

12   **Q.**  And there's a reference in paragraph 37, where you

13   describe that "historical market shares likely provide the

14   best predictor of future competitive significance."

15             Do you see that?

16   **A.**  Um --

17   **Q.**  It's about a quarter of way down on page 23.

18   **A.**  Yes, I see that and refer to that as a standard

19   assumption in antitrust.

20   **Q.**  But by that -- well, but by that, you don't mean that

21   market positions are fixed and unsalable, right?

22   **A.**  Not as an absolute statement, just that shares --

23   probably you could say also trends in shares give us an

24   indication about what's likely to happen going forward.  I

25   don't mean they can never change.

1    **Q.**  Well, if in fact, in Boston over time, we saw Delta grow

2    its position from a lower market share to its current

3    position, right?

4    **A.**  Yes, I agree with that.  There was an opening for a

5    legacy carrier to take a hub position in Boston and then

6    Delta did so.

7    **Q.**  We also saw JetBlue begin as an entry to become the

8    largest carrier in Boston, right?

9    **A.**  I mean, an entrant has been some time ago, but yes,

10   JetBlue, until the last three years, had been growing in

11   Boston.

12   **Q.**  Well, and in fact, Dr. Israel, JetBlue was growing right

13   up through 2019, correct, it's share continued to increase.

14   The highest share it had ever achieved in Boston was in 2019,

15   right?

16   **A.**  Well, I think that's true in the picture that we looked

17   at, yes, and then applied to it after that, but yes, JetBlue

18   has been successful in Boston.  I see the NEA as a way to

19   continue that.

20   **Q.**  Well, let me ask you to stick to paragraph 37 of your

21   report.  And you see that there's a -- there you write, or it

22   begins, "Absent the ability" -- I can highlight that for you.

23   It's a little bit lower in that same --

24   **A.**  Yeah.  I got it.

25   **Q.**  There you write, "Absent the ability to attract customers

1    by offering a competitive network, even small amounts of

2    growth would have been difficult to achieve, instead what

3    airline economics, including the well known Esker, tell us is

4    that the airline that starts from a weaker network position

5    tends to fall farther behind, despite it's best efforts, yet

6    it is consistently running uphill against larger carriers

7    running downhill with their network advantages."

8            Do you see that?

9    **A.**  Yes.

10   **Q.**  And in your view, one thing that the term "S-Curve

11   Effect" is used to capture is an advantage that an airline

12   has if it has the most frequencies on a route, right?

13   **A.**  I think that's fair.

14   **Q.**  And another thing that the term the S-curve is used to

15   capture is an advantage for an airline if it has the largest

16   presence at a specific airport, right?

17   **A.**  I think that's fair.  Generally, the larger airlines, by

18   frequencies or presence on a route or airport, tend to have

19   an advantage that tends -- not always, but tends to sustain

20   itself.

21   **Q.**  And so it's your view that if a legacy carrier

22   establishes a hub, they tend to be hard for another legacy

23   carrier to catch up with; is that right?

24   **A.**  Yeah, it depends on the size of the city.  Some very

25   large cities have competition among multiple hubs, but

1   generally we see a single hub that is hard for other legacy

2   carriers to displace.

3   **Q.**   And in terms of the metric for share that would identify

4   when a hub airport is at that place, you're not able to

5   identify a particular share level that an airline needs to

6   achieve it, right?

7   **A.**   Yeah, I wouldn't try to define a hub by a share level.  I

8   would define it by the presence of a connective hub, where

9   there's lots of spokes and a big connecting service.  It's

10  that pooling of demand through connecting service that

11  defines a hub.

12  **Q.**   Well, let's turn to Defendants' Exhibit 974.  And this

13  will come up on your screen, too.  And this is from Professor

14  Miller's reply report.  We're just going to focus on the pie

15  chart that relates to Boston.  This is reflecting shares of

16  domestic traffic in 2019.  So if we could blow that up.

