<pre>
 1                   UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MASSACHUSETTS

 3

 4   _____

 5   UNITED STATES OF AMERICA, et al.

 6         Plaintiffs,                    Civil Action No.
                                          1:21-cv-11558-LTS
 7      v.

 8   AMERICAN AIRLINES GROUP, INC.,
     et al.,
 9
           Defendants.
10
11   _____

12      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                        BENCH TRIAL
                           Day 15
15

16
                     Tuesday, October 25, 2022
17                         9:00 a.m.

18

19

20
     John J. Moakley United States Courthouse
21   Courtroom 13
     One Courthouse Way
22   Boston, Massachusetts

23
     Rachel M. Lopez, CRR
24   Official Court Reporter
     raeufp@gmail.com
25
</pre>

1                        **A P P E A R A N C E S**

2

3    On behalf of the Plaintiff United States of America:

4        United STATES DEPARTMENT OF JUSTICE
         BY:  WILLIAM H. JONES, III; EDWARD WILLIAM DUFFY; AND
         JAMES MOORE, III
5        450 Fifth Street, Northwest
         Suite 8000
6        Washington, D.C.  20530
         (202) 514-0230
7        bill.jones2@usdoj.gov
         edward.duffy@usdoj.gov
8        james.moore4@usdoj.gov

9

10   On behalf of the Defendant American Airlines Group, Inc.:

11       LATHAM & WATKINS, LLP
         BY:  DANIEL M. WALL AND ALLYSON M. MALTAS
12       505 Montgomery Street
         Suite 2000
13       San Francisco, California  04111
         (415) 391-0600
14       dan.wall@lw.com
         allyson.maltas@lw.com

15

16

17   On behalf of the Defendant JetBlue Airways Corporation:

18       SHEARMAN & STERLING LLP
         BY:  RICHARD F. SCHWED
19       599 Lexington Avenue
         New York, New York  10022
20       (212) 848-4000
         richard.schwed@shearman.com

21

22

23

24

25

1                      **TABLE OF CONTENTS**

2

3                       **TRIAL WITNESSES**

4

5     On behalf of the Defendants:                    Page

6     JAN BRUECKNER, Ph.D.

7              By Mr. Malone                          4

8              By Mr. Duffy                          31

9              By Mr. Malone                         56

10    BRIAN ZNOTINS

11             By Ms. Maltas                         58

12             By Mr. Moore                         116

13

14

15                        **EXHIBITS**

16

17    On behalf of the Defendants:                Admitted

18     Number DX-1087                               85

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1
2          (In open court.)
3          THE DEPUTY CLERK:  The United States District Court
4  for the District of Massachusetts is now in session, the
5  Honorable Leo T. Sorokin presiding.
6          THE COURT:  Please be seated.  Good morning.
7          Everybody ready to go?
8          MR. WALL:  We are.
9          THE COURT:  Okay.  Go ahead.
10         MR. WALL:  We will call Dr. Jan Brueckner, and my
11  partner, Farrell Malone, will conduct the investigation.
12         THE COURT:  Good morning, Mr. Malone.
13         MR. MALONE:  Good morning.
14                 **JAN BRUECKNER, Ph.D.**
15         having been duly sworn, testified as follows:
16   **DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT AMERICAN AIRLINES**
17  BY MR. MALONE:
18  **Q.**  Good morning.
19  **A.**  Good morning.
20  **Q.**  Professor Brueckner, could you give us your current
21  occupation and title?
22  **A.**  I am a distinguished professor of economics at the
23  University of California, Irvine.
24  **Q.**  And how long have you been in that role?
25  **A.**  I've been in there since 2005.

**Q.**  Did you have any professional roles before your time at UC Irvine?

**A.**  I was at the University of Illinois for almost 30 years. I went there after graduate school in 1976.

**Q.**  And what's your primary field of research?

**A.**  My work falls under the broad heading of applied microeconomics.  I actually work in four different areas, one is urban economics --

THE COURT:  Did you say "urban"?  I'm sorry, did you say "urban"?

THE WITNESS:  Urban economics, yes.  Economics of various aspects of cities, in addition, public economics, taxes and spending, real estate economics, which is basically the economics of mortgages and mortgage markets, and then finally airline economics.

BY MR. MALONE:

**Q.**  And for how long have you been doing your airline work?

**A.**  My first publication on airlines was in 1990, so it's been about 30 years.

**Q.**  And you mentioned your research is focused on a few different areas.  What portion of your work relates to the airlines?

**A.**  Lately maybe a third does.

**Q.**  Have you had any airline research published -- or just research, in general, published in peer-reviewed journals?

1    **A.**   Yeah.  I have about 160 papers published and 37 of those,

2    at least, are about airlines.

3    **Q.**   You checked your CV for that?

4    **A.**   I did, yes.

5    **Q.**   Have you served as an expert in any airline cases before?

6    **A.**   Well, first, I've done a lot of consulting work in a

7    nonexpert way for airlines, mainly related to

8    international airline alliances.  So that was regulatory

9    stuff.  It wasn't really -- it didn't involve court

10   testimony.  The one airline court case that I've been

11   involved in is the -- is a class action suit against

12   Southwest Airlines and Boeing, alleging that those two

13   entities allowed people to fly on the MAX airplane while

14   knowing it was unsafe, and I was on the plaintiffs' side, so

15   against Southwest.

16   **Q.**   And what types of issues has your research in the airline

17   industry focused on?

18   **A.**   It's quite a range of issues.  I started looking at

19   hub-and-spoke systems, the economics of hub-and-spoke

20   networks, and then international airline alliances, price and

21   frequency competition among airlines, market definition, as

22   we'll see in a moment, airline bag fees.  Airline emissions

23   and the contribution of airlines deployment change.  Most

24   recently worked on airline schedule buffers, which are the

25   time slots that airlines add to their schedule to keep

1    flights on time.

2    **Q.**   Thank you.  Can you tell me more about the market

3    definition work?

4    **A.**   So I worked on the United/Continental merger, along with

5    Darren Lee and Ethan Singer, and United basically

6    commissioned us to write a suite of academic papers on topics

7    that basically we chose and they approved of, one of them was

8    the market definition paper.  And there was another paper

9    about international alliances, and a third paper about price

10   competition between airlines.  And in effect, United paid us

11   to do, quote/unquote, basic research, and they had no

12   influence on what we did or the results that we got.

13   **Q.**   Is that market definition paper you mentioned the work

14   you co-authored with --

15   **A.**   Yes.

16   **Q.**   -- Ethan and -- can you explain?

17   **A.**   Excuse me?

18   **Q.**   Who your co-authors were?

19   **A.**   Yes, it was Darren Lee and Ethan Singer.

20   **Q.**   Is it okay if I call that the BLS 2014 paper?

21   **A.**   Yes, please do.

22   **Q.**   Has that paper been cited in other work?

23   **A.**   It's been cited a fair amount.  I think about 40 times in

24   the journals.

25   **Q.**   Are you aware of any criticisms of that paper?

1    **A.**   No.

2               MR. MALONE:  Your Honor, we would proffer Professor

3    Brueckner as an expert witness in this matter with respect to

4    airline industry economics in competition.

5               MR. DUFFY:  No objection, Your Honor.

6               THE COURT:  All right.  So qualified.

7    BY MR. MALONE:

8    **Q.**   Professor Brueckner, when were you engaged as an expert

9    in this case?

10   **A.**   It was around March of this year.

11   **Q.**   And what were you asked to do?

12   **A.**   I was asked to redo the market definition study using

13   more recent data.

14   **Q.**   Did anyone help you?

15   **A.**   Ethan Singer at Compass Lexecon helped me.  He was one of

16   the original co-authors and so he did the regressions under

17   my supervision.

18   **Q.**   Did you change the methodology at all from 2014?

19   **A.**   No, we did not.

20   **Q.**   Have there been any significant changes in the

21   marketplace?  Well, I guess in the New York City area

22   specifically, since 2014?

23   **A.**   Well, a big change is that United, after the merger with

24   Continental, relocated most of its service to Newark.  And so

25   Newark previously was a continental hub.  Now it's a hub for

1   a much bigger airline, and so that's a dramatic change in the

2   market situation in New York.  You have this hub operated by

3   one of the world's biggest airlines right across the river

4   from Manhattan.

5   **Q.**  So we'll go through this in more detail, but just to get

6   it out there, what were the primary findings of your report

7   updating the 2014 BLS data.

8   **A.**  Well, let me just say that the report does airport

9   groupings.  In other words, decides what airports in

10  multiairport metro areas should be considered as a single end

11  point, And so we did that in the original paper.  We do it in

12  this paper.  The focus for the present case, though, is on

13  the results for New York.  And the results for New York

14  indicate that all three airports should be grouped, Newark,

15  LaGuardia, and JFK.  They should all be grouped and treated

16  as a single end point for the purpose of competition

17  analysis.

18  **Q.**  The 2014 paper, was it written for a specific

19  metropolitan area?

20  **A.**  No, it wasn't.  The idea was to come up with a method for

21  airport groupings that would apply generally to all metro

22  areas.  So we were not focused on New York.  New York was

23  just one of the cases we looked at.

24  **Q.**  Thank you.  I want to step back and put that work, your

25  paper, into context -- your work for this case.  Have you

1  reviewed the complaint in this case?

2  **A.**  Yes.

3  **Q.**  And what's your understanding of how the plaintiffs have

4  defined the market for purposes of this case?

5  **A.**  Well, they defined the New York market as consisting of

6  LaGuardia and JFK airports.  Newark is not part of that

7  market.

8  **Q.**  And what's your opinion of that?

9  **A.**  Well, I think that's unreasonable and incorrect.  It goes

10 against intuition, first of all, because you have this big

11 airport proximate to Manhattan and other parts of New York,

12 and to act like as if that's not part of the Newark market,

13 it just seems counterintuitive and implausible.

14 **Q.**  What is your understanding of how plaintiffs have reached

15 their conclusion on grouping just JFK and LaGuardia?

16 **A.**  Well, the way they reach their conclusion is not really

17 clear.  They do not have a systematic method for deciding on

18 airport grouping.  In other words, there's no decision rule

19 that says, okay, if such and such is true, we group the

20 airports.  If, on the other hand, such and such is not true,

21 we don't group the airports.  There's no decision rule in

22 their method.  And in fact, I don't really think they have a

23 method.

24 **Q.**  Can you describe in your words the key question from an

25 economics perspective when defining a relevant market?

1   **A.**   So the main question is whether consumers substitute

2   across products in the market.  If there's substitution, then

3   we want to keep those -- put those products in the same

4   market.  If the consumers don't substitute across products,

5   then we're allowed to keep some products out of the market.

6   And so in the airline context, what that means is that the

7   product is a flight from a particular airport, so the

8   question is do we want to include multiple airports in the

9   product definition, where the product has traveled from a

10  given metro area to various end points.

11  **Q.**   How does your methodology address that question?

12  **A.**   Well, what we do is we look for competitive spill overs

13  across airports.  So in other words, the idea is that if

14  fares at one airport -- I'm sorry, if competition at one

15  airport affects fares at another airport, where the fares are

16  for travel to the same destination, then that's evidence of a

17  competitive spill over across airports.  So basically, our

18  grouping method looks for competitive spill overs and groups

19  airports where these spill overs exist.

20  **Q.**   Thank you.  Professor Brueckner, I want to ask you to

21  give an overview, a slightly more detailed overview of the

22  2014 methodology.  I understand that you've prepared a

23  demonstrative to do that.

24  **A.**   Yes.

25  **Q.**   If you can take a few minutes to walk us through how the

1    method works.

2    **A.**  Okay.  So --

3              MR. MALONE:  You have to turn it on, by the way.

4              THE WITNESS:  Okay.  Is it not on?  Okay.  Hold on

5    a minute.  There we go.

6              All right.  So let's -- let me show you how the

7    method works.  And we're going to focus on New York City for

8    concreteness here, since that's what we're interested in in

9    the case.  So what the method does is it starts by

10   identifying a primary airport for the metro area.  And that

11   primary airport in this particular example is going to be

12   John F. Kennedy.  And then we identify secondary airport,

13   Newark in this case.  Now, you say what happened to

14   LaGuardia?  Well, it's coming.  We'll consider LaGuardia in a

15   minute.  But just consider the method applied to these two

16   airports.  And so what the slide shows is it shows travel to

17   a particular destination, namely Atlanta international, from

18   the secondary and primary airport, and we can see that Delta

19   and JetBlue serve Atlanta out of JFK, whereas United, Delta,

20   and Spirit serve Atlanta out of Newark.  And so -- and we

21   want to decide whether JFK and Newark should be grouped,

22   namely treated as a single end point for the purposes of

23   competitive analysis.  That's the question.

24             Now, let's suppose an additional carrier starts

25   Atlanta service from either JFK or Newark.  Bear in mind that

1    what we're carrying out here is a thought experiment, and it

2    will relate to the regressions that we run eventually, as

3    I'll explain.

4           So let's suppose that the additional carrier serves

5    Atlanta out of the -- out of JFK, out of the primary airport.

6    Now, we expect that when -- there's more carriers serving a

7    route, that the fare will go down.  And if the fare that

8    we're talking about here is the fare -- the average fare

9    between JFK and Atlanta, across all airlines.  And so let's

10   suppose that the -- the fare on this primary route, which

11   we'll call the in route, as opposed to the out route, as

12   you'll see in a minute, let's suppose the fare goes down by X

13   percent, so X is some number, positive number.  Okay.

14          But now here's where things get different from a

15   normal approach to looking at competition.  Now we're going

16   to add the additional carrier to the secondary airport route.

17   And so in other words, we're going to assume that another

18   carrier is now serving Atlanta, but now it's serving from

19   Newark.

20          Now, if there's a competitive spillover, the

21   presence of this additional carrier from the secondary

22   airport should reduce fares from JFK to Atlanta.  In other

23   words, extra competition on the secondary route to Atlanta is

24   going to reduce the primary route's average fare.  That's the

25   idea.  And so let's -- let's suppose that such an effect

1   exists, and let's imagine the magnitude is wide.  So fares go

2   down on the JFK-Atlanta route by Y percent.

3           Now, Y could be zero, and that would tell you that

4   there's no competitive spillover, okay?

5           Now, what we want to do in judging -- well, okay,

6   another point here is the additional carrier could be an LCC

7   or a legacy.  Now, those types of carriers have different

8   competitive effects, as is well known from a huge amount of

9   work on pricing in airline markets.  So we expect that the

10  effects would be different for those.  So what that means is

11  that there's a -- there's a particular X and a particular Y

12  for an LCC, when the additional carrier is an LCC, and a

13  particular X and a particular Y for a legacy carrier.

14          Okay.  Now, not only is there the possibility of

15  different types of airlines affecting -- affecting fares

16  through extra competition, but in addition, there are many

17  different destinations that are relevant.  In other words,

18  JFK -- service from JFK to many different destinations exists

19  beyond just Atlanta.  And so what we have here is a whole

20  constellation of things.  We have different types of carriers

21  generating competitive effects, and the effects existing to

22  many different destinations.  And so what we're going to do

23  is run a regression to find the typical X and typical Y

24  values for both LCCs and legacies.  And the data for the

25  regression is fares and competition levels to all the

 1    different JFK destinations, destinations out of the primary

 2    airport.

 3            THE COURT:  What do you mean by "competition

 4    levels"?

 5            THE WITNESS:  Excuse me?

 6            THE COURT:  What do you mean by "competition

 7    levels"?

 8            THE WITNESS:  In other words, we're going to count

 9    the number of carriers that are serving --

10            THE COURT:  A particular route.

11            THE WITNESS:  Yes.  That are serving both the in

12    route from the primary airport, and the out route.  So

13    there's going to be a discreet count, like 1, 2, 3 --

14            THE COURT:  So the level of competition, if there

15    was one carrier from JFK to Atlanta, and no carriers from New

16    York to Atlanta, you wouldn't be having any competition.

17            THE WITNESS:  That's right.

18            THE COURT:  And on the other end would be if you

19    say you had five carriers from an airport, serving --

20            THE WITNESS:  That's true and one of the --

21            THE COURT:  That would be how you measure the

22    level, by looking at the number of different carriers

23    offering that kind of service.

24            THE WITNESS:  Right.  One thing we do is we don't

25    double count.  If the carrier is serving the primary route

1  and it's also serving a secondary route, we don't count it as

2  an additional competitor.  Another thing to note is that --

3          THE COURT:  Does frequency affect the competition

4  level?

5          THE WITNESS:  No, frequency is not taken into

6  account.

7          THE COURT:  Okay.

8          THE WITNESS:  Another thing that is germane to your

9  question is that sometimes there's no service, as you just

10  said, on the secondary routes.  In other words, our focus is

11  on the routes out of JFK and maybe some JFK destinations

12  don't get served out of Newark.  And so we get a zero for

13  those, like you said.

14          All right.

15  BY MR. MALONE:

16  Q.  So where does it go from there?

17  A.  All right.  So in order to figure out -- in order to

18  engage the extent of these in and out competition effects,

19  we're going to do a statistical test for equality of the X

20  and Y numbers.  We want to know whether X is equal to Y.  And

21  to do that, we use something that's called a P value, which

22  is a standard thing in statistical procedures.  And if the P

23  value for this test that X equals Y is bigger than .05, that

24  means there's no statistically significant difference between

25  the in and out competition effects.

1            If, however, P is less than .05, then we can reject

2     equality co-efficient.  So that's a kind of familiar

3     statistical test, right?  Where we test for equality, we

4     reject it at the five percent level.  You've heard this many

5     times in, you know, reading about medical -- medical

6     experiments, and so on and so forth.  So anyway, deciding

7     whether X and Y are equal relies on this test and the P

8     value.  And so if they're equal, we think that competition --

9     that the spill over effects are big.  In other words, they're

10    the same as the in-market effects.

11    BY MR. MALONE:

12    **Q.**  Thank you, Professor Brueckner.  You mentioned the

13    multi-airport, how does the method get applied when there's

14    more than two airports?

15    **A.**  Okay.  So let me show you what we do for New York, when

16    there are three airports.  And you know, there are a number

17    of different metro areas with more than two airports.

18            So first, the first thing we do is to carry out

19    what's called a first stage test.  And the first stage test,

20    what we do is we group the secondary airports into a single

21    entity.  So in other words, we group Newark and LaGuardia

22    into one end point, and then we go through the procedures

23    I've just told you about, and we ask whether the

24    in-competition effect is the same as the out-competition

25    effect, and we do it both for LCCs and legacies.  And when we

do this for New York, you can see at the top of the table there that the LCC for P value is 0.464.  Now that number is bigger than .05, and that tells us we cannot reject the equality of effect for LCCs, so the in and out effects are the same statistically for LCCs.  For legacies, the P values are really small.  It's not exactly zero, but it's close to zero.  And so we -- the LCC in and out effects are different.  Now, here's a crucial point.  In deciding whether to group, our rule is as follows:

We group if the in and out effects are equal for at least one carrier type.  In other words, for LCCs or legacies or both.  So in this particular case, we pass the test because the P value is bigger than .05 for LCCs, even though it's not for legacies.  So this particular grouping of airports, or division of airports, JFK versus a composite of Newark and LaGuardia, our method says group these airports, put them all together.

Now, if we were just doing a two airport metro area, we'd be done.  But since we have three airports, we want to make -- we want to see whether binary comparisons lead to the same conclusion.  So now what we're going to do is we're going to carry out the same method for JFK versus Newark, all by itself, not grouped with -- not considered as a composite with LaGuardia.  And so when we do that, you see the results in the middle of the screen there.

1          So now you can see the P values are both bigger

2     than .05.  What that says is that the in and out competition

3     effects are equal for legacies, and they're also equal for

4     LCCs.  So we meet our at least one criterion in this case.

5     So doing the choice as this -- whether or not to group this

6     pair of airports, the answer is yes, group them.

7          But now lastly, we want to treat JFK versus

8     LaGuardia.  And when we do this, the results kind of look

9     like they do at the top of the screen there.  We have the LCC

10    P value is bigger than .05, indicating that -- indicating no

11    difference in the in and out effects.  The legacy P value is

12    small.  So at least one of the P values is bigger than .05.

13    So again, we group the three airports.

14          And so, we're done.  All those three different

15    tests point to grouping, so we group all three airports, all

16    the New York City airports.

17    Q.   Thank you, Professor Brueckner.  I want to turn now to --

18          THE COURT:  So wait.  So no -- sorry.

19          MR. MALONE:  Sorry.

20          THE COURT:  No statistically difference in your

21    method means that there is fungible replacement?  In other

22    words, if -- is that what you're saying?

23          THE WITNESS:  Well, what do you mean by fungible

24    replacement?

25          THE COURT:  In other words, the whole idea is

1   whether someone who was going to buy JFK is effected by the

2   differential price to the same end point out of Newark.

3          THE WITNESS:  Yeah.  That's right.

4          THE COURT:  And so there's no statistically

5   significant difference, say, in the top row here, no

6   statistically significant difference for LCCs, and that means

7   that, at least as to LCCs, there is --people are switching to

8   Newark --

9          THE WITNESS:  Right.

10          THE COURT:  -- for cost difference.  And then,

11   under your method, therefore that would suggest that it's in

12   the same group.

