**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA et al.,<br><br>    *Plaintiffs*,<br><br>v.<br><br>AMERICAN AIRLINES GROUP INC. and<br>JETBLUE AIRWAYS CORPORATION,<br><br>    *Defendants*. | Case No. 1:21-cv-11558-LTS |

---

**PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW**

---

# TABLE OF CONTENTS

I.      Jurisdiction and Venue ................................................................................................. 1

    A.    The Court has jurisdiction over this action and over each of the Defendants. ................. 1

    B.    Venue is proper in this Court. ........................................................................................ 2

II.     Unreasonable Restraint of Trade ................................................................................. 2

    A.    The NEA is a contract in restraint of trade that affects interstate commerce. ................. 2

    B.    The NEA should be judged by the rule of reason. ........................................................... 4

    C.    The rule of reason usually entails a burden-shifting analysis. ......................................... 7

    D.    A restraint with probable anticompetitive effects unreasonably restrains trade and violates the Sherman Act. ......................................................................................................... 9

III.    Step One: Anticompetitive Effects ............................................................................ 11

    A.    The NEA is facially anticompetitive under a "quick look" analysis. .............................. 11

    B.    Direct evidence of harm to the competitive process satisfies Plaintiffs' burden at step one of the rule of reason. .......................................................................................................... 14

    C.    Indirect evidence of Defendants' market power and evidence of the NEA's likely anticompetitive effects also satisfies Plaintiffs' burden at step one of the rule of reason. ....... 16

    D.    Defendants have significant market power in the relevant markets. ............................... 16

        1.    Plaintiffs have established the relevant markets. ..................................................... 16

            a.    The relevant product market is scheduled air passenger service. ......................... 17

            b.    Origin-and-destination pairs are relevant geographic markets. ............................. 19

            c.    Courts use the hypothetical monopolist test as a tool for defining relevant markets. 22

        2.    Defendants' high combined market shares in highly concentrated markets establish market power. ...................................................................................................................... 24

        3.    High barriers to entry or expansion by other legacy airlines and smaller competitors support a finding of market power. ...................................................................................... 30

    E.    The NEA has significant likely anticompetitive effects. ............................................... 31

        1.    Ordinary-course business documents and testimony of industry participants and economic experts reveal the likely competitive consequences of a restraint. ....................... 31

        2.    Merger analysis under Section 7 of the Clayton Act is similar to, and can be applied to, Section 1 challenges to joint ventures like the NEA. ....................................................... 32

        3.    The NEA unreasonably restrains trade by eliminating vigorous head-to-head competition between Defendants in the overlap markets. ..................................................... 36

        4.    The NEA unreasonably restrains trade by diminishing JetBlue's independence and uniquely disruptive impact on airline prices and service quality. ......................................... 37

        5.    The NEA unreasonably restrains trade by facilitating industry-wide capacity discipline and coordination. ................................................................................................ 38

F.     Evidence of actual price increases is unnecessary in an indirect-evidence case under step one of the rule of reason............................................................................................ 40

IV.    Step Two: Alleged Procompetitive Justifications............................................................ 42

A.     Defendants must justify the NEA by proving the existence of procompetitive justifications that benefit consumers, not just their own profitability. ..................................... 42

B.     Growth that Defendants could have achieved without the NEA is not a cognizable procompetitive justification. ...................................................................................................... 44

C.     Defendants cannot justify anticompetitive harm to consumers in one relevant market by pointing to purported benefits to consumers in a different relevant market. ............................ 45

D.     Vigorous competition in certain markets from Delta and United does not justify harming competition and consumers........................................................................................................ 49

E.     Defendants' claims about the post-implementation evidence of the NEA's effects are unavailing.................................................................................................................................... 51

V.     Step Three: Less Restrictive Alternatives ...................................................................... 52

A.     Any purported benefits attributable to the NEA could have been achieved through less restrictive means without nearly as severe harm to consumers. ................................................. 52

B.     Defendants misstate the relevant legal standard for less restrictive alternatives. ............. 54

VI.    Weighing of Harms and Benefits..................................................................................... 55

A.     The ultimate question in this case is whether the NEA's harms to competition are outweighed by its purported benefits in each relevant market. ................................................. 55

VII.   Defendants' Proposed Remedies ..................................................................................... 57

A.     The DOT Agreement is insufficient to remedy the anticompetitive effects of the NEA.  57

B.     Defendants' voluntary, non-enforceable carve-out agreement is irrelevant as a matter of law. 59

VIII.  Permanent Injunction ....................................................................................................... 60

A.     The Court has broad remedial powers to restore competition. ......................................... 60

B.     An injunction may be tailored to address the harms to competition identified in the rule-of-reason analysis........................................................................................................................ 61

## TABLE OF AUTHORITIES

**Cases**

*American Needle, Inc. v. NFL*,
   560 U.S. 183 (2010) ................................................................................................ 2, 34, 35

*Amphastar Pharmaceuticals, Inc. v. Momenta Pharmaceuticals, Inc.*,
   297 F. Supp. 3d 222 (D. Mass. 2018) ........................................................................... 3

*Arizona v. Maricopa County Medical Society*,
   457 U.S. 332 (1982) ................................................................................................... 4, 50

*Associated Press v. United States*,
   326 U.S. 1 (1945) ............................................................................................................ 10

*Atlantic Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990) ....................................................................................................... 49

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
   214 F. Supp. 2d 530 (D. Md. 2002) ............................................................................. 23

*Bio-Rad Laboratories, Inc. v. 10X Genomics, Inc.*,
   483 F. Supp. 3d 38 (D. Mass. 2020) ............................................................... 18, 22, 24

*BookLocker.com, Inc. v. Amazon.com, Inc.*,
   650 F. Supp. 2d 89 (D. Me. 2009) ............................................................................... 25

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ................................................................................................. 49, 50

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962) ....................................................................................... 17, 18, 24

*California Dental Association v. FTC*,
   224 F.3d 942 (9th Cir. 2000) ........................................................................................ 14

*California Dental Association v. FTC*,
   526 U.S. 756 (1999) ............................................................................................. *passim*

*California ex rel. Harris v. Safeway, Inc.*,
   651 F.3d 1118 (9th Cir. 2011) ...................................................................................... 14

*California v. American Stores Co.*,
   495 U.S. 271 (1990) ................................................................................................. 10, 58

*Capital Imaging Associates, P.C. v. Mohawk Valley Medical Association*,
996 F.2d 537 (2d Cir. 1993) ........................................................................................ 56

*Castro v. Sanofi Pasteur Inc.*,
134 F. Supp. 3d 820 (D.N.J. 2015) .............................................................................. 32

*Chicago Board of Trade v. United States*,
246 U.S. 231 (1918) ....................................................................................................... 9

*Chicago Bridge & Iron Co. N.V. v. FTC*,
534 F.3d 410 (5th Cir. 2008) ....................................................................................... 52

*Chicago Professional Sports Ltd. Partnership v. NBA*,
754 F. Supp. 1336 (N.D. Ill. 1991) .............................................................................. 43

*Chicago Professional Sports Ltd. Partnership v. NBA*,
961 F.2d 667 (7th Cir. 1992) ....................................................................................... 12

*Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*,
754 F.2d 404 (1st Cir. 1985) ........................................................................................ 10

*Citizen Publishing Co. v. United States*,
394 U.S. 131 (1969) ............................................................................................... 13, 36

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*,
79 F.3d 182 (1st Cir. 1996) .................................................................................. *passim*

*Compact v. Metropolitan Government of Nashville & Davidson County, Tennessee*,
594 F. Supp. 1567 (M.D. Tenn. 1984) ......................................................................... 35

*Copperweld Corp. v. Independent Tube Corp.*,
467 U.S. 752 (1984) .................................................................................... 3, 33, 35, 50

*County of Tuolumne v. Sonora Community Hospital*,
236 F.3d 1148 (9th Cir. 2001) .................................................................................. 8, 55

*Eastern Food Services, Inc. v. Pontifical Catholic University Services Association, Inc.*,
357 F.3d 1 (1st Cir. 2004) ............................................................................... 16, 17, 24

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
504 U.S. 451 (1992) ................................................................................................ 17, 18

*Fashion House, Inc. v. K mart Corp.*,
892 F.2d 1076 (1st Cir. 1989) ................................................................................ 59, 60

*Flovac, Inc. v. Airvac, Inc.*,
    817 F.3d 849 (1st Cir. 2016) ........................................................................... 18

*Ford Motor Co. v. United States*,
    405 U.S. 562 (1972) ................................................................................... 57, 61

*FTC v. Actavis, Inc.*,
    570 U.S. 136 (2013) ............................................................................... 9, 11, 15

*FTC v. Arch Coal, Inc.*,
    329 F. Supp. 2d 109 (D.D.C. 2004) ................................................................ 28

*FTC v. Cardinal Health, Inc.*,
    12 F. Supp. 2d 34 (D.D.C. 1998) .................................................................... 59

*FTC v. Consolidated Foods Corp.*,
    380 U.S. 592 (1965) ........................................................................................ 51

*FTC v. Hackensack Meridian Health, Inc.*,
    30 F.4th 160 (3d Cir. 2022) ............................................................................ 28

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ................................................................. *passim*

*FTC v. Indiana Federation of Dentists*,
    476 U.S. 447 (1986) ......................................................................... 9, 11, 12, 15

*FTC v. Libbey, Inc.*,
    211 F. Supp. 2d 34 (D.D.C. 2002) .................................................................. 37

*FTC v. Peabody Energy Corp.*,
    492 F. Supp. 3d 865 (E.D. Mo. 2020) ......................................................... 6, 34

*FTC v. PPG Industries, Inc.*,
    798 F.2d 1500 (D.C. Cir. 1986) ...................................................................... 39

*FTC v. ProMedica Health System, Inc.*,
    No. 3:11 CV 47, 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ................... 20

*FTC v. Staples Corp.*,
    190 F. Supp. 3d 100 (D.D.C. 2016) ........................................................... 28, 36

*FTC v. Staples, Inc.*,
    970 F. Supp. 1066 (D.D.C. 1997) ................................................................... 38

*FTC v. Swedish Match,*
   131 F. Supp. 2d 151 (D.D.C. 2000) ................................................................. 27, 37

*FTC v. Sysco Corp.,*
   113 F. Supp. 3d 1 (D.D.C. 2015) ............................................................................ 28

*FTC v. Tronox Ltd.,*
   332 F. Supp. 3d 187 (D.D.C. 2018) ................................................................. 21, 39

*FTC v. University Health, Inc.,*
   938 F.2d 1206 (11th Cir. 1991) ............................................................................. 39

*FTC v. Wilh. Wilhelmsen Holding ASA,*
   341 F. Supp. 3d 27 (D.D.C. 2018) ................................................................. 30, 32

*George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,*
   508 F.2d 547 (1st Cir. 1974) .............................................................................. 17, 18

*Georgia v. Pennsylvania Railroad Co.,*
   324 U.S. 439 (1945) ................................................................................................ 58

*Graphic Products Distributors, Inc. v. ITEK Corp.,*
   717 F.2d 1560 (11th Cir. 1983) ............................................................................. 44

*Grappone, Inc. v. Subaru of New England, Inc.,*
   858 F.2d 792 (1st Cir. 1988) .............................................................................. 25, 46

*Hospital Corporation of America  v. FTC,*
   807 F.2d 1381 (7th Cir. 1986) .......................................................................... 52, 60

*Impax Laboratories, Inc. v. FTC,*
   994 F.3d 484 (5th Cir. 2021) ......................................................................... *passim*

*In re AMR Corp.,*
   625 B.R. 215 (S.D.N.Y. 2021) .......................................................................... 26, 29

*In re Intuniv Antitrust Litigation,*
   496 F. Supp. 3d 639 (D. Mass. 2020) ......................................................... 17, 19, 22

*In re Live Concert Antitrust Litigation,*
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ................................................................... 23

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litigation,*
   375 F. Supp. 3d 1058 (N.D. Cal. 2019) ......................................................... *passim*

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litigation*,
   958 F.3d 1239 (9th Cir. 2020) ................................................. 47

*In re Nexium (Esomeprazole) Antitrust Litigation*,
   968 F. Supp. 2d 367 (D. Mass. 2013) ....................................... 19

*In re Southeastern Milk Antitrust Litigation*,
   739 F.3d 262 (6th Cir. 2014) ................................................. 4, 11

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litigation*,
   No. 16-cv-5073, 2022 WL 3588024 (E.D. Pa. Aug. 22, 2022) .............. 43

*International Salt Co. v. United States*,
   332 U.S. 392 (1947) ........................................................ 60, 61

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
   359 U.S. 207 (1959) ........................................................... 4

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) .................................................. 45

*Kottaras v. Whole Foods Market, Inc.*,
   281 F.R.D. 16 (D.D.C. 2012) .................................................. 48

*Law v. NCAA*,
   134 F.3d 1010 (10th Cir. 1998) ......................................... 43, 48, 55

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ........................................................ 5, 6, 8

*Los Angeles Memorial Coliseum Commission v. NFL*,
   726 F.2d 1381 (9th Cir. 1984) ................................................ 46

*M&H Tire Co. v. Hoosier Racing Tire Corp.*,
   733 F.2d 973 (1st Cir. 1984) ................................................. 46

*MacDermid Printing Solutions LLC v. Cortron Corp.*,
   833 F.3d 172 (2d Cir. 2016) .................................................. 42

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) .................................................. 35

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*,
   866 F.2d 525 (1st Cir. 1989) .................................................. 2

*National Society of Professional Engineers v. United States*,
    435 U.S. 679 (1978) ............................................................................................ *passim*

*NCAA v. Alston*,
    141 S. Ct. 2141 (2021) ...................................................................................... *passim*

*NCAA v. Board of Regents of the University of Oklahoma*,
    468 U.S. 85 (1984) ............................................................................................ *passim*

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*,
    No. 1:21-cv-00540-AWI-EPG, 2022 WL 2791201 (E.D. Cal. July 15, 2022) ....................... 20

*Northern Securities Co. v. United States*,
    193 U.S. 197 (1904) ................................................................................................ 14

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998) ................................................................................................ 15

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018) ...................................................................................... *passim*

*Paladin Associates, Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) .................................................................................... 3

*Palmer v. BRG of Georgia., Inc.*,
    498 U.S. 46 (1990) ................................................................................................ 13

*Parikh v. Franklin Medical Center*,
    940 F. Supp. 395 (D. Mass. 1996) ............................................................................ 20

*Polygram Holding v. FTC*,
    416 F.3d 29 (D.C. Cir. 2005) .................................................................................... 43

*ProMedica Health System, Inc. v. FTC*,
    749 F.3d 559 (6th Cir. 2014) ............................................................................. 28, 58

*Realcomp II, Ltd. v. FTC*,
    635 F.3d 815 (6th Cir. 2011) ............................................................................. 16, 41

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*,
    899 F.2d 951 (10th Cir. 1990) .................................................................................. 30

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) .................................................................................... 30

*Saint Alphonsus Medical Center-Nampa, Inc. v. Saint Luke's Health System, Ltd.*,
    778 F.3d 775 (9th Cir. 2015) ................................................................ 20, 58

*Smith v. Pro Football, Inc.*,
    593 F.2d 1173 (D.C. Cir. 1978) ....................................................... 45, 54, 55

*SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.*,
    188 F.3d 11 (1st Cir. 1999) ........................................................................ 16

*Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communications, Inc.*,
    376 F.3d 1065 (11th Cir. 2004) ................................................................. 10

*Spectators' Communication Network Inc. v. Colonial Country Club*,
    253 F.3d 215 (5th Cir. 2001) ..................................................................... 25

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) .................................................................................. 50

*Standard Oil Co. v. United States*,
    221 U.S. 1 (1911) ........................................................................................ 4

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) .................................................................................... 4, 6

