# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, ET AL.,

Plaintiffs,

v.

AMERICAN AIRLINES GROUP INC. and
JETBLUE AIRWAYS CORPORATION,

Defendants.

Civil Action No. 1:21-cv-11558-LTS

## DEFENDANTS' POST-TRIAL PROPOSED CONCLUSIONS OF LAW

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................1

II.  THE RULE OF REASON .....................................................................................1

III. PLAINTIFFS HAVE NOT SHOWN THAT THE NEA HAS PRODUCED OR IS
     PRODUCING ANTICOMPETITIVE EFFECTS ..............................................3

    A.   Plaintiffs Have Offered No Direct Evidence Of Anticompetitive Effects..............7

    B.   Plaintiffs Have Not Proffered Sufficient Indirect Evidence Of
        Anticompetitive Effects ....................................................................................11

        1.   Plaintiffs Have Not Adequately Shown That Defendants Have
            Market Power In A Relevant Market..........................................................12

            a.   Relevant Product and Geographic Markets ...................................14

            b.   New York...................................................................................24

            c.   Boston .......................................................................................25

        2.   Plaintiffs Have Not Adequately Shown That Defendants Are
            Engaging In Any Practice That Has A High Likelihood Of
            Harming Competition .................................................................................28

            a.   The NEA Is Not A Merger, And Its Likely Competitive
                Effects Are Not Captured By Dr. Miller's Merger
                Simulation.................................................................................28

                (1)   Plaintiffs' Theory Of Capacity Discipline Is
                      Factually Deficient.............................................................33

                (2)   Plaintiffs Have Offered No Evidence To Show That
                      The NEA Has Or Will Cause JetBlue To Change Its
                     Business Model...................................................................37

                 (3)   Plaintiffs Have Offered No Evidence Of Customer
                      Complaints About The NEA................................................38

IV.  DEFENDANTS HAVE SHOWN THAT THE NEA HAS A PROCOMPETITIVE
     RATIONALE AND IS PRODUCING NUMEROUS, SUBSTANTIAL
     BENEFITS.............................................................................................................40

V.      PLAINTIFFS HAVE NOT SHOWN THAT THE BENEFITS OF THE NEA
        COULD BE ACCOMPLISHED THROUGH LESS RESTRICTIVE
        ALTERNATIVES.............................................................................................................47

VI.     CONCLUSION................................................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*1-800 Contacts, Inc. v. FTC,*
 1 F.4th 102 (2d Cir. 2021) ..................................................................................................2

*Am. Steel Erectors v. Loc. Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers,*
 815 F.3d 43 (1st Cir. 2016)................................................................................................4

*In re AMR Corp.,*
 625 B.R. 215 (Bankr. S.D.N.Y. 2021)..............................................................................15

*In re Asacol Antitrust Litig.,*
 No. 15-CV-12730-DJC, 2016 WL 4083333 (D. Mass. July 20, 2016) ..............................48

*Bathke v. Casey's Gen. Stores,*
 64 F.3d 340 (8th Cir. 1995) ..............................................................................................21

*Bogan v. Hodgkins,*
 166 F.3d 509 (2d Cir. 1999)................................................................................................2

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
 441 U.S. 1 (1979)..............................................................................................................41

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
 509 U.S. 209 (1993)......................................................................................................5, 45

*Cal. Dental Ass'n v. FTC,*
 526 U.S. 756 (1999)............................................................................................................2

*Chicago Board of Trade v. United States,*
 246 U.S. 231 (1918)......................................................................................................6, 44

*Chicago Bridge & Iron Co. v. FTC,*
 534 F.3d 410 (5th Cir. 2008) ..............................................................................................8

*Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.,*
 79 F.3d 182 (1st Cir. 1996)...........................................................................................2, 21

*Compass, Inc. v. Real Est. Bd. of N.Y., Inc.,*
 No. 21-CV-2195 (AJN), 2022 WL 992628 (S.D.N.Y. Mar. 31, 2022) ..................................4

*Copperweld Corp. v. Indep. Tube Corp.,*
 467 U.S. 752 (1984)..........................................................................................................43

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)........................................................................................................31

*Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*,
    243 F.3d 980 (6th Cir. 2001) .....................................................................................7, 12

*Flegel v. Christian Hosp., Ne.-Nw.*,
    4 F.3d 682 (8th Cir. 1993) ..............................................................................................10

*FTC v. Actavis, Inc.*,
    570 U.S. 136 (2013)........................................................................................................42

*FTC v. Advocate Health Care Network*,
    841 F.3d 460 (7th Cir. 2016) .....................................................................................19, 20

*FTC v. Penn State Hershey Med. Ctr.*,
    838 F.3d 327 (3d Cir. 2016)..............................................................................13, 16, 20

*FTC v. Tenet Health Care Corp.*,
    186 F.3d 1045 (8th Cir. 1999) ........................................................................................16

*Hospital Corporation of America v. FTC*,
    807 F.2d 1381 (7th Cir. 1986) ..........................................................................................8

*Hudson's Bay Co. Fur Sales Inc. v. Am. Legend Co-op.*,
    651 F. Supp. 819 (D.N.J. 1986) .....................................................................................45

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547
    U.S. 28 (2006)................................................................................................................40

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)........................................................................................................31

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018)............................................................................32

*Lucas v. Citizens Commc'ns Co.*,
    409 F. Supp. 2d 1206 (D. Haw. 2005), *aff'd*, 244 F. App'x 774 (9th Cir. 2007) .....................7

*M & H Tire Co. v. Hoosier Racing Tire Corp.*,
    733 F.2d 973 (1st Cir. 1984)..............................................................................48, 52, 53

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
    833 F.3d 172 (2d Cir. 2016)........................................................................................4, 11

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)..............................................................................................2

*Malaney v. UAL Corp.*,
    434 F. App'x 620 (9th Cir. 2011) ........................................................................................15

*McLaughlin Equip. v. Servaas*,
    No. IP98-0127-C-T/K, 2004 WL 1629603 (S.D. Ind. Feb. 18, 2004).....................................11

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
    922 F.3d 713 (6th Cir. 2019) ........................................................................................12, 41

*Metro Indus., Inc. v. Sammi Corp.*,
    82 F.3d 839 (9th Cir. 1996) ...............................................................................................10

*Mil. Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.*,
    823 F.2d 829 (4th Cir. 1987) ..............................................................................................10

*Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*,
    208 F.3d 655 (8th Cir. 2000) ..............................................................................................10

*Minn. Min. & Mfg. Co. v. N.J. Wood Finishing Co.*,
    381 U.S. 311 (1965)..............................................................................................................6

*Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*,
    525 F.2d 630 (D.C. Cir. 1976)..............................................................................................9

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
    596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986)...........................48

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    375 F. Supp. 3d 1058 (N.D. Cal. 2019) ...............................................................................50

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
    958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom. Alston*, 141 S. Ct. 2141 ..........................47, 50

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    141 S. Ct. 2141 (2021)................................................................................................. *passim*

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*,
    468 U.S. 85 (1984)..............................................................................................................41

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008)..............................................................................................5, 32

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
    7 F. Supp. 3d 955 (N.D. Cal. 2014), *aff'd in part, vacated in part on other grounds*, 802 F.3d
    1049..................................................................................................................48, 52, 53, 54

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
    802 F.3d 1049 (9th Cir. 2015) ........................................................................................3, 50

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ........................................................................................... *passim*

*Oksanen v. Page Mem'l Hosp.*,
    945 F.2d 696 (4th Cir. 1991) .................................................................................21, 22

*Paladin Assocs., Inc. v. Mont. Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ......................................................................................41

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
    776 F. 2d 185 (7th Cir. 1985) ......................................................................................12

*Procaps S.A. v. Patheon Inc.*,
    141 F. Supp. 3d 1246 (S.D. Fla. 2015), *aff'd*, 845 F.3d 1072 (11th Cir. 2016)..................4, 10

*In re Processed Egg Prod. Antitrust Litig.*,
    962 F.3d 719 (3d Cir. 2020).........................................................................................53

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) .......................................................................................14

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986).........................................................................13, 29, 47

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
    28 F.3d 1379 (5th Cir. 1994) .......................................................................................10

*SCFC ILC, Inc. v. Visa USA, Inc.*,
    36 F.3d 958 (10th Cir. 1994) .......................................................................................29

*Sterling Merch., Inc. v. Nestle S.A.*,
    656 F.3d 112 (1st Cir. 2011).............................................................................3, 4, 6, 40

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
    373 F.3d 57 (1st Cir. 2004)...................................................................................4, 5, 6

*Sullivan v. Nat'l Football League*,
    34 F.3d 1091 (1st Cir. 1994)...........................................................................40, 44, 48, 51

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961)....................................................................................................16

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006).......................................................................................................41

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
    142 F. 3d 90 (2d Cir. 1998)....................................................................................6, 10

*United States v. Anthem, Inc.*,
    236 F. Supp. 3d 171 (D.D.C. 2017) ........................................................................51

*United States v. Booz Allen Hamilton Inc.*,
    No. CV CCB-22-1603, 2022 WL 9976035 (D. Md. Oct. 17, 2022) ...........................2, 20, 23

*United States v. Engelhard Corp.*,
    126 F.3d 1302 (11th Cir. 1997) ..............................................................................21

*United States v. General Dynamics Corp.*,
    415 U.S. 486 (1974).................................................................................................8

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)...............................................................................................22

*United States v. Long Island Jewish Med. Ctr.*,
    983 F. Supp. 121 (E.D.N.Y. 1997) ...................................................................16, 20

*United States v. Penn-Olin Chem. Co.*,
    378 U.S. 158 (1964)..........................................................................................13, 29

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963)...............................................................................................16

*United States v. U.S. Sugar Corp.*,
    No. CV 21-1644 (MN), 2022 WL 4544025 (D. Del. Sept. 28, 2022) ..............................21, 23

*United States v. UnitedHealth Grp. Inc.*,
    No. 1:22-CV-0481 (CJN), 2022 WL 4365867 (D.D.C. Sept. 21, 2022) ..........................29, 38

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC*,
    257 F.3d 256 (2d Cir. 2001)...................................................................................10

## STATUTES

15 U.S.C. § 18..............................................................................................................1, 5

Clayton Act § 7 .........................................................................................................1, 5, 6

Sherman Act § 1................................................................................................... *passim*

## OTHER AUTHORITIES

Craig Peters, *Evaluating the Performance of Merger Simulation: Evidence from the U.S. Airline Industry*, 49 J. L. & Econ. 627 (2006) .....................................................................33

DOJ & FTC, *Horizontal Merger Guidelines* § 4.2.1 (Aug. 19, 2010),
    https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf.......16, 17, 51

FTC & DOJ, *Antitrust Guidelines for Collaborations Among Competitors* (Apr. 2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf ...................5, 48

Gregory J. Werden, Luke M. Froeb, and David T. Scheffman, *A* Daubert *Discipline for Merger Simulation*, 18 ANTITRUST 89 (2004) ...................................................................................32

Herbert Hovenkamp, *Antitrust Balancing*, 12 N.Y.U. J. L. & BUS. (2016) ...................................49

Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice* § 3.6d (1994) ................................................................................................................................21

Michael A. Carrier, *The Rule of Reason: An Empirical Update for the 21st Century*, 16 GEO. MASON. L. REV. (2009) ..........................................................................................................49

Philip E. Areeda & Herbert E. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2022) ................................................................................4, 12

Thomas A. Piraino, Jr., *Beyond Per Se, Rule of Reason or Merger Analysis: A New Antitrust Standard for Joint Ventures*, 76 MINN. L. REV. 1, 7 (1991) ...................................................29

## I.   INTRODUCTION

1.      Plaintiffs challenge the Northeast Alliance (the "NEA") between American Airlines Group Inc. ("American") and JetBlue Airways Corporation ("JetBlue") under Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Importantly, Plaintiffs have *not* brought this action pursuant to Section 7 of the Clayton Act, the principal federal law governing mergers that prohibits any acquisition "the effect of [which] . . . may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

2.      Plaintiffs allege that the NEA is an illegal agreement that effectively merges the networks of American and JetBlue in the northeastern United States and lacks procompetitive benefits that outweigh the potential anticompetitive harms from the agreement. Plaintiffs, however, have not presented any direct or indirect evidence of anticompetitive effects resulting from the NEA. And they have not rebutted the procompetitive benefits of the NEA that Defendants have entered into evidence, either directly or by showing that Defendants could have achieved those benefits through less restrictive alternatives. Plaintiffs have therefore failed to carry their burden to show that the NEA violates Section 1.

## II.   THE RULE OF REASON

3.      Plaintiffs acknowledge that "determining whether a restraint is unreasonable ordinarily 'calls for . . . a rule of reason analysis.'"[1] The rule of reason framework proceeds through a three-stage analysis.

---

[1] ECF No. 160 at 14 (some internal quotations omitted) (quoting *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2151 (2021)); *see also* ECF No. 160 at 17–42 (discussing the NEA under the rule of reason framework).

Plaintiffs have also suggested that the NEA may be condemned under the abbreviated "quick look" standard, *see* ECF No. 160 at 17, which is "designed for restraints that are not per se unlawful

4.    "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018); *see also Alston*, 141 S. Ct. at 2160.  Thus, Plaintiffs also bear the burden of establishing a relevant product and geographic market, *i.e.*, "the area of effective competition," *Am. Express*, 138 S. Ct. at 2285, in which any anticompetitive effects may be measured, *see Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 197 (1st Cir. 1996).

