1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3

4      _____

5      UNITED STATES OF AMERICA, et al.

6            Plaintiffs,                     Civil Action No.
                                             1:21-cv-11558-LTS
7         v.

8      AMERICAN AIRLINES GROUP, INC.,
       et al.,
9
             Defendants.
10
11     _____

12        BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                          BENCH TRIAL
                             Day 18
15

16
                        Friday, November 18, 2022
17                           9:31 a.m.

18

19

20
       John J. Moakley United States Courthouse
21     Courtroom 13
       One Courthouse Way
22     Boston, Massachusetts

23
       Rachel M. Lopez, CRR
24     Official Court Reporter
       raeufp@gmail.com
25

1                        **A P P E A R A N C E S**

2

    On behalf of the Plaintiff United States of America:

3
        United STATES DEPARTMENT OF JUSTICE
4       BY:  WILLIAM H. JONES, II; KATE M. RIGGS;
        AND JAMES H. CONGDON
5       450 Fifth Street, Northwest
        Suite 8000
6       Washington, D.C.  20530
        (202) 514-0230
7       bill.jones2@usdoj.gov
        kate.riggs@usdoj.gov
8       james.congdon@usdoj.gov

9

10   On behalf of the Defendant American Airlines Group, Inc.:

11       LATHAM & WATKINS, LLP
        BY:  DANIEL M. WALL; MARGUERITE M. SULLIVAN; FARRELL J.
12      MALONE; AND SEUNG WAN PAIK
        505 Montgomery Street
13      Suite 2000
        San Francisco, California  04111
14      (415) 391-0600
        dan.wall@lw.com
15      marguerite.sullivan@lw.com
        farrell.malone@lw.com
16      seung.paik@lw.ocom

17

18   On behalf of the Defendant JetBlue Airways Corporation:

19       SHEARMAN & STERLING LLP
        BY:  RICHARD F. SCHWED AND MATTHEW L. CRANER
20      599 Lexington Avenue
        New York, New York  10022
21      (212) 848-4000
        richard.schwed@shearman.com
22      matthew.craner@shearman.com

23

24

25

1

<u>**TABLE OF CONTENTS**</u>

2

3

**CLOSING ARGUMENTS**

4

5                                                                                                                    <u>Page</u>

6      By Mr. Jones for Plaintiff USA                              5

7      By Mr. Schwed for Defendant JetBlue                        39

8      By Mr. Wall for Defendant American Airlines                58

9      By Mr. Jones for Plaintiff USA                             82

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2        (In open court.)

3        THE DEPUTY CLERK:  The United States District Court

4   for the District of Massachusetts is now in session, the

5   Honorable Leo T. Sorokin presiding.

6        THE COURT:  Please be seated.

7        I have your 500 pages.  I -- I confess that I

8   wasn't capable of reading all 500 pages between last night

9   and this morning.  I'm sure that surprises you, so I'm sorry

10  to disappoint you in that regard, but I have read some of,

11  it, and I've been going through the evidence.  I'm not

12  through all the evidence yet, but I'm going through it.  So

13  as I sort of said before, we'll do closing arguments today.

14  When I finish my review of all of the evidence and arguments

15  and briefs you've submitted, I'm sure that I will have

16  questions and things that I want to address, and we'll have a

17  further hearing that I'll view in the nature of like a motion

18  hearing, where I'll come -- and I'm thinking about your

19  suggestion, Mr. Wall, about questions.  I might provide them

20  to you in advance, or some in advance, just so you can be

21  more prepared for them.  It will probably make it better for

22  all of you and for me.

23        But in the meantime, we'll do the closing arguments

24  today to complete the trial.

25        And so just a couple of questions on timing.  So

1  how long do each of you anticipate being?

2         MR. JONES:  Your Honor, I anticipate being just

3  under an hour, pursuant to the Court's order on that.

4         THE COURT:  Okay.  All right.

5         MR. JONES:  And then with some limited rebuttal,

6  depending on what defendants do with their closing.

7         THE COURT:  And about how long will you be?

8         MR. WALL:  Same, Your Honor.  An hour.  I mean, I

9  guess our expectation with the timing is are we going to go

10  straight through, or are we --

11         THE COURT:  I think if it's really an hour and an

12  hour, and then rebuttal is probably, what, pretty short, if

13  there is any?

14         MR. JONES:  Pretty short, Your Honor.  It

15  certainly -- five to ten minutes, somewhere in that --

16         THE COURT:  Then I will say we'll go straight

17  through because I think -- I guess that question is, Rachel,

18  could we -- yeah, we could do that.  If we're going to be a

19  lot past 11:15, or no 11:15, but two hours and a quarter,

20  then I would say we might need to take a break, but yeah.

21         All right.  So go ahead, I'll hear the government

22  first.

23              **CLOSING ARGUMENTS BY PLAINTIFF USA**

24         MR. JONES:  And Your Honor, we have binders with

25  hard copies of our presentation, as well.  We'll give you

1    those.

2            THE COURT:  Okay.  Sure.

3            Just forewarning all of you, at the end of this

4    trial, when it's all said and done and I've resolved it, I'm

5    going to return all of these notebooks to you, because I

6    don't know what we're going to do with them.

7            Go ahead.

8            MR. JONES:  All right.  Well, thank you,

9    Your Honor.

10           And good morning, Mr. Wall, Mr. Schwed.  And good

11   morning to your teams, as well.

12           Your Honor, it's really kind of fitting that we're

13   having the closing for the case here today, since we're

14   coming up on the holiday season, and the busiest travel times

15   of the year.  So it's really kind of a fitting time for this.

16   We're going to have folks kind of all over the country

17   traveling to grandmothers for Thanksgiving, folks going home

18   from college, all over the place.  And so this is kind of the

19   best time to have a closing argument in a case about the

20   airline industry.

21           Your Honor, the trial itself, it was a long trial,

22   a lot of disputed facts, a lot of disputes overall.  I think,

23   though, when we think about the trial, there are a few things

24   that really can't fairly be disputed here, and that is

25   thinking about this in a way, Your Honor, of, one, the NEA is

1     an agreement between competitors.

2               Two, the competitors enjoy significant market power

3     in Boston and New York.  40 percent, 50 percent, 60 percent

4     share in those Boston and New York markets, Your Honor.

5               And three, by their own admission, Your Honor, the

6     defendants in these markets no longer compete.

7               And the conclusion from this, Your Honor, is pretty

8     straightforward here.  It's that this deal is really poised

9     to hit consumers with hundreds of millions of dollars a year

10    in harm in the form of higher prices and lower quality

11    service, and it's particularly the case in those 29 nonstop

12    overlap markets where American and JetBlue had previously

13    been direct head to head competitors, and particularly here

14    in Boston, out at Logan, Your Honor.

15              And the harm in any one of those markets is

16    sufficient to find a violation of the Sherman Act.  And the

17    fact that we have harm of hundreds of millions of dollars

18    over multiple markets just really illustrates how bad this

19    deal actually is.

20              Now, over the course of the trial, the Court has

21    noted several times that this trial is an important case for

22    the folks on the plaintiffs side, and for the defendants,

23    Your Honor.  And I can tell you, Your Honor, it is a very

24    important case to us.  You've seen the number of folks that

25    we've had here, the number of folks who've kind of come and

1   made a best effort to present this case to Your Honor.  It's

2   important to us, Your Honor, for all the effort that we've

3   put into it, but really, it's most important to us,

4   Your Honor, because of those -- those families that need to

5   travel and want affordable tickets and good service,

6   Your Honor.  It's important to us for the people we

7   represent, both in the Department of Justice, and for the

8   plaintiff states.  It's important for us, Your Honor, really,

9   because what we're looking at here is an industry that is

10  rife with dysfunction that needs to preserve as much

11  competition as possible, and this deal threatens to do

12  exactly the opposite, by having the largest airline in the

13  country team up with its most effective low cost competitor,

14  in exactly those places where that competitor is at its

15  strongest.

16          On top of all of that, Your Honor, there's just no

17  real justification for the loss of the head to head direct

18  competition that the NEA is causing and will cause, and

19  there's absolutely no justification at all, Your Honor, for

20  the NEA here in Boston.  And on that basis alone, there's

21  enough to enjoin the NEA.

22          Let me, Your Honor, talk a little bit about the

23  law, to start here.  So, Your Honor, we start with section

24  one of the Sherman Act, which prohibits agreements between

25  competitors that unreasonably restrain trade, and the rule of

1    reason is the test here.

2           Your Honor, if I can have just a moment, please.

3           THE COURT:  Of course.

4           MR. JONES:  All right.  Apologies for that,

5    Your Honor.

6           THE COURT:  Quite all right.

7           MR. JONES:  Let me start here at the first step of

8    the analysis, Your Honor, the first step of the rule of

9    reason, where the burden is on us to show substantial

10   anticompetitive effects.  And Your Honor, based on the

11   evidence produced at trial, we think we unambiguously meet

12   our burden at step one.

13          And let me start with just the fact that American

14   and JetBlue used to be fierce head to head competitors in the

15   Northeast Alliance airports.  And then they got together,

16   they signed an agreement that ends that competition, and it

17   ends it importantly, Your Honor, over an area that comprises

18   roughly 70 percent of JetBlue's business.  And it does this

19   by allowing these two companies to coordinate in three

20   distinct ways here.  First, market allocation.  Before the

21   NEA, Your Honor, the defendants competed on routes, and that

22   meant entering routes the other served to try to take

23   business away from them.

24          So now, though, they jointly decide which airline

25   should serve which route within the NEA.  And to be clear

1    about this, that includes simply dividing up markets.  You

2    take one; I'll take the other.  And this is real, Your Honor.

3    This has happened.  American said that they've exited 12

4    routes because of the NEA.  And that also includes simply

5    divvying up Boston/LaGuardia, LaGuardia/Charleston, and

6    LaGuardia/Orlando.  On all of those routes, Your Honor, there

7    used to be two, JetBlue and American, and now there's one.

8    And that means one less choice for the passengers on all of

9    those routes.

10          Now, that might be convenient for American and

11   JetBlue, but it's certainly not competition.

12          And the second way they coordinate is capacity and

13   schedule coordination.  Before the NEA, American and JetBlue

14   would make independent decisions about how much to fly and

15   when to fly.  And they tried to take passengers from each

16   other.  Now, they jointly decide.  In fact, they kind of

17   touted that, Your Honor, as a benefit.  They've touted this

18   idea that if you have two planes on a route that both leave

19   at 8:00 a.m. or around 8:00 a.m., that taking away one of

20   those flights is somehow a benefit to consumers and

21   competition.  They call it wing tipping and they talk about

22   how they're going to eliminate wing tipping, you know, that

23   it didn't make sense for two airplanes to be leaving on the

24   same route, at about the same time.  Well, who it made sense

25   for, Your Honor, were the passengers that they were competing

1    to try to win over, and it gave those passengers a choice.

2           Now, what they've done through the NEA and the NEA

3    airports is they've taken away that choice.  And again,

4    Your Honor, it's a matter of convenience for the defendants,

5    but it's not competition.  And it's certainly not the

6    competition that they used to engage in.

7           And third thing, Your Honor, they share the spoils.

8    Before the NEA, American and JetBlue, they made money or they

9    didn't make money, based on persuading passengers to fly one

10   of them over the other.  And now that doesn't matter at all,

11   really, Your Honor, if one of them loses a passenger to the

12   other airline, they still win.  So again, that's that

13   convenience for them, but not competition.

14          And Your Honor, in each of these three ways, this

15   former head to head competition is now replaced by

16   collaboration.  And we've heard talk about how this is a

17   creative solution, how it's innovative.  All of those

18   accolades, but really, it just boils down to being a classic

19   antitrust violation, Your Honor, that kind of hits in the

20   heartland of what antitrust law is supposed to prevent.  And

21   really no matter how we look at it, how we style it, the

22   competition between American and JetBlue is gone at those

23   four NEA airports.

24          Now, in reaching this point, Your Honor, you don't

25   really have to take what I'm saying now and my word for it.

1    We had testimony from defendants' executives.  We heard from

2    Mr. Laurence and Mr. Hayes, and they were absolutely clear on

3    this.  They no longer compete directly on NEA routes.

4              And also, Your Honor, it wasn't just Mr. Laurence

5    and Mr. Hayes, it was Mr. Swartz and Mr. Znotins, as well.

6    They were just as direct, American and JetBlue are no longer

7    competitors.  That's clear evidence, Your Honor, of the end

8    of head-to-head competition at the NEA airports.

9              Now, we've gone into some detail in our briefs, in

10   our papers, about the restraints, about capacity

11   coordination, and about market allocation, and about revenue

12   sharing.  And Your Honor, we submit in the papers that these

13   are so anticompetitive on their face that this case actually

14   satisfies the quick look test under step one, and that no

15   more evidence is really needed for Your Honor to decide that

16   we meet step one.  But of course, we spent four weeks in

17   trial, and there is a lot more evidence.  And I want to walk

18   through just a portion of that in this closing.

