CORRECTED

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA et al., | |
| *Plaintiffs*, | |
| v. | Case No. 1:21-cv-11558-LTS |
| AMERICAN AIRLINES GROUP INC. and JETBLUE AIRWAYS CORPORATION, | **Motion for leave to file under seal granted on November 18, 2022** |
| *Defendants*. | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

# TABLE OF CONTENTS

I.    THE DEFENDANTS ................................................................................. 1

    A.  American Airlines .......................................................................... 1

    B.  JetBlue Airways ............................................................................. 1

II.   THE AIRLINE INDUSTRY ................................................................... 2

    A.  Airlines use different business models to compete. ...................... 2

    B.  The airline industry is dominated by American, Delta, United, and Southwest. .......... 4

    C.  JetBlue disrupted the airline industry, leading to better outcomes for consumers ....... 5

        1.  Competition from LCCs and ULCCs forces legacy airlines to offer lower fares. ........ 5

        2.  JetBlue is unique among low-cost airlines ....................... 6

        3.  JetBlue competed successfully for both business and leisure passengers. ....... 8

        4.  JetBlue is a close competitor to legacy airlines and is able to constrain their pricing. ........ 9

        5.  The JetBlue Effect produces lower prices and higher quality service on routes where JetBlue competes. .......... 12

III.  THE NORTHEAST ALLIANCE .......................................................... 14

    A.  Overview of the Northeast Alliance .............................................. 14

        1.  The Northeast Alliance Agreement ................................ 14

        2.  The Codeshare Agreement ............................................. 16

        3.  The AAdvantage Participating Carrier Agreement and the TrueBlue Participating Carrier Agreement ............ 17

        4.  The Mutual Growth Incentive Agreement ..................... 17

        5.  The Slot Lease Agreements ............................................ 18

        6.  The Bilateral Special Prorate Agreement for Passengers ............ 18

    B.  The terms of the Northeast Alliance require American and JetBlue to coordinate capacity and share revenues. .......... 19

        1.  Capacity Coordination .................................................. 19

        2.  Revenue Sharing ........................................................... 20

        3.  Loyalty Program Integration .......................................... 21

    C.  The Northeast Alliance is an unprecedented partnership between domestic airlines. 21

        1.  The NEA is modeled on international joint ventures that typically require antitrust immunity. .......... 21

        2.  American's and JetBlue's domestic networks overlap substantially more than in most airline partnerships. .......... 23

        3.  No other domestic airline partnership includes capacity coordination and revenue sharing. .......... 24

4.  Defendants knew the Northeast Alliance would be subject to regulatory scrutiny by the U.S. DOT and the U.S. DOJ. .................................. 26

IV.    PLAINTIFFS HAVE MET THEIR BURDEN TO PROVE EACH OF THE RELEVANT MARKETS ALLEGED IN THE COMPLAINT. ....................... 27

A.  Scheduled air passenger service is a relevant product market. ................................... 27

1.  Other forms of transportation are not adequate substitutes for scheduled air passenger service. ................................................................. 27

2.  Amtrak is not an adequate substitute for scheduled air passenger service. .... 28

B.  Travel between an origin-and-destination pair is a relevant geographic market. ....... 29

1.  Most endpoints consist of all airports serving a metropolitan area. .............. 29

2.  Boston Logan International Airport is an endpoint for relevant geographic market purposes. ......................................................................... 29

3.  Ronald Reagan Washington National Airport is an endpoint for relevant geographic market purposes. ............................................................. 30

C.  It is appropriate to define the relevant geographic market to combine JFK and LGA, but exclude EWR. ................................................................. 30

1.  JFK/LGA passes the hypothetical monopolist test. ........................................ 31

2.  Catchment data shows certain consumers have strong preferences for JFK/LGA over EWR. ...................................................................... 32

3.  Defendants price JFK/LGA distinctly from EWR for domestic routes. ......... 33

4.  Defendants often ignore competition at EWR when making competitive decisions for JFK/LGA. ....................................................................... 36

V.    PLAINTIFFS HAVE MET THEIR BURDEN TO PROVE THE ANTICOMPETITIVE EFFECTS OF THE NORTHEAST ALLIANCE IN THE OVERLAP MARKETS. ........................................................................... 37

A.  Before the Northeast Alliance, American and JetBlue competed head to head, which benefitted consumers. ................................................................. 37

1.  Boston ........................................................................................... 37

2.  New York City ................................................................................. 47

B.  Before the Northeast Alliance, competition between American and JetBlue was escalating. ............................................................................... 56

1.  Boston ........................................................................................... 56

2.  New York City ................................................................................. 62

3.  London ........................................................................................... 65

C.  The revenue sharing and capacity coordination provisions of the Northeast Alliance are widely understood in the industry to eliminate competition. .................................. 70

D.  The Northeast Alliance has adversely affected competition. .................................. 71

1.  Defendants now cooperate instead of competing on overlapping NEA Routes . ................................................................................................ 71

2.  The NEA incentivizes Defendants to allocate markets, which they have done, eliminating competition between American and JetBlue on several routes. .. 75

3. The NEA has led JetBlue to be less disruptive in the London market than it could have been................................................................................................ 77

E. The Northeast Alliance likely will continue to have anticompetitive effects, to the detriment of consumers....................................................................................... 80

1. The relevant markets are highly concentrated and the NEA increases that concentration............................................................................................... 80

2. The NEA likely will enable Defendants to reduce output and increase prices... ..................................................................................................................... 83

F. Competition from other legacy airlines or smaller competitors will not constrain the anticompetitive effects of the Northeast Alliance. ....................................... 88

1. Barriers to entry or expansion at an airport include access to gates and slots.88

2. Entry or expansion by smaller airlines likely would not constrain Defendants' exercise of market power. ........................................................................... 90

3. Competitive responses by legacy airlines likely would not constrain Defendants' exercise of market power. ....................................................... 91

G. Economic evidence demonstrates that the Northeast Alliance will likely result in harm in overlap markets......................................................................................... 93

1. Dr. Miller's simulation demonstrates that the Northeast Alliance will likely result in harm in overlap markets................................................................ 93

2. Dr. Miller's simulation results are further supported by econometric analysis of the JetBlue Effect, his hub structure regression, and his 737 MAX grounding natural experiment. ........................................................................ 97

3. Dr. Miller's conclusion is further supported by results from his Cournot simulation and the Stackelberg supply model. ............................................ 99

4. Dr. Carlton's results do not show that harm has not occurred in nonstop overlaps........................................................................................................ 99

VI. PLAINTIFFS HAVE MET THEIR BURDEN TO PROVE THE ANTICOMPETITIVE EFFECTS OF THE NORTHEAST ALLIANCE IN MARKETS BEYOND THE OVERLAP MARKETS. ............................... 100

A. The airline industry is susceptible to coordination. .................................. 100

1. Airline capacity decisions are transparent. .................................................. 100

2. Airline prices are transparent. ..................................................................... 101

3. Multi-market contacts facilitate coordination.............................................. 102

4. Other attributes of the airline industry make it susceptible to coordination. 103

B. The Northeast Alliance fosters a spirit of partnership that will encourage American and JetBlue to coordinate to reduce competition outside of the overlap markets. ... 104

C. The Northeast Alliance advances American's efforts to consolidate the industry and enhances the risk of capacity discipline.................................................................. 107

1. The airline industry has a history of consolidating which leads to high market concentration.............................................................................................. 107

2. The airline industry has a history of coordinated efforts to constrain capacity growth, leading to worse outcomes for consumers...................................... 109

3.  The NEA risks a return to capacity discipline. ............................................. 114

VII.  DEFENDANTS HAVE NOT MET THEIR BURDEN TO PROVE PROCOMPETITIVE JUSTIFICATIONS FOR THE NORTHEAST ALLIANCE. ..................................................................................... 117

A.  The Northeast Alliance will not result in significant growth in Boston beyond what JetBlue and American could have achieved independently. ..................................... 117

1.  JetBlue planned to grow organically in Boston before the NEA. ................ 117

2.  American planned to grow organically in Boston before the NEA. ............. 118

3.  Other competitors grew organically in Boston. ........................................... 119

4.  JetBlue's expansion in Boston is about the same as what it could have achieved independently. .................................................................................. 119

5.  The NEA allows American to pull back in Boston. ...................................... 120

B.  The Northeast Alliance will not result in significant growth in New York City beyond what JetBlue and American could have achieved independently. ............................ 121

1.  JetBlue planned to pursue organic growth in New York City. ...................... 121

2.  American was poised to grow in New York City by upgauging its regional jets. ................................................................................................................ 122

3.  Defendants had agreed to a significant slot lease before the NEA. ............. 122

4.  Nothing prevents American from selling or leasing slots to JetBlue. ........... 123

5.  JetBlue is flying larger aircraft from the slots it received from American, which did not require the NEA. .................................................................... 124

C.  The Northeast Alliance does not result in significant benefits from combining "complementary" networks. ...................................................................................... 125

1.  Adding JetBlue's network to American's network does not result in American necessarily serving any additional domestic markets. ................................. 125

2.  Combining Defendants' networks at NEA Airports does not drive significant additional traffic. ......................................................................................... 126

3.  To the extent the NEA results in increased "relevance" or airport presence at NEA Airports, that is a consumer harm—not a benefit. ............................... 127

D.  Defendants' claimed growth within the Northeast Alliance supplants growth elsewhere in their networks. ..................................................................................... 127

1.  The increased transatlantic capacity in New York City Defendants attribute to the NEA stems from American shifting capacity from Philadelphia and other hubs. ............................................................................................................ 127

2.  JetBlue shifting aircraft to grow within the NEA reduces its capacity in the rest of its network ....................................................................................... 130

E.  The Northeast Alliance does not result in any unilateral growth by American or JetBlue that is inconsistent with their joint MGIA interest. .................................... 132

F.  The Northeast Alliance has not resulted in American or JetBlue adding to their fleets . ................................................................................................................. 134

1.  The NEA did not cause American to change its fleet plans. ......................... 134

2.  The NEA did not cause JetBlue to delay retirement of its planes. ................ 134

    G.  The Northeast Alliance is not justified by competition with Delta and United. ....... 141

        1.  Delta and United grew organically to become strong competitors, and so too could American and JetBlue. ...................................................................... 141

        2.  The NEA has not spurred Delta and United to significantly lower prices or change corporate strategy in response to the NEA. ..................................... 142

    H.  Defendants' estimates of the supposed procompetitive benefits of the Northeast Alliance are fatally flawed. ....................................................................................... 143

        1.  Dr. Israel's two approaches for estimated consumer benefits...................... 143

        2.  Shortcomings in Dr. Israel's passenger share change estimate.................... 152

        3.  Even if Dr. Israel were correct that the NEA will cause some increase in capacity, his effort to convert that increase into a dollar value is flawed. .... 153

VIII.  THERE IS A REASONABLE LESS RESTRICTIVE ALTERNATIVE TO THE NORTHEAST ALLIANCE THAT WOULD ACHIEVE ANY LEGITIMATE PROCOMPETITIVE BENEFIT. .............................................................. 155

IX.  DEFENDANTS' PROFFERED FIXES DO NOT REMEDY THE ANTICOMPETITIVE EFFECTS OF THE NORTHEAST ALLIANCE. ....... 159

    A.  The U.S. DOT Agreement with Defendants was not an approval of the Northeast Alliance. .................................................................................................................. 159

    B.  The U.S. DOT commitments do not remedy the anticompetitive effects of the Northeast Alliance. ............................................................................................... 160

        1.  The U.S. DOT commitments are limited in geographic scope and expire in 2025. ....................................................................................................... 160

        2.  The U.S. DOT Agreement's growth targets could have been achieved without the NEA, and can be achieved while still reducing capacity in overlap markets and non-NEA markets. ................................................................................ 160

        3.  The slot divestitures required by the U.S. DOT Agreement are insufficient to allow meaningful entry or expansion by competitors.................................. 161

    C.  Defendants' carve-out agreement does not remedy the anticompetitive effects of the Northeast Alliance. ............................................................................................... 162

        1.  The carve-out agreement is voluntary and could be rescinded at any time. . 162

        2.  The carve-out agreement may not be effective........................................... 163

APPENDIX ....................................................................................................................... 168

    Appendix A ................................................................................................................. 169

    Appendix B ................................................................................................................. 170

    Appendix C ................................................................................................................. 171

    Appendix D................................................................................................................. 172

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

### I.     THE DEFENDANTS

#### A.     American Airlines

1.      American Airlines Group Inc. ("American") is an airline incorporated in Delaware and headquartered in Fort Worth, Texas. *Uncontested Facts*: PTO Ex. A ¶¶ 1-2, ECF No. 196.

2.      American is the largest airline in the United States (Tr. Vol. 5. 30:6-10 (Isom/American); Tr. Vol. 7, 51:19-21 (Harrison/Alaska)) and the world. Tr. Vol. 4, 70:12-18 (Raja/American). American flies more available seat miles ("ASMs"), offers more seats, and serves more origins and destinations within the United States than any other airline. Tr. Vol. 4, 72:18–73:14 (Raja/American); DX0089 at 16. ASMs are a measure of capacity and are calculated by multiplying the number of seats on an aircraft by the length of the flight. Tr. Vol. 1, 131:7-13 (Hayes/JetBlue). In other words, one seat flying one mile is one ASM. Tr. Vol. 1, 131:7-13 (Hayes/JetBlue).

3.      American operates hubs in Charlotte, North Carolina; Dallas/Fort Worth, Texas; Los Angeles, California; Miami, Florida; New York City, New York; Philadelphia, Pennsylvania; Phoenix, Arizona; and Washington, District of Columbia. *Uncontested Facts*: PTO Ex. A ¶ 3, ECF No. 196.

#### B.     JetBlue Airways

4.      JetBlue Airways Corporation ("JetBlue") is an airline incorporated in Delaware and headquartered in Long Island City, New York. *Uncontested Facts*: PTO Ex. A ¶¶ 10-12, ECF No. 196.

5.      JetBlue is the sixth-largest airline in the United States. Tr. Vol. 1, 108:12-13 (Hayes/JetBlue). It operates six focus cities: New York City, New York; Boston, Massachusetts; Fort Lauderdale/Hollywood, Florida; Orlando, Florida; Los Angeles, California; and San Juan, Puerto Rico. *Uncontested Facts*: PTO Ex. A ¶ 13, ECF No. 196.

## II.   THE AIRLINE INDUSTRY

### A.   Airlines use different business models to compete.

6.      American, Delta, and United are called "legacy" airlines. Mehoke (JetBlue) Dep. 51:17-23, June 2, 2022; Casey (American) Dep. 47:11-17, May 4, 2022.

7.      Legacy airlines operate hub-and-spoke business models. Casey (American) Dep. 45:10-18, May 4, 2022; ██████████████████████████████████████████ ██████████████████; PX0339 at 125; PX0370 at 11.

8.      In a hub-and-spoke model, a large number of flights arrive to one destination (the hub); customers then connect from that hub to other destinations (the spokes). Casey (American) Dep. 44:13–45:9, May 4, 2022; *see also* ████████████████████████████.

9.      Low-cost-carriers ("LCCs") are airlines that offer lower fares and operate at lower costs than the legacy airlines. Casey (American) Dep. 48:19-25, May 4, 2022 (explaining that LCCs have a lower cost base than legacy airlines); Mehoke (JetBlue) Dep. 52:17-19, June 2, 2022 (explaining that LCCs offer low fares). Unlike legacy airlines, LCCs tend to fly point-to-point, rather than operating a hub-and-spoke model. PX0357 at 35 (noting that LCCs "offer lower fares and compete on a point-to-point model"); Nocella (United) Dep. 25:24–26:7, Apr. 29, 2022 (explaining that LCCs and ULCCs use a point-to-point business model). Point-to-point business models eliminate the use of hubs and offer direct routes, minimizing connections and travel time. PX0357 at 35.

10.     LCCs are often further broken down into two categories. A traditional LCC—such as Southwest—focuses on point-to-point service, operates a single aircraft type, does not have a premium cabin, and tends to serve larger population centers. Casey (American) Dep. 49:1-8, May 4, 2022; Tr. Vol. 2, 102:9-10 (Watterson/Southwest). In contrast, JetBlue and Alaska are sometimes characterized as hybrids between LCCs and legacy airlines because they offer higher quality service (*e.g.*, premium cabins), operate more than one fleet type, and serve a broader spectrum of markets. Tr. Vol. 2, 102:11-23 (Watterson/Southwest) (describing JetBlue); Tr. Vol. 7, 50:1-15 (Harrison/Alaska) (describing Alaska).

11.     Ultra-low-cost carriers ("ULCCs") are airlines that maintain even lower costs than legacy airlines and LCCs, and also offer even lower fares. Tr. Vol. 2, 101:25–102:8 (Watterson/Southwest); PX0217 at 15. Like LCCs, ULCCs operate a point-to-point business model. Nocella (United) Dep. 25:24–26:7, Apr. 29, 2022. Unlike LCCs, however, ULCCs completely "unbundle" their products; for the fare, the traveler generally receives transportation from an origin to a destination, but nothing else. Casey (American) Dep. 49:12–50:9, May 4, 2022. ULCCs generally offer a lower quality product—*e.g.*, by having very little leg room and less comfortable seats—which minimizes operating costs to a greater extent than other airlines. Tr. Vol. 3, 112:6-23 (Kirby/Spirit) (describing Delta's higher costs relative to Spirit's).

12.     Examples of ULCCs include Frontier Airlines, Allegiant, and Spirit Airlines. Tr. Vol. 2, 211:12-14 (McMenamin/JetBlue). American's Senior Vice President of Revenue, Don Casey, testified that the only ULCCs of material scale in the United States are Spirit and Frontier. Casey (American) Dep. 50:10-18, May 4, 2022. Spirit is the largest and fastest growing ULCC in the United States. Tr. Vol. 12, 180:24–181:3 (Lee/Defs. Expert). JetBlue is currently attempting to acquire Spirit. Tr. Vol. 2, 85:5-6 (Hayes/JetBlue).

13.     The differences in airline business models result in differing abilities to compete for distinct passenger segments. Tr. Vol. 1, 126:14-23 (Hayes/JetBlue); Tr. Vol. 2, 102:11–104:11 (Watterson/Southwest); Tr. Vol. 2, 209:13–211:11 (McMenamin/JetBlue); Tr. Vol. 5, 89:7–91:9 (Isom/American). As a general matter, legacy airlines and hybrid LCCs compete for all passenger types since they provide a product that is attractive to business and other, higher-value passengers. Tr. Vol. 1, 141:4-20 (Hayes/JetBlue); Tr. Vol. 2, 102:11–103:14 (Watterson/Southwest). In contrast, ULCCs do not offer a first class option and therefore do not compete for passengers who want to fly first class. Tr. Vol. 5, 89:7–91:9 (Isom/American). An American network strategy deck from July 2021 illustrates the spectrum of business models utilized by U.S.-based airlines. PX0314 at 8.

**B.    The airline industry is dominated by American, Delta, United, and Southwest.**

14.    American, Delta, United, and Southwest collectively control over 80 percent of domestic air travel, as measured by capacity. PX0668 at 5; Tr. Vol. 1, 108:9-11, 124:21-25 (Hayes/JetBlue); Mehoke (JetBlue) Dep. 59:10-16, June 2, 2022.

15.    American, Delta, United, and Southwest are also the leading operators of U.S. airport gates. *See* Goodman (American) Dep. 29:3-14, Dec. 22, 2020 (gates are the "physical boarding gates" at airports). In 2019, American, Delta, and United had the largest number of gates with 798, 687, and 615, respectively. Southwest was the next largest operator of U.S. airport gates, with 300. PX0247, Charts at Rows 2-16; *see also* Tr. Vol. 2, 130:8-11 (Watterson/Southwest) (explaining that the U.S. airline industry is dominated by the "big three" of American, Delta, and United). American has recently indicated Southwest is becoming more like a legacy, thereby putting less pressure on American's yields, *i.e.*, prices. PX0108 at 14; *see also* PX0179 at 1 (noting that, in a 2018 earnings call, Southwest acknowledged that it was no longer a point-to-point carrier).

16.    JetBlue repeatedly has criticized consolidation by the legacy airlines. JetBlue's Chief Executive Officer, Robin Hayes, has stated that the high levels of concentration in the airline industry have reduced options, raised fares, and worsened service for travelers. Tr. Vol. 1, 125:16–126:4 (Hayes/JetBlue). In 2015, JetBlue sent a letter to the U.S. secretaries of State, Transportation, and Commerce stating that "[t]hrough multiple bankruptcy filings and consolidation with other carriers, Delta, United and American have grown to dominate the domestic aviation landscape in an unprecedented manner . . . ." Land (JetBlue) Dep. 98:8-10, 99:23–100:11, Apr. 28, 2022; *see also* Land (JetBlue) Dep. 101:2-3, 101:5, 101:7-9, 101:12-21, Apr. 28, 2022 (objection pending) (testifying that the combined shares have grown or stayed the same since 2015). At trial, Mr. Hayes testified that legacy airlines possess "market power." Tr. Vol. 1, 138:17–139:2 (Hayes/JetBlue). In 2019, JetBlue wrote that "the industry consolidation that followed and accelerated in the 2000s has placed incredible market power (and slots and

4

gates and infrastructure at key airports) in the hands of three deep-pocketed legacy airlines." PX0542 at 20.

17.     Executives at other airlines also acknowledge the harms of consolidation. The Chair of American's Board of Directors, Doug Parker, agreed that legacy airline mergers have eliminated service on certain routes. Tr. Vol. 6, 31:4–32:77 (Parker/American). The Vice President of Network Planning at Spirit Airlines, John Kirby, testified that consolidation has led to increased difficulty in obtaining slots and gates. Tr. Vol. 3, 125:14–126:1 (Kirby/Spirit).

### C.     JetBlue disrupted the airline industry, leading to better outcomes for consumers.

#### 1.     Competition from LCCs and ULCCs forces legacy airlines to offer lower fares.

18.     Legacy airlines, LCCs, and ULCCs compete for some—but not all—of the same customers. PX0142 at 7, 24 (used in PX0461 (Miller Report) ¶ 82 n.90). Low-cost airlines maintain a lower cost structure than legacy airlines by operating a simplified fleet and flying point-to-point routes. Tr. Vol. 2, 101:7-24, 102:9-10 (Watterson/Southwest). The lower cost structure enables them to offer lower fares than legacy airlines. Tr. Vol. 2, 101:7-24, 102:9-10 (Watterson/Southwest).

19.     Competition from low-cost airlines constrains the pricing of legacy airlines. Legacy airlines respond to low-cost competitors in part by matching their prices. PX0230 at 66. American, for example, monitors and often matches LCC and ULCC fares. PX0214 at 1, 15. When low-cost airlines enter a route, fares drop. PX0542 at 22. In contrast, when low-cost airlines exit a route, fares rise. PX0542 at 22.

20.     JetBlue's ordinary course documents confirm that low-cost airlines constrain legacy airlines. In 2019, JetBlue wrote that smaller airlines "play a critical role in keeping the commercial aviation industry competitive and keeping the immense power of the legacy airlines in check." PX0542 at 20. In 2015, JetBlue wrote to the federal government that legacy airlines "have routinely provided services at extremely high fares only to lower fares upon entry of a disruptive competitor." Land (JetBlue) Dep. 110:24–111:21 at 111:15-21, Apr. 28, 2022. Mr.

Land explained that he has seen this behavior in the industry in both the 20th and 21st centuries, and that he believes that is still the market reality. Land (JetBlue) Dep. 111:22-24, 112:2-5, 123:6-12, 123:15-16, Apr. 28, 2022 (objection pending); *see also* PX0574 at 23 ("Absent the entry of a low fare competitor like JetBlue in a market, our legacy competitors have routinely provided subpar product/services at extremely high fares").

21.     Ordinary course documents show that LCCs constrain American's pricing. In May 2018, an internal American document stated that an attempted price increase "failed due to lack of participation from LCCs/Unaligned/foreign carriers." PX0170 at 2. In 2019, another internal American document explained that a systemwide price increase was only partially successful due to "Reluctance of AS [Alaska Airlines] and B6 [JetBlue] to come along." PX0205 at 1.

22.     Mr. Kirby also testified that competition from LCCs and ULCCs is necessary to bring down fares in markets where only legacy airlines fly. Tr. Vol. 3, 131:24–132:5 (Kirby/Spirit).

23.     As Defendants' expert Dr. Darin Lee explained, a traveler does not "need to fly on a low-cost carrier to receive the competitive benefits of it" because "their very presence on a route puts downward pressure on the fares of all the carriers." Tr. Vol. 12, 63:15-22 at 63:18-22 (Lee/Defs. Expert).

**2.     JetBlue is unique among low-cost airlines.**

24.     JetBlue differentiated itself from other low-cost airlines by offering not only low fares, but also high-quality service. Tr. Vol. 1, 109:13-20 (Hayes/JetBlue). Consistent with the LCC business model, JetBlue's pricing strategy was to stimulate demand by offering lower fares. Tr. Vol. 3, 89:7-12 (Jarashow/JetBlue). JetBlue also offered superior service to many airlines, including legacies. *See, e.g.*, PX0542 at 12 (describing JetBlue as "the only major airline in the U.S. with seatback entertainment at every seat" and the airline offering "the most legroom in coach of any airline in the United States"). In January 2020, JetBlue touted offering the "best coach class product in North America." PX0934 at 12. JetBlue stated that it "revolutionized the

industry's in-flight entertainment with personal seatback screens" in the economy cabin. PX0934 at 12.

25.     One of JetBlue's distinctive features is its business class product, Mint. Tr. Vol. 1, 109:21–110:13 (Hayes/JetBlue). Mint is similar to a legacy airline's business class. Tr. Vol. 3, 82:18-24 (Jarashow/JetBlue). JetBlue prices Mint separately from its economy cabin. Tr. Vol. 3, 82:25–83:1 (Jarashow/JetBlue). When JetBlue looks at competitors to Mint, it primarily looks at business class fares charged by legacy airlines. Tr. Vol. 3, 83:2-7 (Jarashow/JetBlue).

26.     Mint differentiated JetBlue from other non-legacy airlines. No other non-legacy airline offers a similar premium product. Mehoke (JetBlue) Dep. 87:1–88:13, June 2, 2022; PX0685 at 1 ("Unlike other traditional low-cost carriers, or newer ultra-low-cost-carriers, JetBlue prides itself on its quality service and offers two classes of service in what we call core (economy) and Mint (business.)"). JetBlue's Vice President of Network Planning, Andrea Lusso, described JetBlue's Mint product as unique because of JetBlue's customer service, the design of its seats, and its competitive fares. Lusso (JetBlue) Dep. 49:25–50:10, Apr. 11, 2022. Robert Land, JetBlue's Senior Vice President of Government Affairs, described Mint as a unique, superior business-class product in terms of the seats themselves, the meals offered, and customer service offered at low fares compared to JetBlue's competitors. Land (JetBlue) Dep. 27:22–28:8, Apr. 28, 2022.

27.     JetBlue's high quality of service allowed it to compete effectively against the legacy airlines in ways other LCCs and ULCCs could not. American's CEO, Robert Isom, testified that ULCCs do not compete against American for passengers who want to fly first class because ULCCs do not offer a first-class product. Tr. Vol. 5, 90:6-8, 91:4-9 (Isom/American). Barry McMenamin, a corporate sales manager for JetBlue in New England, testified that he does not typically consider ULCCs to be strong competitors for corporate customers, as ULCCs do not use a global distribution system ("GDS") allowing clients to book corporate travel and therefore do not feature in the same travel programs for which JetBlue competes. Tr. Vol. 2, 209:18–210:20 at 210:8-17, 210:21–211:11 (McMenamin/JetBlue). Mr. Hayes testified, "Well,

7

something I believe that's different between JetBlue and ULCCs is that when JetBlue flies a market, competitors react more broadly than when a ULCC flies the market, because JetBlue is flying a broader set of customers than ULCCs." Tr. Vol. 1, 141:4-14 (Hayes/JetBlue).

28.     JetBlue's ordinary course documents confirm that its business model was unique. PX0673 at 16 (describing JetBlue as having "a unique business model that isn't used by any other North American carrier"); PX0934 at 11, 12 (explaining that JetBlue's "founders saw the opportunity to create an airline that found a sweet spot in the middle, offering competitive prices with a Customer-centric offering tailored to give [JetBlue's] Customers what they want," and that JetBlue's "unique attributes allowed [JetBlue] to compete effectively and benefit the consumer").

29.     Mr. Hayes characterized JetBlue a "disrupter" in the domestic airline industry. Tr. Vol. 1, 125:5-7 (Hayes/JetBlue); PX0685 at 1 (writing to the European Commission that JetBlue was "recognized as a disruptor in the U.S. airline industry, having pioneered the concept of free seatback live-television, reserved all-leather seats and, more recently, free high-speed Wi-Fi."). Mr. Hayes testified that JetBlue's attributes enabled it to have an outsized impact on the airline industry. Tr. Vol. 1, 110:17–111:1 (Hayes/JetBlue).

>           **3.     JetBlue competed successfully for both business and leisure passengers.**

30.     Before the NEA, JetBlue sought to attract not only leisure passengers, typical of LCCs, but also corporate customers. JetBlue launched Mint to compete more effectively for travelers preferring premium service. *See* PX0441 at 1 (announcing the introduction of Mint). Other airlines recognized JetBlue's aggressive efforts to attract corporate customers. ███ ████████████████████████████████████████████████████████ ████████████████████████████ .

31.     Before the NEA, JetBlue succeeded in attracting business and leisure customers. In 2018, JetBlue's Chief Revenue Officer, Martin St. George, told JetBlue's investors that JetBlue exhibited strength in attracting corporate customers. PX0679 at 17 (explaining that Mint

service "ties to the corporate account strength" JetBlue was experiencing, and adding that JetBlue had "some very, very good corporate comp presence in Boston and a significantly improved corporate comp presence in New York from corporate customers who are . . . desperately angling to get on the Mint product").

### 4. JetBlue is a close competitor to legacy airlines and is able to constrain their pricing.

32.     Before the NEA, JetBlue was an effective competitor to the legacy airlines. A JetBlue employee observed, for example, that "one of the most common trends in JetBlue's 20 year history is easily stealing share from AA and eventually winning." PX0710 at 3.

33.     American's documents confirm that JetBlue constrained the pricing of legacy airlines. In May 2019, American attempted a system-wide price increase, but ultimately reversed the attempted price increase in markets where JetBlue competed against American nonstop and did not increase its prices. PX0220. In the same month, when American attempted another system-wide price increase, JetBlue did not increase some of its prices, causing American to lower prices in markets in which it competed with JetBlue. PX0221 at 1.

34.     JetBlue's competitive actions, such as increasing frequencies and offering refundable fares, concerned American. American executives acknowledged that competitive actions from JetBlue forced an American response. American's Regional Sales Director Paul Swartz testified, for example, that JetBlue's $99 fully-refundable fare for corporate travelers flying BOS-DCA and increased frequencies on that route created a "problem" for American in 2019. Tr. Vol. 8, 11:18–12:20 (Swartz/American).

35.     JetBlue's Mint product contributed to JetBlue's success in constraining the pricing of legacy airlines. When JetBlue launched Mint, it saw average fares come down as a result of its entry into markets. Lusso (JetBlue) Dep. 51:3-10, Apr. 11, 2022; Tr. Vol. 3, 88:1-6 (Jarashow/JetBlue). Mr. Lusso testified that Mint was revolutionary in the transcontinental markets, resulting in lower premium fares. Lusso (JetBlue) Dep. 59:16–60:9, Apr. 11, 2022; PX0555 at 11; PX0725 at 18-22.

36.     When JetBlue entered the JFK-Los Angeles (LAX) route with Mint service in June 2014, American and Delta lowered their fares to match JetBlue. PX0544 at 2; Tr. Vol. 3, 86:7-9 (Jarashow/JetBlue). As a result, publicly available business class fares on the JFK-LAX route decreased. PX0544 at 2; Tr. Vol. 3, 86:10–87:25 (Jarashow/JetBlue). Refundable walk-up fares decreased 65 percent, non-refundable walk-up fares decreased 49 percent, and non-refundable 30-day advance purchase fares decreased 79 percent following JetBlue's Mint entry on JFK-LAX. PX0544 at 2; Tr. Vol. 3, 86:10–87:25 (Jarashow/JetBlue).

37.      Legacy airlines offered more fare options for business class customers after JetBlue introduced Mint. Tr. Vol. 3, 88:1-16 (Jarashow/JetBlue). For example, before JetBlue entered JFK-LAX with Mint in June 2014, American and Delta had only two business class fares: a refundable fare and a non-refundable walk-up fare. PX0544 at 2; Tr. Vol. 3, 85:18–86:1 (Jarashow/JetBlue). By August 2016, two years after Mint's launch, both American and Delta had introduced additional business class fares. PX0544 at 2; Tr. Vol. 3, 86:2-6, 87:4-25 (Jarashow/JetBlue).

38.     Competition from Mint resulted in an increase in the number of business class seats. Lusso (JetBlue) Dep. 66:22–68:9, Apr. 11, 2022; PX0555 at 15. The number of premium class seats in NYC-LAX and NYC-San Francisco (SFO) increased from 749 per day in 2013 to 1,929 in 2019, and increased in BOS-LAX and BOS-SFO from 289 per day in 2015 to 486 in 2019. PX0555 at 15.

39.     Competition from JetBlue resulted in legacy airlines reducing ancillary fees. In June 2020, JetBlue initiated $0 change fees—which Delta and United matched—leading American's Vice President of Revenue Management Jim Fox to note, "We don't really have a choice but to match." PX0159 at 1.

40.     Competition from JetBlue resulted in higher-quality service offered by legacy airlines. Mr. Swartz inquired about upgrading aircraft equipment in order to compete more effectively against JetBlue on BOS-LAX. PX0201. Mr. Hayes testified that the legacy airlines responded to competition from JetBlue on JFK-LAX by offering an improved product. Tr. Vol. 1,

142:24–143:13 (Hayes/JetBlue). Mr. Lusso testified that when JetBlue introduced Mint product in transcontinental markets in 2014, public fares decreased, the number of premium seats grew, and other airlines improved their front cabin product to better compete with Mint. Lusso (JetBlue) Dep. 60:17–61:19, Apr. 11, 2022; PX0555 at 11, 16, 18, 23.

41.     Competitors have copied elements of JetBlue's Mint product. PX0542 at 17.

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

42.     An empirical analysis of the destinations served by JetBlue in the Northeast further confirms that JetBlue competes closely with the legacy airlines, particularly in Boston and New York City. In contrast to other LCCs—which primarily serve only large cities from the NEA Airports—JetBlue serves large, midsize, and small cities, just as the legacy airlines do. Tr. Vol. 16, 133:2–134:1 at 133:21-25 (Town/Pls. Expert) (discussing demonstrative slide 49). Before the NEA, JetBlue had plans to expand service in Philadelphia and Los Angeles, which are both American hubs. PX0506 at 63, 66, 68, 74, 78.

43.     Consumers benefited from competition between JetBlue and the legacy airlines. For example, before JetBlue's entry into BOS-LGA, JetBlue warned State Street Corporation that American and Delta were "price gauging [*sic*]" in the market. PX0902 at 1. After JetBlue entered BOS-LGA in October 2016, however, American contacted State Street to renegotiate its contract, resulting in State Street's fare on BOS-LGA decreasing from over $400 to $125. PX0901 at 1-2.

44.     When JetBlue entered transcontinental markets in the United States with Mint, JetBlue introduced fares that were lower than the market average, and incumbent airlines responded by lowering their prices too, "thereby producing consumer benefits for customers beyond just JetBlue flights, but for everybody." Lusso (JetBlue) Dep. 219:20–220:10, Mar. 18, 2021; PX0692 at 3.

45.     In total, competition between JetBlue and the legacy airlines has saved travelers billions of dollars. Before the NEA, JetBlue itself estimated that it had saved passengers at least "$12 billion that would otherwise have gone to the four large airlines that hold vast pricing power in the airports they dominate." PX0466 at 2.

**5.     The JetBlue Effect produces lower prices and higher quality service on routes where JetBlue competes.**

46.     The "JetBlue Effect" describes the decrease in fares that occurs after JetBlue enters a market, or the increase in fares that occurs after JetBlue exits a market. PX0562 at 2-6. The JetBlue Effect takes its name from an MIT study that determined that when JetBlue enters a market, other competitors lower their fares and passenger demand increases. Land (JetBlue) Dep. 29:20–30:4, Apr. 28, 2022.

47.     JetBlue executives tout the JetBlue Effect. Mr. Hayes testified that when JetBlue enters a market at a lower fare, other airlines match its fare, and when JetBlue exits a market, fares increase. Tr. Vol. 1, 111:2-9 (Hayes/JetBlue). Mr. Lusso described the JetBlue Effect as "a market dynamic whereby a carrier, mainly JetBlue, enters a route adding capacity, lowering fares and stimulating the market size." Lusso (JetBlue) Dep. 193:12-16, Mar. 18, 2021; *see also* Lusso (JetBlue) Dep. 38:8-13, Apr. 11, 2022. JetBlue's Director of Sales, Roberta Mehoke, testified that when JetBlue enters a market, fares typically decrease, and products and service improve. Mehoke (JetBlue) Dep. 220:6–221:1, June 2, 2022. Ms. Mehoke testified that JetBlue has observed competitors dropping price, upgauging, and improving their quality of service in response to entry by JetBlue. Mehoke (JetBlue) Dep. 220:6–221:1, June 2, 2022.

48.     JetBlue discussed the JetBlue Effect in its ordinary course documents. For instance, in a presentation to a potential corporate customer, JetBlue described the JetBlue Effect as when JetBlue goes "into markets with limited competition, bringing fares down." PX0664 at 17; PX0629 (providing market-by-market data with examples of the JetBlue Effect).

49.     JetBlue cited the JetBlue Effect in submissions to the government of the United Kingdom. In a June 2020 submission to the U.K.'s Competition Markets Authority (the "U.K.

12

CMA") JetBlue provided examples of the "JetBlue Effect." Tr. Vol. 10, 96:3-21 (Miller/Pls. Expert) (discussing demonstrative at 8, citing PX0470). The submission showed that walk-up fares decreased by: 69 percent when JetBlue entered BOS-LGA, 65 percent when it entered BOS-DCA, and 38 percent when JetBlue entered BOS-Minneapolis-St. Paul. Tr. Vol. 10, 96:3-21 (Miller/Pls. Expert) (discussing demonstrative at 8, citing PX0470 at 13).

50.     JetBlue has measured the magnitude of the JetBlue Effect in the ordinary course of business. Tr. Vol. 10, 97:2–98:10 (Miller/Pls. Expert) (discussing demonstrative at 9, citing PX0461 (Miller Report) ¶ 201, Ex. 20). An internal JetBlue analysis found that JetBlue's entry and exit from a route can impact prices between 14 percent and 75 percent. Tr. Vol. 10, 97:2–98:10 (Miller/Pls. Expert) (discussing demonstrative at 9, PX0461 (Miller Report) ¶ 201, Ex. 20). For example, when JetBlue entered BOS-DCA—an NEA overlap route—in 2010, average fares fell by 29 percent, *i.e.*, prices were 40 percent higher before JetBlue's entry. Tr. Vol. 10, 164:14–166:22 at 164:17-20, 165:3-5 (Miller/Pls. Expert) (discussing demonstrative at 65, citing PX0644).

51.     American recognizes the JetBlue Effect. Anmol Bhargava, the Vice President of Global Alliances and Partnerships for American, agreed that the "JetBlue [E]ffect," which refers to "low fares" and the product that JetBlue offers, exists. Bhargava (American) Dep. 192:20–193:5, June 3, 2022.

52.     American's and JetBlue's experts recognize the JetBlue Effect. They found, on average, that JetBlue's presence lowered prices by 20 percent to 21 percent, depending on the methodology employed. Tr. Vol. 10, 97:2–98:10 at 98:8-10 (Miller/Pls. Expert) (discussing demonstrative at 9, PX0461 (Miller Report) ¶ 201, Ex. 20). Defendants' expert, Darin Lee, calculated that JetBlue's presence on routes lowered fares by 18 percent to 25 percent—more than any other LCC. Tr. Vol. 12, 182:4-11 (Lee/Defs. Expert); DX0861.

53.     Travelers benefited from the JetBlue Effect whether or not they flew on JetBlue. Mr. Lusso testified that the JetBlue Effect "is measured as an impact on the customers that [JetBlue] serve[s]," as well as customers that "don't fly JetBlue" because "customers are better

off after [JetBlue] introduce[s] [its] service." Lusso (JetBlue) Dep. 68:24–69:14 at 69:2-7, Apr. 11, 2022.

54.     When JetBlue exits a market, prices tend to increase. When JetBlue left the JFK-Richmond route, fares rose by 65 percent and passenger counts fell by 49 percent. Tr. Vol. 10, 97:2–98:10 (Miller/Pls. Expert) (discussing PX0644 (Miller Report) ¶ 201, Ex. 20).

## III.   THE NORTHEAST ALLIANCE

### A.   Overview of the Northeast Alliance

55.     On July 15, 2020, American and JetBlue executed a contract titled the "Northeast Alliance Agreement." PX0001a at 1-44. American and JetBlue also entered four related agreements that same day: (1) the Codeshare Agreement (PX0001c), (2) the AAdvantage Participating Carrier Agreement (PX0001d), (3) the TrueBlue Participating Carrier Agreement (PX0001e), and (4) the Mutual Growth Incentive Agreement (PX0001b). On August 6, 2020, American and JetBlue entered into a Bilateral Special Prorate Agreement for Passengers. PX0001f. On October 13, 2021, American and JetBlue executed two slot lease agreements: one for American leasing slots to JetBlue (PX0001h) and the other for JetBlue leasing slots to American (PX0001i). In the time since July 15, 2020, American and JetBlue have amended and extended their contracts. *See, e.g.*, PX0001a at 45, 48; PX0001b at 31.

56.     Defendants began implementing the NEA in approximately January or February 2021. Tr. Vol. 6, 18:7-22 (Laurence/American).

### 1.     The Northeast Alliance Agreement

57.     The Northeast Alliance Agreement (the "NEA Agreement") is "the governing agreement for the NEA." PX0001a at 4. The NEA Agreement "supersede[s] any contradictory or inconsistent provisions" in the other contracts comprising the NEA Agreement. PX0001a at 4 (unless otherwise explicitly stated in a related agreement). The plain language of the NEA Agreement requires American and JetBlue "to use commercially reasonable efforts to coordinate the NEA Services," including "to optimize their respective, individual network plans regarding the NEA Services" after "due consultation on all aspects" of their network plans; to "ensure

14

timely communication" of each airline's network plans for NEA Airports in a way that permits the other "to plan resources effectively;" and to "regularly review performance of the NEA Services," agreeing to take "remedial action" if a route is "underperforming." PX0001a at 4-5. "Optimizing" capacity means "coordinating" capacity. Tr. Vol. 1, 173:25–174:2 (Hayes/JetBlue). "NEA Airports" is defined as "Boston Logan Airport (BOS), John F. Kennedy International Airport (JFK), LaGuardia Airport (LGA), and Newark Liberty International Airport (EWR)." PX0001a at 24. "NEA Services" is defined as the scheduled air passenger services of American and JetBlue—including their respective affiliates and franchisees—flying on NEA Routes. PX0001a at 24. "NEA Routes" includes all routes for JetBlue's short-haul services, American's short-haul services, and American's long-haul services. PX0001a at 24. The NEA Agreement specifically provides that JetBlue's long-haul routes to Europe "may be included in the NEA" in the future if American and JetBlue so agree. PX0001a at 4.

58.    The NEA Agreement contemplates that American and JetBlue will jointly market and sell their services within the NEA, including "developing joint customer bids" and "enter[ing] into joint corporate sales agreements." PX0001a at 5. The NEA Agreement contains provisions for American and JetBlue to implement sales and marketing cooperation, and to co-locate at airports or otherwise coordinate assets and facilities. PX0001a at 5-6. The NEA Agreement provides a mechanism for American and JetBlue to lease slots to one another at NEA Airports. PX0001a at 6, 28-31. The NEA Agreement also establishes a management committee consisting of representatives from American and JetBlue "to oversee the NEA." PX0001a at 7-8. This committee is responsible for, among other tasks, ensuring the NEA achieves "the commercial benefits (including financial)" that American and JetBlue expect to receive from the NEA, and for appointing "functional committees" to execute the NEA. PX0001a at 7-8. The functional committees serve as "the first point of contact for resolution of disputes" between American and JetBlue regarding the NEA, but if there are "unresolved disputes," those are escalated to the management committee. PX0001a at 8.

59.     American and JetBlue executed the First Amendment to the NEA Agreement on September 11, 2020. PX0001a at 45-47. The First Amendment modified the "Slot Usage and Maintenance," "Subsequent Exclusivity Termination Fee," and "Consequential Damages" sections of the NEA Agreement. PX0001a at 45-46. The First Amendment included two "replacement" sections, both pertaining to the Slot Usage and Maintenance section of the original NEA Agreement. *See* PX0001a at 45. Of note, the First Amendment prevents American and JetBlue from voluntarily selling or transferring any slots at any slot-controlled airport to other airlines. PX0001a at 45. American and JetBlue executed the Second Amendment to the NEA Agreement—which became effective on January 15, 2021—adding a section about the "Operation of the NEA." PX0001a at 48-51. The Third Amendment to the NEA Agreement— also effective January 15, 2021—further modified the "Operation of the NEA" language. PX0001a at 52-54.

60.     The NEA will continue indefinitely unless Defendants choose to terminate it or decline to renew it after five years. PX0001a at 7. The NEA Agreement includes specific procedures for winding down the NEA, with minimal disruption to passengers, that would apply in the event the NEA is terminated as a result of this enforcement action. PX0001a at 13-14.

## 2.     The Codeshare Agreement

61.     The Codeshare Agreement (PX0001c) allows American and JetBlue to market and sell a flight from the other airline as its own. The Codeshare Agreement allows American and JetBlue to include additional flights in the NEA in the future without formally amending the Codeshare Agreement. PX0001c at 2-3. The Codeshare Agreement requires American and JetBlue to "coordinate their service schedules" with one another. PX0001c at 3. The Codeshare Agreement allows a passenger to book a flight on an American flight number even if that flight is operated by JetBlue and vice versa. Mehoke (JetBlue) Dep. 139:24–140:1, 140:14-21, June 2, 2022. The Codeshare Agreement covers all domestic markets that touch one of the four NEA Airports. Tr. Vol. 4, 96:17–98:4 (Raja/American).

62.     The Codeshare Agreement also establishes a "joint management committee" to "review the planning and implementation" of the Codeshare Agreement. PX0001c at 21. The joint management committee is tasked with identifying ways to "increase the benefits afforded to American and JetBlue," as well as seek out "opportunities for expanding the scope of the relationship" between American and JetBlue. PX0001c at 22. The Codeshare Agreement was amended by the Second Amendment to the NEA Agreement (PX0001a at 48-51) and by the Third Amendment to the NEA Agreement (PX0001a at 52-54).

### 3.     The AAdvantage Participating Carrier Agreement and the TrueBlue Participating Carrier Agreement

63.     American and JetBlue also entered a set of agreements regarding one another's frequent flier programs: the AAdvantage Participating Carrier Agreement (PX0001d) and the TrueBlue Participating Carrier Agreement (PX0001e) (collectively, the "Frequent Flier Agreements"). The Frequent Flier Agreements set out passenger mileage accrual for travel on the other carrier's flights, conditions under which passengers may use "award travel" on the airlines, and other administrative processes. PX0001d at 5; PX0001e at 5; Tr. Vol. 2, 59:20–60:18 (Hayes/JetBlue) (explaining how Defendants compensate each other for customers redeeming one airline's points on the other airline's flights). The Frequent Flier Agreements also require American and JetBlue to pay each other fees and charges associated with their own frequent flier programs. PX0001d at 18; PX0001e at 18.

### 4.     The Mutual Growth Incentive Agreement

64.     The Mutual Growth Incentive Agreement (the "MGIA") is a revenue-sharing agreement between American and JetBlue. Tr. Vol. 1, 182:23–183:1 (Hayes/JetBlue). The MGIA was modeled after American's revenue-sharing provisions in its international joint ventures. Tr. Vol. 5, 140:10-14 (Laurence/American); *compare* PX0450 (describing revenue sharing in the MGIA), *with* PX0756 (describing revenue sharing in agreements that pre-date the NEA). Under the MGIA, American and JetBlue set a baseline revenue equal to each airline's 2019 revenue. PX0001b at 5. American and JetBlue then evaluate how much capacity and how much revenue

each party added to calculate "incremental revenue." PX0001b at 3-5. As between American and JetBlue, whichever airline had higher incremental revenue then pays a "transfer payment" to the airline with lower incremental revenue. Tr. Vol. 1, 183:10–185:15 (Hayes/JetBlue). *See* discussion on the operation of the revenue sharing provisions of the MGIA *infra* Section III.B.2.

### 5. The Slot Lease Agreements

65.     After signing the NEA, American and JetBlue also executed a series of slot lease agreements. On October 13, 2021, two slot lease agreements were executed: one American to JetBlue (PX0001h) and one JetBlue to American (PX0001i). American leased ten JFK slots and 37 LGA slots to JetBlue. PX0001h at 1-3. The lease term was approximately one year, starting between October 29 and November 1 of 2021. PX0001h at 1-3. JetBlue leased eight JFK slots to American for a term of October 31, 2021 until October 29, 2022. PX0001i.

66.     On March 11, 2022, Defendants executed an agreement in which American leased an additional 32 LGA slots and 20 JFK slots to JetBlue. PX0001j at 1-2. Those slot leases started at varying points in the spring and summer of 2022, lasting through March or October 2023. PX0001j at 1-2. Those leases were modified on May 24, 2022, but the number of slots and terms of the leases did not change. PX0001k at 1-2.

### 6. The Bilateral Special Prorate Agreement for Passengers

67.     As part of the NEA, American and JetBlue also entered an agreement that set out the proration of ticket revenue between the parties. This agreement was called the "Bilateral Special Prorate Agreement," and initially began on October 1, 2020. PX0001f at 1, 3. Under this agreement, for flights sold by American but flown by JetBlue that touch BOS, EWR, LGA, or JFK, JetBlue bills American the prorated ticket value plus any carrier-imposed fees or surcharges associated with the ticket. PX0001f at 8. For flights sold by American but flown by JetBlue that do *not* touch BOS, EWR, JFK, or LGA, the Bilateral Special Prorate Agreement includes fixed amounts JetBlue will bill American per one-way ticket. PX0001f at 8-10. For flights sold by JetBlue but flown by American touching BOS, EWR, JFK, or LGA, American bills JetBlue the prorated ticket value plus any carrier-imposed fees or surcharges associated with the ticket.

18

PX0001f at 11. For flights sold by JetBlue but flown by American that do *not* touch BOS, EWR, JFK, or LGA, the Bilateral Special Prorate Agreement includes fixed amounts American will bill JetBlue per one-way ticket. PX0001f at 11-13. The agreement was set to renew automatically on an annual basis unless American and JetBlue terminate the agreement. PX0001f at 3. On November 1, 2021, American and JetBlue amended the agreement. PX0001g at 1.

### B.    The terms of the Northeast Alliance require American and JetBlue to coordinate capacity and share revenues.

#### 1.    Capacity Coordination

68.    Under the NEA, American and JetBlue are obligated to optimize their joint networks. "Optimizing" capacity in the NEA Agreement means "coordinating" capacity. Tr. Vol. 1, 173:25–174:2 (Hayes/JetBlue). Optimization also means coordinating their network plans for routes that touch the four NEA Airports, including: (1) which airline will fly each route, (2) what aircraft will be flown on a particular route, (3) what slots will be used in the slot-constrained airports, (4) what gates will be used, and (5) how many flights each airline will fly to each city pair. Tr. Vol. 4, 98:16–100:8 (Raja/American); *accord* Tr. Vol. 5, 132:21-24 (Laurence/American); Tr. Vol. 1, 164:4-8 (Hayes/JetBlue).

69.    To facilitate this coordination, American and JetBlue established a "coordination process" for making capacity decisions related to routes within the scope of the NEA. Tr. Vol. 8, 115:21–116:1 (Fintzen/JetBlue). As part of this coordination process, network and schedule planning teams from both American and JetBlue convene to reach consensus before publishing their respective schedules. Tr. Vol. 8, 117:8-18 (Fintzen/JetBlue). This process enables American and JetBlue to make collective, rather than independent, capacity decisions. Tr. Vol. 15, 117:25-118:13 (Znotins/American); Lusso (JetBlue) Dep. 34:23–35:19, Mar. 18, 2021; Tr. Vol. 8, 117:1-23 (Friedman/JetBlue); Tr. Vol. 15, 117:17–118:13 (Znotins/American). It also enables coordination of schedules. Mehoke (JetBlue) Dep. 141:18-21, June 2, 2022. As a result of this coordination, American and JetBlue no longer both operate flights using their own aircraft on

certain origin-and-destination pairs. Tr. Vol. 4, 100:10-21 (Raja/American). *See infra* Section VI.D.

> **2.      Revenue Sharing**

70.      The MGIA sets out the specific revenue-sharing mechanism within the NEA. Tr. Vol. 5, 136:1-24 (Laurence/American); *see also* Tr. Vol. 4, 100:22–101:4 (Raja/American). Under this provision, American's and JetBlue's revenue from the NEA Airports goes into a common pot and each airline receives a portion of that revenue. Casey (American) Dep. 127:25–128:13, May 4, 2022. The MGIA applies to all domestic routes in and out of the four NEA Airports (except for a handful which were subsequently carved out in an amendment), including routes on which American and JetBlue both provided nonstop service pre-NEA. Tr. Vol. 4, 101:5-19 (Raja/American). The purpose of the revenue-sharing agreement is to align American's and JetBlue's incentives. Tr. Vol. 4, 101:20-24 (Raja/American). *See* discussion of the economic incentives created by the MGIA revenue sharing formulas *infra* Section V.E.2.f.

71.      Under the terms of the MGIA, JetBlue owed American a transfer payment in the range of $200 million at the end of 2021. Tr. Vol. 8, 122:4-18 (Fintzen/JetBlue). Notwithstanding that total, American agreed to cap JetBlue's 2021 MGIA transfer payment at $27 million. Tr. Vol. 8, 124:17–125:5 (Fintzen/JetBlue); PX0800 at 4. Mr. Laurence testified that American and JetBlue did not want to sour the NEA relationship with this initial payment. Tr. Vol. 5, 219:5–220:17 at 220:5-8 (Laurence/American). Mr. Hayes also testified that "it never was something that I didn't feel that we would end up resolving." Tr. Vol. 1, 214:24–215:17 (Hayes/JetBlue). Following American's decision to forgive a large portion of what JetBlue owed, Defendants did not amend the MGIA. Tr. Vol. 8, 125:6–126:7 at 125:20-24 (Fintzen/JetBlue); DX0437 at 1.

72.      In addition to aligning their incentives, the MGIA renders American and JetBlue "metal neutral" with one another. PX0363 at 47; Bhargava (American) Dep. 304:10–305:1, June 3, 2022. The phrase "metal neutrality" refers to when airlines are "agnostic" about the airline on which a customer flies. Bhargava (American) Dep. 186:15-21, June 3, 2022. Metal neutrality is a feature of the NEA, and therefore it "doesn't matter whether it's B6 metal or American metal."

Bhargava (American) Dep. 187:13-16, 187:18–188:5, June 3, 2022; *see also* Tr. Vol. 5, 143:23–144:11 (Laurence/American); PX0450 at 3 (explaining that "[t]he MGIA is designed to make each carrier indifferent as to which carrier an incremental passenger flies").

73.     The MGIA's revenue-sharing provision applies to American's and JetBlue's "incremental revenue and incremental costs attributed to the NEA" compared to each airline's base-period data. PX0001b at 3. American's flights from JFK to London and BOS to London are included in the NEA's revenue sharing. Tr. Vol. 6, 21:20-24 (Laurence/American).

### 3.     Loyalty Program Integration

74.     The NEA entangles American's and JetBlue's loyalty programs. Before entering the NEA, JetBlue had plans and the potential to add frequent flyer program reciprocity beyond its deal with Hawaiian Airlines, to partners like Emirates. Tr. Vol. 6, 10:25–11:23 at 11:10-11, 11:18-23 (Laurence/American). Instead, under the NEA, JetBlue determined that integrating TrueBlue with AAdvantage may negatively impact the TrueBlue program. Tr. Vol. 8, 144:22–145:10 (Fintzen/JetBlue). JetBlue calculated that "absent AA/FFP deal," its TrueBlue program would grow at a rate of 20 percent. PX0819 at 11.

75.     In August 2020, the JetBlue Loyalty Team expressed concern that excluding co-brand revenue, *i.e.*, revenue from both airlines, from the MGIA would create more losses in customers than JetBlue would make in the MGIA, causing JetBlue to lose over $100 million. PX0723 at 8. Providing JetBlue's TrueBlue customers with reciprocal access to AAdvantage is likely to cause a five percent fare increase for JetBlue flights. Tr. Vol. 4, 61:24–62:4 (Kirby/Spirit).

### C.     The Northeast Alliance is an unprecedented partnership between domestic airlines.

#### 1.     The NEA is modeled on international joint ventures that typically require antitrust immunity.

76.     The NEA was inspired by—and many of its terms are based on—the metal-neutral joint-business agreements used on international routes for airlines operating in different countries. Bhargava (American) Dep. 98:19-25, June 3, 2022 (acknowledging that the NEA's

incentive structure was modeled "in a similar fashion" to American's Atlantic Joint Business alliance, which has antitrust immunity). Revenue sharing under the NEA is modeled after American's revenue-sharing agreements with its international joint venture partners. Tr. Vol. 5, 140:10-14 (Laurence/American); *see* PX0756 at 4.

77.     International alliances emerged as a solution because airlines from different countries desire to connect passengers to more destinations, but cannot merge with each other. Tr. Vol. 13, 109:15–112:15 at 111:17-20 (Israel/Defs. Expert). For example, the American-British Airways alliance gives American access to over 150 airports that are not otherwise in American's network. PX0462 (Town Report) ¶ 127, Ex. 19. The Delta-Air France alliance gives Delta access to approximately 140 airports that are not otherwise in Delta's network. PX0462 (Town Report) ¶ 127, Ex. 19. And the United-Lufthansa alliance gives United access to over 150 airports that are not otherwise in United's network. PX0462 (Town Report) ¶ 127, Ex. 19.

78.     Domestic airlines like American and JetBlue do not face the challenges that have historically been used to justify international alliances and joint ventures. This explains why the NEA provides far fewer complementarities than the three main, transatlantic alliances. Tr. Vol. 9, 72:12-19 (Town/Pls. Expert). Plaintiffs' expert Dr. Town analyzed American's and JetBlue's September 2019 schedule data and determined that the NEA gives JetBlue and American access to far fewer new airports than each of the legacy airlines gains from their transatlantic alliances. Tr. Vol. 9, 72:20–73:14 (Town/Pls. Expert); PX0462 (Town Report) ¶ 127, Ex. 19.

79.     Before entering the NEA, JetBlue had a long history of critiquing international joint ventures. For example, JetBlue executives complained that the U.S. DOT rubber-stamps all international joint venture requests, resulting in reduced competition and higher fares. PX0869 at 3 ("only in aviation, in a historical and outdated anomaly, does US DOT have the say on airlines, colluding and in 25 years, they have grated [sic] every single request to allow parties to stop competing and start colluding . . . The result is HUGE PREMIUMS and HUGE GAPS in markets with competition (US-UK/US-EU) and higher fares"). In 2018, Mr. Hayes described the

international joint ventures' practices of "coordinating prices, coordinating schedules, and sharing revenues" as "legalized collusion." Tr. Vol. 1, 149:19–150:5 (Hayes/JetBlue).

80.     JetBlue has routinely expressed a belief that international joint ventures with antitrust immunity have the effect of "harming consumers and stifling innovation and competition." Land (JetBlue) Dep. 107:20-23, 108:1-6, Apr. 28, 2022 (objection pending). JetBlue sent a letter to multiple cabinet secretaries in 2015 stating that "[l]eft unchecked, this U.S. government-sanctioned collusion will continue to stifle innovation and competition in international aviation and will directly harm JetBlue and consumers." Land (JetBlue) Dep. 105:6-13, Apr. 28, 2022.

81.     Even after entering the NEA, JetBlue executives recognize that international joint ventures harm consumers. For instance, Mr. Land testified that he agreed joint ventures in the transatlantic market context have stifled competition and increased fares. Land (JetBlue) Dep. 168:2-8, 168:10-14, Apr. 28, 2022.

### 2.     American's and JetBlue's domestic networks overlap substantially more than in most airline partnerships.

82.     The NEA involves a much higher degree of overlap in nonstop routes than the American-British Airways, Delta-Air France, and United-Lufthansa transatlantic alliances. Tr. Vol. 9, 74:16-25 (Town/Pls. Expert) (discussing demonstrative at 5); PX0462 (Town Report) ¶ 128, Ex. 20. Thirty percent of the nonstop routes served by American from NEA Airports are also served by JetBlue. Tr. Vol. 9, 74:16-25 (Town/Pls. Expert) (discussing demonstrative at 5); PX0462 (Town Report) ¶ 128, Ex. 20. Twenty-seven percent of the nonstop routes served by JetBlue from NEA Airports are also served by American. Tr. Vol. 9, 74:16-25 (Town/Pls. Expert) (discussing demonstrative at 5); PX0462 (Town Report) ¶ 128, Ex. 20.

83.     The degree of overlap between American and JetBlue is even greater when measured by passenger count rather than route count. In markets with a JFK or LGA endpoint, 57 percent of American passengers and 70 percent of JetBlue passengers were traveling on a nonstop overlap route—a route which, prior to the NEA, both American and JetBlue offered

23

nonstop service—in 2019. Tr. Vol. 17, 62:24–63:3 (Miller/Pls. Expert); *see* PX0461 (Miller Report) ¶ 59 (defining nonstop overlap markets as "markets in which at least one endpoint is an NEA airport and both American and JetBlue offer nonstop service."). Across JFK, LGA, and EWR, 73 percent of Defendants' nonstop passenger count was on nonstop overlaps in 2019. Tr. Vol. 13, 145:15–147:13 (Israel/Defs. Expert) (discussing demonstrative at 10). At BOS, 76 percent of American's passengers and 28 percent of JetBlue's passengers were traveling on a nonstop overlap route in 2019. Tr. Vol. 17, 64:9-12 (Miller/Pls. Expert); *see also* Tr. Vol. 13, 161:25–162:5 (Israel/Defs. Expert) (discussing demonstrative at 12) (testifying that 40 percent of Defendants' nonstop passenger count was on nonstop overlap routes in 2019).

### 3. No other domestic airline partnership includes capacity coordination and revenue sharing.

84. Defendants' executives acknowledge that the NEA is unprecedented. Mr. Hayes testified that he has never seen a domestic alliance that involves revenue sharing and capacity coordination. Tr. Vol. 1, 200:19-23 (Hayes/JetBlue). David Fintzen, who is now the Vice President for the Northeast Alliance at JetBlue, called the NEA the "most complex" and "first domestic JV in our industry." PX0702 at 2. Jordan Pack, American's Senior Manager for Commercial Planning and Analysis, said he was not aware of any partnerships between two domestic airlines that involve both revenue sharing and capacity coordination, other than the NEA. Tr. Vol. 8, 179:14-18 (Pack/American). Brian Znotins, American's Vice President of Network and Schedule Planning, would never have coordinated schedules with a competitor before the NEA because he understood he could "go to prison" for doing so. Tr. Vol. 15, 125:4-21 (Znotins/American); PX0315 at 3. Massimo Mancini, American's Vice President of Commercial Planning and Analysis, does not know of any other alliance between two U.S. airlines that previously competed, but now share revenues and coordinate on network planning and routes. Mancini (American) Dep. 162:6-10, 162:12-16, Apr. 29, 2022. And Robert Isom, American's Chief Executive Officer, is not aware of any arrangements between domestic airlines similar to the NEA. Tr. Vol. 5, 43:18-23 (Isom/American).

85.     Defendants' expert, Darin Lee, testified that the NEA is "unique" among domestic alliances, and is the first to align the interests of a legacy airline and an LCC. Tr. Vol. 12, 183:24–184:6 (Lee/Defs. Expert).

86.     Executives from other airlines agree that the NEA is unprecedented. Spirit's Vice President of Network Planning, John Kirby, testified that "coordination among carriers in the United States about schedules is really unheard of." Tr. Vol. 3, 150:19–151:5 (Kirby/Spirit). Mr. Kirby also testified that allowing domestic airlines to coordinate in the way American and JetBlue do under the NEA is akin to opening "Pandora's box." Tr. Vol. 3, 147:6–148:8 (Kirby/Spirit).

87.     ███████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

88.     Delta's Director of Alliances, Andrew Guenthner, testified he was not aware of any domestic airline partnership or alliance involving capacity coordination and revenue sharing other than the NEA. Guenthner (Delta) Dep. 216:9-13, June 1, 2022. Delta's current domestic partnerships do not include capacity coordination or profit sharing. Guenthner (Delta) Dep.179:24–181:7, 183:24–185:9 June 1, 2022 (confirming Delta does not coordinate capacity or share profits with Hawaiian Airlines or Cape Air); Guenthner (Delta) Dep. 194:8-15, June 1, 2022 (confirming Delta did not coordinate capacity or share profits with Alaska in their prior relationship).

89.     Andrew Harrison, Alaska's Chief Commercial Officer, testified that several elements of the NEA—including revenue sharing on overlapping domestic routes, the ability to allocate domestic markets, and domestic capacity coordination—are unprecedented. Tr. Vol. 7, 68:11–69:16 (Harrison/Alaska).

90.     Andrew Watterson, Executive Vice President and Chief Commercial Officer of Southwest, testified that Southwest never discusses its network planning or capacity decisions with other airlines, nor does Southwest coordinate its scheduling with other airlines. Tr. Vol. 2,

106:9-13, 107:14-18, 108:19-23 (Watterson/Southwest). Mr. Watterson testified that he understood such discussions or such coordination to be illegal. Tr. Vol. 2, 106:9-13, 107:14-18, 108:19-23 (Watterson/Southwest). He added that if another airline were to approach Southwest to discuss network planning or capacity decisions, he would immediately report the contact to Southwest's general counsel. Tr. Vol. 2, 106:14-17, 107:19-21 (Watterson/Southwest).

91.     Mr. Casey, a retired American executive with over 30 years of experience in the airline industry, acknowledged that there has never been a partnership like the NEA—where two domestic competitors agree to share revenue and coordinate capacity on overlapping domestic routes. Casey (American) Dep. 146:18–148:25, May 4, 2022.

92.     American's other domestic alliance, the West Coast International Alliance ("WCIA"), does not have joint network planning for domestic overlaps, capacity coordination, or reciprocal revenue sharing on overlap routes. Tr. Vol. 4, 103:17–104:7, 104:24–105:11 (Raja/American); *see also infra* Section VIII.

### 4.     Defendants knew the Northeast Alliance would be subject to regulatory scrutiny by the U.S. DOT and the U.S. DOJ.

93.     Defendants expected the NEA to face regulatory scrutiny because it was an unprecedented domestic combination. Mr. Hayes acknowledged that the NEA "would face a lot of regulatory review." Tr. Vol. 1, 200:24–201:5 (Hayes/JetBlue). JetBlue's Vice President of the Northeast Alliance, David Fintzen, testified that he understood that the U.S. DOJ would scrutinize the NEA. Tr. Vol. 8, 95:24–96:10 (Fintzen/JetBlue).

94.     Defendants were aware that they needed to be on good behavior until they were no longer under regulatory scrutiny. For example, Mr. Hayes stated in June 2020, "I certainly wouldn't close off Orlando growth until we know Connie [the NEA] has approval." PX0712 at 14. When considering plans to cut capacity on routes out of JFK, JetBlue executives cited the "optics" of meeting their commitments to the government related to the NEA. PX0832 at 1. Mr. Kirby was asked if he had seen any analysis showing whether "JetBlue has changed its pricing

philosophy as a result of the NEA," to which he answered no because he "believe[s] they are on their best behavior." Tr. Vol. 4, 43:18-19 (Kirby/Spirit).

95.     Even before announcing the NEA, Defendants knew they would need to present to regulators a favorable comparison, or "counterfactual," of their schedules with the NEA versus without the NEA. Tr. Vol. 8, 97:11-17 (Fintzen/JetBlue); PX0707 at 1 (identifying, in May 2020, information JetBlue thought the U.S. DOJ would request for a counterfactual).

96.     To assist in this process, American and JetBlue each relied on work performed by a Clean Team, comprised of employees from each airline. The Clean Team had been created at the suggestion of the in-house legal departments while discussions about a potential alliance were underway and worked together with the "goal" of providing a "more detailed build-out of what the [NEA] strategy would look like." Tr. Vol. 5, 108:12–109:5 at 108:23-25 (Laurence/American). The Clean Team was tasked with building out or creating a schedule to see if an alliance between American and JetBlue was feasible. Tr. Vol. 4, 219:8–220:3 (Raja/American).

97.     As part of the Clean Team work, the Defendants constructed a "steady state" 2023 schedule under the belief that "regulatory scrutiny was coming from the Department of Justice." Tr. Vol. 8, 102:13-17 (Fintzen/JetBlue). Mr. Fintzen expected the counterfactual would be "[w]hat [JetBlue] probably look[s] like in terms of fleet and capacity by 2023 if there isn't a JV." Tr. Vol. 8, 99:23–100:5 (Fintzen/JetBlue); PX0707 at 1. *See* discussion of the reliability of the Clean Team's work for assessing potential benefits of the NEA *infra* Section VII.H.1.

## IV.     PLAINTIFFS HAVE MET THEIR BURDEN TO PROVE EACH OF THE RELEVANT MARKETS ALLEGED IN THE COMPLAINT.

### A.     Scheduled air passenger service is a relevant product market.

#### 1.     Other forms of transportation are not adequate substitutes for scheduled air passenger service.

98.     There are no substitutes for scheduled air passenger service that should be included in a relevant product market for analyzing the competitive effects of the NEA. PX0461 (Miller Report) ¶¶ 76-82. Travel by train, car, or bus may be a reasonable substitute for air travel

over shorter distances, but the NEA does not include any market involving one-way travel of less than 100 miles. PX0461 (Miller Report) ¶¶ 78-79.

99.     Dr. Miller's hypothetical monopolist analysis shows that "alternative forms of travel are not a sufficiently close substitute to air travel for enough passengers that they should be included in a relevant antitrust market." PX0461 (Miller Report) ¶ 80; Tr. Vol. 10 185:25–186:22 (Miller/Pls. Expert). In his simulation model, Dr. Miller found there is not sufficient substitution between air travel and other modes of transportation to constrain a hypothetical monopolist of scheduled air passenger service from increasing prices. Tr. Vol. 10, 139:21–142:4 (Miller/Pls. Expert); *see also* PX0461 (Miller Report) ¶ 80.

### 2.     Amtrak is not an adequate substitute for scheduled air passenger service.

100.     Amtrak is not an adequate substitute for scheduled air passenger service because on key NEA Routes where Amtrak also offers service—Boston-Washington, D.C., Boston-Philadelphia, and Boston-Baltimore—air travel dominates. *See* PX0386 at 4, 6; PX0387 at 3, 6; PX0388 at 11, 14-15. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

101.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ PX0461 (Miller Report) ¶ 79 n.87 (citing PX0387). Just as Amtrak does not appear to price in response to airlines, Defendants do not respond to train prices in setting fares. For example, JetBlue's Pricing Strategies Document contains no mention of Amtrak—only other airlines. *See* PX0608. JetBlue also does not monitor its market share compared to Amtrak. Mehoke (JetBlue) Dep. 227:22-25, June 2, 2022.

**B.** **Travel between an origin-and-destination pair is a relevant geographic market.**

**1.** **Most endpoints consist of all airports serving a metropolitan area.**

102.   Customers' chosen origin-and-destination pairs constitute relevant geographic markets. For example, travel between Atlanta and Minneapolis is not a reasonable substitute for travel between San Francisco and Los Angeles, nor could a ticket specifying one origin-and-destination pair be used for any other. PX0461 (Miller Report) ¶ 87.

103.   Of the 350 metropolitan areas in the U.S. and its territories that are served by airports, only 16 of them include multiple airports. *TranStats Glossary*, Dep't of Transp., transtats.bts.gov/printglossary.asp (last visited Nov. 16, 2022) (cited in PX0461 (Miller Report) ¶ 91 n.97).

104.   Dr. Miller concluded that, for most endpoints, the geographic market includes all of the airports serving a metropolitan area (*e.g.*, Miami includes both Miami International Airport ("MIA") and Fort Lauderdale-Hollywood International Airport ("FLL")). Tr. Vol. 10, 185:25–186:22 (Miller/Pls. Expert); PX0461 (Miller Report) ¶ 84. However, in "evaluating the competitive effects of the NEA," it is appropriate to consider whether BOS, JFK/LGA, EWR and Reagan National ("DCA") airports constitute separate, narrower market from other airports in their metropolitan areas. PX0461 (Miller Report) ¶ 85; Tr. Vol. 10, 185:25–186:22 at 186:12-17 (Miller/Pls. Expert).

**2.** **Boston Logan International Airport is an endpoint for relevant geographic market purposes.**

105.   The parties' experts agree that BOS is a proper endpoint. PX0955 (Miller Reply Report) ¶ 50 n.52 (citing DX1090 (Brueckner Report) ¶ 33, DX1093 (Lee Report) ¶ 99). Dr. Lee has "no issue with Plaintiff's contention that Boston's Logan International Airport…is a discrete endpoint for city-pairs originating or terminating in the Boston metropolitan area." DX1093 (Lee Report) ¶ 99. Dr. Brueckner also "agree[s] with Professor Miller on the outcome (BOS/Logan International is a discrete endpoint)." DX1090 (Brueckner Report) ¶ 33.

29

106.    Dr. Miller independently confirmed this fact. He found that a hypothetical monopolist could raise prices by at least ten percent in each of the NEA nonstop overlap markets with an endpoint in BOS, and by at least five percent in all directional market-quarters with a BOS endpoint. PX0461 (Miller Report) ¶¶ 157-161, Ex. 15.

### 3.    Ronald Reagan Washington National Airport is an endpoint for relevant geographic market purposes.

107.    Dr. Miller's economic analysis shows that DCA is a separate geographic market from Dulles ("IAD") and Baltimore ("BWI"). Tr. Vol. 10, 185:25–186:22 at 186:12-17 (Miller/Pls. Expert). His analysis of documents, catchment maps, and simulation model are all consistent with treatment of DCA as a separate endpoint. Tr. Vol. 10, 195:15-23 (Miller/Pls. Expert).

108.    Dr. Brueckner agreed that DCA is a separate endpoint that should not be grouped with IAD or BWI. Tr. Vol. 15, 42:6-10, 47:14-18 (Brueckner/Defs. Expert).

109.    Dr. Miller found that a hypothetical monopolist could impose a small but significant and non-transitory increase in price ("SSNIP") of at least five percent in DCA. PX0461 (Miller Report) ¶¶ 160-161, Ex. 15; Tr. Vol. 10, 185:25–186:22 (Miller/Pls. Expert). Based on this analysis, he concluded that it was appropriate to treat DCA as a distinct endpoint for the purpose of evaluating the effects of the NEA. PX0461 (Miller Report) ¶ 161.

110.    Dr. Miller also performed a catchment map analysis, which found that a vast majority of Defendants' frequent flier customers in DCA's 90 percent "draw area" chose DCA: 95.2 percent for JetBlue, and 85.8 percent for American. PX0461 (Miller Report) ¶ 124, Ex. 11. In other words, most of Defendants' customers who fly from DCA do not see other metro-area airports as close substitutes for DCA. PX0461 (Miller Report) ¶¶ 118-126.

### C.    It is appropriate to define the relevant geographic market to combine JFK and LGA, but exclude EWR.

111.    Dr. Miller—relying upon ordinary course documents, catchment maps reflecting consumer locations, a hypothetical monopolist test, and his simulation model—concluded that

JFK/LGA should be treated as a single endpoint for domestic travel. Tr. Vol. 10, 185:25–186:22, 188:4-19 (Miller/Pls. Expert); PX0461 (Miller Report) ¶¶ 65, 160-161, Ex. 15.

### 1.   JFK/LGA passes the hypothetical monopolist test.

112.    Dr. Miller performed a hypothetical monopolist test and found conclusively (in 99.9 percent of tests) that a hypothetical monopolist could impose a SSNIP of at least five percent in JFK/LGA. PX0461 (Miller Report) ¶¶ 160-161, Ex. 15. Based on this analysis, he concluded that it was appropriate to treat JFK/LGA as a distinct endpoint for the purpose of evaluating the effects of the NEA. PX0461 (Miller Report) ¶ 161; PX0955 (Miller Reply Report) ¶ 88; Tr. Vol. 17, 51:1–54:24 (Miller/Pls. Expert).

113.    Dr. Miller found that *all* NEA nonstop overlaps with a JFK/LGA endpoint pass the hypothetical monopolist test. Tr. Vol. 10, 194:18–195:14 (Miller/Pls. Expert). The results are consistent whether a five percent or ten percent simulated price increase—the most standard numbers used in this exercise—is chosen, and across all quarters of 2019. Tr. Vol. 10, 194:18–195:14 (Miller/Pls. Expert).

114.    Expanding the analysis to all JFK/LGA markets flown nonstop by Defendants, 99.9 percent pass the hypothetical monopolist test when a five percent price increase is used, and 99.7 percent pass when a ten percent price increase is used. Tr. Vol. 10, 194:18–195:14 (Miller/Pls. Expert). This means that the amount of diversion from JFK/LGA, in the face of these price increases, is insufficient to constrain market power by a hypothetical monopolist at JFK/LGA. Tr. Vol. 10, 213:22–214:7 (Miller/Pls. Expert).

115.    Dr. Miller concluded that JFK/LGA passes the hypothetical monopolist test, regardless of whether national data—*i.e.*, information on all U.S. routes—or data for only JFK/LGA passengers are used. Tr. Vol. 17, 44:16–46:1 at 45:11-24 (Miller/Pls. Expert). Dr. Miller performed two separate tests to determine whether customers in this market might be more willing to substitute than consumers overall. To the contrary, Dr. Miller found that customers traveling to and from JFK/LGA are *less* price-sensitive and *less* willing to substitute than consumers overall. PX0461 (Miller Report) ¶¶ 162-165.

116.     None of Defendants' experts conducted a hypothetical monopolist test to support their proposed inclusion of EWR in the market with JFK/LGA. Tr. Vol. 12, 108:4-8 (Lee/Defs. Expert) (stating he did no new econometric analysis for the case); Tr. Vol. 12, 108:9–109:3 (Lee/Defs. Expert) (stating the Brueckner-Lee-Singer ("BLS") method used by Dr. Brueckner is not a SSNIP test).

117.     Dr. Brueckner performed a formal statistical analysis for a 2014 paper funded by United showing that JFK and LGA should be grouped separately from EWR, but he rejected the result based only on "common sense." Tr. Vol. 15, 44:12–45:7 (Brueckner/Defs. Expert).

118.     Dr. Brueckner presented the Court with regression results that were calculated based on airport groupings that his own report concluded were incorrect (and which was contrary to the methodology described in his 2014 paper), and he did not offer any statistical evidence of what the airport groupings would have been had he applied the correct methodology. Tr. Vol. 15, 36:15-19, 40:5-13 (Brueckner/Defs. Expert). Moreover, Dr. Bruckner did not calculate the false positive rate for his results, contrary to the method described in his 2014 paper. Tr. Vol. 15, 49:16-24 (Brueckner/Defs. Expert).

### 2.     Catchment data shows certain consumers have strong preferences for JFK/LGA over EWR.

119.     Dr. Miller performed a catchment map analysis and found that the vast majority of American's frequent flier customers and JetBlue.com customers in the JFK/LGA 90 percent "draw area" chose JFK/LGA—86.7 percent for JetBlue, and 88.9 percent for American. PX0461 (Miller Report) ¶ 112, Ex. 7. These maps demonstrate that customers in Manhattan, Queens, the Bronx, Brooklyn, and Long Island prefer flying out of JFK/LGA rather than other airports. PX0461 (Miller Report) ¶¶ 109-110, Ex. 5, Ex. 6; Tr. Vol. 10, 189:7–193:10 at 190:5–191:7, 192:4-11 (Miller/Pls. Expert).

120.     Dr. Miller further analyzed New York City taxi data for trips to area airports. These data: (1) show passengers' points of origin for their taxi rides (rather than their home addresses), (2) encompass passengers flying on all airlines (not just American and JetBlue), and

(3) include both originating and returning passengers. PX0461 (Miller Report) ¶¶ 113-114, Ex. 8. "These data show that the vast majority of passengers picked up in all areas of New York City, with the exception of Staten Island, chose to fly from JFK or LaGuardia." PX0461 (Miller Report) ¶ 114. The map shows that JFK/LGA have a very high share—approaching 100 percent—of taxi passengers in Manhattan, Brooklyn, and Queens. Tr. Vol. 10, 189:7–193:10 at 192:18–193:10 (Miller/Pls. Expert). Dr. Lee observed that only 17.7 percent of taxis carrying passengers from Manhattan to airports went to EWR, with over 80 percent going to JFK or LGA. Tr. Vol. 12, 137:2-7 (Lee/Defs. Expert).

121.     Dr. Miller noted that he relied on statements from Scott Laurence, formerly of JetBlue and now Senior Vice President of Partnership Strategy at American, specifically that "customers flying out of JFK tend to live east of the Hudson River, and customers that operate from Newark tend to live west of the Hudson River." Tr. Vol. 10, 193:23–194:17 (Miller/Pls. Expert). Dr. Miller testified that Mr. Laurence's statement was consistent with his catchment maps analysis. Tr. Vol. 10, 193:23–194:17 (Miller/Pls. Expert); PX0488 at 12 (explaining in a JetBlue 2020 earnings call that EWR has a "catchment area that does not largely overlap with LGA or JFK"). Mr. Laurence agrees that while there might be specific or anecdotal examples that differ, there is less of an interaction between EWR and JFK/LGA than there is between JFK and LGA. Tr. Vol. 5, 192:13-17 (Laurence/American).

122.     The airline industry recognizes that JFK and LGA attract different customers than EWR. Tr. Vol. 11, 189:7–193:10 (Miller/Pls. Expert); Tr. Vol. 12, 25:24–27:10 (Miller/Pls. Expert).  United, the largest airline at EWR, agrees that certain New York City travelers prefer JFK. Nocella (United) Dep., 32:16-23. So, too, does Delta—which is why Delta serves all three airports. Esposito (Delta) Dep., 248:15–249:4.

###     3.     Defendants price JFK/LGA distinctly from EWR for domestic routes.

123.     Defendants typically ignore United's EWR pricing when setting prices at JFK and LGA. Tr. Vol. 10, 193:23–194:14 at 194:10-13 (Miller/Pls. Expert); *see also* PX0225 at 2

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

124.    Allysen Roberts, Senior Manager in Contract Pricing at American, testified that American's pricing strategy treated JFK differently than EWR. Roberts (American) Dep. 152:22–153:6, May 10, 2021.

125.    As of August 17, 2020, a month after entering the NEA, JetBlue's Pricing Strategies Document reflected that JetBlue often priced routes to and from JFK and LGA the same as one another, but differently than routes to and from EWR. PX0608. This document explains how JetBlue was pricing each of its routes at the time, including whether it was matching another airline's pricing on the route and, if so, which airline(s) JetBlue matched. Tr. Vol. 3, 44:18–46:22 (Jarashow/JetBlue). The Pricing Strategies Document was a "one-stop shop" for how JetBlue was pricing its routes that was provided to JetBlue's then-Director of Revenue Management, Jonathan Weiner. Tr. Vol. 3, 44:1–45:20 (Jarashow/JetBlue).

126.    JetBlue's pricing analysts complained that one of JetBlue's internal reports (called FOIL) did not match the "pricing reality," and encouraged JetBlue to "keep JFK/LGA grouped and separate from EWR." PX0773 at 1-2. As one pricing analyst explained, "[f]or almost all of my LGA/JFK markets, I don't comp to EWR." PX0774 at 1.

127.    Where JetBlue provided nonstop service to and from JFK, it would match competitors' nonstop service at JFK and LGA, but not at EWR, for the following cities: Fort Lauderdale ("FLL"), Orlando ("MCO"), Tampa ("TPA"), and West Palm Beach ("PBI"). PX0608, Domestic at Rows 123, 131, 132 (FLL); Rows 98, 101, 102 (MCO); Rows 108, 110,

34

114 (TPA); Rows 112, 115, 116 (PBI); *see also* PX0584 at 1 (on JFK-Las Vegas ("LAS"),

JetBlue's pricing strategy is to match American and Delta, but ignore United from EWR).

128.    Likewise, JetBlue treated its EWR flights separately from JFK/LGA for the

following nonstop routes: Austin ("AUS"), BOS, Charleston ("CHS"), Jacksonville ("JAX"),

Los Angeles ("LAX"), LAS, Phoenix ("PHX"), San Diego ("SAN"), San Francisco ("SFO"),

and San Juan ("SJU"). PX0608, Domestic at Row 129, 159 (AUS), Row 2, 44, 45 (BOS), Row

115, 123 (CHS), Row 91, 128 (JAX), Row 165, 199 (LAX), Row 163, 186 (LAS), Row 162, 184

(PHX), Row 164, 197 (SAN), Row 161, 204 (SFO), Row 170, 217 (SJU).

129.    JetBlue's prices for BOS-JFK and BOS-LGA are often the same, whereas

JetBlue's prices for BOS-EWR are not always the same as its prices for BOS-JFK and BOS-

LGA. Tr. Vol. 3, 43:7-17 (Jarashow/JetBlue). The Pricing Strategies Document shows that

JetBlue's pricing strategy for BOS-EWR was to match United's and Delta's nonstop service in

BOS-EWR, while for BOS-JFK/LGA, JetBlue matched American's and Delta's nonstop service

in BOS-JFK/LGA—but not service in EWR. PX0608, Domestic at Row 2, 44-45; Tr. Vol. 3,

47:11–48:19 (Jarashow/JetBlue).

130.    In its assessment of the JetBlue Effect of lower market fares after JetBlue entered

a route, JetBlue evaluated its entry from EWR separately from its entry to JFK or LGA. JetBlue

saw the JetBlue Effect result after its 2011 entry on BOS-EWR, and a separate fare drop after

JetBlue's 2016 entry on BOS-LGA. PX0574 at 23; Tr. Vol. 1, 123:4-11 (Hayes/JetBlue). In a

September 2021 submission to the U.S. DOT seeking additional runway access at EWR, JetBlue

explained the impact its entry had on "monopoly" routes at EWR, even though it already served

the same destinations from JFK or LGA. PX0446 at 2 (indicating that it had introduced much-

needed low fare competition to EWR, and that "[f]ifteen of the 29 new JetBlue destinations were

previously monopoly markets that only United served from EWR"). Tr. Vol. 5, 199:9–200:8 (Laurence/American).

### 4. Defendants often ignore competition at EWR when making competitive decisions for JFK/LGA.

131.   A Clean Team spreadsheet analysis of the NEA that included multiple columns listed "NYC" in the City column for JFK and LGA, whereas the city column was "EWR" for EWR. Tr. Vol. 14, 158:10-24 (Israel/Defs. Expert); PX1145, Segment Data at Column AG. When defining overlaps based on city, the analysis characterized BOS-JFK and BOS-LGA as overlaps between Defendants, but identified BOS-EWR as a nonoverlap. Tr. Vol. 14, 159:9–160:9 (Israel/Defs. Expert); PX1145, v2 Segment Data at Column AI. The initial Clean Team proposal for the NEA did not include EWR. PX0752 at 5; Tr. Vol. 5, 112:21-23 (Laurence/American).

132.   JetBlue's August 25, 2022 schedule had an EWR-LAX and JFK-LAX flight scheduled to depart within five minutes of each other. Tr. Vol. 17, 26:9-19 (Miller/Pls. Expert). The close timing of these flights is consistent with the proposition that EWR and JFK draw from different customer bases. Tr. Vol. 17, 27:3-10 (Miller/Pls. Expert).

133.   JetBlue documents note that new service from EWR would not cannibalize existing business on the same route from JFK/LGA. Tr. Vol. 11, 156:21–158:15 (Miller/Pls. Expert); Tr. Vol. 17, 43:1–44:15 (Miller/Pls. Expert). "Adding flying from Newark strengthens" JetBlue's "New York Focus City, and brings low fares to more customers and increases a catchment area that does not largely overlap with LGA or JFK." PX0639 at 6.

134.   When deciding whether to add EWR-SJU service, JetBlue analyzed the JFK-SJU catchment area and found that the majority of passengers are east of the Hudson River. JetBlue concluded that adding EWR service would not cannibalize demand for the existing JFK service. Tr. Vol. 17, 43:1–44:15 (Miller/Pls. Expert).

## V.   PLAINTIFFS HAVE MET THEIR BURDEN TO PROVE THE ANTICOMPETITIVE EFFECTS OF THE NORTHEAST ALLIANCE IN THE OVERLAP MARKETS.

### A.   Before the Northeast Alliance, American and JetBlue competed head to head, which benefitted consumers.

#### 1.   Boston

##### a.   JetBlue and American are the first and third-largest airlines in Boston, respectively.

135.    Before the NEA, JetBlue was a "dominant" airline in Boston. Tr. Vol. 12, 217:24–218:12 (Carter/American); PX0088 at 1. As of 2019, JetBlue offered more flights to more destinations than any other airline in the history of BOS. PX0539 at 1; Lusso (JetBlue) Dep. 106:11–107:18, Apr. 11, 2022. It was the largest airline in Boston before COVID-19 and before entering the NEA, with a 33 percent market share based on domestic traffic. Tr. Vol. 17, 64:2-19 (Miller/Pls. Expert); PX0955 (Miller Reply Report) ¶ 244, Ex. 15. JetBlue considered Boston an important focus city. Tr. Vol. 8, 264:6-7 (Friedman/JetBlue); Lusso (JetBlue) Dep. 29:22–30:1, Mar. 18, 2021. Today, Boston is JetBlue's second largest focus city in terms of operations, behind only New York City. Tr. Vol. 10, 64:8-15 (Clark/JetBlue).

136.    JetBlue earned its current leadership position at BOS over time. JetBlue began serving Boston in 2004 and grew substantially between 2008 and 2022. Tr. Vol. 10, 10:9-11 (Clark/JetBlue); Tr. Vol. 5, 107:7-9 (Laurence/American). By 2010, JetBlue had become the largest airline in Boston. Tr. Vol. 17, 64:20–65:19 at 64:25–65:3 (Miller/Pls. Expert) (discussing demonstrative at 21, PX0955 (Miller Reply Report) ¶ 235, Ex. 14). Between 2010 and 2019, JetBlue continued growing, increasing its seat share by 11 percentage points. Tr. Vol. 8, 264:8-10, 265:19–266:4 (Friedman/JetBlue); PX0643 at 8.

137.    Robin Hayes, the Chief Executive Officer of JetBlue, testified that as of 2019, JetBlue had a leading position and offered the most nonstop flights to and from BOS. Tr. Vol. 1, 113:1-4, 120:15-17 (Hayes/JetBlue). Mr. Hayes testified that JetBlue remained the leading airline at BOS throughout 2019 by approximately 20 percentage points over America and Delta, as measured by domestic ASMs. Tr. Vol. 2, 75:2-13 (Hayes/JetBlue); PX0716 at 19. The highest

passenger market share JetBlue ever achieved at BOS was in 2019, the year before it entered the NEA. Tr. Vol. 14, 179:12-19 (Israel/Defs. Expert).

138.     Today, even after the outbreak of COVID-19, JetBlue remains the number one airline at BOS in terms of departures. Mehoke (JetBlue) Dep. 194:2-4, June 2, 2022; Tr. Vol. 10, 10:12-15, 83:21-25 (Clark/JetBlue). JetBlue is also the number one airline at BOS as measured by ASMs. PX0467 at 1 (stating that JetBlue is the top airline in Boston).

139.     JetBlue has repeatedly touted its strength in Boston to government officials in the United Kingdom. In a filing to the U.K. Department for Transport in June 2019, JetBlue noted its "significant presence in Boston," and in other cities, including New York City. PX0576 at 4. Similarly, in a March 2020 presentation prepared for a British member of parliament (and then Secretary of State for Transport), JetBlue described its Boston network as "expansive." PX0725 at 3, 5. In a June 2020 filing with the U.K. Competition and Markets Authority (the "U.K. CMA"), JetBlue represented that it had "a strong network and hub at BOS." PX0870 at 4.

140.     JetBlue has more gates than any other airline at BOS, and American has the third-most gates. PX0246 at 22 (noting that in 2020, JetBlue had 28 gates at BOS, American had 18, Delta had 21, and United had nine).

141.     JetBlue achieved its leading position at BOS organically, without partnering with a competitor. Tr. Vol. 10, 10:12-15 (Clark/JetBlue); Tr. Vol. 1, 113:1-4 (Hayes/JetBlue).

142.     American is also a significant airline at BOS. After American merged with US Airways in 2014, American had the second most peak-day departures among airlines serving BOS. PX0246 at 22. American remained the second largest airline at BOS from 2013 to 2018. Tr. Vol. 17, 64:20–65:19 at 65:4-8 (Miller/Pls. Expert).

143.     By 2019, JetBlue observed that Delta had risen to tie American as the second largest airline in BOS measured by ASMs. PX0683 at 17. David Clark, Head of Revenue and Planning at JetBlue, testified that American had fallen to third place in BOS by the end of 2019. Tr. Vol. 10, 10:12-20 (Clark/JetBlue); ██████████████████████████████ At

that time, American's share of domestic traffic was approximately 19 percent. PX0955 (Miller Reply Report) ¶ 244, Ex. 15.

144.     Despite falling behind Delta, Vasu Raja, the Chief Operating Officer for American, testified that Boston remains an important market for American because of its size, demographics, and high percentage of business travelers. Tr. Vol. 4, 107:7-18 (Raja/American). He admitted that if American had not entered into the NEA, the airline would have continued to compete in Boston. Tr. Vol. 4, 107:19-23 (Raja/American); *see also* Tr. Vol. 8, 24:15-19 (Swartz/American) (noting that, between March 2019 and March 2020, American projected increasing its flights out of BOS by 13.8 percent and its seats by 14 percent); PX0089 at 3.

145.     Mr. Raja's testimony is supported by an American slide deck from September 2019 titled "Boston Strategy," which notes the importance of BOS because it is the 16th largest airport in the U.S. and has travel from a high proportion of corporate accounts. PX0090 at 14. The Boston Strategy deck also describes American's 2018 market share as being just one point below Delta's and 12 points below JetBlue's. PX0090 at 14. American's sales staff discussed plans to "aggressively gain back lost ground" at BOS, noting upgrades to American's service on BOS-Los Angeles ("LAX") since American had not performed well due, in part, to competition from JetBlue. PX0092 at 1.

146.     An analysis by Dr. Israel defines BOS Local Origin Passengers as passengers with roundtrip itineraries starting and ending at BOS. DX0913. In 2019, JetBlue accounted for 40.7 percent of BOS Local Origin Passengers, and American accounted for 17.0 percent of BOS Local Origin Passengers. DX0913. JetBlue's 2019 BOS Local Origin Passenger share was more than twice that of Delta's, which was 20.1 percent. DX0913. From 2014 to 2019, JetBlue's BOS Local Origin Passenger share grew from 35.3 percent to 40.7 percent. DX0913.

**b.     JetBlue and American competed head to head on price for Boston routes.**

147.     Before the NEA, JetBlue and American competed on price for routes into and out of BOS. For instance, in November 2018, JetBlue launched a regional sale between its focus

cities in Boston, New York City, and Fort Lauderdale to certain destinations in the Southeastern United States. PX0520 at 2. American responded by first matching JetBlue's sale, and then extending the length of the sale and expanding the days of the week of the sale. PX0520 at 2; Tr. Vol. 3, 63:4-23 (Jarashow/JetBlue). Mr. Clark directed his team to "please be sure we get competitive" with American "on these routes and travel dates as soon as possible." PX0520 at 2; Tr. Vol. 3, 64:20–65:12 (Jarashow/JetBlue). As a result, JetBlue matched American's expanded fare sale for seven routes, including BOS-Charlotte ("CLT"). PX0520 at 1; Tr. Vol. 3, 65:13–66:19 (Jarashow/JetBlue). JetBlue was the only airline to match American's expanded fare sale in these markets. PX0520 at 2; Tr. Vol. 3, 66:20–67:10 (Jarashow/JetBlue).

148.    In another example, when JetBlue lowered its fare on BOS-LGA, American lowered its fare on that route as well. Tr. Vol. 1, 118:2-14 (Hayes/JetBlue). One year after JetBlue entered BOS-LGA, average fares had dropped by 35 percent, and passenger count had increased by 41 percent. Lusso (JetBlue) Dep. 89:6-18, Apr. 11, 2022; PX0562 at 3.

149.    After JetBlue entered the BOS-DCA route, American dropped its prices by 60 percent. Lusso (JetBlue) Dep. 78:12-17, Apr. 11, 2022 (comparing fares between April 2010 and November 2010); PX0618 at 1. One year after JetBlue entered BOS-DCA, average fares had dropped 29 percent and passenger count had increased by 73 percent. Lusso (JetBlue) Dep. 91:2-17, Apr. 11, 2022; PX0562 at 3. The price competition on the BOS-DCA route continued in 2020 when JetBlue stated its strategy was to "match DL/AA." PX0684, 2.28.20 at Row 51-52; *see also* PX0538 at 12 (noting that "JetBlue has reduced participation in fare increases over the past three years").

150.    In November 2019, JetBlue filed tactical fares—which are temporary fares that have a limited or specific date range in which they are valid—on BOS-Philadelphia ("PHL"), which is an American hub. Tr. Vol. 3, 49:10–50:23 (Jarashow/JetBlue) (describing tactical fares); PX0593 at 3. American responded by undercutting JetBlue's tactical fares, but JetBlue matched American's pricing action which kept fares on BOS-PHL low. PX0593 at 1-2 (commenting that "AA has undercut [JetBlue's] 3AP fare of $119 by $10" and that JetBlue "should match AA on

40

the 3AP (O class) [fare of] $109"); PX0593 at 2 (observing that "AA undercut [JetBlue's] 7AP tactical fare in Z class for BOSPHL by $5 and [JetBlue] matched it in the 1300 subs").

151.    Another example of pre-NEA head-to-head competition between American and JetBlue occurred when JetBlue entered the BOS-Rochester, NY ("ROC") market in January 2019. PX0516 at 3. By May 2019, JetBlue accounted for 42 percent of the ASMs on that route. PX0516 at 3. Mitch Goodman, a Manager in Domestic Network Planning at American, testified that after JetBlue's entry into BOS-ROC, American lowered its fare and still lost passengers to JetBlue. Goodman (American) Dep. 249:21–250:23, 270:14–272:24, Dec. 20, 2020; PX0103 at 6; PX0143. Paul Swartz, American's Regional Sales Director for the New England area, testified that American felt the effects of JetBlue entering BOS-ROC within three months of JetBlue's entry. Tr. Vol. 8, 15:14-17 (Swartz/American).

152.    JetBlue also pursued systematic strategies to meet or beat American's pricing on routes out of Boston. JetBlue's pricing strategy explicitly called for matching American's fares on nonstop overlaps from BOS-Syracuse ("SYR"), JFK/LGA-ROC, JFK/LGA-PHL, JFK/LGA-DCA, JFK/LGA-Charlotte ("CLT"), JFK/LGA-Chicago, JFK/LFA-Dallas-Ft. Worth ("DFW") JFK/LGA-Phoenix ("PHX"), and JFK/LGA-Los Angeles ("LAX"). PX0608, Domestic at Row 10 (SYR), Row 44 (JFK), Row 45 (LGA), Row 46 (ROC), Row 54 (PHL), Row 63 (WAS), Row 86 (CLT), Row 93 (Chicago), Row 160 (DFW), Row 189 (PHX), Row 207 (LAX).

153.    Similarly, JetBlue's pricing strategy on BOS-DCA for 2020 was to "match DL/AA." PX0684, 2.28.20 at Row 51-52. Around the same time, American noted that JetBlue's connect fares undercut American's pricing on several nonstop routes out of BOS. PX0151 (referenced in PX0461 (Miller Report) ¶ 206, nn.250-251).

### c.    JetBlue and American competed head to head for corporate customers in Boston.

154.    JetBlue and American also competed aggressively for corporate customers in Boston before the NEA. Tr. Vol. 10, 12:5-10 (Clark/JetBlue). Mr. Hayes testified that JetBlue is more dependent on business travelers in Boston than anywhere else in its network. Tr. Vol. 1,

122:17-21, 123:12-22 (Hayes/JetBlue). Barry McMenamin, a corporate sales manager for JetBlue in the New England region, wrote in late August 2019 to a prospective corporate customer that Boston represents JetBlue's "largest corporate partner base." PX0649 at 3. He also testified that of JetBlue's focus cities, the "strongest support" for JetBlue's corporate sales is in Boston, where JetBlue is a leading airline. Tr. Vol. 2, 219:12-21 (McMenamin/JetBlue). Mr. McMenamin attributed this to JetBlue's advantages in competing for corporate customers in Boston. Tr. Vol. 3, 12:15-17 (McMenamin/JetBlue). These included the customer experience at the airport as well as the consistency of JetBlue's in-flight offerings, such as entertainment, free Wi-Fi, and free snacks and beverages. Tr. Vol. 3, 12:18-13:7 (McMenamin/JetBlue).

155.    Mr. McMenamin viewed JetBlue as "truly loved in Boston," and said that "the corporate community here truly supports [JetBlue's] programs," with JetBlue having enjoyed (and continuing to enjoy) advantages in competing for corporate customers in Boston. Tr. Vol. 3, 12:1-17 (McMenamin/JetBlue).

156.    Pre-NEA, American was one of JetBlue's "primary competitors" for corporate customers in Boston. Tr. Vol. 2, 227:17-24 (McMenamin/JetBlue). JetBlue competed directly with American for corporate customers on BOS-DCA, BOS-PHL, and BOS-LGA. Tr. Vol. 2, 224:19–225:9, 225:17-22 (McMenamin/JetBlue); PX0649 at 2; PX0650 at 2.

157.    JetBlue was aggressive in competing with American, offering discounts to corporate customers on various routes. Tr. Vol. 2, 235:17–236:10, 238:19–242:3 (McMenamin/JetBlue); PX0662 at 1; PX0663 at 5. JetBlue and American also competed for corporate customers on transcontinental routes out of Boston. PX0665 at 1.

158.    Price competition between JetBlue and American was intense in 2019, the year before Defendants signed the NEA. American recognized that it needed to "stay competitive in Boston against the substantial ramp of B6 & DL in the future." PX0196 at 1. American needed "to be highly price competitive, in many cases [the] low cost carrier against B6 & DL(VS)." PX0196 at 1. This meant American would need to use tactical fares or else "run the risk of falling

to a secondary/tertiary" position with customers. PX0196 at 1; *see* Tr. Vol. 3, 49:10–50:23 (Jarashow/JetBlue) (describing tactical fares).

159.    In December 2019, JetBlue added so-called "shuttle flights" from BOS to LGA, DCA, and PHL in an effort to compete with American and Delta. Mehoke (JetBlue) Dep. 212:6–25, 213:14–214:10, 214:15–215:2, June 2, 2022. For JetBlue, this was an effort to win share from corporate customers who had traditionally relied on American's BOS-DCA shuttle service, in addition to BOS-LGA and BOS-PHL. PX0649 at 2. American, in return, approved higher shuttle discounts for corporate customers on BOS-LGA in order to "keep [JetBlue] out of the shuttle routes." PX0137 at 3. Due to this competition from JetBlue on the BOS-LGA route, American's published fares decreased. Mehoke (JetBlue) Dep. 224:16-18, June 2, 2022. Now, under the NEA, American no longer flies the BOS-LGA route. Mehoke (JetBlue) Dep. 224:19–225:3, June 2, 2022.

160.    Pre-NEA, JetBlue sought to win market share in BOS-DCA and BOS-PHL—routes that were "highly trafficked by the business travel community"—by increasing its frequencies and improving its schedule on those routes. Tr. Vol. 2, 227:2-16 (McMenamin/JetBlue); PX0649 at 2. JetBlue, moreover, sought to "win" over "AA loyalists" by offering to match their frequent flier status with "JetBlue's Mosaic status, which gives the same benefits." PX0649 at 2.

161.    The evidence includes several instances of competition between JetBlue and American for Boston-based corporate customers. ███████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████

162.    After American announced that it would enter ████████████████████ Mr. McMenamin recommended that JetBlue avoid raising fares for a top corporate customer who flew the ███████ route, and instead hold fares flat "as they'll more than likely decrease anyway with the added competition." PX0663 at 5; Tr. Vol. 2, 236:23–240:15

(McMenamin/JetBlue). Mr. McMenamin requested a price that fell below JetBlue's internally recommended corporate customer discount range due to "AA's announcement that they are entering the ███████ market" in order to "protect our share position." PX0663 at 1-2; Tr. Vol. 2, 240:16–241:21 (McMenamin/JetBlue). His request was approved. PX0663 at 1.

163.    In September 2018, JetBlue was reviewing flat fares for a corporate contract with ████████████████ that included BOS-LGA, ██████████████████████ ███████. In his request to grant flat fares on these routes, Mr. McMenamin noted that JetBlue had won the business of corporate travelers from ████████████████ on BOS-LGA who were "historic AA and DL travelers." PX0655 at 1-2. Roberta Mehoke, JetBlue's Director of Sales, testified that before the NEA, it mattered whether JetBlue or American had better discounts because it was an element that corporate travelers considered when they chose an airline. Mehoke (JetBlue) Dep. 189:8-13, June 2, 2022.

164.    JetBlue worked to negotiate new flat fares for another corporate customer, ████████ ████████████, on two routes: BOS-San Francisco ("SFO") and BOS-LGA. PX0660 at 3. After initially being unable to obtain a share commitment in BOS-LGA, Mr. McMenamin told the customer that he understood "shuttle services are strong on that route from both AA and DL" but that "[JetBlue's] pricing is significantly lower" and since "[JetBlue] entered the market, on average, fares are more than $108 lower . . . showing the need for competition on this route." PX0660 at 3.

165.    JetBlue also worked to win more business from ██████████ (a corporate customer) on Boston routes because ██████████ was spending $10 million annually with American, but indicated it was "willing to try to shift some of this business onto [JetBlue]." PX0595 at 2, 3. JetBlue's pricing team noted that JetBlue was only getting "a fraction of [the customer's] business because AA has aggressive pricing . . . ." PX0595 at 3.

166.    American, for its part, structured its proposed discounts to corporate customers based on competition with JetBlue. For one corporate customer, ██████████████████, an American employee asked "for some slight improvements to the discount percentage . . . to not

give any room for JetBlue to take any revenue away on this renewal." PX0199 at 6. Further,

American proposed offering "high discounts" for a medium-sized corporate account, ▮▮, in

order to compete with JetBlue. PX0200 at 1.

### d.    Consumers benefitted from the JetBlue Effect in Boston.

167.    The JetBlue Effect in Boston led to decreased fares and increased traffic. Mr.

Hayes testified that JetBlue had brought lower fares to consumers in Boston. Tr. Vol. 1, 113:5-10

(Hayes/JetBlue). He further testified that "JetBlue has saved customers billions of dollars across

the country, including in Boston . . . ." Tr. Vol. 1, 119:12-17 (Hayes/JetBlue).

168.    There are many examples of the JetBlue Effect in Boston. When JetBlue entered

BOS-DCA, fares dropped and traffic increased. Land (JetBlue) Dep. 30:24–31:3, 32:1-18, Apr.

28, 2022. JetBlue's Senior Vice President of Government Affairs, Robert Land, testified that

fares dropped 65 percent in BOS-DCA after JetBlue entered the market. Land (JetBlue) Dep.

55:20–56:3, Apr. 28, 2022; PX0629 at 1. Mr. Hayes noted that traffic increased by nearly 100

percent on this route following JetBlue's entry. Tr. Vol. 1, 119:4-8 (Hayes/JetBlue); Tr. Vol. 10,

164:14–166:22 at 164:17-20, 165:3-5 (Clark/JetBlue). Mr. Land testified that the average walk-

up fare for BOS-DCA fell from $484 to $188. Land (JetBlue) Dep. 56:22–57:2; 57:6-12, Apr. 28,

2022; PX0629 at 3.

169.    Mr. Hayes also described additional specific examples when consumers benefited

from the JetBlue Effect in Boston at trial. When JetBlue started flying BOS-Buffalo ("BUF"), the

fares for that route decreased by 50 percent and the traffic volume increased by 200 percent. Tr.

Vol. 1, 118:19-24 (Hayes/JetBlue). After JetBlue entered BOS-EWR, fares on that route dropped

54 percent and traffic increased 158 percent. Tr. Vol. 1, 123:4-8 (Hayes/JetBlue); PX1024.

170.    When JetBlue entered the BOS-LGA market in October 2016, the price of walk-

up tickets dropped approximately 70 percent overnight—from $434 to $129. Tr. Vol. 1, 116:19–

117:12 at 117:10-12 (Hayes/JetBlue). Overall fares on BOS-LGA also decreased by 51 percent

compared to the year before JetBlue offered the BOS-LGA route. Tr. Vol. 1, 117:13-23

(Hayes/JetBlue). Fares also decreased by 53 percent when JetBlue entered BOS-Cleveland

("CLE") and decreased by 35 percent when JetBlue entered BOS-Detroit ("DTW"). Land
(JetBlue) Dep. 46:11-24, 47:1-3, 48:4-23, Apr. 28, 2022; PX1024.

171.    American noted that as a result of the JetBlue Effect, "B6 has been adding
increasingly lower fares into markets" with Boston as an endpoint. PX0182 at 1. Mr. Swartz
testified that because of JetBlue's presence, American's yield-per-segment—which is a measure
of price—is lower in Boston than it otherwise would be. Tr. Vol. 8, 20:16-25 (Swartz/American).
An American sales manager also noted that "[t]he fact is, unfortunately, Boston does not perform
as well from a profitability perspective as other cities largely due to the fare destruction JetBlue
have wrought." PX0195 at 1. American sales managers expressed concern that Boston did not
perform well compared to other cities in American's network, largely due to the lower fares
JetBlue offered consumers in Boston. Tr. Vol. 8, 17:11-23 (Swartz/American).

172.    In total, JetBlue estimated that, as of January 2019, competition from JetBlue had
saved Boston travelers more than $3 billion. PX0518 at 5.

>               **e.    Consumers benefitted from competition between JetBlue,**
>                       **Delta, and American in Boston.**

173.    The presence of three significant airlines competing in Boston benefitted
consumers. For instance, American offered relatively high discounts for a corporate customer in
order to "be competitive w/ B6 & DL." PX0200 at 1.

174.    Mr. McMenamin testified that Delta alone was not a sufficient alternative for a
large corporate customer who he understood to be unhappy with American before the NEA. Tr.
Vol. 2, 234:6-8, 234:20–235:16 (McMenamin/JetBlue). The corporate customer noted that "DL
wouldn't be able to handle the volume" of the corporation's travel program. PX0662 at 2. As a
result, Mr. McMenamin suggested that JetBlue extend its discount to the corporate customer for
another year, providing an "opportunity for [JetBlue] to naturally grow [its] share of their
business if they do continue with phasing AA out . . . ." PX0662 at 2.

175.    Mr. McMenamin also testified that JetBlue increased frequencies at relevant times
for business passengers on routes where JetBlue competed with American, such as BOS-DCA

and BOS-PHL. Tr. Vol. 2, 224:19–225:22, 227:2-16 (McMenamin/JetBlue); PX0649 at 2. Mr. Friedman agreed, noting that before the NEA, JetBlue planned to add capacity to business markets from Boston, including to American hubs at Charlotte ("CLT"), Dallas ("DFW"), DCA, LAX, and PHX. Tr. Vol. 8, 266:14–267:14, 267:15–268:12 (Friedman/JetBlue); PX0643 at 8. A JetBlue corporate customer in Boston removed Delta from its corporate travel program, which resulted in travelers choosing between JetBlue and American. Tr. Vol. 2, 230:14–231:7 (McMenamin/JetBlue); PX0650 at 2.

176.    Delta viewed JetBlue and American as serious competitors for corporate sales in Boston. Somers (Delta) Dep. 171:12-22, July 25, 2022. Delta was planning to "win" corporate customers from both American and JetBlue in Boston even before the NEA was announced. Somers (Delta) Dep. 178:23–179:18, July 25, 2022.

177.    Dorothy Nee, the former travel manager at State Street Corporation, testified that State Street had contracts with both American and JetBlue, as well as Delta and United. Nee (State Street) Dep. 76:2-12, July 21, 2022. State Street generally leveraged offers from one airline to try to obtain better offers from other airlines. Nee (State Street) Dep. 70:15–71:18, July 21, 2022 (objection pending). Ms. Nee indicated that having multiple airlines compete for contracts gave State Street leverage in negotiations and that "[t]he more options, the more competition. It's pretty simple . . . . [C]ompetition keeps prices down." Nee (State Street) Dep. 82:6-17, July 21, 2022. Even Mr. Lusso admitted that more choices lead to a number of benefits for consumers. Lusso (JetBlue) Dep. 260:14-23, Apr. 11, 2022 (objection pending).

2.    **New York City**

a.    **JetBlue has a strong presence in New York City and boasts it is New York's "Hometown Airline."**

178.    New York City is an important city for JetBlue. In a presentation to lenders, JetBlue called itself "New York's Hometown Airline," with a "Leading Position on U.S. East Coast, and a "Defensible NYC Home Market." PX0716 at 8, 27; Tr. Vol. 2, 72:7-19 (Hayes/JetBlue). It further noted that JetBlue has "strong market positions in the largest and most

capacity constrained U.S. markets" which includes New York City. PX0716 at 15; PX0745 at 19, 26.

179.    JetBlue chose New York City as its headquarters because it "is the biggest air travel market in the country" and a "high value geography." DX0297 at 10. Mr. Hayes testified that in 2019, JetBlue was the largest airline in JFK. Tr. Vol. 2, 76:19-25 (Hayes/JetBlue). Today, JetBlue is the second largest slot holder at JFK. Tr. Vol. 2, 80:17-21 (Hayes/JetBlue). JetBlue has 250 peak slots at JFK, accounting for about one quarter of all peak slots at the airport. Tr. Vol. 2, 80:12-21 (Hayes/JetBlue).

180.    As it did for its position in Boston, JetBlue touted its pre-NEA strength in New York City to British officials. In a June 2019 filing with the U.K.'s Department for Transport, JetBlue noted its "significant presence" in New York City, along with Boston and other cities. PX0576 at 4. In a March 2020 presentation to a British member of parliament (and then Secretary of State for Transport), JetBlue described its New York network as "expansive." PX0725 at 5, 12. In 2019, JetBlue was the third largest airline in New York City, with a 19 percent share of domestic traffic. Tr. Vol. 17, 62:9–63:9 (Miller/Pls. Expert); PX0955 (Miller Reply Report) ¶ 244, Ex. 15. If EWR were included in the market, JetBlue's share would be approximately 14.4 percent, slightly below American's. DX1091 (Israel Report) ¶ 47, Table 2.

181.    The Port Authority of New York and New Jersey ("PANYNJ"), which operates airports throughout New York and New Jersey, believed that JetBlue was a significant airline at the NEA Airports under PANYNJ control. In an internal PANYNJ NEA Impact Assessment, PANYNJ calculated JetBlue as having a 24 percent share at JFK and was one as one of three airlines that controlled 72 percent of the total capacity at PANYNJ-controlled airports. PX0885 at 4-5; Murray (PANYNJ) Dep. 153:10–154:18, May 3, 2022 (JetBlue).

####    b.    American was historically the market leader in New York City.

182.    In the past, American has been a market leader in New York City. Between 2008 and 2012, American had the third highest market share in the New York City metropolitan area behind United and Delta. PX0912 at 12. And following its merger with US Airways, American

projected that the combined airline would create the "#1" airline in the eastern United States with a "good presence in New York City." Tr. Vol. 5, 15:13–16:4, 17:5-18 (Isom/American); PX0014 at 10-11. Mr. Parker testified before a federal bankruptcy court that allowing American to merge with US Airways would create a "perfect solution for American's lack of East Coast presence." Tr. Vol. 6, 79:7-19 (Parker/American). At the time of the merger, US Airways was the third largest airline at LGA, behind Delta and American. PX0014 at 11, 25. Combined, American and US Airways anticipated having a 30 percent share of LGA/JFK, in second place behind Delta's 40 percent share. PX0014 at 25.

183.    According to American's current CEO, the merger between American and US Airways was successful in creating a comparable network to compete against Delta and United. Tr. Vol. 5, 7:17–8:15 (Isom/American). Mr. Isom specifically testified that he believes the merger created a network with a "good market presence in New York City." Tr. Vol. 5, 17:5-18 (Isom/American); PX0014 at 12.

> c.    **American traded and underutilized its slots and squandered its leadership position.**

184.    American and its predecessor, US Airways, underutilized their resources in New York City and over time relinquished a leadership position in the market. Doug Parker testified that US Airways underutilized its slots at LGA while he was the CEO of the airline. Tr. Vol. 6, 72:6–73:3 (Parker/American). Before its merger with American, US Airways chose to swap 256 slots at LGA with Delta for approximately 84 slots at DCA. Tr. Vol. 6, 67:10-16 (Parker/American). As Mr. Parker explained, that slot swap contributed to Delta obtaining more capacity at LGA. Tr. Vol. 6, 67:17-23 (Parker/American). Without that slot swap, American would be less disadvantaged at LGA today. Tr. Vol. 6, 68:2-12 (Parker/American).

185.    After this slot swap, when American and its predecessor US Airways sought to merge in 2014, they justified the combination as a way to create a network comparable to Delta's and United's networks. Tr. Vol. 5, 8:1-4 (Isom/American); PX0421 at 32 (Def. Am. Airlines Grp.

Inc.'s Proposed Findings of Fact and Conclusions of Law ¶ 55, *Fjord et al. v. AMR Corp. et al.*, 625 B.R. 215 (Bankr. S.D.N.Y. 2021) (No. 1:13-ap-1392)).

186.    At the time led by Doug Parker and with Robert Isom as COO, US Airways predicted that its merger with American would form the number one airline in the Eastern United States. Tr. Vol. 5, 15:13–16:9 (Isom/American); PX0014 at 11. US Airways also forecasted that the merged airline would have "good market presence" in New York City. Tr. Vol. 5, 16:15–17:18 (Isom/American); PX0014 at 12.

187.    American recognized that the 2014 merger successfully created a network comparable to Delta's and United's networks, allowing it to compete on "equal footing" with those two airlines, particularly in New York City. Tr. Vol. 5, 8:5-15 (Isom/American); PX0421 at 86 ("[T]he Merger resulted in a broad network that allowed the new American to compete on equal footing with the recently merged Delta and United, which neither American nor US airways could do prior to the Merger.").

188.    After justifying the US Airways merger in 2014 as a way to forge a comparable network to Delta and United, American now offers a similar rationale to justify the NEA. Tr. Vol. 5, 10:16–11:2 (Isom/American). Nonetheless, Delta and United have grown without acquiring another domestic airline during that same time period, and without entering into a domestic joint venture like the NEA. Tr. Vol. 5, 12:6-13, 13:22–14:1 (Isom/American).

189.    After merging with US Airways, American failed to capitalize on its position, instead underutilizing the resources it obtained from the merger. American sat on slots by flying smaller aircraft than it could have flown. Tr. Vol. 5, 122:2-8 at 5-6 (Isom/American). Mr. Laurence acknowledged that American took this approach in order to suppress competition. PX0550 at 1; *see also* Tr. Vol. 3, 137:4–139:2 (Kirby/Spirit).

190.    For years after the merger between American and US Airways in 2014, American did not accurately track and failed to fully utilize its slots at JFK. Tr. Vol. 4, 142:7–143:7 (Raja/American); PX0298 at 1-2. Mr. Raja provided multiple explanations for the reason American misused its slots. On day four of trial, Mr. Raja testified that "the FAA thought that we

had 16-ish slots more than what we did." Tr. Vol. 4, 145:11-20 (Raja/American). This testimony

conflicted with a document in which Mr. Raja wrote: "We thought 216 they thought 200."

PX0298 at 1. Following a break, Mr. Raja confirmed that "American thought that it had 216 JFK

slots," and that the FAA thought American had 200 slots. Tr. Vol. 4, 169:21–170:2 at 169:21-22

(Raja/American).

      191.     When Mr. Raja returned a week later on day seven of trial, after the weekend, Mr.

Raja changed his testimony—contrary to the text of the exhibit—and asserted that the FAA

thought American had 216 slots and American thought it had 200 slots. Tr. Vol. 7, 82:13–84:12

(Raja/American). On re-direct, Mr. Raja admitted that he did not realize at his deposition, when

questioned about the same exhibit, that the numbers were "transposed." Tr. Vol. 7, 147:2–148:13

(Raja/American). He also testified that, at the end of the day, American did not know how many

slots it had at JFK. Tr. Vol. 7, 147:2–148:13 (Raja/American).

      192.     Mr. Isom conceded that American could have used its assets at JFK more

efficiently by keeping accurate track of its JFK slots. Tr. Vol. 5, 98:19-25 (Isom/American).

      193.     Mr. Hayes testified that legacy airlines, like American, often sit on slots so that

other airlines cannot enter the New York City market. Tr. Vol. 1, 140:10-15 (Hayes/JetBlue). For

instance, in September 2019, American was not operating approximately 80 of its JFK slots.

PX0918 at 13. An internal document notes that after the expiration of American's JFK runway

slot waiver, American considered not operating approximately 80 of its JFK slots. PX0148 at 1-3.

JetBlue was aware that American was sitting on slots in New York City at the beginning of 2020.

Tr. Vol. 1, 140:16-21. (Hayes/JetBlue).

      194.     Delta also observed that American was not fully using its resources in New York

City. According to Delta, before the NEA, American was underutilizing its slots in JFK and

LGA. Esposito (Delta) Dep. 212:3-6, June 21, 2022 ("They were underutilizing them, yes.").

Robert Somers, Delta's Senior Vice President of Global Sales, testified that "American was

not—not using slots that were available to them. They could have done things with the slots and

they didn't." Somers (Delta) Dep. 249:18–250:9, July 25, 2022 (discussing DX0230); DX0233 at 14 ("American has squandered its historic NYC leadership position.").

> **d.    American will always compete in New York City because it is the most important business market in the United States.**

195.    New York City is a vital business market for American. Despite its problems in New York City, American was still the second largest airline there with a 22 percent market share of domestic traffic in 2019. Tr. Vol. 17, 62:9–63:9 (Miller/Pls. Expert); PX0955 (Miller Reply Report) ¶ 244, Ex. 15. Including EWR, American would be the third largest airline—behind Delta and United—with approximately 15.4 percent of the market share; Defendants' shares changed very little between 2014 and 2019, with Delta and United gaining less than five percentage points. DX1091 (Israel Report) ¶ 47, Table 2; *see also* PX0108 at 158. Mr. Raja testified that American would continue to compete in New York City regardless of whether it entered into the NEA. Tr. Vol. 4, 126:15–127:2 (Raja/American). In fact, American never contemplated not serving New York City because of the large number of business accounts in New York City. Casey (American) Dep. 95:21–96:3, May 4, 2022. Those accounts were profitable because, on average, business customers in New York City paid higher fares. Casey (American) Dep. 95:21–96:3, May 4, 2022; ███████████████████████ ████████████████████████████████████████████████ ███████████████ .

196.    American recognized that without New York City, its ability to compete as a hub-and-spoke airline would be diminished. In October 2020, American board member Michael Embler emailed then-President Robert Isom expressing his concern about American's ability to compete long term as a global hub-and-spoke airline without critical mass in New York City. PX0320 at 1; *see also* Tr. Vol. 5, 42:11–43:17 (Isom/American). Mr. Embler was also skeptical that joint ventures could provide a "seamless experience" to replace a robust American presence in New York City. PX0320 at 1; *accord* Tr. Vol. 5, 42:11–43:17 (Isom/American).

e.    **JetBlue and American competed head to head on price for New York City routes.**

197.    JetBlue and American competed on price for New York City routes, just as they did in Boston. JetBlue's pricing strategy involved matching American's nonstop fares on certain JFK and LGA routes. PX0608 at Domestic, Row 18 (Martha's Vineyard), Row 44, 45 (BOS), Row 84 (Chicago), Row 64 (RDU), Row 159 (AUS), Row 184 (PHX), Row 186 (LAS), Row 199 (LAX), Row 204 (SFO). American also regularly matched JetBlue pricing on JFK routes. PX0166 at 1.

198.    Price competition between American and JetBlue in New York City is illustrated by several specific examples. After JetBlue launched Mint in 2014, American lowered its business class fares significantly on important transcontinental routes including JFK-LAX and JFK-SFO. PX0555 at 33-34. On JFK-LAX, American's refundable business fare went from $4,009 in the third quarter of 2013 to $2,313 in the third quarter of 2018. PX0555 at 33. Further, on JFK-SFO, American's lowest fare went $1,926 in the second quarter of 2014 to $506 in the third quarter of 2018. PX0555 at 34.

199.    When JetBlue launched a regional sale in November 2018 that included JFK, American responded by matching JetBlue's sale. PX0520 at 2; Tr. Vol. 3, 63:4-23 (Jarashow/JetBlue). In return, JetBlue matched American's expanded fare sale for seven routes including JFK-AUS, LGA-CHS, LGA-SAV, LGA-RDU, and JFK-RDU. PX0520 at 1; Tr. Vol. 3, 65:12–66:19 (Jarashow/JetBlue). JetBlue was the only airline to match American's expanded fare sale in these markets. PX0520 at 1; Tr. Vol. 3, 66:20–67:10 (Jarashow/JetBlue).

200.    In early 2019, JetBlue and American engaged in a tactical fare war on transcontinental routes. *See* PX0615 at 1-3; Tr. Vol. 3, 49:10–50:23 (Jarashow/JetBlue) (describing tactical fares). Evan Jarashow, a JetBlue Pricing Manager, drafted a summary and detailed timeline of this tactical fare activity by JetBlue and American, which he provided to Andrew Parker, JetBlue's then-Director of Revenue Management, to be forwarded on to Martin St. George, JetBlue's Chief Commercial Officer. PX0615 at 1-3; Tr. Vol. 3, 51:6–52:2 (Jarashow/JetBlue). Mr. Jarashow wrote that he had observed "[i]ncreased AA tactical activity"

on walk-up fares between January 22, 2019 and February 18, 2019 "in both nonstops and connections across the AA network." PX0615 at 2; Tr. Vol. 3, 52:3-25 (Jarashow/JetBlue).

201.    This tactical fare war drove prices down on transcontinental routes from New York City. For example, on January 28, 2019, JetBlue filed two walk-up tactical fares, both $149, on JFK-LAX and JFK-SFO. PX0615 at 2. When JetBlue attempted to cancel the $149 fare for JFK-LAX on January 31, American did not match the fare cancellation and JetBlue was forced to refile the low $149 fare. *See* PX0615 at 2. On February 7, JetBlue again attempted to cancel the $149 fare for JFK-LAX. PX0615 at 2. At first, American matched JetBlue's fare cancellation, but then American refiled the $149 fare for JFK-LAX the following day. PX0615 at 2. JetBlue again matched that fare action by American, which meant fares for JFK-LAX stayed at $149 as a result of the competition between JetBlue and American. PX0615 at 2; *see also* Tr. Vol. 3, 53:8–54:5 (Jarashow/JetBlue).

202.    JetBlue also lowered prices on JFK-Seattle ("SEA") in early 2019. PX0099 at 1. At the time, JetBlue competed with American on JFK-SEA. Tr. Vol. 5, 39:4-11 (Isom/American). This competition caused American to experience "yield softness" for coach fares on JFK-SEA. PX0099 at 1; Tr. Vol. 5, 39:12-15 (Isom/American) (stating that yield is a measure of ticket price).

203.    On January 31, 2019, American initiated a $5 network-wide price increase that was subsequently matched by Delta, United, and Southwest. PX0615 at 2. After JetBlue did not match the higher fares, American and the other airlines rescinded the price increase. PX0615 at 2. Competition from JetBlue ensured the price increase did not "stick" and consumers benefitted as a result. PX0615 at 2; *see also* Tr. Vol. 3, 54:23–55:4 (Jarashow/JetBlue).

### f.    Consumers benefitted from the JetBlue Effect in New York City.

204.    The JetBlue Effect led to more passengers, lower fares, and better service in New York City markets. Mr. Hayes testified that growth at JFK, in particular, was the result of JetBlue competing at the airport. Tr. Vol. 1, 138:11-13 (Hayes/JetBlue). He noted that JetBlue's entry in

1999 is what led passenger volume at JFK to grow from 31.7 million annual passengers to 62 million passengers in 2018. Tr. Vol. 1, 136:24–137:9 (Hayes/JetBlue).

205.    When JetBlue entered JFK-LAX and JFK-SFO, premium fares dropped. Lusso (JetBlue) Dep. 222:3-10, Mar. 18, 2021; PX0692 at 12-14. JetBlue's entry also stimulated those markets, resulting in more availability of premium seats on competitor airlines. Lusso (JetBlue) Dep. 222:14-22, Mar. 18, 2021; PX0692 at 12-14. JetBlue's entry introduced a "superior" product to the market, which "resulted in a better experience for customers flying." Lusso (JetBlue) Dep. 223:7–224:3, Mar. 18, 2021; PX0692 at 12-14. In sum, JetBlue's entry on JFK-LAX and JFK-SFO resulted in lower fares, more capacity, and a better quality product for premium passengers. Lusso (JetBlue) Dep. 224:4-8, Mar. 18, 2021; PX0692 at 12-14.

206.    JetBlue's pricing undercut legacy nonstop competitors with connecting fares. PX0591 at 4. A pricing analyst noted that "[w]e take a large number of connection bookings in business markets where there are only legacy nonstop competitors" when describing competition on NYC-Pittsburgh ("PIT"). PX0591 at 4.

207.    Conversely, when JetBlue exits a market, fares increase. On JFK-RIC, fares rose by 65 percent and passenger count fell by 49 percent one year after JetBlue exited. PX0562 at 5; Lusso (JetBlue) Dep. 92:11–93:1, 93:5-11, Apr. 11, 2022. Similarly, on JFK-PIT, fares rose by 75 percent and passenger count fell by 68 percent one year after JetBlue exited. PX0562 at 5; Lusso (JetBlue) Dep. 92:11–93:1, 93:5-11, 93:18–94:2, Apr. 11, 2022; PX0461 (Miller Report) ¶ 201, Ex. 20.

### g.    Consumers benefitted when American and JetBlue competed on New York City routes.

208.    When American and JetBlue competed on New York City routes, consumers benefitted from lower fares and better service. After JetBlue introduced Mint on JFK-LAX in 2013, American and Delta lowered their premium fares significantly—the lowest fare either of them offered was nearly $3,000 before JetBlue entered the market in 2014; American and Delta both offered $599 fares in 2016, and $659 fares in 2018. Lusso (JetBlue) Dep. 64:5–65:13, Apr.

11, 2022 (objection pending); PX0555 at 12. With this offering in the market, American noted that it was seeing "yield softness" in transcontinental routes. PX0099 at 1. In March 2020, American lowered fares on JFK-LAX, and JetBlue matched those lower fares. PX0734 at 1.

209.    Following the introduction of Mint on JFK-SFO, American and Delta lowered their premium fares significantly—from about $2,000 to $506. Lusso (JetBlue) Dep. 65:16–66:6, Apr. 11, 2022; PX0555 at 13. When JetBlue introduced Mint on JFK-SFO, it introduced an "option that was clearly compelling and competitive," and as a result, JetBlue observed "market stimulation in the form of more people traveling in the front cabin" and the number of premium seats in the market increased. Lusso (JetBlue) Dep. 66:22–68:15, Apr. 11, 2022; PX0555 at 15.

210.    Likewise, competition from American constrained JetBlue's pricing. When American stopped flying JFK-San Diego ("SAN") due to the 737 MAX grounding, JetBlue began "ignoring AA pricing until it becomes clear they will re-enter the market." PX0515 at 4; Tr. Vol. 3, 71:23–72:1 (Jarashow/JetBlue); *see infra* Section V.G.2. During the period when American was not flying JFK-SAN, JetBlue "down-bucketed its entire fare structure in JFK to San Diego," which "effectively increased fares by $20-$40 throughout the structure." PX0583 at 1; Tr. Vol. 3, 72:2-9, 73:21–74:7 (Jarashow/JetBlue). JetBlue took this fare action "in response to very strong summer demand, fueled in part by the AA cancellations." PX0583 at 1; Tr. Vol. 3, 73:13-17, 74:14–75:2 (Jarashow/JetBlue). As a result, JFK-SAN was "one of the highest-fare trans-con markets in the system." PX0583 at 1; Tr. Vol. 3, 73:13-17 (Jarashow/JetBlue). In short, when JetBlue faced reduced competition from American, JetBlue charged higher prices.

**B.    Before the Northeast Alliance, competition between American and JetBlue was escalating.**

**1.    Boston**

**a.    JetBlue had plans to reach 200 daily departures in BOS before the NEA.**

211.    In 2019, JetBlue had a plan to compete aggressively in Boston on its own, without the NEA. JetBlue's plan was called "Boston 200" and the goal was to have 200 daily departures in Boston by 2022. Tr. Vol. 1, 123:12–124:9 (Hayes/JetBlue); Lusso (JetBlue) Dep. 101:8–

102:23, 114:9-15, Apr. 11, 2022; PX0539 at 1. This was a significant increase from the 173 maximum daily departures JetBlue was operating at BOS in 2019. Lusso (JetBlue) Dep. 114:9-21, Apr. 11, 2022; Tr. Vol. 8, 279:20–280:19 at 280:14-16, 281:20-22 (Friedman/JetBlue); PX0525 at 1 (describing JetBlue's five-year plan without the NEA); Lusso (JetBlue) Dep. 62:10-23, 63:2-3, Mar. 18, 2021. JetBlue believed that its Boston 200 strategy would cause other airlines to add capacity or lower fares. Lusso (JetBlue) Dep. 118:10–120:14, Apr. 11, 2022; PX0543 at 1 (stating that JetBlue "wouldn't really have a BOS200 strategy if [it] were worried about competitive reactions").

212.     JetBlue's plans to grow in Boston included increasing capacity in nonstop markets where it competed with American. In its December 2019 press release announcing Boston 200, JetBlue described itself as "the top airline in Boston" and noted it would "continue in 2020 with more flights being added . . . to top performing routes at Logan International Airport (BOS)." PX0633 at 2; Tr. Vol. 5, 107:12-17 (Laurence/American). The press release identified ten daily roundtrips from BOS-LGA, new flights from BOS to JFK and EWR, up to three daily roundtrips on BOS-AUS, and additional flights from BOS to more than a dozen destinations. PX0633 at 2-3. ██████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ .

213.     Robert Land, JetBlue's Senior Vice President for Government Affairs and Associate General Counsel, testified that JetBlue's decision to add flights between BOS-LGA as part of Boston 200 was made so that JetBlue could compete against and "discipline" the entrenched legacy airlines, American and Delta. Land (JetBlue) Dep. 65:25–66:3, 66:5-8, 66:10–67:9, Apr. 28, 2022; PX0633 at 1 (Land stating JetBlue's goal was "to compete more head to head and bring low fares on the shuttle market between LGA-BOS").

214.     Additionally, JetBlue planned to add capacity to business markets from BOS, including to American hubs at Charlotte, Dallas, Washington, D.C., Los Angeles, and Phoenix. Tr. Vol. 8, 266:14–267:14, 267:21–268:12 (Friedman/JetBlue); PX0643 at 8. For instance, JetBlue planned to add frequency from BOS to CLT—an American hub. Tr. Vol. 8, 266:14–267:3

(Friedman/JetBlue); PX0643 at 8; Tr. Vol. 4, 109:10–110:4 (Raja/American); PX0066 at 1
(noting that American and JetBlue competed on BOS-CLT before the NEA). JetBlue planned to
add frequency between BOS and DCA, an American hub. Tr. Vol. 8, 267:9-14
(Friedman/JetBlue); PX0643 at 8. JetBlue planned to add daytime service on BOS-PHX, an
American hub, which had been a redeye-only route for JetBlue. Tr. Vol. 8, 268:2-7
(Friedman/JetBlue); PX0643 at 8; Tr. Vol. 4, 109:10–110:4 (Raja/American); PX0066 at 1
(noting that American and JetBlue competed on BOS-PHX and JetBlue added frequency on this
route). JetBlue also planned to add frequency on BOS-DFW—another American hub. Tr. Vol. 8,
267:4-8 (Friedman/JetBlue); PX0643 at 8. During this time, American also observed JetBlue
adding frequencies on BOS-ORD. Tr. Vol. 4, 109:10–110:4 (Raja/American); PX0066 at 1.

215.    JetBlue planned to solidify its premium Mint service on BOS to LAX—an
American hub—as part of this growth. Tr. Vol. 8, 267:21–268:1 (Friedman/JetBlue); PX0643 at
8. JetBlue added frequencies on BOS-LAX in December 2019. Tr. Vol. 4, 109:10–110:4
(Raja/American); PX0066 at 1. This was significant competition for American at the time. Lusso
(JetBlue) Dep. 66:22–68:15, Apr. 11, 2022; PX0555 at 15.

216.    JetBlue also remained committed to growing at BOS on its own, even while Delta
and American expanded service. JetBlue launched this plan, which it called, "Project Revere" in
the summer of 2019, in order to defend its market position in Boston by adding more flights to
routes that were frequently flown by American and Delta. Lusso (JetBlue) Dep. 126:12-25, Apr.
11, 2022; PX0508 at 10; Tr. Vol. 10, 67:9-20 (Clark/JetBlue); Mehoke (JetBlue) Dep. 252:16-25,
258:8-23, June 2, 2022 (objection pending); PX0484 at 40-41 (listing fourteen BOS routes on
which JetBlue planned to increase its frequencies and improve its service as of October 2019).
The plan called for adding frequencies and destinations to increase travel flexibility. PX0508 at
10; PX0484 at 7, 11. As part of Project Revere, JetBlue planned to offer hourly service and free
same-day changes on routes between Boston and New York, Washington, D.C., and Philadelphia.
Lusso (JetBlue) Dep. 128:2-11, 128:19–129:4, Apr. 11, 2022; PX0508 at 11-12. Mr. Clark

testified at trial that JetBlue wanted to compete as hard as possible against a number of competitors in Boston, including American and Delta. Tr. Vol. 10, 11:9–12:4 (Clark/JetBlue).

217.    Mr. Clark testified that Boston 200 and Project Revere were "extremely related" because JetBlue planned to use the infrastructure added through Project Revere to support the Boston 200 plan. Tr. Vol. 10, 67:21–68:4 (Clark/JetBlue). Other airlines were aware of JetBlue's plans to grow organically in Boston. *See* Tr. Vol. 2, 177:9-15, 177:20-22 (Watterson/Southwest). A set of talking points prepared for Mr. Hayes in December of 2019 described Boston as "solidly profitable with great growth potential" such that JetBlue was "confident in our ability to compete and win in Boston." PX0577 at 6-7.

218.    JetBlue's initiatives to compete in Boston showed success in defending its market share before the NEA. Despite Delta's growth at BOS, JetBlue was "holding its own" with corporate customers, and believed it would be successful due to the additions to its network. Mehoke (JetBlue) Dep. 266:10–268:13, June 2, 2022; PX0567 at 2. As of 2019, JetBlue offered the "[m]ost flights, most seats, most ASMs and most nonstop destinations" from BOS. Lusso (JetBlue) Dep. 107:14-18, Apr. 11, 2022; PX0539 at 1. As a result of choosing to compete, JetBlue had not seen a decline in customers before the NEA and there had only been a slight erosion in share. PX0933 at 3.

219.    Despite COVID-19, JetBlue saw "offensive opportunities manifesting," in light of "recent [Southwest] exits," with plans to grow as other airlines reduced capacity in June 2020. PX0505 at 10. JetBlue announced plans to phase in flights on more than a dozen Boston routes in 2020, including Charlotte, Chicago, Cleveland, Denver, Los Angeles, San Diego, San Francisco and Washington, D.C. PX0633 at 2-3. In 2020, JetBlue observed a 26 percent increase in Boston flights over the last three years, including 52 domestic and 18 international destinations. PX0623 at 33.

b.   **American was increasing flights to compete more aggressively in Boston.**

220.     In late 2019, after seeing its position erode in Boston over time, American was determined to compete aggressively. It planned to increase its flights by 13.8 percent and its seats 14 percent between 2019 and 2020. Tr. Vol. 8, 24:15-19 (Swartz/American). Mr. Raja testified that American had plans to grow in Boston before the NEA. Tr. Vol. 4, 107:24–108:1, 110:5–113:12 (Raja/American). In one e-mail with the vice chair of the American Pilots Association in Boston, Mr. Raja stated that "we are not done in Boston, we are going to kick ass globally, even if it kills me, including Boston." PX0122 at 1; Tr. Vol. 4, 110:5–113:12 (Raja/American). He went on to underscore that he doesn't "BS about these thing[s], and I am done [expletive] around." PX0122 at 1; Tr. Vol. 4, 110:5–113:12 (Raja/American). Mr. Raja added, "we are going to fight like hell in Boston." PX0122 at 1; Tr. Vol. 4, 110:5–113:12 (Raja/American).

221.     Several months later, Mr. Raja explained to American's Senior Vice President of Airports, Jim Butler, that "Boston is and will be the largest nonhub mainline operation." PX0119 at 1; Tr. Vol. 4, 113:13–117:18 (Raja/American). He went on to suggest that American would have 120 daily flights in BOS by 2025, up from about 90 flights at that time. PX0119 at 1; Tr. Vol. 4, 113:13–117:18 (Raja/American). In 2019, American had plans to increase its BOS peak-day departures from 96 to at least 104, and to increase departures to around 140. Tr. Vol. 4, 118:7-17 (Raja/American); PX0065 at 1. At the time, American was underutilizing its BOS gates and planned to increase its utilization while also trying to obtain three new gates. Tr. Vol. 4, 119:5–121:3 (Raja/American); PX0065 at 1; Mancini (American) Dep. 104:5-9, Apr. 29, 2022 (stating that American's gate utilization at BOS lagged its competitors); PX0053 at 1-2. American continued strategizing about increased departures at "strategic spokes" in 2020, which included BOS. PX0172 at 1-2.

222.     Mr. Raja was serious about competing in Boston. When Jim Carter, American's Managing Director of the Eastern Division of Global Sales, noted that he was receiving a lot of inquiries about new American routes from BOS, Mr. Raja stated "Awesome. Gird your loins. Time to swing the bat in Boston." PX0064 at 1; Tr. Vol. 4, 124:19–126:14 (Raja/American).

223.     American planned to enter several new routes that were overlaps with JetBlue. As of October 2019, American planned to add two peak-day BOS-AUS flights and three BOS-RDU flights. Goodman (American) Dep. 203:14-21, Dec. 22, 2020. Mitch Goodman, Manager in Domestic Network Planning at American, testified that American planned to launch BOS-RDU as of January 2020. Goodman (American) Dep. 216:22–217:9, Dec. 20, 2020. In December 2019, American announced the return of the "Nerd Bird," which refers to the BOS-AUS route, to compete with JetBlue and Delta. PX0085 at 1-2.

224.     Mr. Goodman testified that a 2020 American press release touted new routes from Boston to Raleigh-Durham, Indianapolis, and Wilmington (NC), as well as additional investments in infrastructure at BOS. Goodman (American) Dep. 196:9-22, Dec. 22, 2020; PX0174 at 3-4. He believed that, before COVID-19, American's performance in Boston was good and American was planning on adding more Boston flights. Goodman (American) Dep. 248:6-24, Dec. 22, 2020; PX0103 at 6.

225.     In late 2019, Mr. Carter was discussing how to "*win BOS back*" from JetBlue and Delta. PX0046 (italics in original). American's 2019 plan to fly new Boston routes to Austin, Raleigh-Durham, and Indianapolis was part of a "new way of thinking" around "strategic spokes." PX0045. After American announced new BOS-AUS flights in late 2019, JetBlue quickly responded in December 2019 by increasing service to three daily flights. PX0140 at 1 (Mr. Swartz commenting, "Didn't take long").

226.     An American slide deck from February 2020 notes that in Boston "AA has aggressively added back flying starting in 2020." PX0103 at 3. When reviewing its 2020 schedule strategy in October of 2019, American projected its JFK ASM growth as 41 percent year-over-year, and BOS 12 percent year-over-year, leading Mr. Carter to exclaim, "Not for distribution but BOS/JFK/RDU big winners in 2020!!!" PX0089 at 1-2; Tr. Vol. 8, 21:14–25:7 (Swartz/American).

227.     JetBlue recognized increased competition from American and Delta. In a September 2019 presentation for its Senior Leadership Team, JetBlue observed that "Delta is

continuing aggressive growth in BOS while American is increasing growth in 2020, other carriers are falling back." DX0282 at 19 (noting further that "American is growing all multi-frequency markets in Q1 2020"); Tr. Vol. 10, 77:15–78:14 (Clark/JetBlue).

228.    Competition from American kept JetBlue's prices lower as well. JetBlue was considering whether to match a $20 price increase by Delta on BOS-RDU. PX0606 at 2; Tr. Vol. 3, 67:17–68:8 (Jarashow/JetBlue). In January 2020, JetBlue inventory analyst Jonah Rosen told JetBlue pricing manager Evan Jarashow that JetBlue should not match Delta's price increase because of "AA's imminent entrance into the market with 5x flights." PX0606 at 1; Tr. Vol. 3, 68:17–69:10 (Jarashow/JetBlue). Mr. Rosen was concerned that when American entered BOS-RDU, JetBlue could lose market share, and keeping JetBlue's prices low was a way for JetBlue to mitigate that possibility. Tr. Vol. 3, 69:11–70:1 (Jarashow/JetBlue).

229.    American intended to compete in Boston through organic growth, just as JetBlue had done. In a strategic planning document for 2020, American noted that "Boston is the largest strategic spoke in the system and one in which we have decided to fight for access to gates, given current and future constraints and that we lost gates to DL to facilitate co-location with US Airways." PX0115 at 4; Mancini (American) Dep. 127:23–128:5, Apr. 29, 2022. Mr. Mancini confirmed that capacity planning indicated that American could get to 120 departures organically at BOS. Mancini (American) Dep. 133:7-15, Apr. 29, 2022; PX0115 at 4. Mr. Goodman testified that, in at least one version of American's pre-NEA 2020 five-year plan, it anticipated increasing point-to-point departures from BOS from five daily in 2019 to ▇ in 2025, and total peak-day departures from 86 to ▇. Goodman (American) Dep. 102:12–104:25, Dec. 20, 2020; PX0178 at 2025 Guidance, Row 13.

   2.    **New York City**

      a.    **American had plans to upgauge its regional jets in JFK/LGA before the NEA.**

230.    Before the NEA, American planned to add 6,900 flights and over 1.7 million seats between 2019 and 2020. Tr. Vol. 8, 23:12-24 (Swartz/American). At LGA, American planned to

increase its flights by 6.8 percent and its seats by 8.8 percent between 2019 and 2020. Tr. Vol. 8, 24:6-14 (Swartz/American). At JFK, American planned to increase its flights by 25.9 percent and its seats by 13 percent between 2019 and 2020. Tr. Vol. 8, 24:20-24 (Swartz/American). As part of its Revenue Plan in 2019, American sought to grow in JFK following the end of the 737 MAX grounding and the expiration of slot waivers at JFK. Tr. Vol. 8, 162:6–163:1, 164:13-21 (Pack/American); PX1143 at 2; PX1142 at 1-2. According to an American presentation and as confirmed by Mr. Mancini, American had the ability to add more than 40 flights at JFK without the need to obtain additional slots. Mancini (American) Dep. 146:19–147:1, Apr. 29, 2022; PX0281 at 3.

231.    One additional way American was planning to grow in New York City before the NEA was by upgauging its planes. In mid-2019, a significant part of American's schedule at JFK was flown using small, regional jets. Tr. Vol. 4, 127:11–128:5 (Raja/American); PX0076 at 3. These were mostly one-class 50-seat aircraft. Tr. Vol. 4, 127:11–128:5 (Raja/American); PX0076 at 3. American had planned to replace all those jets with two-class jets that seat between 65 and 75 passengers. Tr. Vol. 4, 127:3–129:16, 136:17–137:7 (Raja/American); PX0105 at 2; PX0128 at 1; PX0119 at 1. Mr. Mancini testified that American planned to upgauge all regional jets at JFK and LGA. Mancini (American) Dep. 144:3-5, 144:7-8 Apr. 29, 2022; PX0281 at 3. Mr. Goodman also testified that before the NEA, American had plans to upgauge its regional jets on LGA routes. Goodman (American) Dep. 153:7–155:19, Dec. 20, 2020; PX0141 at 1.

232.    In a business planning document, American stated that "[d]eploy[ing] more 2-class [regional jets] in LGA" was an opportunity for the domestic network in 2021. PX0238 at 71. In an October 2019 e-mail exchange regarding LGA plans, Mr. Goodman noted that "[o]ver the next couple of years [he] would expect the small RJs to be replaced with larger RJs." PX0141 at 1. A February 2020 strategy deck also noted that American planned to "[p]rovide dual-class aircraft to markets with large business patterns" at LGA. PX0050 at 3.

> **b.    JetBlue also had plans to grow in New York City before the NEA.**

233.    Before the NEA, JetBlue had several plans to grow in New York City. JetBlue recognized in 2019, before considering the NEA, that it had plenty of growth potential at JFK, if it could obtain slots and aircraft. Tr. Vol. 6, 22:6-9 (Laurence/American). Mr. Friedman testified that JetBlue planned to grow from 174 maximum daily departures at JFK to 191 maximum daily departures in 2026. Tr. Vol. 8, 279:15-19 (Friedman/JetBlue); PX0525 at 1. This growth was independent of JetBlue entering the NEA. Tr. Vol. 8, 281:11-19 (Friedman/JetBlue).

234.    To facilitate this growth, JetBlue agreed on a slot lease with American at JFK. American and JetBlue began discussing a potential slot deal at JFK for 18 to 20 pairs in December 2019, before the NEA. PX0163 at 1. Mr. Laurence testified that JetBlue was very eager to grow at JFK and therefore jumped at an opportunity in 2020 to obtain slots from American. Tr. Vol. 5, 128:6-16 (Laurence/American). Ultimately, JetBlue and American agreed to lease 27 slots before COVID-19 and the NEA. Tr. Vol. 5, 130:10-25 (Laurence/American). Mr. Laurence told Mr. Lusso that he was "confident that American isn't going to want [the slots] back from us once we are flying them." PX0507 at 1.

235.    JetBlue's Network Planning team built in additional JFK slots in its baseline assuming that JetBlue would get additional slots. Tr. Vol. 8, 299:21–300:20 (Friedman/JetBlue); Friedman (JetBlue) Dep. 220:7-13, Dec. 21, 2020; PX0527 at 1-2. Because JetBlue's Network Planning Team was "trying to show increased growth as a result of Connie," Mr. Friedman, with Mr. Lusso's endorsement, instructed a Manager of Route Planning—Nicholas Han—to attribute 14 slots to the NEA that would have been included in the standalone five-year plan. PX0531 at 1-2.

236.    In June 2020, before signing the NEA, JetBlue announced that it would offer service on 30 new routes, including service from JFK, LGA, and EWR, and many nonstop routes that competed with American. Tr. Vol. 5, 208:14–209:16 (Laurence/American); *see also* PX0640 at 2. JetBlue's plan, titled Project Reach, called for JetBlue to grow EWR to 70 daily departures by 2022 with or without the NEA. Lusso (JetBlue) Dep. 247:2-8, 247:13–248:12, Mar. 18, 2021;

PX0641 at 2; PX0786 at 5. Mr. Lusso admitted that without the NEA, JetBlue would have attempted to reach 70 daily departures at EWR. Lusso (JetBlue) Dep. 137:21–138:2, Apr. 11, 2022; PX0786 at 5. Through this plan, JetBlue also planned to add daytime flights from JFK-Phoenix—an American hub. Lusso (JetBlue) Dep. 257:18-23, Mar. 18, 2021.

> **3.   London**
>
> > **a.   There is limited competition on transatlantic routes, which are dominated by joint ventures involving American, Delta, and United.**

237.    American, Delta, and United are members of oneworld Alliance, SkyTeam, and Star Alliance, respectively. *Uncontested Facts*: PTO Ex. A ¶ 7, ECF No. 196. Oneworld Alliance, SkyTeam, and Star Alliance are international joint ventures. *Uncontested Facts*: PTO Ex. A ¶ 7, ECF No. 196. American, Delta, and United are also members of separate transatlantic alliances. Casey (American) Dep. 172:18–173:12, May 4, 2022. American, for example, is a founding member of the Atlantic Joint Business ("AJB"), a transatlantic joint venture, along with British Airways, Iberia, and Finnair. PX0415 at 6; PX1151 at 9 (explaining that joint business agreements address key regulatory restrictions typically applicable to international airline service, including limitations on foreign ownership of airlines and national laws prohibiting foreign airlines from carrying passengers beyond specific gateways).

238.    Combined, the transatlantic joint ventures account for virtually all flights between the U.S. and London/Heathrow ("LHR"), and control over 75 percent of slots at LHR. Land (JetBlue) Dep. 196:17-23, 197:2-25, 198:3-11, 198:13-14, Apr. 28, 2022. In 2019, the three transatlantic joint ventures accounted for *all* of the flying on each of the top 30 U.S.-LHR routes. Tr. Vol. 10, 197:13–198:2 (Miller/Pls. Expert) (discussing demonstrative at 90). Mr. Land testified that the three legacy airlines and their alliance partners have all or nearly all of the shares of the BOS-London market. Land (JetBlue) Dep. 149:21-22, 149:25–150:8, Apr. 28, 2022 (objection pending). Mr. Land also testified that the market share of the three legacy airlines and their alliance partners in the New York City to LHR market is 100 percent. Land (JetBlue) Dep. 151:20-23, 152:1-2, 181:12-15, 181:17-22, Apr. 28, 2022 (objection pending).

239.     JetBlue complained that the high market shares enjoyed by the international airline alliances between the U.S. and London led to high prices for consumers. Talking points for Mr. Hayes for "The Beat Live," a panel discussion concerning business travel, stated that "[t]he Big 3 U.S. legacy airlines – American, Delta, and United – through their equity relationships and alliance and joint venture partners dominate many international markets and control an equally and alarmingly high portion of the transatlantic . . . marketplace." PX0574 at 11. The document further stated that "the Big 3 have unprecedented power" and can "legally collude." PX0574 at 11. Finally, the document noted that "[i]n general, joint ventures create less competition and higher fares." PX0574 at 11; *see also* PX0631 at 5 ("These fares are obscene – they are obscene – and they should not be permitted to exist.  But competition is the way to fix it.").

240.     JetBlue's own analysis of transatlantic joint ventures found that in general, joint ventures create less competition and higher fares. Tr. Vol. 8, 273:12-16 (Friedman/JetBlue); PX0672 at 1. Those joint ventures allow the airlines involved to coordinate capacity, coordinate schedules, and share revenue, in addition to coordinating pricing. Tr. Vol. 8, 271:4-10 (Friedman/JetBlue); Lusso (JetBlue) Dep. 202:25–203:6, Mar. 18, 2021.

241.     After American and British Airways entered into the AJB in 2010, fares rose 21 percent, while capacity rose only six percent on the route between New York City and London. Tr. Vol. 8, 271:17–272:1 (Friedman/JetBlue); PX0672 at 1, 7. On BOS-London, American shifted capacity to British Airways, and overall capacity in the market dropped by 16 percent. Tr. Vol. 8, 272:2-9 (Friedman/JetBlue); PX0672 at 1, 8.

242.     Similarly, after Delta and Virgin Atlantic entered into a transatlantic joint venture in 2013, fares increased by 13 percent and capacity dropped seven percent on BOS-London. Tr. Vol. 8, 273:6-11 (Friedman/JetBlue); PX0672 at 1, 7. Fares increased on NYC-London relative to other transatlantic markets, and as of 2018, fares were eight percent higher than they were before the joint venture. Tr. Vol. 8, 272:10–273:5 (Friedman/JetBlue); PX0672 at 1.

### b. There is limited competition to Heathrow which is differentiated from other London Airports.

243.     JetBlue planned to introduce the JetBlue Effect to transatlantic markets. Lusso (JetBlue) Dep. 193:17-19, Mar. 18, 2021. Before JetBlue could launch transatlantic service, it needed to secure access to an airport in London. Lusso (JetBlue) Dep. 190:10-13, Mar. 18, 2021. Permanent slots at LHR are difficult and expensive to acquire. Lusso (JetBlue) Dep. 275:13-16, Apr. 11, 2022. JetBlue had been trying to access slots at LHR for years. Lusso (JetBlue) Dep. 190:14-17, Mar. 18, 2021. Slots at commercially viable times at LHR are scarcer and more expensive than slots at off-peak times. Land (JetBlue) Dep. 406:4-7, 406:11-12, 406:15-17, Apr. 28, 2022.

244.     JetBlue believed it would be more successful and more disruptive if JetBlue could fly into LHR because LHR is the preferred London-area airport for many customers. Lusso (JetBlue) Dep. 192:9–193:8, Mar. 18, 2021. LHR is very congested and constrained, resulting in high fares. Lusso (JetBlue) Dep. 192:9–193:8, Mar. 18, 2021. Other London-area airports, such as London/Gatwick ("LGW"), London/Stansted ("STN"), and London/Luton ("LTN"), are less attractive from a commercial perspective than LHR because they are further away from the city center and less connected to the areas where travelers want to go. Lusso (JetBlue) Dep. 191:12–192:3, Mar. 18, 2021. That is true for customers overall, and particularly for premium travelers. Lusso (JetBlue) Dep. 192:4-7, Mar. 18, 2021. Airlines that fly to LHR therefore command a yield premium in the premium cabins compared with flying to LGW. Lusso (JetBlue) Dep. 226:5-11, Mar. 18, 2021; PX0692 at 15. Thus, JetBlue preferred slots at LHR over slots at LGW. Lusso (JetBlue) Dep. 229:25–230:3, Mar. 18, 2021.

245.     A Memorandum of Understanding between JetBlue and the LHR Airport Authority stated, "Gatwick long-haul carriers have had a limited ability to impact the premium London long-haul markets." Lusso (JetBlue) Dep. 227:11-25, Mar. 18, 2021; PX0692 at 15. For example, despite WestJet offering lower prices on its premium economy fare to LGW, premium fares at LHR did not come down in response. Lusso (JetBlue) Dep. 228:24–229:15, Mar. 18, 2021.

### c. Before the NEA, JetBlue was planning to disrupt competition in transatlantic markets to London.

246.    Before the NEA, JetBlue was poised to compete aggressively and lower fares on London routes. Mr. Land testified that one of JetBlue's goals in entering the transatlantic market involving London was to "lower fares" in that market. Land (JetBlue) Dep. 78:24–79:2, 79:5-6, Apr. 28, 2022.

247.    In late 2018, the U.K. CMA launched an investigation of the AJB. Lusso (JetBlue) Dep. 280:20–281:4, Apr. 11, 2022; *see also Investigation of the Atlantic Joint Business Agreement*, Competition & Markets Authority, (Oct. 11, 2018),  https://www.gov.uk/cma-cases/ investigation-of-the-atlantic-joint-business-agreement. As a result of that investigation, the U.K. CMA awarded interim "remedy slots" at LHR to an airline that was not part of AJB. Lusso (JetBlue) Dep. 280:20–281:4, Apr. 11, 2022.  The "remedy" slots were ones that American and British Airways had been required to divest when they formed a partnership in 2010. PX0805 at 3 ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

248.    JetBlue aggressively sought to win these remedy slots. Acquiring the four slots at LHR from the U.K. CMA was one of Mr. Land's most significant projects in 2019 and 2020. Land (JetBlue) Dep. 263:2-4, 263:6-11, 263:15, 263:17-18, Apr. 28, 2022. JetBlue believed that it was the only airline qualified to effectuate the pro-competitive policy behind the remedy slots at LHR. Land (JetBlue) Dep. 288:12-19, 288:24–289:6, 289:9-11, Apr. 28, 2022.

249.    JetBlue told government officials that it could bring much needed fare and service discipline to transatlantic routes to London if it could obtain the LHR slots. Land (JetBlue) Dep. 197:16-25, 198:3-11, 198:13–199:1, 199:3-7, Apr. 28, 2022. In September 2020, JetBlue submitted a filing to the U.S. DOT seeking at least four daily slot pairs to meaningfully serve the U.S.-LHR market and provide a desperately needed competitive alternative to the American-led oneworld Alliance and Delta-led SkyTeam immunized joint ventures. Land (JetBlue) Dep. 209:13–210:6, 210:9-15, Apr. 28, 2022.

250.     JetBlue told the U.K. CMA that it would bring competitive discipline by offering lower fares to a number of transatlantic routes, including Miami-London, DFW-London, and PHL-London. Lusso (JetBlue) Dep. 209:20-25, 213:24–214:2, 214:3-15, Mar. 18, 2021 (objection pending); PX0552 at 6, 8-9. Specifically, JetBlue told the U.K. CMA that it would provide "competitive connecting schedules and drive lower fares" on DFW-LHR, a market for which the oneworld Alliance controlled 100 percent of the nonstop flights, and which "has particularly high fares." PX0552 at 8; Lusso (JetBlue) Dep. 210:3-6, 212:21–213:14, Mar. 18, 2021 (objection pending). JetBlue said the same thing regarding PHL-LHR, which had limited nonstop service and high fares. Lusso (JetBlue) Dep. 214:3-15, Mar. 18, 2021 (objection pending); PX0552 at 10-11.

> **d.     American predicted competition from JetBlue at London Heathrow would impact its transatlantic fares and profitability.**

251.     Based on the experience of JetBlue's entry into transcontinental routes, American believed that JetBlue's entry into transatlantic routes would lower fares and hurt American's profitability. When JetBlue had entered transcontinental markets with its Mint product, American's lowest fare decreased by 50 percent. Casey (American) Dep. 254:5-15, May 4, 2022; PX0190 at 99 ("In TCON, lowest fare decreased by ~50% as B6 entering the markets"). American expected that JetBlue's entry on BOS-LHR would similarly reduce fares 50 to 60 percent. Casey (American) Dep. 256:10-19, May 4, 2022; PX0190 at 99 (concluding that it was "reasonable to assume 50-60% fare drop in BOSLON once B6 starts non-stop service.").

252.     Paul Swartz, Regional Sales Director at American, acknowledged that JetBlue's entry into BOS-LHR would increase competition. Tr. Vol. 8, 55:20–56:2, 56:17-21 (Swartz/American). Mr. Swartz worried that the new Mint offering on BOS-LHR "would be trouble," but it would be less painful if served BOS-LGW. PX0192.

253.     After the internal announcement that American's BOS-LHR flight would resume, an American executive suspected that "BOSLHR is going to be a fare fight especially when B6 looks to get into the fray." PX0135 at 1. American feared that BOS-LHR competition would only

intensify after JetBlue's entry, threatening American's Boston international stronghold, which has kept us in a "domina[nt] BOS position." PX0149 at 1.

> **C.** **The revenue sharing and capacity coordination provisions of the Northeast Alliance are widely understood in the industry to eliminate competition.**

254.     American understood that an alliance involving capacity coordination and revenue sharing provisions would raise antitrust concerns. In April 2020, an internal agenda discussing potential structures for what would become the NEA outlined two different options, one which American believed would require antitrust immunity and one which would not. PX0234 at 1. The option that "needed" antitrust immunity involved "[n]etwork optimization . . . with the ability to co-ordinate capacity" and sharing revenue "including both domestic and international revenues for both the carriers." PX0234 at 1. In contrast, the option involving slot swaps, a limited geographic scope "with no network coordination", and a revenue share involving only JetBlue's domestic revenue from certain gateways and American's LHR international revenues would not need antitrust immunity. PX0234 at 1.

255.     American's internal assessment that a joint venture involving capacity coordination and revenue sharing would need antitrust immunity is unsurprising. International joint ventures—such as oneworld Alliance, SkyTeam, and Star Alliance—that include capacity coordination and revenue sharing between airlines must have antitrust immunity in order to operate. Land (JetBlue) Dep. 136:2–137:1, 137:3-8, Apr. 28, 2022. American's Chief Commercial Officer, Vasu Raja, agreed that antitrust immunity is required for international alliances that involve schedule coordination and revenue sharing on nonstop overlap international routes. Tr. Vol. 7, 180:15–181:9 (Raja/American). Dr. Israel similarly recognized that the features of an international joint venture that require antitrust immunity include revenue sharing, network planning, and joint pricing. Tr. Vol. 14, 17:25–18:13 (Israel/Defs. Expert). In fact, American's international joint ventures that involve network coordination do have antitrust immunity. Tr. Vol. 8, 169:7–170:8 (Pack/American).

256.     Mr. Hayes testified that antitrust immunity allows international joint ventures to "coordinate schedules, coordinate prices, share revenue" which, in his words, is "legalized collusion," further noting that such agreements allow airlines to "gain strength and market share that often prevents new competitors from even considering or stepping into market." Tr. Vol. 1, 149:7–150:17 at 149:20-25 (Hayes/JetBlue).

257.     Andrew Guenthner, Delta's Director of Alliances, testified that "when you have antitrust immunity" you can have "revenue sharing and/or [a] profit sharing arrangement" but "[i]f you don't have antitrust immunity . . . [y]ou don't coordinate fares, you don't coordinate inventory access." Guenthner (Delta) Dep. 234:16–236:19 at 235:19-23, 236:5-14, June 1, 2022.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

258.     It is notable that no domestic airline joint venture has received antitrust immunity. Mr. Raja testified that, before the NEA, American had no domestic alliances involving pooled slots and gates and joint decisions on who was going to use them. Tr. Vol. 4, 104:12-16 (Raja/American). American's west coast alliance with Alaska (the "WCIA") does not include coordination on the number of flights for overlap routes, because only international joint ventures with those features can obtain antitrust immunity. Tr. Vol. 4, 104:2–105:15 at 104:2-11 (Raja/American). American understood that domestic alliances had limits, noting internally about a potential JetBlue partnership that became the NEA, "[s]imilar to the AS [Alaska] partnership [WCIA], without ATI there are many things the two partnerships cannot discuss." PX0334 at 36.

**D.     The Northeast Alliance has adversely affected competition.**

     **1.     Defendants now cooperate instead of competing on overlapping NEA Routes.**

          **a.     As a result of the NEA, Defendants no longer compete with one another at NEA Airports.**

259.     The NEA ended the fierce head-to-head competition between American and JetBlue in Boston and New York City. Mr. Hayes admitted that "*outside of the NEA*, we are full blooded competitors", but "*within the NEA* . . . we don't compete with each other directly." Tr.

Vol. 2, 53:7-15 (Hayes/JetBlue) (emphasis added); Tr. Vol. 1, 182:6-10 (Hayes/JetBlue) (emphasis added). Similarly, Mr. Laurence—formerly of JetBlue and now at American—agreed that "it makes more sense [for JetBlue] to cooperate with American, rather than compete for NEA Routes." Laurence (JetBlue) Dep. 146:18-25 (admitted at Tr. Vol. 5, 139:25–140:3).

260.    American and JetBlue now coordinate on the NEA Routes that each flies. Tr. Vol. 15, 117:21–118:13 (Znotins/American). This means that American does not view JetBlue as a competitor on NEA Routes both from a network perspective and from a sales perspective. Tr. Vol. 15, 118:14-16, 126:15-21 (Znotins/American); Tr. Vol. 8, 28:13-20 (Swartz/American). As American's Vice President of Network Strategy, Brian Znotins noted, "We're still competitors in all respects *until we choose to implement the [NEA]* . . . ." PX0315 at 3 (emphasis added).

261.    Pre-NEA, JetBlue competed with American for corporate customer business on NEA Routes. Roberta Mehoke, JetBlue's Director of Sales, recognized that that if business shifted from JetBlue to American, then JetBlue would lose revenue. Mehoke (JetBlue) Dep. 166:7-19, June 2, 2022 (objection pending). JetBlue therefore competed with American for corporate customer business because "whichever carrier has the better pricing/discount will get the sale." Mehoke (JetBlue) Dep. 186:2-12, June 2, 2022; PX0863 at 1. The NEA changes this competitive dynamic. Ms. Mehoke acknowledged that if business shifts to American in the NEA environment, "in the end the revenue is pooled between [American] and [JetBlue] so that is okay." Mehoke (JetBlue) Dep. 160:18–161:16, June 2, 2022; PX0834 at 1.

262.    Other industry participants recognize that the NEA has changed the competitive landscape in the northeast. Delta considers there now to be one fewer competitors in Boston. Somers (Delta) Dep. 158:17-26, July 25, 2022 (objection pending). Andrew Murray, Senior Policy Analyst at the Port Authority of New York and New Jersey ("PANYNJ"), testified that the PANYNJ views American and JetBlue as a single competitor when analyzing competition within the NEA. Murray (PANYNJ) Dep. 230:13–230:20, 230:25–231:12, May 3, 2022; PX0887 at 63. Spirit's Vice President of Network Planning, John Kirby, testified that the NEA will create a

virtual duopoly between Delta and the NEA in New York City. Tr. Vol. 3, 128:11-13 (Kirby/Spirit); PX0894 at 3-4.

> **b.** **The Northeast Alliance has eliminated independent competition between the Defendants to set their own routes and schedules.**

263.     American and JetBlue now cooperate with one another on NEA Routes rather than compete to build their own schedules and networks. Before the NEA, Mr. Laurence (then at JetBlue) agreed that JetBlue made independent business decisions to enter new routes without consulting with American; now, if JetBlue planned to enter new routes encompassed by the NEA, it would expect to consult with American first. Tr. Vol. 5, 209:11-16, 211:5-14 (Laurence/American). Mr. Fintzen was unaware of an instance when American's and JetBlue's network representatives were unable to come to a consensus on a proposed schedule post-NEA. Tr. Vol. 8, 119:15–120:20 (Fintzen/JetBlue).

> **c.** **The Northeast Alliance ensures metal neutrality between American and JetBlue, making the Defendants indifferent about whether customers choose either airline.**

264.     The phrase "metal neutrality" refers to when airlines are "agnostic" about the airline on which a given customer flies. Bhargava (American) Dep. 186:15-21, June 3, 2022. The NEA renders American and JetBlue metal neutral, and therefore it "doesn't matter whether" a passenger purchases a ticket on "B6 metal or American metal." Bhargava (American) Dep. 187:13–188:16, June 3, 2022. Metal neutrality also means that American and JetBlue would "rather offer the customer an option between JetBlue and American than have them choose another airline or set of airlines." PX0793 at 1; Tr. Vol. 3, 7:25–9:11 at 9:4-11 (McMenamin/JetBlue); Tr. Vol. 5, 112:2–113:5, 144:5-11 (Laurence/American); PX0450 at 16. As discussed in more detail below, this metal neutrality eliminates any economic incentives for Defendants to win business from one another. *See infra* Section V.E.2.d.

### d. Defendants now coordinate capacity, which directly impacts prices.

265.    In general, airline capacity has a direct impact on ticket prices. Casey (American) Dep. 177:15-16, May 4, 2022; Tr. Vol. 6, 42:9-12 (Parker/American) (characterizing the phenomenon as "Economics 101."). The amount of capacity an airline will fly on any particular route is determined by its network schedule. Tr. Vol. 2, 105:18–106:1 (Watterson/Southwest); Tr. Vol. 5, 100:19-21 (Laurence/American); Tr. Vol. 8, 263:15-17 (Friedman/JetBlue) (confirming that route planning is part of network planning department).

266.    The NEA enables capacity coordination and the MGIA creates upward pricing pressure which, taken together, effectively ends competition between American and JetBlue on routes touching NEA Airports. Tr. Vol. 10, 101:11-21 (Miller/Pls. Expert); *see also* discussion on upward pricing pressure *infra* Section V.E.2.f. These features of the NEA incentivize American and JetBlue to increase price and reduce output on routes they both serve. Tr. Vol. 10, 101:11-21 (Miller/Pls. Expert).

267.    The Defendants' aligned incentives and ability to coordinate capacity make it more likely, as a matter of economic principle, that they will jointly cut capacity in overlap markets, thereby raising prices. Tr. Vol. 10, 101:11-21, 101:22–103:10 at 102:4-25, 103:25–105:14 at 105:5-14, 106:1-20, 117:20–118:25 at 117:23–118:1, 119:2–120:2 at 119:24–120:2, 127:12–128:7, 146:3–149:6 at 148:18–149:6 (Miller/Pls. Expert); Tr. Vol. 17, 70:13-25, 77:9–78:16 (Miller/Pls. Expert). Defendants recognize this dynamic. As Mr. Laurence described in an e-mail, "when AA doesn't fly JFKSFO or BOSLAX, we see all of those customers at fares much higher than we've normally realized in the forecast environment[.]" PX0827 at 8.

### e. The NEA diminishes competition between Defendants for corporate customers.

268.    The NEA structure disincentivizes American and JetBlue from competing with one another for corporate customers. Defendants planned to jointly design discounts and goals for corporate customers by using a Clean Team. PX0875 at 7. The Clean Team would enable Defendants to share data from bilateral corporate deals. PX0303 at 1.

74

269.     Defendants had a two-phase go-to-market strategy for corporate customers. Mehoke (JetBlue) Dep. 278:14-22, June 2, 2022; PX0862 at 6, 8 (including strategies for both overlap and non-overlap accounts). Phase One was to offer an amendment to each airline's existing stand-alone agreements independently that would provide each airline's current corporate discounts on codeshare flights. Mehoke (JetBlue) Dep. 278:23–279:18, June 2, 2022. Phase Two, which has yet to begin, calls for American and JetBlue to offer joint agreements at the request of a customer. Mehoke (JetBlue) Dep. 279:19–280:2, June 2, 2022. As of June 2022, American and JetBlue had not received any requests from corporate customers for joint agreements. Mehoke (JetBlue) Dep. 280:1-5, June 2, 2022.

### 2.    The NEA incentivizes Defendants to allocate markets, which they have done, eliminating competition between American and JetBlue on several routes.

270.     When negotiating the NEA, Defendants explicitly contemplated allocating certain markets, thereby eliminating pre-NEA head-to-head competition between them. The Clean Team designed a joint schedule that called for one Defendant to exit certain markets in which American and JetBlue previously competed. Tr. Vol. 8, 184:12–186:3 (Pack/American) (summarizing PX0248, which lists markets where both American and JetBlue competed pre-NEA, but post-NEA, only one Defendant would offer service); *see also* Tr. Vol. 13, 160:20–162:3 (Israel/Defs. Expert); PX1145 (attaching a pivot table in an Excel document with the v2 Schedule compared to the 2019 Base Schedule). American saw an opportunity for JetBlue to fly routes previously flown by American, while American moved its fleet to other, more profitable hubs. Casey (American) Dep. 95:2-17, May 4, 2022. American considered transferring certain high-frequency business markets such as BOS-LGA, BOS-ORD, and BOS-LAX to JetBlue, as well as using JetBlue exclusively in NYC-SFO, while American would take over routes from JFK to American hubs. PX0918 at 10. JetBlue similarly contemplated: (1) exiting or reducing service from BOS to four American hubs, (2) including exiting JFK-CLT, and (3) exiting JFK-ORD. PX0699 at 16-17. The Clean Team designed a joint schedule that contemplated one of

American or JetBlue exiting certain markets in which Defendants previously competed. Tr. Vol. 14, 161:20–162:3 (Israel/Defs. Expert).

271.    In April 2021, two American employees—including Jordan Pack, Senior Manager for Commercial Planning and Analysis—discussed goals of the NEA in an e-mail. PX0318 at 1. A "Global" goal of the NEA was to create network synergies including "1 carrier in 1 market, limit new station openings if other carrier already flies in market[.]" PX0318 at 1.

272.    The Defendants are already executing on this market allocation strategy. For example, American exited BOS-LGA on January 3, 2022, transferring flying entirely to JetBlue. Mehoke (JetBlue) Dep. 326:3-18, June 2, 2022; Tr. Vol. 1, 180:11-18 (Hayes/JetBlue); Tr. Vol. 15, 96:7-14, 118:21–119:14 (Znotins/American); PX0792 at 1-2. Before the NEA, American had no plans to exit BOS-LGA. Tr. Vol. 15, 128:16–129:17 at 129:15-17 (Znotins/American). Now, American has no plans to reenter the BOS-LGA route. Tr. Vol. 15, 118:21–119:14 at 119:12-14 (Znotins/American); *see also* PX0331 at 1 (regarding American's service on this route, Mr. Raja remarked in December 2021, "I'd say plan for it to be gone for good but rule nothing out.").

273.    American also exited 12 LGA routes as a result of the NEA's coordination process with JetBlue, including previous nonstop overlaps to CHS, MCO, and Martha's Vineyard ("MVY"). Tr. Vol. 15, 121:23–122:25 at 112:5-10 (Znotins/American); PX0322 at 6; PX0880 at 10. Pursuant to its August 2021 Five-Year Plan, American planned for fewer departures and airplanes in LGA in 2026 than it had in 2019. DX0111 at 23. Mr. Znotins explained that the projected decrease in departures and airplanes from LGA owed to JetBlue "fly[ing] a number of routes in LaGuardia that had prior [sic] been operated by American." Tr. Vol. 15, 93:20-25 (Znotins/American).

274.    Similarly, JetBlue has agreed to take over JFK-SFO flying from American with American planning to exit that route. PX0779 at 2; Tr. Vol. 15, 120:9–121:4 (Znotins/American) (route not specifically referenced in testimony because of confidentiality designation).

275.    American had planned to enter two new routes, BOS-RDU and BOS-AUS, in the summer of 2020. PX0096 at 1. But after the NEA, Mr. Swartz asked his colleagues whether

American would abandon those routes because "B6 already [had] these routes covered in BOS[.]" PX0096 at 1. In response, Mr. Carter explained that "Vasu said these are likely off the table for the short term." PX0096 at 1.

276.    Other airlines recognize that Defendants are engaged in market allocation. Andrew Watterson, Executive Vice President and Chief Commercial Officer of Southwest Airlines, observed that JetBlue ceased flying the BOS-SYR and BOS-ROC routes, both of which had nonstop service from American and JetBlue as of February 2021 and "[i]t's just American now." Tr. Vol. 2, 189:1–190:6 at 190:3-6 (Watterson/Southwest); ▓▓▓▓▓▓▓. Delta views the NEA as allowing American to exit routes where it American competed against JetBlue. Esposito (Delta) Dep. 217:20-22, June 21, 2022. One market where Delta believed American and JetBlue would allocate markets is service between BOS-RDU, despite American previously announcing its intentions to enter and compete against JetBlue. Esposito (Delta) Dep. 230:5-21, June 21, 2022.

277.    In the context of the Atlantic Joint Business ("AJB"), American determined that in "most cases, any capacity increase beyond average industry growth leads to a revenue penalty." PX0033 at 5; Bhargava (American) Dep. 120:12–121:4, June 3, 2022. As a result, when its alliance partners in the AJB began expanding capacity, American explored "whether a reduction in AJB capacity [was] in the best interests of the AJB and the individual carriers" and found that, assuming a "40% recapture rate, in all scenarios all entities will be more profitable in removing suboptimal AJB capacity." PX0033 at 6-7, 17.

### 3.    The NEA has led JetBlue to be less disruptive in the London market than it could have been.

#### a.    The NEA's revenue-sharing provision reduces JetBlue's incentive to compete in the London market.

278.    American's revenue from transatlantic flying is subject to the NEA's revenue-sharing provision. Tr. Vol. 10, 198:3–199:2 (Miller/Pls. Expert). JetBlue's ability to receive revenue from American's London service will reduce JetBlue's incentive to compete on London routes due to the upward pricing pressure created by revenue sharing. Tr. Vol. 10, 198:3–199:2

(Miller/Pls. Expert). Revenue sharing creates incentives for JetBlue to set higher prices on routes that go from the U.S. to London than it otherwise would because, if JetBlue sets a low price, it may force American might respond in kind, which would reduce American's revenues and, in turn, reducing JetBlue's revenue share. Tr. Vol. 10, 198:3–199:2 (Miller/Pls. Expert); PX0461 (Miller Report) ¶¶ 283-286.

279.    As Derek Klinka, JetBlue's Director of Strategy and Business Development, summarized it, "[i]f we come into Boston/Heathrow or New York City/Heathrow and screw up fares, American pull out pricing, and we pay a transfer payment. So we are our own worst enemy." Tr. Vol. 10, 198:3–199:2 (Miller/Pls. Expert) (discussing PX0706).

> **b.    JetBlue's plan for London involved obtaining four or more slot pairs at LHR, which it lost because of the NEA.**

280.    In order to initiate service to London Heathrow, JetBlue required slots from the U.K. authorities. JetBlue projected internally that it would need a minimum of four daily, commercially-timed slot pairs at London Heathrow to financially justify opening a station there. Land (JetBlue) Dep. 209:25–210:6, 210:9-15, Apr. 28, 2022.

281.    In its submission to the U.K. CMA, JetBlue explained that it required "at least four daily slot pairs to meaningfully serve the U.S.-Heathrow market and to provide a desperately needed competitive alternative to the Oneworld and Sky Team immunized JVs." PX0858 at 3-4; *see supra* Section V.B.3. JetBlue believed that it would win the four remedy slots available at London Heathrow from the U.K. CMA review of the Atlantic Joint Business. Land (JetBlue) Dep. 288:2-5, 288:9-10, 288:12-19, 288:24–289:6, 289:9-11, Apr. 28, 2022.

282.    Ultimately, the U.K. CMA decided that the NEA meant JetBlue was not eligible for the remedy slots. Tr. Vol. 1, 247:1-14 (Hayes/JetBlue); PX0805 at 4. JetBlue understood that it lost remedy slots because ███████████████████████████████████ ███████████████████████████████████████████████. Land (JetBlue) Dep. 347:11-22, 347:24–348:7, 348:9, 366:21-24, 367:2-11, Apr. 28, 2022. The U.K. CMA explained:



PX0801 at 4.

283.     Internally within JetBlue, the VP of Network Planning, Andrea Lusso was aware that the NEA could cost JetBlue remedy slots at London/Heathrow. Lusso (JetBlue) Dep. 232:17–233:8, Mar. 18, 2021; PX0564 at 1. Nevertheless, Mr. Lusso thought it was worth giving up the opportunity for free remedy slots at London/Heathrow to partner with American. Lusso (JetBlue) Dep. 233:9-19, Mar. 18, 2021; PX0564 at 1.

> **c.      JetBlue has only been able to secure two slot pairs at London Heathrow, making it a less effective competitor than it would have been.**

284.     Having lost out on the remedy slots, JetBlue has only been able to secure two slot pairs at London/Heathrow, rather than the four it thought necessary to "meaningfully" serve the market. PX0858 at 4, 12. These two slot pairs have cost JetBlue money. Lusso (JetBlue) Dep. 273:10-16, Apr. 11, 2022. JetBlue obtained one permanent slot pair at London/Heathrow from Qatar Airways and an additional slot pair from Qatar Airways on an ad hoc basis. Lusso (JetBlue) Dep. 271:20–272:9, Apr. 11, 2022. JetBlue also obtained one slot pair at Gatwick from Qatar Airways. Lusso (JetBlue) Dep. 271:20–272:9, Apr. 11, 2022. JetBlue paid Qatar Airways $1 million per year for the slot pair at Heathrow and $100,000 per year at Gatwick. Lusso (JetBlue) Dep. 272:10-20, Apr. 11, 2022. ████████████████████████████████ ████████████████████████████████ Lusso (JetBlue) Dep. 273:10-16, Apr. 11, 2022.

**E.    The Northeast Alliance likely will continue to have anticompetitive effects, to the detriment of consumers.**

**1.    The relevant markets are highly concentrated and the NEA increases that concentration.**

**a.    Defendants have large combined market shares in the nonstop overlap markets.**

285.    The Defendants have high market shares on a number of routes. Tr. Vol. 10, 95:1–96:2 (Miller/Pls. Expert). Their combined shares are 49 percent or greater on each of the 11 nonstop overlaps with a Boston endpoint, ranging from 49 percent (BOS-ORD) to 96 percent (BOS-CLT). Tr. Vol. 10, 94:12–95:14 (Miller/Pls. Expert) (discussing demonstrative at 6). In JFK/LGA and EWR, the Defendants' combined shares exceed 30 percent on all but one of the nonstop overlaps, with shares reaching as high as 97 percent (JFK/LGA-Nantucket). Tr. Vol. 10, 94:12–95:14 (Miller/Pls. Expert) (discussing demonstrative at 7).

**b.    The NEA is presumptively anticompetitive in 29 nonstop overlap markets.**

286.    The Defendants' market shares on nonstop overlap markets—and the resulting concentration levels—demonstrate that the NEA will enhance Defendants' market power in many nonstop overlap markets. Tr. Vol. 10, 163:7–164:13 at 164:8-13 (Miller/Pls. Expert). All but one of these markets generate Herfindahl-Hirschman Index ("HHI") measures that exceed the Horizontal Merger Guidelines ("HMG") thresholds for identifying a merger that is likely to enhance market power—a post-transaction HHI greater than 2,500 and a change in the HHI greater than 200. Tr. Vol. 10, 177:21–178:22, 179:20–180:23 (Miller/Pls. Expert). Dr. Miller evaluated the nonstop overlap markets using a modified HHI ("mHHI") that accounts for the extent of change of control resulting from the NEA (which is none) and the change in the Defendants' financial interests resulting from the NEA's revenue-sharing provision. Tr. Vol. 10, 179:4-19 (Miller/Pls. Expert). Appendix A includes Dr. Miller's mHHI results.

287.    In Boston, the mHHIs calculated by Dr. Miller exceed the HMG thresholds on every nonstop overlap touching Boston. Tr. Vol. 10, 179:20–180:8 (Miller/Pls. Expert) (discussing demonstrative at 74 (citing PX1021)).

288.     In New York City and EWR, the mHHI exceeds the HMG thresholds on all
nonstop overlaps except Atlanta ("ATL"), which is a highly concentrated market, but one where
the NEA does not increase the concentration by more than 200 points. Tr. Vol. 10, 180:9-23
(Miller/Pls. Expert) (discussing demonstrative at 75 (citing PX1021)).

289.     These concentration levels are correlated with Dr. Miller's predicted harms—
more concentrated markets with bigger changes in post-NEA concentration generate larger price
effects in Dr. Miller's model. Tr. Vol. 10, 181:5-19 (Miller/Pls. Expert); *see infra* Section V.G.1.

### c.     The NEA is presumptively anticompetitive in 27 nonstop overlap markets even if Newark is in the market.

290.     Even if EWR is included in the same market as JFK and LGA, the NEA generates
mHHI values above the HMG threshold in all but three routes, meaning that 27 out of 30 NEA
nonstop overlap markets meet the structural presumption for both standard HHI and mHHI. Tr.
Vol. 10, 186:23–187:18 (Miller/Pls. Expert); PX0461 (Miller Report) ¶ 183 n.199.

### d.     Defendants have large combined market shares in the connecting and mixed overlap markets.

291.     Dr. Miller defines mixed overlap markets as markets in which: (1) at least one
endpoint is an NEA airport, (2) one of American or JetBlue offers nonstop service, and (3) the
other offers only connecting service. Tr. Vol. 10, 152:18–153:23 at 153:4-14 (Miller/Pls. Expert);
PX0461 (Miller Report) ¶ 185. Dr. Miller shows that American's and JetBlue's revenue shares in
select mixed overlap markets range from 29.9 percent to 90.3 percent. PX0461 (Miller Report) ¶
188.

292.     Dr. Miller defines connect overlap markets as markets in which both American
and JetBlue compete with connecting service, and at least one segment of one of their products is
covered by the revenue-sharing and capacity-coordination provisions of the NEA. Tr. Vol. 10,
152:18–153:23 at 153:15-23 (Miller/Pls. Expert); PX0461 (Miller Report) ¶ 189. Dr. Miller
shows that American's and JetBlue's revenue shares in select connect overlap markets range
from 40.6 percent to 99.1 percent. PX0461 (Miller Report) ¶ 192.

e.    **The NEA is presumptively anticompetitive in 91 connect overlap markets and 27 mixed overlap markets.**

293.    Dr. Miller's analysis shows that 27 out of 73 NEA mixed overlap markets meet the structural presumption for mHHI. PX0461 (Miller Report) ¶ 188. It also shows that 91 out of 806 NEA connect overlap markets meet the structural presumption for mHHI. PX0461 (Miller Report) ¶¶ 191-192.

f.    **The Defendants have high shares across all the NEA Airports and their market power at each will increase as a result of the NEA.**

294.    "Relevance" or "airport presence" are terms used to describe the size of an airline's service at a given airport. Tr. Vol. 9, 75:12-17 (Town/Pls. Expert). The academic literature shows that an increase in airport presence or relevance is associated with an increase in fares on routes served by the airline from the airport. Tr. Vol. 9, 75:18-22 (Town/Pls. Expert); PX0462 (Town Report) ¶ 135. An updated analysis by Dr. Town shows that a ten percentage-point increase in an airline's airport presence is associated with an increase in fares of about one percent across all routes that the airline serves from that airport, over and above any impact on concentration at the route level. Tr. Vol. 9, 75:23–76:9 (Town/Pls. Expert); PX0462 (Town Report) ¶¶ 136-137, Ex. 23.

295.    In Boston, JetBlue is already the market leader and as a result of the NEA the Defendants combined will have a dominant number one position with a combined 51% share of domestic traffic (using 2019 data). *See generally supra* Section V.A.1.a; PX0955 (Miller Reply Report) ¶ 244, Ex. 14. Mr. Esposito, Delta's Senior Vice President of Network Planning, testified that as a result of the NEA, the "BOS landscape transforms from competitive three-carrier market to single dominant partnership." Esposito (Delta) Dep. 207:18–208:6, June 21, 2022; PX0927 at 4. In New York City, the NEA gives American and JetBlue a combined 41% share of domestic traffic (using 2019 data). PX0955 (Miller Reply Report) ¶ 244, Ex. 14. In an airport impact assessment, the PANYNJ determined the NEA "is likely to increase market concentration" on routes in which American and JetBlue had previously competed, "which generally increases average fares." PX0885 at 2. The assessment further predicted that the NEA

will likely lead to "a total of two new monopoly routes and 16 new duopoly routes" at JFK and LGA. PX0885 at 2.

> **2.    The NEA likely will enable Defendants to reduce output and increase prices.**
>
> > **a.    The COVID-19 pandemic makes it impossible to know with certainty how Defendants would have behaved absent the NEA.**

296.    The period since the beginning of the implementation of the NEA is not representative of how Defendants will behave going forward. The Defendants began to implement the NEA in February 2021. PX0419 at 7, 40. According to Defendants' expert, Dr. Lee, 2020 and 2021 were anomalies. Dr. Lee testified that the COVID-19 pandemic "severely distorted" travel patterns in 2020 and 2021. Tr. Vol. 12, 177:21-24 (Lee/Defs. Expert). Travel was disrupted such that airlines parked some planes in the desert during this time. Tr. Vol. 10, 39:16–40:8 (Clark/JetBlue); Tr. Vol. 15, 106:9-17 (Znotins/American). Further, Dr. Israel admitted that his analysis of market shares, comparing pre-NEA to 2021 "still had some COVID effects." Tr. Vol. 14, 59:18–60:1 (Israel/Defs. Expert). Similarly, John Kirby of Spirit testified that "when we look at 2020 and, really, 2021 even, we kind of view those as lost years, that the data really isn't relevant for the future." Tr. Vol. 3, 155:15-21 (Kirby/Spirit). Mr. Kirby also testified that COVID-era data in the airline industry would not show actual competitive conditions in the long run. Tr. Vol. 3, 156:2-4 (Kirby/Spirit).

> > **b.    American viewed the NEA as a way to shed capacity.**

297.    American executives viewed the NEA as an opportunity to reduce capacity. Mr. Isom testified that he thought that the NEA would help facilitate American's goal of shedding a "tremendous amount of capacity." Tr. Vol. 5, 30:22–31:9, 36:1-16 (Isom/American); PX0069 at 1. Mr. Laurence admitted that the NEA contemplated a pull-down in capacity for American, at least in terms of departures, because "it's kind of a zero-sum game for slots." Laurence (JetBlue) Dep. 150:3-11, June 3, 2021 (admitted at Tr. Vol. 5, 119:11-16).

c.    **The NEA incentivizes Defendants to behave as if they were a merged firm.**

298.    The incentives created by the MGIA's revenue share creates pricing pressure incentives similar to those created in a horizontal merger. Tr. Vol. 10, 106:1-20, 117:20–118:25 at 117:23–118:1, 127:12–128:7 (Miller/Pls. Expert). Sharing revenue—as opposed to profits—does not prevent the creation of upward pricing pressure. PX0461 (Miller Report) ¶¶ 36-37. In fact, sharing revenue generates *greater* upward pricing pressure than sharing profit. Tr. Vol. 10, 149:17–151:25 at 150:12-18 (Miller/Pls. Expert); *see* discussion on upward pricing pressure *infra* Section V.E.2.f.

299.    The NEA creates merger-like incentives for capacity because it allows for capacity coordination for the mutual benefit of American and JetBlue. Tr. Vol. 17, 70:13-25 (Miller/Pls. Expert); Tr. Vol. 10, 119:2–120:2 at 119:24–120:2, 127:12–128:7 (Miller/Pls. Expert). Defendants share their respective key flight patterns and connectivity to optimize schedules with each other. PX0879 at 7-8; PX0880 at 5-6.

d.    **The NEA makes Defendants "metal neutral."**

300.    Flights under the MGIA become metal neutral. *See supra* Section V.D.1.c. Dr. Israel explained that the "metal neutrality" concept established by NEA revenue sharing means that "for the flight…you're generally indifferent about whose plane it is." Tr. Vol. 14, 16:23–17:24 at 17:23-24 (Israel/Defs. Expert).

301.    American believes that "within the NEA, we are metal neutral with [JetBlue] since it is a 100% revenue share." PX0363 at 47. American, when instructing revenue management employees on how to manage inventory for NEA flights, explained American and JetBlue are "metal neutral" as there is a "100% revenue share." PX1121 at 46. JetBlue agrees. During JetBlue's 2021 fourth quarter earnings call, Mr. Clark stated that, under the NEA, JetBlue and American are not worrying about whether customers choose JetBlue or American. PX0904 at 24.

302.    Defendants at times tried to walk away from the fact that they intended the NEA to make each partner metal neutral as to which airline each passenger flies by claiming that they

still prefer customers fly on their own planes so they can better earn their loyalty and sell other products like credit cards. *See* Tr. Vol. 1, 196:6-20 (Hayes/JetBlue). Defendants never explained how such secondary incentives could engender competition and counteract the well-established "metal neutrality" principle that they repeatedly ascribed to the NEA. Nor did they point to any ordinary course of business documents showing their executives attempting to win customers from their partner within the NEA. *Cf.* PX1121 at 46 (instructing American revenue management employees that American is "metal neutral with B6 since it is a 100% revenue share" and thus employees should to "Maximize revenue between the two."); PX0904 at 23-24 (JetBlue executive explaining on an earnings call regarding the revenue sharing in the NEA, "what it does is that it ensures that we're both thinking about the NEA as a whole and the partnership as a whole, and we're not worrying about is the customer choosing the JetBlue flight that day or the American flight that day.").

> ### e.   Defendants are likely to coordinate capacity choices.

303.   The NEA replaces competitive capacity choices with coordinated capacity choices, allowing Defendants to raise their combined profits to the benefits of both partners. Tr. Vol. 10, 119:2–120:2 at 119:5-10 (Miller/Pls. Expert); PX0461 (Miller Report) ¶ 28. In thinking about capacity decisions, JetBlue will consider what is the best overall solution for the NEA. Tr. Vol. 10, 119:2–120:2 at 119:14-18 (Miller/Pls. Expert) (discussing demonstrative at 24); PX0461 (Miller Report) ¶ 28. Likewise, American instructs its revenue management employees to maximize revenue and evaluate the combined market share between American and JetBlue when managing NEA flights. PX1121 at 46; *see* discussion on the interaction between capacity coordination and the MGIA *infra* Section VII.E.

> ### f.   Revenue sharing will lead to upward pricing pressure on NEA Routes.

304.   The MGIA determines how NEA payments are calculated. Tr. Vol. 10, 107:12–108:10 (Miller/Pls. Expert). These payments are comprised of two components: a base revenue

payment and a share of incremental revenue. Tr. Vol. 10, 107:12–108:10 at 108:1-7 (Miller/Pls. Expert).

305.    The base payment is equal to the pre-NEA unit revenue (the 2019 RESM), multiplied by the current capacity of the airline and a "stage-length adjuster." Tr. Vol. 10, 108:11–109:5 at 108:17-20 (Miller/Pls. Expert); Tr. Vol. 1, 187:15–189:19 (Hayes/JetBlue) (explaining RESM and RASM for purposes of transfer payment). The base payment is not fixed over time, as it changes with each Defendant's current capacity. Tr. Vol. 10, 108:11–109:5 at 108:21-25 (Miller/Pls. Expert). This means that, all else equal, one of the airlines will receive a higher base payment if it flies with more capacity—the airline that flies more routes incurs more costs, and as such, gets more revenue. Tr. Vol. 10, 108:11–109:5 (Miller/Pls. Expert); Tr. Vol. 17, 74:11–76:2 at 75:3-9 (Miller/Pls. Expert).

306.    Incremental revenue is equal to the total revenue, minus the base payments. Tr. Vol. 10, 109:18–114:14 at 109:19-20 (Miller/Pls. Expert). The incremental revenue is split between the Defendants in proportion to their current capacities. Tr. Vol. 10, 109:18–114:14 at 114:2-8 (Miller/Pls. Expert). Incremental revenue can be either positive or negative—in the event it is negative, the airline with the greater proportion of current capacity bears a larger share of the negative amount and may be required to make a transfer payment to the other carrier. Tr. Vol. 10, 109:18–114:14 at 114:2-8 (Miller/Pls. Expert).

307.    Revenue sharing aligns the pricing incentives of American and JetBlue, creating "upward pricing pressure." Tr. Vol. 10, 100:14–101:10, 101:22–103:10, 117:23–118:25 (Miller/Pls. Expert). In the context of the NEA, there is no joint control of the Defendants' pricing—they each set their own prices—but the shared financial interest that each obtains in the other's products creates upward pricing pressure. Tr. Vol. 10, 101:22–103:10, 117:23–118:25 (Miller/Pls. Expert); Tr. Vol. 17, 65:20–70:12 at 66:8-12 (Miller/Pls. Expert). Normally, if one NEA airline charges a higher price that causes some customers to substitute to the other NEA airline, then the revenue from those customers is simply lost to the NEA airline that raised price. Tr. Vol. 10, 101:22–103:10 (Miller/Pls. Expert). But with revenue sharing, some revenue from

those lost customers can be recaptured by the other NEA airline. Tr. Vol. 10, 101:22–103:10 (Miller/Pls. Expert). The ability to recapture some lost revenue gives the incentive to raise prices—all else equal—creating what is known as "upward pricing pressure." Tr. Vol. 10, 101:22–103:10 (Miller/Pls. Expert). The higher the Defendants' combined market share, the more likely the amount of revenue that can recaptured ("diversion") will be large. Tr. Vol. 10, 106:21–107:11 (Miller/Pls. Expert).

308.    The upward pricing pressure created by the MGIA is unaffected by the proportion of revenue sharing, which is determined by the Defendants' relative capacities. Tr. Vol. 17, 65:20–70:12 at 69:12–70:12 (Miller/Pls. Expert); PX0461 (Miller Report) ¶ 38.

### g.    The NEA likely will raise JetBlue's costs and reduce the JetBlue Effect.

309.    Despite JetBlue's record revenue in the first quarter of 2022, JetBlue was not profitable due to increased costs. Tr. Vol. 1, 243:1-10 (Hayes/JetBlue). To offset the increased costs caused by the NEA, JetBlue considered a number of strategies for ███████████ ███████████████████████████████████████████████ PX0771 at 3 (CASM or cost per available seat mile is a measure of an airplane's cost to operate and ability to generate revenues). ███████████████████████████████ PX0868 at 3. Mr. Hayes advocated for eliminating overhead bag space guarantees and implementing overbooking on certain flights so JetBlue could offset NEA costs. Tr. Vol. 1, 233:24–234:20 (Hayes/JetBlue); PX0818 at 3. JetBlue introduced new carry-on bag-restricted fares to reduce costs. PX0856 at 2.

310.    Dr. Miller's analysis of legacy hub structure and the 737 MAX grounding show that JetBlue pricing responds to supply and demand just like other airlines do, implying that the competition lost from the NEA will result in higher JetBlue prices. Tr. Vol. 10, 99:4-12 (Miller/Pls. Expert); *see also* Tr. Vol. 1, 243:1-16 (Hayes/JetBlue) (explaining that JetBlue's capacity in the first quarter of 2022 was lower than in 2019, but revenue was at record-high levels). *See supra* Section V.A.2.g.

h.   **The NEA likely will result in about $700 million in annual consumer harm.**

311.    Dr. Miller determined that the NEA would be likely to substantially lessen competition and harm consumers in many relevant antitrust markets. *See infra* Section V.G.1. Dr. Miller calculated the harm resulting from the NEA to be $696 million annually. Tr. Vol. 10, 92:18-93:17 at 93:12-17 (Miller/Pls. Expert). This calculation represents the additional amount of money that consumers would have to pay in a given year to purchase the same tickets that they would have absent the NEA. Tr. Vol. 10, 92:15–93:17 (Miller/Pls. Expert).

312.    The NEA markets where both American and JetBlue offer nonstop service are the most significant source of harm. Tr. Vol. 10, 92:15-23 (Miller/Pls. Expert). Consumers are likely to pay higher prices for flights because the NEA removes competition between American and JetBlue on NEA Routes by allowing them to coordinate their capacity decisions and implementing a revenue-sharing agreement that will affect pricing incentives. Tr. Vol. 10, 92:15–93:17 (Miller/Pls. Expert).

F.   **Competition from other legacy airlines or smaller competitors will not constrain the anticompetitive effects of the Northeast Alliance.**

1.   **Barriers to entry or expansion at an airport include access to gates and slots.**

313.    Entry is difficult due to slot constraints at JFK and LGA and gate access at BOS. Tr. Vol. 10, 207:17–209:8 at 207:24–208:3 (Miller/Pls. Expert); Tr. Vol. 2, 21:20–23:9 (Hayes/JetBlue) (explaining how slot restraints work).

314.    As Mitch Goodman, a Manager in American's Domestic Network group explained, there is a "limited amount of real estate at every airport," and three domestic airports—JFK, LGA, and Washington's DCA—are slot constrained. Goodman (American) Dep. 29:15-25, Dec. 22, 2020.

315.    Slots are a scarce and valuable resource at JFK and LGA. Tr. Vol. 4, 138:19–139:13 (Raja/American). Multiple airlines identify the slot constrained nature of JFK and LGA as hampering airlines from entering or expanding service. Materials prepared for JetBlue's Chief Executive Officer Robin Hayes before an interview reported that "LGA access remains limited

by slot restrictions" and the high cost to acquire slots. PX0728 at 8. ████████████
████████████████████████████████████████████████████████████████████████
████████████████; Esposito (Delta) Dep. 192:11–193:9, June 21, 2022. Southwest is
unable to expand its operations at LGA without additional slots. Tr. Vol. 2, 113:22-23
(Watterson/Southwest). While Southwest has sought to expand at LGA (it does not serve JFK),
outside of subleased slots from Alaska Airlines, it has only obtained slots "when there were
government forced divestitures." Tr. Vol. 2, 111:24–112:5, 114:16–115:10 at 115:5-10
(Watterson/Southwest). Alaska, outlining its post-pandemic strategy in May 2021, concluded it
did not have enough slots to compete effectively at JFK, thought it ████████████████
████████████ and therefore would need to improve performance using its existing slot
portfolio. PX0391 at 2, 7. Spirit and other ULLCs also believe they are locked out of the New
York City market due to slot constraints. PX0898 at 8.

316.    A further barrier at slot-constrained airports is the legacy airlines dominance and
their efforts to protect their positions. In a 2018 speech, Mr. Hayes outlined the challenges for
LCCs/ULCCs due to legacy airlines' control of resources at major airports like LGA and EWR.
PX0472 at 11:00–13:30. As of 2019, the Big Four (American, Delta, United and Southwest)
operated more than 90 percent of LGA departures. Tr. Vol. 3, 118:17-22 (Kirby/Spirit); Tr. Vol. 3,
124:11-19 (Kirby/Spirit). In contrast, ULCCs had only three percent of domestic departures at
LGA and zero percent at JFK. Tr. Vol. 3, 117:1-18 (Kirby/Spirit).

317.    Legacy airlines are able to exploit this dominance at slot constrained airports. For
example, American has around 200 slots at JFK and around 170 at LGA. Tr. Vol. 4, 138:19–
139:4 (Raja/American). But for years—dating back to the time of the American-US Airways
merger in 2014—American failed to fully utilize its portfolio of slots at JFK. Tr. Vol. 4 at 142:7–
143:7 (Raja/American); PX0298 at 1-2. In fact, the NEA came at a convenient time for American
because in late 2019, the FAA was set to end the practice of allowing airlines to informally give
back some of their JFK slots on a temporary basis, while retaining historical rights. Tr. Vol. 5,

123:1-6 and 19-25 (Laurence/American). Airlines would have to do more flying or risk losing their slots. Tr. Vol. 5, 124:8-15 (Laurence/American).

318.     While BOS is not slot-constrained, it does have "very limited available capacity for growth." Tr. Vol. 4, 63:12 (Kirby/Spirit). Southwest has a modest offering in Boston, limited to five gates, representing approximately seven percent of domestic traffic. Tr. Vol. 2, 116:6-11 (Watterson/Southwest); PX0955 (Miller Reply Report) ¶ 244, Ex. 15. Andrew Watterson, Executive Vice President and Chief Commercial Officer of Southwest, testified that he understands that all gates at Boston are currently allocated. Without additional gates, Southwest cannot expand in Boston. Tr. Vol. 2, 119:3-11 (Watterson/Southwest). Other non-legacies have smaller market shares in Boston, with Spirit and Alaska representing four percent and three percent, respectively. PX0955 (Miller Reply Report) ¶ 244, Ex. 15.

> ### 2.     Entry or expansion by smaller airlines likely would not constrain Defendants' exercise of market power.

319.     The slot and gate constrained components of JFK, LGA and BOS make it unlikely that smaller airlines can constrain Defendants. In an airport impact assessment, the PANYNJ determined that the NEA leaves other airlines with "scant options to mount meaningful challenges to their dominance at New York's capacity constrained airports." PX0885 at 4. The assessment further predicted that the NEA will likely lead to "a total of two new monopoly routes and 16 new duopoly routes" at JFK and LGA. PX0885 at 2.

320.     The loss of competition from JetBlue is particularly acute. Besides the legacy airlines, JetBlue is the only other significant airline with a strong market position at airports with high barriers to entry and expansion. PX0683 at 13, 29. JetBlue has a unique combination of low costs and high quality that allows it to provide a point-to-point service and compete with the legacy airlines and smaller airlines. Tr. Vol. 10, 207:17–209:8 at 209:1-6 (Miller/Pls. Expert). There is no obvious replacement for the value proposition that JetBlue provides. Tr. Vol. 10, 207:17–209:8 at 209:1-6 (Miller/Pls. Expert).

321.    For example, on BOS-DCA—the route predicted to be harmed the most by the NEA—no other airline (including Southwest) entered when US Airways was a monopolist, and it took Delta nine years to enter after JetBlue did; it seems implausible that a competitor is positioned to enter in response to a price increase by American and JetBlue. PX0955 (Miller Reply Report) ¶ 154.

322.    Further, JetBlue's proposed acquisition of Spirit, the largest ULCC in the United States, could remove a potential competitive constraint on the NEA. Spirit is the seventh largest domestic airline (behind JetBlue) with about 40 percent of current capacity among ULCCs. Tr. Vol. 3, 107:9-18 (Kirby/Spirit). Spirit's Board of Directors originally recommended against a merger with JetBlue because the Board found an unacceptable level of closing risk with a low probability of receiving antitrust clearance so long as the NEA remained in place. Tr. Vol. 1, 258:2-6 (Hayes/JetBlue). Spirit believes a combination of JetBlue and Spirit would make the NEA even more anticompetitive than it is already. Tr. Vol. 3, 159:1-10 (Kirby/Spirit).

### 3.    Competitive responses by legacy airlines likely would not constrain Defendants' exercise of market power.

323.    Industry participants recognize that legacy airlines tend not to compete aggressively against each other on price. Mr. Hayes testified that legacies do not compete with each other, preferring to keep ticket prices high. Tr. Vol. 1, 126:20-23, 144:9-15 (Hayes/JetBlue). Even Defendants' expert Dr. Israel acknowledged that the presence of American competing with Delta and United was insufficient to lower fares for major routes like New York City to Los Angeles if the JetBlue Effect goes away. Tr. Vol. 14, 192:17–193:17 (Israel/Defs. Expert). Spirit's Vice President of Network Planning, John Kirby, observed that in markets served by only legacy airlines, fares tend to be higher than markets with more diverse competition. Tr. Vol. 3, 131:8-12 (Kirby/Spirit). Mr. Kirby also testified that legacy airlines do not compete on price. Tr. Vol. 3, 131:16-23 (Kirby/Spirit). Consistent with that fact, American earns its highest margins in markets where it does not face LCC or ULCC competition. Tr. Vol. 4, 105:25–107:5 (Raja/American); DX0089B at 19. Mr. Hayes testified that where LCCs do not compete,

consumers pay higher fares per mile and have fewer choices. Tr. Vol. 1, 140:22–141:20 at 141:4-6 (Hayes/JetBlue). JetBlue's Vice President of Government Affairs, Robert Land, testified that that legacy airlines keep high or extremely high fares unless they are disciplined by JetBlue or another LCC. Land (JetBlue) Dep. 113:22-25, 114:3-8, Apr. 28, 2022 (objection pending).

324.    In addition, expansion by airlines that have slots or gates at NEA Airports can be difficult and costly. Tr. Vol. 10, 207:17–209:8 at 208:4-18 (Miller/Pls. Expert). There is an opportunity cost associated with moving aircraft from one market to another: doing so foregoes the profit that was being earned on the current route when it is moved to the new route. Tr. Vol. 10, 207:17–209:8 at 208:4-18 (Miller/Pls. Expert); Tr. Vol. 17, 91:23–94:16 at 92:20–93:9 (Miller/Pls. Expert).

325.    Legacy airlines already present on NEA overlaps do not have the incentive to expand or become "rapid entrants." Tr. Vol. 17, 91:23–94:16 at 93:20–94:16 (Miller/Pls. Expert). Delta is not likely to be an entrant, as it is already present on 23 of the 29 NEA nonstop overlaps. Tr. Vol. 17, 91:23–94:16 at 93:20–94:2 (Miller/Pls. Expert). With respect to expansion, these airlines profit from the increased prices that will result from the NEA because when Defendants' prices increase, the other airlines can increase their prices too—they would not want to add more capacity that could jeopardize that. Tr. Vol. 17, 91:23–94:16 at 94:3-10 (Miller/Pls. Expert).

326.    ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████      Mr. Nocella acknowledged that United has difficulty in winning over customers invested in a loyalty program with American in New York City. Nocella (United) Dep. 36:25–37:15, Apr. 29, 2022. ████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

United acknowledges it would take years to address its any structural gap issues identified in its network plan. DX0560 at 23. Nocella (United) Dep. 67:5-24, 68:4-11, Apr. 29, 2022.

327.    Doreen Burse, the Senior Vice President of Worldwide Sales at United Airlines, stated that she did not remember any specific actions that were taken by United Airlines to respond to the NEA. Burse (United) Dep. 139:2-11, June 8, 2022. When Ms. Burse learned about the NEA, she "didn't really have a strong reaction, not one enough to remember." Burse (United) Dep. 149:19–150:12, June 8, 2022. Ms. Burse could not recall doing anything as part of her sales function to respond to the NEA, and did not know of any competitive response, current or future, by the United Airlines global sales department in response to the NEA. Burse (United) Dep. 152:13-20, 153:10-17, June 8, 2022. Further, United's Director of Network Planning, Mr. Weithofer, noted that United has not changed it pre-pandemic growth plans, in response to the NEA. Weithofer (United) Dep. 63:7-9, 63:11-17, June 9, 2022. Mr. Weithofer also noted that United's network strategy has not changed since the NEA was announced—United has the same strategy that it had coming into COVID-19 for the New York area and Boston. Weithrofer (United) Dep. 99:15-23, June 9, 2022.

328.    Delta has not lost any corporate customer accounts completely, nor significant share of any corporate customer's business, as a result of the NEA. Somers (Delta) Dep. 148:5-11, July 25, 2022.

329.    Though Delta currently serves the BOS-DCA route, there have been times in the past that only American and JetBlue served BOS-DCA, and American and JetBlue jointly offer more frequencies than Delta at present. Tr. Vol. 2, 119:24–120:20 (Watterson/Southwest). Further, Southwest cannot enter that route because it does not have the available slots at DCA, and has unsuccessfully sought more slots. Tr. Vol. 2, 120:21–121:3 (Watterson/Southwest).

**G.    Economic evidence demonstrates that the Northeast Alliance will likely result in harm in overlap markets.**

**1.    Dr. Miller's simulation demonstrates that the Northeast Alliance will likely result in harm in overlap markets.**

330.    Dr. Miller created a Bertrand model, which models the price setting behavior of firms. Tr. Vol. 10, 142:6–143:19 at 142:10-22 (Miller/Pls. Exhibit). The Bertrand model assumes that firms set prices to maximize profit. Tr. Vol. 10, 142:6–143:19 at 142:23-24 (Miller/Pls.

Expert). Dr. Miller's model uses real world customer purchase data and isolates the effects of the NEA as if the NEA were in effect in 2019. Tr. Vol. 10, 146:3–149:6 at 146:17–147:6 (Miller/Pls. Expert). Using this model, Dr. Miller calculated $696 million in annual harm would result from the NEA. Tr. Vol. 10, 154:14–156:4 at 156:2-4 (Miller/Pls. Expert). This calculation represents "overcharge"—the additional amount of money that consumers would have to pay in a given year to purchase the same tickets that they would have absent the NEA. Tr. Vol. 10, 92:3–93:17 (Miller/Pls. Expert). The overcharge is generated by price increases by the Defendants as well as third-party competitors—which economic theory tells us would also increase prices (although by a smaller amount than the Defendants)—due to the loss of competition and increased demand. Tr. Vol. 10, 156:5–157:14 at 156:21–157:9 (Miller/Pls. Expert) (discussing demonstrative at 59).

331.   Dr. Miller found harm in three types of markets: (1) NEA nonstop overlaps, (2) NEA "mixed" overlaps, and (3) connect overlaps. Tr. Vol. 10, 152:18–153:23 (Miller/Pls. Expert).

332.   Nonstop overlaps involve NEA endpoints which both American and JetBlue serve nonstop, such as BOS-DCA. Tr. Vol. 10, 152:16–153:23 at 152:22-25 (Miller/Pls. Expert). On these routes, Dr. Miller estimated $640 million in annual overcharges, with Defendants increasing prices by 16.2 percent and all airlines' prices increasing by nine percent on average. Tr. Vol. 10, 154:14–156:4 at 154:21–155:4 (Miller/Pls. Expert). The predicted harm is inclusive of the carve-out routes—removing them lowers the predicted harm to $437 million. Tr. Vol. 10, 154:14–156:4 at 155:5-9 (Miller/Pls. Expert).

333.   The harm estimates from Dr. Miller's simulation for each nonstop overlap market are reflected in Appendix B. For example, Dr. Miller estimates a price increase of approximately 55% in BOS-DCA, resulting in $108 million in annual harm. PX0461 (Miller Report/Pls. Expert) ¶ 256, Exhibit 25; Tr. Vol. 10, 156:5–157:14 (Miller/Pls. Expert). Other than American and JetBlue, the only other nonstop service on BOS-DCA is from Delta. Tr. Vol. 14, 168:18-22 (Israel/Defs. Expert). The schedule created by the Clean Team assumed significant frequency and seat capacity reductions on BOS-DCA by American and JetBlue under the NEA. Tr. Vol. 14,

163:15–164:18 (Israel/Defs. Expert). By way of another example, Dr. Miller estimates a price increase of approximately 12 percent and annual harm of approximately $22 million in BOS-LGA/JFK. PX0461 (Miller Report/Pls. Expert) ¶ 256, Exhibit 25. Again, Delta is the only other nonstop carrier in BOS-LGA/JFK. Tr. Vol. 3, 48:4-23 (Jarashow/JetBlue); PX0608, Domestic at Rows 44-45. The optimized Clean Team schedule assumed that American would exit BOS-LGA as a result of the NEA. Tr. Vol. 14, 160:13–161:4 (Israel/Defs. Expert). American no longer flies BOS-LGA—along with 11 other LGA routes—because of the NEA. Tr. Vol. 15, 121:23–122:25 (Znotins/American) (discussing PX0322 at 6). It appears that the Clean Team calculated the nonstop overlaps as providing the greatest value of the NEA, a point with which then JetBlue executive Mr. Laurence agreed. Tr. Vol. 5, 115:5-7 (Laurence/American); *see also* PX0752 at 7 (value drivers for the NEA were "likely highest" for the 40 nonstop overlaps, compared to "likely limited" for the 179 standalone routes).

334.    In addition to BOS-LGA, American has already exited JFK/LGA to CHS, MCO, and MVY due to the NEA; and, American intends to exit JFK/LGA-SFO. Tr. Vol. 15, 121:23–122:25 (Znotins/American) (noting exits to CHS, MCO, and MVY); Tr. Vol. 15, 120:20-121:4 (Znotins/American) (noting American's current plan to exit JFK-SFO). These four markets collectively reflect roughly $32.8 million in annual harm. PX0461 (Miller Report) ¶ 256, Ex. 25.

335.    "Mixed" overlaps involve an NEA endpoint which American or JetBlue serves nonstop, while the other provides connecting service. Tr. Vol. 10, 152:16–153:23 at 153:4-14 (Miller/Pls. Expert). For example, JetBlue serves BOS-SAV nonstop while American provides connect service through CLT, PHL, DCA, LGA, and MIA. In these overlaps, the nonstop traffic is fully in the scope, while the NEA airport connecting traffic is partly in scope of the NEA. Tr. Vol. 10, 152:16–153:23 at 153:4-14 (Miller/Pls. Expert). On these routes, Dr. Miller estimated $38 million in annual overcharges, with Defendants increasing prices by 1.3 percent. Tr. Vol. 10, 154:14–156:4 at 155:10-17 (Miller/Pls. Expert).

336.    For connect overlaps, neither American nor JetBlue offer a nonstop flight that is within the scope of the NEA. Tr. Vol. 10, 152:16–153:23 at 153:15-23 (Miller/Pls. Expert). An

example might be Philadelphia to Nantucket, which American serves connecting through LGA, while JetBlue serves that route connecting through Boston. Tr. Vol. 10, 152:16–153:23 at 153:15–23 (Miller/Pls. Expert). In this this instance, the connect legs are in scope. Tr. Vol. 10, 152:16–153:23 at 153:15-23 (Miller/Pls. Expert). On these routes, Dr. Miller estimated $9 million in annual overcharges, with Defendants increasing prices by 0.1 percent. Tr. Vol. 10, 154:14–156:4 at 155:18-22 (Miller/Pls. Expert).

337.    In addition to these overlaps, Dr. Miller estimated $8 million in other markets where Defendants don't actually overlap but the NEA distorts pricing incentives. Tr. Vol. 10, 154:14–156:4 at 155:23–156:1 (Miller/Pls. Expert).

338.    Of the $696 million in harm predicted by Dr. Miller, $428 million is generated by routes that touch BOS. Tr. Vol. 10, 156:5–157:14 at 156:7-10 (Miller/Pls. Expert) (discussing demonstrative at 59). The largest contributor to that harm is BOS-DCA, generating $108 million in overcharges. Tr. Vol. 10, 156:5–157:14 at 156:7-10 (Miller/Pls. Expert) (discussing demonstrative at 59).

339.    Two-hundred thirty-four million dollars of the harm predicted by Dr. Miller is attributable to routes that touch EWR, JFK, and LGA—$226 million at JFK/LGA and $8 million at EWR. Tr. Vol. 10, 159:16–160:12 at 159:18-20 (Miller/Pls. Expert) (discussing demonstrative at 60). The largest contribution to this harm is JFK/LGA-Miami, accounting for $64 million in overcharges. Tr. Vol. 10, 159:16–160:12 at 159:18-20 (Miller/Pls. Expert) (discussing demonstrative at 60).

340.    The treatment of EWR as part of the New York City market with JFK/LGA or as a separate market is not that important from an economic standpoint. Tr. Vol. 17, 40:6–41:5 (Miller/Pls. Expert). When EWR is combined with JFK/LGA into a single endpoint, Dr. Miller's model predicts only a slight change in harm—total harm decreases by approximately $69 million, from $696 million to $627 million. Tr. Vol. 10, 186:23–187:18 at 187:5-14 (Miller/Pls. Expert); Tr. Vol. 17, 40:6–41:5 (Miller/Pls. Expert).

341.     The price increases predicted by Dr. Miller's model may manifest in different ways. In addition to a literal price increase, it may become profitable for Defendants to change aspects of service or, more likely, that one of JetBlue or American will discontinue service on a route. Tr. Vol. 10, 158:23–159:15, 166:23–168:14 at 168:8-14 (Miller/Pls. Expert).

> **2.     Dr. Miller's simulation results are further supported by econometric analysis of the JetBlue Effect, his hub structure regression, and his 737 MAX grounding natural experiment.**

342.     Dr. Miller's results are consistent with analysis of: (1) the "JetBlue Effect," as quantified by JetBlue in the ordinary course and their economists, (2) the impact of the presence of legacy airlines on prices, and (3) JetBlue's prices after American's grounding of the 737 MAX.

343.     Dr. Miller's simulation results are consistent with the magnitude of the "JetBlue Effect" calculated by JetBlue and its economists, both at the route-level and on average across all NEA nonstop overlap routes. Tr. Vol. 10, 163:7–164:13 at 163:17-20 (Miller/Pls. Expert). Dr. Miller's predicted price increases are within the range of and do not exceed the JetBlue effect— the model's results range from 90.1 percent to 0.9 percent, while the JetBlue Effect ranges from 114 percent to 14 percent. Tr. Vol. 17, 97:10–98:8 (Miller/Pls. Expert) (discussing demonstrative at 39). For example, the model predicts that the loss of JetBlue as an independent competitor would increase the prices of all airlines on BOS-DCA by 55 percent, which is comparable to the 40 percent JetBlue found on BOS-DCA. Tr. Vol. 10, 164:14–166:22 at 165:6-14 (Miller/Pls. Expert) (discussing demonstrative at 65 (citing PX0644)). The average price increases predicted by the model—16 percent for Defendants and nine percent for all airlines—are also similar to the 20 to 21 percent average JetBlue Effect obtained by the Defendants' economists. Tr. Vol. 10, 164:14–166:22 at 166:3-16 (Miller/Pls. Expert) (discussing demonstrative at 66 (citing PX0644)); Tr. Vol. 17, 98:9–99:3 (Miller/Pls. Expert) (discussing demonstrative at 40).

344.     Dr. Miller performed a hub structure regression showing that when more legacy airlines are present, prices are lower. Tr. Vol. 10, 98:11–99:3 (Miller/Pls. Expert). This analysis looked at routes across the U.S. and found that exposing them to more competition from legacy

airlines led to lower prices. Tr. Vol. 10, 169:6–170:13 at 169:8-11 (Miller/Pls. Expert). By comparing routes that have more legacy competitors to those that have fewer competitors, Dr. Miller found that removing a legacy airline increases average prices by 15 percent. Tr. Vol. 10, 169:6–170:13 at 170:5-13 (Miller/Pls. Expert). This is comparable to the price increases—16 percent for Defendants and nine percent for all airlines—predicted by Dr. Miller's model. Tr. Vol. 10, 169:6–170:13 at 170:5-13 (Miller/Pls. Expert); Tr. Vol. 17, 98:9–99:3 (Miller/Pls. Expert) (discussing demonstrative at 40).

345.     Dr. Miller performed econometric analysis showing that when competition was reduced due to American's grounding of the 737 MAX—resulting in withdrawn capacity from New York City markets—JetBlue's prices increased. Tr. Vol. 10, 98:11–99:12 (Miller/Pls. Expert); Tr. Vol. 10, 163:7–164:13 at 163:21-25 (Pls. Expert); Tr. Vol. 10, 170:25–172:23 at 171:14-18 (Miller/Pls. Expert); PX0461 (Miller Report) ¶¶ 217-222. Dr. Miller compared pre-grounding and post-grounding prices on eight nonstop routes out of New York City, which had seen a ten percent capacity reduction due to the grounding. Tr. Vol. 10, 170:25–172:23 at 171:6-12 (Miller/Pls. Expert). He found that JetBlue increased its prices, on average, by 7.8 percent on these routes. Tr. Vol. 10, 170:25–172:23 at 171:14-18 (Miller/Pls. Expert). These results are supported by testimony from JetBlue's Pricing Manager, Evan Jarashow, who explained that the higher prices were "an adjustment, really, to a demand scenario that resulted from the 737 MAX groundings." Tr. Vol. 10, 170:25–172:23 at 171:25–172:15 (Miller/Pls. Expert). The 7.8 percent price increased obtained from this analysis is comparable to Dr. Miller's simulation results in New York City, which found an 8.5 percent price increase for Defendants' products and 4.6 percent for all products. Tr. Vol. 10, 170:25–172:23 at 172:16-20 (Miller/Pls. Expert).

346.     Dr. Miller's simulation results are consistent with academic literature analyzing price effects of prior airline mergers which has found that prior airline mergers have resulted in price effects between ~30 percent and ~13 percent. Tr. Vol. 17, 99:4–99:16 (Miller/Pls. Expert) (discussing demonstrative at 41). Dr. Miller's predicted average price increase for all products is

consistent with, and in the middle of the range of, the findings of this literature. Tr. Vol. 17, 99:4–16 (Miller/Pls. Expert) (discussing demonstrative at 41).

### 3.    Dr. Miller's conclusion is further supported by results from his Cournot simulation and the Stackelberg supply model.

347.    Dr. Miller also simulated the effects of the NEA using a Cournot supply model. Tr. Vol. 10, 161:21–162:18 (Miller/Pls. Expert). Under a Cournot model, airlines set quantities, rather than prices, to maximize profit. Tr. Vol. 10, 160:13–161:20 at 160:19-24 (Miller/Pls. Expert). Using the Cournot model, Dr. Miller predicts $989 million of annual overcharges on the NEA nonstop overlaps. Tr. Vol. 10, 161:21–162:18 at 162:8-15 (Miller/Pls. Expert).

348.    Dr. Israel suggested that the airline industry might be best modeled using the Stackelberg model. PX0955 (Miller Reply Report) ¶ 201. Dr. Israel's analysis shows that a commitment to output expansion under the Stackelberg model would not be profitable, and, instead, would reduce profits on most NEA nonstop overlap markets. PX0955 (Miller Reply Report) ¶ 201. These results are consistent with Dr. Miller's conclusion that Defendants' incentives in many markets, including NEA nonstop overlap markets, is to decrease capacity and raise price. PX0955 (Miller Reply Report) ¶ 201.

### 4.    Dr. Carlton's results do not show that harm has not occurred in nonstop overlaps.

349.    A comparison of prices from before and after implementation of the NEA is not informative of the NEA's competitive effects. Tr. Vol. 10, 129:5–130:6 at 130:9-11 (Miller/Pls. Expert). Dr. Carlton admitted that his difference-in-differences analysis could not rule out fare increases on nonstop overlap routes in New York. Tr. Vol. 16, 76:19-24 (Carlton/Defs. Exert). Although some of his results for Boston showed fare decreases, Dr. Carlton did not account for the effects of the pandemic on business-heavy routes in Boston because he "didn't see an easy way of doing that." Tr. Vol. 16, 64:11-14 (Carlton/Defs. Expert).

350.    The post-NEA data makes it difficult to perform such a comparison. Tr. Vol. 10, 129:5–130:6 (Miller/Pls. Expert). First, the NEA was implemented during the major disruptions to the airline industry created by COVID-19. Tr. Vol. 10, 129:5–130:6 at 130:11-17 (Miller/Pls.

Expert). Even Defendants acknowledge that COVID-19 continued to impact revenues in 2021. DX0437 at 1. Second, the NEA was implemented while the U.S. DOJ investigation and subsequently this litigation were ongoing—Defendants have an incentive to avoid changes in price and non-price aspects of competition that could be used as evidence of anticompetitive effects in the investigation and litigation. Tr. Vol. 10, 129:5–130:6 at 130:18-22 (Miller/Pls. Expert); PX0955 (Miller Reply Report) ¶¶ 15, 123. Third, the NEA has only partially been in place for much of the period for which data is available and the rollout of the NEA has been gradual over time. Tr. Vol. 10, 129:5–130:6 at 129:23–130:1 (Miller/Pls. Expert); DX1091 (Israel Report) ¶¶ 201-207.

351.   These data issues make it difficult to identify proper control groups that can be used as a point of comparison for Dr. Carlton's difference-in-differences study. Tr. Vol. 17, 81:11–85:23 at 82:3-8 (Miller/Pls. Expert). Specifically, Dr. Carlton's control group and the treated group respond differently to COVID-19, meaning that a comparison across different markets is likely to be confounded with the effects of COVID-19. Tr. Vol. 17, 81:11–85:23 at 83:8-12 (Miller/Pls. Expert); PX0955 (Miller Reply Report) ¶ 18. This is likely because most of the treated routes are business routes, while a smaller portion of the control routes are business routes—and business routes suffered larger declines during COVID-19 than leisure routes. Tr. Vol. 17, 81:11–85:23 at 82:13–83:9 (Miller/Pls. Expert) (discussing demonstrative at 31).

## VI.   PLAINTIFFS HAVE MET THEIR BURDEN TO PROVE THE ANTICOMPETITIVE EFFECTS OF THE NORTHEAST ALLIANCE IN MARKETS BEYOND THE OVERLAP MARKETS.

### A.   The airline industry is susceptible to coordination.

#### 1.   Airline capacity decisions are transparent.

352.   Coordinated interaction among airlines can harm consumers even without an express agreement or direct communication among the airlines because it can reduce the intensity of competition. Tr. Vol. 9, 78:24–79:10 (Town/Pls. Expert). This kind of coordination involves conduct by multiple firms that is profitable for each of them only as a result of the accommodating reactions of the others. Tr. Vol. 9, 78:7-23 (Town/Pls. Expert).

353.    Airlines can easily monitor their rivals' capacity decisions. Tr. Vol. 9, 81:7-16 (Town/Pls. Expert). Airlines publicize their schedules well in advance of flights taking place. PX0066. JetBlue's Pricing Manager, Evan Jarashow, for example, testified that JetBlue will "certainly be aware" of other airlines' schedule changes, including changes in capacity. Tr. Vol. 3, 99:7-25 (Jarashow/JetBlue).

354.    Defendants' economic expert, Dr. Lee, testified that airlines have discussed capacity "openly" and that it is "unremarkable," for example, for competitor airlines to discuss capacity in the same room as each other at industry conferences. Tr. Vol. 12, 141:7-17 (Lee/Defs. Expert).

### 2.    Airline prices are transparent.

355.    Airlines can easily monitor their rivals' pricing. Tr. Vol. 9, 81:7-16 (Town/Pls. Expert); Tr. Vol. 10, 206:21–207:16 (Miller/Pls. Expert).

356.    Airlines file their fares through the Airline Tariff Publishing Company ("ATPCO"), an industry standard clearinghouse for airfares. Tr. Vol. 3, 37:23–38:6 (Jarashow/JetBlue). For domestic markets, airlines file fares on ATPCO four times each weekday. Tr. Vol. 3, 38:7-11 (Jarashow/JetBlue).

357.    Fares filed in ATPCO can be observed by anyone with an ATPCO subscription. Tr. Vol. 3, 38:12-14 (Jarashow/JetBlue). All domestic airlines have an ATPCO subscription. Tr. Vol. 3, 38:15-25 (Jarashow/JetBlue).

358.    Other tools also enable airlines to monitor their competitors' fares. JetBlue uses AirPrice to evaluate changes other airlines make to their publicly filed fares in ATPCO. Tr. Vol. 3, 39:1-9 (Jarashow/JetBlue). JetBlue also uses a web-scraping tool to monitor the fares that competitors are selling on their websites and on third party sites. Tr. Vol. 3, 39:10-22 (Jarashow/JetBlue).

359.    JetBlue considers what other airlines are charging, including their filed fares and what fares they are selling, as factors in setting its own prices. Tr. Vol. 3, 89:13–90:12 at 90:2-3

(Jarashow/JetBlue); *see infra* Section VI.A.2. American also monitors the prices that its competitors publish on ATPCO. Casey (American) Dep. 61:4–62:23, May 4, 2022.

### 3.    Multi-market contacts facilitate coordination.

360.    The airline industry has a high degree of "multi-market contacts" that facilitate coordination. Multi-market contacts refer to the fact that airlines compete with one another across many different city-pair markets, which increases the rewards from coordinating with one another and increases the costs of deviating from coordination. Tr. Vol. 9, 81:17-25 (Town/Pls. Expert).

361.    One method used by airlines to punish a rival for competing too intensely is a cross-market initiative. A cross-market initiative occurs when one airline responds to a rival's low fare in one market by filing a low fare in a different market. Tr. Vol. 3, 55:22–56:9 (Jarashow/JetBlue); Tr. Vol. 14, 152:8-18 (Israel/Defs. Expert); Casey (American) Dep. 232:1-22, May 4, 2022. Airlines often use cross-market initiatives to punish rivals for cutting prices on certain routes, thereby helping to keep prices high. PX0521 at 1-2.

362.    Executives from American, JetBlue, and other airlines admit that all airlines implement cross-market initiatives. Evan Jarashow, Pricing Manager at JetBlue, testified that airlines engage in cross-market initiatives. Tr. Vol. 3, 55:22–56:9 (Jarashow/JetBlue). Allysen Roberts, Senior Manager in Contract Pricing at American Airlines, testified that American and other airlines engage in cross-market initiatives. Roberts (American) Dep. 63:13–64:2, 68:5-11, May 10, 2021; PX0259 at 38. Don Casey, the former Senior Vice President of Revenue at American, explained that competitor pricing actions sometimes cause cross-market initiatives. Casey (American) Dep. 231:23–232:5, May 4, 2022. ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

363.    Defendants' economic expert, Dr. Israel, also testified that airlines engage in cross-market initiatives. Tr. Vol. 14, 152:19-22 (Israel/Defs. Expert).

364.    One example of a cross-market initiative occurred in February 2019. A JetBlue pricing summary reported that for the week ending February 22, 2019, walk-up fares in BOS-LAX "remained low at $139" because American had maintained a low price rather than follow its rivals' fare increases. PX0612 at 10; Tr. Vol. 3, 57:8–58:25 (Jarashow/JetBlue). JetBlue responded to this low $139 fare from American, which targeted JetBlue's focus city of Boston, by filing a $139 tactical fare in five routes to and from American's hubs. PX0612 at 10; Tr. Vol. 3, 59:1–60:9 (Jarashow/JetBlue). JetBlue intentionally chose a fare of $139 for BOS-DCA, BOS-DFW, FLL-PHL, JAX-DCA, and ORD-FLL, identical to American's fare for BOS-LAX. PX0612 at 10; Tr. Vol. 3, 61:4-13 (Jarashow/JetBlue).

365.    Airlines also "flash" each other in an effort to highlight fare changes to other airlines in ATPCO. Tr. Vol. 3, 75:9–78:13 (Jarashow/JetBlue). For example, on February 10, 2020, Jeremy Blechman, an inventory manager at JetBlue, reported that American was selling a $44 fare between Boston and Philadelphia outside of JetBlue's timeband, meaning at times of the day when JetBlue wasn't selling the $44 fare. PX0616 at 1; Tr. Vol. 3, 78:24–80:7 (Jarashow/JetBlue). In response, Catterina Yanez, a JetBlue pricing analyst wrote that for the 4 p.m. ATPCO submission she was planning to "try to flash American, and if it doesn't work, then we'll discuss further actions." PX0616 at 1; Tr. Vol. 3, 80:10–81:14 (Jarashow/JetBlue). One reason JetBlue would "flash" American could be to try to encourage American to change its fare. Tr. Vol. 3, 81:12-23 (Jarashow/JetBlue). This "flashing" action was something Ms. Yanez said she would do after having discussed it with JetBlue's pricing manager Evan Jarashow. PX0616 at 1; Tr. Vol. 3, 82:9-16 (Jarashow/JetBlue).

### 4.    Other attributes of the airline industry make it susceptible to coordination.

366.    Other characteristics of the airline industry make it susceptible to coordination as well. The airline industry features a large number of small, frequent transactions, each of which reduces the benefits of deviating from a coordinated understanding relative to the potential gains. Tr. Vol. 9, 82:1-9 (Town/Pls. Expert); Tr. Vol. 10, 207:6-8 (Miller/Pls. Expert).

367.    There are also a small number of firms, meaning that there are fewer firms to monitor and track, and the gains from coordination are greater because they are divided among fewer participants. Tr. Vol. 9, 82:19–84:2 (Town/Pls. Expert).

368.    Defendants' economic expert, Dr. Israel, testified that the airline industry is an oligopoly. Tr. Vol. 14, 95:3-10 (Israel/Defs. Expert). Consistent with an oligopoly, airlines engage in strategic interactions where firms coordinate with one another and consider reactions to one another in making their strategies. Tr. Vol. 14, 95:11-25; 96:18–97:2 (Israel/Defs. Expert).

**B.**     **The Northeast Alliance fosters a spirit of partnership that will encourage American and JetBlue to coordinate to reduce competition outside of the overlap markets.**

369.    The scope of harm created by the NEA is likely to extend beyond the NEA Airports due to Defendants coordinating their competitive decisions in the "spirit of partnership." Tr. Vol. 10, 200:7-18 (Miller/Pls. Expert). JetBlue recognized that it was at risk of being negatively influenced by American as a result of the NEA. PX0828 at 7 (identifying a risk of the NEA as being that "JetBlue may lose some level of independence and may be co-opted by Connie manipulation"). American's ability to influence JetBlue is exacerbated by the fact that approximately 75 percent of JetBlue's flights in 2019 originated on routes touched by an NEA airport. PX0461 (Miller Report) ¶ 22, Ex.1. JetBlue understood the risk that American would be able to use NEA to the "manipulate" JetBlue. Tr. Vol. 1, 206:5-22 (Hayes/JetBlue). Further, the revenue sharing provision of the NEA means that it makes more sense for JetBlue to cooperate with American, rather than compete. Laurence (JetBlue) Dep. 146:18-25, June 3, 2021 (employed by JetBlue at time of deposition) (admitted at Tr. Vol. 5, 140:1-3).

370.    The NEA is also causing JetBlue's cost structure to look more like American's, further aligning their competitive interests. JetBlue's costs have risen since it entered the NEA. Tr. Vol. 10, 84:23–86:2 at 85:20-23 (Clark/JetBlue). Spirit's Vice President of Network Planning, John Kirby, testified that the NEA hastens JetBlue's movement toward being a higher cost carrier. Tr. Vol. 4, 48:25–49:2 (Kirby/Spirit).

371.    Defendants are already acting in a manner consistent with the spirit of partnership. Tr. Vol. 10, 204:22–205:9 (Miller/Pls. Expert). For example, American agreed to reduce a $200 million transfer payment it was owed by JetBlue down to $27 million. Tr. Vol. 10, 204:22–205:9 (Miller/Pls. Expert); Tr. Vol. 8, 122:4-18, 124:17–125:5 (Fintzen/JetBlue); Bhargava (American) Dep. 212:11–213:20, June 3, 2022; PX0800 at 4. Instead of using the process set out to resolve disagreements under the NEA, Mr. Laurence stated that American and JetBlue treated disagreements less formally, without convening a management committee, "because we sort of – we were urging the teams to be able to work through disagreements." Tr. Vol. 5, 134:13-17, 135:9-15 (Laurence/American); *see also* PX0001a at 7 (Section 4.1.3(iv)). Mr. Hayes testified that he was aware of the $200 million debt but paid it little attention because the number was never seriously contemplated as the payment. Tr. Vol. 2, 82:3-18 (Hayes/JetBlue).

372.    Other airlines agree. Mr. Harrison of Alaska testified that alliance partners have the ability to influence their partners' commercial decisions. Tr. Vol. 7, 57:3-10 (Harrison/Alaska). ███████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ Mr. Kirby of Spirit testified that numerous entanglements from the series of NEA agreements will likely cause American and JetBlue to "pull competitive punches" with each other. Tr. Vol. 3, 134:2-8 (Kirby/Spirit). Mr. Kirby explained that the NEA gives American levers to punish or reward JetBlue, such as slot transfers, and that concentration under the NEA could chill competition between American and JetBlue for fear of upsetting each other and related reprisals. Tr. Vol. 3, 135:2-19 (Kirby/Spirit).

373.    American has a history of accommodation with its partners. For example, during its partnership with LATAM, American did not compete as aggressively against LATAM as it would have otherwise, including by choosing not to try to win customers away from LATAM by undercutting LATAM's pricing on nonstop markets. Tr. Vol. 6, 65:16-23 (Parker/American); Tr. Vol. 10, 200:19–201:8 (Miller/Pls. Expert); PX0242 at 2 (explaining that American does "a lot of things in the spirit of 'partnership' . . . that help LATAM at the expense of revenue maximization

for AA"). In contrast, as soon as the partnership ended, American began competing aggressively against LATAM, adding frequencies in overlap nonstop markets and undercutting LATAM nonstop pricing with American's connecting service. Tr. Vol. 6, 66:10-22 (Parker/American); PX0242 at 2 (explaining that "in the immediate term" American was "discontinuing all of the unbalanced codesharing and pricing that has been in effect" and would soon "announce new additional flights from Miami to Santiago, Lima and Sao Paulo").

374.   In addition, during an earlier partnership with American, Alaska avoided network expansion when doing so would have increased competition with American. Tr. Vol. 10, 200:19–201:8, 204:13-21 (Miller/Pls. Expert). One of the reasons Alaska exited the JFK-LAX route—one of the most traveled, most in-demand routes in the country—was Alaska's alliance with American. Tr. Vol. 7, 57:11–58:1 (Harrison/Alaska).

375.   Alaska's CEO, Andrew Harrison, testified about pressure legacy airlines were able to exert on Alaska in partnerships. For example, during a now ended partnership between Delta and Alaska, Delta was able to exert significant pressure on Alaska. Tr. Vol. 7, 11:13–12:19, 80:16-23 (Harrison/Alaska). When Alaska actually refused Delta's demands to stop partnering with certain foreign airlines, Delta "attacked" Alaska, putting a "huge strain" on Alaska's business and ultimately causing the partnership to collapse. Tr. Vol. 7, 12:25–13:19, 14:24–16:3 (Harrison/Alaska). Similarly, Alaska had to make concessions as part of its alliance relationship with American. Mr. Harrison explained that in June 2021, Alaska had to exit its JKF-LAX route, one of the "most traveled, most demanded routes in the country" because of its alliance with American. Tr. Vol. 7, 57:11–58:1 at 57:15-17 (Harrison/Alaska). Alaska also had to tread carefully before submitting an advocacy piece relating to open skies (the issue pertaining to the ability to do business in foreign countries); Mr. Harrison expressed concern that Alaska's advocacy piece would put a "strain" on the relationship with American and requested "tak[ing] this back a few notches" given his "concern about upsetting the alliance with American . . . ." Tr. Vol. 7, 60:13–61:1, 61:21–62:24 at 62:13-24 (Harrison/Alaska); PX0022 at 1.

376.    If Defendants acted in full coordination under the spirit of partnership, Dr. Miller's model estimates total annual harm of $1.2 billion across all the routes on which Defendants compete. Tr. Vol. 10, 205:10-23 (Miller/Pls. Expert).

**C.    The Northeast Alliance advances American's efforts to consolidate the industry and enhances the risk of capacity discipline.**

**1.    The airline industry has a history of consolidating which leads to high market concentration.**

**a.    Consolidation between 2000 and 2015 significantly reduced the number of airlines in the United States.**

377.    Since 2000, the total number of airlines operating within the U.S. has declined. PX0668 at 5; Mehoke (JetBlue) Dep. 59:17–60:1, June 2, 2022; Casey (American) Dep. 158:18-20, 158:23, May 4, 2020.

378.    Mergers and acquisitions between competitors have contributed to the reduction in the number of US airlines. In 2005, America West Airlines merged with US Airways. Tr. Vol. 6, 40:16-41:6 (Parker/American). In 2008, Delta Air Lines merged with Northwest Airlines. Tr. Vol. 9, 83:12–84:2 (Town/Pls. Expert). In 2010, United Airlines merged with Continental Airlines. Tr. Vol. 9, 83:12–84:2 (Town/Pls. Expert). In 2011, Southwest Airlines merged with Air Tran Airways. Tr. Vol. 9, 83:12–84:2 (Town/Pls. Expert). In 2013, American Airlines merged with US Airways. Tr. Vol. 9, 83:12–84:2 (Town/Pls. Expert). In 2016, Alaska Airlines merged with Virgin America. Tr. Vol. 7, 37:19–38:11 (Harrison/Alaska). Before 2008, there were six hub-and-spoke airlines in the United States; now, there are only three. Tr. Vol. 9, 84:20-24 (Town/Pls. Expert). After each of the legacy mergers since 2008, overall capacity (as measured in ASMs) was concentrated in a smaller number of airlines. Tr. Vol. 9, 83:12–84:2 (Town/Pls. Expert).

379.    In parallel, the legacy airlines have entered into joint ventures with foreign airlines. PX0728 at 5. In markets between the United States and Europe, for example, American created the Atlantic Joint Business—a joint venture between American Airlines, British Airways, Iberia, and Finnair. PX0415 at 6; Bhargava (American) Dep. 61:2-6, 62:13–63:17, June 3, 2022.

Delta created the Blue Skies joint venture with Air France, KLM, and Virgin Atlantic. DX0260 at 12. United created the A++ joint venture with Air Canada and Lufthansa. Nocella (United) Dep. 96:22–97:13, Apr. 29, 2022. These international alliances must apply for and be granted antitrust immunity (or ATI) by the government which protects them from antitrust lawsuits. Tr. Vol. 1, 147:2-8 (Hayes).

380.    Like domestic mergers and acquisitions, international joint ventures have eliminated competition between former rivals. PX0569 at 48 (Mr. Hayes describing international joint ventures as "legalized collusion," adding that such collusion is "perfectly legal" because the immunized parties "got permission to do it"; and, explaining that "what they really do is wipe out a competitor. They gain strength and market share that often prevents new competitors from even considering or stepping into market."). Mr. Hayes has stated that if similar partnerships were to occur "in any other industry, they'd march you off to the penitentiary, but in aviation it's taken hold, and it's really challenging, because it means now, if we look, say, between here and Europe, you have a--most of the business in the hands of three large joint ventures. And that's why you get such high fares." PX0459 at 2.

381.    Mr. Hayes predicted that the international joint ventures would argue that their getting bigger actually benefits the consumer because the other international joint ventures were also getting bigger. Tr. Vol. 1, 158:18-22 (Hayes/JetBlue).

### b.    American had championed industry consolidation.

382.    American's leaders have been proponents of consolidation. The Chair of American's Board of Directors, Doug Parker, is a self-described advocate of consolidation. Tr. Vol. 6, 29:3-12 (Parker/American); PX0359 at 10 ("a leading advocate and participant in consolidation across the industry . . . .") Internally, American has referred to Mr. Parker as the "Godfather of consolidation." PX0074 at 5, Tr. Vol. 4, 162:16–163:3 (Raja/American). American's Chief Financial Officer, Derek Kerr, has told investors that he is a proponent of consolidation. PX0344 at 3 ("You know we have been a proponent of consolidation since 2005.").

383.    American's Chief Commercial Officer, Vasu Raja, has identified "[d]omestic consolidation" as one of American's "long term projects." PX0161 at 2. Mr. Raja also testified that "[c]onsolidation has been good for American." Tr. Vol. 4, 156:7-15 (Raja/American).

### 2. The airline industry has a history of coordinated efforts to constrain capacity growth, leading to worse outcomes for consumers.

### a. Capacity discipline allows airlines to constrain output.

384.    "Capacity discipline" refers to efforts by the legacy airlines to coordinate their capacity decisions. Tr. Vol. 9, 88:6-17 (Town/Pls. Expert). Capacity discipline is defined as growing at or below GDP. Tr. Vol. 9, 85:22-86:11 (Town/Pls. Expert) (discussing case-in-chief demonstrative slide 14); PX0462 (Town Report) ¶ 45 (citing additional documents). Academic sources confirm that capacity discipline was an intentional strategy that allowed competing airlines to increase fares. Tr. Vol. 9, 91:12–92:16 (Town/Pls. Expert).

385.    The legacy airlines coordinated their efforts to maintain capacity discipline in part by making statements in public earnings calls. Tr. Vol. 9, 91:12–92:16 (Town/Pls. Expert). Then-CEO of US Airways (and later CEO of American) Doug Parker and then-President of US Airways Scott Kirby made numerous public statements warning about the effects that adding capacity would have on revenue and margins. PX0039 at 1; PX0034 ("Scott [Kirby] was outspoken at the PHX symposium yesterday about capacity discipline. Said that the industry growth this year and in 16 is not consistent with 'capacity discipline,' and that is driving fares, and RASM, down.").

386.    American's executives viewed industry capacity growth as harmful to American's profitability, and sought to reduce its own growth and that of its partners. American determined that in "most cases, any capacity increase beyond average industry growth leads to a revenue penalty." PX0033 at 5, 26; Bhargava (American) Dep. 120:12–121:4, June 3, 2022. As a result, when its alliance partners in the Atlantic Joint Business began to expand capacity, American Airlines explored "whether a reduction in AJB capacity [was] in the best interests of the AJB and

the individual carriers" and found that, assuming a "40% recapture rate, in all scenarios all entities will be more profitable in removing suboptimal AJB capacity." PX0033 at 3-4, 14.

> **b.**     **Reductions in airline capacity tend to lead to higher average fares for consumers.**

387.     Capacity, or supply, has a direct impact on prices. Tr. Vol. 10, 83:4-13 (Clark/JetBlue); Tr. Vol. 6, 42:9-12 (Parker/American) ("holding everything else constant, as supply goes down, prices go up" is "Economics 101"); *see also* Tr. Vol. 1, 131:7-13 (Hayes/JetBlue) (explaining that in the airline industry, capacity is a measure of output).

388.     Greater capacity leads to lower prices. When capacity increases, more seats become available to travelers. Casey (American) Dep. 177:17–178:1, May 4, 2022. That, in turn, leads to lower average prices, assuming demand remains constant. Casey (American) Dep. 178:2-5, 179:3-11,179:14-15, May 4, 2022. Thus, greater capacity in the airline industry makes raising fares more difficult. Tr. Vol. 5, 22:13-23 (Isom/American); Isom (American) Dep. 160:13-15, May 27, 2022; PX0098 at 1.

389.     Greater capacity also leads to lower airline profits. ███████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████; Tr. Vol. 6, 103:12–105:4 (Parker/American) (confirming 2013 testimony that increasing supply, without increasing demand, lowers profitability).

390.     Conversely, lower capacity leads to higher prices. Tr. Vol. 3, 153:5-12 (Kirby/Spirit). A JetBlue presentation to a new board member shows that "high demand / constrained capacity" has led JetBlue to "attain higher yields." By contrast, "low demand / surplus capacity" has led for JetBlue to adopt "attractive fares." PX0813 at 5. Defendants' economic expert, Dr. Israel, admitted that raising prices to reduce supply, and reducing supply to raise prices are "flip sides of the same coin." Tr. Vol. 13, 126:9-16 (Israel/Defs. Expert).

391.     Airlines can raise fares by artificially limiting supply. For each flight, airlines will set (or "file") fares for different "booking classes," representing the number of seats on the plane

they are willing to sell at each price point. *See generally* Tr. Vol. 3, 34:6–36:25 (Jarashow/JetBlue). An airline's inventory management team can open and close booking classes, changing the number of seats for sale at each price. Tr. Vol. 3, 36:9-12 (Jarashow/JetBlue). Opening and closing booking classes can effectively adjust prices upward or downward. Tr. Vol. 3, 36:22–37:3 (Jarashow/JetBlue). All else being equal, opening a booking class with a low fare will cause selling prices to decrease and, conversely, closing a booking class with a low fare will cause selling prices to increase. Tr. Vol. 3, 37:4-15 (Jarashow/JetBlue).

### c. Legacy airlines engaged in a period of coordinated capacity discipline between 2009 and 2016.

392.    The legacy airlines' ordinary course documents reveal a period of capacity discipline starting shortly after the Delta-Northwest merger in 2008 and continuing until approximately 2016. Tr. Vol. 9, 86:12–87:17 (Town/Pls. Expert) (discussing case-in-chief demonstrative slide 15); PX0184 at 34 ("From 2009 to 2013, the industry maintained relatively flat capacity growth in the wake of an economic downturn and multiple mergers."); Mancini (American) Dep. 73:25–74:11, Apr. 29, 2022.

393.    In general, airlines' capacity decisions are heavily influenced by GDP. Tr. Vol. 9, 95:23–96:13 (Town/Pls. Expert); Tr. Vol. 5, 27:13-22 (Isom/American) ("[Y]ou would take a look at what your projected growth in GDP is for the coming year, and that would give a correlation to revenues, historically, and then you would go ahead and plan what kind of capacity."); PX0108 at 147 ("Over time we will seek to grow our capacity at roughly GDP.").

394.    During the capacity discipline period, legacy airlines' capacity was lower than it would have been based on the historical relationship between capacity, GDP, and jet fuel prices. Tr. Vol. 9, 99:6-22 (Town/Pls. Expert). American, Delta, and United all grew at less than one percent per year from 2009 to 2013. Tr. Vol. 6, 86:23–87:1 (Parker/American). From 2013 to 2016, American, Delta, and United all grew at or less than four percent. Tr. Vol. 6, 87:2-5 (Parker/American). Between 2009 and 2016, legacy airlines collectively grew less than one

percent annually on average, from 450 billion available seat miles to 472 billion available seat miles. Tr. Vol. 12, 171:18–172:3 (Lee/Defs. Expert); DX0881.

395.    American acknowledged that it maintained capacity discipline during the 2016 to 2018 time period, but Delta and United had grown. Tr. Vol. 6, 87:19-23 (Parker/American); Tr. Vol. 5, 26:12-15 (Isom/American); DX0032 at 33. An American presentation, confirmed by Mr. Mancini, explained that American maintained capacity discipline while United and Delta have been able to grow substantially. Mancini (American) Dep. 81:13-18, Apr. 29, 2022; PX0114 at 8; DX0032 at 33. As a result of their growth, Delta and United began to take industry market share from American. Tr. Vol. 5, 28:1-18 (Isom/American); DX0032 at 34. As Mr. Isom explained it "[W]e took a conservative approach, and during that period, United and Delta did something different. They grew and they were able to take share from us." Tr. Vol. 5, 28:12-18 (Isom/American).

396.    Slow capacity growth by the legacy airlines during the capacity discipline period cannot be explained by other factors, including unemployment and load factors. Tr. Vol. 9, 97:8–99:5 (Town/Pls. Expert). Slower capacity growth occurred after most of the airline bankruptcies during the 2000s, and Dr. Town's empirical analysis demonstrated that capacity did not deviate from its historical relationship with GDP and jet fuel prices during the period of bankruptcies. Tr. Vol. 9, 100:8–101:18 (Town/Pls. Expert).

### d.    Consolidation facilitated capacity discipline.

397.    The legacy airlines' ordinary course documents attribute capacity discipline in part to the mergers that occurred between 2008 and 2013. PX0012 at 13-14 ("The industry has shown capacity discipline due to consolidation and fuel price volatility . . . . Industry consolidation and ongoing fuel price volatility has largely kept capacity discipline intact."); PX0344 at 3 (then-US Airways CFO Derek Kerr referring to "pricing power and the ability to take out capacity by consolidation"); Tr. Vol. 9, 87:22–88:5 (Town/Pls. Expert) (discussing opening demonstrative slide 17).

398.     American's 2013 merger with US Airways illustrates the connection between consolidation and capacity discipline. Before the American/US Airways merger, US Airways worried that American Airlines' plan to grow after emerging from bankruptcy would undo "much of the recent capacity discipline and put pressure on [revenue]." PX0349 at 33. US Airways further worried that competitors' responses to American's growth plans would be "destabilizing" for the industry, and that a merger with American was "a lower risk alternative" to organic growth. PX0349 at 33. After American merged with US Airways, the growth rate of the combined airline was below GDP through 2018, and was lower than what American had planned when it was in bankruptcy. Tr. Vol. 9, 217:7-13 (Town/Pls. Expert).

399.     Empirical analysis of the capacity discipline period from 2008 to 2013 shows that capacity was approximately 9.5 percent lower than it would have been without capacity discipline. Tr. Vol. 9, 99:23-25 (Town/Pls. Expert).

> **e.     JetBlue mitigated the effects of capacity discipline by growing capacity.**

400.     Nonlegacy airlines, including most prominently JetBlue, increased capacity during the prior capacity discipline period, indicating they did not participate in the earlier effort to slow industry capacity growth. Tr. Vol. 9, 102:5-103:5 (Town/Pls. Expert). Between 2009 and 2019, JetBlue grew more in the Northeast in percentage terms than any other airline, and added almost as much total capacity in the Northeast as Delta, even though it is a much smaller airline. Tr. Vol. 9, 103:6–104:21 (Town/Pls. Expert) (discussing demonstrative at 32, 33). Although it helped mitigate the harm, the growth of JetBlue and other LCCs during the capacity discipline period was not enough to fully offset the shortfall between predicted and actual legacy airline capacity, and so capacity discipline by the legacy airlines still resulted in fewer available seat miles industrywide than would have been available absent coordination. PX0964.

### 3.      The NEA risks a return to capacity discipline.

#### a.      Industry conditions are ripe for restoration of capacity discipline.

401.    Industry conditions are similar today to when the earlier capacity discipline period began in 2009. Tr. Vol. 9, 105:21–106:4 (Town/Pls. Expert). Recovery from COVID-19 mirrors the recovery after the Great Recession and provides airlines the opportunity to control how quickly capacity returns to the market. Tr. Vol. 9, 106:5-8 (Town/Pls. Expert).

402.    In March 2020, Mr. Isom acknowledged that American viewed the COVID-19 pandemic downturn as helping American to shed capacity. Tr. Vol. 5, 36:14-16 (Isom/American). Mr. Isom further explained that American carefully monitored industry analyst reports and public statements to track competitors' schedule adjustments as they react to COVID-19. Tr. Vol. 5, 50:12-24, 51:9–52:18 (Isom/American); DX0034.

#### b.      American saw the NEA as a way to further consolidate the domestic airline industry.

403.    For many years, American's business strategy has been to "further drive consolidation." PX0306, What is our strategy at Rows 2-4, B-G. American's Chief Commercial Officer Vasu Raja testified that "[c]onsolidation has been good for us," and that American was open to further consolidation. Tr. Vol. 4, 156:7-15 (Raja/American). In preparing materials for a July 2021 Board meeting, Mr. Raja and his colleagues noted that American's ██████████ ████████████████████████████ PX0306, What is our strategy at Rows 2-4, B-G; Tr. Vol. 4, 206:12-17 (Raja/American) (noting that Mr. Raja conceived the idea of the NEA).

404.    American has sought to consolidate through alliances that produced a deep level of integration "without actually merging" with partners. *See* PX0233 at 1; Bhargava (American) Dep. 80:5-16, June 3, 2022. For example, the Atlantic Joint Business enables "[c]apacity growth alignment" and "[c]oordinated schedules in overlaps" between alliance members. Bhargava (American) Dep. 62:14-25, 63:2-15, 63:17, June 3, 2022.

405.    The NEA is another step toward American's goal of industry consolidation. Tr. Vol. 4, 160:19–162:3 at 162:1-3 (Raja/American); PX0074 at 4; PX0161 at 2. When developing

114

an incentive structure for domestic airline alliances—including the high-level vision for what became the NEA—American sought to create a "revenue share with domestic carriers absent [antitrust immunity]" and evaluated how to put "collars" on such alliances to "protect against run away capacity growth." Bhargava (American) Dep. 171:1-11, 174:4-11, 174:13–175:4, June 3, 2022; PX0158 at 1. Executives at American, including Mr. Raja, viewed "further domestic consolidation" as a valuable benefit to American when evaluating the NEA. PX0125 at 1.

406.   Even outside the geographic scope of the NEA, partnering with JetBlue facilitates increased network-wide coordination between American and JetBlue via frequent, high-level communication. Tr. Vol. 4, 95:24–96:16 (Raja/American). The NEA allows American and JetBlue to operate similarly to a merged airline without formally merging. Tr. Vol. 4, 21:11-18 (Kirby/Spirit).

<b>c.   American decided to "borrow" JetBlue's network rather than invest in organic growth, which allowed American to reduce capacity in other parts of its network and limited JetBlue's ability to grow capacity elsewhere.</b>

407.   American has relied on inorganic growth to expand its network, enabling American to "serve" routes without expanding capacity using its own planes. Tr. Vol. 4, 76:23–77:8, 77:21–78:6 (Raja/American). American sometimes uses the phrase "build or borrow" to express the distinction between organic and inorganic growth. Tr. Vol. 4, 78:7-18 (Raja/American). Before entering the NEA, American sought to "efficiently produce capacity through minimizing capital expenditure and maximizing return on invested capital," in part through "coastal partners" to "Borrow and Build networks to create a customer value proposition where we have been historically weak." PX0368 at 9-10. In June 2021, American expressed interest "borrowing" to develop existing partnerships, borrowing in coastal markets, and borrowing in mature markets. PX0341 at 3.

408.   The NEA permits American to grow its network by "borrowing" from JetBlue in lieu of organic growth. Tr. Vol. 4, 80:4-6 (Raja/American). One of American's growth scenarios in 2019 was to grow at 4.8 percent, which would have reflected organic growth. Tr. Vol. 6, 89:9-

18 (Parker/American). American's Network Planning team recommended this organic growth. Tr. Vol. 6, 91:1-6 (Parker/American). But American recognized that organic growth risked a "competitive response" from other legacy airlines, and such growth would have added to overall industry capacity. Tr. Vol. 9, 106:9–110:17 (Town/Pls. Expert); PX0120 at 115-116 (identifying "competitive response" as a risk of organic growth).

409.    By partnering with JetBlue, American synthetically adds to its network and avoids growing organically. PX0314 at 73 (NEA allows American to "borrow" instead of "build" in the Northeast); PX0071 at 51 ("Partners enable us to capture more revenue share with less investment in high-cost, unwinnable markets."). American describes the NEA as a "capital light" strategy, *i.e.*, a way to grow synthetically without actual organic investment in aircraft or other resources. Tr. Vol. 5, 29:8–30:5 (Isom/American). Similarly, JetBlue documents describe the NEA as a "capital-light" path to grow margins. PX0814 at 9.

410.    Moreover, as discussed *infra* Section VII.D.1, by enabling American to rely on JetBlue's network, the NEA facilitates American drawing down capacity at its other hubs, particularly in Philadelphia. After entering into the NEA, American reversed its prior plans to grow in Philadelphia and decided that Philadelphia should be "de prioritized" and that American was "not keen to grow" there. PX0132 at 1; PX0147 at 2. As of December 2021, none of American's five-year plans proposed restoring the fleet in Philadelphia to its pre-NEA level. Tr. Vol. 8, 157:15-24 (Pack/American); PX0378 at 3. ██████████████████████████████

███████████████████████████████████████████████████████████████

████████████ A comparison of 2018 capacity to 2022 capacity reveals that American's capacity in Philadelphia has decreased by even more than JFK capacity has increased. Tr. Vol. 16, 103:4-17 (Town/Pls. Expert).

411.    Similarly, as discussed *infra* Section VII.D.2, JetBlue's operation of American's slots in New York City constrains its plans to grow outside of the NEA Airports, which will also make it easier for the legacies to maintain capacity discipline. JetBlue executives Scott Laurence (then-Head of Revenue Planning) and Andrea Lusso (then-Director of Route Planning) explained

in a presentation for senior JetBlue executives in August 2021 that investing in NEA growth likely meant abandoning or scaling back other JetBlue growth initiatives. Tr. Vol. 5, 178:16–179:16 (Laurence/American); PX0791 at 7. Non-NEA Airports, such as Los Angeles, Orlando, Fort Lauderdale, and San Juan, were all identified for scaled back or slowed down growth, despite being JetBlue focus cities. Tr. Vol. 5, 179:22–180:16 (Laurence/American); PX0791 at 7; Tr. Vol. 9, 58:9-15 (Friedman/JetBlue); PX0791 at 15.

412.    The NEA aligns the financial incentives of JetBlue, which had grown aggressively during the prior capacity discipline period, with American. Tr. Vol. 9, 111:4-13 (Town/Pls. Expert). Since entering the NEA, JetBlue has projected more limited future growth overall, more in line with its legacy counterparts. In February 2021, JetBlue network planning predicted slower growth for the airline, stating that "[f]or the first time, JetBlue will grow only slightly above industry, and significantly behind ULCCs." PX0789 at 4. This slower growth rate (around four percent, instead of seven percent) is contrasted to other post-crisis periods, when JetBlue continued to grow more quickly than the competition. PX0789 at 4; *see also* Lusso (JetBlue) Dep. 169:23–170:12, Apr. 11, 2022; PX0781 at 2.

## VII.   DEFENDANTS HAVE NOT MET THEIR BURDEN TO PROVE PROCOMPETITIVE JUSTIFICATIONS FOR THE NORTHEAST ALLIANCE.

### A.    The Northeast Alliance will not result in significant growth in Boston beyond what JetBlue and American could have achieved independently.

#### 1.    JetBlue planned to grow organically in Boston before the NEA.

413.    JetBlue first began service from BOS in 2004 and, by 2010, had the largest operations flying into and out of that airport. Tr. Vol. 17, 64:20–65:19 at 64:24–65:3 (Miller/Pls. Expert). JetBlue remained the leader among other airlines at BOS through 2019. Tr. Vol. 1, 112:1-4 (Hayes/JetBlue); Tr. Vol. 17, 64:2-8 (Miller/Pls. Expert) (discussing demonstrative at 21 (citing PX0955 (Miller Reply Report) ¶ 234, Ex. 14)). In fact, in an internal presentation to its Board of Directors outlining different potential transactions with American, JetBlue highlighted the transaction that became the NEA as the one that presented the greatest level of antitrust risk,

in part because of the strength of JetBlue's position in Boston. Tr. Vol. 1, 213:10-25 (Hayes/JetBlue); PX0807 at 72 (identifying NEA option as "[h]igh risk due to extent of integration, geographic scope.").

414.    JetBlue achieved its pre-NEA growth in BOS by making its own investments and growing organically. Tr. Vol. 17, 64:20–65:19 at 65:9-13 (Miller/Pls. Expert).

415.    Despite being the largest airline at BOS, JetBlue sought to expand its presence there. Between 2017 and 2020—*i.e.*, before the NEA—JetBlue continued expanding in BOS. Tr. Vol. 10, 79:15-18 (Clark/JetBlue); DX0290 at 8.

416.    JetBlue's BOS expansion was a deliberate internal corporate strategy. PX0646 at 2; *see also* PX0241 at 4-5 (cited in PX0462 (Town Report) ¶ 14, nn.23-24). JetBlue dubbed this strategy Project Revere, and it included adding frequencies, adding destinations, and increasing travel flexibility. PX0508 at 10. For example, ███████████████████████████ ████████████████████████████████████████████████████ ██████████████████████ PX0936 at 2.

417.    JetBlue publicly touted its projected BOS growth plans. In 2019, it announced a goal to increase departures from BOS to up to 200 peak-day daily flights. Tr. Vol. 5, 107:12-17 (Laurence/American) (Mr. Laurence worked at JetBlue at the time of this announcement). This announced growth was organic growth, not "growth" through a domestic joint venture. Tr. Vol. 10, 81:1-9 (Clark/JetBlue).

## 2.    American planned to grow organically in Boston before the NEA.

418.    American also had plans to grow organically in BOS before the NEA. Vasu Raja, American's Chief Commercial Officer, was committed to aggressive competition, telling colleagues in the autumn of 2019 that American was "going to fight like hell in Boston." Tr. Vol. 4, 107:24–108:1, 110:5–113:12 (Raja/American); PX0122; *see also* Tr. Vol. 4, 113:13–115:10, 116:6-18 (Raja/American); PX0119; PX0064 at 1 (urging colleagues to "gird your loins" and prepare for growth at BOS).

419.    American demonstrated its commitment to BOS in early 2020 by announcing plans to add service to airports such as Indianapolis ("IND"), Raleigh/Durham ("RDU"), Wilmington ("ILM"), and Austin ("AUS"). PX0174 (announcing service on BOS-IND, BOS-RDU, and BOS-ILM); PX0191 (cited in PX0461 (Miller Report) ¶ 269 n.316) (announcing BOS-AUS). Prior to the NEA, American had announced plans to enter many of the BOS markets that it now claims should be "growth" attributed to the NEA. Tr. Vol. 7, 148:14–149:23 (Raja/American).

420.    Another example of American's commitment to BOS was its plan to increase weekly departures from 76 in July 2019 to 101 by July 2020. PX0241 at 9, 11, 14. This plan required additional gates, and American was determined to "fight for access to gates," with three Air Canada gates identified as potential acquisitions—which would have required American to increase its BOS departures to 140 daily departures. PX0115 at 4.

### 3.    Other competitors grew organically in Boston.

421.    Other competitors also grew organically in BOS in the pre-NEA period without any domestic partnerships. Mr. McMenamin testified that Southwest built itself into a major competitor for corporate customers in BOS despite lacking a global network and passenger lounges. Tr. Vol. 3, 23:5-14 (McMenamin/JetBlue). Similarly, Delta achieved significant market share in BOS through organic growth—and to a degree, international partnerships—and had plans to continue to grow further in BOS, even before the NEA was announced. Somers (Delta) Dep. 174:2–176:7, 176:18–177:24, July 25, 2022.

### 4.    JetBlue's expansion in Boston is about the same as what it could have achieved independently.

422.    Any purported expansion by JetBlue in BOS could have been achieved without the NEA, and cannot be attributed to it. In JetBlue's 2021 Five-Year Plan—which was prepared for its Board of Directors in mid-2021—senior executives outlined different scenarios based on two factors: (1) whether JetBlue entered the NEA, and (2) whether it retired its fleet of E190 airplanes. Tr. Vol. 10, 17:13–20:8 (Clark/JetBlue); PX0816 at 15, 193. The plan projected higher

revenue and loyalty revenue for JetBlue if it retained its E190 airplanes, but did *not* enter the NEA. Tr. Vol. 10, 22:13–24:21, 25:18-25, 40:10-22 (Clark/JetBlue); PX0816 at 3. The plan also projected ASMs for JetBlue in 2022 as slightly higher if JetBlue kept its E190 airplanes, but did not enter the NEA. Tr. Vol. 10, 27:1–28:16 (Clark/JetBlue). In total, JetBlue predicted a less than one percent difference in seats between the scenarios where it retained its E190 airplanes and entered the NEA versus keeping the E190 airplanes and not entering the NEA. Tr. Vol. 10, 31:16–34:23 (Clark/JetBlue).

423.    If anything, JetBlue's growth in Boston has been negatively impacted by the NEA. Because JetBlue faces fleet constraints and must fly American slots in LGA and JFK, it may lack the aircraft and pilots to meet its pre-NEA aspirations. For example, a November 2021 JetBlue Network Planning presentation explains that, due to fleet constraints, Boston, Orlando, and Fort Lauderdale will only be able to reach 2019 levels of flying. PX0769 at 4 (explaining that growth in JFK and LGA will occur in 2022, but that BOS, Orlando, and Fort Lauderdale will only achieve 2019 levels, and that the growth at LGA and JFK will be funded in part by the delayed E190 retirements). Mr. Hayes testified that during JetBlue's recent operational difficulties, it has pulled back in Boston but not in the slot-controlled airports (JFK and LGA). Tr. Vol. 1, 243:19-244:6 (Hayes/JetBlue) (awaiting correction to transcript); PX0438 at 13-14.

### 5.    The NEA allows American to pull back in Boston.

424.    The NEA has led American to reduce its BOS operations. In 2019, American planned to "fight like hell in Boston." Tr. Vol. 4, 107:24–108:1, 110:5–113:12 (Raja/American); PX0122. But by May 2020, with negotiations over the NEA almost complete, American proposed exiting six BOS routes. PX0285, Overview at Row 20 (identifying routes as BOS-JFK, BOS-LGA, BOS-Reagan National ("DCA"), BOS-Harrisburg ("MDT"), BOS-Syracuse ("SYR"), and BOS-Rochester ("ROC")).

425.    After signing the NEA, American immediately sought to reduce its BOS service; a 2021 Network Plan showed that American's BOS departures would fall from 89 in the summer of 2021 to ▮ by 2023, a ▮ percent decrease. PX0062 at 72. A March 2021 spreadsheet showed

an even larger flight reduction as it listed ▇ routes from BOS while proposing that American only fly ▇ of them. PX0365, Breakout at Rows 1-83.

426.    American's move likely came as no surprise to JetBlue which recognized that American might retrench into its core hubs with the NEA in place. Laurence (American) Dep. 149:23–150:1, June 3, 2021 (admitted as party admission and for impeachment at Tr. vol. 5 117:12-14, 18-21 (Laurence/American)). *See also* PX0752 at 11 (identifying an American goal under the NEA as "Protect existing infrastructure assets during retrenchment"); PX0872 at 62-63 (JetBlue's June 2021 board of directors strategy offsite Competitive Assessment Primer states that "[t]he recent codeshare agreements with Alaska and JetBlue enable [American Airlines] to scale down operations in coastal hubs without losing market share" and that "[t]he NEA agreement allows American to decrease flying to second-tier cities from the Northeast as it can now be flown on our aircraft.").

427.    ████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████

**B.    The Northeast Alliance will not result in significant growth in New York City beyond what JetBlue and American could have achieved independently.**

**1.    JetBlue planned to pursue organic growth in New York City.**

428.    Before entering the NEA, JetBlue planned to grow in the New York City area. In 2019, JetBlue's Five-Year Plan projected a 67 percent increase in ASMs flown from JFK— starting from just under 13 million in 2019 to over 21 and a half million in 2024. PX0648 at 2. This growth would be supported by capital improvements. In JetBlue's first quarter 2019 earnings call, Mr. Hayes, JetBlue's Chief Executive Officer, told investors that "[w]e have talked about our progress in securing and developing valuable real estate in our network. This includes our plans to redevelop Terminal 6 and 7 at JFK . . . ." PX0680 at 4. JetBlue recognized that it had plenty of growth potential at JFK, if it could just get the slots and aircraft. Tr. Vol. 6, 22:6-9 (Laurence/American); *see also* DX0285B at 28.

429.    JetBlue also expected to grow in EWR pre-NEA. JetBlue planned to increase to 70 daily departures from EWR by 2022, viewing this initiative as "integral to JetBlue's NYC growth strategy." PX0812 at 5. JetBlue projected the same number of flights at EWR in scenarios with and without the NEA. PX0812 at 5. Indeed, this initiative has been successful. JetBlue's materials presented to its Board of Directors in a June 2021 strategy offsite reflect that JetBlue's growth at Newark Airport was not attributable to the NEA. PX0872 at 55 (Figure 6.3 states "The NEA did not contribute to our growth at EWR; it was attributed to available airport infrastructure.").

### 2.    American was poised to grow in New York City by upgauging its regional jets.

430.    Before entering the NEA, American planned to grow in New York City by upgauging its fleet, *i.e.*, flying larger planes. In an internal March 2020 presentation, American outlined plans to upgauge its 50-seat regional jets to dual-class jets across its network. PX0117 at 8. American's Vice President of Network Strategy, Brian Znotins, confirmed that American had discussed this option before entering the NEA. Tr. Vol. 15, 135:14-17, 140:25–141:3 (Znotins/American); PX0118 at 1; PX0134 at 20 ██████████████████████████████ ████████████████████████████

431.    Mr. Znotins testified that American's decisions to expand its fleet by ordering new planes and reactivating older planes were all options under consideration and available to American before the NEA. Tr. Vol. 15, 132:20–134:16 (Znotins/American). He agreed that these fleet expansion decisions could not be tied to the NEA. Tr. Vol. 15, 110:8-14 (Znotins/American).

### 3.    Defendants had agreed to a significant slot lease before the NEA.

432.    In late 2019, before the NEA, American and JetBlue began discussions that ultimately led to an agreement whereby JetBlue would acquire 37 slots from American at JFK. Tr. Vol. 5, 125:2-21, 130:10-25 (Laurence/American); *see also* PX0507 at 5-6; PX0204 at 1-2.

Shortly thereafter, JetBlue began internal discussions of how it would fund the additional aircraft needed to utilize those slots. PX0507 at 2.

433.    American recognized that it could not wait for the then-ongoing NEA negotiations to conclude to wrap up these slot deals. PX0067 at 1; PX0080 at 1-2.

434.    JetBlue recognized that this slot lease was separate from the NEA and its Network Planning team assumed that JetBlue would maintain those slots going forward. Lusso (JetBlue) Dep. 161:19–162:2, Mar. 18, 2021. In June 2020, Mr. Andrea Lusso—JetBlue's then-Vice President of Network Planning—instructed his colleague Eric Friedman—JetBlue's Director of Route Planning—to include the slot pairs as part of JetBlue's standalone plans. Tr. Vol. 8, 304:6-12 (Friedman/JetBlue); PX0527 at 2. Mr. Friedman followed that instruction in finalizing JetBlue's Five-Year Plan following month. Tr. Vol. 8, 278:23–279:4 (Friedman/JetBlue); PX0525 at 1.

435.    Mr. Hayes and Mr. Lusso agreed that the slot lease agreements were transactions independent of the NEA, and should not be considered "growth" attributable to the alliance. Tr. Vol. 1, 225:5–226:3 at 225:20–226:3 (Hayes/JetBlue); Lusso (JetBlue) Dep. 169:10-20, Mar. 18, 2021.

### 4.    Nothing prevents American from selling or leasing slots to JetBlue.

436.    American owns many valuable slots at JFK and LGA, both of which are slot-constrained airports. ███████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████ PX0162 at 5.

437.    Nothing prevents American from leasing its slots to JetBlue absent the NEA. Murray (PANYNJ) Dep. 271:9-11, 271:13–272:11, May 3, 2022 (objection pending); Tr. Vol. 1, 139:11–140:2 (Hayes/JetBlue) (explaining that airlines can lease their slots at market rate). Neither revenue sharing nor capacity coordination are required in order to lease or swap slots. Tr. Vol. 8, 173:4-8 (Pack/American).

438.     In fact, during NEA negotiations, American's Clean Team evaluated potential alliance structures involving slot exchanges. For example, American considered trading JetBlue five gates at BOS for 25 additional JFK slots in an arrangement that did not include network or capacity coordination. Tr. Vol. 8, 171:2–172:14 (Pack/American); PX0185 at 2. Instead, the trade allowed JetBlue to more fully utilize American's network and increase transatlantic flying on its own planes. Tr. Vol. 8, 171:13–172:2 (Pack/American); PX0185 at 2.

439.     Another partnership structure that American evaluated involved swapping slots at JFK and LGA, again without network or capacity coordination. Tr. Vol. 8, 172:15–173:3, 250:21–251:9 (Pack/American); PX0185 at 2. American recognized that this scenario would result in American and JetBlue competing against each other on nonstop overlap routes. Tr. Vol. 8, 173:16–174:10 (Pack/American); PX0185 at 2.

### 5.     JetBlue is flying larger aircraft from the slots it received from American, which did not require the NEA.

440.     The growth that comes from JetBlue flying larger planes than American had flown using these slots is not NEA-specific growth. Andrew Watterson, Executive Vice President and Chief Commercial Officer of Southwest Airlines, testified that "growth" stemming from JetBlue flying a larger plane from these slots could have been achieved if American had flown a larger plane of its own. Tr. Vol. 2, 164:3-14, 184:20–185:7 (Watterson/Southwest). Chad Schweinzger, the Director of Commercial Analysis at American, testified that American "could have always" exchanged slots with JetBlue, allowing JetBlue to fly larger planes than American had been flying in New York City. Tr. Vol. 13 77:25–78:7 (Schweinzger/American); PX0301.

441.     Though JetBlue flew these slots with larger planes, the total number of flights has not increased. At a slot-controlled airport, the number of slots limits the number of departures an airline can make. Tr. Vol. 2, 176:4-15 (Watterson/Southwest). If two airlines pool their slots, for one airline to add a slot it must be subtracted from elsewhere in the slot pool. Tr. Vol. 2, 176:4-15 (Watterson/Southwest). Thus, when American and JetBlue pooled their slots, the additional slots

that JetBlue used reduced the number of slots that American could use. Tr. Vol. 2, 163:18–164:2 (Watterson/Southwest).

442.    Dr. Town concluded that about thirteen percent of the total seat increase assumed in the v2 Schedule used in Dr. Israel's Raven-based benefits estimate is attributable to American shifting LGA slots and departures to JetBlue, and JetBlue flying those departures with larger airplanes than American flew in the 2019 baseline. Tr. Vol. 16, 109:8-20 (Town/Pls. Expert). Again, this should not represent NEA "growth," as American always had the option to fly larger planes from these slots.

**C.    The Northeast Alliance does not result in significant benefits from combining "complementary" networks.**

**1.    Adding JetBlue's network to American's network does not result in American necessarily serving any additional domestic markets.**

443.    American is the largest global airline and has the world's largest network. PX0916 at 14. As of 2019, American was also the largest domestic airline in terms of available seat miles, seats, and origin and destination pairs served. Tr. Vol. 4, 70:12-18 (Raja/American); PX0925 at 26.

444.    The NEA has a marginal impact on American's network. American gains access to only four airports served by JetBlue through the NEA that American did not already serve, with only a single one of those in the continental United States. Tr. Vol. 9, 73:9-20 (Town/Pls. Expert); PX0462 (Town Report) ¶ 127, Ex. 19.

445.    Regardless, the vast majority of customers are not interested in the size of an airline's network. According to a 2019 American presentation, 85 percent of its customers are "infrequent customers" who "flew one time," and they account for 55 percent of American's revenues. DX0009 at 19. These ordinary travelers care more about ticket prices than they do an airline's network size. Tr. Vol. 2, 103:25–104:7 (Watterson/Southwest).

### 2.    Combining Defendants' networks at NEA Airports does not drive significant additional traffic.

446.    Combining the Defendants' networks at NEA Airports does not drive the additional traffic that would be necessary to create the amount of benefit required to offset the NEA's harm. Dr. Israel, Defendants' expert, modeled networks in Raven by turning on a codeshare between the alliance partners. Tr. Vol. 14, 144:17–145:12 (Israel/Defs. Expert). The Raven-based benefits estimates are driven by the increases in capacity assumed by the Clean Team. Tr. Vol. 16, 97:22–98:3 (Town/Pls. Expert). In the Clean Team's v2 Schedule Raven run, very little passenger traffic comes from codesharing. Of the 36 routes that are predicted to have new nonstop flights in the NEA scenario, 15 have fewer than one percent of their nonstop passengers coming from the partner airline marketing the flight through the codeshare. PX0956 (Town Reply Report) ¶ 168, Ex. 28. A comparison of Raven output from the 2019 base and v2 Schedule shows that American and JetBlue do not leverage geographic complementarities to create any meaningful new domestic itineraries. Only seven newly-possible, connecting itineraries shown in the v2 Schedule—but not shown in the base scenario or reflect in actual traffic data—include more than five predicted weekly passengers, and zero newly-possible, connecting itineraries show more than ten weekly passengers. PX0462 (Town Report) ¶ 130, Ex. 21.

447.    Dr. Israel recognizes the limited traffic and benefit created by combining the Defendants' networks. He admitted that "if you assume you have the same fleet, stand-alone, versus NEA, you're going to get very small passenger increases if any." Tr. Vol. 14, 68:18–69:12 (Israel/Defs. Expert). He subsequently testified that "you don't get much" consumer benefit "without more capacity." Tr. Vol. 14, 147:2-8 (Israel/Defs. Expert).

448.    Dr. Israel concedes that the Raven runs he considered reveal that putting American and JetBlue networks together as each existed at the NEA Airports in 2019, without any additional changes, does not create much benefit. Tr. Vol. 14, 143:15-23 (Israel/Defs. Expert). Dr. Israel presented a Raven-based analysis to the Department of Justice that calculated the benefits created by putting the 2019 American and JetBlue networks together at about $50

million. Tr. Vol. 14, 143:24–144:4 (Israel/Defs. Expert). He subsequently testified that this $50 million benefit would have been lower had he used the 2.1 elasticity estimate that he presented at trial. Tr. Vol. 14, 145:24–146:13 (Israel/Defs. Expert).

> **3.     To the extent the NEA results in increased "relevance" or airport presence at NEA Airports, that is a consumer harm—not a benefit.**

449.     The academic literature shows that frequent flyer programs have ambiguous effects on consumer welfare. Tr. Vol. 9, 76:13-18 (Town/Pls. Expert); PX0462 (Town Report) ¶¶ 141-145. Frequent flyer programs soften competition between airlines by inducing switching costs for power travelers who have incentive to concentrate their points with one airline and become less sensitive to prices. Tr. Vol. 9, 76:10–77:10 at 77:3-6 (Town/Pls. Expert). As a result, frequent flyer programs incentivize business travelers to choose less cost-effective flights in order to earn points. Tr. Vol. 9, 76:10–77:10 at 77:7-10 (Town/Pls. Expert); *see also* Tr. Vol. 2, 27:1–29:4 at 27:22–28:2 (Hayes/JetBlue) (explaining why frequent flier programs are valuable to airlines; "the margin is 30, 35 percent" compared to an operating margin of ten to 12 percent).

> **D.     Defendants' claimed growth within the Northeast Alliance supplants growth elsewhere in their networks.**

> **1.     The increased transatlantic capacity in New York City Defendants attribute to the NEA stems from American shifting capacity from Philadelphia and other hubs.**

450.     Because American and JetBlue have a fixed number of aircraft at any given time, capacity decisions for the NEA necessarily impact the rest of their networks and the capacity they could deploy elsewhere. Tr. Vol. 1, 222:9–223:4 (Hayes/JetBlue); Tr. Vol. 9, 161:2-6 (Town/Pls. Expert); Tr. Vol. 10, 23:18–24:6 (Clark/JetBlue).

451.     American planned to expand its operations in PHL before the NEA. PHL was a logical option for growth as it had ███████████████████████████████████████

███. PX0342 at 6. American's Vice President of Commercial Planning and Analysis, Massimo Mancini, testified that he thought of PHL as a good airport for transatlantic service. Mancini (American) Dep. 47:7-14, Apr. 29, 2022. He anticipated that PHL would close the gap with JFK and EWR. Mancini (American) Dep. 47:18-21, Apr. 29, 2022 (discussing PX0321 at 9).

452.    In American's Five-Year Plan prepared in February 2020, American anticipated aggressive growth in the 2020 to 2024 period in PHL, with an increase its operations to up to 450 departures per day. PX0167 at 1; *see also* PX0316 at 1.

453.    American's plans in PHL changed because the NEA required American to increase its flying from NEA Airports in order to project alliance-related growth. When American's Clean Team dug into its work during the second quarter of 2020, its members discussed reallocating American's XLR planes—which were scheduled to support flying in PHL—to JFK. Tr. Vol. 8, 159:4–160:12 (Pack/American); PX0372 at 1. American recognized that the NEA presented an "opportunity cost" in the form of lost revenue at PHL, but viewed these losses as necessary to fund more flying at JFK. Tr. Vol. 8, 160:23–161:6 (Pack/American); PX0372 at 31.

454.    American's Chief Commercial Officer, Vasu Raja, admitted that he instructed his subordinates to assume that the planes for transatlantic service from JFK would come from PHL because American lacked other aircraft. Tr. Vol. 7, 158:4–159:24 (Raja/American); *see also* Tr. Vol. 8, 159:9-160:12 (Pack/American). American executives openly recognized that the NEA could allow American "to feed a JFK TA [transatlantic] hub and then reduce PHL to a spoke." PX0251 at 2 (cited in PX0462 (Town Report) ¶ 52 n.194).

455.    By the time the NEA negotiations were being finalized, American changed its pre-NEA-negotiation approach regarding PHL. In June 2020, four months after committing to expand departures in PHL and during the course of NEA negotiations, American declared that service at PHL should be "de prioritized" and that American was "not keen to grow" there. PX0132 at 1; PX0147 at 2.

456.    In the 18-month period after the signing of the NEA, PHL lost out repeatedly to NEA Airports for American's resources and service. In September 2020, American discussed plans to de-prioritize PHL for the benefit of JFK. PX0327 at 13. The next month, an American slide deck showed that over half of transatlantic flying from PHL could be covered if it were moved to JFK ("If PHL TA moved to JFK, 65% of flow volume would be covered"). PX0337 at

41. And by November 2020, American actively outlined moving transatlantic flying to JFK at the expense of PHL. PX0326 at 53, 65. American's post-NEA Five-Year Plan also included a large decrease in daily departures from PHL. PX0302 at 2.

457.    This strategy continued throughout 2021. The summer of 2021 brought service cuts at PHL that were not tied or related to wage increases. PX0360 at 1. American's 2021 plans projected a 50 percent reduction in operations at PHL compared to 2019. PX0305. American reported internally that ███████████████████████████████. PX0338 at 1.

458.    American's Senior Manager for Commercial Planning and Analysis Jordan Pack testified that American prioritized fleet allocation to the NEA Airports over fleet allocation to PHL, which presented an "opportunity cost" in the form of lost revenue in PHL. Tr. Vol. 8, 155:14–157:5, 160:22–161:6 (Pack/American); PX0378 at 2.

459.    American's Vice-President of Network Strategy, Brian Znotins, submitted a written statement to the PHL Airport Authority in July 2020 seeking to assuage it about the NEA by claiming that "Philadelphia will continue to be American's primary transatlantic gateway." Tr. Vol. 15, 114:16–115:4 (Znotins/American) (discussing DX0016 at 1). Notwithstanding such assurances, by December 2021, American's fleet deployment initiative priorities ranked the NEA Airports and DCA tied for first, with PHL ranking eighth. Tr. Vol. 8, 155:14–157:5 (Pack/American); PX0378 at 2.

460.    American elected to prioritize deploying its fleet to support the NEA Airports rather than restoring PHL to its pre-COVID-19, pre-NEA level. Tr. Vol. 8, 156:3-24 (Pack/American). As of December 2021, American's Five-Year Plan did not propose restoring its PHL fleet to pre-NEA levels. Tr. Vol. 8, 157:15-24 (Pack/American); PX0378 at 3. One internal American proposal for its 2026 fleet plan projected decreasing PHL departures from 414 in summer 2019 to ██ by 2026. PX0381 at 3.

461.    The ████████████████████████████████. PX0117 at 12. This is particularly true for transatlantic service. A comparison of 2018 capacity to 2022 capacity reveals that American's increased international flying out of JFK has been offset by decreased

international flying out of PHL; notably, PHL capacity has decreased more than JFK capacity has increased. Tr. Vol. 16, 103:4-17 (Town/Pls. Expert).

462.     The shift away from PHL in favor of flying from NEA Airports is not unique to that airport. According to Mr. Znotins, American is relocating planes from elsewhere in its network—including DFW, CLT, and PHL—in order to upgauge planes within the NEA. Tr. Vol. 15, 77:22–78:8, 79:12–80:20 (Znotins/American).

463.     Mr. Znotins testified that American is prioritizing New York City over other parts of its network when allocating planes as part of the NEA's re-optimization process. Tr. Vol. 15, 77:22–78:8 (Znotins/American). American must pull down flying or grow more slowly in other areas of its network to support NEA flying. Tr. Vol. 15, 104:17–105:6 (Znotins/American).

**2.     JetBlue shifting aircraft to grow within the NEA reduces its capacity in the rest of its network.**

464.     By entering the NEA, JetBlue committed to flying a significant number of American's slots at LGA, in addition to several at JFK. As reflected in the Clean Team's 2023 v2 NEA Schedule, JetBlue would fly 51 average daily departures from LGA and 159 average daily departures from JFK, up from 16 and 155 respectively in the 2019 baseline. PX0462 (Town Report) ¶ 10, Ex. 1; PX0288 at 18. But that commitment (combined with fleet constraints), forced JetBlue to limit previous growth plans in non-NEA Airports, including Los Angeles, Fort Lauderdale, and Orlando. Tr. Vol. 9, 58:9-15 (Friedman/JetBlue); PX0791 at 15. David Fintzen, JetBlue's Vice President of the Northeast Alliance, testified that JetBlue would need to pull down flying elsewhere if JetBlue were to fly the optimized NEA schedule in 2019 (as reflected in the v4 Schedule). Tr. Vol. 8, 110:9-17 (Fintzen/JetBlue).

465.     Mr. Hayes explained that when an airline shifts an airplane from one market to another, that airplane is no longer available to fly in the original market and, accordingly, no longer generates revenue in the original market. Tr. Vol. 1, 222:23–223:1 (Hayes/JetBlue).

466.     JetBlue executives Mr. Laurence (then-Head of Revenue Planning) and Mr. Lusso (then-Director of Route Planning) summarized the issue for senior JetBlue executives in August

2021 when presenting the Quarterly Network Review. This included a slide outlining that investing in NEA growth likely meant abandoning or scaling back other JetBlue initiatives, including flying at non-NEA Airports. Tr. Vol. 5, 178:16–179:16, 179:22–180:16 (Laurence/American); PX0791 at 7; *see also* Tr. Vol. 1, 269:12–270:16 (Hayes/JetBlue) (discussing PX0739) (explaining that in April 2020, JetBlue was considering building a "seventh focus city" that a legacy airline might abandon during the COVID-19 pandemic).

467.    Since entering the NEA, JetBlue has projected more limited future growth. In February 2021, JetBlue's Network Planning team predicted slower growth for the airline, stating that "[f]or the first time, JetBlue will grow only slightly above industry, and significantly behind ULCCs." PX0789 at 4. This slower growth rate—around four percent, instead of seven percent—is contrasted to other post-crisis periods, when JetBlue continued to grow more quickly than its competition. PX0789 at 4; *see also* Lusso (JetBlue) Dep. 169:23–170:12, Apr. 11, 2022; PX0781 at 2.

468.    Earlier this year, JetBlue reported that it plans to grow zero percent to five percent compared to 2019 levels, rather than its original plan to increase capacity 11 percent to 15 percent. PX0465 at 1-2. The NEA remains the focus. ████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████. PX0883 at 5-9.

469.    Increases in flying at NEA Airports comes at the expense of non-NEA Airports—JetBlue's pre-NEA focus. Capacity data benchmarked against a September 2018 base shows that after approximately September 2021, JetBlue's deployment of capacity in NEA and non-NEA Airports diverged, with NEA Airport deployment above the baseline while non-NEA deployment fell below the baseline. Tr. Vol. 16, 102:8–103:3 (Town/Pls. Expert); PX0956 (Town Reply Report) ¶ 139, Ex. 25).

470.    Other airlines have observed JetBlue shifting its capacity to the NEA at the expense of other parts of its network. Mr. Kirby testified at trial that he has observed JetBlue prioritizing flying NEA capacity over some of its previous initiatives. Tr. Vol. 4, 57:10-14

(Kirby/Spirit); ███████████████████████████████████. He testified that JetBlue's departures were down 40 percent at FLL and down 20 percent at MCO compared to 2019 levels. Tr. Vol. 3, 149:5–150:4 (Kirby/Spirit).

471.    JetBlue faces fleet constraints, despite delaying the retirement of 30 of its E190 aircraft in the spring of 2021. JetBlue's delayed retirement of the E190 aircraft only satisfied about 40 percent of the aircraft gap that JetBlue's Network Planning team had identified. Lusso (JetBlue) Dep. 171:20–173:2, Apr. 11, 2022; PX0781 at 2. After delaying the retirement of 30 of its E190 aircraft, JetBlue still projected that would need an additional 18 Mint aircraft and 34 all-core aircraft to achieve its desired steady state level of flying. PX0791 at 15.

472.    JetBlue has also experienced quality shortfalls this year. American's internal assessment of whether the NEA was resulting in higher quality of service (QSI) at NEA Airports shows that, first, other airlines' QSI improved more than either American or JetBlue during the NEA implementation, and second, that JetBlue actually lost QSI share in ███████████████ ████████████████████████████████████████████████████████████████ █████████████████████████. *See* DX0149 at 18. The only place where JetBlue's share gap improved was at ████████████████████████████████████████████████████ ███████████████████████ *See* DX0149 at 18.

###    E.    The Northeast Alliance does not result in any unilateral growth by American or JetBlue that is inconsistent with their joint MGIA interest.

473.    The MGIA does not give American or JetBlue the incentive to create additional capacity. Tr. Vol. 10, 120:3–122:4 at 120:18-21 (Miller/Pls. Expert). First, the evidence at trial revealed that the MGIA is not in fact causing the Defendants to choose to increase capacity. Mr. Friedman explained that the network planning team does not take the MGIA into account when making route-planning decisions. Tr. Vol. 9, 8:22–9:3 (Friedman/JetBlue). Mr. Hayes admitted that the MGIA transfer payment is "not that material" to JetBlue's decisions within the NEA. Tr. Vol. 1, 194:22–195:1 (Hayes/JetBlue).

474.     These facts are consistent with Dr. Miller's economic analysis, which shows that the MGIA will not incentivize Defendants to create additional capacity. Tr. Vol. 10, 120:3–123:24 (Miller/Pls. Expert). While Dr. Israel claimed to have a formula supporting the claim that the MGIA incentivizes capacity increases by each airline, the formula does not do so. Tr. Vol. 17, 71:1–74:5 (Miller/Pls. Expert). Dr. Israel discussed a specific scenario regarding routes with below-average RESM, wrongly suggesting it as representative of the incentives created across all routes. Tr. Vol. 17, 71:1–74:5 at 71:24–72:24 (Miller/Pls. Expert). But even in the specific scenario discussed by Dr. Israel, neither Defendant will choose to expand capacity because the growth is not in the Defendants' *mutual* best interest, and the NEA calls on the Defendants to coordinate their capacity decisions. Tr. Vol. 10, 120:3–122:4; Vol. 17, 71:1–74:5 at 71:24–72:12 (Miller/Pls Expert); *see also supra* Section III.B.1 (describing Defendants' obligations to coordinate capacity with one another under the NEA). In that scenario, the partner that expands would be exploiting the other partner—that is, the other partner would be subsidizing capacity growth that is otherwise unprofitable for the alliance as a whole. Tr. Vol. 10, 120:3–122:4 at 120:18-25 (Miller/Pls. Expert).

475.     The NEA's capacity coordination provisions are explicitly designed to prevent such exploitation from occurring. Recognizing the risk that the NEA could require "fund[ing] of loss-making capacity," JetBlue identified "concurrence [in] capacity deployment" as the mechanism to prevent such jointly unprofitable growth. Tr. Vol. 10, 124:7–125:5 (Miller/Pls. Expert); PX0807 at 7. Similarly, American noted that "cheating on the pool"—a term referring to the risk that growth could harm the NEA's profitability—may occur when one alliance member expands in a way that does not increase joint profits. Tr. Vol. 10, 125:23–126:25 (Miller/Pls. Expert) (referring to the testimony of Mr. Raja); *see also* Tr. Vol. 7, 186:13-21 (Raja/American) (describing Defendants' efforts to prevent "cheating on the pool" and "to grow in the places that make the most sense for us together because that's how you expand the revenue pool"). Defendants, however, are not likely to pursue this kind of capacity expansion because, by requiring Defendants to jointly coordinate and meet to discuss capacity, the NEA minimizes the

ability of one partner to unilaterally exploit the other. Tr. Vol. 10, 127:1-11 (Miller/Pls. Expert). Furthermore, even if one airline did exploit the other in this way, that would make it more difficult for Defendants to cooperate going forward. Tr. Vol. 10, 122:5–123:24 at 122:21–123:3 (Miller/Pls. Expert). American discussed adding "collars to protect against run away capacity growth" as it contemplated the incentives that would be created by a revenue-sharing arrangement like the NEA. PX0461 (Miller Report) ¶ 50 n.58 (citing PX0168).

### F.     The Northeast Alliance has not resulted in American or JetBlue adding to their fleets.

#### 1.     The NEA did not cause American to change its fleet plans.

476.     Brian Znotins, American's Vice President of Network Strategy, acknowledged that American's 2027 fleet projections effectively remained the same in both its 2019 fourth quarter (pre-NEA) projection and its 2022 second quarter (post-NEA) projection, *i.e.*, the NEA did not lead to American projecting net additions to its fleet. Tr. Vol. 15, 130:3-15 (Znotins/American). While Mr. Znotins testified about "recent fleet additions," he conceded that American had already planned many of those "additions" before the NEA. Tr. Vol. 15, 131:6–135:17 (Znotins/American). He also agreed that in the "short term," American was "hav[ing] to pull down flying" or "grow more slowly in other areas to fund the NEA." Tr. Vol. 15, 104:17–105:6 (Znotins/American).

#### 2.     The NEA did not cause JetBlue to delay retirement of its planes.

##### a.     JetBlue's fleet decisions regarding to E190 and A220 would have occurred regardless of the NEA.

477.     David Clark, JetBlue's Head of Revenue and Planning, claimed that before the onset of COVID-19, JetBlue planned a phased retirement of its 60 aircraft E190 to occur between 2020 and 2025. Tr. Vol. 10, 24:13-21 (Clark/JetBlue). The E190 is the smallest aircraft operated by JetBlue, with each aircraft containing approximately 100 seats. Tr. Vol. 2, 42:25–43:12 (Hayes/JetBlue). During this same period, JetBlue planned to acquire 70 A220 aircraft, each of which has approximately 140 seats. Tr. Vol. 9, 59:9–60:16 (Friedman/JetBlue). The net effect of those plans would have been an increase of approximately 2,400 seats in JetBlue's fleet.

JetBlue also held options to obtain an additional 50 A220s, which JetBlue could exercise between 2026 and 2028. PX0949 at 36.

478.    The COVID-19 pandemic presented JetBlue with a "crisis" opportunity to increase its market share. JetBlue historically has taken advantage of crises to grow. For example, following the 2008 financial crisis, JetBlue recovered to pre-crisis levels within a year and significantly outpaced industry capacity growth over the next five years. PX0781 at 4; PX0789 at 4; *see supra* Sections VII.D.2. Similarly, the early COVID-19 period saw JetBlue identify and pursue multiple initiatives that would support annual ASM growth in the range of seven to eight percent. PX0781 at 5; PX0789 at 4; Lusso (JetBlue) Dep. 163:7-17, 169:23–170:12, Apr. 11, 2022.

479.    JetBlue did consider in mid-2020 whether to accelerate the E190 fleet retirement and complete it by ▮▮▮▮▮▮▮. DX0266 at 8; DX0356 at 76, 77. Ultimately, JetBlue declined to do so, recognizing that losing all these aircraft would leave it with insufficient aircraft to pursue its non-NEA initiatives, let alone the additional NEA flying required for JetBlue to fly American slots at LGA and JFK. PX0788 at 14, 20. JetBlue also decided to exercise and accelerate its options to order 30 additional A220 aircraft. Tr. Vol. 5, 183:24–184:1 (Laurence/American); PX2000 at 1-2.

480.    As Mr. Friedman highlighted in a July 2020 e-mail, "regardless of Connie, JetBlue will have to find a way to preserve and likely grow the current order book: whether through new aircraft, old aircraft, keeping E90s, purchasing or leasing . . . If the fleet can't grow, something has to go." PX0525 at 2; *see also* PX0561 (Mr. Friedman explaining in a July 14, 2020 text that JetBlue "is going to need more a/c [aircraft] for sure even without connie if we intend to grow mco, lax, and JFK"). A JetBlue study on industry capacity recovery in February 2021 also concluded that JetBlue's order book should be at least 40-60 aircraft larger than it was, excluding the NEA. PX0789 at 4, 7.

        **b.**    **JetBlue's summer 2021 decision to postpone the retirement of some E190s was not related to the NEA.**

481.    In February 2021, JetBlue network planners predicted that flight constraints would allow JetBlue to grow only about four percent during the COVID-19 crisis. Lusso (JetBlue) Dep. 163:7-17, Apr. 11, 2022; PX0789 at 4; *see also* Lusso (JetBlue) Dep. 169:23–170:12, Apr. 11, 2022; PX0781 at 2. JetBlue's Network Planning team determined that JetBlue's fleet would need to grow by 40 to 60 aircraft to meet JetBlue's growth opportunities independent of the NEA. Lusso (JetBlue) Dep. 165:10–166:25, Apr. 11, 2022; PX0789 at 4. JetBlue anticipated a deficit of between 55 and 90 aircraft by 2025. PX0789 at 17.

482.    In the summer of 2021, JetBlue opted to delay the planned retirement of 30 E190 aircraft. Tr. Vol. 9, 40:15–41:19 (Friedman/JetBlue). Without this delay, JetBlue's E190 fleet would have fallen from the 60 E190s as of 2020 to only three in 2025; with the delay, attrition of the E190s would be slowed during the period from 2022 through 2025. PX0816, comparing "In Service AC" rows for E190s in the "Base No NEA" tab and the "Keep E90 No NEA" tab, shows this difference:

| Plan | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|------|------|------|------|------|------|------|
| Base | 60 | 58 | 50 | 40 | 20 | 3 |
| Keep E190 | 60 | 58 | 60 | 58 | 42 | 32 |

483.    Delaying the retirement of the E190s served to bridge the gap in JetBlue's order book, where in 2026 it would bring on four A220s already on order and exercise options for an additional 19 A220s, as well as some A321s. DX0374 at 7. The E190s would be replaced when JetBlue began to exercise its options on A220 aircraft in 2026. DX0374 at 7.

        **c.**    **JetBlue's Claim at Trial Regarding the Delayed Retirement of the E190s Is Inconsistent with the Facts.**

484.    At trial, Mr. Friedman and Mr. Clark testified that the decision to delay the E190s retirement would not have been made absent the NEA. Tr. Vol. 10, 43:9-21 (Clark/JetBlue); Tr. Vol. 9, 41:3-21 (Friedman/JetBlue).

485.     This testimony is inconsistent with contemporaneous evidence. First, the underlying analysis used to evaluate delaying the retirement of the E190s shows that retaining them in a world without the NEA would produce more incremental revenue than would retaining them in a world with the NEA. Tr. Vol. 10 23:18–24:21 (Clark/JetBlue); PX0816 at 3 (comparing row 42 of the "Mid-Scenario" (Keep E90 with NEA) with row 50 of the "Mid-Scenario" (Keep E90 No NEA).

486.     Second, JetBlue had profitable non-NEA opportunities to pursue with the retained E190s. JetBlue's 2021 fleet plan projected that, in 2025, it would have a shortfall of between approximately 55 and 90 aircraft. PX0789 at 17; *see also* Lusso (JetBlue) Dep. 171:20–173:2, Apr. 11, 2022 (explaining that delayed retirement of the E190 would only make up about 40 percent of the aircraft gap). Only approximately 27 of this aircraft short-fall was explained by the demands of the NEA ("Connie"), such as the need to fund the flying required to operate American slots at JFK and LGA. PX0791 at t17.

487.     Third, even after the decision to extend the E190s, JetBlue continued to identify the need to fund NEA flying at the expense of flying outside of the NEA. Lusso (JetBlue) Dep. 252:5-17, Apr. 11, 2022. In July 2021, JetBlue projected that it would be unable to reach 2019 flying in Orlando until 2025 because of aircraft constraints and growth commitments at the four NEA Airports (JFK, LGA, EWR, and BOS). Lusso (JetBlue) Dep. 236:16–237:17, Apr. 11, 2022; PX0783 at 3. JetBlue's flying in 2022 would be lower than it had been in 2019 because of other network priorities including the NEA, as well as pilot constraints and aircraft availability. Lusso (JetBlue) Dep. 238:12–239:4, Apr. 11, 2022; PX0783 at 4; Tr. Vol. 2, 44:14-24 (Hayes/JetBlue) (explaining that JetBlue's pilot shortage resulted in 2022 capacity cuts).

488.     An August 2021 Quarterly Network Review stated that, even after the E190 retirement delay, JetBlue would still need 18 Mint aircraft and 34 all-core aircraft to achieve the NEA steady state. PX0788 at 20. The steady state would be unachievable until 2026 through 2027, and even that timeframe assumed limited growth in JetBlue's focus cities such as Los Angeles, Fort Lauderdale, and Orlando. PX0788 at 20.

489.     JetBlue projected that five out of six of JetBlue's focus cities—all but New York City—would fail to reach their desired growth levels by 2025. Lusso (JetBlue) Dep. 249:4–252:9, Apr. 11, 2022; PX0788 at 21. The order book was projected to constrain growth in BOS, LAX, South Florida, MCO, and San Juan. Lusso (JetBlue) Dep. 253:9-18, Apr. 11, 2022; PX0788 at 21. That delayed growth was projected after the decision to delay the retirement of 30 E190 aircraft. Lusso (JetBlue) Dep. 252:10-17, Apr. 11, 2022.

490.     A November 2021 JetBlue Network Planning presentation explained that due to fleet constraints, BOS, MCO, and FLL would only reach 2019 levels of flying. PX0769 at 4 (explaining that (1) growth in JFK and LGA will occur in 2022, (2) BOS, MCO, and FLL will only achieve 2019 levels in 2022, and (3) growth at LGA and JFK will be funded in part by the delayed E190 retirements); PX0783 at 5 (noting that MCO will be unable to return to 2019 levels before 2025 because of fleet constraints); Lusso (JetBlue) Dep. 236:16–237:17, Apr. 11, 2022.

491.     Fourth, at the onset of COVID-19, JetBlue had reduced its planned fleet by deferring deliveries of approximately 34 A320s from 2020 through 2024 to 2025 through 2027, and entering into sale-leasebacks for 22 A320s. Tr. Vol. 9, 38:21-25 (Friedman/JetBlue); DX0374 at 2-3. As Mr. Friedman testified, these deferrals exacerbated his concerns in the summer of 2020 about JetBlue's fleet constraints with or without the NEA. Tr. Vol. 8, 283:20-23 (Friedman/JetBlue). Mr. Friedman further testified that JetBlue's standalone Five-Year Plan prepared in the summer of 2020 did not make an adjustment for these changes. Tr. Vol. 9, 39:1-12 (Friedman/JetBlue). The Clean Team also did not make these adjustments, which included aircraft that would be delivered by 2023 in creating the 2023 v2 Schedule. Tr. Vol. 8, 188:1-12 (Pack/American).

492.     Finally, when asked why JetBlue would not have revisited its pre-COVID-19 decision about the timing of the E190 retirements even without the NEA, Mr. Clark responded that JetBlue had made the decision to retire the E190s before COVID-19 and that it was only the growth opportunities presented by the NEA that caused JetBlue to revisit this issue. Tr. Vol. 10, 37:5-28:18 (Clark/JetBlue). Mr. Clark's explanation ignores the extensive record of JetBlue's

138

many post-COVID-19 growth opportunities and the fleet constraints that prevented JetBlue from pursuing them. Mr. Clark's testimony also ignores that the initial pre-COVID-19 decision on the timing of the E190 retirements was made before the post-COVID-19 decision to defer deliveries of approximately 30 to 40 A320 aircraft. Given these A320 deferrals, reconsideration of the E190 retirement schedule would have been necessary for JetBlue to accomplish its non-NEA growth objectives. Tr. Vol. 8, 281:23–282:13 (Friedman/JetBlue); PX0525 at 2; Tr. Vol. 9, 57:11–58:15 (Friedman/JetBlue); PX0791 at 15 (noting that JetBlue would still need 18 Mint aircraft and 34 All-Core aircraft). Internal JetBlue communications recognized that JetBlue leadership likely would not retire the E190s regardless of the NEA. PX0561 ("certain member of leadership have no desire to retire any E90s and when the time is right they'll make that clear"); PX0499 at 1, 17.

> ### d.    JetBlue's decision in early 2022 to accelerate A220s.

493.     In early 2022 JetBlue accelerated exercising options for 30 A220s from 2026 through 2028 to 2022 through 2026. Tr. Vol. 9, 41:3-19 (Friedman/JetBlue). The evidence shows that even without the NEA, other growth initiatives justified this decision. PX0789 at 17. Despite Mr. Friedman's claims that the decision was tied to the NEA, it is notable that the public announcement of the acceleration did not link it to the NEA, instead citing continued initiatives to improve operational performance. Tr. Vol. 9, 41:20-21 (Friedman/JetBlue); PX2000 at 1.

494.     Moreover, the accelerated A220s involved simultaneously retiring the remaining owned E190s on a one-for-one basis. PX0949 at 36 (explaining that E190s "will exit on 1:1 for each of these A220 options"); PX0876 at 25 ████████████████████████████████ ██████████████████████ As such, the acceleration of the A220s did not change the number of aircraft available to JetBlue in any year between 2022 and 2026. PX0949 at 36 (explaining that by accelerating the A220 options, JetBlue "will set new retirement dates for the owned E190s"); PX0956 (Town Reply Report) ¶¶ 132-133. Rather, for each year that an A220 was added, an E190 would be subtracted. The acceleration of the A220 options merely changes the year that the owned E190s would be replaced by A220s that were under option. DX0374 at 14.

As a result, JetBlue would have had the same number of A220/E190 aircraft from 2022 through 2026 with or without accelerating the options, as reflected in the tables below:

**E190/A220 Fleet Plan Before Accelerating Options**

| Fleet | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | Total by 2027 |
|---|---|---|---|---|---|---|---|---|
| A220 On Order | 7 | 9 | 18 | 22 | 12 | 1 | | 70 |
| A220 Options | | | | | | 19 | 18 | 37 |
| Total A220 Fleet | 8 | 17 | 35 | 57 | 69 | 89 | 107 | 107 |
| | | | | | | | | |
| Total Leased E190s | 30 | 30 | 21 | 4 | 0 | | 0 | 0 |
| Total Owned E190 | 30 | 30 | 30 | 30 | 30 | 11 | 0 | 0 |
| Total E190 Fleet | 60 | 60 | 51 | 34 | 30 | 11 | 0 | 0 |
| Total E190/A220 | 68 | 77 | 86 | 91 | 99 | 100 | 107 | 107 |

**E190/A220 Fleet Plan After Accelerating Options**

| Fleet | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | Total by 2027 |
|---|---|---|---|---|---|---|---|---|
| A220 On Order | 7 | 9 | 18 | 22 | 12 | 1 | | 70 |
| A220 Options | | 1 | 3 | 5 | 8 | 13 | 7 | 37 |
| Total A220 Fleet | 8 | 18 | 39 | 66 | 86 | 100 | 107 | 107 |
| | | | | | | | | |
| Total Leased E190s | 30 | 30 | 21 | 4 | 0 | 0 | 0 | 0 |
| Total Owned E190 | 30 | 29 | 26 | 21 | 13 | 0 | 0 | 0 |
| Total E190 | 60 | 59 | 47 | 25 | 13 | 0 | 0 | 0 |
| Total E190/A220 | 68 | 77 | 86 | 91 | 99 | 100 | 107 | 107 |

*Tables based on PX0949 at 36 and DX0374 at 14.*

495. The acceleration of the 30 A220s does increase seat capacity for JetBlue, as the A220 has 140 seats compared to the E190s' 100 seats. That impact is minimal before 2025 since only nine additional A220s are scheduled to be delivered between 2022 and 2024. Further, because the number of aircraft does not change, JetBlue's ability to meet its departure goals at its focus and beachhead airports is not enhanced. PX0788 at 18, 20-21.

       e.    **Any growth of Mint service at the NEA Airports has been funded from forgoing flying outside the NEA.**

496. In August 2021, JetBlue forecasted that it would need 18 Mint aircraft to reach the NEA steady state vision. Tr. Vol. 9, 57:11-24 (Friedman/JetBlue); PX0791 at 15. Because of those fleet constraints, JetBlue's Network Planning team projected that the NEA steady state

would be unachievable until 2026 or 2027. Tr. Vol. 9, 58:5-8 (Friedman/JetBlue); PX0791 at 15. JetBlue assumed limited growth in non-NEA focus cities, such as Los Angeles, Fort Lauderdale, and Orlando. PX0791 at 15.

497.    In November 2021, the JetBlue network planners asked for incremental Mint aircraft to be added to JetBlue's order book. Lusso (JetBlue) Dep. 190:15-22, Apr. 11, 2022. When American and JetBlue decided that JetBlue would fly JFK-SFO with nine (and eventually eleven) frequencies, JetBlue had to pull—at least for the short-term—Mint aircraft from other routes to fund that incremental flying. Lusso (JetBlue) Dep. 193:16–194:20, 197:11–198:4, Apr. 11, 2022; PX0779 at 2-3. To fund JFK-SFO, JetBlue proposed moving Mint frequencies from ███████████████████████████. Lusso (JetBlue) Dep. 200:3-16, 200:21–201:4, Apr. 11, 2022; PX0779 at 2-3. Mr. Friedman wrote that this plan meant, "all in all, this represents Mint *exiting* two of five west coast cities" and that that was "strategically upsetting." PX0779 at 3. Mr. Lusso agreed that the plan was upsetting. Lusso (JetBlue) Dep. 201:23–203:4, Apr. 11, 2022. Mr. Friedman further explained: "It's important to recognize that by 'prioritizing' JFKSFO all we're *really* doing is moving a/c around." PX0779 at 3. Mr. Lusso explained that JetBlue has 37 Mint-configured aircraft designed for the transcontinental market, and "until we have more, the fleet is what it is." Lusso (JetBlue) Dep. 205:16–206:1, Apr. 11, 2022.

G.    **The Northeast Alliance is not justified by competition with Delta and United.**

1.    **Delta and United grew organically to become strong competitors, and so too could American and JetBlue.**

498.    Delta and United have demonstrated that organic growth in New York City and Boston is possible given the necessary commitment. Delta and United have demonstrated that organic growth in New York City and Boston is feasible. Delta grew from being the fourth-largest airline in New York City to being the largest over the course of approximately 15 years. Esposito (Delta) Dep. 54:21–55:12, June 21, 2022; Esposito (Delta) Dep. 190:4-17, June 21, 2022. Delta achieved this without partnering with a domestic competitor. Esposito (Delta) Dep. 56:9-12, June 21, 2022; Esposito (Delta) Dep. 190:21-24, June 21, 2022.

499.     Delta has pursued multiple avenues to organic growth in New York City. One way is by investing in infrastructure, including by building and expanding terminals at JFK and LGA. Esposito (Delta) Dep. 55:13–56:4, June 21, 2022. Another way is by upgauging its aircraft, which allows Delta to transport more passengers per flight. Esposito (Delta) Dep 193:10–194:15, June 21, 2022.

500.     Similarly, United has made investments at JFK, enabling United to become a preferred airline for a corporate customer, overtaking Delta and JetBlue. PX0908 at 1.

501.     The story is the same in Boston. Over approximately the past five years, Delta has more than doubled its flights at BOS, increasing from around 60 to 70 daily departures to about 150. Esposito (Delta) Dep. 59:20–60:13, June 21, 2022.

502.     Delta's growth at BOS has been entirely organic. Esposito (Delta) Dep. 189:22-24, 189:25–190:3, June 21, 2022. Delta grew because it invested hundreds of millions of dollars in infrastructure. Esposito (Delta) Dep. 189:6-21, June 21, 2022.

> **2.     The NEA has not spurred Delta and United to significantly lower prices or change corporate strategy in response to the NEA.**

503.     Delta and United have not altered their strategies in New York City or Boston despite the claim that the NEA would allow American to better compete with the other legacy airlines. Delta executive Esposito testified that he does not view the NEA as meaningfully altering the strength of competition previously provided by American and JetBlue. Esposito (Delta) Dep. 87:20–88:13, June 21, 2022. This is in part because Delta did not view American as a weak competitor in New York City pre-NEA. Esposito (Delta) Dep. 150:20–151:10, June 21, 2022.

504.     Instead, Delta's corporate strategy has remained unaltered post-NEA. Mr. Esposito testified that the NEA has not impacted Delta's capacity plans across its network. Esposito (Delta) Dep. 237:25–238:4, June 21, 2022 ("Q. I'm thinking in aggregate, has the NEA impacted Delta's capacity planning process across its domestic network? A. No.").

505.    Nor has Delta accelerated any of its growth plans at BOS as a result of the NEA. Esposito (Delta) Dep. 129:8–130:6, June 21, 2022. In fact, Delta has not added any additional routes from BOS in response to the NEA. Esposito (Delta) Dep. 236:23–237:14, June 21, 2022.

506.    Delta had already designated BOS as a hub in 2019, before the NEA had been announced. Delta's plans to grow to 120 flights per day in BOS also pre-date the NEA. Esposito (Delta) Dep. 186:9-17, 186:21–187:20, June 21, 2022.

507.    Prior to the NEA, Delta had already planned to launch Boston and New York City flights using larger A220 aircraft. Esposito (Delta) Dep. 234:25–235:3, June 21, 2022.

508.    American's new service between JFK-Athens, JFK-Tel Aviv, and JFK-Rio de Janeiro have not engendered a competitive response. Esposito (Delta) Dep. 119:4–120:4, June 21, 2022.

509.    The NEA has not engendered a competitive response from United. ████████

█████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████

**H.    Defendants' estimates of the supposed procompetitive benefits of the Northeast Alliance are fatally flawed.**

**1.    Dr. Israel's two approaches for estimated consumer benefits.**

510.    Defendants' economic expert, Dr. Israel, presented two approaches for estimating consumer benefits, which he referred to, respectively, as the Clean Team approach and the passenger share change approach. Tr. Vol. 14, 65:21-66:5, 83:6-21 (Israel/Defs. Expert); DX1091 (Israel Report) ¶¶ 277, 281. The two approaches differ in the way that Dr. Israel estimates increases in passenger traffic that he attributes to the NEA. However, to convert those passenger

increases into a monetary value of consumer benefit, he relies on the same methodology. Tr. Vol. 16, 97:5-21 (Town/Pls. Expert); Tr. Vol. 14, 65:21–67:10 (Israel/Defs. Expert).

511.    Under his first approach to estimating the NEA's benefits, Dr. Israel's framework purports to compare passengers carried by American and JetBlue in a world with the NEA and a world without the NEA. For his counterfactual, Dr. Israel compared: (a) the actual schedule flown in September 2019 with (b) a hypothetical 2023 NEA Schedule created by the Clean Team. Tr. Vol. 16, 97:5-21 (Town/Pls. Expert); Tr. Vol. 14, 65:21–67:10 (Israel/Defs. Expert); *see supra* Section III.C.4. Appendix C provides a visual of Dr. Israel's comparison.

512.    The Clean Team's hypothetical NEA schedule is referred to as the "2023 v2 Schedule." The 2023 v2 Schedule assumed a larger fleet than American and JetBlue had in September 2019. Tr. Vol. 8, 183:13-17, 190:18–191:4, 217:8-11 (Pack/American); PX0288 at 22. Consequently, the 2023 v2 Schedule includes greater capacity than the 2019 actual schedule. Tr. Vol. 16, 99:11-18 (Town/Pls. Expert). Clean Team members used information regarding Defendants pre-NEA order books to determine the size of the capacity increase incorporated in the 2023 v2 Schedule. Tr. Vol. 16, 108:8-17 (Town/Pls. Expert); Tr. Vol. 8, 69:5-8 (Fintzen/JetBlue); Tr. Vol. 13, 25:2–26:6 (Schweinzger/American); Tr. Vol. 14, 67:11–68:1 (Israel/Defs. Expert). Dr. Israel admitted that the Clean Team did not revise the order book in light of the anticipated changes in demand from the NEA; instead, they "used the order book, as I understand it, that existed." Tr. Vol. 14, 70:2-18 at 70:5-6 (Israel/Defs. Expert).

513.    American uses a proprietary system called Raven to estimate passenger traffic that will be generated based on inputted schedules for American and other airlines. Tr. Vol. 8, 181:21-24 (Pack/American). Raven inputs include the schedules of all airlines. Tr. Vol. 12, 248:18–249:2 (Schweinzger/American). Raven uses the characteristics of a given schedule pattern to predict traffic. Raven can estimate the traffic that will result from two airlines operating under a partnership. Tr. Vol. 13, 66:23–67:3 (Schweinzger/American). Raven is calibrated using actual booking data. Tr. Vol. 13, 66:23–67:3 (Schweinzger/American). Raven is sometimes referred to as a "quality of service index" or QSI model. Tr. Vol. 13, 66:23–67:3 (Schweinzger/American).

514.     The Clean Team provided Dr. Israel with Raven runs based on the 2019 Actual Schedule and 2023 v2 Schedule, which allowed a comparison of estimated passenger traffic for each schedule respectively. The Raven run for the 2019 Actual Schedule treated JetBlue and American as operating independently while the Raven run for the 2023 v2 Schedule treated JetBlue and American operating as partners at the NEA Airports. Tr. Vol. 16, 97:5-21 (Town/Pls. Expert); Tr. Vol. 14, 65:21–67:10 (Israel/Defs. Expert).

515.     In creating the 2023 v2 Schedule, the Clean Team did not assess whether this schedule would have impacts outside of the NEA footprint. Tr. Vol. 8, 191:24–192:2 (Pack/American).

              **a.**      **Dr. Israel's framework is not an apples-to-apples comparison.**

516.     Because Dr. Israel's analysis involves comparing a non-NEA world in 2019 with an NEA world in 2023, it is not an apples-to-apples comparison. As Plaintiffs' expert Dr. Town explained, the Raven runs that Dr. Israel relies on do not isolate the impact of the NEA. Tr. Vol. 9, 71:10-15 (Town/Pls. Expert). For example, the Raven runs that Dr. Israel relies on do not hold fixed the fleet available to American and JetBlue. Tr. Vol. 16, 108:8-17 (Town/Pls. Expert). Put simply, Dr. Israel's benefits analysis fails to estimate the true benefits of the NEA because it does not consider the extent that Defendants would have grown on their own between 2019 and 2023 absent the NEA. Tr. Vol. 16, 98:9-22 (Town/Pls. Expert).

517.     Dr. Israel's assumption that Defendants would not have grown capacity between 2019 and 2023 absent the NEA is unreliable. Defendants increased capacity in almost every year between 2009 and 2019. Tr. Vol. 16:98:23–99:10, 100:10-14 (Town/Pls. Expert) (discussing demonstrative at 6, 7).

518.     Eighty-four percent of the ASM capacity growth assumed by the Clean Team between 2019 and the 2023 v2 Schedule, as adopted by Dr. Israel, is attributable to JetBlue. Tr. Vol. 16, 100:6-9 (Town/Pls. Expert). Yet JetBlue's own standalone plan developed in July 2020, without factoring in the NEA, called for even more growth than Dr. Israel assumed the NEA would create. Tr. Vol. 16, 100:19–101:7, 108:21–109:4 (Town/Pls. Expert) (discussing

demonstrative at 8, 18); PX0525 at 5. Indeed, even in JetBlue's Retire E190s scenario contained in the July 2021 JetBlue "No NEA" plan, there is substantial ASM growth projected between 2019 and 2023. Tr. Vol. 16, 101:8-20 (Town/Pls. Expert) (discussing demonstrative at 9); PX0816 at 45.

519.    About one-third of the assumed capacity increase in the 2023 v2 Schedule can be directly attributed to causes unrelated to the NEA. Tr. Vol. 16, 107:19-24 (Town/Pls. Expert) (discussing demonstrative at 16).

520.    A portion of this assumed capacity increase comes from ending the 737 MAX slot waiver. Tr. Vol. 16, 106:16–107:8 (Town/Pls. Expert); PX0956 (Town Reply Report) ¶¶ 174-176. (the waiver was granted by the FAA related to the grounding of the Boeing 737 MAX due to safety concerns). Mr. Pack testified that American's capacity would increase when the 737 MAX aircraft came back online. Tr. Vol. 8, 162:6-16 (Pack/American). Dr. Israel admitted that when he took American's 2019 JFK slot waiver into account, it reduced his benefit estimate by fourteen percent. Tr. Vol. 14, 109:16–110:1 (Israel/Defs. Expert).

521.    Another portion of this assumed capacity increase comes from deployment of American's pre-existing Embraer 175 orders and American's plan to upgauge regional jets in New York. Tr. Vol. 16, 106:16–107:8 (Town/Pls. Expert); PX0956 (Town Reply Report) ¶¶ 177-180.

522.    Another portion of this assumed capacity increase comes from deployment of JetBlue's pre-existing Airbus 321 and A220 orders. Tr. Vol. 16, 106:16–107:8 (Town/Pls. Expert); PX0956 (Town Reply Report) ¶¶ 181-182.

523.    In addition to the one-third capacity increase that Dr. Town identified as explicitly driven by non-NEA causes, additional capacity increases in the 2023 v2 Schedule also derive from deployment of new planes from Defendants pre-NEA order books. Tr. Vol. 16, 107:25–108:7 (Town/Pls. Expert).

524.    Dr. Israel also did not adjust the 2019 baseline used in his benefits estimate to account for the new routes that JetBlue added to its schedules in late 2019 and early 2020,

despite the Clean Team accounting for this in its own analysis. Tr. Vol. 14, 112:13-20 (Israel/Defs. Expert); Tr. Vol. 8, 89:14–90:4 (Fintzen/JetBlue).

525.    JetBlue's network planners recognized that the 2023 v2 Schedule attributed significant growth to the NEA that JetBlue would have experienced independently. Eric Friedman, JetBlue's Director of Route Planning, testified that the Clean Team was "including value here that would have been generated anyway[.]" Tr. Vol. 8, 285:25–286:19 (Friedman/JetBlue); PX0553 at 1. Mr. Friedman, with the approval of his supervisor Mr. Lusso, sent those concerns to JetBlue Clean Team member David Fintzen, copying Scott Laurence, JetBlue's Head of Revenue and Planning. Tr. Vol. 8, 286:25–287:14 (Friedman/JetBlue); PX0553 at 1; *see also* PX0751. He further recognized that the Clean Team was giving credit to "new routes" that JetBlue had been considering without the NEA. Tr. Vol. 8, 294:22–295:2, 297:9-12 (Friedman/JetBlue); PX0535.

526.    The JetBlue Clean Team and Network Planning team understood that to calculate the incremental value attributable to the NEA, any value based on JetBlue's independent plans to grow absent the NEA should not be included. Tr. Vol. 8, 85:13–86:23 (Fintzen/JetBlue); PX0751 at 4.

>           **b.    Dr. Israel's comparison does not capture any impact that growth at the NEA might have on flying by Defendants outside of the NEA.**

527.    Dr. Israel's comparison does not capture any impact that growth at the NEA Airports in 2023 might have on flying by JetBlue or American outside of the NEA. The capacity growth assumed by the Clean Team in the 2023 v2 Schedule comes entirely from NEA Airports; schedules outside of the scope of the NEA are assumed to be held fixed. Tr. Vol. 16, 102:4-7 (Town/Pls. Expert). To the extent the assumed growth at NEA Airports will need to be funded from capacity taken from non-NEA Airports, growth at NEA Airports will not produce much consumer benefit. Tr. Vol. 16, 101:21-103:17 (Town/Pls. Expert); PX0462 (Town Report) ¶¶110-115; PX0956 (Town Reply Report) ¶ 187.

c.      **Dr. Israel could have pursued an apples-to-apples comparison.**

528.     As Dr. Town testified, comparing the 2019 actual schedule with the 2023 v2 Schedule is not an apples-to-apples comparison. An actual apples-to-apples comparison would involve either a comparison of: (1) the 2019 actual schedule with a 2019 NEA schedule reflecting the fleet that existed in 2019, or (2) a 2023 standalone schedule, reflecting any growth Defendants would have engaged in absent the NEA by 2023, with the 2023 v2 NEA Schedule. Tr. Vol. 9, 68:12–69:23 (Town/Pls. Expert) (discussing case-in-chief demonstrative at 3).

529.     The Clean Team did prepare a schedule that would have allowed an apples-to-apples comparison based on 2019, but Dr. Israel elected not to use it. In late May 2020, the Clean Team constructed a schedule called "v4" which "showed what the world would have looked like if the NEA were in place in 2019." Tr. Vol. 8, 193:2-4 (Pack/American); PX0297 at 2. In the v4 Schedule, unlike the 2023 v2 Schedule, the Clean Team kept the fleet of the two airlines the same as it was in September 2019. Tr. Vol. 8, 193:11-14, 228:11-16 (Pack/American).

530.     Defendants initially contemplated a Raven run that would rely on a "v4" schedule designed to hold Defendants' available aircraft fleet fixed at 2019 levels. Dr. Israel acknowledged discussing developing "something like a v4" with the Clean Team, explaining that it was something "we would need to do because DOJ would ask." Tr. Vol. 14, 125:25–126:9 at 126:7-8 (Israel/Defs. Expert).

531.     However, after the JetBlue Clean Team circulated its version of the v4 Schedule to its American counterparts on May 29, 2020, Mr. Pack texted his American Clean Team colleague Mr. Schweinzger that he was, "[s]lightly scared that when we run v4 through raven B6 may not be rev positive." Tr. Vol. 8, 208:11-16 (Pack/American); PX0372 at 29. Mr. Schweinzger replied by asking Mr. Pack to do a back-of-the-envelope estimation of what the Raven run would show, to which Mr. Pack responded with a "like." Tr. Vol. 8, 209:14-17 (Pack/American); PX0372 at 30, 32.

532.     Mr. Pack's concerns proved prescient. Later that same day, he and Mr. Schweinzger determined that showing the full network results of the NEA would be "no bueno."

Tr. Vol. 8, 214:4-14 (Pack/American); PX0372 at 41. This observation came during a meeting with counsel and Dr. Israel about potential counterfactuals to present to regulators to justify the NEA. Tr. Vol. 8, 237:6-16 (Pack/American). Mr. Schweinzger further observed that "based on what [they] were hearing [during the call] the DOJ could kill any deal…any deal" and that "on network alone [the regulatory case for the NEA] does not exist." PX0372 at 44 and 58. Mr. Pack agreed. Tr. Vol. 8, 214:15-25 (Pack/American); PX0372 at 44. Schweinzger further stated, "I think the Raven forecast for new routes is not great." PX0375 at 39.

533.    Defendants never presented the DOJ with the results of a Raven run using the v4 Schedule. Tr. Vol. 9, 68:24–69:2 (Town/Pls. Expert). It appears that Defendants abandoned their plan to generate Raven runs that would have permitted an apples-to-apples comparison based on 2019 after the May 29, 2020 meeting with counsel and Dr. Israel.

534.    Having rejected an approach using the 2019 v4 Schedule, the Clean Team also considered developing standalone 2023 schedules, which would have been an alternative way to create an apples-to-apples comparison. On May 29, 2020, Mr. Fintzen explained to JetBlue's CFO that he was developing a standalone network plan that would reflect what JetBlue would "probably look like in terms of fleet and capacity by 2023 if there isn't a JV." PX0707. JetBlue's initiation of efforts to develop a standalone 2023 plan on May 29 is also reflected in an e-mail exchange between Mr. Friedman and members of the JetBlue Clean Team. PX0749 at 2-3. Midday on June 3, Mr. Klinka and Mr. Friedman discussed the status of the development of the JetBlue standalone plan. Tr. Vol. 8, 287:15–288:12 (Friedman/JetBlue) (discussing PX1124 at 3).

535.    By June 3, 2020, the JetBlue Network Planning Team was developing a 2023 standalone plan. PX1125 at 4. After reviewing this, Mr. Friedman texted with his colleague David Klinka, telling him that projections for "incremental NEA growth" would have materialized without the NEA. PX1124 at 5 ("you are definitely including value that would have come anyway per the plan").

536.    That same day, Dr. Israel had separate calls with American's and JetBlue's Clean Teams to discuss the counterfactual issue. Tr. Vol. 14, 133:14–134:12 (Israel Defs. Expert);

PX0374 (text exchange between Mr. Schweinzger and Mr. Bhargava discussing plans for the calls); PX1144 (calendar invite for call with American Clean Team at noon on June 3); PX0509 (calendar invite for call with JetBlue's Clean Team). Though JetBlue did develop a standalone 2023 schedule, there is no evidence that Dr. Israel pursued this approach after the meetings on June 3, 2020. Tr. Vol. 8, 278:19-279:4 (Friedman/JetBlue); PX0525 at 1. Dr. Israel's claimed reliance on the Clean Team's schedules is not credible.

537.    In seeking to justify his approach as an apples-to-apples exercise, Dr. Israel contends that the Clean Team made an independent judgment about the appropriate counterfactual on which he relies. Tr. Vol. 14, 63:23–65:20 (Israel/Defs. Expert). In support, Dr. Israel made factual representations, purportedly based on his contemporaneous interactions with the Clean Team, to justify his counterfactual as an apples-to-apples comparison. Tr. Vol. 14, 112:21–113:18 (Israel/Defs. Expert).

538.    As an initial matter, the Clean Team had limited or no experience with network planning. For example, no one from JetBlue's Network Planning Department was a member of the JetBlue Clean Team. Tr. Vol. 8, 283:24–284:9 (Friedman/JetBlue). As Mr. Laurence, then at JetBlue, explained, this was because he "[did not] think it would be in [JetBlue's] interest to share that type of information with American." Tr. Vol. 5, 109:6-10 (Laurence/American).

539.    Dr. Israel's reliance on the Clean Team raises two issues: (1) his deep involvement in shaping the Clean Team's counterfactual choice, and (2) inconsistencies between his factual representations and evidence in the record.

540.    Dr. Israel met with the Clean Team at least three times in a two-week period in 2020—May 20 and 29, and June 3—to discuss developing an appropriate counterfactual to measure the NEA's benefits. Tr. Vol. 14, 126:24–127:9, 133:14–134:4 (Israel/Defs. Expert); PX1145 (calendar invitation for May 29, 2020 meeting).

541.    The May 20, 2020 meeting occurred one day before Mr. Pack asked JetBlue to complete the 2019 v4 Schedule. Tr. Vol. 14, 129:12-15 (Israel/Defs. Expert); PX0297 at 2. During the May 29, 2020 meeting, members of American's Clean Team were texting each other

that their understanding from the meeting was that showing full network results would be "no bueno". PX1145 (calendar invitation for May 29, 2020 meeting); Tr. Vol. 8, 214:4-8 (Pack/American); PX0372 at 41.

542.    The June 3, 2020 meeting occurred shortly after JetBlue began developing a standalone 2023 schedule. *See* PX1144 (calendar invitation from counsel to American and Compass Lexecon); PX0509 (calendar invitation from counsel to JetBlue); PX0707 (explaining the JetBlue Clean Team was in the process of developing standalone schedule as of May 29).

543.    While Dr. Israel admits he asked the Clean Team for a fleet constrained schedule, he testified that the Clean Team told him "that it didn't make sense to do and it didn't go further." Tr. v. 14, 138:18-140:4 (Israel/Defs. Expert). This testimony is inconsistent with Mr. Pack, who testified that the Clean Team created the 2019 v4 Schedule and determined that it resulted in large reductions in JetBlue flying outside of the NEA. Tr. Vol. 8, 203:25–204:3 (Pack/American); PX0340 at v4 Resources, Row 11. Dr. Israel did not explain why the Clean Team's purported pushback at the May 29, 2020 meeting changed his earlier view that such results were needed for him to conduct the proper analysis.

544.    Dr. Israel testified that he could not perform an apples-to-apples comparison of the "No NEA in 2023" world to the "NEA in 2023" world because no 2023 schedule was available for him to compare to the 2023 v2 Schedule, stating that: "there's not a prediction about the positive or the negative" about fleet growth in the absence of the NEA. Tr. Vol. 14 75:11–76:15 at 75:24-25 (Israel/Defs. Expert). There was no 2023 schedule because "[t]hey can't make one during COVID." Tr. Vol. 14, 75:11–76:15 at 76:1-2 (Israel/Defs. Expert). Dr. Israel also testified that he talked "at some length" with Mr. Fintzen about the possibility of developing 2023 no-NEA schedules. Tr. Vol. 14, 122:7-19 (Israel/Defs. Expert); and that he asked Mr. Fintzen, among others, whether it would be possible to develop a stand-alone growth plan for 2023, and was told that "it was impossible to do this in a meaningful way" during COVID-19. Tr. Vol. 14, 122:7-19, 124:12–125:2 (Israel/Defs. Expert).

545.     Notwithstanding Dr. Israel's testimony, JetBlue created standalone plans in the summer of 2020. Tr. Vol. 16, 100:19–101:7 (Town/Pls. Expert). Mr. Friedman recognized that this standalone plan showed that much of the growth that the Clean Team was attributing to the NEA would have occurred even without entering the NEA. Tr. Vol. 8, 285:25–286:19 (Friedman/JetBlue).

### 2.     Shortcomings in Dr. Israel's passenger share change estimate.

546.     Dr. Israel's share-based benefit estimate relies on the same monetization framework as his Raven-based benefits; accordingly, the same shortcomings apply. Tr. Vol. 16, 120:4-23 at 120:5-11, 120:16-19 (Town/Pls. Expert) (identifying COVID-19 as a confounding issue); Tr. Vol. 14, 85:3-7 (Israel/Defs. Expert) (agreeing he used the same monetization framework to calculate his benefit estimation).

547.     Dr. Israel's share-based benefit estimate relies on a self-selected comparison of March through December 2019 market shares against March through December 2021 market shares. PX0956 (Town Reply Report) ¶ 252. But, the American/JetBlue combined market share in Dr. Israel's 2019 baseline is particularly depressed during the period that American had a slot waiver due to the 737 MAX grounding. Tr. Vol. 16, 120:24-121:13 at 121:9-13. The American/JetBlue combined market share in Dr. Israel's 2021 post-NEA period is set at a particularly high point. Tr. Vol. 16, 120:24–121:13 (Town/Pls. Expert) (discussing demonstrative at 33).

548.     Across all U.S. airports, Defendants' combined late-2022 market share is not significantly higher than it was in 2018. Tr. Vol. 16, 120:24–121:13 (Town/Pls. Expert) (discussing demonstrative at 35). The increase is largely explained by increases in international flying, which receives relatively great weight in the Available Seat Mile measurement of capacity. Dr. Israel admitted that his share-based benefits analysis shows that "growth has largely been on international routes so far." Tr. Vol. 14, 85:17–86:2 (Israel/Defs. Expert). But, because this increase in international flying is offset by a decrease in international flying outside of the NEA, it does not represent true, net growth. Tr. Vol. 16, 122:6-17 (Town/Pls. Expert).

549.     Of the eight new intercontinental destinations served by American out of JFK in 2022, American already served five from non-NEA Airports in 2019 and six from non-NEA Airports in 2022; American has announced it will exit four of those airports. Tr. Vol. 16, 104:12–105:3 (Town/Pls. Expert) (discussing demonstrative at 13). American is exiting all three JFK-Colombia routes in November 2022 and the JFK-Santiago route in January 2023. Tr. Vol. 16, 105:5-7 (Town/Pls. Expert).

550.     Capacity data showing domestic flying from NEA Airports—benchmarked against a September 2018 base—reveals that by 2022, American's and JetBlue's combined growth was similar to both Delta and United. Tr. Vol. 16, 122:18–123:5 (Town/Pls. Expert) (discussing demonstrative at 36 (citing PX0956 (Town Reply Report) ¶ 137, Ex. 23)). This conclusion is depicted in Appendix D.

551.     Capacity data showing all flying from *all* U.S. airports—benchmarked against a September 2018 base—shows that American's and JetBlue's combined growth by 2022 was similar to both Delta and United. Tr. Vol. 16, 123:6-15 (Town/Pls. Expert) (discussing demonstrative at 37 (citing PX0956 (Town Reply Report) ¶ 138, Ex. 24)).

552.     A comparison of the traffic increases predicted by Dr. Israel's Raven-based benefits methodology and Dr. Israel's share-based benefits methodology shows almost no correlation on a route-by-route basis. Tr. Vol. 16, 123:16–124:7 (Town/Pls. Expert) (discussing demonstrative at 38, 39); PX0956 (Town Reply Report) ¶¶ 261-264.

### 3.     Even if Dr. Israel were correct that the NEA will cause some increase in capacity, his effort to convert that increase into a dollar value is flawed.

553.     Dr. Israel used the same methodology to convert the predicted passenger increases in his Clean Team approach and his passenger share approach into an estimate of consumer benefits. Tr. Vol. 16, 119:11–120:1 (Town/Pls. Expert). However, the "monetization" methodology that Dr. Israel uses is unreliable. Tr. Vol. 16, 118:20–119:10 (Town/Pls. Expert); PX0956 (Town Reply Report) § VI.C.

554.     Dr. Israel modeled consumer benefit by comparing the passenger traffic from the Defendants' 2019 actual schedules to the passenger traffic estimated when the 2023 v2 schedule was run through Raven. Tr. Vol. 16, 109:21–110:7 (Town/Pls. Expert). He then assumed that the demand curve for air travel is linear, and that any increase in passenger traffic on particular routes meant that the demand curve shifted, reflecting an increase in demand. Tr. Vol. 16, 111:8–112:7 (Town/Pls. Expert). However, this relies on an unsupported assumption that linear demand curves shift in a parallel manner post-NEA. Tr. Vol. 16, 112:14–113:16 at 113:11-16 (Town/Pls. Expert). Dr. Israel then calculated that the amount of consumer benefit in dollars was equivalent to the area under the shifted linear demand curve, which he then arbitrarily reduced. Tr. Vol. 16, 112:8-13, 114:4–115:4 (Town/Pls. Expert).

555.     As Dr. Town explained, Dr. Israel's linear demand assumption leads to incoherent results that are not mathematically valid. Tr. Vol. 16, 114:4–115:4, 164:19–165:1 (Town/Pls. Expert); PX0956 (Town Reply Report) ¶ 205 n.345. For example, under the logic of Dr. Israel's analysis, over 400 markets—which account for 45 percent of Dr. Israel's total benefit estimate—exhibit negative "quality adjusted prices" post-NEA. Tr. Vol. 16, 115:22–116:20 (Town/Pls. Expert); PX0956 (Town Reply Report) ¶ 217. The negative quality adjusted price means that Dr. Israel assumed American and JetBlue literally would be paying passengers to fly the route. Tr. Vol. 16 112:14-113:16 (Town/Pls. Expert); PX0956 (Town Reply Report) ¶¶ 212-217.

556.     In an attempt to justify his use of only a portion of the shift in the linear demand curve, Dr. Israel claimed that his method approximates an estimate that would result from using a shift in a logit-form demand curve. Tr. Vol. 14, 87:25–89:6 (Israel/Defs. Expert). However, as Dr. Town explained, Dr. Israel's use of a linear demand curve to approximate a methodology based on a logit demand curve is not mathematically valid. Tr. Vol. 16, 114:4–115:4, 164:19–165:1 (Town/Pls. Expert); PX0956 (Town Reply Report) ¶ 205 n.345. In cases that involve large changes in demand, like the ones Dr. Israel is assuming, Dr. Israel's approach does not approximate use of a logit-demand curve. Tr. Vol. 14,114:4-115:4 (Town/Pls. Expert).

557.     Given the significant failures in Dr. Israel's monetization methodology, even if Defendants had established that the NEA would create cognizable benefits (which they have not), Dr. Israel's estimate of the value of those benefits cannot be used to weigh against the demonstrated harms of the NEA. *Cf. supra* Section V.G.1 (describing Dr. Miller's estimates that the NEA would cause $640 million in harm annually on nonstop overlap routes alone).

## VIII.  THERE IS A REASONABLE LESS RESTRICTIVE ALTERNATIVE TO THE NORTHEAST ALLIANCE THAT WOULD ACHIEVE ANY LEGITIMATE PROCOMPETITIVE BENEFIT.

558.     Defendants could grow and improve their competitive positions through an alliance modeled on the West Coast International Alliance ("WCIA") in conjunction with American transferring slots to JetBlue. The WCIA contains provisions that enable Alaska and American to broaden their presence at West Coast airports. They include a codeshare provision, a loyalty provision (including both frequent flyer reciprocity and lounge reciprocity), and a type of revenue-sharing provision. Tr. Vol. 7, 51:25–52:8, 53:1-4 (Harrison/Alaska).

559.     However, the WCIA is less restrictive to competition than the NEA in several respects. The WCIA: (1) does not include capacity coordination or allocation of markets, (2) does not permit codesharing on nonstop overlap routes, and (3) has a non-reciprocal revenue-sharing provision—American only contributes revenue from its long-haul international flights from the West Coast. Tr. Vol. 7, 52:11–53:19 (Harrison/Alaska); Tr. Vol. 7, 169:22–171:2 (Raja/American); PX0394 at 1; PX0397 at 1. Alaska and American do not compete on long-haul international flights from the West Coast, and Alaska did not fly those routes pre-WCIA (nor does it have plans to do so). Tr. Vol. 7, 53:20–54:18 (Harrison/Alaska).

560.     In addition, an Alaska document prepared to explain the WCIA to its Board of Directors includes a section titled "risk mitigation," explaining that the revenues shared in the WCIA are capped. PX0392 at 7. There are no such revenue sharing caps in the MGIA. *See, e.g.*, Tr. Vol. 8, 124:17–125:5 (Fintzen/JetBlue).

561.     The WCIA purports to achieve the same benefits as the NEA. An internal Alaska document describes the WCIA's goals as: (1) creating a more competitive, seamless network, (2)

enabling Alaska to connect to American's broader network, (3) improving reciprocal loyalty benefits, and (4) competing better for corporate customers. PX0393 at 7-10.

562.    Both Alaska and American have described the WCIA as a success. Tr. Vol. 7, 55:25–56:19 (Harrison/Alaska); Tr. Vol. 4, 201:22–202:1 (Raja/American). Mr. Andrew Harrison, Alaska's Chief Commercial Officer, testified that the WCIA has improved passenger connectivity and helped Alaska and American compete against Delta. Tr. Vol. 7, 20:4-18, 21:7-18 (Harrison/Alaska); PX0393 at 7-10. American's Chief Commercial Officer, Vasu Raja—who authored the proposal that eventually became the WCIA—testified that the WCIA is "thriving" and going "great." Tr. Vol. 4, 166:15-21, 201:21–202:1 (Raja/American). He explained that the only reason that American is able to continue to offer Seattle-Heathrow service is because the WCIA provides American access to Alaska's domestic network on the West Coast. Tr. Vol. 4, 201:25–204:8 at 202:2-20 (Raja/American). Alaska also recognizes that American has successfully used Alaska's domestic network to feed its international flights. Tr. Vol. 7, 69:21–70:2 (Harrison/Alaska). Mr. Raja further testified that American has used the codeshare structure of the WCIA to grow in Dallas, and to do so without needing to add any gates or other infrastructure. Tr. Vol. 4, 201:25–204:8 at 203:19-23 (Raja/American).

563.    JetBlue's Chief Executive Officer, Robin Hayes, testified that airlines can use codeshare agreements like the one in the WCIA to: (1) improve schedule coordination, (2) achieve slot swaps, network expansion, and frequent-flier program benefits, and (3) to improve connectivity and customer service. Tr. Vol. 2, 67:11-20 (Hayes/JetBlue). The June 2020 NEA presentation to JetBlue's Board of Directors noted that if capacity coordination was limited, American and JetBlue could "[m]ove to codeshare only agreement with slot leases." PX0807 at 66. Mr. Andrew Guenthner, the Director of Alliances at Delta, testified that Delta has used codeshare agreements to extend its network. Guenthner (Delta) Dep. 187:14–188:13, June 1, 2022.

564.    Even with the WCIA in operation, American still treats Alaska as a competitor on all routes, in contrast to how American treats JetBlue under the NEA. *See* PX1121 at 46 (slide

deck for American revenue management personnel contrasting how personnel should treat JetBlue, with whom American is "metal neutral" and therefore American should work to "[m]aximize revenue between the two," and Alaska, with whom American is "not metal neutral" and accordingly personnel should "consider AS [Alaska] as OA [other airline] in all ways").

████████████████████████████████████████████

████████████████████████████████████████████

PX0229 at 5, 16 (cited in PX0462 (Town Report) ¶ 151 n.302).

565.    American and JetBlue explicitly considered achieving their claimed benefits from the NEA by instead pursuing an agreement structured like the WCIA, coupled with American leasing slots in New York City to JetBlue. American's Clean Team considered an alliance with JetBlue that mirrored the WCIA structure, which it referred to as an "East Coast International Alliance" ("ECIA"). Tr. Vol. 8, 175:16–176:20 (Pack/American); PX0268 at 5. This ECIA did not include capacity coordination, American and JetBlue would not have been able to codeshare on overlapping domestic routes, and JetBlue would have only included codesharing on American's international flights from JFK and BOS. Tr. Vol. 8, 179:4-6, 177:17–178:14 (Pack/American); PX0268 at 5. The Clean Team estimated that this ECIA would generate approximately $120 million in combined revenue for JetBlue and American, only slightly below the combined revenue projected for an NEA structure. PX0268 at 5. The Clean Team further recognized that swapping slots to JetBlue could be a component of an ECIA arrangement. PX0268 at 5 ("JFK/LGA/BOS Slot Swap Possible"). American considered the "downsides" to entering into a WCIA-like partnership with JetBlue, without capacity coordination, to be a need to acquire additional aircraft and the likelihood of increased overlap with JetBlue. PX0185, Options at Row 7-8.

566.    When the American Clean Team modeled this ECIA between American and JetBlue, it used Raven to compare the codeshare structure of the ECIA to what would become the codeshare structure of the NEA. Tr. Vol. 16, 125:14-20 (Town/Pls. Expert). Using 2019 schedules, the two scenarios generated similar numbers of incremental passengers. Tr. Vol. 16,

125:21–126:1 (Town/Pls. Expert); PX0956 (Town Reply Report) ¶ 151 n.250. Further, under either proposed partnership model, increasing capacity would generate similar increases in passenger traffic. Tr. Vol. 16, 126:2-7 (Town/Pls. Expert).

567.     There is no dispute that American could have leased slots in New York City to JetBlue even under a much less restrictive partnership like the ECIA. Slot leases do not require the network and capacity coordination present in the NEA. Tr. Vol. 8, 172:15–173:8 (Pack/American).

568.     Without any partnership in place, American agreed to lease 37 JFK slots to JetBlue, which would have resulted in substantial growth by JetBlue in New York City. Just a few months before signing the NEA, American and JetBlue agreed in principle to a slot lease agreement whereby American would lease 37 JFK slots to JetBlue for two years. Tr. Vol. 4, 149:10–150:1 (Raja/American); Lusso (JetBlue) Dep. 139:22–140:2, 149:18-23, Apr. 11, 2022; *see* PX0227 (cited in PX0462 (Town Report) ¶ 17 n.35). Eric Friedman, JetBlue's Director of Route Planning, testified that JetBlue could have used slots at JFK and LGA to grow in New York City similar to how it would with the NEA. Tr. Vol. 9, 46:8-25 (Friedman/JetBlue). Chad Schweinzger, American's Director of Commercial Analysis and a member of American's Clean Team, testified that this growth could have stemmed in part from JetBlue using these New York City slots to fly "larger planes" than American had been flying from them. Tr. Vol. 13, 77:25–78:7 (Schweinzger/American); PX0301 at 1-2.

569.     Similarly, American's Clean Team determined that American could have grown its network—and could have continued to compete with JetBlue—had it entered into a straightforward slot swap agreement with JetBlue. While analyzing potential agreements with JetBlue in 2020, American's Clean Team considered multiple variations of the ECIA, including scenarios where the two airlines would trade slots without any other network coordination, *e.g.*, American would trade five of its gates at BOS to JetBlue for 25 JFK slots, or American would trade its LGA slots for JetBlue's JFK slots. Tr. Vol. 8, 171:2–172:2, 172:15-21 (Pack/American). Jordan Pack, American's Senior Manager for Commercial Planning and Analysis and a member

of American's Clean Team, testified that these slot swap scenarios would have allowed American to grow its transatlantic flying organically. Tr. Vol. 8, 171:13–172:2 (Pack/American). Mr. Pack also recognized that American and JetBlue would have continued to compete against each other on nonstop overlap routes if they had pursued a scenario that included a slot swap without network coordination. Tr. Vol. 8, 173:16–174:10 (Pack/American); PX0185 at 2.

570.    Defendants cite Delta documents to support their view that the NEA spurs competition. *See supra* VII.G.2. Even if the NEA were to spur a competitive response by Delta, the Delta documents illustrate that a WCIA-like structure would have achieved the same benefits as the NEA. When Delta first evaluated the NEA after it was announced, Delta did not know that American and JetBlue had agreed to share revenues and coordinate capacity. Esposito (Delta) Dep. 196:2-19, 200:6-19, 200:21–201:14, June 21, 2022. Instead, Delta focused on the aspects of the NEA that it shares in common with the WCIA, primarily the codeshare and frequent flyer portions of the agreement. Esposito (Delta) Dep. 201:7-14, June 21, 2022. ████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████

## IX.    DEFENDANTS' PROFFERED FIXES DO NOT REMEDY THE ANTICOMPETITIVE EFFECTS OF THE NORTHEAST ALLIANCE.

### A.    The U.S. DOT Agreement with Defendants was not an approval of the Northeast Alliance.

571.    On January 10, 2021, American and JetBlue entered into a series of commitments with the U.S. DOT. PX0447 at 1. These commitments "did not address all of the Department's concerns resulting from the NEA's impacts on competition," PX0452 at 3-4. The U.S. DOT conducted a review "informally and without establishing a docketed proceeding." PX0452 at 2. It did so under its separate statutory authority, distinct from the antitrust laws. PX0452 at 5 n.6. The U.S. DOT made clear that "DOT's review of the NEA . . . was not designed to approve or disapprove the alliance." PX0452 at 3. In addition to limited slot divestitures and capacity

growth commitments, the U.S. DOT Agreement prohibits Defendants from using slots and gates to influence each other's behavior. PX0447 at 2.

**B.     The U.S. DOT commitments do not remedy the anticompetitive effects of the Northeast Alliance.**

**1.     The U.S. DOT commitments are limited in geographic scope and expire in 2025.**

572.    The geographic scope of the U.S. DOT commitments is limited, and does nothing to address the NEA's competitive harm in Boston or London. PX0447 at 1. Scott Laurence, American's Senior Vice President of Partnership Strategy, acknowledges that the U.S. DOT Agreement does not address BOS in any way. Tr. Vol. 5, 163:20-23 (Laurence/American). The U.S. DOT Agreement does not require any divestitures in BOS, nor does it impose any capacity requirements in BOS. Tr. Vol. 13, 73:1-6 (Schweinzger/American).

573.    In New York City, the limited nature of the U.S. DOT capacity commitments and slot divestitures renders them ineffective to overcome the anticompetitive impacts of the NEA there. First, the capacity commitments are set to expire in 2025. Tr. Vol. 13, 73:9-12 (Schweinzger/American). They are also limited in nature, requiring only 15 percent growth over a six-year period. Tr. Vol. 7, 160:6-14 (Raja/American). The slot divestitures in the U.S. DOT Agreement are also temporary. Tr. Vol. 5, 162:6-13 (Laurence/American).

**2.     The U.S. DOT Agreement's growth targets could have been achieved without the NEA, and can be achieved while still reducing capacity in overlap markets and non-NEA markets.**

574.    American and JetBlue could have achieved the growth commitments in the U.S. DOT Agreement without the NEA. For instance, Mr. Chad Schweinzger, American's Director of Commercial Analysis, testified that a slot swap in New York City could have resulted in growth from JetBlue flying larger planes than American had been flying in New York City. Tr. Vol. 13 77:25–78:7 (Schweinzger/American); PX0301 at 1-2.

575.    Defendants' capacity growth commitments to the U.S. DOT are aggregate percentages; they are not tied to capacity growth in any specific market. Thus, Defendants could meet them while still reducing capacity on certain routes, including on NEA nonstop overlap

routes, while growing elsewhere. *See* PX0447 at 6; PX0955 (Miller Reply Report) ¶ 184 n.216; Tr. Vol. 5, 163:10-14 (Laurence/American). The U.S. DOT Agreement also does not require any capacity commitments on the overlap routes—the routes that will likely experience the greatest harm as a result of the NEA. Nothing in the U.S. DOT Agreement prevents Defendants from decreasing capacity on nonstop overlap routes while growing elsewhere.

576.    Because it only covers JFK and LGA, the U.S. DOT Agreement does not account for the loss of capacity in non-NEA markets if American and JetBlue seek to meet their growth commitments in New York City by moving aircraft to New York City from outside of NEA Routes. Tr. Vol. 16, 124:25–125:13 (Town/Pls. Expert).

577.    Revenue sharing between American and JetBlue disincentivizes them from adding capacity on nonstop overlaps in order to meet the U.S. DOT commitments. Tr. Vol. 12, 23:18–24:8 (Miller/Pls. Expert). Revenue sharing creates incentives to raise price, and doing so means that American and JetBlue will sell fewer tickets. Tr. Vol. 12, 23:18–24:8 (Miller/Pls. Expert). As a result, there is a reduced incentive to fly additional capacity on those routes. Tr. Vol. 12, 23:18–24:8 (Miller/Pls. Expert).

### 3. The slot divestitures required by the U.S. DOT Agreement are insufficient to allow meaningful entry or expansion by competitors.

578.    The small number of slots that the U.S. DOT Agreement requires to be divested limits their effectiveness in remedying the NEA's competitive harm. The U.S. DOT Agreement requires Defendants to divest only 14 of the 544 slots they control at JFK and only 12 slots from Reagan National ("DCA"), an airport where American alone holds 357 slots. Tr. Vol. 5, 161:23–162:19 (Laurence/American); PX0447 at 3. The Port Authority of New York and New Jersey ("PANYNJ") determined that a divestiture of 14 slots at JFK may be inadequate, and that a loss of less than one percent of the Defendants' joint slot holdings is unlikely to mitigate the competitive harm of the NEA. Murray (PANYNJ) Dep. 156:4–156:10, 300:18–301:8, May 3, 2022; PX0885 at 10.

579.    The slot divestitures are also ineffective in resolving the NEA's harm because they do not require any slot divestitures at LGA or gate divestitures at BOS. Tr. Vol. 2, 122:12–123:14 (Watterson/Southwest). Andrew Watterson, Executive Vice President and Chief Commercial Officer at Southwest, testified that without additional slots at LGA or additional gates at BOS, Southwest cannot expand at either airport. Tr. Vol. 2, 114:13-24, 118:2-4 (Watterson/Southwest).

580.    John Kirby, Spirit's Vice President of Network Planning, testified that because of their timing, the slots divested under the U.S. DOT Agreement are not "economically viable" and "weren't worth bidding on." Tr. Vol. 3, 143:13–144:8, 144:16–145:1 (Kirby/Spirit).

### C.    Defendants' carve-out agreement does not remedy the anticompetitive effects of the Northeast Alliance.

#### 1.    The carve-out agreement is voluntary and could be rescinded at any time.

581.    The carve-out agreements do not remedy the NEA's anticompetitive effects because they are limited in nature, voluntary, and could be rescinded or changed at any time. American and JetBlue negotiated and entered into the carve-out agreements related to the NEA and MGIA while the NEA was being investigated by the Department of Justice. Tr. Vol. 7, 163:17–164:4 (Raja/American). The "carve-out" agreements apply only to revenue-sharing and capacity coordination; all other elements of the NEA, including codesharing, continue to apply to all routes, whether carved out or not. Tr. Vol. 7, 165:22–166:23, 178:9–179:25 at 179:20-25 (Raja/American). The carve-out routes are also determined by a set of criteria that Defendants created and could change at any time. PX0001b at 31-32. At trial, for instance, Defendants represented that JFK-Antigua has since been added as an additional carve-out route. *See* Tr. vol. 13, 160:24–161:9 (Israel). Vasu Raja, American's Chief Commercial Officer, acknowledged that the agreement to exclude certain routes from capacity coordination and revenue sharing was voluntary, and could be rescinded or modified. Tr. Vol. 7, 164:5-20, 165:22–166:23 (Raja/American).

## 2.    The carve-out agreement may not be effective.

582.    The nature of airline network planning also limits the effectiveness of the carve-out routes as a remedy. In the context of a hub-and-spoke system, flights have to line up—airlines need to move passengers from one segment to the other to make the system work. Tr. Vol. 17, 90:14–91:22 at 90:25–91:11 (Miller/Pls. Expert). In that setting, it is difficult to carve out routes because the decisions an airline makes as to the timing and frequency of flights are fundamentally intertwined with the rest of its system. Tr. Vol. 17, 90:14–91:22 at 90:25–91:11 (Miller/Pls. Expert). Therefore, it is impractical to carve routes out from the NEA because decisions made on all other routes that remain a part of the NEA will impact the carve-out routes. Tr. Vol. 17, 90:14–91:22 at 90:25–91:11 (Miller/Pls. Expert).

583.    The ongoing relationship between American and JetBlue also limits the effectiveness of any carve-out routes to remedy the NEA's consumer harm. Competition between the Defendants on carve-outs may be softened in the "spirit of partnership." Tr. Vol. 17, 90:14–91:22 at 91:12-19 (Miller/Pls. Expert); Tr. Vol. 7, 177:24–179:25 (Raja/American) (Defendants not precluded from codesharing on carve-out routes).

584.    The carve-out agreements originally applied to only six of the 11 nonstop overlap routes in BOS; but, JetBlue has exited two of those routes, and—despite now claiming that these exits are temporary—JetBlue has moved back its potential reentry to May 2023. Tr. Vol. 7, 166:3-17 (Raja/American); *but see* Tr. Vol. 9, 26:2-8, 30:11-22 (Friedman/JetBlue).

585.    The carve-out agreement also omits markets even though American and JetBlue only face competition from Delta. For example, BOS-DCA would not qualify as a carve-out route because the Defendants have defined "city pairs" to include service by airlines to other airports in the larger metropolitan area. Tr. Vol. 14, 172:5-13 (Israel/Defs. Expert).

586.    In a 2021 complaint filed with the U.S. DOT, Spirit alleged that American historically "under-utilized its slots at LGA and JFK by operating small aircraft and obtaining waivers from the Federal Aviation Administration to avoid compliance with the 80/20 use-it-or-lose-it rule." Tr. Vol. 3, 136:11–137:3 at 136:12-15 (Kirby/Spirit); PX0895 at 6-7.

Dated: November 17, 2022

Respectfully submitted,

 /s/ William H. Jones II
William H. Jones II
John J. Hogan
Maisie A. Baldwin
Grant A. Bermann
Craig L. Briskin
Jeremy P. Evans
Sarah P. McDonough
Scott Reiter

U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 8000
Washington, DC 20530
Tel: (202) 598-8805
Fax: (202) 307-5802
Email: bill.jones2@usdoj.gov

*Attorneys for Plaintiff*
*United States of America*

MARK BRNOVICH
Attorney General

 /s/ Robert Bernheim
ROBERT BERNHEIM
(AZ Bar No. 024664)

Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Tel: (520) 628-6507
Email: robert.bernheim@azag.gov

*Attorneys for Plaintiff State of Arizona*

ROB BONTA
Attorney General

KATHLEEN E. FOOTE
Senior Assistant Attorney General

NATALIE S. MANZO
MICHAEL W. JORGENSON
Supervising Deputy Attorneys General

ROBERT B. McNARY
JAMIE L. MILLER
Deputy Attorneys General

/s/ Robert B. McNary
ROBERT B. McNARY
Deputy Attorney General
California State Bar No. 253745
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Phone: 213-269-6283
E-mail: robert.mcnary@doj.ca.gov

*Attorneys for Plaintiff State of California*

KARL A. RACINE
Attorney General

KATHLEEN KONOPKA
(DC Bar No. 495257)
Senior Advisor for Competition Policy

/s/ Adam Gitlin
ADAM GITLIN
Section Chief, Antitrust and Nonprofit
Enforcement Section
Office of the Attorney General for the
District of Columbia
400 Sixth Street NW, Tenth Floor
Washington, DC 20001
Tel: (202) 442-9853
Email: adam.gitlin@dc.gov

*Attorneys for Plaintiff District of Columbia*

ASHLEY MOODY
Attorney General

 /s/ Lizabeth A. Brady
LIZABETH A. BRADY
(FL Bar No. 457991)
COLIN G. FRASER (FL Bar No. 104741)

Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399
Tel: (850) 414-3300
Email: Liz.Brady@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

MAURA HEALEY
Attorney General

 /s/ William T. Matlack
WILLIAM T. MATLACK
(MA Bar No. 552109)
DANIEL H. LEFF (MA Bar No. 689302)

Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Tel: (617) 727-2200
Email: William.Matlack@mass.gov
Email: Daniel.leff@mass.gov

*Attorneys for Plaintiff*
*Commonwealth of Massachusetts*

JOSH SHAPIRO
Attorney General

JAMES A. DONAHUE, III
(PA Bar No. 42624)
Executive Deputy Attorney General
Public Protection Division

/s/ Tracy W. Wertz
TRACY W. WERTZ (PA Bar No. 69164)
JOSEPH S. BETSKO (PA Bar No. 82620)
JENNIFER A. THOMSON
(PA Bar No. 89360)

Pennsylvania Office of Attorney General
Antitrust Section
14th Floor Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
Email: twertz@attorneygeneral.gov

*Attorneys for Plaintiff*
*Commonwealth of Pennsylvania*

JASON S. MIYARES
Attorney General

 /s/ Tyler T. Henry
TYLER T. HENRY (VA Bar No. 87621)
Assistant Attorney General
Antitrust Unit
Office of the Virginia Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Tel: (804) 692-0485
Email: THenry@oag.state.va.us

*Attorneys for Plaintiff*
*Commonwealth of Virginia*

**APPENDIX**

# Appendix A

## American and JetBlue combined revenue shares and HHIs, NEA nonstop overlap markets

*PX0461 (Miller Report) at 88; see Tr. Vol. 10, 177:21-180:23 (Miller/Pls. Expert)*

| | Markets with BOS endpoint | Annual revenue share AA + B6 | Standard HHI[1] Post-Merger | Delta | Modified HHI[1][2] Post-NEA | Delta |
|---|---|---|---|---|---|---|
| 1. | Boston (BOS) – Charlotte (CLT)[4] | 96.1% | 9,249 | 3,511 | 9,245 | 3,507 |
| 2. | Boston (BOS) – Washington National (DCA)[3] | 88.0% | 7,875 | 3,868 | 7,870 | 3,864 |
| 3. | Boston (BOS) – Philadelphia (PHL)[4] | 86.8% | 7,710 | 3,425 | 7,707 | 3,422 |
| 4. | Boston (BOS) – Rochester (ROC)[4] | 86.2% | 7,524 | 3,341 | 7,212 | 3,029 |
| 5. | Boston (BOS) – Phoenix (AZA/PHX)[4] | 85.2% | 7,326 | 2,223 | 7,383 | 2,280 |
| 6. | Boston (BOS) – Dallas/Fort Worth (DFW/DAL)[4] | 83.6% | 7,094 | 2,193 | 7,120 | 2,219 |
| 7. | Boston (BOS) – Syracuse (SYR)[4] | 82.1% | 6,922 | 2,845 | 6,409 | 2,332 |
| 8. | Boston (BOS) – Miami (MIA/FLL) | 76.5% | 6,084 | 2,907 | 6,005 | 2,827 |
| 9. | Boston (BOS) – Los Angeles (BUR/ONT/LAX/LGB/SNA) | 62.6% | 4,402 | 1,938 | 4,323 | 1,859 |
| 10. | Boston (BOS) – NYC (JFK/LGA)[5] | 49.8% | 4,999 | 1,202 | 4,999 | 1,202 |
| 11. | Boston (BOS) – Chicago (MDW/ORD) | 48.5% | 3,671 | 943 | 3,669 | 942 |
| | **Markets with NYC endpoint** | | | | | |
| 12. | NYC (JFK/LGA) – Nantucket (ACK) | 96.8% | 9,372 | 1,069 | 9,372 | 1,069 |
| 13. | NYC (JFK/LGA) – Martha's Vineyard (MVY) | 92.5% | 8,603 | 2,686 | 8,603 | 2,686 |
| 14. | NYC (JFK/LGA) – Phoenix (AZA/PHX) | 61.5% | 4,948 | 954 | 4,999 | 1,004 |
| 15. | NYC (JFK/LGA) – West Palm Beach/Palm Beach (PBI) | 60.0% | 5,177 | 379 | 5,103 | 306 |
| 16. | NYC (JFK/LGA) – Los Angeles (BUR/ONT/LAX/LGB/SNA) | 57.0% | 4,369 | 1,590 | 4,309 | 1,530 |
| 17. | NYC (JFK/LGA) – Miami (MIA/FLL) | 55.9% | 4,617 | 1,523 | 4,599 | 1,505 |
| 18. | NYC (JFK/LGA) – Orlando (MCO) | 55.3% | 4,798 | 672 | 4,722 | 595 |
| 19. | NYC (JFK/LGA) – Boston (BOS)[5] | 49.8% | 4,999 | 1,202 | 4,999 | 1,202 |
| 20. | NYC (JFK/LGA) – Raleigh/Durham (RDU) | 47.8% | 4,973 | 815 | 4,971 | 813 |
| 21. | NYC (JFK/LGA) – Savannah (SAV) | 46.5% | 5,003 | 424 | 4,914 | 334 |
| 22. | NYC (JFK/LGA) – Las Vegas (LAS) | 46.5% | 4,626 | 905 | 4,505 | 784 |
| 23. | NYC (JFK/LGA) – San Francisco (SJC/OAK/SFO) | 45.7% | 3,654 | 986 | 3,618 | 950 |
| 24. | NYC (JFK/LGA) – San Diego (SAN) | 44.7% | 4,623 | 789 | 4,455 | 621 |
| 25. | NYC (JFK/LGA) – Austin (AUS) | 44.6% | 4,309 | 992 | 4,223 | 907 |
| 26. | NYC (JFK/LGA) – Charleston (CHS) | 43.6% | 5,050 | 611 | 4,982 | 542 |
| 27. | NYC (JFK/LGA) – Portland, ME (PWM) | 37.4% | 5,315 | 698 | 5,307 | 689 |
| 28. | NYC (JFK/LGA) – Chicago (MDW/ORD) | 36.2% | 2,740 | 207 | 2,749 | 216 |
| 29. | NYC (JFK/LGA) – Atlanta (ATL) | 15.8% | 5,333 | 109 | 5,331 | 107 |
| | **Market with EWR endpoint** | | | | | |
| 30. | Newark (EWR) – Miami (MIA/FLL) | 31.0% | 4,668 | 459 | 4,657 | 447 |

Source: DB1B; T-100; MGIA; First Amendment to the MGIA

Note: Exhibit excludes NYC (JFK/LGA)–Daytona Beach, FL (DAB), NYC (JFK/LGA)–Charlotte (CLT), and NYC (JFK/LGA) – Seattle (SEA), where I am aware of a structural change prior to COVID-19 that would make the market no longer an NEA nonstop overlap.

[1] The Merger Guidelines state, "Mergers resulting in highly concentrated markets [HHI > 2,500] that involve an increase in the HHI of more than 200 points will be presumed to be likely to enhance market power." Values which pass this presumption are highlighted in gray.

[2] Assumes that revenue from a connect product is divided among segments in proportion to miles, and that NEA segments are all segments which touch an NEA airport. Further assumes that post-NEA revenue for NEA segments is split in proportion to the share of NEA seat-miles controlled by JetBlue and American pre-NEA. In particular, JetBlue and American receive 57% and 43% respectively of all incremental NEA revenue.

[3] Shares and HHIs are based off of 2019 Q4 only because it is the only quarter I use to quantify the competitive effects of the NEA. American and JetBlue were the only nonstop carriers for Q1, Q2, and part of Q3, but Delta began offering nonstop service during Q3.

[4] Currently carved out of the NEA according to the First Amendment to the MGIA. Defendants acknowledge that these markets have only American, JetBlue, and potentially one other airline as competitors.

[5] Boston (BOS) – NYC (JFK/LGA) is included in both the BOS endpoint and NYC endpoint panels.

## Appendix B

## Simulation results for domestic NEA nonstop overlap markets

*PX0461 (Miller Report) at 124; see also Tr. Vol. 10, 156:5–160:12 (Miller/Pls. Expert)*

| | Markets with BOS endpoint | Revenue pre-NEA | Overall price change[1] AA/B6 | All products | Overcharge[2] Total | Per pre-NEA passenger |
|---|---|---|---|---|---|---|
| 1. | Boston (BOS) – Washington National (DCA)[3] | $136.9 M | 60.2% | 54.7% | $108.3 M | $170.11 |
| 2. | Boston (BOS) – Charlotte (CLT)[4] | $58.8 M | 92.5% | 90.1% | $69.8 M | $311.62 |
| 3. | Boston (BOS) – Philadelphia (PHL)[4] | $88.4 M | 48.7% | 44.0% | $55.7 M | $131.16 |
| 4. | Boston (BOS) – Los Angeles (BUR/ONT/LAX/LGB/SNA) | $202.6 M | 16.3% | 10.9% | $39.3 M | $57.38 |
| 5. | Boston (BOS) – Miami (MIA/FLL) | $137.1 M | 21.3% | 17.7% | $37.8 M | $66.00 |
| 6. | Boston (BOS) – Phoenix (AZA/PHX)[4] | $76.3 M | 36.4% | 32.1% | $35.9 M | $174.39 |
| 7. | Boston (BOS) – Dallas/Fort Worth (DFW/DAL)[4] | $111.0 M | 24.9% | 21.7% | $34.2 M | $95.21 |
| 8. | Boston (BOS) – NYC (JFK/LGA)[5] | $105.4 M | 20.7% | 12.3% | $21.7 M | $43.28 |
| 9. | Boston (BOS) – Chicago (MDW/ORD) | $163.2 M | 13.4% | 7.1% | $17.2 M | $23.36 |
| 10. | Boston (BOS) – Rochester (ROC)[4] | $4.2 M | 94.7% | 84.9% | $5.7 M | $193.60 |
| 11. | Boston (BOS) – Syracuse (SYR)[4] | $1.8 M | 70.4% | 60.1% | $2.2 M | $128.13 |
| | **Markets with NYC endpoint** | | | | | |
| 12. | NYC (JFK/LGA) – Miami (MIA/FLL) | $391.6 M | 15.8% | 10.2% | $63.6 M | $36.18 |
| 13. | NYC (JFK/LGA) – Los Angeles (BUR/ONT/LAX/LGB/SNA) | $692.3 M | 7.5% | 4.7% | $53.9 M | $32.57 |
| 14. | NYC (JFK/LGA) – Boston (BOS)[5] | $105.4 M | 20.7% | 12.3% | $21.7 M | $43.28 |
| 15. | NYC (JFK/LGA) – San Francisco (SJC/OAK/SFO) | $365.8 M | 4.5% | 2.4% | $15.0 M | $15.51 |
| 16. | NYC (JFK/LGA) – Orlando (MCO) | $192.9 M | 6.3% | 4.0% | $12.4 M | $13.43 |
| 17. | NYC (JFK/LGA) – Phoenix (AZA/PHX) | $91.9 M | 10.7% | 7.3% | $10.8 M | $36.21 |
| 18. | NYC (JFK/LGA) – Las Vegas (LAS) | $147.8 M | 5.7% | 3.3% | $8.4 M | $18.48 |
| 19. | NYC (JFK/LGA) – Raleigh/Durham (RDU) | $68.7 M | 12.7% | 8.0% | $8.2 M | $25.10 |
| 20. | NYC (JFK/LGA) – Austin (AUS) | $74.4 M | 11.4% | 6.1% | $7.3 M | $27.57 |
| 21. | NYC (JFK/LGA) – Chicago (MDW/ORD) | $325.4 M | 2.7% | 1.1% | $5.2 M | $3.54 |
| 22. | NYC (JFK/LGA) – San Diego (SAN) | $93.6 M | 3.9% | 2.2% | $3.5 M | $13.18 |
| 23. | NYC (JFK/LGA) – Atlanta (ATL) | $254.6 M | 4.2% | 0.9% | $3.3 M | $3.49 |
| 24. | NYC (JFK/LGA) – West Palm Beach/Palm Beach (PBI) | $104.8 M | 3.0% | 1.9% | $3.2 M | $7.42 |
| 25. | NYC (JFK/LGA) – Martha's Vineyard (MVY) | $3.1 M | 51.2% | 48.8% | $2.9 M | $195.32 |
| 26. | NYC (JFK/LGA) – Charleston (CHS) | $35.8 M | 8.0% | 4.6% | $2.5 M | $14.68 |
| 27. | NYC (JFK/LGA) – Nantucket (ACK) | $5.1 M | 24.8% | 24.3% | $2.2 M | $93.67 |
| 28. | NYC (JFK/LGA) – Portland, ME (PWM) | $11.8 M | 11.7% | 6.0% | $1.3 M | $20.31 |
| 29. | NYC (JFK/LGA) – Savannah (SAV) | $26.6 M | 2.8% | 1.7% | $0.6 M | $4.89 |
| | **Market with EWR endpoint** | | | | | |
| 30. | Newark (EWR) – Miami (MIA/FLL) | $189.9 M | 6.1% | 2.6% | $7.9 M | $9.22 |

Source: DB1B; T-100; MGIA; First Amendment to the MGIA

Note: NEA nonstop overlap markets are determined at the annual, nondirectional level. The exhibit excludes NYC (JFK/LGA)–Daytona Beach, FL (DAB), NYC (JFK/LGA)–Charlotte (CLT), and NYC (JFK/LGA)–Seattle (SEA), where structural change prior to COVID-19 made the market no longer an NEA nonstop overlap.

[1] Price changes are averages across all relevant products, weighted by pre-NEA passenger count.

[2] Overcharge is the difference in observed and post-NEA prices multiplied by the number of tickets sold in the pre-NEA, 2019 data. Overcharge is adjusted to account for one-way passengers using quarter-specific one-way passenger scaling factors. See Appendix § **Error! Reference source not found.** for an explanation of this adjustment.

[3] Values based off of 2019 Q4 only because it is the only quarter I use to quantify the competitive effects of the NEA. Overcharge and AA/B6 pre-NEA revenue are scaled up for each direction separately to the full year using passenger counts. American and JetBlue were the only nonstop carriers for Q1, Q2, and part of Q3, but Delta began offering nonstop service during Q3.

[4] Currently carved out of the NEA according to the First Amendment to the MGIA. Defendants acknowledge that these markets have only American, JetBlue, and potentially one other airline as competitors.

[5] Boston (BOS) – NYC (JFK/LGA) is included in both the BOS endpoint and NYC endpoint panels.

**Appendix C**

**Appendix D**

