CORRECTED

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>AMERICAN AIRLINES GROUP INC. and<br>JETBLUE AIRWAYS CORPORATION,<br><br>*Defendants*. | Case No. 1:21-cv-11558-LTS<br>**Motion for leave to file under seal granted<br>on November 18, 2022** |

## PLAINTIFFS' POST-TRIAL BRIEF

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 5

I.   The NEA ends head-to-head competition between American and JetBlue for
     millions of passengers. ................................................................................................. 5

II.  The NEA incentivizes Defendants to reduce capacity and raise prices, not to grow and
     increase competition. .................................................................................................... 7

LEGAL STANDARD ........................................................................................................... 9

I.   The Sherman Act prohibits all unreasonable restraints of trade. ............................. 9

II.  Defendants argue for standards that are not the law. ................................................11

ARGUMENT ........................................................................................................................ 14

I.   Plaintiffs have met their burden to prove that the Northeast Alliance has a substantial
     anticompetitive effect. ................................................................................................ 14

     A.  Plaintiffs have proved the NEA is anticompetitive under a "quick look" analysis .......... 15

     B.  Plaintiffs have produced "direct" evidence that the NEA has caused adverse
         effects on competition. ........................................................................................ 17

     C.  Plaintiffs have produced "indirect" evidence that the NEA gives Defendants
         market power and harms competition. ............................................................... 20

         1.  Plaintiffs have proved each of the relevant markets. ................................... 21

         2.  Plaintiffs have proved the NEA gives Defendants market power in the relevant
             markets. ....................................................................................................... 24

         3.  Plaintiffs have proved the NEA harms competition and is likely to increase
             prices and reduce output in the relevant markets. ....................................... 27

             a.  The NEA unreasonably restrains trade by eliminating competition between
                 American and JetBlue. ............................................................................ 28

             b.  The NEA makes JetBlue more like a legacy airline and less of a disruptive
                 LCC competitor. ..................................................................................... 37

             c.  The NEA will further consolidate the airline industry, risking the return of
                 coordinated effects. ................................................................................ 38

             d.  Dr. Miller's economic testimony, including his NEA simulation model,
                 projects hundreds of millions of dollars in annual harm to consumers. ............. 41

         4.  Competition from other airlines cannot constrain the anticompetitive effects of
             the NEA. ....................................................................................................... 43

II.  Defendants have failed to meet their burden to prove sufficient procompetitive
     justifications for the Northeast Alliance. .................................................................... 43

     A.  Defendants cannot justify the NEA by pointing to amorphous benefits supposedly
         accruing outside the relevant markets. ............................................................... 45

     B.  Defendants have failed to substantiate any benefits that can be properly attributed
         to the NEA. ........................................................................................................... 48

     C.  The NEA is not justified by supposed capacity growth. .................................... 51

1. The Court should disregard post-NEA implementation evidence as unreliable and subject to manipulation. ................................................................. 51

2. Defendants have not proved the NEA results in meaningful capacity growth. ......... 52

3. Any growth within the NEA comes at the expense of growth elsewhere in Defendants' networks. ................................................................................ 54

4. Defendants have not proved the NEA "caused" JetBlue's fleet additions. ................ 55

5. Defendants have not proved that the NEA creates new incentives for them to grow their capacity. .................................................................................... 57

6. Defendants could have grown organically in Boston without the NEA. .................. 58

7. Defendants had negotiated a slot lease that would have facilitated growth in New York City. ........................................................................................ 60

D. The NEA is not justified by increased network "relevance." .......................................... 61

E. Competition from Delta and United cannot justify the NEA. .......................................... 63

F. Defendants' interest in achieving higher profits does not justify the NEA. .................... 66

III. Any legitimate benefits from an alliance between American and JetBlue could be achieved through less restrictive means. ............................................................................ 67

A. The court need not consider less restrictive alternatives for Boston or London because Defendants have failed to justify the NEA in those markets. ........................... 67

B. The "East Coast International Alliance" Defendants considered is a substantially less restrictive alternative to the NEA. ........................................................................ 68

IV. The anticompetitive effects of the NEA outweigh any purported procompetitive benefits of the NEA. ........................................................................................................ 72

V. The DOT agreement and Defendants' voluntary carve-out agreement do not remedy the Sherman Act violation. .............................................................................................. 74

A. The DOT agreement does not remedy the anticompetitive effects of the NEA. ............. 74

B. Defendants' voluntary carve-out agreement is insufficient to remedy the anticompetitive effects of the NEA. ............................................................................. 76

CONCLUSION ........................................................................................................................ 77

# TABLE OF AUTHORITIES

**CASES**

*Associated Press v. United States*,
   326 U.S. 1 (1945)...................................................................................................11

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ............................................................................................ 64

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)............................................................................................ 21

*Cal. Dental Ass'n v. FTC*,
   526 U.S. 756 (1999) ........................................................................... 10, 44, 73

*California v. Am. Stores Co.*,
   495 U.S. 271 (1990)............................................................................................11

*Chi. Bd. of Trade v. United States*,
   246 U.S. 238 (1918)............................................................................................ 13

*Chi. Bridge & Iron Co. N.V. v. FTC*,
   534 F.3d 410 (5th Cir. 2008) ........................................................................... 51

*Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*,
   754 F.2d 404 (1st Cir. 1985) ............................................................................11

*Citizen Publ'g Co. v. United States*,
   394 U.S. 131 (1969)........................................................................................... 14

*FTC v. Actavis, Inc.*,
   570 U.S. 136, 159 (2013) .................................................................................. 10

*FTC v. H.J. Heinz Co.*,
   246 F.3d 708 (D.C. Cir. 2001) ......................................................... 40, 45, 49, 64

*FTC v. Ind. Fed'n Dentists*,
   476 U.S. 447 (1986)........................................................................................... 17

*FTC v. Tronox Ltd.*,
   332 F. Supp. 3d 187 (D.D.C. 2018) ............................................................... 39

*Grappone, Inc. v. Subaru of New Eng., Inc.*,
   858 F.2d 792 (1st Cir. 1988) ........................................................................... 47

*Hosp. Corp. of Am. v. FTC*,
   807 F.2d 1381 (7th Cir. 1986) ........................................................................ 51

*Impax Lab'ys, Inc. v. FTC*,
   994 F.3d 484 (5th Cir. 2021)...................................................................11, 69, 72

*In re Intuniv Antitrust Litig.*,
   496 F. Supp. 3d 639 (D. Mass. 2020) ........................................................... 22

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
   375 F. Supp. 3d 1058 (N.D. Cal. 2019) ....................................................... 68

*In re Se. Milk Antitrust Litig.*,
   739 F.3d 262 (6th Cir. 2014)............................................................................ 16

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000)........................................................................... 46

*L.A. Memorial Coliseum Comm'n v. NFL*,
  726 F.2d 1381 (9th Cir. 1984) .................................................................................. 47

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ................................................................................................... 9

*M & H Tire Co. v. Hoosier Racing Tire Corp.*,
  733 F.2d 973 (1st Cir. 1984) ..................................................................................... 47

*MacDermid Printing Solutions LLC v. Cortron Corp.*,
  833 F.3d 172 (2d Cir. 2016) ...................................................................................... 13

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
  435 U.S. 679 (1978) ................................................................................ 11, 15, 45, 72

*NCAA v. Alston*,
  141 S. Ct. 2141 (2021) ...................................................................................... passim

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984) ............................................................................................ passim

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ..................................................................................... passim

*Palmer v. BRG of Ga., Inc.*,
  498 U.S. 46 (1990) (per curiam) ............................................................................... 16

*Smith v. Pro Football, Inc.*,
  593 F.2d 1173 (D.C. Cir. 1978) ................................................................................ 46

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
  376 F.3d 1065 (11th Cir. 2004) ................................................................................ 13

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
  373 F.3d 57 (1st Cir. 2004) ....................................................................................... 14

*Sullivan v. NFL*,
  34 F.3d 1091 (1st Cir. 1994) ............................................................................ passim

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998) ....................................................................................... 13

*United States v. Aetna Inc.*,
  240 F. Supp. 3d 1 (D.D.C. 2017) ............................................................... 22, 36, 74

*United States v. Airline Tariff Publ'g Co.*,
  836 F. Supp. 9 (D.D.C. 1993) ................................................................................... 39

*United States v. Anthem, Inc.*,
  236 F. Supp. 3d 171 (D.D.C. 2017) .......................................................................... 21

*United States v. Bertelsmann SE & Co. KGaA*,
  No. 21-2886-FYP, 2022 WL 16949715 (D.D.C. Nov. 15, 2022) ............................... 36, 39, 76

*United States v. Brown Univ.*,
  5 F.3d 658 (3d Cir. 1993) ..................................................................................... 2, 47

*United States v. E.I. du Pont de Nemours & Co.*,
  366 U.S. 316 (1961) .................................................................................................. 74

*United States v. H & R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011) .............................................................. 37, 64, 76

*United States v. Paramount Pictures*,
    334 U.S. 131, 148, (1948) ................................................................. 73

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963) ........................................................................... 46

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972) ................................................. 3, 45, 46, 47

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ............................................................... 46

## STATUTES

15 U.S.C. § 1 ............................................................................................. 9

## OTHER AUTHORITIES

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010) .......... passim

## TREATISES

7 Phillip Areeda & Herbert Hovenkamp,
    *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed. 2017) ....... 44

## INTRODUCTION

The Northeast Alliance (NEA) eliminates competition between Defendants American Airlines and JetBlue at four major airports in Boston and the New York metropolitan area: Boston Logan International Airport, LaGuardia Airport, John F. Kennedy International Airport, and Newark Liberty International Airport. Defendants' agreement to eliminate competition at these airports likely will cause hundreds of millions of dollars of harm a year. Most of it will be borne by passengers on 29 overlap routes to and from the NEA airports where Defendants offer competing nonstop service and have high combined market shares. Defendants' claims that the NEA will benefit consumers do not justify the harm the NEA causes because those benefits do not offset harm to passengers flying on these nonstop overlap routes, would have occurred without the NEA, or could have been achieved through a less restrictive agreement that allowed Defendants to continue competing with one another in Boston and New York.

After nearly a month of trial testimony and record evidence, key facts are undisputed. First, every year millions of passengers traveling to and from the NEA airports have benefitted from competition between Defendants that drove lower prices, higher quality service, and more choices. At Boston Logan airport alone, millions of families, students, and other travelers choose between American and JetBlue for nonstop flights to cities like Charlotte, Miami, Phoenix, and Washington, D.C., where Defendants together have near monopoly shares.

Defendants' senior executives also have admitted that the NEA eliminates direct competition between Defendants on the 29 nonstop overlap routes dominated by Defendants at the NEA airports. JetBlue's CEO Robin Hayes admitted that within the NEA, "we don't compete with each other directly." Tr. vol. 1, 182:6-10 (Hayes). Similarly, Scott Laurence (formerly of JetBlue and now employed by American) conceded that "it makes more sense [for JetBlue] to cooperate with American, rather than compete for NEA routes." Tr. vol. 5, 137:21–139:25 (Laurence). These admissions are unsurprising. Under the NEA, American and JetBlue are partners, not competitors. Competitors would independently decide which routes to fly and how much capacity to add on those routes. Competitors would fight to win customers from one

another and keep the hard-won revenues for themselves. Instead, under the NEA, American and JetBlue decide together how much capacity to fly and whether one airline should exit the market altogether. They then share revenues from those routes with one another. Defendants attempt to confuse the issue by focusing on their "independent" pricing, but have conceded the ultimate point under Section 1 of the Sherman Act: the NEA eliminates most aspects of competition between Defendants at the NEA airports.

Defendants' quibbles over market definition notwithstanding, the evidence clearly establishes that Defendants have combined market shares exceeding the threshold for finding market power on 28 of the 29 nonstop overlap routes. And the record shows that the NEA significantly increases market concentration in these already highly concentrated markets. On the 11 nonstop overlap routes out of Boston, Defendants' combined market shares range from just under 50 percent from Boston to Chicago, to 96 percent from Boston to Charlotte. In New York, Defendants have market power in the vast majority of the relevant nonstop overlap routes (27 of 29 routes) whether Newark is included or not. Their market power is likely to endure, and other airlines are unlikely to replace the competition lost through the NEA, because the assets needed to compete at the NEA airports—slots and gates—are scarce.

The implications of these conclusions are clear. The NEA eliminates competition affecting over 32 million passengers and seven billion dollars in commerce each year. Instead, Defendants contend Plaintiffs have not proven that the NEA *already* has caused price or output effects. The law imposes no such requirement. *See United States v. Brown Univ.*, 5 F. 3d 658, 674 (3d Cir. 1993); *see also* Plaintiffs' Proposed Conclusions of Law (PCOL) ¶¶ 25-27. Showing that Defendants have market power and some evidence that the restraint harms competition is sufficient to prove that an agreement violates Section 1 of the Sherman Act, absent an offsetting procompetitive justification. Defendants' market shares alone are enough to establish market power. And Defendant's concession that they do not compete within the scope of the NEA satisfies the second element of Plaintiffs' case, though there is far more evidence that the terms of the NEA eliminate competition on NEA routes.

Defendants thus face a high bar to justify their restraint of trade, and they have not cleared it. Companies do not have a right to coordinate rather than compete in the name of profits. While capacity growth may lead to lower profits for airlines, it can also lead to lower prices and more options for passengers. Those passengers lose out when coordination between airlines result in higher prices, fewer choices, less resiliency, and crowded flights.

Defendants' justifications do not benefit the millions of consumers harmed by the NEA in the 29 nonstop overlap markets. Under the Sherman Act, Defendants' justification must benefit competition in the relevant markets. Rather, Defendants ask this Court to rule that competitors can sacrifice one set of consumers, those that benefitted from the fierce competition between American and JetBlue in the relevant markets before the NEA, for purported benefits to other customers in other markets. The Supreme Court has cautioned against this type of cross-market balancing (and explicitly forbids it in assessing mergers) because courts are ill-equipped "to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition in another sector." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 609-10 (1972). The First Circuit has recognized that benefits outside the market should "have a beneficial impact on the competition in the market itself" and that it is generally improper to "validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market." *Sullivan v. NFL*, 34 F.3d 1091, 1112-13 (1st Cir. 1994). And the Defendants' expert, Dr. Israel, by his own admission, did not do a "route-by-route benefit analysis." Tr. vol. 14, 162:24-163:1 (Israel).

Moreover, Defendants failed to meet their legal obligation to prove that the elimination of competition within the NEA created procompetitive benefits at all. PCOL ¶¶ 104-106. They assert that all recent growth is attributable to the NEA and simply assume—contrary to their contemporaneous, ordinary-course documents—that they would not have grown without the NEA. Growth that both American and JetBlue would have undertaken as independent airlines, however, is not attributable to the NEA. The evidence presented at trial shows that JetBlue needed to expand its fleet to satisfy its appetite for growth *whether it entered the NEA or not*.

And the evidence shows that, post-NEA, American intended to reduce its Boston departures from 89 in the summer of 2021 to ▮ by 2023. PX0062 at 72.

Defendants also make much of the NEA's complicated revenue-sharing formula, contained in the Mutual Growth Incentive Agreement (MGIA), which they argue incentivizes growth. But multiple witnesses from Defendants admitted they do not consider the MGIA when making decisions about schedules or capacity. Tr. vol. 9, 8:22–9:3 (Friedman); Tr. vol. 1, 194:22–195:1 (Hayes). Moreover, other terms in the NEA agreements were designed to counteract any incentives to grow created by the MGIA. By their own admission, Defendants put in place capacity coordination to mitigate the risk that a partner might use the MGIA to "fund loss-making capacity," PX0807 at 66, a concept that Defendants call "cheating on the pool." Tr. vol. 7, 186:15-21 (Raja).

The travelers most likely to feel the lack of competition between American and JetBlue at the NEA airports are not business customers, but rather the passengers who have to pay for their own tickets and may have to forgo trips as a result of increased fares. Vasu Raja of American testified that American refers to these ordinary travelers as "marginal users," and made no secret that who American really cares about and prioritizes are the "power travelers." Tr. vol. 4, 211:5-213:14 (Raja). But the supposed benefits of the NEA for this small group do not justify the NEA's widespread harm. "Power travelers" make up only 15 percent of American's customers, and the vast majority of travelers care the most about price and choice. *See* Plaintiffs' Proposed Findings of Fact (PFOF) ¶ 445. These "marginal" customers without a corporate travel account or elite mileage perks depend on the antitrust laws to guarantee them quality service at competitive prices.

Even if Defendants had met their burden of establishing legitimate procompetitive benefits that offset the NEA's harm—which they have not—the NEA is unreasonable because there are obvious less restrictive alternatives to achieving those claimed benefits. They could have excluded Boston from the NEA. And American already has an alliance on the West Coast (the "West Coast International Alliance" or WCIA) with Alaska Airlines, and it expressly

considered a similar alternative to the NEA that it termed the "East Coast International Alliance." PFOF ¶¶ 565-566.

The Court therefore need not reach the balancing stage because Defendants have failed to prove the NEA is necessary to achieve legitimate, competition-enhancing objectives that could just as easily be achieved through less anticompetitive alternatives. Even so, the weight of the evidence establishes that, on balance, the harm to competition and to consumers from the NEA outstrips any legitimate procompetitive efficiencies that could be fairly attributed to it. To protect those consumers and preserve competition, the NEA should be enjoined.

## BACKGROUND

### I.    The NEA ends head-to-head competition between American and JetBlue for millions of passengers.

Defendants' Northeast Alliance (NEA) stops all direct competition between American and JetBlue on routes where they overlap, affecting 32 million passengers on the nonstop overlap routes alone, and over 45 million passengers when including the connecting overlaps and mixed overlap routes within its reach. PX0461 at 223-227 (Miller Report App'x F). As JetBlue's CEO Robin Hayes admitted at trial, within the NEA, "we don't compete with each other directly."[1] Tr. vol. 1, 182:6-10 (Hayes) (emphasis added).

For all intents and purposes, the series of related agreements that make up the NEA require the two previously independent airlines to operate as a single airline in Boston and New York. For example, the NEA requires American and JetBlue to coordinate their flying on NEA routes. PX0001-a at 4-5 (NEA Agreement § 3.1). It requires Defendants to "optimize" their network plans in Boston and New York. PX0001-a at 5 (NEA Agreement § 3.1.2). And it requires Defendants to regularly review performance on NEA routes and take steps to fix it if it is found lacking. PX0001-a at 5 (NEA Agreement § 3.1.2).

---

[1] While Mr. Hayes pointed to the so-called "carve-out" routes as an exception to his statement, Tr. vol. 1, 182:6-10 (Hayes), as explained below the carve-out agreement does not ameliorate the anticompetitive effects of the NEA. *See infra* Argument Part V.B.

One part of the NEA, the Mutual Growth Incentive Agreement (MGIA), requires American and JetBlue to share revenue on NEA routes where they otherwise would compete, which incentivizes them to avoid competing. PFOF ¶¶ 64, 70, 72. Specifically, the MGIA requires American and JetBlue to pay each other based on the revenue generated by each NEA route compared against a base period from 2019 (which is not fixed but varies with changes in capacity and length of flights). PX0001-b at 3-5 (MGIA § 2). While a competitor normally wants to adopt a strategy that gives itself more customers, revenues, and profits, the MGIA stifles those incentives because it gives each Defendant an interest in its partner's generation of incremental revenue. PFOF ¶¶ 266, 278, 298, 304-308, 312. With the NEA in place, each Defendant earns money when a passenger chooses the other Defendant and stands to lose money if its partner's prices decrease, eliminating the incentive for Defendants to undercut each other. PFOF ¶ 307. The NEA also emboldens Defendants to individually raise prices on NEA routes by limiting the downside of losing customers to the other Defendant following a price increase. PFOF ¶ 307.

The NEA encompasses all short-haul and long-haul routes flown by American and JetBlue to or from Boston and New York, except for JetBlue's flights to Europe. PX0001-a at 4 (NEA Agreement § 2.1).[2] Defendants' agreements cover a significant amount of commerce by any definition. In the Boston markets where American and JetBlue compete with nonstop service, airlines carried roughly 8.9 million passengers and generated $1.78 billion in revenue in 2019. PX0461 at 218, 223 (Miller Report App'x E-F). In the New York nonstop overlap markets, airlines carried 24.2 million passengers and generated $5.56 billion in revenue in 2019. PX0461 at 218, 223 (Miller Report App'x E-F). Defendants have combined market shares ranging from 49 percent to 96 percent on the Boston nonstop overlap routes and from 16 percent to 97 percent on the New York nonstop overlap routes. PFOF ¶ 285.

