UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil No. 21-11558-LTS |
| ) | |
| AMERICAN AIRLINES GROUP INC. and ) | |
| JETBLUE AIRWAYS CORPORATION, ) | |
| ) | |
| Defendants. ) | |
| ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

May 19, 2023

SOROKIN, J.

I.     INTRODUCTION

This case turns on what "competition" means.  To the defendants, competition is

enhanced if they join forces to unseat a powerful rival.  The Sherman Act, however, has a

different focus.  Federal antitrust law is not concerned with making individual competitors larger

or more powerful.  It aims to preserve the free functioning of markets and foster participation by

a diverse array of competitors.  Those principles are generally undermined, rather than promoted,

by agreements among horizontal competitors to dispense with competition and cooperate instead.

That is precisely what happened here.

Each of the defendants is a formidable and influential player in the air travel market in

this country.  American Airlines Group Inc. is the largest airline in the world.  It offers more

seats and serves more origins and destinations than any other carrier in the United States.  It is

one of four airlines that control approximately eighty percent of domestic air travel.  JetBlue

Airways Corporation is the sixth-largest airline in the United States.  Younger than its larger domestic competitors and using a lower-cost business model, JetBlue has nurtured its reputation as a maverick airline seeking to disrupt the industry to the benefit of consumers.  Until 2020, American and JetBlue were fierce and frequent head-to-head competitors.  This was especially so in the northeast, where JetBlue looms large and centers a majority of its operations.

American and JetBlue are two of the four largest carriers operating in New York, and two of the largest three in Boston.  Delta Air Lines is the only other carrier with a large presence in Boston.  Besides Delta and United Airlines, no other carrier matches or approaches in size the defendants' respective positions in New York.  Challengers seeking to enter or expand in New York would first need to secure gates from which to operate, as well as schedule authorizations from federal regulators who control air traffic in one of the most congested markets in the world.  Both the gates and the authorizations are exceedingly difficult to acquire.  Challengers seeking to enter or expand in Boston would need to secure gates, which also are in scarce supply.  Because of these significant barriers, the defendants' positions at or near the top of these constrained markets had proven relatively robust and durable over the decade or so preceding the onset of the COVID-19 pandemic.

In the first months of 2020, executives at American Airlines and JetBlue negotiated and signed a first-of-its-kind alliance, in which the two carriers essentially agreed to operate as one airline for most of their flights in and out of New York City and Boston.  The partnership is called the Northeast Alliance, or the NEA.  This was a sea change in the relationship between two airlines that were direct and aggressive competitors with decidedly different business models and cost structures.  There is no doubt that savvy executives representing both defendants earnestly believe the NEA promotes the interests of their respective shareholders and will

strengthen American and JetBlue in their rivalry against Delta (and, to a lesser extent, United) in New York and Boston. It is similarly beyond dispute that the NEA involves substantial coordination by two powerful competitors in an industry that, on a domestic level, is closely regulated, highly concentrated, and often volatile.

Invoking the Sherman Act, the United States Department of Justice, joined by the District of Columbia, the states of Arizona, California, and Florida, and the Commonwealths of Massachusetts, Pennsylvania, and Virginia, filed suit to enjoin the defendants from proceeding with the NEA. The lawsuit culminated in a month-long bench trial featuring testimony by two dozen witnesses, most of whom were either executives of the defendants or experts paid for their testimony by one side or the other. The trial transcript surpasses 3,600 pages, accompanied by at least fifty binders containing exhibits presented to witnesses. The live testimony was augmented by more than 2,700 pages of excerpts from the depositions of seventeen additional witnesses. More than a thousand exhibits were admitted into evidence. Post-trial written submissions by the parties exceeded six hundred pages. This tidal wave of evidence reflects both the state of antitrust litigation[1] and the "unprecedented" nature of the NEA. Doc. No. 1 at 2.[2]

After close attention to the evidence at trial and a careful review of the voluminous submissions by the parties, certain points became clear. Within the highly concentrated airline markets in New York and Boston, where opportunities to enter or expand are vanishingly rare, JetBlue stood largely alone as the only low-cost airline with a significant presence in a domestic

---

[1] This unwieldy process has led one federal judge to liken "[a]djudication of antitrust disputes" to "a judicial reading of the future"—a "murky function [which] demands a massive enterprise." New York v. Deutsche Telekom AG, 439 F. Supp. 3d 179, 187 (S.D.N.Y. 2020).

[2] Citations to "Doc. No. __ at __" reference items appearing on the court's electronic docketing system, and pincites are to the page numbers in the ECF header (which may differ from page numbers included elsewhere as part of the original document).

market dominated by larger, higher-cost network carriers.  With the NEA, American and JetBlue transformed themselves from competitors to collaborators, joining forces to create a single "optimized network."  They design that network together, jointly determining which airline will fly which routes in and out of the NEA region, how often and on what schedule they will serve each route, and which aircraft (i.e., how many seats) will be used on each route.  To further promote the arrangement, American and JetBlue share the revenues each generates within the NEA.

This is no minor shift for the two businesses or the region.  Nearly three-quarters of JetBlue's overall operations are flights in or out of the NEA.  American counts New York among its hubs and is the third-largest carrier operating in Boston.  In both locations, the defendants vigorously competed on everything from fares to the features they offered customers.  The NEA changes all of that.  It makes the two airlines partners, each having a substantial interest in the success of their joint and individual efforts, instead of vigorous, arms-length rivals regularly challenging each other in the marketplace of competition.  Though the defendants claim their bigger-is-better collaboration will benefit the flying public, they produced minimal objectively credible proof to support that claim.  Whatever the benefits to American and JetBlue of becoming more powerful—in the northeast generally or in their shared rivalry with Delta—such benefits arise from a naked agreement not to compete with one another.  Such a pact is just the sort of "unreasonable restraint on trade" the Sherman Act was designed to prevent.

In arriving at the findings of fact and conclusions of law set forth in the following pages, the Court sifted through the evidence and assessed it with a few foundational principles in mind.  First, the Sherman Act aims to broadly preserve "free and unfettered competition as the rule of trade."  N. Pac. Ry. Co. v. United States, 356 U.S. 1, 4 (1958).  As long as the competitive

process is functioning freely, it is not the concern of the Sherman Act (or of a federal court applying it) which competitors win dominant shares in any given market. Next, certain restraints, based on their character or context, pose threats of anticompetitive harm that are sufficiently obvious that they warrant careful scrutiny, if they can be justified at all. See United States v. Topco Assocs., Inc., 405 U.S. 596, 607-09 (1972). Such restraints include agreements between powerful horizontal competitors to control output or allocate markets, which trigger an especially heavy burden on the collaborators to justify what otherwise would be obviously unlawful collusion. Lastly, despite its unusual complexity, this case requires the Court to call upon familiar tools of the judicial trade—observations of witness demeanor, common sense, and a general understanding of human behavior—as it evaluates the credibility and assesses the motivation of people describing their roles in conceiving, debating, and implementing business decisions on behalf of their employers.

Guided by these standards, and for the reasons explained below, the Court finds that the plaintiffs have convincingly established that the NEA violates Section 1 of the Sherman Act.[3]

II.   FINDINGS OF FACT

A.  The Industry

The United States passenger airline industry, as we know it today, has been shaped by a series of events that unfolded during the past four decades. After the industry was deregulated in

---

[3] The Court anticipated convening a further argument or hearing once it had reviewed, digested, and analyzed all of the evidence and the parties' submissions. After concluding that process, and given the clear and comprehensive post-trial submissions cogently expressing each party's arguments, the Court determined that a further proceeding was unnecessary. Such a hearing would have been for the benefit of the Court only, to clarify any questions remaining after review of the record and post-trial papers. Having no such lingering questions, the Court proceeded to its decision without further argument.

1978, then-existing carriers began building larger, nationwide networks.[4]  Meanwhile, new carriers emerged, operating with lower cost structures that allowed them to offer lower prices and compete for market share with the established network carriers.  Vigorous competition, an increase in capacity,[5] and a reduction in ticket prices followed.  The first decade of the 2000s, however, saw the airline industry rocked by external events including the September 11, 2001, terrorist attacks and the 2008 global financial crisis.  During the same time period, overall airline capacity fell, and the number of domestic carriers declined, as struggling airlines—including all of the predecessors to the current three largest domestic carriers—declared bankruptcy or pursued mergers and acquisitions.  As a result of these events, market share and capacity in the industry are now concentrated among a relatively small number of domestic carriers.

Today, domestic carriers can be roughly divided into four categories based on business model and cost structure.  Global network carriers ("GNCs") possess broad networks that reach a wide range of origins and destinations ("O&Ds") either directly or through connecting itineraries.  A GNC relies on a collection of "hubs"—airports where the carrier operates at a significant scale, with many flights arriving and departing each day—and "spokes"—other destinations the carrier serves on a smaller scale—to create a network that can serve customers going to or from as many places as possible.  Three GNCs operate domestically today: American, Delta, and United.  Each GNC is the result of one or more mergers.[6]

---

[4] Airlines that were operating before 1978 are sometimes called "legacy carriers."

[5] Capacity in the airline industry is generally measured in terms of "available seat miles," or "ASMs."  One ASM is one seat on one plane flying one mile.  Thus, an airline can increase its ASMs by operating more planes, offering more seats, or flying longer routes.

[6] For example, America West Airlines merged with US Airways in 2005; Delta merged with Northwest Airlines in 2008; United merged with Continental Airlines in 2010; and American merged with US Airways in 2013.

Low-cost carriers ("LCCs") generally rely on point-to-point flying using a single type of aircraft with a single class of service. This simplifies operations by ensuring every pilot, flight attendant, and mechanic can serve every plane in the fleet. Carriers employing this business model enjoy operation costs that are lower than those of a GNC, allowing them to remain profitable while offering lower fares than a GNC. Southwest Airlines was the first LCC and remains the largest domestic LCC. Ultra-low-cost carriers ("ULCCs"), as the name suggests, operate with even lower costs and offer even lower fares. They, too, generally offer point-to-point flying with one class of service and one type of aircraft, often focusing on high-traffic routes with a substantial demand for direct service. ULCCs achieve lower fares by selling an "unbundled" product. That is, a typical ULCC fare includes only transportation from one place to another (often in less comfortable seats); few additional products and services are available, and they carry additional fees. Spirit Airlines was the original domestic ULCC, with Frontier Airlines, Allegiant Air, Avelo Airlines, Breeze Airways, and Sun Country Airlines now joining it in the category.

The last category includes carriers that fall somewhere between the GNC and LCC business models. Alaska Airlines and Hawaiian Airlines are such hybrid carriers, operating what amount to regional hub-and-spoke networks. At trial, different witnesses characterized JetBlue as an LCC, a hybrid carrier, or a carrier presently transitioning between categories. The Court will describe JetBlue's status further in the next subsection. See discussion infra Section II(B).

Airlines serving overlapping geographical areas with similar business models tend to compete most directly and most often with one another. Such carriers offer similar fares, fly similar types of aircraft, provide similar levels and varieties of services, and serve similar locations and categories of customers. However, airlines make pricing and scheduling decisions

on a market-by-market basis.  As to any given market, an airline generally considers the actions

of, and views itself as competing with, every other airline serving that market, regardless of

business model, as well as other airlines capable of entering that market.  If American, Delta,

Southwest, and Spirit all provide direct flights from City A to City B, Delta will consider

reacting to fare or schedule changes by any of its three direct competitors serving the route.  In

the airline industry, scheduling and pricing information is published and updated multiple times

each day, enabling each carrier to track its competitors' actions almost constantly.  As a result,

strategic fare and schedule changes are the subject of continual analysis and discussion.  Any

carrier operating in a particular market also considers the prospect of other carriers entering that

market, as well as the likelihood and possible timing of such an event.

 The industry is highly concentrated.  Four carriers control more than eighty percent of the

market for domestic air travel: the three GNCs (American, Delta, and United) and Southwest.

The remainder of the market—less than twenty percent—is generally split among nine smaller

carriers.  Though most of the smaller carriers formed after the industry was deregulated, the four

dominant carriers existed in some form before that time.  Each of those four is the product of

consolidation in the industry.[7]

 Though the merger of two carriers with complementary networks can result in one bigger

carrier with a network that is broader and deeper than what existed before, a merger also requires

the investment of substantial time and resources.  The process of effectively combining the

separate operations and assets of two merging entities is costly and complex.  For example,

schedules, networks, aircraft, personnel (including unionized groups of workers), technology

systems, advertising and branding, loyalty programs, and real estate (from airport lounges to

---

[7] Southwest acquired Air Tran Airways, another LCC, in 2011.

hangars) all must be combined into a cohesive, seamless, single carrier.  American's Chief Executive Officer ("CEO") described the numerous challenges created by mergers, as well as the "inordinate amount of management time and attention" required to integrate two airlines.  Trial Tr. vol. 5 at 58-59.  Evidence regarding carrier growth from 2009 to 2019 corroborates that testimony and suggests a correlation between growth trends and the merger digestion process. For example, Delta appears to have benefited from completing its merger first and managing the integration expeditiously, paving the way for fairly aggressive and steady growth beginning in 2012.  United trailed Delta by two years and effected its merger slightly less smoothly; its growth line turned upward in 2014 but became more aggressively so only around 2016. American's merger was later and more protracted, with the integration continuing into 2019. Nevertheless, American's growth was on an upward trajectory even before its merger, with a steeper incline beginning in 2017.

The trend of consolidation over the past twenty or so years is subject to differing interpretations.  For example, various American executives have praised consolidation as a necessary strategy that created a healthier industry with capacity levels that appropriately balance the needs of consumers and carriers.  On the other hand, JetBlue's executives have often warned that consolidation leads to higher costs, reduced capacity, and less choice for consumers.  The Court's role is not to resolve which general view is more apt or to chart a regulatory course for the industry, but rather to resolve the dispute presented in this case.  It is enough for present purposes to observe that the number of domestic carriers from which air travelers in the United States may choose has diminished, and market share in this industry has become meaningfully more concentrated, over time.

These trends are evident in the northeast, though with one caveat worth noting. Despite the power it commands nationally, Southwest controls a relatively small segment of the market in Boston and New York.[8]  There, the three GNCs and JetBlue account for a substantial majority of domestic traffic.  In Boston, those four carriers controlled more than eighty percent of the market for domestic air travel in 2019.  In New York, their combined share exceeded seventy percent.  Though other carriers also operate in both places, they do so on much smaller scales.  JetBlue considers Boston Logan International Airport ("Logan") its second-largest focus city; Delta considers it a hub.  New York is JetBlue's largest focus city, which it serves with operations at John F. Kennedy International Airport ("JFK"), LaGuardia Airport ("LaGuardia"), and Newark Liberty International Airport ("Newark").  Indeed, JetBlue touts itself as New York City's "Hometown Airline."  Delta considers New York a hub and is the biggest carrier at both LaGuardia and JFK.  Newark is a major hub for United's domestic and international service.

An airline's ability to operate at a particular airport depends on a number of factors, some of which are especially pertinent here.  One is access to gates at which passengers can board and disembark flights.  The number of gates allocated to a carrier dictates the number of flights it can operate at the airport.[9]  Like most airports, Logan is gate-constrained; a carrier looking to initiate or expand service there would first need to secure access to gates.[10]  A handful of airports have

---

[8] Southwest's presence in the northeast is limited, amounting to a single-digit market share in Boston and New York (where its only operations are at LaGuardia Airport).

[9] In some instances, the nature or location of the gate might further limit the size of the aircraft that can be operated and/or the route that can be served.  Additionally, there is some variation in how a single gate is used, depending on the nature of the carrier operating it.  For example, all other factors held constant, a ULCC tends to "highly utilize assets," keeping overall costs low by scheduling more flights per day out of a single gate, than does a GNC.  Trial Tr. vol. 3 at 114.

[10] A Southwest executive described the steps it would need to take in order to expand its modest operations at Logan but expressed skepticism about the ability to grow based on his "understanding" that "all the gates" in the terminal where Southwest operates at Logan "are allocated" already.  Trial Tr. vol. 2 at 118-19.

additional limitations on access to air space.  In Newark, a carrier must secure access to gates and schedule approval from the Federal Aviation Administration ("FAA"), which monitors air traffic demand there.  At LaGuardia and JFK—two of the busiest airports in the country— carriers must acquire both gates and "slots."  A slot is authorization from the FAA to land or take off during a particular period of time.  Slot control enables the FAA to regulate air traffic in certain congested, high-demand areas.  Generally, once slots are awarded, they are treated as the property of the airline obtaining them.  A carrier looking to initiate or expand service at LaGuardia or JFK would first need to secure access to gates and slots, both of which are scarce, valuable, and sought-after resources.[11]  Numerous witnesses explained at trial that operating in New York is a costly proposition, and that opportunities to obtain slots at LaGuardia and JFK are exceedingly rare.[12]  Though these constraints make growth in New York challenging for all airlines, they also insulate those carriers who have accrued substantial slot holdings from challenges by new or smaller competitors.

The airline industry, like the rest of the world, was turned upside down by the COVID-19 pandemic.  In March 2020, demand for air travel in the United States all but vanished.  Airlines cut capacity, parking planes in the desert to wait out the pandemic.  The FAA temporarily

---

[11] It is possible to operate to some extent without obtaining slots, but only during limited (and often unappealing) time periods.  One additional constraint impacts LaGuardia: a rule imposed by the Port Authority of New York and New Jersey, which operates the airport, limits the length of flights originating there to a maximum of 1,500 miles, with one exception not relevant here.

[12] Slots can be sold or leased by the carriers holding the rights to them.  In addition, in some circumstances the FAA might divest an airline of slots, either due to the airline's failure to satisfy the minimum usage requirements or to ameliorate competitive concerns arising from a merger or other joint venture, then conduct a process to review and choose among applications from other airlines interested in receiving the divested slots.  For example, after American and US Airways merged, JetBlue received slots at Ronald Reagan Washington National Airport ("Reagan") because American was required to divest them as a condition of the merger's approval.

excused carriers at slot-controlled airports from the usage requirements they normally must satisfy in order to retain the rights to their slots.  As travel began to resume—later and much more slowly than expected—airlines altered strategies and schedules to account for changes in the relative demands for leisure and business travel that persist even today.  Some executives predicted that business travel might never return to pre-pandemic patterns.

It is against this backdrop of industry consolidation, in this competitive landscape, and amid an industry meltdown during the early months of the COVID-19 pandemic that the agreement at issue here arose.

### B.  The Defendants

JetBlue is much smaller than American, ranking as the sixth-largest airline in the United States.  In 2019, it operated six "focus cities":  New York City, New York (also the location of JetBlue's headquarters); Boston, Massachusetts; Fort Lauderdale/Hollywood and Orlando, Florida; Los Angeles, California; and San Juan, Puerto Rico.  Approximately three-quarters of JetBlue's operations have either Boston or New York as an origin or destination.  JetBlue's business model has historically centered on pursuing aggressive growth, providing high-quality service, offering affordable fares, and taking market share from other airlines (especially the GNCs).  This model has constrained prices charged by other airlines (again, especially the GNCs) and promoted competition.  Though often referred to as an LCC—a category into which it once comfortably fit—JetBlue's business model and cost structure have evolved over time. The carrier now offers more than one class of service and has a fleet featuring more than one type of aircraft.  Some witnesses characterized JetBlue as either a hybrid carrier (akin to Alaska, but focusing its operations along the east coast), or as attempting a migration to the GNC category.

However it is presently categorized, JetBlue plainly occupies a unique position in the domestic airline industry. The carrier prides itself on its "disruptor" status. Its executives have spoken publicly—loudly and often—about the harms they believe consolidation, the GNCs, and coordination via unchecked alliances have wrought on consumers. JetBlue's aggressive approach to competing with the GNCs and the responses it has provoked are well documented.[13] See, e.g., Doc. No. 325 ¶¶ 32-45 (summarizing evidence of various instances in which JetBlue impacted the prices and service of the GNCs, and American in particular). For example, its introduction of Mint (a premium class of service akin to the GNCs' business class) on transcontinental routes increased demand for premium seats on such flights and triggered a substantial, market-wide reduction in fares for such seats.

It is beyond dispute that, through June 2020, JetBlue vigorously and directly competed with American across all markets both carriers served. See Doc. No. 325 ¶ 236 (describing announcement of new routes by JetBlue on the eve of the NEA's signing, including new nonstop overlaps with American). JetBlue's Mint service distinguished it from every domestic LCC and ULCC carrier (all of which offer a single class of service) and enabled it to compete with the GNCs for corporate clients—especially those in the northeast, where JetBlue's presence is especially strong—in a way the other non-GNC airlines could not. The competition was not a one-way street, with JetBlue triggering fare responses by American. It worked in the other direction, too. For instance, when American removed capacity in some markets in the northeast due to the grounding of part of its fleet, the competitive pressure arising from American's presence eased, and JetBlue raised its fares in response.

---

[13] The effect of its entry or departure in a market—increasing demand and lowering fares—has its own name ("the JetBlue Effect"), though the effect originated with Southwest before JetBlue's inception.

American is one of the most powerful airlines in the world.  By some measures, it is the largest carrier both domestically and internationally.  Headquartered in Texas, American identified the following cities as its hubs in 2019:  Charlotte, North Carolina; Chicago, Illinois; Dallas/Fort Worth, Texas; Los Angeles, California; Miami, Florida; New York City, New York;[14] Philadelphia, Pennsylvania; Phoenix, Arizona; and Washington, D.C.  The carrier achieved its dominant position via a combination of mergers, alliances, and joint ventures, some of which aimed specifically to strengthen American's network in the northeast.

