**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> AMERICAN AIRLINES GROUP INC. and JETBLUE AIRWAYS CORPORATION, <br><br> *Defendants*. | Case No. 1:21-cv-11558-LTS |

**PLAINTIFFS' MOTION FOR ENTRY OF FINAL JUDGMENT**
**AND PERMANENT INJUNCTION**

**<u>INTRODUCTION</u>**

Defendants American Airlines and JetBlue Airways engaged in "a naked agreement not to compete with one another." *United States et al. v. American Airlines Group, Inc. and JetBlue Airways Corporation*, Civil No. 21-11558, slip op. at 4 (D. Mass. May 19, 2023), ECF No. 344, ("Opinion", Dkt. 344). They entered into their anticompetitive agreement, called the Northeast Alliance ("NEA"), with their eyes wide open to the antitrust risks involved and chose to implement the agreement while they knew that the U.S. Department of Justice was investigating it. Opinion at 78-79; Pls' PFOF ¶ 350, Dkt. 332. After a lengthy trial and review of an extensive record, the Court ruled that the NEA "plainly violates Section 1 of the Sherman Act." Opinion at 93.

The Court thus permanently enjoined Defendants "from continuing, and restrained from further implementing" the Northeast Alliance, effective 30 days from the May 19 order. After finding that the NEA considered as a whole, not merely specific aspects of it, was anticompetitive, the Court ordered the parties to submit a proposed order reflecting their joint or separate positions

on the language of the proposed permanent injunction. Opinion at 93. Attached as Exhibit 1 is Plaintiffs' Proposed Final Judgment ("PFJ").[1]

Plaintiffs' PFJ provides the framework for terminating the illegal NEA and helps prevent Defendants from committing the same or similar violations of the antitrust laws in the future. There are three elements to the PFJ. First, it orders Defendants to terminate immediately most provisions of the NEA Agreement and its related contracts to restore, as quickly as possible, the competition that existed between American and JetBlue before formation of the NEA. Second, Plaintiffs' PFJ prevents American and JetBlue from re-forming the NEA, crafting similar arrangements that harm competition in the same manner, and misusing the other Defendant's competitively sensitive information from the NEA through appropriately tailored "fencing-in" relief. Finally, the PFJ appoints an antitrust compliance monitor to ensure that the Defendants comply with the PFJ.

Plaintiffs' PFJ also instructs American and JetBlue to prevent undue disruption to travelers arising from termination of the NEA. Having entered the illegal agreement, Defendants have the burden to identify any temporary and narrowly tailored mitigation measures necessary to avoid passenger disruption. Plaintiffs have engaged with Defendants over the past two weeks, and through that process identified two areas where temporary measures are appropriate. The first, identified in Plaintiffs' initial proposal to Defendants, helps ensure that scheduled flights are not affected by the injunction. The PFJ requires Defendants to fulfill the terms of tickets already issued to travelers, and instructs Defendants to develop a plan, and to submit it to Plaintiffs and ultimately

---

[1] Plaintiffs base this submission on Defendants' redline of Plaintiffs' draft PFJ that Defendants provided to the Plaintiffs on Monday, June 5, 2023. The Plaintiffs shared draft PFJs with the Defendants on May 31, June 7, and June 8. Defendants represented to Plaintiffs during a meet and confer today, June 9, that they had no substantive changes to their June 5 draft redline. Defendants then sent a revised version containing substantive changes at 5:09 pm on June 9. Plaintiffs' submission does not respond to substantive changes included in Defendants' revised version.

to the Court, for winding down slot and gate leases by a date certain in a way that minimizes disruption to travelers.  Second, Defendants have represented that they require up to thirty days to terminate the Frequent Flyer Agreements without disruption due to certain information technology limitations.  Defendants have identified no other temporary and narrowly tailored mitigation measures that are necessary, instead seeking to *indefinitely* maintain the codeshare and Frequent Flyer Agreements.  Such a result would be contrary to this Court's order to end the NEA, and would fail to restore the benefits of competition for the traveling public.

Overall, as directed by the Court, Plaintiffs' PFJ permanently enjoins the illegal NEA agreement, which protects travelers from further suffering the consequences of Defendants' risky decision to enter this plainly anticompetitive pact.

