## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN AIRLINES GROUP INC. and JETBLUE AIRWAYS CORPORATION, <br><br> Defendants. | Civil Action No. 1:21-cv-11558-LTS <br><br> **ORAL ARGUMENT REQUESTED** |

## AMERICAN AIRLINES GROUP INC. AND JETBLUE AIRWAYS CORPORATION'S MOTION FOR ENTRY OF FINAL JUDGEMENT AND PERMANENT <u>INJUNCTION, WITH INCORPORATED MEMORANDUM OF LAW</u>

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ........................................................................................................6

LEGAL STANDARD...................................................................................................9

ARGUMENT .............................................................................................................11

I.  THE INJUNCTION SHOULD BE LIMITED TO THE PROVISIONS OF THE
    NEA THAT THIS COURT HELD VIOLATE THE ANTITRUST LAWS.....................11

    A.  Defendants should be allowed to continue codesharing and reciprocal
        frequent flyer recognition. ...................................................................................12
    B.  Defendants should not be barred from entering into agreements with other
        Domestic Air Carriers that provide for revenue sharing or coordination of
        routes or capacity. ...............................................................................................15

II. THE INJUNCTION SHOULD NOT DISTURB THE CONTRACTUAL WIND-
    DOWN PROVISIONS NEGOTIATED BY THE PARTIES. ...........................................16

III. THE INJUNCTION SHOULD NOT REQUIRE INVASIVE MONITORING, OR
     NOTICE PRIOR TO ENTRY INTO AGREEMENTS WITH OTHER
     DOMESTIC CARRIERS.................................................................................................18

    A.  Defendants should not be subject to five years of invasive monitoring. ...............18
    B.  Defendants should not be required to notify the DOJ prior to entering into
        or amending agreements, partnerships, or joint ventures with other
        Domestic Air Carriers. ..........................................................................................20

IV. THE COURT SHOULD ADOPT DEFENDANTS' PROPOSED EFFECTIVE
    DATE............................................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Avaya Inc. v. Telecom Labs, Inc.*,
  No. 06-2490, 2014 WL 2940455 (D.N.J. June 30, 2014).........................................................15

*Bossé v. N.Y. Life Ins. Co.*,
  992 F.3d 20 (1st Cir. 2021).....................................................................................................11

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962).................................................................................................................17

*Brown v. Trs. of Bos. Univ.*,
  891 F.2d 337 (1st Cir. 1989)......................................................................................................4

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)...................................................................................................................4

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004)...................................................................................................................5

*Ford Motor Co. v. United States*,
  405 U.S. 562 (1972)...................................................................................................................5

*FTC v. Beech-Nut Packing Co.*,
  257 U.S. 441 (1922)...................................................................................................................6

*Hartford-Empire Co. v. United States*,
  323 U.S. 386 (1945).........................................................................................................5, 6, 17

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*,
  516 F. Supp. 2d 324 (D. Del. 2007), *aff'd*, 602 F.3d 237 (3d Cir. 2010) ...............................13

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ...................................................................................................6

*Int'l Salt Co. v. United States*,
  332 U.S. 392 (1947), *abrogated on other grounds by Ill. Tool Works Inc. v.*
  *Indep. Ink, Inc.*, 547 U.S. 28 (2006) .........................................................................................5

*Latas Libby's, Inc. v. United Steelworkers of Am.*,
  609 F.2d 25 (1st Cir. 1979).........................................................................................................4

*Luis Rosario, Inc. v. Amana Refrigeration, Inc.*,
  733 F.2d 172 (1st Cir. 1984) (Breyer, J.)................................................................................11

*Micro Data Base Sys., Inc. v. Nellcor Puritan Bennett, Inc.*,
  165 F.3d 1154 (7th Cir. 1999) ........................................................................11

*Milwaukee Towne Corp. v. Loew's, Inc.*,
  190 F.2d 561 (7th Cir. 1951) ..........................................................................17

*Nat'l Soc. of Pro. Eng'rs v. United States*,
  435 U.S. 679 (1978)..........................................................................................7

*NBO Indus. Treadway Cos. v. Brunswick Corp.*,
  523 F.2d 262 (3d Cir. 1975), *vacated on other grounds sub nom. Brunswick
  Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ............................6

*NCAA v. Alston*,
  141 S. Ct. 2141 (2021)................................................................................10, 11

*New York v. Microsoft Corp.*,
  224 F. Supp. 2d 76 (D.D.C. 2002), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004)..................... *passim*

*Paramount Film Distrib. Corp. v. Vill. Theatre, Inc.*,
  228 F.2d 721 (10th Cir. 1955) ........................................................................17

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
  217 F.3d 8 (1st Cir. 2000)..................................................................................1

*United States v. Am. Express Co.*,
  No. 10-4496 (E.D.N.Y. Apr. 30, 2015), Dkt. 638 ..........................................18

*United States v. Apple Inc.*,
  992 F. Supp. 2d 263 (S.D.N.Y. 2014), *aff'd*, 787 F.3d 131 (2d Cir. 2015)............................14

*United States v. Bausch & Lomb Optical Co.*,
  321 U.S. 707 (1944)..........................................................................................6

