# Exhibit 1

**Defendants' Proposed Changes to Plaintiffs' Proposed Final Judgment**

| Section from Plaintiffs' PFJ | Issue | Defendants' Proposed Changes[1] | Reasoning |
|---|---|---|---|
| Preamble | Purpose of injunction | The purpose of this Permanent Injunction is the prompt and certain termination of the NEA, while minimizing disruption to passengers as a result of the termination~~, and preventing the recurrence of similar anticompetitive conduct~~. | The purpose of the relief should be to enjoin the conduct that has been found unlawful by the Court, not to provide the Government broad authority to unilaterally prohibit Defendants from engaging in otherwise lawful activities with the vague purpose of preventing "similar anticompetitive conduct." *See* Section I of Defendants' Memorandum. |
| I.H. | Timing for injunction to take effect | "Effective Date" means the later of (i) ~~seven (7)~~ **thirty (30)** days following the date of entry of this Permanent Injunction**; (ii) if a notice of appeal and motion to stay are filed, thirty (30) days following resolution of a stay motion in the First Circuit;** or (iii) ~~seven (7)~~ **thirty (30)** days following the expiration of any stay of this Permanent Injunction entered by this Court or any appellate court of competent jurisdiction. | It is impossible for Defendants to unwind the NEA within 7 days without risking significant consumer disruption. Thirty (30) days will be challenging, but Defendants are willing to offer this limited time period as a compromise. *See* Section IV of Defendants' Memorandum. |
| I.K. | Timing for termination of existing frequent flyer cooperation | Frequent Flyer Cutoff Date" means **ninety (90) days following the Effective Date.** ~~the later of (i) thirty (30) days following the date of entry of this Permanent Injunction, or (ii) thirty (30) days following the expiration of any stay of this Permanent Injunction entered by this Court or any appellate court of competent jurisdiction.~~ | The BSPA, Codeshare Agreement, and Frequent Flyer Agreement are less restrictive means of delivering benefits to customers that the Court did not find to be illegal. If these industry-standard agreements that deliver significant consumer benefits have to be terminated at all, doing so without sufficient time to negotiate and execute new agreements would cause consumer harm and confusion. Additionally, it is impractical to require Defendants to honor rewards for customers who have booked flights, but not provide those same benefits to customers that have yet to book flights but will travel on the same itinerary, and requiring Defendants to do so will lead to further customer confusion and frustration. Finally, any requirement on Defendants to honor tickets sold must allow Defendants to remunerate each other for codesharing and frequent flyer benefits. *See* Section I of Defendants' Memorandum. |

---

[1] Language in this column is marked to show Defendants' proposed changes, with red/strike-though language representing proposed deletions and **bold/blue** language representing proposed additions.

1

| Section from Plaintiffs' PFJ | Issue | Defendants' Proposed Changes[1] | Reasoning |
|---|---|---|---|
| II. | Entities covered by the injunction | This Permanent Injunction applies to American Airlines, JetBlue, and each of their affiliates, subsidiaries, officers, directors, agents, employees, successors, and assigns~~, and to any successor to any substantial part of the business~~. | The stricken passage is surplusage and ambiguous. "Successors" are already covered. "Any substantial part of the business" is vague and raises questions regarding whether an airline that may in the future purchase fleet or other parts of Defendants' business may become subject to the Permanent Injunction. If this is retained, it should be clarified to apply to "substantially all of each Defendant's business" which would provide more clarity. |
| III.A. | Agreements that will terminate | On or before the Effective Date, and subject only to the limitations and exceptions explicitly included in Section IV, the Defendants shall terminate the NEA Agreement and the ~~Related Agreements~~ **Mutual Growth Incentive Agreement. The BSPA, Codeshare Agreement, and Frequent Flyer Agreements remain in effect.** | The BSPA, Codeshare Agreement, and Frequent Flyer Agreement are less restrictive means of delivering consumer benefits to customers that the Court did not find to be illegal. Terminating these agreements that are industry standard and deliver significant consumer benefits would cause consumer harm and confusion. *See* Section I of Defendants' Memorandum. |
| III.B. | Prohibited activities – schedule coordination | On or before the Effective Date, and subject only to the limitations explicitly included in Section IV, the Defendants shall cease all activities governed by the NEA Agreement, including but not limited to all coordination of schedules and routes~~, and any effort to allocate markets~~. | "And any effort to allocate markets" is unnecessary given the remainder of this provision. |
| III.C. | Prohibited activities – MGIA | ~~On or before the Effective Date, the Defendants shall cease all activities governed by the MGIA, including but not limited to revenue sharing.~~ | This provision is superfluous given Section III.A., which directs Defendants to terminate the MGIA. Termination invokes a number of specific activities associated with winding down the MGIA, as governed by the MGIA. Thus, the directive to cease "all activities governed by the MGIA" is inconsistent with III.A's directive to terminate as well as to honor flights booked prior to the effective date of the termination of the NEA. *See* Section I and II of Defendants' Memorandum. |

