# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> AMERICAN AIRLINES GROUP INC. and JETBLUE AIRWAYS CORPORATION, <br><br> *Defendants*. | Case No. 1:21-cv-11558-LTS |

**DEFENDANTS' [PROPOSED] FINAL JUDGMENT AND ORDER ENTERING PERMANENT INJUNCTION**

Plaintiff United States of America and Plaintiff States filed a Complaint on September 21, 2021; Defendants filed a Motion to Dismiss on November 22, 2021 which this Court denied on June 9, 2022; Defendants filed their Answers on July 11, 2022; this Court having conducted a full month-long trial on all issues of liability and issued its Findings of Fact and Conclusions of Law on May 19, 2023, holding that the NEA violated Section 1 of the Sherman Act, 15 U.S.C. § 1, permanently enjoining Defendants from continuing, and restraining Defendants from further implementing, the NEA, and ordering that the parties submit a proposed order regarding the text of the Permanent Injunction ordered by the Court.

The purpose of this Permanent Injunction is the prompt and certain termination of the NEA, while minimizing disruption to passengers as a result of the termination.

It is hereby ORDERED, ADJUDGED, AND DECREED:

I. Definitions

As used in this Final Judgment and Order Entering Permanent Injunction:

A. "Airport Infrastructure" means gates, ground facilities, or other airport infrastructure.

B. "American Airlines" means American Airlines Group Inc.

C. "BSPA" means the Bilateral Special Prorate Agreement for Passengers between American Airlines and JetBlue executed on or about November 1, 2021, or as subsequently amended.

D. "Codeshare Agreement" means the Codeshare Agreement between American Airlines and JetBlue executed on or about July 15, 2020, or as subsequently amended.

E. "Competitively Sensitive Information" means any non-public information of Defendants relating to scheduled air passenger services, including without limitation non-public information relating to network plans, pricing or pricing strategies, frequent flyer programs, corporate customer negotiations, tactics or strategy, costs, revenues, profits, margins, output, marketing, advertising, promotion, or research and development.

F. "Defendant" means separately or collectively American Airlines and JetBlue.

G. "Domestic Air Carrier" means Alaska Airlines, Allegiant Air, American Airlines, Avelo Airlines, Breeze Airways, Delta Air Lines, Frontier Airlines, Hawaiian Airlines, JetBlue, Southwest Airlines Co., Spirit Airlines, Inc., Sun Country Airlines, and United Airlines, Inc.

H. "Effective Date" means the later of (i) thirty (30) days following the date of entry of this Permanent Injunction; (ii) if a notice of appeal and motion to stay are filed, thirty (30) days following resolution of a stay motion in the First Circuit; or (iii) thirty (30) days following the expiration of any stay of this Permanent Injunction entered by this Court or any appellate court of competent jurisdiction.

I. "Final Judgment" means this Final Judgment and Order Entering Permanent Injunction.

J. "Frequent Flyer Agreements" means the AAdvantage Participating Carrier Agreement and the TrueBlue Participating Carrier Agreement between American Airlines and JetBlue executed on or about October 21, 2020, or as subsequently amended.

K. "Frequent Flyer Cutoff Date" means ninety (90) days following the Effective Date.

L. "JetBlue" means JetBlue Airways Corporation.

M. "MGIA" means the Mutual Growth Incentive Agreement between American Airlines and JetBlue executed on or about July 15, 2020 and all amendments thereto.

N. "NEA" means the partnership between the Defendants governed by the NEA Agreement and Related Agreements executed on or after July 15, 2020.

O. "NEA Agreement" means the Northeast Alliance Agreement between American Airlines and JetBlue on or about July 15, 2020 and all amendments thereto.

P. "Plaintiffs" means collectively the United States and the Plaintiff States.

Q. "Plaintiff States" means the States and Commonwealths of Arizona, California, Florida, Massachusetts, Pennsylvania, and Virginia and the District of Columbia.

