**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA et al., | |
| *Plaintiffs*, | |
| v. | Case No. 1:21-cv-11558-LTS |
| AMERICAN AIRLINES GROUP INC. and JETBLUE AIRWAYS CORPORATION, | |
| *Defendants*. | |

**PLAINTIFFS' REVISED PROPOSED FINAL JUDGMENT AND ORDER ENTERING PERMANENT INJUNCTION**

Plaintiff United States of America and Plaintiff States filed a Complaint on September 21, 2021; Defendants filed a Motion to Dismiss on November 22, 2021 which this Court denied on June 9, 2022; Defendants filed their Answers on July 11, 2022; this Court having conducted a full month-long trial on all issues of liability and issued its Findings of Fact and Conclusions of Law on May 19, 2023, holding that the NEA violated Section 1 of the Sherman Act, 15 U.S.C. § 1, permanently enjoining Defendants from continuing, and restraining Defendants from further implementing, the NEA, and ordering that the parties submit a proposed order regarding the text of the Permanent Injunction ordered by the Court.

The purpose of this Permanent Injunction is the prompt and certain termination of the NEA, while minimizing disruption to passengers as a result of the termination, and preventing the recurrence of similar anticompetitive conduct.

It is hereby ORDERED, ADJUDGED, AND DECREED:

I. <u>Definitions</u>

As used in this Final Judgment and Order Entering Permanent Injunction:

A.      "Airport Infrastructure" means gates, ground facilities, or other airport infrastructure.

B.      "American Airlines" means American Airlines Group Inc.

C.      "BSPA" means the Bilateral Special Prorate Agreement for Passengers between American Airlines and JetBlue executed on or about November 1, 2021, or as subsequently amended.

D.      "Codeshare Agreement" means the Codeshare Agreement between American Airlines and JetBlue executed on or about July 15, 2020, or as subsequently amended.

E.      "Competitively Sensitive Information" means any non-public information of Defendants relating to scheduled air passenger services, including without limitation non-public information relating to network plans, pricing or pricing strategies, frequent flyer programs, corporate customer negotiations, tactics or strategy, costs, revenues, profits, margins, output, marketing, advertising, promotion, or research and development.

F.      "Defendant" means separately or collectively American Airlines and JetBlue.

G.      "Domestic Air Carrier" means Alaska Airlines, Allegiant Air, American Airlines, Avelo Airlines, Breeze Airways, Delta Air Lines, Frontier Airlines, Hawaiian Airlines, JetBlue, Southwest Airlines Co., Spirit Airlines, Inc., Sun Country Airlines, and United Airlines, Inc.

H.      "Effective Date" means the later of (i) twenty-one (21) days following the date of entry of this Permanent Injunction, or (ii) twenty-one (21) days following the expiration of any stay of this Permanent Injunction entered by this Court or any appellate court of competent jurisdiction.

I.      "Final Judgment" means this Final Judgment and Order Entering Permanent Injunction.

2

J.      "Frequent Flyer Agreements" means the AAdvantage Participating Carrier Agreement and the TrueBlue Participating Carrier Agreement between American Airlines and JetBlue executed on or about October 21, 2020, or as subsequently amended.

K.      "Frequent Flyer Cutoff Date" means the later of (i) thirty (30) days following the date of entry of this Permanent Injunction, or (ii) thirty (30) days following the expiration of any stay of this Permanent Injunction entered by this Court or any appellate court of competent jurisdiction.

L.      "JetBlue" means JetBlue Airways Corporation.

M.      "MGIA" means the Mutual Growth Incentive Agreement between American Airlines and JetBlue executed on or about July 15, 2020 and all amendments thereto.

N.      "NEA" means the partnership between the Defendants governed by the NEA Agreement and Related Agreements executed on or after July 15, 2020.

O.      "NEA Agreement" means the Northeast Alliance Agreement between American Airlines and JetBlue on or about July 15, 2020 and all amendments thereto.

P.      "Plaintiffs" means collectively the United States and the Plaintiff States.

Q.      "Plaintiff States" means the States and Commonwealths of Arizona, California, Florida, Massachusetts, Pennsylvania, and Virginia and the District of Columbia.

