CORRECTED

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, ET AL.,

Plaintiffs,

v.

AMERICAN AIRLINES GROUP INC. and
JETBLUE AIRWAYS CORPORATION,

Defendants.

Civil Action No. 1:21-cv-11558-LTS

**This document relates to
ECF No. 322-1**

## DEFENDANTS' POST-TRIAL BRIEF

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ...................................................................................................1

II.  ARGUMENT .......................................................................................................14

     A.   Plaintiffs Failed to Prove That The NEA Has Produced, Is Producing, or
          Will Produce Anticompetitive Effects ...................................................15

          1.   The Legal Standard ........................................................................15

          2.   The NEA's Actual Competitive Effects Are Increased Output
               Without Higher Fares......................................................................18

          3.   Plaintiffs Failed to Prove Market Power, Without Which There
               Can Be No "Indirect" Inference of Anticompetitive Effects ...................23

          4.   Dr. Miller's Merger Simulation—the Only Significant Predictive
               Evidence Plaintiffs Offered—Is Unreliable, Immaterial and Should
               be Given No Weight and Stricken from the Record ...............................32

          5.   There Has Been a Complete Failure of Proof With Regard to the
               Alleged Loss of "JetBlue Effect".................................................38

          6.   Dr. Town's "Capacity Discipline" Theory Is Wholly Immaterial to
               the NEA ........................................................................40

     B.   Defendants Have Proven That The NEA Has a Procompetitive Rationale
          And Is Producing Numerous, Substantial Consumer Benefits .............................43

     C.   Plaintiffs Have Not Proven That The Benefits of The NEA Could Be
          Accomplished Through Less Restrictive Alternatives ...........................................49

III. CONCLUSION....................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Addamax Corp. v. Open Software Found., Inc.*,
  152 F.3d 48 (1st Cir. 1998) ........................................................................................17

*Am. Steel Erectors v. Loc. Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental &
  Reinforcing Iron Workers*,
  815 F.3d 43 (1st Cir. 2016) ........................................................................................16

*Compass, Inc. v. Real Est. Bd. of N.Y., Inc.*,
  No. 21-CV-2195 (AJN), 2022 WL 992628 (S.D.N.Y. Mar. 31, 2022), *reconsideration
  denied*, No. 21 CIV. 2195 (LGS), 2022 WL 2967566 (S.D.N.Y. July 27, 2022) ...................17

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ..............................................................................................35, 38

*FTC v. Penn State Hershey Med. Ctr.*,
  838 F.3d 327 (3d Cir. 2016) .......................................................................................27

*FTC v. Tenet Health Care Corp.*,
  186 F.3d 1045 (8th Cir. 1999) ....................................................................................28

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ..................................................................................................35

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018) ..........................................................................35

*MacDermid Printing Sol. LLC v. Cortron Corp.*,
  833 F.3d 172 (2d Cir. 2016) .......................................................................................16

*Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*,
  525 F.2d 630 (D.C. Cir. 1976) ....................................................................................22

*Nat'l Collegiate Athletic Ass'n v. Alston*,
  141 S. Ct. 2141 (2021) ..................................................................................... *passim*

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ..........................................................................................15

*O'Bannon v. NCAA*,
  802 F.3d 1049 (9th Cir. 2015) ................................................................................9, 49

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) .................................................................................... *passim*

*Polk Bros., Inc. v. Forest City Enterprises, Inc.*,
    776 F. 2d 185 (7th Cir. 1985) ................................................................................8

*Procaps S.A. v. Patheon Inc.*,
    141 F. Supp. 3d 1246 (S.D. Fla. 2015), *aff'd*, 845 F.3d 1072 (11th Cir. 2016).....................17

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) .............................................................................26

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986)......................................................................24, 49

*SCFC ILC, Inc. v. Visa USA, Inc.*,
    36 F.3d 958 (10th Cir. 1994) .............................................................................24

*Sterling Merch., Inc. v. Nestle, S.A.*,
    656 F.3d 112 (1st Cir. 2011)..............................................................................16

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
    373 F.3d 57 (1st Cir. 2004)...............................................................................16

*Sullivan v. Nat'l Football League*,
    34 F.3d 1091 (1st Cir. 1994) ...................................................................... *passim*

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961).......................................................................................27

*Tops Markets, Inc. v. Quality Markets, Inc.*,
    142 F. 3d 90 (2d Cir. 1998)...............................................................................17

*United States v. Long Island Jewish Med. Ctr.*,
    983 F. Supp. 121 (E.D.N.Y. 1997) .......................................................................28

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ..................................................................29

*United States v. Penn-Olin Chem. Co.*,
    378 U.S. 158 (1964).......................................................................................24

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963).......................................................................................27

*United States v. U.S. Sugar Corp.*,
    No. CV 21-1644 (MN), 2022 WL 4544025 (D. Del. Sept. 28, 2022)....................................31

## STATUTES

15 U.S.C.
  § 1....................................................................................................16, 17, 19, 24
  § 15............................................................................................................22
  § 18............................................................................................................16

## OTHER AUTHORITIES

U.S. Dep't of Justice and Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010) ....... *passim*

Philip E. Areeda & Herbert E. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2022)............................................................... *passim*

U.S. Dep't of Justice and Fed. Trade Comm'n, *Antitrust Guidelines for Collaborations Among Competitors* (2000) ............................................................................................ *passim*

Defendants American Airlines Group Inc. ("American") and JetBlue Airways Corporation ("JetBlue," and together with American, "Defendants") respectfully submit this Post-Trial Brief.

## I.       INTRODUCTION

Over four weeks of trial, the evidence overwhelmingly proved that the Northeast Alliance ("NEA") was intended to create—and already has created—more competition in the Northeastern United States to the benefit of consumers.  Because of the NEA, American and JetBlue have added capacity, launched new routes, improved flight schedules, created better connections, and expanded frequent flyer benefits.  On every measure, the NEA has been a boon for consumers. Remarkably, Plaintiffs did not meaningfully address the actual benefits of the NEA, the precise terms of the operative agreements, or the highly competitive environment in which it operates. Instead, Plaintiffs presented a series of superficial arguments that focused on random emails proving largely uncontested and irrelevant points (*e.g.*, American and JetBlue compete), moralistic narratives about the once-virtuous JetBlue partnering with a dreaded legacy airline, but-for worlds in which the NEA is unnecessary because every growth aspiration that either airline had before COVID-19 has been achieved, and the fiction that the NEA is a *de facto* merger that eliminates all competition between American and JetBlue.  With few exceptions, Plaintiffs did not even challenge, and never disproved, Defendants' key points.  In the end, the evidence presented at trial proved exactly what Defendants said it would.

*First,* the NEA is a way for American and JetBlue *to compete more effectively,* not to reduce competition.  The Court heard the business logic of the NEA from those who conceived it: to produce through collaboration a better, more competitive network—one offering consumers more destinations and choices, better schedules, more expansive frequent flyer benefits, and a superior alternative to the larger networks Delta Airlines ("Delta") and United Airlines ("United") have in the Northeast.  *See, e.g.*, Tr. Day 5 (Isom) at 29:4-23 (the NEA is intended to create a "really viable

competitor, versus Delta and United that are entrenched and will be entrenched . . . at both JFK and LaGuardia"); Tr. Day 4 (Raja) at 206:12-17, 207:24-208:5; Tr. Day 2 (Hayes) at 12:1-13:5 (JetBlue was a "distant third behind Delta and United when you look at . . . New York" and the NEA "presented a generational opportunity, particularly coming out of COVID, to accelerate" growth in that market which was "critical" to JetBlue remaining "relevant in Boston" in light of Delta's growth in Boston). Delta studied the NEA in detail and concluded it "create[s] one relevant competitor out of two weak ones." DX-0238 at -002. Even Plaintiffs' two non-party airline witnesses acknowledged that the NEA improves American's and JetBlue's local relevance in the Northeast and makes them more attractive to consumers.[1] There is no meaningful evidence to the contrary.

*Second*, the NEA has the characteristics of a classic procompetitive collaboration. It "combine[s] complementary technologies, know-how, or other assets to enable the collaboration to produce a good more efficiently or to produce a good that no one participant alone could produce." *See* U.S. Dep't of Justice and Fed. Trade Comm'n, *Antitrust Guidelines for Collaborations Among Competitors* (2000) at § 3.31(a) ("*Collaboration Guidelines*"). The evidence shows clearly that the NEA network is broader, deeper, and better than anything the Parties could create alone;[2] that it is rooted in pooling and sharing complementary network assets;[3]

---

[1] Tr. Day 2 (Watterson) at 156:22-157:6 (explaining how codesharing and harmonizing loyalty programs under the NEA make American and JetBlue more attractive), 140:8-12 ("[The NEA] improves their schedule quality in the northeast."), 141:1-5 (same); *see also* Tr. Day 3 (Kirby) at 170:12-22.

[2] *See* DX-0011 at -004 (determining American had no "organic" path to improve its position in NYC due to the lack of slot availability); DX-1075A at -002 ("Neither AA nor B6 can offer customers a network that is competitive with DL or UA, and slot/gate restrictions prevent both of us from organically developing a competitive network."); Tr. Day 2 (Hayes) at 14:1-8 (same).

[3] Tr. Day 7 (Raja) at 102:3-103:12; PX0369 at -060 (describing seamlessness as "leveraging the unique competitive advantage offered by each partner"); Tr. Day 6 (Laurence) at 9:15-23

2

that joint scheduling is fundamental to producing the new network;[4] that revenue-sharing provides the required degree of "metal neutrality" toward scheduling decisions;[5] and that codesharing and frequent flyer reciprocity permit the NEA network to be marketed effectively and embraced by consumers.[6]   At the same time, the NEA leaves undisturbed most key forms of competition between American and JetBlue, even within the geographic scope of the NEA, including pricing, aggregate capacity setting, business models, and competition for customer loyalty.[7]

*Third,* the NEA expands output and benefits consumers.  Plaintiffs did not challenge any of the accomplishments of the NEA proven at trial, such as the more than 200% increase in available seat miles ("ASMs") in the NEA region[8] (as compared to when American and JetBlue

---

(describing how the NEA would allow American and JetBlue to grow because they could "utilize a pool of slots" to "coordinate so that [they] could connect more customers").

[4] Tr. Day 2 (Hayes) at 20:14-20 ("So by pooling assets with American, we were able to use some of their slots in that period to create better schedules for JetBlue.  And schedule optimization really talks about the concept yesterday about partnering with American to create connective schedules, so customers who would fly on a mix of JetBlue and American would now have schedules that work."), 43:23-44:3; Tr. Day 9 (Friedman) at 31:9-20 (same), 32:17-25; Tr. Day 7 (Raja) at 98:11-22 (same); DX-0037 at -012 ("Un-coordinated network produces weak TA connection offering").

[5] Defs.' Post-Trial Findings of Fact ("FoF") ¶¶ 183-200; Tr. Day 14 (Israel) at 17:3-13 ("[M]etal neutrality has just come to mean that we are sharing enough revenue that we are willing to try to plan the best networks, even if it means some people will fly your plane instead of mine."); PX0793 ("Metal neutral – the philosophy that offering a Customer choice is the guiding principle and letting them choose [JetBlue] or [American] is in the overall best interest as we'd rather offer the Customer an option between [JetBlue] and American] than have them choose another airline or set of airlines.").

[6] FoF ¶¶ 172-176; *see also* Tr. Day 2 (Hayes) at 26:6-11, 26:15-25, 28:14-29:3.

[7] FoF ¶¶ 213-218; *id.* at ¶¶ 231-238; Tr. Day 2 (Hayes) at 41:17-42:8 ("JetBlue is still acting differently, we're pricing independently. . . . Q. When you said the phrase 'pricing independently,' does JetBlue discuss any prices with American at all?   A. Absolutely not."); Tr. Day 3 (McMenamin) at 9:7-11 ("We're not indifferent.  We would always want our customers booking JetBlue; but if that option doesn't exist, booking with a partner is preferred over a nonpartner.").

[8] Defendants define the "NEA region" as flights to and from four airports in the Northeastern United States (LaGuardia Airport, John F. Kennedy International Airport, Newark International Airport, and Boston Logan International Airport).  *See* FoF ¶ 15.

began implementing the NEA), dozens of new routes, increased capacity (more frequencies and/or larger aircraft) and added codeshare on routes throughout the NEA region.[9]  They did not contest the market share gains made by American and JetBlue since implementing the NEA or the Quality of Service Index ("QSI") improvement, both of which imply consumers reacting favorably to the NEA.[10]  They did not question the hard work and the financial resources that go into the carriers' many "seamlessness" initiatives so that it is as easy for consumers to choose and travel on the NEA as on Delta or United.[11]  They simply ignored the testimony about what the NEA does to make American and JetBlue more competitive for corporate accounts, never examining any of three corporate sales witnesses (Messrs. Carter, McMenamin, and Swartz) on that issue.[12]  And while

---

[9] FoF ¶¶ 257-266; DX-0932 (showing a more than 200% increase in ASMs since the Parties began implementing the NEA); Tr. Day 15 (Znotins) at 78:11-83:16 (discussing DX-1087, a summary exhibit listing all added routes in Boston and New York since implementation of the NEA); DX-0057 at -008 ("Delivering on our promise: progress to date . . . 57 new domestic and international routes"); DX-0055 at 3; *see also* Tr. Day 1 (Defs.' Opening Statement) at 48:12-49:4 (explaining the benefits of the NEA being shown on Defs.' Opening Demonstratives at 2).

[10] FoF ¶¶ 281-284; DX-0149 at -018; Tr. Day 13 (Schweinzger) at 70:10-18 (explaining that American's share gap relative to 2019 in the NEA region is 1.3 points positive, and JetBlue's is 0.5 points positive, which indicates "it's coming largely from the largest competitors who we're trying to build a network to compete with, which is Delta and United."), 71:16-72:3 (explaining that any positive share gap shows "customers are selecting AA and JetBlue relative to our largest competitors when you adjust for the changes in schedule").

[11] FoF ¶¶ 247-256; *see also* PX0369 at -035, -055-57; Tr. Day 13 (Schweinzger) at 45:6-10 ("[T]he point of seamlessness is we need to be able to deliver a cohesive, you know, experience across the entire journey, not just on one individual stage, not just when you fly or when you shop, but holistically across the journey."); Tr. Day 7 (Raja) at 94:24-95:1 ("[I]t's not credible until you can actually deliver a seamless, as we call it, service for the customers."), 95:23-96:2, 96:12-18; Tr. Day 13 (Schweinzger) at 46:16-59:3 (discussing the many seamless initiatives that have been accomplished); *see also* Tr. Day 5 (Isom) at 77:16-78:9.

[12] *See, e.g.*, Tr. Day 3 (McMenamin) at 20:7-22:10 ("[The NEA] has definitely given us more relevance, and people who may not have looked at JetBlue on their own are definitely giving us a second look."); Tr. Day 8 (Swartz) at 45:3-:22 (describing how the NEA has given American "more direct-direct, point-to-point destinations, bigger network" and has helped it compete better in Boston); Tr. Day 12 (Carter) at 206:7-19 (explaining how corporate customers have had an "overwhelmingly positive" response to the NEA because, "[American] now ha[s] a network [they] can compete against Delta and United").