17          And there you see that in 2019, Delta has about a

18  21 percent domestic passenger share, right?

19  **A.**   Yes.

20  **Q.**   And combined in 2019, JetBlue and American would have a

21  combined 52 percent domestic share in Boston, correct?

22  **A.**   If you add up those two parts of the pie, that looks

23  right.

24  **Q.**   And simply applying your network disadvantage logic,

25  that's going to leave other airlines in Boston -- that

1    52-percent share is going to leave other airlines in Boston

2    in a weaker position, right?

3    **A.**   I mean, they have smaller shares.  I think I just said

4    that my definition of hub has to do with the pooling of

5    connecting demand, which is what Delta is now doing.

6    **Q.**  Well, fair to say that in assessing the effects of the

7    NEA in Boston, you didn't assess the impact of other airlines

8    being left in a weaker position, relative to the combined

9    American/JetBlue partnership, right?

10   **A.**   I mean, I -- I assessed the market condition and talked

11   about it in some length.  And I think my view is that Delta,

12   as a hub with a connecting presence, is the strongest

13   position to offer service.  American by -- and the NEA, by

14   fueling JetBlue, creates the competition for that.  That's

15   the testimony that I gave.

16          I didn't assess separately United and Southwest and

17   others, versus American and JetBlue, because I testified that

18   I think, to the extent there's market power in Boston, it

19   would sit with Delta, given their hub.

20   **Q.**  Well, it's also fair to say, Dr. Israel, that in

21   examining the effects of the NEA in Boston, you did not

22   consider whether other airlines would then need a partnership

23   to compete with the combined American and JetBlue?

24   **A.**   I did not analyze possible partnerships for anyone else.

25   I think other airlines are probably all thinking about how to

1  compete with Delta's hub.  I hope they all think about

2  creative ways to do it.

3  **Q.**  Dr. Israel, American has in excess of a 60-percent share

4  in Philadelphia, right?

5  **A.**  I don't recall the exact share numbers.  It's an American

6  hub, so I suspect the share is reasonably large.  But I don't

7  remember the exact number.

8  **Q.**  Well, fair to say, given your statement in paragraph 37,

9  that it's your view that it would be difficult for another

10  airline to displace American in Philadelphia, right?

11  **A.**  I think that's fair.  In Philadelphia, I think the hub

12  position -- I think it's unlikely that another airline is

13  going to come displace American in Philadelphia.

14  **Q.**  But Delta does compete in Philadelphia by providing

15  nonstop service from each of its hubs to Philadelphia, right?

16  **A.**  Right.  A hub is -- as I think I said in my testimony,

17  where carriers have hubs and can provide spokes, they provide

18  competition on those routes.  So you can provide a spoke from

19  Boston to Philadelphia, that would provide a competition,

20  primarily centered in Boston, but on that Boston-Philadelphia

21  route.

22  **Q.**  Well, but Delta can also offer -- by having that service

23  from its hubs to Philadelphia, it can also offer competing

24  service on a connecting basis throughout the entire United

25  States, right?

1    **A.**   I mean, so you're asking me, can hubs -- on connecting

2    origin destination pairs, can competing services be through

3    two different hubs?  Yes, I agree with that.

4    **Q.**   And to the extent that Delta has a disadvantage in

5    Philadelphia with respect to American, you would agree that

6    Delta also has a disadvantage with respect to American in,

7    say, Chicago and Washington, D.C., right?

8    **A.**   Those two market -- I mean, Delta is not what I would

9    list as the primary competition for American in those two

10   markets.  I mean, it would be strongly United, to start with,

11   in those markets, because those are examples of cities where

12   there is a second hub carrier.

13   **Q.**   So those are two cities where Delta's position is roughly

14   similar to American's position in New York City, right?