13          THE WITNESS:  Yes.  You know, I didn't have a

14   chance to say this before, but let me say it now in response

15   to your question.  The ultimate issue in deciding on airport

16   grouping is consumer substitution across airports.

17          THE COURT: Right.

18          THE WITNESS:  We don't measure consumer

19   substitution.  To do that, you'd need to have a travel

20   survey, where you ask people.  You know, if the fare were --

21   were five percent lower at one airport, would you switch and

22   use that airport? We don't have that.  But the -- this

23   competitive spillover test is sort of the next best thing to

24   looking at consumer substitution, because if we see these

25   competitive spillovers, that means that consumers must be

1    looking across these airports if -- in other words, airlines

2    know that, and so they're going to respond to competition at

3    the secondary airport.  So that's an important point about

4    the method; namely, we're not measuring substitution, but

5    it's the next best thing.

6            THE COURT:  Did you do the analysis route by route?

7            THE WITNESS:  No, because, see, all the routes out

8    of the primary airport are in the sample.  In other words, we

9    don't -- we wouldn't have enough data to do it route by

10   route.

11           THE COURT:  I see.

12           THE WITNESS:  We'd only have one observation.

13           THE COURT:  Right.

14           THE WITNESS:  Now, we do this across years, so the

15   sample, it has multiple destinations, multiple years, and

16   that's how we have enough data to estimate this stuff.

17           THE COURT:  I see.  Okay.  Thank you.

18           Go ahead.

19   BY MR. MALONE:

20   Q.  Thank you, Professor Brueckner.  I want to turn to the

21   results of the update report you did for this case.  And the

22   example you just gave used JFK as the primary airport.  And I

23   think this table, I think, reports the results of all the

24   work you did for New York.

25           Could you walk us through the key output here?

**A.**  Okay.  So first of all, the columns 7, 8, and 9, those
are the results that I've just been telling you about, and
I'll come back to them in a second.  But the question you
might have is why treat JFK as the primary airport, maybe
LaGuardia is the primary airport, or maybe Newark is the
primary airport.  And so what we did is we redid this
procedure using alternatively each of the three New York area
airports as the primary.  And so the columns one through
three show you the results when LaGuardia is the primary.
Columns 4 through 6 show you the results when Newark is the
primary.

       Okay, so we can go and look at the JFK results now,
and --

**Q.**  So what are we looking at?

**A.**  So the first column shows you the -- the first stage
test, where we're -- JFK is the primary, and the other two
airports are grouped as the secondary.  That number there is
the LCC in effect -- you can see over on the left-hand side
of the table, it says LCC comps in.  Well, that is our
unfortunate variable name, but anyway, that's the -- this is
the LCC in effect.  And what does the number tell you?  It
should be read as a percentage.  So in other words, this
tells you that another LCC carrier, serving JFK to the
particular -- a particular destination is going to reduce the
average fare at JFK by 5.51 percent.  So you put the decimal

1    place two places over to get the percentage effect.

2            Okay.  Now, the next circled number is the out

3    effect.  So this says that if we put another -- another LCC

4    carrier on the out route, namely serving either LaGuardia or

5    Newark --

6            THE COURT:  Wait, wait.  If you add on the first

7    line, you add an LCC at JFK, this is saying it's going to

8    reduce the fare at JFK by 5.5 percent?

9            THE WITNESS:  Yes.  Yes.

10           THE COURT:  Not -- what about Newark and LaGuardia?

11           THE WITNESS:  We don't look at -- the only fares

12   that we look at are at the primary airport.

13           THE COURT:  I see.  Okay.

14           THE WITNESS:  Okay.  So the second number is

15   -0.301, and that tells you that another LCC on the out route,

16   in other words, from LGA or LaGuardia to the particular

17   destination, is going to reduce fares at JFK by 3 percent.

18           Now, the question is, are those numbers equal

19   statistically?  And the test -- the P value for that test is

20   0.464.  In other words, those numbers are statistically

21   indistinguishable.

22   BY MR. MALONE:

23   Q.  Is that what the -- so you've added a check mark here

24   that --

25   A.  And the check mark says, okay, that tells you that we

group when we're dividing up the airports in this fashion.

Now, the other -- the other columns of the table do the JFK versus Newark, JFK versus LaGuardia, and the P values I already told you about. They're there. And so those -- those things also have -- those columns also have checkmarks, as we saw before.

Q. So what do we take from this, the fact that --

A. That treating JFK as the primary airport, we should group all three New York area airports.

Now, let's look at the rest of the table. The circles toward the bottom there are the -- indicate when P values are bigger than .05. And so across the board, you can see that at least one of the P values in each column is bigger than .05. And that means that, for all those grouping tests, the primary and secondary tests, the grouping is the outcome. And hence, we have these checkmarks across the board.

So what this means is that, regardless of which airport is viewed as primary, our method indicates that the three New York area airports should be grouped. And this result not only comes out of the method, but it makes sense. It conforms to common sense, that Newark should be in the airport group with LaGuardia and Newark -- LaGuardia and JFK.

Q. Thank you, Professor Brueckner. I have a few other questions about the output here. What do the asterisks mean

1  on -- so, for example, the second blue --

2  **A.**   Okay.  So the asterisk attached to the 0.301 number, that

3  means that that coefficient is significantly different from

4  zero, or it's statistically significant.

5  **Q.**   And what's the primary output we should focus on from the

6  results?  Is it the -- well, yeah.  What's the primary output

7  we should focus --

8  **A.**   Let me just say -- before I answer your question, let me

9  just say one other thing.  The first number there, the 0.551

10 is -- does not have an asterisk.  So that estimate is not

11 significantly different from zero.

12         Now, bear in mind that this estimate is still an

13 unbiased estimate of the LCC in effect, it's just imprecisely

14 measured and, therefore, we cannot reject the null hypothesis

15 that it is equal to zero.

16         But the thing is, in response to your question, we

17 don't really care too much about the statistical significance

18 of the individual co-efficients.  What we're interested in is

19 testing for the quality of the co-efficients.  And those are

20 different things.

21         So results like this are perfectly fine, as far as

22 we're concerned.  So that's the answer.

23 **Q.**   Does the test in the null hypothesis row depend on

24 statistical significance of -- or statistically significantly

25 different from zero of any of the output of the model?

**A.**  In testing equality of co-efficients in a regression

model, three things matter.  One, how big -- how big the

co-efficients are.  These co-efficients are kind of not that

far apart, five percent, three percent, so the co-efficient

magnitudes matter.  The standard errors of the co-efficients,

which determines statistical significance, matter, too, in

the test for equality.  But there's a third thing and that's

the estimated co-variants of the co-efficients.  That's a

pretty arcane concept, but the co-variants matter in deciding

whether that things are statistically equal.  So statistical

significance is just -- is one element that leads to either

yes or no test on -- for equality, but it's not the only one.

**Q.**  Thank you.  Your technician that the tests, your method

looks for statistical equality either for LCCs or legacies,

but not both.  Why is that?

**A.**  Well, we think it's reasonable, you know.  For

competition spillovers to exist across airports.  We think

that showing that it exists for one carrier type is

sufficient.  It's a reasonable approach.

A secondary fact is that the other test would make

our -- the other criteria, namely, requiring a quality of in

and out effects for both carrier types, would make it

impossible to apply our method for many of the metro areas,

so the method would kind of be useless.  And the reason is --

the reason we won't apply it is because what we're talking

1    about earlier, is that oftentimes we don't have enough out

2    service in order to do the test.  And if you look -- for

3    example, look at the column 3 on -- in the table there,

4    there's an "NA" in the P value part of column 3.  And why is

5    that?  It's because on the out routes, in other words, routes

6    served from LGA, JFK service only exists for legacies on two

7    of those routes.  And that's not enough out competition to

8    decide whether in and out competition are equal.

9            And so if we tried to apply our method using this

10   criterion, we couldn't do it.  We couldn't do it for New York

11   with LaGuardia as the primary airport, and we couldn't do it

12   for lots of other metro areas.  So the answer is that we

13   think that the -- requiring equality of effects for one

14   carrier, at least one carrier type is reasonable.  A

15   secondary consideration is that making the requirement that

16   both effects be equal would make our method hard to use.

17   **Q.**  Thank you, Professor Brueckner.  Don't laugh at me for

18   asking this, but are you familiar with endogeneity?

19   **A.**  Yes, endogeneity is an important issue in empirical

20   economics.  And basically what it -- in the present context,

21   what endogeneity boils down to is two-way causation.  So what

22   we're looking at here is the effect of competition on fares.

23   Right?  So the fares are the dependent variable and the

24   causation is the independent variable.  So we have a

25   causation running from competition to fares, but it's

1    possible that there's a reverse causal effect, namely that

2    the level of fares effect the amount of competition on a

3    route.  Why?  Because if there are high fares on a route,

4    then carriers want to serve that route.  They can make a lot

5    of money.  And so therefore, we might expect that there's

6    this reverse causation running from fares to competition.

7    **Q.**   Did you consider that endogeneity and adjust for it?

8    **A.**   Well, we considered it.  We talked extensively about it

9    in our 2014 paper, and we did not adjust for endogeneity in

10   this setting for the following reason:  First, we're

11   measuring these competition variables in a discrete manner.

12   In other words, it's a one, two, three, four type measure.

13   It's not a continuous variable that -- where we would have 1,

14   1.1, 1.2.  That kind of thing.  So in other words, in order

15   to change the level of competition, you would need to get

16   sort of over a hurdle.  It's not -- you would need a big

17   something to happen to get you from one to two, say.  And so

18   in that setting we think that the problems caused by

19   endogeneity are not as severe as they would be in a

20   continuous setting like I just described.  But not only do we

21   have that opinion, but we also buttress it by results from a

22   paper by Gale and Wu that we cite in the original paper, and

23   I believe in the expert report, too.

24           And what Gale and Wu did is they looked at the

25   effects of correcting for endogeneity of competition in a

1    model just like this, where you have discrete carrier counts,

2    where you measure competition as a count.  And what they

3    showed is that if you go through an elaborate method to

4    correct for endogeneity, it has no effect on the competition

5    estimates.  In other words, the effect of competition on

6    fares is the same, regardless of whether or not you correct

7    for this endogeneity.  So that's a sort of formal support for

8    our choice of not doing anything about competition, the

9    endogeneity competition in this -- in this setting.

10   **Q.**  Thank you.  Professor Brueckner, are the results that you

11   got in your updated report consistent with the BLS 2014

12   results?

13   **A.**  The grouping results differ for different metro areas.

14   For example, we grouped the three at Washington airports in

15   2014.  We don't group them this time.  So there are other

16   changes like that.

17          When it comes to New York, a different type of

18   explanation is needed.  In the New York case, for the 2014

19   paper, the only thing we did was to treat LaGuardia as the

20   primary airport.  In other words, we didn't do this thing of

21   switching and allowing each of the airports to be primary.

22   When we ran the regressions for -- for LaGuardia as the

23   primary, the equivalent to column 2 there, LaGuardia versus

24   Newark, we found that the P values were both less than .05.

25   So the secondary -- the second stage test said don't group

1    LaGuardia and Newark.

2              And so the strict output of the method was no

3    grouping for the New York area airports.  However, we

4    discounted this result, and in the paper we stated that our

5    grouping for -- for New York has all three airports grouped.

6    We did so based on the -- on common sense.  In other words,

7    we -- we don't want to use the method to lead to -- to

8    generate conclusions that we think are at variance with

9    common sense, and so our belief was that with a big hub

10   airport right across the river from New York, operated by

11   Continental, it made no sense whatsoever to say that Newark

12   was not part of the New York market.

13   **Q.**   This was in 2014?

14   **A.**   In the 2014 paper.

15             Here in the updated paper -- and perhaps this is a

16   result of more of United's big hub, bigger hub at Newark,

17   compared to the previous period.  There's no question that

18   the three airports should be grouped.  It's unequivocal.

19   **Q.**   Thank you, Professor Brueckner, so based on the updated

20   analysis of your paper, what's your conclusion regarding the

21   appropriate market definition for assessing competitive

22   effects in New York City?

23   **A.**   The appropriate market definition is that all three New

24   York area airports should be treated as a single end point

25   for the purposes of competition analysis.  And so the

1   conclusion is that New York is a very competitive airline

2   market.  You have service from all of these airports, and

3   they all should be grouped in assessing competitive effects.

4            MR. MALONE:  Thank you, Your Honor.  No further

5   questions.

6            THE COURT:  All right.  Cross.

7            MR. DUFFY:  Yes, Your Honor.  Ed Duffy from the US

8   Department of Justice for plaintiffs.  If you can give us

9   just a moment to pass out binders.

10            THE COURT:  Yes.

11   **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

12   BY MR. DUFFY:

13   **Q.**  All right, Dr. Brueckner, in front of you should be a

14   binder that contains the deposition transcript and some other

15   materials that we'll refer to.  First question, Professor

16   Brueckner, I take it you stand by the method you described,

17   referred to, as the BLS method as a reliable tool to decide

18   whether to group airports?

19   **A.**  I do.

20   **Q.**  You testified on direct that you did not change the

21   methodology from the 2014 paper for your report in this case;

22   is that correct?

23   **A.**  That's true.

24   **Q.**  And it's correct that the entire purpose of the BLS

25   method is to determine whether airports in the same metro

1   area should be grouped together for purposes of analyzing

2   competition in the airline industry, right?

3   **A.**   True, yes.

4   **Q.**   And the BLS method depends on accurately counting the

5   number of airlines serving routes between airports in a given

6   metro area and destinations outside that metro area, right?

7   **A.**   Correct.

8   **Q.**   And so the destinations outside the metro area, fair to

9   refer to those as the end point?

10   **A.**   Yes.

11   **Q.**   Right.  All of the co-efficients and P values in your

12   report and in the demonstrative that was last on the screen,

13   those are all based on how many legacy and LCC airlines serve

14   routes between the airports in a given metro area and the end

15   point, right?

16   **A.**   Yes.  Right.

17   **Q.**   And you need to decide how airports at the end point are

18   grouped in order to determine how many carriers are flying on

19   a given route, right?

20   **A.**   That's true.

21   **Q.**   And so for example, there is a different number of

22   airlines flying between Boston Logan and Washington Dulles

23   than there are as compared to Boston Logan and all the DC

24   airports combined, right?

25   **A.**   Correct.

1   **Q.**  Right.  So once the BLS method determines that a given

2   set of airports should be grouped, the method calls for

3   treating that set of airports as a single end point for

4   determining whether airports in other metro areas should be

5   grouped, right?

6   **A.**  Could you say that again?

7   **Q.**  Sure.  Once your method determines that a given set of

8   airports should be grouped, when looking at other metro

9   areas, you're looking at that end point, based on the

10   grouping decision, right?

11   **A.**  Yes.

12   **Q.**  Right.  So in other words, you want your grouping of

13   airports to be consistent across the methodology, right?

14   **A.**  Yes.

15   **Q.**  And similarly, if your method calls for each airport

16   being a discrete end point, your method would treat them as

17   separate end points, right?

18   **A.**  Right.

19   **Q.**  And so your 2014 paper, you call this principle "mutual

20   consistency," correct?

21   **A.**  That's true.

22   **Q.**  And in fact, according to your 2014 paper, the goal of

23   your method is to find a set of mutually consistent airport

24   groupings across metro areas, right?

25   **A.**  Yes.

1 **Q.**  And the results published in your 2014 paper showed

2 mutual consistency, correct?  And in --

3       THE COURT:  You have to let him answer the

4 question.

5       MR. DUFFY:  Oh, I'm sorry.

6       THE COURT:  He said right.  Did you answer that

7 question?

8       THE WITNESS:  I think I said yes.  I have the habit

9 of speaking too quickly here.

10       MR. DUFFY:  I think I'm the one speaking too

11 quickly, so I'll slow down a bit, Professor Brueckner.

12 Apologies.

13 BY MR. DUFFY:

14 **Q.**  The results you published in 2014 show mutual

15 consistency, right?

16 **A.**  Right.

17 **Q.**  And in conducting your analysis for this case, you

18 started as your default with the airport groupings from the

19 2014 paper, right?

20 **A.**  That's true.

21 **Q.**  And the regressions that were run in this case yielded

22 some different groupings than the 2014 paper?

23 **A.**  Right.

24 **Q.**  And you mentioned the Washington, D.C. airports as one

25 example of that?  Right?

1    **A.**   Yes.

2    **Q.**   Right.  So in your 2014 paper you found that DCA, Dulles,

3    and BWI should be grouped, but in your analysis for this

4    case, you found that each should be a separate end point,

5    right?

6    **A.**   Right.

7    **Q.**   And so table 3, you agree this is showing the

8    metropolitan areas with multiple airports?

9    **A.**   Yes.

10   **Q.**   And there's one missing, I think, Houston should also be

11   on the --

12   **A.**   Yeah.  I forgot to put Houston on the table.

13   **Q.**   Right.  And it's correct that in this -- as part of your

14   work in this case, you expert report yielded different

15   groupings for not only Washington, D.C., but also Los

16   Angeles, San Francisco, Cincinnati, Cleveland, and Tampa,

17   right?

18   **A.**   Right.

19         THE COURT:  When you say "different," you mean

20   different than 2014?

21         MR. DUFFY:  Different than 2014.  Right.

22   BY MR. DUFFY:

23   **Q.**   That's correct, right?

24   **A.**   Yes.

25   **Q.**   Right.  So 6 of the 13 metro areas with multiple airports

1    yielded a different grouping decision.

2    **A.**   Right.

3    **Q.**   Right?  But when you were calculating the co-efficients

4    and P values shown in your report in this case, and in the

5    demonstrative that was put on the screen, you did not rerun

6    your regressions when your method indicated that some

7    airports should be grouped differently than from your 2014

8    paper, right?

9    **A.**   Well, we did rerun them, but we have those results, but

10   they're not in the expert report, and they give the same

11   grouping conclusions as in the expert report.

12              MR. DUFFY:  Could we pull up the last slide of the

13   demonstrative, please?

14   BY MR. DUFFY:

15   **Q.**   And so let me clarify the question.  It is correct that

16   the co-efficients and P values reflected both in this

17   demonstrative and in your expert report do not reflect the

18   mutual consistency principle, right?

19   **A.**   No, they don't.

20   **Q.**   Right.  And that last step of the process is necessary to

21   use the groupings that your own method shows are correct,

22   right?

23   **A.**   Well, that's a bit of a mouthful.  Ideally, we'd like the

24   groupings to be mutually consistent.

25   **Q.**   And that was the method you used in your 2014 paper.

1    **A.**   Right.

2    **Q.**   And you did not do that last step of the process as part

3    of your work in this case?

4    **A.**   Well, as I said a minute ago, the results in the expert

5    report are based on use of the 2014 groupings for the other

6    end points.  We have -- we updated the results and tested for

7    mutual consistency and the groupings are mutually consistent.

8    **Q.**   In the 2014 report?

9    **A.**   No, in this work here.

10   **Q.**   But it's correct that the co-efficients and the P values

11   reflected in this demonstrative do not reflect a mutually

12   consistent grouping, right?

13   **A.**   Yes.

14   **Q.**   Right.  So if you were to recalculate the P values and

15   the co-efficients here, you would have entirely different

16   numbers than what is shown on this demonstrative, correct?

17   **A.**   The numbers that we get when we do the mutually

18   consistent groupings are similar.

19   **Q.**   And my question is not whether they're similar, but the

20   numbers themselves would be different, every number on this

21   demonstrative would be different if it reflected mutually

22   consistent groupings, correct?

23   **A.**   I'd have to look, but -- so I'm not sure whether the

24   answer is yes, but there would be many differences.

25   **Q.**   Many -- it would be statistically very improbable for any

1    co-efficient or P value to be the same, right?

2    **A.**   Yeah.

3    **Q.**   And it's correct that, at the time of your deposition, we

4    discussed this mutual consistency issue, right?

5    **A.**   We did, yes.

6    **Q.**   And counsel for both American Airlines and JetBlue were

7    present during that deposition, right?

8    **A.**   Right.

9    **Q.**   And you never produced updated regressions after your

10   deposition, right?

11   **A.**   We did them.   They're not in evidence, though.

12   **Q.**   Right.   Those have never been produced to plaintiffs, as

13   far as you know?

14   **A.**   No.

15   **Q.**   Right.   It's true that, at the time of your deposition,

16   you personally had never actually looked at the regression

17   results, right?

18   **A.**   You mean the mutually consistent ones?

19   **Q.**   Yes.

20   **A.**   I hadn't seen them, no.

21   **Q.**   You hadn't seen them.   You relied on Dr. Singer from

22   Compass Lexecon to run the regressions and look at those

23   results, right?

24   **A.**   Right.

25   **Q.**   And at the time of your deposition, you actually said

1    that, as far as you knew, those results had never been

2    reduced to writing, right?

3    **A.**   Right.   I actually did write a narrative to go along with

4    the mutually consistent results, but anyway.   It exists.

5    **Q.**   All right.   So it exists, but that's never been provided

6    to plaintiffs, as far as you know?

7    **A.**   No.

8    **Q.**   So --

9                THE COURT:   Is that a question?

10                MR. DUFFY:   That's a question, yes.   That has never

11   been produced to plaintiffs, as far as you know, right?

12                THE WITNESS:   Yes.

13   BY MR. DUFFY:

14   **Q.**   Are you aware that every other expert who's testified in

15   this case has submitted supplemental reports after

16   August 25th?

17   **A.**   I am not aware -- I take your word for it.