*Steward Health Care System, LLC v. Blue Cross & Blue Shield of Rhode Island*,
    311 F. Supp. 3d 468 (D.R.I. 2018) ..................................................... 37. 38

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island*,
    373 F.3d 57 (1st Cir. 2004) ................................................................. 4, 56

*Sullivan v. NFL*,
    34 F.3d 1091 (1st Cir. 1994) .............................................................. *passim*

*Times-Picayune Publishing Co. v. United States*,
    345 U.S. 594 (1953) .................................................................................. 19

*Timken Roller Bearing Co. v. United States*,
    341 U.S. 593 (1951) .................................................................................. 35

*Tops Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998) .................................................................... 9, 10

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) .................................................................... 25

*United States v. Aetna, Inc.*,
   240 F. Supp. 3d 1 (D.D.C. 2017) .................................................................... *passim*

*United States v. Airline Tariff Publishing Co.*,
   836 F. Supp. 9 (D.D.C. 1993) ................................................................................ 40

*United States v. Anthem, Inc.*,
   236 F. Supp. 3d 171 (D.D.C. 2017) ............................................................... *passim*

*United States v. Anthem, Inc.*,
   855 F.3d 345 (D.C. Cir. 2017) ............................................................................... 48

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) ................................................................................... 50

*United States v. Apple, Inc.*,
   No. 12-cv-2826, 2013 WL 4774755 (S.D.N.Y. Sept. 5, 2013) ............................... 61

*United States v. Bazaarvoice, Inc.*,
   No. 13-cv-00133-WHO, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ........................ 44, 51, 52

*United States v. Bertelsmann SE & Co. KGaA*,
   No. 21-2886-FYP, 2022 WL 16949715 (D.D.C. Nov. 15, 2022) .............................. 29, 39, 59

*United States v. Blue Cross Blue Shield of Michigan*,
   809 F. Supp. 2d 665 (E.D. Mich. 2011) .................................................................. 25

*United States v. Brown University*,
   5 F.3d 658 (3d Cir. 1993) ...................................................................... 15, 41, 48, 54

*United States v. Connecticut National Bank*,
   418 U.S. 656 (1974) ............................................................................................... 21

*United States v. Continental Can Co.*,
   378 U.S. 441 (1964) ............................................................................................... 27

*United States v. E.I. du Pont de Nemours & Co.*,
   366 U.S. 316 (1961) ............................................................................... *passim*

*United States v. Energy Solutions, Inc.*,
   265 F. Supp. 3d 415 (D. Del. 2017) ................................................................. 27, 28

*United States v. Falstaff Brewing Corp.*,
   410 U.S. 526 (1973) ............................................................................................... 32

*United States v. First National Bank & Trust Co. of Lexington*,
376 U.S. 665 (1964) ............................................................................ 27, 33

*United States v. General Dynamics Corp.*,
415 U.S. 486 (1974) .................................................................................. 51

*United States v. Glaxo Group Ltd.*,
410 U.S. 52 (1973) .................................................................................... 61

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) .................................................................................. 61

*United States v. H & R Block, Inc.*,
833 F. Supp. 2d 36 (D.D.C. 2011) .................................................... *passim*

*United States v. Insurance Board of Cleveland*,
144 F. Supp. 684 (N.D. Ohio 1956) ........................................................ 10

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) .................................................................. 61

*United States v. Pabst Brewing Co.*,
384 U.S. 546 (1966) ............................................................................ 24, 29

*United States v. Paramount Pictures*,
334 U.S. 131 (1948) ...................................................................... 13, 42, 60

*United States v. Parke, Davis & Co.*,
362 U.S. 29 (1960) .............................................................................. 60, 61

*United States v. Penn-Olin Chemical Co.*,
378 U.S. 158 (1964) .............................................................................. 6, 34

*United States v. Philadelphia National Bank*,
374 U.S. 321 (1963) .................................................................. 27, 47, 48, 58

*United States v. Rockford Memorial Corp.*,
898 F.2d 1278 (7th Cir. 1990) .......................................................... 20, 33, 41

*United States v. Siemens Corp.*,
621 F.2d 499 (2d Cir. 1980) .................................................................... 32

*United States v. Topco Associates, Inc.*,
405 U.S. 596 (1972) ............................................................................ 45, 47

*United States v. Union Pacific Railroad Co.*,
    226 U.S. 61 (1912) ............................................................................................. 9

*United States v. United Shoe Machinery Corp.*,
    391 U.S. 244 (1968) ......................................................................................... 61

*United States v. US Airways Group, Inc.*,
    No. 1:13-cv-01236-CKK (D.D.C. Sept. 5, 2013) ...................................... 26

*United States v. Vega-Martinez*,
    949 F.3d 43 (1st Cir. 2020) ......................................................................... 2, 3

*United States v. Visa U.S.A., Inc.*,
    163 F. Supp. 2d 322 (S.D.N.Y. 2001) ................................................... 6, 61

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003) ......................................................................... 25

*United States v. W. T. Grant Co.*,
    345 U.S. 629 (1953) ................................................................................. 10, 58

*United States v. Ward Baking Co.*,
    376 U.S. 327 (1964) ......................................................................................... 61

*West Penn Allegheny Health System, Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ........................................................................... 45

*Wilk v. American Medical Association*,
    895 F.2d 352 (7th Cir. 1990) ................................................................... 25, 26

*Yagoozon, Inc. v. Kids Fly Safe*,
    No. CA 14-040 ML, 2014 WL 3109797 (D.R.I. July 8, 2014) ............... 16

**Statutes**

15 U.S.C. § 1 ................................................................................................... 1, 2

15 U.S.C. § 4 ...................................................................................................... 1

15 U.S.C. § 22 ................................................................................................. 1, 2

15 U.S.C. § 26 ...................................................................................................... 1

**Treatises**

*Phillip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application*,
(rev. ed. 1998) ................................................................................................................... 40
(4th ed. 2014) ................................................................................................................... 21
(4th ed. 2017) ............................................................................................... 14, 42, 56
(4th ed. 2018) ............................................................................................... 26, 41, 52

*Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust Law*,
(4th ed. 2017) ................................................................................................................... 56

*Julian O. von Kalinowski et al., Antitrust Laws and Trade Regulation*,
(2d ed. 2017) ................................................................................................................... 56

**Other Authorities**

*DOJ & FTC, Antitrust Guidelines for Collaborations Among Competitors*,
(2000) ....................................................................................................... 34, 35, 36, 39

*DOJ & FTC, Horizontal Merger Guidelines*,
(2010) ................................................................................................................... *passim*

## I.    JURISDICTION AND VENUE

### A.    The Court has jurisdiction over this action and over each of the Defendants.

1.    The Court has subject-matter jurisdiction over this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, which provides that "[t]he several district courts of the United States are invested with jurisdiction to prevent and restrain violations of" Section 1 of the Sherman Act, 15 U.S.C. § 1. Neither Defendant disputes the Court's subject-matter jurisdiction. Joint Pretrial Order ¶ 4, *United States v. Am. Airlines Grp. Inc.*, 1:21-cv-11558-LTS (D. Mass. Sept. 9, 2022), ECF No. 196 [hereinafter "Joint Pretrial Order"].

2.    The United States has standing to bring this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, which charges the United States attorneys with the "duty . . . to institute proceedings in equity to prevent and restrain . . . violations" of Section 1 of the Sherman Act.

3.    The States of Arizona, California, and Florida, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, and the District of Columbia ("Plaintiff States") have standing to bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, as *parens patriae* on behalf of and to protect their general economies and the health and welfare of their residents.

4.    Section 12 of the Clayton Act, 15 U.S.C. § 22, authorizes nationwide service of process and the exercise of personal jurisdiction over corporate defendants. Accordingly, this Court has personal jurisdiction over both American and JetBlue. Neither Defendant disputes the Court's personal jurisdiction over them. Joint Pretrial Order ¶ 4.

**B.     Venue is proper in this Court.**

5.     Section 12 of the Clayton Act, 15 U.S.C. § 22, provides that "[a]ny suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business."

6.     Both American and JetBlue transact business within this district. *See* Answer of Def. Am. Airlines to Pls.' Compl. at ¶ 16, *United States v. Am. Airlines Grp. Inc.*, No. 1:21-cv-11558-LTS (D. Mass. July 11, 2022), ECF No. 111; Answer of Def. JetBlue Airways Corp. at ¶ 17, *United States v. Am. Airlines Grp. Inc.*, No. 1:21-cv-11558-LTS (D. Mass. July 11, 2022), ECF No. 110. Accordingly, venue is proper in this district under Section 12 of the Clayton Act. Neither Defendant disputes that venue is proper in this district. Joint Pretrial Order ¶ 4.

## II.     UNREASONABLE RESTRAINT OF TRADE

**A.     The NEA is a contract in restraint of trade that affects interstate commerce.**

7.     Section 1 of the Sherman Act prohibits "[e]very contract . . . in restraint of trade or commerce among the several States." 15 U.S.C. § 1. To establish a violation of Section 1, a plaintiff must show (1) an agreement that (2) unreasonably restrains trade. *See Monahan's Marine, Inc. v. Bos. Whaler, Inc.*, 866 F.2d 525, 526 (1st Cir. 1989). A plaintiff also must show "a nexus between the scheme and interstate commerce." *United States v. Vega-Martinez*, 949 F.3d 43, 48 (1st Cir. 2020); *see* 15 U.S.C. § 1.

8.     The first element requires "concerted action"—an agreement or mutual understanding that "joins together . . . separate economic actors pursuing separate economic interests." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195 (2010) (internal quotation marks omitted). Contracts are the paradigmatic form of agreement for purposes of Section 1; they constitute

direct evidence of concerted activity and are therefore subject to antitrust scrutiny under Section 1 of the Sherman Act. *See, e.g.*, *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1154 n.7 (9th Cir. 2003) ("The Supreme Court's cases demonstrate that '*every* commercial agreement' is a 'restraint of trade,' meaning that every commercial agreement . . . is 'an agreement . . . among two or more entities,' in the words of the Ninth Circuit's prima facie § 1 claim." (first and third alterations in original) (citation omitted)); *Amphastar Pharms., Inc. v. Momenta Pharms., Inc.*, 297 F. Supp. 3d 222, 231 (D. Mass. 2018) (finding that a collaboration agreement between pharmaceutical manufacturers constituted concerted action within the meaning of Section 1 of the Sherman Act). The NEA is a contract between two separate economic actors, American and JetBlue. *See, e.g.*, *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984) (agreement is subject to Section 1 scrutiny when it "bring[s] together economic power that was previously pursuing divergent goals"). It therefore constitutes concerted action within the meaning of the Sherman Act.

9.     A challenged scheme satisfies the interstate-nexus requirement of the Sherman Act if it either (1) took place "in the flow of interstate commerce"; or (2) even if "wholly local in nature, would substantially affect interstate commerce if successful." *Vega-Martinez*, 949 F.3d at 48. Because the NEA involves the transportation of passengers between airports in different states, the NEA easily satisfies the interstate-nexus requirement.

10.     To determine whether a restraint of trade is "unreasonable" so as to satisfy the second element of a Section 1 claim, courts apply either a *per se* rule or the rule of reason. As detailed below, courts may employ the full rule of reason or an abbreviated form of it, sometimes called the "quick look" or truncated rule of reason. This judgment of reasonableness must be

made in each relevant market in which the restraint imposes anticompetitive effects. *See infra*, Section IV.C.

**B.**      **The NEA should be judged by the rule of reason.**

11.      Section 1 of the Sherman Act outlaws "unreasonable restraints" of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997); *see also Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 211 (1959) (Section 1 "prohibit[s] those classes of contracts or acts which the common law had deemed to be undue restraints of trade and those which new times and economic conditions would make unreasonable.").

12.      To determine whether a restraint is "unreasonable," courts examine the restraint in question with varying degrees of scrutiny, generally falling within one of two analytical "frameworks": *per se* or the rule of reason. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018) ("*Amex*"). Agreements between direct competitors, sometimes called "horizontal" restraints, are considered "to be more threatening," which is why they "more regularly" result in more searching scrutiny than other types of restraints. *See In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 272 (6th Cir. 2014).

13.      The most common types of *per se* illegal agreements are "naked horizontal price-fixing, market allocation, and output restrictions." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004). The Supreme Court has consistently held that these types of restraints are *per se* unreasonable based on their inherently anticompetitive "nature and character." *Standard Oil Co. v. United States*, 221 U.S. 1, 64–65 (1911). The anticompetitive potential inherent in all *per se* illegal agreements "justifies their facial invalidation even if procompetitive justifications are offered for some." *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 351 (1982).

4

14.     Restraints that are not unreasonable *per se* are judged under the rule of reason. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). Agreements like those found in the NEA—including the provisions to fix output and share revenues—ordinarily are condemned under the *per se* rule unless they are part of a joint venture. Because "most joint venture restrictions are subject to the rule of reason," *NCAA v. Alston*, 141 S. Ct. 2141, 2155 (2021) (internal punctuation mark omitted), Plaintiffs have focused on proving their claims under that standard.

15.     There is no one-size-fits-all approach to the rule of reason. The Supreme Court has made clear that the rule of reason is flexible and entails an "enquiry meet for the case." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 781 (1999). In some cases, a full rule-of reason analysis may be required. In other cases, however, the Supreme Court has recognized that "no elaborate industry analysis is required to demonstrate" a restraint's "anticompetitive character" under the rule of reason because "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect." *Id.* at 770 (quoting *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). This version of the rule of reason is called "abbreviated or 'quick-look' analysis." *Id.*

16.     The rule of reason requires "the factfinder [to] weigh[] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Alston*, 141 S. Ct. at 2160 (quoting *Leegin*, 551 U.S. at 885). Under the rule of reason, courts inquire "whether the challenged agreement is one that promotes competition or one that suppresses competition." *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 691; *see also Amex*, 138 S. Ct. at 2284 (The "goal" of the rule of reason is to "distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and restraints

stimulating competition that are in the consumer's best interest." (alteration in original) (quoting *Leegin*, 551 U.S. at 886). The rule of reason analysis takes "into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil*, 522 U.S. at 10. "Whether the businesses involved have market power is a further, significant consideration." *Leegin*, 551 U.S. at 885–86. Because the rule of reason ultimately requires a weighing of anticompetitive and procompetitive effects, *see* Section VI *infra*, the greater the competitive concerns, the more difficult it is for a defendant to justify its restraints.

17.     Joint ventures, which join together independent economic actors, "have no immunity from the antitrust laws." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 113 (1984). Where, as here, a joint venture agreement mirrors the effects of a merger, courts should deploy the principles and tools of merger analysis when assessing the lawfulness of the joint venture. *See, e.g.*, *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 170 (1964) ("Overall, the *same considerations apply to joint ventures as to mergers*, for in each instance we are but expounding a national policy enunciated by the Congress to preserve and promote a free competitive economy." (emphasis added)); *see also, e.g.*, *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020) (after applying the analytical framework for mergers developed under Section 7 of the Clayton Act, enjoining a joint venture in which the parties merged their assets in one geographic region but remained separate economic actors elsewhere); *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 402 (S.D.N.Y. 2001) ("[J]oint ventures should not provide an organizational ruse for evading the antitrust laws.").

C.      **The rule of reason usually entails a burden-shifting analysis.**

18.      To evaluate whether a restraint unreasonably restrains trade under the rule of reason, courts usually employ a burden-shifting framework. At the first step, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect." *Alston*, 141 S. Ct. at 2160 (quoting *Amex*, 138 S. Ct. at 2284).

19.      The burden then shifts to the defendants, who must "show a procompetitive rationale for the restraint." *Id.* at 2160 (quoting *Amex*, 138 S. Ct. at 2284). The purported procompetitive effects justifying the restraint should occur, either directly or indirectly, in the same market as the anticompetitive effects. *See* Section IV.C. And where a plaintiff has shown significant anticompetitive effects, the defendants face a "heavy burden" at step two to "competitively justif[y]" the restraint's "apparent deviation from the operations of a free market." *Bd. of Regents*, 468 U.S. at 113.