_____

but are sufficiently anticompetitive on their face that they do not require a full-blown rule of reason inquiry," *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 763 (1999).  Under the quick look framework, a plaintiff need not demonstrate anticompetitive harm arising from the challenged conduct, and the burden immediately shifts to the defendant to show a procompetitive rationale for, or benefits resulting from, the conduct.  *See Bogan v. Hodgkins*, 166 F.3d 509, 514 n.6 (2d Cir. 1999).  If the defendant makes that showing, the case proceeds under the full rule of reason framework.  *See id.*

The quick look standard, however, applies only when the "experience of the market [with a particular arrangement] has been so clear" that "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental*, 526 U.S. at 770, 781; *see id.* at 781–83 (rejecting application of the quick look standard because the challenged conduct "call[ed] for more than [the] cursory treatment" applicable to "classic horizontal agreements to limit output or price competition").  Plaintiffs do not come close to showing that the NEA meets this standard. First, Plaintiffs' contention that the NEA is "unprecedented," *see, e.g.*, ECF No. 160 at 1, forecloses a showing that judicial experience has uniformly found that arrangements like the NEA are anticompetitive, *see, e.g.*, *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 116 (2d Cir. 2021) (rejecting the quick look standard where "[c]ourts do not have sufficient experience with this type of conduct to permit [ ] abbreviated analysis").  Second, the quick look standard cannot apply because Plaintiffs do not dispute that the NEA creates consumer benefits or that the evidence to date shows that the harms they predict have not materialized.  *See* ECF No. 160 at 24–34; *see also Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 318 (2d Cir. 2008) ("If an arrangement 'might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition,' more than a 'quick look' is required." (quoting *Cal. Dental*, 526 U.S. at 771)); *United States v. Booz Allen Hamilton Inc.*, No. CV CCB-22-1603, 2022 WL 9976035, at *4 n.13 (D. Md. Oct. 17, 2022) (rejecting quick look analysis where the transaction at issue could give the parties "a stronger position to challenge entrenched incumbents").

In any event, Defendants prevail under the quick look standard because, as discussed below, they have shown sufficient procompetitive rationales for, and benefits arising from, the NEA, and Plaintiffs have failed to rebut those rationales and justifications or demonstrate adequate less restrictive alternatives.

2

5.      Plaintiffs may meet their burden to prove that the challenged restraint has a substantial anticompetitive effect either "directly" with evidence of higher prices or restricted output, or "indirectly" by showing that firms with market power in a relevant market are engaging in conduct that predictably harms the competitive process.  *See Am. Express*, 138 S. Ct. at 2284. If a plaintiff does not meet this burden, it cannot establish liability under the rule of reason.  *See Sterling Merch., Inc. v. Nestle S.A.*, 656 F.3d 112, 124–25 (1st Cir. 2011) (affirming grant of summary judgment where plaintiff failed to show actual adverse effects); *see also Alston*, 141 S. Ct. at 2160.

6.      If Plaintiffs meet their threshold burden, the burden then "shifts to the defendant[s] to show a procompetitive rationale for the restraint."  *Am. Express*, 138 S. Ct. at 2284.

7.      Upon a showing of a procompetitive justification by Defendants, the burden shifts back to the Plaintiffs to show that the same "procompetitive efficiencies could be reasonably achieved through less anticompetitive means."  *Id.*  Notably, a "less restrictive alternative" must be substantially less restrictive, practical, and equally effective as the challenged conduct in generating procompetitive benefits.  *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1074 (9th Cir. 2015) (emphasizing that a less restrictive alternative "must be virtually as effective in serving the procompetitive purposes of the [challenged conduct] . . . , and without significantly increased cost" (internal quotations omitted)).

## III.   PLAINTIFFS HAVE NOT SHOWN THAT THE NEA HAS PRODUCED OR IS PRODUCING ANTICOMPETITIVE EFFECTS

8.      To prove anticompetitive effects—the first step in the rule of reason balancing framework—Plaintiffs must show that "the challenged restraint has a substantial anticompetitive effect."  *Alston*, 141 S. Ct. at 2160; *see also Am. Express*, 138 S. Ct. at 2284 ("The rule of reason requires courts to . . . assess the [restraint]'s actual effect on competition." (alteration in original)

(internal quotations omitted)).  Making this showing is "no slight burden."  *Alston*, 141 S. Ct. at 2160.

9.      Anticompetitive effects may be proven "directly" by evidence of output reductions, price increases, or quality reductions.  *See Am. Express*, 138 S. Ct. at 2284.  Direct evidence, however, is not always required because such evidence can sometimes be "elusive or simply unavailable."  Philip E. Areeda & Herbert E. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1914b (5th ed. 2022) [hereinafter "Areeda & Hovenkamp"].  Accordingly, when plaintiffs lack actual evidence of anticompetitive effects, they may seek to meet their burden through "indirect" or inferential evidence of anticompetitive effects.  *See Am. Express*, 138 S. Ct. at 2284.  This does not change the plaintiff's legal burden, which remains proving "that the challenged restraint has a substantial anticompetitive effect."  *Alston*, 141 S. Ct. at 2160.  While courts "sometimes describe[ ] 'direct' and 'indirect' proof as alternative ways of satisfying the adverse-effect requirement, there is really only one way to prove an adverse effect on competition under the rule of reason: by showing actual harm to consumers in the relevant market."  *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016).[2]

---

[2] *See Compass, Inc. v. Real Est. Bd. of N.Y., Inc.*, No. 21-CV-2195 (AJN), 2022 WL 992628, at *4 (S.D.N.Y. Mar. 31, 2022) (explaining that "[e]ven when adverse effects are proven indirectly, the plaintiff must ultimately proffer, as a practical matter, some evidence that the challenged action has *already* had an adverse effect on competition, even if consumers have not yet felt that effect" (emphasis in original) (internal quotations omitted)); *Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1267 (S.D. Fla. 2015) (noting that there is "significant support for the view that the actual detrimental effect must be a result which has in fact already *happened*, as opposed to a result which is speculative, hypothetical, likely, inherent or one having potential to create damage," and collecting cases), *aff'd*, 845 F.3d 1072 (11th Cir. 2016); *see also, e.g.*, *Am. Steel Erectors v. Loc. Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 815 F.3d 43, 61 (1st Cir. 2016) (explaining that the "demanding calculus" of the rule of reason "compels an antitrust plaintiff to show" that the defendant's conduct has "*had* anti-competitive consequences" (emphasis added) (quoting *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004))); *Sterling Merch.*, 656 F.3d at 124 (stating that "[i]t is not easy to think of a rule of reason analysis that does not depend on showing adverse effects on competition"

10.     Plaintiffs argue that the decisional rule "is whether the challenged restraint is likely to harm competition."[3]  That is incorrect.  Although a plaintiff may seek to demonstrate that the challenged conduct tends to have certain effects—and thus a court may imply or infer likely actual anticompetitive effects—the predicted effects must be "real and immediate," as Section 1 requires, and "not conjectural or hypothetical."  *See In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 14–15 (1st Cir. 2008) (internal quotations omitted).  As the First Circuit has explained, the "demanding calculus" of Step One of the rule of reason "compels an antitrust plaintiff to show" that the defendant's conduct has "*had* anti-competitive consequences."  *Am. Steel Erectors*, 815 F.3d at 61 (emphasis added) (quoting *Stop & Shop*, 373 F.3d at 61).  Even direct evidence fails to prove adverse effects "absent some evidence that tends to prove that ***output was restricted*** or ***prices were above a competitive level***."  *Am. Express*, 138 S. Ct. at 2288 (emphasis added) (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993)).

11.     In effect, Plaintiffs argue for the use of the predictive standard applied to mergers and acquisitions under Section 7 of the Clayton Act, which prohibits mergers and acquisitions that "may" substantially lessen competition.  *See* 15 U.S.C. § 18.  But Section 1 of the Sherman Act condemns contracts, combinations, and conspiracies "in restraint of trade."  *See* 15 U.S.C. § 1.  In a Section 1 case, a plaintiff cannot satisfy its burden at Step One solely by showing a basis on

---

(quoting *Stop & Shop*, 373 F.3d at 69)); FTC & DOJ, *Antitrust Guidelines for Collaborations Among Competitors* at 4 (Apr. 2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf ("The Agencies' analysis begins with an examination of the nature of the relevant agreement.  As part of this examination, the Agencies ask about the business purpose of the agreement and examine whether the agreement, if already in operation, *has caused* anticompetitive harm." (emphasis added)).

[3] ECF No. 160 at 16.

which effects *might* occur.  *See Minn. Min. & Mfg. Co. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 323 (1965) (noting that Section 7 of the Clayton Act "require[s] proof only of a potential anticompetitive effect while [Section 1 of] the Sherman Act carries the more onerous burden of proof of an actual restraint"); *Sterling Merch.*, 656 F.3d at 124 (stating that "[i]t is not easy to think of a rule of reason analysis that does not depend on showing adverse effects on competition" (quoting *Stop & Shop*, 373 F.3d at 69)).  This has been understood since Justice Brandeis's seminal opinion in *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 240 (1918), which found that a challenged rule that nominally fixed prices was not a "restraint of trade" because it had neither anticompetitive price nor output effects.[4]

12.     The proper way to incorporate likelihoods or tendencies into the analysis of the NEA is through the required analysis of "actual detrimental effects [on competition], such as reduced output, increased prices, or decreased quality in the relevant market."  *Am. Express*, 138 S. Ct. at 2284 (alteration in original) (internal quotations and citation omitted).  Specifically, the Court will address whether adverse effects can be inferred through "market power plus some evidence that the challenged restraint [by its nature] harms competition."  *Id.* (citing *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F. 3d 90, 97 (2d Cir. 1998) ("A plaintiff seeking to use market power as a proxy for adverse effect must show market power, plus some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent

---

[4] *Dicta* in *Addamax Corp. v. Open Software Foundation, Inc.* states that it is "technically" possible to establish adverse effects through a combination of "a sufficiently high risk of an anticompetitive effect, coupled with marginal benefits."  152 F.3d 48, 53 (1st Cir. 1998) (emphasis omitted).  This is not a materially different standard than the one articulated in *New Motor Vehicles*, *American Steel Erectors*, and similar cases, because the conditions that would establish the "sufficiently high risk" referenced in *Addamax* would likely permit an inference of "real and immediate" adverse effects as well.  In any event, there is no basis in the present record to find that the NEA has only "marginal benefits" to competition or that any adverse effects are "real and immediate" such that the *Addamax dicta* might apply.

anticompetitive nature of the defendant's behavior or the structure of the interbrand market.")). Both factors must be proven for an inference of adverse effects to arise, since "[w]ithout market power, a firm cannot have an adverse effect on competition," *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 988 (6th Cir. 2001) (alteration in original), and "[a] finding of the absence of harm" on any basis "makes it unnecessary to reach the issue of market power," *Lucas v. Citizens Commc'ns Co.*, 409 F. Supp. 2d 1206, 1220 (D. Haw. 2005), *aff'd*, 244 F. App'x 774 (9th Cir. 2007).

### A.   Plaintiffs Have Offered No Direct Evidence Of Anticompetitive Effects

13.   Plaintiffs presented no direct evidence at trial that the NEA has caused or is causing actual adverse effects to consumers.  In fact, Plaintiffs, through their witnesses, argued that *it is not possible to tell* whether the NEA has harmed consumers because (1) the effects of the COVID-19 pandemic on the industry make it too difficult to measure,[5] (2) the fact of the litigation means the implementation of the NEA and its actual effects must be ignored because the defendants may be refraining from anticompetitive behavior due to this litigation and are likely to change tact in the event that the Court finds against Plaintiffs,[6] and (3) the NEA has only been partially implemented.[7]

14.   Plaintiffs' arguments cannot substitute for direct evidence of actual adverse effects from a collaboration that had been underway for 18 months at the commencement of trial. Regardless, there is no evidence supporting these arguments.

---

[5] *See* Defs.' Post-Trial Findings of Fact ("FoF") ¶¶ 456–59.

[6] *See* ECF No. 160 at 36-37; *see also* FoF ¶¶ 460–64.

[7] *See* FoF ¶¶ 465–67.

15.     In the first place, economists can and regularly do model the competitive effects of transactions while controlling for various "confounding" factors.  Both of Plaintiffs' experts have written on retrospective analyses of mergers, using real world data, even though those mergers occurred during or in the wake of recessions, terrorist attacks, and other "shocks" to the industry.[8] In fact, Defendants' economic experts modeled the actual effects of the NEA, accounting for the impact of COVID, and the actual data reflects that the NEA has had no negative effects and a strongly net positive effect on consumers.[9]

16.     Regarding the effect of litigation risk, Plaintiffs' argument is entirely theoretical and accompanied by no evidence that Defendants are presently refraining from activities that would raise anticompetitive concerns.

17.     Furthermore, the cases Plaintiffs cite on this issue—*United States v. General Dynamics Corp.*, 415 U.S. 486, 504–05 (1974); *Hospital Corporation of America v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986); *Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410, 435 (5th Cir. 2008)—are merger cases and are therefore inapposite.[10]  Courts are properly wary that parties to a merger might refrain from anticompetitive behavior for a short period of time until the legality of the merger is determined because, due to the impracticality of unwinding a merger, the litigation risk ends if a court finds the merger lawful.

18.     However, the legal risk that Defendants are undertaking related to the NEA will never end because the NEA will forever remain subject to the antitrust laws.  The Court's decision does not give American and JetBlue *carte blanche* to operate the NEA with legal impunity.  If the

---

[8] *See id.* ¶ 457.

[9] *See id.* ¶¶ 376–85.

[10] *See* ECF No. 160 at 37.