19             A way for us to also meet step one, Your Honor,

20   under the rule of reason, is to show proof of market power

21   and some evidence that the restraint harms competition.  So

22   I'm going to start with proof of market power.  On that

23   front, Your Honor, I've given a couple of examples here of

24   the level of market shares that are sufficient to establish

25   market power in Section 1 cases, so not in merger cases,

1     Your Honor, starting with Section 1 cases.  Courts have found

2     market shares as low as 20 percent, 26 percent, 30 percent

3     sufficient to establish market power.  And Your Honor, those

4     are just three examples, but clearly in the markets that

5     we've identified here, those nonstop overlap markets, the

6     shares well exceed that 20 percent to 30 percent bar.  In

7     fact, just looking again here at Boston, in the 11 nonstop

8     overlap routes, the evidence shows combined shares well above

9     that kind of low bar of 20 to 30 percent.  Most of the

10    markets, Your Honor, have combined market shares over

11    50 percent.  Los Angeles has 63 percent, Miami 77, Washington

12    National, 88.  And measured by HHIs, which we talked quite a

13    bit about in the trial, Your Honor, measured by that count,

14    each of these markets meets the presumption of market power

15    that antitrust law has developed in the merger context.

16            So again, let me -- let me put some perspective on

17    the evidence about Boston that we talked about at trial.  9

18    million passengers served in these eleven nonstop overlap

19    routes across all airlines, and these passengers generated

20    almost $2 billion in revenue, again, across all airlines in

21    2019 numbers, and Your Honor, the combined market shares for

22    some of these markets reach as high as 96 percent.  So we're

23    really talking about large impacts on large markets out of

24    Logan, Your Honor.

25            Kind of the same thing in New York.  Again, the

1    market shares are significant, and many of them in New York

2    are also over 50 percent, 56 percent to Miami, 57 percent to

3    Los Angeles, 67 to Phoenix.  29 million passengers served on

4    those markets in 2019, Your Honor, again, across all

5    airlines, generating over $5 billion in revenue, in that same

6    year across all airlines, Your Honor.  And again, combined

7    market shares reaching in the 90s between defendants in some

8    of these markets.  And again, Your Honor, we're talking about

9    large markets that serve lots of people, a large impact here,

10   Your Honor.

11           Now, when we talk about market power, though, it is

12   not just about the market shares.  It's also, Your Honor,

13   about whether other competitors can either come in or expand,

14   in an attempt to replace lost competition.  So in antitrust

15   law, when we talk about the barriers to entry and barriers to

16   expansion, really, we're most concerned about market power,

17   where there's that combination of high shares and then high

18   barriers to entry and high barriers to expansion.  And in

19   this case, Your Honor, in New York, almost the entire

20   rationale of the deal that defendants have put in front of

21   you rests on this notion that there are high barriers to

22   entry in New York.  Slots.  Slots that we talked quite a bit

23   about through the trial that we heard over and over about.

24           You also heard Mr. Raja and other witnesses talk

25   about gate constraints out at Logan.  And really, when you

1     take this all together, that illustrates why this deal is so

2     bad.  It's the enormous market shares, and no one to replace

3     the lost competition because of the barriers to entry, and

4     the barriers to expansion at both New York and at Boston.

5              So the second prong that we need to satisfy here in

6     step one is showing some evidence that the restraints that

7     we've challenged harm competition, some evidence.

8              Well, the first thing, Your Honor, I would just

9     point to is back to the testimony of Mr. Hayes and

10    Mr. Laurence and Mr. Swartz and Mr. Znotins, about the end of

11    direct head-to-head competition.  But also, Your Honor, the

12    terms of the NEA itself supports this on this prong, as well.

13    And I want to talk a little bit about those and what they

14    mean here.

15             Now, Dr. Miller, he examined the NEA and he

16    examined the MGIA and the revenue sharing component of that

17    in particular in detail.  He thoroughly analyzed how those

18    arrangements increased the incentives to raise prices.  It's

19    what the economists call upward pricing pressure.  And the

20    reason here that revenue sharing creates upward pricing

21    pressure is pretty straightforward and simple.  It's that

22    before the NEA, if American or JetBlue raised price, they

23    lost some of their customers.  And in this example, the

24    customers would go to -- if JetBlue raised price, the

25    customers would go to American or to Delta, and they lost all

1    the revenue that was associated with those lost customers.

2         Now, with the NEA in place, if JetBlue raises

3    prices, it's going to recapture revenue from the passengers

4    who actually go and choose American.  And that revenue,

5    Your Honor, showed in the graphic here on green goes to the

6    combined JetBlue/American, and it goes to their revenue pool

7    to be divvied up between them.  And so the NEA, with the

8    revenue sharing provision in place, makes it more profitable

9    for JetBlue to raise price in that circumstance.

10        Just to think about this for a moment, Your Honor.

11   On a route like Boston to Washington National, defendants

12   have 88 percent share.  So it's not really hard to see in

13   that example why JetBlue would want to increase its prices,

14   because with the NEA in place, and the revenue sharing in

15   place, the passengers they would lose would most likely go to

16   American, because it's the other big player in the market.

17   And ultimately JetBlue doesn't lose out.

18        And Your Honor, we talked a lot in the trial about

19   pricing independence.  We want to make the point here that

20   regardless of whether the defendants price independently, and

21   regardless of the fact that they aren't merged and have --

22   they still have the two separate boards and two separate

23   management teams, this pricing incentive is still the same.

24   And ultimately, what this means with this pricing incentive

25   in place in the overlap markets is that defendants are going

1    to benefit from decreasing capacity.

2            And we know what happens when airlines decrease

3    capacity.  Mr. Parker said it.  It's Econ 101, if capacity

4    goes down, the prices goes up.  And Mr. Clark objectively

5    testified to the same, decreased capacity would put upward

6    pressure on prices.  And Mr. Clark also confirmed why

7    Professor Miller, with revenue sharing in place, this

8    pressure would occur even if defendants are pricing

9    independently.  And Dr. Israel, defendants' expert, he said

10   price and capacity are the flip sides of the same coin.  On

11   the one side, higher price reduces ticket sales and lessens

12   the need for capacity.  On the other side, reduced capacity

13   restricts supply and drives up prices.  And either way you

14   look at it, the anticompetitive effects, Your Honor, of the

15   NEA is going to lead to higher prices, reduced capacity in

16   the overlap markets.

17            And I would offer to the Court that this isn't

18   merely theoretical, that we've seen this happen out in the

19   real world.

20            You recall evidence on the grounding of the MAX

21   737, Your Honor.  When that happened, JetBlue saw an

22   opportunity when American exited the market between JFK and

23   San Diego.  The capacity went down in that market and JetBlue

24   responded to that.  And JetBlue responded by raising its

25   prices.  So with the NEA in place now, Your Honor, what the

1    defendants have the ability to do on the overlap routes is

2    really to hold together, reduce capacity, and raise prices.

3    And they don't have to wait for some dramatic event like the

4    grounding of the 737 MAX, or anything like that.  They can

5    just huddle together and decide amongst themselves in those

6    markets where they have high market shares.

7              Now, the defendants have argued that they have

8    found some type of, I don't know, elegant solution, or maybe

9    even magical bullet, or something like that, Your Honor.  The

10   MGIA in its revenue sharing formula.  And the reason they

11   offer for that is that because the transfer payments under

12   the MGIA are based on incremental capacity.  It gives them an

13   independent incentive to grow.  But that independent growth,

14   Your Honor, won't happen if it's contrary to the joint

15   interest of JetBlue and American together, and that's what

16   capacity coordination really ensures.  So JetBlue, its

17   management, in a presentation to the board of directors

18   before it entered the NEA, it identified the MGIA and the

19   formula in it as one that could allow one party to fund

20   loss-making capacity.  And the way to alleviate that risk was

21   that the NEA contract would call for concurrence capacity

22   deployment.

23             Now, all said, Your Honor, that's a phrase that's

24   probably hard to parse, at least it is for me.  But it's kind

25   of really just a fancy way of saying that the two parties can

1    huddle together and coordinate the capacity and to avoid the

2    loss-making by doing so.  And Mr. Raja told us really that

3    capacity coordination and revenue sharing go hand in hand.

4    He said we don't want each other to be "cheating on the

5    pool."  In other words, they only grow if it's in their joint

6    interest.  And what's in their joint interest, Your Honor, on

7    these nonstop overlap routes is to reduce capacity and raise

8    prices.  So a key takeaway here, Your Honor, is that, for

9    these nonstop overlap routes, the defendants have a joint

10   incentive to reduce output and increase price, and nothing

11   about the growth incentives in the MGIA changes that

12   conclusion, that the defendants will still pursue their joint

13   interests in increasing output and raising prices in t hose

14   markets.  And ultimately, Your Honor, the travelers out of

15   Boston and New York will pay the price for that.

16            Dr. Miller, he quantified the harm in the overlaps

17   from this incentive to raise prices, and really, no matter

18   how you look at it, how we look at it, consumers are going to

19   lose out here.  First, his economic analysis found $696

20   million in total harm a year, with roughly two-thirds of that

21   being in Boston, and about one-third of that being out of New

22   York.

23            Second, Your Honor, $240 million of that total

24   estimated harm comes from the 29 nonstop overlap markets that

25   I've been talking about.

1    Third, thinking about Newark and the market

2 definition from New York City, even if Newark is in the

3 market with LaGuardia and JFK, and we submit it's not, but

4 even if it is, the harm is still $627 million.  And that's

5 under defendants' market definition in New York.

6    Fourth, carve-outs.  As the Court is aware, there

7 has been an argument that there can be no harm from those

8 carve out markets from Boston.  Now, we don't think that's

9 right, and we don't think Your Honor should credit that.  But

10 even if you do, without the carve-outs, there's still almost

11 $500 million in harm a year on the other nonstop overlap

12 routes.  So Your Honor, half a billion dollars of harm is

13 still substantial by any real definition here.

14    But even taking this final step, Your Honor, and

15 it's not displayed, but taking the final step here, if you

16 credit defendants for the carve-outs, and if you use their

17 market definition in New York City and include Newark with

18 LaGuardia and JFK, the harm would still total to about

19 $420 million a year.  So still substantial, even crediting

20 their arguments about Newark, and even crediting their

21 arguments about the carve-outs.

22    Now, of course, this is a highly disputed issue in

23 this trial and defendants take issue with this.  And they

24 take issue with the fare increases that Dr. Miller predicts.

25 And one of the arguments they make is that those predicted

1    fare increases are too large, and that they don't fit in with
2    prior findings of fare increases after other transactions.
3    But in their own contemporaneous document, Your Honor, as you
4    can see on the left side of the chart I have up, in their own
5    contemporaneous documents where JetBlue modeled the JetBlue
6    effect, it found significantly higher prices than what
7    Professor Miller found.  And I would point out so did
8    defendants' experts when they were looking at this during the
9    investigation of this case.  And that's in the light blue.

10           Professor Miller's numbers in the red on the far
11   right show how they stack up with the numbers that JetBlue
12   found and how defendants experts looked at this during the
13   investigation.  And Your Honor, I would also point out for
14   JetBlue and its numbers, these are based on figures that the
15   company has spent decades touting to the public and touting
16   to regulators, both here and in other countries about the
17   JetBlue effect.

18           Finally, Your Honor, the defendants have repeated
19   the mantra, over and over again, that we haven't identified
20   specific fare increases attributable to the NEA yet.  And I
21   suspect strongly that we're going to hear that again in half
22   an hour or so, as well.  I think that's probably a safe bet.
23   But to be clear, Your Honor.  That's not the law.  And that's
24   not the law, really, for a good reason.  And that's because
25   we're not required to isolate market effects of the

1    challenged conduct because of the difficulty of doing so.

2            A third circuit case, the *Brown* case, Your Honor,

3    kind of lays this out.  And it says that we can look at

4    market power as a surrogate for detrimental effects.  And

5    that's that's not rare, that's a typical way of doing it.

6            And Your Honor, I would note about the *Brown* case,

7    that it says that, really, isolating these effects is

8    difficult under normal circumstances.  And what we know here

9    both from this trial and from lived experiences, that the

10   last two years in the airline industry and in this country

11   haven't really been normal.  And we can look, actually, at

12   defendants' own actions in this regard, as well.  They

13   illustrate exactly that.

14           2021, instead of JetBlue paying $200 million to

15   American as the MGIA called for, American agreed to accept

16   $27 million instead.  So stepping back and considering this

17   for a second, the one full year that the MGIA was in place,

18   the one full year we have to evaluate the so-called creative,

19   innovative solution, defendants, they ignored it.  They threw

20   out the results, and they didn't change the formula, they

21   just wiped away that $170 million in debt.  And I would just

22   note on the side, Your Honor, we're still supposed to believe

23   that they compete with each other.  But with competitors like

24   that, really, who needs friends, right?

25           Now, we look at this, though.  They put forth the

1    reason why they threw out the debt.  Their story here was

2    that it's because the revenue from that flying wasn't

3    representative because of COVID.  But now, Your Honor, they

4    want to put the onus on us, because we haven't shown actual

5    fare increases attributable to the NEA during a time that

6    they, themselves, by their actions, show that are not

7    representative.  We think the Court should reject that.