---

[2] JetBlue's flights to Europe, although not initially within the scope of the NEA, "may be included in the NEA" in the future if American and JetBlue so agree. PX0001-a at 3 (NEA Agreement § 2.1).

Absent this Court enjoining it, the NEA will continue indefinitely unless Defendants choose to terminate it. PX0001-a at 8 (NEA Agreement § 5.1). The NEA Agreement includes specific procedures for winding-down the NEA, with minimal disruption to passengers, that would apply in the event the NEA is terminated as a result of this enforcement action. PX0001-a at 13-14 (NEA Agreement §§ 5.9, 5.11).

## II.   The NEA incentivizes Defendants to reduce capacity and raise prices, not to grow and increase competition.

All the provisions of the NEA discussed above apply to NEA routes on which American and JetBlue competed prior to the NEA.[3] The NEA eliminates any meaningful incentive for Defendants to continue competing on those routes.

In a competitive market, competition creates incentives for firms to reduce price and offer better quality service to win business from their competitors. PFOF ¶¶ 19, 24, 197, 261. Before the NEA, American and JetBlue individually determined their schedules, including which routes to fly and how much capacity to fly on those routes. PFOF ¶¶ 84-91, 263. Likewise, before the NEA, American and JetBlue individually determined their prices on the routes they flew to maximize the overall profitability of their individual networks and schedules. Tr. vol. 10, 100:14-101:10 (Miller).

The NEA fundamentally changes both of those aspects of airline economics. First, after the NEA, American and JetBlue are required to coordinate their schedules for all routes touching an NEA airport—including routes on which they previously competed. PFOF ¶¶ 68-69, 263. This enables Defendants to plan their schedules in a way that avoids directly competing with each other (for example, by allocating routes to one or the other of them, or by not flying the

---

[3] Defendants later attempted to "carve-out" certain routes from the NEA in a separate agreement, *see infra* Argument Part V.B, but the NEA agreements as signed in July 2020 do not by their terms exclude any of these so-called "carve-out" routes.

same route at the same time of day,[4]) and allows them to set combined capacity levels that maximize their joint profits. PFOF ¶¶ 265-267, 270-276, 297. In other words, for all routes that touch an NEA airport, Defendants operate as if they are a single airline: they cooperate instead of compete. PFOF ¶¶ 259-262.

Second, due to the MGIA, American and JetBlue have a shared interest in each other's revenue. PFOF ¶¶ 307-308. This incentivizes Defendants to avoid undercutting each other on price. PFOF ¶ 307. For example, if JetBlue raised prices on a route where it competed with American (and American did not match the price increase), some customers would switch from JetBlue to American ("diversion"). PFOF ¶ 307. Before the NEA, JetBlue would lose the revenue from those customers who switched; but after the NEA, JetBlue is able to share in the revenues American earns from those customers ("recapture"). PFOF ¶ 307. As a fundamental matter of economics, this ability to recapture revenue from lost sales creates an incentive for Defendants to raise prices ("upward pricing pressure"). PFOF ¶¶ 307-308. This is true even though Defendants maintain that the NEA allows them to set prices independently. A rational firm will set its prices in the way that maximizes its profits; because of the upward pricing pressure created by the MGIA, Defendants will seek to maximize their profits by increasing prices, or at least by not decreasing prices as much as they would have if they were not partners. PFOF ¶ 307. Defendants do not need to openly discuss prices with one another for these incentives to still hold true. PFOF ¶ 307.

These are the same incentives created by a typical merger of direct competitors. PFOF ¶¶ 298-299. The only difference here is the form in which those incentives are created— through a joint venture instead of a merger. But it is the reality of the NEA, not its form, that

---

[4] At trial, Mr. Raja referred to this aspect of the NEA, where Defendants adjust their schedules to avoid directly competing with each other by not offering service as the same time of day, as his "eureka" moment. Tr. vol. 4, 223:23–225:24 at 225:3-4 (Raja) ("Note that JetBlue and American flights are stacked up on top of one another."). In other words, the very thing that makes the NEA anticompetitive is what makes it attractive to Defendants.

matters when assessing whether the NEA violates the Sherman Act. PCOL ¶¶ 82-87.

As explained below, the evidence proves it does.

## LEGAL STANDARD

**I.     The Sherman Act prohibits all unreasonable restraints of trade.**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust

or otherwise, or conspiracy, in restraint of trade or commerce among the several States."

15 U.S.C. § 1. Establishing a violation of Section 1 requires a plaintiff to prove (1) an agreement

among the defendants that (2) unreasonably restrains trade and (3) affects interstate commerce.

PCOL ¶ 7. In this case, there is no dispute that Plaintiffs have proved the first and third

requirements—the NEA is clearly an agreement between American and JetBlue that affects

interstate commerce. PFOF ¶¶ 1-5, 55-58. The only remaining question is whether the NEA

*unreasonably* restrains trade by turning two firms that were once vigorous competitors into

economically aligned partners. It plainly does.

Under Section 1, restraints of trade "can be unreasonable in one of two ways." *Ohio v.

Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) ("*Amex*"). Per se illegal restraints are certain

types of agreements, such as naked price-fixing, market allocation, and output restrictions, that

courts have recognized are so often anticompetitive that they can be condemned without

examining whether they produce harm to competition or benefits to consumers in a particular

case. PCOL ¶¶ 12-13. Other restraints are assessed under the rule of reason, in which "the

factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice

should be prohibited as imposing an unreasonable restraint on competition." *NCAA v. Alston*,

141 S. Ct. 2141, 2160 (2021) (alteration deleted) (quoting *Leegin Creative Leather Prods., Inc. v.

PSKS, Inc.*, 551 U.S. 877, 885 (2007)).

In a rule of reason case, courts typically employ a three-step burden-shifting framework

to determine whether a challenged restraint is unreasonable. PCOL ¶ 18. At the first step, the

plaintiff has the burden to prove the challenged restraint "has a substantial anticompetitive effect

that harms consumers in the relevant market." *Amex*, 138 S. Ct. at 2284 (cited in *Alston*, 141 S. Ct. at 2160).

A plaintiff may meet this burden at step one in several ways. First, a plaintiff may show that a challenged restraint is so facially anticompetitive that "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *FTC v. Actavis, Inc.*, 570 U.S. 136, 159 (2013) (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999)). Such restraints satisfy the first step of the rule of reason following an abbreviated "quick look," without a detailed analysis of the defendants' market power or the effects of the restraint. PCOL ¶ 28. Alternatively, a plaintiff may meet its burden to show that the challenged restraint "has a substantial anticompetitive effect" through two types of evidence: "direct" evidence or "indirect" evidence. PCOL ¶¶ 36, 39. "Direct" evidence includes evidence of harm to competition "such as reduced output, increased prices, or decreased quality in the relevant market," and evidence of harm to the competitive process. *Amex*, 138 S. Ct. at 2284; *see also* PCOL ¶ 36. "Indirect" evidence consists of "proof of market power plus some evidence that the challenged restraint harms competition." *Amex*, 138 S. Ct. at 2284; *see also* PCOL ¶ 39. The analysis at this step is a sliding scale based on the nature of a restraint; even if quick look does not apply, a "plenary market examination" may not be required when the anticompetitive effects of the conduct are more obvious. *Cal. Dental*, 526 U.S. at 779.

If the plaintiff makes such a showing, the burden shifts to the defendant to prove "a procompetitive rationale for the restraint." *Amex*, 138 S. Ct. at 2284 (quoted in *Alston*, 141 S. Ct. at 2160). Where, as here, the challenged restraint has significant anticompetitive effects, Defendants face "a heavy burden" at step two of the rule of reason to "competitively justif[y]" the restraint's "apparent deviation from the operations of a free market." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 113 (1984).

If the defendant makes that showing, the burden shifts back to the plaintiff to prove that "the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Amex*, 138 S. Ct. at 2284 (quoted in *Alston*, 141 S. Ct. at 2160).

Even if no less restrictive alternative exists, the end of the rule of reason analysis begins where it started, with a return to the guiding principles behind the Sherman Act and a weighing of the evidence. PCOL ¶¶ 21-22, 132-136. The Supreme Court "has adhered to the position that the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 691 (1978); *see also Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 492 (5th Cir. 2021) ("Finally, if the FTC fails to demonstrate a less restrictive alternative way to achieve the procompetitive benefits, the court must balance the anticompetitive and procompetitive effects of the restraint."). The Supreme Court has cautioned, however, that these steps "do not represent a rote checklist, nor may they be employed as an inflexible substitute for careful analysis." *Alston*, 141 S. Ct. at 2160.

## II.    Defendants argue for standards that are not the law.

At various times during the trial, Defendants argued for legal standards unmoored from precedent. Their four most significant errors are addressed here.

First, Defendants have repeatedly asked the Court to "wait and see" what happens with the NEA instead of enjoining it. Plaintiffs have produced substantial evidence that the NEA already has harmed competition, particularly on nonstop overlap routes, and therefore the NEA should be enjoined. But even if that were not the case, nothing in the antitrust laws requires the Court to wait for proof that Defendants already have raised prices or reduced output before enjoining a violation of the Sherman Act. PCOL ¶¶ 25-27. To the contrary, Congress intended that equitable, injunctive relief for violations of the Sherman Act be "prospective and prophylactic," *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 407-08, 412 (1st Cir. 1985), including remedying "harms that are as yet unrealized," *California v. Am. Stores Co.*, 495 U.S. 271, 282 n.8 (1990); *see Associated Press v. United States*, 326 U.S. 1, 12 (1945)

(in lawsuit by United States, condemning joint venture's restraint under Section 1 "without regard to [its] past effect" because "[c]ombinations are no less unlawful because they have not as yet resulted in restraint").

Second, Defendants dispute the quantum of proof that Plaintiffs or Defendants must produce at each step to satisfy their respective burdens under the rule of reason. Defendants imply *Alston* revolutionized the rule of reason by requiring plaintiffs to show proof of "*present* adverse effects" irrespective of whether plaintiffs are presenting "direct" or "indirect" evidence of a restraint's anticompetitive effect. Defs.' Opening Stmt. at 47 (emphasis added). But this is not so. *Alston* is entirely consistent with prior Supreme Court precedent and lower courts' application of the rule of reason. *See* PCOL ¶ 102.

Remarkably, Defendants do not rest this interpretation on some detailed discussion in *Alston* overruling either the long-settled "indirect evidence" method for proving anticompetitive effects or an antitrust plaintiff's ability to obtain prospective relief. Instead, Defendants argue *Alston* and *Amex* silently changed the law through the Supreme Court's unremarkable statement that an antitrust plaintiff must show the restraint "has a substantial anticompetitive effect." Defs.' Opening Stmt. at 46 (citing *Alston*, 141 S. Ct. at 2160, and *Amex*, 138 S. Ct. at 2284). That is incorrect. Neither *Alston* nor *Amex* suggested it was overruling precedent permitting proof through indirect evidence, or limiting the prophylactic relief available to plaintiffs. Nor did the Supreme Court have occasion to do so—in *Alston*, the NCAA did not dispute plaintiffs' proof at step one, 141 S. Ct. at 2161, and in *Amex*, the plaintiffs only pursued a direct evidence theory before the Supreme Court, 138 S. Ct. at 2284–85.

Moreover, as the cases *Amex* cited explain, in an indirect evidence case, the plaintiff must show proof of market power plus "ground[s] for believing that the challenged behavior *could harm competition* in the market, such as the *inherent anticompetitive nature* of the defendant's behavior or the structure of the . . . market." *See Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d

90, 97 (2d Cir. 1998) (emphasis added)[5]; *see also Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073 (11th Cir. 2004) ("Concluding that no actual damage to competition has been sufficiently alleged in the plaintiff's amended complaint, we turn to the alternative method for alleging an anticompetitive effect: the *potential* for genuine adverse effects on competition." (emphasis added) (quotation marks omitted)). This forward-looking standard should come as no surprise to Defendants—it has been the law for over a century. *See Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) (determining whether a restraint promotes or suppresses competition requires examining "the nature of the restraint and its effect, actual *or probable*" (emphasis added)).

Third, when assessing the availability of less restrictive alternatives, Defendants assert that Plaintiffs must demonstrate that American and JetBlue would have, in fact, chosen the less restrictive alternative, and that the less restrictive alternative would have been equally as profitable for Defendants as the NEA. Tr. vol. 12, 39:15-19. That argument grossly distorts step three of the rule of reason. The law only requires Plaintiffs to show that a less restrictive alternative is reasonable, not that Defendants actually would have chosen that alternative. PCOL ¶¶ 129-130. The less restrictive alternative must be similarly beneficial to *consumers* as the challenged restraint; whether it is as beneficial or profitable to *Defendants* is not the question. PCOL ¶¶ 125, 129-130. Indeed, an especially anticompetitive restraint often may be more profitable for a defendant than a less restrictive one. PCOL ¶ 130. Defendants' argument would stand the antitrust laws on their head by excusing a violation of law as long as the violation benefits *Defendants*.

Fourth, Defendants argue that if no less restrictive alternative is available, the rule of reason inquiry ends without a weighing of the restraint's anticompetitive and procompetitive

---

[5] Defendants rely on *MacDermid Printing Solutions LLC v. Cortron Corp.*, to no avail. In *MacDermid*, the Second Circuit reaffirmed the standard articulated in *Tops Markets* that a plaintiff can meet its burden at step one of the rule of reason through proof that a restraint is "inherently anticompetitive," and further held, as Plaintiffs have shown here, that "reduc[ing] consumer choice [is] inherently anticompetitive." *MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016).

effects. Defs' Opening Stmt. at 43. That is not the law. Courts have recognized that if no less restrictive alternative exists, a court must still proceed to weighing the anticompetitive and procompetitive effects of a restraint. PCOL ¶¶ 21-22, 132-136. Despite Defendants' reliance on *Alston* and *Amex*, neither had occasion to address such weighing. In *Alston*, the plaintiffs succeeded in proving a less restrictive alternative, 141 S. Ct. at 2164, and in *Amex*, the plaintiffs failed to meet their burden at step one, 138 S. Ct. at 2290. The Supreme Court simply had no reason to address the issue of ultimate weighing in either case.

Defendants' arguments for different legal standards are meritless, and the Court should proceed to apply traditional rule of reason analysis to this case.

## ARGUMENT

I. **Plaintiffs have met their burden to prove that the Northeast Alliance has a substantial anticompetitive effect.**

The NEA replaces competition at NEA airports with capacity coordination and it throttles Defendants' incentive to compete on price; thus, the NEA has a substantial anticompetitive effect. Indeed, courts have found similar types of agreements involving output restrictions and capacity coordination, *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004), or profit pooling, *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 135 (1969), to be per se illegal.

Because "most joint venture restrictions are subject to the rule of reason," *Alston*, 141 S. Ct. at 2155 (internal punctuation mark omitted), however, Plaintiffs have chosen to focus on proving the anticompetitive effects of the NEA under that standard. A "quick look" at the terms of the NEA is enough to conclude that the NEA, on its face, is anticompetitive. But Plaintiffs have not stopped at the terms of the NEA alone, and have produced substantial additional evidence that the NEA already has harmed competition (particularly on nonstop overlap routes) and likely will continue to harm competition in each of the relevant markets. For these reasons, the Court should find Plaintiffs have established the NEA's likely anticompetitive effects, which shifts the burden of proof to Defendants to justify the NEA.

**A.  Plaintiffs have proved the NEA is anticompetitive under a "quick look" analysis.**

A "quick look" is apt because two direct competitors have entered into a commercial agreement to coordinate capacity and share revenue. Courts have assessed similar agreements, such as agreements between direct (sometimes called "horizontal") competitors not to compete or to limit output and share profits or revenues—where ancillary to a broader agreement, such as a joint venture—using a "quick look." PCOL ¶¶ 30-34. "[W]hen there is an agreement not to compete in terms of . . . output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.'" *Bd. of Regents*, 468 U.S. at 109-10 (quoting *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 692).

The NEA is exactly that—it *expressly provides* that American and JetBlue will agree on how much (or how little) capacity to fly to and from NEA airports *and* that American and JetBlue will share the revenues they earn on NEA routes. Accordingly, because Plaintiffs have shown that the NEA shares characteristics with agreements previously been found to be subject to a quick look, the NEA can, and should, be evaluated under the same standard. On this basis alone, the Plaintiffs have met their initial burden to demonstrate the NEA has a substantial anticompetitive effect. PCOL ¶¶ 28-29.

In the airline industry, capacity typically is measured by "available seat miles" or ASMs.[6] Capacity and passenger traffic can both be used as measures of output. PFOF ¶ 387. The amount of capacity an airline will fly on any particular route is determined by its network schedule. PFOF ¶ 265. The NEA requires American and JetBlue "to use commercially reasonable efforts to coordinate" their flying on NEA routes, including consulting with each other about their network plans, jointly "optimizing" their schedules, and reviewing the performance of NEA routes with each other. PX0001-a at 4-5 (NEA Agreement § 3.1). The NEA therefore, on its face, not only permits but *requires* Defendants to coordinate their output within the scope of the NEA.

---

[6] Available seat miles or ASMs are calculated by multiplying the number of seats on an aircraft by the length of the flight; in other words, one seat flying one mile is one ASM. Tr. vol. 1, 131:7-11 (Hayes).

In practice, American and JetBlue understand the NEA requires them to coordinate all aspects of their network plans for NEA routes, including which of them will fly each route, what aircraft will be flown on each route, what slots and gates each will use at NEA airports, and how many flights each of them will fly on each route. PFOF ¶ 68-69. Representatives from Defendants draw up proposals for "ideal NEA frequency, schedule timing and equipment," and then they "convene on [these] proposals to determine consensus." PX0782 at 3. And, so far, they have never failed to reach consensus. PFOF ¶ 263.

Yet even Defendants recognize that normally it is illegal for airlines to coordinate their schedules because of the competitively sensitive nature of such decisions—indeed, scheduling is a central dimension (like price) on which airlines compete. *See, e.g.*, PFOF ¶¶ 84, 90; Tr. vol. 15, 125:17-21 (Znotins) ("Q. And what you're saying here is that prior to the Northeast Alliance, you would not have coordinated schedules with a competitor without talking to your legal team first; is that right? A. Yes."). Despite this, Defendants admit that under the NEA, JetBlue and American now function as a single airline "in terms of optimizing capacity." Tr. vol. 1, 182:1-5 (Hayes). This includes getting together and jointly deciding whether to exit any NEA routes. PFOF ¶¶ 270-276. In other words, the NEA *on its face* permits Defendants to allocate routes (markets) where they previously competed with each other. Such an "agreement between horizontal competitors for the express purpose of limiting competition between them" is a "facially anticompetitive restraint." *See In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 275 (6th Cir. 2014); *see also Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 (1990) (per curiam) (agreement "not to compete in the other's territories" was per se illegal).

Defendants argue they do not coordinate their *aggregate* capacity under the NEA, but that is immaterial because they coordinate their capacity in each relevant market, and the amount of capacity in each market affects the prices available to travelers on that route. PFOF ¶ 265. For example, the NEA requires Defendants to coordinate capacity on the Boston to Washington, D.C. (BOS-DCA) route, where Defendants have a combined market share of 88 percent, and the NEA

enables them to decide that only one of them will serve that market. PFOF ¶¶ 270-271.[7] Indeed, about 75 percent of JetBlue's total capacity is tied up in the NEA, PX0461 at 15, which means that under the NEA, for the vast majority of its network JetBlue will coordinate its capacity decisions with American.

The NEA's capacity coordination provisions would be enough on their own to demonstrate the NEA is anticompetitive, but the NEA also contains revenue sharing provisions that, taken alone, are anticompetitive. Profit pooling and revenue sharing among competitors ordinarily can be condemned as unlawful per se. PCOL ¶ 34. Here, the terms of the MGIA allow Defendants to earn *more* revenue from reducing or eliminating competition between them on NEA routes and raising prices than they would earn by competing. PFOF ¶ 307. This requires no great logical leap: unrebutted testimony established that reducing airline capacity tends to cause higher prices. PFOF ¶¶ 387-388. Taken together, capacity coordination and revenue sharing are particularly dangerous because they enable Defendants to operate within the NEA as if they were a single airline. PFOF ¶¶ 259-260. "[S]uch an agreement limiting consumer choice by impeding the ordinary give and take of the market place cannot be sustained under the Rule of Reason," *FTC v. Ind. Fed'n Dentists*, 476 U.S. 447, 459 (1986) (internal citation and quotation marks omitted), and no detailed inquiry into market power and the nature of the restraint is necessary for the Court to find the NEA has a substantial anticompetitive effect.