American pursued growth by establishing relationships with other domestic and international carriers.  It founded the global **one**world alliance, which includes American and thirteen other airlines, and it participates in three smaller joint ventures focused on transatlantic service and transpacific service to both Asia and Australia/New Zealand.  An airline based in one country is generally unable to serve routes that begin and end in other countries.  For example, American can (and does) offer a flight from New York to Madrid, but it cannot provide a

---

[14] New York was conspicuously absent from the list of hubs American included in its Proposed Findings of Fact.  Doc. No. 324 ¶ 5; cf. Trial Tr. vol. 7 at 131 (claiming "what the NEA did was" allow American to "buil[d] another hub" in New York, and thereby implying that American had not considered New York a hub before the NEA).  Its own business documents (including the slide deck American cited to support its list of hubs), however, characterize New York as a hub for all three GNCs—American included.  DX-0089B at -014.  And, though it contended at trial that New York was not one of its hubs, American took precisely the opposite position before this Court in a recently filed private antitrust lawsuit challenging the NEA.  See Mem. Supp. Mot. Dismiss Transfer at 6-7, 18, Buehler v. JetBlue Airways Corp., No. 23-cv-10281-LTS, ECF No. 23 (D. Mass. Mar. 16, 2023) (supporting request for dismissal or transfer to the Eastern District of New York of a putative class action by consumers alleging harm arising from the NEA by asserting that "American operates a hub in New York," making litigation there "more convenient").  These references to New York as a hub do not depend on the NEA.  The internal documents are describing the network in 2019 (pre-NEA), and the more recent motion papers advance distinct arguments about why New York is a more convenient forum for American and for JetBlue independently.  These are just some of the facts supporting the Court's straightforward finding that New York is among American's hubs, despite protestations otherwise.  Simply put, American's hubs include New York.  The Court rejects the contrary contention as unsupported by the facts, contradicted by the record, and not credible.

connecting flight from Madrid to a smaller destination in Spain, or from Madrid to other destinations throughout Europe.  Through the **one**world alliance, however, American can rely on one or more partner airlines (for example, Iberia) to complete such itineraries—and members of American's frequent-flyer program can accrue or spend miles on all legs of the trips.

Members of these international arrangements generally coordinate schedules, share access to airport lounges, offer reciprocal loyalty benefits, allocate markets, jointly decide on capacity, share profits, and sometimes make joint pricing decisions, all with the aim of providing their customers with access to a global network no member airline alone could replicate. Because of such features, alliances and joint-business agreements like these are reviewed by government regulators and require antitrust immunity in order to operate.

Carriers in the United States have not historically attempted arrangements that intertwine their operations so broadly with other domestic airlines.  This is at least partly due to a general understanding across the industry that such coordination would run afoul of federal antitrust law.[15]  Domestic carriers have cooperated on much smaller scales.  For example, some develop interline agreements, which essentially promise that if one carrier must rebook its passengers in the wake of a cancelled flight, it may offer its passengers open seats on its interline partner's flights as well as its own.  Others have adopted codesharing—whereby one carrier places its own number (or code) on a flight operated by its partner, allowing for customers of both carriers to

---

[15] See, e.g., Trial Tr. vol. 1 at 145-47 (addressing comments by JetBlue's CEO criticizing regulators' liberal approach to granting antitrust immunity to international joint ventures among airlines and noting that "in any other industry, they'd march you off to the penitentiary" for that degree of coordination with competitors); Trial Tr. vol. 2 at 106 (reflecting belief of Southwest's Executive Vice President and Chief Commercial Officer that discussing network planning with another airline would be "illegal"); Trial Tr. vol. 15 at 125 (addressing email in which American's Vice President of Network Strategy suggested executives in his position "go to prison if [they] coordinate schedules" without approval from their "legal team").

locate and purchase seats on the flight through either carrier's website—with or without some degree of loyalty-program reciprocity.  Delta once had such a relationship with Alaska (before Delta strengthened its own west-coast presence), as does JetBlue with Hawaiian.

Led by Vasu Raja, then its Senior Vice President of Strategy,[16] American began contemplating a new domestic strategy in 2019, which involved pursuing deeper partnerships with other domestic carriers.  This effort started before the pandemic took hold, and it eventually crystallized into two partnerships—one aimed at addressing American's perceived weaknesses on each coast.  In February 2020, American announced the West Coast International Alliance ("WCIA") it formed with Alaska.[17]

The WCIA has the following salient features: 1) it makes Alaska a member of American's **one**world alliance; 2) it continues the codeshare relationship the partners already had; 3) it offers reciprocal lounge access and other loyalty benefits to frequent flyers with both partners; 4) it allows the partners to jointly contract with corporate clients; and 5) it establishes capped and non-reciprocal revenue sharing between the partners, with Alaska contributing revenue from its domestic service within the defined region and American contributing revenue only from its long-haul international flights from the west coast.  The collaboration between American and Alaska is also limited in certain important ways.  For example, the WCIA does not include any coordination by the partners regarding capacity, scheduling, or network planning, nor does it allocate to one partner any markets previously served by both partners.  In addition,

---

[16] Raja became American's Chief Revenue Officer in June 2020, and then its Chief Operating Officer in November 2021.  In each role, his responsibilities have included network planning, as well as alliances and partnerships.

[17] The WCIA essentially replaced a more limited partnership the two airlines previously had, which included codeshare and frequent flyer reciprocity agreements.

any routes on which both partners offered competing direct service ("nonstop overlaps") are excluded from the scope of the WCIA, including its codesharing provision.

Representatives of both Alaska and American described the WCIA as a success, noting it remains in place today and is serving its intended purposes.  The WCIA is designed to benefit each partner in a different way.  It enables Alaska, an airline without significant international service and with no plans to begin long-haul flying, to provide its customers access to American's international flights and those of its **one**world partners.  This, in turn, helps Alaska "address a growing threat from Delta in Seattle, Alaska's primary hub."  Doc. No. 324 ¶ 10.  For American, the WCIA feeds connecting traffic to its international long-haul flights via Alaska's domestic service on the west coast (primarily, at its Seattle hub).  The relationship is important to American, which viewed itself as operating at a disadvantage on the west coast, where Delta, United, and Southwest each have a more substantial presence.[18]  Both partners to the WCIA believe it provides their customers with access to a better network and better loyalty benefits on the west coast, and that it does so as seamlessly as possible.

For purposes of antitrust analysis, there are other salient features of the WCIA.  American and Alaska, by and large, were not direct competitors.  They provided competing nonstop service on few, if any, domestic O&Ds, and Alaska did not offer international long-haul service.  In other words, their separate networks were fairly characterized as more complementary than overlapping.  The terms of the WCIA largely leave competition between the two airlines intact. They do not coordinate schedules, they do not allocate markets, they share revenue only in a

---

[18] Of course, every carrier is strong in some places and relatively weaker in others.  No carrier, not even a GNC—and not even American, the largest carrier in the world by some measures— can have a hub in every city or serve every connecting market.  Like all businesses, airlines make choices about where to focus the resources they have and where to pursue growth in the short and long term.

limited way, and they continue to operate as separate airlines in all respects.  Even with these limitations, both partners believe the WCIA accomplishes its purposes—including strengthening their positions with respect to their shared rival, Delta.

Neither the WCIA nor any other domestic airline joint venture has received antitrust immunity.  There is no evidence that any domestic airlines have formed relationships involving revenue sharing, pooling of slots and gates with joint decision-making about their use, allocation of markets, coordination of schedules, or broad efforts to operate as one airline in a substantial region of the country.  At least, that was the case until American and JetBlue formed the NEA.

C.   The Agreement

By 2020, JetBlue knew that Delta was mounting a challenge to its dominance in Boston. Delta had invested in growth there, ultimately declaring Logan a Delta hub.  Meanwhile, JetBlue's growth in New York had stalled due to its inability to secure access to more slots at LaGuardia or JFK.  Around the same time, American was fretting about its operations in New York.  It had a strong historical position there,[19] controlled the second-most slots at LaGuardia and the third-most slots at JFK, and counted New York among its hubs.  Nevertheless, American did not consider its operations in New York to be sufficiently profitable, and it believed growth by Delta (at JFK and LaGuardia) and United (at Newark) posed a threat to American's overall position in the region.  By the fall of 2019, American perceived that JFK slot usage was "under heavy scrutiny with the FAA," and that American's underuse of its slots in recent years put those

---

[19] According to at least one witness, American benefitted in New York due to its legacy of having launched the first nonstop transcontinental flight, from New York to Los Angeles.  This fact, it appears, created a preference among corporate clients in the entertainment industry for American over other airlines—a preference which continues to this day.

valuable assets at risk.  PX 0148 at 3.[20]  These atmospherics set the scene for negotiations

between American and JetBlue that culminated in the NEA.

In late 2019, the two carriers began discussing a possible lease, through which JetBlue

would acquire temporary control over some of American's slots at JFK.  Though they negotiated

an agreement to lease twenty-seven slots on a short-term basis, American subsequently proposed

adding more slots for a longer (two-year) term, and internal discussions at JetBlue reflect a belief

among its network planners that the leases would continue or renew for longer than a season or

two.  E.g., PX 0507 at 1; PX 0527 at 1.  Talks between the carriers expanded to contemplate a

broader domestic partnership focused on the northeast, as envisioned by Raja and modeled after

the WCIA.  The record establishes that a primary goal—and a significant concern—motivating

both American and JetBlue to pursue a partnership was a mutual desire to address the

competitive threat they each perceived Delta presented in markets they deemed important.[21]  See

PX 0268 at 2-3 (describing purpose of the initiative that yielded the NEA as improving the

competitive positions of American and JetBlue "relative to" Delta and United).  The parties had

---

[20] Copies of the trial exhibits, cited by "PX" or "DX" number here, are on file with the Court.
The original exhibits "remain in the custody of the party that introduced them" in accordance
with this Court's Local Rule 79.1(a).  The same rule requires the party having custody of an
exhibit to maintain it "in the form in which [it was] offered until the proceeding is finally
concluded," and to "make the exhibits available to all parties."
[21] Testimony by executives for both defendants—including Raja, the NEA's architect—makes
this abundantly clear.  See, e.g., Trial Tr. vol. 1 at 182, 213 (reflecting testimony by JetBlue's
CEO that JetBlue is "collaborating" with American in order to "compete against two much larger
airlines in the form of Delta and United" in New York and "to ensure that we had a long term
viable position in Boston . . . as Delta continued to grow"); Trial Tr. vol. 4 at 101-02 (reflecting
Raja's description of the NEA's revenue sharing component as meant "to align our incentives to
get people away from Delta"); Trial Tr. vol. 5 at 8-9, 29 (reflecting testimony by American's
CEO that a rationale for entering the NEA was "to make [American] stronger versus Delta and
United"); see also Trial Tr. vol. 13 at 110-11 (reflecting testimony by defense expert that the
NEA is the result of JetBlue and American "trying to figure out how to compete with Delta's
position in Boston" and "with Delta and United" in New York).

another set of complementary goals.  JetBlue sought access to more slots in New York, so it could expand its presence there.  American hoped to reduce the unprofitable portion of its New York operations and avoid regulatory action for underuse of its New York slots.

Negotiations between American and JetBlue continued despite the COVID-19 pandemic. In April 2020, on the advice of their legal departments, American and JetBlue each designated representatives to a "Clean Team"—a group of individuals with knowledge of scheduling and network planning, but whose daily responsibilities did not involve such work.[22]  The Clean Team built a theoretical joint network schedule that would allow American and JetBlue to evaluate what the carriers could achieve via a partnership.   This process lasted through May 2020. Ultimately, the Clean Team produced a hypothetical schedule for 2023,[23] which pooled the resources of both carriers—including aircraft they did not yet possess but, per their respective order books, they expected to receive by 2023[24]—and "optimized" them to create one cohesive NEA schedule.  The Clean Team then ran the schedule through a proprietary tool American uses to estimate passenger traffic and revenue.[25]

---

[22] The idea was that Clean Team participants would be sufficiently versed in the network planning process to construct a viable joint schedule, but could do so without risking disclosure of actual network planning insights that the two carriers normally could not share without raising strategic, confidentiality, and potentially legal concerns.

[23] The year was selected based on a belief that the pandemic's effects on the industry were likely to have subsided by then.

[24] Order books include aircraft actually ordered, with a known estimate of when delivery is expected, as well as aircraft the carrier has the option to order.  Evidence at trial suggested that the pandemic interfered with manufacturers' ability to continue producing and delivering aircraft on schedule.

[25] The schedule the Clean Team ran through this tool was referred to as "the v2 schedule."  The Clean Team also devoted at least some effort to producing different theoretical schedules for possible comparison to the defendants' pre-NEA standalone schedules.  One, "the v4 schedule," was intended to model what a joint, optimized NEA schedule would have been for 2019, using only the combined fleet as it existed then, without including additional aircraft.  The Clean Team did not run that alternative through American's proprietary tool.  There is evidence suggesting the defendants' decision to proceed based on the v2 schedule, and to cease analysis of the v4

Satisfied with the results, and after consulting with experts and lawyers, American and JetBlue proceeded to finalize their partnership.  The NEA was established and publicly announced on July 15, 2020.  The defendants' relationship consists of a set of related contracts and is primarily governed by the NEA Agreement, the terms of which take priority in the event of any conflict among the contracts.  Together, these agreements create a relationship between American and JetBlue that includes codesharing, schedule coordination, revenue sharing, reciprocal loyalty benefits, and joint corporate customer benefits, all of which extend to most of the carriers' flights to and from Logan, JFK, LaGuardia, and Newark ("the NEA airports").  In particular, both carriers' short-haul services to and from the NEA airports are included within the scope of the agreements, as are American's long-haul services touching the NEA airports.[26]

A "core feature of the NEA is the optimization of American's and JetBlue's route networks and scheduling of flight times and frequencies at the NEA Airports."  Doc. No. 324 ¶ 168.  The NEA Agreement requires both partners to "use commercially reasonable efforts to coordinate the NEA Services."  PX 0001-a § 3.1.1.  Though it states each partner "will continue to make independent decisions regarding pricing, capacity and network management," the NEA's process of creating a joint or optimized schedule necessarily involves cooperation and joint decisions by the defendants regarding capacity allocation, both within the NEA generally and on individual NEA routes specifically.  The NEA Agreement further requires that the partners: "endeavor in good faith to optimize their respective, individual network plans . . . after due consultation on all aspects of [their] network plans related to the NEA Services"; "develop a

---

schedule, was based on concerns that further evaluation of the v4 schedule would yield results less favorable to the "regulatory case" they were attempting to build in favor of the NEA.

[26] Certain nonstop overlap routes were later carved out of the NEA via an agreement further described below.  The NEA expressly contemplates that JetBlue's long-haul transatlantic service "may be included" in the future, by agreement of the partners.  PX 0001-a § 2.1.

process to ensure timely communication of such schedules between the Parties to allow adequate lead times for each Party to plan resources effectively"; and "regularly review performance" within the NEA to identify "any routes [that] are underperforming" and then "endeavor in good faith to agree to a course of remedial action."  Id. § 3.1.2.  To accomplish the envisioned optimization, the NEA also provides for the pooling of both carriers' "airport infrastructure, such as takeoff and landing slots . . . and airport gates."  Doc. No. 324 ¶ 169.  The express purpose of this coordination and schedule optimization is to strengthen the competitive position of American and JetBlue with respect to "Delta and United in the Northeast."  Id. ¶ 171.

The NEA also includes separate agreements providing for codesharing and reciprocal loyalty benefits by American and JetBlue on NEA routes.[27]  Though the NEA Agreement contemplates joint bids for corporate customers, no customer had requested such a bid, and the defendants had not sua sponte engaged in such a practice, as of the time of trial.

The NEA's revenue-sharing mechanism is established by the Mutual Growth Incentive Agreement ("MGIA"), which was executed concurrently with the NEA Agreement.  Modeled after the profit- or revenue-sharing features of American's other joint ventures and alliances, the MGIA's purpose is to align the partners' incentives and achieve something the parties call "metal neutrality."  Metal neutrality means American and JetBlue are indifferent to whether a passenger flies a particular NEA route on an American plane or a JetBlue plane.  Metal neutrality within the NEA region—that is, on flights to or from the four NEA airports—is a cornerstone of the NEA.  The sharing of revenues generated by both partners in the alliance renders each agnostic

---

[27] A separate agreement between the parties establishes the terms governing how one partner will bill the other for passengers who purchased tickets through the NEA's codeshare process—for example, how JetBlue would bill American after American sells a ticket on a flight operated by JetBlue.  See Doc. No. 325 ¶ 67.  That agreement was not the focus of substantial testimony at trial, nor does it feature prominently in the parties' legal arguments or the Court's decision.

about which partner's aircraft a customer chooses, and also furthers both partners' shared objective of attracting passengers away from other competitors (here, Delta and United).

The MGIA establishes a complex process for splitting the revenue pool annually. The pool itself, or Net Revenue, is composed of defined categories of passenger-related revenue, less certain selling expenses.[28]  Doc. No. 324 ¶ 189.  The Net Revenue is then divided between the partners in two stages.  First, each carrier recovers a Base Revenue, calculated by multiplying a defined measure of that carrier's performance during 2019 by "an agreed upon measure of seats and distance flown by [that] carrier during the most recent year."[29]  Id. ¶ 191.  After subtracting each carrier's Base Revenue from the Net Revenue, the remaining Incremental Revenue is divided based on each partner's proportion of the total NEA capacity for the relevant year.  Id. ¶ 195.  Because there is no literal "pool" of money awaiting division according to these formulas—each carrier having collected revenues from sales made to its respective customers throughout the year—the revenue-sharing process is settled via an annual "transfer payment" due from the partner that collected more than its designated share to the partner that came up short.

The defendants urge that the MGIA is designed to incentivize growth by both of them, and to spur continued competition between them.  E.g., id. ¶¶ 196-97.  Certain features do appear to reward growth.  For example, by calculating the Base Revenues using a factor tied to each partner's present-year flying, rather than sharing in a fixed proportion based entirely on performance in the base year, the MGIA makes it possible for a carrier to increase its share by

---

[28] The defendants elected not to include other sources of revenue, such as those derived from branded credit cards and related travel programs, within the pool of shared revenue.

[29] Because this term ties the Base Revenue to a measure that changes year-to-year, the MGIA does not provide for sharing of revenue in fixed proportions.  The Base Revenue also is adjusted for stage length, which slightly diminishes the weight assigned to long-haul capacity growth relative to the weight assigned to short-haul capacity growth, though these adjustments generally appear to be very small.  Doc. No. 324 ¶ 193.

adding capacity (in the form of seats or miles).  And, of course, splitting Incremental Revenue based on capacity might reward one partner for growing more than the other.  These features, however, are not the only incentives at play, and they do not overpower other, stronger influences affecting the parties' behavior.

For one thing, like partners in nearly any joint venture, both American and JetBlue have a strong and admitted interest in ensuring the NEA succeeds over the long term.  Common sense suggests, and the Court finds based on all of the testimony and evidence, that a spirit of partnership between the two carriers will overwhelm any incentive for intra-partnership competition the MGIA might facially appear to create.[30]  American and JetBlue "now function as a single airline" when they decide how to "optimiz[e] capacity" in the NEA region, and they "don't compete with each other directly" on NEA routes.  Trial Tr. vol. 1 at 182.  It is implausible that revenue-sharing terms designed and intended to align the parties' economic incentives and foster decision-making in the best interests of the partnership will simultaneously spur the partners to compete vigorously with one another in terms of growth.  Unchecked growth by one partner undermines the spirit of partnership and, thus, the entire venture.  If one carrier believes its partner exploited the alliance by "cheating on the pool" (i.e., by expanding in a way that does not increase the joint revenue pool), see Trial Tr. vol. 7 at 186, or if lopsided growth leads to a painful transfer payment due from one carrier at the end of the year, the alliance itself

---

[30] Evidence supporting this finding includes an unsurprising concession by American's former CEO that its previous partnership with a Latin American airline caused American to temper the extent to which it competed with its partner's fares, out of concerns that such competition might divert passengers away from the partner carrier or otherwise strain the relationship.  Trial Tr. vol. 6 at 60-65.  Moreover, this spirit of partnership already has influenced the defendants' interactions within the NEA in at least one significant way, which the Court will describe later. See discussion infra Section II(D).

is jeopardized.  There is simply no evidence the MGIA has had the growth- and competition-inducing effects the defendants claim are built into it.[31]

Apart from the prevailing spirit of partnership, many other factors impact both partners' ability and desire to embark on a race against one another to add capacity.  For example, each carrier is limited by its fleet, its workforce, its access to capital, its business goals, its brand, its fixed cost structure, and its operational needs in regions beyond the northeast—all of which are factors likely to bear more heavily on their joint or separate capacity decisions than the details of the MGIA's revenue-sharing formula.  The Court rejects the defendants' suggestion that the MGIA will, in practice, foster or preserve substantial and vigorous competition between American and JetBlue.

The NEA automatically renews for consecutive five-year terms, unless certain defined processes are invoked.  If one partner notifies the other within the first five years "that it does not want to proceed to another term absent material changes," then the parties must discuss possible amendments in good faith.  PX 0001-a § 5.1.  If they "cannot reach agreement," then the NEA automatically extends "for an additional two years" and will "expire on the seventh anniversary" of its signing.  Id.  Additionally, in various circumstances, a party may elect to invoke termination rights defined in the NEA Agreement, subject to specified procedures and fees.  Id. §§ 5.2-5.10.  After the first five-year term has concluded, any party may decline the automatic renewal process by notifying the other party "at least one year in advance of the end of the then-current term that it does not desire to renew this Agreement."  Id. § 5.1.  In other words, the

---

[31] There was evidence that the mechanics of the MGIA are not understood by, and have no effect on, those responsible for JetBlue's capacity and route-planning decisions.  E.g., Trial Tr. vol. 9 at 8; see Trial Tr. vol. 1 at 194-95.

arrangement will be in place for at least seven years and, absent affirmative efforts to terminate or prevent renewal, will continue indefinitely.