## I.     The Court Possesses Broad Authority to Remedy Antitrust Violations and Prevent Future Violations

A permanent injunction in an antitrust case must serve three key functions: (1) ending the violation; (2) preventing a recurrence of the same or similar violation; and (3) restoring competition in the market.  *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978); *Ford Motor Co. v. United States*, 405 U.S. 562 573 (1972); *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961); *see also Int'l Salt Co. v. United States*, 332 U.S. at 401 (stating end to be served in equity suit not "*merely to end* specific illegal practices.") (emphasis added).  After finding a violation of the antitrust laws, a trial court "has the duty to compel action by the conspirators that will, so far as practicable, cure the ill effects of the illegal conduct, and assure the public freedom from its continuance." *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88 (1950).  It is not enough simply for a permanent injunction to return the markets back to their *status quo ante*.  *Ford*, 405 U.S. at 573 n.8.

"[I]t is well settled that once the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor." *du Pont*, 366 U.S. at 334; *see also F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170 – 71 (2004) (quoting same).  "[C]ourts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests."  *du Pont*, 366 U.S. at 326.  If a permanent injunction in a successful antitrust challenge brought by the United States fails to attain the key functions of an injunction, "the Government has won a lawsuit and lost a cause."  *Int'l Salt Co.*, 332 U.S. at 401.

In meeting the three key functions, the Court is not limited to entering a permanent injunction that only ends the exact violation it found and prevents its exact recurrence.  The Court is "invested with large discretion to model [its] judgments to fit the exigencies" of the case.  *United States v. Int'l Salt Co.*, 332 U.S. 392, 400 – 01 (1947) (abrogated on other grounds).  "[A] mere prohibition of the precise scheme would be ineffectual to prevent restraints."  *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 727 (1944).  For instance, the permanent injunction may ban other ways to achieve the same violation that the Court found.  "When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed."  *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 698 (citing *Int'l Salt Co.*, 332 U.S. at 400).

The Court can also enjoin actions other than those found illegal, both to prevent Defendants from committing the same or similar violations and to undo the consequences of the antitrust violation it found.  The Court "has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from defendant[s'] conduct in the past."  *Brown v. Trustees of Boston Univ.*, 891 F.2d 337, 361 n.23 (1st Cir. 1989) (quoting *NLRB v. Express Pub.*

4

*Co.*, 312 U.S. 426, 435 (1941)). Violators of the antitrust laws "must expect some fencing in" of their activities. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 381 (1973). This "fencing in" of future activities may include acts connected with those the Court found illegal, even if those acts when viewed alone may otherwise be proper acts. *U.S. Gypsum*, 340 U.S. at 88 – 89. "Equity has power to eradicate the evils of a condemned scheme by prohibition of the use of admittedly valid parts of an invalid whole." *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 724 (1944). Future fencing in can also extend to prohibiting a Defendant from entering deals with third parties similar to ones the Court found to have violated the antitrust laws. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132 – 33 (1969) (barring violator of Section 1 of Sherman Act from conspiring with others beyond co-conspirator in the case and in markets other than market subject of the initial conspiracy).

## II.     The PFJ Accomplishes the Three Goals of Permanent Injunctive Relief

Plaintiffs' PFJ satisfies the Court's order permanently enjoining American and JetBlue's violation of Section 1 of the Sherman Act. The Plaintiffs' PFJ ends the violation by prohibiting Defendants from partnering with one another as they have under the NEA, forcing them instead to be the "vigorous, arms-length rivals" that they were before they created the NEA. Opinion at 4, 24, 29, 68. Forward-looking provisions forestall Defendants from repeating their violation by forming similar partnerships that clearly threaten the same harm to competition as the NEA; for instance, by prohibiting revenue sharing or coordination on routes or capacity. Similarly, Plaintiffs' PFJ requires the Defendants to provide notice to the Plaintiffs before entering new partnerships with each other or with other domestic airlines. Collectively, these provisions close off the "untraveled roads" to the same type of antitrust violations the Defendants committed through the NEA. *See, e.g.*, *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 698 (citing *Int'l Salt Co.*, 332 U.S. at 400). Moreover, the PFJ puts in place protections that restrain Defendants from diluting the competition

that existed before their partnership, or continuing to benefit from their unlawful agreement, by prohibiting the use of each other's sensitive business information learned during the course of the NEA.