*United States v. Imperial Chem. Indus., Ltd.*,
  105 F. Supp. 215 (S.D.N.Y. 1952)..............................................................12, 13

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ............................................................................5

*United States v. United Liquors Corp.*,
  77 S. Ct. 208 (1956)..........................................................................................5

*United States v. Visa U.S.A., Inc.*,
  163 F. Supp. 2d 322 (S.D.N.Y. 2001)................................................................6

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)........................................................................................12

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
   395 U.S. 100 (1969)................................................................................................................5

**TREATISES**

3 Areeda & Hovenkamp, *Antitrust Law*  ¶ 653(b) (1996) ................................................................5

P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles
   and Their Application ¶ 325a...............................................................................................1, 4

**OTHER AUTHORITIES**

U.S. Dep't of Justice, Antitrust Div., *Merger Remedies Manual* (2020),
   https://www.justice.gov/atr/page/file/1312416/download.......................................................17

## INTRODUCTION

The Court held that certain aspects of the NEA violate the Sherman Act.  But Plaintiffs did not properly tailor their proposed relief to what the Court held.  Plaintiffs' Proposed Final Judgment ("PFJ") drastically overreaches by, among other things:

- seeking to invalidate frequent flyer and codeshare arrangements that are common in the airline industry, and that Plaintiffs recognize are actually procompetitive;

- proposing an extraordinary compliance regime that is vastly disproportionate to the evidence in this case and entirely unwarranted given existing regulatory requirements;

- proposing onerous notice requirements which would reduce options for and ultimately harm consumers, including by demanding advance approval of common inter-airline agreements to accommodate passengers during flight cancellation or provide spare parts to another airline to allow an aircraft to resume flying; and

- requiring an unnecessary monitoring trustee—and one with a term longer than those in *criminal* cases.

None of this is necessary or appropriate.  This case calls for a straightforward injunction allowing the orderly winding down of the aspects of the NEA this Court deemed unlawful, while minimizing consumer disruption.  But disruption is exactly what will result if the Court adopts Plaintiffs' PFJ.

Rather than narrowly "tailor[]" the injunction "to the specific harm to be prevented," *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 14 (1st Cir. 2000), Plaintiffs' PFJ sweeps far beyond the challenged conduct and would improperly make the Court the central planner in the unwinding of a multi-year integrated joint venture in violation of cardinal principles of antitrust law.  *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 100 (D.D.C. 2002), *aff'd*, 373 F.3d 1199

(D.C. Cir. 2004) (quoting P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 325a) ("Equitable relief in an antitrust case should not 'embody harsh measures when less severe ones will do," and must avoid entangling "the judiciary in the intricacies of business management."). Plaintiffs' proposal amounts to unprecedented overreach, and it should be rejected.[1]

*First*, the PFJ sweeps far beyond the agreements that this Court held violated the Sherman Act. Specifically, Plaintiffs seek to uproot Defendants' existing Codesharing and Frequent Flyer Agreements. But that dramatic remedy is inconsistent with this Court's recognition that airlines "regularly" enter codesharing and frequent flyer agreements; that such agreements provide procompetitive benefits; and that such agreements offer less restrictive alternatives to the NEA. Dkt. 344 (Findings of Fact and Conclusions of Law) at 90 n.112; *see id.* at 15-16, 43-44. Plaintiffs offer no valid reason for demanding that Defendants cease this commonplace and concededly procompetitive conduct. Nor is it viable within the timeframes Plaintiffs provide to terminate these agreements and propose new versions to the Department of Justice ("DOJ") for consideration under Plaintiffs' lengthy notice provisions. The result will be wholly unnecessary consumer frustration.

*Second*, Plaintiffs' proposal improperly replaces Defendants' contractual wind-down provisions with Plaintiffs' own intuitions about how to best reverse an integrated, multi-year joint venture. Defendants carefully considered the possibility that the NEA might end, including due

---

[1] Defendants submit a chart, attached as Exhibit 1, that identifies the key provisions in the PFJ that Defendants object to, contrasts Plaintiffs' language and Defendants' proposed language, and briefly explains why Defendants' proposed language should be adopted. As the Court has directed, "[b]y participating in the crafting of the proposed order, the defendants do not waive any rights." Dkt. 344 at 93 n.114. A complete copy of Defendants' Proposed Injunction is attached as Exhibit 2.

to a court order.  Thus, to "minimize disruption to operations and to passengers as a result of the termination," Defendants negotiated and agreed upon detailed provisions for winding down that agreement.  NEA §§ 5.11.1, 5.11.2-.4.  Plaintiffs present no basis for rejecting Defendants' wind-down provisions—which are standard in most commercial contracts—and no argument for why they know better than the contracting parties how to minimize consumer harm.  In addition, the PFJ requires Defendants to "honor the terms of all tickets purchased or issued" and "honor the rewards accrued"—but appears to require Defendants to do so without compensation since the PFJ also mandates that Defendants "cease all activities governed by the MGIA," PFJ III.C, E-F, which include the "audit, reconciliation and payment processes" for services under the NEA, NEA § 5.11.2.