2

| Section from Plaintiffs' PFJ | Issue | Defendants' Proposed Changes[1] | Reasoning |
|---|---|---|---|
| III.E. | Prohibition of Codesharing | On or before **120 days following** the Effective Date, each Defendant shall cease marketing and selling flights operated by the other Defendant pursuant to the Codeshare Agreement or any other agreement between the Defendants related to the NEA Agreement. Notwithstanding this provision, the Defendants shall honor the terms of all tickets purchased or issued prior to the Effective Date pursuant to the Codeshare Agreement, and may continue to place their respective airline code on (but not sell new tickets for) flights operated by the other Defendant, including for travel that will take place after the Effective Date. **Defendants may execute amendments to the existing Codeshare Agreement necessary to provide for industry standard codeshare commissions for passengers who purchased tickets prior to the Effective Date for trips to be flown following the Effective Date.** | The BSPA, Codeshare Agreement, and Frequent Flyer Agreement are less restrictive means of delivering consumer benefits to customers that the Court did not find to be illegal. Terminating these agreements that are industry standard and deliver significant consumer benefits without sufficient time to negotiate and execute new agreements would cause consumer harm and confusion. Additionally, any requirement on Defendants to honor tickets sold must allow Defendants to remunerate each other for codesharing and frequent flyer benefits. *See* Section I of Defendants' Memorandum. |

3

| Section from Plaintiffs' PFJ | Issue | Defendants' Proposed Changes[1] | Reasoning |
|---|---|---|---|
| III.F. | Prohibition of Frequent Flyer reciprocity | On or before the Frequent Flyer Cutoff Date, each Defendant shall cease allowing passengers to accrue rewards for its frequent flyer program while traveling on flights operated by the other Defendant pursuant to the Frequent Flyer Agreements or any other agreement between the Defendants related to the NEA Agreement. **Notwithstanding this provision, the Defendants will permit redemption of frequent flyer awards for tickets purchased prior to the Frequent Flyer Cutoff Date for flights to be flown after the Frequent Flyer Cutoff Date; and the parties will pay each other the accrual and redemption amounts as set forth in the FFP Agreements as stated therein.** ~~loyalty program of each Defendant shall honor the rewards accrued by its members pursuant to the Frequent Flyer Agreements on flights operated by the other Defendant prior to the Frequent Flyer Cutoff Date, and shall allow its members to accrue rewards on flights operated by the other Defendant that were purchased prior to the Frequent Flyer Cutoff Date, as governed by the Frequent Flyer Agreements. In addition, each Defendant shall also honor tickets or other products or services purchased using rewards prior to the Frequent Flyer Cutoff Date, including for flights that will take place after the Frequent Flyer Cutoff Date.~~ **Defendants may execute amendments to the existing Frequent Flyer Agreements necessary to provide for industry standard provisions, including remuneration for accrual and redemption.** | Any requirement on Defendants to honor tickets sold must allow Defendants to remunerate each other for codesharing and frequent flyer benefits. Additionally, JetBlue is technically incapable of honoring codeshare accrual and elite benefits for purchases made before the Frequent Flyer Cutoff Date but flown thereafter. Defendants' systems track points mileage accrual and benefits available on the date of the flight, not the date of the booking—meaning that it is not currently possible to distinguish between those customers who booked their tickets before the effective date of the injunction and those who booked after. *See* Section I of Defendants' Memorandum. |

4

| Section from Plaintiffs' PFJ | Issue | Defendants' Proposed Changes[1] | Reasoning |
|---|---|---|---|
| III.G. | BSPA | ~~On or before the Effective Date, the provisions of the BSPA governing settlement of passengers accommodated under the Codeshare Agreement shall be terminated.~~ | The BSPA, Codeshare Agreement, and Frequent Flyer Agreement are less restrictive means of delivering consumer benefits to customers that the Court did not find to be illegal. Terminating these agreements that are industry standard and deliver significant consumer benefits would cause consumer harm and confusion. Indeed, the Court noted the BSPA "was not the focus of substantial testimony at trial, nor does it feature prominently in the parties' legal arguments or the Court's decision." *See* Section I of Defendants' Memorandum. |
| III.I. | Future partnerships | ~~Neither Defendant shall enter into any new alliance, partnership, joint venture, or other agreement with another Domestic Major Air Carrier if such agreement provides for revenue sharing, or for coordination of routes or capacity, in a manner substantially similar to the NEA. This provision shall expire on the second anniversary of the Effective Date.~~ | This provision effectively treats all agreements involving revenue sharing or coordination of routes and capacity as presumptively illegal when that is not the law and was not found to be the case by the Court. "Substantially similar to the NEA" is vague and provides no coherent limitation on the prohibition. *See* Section I of Defendants' Memorandum. |
| III.G. | Competitive Sensitive Information | Neither Defendant may send, receive, request, or otherwise communicate any Competitively Sensitive Information to or from the other Defendant after the Effective Date. Neither Defendant shall use in any way any Competitively Sensitive Information obtained from the other Defendant during the period when the NEA or any applicable wind-down activities were in effect. Any of Defendant's officers, agents, directors, or employees with Competitively Sensitive Information obtained from the other Defendant shall not disclose such information to any other person, including other persons working for any Defendant or any other air carrier. Notwithstanding this paragraph, Defendants may communicate or use Competitively Sensitive Information as necessary to (i) fulfill existing bookings or rewards for travel booked prior to the Effective Date, or (ii) as otherwise **permitted by or** necessary to comply with this Final Judgment, or other court order, **protective order**, law, or regulation. | Plaintiffs define Competitively Sensitive Information very broadly to include non-public information regarding Defendants' business. As drafted by Plaintiffs, the provision could be read to prevent Defendants from sharing information necessary to fulfill codeshare bookings or provide frequent flyer reciprocity to customers, engage in joint defense efforts in litigation, or engage in other uncontroversial activities that the Court did not find unlawful. Defendants propose minor edits in order to clarify the scope of this provision. |