R. "Related Agreements" means the MGIA, the Frequent Flyer Agreements, the Codeshare Agreement, and the BSPA.

S. "Slot" means the right and operational authority to conduct a landing or take-off operation at a specific time or during a specified time period at a specific airport, including without limitation, slots, arrival authorizations, and operating authorizations, whether pursuant to

federal regulations or orders pursuant to Title 14, Title 49, or other federal statutes or regulations now or hereinafter in effect.

T.  "Slot Lease Agreement" means any agreement entered between American Airlines and JetBlue under which one Defendant temporarily leases or subleases Slots to the other Defendant.

## II. Applicability

This Permanent Injunction applies to American Airlines, JetBlue, and each of their affiliates, subsidiaries, officers, directors, agents, employees, successors, and assigns.

## III. Required Conduct

A.  On or before the Effective Date, and subject only to the limitations and exceptions explicitly included in Section IV, the Defendants shall terminate the NEA Agreement and the Mutual Growth Incentive Agreement.  The BSPA, Codeshare Agreement, and Frequent Flyer Agreements remain in effect.

B.  On or before the Effective Date, and subject only to the limitations explicitly included in Section IV, the Defendants shall cease all activities governed by the NEA Agreement, including but not limited to all coordination of schedules and routes.

C.  In order to support continuity of service scheduled prior to the Effective Date, each Defendant may continue to use any slots it is currently using pursuant to a Slot Lease Agreement or otherwise in connection with the wind-down provisions of the NEA, and may continue to share Airport Infrastructure, until a date that shall be established by subsequent order of the Court. No later than 21 days after the Effective Date, Defendants shall submit to Plaintiffs a proposed wind-down plan for expeditious and orderly termination of all Slot Lease Agreements related to the NEA and Airport Infrastructure" sharing agreements related to the NEA. The parties shall submit their positions no later than 45 days after the Effective Date, at which point

the Court shall order such additional relief as shall be necessary to ensure the complete termination of all Slot Lease Agreements and Airport Infrastructure sharing agreements related to the NEA without unnecessary delay.

      D.      On or before 120 days following the Effective Date, each Defendant shall cease marketing and selling flights operated by the other Defendant pursuant to the Codeshare Agreement or any other agreement between the Defendants related to the NEA Agreement. Notwithstanding this provision, the Defendants shall honor the terms of all tickets purchased or issued prior to the Effective Date pursuant to the Codeshare Agreement, and may continue to place their respective airline code on (but not sell new tickets for) flights operated by the other Defendant, including for travel that will take place after the Effective Date.  Defendants may execute amendments to the existing Codeshare Agreement necessary to provide for industry standard codeshare commissions for passengers who purchased tickets prior to the Effective Date for trips to be flown following the Effective Date.

      E.      On or before the Frequent Flyer Cutoff Date, each Defendant shall cease allowing passengers to accrue rewards for its frequent flyer program while traveling on flights operated by the other Defendant pursuant to the Frequent Flyer Agreements or any other agreement between the Defendants related to the NEA Agreement. Notwithstanding this provision, the Defendants will permit redemption of frequent flyer awards for tickets purchased prior to the Frequent Flyer Cutoff Date for flights to be flown after the Frequent Flyer Cutoff Date; and the parties will pay each other the accrual and redemption amounts as set forth in the FFP Agreements as stated therein.  Defendants may execute amendments to the existing Frequent Flyer Agreements necessary to provide for industry standard provisions, including remuneration for accrual and redemption.

    F.    Neither Defendant shall enter into any new alliance, partnership, joint venture, or other agreement with each other if such agreement provides for revenue sharing, or for coordination of routes or capacity, in a manner substantially similar to the NEA. This provision shall expire on the tenth anniversary of the Effective Date.

    G.    Neither Defendant may send, receive, request, or otherwise communicate any Competitively Sensitive Information to or from the other Defendant after the Effective Date. Neither Defendant shall use in any way any Competitively Sensitive Information obtained from the other Defendant during the period when the NEA or any applicable wind-down activities were in effect. Any of Defendant's officers, agents, directors, or employees with Competitively Sensitive Information obtained from the other Defendant shall not disclose such information to any other person, including other persons working for any Defendant or any other air carrier. Notwithstanding this paragraph, Defendants may communicate or use Competitively Sensitive Information as necessary to (i) fulfill existing bookings or rewards for travel booked prior to the Effective Date, or (ii) as otherwise permitted by or necessary to comply with this Final Judgment, or other court order, protective order, law, or regulation.