R.      "Related Agreements" means the MGIA, the Frequent Flyer Agreements, the Codeshare Agreement, and the BSPA.

S.      "Slot" means the right and operational authority to conduct a landing or take-off operation at a specific time or during a specified time period at a specific airport, including without limitation, slots, arrival authorizations, and operating authorizations, whether pursuant to

federal regulations or orders pursuant to Title 14, Title 49, or other federal statutes or regulations now or hereinafter in effect.

T.     "Slot Lease Agreement" means any agreement entered between American Airlines and JetBlue under which one Defendant temporarily leases or subleases Slots to the other Defendant.

## II. Applicability

This Permanent Injunction applies to American Airlines, JetBlue, and each of their affiliates, subsidiaries, officers, directors, agents, employees, successors, and assigns, and to any successor to any substantial part of the business.

## III. Required Conduct

A.     On or before the Effective Date, and subject only to the limitations and exceptions explicitly included in Section IV, the Defendants shall terminate the NEA Agreement and the Related Agreements.

B.     On or before the Effective Date, and subject only to the limitations explicitly included in Section IV, the Defendants shall cease all activities governed by the NEA Agreement, including but not limited to all coordination of schedules and routes, and any effort to allocate markets.

C.     On or before the Effective Date, the Defendants shall cease all activities governed by the MGIA, including but not limited to revenue sharing.

D.     In order to support continuity of service scheduled prior to the Effective Date, each Defendant may continue to use any slots it is currently using pursuant to a Slot Lease Agreement or otherwise in connection with the wind-down provisions of the NEA, and may continue to share Airport Infrastructure, until a date that shall be established by subsequent order of the Court. No later than 21 days after the Effective Date, Defendants shall submit to Plaintiffs

a proposed wind-down plan for expeditious and orderly termination of all Slot Lease Agreements

related to the NEA and Airport Infrastructure" sharing agreements related to the NEA. The

parties shall submit their positions no later than 45 days after the Effective Date, at which point

the Court shall order such additional relief as shall be necessary to ensure the complete

termination of all Slot Lease Agreements and Airport Infrastructure sharing agreements related to

the NEA without unnecessary delay.

      E.      On or before the Effective Date, each Defendant shall cease marketing and selling

flights operated by the other Defendant pursuant to the Codeshare Agreement or any other

agreement between the Defendants related to the NEA Agreement. Notwithstanding this

provision, the Defendants shall honor the terms of all tickets purchased or issued prior to the

Effective Date pursuant to the Codeshare Agreement, and may continue to place their respective

airline code on (but not sell new tickets for) flights operated by the other Defendant, including

for travel that will take place after the Effective Date.

      F.      On or before the Frequent Flyer Cutoff Date, each Defendant shall cease allowing

passengers to accrue rewards for its frequent flyer program while traveling on flights operated by

the other Defendant pursuant to the Frequent Flyer Agreements or any other agreement between

the Defendants related to the NEA Agreement. Notwithstanding this provision, the loyalty

program of each Defendant shall honor the rewards accrued by its members pursuant to the

Frequent Flyer Agreements on flights operated by the other Defendant prior to the Frequent Flyer

Cutoff Date, and shall allow its members to accrue rewards on flights operated by the other

Defendant that were purchased prior to the Frequent Flyer Cutoff Date, as governed by the

Frequent Flyer Agreements. In addition, each Defendant shall also honor tickets or other

products or services purchased using rewards prior to the Frequent Flyer Cutoff Date, including for flights that will take place after the Frequent Flyer Cutoff Date.

G.      On or before the Effective Date, the provisions of the BSPA governing settlement of passengers accommodated under the Codeshare Agreement shall be terminated.

H.      Neither Defendant shall enter into any new alliance, partnership, joint venture, or other agreement with each other if such agreement provides for revenue sharing, or for coordination of routes or capacity, in a manner substantially similar to the NEA. This provision shall expire on the tenth anniversary of the Effective Date.

I.      Neither Defendant shall enter into any new alliance, partnership, joint venture, or other agreement with another Domestic Air Carrier if such agreement provides for revenue sharing, or for coordination of routes or capacity, in a manner substantially similar to the NEA. This provision shall expire on the second anniversary of the Effective Date.