Plaintiffs criticized Dr. Israel's estimates of hundreds of millions of dollars in annual consumer benefits that he calculated under methodologies DOJ has used itself, they do not claim that the NEA creates no benefits nor have they offered any alternative calculation.[13]

*Fourth,* Plaintiffs presented no evidence that the NEA has harmed anyone. As Dr. Miller was forced to concede, Plaintiffs have *no evidence* of any anticompetitive fare increase or reduction in output.[14] Much of Plaintiffs' case tried to explain that away, but as the parties with the burden of proof, Plaintiffs were required to prove "that the challenged restraint has a substantial anticompetitive effect." *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2160 (2021). They did not even attempt to show actual harm, despite the fact that Defendants have already made hundreds of competitively consequential decisions during the first 20 months of the NEA, including a handful (such as American's exit from the Boston-LaGuardia route) that Plaintiffs criticize.[15] There is no excuse for Plaintiffs' failure to address the actual competitive effects of the NEA. It is a default, pure and simple. For good reason, there has *never* been a case in which a court has enjoined a collaboration subject to the rule of reason on a similar record.

---

[13] Tr. Day 14 (Israel) at 87:6-24; Tr. Day 16 (Town) at 168:5-7; Tr. Day 17 (Town) at 30:13-31:5.

[14] Tr. Day 11 (Miller) at 82:23-25 ("Q. Okay. You provided no analysis of observed postNEA price increases or other changes adverse to customers, did you? A. That's correct."); Tr. Day 12 (Miller) at 32:5-10 ("Q. And you have not analyzed [actual NEA schedules] to determine whether there are any anticompetitive reductions of output, have you, sir? A. I have not analyzed those schedules."); *see also* Tr. Day 17 (Miller) at 151:9-17, 127:3-128:3 ("Q. . . . Are you saying that, in almost the 20 months that the NEA partners from -- that the NEA has been in effect, American and JetBlue have not taken any action, potentially anticompetitive, that can be evaluated for actual adverse effects? A. I don't know the answer to that question.").

[15] *See, e.g.*, Tr. Day 15 (Znotins) at 70:4-71:6 (explaining how American has "already implemented the NEA schedules that we had planned to launch" including new nonstops in partnership with JetBlue" that American "wouldn't have invested in" but-for the NEA because there is now the opportunity to make that new flight profitable), 118:21-119:14 (confirming that American has exited Boston-LaGuardia and has no current plans to reenter).

*Fifth,* Plaintiffs' "predictive" case, premised on Dr. Miller's merger analysis and merger simulation, is pretense and make-believe.  It is not an analysis of the NEA by its own terms, for as the Court heard it is grounded in an unfounded assumption that American and JetBlue will disregard their contract and "behave" as if they were merged.[16]  But even then it is not actually a merger analysis, as Dr. Miller only models the *upward* pricing pressure (from a merger-induced change in pricing incentives) and not any offsetting efficiencies, consumer benefits, or downward pricing pressures.[17]  Of course, if one presumes that the NEA will *only* have the negative consequences of a merger, that analysis *will* predict anticompetitive effects.  But that perspective is entirely divorced from the reality of the NEA.  It ignores the evidence of growth and output expansion enabled by the NEA—in sharp contrast to the DOJ's historical acknowledgement of the consumer benefits of airline mergers and alliances.[18]  And the simulation itself is not credible;

---

[16] Tr. Day 11 (Miller) at 110:25-111:11 (discussing PX0461 (Miller Report) at n.68).

At various times throughout this trial, Plaintiffs have sought the admission of the Parties' expert reports into evidence, and Defendants have consistently objected to the admission of those reports on hearsay grounds.  *See, e.g.*, Tr. Day 16 at 89:22-90:9.  The Court has tentatively overruled those objections and admitted the reports into evidence, noting that it reserves the right to amend its ruling.  See *id*. at 90:12-90:14 ("I'm going to allow the request to admit the expert reports into evidence, subject to the caveat that I reserve the right to reverse myself after I've reviewed everything . . . .").

Defendants cite to some expert reports in this Post-Trial Brief.  However, Defendants clarify that, by doing so, they are not waiving their argument that the expert reports constitute inadmissible hearsay.  It would be plainly unfair to Defendants if, for example, Plaintiffs affirmatively cited the reports in their post-trial materials, while Defendants remained unable to do so to avoid potential waiver.  Defendants further note that no citation to an expert report in this document constitutes sole support for a dispositive fact.

[17] Tr. Day 11 (Miller) at 132:23-133:1 ("The model does not consider efficiencies"); Tr. Day 17 (Miller) at 115:25-116:6 (same).

[18] *See generally* DX-1068 (Ken Heyer, Carl Shapiro, and Jeffrey Wilder, "The Year in Review: Economics at the Antitrust Division, 2008-2009, 35 REV. OF INDUS. ORG. 349 (2009), at 356 (acknowledging the benefits of airline mergers and partnerships after investigation into the Delta-*Northwest* merger and Star Alliance).

among other things, it generates preposterous estimates of harm never before witnessed, even following the legacy airline mergers Plaintiffs scorn.[19]  Dr. Town's "capacity discipline" theory is even more speculative, unrealistic, and inapposite to the NEA.  Dr. Town himself admits that capacity discipline ended years before the conception of the NEA (without offering an opinion as to why it ended), and he has performed no analysis to assign any magnitude to his conception of "increased risk" of "capacity discipline" returning as a result of the NEA nor has he made any attempt to analyze whether there has been any evidence of "capacity discipline" since the NEA was implemented.[20]  In any event, an alliance that does not involve any coordination of aggregate industry capacity and *strengthens* JetBlue[21]—one of the most important "disruptors" of "capacity discipline" under Dr. Town's theory[22]—cannot possibly promote legacy airline coordination. Plaintiffs' competitive effects proofs are just not believable or supported by anything in the record.

*Sixth,* American and JetBlue do not have market power, individually or collectively. Obviously that is true in the NEA region overall, given the size and scope of the competing hub carriers, Delta and United.  But Plaintiffs have not proven market power even at the route level, because—once again acting like this is a merger challenge—they have simply aggregated

---

[19] *See* FoF ¶¶ 434-437.

[20] Tr. Day 9 (Town) at 136:14-18, 137:3-5 ("Q. [B]ut you're not offering an opinion as to why capacity discipline ended, are you?  A. No, I am not."), 156:2-5 ("Q. You have not attempted to assess whether there has been any capacity discipline following the implementation of the NEA? A. No, I haven't[.]"); *see also* FoF ¶¶ 471-494.

[21] FoF ¶¶ 128-134; Tr. Day 2 (Hayes) at 12:7-9, 85:14-22 ("What I'd say is all of the smaller airlines need to think outside the box and be creative in order to have sustainable, competitive business models to . . . compete with these four large legacy airlines. Q. And that's what you did your whole history until the NEA, right? A. That's what we've done up to and including the NEA, because the NEA is enabling us to do more of what we do best."); Tr. Day 9 (Friedman) at 8:13-15 ("Q. And do you ever discuss capacity outside the Northeast Alliance with American? A. Absolutely not.").

[22] Tr. Day 9 (Town) at 111:8-11 ("JetBlue is a maverick."), 161:12-16 ("JetBlue played a disruptive role.").

American and JetBlue market shares,[23] ignored the extent to which the limited scope of the collaboration under the NEA preserves competition between American and JetBlue,[24] and ignored the constraining effect of Delta, United, and other airlines on every highly traveled NEA route.[25] Nothing matters more to a market power analysis than the ability of rivals to prevent the exercise of market power.  *See*, *e.g.*, Philip E. Areeda & Herbert E. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1507a (5th ed. 2022) ("Areeda & Hovenkamp") (If "the exercise of market power is not plausible, the challenged practice is legal"); *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F. 2d 185, 191 (7th Cir. 1985) ("Unless the firms have the power to raise price by curtailing output, their agreement is unlikely to harm consumers and it makes sense to understand their cooperation as benign or beneficial.").  On this record there is no basis to conclude that American and JetBlue could profitably restrict output to raise prices *anywhere*.

*Seventh,* Plaintiffs did not even put on a proper "less restrictive alternatives" case.  Instead, they speculated—in what was in fact Plaintiffs' main argument at trial—that American and JetBlue may not have needed to enter into the NEA because they had other ways to grow.[26]  That is *not* how a less restrictive alternatives analysis proceeds.  Plaintiffs' legal burden was to identify another practical and less restrictive way to accomplish substantially all of the procompetitive benefits of the NEA that Defendants have proven, including the qualitative benefits such as better local relevance, a more competitive product offering, and higher quality schedules that creates

---

[23] FoF ¶¶ 94-99; *id.* at ¶¶ 118-121.

[24] *Id.*

[25] *Id.*

[26] FoF ¶¶ 495-510; *see also*, *e.g.*, Tr. Day 2 (Watterson) at 177:20-22; 178:14-16.

feeder traffic and de-risks growth.[27]  *See Alston*, 141 S. Ct. at 2160; *O'Bannon v. NCAA*, 802 F.3d 1049, 1074 (9th Cir. 2015) (any less restrictive alternative must be "virtually as effective in serving the procompetitive purposes" of the challenged conduct (internal quotations omitted)).  The baseline for that analysis is the "condition [of the relevant industry] before . . . the restraint was imposed," not some imaginary world in which all growth aspirations come true.  *See Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1112 (1st Cir. 1994) (cleaned up).  Neither of Plaintiffs' experts even *attempted* that analysis, let alone established that any particular alternative to the NEA would be commercially acceptable to either party and produce gains equivalent to those achieved by the NEA.[28]  Plaintiffs also failed to address the fact that American and JetBlue analyzed alternatives when considering and evaluating the NEA, concluding that those alternatives were not nearly as good as the NEA for themselves *or consumers*.[29]  Plaintiffs are just "second-guess[ing]" the NEA, exactly the approach that the Supreme Court in *Alston* cautioned is "a recipe for disaster."  *Alston*, 141 S. Ct. at 2161.

These seven points mean that Plaintiffs have failed to meet their burdens under Steps One and Three of the three-step rule of reason framework, and that Defendants have easily met their burden under Step Two.  Defendants are therefore entitled to judgment as a matter of law.  The non-substantive arguments that permeated Plaintiffs' trial presentations do not change a thing.

---

[27] *See generally* FoF ¶¶ 128-134, 247-275.

[28] FoF ¶¶ 495-510; Tr. Day 17 (Town) at 24:10-31:5, 30:7-20 ("Q. You have not assessed whether a WCIA-like arrangement would have made financial sense for JetBlue, correct?  A. No, I have not made that assessment.  Q. You have not assessed the benefits of American doing a similar arrangement with JetBlue, correct?  A. I have not done the financial analysis with any so-called less restrictive alternative, correct?  A. That is correct, as I testified earlier, yes.  Q. And you have not offered the opinion that any so-called less restrictive alternative achieved substantially the same benefits as the Northeast Alliance, correct?  A. I have not quantified it.").

[29] FoF ¶¶ 495-510.

*Plaintiffs' disdain for legacy airlines.*  Much of Plaintiffs' case was just a screed against American and other legacy airlines for past mergers, high fares, and not competing—in Plaintiffs' opinion—vigorously enough.  The perspectives revealed by those arguments go a long way to explaining why Plaintiffs sued, but they do nothing to advance the merits of the case.  As Dr. Lee explained, the airline industry is highly competitive, fares in real dollars are lower than ever, and fare differences among different classes of competitors reflect different costs and business models, nothing more.[30]  That said, Plaintiffs' arguments reflect a fundamental misconception about the nature of antitrust analysis.  Antitrust law takes competition as it finds it and asks whether the challenged conduct makes things better or worse.  That is, one compares the "condition [of the relevant industry] before and after the restraint was imposed."  *Sullivan*, 34 F.3d at 1112.  The NEA *intensifies* competition against Delta and United in a region they dominate.  That is all to the good, *especially* if one is concerned that legacy airlines do not compete hard enough.

*JetBlue's willingness to consort with the enemy.*  Plaintiffs' moralizing continues with the argument that "JetBlue has sold out and cashed in."[31]  JetBlue CEO Robin Hayes was apparently called as Plaintiffs' first witness to castigate him for embracing an alliance with a legacy carrier.  But again, preconception blinds Plaintiffs to the facts.  JetBlue gets *stronger*, not weaker, because

---

[30] *See* FoF ¶¶ 35; *see also, e.g.*, Tr. Day 12 (Lee) 49:1-15 (explaining that the airline industry "has evolved into this incredibly competitive and dynamic industry, with multiple different business models, multiple carriers competing using different business models, and it has really resulted in what I believe is the most competitive industry we have seen" in the United States where "[p]rices in 2019 were at their lowest level in history" and "[t]he consumer has more choices between and among different airline business models than they've ever had"), 77:13-16 ("When I look at this as an economist, when I see new entrant carriers continually expanding share and fares continually going down, that, to me, is really the sign of a highly competitive industry.").

[31] ECF No. 160 at 3.

of the NEA.[32]  JetBlue retains its disruptive business model and its pricing independence, and it grows in ways it could not but for the NEA.  That is what Mr. Hayes said; what every other JetBlue witness said; and what JetBlue's documents show.[33]  There is no evidence to the contrary.

The NEA is "unprecedented."  Plaintiffs use the word "unprecedented" as if it means pernicious or anticompetitive.  But antitrust law has no aversion to innovative methods of competition; quite the contrary.  If anything, the absence of precedent means there is no basis for predicting the worst from the NEA, as Plaintiffs do, particularly when the returns have been entirely positive.[34]  In any case, this narrative ignores that the features of the NEA that Plaintiffs criticize most—revenue sharing and joint scheduling—have deep precedent in international alliances that the U.S. Department of Transportation ("DOT") has repeatedly found serve the public interest.  Indeed, the DOT *requires* both practices as a condition of antitrust immunity.[35]

---

[32] Even Plaintiffs' witnesses admit this.  *See* Tr. Day 3 (Kirby) at 169:25-170:6 (quoting DX-1076) ("At a minimum, the approximate B6 Mosaic program gets a bump, and more folks could be willing to pay a little more for a B6 flight knowing that they could use their points on AA.  It could also have a nice halo effect on B6 in South Florida.  There's likely an S-curve effect in the NYC area, and to a lesser extent at Logan."); Tr. Day 4 (Kirby) at 23:5-13, 55:25-56:4.

[33] *See, e.g.*, Tr. Day 2 (Hayes) at 11:13-19, 54:11-18 ("[W]e've rolled out London, we've launched with much lower fares. You know, we did some work back in May that showed the impact of Mint fares to London were 40 to 50 percent lower in New York, and before we entered it, fares on Boston and Chicago, for example, hadn't changed.  This is before we started flying to Boston.  So we continue to disrupt, because it's our DNA. It's called our business model."); Tr. Day 1 (Hayes) at 195:12-21; Tr. Day 3 (Jarashow) at 91:4-92:1, 96:5-97:4 (testifying that JetBlue continues to "disrupt[] the pricing landscape," including with respect to transatlantic fares), 101:6-25, 102:7-12 (testifying that JetBlue's pricing strategy has not changed as a result of the NEA); Tr. Day 10 (Clark) at 75:14-76:21; *see also* DX-0356 at -058; DX-0372; DX-0381; DX-0384 at -002.

[34] FoF ¶¶ 247-323; *id.* at ¶¶ 376-385; *id.* at ¶¶ 292-306.