15   **A.**   I haven't done that comparison for similarity.  There are

16   cities in which Delta is not the hub carrier.  And each of

17   them has hub competition, so that's a big benefit to those

18   two cities, but Delta is not part of that hub competition in

19   those two cities.

20   **Q.**   In the same way, to the extent that you're treating

21   Newark as part of the larger market in New York City, New

22   York City has the benefit of United competition with Delta as

23   two large hub carriers, right?

24   **A.**   Yes.  Absolutely.

25   **Q.**   Okay.  But Dr. Israel, isn't it an implication of your

1    theory that if Delta cannot overcome this network

2    disadvantage in Philadelphia or Washington, D.C. or Chicago,

3    isn't it an implication of your theory that it now needs to

4    partner with another airline in order to more effectively

5    compete with American and United at those airports?

6    **A.**   I don't mean to have said anything about what an airline

7    needs to do.  "Need" is not a word that I use much as an

8    economist.  It certainly is an implication of my theory that,

9    if Delta has strategies, partnerships or otherwise, that make

10   it a more effective competitor, we should evaluate those and

11   see if they increase competition.

12   **Q.**   So you would at least agree that the same logic that

13   you're using to support the NEA would apply to a potential

14   partnership that Delta might present with respect to

15   Washington, D.C., or Chicago or Philadelphia, right?

16   **A.**   If by "same logic," you mean we should evaluate it and

17   see if it increases competitive intensity in order to decide

18   if it's good or bad, then, yes.

19   **Q.**   And it also implies that the same logic involves needing

20   to be -- since you can't organically do it, you need to find

21   a partner to allow you to synthetically expand the scope of

22   your presence at that airport, right?  That's what Delta

23   would need at any of those three airports?

24   **A.**   I really don't agree with any part of that.  Delta --

25   things that Delta can do to make itself a stronger competitor

1   would be procompetitive.  I don't -- I have never said anyone

2   needs a partner.  I would evaluate a strategy on whether it

3   made them a stronger competitor or not.  And I don't agree

4   with the concept of a synthetic growth as somehow an

5   alternative.  It's, again, a way -- it's a part of an

6   analysis of whether someone is a stronger competitor or not.

7   **Q.**  Well, let me ask, Dr. Israel, in the context of the

8   American Airlines/US Airways merger, is it fair to say that

9   it was your position that American needed to do that merger,

10   because it needed to expand the scope of its network to

11   compete with the larger Delta/United networks, right?

12   **A.**  Again, I don't -- my testimony is never anyone needed

13   something.  My view of that merger was that it made the

14   combined network more effective, and when I worked through

15   the detailed analysis of that case, that was procompetitive.

16   **Q.**  All right.  So again, I apologize for using the word

17   "need."  Let me ask it differently.  It was your opinion that

18   your network logic justified the American/US Airways merger,

19   because the logic entails that a larger network is a more

20   effective competitor to -- there is -- that larger network is

21   required to address the network deficiencies with respect to

22   those other two carriers.

23   **A.**  Again, I wouldn't used "required," but my view is that

24   networks are an important part of airlines competition.  And

25   stronger networks is something that we should assess when we

1    assess airlines transactions.  It's not the only thing that

2    we should assess.  I talked about market conditions and

3    output effects and incentives in the contract, but yes, I

4    strongly believe that airline network, stronger airline

5    networks are procompetitive and should be an important part

6    of the evaluation.

7    **Q.**  And so I think what -- what we don't see, Dr. Israel, and

8    maybe you could enlighten us, is that there's any limiting

9    principle to this network disadvantage logic.  Why isn't it

10   just going to be the case that, as one legacy expands through

11   a partnership or through a merger, the other legacy is going

12   to have to respond to match the increase in size?  And that's

13   the spiral you send us down.

14   **A.**  I mean, I would evaluate each of those on the effect they

15   have on competition.  Right?  There's certainly -- I mean,

16   networks are beneficial.  We should evaluate those networks.