18   **Q.**   All right.   Have you since actually looked at the updated

19   regression results that do account for mutual consistency?

20   **A.**   What do you mean have I since looked at them?

21   **Q.**   You have since looked at the regression results showing

22   the mutually consistent?

23   **A.**   Yes, I spent a lot of time writing a document explaining

24   them.

25   **Q.**   Right.   And so you've looked at it, and you know that the

1    numbers put on this demonstrative do not reflect that last

2    step of the analysis of checking for mutual consistency and

3    using the groupings that your own method shows are correct?

4    **A.**   Right.  But as I said, the groupings are the same.

5    **Q.**   But the P values and the co-efficients are all different

6    than what you showed the Court, right?

7    **A.**   I believe that many of them are different, yes.

8    **Q.**   Right.  And plaintiffs have never received those, right?

9    **A.**   Right.

10   **Q.**   Right.  So we have to take your word for it that all of

11   the numbers are going to yield a grouping decision that is

12   the same?

13   **A.**   Yes.

14   **Q.**   It's also correct -- so you testified, I believe, that

15   Dr. Singer actually ran the regressions in this case, right?

16   **A.**   Right.  Yes.

17   **Q.**   It's also true that Dr. Singer decided what time period

18   of data to use for running the regressions, correct?

19   **A.**   We discussed it at the deposition.  I was a little foggy

20   on what we had come up with, or the logic, but we had

21   discussed it at the time.

22   **Q.**   Right.  So you didn't know why the time frame of data

23   looked at was 2016 to 2019, as opposed to 2014 to 2019, for

24   example, right?

25   **A.**   Well, the answer is that we didn't -- we wanted it a

1    nonoverlapping time period.  We wanted new data and we did

2    not want the sample to include the year 2015, which was when

3    United was moving its service from JFK to Newark.  That was

4    the -- that was the Main criteria that led to this sample of

5    2016-2019.

6    Q.  Right.  And you would agree that the time period of data

7    used can make a big difference in the groupings provided,

8    right?

9    A.  Not necessarily.  I don't think there's any clear obvious

10   connection between time period and the grouping decisions.

11   Q.  Well, in this case, your grouping decisions changed in 6

12   of the 13 metro areas with multiple airports based on the

13   time frame of data looked at, right?

14   A.  That's true.  But you know, let's put it this way, the

15   time period, other things equal, shouldn't matter, but there

16   was a lot of service changes during the -- between these two

17   periods, and those service changes, in other words, the

18   amount of in and out services by legacies and LCCs, those

19   service changes are the result -- or are the factor that led

20   to the grouping changes.

21   Q.  Right.  So you would agree that the choice of inputs for

22   the data will often determine what the conclusions will be

23   for this method.  Do you agree with that?

24   A.  Well, you know, what we wanted was a recent sample, going

25   as late as we could prior to the pandemic.  And so of course,

1    we wanted to -- we wanted a sample that was different from

2    the previous one, because we wanted to know what the current

3    situation is.  What the current competitive effects are to

4    decide on whether New York City airport should be grouped now

5    versus at some other time.

6    **Q.**  I want to quickly pivot to a slightly different topic and

7    just address the issue of DC.  To be clear, it's your expert

8    opinion that DCA should not be grouped with BWI and Dulles as

9    an end point; is that right?

10    **A.**  That's right.

11    **Q.**  Okay.  And that is a change from your 2014 paper?

12    **A.**  Right.

13    **Q.**  Right.  And so in your expert opinion, a carrier flying

14    from Dulles to Boston, for example, is not going to constrain

15    prices for carriers flying from DCA to Boston.  Fair to say?

16    **A.**  That's true, yeah.

17    **Q.**  Okay.  I want to talk a little bit about the 2014 paper.

18    But before we do that, can you turn to the -- there's a tab

19    in your binder entitled product unbundling for the travel

20    industry?

21    **A.**  Uh-huh.

22    **Q.**  I just have a couple quick questions on that.

23    **A.**  Right.

24    **Q.**  This is a paper that you published with Pierre Picard,

25    Dr. Ethan Singer, and Dr. Darin Lee, correct?

**A.**  Correct.

**Q.**  And Dr. Lee also testified as an expert on behalf of defendants in this case?

**A.**  Yes.

**Q.**  And it's correct that you and your co-authors made changes to this paper based on comments received from Delta's counsel, right?

**A.**  Yes.  I made the changes, actually.  I was in charge of the writing of the paper, so I made the changes, and they consisted of wording changes that were very minor.

**Q.**  All right.  And let's talk about another paper, the 2014 paper that the BLS method is based on.  You testified that this was part of a suite of papers that United Airlines had approved of as far as the topics, right?

**A.**  Correct.

**Q.**  And United funded that paper and two others, correct?

**A.**  Correct.

**Q.**  And whether Newark was grouped with LaGuardia and JFK, for antitrust purposes, was an important question for United at that point in time, correct?

**A.**  Yes.

**Q.**  And so because Continental and then postmerger United had and still have a hub at Newark, right?

**A.**  Right.

**Q.**  And at the time you were working for United on this

1    paper, that was when the merger was going on, right?

2    **A.**   Right.

3    **Q.**   And it's correct that it was your opinion that United

4    would have preferred to Newark to be grouped with JFK and

5    LaGuardia, because it did not want its merger with

6    Continental to appear anticompetitive, right?

7    **A.**   I don't know what United would have thought.

8    **Q.**   Well, in your opinion, the merger would be less likely to

9    raise competition concerns if Newark was grouped with JFK and

10   LaGuardia.  Is that fair to say?

11   **A.**   I suppose so, yes.

12   **Q.**   And it's correct that the formal statistical analysis

13   that you conducted for your 2014 paper showed that JFK and

14   LaGuardia should be grouped together, but that Newark should

15   not be grouped with them, right?

16   **A.**   Right.

17   **Q.**   And that's the same conclusion that Professor Miller

18   arrived at in this case, right?

19   **A.**   Yes.

20   **Q.**   But in your 2014 paper, you rejected the model's output,

21   and instead decided, notwithstanding the result of that

22   method, Newark should be grouped with LaGuardia and JFK,

23   correct?

24   **A.**   Yes.

25   **Q.**   And so you developed a -- and let me just ask you this,

1    you criticized Professor Miller's work in this case for not

2    having a decision rule.  Right?  That was the term you used?

3    **A.**  Yes.

4    **Q.**  Right.  There was no decision rule for rejecting the

5    strict implementation of your regression that showed Newark

6    should be a separate end point to JFK and LaGuardia, right?

7    **A.**  Well, the rule was common sense.

8    **Q.**  Right.  There's no econometric test for common sense,

9    right, Dr. Brueckner?

10   **A.**  Yes.

11   **Q.**  And so you developed a statistical methodology top

12   determine whether airports should be groups, you applied that

13   methodology to a number of airports, and you overruled the

14   application of that methodology with respect to Newark,

15   right?

16   **A.**  Yes.

17   **Q.**  And in overruling that methodology, you produced a result

18   that would be more favorable to United in connection with the

19   antitrust review of it's merger with Continental, correct?

20   **A.**  Yes.  The implication that United influenced this writing

21   of the paper is totally incorrect.  They never even said a

22   word to us about this paper.

23   **Q.**  But United was providing funding for that paper, correct?

24   **A.**  Yes.

25   **Q.**  Right.  And while we're on the topic, did you hear

1    Dr. Israel testify yesterday that, as for American Airlines

2    operations at DCA, United operating out of Dulles is its

3    primary competition?

4    **A.**  Could you say that again?

5    **Q.**  Did you hear or did you read the transcript of testimony

6    in which Dr. Israel testified that, as for American's

7    operations at Washington Reagan airport, United's operations

8    out of Dulles were its primary competition?

9    **A.**  I didn't hear that.  I didn't listen to that part of the

10   testimony.

11   **Q.**  All right.  And so you would disagree with Dr. Israel

12   that Dulles and DCA are part of the same end point, right?

13   In your opinion, they're separate?

14          MR. MALONE:  Objection, he just testified that he

15   didn't hear the testimony.

16          THE COURT:  Sustained.

17          MR. MALONE:  All right.

18   BY MR. DUFFY:

19   **Q.**  You would agree, though, that United operates a large hub

20   out of Dulles, about 25 miles from DCA, right?

21   **A.**  Yes.

22   **Q.**  And so the fact that United may operate a large hub 25

23   miles from another airport doesn't mean those two airports

24   are necessarily in the same market, right?

25   **A.**  The question is a little unclear.  Could you repeat it?

1   **Q.**  Sure.  You would agree that simply because United
2   Airlines operates a large hub 25 miles from a different
3   airport, that doesn't mean those two airports are necessarily
4   in the same market, right?
5   **A.**  Well, look, let me just say that, you know, I've flown
6   out of Washington Reagan many times and I've flown out of
7   Dulles a few times, and Dulles is a very inconvenient
8   airport.  It takes a long time to get there from Washington.
9   So to my mind, it's not clear that Dulles should be grouped
10  with DCA, and you know, I was basically agnostic about it,
11  and hence, it's different from the New York case, where
12  common sense to me says that Newark should be part of the New
13  York market.
14  **Q.**  And you testified that it's your opinion that DCA is a
15  stand-alone end point, right?
16  **A.**  Well, that's what our results show.  Yes.
17  **Q.**  Right.  Even though United operates out of Dulles?
18  **A.**  Yes.
19  **Q.**  In 2014, you conducted what you called a placebo test,
20  right?
21  **A.**  Right.
22  **Q.**  And that placebo test was designed to identify the rate
23  of false positives produced by your method, correct?
24  **A.**  Not quite.  The placebo test, because it's carried out in
25  a different fashion, namely, we're asking whether airports

1    should be -- in different metro areas should be grouped.

2    It's not the same as the method itself, where we're looking

3    at airports within a given metro area.  But the test is sort

4    of suggestive.  It's sort of a way of -- of getting at this

5    question.  For the -- can I speak to the --

6    Q.  Let me just ask the question.  The way this test works is

7    you calculate the p-values for all possible airport

8    groupings, including those not in the same metro area, right?

9    A.  Yes.

10   Q.  And so, for example, you looked at whether the results

11   would show that Newark should be grouped with LAX, for

12   example?

13   A.  Right.

14   Q.  Right.  So that's a grouping that makes no economic

15   sense, right?

16   A.  Right.

17   Q.  And so you were looking to see how many of those types of

18   groupings would show up?

19   A.  Right.

20   Q.  By implementing your method?

21   A.  That's true.  So this is -- but the placebo test is what

22   economists frequently do in empirical work.  They've shown

23   that a particular effect exists in a preferred empirical

24   design, and then they change the design in a way that the

25   test -- the effect shouldn't exist.  And they ask if we

1    estimate the effect, do we find that it's there.  And so if

2    the effect is not there, that buttresses the original

3    findings.  So that's the idea here.

4    **Q.**   Sure.  And in your 2014 paper, you found that false

5    positives like grouping Newark and LAX, occurred 17.4 percent

6    of the time?

7    **A.**   That's right.

8    **Q.**   You didn't do any analysis in this case to determine what

9    that false positive rate would be, correct?

10   **A.**   We didn't, no.

11   **Q.**   Right.  You didn't run a placebo test as part of your

12   work in this case?

13   **A.**   We had done it before and, you know, we thought that that

14   was -- gave a sense of what a placebo test does in this

15   setting.

16   **Q.**   But you don't know whether that -- that that rate would

17   be higher or lower than 17.4 percent, based on your work in

18   this case, right?

19   **A.**   That's true, yeah.

20   **Q.**   And there's no way to know whether any of the airport

21   groupings on your demonstrative or in your report are false

22   positives, right?

23   **A.**   No, you never know anything like that in econometrics.

24   You may be doing the wrong thing.  You're never sure.

25   **Q.**   Right.  And in this particular case, you didn't try to

1    determine what that error rate would be as to the dataset you

2    looked at in this case?

3    **A.**   Right.  But, again, that placebo test doesn't necessarily

4    tell you whether the procedure itself, the way it's applied,

5    is producing false results.  It's a suggestive exercise, but

6    it's not a test for false positives in our -- in the method

7    as used.

8    **Q.**   Right.  It can tell you what the rate of false positives

9    is, approximately, right?

10   **A.**   Yeah, but you're doing something that doesn't make sense.

11   You know, you're asking whether airports should be grouped in

12   different metro areas.  And, you know, that's not a sensible

13   question to ask.

14   **Q.**   Right.  I've got a final series of questions for you,

15   Dr. Brueckner.  You've written a number of papers that rely

16   on the 2014 BLS paper.  Is that fair to say?

17   **A.**   No.  Let's see, where did we use the --

18   **Q.**   Fair to say --

19   **A.**   I believe -- let's see, I believe that our 2013 paper

20   uses the BLS groupings -- 2013 paper called "Air Fares

21   Comprehensive Reappraisal," I believe we used the 2014

22   groupings in that paper.  I think that's the only one,

23   though.

24   **Q.**   Okay.  If you turn to the last tab in your binder and

25   this is just a minor point.  The 2019 paper is entitled

1    "Pricing By International Alliances:  A Retrospective Study."

2          Correct?

3    **A.**  Yes.

4    **Q.**  And this is a paper you wrote in 2019.  It's included in

5    your list of reliance materials in this case, right?

6    **A.**  Yes.  This study was commissioned by the US Department of

7    Transportation as an overview of pricing by international

8    alliances.

9    **Q.**  Right.  And in fact, the US Department of Transportation

10   provided some confidential data that foreign carriers

11   submitted that previously was not available to people --

12   **A.**  That's right.  That's right.

13         MR. MALONE:  Objection, Your Honor.  This is not

14   the focus of Professor Brueckner's testimony on market

15   definition, as far as I can tell.

16         MR. DUFFY:  Your Honor, this is listed in

17   Dr. Brueckner's reliance materials.  He was asked --

18         THE COURT:  Overruled for now.

19         MR. DUFFY:  Okay.  And I promise I'll be brief with

20   this, Your Honor.

21   BY MR. DUFFY:

22   **Q.**  So this paper was looking specifically at the effect of

23   international alliances on fares between gateway airports,

24   right?

25   **A.**  Well, we also looked at connecting fares.

**Q.**  Right.  And so for example, in terms of the gateway to gateway markets, you were looking at the effect of alliances like American and British Airways on fares like JFK to London Heathrow, right?

**A.**  Exactly.

**Q.**  So that's -- a gateway market is JFK to Heathrow.

**A.**  Right.

**Q.**  That's kind of a nonstop market where both alliance partners compete?

**A.**  Right.

**Q.**  And in that paper, you concluded that cooperation and fare setting on gateway to gateway routes where alliance partners overlap leads to higher economy fares, correct?

MR. MALONE:  Objection.  Same scope.  Objection. He hasn't testified to any of this.

THE COURT:  Why isn't this now beyond the scope? It doesn't seem like it's impeachment.

MR. DUFFY:  Well, this -- he cites the 2014 paper in this particular publication, Your Honor.  And this came up in doctor --

THE COURT:  Why don't you ask him if he relied on it for the market definition?

MR. DUFFY:  If I may note, this came up in Dr. Town's examination, and both Mr. Wall and Mr. Schwed said very clearly that publications of an expert are fair game,

1    particularly where they undermine the conclusions of another

2    expert and the Court overruled properly those objections.

3              MR. WALL:  Well, first of all, I didn't say

4    anything remotely that general.  We are in our case.  Scope

5    matters.  And we called him on a very narrow scope of market

6    definition.  And if this is allowed, then we're going to want

7    to ask him a whole lot of questions about his views about the

8    NEA.  It will open up a completely different set of scope

9    issues that are beyond anything in his report in this case,

10   if they're going to be able to do this.

11             MR. DUFFY:  And I will not ask him about the NEA

12   specifically, but I just want to know --

13             MR. MALONE:  You can't choose how far beyond the

14   scope.

15             MR. DUFFY:  I just want to note that Mr. Wall

16   specifically said, in reference to Dr. Town's deposition,

17   that it would be ridiculous to not allow questions related to

18   Dr. Town's previous writings on retrospective analysis.

19             MR. SCHWED:  If I may, since I was examining

20   Dr. Town.  He wrote a report that talked about retrospective

21   analyses.  That report, I was questioning him about items in

22   his report, not about things he wrote unrelated to his work

23   in this case.  They were in his report.  He was trying to

24   save them for rebuttal.  We thought it made a lot of sense to

25   question him on the direct case.  These items are not in

1    Dr. Brueckner's report.  He didn't opine anywhere in this

2    case about joint ventures.

3            And also, frankly, what joint ventures on the

4    international arena have done are not the direct part of any

5    expert's testimony, whereas what I questioned Dr. Town about

6    were a critical part of multiple expert's testimony.

7            MR. DUFFY:  And his paper is one of only a dozen or

8    so listed in Dr. Brueckner's reliance materials for this

9    case, Your Honor.  And this will be one minute worth of

10   questions, Your Honor.

11           THE COURT:  How did you rely upon this report --

12   well, he didn't refer to this report or pricing in his expert

13   report?

14           MR. MALONE:  No, Your Honor.

15           MR. DUFFY:  Well, it's listed in his reliance

16   materials.

17           THE COURT:  Well, that's a different question.

18           How did you rely upon this report -- I'm sorry, how

19   did you rely on this article in the expert report?

20           THE WITNESS:  I didn't rely on it.

21           THE COURT:  Then why did you list it in the

22   reliance materials?

23           THE WITNESS:  I don't know.  I think that the

24   choice of articles was probably up to the counsel.

25           THE COURT:  What's the question you want to ask?

1         MR. DUFFY:  The question that I want to ask is

2    simply that, in this paper, you concluded, "Cooperation and

3    fare setting on gateway to gateway routes where reliance

4    partners overlap leads to higher economy fares."  That was

5    your conclusion?

6         THE WITNESS:  That's true, but you know, that

7    conclusion is irrelevant to the NEA, because --

8         THE COURT:  Sustained.  It's beyond the scope.

9         THE WITNESS:  -- international alliance --

10        THE COURT:  You can stop.

11        Next question.

12        MR. DUFFY:  All right.  Just one last question.

13   BY MR. DUFFY:

14   Q.  We can pull up the co-efficients, the last slide of the

15   demonstratives.

16        Just one last question, so for a number of these

17   co-efficients, they are positive, correct?  Showing that an

18   additional carrier would result in an increase in fares,

19   correct?

20   A.  Some of them, yes.

21   Q.  Right.  And there's no economically plausible way for

22   that to be the case, correct?

23   A.  That's true.  But the positive co-efficients are all

24   statistically insignificant, meaning they're not different

25   from zero.  So basically the positive co-efficients are

1   zeros.

2   **Q.**  Right.  And so those are showing that there is no effect

3   of an additional carrier?

4   **A.**  Right.

5   **Q.**  And is that an economically plausible result?

6   **A.**  It can happen.  Sometimes competition, you know, doesn't

7   matter that much.  Competition among legacy carriers often is

8   fairly weak, and so it's not totally surprising that some

9   things are zero.

10   **Q.**  Right.  And you agree that competition from LCCs is often

11   stronger, right?

12   **A.**  Yes.

13   **Q.**  And from JetBlue in particular.  You agree with that?

14   **A.**  Well, I don't know anything about JetBlue's competition.

15   I've never run a regression that singled out JetBlue as a

16   separate LCC.

17   **Q.**  Right.  Your methodology doesn't distinguish between

18   LCCs, correct?

19   **A.**  No.

20         MR. DUFFY:  Okay.  Pass the witness.

21         THE COURT:  Anything else?

22         MR. MALONE:  Just two quick questions, Your Honor.

23                **REDIRECT EXAMINATION BY COUNSEL**

24               **FOR DEFENDANT AMERICAN AIRLINES**

25   BY MR. MALONE:

1    **Q.**  Professor Brueckner, how long have you been doing

2    econometrics?

3    **A.**  For almost 50 years.

4    **Q.**  And are there various types of statistical issues that

5    you have to address when you conduct --

6    **A.**  All kinds of issues, yes.

7    **Q.**  Do any of the issues that we've discussed today affect

8    your conclusions as to the New York market?

9    **A.**  No.

10             MR. DUFFY:  Objection, leading.

11             THE COURT:  Sustained as to the form.

12   BY MR. MALONE:

13   **Q.**  Is it still your conclusion that the New York City

14   markets should be grouped?

15   **A.**  Yes.  I stand by this method.  I wouldn't change it.  You

16   know, we replicated it.  I wouldn't change it.  Nothing about

17   it today makes me less confident than I was when we published

18   the 2014 paper.