20.      If the defendants can make that showing, the burden then shifts back to the plaintiffs. In this step, "if a reasonable, less restrictive alternative to the [restraint] exists that would provide the same benefits," then the restraint violates the Sherman Act without further inquiry. *Sullivan v. NFL*, 34 F.3d 1091, 1103 (1st Cir. 1994); *see also Alston*, 141 S. Ct. at 2160 (if defendant makes showing of procompetitive justification, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means" (quoting *Amex*, 138 S. Ct. at 2284).

21.      If no less restrictive alternative exists, the court must proceed to weighing the restraint's anticompetitive effects and procompetitive justifications. *Sullivan*, 34 F.3d at 1111 ("[T]he rule of reason analysis requires a weighing of the injury and the benefits to competition attributable to a practice that allegedly violates the antitrust laws."); *see also Impax Lab'ys, Inc.*

*v. FTC*, 994 F.3d 484, 492 (5th Cir. 2021) ("Finally, if the FTC fails to demonstrate a less restrictive alternative way to achieve the procompetitive benefits, the court must balance the anticompetitive and procompetitive effects of the restraint."). The Supreme Court "has adhered to the position that the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 691.

22.     The burden-shifting steps defer the need for weighing anticompetitive effects against procompetitive justifications until the end of the reasonableness analysis. Indeed, most cases can be resolved without weighing. But if the restraint has an anticompetitive effect and a procompetitive effect, and there is no less restrictive alterative to achieve that procompetitive effect, then the court needs to make a judgment whether the "net" effect of the restraint is anticompetitive or procompetitive by looking to the "principal tendency" of the restraint. *See Cal. Dental*, 526 U.S. at 781; *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (reaching "the balancing stage" because there was no less restrictive alternative). As the Supreme Court explained in *Alston*, the "whole point" of the rule of reason is to condemn a restraint that "unduly harms competition" after a "weigh[ing of] all of the circumstances of a case." 141 S. Ct. at 2160 (quoting *Leegin*, 551 U.S. at 885).

23.     In *Alston*, the Supreme Court cautioned that the burden-shifting steps of the rule of reason "do not represent a rote checklist, nor may they be employed as an inflexible substitute for careful analysis." *Id.*

24.     Once the United States has established a violation through this rule-of-reason analysis, "all doubts as to the remedy are to be resolved in [the United States's] favor." *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961).

**D.    A restraint with probable anticompetitive effects unreasonably restrains trade and violates the Sherman Act.**

25.    Section 1 of the Sherman Act focuses not only on ongoing anticompetitive effects, but, importantly, on probable effects as well. *See, e.g.*, *Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) (in determining whether a restraint "*may* suppress or even destroy competition," the court "must ordinarily consider . . . the nature of the restraint and its effect, *actual or probable*" (emphasis added)). The "traditional antitrust factors" under the rule of reason include "*likely* anticompetitive effects, redeeming virtues, market power, and potentially offsetting legal considerations present in the circumstances." *FTC v. Actavis, Inc.*, 570 U.S. 136, 149 (2013) (emphasis added).

26.    This is why Defendants' assertion that Plaintiffs have failed to meet their burden because they have not offered quantitative proof of actual price effects from the NEA is unavailing. First, as explained in Section III.B, *infra*, proof of price effects is not the only measure of harm; harm to the competitive process itself is evidence of anticompetitive effects. Second, the Sherman Act does not require proof of present effects. As the Supreme Court explained in *FTC v. Indiana Federation of Dentists*, a horizontal agreement between competitors that is "likely enough to disrupt the proper functioning of the price-setting mechanism of the market . . . may be condemned even absent proof that it resulted in higher prices." 476 U.S. 447, 461–62 (1986) (calling "unpersuasive" an argument that the FTC failed in its burden of proof because it did not show that the restraint resulted in provision of "more costly" services); *see also United States v. Union Pac. R.R. Co.*, 226 U.S. 61, 88 (1912) ("Nor does it make any difference that rates *for the time being* may not be raised . . . . It is the scope of such combinations and *their power* to suppress or stifle competition or create monopoly which determines the applicability of the act." (emphasis added)); *Tops Mkts., Inc. v. Quality Mkts.*,

*Inc.*, 142 F.3d 90, 97 (2d Cir. 1998) (indirect evidence includes market power plus "ground[s] for believing that the challenged behavior *could harm competition* in the market, such as the *inherent anticompetitive nature* of the defendant's behavior or the structure of the . . . market") (emphasis added)); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073 (11th Cir. 2004) (considering "the alternative method for alleging an anticompetitive effect: the *potential* for genuine adverse effects on competition" (emphasis added) (quotation marks omitted)).

27.     Courts are entrusted to enjoin a restraint without waiting to quantify its precise harmful effects on the public. And that makes sense given what Congress was trying to accomplish with the Sherman Act. For example, recognizing the danger presented by waiting for the effects of anticompetitive conduct to manifest, the Supreme Court has previously condemned restraints of trade resulting from a joint venture—under Section 1 of the Sherman Act—"without regard to their past effect" because "[c]ombinations are no less unlawful because they have *not as yet* resulted in restraint." *Associated Press v. United States*, 326 U.S. 1, 12 (1945) (emphasis added); *see also United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) (injunction "of course, . . . can be utilized even without a showing of past wrongs"); *United States v. Ins. Bd. of Cleveland*, 144 F. Supp. 684, 702 (N.D. Ohio 1956) ("It is settled that without regard to its past effects an agreement to follow a course of conduct which will necessarily restrain a part of the trade or commerce, may constitute a violation of the Sherman Act."). The First Circuit has described the injunctive, remedial provisions of the act as "prospective and prophylactic," *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 406–12 (1st Cir. 1985), and the Supreme Court has instructed that these provisions reach "harms that are as yet unrealized." *California v. Am. Stores Co.*, 495 U.S. 271, 282 n.8 (1990). Simply put, courts do not require the

United States to "wait and see" whether consumers are harmed, as Defendants suggest the Court do here.

## III.    STEP ONE: ANTICOMPETITIVE EFFECTS

### A.    The NEA is facially anticompetitive under a "quick look" analysis.

28.    At the first step of the rule of reason, an abbreviated "quick look" analysis may apply. Quick looks are appropriate when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Actavis*, 570 U.S. at 159 (quoting *Cal. Dental*, 526 U.S. at 770). In these circumstances, plaintiffs can establish likely anticompetitive effects without needing to define a relevant market and calculate the defendants' precise shares within that market through a "detailed market analysis." *Bd. of Regents*, 468 U.S. at 110; *see also Alston*, 141 S. Ct. at 2155 (describing quick look as occurring in the "twinkling of an eye" (quoting *Bd. of Regents*, 468 U.S. at 110 n.39). "[T]he absence of proof of market power does not justify" these types of restrictions. *Ind. Fed'n of Dentists*, 476 U.S. at 460 (quoting *Bd. of Regents*, 468 U.S. at 109–10). Once a plaintiff has established the existence of such a plainly anticompetitive restraint, the burden immediately shifts to the defendant to provide "some competitive justification" for the restraint. *Bd. of Regents*, 468 U.S. at 110.

29.    The NEA embodies or contains at least three restraints that justify a quick look: an agreement not to compete; an agreement to fix output; and an agreement to share revenue.

30.    An agreement not to compete where the parties would otherwise have competed, that is ancillary to a broader joint venture, is subject to quick look analysis. *See Ind. Fed'n of Dentists*, 476 U.S. at 459–60 (applying quick look to "refusal to compete with respect to the package of services offered to customers"); *see also In re Se. Milk*, 739 F.3d at 275 (holding

11

"agreement between the horizontal competitors for the express purpose of limiting competition between them could be viewed as a 'facially anticompetitive restraint,'" and therefore subject to quick look, despite other vertical aspects of the agreement).

31.     For example, in *FTC v. Indiana Federation of Dentists*, a group of dentists agreed not to provide dental insurers with x-rays that would be used in claims analysis and benefits determinations. 476 U.S. at 448–49. The Supreme Court affirmed the FTC's conclusions that "in the absence of" this agreement, "individual dentists would have been subject to market forces of competition," which would have pressured them to offer these services. *Id.* at 456 (cleaned up). The Supreme Court proceeded to determine the agreement was anticompetitive at step one on a quick look, holding that "[a] *refusal to compete* with respect to the package of services offered to customers . . . impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them." *Id.* at 459–60 (emphasis added). The Supreme Court also held that where a facially anticompetitive agreement is proven, a plaintiff need not define a relevant market and show market power. *Id.* at 460.

32.     So, too, agreements like the NEA that fix output in the context of joint ventures are subject to quick look analysis. *See, e.g.*, *Bd. of Regents*, 468 U.S. at 109 ("[W]hen there is an agreement *not to compete* in terms of price or *output*, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.'" (emphasis added) (quoting *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 692)); *id.* at 107–08 ("Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit."); *Chi. Pro. Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 676 (7th Cir. 1992) (Easterbrook,

J.) (affirming the use of quick look against an agreement on output in the context of a

professional sports league).

33.     For example, in *NCAA v. Board of Regents*, the members of the NCAA

collectively agreed on a set of rules for televising collegiate football games that "limit[ed] the

total amount of televised intercollegiate football and the number of games that any one team may

televise." 468 U.S. at 94. The Court determined that the *per se* rule did not apply because for the

NCAA, "horizontal restraints on competition are essential if the product is to be available at all."

*Id.* at 101. Nevertheless, the television rules "ha[d] significant potential for anticompetitive

effects" because "[i]ndividual competitors los[t] their freedom to compete," which "restrain[ed]

price and output." *Id.* at 104, 106. That was enough to shift the burden to the NCAA to justify

the restraint. *Id.* at 113. The Court did not require any "detailed market analysis" or "proof of

market power" before proceeding to require "some competitive justification" for the restraint. *Id.*

at 109–10.

34.     Finally, agreements among competitors to share or "pool" profits or revenues, like

those found in the NEA, also eliminate incentives between parties to compete. Accordingly, such

agreements, in the context of a joint venture, justify the application of a quick look. *See, e.g.*,

*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49–50 (1990) (per curiam) (summarily reversing lower

court's decision granting summary judgment to parties that entered into a market-allocation

agreement involving revenue sharing, which the Court concluded was "unlawful on its face");

*Citizen Publ'g Co. v. United States*, 394 U.S. 131, 135 (1969) (condemning profit pooling

because it "reduces incentives to compete . . . and runs afoul of the Sherman Act"); *United States*

*v. Paramount Pictures*, 334 U.S. 131, 149 (1948) (describing profit-pooling agreements—

through which separate theaters, which would otherwise have competed against each other, were

13

now managed by a "joint committee"—as "bald efforts to substitute monopoly for competition");

*N. Sec. Co. v. United States*, 193 U.S. 197, 328 (1904) (pooling earnings "destroys every motive

for competition between . . . natural competitors"); 7 Phillip E. Areeda & Herbert Hovenkamp,

*Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1508 (4th ed. 2017)

[hereinafter, "Areeda & Hovenkamp"] ("Profit pooling unaccompanied by any ancillary activity

is ordinarily unlawful per se . . . ."). By contrast, in *California ex rel. Harris v. Safeway, Inc.*, the

Ninth Circuit declined to apply *per se* or quick look to a revenue-sharing agreement, but only

after it determined that the normal justifications for condemning such agreements do not apply,

including that the "temporary duration" of the agreement meant that the "grocers retained

incentives to compete." 651 F.3d 1118, 1134–37 (9th Cir. 2011) (en banc).

35.     Even if the Court determines that something more than a quick look is needed, a

"plenary market examination" may not be required given that the anticompetitive effects of the

NEA are obvious. *Cal. Dental*, 526 U.S. at 779–80 (approving use of "sliding scale in appraising

reasonableness"); *see also Cal. Dental Ass'n v. FTC*, 224 F.3d 942, 947 & n.2 (9th Cir. 2000)

(on remand, stating that it was "[s]eeking to situate our inquiry somewhere on the rule-of-reason

continuum between abbreviated and full-blown" analysis, but choosing to "employ a level of

inquiry closer to the latter" based on the facts of that restraint); 7 Areeda & Hovenkamp, ¶ 1508

(4th ed. 2017) (explaining that terms like *per se*, quick look, and rule of reason "suggest[] a

tripartite division that does not account for the full range of variations that the cases display").

**B.     Direct evidence of harm to the competitive process satisfies Plaintiffs' burden at step one of the rule of reason.**

36.     Plaintiffs can satisfy their initial burden by offering direct evidence of

anticompetitive effects. *Amex*, 138 S. Ct. at 2284. Direct evidence of anticompetitive effects

includes reduced quality, decreased innovation, or harm to the competitive process itself, in

addition to higher prices and reduced output. *See Actavis*, 570 U.S. at 157 (noting that "prevent[ing] the risk of competition" itself can "constitute[] the relevant anticompetitive harm"); *Impax Lab'ys*, 994 F.3d at 493 ("Eliminating potential competition is, by definition, anticompetitive."); *United States v. Brown Univ.*, 5 F.3d 658, 674 (3d Cir. 1993) (holding that a Section 1 violation can be established without proof of "higher price or lower output" because "actual dollar amount effects do not necessarily reflect the harm to competition which Congress intended to eliminate in enacting the Sherman Act"). Restraints harm the competitive process when, among other things, they interfere with consumers' "freedom to switch suppliers," *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137 (1998), or "withhold from . . . customers a particular service that they desire," *Ind. Fed'n of Dentists*, 476 U.S. at 459; *see also id.* at 461 (finding "actual, sustained adverse effects on competition" based on dentists' collective refusal to supply x-rays to insurers, "even absent proof that [the agreement] resulted in higher prices . . . than would occur in its absence").

37.     As the Supreme Court explained in *NCAA v. Board of Regents*, harm to the competitive process can be one of the most powerful types of anticompetitive effects: "Price is higher and output lower than they would otherwise be, and both are unresponsive to consumer preference. *This latter point is perhaps the most significant*, since" "[a] restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with the fundamental goal of antitrust law." 468 U.S. at 106–07 (emphasis added) (internal footnote, citations, and quotation marks omitted).

38.     The NEA has already caused such effects. Following implementation of the NEA, Defendants have exited markets where they previously competed. As a result, customers no longer have the ability to choose between American and JetBlue on those routes, and flyers

15

cannot pit them against each other to obtain lower prices or better service. Such market

allocation is direct evidence of harm to the competitive process, even absent proof of price

effects, and this evidence plainly establishes the likely anticompetitive effects of the NEA.

C. **Indirect evidence of Defendants' market power and evidence of the NEA's likely anticompetitive effects also satisfies Plaintiffs' burden at step one of the rule of reason.**

39. Plaintiffs can also satisfy their initial burden by offering indirect evidence of

anticompetitive effects. *Amex*, 138 S. Ct. at 2284. "Indirect evidence would be proof of market

power plus some evidence that the challenged restraint harms competition." *Id.*; *see also, e.g.*,

*Alston*, 141 S. Ct. at 2155 (describing the purpose of the rule of reason as assessing the restraint's

"*capacity* to reduce output and increase price" (emphasis added)); *Realcomp II, Ltd. v. FTC*, 635

F.3d 815, 825 (6th Cir. 2011) ("If Realcomp's challenged policies are shown to have an

anticompetitive effect, or if Realcomp is shown to have market power and to have adopted

policies *likely* to have an anticompetitive effect, then the burden shifts to Realcomp to provide

procompetitive justifications for the policies."); *Yagoozon, Inc. v. Kids Fly Safe*, No. CA 14-040

ML, 2014 WL 3109797, at *7 (D.R.I. July 8, 2014) ("As plaintiff, Yagoozon bears the burden of

proving that a restraint has *(or is likely to have)* a substantial anticompetitive effect on

competition." (emphasis added)).