NEA causes harm in the future, the Department of Justice ("DOJ") or private plaintiffs could bring a Section 1 claim at that time.[11]  *See Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 525 F.2d 630, 639 (D.C. Cir. 1976) ("[T]here will be ample opportunity to challenge anticompetitive effects as the time approaches when they will be felt, and the extent of the impact on competition becomes more readily assessable.  The Justice Department no doubt will make a continuing assessment.").  Nor is the evidence of the NEA's lack of harm subject to manipulation, which was the reason the courts in the cases Plaintiffs cite discounted the post-merger evidence.  Here, the NEA's pro-consumer results are consistent with, and corroborated by, the way that American's and JetBlue's competitors view the NEA.[12]

19.     Moreover, Defendants remain under settlement obligations with the U.S. Department of Transportation ("DOT"), including growth obligations.[13]  Failure to meet those growth obligations will result in actual effects, in the form of slot divestitures to third-party airlines.[14]

20.     As for Plaintiffs' argument that the effects of the NEA cannot be analyzed due to the NEA's partial implementation, that position, if anything, suggests that the observed effects of the NEA are *conservative* estimates of the NEA's actual effects, and thus the procompetitive effects of the NEA will be larger than those currently estimated.[15]

---

[11] At best, Plaintiffs' inability to discern harm because of COVID, litigation risk, and partial implementation indicates that Plaintiffs have prematurely brought a challenge, and Defendants therefore prevail on the present record.

[12] *See* FoF ¶¶ 239–46.

[13] *See id.* ¶¶ 206–07, 211–12.

[14] *See id.* ¶ 208.

[15] *See id.* ¶¶ 465–67.

21.     Plaintiffs cannot meet their initial burden under the direct evidence method through theoretical evidence and models, and with no analysis of the NEA's actual competitive effects to date.  *See Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001) (affirming insufficient showing of anticompetitive harm, and noting that "expert testimony rooted in hypothetical assumptions cannot substitute for actual market data" (citing *Brooke*, 509 U.S. at 242)); *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 662 (8th Cir. 2000) (insufficient showing of anticompetitive effects where plaintiff failed to provide "concrete evidence" of "increased prices for anesthesia services, or a decline in either the quality or quantity of such services"); *Tops Mkts.*, 142 F.3d at 96 (evidence of "*potentially* higher prices" without proof that "prices were *actually* higher" is insufficient to show anticompetitive effects (emphasis in original)); *Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 848 (9th Cir. 1996) (no antitrust injury where the plaintiff merely "speculated that it could provide direct evidence of injury to competition in the future"); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994) ("Speculation about anticompetitive effects is not enough," and a plaintiff must "show that the [restraint] as it actually operated in the market" harmed competition."); *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 689 (8th Cir. 1993) (insufficient showing of anticompetitive effects where expert testimony "addresse[d] only the possibility" of harm as opposed to demonstrating "actual detrimental effects to competition"); *Mil. Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.*, 823 F.2d 829, 832 (4th Cir. 1987) (same where the plaintiff's expert "based his conclusion [of adverse effects] on general economic theory and did not conduct any market surveys or other studies of the relevant market to determine the actual effect the [defendants] had on competition"); *Procaps*, 141 F. Supp. 3d at 1267 (dismissing case for lack of sufficient anticompetitive effects, and noting that "predictions and speculation and possible effects are insufficient to show the

required actual detrimental effects"), *aff'd*, 845 F.3d at 1076 (affirming summary judgment for lack of actual anticompetitive effects because "both this Court and our sister circuits have continued to require some empirical evidence of actual effects"); *McLaughlin Equip. v. Servaas*, No. IP98-0127-C-T/K, 2004 WL 1629603, at *29 (S.D. Ind. Feb. 18, 2004) (evidence establishing only that prices *may* increase, as opposed to establishing that prices actually *have* increased, is insufficient to establish an adverse effect on competition).

22.    In sum, Plaintiffs have not produced any direct evidence showing that the NEA has caused anticompetitive effects.

**B.    Plaintiffs Have Not Proffered Sufficient Indirect Evidence Of Anticompetitive Effects**

23.    To the extent Plaintiffs attempt to prove anticompetitive effects "indirectly" by showing that firms with market power are engaging in conduct that predictably harms the competitive process, that attempt likewise fails.

24.    To begin, while it is "technically" possible to satisfy this burden through indirect evidence of market power and the likelihood of harm, *see Addamax*, 152 F.3d at 53, the Court is unaware of any case in which a joint venture like the NEA was condemned based solely on predicting adverse effects with indirect proof, *see MacDermid*, 833 F.3d at 183 ("[I]n no precedential opinion in [the Second] Circuit has a plaintiff successfully proved an adverse effect on competition without offering evidence of changed prices, output, or quality.").  This likely explains why Plaintiffs try to convince the Court to view the NEA as a merger and to "evaluate the collaboration using analytical tools from merger analysis."[16]

---

[16] ECF No. 1 ¶ 48; *see also* ECF No. 160 at 18 (describing the NEA as an "effective merger").

25.     But the NEA is *not* a merger, nor is it even akin to a merger.  It is an output-expanding joint venture of a type that ordinarily receives ample latitude to operate under the law. *See Alston*, 141 S. Ct. at 2155 ("There's no question . . . that many 'joint ventures are calculated to enable firms to do something more cheaply or better than they did it before,'" and "the fact that joint ventures can have such procompetitive benefits surely stands as a caution against condemning their arrangements too reflexively." (quoting Areeda & Hovenkamp, ¶ 2100c)); *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 724 (6th Cir. 2019) (noting that "joint ventures often have procompetitive efficiencies"); Areeda & Hovenkamp, ¶ 2100g (joint ventures are "presumptively lawful," and that "antitrust's duty is only to 'disapprove' those provisions [of a joint venture agreement] that seem, on balance, to produce greater competitive harms than efficiency gains"); *Antitrust Guidelines for Collaborations Among Competitors* at 1 (noting that joint ventures "often are not only benign but procompetitive").  The NEA falls squarely within the First Circuit's observation in *Addamax* that, "as a practical matter, most courts would be unlikely to condemn an otherwise legitimate joint venture absent some showing of anticompetitive effect." 152 F.3d at 53.

### 1.     Plaintiffs Have Not Adequately Shown That Defendants Have Market Power In A Relevant Market

26.     Plaintiffs have failed to prove market power, without which there can be no inference of adverse effects.  *See Ezzo's Invs.*, 243 F.3d at 988; *see also Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F. 2d 185, 191 (7th Cir. 1985) ("Unless the firms have the power to raise price by curtailing output, their agreement is unlikely to harm consumers and it makes sense to understand their cooperation as benign or beneficial."); Areeda & Hovenkamp, ¶ 1507a (If "the exercise of market power is not plausible, the challenged practice is legal").

27.     "Market power can be shown through two types of proof.  A plaintiff can either show direct evidence of market power (perhaps by showing actual supracompetitive prices and restricted output) or circumstantial evidence of market power.  Market power may be proved circumstantially by showing that the defendant has a dominant share in a well-defined relevant market and that there are significant barriers to entry in that market and that existing competitors lack the capacity to increase their output in the short run."  *Car oastal Fuels*, 79 F.3d at 196–97 (internal citations omitted).

28.     Plaintiffs' purported proof of market power reflects their approach of treating the NEA as if it were a merger.  They offer statistical evidence that merely sums and squares the market shares of American and JetBlue,[17] as if they had merged.[18]  But, in the context of a joint venture, market power cannot be proven that way; "the competitive threat [from a joint venture] does not result from a reduction in the number of market participants—or indeed from any measurable increase in market concentration at all," so "concentration indexes such as the HHI . . . are of less utility."  Areeda & Hovenkamp, ¶ 2122b; *see Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 220 (D.C. Cir. 1986) (explaining that merger standards were developed for and "apply to mergers between firms that ordinarily have no internal competition[,] . . . [not] firms that are merely limiting internal competition and are not merging"); *see also United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 170 (1964) (noting that a joint venture is not "controlled by the same criteria as the merger or conglomeration" because "[t]he merger eliminates one of the participating corporations from the market while a joint venture creates a new competitive force

---

[17] In merger cases, market concentration is often measured by the Herfindahl–Hirschman Index ("HHI"), which is "calculated by summing the squares of the individual firms' market shares." *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 346 (3d Cir. 2016).

[18] *See* ECF No. 160 at 23–24.

therein").  The Court therefore assigns little weight to Plaintiffs' evidence of combined market shares and HHIs.

29.     Instead, the Court focuses on whether Plaintiffs have proven that, on account of the NEA, Defendants have the ability to raise prices above competitive levels by restricting output for a substantial period of time.  *See Am. Express*, 138 S. Ct. at 2288.

30.     Importantly, "[s]ubstantial market power can persist only when there are significant and continuing barriers to expansion and entry."  Areeda & Hovenkamp, ¶ 506d; *see Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) (noting that "[a] mere showing of substantial or even dominant market share alone cannot establish market power," and "[t]he plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price").

31.     Therefore, the key question is whether it is reasonable to conclude, based on the record evidence, that American and JetBlue could profitably and persistently restrict output on NEA routes notwithstanding the likely responses of rival airlines.  The Court finds that this is not a reasonable conclusion and that Defendants therefore lack sufficient market power in the relevant market.

### a.     *Relevant Product and Geographic Markets*

32.     The first and foundational step in assessing market power is defining the relevant product and geographic markets.  *See Am. Express*, 138 S. Ct. at 2285 ("Courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market.  Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." (cleaned up)).

33.     There is no dispute that "scheduled air passenger service" is the relevant product market.[19]  While there is evidence that other methods of transportation compete with "scheduled air passenger service" on some routes—for example, commuter train service between certain cities—neither Plaintiffs nor Defendants contend that such evidence affects any issue in this case.[20]

34.     With one prominent exception, there is also no dispute regarding the relevant geographic markets.  They are "origin and destination pairs" associated with the NEA, and ordinarily "city pairs" that, at each end of a route, aggregate airports that reasonably serve the city in question.[21]  *Cf. Malaney v. UAL Corp.*, 434 F. App'x 620, 621 (9th Cir. 2011) ("The city-pair market has [ ] been endorsed as the most appropriate market for antitrust analysis by all academics and government agencies in the record, including the Department of Justice . . . ."); *In re AMR Corp.*, 625 B.R. 215, 247 (Bankr. S.D.N.Y. 2021) (concluding, in a private challenge to the merger of US Airways and American Airlines, that "city-pairs constitute the 'proper geographic market'"). For example, "Los Angeles" includes not only Los Angeles International Airport, but also nearby airports at Burbank and Long Beach.  Similarly, "Miami" includes not only Miami International Airport, but also Ft. Lauderdale-Hollywood International Airport, approximately 30 miles away.

35.     The sole market definition dispute in this case concerns Plaintiffs' exclusion of Newark Liberty Airport ("EWR")—where United Airlines ("United") maintains its New York hub—from their New York market definition.[22]  Plaintiffs argue that the New York endpoints for service between New York and other U.S. cities should be only LaGuardia Airport ("LGA") and

---

[19] *See id.* at 19–20.

[20] *See id.*; *see generally* ECF No. 162.

[21] *See* ECF No. 160 at 20–22; *see generally* ECF No. 162.

[22] *See* ECF No. 160 at 20–22.

John F. Kennedy International Airport ("JFK").[23]   This is, in substance, an argument that competition from United and other airlines operating from EWR is not a meaningful competitive constraint on the NEA carriers, who mostly (though not exclusively) serve New York from LGA and JFK.  The Court disagrees.

36.     The geographic market in an antitrust case is "the 'area of effective competition . . . in which the seller operates, and to which the purchaser *can practicably turn* for supplies." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963) (emphasis modified) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)); *see Penn State Hershey Med. Ctr.*, 838 F.3d at 338 ("The relevant geographic market is that area in which a potential buyer may rationally look for the goods or services he seeks." (internal quotations omitted)).

37.     In nearly all cases, the geographic market includes the suppliers to which consumers *already* turn (before considering the additional substitution that may result from the exercise of market power).  *See, e.g.*, *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1050, 1053–54 (8th Cir. 1999) (proposed geographic market rejected where patients already procured services outside that region); *United States v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121, 141–42 (E.D.N.Y. 1997) (finding distinct geographic markets for primary, secondary, and tertiary care services based on choices patients made with regard to each).

38.     Plaintiffs' expert, Dr. Nathan Miller, acknowledged that the geographic market definition principles from the DOJ and Federal Trade Commission's *Horizontal Merger Guidelines* that apply to this case are those found in Section 4.2.1, titled "Geographic Markets Based on the Locations of Suppliers."[24]  DOJ & FTC, *Horizontal Merger Guidelines* § 4.2.1 (Aug.

---

[23] *See id.*

[24] *See* FoF ¶ 373.

16

19, 2010), https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf.   The

*Horizontal Merger Guidelines* state that such markets "encompass the region from which sales are

made" and "[c]ompetitors in the market are firms with relevant production, sales, or service

facilities in that region."  *Id.*  The *Horizontal Merger Guidelines* further state that sales made by

suppliers in the region are counted toward market shares "regardless of the location of the customer

making the purchase."  *Id*.  That is, the location of the *customer* does not limit the scope of a

*Horizontal Merger Guidelines* market "Based on the Locations of Suppliers."[25]

39.    Applying these principles to the record, it is clear that service to and from EWR

must be included in the New York market endpoints.

40.    First, there is no doubt that flights operating from EWR, on the one hand, and LGA

and JFK, on the other hand, are in active competition with one another.  Several witnesses

addressing this issue (live or by deposition) from American, JetBlue, United, and Alaska Airlines

("Alaska") testified to that effect, and internal documents from Delta Air Lines ("Delta") and

Southwest Airlines ("Southwest") show that those airlines consider EWR to be part of the New

York market.[26]

41.    The service patterns evident in data from OAG, a global travel data provider,

confirm that, for nearly every significant domestic route serviced by one or more JFK-based

airlines, there are EWR alternatives.[27]  In fact, Dr. Miller conceded that consumers could chose—

---

[25] The *Horizontal Merger Guidelines* have an altogether different geographic market definition test for the circumstance "[w]hen the hypothetical monopolist could discriminate based on customer location," § 4.2.2, but Dr. Miller admitted that is not applicable, *see* Tr. Day 11 (Miller) at 39:5–39:22.