8            So Your Honor, back to the framework here.  In step

9    one, there's ample evidence here that the NEA is likely to

10   cause substantial competitive harm in the relevant markets

11   and all to the tune of hundreds of millions of dollars a

12   year.

13           So we go to step two and there the defendants face

14   a heavy burden to justify the NEA, and they fail to do so.

15   The first point here, Your Honor, is a basic one, and that is

16   that defendants have failed to meet their burden to show

17   competitive benefits in each relevant market that offset the

18   harms that we've proved in that market.

19           Now, there's been a lot of discussion in the trial

20   about new routes and global networks, about Tel Aviv and

21   Athens, but really, in producing that evidence, what

22   defendants are doing here is asking the Court to balance

23   harms to some customers, in some markets, against benefits to

24   other customers in different markets.

25           But the Supreme Court, Your Honor, has directed

1    that courts shouldn't be in the business of making value

2    judgements and picking and choosing which customers win and

3    which customers lose.  Instead, Your Honor, where there's

4    harm established, and the core of our case here is the harm

5    is established in those nonstop overlap markets, where

6    there's harm established, the defendants must show

7    competitive benefits from the restraints in those markets.

8    Here they haven't even really attempted to do so.

9              Dr. Israel, he admitted that he hasn't presented

10   benefits on an individual market basis.

11             Professor Miller, on the other hand, he presented

12   evidence of harm market by market.

13             But Your Honor, even if you consider their

14   generalized benefits that they don't attribute to specific

15   markets, they still fail to meet their burden at step two.

16   I'm going to walk through a few reasons why here.

17             First, Dr. Israel, he conceded that there are no

18   real benefits from this idea of schedule optimization, and we

19   see that here with this snippet from his testimony.  If you

20   just put the networks together and you include schedule

21   optimization, you can, quote, "Squeeze a little bit more from

22   the stone."

23             That's what Dr. Israel said.  But no more than

24   that.

25             So the argument here that schedule optimization

1     will give you some benefit on its own, Dr. Israel, he plainly

2     admits that it doesn't.  There's this little increase in

3     passengers from combining the networks.  So instead, going

4     beyond that, Dr. Israel just assumes capacity growth and

5     that's where the benefits come from.  And all of that

6     increase in capacity that Dr. Israel assumes and it's based

7     on the clean team schedule that was created with an eye

8     towards investigation and litigation, Dr. Israel attributes

9     that to the NEA.  But really, Your Honor, that's

10    fundamentally incorrect, because what Dr. Israel ignores is

11    what documents say on their face from JetBlue, and that's

12    that JetBlue would have grown anyway, regardless of joining

13    the NEA.

14            Let's recall what Mr. Friedman said, what

15    Mr. Friedman said in his documents before he was in the

16    spotlight on the witness stand.  What he said was that "the

17    clean team schedule was giving credit to new routes we were

18    considering, anyway."  And that JetBlue's five-year plans

19    confirm that.  They were planning to enter many markets,

20    anyway.  In other words, the clean team didn't show true

21    incremental value of the NEA.  That was Mr. Friedman's

22    concern and he said it multiple times.

23            But Dr. Israel, in relying on the clean team's

24    schedule, he did the same thing.  He just simply assumed any

25    JetBlue increase from 2019 to 2023 was attributable to the

1   NEA.

2          But as Mr. Friedman stated, that's just simply not

3   right.  That's not the case.  And in fact, Dr. Town looked at

4   this, and what he found was that all of the capacity

5   increases, and more, that the clean team and Dr. Israel

6   predict was accounted for in JetBlue's standalone growth

7   plans.

8          Now, the upshot of all of this is that Dr. Israel's

9   analysis doesn't really answer the relevant question of how

10  much growth actually can be attributed to the NEA.  So even

11  if Dr. Israel doesn't properly attribute growth to the NEA,

12  the question is still out there, is there other evidence that

13  the NEA caused growth?  And here, Your Honor, we think the

14  answer is straightforward again.  If you look at the two

15  airlines together, across their entire networks, the answer

16  is no.  There's no growth relative to Delta and United, and

17  American and JetBlue are smaller than they were in 2018.  And

18  specifically, looking at JetBlue, this next chart makes the

19  same point.  There's been increases in JetBlue's capacity on

20  the NEA routes, and there's been a corresponding decrease in

21  its capacity in the nonNEA routes.  And this makes sense

22  because capacity growth is necessarily limited by their

23  fleets.  That's why, Your Honor, ultimately defendants' only

24  argument here is that the NEA caused them to grow their

25  fleets, but that's not really right.

1            And just starting with American, the answer is

2      pretty easy to see.  They admit that they're robbing Peter to

3      pay Paul, a phrase that we used a couple of times in the

4      trial.

5            Now, defendants, in their brief yesterday, they

6      claim that's not the case, but their own counsel asked

7      Mr. Znotins if American is robbing Peter to pay Paul, and his

8      answer is here.  Mr. Znotins may have gone on to express some

9      type of optimism about going to the American board and making

10     the case for new planes later and having the confidence to

11     make that case, but hope and optimism and confidence and

12     making a case to the board later on in the future,

13     Your Honor, those aren't enough under the law, and it's not

14     even close.

15            So let me turn to JetBlue.  JetBlue said,

16     effectively, that it added 30 new planes due to the NEA by

17     delaying the retirement of their E190s.  But really, was that

18     due to the NEA?  Well, there's testimony on this from

19     Mr. Clark.  Mr. Clark's team showed that delaying the

20     retirement of the E190s was justified, regardless of the NEA.

21     Delaying the retirement of the E190s resulted in less overall

22     capacity in ASMs and only very slightly more seats and

23     departures in a scenario with the NEA.  It wasn't the NEA

24     that was driving growth at all.  All of that growth could

25     have happened anyway.

1      And the Court puts its finger on this, when

2  Mr. Clark was testifying, and asked Mr. Clark, "It didn't

3  occur to anyone to grow before the NEA by keeping the E190s.

4  And Mr. Clark said, "Correct, it didn't."

5      But, Your Honor, it actually did.  It did occur to

6  JetBlue's planning group.  They said, in July of 2020,

7  regardless of Connie, JetBlue will have to find a way to

8  preserve and likely grow the current order book, and to do so

9  by keeping the E190s.

10      Mr. Clark, his analysis later confirmed that they

11  made business sense.  Whatever defendants say about this now

12  at trial, whatever the JetBlue witnesses now say about it at

13  trial, the figures at the time show that it made lots of

14  business sense.  It would have generated more revenue to keep

15  the E190s, even without the NEA.

16      2021 internal discussions at JetBlue confirmed

17  this, Your Honor.  Network planning documents show that, by

18  2025, they would have needed 40 to 60 new aircraft just to

19  meet their growth plans without the Northeast Alliance.

20      So Your Honor, all of this, the plans Dr. Israel

21  ignored, the plans Mr. Freidman said weren't accounted for by

22  the clean team, the projected need for more aircraft,

23  regardless of the NEA, all of those things, Your Honor, they

24  tell the same story, none of the growth that defendants

25  attributed to the NEA is actually attributable to it.

1          Now, there are a few other supposed benefits that

2     defendants point to, and I'll start with the loyalty programs

3     and the network breadth.  And this might be a moralistic

4     point, I think, defendants called it.  But the question

5     really about these benefits is who do they go to?  Who gets

6     them and why do they matter?

7          Well, Mr. Raja, he told you.  And he was really

8     clear about it, that they care about the power traveler.

9     That's who these benefits go to.  And this American document

10    shows that 85 percent of American's own customers are what

11    Mr. Raja called the marginal user, the ones they value less.

12         Now, that 85 percent, Your Honor, can include those

13    who are most price sensitive, and for whom lounge access

14    doesn't matter as much.  They just want cheaper fares and

15    good service.

16         And Your Honor, let me step back and just say

17    what's probably obvious to everyone in this room, which is

18    these power travelers that Mr. Raja mentioned, the airlines

19    are always going to look out for them, they are always going

20    to be taken care of by the airlines, their are always going

21    to be covered by the airlines.  It's those marginal users are

22    the ones who are going to need protection of competition, and

23    protection of the antitrust laws, not the folks who are

24    always going to be sought after and always going to be taken

25    care of, anyway, Your Honor.

1          Defendants also talk about the concept of

2     relevance, as well, but that really just means the bigger you

3     are, the more attractive you are to customers.  Defendants

4     view here appears to be that bigger is always better.  Well,

5     know from market shares that JetBlue and American already

6     have significant presence in New York and in Boston.  And

7     JetBlue said as much to lenders in June 2020, right before it

8     entered the NEA, leading positions in key US markets.

9     Significant market share in some of the highest value

10    geographies in the United States.  Those are not the words,

11    Your Honor, of a company that lacks relevance.  JetBlue was

12    selling dominance to its prospective lenders.  It wasn't

13    crying weakness with those words.

14          And for American's part, I'm not going to spend a

15    lot of time here on talking about the relevance of the

16    largest airline in the country and in the world, but I will

17    point out one thing, Your Honor.  When we talk about

18    American's position in New York, American isn't where it is

19    in New York just because of some type of immutable business

20    environment or some type of act of nature or anything like

21    that.  It's in the position in New York today that it is

22    because of a business choice by Mr. Parker.  American just

23    didn't end up with fewer slots in New York, Your Honor, they

24    traded -- Mr. Parker traded those slots in New York to Delta

25    for a dominant position in Washington.  And American still

has that dominant position in Washington.  And they aren't
giving it back.  And what they really want here, Your Honor,
is they want the dominant position in D.C., in Philly, in New
York, and in Boston.  That's this bigger is better concept.
And even with the slots that American did have in New York,
we saw how they treated those.  They used them as little as
possible, as little as possible as they could get away with,
and they even lost track of the number, Your Honor.  Mr. Raja
testified about that.  So now they come to this court in this
case and talk about their position in New York, when they
lost track of their slots.

Finally, Your Honor, we want to touch briefly on
the competitive response.  Defendants talked a lot about
this, Your Honor, in terms of Delta and United and their
responses to the NEA.

Now, the Court may recall that, in their opening,
defendants talked about there's going to be evidence in this
trial about Delta and about United, and how they've responded
to the NEA, and how that's also a benefit of the NEA, this
competitive response.  And Your Honor, they even moved the
Court to compel live testimony of a couple of Delta
witnesses.  They said it would be crucial to this trial.  And
the Court granted that motion with regard to one of the Delta
witnesses.  But, of course, they were never compelled to
actually show up.  And same for the United witness.  And it's

1    not really hard to see why, because both of those witnesses

2    were deposed in this case, Your Honor.  Mr. Esposito from

3    Delta, he was asked, "Has Delta added any new routes out of

4    or into Boston because of the NEA?

5            "No."

6            Mr. Weithofer, "Our network strategy has not

7    changed since the NEA was announced."

8            That testimony, Your Honor, from those executive in

9    their depositions, contradict the narrative that defendant's

10   tried to leave about Delta and United in their responses to

11   the NEA.

12           Also, Your Honor, while we're on justifications,

13   regardless of how the Court views what we think are flimsy

14   justifications here, Your Honor, regardless of how the Court

15   ultimately lands on those, there is simply no way to justify

16   the NEA here in Boston, Your Honor, and that alone is enough

17   to block this deal.  There is a presentation to the JetBlue

18   board of directors that Mr. Hayes testified about way back

19   when on the first day of trial.  And in that presentation on

20   this slide, the JetBlue management recognized that the single

21   biggest antitrust risk, the version of the NEA that was least

22   justified was the inclusion of Boston in the NEA, and

23   JetBlue's management said why that was.  JetBlue was already

24   much stronger in Boston, and we know that's true.

25           Mr. Hayes and Mr. Clark, they both testified about

1     that very scenario.  They both testified that, before the

2     NEA, JetBlue used organic growth not just to establish itself

3     in Boston and not just to succeed in Boston, but to become

4     number one in Boston.  And unsurprisingly, JetBlue's growth

5     prompted some reaction from American and Delta, as the first

6     quarter of 2020, as of that time, which is right before the

7     NEA was formed, this internal JetBlue presentation shows that

8     all three of Delta, JetBlue, and American were growing and

9     competing in Boston.  And that growth and that competition

10    benefitted travelers by giving them choices.

11            That competitive landscape now, though, out at

12    Logan, that's changed dramatically, based on the 2019 share

13    of passengers, Your Honor, American and JetBlue accounted for

14    a 51 percent share of passengers going out of Logan, with

15    Delta at about 23 percent.  So functionally, Your Honor, we

16    have 75 percent of the passenger share at Logan controlled by

17    Delta and JetBlue and American acting together as one airline

18    at Logan.  So once again, though, why we're here is that

19    defendants' argument is that bigger is better.  If Delta is

20    getting bigger, we have to get bigger.  But getting bigger

21    through cooperating and collaborating, rather than competing,

22    Your Honor, isn't better.  It's just a shortcut and consumers

23    pay the price for that shortcut.