## B. Plaintiffs have produced "direct" evidence that the NEA has caused adverse effects on competition.

Although Plaintiffs can establish their prima facie case based on the terms of the NEA alone, Plaintiffs have amassed substantial additional evidence demonstrating the anticompetitive

---

[7] That JetBlue can independently determine its capacity in markets outside the NEA will not protect travelers in NEA markets. For example, while JetBlue can independently determine how much capacity to fly from Kansas City, Missouri to Jacksonville, Florida, that does not directly impact prices for travelers flying from Boston to DCA, which are determined by the capacity and competition in that market. Defendants cannot gloss over the anticompetitive effect on BOS-DCA by suggesting that there are some other, non-NEA routes on which their anticompetitive restraint does not apply.

effects of the NEA. This includes evidence that the NEA *already* has caused adverse effects on competition.

Defendants began implementing the NEA in early 2021. PFOF ¶ 56. Since that time, as a result of the NEA, (1) Defendants have stopped competing with one another on NEA routes, (2) JetBlue has been a less successful competitor on routes to London than it otherwise would have been, (3) Defendants have begun allocating NEA routes between them, and (4) Defendants have begun reducing capacity on nonstop overlap routes.

First, numerous employees of both Defendants conceded that, within the scope of the NEA, American and JetBlue are no longer competing. For example, JetBlue's CEO Robin Hayes admitted that "*outside of the NEA*, we are full blooded competitors," Tr. vol. 2, 53:7-15 (Hayes) (emphasis added), but "*within the NEA* . . . we don't compete with each other directly," Tr. vol. 1, 182:6-10 (Hayes) (emphasis added). Scott Laurence (formerly of JetBlue and now employed by American) conceded at deposition that "it makes more sense [for JetBlue] to cooperate with American, rather than compete for NEA routes." Tr. vol. 5, 137:21–139:25 (Laurence). This evidence demonstrates the NEA already has caused harm to the competitive process. Within the NEA, consumers no longer benefit from the "full blooded" competition between American and JetBlue that existed before the NEA. The Supreme Court has explained that harm to the competitive process can be one of the most powerful types of anticompetitive effects: "A restraint that has the effect of *reducing the importance of consumer preference* in setting price and output is not consistent with the fundamental goal of antitrust law." *Bd. of Regents*, 468 U.S. at 107 (emphasis added) (internal citations and quotation marks omitted). The NEA eliminates consumers' ability to choose between an American flight or a JetBlue flight, and instead allows Defendants to decide between themselves that only one of them will fly a particular route or at a particular time of day. PFOF ¶¶ 265-267, 270-276, 297.

Second, JetBlue's ability to compete on new routes to London from both Boston and New York have suffered as a result of the NEA. This is because JetBlue was unable to acquire meaningful "remedy" slots at London Heathrow airport from the United Kingdom's Competition

& Markets Authority (CMA) given its current entanglements with American.[8] The CMA found

that ███████████████████████████████████████████████████████

███████████████████████████ PX0801 at 1. Losing the chance to obtain the remedy slots

was a blow to JetBlue, which had been trying to secure access to slots at Heathrow for years.

PFOF ¶ 243. JetBlue had long complained that the high market shares enjoyed by the

international airline alliances serving the United States to London markets led to obscenely high

prices for consumers. PFOF ¶¶ 239-242. JetBlue told the CMA it needed at least four daily slot

pairs at Heathrow to meaningfully compete with these international alliances. PFOF ¶ 281.

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████ PFOF ¶ 282. Far from being the major disruptive force JetBlue

thought it would be, PFOF ¶¶ 246-250, or the enhanced competitive threat American feared,

PFOF ¶¶ 251-253, JetBlue's London entry has had little impact. JetBlue flies only one flight

from Boston to Heathrow and one from JFK to Heathrow, and its market share is miniscule.

PFOF ¶ 284.

Third, as a result of the NEA, Defendants already have exited some routes in which they

previously competed. The Court need look no further than the example of Boston to LaGuardia

(BOS-LGA), which was discussed often at trial, to understand exactly how the incentives of the

NEA have played out—and will continue to play out if not enjoined. Before the NEA, JetBlue

and American competed head-to-head on BOS-LGA, including competing on price. PFOF ¶¶ 43,

49, 156, 159, 161, 170. This competition benefitted consumers: publicly available fares on the

BOS-LGA route fell by 69 percent when JetBlue entered, PX0470 at 13, and at least one

corporate customer's fares fell from over $400 to $125, PX0901 at 1-2. But after Defendants

---

[8] The "remedy" slots are slots American and British Airways were required to divest when they formed a partnership in 2010. PFOF ¶ 247. The CMA was in the process of re-allocating the remedy slots when Defendants announced the NEA. Awarding the remedy slots to JetBlue would have simply transferred those slots from one American alliance to another.

entered the NEA, they decided this competition no longer made sense for them. Instead, the "optimal" schedule they jointly discussed and agreed upon concluded that only JetBlue would fly BOS-LGA. PFOF ¶ 272. As a result of these capacity coordination discussions under the NEA, American exited BOS-LGA, depriving consumers of a choice and all the benefits of competition between Defendants that drives lower prices and better-quality service. PFOF ¶¶ 43, 272.

Fourth, as a result of the NEA, Defendants already have reduced capacity in some routes where they both continue to offer nonstop service. For example, in the Boston to DCA market, JetBlue's entry before the NEA resulted in average prices falling 29 percent. PFOF ¶ 50. But under the NEA, Defendants determined that frequencies and seat capacity on Boston to DCA should be reduced in their "optimal schedule." PFOF ¶ 333. As a result of the NEA, JetBlue and American today fly fewer frequencies and seats on the Boston to DCA route than they did prior to the NEA. DX-736 (OAG data; underlying source of PX2003 at 1); *see also* PFOF ¶¶ 333, 424-426.

No more is required to establish that the NEA is anticompetitive.

### C.  Plaintiffs have produced "indirect" evidence that the NEA gives Defendants market power and harms competition.

Even if the Court determines that this case requires it to conduct a plenary market examination, Plaintiffs have established the necessary "proof of market power plus some evidence that the challenged restraint harms competition" to satisfy the first step of the rule of reason. *Amex*, 138 S. Ct. at 2284.

Plaintiffs have produced substantial evidence that the NEA gives Defendants market power in each of the relevant markets and tends to harm competition by (1) eliminating competition between American and JetBlue, (2) aligning JetBlue with a legacy airline and reducing its incentives to act as a disruptive competitor, and (3) further consolidating a highly concentrated industry and increasing the risk of coordination and capacity discipline among airlines. Plaintiffs have further produced evidence quantifying this harm: Dr. Miller's simulation model predicts the NEA will cost consumers nearly $700 million annually. PFOF ¶ 311. This consumer harm can present in the form of higher prices and lower quality services. Nor can these

likely anticompetitive effects be constrained by competition from other LCCs or ULCCs, who face significant barriers to entry and expansion in the relevant markets. This proof satisfies Plaintiffs' burden at step one of the rule of reason.

### 1.   Plaintiffs have proved each of the relevant markets.

Defining a relevant market enables the Court to assess market power and can illuminate the likely effects of the challenged restraint. PCOL ¶ 40. The market definition exercise is the same, and courts employ the same analytical tools to define markets, whether the plaintiff has sued under the Sherman Act or the Clayton Act. PCOL ¶ 43.

A relevant market has two components: (1) the relevant product market and (2) the relevant geographic market. PCOL ¶ 41. Here, the undisputed evidence establishes that scheduled air passenger service is a relevant product market. PFOF ¶¶ 98-101; PCOL ¶¶ 45-51. Even with respect to geographic market, the only dispute is narrow and inconsequential. Defendants concede that the relevant geographic market consists of travel to and from origin and destination pairs or endpoints. Nor do Defendants dispute how Plaintiffs have defined any particular endpoint, with one exception. Defendants have objected, loudly and often, to Plaintiffs' definition of John F. Kennedy International Airport and LaGuardia Airport as a relevant endpoint for domestic travel because it excludes Newark Liberty International Airport. Their objection is meritless. And even if the relevant market were expanded to include Newark, the NEA is still anticompetitive.

A relevant geographic market need not be defined with "scientific precision," nor must it include "all potential customers or participants." *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 193, 202 (D.D.C. 2017). The tests commonly used by courts to define antitrust markets do not, and are not intended to, arrive at a single "right" relevant market. PCOL ¶ 60. As the Supreme Court has recognized, within any product or geographic market, narrower markets may exist which themselves constitute relevant antitrust markets. *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). Rather, the proper inquiry is whether the chosen relevant market illuminates the likely competitive effects of the conduct at issue. PCOL ¶ 60.

"[I]n the First Circuit, it remains true that the hypothetical monopolist test is the touchstone of market definition, even in contexts outside of horizontal mergers." *In re Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639, 664 (D. Mass. 2020) (internal quotation marks omitted). The test poses a simple question: whether a firm that controls all the products in the candidate geographic market (the "hypothetical monopolist") could impose a small but significant price increase without losing so many customers to firms outside the candidate geographic market that the price increase would be unprofitable. PCOL ¶ 58. The Court may evaluate a transaction in "any relevant market satisfying the [hypothetical monopolist] test." *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 40 (D.D.C. 2017) (alteration in original) (quoting U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 4.1.1 (2010) [hereinafter, Merger Guidelines]). The hypothetical monopolist test "'ensures that markets are not defined too narrowly' and, in so doing, identifies a market that will 'illuminate the evaluation of competitive effects.'" *Id.* at 39 (quoting Merger Guidelines § 4.1.1).

Defining JFK and LaGuardia as a relevant endpoint for domestic travel separately from Newark is entirely consistent with these principles. As Dr. Miller demonstrated, a market defined around JFK and LaGuardia passes the hypothetical monopolist test. PFOF ¶¶ 112-115. Contrary to Defendants' assertions, this is consistent with common sense: a significant portion of travelers in New York City and Long Island would not cross the Hudson River to take a flight out of Newark if prices at JFK and LaGuardia went up by 5 percent. Defendants' criticisms of Dr. Miller's hypothetical monopolist test also are meritless. Defendants' experts reject the test not based on any economic analysis but purely their own subjective conclusions that the "right" way to define the market is to include Newark. PFOF ¶¶ 117. This is neither economically nor legally sufficient to rebut Dr. Miller's expert opinion, which is based on well-tested and accepted

economic principles. PCOL ¶¶ 59-60.[9] Tellingly, none of Defendants' experts conducted a
hypothetical monopolist test to support their proposed inclusion of Newark in the market.
PFOF ¶¶ 116.

But Plaintiffs have not relied on just the hypothetical monopolist test and common sense
alone. Additional economic analysis, testimony from Defendants and third parties, and
Defendants' ordinary-course documents all support the conclusion that JFK and LaGuardia are a
properly defined antitrust market.

First, in addition to conducting a hypothetical monopolist test, Dr. Miller studied frequent
flyer data from American, ticket data from JetBlue, and taxi data from New York City to assess
consumer preferences for JFK and LaGuardia, on the one hand, and Newark on the other hand.
PFOF ¶¶ 119-120. Each data source confirmed Dr. Miller's overall conclusion that JFK and
LaGuardia appeal to a distinct set of customers than Newark and that it is appropriate to treat
JFK and LaGuardia as a separate relevant market. PFOF ¶¶ 119-120. As Dr. Miller testified, the
data demonstrates an intense "local preference": 88.9 percent of American frequent flyers and
86.7 percent of JetBlue passengers who reside in the primary "draw area" surrounding JFK or
LaGuardia choose one of those two airports over Newark. Tr. vol. 10, 189:7–193:10 (Miller).
The taxi data is even more robust (because it is not limited to American and JetBlue fliers or to
residents of New York) and the results are the same: a distinct set of consumers demonstrates a
strong preference for JFK and LaGuardia over Newark. PFOF ¶ 120.

Second, the industry recognizes that JFK and LaGuardia attract different customers than
Newark. For example, John Kirby of Spirit Airlines testified that Newark is primarily used by the
New Jersey population, whereas LaGuardia is preferred for New York City travelers unless they
are traveling beyond LaGuardia's 1,500-mile "perimeter" limit, in which case JFK is preferred.

---

[9] Defendants also argue that the "outside good" in Dr. Miller's demand model does not accurately capture
substitution to Newark because it is a national model that uses data for all routes; however, Dr. Miller
demonstrated that JFK/LGA pass the hypothetical monopolist test even when estimating demand based
only on New York passengers. PFOF ¶ 115.

Tr. vol. 3, 160:4-15 (Kirby). Delta agrees, which is why it serves all three airports. PFOF ¶ 122. Even United, the largest airline at Newark, agrees that certain New York City travelers prefer JFK. PFOF ¶ 122. Similarly, in the normal course of business Defendants admit that Newark attracts different passengers that do not largely overlap with JFK and LaGuardia. PFOF ¶ 121. Even JetBlue, in its advocacy to the Department of Transportation (DOT), argued that its entry had a significant impact on "monopoly" routes that United served from Newark, even though JetBlue already served those routes from JFK or LaGuardia. PX0446 at 2.

Finally, the evidence shows Defendants price JFK and LaGuardia differently than Newark, and they often ignore competition from United out of Newark when making competitive decisions. For example, Evan Jarashow of JetBlue testified that JetBlue's pricing strategy for Boston to JFK and Boston to LaGuardia is the same (it does not involve matching United), but different than JetBlue's pricing strategy for Boston to Newark (which does involve matching United). PFOF ¶ 129. The same is true for many other routes in JetBlue's network. PFOF ¶¶ 127-128. And JetBlue has consistently—in public speeches by its CEO and in statements to regulators—touted the JetBlue effect *separately* for Newark compared to JFK and LaGuardia. PFOF ¶ 130. Similarly, Allysen Roberts, a senior manager in American's pricing department, testified at deposition that American's pricing strategy treats Newark differently than JFK. Roberts (American) Dep. 152:22–153:6, May 10, 2021.

In sum, defining JFK and LaGuardia as a single endpoint, separately from Newark, is fully supported by the weight of the quantitative and qualitative evidence in the record and the Court should find Plaintiffs have met their burden to prove the relevant geographic market. Even if the Court disagrees, however, including Newark in the relevant market does not materially change the outcome: the NEA remains anticompetitive. *See infra* Argument Part I.C.2, 3.d.

## 2. Plaintiffs have proved the NEA gives Defendants market power in the relevant markets.

The evidence shows Defendants possess market power in the relevant markets. Market power is the ability to raise or maintain prices above those that would be charged in a

competitive market. PCOL ¶ 61. Evidence supporting a finding of market power includes evidence of (1) high market shares in (2) a highly concentrated relevant market that is (3) protected by high barriers to entry. PCOL ¶¶ 62, 66-70. While there is no minimum threshold, courts have found market shares of 30 percent or more (and sometimes as low as 20 percent) sufficient to establish market power. PCOL ¶ 63. In challenges to mergers under Section 7 of the Clayton Act, courts presume the merger will create or enhance market power when the defendants' combined market shares exceed 30 percent or the combination results in a significant increase in market concentration in a highly concentrated market. PCOL ¶¶ 67-70. And a trend toward consolidation in an industry, like the airline industry, is further evidence supporting a finding of market power and likely anticompetitive effects. PCOL ¶ 71.

Dr. Miller calculated Defendants' combined revenue shares[10] in each of the relevant markets. PFOF ¶¶ 285, 291-292. Dr. Miller also calculated the impact of the NEA in each of the relevant markets using the Herfindahl-Hirschman Index, which is a standard and well-accepted measure of market concentration. PFOF ¶¶ 286-290, 293; PCOL ¶ 69. As shown below, Defendants' combined market share ranges from 48.5 percent to 96 percent in the eleven Boston nonstop overlap markets, and from 36 percent to 97 percent in sixteen JFK/LGA nonstop overlap markets, and is 31 percent in one Newark nonstop overlap market. PFOF ¶ 285; PX0461 (Miller Report App'x E). The NEA also significantly increases market concentration in these already highly concentrated markets. PFOF ¶¶ 286-288, 290.

| Relevant Market | Defendants' Combined Revenue Share (2019) | Total Market Revenue |
|---|---|---|
| Boston – Charlotte | 96.1% | $84.7M |
| Boston – Chicago | 48.5% | $253.1M |
| Boston – Dallas/Fort Worth | 83.6% | $166.1M |
| Boston – Los Angeles | 62.6% | $393.2M |
| Boston – Miami | 76.5% | $223.8M |

---

[10] When the challenged restraint is part of a joint venture, it is appropriate to examine the combined market shares of the joint venture participants, rather than their individual market shares, to evaluate whether the joint venture has or creates market power. PCOL ¶ 64.

| | | |
|---|---|---|
| Boston – New York City (JFK/LGA) | 49.8% | $194.4M |
| Boston – Philadelphia | 86.8% | $132.0M |
| Boston – Phoenix | 85.2% | $116.5M |
| Boston – Rochester | 86.2% | $7.4M |
| Boston – Syracuse | 82.1% | $4.1M |
| Boston – Washington, D.C. (DCA) | 88.0% | $203.0M |
| JFK/LGA – Austin | 44.6% | $130.8M |
| JFK/LGA – Charleston | 43.6% | $61.7M |
| JFK/LGA – Chicago | 36.2% | $513.1M |
| JFK/LGA – Las Vegas | 46.5% | $266.4M |
| JFK/LGA – Los Angeles | 57.0% | $1,223.1M |
| JFK/LGA – Martha's Vineyard | 92.5% | $6.2M |
| JFK/LGA – Miami | 55.9% | $733.1M |
| EWR – Miami | 31.0% | $323.5M |
| JFK/LGA – Nantucket | 96.8% | $10.9M |
| JFK/LGA – Orlando | 55.3% | $348.9M |
| JFK/LGA – Phoenix | 61.5% | $162.5M |
| JFK/LGA – Portland, ME | 37.4% | $24.3M |
| JFK/LGA – Raleigh-Durham | 47.8% | $114.5M |
| JFK/LGA – San Diego | 44.7% | $166.3M |
| JFK/LGA – San Francisco | 45.7% | $670.6M |
| JFK/LGA – Savannah | 46.5% | $43.5M |
| JFK/LGA – West Palm Beach | 60.0% | $193.4M |
| **Total market revenue** | | **$6.77B** |

Defendants' market power is further protected by high barriers to entry. Overwhelming evidence established that slot constraints at JFK and LaGuardia, and gate constraints at Boston Logan, are significant barriers to entry or expansion by competitors in the relevant markets. PFOF ¶¶ 313-318. Nor is there any evidence to suggest that airlines that already compete in the relevant markets can constrain Defendants' market power—the HHI analysis already takes that competition into account in concluding these markets are highly concentrated and the NEA significantly increases that concentration, PFOF ¶¶ 319-329. Further, as Dr. Miller explained, there is an "opportunity cost" associated with competitors repositioning aircraft from other, profitable routes to increase their capacity in the relevant markets. Tr. vol. 10, 207:17–209:13, at 208:4-12 (Miller); PFOF ¶ 324. Dr. Miller's conclusion that repositioning is unlikely, especially by legacy airlines, is further confirmed by data showing high sustained profits in the

26

past have not prompted entry or repositioning by airlines other than JetBlue. Tr. vol. 17, 91:23–94:16, at 92:1-10 (Miller). Plaintiffs therefore have established that Defendants have market power in the relevant markets.

### 3. Plaintiffs have proved the NEA harms competition and is likely to increase prices and reduce output in the relevant markets.

Agreements between close, head-to-head competitors to no longer compete with each other predictably cause anticompetitive effects by eliminating incentives to reduce prices or offer better products to win customers away from each other. PCOL ¶¶ 88-95. When such an agreement increases concentration in highly concentrated markets, courts typically presume the agreement creates or enhances market power, and that competitive harm will follow. PCOL ¶¶ 67-70. In concentrated industries, like the airline industry, the risks are greater still because the elimination of competition makes it easier not only for the parties to the agreement to collude, but for remaining competitors to compete less intensely, secure in the knowledge that there is one fewer competitor who might undercut them. PCOL ¶¶ 96-99. For these reasons, antitrust law views agreements between direct, horizontal competitors with great skepticism. PCOL ¶ 12. Whether the agreement is an acquisition of control or simply an agreement not to compete, the concern is the same: the loss of competition to which consumers are entitled.