The NEA Agreement has been amended three times.  The First Amendment, signed September 11, 2020, replaced certain provisions in the original agreement and added language to others.  PX 0001-a at 45-47.  Of note, it added language limiting the ability of either partner to "voluntarily sell or otherwise transfer any slots" at JFK or LaGuardia to other carriers.  Id. at 45. The Second and Third Amendments occurred in connection with a regulatory review process undertaken by the Department of Transportation ("DOT").  That process began shortly after the NEA was announced and continued through the end of 2020.  PX 0447 at 1.  The DOT terminated its review after securing a series of commitments from American and JetBlue "to address competitive issues arising from the NEA."  Id.

The commitments are memorialized in an agreement signed on January 10, 2021 ("the DOT Agreement").[32]  They include:  1) a promise by JetBlue not to exit certain routes it served from JFK before the pandemic; 2) an agreement by the defendants to amend the NEA to add certain "mandatory limitations on what can be discussed" during joint "network planning sessions";[33] 3) an agreement to amend the NEA to prohibit certain actions a partner might otherwise take "in response to, or to influence, the other's competitive behavior," and to require that any slot leases between the partners have a minimum one-year duration; 4) a promise by both defendants to maintain and provide to the DOT certain data, records, and reports about the

---

[32] On September 21, 2022, the same day this lawsuit was filed, the DOT issued a formal "Clarification of Departmental Position," noting its review of the NEA had occurred "informally and without establishing a docketed proceeding," and explaining the DOT Agreement "was not designed to approve or disapprove the alliance."  PX 0452 at 1-3.
[33] For example, the partners cannot discuss future fares, revenue management strategies, or capacity decisions made outside the scope of the NEA.  See PX 0447 at 1-2.

NEA; 5) an agreement to divest "upfront" seven slot pairs at JFK and six slot pairs at Reagan, pursuant to certain procedures;[34] and 6) an agreement to divest "up to ten (10) additional slot pairs at JFK," should the partners fail to meet certain annual capacity-growth targets at JFK and LaGuardia each year from 2022 to 2025.  Id. at 1-8.  For context, JetBlue and American together hold more than five hundred slots at JFK.  Trial Tr. vol. 5 at 161; see also Trial Tr. vol. 2 at 80 (estimating that JetBlue holds "about one quarter of all peak slots" at JFK).  As of the time of trial, the upfront divestiture process had not yet resulted in any carrier obtaining and operating the slot pairs the defendants were required to relinquish.[35]

The Second and Third Amendments to the NEA Agreement, signed shortly after the DOT Agreement, effect the changes the defendants promised in the commitments described above. See PX 0001-a at 48-54.  American and JetBlue concurrently amended the MGIA "to remove revenue sharing on routes in which American and JetBlue have a high market share."  PX 0001-b at 31.  That amendment defines "Excluded Services"—or, as they were referred to throughout

---

[34] Four of the slot pairs at JFK and four at Reagan belong to American; the remaining three at JFK and two at Reagan are JetBlue's.  The JFK divestitures are to be permanent, while the Reagan divestitures are to take the form of renewable leases to remain in place for the duration of the NEA.

[35] Testimony by executives from Spirit and Southwest suggested this was because the divested slots were not sufficiently appealing to permit meaningful entry or expansion of operations; testimony from an American executive was to the contrary.  See Trial Tr. vol. 2 at 123, 167 (describing Southwest's assessment that the divested slots were "unattractive for us to request," and also expressing "outrage[]" that the DOT had not required divestiture of slots American had previously been compelled to divest to JetBlue in earlier transactions); Trial Tr. vol. 4 at 42 (addressing complaint filed by Spirit to challenge the NEA, which includes suggestion that "significant slot divestitures" of at least sixteen pairs "at each of the affected New York airports" should be required); but see Trial Tr. vol. 7 at 107 (reflecting testimony by Raja that slot pairs to divest were selected to permit "a point to point low cost carrier [to] come in and build . . . an efficient schedul[e] . . . to and from New York through the course of the day").  Whatever the reason, the result at present is that, though American and JetBlue incrementally reduced their own slot holdings at JFK, no other carrier has correspondingly increased its access in that market such that it provides an enhanced check on actions by the partnership.

these proceedings, "carve-out routes"—in a manner that described six O&Ds as of January 2021, all of which included Logan as an endpoint.[36] See id. § 1.2 (defining term and listing routes between Boston and Phoenix, Rochester, Syracuse, Charlotte, Philadelphia, and Dallas/Fort Worth). The amendment to the MGIA is not a condition of the DOT Agreement. The partners still engage in codesharing and frequent-flyer reciprocity on the excluded routes, and they retain discretion regarding whether and when additional routes should be added to the list of excluded markets. See Doc. No. 325 ¶ 581.

Later in 2021, American and JetBlue executed a pair of slot lease agreements. American leased to JetBlue ten slots at JFK and thirty-seven at LaGuardia for approximately one year, ending October 29, 2022. PX 0001-h. JetBlue leased to American eight slots at JFK for essentially the same term. PX 0001-i. In March 2022, American leased to JetBlue thirty-two more slots at LaGuardia and twenty more at JFK for terms beginning on different dates in 2022 and ending in March or October of 2023.[37] PX 0001-j.

The NEA, of course, is not a merger. American and JetBlue remain separate entities. Both have operations that fall beyond the NEA's reach, and the agreement does not formally embody a complete combination of the partners' operations even within the NEA region. Nevertheless, as implemented by the parties, its effects resemble those of a merger of the parties' operations within the northeast in ways the Court will describe next.

---

[36] After these routes were carved out of the MGIA, JetBlue suspended its service on two of them—a decision the defendants say was made by JetBlue "independently," due to "recent operational issues," with service expected to resume in May 2023. Doc. No. 324 ¶¶ 227-30.
[37] In May 2022, the parties amended this contract to replace three of the leased slots with different ones. PX 0001-k.

D. **The Effects**

American and JetBlue began implementing the NEA in early 2021. They did so in phases and were approximately eighty percent done by the time of this trial. That the partnership was unveiled, and its implementation undertaken, during a period when the COVID-19 pandemic continued to substantially impact the airline industry makes efforts to assess the NEA's effects especially challenging.[38] Nevertheless, the parties point to a number of changes arising after the NEA that they attribute to it. The Court's evaluation of the evidence adduced at trial leads it to make the following findings about the NEA's effects.

First, American and JetBlue no longer compete with one another within the scope of the NEA. Rather, they function like a single airline in the NEA region, as much as possible. The revenue sharing established by the MGIA is designed to make the two carriers indifferent to whether a customer chooses to purchase a flight from American or from JetBlue. The provisions of the NEA aimed at optimizing the carriers' schedules to produce one cohesive schedule mean that the carriers act as one airline in the northeast when choosing which routes to fly, when to fly them, and which aircraft (and which partner) will do so. Indeed, nearly every witness employed by either defendant testified to some extent about the importance of achieving a "seamless" customer experience within the NEA. In pursuit of that goal, the defendants necessarily collaborate to ensure that, throughout their "NEA network," customers receive service that matches as closely as possible that which would be provided by a single carrier.[39]

---

[38] Indeed, the impacts of the pandemic on air travel persisted at least through the time of trial, with numerous witnesses describing its lingering effects on demand both in terms of volume and types of travel.

[39] The defendants have gone to great lengths to achieve "seamlessness," including by conceiving and launching a shuttle bus at JFK to take connecting passengers from one defendant's terminal to the other's more efficiently and without the need to clear security. The pursuit of seamlessness is, in the defendants' own words, "an important factor in [their] ability . . . to

There is simply no credible evidence that American and JetBlue have continued to treat each other as competitors within the NEA.  For example, though the plaintiffs adduced evidence of several specific examples illuminating the ways the carriers directly competed through early 2020, see Doc. No. 325 ¶¶ 147-66,[40] the defendants have offered no proof that such competition continued after they entered the NEA.  To the extent executives of both defendants have made general claims that they continue to view one another as competitors in the northeast, see, e.g., Doc. No. 324 ¶ 231 (citing various instances of such testimony), their assertions are unsupported by specific examples or objective evidence, and the Court does not credit them.[41]  Rather, the record confirms what common sense suggests: in forming the NEA, American and JetBlue decided to stop competing and start cooperating with one another in the northeast.  Airlines engaged in competition with one another would tactically respond to each other's fares.  They would consider launching new service to directly compete with a rival's service on an O&D.  They would not cede certain routes to a competitor.  Within the NEA, American and JetBlue no

_____

compete effectively against Delta and United."  Doc. No. 324 ¶ 251.  There is, however, evidence that the NEA continues to suffer from "seams," e.g., Trial Tr. vol. 13 at 65, and that Delta executives identify such seams, and the difficulty of eliminating them in a joint-venture context, as a relative weakness of the NEA.

[40] The plaintiffs have specifically identified evidence, which the Court credits, that such competition especially benefitted travelers in Boston, where only one carrier besides the defendants controls a sizeable share of the market.  See Doc. No. 325 ¶¶ 154-77.

[41] To be clear, the Court does believe that JetBlue's executives sincerely hope that customers will choose their airline, sign up for their credit cards, and enroll in their frequent flyer program, rather than American's, and that American's executives similarly care whether customers choose their airline.  Such preferences, however, are not proof that American and JetBlue remain engaged in direct competition with one another within the NEA region.  That an executive would rather have a customer travel on their aircraft is not evidence that JetBlue and American continue to tactically respond to each other's fares on NEA routes, or that JetBlue makes network decisions aimed at winning market share from American (e.g., whether to launch service in a new domestic market that would compete with American's service and would touch an NEA city).  The evidence is to the contrary, and the Court so finds.

longer adhere to these competitive practices with respect to one another.  In that region, competition between them has effectively ceased.

Second, the NEA has caused both American and JetBlue to adjust their overall network priorities, with both carriers now intensely focused on serving and growing in New York, at the expense of at least some pre-NEA plans to devote resources to growth elsewhere.[42]  For example, though American's long-range plans in February 2020 included growth in Philadelphia, by September 2020 it had deprioritized Philadelphia relative to JFK.  See Doc. No. 325 ¶¶ 451-52, 455-56.  To launch new transatlantic flights from JFK and support growth in the NEA region, American took aircraft out of its hub in Philadelphia.  See Trial Tr. vol. 7 at 158-59 (stating American "very much want[s] to put back [the planes it took out of] Philadelphia," and "lament[ing] very publicly . . . that the airplanes [it has on order] haven't yet delivered"); cf. PX 0322 at 3 (reflecting that American's "block hours," a measure related to the length of a flight that is used in determining pay of flight crews, had increased by eight percent within the NEA region but had decreased by twelve percent across the rest of American's system).  For JetBlue, reconfiguring its fleet to cover the slots American leased to it and the markets allocated to it as part of the NEA's optimized schedule has meant revising or pausing JetBlue's earlier growth plans in other focus cities, such as Fort Lauderdale.  Doc. No. 325 ¶¶ 411, 464, 466, 468-69; see PX 0883 at 6-9; Trial Tr. vol. 3 at 149-50.

---

[42] Airlines do not have access to unlimited capital or resources.  For example, at any given time, an airline has access to a finite number of planes.  A decision to use a newly delivered aircraft to begin service in one market necessarily means the carrier will not deploy that resource in another market.  And, absent a new aircraft, a decision to expand service in one market generally requires diversion of resources from another market.  Cf. Trial Tr. vol. 7 at 159 (reflecting Raja's view that "in our business . . . your assets are constrained," and that "to go start something new, it's got to come from somewhere").

These tradeoffs, which the defendants hope will be temporary, are necessary because American and JetBlue are constrained by the size of their fleets. Like any airline, each defendant has a finite number of aircraft presently available, plus additional aircraft it anticipates receiving in the future based on its order book. A carrier, therefore, cannot generally grow everywhere, all at once. Rather, like all businesses, airlines must evaluate their priorities, decide how to allocate their limited resources, and choose where and when to pursue growth. Here, in the short term at least, the record establishes that this internal process has led the defendants to prioritize the NEA region when determining how to allocate resources.[43] To be sure, executives of both defendants expressed confidence that the NEA's anticipated success would support efforts to add to their fleets by purchasing new planes in the future—a proposition that makes intuitive sense, assuming all else remains constant and the industry is not rocked by another negative demand shock triggered by an unforeseen global event. However, the record simply contains no proof that this optimism has yielded such results to date. Of course, the elimination of competition between American and JetBlue is the fuel supporting the hope for future expansion by ending a major risk that would otherwise balance against the possible revenues generated by a new plane.[44]

---

[43] If the defendants do not meet defined benchmarks for increased flying out of New York's two slot-constrained airports, they risk losing twenty additional slots at JFK. They are subject to no such consequence arising from their growth, or lack thereof, in any other location—including Boston. The Court fully appreciates and finds that any rational executive (and the American and JetBlue executives here are not only rational, but exceptionally savvy) would be highly motivated to fulfill the growth commitments in the DOT agreement, including by reallocating planes and other resources to New York at the expense of other locations (whether temporarily or permanently).

[44] Clearing aside general assertions of hope and expectation that the NEA will support decisions to acquire aircraft in the future, what remains are two claims by the defendants. First, they adamantly urge that JetBlue delayed the retirement of thirty aircraft in order to support the increased flying required of it by the NEA. E.g., Doc. No. 324 ¶ 277. Second, they more gently suggest that the NEA is "in part" responsible for "additions" to American's fleet. Id. ¶ 280. The Court rejects both of these claims, as neither is supported by credible, objective evidence.

<u>Third</u>, since the NEA was announced, American's slots at JFK and LaGuardia have been used more heavily and efficiently.  This is in part because American has leased nearly a hundred of its slots to JetBlue, which operates them using larger aircraft (on average) than the small regional jets American had been using.  Of course, JetBlue was seeking to lease slots American was admittedly underutilizing in New York even before the NEA—a possibility American not only had considered but had at least tentatively decided to pursue.  American itself has "upgauged" its regional jets (replacing smaller jets offering fewer seats with larger ones offering more), has added some long-haul routes with larger aircraft, and has generally used its valuable "slot portfolio harder than [it] ever ha[s]."  <u>E.g.</u>, Trial Tr. vol. 7 at 123-24 (describing increase in

---

As to the first, business records reflect that JetBlue's Revenue Management team analyzed various scenarios regarding the retirement of the thirty aircraft—including one in which JetBlue would delay their retirement even without the NEA.  <u>See generally</u> PX 0816.  Witnesses' later attempts to suggest that this scenario was included "for completeness," was only "theoretical," or was never "really under consideration," <u>see</u> Doc. No. 324 ¶ 279, are not supported by any similar characterization in any document contemporaneous to the analysis at issue, and the Court does not credit them.  No evidence before the Court suggests, let alone establishes, that JetBlue could not have delayed the retirements to pursue its own standalone growth plans.  To the extent the defendants also suggest that JetBlue accelerated its existing orders for new aircraft because of the NEA, the record leads the Court to conclude that the new planes at issue were part of JetBlue's plan (with or without the NEA) to retire an older, smaller, and less efficient segment of its fleet and replace it with newer, larger, more efficient planes.  And, to the extent JetBlue exercised options to order more planes than the number necessary to replace those being retired—a claim supported by evidence the Court finds murky, at best—such planes are not presently part of JetBlue's fleet and may not be so for several years, at least.  PX 0949 at 36; <u>cf.</u> Trial Tr. vol. 7 at 158-59 (expressing frustration that aircraft American ordered and expected to receive already have not yet arrived).

As to American's weaker claim of fleet expansion, the witness who testified most candidly on this topic declined to directly attribute such (potential, future) expansion strategies to the NEA.  <u>E.g.</u>, Trial Tr. vol. 15 at 107-08, 110; <u>see also</u> <u>id.</u> at 77-78 (conceding "the source of the bigger planes" in New York in "the short term" is to "relocate [them] from other markets across the system"); <u>id.</u> at 94 (saying generally that American "would look to add a number of airplanes . . . by 2026").  The parties have not pointed the Court to any ordinary-course business records of either defendant reflecting a specific pitch to a Chief Financial Officer or lender seeking and obtaining funding for aircraft because of the actual or anticipated effects of the NEA.

service in New York, including addition of flights to leisure destinations instead of "cut[ting] the schedule down harder on Saturdays" as it previously did, but not explaining why such flights could not have occurred without the NEA). To be sure, the defendants' incentive to grow in New York and make full use of their valuable resources at LaGuardia and JFK is intensified by the promises they made to the DOT. See supra note 43.

Fourth, the NEA's schedule optimization and capacity coordination process has led to decreased capacity, lower frequencies, or reduced consumer choices on multiple routes, including some that are heavily traveled. This has happened in at least two ways. In certain markets the defendants both previously served, the NEA has allocated the route to one of them and caused the other to exit. In short, they are dividing the NEA markets between themselves. Examples include thirteen markets touching LaGuardia at one end, including those with Logan, Philadelphia, Charleston, and Orlando at the other end. Doc. No. 325 ¶¶ 272-73 (citing testimony and exhibits); PX 0322 at 6. In these markets, the number of competitors has literally decreased by one, leaving consumers with one fewer option when traveling between these pairs of cities. On the heavily traveled business route between Logan and LaGuardia, American's exit reduced the total number of carriers providing nonstop service from three to two, with Delta providing the only direct service competing with JetBlue's. The only reason either defendant stopped service on these routes is the NEA. Moreover, the evidence suggests that the defendants will continue to allocate more markets between them. It was the Clean Team's "[g]lobal" plan that the NEA's "improved combined network offering" would involve "only having 1 carrier in 1 market" once implementation was complete. PX 0318; Doc. No. 325 ¶¶ 270-71; cf. id. ¶¶ 274-75 (identifying evidence that American plans to cease flying another significant transcontinental route "in the NEA fully implemented steady state schedule"). The evidence also establishes that,

on routes within the NEA that both defendants continue to serve, their "optimized" schedule means that they do not offer directly competing flights, or "wing tips," in those markets.[45]  See Doc. No. 324 ¶ 270; PX 322 at 4 (listing eight NEA markets served by both partners but with "joint optimized schedules," most of which are major routes featuring substantial business travel).

These facts bear on the number of competitors participating, and the choices available, in NEA markets.  The defendants' partnership also has reduced total frequencies or capacity in certain NEA markets that the defendants have allocated to only one of them in their optimized NEA schedule.  The same markets identified in the previous paragraph provide examples of such reductions.  See Trial Tr. vol. 9 at 48-49 (predicting JetBlue "will eventually have roughly the same capacity" on Logan-LaGuardia "that existed in the market" before the NEA, but not until "some time between now and 2025"); PX 0792 (describing plan for American to stop its four daily Logan-LaGuardia flights at the start of 2022, for JetBlue to continue offering only the same twelve daily flights it already offered until summer 2022, when it would increase to fifteen daily flights); see also PX 0322 at 3 (reflecting that both carriers plan to reduce frequencies in Logan-Reagan, an overlap market, between January 2022 and the time when the NEA reaches its

---

[45] The defendants cast this as a benefit, saying it gives customers "more options" by offering flights in a market at more times throughout the day.  Doc. No. 324 ¶ 270.  But the flip side of the "choice" coin is that customers who wish to fly at a particular time of day have fewer carriers from which to choose.  This might especially matter on business routes, such as Boston to Washington, D.C., where corporate travelers might need to arrive or depart at specific times of day.  Cf. Trial Tr. vol. 4 at 212-13 (acknowledging there are certain times of day "when all the demand is," and when "spill carriers" operating only during those times can pick up "left over" travelers).  If such a traveler was able to choose among multiple carriers before the NEA, including between "wing tips" offered by American and JetBlue during the desired window of time, the defendants' optimized schedule will remove one of the choices previously available to that person.  Furthermore, the avoidance of "wing tip" flights is further proof of the extent to which direct competition between the defendants within the NEA has been eliminated.

"steady state").  Though the defendants characterize this as a temporary reduction that will be remedied when they have eventually obtained additional aircraft needed to bring service back up to pre-NEA levels, such hope and speculation does not change the fact that the capacity reductions have occurred and (as far as the record is concerned) presently remain.

Fifth, through the NEA's reciprocity and codesharing features, frequent flyers and many corporate clients of both defendants have gained broader access to benefits and discounts than they had previously.  The travelers for whom these features matter most make up a relatively small proportion of American's customers and account for less than half of its revenue.  See PX 0009 at 19.  Though "power travelers" are the ones American is "most after," approximately eighty-five percent of its customers are "infrequent" travelers, for whom price matters more than loyalty benefits or network breadth.[46]  Trial Tr. vol. 4 at 211; Trial Tr. vol. 2 at 103-04; PX 0009 at 19.  As far as corporate clients are concerned, many (though not all) businesses that had existing corporate travel contracts with American or JetBlue accepted and signed amendments to those contracts providing that the discounts offered by the relevant carrier would extend to include all routes within the scope of the NEA's codesharing provisions.[47]  Though the NEA

---

[46] One American executive was quite candid about the extent to which American prefers and prioritizes the smaller category of "power travelers" over the larger group of travelers it describes as "marginal."  Trial Tr. vol. 4 at 212-13.