### A.     The PFJ Terminates Most Provisions of the NEA Upon the Effective Date

Section III of the PFJ identifies required conduct that the Defendants must undertake. Section III.A requires the Defendants to terminate the NEA Agreement and all of its related contracts on the Effective Date of the PFJ, with limited exceptions discussed below.[2]  Terminating these contracts will end—immediately—American and JetBlue's NEA relationship that includes "codesharing, schedule coordination, revenue sharing, reciprocal loyalty benefits, and joint corporate customer benefits" for Defendants' flights out of the NEA airports.  Opinion at 21.  By requiring termination of the agreements, the PFJ serves the goals of ending the violation and begins the process of eliminating its consequences.

Section III.B requires the Defendants to cease all of the activities governed by the NEA Agreement on the Effective Date.  Particularly, Section III.B requires American and JetBlue to stop "all coordination of schedules and routes, and any efforts to allocate markets."  The Court found that coordination of schedules and the related allocation of routes to either American or JetBlue as one of the NEA's "core features."  Opinion at 73.  "This is a straightforward example of market allocation."  *Id*.  As such, there is no plausible rationale for Defendants to continue this activity. Section III.B mandates that the Defendants immediately cease any forward-looking coordination, while not disturbing flights already scheduled under the existing arrangement.  This provision

---

[2]  Under Section I.H, in the Definitions, the Effective Date is the later date of (i) seven (7) days following the date of entry of the Permanent Injunction, or (ii) seven (7) days following the end of any stay of the Permanent Injunction.

attempts to protect those travelers who have already booked travel on Defendants' existing schedules.

Section III.C requires the Defendants to cease all activities governed by the MGIA, which predominantly addresses revenue sharing between Defendants. The Court found that the purpose of the MGIA is to align American and JetBlue's incentives and achieve metal neutrality—rendering them indifferent to which of them a traveler chooses. Opinion at 22. The Court also found "overwhelming evidence" that the NEA has successfully rendered Defendants metal neutral and eliminated "the incentive to fight for revenue and customers," which is "a hallmark of a free market."" *Id*. at 69. Like coordination of schedules and routes, metal neutrality facilitated by the MGIA is a key aspect of the NEA. *Id*. at 22. Ending metal neutrality upon the Effective Date will help restore both American's and JetBlue's financial incentive to compete against each other to win travelers.

Sections III.E, III.F, and III.G require the Defendants to cease their activities upon the Effective Date or the Frequent Flyer Cutoff Date[3], respectively, under the other contracts related to the NEA Agreement: the Codeshare Agreement, the Frequent Flyer Agreements, and the BSPA. These provisions will arrest Defendants' efforts to integrate their businesses while allowing them to provide uninterrupted service as they develop a plan to fulfill their obligations to customers as independent competitors. For example, while immediately stopping Defendants from continuing to sell tickets on each other's flights under the Codeshare Agreement, Section III.E requires the Defendants to honor tickets purchased pursuant to the Codeshare Agreement before the Effective Date. Section III.F contains a similar provision related to frequent flyer reciprocity, permitting

---

[3] Under Section I.K, in the Definitions, the Frequent Flyer Cutoff Date is the later of (i) thirty (30) days following the date of entry of this Permanent Injunction, or (ii) thirty (30) days following the expiration of any stay of this Permanent Injunction entered by this Court or any appellate court of competent jurisdiction.

7

Defendants to honor loyalty rewards accrued before the Frequent Flyer Cutoff Date.  These

provisions cure the ill effects of Defendants' violation, *U.S. Gypsum*, 340 U.S. at 88, and enable

Defendants to minimize disruption to travelers despite their lack of planning for this foreseeable

outcome.