*Third*, Plaintiffs' proposal would subject Defendants to highly invasive monitoring and unprecedented notice requirements.  Specifically, Plaintiffs seek to appoint an external monitor with unjustifiably broad discretion to review Defendants' internal books and activities for five years—a period longer than monitorships in *criminal* cases.  Moreover, Plaintiffs propose that Defendants notify federal agencies not only of any future agreements between them, but also of any future agreements with any other Domestic Air Carrier.  These notice provisions, which include substantial documentation requirements and lengthy waiting periods, are poorly drafted and far too broad; if accepted by the Court, they would undoubtedly chill procompetitive conduct and harm consumers.

*Fourth*, the PFJ paints with such a broad brush that it outlaws all "revenue sharing" (an undefined term), including with other Domestic Air Carriers.  However, revenue sharing with other Domestic Air Carriers occurs every day.  For example, Alaska sells itineraries that include American legs (and vice versa) every day.  The marketing carrier collects the money and the

operating carrier provides the service to the consumer and must be compensated, which means that "revenue" is "shared." There are innumerable other examples where one airline will compensate another for services provided—all of which are commonplace and none of which Plaintiffs even attempted to prove were anticompetitive at trial.

*Finally*, the Court should grant a delayed effective date of 30 days to give itself and, potentially, the Court of Appeals sufficient time to rule on any stay motion and to give Defendants sufficient time to come into compliance with what will be, in any formulation, a complex and far-reaching injunction.

Defendants respectfully request oral argument to assist the Court in addressing the complexity of the issues and in mitigating the risk of unintended harm to competition, consumers, and Defendants.

## LEGAL STANDARD

It is blackletter law that "[a]n injunction should be narrowly tailored to give only the relief to which plaintiffs are entitled." *Brown v. Trs. of Bos. Univ.*, 891 F.2d 337, 361 (1st Cir. 1989) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Thus, "prospective injunctive relief should go as far as, but no farther than, the pattern of violations suggests is necessary," *Latas Libby's, Inc. v. United Steelworkers of Am.*, 609 F.2d 25, 31 (1st Cir. 1979) (alteration and quotation omitted), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano*, 442 U.S. at 702. Consistent with these principles, "[e]quitable relief in an antitrust case should not 'embody harsh measures when less severe ones will do,' nor should it adopt overly regulatory requirements which involve the judiciary in the intricacies of business management." *Microsoft Corp.*, 224 F. Supp. 2d at 100 (citation omitted) (quoting P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 325a), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004).

As the party seeking the relief, Plaintiffs bear the burden of demonstrating that there is a "significant causal connection between the conduct [to be] enjoined or mandated and the [antitrust] violation found.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) (quoting 3 Areeda & Hovenkamp, *Antitrust Law* ¶ 653(b) (1996)).  While the injunction may extend beyond the precise violation, "the relief must be directed to that which … will 'cure the ill effects of the illegal conduct, and assure the public freedom from its continuance.'" *Ford Motor Co. v. United States*, 405 U.S. 562, 573 n.8 (1972) (citation omitted).  The crucial question, in other words, is whether the injunction is "necessary to correct the evil effects of [the] unlawful conduct" or prevent its recurrence.  *United States v. United Liquors Corp.*, 77 S. Ct. 208, 210 (1956) (Reed, J., in chambers).  To the extent the injunction extends to future conduct beyond the particular misconduct in the case, it must be limited to conduct that is "of the same type or class as unlawful acts which the court has found to have been committed."  *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969) (citation omitted); *see also Microsoft Corp.*, 224 F. Supp. 2d at 110 ("[T]o the extent that the remedy imposed [in prior cases] exceeded the specific anticompetitive conduct, the restrictions were closely related to the anticompetitive conduct.").

The injunction cannot be so broad as to subject Defendants "to an outright denial of the[ir] ability to continue to do business and to compete with other participants in the market and in other markets."  *Microsoft Corp.*, 224 F. Supp. 2d at 108.  Nor may the injunction be used to "punish[]" Defendants for their alleged misconduct.  *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *see also Hartford-Empire Co. v. United States*, 323 U.S. 386, 409 (1945) ("[W]e may not impose penalties in the guise of preventing future violations." (footnote omitted)).  Instead, the goal of injunctive relief—as in all of antitrust law—is to "protect the public from further anticompetitive

conduct and to redress anticompetitive harm." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170 (2004).

Consistent with these principles, courts have long rejected overbroad injunctions in the antitrust context. *See, e.g.*, *Hartford-Empire Co.*, 323 U.S. at 413 ("The injunction as drawn is not directed at any combination, agreement or conspiracy"); *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 728-29 (1944) (rejecting government's requests to expand scope and duration of injunction); *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 455-56 (1922) (holding that FTC order was "too broad"); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1225-28 (9th Cir. 1997) (modifying injunction to remove terms that were "unnecessary and anticompetitive"); *NBO Indus. Treadway Cos. v. Brunswick Corp.*, 523 F.2d 262, 279 (3d Cir. 1975) (rejecting injunction requiring divestiture on the ground that "less drastic relief will provide sufficient redress"), *vacated on other grounds sub nom. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977); *United States v. Visa U.S.A.*, Inc., 163 F. Supp. 2d 322, 410 (S.D.N.Y. 2001) (rejecting injunction provisions proposed by the government as "overbroad, uncertain, and risk[ing] prohibiting practices that may be on balance procompetitive").