| Section from Plaintiffs' PFJ | Issue | Defendants' Proposed Changes[1] | Reasoning |
|---|---|---|---|
| IV.A. | Provisions surviving termination | After termination of the NEA Agreement and the Related Agreements, the following provisions in the NEA Agreement shall continue in force and effect to fulfill the purpose stated in Section 5.11 in the NEA Agreement ("Effect of Termination"): "to fulfill existing bookings under applicable Related Agreements and to minimize disruption to operations and to all passengers as a result of the termination." Section 5.11.1 (requiring that each Defendant agrees to provide reasonable assistance to the other Defendant to wind-down the NEA, and that each Defendant will use its commercially reasonable efforts to minimize any disruption caused to customers); Section 6.1 (Confidentiality); and Section 10.1 (Data Protection and Privacy). The survivability or severability of all other provisions of the NEA Agreement and the Related Agreements after termination shall be governed by the ~~relevant law of contracts~~ **terms of the NEA Agreement or the Related Agreements, as applicable**, except where prohibited elsewhere in this Final Judgment. | Defendants propose to simply clarify this potentially vague language as the "relevant law of contracts" would dictate that the terms of the contract at issue control and that the remaining termination provisions not specifically identified by the Proposed Final Judgment continue to survive. *See* Section II of Defendants' Memorandum. |
| V.B. | Future partnerships | ~~Neither Defendant may enter into any new agreement, partnership, or joint venture with another Domestic Major Air Carrier, or enter into an amendment thereto, without prior notification to the Plaintiffs. Such notification shall be provided to the Chief of the Transportation, Energy, and Agriculture Section of the Antitrust Division of the Department of Justice (or any successor to that Section), and to the Attorney General of each of the Plaintiff States. This provision shall expire on the fifth anniversary of the Effective Date of this Final Judgment.~~ | The Government already has ample opportunity to receive notice and investigate any new major agreements between domestic airlines. The provision is extremely broad to cover even the most mundane agreements and would chill day-to-day cooperation among airlines that help to minimize travel disruption and benefit consumers. *See* Section III of Defendants' Memorandum. |

| Section from Plaintiffs' PFJ | Issue | Defendants' Proposed Changes[1] | Reasoning |
|---|---|---|---|
| V.D. | Future partnerships | Any agreements, partnerships, joint ventures, or amendments subject to Section V.A ~~or V.B~~, above, may not be implemented or otherwise enter into force or effect until at least 30 calendar days following notification to the Plaintiffs and submission of the materials required under Section V.C, unless representatives of the Department of Justice Antitrust Division agree in writing to a shorter period. If, within 30 calendar days following notification and submission of the materials required under Section V.C, representatives of the Department of Justice Antitrust Division issue one or more Civil Investigative Demands seeking information related to the agreement, partnership, joint venture, or amendment thereto, a Defendant who received a Civil Investigative Demand may not implement the proposed agreement, partnership, joint venture, or amendment until 60 calendar days after ~~submitting all information required under~~ **substantially complying with** the Civil Investigative Demand. | It is well-accepted in the context of the Hart Scott Rodino pre-merger notification regulatory regime that "substantial compliance" is the right standard for parties that are subject to an extensive and burdensome investigation from the Department of Justice. A requirement to submit all information required is often an impossibility and would effectively allow the Department of Justice to filibuster otherwise lawful agreements with Civil Investigative Demands that are impossible to fully comply with. *See* Section III of Defendants' Memorandum. |
| VI.A. – K. | Monitoring trustee | **Defendants propose omitting these provisions, which provide for a monitoring trustee.** | A monitoring trustee as proposed would be seriously invasive to Defendants' business and chill procompetitive behavior. *See* Section III of Defendants' Memorandum. |