    H.    Within 30 days of the Effective Date, each Defendant shall develop, implement, and communicate to all relevant personnel a plan for complying with the terms of this Final Judgment, and shall provide copies of such plan to the Plaintiffs.

IV. <u>Additional Provisions</u>

    A.    After termination of the NEA Agreement and the Related Agreements, the following provisions in the NEA Agreement shall continue in force and effect to fulfill the purpose stated in Section 5.11 in the NEA Agreement ("Effect of Termination"): "to fulfill

existing bookings under applicable Related Agreements and to minimize disruption to operations and to all passengers as a result of the termination."

    a. Section 5.11.1 (requiring that each Defendant agrees to provide reasonable assistance to the other Defendant to wind-down the NEA, and that each Defendant will use its commercially reasonable efforts to minimize any disruption caused to customers);

    b. Section 6.1 (Confidentiality); and

    c. Section 10.1 (Data Protection and Privacy).

The survivability or severability of all other provisions of the NEA Agreement and the Related Agreements after termination shall be governed by the terms of the NEA Agreement or the Related Agreements, as applicable, except where prohibited elsewhere in this Final Judgment.

    B. Subject to the Notice requirements in Section V, and the prohibitions of Paragraphs III.H and III.I, nothing in this Final Judgment shall be construed to prohibit either Defendant from entering into new agreements, including with the other Defendant, that are not otherwise prohibited by the antitrust laws or other laws or regulations.

## V. Notice

    A. Neither Defendant may enter into any new agreement, partnership, or joint venture, with the other Defendant, or enter into an amendment thereto, without prior notification to the Plaintiffs. Such notification shall be provided to the Chief of the Transportation, Energy, and Agriculture Section of the Antitrust Division of the Department of Justice (or any successor to that Section), and to the Attorney General of each of the Plaintiff States. This provision shall expire on the tenth anniversary of the Effective Date of this Final Judgment.

B.  For agreements, partnerships, joint ventures, or amendments subject to Section V.A above, the respective Defendant must provide Plaintiffs with copies of all related contracts or other agreements, and all studies, surveys, analyses, and reports which were prepared by or for any officer(s) or director(s) for the purpose of evaluating or analyzing the new agreement, partnership, joint venture, or amendment thereto with respect to market shares, competition, competitors, markets, potential for sales growth, or expansion into new products or geographic areas in a manner consistent with the instructions and guidance issued by the Premerger Notification Office of the Federal Trade Commission on Item 4(c) and Item 4(d) of the Notification and Report Form pursuant to 16 C.F.R. § 803.1(a).

C.  Any agreements, partnerships, joint ventures, or amendments subject to Section V.A, above, may not be implemented or otherwise enter into force or effect until at least 30 calendar days following notification to the Plaintiffs and submission of the materials required under Section V.C, unless representatives of the Department of Justice Antitrust Division agree in writing to a shorter period. If, within 30 calendar days following notification and submission of the materials required under Section V.C, representatives of the Department of Justice Antitrust Division issue one or more Civil Investigative Demands seeking information related to the agreement, partnership, joint venture, or amendment thereto, a Defendant who received a Civil Investigative Demand may not implement the proposed agreement, partnership, joint venture, or amendment until 60 calendar days after substantially complying with the Civil Investigative Demand.

D.  Notwithstanding the foregoing, the Defendants are not required to provide notice or observe a waiting period for any agreement solely constituting short-term (less than 90 days) sharing of Airport Infrastructure. In addition, the Department of Justice, in writing to the

Defendants, may exclude from the Notice requirements of this Section certain other classes of agreements that the Department of Justice in its sole discretion determines to be unlikely to raise competitive concerns.

## VI.     Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Permanent Injunction to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Permanent Injunction, to modify any of its provisions, to enforce compliance, and to address violations of its provisions.

SO ORDERED.

_____
United States District Judge