J.      Neither Defendant may send, receive, request, or otherwise communicate any Competitively Sensitive Information to or from the other Defendant after the Effective Date. Neither Defendant shall use in any way any Competitively Sensitive Information obtained from the other Defendant during the period when the NEA or any applicable wind-down activities were in effect. Any of Defendant's officers, agents, directors, or employees with Competitively Sensitive Information obtained from the other Defendant shall not disclose such information to any other person, including other persons working for any Defendant or any other air carrier. Notwithstanding this paragraph, Defendants may communicate or use Competitively Sensitive Information as necessary to (i) fulfill existing bookings or rewards for travel booked prior to the Effective Date, or (ii) as otherwise necessary to comply with this Final Judgment, or other court order, law, or regulation.

K.     Within 30 days of the Effective Date, each Defendant shall develop, implement, and communicate to all relevant personnel a plan for complying with the terms of this Final Judgment, and shall provide copies of such plan to the Plaintiffs.

### IV. Additional Provisions

A.     After termination of the NEA Agreement and the Related Agreements, the following provisions in the NEA Agreement shall continue in force and effect to fulfill the purpose stated in Section 5.11 in the NEA Agreement ("Effect of Termination"): "to fulfill existing bookings under applicable Related Agreements and to minimize disruption to operations and to all passengers as a result of the termination."

a.    Section 5.11.1 (requiring that each Defendant agrees to provide reasonable assistance to the other Defendant to wind-down the NEA, and that each Defendant will use its commercially reasonable efforts to minimize any disruption caused to customers);

b.    Section 6.1 (Confidentiality); and

c.    Section 10.1 (Data Protection and Privacy).

The survivability or severability of all other provisions of the NEA Agreement and the Related Agreements after termination shall be governed by the terms of the NEA Agreement or the Related Agreements, as applicable, except where prohibited elsewhere in this Final Judgment.

B.     Subject to the Notice requirements in Section V, and the prohibitions of Paragraphs III.H and III.I, nothing in this Final Judgment shall be construed to prohibit either Defendant from entering into new agreements, including with the other Defendant, that are not otherwise prohibited by the antitrust laws or other laws or regulations.

V. <u>Notice</u>

A.      Neither Defendant may enter into any new agreement, partnership, or joint venture, with the other Defendant, or enter into an amendment thereto, without prior notification to the Plaintiffs. Such notification shall be provided to the Chief of the Transportation, Energy, and Agriculture Section of the Antitrust Division of the Department of Justice (or any successor to that Section), and to the Attorney General of each of the Plaintiff States. This provision shall expire on the tenth anniversary of the Effective Date of this Final Judgment.

B.      Neither Defendant may enter into any new agreement, partnership, or joint venture with another Domestic Air Carrier, or enter into an amendment thereto, without prior notification to the Plaintiffs. Such notification shall be provided to the Chief of the Transportation, Energy, and Agriculture Section of the Antitrust Division of the Department of Justice (or any successor to that Section), and to the Attorney General of each of the Plaintiff States. This provision shall expire on the fifth anniversary of the Effective Date of this Final Judgment.

C.      For agreements, partnerships, joint ventures, or amendments subject to Section V.A or V.B, above, the respective Defendant must provide Plaintiffs with copies of all related contracts or other agreements, and all studies, surveys, analyses, and reports which were prepared by or for any officer(s) or director(s) for the purpose of evaluating or analyzing the new agreement, partnership, joint venture, or amendment thereto with respect to market shares, competition, competitors, markets, potential for sales growth, or expansion into new products or geographic areas in a manner consistent with the instructions and guidance issued by the Premerger Notification Office of the Federal Trade Commission on Item 4(c) and Item 4(d) of the Notification and Report Form pursuant to 16 C.F.R. § 803.1(a).

D.      Any agreements, partnerships, joint ventures, or amendments subject to Section V.A or V.B, above, may not be implemented or otherwise enter into force or effect until at least 30 calendar days following notification to the Plaintiffs and submission of the materials required under Section V.C, unless representatives of the Department of Justice Antitrust Division agree in writing to a shorter period. If, within 30 calendar days following notification and submission of the materials required under Section V.C, representatives of the Department of Justice Antitrust Division issue one or more Civil Investigative Demands seeking information related to the agreement, partnership, joint venture, or amendment thereto, a Defendant who received a Civil Investigative Demand may not implement the proposed agreement, partnership, joint venture, or amendment until 60 calendar days after submitting all information required under the Civil Investigative Demand.