[35] *See e.g.*, U.S.-Japan Alliance Case, Order 2010-10-4 (DOT-OST-2010-0059) at 14, 17 (refusing to place restrictions on revenue sharing because it was "intrinsic to the efficiencies and benefits promoted by a grant of antitrust immunity" and noting that "without . . . sharing of costs and revenues, two carriers are more reluctant to closely align their frequent flyer programs . . . [and] less likely to invest in other product improvements . . . ."); Delta et al., Order 2013-8-21 (DOT-OST-2013-0068)) at 17 (granting antitrust immunity because it would "allow the [applicants to

Plaintiffs seem to be suggesting that those practices *minus price coordination* and *without antitrust immunity* will somehow be worse than what has been experienced internationally.  That makes no sense, and has not been proven.

*Robbing Peter to pay Paul.*  The first thing to note about this argument is its implication that "Paul"—the NEA consumer—*is better off with the NEA than without it.*  So to make this argument is to admit that the NEA benefits consumers.  The second point is that there is absolutely no evidence that any consumer anywhere—Plaintiffs' hypothesized "Peter"—paid a price for NEA growth.  Plaintiffs suggest a "zero sum game" whereby, unavoidably, any NEA benefits must be offset by a loss to someone, but that is false for multiple reasons.  From the American perspective, its large fleet makes it both easier to "fund" NEA flying in the short-term and more difficult to draw a straight line between any particular aircraft order and the NEA.  Nevertheless, American Chief Commercial Officer Vasu Raja testified that, in the midst of COVID-19, American decided to go forward with a large wide-body order in part because of the NEA, and Brian Znotins testified that NEA-driven profitability in New York has bolstered the case for a larger fleet.[36]  For the smaller JetBlue, funding NEA growth is more challenging, but the evidence shows it stepped up

---

engage in the kind of revenue and benefit sharing that is necessary to alleviate the commercial risks and create substantial public benefits"); FoF ¶¶ 386-399.

[36] Tr. Day 7 (Raja) at 176:17-23 ("Q. . . .[I]f the NEA generates demand in the way that you described [in your] testimony, will you buy new planes to supply -- A. We already did.  Like, we were in COVID.  We could have canceled -- the 787s were late.  We could have canceled the whole order, I mean, billions of dollars in savings.  We kept them going because of this."); *see also* Tr. Day 15 (Znotins) at 77:22-78:8 ("THE COURT: What's the source of the bigger planes? THE WITNESS: In the short term, we will relocate airplanes from other markets across the system. We'll optimize the whole system to say we're bringing 30 new large regional jets in. And some will come from Dallas and Charlotte, Philadelphia. Across the whole system, we will reoptimize it with New York as a priority.  And in the long run, what we'll do is we'll go to the board and order more airplanes and say that, now that New York is a source of profitability for us, we need to backfill those airplanes elsewhere in the network so we can address other priorities over the long run."); FoF ¶¶ 386-399.

to the challenge by delaying the retirement of its E-190 fleet and ultimately ordering an incremental 30 new A220 aircraft.[37]  So, in fact, no one was "robbed."  The record evidence of consumer effects shows only winners from the NEA.

*The constrained fleet (v4) "counterfactual."*  Plaintiffs' efforts to deny NEA consumer benefits reached their peak in the many court hours wasted on the text exchange over using a fleet-constrained schedule, "v4," as the "counterfactual" for a consumer benefits estimate.  The evidence is clear that v4 was never the Defendants' counterfactual, and indeed the object of the texts and the authors' evident frustration was not the NEA but rather the idea that the DOJ would only credit benefits generated by more flying on existing fleets.[38]  That is, indeed, "no bueno" with respect to a growth initiative justifying additional aircraft.  It is also at odds with the testimony of Plaintiffs' own expert, Dr. Town, that airline "capacity will expand to accommodate . . . increase[s] in demand."[39]  Accessing incremental demand is the business objective of the NEA in a nutshell.  A fleet-constrained counterfactual is just another device Plaintiffs use to try to deny the actual resulting growth and NEA benefits.

*Only "organic" growth is procompetitive.*  This narrative of Plaintiffs advances a false choice between purportedly "good" output-expanding organic growth and purportedly "bad" output-reducing "synthetic" (or "inorganic") growth.  At the outset, the consumer benefits arising from the NEA do not depend solely on traffic growth.  As soon as American and JetBlue optimized their NEA assets, they created schedules and options far superior to what either could offer on their own on virtually every route within the NEA geography.  Quality improved, consumer choice

---

[37] FoF ¶¶ 276-280; Tr. Day 2 (Hayes) at 82:21-83:3; Tr. Day 9 (Friedman) at 43:25-44:17, 46:15-20; Tr. Day 10 (Clark) at 48:4-15; *see also* DX-0374.

[38] *See* FoF ¶¶ 309-319.

[39] Tr. Day 9 (Town) at 96:5-7.

improved, and both effects are procompetitive.  In all events, the evidence is clear that the NEA partnership *enables otherwise unprofitable organic growth*.[40]  Prime examples are the first new American international flights from New York in many years and massive JetBlue growth, including more than tripling its operations in LaGuardia.[41]  Denigrating a metaphor ("Build vs. Borrow") to make alliances seem somehow unworthy is not serious antitrust analysis.  The DOJ's *Collaboration Guidelines* state that "collaborations often are not only benign but procompetitive,"[42] precisely because they allow parties to accomplish things they could not on their own.  Such is the case with the NEA.

The stark contrast between Plaintiffs' moralizing and superficiality, on the one hand, and Defendants' substantive proofs, on the other hand, determines the outcome of this case.  In short, Plaintiffs have not come close to meeting their burdens under the rule of reason.

## II.    ARGUMENT

The remainder of this Post-Trial Brief is organized around the three steps of the rule of reason analysis.  That is, we will address (1) anticompetitive effects (including market power and market definition), (2) procompetitive rationales, and (3) less restrictive alternatives, in that order.

The fatal weaknesses in Plaintiffs' case are evident in the ways they urge the Court to depart from a standard rule of reason analysis.  At Step One, Plaintiffs urge the Court to ask not whether "the challenged restraint has a substantial anticompetitive effect," *Alston*, 141 S. Ct. at

---

[40] FoF ¶¶ 257-266; Tr. Day 15 (Znotins) at 68:11-69:9 ("It gave us a reason to think that investing in there could actually pay off for American, whereas prior to the NEA, it felt like you were just putting good money after bad in the New York market, and you would be better off as an airline investing in some other place."); Tr. Day 14 (Israel) at 53:20-22 ("The NEA is a growth initiative. It builds in intentional growth inducing pieces into the contract.  It's creating growth in the Northeast.").

[41] *See* FoF ¶¶ 158-200; *id.* at ¶¶ 257-266.

[42] *Collaboration Guidelines* at 1.

2160, but rather "whether the challenged restraint is likely to harm competition," ECF No. 160 at

16.  At Step Two, where (only if a plaintiff has met its burden under Step One) a defendant's

burden is simply "to show a procompetitive rationale for the restraint," *Ohio v. Am. Express Co.*,

138 S. Ct. 2274, 2284 (2018), Plaintiffs ask the Court to require Defendants to "show the

lawfulness of [the restraint]" by what they call "sufficient procompetitive effects," ECF No. 160

at 16-17.  And at Step Three, where the burden is clearly on Plaintiffs "to demonstrate that the

procompetitive efficiencies [of the NEA] could be reasonably achieved through less

anticompetitive means," *id.*, Plaintiffs first try to put the burden on Defendants to prove

"efficiencies," as in a merger challenge, and then suggest that in the alternative the NEA may be

condemned based on "a weighing of the injury and the benefits to competition," ECF No. 160 at

17 (quoting *Sullivan*, 34 F. 3d at 1111).

        The fact is that most if not all of these distinctions are now moot.  The preponderance of

the evidence does not support even a likelihood of adverse effects from the NEA, the evidence

shows large consumer benefits, and Plaintiffs did not offer any reliable proof of either genuine less

restrictive alternatives to the NEA or injury greater than proven benefits.

  A.    **Plaintiffs Failed to Prove That The NEA Has Produced, Is Producing, or Will
        Produce Anticompetitive Effects**

        1.    **The Legal Standard**

        The correct legal standard for proving anticompetitive effects under a rule of reason

analysis is found in *Alston* and *American Express*: "[T]he plaintiff has the initial burden to prove

that the challenged restraint has a substantial anticompetitive effect."  *Alston*, 141 S. Ct. at 2160.

Adverse effects must be "real and immediate, not conjectural or hypothetical."  *In re New Motor

Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 14-15 (1st Cir. 2008) (internal quotations

omitted).

Plaintiffs argue that they "need not show that the restraint has already inflicted quantifiable effects on consumers.  The test is whether the challenged restraint is likely to harm competition." ECF No. 160 at 16.  The first part of that statement is true:  it is not a plaintiff's burden to prove "quantifiable" adverse effects on consumers.  Indeed, one key reason the law accepts both "direct" and "indirect" proof of adverse effects is that sometimes direct evidence "is elusive or simply unavailable."  *See* Areeda & Hovenkamp  ¶ 1914b.  Nevertheless, the second part of Plaintiffs' contention—the asserted "test"—is incorrect.  "Likely" is not the decisional rule or "test" in a Section 1 rule of reason case.  It is, expressly, in merger challenges under Section 7 of the Clayton Act because 15 U.S.C. §18 prohibits mergers and acquisitions that "may" substantially lessen competition.  A prospective standard is also a practical necessity with respect to mergers since they are typically challenged *before* they are consummated.  But Section 1 of the Sherman Act condemns contracts, combinations, and conspiracies "in restraint of trade," 15 U.S.C. §1, and the great weight of authority—particularly recent authority—is that the "demanding calculus" of the rule of reason "compels an antitrust plaintiff to show" that a defendant's conduct "*had* anti-competitive consequences."  *Am. Steel Erectors v. Loc. Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 815 F.3d 43, 61 (1st Cir. 2016) (emphasis added) (quoting *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004))); *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 124 (1st Cir. 2011) (stating that "[i]t is not easy to think of a rule of reason analysis that does not depend on showing adverse effects on competition" (quoting *Stop & Shop*, 373 F.3d at 69)).[43]  So to satisfy the first element of their claim, Plaintiffs must prove that the NEA has, in fact, harmed consumers.

---

[43] *See MacDermid Printing Sol. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) (despite the direct/indirect distinction, "there is really only one way to prove an adverse effect on competition under the rule of reason: by showing actual harm to consumers in the relevant

This does not mean that likelihoods are irrelevant.  They are clearly *part* of the analysis when a plaintiff attempts to prove adverse effects through "indirect evidence," the process of *inferring actual effects* from "market power plus some evidence that the challenged restraint [by its nature] harms competition."  *Am. Express,* 138 S. Ct. at 2284 (citing *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F. 3d 90, 97 (2d Cir. 1998)) ("some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior"); *see also Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 53 (1st Cir. 1998) (*dicta* suggesting that a combination of "a sufficiently high risk of an anticompetitive effect, coupled with marginal benefits" would meet a plaintiff's Step One burden). Nevertheless, likelihoods are relevant for their inferential value, not as decisional rules.  A practice that is "in restraint of trade," 15 U.S.C. § 1, is one that "has a substantial anticompetitive effect." *Alston*, 141 S. Ct. at 2160.  Put simply, there is no precedent in any court for what Plaintiffs are trying to do here:  enjoin an ongoing collaboration based entirely on a predictive simulation where (i) unrefuted evidence shows that the collaboration already has produced substantial consumer benefits in the form of increased output; (ii) Plaintiffs have not presented any evidence of actual consumer harm; and (iii) the actual results of the collaboration are not at all consistent with what Plaintiffs' expert, Dr. Miller, simulation predicts.

---

market"); *Compass, Inc. v. Real Est. Bd. of N.Y., Inc.*, No. 21-CV-2195 (AJN), 2022 WL 992628, at *4 (S.D.N.Y. Mar. 31, 2022) (explaining that "[e]ven when adverse effects are proven indirectly, the plaintiff must ultimately proffer, as a practical matter, some evidence that the challenged action has already had an adverse effect on competition, even if consumers have not yet felt that effect" (emphasis in original) (internal quotations omitted)), *reconsideration denied*, No. 21 CIV. 2195 (LGS), 2022 WL 2967566 (S.D.N.Y. July 27, 2022); *Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1267 (S.D. Fla. 2015) (noting that there is "significant support for the view that the actual detrimental effect must be a result which has in fact already *happened*, as opposed to a result which is speculative, hypothetical, likely, inherent, or one having potential to create damage," and collecting cases), *aff'd*, 845 F.3d 1072 (11th Cir. 2016).

## 2. The NEA's Actual Competitive Effects Are Increased Output Without Higher Fares

Plaintiffs have challenged the NEA without proffering any evidence of actual adverse effects.[44] They can try to minimize or excuse this fundamental shortcoming by pointing to the effects of the COVID-19 pandemic and the ongoing threat of this litigation, but the fact remains that the Plaintiffs—who have access to the same data and economic analysis resources as Defendants—did not even try to put on direct evidence of any adverse effects, even though the NEA has been in effect for 20 months.[45]

It is perfectly obvious why Plaintiffs ignore the NEA's actual effects. Defendants' experts Drs. Carlton and Israel took on the challenge that Plaintiffs avoided and provided uncontroverted evidence, respectively, of the *absence* of actual adverse effects—no higher fares—and the existence of *procompetitive* effects through increased output. *See* FoF ¶¶ 247-323; *id.* at ¶¶ 376-385; *id.* at ¶¶ 292-306. Their testimony is for all practical purposes dispositive given the Supreme Court's holding in *American Express Co.*, 138 S. Ct. at 2288, that even direct evidence of higher prices (which Plaintiffs did not offer) will not establish anticompetitive effects "absent some evidence that tends to prove that output was restricted or prices were above a competitive level."

---

[44] Tr. Day 11 (Miller) at 82:23-25 ("Q. Okay. You provided no analysis of observed post[-]NEA price increases or other changes adverse to customers, did you? A. That's correct."); Tr. Day 9 (Town) at 171:5-12 ("Q. Now, you're also not offering the opinion that the Northeast Alliance has caused consumer harm, correct? A. Has caused? Q. Yes. A. I don't offer a view on that because I think it would be difficult to assess, given the current circumstances. You wouldn't be able to disentangle COVID from the other fact -- from this other factor."); Tr. Day 10 (Miller) at 129:5-22 ("Q. So you mentioned that you used the model, but the NEA has been in effect for some time. Why didn't you just do a comparison of prices from before and after implementation of the NEA? A. I considered it and I don't think analysis would be informative.); Tr. Day 17 (Miller) at 127:3-9 ("Q. . . . Are you saying that, in almost 20 months that the NEA partners from -- that the NEA has been in effect, American and JetBlue have not taken any action, potentially anticompetitive, that can be evaluated for actual adverse effects? A. I don't know the answer to that question."); *see also supra*, n.14; FoF ¶¶ 376-385.

[45] *See* FoF ¶¶ 408-411.

The legal focus on output aligns with the economic principle acknowledged by Plaintiffs' experts that *increased* output puts *downward* pressure on prices.[46]  Where the challenged conduct has *increased* output, a finding of anticompetitive effects is simply not possible.  *Brooke,* 509 U.S. at 237 ("Where, as here, output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand."); *see also,* Areeda & Hovenkamp ¶ 1502 ("The most general and useful meaning of th[e] term ["restraint" as used in Section 1] is an anticompetitive reduction in output[.]").