17   Some of them have more network benefits than others.  I've

18   been quite clear that things -- mergers or fixed proportion

19   profit sharing, things I've talked about could in some cases

20   have harms to competition.  A limiting principle is you

21   should evaluate the size of the network efficiencies against

22   the potential harms in each of those cases and decide which

23   is bigger.

24   **Q.**  Over here, if we can just, again, thinking about what's

25   happening in Boston, it's your opinion that we need to go

1    down this path where JetBlue already has approximately

2    33 percent market share in Boston, relative to what we saw in

3    2019, at 21 percent share by Delta, right?

4    **A.**   Again, I wouldn't -- my opinion is that strengthening

5    JetBlue's network via this partnership makes them a more

6    effective competitor for Delta, and that's a good thing.

7    **Q.**   Let's turn to slide 10 of your -- I believe it's slide

8    ten, although the numbers may have changed, but slide ten of

9    your demonstratives this morning.  Yeah, that's it.

10            And Dr. Israel, here on slide 10, you're

11   identifying, in the first -- in the initial rows, you're

12   identifying the New York City nonstop overlaps, right?

13   Between American and JetBlue.

14   **A.**   Correct.  There's nonoverlaps at the bottom.  We talked

15   about this, it was a week ago, but there's nonoverlaps at the

16   bottom, and then there's the overlaps above that, split out

17   by how many other carriers there are.

18   **Q.**   Okay.  And just to get us caught up because, you're

19   right, it was last week, here you're defining New York City

20   as including JFK, LaGuardia, and Newark, right?

21   **A.**   That's consistently my definition.

22   **Q.**   And if we take a look at the row that relates to two

23   other carriers in the market, you see we have six for a

24   domestic.  Is that right?

25   **A.**   Yes.

1   **Q.**  And last week you explained you didn't have concerns with

2   respect to market's potential competitive effects, with

3   respect to markets where there was two other carriers or

4   greater than two other carriers in a market, right?

5   **A.**  I mean, one of the things that I've said is that markets

6   with at least two other carriers tend, in my view, not to be

7   a competitive issue, or I haven't seen them be as much.  That

8   was along with the opinions about this being a hub for two

9   other carriers and the effective alliances, and so on.  But

10  yes, I said, in my experience, when there's two other

11  carriers, those receive less attention in these sorts of

12  transactions.

13  **Q.**  And with respect to those six carriers that you've

14  identified in that row, those six routes you've identified,

15  fair to say that Boston to New York City is one of those

16  routes, right?

17  **A.**  I -- is Boston to New York City one of those routes.

18  **Q.**  That Delta serves and United serves to New York.  Those

19  are the only two, correct?

20  **A.**  That's correct, as far as who serves it.  I just am

21  trying to remember in this one if it just split out DCA,

22  because that's what DOJ had done or not.  So I don't recall

23  what's in which row as I sit here.

24  **Q.**  All right.  Well, let's assume that, for the sake of

25  argument, that Boston to New York is one of those six that

1    you've identified on that row.

2    **A.**   Okay.

3    **Q.**   And if your theory about two other carriers being enough,

4    again, there we only have -- we'd have United, Delta,

5    American, and JetBlue in 2019, right?

6    **A.**   That sounds right.

7    **Q.**   And if your theory about three being enough holds, then

8    JetBlue's entry into Boston/New York City shouldn't matter

9    with respect to the pricing that prevailed in those markets

10   prior to the entry, right?  Because three is enough.

11   **A.**   No, I think JetBlue always matters.  So I would take a

12   very different position on these if I thought that what was

13   going to happen here was a loss of the JetBlue effect.

14   I just -- my opinion is that the JetBlue effect will be

15   strengthened.  And so given that and I think the usual logic

16   about the number of other carriers applies.  But just to be

17   clear, if I for a second thought that an effect of this

18   transaction would be to weaken JetBlue, my position would be

19   very different.