19             MR. MALONE:  Thank you.  No further questions.

20             MR. DUFFY:  Nothing further, Your Honor.

21             THE COURT:  All right.  Thank you very much.

22   You're excused.

23             MR. WALL:  Your Honor, our next witness will be

24   Brian Znotins, and Ms. Allyson Maltas will conduct the

25   examination.

```
1              THE COURT:  What's the name of the witness again?
2              MR. WALL:  It's Znotins, Z-N-O-T-I-N-S.
3              THE COURT:  Spell it again.  Sorry.
4              MR. WALL:  Z-N-O-T-I-N-S.
5              THE COURT:  Thank you.
6              THE DEPUTY CLERK:  And, sir, if you could please
7    raise your right hand.
8                  (The witness was duly sworn.)
9              THE DEPUTY CLERK:  Thank you.  You may be seated.
10             THE COURT:  Whenever you're ready, Ms. Maltas, go
11   ahead.
12             MS. MALTAS:  Thank you, Your Honor.
13                         BRIAN ZNOTINS
14         having been duly sworn, testified as follows:
15   DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT AMERICAN AIRLINES
16   BY MS. MALTAS:
17   Q.  Mr. Znotins, what's your current role at American?
18   A.  Vice President of Network Strategy.
19   Q.  Now, was there a nickname that your co-workers used for
20   you that the Court might see in American documents?
21   A.  Yes.  Zed.
22   Q.  And who do you report to in your current role?
23   A.  Vasu Raja.
24   Q.  What are your responsibilities as the vice president of
25   network?
```

1   **A.**   I'm responsible for the profitability of our route

2   network.  I lead a team that designs our aircraft schedules,

3   where we fly, how often, how frequently, and with what

4   airplane.

5   **Q.**   And how long have you worked in the airline industry

6   generally?

7   **A.**   About 25 years.

8   **Q.**   Could you give the Court, please, a brief overview of

9   your career prior to joining American Airlines.

10   **A.**   I start in the industry in Calgary with Canadian

11   Airlines.  That was about 18 months.  And then I moved to

12   Houston to work for Continental, which merged with United, so

13   that was about 17 years, back to Calgary with WestJet for

14   about three years, and then at American now for three years

15   in Dallas.

16   **Q.**   And what were your responsibilities at Continental and

17   then United?

18   **A.**   The same responsibilities as I have now.  I started at

19   Continental as an analyst, and by the time I left United, I

20   was vice president of network.

21   **Q.**   And when did you start working for American Airlines?

22   **A.**   In January of 2020.

23   **Q.**   When you arrived in January 2020 at American, did

24   American have any network plans in place?

25   **A.**   Yes.

1    **Q.**  And did you receive any instructions or mandates from

2    Mr. Raja when you joined American about those network plans?

3    **A.**  Yes.  Vasu was very clear with me that I'm joining

4    American.  Any plans that we were in place, he was fine with

5    me, in my experience, changing those plans.  I basically had

6    a clean slate to go and redesign the network as I saw fit.

7    **Q.**  And the Court's obviously heard a lot about COVID and its

8    impact on the airline industry; but from your perspective,

9    how long was it in your tenure at American when the effects

10   of COVID began to hit the airline industry?

11   **A.**  After about two weeks of being with American, we were

12   already starting to pull flights down in China for the virus

13   that had emerged there.

14   **Q.**  And what was it like starting a new job at American

15   Airlines at the time that COVID was starting to spread

16   rapidly?

17   **A.**  It was much different than I expected.  Joining American,

18   I had planned to dive deep into the network, and the history

19   of the network, and the strategy and the data surrounding it.

20   Generally how you learn the performance of the network is to

21   look at all the historical financial performance and the

22   demand.  So there would be a lot of time I would spend doing

23   that.

24          And then once COVID hit, it was clear that the

25   slate was being up wiped clean, and everything that I would

have done going to American was now moot; and, instead, my role, instead of tweaking the network, and making minor design changes, compared to what happened with the pandemic, became a huge exercise of rebuilding the network from the ground up.

**Q.**   And how did COVID affect the plans that were in effect when you joined in January of 2020?

**A.**   Like I said, it basically wiped the slate clean. Anything that we had thought prior to the pandemic was no longer relevant, and we had -- were in survival mode at that point.  And so we had to design the very best network that we could to get us through the crisis.  No one knew how long it would be at that time; and, actually, most of us thought it would be much shorter than it ended up being.

But we could no longer use historical data to guide our decisions.  Traditionally, network planning is more of what works and less of what doesn't.  It boils down to being that simple.  And more of what works is based on what has worked in the past.

And you look at historical data.  The very best predictor of passenger behavior in the future is passenger behavior in the past.  That's been true for the 22 years that I had been in the industry up until that point.

But with COVID, that was thrown out the window. People flying for business didn't exist anymore.  People who

1   were making leisure trips weren't going to Europe and Rome
2   anymore.  Instead, they were going to Montana.
3          So in the first time in my career, we found
4   ourselves having to plan the airline on incoming bookings,
5   which is a really strange way to do things.  In network
6   planning, you usually want to have flights for sale so you
7   can take incoming bookings, but having to plan in realtime
8   based on the bookings coming in was a very unique way to do
9   things.  I never done it before, but it's how we had to do
10  things given the environment.
11          THE COURT:  What do you mean by incoming booking?
12          THE WITNESS:  So normally we put a flight out for
13  sale 310 days in advance, and we'll put that flight out for
14  sale based on how -- you know, we can look at how many people
15  flew for Thanksgiving between New York and Dallas.
16          THE COURT:  Based on historical data?
17          THE WITNESS:  Based on historical data.  But with
18  COVID, the business travelers and other leisure travelers,
19  their behavior all changed.  And so what we had to do was --
20  see, we have a schedule out selling, kind of a placeholder
21  schedule, and we can see that nobody is booking between
22  New York and Dallas anymore because New York is shut down for
23  COVID; and instead, we're taking lots of booking to
24  Kalispell, Montana, which -- or Orlando or people -- the few
25  people who were traveling and were making leisure trips,

1    those were the places that they wanted to go.

2                    THE COURT:  I see.

3                    THE WITNESS:  And so on those incoming bookings,

4    it's almost like having to plan the airline while you're

5    selling your product at exactly the same time.  And so we

6    could see bookings coming in for Kalispell and are, like,

7    "Okay.  Let's take all this capacity out of Dallas to

8    New York and put it into Kalispell and, hopefully, capitalize

9    on those booking as people are buying tickets."

10   BY MS. MALTAS:

11   **Q.**  So also in the midst of COVID, American was negotiating

12   the NEA; is that right?

13   **A.**  Yes.

14   **Q.**  And how did you first become aware of the NEA?

15   **A.**  I can't recall the specific moment, but Vasu mentioned it

16   to me in a one-on-one conversation.

17   **Q.**  And what has your role been in the NEA?

18   **A.**  I've been more of an advisor in the NEA.  The structure

19   of the deal was created by the corporate strategy team, the

20   long-range planning team, and the partnership team.

21                    And through the course of that construction, I was

22   brought in to advise on routes that might be possible under

23   the NEA, the structures that were put in place in terms of

24   who would operate what route and what were my opinions of

25   that.  But largely I -- I was focused on running the network

1   itself through COVID, and the NEA was something that I

2   consulted on but wasn't an architect of.

3   **Q.**   Since the implementation of the NEA, have you been

4   involved in that implementation?

5   **A.**   At a very high level.  My team will keep me in the loop

6   on what routes they were proposing, what routes they were

7   flying.  But generally speaking, I was just guiding the NEA

8   related to our overall network strategy and not involved in

9   the day-to-day decisions of our network planning.

10  **Q.**   And from your position as the head of network planning at

11  American, what was your reaction to hearing about the NEA?

12  **A.**   I was very excited about it, because coming to American

13  and looking at what worked and what didn't work, in that

14  latter category, we had a number -- a small number of hubs

15  that weren't working for us, and among those were JFK and

16  LaGuardia.

17          And I was really scratching my head on how we were

18  going to fix our unprofitability in New York, and the NEA

19  really gave me hope that being able to combine our schedules

20  and our frequent flyer programs and have reciprocity among

21  our frequent flyer programs with JetBlue gave us the schedule

22  depth and breadth to compete with Delta and United in the

23  New York market when we otherwise had no way to do that.

24  **Q.**   And what's your understanding of how that prior

25  unprofitability had affected American's approach to New York?

1          MR. MOORE:  Objection, Your Honor.  Lack of
2    foundation.  Mr. Znotins has testified he didn't join the
3    company until 2020, so there's been no foundation laid that
4    he would have any knowledge as to that.
5          MS. MALTAS:  Your Honor, he just testified that he
6    was knowledgeable about American's unprofitability in
7    New York.  It was in his prior answer.
8          THE COURT:  Maybe ask him one foundational
9    question.
10   BY MS. MALTAS:
11   Q.  Did you have any understanding that American was
12   unprofitable in New York at the time that you joined?
13   A.  Yes.  I was able to review historical profitability of
14   all American's hubs and routes when I joined the airline.
15   It's actually -- it's a little bit like Christmas morning,
16   when you get to see all the information that -- when you work
17   for another airline, you never get to see this information
18   from your competitor; and then, finally, you get to wake up
19   and see this information from your competitor.
20          And it was the first thing I did.  And so there
21   were lots of thing I learned with that and then, as I saw in
22   that data, that New York had long been unprofitable for
23   American.
24   Q.  And what was your understanding of how that
25   unprofitability, based on this research and this reading that

1    you had done, had affected American's approach to New York?

2    **A.**   So in the category -- again, I'll go back to this a lot,

3    of more of what works and less of what doesn't.  American was

4    finding ways to invest in markets like Dallas and Charlotte.

5              And a good example of this is the MAX grounding.

6    When the fleet, the MAX -- the 737 MAX fleet was unavailable

7    to American, American chose to source that capacity to ground

8    the fleet from JFK and the New York.  And that really is

9    indicative of, "Okay.  If we have to put this many airplanes

10   on the ground, we're going to take them out of the most

11   unprofitable market we have"; and at the time, it was New

12   York.

13   **Q.**   So pivoting to Boston, based on this research and the

14   understanding that you gained when you had your Christmas

15   morning with American's documents, what did you understand

16   American's Boston strategy to be at the time that you

17   arrived?

18   **A.**   So Boston was a focus city for American, and the team had

19   advised me they had a couple of new routes that they were

20   thinking about out of Boston.  But there was no Boston

21   overarching strategic mandate that impacted the market there.

22   **Q.**   Did you have any understanding or gain any understanding

23   that American had any mayor growth aspirations in Boston?

24   **A.**   No, no major growth aspirations -- again, a handful of

25   markets, maintaining it as a focus city, but nothing that

1    would really change the shape of what Boston was.

2    **Q.**  Did you have or gain any understanding that American

3    planned to challenge JetBlue or Delta for Boston leadership?

4    **A.**  No, no awareness of that at all.

5    **Q.**  And based on your general experience of 25 years in the

6    industry, did you think American could have done so?

7    **A.**  The investment required to challenge Delta and JetBlue in

8    Boston would have been significant and would have detracted

9    from other investments American could be making.  So,

10   certainly from my experience, I -- I wasn't aware of any

11   plans for American doing that, and I certainly wouldn't have

12   supported any plans to do that.

13   **Q.**  Focusing back on New York, as well as Boston, how, if at

14   all, has the NEA changed the situation for American in

15   New York and Boston?

16   **A.**  It gives us a runway to success and profitability there.

17   I'm a network planner.  So first and foremost, we design

18   schedules that will get people to their destinations faster

19   than anyone else can.  And so in New York, we would have

20   fewer nonstops and fewer frequencies in existing markets and

21   competitive markets with Delta and United.

22         So on most routes, if somebody wanted to get to

23   their business meeting the morning of their meeting, instead

24   of going the night before, or they wanted to get home for

25   their kids' soccer game that evening after their meeting,

1    instead of having to come home the day after, American was in

2    that secondary position of -- we couldn't get you there

3    nonstop as frequently as Delta and United could.

4           And more often than not, we couldn't get you there

5    the morning of your meeting or get you out the evening of

6    your meeting.  And so for those schedule-sensitive travelers

7    who are spending their company's money to save themselves

8    time, that's not a game we were playing in; and given our

9    cost structure, that's a game we have to play in order to be

10   profitable.

11          And so for us in New York, given the slot

12   constraints there and the infrastructure constraints, A, even

13   if they didn't -- those constraints didn't exist, the level

14   of investment we would have to make to compete with Delta and

15   United was significant and --

16          But being able to combine with JetBlue and have our

17   passengers and guests look at our combined network, instead

18   of just JetBlue and American in isolation, that gives us the

19   schedule depth in dozens of markets where we would have

20   nonstops competing with Delta and United and high frequencies

21   competing with Delta and United.

22          And it gave us a runway to success in New York.  It

23   gave us a reason to think that investing in there could

24   actually pay off for American, whereas prior to the NEA, it

25   felt like you were just putting good money after bad in the

1    New York market, and you would be better off as an airline

2    investing in some other place.

3    **Q.**  And, Mr. Znotins, you mentioned schedule-sensitive

4    passengers.  Do leisure passengers also benefit from the

5    optimized schedule from the NEA?

6    **A.**  Absolutely.  If we're adding new nonstops or new

7    frequencies catered to those schedule-sensitive passengers,

8    the leisure passengers get the same benefit.  They have more

9    choice.

10           THE COURT REPORTER:  I'm sorry, can you slow down

11   just a little bit.

12           THE WITNESS:  The leisure passengers have more

13   choice as a result of building schedules for business

14   passengers.  So while those leisure passengers may be focused

15   more on getting a lower airfare, they can benefit by having

16   that early or late flight or that nonstop where they don't

17   have to drag their kids through an airport on a connection

18   when they otherwise wouldn't want to.  All because we're

19   looking to attract those business passengers, those leisure

20   passengers then get the same benefit.

21   BY MS. MALTAS:

22   **Q.**  And just generally, where do these schedule-sensitive

23   passengers and these leisure passengers come from?

24   **A.**  In the New York market, we're generally not in the

25   business of creating demand.  That's not what

1   American Airlines does.  We would be interested in stealing

2   demand from Delta and United, especially the

3   schedule-sensitive passengers.

4   **Q.**  And how does American plan to capitalize on the success

5   of the NEA?

6   **A.**  We've already implemented the NEA schedules that we had

7   planned to launch.  We've got new nonstops in partnership

8   with JetBlue.  We have invested in new markets that we

9   otherwise wouldn't have invested in.

10          A good example of this is JFK to Tel Aviv.  In a

11   world where you're optimistic for New York profitability, you

12   can take that one slot that you have and launch a new flight

13   to Tel Aviv, and that flight to Tel Aviv costs us

14   $180 million a year to fly -- that's a significant

15   investment -- when, instead, if I was more bearish on

16   New York, I could take that one slot and fly to Charlotte,

17   and that would cost me $17 million to fly a year.

18          In essence, a network planner like me, when we're

19   making that choice to launch one flight that costs ten times

20   more than the other flight, we're betting our job on that

21   flight being successful because, obviously, what you have at

22   stake is much greater.  You can lose much more money on JFK

23   to Tel Aviv than you could possibly ever lose on JFK to

24   Charlotte, even if JFK to Charlotte were to it run entirely

25   empty, which it wouldn't.

1          So for us, this -- the NEA has given us this

2     ability to launch these new routes and have faith that

3     they're going to work for us.  We're going to make these

4     investments and be successful, whereas prior to the NEA, I

5     wouldn't advised investing in New York like we are now if it

6     were not for the NEA.

7     **Q.**  Plaintiffs have suggested that synthetic growth that

8     arises from things like alliances comes at the expense of

9     organic growth.  Based on your experience in network

10    planning, is that true?

11    **A.**  No, not at all.  In fact, I think it's the opposite.  If

12    you look around the world and you see partnerships being

13    built, not just with American Airlines, but other airlines,

14    when a partnership is launched, network growth follows that

15    launch of a partnership.

16          So in the case of American Airlines, where we have

17    a partnership with British Airways and London, we have more

18    flights than any other airline to London.  And in a

19    partnership with Iberia in Madrid, we launched new flights to

20    Madrid to build those connections in Madrid to points beyond

21    and also attract the passengers in Spain that would otherwise

22    just be loyal to Iberia but are now willing to consider

23    American Airlines.

24          And it's not just true for us.  If you look at --

25    Delta, for example, flies heavily to Amsterdam and Paris

1    where they have partnerships.  In my history, I've seen five

2    nonstop flights a day between Detroit and Amsterdam.  You

3    wouldn't normally think that you'd have five nonstop flights

4    between Detroit and Amsterdam, but it's happened because of

5    the partnership there.

6            And so in New York, as we have a partnership there,

7    it drives us to grow, and so that synthetic feed that comes

8    into our network incentivizes network planners to put more of

9    our own metal in the market to capitalize on that feed.  And

10   so, in essence, I believe synthetic growth drives organic

11   growth, rather than what you implied, being the opposite.

12   **Q.**  One of the plaintiffs' experts has suggested that the NEA

13   allows American to increase profitability by agreeing with

14   JetBlue to shrink in the Northeast, and what's your reaction

15   to that?

16   **A.**  Well, that's not what we've done.  We've grown in the

17   Northeast.  We've added bigger airplanes.  We've added longer

18   stage length flights, the investment like Tel Aviv that I've

19   discussed before.  So everything that we've done in New York

20   has been about growing and not shrinking.  So I think the

21   data indicates that exactly the opposite is happening.

22   **Q.**  As a network planner, in your experience, is it possible

23   to shrink and, therefore, become profitable?

24   **A.**  There's a common phrase in the industry used mostly by

25   network planners, but most other experts as well, and that's

1   "You can't shrink to profitability."

2        We have a heap of fixed costs in our business, be

3   it airplane ownership, terminal fees and rent, gates, all --

4   hangers, all of this infrastructure that we have.  And it

5   becomes a vicious cycle if you try to shrink to profitability

6   because you're taking those fixed costs that are hard to get

7   out of and just spreading them over fewer and fewer seats.

8        And it becomes a vicious cycle where, by shrinking,

9   your costs per seat go up, which drives other flights to

10  unprofitability; and then you pull those flights, and then

11  you can see how it just cycles all the way down.  And so most

12  airline experts will say you can't shrink to profitability.

13  **Q.**  Can you give us some examples of what American has done

14  in terms of investing in growth in New York and Boston as a

15  result of the NEA?

16  **A.**  Yeah.  I think the Tel Aviv example is just a really

17  great one, but then it's not just Tel Aviv that we invested

18  in long-haul flying.  We've launched new service to Doha and

19  to Delhi.  We've launched new services to Latin America.

20       And so all these longer stage length flights that

21  drive more investment, the new routes that we've launched,

22  it's not just about flying a short-haul stage length to

23  Charlotte anymore.  It's going into these markets where we

24  can attract the customers and we're willing to take the risk,

25  in essence, that this is going to work and pay off for us.

1  **Q.**  And has American engaged in any upgauging or use of

2  larger planes?

3  **A.**  Absolutely.  We've taken the 50 seaters, 50-seat RJs.

4  Some of them have 44 seats, but we call them in the industry

5  "50-seaters," that don't have a front cabin on the airplane.

6  They don't have the extra leg room seating.

7  We've taken all of those out of the New York market

8  and replaced them with either 65-, 70-, 76-seaters -- you'll

9  hear them referred to as "76-seaters" -- which have a front

10  cabin product, extra leg room seating.  And they have WiFi

11  aboard the airplane.

12  And then for the mainline airplanes, the narrow

13  bodies, we've replaced smaller narrow bodies, A319s, with 737

14  MAXs, and A321s.  And then finally, as I mentioned before, we

15  added wide bodies to the market, which are 787 and 777s.  And

16  so that's generally how you grow in New York now in a

17  slot-constrained environment, is you add larger airplanes to

18  add capacity, and that comes with a better product for both

19  business and leisure passengers.

20  **Q.**  And how has the NEA contributed to American's decision to

21  upgauge these flights?

22  **A.**  Again, going back to the reason to be hopeful for the

23  New York market, the reason to think that if we make an

24  investment there, it will pay off for us, and the NEA gives

25  us the schedule depth to say we enable our sales team to go

1    into New York and say, you know, "Company X, Y, Z, you should

2    consider us because now we have a nonstop in this market that

3    is important to you, wherever you may be going --

4    Fayetteville, Arkansas, for example, for Walmart.  You should

5    use American now, because combined with JetBlue, we can get

6    you to all the same case places that Delta and United can,

7    some cases maybe even better."

8           But before that conversation was very tough for

9    that salesperson, because they would go in and say you should

10   choose American Airlines, and the company would say, "Well,

11   my workers are forced to connect whenever they use American,

12   and they can fly nonstop on Delta and United."

13          And that's, in essence, a network planner -- that's

14   our job, is to make this conversation not happen.  And by

15   having this alliance and working with JetBlue, hopefully it

16   happens much less frequently, and there are times when our

17   sales people can go in and say we actually have a better

18   schedule than Delta and United when we combine with JetBlue,

19   and it makes it an easier sell for them.

20   Q.  And we have a demonstrative to look at regarding

21   upgauging.  So, Mr. Znotins, can you just explain what's

22   going on in this demonstrative?

23   A.  So here we have a 50-seater on the left.  It happens to

24   be 44 seats, as I said before.  And then as we upgauge in

25   LaGuardia and Montreal, those are the two bars on the right,

1    and then on the left and --

2              THE COURT REPORTER:  I'm sorry, "As we upgauge,"

3    and then what did you say after that?

4              THE WITNESS:  So on the left-hand side, we have

5    LaGuardia and Montreal.  And on that left-hand side of the

6    slide, we have a 44-seater, which we call 50-seaters in the

7    business.  And then we have a 67-seater, which are sometimes

8    called 76-seaters in our business -- a small RJ versus a

9    large RJ.