D. **Defendants have significant market power in the relevant markets.**

1. **Plaintiffs have established the relevant markets.**

40. The first step in a rule-of-reason case based on indirect evidence is to define the

relevant market. "The purpose of defining a relevant market is to assist in determining whether a

firm has market power." *SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*, 188 F.3d 11, 16 (1st

Cir. 1999); *see also E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 5

(1st Cir. 2004) ("[T]he identification of market power is ordinarily the first step in any rule of reason claim under section 1. This in turn requires the identification of some economic market in which power can be measured and the consequences of the act or transaction assessed." (citations omitted)).

41.     A relevant market is comprised of two components: a relevant product market and a relevant geographic market. *In re Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639, 662 (D. Mass. 2020).

42.     The Supreme Court has instructed that courts should apply "a pragmatic, factual approach to definition of the relevant market and not a formal, legalistic one." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). Market definition is a factual determination that must consider the "commercial realities" of the marketplace. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992).

43.     The principles of market definition are the same whether proceeding under the Sherman Act or the Clayton Act. *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 552 n.7 (1st Cir. 1974).

44.     As explained below, the relevant product market in which to assess the competitive effects of the NEA is scheduled air passenger service, and the relevant geographic markets are origin-and-destination pairs in which Defendants compete or would likely compete absent the NEA.

**a.      The relevant product market is scheduled air passenger service.**

45.     The legal standard for relevant markets is reasonable interchangeability. *Brown Shoe*, 370 U.S. at 325 ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself

17

and substitutes for it."); *Eastman Kodak*, 504 U.S. at 482 (articulating reasonable interchangeability standard).

46.     To assess reasonable interchangeability of use, one piece of evidence that courts consider is "practical indicia," sometimes also called "*Brown Shoe* factors." These factors include "industry or public recognition of the [product market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325; *see also George R. Whitten, Jr.*, 508 F.2d at 552–53 (quoting *Brown Shoe* and noting that "[t]he market for a product must be defined not by focusing on a single factor alone but by evaluating the reasonable limits of that product's effective competition with other products").

47.     "Determining the scope of a product market begins with examining the universe of products that are considered reasonably interchangeable by consumers for the same purposes. The market is established by examining both the substitutes that a consumer might employ and the extent to which consumers will change their consumption of one product in response to a price change in another, i.e., the cross-elasticity of demand." *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 854 (1st Cir. 2016). The definition of the relevant market "ultimately depends" upon "consumer's options and consumer's choices among them." *Id.* at 855.

48.     In determining whether a product is sufficiently reasonably interchangeable to be included in the candidate product market, courts consider whether the alternative is "inferior, and thus [a] poor substitute[]." *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 57 (D. Mass. 2020). If a proposed alternative product is so inferior that a customer would not turn to that product in the event of a price increase, that alternative may be excluded from the relevant product market. *Id.* at 57.

18

49.     The fact that products share *some* forms or functions, or even that they are

functionally identical, is not enough, on its own, to establish that they are reasonably

interchangeable. *In re Intuniv*, 496 F. Supp. 3d at 665. "[I]nstead, '[s]uch limits are drawn

according to the cross-elasticity of demand for the product in question—the extent to which

purchasers will accept substitute products in instances of price fluctuation and other changes.'"

*In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 387–88 (D. Mass. 2013).

50.     Antitrust law does not require the Court to include in the relevant product market

*any* products that a customer may use as a substitute; of course, *some* customers in any relevant

market may switch away from a product in that relevant market to a product outside it. Rather,

the inquiry is whether there is *enough* consumer switching to prevent a small, but significant,

price increase. *See Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953)

("For every product, substitutes exist. But a relevant market cannot meaningfully encompass that

infinite range. The circle must be drawn narrowly to exclude any other product to which, within

reasonable variations in price, only a limited number of buyers will turn; in technical terms,

products whose 'cross-elasticities of demand' are small.").

51.     Scheduled air passenger service qualifies as a relevant product market. Although

other forms of transportation, such as trains or buses, may offer similar services in that

passengers can travel from one destination to another, scheduled air passenger service cannot be

used interchangeably with these other modes of transportation given the significant time savings

and differentiated customer experience that air travel offers.

>    **b.      Origin-and-destination pairs are relevant geographic markets.**

52.     A relevant geographic market "consists of 'the geographic area in which the

defendant faces competition and to which consumers can practically turn for alternative sources

19

of the product.'" *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196 (1st Cir. 1996). To determine the scope of the relevant geographic market, courts must "consider[] the possible competitive responses of firms outside the current market area." *Parikh v. Franklin Med. Ctr.*, 940 F. Supp. 395, 403 (D. Mass. 1996). This requires an analysis of a firm's "ability to increase prices, decrease its supply, or otherwise deliver inferior [products] without losing customers to alternative suppliers" outside the geographic market. *Id.* at 403.

53.     The determination of the relevant geographic market turns on whether enough customers could turn to suppliers outside the market to make the price increase unprofitable, even if certain customers remained within the market. *See, e.g.*, *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1284–85 (7th Cir. 1990) (Posner, J.) (affirming market definition of "the provision of inpatient services by acute-care hospitals in Rockford and its hinterland" even though some "people who live in Rockford . . . use hospitals outside the area."); *Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, No. 1:21-cv-00540-AWI-EPG, 2022 WL 2791201, at *6 (E.D. Cal. July 15, 2022) ("The geographic market inquiry . . . does not focus on whether *all* customers within the alleged area purchase solely from sellers within that area. Rather, the inquiry is whether *enough* consumers would respond to a SSNIP by purchasing the product from outside the proposed geographic market." (quoting *St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015)); *FTC v. ProMedica Health Sys., Inc.*, No. 3:11 CV 47, 2011 WL 1219281, at *10 (N.D. Ohio Mar. 29, 2011) (relevant geographic market for hospital services was limited to a single county, even though some patients left the county for service, because "a hypothetical monopolist controlling every hospital in Lucas County could increase the price of inpatient general acute-care services and obstetrics services in Lucas County by at least 5–10 percent").

54.     The fact that some customers may switch outside the market is not enough to defeat a plaintiffs' market definition. For example, as one court explained in addressing defendants' objections to a relevant geographic market, even where a market is "characterized by global trade," the relevant geographic market was appropriately limited to North America because not enough customers could switch to foreign producers to defeat a price increase. *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202–06 (D.D.C. 2018) (stating, in response to defendants' objections to the relevant product market: "Whatever the market urged by the [Government], the other party can usually contend plausibly that something relevant was left out, that too much was included, or that dividing lines between inclusion and exclusion were arbitrary," but that does not mean the Government has not met its burden. (quoting 2B Areeda & Hovenkamp, § 530d (4th ed. 2014))).

55.     Consistent with the principles described above, Plaintiffs and the Court need not define the relevant geographic market with "scientific precision," since an "element of 'fuzziness would seem inherent in any attempt to delineate the relevant geographic market.'" *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 202 (D.D.C. 2017) (quoting *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974)).

56.     Relevant geographic markets in which to assess the NEA's likely anticompetitive effects are origin-and-destination pairs. Defendants do not dispute that Plaintiffs have properly defined Boston Logan as an endpoint for the relevant markets touching Boston Logan. Joint Pretrial Order, Ex. A ¶ 23. Defendants' sole dispute with Plaintiffs' geographic market definition is that Newark must be included in the same market as LaGuardia and JFK. However, ordinary-course business documents and catchment studies performed by Defendants in the past confirm that LaGuardia and JFK, on one hand, and Newark, on the other, constitute separate relevant

21

endpoints for geographic markets. Airlines price flights to Newark differently than those to LaGuardia and JFK, and past case studies of entries and exits at the airports show that changes to service at Newark does not constrain pricing at LaGuardia and JFK. Defendants' arguments are meritless.

**c.    Courts use the hypothetical monopolist test as a tool for defining relevant markets.**

57.    Plaintiffs' expert, Dr. Nathan Miller, appropriately used the hypothetical monopolist test as a tool to determine whether routes with an endpoint in Newark are distinct geographic markets from those with an endpoint in LaGuardia or JFK. The hypothetical monopolist test has been adopted by courts in the First Circuit as an important tool for defining both relevant product and geographic markets. *See, e.g.*, *Coastal Fuels*, 79 F.3d at 198 ("The touchstone of market definition is whether a hypothetical monopolist could raise prices."); *In re Intuniv*, 496 F. Supp. 3d at 664 ("[I]n the First Circuit, it remains true that the hypothetical monopolist test is the touchstone of market definition, even in contexts outside of horizontal mergers." (internal quotation marks omitted)); *Bio-Rad Lab'ys*, 483 F. Supp. 3d at 57 (approving use of hypothetical monopolist test in defining technology market, and describing the approach as "conceptually similar to defining any other market").

58.    The hypothetical monopolist test is set out in the United States Department of Justice's and Federal Trade Commission's Horizontal Merger Guidelines. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* §§ 4.1.1, 4.1.2 (2010) [hereinafter, "Merger Guidelines"]. Under the hypothetical monopolist test, "[a] market may be any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level. If the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market."

22

*Coastal Fuels*, 79 F.3d at 197. Specifically, the test asks whether a profit-maximizing hypothetical monopolist over all current and future sales of products in a candidate market would impose a small but significant and non-transitory increase in price ("SSNIP")—typically five or ten percent—on one of or all those products. Merger Guidelines §§ 4.1.1, 4.1.2.

59.     Defendants' experts, Dr. Mark Israel and Dr. Jan Brueckner, criticized Plaintiffs' definition of the relevant geographic market for excluding Newark. They did not base those criticisms on any rigorous analysis or application of the hypothetical monopolist test. Instead, they used their own intuition. But expert opinions on market definition must be based on sufficient facts and data, not *ipse dixit* personal observations unmoored from rigorous analysis of the data and documentary evidence. *See, e.g.*, *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 988 (C.D. Cal. 2012) (excluding expert's market-definition opinion because expert improperly applied the hypothetical monopolist test by presuming that market was limited to concerts by "rock" artists and then "look[ing] for corroborating evidence without meaningfully testing his assumption"); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530, 539 (D. Md. 2002) (rejecting expert's market-definition opinion in part because it was based on the expert's "own experience in the newspaper industry, drawing on instinct and intuition to patch holes in his methodology that properly should be filled with specific facts, research, and established economic principles")

60.     Defendants made much of the fact that in addition to Plaintiffs' proposed relevant geographic markets, a relevant geographic market with endpoints including LaGuardia, JFK, and Newark would also satisfy the hypothetical monopolist test. That is neither surprising nor unexpected. Nor does it undermine the soundness of Dr. Nathan Miller's conclusions. The tests for defining relevant markets do not, and are not intended to, identify a single relevant market.

23

*United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 39 (D.D.C. 2017); *see also Brown Shoe*, 370 U.S. at 336 (defining multiple relevant markets). "Rather, the test 'ensures that markets are not defined too narrowly' and, in so doing, identifies a market that will 'illuminate the evaluation of competitive effects.'" *Aetna*, 240 F. Supp. 3d at 39 (quoting Merger Guidelines § 4.1.1); *Brown Shoe*, 370 U.S. at 325, 336 (within a broader market, "well-defined submarkets may exist, which, in themselves, constitute [relevant markets] for antitrust purposes"); *see also United States v. Pabst Brewing Co.*, 384 U.S. 546, 552 (1966) (finding that a merger may violate the Clayton Act in three overlapping relevant markets). The Court may evaluate a transaction in "any relevant market satisfying the [hypothetical monopolist] test." *Aetna*, 240 F. Supp. 3d at 40 (quoting Merger Guidelines § 4.1.1).

> **2.    Defendants' high combined market shares in highly concentrated markets establish market power.**

61.    After the relevant markets have been defined, the analysis turns to market power. "Market power is defined in economic terms as 'the ability to raise prices above those that would be charged in a competitive market.'" *Bio-Rad Lab'ys*, 483 F. Supp. 3d at 52.

62.    A plaintiff can establish market power through circumstantial evidence of defendants' "dominant share in a well-defined relevant market," which is reinforced by evidence of "significant barriers to entry in that market and that existing competitors lack the capacity to increase their output in the short run." *Coastal Fuels*, 79 F.3d at 197; *E. Food Servs.*, 357 F.3d at 6 ("[T]he conventional way [to assess market power] is to determine whether the relevant actor *or combination* has a sufficient percentage share of a 'relevant market' to give it *or them* power to raise price over cost without losing so many customers as to defeat the effort." (emphasis added)).

63.     Courts have found market shares of roughly 30% or more sufficient to support a finding of market power under Section 1 of the Sherman Act. *See, e.g.*, *BookLocker.com, Inc. v. Amazon.com, Inc.*, 650 F. Supp. 2d 89, 104 (D. Me. 2009) (stating in the context of a Section 1 tying claim that "there seems to be a consensus that thirty percent is a threshold" for market power) (citing *Grappone, Inc. v. Subaru of New Eng., Inc.*, 858 F.2d 792, 797 (1st Cir. 1988) (Breyer, J.)). In some cases, courts have found that shares as low as 20% support a finding of market power. *See United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239–40 (2d Cir. 2003) (a 26% share of a highly concentrated market supported a finding of market power); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (substantial evidence supporting finding of market power included defendant's 20% market share); *United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665, 673–74 (E.D. Mich. 2011) ("market share . . . rang[ing] from 40% to more than 80%").

64.     In assessing whether the NEA engenders market power sufficient to cause anticompetitive effects in the relevant markets, it is appropriate to calculate American and JetBlue's combined market shares in the relevant markets. *See, e.g.*, *Visa U.S.A.*, 344 F.3d at 239–40 (affirming holding that Visa and Mastercard "*jointly* and separately, have power within the market for network services" (emphasis added)); *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 225 (5th Cir. 2001) ("[T]he reason for looking at market power is to determine *whether the combination or conspiracy, not each individual conspirator*, has the power to hurt competition in the relevant market." (emphasis added)); *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990) (The AMA "challenges . . . the district court's lumping together all AMA members as a group in assessing market share as a basis for its market power finding. We are not convinced the trial court erred. The district court properly relied on the AMA

*membership's* substantial market share in finding market power." (emphasis added)); 11 Areeda

& Hovenkamp, § 1914 n.5 (4th ed. 2018) ("In most horizontal restraints cases power is measured

by aggregating the market shares of the participants in the challenged restraint.").

65.     Market shares for scheduled air passenger service between origin-and-destination

pairs are typically measured by the revenues earned in each relevant market. *See* Merger

Guidelines § 5.2 ("In most contexts, the Agencies measure each firm's market share based on its

actual or projected revenues in the relevant market. Revenues in the relevant market tend to be

the best measure of attractiveness to customers . . . ."); *see also, e.g.*, *In re AMR Corp.*, 625 B.R.

215, 251 & n.32 (S.D.N.Y. 2021) (finding that Plaintiffs satisfied showing of increased market

concentration following American/US Airways merger, where Plaintiffs' expert used the same

measures of market shares as DOJ in its challenge to American/US Airways merger); Am.

Compl., App. A, *United States v. US Airways Grp., Inc.*, No. 1:13-cv-01236-CKK (D.D.C. Sept.

5, 2013), ECF No. 73 (measuring market shares and concentration using airline ticket revenue

data).

66.     Merger analysis under Section 7 of the Clayton Act also informs the analysis in

this case because, in many respects, the NEA functions as a *de facto* merger between the

Defendants in the northeastern United States. As in Section 1 analysis, the creation or

enhancement of market power is a central concern in analyzing mergers. *See, e.g.*, *Anthem*, 236

F. Supp. 3d at 193 ("[T]he ultimate determination of the legality of a merger involves an

assessment of the new firm's market power . . . .").