[26] *See* FoF ¶¶ 338–40.

[27] *See id.* ¶ 327.

and that many *do* choose—United's services to and from EWR over others' JFK services.[28]  Ticket search functions on any airline website or online travel agency include EWR, LGA, and JFK as a unified search term for New York City.[29]

42.     The DOT has routinely analyzed airline service in the New York City metropolitan area using this three-airport system.  Every quarter, the DOT issues a "Domestic Airline Fares Consumer Report" to assist travelers in making informed decision by compiling and disseminating information about market shares, average fares, and so on.  In those reports, EWR is considered part of the New York City market.[30]  Most recently, the DOT awarded takeoff and landing rights at EWR to Spirit Airlines ("Spirit"), rather than JetBlue, based on an analysis of New York area competition that emphasized JetBlue's enhanced position at LGA and JFK because of the slots it obtains through the NEA.[31]

43.     It is notable that many of the New York nonstop overlap markets that Plaintiffs emphasize are to and from cities outside of the 1500-mile "perimeter" for flying from LGA[32]— namely Los Angeles, San Francisco, Phoenix, Las Vegas, Austin and San Diego.[33]  For travelers between New York and those cities, JFK and EWR offer the only options for nonstop travel and are therefore clearly the reasonable substitutes.[34]

---

[28] *See id.* ¶ 326.

[29] *See id.* ¶ 336.

[30] *See* FoF ¶ 337.

[31] *See id.*

[32] The "perimeter rule" limits the destinations from which an airline may schedule flights from LaGuardia to a distance of 1,500 miles (with a grandfather clause permitting flying to Denver). *See id.* ¶ 88.

[33] *See* ECF No. 160 at 28.

[34] *See* FoF ¶ 329.

44.     An important factor binding EWR and JFK in the same market is that Manhattan—roughly equidistant to both airports—is the focal point of demand for both inbound and outbound travel to New York City.[35]   As the global financial capital of the world, the headquarters of numerous major corporations, and an important tourist destination, Manhattan is the principal destination of inbound traffic.[36]   With regard to outbound traffic, Manhattan is the single most densely populated area in the United States, with a population of 1.7 million that swells to approximately 4 million with the influx of commuters.[37]

45.     Manhattan feeds a high volume of traffic to all three New York City airports. Specifically, data produced by the Port Authority of New York and New Jersey shows that Manhattan is the single largest source (by county) of travelers at EWR.[38]

46.     Data showing travel in taxis and for-hire vehicles (for example, Uber and Lyft) to airports similarly shows that travelers living or spending time in Manhattan rely on all three New York City airports.[39]

47.     Including EWR in the relevant markets is also required by the principle that the relevant geographic market is "the place where the effect of the [conduct] on competition will be direct and immediate" and it "includes the [location of] competitors that discipline . . . [Defendants'] prices." *FTC v. Advocate Health Care Network*, 841 F.3d 460, 476 (7th Cir. 2016) (internal quotations omitted).

---

[35] *See* FoF ¶ 3331.

[36] *See id.* ¶ 332.

[37] *See id.* ¶ 333.

[38] *See id.* ¶ 334.

[39] *See id.* ¶ 335.

48.     Here, on the one hand, the NEA is part of a competitive strategy directed at improving the Parties' competitive position in Boston and against the two New York hub carriers, one of which is United, with its extensive EWR operations.[40]  The NEA will have a "direct and immediate" effect on competition with United.  *See id.*  On the other hand, United's EWR hub is unquestionably a force that has the potential to "discipline . . . [Defendants'] prices."  *See id.*  As Dr. Israel explained, "the defining feature of New York . . . is that it has competition between strong hub carriers."[41]

49.     Against all of this evidence, Plaintiffs' expert, Dr. Miller, argues for a LGA/JFK-only market based on (1) evidence that some New Yorkers "prefer" those airports to EWR, and (2) his erroneous application of the Hypothetical Monopolist Test ("HMT").[42]

50.     It may be presumed that, all else equal, consumers would prefer to travel from more convenient rather than less convenient airports.  Nevertheless, the Court cannot define the relevant market based on consumer preferences of this type.  "The critical question is where can consumers of the product involved practically turn for alternative sources of the product should the [transaction] be consummated and . . . prices increase."  *Long Island Jewish Med. Ctr.*, 983 F. Supp. at 140; *see also Booz Allen Hamilton*, 2022 WL 9976035, at *12 (noting that 'preference[s] alone' cannot justify excluding other reasonably interchangeable companies from the relevant

---

[40] *See id.* ¶¶ 128–34.

[41] Tr. Day 13 (Israel) at 118:14–118:16; *see also id.* at 118:19–118:22 ("[F]or the question of . . . who's in the market in New York, . . . given the way airline competition works . . . , you just can't leave out United's hub in Newark.").

[42] *See* FoF ¶¶ 355–75.  The HMT is a method used to determine the relevant geographic market. *See Penn State Hershey Med. Ctr.*, 838 F.3d at 338.  Per the HMT, "if a hypothetical monopolist could impose a small but significant non-transitory increase in price ('SSNIP')"—usually defined as a 5 percent increase—"in the proposed market, the market is properly defined."  *Id.* at 338 & n.1.

market definition" (alteration in original) (quoting *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) (en banc))).  As noted, the case law consistently finds that the suppliers to which consumers presently turn (at least in significant numbers) are in the market, because they would probably also turn to those suppliers to defeat an attempted exercise of market power.

51.     There could be a *broader* group of suppliers to which consumers would turn "to *avoid* doing business" with airlines that tried to increase fares on LGA and JFK flights.  *See Bathke v. Casey's Gen. Stores*, 64 F.3d 340, 346 (8th Cir. 1995) (emphasis in original) (quoting Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice* § 3.6d (1994))).  But the market cannot be *narrower* based on the preferences of some consumers.  New Yorkers who would never fly out of EWR are still protected by the competition that United and other airlines offer from EWR because of the much larger group of consumers (inbound and outbound) who are indifferent and therefore force airlines to act competitively.  *See United States v. Engelhard Corp.*, 126 F.3d 1302, 1306 (11th Cir. 1997) ("[I]t is possible for only a few customers who switch to alternatives to make the price increase unprofitable, thereby protecting a larger number of customers who would have acquiesced [to] higher [ ] prices.").

52.     The Court is also unpersuaded by Dr. Miller's efforts to connect his market definition argument to the *Horizontal Merger Guidelines* and the HMT.[43]  Courts have, on occasion, accepted a properly conducted HMT as a tool that may aid in the market definition inquiry.  *See Coastal Fuels*, 79 F.3d at 198.  However, as noted in a recent case, while the HMT plays an "important role" in some antitrust cases, "the process of identifying the relevant geographic market must conform to the economic realities of the industry to recognize competition where competition exists."  *United States v. U.S. Sugar Corp.*, No. CV 21-1644 (MN), 2022 WL

---

[43] *See* FoF ¶¶ 363–64.

4544025, at *25 (D. Del. Sept. 28, 2022); *see Oksanen*, 945 F.2d at 709 (stating that it is a "fundamental tenet of antitrust law that the relevant market definition must encompass the realities of competition" (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 572–73 (1966))).

53.     Hence, it is not proper to use a HMT to negate competition that stands to constrain the exercise of market power.  Indeed, in the *Horizontal Merger Guidelines*, the HMT is just one component of a multifaceted inquiry into the relevant markets.  *See, e.g.*, *Horizontal Merger Guidelines* § 4.2.1 ("In considering likely reactions of customers to price increases for the relevant product(s) imposed in a candidate geographic market, the Agencies consider any reasonably available and reliable evidence . . . .").

54.     The Court is also not persuaded that Dr. Miller has conducted HMTs as envisioned by the *Horizontal Merger Guidelines*.  Dr. Miller's 737 MAX exercise—whereby Dr. Miller analyzed airlines' responses to the Boeing 737 MAX grounding in March 2019 and concluded that this event "led to a reduction in capacity in many candidate markets with an endpoint in NYC (JFK and LaGuardia)"[44]— is not a HMT.  One of the core principles of the HMT is that "the terms of sale for all products produced elsewhere [must be] held constant."  *Id.* § 4.2.1.  Dr. Miller's 737 MAX exercise does not hold the terms of other products constant; it is simply an observation that an unexpected supply shock led to higher fares.  Critically, the 737 MAX was grounded *everywhere*, leading to similar fare increases at EWR, where Southwest—the largest U.S. operator of the 737 MAX—operated at the time.[45]  This was not (and could not have been) a test of whether diversion to EWR constrained LGA and JFK fares.

---

[44] FoF ¶ 366.

[45] *See id.* ¶¶ 365–67.

55.     Dr. Miller's merger simulation—in which Dr. Miller simulated a merger of all of the services at JFK and LGA and asked whether prices increase by 5–10 percent as a result[46]—is not a proper HMT test, either.  No part of that exercise assumes a price increase (*i.e.*, the SSNIP) and studies whether substitution to EWR flights specifically would render that price increase unprofitable.  *See Booz Allen Hamilton*, 2022 WL 9976035, at *13 (noting that "if consumers respond to the SSNIP in a way that makes the SSNIP unprofitable, the proposed market definition is too narrow," and rejecting the plaintiff's expert's use of the HMT because he "never analyzed the *profitability* of any rate increase by a hypothetical monopolist in the proposed market" (emphasis in original)).  Dr. Miller is simply arguing that, according to his model, a merger of every airline operating at LGA and JFK would result in a SSNIP.[47]  But as Dr. Israel demonstrated, a merger of every airline operating at any single New York airport, or any combination of New York airports, leads to the same result.[48]  The HMT in this application reveals that every possible New York market definition is right and none is wrong.  As in *U.S. Sugar Corp.*, 2022 WL 4544025, at *25, and *Booz Allen Hamilton*, 2022 WL 9976035, at *13, the Court finds Dr. Miller's application of the HMT unilluminating in that circumstance.

56.     Accordingly, the relevant geographic market for assessing the competitive effects of the NEA on travelers to and from New York includes services offered from EWR with those offered at JFK and LGA.

---

[46] *See id.* ¶ 368.

[47] *See id.* ¶¶ 368–69.

[48] *See id.*

b.   *New York*

57.   JetBlue and American lack market power in New York.  Air passenger service to and from New York is dominated by Delta and United, both of which operate domestic and international hubs from the city.[49]  There are only three New York routes (to and from Nantucket, Martha's Vineyard, and Phoenix) for which the Parties provide more than half of the current airline capacity.[50]  On the typical New York route, Delta and United are the leading carriers by a substantial margin.  Dr. Israel's summary of New York overlaps (Figure 1 below) is instructive:

**Figure 1: New York City Overlaps[51]**

| New York City Nonstop Overlaps | | | | |
| --- | --- | --- | --- | --- |
| NUMBER OF OTHER CARRIERS ON THE ROUTE | DOMESTIC | | INTERNATIONAL | |
| | Number of Routes | Share Out Of Total Passengers on Nonstop Routes | Number of Routes | Share Out Of Total Passengers on Nonstop Routes |
| No Other Carriers | 0 | 0% | 0 | 0% |
| 1 Other Carrier | 2 | 0% | 1 | 1% |
| 2 Other Carriers | 6 | 11% | 3 | 6% |
| 3 Other Carriers | 11 | 50% | 2 | 8% |
| 4+ Other Carriers | 1 | 2% | 1 | 1% |
| Non-Overlap Nonstops | 54 | 37% | 32 | 85% |

Notes: (1) Nonstop overlaps are routes where both American and JetBlue had at least 52 nondirectional departures in 2019; (2) Carriers are adjusted for merger events; (3) A carrier is considered a nonstop competitor if they have at least 5% passenger share on the route; (4) NYC includes LGA, JFK, and EWR

Sources: Domestic O&D Survey Data; Sabre MIDT Data; Domestic and International T100 Segment Data.   10

58.   Hence, on the larger, heavily-trafficked routes, American and JetBlue always face a strong competitive constraint, particularly from the two hub carriers in New York.  There is no

---

[49] *See id.* ¶¶ 67–71.

[50] *See id.* ¶ 99.

[51] *See* Israel Demonstratives at 10.

basis to find or presume that a collaboration like the NEA, which preserves competition in many ways, is anticompetitive in such markets.

59.    If nothing else, the fact that American and JetBlue are in competition with two hub carriers in New York makes a claim of market power implausible.  *See* Areeda & Hovenkamp, ¶ 1507a (If "the exercise of market power is not plausible, the challenged practice is legal").  As Dr. Israel explained, airline economists are typically concerned with *hub carriers* (in this case, Delta and United) exercising market power, not the airlines *competing with hub carriers* (American and JetBlue, among others) because it is the hub carriers that have substantial competitive advantages on any route associated with their hubs.[52]

60.    Plaintiffs and Dr. Miller largely ignore the competitive constraint from Delta and United's New York hubs, expressing only general "concern about whether . . . entry or repositioning [ ] would ameliorate harm."[53]  This is insufficient to carry Plaintiffs' burden to prove market power, which "can persist only when there are significant and continuing barriers to expansion and entry."  Areeda & Hovenkamp, ¶ 506d.  As Dr. Israel explained, given their large asset holdings, Delta and United have enormous flexibility in their New York operations to respond in the event American or JetBlue were to cut capacity or raise prices.[54]

### c.    *Boston*

61.    Nor do JetBlue and American have market power in Boston.  Plaintiffs focus their attention on (and predict most adverse effects from) just 12 nonstop overlaps with Boston

---

[52] *See* FoF ¶¶ 97–98.