24            Now, the analysis could end there, Your Honor.  And

25    we think it should.  But if the Court does decide to credit

1    these justifications, the question of less restrictive
2    alternatives has to be resolved.  And here there is a less
3    restrictive alternative that's clear.  The less restrictive
4    alternative analysis simply requires consideration of whether
5    the procompetitive efficiencies could be reasonably achieved
6    through less anticompetitive means.

7            Reasonable, Your Honor, doesn't mean what's best
8    for the defendants or what's most profitable for them.  And
9    in this case, we don't have to imagine what the less
10   restrictive alternative is.  The defendants have deployed
11   such an alternative successfully already, and that's the WCIA
12   between American and Alaska on the West Coast.  Combine that
13   with a slot lease agreement between American and JetBlue in
14   New York, which there is evidence in the record that the
15   defendants were already planning to do so before they entered
16   the NEA.  Combining that slot lease with the WCIA structure
17   would achieve the benefits of the NEA without its most
18   restrictive elements.

19           And there's been ample evidence on the WCIA
20   establishing that it features many of the same aspects of the
21   NEA and achieves the same legitimate benefits.  It's much
22   more than just a codeshare, Your Honor.  It includes a growth
23   incentive, it includes connecting domestic passengers to
24   international flights, frequent flyer benefits, joint
25   corporate sales.

1            And Your Honor, as to how it's actually working, we

2       have testimony in the record from Mr. Harrison and Mr. Raja

3       that it's not only up and running, but it's beneficial.  And

4       in Mr. Raja's words, it's actually thriving.

5            Combining it with a slot lease from American to

6       JetBlue, that would provide for increases in capacity.  And

7       importantly here, Your Honor, it would do so without the most

8       egregious aspects of the NEA.  No capacity coordination and

9       no codesharing or revenue sharing on the nonstop overlap

10      routes.

11           And again, we don't have to imagine this.  We don't

12      have to imagine this alternative.  American and JetBlue

13      did -- American did, Your Honor.  Pardon me.  And what

14      American did, they called it an East Coast international

15      alliance, and including the possibility of a slot swap.

16      American called it a fallback option.  And the fact that a

17      version of this has been successfully implemented on the West

18      Coast is evidence, direct evidence that it's reasonable and

19      viable, that the defendants chose a more anticompetitive

20      option as their preference doesn't change the legal analysis

21      here.

22           So we've shown that there's a reasonable, less

23      restrictive alternative here.

24           THE COURT:  You're getting close to the hour, just

25      to give you a heads up.

1          MR. JONES:  I have about --

2          THE COURT:  I know you don't have much more.

3          MR. JONES:  I don't have much more, Your Honor.

4    I'm at the end of the analysis, almost.  But I do want to

5    say, Your Honor, that even after going through the three-step

6    analysis, there is a function of weighing the anticompetitive

7    harm against the anticompetitive impact of the NEA.  And the

8    defendants claim this balances or weighing is not part of the

9    analysis, but First Circuit disagrees and says otherwise.

10   And ultimately the point of the rule of reason is to weigh

11   the harm against the benefits.

12          So let's consider the two sides of this exercise

13   here.  So on the one side, you have loss of harm, loss of

14   head-to-head competition on overlap routes, or billions of

15   dollars in commerce affecting millions of passengers a year,

16   and joint control of a significant amount of capacity in very

17   important air space in this country.

18          On the other hand, you have Dr. Israel's assertion

19   of generalized benefits not attributed to any particular

20   market, that don't answer the relevant legal question, and

21   rest on plot assumptions of growth.  And you have defendant's

22   intangible justifications, which are not unique to the NEA,

23   and most are really promises about benefits that will go to

24   power travelers.  So Your Honor, the weight of the evidence,

25   in weighing the harm and the benefits is pretty clear.

1          So lastly, Your Honor, I really want to just talk
2     about the stakes here.  And what this case means not just for
3     JetBlue and American, but for all of us who use the airline
4     industry in this country.  We don't really have to look very
5     far to see kind of an industry that is sometimes rife with
6     dysfunction, that really affects travelers in real and
7     hurtful ways.  And in terms of what the NEA means for it,
8     well, think about the logic we've heard from defendants, that
9     if you have independent pricing and a growth incentive,
10    that's all you really need to justify consolidation in the
11    form of something like the NEA.  I mean, if you use that
12    logic, Your Honor, Delta or United can join the NEA.
13          Now, obviously, that's not right, but it's
14    defendants' logic here about bigger being better.  But
15    probably more worrisome, Your Honor, is this prospect of what
16    Mr. Kirby testified about, which is that if the NEA is
17    allowed, perhaps Delta and United will follow suit.  And what
18    we're going to have in the industry here is a bunch of NEA
19    type agreements focused on different parts of the country,
20    that cluster around each of the three legacy airlines.  It
21    will be a world in which the legacies not only control most
22    of the capacity, but have locked up low cost carriers and
23    these NEA-like joint ventures.  It would open kind of a
24    Pandora's box in the industry, Your Honor.  And Mr. Hayes
25    told us what that would look like.  It would look like this

1    world of the international joint ventures.  First, the

2    airlines would argue that because their competitors are big,

3    they need to get bigger.  That's the argument right now,

4    even.  If Delta is big, we must get bigger.  And it won't

5    stop there, Your Honor, because it never does.

6             Second, they'll team up, coordinate schedules,

7    share revenues, legalize collusion, that's what Mr. Hayes

8    called it.  And that's why we're here now, in this case.

9             Third, Your Honor, what it will ultimately mean for

10   customers, for consumers, it means they will have fewer

11   choices, and they'll face higher fares, and that's what

12   Mr. Hayes said, that's what he described.  And that's what we

13   have to look forward to, potentially, Your Honor, if the NEA

14   isn't stopped.

15            The last thing I'll say here, Your Honor, really is

16   that the NEA isn't some kind of creative, innovative

17   solution.  It just continues a trend of 20 years of

18   consolidation in this industry.  And it's dressed up now in a

19   different form, but that's all it does.  And, Your Honor, the

20   old form is still out there, too.  We're seeing that with

21   JetBlue currently trying to swallow up Spirit, the largest

22   ULCC in the country.  So we have the new form of

23   consolidation, next to the old form, but it's all pointing in

24   the same direction.  And to paper over the anticompetitive

25   nature of this deal here, we've effectively been told to

1    trust American and JetBlue working together, that they can

2    decide what's best for travelers, that they'll decide which

3    airline can fly the Boston/LaGuardia route, and which one

4    will exit that route.  That they'll decide that customers

5    only want one option at 8:00 a.m. on a particular market, not

6    a JetBlue option and an American option.  But I ask the Court

7    to remember, when defendants say that they'll optimize

8    everything for customers, these are companies that have

9    duties to their boards of directors and to their investors,

10   and when the choice comes down to it of picking what's best

11   for their customers and best for their investors, we know

12   who's going to win that fight every single time, Your Honor.

13          The one thing that gives pause in that scenario,

14   though, is the antitrust laws are clear on this point.  When

15   it comes to that choice, the law protects consumers, and the

16   competition decides, not the executives of two companies

17   huddling up together, telling us what's best.

18          Your Honor, the last thing I'll say here is, based

19   on all the evidence at trial, this is a bad deal for

20   travelers, and we ask the Court to enjoin it permanently.

21          THE COURT:  Thank you, Mr. Jones.

22          Can I hear from the defense?

23          **CLOSING ARGUMENTS FROM DEFENDANT JETBLUE**

24          MR. SCHWED:  We also have a presentation.

25          THE COURT:  I think I have a copy.

1          MR. SCHWED:  It's already been handed out.

2          Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. SCHWED:  Good morning, counsel.

5          When this trial started, I stood here at this table

6    and promised that the evidence would show that the NEA is a

7    highly procompetitive alliance that already has produced

8    substantial benefits to consumers, and that's what I

9    promised.  And I wasn't talking about hypothetical benefits.

10   I wasn't talking about simulated benefits.  I wasn't talking

11   about future benefits about some other transaction that

12   hasn't happened yet that might happen some day.  I was

13   talking about actual, real benefits for consumers in the form

14   of more flights, more choices, more capacity.  And this

15   morning, Mr. Wall and I will show you that, during the four

16   weeks of trial, we kept that promise.  We kept all of those

17   promises of showing future benefits and the government has

18   not met its burden under the rule of reason.

19          Now, today, we will focus on four key aspects of

20   our case that were conclusively established during trial.

21   They are all supported by testimony and documents and many

22   are not seriously contested.

23          First, the Northeast Alliance is a limited

24   collaboration that is nothing like a merger.  The principle

25   restraint -- and we put that in quotes, that the plaintiffs

1    have complained about, is joint scheduling and coordination,

2    but the evidence showed, very conclusively, that that is

3    necessary and critical and creates substantial benefits and

4    creates a strong NEA network that benefits consumers.

5            Other forms of competition, including pricing and

6    business model, are fully preserved.

7            Second, there is a demonstrated procompetitive

8    rationale for the Northeast Alliance.  It allows JetBlue and

9    American to become stronger, more competitive -- more

10   relevant competitors.  It allows them to combine

11   complementary assets to create a new network.

12           Third, there already have been substantial

13   procompetitive effects in the form of consumers benefits.

14   These are unambiguously positive benefits in the form of

15   increased output.  This is game-changing competition in New

16   York City and Boston that has been recognized by the

17   competition in their own business documents.

18           And maybe most importantly, given the way

19   plaintiffs have framed this case, JetBlue has been

20   strengthened, substantially strengthened in the Northeast,

21   not changed, not co-opted.

22           And fourth, the expert analysis confirms these

23   results.  There's no evidence of actual harm of any form.

24   Output has actually increased and the evidence also shows

25   that the merger simulation is entirely unreliable.

1          Starting with the first of these four elements, the
2    limited collaboration, there are the agreements themselves,
3    retain and encourage key aspects of competition.  Dr. Israel
4    explained the different aspects of competition in the airline
5    industry.  The first bar, if I could just -- shows overall
6    business model, capacity, pricing, the NEA agreements
7    themselves talk about how those elements are completely
8    retained.  And the evidence, from all the witnesses and the
9    documents show that the airlines are still competing across
10   all those elements of competition.  And at the bottom, you
11   see loyalty.  There was extensive testimony about the fierce
12   competition between American and JetBlue within the Northeast
13   Alliance for loyalty.
14         The one potentially arguable coordination that the
15   plaintiffs have focused on is the route specific network
16   planning.  But the evidence has shown that that route
17   specific network planning, the fact evidence, the expert
18   evidence has led to substantial consumer benefits in the form
19   of more choices and more capacity.
20         Now, there have been some sound bites about not
21   competing that plaintiffs put up in their presentation.  I'm
22   sure the Court recalls the entirety of the testimony about
23   whether or not American and JetBlue compete within the
24   Northeast Alliance.  There was a lot of it.  It was very
25   substantial for Mr. Hayes.  So a single sound bite to a

single question about whether, on some element, there's
competition does not in any way come close to encapsulating
the fierce competition.  I'm sure the Court will recall
Mr. Hayes, for example, and Mr. Laurence, for example,
testifying why JetBlue is competing for customers, competing
with American for customers in the Northeast Alliance, how
it's good for JetBlue when those customers get on at JetBlue
and experience the JetBlue product.  Maybe they'll join the
loyalty program, maybe their next flight from Miami to Los
Angeles they'll choose JetBlue instead of American because
they like the product.  JetBlue is competing every day for
those customers.

        And Mr. Clark testified that the pricing team and
the revenue management team do not consider the NEA at all
when they are setting prices.  And those are the two teams
that determine what every single passenger on every single
seat on every single flight actually pay.  They are competing
against American just as hard for those customers as they
were before we ever entered the NEA, and those employees,
they don't know what the MGIA is or what it's about.  They
are not accounting for whether revenue will flow back to them
if they -- if they change their prices one way or the other.
They have no knowledge of that agreement.  They are pricing
exactly the same way they did before the Northeast Alliance.
        And their own expert, Mr. Miller, says he has no

1    evidence of actual fare increases.  He admitted that there is

2    no evidence of an actual fare increase in this case.  And

3    there is no evidence of any loss of any aspect of the JetBlue

4    effect.  Zero.

5         Now, Mr. Hayes did testify broadly about the

6    broader issue, about whether JetBlue can or will change.  And

7    that's a big centerpiece of plaintiffs' claim, that somehow

8    JetBlue is going to disappear or the JetBlue effect or the

9    JetBlue model will disappear.  They use the phrase that

10   JetBlue sold out and cashed in.  They've had a lot of

11   different terminology.

12        Mr. Hayes testified that JetBlue did not enter the

13   Northeast Alliance because it wanted to change its business

14   model.  Quite to the contrary, JetBlue entered the Northeast

15   Alliance because it wanted to accelerate its business model,

16   bring it to more customers, in more places.  And he also

17   testified to the question of -- there was a question asked to

18   him by me, have you changed your business model, or will you

19   change your business model?  And Mr. Hayes answered, well,

20   you can't.  And Your Honor may recall, you actually

21   interrupted that motif, "You can't, or you have not?"