The NEA threatens to cause each of these anticompetitive harms. For the past two decades, American and JetBlue competed vigorously on routes to and from Boston and New York City. That competition resulted in lower prices and increased choice for consumers, exemplifying the type of conduct that the antitrust laws encourage. In assessing the likely competitive consequences of agreements like the NEA, courts treat a history of head-to-head competition, particularly as reflected in the parties' ordinary-course business documents, as critical to understanding the restraint's competitive consequences. PCOL ¶ 79.

Absent the NEA, competition between American and JetBlue would have continued to intensify. But the NEA eliminates that competition indefinitely, depriving consumers of the resulting benefits—including benefits JetBlue has proclaimed it uniquely provides. With reduced

competition, prices will go up. The documentary, testimonial, and economic evidence at trial showed that Defendants' decision to end this competition between them will result in upward pricing pressure on overlap routes, to the public's detriment. All this occurs against the historical backdrop of an industry that has shown itself both willing and able to reduce capacity to drive higher prices. As explained below, experience teaches that such an agreement may benefit the airlines, but it does not benefit competition or consumers. These predictable, likely anticompetitive effects satisfy Plaintiffs' burden at step one of the rule of reason.

### a. The NEA unreasonably restrains trade by eliminating competition between American and JetBlue.

In determining whether an agreement unreasonably restrains trade, courts consider the likely unilateral anticompetitive effects that result from agreements between direct, horizontal competitors. PCOL ¶ 88. Agreements between direct competitors harm competition by reducing the parties' incentives to compete with each other. PCOL ¶ 89. When that competition is lost, the competitors no longer exert pressure on each other to win business, resulting in upward pricing pressure. PCOL ¶¶ 90-91. A history of head-to-head competition, combined with an agreement to end that direct competition, establishes a likelihood of anticompetitive effects. PCOL ¶¶ 90-91.

### i. Before the NEA, Defendants had long battled each other for a leadership position in Boston.

Before the NEA, JetBlue was the leading airline in Boston by any measure, including ASMs and departures, growing from zero percent ASM share in 2004 to 35 percent ASM market share by 2019. PFOF ¶¶ 135-140. In fact, JetBlue achieved its highest market share in Boston in 2019, the year before the NEA. PFOF ¶ 136. To its credit, JetBlue earned that market share by competing fiercely to win passengers from American and other rivals. It launched new services, expanded its capacity, and offered consumers lower fares. PFOF ¶¶ 147-166. That competition against the legacy airlines, including American, produced exactly the effects the antitrust laws encourage: billions of dollars in consumer savings, by JetBlue's own calculations. PFOF ¶ 167. Notably, JetBlue achieved this leading position on its own, without partnering with a competitor.

American also was a leading airline in Boston. For many years over the last decade, American was in second place behind JetBlue. PFOF ¶ 142. By the end of 2019, Delta had overtaken American, but American nevertheless remained the third-largest airline in Boston. PFOF ¶ 143. Delta, like JetBlue, achieved its new position by investing in Boston and growing organically—putting in the hard work of competition. PFOF ¶¶ 421, 502. To this day, no other airline in Boston offers the level of service provided by JetBlue, Delta, and American. Combining American and JetBlue will transform Boston from a competitive three-firm airport into one dominated by a single partnership, the NEA.

As one would expect from close competitors vying for a leading position, this rivalry resulted in intense competitive responses, to the benefit of Boston travelers. For example, in November 2018, JetBlue launched a regional fare sale on routes in several of its focus cities, including Boston, which American matched. PFOF ¶ 199. In early 2019, such competition provoked a fare war between American and JetBlue, with each matching the other's pricing moves, tit-for-tat. PFOF ¶¶ 200-201. Examples of this type of competition abound at the route level as well. For example, after JetBlue entered the Boston to Rochester route in 2019, JetBlue quickly achieved over 40 percent of the ASMs on the route. PFOF ¶ 151. Prices on transcontinental routes similarly plummeted following JetBlue's entry with its premium Mint product, with American's lowest fares dropping 50 percent. PX0190 at 99. Internally, in the face of such competition, American and JetBlue fretted about the threat each posed to the other's plans in Boston. PFOF ¶¶ 225, 227-228. One American sales manager complained that Boston was less profitable for American "due to the fare destruction JetBlue have wrought." PX0195 at 2. That "fare destruction" is the very goal of the antitrust laws.

JetBlue and American also fought each other for contracts with Boston-based corporate customers. For example, to expand its options for corporate customers in Boston, JetBlue launched its own "shuttle flights" to win customers on routes between Boston and major business markets, including New York, Philadelphia, and Washington, D.C. PFOF ¶ 159. To stave off this competition from JetBlue, American approved discounts for corporate customers on the Boston

to LaGuardia route. PFOF ¶ 159. Likewise, on the Boston to Philadelphia and Boston to DCA routes, JetBlue offered deals to corporate customers to match American's frequent flier status. PFOF ¶ 160. One corporate customer pressured American to lower its fares because JetBlue was offering $█ on a route where American was charging $█—nearly █ times more. PFOF ¶ 161. This record of competition between Defendants—the very competition which will be lost if the NEA is not enjoined—benefitted consumers.

### ii. American and JetBlue both planned to contest, not withdraw from, the battlefield in Boston.

This intense competition between American and JetBlue in Boston would have continued. In 2019, the year before the NEA was signed, JetBlue's CEO was confident in JetBlue's ability to compete and win in Boston, PX0577 at 6-7, and JetBlue was enacting its "Boston 200" goal to achieve 200 flights per day in Boston. PFOF ¶ 211. Although JetBlue knew this growth would provoke a competitive response, including lower fares, it was undeterred. PFOF ¶ 211. To the contrary, JetBlue developed yet another plan in 2019, titled "Project Revere." Through Project Revere, JetBlue intended to add service and frequencies along key business routes in Boston, including New York, Washington, D.C., and Philadelphia. PFOF ¶ 216. And in December 2019, just months before NEA discussions began in earnest, JetBlue announced plans to grow in numerous routes out of Boston, including routes to American's hubs in Charlotte, Los Angeles (LAX), Philadelphia, Phoenix, and Washington, D.C. (DCA). PX0633. Simply put, JetBlue had no plans to lay down its arms and stop competing with American in Boston, until the NEA.

American had its own plans for expansion in Boston as well. Mr. Raja, the head of American's network planning at the time, repeatedly urged his team to consider ways to expand American's enterprise in Boston. PFOF ¶¶ 220-222. And American had room to grow. Before the NEA, American had underutilized gates in Boston; but in 2019, American developed plans to increase utilization at its existing gates as well as obtain new gates. PFOF ¶ 221. And just prior to the NEA, American announced new routes, including Boston to Raleigh-Durham, Indianapolis, Austin, and Wilmington, as well as additional frequencies on numerous other

routes. PFOF ¶¶ 223-225. In sum, despite recently falling behind Delta in Boston, American intended to "*win BOS back*." PX0046 at 1 (emphasis in original); *see also* PFOF ¶ 226 (American's Boston plans included 12 percent ASM growth in 2020).

### iii. American, the historic market leader, and JetBlue, the "Hometown Airline," competed for customers in New York City before the NEA.

Like in Boston, both American and JetBlue are longtime competitors in New York City. JetBlue has touted itself as New York's "Hometown Airline." PFOF ¶ 178. And that's more than empty puffery. In a presentation to lenders in June 2020, just a month before the NEA was signed, JetBlue highlighted its "strong market positions," including in New York City. PX0716 at 15. The numbers confirm that statement: JetBlue was either the number one or number two airline at JFK before the NEA. PFOF ¶ 179. Moreover, for all Defendants' discussion at trial of needing slots in New York City, JetBlue has those, too. JetBlue has 250 peak slots at JFK, accounting for about one quarter of all the peak slots at the airport. Tr. vol. 2, 80:12-21 (Hayes).

American, for its part, was once a market leader in New York. Between 2008 and 2012, American had the third-largest market share in New York. PFOF ¶ 182. Then, in 2014, to further bolster their combined positions on the East Coast, including in New York City, American and U.S. Airways merged—a move that American projected would make it the number two airline at both LGA and JFK, with "good market presence" in New York. PX0014 at 12.

The evidence at trial established a pattern of aggressive price competition between American and JetBlue in New York City. For example, Mr. Jarashow described a recurring tactical fare war between American and JetBlue over various transcontinental routes, which resulted in lower prices on a number of routes out of JFK and LaGuardia. PFOF ¶¶ 200-201, 236-237. American and JetBlue competed particularly vigorously on routes from JFK to Seattle, San Francisco, and Los Angeles, where JetBlue offered its premium Mint product (a business class-quality product that other LCCs do not offer) to challenge American. PFOF ¶¶ 234, 236-238, 244-245. The result was lower prices. American's fares dropped by more than

50 percent on some routes, resulting in thousands of dollars in savings *per ticket*.
PFOF ¶¶ 208-209. The converse also is true: when American and JetBlue did not compete on
routes, such as when American temporarily exited the JFK to San Diego route due to the
737 MAX grounding, JetBlue raised its prices as a result and consumers suffered. PX0583 at 1;
Tr. vol. 3, 72:2-9, 73:21–74:7 (Jarashow).

    iv. **Defendants' rivalry in New York City would have continued without
the NEA.**

  Without the NEA, American and JetBlue's intense competition would have continued in
New York City. New York City, as a global business and population center, is an important part
of airline networks, including for American and JetBlue, PFOF ¶¶ 178-179, 195-196, and neither
Defendant has argued it had any intention to exit New York City before the NEA. American, in
particular, had room to grow because, before the NEA, it often underutilized its valuable slot
holdings. PFOF ¶¶ 189-194, 317. In JFK, for example, American could have added more than 40
flights without obtaining a *single new slot*. PFOF ¶ 230. American's practice of sitting on its
slots was no secret. JetBlue and Delta, for example, were well aware American was pulling its
punches and holding back on fully using its available slots. PFOF ¶¶ 193-194. American also
was planning to upgauge its aircraft in New York City, PFOF ¶¶ 230-232, which would have
increased its capacity and the attractiveness of its service—again without adding a single slot.

  JetBlue also had a strategy to grow in New York City that did not depend on the NEA.
PFOF ¶¶ 233-236. In the months before the NEA, American and JetBlue negotiated a contract
for a slot lease at JFK. PFOF ¶¶ 234, 432-435. Mr. Laurence testified that JetBlue was very eager
to grow at JFK and jumped at an opportunity to obtain these slots that previously went to waste
in American's possession. PFOF ¶ 234. Consistent with these plans, JetBlue announced a
number of new routes out of JFK in June 2020, one month before entering the NEA.
PX0640 at 2.

####    v.    JetBlue was poised to challenge the dominance of legacies, including American Airlines, in transatlantic routes to London.

JetBlue has long criticized the significant concentration of market share in transatlantic routes to and from London. PFOF ¶ 239. By JetBlue's own assessment, consolidating routes from Boston and New York to London in the hands of three airline alliances (on which JetBlue's partnership with American is now modeled) reduced competition and led to exorbitantly higher fares for consumers. PFOF ¶¶ 240-242. To disrupt this longstanding dominance of the legacy airlines, JetBlue announced plans to enter London Heathrow, with the express goal of lowering fares for customers. PFOF ¶¶ 243-246. JetBlue made numerous presentations to the United Kingdom's CMA explaining the benefits it planned to bring to multiple London routes, including lower prices. PFOF ¶¶ 249-250.

American knew all too well that JetBlue's entry into transatlantic routes to London would push prices down. For example, in a September 2019 email, one American employee predicted JetBlue's entry into the Boston to London Heathrow route would result in a "fare fight." PX0135 at 1. Paul Swartz of American confirmed at trial that American was concerned about the Boston to London Heathrow route becoming more competitive with JetBlue's planned entry. Tr. vol. 8, 55:20–56:2, 56:17-21 (Swartz). By one estimate, American believed JetBlue's entry could result in a 50-percent to 60-percent price drop. PX0190 at 99.

####    vi.    The NEA reduces or eliminates competition between JetBlue and American Airlines that would have benefitted consumers.

All the competition described above, which had benefitted the traveling public for years, is severely curtailed, if not completely eliminated, because of the NEA.

***No competition on nonstop overlaps.*** Mr. Hayes and Mr. Laurence both testified at trial that American and JetBlue no longer compete on routes within the scope of the NEA. Tr. vol. 1, 182:6-10 (Hayes); Tr. vol. 5, 137:21–139:25 (Laurence). Roberta Mehoke, JetBlue's Director of Sales, similarly acknowledged at deposition that before the NEA, American and JetBlue had to compete to earn revenues on passenger sales, but now they share in the profits regardless of who makes the sale. PFOF ¶ 261. American understands this as well. Brian Znotins of American

admitted at trial that American and JetBlue no longer compete from a network perspective on routes within the scope of the NEA. Tr. vol. 15, 118:14-16 (Znotins). Third parties, like Delta, Spirit, and the Port Authority of New York and New Jersey, also agree: they consider American and JetBlue to be one airline with respect to NEA routes. PFOF ¶ 262.; *see also* Tr. vol. 3, 165:22–166:3 (Kirby) (instead of remaining an independent, disruptive competitor, under the NEA, JetBlue is now a "feeder" airline for American).

      ***Market allocation.*** Perhaps the most obvious example of lost competition caused by the NEA is the evidence American has exited routes because of the NEA, including Boston to LaGuardia, LaGuardia to Orlando, and LaGuardia to Charleston. PFOF ¶¶ 272-273. These exits are a feature, not a bug, of the NEA. The so-called "clean team" that created the NEA designed a joint schedule that had Defendants exiting certain markets in which they previously competed. PFOF ¶ 270. Defendants call this "optimization"—the antitrust laws call it market allocation. And the Court should expect this pattern to continue: Mr. Znotins testified American plans to cede the JFK to San Francisco route to JetBlue as well. Tr. vol. 15, 120:9–121:4 (Znotins). American's internal documents are even more plain: one April 2021 email received by Jordan Pack describes the goal of the NEA as "only having 1 carrier in 1 market." PX0318 at 1. Antitrust law's prohibition on "unreasonable" restraints on competition means nothing if it does not include restraints like the NEA that *end* competition.

      ***Restricted output and less capacity.*** By jointly planning their schedules, American and JetBlue can now decide how much capacity to put into any particular market. This includes the ability to reduce capacity and exit markets. American's President Robert Isom conceded at trial that he views the NEA as "helping American," during this time period, shed capacity. Tr. vol. 5, 36:14-16, 30:22–31:9 (Isom). Significantly, because the NEA continues indefinitely, Defendants also are empowered going forward to jointly make additional strategic decisions to dial back capacity in markets with high combined shares and barriers to entry.

      ***Diminished competitive pressure from JetBlue on routes to London.*** Customers on transatlantic routes to and from London Heathrow, for whom JetBlue had long lobbied until its

agreement with American, will suffer as a result of the NEA. Indeed, the effects of the NEA on this route already have manifested. Before the NEA, JetBlue lobbied the CMA for four Heathrow slots that were being divested by the Atlantic Joint Business Agreement, but ███████████

███████████████████████████████████████████████████████████████████████

███████ PFOF ¶¶ 280-283. More importantly, JetBlue's incentive to compete aggressively with the London slots it did obtain is reduced due to the MGIA's revenue-sharing mechanism. JetBlue understands that if it undercuts American on London routes, the NEA's pool of revenue will be smaller, and JetBlue will make less money. PFOF ¶¶ 278-279.

*Accommodation in the "spirit of partnership."* American's history of partnerships suggests that on routes both within and outside the NEA, American and JetBlue will compete less vigorously with each other to maintain favorable relations within their partnership. For example, in its partnership with LATAM, American chose to compete less vigorously and undercut its partner's prices less often to maximize the value of the partnership. PFOF ¶ 373. Likewise, in American's and Alaska's previous partnership, each airline cut service on important routes serviced by the other to avoid tension with the partner. PFOF ¶ 374. Defendants' own witness, Andrew Harrison of Alaska, testified about the pressure both American and Delta placed on Alaska during their respective alliances. PFOF ¶ 375.

The Court need not speculate whether JetBlue and American will succumb to the same temptation: the evidence confirms accommodating behavior already has begun with the NEA. In the first full year the NEA was in effect, the MGIA formula would have resulted in JetBlue paying American an enormous transfer payment of approximately $200 million. Tr. vol. 8, 122:4-18 (Fintzen). But rather than enforce the terms of the MGIA, American accommodated JetBlue in the spirit of partnership and agreed to cap the transfer payment at $27 million. Tr. vol. 8, 124:17–125:5 (Fintzen). Nor was this accommodation surprising to JetBlue. As Mr. Hayes testified, "it never was something that I didn't feel that we would end up resolving." Tr. vol. 1, 214:24–215:17 (Hayes); *see also* PFOF ¶ 71.

35

In response to the overwhelming evidence of past and future competition (absent the NEA) above, Defendants have no plausible answer. They have simply chosen to run away from it, asking the Court to credit their self-serving testimony at trial and not to believe their contemporaneous, ordinary-course documents. Mr. Raja claims his instructions to his staff to "swing the bat," PX0064 at 1, and "fight like hell" in Boston, PX0122 at 1, or to upgauge aircraft in New York, PFOF ¶ 430, were merely rallying cries, devoid of substance, *see, e.g.,* Tr. vol. 4, 178:7-12 (Raja). Mr. Znotins, in an effort to sidestep all evidence of American's documented plans to expand and compete in Boston and New York, PFOF ¶¶ 220-232, contends that Mr. Raja effectively told him to write on a clean slate, Tr. vol. 15, 60:1-6 (Znotins). David Clark of JetBlue, for his part, claims JetBlue had no plans to extend the lifespan of its E190 fleet, Tr. vol. 10, 24:13-21 (Clark), even though ordinary-course documents show JetBlue considering just such a plan, PX0525 at 2. When pressed by the Court to explain, Mr. Clark could provide no explanation for his view that the E190 fleet would have been retired except for the NEA. Tr. vol. 10, 37:5–38:19 (Clark).

Whatever the intentions behind these statements, courts routinely give little to no weight to self-serving testimony concerning future intentions to compete, absent objective evidence to verify the testimony. PCOL ¶ 80. This is no arcane principle of antitrust law; it is simply a common-sense rule of thumb for weighing evidence. *See, e.g.*, *United States v. Bertelsmann SE & Co. KGaA*, No. 21-2886-FYP, 2022 WL 16949715, at *32 (D.D.C. Nov. 15, 2022) ("A unilateral promise by PRH that it will not use its market power if it acquires S&S cannot rebut the government's prima facie case."); *Aetna*, 240 F. Supp. 3d at 70 ("The Court is more persuaded by the contemporaneous email exchanges than by the in-court attempts to explain or disavow those documented exchanges.").

The objective evidence of competition between American and JetBlue in Boston and New York City that Plaintiffs presented at trial, through ordinary-course business documents, is "central to the evaluation" of the NEA's unilateral effects. Merger Guidelines § 6.1; *see also* PCOL ¶¶ 90-91. Courts routinely enjoin mergers based on similar evidence, despite executives'

claims about unlocking new benefits. As just one example, the court in *United States v. H & R Block* pointed to evidence that H & R Block "appear[ed] to acknowledge that TaxACT has put downward pressure on HRB's pricing ability" as evidence that a merger between H & R Block and TaxAct should be enjoined. *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 81–82 (D.D.C. 2011). Here, the long history of competition between American and JetBlue compels a similar conclusion that the NEA likely will result in *less* downward pricing pressure—meaning higher prices for consumers.

      **b.  The NEA makes JetBlue more like a legacy airline and less of a disruptive LCC competitor.**

Anticompetitive effects become more likely when an agreement eliminates the impact of a particularly aggressive competitor. PCOL ¶¶ 93-95. Such particularly aggressive competitors are called "mavericks" because they typically "play a disruptive role in the market to the benefit of customers," given that they "take the lead in price cutting" or "resist[] otherwise prevailing industry norms to cooperate on price setting or other terms of competition." *H & R Block*, 833 F. Supp. 2d at 79 (quoting Merger Guidelines § 2.1.5).