[47] Many businesses secure travel contracts with one or more airlines, through which their employees generally receive discounted fares for business travel that apply across the carrier's network.  Airlines sometimes offer flat fares on particular routes where the client's employees travel most frequently.  These contracts often feature promises by the client to direct specified percentages of its corporate air travel to the contracting airline.  Carriers bid on such contracts, in competition with one another, and businesses often renew and/or solicit new bids every few years.  A business might have contracts with multiple airlines, but it might promise different shares of its travel to each of them, leading to a sort of hierarchy among its contracted airlines.  Corporate travel managers select airlines based, in large part, on price and the fit between the locations its employees most often must visit and the carrier's network.  The three GNCs and JetBlue all are competitors for corporate travel contracts in the northeast.  Other LCCs and ULCCs have limited or no presence in this field of competition, at least in the NEA region, as

allows the carriers to bid jointly for corporate contracts, no corporate client had requested such a bid at the time of the trial. Additionally, there is no evidence that any such customer was dissatisfied before the NEA with its choices, as far as corporate-air travel contracts are concerned, nor any significant, non-hearsay evidence that the NEA has led any such customer to make changes to its corporate air travel contracts.[48]

Sixth, because of its partnership with American, JetBlue has increased its operating costs and lost two significant opportunities to expand its own collection of slots and approvals necessary to pursue long-term access and growth domestically and abroad. JetBlue's business model—the recipe for its two decades of pre-NEA success and a source of great pride for its executives—depends on its ability to offer high-quality service while keeping costs low. E.g., Trial Tr. vol. 2 at 53-54. The defendants admit, however, that the NEA has increased JetBlue's operating costs. Doc. No. 324 ¶ 265; Trial Tr. vol. 1 at 228-29.[49] The record also establishes

_____

corporate clients generally seek access to features like business- or first-class seating and airport lounges, which those airlines do not offer.

[48] Very little direct evidence was adduced from any corporate clients. The plaintiffs offered deposition excerpts of testimony by two clients' representatives; that testimony does not suggest either client perceived a need for, or a benefit from, the NEA for their own corporate travel purposes. The defendants offered no non-hearsay evidence demonstrating the views of any clients, relying instead on general testimony by the defendants' own sales executives that they expected the NEA to strengthen their ability to establish new corporate contracts or expand existing ones. The Court believes the defendants' sales teams expected such results, but testimony about these expectations is not a sufficient basis for the Court to find that the anticipated benefits described are real or substantial.

[49] Though JetBlue's CEO asserted that the cost increases would have arisen from JetBlue increasing its capacity by delaying the retirement of part of its fleet, with or without the NEA, Trial Tr. vol. 1 at 229-30, that claim is at odds with his description just moments earlier that the NEA had required JetBlue to spend "several million dollars" to install or upgrade technology necessary "to create a more seamless experience between JetBlue and American customers" (an expenditure explicitly tied only to the NEA), id. at 229. The same witness acknowledged that JetBlue "had always allowed its passengers one free carry-on bag" (an example of JetBlue's historically strong value proposition), then characterized as "coincidental" JetBlue's decision—announced during the same month implementation of the NEA began—to eliminate this perk for passengers purchasing its least expensive "Blue Basic" fares. Id. at 235-36.

that JetBlue's partnership with American has caused regulators in the United States and the

United Kingdom to doubt JetBlue's independence and question its status as a true low-cost

alternative to the GNCs.  In particular, JetBlue vigorously lobbied the U.K. Competition and

Markets Authority ("CMA") in support if its application for four slot pairs at London's Heathrow

Airport.[50]  Acquiring these slots was a primary focus of JetBlue's Senior Vice President of

Government Affairs and Associate General Counsel throughout 2019 and 2020, and JetBlue

viewed itself as the strong frontrunner for the slots.  Doc. No. 325 ¶¶ 248, 281.  Because of

JetBlue's cooperation with American in the form of the NEA, however, the CMA issued a

decision in November 2020 finding JetBlue ineligible for the slots.  PX 0805.  Though JetBlue

has pursued alternative strategies to begin its service to London, its access to Heathrow

(London's busiest airport and the one JetBlue itself deemed most effective for providing

meaningful competition to the GNCs) is limited to two flights per day using slot pairs it acquired

on terms less favorable than those attached to the remedy slots.[51]  See Doc. No. 325 ¶ 284.

Similarly, in July 2022, the DOT issued a written determination regarding the

reassignment of sixteen "peak-hour runway timings" at Newark.  See generally DX 1083.  The

timings once belonged to United, but had essentially been divested when United merged with

Continental in 2010.  Id. at 1.  The DOT originally awarded them to Southwest, to enhance

Southwest's ability to provide low-cost competition to the GNCs operating in the New York

---

[50] The slots were available after the CMA required American and British Airways to divest them
in order to remedy competitive concerns arising from American's Atlantic Joint Business
Agreement ("AJB") with British Airways.  Doc. No. 325 ¶ 247.  The slots were to be leased, at
no cost and for ten years, to a competing airline that was not part of the AJB.

[51] In particular, to lease the slots from another carrier, JetBlue had to pay for them and was
required to terminate an existing codeshare relationship with a different international carrier.
And, JetBlue is not guaranteed access to the slots for as long a term as the CMA slots would
have provided.

area.  Id.  Southwest decided to end its service out of Newark in 2019, and the DOT began a

reassignment process.  Id. at 2-3.  JetBlue, Spirit, and Alaska each applied.  Id. at 3.  The DOT

awarded the timings to Spirit, citing the NEA as a factor that led it not to select JetBlue.  Id. at 9-

10.[52]  The Court finds that these effects—the increased costs and the lost opportunities for

gaining independent and long-term access to important markets—diminish JetBlue's ability to

provide disruptive, low-cost competition to the GNCs in the northeast.

    Finally, the spirit of partnership implicit in the NEA relationship has already led the

defendants to disregard the NEA's express requirements at least once.  At the end of 2021, the

parties applied the MGIA's revenue-sharing process for the first time, determining how revenues

generated by the NEA that year should be divided between them.  Under the terms of the

MGIA—terms which the parties designed, and which numerous witnesses described as necessary

to appropriately align their incentives—JetBlue owed American a transfer payment upwards of

$200 million.  The hefty sum resulted from American "adding a great deal of long-haul capacity

into JFK that didn't perform as well as . . . expected."  Trial Tr. vol. 5 at 219-20.  Nevertheless,

American forgave the lion's share of the amount due, agreeing to accept from JetBlue only a

fraction of the total due and cap the transfer payment at $27 million.  The defendants explain this

by pointing to "the lingering effects of COVID," calling the pandemic's impacts on air travel in

2021 "unforeseen."[53]  Doc. No. 324 ¶¶ 199-200.  Because both defendants viewed the NEA as "a

---

[52] The DOT reasoned: "Combined with JetBlue's significant presence in the NYC market as the second-largest slot holder at JFK, the NEA joint venture," which aligns the partners "services and financial incentives" in New York (including Newark), "clearly puts JetBlue in a position to maintain or increase its access in NYC without being awarded the timings at issue."  DX 1083 at 9.  Though the DOT rejected Alaska's application because it sought fewer than all available timings, in a footnote the DOT also observed the relationship Alaska shared with American through the WCIA "would impact its competitive incentives."  Id. at 9 n.26.

[53] To be sure, the pandemic and its many impacts, including on air travel, were and continue to be unprecedented.  And, certainly, the defendants hoped the impacts would subside sooner rather

long-term agreement" they did not "want to . . . sour," they agreed to set aside the MGIA's terms

and negotiated the lower payment.  Trial Tr. vol. 5 at 219-20.

Despite departing from the contract's requirements so early in the venture, the parties did

not elect to amend the MGIA to correct for such scenarios in the future.  They also left intact the

"Force Majeure" clause in the NEA Agreement itself.  That provision—devised by the parties

amid the effects of the pandemic—expressly states that "no obligation to make a payment" due

under any of the NEA contracts (including the MGIA) "will be excused or limited by virtue of

any Force Majeure Event," a term the parties understandably defined to include a "pandemic."[54]

PX 0001-a § 10.9 & App. A.  In other words, in agreeing to a lower transfer payment, the

defendants disregarded their obligations as defined by both the MGIA and the NEA Agreement

itself.  This decision not to adhere to their agreement substantially undermines claims by the

defendants elsewhere that the terms of their contracts will guarantee certain procompetitive

conduct or prevent anticompetitive effects.  See, e.g., Doc. No. 324 ¶¶ 188, 197 (noting that the

defendants have agreed not to share revenues on certain nonstop overlap routes where their

than later.  The Court, however, finds implausible the defendants' suggestion that they actually
and reasonably could have expected the industry to be back to "business as usual" in 2021,
rendering the lingering effects that year "unforeseen."  Indeed, testimony by American's CEO is
to the contrary.  See Trial Tr. vol. 5 at 32 ("[M]y assessment was that we could be looking at
something that could take five years to overcome.").

[54] Though a common feature of contracts, the evidence suggests including and carefully
delineating the boundaries of a force majeure clause is especially crucial in the airline industry,
which various witnesses explained is susceptible to "negative demand shocks" arising from
many kinds of events.  See Doc. No. 324 ¶ 150 (referencing at least seven specific events in the
2000s, from the 9/11 terrorist attacks to the eruption of a volcano in Iceland, that have impacted
global air travel and required airlines to alter schedules and plans in response).  Though surely
aware of this prospect, the defendants tailored the NEA's force majeure language to suspend
most obligations, but to continue requiring payments even in the face of unforeseeable events
beyond their control that impact demand for air travel.

combined market share poses especially acute competitive concerns, and that the distribution of revenue pursuant to the MGIA will incentivize growth by both defendants).

The Court also finds that this same spirit of partnership will diminish competition between the defendants outside the NEA region. See supra note 30 (regarding evidence American competed less vigorously with at least one other joint-venture partner); cf. Trial Tr. vol. 7 at 12-13 (describing the devolution of a more limited collaboration between two other domestic airlines when the spirit of partnership did not prevail). It is neither logical nor possible to view the NEA's impact on the defendants' competitive relationship as confined to the northeast. Both carriers have a strong and vested interest in the NEA's success. They intended to form a long-term partnership, and they each have invested substantial time and resources in developing and implementing the partnership.[55] All of this materially changes the competitive relationship between American and JetBlue, increasing their mutual interest in the success and survival of the other within the NEA and beyond.

     E.  Alternatives

The plaintiffs point primarily toward one less-restrictive alternative to the NEA.[56] They suggest the defendants could have more closely modeled their partnership after American's

---

[55] Besides JetBlue's investment in necessary technology, the defendants have made changes to their loyalty programs (so that status and benefits can align as much as possible, regardless which carrier a frequent flyer chooses for a given flight), and have launched a shuttle bus to transport passengers connecting through JFK (where the defendants generally do not operate from the same terminal) such that they can move between terminals more efficiently and without clearing security mid-trip. The JFK bus was touted at trial, especially by American's executives, as an example of the lengths to which the defendants have gone to ensure a seamless customer experience. It also, however, demonstrates the magnitude of the collaboration and the intertwining of the defendants' operations.

[56] There also were numerous ordinary course business records providing insight into the standalone growth plans of both American and JetBlue in the NEA region, as well as evidence that the parties could have entered (and, in fact, had actually negotiated) arms-length agreements to lease or transfer slots at the constrained New York airports to facilitate such standalone plans.

current relationship with Alaska, the WCIA, and supplemented such a partnership with agreements to lease or transfer slots in New York.  See Doc. No. 325 ¶¶ 558-70.  Indeed, the defendants devoted time and consideration to whether they should pursue such a partnership instead of the NEA.  See, e.g., PX 0268 at 5 (identifying an "East Coast Int'l Alliance," structured like the WCIA, as a "Fall Back" scenario in internal presentation pitching what became the NEA).  A WCIA-style arrangement would have differed from the NEA in three respects that bear on the competitive impact of the venture.  First, it generally would not have included codesharing on domestic O&Ds where the defendants offer competing nonstop service, preserving their status as independent competitors in such markets.[57]  Second, it would have limited the shared revenue pool to American's international flying and JetBlue's domestic flying touching the relevant airports—eliminating the risk that one partner might be tempted to raise its fares on a domestic O&D served by both partners due to a belief that its counterpart would recapture a portion of any lost traffic and contribute its revenue to the shared pool in any event. Cf. Trial Tr. vol. 10 at 102-03, 106-07 (explaining how revenue sharing can create an incentive to raise prices due to ability to "recapture" some lost sales).  Third, an alternative modeled after the WCIA would not permit the parties to discuss network planning, coordinate regarding capacity, and jointly decide to allocate markets.  See PX 0268 at 5.

---

In addition, there was evidence that both defendants have (or have had) more limited collaborations with other domestic carriers, featuring only codesharing and some form of frequent-flyer reciprocity.  Though both of these alternatives appear to be less restrictive than the NEA, the plaintiffs have not pursued them in their papers and, following suit, the Court will not (and, given its legal conclusions, need not) further evaluate them.

[57] It might not have eliminated all such codesharing, but it would have permitted it on a substantially smaller scale than the NEA does.  Cf. id. (proposing codesharing on such routes only if they were part of itineraries connecting through JFK or Logan to or from an international location).

Though these limitations are features of the WCIA, they have not prevented it from fulfilling that venture's central goals—goals that mirror the major purposes of the NEA. In particular, the more limited WCIA still enables Alaska's customers and frequent flyers to tap into American's international service (on American's own network and through its **one**world alliance), while strengthening the feed of passengers to American's international flights from the west coast. In doing so, it encourages both WCIA partners to grow and incentivizes them to strive to provide high-quality and seamless customer service. These objectives serve the two partners' overarching aim: the WCIA enhances their ability to fend off threats from, and compete more fully with, Delta and United.[58] Both American and Alaska consider the WCIA a success. There is no evidence before the Court that either WCIA member is dissatisfied with the endeavor, that their incentives are not aligned sufficiently to achieve their mutual and individual purposes, or that consumer benefits would be greater under a different structure than the one they selected.

Though American and JetBlue elected to forego a WCIA-style venture in favor of the broader NEA, projections by American before the NEA was finalized suggest both alternatives offered comparable value and would have spurred comparable growth. See Doc. No. 325 ¶¶ 565-69; PX 0268 at 5; see also Trial Tr. vol. 16 at 125-26 (describing internal American analysis comparing NEA to WCIA-style partnership, showing similar increase in passengers predicted). The Court further finds that a venture modeled after the WCIA would have provoked

---

[58] Alaska's Chief Commercial Officer, who led the team from his airline that negotiated the WCIA, expressed this motivation candidly. He described the threat Delta posed to Alaska in Seattle, said Alaska was losing corporate clients to Delta, and noted Alaska's inability to connect its customers to an integrated international network. Trial Tr. vol. 7 at 15-16, 20. He also shared his understanding that American sought access to a feed of customers to fill and expand its international service from the west coast, where it had struggled in the face of strong hub offerings by both Delta (out of Seattle) and United (out of San Francisco). Id. at 21.

the defendants' competitors—in particular, Delta and United—to undertake comparable evaluations, and entertain comparable competitive responses, to those that followed the NEA's announcement.  Doc. No. 325 ¶ 570.

Neither American nor JetBlue considered—at all, let alone seriously—winding down its operations in the NEA region.  That is, with or without the NEA, both carriers intended to continue serving Boston and New York, and both would have done so.  For JetBlue, the region contains its two most important focus cities, which account for three-quarters of its overall capacity.  See Doc. No. 325 ¶¶ 135, 137-38, 140, 178-79.  JetBlue's pre-NEA network plans identified goals for growth in the two cities over both the short and long term.  See, e.g., id. ¶¶ 211-12, 219, 233, 236 (summarizing evidence of JetBlue's plan to grow to 200 daily departures at Logan, to pursue "offensive opportunities" for growth during the pandemic, and to increase its daily departures at JFK and Newark).  Those plans included strategies for obtaining approvals necessary to add more flying in New York,[59] as well as for securing access to slots in London that would permit JetBlue to begin transatlantic service from the northeast.

American considered itself "too small to win, but too big to quit" in both New York and Boston.  Trial Tr. vol. 7 at 167; accord Trial Tr. vol. 4 at 207.  It was the second-largest carrier serving Boston until Delta surpassed it in the year or two before the NEA, and it hoped to win back some of the share it had lost because of its view of Boston as an important market with "a very high proportion of business travelers."  Doc. No. 325 ¶¶ 142-45; PX 0090 at 4.  In New York, one of the busiest corporate travel markets in the world, American consistently has been

---

[59] For example, JetBlue was actively pursuing a JFK slot lease with American, and it had applied for additional "runway timings" at Newark (i.e., FAA approvals permitting a carrier's scheduled takeoff or landing, necessary at certain airports that are not slot-constrained but are subject to a lower level of operational oversight).

among the three largest carriers for decades, though it admittedly underutilized its resources there (i.e., its substantial slot holdings).  Doc. No. 325 ¶¶ 182-83, 189-93, 195.  It, too, strategized and discussed internally tactics it could pursue to strengthen its position and grow in the northeast.  See, e.g., id. ¶¶ 220-21, 223-24, 230-32 (summarizing evidence of American's plan to increase capacity and "fight" back in Boston, and add capacity in the form of more seats and more flights out of JFK and LaGuardia).  Those plans included better utilizing American's gates at Logan and upgauging its regional jets at JFK and LaGuardia.  Id. ¶¶ 221, 231.

There is no evidence that any other carrier was poised to mount a meaningful challenge to the defendants' positions among the top three and top four carriers in Boston and New York, respectively.  In other words, any alternative to the NEA would have included both American and JetBlue continuing to operate and continuing to occupy strong positions among the largest carriers in Boston and New York.[60]

F.   The Experts

Throughout the trial, the Court carefully observed and assessed each witness, considering their credibility generally and as to the specific matters about which they testified.  Most

---

[60] This distinguishes the defendants from certain other carriers, whose struggles in New York led them to exit one or more airports altogether.  E.g., Trial Tr. vol. 2 at 112, 134-36 (explaining that Southwest withdrew from Newark in 2019 and focused its New York strategy on bringing its customers to LaGuardia from other places); Trial Tr. vol. 8 at 300 (noting United had just "exited JFK" because it "couldn't get more slots").  It also differentiates American and JetBlue from defendants that have pursued "failing firm" defenses in other antitrust actions, claiming that the restraint at issue was necessary to keep one or both collaborators afloat.  Cf. Brown Shoe Co. v. United States, 370 U.S. 294, 319 (1962) (noting "a merger between a corporation which is financially healthy and a failing one which no longer can be a vital competitive factor in the market" might stimulate, rather than suppress, competition).  Though COVID-19 certainly upended the operations and revenue streams of all airlines around the time the NEA was being negotiated, the defendants neither argued nor sought to prove that the NEA was necessary to ensure the survival of either partner.  The record would not support such a defense, and the Court need not consider it further.

witnesses were employed by the defendants.  Several hold high-level positions, and many were

personally involved in orchestrating the transaction at issue here.  The Court paid close attention

to witnesses falling within this category, evaluating their credibility, likely motivations, and

possible biases.  Such evaluations factored into the Court's assessment of the evidence and the

issues presented in this case, and they influenced the findings and conclusions expressed in this

decision.  A second category of witnesses also merited close scrutiny: the six expert witnesses

called to opine on the features and effects of the NEA.  As it did with the defendants' executives,

the Court considered the demeanor and credibility of each expert.  The Court's in-person

evaluation of these witnesses influenced the weight it accorded (if any) to their testimony, a

subject that warrants some discussion and to which the Court now turns.[61]

The plaintiffs' primary expert witness was Dr. Nathan H. Miller, a professor and

economist who testified about economics and industrial organization.[62]  In their pretrial filings,

the defendants embarked on a quest to strike Dr. Miller's analysis and opinions from the record

in this case.  The Court denied the pretrial motion during the final pretrial conference, Doc. No.

220, and now addresses the renewed objections to Dr. Miller's testimony expressed in the

defendants' post-trial papers.  Dr. Miller was a thoughtful, credible, and well-credentialed expert

witness.  He was articulate and methodical in explaining his conclusions and the analysis

underlying them, but also candid in acknowledging the limitations of his opinions.  More than

---

[61] This is not the first major antitrust trial in which the parties have presented "costly and conflicting . . . economic . . . models" and "incompatible visions of the competitive future," raising the possibility that their dueling experts "essentially cancel each other out as helpful evidence the Court could comfortably endorse as decidedly affirming one side rather than the other."  Deutsche Telekom AG, 439 F. Supp. 3d at 187.

[62] The plaintiffs' other expert, Dr. Robert Town, opined primarily on a topic that does not factor prominently in the Court's resolution of any issues in this case (i.e., "capacity discipline" by GNCs historically in the industry).  The Court has accorded weight to his analysis only to the extent it is expressly referenced in this decision.

any other expert testifying in this case, Dr. Miller was consistently measured and precise in his responses, even throughout defense counsel's aggressive cross-examination.  Dr. Miller expressly accounted for the specific terms of the NEA—that is, he did <u>not</u> ignore the agreements' terms, as the defendants argue—and explained why he chose the models he used to assess its effects.  To the extent the defendants renew their pretrial attack on the admissibility of Dr. Miller's testimony, their objections are OVERRULED, and their request to strike his testimony is DENIED.

The defendants' challenges are more appropriately viewed as directed to the weight the Court should accord Dr. Miller's testimony.  In that regard, the Court credits Dr. Miller's analysis to the extent it suggests the NEA will create upward pricing pressure, a conclusion which is well supported by basic economic principles and incentives, and which confirms the conclusions the Court reaches independently and explains in the discussion of its legal conclusions below.  The Court need not, and does not, endorse the specific dollar amount of harm Dr. Miller's models predicted (nor did Dr. Miller himself characterize that prediction as a rigid, definite value of literal fare increases).  The Court also mentions and credits Dr. Miller's testimony and analysis as to other topics where they are material to the Court's analysis and specifically noted in this decision.