      **B.**      **Defendants' Insistence on Preserving the Codeshare Agreement and Frequent**
                **Flyer Agreement is an Attempt to Re-Litigate the Case**

      Defendants have proposed an injunction to Plaintiffs that fails to terminate the NEA's

Codeshare Agreement, Frequent Flyer Agreements, and BSPA.  The Court found that the NEA

considered as a whole, not merely specific aspects of it, was anticompetitive and illegal; allowing

portions of the NEA to remain in place indefinitely would provide incomplete relief.  These

contracts each govern part of Defendants' relationship under the NEA and are explicitly designated

as related to the umbrella NEA Agreement.  Opinion at 21.  Defendants now seek to leave some of

the contracts governing the NEA in place despite telling the Court that the contracts are inextricably

linked.  *See e.g.*, Defs' Proposed Findings of Fact at ¶ 498 ("Without revenue sharing, it is unlikely

that American and JetBlue would agree to codesharing alone."); *id*. at ¶ 159 ("The NEA was

established through several agreements, which together create a relationship . . .").

      The Court should reject Defendants' invitation to craft a new "NEA Lite" on the fly.  After

choosing to enter the most extensive partnership they contemplated—a partnership with an

unprecedented level of coordination and known antitrust risk—Defendants are asking the Plaintiffs

and the Court to bless a different partnership, in a matter of days, simply because it lacks some of

the most brazen features of the NEA.  *See* Opinion 15.  Defendants must abandon their

entanglements and return to being fully independent competitors to remedy their unlawful

distortion of airline competition in the Northeast and beyond.  Even if individual contracts that are

part of an overall anticompetitive scheme might be "otherwise valid," the proper remedy is for all

of them to be cancelled "in order that the ground may be cleansed effectually from the vice of the former illegality." *Bausch & Lomb Co.*, 321 U.S. at 724 (citations omitted).  If Defendants later wish to propose a new, more limited agreement involving codesharing or frequent flyer reciprocity, the injunction provides a process for them to do so and for those proposals to be considered thoughtfully and in due course.  *See* PFJ Sections IV.B and V.

Even if the Court were inclined to take on the unreasonable task of quickly deciding the legality of a less expansive partnership incorporating parts of the NEA, the record in this case does not support the conclusion that these agreements are competitively innocuous.  For instance, the Court found that, unlike some other codeshares, the codeshare agreement in the NEA includes routes on which both partners offered competing direct nonstop service, compromising their status as independent competitors in such markets.  *See* Opinion 16-17, 42 & n.57.  Moreover, the Court found that a "spirit of partnership" has developed between American and JetBlue that diminishes competition between them.  Opinion at 24 & n.30, 41.  Even after paring back the NEA, Defendants might still have a strong interest in ensuring their proposed partnership succeeds over the long term, and that "spirit of partnership" may continue to diminish competition.

While Defendants claim that keeping the codesharing and frequent flyer reciprocity agreements in place is necessary to avoid consumer disruption, they have not identified any meaningful way in which Plaintiffs' PFJ would actually disrupt travel consumers have already booked.  Indeed, as explained above, Plaintiffs' PFJ requires Defendants to honor tickets already purchased pursuant to the Codeshare Agreement.  Over the past two weeks, Plaintiffs have repeatedly offered to consider other *temporary* measures that the Defendants identify, in writing, as necessary to reduce the risk of disruptions to passengers if Defendants certify that there are no other ways to avoid those disruptions.  Through this dialogue, the only issue that Defendants raised was that certain IT limitations could interfere with Defendants' ability to quickly terminate the Frequent

Flyer Agreements.  In response to this concern, Plaintiffs' PFJ permits the Frequent Flyer

Agreements to continue for thirty days after entry.  Defendants have not proposed any other

temporary measures to avoid disruption.  Rather, Defendants seek to retain the Codeshare

Agreement and Frequent Flyer Agreements *indefinitely*, effectively re-litigating whether the NEA is

good for consumers.

### C.    The PFJ Prevents Recurrence of the Illegal Behavior and Appropriately "Fences In" Further Misconduct

Sections III.H and III.I prohibit the Defendants from entering future arrangements with each

other and with other domestic airlines, respectively, that feature revenue sharing or coordination of

routes or capacity, similar to the NEA.  The bar against the Defendants entering such an

arrangement among themselves lasts ten years, a common length of time for antitrust decrees.  The

prohibition against either airline entering into partnerships with other domestic airlines featuring

revenue sharing or coordination of routes or capacity like the NEA expires in two years.[4]  These

provisions appropriately "fence in" Defendants' ability to engage in conduct similar to the NEA.