## ARGUMENT

### I.   THE INJUNCTION SHOULD BE LIMITED TO THE PROVISIONS OF THE NEA THAT THIS COURT HELD VIOLATE THE ANTITRUST LAWS.

The injunction should be limited to the provisions of the NEA that the Court held violate the antitrust laws.  It should not cover the Codeshare Agreement, the Frequent Flyer Agreements, or the Bilateral Special Prorate Agreement.  These agreements are common, procompetitive, and customers often use them to book air travel with a more efficient route or a lower fare.  *See* Tr.

Day 7 (Harrison) at 28:7-13, 37:2-14; Day 2 (Hayes) at 69:15-17.[2]  Indeed, the Court treated these agreements as less restrictive means of delivering consumer benefits.  *See* Dkt. 344 at 42 n.56, 91. There is no basis in the record to prevent Defendants from using these widely accepted and procompetitive agreements.

### A. Defendants should be allowed to continue codesharing and reciprocal frequent flyer recognition.

The PFJ would require Defendants to dismantle the agreements permitting them to market each other's flights and award reciprocal frequent flyer benefits—despite Plaintiffs' express recognition that such agreements are perfectly lawful.  *See* Dkt. 333 (Plaintiffs' Post-Trial Brief) at 69-70 (proposing "[c]odesharing and frequent flyer reciprocity" as less restrictive alternatives to the NEA).  That relief is unwarranted.

Although the Court may enjoin some lawful conduct if such an injunction "represents a reasonable method of eliminating the consequences of the illegal conduct," *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978), codesharing and frequent-flyer reciprocity are not allegedly unlawful aspects of the NEA.  In fact, the terms of these agreements establish that Defendants viewed them as independent, as neither the codesharing nor frequent flyer agreements automatically terminate in the event of a termination of the NEA.  These agreements are also— under both Plaintiffs' and the Court's analysis—common and less restrictive means of delivering consumer benefits.  *See, e.g.*, Dkt. 333 at 69-70; Dkt 344 at 42 n.56 ("[B]oth defendants have (or have had) more limited collaborations with other domestic carriers, featuring only codesharing and some form of frequent-flyer reciprocity," which "appear to be less restrictive" alternatives to the

---

[2] Inclusion of the BSPA in the list of agreements to be enjoined serves to demonstrate Plaintiffs' overreach.  As the Court noted in footnote 27 of its opinion, the BSPA "was not the focus of substantial testimony at trial, nor does it feature prominently in the parties' legal arguments or the Court's decision."

NEA), 91 ("[T]he record suggests many of the objectives cited by the defendants could be achieved via some degree of codesharing and loyalty reciprocity").

As the Court recognized, codesharing and frequent-flyer reciprocity are extremely common in the airline industry, precisely because they help promote competition. *See, e.g.*, Dkt. 344 at 90 n.112 ("[A]irlines regularly establish more limited relationships with one another through which some amount of codesharing and loyalty reciprocity are offered . . . ."), 15-16 (describing such agreements between Delta and Alaska, and JetBlue and Hawaiian).  The Court even described the WCIA, which includes codesharing and frequent flyer reciprocity, in glowing terms as "encourag[ing]" growth; "incentiviz[ing] … high-quality and seamless customer service"; permitting American and Alaska to "compete more fully with[] Delta and United"; and "largely leav[ing] competition between the two airlines intact." *Id.* at 17, 43.  Plaintiffs offer no serious explanation for why Defendants alone should be prohibited from pursuing these agreements, or forced to terminate the agreements wholesale, and then at a later date, re-establish codesharing and frequent flyer arrangements after complying with Plaintiffs' lengthy notice process.

On the flip side, the harm to Defendants and their customers from being forced to exit Defendants' existing codesharing and frequent flyer agreements is real and substantial.  Customers who have not yet purchased their tickets will lose access to scores of nonstop flight options and the ability to mix-and-match American and JetBlue flights to create hundreds of convenient one-stop connections. Tr. Day 2 (Hayes) at 24:18-23; Tr. Day 7 (Raja) at 131:17.  The loss of these more efficient options will make travel significantly less convenient.  And customers who have already obtained codeshare tickets may well experience disruptions too, especially if the agreements must be terminated, renegotiated under Plaintiffs' supervision, and eventually reinstated.

Moreover, even Plaintiffs recognize that Defendants should "honor the terms of all tickets purchased or issued" and "honor the rewards accrued" by Defendants' frequent flyer members, including by allowing "members to accrue rewards on flights operated by the other Defendant that were purchased prior to the Effective Date for travel before or after the Effective Date[.]"  PFJ III.E-F.  But JetBlue's systems are not technically capable of honoring codeshare accrual and elite benefits for purchases made before the Frequent Flyer Cutoff Date but flown thereafter.  Defendants' systems track points accrual and benefits available on the date of the flight, not the date of the booking—meaning that it is not currently possible to distinguish between those customers who booked their tickets before the effective date of the injunction and those who booked after.  These harms weigh heavily against the entry of Plaintiffs' proposed injunction.