E.      Notwithstanding the foregoing, the Defendants are not required to provide notice or observe a waiting period for any agreement solely constituting short-term (less than 90 days) sharing of Airport Infrastructure. In addition, the Department of Justice, in writing to the Defendants, may exclude from the Notice requirements of this Section certain other classes of agreements that the Department of Justice in its sole discretion determines to be unlikely to raise competitive concerns.

## VI. Appointment of Monitoring Trustee

A.      The Court will appoint a monitoring trustee selected by the Plaintiffs and approved by the Court.

B.      The monitoring trustee will have the power and authority to monitor Defendants' compliance with the terms of this Final Judgment entered by the Court. The Monitoring Trustee will have no responsibility for the operation of Defendants' businesses.

C.      Defendants may not object to actions taken by the monitoring trustee in fulfillment of the monitoring trustee's responsibilities under any Order of the Court on any ground other than malfeasance by the monitoring trustee. Objections by Defendants must be conveyed in writing to the Plaintiffs and the monitoring trustee within 10 calendar days of the monitoring trustee's action that gives rise to Defendants' objection.

D.      The monitoring trustee will serve at the cost and expense of Defendants pursuant to a written agreement, on terms and conditions, including confidentiality requirements and conflict of interest certifications, approved by the United States in its sole discretion.

E.      The monitoring trustee may hire, at the cost and expense of Defendants, any agents and consultants that are reasonably necessary in the monitoring trustee's judgment to assist with the monitoring trustee's duties. These agents or consultants will be solely accountable to the monitoring trustee and will serve on terms and conditions, including confidentiality requirements and conflict-of-interest certifications, approved by the United States in its sole discretion.

F.      The compensation of the monitoring trustee and agents or consultants retained by the monitoring trustee must be on reasonable and customary terms commensurate with the individuals' experience and responsibilities. If the monitoring trustee and Defendants are unable to reach agreement on the monitoring trustee's compensation or other terms and conditions of engagement within 14 calendar days of the appointment of the monitoring trustee, the United States, in its sole discretion, may take appropriate action, including by making a recommendation to the Court. Within three business days of hiring any agents or consultants, the monitoring trustee must provide written notice of the hiring and the rate of compensation to Defendants and the Plaintiffs.

G.      The monitoring trustee must account for all costs and expenses incurred.

H.      Defendants must use best efforts to assist the monitoring trustee to monitor Defendants' compliance with their obligations under this Final Judgment. Subject to reasonable protection for trade secrets, other confidential research, development, or commercial information, or any applicable privileges, Defendants must provide the monitoring trustee and agents or consultants retained by the monitoring trustee with full and complete access to all personnel, books, records, and facilities. Defendants may not take any action to interfere with or to impede accomplishment of the monitoring trustee's responsibilities.

I.      The monitoring trustee must investigate and report on Defendants' compliance with this Final Judgment, including Defendants' compliance with the prohibitions on the exchange, further dissemination, or use of Competitively Sensitive Information contemplated in Paragraph III(J) of this Final Judgment. The monitoring trustee must provide yearly reports to the Plaintiffs setting forth Defendants' efforts to comply with their obligations under this Final Judgment. The monitoring trustee must review the compliance plans created by each Defendant pursuant to Paragraph III(K) of this Final Judgment, and may make recommendations to the Defendants regarding the content of the plan, and may recommend to Plaintiffs additional relief that should be sought from the Court to ensure compliance. The United States, in its sole discretion, will set the frequency of the monitoring trustee's reports.

J.      The monitoring trustee will serve until the fifth anniversary of the Effective Date.

K.      If the United States determines that the monitoring trustee is not acting diligently or in a reasonably cost-effective manner, they may recommend that the Court appoint a substitute.

## VII. <u>Retention of Jurisdiction</u>

This Court retains jurisdiction to enable any party to this Permanent Injunction to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Permanent Injunction, to modify any of its provisions, to enforce compliance, and to address violations of its provisions.

SO ORDERED.

_____
United States District Judge