The Court should emphatically reject Plaintiffs' excuses for failing to present evidence of actual adverse effects.  In all probability, Plaintiffs' economists *did* analyze the available data and simply could not show any adverse effects.  But even if we indulge in the assumption that Plaintiffs determined in good faith that there was no point in even analyzing the data, the most generous conclusion for Plaintiffs is that the effects of the NEA are indeterminate, in which case any legal challenge is premature.  Instead, Plaintiffs are trying to force the Court into accepting predictive proofs by nullifying the utility of actual effects analysis—the most important component of any rule of reason analysis.

Plaintiffs chose to sue, and thereafter insisted that the case go to trial within one year.  There is now a trial record, which includes abundant evidence about the NEA's actual effects.[47]  The legal question of whether Plaintiffs have met their burden of proof is determined by that record.  With respect to the NEA's actual effects, it is *entirely* one-sided:  the evidence consists of testimony from Drs. Israel and Carlton of no adverse effects and procompetitive output increases,

---

[46] Tr. Day 9 (Town) at 171:22-25 ("Q. You would agree that, all else being equal, if there's an increase in capacity, then average consumer welfare will increase?  A. Typically, yes, all else equal."), 192:23-193:3; Tr. Day 11 (Miller) at 113:5-9.

[47] *See generally*, FoF ¶¶ 247-323.

with *no response from Plaintiffs*.[48]  Plaintiffs have failed to carry their burden of proving that the NEA "has a substantial anticompetitive effect."  *See Alston*, 141 S. Ct. at 2160.

As to Plaintiffs' excuses, first, there is no basis to accept Plaintiffs' unsupported argument that for over 20 months Defendants have somehow moderated their behavior to create a false picture of the NEA's effects, and that the procompetitive output effects of the NEA are some kind of made-for-litigation illusion.  ECF No. 160 at 36-37.  American and JetBlue have "coordinated capacity" (to use Plaintiffs' preferred phrasing) on a substantial number of nonstop routes, including in all of the nonstop routes where Plaintiffs predict harm (save for the carve-outs).[49] Each has set and changed its respective fare levels on each of those routes many times.  They have done things that Plaintiffs openly criticize, such as American's "coordinated exit" from the Boston-LaGuardia shuttle service[50] and JetBlue capacity reductions to deal with its operational challenges.[51]  In addition, beginning with the Clean Team schedule presented to DOJ more than two years ago, and then through successive actual schedule changes, Defendants have shown exactly what the NEA is and what it will continue to be.  One hundred percent of the record

---

[48] *See generally* FoF ¶¶ 376-494; *id.* at ¶¶ 292-306.

[49] DX-1087; *see* Tr. Day 15 (Znotins) at 78:11-83:16, 83:12-15 (describing the 31 new routes in New York since the implementation of the NEA); *see also* FoF at ¶ 257-272.

[50] Tr. Day 15 (Znotins) at 96:7-14 (confirming that, as part of the NEA American and JetBlue have decided that American will no longer fly Boston-LaGuardia), 97:12-15 ("Q. And what has American done with its capacity that it's no longer flying Boston-LaGuardia?  A. We've launched many of the new routes and frequencies that we've discussed prior."), 98:24-99:6 ("Q. And is this decision to not fly Boston-LaGuardia on American metal set in stone?  A. No. When we're doing our network optimization, there could be a point in the future where we say that most efficient schedule to operate, with the best airplanes and the best route, means American . . . airplanes reenter the market or even American operates it exclusively. Both possibilities are there."); *see also* FoF ¶¶ 403-407.

[51] *See also* Tr. Day 1 (Hayes) at 243:19-244:6 (explaining JetBlue's capacity cuts were due to operational issues, not the NEA); Tr. Day 2 (Hayes) at 44:9-47:2 (explaining that the specific challenges that JetBlue faced coming out of Omicron—schedule reductions and capacity reductions—are related to pilot attrition levels, among other things).

evidence is that both the purpose and effect of the NEA has been to increase output.  The growth in ASMs is real.[52]  The new flights and new frequencies are real.[53]  The higher quality schedules are real.[54] The market share and QSI increases are real.[55]  That is simultaneously the best evidence of what the output effects of the NEA *have been* and what they *will be*, and it forecloses any inference of anticompetitive effects now or in the future.[56]  And this is all corroborated by the way

---

[52] DX-0932 (showing ASM growth at NEA airports); *see also* Tr. Day 14 (Israel) at 56:23-57:14, 59:6-17, 62:23-63:5 ("Everything I've seen in this case, every data I've looked at says that at -- in the NEA airports, in the routes that we're focused on here, American and JetBlue have grown capacity.  They've grown relative to the industry, they've grown relative to other carriers."); FoF ¶¶ 257-266.

[53] Tr. Day 15 (Znotins) at 78:11-83:16 (discussing DX-1087, a summary exhibit listing all added routes in Boston and New York since implementation of the NEA); DX-0057 (NEA customer pitch deck) at -008 ("Delivering on our promise:  progress to date . . . 57 new domestic and international routes"); Tr. Day 8 (Swartz) at 45:3-45:22 ("[H]as American added more flights out of Boston to more destinations because of the NEA?  A. Yes.  Q. And how, if at all, has that helped you compete in Boston?  A. The network is key.  Network is key.  When people want to fly these days, people want to fly direct.  And it's even more so with the corporate business traveler.  They don't have time to connect.  They much prefer to fly direct.  So it just gives more direct destinations that we can offer with our combined Northeast Alliance."); DX-0388 at -005, -012 ("NEA Update December 2021" deck showing new JetBlue service out of New York to Denver; Jacksonville; New Orleans; Fort Myers; Tampa; Bozeman; Detroit; Key West; Minneapolis; Puerto Vallarta, Mexico; Cabo, Mexico; San Jose, Costa Rica; and Vancouver, Canada); FoF ¶¶ 257-266.

[54] Tr. Day 7 (Raja) at 137:8-18 ("[The NEA] greatly improved our ability to go and compete.  You see the scheduling improvement in Boston-DCA, again, pre-NEA, you see at those peak time trips we're basically on top of one another. . . .  Now, post-NEA, it's a nice hourly pattern.  You can get on any flight you want."); Tr. Day 2 (Hayes) at 20:14-21:2; FoF ¶¶ 267-272.

[55] Tr. Day 13 (Schweinzger) at 70:1-22 ("Q. . . . And so can you summarize what the results . . . are showing about your QSI performance after the NEA?  A. Yeah.  What this shows at the bottom is -- that our share gap for both American and JetBlue has improved relative to the 2019 baseline."); FoF ¶¶ 408-411.

[56] These effects also provide the full response to Plaintiffs' argument that "evidence of harm to the competitive process" will prove adverse effects.  ECF No. 160 at 16.  It is standard in antitrust analysis to say that all genuine anticompetitive effects result from "harm to the competitive process."  The converse, however, is not true—the most obvious case being when a firm or group of firms incapable of exercising market power tries to restrict competition.  Antitrust law therefore has both "filters" (such as the market power requirement) and substantive standards (such as reduced output) for determining that an alleged "harm to the competitive process" has manifested in an actionable adverse effect.  That said, conduct that *promotes* competition and *increases* output

Defendants' competitors view the NEA.[57]  Despite so much change from the *status quo ante,* Plaintiffs have *nothing* in the way of proof of actual adverse effects.

Plaintiffs also have no answer for the fact that the threat of government and private litigation—including class action lawsuits seeking treble damages—does not go away when this litigation ends.[58]  *See* 15 U.S.C. § 15 (Section 4 of the Clayton Act, providing a private right of action, treble damages, and attorney's fees for any person injured in their "business or property" by a violation of the antitrust laws); *Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 525 F.2d 630, 639 (D.C. Cir. 1976) ("[T]here will be ample opportunity to challenge anticompetitive effects as the time approaches when they will be felt, and the extent of the impact on competition becomes more readily assessable.  The Justice Department no doubt will make a continuing assessment.").  The NEA is indeed "unprecedented" in that American and JetBlue do not have antitrust immunity

---

is never deemed to harm "the competitive process."  None of the cases Plaintiffs cite says anything like that.  To the contrary, the DOJ's *Collaboration Guidelines* state: "collaborations often are not only benign but procompetitive."  *Collaboration Guidelines* at 1; *Alston,* 141 S. Ct. at 2155 ("the fact that joint ventures can have such procompetitive benefits surely stands as a caution against condemning their arrangements too reflexively").

[57] FoF ¶¶ 239-246.

[58] Tr. Day 12 (Miller) at 33:8-20 ("Q. . . . Let me just finish on one point that you made yesterday.  And that is about this idea that litigation risk prevents you from being able to conduct a meaningful study of post-implementation data and activity.  Now, what your reasoning, right, is because American and JetBlue are presently in litigation with plaintiffs, the Department of Justice and the States, and there is a risk that they would lose -- that they may refrain from the predicted fare hikes, right?  A. Yes, that's more or less the line of thinking.  Q. Okay.  But the reality is that, in this context, the risk of litigation doesn't end with this case, does it, sir?  A. I believe the risk of litigation would continue.")  At his deposition Dr. Miller testified that he was unaware of the possibility of treble damage class action litigation, and thus had not factored that into his analysis.  *See* Tr. Day 12 (Miller) at 31:2-25 (referring to a video clip played during trial of Miller Dep. Tr. (08/17) at 71:5-72:15).  At trial, he testified that he had been confused.  Tr. Day 12 (Miller) at 34:10-16.  Regardless, there is no dispute that the threat of ongoing antitrust liability is real.

and therefore assume that ongoing risk.[59]   In other words, moderating behavior today, or temporarily, will not avoid prosecution for later anticompetitive behavior.

Second, Plaintiffs are wrong that the effects of the COVID-19 pandemic make it impossible to study fare effects.  Dr. Carlton did it, using the same differences-in-differences econometric technique that has been used to study the effects of airline mergers notwithstanding the Great Recession and other large supply and demand "shocks."[60]  Plaintiffs' response to Dr. Carlton's analysis is makeweight—all criticism and no proof that the criticisms matter at all.[61]  Their primary argument is that Dr. Carlton did not segregate business and leisure traffic.[62]  But surely if that mattered—if it would change the results—Dr. Miller would have shown that. He did not.[63]  On this issue of fare effects, and the fact that the NEA has not resulted in higher fares, the preponderance of the evidence is Dr. Carlton's testimony, not half-baked criticisms.

### 3.   Plaintiffs Failed to Prove Market Power, Without Which There Can Be No "Indirect" Inference of Anticompetitive Effects

Plaintiffs' purported proof of market power was nothing more than summing American and JetBlue market shares as if they had merged, coupled with implausible arguments that other carriers would not increase or reallocate their capacity to exercise market power if American and

---

[59] *See* FoF ¶¶ 460-464; Tr. Day 4 (Raja) at 191:17-19 ("Q. So in -- and there's no application for antitrust immunity with respect to the NEA, is there?  A. There's not.").

[60] Tr. Day 16 (Carlton) at 14:17-15:20 ("[E]conomic factors are always changing, and that shouldn't prevent you from looking at the data to see what you can learn from it. * * * I'm confident that I've been able to isolate the effect of the NEA, at least to date.  And I'm able to conclude that the evidence would not support a claim that the NEA has raised fares.").

[61] *See generally* Tr. Day 17 (Miller) at 81:11-85:23.

[62] *Id.* at 86:1-11.

[63] Tr. Day 17 (Miller) at 123:23-124:2 ("Q. Okay.  So you brought up this point about distinction between business and leisure passengers, but you didn't try to come up with different business or leisure passenger control groups to see if that made a difference, did you?  A. That's true.  I didn't try to do that.").

JetBlue tried to reduce their capacity.[64]  But summing market shares and applying merger law presumptions of anticompetitive effects is the wrong approach in a Section 1 challenge to a collaboration.  *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 220 (D.C. Cir. 1986) (explaining that merger standards were developed for and "apply to mergers between firms that ordinarily have no internal competition[,] . . . [not] firms that are merely limiting internal competition and are not merging");  Areeda & Hovenkamp ¶ 2122b ("Because the competitive threat [from a joint venture] does not result from a reduction in the number of market participants— or indeed from any measurable increase in market concentration at all—concentration indexes such as the HHI … are of less utility"); *see also United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 170 (1964) (noting that a joint venture is not "controlled by the same criteria as the merger or conglomeration" because "[t]he merger eliminates one of the participating corporations from the market while a joint venture creates a new competitive force therein"); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir. 1994) ("Joint ventures . . . differ from mergers in a critical way: because they are less integrated than mergers, *they allow their partners to continue to compete with each other in the relevant market*." (emphasis in original) (quoting Thomas A. Piraino, Jr., *Beyond Per Se, Rule of Reason or Merger Analysis: A New Antitrust Standard for Joint Ventures*, 76 MINN. L. REV. 1, 7 (1991))).

What is required instead—under case law and the DOJ's *Collaboration Guidelines* —is proof that a defendant has the ability to raise prices by restricting output.  *Am. Express Co.*, 138 S. Ct. at 2288; *Collaboration Guidelines* at §3.33 ("[M]arket share affects the extent to which participants or the collaboration must restrict their own output in order to achieve anticompetitive effects in a relevant market.  The smaller the percentage of total supply that a firm controls, the

---

[64] FoF ¶¶ 408-411.

more severely it must restrict its own output in order to produce a given price increase, and the less likely it is that an output restriction will be profitable.").

In this case, the obvious constraint on the exercise of market power is the presence of the competing hub carriers, Delta and United.  Delta has hubs in both Boston and New York, and United has a hub in New York (Newark).[65]  Not surprisingly, one or both are present on every NEA nonstop overlap route of any size.[66]  As Dr. Israel explained, airline economists typically are concerned with the exercise of market power *by hub carriers* (in this case, Delta and United), not by the airlines *competing with hub carriers* (American and JetBlue, among others).[67]  It is the hub carriers that have the market position and the control of competitively critical assets (*e.g.*, slots) that are in the power position.[68]  Yet here, Plaintiffs and Dr. Miller sluff off the competitive constraint from Delta and United's Boston and New York hubs.  Dr. Miller did not even address the issue in his Reports and in his rebuttal testimony would only go so far as saying that due to the "opportunity costs" of not flying other routes he has "concern about whether the sort of entry or repositioning thing would ameliorate harm."[69]  That is not nearly enough to dismiss the constraining effect of hub carriers.  "Substantial market power can persist only when there are

---

[65] *See* FoF ¶ 97; *id.* at ¶ 105; DX-0560 at -009; Tr. Day 13 (Israel) at 110:24-111:1 ("[A]s we've heard, Delta has now made Boston into a hub as of a few years ago, so we now again have a city with a hub carrier."); *see generally* DX-0515; DX-230 at -002 ("DL remains the #1 NYC franchise").

[66] Tr. Day 11 (Miller) at 80:15-23 ("Q. Now, let's put up slide 54 from my opening that talked about the position of United and Delta on New York routes.  [D]o you have any reason to dispute that on the routes that are listed here, the predominant market shares come from some combination of United and Delta?  A. That seems right.").

[67] *See* FoF ¶ 97; Tr. Day 13 (Israel) at 117:21-2.

[68] *Id.*

[69] *See* FoF ¶ 435; Tr. Day 17 (Miller) at 92:1-93:9.

significant and continuing barriers to expansion and entry."[70]  Areeda & Hovenkamp ¶ 506d; *see*

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) (noting that a "mere showing

of substantial or even dominant market share alone cannot establish market power," and the

plaintiff "must show that new rivals are barred from entering the market and show that existing

competitors lack the capacity to expand their output to challenge the predator's high price").  There

is no showing in this case that on any NEA route American and JetBlue have the degree of freedom

from expansion by rivals to profitably restrict their output.