20   **Q.**   Well, in taking those other six, at least sitting here

21   today, you wouldn't disagree with me if I suggested that the

22   other five of those six, again, the two other carriers you've

23   identified are United and Delta?

24   **A.**   I mean, yeah.  It seems likely, given United and Delta's

25   position in New York.

1  **Q.**  And it's your position that United or Delta would

2  increase supply in response to higher fares by the NEA

3  defendants?  That's where repositioning and a competitive

4  response would occur?

5  **A.**  I think -- as I said, I think it very likely, in an

6  attempt to restrict output by another carrier, it would lead

7  to growth by the hub carrier.  So in this case, that's Delta

8  and United, so, yes.

9  **Q.**  But fair to say that Delta and United are already in the

10  route, right?

11  **A.**  I mean, again, taking -- I accept your representation

12  that that's Delta and United, so, yes, they would be on those

13  routes.

14  **Q.**  So fair to say that if they're already in that route and

15  they don't increase capacity, they benefit from the higher

16  fairs introduced into that nonstop over lap, right?

17  **A.**  The fares that would occur would be one thing in their

18  calculus, but so would their ability to strengthen their

19  network and increase their position on the route.  What I

20  experienced is that when given the opportunity, is hub

21  carriers generally like to control as much of the share on a

22  route as they can.

23  **Q.**  Okay.  So you think United or Delta would sacrifice its

24  operations on some other route in order to respond to higher

25  fares that -- if American and JetBlue decrease capacity on

1    one of these overlaps?

2    **A.**   I'm not saying they would "sacrifice."  I think one thing

3    that I said explicitly was they are the two carriers that

4    have very large slot positions, so their network has a lot of

5    flexibility to respond to opportunities.

6    **Q.**   But you would agree that if they're going to take

7    advantage of that slot position, they're going to have to use

8    flying from one market where they're using the slot, to a

9    market -- one of these overlap markets, right?

10   **A.**   They would either have to move one slot to add a flight,

11   or they would have to swap planes so often they could

12   up-gauge on one route and replace it with a plane that was

13   not quite full from another route.  When you have very large

14   networks, that's why hub carriers are strong.  They have lots

15   of flexibility.  They have lots of levers to pull to respond

16   to the spokes in their network.

17   **Q.**   So let me ask you to think about another example.  Let's

18   go down to the third row, where you've identified 11 routes

19   that had three other carriers.

20   **A.**   Okay.

21   **Q.**   And perhaps you don't recall, but fair -- maybe you do,

22   so I'll ask.  Is New York City to Los Angeles one of those?

23   **A.**   I don't know.  Those are large passenger routes, as you

24   see.  So could well be.  But I don't remember.

25   **Q.**   In any case, your understanding that Delta, United, and

1    American all offer premium cabin service in that market,

2    right?

3    **A.**   Yes.

4    **Q.**   And fair to say that you've seen evidence in the record,

5    including testimony, that when JetBlue introduced its Mint

6    service, the premium -- the premium fares that American and

7    United and Delta offered in that market all came down, right?

8    **A.**   I don't recall the testimony, but I'm sure that's

9    correct.  I fully believe that the JetBlue effect is real.

10   **Q.**   So again, not your position in that particular instance,

11   that having three other airlines was sufficient to prevent

12   the possibility of fares coming down in a market, right?

13   **A.**   Yeah, as I said, if it's -- JetBlue, with the JetBlue

14   effect or an LCC, that definitely has an effect.  So like I

15   said, I want to be clear.  If the JetBlue effect were going

16   away, then that would be -- that would entirely change my

17   view of this case.

18            MR. DOIDGE:  Can I just have a brief moment,

19   Your Honor?

20            THE COURT:  Yes.

21            (Counsel confers.)

22            MR. DOIDGE:  All right.  Your Honor, before we pass

23   the witness, we would like to, in light of Dr. Israel's

24   testimony earlier today, to renew the motion with respect to

25   the documents that have been withheld for privilege.