10             And in the small RJ, we have 22 percent of the

11   passengers in this case in LaGuardia-Montreal, that are

12   originating in New York.  And then the remainder of the

13   airplane is comprised with passengers either originating

14   outside of New York -- probably most of them in Montreal --

15   and then connecting passengers either behind Montreal or

16   behind LaGuardia.

17             And by upgauging, we can offer our product to more

18   passengers, both origin New York, because we are -- our

19   presence in New York has increased.  We have access to

20   JetBlue's frequent flyer base, and we have more passengers

21   choosing the American Advantage program because of our

22   increased schedule depth and breadth in New York.

23             And so we have 33 percent of the passengers

24   originating in New York, plus those passengers that would

25   otherwise be loyal to JetBlue at 6 percent.  And then coming

1     out of Montreal or connecting, we get a further 3 percent

2     from our relationship with JetBlue.

3              And that helps us to fill this larger airplane in

4     the New York market.  And the same is true for Toronto on the

5     right-hand side here.  We have 7 percent of the passengers

6     being added as a result of our relationship with JetBlue and

7     another 4 percent outside of the origin New York passengers

8     outside of the or gin New York market coming from the JetBlue

9     relationship.

10             And in a business where American Airlines made a

11    6.7 percent margin in 2019, we're a very thin margin

12    business.  A few percentage points of improvement can really

13    mean a different between turning a profit on a route and not.

14    In this case, nine points of improvement on

15    LaGuardia-Montreal is greater than our average margin that we

16    earned as an airline in 2019.

17             And so in the airline business, small changes in

18    revenue can drive bigger changes in profitability and drive

19    the way we think about given routes, and we will choose to

20    grow in a market because of a 9 percent improvement, when

21    before that, we had not chosen to grow or otherwise shrink.

22             THE COURT:  What's the source of the bigger planes?

23             THE WITNESS:  In the short term, we will relocate

24    airplanes from other markets across the system.  We'll

25    optimize the whole system to say we're bringing 30 new large

1    regional jets in.  And some will come from Dallas and

2    Charlotte, Philadelphia.  Across the whole system, we will

3    reoptimize it with New York as a priority.

4                   And in the long run, what we'll do is we'll go to

5    the board and order more airplanes And say that, now that

6    New York is a source of profitability for us, we need to

7    backfill those airplanes elsewhere in the network so we can

8    address other priorities over the long run.

9                   THE COURT:  Go ahead.

10   BY MS. MALTAS:

11   **Q.**  So let's take a look at some of the new routes that you

12   mentioned.  Mr. Znotins, can you explain what is on this

13   first slide?

14   **A.**  So this is a list of new New York routes operated or

15   launched by either JetBlue or American since the

16   implementation of the NEA.

17   **Q.**  And what's the data source for this list of new routes?

18   **A.**  It's an industry data source that has historical and

19   forwarding-looking schedules it's called the OAG.

20   **Q.**  And are you familiar with the OAG database?

21   **A.**  Yes.

22   **Q.**  And do you use that in the ordinary coarse of your

23   business?

24   **A.**  Yes.

25   **Q.**  And does this chart convey your understanding of the

1  routes that American and JetBlue have added since the NEA?

2  **A.**  Yes.

3  **Q.**  There's a methodology down at the bottom.  Did you

4  explain what that means?

5  **A.**  Right.  Whenever you're looking at launched routes or

6  changes in schedules, you have to have a base period that

7  you're comparing to.  In this case it's 2019 -- January 2019

8  through January 2021.  And then you look at the comparison

9  period, which in this case is either operating or selling

10  through from the third quarter of 2022 through the second

11  quarter of 2023.

12          THE COURT:  I just have a question.  So on the --

13  take these first three routes, JFK, Athens, Bogota, Cali.

14          THE WITNESS:  Yes.

15          THE COURT:  Those are routes that neither American

16  nor JetBlue flew prior to this time period from JFK.

17          THE WITNESS:  They didn't fly them in January '19

18  to January 2021.

19          THE COURT:  So these were long-haul planes for

20  those kind of distances.

21          THE WITNESS:  They are long-haul routes, but the

22  wide body -- the longest haul is Athens and requires a wide

23  body.  Bogota and Cali could be operated with a narrow body,

24  but they're still very long stage lengths.

25          THE COURT:  So take Athens, then, or Doha, that

```
 1   would require a wide body?
 2               THE WITNESS:  Yes.
 3               THE COURT:  So those planes are pulled from
 4   somewhere else?
 5               THE WITNESS:  Right.
 6               THE COURT:  And so were those routes -- were those
 7   destinations that American wasn't flying at all, or were
 8   those destinations that it flew from somewhere else.
 9               THE WITNESS:  So we had Athens in our plan prior to
10   the NEA.  We flew it from O'Hare and Philadelphia.  And
11   that -- the JFK flight was added to that plan.  The
12   airplane --
13               THE COURT:  So when you say "added," it means you
14   still flew from O'Hare and Philadelphia to Athens.
15               THE WITNESS:  Right.  Exactly.  And so we added the
16   JFK to Athens flight.  That airplane, itself, came from
17   somewhere in the system, in the short term, as it did with
18   the RJs.  And in the long term, with success on these routes,
19   we would look to back fill where that airplane came from and
20   get new airplanes to do that.
21               THE COURT:  I see.  Okay.  So some of them, like
22   Athens might be additive and some of them might be -- I don't
23   know.  What word you would use, but it might be, instead of
24   O'Hare to Athens, it might become JFK to Athens.
25               THE WITNESS:  Yes.  And actually, I would --
```

1    looking at the list very quickly here, I would say the vast

2    majority here are added, if we didn't fly to Doha at all

3    until we launched the JFK-Doha service.  We didn't fly to

4    Tel Aviv at all until we launched the JFK to Tel Aviv

5    service.  We actually added Miami at the same time.  But for

6    those routes for us, it's --JFK gives us the ability to

7    play -- or sorry.  The NEA gives us the ability to play in

8    the local market.  And so Philadelphia, O'Hare, those are

9    more connecting markets for us.  About two thirds of the

10   passengers on board a Philadelphia to Europe flight are

11   connecting.  And so Philadelphia plays a role for us in the

12   network that says, if you're anywhere in the country, and

13   looking at a small destination, we can get you, via

14   Philadelphia, to Europe.  But that's the reason for

15   Philadelphia's being for us.

16           But New York is different because New York is so

17   highly competitive.  It has nonstops to everywhere.  So even

18   though I have a gateway in Philadelphia, I can't hope to tap

19   into the New York market, because I'm selling, at best, a

20   connection over Philadelphia, which sometimes we operate in

21   New York and Philadelphia and sometimes we don't, but that's

22   head to head with nonstops to everywhere in the world, so if

23   I have hope to get those passengers, I have to heavily

24   discount to get them to take that connection.  And that's not

25   the path to profitability for American Airlines, is the

1    heavily discounting side.

2              And so in order to tap into the New York market, we

3    have to launch our own nonstops to the New York market, and

4    that drives a dual strategy for us, where we're launching

5    routes out of New York that are predominantly local, and they

6    don't compete, even internally with American, on the routes

7    out of our other hubs that are predominantly connections.

8    They have two reasons for being.  And so everything that we

9    have on this page here is meant to go after those New York

10   passengers.  And the small number of connections we do get,

11   maybe -- depending on the route, maybe a third of the flight

12   is connecting, it helps us make money in that small emerging

13   business, but that's not the reasons we have the flights.

14             Whereas, in Philadelphia, the reason we have the

15   flights is to have that gateway and connect across the US.

16   And we get a third of the passengers locally in Philadelphia,

17   which is great, too.  But there are two different strategies

18   for us, and the NEA really enables a local New York strategy

19   that we otherwise couldn't have.

20             THE COURT:  Thank you.  Go ahead.

21   BY MS. MALTAS:

22   **Q.**  Let's turn to the next slide.  And what is this slide

23   showing?

24   **A.**  It shows the new routes that we've launched out of Boston

25   since the NEA began.

1    **Q.** And is the methodology for selecting these routes the

2    same?

3    **A.** Yes.

4    **Q.** And what's generally been the experience for American

5    with these new routes in Boston?

6    **A.** So this level -- again, the significance of these two

7    slides is really the level of investment that we're making.

8    In a prior to the NEA strategy, we might have launched two,

9    three new routes in Boston, and that would be -- that would

10    be fine.  It's not strategy altering for Boston, but to make

11    this level of investment, where we're launching, I'm counting

12    here, 18 new routes combined, that's significant.  And then

13    the prior slide was even more new routes, and you wouldn't

14    see that level of attention and network -- and network

15    growth, were it not for our hope of the NEA making money down

16    the road.

17         MS. MALTAS:  And Your Honor, we can either have

18    Mr. Znotins read all of these routes into the record, or we

19    were proposing to introduce these two slides as a 1006

20    summary of Defendants' Exhibit 736, our new DX-1087.

21         MR. MOORE:  Your Honor, we would object to moving

22    these documents into evidence.  The reason it's multifold.

23    As you can see at the bottom, this is new data, including

24    apparently selling data for flights that have not even

25    occurred yet, so there's that basis.  Secondly, this was

1    provided to us as a demonstrative yesterday.  We were okay

2    using it for demonstrative purposes, but this is the first

3    time we've gotten this document, was yesterday at 9:00 a.m.,

4    so we don't think it should be moved into evidence for the

5    truth of the matter asserted.

6              MS. MALTAS:  And Your Honor, this is not new data.

7    This is AOG data.

8              THE COURT:  So as to the fact they haven't flown

9    some of the flights yet, because it goes to the future, that

10   just goes to the weight, not to the admissibility, in my

11   view, of the evidence.  As for the truth of the matter

12   asserted, his testimony is in for the truth of the matter

13   asserted.  And his testimony, for example, that they flew to

14   Tel Aviv is in for the truth, without an admissibility

15   objection from you, understandably, because there is no

16   admissibility objection to that testimony.

17             MR. MOORE:  Agreed.

18             THE COURT:  And so that distinction between that

19   and the demonstrative, I don't perceive one.  So I'm -- I'm

20   going to admit them, over your objection, subject just to one

21   thing, which is you didn't realize, fair enough, that there

22   was going to be offered until now, or shortly before, that's

23   fine.  So if you wish, after you've looked it over, to make

24   an admissibility objection, because you've had a chance -- if

25   you have a chance, you need to look at the summaries and what

1  have you, and you think -- and that's the basis for coming

2  in.  That's perfectly fine.

3           And you can raise that objection, say, within -- I

4  don't know, by the end of the week, then file something, and

5  that's fine.  And then I would look at that, and I wouldn't

6  hold that against you that you didn't raise that right now.

7  I just look at it on the merits.  But I admit it now, over

8  the objections, subject to that, and if you don't file

9  anything, then it will just be in.  And if you do, then we'll

10  cross that bridge when we get there.

11           Go ahead.

12           MS. MALTAS:  Thank you, Your Honor.

13           (Defendants' Exhibit No. DX-1087 admitted into

14           evidence.)

15  BY MS. MALTAS:

16  **Q.**  So, Mr. Znotins, would any of these new routes or routes

17  be launched without the NEA?

18  **A.**  It's possible.  It's really impossible to know what would

19  have happened without the pandemic and what would have

20  happened without the NEA.  We're always adjusting our

21  decisions based on the information we have at the time.  But

22  as I said before, the level of new route activity that you

23  see here, you wouldn't see without a real change in the

24  perception on the viability of New York and Boston going

25  forward.

1    **Q.**  And is American planning to continue to grow in New York

2    and Boston?

3    **A.**  Yes, with success, again, more of what works, less of

4    what doesn't, with success in New York and Boston, we'll

5    continue to invest and allocate resources there.

6    **Q.**  So let's take a look in your binder and it will also be

7    up on the screen, at Defendants' Exhibit 111, which has

8    already been admitted into evidence.  And this will be, I

9    will caution, a heavily redacted view on the screen, but

10   everyone who has binders can take a look at the unredacted

11   versions, as well.

12            So Mr. Znotins, what is this document?

13   **A.**  It is -- it's titled the 2021-2026 network five year

14   plan.  It's, in essence, a long range planning document for

15   American Airlines.

16   **Q.**  And when is it from?

17   **A.**  August of 2021.

18   **Q.**  So just taking a step back, what's the general process

19   for creating a plan like this at American?

20   **A.**  So throughout my career, airlines will generally create

21   five year plans like this for two reasons, really.  On a

22   day-to-day basis, we can move airplanes around, and that's

23   not part of the five year plan, and we can choose routes, and

24   that's really not part of the five year plan, either.  There

25   are routes listed, but it's -- we know that, by the time we

1    get to the year in question, the information will be

2    different, the market will be different, and we'll probably

3    make adjustments to our route plans.  But the things that are

4    very difficult to make adjustments to are your fleet strategy

5    and your airport strategy.  So this is largely for the

6    benefit of our real estate team, to know when we'll need a

7    new runway in Charlotte, for example.  When we'll need new

8    gates in Dallas, and it's a benefit to our fleet team to know

9    that we'll need new wide-body airplanes four or five years

10   from now.  Because of Boeing and Airbus's backlog, you have

11   to get in the queue for new airplanes now in order to have

12   that plane delivered three to four years from now.  And we'll

13   put together a document like this to guide the company on

14   when and where we're looking to invest in airports, and when

15   and where we're looking to invest in our fleet.

16   **Q.**  And focusing on these five year plans, what factors are

17   considered in creating them?

18   **A.**  It goes to market demand, competitiveness.  So what goals

19   do we want to achieve in the long run?  Where will demand be

20   in the long run?  We take a GDP forecast and we estimate that

21   this many passengers will be flying over the next five years,

22   and at a very rough basis, you want your airline to at least

23   grow with GDP, because as GDP grows, there are more business

24   travelers, they are more leisure travelers, and thus you need

25   more capacity to capture them.  And then furthermore, where

1    do we want to invest as an airline.

2              So in many cases, we'll say that we want to

3    continue to grow Charlotte, which is a great hub for us, but

4    in order to do that, we need a runway there, and it takes

5    three to five years to build a runway, and this document --

6              THE COURT:  You need a runway, meaning there's just

7    not enough landing capacity at the airport without another

8    runway to meaningfully expand?

9              THE WITNESS:  Yes, Your Honor.

10   BY MS. MALTAS:

11   **Q.**  What groups at American provide input into five-year

12   plans?

13   **A.**  A number of groups provide input, but the real meat of it

14   comes from network planning, corporate strategy, finance,

15   real estate, and the fleet team.

16   **Q.**  And you mentioned that some aspects of the plan can

17   change.  Why is that?

18   **A.**  Because the world changes.  I joke with my team I

19   sometimes can be frustrated with change, And none of us would

20   have jobs if things changed -- or if things didn't change.

21   We could set the schedule once and walk away, but because

22   there's a volcano in Iceland that's impacting transatlantic

23   travel, there's a MAX grounding, there's SARS in Asia,

24   there's a pandemic, we have to be continually rewriting our

25   schedules and continually changing our plans to address where

 1    demand is and is going to be.

 2            So we -- in essence, we're always working on the

 3    five year plan.  It's a living document, we're always

 4    updating it, and then one time a year, you press print, and

 5    almost a day after, you'll learn something new and say, okay,

 6    well, we're going to tweak this in the plan, and then the

 7    next year will roll by and you'll print again.  So if you

 8    were going to look at five-year plans from year to year to

 9    year at any airline, it's never the same document.  But if

10    you see the same themes happening in that document from year

11    to year to year, perhaps needing a new runway in Charlotte,

12    then you know that that's one thing that's going to stick and

13    you're going to act on.

14            THE COURT:  Am I correct, sorry, that there would

15    be input -- the fleet costs -- the costs of acquiring new

16    planes or the price differential of retiring planes or not

17    retiring planes and continuing them on influences sort of the

18    schedule -- long term schedule construction because it

19    potentially influences the profitability of various routes?

20            THE WITNESS:  That's right, Your Honor.  We will

21    work with the fleet team to say this is the schedule we would

22    like to operate five years from now.  We want to be bigger in

23    Dallas and Charlotte, and because of the NEA, we're bigger in

24    New York.  And this is the number of airlines we need to fly

25    it.  And then we'll work with the fleet team to say what's

1    the most cost effective way to fly, to get those airplanes.
2    Are we going to order new ones from Boeing or from Airbus, or
3    do we want to go to the used market and get cheaper airplanes
4    that are used, but many have more maintenance expense or burn
5    more fuel.  So it really starts with the schedule, and we
6    say, this is what we want to offer to our customers in terms
7    of schedule, and how do we best do that with the fleet and in
8    the most cost-effective way, and the finance team will help
9    with that.

10             THE COURT:  So were there discussions in 2020?
11             Let me rephrase that.  I assume in 2020, many
12   people were cancelling or delaying orders of new planes.
13             THE WITNESS:  Right.  And American Airlines, we
14   actually grounded a number of fleets permanently then.
15             THE COURT:  So I assume the manufacturers were
16   desperate to sort of ramp up commitments from airlines
17   because everybody was cancelling.
18             THE WITNESS:  That's right.
19             THE COURT:  Which then creates the opportunity to
20   get the planes cheap, if you're willing to take the risk.
21             THE WITNESS:  That's absolutely right.  Just like
22   in any market, in really uncertainly times, you can get
23   investments like planes cheap.  But at the time in the
24   pandemic, we were worried about making it to the end of the
25   year, and so spending money and making new orders for

1    airplanes, that's not something that the board was going to

2    get really excited about for us.  Just we needed to focus on

3    getting to the end of the year.  And as it turns out,

4    everything that we -- we sourced financing, the government

5    provided some backstop for us, we leveraged our frequent

6    flyer program, and everything worked out fine, and we're

7    getting airplanes now again.  But in that moment, you know,

8    as a network planner, it's keeping the lights on, keeping

9    everybody employed.  And we weren't -- going to the board and

10   asking for more airplanes in that moment would feel pretty --

11            THE COURT:  Did any of the airlines make that kind

12   of bet?

13            THE WITNESS:  Not right away.  You know,

14   British Airways ordered some 737 MAXs kind of further into

15   the pandemic.

16            But we were -- we had a very solid order book to

17   begin with, as well, and our fleet team, they naturally build

18   flexibility into our order book.  So sometimes you'll hear an

19   airline announce 200 new airplanes plus 200 options, and

20   those options are spread out over the course of the delivery

21   stream.  And that gives the airline flexibility to say, times

22   are good, I'm going to exercise those options with Boeing and

23   Airbus, which we've done.  And so we had a really deep option

24   order book in our portfolio already, so we didn't have to

25   place a new order.  We could just come up to the time when

1    we'd exercise those options and say to the board things are
2    looking up.  We've got some optimism for the future.  We're
3    going to start taking some of these options from Boeing and
4    Airbus.  Whereas, if things weren't looking great --
5            So we didn't feel pressure to say let's go place a
6    new order, because we already had that flexibility.  Now,
7    maybe we could've gotten a little deal by doing so, but also
8    at the end of the day, aircraft ownership is -- you know,
9    coming off the top of my head, about 10 percent of our cost
10   of operating a flight at JFK to Tel Aviv, you know, call it
11   $18 million a year, whereas the fuel and the pilots and the
12   flight attendants and the mechanics and the parts, and all
13   that's what the lion's share of the expense is.  So even if
14   you're saving 10 percent on an airplane that's 10 percent of
15   your expense, it's really only one percent at the end of the
16   day.  And so we'll --
17           THE COURT:  It's not as big of an expense as it
18   might appear.
19           THE WITNESS:  That's correct exactly.  Exactly.
20           THE COURT:  Go ahead.
21   BY MS. MALTAS:
22   Q.  So Mr. Znotins, let's go ahead and turn to page 22 of the
23   document, and there are some redactions on here.  So is
24   page 22 the 2026 plan for New York, as of August of 2021?
25   A.  Yes.

1  **Q.**  Now, in the redacted section, there's a column with the

2  header 2026 versus 2019.  And again, just generally, without

3  speaking any of the numbers, what's that column showing for

4  each of the rows?

5  **A.**  It indicates that we would be growing versus 2019 in our

6  domestic and short-haul Latin, and our long-haul and XLR

7  rows.  And then there would be some reductions in the

8  LaGuardia row.

9  **Q.**  And why were you comparing 2026 to 2019?

10  **A.**  Well, first and foremost, 2019 is the last normal year we

11  had to compare to.  If we compare it to 2020 or 2021, it

12  really wasn't reflective of where the airline sat before we

13  hit the pandemic.  And then 2026, it's just the last year of

14  the plan, so it's the furthest out we're looking in this

15  document.

16  **Q.**  There's also a column "header of shells versus 2019."

17  What does that mean?

18  **A.**  It's roughly the number of airplanes that we were

19  allocating to each of these categories.

20  **Q.**  So speaking directionally, both the departures and shells

21  for 2026 are negative when compared with 2019 for AA/LGA.

22  Why is that?

23  **A.**  Because in the NEA, we were optimizing our slot portfolio

24  with JetBlue, and they would fly a number of routes in

25  LaGuardia that had prior been operated by American.

1    **Q.**   And does that mean that the NEA shrinks in LaGuardia?