67.     In a Section 7 case, a plaintiff may establish the presumption of anticompetitive

effects based on undue concentration through either of two methods. First, like a Section 1 case,

a Section 7 plaintiff may do so "by showing that the merged entity will have a significant

percentage of the relevant market." *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 166 (D.D.C. 2000). While the Supreme Court has not identified a minimum threshold for an "undue percentage share of the market" under Section 7, it has held that a post-combination market share of 30% triggers the presumption of illegality. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 364 (1963) ("Without attempting to specify the smallest [resulting] market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."); *see also United States v. First Nat'l Bank & Tr. Co. of Lexington*, 376 U.S. 665, 668–70 (1964) (presuming merger anticompetitive under Section 1 based on finding of roughly 50% market shares); *United States v. Cont'l Can Co.*, 378 U.S. 441, 461 (1964) (holding a merger presumptively anticompetitive where the acquiring firm's market share increased from 21.9% to 25% and the number of market competitors reduced from five to four); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 712 (D.C. Cir. 2001) (applying a presumption of anticompetitive effects where the combined firm would have a market share of 32.8%); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) (same for 28.4%).

68.     In addition to evidence of the combined firm's market shares, an antitrust plaintiff may establish a presumption of anticompetitive harm by showing that an agreement will substantially increase market concentration and result in a highly concentrated market. *See, e.g.*, *United States v. Energy Sols., Inc.*, 265 F. Supp. 3d 415, 441–42 (D. Del. 2017) (finding a presumption of anticompetitive harm after calculating post-merger market concentration and the change in market concentration resulting from the merger); *see also Phila. Nat'l Bank*, 374 U.S. at 363–364 (A merger that produces "a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence

27

of evidence clearly showing that the merger is not likely to have such anticompetitive effects.");
*H.J. Heinz*, 246 F.3d at 716 ("Sufficiently large [market concentration] figures establish the
[plaintiff's] prima facie case that a merger is anticompetitive.").

69.    "Market concentration is a function of the number of firms in a market and their
respective market shares." *FTC v. Staples Corp.* ("*Staples II*"), 190 F. Supp. 3d 100, 128 (D.D.C.
2016) (quoting *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 123 (D.D.C. 2004)). A common
and "useful" method that courts use for analyzing market concentration is the Herfindahl-
Hirschman Index ("HHI"). *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 172 (3d Cir.
2022); *Energy Sols.*, 265 F. Supp. 3d at 441. A market's HHI is "calculated by summing the
squares of the market shares of each market participant." *Hackensack Meridian Health*, 30 F.4th
at 172; Merger Guidelines § 5.3. A market is considered "highly concentrated" if it has a post-
merger HHI of over 2,500. *Aetna*, 240 F. Supp. 3d at 42; Merger Guidelines § 5.3. If the
agreement "would produce a highly concentrated market and 'involve an increase in the HHI of
more than 200 points,' then it 'will be presumed to be likely to enhance market power.'" *Aetna*,
240 F. Supp. 3d at 42 (quoting Merger Guidelines § 5.3).

70.    "Courts have adopted these thresholds [from the Merger Guidelines] in
determining whether a merger is presumptively unlawful." *Id.*; *ProMedica Health Sys., Inc. v.
FTC*, 749 F.3d 559, 568 (6th Cir. 2014) (noting that a 1,078-point increase to 4,391 and a 1,323-
point increase to 6,854 "blew through [the presumption] barriers in spectacular fashion"); *H.J.
Heinz*, 246 F.3d at 716–17 (holding that a 510-point increase to 4,775 created a presumption of
illegality "by a wide margin"); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 61 (D.D.C. 2015) (finding
that the economic and other evidence "has shown that a merged Sysco-USF will significantly
increase concentrations" and that the government "therefore has made its *prima facie* case and

established a rebuttable presumption that the merger will lessen competition in the local markets").

71.     Over the past two decades, the domestic airline industry has trended towards concentration as a result of mergers among large passenger airlines. American admitted this trend towards concentration in defending against an antitrust challenge to its merger with US Airways during bankruptcy proceedings. *In re AMR*, 625 B.R. at 252. Such a trend towards concentration like the one promoted by American further heightens the likelihood of anticompetitive effects going forward. *United States v. Bertelsmann SE & Co. KGaA*, No. 21-2886-FYP, 2022 WL 16949715, at *21 (D.D.C. 2022) ("Moreover, the high concentration must be considered in the context of an undeniable trend in consolidation in the . . . industry."); *Pabst Brewing*, 384 U.S. at 552–53 ("[A] trend toward concentration in an industry, whatever its causes, is a highly relevant factor in deciding how substantial the anti-competitive effect of a merger may be.").

72.     Whether proceeding under the standards for Section 1 or Section 7, the result is the same: Defendants' market shares are more than enough to trigger a presumption of market power. Defendants' combined market shares by revenue range from 31% to as high as 97% in the nonstop overlap markets in Boston and New York City. These ranges easily clear the standard thresholds and establish a presumption of market power under Section 1, and they also exceed the 30% threshold in *Philadelphia National Bank* for a presumption of illegality, sometimes by as much as 67%. Dr. Nathan Miller also calculated the HHIs in each of the domestic nonstop overlap markets and found that numerous markets exceed the thresholds established in the Merger Guidelines for a presumption of illegality "by a wide margin," *H.J. Heinz*, 246 F.3d at 716.

### 3.     High barriers to entry or expansion by other legacy airlines and smaller competitors support a finding of market power.

73.     Barriers to entry that would prevent new entrants from restraining the exercise of market power reinforce a finding of market power. *Coastal Fuels*, 79 F.3d at 197. Examples of common barriers to entry include: "(1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995); *see also, e.g.*, *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 968 (10th Cir. 1990) ("Entry barriers are particular characteristics of a market which impede entry by new firms into that market. Entry barriers may include high capital costs or regulatory or legal requirements such as patents or licenses.").

74.     To counteract likely competitive harm, "entry must be timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern." *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 66–67 (D.D.C. 2018) (internal quotation marks omitted).

75.     Entry is "timely" when "it is 'rapid enough to make unprofitable overall the actions causing [competitive] effects and thus leading to entry.'" *Id.* at 67 (alteration in original) (citing Merger Guidelines § 9.1).

76.     Entry is "likely" where "it is profitable even 'accounting for the assets, capabilities, and capital needed and the risks involved'—including sunk costs." *Id.* (citing Merger Guidelines § 9.2).

77.     Entry is "sufficient" where "the entering competitors provide products that 'are . . . close enough substitutes to the products offered by the merged firm to render a price increase

. . . unprofitable' and there are limited constraints on entrants' 'competitive effectiveness,' such that one firm can replicate the scale and strength of a merging firm, or one or more firms can operate without competitive disadvantage." *Id.* (citing Merger Guidelines § 9.3).

78.     Entry into the relevant markets is unlikely to constrain Defendants' exercise of market power. Defendants understand the significant barriers to entry created by the limited resources available in Boston and New York—indeed, they suggest that those entry barriers alone justify the NEA. Those same barriers will prevent other airlines from entering or expanding to undercut any anticompetitive consequences of the NEA. At most, other airlines will have to sacrifice their position in other relevant markets served by those airports should they choose to enter the relevant markets harmed by the NEA.

**E.     The NEA has significant likely anticompetitive effects.**

        **1.     Ordinary-course business documents and testimony of industry participants and economic experts reveal the likely competitive consequences of a restraint.**

79.     When evaluating the likely competitive effects of Defendants' conduct, ordinary-course-of-business documents and the testimony of industry participants are particularly informative. *See, e.g.*, *Anthem*, 236 F. Supp. 3d at 216 ("relevant evidence" includes "ordinary course of business documents, testimony of industry participants, and the history of head-to-head competition" between the parties); *see also Aetna*, 240 F. Supp. 3d at 21 ("Ordinary course of business documents reveal the contours of competition from the perspective of the parties . . . .").

80.     Executives like American's and JetBlue's routinely testify in antitrust trials brought by the Government that ordinary-course documents do not mean what they say on the face of the document. That makes sense because party executives are, of course, invested in seeing their deals blessed by courts. But post hoc testimony of party executives who attempt to

minimize or reframe their contemporaneous words and perspectives is entitled to little weight absent objective evidence verifying such testimony. *See, e.g.*, *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 567–68 (1973) (Marshall, J., concurring) ("[S]ubjective evidence" of a "firm's future intent" "should obviously be given no weight if it is not credible. But it is in the very nature of such evidence that it is usually not worthy of credit. . . . [A]ny statement of future intent will be inherently self-serving."); *United States v. Siemens Corp.*, 621 F.2d 499, 508 (2d Cir. 1980) (explaining that "self-serving testimony by officials of the acquiring firm regarding its intentions must be viewed with skepticism" unless "it is confirmed by objective evidence"); *Aetna*, 240 F. Supp. 3d at 70 ("The Court is more persuaded by the contemporaneous email exchanges than by the in-court attempts to explain or disavow these documented exchanges.").

81.     Likewise, an expert economist's opinions, often when based on an economic simulation model, can guide a court's analysis of likely competitive effects, including a rough quantification of harm. *See, e.g.*, *Wilh. Wilhelmsen*, 341 F. Supp. 3d at 65 (finding that "merger simulation model strengthen[ed] the [Government's] *prima facie* case"); *H & R Block*, 833 F. Supp. 2d at 88 (crediting a merger simulation model in "predicting the likelihood of a potential price increase" even though it is sometimes an "imprecise tool"); *see also Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 837 (D.N.J. 2015) (finding Bertrand merger simulation model appropriate in Sherman Act Section 1 and 2 case). Here, consistent with prior cases under both Section 1 and Section 7, Dr. Miller used a Bertrand simulation model to analyze the NEA's anticompetitive effects.

> **2.     Merger analysis under Section 7 of the Clayton Act is similar to, and can be applied to, Section 1 challenges to joint ventures like the NEA.**

82.     American and JetBlue have strenuously argued since the Complaint was filed in this case that the NEA is not a merger, and that the tools to analyze mergers are therefore

inapposite. But the Sherman Act "is aimed at substance rather than form." *Copperweld*, 467 U.S. at 760. For this reason, the Supreme Court has refused to design a one-size-fits-all approach to analyzing competitive effects under the rule of reason. Instead, the Court has repeatedly emphasized that the rule of reason "furnish[es] an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint." *Alston*, 141 S. Ct. at 2160.

83.     Consistent with this pragmatic approach, courts may use (and have used) the same tools for analyzing the likely effects of mergers and other forms of agreements whether proceeding under Section 1 of the Sherman Act or Section 7 of the Clayton Act. For example, in invalidating a bank merger under Section 1 of the Sherman Act, the Supreme Court applied the standards used in analyzing the competitive effects of mergers under Section 7 of the Clayton Act. *First Nat'l Bank*, 376 U.S. at 668–72. In analyzing the "facts relevant to the alleged restraint of trade under the Sherman Act," the Court pointed to the fact that the merging parties "had been close competitors," and it calculated the shares of the merging parties in the relevant markets both before and after the merger. *Id.* at 668–70. After considering all the evidence, the Court concluded that "where merging companies are major competitive factors in a relevant market, the elimination of significant competition between them, by merger *or consolidation*, itself constitutes a violation of § 1 of the Sherman Act." *Id.* at 671–72 (emphasis added); *see also id.* at 674 (1964) (Harlan, J., dissenting) (noting that the parties' market shares were the primary evidence supporting the Court's decision to enjoin the merger under Section 1). Similarly, in *Rockford Memorial Corp.*, the Seventh Circuit affirmed an injunction against a hospital merger under Section 1 of the Sherman Act after concluding that the "[d]efendants' immense shares in a reasonably defined market create a presumption of illegality." 898 F.2d at 1285.

84.     Likewise, joint ventures like the NEA may be analyzed as mergers where the competitive effects of the joint venture mirror those of a merger. *See, e.g.*, *Penn-Olin Chem.*, 378 U.S. at 170 ("Overall, the *same considerations apply to joint ventures as to mergers*, for in each instance we are but expounding a national policy enunciated by the Congress to preserve and promote a free competitive economy." (emphasis added)); U.S. Dep't of Justice and Fed. Trade Comm'n, *Antitrust Guidelines for Collaborations Among Competitors* § 1.3 (2000) [hereinafter, "Collaboration Guidelines"] ("[I]n some cases, competitor collaborations have competitive effects identical to those that would arise if the participants merged in whole or in part."). Where the joint venture aligns the economic incentives and resources of separate economic actors in the relevant market, eliminating competition that existed prior to the joint venture, it is appropriately evaluated using the traditional tools for merger analysis. *See generally, e.g.*, *Peabody Energy*, 492 F. Supp. 3d 865 (after applying the analytical framework for mergers developed under Section 7 of the Clayton Act, enjoining a joint venture in which the parties merged their assets in one geographic region but remained separate economic actors elsewhere).

85.     The Supreme Court has repeatedly rejected efforts by antitrust defendants to evade legal scrutiny by manipulating the legal form of their agreements. For example, in *American Needle*, the Supreme Court dismissed the argument that the member teams of the NFL are exempt from antitrust scrutiny simply because they formed a separate legal entity to conduct their joint licensing activities. 560 U.S. at 191 ("[W]e have repeatedly found instances in which members of a legally single entity violated § 1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity."). The Court explained that "[a]n ongoing § 1 violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and label." *Id.* at 197. Instead, the Court subjected both the decisions

34

made by the 32 separate teams of the NFL as well as the decisions *by their joint venture* to

Section 1 scrutiny. *Id.* at 196–202. Ultimately, the Court concluded, it is "competitive reality,"

and not legal form, that determines antitrust liability. *Id.* at 196; *see also Timken Roller Bearing*

*Co. v. United States*, 341 U.S. 593, 594–95 (1951) (failing to "find any support in reason or

authority for the proposition that agreements between legally separate persons and companies to

suppress competition among themselves and others can be justified by labeling the project a

'joint venture'"), *overruled on other grounds by Copperweld*, 467 U.S. at 764–65.

86.    The lower courts have likewise rejected efforts by competitors to escape legal

scrutiny by simply labeling their anticompetitive agreement a joint venture. *See, e.g.*, *Major*

*League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 336 (2d Cir. 2008) (Sotomayor, J.,

concurring) ("[L]abeling an arrangement a 'joint venture' will not protect what is merely a

device to raise price or restrict output . . . ." (alterations in original) (quoting Collaboration

Guidelines § 3.2)); *Compact v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 594 F. Supp.

1567, 1574 (M.D. Tenn. 1984) ("A court must be guided by the facts, rather than the legal

characterizations the parties attach to the facts. Individuals who normally compete directly

against one another may not hide the collusive nature of mutual concessions by labelling their

agreements 'joint ventures.'").

87.    Defendants' "legal characterization" of the NEA as a joint venture and not a

merger elevates form over substance, ignores the economic substance of their agreement, and is

not controlling. Plaintiffs' evidence, by contrast, reflects the economic realities of the NEA. For

example, Dr. Nathan Miller's calculation of modified HHIs in assessing market concentration

reflects that there has been no change in corporate control. Moreover, Dr. Miller's simulation

model assumes no change in control in pricing decisions, instead relying only on the changes in

pricing incentives that flow from revenue sharing (proxied as profit sharing) as the basis of

effects. As Dr. Miller explained, when profits are shared in a common pool, these incentive

effects mimic those of a merger, and the assumption regarding change in control has no impact

on the results of the model.

> ### 3. The NEA unreasonably restrains trade by eliminating vigorous head-to-head competition between Defendants in the overlap markets.

88.     In addition to increased market concentration, agreements among direct,

horizontal competitors may cause unilateral anticompetitive effects. *Anthem, Inc.*, 236 F. Supp.