[53] Tr. Day 17 (Miller) at 92:1–93:9.

[54] *See* Tr. Day 14 (Israel) at 191:23–192:16 ("When you have very large networks, that's why hub carriers are strong.  They have lots of flexibility.  They have lots of levers to pull to respond to the spokes in their network.").

endpoints.[55]  Half of those routes are carved out of the revenue-sharing and capacity coordination provisions of the NEA, which are the only features of the NEA on which Plaintiffs rely to support the use of a merger simulation to predict fare increases.[56]  Three of the remaining six routes are highly trafficked, competitive routes:  Boston-Miami, Boston-Los Angeles, and Boston-Chicago.[57]

62.     In addition, there are only three Boston routes—two of which are referenced above (Miami and Los Angeles), as well as Ronald Reagan Washington National Airport ("DCA")—for which the parties (a) share revenue and coordinate scheduling, and (b) provide more than half of the current airline capacity.[58]

63.     Meanwhile, Delta offers competing nonstop service from Boston to DCA (and United offers competing service to Washington Dulles International Airport); Southwest, Spirit, and Delta offer competing nonstop service from Boston to Miami; and Delta, United, and Alaska offer competing nonstop service from Boston to Los Angeles.[59]

64.     Two of the remaining Boston nonstop overlap routes—Rochester and Syracuse, both of which are carve-outs—are small routes that are overlaps only because JetBlue serves them to park aircraft overnight so they can be brought back to Boston early in the morning for their primary missions.[60]

---

[55] *See* FoF ¶ 446.

[56] *See id.*

[57] *See id.*

[58] *See id.*

[59] *See id.* ¶ 447.

[60] *See id.* ¶¶ 163, 448.

65.    Eighty-six percent of the Parties' nonstop 2019 flights to and from Boston did not even overlap.[61]  As shown in Figure 2 below, Dr. Israel presented an analysis of the overall degree of competition between American and JetBlue in Boston that shows that the vast majority of travelers are not dependent on any competition between American and JetBlue.

**Figure 2:  Boston Nonstop Overlaps[62]**

| | DOMESTIC | | INTERNATIONAL | |
| NUMBER OF OTHER CARRIERS ON THE ROUTE | Number of Routes | Share Out Of Total Passengers on Nonstop Routes | Number of Routes | Share Out Of Total Passengers on Nonstop Routes |
|---|---|---|---|---|
| **Carveout Routes** | | | | |
| No Other Carriers | 1 | 2% | - | - |
| 1 Other Carrier | 4 | 6% | - | - |
| 2 Other Carriers | 1 | 3% | - | - |
| **Non-Carveout Routes** | | | | |
| No Other Carriers | 0 | 0% | 0 | 0% |
| 1 Other Carrier | 1 | 6% | 0 | 0% |
| 2 Other Carriers | 3 | 18% | 0 | 0% |
| 3 Other Carriers | 1 | 6% | 1 | 14% |
| 4+ Other Carriers | 0 | 0% | 0 | 0% |
| **Non-Overlap Nonstops** | 36 | 60% | 16 | 86% |

Notes: [1] Nonstop overlaps are routes where both American and JetBlue had at least 52 nondirectional departures in 2019; [2] Carriers are adjusted for merger events; [3] A carrier is considered a nonstop competitor if they have at least 5% passenger share on the route; [4] For BOS-DCA, only 2019 Q4 data are included in this analysis.

Sources: Domestic O&D Survey Data; Sabre MIDT Data; Domestic and International T100 Segment Data.                                    12

66.    There is no basis for the Court to find on the present record that American and JetBlue have market power on Boston routes generally or on most of the nonstop overlap routes. The parties carved out certain Boston routes (mostly to American hubs) from network optimization and revenue sharing to address competitive concerns DOJ raised during its investigation of the NEA.  There is no reason to think , and no evidence has been presented, that the NEA adversely impacts competition on the carve-out routes.  More broadly, the vast majority of travelers have

---

[61] *See id.* ¶ 449.

[62] *See* Israel Demonstratives at 12.

strong non-NEA options, particularly from Delta.  American and JetBlue do not have the freedom from expansion by rivals to make the exercise of market power a realistic and profitable endeavor.

### 2. Plaintiffs Have Not Adequately Shown That Defendants Are Engaging In Any Practice That Has A High Likelihood Of Harming Competition

#### a. *The NEA Is Not A Merger, And Its Likely Competitive Effects Are Not Captured By Dr. Miller's Merger Simulation*

67.     The heart of Plaintiffs' indirect proof case is their effort to characterize the NEA an "effective merger."[63]  That is, Plaintiffs have not put on a case targeted at particular features of the NEA that they claim are not justified (for example, revenue sharing).  Instead, they argue that, when all of the features of the NEA are taken together and the parts that preserve each airline's independence and reward growth are ignored, the NEA creates incentives for the carriers to behave as if they have merged.

68.     However, the actual structure of the NEA is not that of a merger.  The record demonstrates that the NEA is a limited joint venture that is finite in scope and duration, with each carrier maintaining separate management, no permanent transfer of assets, two distinct fleets and fleet plans, independent brands and business models, and, crucially, no coordination on *any* pricing.[64]

69.     Further, as discussed above, the scope of collaboration between American and JetBlue is further limited because multiple routes have been carved out of schedule optimization and revenue sharing in the NEA, further demonstrating the inaptness of a merger analysis.[65] Plaintiffs cannot disregard these contractual commitments or assume that they will be breached or

---

[63] *See* ECF No. 160 at 18.

[64] *See* FoF ¶¶ 213–18.

[65] *See supra* pp. 25–26.

change.  *See United States v. UnitedHealth Grp. Inc.*, No. 1:22-CV-0481 (CJN), 2022 WL 4365867, at *16 (D.D.C. Sept. 21, 2022) (finding it unlikely that a party to a proposed acquisition would, after the acquisition was consummated, "intentionally violate or repeal longstanding [ ] policies; flout existing contractual commitments; and sacrifice significant financial and reputational interests"); *id.* at *20 (noting that "firewalls are an industry standard means of protecting [competitively sensitive information] in the vertically integrated healthcare space"); *Antitrust Guidelines for Collaborations Among Competitors* at 21 ("In general, it is less likely that the collaboration will facilitate collusion on competitively sensitive variables if appropriate safeguards governing information sharing are in place.").

70.     Mergers, by definition, eliminate all existing competition between the merging parties.  Joint ventures, on the other hand, hold the promise of "creat[ing] a new competitive force." *Penn-Olin Chem. Co.*, 378 U.S. at 170.  Thus, when evaluating the competitive effects of a joint venture, it is essential to account for the degree to which the collaboration, by its terms, merely limits competition, or conversely preserves competition—considerations that are lost by uncritically applying merger analysis.  *See Rothery*, 792 F.2d at 220 (explaining that merger standards were developed for and "apply to mergers between firms that ordinarily have no internal competition[,] . . . [not] firms that are merely limiting internal competition and are not merging"); *see also SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir. 1994) ("Joint ventures . . . differ from mergers in a critical way: because they are less integrated than mergers, *they allow their partners to continue to compete with each other in the relevant market*." (emphasis in original) (quoting Thomas A. Piraino, Jr., *Beyond Per Se, Rule of Reason or Merger Analysis: A New Antitrust Standard for Joint Ventures*, 76 MINN. L. REV. 1, 7 (1991))).  Indeed, the DOJ's *Antitrust Guidelines for Collaborations Among Competitors* recognize this.  *See Antitrust*

*Guidelines for Collaborations Among Competitors* at 5 ("Most mergers completely end competition between the merging parties in the relevant market(s).  By contrast, most competitor collaborations preserve some form of competition among the participants. . . .  The potential for future competition between participants in a collaboration requires antitrust scrutiny different from that required for mergers.").  Unlike a merger, the NEA preserves some competition on routes to and from the NEA airports.[66]  Thus, the NEA should not be treated like a merger.

71.    Because the Court finds that it is improper to evaluate the NEA like a merger, the Court finds that Dr. Miller's use of a merger simulation model to evaluate the NEA is also improper.  Plaintiffs have cited neither economic literature nor judicial precedent for the use of a *merger* simulation in estimating the effects of a *collaboration*, such as the NEA.  Dr. Miller nevertheless argues that, because Defendants share revenues (but not profits), they will "behave" as if merged, meaning they will find it mutually beneficial to maximize "joint" rather than unilateral profits.[67]  This is circular reasoning: an *assumption* of merger-like behavior justifying the *conclusion* that a merger simulation is appropriate.  Dr. Miller explicitly disregards the unilateral incentives for capacity expansion that the Parties wrote into the Mutual Growth Incentive Agreement ("MGIA").  Dr. Miller acknowledged those incentives exist, but he disregarded them on the ground that they conflicted with joint profit maximization.[68]  In effect, he denies a proven fact because it is inconsistent with what he prefers to believe, and he cites no evidence in the record to support his claim.[69]

---

[66] *See* FoF ¶ 234.

[67] *See id.* ¶ 414.

[68] *See id.*

[69] *See id.* ¶¶ 414, 469.

72.     Dr. Miller's model therefore does not satisfy the "fit" requirement of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591–92 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 154 (1999).  It predicts the effect of a merger that is not happening.

73.     Even if the Court were to agree that a merger-type analysis is appropriate, Dr. Miller's merger simulation is not a proper evaluation of the competitive effects of the NEA for several additional reasons.

74.     Dr. Miller predicts harm from the NEA using a slightly modified version of a standard "unilateral effects" merger simulation—an economic model that estimates how much firms can raise prices after merging, given that some lost sales are "recaptured" by the merger partner.[70]  With respect to nonstop overlap traffic—which generates the great majority of predicted harm—the model attempts (and fails) to produce outcomes nearly identical to those of a merger (assuming no efficiencies or repositioning of competitors).[71]  The model assumes all competition between American and JetBlue is eliminated; holds capacity constant; and ignores all efficiencies, consumer benefits, and other sources of downward price pressure, which guarantees predictions of higher prices.  Dr. Miller admits "the model does not incorporate any possible efficiencies that would be relevant.  It quantifies the anticompetitive side of the effect."[72]  In other words, the model does not actually simulate the *full* effects of a merger (or the NEA), only the change in the profit-maximizing price implied by a particular recapture effect.[73]

75.     Moreover, the simulation itself is unreliable.  Defendants offered unrebutted evidence that the model incorrectly predicts the effects of past airline mergers, incorrectly predicts

---

[70] *See id.* ¶ 416.

[71] *See id.*

[72] Tr. Day 17 (Miller) at 115:25–116:6.

[73] *See* FoF ¶ 416.

the effects of the NEA, and generates predictions of price increases wholly out of line with the economic literature on past airline mergers (let alone describing the reality of what has happened since the NEA's implementation).[74]   Dr. Israel showed that, applying Dr. Miller's merger simulation to data from the American/US Airways merger, his model predicts an average 21% price increase and capacity reductions on nonstop overlap routes on which, in reality, fares had *decreased* and output *increased*.[75]   *See* Gregory J. Werden, Luke M. Froeb, and David T. Scheffman, *A* Daubert *Discipline for Merger Simulation*, 18 ANTITRUST 89, 90 (2004) ("Anyone performing a simulation ultimately should be convinced, and prepared to persuade others, that the oligopoly model employed explains the past well enough to provide useful predictions of the future."); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 468, 479-81 (S.D.N.Y. 2018) (finding expert's testimony inadmissible where "[r]obustness testing and sensitivity testing" produced "contradictory or otherwise implausible results").   In short, Dr. Miller's model does not "explain[ ] the past well enough to provide useful predictions of the future."  Werden et al., 18 ANTITRUST at 90.

76.     Indeed, Dr. Carlton compared Dr. Miller's predictions to actual post-implementation fares on NEA nonstop overlap routes and showed that nothing remotely like the predicted fare increases has come to pass.[76]

77.     The Court also heard extensive testimony about how Dr. Miller's predictions are inconsistent with the historical record of legacy airline mergers.  The 27.8% weighted average fare increase predicted by Dr. Miller on the Boston nonstop overlap routes[77]— which account for the

---

[74] *See id.* ¶¶ 420–55.

[75] Tr. Day 13 (Israel) at 125:3–125:24; Israel Demonstratives at 4; *see also* FoF ¶ 429.

[76] *See* FoF ¶¶ 450–55.

[77] *See id.* ¶ 437.

lion's share of the predicted harm—is *over ten times* what Dr. Town himself called the "low single digit fare impacts on price (one way or the other)"[78] witnessed after legacy airline mergers. Contrary to these predictions, the published literature consistently finds that, on heavily trafficked nonstop overlap routes, including routes associated with hubs, output tends to *increase* and fares tend to *decrease* after mergers.[79]  Dr. Miller's predictions are therefore not even directionally consistent with the academic literature analyzing airline mergers.[80]

78.     Regardless, the NEA is not a merger, and neither analogies to mergers nor analytical tools from the merger context can predict the NEA's effects, especially if (as Plaintiffs have done) one ignores the material aspects of the NEA, including the growth incentives it creates and the competitive responses from other airlines.[81]

(1)     **Plaintiffs' Theory Of Capacity Discipline Is Factually Deficient**

79.     Plaintiffs have also attempted to meet their burden through a theory, championed by their expert witness Dr. Robert Town, that the NEA will increase the risk that alleged past "capacity discipline" will return to the airline industry.[82]  But there is no evidence of American, JetBlue, or any other carrier having engaged in "capacity discipline" since the NEA was announced

---

[78] FoF ¶ 437.

[79] Tr. Day 11 (Miller) at 141:22–142:15; Tr. Day 16 (Carlton) at 48:1–49:12; *see also* FoF ¶¶ 428–30.