22        And he said, "we can't."

23        It is so engrained in our fabric.  It is so

24   essential to who we are, to what we are.  That is who we are

25   in the marketplace.  We can't go back 70 years and say and

1    recreate time and become a legacy airline.  JetBlue is -- it

2    has that sweet spot that we saw because of what -- because of

3    its low price and high quality.  It is the only airline in

4    that sweet spot and it just cannot and would not ever change.

5    And that sweet spot diagram is actually from an orientation

6    deck.  And Mr. Hayes explained that every single new crew

7    member is told about the role that JetBlue plays in the

8    marketplace, often by Mr. Hayes himself, because it is so

9    fundamental to who JetBlue is, to what they do every day.

10              Turning to the next aspect that we want to talk

11   about, is the actual rationale.  Why did the parties enter

12   the Northeast Alliance?  Well, let's start with New York

13   City.  This is the actual data showing what was happening in

14   New York City leading up to the Northeast Alliance.  JetBlue

15   and American were both losing share in New York at the

16   expense of -- to the benefit of United and Delta.  They were

17   going opposite directions and this is not a one-year trend.

18   This is not a slice of time.  This is a five-year trend that

19   the airlines needed to address.  There has been extensive

20   testimony about the importance of slots and landing rights in

21   New York.  The evidence is clear, it's not disputed.  Delta

22   and United dominate the New York City takeoff and landing

23   rights.  They have -- there is just no comparison.  These are

24   structural advantages that Delta and United enjoy over

25   American and JetBlue.  These are virtually permanent

advantages that, without the NEA, there's no way for American
and JetBlue to overcome.  It's not just the data, but the
Court also heard the testimony from many witnesses about the
role of slots in New York City.  Mr. Hayes explained that the
number one hindrance to growth that JetBlue had was the lack
of slots.  And everybody would agree, I think even
plaintiffs' agree, hindrances to JetBlue's growth are not
good.  They are not good for consumers, they are not good for
anybody.  And JetBlue had tried over the years, repeatedly,
to get those slots.  Mr. Hayes testified about it,
Mr. Laurence actually went through a slide deck that went --
that showed every single attempt or many of the big attempts
that JetBlue had made over the last decade to try to get
those slots and how they had failed regularly and repeatedly.
He explained that he had a standing order to get slots
whenever there was an opportunity and that the answers were
roundly no.

JetBlue slot problems are easiest to see in
LaGuardia, where, in twenty years of their existence, they
had managed to obtain a grand total of 15 slot pairs in
LaGuardia, and overnight, with the Northeast Alliance,
those -- the amount of slot pairs they had jumped up to 55,
it more than tripled what they were able to do in their first
20 years of existence.

Boston, of course, is not a slotted airport.  The

1    story is slightly different.  And it's also different

2    because, as plaintiffs point out, JetBlue was, leading into

3    the NEA, the largest carrier by a little bit over Delta.  But

4    it's also very clear that Delta was threatening that

5    position.  Delta had committed to becoming the number one

6    carrier.  On their own documents, they had committed to

7    becoming the number one carrier in Boston.  They had

8    designated it a hub.  And we heard from Mr. Clark, Mr. Hayes,

9    Mr. McMenamin about the challenges that JetBlue faced in

10   Boston.  And most significantly was JetBlue had a larger --

11   in order to be successful in Boston, needed to be more

12   attractive to business customers than it might in other

13   marketplaces, and that on that front in particular, but also

14   with leisure travelers, it could not compete with Delta's

15   global network.  The reach of JetBlue, the relevance of

16   JetBlue could not compete with Delta's global network once

17   Delta set its sights on Boston, just like it had done on the

18   West Coast once before.  And it wasn't like JetBlue was

19   sitting around saying let's wait for an opportunity with

20   American.  JetBlue had projects.  The Court heard about

21   Project Revere in Boston 200.  Those just were not doing the

22   job.  And it was not like this was JetBlue ran to American.

23   It had tried and it was not able to compete because of a lack

24   of a global network, and nothing they could do on their own,

25   nothing at all, could compensate for that, or could create

1    anything close to the global network that Delta was bringing

2    to Boston.

3                So the solution in New York and in Boston was the

4    Northeast Alliance, and what the Northeast Alliance does is

5    unlock customer value.  It improves JetBlue's and American's

6    incomplete customer proposition relative to Delta and United.

7    It maximizes customer value in the Northeast, and it improves

8    overall competitiveness with Delta and United.

9                The Court heard testimony from Mr. Raja from how

10   American thought of this, how it creates a real customer

11   proposition that allows American to go out and compete, that

12   it creates a better schedule pattern and frequencies that

13   allow it to compete better with United and Delta, which were

14   dominant in the Northeast.

15               Mr. Raja testified about this document, which he

16   referred to as the eureka slide, and I think this document

17   shows, in many respects, two different things very

18   effectively.  First, the gray columns, where it shows AA and

19   B6, show that leading into the NEA, in New York, American and

20   JetBlue were half the size of Delta and United.  That was the

21   challenge they faced when they were trying to be relevant in

22   New York City.

23               The green shows that the NEA allowed them to be a

24   comparable competitor to Delta and United.  But the reason

25   that this was the eureka slide was that the green also shows

that one plus one is greater than two, that the whole is greater than the sum of the parts, and those are the numbers in purple, I think it is, in parentheses, that show when you combine the networks, when you combine all of the elements of the Northeast Alliance, it provides more than just mushing the two together.  It allows opportunities for growth and expansion because of the schedule optimization, because of the coordination.

This is JetBlue's presentation to its board.  It was a similar explanation, although, of course, from the JetBlue point of view.  And Mr. Laurence and Mr. Hayes explained -- the way this was explained to the board was that it was very simple.  The strategic rationale for the Northeast Alliance was to bring low fares and award winning service to more New York and Boston customers.  Nothing more, nothing less.  This alliance allows JetBlue to bring more of JetBlue to more people.  That's a really good thing.  And the way it did it was by improving network relevance and customer utility.

Mr. Hayes testified that this was a generational opportunity for JetBlue to grow in New York, and that it allowed it to stay relevant in Boston, two key goals -- addressing two key competitive concerns they had going into the Northeast Alliance.

The competitive reaction was telling.  This is a

1    business document.  This isn't testimony.  This is a document

2    that Delta created when they were trying to figure out what

3    to do in response to the Northeast Alliance?  Now, if the

4    plaintiffs were right, one would think that Delta would be

5    jumping up and down when they heard about the Northeast

6    Alliance, celebrating the Northeast Alliance.  It will bring

7    less capacity that will be challenging us.  It will get rid

8    of that pesky JetBlue that forces us to lower our fares,

9    because they will be co-opted.  We'll get more passengers and

10   we'll charge more.  That's not what Delta was saying.  That's

11   not what United was saying.  That's not what Southwest was

12   saying.  Nobody was saying that.  Because they all recognized

13   that this made JetBlue and American more competitive.  And I

14   think Delta summed it up really nicely, that the Northeast

15   Alliance creates one relevant competitor out of two weak

16   ones.  That's good for consumers.

17          Even Mr. Watterson, who was called by plaintiffs on

18   their case, supported this view, that the Northeast Alliance

19   makes JetBlue and American more relevant, more attractive to

20   customers.

21          Now, of course, Southwest might not like having a

22   competitor that's more relevant and more attractive for

23   customers, but that's good for the customers and that's in

24   their documents and in their testimony.

25          So what are the actual effects, what actually has

1    happened under the Northeast Alliance?  The evidence shows
2    that the actual benefits, based on actual flying and actual
3    schedules was tangible, real, and substantial.  It shows it
4    across many different metrics.  We haven't cherry-picked
5    individual metrics.  We have shown this.  The evidence has
6    shown this across multiple metrics.
7         Now, the plaintiffs argue, well, all of this would
8    have happened without the NEA.  There's absolutely no
9    evidence to support that proposition, that this all would
10   have happened, that any amount of this would have happened
11   coming out of COVID without the Northeast Alliance, this
12   massive growth, this massive consumer benefit.  Nothing.  And
13   these basic facts are simply uncontested in the record.
14        I'm going to go through some of the details.  Just
15   a very common metric, kind of the overall metric that often
16   is easiest to use if you want to sum it all up without
17   looking at the individual items is just available seat miles.
18   And this shows that across the NEA, JetBlue and American's
19   combined ASMs went up from roughly 18 and change to over
20   26 percent of the ASMs in those markets.  And we didn't
21   cherry-pick 2017, 2018, 2019.  You look at any of those years
22   and compare them to what happened in 2021, after the
23   Northeast Alliance went from 18 percent to 26 percent.  A
24   massive growth.  If we look at LaGuardia alone, the
25   right-hand column shows average number of seats, a 20 percent

1    increase from before the NEA, before COVID, to under the NEA

2    in 2022, and you can see that most of that is from JetBlue.

3    And actually, if we look at the next slide, this will show

4    the average departures of JetBlue went up -- went up by more

5    than 100 percent, more than doubled.  The average seats by

6    JetBlue more than doubled.  Again, more JetBlue flying, good

7    for consumers.  Just one thing to note is this shows 40

8    average seats.  You might remember the number 55.  The

9    average is lower than the maximum, because weekend flying is

10   lower, but during the week, JetBlue is flying those 55 slots.

11          There were real ordinary course business documents

12   that show this.  This was a network planning presentation to

13   the bosses that Mr. Friedman testified in detail about.  And

14   this shows the actual new routes and the growing capacity as

15   a result of the Northeast Alliance.  This is not some made up

16   testimony.  These are real, actual results.  This is more

17   flying that is good for those customers that are flying home

18   for Thanksgiving.  This isn't bad.  This is good.  They have

19   more choices, can get to more places, and they have more

20   seats.

21          Mr. Raja testified from the American perspective

22   about the 15 new routes in Boston.  He -- a similar number of

23   new routes in JFK, including, as this chart shows, a number

24   of new transatlantic routes enabled by the Northeast

25   Alliance.  And it had been years since American had launched

1        a new transatlantic route.

2                He also talked about what happened in LaGuardia.

3        These charts, just to put very similar ideas, just listing

4        out all the new growth in New York.  The red is American, the

5        blue is JetBlue.  And the same thing you can see in Boston.

6                And the only real response when witnesses testified

7        about this on cross-examination or Dr. Town talked about it

8        was they would cherry-pick a few of these many, many routes,

9        and they would say, "Well, you're no longer flying this one,

10       are you?"  And the witnesses would explain, "No, that one

11       we're not flying."  Because that's what's expected when you

12       introduce a whole host of new routes that you haven't flown

13       or were not flying.  They're not all going to work, and if

14       you don't have consumer interest, you should switch from

15       those routes to another.

16               And the way Dr. Town approached this was telling.

17       He criticized American for getting out of -- for no longer

18       flying to Colombia without considering whether there was any

19       demand for it, or the fact that American had replaced that

20       with other international flying to meet where the consumers

21       wanted to go.  That's all good.  These are benefits to

22       consumers.

23               Schedule optimization is another concrete benefit

24       of the Northeast Alliance.  One benefit is improved

25       schedules, where there's overlaps or codesharing.  Instead of

1    having wing-tipped flying, the planes are spread out through

2    the day.  That gives consumers more options.  That's a good

3    thing.  That shows a different benefit, which is the actual

4    connectivity, connecting -- connecting, for example, in this

5    case, flights to JFK/Tel Aviv.

6            This is particularly notable, because that -- the

7    JFK/Tel Aviv flight is a flight that would not have happened,

8    period, without the Northeast Alliance.  This increased

9    connectivity added the passengers that justify the

10   $170 million cost that we heard about for flying that flight.

11   And all the green and all the blue on this matter is JetBlue

12   connectivity to that flight that made that flight possible.

13           And it's not just the codesharing.  It's the

14   schedule optimization that's key, because those flights

15   actually have to connect at a reasonable time, and the

16   parties need to talk about how to do that, and JetBlue needed

17   the slots that American had.  JetBlue didn't have the slots

18   to be able to bring the planes in, all those green planes,

19   without -- without the Northeast Alliance.  These are real

20   tangible benefits.

21           A different type of benefit, another metric that

22   Mr. Schweinzger explained was QSI, a quality of service

23   index.  It's not necessarily intuitive, but when -- it's

24   often referred to as maybe whether an airline is punching

25   above its weight.  How does the actual market -- what it's

1    really measuring is how does the actual market share of flown

2    passengers compare to what would be predicted based on your

3    aircraft.  And what it's showing is and where there's

4    improvement and means that you're becoming more attractive to

5    your consumers on a qualitative basis.

6              And the -- and the right-hand -- the chart on the

7    right shows from preNEA to postNEA JetBlue and American are

8    more attractive to their customers, and that is coming at the

9    expense of United and Delta.  The customers, the bottom line

10   is that, as a result of the Northeast Alliance, JetBlue and

11   American are more attractive to their customers.  And the

12   customers are voting with their -- with their wallets and

13   their feet.