JetBlue historically has behaved like a maverick in the airline industry. It differentiates itself from legacy airlines and other LCCs by offering low fares and high-quality services, including its premium Mint product and more leg room in coach class, among others. PFOF ¶¶ 24-25. Although other LCCs and ULCCs compete by offering lower prices, they do not have a premium business product like Mint, or comparable high-quality coach service. PFOF ¶¶ 26-27. Whereas legacies compete with each other's premium services, they do not offer the same kind of price competition that JetBlue provides. *See* PFOF ¶ 323.

JetBlue has exerted a particularly unique, disruptive force on the marketplace, termed the "JetBlue Effect." PFOF ¶ 46. In the past, when JetBlue entered a market, it benefitted not only its own customers, but also customers of its competitors, who were forced to lower their prices in response to JetBlue. PFOF ¶ 47-53. By JetBlue's own estimate, its entry has driven prices down by 14 percent to 75 percent. PX0644 at 3-4. The opposite has occurred when JetBlue exits a

market; for example, when JetBlue left the JFK to Richmond route, fares rose by 65 percent and passenger counts fell by 49 percent. PX0644 at 5.

The NEA undermines, not enhances, JetBlue's previous pro-consumer efforts. The NEA consumes at least 75 percent of JetBlue's capacity—meaning that for the vast majority of its business, JetBlue is now coordinating with American. PFOF ¶ 369. JetBlue's previously low costs, which form the cornerstone of its strategy to offer consumers lower prices, have risen since the NEA. PFOF ¶ 370. And JetBlue itself acknowledged the risk that American would use the NEA to "manipulate" JetBlue. Tr. vol. 1, 206:5-22 (Hayes). ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

PX0801 at 4. Spirit (an airline JetBlue has proposed to now co-opt as well), similarly views the NEA as another step along JetBlue's recent path toward legacy, and not LCC, status. Tr. vol. 4, 48:25–49:2 (Kirby).

### c. The NEA will further consolidate the airline industry, risking the return of coordinated effects.

In addition to the unilateral effects described above, courts also consider whether an agreement will enhance the risk of coordinated effects in the relevant markets. PCOL ¶ 96. "Coordinated effects" refers to joint efforts, whether through overt collusion or implicit understanding, to reduce output and increase prices. PCOL ¶ 96. Whether an agreement enhances the risk of coordination depends on the character of the market, including market concentration, price transparency, and evidence that market participants understand such coordination would be beneficial to improving their profits. PCOL ¶ 97.

The airline industry satisfies each of these criteria, making it prone to collusion. First, the airline industry is highly concentrated. Through a series of mergers, the number of independent airlines in the industry has declined precipitously since 2000. PFOF ¶¶ 377-378. Today, only four domestic airlines (American, Delta, United, and Southwest) dominate the industry with 80 percent market share. PX0668 at 5. As Doug Parker, American's Chairman and former CEO

testified, American championed these consolidation efforts and viewed them as an important strategic objective to improving the bottom line. Tr. vol. 6, 29:3-12, 37:1-22 (Parker). The reason is obvious: less capacity means higher prices and higher profits. PFOF ¶¶ 390-391. By contrast, before the NEA, JetBlue led the charge against such consolidation. PFOF ¶ 16.

Second, both pricing and capacity decisions are exceptionally transparent in the airline industry. Airlines publicly file their fares on ATPCO, an industry-standard clearinghouse for airfares. Tr. vol. 3, 37:23–38:6 (Jarashow). Fares are updated multiple times each day. Tr. vol. 3, 38:7-11 (Jarashow). Airlines also monitor actual selling prices using other technology, such as data scraping. Tr. vol. 3, 39:10-22 (Jarashow). Likewise, airlines publish their schedules well in advance to the public, and airlines closely watch each other's scheduling decisions. PFOF ¶¶ 352-354. Defendants' own expert, Dr. Lee, testified that airlines "openly" discuss capacity in public forums, which he found "unremarkable." Tr. vol. 12, 141:7-17 (Lee). And Mr. Jarashow acknowledged that airlines "flash" each other in ATPCO to signal suggested pricing adjustments. Tr. vol. 3, 75:9–78:13 (Jarashow). In sum, airline prices and capacity are no mystery.

Other aspects of the airline industry make collusion likely as well, including the oligopolistic structure of the industry and the high number of multi-market contacts between airlines. PFOF ¶¶ 360, 368. Similarly, the small number of firms further facilitates monitoring competitor efforts to undercut price. PFOF ¶ 367.

Finally, historical evidence establishes the industry's susceptibility to coordinated effects and understanding that "implicit coordination would be beneficial." *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 209 (D.D.C. 2018); *see Bertelsmann*, 2022 WL 16949715, at *27 ("[A] history of collusion or attempted collusion is *highly probative* of likely harm from a merger." (emphasis added)); *United States v. Airline Tariff Publ'g Co.*, 836 F. Supp. 9, 12 (D.D.C. 1993) (court entry of final judgment designed to prevent airlines from continuing to "use[] the ATP fare dissemination system in a manner that enables them to reach price-fixing agreements or unnecessarily to facilitate fare coordination"). Economic analysis and ordinary-course documents reveal that airlines engaged in a sustained period of coordinated "capacity discipline" between

2009 and 2016. PFOF ¶ 392. Capacity discipline refers to growing capacity at or below GDP, which leads to higher prices because consumer demand increases faster than airline supply. PFOF ¶¶ 393-394. As Dr. Town explained at trial, data shows airlines' capacity grew less during that period than would be expected based on the historical relationship between capacity, GDP, and jet fuel prices, suggesting a coordinated effort at capacity discipline. PFOF ¶ 394.

Documents from that period reflect that market participants were aware of this coordinated capacity discipline. PFOF ¶¶ 385, 394, 397. For example, Mr. Parker described the need for the industry to restrict its growth during earnings calls made to the public. PFOF ¶ 385. Like Mr. Parker, executives at other airlines also understood industry consolidation contributed to the effectiveness of coordinated capacity discipline. PFOF ¶ 397. Other factors suggested by Defendants, such as unemployment or load factors, do not explain this period of sustained capacity discipline in the industry. PFOF ¶ 396.

By enhancing market concentration, the NEA facilitates a return to capacity discipline. The industry has not changed: high levels of market concentration and pricing transparency remain. In addition, just as the recovery from the Great Recession created the opportunity for coordinated capacity discipline, the recovery from the COVID-19 pandemic presents the same "opportunity" to "shed a tremendous amount of capacity." PX0069 at 1; PFOF ¶ 402.

No contrary evidence suggests the airline industry is one where firms would not engage in profit-maximizing behavior and tacitly coordinate capacity, restrict output, and raise prices if able to do so. Absent "'structural market barriers to collusion' that are unique to the . . . industry," which Defendants have not attempted to show, a court must apply the "ordinary presumption of collusion" that applies to concentrated markets to the airline industry. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 725 (D.C. Cir. 2001).

### d. Dr. Miller's economic testimony, including his NEA simulation model, projects hundreds of millions of dollars in annual harm to consumers.

The economic evidence provided by Plaintiffs' expert Dr. Miller confirms the documentary and testimonial evidence that the NEA likely will result in significant harm to competition and consumers.

First, the NEA enhances concentration in numerous highly concentrated markets in Boston and New York. Dr. Miller calculated "modified" HHIs (mHHIs) for each of the domestic nonstop overlap markets touching Boston and New York, accounting for the fact that the NEA by its terms does not result in a change of control among Defendants. PFOF ¶ 286. In every relevant Boston market, the mHHIs exceeded the Merger Guidelines' thresholds for applying a presumption of likely anticompetitive effects. PFOF ¶ 287. Likewise, for the relevant New York markets, the mHHIs exceed these thresholds, except for Atlanta (a market that also is highly concentrated, but not because of the NEA). PFOF ¶ 288. That conclusion changes little even if Newark is included in the relevant market. PFOF ¶ 290. The mHHIs also exceed the Merger Guidelines thresholds in 91 connecting overlap markets and 27 mixed overlap markets. PFOF ¶ 293.

In cases under Section 7 of the Clayton Act, such evidence would, *standing alone*, create a presumption of anticompetitive effects sufficient to condemn the merger absent countervailing evidence from the Defendants. PCOL ¶¶ 67-70. Some courts have presumed a merger creates anticompetitive effects based on the merging parties' market shares in enforcement actions brought under Section 1 of the Sherman Act as well. PCOL ¶ 83. The Court can apply the same reasoning to its analysis of the NEA, which is effectively a merger with respect to the relevant markets. PFOF ¶¶ 298-302. But even if the Court does not apply a presumption of anticompetitive effects, these concentration levels enhance the likelihood of anticompetitive consequences supported by the documentary and testimonial evidence, and the Court should view that evidence in light of these significant concentration levels.

Second, using a standard Bertrand model routinely used by economists in antitrust litigation, Dr. Miller modeled the likely price effects of the NEA. PFOF ¶ 330. Dr. Miller's

41

model relies upon real-world customer purchasing data and isolates the effects of the NEA as if it were in place in 2019, the last year for which reliable data exists. PFOF ¶ 330. The model calculates the "overcharge" (the additional amount of money consumers would have to pay in a given year to purchase the same tickets they would have purchased absent the NEA) in three market types: nonstop overlaps, mixed overlaps, and connect overlaps. PFOF ¶¶ 330-331. Dr. Miller concluded the NEA results in a predicted overcharge to consumers of $696 million annually, caused by the upward pricing pressures created by the NEA. PFOF ¶ 330. Even including Newark in the relevant market, Dr. Miller predicts $627 million in annual harm. PFOF ¶ 340. Dr. Miller confirmed this analysis using alternative approaches, which show that his results are robust. PFOF ¶¶ 342-348.

Although they repeatedly tried, Defendants failed to show that Dr. Miller erred by not analyzing prices and output in the relevant markets following implementation of the NEA. As Dr. Miller explained, the lingering effects of the COVID-19 pandemic make post-implementation data uninformative. PFOF ¶¶ 349-351. While Dr. Carlton attempted to offer his own differences-in-differences analysis, he conceded that he could not rule out price increases in New York, and further that he had not accounted for differences between business-heavy routes and leisure-heavy routes in Boston. PFOF ¶ 349. Even Defendants agreed that 2021 was not representative when it impacted their bottom line—they threw out the $200 million transfer payment based on 2021 flying that would have been required by the MGIA. *See* PFOF ¶ 371.

Defendants' conduct has been under the microscope from the very moment the NEA was announced. As Dr. Miller explained, no rational actor would implement anticompetitive price increases or output restrictions when subject to government investigation and litigation. PFOF ¶ 350. As trial testimony made clear, antitrust counsel was involved from the moment the NEA was conceived, with an eye towards this litigation. PFOF ¶ 94. Courts discount such post-transaction evidence for that very reason. PCOL ¶¶ 122-124.

### 4.   Competition from other airlines cannot constrain the anticompetitive effects of the NEA.

The lost competition between American and JetBlue that results from the NEA cannot be replaced in the short term by entry, expansion, or repositioning by other airlines. First, competition from legacy airlines like Delta or United cannot adequately replace lost competition from JetBlue. PFOF ¶ 323-329. The evidence at trial was overwhelming that the "JetBlue Effect" brings lower prices and better-quality service to routes JetBlue serves, thereby driving increased passenger demand much more than competition from legacy airlines. PFOF ¶¶ 46-54. Only increased competition from a similar LCC or ULCC in the relevant markets would be sufficient to constrain the likely anticompetitive effects of the NEA. But JetBlue has a far greater presence at NEA airports and on NEA routes than other LCCs and ULCCs. PFOF ¶ 320. Airlines like Southwest, Alaska, Spirit, and Frontier have low market shares at NEA airports today and face significant barriers to expanding their capacity at those slot-constrained and gate-constrained airports. PFOF ¶¶ 319-321. For example, no ULCCs possess slots at JFK today. PFOF ¶ 316. And the NEA ensures Defendants will not sell or transfer any of their slots at NEA airports to any LCCs or ULCCs. PX0001-a (NEA Agreement § 3.4.2). Moreover, JetBlue's proposed acquisition of Spirit would effectively eliminate another competitor, PFOF ¶ 322, thereby further consolidating the industry and increasing the harm to competition and consumers likely to result from JetBlue's tie-up with American.

In sum, regardless of where on the sliding scale of rule of reason analysis the Court examines the record, PCOL ¶ 35, Plaintiffs have produced substantial evidence of the anticompetitive effects of the NEA. This evidence establishes Plaintiffs' prima facie case, and the burden of proof shifts to Defendants.

## II.   Defendants have failed to meet their burden to prove sufficient procompetitive justifications for the Northeast Alliance.

Against this substantial evidence that the NEA harms competition in the relevant markets, causing nearly $700 million in annual consumer harm in the form of higher prices and reduced quality of service, Defendants fail to demonstrate any legitimate procompetitive benefits that can

offset the anticompetitive effects of the NEA. Although Defendants' executives tossed around the word "benefits" at every opportunity during trial, often without clarifying what specific "benefits" they meant, Defendants' argument at step two of the rule of reason boils down to four main contentions: (1) that the NEA spurs them to increase their capacity, (2) that the NEA increases their "relevance" to customers, (3) that the NEA is necessary for them to compete with Delta and United, and (4) that the NEA puts them in a better financial position. But none of these arguments establishes the NEA *enhances competition* more than a world with without the NEA.

Defendants also have failed to quantify any benefits that can be properly attributed to the NEA. Instead, as explained below, Defendants' attempt to quantify the NEA's anticompetitive effects in the relevant markets by pointing to supposed benefits outside the relevant markets fails as a matter of law. Without such offsetting procompetitive benefits in the relevant markets, the anticompetitive effects of the NEA in the relevant markets are unrebutted, and the Court can enjoin the NEA without further inquiry.

At times, Defendants have complained that they should not be required to "justify" the NEA. Tr. vol. 1, 72:20-24. This is nothing more than semantics. Defendants concede, as they must, that they have the burden to prove a procompetitive rationale for the NEA. Defs.' Opening Stmt. at 42. A procompetitive benefit is one that enhances competition in the relevant market affected by the anticompetitive restraint. PCOL ¶ 106. And to satisfy their burden of showing a procompetitive benefit that enhances competition, Defendants must establish more than simply "a plausible connection" between the restraint and "a legitimate objective." 7 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1505b (4th ed. 2017). To meet this burden, Defendants must point to "empirical evidence of procompetitive effects." *Cal. Dental,* 526 U.S. at 775 n.12.

Moreover, a justification designed to insulate a defendant from competition is not procompetitive and cannot justify a restraint on trade. Nor can a justification that substitutes a defendant's beliefs about what is "best" for consumers or for competition. The Supreme Court

has made clear that "the Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable." *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 696.

Rather, Defendants must prove their claimed benefits result *from the restraint itself*. *See, e.g.*, *Bd. of Regents*, 468 U.S. at 114 (condemning restraint because "any procompetitive efficiencies . . . could be [achieved] just as effectively" without it). Any "asserted benefits [that] can be achieved without the concomitant loss of a competitor" should receive no weight in the Court's analysis. *H.J. Heinz*, 246 F.3d at 722.

Defendants have failed to meet their burden.

### A.  Defendants cannot justify the NEA by pointing to amorphous benefits supposedly accruing outside the relevant markets.

Defendants cannot claim "benefits" from adding new flights on routes in which they do not compete to justify the NEA's manifest anticompetitive effects; those benefits—even if they occur—are not cognizable efficiencies. PCOL ¶¶ 109-111, 114-116. Put another way, Defendants cannot claim that because some passengers in *other* markets may be better off as a result of the NEA, the antitrust laws do not protect those passengers flying on the Boston and New York overlap markets who are worse off. None of Defendants' employees or experts explained, for example, how the harm to passengers who face higher prices when they fly from Boston to DCA—a route on which Defendants aggressively competed with each other before the NEA— would be ameliorated by American's new service from JFK to Tel Aviv. Even if Defendants had proven that the "net" result of decreased capacity on routes in the relevant markets plus increased capacity on routes in other markets would be an overall increase in capacity (which they did not), courts rightly refuse to engage in such "cross-market balancing" in antitrust cases. PCOL ¶¶ 109-111, 114-116.

The Supreme Court has cautioned that courts are ill-equipped "to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition in another sector." *Topco Assocs.*, 405 U.S. at 609-10. Any decision "to sacrifice

competition in one portion of the economy for greater competition in another" is for Congress alone—not for courts or private businesses. *Id.* at 611.

As the First Circuit and other federal courts have made clear, it is generally improper to "validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market." *Sullivan v. NFL*, 34 F.3d 1091, 1112 (1st Cir. 1994); *see also W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 105 (3d Cir. 2010); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000); *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1186 (D.C. Cir. 1978); *Amex*, 138 S. Ct. at 2302 (Breyer, J., dissenting) ("A Sherman Act § 1 defendant can rarely, if ever show that a pro-competitive benefit in the market for one product offsets an anticompetitive harm in the market for another.").

Trading off benefits to some consumers against harm to others is particularly inappropriate in the context of a *de facto* merger such as the NEA. Horizontal mergers that produce a firm controlling an undue share of the market and significantly increase concentration are presumptively anticompetitive. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963). In those circumstances, "anticompetitive effects in one market" cannot "be justified by procompetitive consequences in another." *Id.* at 370; *see also Topco Assocs.*, 405 U.S. at 609-610.

Nor can Defendants insist on harming overlap-route passengers because the First Circuit has suggested the possibility of crediting benefits outside a relevant market that "ultimately have a beneficial impact on competition in the relevant market itself." *Sullivan*, 34 F.3d at 1113. In *Sullivan*, the then-owner of the New England Patriots challenged the NFL's rule that prohibited the sale of a franchise to the public, which limited competition for franchise ownership. The NFL argued that the rule improved the quality of professional football, which did not directly occur in the market in which the harm occurred, the market for franchise owners. The court found that the jury could consider the NFL's proffered justification to "the extent the NFL's policy strengthens and improves the league, resulting in increased competition in the market for ownership interests

in NFL clubs through, for example, more valuable teams." *Id.* at 1113. Here, Defendants have not established how their purported out-of-market benefits will be realized in each of the relevant overlap markets where Plaintiffs have shown harm.

On the contrary, the evidence shows the NEA simply suppresses Defendants' competition in the relevant overlap markets and thus possibly channels it to other markets. That is not the sort of "procompetitive virtue contemplated under the [Sherman] Act, but rather one mere consequence of limiting . . . competition." *U.S. v. Brown Univ.*, 5 F.3d 658, 675 (3d Cir. 1993); *see also* Merger Guidelines § 10 ("Cognizable efficiencies are merger-specific efficiencies that have been verified and do not arise from anticompetitive reductions in output or service.").[11]

The expansion of this rule sought by Defendants—permitting anticompetitive restraints harming some consumers on the basis of benefits to unrelated consumers—would upend the antitrust laws. It would deprive some customers of the protection of the antitrust laws altogether. And it would allow widespread harms to competition based on the kind of broad societal judgment—made by erstwhile competitors—that *Topco Associates* warned is for Congress alone. *Topco Assocs.*, 405 U.S. at 609-610. Defendants offer no limiting principle that would prevent American and JetBlue from entering into additional joint ventures that would consolidate the relevant markets even further based on alleged growth in other parts of the country.

---

[11] The other out-of-market benefits cases cited in *Sullivan* are therefore inapposite; none of those cases involved a restraint that suppressed competition in one market merely so that it could be channeled elsewhere, as the NEA does. *See Grappone, Inc. v. Subaru of New Eng., Inc.*, 858 F.2d 792, 799 (1st Cir. 1988) (Breyer, J.) (tie of spare Subaru parts closely related to increasing Subaru car sales and insuring no shortage of parts); *M & H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 986 (1st Cir. 1984) (rule requiring racecar drivers at particular track to use one brand of tire closely related to promoting parity in races and lower costs for tires, which would increase the value of the product and thereby benefit the race car drivers); *L.A. Memorial Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1394, 1397 (9th Cir. 1984) (where "precise market definition [was] especially difficult," "critical question" was whether rule promoted interbrand "compet[ition] in the entertainment market" or "harmed [intrabrand] competition among the 28 teams to such an extent that any benefits to the League as a whole were outweighed"); *cf. Amex*, 138 S. Ct. at 2285-87 (assessing both sides of a two-sided simultaneous transaction platform). In the Supreme Court's most recent rule of reason decision, the legal issue of balancing effects in different markets was not presented by the parties, so the Supreme Court had no occasion to address it. *See* PCOL ¶¶ 112-113.