The defendants presented four expert witnesses.  All of the defense experts work together for the same consulting firm.  This is not the first time a GNC has retained their firm—or any of them in particular—in connection with an antitrust matter.  Two of them have written papers funded by a GNC, and they accepted feedback from the GNC before finalizing and publishing at least one such paper.  Two have never rendered an opinion adverse to a GNC's position in an antitrust proceeding, and another has not done so in the last two decades.  American itself has

retained at least two of them in the past.  These facts cause the Court to view the testimony of

each of these experts with heightened skepticism, as they suggest partiality and substantially

undermine the independence and credibility of all four defense experts.  Moreover, each defense

expert exhibited during his testimony, to varying degrees, the demeanor and tone of an advocate

invested in the outcome of this case.[63]  Based on the combination of their historical ties to

powerful airlines and the manner in which they expressed their opinions from the witness stand,

the Court finds as a general matter that the defense experts' testimony about the defendants and

the NEA was tainted by bias.

The apparent bias of the defendants' retained experts is reason enough to reject the

opinions and conclusions they rendered in this case.  Certain specific aspects of three defense

experts' testimony further undermine their credibility and merit comment.[64]  Dr. Darin Lee, an

expert on competitive dynamics in the airline industry, expressed opinions that were not soundly

reasoned, tailored to this case, or supported by the evidence.  Two examples will suffice.  First,

Dr. Lee "confidently" declared that the NEA is "part of the constant evolution" of an "incredibly

competitive" industry where, "clearly," "the barriers to entry are quite low."  Trial Tr. vol. 12 at

49, 65.  This sweeping assertion misleadingly invokes the language of competition,

misunderstands the standards governing federal antitrust analysis, and disregards the specific

context in which this case arises.  The primary basis Dr. Lee cited to support his assessment that

competition is high and barriers are low is the increase in non-GNC options over the last thirty

---

[63] This was especially the case with respect to Drs. Lee and Israel.  It stood in marked contrast to the forthright manner in which Dr. Miller addressed the Court.

[64] The fourth expert, Dr. Jan Brueckner, testified only about the proper definition of the New York City geographic market, and whether it must include Newark.  As the Court's findings and conclusions do not depend on this question, it has not relied on Dr. Brueckner and need not further discuss his opinions.

years.  But that increase was calculated on a nationwide basis, not with a focus on the unique

setting at issue here: the highly constrained northeast.  That the ULCC category has grown

rapidly says little about the level of competition or barriers to entry and expansion in New York

if few such carriers have acquired the tools necessary to operate there.[65]  Cf. id. at 65

(acknowledging "there are certain places in New York, in particular, . . . where entry is more

difficult" but suggesting the alleged size of "the low cost carrier order book" shows "barriers to

entry have not . . . constrained [non-GNCs] in any way").

   Similarly, Dr. Lee glibly declared it "completely unplausible" that the NEA would

imperil JetBlue's disruptive role in the market and cause it to stop "behaving like a" LCC.  Id. at

80-81.  The only explanation he provided to support this opinion was his belief that "it [would]

make[] no sense" for JetBlue to "cede . . . their most important advantage, and really their secret

to growth"—"their low cost structure," around which "they've built their entire brand."  Id.  In

making these pronouncements, Dr. Lee did not mention, let alone engage with, evidence that

JetBlue's business model and cost structure have moved away from a classic LCC model to

something more complex—a change that the NEA and its associated costs will only exacerbate.

He cited no analysis of JetBlue's business model and how it has evolved, historically or in recent

years, nor did he examine how the NEA and its implementation impact JetBlue's cost structure.

   These are not the only instances in which Dr. Lee conveyed unnuanced and poorly

reasoned conclusions.  Based on his demeanor and his failure to tailor his opinions to the

evidence in this case, the Court rejects both the specific conclusions described above and all

other opinions Dr. Lee expressed on topics material to the Court's decision.

---

[65] In fact, Dr. Lee provided no general description, let alone specific details, of the extent to
which any ULCC has access to New York's slot-controlled airports or has impacted fares in the
NEA region.

The defendants' lead expert, Dr. Mark Israel, suffered from similar problems.  In his lengthy testimony, Dr. Israel also demonstrated a misunderstanding and misapplication of antitrust concepts, rendered opinions based on false assumptions, and failed to account for the circumstances presented by the NEA.  Again, a few examples make the point.  Dr. Israel opined that JetBlue and American—individually and collectively under the NEA—lack market power in Boston and New York.  This is so, he says, because market power in the airline industry is linked to hub-carrier status, such that "in no case" can he "imagine a non-hub carrier having the ability to" exercise market power "without ceding share to the hub carrier."  Trial Tr. vol. 13 at 117-18.  According to Dr. Israel, market power in Boston lies only with Delta, and in New York it is split between Delta and United, leaving all other carriers asking what they can "do to try to compete with that hub position."  Id.; accord id. at 154.  This overly simplistic view is wrong as a matter of fact and law.  It ignores American's own designation of New York as among its hubs.  In other words, American is a hub carrier in New York.  If hub status is an indicator of market power for Dr. Israel, then American has market power in New York.  Dr. Israel's view also would mean JetBlue never could have market power—anywhere—because it is not a GNC with operations it calls "hubs."  This is absurd.  JetBlue's "focus cities" are its equivalent of hubs.  New York and Boston are the two it ranks highest, accounting for nearly three-quarters of its overall operations.  They are the centers of its business.  Dr. Israel accounts for none of this, adhering to the belief that the NEA lacks market power in the region, essentially because JetBlue is not a GNC (and, presumably, because he either does not realize, or does not believe, that New York is an American hub).  The Court emphatically rejects this arbitrary, unfounded view.[66]

---

[66] Dr. Israel also based some of his testimony about market power on the assumption that there is "no competitive concern" arising from the NEA on routes where the defendants do not provide overlapping service.  Trial Tr. vol. 12 at 147-48.  This assumption, also made by the defendants'

When it comes to Dr. Israel's analysis predicting the NEA's benefits, his projections are contaminated by his reliance on scenarios designed and selected by the defendants; they also are founded on the false assumption that COVID-19 simply placed the world of air travel "on pause." Trial Tr. vol. 14 at 64-65. To evaluate the defendants' deal, Dr. Israel assessed the world with and without the NEA by relying entirely upon two scenarios the defendants chose as the appropriate comparators. These scenarios were not defined by Dr. Israel based on economic principles; they were devised by the defendants, the Court finds, with an eye toward bolstering their case for the NEA. They were then "explained to" Dr. Israel, who accepted the defendants' reasoning and overlooked facts that show he was not comparing apples to apples.[67] The Court cannot, and does not, simply defer to the defendants' choice of counterfactuals. Furthermore, Dr. Israel's testimony makes clear that the chosen scenarios, and his predictions derived therefrom, assumed that the world would "come out of COVID" by simply un-pausing and getting "back to 2019." Id. But the evidence in this case makes it abundantly clear that the pandemic did not merely pause the airline industry; it changed the industry entirely and, it appears, for the long-term. Travel has not simply resumed, and many witnesses shared their expectation that it will not simply resume, the patterns that existed in 2019. Business travel, in particular, appears to be permanently transformed. The comparison devised by the defendants and relied upon by Dr. Israel did not even attempt to account for such changes and, thus, the resulting predictions are flawed.

---

final expert, is wrong. As the Court explains below, the threat that JetBlue could enter a market American serves (or vice versa) is a competitive dynamic influencing the market and is eliminated by the NEA.

[67] The most obvious example is that he compared a "no NEA" world limited to the carriers' 2019 fleets with an "NEA" world featuring additional aircraft they expected to receive by 2023.

For these reasons, and having considered his demeanor and evaluated the basis for all of his testimony, the Court finds Dr. Israel's opinions rendered in this case are entitled to no weight.[68]

The last expert to testify for the defendants was Dr. Dennis Carlton, an economist specializing in industrial organization.  His opinions, though expressed more carefully and narrowly than those of his colleagues, were rendered based on a pair of fundamentally flawed assumptions.  In assessing whether the NEA had caused fare increases, Dr. Carlton compared fare data from a set of "treatment routes" and a set of "control routes."  Dr. Carlton chose nonstop overlap routes within the NEA (the routes where Dr. Miller predicted the most harm) as the treatment routes, and he used routes within the NEA where JetBlue and American did not offer competing nonstop service as the control routes.  Trial Tr. vol. 16 at 19-20.  In defining the scope of these two groups, Dr. Carlton made two basic assumptions:  1) that the NEA would have "hardly any [anticompetitive] effect" on the routes in the control group; and 2) that both groups would respond to "industry factors, [including] COVID, in a similar way."  Id. at 20, 64.

The Court finds, based on the overwhelming weight of evidence, that both of Dr. Carlton's assumptions are wrong.  The NEA depends on the defendants embracing a spirit of partnership and acting in the interests of the venture on all routes, not only on nonstop overlaps.  This incentive already has caused, and will continue to cause, the defendants to allocate routes to one or the other of them.  That practice can mean American exiting a nonstop overlap where both

---

[68] Dr. Israel also testified about conversations he had with the defendants' executives and lawyers regarding the Clean Team's work (upon which he relied).  Though he admittedly took no notes during these conversations, which occurred more than two years before the trial, he claims they are "imprinted in [his] brain" because "[t]his stuff is what [he] do[es] all the time."  Trial Tr. vol. 14 at 104.  That is not credible.  It also is undermined by his own concession, moments later, that he could not "recall the specifics" of trial testimony for which he was present only two weeks earlier.  Id. at 111-12.

previously competed, but it also can mean JetBlue choosing not to launch new competing service on an NEA route American serves.  Of course, the JetBlue Effect means JetBlue's entry in the latter scenario would drive fares down, and JetBlue's NEA-related decision not to enter such a route would eliminate the threat of such downward pressure on pricing.  Dr. Carlton's analysis not only fails to account for this but assumes it is not the case.  As to COVID-19, the overwhelming weight of evidence is that the pandemic's impact on business travel is different, and more lingering, than its impact on leisure travel.  Because Dr. Carlton "didn't see an easy way of" evaluating whether the control and treatment routes included similar proportions of business-heavy and leisure-heavy routes, his analysis also does not account for the possibility that the pandemic impacted fares in one group more or differently than the other.  Id. at 64-65.  Because of these two basic flaws, the Court finds the opinions Dr. Carlton rendered in this case are entitled to no weight.

In sum, based on both the content of his testimony and the manner in which he provided it, the Court finds Dr. Miller's analysis both credible and helpful.  The same considerations lead the Court to reject, entirely, the opinions and conclusions offered by Dr. Lee, Dr. Israel, and Dr. Carlton.

G.  The Litigation[69]

Though the DOT ended its informal review of the NEA based on the commitments made by the defendants, the Department of Justice ("DOJ") undertook its own evaluation of the NEA's legality and its impacts on competition.  Cf. PX 0452 at 1 (reflecting DOT's statement that it

---

[69] The Court commends the three lead counsel in this case for including, as the Court suggested, less experienced counsel in the examination of witnesses and argument on motions.  Doing so enhances the quality of the presentations and meaningfully contributes to the development of the legal profession.

would "defer to DOJ" regarding any antitrust concerns arising from the NEA).  The defendants had anticipated and prepared for such scrutiny, enlisting the guidance of expert airline economists and antitrust lawyers before the deal was signed and publicized.  Doc. No. 325 ¶¶ 93, 95.  Ultimately, the DOJ concluded that the defendants' commitments to the DOT, amendments to the NEA Agreement, and amendment to the MGIA did not eliminate the competitive harms the DOJ anticipated would arise from the defendants' collaboration.  And so, this lawsuit followed.

The United States and the other plaintiffs sued the defendants on September 21, 2021, alleging the NEA violates Section 1 of the Sherman Act.  Doc. No. 1.  Two months later, the defendants moved to dismiss the complaint.  Doc. No. 67.  Meanwhile, the parties asked the Court to enter a scheduling and case management order without awaiting resolution of the defendants' motion, so that they could begin discovery and the Court could calendar their agreed-upon September 2022 trial date.  Doc. No. 65.  The jointly proposed case-management regime (which the Court accepted) included deadlines for dozens of events, from discovery to motions in limine, but it did not propose a date for dispositive, post-discovery motions.  See generally Doc. No. 76.  Discovery proceeded, as did some measure of motion practice arising out of discovery disputes.  In June 2022, after briefing was complete, the Court denied the defendants' motion to dismiss.  Doc. No. 103.

The Court subsequently set a trial schedule, Doc. No. 131, and resolved various requests regarding the treatment of confidential materials in pre-trial submissions and at trial, e.g., Doc. Nos. 138, 139.  The parties filed, and the Court ruled on, several motions in limine, Doc. Nos. 140, 141, 144, and the Court resolved various disputes pertaining to other aspects of the trial procedure, Doc. No. 221.  The defendants sought to compel two Delta executives to appear in

person as trial witnesses, Doc. No. 175, the executives responded by seeking to quash the trial

subpoenas, Doc. No. 230, and the Court resolved that pair of motions, Doc. No. 248.

Trial commenced on September 27, 2022.  Doc. No. 252.  At the outset, both parties

offered into evidence exhibits to which there was no objection, handing up lists of the items

within that category.  Trial Tr. vol. 1 at 6-7.  Those lists, combined, identified—and deposited

into the record in a matter of seconds—more than 1,400 exhibits.  Many other exhibits were

subject to objections, some of which fell into a few categories of objections that the parties

identified in pretrial submissions, Doc. No. 157 at 22; Doc. Nos. 157-5, 157-6, and the Court

ruled on those objections as the exhibits were offered during the trial.  When the plaintiffs were

nearing the end of their case-in-chief, they moved for the admission of about fifty more exhibits

over defense objections that mirrored objections the Court had overruled during the course of the

proceedings as to other similar exhibits.  Doc. No. 266.  After considering the parties' positions,

the Court allowed that motion and admitted the underlying batch of exhibits.  Doc. No. 283.

Along with its ruling, the Court admonished the parties that, given the volume of exhibits (and

the substantial length of many of them), the Court would not "plac[e] any weight on an exhibit

unless it has been explored with a witness . . . at trial and/or meaningfully described or relied

upon in any party's post-trial submission."  Id. at 2.  No party objected to or otherwise expressed

concerns about that admonition, and the Court has adhered to it.  Ultimately, the parties cited at

least four hundred exhibits in their post-trial papers.

Twenty-four witnesses appeared and testified during the trial.  The list included eight

American executives, six JetBlue executives, and one executive now employed by American

after working for many years at JetBlue (who, in fact, oversaw the NEA negotiations on behalf

of JetBlue before departing to join American).  Executives from Southwest, Spirit, and Alaska

also testified.  The remaining witnesses were experts—economists with specialized knowledge about antitrust issues, the airline industry, or both.  Two experts testified for the plaintiffs, and four for the defendants.  The parties were unable to complete their presentation of these two dozen witnesses in the time originally allotted for this trial, leading the plaintiffs to request additional time.  Trial Tr. vol. 12 at 5-7.  The Court allowed the request, over the defendants' objection, adding more than seven hours of trial time to the schedule.  Id. at 87-88.  Witness testimony concluded on October 27, 2022.  See Doc. No. 290.

From the start, the parties intended to supplement the live witness testimony with excerpts from depositions of a number of additional witnesses.  Even with the added trial time and despite a Court order that would have compelled one Delta executive to appear in person to testify (a result fervently pursued by the defendants), Doc. No. 248 at 3, the number of deposition excerpts submitted in lieu of live testimony only increased during the trial.  In the end, the parties submitted to the Court substantial portions of the transcribed deposition testimony of seventeen additional witnesses.  Cf. Doc. No. 157-2 (designating selections from fourteen deponents' transcripts).  These witnesses included: five more American executives (one of whom was a member of the NEA Clean Team) and three more JetBlue executives; three Delta executives and three United executives (the only witnesses representing the two carriers against whom the NEA is primarily intended to compete); employees two corporate clients of one or both defendants (the only two witnesses representing any customer of either defendant); and a manager at the organization responsible for overseeing the major New York area airports.  Though the Court reviewed all designated excerpts after the trial, it obviously did so without the benefit of an opportunity to assess the witnesses' demeanor and credibility, and without any

insight the witnesses might have provided in response to questions formulated during the trial based on the evidence as it developed before the Court.[70]

The Court scheduled closing arguments for November 18, 2022.  Doc. No. 296.  Pursuant to the case management order, the parties' post-trial submissions were due three weeks after the trial ended—or, as it turned out, the day before the scheduled closings.  Doc. No. 76 at 4; Doc. No. 196 at 9.  The parties timely provided the Court with sealed copies of their post-trial papers, followed by redacted versions filed publicly on the docket.  Doc. Nos. 320, 322, 323, 324, 325, 326.  The post-trial submissions were voluminous, exceeding six hundred pages in all.  See Trial Tr. vol. 18 at 4 (reflecting the Court's "confess[ion] that [it] wasn't capable of reading all 500 pages"—a sizeable underestimate—"between last night and this morning").  On November 29, 2022, the parties provided to the Court hyperlinked versions of their post-trial submissions— accompanied by more than 1,500 files consuming approximately twelve gigabytes of disc space—facilitating more efficient review and cross-referencing of the exhibits, testimony, and authorities cited throughout the papers.  Cf. Doc. No. 196 at 9 (requiring hyperlinked versions a week after the original submissions).

---

[70] It is worth emphasizing the defendants' choice not to present live testimony from any executive representing either of their biggest competitors: Delta and United.  The defendants characterize the NEA as necessary primarily (indeed, almost entirely) based on their claim that they could not otherwise challenge Delta and United in the northeast.  They also urge that the NEA created such a seismic shift in the competitive landscape in New York that Delta and United were compelled to respond (which, according to them, is a procompetitive benefit).  To the defendants, their competitors' views are so crucial to this case that they vigorously criticized the plaintiffs for not including Delta or United executives on their own witness list and "litigat[ing] the case as if these dominant northeast competitors don't exist."  Doc. No. 176 at 2; accord Doc. No. 239 at 2.  But despite the Court's order empowering them to require a Delta executive's in-person appearance, and despite the fact that United's executives apparently did not resist the defendants' trial subpoenas in the first instance, see Doc. No. 239 at 2 (averring that "senior executives from . . . United . . . will testify" at trial), the Court evaluates any relevant perspectives of the defendants' largest competitors on a limited paper record.

Shortly thereafter—that is, after the testimony had concluded and the post-trial submissions were received, and while the Court had this matter under advisement—the first in a series of lawsuits was filed by an individual seeking to represent a proposed class of consumers alleging antitrust injuries arising from the NEA.  Compl., <u>Berger v. JetBlue Airways Corp.</u>, No. 22-cv-7374 (E.D.N.Y. Dec. 5, 2022); <u>see also</u> Compl., <u>Kupferberg v. Am. Airlines Grp. Inc.</u>, No. 23-cv-1220 (E.D.N.Y. Feb. 15, 2023); Compl., <u>Buehler v. JetBlue Airways Corp.</u>, No. 23-cv-10281 (D. Mass. Feb. 2, 2023); Compl., <u>Guerin v. JetBlue Airways Corp.</u>, No. 22-cv-7423 (E.D.N.Y. Dec. 7, 2022).  Those lawsuits remain pending.[71]

One final event bears mention.  In July 2022, JetBlue announced it had reached an agreement to acquire Spirit.  <u>See</u> Compl. ¶ 29, <u>United States v. JetBlue Airways Corp.</u>, No. 23-cv-10511 (D. Mass. Mar. 7, 2023).  That proposed acquisition, referenced at times during the trial in this case, was also subject to regulatory review, a process which recently yielded a separate antitrust suit by the United States seeking to prevent the merger based on alleged violations of the Clayton Act.  <u>See generally</u> <u>id.</u> ¶¶ 1-86.  Another session of this Court has scheduled trial in that matter to begin in October 2023.

III.   <u>CONCLUSIONS OF LAW</u>

A.  <u>The Sherman Act</u>[72]

Section 1 of the Sherman Act prohibits the formation of any "contract . . . in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  Intended as "a comprehensive

---

[71] Three have been consolidated and are pending before the same District Judge in the Eastern District of New York.  The fourth is before this Court, designated related to this action; there is a pending motion to dismiss or transfer it to the Eastern District of New York for consolidation with the others.  <u>See</u> Mot. Dismiss Transfer, <u>Buehler v. JetBlue Airways Corp.</u>, No. 23-cv-10281-LTS, ECF No. 22 (D. Mass. Mar. 16, 2023).

[72] As the parties correctly concede that the Court has both subject-matter jurisdiction over this action and personal jurisdiction over the defendants, and that venue is proper in this District, no

charter of economic liberty aimed at preserving free and unfettered competition as the rule of

trade," the Sherman Act "unequivocally" establishes a policy favoring and protecting

competition.  N. Pac. Ry. Co., 356 U.S. at 4; see Nat'l Collegiate Athletic Ass'n v. Alston, 141

S. Ct. 2141, 2147 (2021) (describing Sherman Act as "task[ing] courts with enforcing a policy of

competition").  Though the language of Section 1 itself is "literally all-encompassing, the courts

have construed it as precluding only those contracts . . . which unreasonably restrain

competition."  N. Pac. Ry. Co., 356 U.S. at 5 (quotation marks omitted); accord State Oil Co. v.

Khan, 552 U.S. 3, 10 (1997).

       In decisions spanning a century, the Supreme Court has characterized the "true test of

legality" under the Sherman Act as "whether the restraint imposed is such as merely regulates

and perhaps thereby promotes competition or whether it is such as may suppress or even destroy

competition."  Bd. of Trade of Chi. v. United States, 246 U.S. 231, 238 (1918); accord Ohio v.