*Cf. Otter Tail*, 410 U.S. at 381 (recognizing that district court's decree fencing in future, similar

predatory conduct was appropriate to remedy Section 2 violation).  The Court found that

Defendants proceeded with forming the NEA despite recognizing that similar arrangements

between domestic and international airlines require antitrust immunity.  Opinion at 78.  American

and JetBlue executives' willingness to proceed despite this foreknowledge counsels for measures to

stop Defendants from constructing the same or slightly tweaked versions of the NEA's revenue

sharing or coordination in the future.  The curb on Defendants' activities in Sections III.H and III.I

is particularly appropriate in light of the Court's findings that Defendants are "powerful

---

[4] Definition G in the PFJ lists the specific other domestic airlines covered by this provision. Specifically, all non-regional airlines in the United States are included.

competitors" in a "highly concentrated" industry, and that the revenue sharing and the coordination of routes or capacity are "core" and "cornerstone" features of the NEA.  Opinion at 3, 22, 73.

Defendants oppose Section III.I because it covers Defendants' agreements with other airlines, and not only with one another, but enjoining Defendants from engaging in similar conduct with other would-be conspirators is appropriate relief.  *See Zenith Radio Corp.* 395 U.S. at 132 – 33 (barring violator of Section 1 from conspiring with others beyond co-conspirator).  Before either Defendant makes any attempt to enter into a potential new partnership that could risk similar competitive effects as the NEA, there should be a "cooling off" period to give time for the NEA to fully unwind, for Defendants to resume their full-throated competition, and for the competitively sensitive information that each Defendant's employees retain about the other Defendant's business and strategies to become stale.  Section III.I is narrowly tailored to this objective, applying only for two years, only to agreements with an enumerated list of domestic carriers,[5] and only to agreements that involve revenue sharing or capacity coordination "substantially similar" to the NEA.

Section III.J restricts how each Defendant treats Competitively Sensitive Information[6] with respect to the other airline.  The Court found that under the NEA, American and JetBlue functioned as a single airline in the Northeast as much as possible.  Opinion at 29.  Such an arrangement requires the flow of Competitively Sensitive Information between the two airlines that would not otherwise occur among competing airlines.  Opinion at 15 & n.15 (citing understanding of

---

[5] The notice requirement does not apply to regional airlines, that is, small airlines that typically operate the bulk of their flights on behalf of a mainline carrier.

[6]  Section I.E defines Competitively Sensitive Information as "any non-public information of Defendants relating to scheduled air passenger services, including without limitation non-public information relating to network plans, pricing or pricing strategies, frequent flyer programs, corporate customer negotiations, tactics or strategy, costs, revenues, profits, margins, output, marketing, advertising, promotion, or research and development."

Southwest Airlines executive that discussing network planning with another airline would be illegal).

The injunctive relief would not "assure the public freedom from [the restraint's] continuance," *U.S. Gypsum*, 340 U.S. at 88, if Defendants were permitted to continue to make use of the fruits of their illegal agreement, including Competitively Sensitive Information about one another's business strategies. The Plaintiffs and the Court lack full transparency into the flow of Competitively Sensitive Information between the Defendants since the genesis of the NEA, especially after the close of discovery in the case. As a result, Section III.J avoids attempting to regulate the flow of Competitively Sensitive Information. Instead, it simply prohibits the Defendants from sending, receiving, requesting, or otherwise communicating Competitively Sensitive Information with each other. It also bars Defendants from using any Competitively Sensitive Information they obtained from each other during the course of the NEA.[7] Moreover, Section III.J expressly prohibits each Defendant's personnel from disclosing Competitively Sensitive Information they obtained from the other Defendant. Section III.J provides narrow exceptions to these prohibitions to permit the Defendants to fulfill existing tickets and to comply with the PFJ, other court order, law, or regulation.