Finally, Defendants should not be barred from remunerating each other for operating codeshare flights and providing frequent flyer accrual and redemptions.  Indeed, the PFJ injunction requires Defendants to honor tickets already sold and to honor rewards, so a mechanism for compensation to the other Defendant *must* remain.  Codeshare commissions and frequent flyer remuneration are standard in the industry precisely to ensure that the right airline is paid for the service provided to the consumer.  But the requirement to "cease all activities governed by the MGIA" in the PFJ (Section III.C) is worded so broadly that it could be read to prohibit the "audit, reconciliation and payment processes" in NEA § 5.11.2—which are required to ensure the right airline is paid for the flights it operates.  An injunction compelling Defendants to fly passengers without compensation is either the result of Plaintiffs' poor drafting or punitive overreach.  It can be addressed by either expressly providing that NEA § 5.11.2 (and other provisions proposed by

Defendants as discussed below) survive or by eliminating Section III.C of the PFJ, which is unnecessary in any event given the language of Section III.A.[3]

### B. Defendants should not be barred from entering into agreements with other Domestic Air Carriers that provide for revenue sharing or coordination of routes or capacity.

For similar reasons, the Court should reject the proposed two-year ban on "enter[ing] into any new alliance, partnership, joint venture, or other agreement with another Domestic Air Carrier if such agreement provides for revenue sharing, or for coordination of routes or capacity, in a manner substantially similar to the NEA."  PFJ III.E.

Plaintiffs' proposal effectively treats revenue sharing and coordination of routes and capacity as inherently anticompetitive—*regardless* of their impact on competition in a relevant market.   That short-circuits the well-established regulatory regime put in place by Congress and the critical inquiry a court must undertake if the DOJ chooses to challenge a proposed venture.  As the Supreme Court has explained, "many 'joint ventures are calculated to enable firms to do something more cheaply or better than they did it before,'" they often produce "procompetitive benefits."  *NCAA v. Alston*, 141 S. Ct. 2141, 2155 (2021) (citation omitted).  Accordingly, the Supreme Court has "caution[ed] against condemning [such] arrangements too reflexively."  *Id.*

But the PFJ represents precisely such reflexive condemnation.   Plaintiffs would bar Defendants from entering into a joint venture with another Domestic Air Carrier involving revenue sharing or coordination of routes and capacity without any analysis of (1) the geographic market; (2) prior competition between the relevant carriers; and (3) the carriers' and others' market power.

---

[3] Section III.A requires termination of the NEA Agreement and Related Agreements, which includes the MGIA.  As a result, there is no need for Section III.C, which requires Defendants to cease all activities governed by the MGIA.  Once terminated, there will be no activities governed by the MGIA—except for the wind-down provisions set out in the NEA, which must survive to ensure an orderly process and mitigation of harm to consumers.

Plaintiffs do not get to skip the critical analysis that antitrust law demands as to *all* of Defendants' future engagements for two years because the Court found *this* arrangement to be anticompetitive.

In any event, the provision is vague and overbroad. The PFJ seeks to prohibit "revenue sharing," without even defining that term, and there are many forms of revenue sharing contained in codesharing and frequent flyer agreements that allow airlines to remunerate each other. Nor does the "manner substantially similar to the NEA" qualifier solve the problem. Plaintiffs make no effort to define what "substantially similar" means, and Defendants are left to guess whether any new agreement violates this provision based on this vague standard. This provision violates the requirement that injunctions be narrowly tailored and precise—which is another reason to reject it.

## II. THE INJUNCTION SHOULD NOT DISTURB THE CONTRACTUAL WIND-DOWN PROVISIONS NEGOTIATED BY THE PARTIES.

Defendants carefully considered the possibility that their agreement would need to be unwound for regulatory or commercial reasons and negotiated detailed provisions for doing so in a manner minimally disruptive to consumers. Those provisions do not themselves run afoul of the antitrust laws under this Court's analysis, and indeed reflect Defendants' intention to execute an orderly unwinding of the NEA precisely in the event a court found the NEA to be unlawful. The Court should not disturb these provisions in its final judgment.

As a general matter, "[i]t is not the role of the court to rewrite the parties' contract." *Bossé v. N.Y. Life Ins. Co.*, 992 F.3d 20, 29 (1st Cir. 2021) (citations omitted). Consistent with that principle, courts in the First Circuit and elsewhere have long rejected requests for injunctive relief that would require "rewrit[ing] the [parties'] contract[s]." *Luis Rosario, Inc. v. Amana Refrigeration, Inc.*, 733 F.2d 172, 174 (1st Cir. 1984) (Breyer, J.); *see also Micro Data Base Sys., Inc. v. Nellcor Puritan Bennett, Inc.*, 165 F.3d 1154, 1157 (7th Cir. 1999).

The NEA makes clear that the "wind-down period is intended solely to fulfill existing bookings under applicable Related Agreements, and to minimize disruption to operations and to passengers as a result of the termination." NEA §5.11.1.  Neither Plaintiffs nor this Court is in a better position to design wind-down procedures than Defendants, who are intimately familiar with their customers' needs, their own resource constraints, and their scheduling obligations.  *Cf. Alston*, 141 S. Ct. at 2166 ("Judges must be mindful . . . of their limitations—as generalists, as lawyers, and as outsiders trying to understand intricate business relationships.").  And Plaintiffs have never identified any aspect of the wind-down provisions that are themselves unlawful.