Furthermore, in all but a few routes, Defendants do not even have the requisite market

share.  There are only three Boston routes (to/from Washington DCA, Miami, and Los Angeles)

for which American and JetBlue (a) share revenue and coordinate scheduling, and (b) provide

more than half of the current airline capacity.[71]  Delta offers competing nonstop service from

Boston to Washington DCA (and United to Washington Dulles); Southwest, Spirit, and Delta offer

competing nonstop service from Boston to Miami; and Delta, United and Alaska offer competing

nonstop service from Boston to Los Angeles.[72]  There are only three New York routes (to/from

Nantucket, Martha's Vineyard and Phoenix) for which American and JetBlue provide more than

half of the current airline capacity.[73]  Of the remaining Boston and New York routes for which

American or JetBlue offered nonstop service in 2019, they (a) did not compete (54 New York

---

[70] *Id.*

[71] PX1020 (showing that the only three routes with more than 50% combined share between American and JetBlue with revenue sharing and schedule coordination (*i.e.*, that are not carved out from the MGIA, as is indicated in Exhibit 16 with "[4]") are Washington DCA, Miami, and Los Angeles); *see also* FoF ¶¶ 119, 447.

[72] *See* FoF ¶¶ 119, 447.

[73] *See* DX-1055 (showing that when all three airports are appropriately included in the New York market, the only three routes where American and JetBlue provide more than half the service are Nantucket, Martha's Vineyard, and Phoenix); FoF ¶ 99.

routes, 36 Boston routes), (b) collectively controlled less than half of the current airline capacity (15 New York routes, 3 Boston routes), or (c) carved-out the routes from NEA revenue sharing and joint scheduling (6 Boston routes).[74]

With respect to New York, the exercise of market power by American and JetBlue should not even be up for discussion.  These markets are clearly dominated by United and Delta, which have large hubs protected by slot holdings and Newark takeoff and landing rights that ensure they will always control most of the capacity for travel to and from New York.  Plaintiffs' specious effort to deny United's New York presence by defining Newark Liberty Airport outside the "relevant markets" must be rejected.  In advocating for LGA/JFK-only markets, Dr. Miller does *not* follow the DOJ's *Horizontal Merger Guidelines*, and he most certainly does not follow the cardinal rule that the geographic market in an antitrust case is "the 'area of effective competition . . . in which the seller operates, and to which the purchaser *can practicably turn* for supplies."[75] *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (emphasis modified); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016) ("The relevant geographic market is that area in which a potential buyer may rationally look for the goods or services he seeks." (internal quotations omitted)).

First, there is no doubt that flights operating from Newark, on the one hand, and LaGuardia and JFK, on the other hand are in active competition with one another.[76]  One does not need to assume and study the effects of a SSNIP to see this, it is *already evident* at current market prices. "[T]he 'area of effective competition,'" *Phila. Nat'l Bank*, 374 U.S. at 359, thus encompasses

---

[74] *See* FoF ¶¶ 99, 119.

[75] *See* FoF ¶¶ 363-375; U.S. Dep't of Justice and Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010) ("*Horizontal Merger Guidelines*").

[76] *Id.* at ¶¶ 324-375.

sellers like United, Alaska, American, JetBlue, and Spirit operating from Newark as well as those and other airlines operating from LaGuardia and JFK.  Likewise, "the purchaser can practicably turn" and in fact *does* turn to airlines operating at all three airports.  *See FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1050, 1053-54 (8th Cir. 1999) (proposed geographic market rejected where patients already procured services outside that region); *United States v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121, 141-42 (E.D.N.Y. 1997) (finding distinct geographic markets for primary/secondary care services and tertiary care services based on choices patients made with regard to each).  Dr. Brueckner's testimony based on his published methodology for measuring "competitive spillovers" confirms that at current market prices flights from all three New York metropolitan area airports are in the same economic markets.[77]

Dr. Miller tried to change this common sense result by emphasizing the preferences of New Yorkers to utilize the closest available airport and through what he claims, falsely, is a Hypothetical Monopolist Test.[78]  But there is not a separate antitrust market for each product or area that some consumers prefer over another. "The critical question is where can consumers of the product involved practically turn for alternative sources of the product should the [transaction] be consummated and . . . prices increase." *Long Island Jewish Medical Center*, 983 F. Supp. at 140.  In this analysis, the suppliers to whom consumers *presently* turn, before any price increase, are routinely included.  *Tenet Health Care Corp.*, 186 F.3d at 1053-54 (proposed geographic market rejected where patients already procured services outside that region); *United States v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121, 141–42 (E.D.N.Y. 1997) (finding distinct geographic markets for primary, secondary, and tertiary care services based on choices patients

---

[77] *Id.* at ¶¶ 341-351.

[78] *Id.* at ¶¶ 363-375.

made with regard to each); *cf. United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1110 (N.D. Cal. 2004) (product market: "high-function" software markets rejected where consumers purchased lower-end products for ostensibly high-function needs).

In all events, Plaintiffs' focus on the preferences of some New Yorkers is myopic and contrary to the DOJ's *Horizontal Merger Guidelines*. As Dr. Miller admitted on cross-examination, he is defining what the DOJ's *Horizontal Merger Guidelines* call "Geographic Markets Based on the Locations of Suppliers." *Horizontal Merger Guidelines* at §4.2.1. The *Horizontal Merger Guidelines* state that such markets "encompass the region from which sales are made" and "[c]ompetitors in the market are firms with relevant production, sales, or service facilities in that region." *Id.* Airlines operating from Newark undoubtedly make sales throughout the New York area and have "relevant production, sales, or service facilities" patronized by passengers flying to and from New York. In that case, the *Horizontal Merger Guidelines* state that sales made by suppliers in the region are counted toward market shares *"regardless of the location of the customer making the purchase.*" *Horizontal Merger Guidelines* at §4.2.1. (emphasis added). That is, the location of the customer does not limit the scope of a *Horizontal Merger Guidelines* market "[b]ased on the [l]ocations of [s]uppliers."[79] Yet Dr. Miller does exactly that.[80]

Plaintiffs have also failed to prove that there are not "enough" passengers sufficiently indifferent to flying in or out of Newark or JFK to combine the airports into one market. ECF No.

---

[79] The *Horizontal Merger Guidelines* have a different geographic market definition test for the circumstance "[w]hen the hypothetical monopolist could discriminate based on customer location," *Horizontal Merger Guidelines* at §4.2.2, but Dr. Miller admitted that is not applicable. Tr. Day 11 (Miller) at 39:5-25.

[80] Dr. Miller was clearly unfamiliar with this principle when Defendants raised it on cross-examination, pausing to consider it and then testifying that he would have to "parse the words" to address its meaning. Tr. Day 11 (Miller) at 41:4-12. He denied that during the rebuttal case, but the fact is he never mentioned it or applied it in his report or testimony.

160 at 21.  In fact, the vast majority of the demand for flights to and from New York comes from (a) *inbound* passengers who do not live near any New York airport, and (b) *outbound* passengers who live (or work) in Manhattan or other areas not meaningfully less convenient to Newark than to JFK.[81]  On the face of it, that should be far more than enough "swing customers" to bind the airports into the same markets.  Plaintiffs, moreover, made no effort to measure the "inframarginal" (most inelastic) customers who might not switch from their "preferred" JFK flights even if fares from JFK became disproportionately expensive.[82]

Instead, Plaintiffs put all their eggs into one basket: Dr. Miller's supposed Hypothetical Monopolist Tests ("HMTs").  First, these are *not* HMTs.[83]  The 737 MAX exercise is admittedly not, because there was no way to hold prices outside the candidate market (LaGuardia and JFK) constant, as the HMT requires.[84]  *See Horizontal Merger Guidelines* at § 4.2.1 ("In this exercise the terms of sale for all products produced elsewhere are held constant.").  Rather, Dr. Miller's 737 MAX exercise is simply an observation that an unexpected supply shock led to higher fares. But critically, the same thing happened at Newark, where Southwest Airlines—the largest U.S.

---

[81] Tr. Day 12 (Lee) at 110:4-22 ("Well, when you think about demand to New York City, there's really two sides of the demand. . . .  There's people coming from outside of New York, from the rest of the country, as well as the rest of the world into New York, and I think there really is no debate over the fact that Manhattan is the focal point of New York City demand. . . .  And then in terms of outbound traffic from New York City, Manhattan is the single most densely populated part of the entire country. . . . [Y]ou can't, as an airline that wants to be a serious competitor in the New York City marketplace, ignore that."); FoF ¶¶ 331-337.

[82] Tr. Day 11 (Miller) at 51:22-52:5 ("Q. [A]s we've discussed in your deposition, you present results from your merger simulation and your hypothetical monopolist tests that predict increases far greater than the cost to an individual, let alone a family, of getting in a ca[]b or an Uber to take a Newark flight, rather than a more expensive LaGuardia or JFK flight, correct?  A. I haven't analyzed the price of a taxi or an Uber from one airport to the other.").

[83] FoF ¶¶ 363-375.

[84] *Id.*

operator of the 737 MAX—operated at the time.[85]  So this was not and could not have been a test of whether diversion to Newark constrained LaGuardia and JFK fares.[86]

 That leaves the purported HMT based on Dr. Miller's merger simulation.  No part of that exercise assumes a price increase (the SSNIP) and studies whether substitution to Newark flights specifically would render that price increase unprofitable.[87]  Dr. Miller is simply arguing that according to his model, a merger of every airline operating at LaGuardia and JFK would result in a SSNIP.[88]  But as Dr. Israel demonstrated, a merger of every airline operating at any single New York airport, or any combination of New York airports, leads to the same result.[89]  The HMT in this application tells us that every possible New York market definition is right and none is wrong.[90] As other courts have observed, when the HMT cannot limit what is a relevant market and what is not, its general utility "must yield to the economic realities of the industry" at issue.  *United States v. U.S. Sugar Corp.*, No. CV 21-1644 (MN), 2022 WL 4544025, at *24 (D. Del. Sept. 28, 2022) (rejecting DOJ geographic market definition supported by HMT, and noting that "the process of identifying the relevant geographic market must conform to the economic realities of the industry to recognize competition where competition exists").

---

[85] Tr. Day 11 (Miller) at 51:7-14.

[86] FoF ¶¶ 363-375.

[87] *Id.*

[88] FoF ¶ 369.

[89] Tr. Day 13 (Israel) at 135:23-137:16 ("[I]f you take those three airports and take any combination of them, LaGuardia alone, LaGuardia plus JFK, LaGuardia plus Newark, all three, those combinations, they all pass the test."); Tr. Day 11 (Miller) at 65:12-66:17 ("So I agree, that if you did all three together, it would also pass the Hypothetical Monopolist Test."); Tr. Day 17 (Miller) at 106:22-107:14 ("Q. Well, you are aware that -- that Dr. Israel established that LaGuardia alone would pass the hypothetical monopolist test, correct?  A. Yes.  I believe he submitted that as -- yes."); DX-1054.

[90] Tr. Day 13 (Israel) at 136:10-12 ("So the Hypothetical Monopolist Test is not telling us which of those markets is correct, it's saying they all pass the test").

Lastly, this effort to pretend that United Airlines is a "distant substitute" to American, JetBlue, and Delta, simply because it operates from Newark, violates "the overarching principle that the purpose of defining the market and measuring market shares is to illuminate the evaluation of competitive effects." *Horizontal Merger Guidelines* at § 4.1.1.  The NEA is a reflection of a competitive dynamic in which American and JetBlue have found themselves unable to compete effectively against *both* New York hub carriers—one of which is United.  United is clearly a target of the NEA and a source of competitive constraint on the NEA.  It makes no sense to disregard or diminish United's New York competitive position.  This is, as Dr. Lee put it, gerrymandering.[91]  It is a desperate argument to save a case that for every New York market borders on frivolous.

### 4.    Dr. Miller's Merger Simulation—the Only Significant Predictive Evidence Plaintiffs Offered—Is Unreliable, Immaterial and Should be Given No Weight and Stricken from the Record

The weakness of Plaintiffs' "predictive" evidence ultimately moots any dispute over whether a plaintiff is required to prove "actual" or "likely" anticompetitive effects.  The centerpiece of Plaintiffs' "likely" effects case is Dr. Miller's merger simulation, which cannot be credited.  Indeed, it should not even be admissible.[92]

Dr. Miller predicts harm from the NEA using a slightly modified version of a standard "unilateral effects" merger simulation—an economic model that estimates how much firms can

---

[91] Tr. Day 12 (Lee) at 50:7-8 ("[I]t's really nothing but an attempt to gerrymander the New York City market definition").

[92] Before trial, Defendants moved to exclude Dr. Miller from offering opinions or testimony that rely on the results of his "merger simulation" model as unreliable for purposes of modeling the competitive effects of the NEA, which is not a merger.  *See generally* ECF No. 141.  Defendants renewed this motion during trial after Plaintiffs rested their case-in-chief.  *See* Tr. Day 12 at 36:21-37:2 ("Mr. Wall: . . . I want to renew for the record our *Daubert* motion, with respect to Dr. Miller, both on the fitting reliability issues that we raised before, but I would add to that also on the failure to model, in any way, shape, or form, the capacity effects of the NEA, which, of course, we covered extensively yesterday and a little bit this morning.").

raise prices after merging given that some lost sales are "recaptured" by the merger partner.[93] Dr. Miller acknowledged on direct examination that with respect to nonstop overlap traffic, his model of the NEA generates outcomes nearly identical to those of a merger.[94]

Merger simulations hold capacity constant and ignore all efficiencies, consumer benefits, and other sources of downward price pressure, which guarantees predictions of higher prices.[95] Formally, the simulation is a one-shot change to the "Nash-Bertrand equilibrium" caused by one thing: the "recapture" effect, meaning the idea that previously unprofitable price increases become profitable because some lost sales are diverted to the merger partner.[96]  In other words, merger simulations do not actually simulate the *full* effects of a merger, only the change in the profit-maximizing price implied by the recapture effect.

There is neither economic literature nor judicial precedent for the use of a *merger* simulation in estimating the effects of a *collaboration*, such as the NEA.  Dr. Miller justifies doing so through an elaborate argument that because Defendants share revenues they will "behave" as if merged, meaning they will find it mutually beneficial to maximize "joint" rather than unilateral

---

[93] Tr. Day 11 (Miller) at 94:7-95:23.

[94] Tr. Day 10 (Miller) at 179:12-19 ("Now, for NEA nonstop overlaps . . . the NEA creates similar incentives as a full merger, even without the change in control.").

[95] *See supra* n.17; *see also* Tr. Day 13 (Israel) at 131:12-16 ("[E]very merger simulation model gets positive price increases.  These models are built to only measure upward pricing pressure. You can't get a negative number, zero is the bottom, unless you build in some efficiencies or something, which he has not done."); Tr. Day 16 (Carlton) at 50:3-10 ("[I]f there are no efficiencies and you do a merger simulation model, you are guaranteed to have only upward pricing pressure. So it's no surprise he's finding in his merger simulation prices are going to go up.  And that's because there's no downward pricing pressure from the efficiencies from the better network, from the better codesharing, from the better – from slot swaps.").