1          THE COURT:  All right.  You can -- you've renewed

2     the motion.

3          Anything that you want to say, Mr. Wall?

4          MR. WALL:  No.

5          THE COURT:  I take it you oppose?

6          MR. WALL:  I oppose.

7          THE COURT:  I'm not inclined to -- you've made the

8     motion, and it's denied for all the reasons that I said.  I

9     understand what he said, but I don't think that anything that

10    he said changes my view about those documents.

11         MR. DOIDGE:  If I may have a brief opportunity to

12    be heard, Your Honor?

13         THE COURT:  Sure.

14         MR. DOIDGE:  Yeah, so I think what I would want to

15    emphasize is what we heard from Dr. Israel earlier today is

16    that his benefits analysis fundamentally relies on a factual

17    claim, and that claim is that the 2019 actual schedule

18    reflects the best prediction of stand-alone 2023.  And he's

19    relying on that factual claim by another factual claim, and

20    is that that was, in fact, the view of the clean team in May

21    and June of 2020.  So there's no -- there is no getting

22    around what Dr. Israel has done with respect to justifying

23    the analysis that he did, without getting beneath whether or

24    not those factual claims are accurate.

25         THE COURT:  You mean whether it's accurate that the

1    clean team said those things, or whether it's accurate the

2    opinions baked within those statements?

3              MR. DOIDGE:  Whether or not that actually reflects

4    what the clean team believed.  And we certainly have seen

5    plenty of evidence to suggest that given the back and forth

6    between both Dr. Israel and the clean team during the

7    meetings where -- that are now being covered by this -- by

8    the privilege claim, were that very factual issue is put into

9    question.

10             THE COURT:  So, one, I, as you all know, reviewed

11   the documents.  I don't think, if you read those documents,

12   they they will in any way, shape, or form illuminate that

13   question, number one.

14             But separate from that, I don't think that's -- so

15   I don't --

16             So to the extent that you want them to illuminate

17   whether or not the clean team was of the view of those

18   factual predicates that you just described, I don't think

19   those documents will illuminate that.  That's my memory,

20   number one.

21             Number two, separate from that, I'm not sure it's

22   very -- like as a practical matter in this case, he did the

23   comparisons he did, just like your experts did the

24   comparisons they did.  I'm thinking about:  Are those

25   comparisons useful?  As to all of them.  Right?  What are the

1   assumptions they made?  What are the conditions they

2   considered?  What didn't they consider?  I'm evaluating all

3   of that.

4            If he made great -- if his -- the comparisons

5   analysis that he did was great and weighty, that will be

6   persuasive.  If it was not great or made assumptions that

7   don't make sense or are limited or undermine it in various

8   ways or contradicted about a number of things, I'm not sure

9   the opinion of the clean team -- I'm not sure of the

10  significance of the opinion, even if you -- like the

11  significance of the clean team on these questions is that

12  weighty.  They did what they did.  He did what he did.  Your

13  experts did what they did.  So -- and the clean team people

14  have been examined.

15           So I hear you, but for all of those reasons, and

16  what I expressed in the decision, the written decision, I

17  stand by the decision, and the request is denied.

18           MR. DOIDGE:  All right.  Thank you, Your Honor.

19           THE COURT:  You're welcome.

20           MR. WALL:  Just one question, Your Honor.

21           THE COURT:  It's not required.

22           MR. WALL:  No, no, it's not, but trust me, I

23  thought about the wisdom of doing this.

24           **REDIRECT EXAMINATION BY COUNSEL**

25            **FOR DEFENDANT AMERICAN AIRLINES**

BY MR. WALL:

**Q.** One thing, which we actually had cut in the interest of time, but then it was raised by counsel here. Can we put up slide 28 of the demonstrative. You asked some questions about whether the benefits of the NEA are coming from the expense of other consumers outside of the NEA. You had prepared this to present in your direct examination, this slide called, "Observed Effects Benefits on Non-NEA Airports." Could you just explain what it is and what you discern from it?