2    **A.**   No, it doesn't.  In fact, in most cases the planes

3    JetBlue was using on these routes were larger than the planes

4    American were using, and it was a net capacity add.

5    **Q.**   The departures and shells comparison for 2025 versus 2019

6    is positive for both AA/JFK domestic short-haul Latin, and

7    AA/JFK long-haul plus XLR.  Why is that?

8    **A.**   That's reflective of the investment we were willing to

9    make in the New York market as a result of the NEA.  We were

10   putting more international flying in, those Bogotas and Calis

11   that we saw on the prior slide.  And then the AA/JFK

12   long-haul plus XLR, that's reflective of the Athens and the

13   Tel Aviv that we were adding, and then as we get this new

14   fleet type, called the A321 XLR, it's actually capable of

15   flying transatlantic missions, and we would look to add a

16   number of airplanes to JFK and new routes using that airplane

17   by 2026, as well.

18   **Q.**   Now, in terms of American's five-year plans today, is

19   this still the plan for New York?

20   **A.**   Yes.

21   **Q.**   Let's turn to page 23, the next page, which is about

22   Boston.  Again, there are quite a few redactions on this

23   page, as well.  But we're going to focus generally on the

24   table in the middle that's entitled remember, "BOS

25   Frequencies - Progression of NEA Implementation."

1          So again, starting with what's not redacted, what
2     are the 2019 and 2021 columns showing?
3     **A.**   It's showing as a result of the pandemic that we shrunk
4     or presence overall in Boston.
5     **Q.**   And it looks like the "Domestic" row increased, despite
6     the overall COVID-related decrease.  Why is that?
7     **A.**   That was a function of the experimentation that I
8     referred to earlier, where people weren't flying
9     transatlantic.  They weren't flying on business routes.  So
10    Boston, obviously there's a lot of business that's done
11    between New York and D.C. and Boston, but during the
12    pandemic, nobody was making those trips.  So instead we
13    looked to point airplanes toward leisure destinations, like
14    Traverse City, where people were making trips.  So we
15    experimented a bit through the pandemic in order to get what
16    travelers were flying in the market.
17    **Q.**   And turning to the redacted parts of the table, and again
18    speaking in generalities, there's a column for 2026 and 2026
19    versus 2019.  What are those columns generally showing?
20    **A.**   In each of those rows, we are growing versus 2019.
21    **Q.**   And if you look at the sentence immediately preceding the
22    table, which is also redacted, what is the sentence saying
23    generally about the relationship between this plan to grow in
24    Boston and the fleet needs?
25    **A.**   That we had planned to use some of our incoming airplanes

1    on new routes in the Boston market.

2    **Q.**   And by "incoming," you mean planes that are on order?

3    **A.**   Yes.

4    **Q.**   And has this -- is this plan still the five-year plan for

5    American in Boston?

6    **A.**   Yes.

7    **Q.**   Now, as part of the NEA, American and JetBlue have, in

8    some cases, decided that only one airline will fly a certain

9    route, when prior to the NEA both airlines flew that route.

10   Is that your understanding?

11   **A.**   Yes.

12   **Q.**   And one such situation is the Boston to LaGuardia

13   high-frequency route; is that right?

14   **A.**   Yes.

15   **Q.**   What is your understanding why in the NEA, it could be

16   better, in some situations, for only one airline to fly a

17   route?

18            MR. MOORE:  Objection, Your Honor.  Leading.

19            THE COURT:  Overruled.

20            THE WITNESS:  In a network planning world, as you

21   grow the size of your fleet, you're always looking to create

22   the most optimal schedule.  So with more airplanes, you can

23   build schedules in a more efficient way and make better use

24   of them.  So by combining our schedules with JetBlue in the

25   New York market, there are possibilities for American to

1     launch new routes that are more efficient and have a more

2     appropriate stage length for the type of airplane that you're

3     flying.  And in the other side of that equation, it's better

4     that JetBlue operates the Boston-LaGuardia route entirely.

5             And it mentions a system optimization.  So in order

6     to get the most flying out of the New York market and the

7     most seats and get the perfect airplanes on the perfect

8     routes, in some cases it's better for American to be the sole

9     operator on a given route, and in other cases it's better for

10    JetBlue to be the sole operator on a given route.

11    BY MS. MALTAS:

12    Q.  And what has American done with its capacity that it's no

13    longer flying Boston-LaGuardia?

14    A.  We've launched many of the new routes and new frequencies

15    that we've discussed prior.

16    Q.  Have you received any complaints about American not

17    flying Boston-LaGuardia on its metal?

18    A.  I've received a number of e-mails from employees in the

19    New York market that are concerned about this.

20    Q.  And what has been your response to their concerns?

21    A.  We have held town halls, both Vasu and I, and we have

22    shared e-mails and data with these concerned employees that

23    shows that our block hours, the number of hours that each

24    airplane flies in aggregate in these markets, is actually

25    increasing versus 2019, as well as versus the rest of the

1    system.

2            And our employees, their jobs are probably -- the

3    statistic that their jobs are tied to the most are block

4    hours.  How many departures do we have, and how far or how

5    long of a stage length are those airlines flying.  Because as

6    you have more block hours, you need more pilots and you need

7    more flight attendants.

8            And so for a pilot who lives in New York and is

9    concerned that, you know, maybe at a high level we are

10   handing over flying -- I'm using air quotes there -- to

11   JetBlue, and that will impact that pilot's career, we can

12   assuage their fears that even though that route is being

13   operated by JetBlue, we've offered far more capacity and far

14   more block hours in the rest of the New York market.

15           So there will be more pilots and more attendants

16   and more airport staff working in New York as a result of the

17   NEA than without the NEA.  And that, in essence, becomes job

18   security and a much higher probability of job progression for

19   these workers in the market.

20           So block hours is a really important number, and

21   that's the data that we would share with these employees to

22   assuage their fears about what may be happening in the

23   market, by just looking at one route in isolation.

24   Q.  And is this decision to not fly Boston-LaGuardia on

25   American metal set in stone?

1   **A.**   No.  When we're doing our network optimization, there

2   could be a point in the future where we say that most

3   efficient schedule to operate, with the best airplanes and

4   the best route, means American -- American airplanes reenter

5   the market or even American operates it exclusively.  Both

6   possibilities are there.

7            MS. MALTAS:  And I noticed it's 11 o'clock.  I

8   didn't know if you wanted to take the break now or if you

9   prefer me to go on.

10           THE COURT:  How much more do you have?

11           MS. MALTAS:  Oh, half an hour.

12           THE COURT:  Oh, why don't we take the break now.

13   We'll stand in recess.

14           (Court in recess at 11:02 a.m.

15           and reconvened at 11:16 a.m.)

16           THE COURT:  Go ahead, Ms. Maltas.

17           MS. MALTAS:  Thank you, Your Honor.

18   BY MS. MALTAS:

19   **Q.**   Mr. Znotins, you mentioned earlier with regard to the

20   five-year plan, that the route planning can change more

21   frequently than some of the other aspects of the plan.

22           When is a new route official or an actual plan for

23   the company?

24   **A.**   It's very hard to draw a clear line to when a route

25   becomes official.  But generally speaking, once we announce

1  that route publically and open it for sale, then we're

2  committed to flying that route.  But there have been cases,

3  right up to the day before announcement, when we thought we

4  would announce the route, and the circumstances changed and

5  we decided not to.

6  **Q.**  And why is the announcement the time where you consider

7  it to be official or actually going to be flown?

8  **A.**  Once we start selling seats to customers, then we have

9  some responsibility to try to deliver those seats as best we

10  can.

11  **Q.**  And why would it change?

12  **A.**  Market conditions are always changing, competition is

13  always changing.  And so an example would be, in my career,

14  we were -- you know, in my past, we were selling a flight to

15  Cairo for a different airline that I worked for, and Arab

16  Spring happened.  And it was clear that that flight wasn't

17  going to be viable as a result of that, so we decided to

18  remove that flight for sale and use that airplane elsewhere.

19  **Q.**  So we've seen a lot of e-mail traffic in this case as

20  exhibits, discussing potential or possible new routes.  In

21  your experience, if there is an e-mail discussing a potential

22  new routes, does that mean that that route is part of

23  American's plans?

24  **A.**  No.

25          MR. MOORE:  Objection, Your Honor.  She's just

1      characterizing evidence in the record.  She is not referring

2      to any specific documents.  If she wants to ask about a

3      specific route, she can, but she's just asking in the

4      abstract about documents that are somewhere in the record.

5                    THE COURT:  Overruled.  I understand it to be just

6      a general explanation of how to understand the way they

7      operate their business.

8                    Go ahead.

9                    MS. MALTAS:  You can answer.

10                   THE WITNESS:  And I think the answer was no.

11     BY MS. MALTAS:

12     **Q.**  And why is that?

13     **A.**  We do a lot of spitballing over e-mail and in person

14     about new, great ideas.  Sometimes it's Vasu.  Sometimes it's

15     me.  Often it's my team.  And we'll say what about flying

16     this?  What about flying this other route?  What if Tesla has

17     set up shop in Austin; does that make us think differently

18     about launching a new Austin to Reno service where they have

19     operations on both ends of that flight?

20                   And so when we're following the news and we're

21     saying that what we thought was a good idea before, now is

22     different, and we want to use that airplane somewhere else,

23     that's in essence what we do.  We brainstorm about routes and

24     launching new flights and adding new frequencies, and what's

25     a good one, what's a bad one.  And that happens over e-mail

1    sometimes.  Other times it happens in person.  And that's, in

2    essence, our job.

3    Q.  All right.  Let's turn back to page 22 of the five-year

4    plan.

5            And do you see at the top where the document says

6    "Northeast Alliance"?

7    A.  Yes.

8    Q.  And you can look on the screen, too, either -- whatever

9    is easier.

10           And then in the last sentence, there's a reference

11   to the "DOT growth commitments."  What does it say about the

12   DOT growth commitments?

13   A.  It reads, "The five-year network plan for New York will

14   also meet the DOT's growth commitment as part of its approval

15   of the NEA."

16   Q.  And from a network planning perspective, could you

17   explain your understanding of the agreement with the DOT

18   that's referenced here?

19   A.  We made a commitment to the US government that, as a

20   result of the NEA, we would grow our capacity in the New York

21   market versus a 2019 base year.

22   Q.  And how has American factored the DOT commitments into

23   its network planning process?

24   A.  We have and plan to meet these commitments and exceed

25   them.

**Q.**  If you look at how American has grown in 2022 and the
plans for the rest of the year in terms of what's being sold
and operated, where is American at with regard to these
commitments for 2022?

**A.**  We are materially above the commitment for 2022 and
actually exceed the commitment as far out as 2025.

**Q.**  And let's take a look at the demonstrative that shows the
progress on the DOT commitments.  And what is this
demonstrative showing?

**A.**  So the -- the dashed blue bars on this slide represent
our commitment to the DOT.  And in the middle of this slide,
in the 2022-year, the bottom, darker red bar shows the number
of seats that we have operated as of June of this year.  And
then on the upper part of the bar, it has the number of seats
that we have scheduled from July through December of this
year.  And it indicates that we are roughly, just eyeballing
it, five million seats above our commitment for 2022, and you
know, maybe about 2 million seats above our commitment where
this would extend out through 2025.

**Q.**  How confident are you that American will meet these
commitments?

**A.**  We will meet these commitments.

THE COURT:  What's a "bidirectional seat"?  It says
in the footnote.

THE WITNESS:  It means a seat from New York to

1    Boston counts as one, and then Boston to New York counts as

2    another.

3              THE COURT:  I see.  Okay.

4    BY MS. MALTAS:

5    **Q.**  So Mr. Znotins, you had mentioned previously the plans --

6              MS. MALTAS:  You can take this down.

7    BY MS. MALTAS:

8    **Q.**  -- the plans for the fleet.  And I would like to turn

9    back to that.

10             Does American have, sitting here today, the fleet

11   it needs to do the NEA flying?

12   **A.**  Yes.

13   **Q.**  And what percentage of the current fleet is dedicated to

14   the NEA?

15   **A.**  Using block hours as a proxy, which is about the best

16   proxy we have, it's about 15 percent.

17   **Q.**  Now, sitting here today as American, robbing Peter to pay

18   Paul, as it were, that is, do you have to pull down flying or

19   grow more slowly in other areas in order to fund the NEA?

20   **A.**  In the short term, yes.  And we optimized the entire

21   system based on our priorities around the system.  Our

22   priorities right now include growing DFW and Charlotte.  It

23   includes growing the NEA.

24             So as a result of that, we have allocated capacity

25   to the NEA, and in theory, some of that capacity would be

1  elsewhere in the system in the short run.  But in the long

2  run, with success in the NEA, we will go back to the board

3  and seek to exercise fleet options or source new airplanes to

4  backfill those other priorities in the system that right now

5  aren't being as addressed as wholly as we would like because

6  we're addressing the NEA.

7  **Q.**  Is this funding choice something that's unique to the

8  NEA?

9  **A.**  No.  This is -- this is, in essence, the job that network

10  planners do every day.  We have a constrained fleet in the

11  short term.  We have constrained resourcing, in terms of

12  employees, and we will design the very best network that we

13  can, using those constraints.  And then, over time, look to

14  relax those constraints with additional airplanes, and hiring

15  of staff, building of runways, and adding of gates.

16  **Q.**  And when you are making your priorities, how do you

17  decide what should be prioritized, and where a shell should

18  serve one set of markets instead of another?

19  **A.**  To oversimplify again, it goes back to more of what works

20  and less of what doesn't.  We seek DFW and Charlotte are very

21  successful hubs for us.  We have, through the pandemic,

22  endeavored to keep them as large as possible, and we will do

23  so going forward.  And then the NEA is a priority for us now,

24  when the New York market wasn't before, because of our

25  optimism for profitability there, going forward.

1   **Q.**  Doesn't that hurt the customers in the nonprioritized

2   areas?

3   **A.**  No.  We're remaining competitive in our other markets

4   across the system.  So we have -- we want to be mindful of

5   our competition in all of our hubs, but O'Hare, Philadelphia,

6   Miami, and we feel comfortable with the capacity that we have

7   in those markets, given the priority that we have across the

8   system.

9   **Q.**  And you mentioned that the long term plan is to have more

10  airplanes.  What is, in particular, that long term plan?

11  **A.**  We have been exercising options on airplanes, we have

12  been sourcing new regional jets, we have been bringing

13  airplanes out of the desert that we had in the desert as a

14  result of the pandemic.  And so working with the fleet team,

15  we're always finding ways to get the fleet we need in order

16  to fly the network we design, And we've been doing that over

17  the course of the last year.

18  **Q.**  And is that true also for international flying?

19  **A.**  Absolutely.  For international flying, you generally need

20  wide bodies to do that, but the XLR is going to be a

21  fantastic airplane for a shorter haul transoceanic flying.

22          MS. MALTAS:  Now, Mr. Znotins, we have another

23  demonstrative about the fleet.  This one has been requested

24  to be confidential by the company and so we're just going to

25  look at it in the binder, if you don't mind.

1          THE COURT:  It's in the binder?

2          MS. MALTAS:  This is the demonstrative that's

3     entitled "2027 Fleet Size Expectations By Quarter."

4          THE COURT:  Would this be in the small binder?

5          MS. MALTAS:  Yes.

6          THE COURT:  I have it.

7     BY MS. MALTAS:

8     **Q.**  And Mr. Znotins, again, with -- respecting the

9     confidentiality that's been requested, particularly of 2022

10    Q3, what is this showing?

11    **A.**  So it's our 2027 fleet size expectations by quarter or by

12    a moment in time.  So to look at 2019 Q4, as of that moment

13    in time, we expected a certain number of airplanes to be in

14    our fleet come 2027.  And so each of these bars represents

15    that -- in that point in time, how many planes did we have in

16    our fleet plan for 2027.  And through the course of late

17    2020, into 2021, as I mentioned before, as we became more

18    optimistic that we were going to -- the airline was going to

19    be around through the pandemic, and that travel patterns and

20    demand were improving, and our results were correspondingly

21    improving, that we became more bullish on our expectations

22    for adding to the fleet.  And so in 2022, Q3, which is today,

23    you can see our fleet expectations for 2027 are in the

24    neighborhood of where they were before.

25    **Q.**  And we can see it rising over the past few years.  Is all

1    of this growth an expectation in the fleet plan attributable

2    to the NEA?

3    **A.**   No.  It's attributable to the overall system performance.

4    We go to the board and when we're looking to grow and justify

5    new airplanes, we have to present a plan that shows that we

6    will have the financial results to warrant the investment

7    that billions of dollars of new airplanes cost.  And so in

8    each of our lines of business, our hubs, we will present a

9    plan on either how to improve results, improve profitability

10   in those hubs like DFW and Charlotte, or to reverse losses in

11   markets like New York.  So to have a credible argument in

12   front of the board to order more airplanes, we need to

13   address -- especially address the areas where we're under

14   performing and we have a good story in New York now to

15   improve performance, and it makes us more -- have a bigger

16   appetite for more airplanes, and have the board be willing to

17   approve the purchase of those airplanes.

18   **Q.**   Let's take a look at another demonstrative that we can

19   put up on the screen.

20           And Mr. Znotins, what is this showing?

21   **A.**   This shows the number of fleet actions -- a number of

22   fleet actions we have taken over the last year to 18 months,

23   to grow our fleet, reflecting our optimism for the

24   performance of our airline.

25   **Q.**   So the first one listed is, "Exercised options on A321

1   neo aircraft in 2022."  Is that the type of option that you

2   were discussing before?

3   **A.**  That's exactly right.  We had our flexibility in our

4   order book prior to the pandemic and we started exercising

5   that flexibility earlier this year.

6   **Q.**  And can you speak generally about these purchasing or

7   options that had been made?

8   **A.**  I'm sorry, I -- could you --

9   **Q.**  Do you have any further detail to add on the

10  demonstrative?

11  **A.**  Yeah, so through the list of the airplanes here, so

12  through the -- and during the pandemic, we parked a number of

13  737s, 37 of them, that were older in our fleet and required

14  to have a significant maintenance investment in order to

15  continue flying.  And there was some talk of leaving that

16  fleet on the ground because of that investment, but because

17  we were emerging from the pandemic, and our results were

18  better, and we had optimistic for returns in our system, we

19  decided to make that investment in those airplanes and take

20  them out of the desert.

21          We also exercised -- we created a new order with

22  Boeing for 30 additional 737-8 MAX airplanes at the beginning

23  of this year.

24          And then on the smaller regional jet side, which I

25  talk about earlier in my testimony, we are adding the large

1    RJs, the CRJ 900s, the Embraer 170 and 175s, and those

2    replaced those 50-seaters that we were moving out of the

3    fleet.  And then finally, in O'Hare, we just signed up a new

4    regional jet operator for us, Air Wisconsin, who will add 40

5    CRJs to our O'Hare operation, and allow us to grow back and

6    address our priorities there quicker than we otherwise would

7    have been able to without that Air Wisconsin flying.

8    **Q.**  And what impact, if any, did the NEA have on these

9    decisions regarding the fleet?

10   **A.**  Again, it can't really be tied to any one specific

11   decision, but not having the -- a forecast for continued

12   losses in New York gives us the credibility, when we go to

13   the board and argue for these investments, that they will

14   approve it.

15   **Q.**  So Mr. Znotins, plaintiffs argue in this case that

16   because of the NEA, American will deprioritize and reduce its

17   flying in Philadelphia.  And you touched on Philadelphia

18   briefly earlier, but what's your reaction to that?

19   **A.**  It goes back to what I mentioned before, that a flight to

20   Europe from JFK addresses an entirely different market than

21   what Philadelphia does.  And so in Philadelphia, we are

22   looking to serve the whole country, generally speaking,

23   again, about two-thirds of the flight.  And then two-thirds

24   of the flight out of New York is looking to address just New

25   York.  And so we want to serve New York and we want to serve

1   the whole country, and JFK will tackle the first for us, and

2   Philadelphia will tackle the second.  And we're not really

3   willing to walk away from either of those strategies.

4   **Q.**   Isn't there some possibility that American can make JFK

5   the connecting gateway that you described instead of

6   Philadelphia?

7   **A.**   No.  The infrastructure constraints in JFK prevent it

8   from being a strong connecting hub for us.  In order to build

9   a strong connecting hub, you need to bring 40 to 50 flights

10  in, all at the same time, from St. Louis and from Kansas

11  City, Chicago.  You bring them all into Philadelphia at the

12  same time, so that they can all build a reasonable connection

13  to that one Rome flight that goes out an hour and a half

14  later.

15         And at JFK, we can't bring 40 flights in all at the

16  same time.  We don't have the slots to do that.  We don't

17  have the gates to do that.  So JFK just physically can't

18  support an activity as a connecting gateway like Philadelphia

19  can.  And just at its core, you're not able to replace

20  Philadelphia as a connecting gate way with JFK.  It just

21  can't be done.  So we truly need both in our network.

22  **Q.**   Do you have any prior experience that informs your belief

23  on this interplay between JFK and Philadelphia?

24  **A.**   A similar, but not precisely identical, comparison would

25  be when I worked for United, and Dulles played more of a

1    connecting gateway role versus Newark in the New York market.

2    **Q.**  Now, since you've been at American, have there been any

3    discussions internally about reducing operations at

4    Philadelphia?

5    **A.**  Because of the pandemic and because passengers weren't

6    going to Europe, we have reduced capacity in Philadelphia for

7    a few reasons.  First and foremost, if someone is not going

8    to Rome, you don't need that seat to Rome.  But then because

9    it's our gateway, that seat that we were flying from

10   St. Louis to Philadelphia on to Rome, it looks like a

11   domestic seat in our network, but it's actually dedicated to

12   that international connecting passenger.