3d at 215–16. "Unilateral effects" refer to the loss of competition between direct competitors. *Id.*

at 216; Merger Guidelines § 6.

89.     Agreements between head-to-head competitors, like American and JetBlue, can

cause unilateral effects by diminishing the parties' incentives to compete with each other. *See,*

*e.g.*, *Citizen Publ'g*, 394 U.S. at 135 (Section 1 violation where an agreement to fix markets and

share revenue changed incentives to compete between previous competitors). With respect to

marketing collaborations, the Antitrust Agencies' Collaboration Guidelines explain that

marketing collaborations can "create or increase market power or facilitate its exercise" by

"limiting independent decision making" or combining "control over competitively significant

assets or decisions . . . or . . . financial interests in ways that undermine incentives to compete

independently." Collaboration Guidelines § 3.31(a).

90.     "The extent of direct competition" is "central to the evaluation" of unilateral

anticompetitive effects. Merger Guidelines § 6.1. Agreements "that eliminate head-to-head

competition between close competitors often result in a lessening of competition." *Staples II*, 190

F. Supp. 3d at 131 (citing Merger Guidelines § 6); *see also, e.g.*, *H.J. Heinz*, 246 F.3d at 716–17

(holding that the government's prima facie case was "bolstered by the indisputable fact that the

merger will eliminate competition between the two merging parties"); *H & R Block*, 833 F. Supp. 2d at 81–82 (noting the likelihood of unilateral anticompetitive effects given evidence of the defendants lowering prices in response to each other, including H&R Block documents that "appear to acknowledge that TaxACT has put downward pressure on HRB's pricing ability").

91.     The parties need not be each other's *closest* competitors; being *close* competitors is enough for a restraint to result in upward pricing pressure. *Anthem*, 236 F. Supp. 3d at 216. Nonetheless, if the collaborating parties are particularly close competitors, the likely unilateral effects are especially acute. *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 47–48 (D.D.C. 2002); *Swedish Match*, 131 F. Supp. 2d at 169 ("[T]he weight of the evidence demonstrates that a unilateral price increase by Swedish Match is likely after the acquisition because it will eliminate one of Swedish Match's primary direct competitors."); Merger Guidelines § 6.1 ("Unilateral price effects are greater, the more the buyers of products sold by one merging firm consider products sold by the other merging firm to be their next choice.").

92.     American and JetBlue are indisputably close head-to-head competitors in the nonstop overlap markets. Their ordinary-course documents evince a history of pricing competition that has exerted downward pricing pressure on their services. Such evidence suggests a high likelihood of anticompetitive effects.

> **4.     The NEA unreasonably restrains trade by diminishing JetBlue's independence and uniquely disruptive impact on airline prices and service quality.**

93.     "Anticompetitive effects are more likely still when 'the merger would result in the elimination of a particularly aggressive competitor in a highly concentrated market.'" *Aetna*, 240 F. Supp. 3d at 43 (enjoining merger in part because Aetna was a "'particularly aggressive' Medicare Advantage competitor"); *see also Steward Health Care Sys., LLC v. Blue Cross &*

*Blue Shield of R.I.*, 311 F. Supp. 3d 468, 509 (D.R.I. 2018) ("[I]t is both legally and factually

important to the antitrust analysis that Steward—a hospital owner that wanted to bring change

and to eventually compete to potentially minimize or displace the modern and traditional role of

insurance companies—was swapped out with a hospital system that concededly had no—and

was even arguably troubled by—such aspirations."); *FTC v. Staples, Inc.* ("*Staples I*"), 970 F.

Supp. 1066, 1083 (D.D.C. 1997) (enjoining merger in part because it would eliminate "a

particularly aggressive competitor in a highly concentrated market").

94.     Such "particularly aggressive competitors" are sometimes referred to as

"mavericks." *H & R Block*, 833 F. Supp. 2d at 79; Merger Guidelines § 2.1.5. Mavericks

typically "play a disruptive role in the market to the benefit of customers," such as by "tak[ing]

the lead in price cutting" or "resist[ing] otherwise prevailing industry norms to cooperate on

price setting or other terms of competition." *H & R Block*, 833 F. Supp. 2d at 79.

95.     The key question in determining whether an agreement is likely to restrain trade

by dampening the maverick's disruptive force is whether the firm "play[s] a special role in th[e]

market that constrains prices." *Id.* at 80. JetBlue has been, until the NEA, just such a maverick.

As JetBlue has long told the public, its aggressive pricing competition has exerted a downward

pricing pressure on airline industry pricing that has been nicknamed the "JetBlue Effect."

### 5.     The NEA unreasonably restrains trade by facilitating industry-wide capacity discipline and coordination.

96.     In assessing the competitive effects of an agreement, courts may also consider

whether the agreement facilitates and increases the likelihood of coordinated effects in that

market. *Anthem*, 236 F. Supp. 3d at 215. "Coordinated effects refer to markets with few

competitors, in which firms may 'coordinate their behavior, either by overt collusion or implicit

understanding in order to restrict output and achieve profits above competitive levels.'" *Id.* at

38

215–16; *see* Collaboration Guidelines § 3.31(b) ("[C]ollaborations can increase concentration in a relevant market and thus increase the likelihood of collusion among all firms, including the collaboration and its participants.").

97.     The likelihood that an agreement between competitors will increase the risk of coordination "depends on whether market conditions, on the whole, are conducive to reaching terms of coordination and detecting and punishing deviations from those terms." *H & R Block*, 833 F. Supp. 2d at 77. A highly concentrated market with few competitors is ripe for such coordination. *See, e.g.*, *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1218 n.24 (11th Cir. 1991) ("Significant market concentration makes it 'easier for firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level.'"); *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1503 (D.C. Cir. 1986) (Bork, J.) ("[W]here rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding, in order to restrict output and achieve profits above competitive levels."). Price transparency may further enhance the risk of coordination. *See, e.g.*, *H & R Block*, 833 F. Supp. 2d at 78 (noting "the importance of price transparency to the likelihood of coordinated effects"). Evidence that market participants, and particularly the parties to the agreement, "have already shown an awareness that implicit coordination would be beneficial" further bolsters the likelihood of coordinated effects. *Tronox*, 332 F. Supp. 3d at 209; *see also Bertelsmann SE*, 2022 WL 16949715, at *27 ("[A] history of collusion or attempted collusion is *highly probative* of likely harm from a merger." (emphasis added)).

98.     The airline industry possesses all the hallmark characteristics of an industry that is ripe for collusion. The industry is highly concentrated, both at the route level and overall. Pricing is also highly transparent. Business documents show that industry participants understand the

relationship between output and price, and that coordinated reductions in output would be to their benefit. And the industry has engaged in just the type of coordinated interaction that creates concerns under the antitrust laws. *See, e.g.*, *United States v. Airline Tariff Publ'g Co.*, 836 F. Supp. 9, 12 (D.D.C. 1993) (court entry of final judgment designed to prevent airlines from continuing to "use[] the ATP fare dissemination system in a manner that enables them to reach price-fixing agreements or unnecessarily to facilitate fare coordination").

99.     Absent evidence that there are "'structural market barriers to collusion' that are unique to the . . . industry," a court must apply the "ordinary presumption of collusion" in a concentrated market. *H.J. Heinz*, 246 F.3d at 715–17, 725 (reversing district court's conclusion that presumption of collusion was defeated because merger would allow two smaller rivals to compete with larger rival); *id.* at 725 ("Tacit coordination is 'feared by antitrust policy even more than express collusion, for tacit coordination, even when observed, cannot easily be controlled directly by the antitrust laws.'" (quoting 4 Areeda & Hovenkamp, ¶ 901b2 (rev. ed. 1998)). Defendants have not even attempted to show that any "market barriers to collusion" exist in the airline industry. Accordingly, the Court should presume that collusion is likely and that the increase in market concentration attributable to the NEA will increase the likelihood of such collusion.

**F.      Evidence of actual price increases is unnecessary in an indirect-evidence case under step one of the rule of reason.**

100.     Defendants assert that the significant evidence of likely anticompetitive effects, described in detail above, should be disregarded absent direct evidence of past effects. The law says otherwise. Indeed, that focus on the harms that are likely, if not yet actual, is why the rule of reason analysis devotes so much care to the market power analysis. For example, in rejecting the notion that Section 1 "punishe[s] only actual restraints," Judge Posner explained that it is

40

precisely "*because* the transactions punished under the Sherman Act, like those punished under the Clayton Act, are ambiguous in their competitive consequences that the courts insist on proof of market power." *Rockford Mem.*, 898 F.2d at 1283; *see also Realcomp II*, 635 F.3d at 827–28 (explicitly rejecting argument that direct evidence of actual effects is required); 11 Areeda & Herbert Hovenkamp, ¶ 1912d (4th ed. 2018) ("In nearly all cases, however, the tribunal does not actually measure the reduction in output that results from a restraint. Rather, the tribunal queries whether the natural tendency of a particular agreement, in the presence of significant market power, will be to reduce output.").

101.    Indirect evidence of market power and likely effects satisfies Plaintiffs' burden at step one because proof of actual anticompetitive effects "is often impossible to make . . . due to the difficulty of isolating the market effects of challenged conduct." *Brown Univ.*, 5 F.3d at 668; *see also Realcomp II*, 635 F.3d at 828 ("'[T]he purpose of the inquiries into market definition and market power is to determine whether an arrangement has the *potential* for genuine adverse effects on competition,' and this is so precisely because actual anticompetitive effects may be difficult to demonstrate." (alterations in original)).

102.    Defendants' position hinges on an incorrect reading of *American Express* and *Alston*. Neither decision overruled prior cases recognizing that evidence of a restraint's *likely* effects is adequate at step one of the rule of reason. Indeed, each decision reinforced that indirect evidence of likely effects will satisfy a plaintiff's step-one burden. *Alston*, 141 S. Ct. at 2155 (equating a restraint's "actual effect on competition" with its "*capacity* to reduce output and increase price" (emphasis added)); *Amex*, 138 S. Ct. at 2284 (for indirect evidence, requiring only "proof of market power plus *some evidence* that the restraint *harms competition*" (emphasis

added)). In fact, the *American Express* Court expressly noted that it was not addressing indirect evidence in that case. 138 S. Ct. at 2284–85 & n.6.

103.    Similarly, Defendants have argued that Plaintiffs must provide precise quantifications of price increases or reduced output in order to show that the NEA is anticompetitive, relying on *MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172, 182–85 (2d Cir. 2016). That reliance is misplaced. *MacDermid* acknowledged that a plaintiff can prove competitive harm indirectly, by showing market power and evidence that a restraint harms competition, which might include evidence that the restraint is "inherently anticompetitive" or evidence of the "structure of the interbrand market." *Id.* at 183. That decision also suggested that actions that "reduce consumer choice are inherently anticompetitive." *Id.* According to *MacDermid*, the "standard courts have used in the past when evaluating purported limitations on consumer choice" is "activity that prevents its victims from making free choices between market alternatives." *Id.* at 186.

## IV.    STEP TWO: ALLEGED PROCOMPETITIVE JUSTIFICATIONS

### A.    Defendants must justify the NEA by proving the existence of procompetitive justifications that benefit consumers, not just their own profitability.

104.    Once a plaintiff has shown significant anticompetitive effects, whether by a quick look or a full rule of reason, the defendant faces a "heavy burden" at step two. *Bd. of Regents*, 468 U.S. at 113; *see also Paramount Pictures*, 334 U.S. at 148 (once likely anticompetitive effects have been demonstrated, defendants are in the best position to show that the restraint comes within the law). Defendants must establish more than simply "a plausible connection" between the restraint and "a legitimate objective." 7 Areeda & Hovenkamp, ¶ 1505b (4th ed. 2017). To meet this high burden, Defendants must provide "empirical evidence of procompetitive effects." *Cal. Dental*, 526 U.S. at 775 n.12.

105.     Only certain benefits may meet a defendant's burden at step two to demonstrate

the procompetitive effects of their conduct. The rule of reason "does not open the field of

antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm

of reason." *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 688. For example, "mere profitability or cost

savings have not qualified as a defense under the antitrust laws." *Law v. NCAA*, 134 F.3d 1010,

1023 (10th Cir. 1998); *see also Polygram Holding v. FTC*, 416 F.3d 29, 35 (D.C. Cir. 2005)

(proffered justification that "restrictions on discounting and advertising enhanced the long-term

profitability" of certain products were "nothing less than a frontal assault on the basic policy of

the Sherman Act" (internal quotation marks omitted)); *Chi. Pro. Sports Ltd. P'ship v. NBA*, 754

F. Supp. 1336, 1359 (N.D. Ill. 1991) ("Maximizing revenues and 'protecting the value' of

individual team or NBA contracts are not legitimate justifications by themselves for restraining

trade by limiting output."). Nor may a defendant offer "a defense based on the assumption that

competition itself is unreasonable." *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 696.

106.     Instead, the justifications must be those that enhance competition in the relevant

markets, rather than merely benefitting the parties to the anticompetitive agreement. *Bd. of

Regents*, 468 U.S. at 104 ("[W]hether the ultimate finding is the product of a presumption or

actual market analysis, the essential inquiry remains the same—whether or not the challenged

restraint *enhances competition*. Under the Sherman Act the criterion to be used in judging the

validity of a restraint on trade is its impact on competition." (emphasis added) (footnotes

omitted)); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 16-

cv-5073, 2022 WL 3588024, at *16 (E.D. Pa. Aug. 22, 2022) ("Procompetitive benefits are those

that 'enhance[] consumer welfare and competition in the marketplace' and 'are consistent with

the procompetitive aspirations of antitrust law.'").

43

**B.     Growth that Defendants could have achieved without the NEA is not a cognizable procompetitive justification.**

107.    Defendants cannot claim credit for benefits that they would or could have achieved anyway by competing with each other and growing organically. Rather, the procompetitive effects must result *from the restraint itself. See, e.g.*, *Bd. of Regents*, 468 U.S. at 114 (condemning a restraint because "any procompetitive efficiencies . . . could be [achieved] just as effectively" without it); *Graphic Prods. Distribs., Inc. v. ITEK Corp.*, 717 F.2d 1560, 1576 (11th Cir. 1983) ("[M]erely offering a rationale for a vertical restraint will not suffice; the record must support a finding that the restraint is in fact necessary to enhance competition and *does indeed have a pro-competitive effect*." (emphasis added)); *cf. In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1083 (N.D. Cal. 2019) (declining to consider certain procompetitive justifications because "Defendants have not shown that the challenged rules have an effect" of achieving their other procompetitive justification, athlete integration into college campuses). In other words, if the benefits would have accrued anyway, there is no reason for consumers to bear the anticompetitive consequences of the restraint.

108.    In challenges to acquisitions brought under Section 7 of the Clayton Act, courts similarly consider whether alleged efficiencies are "merger-specific." *See, e.g.*, *H.J. Heinz*, 246 F.3d at 721–22 (defining merger-specific efficiencies as those "that cannot be achieved by either company alone"); *United States v. Bazaarvoice, Inc.*, No. 13-cv-00133-WHO, 2014 WL 203966, at *64 (N.D. Cal. Jan. 8, 2014) (enjoining merger and holding that "there is no evidence that the merger increased innovation or that, absent the merger, the efficiencies and innovation claimed would not have been realized"); Merger Guidelines § 10 ("The Agencies credit only those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable

44

anticompetitive effects."). Courts require merger-specificity in merger cases because otherwise, anticompetitive mergers might be allowed even when the benefits "can be achieved without the concomitant loss of a competitor.'" *H.J. Heinz*, 246 F.3d at 722.