[80] Plaintiffs and Dr. Miller rely on the findings of one article studying pre-2000 airline mergers that found, in one case, a 30% post-merger price increase.  *See* FoF ¶ 431 n.12; Craig Peters, *Evaluating the Performance of Merger Simulation: Evidence from the U.S. Airline Industry*, 49 J. L. & ECON. 627 (2006).  The article expressly states that the 30% increase was exceptional and likely due to the fact that the acquired airline, People Express, was pricing at unsustainably low levels.  *See* Peters, 49 J. L. & ECON. at 641–46.

[81] *See supra* p. 28; *see* FoF ¶ 186.

[82] *See* FoF ¶¶ 471–72.

or implemented, nor even within the four-to-six years prior to the NEA (assuming it ever occurred). On the contrary, the evidence has shown that overall capacity has increased in the airline industry since the NEA was implemented.[83]  Also, American's and JetBlue's capacity has increased at a faster rate in the NEA than competitors' capacity increases.[84]

80.      According to Dr. Town, historical increases in industry concentration, which were the result of airline mergers beginning around 2009 and ending in 2013 (Delta/Northwest, United/Continental, Southwest/AirTran, and American/US Airways), enabled legacy carriers to coordinate their behavior, and specifically to suppress the growth of capacity (*i.e.*, to engage in "capacity discipline") to put upward pressure on airfares.[85]

81.      To support his theory, Dr. Town relies on a series of regressions measuring the differences between actual legacy carrier capacity and capacity predicted based on the historical relationship between capacity, GDP, and jet fuel prices.[86]  Dr. Town purports to identify a period of "capacity discipline" (or less growth by legacy carriers) starting around 2009, during the Great Recession, and lasting until around 2014 to 2016, when he states that "capacity discipline" began to "unravel."[87]  Dr. Town alleges that the NEA increases the risk that this purported "capacity discipline" will return to the airline industry.[88]  Dr. Town, however, offers no opinion about what caused capacity discipline to end, provides no evidence that "capacity discipline" has returned

---

[83] *See id.* ¶¶ 471–94.

[84] *See id.* ¶¶ 488–92.

[85] *See id.* ¶ 472.

[86] *See id.* ¶ 474.

[87] *See id.* ¶ 488.

[88] *See id.* ¶ 473.

following implementation of the NEA (or even that it ever occurred in the first place), and fails to explain how JetBlue is likely to engage in this conduct.[89]

82.     With respect to the predicate that there was a period of "capacity discipline," Defendants' expert, Dr. Darin Lee, testified that the overwhelming majority of lower legacy capacity that Dr. Town identifies started *before* the period on which Dr. Town focuses.[90]  These changes by legacy carriers were in direct response to increasingly intense competition from low-cost carriers ("LCC"), which were growing rapidly and capturing share of air travel, which, combined with a series of external shocks (such as 9/11 and the Great Recession), undermined the profitability of legacy carriers, caused billions of dollars of losses, pushed multiple carriers into bankruptcy, and forced the surviving carriers to pursue aggressive cost-saving measures, including cutting uneconomic capacity and laying off thousands of employees.  In other words, the legacy carriers reduced capacity in an attempt to stem unsustainable losses and emerge from multiple bankruptcies, not as part of a coordinated plan to raise airfares.[91]  In addition, when Dr. Lee accounts for LCC growth in Dr. Town's legacy capacity discipline model, the alleged evidence of capacity discipline all but disappears.[92]

83.     There is, to be sure, evidence that "capacity discipline" is something that the management teams at legacy airlines value and talk about on earnings calls and other investor-related forums.  But there is no evidence that any use of the term "capacity discipline" refers to an anticompetitive practice of restricting supply to exercise market power, as Dr. Town implies.  It appears instead to be a term used by some airlines to indicate that an airline is not going to grow

---

[89] *See id.* ¶¶ 488–89.

[90] *See id.* ¶ 479.

[91] *See id.* ¶¶ 28–34.

[92] *See id.* ¶ 480.

capacity in excess of anticipated demand, thereby creating redundant capacity.[93]  Investors appear

to be sensitive to the possibility of excess capacity, and speaking of "capacity discipline" assuages

those concerns.  That is not the same as coordinating the level of capacity growth, which is what

Plaintiffs imply.

84.     In all events, this case is not the occasion to determine whether, a decade before the

implementation of the NEA, legacy airlines coordinated capacity growth.  The larger problem with

this theory is that it has no logical connection to the NEA and what it is intended to accomplish.

Dr. Town's theory is about what decisions carriers make with respect to their *aggregate* industry

capacity (roughly speaking, how many planes they buy and put into service).  However, there is

no coordination whatsoever of aggregate capacity in the NEA.[94]

85.     Plaintiffs have offered no evidence showing that any airline views the NEA as an

opportunity to cut capacity.  To the contrary, all the contemporaneous business documents—

including those presented to American and JetBlue's Boards of Directors—as well as the trial

testimony of American and JetBlue employees, focus on the NEA as an opportunity for *growth* to

compete with United and Delta.[95]  Further, the DOT agreement with Defendants mandates growth

and imposes penalties in the event of missed growth.[96]

86.     The NEA is also a growth initiative that has already resulted in an expansion of

American and JetBlue's fleet.[97]  Because, in Dr. Town's theory, JetBlue is supposed to be a

---

[93] *See id.* ¶ 491.

[94] *See id.* ¶ 225.

[95] *See id.* ¶¶ 128–33.

[96] *See id.* ¶¶ 206–08.

[97] *See id.* ¶ 276.

disruptor of capacity discipline, an alliance that positively impacts JetBlue growth cannot be a tool for restoring capacity discipline.

> (2) **Plaintiffs Have Offered No Evidence To Show That The NEA Has Or Will Cause JetBlue To Change Its Business Model**

87.     The Complaint in this action emphasized that the most serious danger to competition posed by the NEA was that American would use the alliance "to co-opt a uniquely disruptive competitor: JetBlue."[98] This is a legitimate concern given the existence and importance of the JetBlue Effect.[99] Plaintiffs, however, have failed to prove that the NEA has caused or is causing JetBlue to change its "disruptive" business model and increase the low fares that comprise the JetBlue Effect.  In fact, the record evidence is overwhelmingly to the contrary.

88.     Plaintiffs called numerous JetBlue executives and managers at trial, and their consistent testimony was that the NEA preserves and further expands JetBlue's "disruptive" business model and independence.[100] Among other things, they testified that JetBlue's corporate "DNA" is centered around a virtuous cycle in which growth leads to a "juniority" advantage that keeps costs low, which enables low fares and high-quality service, and which in turn enable growth.[101] JetBlue's CEO Robin Hayes testified that JetBlue needs to adhere to this model to remain profitable, and that it cannot feasibly change.[102] The Court finds this testimony credible. As in the recent case of *UnitedHealth*, the Court declines to accept a theory that would require

---

[98] ECF No. 1 ¶ 30.

[99] The JetBlue Effect is the phenomenon whereby JetBlue's entry in a particular market is often accompanied by price decreases among all carriers serving that market.  *See* FoF ¶ 21.

[100] *See id.* ¶¶ 221–23, 225, 228.

[101] *See id.* ¶ 221.

[102] *See id.*

JetBlue to "uproot its entire business strategy and corporate culture," since Plaintiffs have "failed to show that [JetBlue's] post-[NEA] incentives will lead it to take such extreme actions." *See* 2022 WL 4365867, at *16.

89.     Moreover, JetBlue continues to undercut American's fares every day on routes within the NEA and outside of it.  There is no evidence of any change in JetBlue's pricing practices, and Plaintiffs offered none.  Since implementation of the NEA, JetBlue has, among other actions, launched London routes with aggressive fares in competition with American and its alliance partners, and it entered into a merger agreement with Spirit Airlines with the stated purpose of extending the reach of JetBlue's disruptive business model.[103]

90.     By all measures, JetBlue has not changed its business strategy of being a disruptive LCC.  It has simply added the NEA to its array of competitive strategies.

### (3)     Plaintiffs Have Offered No Evidence Of Customer Complaints About The NEA

91.     Lastly, it is significant that Plaintiffs have not proffered the testimony of any customers complaining about the effects of the NEA.  Nor has the Court seen any significant documentary evidence of complaints or negative customer reactions to the NEA.  The complaints the Parties have received have been very few and have mostly concerned "seamlessness," meaning the state of technical and operational integration between American and JetBlue, which is an ongoing process and is to be expected as a new joint venture gets underway.[104]

---

[103] *See id.* ¶ 226.

[104] The Court has heard some customer complaints about American's decision to discontinue its Boston-LGA shuttle service.  *See* Tr. Day 8 (Swartz) at 31:20–31:23; FoF ¶¶ 393–97.  But it has not heard that this has allowed JetBlue to exercise market power on that route.  Far from it, as JetBlue competes with Delta on a route that has been severely affected by post-pandemic changes in business travel patterns.  *See* Tr. Day 7 (Raja) at 138:2–5 (noting that Boston-LGA is a "big high-frequency business market" with "a lot of demand" and "a lot of competition"); Tr. Day 4 (Raja) at 94:14–19 ("Q. . . .  Let's say the Boston to LaGuardia route, if American Airlines was in

92.     Overall, the NEA has been very positively received by passengers.[105]   Indeed, Defendants offered evidence that they advertise the NEA to both the general traveling public and, by way of presentations and sale pitches, to corporate customers.[106]   This is not a case in which the challenged conduct is something the parties hide from scrutiny.   American and JetBlue want their customers to focus on the NEA, which is a strong sign that they think customers will see and be attracted to the benefits of the NEA.

93.     In sum, Plaintiffs have failed to show—either through direct evidence or indirect evidence and inferences of harm—that the NEA has generated or is generating any anticompetitive effects.   Nor have Plaintiffs demonstrated that the NEA has such a strong tendency to create anticompetitive effects that actual effects may be inferred.

94.     The Court will also not disregard Defendants' unrebutted proofs of actual effects. The Court credits the testimony of Defendants' expert, Dr. Dennis Carlton, showing—through differences-in-difference regressions—that fares on NEA nonstop overlap routes have not risen in any manner that constitutes statistically significant proof of higher fares.[107]   The Court also credits the testimony of Defendants' expert, Dr. Mark Israel, and that of numerous lay witnesses that the NEA has already yielded positive output effects during its first 18 months.[108]   This is all credible, direct evidence that the competitive effects of the NEA have been beneficial for consumers.   It is incompatible with any finding of adverse effects.

---

that route; and JetBlue were in that route and JetBlue left that route, that would then become an American Airlines only route . . . .   A.  Well, in that route, Delta and United are both in it."); FoF ¶¶ 403–07.

[105] *See* FoF ¶ 182.

[106] *See id.* ¶¶ 179–82.

[107] *See id.* ¶ 377.

[108] *See id.* ¶¶ 247–75.

95.     Accordingly, Plaintiffs have failed to meet their burden under the rule of reason, and their case must be dismissed.  *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 31 (1984) ("Without a showing of actual adverse effect on competition, [a plaintiff] cannot make out a case under the antitrust laws."), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *Sterling Merch.*, 656 F.3d at 124 (affirming summary judgment for the defendant where "[t]here [was] no evidence that the challenged exclusivity agreements impair[ed] competition").

## IV.   DEFENDANTS HAVE SHOWN THAT THE NEA HAS A PROCOMPETITIVE RATIONALE AND IS PRODUCING NUMEROUS, SUBSTANTIAL BENEFITS

96.     In light of the Court's finding that there has been no showing of adverse effects, it is not strictly necessary to go through the remaining two steps of the rule of reason.  *See Jefferson Parish*, 466 U.S. at 31.  For the sake of completeness, however, the Court will address those issues as well.

97.     At Step Two, the burden shifts to Defendants to provide a procompetitive justification for, or benefits resulting from, the NEA.  *See Alston*, 141 S. Ct. at 2160.

98.     Defendants may meet their burden simply by showing that the alleged conduct "collectively yield[s] a procompetitive benefit."  *Alston*, 141 S. Ct. at 2162.  "[C]ourts should generally give a measure of latitude to antitrust defendants in their efforts to explain the procompetitive justifications for their policies and practices," *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1112 (1st Cir. 1994), and they "must give wide berth to business judgments before finding liability," *Alston*, 141 S. Ct. at 2163.  This is especially true in cases involving joint

ventures because "joint ventures often have procompetitive efficiencies." *Elizabeth Place*, 922 F.3d at 724.[109]

99.    Courts have held that procompetitive justifications that suffice for a defendant to meet its burden at this step include enhanced efficiency and "[i]mproving customer choice," *see Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1157 (9th Cir. 2003); increased output and the creation of new products, *see Broad. Music*, *Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19–20, 23 (1979); and "improved [product] quality," *Am. Express*, 138 S. Ct. at 2289.

100.    In addition, restraints that are "ancillary to the legitimate and competitive purposes of [a joint venture]" or that "involve[ ] the core activity of the joint venture itself" are usually not anticompetitive. *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006); *see Elizabeth Place*, 922 F.3d at 724–25 ("The Supreme Court has distinguished three categories of restraints: (1) restraints that are *core* to the joint venture's efficiency enhancing purpose; (2) restraints that are *ancillary* to the joint venture's efficiency enhancing purpose; and (3) restraints that are *nakedly* unrelated to the purpose of the joint venture.  Only the last of these three justifies per se treatment." (emphasis in original) (citation omitted)); *see also id.* at 725 ("A restraint is ancillary if it bears a reasonable relationship to the joint venture's success." (emphasis omitted)).