14             There's also Mr. Schweinzger and Mr. Fintzen, on

15   behalf of JetBlue, talked a lot -- testified about the time

16   and money that went into seamlessness.  It's an extensive

17   effort.  I'm not going to go through this, don't worry, but

18   it was a lot of time and money by both airlines.  And they

19   did this because their goal was to create a seamless network

20   that could compete with United and Delta.  They would not

21   have done this if their goal, as the government would

22   suggest, was merely to coordinate capacity to reduce flying

23   and raise fares.  You don't need a seamless network to do

24   that.

25             This was done because they wanted a better product.

1    They want to address competitive deficiencies against United

2    and Delta and be a real true third competitor, which is

3    exactly what Delta saw coming.

4           Before I turn this over to Mr. Wall, I do want to

5    address one of the themes that has permeated this case, and

6    we saw in the opening.  Sometimes they use the phrase

7    "robbing Peter to pay Paul."  Sometimes they say, "Well, it's

8    all a shell game."  Sometimes they say, "It's a zero sum

9    game."  It's the argument that -- because JetBlue in

10   particular had a limited number of planes, there could never

11   be growth because of the Northeast Alliance.  It's just

12   impossible.

13          As a starting point, that ignores the ability that

14   we heard from witnesses to use your aircraft, to use your

15   fleet more efficiently.  But more importantly, it ignores the

16   fact that JetBlue grew its fleet because of the Northeast

17   Alliance.  It delayed the retirements of the E190s because of

18   the Northeast Alliance, and it accelerated and exercised

19   options of A220s because of the Northeast Alliance.

20          Now, plaintiffs say, well, JetBlue would have done

21   that anyway because they needed planes to fund their preCOVID

22   growth plans.  The simple fact is -- excuse me, Your Honor --

23   the simple fact is those growth plans did not survive COVID.

24   They didn't, and they wouldn't have been expected to.

25          Now, while Mr. Friedman himself, in route planning,

did what route planning people always do, Mr. Hayes explained this, he advocated to try to get back to those plans.  He advocated for more planes.  But the people who actually had to pay for the planes, the people who had to make the decisions had already decided to retire the E190s.  That decision was made.  While Mr. Friedman may not have been happy about it, he was not the department that was paying for them.  His job was to show opportunities and senior management decides whether to keep the planes, retire the planes, or get new planes, And that decision had been made.

          And they also showed -- the plaintiffs also showed a spreadsheet from Mr. Clark, where he was showing the revenue from -- under -- with NEA or not.  That spreadsheet was done after the decision was already made.  It didn't show costs, and it didn't show profits.  And Mr. Clark explained why the costs would have been very different with the NEA flying versus the nonNEA flying.  The decision was made and that didn't change the decision.  They had already decided not to keep the E190s.  And the only thing -- the testimony is crystal clear, and there's nothing contradicting it, the only thing that caused JetBlue to keep the E190s was the Northeast Alliance.  Mr. Hayes said it.  "We were due to retire the E-190s, which we announced that we would no longer retire to cover NEA flying."

          As Mr. Friedman said, "We," JetBlue, "have 30

1    incremental aircraft, period, as the result of the Northeast

2    Alliance."  And eventually those 30 incremental aircraft will

3    turn into A220s with 30 percent more seats because of the

4    Northeast Alliance.  That's good for consumers.  That's real

5    growth.

6           And Mr. Raja, he testified the exact same thing.

7    He actually interrupted Mr. Wall, asking if they will grow,

8    and he said we already have.  We've already increased our

9    fleet because we were going to delay those 787s, cancel the

10   787s, and we did not because of the NEA.

11          And now I will hand this over to Mr. Wall.

12          THE COURT:  All right.

13          **CLOSING ARGUMENTS BY DEFENDANT AMERICAN AIRLINES**

14          MR. WALL:  Thank you, Your Honor.

15          THE COURT:  Good morning.

16          MR. WALL:  Thank you.  So I'm here mostly to talk

17   about the things that, as an antitrust analyst, I think are

18   most important.  But first, before I do that, I have to talk

19   about some of the things that I think are least important.

20   And we are going to borrow your phrase from the trial in

21   which you called something a red herring, and there were a

22   number of them that have come up constantly.  The first one

23   is I'm just going to pick up right where Mr. Schwed did with

24   this whole idea of robbing Peter to pay Paul.  Because when

25   we turn this into -- when we get serious about antitrust

1    analysis, when we think about what actually needs to be

2    proven to meet burden of proofs of and so forth, it's not

3    enough to just throw out a theme.

4              Now, this narrative is a way of denying NEA growth.

5    It is -- it is denying it based upon the idea that there's

6    some victim, Peter, that is actually paying for the benefits

7    of the NEA.  And the first thing that anyone needs to

8    recognize about that argument is you don't need it, unless

9    you, in the position of the plaintiff, are confronted with

10   evidence of NEA growth.  The argument implicitly admits to

11   the fact that there is a Paul.  There is someone who is

12   benefitting from the NEA growth.  And its object and purpose

13   is to try to say cancel that out, because there's someone

14   else.  There's this fellow, Peter.

15             But in four weeks of trial, we never heard who

16   Peter is, where Peter is, what happened to Peter?  Did Peter

17   pay more?  Did Peter have fewer choices?  It was all an

18   unfinished sentence.  It's all just an idea and it's based

19   upon the false logic that life is, in the airline industry,

20   is a zero sum game.  And you can't actually grow, and you

21   actually can't increase output and create consumer benefits

22   because, as Mr. Jones put it earlier, I wrote down the quote,

23   "capacity growth is necessarily limited by their fleets."

24             Well, that's just nonsense.  You can buy more

25   planes.  And in fact, even Dr. Town testified in this case

1    that the fundamental model of investment in the industry is
2    that airlines grow capacity to serve anticipated demand.  And
3    that's what the NEA is about, in a nutshell.  It's about
4    creating a more competitive position that captures more
5    demand that can fuel more investment and more growth.  And as
6    Mr. Schwed just said, on the JetBlue side, where this was
7    more challenging, they grew.  They ordered the 30 planes.
8    It -- that's real, that's not fake.  That is something that
9    actually happened because of the NEA.

10          But I really want to focus on the last part,
11   because none of this matters at all without proof of the
12   victim, proof that someone was harmed.  There's no evidence,
13   none of their experts addressed this, nobody says, well, look
14   at what happened in funding market A and funding market B.
15   What Mr. Znotins and others explained is that you usually can
16   find the planes in some place where they're not needed as
17   much.  Well, maybe there's excessive capacity, maybe it's
18   already unprofitable flying.  You move things around.  And
19   this is the nature of what network planners do every single
20   day and it allows them to create benefits without having to
21   actually damage anyone else.

22          The next red herring -- I'm glad we didn't hear
23   much about it this morning, maybe we're making progress, was
24   the frenzied text messages, and all of the time that we spent
25   talking about the text that Jordan Pack and Chad Schweinzger

exchanged.  I think the evidence showed very clearly that had
nothing to do with what it was represented to be about at the
time of the opening statement.  It wasn't commentary on the
NEA or the lack of the NEA benefits.  It was frustrated
commentary about what the regulatory process might entail and
what the DOJ might argue.  It's very clear in the evidence
that the business case for the NEA was based upon the
so-called v2 schedule, which was not fleet constrained,
because it is indeed no bueno to actually think that you
would model a growth initiative without allowing growth.
It's insane.  It makes no sense at all.  And the business
people would have none of it.

Another thing which, very surprisingly, you heard
nothing about in the closing statement, was the extraordinary
amount of attention that had been given to the idea of legacy
airline capacity discipline.  And this is Dr. Town.  This is
two experts, basically two competitive effects theories that
they spent time on.  One of which was capacity discipline and
it doesn't make any sense.  The first question is why are we
talking about this at all in this case?  It's something that
happened years ago and it involves an activity, which is the
coordination of aggregate capacity, your fleet size, which is
fully outside the scope of the NEA.  It is not something that
is coordinated in the NEA.

Now, I won't take any time with this, but I would

say that Dr. Lee established very clearly that the predicate

that there was ever this period of capacity discipline hasn't

been proven, but again, the more important point is that the

NEA was a growth initiative, and it's not even directionally

aligned with capacity restriction.  In fact, if you think

about it, the last thing that you would want to do if you

believed any part of Dr. Town's predicate is enter into an

alliance that strengthens JetBlue, who, in his narrative, is

a primary force that that is supposedly frustrating and

blocking capacity discipline.  We actually did something that

caused that disruptor to grow.  So this was an awful lot of

time wasted on something that makes no sense.

        Now, I did notice that, in plaintiffs' post trial

brief and their findings of fact, they're still trying to

make use, this what I consider just this specious use of this

e-mail exchange that Robert Isom and Vasu Raja had on

March 20, 2020, when the effects of COVID were hitting the

airline industry like a ton of bricks, in which Mr. Isom had

reached out to a mentor formally, not then, but formerly

associated with Delta, and they had a conversation about how

the industry was going to have to take down capacity.  And

they tried to relate that to capacity discipline.  And

indeed, it was the one document that they had that they said

was going to show that the NEA had some relation to capacity

discipline.  That's entirely frivolous.

1          They knew before this trial started, from

2    Mr. Isom's deposition, exactly what that call was about, and

3    what that e-mail was about, that it had everything to do with

4    COVID, nothing to do with anything else.  And they went

5    forward with it, anyway.

6          The next point that I want to talk about in the red

7    herrings is -- is their take on metal neutrality.  The effort

8    they are trying to make to say that that means that the NEA

9    really is a merger.  In the first place, metal neutrality is

10   not something new or unusual.  It is a standard feature of

11   international alliances.  It is one that the Department of

12   Transportation demands of international alliances before it

13   will find that they create the public benefits required for

14   antitrust immunity.  And it's -- in the case of the NEA, it

15   is a very narrow and specific concept that is intended to

16   align incentives around making route planning decisions that

17   are in the best interest of the alliance and to consumers,

18   rather than an individual airline's immediate self-interest,

19   like I'd rather fly the 8 o'clock flight than the 6 o'clock

20   flight.

21          Beyond that, the parties aren't neutral.  They

22   absolutely are able to keep their pricing -- I just -- I

23   can't stress enough, in the general arch of an antitrust

24   case, you just can't slough off the fact that there is no

25   pricing coordination in the NEA.  You know, we frequently

call price the central nervous system of the economy.  You
have heard that from them if there was any pricing
coordination under the NEA.  They would have been all over
that every single day, that we are messing with the central
nervous system of the economy.  But we're not.  And as a
result of that, they can't argue that.

And so they just try to ignore the fact that the
things that distinguish these two airlines, more than
anything else at all, which is their pricing philosophy.  The
low cost carrier with the low fares, the legacy airline with
the higher quality but higher fares, that doesn't change.
That's still happening.  I can still choose, on any route
that they overlap, which one of them I want to fly and which
fare structure I want to buy.

They pretend it doesn't happen.  They say that
we've eliminated all competition.  You can't say that someone
has eliminated all competition, when their most important
competitive distinction is fully preserved by the NEA.
That's not a small thing.  That's not a slough-off point in
any way, shape, or form.

Now, London-Heathrow remedy slots.  In their trial
brief, you will see that they argue that there are four
things that they now say actually constitute direct evidence,
that's direct evidence of anticompetitive effects.  And one
of them is this tale that you heard about JetBlue being

1    disqualified by the UK competition markets authority from

2    being able to get these four Heathrow remedy slots.  This is

3    another unfinished sentence, because that's a regulatory

4    decision.  That's not a market decision.  Antitrust adverse

5    effects are about what happens in the market.

6            So you now have to connect that to lower output,

7    higher prices on a market-wide basis.  That's our metric,

8    that's our analysis, but there's no connection there.  And

9    the reason that there's no connection there is because, as

10   Mr. Hayes testified, JetBlue had other ways to get the slots

11   they needed on the timeline that coalesced with the aircraft

12   that they needed to acquire, the long-range aircraft that

13   they needed to acquire to provide that service.  And so there

14   wasn't any time, at all, when JetBlue had airlines that --

15   aircraft it could have used for those services and didn't

16   have the slots to fly them.  They were able to enter on time

17   with the service they want, at the fares that they chose,

18   which are the low disruptive fares that they always choose.

19           Now, when we go on and we now start turning to the

20   rule of reason, I want to make a comment about the -- about

21   the reference that's been made to the quick look today.

22   You'll see a -- if you read it last night, in their trial

23   brief, all of a sudden at the end of the trial, we're seeing

24   an argument that maybe the capacity coordination and the

25   revenue sharing could be condemned without market analysis.

1    That's what quick look means.  Mr. Jones misspoke.  It

2    doesn't mean that you satisfy your first step.  It means you

3    win the case.  It means you dispense with the rest of the

4    analysis.

5            There is no good-faith argument that the quick look

6    applies in this case.  This is a joint venture.  In a joint

7    venture that creates integrative efficiencies, people are

8    allowed to do all sorts of things that could otherwise

9    possible be illegal in the antitrust law, including fixed

10   prices.  We're not doing that.  But in a joint venture, the

11   rules change entirely.  The full rule of reason applies,

12   without a doubt.  I don't even know why they're trying to

13   bring that up at this point.