Accordingly, the Court should assess the impact of the NEA on each relevant market and not weigh purported benefits to passengers in other markets against the demonstrated harms to competition in the relevant overlap markets in Boston and New York. The evidence presented at trial provided no basis to conclude that the asserted benefits of the NEA would counteract the harms to the overlap-route passengers likely to be harmed. Those passengers deserve the protections of the antitrust laws—they deserve competition between American and JetBlue.

### B. Defendants have failed to substantiate any benefits that can be properly attributed to the NEA.

Defendants cannot claim credit for benefits that they would or could have achieved anyway by competing with each other and growing organically. PCOL ¶¶ 107-108. Rather, at step two of the rule of reason, Defendants must prove their claimed benefits result *from the restraint itself*. PCOL ¶¶ 107-108. In this case, that means comparing the benefits Defendants attribute to the NEA to the "but-for world" where Defendants did not enter the NEA. In other words, to know whether any purported benefits result *from the NEA itself* the Court must examine the "counterfactual" scenario in which Defendants pursued standalone growth instead of the NEA. If the "counterfactual" produces the same benefits as the NEA, those benefits cannot be said to flow from the NEA itself and are not cognizable procompetitive justifications.

Defendants failed to produce at trial any "apples-to-apples" comparison of the benefits they claim flow from the NEA versus the benefits that would have resulted anyway if Defendants had not entered the NEA. PFOF ¶¶ 516-545. As Plaintiffs showed, there were two ways to conduct such a comparison: (1) by comparing Defendants' actual 2019 schedules without the NEA to what Defendants' 2019 schedules would have looked like with the NEA, *or* (2) by comparing Defendants' 2023 schedules with the NEA to what Defendants' 2023 schedules would have looked like without the NEA. PFOF ¶ 528.

The first of these scenarios relies on modeling "what the world would have looked like if the NEA were in place in 2019"—what was referred to by Defendants internally and at trial as the "v4 schedule." PFOF ¶ 529; Tr. vol. 8, 193:2-4 (Pack); PX0297 at 2. Although Defendants'

witnesses testified the v4 schedule was shared between them and discussed with Defendants' expert, Dr. Israel, they never performed (or at least, never produced to Plaintiffs or the Court) an estimate of benefits using the Raven modeling tool that incorporated the v4 schedule. PFOF ¶¶ 529-533. The second scenario relies on what was referred to at trial as the "2023 standalone schedule." PFOF ¶ 528. Again, although JetBlue witnesses testified that their network planning department created such a schedule, no 2023 standalone schedule was ever used by Defendants to quantify the supposed benefits of the NEA. PFOF ¶¶ 534-536, As Plaintiffs demonstrated, the most likely explanation for Defendants' failure to produce either comparison is that the results would have been "no bueno," PX0372 at 41, for Defendants' litigation position— they would have shown the NEA does not unlock any meaningful efficiencies or produce any meaningful increase in capacity. PFOF ¶¶ 531-532, 541-542. Even Dr. Israel conceded that simply comparing Defendants' 2019 schedules *with* the NEA and *without* the NEA would not reveal much benefit—which is not surprising because Defendants' networks are not significantly complementary. PFOF ¶¶ 446-448.

Whatever Defendants' reasons for failing to conduct a comparison based on the v4 schedule or the 2023 standalone schedule, one thing is certain: no apples-to-apples comparison of benefits exists in the record. This is remarkable considering that Defendants *anticipated* the exact counterfactual scenario that would be required to do a true apples-to-apples comparison, Tr. vol. 8, 241:6-10, *and they were correct*. The comparisons Defendants withheld are exactly what the law requires. *See, e.g.*, *Bd. of Regents*, 468 U.S. at 114 (procompetitive objective not cognizable if it could be achieved "just as effectively without the [restraint]"); *cf. H.J. Heinz*, 246 F.3d at 721–22 (defining merger-specific efficiencies as those "that cannot be achieved by either company alone"). Yet Defendants failed to provide the Court with the comparison necessary to assess their claimed procompetitive justifications for the NEA.

Instead, Dr. Israel relies on an "apples-to-oranges" comparison that purports to measure the effects of the NEA by comparing Defendants' actual 2019 schedules *without* the NEA to Defendants' 2023 schedule *with* the NEA—a schedule that was made for litigation by the "clean

team" to get "the deal through DOJ." PX0751 at 2. This mix-and-match approach fails to carry Defendants' burden to prove that any of their claimed benefits can be properly attributed to the NEA. As a result of this fundamental error, Dr. Israel improperly attributes capacity growth to the NEA that would have occurred anyway. PFOF ¶¶ 516-526. As Dr. Town testified, the increased capacity Dr. Israel attributes to the NEA can be explained by causes completely unrelated to the NEA. PFOF ¶¶ 519, 523. For example, Jordan Pack of American testified that American's capacity would have increased when the 737 MAX aircraft came back online, regardless of the NEA, Tr. vol. 8, 162:6-16 (Pack)—yet Dr. Israel remarkably attributes this increase solely to the NEA. PFOF ¶ 520.

Even more egregiously, Dr. Israel concludes that the NEA creates capacity growth, but ignores that JetBlue's standalone plan from July 2020 anticipates JetBlue would have grown capacity on its own by *more* than the amount Dr. Israel claims is generated by the NEA. PFOF ¶ 518. Put another way, Dr. Israel's analysis is circular: he starts from the premise that capacity would have increased between 2019 and 2023 and then simply *assumes* that the entire increase must be attributed to the NEA and nothing else. Contrary to Dr. Israel's benefits estimate, Defendants' ordinary-course business documents reach far different conclusions. For example, a JetBlue document projected growth between 2022 and 2026 in terms of ASMs, seats, and departures without the NEA and with the NEA (holding the fleet constant) and concluded that the NEA resulted in a 1-percent *decrease* in overall capacity. PFOF ¶ 422.

Dr. Israel's attempt to quantify benefits using his passenger share estimates fares no better. That analysis is contaminated by the confounding impact of the COVID-19 pandemic, PFOF ¶ 546, as well as by Dr. Israel's choice of a non-representative baseline time period in which Defendants' combined market share was artificially depressed due to the 737 MAX waiver, PFOF ¶ 547. In addition, contrary to Dr. Israel's claims, Dr. Town demonstrated that any increased international flying from NEA airports between 2018 and 2022 comes at the expense of international flying outside the NEA. PFOF ¶ 548. As for domestic flying from NEA airports

between 2018 and 2022, Defendants grew no more as a result of their partnership than Delta or United were able to grow organically. PFOF ¶ 550.

Far from demonstrating a legitimate procompetitive justification for the NEA, this evidence proves the opposite—that Defendants' benefits estimates are wildly inflated and entitled to no weight.

### C. The NEA is not justified by supposed capacity growth.

Defendants urge the Court to find that the NEA is justified because Defendants have grown their capacity in the months since they began implementing the NEA in early 2021. This argument fails because (1) post-NEA implementation evidence is unreliable and subject to manipulation and (2) Defendants have failed to prove any supposed capacity increases can be attributed to the NEA.

### 1. The Court should disregard post-NEA implementation evidence as unreliable and subject to manipulation.

Courts routinely disregard evidence of post-transaction conduct by antitrust defendants. *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 435 (5th Cir. 2008) ("The probative value of such evidence [supporting the transaction] is deemed limited not just when evidence is actually subject to manipulation, but rather is deemed of limited value whenever such evidence *could arguably* be subject to manipulation."); *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1384 (7th Cir. 1986) (Posner, J.) ("Post-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight."). Here, the Court should disregard (or at least discount) evidence that Defendants *after this lawsuit was instituted* chose to add capacity within the NEA in the form of new routes, increased frequencies, or larger aircraft, because such evidence arguably could be subject to manipulation by Defendants. Indeed, the evidence shows that increases in NEA capacity come at the expense of capacity elsewhere in the country, further supporting the conclusion that Defendants can move capacity around to emphasize NEA growth when it suits them to do so. *See infra* Argument Part II.C.3.

So-called "implementation evidence" from 2021 and 2022 also is unreliable because of the lingering effects of the COVID-19 pandemic. PFOF ¶¶ 296, 350-351. As Mr. Kirby testified, COVID-era data is not representative of actual competitive conditions in the airline industry. Tr. vol. 3, 156:2-4 (Kirby). The airline industry ground to a halt during the pandemic, with airlines going so far as to park planes in the desert. PFOF ¶ 296. Obviously, as consumer demand began to recover, airlines began to increase their capacity. The NEA was signed in July 2020, at the height of the pandemic, and Defendants began implementing it in early 2021, just as the country was beginning to recover from the pandemic. It is therefore impossible to untangle whether Defendants' capacity increases occurred *because of* the NEA or whether they would have occurred anyway as Defendants recovered from the pandemic. Defendants' benefits analysis is fatally infected with this problem.

### 2. Defendants have not proved the NEA results in meaningful capacity growth.

Defendants hang most of their capacity growth argument on the idea that they have increased their flying following implementation of the NEA. The Court should disregard this evidence as discussed above. Defendants' argument also is belied by their own ordinary-course documents. American internally acknowledged that the NEA allows it to pull back in Boston, not grow. PFOF ¶¶ 424-427. For example, a document discussing plans for the NEA shows American intended to reduce its Boston departures from 89 in the summer of 2021 to █ by 2023. PX0062 at 72.

Even more striking, data show the NEA has resulted in no more growth by American and JetBlue than Delta and United, either within the scope of the NEA or systemwide. PFOF ¶¶ 550-551. As depicted in the two graphs below, coming out of the pandemic the combined American--JetBlue have grown their capacity about the same as Delta and United when looking at either (1) domestic flying at the NEA airports or (2) domestic and international flying across all U.S. airports. *See* Tr. vol. 16, 122:18–123:15 (Town).





**Percent Change in Capacity Relative to September 2018**
Domestic and International Routes at All U.S. Airports

### 3. Any growth within the NEA comes at the expense of growth elsewhere in Defendants' networks.

Even setting aside the comparison to Delta and United, any growth by American and JetBlue within the NEA (absent fleet expansion) necessarily causes capacity reductions outside the NEA. As JetBlue recognized internally, "fulfilling the NEA vision" means other markets previously targeted for growth by JetBlue, such as Los Angeles, South Florida, Orlando, and San Juan, "all see limited to no growth." PX0791 at 45. David Fintzen of JetBlue acknowledged that the "optimized" NEA schedule developed by the "clean team" would force JetBlue to reduce flying outside the NEA compared to its pre-NEA schedule. Tr. vol. 8, 110:9-17 (Fintzen). And in July 2021, JetBlue projected that it would be unable to resume 2019 levels of flying in Orlando until 2025 because of fleet constraints and needing to fund growth at NEA airports.[12] PX0783 at 3. The impact of JetBlue shifting its capacity to the NEA at the expense of the rest of its network has already been noticed by its competitors. For example, Mr. Kirby testified that

---

[12] JetBlue's growth at NEA airports is in large part attributable to the slots it gained from American, which did not require the NEA. PFOF ¶¶ 442, 445-457.

compared to October 2019, as of the time of trial JetBlue was down 40 percent in departures at Fort Lauderdale and 20 percent in departures at Orlando. Tr. vol. 3, 149:5–150:4 (Kirby).

Similarly, the increased international capacity Defendants attribute to the NEA is a result of American shifting capacity from the rest of its network, including from Philadelphia. PFOF ¶¶ 451-463. Given the imperative to prioritize NEA flying, aircraft American had intended for Philadelphia were reallocated to JFK instead as American began to deprioritize transatlantic flying from Philadelphia. PFOF ¶ 453. Following the NEA, American's five-year plan showed significant decrease in daily departures from Philadelphia, and American projected that Philadelphia was unlikely to return to its pre-NEA, 2019 capacity levels. PFOF ¶ 460. Mr. Pack confirmed the reasons for this change: American recognized that the NEA presented an "opportunity cost" in the form of lost revenue in Philadelphia, but this was necessary to fund more flying at JFK. Tr. vol. 8, 160:23–161:6 (Pack). Mr. Raja further admitted that he instructed his subordinates to assume increased transatlantic service from JFK would come at the expense of Philadelphia because American otherwise did not have the aircraft. Tr. vol. 7, 158:4–159:24 (Raja). But perhaps Mr. Znotins was the most transparent when he admitted at trial that, in the short term, American would have to "pull down flying or grow more slowly in other areas to fund the NEA," which would be "robbing Peter to pay Paul." Tr. vol. 15, 104:17-20 (Znotins).

Defendants are playing a shell game, in which they shift capacity from outside the NEA to within the NEA, and then claim the NEA has "caused" capacity growth. But there is no net growth from simply moving aircraft around and, as explained below, the NEA did not "cause" Defendants to buy more aircraft. This shell game cannot satisfy Defendants' burden to prove that their claimed capacity increases derive from the NEA itself.

### 4. Defendants have not proved the NEA "caused" JetBlue's fleet additions.

Recognizing that capacity growth necessarily is limited by the size of their fleets, Defendants sought to argue at trial that JetBlue retained old aircraft and ordered new aircraft "because of" the NEA—but this is revisionist history. Before the COVID-19 pandemic (and before the NEA), JetBlue had decided to conduct a phased retirement of its E190 fleet (totaling

60 aircraft) between 2020 and 2025. PFOF ¶ 477. At the same time, JetBlue planned to acquire 70 new A220 aircraft. PFOF ¶ 477. JetBlue also had option rights it could exercise to acquire 50 additional A220 aircraft between 2026 and 2028. PFOF ¶ 477.

After the onset of COVID-19, JetBlue examined whether to accelerate its retirement of the E190 fleet. PFOF ¶ 479. Ultimately, JetBlue decided not to pursue this course of action and to instead delay retirement of 30 aircraft in the E190 fleet. PFOF ¶¶ 479, 482. JetBlue also decided to exercise and accelerate its options to order 30 additional A220 aircraft, PFOF ¶¶ 479, 493, to replace the 30 E190s. Critically, these decisions did not require—and cannot, as Defendants claim, solely be attributed to—the NEA. PFOF ¶¶ 484-492. Contemporaneous evidence shows JetBlue already had concluded that "*regardless of Connie*" (the codename for the NEA) "JetBlue will have to find a way to preserve and *likely grow the current order book*; whether through new aircraft, old aircraft, *keeping E90s*, purchasing or leasing. . . . If the fleet can't grow, something has to go." PX0525 at 2 (emphasis added). JetBlue estimated that it needed at least 40 to 60 additional aircraft to fulfill its planned standalone growth opportunities "excluding the NEA." PX0789 at 4.

At trial, JetBlue's Eric Friedman and David Clark claimed that the decision to delay retirement of 30 E190s, and to later replace them by accelerating delivery of 30 A220s, would not have been made without the NEA. The evidence does not support those claims.

First, with respect to the E190s, as Mr. Clark conceded, JetBlue's internal analysis showed that it would have been better off keeping the E190s and deploying them differently *without the NEA* because it would have made more revenue that way. Tr. vol. 10, 23:18–24:6 (Clark). Second, as noted above, JetBlue had profitable standalone growth opportunities that would have required not only delaying retirement of the E190s, but obtaining additional aircraft as well. PFOF ¶ 486. Third, JetBlue has consistently recognized the need to fund NEA flying by pulling aircraft from elsewhere in the country, emphasizing the continuing nature of its fleet constraints. PFOF ¶¶ 487-490. Fourth, the E190s would have been needed because JetBlue deferred a number of aircraft deliveries at the onset of the pandemic, which exacerbated

JetBlue's fleet constraints. PFOF ¶ 491. When asked by the Court why JetBlue would not have considered delaying the retirement of the E190s without the NEA, Mr. Clark had no clear explanation, saying only that the NEA's growth opportunities required them to revisit the issue. Tr. vol. 10, 37:17-38:12 (Clark). But this ignores the extensive record that JetBlue would have required additional aircraft even without the NEA.

The same logic applies to JetBlue's decision to accelerate its options on the A220s from 2026-2028 to 2022-2026 to replace the E190s. Accelerating those options would have been justified for the same reasons discussed above. But in any event, the new A220s will not result in any net change to the size of JetBlue's fleet because they will replace the outgoing E190s on a one-for-one basis. PFOF ¶ 494. Accelerating the A220 options merely changes the year in which the E190s will be replaced by the A220s that were under option. PFOF ¶ 494. There is simply no compelling evidence JetBlue would have made different decisions regarding the E190s and A220s absent the NEA; it planned to grow anyway, and it needed these aircraft to do so.[13]

### 5. Defendants have not proved that the NEA creates new incentives for them to grow their capacity.

Defendants also argue that under the NEA, they will have greater incentive to grow capacity than they would independently. Here, they are simply wrong. As a basic principle of economics, when the incentives of profit-maximizing firms become aligned in a manner like the NEA, they become more likely to reduce capacity and raise prices in markets where they competed, not the opposite. PFOF ¶ 307. The self-serving testimony of Defendants' employees cannot rebut this conclusion. PCOL ¶ 80. Nor can the *ipse dixit* of their expert. The evidence shows Defendants do very much think about their broader partnership when making decisions. PFOF ¶ 71. And Dr. Israel's assumption that Defendants will grow their capacity simply because "if you can sign a contract that incentivizes you to grow capacity, you want to do that,"

---

[13] To the extent JetBlue obtained additional aircraft to fund growth in New York City after the NEA, a slot transfer with American (which did not require the broader NEA partnership) could just as easily have provoked a similar need to obtain additional aircraft to fund JetBlue's growth. PFOF ¶¶ 434-435, 480.

Tr. vol. 14, 50:12-21 (Israel), is not an expert opinion grounded in economics—it is substituting Dr. Israel's judgment of Defendants' credibility for the factfinder's. *See also* Tr. vol. 17, 77:9–78:16 (Miller) ("I don't think it's as simple as Dr. Israel makes out.").

Finally, the formula presented by Dr. Israel does not prove that the MGIA incentivizes capacity increases. PFOF ¶¶ 473-475. He asserts the MGIA creates an incentive for Defendants to grow unilaterally in certain situations, but fails to consider that growth by one partner is unlikely to occur unless the growth happens to be mutually beneficial—because doing so would exploit the partner that is not expanding. PFOF ¶¶ 474-475. Unlike Dr. Israel, multiple witnesses testified at trial that they do not consider the MGIA in making decisions about schedules or capacity. PFOF ¶ 473. Moreover, Defendants fully recognized this problem when they were negotiating the NEA, which is why they put in place capacity coordination to mitigate the risk that a partner might use the MGIA to "fund loss-making capacity," PX0807 at 66, and to prevent "cheating on the pool," Tr. vol. 7, 186:15-21 (Raja).

### 6. Defendants could have grown organically in Boston without the NEA.

Defendants could have achieved all of their claimed "growth" in Boston without the NEA. In fact, Defendants had plans to do so. Before the NEA, JetBlue had plans to reach 200 flights per day in Boston by 2022. PFOF ¶ 211. In the summer of 2019, JetBlue launched "Project Revere," which was a plan to grow in Boston to maintain JetBlue's leadership position by adding capacity in routes frequently flown by Delta and American. PFOF ¶ 216. In December 2019, JetBlue announced plans to grow in Boston by increasing flights on the BOS-LGA shuttle route, adding new flights from Boston to JFK and Newark, adding new flights from Boston to Austin, and increasing flights to more than a dozen additional destinations. PX0633 at 2-3. JetBlue also was planning to challenge American by adding capacity to business markets from Boston, including to American's hubs in Charlotte, Dallas, Los Angeles, Phoenix, and Washington D.C. PFOF ¶ 214. As of 2019, before the NEA, JetBlue offered more flights to more destinations than any other airline in the history of Boston Logan airport. PFOF ¶ 135. In July 2020, contemporaneously with the signing of the NEA, JetBlue's five-year plan projected it

would grow in Boston even without the NEA, from 178 daily departures in 2019 to ███ daily departures in 2026. PFOF ¶ 212.