Am. Express Co., 138 S. Ct. 2274, 2284 (2018) [hereinafter Amex]; see Nat'l Collegiate Athletic

Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 104 (1984) [hereinafter Bd. of Regents]

("Under the Sherman Act the criterion to be used in judging the validity of a restraint on trade is

its impact on competition."); see also Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679,

692 (1978) (describing "the purpose of the analysis" as formation of "a judgment about the

competitive significance of the restraint").  Because a joint venture can involve some of the same

features as a merger—for example, the pooling of assets or resources—courts can, and often do,

call upon principles and tools of merger analysis when resolving antitrust challenges to joint

ventures.  See Doc. No. 320 ¶ 17 (citing examples, but by no means an exhaustive list, of such

---

more need be said here as to these preliminary matters.  See, e.g., Doc. No. ¶¶ 1-6.  Likewise, the
defendants have not challenged the standing of any plaintiff in this action.

cases); see also U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Guidelines for Collaborations Among Competitors § 1.3 (2000) (noting that some collaborations between competitors produce effects akin to a complete or partial merger, such that analysis provided in the agencies' Horizontal Merger Guidelines might be appropriate).

The Sherman Act distinguishes between concerted action by separate entities and independent action by a single firm.  Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 767-68 (1984).  A single firm faces liability only if it engages in conduct that "threatens actual monopolization."  Id. at 767.  Otherwise, "an efficient firm" may act vigorously to "capture unsatisfied customers from an inefficient rival, whose own ability to compete may suffer as a result," because such "competitive zeal" by a single actor "is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster."  Id. at 767-68.  Where concerted activity is involved, however, it is "judged more sternly," and "it is not necessary to prove [a threat of] monopolization."  Id. at 768.  The reason for this distinction between unilateral and concerted behavior is "readily appreciated":

> Concerted activity inherently is fraught with anticompetitive risk.  It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands.  In any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit.  This not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction.  Of course, such mergings of resources may well lead to efficiencies that benefit consumers, but their anticompetitive potential is sufficient to warrant scrutiny even in the absence of incipient monopoly.

Id. at 768-69.

Horizontal restraints—that is, agreements among "actual or potential rivals" that "eliminate[] some avenue of rivalry among them"—"have traditionally received antitrust's highest level of scrutiny."  11 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles & Their Application ¶¶ 1900, 1901b (4th ed. 2018) [hereinafter,

Areeda on Antitrust].[73]  Such restraints "as a class provoke harder looks than any other

arrangement"—harder, even, than mergers—because they generally pose a greater "threat of a

market output reduction" than do other classes of restraints.  Id. ¶ 1902a.  One reason for this is

that "the costs of forming a horizontal agreement are typically less than the costs of a merger

involving the same firms."  Id. ¶ 1902c.  As a result, competing firms might be tempted to pursue

a horizontal agreement "in order to obtain monopoly profits when a merger among the same

firms would not likely be profitable" or, perhaps, would be impossible or undesirable for other

reasons.  Id.  Independent economic actors neither eliminate this threat nor evade application of

the antitrust laws by pursuing a horizontal restraint publicly, through a joint venture established

contractually, rather than via a "clandestine and legally unenforceable" cartel.  Id.; see Bd. of

Regents, 468 U.S. at 113.

　　　　Generally speaking, a plaintiff alleging a violation of Section 1 must prove the existence

of (1) an agreement between or among separate entities that (2) unreasonably restrains trade and

(3) impacts interstate commerce.  Here, it is beyond dispute that the NEA constitutes an

agreement between two separate entities (American and JetBlue), and that it impacts interstate

commerce (air travel from one state to another).  The focus of this litigation and the Court's

analysis, then, is on whether the NEA amounts to an "unreasonable" restraint on trade.

　　　B.  Mode of Analysis

　　　　"In evaluating . . . claims under the Sherman Act, one of the first considerations a court

faces is determining the appropriate framework for its review . . . ."  Am. Steel Erectors v. Local

---

[73] This authoritative treatise, compiled and updated by two preeminent scholars of antitrust law, has been cited throughout both parties' papers and by numerous courts, including the Supreme Court, in antitrust matters spanning decades.  The Court references and relies upon it when helpful.

<u>Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers</u>, 815 F.3d 43, 60 (1st Cir. 2016).  The parties express a surface-level agreement that the rule of reason should provide the framework for the Court's analysis of the NEA.  <u>E.g.</u>, Doc. No. 322 at 19; Doc. No. 326 at 20.  They part ways almost immediately, though, when it comes to defining the contours of that framework.  <u>Compare</u> Doc. No. 320 ¶¶ 25, 132 (explaining the plaintiffs' view that the first step can be satisfied by proof of likely anticompetitive effects or harm to the competitive process itself, and if the analysis proceeds beyond identifying harms and benefits, the final step requires a weighing of such effects whether or not less restrictive alternatives exist), <u>with</u> Doc. No. 323 ¶¶ 10, 118 (describing the defendants' belief that the first step requires proof that the restraint already has caused identifiable anticompetitive harm, and that weighing harms and benefits, if ever appropriate, would occur only if a less restrictive alternative is proven).  The Court finds that the plaintiffs' recitation of these legal standards is the correct one, and it will proceed to outline the mode of analysis required by those standards here.[74]

When tasked with determining whether a restraint is "unreasonable," courts apply a level of scrutiny that varies depending on the nature of the restraint.  <u>See</u> <u>Cal. Dental Ass'n v. Fed. Trade Comm'n</u>, 526 U.S. 756, 780 (1999) (invoking <u>Areeda on Antitrust</u> and endorsing the view that the amount and quality of proof required depends on the circumstances); <u>accord</u> <u>Alston</u>, 141 S. Ct. at 2160.  Some agreements, including those fixing prices or allocating markets, "are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused."  <u>Copperweld</u>, 467 U.S. at 768; <u>accord</u> <u>Palmer v. BRG of Ga., Inc.</u>, 498 U.S. 46, 49-50 (1990) (per curiam); <u>see</u> <u>Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of</u>

---

[74] To be clear, the Court <u>rejects</u> the defendants' proposed conclusions of law to the extent they describe a rule-of-reason analysis that differs from the process described herein.

R.I., 373 F.3d 57, 61 (1st Cir. 2004). Others, including many mergers and joint ventures, "are judged under a rule of reason . . . designed to assess . . . actual effect," because the restraints "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively." Copperweld, 467 U.S. at 768. The Supreme Court has instructed that the rule of reason "presumptively applies," with per se liability limited to categories of agreements with known and obvious anticompetitive effects.[75] Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006); see Topco, 405 U.S. at 607 (acknowledging the rule of reason is "utilized . . . in evaluating the legality of most restraints").

Restraints arising in the context of joint ventures ordinarily are subject to the rule of reason, which involves some form of burden shifting but is not a rigid framework. See Alston, 141 S. Ct. at 2160 (admonishing that the rule of reason's steps "do not represent a rote checklist, nor may they be employed as an inflexible substitute for careful analysis"). The level of scrutiny and the magnitude of each party's burden depends on "the circumstances, details, and logic of a restraint," yielding "an enquiry meet for the case." Cal. Dental, 526 U.S. at 781. That said, the typical stages of the inquiry can be summarized as follows.

First, the plaintiff must make an initial showing that the challenged agreement "has a substantial anticompetitive effect." Amex, 138 S. Ct. at 2284. This showing can be made with direct proof of actual harm to the competitive process—including, though plainly not limited to, evidence that price has increased—or by indirect proof that such harm is likely to arise from the restraint. See Doc. No. 320 ¶ 26 (collecting cases); cf. Addamax Corp. v. Open Software

---

[75] Here, though the plaintiffs suggest the NEA has features that approach per se illegality, they have stopped short of pursuing a per se challenge. See Doc. No. 320 ¶ 14 (noting Alston treats the rule of reason as applicable to "most joint venture restrictions," and stating the plaintiffs have chosen to focus here "on proving their claims under that standard"). As such, the Court need not (and does not) conduct a per se analysis.

Foundation, Inc., 152 F.3d 48, 53 (1st Cir. 1998) (allowing that "a sufficiently high risk of an anticompetitive effect, coupled with marginal benefits . . . might justify condemnation under the rule of reason").  As explained further below, though this step can require an evaluation of market power, it need not always involve such an assessment.

If the plaintiff succeeds, the burden shifts to the defendant "to show a procompetitive rationale for the restraint."  Amex, 138 S. Ct. at 2284.  The measure of proof required of the defendant depends on the strength of the plaintiff's initial showing; that is, the more significant the anticompetitive effects, the heavier the defendant's burden to justify the restraints with evidence of procompetitive benefits.  See Bd. of Regents, 468 U.S. at 113.  This step of the analysis "does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason"; rather, the defendant must remain "focuse[d] directly on the challenged restraint's impact on competitive conditions" as it seeks to justify the restraint.  Nat'l Soc'y of Prof'l Eng'rs, 435 U.S. at 688.

Should the defendant satisfy its obligation, the ultimate burden returns to the plaintiff.  A plaintiff can prevail at this point with proof that "the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."  Amex, 138 S. Ct. at 2284.  Absent such proof, the plaintiff may alternatively seek to establish that, on balance, the restraint's anticompetitive effects outweigh any procompetitive benefits.[76]  See Michael A. Carrier, The

---

[76] The defendants misunderstand the plaintiffs' burden regarding less restrictive alternatives. Though they urge that a plaintiff is "require[d] to show the existence of less restrictive alternatives," Doc. No. 323 ¶ 118, suggesting failure to do so is fatal to an antitrust claim and balancing is never required, the defendants support this assertion by mischaracterizing Alston. Compare id. (asserting "Alston proves that balancing is not required," then describing the district court's decision as having rejected the challenge to one NCAA rule after finding that "the plaintiffs had not proffered less restrictive" alternatives, which "ended the analysis") (emphasis in original), with In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig., 375 F. Supp. 3d 1058, 1107 (N.D. Cal. 2019) (summarizing finding "that Plaintiffs have shown a

Rule of Reason: An Empirical Update for the 21st Century, 16 Geo. Mason L. Rev. 827 (2009) (canvassing decades of rule-of-reason cases and describing burden-shifting approach employed by federal courts); cf. Sullivan v. Nat'l Football League, 34 F.3d 1091, 1111 (1st Cir. 1994) ("[T]he rule of reason analysis requires a weighing of the injury and the benefits to competition attributable to a practice that allegedly violates the antitrust laws.").

As noted above, not every case within the reach of the rule of reason "is a candidate for plenary market examination." Cal. Dental, 526 U.S. at 779; accord United States v. Apple, Inc., 791 F.3d 290, 329 (2d Cir. 2015) (Livingston, J.). If an agreement "does not quite fit the bill of per se liability," but bears some hallmarks of such a restraint (e.g., apparent market division among the parties), its "anticompetitive effect on customers and markets" might be so apparent at first glance that a court may appropriately shift the burden promptly to the defendant "'to show empirical evidence of procompetitive effects.'" Am. Steel Erectors, 815 F.3d at 61 (quoting Cal. Dental, 526 U.S. at 775 n.12). That is, where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect," a more abbreviated analysis suffices.[77] Cal. Dental, 526

---

less restrictive alternative to the challenged rules," and then concluding the court could require the NCAA to adopt that alternative without the need for further weighing of the harms and benefits of the original restraint). The defendants also gloss over the extent to which their view invites absurd results in a category of cases they brush aside as "exceptional." Doc. No. 323 ¶ 119 (implicitly conceding that the bright-line rule they urge at step three would permit "a marginal but otherwise unattainable benefit [to] justify a clearly anticompetitive restraint"). To be sure, the burden-shifting process is meant to defer any need for weighing as much as possible. See 7 Areeda on Antitrust ¶ 1507a. In many cases—including this one—careful resolution of the early stages of the process can eliminate the need to engage in that thorniest of steps. Cf. Topco, 405 U.S. at 609 & n.10 (describing "limited utility" of courts in "examining difficult economic problems" and warning that full-blown rule-of-reason analysis can "leave courts free to ramble through the wilds of economic theory"). These realities, though, do not render the defendants' proposed interpretation of the law accurate.

[77] Some courts, parties, and commentators have characterized the reasonableness inquiry as proceeding via one of three distinct analytical methods: per se illegality, a "quick look," and the

U.S. at 770; cf. Nat'l Soc'y of Prof'l Eng'rs, 435 U.S. at 692 (noting some restraints "are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality"). For example, a "naked restriction on price or output," even in the context of an otherwise legitimate joint venture, "requires some competitive justification even in the absence of a detailed market analysis." Bd. of Regents, 468 U.S. at 109-10.

A scenario hypothesized by Professor Areeda and invoked by the Supreme Court provides a helpful illustration of such a restraint, neither "categorically unlawful in all or most of its manifestations" nor "universally lawful":

> [J]oint buying or selling arrangements are not unlawful per se, but a court would not hesitate in enjoining a domestic selling arrangement by which, say, Ford and General Motors distributed their automobiles nationally through a single selling agent. Even without a trial, the judge will know that these two large firms are major factors in the automobile market, that such joint selling would eliminate important price competition between them, that they are quite substantial enough to distribute their products independently, and that one can hardly imagine a pro-competitive justification actually probable in fact or strong enough in principle to make this particular joint selling arrangement "reasonable" . . . .

Phillip Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues, 37-38 (Fed. Jud. Ctr. 1981) [hereinafter Areeda Monograph]; accord Bd. of Regents, 468 U.S. at 109 n.39; 7 Areeda on Antitrust ¶ 1508. In such circumstances, it is possible to perform the rule of reason and balance the relevant considerations "in the twinkling of an eye." Areeda Monograph at 38.

As the following sections explain, the parties' presentation of this case places it within the realm of the rule of reason. Given the dearth of instances in which other courts have

---

full-blown rule of reason. See Herbert Hovenkamp, The Rule of Reason, 70 Fla. L. Rev. 81, 122 (2018) [hereinafter Hovenkamp]; cf. Am. Steel Erectors, 815 F.3d at 60 (listing the same three methods as options in "determining the appropriate framework" for review of a Section 1 claim). The Supreme Court, however, "has never embraced a three-silo" scheme; its collective guidance suggests courts should "divide the inquiry into smaller pieces, assessing evidentiary burdens at each stage," thus "structur[ing] the query in a way that [i]s relevant for the case at hand." Hovenkamp at 123-25; see also Cal. Dental, 526 U.S. at 770-71, 779-81.

confronted an arrangement like this involving domestic airlines, that placement is almost certainly appropriate.  That said, after a deep and searching review of the voluminous record in this case, the findings of fact set forth above compel the Court to conclude that the NEA is situated "at [one] end[] of the competitive spectrum," Alston, 141 S. Ct. at 2155, and that no deep and searching analysis is required in order to discern its unlawfulness.  See Doc. No. 320 ¶¶ 28, 30-35 (identifying cases in which some form of abbreviated review was deemed appropriate where horizontal restraint at issue involved obviously anticompetitive features).

####    C.  Substantial Anticompetitive Harm

"Every antitrust suit should begin by identifying the ways in which a challenged restraint might possibly impair competition."  7 Areeda on Antitrust ¶ 1503a (4th ed. 2017).  Here, notwithstanding the defendants' vigorous claims otherwise, the harms are considerable and obvious.

####    1.  *Direct Evidence of Actual Harm*

To start, the plaintiffs have proven that the NEA already has caused actual and substantial harm to competition.  The defendants have expended many pages in an effort to resist the evidence showing the NEA has already produced anticompetitive effects.[78]  E.g., Doc. No. 322 at 20-48.  Nevertheless, the Court concludes that the plaintiffs have proven actual competitive harm in at least three ways.

First, the NEA has eliminated the once vigorous competition between two of the four largest domestic carriers in the northeast, replacing it with broad cooperation in pursuit of the

---

[78] In so arguing, the defendants echo their experts' misapprehension of what "competition" means in the antitrust context.  To the defendants, anything that makes them stronger rivals to Delta and United is "procompetitive."  As the Court already has explained, the Sherman Act does not enshrine the defendants' view.

shared interests of their partnership.  American and JetBlue no longer operate in the northeast as

two distinct carriers engaged in direct competition with one another.  Rather, they work together

as one combined carrier with a single "optimized" network.  As JetBlue's CEO conceded on the

first day of trial, American and JetBlue no longer "compete with each other directly" within the

NEA region; they collaborate and make capacity (i.e., output) decisions "as a single airline"

would.  Trial Tr. vol. 1 at 182.

 The two carriers pool their resources and decide together what routes to fly within the

NEA and on what schedule.  As to each O&D, they decide together which partner should operate

the route—a decision which determines what aircraft will be used and, thus, what capacity (and

what amenities) will be available.  In other words, they coordinate in a way that impacts their

output within the NEA.  If both carriers will operate the same route, they do so on an

"optimized" schedule they jointly design to minimize (and, ideally, eliminate) instances in which

the two offer flights departing at or around the same time.  This optimized NEA schedule

emulates that of a single carrier.  Though American and JetBlue do not discuss the fares they will

set, they otherwise strive to provide a seamless product by operating, as much as they can, as a

single airline would.  Put simply, the NEA has replaced direct and aggressive competition

between American and JetBlue on nearly every front (including routes, schedules, and capacity)

with cooperation.  This, in and of itself, is a fundamental assault on competition and an actual

harm the Sherman Act is designed to prevent.  See Impax Labs., Inc. v. Fed. Trade Comm'n, 994

F.3d 484, 493 (5th Cir. 2021) ("Eliminating potential competition is, by definition,

anticompetitive."); Doc. No. 320 ¶ 36 (citing additional cases).

 The combination of two powerful competitors within the northeast effectively reduces the

number of market participants—and the number of distinct choices for consumers—by one.

Though various executives claimed American and JetBlue continue to compete in some fashion within the northeast, there is no credible support for those claims. There is no evidence the defendants have engaged in meaningful competition with respect to fares, schedules, service, advertising, or anything else within the NEA region (or even on the carve-out routes touching an NEA airport) since implementation of the partnership began. The absence of such evidence makes perfect sense, as the NEA is designed to render American and JetBlue agnostic as to which of them a customer selects, so that they will work together in pursuit of their shared, rather than individual, interests. The executives' testimony, at best, describes a philosophical hope or preference—and certainly a sincere one—that customers will choose their carrier. Such hopes, however, mean little in the face of overwhelming evidence that the NEA is meant to align the defendants' incentives and render them "metal neutral," and that it has done so. A hallmark of a free market is the incentive to fight for revenue and customers against one's direct competitors. As between American and JetBlue, that incentive is eliminated by the NEA.

The harm flowing from this loss of competition is magnified in the two cities within the NEA region. In Boston, only one other domestic carrier (Delta) occupies a sizeable share of the market. By ending competition between American and JetBlue, the NEA means that seventy-three percent of domestic flights at Logan are controlled by two (rather than three) entities: Delta and the NEA. In New York, where entry or expansion by any airline is severely limited due to the FAA's slot constraints at JFK and LaGuardia, the NEA ensures that eighty-four percent of the slots at JFK and LaGuardia are held by the same two (rather than three) entities that now dominate Logan.[79] Moreover, access to gates (at Logan), slots (at JFK and LaGuardia), and

---

[79] The percentages in this paragraph are derived from Exhibit 15 to Dr. Miller's reply report (PX 0955), which depicts carrier shares in 2019. Those percentages, for New York, are consistent with information contained in a Port Authority report also in the record (PX 0885). That report

runway timing (at Newark) are scarce and valuable resources, creating significant—and in some instances insurmountable—barriers to entry blocking other carriers from constraining harms flowing from the defendants' collaboration.  Carriers possessing the rights to slots at JFK or LaGuardia have an enormous interest in retaining and protecting those rights, and in not making them available to competitors.  And, the evidence establishes that slots rarely become available at all, despite testimony by executives of airlines in every category that they want to acquire more slots and grow their New York operations.

Conditions such as these make a horizontal collaboration like the NEA especially tempting; the competitive landscape is challenging, and the possibility of increased profits without the full cost of a merger is appealing, as is the prospect of operating with one powerful rival removed from the mix.  See Areeda on Antitrust ¶ 1902c.  The NEA not only pools for shared use valuable resources that the defendants once used to directly compete with one another, it also limits the ability of either partner to transfer slots to competing carriers, fortifying the barriers to outside competition.  In this way, the NEA "deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands," and "suddenly increases the economic power moving in one particular direction" in Boston and New York.  Copperweld, 467 U.S. at 768-69.  In constrained and concentrated markets like those within the NEA region, the reduction in competition and choice resulting from the defendants' cooperation is a real and substantial harm.[80]

_____

measures overall share (not only for domestic markets) and also references the NEA's effect of consolidating power in the region generally and at its individual airports among fewer competitors.  See PX 0885 at 4 ("Post-NEA, effectively three marketing carriers account for 72% of the capacity at Port Authority airports.").  The defendants have pointed to no evidence suggesting these values are not at least directionally correct.

[80] The Court specifically credits Dr. Miller's testimony and assessment that the domestic airline industry in general and the markets within the NEA in particular are highly concentrated, and

Second, and relatedly, by aligning its interests with a powerful GNC, JetBlue has

sacrificed a degree of its independence and weakened its status as an important "maverick"

competitor in the industry.[81]  This amplifies the anticompetitive effects flowing from the NEA's

transformation of these particular defendants from competitors into collaborators.[82]  See Doc.

No. 320 ¶¶ 93-95 (citing cases finding greater likelihood of harm where a restraint alters the

conduct of a particularly aggressive competitor in a concentrated market).