**D.     The PFJ Protects Travelers During the Wind Down of the NEA**

Section III.D addresses the continuity of service based on Defendants' slot and gate leases under the NEA. Section III.D seeks to ensure that travelers face as little disruption as possible to previously booked travel. To that end, Section III.D allows the Slot Lease Agreements and sharing

---

[7] Section IV.A.b also provides another layer of protection for confidential information, albeit an incomplete one, by allowing the provisions of the NEA Agreement dealing with treatment of confidential information to survive termination of the NEA. PX0001-a at 14 – 15. This provision is insufficient to protect against the inappropriate flow of confidential information on its own, however, because only the Defendants would possess the ability to act upon any breaches.

of gates or other ground facilities to continue temporarily until a subsequent order of the Court.  In the interim, Section III.D requires the Defendants to submit to Plaintiffs a proposed wind-down plan for terminating Slot Lease Agreements and agreements on the use of gates and other ground facilities.  This step is necessary because Plaintiffs lack complete post-discovery information on the exchange of slots and gates between the Defendants.  Plaintiffs also lack complete information on the extent to which each Defendant's Boston and New York schedules in the near future rely on using slots or gates obtained from the other Defendant under the NEA and the wind-down timeline needed for Defendants to be able to mitigate any passenger disruption that would be caused by terminating these leases.[8]  Section III.D enables Defendants to fly already scheduled flights that travelers have relied upon in planning upcoming summer travel, but requires Defendants to put in place a concrete plan for disentangling American and JetBlue slot and gate sharing at NEA airports. Section III.D requires the Parties to submit to the Court their respective positions on winding down the Slot Lease Agreements and gate lease agreements within 45 days of the Effective Date of the PFJ.

The PFJ also builds on the termination provisions on the NEA Agreement itself, reflecting Defendants' own choices about how to wind down their partnership and minimize the resulting impact on their customers.  Section IV.A specifies that certain portions of the NEA Agreement that address winding down the partnership and that are focused on preventing disruption or harm to passengers shall survive its termination.  Specifically, Section IV.A.a requires Section 5.11 of the NEA Agreement to survive, obligating Defendants to minimize customer disruptions as a result of

---

[8] Determining how to untangle their operations in a timely and efficient manner should not pose significant difficulties for Defendants.  Defendants' contracts always contemplated the possibility of termination, including simply for the convenience of the parties.  PX0001-a at 7-8 (providing for termination for convenience on only 60 days' prior written notice).  Dr. Carlton, one of Defendants' experts, testified that because the NEA is not literally a merger, there was not a significant concern with "unscrambling the egg" if the NEA were later found to be illegal.  Tr. Day 16, 18:4 – 8.

termination.  PX0001-a at 13.  Provisions relating to confidentiality and customer privacy also survive.  Requiring these limited provisions of the NEA Agreement to survive assists in protecting travelers from the fallout of unwinding Defendants' anticompetitive partnership.

### E.    Notice Requirements Will Facilitate Antitrust Review of Any Future Partnerships by Defendants

Section V requires the Defendants to provide notice to the Plaintiffs of any new agreements, partnerships, or joint ventures they enter with each other or with other domestic airlines.  The notice requirement for Defendants' agreements, partnerships, and joint ventures with each other, Section V.A, expires after ten years.  The notice requirement for such arrangements with other domestic airlines expires after five years.  Section V.C requires the Defendants to provide the Plaintiffs with information about such agreements, partnerships, or joint ventures to facilitate antitrust analyses by the Plaintiffs.  This limited information is a subset of information parties are required to provide under the Hart-Scott-Rodino Act, 15 U.S.C. § 18a, for reportable mergers and acquisitions.  Section V.D requires Defendants to pause implementing or putting into effect any agreements, partnerships, or joint ventures if the United States seeks additional information about the arrangement.  The pause would continue until sixty days after the Defendant has provided any additional information the United States seeks through a Civil Investigative Demand.

Defendants propose to omit the requirement to provide notice to the Plaintiffs of their transactions with other domestic airlines.[9]  Defendants' demonstrated track record of proceeding with the NEA despite understanding the meaningful antitrust risks, however, illustrates the necessity of providing antitrust authorities advance notice.  Plaintiffs are not requesting a categorical ban on any agreements with other domestic airlines; Section V.B merely creates a

---

[9] Defendants have not indicated that they object to Section V.A requiring them to provide Plaintiffs notice of transactions between each other.

mechanism for Plaintiffs to assess such agreements before they go into effect, to avoid ending up in the similar predicament of needing to unwind an unlawful combination.  *See Gypsum*, 340 U.S. at 90 (enlarging scope of injunction beyond the violation given "close similarity" between violation and other anticompetitive conduct using the same mechanism); *Zenith Radio Corp.* 395 U.S. at 132 – 33.