Striking key termination provisions of the NEA and the Related Agreements would greatly prejudice Defendants' ability to unwind the NEA in an orderly manner.  Provisions that govern notice requirements between Defendants, NEA §7.1; designate the governing law, appropriate venue, and available remedies in the event of a dispute between Defendants arising from the NEA, *id*. §§ 8, 9; allow parties to enforce confidentiality obligations, *id.* § 6.3; allow for coordination on public announcements regarding the NEA (including regarding termination), *id*.; and provide for the completion of audit, reconciliation and payment processes, *id.* § 5.11.2; MGIA §§ 4.93, 5, 6.2, 6.3, 7, are all necessary for Defendants to unwind the NEA with a mutual understanding of their rights and obligations toward each other, customers, and to tax and other authorities.  Indeed, the PFJ would leave no mechanism for payment for flights already booked, including those that the PFJ requires Defendants to "honor" under Section III.E.  That cannot be the result intended by the Plaintiffs.  There is simply no reason to sow chaos by excluding lawful contractual provisions designed to address the exact circumstances the parties are facing here.

III.     **THE INJUNCTION SHOULD NOT REQUIRE INVASIVE MONITORING, OR NOTICE PRIOR TO ENTRY INTO AGREEMENTS WITH OTHER DOMESTIC CARRIERS.**

Antitrust injunctions "must be . . . designed to be carried out with a minimum of judicial supervision and control of the future activities of the defendants." *United States v. Imperial Chem. Indus., Ltd.*, 105 F. Supp. 215, 220 (S.D.N.Y. 1952); *see also Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko*, LLP, 540 U.S. 398, 414-15 (2004) (cautioning against relief that would "chill the very conduct the antitrust laws are designed to protect" and that would "require[] the court to assume the day-to-day controls characteristic of a regulatory agency") (quotations and citations omitted). Plaintiffs' proposed compliance procedures stand in stark contrast to this principle and should be rejected.

### A.  Defendants should not be subject to five years of invasive monitoring.

The demand for a monitor with a roving mandate to review Defendants' internal records and activities for five years is unwarranted.

Plaintiffs seek the five-year appointment of an external compliance monitor—along with any supporting "agents and consultants" the monitor may deem necessary—at the sole "cost and expense of Defendants." PFJ VII.D-E, J. Under Plaintiffs' proposal, the monitor and her team would have "full and complete access to all personnel, books, records, and facilities" of Defendants, under "confidentiality requirements and conflict of interest certifications, approved by the United States in its sole discretion." *Id.* VII.D-E, H. The monitor would further be instructed to provide unlimited compliance reports at a "frequency" to be set by DOJ, again "in its sole discretion." *Id.* VII.H.

This far-reaching request ignores the history of Defendants approaching both the Department of Transportation and Department of Justice regarding the NEA before it was implemented, and lacks any serious justification beyond Plaintiffs' misplaced mistrust of

Defendants.  Courts ordinarily "presume that parties will adhere to orders of the Court," absent any "history of noncompliance with judicial decrees." *Microsoft Corp.*, 224 F. Supp. 2d at 181 & n.79.  And plainly, no such history exists here.  The Court should reject Plaintiffs' request to appoint a third party as "detective, prosecutor, and judge" to enforce the injunction. *Id.* at 181; *see Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 516 F. Supp. 2d 324, 335 (D. Del. 2007) (rejecting private plaintiffs' request that defendant "hire an outside, independent monitor, in contrast to the employee it has designated as the antitrust compliance officer"), *aff'd*, 602 F.3d 237 (3d Cir. 2010); *cf. Imperial Chem.*, 105 F. Supp. at 222 (court "may not act entirely upon an assumption that the defendants will continue in their disregard of the law and violate the injunctions of a final judgment").  While monitors may be appropriate in criminal cases or those involving concealed cartel conduct, that is the opposite of the situation here—where Defendants proactively approached the Department of Transportation and Department of Justice long before the NEA took effect.

At a minimum, the duration of the Plaintiffs' monitoring request is out of step with that which has been approved in prior cases.  Here, Plaintiffs seek to subject Defendants to a five-year monitoring period.  But to the extent courts have imposed this extraordinary remedy, they have done so only for much shorter time frames.  For example, the Southern District of New York limited its appointment of an external compliance monitor in *United States v. Apple* (a concealed conspiracy case) to two years, despite the DOJ's request for a ten-year monitoring period.  *See* Order Entering Permanent Injunction at 10-11, *United States v. Apple, Inc.*, No. 12-2826 (S.D.N.Y. Sept. 5, 2013), Dkt. 374; *see also United States v. Apple Inc.*, 992 F. Supp. 2d 263, 267 (S.D.N.Y. 2014) (noting that Court "prefer[red] that Apple adopt a vigorous in-house antitrust enforcement program and convince the plaintiffs, and this Court, that there is no need for a monitor" but that