[96] Tr. Day 11 (Miller) at 94:7-11 ("Q. So what you have done for the NEA, nonstop overlap markets, is model it like a unilateral products merger in which there's a one-sho[t] change in something called a Nash Bertrand equilibrium, right?  A. Yes, that's correct.").

profits.[97]  That is plainly circular reasoning: an *assumption* of merger-like behavior justifying the *conclusion* that a merger simulation is appropriate.  Worse, to support his desired conclusion, Dr. Miller explicitly disregards the unilateral incentives for capacity expansion that the Parties wrote into the Mutual Growth Incentive Agreement ("MGIA").[98]

As Dr. Israel explained, it is entirely rational as a matter of economics for firms in American's and JetBlue's positions to choose an alliance structure that incentivizes both airlines to *expand* output, *i.e.*, to grow.[99]  That is what they did in the MGIA, based on a template American already knew from experience would incentivize capacity expansion.[100]  They chose not to share profits, not to share most costs, and not to share revenues in fixed proportions.  Dr. Miller unequivocally acknowledged that those choices create unilateral expansion incentives, yet he

---

[97] Tr. Day 10 (Miller) at 120:3-123:24.

[98] Tr. Day 11 (Miller) at 109:3-6 ("Q. So one take away, from the start, is that these parties negotiated an agreement between them that can create unilateral incentives to expand capacity. Right?  A. Yes, that's true."), 105:11-18 ("Q. So essentially, the argument is that no one should believe that the parties will behave consistent with that capacity expansion incentive because, as you put it in your initial report, on paragraph 41, those characteristics of the NEA revenue sharing highlighted by the defendants actually, if taken in isolation, create an incentive to exploit the partner airline, i.e., profit at the partner's expense?  A. That's [what] the report says.").

[99] Tr. Day 14 (Israel) at 15:14-25 ("Q. So would the MGIA and [its'] particular form of revenue sharing be a rational choice for an alliance that was intended to reduce capacity?  A. No, it's the opposite. . . . [T]hey intentionally chose the contract that's the box all the way on the left.  In the way I think about it, there's a choice.  Firm's make optimal choices.  They choose contract that builds in growth incentives and that builds in -- let's them maintain their separate cost structure. That's an intentional choice that they made.  That's not a choice you would make if you were trying to simulate a merger."); *see also* Tr. Day 4 (Raja) at 237:6-25 ("[The MGIA] incentivizes both carriers to effectively grow. . . .  Because what you want is . . . to generate more revenue.").

[100] Tr. Day 4 (Raja) at 235:5-12 ("Q. . . .  Can you just tell the Court how you came up with the concepts and how it ultimately turned into what we have here in the MGIA?  A. . . .  They're based out of things that we do in international joint ventures.  They're designed -- great common [incentives] for us to be able to grow and make the right capacity choices."), 239:3-21 (describing American's experiences in other alliances, including immunized international alliances, regarding revenue sharing terms similar to those found in the MGIA, including noting that as a result American has "grown at a greater rate than we grew before it").

*disregarded them* and modeled altogether different behavior on no more than his opinion that the choices actually made conflicted with joint profit maximization and that joint profit maximization would be better.[101]   That is a make-believe rationale for modeling the NEA like a make-believe merger.  And it is not even the end of this process: Dr. Miller's merger simulation is also predicated on the total elimination of competition between American and JetBlue notwithstanding the undisputed testimony that American and JetBlue continue to engage in price competition against one another (and everyone else) on routes within the scope of the NEA.[102]   Fundamentally, Dr. Miller denies proven facts on the ground that they are inconsistent with what he prefers to believe.  No such model could possibly satisfy the "fit" requirement of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591-92 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 154 (1999); *see also* ECF No. 142.

The simulation itself is also unreliable.  This is readily seen in how badly it predicts the effects of past airline mergers, how badly it predicts the effects of the NEA, and how wildly out-of-step its predictions are from the economic literature on past airline mergers.[103]   First, Dr. Israel showed that when applied to the American/US Airways merger, Dr. Miller's model predicts an average 21% price increase and capacity reductions on nonstop overlap routes on which actual

---

[101] Tr. Day 11 (Miller) at 109:3-6, 105:11-18.

[102] Tr. Day 1 (Hayes) at 196:6-197:9; Tr. Day 6 (Laurence) at 12:6-13:17; Tr. Day 12 (Carter) at 204:24-205:12; Tr. Day 14 (Israel) at 16:23-17:24; *see also* FoF ¶¶ 231-238.

[103] *See* Gregory J. Werden, Luke M. Froeb, and David T. Scheffman, A *Daubert* Discipline for Merger Simulation, 18 ANTITRUST 89 (2004), at 90 (anyone performing a simulation "ultimately should be convinced, and prepared to persuade others, that the oligopoly model employed explains the past well enough to provide useful predictions of the future"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 468, 479-81 (S.D.N.Y. 2018) (finding expert's testimony inadmissible where "[r]obustness testing and sensitivity testing [] produce[d] contradictory or otherwise implausible results").

fares *decreased* and output *increased*.[104]  Dr. Miller's model in no way "explains the past well

enough to provide useful predictions of the future."  Werden et al., 18 ANTITRUST 89 (2004), at

90.  Second, Dr. Carlton compared Dr. Miller's predictions to actual post-implementation fares on

NEA nonstop overlap routes and showed that nothing remotely like the predicted fare increases

have come to pass.[105]  That is not surprising because there is absolutely no evidence that either of

American's or JetBlue's revenue management teams is pricing any differently than they did before

the NEA, let alone accounting for "recapture."[106]

Third, the Court heard extensive testimony about how Dr. Miller's predictions are wholly

inconsistent with the historical record of legacy airline mergers.  The 27.8% weighted average fare

increase predicted by Dr. Miller for Q4 2022 on the Boston nonstop overlap routes—the lion's

share of the predicted harm—is *over ten times* what Dr. Town himself called the "low single digit

fare effects, one way or the other"[107] witnessed after the American/US Airways merger.  It is

actually worse than that, since the published literature consistently finds that on heavily trafficked

---

[104] Tr. Day 13 (Israel) at 125:3-127:7 (describing Israel Demonstrative slide 4 showing that although Dr. Miller's model would predict "double-digit fare increases" and "enormous declines in passengers" from the American/US Airways merger, the data shows that in reality "[p]rices went down, and output went up").

[105] FoF ¶¶ 376-385.

[106] DX-0128 at Recital 5, Section 3.1.1; Tr. Day 3 (Jarashow) at 91:4-92:1, 101:6-25, 102:7-12; Tr. Day 10 (Clark) at 53:13-54:3; Tr. Day 9 (Friedman) at 8:2-4 ("Q. In the meetings with American, do you ever discuss pricing? A. Absolutely not."), 8:22-9:5 (explaining that American and JetBlue have" simply been told, 'Go and create the best competitive networks you can in New York and Boston against Delta and United. Leave the MGIA math to the other teams, don't worry about it, just go create the network. It will take care of itself'" and confirming that is what they've done); Tr. Day 4 (Raja) at 229:11-17 ("[T]he parties are free to go and price as they see fit[,] to determine their maintenance routings, go, you know, fly a route to Timbuktu if they so choose to do it. . . . [W]hat we do is we just optimize our planning and scheduling in New York for the benefit of those customers . . . in Boston."); *see also* DX-0384 at -002 (outlining aggressive JetBlue pricing for transatlantic).

[107] Tr. Day 9 (Town) at 203:2-10 (discussing PX0956 (Town Reply Report) at ¶ 111); *see also* FoF ¶¶ 247-256.

nonstop overlap routes, including routes associated with hubs, output tends to increase and fares tend to decrease after mergers.[108]   Dr. Miller's predictions are thus not even directionally correct.[109]

This leads to Plaintiffs' efforts to defend the predictions in relation to the *entry and exit* of JetBlue and other LCCs on particular routes.[110]   There is no dispute that LCC entry is uniquely capable of driving down fares on routes previously without LCC service.   That is the essence of the "Southwest Effect" and "JetBlue Effect."[111]   That in no way validates the results of Dr. Miller's merger simulation, for two reasons.   First, *merger simulations do not simulate entry or exit*— where, by definition, capacity is increased or decreased.   To the contrary, they model changes in pricing incentives due to common control, with capacity held constant.[112]   Second, mergers have much smaller effects on fares than LCC exit or entry, as the retrospective literature shows.[113]   So rather than validate Dr. Miller's predictions, this resort to data points about LCC entry and exit should be seen for the desperate tactic it is.   Fundamentally, Dr. Miller is asking this Court to believe that the NEA, with all its limitations, should be equated *to the complete elimination of the JetBlue brand and aircraft on the overlap routes*—a result that would not only be wildly beyond

---

[108] Tr. Day 11 (Miller) at 141:22-142:15; Tr. Day 16 (Carlton) at 48:1-49:12.

[109] Plaintiffs and Dr. Miller cling to the findings of one article studying pre-2000 airline mergers that found in one case a 30% post-merger price increase.   *See* Craig Peters, "Evaluating the Performance of Merger Simulation: Evidence from the U.S. Airline Industry," 49 THE J. OF LAW & ECON 627 (2006).   The article expressly states that the 30% increase was exceptional and likely due to the fact that the acquired airline, People Express, was pricing at unsustainably low levels.

[110] Tr. Day 11 (Miller) at 143:7-11 ("Q. Now, one of the ways that you've tried to justify [large predicted price increases] by saying that the experience with JetBlue entry and exit is that – your results are consistent with the experience of JetBlue entry and exits, right?  A. That is correct.").

[111] *See* Tr. Day 12 (Lee) at 57:24-58:3; DX-0861.

[112] FoF ¶¶ 410-423.

[113] FoF ¶¶ 434-437; FoF ¶ 21.

anything seen in any prior mergers, but would be immediately evident in the readily available data. That is far beyond the realm of reason.

The failure to validate the model's predictions against any realistic *merger benchmarks* is a clear violation of *Daubert's* requirement that scientific testimony be testable and tested.  *See Daubert,* 509 U.S. at 593.  Dr. Miller's testimony based on the simulation should be stricken, and at the very least given no weight.[114]

> **5.    There Has Been a Complete Failure of Proof With Regard to the Alleged Loss of "JetBlue Effect"**

Plaintiffs' Complaint alleged that the most serious danger to competition posed by the NEA was that American would use the alliance "to co-opt a uniquely disruptive competitor: JetBlue." ECF No. 1 at ¶ 33.  An Opening Statement slide declared: "The NEA Takes JetBlue Out Of The Fight."  Pls' Opening at 31.  Yet, Plaintiffs offered no evidence whatsoever that the purpose or effect of the NEA is to control or co-opt JetBlue, change its "disruptive" business model, or diminish (let alone eliminate) the JetBlue Effect.

The fact is that this narrative did not survive Plaintiffs' first witness: Robin Hayes. Mr. Hayes credibly and emphatically rebuffed Plaintiffs' efforts to suggest that the NEA would change JetBlue's character.  Under the Court's questioning, he explained that this is not just a matter of whether JetBlue *has* changed, but whether it profitably *could*.

> THE COURT: You can't [change your model] or you haven't?
>
> THE WITNESS: We can't.   I mean, we're … a [for]-profits company, we have to find a business model that makes money.  We found a unique model here in the U.S., which is to focus on being a very efficient airline and keep our cost down, offer low fares, offer customers a better service and grow.  We can't become … like a Legacy Airline because we [would] need[] to go back 70 years and get all of the [hubs] and global connectivity that [they have] – but

---

[114] *See generally* ECF No. 141; *see also supra* n.92.

> we can't have.  And I think there's a huge need for an airline like
> JetBlue, we just need to be bigger.[115]

Indeed, JetBlue's unique business model, which combines low fares and great service, is so ingrained into the company's fabric that it is taught to every new crewmember at orientation, often by Mr. Hayes himself.[116]  There is not a shred of evidence undermining this testimony.[117]  Inclusive of Mr. Hayes, Plaintiffs called *seven* JetBlue witnesses—more than enough opportunity to present evidence or develop testimony of some change in JetBlue's business practices.  Nothing came of it.  JetBlue continues to offer the same low JetBlue fares, it undercuts American's fares every day on routes within the NEA and outside of it, it has launched London routes with aggressive fares in competition with American and its alliance partners, and it entered into a merger agreement with Spirit Airlines with the stated purpose of extending the reach of JetBlue's disruptive business model.[118]  JetBlue remains JetBlue.

There is also no evidence that American expects JetBlue to change.  As Vasu Raja explained, American's "Partnership 2.0" strategy requires only a specific and narrow strategic alignment around increasing network value through joint scheduling and seamlessness.[119]  It does not require changes in business models.[120]  In fact, American does not want that.  The NEA works *because* American and JetBlue bring different business models to the table.[121]  American has multiple LCC partners, including Aer Lingus, an Irish carrier with a business model very similar

---

[115] Tr. Day 2 (Hayes) at 53:21-54:6.

[116] *Id.* at 8:9-11:2; PX0536.

[117] FoF at ¶¶ 219-230.

[118] *See* FoF at ¶ 226

[119] Tr. Day 7 (Raja) at 88:10-104:24; *see also*, PX0369 at -007, -010, -035, -055-57.

[120] *Id.*

[121] Tr. Day 7 (Raja) at 100:8-16 (discussing PX0369 at -057).

to JetBlue's and that has not changed its model since becoming associated with British Airways and American.[122]   Clearly Plaintiffs find this impossible to believe, but the evidence proves American and JetBlue can each benefit from the NEA without expecting the other to change.

### 6.      Dr. Town's "Capacity Discipline" Theory Is Wholly Immaterial to the NEA

Plaintiffs also have not proven a likelihood of adverse effects from "capacity discipline." As an initial matter, Dr. Town's testimony did not prove the predicate that there was a period of time (six to thirteen years ago) when legacy airlines, through some sort of tacit collusion, restricted capacity growth below a GDP benchmark.[123]   His regressions are deeply flawed, for the reasons Dr. Lee explained.[124]   First, he treats legacy airlines as a monolithic entity, when it is very clear that in the critical period of time American, United, and Delta were not adding or reducing capacity in unison.  *See* FoF ¶¶ 493-494; PX0967; Tr. Day 12 (Lee) at 89:1-90:21 ("Q. [I]s the behavior of each of the three airlines shown here consistent with Dr. Town's theory, that legacy carriers were coordinating or accommodating one another in parallel?  A. No, I think [Exhibit 11] shows the opposite . . . .  [A]s you can see, there's really no meaningful pattern at all of any type of coordinated or accommodating behavior.").  Second, Dr. Town's overarching error is failing to account for the growth of LCC competition, which not only took share from legacy carriers but, combined with a series of external shocks (such as 9/11 and the Great Recession), forced every

---

[122] *Id.* at 100:17-101:9.

[123] FoF ¶¶ 471-494.

[124] FoF ¶¶ 476-487

legacy carrier into bankruptcy.[125]  When Dr. Lee accounts for LCC growth in Dr. Town's model for legacy airline capacity, the alleged evidence of capacity discipline vanishes.[126]

Dr. Town tried to pivot to his model of overall industry capacity, but that makes no sense. The "capacity discipline" theory is about the behavior of legacy airlines, not all airlines.[127]  If the industry as a whole grows less than GDP—including the disruptors like JetBlue and the ULCCs—that does not prove anticompetitive coordination by legacy airlines.  In all events, this effect also vanishes when considering the "jobless recovery" from the Great Recession and the industry trend of increasing load factor over time.[128]

All that said, the far larger problem with Dr. Town's theory is that it is completely detached from the NEA.  Dr. Town admits that his "capacity discipline" period has been over since at least 2018.[129]  He does not offer any opinion as to why the alleged capacity discipline period ended, and he does not claim that JetBlue caused capacity discipline to end.[130]  To the extent that JetBlue's growth was keeping the former capacity discipline period in check, Dr. Town acknowledges that JetBlue grows more with the NEA than without it.[131]  And he acknowledged not reviewing a single Delta or United document produced in this case to determine whether they see the NEA as an opportunity to cut back their capacity growth, even though he relied on a documentary review as

---

[125] FoF ¶¶ 478-480.