**A.** Sure. This was thinking about this question about whether there was harm outside the NEA. So it is literally the same analysis, the same observed share analysis that I showed, where you compare share in 2019 to share in 2021. You convert that into passenger changes and then you turn it into benefits. It's the same thing, only done for the nonNEA airports, and it gets $400 million in benefits to the nonNEA airports, because the traffic -- the share has gone up some in those locations.

**Q.** So that's a passenger change there in the middle column of about 1.7 million incremental 258 passengers?

**A.** Correct. So there are about 200 million passengers in 2019, about 1.7 million in -- it went up. You do all of that arithmetic we went through, you figure out --

THE COURT: It's not that the total was

1    1.7 million, it went up almost 1.7 million.

2              THE WITNESS:  Correct.  Correct.  And that's a

3    little less than 1 percent of the 200 million that it started

4    at.  You do that same division, by the elasticity, all that

5    stuff we did, same thing, you get $400 million.

6              MR. WALL:  Thank you, sir.  No more questions.

7              MR. DOIDGE:  Just one, Your Honor.

8          **RECROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

9    BY MR. DOIDGE:

10   **Q.**  Dr. Israel, the analysis that you were just looking at,

11   that wholly depends on the inference you were using where you

12   were finding those share changes, right?

13   **A.**  I mean, certainly it depends on the share changes.  I

14   mean, yes.  I showed other numbers looking at -- or, maybe,

15   there are other numbers certainly and important things

16   looking at other time periods, and so on, but, yes, it

17   depends on the shares.  The benefits calculation depends on

18   the shares that you input.

19             MR. WALL:  Nothing else, Your Honor.

20             THE COURT:  All right.  You're excused.

21             MR. WALL:  Thank you, Your Honor, for giving us the

22   extra time.  We appreciate it very much.

23             THE COURT:  No problem.

24             Let me just -- where are we?  Tomorrow we have --

25   we're going to proceed tomorrow 9:00 to 1:00?

1         MR. WALL:  Yes, and we have two witnesses tomorrow.

2    Dr. Brueckner -- Dr. Brueckner's direct exam is probably 45

3    minutes or so.  And then the final lay witness that we put

4    on, Brian Znotins.  So apropos some of the questions that you

5    asked before, Mr. Znotins is the head of network planning at

6    American Airlines.  If there's anything in the realm of

7    network planning that you want to ask about tomorrow, he's

8    your man.  He will be the one that will be able to answer

9    that.  That's all we have planned for tomorrow.  It's

10   possible that we'll end a little bit early.  We'll see.  And

11   then we'll finish with Dr. Carlton on the next day.

12        THE COURT:  On Wednesday.

13        MR. WALL:  Yes.

14        THE COURT:  So then should I anticipate -- what

15   should I anticipate for -- like in terms of Thursday and --

16   should I anticipate -- I have blocked out Thursday morning,

17   but should I anticipate that we'll have witnesses Thursday

18   morning?

19        MR. JONES:  Yes, Your Honor, so after Dr. Carlton,

20   we will put on Doctors Town and Dr. Miller, in that order, I

21   think.  Dr. Town first and Dr. Miller.  So I would anticipate

22   certainly going through until Thursday morning, at least.

23        THE COURT:  And just in terms of -- I haven't done

24   an exact calculation of the time, but my calculation was that

25   9:00 to 1:00, these four days, which is now -- I've given you

1    an extra -- just about an hour, would complete everything of

2    the time, roughly, the breaks, the extra time, everything

3    other than the closings.

4              MR. WALL:  That's how we look at it, as well,

5    Your Honor.

6              THE COURT:  Is that how you look at it?

7              MR. JONES:  I think that's right, Your Honor.  The

8    only thing that I would say is just in terms of how this all

9    shakes out, it depends in part on how early on Wednesday we

10   get into the rebuttal case, taking into account how long the

11   directs will be and how long the cross is going to be.