13            They don't exist because of the pandemic, and so we

14   reduced domestic capacity in Philadelphia, as well, their

15   domestic flights.  But in a way, as a network planner, we see

16   that as international capacity.  So those two things, you

17   know, Philadelphia's reason for being, its international

18   gateway status just didn't need to be served through the

19   pandemic.

20            And then furthermore, on a local traffic basis, we

21   saw passengers who were willing to fly during the pandemic

22   tended to be in the south.  And then passengers in the north

23   who were willing to fly tended to want to go south.  And so

24   that had us focus our capacity more on DFW and Charlotte,

25   than at Philadelphia, O'Hare, and our other northeastern

1   operations prior to the growing for the NEA.

2   **Q.**  And were there any discussions about potentially leaving

3   Philadelphia small after the COVID recovery was over?

4   **A.**  Our lease was up in Philadelphia, and much like when you

5   have a lease at home and your lease is up, it's a good time

6   to say, "If we were to move, now is a good time to do it

7   because our lease is up."  And so the lease was up in

8   Philadelphia, and as you do when you have an opportunity to

9   get out of fixed costs, you evaluate what the future of that

10  hub is going to be.

11          So we went through an exercise with Philadelphia

12  that looked at the performance of the hub, its role in our

13  network, the costs of the hub as they existed, and we

14  determined that it had an important role in our network and

15  we should renew the lease and continue to operate there.

16  **Q.**  Now, plaintiffs have cited in this case a March 2020

17  planning deck related to the new American that states that,

18  "A partnership with JetBlue will erode the unique value of

19  Philadelphia."

20          Is that a statement that you wrote or endorsed?

21  **A.**  No.

22  **Q.**  Sitting here today as the vice president for network, do

23  you agree with that statement?

24  **A.**  No.

25  **Q.**  Let's go ahead and take a look at DX16, which I believe

1    has already been admitted into evidence.

2              Mr. Znotins, what's DX16 about?

3    **A.**   This is an e-mail from Amanda Zhang.  She is in our

4    corporate real estate department.  She is responsible for our

5    Philadelphia relationship.  And she is asking me to provide

6    written confirmation to Shelly -- I forget her last name,

7    unfortunately -- in Philadelphia.  She ran the Philadelphia

8    airport on behalf of the city.  And asking for written

9    confirmation to Shelly that we remain committed to

10   Philadelphia, despite the NEA.

11             Because much like those misplaced fears from our

12   employees in the market, also Philadelphia was worried that

13   JFK would become our transatlantic gateway and didn't

14   understand that JFK couldn't be a gateway for us for the

15   reasons that I already described.

16   **Q.**   And did American provide that written statement to the

17   City of Philadelphia?

18   **A.**   Yes, I did in this e-mail.

19   **Q.**   And what did you write?

20   **A.**   I wrote that, "Philadelphia will continue to be

21   American's primary transatlantic gateway.  Our relationship

22   with JetBlue is designed to give" -- American the -- "the

23   American brand added relevance in the New York and Boston

24   markets and is not designed to build JFk in a way which would

25   see it replace Philadelphia in that role."

1    **Q.**   And who did that statement go to?

2    **A.**   That went to Shelly.  Well, it first went to Amanda

3    Jennings in our real estate department, and then on to Shelly

4    at the Philadelphia airport.

5    **Q.**   And was that a true statement at the time?

6    **A.**   Yes.

7    **Q.**   Is it still true?

8    **A.**   Yes.

9    **Q.**   All right.  Let's just finally take a look at Defendants'

10   Exhibit 111 again.  And this time we'll be on page 29, which

11   is related to Philadelphia.

12              THE COURT:  I'm sorry, which document again?

13              MS. MALTAS:  DX-111.

14   BY MS. MALTAS:

15   **Q.**   And Mr. Znotins, do you see the section

16   titled, "Philadelphia" below the redaction?

17   **A.**   Yes.

18   **Q.**   There is a reference here to an exercise between network,

19   finance, and corporate real estate in the fall of 2020, to

20   evaluate the potential future performance of the hub.  Is

21   that the exercise you referred to earlier?

22   **A.**   Yes.

23   **Q.**   And what did that exercise allow the team to conclude

24   regarding the future of Philadelphia for American's network?

25   **A.**   That it played an important role in our network, it was a

1    strong performer in terms of profitability, and that it would

2    play the transatlantic gateway role in our network, in our

3    five year plan.

4    **Q.**  And let's just turn to the next page, page 30.

5              In the middle of the page, if you look, there's a

6    bolded section that reads, "We recommend that by the second

7    half of this decade, Philadelphia gradually returns to its

8    scale, circa 2018/2019."  And then there are a few bullets

9    below.

10             What does this mean?

11   **A.**  This means that as we emerge from the pandemic and

12   continue to grow, that we will get Philadelphia back to, or

13   exceed, it's 2019 size.

14             MS. MALTAS:  Thank you, Mr. Znotins.  I'll pass the

15   witness.

16             THE COURT:  All right.  Cross-examination.

17             MR. MOORE:  Yes, Your Honor.  Jimmy Moore for the

18   United States.  And we'll be passing out some binders.

19             THE COURT:  Okay.

20             Whenever you're ready.

21             **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF USA**

22   BY MR. MOORE:

23   **Q.**  Good morning, Mr. Znotins.

24   **A.**  Good morning.

25   **Q.**  So I just wanted to first start off with a few topics

1    that you discussed with your counsel on your direct

2    examination.  So you spoke a little bit about American's

3    strategy, the network strategy, prior to 2020.  Do you recall

4    that?

5    **A.**  Yes.

6    **Q.**  And you mentioned doing some research by reviewing some

7    documents.  Do you recall that?

8    **A.**  Yes.

9    **Q.**  But you were not at American prior to 2020, correct?

10    **A.**  Correct.

11    **Q.**  So you were not personally involved in any of the

12    decisions that American made prior to 2020 about its network;

13    is that right?

14    **A.**  Correct.

15    **Q.**  I'm sorry.  That was a yes to my question?

16    **A.**  Yes.  Yes.

17    **Q.**  You also spoke earlier with your counsel about some of

18    the routes that American has decided with JetBlue to fly as a

19    result of the Northeast Alliance.  Do you recall that?

20    **A.**  Yes.

21    **Q.**  But when you joined American in early 2020, you and your

22    team were making independent decisions about which routes

23    American would fly, correct?

24    **A.**  Yes.

25    **Q.**  American didn't coordinate with any other domestic

1    airline about the routes that it would fly.  Is that right?

2    **A.**  Yes.

3    **Q.**  And American didn't reach agreements with any other

4    domestic airline about the routes it would fly, correct?

5    **A.**  Yes.

6    **Q.**  And you made these decisions based on what was in the

7    best interest of American alone, correct?

8    **A.**  Yes.

9    **Q.**  But now, under the Northeast Alliance, you and your team

10   are coordinating with JetBlue on the routes that either of

11   you will fly into or out of New York and Boston, correct?

12   **A.**  Yes.  Domestic routes.  I'm sorry, domestic and

13   short-haul international, not long-haul international.

14   **Q.**  So American is not trying to attract passengers away from

15   JetBlue to American on those routes anymore, correct?

16   **A.**  From a network perspective, correct.

17   **Q.**  And in response to the Court's questions about taking

18   planes from other markets, do you recall those questions

19   earlier?

20   **A.**  Yes.

21   **Q.**  And you mentioned -- you mentioned taking those planes

22   from markets that may no longer be served by American,

23   correct?

24   **A.**  Yes.

25   **Q.**  So passengers on those markets, they no longer have the

1    options to fly on American planes, correct?

2    **A.**   We, in many cases, in most cases, we still cover the same

3    markets that we flew before.  So they may have a different

4    timed flights, or a different schedule than they would have

5    had otherwise.  But we -- if -- you can't tie any direct

6    market action to the NEA, but the number of routes we have

7    exited entirely is very small through the course of the

8    pandemic.

9    **Q.**   And one of those routes is the routes from Boston to

10   LaGuardia, correct?

11   **A.**   Yes.

12   **Q.**   And sitting here today, you have no firm plans to reenter

13   that route; is that right?

14   **A.**   Yes.

15   **Q.**   I want to talk about another route that American has

16   either already exited or planning to exit.  This route has

17   actually been designated confidential by your counsel, so we

18   have to be careful about not saying the city names out loud.

19   But just to make sure that we're talking about the same

20   route, if you could turn to your deposition transcript.  It's

21   going to be the first tab in your large binder and we're

22   going to go to page 30.

23            THE COURT:  30?

24            MR. MOORE:  Yes, Your Honor.

25   BY MR. MOORE:

1   **Q.**  And I just want to look all the way to the bottom of the

2   page, at line 25.  Do you see that?

3   **A.**  Yes.

4   **Q.**  So you see there's a route name there, again, without

5   reading the name out loud?

6   **A.**  Yes.

7   **Q.**  So my next set of questions is going to be about that

8   route.

9            When you started your role at American, American

10  was flying this route with its own planes, correct?

11  **A.**  Yes.

12  **Q.**  And it's a significant route in American's portfolio; is

13  that right?

14  **A.**  Yes.

15  **Q.**  It serves both business and leisure passengers?

16  **A.**  Yes.

17  **Q.**  And JetBlue was one of American's competitors on that

18  route prior to the Northeast Alliance, correct?

19  **A.**  Yes.

20  **Q.**  But American and JetBlue have agreed that, in the NEA

21  fully implemented steady state schedule, only JetBlue would

22  be flying that route on its own metal; is that right?

23  **A.**  That's the way it stands today, yes.

24  **Q.**  So according to that plan, American will not be operating

25  on its own metal after full implementation of the NEA; is

1    that right?

2    **A.**   If the plan were to come to fruition, yes.

3    **Q.**   And that's the plan today?

4    **A.**   Yes.

5    **Q.**   Let's turn in your binder to PX322?

6              MR. MOORE:  And Your Honor, this exhibit is already

7    in evidence.

8              THE COURT:  All right.  Okay.

9    BY MR. MOORE:

10   **Q.**   Mr. Znotins, this document is an e-mail from Mr. Ryan

11   Isemeyer to you and Mr. Raja, along with a few others at

12   American.  Is that right?

13   **A.**   Yeah.  Ryan Isemeyer.

14   **Q.**   Thank you.  And he attaches two cheat sheets to his

15   e-mail.  Do you see that?

16   **A.**   Yes.

17   **Q.**   And these attachments were used at town halls with

18   American's pilots and airline staff at JFK and LaGuardia; is

19   that right?

20   **A.**   The same town halls I referenced earlier, yes.

21   **Q.**   And you participated in those town halls, correct?

22   **A.**   At JFK, but not LaGuardia.

23   **Q.**   Let's turn to page 6 of the document.  I'm going to be

24   looking for a table that's labeled "Market Exits From AA in

25   NYC."  Let me know when you're there.

1   **A.**   Okay.  I'm there.

2   **Q.**   And the word "exit" here, that means American is no

3   longer flying the routes on its own planes; is that right?

4   **A.**   Right.

5   **Q.**   And there's 12 LaGuardia routes listed in this table.  Do

6   you see that?

7   **A.**   Yes.

8   **Q.**   And in all 12 of these LaGuardia routes, American exited

9   because of the Northeast Alliance; is that right?

10   **A.**   Yes.

11   **Q.**   So for example, American exited the LaGuardia to

12   Charleston route because of the Northeast Alliance?

13   **A.**   It was -- I'll elaborate on my further yes, or my prior

14   yes.  It's -- as part of the Northeast Alliance planning

15   process, American metal would not operate LaGuardia to

16   Charleston.

17   **Q.**   So American agreed with JetBlue that it would not fly its

18   metal on that route, correct?

19   **A.**   Correct.

20   **Q.**   And American also exited the LaGuardia to Orlando route,

21   correct?

22   **A.**   Yes.

23   **Q.**   And again, it did so after agreeing with JetBlue to do

24   so; is that right?

25   **A.**   As part of our joint scheduling process, yes.

1          MR. MOORE:  And you can take that document down.

2     BY MR. MOORE:

3     Q.  You spoke earlier with your counsel about American's

4     plans for the Philadelphia airport.  Do you recall that?

5     A.  Yes.

6     Q.  And you're aware that the airport authority expressed

7     concerns to American that it might abandon the airport as a

8     result of the Northeast Alliance; is that right?

9     A.  Yes.

10    Q.  And you, in fact, met with Shelly who you referenced

11    earlier, in order to discuss those concerns, correct?

12    A.  Yes.

13    Q.  And then after that meeting, Philadelphia withdrew its

14    concerns about the Northeast Alliance; is that right?

15    A.  I'm not familiar with that, no.

16    Q.  After that meeting, Philadelphia was no longer expressing

17    concerns to you about the abandonment of the airport as a

18    result of the Northeast Alliance?

19    A.  They did not express concerns to me about it.

20    Q.  And that meeting was in the fall of 2021, correct?

21    A.  I believe so.

22    Q.  Was that after we filed a complaint in this action?

23    A.  I don't recall.

24    Q.  Let's turn to PX315.

25               And Mr. Znotins, you recall that, during your

1    discussion with your counsel, you talked about complaints

2    that -- or concerns that might have been expressed by

3    American pilots about the Northeast Alliance; is that right?

4    **A.**   Yes.

5    **Q.**   And those concerns included cutting service from New York

6    or Boston as a result of the Northeast Alliance, correct?

7    **A.**   Yes.

8    **Q.**   So looking at this document, this is an e-mail exchange

9    between yourself and Mr. Chip Long; is that right?

10   **A.**   Yes.

11   **Q.**   And Mr. Long was American's chief pilot at the time of

12   this e-mail; is that right?

13   **A.**   Yes.

14   **Q.**   Let's go to the first e-mail in the thread.

15   **A.**   The oldest or the newest?

16   **Q.**   It's at the end of the document the way it's produced.

17   The oldest ones are all the way at the back of the document.

18   **A.**   Okay.

19   **Q.**   So this is an e-mail -- it is an example of a complaint

20   that was being expressed by an American pilot; is that right?

21   **A.**   Yes.

22   **Q.**   And then Mr. Long forwards along that e-mail to you,

23   correct?

24   **A.**   Yes.

25   **Q.**   I want to focus on your response, which appears on

1    page 994.

2    **A.**  Yes.

3    **Q.**  And we'll pull it up on the screen, as well.

4            So in this response, you write, "Hey, Chip, we're

5    still competitors in all respects until we choose to

6    implement the agreement, which we haven't yet.  People like

7    me go to prison if we coordinate schedules in advance of

8    agreement implementation."

9            Do you see that?

10   **A.**  Yes.

11   **Q.**  And when you say "we," you're talking about American and

12   JetBlue; is that right?

13   **A.**  Yes.

14   **Q.**  And when you say "agreement," you're referring to the

15   Northeast Alliance; is that right?

16   **A.**  Yes.

17   **Q.**  And what you're saying here is that prior to the

18   Northeast Alliance, you would not have coordinated schedules

19   with a competitor without talking to your legal team first;

20   is that right?

21   **A.**  Yes.

22   **Q.**  And when you say, "We're still competitors in all

23   respects until we choose to implement the agreement," you're

24   saying that American and JetBlue are not competitors on

25   routes that are subject to the Northeast Alliance; is that

1  right?

2  **A.**  I'm not saying that here.

3  **Q.**  That's what you meant when you wrote that, right?

4  **A.**  I'm sorry, can you reword the question for me?  I'm

5  sorry.

6  **Q.**  So when you write we're still competitors in all respects

7  until we choose to implement the Northeast Alliance, you're

8  saying that American and JetBlue would not be competitors

9  once you do implement the Northeast Alliance, correct?

10  **A.**  I'm sorry saying that we're not competitors -- what I'm

11  saying here is that we're still competitors in all respects,

12  until we choose to implement the agreement.  I don't say

13  anything about what we are and how we compete after we

14  implement the agreement.

15  **Q.**  American and JetBlue do not compete against each other to

16  take customers away from one another on the Northeast

17  Alliance routes; is that right?

18  **A.**  From a network perspective, no.

19  **Q.**  So you are no longer competitors on those routes from a

20  network perspective?

21  **A.**  Yes.

22  **Q.**  I want to go to DX111.  It's going to be back in that

23  small binder that you received from your counsel.  And I want

24  to go to page 11 in DX111.

25          So you recall that you discussed organic and

1    inorganic growth with your counsel.  Do you recall that?

2    **A.**  Yes.

3    **Q.**  And one other term that American uses for that is build

4    and borrow; is that right?

5    **A.**  We don't use that term commonly at American in network or

6    partnerships.

7    **Q.**  However, when it's used here, "build" refers to organic

8    growth, correct?

9    **A.**  I believe so, yes.

10   **Q.**  And "borrow," that refers to inorganic growth; is that

11   right?

12   **A.**  Yes.

13   **Q.**  And the Northeast Alliance with JetBlue, that's one of

14   the types of borrowing, correct?

15   **A.**  It's categorized there, yeah, on that document, yes.

16   **Q.**  And as part of borrowing, American does not have to

17   expend as much capital expenditures in order to expand its

18   network when it borrows from an alliance partner, correct?

19   **A.**  That's not necessarily true.  You -- as a result of any

20   new alliance, you will have to build seamlessness with the

21   partner in order for customers to receive, like, reciprocal

22   frequent flyer benefits on JetBlue.  The technology needs to

23   be invested there.

24           And as I mentioned before, because this synthetic

25   or inorganic or borrowed growth, whichever you term it,

1    drives growth at the main line and drives organic growth as a
2    result of a new relationship with a British Airways, a
3    JetBlue, a Qantas, whoever it may be, the idea is that that
4    relationship adds feed to your network.  It makes it
5    stronger, and you actually need more airplanes to address
6    that increased demand for your own network.  And so I think
7    there are cases where inorganic growth will actually drive
8    further capital expenditures on your fleet.
9    **Q.**  Mr. Znotins, I'm just asking you about routes that your
10   partners are now flying as part of the alliance, such as the
11   Northeast Alliance.  When a partner is not flying that route,
12   you don't have to spend, for example, on a plane in order to
13   support flying on that route any further, correct?
14   **A.**  Only if we believed that route would otherwise need to be
15   operated outside of the alliance.
16   **Q.**  So for example, that would be Boston-LaGuardia?
17   **A.**  We haven't determined whether that route would need to be
18   operated outside of the NEA.  But in the event we thought it
19   would, then we would operate it with our own metal.
20   **Q.**  But for now, it's part of the Northeast Alliance,
21   correct?
22   **A.**  Yes.
23   **Q.**  And in fact, as we discussed earlier, because of the
24   Northeast Alliance, American is no longer flying its plane on
25   that route?

1    **A.**  It was part of the join process of the NEA for us not to

2    fly that route, in concert with the other changes that we

3    made in the network.

4    **Q.**  So that's a yes to my question?

5    **A.**  I don't think it is, actually.  I think you attributed it

6    exclusively to the NEA, when you don't know what the but-for

7    would be, and I don't know what the but-for would be.  And so

8    it was decided, as part of the NEA, that American metal would

9    not operate on that route.  I can't say specifically that the

10    NEA, absent any other changes in the market, would have

11    driven American to not fly -- or there wouldn't be anything

12    else in the world that would keep American from operating

13    that route, and it was exclusively the NEA that drove that

14    decision.

15    **Q.**  But prior to the Northeast Alliance, American had no

16    plans to exit that route, correct?

17    **A.**  Yes.

18    **Q.**  I want to turn back now to the demonstrative that you

19    discussed with your counsel, and it may be easiest just to

20    use the one in your small binder.  And let's turn first to

21    slide 14 -- I'm sorry, not 14, because that was my version of

22    it.  Let's go to the one that's titled "2027 Fleet Size

23    Expectations By Quarter."

24    **A.**  Yes.

25    **Q.**  You recall discussing this slide with your counsel,

1    correct?

2    **A.**   Yes.

3    **Q.**   And again, we're not going to put that on the screen due

4    to confidentiality concerns, but we'll just be referring to

5    your hard copy in your binder.

6            So just looking at this chart, looking at Q4 2019,

7    do you see the number of planes that are estimated for 2027

8    there?

9    **A.**   Yes.

10   **Q.**   And then let's look now, you see the number of planes

11   that are estimated in Q3 2022?

12   **A.**   Yes.

13   **Q.**   And there's only about a ▮▮ plane difference between

14   those two numbers, correct?

15   **A.**   Yes.

16   **Q.**   And if we look at Q2, '22, so just one column over to the

17   left, that number was less than Q4 2019, correct?

18   **A.**   Yes.  I'm sorry, I'm a little reluctant to respond to

19   some of the specifics of this question because of

20   confidentiality.

21   **Q.**   Yeah.  We will not get into any of the numbers, only

22   talking directionally.

23   **A.**   Okay.

24   **Q.**   So just to be clear, American revised this plan to be

25   higher than Q4 2019 in just the last few months; is that

1  right?

2  **A.**  Yes.

3  **Q.**  And prior to that revision, at no point was the 2027

4  fleet plan as high as in Q4 2019, correct?

5  **A.**  Yes.

6  **Q.**  Let's turn now to the next slide, which is entitled

7  "Notable Recent Fleet Additions."