> C.   **Defendants cannot justify anticompetitive harm to consumers in one relevant market by pointing to purported benefits to consumers in a different relevant market.**

109.   To defend against Plaintiffs' proof of the likely anticompetitive effects of the NEA on many of the relevant markets, Defendants point to benefits, allegedly attributable to the NEA, that accrue outside those relevant markets. But courts are ill-equipped "to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition in another sector." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 609–10 (1972). Instead, any decision "to sacrifice competition in one portion of the economy for greater competition in another" is for Congress alone—not for courts or private businesses. *Id.* at 611.

110.   It is generally improper to "validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market." *Sullivan*, 34 F.3d at 1112; *see also W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 105 (3d Cir. 2010) (holding that insurer could not justify agreement to reduce reimbursement rates to hospitals by arguing that the savings would allow it to offer lower premiums on insurance plans to consumers); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) (conspiracy to lower purchase price of milk could not be justified by lower prices in the sale of cheese); *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1186 (D.C. Cir. 1978) (refusing to weigh anticompetitive effects of draft on the market for players' services against alleged procompetitive, but noneconomic, benefits of competition on the football field); *Amex*, 138 S. Ct. at 2302 (Breyer, J., dissenting) ("A Sherman Act § 1 defendant can rarely, if

ever show that a pro-competitive benefit in the market for one product offsets an anticompetitive harm in the market for another."). Any procompetitive benefit should be considered only to the extent it may "ultimately have a beneficial impact on competition in the relevant market itself." *Sullivan*, 34 F.3d at 1113.

111.    As the First Circuit noted in *Sullivan*, courts have sometimes accounted for out-of-market benefits if the relevant market in which those benefits accrue is sufficiently "closely related to the relevant market . . . such that the procompetitive benefits in one [market] can be compared to the anticompetitive harms in the other [market]." *Id.* at 1112; *cf. Amex*, 138 S. Ct. at 2285–87 (assessing both sides of a two-sided simultaneous transaction platform). In *Board of Regents*, for example, the Supreme Court considered whether the NCAA's interest in maintaining competitive balance between college football teams might justify restraints in the market for live college football television on the theory that "equal competition will maximize consumer demand for the product." 468 U.S. at 117–20. By contrast, the Court rejected the NCAA's interest in protecting live attendance at games because it was unrelated to maintaining college football as an "attractive product." *Id.* at 116–17.

112.    The other cases the First Circuit pointed to in *Sullivan* are consistent with this rule, and none involved a restraint that suppressed competition in one market while allegedly channeling it elsewhere, as Defendants assert the NEA does. *See Grappone*, 858 F.2d at 799 (tie of spare Subaru parts closely related to increased Subaru car sales and insuring no shortage of parts); *M&H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 986 (1st Cir. 1984) (rule requiring racecar drivers at particular track to use one brand of tire closely related to promoting parity in races and lower costs for tires, which would increase the value of the product and thereby benefit the racecar drivers); *L.A. Memorial Coliseum Comm'n v. NFL*, 726 F.2d 1381,

1394, 1397 (9th Cir. 1984) (where "precise market definition was especially difficult," "critical question" was whether rule promoted interbrand "compet[ition] in the entertainment market" or "harmed [intrabrand] competition among the 28 teams to such an extent that any benefits to the League as a whole were outweighed").

113.     In the Supreme Court's most recent decision applying the rule of reason, the legal issue of balancing effects in different markets was not presented by the parties, so the Supreme Court had no occasion to address it. *Alston*, 141 S. Ct. at 2155 (noting that "parties before us do not pursue" issue of "sacrificing a legally cognizable interest in competition in one market to better promote competition in a different one"). The decision of the Ninth Circuit panel, which the Supreme Court affirmed, likewise noted the issue but left it "for another day." *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1257 n.14 (9th Cir. 2020).

114.     The Supreme Court plainly articulated the rationale for this approach in *Topco Associates*, 405 U.S. at 611. There, the Court explained that the policy of the Sherman Act is inconsistent with permitting harm to one set of consumers in one market, warning that "if a decision is to be made to sacrifice competition in one portion of the economy for greater competition in another portion this too is a decision that must be made by Congress and not by private forces or the courts." *Id.*; *see also In re NCAA Athletic Grant-in-Aid Cap*, 958 F.3d at 1269–70 (Smith, J., concurring) (because the purpose of the rule of reason is to determine whether a restraint in the relevant market is net procompetitive or anticompetitive, allowing out-of-market benefits "disrupts that balancing . . . [and] weakens antitrust protections").

115.     For this reason, courts routinely refuse to consider purported out-of-market efficiencies when determining whether a merger will substantially lessen competition under Section 7 of the Clayton Act. *Phila. Nat'l Bank*, 374 U.S. at 370 (rejecting argument that

"anticompetitive effects in one market could be justified by procompetitive consequences in another"); *Aetna*, 240 F. Supp. 3d at 94 (merging parties must demonstrate efficiencies accrue to "the customers in the challenged markets"); *Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012) ("[A] merger that substantially decreases competition in one place— injuring consumers there—is not saved because it benefits a separate group of consumers by creating competition elsewhere."). The same rule should apply here because the NEA operates like a merger, combining Defendants' resources, aligning their economic incentives, and extinguishing competition between them. To hold otherwise would elevate form over substance.

116.    Applying a similar principle, courts have also refused to accept the reduction of costs and preservation of margins as a justification for an illegal agreement to eliminate competition in an input market, even where the conspirators promise to "channel" the proceeds of lost competition to other markets. *Brown Univ.*, 5 F.3d at 675; *see also Law*, 134 F.3d at 1023 (cost-cutting was not valid justification for restraint on compensation of entry-level coaches because "mere profitability or cost savings have not qualified as a defense under the antitrust laws"); *Anthem*, 236 F. Supp. 3d at 252 (rejecting argument that merged insurer's ability to lower costs paid to medical providers justified merger; "[w]hat the defense is asking the Court to do is to elevate Anthem's ability to sustain its margins over the need or ability of physicians and hospitals to do the same, and Supreme Court precedent indicates that courts should not be in the business of making policy determinations about the appropriate allocation of healthcare dollars; those are value judgments that are better directed to the legislature"), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017).

117.    For the reasons provided in Section III.D.1 above, the relevant markets in which to assess the competitive effects of the NEA are scheduled air passenger service on origin-and-

destination pairs. Although Defendants dispute whether one of the endpoints in this case should

encompass Newark airport or not, they do not otherwise dispute this methodology for defining

the relevant markets. Thus, whether the NEA "unreasonably restrains trade" on a given route

(e.g., Boston to DCA) depends on whether the likely anticompetitive effects on that route are

outweighed by procompetitive effects, if any, on that same route. Defendants cannot rely on

putative procompetitive effects elsewhere, such as flights from JFK to Tel Aviv, to justify the

harms to consumers from Boston to DCA—putting aside the question of whether the JFK to Tel

Aviv "expansion" is attributable to the NEA anyway. If the harms to consumers outweigh the

benefits to consumers on the Boston to DCA route, Plaintiffs have proven the NEA violates

Section 1 of the Sherman Act within that relevant market.

### D.  Vigorous competition in certain markets from Delta and United does not justify harming competition and consumers.

118.    The Sherman Act "precludes inquiry into the question whether competition is

good or bad." *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 695. As long as the market is working, it

makes no difference which firm is the market leader. Antitrust law and the courts that apply that

law do not pick winners and losers. That is why Defendants cannot justify the anticompetitive

effects of the NEA by claiming that the NEA will save them from competition with Delta and

United—particularly when American and JetBlue are themselves the market leaders in many

routes into and out of Boston and New York, as well as numerous other routes throughout the

country.

119.    Antitrust law protects and enshrines competition, not specific competitors like

American and JetBlue. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990).

Although large, successful firms "may impose painful losses" on their competitors, that "is of no

moment to the antitrust laws if competition is not injured." *Brooke Grp. Ltd. v. Brown &*

49

*Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993). "Conduct which is competitive, even severely so," is a good thing—it means the market is working. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). "[A]n efficient firm may capture unsatisfied customers from an inefficient rival, whose own ability to compete may suffer as a result. This is the rule of the marketplace and is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster." *Copperweld*, 467 U.S. at 767.

120.     Courts routinely reject the idea that the mere presence of vigorous competition, even from large, well-resourced competitors like Delta or United, justifies the combination of two direct competitors (absent evidence that without the combination one of them would exit the market, the so-called "failing firm" defense, which has not been asserted here). *See, e.g.*, *H & R Block*, 833 F. Supp. 2d at 80 (rejecting argument that merger of H&R Block and TaxAct was justified by better ability to compete with market leader Intuit); *H.J. Heinz*, 246 F.3d at 720 (rejecting argument that merger of Heinz and Beech-Nut was justified by better ability to compete with market leader Gerber). Permitting two competitors to join forces whenever they face a competitive threat from a more successful firm would turn the Sherman Act on its head. *Cf. United States v. Apple, Inc.*, 791 F.3d 290, 332 (2d Cir. 2015) (opinion of Livingston, J.) ("[T]he Sherman Act does not authorize [collusion] as a form of marketplace vigilantism to eliminate perceived 'ruinous competition' or other 'competitive evils.'" (quoting *Maricopa Cnty. Med. Soc'y*, 457 U.S. at 346). As the Supreme Court has said, "The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports*, 506 U.S. at 458.

E.   **Defendants' claims about the post-implementation evidence of the NEA's effects are unavailing.**

121.   Defendants presented expert testimony from Dr. Dennis Carlton that there have allegedly been no price increases since Defendants began implementing the NEA. But that is not surprising. Putting aside the fact that the NEA is ongoing and market conditions can always change—providing even greater opportunity for Defendants to use the NEA to harm consumers—antitrust counsel has been advising Defendants regarding antitrust risk since the moment planning for the NEA began, through the date of this litigation. The parties understandably and predictably planned on how best to position and present their deal today, while understanding that the spotlight that the deal is under in the courtroom is temporary. Anticompetitive conduct should not be expected in the shadow of litigation, particularly where Defendants have shown their awareness of government scrutiny.

122.   For these reasons, courts disregard or discount "a firm's behavior undertaken with the aim of persuading a court or the government regarding the legality of a merger." *Aetna*, 240 F. Supp. 3d at 80; *H.J. Heinz*, 246 F.3d at 721 (expressing skepticism regarding defendants' "mere . . . promises about post-merger behavior," particularly in light of the "high concentration levels"). "The Supreme Court has recognized this simple proposition." *Aetna*, 240 F. Supp. 3d at 79 (citing *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 504–05 (1974)). The danger of reliance on the parties' "good behavior" is self-evident: "If a court incorrectly relies on post-merger testimony that a merged entity has not raised prices and the court blesses the transaction, there is little to prevent the merged entity from creating anticompetitive effects at a later time." *Bazaarvoice*, 2014 WL 203966, at *73; *see also FTC v. Consol. Foods Corp.*, 380 U.S. 592, 598 (1965) ("If the post-acquisition evidence were given conclusive weight or allowed to override all probabilities, then acquisitions would go forward willy-nilly . . . .").

123.    Application of this common-sense principle is particularly important "when the parties are aware of the government's scrutiny and the potential for a court challenge." *Bazaarvoice*, 2014 WL 203966, at \*73.

124.    This principle has been expanded by lower courts to include any evidence that could *arguably* be manipulated by the defendants. *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 435 (5th Cir. 2008) ("The probative value of such evidence . . . is deemed limited not just when evidence is actually subject to manipulation, but rather is deemed of limited value whenever such evidence *could arguably* be subject to manipulation."); *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986) (Posner, J.) ("Post-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight.").

## V.    STEP THREE: LESS RESTRICTIVE ALTERNATIVES

### A.    Any purported benefits attributable to the NEA could have been achieved through less restrictive means without nearly as severe harm to consumers.

125.    Even if the Court credits Defendants' evidence at step two, the NEA is nevertheless unreasonable under the rule of reason if a less restrictive alternative exists. *Sullivan*, 34 F.3d at 1103 ("One basic tenet of the rule of reason is that a given restriction is not reasonable, that is, its benefits cannot outweigh its harm to competition, if a reasonable, less restrictive alternative to the policy exists that would provide the same benefits as the current restraint."); *Impax Lab'ys*, 994 F.3d at 497 ("[I]t is unreasonable to justify a restraint of trade based on a purported benefit to competition if that same benefit could be achieved with less damage to competition."); *see also* 11 Areeda & Hovenkamp, ¶ 1913b (4th ed. 2018) ("The importance and scope of any inquiry into less restrictive alternatives increase as the power and competitive threat posed by the defendants' conduct increase."). "When a less restrictive alternative exists, a party's decision to nonetheless engage in conduct that harms consumers

likely results from a desire to gain from the resulting consumer harm." *Impax Lab'ys*, 994 F.3d at 498 (internal quotation marks omitted).

126.    A less restrictive alternative satisfies Plaintiffs' burden at step three if it is "substantially less restrictive" while achieving "the same procompetitive benefits . . . proven at the second step." *Alston*, 141 S. Ct. at 2162. In determining whether a less restrictive alternative would accomplish these goals, "'actual experience in analogous situations' can help establish the feasibility or practicality of a less restrictive alternative." *Impax Lab'ys*, 994 F.3d at 499. Such evidence "may be especially compelling as the defendant often will not want to acknowledge its willingness to enter into an arrangement that would not have included 'the illicit profits arising from an anticompetitive effect.'" *Id.* As the Court heard during trial, the Clean Team considered numerous alternatives to the NEA, many of which resulted in similar benefits to the NEA, and this evidence sheds light on potential less restrictive alternatives.

127.    When considering potential alternatives at step three of the rule of reason, a defendant's failure to establish its procompetitive justifications at step two will necessarily "influence[] the analysis" at step three. *Alston*, 141 S. Ct. at 2162. Therefore, if a defendant fails to prove that the restraint actually achieves the proffered procompetitive benefits, then those benefits are not considered in measuring the effectiveness of a less restrictive alternative against the effectiveness of the challenged restraint at step three. *See id.* ("The court's judgment ultimately turned on the key question at the third step: whether the student-athletes could prove that 'substantially less restrictive alternative rules' existed to achieve the same procompetitive benefits *the NCAA had proven at the second step*. Of course, *deficiencies in the NCAA's proof of procompetitive benefits at the second step influenced the analysis at the third*." (emphasis added)); *In re NCAA Athletic Grant-in-Aid Cap*, 375 F. Supp. 3d at 1104 ("Because Defendants

have not shown that the challenged rules can be justified on the ground that they promote integration, the Court does not consider whether any proffered less restrictive alternatives would promote integration."). Accordingly, to the extent Defendants failed to meet their burdens at step two to show benefits resulting from the NEA, such as in Boston or transatlantic routes to London, those benefits can be disregarded at step three.

128.    A finding that a less restrictive alternative exists does not mean that alternative itself would be legal under the rule of reason. *Smith*, 593 F.2d at 1188 (in discussing less restrictive alternatives, stating that "[w]e are not required in this case to design a draft that would pass muster under the antitrust laws").

**B.    Defendants misstate the relevant legal standard for less restrictive alternatives.**

129.    Defendants have argued that Plaintiffs must show that the less restrictive alternative is both "something that the parties would have done" and that it "would have been profitable for them to do that." Tr. vol. 12, 39:15-19. Defendants' proposed standards well exceed what the law requires. A less restrictive alternative need only be "viable." *Brown Univ.*, 5 F.3d at 679.