101.    An antitrust defendant need not quantify the magnitude of any alleged benefits arising from the challenged conduct to meet its burden at this step.  *See Alston*, 141 S. Ct. at 2162

---

[109] Plaintiffs argue that Defendants must carry "the 'heavy burden' that the law requires to justify the NEA's significant harms to competition."  ECF No. 160 at 6 (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 113 (1984)).  That might be true if Plaintiffs had proven "significant harms to competition" as in *Board of Regents*, where the conduct at issue resulted in higher prices and reduced output.  468 U.S. at 107.  But, because Plaintiffs have merely speculated that harm may result from the NEA, there is no basis for placing any greater burden on Defendants than the burden articulated in *Alston*.

(noting that, at the second step of the rule-of-reason framework, an antitrust defendant need only show that the challenged conduct "yield[s] a procompetitive benefit").

102.     In fact, an antitrust defendant need not show that the benefits from the challenged conduct are of *any* particular magnitude.  While Plaintiffs argue that there is a "sufficiency" requirement at Step Two,[110] that position is unfounded.  Selectively quoting *FTC v. Actavis, Inc.*, 570 U.S. 136, 156 (2013), Plaintiffs argue that Defendants must "show the lawfulness of [the restraint] under the rule of reason."[111]  That is not what *Actavis* holds, and the quoted language does not purport to describe a defendant's burden at Step Two; it is simply an observation, made in support of a decision not to give "reverse payment" schemes in the pharmaceutical industry antitrust *immunity*, that "legitimate justifications" for a practice may establish lawfulness.  *Id*.  The *Actavis* Court's articulation of a defendant's burden at Step Two is entirely consistent with the absence of a magnitude requirement:  "An antitrust defendant may show in the antitrust proceeding that *legitimate justifications are present*, thereby explaining the presence of the challenged [conduct] and showing the lawfulness of that [conduct] under the rule of reason."  *Id.* (emphasis added).

103.     In the logic of the burden-shifting framework, the magnitude of the benefits proven by a defendant in Step Two is important, but its import is at Step Three, where, as *Alston* explains, plaintiffs are required to prove "that 'substantially less restrictive alternative [practices]' existed to achieve the same procompetitive benefits the [defendant] *had proven at the second step*." *Alston*, 141 S. Ct. at 2162 (emphasis added).  In that way, it benefits a defendant to show large efficiencies and consumers benefits, but the Step Two burden itself is nevertheless modest.

---

[110] *See* ECF No. 160 at 16–17.

[111] ECF No. 160 at 16 (quoting *Actavis*, 570 U.S. at 156).

104.    Defendants in this case have easily satisfied their Step Two burden.  They have proffered multiple categories of procompetitive benefits, along with quantifications of those benefits, and each category would be sufficient evidence of the NEA's procompetitive benefits to satisfy Defendants' burden at this stage.  Further, they have offered a procompetitive rationale for the structure of the NEA and the MGIA and why these structures facilitate the benefits at the core of the NEA.

105.    The underlying purpose of the NEA is procompetitive—*i.e.*, to efficiently pool some of JetBlue and American's resources so that the two carriers can better compete against other carriers (like Delta and United) in the Northeast and "maximize customer value."[112]  Doing so allows JetBlue and American functionally to expand their networks, increase connectivity, permit greater scheduling convenience, add routes, increase frequencies on existing routes, and in general, expand output.[113]  *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) ("[J]oint ventures . . . hold the promise of increasing a firm's efficiency and enabling it to compete more effectively."); *Antitrust Guidelines for Collaborations Among Competitors* at 1 ("In order to compete in modern markets, competitors sometimes need to collaborate. . . .  Such collaborations often are not only benign but procompetitive. Indeed, in the last two decades, the federal antitrust agencies have brought relatively few civil cases against competitor collaborations.").

106.    In addition, and as described above and in the Defendants' Proposed Findings of Fact, Defendants have shown that the NEA has generated—and continues to generate—numerous significant benefits to consumers.   Indeed, Defendants' expert Dr. Mark Israel, using a

---

[112] DX-0037 at -0002 (noting further that "Project Garland is focused on creating a post – COVID position in NYC/BOS that generates competitive consumer benefits compared to DL & UA."); *see* FoF ¶¶ 127–32, 146–47.

[113] *See* FoF ¶¶ 128–33, 247–75.

methodology consistent with DOJ's practice in previous cases, employed three methods for quantifying benefits: one based on the Raven predictions using the Clean Team schedule, and two based on actual market share changes observed since the NEA has been in effect. Dr. Israel estimates that the NEA has already resulted in at least $510 million, and up to $610 million, annually in consumer benefits, depending on the calculation method—a conservative estimate given that the NEA is not yet fully implemented.[114] Once fully implemented, Dr. Israel estimates that the NEA will result in approximately $635 million of annual consumer benefits.[115]

107.   The NEA has also improved on JetBlue's and American's independent growth plans, and it is spurring JetBlue's and American's competitors to compete and expand output.[116] The benefits of this increased competition have not been quantified or incorporated in any of Defendants' estimates of consumer benefits from the NEA, so the NEA's actual procompetitive effects today exceed (and will continue to exceed, post–full implementation) Dr. Israel's calculations.[117]

---

[114] *See id.* ¶¶ 292–304.

[115] *See id.* ¶ 300.

[116] *See id.* ¶¶ 239–46.

[117] To the extent Plaintiffs argue that Defendants have not met their burden at Step Two because the benefits of the NEA would have been somehow achieved regardless of the NEA, that position is wrong as a matter of law (in addition to being factually implausible, as discussed below). First, Plaintiffs do not dispute that Defendants have shown that the NEA "yield[s] a procompetitive benefit," which is all that is required at Step Two. *See Alston*, 141 S. Ct. at 2162. Instead, Plaintiffs suggest that, at Step Two, any benefits of the NEA must be measured against a hypothetical counterfactual scenario involving what American and JetBlue would have done in the absence of the NEA. *See* ECF No. 160 at 34–35. But, when considering whether a defendant has adduced evidence of procompetitive benefits at Step Two, the proper benchmark for comparison is the *status quo ante—i.e.*, the state of affairs before the conduct commenced, measured against the *actual* state of affairs thereafter. A comparison between the post-conduct state of affairs and an imaginary scenario of what might have occurred in the absence of the challenged conduct is improper at Step Two. *See Sullivan*, 34 F.3d at 1112 (when evaluating the legality of a restraint under the rule of reason, "the court must ordinarily consider . . . [the] condition [of the relevant industry] *before and after the restraint was imposed* . . . ." (emphasis added) (quoting *Bd. of Trade*

108.     Plaintiffs also argue that NEA growth should be discounted because some portion of it was "funded" from other parts of American's or JetBlue's networks.[118]   Even if it were appropriate to consider alternative explanations for any benefits at the second step, there is no evidence that NEA benefits come at the expense of other consumers—*i.e.*, that the NEA "rob[s] Peter to pay Paul," as Plaintiffs put it[119]—and that the benefits should be disregarded on that basis. Conceptually, Defendants are correct to point out that the implication of this argument is that "Paul"—the NEA consumer—is better off with the NEA than without it.  In other words, Plaintiffs effectively admit that the NEA results in consumer benefits in the relevant market.  Plaintiffs cite no authority that allows the Court to ignore or discount those benefits to consumers in the relevant market on the ground that an unidentified individual or entity outside the relevant market has been harmed.

109.     Regardless, there is no evidence that any consumer *anywhere* has paid a price for NEA growth.  Plaintiffs suggest a "zero sum game" whereby, unavoidably, any NEA benefits must be offset by a loss to someone.  For example, Plaintiffs argue that the NEA might, in the future, cause American and JetBlue to "deprioritiz[e] other areas" outside the NEA airports—*i.e.*, Fort Lauderdale, Orlando, and Philadelphia.[120]   However, Plaintiffs have made no attempt to quantify or even describe with particularity the supposed adverse effects that would arise in these areas as

---

*of the City of Chicago v. United States*, 246 U.S. 231, 238 (1918)); *accord Hudson's Bay Co. Fur Sales Inc. v. Am. Legend Co-op.*, 651 F. Supp. 819, 842 (D.N.J. 1986) (courts must consider "the condition of the business and industry prior and subsequent to the imposition of the alleged economic restraint").    Any other "counterfactual proposition[s]"—which, in any event, are "difficult to prove in the best of circumstances"—may be considered only at Step Three.  *See Brooke*, 509 U.S. at 233.

[118] *See* ECF No. 160 at 5.

[119] Tr. Day 1 (Pls.' Opening Statement) at 35:15–35:17.

[120] *See id.* at 35:15–35:23; ECF No. 160 at 10.

a result of any such actions.[121]  Their treatment of Philadelphia is illustrative.  Based on internal American documents considering a downsized global gateway in Philadelphia, Plaintiffs conclude that NEA growth will come at the expense of Philadelphia.  Plaintiffs ignore the evidence that makes clear this is not American's plan, including (1) the testimony of Brian Znotins, American's Vice President of Network & Schedule Planning, that JFK, because of its well-known slot constraints, could not possibly assume Philadelphia's role of a connecting gateway,[122] and (2) American's 5-Year Network Plan that *post-dates* any discussions considering a downsized Philadelphia, and which concludes that American should maintain the Philadelphia hub in that role.[123]

110.    Even if there was legal authority to do so, the Court would not disregard or discount the benefits of the NEA based on amorphous and speculative arguments that unspecified others will be harmed. The suggestion of a "zero sum game" is false for multiple reasons.  From the American perspective, its large fleet allows it to "fund" NEA flying in the short-run with a combination of small service reductions elsewhere and a modest number of redeployed aircraft; in

---

[121] *See* FoF ¶¶ 386–95.

[122] *See* Tr. Day 15 (Znotins) at 111:4-111:21 ("Q.  Isn't there some possibility that American can make JFK the connecting gateway that you described instead of Philadelphia?  A.  No.  The infrastructure constraints in JFK prevent it from being a strong connecting hub for us.  In order to build a strong connecting hub, you need to bring 40 to 50 flights in, all at the same time, from St. Louis and from Kansas City, Chicago.  You bring them all into Philadelphia at the same time, so that they can all build a reasonable connection to that one Rome flight that goes out an hour and a half later.  And at JFK, we can't bring 40 flights in all at the same time.  We don't have the slots to do that.  We don't have the gates to do that.  So JFK just physically can't support an activity as a connecting gateway like Philadelphia can.  And just at its core, you're not able to replace Philadelphia as a connecting gate way with JFK.  It just can't be done.  So we truly need both in our network.").

[123] *See* DX-0111 at -0031 ("[W]e recommend that by the second half of this decade, PHL gradually returns to its scale circa 2018/2019"; "Returning to 2018/2019 frequency levels coupled with continued utilization of PHL's shortest runway will allow us to feasibly increase the departure throughput of the airfield").

the long run, the NEA is expected to result in incremental aircraft being added to American's fleet.[124]  While funding NEA growth is more challenging for JetBlue, the evidence shows that it is meeting the challenge by delaying the retirement of its E-190 fleet and ultimately ordering 30 incremental new aircraft.[125]  Plaintiffs' innuendo and suppositions do not undermine Defendants' evidence of a procompetitive rationale for, and actual procompetitive benefits resulting from, the NEA.

111.    In sum, Defendants have met their burden at Step Two by demonstrating a legitimate procompetitive rationale for, and substantial procompetitive benefits resulting from, the NEA.

## V.    PLAINTIFFS HAVE NOT SHOWN THAT THE BENEFITS OF THE NEA COULD BE ACCOMPLISHED THROUGH LESS RESTRICTIVE ALTERNATIVES

112.    Once a defendant has established procompetitive effects, the burden shifts back to the plaintiff to show that the procompetitive effects could be achieved through a substantially less restrictive alternative.  *See Alston*, 141 S. Ct. at 2160, 2162; *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1260 (9th Cir. 2020) ("At the Rule of Reason's third step, it is [the plaintiff's] burden to make a strong evidentiary showing that their proposed [less restrictive alternatives] to the challenged scheme are viable." (internal quotation marks omitted)), *aff'd sub nom. Alston*, 141 S. Ct. 2141.

113.    The Supreme Court has emphasized that "courts should not second-guess 'degrees of reasonable necessity' so that 'the lawfulness of conduct turn[s] upon judgments of degrees of efficiency.'"  *Alston*, 141 S. Ct. at 2161 (alteration in original) (quoting *Rothery*, 792 F.2d at 227).

---

[124] *See* FoF ¶ 388.

[125] *See id.* ¶ 277–79.

114.     Furthermore, the alternative must be plausible and practical; it cannot be a preferable but infeasible option. *See M & H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 987 (1st Cir. 1984) ("possible less restrictive alternatives" cannot be "more hypothetical than practical"); *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 1005 (N.D. Cal. 2014) ("[A]ny less restrictive alternatives 'should either be based on actual experience in analogous situations elsewhere or else be fairly obvious,'" and "[a] defendant may show that a proffered less restrictive alternative is not feasible with 'evidence that the proffered alternative has been tried but failed, that it is equally or more restrictive, or otherwise unlawful.'" (quoting Areeda & Hovenkamp, ¶ 1913b)), *aff'd in part, vacated in part on other grounds*, 802 F.3d 1049; *see also Antitrust Guidelines for Collaborations Among Competitors* at 9 (noting that, in considering less restrictive alternatives, "the Agencies consider whether practical, significantly less restrictive means were reasonably available when the agreement was entered into, but do not search for a theoretically less restrictive alternative that was not practical given the business realities").

115.     Ultimately, "[s]o long as a practice is fairly necessary to achieve a legitimate purpose, it is not unlawful under the rule of reason." *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 596 F. Supp. 1231, 1257 (S.D. Fla. 1984) (internal quotations omitted), *aff'd*, 779 F.2d 592 (11th Cir. 1986).