14           The argument also treats the joint scheduling as if

15   it's just a generic market division, that all we do is we get

16   in a room and we divide up markets.  That's sort of how

17   Mr. Jones said it.  Well, you know that's not true.  You know

18   that they do something completely different.  They try to

19   create a network and that joint planning is essential to that

20   network, as we'll talk about.

21           So back to the regular rule of reason.  So step

22   one, look, the standard is actual harm.  I'm not going to

23   spend time on the law today.  I look forward to the next

24   hearing, where we get to talk about this as long as we can,

25   but the -- let's just talk about the evidence right now.

1   There isn't any evidence of actual harm.  And that's just not

2   the half of it, because there is actually lots of evidence of

3   expanded output.  But then I don't think that they've

4   established -- come close to establishing a basis for the

5   indirect proof of harm either through the combination of

6   market power and inherently anticompetitive conduct.  There's

7   certainly no foundation for Dr. Miller's merger simulation.

8          And I just want to emphasize again what Mr. Schwed

9   said at the very beginning, about the complete absence of

10  evidence about the loss of the JetBlue effect.  Go back to

11  the complaint in this case, read the complaint in this case,

12  it's number one theme is that the NEA will threaten the loss

13  of the JetBlue effect.  And as I said in the opening

14  statement, that is actually the most reasonable and credible

15  concern that someone could have with an alliance like this

16  between American and a low cost carrier.

17         And so it is, again, not a small thing that, in

18  four weeks of trial, they didn't present a shred of evidence

19  about the loss of the JetBlue effect.  Nothing.  Nothing at

20  all.  And they started by trying.  They brought Mr. Hayes in

21  here as the first witness, but it just didn't work.  It

22  didn't work at all.

23         So let's look at the actual effects.  We couldn't

24  disagree more that you can't do an actual effects analysis

25  here because of COVID or anything else.  There's --

1    apparently there was a suggestion in the post-trial brief

2    that the real problem is that we have been giving antitrust

3    advice from the very beginning of this that vastly overstates

4    our influence with these companies, to say the least.  Look,

5    these companies didn't hide in a trench over the last 20

6    years; they came out with what the NEA is, boldly, by making

7    hundreds of competitively significant decisions.  They -- if

8    you want to use their terminology, coordinated capacity, on

9    nearly 100 routes, they made countless pricing decisions.

10   They've done all sorts of things.  They have all of the

11   resources that we have, all of the economists that we have to

12   analyze the data about those, to see what happened.

13   Undoubtedly, they did it.  Don't think for a moment that they

14   didn't do it.

15          And yet, they came to this trial without any

16   evidence whatsoever of any tangible harm to any consumer, any

17   market in it which, as a result of the NEA -- not just we

18   might have lowered our capacity, that's just -- that's not

19   even half of the analysis in an antitrust case.  A market --

20   a reduction of capacity means enough of a reduction of

21   capacity of your own reduction of capacity to effect the

22   market-wide capacity, and therefore, the price.  And there's

23   no effort to show that here.  They did nothing at all to show

24   anything like that.  Nothing whatsoever.

25          But the key thing that I want to stress is output.

1    Because output increased and you can't fake output.  Output
2    is real more flying, more seats, more frequencies, better
3    schedules, all of those things that we did, the things that
4    create the QSI improvement.  That's real output enhancement.
5    And there is no case, under the rule of reason, I will say
6    flat-out none, in which a court has found that conduct was
7    anticompetitive in the face of increased output.
8          I mean, the classic statement now, the recent
9    statement from the Supreme Court in the *American Express* case
10   is that you need to show reduced output.  But forget reduced
11   output.  I'm saying when it's positive, when the pricing
12   pressure is going to be downward because of the increased
13   output, the plaintiff loses, period.  End of sentence.
14   That's simply the end of the analysis.
15         So Dr. Israel went through, and that he cataloged
16   as Mr. Schwed did, all the different ways in which output has
17   increased.
18         And then Dr. Carlton took on the other side,
19   because the fact is you can do fare analysis, it's not nearly
20   as hard as what they said.  And his analysis showed that
21   there was no basis to find that there were any adverse fare
22   effects.  And by the way, as we'll see in a moment, the more
23   recent the data are, the better the picture looks.  As we
24   come out of COVID, and we start to have more normalcy, the
25   picture for us gets better, which means the picture for

1    consumers is getting better.

2         Now, I want to go on to the question of market

3    power.  It's interesting, as you remember, prior to today,

4    the proof that they would throw up with respect to market

5    power was a merger analysis.  That's what you heard in the

6    opening.  That's what you heard in the -- read in the

7    pretrial brief.  That's what Dr. Miller had put on.

8         Today, finally, they at least start talking a bit

9    about the Section 1 concepts of market power.  But still,

10   they fail to deal with the two giant elephants in the room,

11   Delta and United standing in the way of any possible exercise

12   of market power by American, by JetBlue on these routes.

13   There is one page in their post-trial brief, page 43, that

14   discusses the issue of a potential competitive restraint from

15   Delta and United, and there was one sentence on that page

16   that addresses it, which -- saying simply that United and

17   Delta can't replace JetBlue.

18        Well, first of all, nobody needs to replace

19   JetBlue, because JetBlue is still JetBlue.  I don't know how

20   many times we need to say this.  They didn't go away, they

21   didn't change their character.  On every overlap route with

22   American, there are still JetBlue low fares.  That is a fact.

23   But in all events, that's simply -- that's a trivial,

24   inconsequential way of dealing with the potential of those

25   carriers to constrain market power in a world, in an

antitrust world in which one of our core principles is that substantial market power can only exist in the presence of barriers to entry and expansion.  And this is really about expansion here.  Because those carriers are already there on the routes that they are -- that they are talking about.

I want to talk, then, about Dr. Miller's merger simulation, because let's be honest, we -- that was Platiniffs' Exhibit A.  We had this trial to hear Dr. Miller's merger simulation.  The only significant proof that they put on of predictive likely anticompetitive effects, the basis for them constantly throwing out the $700 million number as if it means anything.  But there is so much wrong with it.

First of all, there is no basis in economics from making this huge leap from any kind of revenue sharing to the idea that you have the incentives of a merger.  You remember that Dr. Israel went over this and he had the chart where he showed how many steps removed MGIA revenue sharing is, dynamic revenue sharing, creating unilateral incentives for capacity expansion, to the idea of a merger or even fixed proportion profit sharing.  There's certainly no basis to ignore the MGIA terms.  We still think this would be inadmissible under the fifth criteria of *Daubert*, because it isn't studying the NEA.  That's completely false.  It's not.  I'll come back to that in a minute.

1          There's certainly no basis to model the NEA or any

2    airline transaction without consumer benefits.  The reason

3    that all of these airline mergers take place, notwithstanding

4    this rhetoric that if there's even a problem in one route,

5    seriously, there never would have been an airline merger,

6    ever, if you could stop them based upon effects in one route.

7    The reason that those mergers all occurred is because the

8    Department of Justice, before this case, always acknowledged

9    that the systemwide benefits that inured to the consumers who

10   are in the region affected by the transaction matter to the

11   analysis, and balance out potentially isolated effects on

12   routes.

13          Well, here, they completely break from their

14   tradition and their precedent, and they throw in a merger

15   simulation that only has upward pricing pressure, and

16   completely ignores consumer benefits, efficiencies, and all

17   other sources of downward pricing pressure.  So we know that

18   predictions are themselves absurd, unlike anything that's

19   ever been witnessed after actual mergers.  We know that they

20   try to validate them, not with mergers, but with JetBlue

21   entry and exit.  I'll come back to that in a moment.  And we

22   know that $200 million of this is happening on the carveout

23   routes, where they don't even -- where the parties don't even

24   share revenues and do joint scheduling, which are the two

25   things that supposedly justify using the merger simulation in

1    the first place.  So it's just so hypocritical and arbitrary.

2            But again, the biggest thing, let's just -- let's

3    focus on the simple things.  The big things is that the

4    predicted pricing hasn't occurred.  None of this has

5    happened.  This is -- it's all -- it's just a theoretical

6    prediction from a college professor with no experience in the

7    airline industry, wanting you to believe that something that

8    hasn't happened at all in 20 months is sort of -- is

9    magically going to occur.

10           And you know, Dr. Israel, one of his analysis

11   addressed this.  Not a particularly, you know, clever or

12   esoteric analysis.  He decided to just compare the

13   predictions to what we've actually witnessed since the NEA

14   went into effect.  And you remember, he talked about it in

15   terms of this idea of prediction error.  But again, when you

16   get to the most recent data and this is -- we're using Boston

17   here, the Boston nonstop overlap routes, the actual data show

18   that fares in Boston are down 12 percent and -- since the NEA

19   went into effect and the prediction error is 42 percentage

20   points, 42 points.  I mean, he's not even in the ballpark of

21   capturing what has happened in the market.

22           We went through the fact that these are all

23   contrary to the observed effects of airline mergers.  Again,

24   the actual history of airline mergers, it shows us that on

25   the heavily trafficked routes, fares tend to go down, output

1    tends to go up.  Directionally, the opposite of what he is

2    predicting.  And yet he is getting these -- this 28.7 average

3    fare increase in Boston.  And that is what then leads to

4    these arguments that say, well, we're going to try to

5    validate this by going to JetBlue entry and exit.

6              Mr. Jones covered this again in slide 23, where he

7    had a different version of this, where he's saying, yeah, but

8    we had these anecdotes from JetBlue, almost all of which --

9    no disrespect, but they almost all come from regulatory

10   advocacy.  They're always -- every one of these ordinary

11   course documents we're talking about is prepared because

12   they're trying to get something out of some regulator

13   somewhere.  But regardless, entry and exit is not a merger

14   effect.

15             I mean, what entry and exit implies is the

16   elimination of JetBlue.  And as aggressive as my friends have

17   been, they haven't actually gone so far as saying that the

18   NEA eliminates JetBlue, takes its capacity out of the

19   markets, and that's what these so-called benchmarks are

20   implying.  They make no sense.

21             But, you know, I just want to -- I want to complete

22   the discussion of Dr. Miller by just going back to me, you

23   know, talk about the Rosetta Stone, my Rosetta Stone was

24   Footnote 68 of Dr. Miller's report, in which there is this

25   just mind boggling statement, where he says, "In my analysis,

1    I assume that, as a mechanical matter, the defendants jointly

2    set capacity and then share revenues according to the dynamic

3    revenue sharing formula in the NEA, but behave as though they

4    share profits according to a static formula."  He just

5    changes the facts.  He just -- this is -- I feel like I'm at

6    a MAGA rally here, where we're just going to have alternate

7    facts here.  There is --

8                THE COURT:  We'll take politics out of the case.

9                MR. WALL:  There is no basis for getting to -- for

10   just changing the facts to make them fit the theory that you

11   want to use.  This is a Section 1 case.  It's about a

12   contract that is supposedly in restraint of trade.  It is the

13   contract that's at issue.  It's what we have to consider.  We

14   can't just base our opinions based on this kind of denialism

15   that pretends the NEA is something that it's not.

16               So I -- as we said when we moved for judgement as a

17   matter of law, you just -- you can't go down this path and

18   find that there's an adverse effect here, based upon a

19   simulation which isn't even about the NEA, in the face of

20   evidence of increased output.  I mean, that's just too

21   extreme.  That is so far away from what is required of a

22   plaintiff, even under the most generous interpretation of

23   step one.  So I don't think they've made their burden of

24   proof.  I think, to the contrary, the evidence conclusively

25   establishes the absence of anticompetitive effects.

1          So we don't really need to go to step two, but it's
2     also not very hard for us to get over the burden of step two.
3     It is not a heavy burden.  We have addressed this in our
4     trial brief.  It's only a heavy burden if there has been a
5     powerful showing of adverse effects, and here there has not
6     been.
7          But in all events, what -- what we -- what we know
8     is that there's a sound logic in business strategy, in
9     airline precedent, for an alliance like the NEA.  We know
10    that the joint scheduling is procompetitive, which is really
11    the heart of this, I think.  The effects, as we've gone
12    through, prove the benefits, and then Dr. Israel quantified
13    them.
14         So you know, just -- you saw this before in the
15    opening, just -- this isn't an unprecedented, this isn't
16    something crazy.  What happened here, very simply, is the
17    parties took a mechanism that has proven itself as a benefit
18    to consumers in the international stage, and which has been
19    embraced by the DOT on dozens of occasions in written
20    decisions talking about the consumers benefits that come out
21    of these international alliance structures.  And it took
22    some, but not all of those mechanisms and brought them on to
23    the domestic scene.
24         And importantly, the only two significant
25    differences are the absence of price coordination, which is,

1    again, a huge thing, and the fact that we operate without

2    antitrust immunity.  That means that, for all they think that

3    we moderate our behavior because of the fear of antitrust

4    liability, that fear never goes away.  In fact, it just turns

5    into a treble damages fear after this case, that if this is a

6    bait and switch, if next year we decide to have a different

7    NEA that has reduced output and higher prices, we are going

8    to get tagged in consumer class actions, and treble damages

9    cases, and that's the world that we would live in.