American, for its part, was responding to this competition from JetBlue in Boston before the NEA. American planned to increase its number of flights and seats on routes out of Boston by approximately 14 percent from 2019 to 2020. Tr. vol. 8, 24:15-19 (Swartz). American also was adding service from Boston to Austin, Indianapolis, Raleigh-Durham, and Wilmington. PFOF ¶¶ 223-224. In the colorful words of Mr. Raja, American was going to "fight like hell" in Boston. PX0122 at 1; *see also* PX0064 at 1 ("Gird your loins. Time to swing the bat in Boston."). This message was received loud and clear by Mr. Raja's subordinates, like Massimo Mancini, a managing director in American's network planning department, who wrote: "BOS is the largest strategic spoke in the system and one in which we have decided to fight for access to gates." PX0115 at 4. This escalating competition between American and JetBlue was good for consumers, too. For example, American's "imminent entrance" into the Boston to Raleigh-Durham market caused JetBlue to think twice about whether it should match a Delta price increase. PX0606 at 1. Similarly, when JetBlue entered BOS-DCA, American dropped its prices by 60 percent. PX0618 at 1.

Defendants' re-packaging of pre-existing standalone growth plans and dressing them up as a benefit of the NEA does not make it so. JetBlue's executives knew that. That is why, behind closed doors, they raised concerns about attributing already planned growth to the NEA. In June 2020, Mr. Friedman wrote: "We still believe that we are including value here that would have been generated anyway, i.e. BUR Mint." PX0553 at 1. In response to questions from Mr. Fintzen, Mr. Friedman explained:

> I'm a bit confused on this. Forgive me if I'm being dense, but my point is just that we intend to fly BUR [Burbank] [with] Mint and other five year plan markets regardless of Connie. The current valuation of Connie includes all of the market revenue. *We would have generated most of that revenue anyway*, so what portion of the revenue is 'enhanced revenue driven by the JV[.]' If we're looking at this from a 'What does JetBlue look like with Connie vs without' *we're currently attributing a lot of revenue to Connie that would have already existed*.

PX0751 at 4 (emphasis added). Mr. Friedman understood that the real question is what *incremental value* is created by the NEA. Yet Defendants' arguments throughout trial, and their expert's supposed "quantification" of benefits make clear that far from estimating the incremental value of the NEA, they have simply credited growth that would have occurred anyway to the NEA. PFOF ¶ 516-526.

### 7. Defendants had negotiated a slot lease that would have facilitated growth in New York City.

The same problems plague Defendants' attempts to attribute growth in New York City to the NEA. The evidence at trial established that Defendants not only *could have* agreed on a slot lease that would have facilitated growth in New York City, they *already had agreed* on a slot lease before the NEA. PFOF ¶¶ 432-435. A slot lease would have enabled JetBlue to increase its capacity using slots American had hoarded and underutilized for years. PFOF ¶¶ 185-194, 440. In July 2020, JetBlue's five-year plan forecasted network expansion to "[c]over JFK slots attained through AA deal (not Connie)." PX0525 at 1. This five-year plan projected JetBlue would grow at JFK from 174 daily departures in 2019 to ███ daily departures in 2026. PX0525 at 1. Despite this, when JetBlue was "trying to show increased growth as a result of Connie," Mr. Friedman instructed his subordinates to attribute 14 slots to the NEA that were already included in JetBlue's standalone five-year- plan. PX0531 at 1-2.

American also had plans to grow organically in New York City. PFOF ¶ 230. For example, American had long planned to upgauge its regional jets to increase its capacity in New York City. PFOF ¶¶ 231-232. American also anticipated capacity increases at JFK and LGA after the slot waivers it had obtained due to the 737 MAX grounding and the JFK runway construction expired. PFOF ¶ 230. In October 2019, American projected it would grow 41 percent in JFK in 2020, leading Jim Carter to exclaim "Not for distribution but BOS/JFK/RDU big winners in 2020!!" PX0169 at 1-2. American could have grown even more if it had kept better track of its slots and used them more efficiently—neither of which required the NEA. PFOF ¶¶ 184-194.

As Mr. Mancini acknowledged, American could have added more than 40 flights at JFK without needing to acquire any slots beyond those it already had. PFOF ¶ 230.

### D.  The NEA is not justified by increased network "relevance."

Defendants argue that the NEA makes them more "relevant" because it combines their networks. But this argument is both factually wrong and legally insufficient to prove the NEA enhances competition.

First, the idea that American Airlines—the largest airline in the United States and in the world, PFOF ¶ 2, and JetBlue—the largest low-cost airline in the northeastern United States, *see* PFOF ¶¶ 135, 137-138, 178-181, were irrelevant choices for customers before the NEA beggars belief. Defendants' relevance argument hangs on the notion that customers prefer an airline with a broad network—in other words, that bigger is always better. But the vast majority of ordinary travelers care more about getting from their home or business to their destination than they do about whether the airline also flies to some other place. PFOF ¶ 445. This is not only common sense, it is the entire basis for the LCC and ULCC business model. Airlines such as JetBlue, Spirit, and Frontier compete with legacy airlines such as American, Delta, and United by offering point--to--point service. PFOF ¶ 18. In addition, for most of these ordinary travelers, the price of their ticket matters at least as much, and probably much more, than the size of the airline's network. PFOF ¶ 445.

Defendants' relevance argument exposes a bigger flaw in their rationale for the NEA: Defendants care mainly about attracting corporate customers and frequent flyers. Mr. Raja, the architect of the NEA, was remarkably transparent about this when he testified in response to questions about what it means for American to become more relevant:

> [T]he customers whom we're most after—and I'm talking about, like, the actual—the flying human, not the transaction—is somebody who is a *power traveler*. They fly us for business. They fly us for leisure. They join our loyalty program. They want to—Because once you join our loyalty program, it's an indication that you want to travel. You're more likely to buy business class when you fly to Rome. You're more likely to want to earn miles or spend on our credit card, buy access to our lounges and things like that. *So we consciously have a high-end product tailored to a power user of it.*

Tr. vol. 4, 210:2–211:24 at 211:12-23 (Raja) (emphasis added). Mr. Raja also was transparent about *why* American cares most about the power travelers: "And for us, like, a huge amount of *the success and profitability of our company* is attracting the power user of our product, less so the marginal user of our product." Tr. vol. 4, 212:9–213:14 at 213:5-8 (Raja) (emphasis added). As the Court correctly observed, however, there are many more people who fly who are not business travelers or frequent flyers. Tr. vol. 4, 212:10-12 (Raja) ("THE COURT: …I mean, you have more nonbusiness class seats than business class seats. THE WITNESS: Yes. Yes."); *see also* Tr. vol. 7, 173:19–174:10 (Raja) ("But the math of it, you're 100 percent right. There's just more economy seats than first. True."). And Mr. Raja agreed that, for these "marginal" travelers, network relevance simply is not that relevant—which is why "spill carriers" can attract a large portion of customer demand by only flying point-to-point a few times per day. Tr. vol. 4, 212:9–213:14 (Raja).

Second, to the extent power travelers care about network breadth, the evidence shows the NEA does not materially improve Defendants' "relevance" because their networks are more overlapping than complementary. Contrary to Defendants' assertions, the NEA does not expand Defendants' networks in the same way as the international airline alliances on which it is modeled. For example, the American-British Airways alliance grants American access to over 150 new airports because American can connect passengers onto British Airways flights that depart from London Heathrow airport. PFOF ¶ 77. Likewise, Delta and United gain access to a similar number of new airports through their respective alliances with Air France and Lufthansa. PFOF ¶ 77. In contrast, the NEA brings only four new airports into American's network. PFOF ¶ 444. Unlike an international alliance, however, there is no legal obstacle to American serving those four airports on its own without the NEA.

Moreover, nearly *one-third* of American's and JetBlue's nonstop routes from NEA airports overlap with their partner. PFOF ¶ 82. Thirty percent of the nonstop routes served by American from NEA airports are also served by JetBlue. PFOF ¶ 82. Twenty-seven percent of the nonstop routes served by JetBlue from NEA airports are also served by American.

PFOF ¶ 82. In markets with a BOS endpoint, 76 percent of American passengers and 28 percent of JetBlue passengers were traveling on a nonstop overlap route in 2019. PFOF ¶ 83. Likewise, in markets with a JFK/LGA endpoint, 57 percent of American passengers and 70 percent of JetBlue passengers were traveling on a nonstop overlap route in 2019. PFOF ¶ 83. This is substantially more overlap than the comparable international alliances between American and British Airways, Delta and Air France, or United and Lufthansa. PFOF ¶ 82. And it is substantially more overlap than other domestic airline alliances—including American's alliance with Alaska Airlines. PFOF ¶ 559. Mr. Harrison testified that the West Coast International Alliance (WCIA) combines Alaska's *domestic* network with American's *international* network from the West Coast. Tr. vol. 7, 69:21–70:2 (Harrison). In other words, the benefits of the WCIA derive from American and Alaska combining complementary networks, not overlapping routes where they compete. PFOF ¶ 559.

Finally, to the extent the NEA improves Defendants' "relevance" by increasing their combined presence at NEA airports, the evidence shows that is not a consumer benefit. PFOF ¶ 294. Dr. Town testified that "an increase in airport presence is associated with an increase in fares on all routes from the airport by that airline." Tr. vol. 9, 75:12-22 (Town). It is undisputed that the NEA increases Defendants' presence at NEA airports. The NEA has about 52 percent market share of domestic traffic at Boston Logan and 41 percent market share of domestic traffic across JFK and LaGuardia. *See* PFOF ¶ 295. Neither Defendant alone had close to this level of airport presence before the NEA. In 2019, American's share at BOS was 19 percent and JetBlue's share was 33 percent; at JFK/LGA, American's share was 22 percent and JetBlue's share was 19 percent. PFOF ¶¶ 135, 143, 180, 195. Defendants have therefore failed to prove that increased "relevance" is a legitimate procompetitive justification for the NEA—if anything, the evidence shows it is more likely to harm consumers.

### E.  Competition from Delta and United cannot justify the NEA.

Throughout the course of this litigation, Defendants stridently claimed that American and JetBlue simply cannot compete with Delta and United without the NEA. *See, e.g.*,

Defs.' Opening Stmt. at 7-12; ECF No. 239. Nearly every question to an American or JetBlue witness about whether they competed with each other was met with a rote "and Delta" in response. But despite Defendants' self-serving testimony, which the Court should not credit, PCOL ¶ 80, whether the NEA allows the combined American-JetBlue to *beat* Delta in Boston or to *win* in New York City is legally irrelevant, PCOL ¶¶ 118-120. Moreover, Defendants are simply wrong on the facts. The weight of the evidence establishes that JetBlue and American were doing just fine competing against Delta and United without the NEA—and consumers benefitted from this competition.

First, to be "procompetitive" a challenged restraint must enhance competition, not merely Defendants' competitive position in the market. PCOL ¶ 106. Increased market shares relative to Delta and United, without more, does not benefit competition or consumers. PCOL ¶ 119. Large, successful firms such as Delta and United "may impose painful losses" on their competitors but that "is of no moment to the antitrust laws if competition is not injured." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993). As long as the market is working, it makes no difference which firm is the market leader: antitrust law is not in the business of picking winners and losers.

Indeed, courts have rejected the very argument Defendants advance here, that second- and third-place competitors should be permitted to combine to take on a market-leading firm. *See, e.g.*, *H & R Block*, 833 F. Supp. 2d at 80 (rejecting argument that merger of H&R Block and TaxAct was justified by better ability to compete with market leader Intuit); *H.J. Heinz*, 246 F.3d at 720 (rejecting argument that merger of Heinz and Beech-Nut was justified by better ability to compete with market leader Gerber). It is not enough if the NEA merely improves Defendants' market position over Delta and United. The salient question is not whether Defendants are more successful as a result of the NEA. It is whether competition—and by extension the traveling public—is better off when American and JetBlue do not compete with each other. The answer is clearly no.

Second, Defendants' account is unsupported by the evidence. In Boston, JetBlue, Delta, and American have been the top airlines since 2013, with Delta only overtaking American for second place in 2018 or 2019. PFOF ¶¶ 138, 142-143. American was not far behind and was aggressively pursuing ways to compete with Delta and JetBlue by adding new destinations, more flights, and more frequencies out of Boston. PFOF ¶¶ 418-420. Defendants have utterly failed to prove that the NEA creates any more benefits for consumers in Boston than the free-market competition that already existed before the NEA.

In New York City, JetBlue and American were the second- and third-largest airlines across JFK and LaGuardia (behind Delta) before the NEA. PFOF ¶¶ 180, 195. Even when including Newark, Defendants were neither failing nor weak—they were the next-two largest airlines after Delta and United. PFOF ¶¶ 180, 195. JetBlue had 14.4 percent market share and American had 15.4 percent market share across JFK, LaGuardia, and Newark before the NEA. PFOF ¶¶ 180, 195. And Defendants' own evidence shows that between 2014 and 2019, their share of passengers across JFK, LaGuardia, and Newark changed very little—with Delta and United gaining by less than five percentage points. PFOF ¶ 195. Given this market reality, it is unsurprising that Defendants have not suggested American or JetBlue would have exited New York City absent the NEA. They would have continued to duke it out—to compete—and consumers would have continued to benefit.

While it is true that JFK and LaGuardia are slot constrained, that problem is not unique to American and JetBlue; all airlines, including Delta and United, are limited in their growth by access to slots. PFOF ¶¶ 313-317, 219. Nor is this a problem that can only be solved by the NEA. To the extent Defendants wanted to grow at JFK and LaGuardia, they had opportunities to grow organically, PFOF ¶¶ 428-439, as Delta and United did, PFOF ¶¶ 498-502. Not least of these was a slot lease that could have given both Defendants what they claimed to need (*see, e.g.*, Defs.' Opening Stmt. at 14-15): more slots for JetBlue, and an additional revenue stream for American from the slot lease payments.

To the extent Defendants claim the NEA enhances competition because it will spur Delta and United to respond by growing capacity or lowering prices, not a single Delta or United witness confirmed Defendants' view of the world. This is remarkable considering Defendants argued to this Court that they desperately needed Delta witnesses to testify in this case, *see* ECF No. 239, and the Court enforced Defendants' subpoena to Delta executive Joseph Esposito, *see* ECF No. 248. In stark contrast, the testimony from Delta and United that does exist in the record establishes that the NEA has not spurred any significant competitive response from those airlines. PFOF ¶¶ 503-509. This is perhaps unsurprising because, as Mr. Hayes put it, "legacy airlines don't really compete with each other." Tr. vol. 1, 126:14-23 (Hayes).

Defendants have therefore failed to prove that increased competition with Delta and United is a legitimate procompetitive justification for the NEA.

### F.  Defendants' interest in achieving higher profits does not justify the NEA.

Defendants make a last-ditch effort to justify the NEA by arguing that American was unprofitable in New York City before the NEA. This argument, of course, cannot rebut Plaintiffs' evidence of the NEA's anticompetitive effects in Boston (which stand unrebutted, for the reasons explained above). But even as to New York City, Defendants' argument is without merit. Absent a "failing firm defense," which Defendants have not and could not advance here,[14] the fact that American stands to make more money with the NEA than it would make in a competitive environment is not a legitimate justification for the NEA. PCOL ¶¶ 116, 120.

Even more problematic is the fact that American's financial woes in New York City were of its own making. First, American's management made a conscious decision to trade 256 LaGuardia slots to Delta in exchange for 84 slots at DCA. Tr. vol. 6, 67:10-16 (Parker). Mr. Parker conceded that this slot swap is "a good piece" of why Delta has more capacity in New York City than American. Tr. vol. 6, 67:17-23 (Parker). Second, Mr. Raja conceded that

---

[14] While Defendants often alluded to the history of bankruptcy among legacy airlines, Defendants have never claimed that they would go bankrupt without the NEA, or that either Defendant would have exited New York City without the NEA.

American had underutilized its JFK slots "for years," even going so far as to admit that he had lost count of how many slots American had at JFK. Tr. vol. 4, 141:16–146:10, at 144:5-8 (Raja). It seems no wonder then that American was not performing as well as it might have at JFK and LaGuardia but for these management decisions. As one Delta document put it, American "squandered its historic NYC leadership position." DX0233 at 14. If American is now unhappy with the consequences of its choices, that is not enough to justify an otherwise anticompetitive alliance with JetBlue.

III.   **Any legitimate benefits from an alliance between American and JetBlue could be achieved through less restrictive means.**

Even if Defendants meet their burden of establishing a legitimate procompetitive justification, the NEA should be condemned under the rule of reason if a less restrictive alternative could achieve similar benefits without harming competition as severely as the NEA. PCOL ¶ 125. When considering potential alternatives at step three, deficiencies in Defendants' proof at step two necessarily "influence[] the analysis." *Alston*, 141 S. Ct. at 2162. The less restrictive alternative need only address the procompetitive benefits that Defendants actually proved; thus any deficiencies in Defendant's proof of procompetitive benefits necessarily lessens Plaintiffs' burden at step three. *Id.*; PCOL ¶ 127. And if a less restrictive alternative would achieve the NEA's cognizable procompetitive benefits, the NEA is unreasonable as a matter of law, and no further analysis is necessary. PCOL ¶ 125.

Because Defendants failed to prove any procompetitive efficiencies in the relevant Boston and London markets, no further inquiry into less restrictive alternatives is necessary. And for the relevant New York markets, there are substantially less restrictive alternatives that could achieve the benefits Defendants attribute to the NEA without the same loss of competition.

A.   **The court need not consider less restrictive alternatives for Boston or London because Defendants have failed to justify the NEA in those markets.**

Nothing Defendants presented at trial justifies the NEA in Boston or London. As explained above, in Boston, American and JetBlue (and Delta) have a long history of organic, fierce competition. *See supra* Argument Part I.C.3.a.i. For most of the last 15 years, JetBlue was

67

the largest and American the second-largest airline by passenger share on flights from Boston. PFOF ¶¶ 135-142. Delta may have overtaken American, but it did so the right way: through organic competition, and not by aligning with a competitor. *See, e.g.*, Somers (Delta) Dep. 174:2–176:7, 176:18–177:24, July 25, 2022. JetBlue's own management, recognizing the NEA lacked any justification in Boston, warned its Board of Directors that an alliance with American in Boston would provoke greater antitrust scrutiny. PX0807 at 72. In London, too, JetBlue was poised to compete organically with American without the NEA. *See supra* Argument Part I.C.3.a.v. If anything, the NEA has made JetBlue less competitive in London by costing it valuable remedy slots at Heathrow airport. *See supra* Argument Part I.C.3.a.vi.

Thus, even if the Court were to credit Defendants' justifications for the NEA in New York, those justifications simply do not apply to Boston or London.

Because Defendants have failed to establish procompetitive benefits for the NEA in Boston or London, the Court need not account consider whether there is a less restrictive alternative in those markets. This follows the approach taken by the district court in *Alston*, which found that "[b]ecause Defendants have not shown that the challenged rules can be justified on the ground that they promote integration, the Court does not consider whether any proffered less restrictive alternatives would promote integration." *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1103 n.43 (N.D. Cal. 2019). The Supreme Court endorsed this approach when it held that "however framed and at whichever step, anticompetitive restraints of trade may wind up flunking the rule of reason to the extent the evidence shows that substantially less restrictive means exist to achieve any proven procompetitive benefits." *Alston*, 141 S. Ct. at 2162. The same is true here, and the Court should find that Defendants have flunked the rule of reason with respect to the Boston and London routes.

### B. The "East Coast International Alliance" Defendants considered is a substantially less restrictive alternative to the NEA.

The NEA is not necessary to achieve any legitimate procompetitive benefits, including in New York, because any such benefits could be achieved with substantially less harm to

competition. But the Court need not take Plaintiffs' word for it. In fact, the Court need look no further than Defendants' own internal analyses.

American expressly considered an alternative to the NEA that it termed the "East Coast International Alliance" or ECIA. PFOF ¶ 565. Modeled on American's partnership with Alaska (the "West Coast International Alliance" or WCIA), this alternative could have included features that would have achieved the same benefits Defendants attribute to the NEA without the concomitant loss of competition.[15] Such evidence of "'actual experience in analogous situations' can help establish the feasibility or practicality of a less restrictive alternative." *Impax Lab'ys*, 994 F.3d at 499; PCOL ¶ 126. Despite this readily available alternative, American chose to pursue the *more* restrictive alternative—the NEA—instead.