These effects are neither theoretical nor predictive.  Already, JetBlue has twice lost out

on valuable assets because regulators have found (and this Court agrees) the NEA entangles

JetBlue with American in a way that diminishes its status as an independent low-cost player in

the market.  Regulators in the U.K. found JetBlue no longer eligible for highly valuable, long-

term remedy slots that were available at Heathrow, and the FAA similarly awarded Spirit (rather

than JetBlue) a set of runway timings at Newark earmarked for a carrier that would provide low-

cost competition against United.  These unfavorable decisions were expressly tied to the NEA,

and they were rendered despite JetBlue having devoted time and advocacy to the pursuit of both

assets.  Thus, the Court concludes that the NEA has caused JetBlue to lose opportunities to

---

[80] that the NEA renders them more so.  As explained earlier, the Court rejects the opinions of the defense experts including their conclusions that the market is highly competitive and not concentrated.

[81] The parties all agree, and the Court finds, that JetBlue has played a unique role in the domestic air travel industry and qualifies as a "maverick" competitor for present purposes.  E.g., Trial Tr. vol. 1 at 250.  The Court finds JetBlue occupied such a role regardless of whether it remained an LCC or had migrated to a hybrid form somewhere between a traditional LCC and a GNC.  In either event, it was justifiably viewed by others—and it indisputably viewed itself—as a unique and disruptive force in the domestic air travel market.

[82] The free-market principles that underlie federal antitrust law value more than competition measured in terms of the number of firms in a market.  They protect against product standardization and the elimination of different types of choices that might appeal to different segments of consumers.  See 7 Areeda on Antitrust ¶ 1503a (providing example of agreement among tire manufacturers to produce only five types of tires, to the detriment of customers who prefer a sixth type of tire).

independently secure greater access to busy, constrained markets where its "maverick" competition would otherwise operate as an important competitive check on the conduct of larger carriers.

Though JetBlue has secured some access to Heathrow and a second London-area airport through other means, such access does not offset the harm flowing from the NEA. For one thing, the access JetBlue has obtained is less desirable in terms of number of slots, cost, location, and duration compared to the CMA slots it had sought. JetBlue's own advocacy powerfully articulates why access to London at Heathrow is preferable to the other London-area airports: it provides the strongest platform from which to challenge GNCs and their international alliance partners and thereby both gain market share and impact transatlantic fares. E.g., Doc. No. 325 ¶¶ 244-45 (citing such evidence). The CMA slots were more numerous, would have been awarded at no cost to JetBlue, and carried a defined and longer duration than the slots JetBlue is leasing now.[83]

Furthermore, JetBlue's motivation to compete aggressively with American's transatlantic fares is inevitably skewed by the MGIA. Though JetBlue's flights to London are outside the NEA (at present), revenue from American's transatlantic flights—including its flights to London that "compete" with JetBlue's—are included in the NEA's revenue-sharing provisions. In other words, JetBlue profits from its own transatlantic flying and from American's competing flights

---

[83] Additionally, there is no reason to think JetBlue could not have secured the CMA slots and leased additional slots from Qatar Airways, thereby expanding its potentially disruptive access to the London market. Though JetBlue's CEO minimized this possibility, saying JetBlue did not have enough larger planes to fly all of the CMA slots anyway, the Court notes that did not prevent JetBlue from seeking the slots in the first place. There is no business record or other objective proof that JetBlue's fleet is so limited. And, assuming the CEO correctly described the fleet, even he referenced at least one existing order for an additional long-range aircraft. Trial Tr. vol. 2 at 56-57.

to London.  This, along with the spirit of partnership underlying the NEA, distorts JetBlue's

incentives when it comes to pricing and other competitive decisions regarding its own

transatlantic service, in a manner articulated by Dr. Miller and corroborated by common sense.[84]

See id. ¶¶ 278-79.  Accordingly, the Court concludes that the NEA has already had a substantial

anticompetitive effect on JetBlue's unique role in market.

Third, though the plaintiffs have pursued a rule-of-reason challenge, at least one of the

NEA's core features closely resembles a restraint that is per se illegal: the defendants'

assignment of various routes to either American or JetBlue as part of their "optimization" of the

combined NEA network.  In New York's slot-constrained airports alone, American has exited

more than a dozen routes that both defendants served before the NEA.  This includes the high-

traffic Boston-to-LaGuardia route—a market in which Delta is now the only carrier besides

JetBlue providing nonstop service.  Moreover, the evidence suggests that the defendants'

ultimate objective, when the NEA is fully implemented, is to continue identifying which carrier

should fly which routes—with one carrier per market wherever possible.  Cf. Trial Tr. vol. 9 at

10 ("I think one of the things with the NEA is we're always looking to figure out which airline

would be best to serve a certain route.").

This is a straightforward example of market allocation.[85]  The Supreme Court has held,

on more than one occasion, that "an agreement between competitors at the same level of the

---

[84] The same spirit of partnership suggests the NEA's actual harms are not, or will not be,
confined to the northeast.  The degree to which the two carriers' operations are intertwined, and
their interest in the venture's success (as demonstrated by American's forgiveness of the
enormous transfer payment it was owed by JetBlue after the first year of the partnership),
strongly suggest their incentives to compete with one another in the same full-throated fashion
they did before July 2020 are diminished both within the NEA and beyond.

[85] The plaintiffs have raised this issue, accusing the defendants of unlawfully dividing markets
between them, throughout these proceedings.  See Doc. No. 80 at 29 n.7 (citing decisions finding
market-allocation restraints per se unlawful in opposition to the defendants' motion to dismiss);

market structure to allocate territories in order to minimize competition" is among "the classic

examples of a per se violation" of the Sherman Act.  Topco, 405 U.S. at 608; accord Palmer, 498

U.S. at 49-50.  Here, American and JetBlue are horizontal competitors who have agreed to make

network decisions together within the northeast.  In doing so, they decide which routes to serve,

and which partner should operate the planes serving them.  Already, that process has led to the

allocation of markets to one or the other defendant, either by one partner exiting a market both

previously served or by one partner tabling plans to enter a market already served by the other.[86]

This sort of "division of markets" is presumptively anticompetitive, without the need for

"elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use."  N.

Pac. Ry. Co., 356 U.S. at 5.  The defendants have not identified any fact or theory that

distinguishes their division of markets from those the Supreme Court has held unlawful per se.

The Court declines to apply per se analysis where the plaintiffs do not invoke it, but it does

conclude that the deliberate market allocation inherent in the NEA is strong evidence of its actual

anticompetitive effect.

In sum, the NEA has materially altered the competitive landscape in a highly

concentrated industry, and in a region with significant barriers to entry.  It has accomplished this

in at least three ways.  It has reduced the number of competitors (and, thus, choices) by one in a

setting where such a reduction is especially harmful.  It has reduced JetBlue's independence and

undermined its status as an important "maverick" competitor.  And, it has allowed the defendants

---

Doc. No. 320 ¶ 34 (identifying "market allocation" as "direct evidence of harm to the competitive process" in proposed conclusions of law).  The defendants have offered no counterargument on this point.

[86] Where the defendants have not allocated entire markets, they have essentially allocated segments of the schedule by organizing their respective departures into a timeline intended to avoid scenarios where both partners have closely-timed departing flights on the same route.  This is anticompetitive market allocation on a smaller scale.

to engage in horizontal market division, a practice historically and consistently invalidated as a matter of antitrust law.  Each of these three actual effects already have resulted from the NEA and, considered together, they amount to a powerful showing of serious anticompetitive harm.[87]

### 2.   *Indirect Evidence of Actual and Likely Harm*

Beyond the actual competitive harms already discussed, the plaintiffs also adduced evidence to alternatively satisfy the first step of a fuller rule-of-reason analysis by showing indirectly that the NEA threatens substantial and imminent harm to competition.  Though the above finding of actual harm is sufficient to shift to the defendants the burden of showing procompetitive benefits, the Court briefly addresses the plaintiffs' alternative showing for the sake of completeness.

To establish an antitrust violation based on indirect evidence, the plaintiffs must identify the relevant market, offer proof that the defendants have power in that market, and supply "some evidence that the challenged restraint harms competition."  Amex, 138 S. Ct. at 2284.  Here the parties agree, and the Court finds, that the relevant product market is "scheduled air passenger service," and the relevant geographic markets are O&Ds "in which Defendants compete or would likely compete absent the NEA."  Doc. No. 320 ¶ 44; Doc. No. 323 ¶¶ 33-34; see Doc. No. 320 ¶¶ 40-44 (outlining legal standards governing market definition).  Here, the geographic markets at issue are those O&Ds that include Logan as an endpoint, and those that include New

---

[87] The Court's conclusion does not depend on an endorsement of certain theories of the defendants' intent that the plaintiffs have pursued at various points in this case.  In particular, the Court need not find, and does not find, that the defendants intend to reinstate "capacity discipline" (as the plaintiffs have used that term), or that the NEA is a nefarious attempt by American to bring JetBlue under its proverbial thumb.  Cf. 7 Areeda on Antitrust ¶ 1506 (discussing the subordinate role of intent in antitrust analysis, and summarizes cases establishing that a restraint "threatening a substantial lessening of competition will be prevented no matter how innocent or procompetitive the parties' intentions").

York as an endpoint.  The parties vehemently disagree regarding the definition and scope of the

"New York" endpoint.  The plaintiffs point to evidence, including analysis by Dr. Miller, that the

geographic market should be limited to those markets beginning or ending at JFK or LaGuardia

only.  See Doc. No. 325 ¶¶ 111-34 (detailing the evidentiary basis for the plaintiffs' geographic

market definition).  The defendants challenged that evidence at every turn, urging that "New

York" must also include Newark.  See Doc. No. 324 ¶¶ 325-75 (expressing such challenges,

including various attacks on the plaintiffs' expert witnesses).

Ultimately, this dispute amounts to much ado about nothing.  For one thing, the tests used

by economists in the antitrust context are neither intended nor required to identify a single

relevant market.  See Doc. No. 320 ¶ 60 (explaining that there may be multiple relevant markets

or sub-markets, any of which might appropriately be examined to assess the competitive effects

of a restraint).  In other words, both sides might be right, and appropriate geographic markets

might exist with New York defined both ways.  The Court need not choose between the two for

purposes of this decision.  Besides the fact that this issue has no bearing on the finding that the

plaintiffs have produced direct evidence of actual harm, the record suggests that neither the

defendants' market power nor the indirect proof of harm here depends on whether Newark is

considered within a relevant geographic market.

However the geographic market is defined with regard to New York, the Court finds that

the defendants plainly have the power to influence prices.  This conclusion is overwhelmingly

supported by evidence ranging from various exhibits expressing the relative market shares of the

defendants and other carriers operating in Boston and New York, to business records showing

that strategic moves made by each defendant individually before the NEA (e.g., changes in fares)

unsurprisingly elicited competitive responses from the other major participants in those markets

(i.e., proof that the defendants have, in fact, exerted control over prices in the past).  See, e.g., PX 0885 at 4-5 (reflecting estimates of market share based on 2019 seat capacity in all three New York airports, with the defendants' combined shares exceeding thirty percent at JFK and LaGuardia, and totaling twenty-five percent in the region with Newark included); see also United States v. Visa U.S.A., Inc., 344 F.3d 229, 239-40 (2d Cir. 2003) (sustaining finding of market power based on "evidence of specific conduct undertaken" demonstrating "the power to affect price" and, alternatively, based on "large shares" such as twenty-six percent in "a highly concentrated market").  The Court rejects as patently incredible the defendants' assertions to the contrary.[88]  E.g., Doc. No. 323 ¶¶ 57, 61.

The defendants wield this power in a highly concentrated market with significant barriers to entry.  This is not a partnership between two autobody shops, in a county with dozens of other autobody shops, where new mechanics could enter and set up their own shops with relative ease.  This is the alignment of two distinct and powerful competitors in a unique and

---

[88] The Court has rejected the defense experts' opinions regarding market power for reasons already explained.  See discussion supra Section II(F).  Those opinions, had the Court credited them, would have supported the Court's finding of market power.  More than one defense expert insisted that, in the airline industry, market power derives from an airline's hub-carrier status.  Boston is one of JetBlue's two most important focus cities—its equivalent of a "hub"—and is a place where JetBlue has been the dominant carrier for years.  New York is JetBlue's hometown and most important focus city (again, akin to a GNC's hub), and it is also among American's hubs.  Both carriers have commanding shares of the available slots at the two slot-constrained airports in New York, and they are among the four largest domestic carriers operating there, no matter how the New York market is defined.  Thus, even were the Court to weigh the expert evidence it rejected, the reasoning described by those experts would confirm that both defendants have market power in the relevant markets.

Evidence describing the "JetBlue Effect" further supports a finding of market power here.  Studies have demonstrated the phenomenon works in both directions—that is, JetBlue's entry in a market triggers a drop in fares, and JetBlue's exit from a market triggers a rise in fares.  In a region where the defendants' resources are substantial, their presence is strong, and JetBlue's role in the market is unique, collaborative decisions about whether JetBlue should continue to serve or exit a market—and about whether JetBlue should or should not enter a new market—are exercises of market power capable of influencing fares in those markets.

congested region.  All other domestic carriers operating there can be counted using single digits.

American and JetBlue command at least a quarter of the market in the northeast generally.  Entry

and growth by other carriers (especially by LCCs and ULCCs) is complicated, and in significant

measure barred, by substantial constraints on access and infrastructure.  This context makes the

NEA more like the joint selling arrangement between Ford and General Motors that Professor

Areeda deemed unreasonable "in the twinkling of an eye," Areeda Monograph at 37-38, than it is

like a collaboration between small-town mechanics.  Additionally, as described in the foregoing

section, the NEA already has harmed competition by reducing the number of participants in the

market, diminishing JetBlue's independence and incentive to pursue disruptive strategies (at least

vis-à-vis American), and allocating markets between the defendants.[89]  All of this supports the

plaintiffs' alternative, indirect showing of anticompetitive harm.[90]

One more point is worth noting.  The antitrust implications of the NEA are, and always

were, apparent and understood by the defendants.  Though this partnership is in some ways

unprecedented, alliances among airlines that otherwise would compete are not.  As their papers

repeatedly concede, international partnerships like those upon which this one is based routinely

provoke scrutiny by regulators and require the conferral of antitrust immunity before they may

proceed.  That is because, absent such immunity, collaboration among competitors in this

manner—sharing profits or revenues and coordinating schedules and output—violates antitrust

law.  Such collusion is unlawful whether or not the participants believe it is beneficial to

---

[89] Neither the direct nor indirect theories of antitrust liability require proof of price increases, as competitive harms come in many other forms, and the Sherman Act plainly protects against all of them.  See Doc. No. 324 ¶¶ 100-03 (identifying the legal flaws in the defendants' focus on price effects alone).

[90] This conclusion does not depend on the dueling expert testimony or the challenges thereto, which the Court addressed earlier.  See discussion supra Section II(F).

themselves or the public.  If regulators agree that the benefits outweigh the harms, then those

regulators immunize the otherwise unlawful cooperation.  They do not decide it was lawful in the

first place.

Numerous executives representing different airlines said as much at trial, evincing

industry-wide awareness about the legal limits on their ability to even discuss certain topics with

their competitors.  The defendants also were concededly aware of this, as it is the reason they

consulted with antitrust lawyers and consultants and formed a "Clean Team" when devising the

relationship.  The fact that antitrust immunity sometimes is bestowed upon such alliances by

regulators (often with concessions, such as the divestment of slots or other resources to entities

the regulators believe will provide a competitive check on the alliance) has little bearing on the

questions before the Court.  The Court is not a regulator.  It is not empowered to excuse a pact

that contravenes federal law, as enacted by legislators and interpreted by the Supreme Court.

### D.  No Legitimate Justification or Cognizable Benefits

Given the strength of the plaintiffs' showing of anticompetitive harms, American and

JetBlue are obligated to produce substantial, credible, and empirical evidence establishing the

procompetitive benefits they claim arise from the NEA.[91]  Doc. No. 320 ¶ 104.  They have not

done so.  The Court will address each benefit the defendants have identified, explaining why

none are sufficient—independently or collectively—to overcome the plaintiffs' proof of the

NEA's illegality.[92]  See Apple, Inc., 791 F.3d at 330 (finding that agreement's "anticompetitive

---

[91] The defendants implicitly acknowledge that they bear a heavy burden to justify the significant
harms arising from their partnership.  See Doc. No. 323 ¶ 98 n.109 (conceding it "might be true"
that their burden would be a heavy one "if Plaintiffs had proven 'significant harms to
competition'").

[92] It is telling that the defendants go to great lengths in their post-trial papers challenging the
plaintiffs' showing of anticompetitive harm, attempting to avoid the need to proceed past the first
step of the antitrust analysis.  E.g., Doc. No. 322 at 20-48; Doc. No. 323 ¶¶ 8-95.  They devote

effects are easily ascertained," and promptly "shifting the inquiry directly to a consideration of the defendant's procompetitive justifications").

The defendants place great emphasis on "the underlying purpose of the NEA," which they characterize as a "procompetitive" effort to "to efficiently pool some of JetBlue and American's resources . . . and maximize customer value." Doc. No. 323 ¶ 105. They even peppered the introductory clauses in the NEA Agreement with self-serving declarations of their good intentions. E.g., PX 0001-a, "Recitals" ¶ 1 (claiming "aim [is] to deliver significant customer benefits" and "to enhance the experience of passengers" in the region). This, however, is simply not a fair characterization of the NEA's "underlying purpose," based on the weight of the evidence presented at trial. It is abundantly clear to the Court that the defendants' primary motivation in establishing the NEA was to strengthen their own competitive positions against Delta (and, to a lesser extent, United) in Boston and New York. Their own witnesses, business records, and submissions to the Court have repeatedly described this purpose. E.g., supra note 21 (citing multiple instances of testimony describing purpose as competing more effectively against Delta); DX 0037 at 2 (reflecting American's description of a potential collaboration with JetBlue as intended to "[a]ddress AA/B6 'incomplete' customer proposition relative to DL/UA in NYC" (emphasis added));[93] Doc. No. 322 at 51 (describing NEA as a "solution" allowing American to "become a stronger competitor against Delta and United," and as "a way" for JetBlue "to answer the competitive threat from Delta in Boston").

The problem for the defendants is that this purpose—strengthening their own position against one or two rivals—is not a valid justification, and cannot render an unreasonable restraint

---

many fewer pages and paragraphs to addressing their step-two burden. E.g., Doc. No. 322 at 48-54; Doc. No. 323 ¶¶ 96-111.

[93] "AA" is the airline code for American, "B6" is JetBlue, "DL" is Delta, and "UA" is United.

on trade reasonable, under the Sherman Act.  That is so because the purpose itself substantially

and unreasonably interferes with, rather than promotes, the operation of the free market.  The

defendants' desire to keep pace with Delta or to replace it as the strongest domestic competitor in

the northeast might be "procompetitive" in the business sense of the word, but it is not on these

facts "procompetitive" under the law.  Cf. Grappone, Inc. v. Subaru of New Eng., Inc., 858 F.2d

792, 794 (1st Cir. 1988) (observing that "the antitrust laws exist to protect the competitive

process itself, not individual firms").  Essentially, American and JetBlue defend their partnership

by broadly urging that "bigger is better," and by claiming that they will be able to match or

overtake (or, as they say, "compete with") Delta only if they are permitted to stop competing

with one another.  That is not the kind of "competition" valued and protected by the Sherman

Act.  Federal antitrust law does not concern itself with which competitor wins the largest share of

a market.  See Apple, Inc., 791 F.3d at 331 (noting "market dominance may . . . arise as a

consequence of a superior product, business acumen, or historic accident, and is not only not

unlawful; it is an important element of the free market system").[94]  And, it does not permit the

elimination of competition between two significant market participants, just so that those

---

[94] Delta is entitled to the fruits of the success it has achieved by operating independently in the
free market.  See Trial Tr. vol. 5 at 28 (reflecting acknowledgement by American's CEO that
"United and Delta . . . grew and they were able to take share from" American by adopting a
different approach to growth); id. at 61-62 ("Delta has done a really nice job of running a
network airline" and "of actually growing and making sure that their network serves customers
on a basis that allows them to achieve a higher level of profitability.").  The principles
underlying the Sherman Act encourage market participants to innovate and compete—
independently and efficiently—to defend or win back shares lost to their adversaries.  Those
principles are thwarted when less efficient competitors use their rival's success as an excuse to
collaborate, rather than continue competing.

participants can unseat the market leader.[95]  See id. at 332 (describing a "preference for collusion over dominance" as "wholly foreign to antitrust law").

Thus, the central thrust of the NEA—to strengthen the defendants with respect to Delta and United—is anticompetitive for purposes of the Sherman Act.  It distorts the concept of free-market competition to pretend that Delta and United are the only two competitors that presently matter in the northeast, then insist that American and JetBlue must be allowed to join forces so that a third competitor becomes available.  That is simply not a reasonable characterization of the industry or its participants, either in general or in terms of the evidence before the Court.  "In short, [the defendants] err in equating a symptom"—two strong competitors with market-leading hub operations in the northeast—"with a disease (a lack of competition), and then err again by prescribing the disease itself as the cure."  Apple, Inc., 791 F.3d at 332 (Livingston, J.); cf. 11 Areeda on Antitrust ¶ 1907b (listing defenses that courts generally reject, including arguments that limitations on some forms or avenues of competition will be offset by increased competition elsewhere, and noting that the "competitive philosophy of our antitrust laws" presumes that the "market aims to weed out," rather than prop up, inefficient market participants).