Section V.E provides a small exception to these notice requirements for short-term agreements to share infrastructure at airports, which are common.  This paragraph also permits the United States to create additional exceptions to the notice requirements, for example if the United States determines that a certain type of agreement that Defendants are frequently reporting is highly unlikely to raise concerns.

F.     **Appointing a Monitor Is Appropriate**

Under Section VI, the Court will appoint a monitoring trustee to oversee the Defendants' compliance with the other terms of the PFJ.  Appointment of a monitoring trustee is appropriate here to ensure that the NEA is unwound promptly and that Defendants are not misusing Competitively Sensitive Information obtained while they were implementing the NEA.

There is "considerable room" for appointing monitors when the purpose of doing so is "to enforce a judicial decree."  *Cronin v. Brower*, 90 F. Supp. 2d 364, 377 (S.D.N.Y. 2000).  The power of a federal court to appoint a monitor to supervise the implementation of its decree has long been established and exercised, including in this district.  *See, e.g.*, *Picker Int'l Corp. v. Imaging Equip. Servs., Inc.*, 931 F. Supp. 18, 45 (D. Mass. 1995) (appointing monitor based on the court's "inherent power to appoint a person to assist it in administering a remedy"); *U.S. Commodity Futures Trading Comm'n v. Kim*, No. 11-CV-1013 (DLC), 2011 WL 1642772 (S.D.N.Y. Apr. 15, 2011); *FTC v. John Beck Amazing Profits, LLC*, No. 2:09-CV-4719, 2009 WL 7844076 at *15 (C.D. Cal. Nov. 17,

2009); *In re The Reserve Fund Sec. & Derivative Litig.*, 673 F. Supp. 2d 182, 210 (S.D.N.Y. 2009).[10]

This precedent for court-ordered outside oversight extends to corporations found to have violated the antitrust laws.  For example, the court appointed an antitrust compliance monitor as part of the injunctive relief against Apple after finding Apple violated Section 1 of the Sherman Act.  *United States v. Apple, Inc.*, 992 F. Supp. 2d 263, 280 (S.D.N.Y. 2014).  Courts have also appointed monitors to oversee the unwinding of illegal consummated mergers.  *E.g.*, *United States v. Bazaarvoice, Inc.*, No. 13-cv-00133-WHO, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014).

A monitoring trustee is similarly appropriate here.  The appointment of a monitor is proper "'when a complex decree requires administration or complex policing, particularly when a party has proved resistant or intransigent or special skills are needed.'"  *United States v. Vulcan Soc'y, Inc.*, No. 07-CV-2067 (NGG)(RLM), 2010 WL 2160057, at *4 (E.D.N.Y. May 26, 2010) (quoting 9C Wright & Miller, *Federal Practice & Procedure* § 2602.1 (3d ed. 2008)).  Although the NEA is not a merger, its "effects resemble those of a merger of the parties' operations within the northeast," Opinion at 28, and so unwinding this agreement can benefit from the oversight of a monitor just as in unwinding mergers.  More generally, the "unusual complexity" of this case, Opinion at 5, counsels in favor of a monitor who can undertake the laborious task of sufficiently learning the details of Defendants' operations to ensure they are meeting their obligations to end the NEA as expeditiously as possible while minimizing disruption to travelers.  American's shifting and contradictory positions on whether it operates a hub in New York Opinion at 14 n.14, illustrates the types of challenges that may arise in seeking Defendants' compliance with the PFJ.

---

[10] Such court-appointed agents have been identified by a "plethora of titles: 'receiver,' 'Master,' 'Special Master,' 'master hearing officer,' 'monitor,' 'human rights committee,' 'Ombudsman,' and others.  The function is clear, whatever the title."  *Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982).  This brief uses the term "monitor" when discussing case law that uses any such title.