Apple had failed to demonstrate that "it was seriously reforming its internal antitrust compliance policies to prevent a repeat of its violation"), *aff'd*, 787 F.3d 131 (2d Cir. 2015).  Similarly, the district court in *AU Optronics*—a *criminal* case involving price-fixing—limited its monitoring period to only three years.  Judgment at 2-3, *United States v. AU Optronics Corp.*, No. 09-0110 (N.D. Cal. Oct. 2, 2012), Dkt. 976.  This "complex[]" civil case is worlds apart from *AU Optronics*, Dkt. 344 at 5, yet Plaintiffs seek a far longer monitoring period.[4]

Finally, the substantial cost and duration of the monitoring period will almost certainly chill Defendants' operations, leading to a reduction in the innovative conduct that is needed in an industry like this one.  *See Avaya Inc. v. Telecom Labs, Inc.*, No. 06-2490, 2014 WL 2940455, at *8 (D.N.J. June 30, 2014) ("Imposing internal and external compliance monitors would add little additional security at great costs.").

### B.  Defendants should not be required to notify the DOJ prior to entering into or amending agreements, partnerships, or joint ventures with other Domestic Air Carriers.

Plaintiffs further propose to require notice and review before Defendants may enter into or amend any agreement with *any other Domestic Air Carrier*—regardless of the subject matter of the agreement.  There is no justification for such an expansive requirement or its lengthy term (five years).

Plaintiffs' proposal would require Defendants to provide significant, confidential business information to regulatory agencies and would impose lengthy waiting periods before most

---

[4] Cases where longer-term monitors have been appointed only underscore why such a lengthy monitor is inappropriate here.  In *Bazaarvoice*, for example, there was a divestiture and sale, where Bazaarvoice was ordered provide a license and access to its technology to the acquirer for a period of four years, thereby justifying supervision for that period.  *See* Third Amended Final Judgemnt at 3, 7, 10-13, *United States v. Bazaarvoice, Inc.*, No. 13-133 (N.D. Cal. Dec. 2, 2014), Dkt. 286. Here, by contrast, DOJ seeks a five-year monitor but the unwinding process will take a matter of months, and the process is specified by the terms of the NEA.

agreements could go into effect.[5]  Specifically, for every proposed agreement with a Domestic Air Carrier, the PFJ would require Defendants to produce "copies of all related contracts or other agreements, and all studies, surveys, analyses, and reports which were prepared by or for any officer(s) or director(s) for the purpose of evaluating or analyzing the new agreement, partnership, joint venture, or amendment thereto with respect to market shares, competition, competitors, markets, potential for sales growth, or expansion into new products or geographic areas."  PFJ V.C.  Plaintiffs would further require Defendants to wait "at least 30 calendar days" following the submission of these materials before implementing the relevant agreement.  *Id.* V.D.  And if the Antitrust Division issued a Civil Investigative Demand within that 30-day period, Plaintiffs' proposal would impose an *additional* delay of "60 calendar days after submitting all information required under the Civil Investigative Demand."  *Id.*

Plaintiffs offer no serious justification for erecting such barriers to entirely unrelated agreements with third-party carriers.  As previously explained, "airlines regularly establish" agreements to engage in "codesharing and loyalty reciprocity."  Dkt. 344 at 90 n.112; *see supra* Part I.A.  Indeed, Defendants themselves already have a number of such agreements, which this Court described as procompetitive.  *See, e.g.*, Dkt. 344 at 15-17 (discussing WCIA and an agreement between JetBlue and Hawaiian).  As proposed, the provision would go so far as to cover even the most mundane agreements between domestic airlines that are often critical for the operational integrity of airlines' existing schedules.  For example, airlines routinely engage in

---

[5] Plaintiffs' proposal exempts "short-term (less than 90 days) sharing of Airport Infrastructure" and any other "classes of agreements that the Department of Justice in its sole discretion determines to be unlikely to raise competitive concerns" from the notice and waiting-period requirements.  PFJ V.E.  Although Defendants agree short-term sharing of Airport Infrastructure and agreements that are unlikely to raise competitive concerns should be omitted, this exception is too vague and does not cover the multitude of everyday agreements necessary to ensure that the American public can travel with disruptions minimized.

agreements to reaccommodate each other's passengers in the event of service disruptions. Airlines also lease or sell aircraft or even spare parts as needed on a one-off basis. And the provision would also cover simple amendments to existing agreements, such as modifications to accrual rates in an existing Frequent Flyer reciprocity agreement to account for changes to an airline's frequent flyer program from mileage-based to revenue-based accrual. The PFJ would severely restrict Defendants' practical ability to continue to enter into such agreements, for no good reason.

There is simply no need to impose additional, burdensome notice procedures on top of the scrutiny that Defendants' actions already receive. As this Court recognized, Defendants made multiple amendments to the NEA in connection with the Department of Transportation's review. Dkt. 344 at 26-28. There is no reason to believe that Defendants will not continue to engage in these review processes in good faith, as they have always done in the past.