[126] *Id.*

[127] Tr. Day 12 (Lee) at 99:16-100:5.

[128] FoF ¶¶ 481-487.

[129] Tr. Day 9 (Town) at 105:7-9.

[130] *Id.* at 137:3-5 ("Q. . . [Y]ou're not offering an opinion as to why capacity discipline ended, are you? A. No, I am not."), 149:13-14 ("A. I can't attribute causally that JetBlue's growth caused the unwinding specifically.").

[131] PX0957; *see also* PX0462 (Town Report) at ¶ 105.

the basis of his opinion that the legacy airlines engaged in capacity discipline in the first place.[132] Indeed, at the time he submitted his reports, he had not even looked at any Delta or United depositions in this case to study how those airlines viewed the NEA—claiming, oddly, that their views were not "within the scope" of his opinion[133]—but then sheepishly admitted at trial that he subsequently had decided to review their depositions.[134]  The fact is that there is not a single piece of evidence indicating that the other legacy airlines interpret the NEA as consistent with some capacity reduction agenda.[135]   And right now, all three legacy airlines are aggressively adding capacity—and directing much of it at the Northeast.[136]

Moreover, Dr. Town's "capacity discipline" theory is explicitly about restricting aggregate industry capacity, *i.e.*, fleets, which is among the many competitive decisions *not within the scope of NEA coordination*.[137]   On top of that, the NEA is a *growth initiative* that, among other things, is causing JetBlue to increase the size of its fleet.[138]  The NEA is the last thing a legacy airline bent on "restoring capacity discipline" would want.

---

[132] Tr. Day 9 (Town) 159:2-9 ("Q. And just to be clear, when you formed your opinion about the historical capacity coordination and discipline, you rely heavily on documents, they provided, I think you said the framework for your entire analysis, right? A. They provided part of the framework. Q. But yet you didn't bother to review a single Delta deposition or document in forming your opinion? A. Well, I don't recall reviewing them, no.").

[133] *Id.* at 157:22-158:4 (quoting Town Dep. Tr. (8/18) at 58:16-19).

[134] *Id.* at 157:22-158:20.

[135] United's Andrew Nocella thought the idea was an implausible explanation for the NEA and in all events would not affect United's aggressive capacity expansion plans.  *See* Nocella Dep. Tr. (04/29) at 124:25-125:20.

[136] *See, e.g.*, *id.* at 142:17-143:4; Weithofer Dep. Tr. (06/09) at 88:11-90:21; DX-0560 at -014, -017, -023-24; DX-0515 at -004, -007-9; Tr. Day 8 (Swartz) at 50:2-11; DX-0238 at -002; *see also* FoF ¶¶ 67-71.

[137] FoF ¶¶ 213-218.

[138] Tr. Day 2 (Hayes) at  82:21-83:3; Tr. Day 10 (Clark) at 37:19-38:2, 43:22-44:10, 48:4-15; Tr. Day 9 (Friedman) at 41:3-21, 43:25-44:17, 45:18-46:1; FoF ¶¶ 276-280.

The decisions that airlines need to make around their investments in fleets are complicated and risky.  At any given time, an airline can find it harder or easier to grow.  But right now, all three legacy airlines are aggressively adding capacity—and directing much of it at the Northeast.[139]  The NEA advances American's growth agenda, indisputably allowing it to add new international and domestic routes, which is turn bolsters the business case for a larger fleet.[140]  Plaintiffs' preoccupation with what happened years ago (and which they investigated without bringing any charges) does not change any of that.

\*     \*     \*

In sum, Plaintiffs have failed to meet their burden of showing that the NEA has generated, is generating, or is likely to generate any anticompetitive effects.  This case therefore joins the long list of rule of reason cases that have failed at the first step.  *See Alston,* 141 S. Ct. at 2160–61 (noting that "courts have disposed of nearly all rule of reason cases in the last 45 years on the ground that the plaintiff failed to show a substantial anticompetitive effect").

### B.     Defendants Have Proven That The NEA Has a Procompetitive Rationale And Is Producing Numerous, Substantial Consumer Benefits

In the unlikely event the Court finds that Plaintiffs have proven adverse effects, the analysis moves to whether the NEA has procompetitive justifications.  *See Alston*, 141 S. Ct. at 2160.  *Alston* emphasizes that Defendants must "show only that . . . [the alleged conduct] collectively yield[s] a procompetitive benefit," *id.* at 2162, at which point the burden shifts back to Plaintiffs.

Plaintiffs cite to the Supreme Court's decision in *FTC v. Actavis*, 570 U.S. 136, 156 (2013), for the proposition that Defendants must "show the lawfulness of [the restraint] under the rule of

---

[139] *See supra* n.136; FoF ¶¶ 285-291.

[140] Tr. Day 15 (Znotins) at 94:5-17, 77:22-78:8, 106:9-21, 108:3-17, 109:11-110:14; *see also* DX-0111 at -023; FoF ¶ 280.

reason." ECF No. 160 at 16. That language, badly miscited, does not purport to describe a defendant's burden at Step Two; it is simply an observation, made in support of a decision not to give "reverse payment" schemes antitrust *immunity*, that "legitimate justifications" for a practice may establish lawfulness. *Id*. Nor does any Supreme Court case impose a "sufficiency" requirement, as Plaintiffs suggest. *Id.* at 17. In the logic of the burden-shifting framework, the procompetitive benefits of a practice shift the burden back to the plaintiff whether they are large or small. The magnitude of the benefits becomes important at Step Three, where, as *Alston* explains, plaintiffs are required to prove "that 'substantially less restrictive alternative [practices]' existed to achieve the same procompetitive benefits the [Defendant] *had proven at the second step*." *Alston*, 141 S. Ct. at 2162 (emphasis added). In that way it benefits a defendant to show large efficiencies and consumer benefits. But strictly speaking, any meaningful procompetitive rationale meets a defendant's Step Two burden.

Defendants' burden under the rule of reason is not affected by Plaintiffs' efforts to import merger law burdens of proof and the doctrine of "merger specificity." *See* ECF No. 160 at 34. Under Section 7 of the Clayton Act, "efficiencies" are a defense as to which the merging parties clearly have the burden of proof. *See United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 235 (D.D.C. 2017) (stating that "evidence of efficiencies may be introduced [by a defendant] to rebut the government's prima facie [Section 7] case"). It is also a defense that hardly ever prevails. *See id.* at 237 (noting that there is not "a single litigated case in which the merging parties were successful in overcoming the government's case by presenting evidence of efficiencies"). To make sure of that, the DOJ and FTC have articulated a doctrine of "merger specificity" that only credits efficiencies "likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable

anticompetitive effects." *See Horizontal Merger Guidelines* at § 10; *see Anthem*, 236 F. Supp. 3d at 236 ("[T]he government will only consider those efficiencies that are merger-specific and verifiable by reasonable means."). This means that in merger cases (a) the "counterfactual" is *whatever else might have been done to achieve merger benefits* and (b) that but-for world limits the scope and magnitude of efficiencies one may claim.

Section 1 standards are different. In a rule of reason analysis, particularly at Step Two, the counterfactual is simply the *status quo ante*, here the position of the parties prior to the NEA. *See Sullivan*, 34 F.3d at 1112 (when evaluating the legality of a restraint under the rule of reason, "the court must ordinarily consider . . . [the] condition [of the relevant industry] ***before and after the restraint was imposed*** . . . ." (emphasis added) (quoting *Bd. of Trade of the City of Chicago v. United States*, 246 U.S. 231, 238 (1918))); *accord Hudson's Bay Co. Fur Sales Inc. v. Am. Legend Co-op.*, 651 F. Supp. 819, 842 (D.N.J. 1986) (courts must consider "the condition of the business and industry prior and subsequent to the imposition of the alleged economic restraint"). Any arguments about "alternatives" are received at Step Three with the plaintiff having the burden of proof and *Alston* identifying the standard of proof. It is simply not a merger law efficiencies analysis, as Plaintiffs contend.[141]

In this case, Defendants put on overwhelming evidence of the NEA's procompetitive rationale, output effects and consumer benefits. The rationale of the NEA is nothing less than to

---

[141] In no event is the counterfactual the sum of all pre-NEA aspirations, which is what Plaintiffs are really arguing. Any reasonable appraisal of the competitive conditions Defendants faced in the Northeast would conclude that Defendants' 2019, pre-pandemic positions were likely "best cases" for their futures. In Boston, Delta's rapid growth was causing both American and JetBlue to lose share. *See* FoF ¶¶ 100-121. And in New York, both faced an insurmountable disadvantage with respect to slots and comparable EWR takeoff and landing rights. *See* FoF ¶¶ 64-99. Collecting the most optimistic growth plans Plaintiffs could find in the discovery record (including random emails) and assuming all of that growth would materialize does not result in a credible counterfactual.

be more competitive.  From American's perspective, the NEA offered an innovative solution for American to address its historically weaker position in New York and become a stronger competitor against Delta and United.[142]  The NEA was projected to justify, and in fact justified, the first new American international routes out of JFK airport in many years.[143]  JetBlue saw the NEA as a unique opportunity to obtain slots it needed and had been unable to obtain for New York growth,[144] and a way to answer the competitive threat from Delta in Boston with a broader and deeper global network proposition.[145]  Both American and JetBlue saw the NEA as increasing their competitiveness for corporate travelers.  Plaintiffs do not dispute that the NEA creates benefits.[146]  It is confirmed by the testimony of Plaintiffs' airline witnesses from Southwest and Spirit, and by numerous ordinary course analyses of the NEA by other airlines.[147]

At the heart of the NEA is what Dr. Israel aptly described as a production joint venture to create the new NEA network.[148]  This is a classic pooling of complementary assets that through joint scheduling, slot and gate sharing, codesharing and reciprocal frequent flyer benefits results

---

[142] FoF ¶¶ 128-134; Tr. Day 4 (Raja) at 206:12-17, 207:24-208:5; Tr. Day 5 (Isom) at 29:4-30:5.

[143] Tr. Day 7 (Raja) at 125:16-126:6 (explaining JFK-Tel Aviv is an example of a flight the NEA has supported and made work "through schedule optimization, through all the partnership that the NEA is"), 126:7-20 ("We wouldn't have dared to even think about something like" a JFK-Tel Aviv prior to the NEA), 132:19-133:6 (American has added "Kennedy-Doha, Kennedy-Delhi"); Tr. Day 15 (Znotins) at 73:18-19.

[144] FoF ¶¶ 128-134; Tr. Day 2 (Hayes) at 11:24-12:13, 13:20-14:8; Tr. Day 5 (Laurence) at 239:20-240:5.

[145] FoF ¶¶ 128-134; Tr. Day 2 (Hayes) at 12:14-13:3, 15:2-16:5; Tr. Day 10 (Clark) at 76:14-77:7.

[146] Plaintiffs' expert Dr. Town concedes the NEA provides consumer benefits.  Tr. Day 16 (Town) at 168:5-7 ("Q. So you're not saying the benefits are zero or anywhere close to zero, right?  A. Oh, no, not at all.").

[147] FoF ¶¶ 239-246; *See*, *e.g.*, DX-0221; DX-0238 at 2-6; DX-0507 at -049-50.

[148] Tr. Day 14 (Israel) at 8:22-10:18.

in an attractive, saleable new network that both American and JetBlue can market to consumers.[149] The new network is broader, deeper and more relevant than what the Parties could develop individually.[150]   It is a perfect example of a joint venture "calculated to enable firms to do something more cheaply or better than they did it before." *Alston,* 141 S. Ct. at 2155.

The consumer benefits of the NEA are substantial and already evident.  Since the NEA has been in place, American and JetBlue have:

- Launched nearly 50 new non-stop routes;[151]

- Increased frequencies on more than 130 routes and codeshare on 175 routes;[152]

- Launched 17 new international routes, including Athens, Delhi, and Doha;[153]

- Upgauged 45 New York City flights formerly flown on 50-seat regional jets;[154]

- Improved American's and JetBlue's coverage of top 50 destinations from New York City;[155]

- Enhanced American's and JetBlue's schedules;[156]

---

[149] *See* FoF ¶¶ 158-200.

[150] *See* FoF ¶¶ 247-323.

[151] *See* FoF ¶¶ 257-266; DX-1087; *see also supra* n.9.

[152] *See* FoF ¶¶ 257-266; DX-0055 at -003 (stating that the NEA has resulting in "more service to customers in New York and Boston, including 58 new routes, and increased frequencies on more than 130 routes and codeshare on 175 routes).

[153] *See* FoF ¶¶ 257-266; DX-1087.

[154] *See* FoF ¶¶ 257-266; *see also* Tr. Day 7 (Raja) at 124:10-25, 154:9-14; Tr. Day 15 (Znotins) at 74:1-19, 74:20-77:21.

[155] *See* FoF ¶¶ 267-272; *see also* Tr. Day 7 (Raja) at 133:21-134:7, 134:21-25.

[156] *See generally* FoF ¶¶ 267-272.

- Invested in a bus connecting Terminals 5 and 8 at JFK airport, cutting connection times between terminals in half;[157] and

- Nearly tripled JetBlue's capacity at LaGuardia.[158]

By virtue of being able to access more demand, American and JetBlue have increased their fleet sizes and orderbooks.[159]  JetBlue delayed the retirement of 30 E190s because of the NEA, and subsequently increased and accelerated its orders of larger A220 aircraft.[160]  American took delivery of 787s in the midst of the pandemic because of the NEA when it otherwise would have cancelled them.[161] All of this *enhances competition* and *benefits consumers*.

Dr. Israel analyzed NEA traffic growth alone, both projected and actual, and determined that it translates into over a half billion dollars in annual consumer benefits:[162]

| Method | Estimated Annual Consumer Benefits |
|---|---|
| Clean Team Schedule, Raven Forecast | $634,567.157 |
| Observed Effects, Passenger Share | $510,959,700 |
| Observed Effect, Seat Share | $609,654,643 |

These estimates are based on an accepted methodology that Dr. Israel described with great care, and which was used by the DOJ itself in concluding not to challenge the merger of Delta and

---

[157] FoF ¶ 256.

[158] FoF ¶¶ 128-134; *see also* Tr. Day 5 (Laurence) at 239:20-9 (explaining that the NEA "enabled all of the JetBlue at LaGuardia from 15 to 55 at LaGuardia"); Tr. Day 2 (Hayes) at 14:9-15:1 (noting that there was "more than tripling the size" of JetBlue at LaGuardia as a result of the NEA).

[159] FoF ¶¶ 276-280.

[160] *Id.*; Tr. Day 9 (Friedman) at 43:25-45:6.

[161] Tr. Day 7 (Raja) at 176:17-23.

[162] FoF ¶¶ 292-306; DX-0919 (showing clean team schedule estimate of $634 million); DX-0922 (showing an estimate of $510 to $610 million based on passenger and seat share, respectively); *see also* Tr. Day 14 (Israel) at 80:25-81:11, 81:24-85:16; *see also* DX-1091 (Israel Report) at ¶¶ 279-280, 287.