12             THE COURT:  Okay.  All right.  I will see you all

13   tomorrow morning.

14             MR. WALL:  Let me just say, from this side of the

15   aisle, we're really hoping that we're done Thursday and

16   believe that we should be done Thursday.

17             THE COURT:  Well, I'll just tell you that I don't

18   have -- I start a criminal trial Monday morning, and we have

19   a pretrial conference Thursday afternoon.  And I don't have

20   any time -- I don't think I have -- maybe I could find an

21   hour for you Friday morning, but that's the most that I could

22   find for you, I'm booked the rest of Friday.  So, you know,

23   if you told me, look, we don't want Thursday, we want to have

24   those four hours for scheduling reasons, or not, we could

25   talk about that.  But I've been calculated that all of this

1    time would -- Monday to Thursday, ran out everything, other

2    than closing arguments.  And we'll just talk about when is a

3    time to come back for closings.

4            And then if you want to do it soon, rather than --

5    I'm going to want to see you probably after I've digested

6    everything, but if you want to do that, I'm willing to try to

7    find that time.  It wouldn't be Friday.  But that's the way

8    that I'm thinking about it.

9            MR. JONES:  And Your Honor, I would say certainly

10   our hope and desire, as well, is to be done 1 o'clock on

11   Thursday, with the taking of evidence.  It's just a matter of

12   getting Doctors Town and Miller up and down in that time

13   frame, starting some time Wednesday, mid morning?

14           THE COURT:  I guess I'm also saying that with

15   respect to the amount of time that I added and the amount of

16   time that we had, that I added the time.  I gave you all the

17   time you asked for.  I thought that was fair under the

18   circumstances for the reasons that I said, but I'm not

19   anticipating, as I said before, adding to that time, for

20   either one of you.  Like the time I gave you originally, plus

21   the additional time, is, in my view, sufficient.  So, you

22   know, short of catastrophic disaster or, you know -- I just

23   don't see --

24           I meant what I said when I told you I was giving

25   you those four hours, but I wasn't giving you five more

1    minutes, and I stand by that.  So you should all plan your

2    time accordingly.  Because when that -- and my rough

3    calculation is 9:00 to 1:00, especially with this additional

4    hour, is we'll be done with all of that time by Thursday.

5              If I'm wrong about that, figure it out, tell me now

6    or tell me tomorrow morning.  But that's the way I've been

7    operating as a rough calculation.  And, you know, nothing

8    stops you from asking, but I meant what I said before, and so

9    far I haven't seen anything that would cause me to revisit

10   and give more time.

11             MR. JONES:  And Your Honor, to be clear, we are not

12   asking for any additional time.

13             THE COURT:  I understand.

14             MR. JONES:  We heard the Court loudly and clearly.

15   We are not asking for not a minute of additional time from

16   our side.

17             MR. SCHWED:  And from our calculation, unless

18   there's more lost time than anticipated, we think all the

19   time should fit in, as Your Honor predicted, by 1:00 p.m. on

20   Thursday, unless something happens that's unexpected in terms

21   of time being lost.

22             THE COURT:  Okay.  Great.  Good.  Have a good

23   night.  I'll see you tomorrow.

24             (Court in recess at 4:38 p.m.)

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5     and for the United States District Court for the District of

6     Massachusetts, do hereby certify that pursuant to Section

7     753, Title 28, United States Code, the foregoing pages

8     are a true and correct transcript of the stenographically

9     reported proceedings held in the above-entitled matter and

10    that the transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United States.

12

13                    Dated this 24th day of October, 2022.

14

15

16

17              /s/ RACHEL M. LOPEZ

18

19

20          _____

             Rachel M. Lopez, CRR
21           Official Court Reporter

22

23

24

25