8         You discussed several recent fleet additions by

9  American on this slide.  You recall that, Mr. Znotins?

10  **A.**  Yes.

11  **Q.**  But I think, as you mentioned earlier in your

12  examination, that American makes orders for planes for

13  reasons other than the Northeast Alliance, right?

14  **A.**  Yes.

15  **Q.**  And you're aren't representing here that the Northeast

16  Alliance is the sole reason for all of these orders, correct?

17  **A.**  Correct.

18  **Q.**  And I want to walk through a few of these fleet additions

19  that are here on this slide.  And as I ask my next set of

20  questions, we're going to keep the demonstrative on the left

21  side of the screen, and then put another document on the

22  right side of the screen.  So it will probably be easiest for

23  you to just look at the screen, but feel free to look at your

24  hard copies, as well.

25         So let's go to DX12 and DX13 in your binder?

 1              MR. MOORE:  And Your Honor, these exhibits are

 2    already in evidence.  I think DX13 is redacted, so we'll use

 3    the redacted version of that.

 4              THE WITNESS:  I don't think I have a DX12 and DX13.

 5              THE COURT:  I think it should be at the very end of

 6    your large binder.

 7              THE WITNESS:  Oh large binder.  I'm sorry.

 8              There it is, thank you.

 9              MR. MOORE:  And we'll start looking at 12, which is

10    on your screen.

11    BY MR. MOORE:

12    **Q.**   So Mr. Znotins, this is the cover e-mail to DX13; is that

13    right?

14    **A.**   It appears to be so, yes.

15    **Q.**   And you received this e-mail in April of 2020, correct?

16    **A.**   It appears to be so.

17    **Q.**   And there's an attachment labeled "2021 network plan."

18    Do you see that?

19    **A.**   Yes.

20    **Q.**   And I want to look at that attachment now.  So that's

21    going to be DX13 in your binder, and we're going to be

22    looking at slide 9 of DX13.

23              So looking at slide 15 of your demonstrative,

24    which, again, is now on the left side of your screen, you

25    indicated that American recently exercised an option to order

1    A321 neos; is that right?

2    **A.**  Yes.

3    **Q.**  But looking at DX13, on the right-hand side of your

4    screen, in April of 2020, American was already considering

5    exercising an option on the A321 neos; is that right?

6    **A.**  We were considering it.  It was -- the purpose of this

7    slide is to describe the growth options that we have at the

8    time of the authoring of this document.  So we had these

9    options available to us in 2019 and in 2020.  It's just a --

10   a listing of ways we could grow our fleet in the future if we

11   wanted to.

12   **Q.**  Right.  So these options are not attributable to the

13   Northeast Alliance, right?  You had them, anyway?

14   **A.**  They're on the order book, anyway, yes.  But

15   exercising -- but exercising the options was attributable to

16   increased optimism for performance of our system, which was

17   in part due to the increased optimism for the NEA.

18   **Q.**  In looking again at slide 15 of your demonstrative on the

19   left, it says that American recently exercised an option to

20   purchase additional 737 MAXs; is that right?

21   **A.**  Yes.

22   **Q.**  But again, in April of 2020, American was already

23   considering an option on the MAXs, correct?

24   **A.**  So many of the -- so again, this is an option that we had

25   available to us, and then we chose to exercise that option on

1    the left-hand portion of the slide you're presenting.

2    **Q.**  And according to slide 15, American recently extended the

3    lifetime of the 737s as well, correct?

4    **A.**  Yes.

5    **Q.**  But again, in April of 2020, American was already

6    considering reactivating these 737s and extending their

7    lifetime; is that right?

8    **A.**  I think "considering" is the word I'm having trouble

9    here.  This is a listing of opportunities and options and

10   paths to grow the fleet going forward.  To say that it was

11   getting consideration may be true, but it's not evident in

12   this document that the option was being considered at that

13   time.  It was just listed as an option.

14   **Q.**  Options that were at least being presented in this

15   document prior to the Northeast Alliance, correct?

16   **A.**  Yes.

17   **Q.**  You can put aside DX13.  We're going to leave up the

18   demonstrative just for a moment longer.

19          So looking, again, at this slide here, recent fleet

20   additions, American -- it says that American was going to

21   replace single class regional jets with duel class regional

22   jets; is that right?

23   **A.**  I'm sorry, could you repeat the question?

24   **Q.**  So American, according to this slide, recently decided to

25   replace some of its single class regional jets, the 50

1    seaters, with the 76 seaters, the dual class jets; is that

2    right?

3    **A.**  I would just further clarify that this slide reads that

4    we replaced this type of 50 seater, the E145, with these

5    types of larger regional jets.

6    **Q.**  And the larger regional jets, those typically have dual

7    class, meaning business and economy?

8    **A.**  Yes.

9    **Q.**  And they have more seats than the single class jets?

10   **A.**  Yes.

11   **Q.**  And switching from the single class, the dual class jets,

12   that's often referred to as up-gauging; is that right?

13   **A.**  Yes.

14   **Q.**  But the idea of up-gauging these regional jets in New

15   York was discussed within American, again before the

16   Northeast Alliance, correct?

17   **A.**  It was another option available to us, yes.

18   **Q.**  Let's look at PX118.

19            MR. MOORE:  And Your Honor, this document is

20   already in evidence.

21   BY MR. MOORE:

22   **Q.**  Mr. Znotins, this is an e-mail from Mr. Massimo Mancini;

23   is that right?

24   **A.**  Mancini, yes.

25   **Q.**  And Mr. Mancini was managing director of network

1    strategic planning and analysis; is that right?

2    **A.**  Yes.

3    **Q.**  And the e-mail is from March 2020, correct?

4    **A.**  Yes.

5    **Q.**  So, again, before the Northeast Alliance; is that right?

6    **A.**  Yes.

7    **Q.**  And this document was created in preparation for the 2021

8    planning process, correct?

9    **A.**  Yes.

10   **Q.**  And if we look down at the row labeled "LGA," that

11   indicates the 2021 strategy includes New York City all dual

12   class," correct?

13   **A.**  It indicates it was an option or an idea for the

14   strategy.  This is a proposal and not a roadmap.

15   **Q.**  A proposal that was occurring prior to the Northeast

16   Alliance, right?

17   **A.**  Yes.

18   **Q.**  Let's look now at PX134.

19          MR. MOORE:  Your Honor, this exhibit is already in

20   evidence.  The attachment is fully sealed, so we're only

21   going to be putting the cover e-mail on the screen.

22          But Mr. Znotins, you can look at the attachment and

23   in your binder in hardcopy.

24   BY MR. MOORE:

25   **Q.**  So looking at the cover e-mail, this is an e-mail from

1    Jhonatan Mateus, to a group that includes yourself; is that

2    right?

3    **A.**   Yes.

4    **Q.**   And the subject line is "Infrastructure Update,"

5    June 15th, meeting; is that right?

6    **A.**   Yes.

7    **Q.**   And that's the regular meeting that occurs within

8    American to discuss infrastructure issues; is that right?

9    **A.**   Yes.

10   **Q.**   And the date of the e-mail is June 2020; is that right?

11   **A.**   June 14th?

12   **Q.**   Of 2020; is that right?

13   **A.**   Yes.

14   **Q.**   So again, before the Northeast Alliance was signed; is

15   that right?

16   **A.**   Yes.

17   **Q.**   Let's go to the second attachment.  And I'm going to be

18   going to page 11.  And again, this is not going to be on your

19   screen, since the attachment is sealed, so you'll need to

20   look at your hardcopy.

21            THE COURT:  This is Bates stamp number ending in

22   412?

23            MR. MOORE:  I'm double-checking that.  Yes,

24   Your Honor, that's correct.

25            THE COURT:  Okay.

1        THE WITNESS:  I'm sorry, I'm having trouble finding

2   it, as well.

3   BY MR. MOORE:

4   **Q.**  If you look at the bottom right-hand side, the pages are

5   numbered.  You're going to be looking for the one ending in

6   412?

7   **A.**  Okay.  I got it.

8   **Q.**  So I first -- and again, this is sealed, so we're going

9   to be talking about it only in general terms, but I want to

10  look at the first bullet at the top of the page.  Do you see

11  a reference to "CPE" there?

12  **A.**  Yes.

13  **Q.**  And that refers to cost per enplanement?

14       THE COURT:  Cost per what?

15       THE WITNESS:  Enplanement, basically the cost that

16  the airline incurs as a result of -- it's measured by

17  boarding a passenger.  So if you add up all the landing fees

18  and terminal rent and everything that we spend at an airport

19  and divide by the passengers, it's basically the cost of

20  getting a passenger on the airplane.  Usually it's all fixed,

21  and you can't get out of it.  It's how we measure things, how

22  expensive an airport is, is what this measure is meant to

23  indicate.

24       THE COURT:  Does that vary a little bit based on

25  how much you push through the airport, or are all of those a

1    fixed variable cost?

2            THE WITNESS:  So one of the ways that you lower CPE

3    is by pushing more through the airport.

4            THE COURT:  I see.

5            Go ahead.

6    BY MR. MOORE:

7    **Q.**  So looking at this first bullet, this is indicating that

8    by 2024, there will be a significant decline in the costs,

9    the fixed costs at JFK; is that right?

10   **A.**  Yes.

11   **Q.**  And this was something that American was projecting in

12   June of 2020, correct?

13   **A.**  Yes.

14   **Q.**  I want to look now at the table at the bottom of the

15   page, which is labeled "AA JFK Departures and Seats by

16   Equipment Type."

17           Do you see that?

18   **A.**  Yes.

19   **Q.**  And the third row is labeled RJ.  Do you see that?

20   **A.**  Yes.

21   **Q.**  And that refers to regional jets?

22   **A.**  Yes.

23   **Q.**  And that includes both the 50 seaters and the 76 seaters

24   that we were talking about earlier?

25   **A.**  Yes.

1   **Q.**  And the table showing departures and seats for 2019 and

2   2024; is that right?

3   **A.**  Yes.

4   **Q.**  And the departures listed for 2024, those correspond to

5   the seats that are listed for 2024, correct?

6   **A.**  Yes.

7   **Q.**  And I know we did the math at your deposition, that if

8   you divide the total number of seats by total number of

9   departures for 2024, that indicates there would be 76 seats

10   per departure; is that right?

11   **A.**  If I recall, yes.

12   **Q.**  So at least according to this chart, as of June 2020,

13   again, before the Northeast Alliance, American was already

14   projecting that it would up-gauge to all large regional jets

15   at JFK; is that right?

16   **A.**  So just to clarify the purpose of this meeting, this

17   infrastructure update, it's not meant to present plans.  It's

18   meant to talk about creating plans and options, and

19   discussing what we should do, not what we will do.

20         So this was a proposal from the infrastructure team

21   to say that this is one way to think about JFK going forward,

22   and do we like that approach, and do we want to work with

23   real estate to achieve that approach?  It isn't meant to be

24   just a simple rote description of this is the plan.

25   **Q.**  So the infrastructure team was telling you, at least at

1   that time, that American should up-gauge to all large

2   regional jets in JFK; is that right?

3   **A.**  Yes.

4         MR. MOORE:  Your Honor, I have no further questions

5   at this time.  I pass the witness.

6         THE COURT:  All right.  Redirect.

7         MS. MALTAS:  Your Honor, we have no further

8   questions.

9         THE COURT:  All right.  Thank you very much.

10  You're excuse.  Where are we?

11        MR. WALL:  We are at the end of the day is where we

12  are.  So we have just one more witness, Dr. Carlton, who will

13  testify tomorrow morning.

14        THE COURT:  Okay.

15        MR. WALL:  And then I believe that Dr. Town will

16  testify at that time.

17        MR. JONES:  Yes, Your Honor, that's correct.  We

18  will have Dr. Town as our first rebuttal witness, followed by

19  Dr. Miller.  I would like to raise, though, Your Honor, I

20  think -- I need to do the math, but I think the amount of

21  trial time we have left on Wednesday and Thursday is slightly

22  less than the amount of time left to both sides collectively

23  in terms of our clocks.  We haven't done the math, since we

24  just ended, but I think it's going to be --

25        THE COURT:  He's got the math right there for you.

```
 1            MR. SCHWED:  My math shows that around 20 minutes
 2    short.  I don't know if you're the same.
 3            MR. JONES:  Yeah, I have 20 minutes short.  And we
 4    didn't have --
 5            THE COURT:  So if we went 9:00 to 1:00 tomorrow and
 6    Thursday, 15 minute break on each day, then your math is that
 7    we're 20 minutes short.
 8            MR. JONES:  Yes, sir.  That's right.
 9            THE COURT:  And yours is about the same?
10            MR. SCHWED:  Yes, Your Honor.
11            THE COURT:  Okay.  How long is Carlton?
12            MR. WALL:  About a 90 minute direct.  I'll just
13    tell you I don't think we're going to have a problem, like 20
14    minutes in the scheme of tings, it's going to shake out
15    somewhere.
16            THE COURT:  So, one, that's fine with me.  Nothing
17    wrong with briefer and shorter.  But if you -- the only time
18    that I could add 20 minutes would be tomorrow afternoon.  In
19    other words -- that you accounted the hour yesterday, right?
20    Okay.  So I am -- it's not hard for me, if you want some time
21    tomorrow afternoon to do that.  I'm fine with that and I can
22    do that.  And then I can add 20 minutes, I can add an hour,
23    you know, or something, and then compensate for that Thursday
24    morning, but I can't add time Thursday afternoon.
25            MR. JONES:  Your Honor, I would then say, if we
```

1    could get the 20 minutes tomorrow, and then keep on schedule

2    for Thursday and finish up with the evidence by 1 o'clock on

3    Thursday, I think that would be sufficient for us.

4         THE COURT:  I mean, I'm prepared to do that.  It

5    seems a little inefficient to just do 20 minutes.

6         Why don't we do this.  We'll break -- we'll go 9:00

7    to 1:00 tomorrow, with a 15 minute break -- wait.  Let me

8    just look at -- I better not get confused.

9         Kellyanne, do you know how long that 2 o'clock is?

10        THE DEPUTY CLERK:  I don't think it should be long.

11        THE COURT:  So I have a status conference by video

12   tomorrow at 2 o'clock.  I anticipate it will be between five

13   and 15 minutes.  So why don't we just say at 2:15.  And it

14   would make -- I mean, well, how long -- like just think

15   either an hour or a reasonable cut -- like how long is --

16   Miller is coming Thursday, right?

17        MR. JONES:  Yes, Miller I would anticipate would

18   come Thursdays, just given with Wednesday with Carlton and

19   the cross and then starting Town, and probably not getting

20   done with Town, I think that's the fairest.

21        THE COURT:  How long do you think you'll be with

22   Town?  You being whomever is asking?

23        MR. JONES:  Yes, Your Honor, we think total around

24   an hour 15, an hour 30, maybe.

25        THE COURT:  Okay.  Well, why don't we say we'll

1     reconvene at 2:15 and we'll go up to an hour.  And we'll

2     still a little bit depends on where we are in terms of -- if

3     we finish the witness, then there's no reason to keep going,

4     but -- and then we'll have more than enough to be done by

5     Thursday.  I promise the whole amount of time, so I'll stand

6     by my promise.  And the other -- both parts of the promise.

7             MR. SCHWED:  Your Honor, the only other question I

8     have is whether, from your perspective, it would be more

9     efficient to just do it -- start early, if it's possible with

10    Your Honor, and the court reporter and everybody, to start 20

11    minutes or something or half an hour early one day.  Would

12    that be more efficient?  We're fine with anything.

13            (The Court and the court reporter confer.)

14            THE COURT:  Sharing may not raise antitrust issues

15    between judges, but it does have its complications.  So, in

16    fact, it turns out that I can't necessarily promise you 2:15

17    tomorrow, it's not so easy.  So 20 minutes.  I can start - we

18    can start --

19            Can you start 20 minutes early, Kellyann?

20            So tomorrow -- would you rather do it tomorrow?

21    Tomorrow morning we'll start at 8:40.  We'll add the 20

22    minutes then.  And then you'll have it, and then that will be

23    the 20.  We won't do tomorrow afternoon.  And then we'll have

24    Thursday, 9:00 to 1:00.  And that will give you all the right

25    amount of time and then we'll be done with the evidence.

1            Anything else -- I guess while we have a

2     membership, and the clock's not running on either of your

3     time -- you know, there's a story about lawyers in private

4     practice.  Have you heard this story?  And it says, the

5     client says -- the client wants to set the rate and the

6     lawyer says, "You can set any rate you want and I count the

7     hours."  So maybe I should count the hours next time.  But in

8     any event, in terms of -- you wanted to do closing arguments

9     at some point, close in time to finishing the evidence?

10            MR. JONES:  Yes, Your Honor, we would --

11            THE COURT:  Is that still your preference?

12            MR. JONES:  That is still our preference, but we

13     recognize, on account of the schedule, so whatever is most

14     convenient for Your Honor.

15            THE COURT:  So here -- I'll just tell you as a

16     practical matter, from my perspective, I intend to talk to

17     all of you after I get the pretrial briefs and digest them

18     and all of that, and I'm not setting a date for that now

19     because I'm not going to do that until I've gone through it

20     all and I'm ready.  And I view that as more like hearing on a

21     motion.  It will be back and forth on whatever the issues are

22     and if there's things that you want to say, you can say them.

23     And it will be a chance for me to ask whatever questions I

24     haven't asked that I want to ask because I'm wrestling with

25     all of the different issues.

1          So that -- I wouldn't think of that really as

2     closing argument.  I wouldn't be anticipating you coming in

3     at that hearing, either one of the three of you, to make a

4     two hour presentation.  You can start like you would at a

5     hearing, but from my perspective, it would be for me to ask a

6     lot of -- whatever questions that I have.  So if you want to

7     do -- I'm prepared to allow you -- give you closing

8     arguments, that does happen in trials, so it seems

9     reasonable.  I'm just not sure when.  Like it may be that the

10    first time I can give you an opportunity to do that, it's

11    basically like a morning between the three of you, if I

12    remember right from what you said, about like -- you were

13    like an hour and a half, right?

14          MR. JONES:  I think that's a fair estimate,

15    Your Honor.  I think I started with an hour, but probably an

16    hour and a half is more realistic.

17          THE COURT:  It's an hour, hour and a half, and I

18    assume you're something similar, shorter.  You don't have to

19    take it right now, but it sounds like basically when we're

20    all said and done, it's mostly 9:00 to 1:00.  So it's -- I

21    don't think I'm going to have an opportunity to do that next

22    week.  I'll look more at my calendar.  I think we're talking

23    about the week -- some time the week of the 7th would be the

24    earliest that I can do it and I can probably talk to you

25    about some times then.  I'm happy to be somewhat flexible

1    then, if that's what you want.

2            MR. WALL:  Your Honor, just -- I'm not going to die

3    on the barricades over this one, but at this point, I

4    honestly don't see the utility of this.  Because you're going

5    to have us back afterwards, I just don't think you're going

6    to be terribly shocked or surprised by what we might come up

7    with in a PowerPoint presentation that lasts an hour and a

8    half.

9            THE COURT:  Well, I don't think I'll be shocked or

10   surprised.  I would agree with that.

11           So why don't you all think about it and think what

12   you want to do with that.  And I'm not sure the utility of

13   that before I've gotten the pretrial briefs, because I assume

14   you're all going to be laying out not only proposed findings

15   of fact, but proposed conclusions of law, but you're

16   addressing all the evidence, and thinking about the way it

17   should work.  And that's what I'm going to do, right?  Like I

18   assume none of you have the expectation that I'm going to

19   rule from the bench after the closing arguments.

20           MR. JONES:  No, sir.

21           MR. WALL:  One can hope.

22           THE COURT:  Right.  You could hope.  And so I don't

23   know -- it's just a -- you know, I'm not sure I'm prepared to

24   preclude you from doing a closing argument if you want to,

25   because it is what happens in trials, but it just -- I don't

1    know, like -- I want to -- I don't know how -- there's a fair

2    point of how useful it is in terms of thinking about all of

3    this, because there's various legal issues to engage with,

4    there's factual issues, there's a lot of facts that you don't

5    really disagree about, and then there's other facts that you

6    obviously deeply disagree about.  And then there's --

7              So that said, I know it's a very important case for

8    the Department of Justice.  I know it's a very important case

9    for both American and JetBlue.  And so I'm not looking to

10   prevent any one of you from, you know, making a fair

11   presentation of what you think, in your interest, makes the

12   most sense.

13             So you think about all of that, I'll think about

14   the schedule, I'll look back and we can talk about it

15   tomorrow or Thursday.

16             MR. JONES:  Thank you, Your Honor.

17             MR. WALL:  Thank you.

18             THE COURT:  All right.  We'll stand in recess, see

19   you tomorrow morning at 8:40.

20             (Court in recess at 12:18 p.m.)

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5     and for the United States District Court for the District of

6     Massachusetts, do hereby certify that pursuant to Section

7     753, Title 28, United States Code, the foregoing pages

8     are a true and correct transcript of the stenographically

9     reported proceedings held in the above-entitled matter and

10    that the transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United States.

12

13                     Dated this 25th day of October, 2022.

14

15

16

17                     /s/ RACHEL M. LOPEZ

18

19

20          _____

21          Rachel M. Lopez, CRR
            Official Court Reporter

22

23

24

25