130.    In proving viability, Plaintiffs need not establish an alternative's profitability to Defendants or the exact benefit to the public through a financial accounting exercise. For example, in *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litigation*, the district court did not precisely quantify the consumer demand created by the challenged compensation rules and the consumer demand created by the less restrictive alternative in order to reach a mathematical conclusion about whether the benefits were equivalent for the restraint and the proposed alternative. It simply found that the less restrictive alternative, uncapping certain education-related benefits, "would not be a vehicle for potentially unlimited cash payments," and therefore

that a less restrictive alternative was adequate to achieve the benefit of amateurism that stimulates consumer demand. 375 F. Supp. 3d at 1088. Nor did it precisely quantify the increased costs that would result from the less restrictive alternative. *Id.* at 1090–91; *see also Smith*, 593 F.2d at 1187–88 (positing multiple alternatives without presenting a precise quantification of benefits and costs for each). In neither case did the court consider how the profitability of less restrictive alternatives compared to the challenged restraint; it is axiomatic that a restraint that allows for greater competition between Defendants will naturally be less profitable for them than one that allows for less competition.

131.    Here, ordinary-course documents from the Clean Team planning process, combined with Dr. Robert Town's testimony, prove that viable alternatives to the NEA that produce the same benefits exist.

## VI.    WEIGHING OF HARMS AND BENEFITS

### A.    The ultimate question in this case is whether the NEA's harms to competition are outweighed by its purported benefits in each relevant market.

132.    The ultimate question that the factfinder must answer under the rule of reason is whether the challenged restraint's anticompetitive effects are outweighed by its alleged procompetitive benefits. Thus, even if no less restrictive alternative exists, the court "must balance the harms and benefits of the [restraint] to determine whether they are reasonable." *Cnty. of Tuolumne*, 236 F.3d at 1160; *see also Cal. Dental*, 526 U.S. at 774 (question is whether the restraint has a "net anticompetitive effect"); *Impax Lab'ys*, 994 F.3d at 492 ("Finally, if the FTC fails to demonstrate a less restrictive alternative way to achieve the procompetitive benefits, the court must balance the anticompetitive and procompetitive effects of the restraint."); *Law*, 134 F.3d at 1019 ("Ultimately, . . . the harms and benefits must be weighed against each other in order to judge whether the challenged behavior is, on balance, reasonable.").

133.     In its two most recent decisions applying the rule of reason, the Supreme Court approvingly cited authorities recognizing an ultimate weighing of harms and benefits. *See Alston*, 141 S. Ct. at 2160 (citing 7 Areeda & Hovenkamp, ¶ 1507a (4th ed. 2017) (recognizing a final balancing step)); *Amex*, 138 S. Ct. at 2284 (citing *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d Cir. 1993) ("Ultimately, it remains for the factfinder to weigh the harms and benefits of the challenged behavior."); Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 15.04 (4th ed. 2017) ("Once we have identified the types and magnitudes of threats to competition, legitimate objectives, and possible alternatives, we have still to reach an 'on balance' judgment about reasonableness."); 1 Julian O. von Kalinowski et al., *Antitrust Laws and Trade Regulation* § 12.02[5] (2d ed. 2017) ("Once a restraint is shown to be reasonably necessary to achieve procompetitive effects, a balancing occurs between the competitive benefits and any anticompetitive effects.")).

134.     The First Circuit has expressly endorsed this balancing approach as well. *See, e.g.*, *Sullivan*, 34 F.3d at 1096 (ultimate question under the rule of reason is whether "the anticompetitive effects of the policy outweigh the policy's legitimate business justifications"); *id.* at 1111 (ultimate question is answered by "weighing . . . the injury and the benefits to competition attributable to [the] practice"); *see also Stop & Shop Supermarket*, 373 F.3d at 61 (explaining that a rule-of-reason claim requires showing "that the alleged agreement involved the exercise of power in a relevant economic market, that this exercise had anticompetitive consequences, and that those detriments *outweighed* efficiencies or other economic benefits" (emphasis added)).

135.     Weighing is necessary in order to achieve the policy goals established by Congress through the Sherman Act. Without an ultimate weighing of a restraint's harms and

benefits, which Defendants suggest here, "an egregious restraint with a minor procompetitive effect would have to be allowed to continue, merely because a qualifying less restrictive alternative was not shown." *In re NCAA Athletic Grant-In-Aid Cap*, 375 F. Supp. 3d at 1109.

136.    If the Court finds that the NEA has both anticompetitive and procompetitive effects in each of the relevant markets, and that the procompetitive effects in each of the relevant markets cannot be achieved absent the NEA, the Court must weigh the harms and benefits in each of the relevant markets. As explained above, the Court cannot weigh benefits in one relevant market against anticompetitive effects in another. So, if the anticompetitive effects outweigh the procompetitive benefits on any route, Plaintiffs have established a violation on that route.

## VII.   DEFENDANTS' PROPOSED REMEDIES

### A.   The DOT Agreement is insufficient to remedy the anticompetitive effects of the NEA.

137.    Defendants have made commitments to the DOT to increase their capacity in New York City, subject to certain penalties (slot divestitures) if they fail to do so. Because Defendants have offered these commitments as evidence of a remedy to the anticompetitive effects established by Plaintiffs, they bear the burden to show both that the remedy is likely to occur and that it will effectively remedy the loss of competition. *See Aetna*, 240 F. Supp. 3d at 60.

138.    In evaluating a remedy, courts require that the remedy must "replace the competition lost" as a result of the restraint, including the "competitive intensity" that previously existed. *Id.* at 60; *see also, e.g.*, *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) ("The relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition.'" (quoting *E.I. du Pont de Nemours & Co.*, 366 U.S. at 326); *E.I. du Pont de Nemours & Co.*, 366 U.S. at 326 ("[C]ourts are authorized, indeed *required*, to decree relief

effective to redress the violations, whatever the adverse effect of such a decree on private interests." (emphasis added)).

139.    A remedy like the DOT Agreement that requires Defendants to adhere to a certain set of standards for conduct is sometimes called a "behavioral remedy." Such remedies are disfavored because they "risk excessive government entanglement in the market," *St. Alphonsus Med. Ctr.*, 778 F.3d at 793, and "there are usually greater long term costs associated with monitoring the efficacy of a conduct remedy than with imposing a structural solution," *ProMedica Health Sys.*, 749 F.3d at 573. Accordingly, the preferred remedy once an antitrust violation has been shown is "structural" relief, i.e., a permanent divestiture of assets. *Cf., e.g.*, *Am. Stores*, 495 U.S. at 280–81 ("[I]n Government actions divestiture is the preferred remedy for an illegal merger or acquisition.").

140.    Similarly, the mere existence of a regulatory regime does not immunize a defendant from antitrust liability; indeed, such implied immunity is "strongly disfavored." *See, e.g.*, *Phila. Nat'l Bank*, 374 U.S. at 350–55. Where a regulatory regime "does not provide remedies for the correction of all the abuses . . . which might constitute violations of the antitrust laws," it does not defeat a showing of an antitrust violation. *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 461 (1945).

141.    Temporary remedies like the DOT agreement, which has an expiration date, are also inadequate to counteract the harms caused by ongoing, indefinite antitrust violations. Rather, when the antitrust violation is ongoing, the appropriate relief is a permanent injunction prohibiting the conduct. *W. T. Grant*, 345 U.S. at 633 (permanent injunction appropriate where "there exists some cognizable danger of recurrent violation").

**B.    Defendants' voluntary, non-enforceable carve-out agreement is irrelevant as a matter of law.**

142.    While the Division's investigation was ongoing and before the filing of this complaint, Defendants entered into a voluntary, fully revocable agreement to "carve out" certain routes from the NEA. A non-binding, revocable, and voluntary agreement by antitrust defendants to refrain from harming competition—particularly one made in the shadow of litigation—is irrelevant as a matter of law to determining whether the conduct is anticompetitive. This determination need not be based on any assessment of the credibility or honesty of defendants, but rather the inability of the court to ensure that the remedy will permanently preserve competition. *See, e.g.*, *Bertelsmann*, 2022 WL 16949715, at *31–32 (giving "no weight" to acquiring publisher's "unenforceable promise" that different imprints of the merged company would compete internally because the promise "would not be profit-maximizing" and "can be broken at will"); *H & R Block*, 833 F. Supp. 2d at 82 ("While the Court has no reason to doubt that defendants would honor their promise [to maintain the acquired firm's current prices for three years post-merger], this type of guarantee cannot rebut a likelihood of anticompetitive effects in this case." (citing *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 64 (D.D.C. 1998)).

143.    To the contrary, courts have considered unenforceable promises to remedy antitrust injuries as evidence of "consciousness of guilt," which "reflect [the defendant's] awareness of how threatening the combined entity would be" to consumers. *Bertelsmann*, 2022 WL 16949715, at *31.

144.    Courts view with skepticism evidence, like the carve-out agreement, that is subject to manipulation by the offering party and made to improve that party's litigation position. *Fashion House, Inc. v. K mart Corp.*, 892 F.2d 1076, 1090 (1st Cir. 1989) (where parties act with an eye toward improving their "litigating position . . . [c]ourts should not reward such

stratagems"); *Hosp. Corp.*, 807 F.2d at 1384 (holding that evidence of "a post-acquisition transaction that may have been made to improve Hospital Corporation's litigating position" need not be credited); *Aetna*, 240 F. Supp. 3d at 74 (not crediting evidence that Aetna had withdrawn from operating in 17 counties because the Court found it did so "to improve its litigation position").

145.    Because the carve-out agreement is not enforceable by any agency or court and Defendants could accordingly rescind it at any time, the Court may decline to consider it as a matter of law.

## VIII.  PERMANENT INJUNCTION

### A.    The Court has broad remedial powers to restore competition.

146.    "The courts have an obligation, once a violation of the antitrust laws has been established, to protect the public from a continuation of the harmful and unlawful activities." *United States v. Parke, Davis & Co.*, 362 U.S. 29, 48 (1960); *see also Paramount Pictures*, 334 U.S. at 148 ("For equity has the power to uproot all parts of an illegal scheme—the valid as well as the invalid—in order to rid the trade or commerce of all taint of the conspiracy."); *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947) ("In an equity suit, the end to be served is not punishment of past transgression, nor is it merely to end specific illegal practices. A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints.").

147.    Antitrust judgments operate prospectively to prohibit unlawful conduct in the future and to restore effective competition. *See E.I. du Pont de Nemours & Co.*, 366 U.S. at 326 ("[C]ourts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests."). The purpose of the injunction

is to both "cure the ill effects of the illegal conduct" and also "assure the public freedom from its
continuance." *United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 64 (1973).

    **B.**    **An injunction may be tailored to address the harms to competition identified in
the rule-of-reason analysis.**

    148.    "[District courts] are invested with large discretion to model their judgments to fit
the exigencies of the particular case." *Int'l Salt*, 332 U.S. at 400–01; *see Parke, Davis & Co.*, 362
U.S. at 48; *see also Ford Motor*, 405 U.S. at 573 (upon finding antitrust violation, court has
"'large discretion' to fit the decree to the special needs of the individual case"). Courts may
fashion the remedy to "unfetter a market from anticompetitive conduct," *id.* at 577–78; "to
prevent future violations and eradicate existing evils," *United States v. Microsoft Corp.*, 253 F.3d
34, 101 (D.C. Cir. 2001) (en banc) (quoting *United States v. Ward Baking Co.*, 376 U.S. 327,
330–31 (1964)); to "deprive the defendants of any benefits of the illegal conduct," *United States
v. Grinnell Corp.*, 384 U.S. 563, 577 (1966); and to "deny the defendant the fruits of its statutory
violation," *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968).

    149.    Courts may use their broad remedial discretion to order defendants not to enforce
certain contract terms or to terminate contracts in their entirety if necessary to achieve effective
relief. *See, e.g.*, *United States v. Apple, Inc.*, No. 12-cv-2826, 2013 WL 4774755, at *2–3
(S.D.N.Y. Sept. 5, 2013) (ordering that defendant "shall not enforce" Most Favored Nations
clause in its contracts; "shall not enter into any agreement" containing such a clause; "shall not
enter into or maintain any agreement" restricting the ability "to offer price discounts"; and shall
"modify" or "terminate" any agreement that does not comply with the decree); *Visa U.S.A.*, 163
F. Supp. 2d at 408–09 (ordering defendants to permit banks to rescind issuing agreements with
defendants to remedy "past foreclosure" of competition). For example, here, the Court may enter
a decree either prohibiting the NEA in its entirety, or that narrows the scope of the NEA or

renders certain terms of the NEA, such as capacity coordination and revenue sharing, unenforceable.

150.    Where the Government has established a violation of the antitrust laws, "all doubts as to the remedy are to be resolved in [the Government's] favor." *E.I. du Pont de Nemours & Co.*, 366 U.S. at 334. Given Defendants' ongoing violations of the antitrust laws, affecting consumers not only based in Boston and New York, but also travelers to those destinations and around the country—all within the context of a highly concentrated, oligopolistic industry—the appropriate remedy is a full injunction.

Dated: November 17, 2022

Respectfully submitted,

/s/ William H. Jones II
William H. Jones II
James L. Moore III
Patricia C. Corcoran

U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 8000
Washington, DC 20530
Tel: (202) 598-8805
Fax: (202) 307-5802
Email: bill.jones2@usdoj.gov

*Attorneys for Plaintiff*
*United States of America*

MARK BRNOVICH
Attorney General

/s/ Robert Bernheim
ROBERT BERNHEIM
(AZ Bar No. 024664)

Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Tel: (520) 628-6507
Email: robert.bernheim@azag.gov

*Attorneys for Plaintiff State of Arizona*

ROB BONTA
Attorney General

KATHLEEN E. FOOTE
Senior Assistant Attorney General

NATALIE S. MANZO
MICHAEL W. JORGENSON
Supervising Deputy Attorneys General

ROBERT B. McNARY
JAMIE L. MILLER
Deputy Attorneys General

 /s/ Robert B. McNary
ROBERT B. McNARY
Deputy Attorney General
California State Bar No. 253745
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Phone: 213-269-6283
E-mail: robert.mcnary@doj.ca.gov

*Attorneys for Plaintiff State of California*

KARL A. RACINE
Attorney General

KATHLEEN KONOPKA
(DC Bar No. 495257)
Senior Advisor for Competition Policy

/s/ Adam Gitlin
ADAM GITLIN
Section Chief, Antitrust and Nonprofit
Enforcement Section
Office of the Attorney General for the
District of Columbia
400 Sixth Street NW, Tenth Floor
Washington, DC 20001
Tel: (202) 442-9853
Email: adam.gitlin@dc.gov

*Attorneys for Plaintiff District of Columbia*

ASHLEY MOODY
Attorney General

 /s/ Lizabeth A. Brady
LIZABETH A. BRADY
(FL Bar No. 457991)
COLIN G. FRASER
(FL Bar No. 104741)

Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399
Tel: (850) 414-3300
Email: Liz.Brady@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

MAURA HEALEY
Attorney General

 /s/ William T. Matlack
WILLIAM T. MATLACK
(MA Bar No. 552109)
DANIEL H. LEFF (MA Bar No. 689302)

Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Tel: (617) 727-2200
Email: William.Matlack@mass.gov
Email: Daniel.leff@mass.gov

*Attorneys for Plaintiff*
*Commonwealth of Massachusetts*

JOSH SHAPIRO
Attorney General

JAMES A. DONAHUE, III
(PA Bar No. 42624)
Executive Deputy Attorney General
Public Protection Division

/s/ Tracy W. Wertz
TRACY W. WERTZ (PA Bar No. 69164)
JOSEPH S. BETSKO (PA Bar No. 82620)
JENNIFER A. THOMSON
(PA Bar No. 89360)

Pennsylvania Office of Attorney General
Antitrust Section
14th Floor Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
Email: twertz@attorneygeneral.gov

*Attorneys for Plaintiff*
*Commonwealth of Pennsylvania*

JASON S. MIYARES
Attorney General

/s/ Tyler T. Henry
TYLER T. HENRY (VA Bar No. 87621)
Assistant Attorney General
Antitrust Unit
Office of the Virginia Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Tel: (804) 692-0485
Email: THenry@oag.state.va.us

*Attorneys for Plaintiff*
*Commonwealth of Virginia*