116.     Plaintiffs challenge their burden to prove a less restrictive alternative, arguing that, at Step Three, "the court engages in 'a weighing of the injury and the benefits to competition.'"[126]

117.     The Court recognizes that some cases describe Step Three as a "balancing" step whereby, in lieu of showing the existence of a less restrictive alternative, a plaintiff may "demonstrate that the anticompetitive harm outweighs the procompetitive benefit." *See In re*

---

[126] ECF No. 160 at 17 (quoting *Sullivan*, 34 F.3d at 1111).

*Asacol Antitrust Litig.*, No. 15-CV-12730-DJC, 2016 WL 4083333, at *9 (D. Mass. July 20, 2016). However, very few rule of reason cases are ever decided on this basis. *See* Michael A. Carrier, *The Rule of Reason: An Empirical Update for the 21st Century*, 16 GEO. MASON. L. REV. 827, 828 (2009) (determining that only 2% of rule of reason cases reach balancing). Prominent antitrust commentators state that "[i]n fact, 'balancing' is a very poor label for what courts actually do." Herbert Hovenkamp, *Antitrust Balancing*, 12 N.Y.U. J. L. & BUS. 369, 373 (2016). Moreover, Plaintiffs have not proven that any harms caused by the NEA outweigh the benefits, so cases discussing "balancing" at Step Three are inapposite.

118.    In any event, in *American Express* and *Alston*, where the Supreme Court first expressly adopted the three-step rule-of-reason framework, the Court clarified that Step Three requires plaintiffs to show the existence of less restrictive alternatives.[127]  *See Alston*, 141 S. Ct. at 2160, 2162; *Am. Express*, 138 S. Ct. at 2284.  Indeed, *Alston* proves that balancing is not required, irrespective of which side prevails.  There, the student-athlete plaintiffs alleged two restraints, one of which was found lawful and the other unlawful.  The Supreme Court affirmed the district court's decision to condemn (under the rule of reason) the NCAA's "caps on education-related benefits— such as rules that limit scholarships for graduate or vocational school, payments for academic tutoring, or paid posteligibility internships."  *Alston*, 141 S. Ct. at 2153.  The Court found clear evidence of anticompetitive effect and concluded that the defendant, NCAA, "could achieve the procompetitive benefits it had established with substantially less restrictive restraints on education-

---

[127] The *amicus* brief for the United States in *American Express* contains a statement of the rule of reason in which the third and final step is substantively what *Alston* holds:  "If the defendant [proves a procompetitive rationale], the burden shifts back to the plaintiff to show that the legitimate competitive benefits proffered by [the defendant] could have been achieved through less restrictive means."  Brief for the United States as Respondent Supporting Petitioners at 8, *Am. Express*, 138 S. Ct. 227 (2018) (No. 16-1454), 2017 WL 6205804, at *8 .

related benefits." *Id.* at 2162.  That concluded the analysis, without balancing.  *See id.*  The district court had also "rejected the student-athletes' challenge to NCAA rules that limit athletic scholarships to the full cost of attendance and that restrict compensation and benefits unrelated to education."  *Id.* at 2153.  It held that, at Step Two, the NCAA carried its burden of showing that "[r]ules that prevent unlimited payments" serve the procompetitive purpose of distinguishing college from professional sports, and that, at Step Three, the plaintiffs had *not* proffered less restrictive means of maintaining legitimate interests in amateurism.  *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1083 (N.D. Cal. 2019).  That ended the analysis on that issue as well, again without balancing.  *See id.* at 1087. The Ninth Circuit subsequently affirmed, again without balancing.  *See generally In re Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239.

119.    It may be that, in an exceptional case, a "fourth step" is required so that a marginal but otherwise unattainable benefit does not justify a clearly anticompetitive restraint.  This case, however, does not present that issue.  The Court will therefore examine Step Three in accordance with *Alston* and similar cases holding that the third step of the rule of reason framework requires Plaintiffs to prove less restrictive alternatives.

120.    Here, Plaintiffs have failed to establish a less restrictive alternative that would achieve the same consumer benefits as the NEA—much less demonstrating the actual existence of a feasible alternative "virtually as effective in serving the procompetitive purposes of . . . [the NEA], and without significantly increased cost."  *See O'Bannon*, 802 F.3d at 1074 (internal quotations omitted).

121.    First, it is evident that Plaintiffs and their experts have approached this issue as if the burden falls on Defendants to justify the NEA by showing that the practices Defendants

adopted were the only ways to achieve the NEA's benefits.  They claim that "Defendants assert an 'efficiencies' defense,'"[128] and then cite merger decisions, conducting analysis under a different statute and different burden test, for the proposition the Defendants must prove "extraordinary efficiencies."[129]

122.    Plaintiffs also attempt to import into this rule of reason case the merger law doctrine of "merger specificity,"[130] whereby only efficiencies that are "likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects" should be credited.  *Horizontal Merger Guidelines* § 10.

123.    These merger doctrines and burdens are immaterial to this case.  A defendant's burden at Step Two of a Section 1 rule-of-reason case is significantly lower than the burden to invoke successfully an efficiencies defense in a merger trial.  *See United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 235 (D.D.C. 2017) (discussing the efficiencies defense).  And the burden of proving less restrictive alternatives at Step Three is clearly on the *plaintiff*.  *See Alston*, 141 S. Ct. at 2160, 2162.

124.    The counterfactual in a rule of reason case is also different:  in a Section 1 case, benefits are measured against the *status quo ante*, *see Sullivan*, 34 F.3d at 1112 (courts must consider "[the] condition [of the relevant industry] before and after the restraint was imposed"), as opposed to the "merger specificity" counterfactual of a but-for world in which the merging parties

---

[128] ECF No. 160 at 33.

[129] *Id*. at 34.

[130] *See id.* at 33–34.

have exhausted all means short of the merger to achieve the claimed efficiencies, *see Anthem*, 236 F. Supp. 3d at 238.

125.    It is not surprising that, operating from an erroneous conception of the burden of proof at this step, none of Plaintiffs' experts have affirmatively shown or quantified the benefits of the NEA or of any such alternative.[131]  Instead, their approach has been scattershot.

126.    Plaintiffs have, at times, alluded to the possibility of standalone codesharing, the sale or leasing of slots, or other alliance structures similar to ones that American has used with other airlines.[132]  But Plaintiffs have failed to show that any or all of these alternatives could create the same consumer benefits as the NEA, including not only the optimization in the use of American and JetBlue's scarce resources—*i.e.*, slots, schedules, and gates—at the NEA airports, but the seamless, combined network that Defendants strive to achieve.[133]  More importantly, American and JetBlue analyzed these alternatives and concluded that they would *not* generate the benefits of the NEA.[134]

127.    Everything that Plaintiffs have argued is either "more hypothetical than practical," *M & H Tire Co., Inc.*, 733 F.2d at 987, or infeasible, *O'Bannon*, 7 F. Supp. 3d at 1005, and thus insufficient to show a legitimate less restrictive alternative.

128.    For example, while Plaintiffs have posited that some of the benefits of the NEA in New York could have been achieved by the sale or leasing of slots by American to JetBlue, they have presented no evidence that a long-term lease was likely to occur or how *American's*

---

[131] *See* FoF ¶¶ 424–28; 495–510.

[132] *See id.* ¶¶ 495–510.

[133] *See id.*

[134] *See, e.g.*, PX-0279, at 27; *see also* FoF ¶¶ 495–510.

competitive disadvantages in New York are addressed by leasing slots to JetBlue—and nor could they, because those disadvantages would plainly remain unaddressed.[135]

129.    In addition, Plaintiffs have not demonstrated that the *network enhancements* and associated consumer benefits of the NEA could be replicated by any practical alternative.[136] Plaintiffs did not call any witness who would have even been competent to make such a showing. Dr. Town was not; he has none of the airline industry and network planning expertise needed to address how any alternatives could potentially replicate NEA network benefits.  Indeed, by his own admission, he offered no analysis showing that any proffered alternative could have replicated or come close to achieving the benefits of the NEA.[137]

130.    Plaintiffs expended most of their effort trying to argue that Defendants had "organic" growth opportunities—for instance, that American could upgauge in New York and add more spokes in Boston, and that JetBlue had plans to grow its Boston departures.[138]  It is debatable whether these arguments even qualify as less restrictive alternatives because they suggest that Defendants should have been content to proceed on a standalone basis, without the NEA.[139]

---

[135] *See* FoF ¶¶ 499–503.

[136] *See id.* ¶¶ 495–510.

[137] *See* Tr. Day 17 (Town) at 27:5–25:8 ("Q.  And you have not done any analysis of the benefits that would have been generated from JetBlue and American entering [a] relationship [without schedule optimization or coordination], correct?  A.  That is correct.  I testified to that on my direct.").

[138] *See* FoF ¶¶ 80–93.

[139] Moreover, in making these arguments, Plaintiffs rely on the carriers' *pre-COVID* network plans, and they assume *both* that (1) COVID did not happen, and (2) that the carriers would have implemented the most favorable combination (to Plaintiffs' case) of those plans.  Such speculative and implausible "hypothetical[s]" do not suffice to rebut the demonstrated procompetitive benefits of the NEA.  *See M & H Tire Co.*, 733 F.2d at 987; *O'Bannon*, 7 F. Supp. 3d at 1005 ("[A]ny less restrictive alternatives should either be based on actual experience in analogous situations elsewhere or else be fairly obvious." (internal quotations omitted)); *Antitrust Guidelines for Collaborations Among Competitors* at 9 ("[T]he Agencies consider whether practical, significantly less restrictive means were reasonably available when the agreement was entered into, but do not

131.    Regardless, the evidence is clear that the NEA results in substantial growth and an enhanced competitive position relative to any standalone benchmark.  JetBlue has incremental planes in its network and actually expanded its order book to serve the expanded network of the NEA.[140]  American added new routes out of Boston and New York facilitated by the feeder traffic that the NEA's schedule optimization created.[141]  And American and JetBlue have collaborated to improve their schedules.[142]  Plaintiffs offered no proposal on how these benefits could have been achieved on a standalone basis or through less restrictive collaborations, especially given that none of their theorized alternatives include scheduling coordination, which is a significant source of the NEA's benefits.[143]

132.    Viewed as a whole, Plaintiffs' arguments regarding less restrictive alternatives do nothing more than second-guess the need for network improvements.  That is insufficient to meet their burden under Step Three.  *See Alston*, 141 S. Ct. at 2161 (allowing courts to "second-guess degrees of reasonable necessity" of joint ventures "would be a recipe for disaster, for a skilled lawyer will have little difficulty imagining possible less restrictive alternatives to most joint arrangements" (internal quotations omitted)).

---

search for a theoretically less restrictive alternative that was not practical given the business realities").  At a minimum, Plaintiffs "would need to present some econometric analysis to explain their contention" that the NEA's benefits would have been achieved without the NEA.  *In re Processed Egg Prod. Antitrust Litig.*, 962 F.3d 719, 724 (3d Cir. 2020).  Plaintiffs have presented no such analysis.

[140] *See* FoF ¶ 278.

[141] *See id.* ¶¶ 257–65.

[142] *See* FoF ¶¶ 267–72.

[143] *See* ECF No. 160 at 40–42.

## VI.    CONCLUSION

133.    Having failed to demonstrate that the NEA has caused, is causing, or likely will cause anticompetitive effects, Plaintiffs have failed to establish a *prima facie* case under the rule of reason.  Thus, Defendants are entitled to judgment in their favor.  In the alternative, Defendants remain entitled to judgment in their favor because (1) they have proffered sufficient procompetitive justifications for, and benefits resulting from, the NEA; and (2) Plaintiffs have failed to rebut those justifications or benefits or show the existence of a legitimate less restrictive alternative.

Dated:  November 17, 2022                    Respectfully submitted,

*/s/ Daniel M. Wall*
Daniel M. Wall (*pro hac vice*)
Elizabeth C. Gettinger (*pro hac vice*)
Elise M. Nelson (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
dan.wall@lw.com
elizabeth.gettinger@lw.com
elise.nelson@lw.com

Allyson M. Maltas (*pro hac vice*)
Ian R. Conner (*pro hac vice*)
Michael G. Egge (*pro hac vice*)
Farrell J. Malone (*pro hac vice*)
Marguerite M. Sullivan (*pro hac vice*)
Tara L. Tavernia (*pro hac vice*)
Seung Wan Paik (*pro hac vice*)
Jesse A. Vella (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200

Facsimile: (202) 637-2201
allyson.maltas@lw.com
ian.conner@lw.com
michael.egge@lw.com
farrell.malone@lw.com
marguerite.sullivan@lw.com
andrew.paik@lw.com
tara.tavernia@lw.com
jesse.vella@lw.com

David C. Tolley (BBO #676222)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
david.tolley@lw.com

*Attorneys for Defendant*
*American Airlines Group Inc.*

*/s/ Richard Schwed*
Richard Schwed (*pro hac vice*)
Matthew L. Craner (*pro hac vice*)
Jessica K. Delbaum (*pro hac vice*)
Leila Siddiky (*pro hac vice*)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-5445
rschwed@shearman.com
matthew.craner@shearman.com
jessica.delbaum@shearman.com
leila.siddiky@shearman.com

Brian Hauser (*pro hac vice*)
Ryan Leske (*pro hac vice*)
Shearman & Sterling LLP
401 9th Street, NW
Washington, DC 20004
Telephone: (202) 508-8005
brian.hauser@shearman.com
ryan.leske@shearman.com

Glenn A. MacKinlay, BBO #561708
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
Telephone: (617) 449-6548
gmackinlay@mccarter.com

*Attorneys for Defendant*
*JetBlue Airways Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served by electronic mail on all counsel of record this 17th day of November, 2022.

*/s/ Daniel M. Wall*
Daniel M. Wall