10        Otherwise, you're dealing here with proven alliance

11   structures that have been found over and over again to

12   benefit consumers.

13        And I think the heart of it is the joint

14   scheduling.  And so when they say -- we'll get to the less

15   restrictive alternatives, when they say do it without the

16   joint scheduling, they're really saying do it without the

17   most important, most consumer friendly thing about the NEA.

18   Because as you've heard, that's what creates the better

19   schedules and the better network and so forth.

20        In antitrust terms, what you have here is a

21   production joint venture creating a network, and a new

22   network.  And in our world, in the spectrum of things we

23   worry about and don't worry about, at a far end of the good

24   side of the spectrum, if you will, is the production joint

25   venture that creates a new product.  Because it's been

1    universally recognized in the case law, in the commentary, in

2    the DOJ's own collaboration guidelines, that that's the kind

3    of joint venture that has the potential not only to be benign

4    but procompetitive, to actually help the consumer.

5          And you just can't do what the NEA does to create

6    those schedules and all of those things without working

7    together and without coordinating how you get the most out of

8    the shots, the most out of the gates, the most out of the

9    aircraft, and how you create, with two different airlines,

10   schedules that match up to United and Delta.  The schedules

11   won't design themselves.  They need to be coordinated in

12   order to make that work.

13         And so what do we get out of that?  We get all of

14   that qualitative increases, the more relevance, the better

15   schedules, the better quality, the better frequent flyer

16   programs.  I can't believe they're questioning the benefit of

17   frequent flyer programs, trying to dismiss them as something

18   that only matters to power buyers.  That's news to the

19   airlines.  Consumers generally are very interested in their

20   power buyers.  You actually see it in the NEA advertising.

21   The consumer level NEA advertising that exists is about more

22   miles, more benefits.  It's focused on the fact that

23   consumers generally like the frequent flyer program.  But

24   that quantitative -- excuse me, that qualitative benefit then

25   translates into more traffic.  And more traffic allows us and

1    Dr. Israel to go ahead and use a methodology that the DOJ has
2    embraced itself, it used it in Delta/Northwest, published
3    about it afterwards, about implying the quantitative consumer
4    benefit from increased passenger growth.
5           And Dr. Israel took us through the analysis in
6    detail and you can see up here on the screen, the three
7    different values that you get, if you look -- the one which
8    is the prospective analysis, based upon the Raven forecast,
9    $635 million a year, and then the two on actual growth, real
10   growth, not projected, real growth of 511 million and
11   610 million.
12          Now, I think that it's significant that almost all
13   the pushback that you heard on this in the case was on the
14   forecasting method, which I think is ironic, because the
15   forecasted method, of course, is the most debatable, most
16   contestable, because it's the forecast.  It's the nature of
17   the forecast.  But the other two columns on which they have
18   no response are based upon the actual effects of the NEA.
19   That is taking the growth that's actually occurred and
20   monetizing it into consumer benefit.  It isn't a prediction.
21   It's not a simulation.  It's actually a calculation based
22   upon what has actually happened.  That is an enormous showing
23   of procompetitive rationale and consumer benefits under the
24   law, under Austin in particular, it sets the bar as to what
25   they need to establish in terms of a less restrictive

1    alternative.

2              And they really just haven't done it.

3              Now --

4              THE COURT:  You're nearing the end?

5              MR. WALL:  I'm very near the end, yeah.

6              THE COURT:  Okay.

7              MR. WALL:  The only thing that I really want to hit

8    about here, Your Honor, today is the lack of rigor.  It's not

9    easy, under the law, to establish a less restrictive

10   alternative.  You actually have to establish -- you have to

11   be specific about it.  You have to show that it was

12   practical, that it is something the parties would have done,

13   and you have to show that it replicates all of the benefits

14   qualitative and quantitative that the other party has shown.

15   And yet here what we're getting is a scatter-shot approach --

16   I'll skip this one, but -- it's legal.  But what we're

17   getting is a scatter-shot approach that, frankly, today is

18   the day, after the close of evidence, that they appear to

19   have first settled on a less restrictive alternative, and

20   that is this slide that they put up about that -- the WCIA --

21   an East Coast version of the WCIA plus slot leases of some

22   kind.  But they didn't put on any testimony of anybody who

23   actually showed what that would mean.  What that --

24              They're basing it off of one document, which

25   ironically rejects it.  The document they cite rejects it as

1    being less valuable to both the airlines and the consumer

2    than the NEA.  And yet, they're saying, well, it's working

3    for Alaska and American.  Yeah, it is, but it's different.

4    It's a connecting alliance.  It's not an alliance where the

5    value comes from taking overlapping networks and optimizing

6    them.  That's what's different here.  What's unique about the

7    NEA is we're creating hundreds of millions of dollars of

8    consumer value, but optimizing these networks that are --

9    even when they overlap, are mostly complementary, so that we

10   can create this third alternative, you know, the more

11   relevant competitor out of two weak ones that Delta talks

12   about.

13              And the panoply of benefits that comes from that

14   have to be shown for it to be a less restrictive alternative.

15   They don't even have a witness qualified to talk about that.

16   Certainly Dr. Town didn't talk about that with any airline

17   industry expertise that would allow you to conclude that

18   that's actually something that's going to be as good as the

19   NEA.

20              My conclusion is simply that the NEA is

21   procompetitive.  This is the slide that we used in the

22   opening.  This isn't a case where we are here to say that

23   something that has an anticompetitive effect is offset by

24   something else.  This is a case about a manifestly

25   procompetitive venture that makes these markets more

1    competitive than they otherwise were, otherwise would be.

2             And Your Honor, if we're wrong and time proves

3    otherwise, the antitrust laws are going to still be there.

4    This is -- this is not a situation in which you need to

5    destroy the consumer benefits of the NEA, based upon the

6    speculation that the other side is giving you, because the

7    antitrust laws will be there, the Justice Department will be

8    there, the private plaintiff bar will be there.  I'm

9    confident none of them will ever bring a case, because the

10   NEA will be what you see it is right now, output enhancing

11   and procompetitive.

12            Thank you, Your Honor.

13            THE COURT:  Thank you, Mr. Wall.

14            Mr. Jones?  It's not required, but I assume you

15   want to do a rebuttal.

16        **REBUTTAL ARGUMENT BY PLAINTIFF USA**

17            MR. JONES:  Yes, sir, I do.  I won't take very

18   long, Your Honor.  I do want to hit a couple of the points

19   that counsel raised during their closing.  Let me just start,

20   Your Honor, with a point of evidence on this.  Counsel for

21   American talked about the ordinary business course documents

22   that we cite for the JetBlue effect, JetBlue's documents,

23   talked about them being regulatory advocacy.  And documents

24   that JetBlue created when it was trying to get something.

25   Well, Your Honor, this whole process here is advocacy, so I

1    would say that certainly JetBlue's words to regulators are

2    reliable enough for this Court to depend on here.

3              Beyond that, Your Honor, let me turn to the

4    so-called eureka document.  Now, that was the document -- the

5    American document that Mr. Raja testified about and that

6    defendants also featured in their closing.  It's actually on

7    their slide 16 in their closing, Your Honor.  So one thing

8    about this -- one thing about this document that I would

9    point out is there's something missing from the eureka slide.

10   And it's mostly missing from the entire deck in which that

11   slide resides and that word is "Boston."  It has nothing to

12   do with Boston.  In no way does it justify or vindicate

13   having this combination in the form of the NEA in Boston,

14   Your Honor.

15             And also, just it's a bit remarkable here where

16   defendants talk about this -- the slide in this document as

17   being a eureka moment.  Your Honor, they're grading their own

18   work.  Of course an American executive is going to be

19   impressed by the work of American executives that they

20   prepare for the chairman and for the board and for the

21   president.  There's nothing really remarkable about that.

22   They're grading their own test.

23             Let me turn quickly, Your Honor, to the West Coast

24   international alliance as NLRA.  Again, Your Honor, this

25   isn't something that we came up with as a theory where

1   theoretical matter here.  It's real.  It's something that

2   they actually consider.  They actually looked at it.  And on

3   top of that, Your Honor, American modeled the structure that

4   we're talking about as an NLRA here.  And Dr. Town, he looked

5   at those modeling results and really what they showed was

6   pretty simple and straightforward that the NEA structure and

7   the ECIA structure would produce the same number of

8   incremental passengers.  So there's really no story here that

9   the proposed, less restrictive alternative that we're talking

10  about here is something that somehow falls short or somehow

11  deficient or somehow is something that wasn't really

12  considered, isn't a real thing.  None of that holds up,

13  Your Honor, and the folks who should know the most about it,

14  Mr. Harrison from Alaska, Mr. Raja, testified about how

15  effective it was.

16          Your Honor, let me also just briefly touch on this

17  whole notion of JetBlue's DNA, JetBlue's fabric.  Well, I'm

18  going to start, as an initial matter here, about JetBlue's

19  fabric and about it not changing and all of that.  There was

20  something else that wasn't in JetBlue's fabric, either, and

21  that's domestic alliances in the United States that have the

22  type of involvement that the NEA has.  And yet, here we are.

23  So fabrics can change.  Fabric did change.

24          Beyond that, Your Honor, what matters beyond the

25  so-called DNA of JetBlue, what matters is its economic

1    incentives and its capabilities.  Companies do not have DNA.

2    They have shareholders, they have bottom lines, they have

3    balance sheets, they have income and loss statements.  That's

4    what they have, Your Honor, and what they respond to isn't

5    some immutable characteristics that's ingrained in the

6    company.  What they respond to are their economic incentives

7    and that's what they're supposed to respond to.

8            Mr. Hayes, he talked about having ten quarters of

9    not being profitable.  He wants to make money and he should.

10   That's his role as the CEO.  So if something is in JetBlue's

11   incentive, they're going to do it, regardless of what they're

12   saying now and what they say publically in their statements

13   to their new employees, their team building exercises,

14   whatever they are, Your Honor, incentives are going to trump

15   the DNA of a company, because this is not such a thing.

16           Your Honor, I guess the last thing that I want to

17   close on here really is just we, on our side of the table,

18   and defendants on theirs, over the course of this trial,

19   we've all thrown out and used a bunch of technical terms in

20   antitrust law, or really terms that apply to this area of

21   law, antitrust, that's fairly esoteric and kind of cabined,

22   and we have the antitrust bar, where we have some of the same

23   folks all the time.  And it's a -- it's a small bar,

24   relatively speaking, all of that, Your Honor.  But really,

25   the point here, the point of the antitrust laws is to promote

1    competition to drive lower prices, better quality, and

2    greater choice.

3              And what I would ask Your Honor as you're looking

4    at the evidence here, and looking at the law, and looking at

5    the context of this case, I would ask Your Honor what about

6    American teaming up with JetBlue at Logan is going to give

7    travelers who fly out of Logan lower prices?  What about

8    JetBlue and American teaming up is going to give travelers

9    out of Logan greater choice?  And what about American and

10   JetBlue teaming up is going to give better services to

11   travelers going out of Logan?  And Your Honor, the answer to

12   that question is absolutely nothing at all.  And in fact,

13   Your Honor, it stands to make consumers worse in each of

14   those areas.

15             So we thank Your Honor, again, for your time.

16             THE COURT:  Thank you.

17             Thank you, Mr. Jones.

18             Thank you to all of you.

19             So this has been very helpful.  And I know you're

20   all disappointed with my silence.  But I really wanted to --

21   I viewed this -- I viewed this as your opportunity to tell me

22   what you want, and I have been going through things, but I

23   obviously have not, since 6 o'clock last night, read all of

24   this.

25             MR. WALL:  Sorry about that.

1              THE COURT:  It's okay.  I read a fair bit of it,

2     but not all of it.

3              So I'm going through it and figuring it out and

4     sorting through the evidence and sorting through the law, and

5     sorting through your various arguments that you've made.  And

6     when I finish sufficient digestion of all of that, I will

7     schedule a hearing, because I know I have questions.  I have

8     a bunch already.  And I'll have you come back for that and

9     we'll engage with that.

10             And that will be -- all I can tell you about that

11    is that will be as soon as I reasonably possibly can do it.

12    I intend to do it as fast as I can.  It's not going to be

13    next week, but it will be as soon as I reasonably can.  And I

14    understand the -- why it makes sense to resolve it as fast as

15    it reasonably can be resolved for all sides.

16             So I hope you all have a wonderful holiday and

17    thank you very much for your arguments and we stand in

18    recess.

19             (Court in recess at 11:58 a.m.)

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5     and for the United States District Court for the District of

6     Massachusetts, do hereby certify that pursuant to Section

7     753, Title 28, United States Code, the foregoing pages

8     are a true and correct transcript of the stenographically

9     reported proceedings held in the above-entitled matter and

10    that the transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United States.

12

13                    Dated this 18th day of November, 2022.

14

15

16

17                    /s/ RACHEL M. LOPEZ

18

19

20          _____
            Rachel M. Lopez, CRR
21          Official Court Reporter

22

23

24

25