***Codesharing and frequent flyer reciprocity.*** The evidence shows American and JetBlue could have achieved the purported network and connectivity benefits of the NEA (and generated substantial profits) through an ECIA that included a codeshare agreement. Several airline representatives, such as Andrew Guenthner of Delta and Mr. Harrison of Alaska, testified that codeshare agreements have successfully expanded their airline networks in the past. PFOF ¶¶ 558, 561-563. Even Mr. Hayes acknowledged that schedule coordination, slot swaps, network expansion, frequent flyer program benefits, and improved connectivity and customer experience—all of which Defendants have touted as benefits of the NEA—could be achieved with a codesharing arrangement short of the NEA. Tr. vol. 2, 67:11-20 (Hayes). Indeed, when the "clean team" modeled an ECIA arrangement between American and JetBlue based on the WCIA, they compared the codesharing structure of the ECIA to what would become the codesharing structure of the NEA. PFOF ¶ 565. Using 2019 schedules, the two scenarios generated similar numbers of incremental passengers. Tr. vol. 16, 125:21–126:1 (Town). These results clearly show that in either scenario, adding capacity would generate similar increases in passenger traffic.

---

[15] Plaintiffs take no position on whether the WCIA, or the less restrictive alternative presented in this section, would pass the rule of reason after a full trial. An antitrust plaintiff need not show its proffered alternative would be legal in order to satisfy its burden at step three. PCOL ¶ 128.

Tr. vol. 16, 126:2-7 (Town). All this could be achieved without wreaking the competitive harms that naturally result from the revenue sharing and capacity coordination provisions of the NEA.

**Slot transfers in New York City.** Defendants' ordinary-course business documents also reveal that a less restrictive alternative to the NEA would have been an ECIA that included slot transfers between American and JetBlue at JFK and LaGuardia. PFOF ¶¶ 565-567, 569. Far from being an unrealistic hypothetical, a temporary slot lease was already in the works. Even before the NEA was signed, American and JetBlue had negotiated a two-year lease of 37 slots at JFK that would have put American's underutilized slots to good use. PFOF ¶ 568. Nothing prevented Defendants, absent the NEA, from extending that slot lease or agreeing to a permanent transfer of slots at JFK and LaGuardia. On the whole, the evidence shows American and JetBlue could have grown in New York City through a combination of their standalone growth plans, the pre-NEA slot lease at JFK, and a transfer of American's underutilized LaGuardia slots to JetBlue. This is sufficient to meet Plaintiffs' burden to show a less restrictive alternative.

**No capacity coordination.** American contemplated that an ECIA partnership with JetBlue need not include capacity coordination. PFOF ¶ 565. American calculated that such a partnership nevertheless would expand Defendants' respective networks, including through new transatlantic flying out of JFK on American metal, and also generate significant revenue for both American and JetBlue. PFOF ¶ 565. In other words, American *already identified* a less restrictive alternative that would provide *the same benefits* in New York that Defendants attribute to the NEA, without the associated anticompetitive effects. To be sure, American's documents identified certain "downsides" to these scenarios, including the need for new aircraft investment and the likelihood of increased overlap—meaning increased competition between American and JetBlue—absent capacity coordination. PX0185 ("Options" at row 7-8). Those may have been downsides for Defendants, but they would have been a boon for consumers.

**Limited revenue sharing.** An ECIA modeled on the WCIA also could have incorporated more limited revenue sharing without creating the same risks to competition as the MGIA. PFOF ¶ 559. Unlike the NEA, under the WCIA the parties do not both contribute revenue from

overlap routes they both fly (i.e., routes on which they compete) to the pool. PFOF ¶ 559. Also, unlike the MGIA, Tr. vol. 8, 124:17–125:5 (Fintzen), transfer payments under the WCIA revenue sharing model are capped. PX0392 at 7.

*International connectivity.* As Mr. Harrison explained, the WCIA includes codesharing (excluding overlap routes), frequent flyer reciprocity, and some limited revenue sharing. PFOF ¶ 559. Mr. Harrison testified that the WCIA enables connectivity between American's and Alaska's networks, including enabling Alaska to feed American's long-haul international flights to Asia and Europe, which helps American and Alaska compete with Delta. Tr. vol. 7, 69:21–70:2 (Harrison). The idea that the WCIA is a realistic alternative to the NEA is no invention of Plaintiffs: in fact, Mr. Raja was the architect of the WCIA too. PFOF ¶ 562. And as Mr. Harrison testified, the WCIA has been "quite successful," in part because it allows Alaska's domestic network to connect to American's international network on the West Coast. Tr. vol. 7, 69:21–70:2 (Harrison). Mr. Raja agreed: in his view, the WCIA is "thriving" and "going great." Tr. vol. 4, 201:22–202:1 (Raja).

*Competitively significant.* Defendants argue the NEA has uniquely benefitted consumers by spurring competitive responses from Delta and United. Yet Defendants failed to call any of the Delta or United witnesses they had planned to call at trial to confirm this theory. In fact, the weight of the evidence does not support Defendants' assertions, no matter how vociferous. As Mr. Esposito of Delta explained at his deposition, Delta has not changed its corporate strategy or accelerated its growth plans as a result of the NEA, and much of Delta's growth that Defendants argue is attributable to the NEA long predated the NEA. PFOF ¶¶ 503-508. Moreover, the statements Defendants repeatedly trumpeted to this Court as "evidence" of the competitive responses the NEA has provoked cannot be attributed to the NEA's anticompetitive revenue sharing and capacity coordination provisions, because Delta did not even know about these features of the NEA until well after its assessment of the NEA's likely consequences. Esposito (Delta) Dep. 196:2-19, 200:6-19, 200:21–201:14, June 21, 2022. Rather, those documents reflect Delta's understanding that the terms of American's partnership with JetBlue would be similar to

the ECIA described above. Esposito (Delta) Dep. 201:7-14, June 21, 2022; ██████████
In other words, to the extent these documents are evidence of Delta and United responding to an
American-JetBlue alliance (which Defendants have not shown), any such competitive response,
and corresponding benefits, could have been achieved through the substantially less restrictive
alternative described above.

In short, Defendants do not need the NEA to compete in New York, and they certainly do
not need it in Boston or London. More importantly, *consumers* do not need the NEA. The same
benefits Defendants attribute to the NEA could be achieved with an ECIA modeled on the WCIA
and a lease of slots from American to JetBlue, which would accomplish the same objectives
without forcing consumers to shoulder the costs of the NEA. Even if this alternative would not
generate the same *profits* for Defendants—particularly when those profits are generated by *the
elimination of competition*—that is to be expected, and is of no concern to the antitrust laws.
PCOL ¶¶ 129-130.

Plaintiffs therefore have met their burden at step three of the rule of reason and the NEA
should be enjoined.

## IV.   The anticompetitive effects of the NEA outweigh any purported procompetitive benefits of the NEA.

Even if no less restrictive alternative exists, the rule of reason analysis ends where it
began: with the guiding principles behind the Sherman Act and a weighing of the evidence.
PCOL ¶¶ 132-136. As the Supreme Court has made clear, "the inquiry mandated by the Rule of
Reason is whether the challenged agreement is one that promotes competition or one that
suppresses competition." *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 691; *see also Bd. of Regents*,
468 U.S. at 104 ("[W]hether the ultimate finding is the product of a presumption or actual market
analysis, the essential inquiry [under Section 1 of the Sherman Act] remains the same—whether
or not the challenged restraint enhances competition."); *Sullivan*, 34 F.3d at 1096 (holding that
under the rule of reason, a "policy is in restraint of trade if the anticompetitive effects of the
policy outweigh the policy's legitimate business justifications"); *Impax Lab'ys*, 994 F.3d at 492

(holding that even if the "FTC fails to demonstrate a less restrictive alternative way to achieve the procompetitive benefits, the court must balance the anticompetitive and procompetitive effects of the restraint."). The Court must conduct "an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint" to determine whether the "principal tendency of [the] restriction" is anticompetitive or procompetitive. *Cal. Dental*, 526 U.S. at 781; *see also Sullivan*, 34 F.3d at 1112 (ultimate balancing question is "whether a challenged practice promotes or suppresses competition").

The weight of the evidence shows that, on balance, the principal tendency of the NEA is to restrain competition rather than to promote it. The NEA eliminates head-to-head competition between the world's largest legacy airline and a disruptive LCC competitor in an important swath of the country, leading to hundreds of millions of dollars in annual harm to consumers, and further consolidating an already highly concentrated industry. If approved, it opens a Pandora's box: it takes no logical leap to predict that Delta and United will follow in American's footsteps by seeking to co-opt their own LCC or ULCC. Tr. vol. 3, 147:6–148:8 (Kirby). The result would be to transform the domestic airline industry into a collection of effectively immunized joint ventures the likes of which JetBlue's CEO has long decried:

> So how's that happen? How did these fares get that high? Again, this is a very informed audience, so I'll save you all the details, but we know that 70% of the traffic between the U.S. and Europe is flown today by airlines in joint ventures who have secured immunity from anti-trust laws.
>
> And as we know, what that means, is these airlines team up in partnerships to *coordinate schedules, coordinate prices, share revenue*—it's legalized collusion, it's perfectly legal, they got permission to do it—*what they really do is wipe out a competitor*. They gain strength and market share that often prevents new competitors from even considering or stepping into market.

PX0569 at 48; Tr. vol. 1, 149:11–150:2 (Hayes) (emphasis added).

Once the Court determines that, on balance, the harms to competition and consumers posed by the NEA outweigh its legitimate competition-enhancing objectives, it should enjoin the NEA in its entirety. *United States v. Paramount Pictures*, 334 U.S. 131, 148 (1948) ("For equity

has the power to uproot all parts of an illegal scheme—the valid as well as the invalid—in order to rid the trade or commerce of all taint of the conspiracy.").

**V.     The DOT agreement and Defendants' voluntary carve-out agreement do not remedy the Sherman Act violation.**

The belated changes to the NEA that Defendants offered after regulatory scrutiny began do not transform the NEA from an anticompetitive agreement to a procompetitive one. Indeed, these agreements are properly assessed as potential remedies to Defendants' violation of the Sherman Act. PCOL ¶ 137. Neither Defendants' commitments to DOT, nor Defendants' agreement to "carve-out" certain routes from the NEA "replace the competition lost" as a result of the NEA, including the "competitive intensity" that previously existed between American and JetBlue. *Aetna*, 240 F. Supp. 3d at 60; *see also United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961) (where the Government has established a violation of the antitrust laws, "all doubts as to the remedy are to be resolved in [the Government's] favor."). Thus, neither are sufficient to uphold the NEA.

**A.  The DOT agreement does not remedy the anticompetitive effects of the NEA.**

The first and most obvious reason the DOT agreement is an insufficient remedy is because the DOT agreement does not address flights to or from Boston or JetBlue's service to London in any way. PFOF ¶ 572. The DOT agreement does not require any divestitures in Boston, nor does it impose any capacity growth commitments in Boston. PFOF ¶ 572. It simply cannot, standing alone, replace the competition that is lost as a result of the NEA or replicate the competitive intensity that existed between American and JetBlue before the NEA.

As to New York City, the DOT agreement is insufficient because (1) it is temporary, (2) it does not prevent the anticompetitive effects of the NEA, and (3) it does not create any procompetitive benefits. PFOF ¶¶ 573-574.

First, temporary remedies are inadequate to counteract harms caused by ongoing, indefinite antitrust violations. PCOL ¶ 141. Defendants' capacity commitments to DOT expire in 2025, whereas the NEA can continue indefinitely unless enjoined. PFOF ¶ 573.

Second, Defendants can satisfy their commitments to DOT *while still reducing competition*. Nothing in the DOT agreement—including any threatened relinquishment of slots—prevents Defendants from decreasing their capacity or exiting[16] the overlap markets where they previously competed, while growing capacity in other markets. PFOF ¶ 575. Thus, the DOT agreement does nothing to prevent the specific anticompetitive effect most likely to result from the NEA.[17] No amount of monitoring or oversight by DOT can cure this defect. Indeed, behavioral remedies that require ongoing government supervision, such as the monitoring and oversight contemplated by the DOT agreement, are strongly disfavored in antitrust cases because they substitute government decision making for the operation of the free market. PCOL ¶¶ 139-140.

Finally, the seven JFK slot pairs the DOT agreement requires Defendants to divest would not create meaningful entry or expansion by competitors. The divested slots are at undesirable times of the day, which makes them unattractive to airlines that might seek to expand or enter at JFK. PFOF ¶ 580. Compared to the 544 slots Defendants collectively control at JFK, the 14 divested slots are miniscule. PFOF ¶ 578. For example, when the Port Authority of New York and New Jersey conducted an "impact assessment" of the NEA it found, among other things, that these divestitures of Defendants' joint slot holdings were unlikely to mitigate the anticompetitive effects of the NEA. Murray (PANYNJ) Dep. 156:4–156:10, 300:18–301:8, May 3, 2022; PX0885 at 10.

In sum, the DOT agreement is irrelevant to Boston and London and insufficient to remedy the anticompetitive effects of the NEA in New York City.

---

[16] While JetBlue agreed not to exit any non-seasonal, nonstop JFK route it served as of February 2020 (except for three routes), PX0447 at 1, the DOT agreement does not commit JetBlue to continue to operate any other routes or to operate at any particular capacity level on any routes, nor does it prevent American from exiting any routes. PFOF ¶ 575.

[17] The DOT agreement also prohibits Defendants from using slots and gates to influence each other's behavior, PFOF ¶ 571, but this limited provision hardly goes far enough to counteract the many incentives created by the NEA's revenue-sharing terms, PFOF ¶ 577.

**B.  Defendants' voluntary carve-out agreement is insufficient to remedy the anticompetitive effects of the NEA.**

Defendants' carve-out agreement fares no better. Defendants negotiated and entered into the carve-out agreement while the NEA was being investigated by the Department of Justice. Tr. vol. 7, 163:17–164:4 (Raja).[18] Defendants can just as easily rescind the carve-out agreement at any time. Tr. vol. 7, 164:5-20, 165:22–166:23 (Raja). A non-binding, voluntary agreement by antitrust defendants to refrain from harming competition—particularly one made in the shadow of litigation—is irrelevant as a matter of law. PCOL ¶ 142. This is not because courts doubt the credibility or honesty of defendants, but because of an inability to ensure such remedies will permanently preserve competition. *See, e.g.*, *Bertelsmann*, 2022 WL 16949715, at *31–32 (giving "no weight" to acquiring publisher's "unenforceable promise" that different imprints of the merged company would compete internally because the promise "would not be profit-maximizing" and "can be broken at will"); *H & R Block*, 833 F. Supp. 2d at 82 ("While the Court has no reason to doubt that defendants would honor their promise [to maintain the acquired firm's current prices for three years post-merger], this type of guarantee cannot rebut a likelihood of anticompetitive effects in this case.").

Even if the Court considers the merits of Defendants' voluntary carve-out agreement, that agreement cannot save the NEA. The carve-out agreement does not in fact carve out all the relevant nonstop overlaps.[19] PFOF ¶¶ 584-585. In fact, which markets are carved out of the NEA at any given time is subject to change based on an arbitrary set of criteria Defendants created for this litigation. PX0001-b at 31-32. The carve-out agreement originally applied to only six of the eleven Boston nonstop overlap routes, but JetBlue has exited two of those six routes until at least May 2023. PFOF ¶ 584. Nothing about the carve-out agreement prevents Defendants from

---

[18] The carve-out agreement is itself evidence that Defendants admit the provisions of the NEA permitting capacity coordination and revenue sharing on overlap routes are anticompetitive. PCOL ¶ 143.

[19] The carve-out routes identified in the agreement are, Boston-Charlotte, Boston-Dallas-Fort Worth, Boston-Philadelphia, Boston-Phoenix, Boston-Rochester, and Boston-Syracuse. At trial, Defendants represented that JFK-Antigua has since been added as an additional carve-out route. *See* Tr. vol. 13, 160:24–161:9 (Israel).

continuing to exit nonstop overlap routes where they previously competed—*which is precisely the problem*. The NEA incentivizes Defendants to allocate markets instead of continuing to compete on the nonstop overlap routes.

Absent an injunction, such harm to competition will continue to occur. Merely carving out a few Boston routes cannot replace this lost competition or replicate the competitive intensity that existed before the NEA—when an independent JetBlue and an independent American fought "like hell" in Boston. PX0122 at 1.

## CONCLUSION

For these reasons, Plaintiffs respectfully ask the Court to enjoin the Northeast Alliance in its entirety. In the alternative, Plaintiffs ask the Court to exercise its authority in equity to modify the Northeast Alliance to (1) exclude Boston Logan International Airport from the scope of the NEA; (2) exclude London flying from the scope of the NEA; (3) prohibit Defendants from coordinating on capacity, including prohibiting Defendants from engaging in joint network planning and joint schedule planning; and (4) prohibit Defendants from revenue sharing on nonstop overlap routes.

Dated: November 17, 2022                       Respectfully submitted,

                                               /s/ William H. Jones II
                                               William H. Jones II
                                               Patricia C. Corcoran
                                               Patricia L. Sindel
                                               James L. Moore III

                                               U.S. Department of Justice
                                               Antitrust Division
                                               450 Fifth Street NW, Suite 8000
                                               Washington, DC 20530
                                               Tel: (202) 598-8805
                                               Fax: (202) 307-5802
                                               Email: bill.jones2@usdoj.gov

                                               *Attorneys for Plaintiff*
                                               *United States of America*

                                               MARK BRNOVICH
                                               Attorney General

                                               /s/ Robert Bernheim
                                               ROBERT BERNHEIM
                                               (AZ Bar No. 024664)

                                               Arizona Attorney General's Office
                                               2005 North Central Avenue
                                               Phoenix, AZ 85004
                                               Tel: (520) 628-6507
                                               Email: robert.bernheim@azag.gov

                                               *Attorneys for Plaintiff State of Arizona*

ROB BONTA
Attorney General

KATHLEEN E. FOOTE
Senior Assistant Attorney General

NATALIE S. MANZO
MICHAEL W. JORGENSON
Supervising Deputy Attorneys General

ROBERT B. McNARY
JAMIE L. MILLER
Deputy Attorneys General

/s/ Robert B. McNary
ROBERT B. McNARY
Deputy Attorney General
California State Bar No. 253745
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Phone: 213-269-6283
E-mail: robert.mcnary@doj.ca.gov

*Attorneys for Plaintiff State of California*

KARL A. RACINE
Attorney General

KATHLEEN KONOPKA
(DC Bar No. 495257)
Senior Advisor for Competition Policy

/s/ Adam Gitlin
ADAM GITLIN

Office of the Attorney General for the
District of Columbia
400 Sixth Street NW, Tenth Floor
Washington, DC 20001
Tel: (202) 442-9853
Email: adam.gitlin@dc.gov

*Attorneys for Plaintiff District of Columbia*

ASHLEY MOODY
Attorney General

 /s/ Lizabeth A. Brady
LIZABETH A. BRADY
(FL Bar No. 457991)
COLIN G. FRASER (FL Bar No. 104741)

Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399
Tel: (850) 414-3300
Email: Liz.Brady@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

MAURA HEALEY
Attorney General

 /s/ William T. Matlack
WILLIAM T. MATLACK
(MA Bar No. 552109)
DANIEL H. LEFF (MA Bar No. 689302)

Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Tel: (617) 727-2200
Email: William.Matlack@mass.gov
Email: Daniel.leff@mass.gov

*Attorneys for Plaintiff*
*Commonwealth of Massachusetts*

JOSH SHAPIRO
Attorney General

JAMES A. DONAHUE, III
(PA Bar No. 42624)
Executive Deputy Attorney General
Public Protection Division

/s/ Tracy W. Wertz
TRACY W. WERTZ (PA Bar No. 69164)
JOSEPH S. BETSKO (PA Bar No. 82620)
JENNIFER A. THOMSON
(PA Bar No. 89360)

Pennsylvania Office of Attorney General
Antitrust Section
14th Floor Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
Email: twertz@attorneygeneral.gov

*Attorneys for Plaintiff*
*Commonwealth of Pennsylvania*

JASON S. MIYARES
Attorney General

 /s/ Tyler T. Henry
TYLER T. HENRY (VA Bar No. 87621)
Assistant Attorney General
Antitrust Unit
Office of the Virginia Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Tel: (804) 692-0485
Email: THenry@oag.state.va.us

*Attorneys for Plaintiff*
*Commonwealth of Virginia*