---

[95] This is especially so where the competition being eliminated is not among bit players occupying insubstantial shares of the market.  Though they wish to minimize their power in New York, their own records acknowledge that they are major factors in the New York market, even with Newark included.  See, e.g., DX 0037 at 3 (predicting collaboration between American and JetBlue would improve their "offering rank" in domestic markets out of New York from third and fourth to second).  This is not a case where the defendants are "two small companies" seeking to collaborate so that they can "compete more effectively with larger corporations dominating the relevant market."  Brown Shoe Co., 370 U.S. at 319.  And, though there is evidence the pandemic sent the entire airline industry spiraling, neither defendant has argued or offered even a shred of evidence that one or the other of them was "failing" and, therefore, pursued the NEA to collaborate with a "financially healthy" partner in order to remain "a vital competitive factor in the market."  Id.  In fact, both defendants have offered contrary evidence, demonstrating that they each intended to continue competing in both NEA cities, with or without the partnership.

American and JetBlue also endeavor to fit the NEA within the realm of productive or otherwise legitimate joint ventures with restraints that are ancillary to their larger, permissible purposes. They invite the Court to approach the NEA the way other courts have approached various sports associations, or collaborations by two competitors with different skills or resources to produce a new product. See Doc. No. 322 at 51-52 (describing NEA as "a classic pooling of complementary assets that . . . results in an attractive, saleable new network"). This is an effort to force a square peg into a round hole.

The NEA is not a venture with an overarching legitimate purpose under the Sherman Act, to which certain restraints with anticompetitive features are ancillary. As explained already, the overarching purpose of the NEA is anticompetitive. Through the NEA, American and JetBlue cease to compete and, instead, operate as a single carrier in the northeast. That is the core of the relationship, and it is a naked assault on competition.[96] Collaboration between the defendants is not required in order to create a new product or market that could not otherwise exist. Cf. Alston, 141 S. Ct. at 2155 (acknowledging NCAA "is a joint venture" where "collaboration among its members is necessary if they are to offer consumers the benefit of intercollegiate athletic competition"). They implicitly concede that other firms (Delta and United), acting independently, already offer "products" comparable to the one they claim their collaboration will enable—a broad network providing seamless access to a diverse array of domestic and

---

[96] The Sherman Act does not countenance, and the Court cannot endorse, the view expressed by JetBlue's CEO that certain NEA markets are "much more competitive" now that American has exited, leaving only two competitors rather than three—JetBlue and Delta—offering nonstop service in at least one of them. Trial Tr. vol. 1 at 179.

international O&Ds.  Indeed, American itself offers such a product, albeit less robustly in New York City.[97]

Similarly, the defendants have not established their pooled assets are "complementary," cf. Doc. No. 325 ¶ 444 (citing evidence that, in 2019, JetBlue served only four airports American did not already serve), such that they enable the defendants to create an innovative product. They are not, for example, pooling resources to engage in research they could not independently fund, with the aim of developing a new, more efficient way to train pilots or service aircraft. They are not combining capital to fund the renovation and expansion of a terminal at an airport in the northeast—a project neither might undertake independently, and which will result in an increase in both output (more daily flights from the expanded terminal) and customer service (better facilities available to customers using the renovated space).  A joint venture through which the carriers were collaborating to achieve procompetitive and otherwise legitimate ends such as these examples might justify ancillary restraints that otherwise appear anticompetitive. For example, they might agree not to share their joint research with other carriers, or not to lease gates at the new terminal to other carriers for a period of time, in order to protect and justify their investment in the venture.

But, of course, the NEA does none of these things.  Its anticompetitive features are at its core, ancillary to no overarching legitimate objective.  The defendants cannot evade scrutiny of their deliberate decision to eliminate competition between them by calling it a "joint venture" and pointing out that other joint ventures have often produced efficiencies.  The Court is

---

[97] Though the defendants insist the "product" is the network, neither the record nor the Court's own experience suggests that is necessarily the "product" most airline customers seek.  For a majority of travelers, the product they buy is a ticket for a flight (or flights) from one place to another.  The Court is not convinced the NEA revolutionizes that "product" in any way.

concerned only with the NEA, the purpose and effects of which are to suppress, rather than enhance, competition.[98]

Beyond the venture's primary objective and essential character, the defendants identify certain benefits or efficiencies they claim the NEA has produced.  None are sufficient to satisfy the defendants' burden in the face of the strength of the plaintiffs' showing of anticompetitive harms.  Some benefits the defendants claim amount to variations on the theme that they can be stronger in the northeast if they can combine, rather than compete with, their resources.[99]  As explained already, that theory is not "procompetitive."  Examples of this type of claimed benefit include:  the creation of a larger and "seamless" NEA network with "better connectivity" by adding together and "optimizing" the defendants' separate networks; the creation of "better schedules" by allocating various routes to only one or the other defendant and spreading out their respective flights on shared routes such that they no longer compete head-to-head; and the defendants' perception that they can compete better for corporate clients if they rely on their combined network (and, potentially, seek joint contracts) instead of having to compete

---

[98] In assessing effects, the Court is concerned primarily with actual, short-term impacts the NEA has had, rather than more speculative effects the defendants predict will occur at inexact points in the future.  Cf. 11 Areeda on Antitrust ¶¶ 1906, 1906b (explaining why restraints are assessed based on their effects "in the short run" rather than uncertain claims of long-term benefits).  This is in line with views the defendants themselves have espoused in this case, accusing the plaintiffs of condemning the NEA based on speculation about future harms.  E.g., Doc. No. 322 at 24 (urging "actual effects" are "the most important component of any rule of reason analysis," and suggesting the Court should not "accept[] predictive proofs").

[99] Another way of characterizing some of the defendants' claims, besides "bigger is better," is that they believe "reducing the number of choices produces more choices."  This is so, for example, with respect to their decision to allocate the Boston-to-LaGuardia service to JetBlue.  The removal of all American flights on that route eliminates one carrier entirely from the menu of available options, but the defendants tout a few more daily flights by JetBlue as increasing the choices and competition there.  Additionally, evidence the defendants became in some ways more appealing to certain categories of customers within the NEA is not evidence competition, generally and objectively, is enhanced in the marketplace.

separately.  These features arise only if the defendants mimic one carrier, elect not to compete

with one another, and cooperate in ways that horizontal competitors normally would not.  This

elimination of competition negatively impacts the number and diversity of choices available to

consumers in the northeast.  As such, "benefits" arising in this way cannot justify the defendants'

collusion.

Other claimed benefits lack evidentiary support entirely or find support only if an

artificially narrow lens is applied.  For example, as the Court's findings of facts explain, see

supra note 44, the defendants have claimed, but not proven, that their fleets have actually grown

as a result of the NEA.  Likewise, they have claimed, but not proven, that corporate customers in

the northeast previously viewed Delta and United as their only choices, and that such customers

are now available to the defendants only because of the NEA.[100]  Though they insist the NEA

has provoked competitive responses from Delta and United (the only "competitors" about whom

the defendants are concerned), their actual evidence of such responses is milquetoast, at best.[101]

Their claims that the NEA has led to growth and increases in capacity rely on evidence that

examines only the northeast.[102]  They also disregard evidence that capacity growth within the

---

[100] What the record does show is that both defendants had contracts with many corporate clients
in the northeast, that some (but not all) chose to extend their existing contract discounts to NEA
codeshare routes, and that no customers have requested joint bids from the defendants as the
NEA would permit.  There is simply no significant evidence the defendants were losing
corporate accounts before the NEA or have gained new accounts because of it.

[101] This, again, is underscored by the defendants' own strategic decision to call no live witnesses
able to illuminate the views of these competitors.  The deposition excerpts provided describe, at
best, a handful of modest changes by Delta to its schedule or service that: are in line with its
typical responses to any moves by any competitors, included changes that were already part of
the carrier's plans, and reflected general recovery trends in New York in the wake of the
pandemic.

[102] Dr. Israel restricted his analysis to the northeast and relied on models selected by the
defendants that attribute to the NEA growth that the parties would have or could have pursued
without the NEA.  For example, the v2 schedule and its corresponding internal projections
incorporate flying that was possible using both defendants' separate order books (i.e., fleet

NEA comes at the expense of resources and output by the defendants elsewhere,[103] as well as evidence the defendants each would have pursued at least some of this growth with or without the partnership.[104] See, e.g., Doc. No. 323 ¶ 110 (acknowledging that "funding" NEA growth required a "small service reduction elsewhere and a modest number of redeployed aircraft" by American, pending the acquisition of new incremental aircraft at some point in the future); Doc. No. 325 ¶¶ 464-70, 497 (describing JetBlue's fleet constraints, its reallocation of resources to the northeast from elsewhere, and evidence showing JetBlue had to stop offering Mint service on some transcontinental routes in order to provide it on other routes it prioritized due to the NEA).[105]

To be sure, the defendants have identified new service they have launched from the northeast since the NEA was implemented.  See DX 1087 (listing in two slides markets the

---

additions that have not been realized yet and were available to the defendants before the NEA) and growth that JetBlue planned to pursue independently.  See, e.g., PX 0751 at 4 (reflecting internal discussion regarding whether Clean Team models were "attributing a lot of revenue to [the NEA] that would have already existed").

[103] Even if one looks only at capacity within the NEA, the growth the defendants identify is not uniform.  For example, growth in New York (incentivized by the threat of losing slots there) is not matched by growth in Boston.  See Doc. No. 325 ¶¶ 424-27 (describing American's post-NEA plans to reduce service in Boston).

[104] Capacity growth that comes from American's upgauging of its own regional jets is growth the evidence suggests American could have pursued, and planned to pursue, with or without the partnership.  E.g., Trial Tr. vol. 7 at 154 ("Look, could we have upgauged [without the NEA]? Sure we could have.").  The same goes for some amount of JetBlue's additional New York flying, which JetBlue intended to pursue via a slot lease to which American already had agreed. See PX 0527 at 1 (confirming JetBlue's independent long-term plan, as of mid-June 2020, included increased flying at JFK using slots it had arranged to lease from American apart from the NEA).

[105] The defendants claim the NEA improved quality by providing more lie-flat service on transcontinental routes, but JetBlue's removal of Mint service in other markets reflects a corresponding decrease in quality elsewhere.  Similarly, to the extent the defendants point to "quality of service index" scores as evidence the NEA has improved customer experiences, the plaintiffs explain that such scores are, at best, ambiguous here.  See Doc. No. 325 ¶ 472 (describing evidence suggesting JetBlue's overall quality has suffered in the wake of the NEA).

defendants served from NEA airports in late 2022 that they had not served in 2019 or 2020).  But even this is not supported strongly and unambiguously by reliable evidence.  For example, the chart the defendants most often cite as proof of these routes does not itself characterize them as having been launched "because of" the NEA; rather, it lists new services that began "since" the NEA.  Id.  It says nothing about whether either defendant served the routes before 2019, whether the routes were included in long-term plans the defendants independently developed and would have pursued without the NEA, or whether they arose from the substantial shift in flying patterns occurring during and after the pandemic.[106]  It also does not identify the sources of the planes allocated to these new markets.  As the Court already has explained, the defendants have not shown they presently possess new aircraft with which they can fund such expansion, so the only possible conclusion is that the new flying is funded by planes pulled from other locations.[107]  Testimony of witnesses confirms that at least a few of these new routes—American's long-haul service to Colombia—were not profitable and already have been cancelled.[108]  No objective or

---

[106] For example, the Court cannot discern (because the defendants have not proven) whether any of the routes added by JetBlue are among those JetBlue intended to launch on its own, using slots it had agreed to lease from American before the NEA was negotiated.

[107] The defendants also have not offered any objective evidence showing how many spare aircraft they possessed, if any, at any point in time.  Though various witnesses referenced planes "parked in the desert" during the height of the pandemic, and though the Court noted that specific details about the defendants' fleets would be helpful, the defendants have directed the Court to no records from which it can meaningfully determine what decisions and changes the defendants made regarding their fleets, and why, during the relevant time period.

[108] This is consistent with the defendants' explanation of how JetBlue came to owe American a transfer payment in excess of $200 million after 2021, following American's launch of new long-haul service that did not correspond with actual demand for such service and, thus, was not profitable.  Even as to the long-haul route American executives touted most in this litigation—a flight from JFK to Tel Aviv—there is no evidence showing whether that route was successful (at all, or compared to whatever service American ceased elsewhere in order to supply the aircraft now flying to Tel Aviv), or whether American's entry impacted fares or demand in that market (which, American concedes, already was served by Delta, United, and at least one international carrier).

helpful corroboration is provided by citations to the defendants' own internal slide decks pitching the benefits or success of the NEA without providing reliable sources or support for the claims contained therein.  E.g., DX 0055 at 3 (pitching NEA in a November 2021 "Customer Announcement" sales slide deck that is plainly intended to advertise the partnership rather than provide an objective assessment of it).[109]

Because the anticompetitive effects of the NEA are clear, it is the defendants' burden— and a heavy one—to justify their collusion.  The evidence they have provided is not sufficient to support a finding that they have added new flying they could not otherwise have pursued,[110] without meaningful reductions in flying elsewhere, and in a manner that produces benefits substantial enough to undermine the plaintiffs' step-one showing.[111]

---

[109] The defendants have distanced themselves from other internal documents—most especially those reflecting their own long-range plans and suggesting independent plans to grow that are in tension with their claims in this lawsuit—conceding such documents are prepared with a specific audience and/or purpose in mind.

[110] The defendants admit that some amount of the increase in flying comes from using American's existing slot portfolio harder, and by adding weekend flying.  The Court cannot attribute such growth to the NEA.  American admittedly and knowingly underutilized its slot portfolio in the past.  The record does not support a finding that it could not have used its slots more itself (vs. it simply made a business decision not to do so, and to devote its resources elsewhere), or leased the slots to JetBlue (which, in turn, would have used them harder and generated more flying in New York) without the NEA.  American's inefficiency in New York before the NEA cannot be used to justify an anticompetitive collaboration with one of its fiercest horizontal competitors.  There also is no evidence that one or both defendants were in any way prevented from adding weekend flying, to answer demand for leisure travel that arose in the wake of the pandemic, independently.

[111] The plaintiffs argue the defendants cannot justify the harms the NEA causes in one place (e.g., the loss of a choice and reduction in frequency and capacity on the Boston-to-LaGuardia route) by pointing to a benefit they created in another place (e.g., the addition of a long-haul flight from JFK to Tel Aviv).  Though the Court does not rest its decision on this point, it does have logical appeal and highlights the extent to which the defendants ask the Court to authorize their decision to tradeoff competition in some places for benefits in others.  The Court's role is to enforce limits on agreements that restrain trade, not to evaluate the merits of how private businesses seek to succeed or to resolve whether it is sensible to focus resources in certain places rather than others.

All that remains are claims of more flexible loyalty benefits.  The ability to earn and spend frequent flyer miles on either carrier might increase the defendants' appeal for some customers—likely the "power" travelers American deems most valuable.  However, it is the role of the marketplace, not the Court, to judge whether such a feature is appealing or worthwhile.  And even if this feature is cognizably "procompetitive," it is de minimis compared to the anticompetitive harms the Court has found and, thus, insufficient to save the NEA from condemnation.[112]

In sum, focusing on the short term, American and JetBlue have not adduced credible evidence demonstrating that the NEA has yielded procompetitive benefits capable of justifying its substantial anticompetitive harms.  The features they identify are "benefits" only if the Court disregards the free-market principles underpinning the Sherman Act and artificially limits its review to those places and categories of customers to which the defendants have reallocated their resources (ignoring the fact that they did so at the expense of other places and other categories of customers).  The Court cannot, and will not, do so.

E.   Reasonable Alternatives and Balancing

As the above sections establish, the plaintiffs have made a decisive showing of anticompetitive harm, against which the defendants have offered insubstantial evidence of cognizable procompetitive benefits.  Because of this, the NEA fails after the first two steps of a rule-of-reason analysis, however calibrated, and the inquiry need not proceed further.  As such, the Court will not address in detail reasonable alternatives or balancing of effects, commenting only briefly on each of those questions.

---

[112] It also is plainly achievable through less restrictive means.  The record establishes airlines regularly establish more limited relationships with one another through which some amount of codesharing and loyalty reciprocity are offered without broader coordination.

As noted in the preceding discussion of the benefits alleged by the defendants, the objectives American and JetBlue sought to realize via the NEA could have been achieved by one or more less restrictive alternative arrangements.  For example, American and JetBlue could have employed a more limited WCIA-style arrangement to leverage any complementary aspects of their networks, better compete with Delta, and use JetBlue's domestic traffic to feed American's international service out of the northeast.  In such an arrangement, the two carriers would not coordinate with one another on scheduling, network, or capacity decisions, and they would not share revenue on any markets where they provide competing nonstop service. American and Alaska entered just such a partnership, and they both consider it successful despite its limitations.  Though the defendants have offered testimony that this alternative was not the one they deemed most appealing, they have not established it would not have been viable.  See Doc. No. 320 ¶¶ 125-30 (correctly outlining the standards governing the step-three analysis).

In fact, the record suggests many of the objectives cited by the defendants could be achieved via some degree of codesharing and loyalty reciprocity, both of which are features of the WCIA.  Domestic carriers—American and JetBlue included—commonly use such arrangements to provide their customers with access to additional destinations (e.g., to smaller airports in Hawaii), and to allow their frequent flyers to earn and use rewards on their partner's flights.  Supplementing those features with a slot lease in New York, such as the one the defendants were negotiating before the pandemic, would enable growth by JetBlue in New York, more efficient use of the leased slots, and the reallocation of American's own resources to new markets (including those potentially fed by JetBlue's increased New York operation).

Such an alternative, which the plaintiffs have identified and supported with evidence, would be less restrictive than the NEA and would likely satisfy any burden the plaintiffs bear at

step three of a full-fledged rule-of-reason analysis.  Of course, that burden would require proof

that the posited alternative would produce only those benefits that are cognizable under the

Sherman Act and proven by the defendants at step two.  A "reasonable" alternative need not

produce benefits claimed by the defendants but rejected at step two as not amounting to

procompetitive effects for Sherman Act purposes.  Here, the class of cognizable benefits is

exceptionally narrow, and the alternative the plaintiffs have identified appears both feasible and

capable of accomplishing them.

Finally, if the defendants' meager showing at step two were somehow sufficient to

warrant further analysis, and if the alternative identified by the plaintiffs were not enough to

warrant a finding in their favor at step three, the Court would proceed to balance the established

harms to competition against the established and cognizable procompetitive benefits.  See id.

¶¶ 132-35 (describing legal basis for ultimately engaging in weighing).  Here, in light of the

Court's lopsided findings at steps one and two, the scales would tip overwhelmingly in the

plaintiffs' favor.[113]

IV.    CONCLUSION

The question before the Court is whether the NEA suppresses or promotes competition.

The record supports only one answer.  The NEA, operating as it was designed and intended by

---

[113] This determination is not altered, and the NEA's anticompetitive effects are not meaningfully tempered, by the defendants' commitments to the DOT or by their voluntary decision to exclude from the NEA the handful of routes on which the anticompetitive harms are too obvious for the defendants to deny.  The DOT commitments do nothing to address competitive harms in Boston. Moreover, the New-York-focused growth commitments incentivize the defendants to reduce capacity outside New York in order to artificially inflate capacity in the airports where slots are at risk.  This magnifies the competitive harms by reducing output in locations other than New York.  As for the carve-out routes, the defendants have not excluded those routes from all aspects of the NEA, and they have demonstrated by their conduct already that the spirit of partnership and their mutual desire for the NEA to succeed tempers the rigor with which they honor the terms of the contracts that bind them.

American and JetBlue, substantially diminishes competition in the domestic market for air travel. It does so by combining the Boston and New York operations of two airlines that are among the most significant competitors in that region.  These two powerful carriers act as one entity in the northeast, allocating markets between them and replacing full-throated competition with broad cooperation.  The plaintiffs have convincingly established that this arrangement immediately and substantially upsets the competitive balance in a highly concentrated industry, not only on a single overlap route or a handful of O&Ds, but throughout the northeast and beyond.  The defendants have offered minimal evidence of any cognizable procompetitive effects arising from the NEA.  Accordingly, having carefully parsed the record and evaluated the evidence in light of the governing legal standard, the Court concludes that the NEA plainly violates Section 1 of the Sherman Act.

V.    <u>ORDER</u>

In light of the foregoing Findings of Fact and Conclusions of Law, it is hereby

ORDERED:

1)  That the defendants are PERMANENTLY ENJOINED from continuing, and restrained from further implementing, the Northeast Alliance, effective thirty days after the date of this Order.

2)  That within twenty-one days of this Order, the parties shall submit a proposed order reflecting their joint or separate positions regarding the text of the injunction.[114]

3)  That any exhibits which were not presented to a witness who testified in person at trial, cited in any party's post-trial papers, or cited by the Court in this decision are hereby STRUCK from the record.  The parties shall confer and, within twenty-one

---

[114] By participating in the crafting of the proposed order, the defendants do not waive any rights.

days of this Order, file a list on the docket containing a complete list of the exhibits

that remain in the record in light of this ruling.

4) That to the extent any prior Order in this case has sealed any of the information

contained herein, such prior Order is AMENDED <u>only</u> to the extent that such

information is UNSEALED,[115] based on the Court's determination that any

confidentiality or other consideration favoring sealing is substantially outweighed by

the public's right to access and understand the Court's decision.

5) That the Motion to Correct Trial Transcript (Doc. No. 334) is ALLOWED insofar as

it is UNOPPOSED—i.e., as to the changes identified in Appendix A to the Motion

(Doc. No. 334-1).  The motion is DENIED as to the one change the defendants

oppose, though the Court notes the disputed testimony was immaterial to its decision.


SO ORDERED.


 /s/ Leo T. Sorokin
United States District Judge

---

[115] As to sealed exhibits, this Order unseals only the specific portions quoted, discussed, or cited in these Findings of Fact and Conclusions of Law.  For example, if the Court cited a single page of a multi-page sealed document, only the single cited page is unsealed, and the remainder of the document remains sealed.