A monitoring trustee will help to ensure that the Defendants comply with these obligations, without requiring significant costs on the part of the Plaintiffs or this Court.  Instead, those costs will be borne by the Defendants, who, as the wrongdoers, are the appropriate parties to bear them. *See, e.g.*, *Alberti v. Klevenhagen*, 46 F.3d 1347, 1363-64 (5th Cir. 1995) (party that is the "primary cause" of harm should bear costs of monitor).

## <u>CONCLUSION</u>

For the reasons outlined above, Plaintiffs request the Court enter Plaintiffs' PFJ.

Dated: June 9, 2023

Respectfully submitted,

 /s/ William H. Jones II
William H. Jones II
James C. Congdon
Patricia C. Corcoran
Kate M. Riggs

U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 8000
Washington, DC 20530
Tel: (202) 598-8805
Fax: (202) 307-5802
Email: bill.jones2@usdoj.gov

*Attorneys for Plaintiff*
*United States of America*

MARK BRNOVICH
Attorney General

 /s/ Robert Bernheim
ROBERT BERNHEIM
(AZ Bar No. 024664)

Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Tel: (520) 628-6507
Email: robert.bernheim@azag.gov

*Attorneys for Plaintiff State of Arizona*

ROB BONTA
Attorney General

KATHLEEN E. FOOTE
Senior Assistant Attorney General

NATALIE S. MANZO
MICHAEL W. JORGENSON
Supervising Deputy Attorneys General

ROBERT B. McNARY
JAMIE L. MILLER
Deputy Attorneys General

/s/ Robert B. McNary
ROBERT B. McNARY
Deputy Attorney General
California State Bar No. 253745
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Phone: 213-269-6283
E-mail: robert.mcnary@doj.ca.gov

*Attorneys for Plaintiff State of California*

KARL A. RACINE
Attorney General

KATHLEEN KONOPKA
(DC Bar No. 495257)
Senior Advisor for Competition Policy

/s/ Adam Gitlin
ADAM GITLIN

Office of the Attorney General for the
District of Columbia
400 Sixth Street NW, Tenth Floor
Washington, DC 20001
Tel: (202) 442-9853
Email: adam.gitlin@dc.gov

*Attorneys for Plaintiff District of Columbia*

19

ASHLEY MOODY
Attorney General

 /s/ Lizabeth A. Brady
LIZABETH A. BRADY
(FL Bar No. 457991)
COLIN G. FRASER (FL Bar No. 104741)

Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399
Tel: (850) 414-3300
Email: Liz.Brady@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

MAURA HEALEY
Attorney General

 /s/ William T. Matlack
WILLIAM T. MATLACK
(MA Bar No. 552109)
DANIEL H. LEFF (MA Bar No. 689302)

Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Tel: (617) 727-2200
Email: William.Matlack@mass.gov
Email: Daniel.leff@mass.gov

*Attorneys for Plaintiff*
*Commonwealth of Massachusetts*

20

JOSH SHAPIRO
Attorney General

JAMES A. DONAHUE,
III (PA Bar No. 42624)
Executive Deputy Attorney General
Public Protection Division

/s/ Tracy W. Wertz
TRACY W. WERTZ (PA Bar No.
69164) JOSEPH S. BETSKO (PA Bar
No. 82620) JENNIFER A. THOMSON
(PA Bar No. 89360)

Pennsylvania Office of Attorney General
Antitrust Section
14th Floor Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
Email: twertz@attorneygeneral.gov

*Attorneys for Plaintiff
Commonwealth of
Pennsylvania*

JASON S. MIYARES
Attorney General

/s/ Tyler T. Henry
TYLER T. HENRY (VA Bar No.
87621)
Assistant Attorney
General Antitrust Unit
Office of the Virginia Attorney
General 202 North Ninth Street
Richmond, Virginia 23219
Tel: (804) 692-0485
Email: THenry@oag.state.va.us

*Attorneys for Plaintiff
Commonwealth of Virginia*

21

## LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1(a)(2), I hereby certify that I conferred with counsel for

Defendants in a good faith effort to resolve or narrow the issues presented in this motion prior to

filing. Defendants confirmed that they opposed the motion.

<div style="margin-left: 50%;">

/s/ James H. Congdon
James H. Congdon
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW
Washington, DC 20530
Phone: 202-299-4574
Fax: 202-307-5802
james.congdon@usdoj.gov

*Attorney for United States of America*

</div>