It is also blackletter law that an antitrust injunction must not provide Defendants' rivals with a "positive competitive advantage" to which they would not have otherwise been entitled. *Paramount Film Distrib. Corp. v. Vill. Theatre, Inc.*, 228 F.2d 721, 727 (10th Cir. 1955). The purpose of antitrust law is, after all, the "protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). For that reason, courts routinely reject proposed injunction terms that "will provide significant benefit to competitors, but have not been shown to benefit competition." *Microsoft Corp.*, 224 F. Supp. 2d at 185; *see also Milwaukee Towne Corp. v. Loew's, Inc.*, 190 F.2d 561, 571 (7th Cir. 1951) ("[Private] plaintiff has no right to the award of a position superior to that of other competitors."). DOJ itself has previously affirmed this basic principle, explaining that "decree provisions should preserve competition rather than protect or favor particular competitors." U.S. Dep't of Justice, Antitrust Div., *Merger Remedies Manual* at 4-5 (2020), https://www.justice.gov/atr/page/file/1312416/download. Placing Defendants at a

disadvantage relative to other carriers would harm rather than aid competition.  Because the Court "may not … place the defendants, for the future, 'in a different class than other people,'" the Court should reject Plaintiffs' proposed notice provisions.  *Hartford-Empire*, 323 U.S. at 409 (citation omitted).

## IV.    THE COURT SHOULD ADOPT DEFENDANTS' PROPOSED EFFECTIVE DATE.

Finally, the Court should adopt Defendants' proposed effective date for the injunction. Defining the effective date as the later of 30 days following the entry of the injunction, or 30 days following the expiration of any stay of the injunction, is standard.  *See, e.g.*, Order Entering Permanent Injunction at 2, *United States v. Am. Express Co.*, No. 10-4496 (E.D.N.Y. Apr. 30, 2015), Dkt. 638 (30 days); Order Entering Permanent Injunction at 2, 16, *United States v. Apple, Inc.*, No. 12-2826 (S.D.N.Y. Sept. 5, 2013), Dkt. 374 (30 days); Final Judgment at 4, *United States v. Visa U.S.A., Inc.*, No. 98 Civ. 7076 (S.D.N.Y. Nov. 28, 2001), Dkt. 216 (90 days).  Defendants' proposal would give this Court and the Court of Appeals sufficient time to resolve any forthcoming motions to stay the judgment pending appeal.  It would also permit Defendants sufficient time to come into compliance with the injunction in a manner that minimizes disruptions to customers. Plaintiffs did not refer Defendants to any examples of antitrust cases in which a complex injunction such as this one—requiring the unwinding of a multi-year joint venture relationship Plaintiffs chose not to challenge before it was implemented—came into effect in just seven days, and Defendants are aware of none.

## CONCLUSION

The Court should reject Plaintiffs' PFJ and enter Defendants' proposed final judgment, which is more narrowly tailored to the Court's findings, legal theories, and the evidence presented at trial.

## REQUEST FOR ORAL ARGUMENT

Defendants respectfully request oral argument on the Motion for Entry of Final Judgement and Permanent Injunction.

Dated: June 9, 2023

Respectfully submitted,

/s/ Alfred C. Pfeiffer
Alfred C. Pfeiffer (*pro hac vice*)
Christopher S. Yates (*pro hac vice*)
Elise M. Nelson (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
al.pfeiffer@lw.com
chris.yates@lw.com
elise.nelson@lw.com
nitesh.daryanani@lw.com

Ian R. Conner (*pro hac vice*)
Michael G. Egge (*pro hac vice*)
Farrell J. Malone (*pro hac vice*)
Allyson M. Maltas (*pro hac vice*)
Marguerite M. Sullivan (*pro hac vice*)
Tara L. Tavernia (*pro hac vice*)
Seung Wan Paik (*pro hac vice*)
Jesse A. Vella (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
ian.conner@lw.com
michael.egge@lw.com
farrell.malone@lw.com
allyson.maltas@lw.com
marguerite.sullivan@lw.com
andrew.paik@lw.com
tara.tavernia@lw.com
jesse.vella@lw.com

David C. Tolley (BBO #676222)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
david.tolley@lw.com

*Attorneys for Defendant*
*American Airlines Group Inc.*

/s/ Richard Schwed
Richard Schwed (*pro hac vice*)
Matthew L. Craner (*pro hac vice*)
Jessica K. Delbaum (*pro hac vice*)
Leila Siddiky (*pro hac vice*)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-5445
rschwed@shearman.com
matthew.craner@shearman.com
jessica.delbaum@shearman.com
leila.siddiky@shearman.com

Brian Hauser (*pro hac vice*)
Ryan Leske (*pro hac vice*)
Shearman & Sterling LLP
401 9th Street, NW
Washington, DC 20004
Telephone: (202) 508-8005
brian.hauser@shearman.com
ryan.leske@shearman.com

Glenn A. MacKinlay, BBO #561708
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
Telephone: (617) 449-6548
gmackinlay@mccarter.com

*Attorneys for Defendant*
*JetBlue Airways Corporation*

## **LOCAL RULE 7.1 CERTIFICATION**

Pursuant to Local Rule 7.1(a)(2), undersigned counsel hereby certifies that American Airlines Group Inc. and JetBlue Airways Corporation have conferred with counsel for Plaintiffs regarding the content of the proposed Final Judgment.  Defendants understand that Plaintiffs will be submitting their own proposed Final Injunction in parallel.


/s/ Alfred C. Pfeiffer
Alfred C. Pfeiffer


## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.

/s/ Alfred C. Pfeiffer
Alfred C. Pfeiffer