Northwest (a merger that Dr. Miller himself worked on while an economist at DOJ[163]).  *See* DX-1068 (Ken Heyer, Carl Shapiro, and Jeffrey Wilder, "The Year in Review: Economics at the Antitrust Division, 2008-2009, 35 REV. OF INDUS. ORG. 349 (2009), at 356).  It is also used routinely in applications to the DOT for antitrust immunity for international joint ventures.  It should not be lost or minimized that Plaintiffs did not present an alternative analysis.  As with anticompetitive effects, they refuse to engage on the NEA's actual procompetitive effects and consumer benefits.

### C.   Plaintiffs Have Not Proven That The Benefits of The NEA Could Be Accomplished Through Less Restrictive Alternatives

The qualitative and quantitative consumer benefits Defendants have proven set the bar for Plaintiffs' next and final burden: to show that the procompetitive effects "proven at the second step" could be achieved through a substantially less restrictive alternative.  *See Alston*, 141 S. Ct. at 2162.   Any less restrictive alternative must be "virtually as effective in serving the procompetitive purposes" of the conduct.  *O'Bannon*, 802 F.3d at 1074 (internal quotations omitted).  In other words, it is not enough to show you can do less with less.  The Supreme Court's *Alston* decision emphasized that "courts should not second-guess 'degrees of reasonable necessity' so that 'the lawfulness of conduct turn[s] upon judgments of degrees of efficiency.'" *Alston*, 141 S. Ct. at 2161 (quoting *Rothery*, 792 F.2d at 227).

Remarkably, Plaintiffs challenge their burden to prove a less restrictive alternative.  In their Pretrial Brief they cite the First Circuit's 1994 decision in *Sullivan,* 34 F.3d at 1111, to argue that in the third step "the court engages in 'a weighing of the injury and the benefits to competition.'" ECF No. 160 at 17.  But *Sullivan* does not address the three-step rule of reason framework that is

---

[163] Tr. Day 11 (Miller) at 97:5-9.

now the law.  *See* 34 F.3d at 1103.  In the past 28 years, there has been a well-chronicled change

in rule of reason law that avoids the kind of "weighing" or "balancing" suggested by *Sullivan* and

similar cases.  *See* Hovenkamp, Antitrust Balancing, 12 N.Y.U.J.L. & Bus. 369, 373 (2016) ("In

fact, 'balancing' is a very poor label for what courts actually do.").  This culminated in the

*American Express* and *Alston* decisions, in which the Supreme Court expressly adopted the three-

step structure with less restrictive alternatives as the third and final step.[164]  Even before those

decisions, rule of reason cases were almost always resolved at one of the three-steps; according to

one study, only 2 percent of rule of reason cases reach "balancing."  Michael A. Carrier, The Rule

of Reason: An Empirical Update for the 21st Century, 16 GEO. MASON L. REV. 827, 828 (2009).

Defendants are unaware of any recent case in which a court found that there was no less restrictive

alternative to a practice and yet went on to condemn it based on balancing.[165]

---

[164] Notably, the *amicus* brief for the United States in *American Express* contains a statement of the rule of reason in which the third and final step is substantively what *Alston* holds:  "If the defendant [proves a procompetitive rationale], the burden shifts back to the plaintiff to show that the legitimate competitive benefits proffered by [the defendant] could have been achieved through less restrictive means."  Brief for the United States as Respondent Supporting Petitioners at 8, *Am. Express Co.*, 138 S. Ct. 2274 (2018) (No. 16-1454), 2017 WL 6205804, at *8.

[165] The *Alston* litigation proves the point, for its actually concerned *two* alleged restraints, one of which was found lawful and the other unlawful. The Supreme Court's decision affirms the decision by the District Court to condemn under the rule of reason the NCAA's "caps on education-related benefits—such as rules that limit scholarships for graduate or vocational school, payments for academic tutoring, or paid post-eligibility internships."  *Alston*, 141 S. Ct at 2153.  The Court found clear evidence of anticompetitive effect and "that the NCAA could achieve the procompetitive benefits it had established with substantially less restrictive restraints on education-related benefits."  *Id.* at 2162.  That was the end of the analysis—on that issue.  But the District Court had also "rejected the student-athletes' challenge to NCAA rules that limit athletic scholarships to the full cost of attendance and that restrict compensation and benefits unrelated to education."  *Id.* at 2153.  It held that at Step Two the NCAA carried its burden of showing that "[r]ules that prevent unlimited payments" serve the procompetitive purpose of distinguishing college from professional sports, and that at Step Three the plaintiffs had not proffered less restrictive means of maintaining legitimate interests in amateurism. *NCAA Athletic Grant-In-Aid Cap Antitrust Litig. (Alston),* 375 F.Supp. 3d 1058 at 1083, 1087  (N.D. Cal. 2019).  That ended the analysis on that issue—without balancing.  The Ninth Circuit subsequently affirmed, again

It is therefore dispositive that Plaintiffs have not shown the existence of a less restrictive alternative that would achieve the same consumer benefits as the NEA. The reality is that they did not even try in any disciplined manner that accepts the third step burden. The "alternatives" case Plaintiffs put on was a textbook example of what the Government argues in a merger litigation in which the burden to prove efficiencies falls on defendants. A plaintiff's burden under the rule of reason requires much more. Postulating alternatives that are "more hypothetical than practical" is insufficient. *See M & H Tire Co., Inc. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 987 (1st Cir. 1984); *see also O'Bannon*, 7 F. Supp. 3d at 1005 ("A defendant may show that a proffered less restrictive alternative is not feasible . . . ."). Even the DOJ's *Collaboration Guidelines* accept that in a less restrictive alternatives analysis one does "not search for a theoretically less restrictive alternative that was not practical given the business realities." *Collaboration Guidelines* at § 3.2.

Despite these principles, Plaintiffs just throw alternatives against the wall hoping something will stick. A prime example is suggesting that short-term slot leases may have satisfied JetBlue's long-term aspirations for New York growth. That is obviously not true, and there was no chance that American would have turned over so many scarce slots to JetBlue without receiving a comparable long-term benefit that, absent the NEA, JetBlue had no ability to provide.[166] But even if that would have happened, it would not replicate the benefits of the NEA. Indeed, by

_____

without balancing. *In re National Collegiate Athletic Assn. Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F. 3d 1239, 1264 (9th Cir. 2020).

The argument is sometimes made that there needs to be balancing in the event of a restraint with serious anticompetitive effects, marginal benefits, but no less restrictive way to accomplish the marginal benefits. Whatever the merits of that position, it has no application to this case.

[166] FoF ¶¶ 499-503; Tr. Day 4 (Raja) at 150:25-152:8 (explaining that the only reason American was looking to lease as many slots as it was to *any* airline in New York City in the first place was because American needed to cover the slots at JFK or risked losing them from being unable to fly them with the ongoing 737 MAX grounding which was affecting American's fleet).

hypothesis, American would have shrunk (since it has fewer slots).  Under the NEA, both American and JetBlue grow.

The NEA works because of its unique ability to create strategic benefits for *both partners* through *network expansion*.[167]  Nothing Plaintiffs have suggested accomplishes that.  The closest Plaintiffs come is in suggesting that a WCIA-style alliance or a codesharing relationship would create some network benefits.[168]  But even that argument is empty rhetoric; Dr. Town admitted he did not "assess[] whether a WCIA-like arrangement would have made financial sense for JetBlue," and did not "assess[], the benefits of American doing a similar arrangement with JetBlue."  Tr. Day 17 (Town) at 24:10-31:5, 30:7-20.  In fact, in the ordinary course American and JetBlue studied those alternatives and determined that they would *not* generate the benefits of the NEA.[169] The reason is because the American and JetBlue networks in the NEA region overlap in ways that demand—and then create large consumer benefits from—schedule optimization.  Tr. Day 4 (Raja) at 104:12-105:7.  Enormous value would be lost without that, as it leaves the Parties "in sub-par competitive position" while, in contrast, an "optimized network increases NE capacity by 23%," "creates better in-market patterns and enables new connection opportunities," and unlocks "[n]ew opportunity for AA to create an expanded JFK-Transatlantic hub with 9 new markets."  DX-1075A

---

[167] FoF ¶¶ 158-200.

[168] Tr. Day 16 (Town) at 125:14-20.

[169] Tr. Day 2 (Hayes) at 43:21-44:8 ("[Codeshare] will give you a small fraction of the benefits. You know, [codeshare] relationships are quite normal. I think the real value for this connectivity is the optimization of the schedules that come with it.").  In fact, Dr. Town conceded that a WCIA-like collaboration that involved only codesharing and no schedule coordination would not produce any of the consumer benefits of improved schedules enabled by the NEA.  Tr. Day 17 (Town) at 26:9-17 ("Q. Codesharing alone would not involve any benefits of improved schedules, right? A. No, it wouldn't, but it doesn't necessarily preclude it, but alone, no. Q. Well, it wouldn't allow the parties to work together to improve the schedules. They'd have to just operate independently and guess what the other is doing, right? A. It will -- unless their – that's true, if it's only codeshare, I would agree with that."); *see also* FoF ¶¶ 495-510.

at -005, -008.  Plaintiffs have no answer to that.  They throw out the words "WCIA-style collaboration" as if they think the mere existence of an alternative meets their burden.

It is telling that despite Plaintiffs' burden of proof, Plaintiffs' experts would not (a) commit to a particular set of less restrictive alternatives, or (b) attempt to prove that all the benefits of the NEA could have been accomplished that way.[170]  Plaintiffs did not even put forward a witness with the airline industry expertise to argue credibly that there was a viable alternative.  Nor did Plaintiffs' economists offer an alternative to Dr. Israel's consumer benefits estimates.[171]  Their case was about exaggerating American's and JetBlue's organic growth potential, and then attempting to show that it possibly, maybe could have been enhanced with lesser forms of collaboration.  As Defendants predicted, this has been no more than second-guessing the NEA, which the rule of reason does not allow.  *Alston*, 141 S. Ct. at 2161 ("[Allowing routine second-

---

[170] Tr. Day 17 (Town) at 30:10-20 ("Q. You have not assessed the benefits of doing a similar arrangement [to the WCIA] with JetBlue, correct?  A. I have not done the financial analysis of those, no.  Q. And just speaking more broadly, Dr. Town, you have not calculated the benefits associated with any so-called less restrictive alternatives, correct?  A. That is correct, as I testified earlier, yes.  Q. And you have not offered the opinion that any so-called less restrictive alternative achieved substantially the same benefits as the Northeast Alliance, correct?  A. I have not quantified it.").

[171] Tr. Day 9 (Town) at 169:24-170:1 ("Q. And you have not attempted to quantify the benefits of the NEA, correct?  A. No."), 170:15-17 ("I did not quantify [the value of the NEA]"); Tr. Day 11 (Miller) at 92:7-19 ("Q. . . . [Y]ou're the last witness in plaintiffs' case-in-chief.  Do you understand that?  A. Yes, I do.  Q. Okay.  You have literally one sentence on page 99 of your slide deck about efficiencies, right?  A. That's true.  Q. You did not quantify efficiencies in any way, shape, or form yourself, did you, sir?  A. I have not quantified efficiencies.  Q. Professor Town, when he was here yesterday, did not quantify efficiencies in any way shape, or form, did he?  A. I don't want to characterize his testimony, but that's consistent with my understanding.").

Even if one were to "balance" the harms and benefits, the conclusion that the NEA creates net benefits would be the same.  Dr. Israel used the same demand curve from Dr. Miller's merger simulation model to calculate benefits and determined that the benefits were more than three times as large as the harms that Dr. Miller predicts.  Tr. Day 16 (Town) at 166:4-18.  Dr. Miller's merger simulation is deeply flawed and unreliable, but even if it is taken seriously, the benefits swamp the predicted harm.  Neither Dr. Town nor Dr. Miller rebutted Dr. Israel's calculation of benefits in this way.  *Id.* at 166:4-18; Tr. Day 17 (Miller) at 135:17-136:12.

guessing of business arrangements] would be a recipe for disaster, for a skilled lawyer will have little difficulty imagining possible less restrictive alternatives to most joint arrangements." (internal quotations omitted)). It does nothing to prove that the NEA is anticompetitive—the ultimate issue in the case.

## III.    CONCLUSION

Plaintiffs have not met their burden under the rule of reason. They have failed to prove actual or even likely harm to competition. In the face of enormous NEA consumer benefits, they have failed to show any less restrictive way to accomplish those benefits.

It may be that Plaintiffs sued prematurely, and that as the Court suggested in an exchange with Dr. Miller it may just be too early to tell whether the NEA leads to the adverse effects Plaintiffs predict.[172] For present purposes, that does not matter. Plaintiffs filed this case in the wake of undeniable and significant output expansion due to the NEA and then insisted on the case going to trial within one year. Enormous resources have been expended to prepare for and conduct this trial. The voluminous record that now exists is the only proper basis for the Court's judgment. And the record is overwhelmingly one-sided, proving the NEA's procompetitive rationale and benefits with scarcely anything but suspicion on the other side of the ledger. A defense judgment is the only possible outcome consistent with the law and trial record.

---

[172] Tr. Day 11 at 130:17-20 ("And so . . . if I stay the case, maybe ten years, then we would know. We would know what actually happened), 134:24-25 ("Then we would know, I would know for sure, for example, whether or not there was, in fact, harm").

Dated: November 17, 2022

Respectfully submitted,

*/s/ Daniel M. Wall*
Daniel M. Wall (*pro hac vice*)
Elizabeth C. Gettinger (*pro hac vice*)
Elise M. Nelson (*pro hac vice*)
Nitesh Daryanani (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
dan.wall@lw.com
elizabeth.gettinger@lw.com
elise.nelson@lw.com
nitesh.daryanani@lw.com

Allyson M. Maltas (*pro hac vice*)
Ian R. Conner (*pro hac vice*)
Michael G. Egge (*pro hac vice*)
Farrell J. Malone (*pro hac vice*)
Marguerite M. Sullivan (*pro hac vice*)
Tara L. Tavernia (*pro hac vice*)
Seung Wan Paik (*pro hac vice*)
Jesse A. Vella (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
allyson.maltas@lw.com
ian.conner@lw.com
michael.egge@lw.com
farrell.malone@lw.com
marguerite.sullivan@lw.com
andrew.paik@lw.com
tara.tavernia@lw.com
jesse.vella@lw.com

David C. Tolley (BBO #676222)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
david.tolley@lw.com

*Attorneys for Defendant*
*American Airlines Group Inc.*

*/s/ Richard Schwed*
Richard Schwed (*pro hac vice*)
Matthew L. Craner (*pro hac vice*)
Jessica K. Delbaum (*pro hac vice*)
Leila Siddiky (*pro hac vice*)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-5445
rschwed@shearman.com
matthew.craner@shearman.com
jessica.delbaum@shearman.com
leila.siddiky@shearman.com

Brian Hauser (*pro hac vice*)
Ryan Leske (*pro hac vice*)
Shearman & Sterling LLP
401 9th Street, NW
Washington, DC 20004
Telephone: (202) 508-8005
brian.hauser@shearman.com
ryan.leske@shearman.com

Glenn A. MacKinlay, BBO #561708
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
Telephone: (617) 449-6548
gmackinlay@mccarter.com

*Attorneys for Defendant*
*JetBlue Airways Corporation*

56

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing document was served by electronic mail on all counsel of record this 17th day of November, 2022.

<u>*/s/ Daniel M. Wall*</u>
Daniel M. Wall