# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN AIRLINES GROUP INC. and<br>JETBLUE AIRWAYS CORPORATION,<br><br>Defendants. | Civil Action No. 1:21-cv-11558-LTS<br><br>**Leave to File Under Seal<br>Granted on 11/17/2022**<br><br>**This document relates to<br>ECF No. 324-1** |

## DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT

## TABLE OF CONTENTS

I.   THE DOMESTIC AIRLINE INDUSTRY AND ITS PARTICIPANTS ...........................1

    A.   American...........................................................................................................1
    B.   JetBlue.............................................................................................................5
    C.   Other U.S. Airlines .........................................................................................7
    D.   U.S. Passenger Airlines Operate Using a Range of Business Models....................8
        i.    Brief History of The U.S. Passenger Airline Industry ................................8
        ii.   Current Airline Business Models................................................................11
            (1)   Global Network Carriers ....................................................................11
            (2)   Low-Cost Carriers .............................................................................14
            (3)   Hybrid Carriers .................................................................................15
            (4)   Ultra-Low-Cost Carriers ...................................................................15
    E.   Networks Are a Primary Feature of U.S. Passenger Airline Competition............16

II.  AMERICAN AND JETBLUE FACED MANY CHALLENGES IN NEW YORK
    AND BOSTON PRIOR TO THE NEA.......................................................................21

    A.   Competitive Landscape in New York.............................................................21
        i.    The New York City Market Is the Largest Air Travel Market in the
            World ........................................................................................................21
        ii.   Delta and United Dominate The New York City Air Market....................22
        iii.  American and JetBlue Were Distant Third and Fourth Competitors
            in NYC .....................................................................................................24
        iv.   Infrastructure Constraints at the New York City Airports Impede
            American and JetBlue from Closing the Gap with Delta and United........27
        v.    Neither American Nor JetBlue Has Market Power in New York
            City...........................................................................................................32
    B.   Competitive Landscape in Boston...................................................................34
        i.    Though JetBlue Historically Was the Largest Carrier in Boston,
            Delta Prioritized Rapid Growth in Boston Starting Around 2015
            and Declared Boston a Hub ......................................................................35
        ii.   JetBlue Had Limited Ability to Keep Up with Delta's Ascendant
            Growth in Boston Because It Lacked the Global Network to
            Compete with Delta's Global Offering.....................................................37
        iii.  American Could Not Significantly Expand in Boston Because
            Delta Already Had A Hub Presence There, and Boston is Not
            Large Enough to Support Two Hub Carriers............................................40
        iv.   Growth Options in Boston Are Limited Due to Gate Constraints ............41
        v.    Neither American Nor JetBlue Has Market Power in Boston ..................42

III. THE NORTHEAST ALLIANCE WAS DESIGNED TO OVERCOME
    AMERICAN'S AND JETBLUE'S RESPECTIVE CHALLENGES IN NEW
    YORK AND BOSTON..............................................................................................44

    A.   Background on Airline Joint Ventures ...........................................................44

| | B. | The NEA Unlocked American's and JetBlue's Respective Strengths and Addressed Their Weaknesses to Better Compete with Delta and United | 46 |
| | C. | Development and Negotiation of the NEA | 50 |
| | D. | In the Midst of NEA Negotiations, COVID Created Massive Disruption to the Entire Airline Industry | 55 |
| | E. | Core Features of the NEA and the NEA Agreements | 57 |
| | | i. | Geographic Scope of the NEA | 58 |
| | | ii. | Codesharing | 60 |
| | | iii. | Schedule Optimization | 60 |
| | | iv. | Reciprocal Loyalty Benefits | 63 |
| | | v. | Corporate Customer Contracting | 65 |
| | | vi. | Revenue Sharing | 68 |
| | F. | The NEA Is Entirely Consistent with JetBlue's Past Criticisms of Airline Alliances | 75 |

| IV. | REGULATORY REVIEW | 77 |

| | A. | Parties Reported the NEA to the DOJ and DOT upon Signing | 77 |
| | B. | DOT/DOJ Investigations | 77 |
| | C. | DOT Agreement | 77 |
| | | i. | Negotiation & Terms | 77 |
| | | ii. | Status of Meeting Commitments | 79 |

| V. | WHAT THE NEA IS NOT | 80 |

| | A. | The NEA Is Not A Merger | 80 |
| | B. | The NEA Does Not Require American or JetBlue to Change Their Business Models | 82 |
| | C. | The NEA Does Not End Competition Between American and JetBlue on Routes within the Scope of the NEA | 89 |

| VI. | COMPETITORS VIEW THE NEA AS COMPETITION-ENHANCING | 92 |

| VII. | NEA IMPLEMENTATION AND SUCCESS TO DATE | 95 |

| | A. | Implementation and Seamlessness Initiatives | 95 |
| | B. | Increased Capacity and New Routes | 99 |
| | C. | Improved Schedules | 104 |
| | D. | Better Connectivity | 107 |
| | E. | The NEA Created the Economic Case for American and JetBlue to Expand their Fleets | 108 |
| | | i. | JetBlue's E190 Retirement Deferral and A220 Acceleration | 108 |
| | | ii. | American's Expanded Fleet | 110 |
| | F. | The NEA is Improving American and JetBlue's Competitiveness | 111 |
| | G. | Observed Competitor Reactions to the NEA | 112 |
| | H. | Dr. Israel's Benefits Analysis Shows More than $600 Million in Benefits from the NEA | 114 |

|  |  | i. | Calculation of Consumer Benefits Using Actual Observed Share Changes | 115 |
|  |  | ii. | Calculation of Consumer Benefits Using Ordinary Course Clean Team Analysis | 117 |
|  | I. |  | Dr. Town's Criticisms of Comparing the v2 Schedule to the 2019 Schedule Are Unfounded | 119 |
|  | J. |  | Text Messages Exchanged Between Members of American's Clean Team Reflect Frustration at How the DOJ Might Evaluate the NEA | 121 |
|  | K. |  | The "Standalone" Growth Plans JetBlue's Network Planning Team Made Do Not Reflect How JetBlue Would Have Performed Absent The NEA | 124 |

VIII. MARKET DEFINITION ................................................................................ 126

|  | A. |  | The Evidence Clearly Establishes that Newark Is Part of the New York City Market | 126 |
|  |  | i. | There Is Ongoing Competition Among and Substitution Between Airlines Offering Service From Newark and JFK Airports | 126 |
|  |  | ii. | Manhattan Is the Focal Point of New York City, and Its Travelers Rely on All Three New York City Airports | 128 |
|  |  | iii. | Competing Airlines and Other Third Parties Recognize that Three Airports Support New York City | 129 |
|  |  | iv. | Dr. Brueckner's Regression Analysis Supports This Conclusion | 131 |
|  |  | v. | Plaintiffs' Expert, Dr. Town, Has Previously Treated Newark As Part of the New York City Market | 135 |
|  |  | vi. | Plaintiffs' Experts' Market Definition Analyses Are Flawed | 135 |
|  |  |  | (1) Dr. Miller's Catchment Analysis Erroneously Ignores Newark | 135 |
|  |  |  | (2) Dr. Miller's "Hypothetical Monopolist Test" Is Invalid | 138 |

IX. NEA HAS NOT HARMED COMPETITION ................................................. 143

|  | A. | NEA Has Had No Adverse Fare Effects in Any Relevant Market | 143 |
|  | B. | No Harm in Any Purported Funding Market | 146 |
|  | C. | The NEA Has Not Delayed JetBlue's Entrance into the London Market | 150 |
|  | D. | JetBlue Brings Disruptive Pricing to Transatlantic Market | 151 |
|  | E. | No Harm on the BOS-LGA Route | 152 |
|  | F. | Plaintiffs Have Not Offered Any Meaningful Evidence of Actual Anticompetitive Harms from the NEA | 154 |
|  | G. | Dr. Miller's Merger Simulation Is Unreliable and Unpersuasive | 156 |
|  |  | i. A Merger Simulation Does Not Appropriately Estimate the Fare Effects of the NEA | 157 |
|  |  | ii. Dr. Miller's Simulation Model Incorrectly Holds Capacity Fixed | 159 |
|  |  | iii. Dr. Miller's Simulation Model Incorrectly Ignores Consumer Benefits | 160 |
|  |  | iv. Dr. Miller's Simulation Model Produces Nonsensical Marginal Cost Estimates | 162 |

v.      Dr. Miller's Predicted Fare Effects Are Inconsistent with the Relevant Economic Literature ...................................................163

vi.     Applying Dr. Miller's Model to the American US Airways Merger Yields Results That Are Inconsistent with Reality ...................164

vii.    Dr. Miller's Simulation Model Assumes No Competitive Response to Large Fare Increases ........................................................165

viii.   Half of Dr. Miller's Nonstop Boston Overlaps are Carve-Outs; Others are Highly Trafficked and Competitive ........................166

ix.     Finally, Actual Fares Contradict Dr. Miller's Predictions......................168

x.      Plaintiffs' Argument that the Effects of the NEA Cannot Be Separated from the Effects of COVID Is Unfounded............................170

xi.     Despite Plaintiffs' Arguments to the Contrary, the Threat of Antitrust Litigation Never Goes Away ....................................171

xii.    Plaintiffs' Argument that Partial Implementation of the NEA Means One Cannot Analyze the Data Is Baseless ...................172

H.      No Evidence that the NEA Increases the Risk that "Capacity Discipline" will Return ................................................................174

i.      Background on Dr. Town's Theory ........................................................174

ii.     Dr. Town's Regressions Suffer from Omitted Variable Bias; When Corrected, Dr. Town's Regressions Show Zero Evidence of "Capacity Discipline" ..................................................................175

iii.    Gaps in Dr. Town's "Capacity Discipline" Theory .................................177

iv.     Exhibit 11 From Dr. Town's Report Undermines His "Capacity Discipline" Theory................................................................179

X.      THERE IS NO LESS RESTRICTIVE ALTERNATIVE THAT WILL CREATE THE SAME BENEFITS AS THE NEA ........................................................180

A.      Codesharing Alone Would Not Create the Same Benefits as the NEA...............181

B.      Slot Leases Would Not Create the Same Benefits as the NEA .........................183

C.      A WCIA-Like Arrangement Would Not Create the Same Benefits as the NEA ................................................................186

## DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT

**I.     THE DOMESTIC AIRLINE INDUSTRY AND ITS PARTICIPANTS**

**A.     American**

1.     American Airlines Group Inc. ("American") is a Delaware corporation, with its headquarters and base of operations located in Fort Worth, Texas.  PX1151 at -1 (Form 10-K for American Airlines for Fiscal Year ending December 31, 2021).

2.     American exists in its current form as a result of a merger with US Airways in 2014, the last of three legacy airline mergers that created today's American, Delta, and United.  Tr. Day 5 (Isom) at 7:12-14 (explaining that the US Airways/American Airlines merger closed in 2014); Tr. Day 4 (Raja) at 184:7-9 (explaining that, historically, "[s]o much of the strategy of the three big network carriers – Delta, American, United – was building big national networks through mergers from smaller ones").

3.     American, like Delta and United, is a global network carrier ("GNC").  Tr. Day 12 (Lee) at 51:18-19.

4.     As a GNC, American relies on airport bases ("hubs") to offer customers both direct and connecting itineraries between a wide range of origins and destinations ("O&Ds").  *See, e.g.,* Tr. Day 12 (Lee) at 51:18-52:4 (explaining that GNCs are "carriers whose business models [are] predicated on network breadth, network scope, the ability to take passengers from anywhere to everywhere," and "that requires a business model that revolves around large hub-and-spoke networks, that aggregate demand from multiple end points[,] connect[] them through a hub, and bring[] them from all over the world, and all across the country"); Tr. Day 7 (Raja) at 90:25-91:4 (noting that American's "core asset" is its "hub-and-spoke model, where you add flights linearly" and "create connections geometrically," which creates "a lot of choices [for] our customers").

1

5.      American operates hubs in Charlotte, North Carolina; Chicago, Illinois; Dallas/Fort Worth, Texas; Los Angeles, California; Miami, Florida; Philadelphia, Pennsylvania; Phoenix, Arizona; and Washington, DC.  DX-0089B at -014, -015 (listing American's hubs).

6.      Over the years, American has entered into certain alliances and joint business agreements with airlines based outside of the United States.  *See, e.g.,* PX0369 at -6 ("We have committed to bilateral partnerships to accelerate the extension of our network with partners with whom we can find strategic alignment"); -12 (listing American's global partnerships); Tr. Day 4 (Raja) at 192:6-18 (mentioning American's transatlantic joint venture and its partnership with Qatar Airways).

7.      American is a founding member of the **one**world international airline alliance, which brings together a global network of 14 member airlines and their affiliates to enhance customer service and provide smooth connections to the destinations served by the alliance, including linking member carriers' loyalty programs and providing reciprocal access to the carriers' airport lounge facilities.  PX1151 at -8 (Form 10-K for American Airlines for Fiscal Year ending December 31, 2021) (describing **one**world, whose members include Alaska Airlines, British Airways, Cathay Pacific, Finnair, Iberia, Japan Airlines, Malaysia Airlines, Qantas Airways, Qatar Airways, Royal Air Maroc, Royal Jordanian Airlines, S7 Airlines, and SriLankan Airlines); Tr. Day 7 (Harrison) at 22:4-5 (stating that American is a founding member of **one**world).

8.      American is also part of the Atlantic Joint Business ("AJB"), through which it partners with Aer Lingus, British Airways, Finnair, and Iberia to offer nonstop transatlantic service; the Pacific Joint Business ("PJB"), through which it partners with Japan Airlines to offer nonstop flights between North America and Asia; and a joint business with Qantas Airways

2

relating to Australia and New Zealand.  PX1151 at -9 (Form 10-K for American Airlines for Fiscal Year ending December 31, 2021).

9.      American entered into a domestic airline partnership with Alaska Airlines in February 2020.  DX-0223 at -001.  American and Alaska refer to this partnership as the West Coast International Alliance (the "WCIA").  Tr. Day 7 (Harrison) at 19:14-17.  Through the WCIA, American and Alaska partner on certain domestic routes and international routes from the West Coast.  DX-0223 at -001.

10.     Alaska entered into the WCIA to address a growing threat from Delta in Seattle, Alaska's primary hub.  DX-0223 at -001; Tr. Day 7 (Harrison) at 20:4-16.  Delta had declared itself "Seattle's global airline," and launched an effort to blanket Alaska's network with its own flights.  Tr. Day 7 (Harrison) at 12:8-19, 15:16-20; DX-0223 at -001.  Alaska recognized that it lacked the network necessary to remain competitive as Delta expanded in Seattle.  DX-0223 at -001 ("We are losing relevance to high value corporate travelers and frequent flyers based in the Pacific Northwest since Delta's expansion, and we will continue to do so without a compelling global offering.").

11.     On the West Coast, American had the capability to fly international flights but struggled to create sufficient demand to support an international gateway from the West Coast.  Tr. Day 4 (Raja) at 193:1-16 (explaining that "we wanted to fly an international network from the West Coast," but  "we've always struggled with that").  Accordingly, the WCIA sought to enhance Alaska's breadth of flying from the West Coast and provide American with the West Coast feed needed to support international flying.  DX-0223 at -001; Tr. Day 7 (Harrison) at 21:11-18.

12.     The WCIA has five key features.  First, through the WCIA, Alaska became a full member of the **one**world global alliance.  Tr. Day 7 (Harrison) at 21:20-22:21.  This enables Alaska

to "pursue deeper, seamless cooperation" with other **one**world partners, including through codesharing on the **one**world global network and loyalty reciprocity benefits for travelers. DX-0223 at -003; Tr. Day 7 (Harrison) at 22:7-21. Second, the WCIA created a codeshare for routes other than nonstop overlap routes. Tr. Day 7 (Harrison) at 24:14-25:11. Third, the WCIA established loyalty reciprocity so that travelers can accrue and use miles on either airline's frequent flyer program. Tr. Day 7 (Harrison) at 28:17-29:7. Fourth, the WCIA allows American and Alaska to jointly contract for corporate customers. Tr. Day 7 (Harrison) at 29:8-18 (explaining that "corporate accounts, invite Alaska and American in, and we get to provide a joint proposal for their company and their employees for travel and discounts and benefits," which means that "the employees get to enjoy sort of the benefits that both bring in"). Fifth, the WCIA implemented revenue sharing through a mutual growth incentive agreement to ensure alignment of the airlines' incentives. Tr. Day 7 (Harrison) at 29:21-30:15; DX-0022 at -001 ("[T]he objective is to create a domestic/international west coast network that is seamless for customers and which we are both financially incentivized to grow."); DX-0035-0005 (explaining that the WCIA included revenue sharing to create "common economic incentives" so that "AA/AS could create an integrated proposition to West Coast customers including corporate sales, international connectivity, [and] loyalty[,]" delivering "AS/AA customers . . . superior network and commercial value vs UA/DL"); Tr. Day 4 (Raja) at 199:20-200:18 (explaining the importance of financial incentives through revenue sharing to create a successful partnership).

13.     Executives from American and Alaska testified that the WCIA has strengthened their respective networks. Tr. Day 4 (Raja) at 201:22-24 (noting that the WCIA is "thriving"); *id.* at 202:17-204:8 (discussing American flights that "wouldn't exist" without the WCIA); Tr. Day 7 (Harrison) at 39:18-23 (explaining that "the WCIA provided absolutely critical elements of utility

that we could not do on our own, and that, essentially, was our ability to connect globally for our guests, our ability to connect throughout the United States for our guests, and to help us be more of a player with large corporate accounts").

14.     The WCIA, in turn, inspired the Northeast Alliance (the "NEA").  Tr. Day 4 (Raja) at 206:7-11.

15.     In July 2020, American entered into a second domestic airline partnership with JetBlue, the NEA, which covers flights to and from four airports in the Northeastern United States (LaGuardia Airport ("LaGuardia" or "LGA"), John F. Kennedy International Airport ("JFK"), Newark International Airport ("Newark" or "EWR"), and Boston Logan International Airport ("Logan" or "BOS")) (the "NEA region").  DX-0128 at -0024 (Northeast Alliance Agreement); DX-0372; Tr. Day 4 (Raja) at 76:4-22 (describing the NEA and WCIA).

### B.     JetBlue

16.     JetBlue is a Delaware corporation, with its headquarters in Long Island City, New York.  DX0128 at -002.

17.     JetBlue is a low-cost carrier ("LCC") that serves the United States, Canada, Latin America and the Caribbean, and the United Kingdom.  PX0440; Tr. Day 1 (Hayes) at 109:1-2 (describing JetBlue as an LCC); Mehoke Dep. Tr. (06/22) at 20:8-11 (explaining that JetBlue's network includes Latin America, the Caribbean, and London).

18.     JetBlue has six "focus cities:"  Boston, Massachusetts, Fort Lauderdale/Hollywood, Florida; Los Angeles, California; New York City, New York ("NYC"); Orlando, Florida; and San Juan, Puerto Rico.  Tr. Day 2 (Hayes) at 53:9-15 (discussing JetBlue's focus cities); Tr. Day 9 (Friedman) at 41:24-25 (same).

19.     As an LCC, JetBlue operates at a lower cost structure than GNCs by offering point-to-point flying (rather than relying on "hub" airports to create connecting itineraries).  Tr.

Day 1 (Hayes) at 227:14-16 (agreeing that "JetBlue has a lower cost structure than legacy airlines"); Tr. Day 9 (Friedman) at 32:17-18 (explaining that JetBlue is "mainly a point-to-point carrier"); Tr. Day 10 (Miller) at 209:1-4 ("And looking at JetBlue, it's got this unusual combination of low costs and high quality that allows it to provide a point-to-point service and compete with the legacy carriers and be compelling in that context.").

20.     Given its lower cost structure, JetBlue is able to offer lower fares than GNCs.  Tr. Day 2 (Hayes) at 53:16-54:21 ("We found a unique model here in the US, which is to focus on being a very efficient airline and keep our cost down, offer low fares, offer customers a better service and grow."); Tr. Day 1 (Hayes) at 159:3-5 (stating that JetBlue is recognized for "lower fares and improve[d] service"); *id.* at 199:17-25 (characterizing JetBlue as a low cost carrier and stating that legacy airlines "have higher cost structures," and thus have to offer higher fares).

21.     JetBlue's fares generally lead to lower fares from other airlines that serve the same route.  The tendency of fares to decrease and passenger traffic to increase when JetBlue enters a route is known as the "JetBlue Effect."[1]  *See, e.g.,* Tr. Day 1 (Hayes) at 110:17-111:1 (explaining that the "JetBlue Effect" is a term "coined by [] MIT," which explains "the impact we have in lowering fares" throughout the market when JetBlue starts flying, "not just on JetBlue, but also because all of our competitors would match those fares," meaning that "the customer benefit of the JetBlue effect was, in fact, much broader than" JetBlue's presence); Tr. Day 12 (Lee) at 57:24-58:3 (describing a study showing that, when JetBlue is present on a route, GNC fares tend to be 18 percent lower than when JetBlue is not present); DX-0861 (Lee Report Exhibit 6); estimated

---

[1] A similar effect can be seen when Southwest, another LCC, enters a market.  *See* Tr. Day 12 (Lee) at 57:24-58:3; DX-0861.

fare effects of lower-cost carrier nonstop service on GNC fares using data from FYE 2016-Q2 and 2019).

22.     JetBlue is unique from other carriers (even other LCCs) because it strives to offer both lower fares and high quality travel.  Tr. Day 1 (Hayes) at 109:16-20 (explaining that JetBlue is "unique" because it "offer[s] customers, not just lower fares, but also great service as well" because JetBlue "fundamentally believe[s] that someone shouldn't have to choose between a low fare [and] great service").  For example, JetBlue offers amenities such as free live television and free WiFi.  *See, e.g.*, Tr. Day 2 (Hayes) at 42:16-24 (explaining that all JetBlue passengers "benefit[]from . . the most leg room, free live TV, [and] free WiFi"); Tr. Day 1 (Hayes) at 110:3-5 (describing JetBlue's Mint product as "our premium cabin," which "offers customers a more traditional . . . first class experience").

### C.     Other U.S. Airlines

23.     In addition to American and JetBlue, numerous airlines compete to provide commercial air travel in the United States, including Delta, United, Southwest, Alaska, Hawaiian, Allegiant, Avelo, Breeze, Frontier, Spirit, and Sun Country.  Tr. Day 12 (Lee) at 51:12-53:5; DX-0856 (Lee Expert Report Exhibit 1; Taxonomy of Airline Business Models).

24.     Southwest, an LCC, is the largest U.S. airline by domestic passengers carried.  *See* Tr. Day 2 (Watterson) at 211:22-23 (noting that Southwest is "the largest domestic US carrier," with a "just enormous" number of flights); Tr. Day 12 (Lee) at 54:20-55:11 (explaining that Southwest became  "the largest domestic carrier today," despite "taking passengers on only around 3,100 city pairs, about one eighth of the number that American did," "because of their point-to-point network that focuses on dense routes between large, generally large cities"); Nocella Dep. Tr. (4/22) at 151:8-18 (█████████████████████████████████████ ██████████████████████████████████████).

7

D.     **U.S. Passenger Airlines Operate Using a Range of Business Models**

i.     **Brief History of The U.S. Passenger Airline Industry**

25.     The U.S. passenger airline industry was deregulated in 1978.  Tr. Day 12 (Lee) at 60:10-61:2.

26.     Deregulation impacted airline industry competition in two ways:  First, it spurred the growth of legacy network carriers—i.e., the predecessors of today's GNCs—which worked to build more complete nationwide networks.  Tr. Day 12 (Lee) at 61:6-62:10 (explaining that, "when deregulation came," carriers "knew that in order for them to better compete in this new deregulated environment, what they were going to have to do was build better networks," and "raced to build more complete nationwide networks").

27.     Second, deregulation enabled the entry of a new breed of carriers that could use a low cost structure to price below legacy network carriers and win market share.  Tr. Day 12 (Lee) at 62:11-15 (noting that deregulation enabled "a whole new breed of carriers that could use a low cost structure to price below and take market share" to enter, "kick[ing] off what the DOT has referred to as the low cost carrier revolution").  Today, lower-cost carriers (a term that includes low-cost carriers ("LCCs") and ultra-low-cost carriers ("ULCCs")) account for nearly half of all domestic O&D passengers, up from roughly 15 percent in 1993.  Tr. Day 12 (Lee) at 63:10-14; DX-0875 (Lee Expert Report Exhibit 20; Real Domestic Price Per Mile ("Yield") vs. Lower Cost Carrier Domestic O&D Share (1993-2021).  However, as Dr. Lee explained, this percentage understates the competitive impact of lower-cost carrier growth over the past few decades. Approximately 89 percent of domestic O&D passengers have the option of traveling on a lower-cost carrier today, and the very presence of a lower-cost carrier on a route puts downward pressure on the fares charged by GNCs.  Tr. Day 12 (Lee) at 63:15-64:9; DX-0869 (Lee Expert

Report Exhibit 14, Percentage of Domestic O&D Passengers with Lower Cost Options (1993-2021).

28.     Intense competition from lower-cost carriers, combined with a series of external shocks in the early 2000s (e.g., 9/11, the fuel shock of 2008, the 2008 global financial crisis), left legacy network carriers with too much unused, high-cost capacity, which severely undermined their profitability.  Tr. Day 12 (Lee) at 67:15-23; 70:9-10 (identifying the "shocks" that impacted the industry).

29.     Between 2000 and 2009, legacy network carriers collectively lost $70 billion.  Tr. Day 12 (Lee) at 70:19-71:13; DX-0878 (Lee Expert Report Exhibit 23, U.S. Passenger Carrier Net Income by Business Model (1977-2010)).  Over the same period, lower-cost carriers remained profitable, with cumulative net income doubling from approximately $4 billion to over $8 billion.  Tr. Day 12 (Lee) at 71:14-22; DX-0878 (Lee Expert Report Exhibit 23, U.S. Passenger Carrier Net Income by Business Model (1977-2010)).

30.     Legacy network carriers reduced capacity in an effort to remain solvent.  Tr. Day 12 (Lee) at 67:20-23; 68:11-15.  Indeed, roughly three quarters of all the capacity that legacy carriers eliminated came out of the effort to remain solvent, and was eliminated before their respective mergers.  Tr. Day 12 (Lee) at 67:20-23; *id.* at 68:16-18.

31.     Ultimately, the growth of lower-cost carriers and the pressure that they imposed on airlines with higher cost structures forced each of the legacy carriers into bankruptcy.  Tr. Day 12 (Lee) at 71:23-72:7.  In 2002, United and US Airways declared bankruptcy; in 2004, US Airways declared a second bankruptcy; in 2005, Delta and Northwest declared bankruptcy; and in late 2011, American declared bankruptcy.  *Id.* at 69:12-17.

32.     While bankruptcy allowed the network carriers to clean up their balance sheets and restructure certain contractual agreements, they remained at a competitive disadvantage versus lower-cost carriers, which continued to have lower costs and were more nimble.  Tr. Day 12 (Lee) at 72:8-16.

33.     Following their bankruptcies, the legacy carriers had a series of mergers through which they expanded their networks.  Tr. Day 12 (Lee) at 72:17-73:4; Tr. Day 4 (Raja) at 184:7-9 ("So much of the strategy of the three big network carriers – Delta, American, United – was building big national networks through mergers from smaller ones.").

34.     Starting with Delta/Northwest in 2008, then United/Continental in 2010, and finally American/US Airways in 2013, today's GNCs—American, Delta, and United—were created by mergers.  DX-0880 (Lee Expert Report Exhibit 25, States Where Legacy Network Carriers Carried at least 10% of Domestic O&D Passengers).  The goal of each merger was to create a more comprehensive nationwide network.  Tr. Day 12 (Lee) at 73:5-74:15; DX-0880 (Lee Expert Report Exhibit 25, States Where Legacy Network Carriers Carried at least 10% of Domestic O&D Passengers).

35.     According to extensive economic literature studying the effects of the legacy airline mergers on overall industry competition (to which Defendants' experts, Drs. Carlton and Israel, contributed a paper[2]), the mergers improved competition in the airline industry.  Tr. Day 9 (Town) at 203:2-209:24 (discussing economic literature, including DX-1061, DX-1062, and DX-1063). Tr. Day 13 (Israel) at 104:17-25 (explaining that the paper studied "what had happened on those mergers, particularly on the nonstop overlaps, and found that across the board on the nonstop

_____

[2] *See* Dennis Carlton, Mark Israel, Ian MacSwain, and Eugene Orlov (2019), *Are Legacy Airline Mergers Pro- or Anti-Competitive, Evidence from Recent U.S. Airline Mergers*, INT'L J. OF INDUS. ORG. 62(1):58-95.

overlaps, capacity had gone up, and prices had gone down"). Indeed, the airline industry is highly competitive, fares in real dollars are lower than ever, and any fare differences between competitors reflect varying costs and business models. *See, e.g.,* Tr. Day 12 (Lee) 49:1-13 ("The first is that if we look at where we are today, in the airline industry, what I can confidently say is that the industry has evolved into this incredibly competitive and dynamic industry, with multiple different business models, multiple carriers competing using different business models, and it has really resulted in what I believe is the most competitive industry we have seen, ever, in the United States in terms of airline competition. Prices in 2019 were at their lowest level in history and there's just more choices. The consumer has more choices between and among different airline business models than they've ever had."), 52:10-22 (explaining differences in fares arising from variance in costs and business models), 52:23-53:35 (same), 77:13-16 ("When I look at this as an economist, when I see new entrant carriers continually expanding share and fares continually going down, that, to me, is really the sign of a highly competitive industry.").

### ii.     Current Airline Business Models

36.     Today, domestic airlines tend to be grouped into four categories based on their network scope (i.e., breadth of destinations served domestically and worldwide), product differentiation, operational complexity, and associated cost structure. Tr. Day 12 (Lee) at 50:23-51:11; Tr. Day 12 (Lee) at 51:12-53:5 (discussing taxonomy of airlines business models); DX-0856 (Lee Expert Report Exhibit 1, Taxonomy of Airline Business Models); DX-0084 at -010 (noting that "US-based carriers utilize multiple business models," and listing those business models).

### (1)     Global Network Carriers

37.     American Airlines ("American"), Delta Air Lines ("Delta"), and United Airlines ("United") are known as GNCs. Tr. Day 12 (Lee) at 51:18-19.

38.    GNCs operate using a hub-and-spoke network model, which means that they provide significant connectivity through large airport bases ("hubs") to connect thousands of O&Ds.[3]  Tr. Day 12 (Lee) at 51:18-52:4 (explaining that GNCs like American, Delta, and United "are carriers who[se] business model[ ] is predicated on network breadth, network scope, the ability to take passengers from anywhere to everywhere"); Tr. Day 5 (Isom) at 63:6-64:22 (describing the connectivity provided by the hub-and-spoke model, and noting that the GNCs "can offer [ ] a tremendous amount of origins and destinations facilitated by connections within hubs," such as American which had "almost 35,000 O&Ds, and then adding in our partners, it grew to almost 50,000 origins and destinations" prior to the pandemic).

39.    Network breadth is a core feature of the product offered by hub-and-spoke carriers. *See, e.g.*, DX-0041A at -067 ("Our network advantage is driven by the strength of our hubs and the proximity of spokes to our hubs."); Tr. Day 5 (Isom) at 8:19-23 (hub-and-spoke airlines like American seek to add new destinations to increase their competitiveness); *see also* Somers Dep. Tr. (07/22) at 42:4-10 (explaining that Delta's network is "attractive to corporate customers" because it "can get any company from anywhere in the world from point A to point B either on our metal or our partners' metal," "offer[ing] complete coverage for each company").

40.    As a result of the complexity of hub-and-spoke networks, this business model requires a higher cost structure than point-to-point flying.  Tr. Day 12 (Lee) at 52:4-9, 53:17-55:18 (comparing airline cost structures), 55:19-56:14 (comparing American's costs to the costs of LCCs and ULCCs:  "[T]he cost and complexity of operating a large hub-and-spoke network, which

---

[3] GNCs are also known as "legacy" airlines.  *See, e.g.,* Tr. Day 1 (Hayes) at 108:4-5; Tr. Day 2 (Watterson) at 100:23-101:3 (explaining that legacy airlines are "airlines with a long history that predominantly . . . [rely on] a hub-and-spoke model, offer multiple classes of service, global network powered by this hub and spoke, with many partners, and pretty much offer you travel from anywhere to anywhere").

requires multiple fleet types, small regional jets, large, wide bodies," and "require[s] connectivity at the hubs," meaning that "the aircraft tend to sit on the ground a little bit longer, as they're waiting for flights from all of these folks to come in from maybe 200 different places and connect them onward to their final destination. . . . [C]arriers like Southwest and Spirit, with a point-to-point network, they land, they unload passengers and bags, they pick up passengers, and they just take off. They don't worry about connectivity in the same way."); Tr. Day 6 (Parker) at 94:2-20 (explaining that providing significant connectivity through a hub-and-spoke model is "really costly"); Tr. Day 5 (Isom) at 64:23-65-4.

41.     The higher costs of GNCs are driven in part by the fact that they must operate multiple fleet types. Tr. Day 12 (Lee) at 52:6-7; 54:4-19 (explaining that, to "carr[y] passengers domestically [to] over 23,000 city pairs," American "needed to use seven different fleet types," such as "aircraft that can serve small communities, . . . [like] a 50-seat regional jet, maybe 76 seat regional jet . . . that serve[s] places like Bangor, Maine or Lubbock, Texas," "long-haul wide-body aircraft that can reach places like Sydney, Australia and New Delhi," and "everything in between," which "adds a lot of cost and complexity to American Airlines's network"); *see also* Tr. Day 12 (Lee) at 55:19-56:14 (explaining that, to have an expansive fleet, "[y]ou have to have different mechanics trained on different aircraft, different pilots trained on different aircraft," which increases costs relative to an airline like Southwest, which utilizes a single fleet type and thus "has every single employee [able to] work on every single aircraft" and "[e]very single pilot can fly any single aircraft in its fleet").

42.     GNCs also offer a full range of services to travelers which further increases their operating costs. *See generally* DX-0089B (discussing American offering a vast network of domestic and international flights to its customers); DX-0025 (listing various services offered by

American such as Business Extra, AirPass Promotions, maintaining extra cleanliness and safety during COVID).

43.     GNCs compete for all customer types, including the most price-sensitive travelers through their "Basic Economy" options.  Tr. Day 12 (Lee) at 53:10-16 (explaining that the GNCs "all introduced an entirely new class of service called basic economy which was intended specifically to compete against the threat of [] growing low cost carriers"); PX0108 at p. 6 (explaining the product segmentation American uses to compete, including basic economy and economy).

### (2)    Low-Cost Carriers

44.     LCCs generally rely on point-to-point flying using a relatively simple fleet (e.g., a single aircraft family).  *See, e.g.,* Tr. Day 2 (Watterson) at 102:17-24 ("LCCs, in general, don't offer hub-and-spoke type networks.  They generally offer a single class of service, and they simplify fleet, so they try to use a high productivity to generate a lower cost"); Tr. Day 12 (Lee) at 54:20-55:11 (noting that the "simplicity of Southwest's network, focusing on this point-to-point network, serving dense routes, allows them to use a single fleet type").

45.     This business model enables LCCs to have lower costs than GNCs.  Tr. Day 12 (Lee) at 55:9-11 (explaining that Southwest has a "cost structure, which, as you can see, [is] roughly a third lower than that of American Airlines, 10.35 cents per mile, as opposed to 14.76 cents for American"); Tr. Day 2 (Watterson) at 101:10-20.

46.     Because LCCs have lower costs than legacy carriers, they are able to offer lower fares profitably.  Tr. Day 2 (Watterson) at 101:17-24 (explaining that LCCs' point-to-point service and simplified fleet "generates a lower cost" which "allows the LCCs to offer low fares profitably").

47.     LCCs have grown significantly in the last decade.  Tr. Day 12 (Lee) at 59:16-60:9

(discussing the "spectacular growth" of LCCs and ULCCs over the last ten years); DX-0863 (Lee

Report Exhibit 8, showing growth in systemwide ASMs of the 11 largest U.S. passenger carriers

from 2010-2019).

### (3)     Hybrid Carriers

48.     Some carriers operate as a hybrid between the GNC and LCC business models,

offering a hub-and-spoke model on a regional basis.  Tr. Day 12 (Lee) at 52:12-15 ("And there's

[sic] different flavors of the lower cost business model.  There's [sic] carriers that also use the

hub-and-spoke network like Alaska and Hawaiian, but do so on a much smaller regional basis.").

49.     Alaska Airlines and Hawaiian are examples of these hybrid carriers.  Tr. Day 12

(Lee) at 52:13-15; Tr. Day 7 (Harrison) at 50:6-12 (explaining that Alaska has "been around

90 years, but we don't have these big hub networks" and instead "view ourself as a small, more

niche carrier, that just likes to provide good value").

### (4)     Ultra-Low-Cost Carriers

50.     Six airlines – Spirit, Frontier, Allegiant, Avelo, Breeze, and Sun Country – operate

as ultra-low-cost carriers ("ULCCs").  Tr. Day 1 (Hayes) at 109:3-12 (explaining that ULCCs are

"committed to offering lower fares" but "are more no frills"); Tr. Day 3 (Kirby) at 107:5-7  ("Yes,

Spirit was actually the – the first ULCC and they coined that phrase.").

51.     ULCCs target routes that have high traffic and significant demand for nonstop

services.  *See, e.g.,* Tr. Day 4 (Raja) at 182:4-17.

52.     Because of their targeted focus on high-traffic routes, ULCCs are able to rely on a

simple fleet and high density seating to keep costs low.    Tr. Day 12 (Lee) at 55:12-18  (noting

that ULCCs "are driving their cost[s] even lower by focusing on very dense routes and a simple

fleet structure").

53.     ULCCs also keep costs low by limiting the scope of their service offering.  *See, e.g.,* Tr. Day 3 (Kirby) at 111:1-3 ("No premium class [of] service, no specialty clubs, no special services/amenities that drive costs without an associated revenue benefit.").

54.     ULCCs are profitable despite charging low base fares because they charge supplemental fees for products and services traditionally included in the price of an airline ticket (e.g., assigned seats and carry-on bags).  Tr. Day 12 (Lee) at 53:2-5 (noting that ULCCs "take the low cost model. . . to the extreme, by unbundling and trying to drive down cost and drive down fares to even lower levels"); Tr. Day 3 (Kirby) at 111:4-6 (noting that ULCCs are "[n]o frills, or if there are frills, they are frills that we've identified that produce revenue"); Tr. Day 2 (Watterson) at 102:4-8 (explaining that ULCCs "generally offer a product which is highly debundled to allow for the lower costs, so that customers have to buy add-ons to the seat only type of product").

### E.     Networks Are a Primary Feature of U.S. Passenger Airline Competition

55.     The primary product offered by passenger airlines is air travel from a point of origin to a separate destination (i.e., an "O&D").  *See, e.g.,* Tr. Day 4 (Raja) at 186:19-20 (noting that American "compete[s] by offering a ton of O&Ds that are out there"); Tr. Day 4 (Raja) at 201:17-19 ("Our system is best when we offer more O&Ds for customers because they value it. They can get to more places.").

56.     Accordingly, for GNCs and to a lesser extent LCCs, a critical feature of an airline's competitive offering is its network breadth (i.e., the nonstop and connecting flights available to travelers).  Tr. Day 4 (Raja) at 186:8-9 ("The more origin and destination markets [American] make[s] for our customers, the more they like [American] and fly [American]."); Tr. Day 2 (Hayes) at 18:2-23 (The "number one driver for most customers" in terms of which airline they choose to fly is "which airline flies to most of the markets that [the customer] want[s] to fly to.").

57.     For example, corporate customers typically evaluate an airline's "fit" (i.e., an airline's ability to meet the customer's travel needs by offering nonstop routes that the customer's travelers want to fly) on a network-wide basis.  Tr. Day 2 (Watterson) at 132:25-133:8 ("[A] customer traveling on business would value flights to a business destination and a flight schedule that offered convenience, being the right time and the number of . . . frequencies."); Tr. Day 12 (Carter) at 192:21-193:4 ("[Network fit is hugely important.  It actually tells us a little bit about our strategy going into that customer. . . . [D]o we have a chance at a primary position?  Should . . . our strategy be about a strong secondary position?  Or maybe we just don't have a good network at all for that company, and maybe we should just be on the shelf and in a tertiary kind of role. . . . [N]etwork fit . . is kind of foundational to this."); Tr. Day 8 (Swartz) at 41:19-24 ("It's about the network.  Business travelers want to fly direct.  They don't want to connect."); Tr. Day 8 (Swartz) at 19:8-9 ("Every corporate customer we have, we're in a position with them depending on the network fit."); Tr. Day 8 (Swartz) at 35:17-36:2 ("Our biggest competitors are the legacy airlines, like United and Delta, because most of these corporations have global footprints. . . .[W]hen we go head-to-head in corporate accounts, it's the . . . Deltas of the world, the Uniteds that we're up against, fighting for primary and secondary positions because . . .  they have, as well as us, the international and domestic routes that . . . can service their business customers"); Tr. Day 3 (McMenamin) at 21:13-17 ("[B]eing aligned with a partner like American in the airports in Boston and New York gives us more relevance as we try and go after customers that may not have believed JetBlue to play a strong part in their program."); Somers Dep. Tr. (07/22) at 40:13-18 (confirming that corporate customers "take into account . . . the full network, including what Delta offers with its partners combined"), 41:19-42:10 (explaining that corporate customers value Delta's ability to

"get any company from anywhere in the world from point A to point B either on our metal or our partners' metal, so we offer complete coverage for each company").

58.     JetBlue's limited network breadth and lack of a global network prevented it from competing effectively for corporate customers versus Delta and United.  *See, e.g.,* Tr. Day 2 (Hayes) at 25:12-25 (explaining that JetBlue "had limited traction with corporate accounts in New York" because it was "so small in LaGuardia and . . . a distant third in the New York area to the large two airlines").

59.     "Relevance" in a particular market is another important factor in an airline's competitiveness.  *See* Tr. Day 2 (Watterson) at 133:10 – 14 (explaining that relevance is important to "attract[ing] the customer set").  Relevance is an airline industry term that describes the breadth of O&Ds and depth of frequencies (i.e., the number of times an O&D is flown each day) from the perspective of the local originating customer.  Tr. Day 2 (Hayes) at 18:4-6 (explaining that network relevance is impacted by "all the destinations that people want to fly, how many destinations I can fly to"); Tr. Day 2 (Watterson) at 132:12-132:13,136:15-137:7 (noting that Southwest seeks "relevance" in a given market, which is the ability to "offer a flight schedule or network to local customers that meets multiple travel purposes," and that achieving "hometown status" in a market, whereby an airline attains a "large enough customer base . . . that reuse [the airline] over and over again," enables an airline to achieve relevance); *id.* at 132:19-24 ("[R]elevance is . . . about that customer who originates in that geography."); Tr. Day 7 (Harrison) at 35:24-36:7 ("[R]elevance, really simply put, is if you're an individual who needs to travel somewhere, you need to, number one, fly where they want to go; number two, you need to be able to fly there at the times they want to go; and of course, you need to be able to fly there at a price that's reasonable."); Tr. Day 4 (Raja) at 209:22-210:1 ("I would . . . say it pretty simply, that you can have the very best product in New

18

York to L[o]s Angeles, but if you can't fly somebody to Toronto or Paris or Raleigh, at some point, they stop flying you to Los Angeles."); Tr. Day 3 (Kirby) at 122:4-15 ("I often use the analogy of a supermarket. . . . [I]f you're a full service provider, you have every product that you could possibly want.  That means that your customers are more interested in going there because it's a one-stop shop.  If you have very small service level[s], let's say you only serve bread, then I think it narrows the amount of people that would consider you.  So that's really what relevance is . . . do you serve the markets that are important to customers that want to fly out of that airport? . . . [T]he more relevance you have, the more likely you're in the consideration set for their business."); Tr. Day 2 (Watterson) at 132:5 – 134:9 (noting that Southwest seeks "relevance" in a given market, which is the ability to "offer a flight schedule or network to local customers that meets multiple travel purposes," and agreeing that "Southwest seeks to improve relevance and attractiveness at LaGuardia.").

60.     Airlines compete on a variety of other dimensions that influence their ability to win customers and generate revenue, including fares, frequent flyer programs, customer amenities such as airport lounges, co-branded credit cards, and ancillary travel products (e.g., selling hotels and rental cars through commercial partnerships).  *See generally* Tr. Day 2 (Hayes) at 27:16-31:2; DX-0089C (listing all the various services American has to offer); DX-0230 at 0011 (█████████ ████████████████████████████████████████).

61.     These types of competitive features are important to the airline's overall profitability.  *See, e.g.,* Tr. Day 1 (Hayes) at 198:9-20 ("[F]or most airlines, [loyalty program] revenue streams themselves are more than the … operating profit of the entire operating company.").

19

62.     These competitive features also help airlines to grow their customer base and attract

more customers.  Tr. Day 8 (Fintzen) at 134:17-135:4 (explaining that JetBlue seeks to "grow [its]

customer base," or "ecosystem," which "goes beyond just an individual flight" – it means that it

strives to "grow our customers," "bring them to our website," get them to "join[] our loyalty

program," "get[] our co-brand credit card," invest in our "JetBlue travel products, so selling a

hotel, a car, trip insurance," all of which is "really important to . . . JetBlue's growth and JetBlue's

strategy in the industry"); Tr. Day 4 (Raja) at 211:17-24 (At American, "once you join our loyalty

program, it's an indication that you want to travel.  You're more likely to buy business class when

you fly to Rome.  You're more likely to want to earn miles or spend on our credit card, buy access

to our lounges and things like that."); Tr. Day 14 (Israel) at 8:3-18 ("[I]f you get somebody to fly

on your plane, they join your loyalty program, then you can sell credit cards to them, but more

generally they're going to fly your flights nationwide or globally, which is going to generate more

revenue.").

63.     However, none of these other features make up for a lack of relevance.  Tr. Day 4

(Raja) at 213:9-14 ("[N]o matter how much we might go and give more gen[erous] frequent flyer

benefits, we've spent billions on lounges and on products and on things like that, nothing made up

for the network deficiency."); Tr. Day 2 (Hayes) at 18:14-19 ("[T]he number one driver for most

customers . . . as they make decisions about what airline they're going to fly and what frequent

flyer program they're going to be in, what credit card they're going to get is which airline flies to

most of the markets that I want to fly to. And so relevance is an extremely important concept for

an airline."); Tr. Day 7 (Harrison) at 36:21-25 ("Essentially, if you're not relevant, you're going

to have a very, very difficult time competing.  You're going to have a very difficult time getting

loyalty members, and of course, holding your credit card, which is another really important part of our program.").

## II.   AMERICAN AND JETBLUE FACED MANY CHALLENGES IN NEW YORK AND BOSTON PRIOR TO THE NEA

### A.   Competitive Landscape in New York

64.   Many airlines, including United, Delta, American, JetBlue, Alaska, Southwest, Spirit, and Frontier, offer domestic service in New York City market, making New York one of the most competitive cities for air travel in the country.  Nocella Dep Tr. (4/22) at 150:12-17; Tr. Day 15 (Znotins) at 81:16-17 (describing New York as "highly competitive"); DX-0501 at -007 (█████████████████████████████████████████████████████████), at -010 ███████████████████████████████████████████████████████████████ ███████████████████ DX-0230 (████████████████████████████████████ ███████████████████████████████); *see generally* DX-0736 (The Official Airline Guide (OAG) Database, 1998-2002).

#### i.   The New York City Market Is the Largest Air Travel Market in the World

65.   New York City is the largest market in the country for air travel and the largest market for corporate air travel in the world.  *See* DX-0041A at -061 ("New York is strategically important as the largest originating market in the U.S. and largest corporate market in the world."); Weithofer Dep. Tr. (06/22) at 23:5-6 ████████████████████████████████████████; Esposito Dep. Tr. (06/22) at 58:8-13 (explaining that it is "important to Delta to have significant presence in New York" because it is "the largest air market in the country").

66.   The New York City air travel market consists of flying to/from three major airports: LaGuardia, JFK, and Newark (together, the "New York City airports").  Tr. Day 3 (Kirby) at 116:16-18; PX0893 at 18; Tr. Day 2 (Hayes) at 73:20-21 (explaining that "in pretty much every

other walk of life, we considered Newark as part of that New York airport"); Tr. Day 7 (Harrison) at 48:3-17 ("[I]n New York City, there's [ ] three airports.").

      **ii.**      **Delta and United Dominate The New York City Air Market**

67.     Delta and United are "by far" the strongest competitors in the New York City area. Tr. Day 7 (Harrison) at 48:3-17 ("By far, United and Delta are the largest and strongest [in New York City]. . . . American and JetBlue are much more distant to that."); Tr. Day 2 (Hayes) at 12:1-9 (testifying that JetBlue is a "distant third behind Delta and United"); Tr. Day 13 (Israel) at 110:17-22 ("[T]he other issue in New York is other carriers, you know, struggling to figure out how to compete with Delta and United, because there just aren't that many assets left. There aren't many slots. Delta and United control a lot of the productive assets, and so other carriers have to try to figure out how to deal with that."); 140:24-141:2 ("You live in New York; you got three airports. You expect to get there nonstop. And the carriers who can get you to far more places nonstop are Delta and United."); 150:15-151:2; PX0279 at 24, 30; *see* Nocella Dep. Tr. (04/22) at 33:17-23.

68.     Delta's largest New York presence is at LaGuardia Airport ("LGA"), where it operates 40 percent more slots than American and JetBlue combined. PX0890 at -131 (showing Delta possessing 44.8 percent of slot holdings in LGA compared with 31.8 percent for a combined American and JetBlue; Tr. Day 4 (Kirby) at 32:15-33:2 (testifying that, at LaGuardia, Delta holds about 56 percent more slots than American and 16 times as many slots as JetBlue). Given the existing constraints, it is impossible for any carrier to independently challenge the number of daily flights that Delta offers from LaGuardia. Tr. Day 2 (Watterson) at 166:20-167:4 ("At LaGuardia, Delta holds the majority . . . of slots; therefore, you cannot challenge . . . Delta's service offering, given the number of slots available at LaGuardia airport.") .

69.     Delta is also the largest slot holder at JFK with the highest share of domestic departures in 2019 as compared to other airlines.  PX0890 at -0132 (showing Delta possessing 38.1 percent of slot holdings in JFK); PX-0893 at -1050  (showing Delta controlling 48 percent of total domestic departures out of JFK); Tr. Day 5 (Isom) at 69:16-70:12 (explaining that Delta has "twice the number of flights" as American at JFK, which "puts [American] at a great disadvantage"); Tr. Day 4 (Raja) at 207:5-12 (explaining that American is "more than [] 100 departures smaller" than Delta at JFK); Tr. Day 4 (Kirby) at 33:3-33:10 (testifying that, at JFK, Delta holds twice as many slots as American and 25 percent  more than JetBlue).

70.     United predominantly serves the New York City market from Newark, which is one of its largest hubs and its largest international gateway, and where it operates nearly 70 percent of the airport's operations.  DX-1083 at -004 ("United is the dominant carrier at EWR with 69 percent of operations in the most-recent 12-month period."); Nocella Dep. Tr. (04/22) at 39:19-40:3; Murray Dep. Tr. (05/22) at 45:13-16 ("Newark is the hub for United Airlines.  They account for the vast majority of activity at Newark, typically in the range of 65 to 70 percent."); Weithofer Dep. Tr. (06/22) at 22:17-21 █████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████; *id.* at 82:21-83:6; Tr. Day 4 (Kirby) at 26:13-24, 28:3-4 (testifying that "United has a larger position at Newark than [American and JetBlue together] enjoy at either JFK or LaGuardia").

71.     Moreover, United is committed to growing in New York City.  It has announced its "United Next" plan to drive a transformational change in the amount of capacity that it offers across its network through 2026.  Nocella Dep. Tr. (04/22) at 63:9-10, 142:17-143:4; Weithofer Dep. Tr (06/22) at 38:21-24; *see* DX-0560 at -014, and -024.  At Newark specifically, United is planning a significant increase in aircraft profile and will significantly expand the scale of Newark

as a global gateway.  DX-0515 at -004, -009; Weithofer Dep. Tr. (06/22) at 53:4-7, 83:7-24, 85:5-87:6, 88:11-90:21.  The NEA has not caused United to slow its aggressive capacity expansion plans.  *See* Nocella Dep. Tr. (04/22) at 124:25-125:20; *id.* at 208:20-209:9.

   **iii.**   **American and JetBlue Were Distant Third and Fourth Competitors in NYC**

  72.  Prior to the NEA, American and JetBlue struggled to compete with Delta and United in New York City and were "distant 3rd/4th place competitors."  *See* DX-0041A  at -062 ("Separately, AA and B6 are distant 3rd/4th place competitors in major NYC customer segments but combined AA+B6 have comparable scale to OA."); DX-1075A at -0002 ("Neither AA nor B6 can offer customers a network that is competitive with DL or UA, and slot/gate restrictions prevent both of us from organically developing a competitive network."); Tr. Day 2 (Hayes) at 12:3-7 ("We were still a distant third behind Delta and United . . . . ."); Tr. Day 4 (Raja) at 207:24-208:5 ("So we realized that until we can do something different and think about this problem differently, we couldn't credibly compete with Delta and United.  And frankly, Delta and United didn't have to work too hard to compete with us.  But we realized we weren't alone.  JetBlue had a version of the same problem."); Tr. Day 9 (Friedman) at 44:19-22; Tr. Day 12 (Lee) at 78:11-20 (the NEA "is really an attempt to close what has become a widening competitive gap, versus Delta and United, which are much larger, roughly twice as large as American in New York."); *see* Weithofer Dep. Tr. (06/22) at 91:21-93:3, 93:6-97:4; DX-0515 at -027; DX-0912.

  73.  Neither American nor JetBlue has historically been able to offer enough flights to be relevant for New York City-based travelers.  *See* DX-0041A  at -062 ("Neither AA nor B6 can offer customers a network that is competitive with DL or UA."); *see also* Tr. Day 13 (Israel) at 140:4-10 (explaining that the NEA "attempts to compete with hub carriers generally . . . [b]ecause as long as we're that much smaller, we're going to lack relevance in that market").  From a local

perspective, American does not have the number of frequencies and the number of cities to be as attractive to the local customers as Delta or United.  Tr. Day 5 (Isom) at 71:20-72:8; Tr. Day 4 (Raja) at 210:11-25 (" [I]f we use this word 'comprehensiveness,' it really means, on the one hand, breadth . . . being able to fly to more places, and depth, having . . . a service pattern, a number of flights within a market.  Relevance or comprehensiveness is those two things, and we lack that in New York."); Tr. Day 13 (Israel) 142:20-23 ("So for local origina[ting], American is really quite weak.  I think there's been testimony about American's lack of relevance in the New York City area means that it just really struggles to attract New Yorkers.").  Although the merger with US Airways had greatly improved American's connectivity across the United States, including in Philadelphia, the merger still left American lacking adequate coverage in New York, particularly because nonstop, not connecting, coverage is necessary to compete effectively for New York customers.  Tr. Day 6 (Parker) at 78:9-17; Tr. Day 7 (Raja) at 119:13-120:24.

74.    American internally referred to itself as only a "niche carrier" in New York City because of its lack of relevance in the market.  DX-0011  at -0005.  American also noted that there was "no organic path to secure a leadership position in NYC."  *Id.* at -0004.

75.    Indeed, American felt that it was too small to succeed in New York but too large to exit.  Tr. Day 4 (Raja) at 207:3-5 ("[B]ut for us in New York . . . the way I described it in times past is we were too small to succeed and too big to exit it.").

76.    Significant infrastructure constraints in New York City limited American's ability to grow independently.  *See* Section II.A.iv, below.

77.    American focused on bringing travelers to New York rather than supporting New York City-based travelers.  Tr. Day 4 (Raja) at 134:2-19; *id*. at 135:12-24 ("The irony of this New York strategy is it's actually not a New York strategy; it's a rest-of-the-country strategy."); Tr.

Day 4 (Raja) at 134:8-16 (explaining that American historically "focus[ed] on having a depth of schedule in northwest Arkansas to New York. . . . to be a carrier that gets people to New York" because "we're not doing particularly well for the New York-originating customer, but we do great with a northwest Arkansas originating customer"); Tr. Day 5 (Isom) at 71:20-72:8.

78.     New York is the largest market for corporate travelers, *see* ¶ 65, and American's deficiencies in New York were particularly acute with respect to corporate travelers, who need to have nonstop routes and a range of flights from which to choose.  Tr. Day 12 (Carter) at 188:14-19 (explaining that corporate customers choose airlines for their network and corporate contracts are "about the network and bringing value [ ] to the customers"); Tr. Day 15 (Znotins) at 67:22-68:10 (explaining that, "on most routes, if somebody wanted to get to their business meeting the morning of their meeting, instead of going the night before, or they wanted to get home for their kids' soccer game that evening after their meeting . . .  American was in that secondary position[.]  [W]e couldn't get you there nonstop as frequently as Delta and United could.  And more often than not, we couldn't get you there the morning of your meeting or get your out the evening of your meeting.  And so for those schedule-sensitive travelers who are spending their company's money to save themselves time, that's not a game we're playing in; and given our cost structure, that's a game we have to play in order to be profitable."); Tr. Day 15 (Znotins) at 75:8-12.

79.     JetBlue also struggled to compete in New York City because it lacked local relevance in New York City.  Tr. Day 2 (Hayes) at 18:19-23 (explaining that JetBlue "always struggled because even in the biggest focus cities of New York and Boston historically, we've had a much lower share of the market than other large airlines have in their home markets"); Tr. Day 13 (Israel) at 143:15-22 (explaining that, inside New York, JetBlue is "much smaller than Delta or United").

iv.     **Infrastructure Constraints at the New York City Airports Impede American and JetBlue from Closing the Gap with Delta and United**

80.     Significant infrastructure constraints at each of the New York City airports limit the ability of American and JetBlue to grow in New York City on a standalone basis.  Tr. Day 4 (Raja) at 207:15-20 (explaining that American "would love to be able to go grow in New York. The reality is it's limited"); Tr. Day 2 (Hayes) at 12:1-3 ("So from a New York perspective, one of the biggest constraints, if not the biggest constraint that we face was the ability to grow."); Tr. Day 2 (Hayes) at 118:8-14 ("[O]ne of the challenges that we had at the time was that, because of our lack of slots in LaGuardia, we were only able to launch . . .  six flights a day. So whilst fares came down and we had a broad stimulation effect on the market, it wasn't a very competitive offering for our Boston or New York corporate customers."); Tr. Day 5 (Laurence) at 226:3-6 ("[W]e did not have the capability of doing sustained growth in a number of the markets that we had listed because of our lack of slot portfolio."), 231:18-22 ("[A]t LaGuardia, there was no availability. We occasionally would work our way into something that operated late at night or early in the morning, but there's no sort of going to the FAA and saying, 'I want to add a flight at a specific time.'  It was fully subscribed."); *see* Nocella Dep. Tr. (04/22) at 60:20-61:11; Weithofer Dep. Tr. (06/22) at 87:7-88:10.

81.     Specifically, the New York City airports are slot constrained, air space controlled, and gate constrained.  Tr. Day 5 (Isom) at 69:16-70:12 (explaining that "New York has been historically problematic, because they're slot controlled and space controlled, air space controlled airports."); Tr. Day 4 (Raja) at 121:21-21-122:12 (explaining that "both [airspace and slots] are an issue" in New York City); Tr. Day 3 (Kirby) at 124:20-125:5 (noting that "most large city airports are constrained," and "generally there aren't gates available at most of the largest cities in the United States," including in New York).

82.     A "slot" is a Federal Aviation Administration ("FAA") authorization to take off or land at a certain airport during a specific time period.  14 CFR § 93.213(a)(2) ("Slot means the operational authority to conduct one IFR landing or takeoff operation each day during a specific hour or 30 minute period at one of the High Density Traffic Airports[.]").

83.     The FAA uses slots to limit scheduled air traffic at certain capacity constrained airports.[4]  Tr. Day 4 (Raja) at 122:8-10 ("Slots are really designed to measure airspace capacity, the number of takeoffs and landings that you can do."); Murray Dep. Tr. (05/22) at 126:18-25 ("The reason there are slots is because there is high demand.").

84.     Two of the three slot-controlled airports in the United States are in New York City: JFK and LaGuardia.  Murray Dep. Tr. (05/22) at 41:18-19 ("LaGuardia is also a slot-controlled airport."); Murray Dep. Tr. (05/22) at 126:21-22 ("A carrier wishing to start service at JFK or LaGuardia can't, unless they have slots."); Weithofer Dep. Tr. (6/22) at 88:4-6 (explaining that LaGuardia and JFK are slot controlled).

85.     Growth plans at the New York City airports are constrained by the number of slots an airline has obtained from the FAA or through leases, regardless of the capital investments the airline is willing to make.  *See, e.g.*, DX-0015 at -0001 ("Slots aren't easily acquired. . . . all slots are spoken for.  So the only way we grow [is] for someone to shrink, or vice versa."); DX-0285B at -0028-0029; Murray Dep. Tr. (05/22) at 126:21-23; Tr. Day 2 (Watterson) at 113:22-23 (noting that Southwest cannot expand at LaGuardia without more slots); *id.* at 114:13-15; Tr. Day 3

---

[4] The Federal Aviation Administration (FAA) defines a slot as "an authorization to either take-off or land at a particular airport on a particular day during a specified time period.  This authorization is for a planned aircraft operation and is distinct from air traffic control clearance or similar authorizations."  *See Slot Administration – Slot Definition*, FED. AVIATION ADM'N, https://www.faa.gov/about/office_org/headquarters_offices/ato/service_units/systemops/perf_ana lysis/slot_administration/slot_definition.

(Kirby) at 175:17-19 ("I think it's unlikely that that amount of slots could become available, absent a larger divestiture or a reauthorization of total slots at JFK."); Tr. Day 4 (Raja) at 121:21-122:2 ("In our business, when you lose access to the infrastructure, you lose the access. It's hard oftentimes to make more gates, more runway, and even if you can do that, you can't make more air space."); Tr. Day 5 (Laurence) at 224:1-10, 225:22-226:6, 231:18-232:11.

86.     Before the NEA, American determined internally that it had no "organic" path to secure a leadership position in NYC due to the lack of available slots.  DX-0011 (Sept. 2018 American NYC Strategy Update) at -004; DX-1075A at -0002 ("Neither AA nor B6 can offer customers a network that is competitive with DL or UA, and slot/gate restrictions prevent both of us from organically developing a competitive network."); DX-0041A at -060 ("Partnerships enable scale in critical markets we can't win organically").  Infrastructure barriers to American's growth included the grounding of the Boeing 737 MAX aircraft and runway and terminal construction. Tr. Day 4 (Raja) at 176:7-177:2 (explaining that American could not fully utilize its slots when the 737 MAX was grounded); PX0917.

87.     JetBlue similarly concluded that it could not obtain the slots it needed to grow in New York City.  Tr. Day 2 (Hayes) at 14:1-8 ("The number one hindrance to growth we had was just the lack of slots. . . . We had tried for years to get slots . . . through a regulatory processes[,] . . . by bidding for them.  They don't come up very often because the airlines who have them don't want to let them go and we had had very little success in the New York area."); Tr. Day 5 (Laurence) at 224:3-10 (explaining that DX-0285B, which states that JetBlue's "opportunities exceed our current ability to grow at JFK," meant that JetBlue "lacked the slot opportunities to be able to grow to the markets that were noted on the page, both in terms of new markets and increased frequency"); DX-0285B at -028; Tr. Day 5 (Laurence) at 231:16-22 ("[A]t LaGuardia, there was

no availability. . . [i]t was fully subscribed."); *id.* at 234:17-24 ("We would make it clear that we were in the market for New York slots whenever possible. . . . I would have printed on a T-shirt that I was looking for JFK slots so people would see it, and the answers were roundly no every time. I don't think our competitors were interested in seeing us gain more access."); *id.* at 229:23-230:20 (explaining that "the demand for slots" during the "traditional peak" afternoon hours between 2:00 and 8:00 pm that's centered around when transatlantic flights both arrive and depart and the flights that connect to them arrive and depart" at JFK has "consistently exceeded supply"); DX-0426 at 11 (showing JetBlue's slot transactions and unsuccessful attempts to acquire slots over the past ten years).

88.     A further constraint on growth at LaGuardia is the "perimeter rule," which limits the destinations from which an airline may schedule flights from LaGuardia to a distance of 1,500 miles (with a grandfather clause permitting flying to Denver). Tr. Day 2 (Watterson) at 194:22-195:6; Tr. Day 3 (Kirby) ("LaGuardia airport . . . has a perimeter r[u]le, so Kennedy is often used as an alternative for New York travelers, when they're going beyond the 1,500 mile limit").

89.     Although Newark is not a slot controlled airport, it has features that similarly constrain airline growth. *See* Weithofer Dep. Tr. (6/22) at 87:9-14. At Newark, the FAA regulates air traffic through air space constraints, which include a formal schedule review and approval process.[5] Tr. Day 9 (Friedman) at 21:5-12; *id.* at 22:8-6 ("Newark is . . . a level two . . . slotted airport. There's some FAA take off authorizations and landing authorizations that are involved. .

---

[5]     *See Slot Administration – U.S. Level 2 Airports*, FED. AVIATION ADM'N, https://www.faa.gov/about/office_org/headquarters_offices/ato/service_units/systemops/perf_ana lysis/slot_administration/slot_administration_schedule_facilitation/level-2-airports (explaining that Newark is a Level 2 airport and thus carriers are required to "provide schedules to the FAA and the local airport schedule facilitators," and are "responsible for ensuring matching runway and terminal approvals.").

. . ”); Weithofer Dep. Tr. (6/22) at 87:9-14 (explaining that ██████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████ ).

90.     Newark is also gate-constrained, meaning that an airline's ability to grow is limited by its ability to secure a scarce number of gates.  Tr. Day 4 (Raja) at 207:21-23  (explaining that it is difficult to obtain gates in Newark, which is why "not very many people have been able to go and operate out of Newark").

91.     Even where American has been able to bypass these constraints on a one-off basis, there has been no material change to its overall competitiveness in New York City.  For example, when American added new routes out of JFK or LaGuardia, it was not able to attract a critical mass of travelers to its flights.  Tr. Day 7 (Raja) at 126:22-127:11 (explaining that American was a "spill carrier" from JFK, which meant that travelers would turn to American "[w]henever the other people are too full," "and that level of demand frankly is not enough to go and make money on the operation"); Tr. Day 5 (Isom) at 71:20-72:8 ("Well, for us, in a place like JFK and LaGuardia, and because of the limitations and what we can fly, we largely bring passengers from the rest of our network to New York.  From a local perspective, we just don't have the number of frequencies and the number of cities to be as attractive to the local customers as would be a Delta or a United.  And for that reason, . . . [we] operate at a pretty big disadvantage when it comes to going and trying to land a corporate customer or appeal to the frequent flyer that flies to a lot of different places in . . . the local New York area.").

92.     Upgauging, or increasing the size of planes flown on a route, also has not materially improved American's position in New York City because, without increasing the number of destinations, upgauging does not improve American's relevance in New York.  Tr. Day 4 (Raja)

at 179:10-13 (explaining that upgauging would not "have any material impact on [American's] relevance issues in New York"); Tr. Day 5 (Isom) at 69:16-70:12 (describing the limitations of upgauging, including that, "even in a place like LaGuardia, . . . there's a maximum size of plane that you can put in"); *see also* Tr. Day 2 (Watterson) at 166:3-13 (acknowledging that, even if an airline upgauges, "it still has the same number of takeoffs and departures," which means that its "schedule pattern stays the same" and it thus "isn't able to increase its overall relevance in New York because it's still operating the same number of slots").

93.     JetBlue tried to upgauge in New York, deploying its new, larger aircraft into the New York airports in an attempt to grow capacity. Tr. Day 5 (Laurence) at 234:25-235:20. This strategy did not remedy JetBlue's relevancy issue because it did not remedy the lack of slots. Tr. Day 5 (Laurence) at 235:21-25 (noting that "JetBlue's flying at unconventional times and upgauging" was not even "close" to satisfying "its need for slots").

> **v.      Neither American Nor JetBlue Has Market Power in New York City**

94.     Market power is generally defined as the ability to profitably raise price above the competitive level. *See*, *e.g.*, Tr. Day 13 (Israel) at 115:5-12. In the context of the airline industry, market power is the ability for a carrier or carriers to reduce capacity with the effect of leading to higher prices. Tr. Day 13 (Israel) at 115:12-19 (explaining that market power "is the ability for a carrier or carriers to pull back capacity, to pull back supply, to restrict output with the effect of raising price").

95.     The *Antitrust Guidelines for Collaborations among Competitors* issued by the U.S. Department of Justice (the "DOJ") state that, "[t]he smaller the percentage of total supply that a firm controls, the more severely it must restrict its own output in order to produce a given price

increase, and the less likely it is that an output restriction will be profitable." DOJ, *Antitrust Guidelines for Collaborations among Competitors* § 3.33.

96.     Defendants' expert Dr. Israel studied the New York City market and concluded that, at the New York City level, American and JetBlue do not have market power. Tr. Day 13 (Israel) at 116:23-117:1 (explaining that he "strongly disagree[s]" with Plaintiffs' assertion that "American and JetBlue will be able to exercise market power because of the NEA").

97.     In New York City, there are two strong hub carriers, United and Delta, which are much more likely to be able to exercise market power than carriers challenging them. Tr. Day 13 (Israel) at 117:21-118:2 (explaining that the economic literature on airlines has focused on the question of "how does somebody else compete with the hub carrier," and Dr. Israel has "never seen it be some [] non-hub carrier potentially having market power"); *id.* at 153:25-154:9 (explaining that he does not see "any reasonable prospect that the NEA carriers will be able to exercise market power," as this would entail "two weaker, nonhub carriers exercising market power against two strong hub carriers. My entire career of studying airlines, the question is how do we get these other guys to inject competition? That is what the NEA is trying to do."); Tr. Day 13 (Israel) at 117:6-8 (noting that "these markets have two strong hub carriers in the case of New York and an increasingly strong hub carrier in the case of Boston").

98.     Hub carriers can serve "almost any route that they choose" from that hub. Tr. Day 13 (Israel) at 117:10-20. Given what hub carriers can do, even if American and JetBlue removed capacity from New York City in connection with the NEA in an attempt to raise prices, they would simply cede share to the hub carriers. Tr. Day 13 (Israel) at 118:5-8.

99.     Market power is also absent at the route level in New York City O&Ds, particularly on larger, heavily-trafficked routes. Tr. Day 13 (Israel) at 145:15-146:6. Based on data from the

DOT's Domestic Origin and Destination Survey database, 89 percent of the passengers traveling to/from New York City airports are traveling either on routes that (i) are not served on a nonstop basis by both American and JetBlue or (ii) have three or more other competitors.  Tr. Day 13 (Israel) at 145:22-146:1.  There are only two New York routes where there is only one other competitor on an American and JetBlue overlap; New York City to Martha's Vineyard and New York City to Nantucket, which are small, seasonal routes.  Tr. Day 13 (Israel) at 146:1-6.  Those routes also are two of only three New York City routes for which American and JetBlue provide more than half of the current airline capacity.  DX-1055 (showing that, when all three airports are included in the New York market, the only three routes where American and JetBlue provide more than half the service are Martha's Vineyard, Nantucket, and Phoenix); *see* Tr. Day 13 (Israel) at 146:1-6 (explaining that "those two . . . New York to Martha's Vineyard, and New York to Nantucket, [are] small seasonal routes that have less competition, but even they're still facing one other competitor").  And in 2019 there were 54 domestic nonstop routes that only one of American and JetBlue served, making them nonstop *non-overlap* routes.  DX-0736; Tr. Day 13 (Israel) at 145:6-14 (discussing Israel Demonstrative at 10, which shows that there are 54 domestic nonstop non-overlap routes in New York).

> ## B.     Competitive Landscape in Boston

100.    Many airlines, including American, JetBlue, Delta, United, Southwest, Alaska, Spirit, and Frontier, offer service in Boston.  Tr. Day 10 (Clark) at 55:7-14; Tr. Day 3 (McMenamin) at 11:16-25 (describing Boston as "very competitive"); Esposito Dep. Tr. (06/22) at 58:22-23 (noting that Delta has "generally had a strong historical position in Boston").

i.        **Though JetBlue Historically Was the Largest Carrier in Boston, Delta Prioritized Rapid Growth in Boston Starting Around 2015 and Declared Boston a Hub**

101.     Boston is a focus city for JetBlue.  Tr. Day 3 (McMenamin) at 12:8; Friedman Tr. Day 8 (Friedman) at 264:3-10.  Because of this, JetBlue historically had a significant presence in Boston.  Tr. Day 10 (Clark) at 54:9-19 ("Boston is a very important city for us.  It's the second largest city in our network.  Over the course of my 13 years at JetBlue, it's been the fastest growing network.  So we've been allocating a large number of resources here, a large number of aircraft.  We've been growing rapidly, hiring staff at the airports, crew bases.  So it's an extremely important and strategic market, not only for its size, but it's also where we've had the highest mix of business customers and where we've generally gone after business customers the most and been best able to compete for business customers."); Tr. Day 1 (Hayes) at 113:1-4 (explaining that JetBlue had a leading position in Boston until 2019), 120:2-17 (same); Tr. Day 2 (McMenamin) at 219:13-16 (agreeing that JetBlue is "one of the leading airlines in Boston overall").

102.     Despite its large presence in Boston, JetBlue had only 29 percent frequency share as of 2019.  Tr. Day 1 (Hayes) Tr. at 120:22-121:2 ("[I]t's important for context, in terms of that 29 percent, that is still a lot lower than many large airlines have in some of the largest hubs, so once we were the largest airline, it was nowhere near as large as you would get in really many— dozens and dozens of other markets in the US.").

103.     Delta operates a significant network out of Boston, both internationally and domestically.  Tr. Day 8 (Swartz) at 36:18-24; Tr. Day 3 (McMenamin) at 16:23-17:12; Tr. Day 10 (Clark) at 55:17-56:20; DX-0395 at -013; Somers Dep. Tr. (07/22) at 175:3-175:8 (explaining that Delta "invested in Boston as . . .  a market, both organically and through our partnerships, for customers . . . so that we can provide them with the services they need anywhere they go in the world or account coverage"); DX-0258 at -002 ("Execution of Boston vision secures Delta's

position as #1 global airline in largest unclaimed market in the country"); DX-0259 at -009 ("Delta is Staking Claim as #1 Global Network Carrier in Boston"); DX-0282 at -005 (showing Delta's increase in average daily BOS departures of 104 percent from Q1 2016 to Q2 2020); DX-0282 at -020 (noting that, in July 2019, Delta publicly announced plans to grow to 200 daily departures in Boston, including service to Fort Lauderdale); DX-0135 at -0003 (showing Delta was the largest non-NEA carrier at Boston Logan in Winter 2019 with 139 departures); DX-0257 at -001 ("Positioning Delta to be #1 in BOS"; "Leverage coverage of top 20 markets to shift corporate share off AA"); DX-395 at -013 (showing Delta growth in Boston from 2013 to 2017, including 65 percent increase in destinations and 34 percent increase in peak daily flights); DX-0240 at -004 (noting that the Delta sales team should focus on "[l]everag[ing] system strength to compete for BOS share").

104.    Prior to the NEA, both American and JetBlue viewed Delta as their primary competitor in Boston. Tr. Day 10 (Clark) at 10:21-24 (acknowledging that JetBlue "view[s] Delta as [its] main competitor in Boston" and has "for many years"); Tr. Day 3 (McMenamin) at 15:25-16:1 ("The biggest competitor by far in the Boston market would be Delta"); Tr. Day 8 (Swartz) at 36:18-20 (explaining that Delta was American's biggest competitor for corporate customers out of Boston "by far"); DX-0047 at -001 (in response to Delta's growing Boston presence, Paul Swartz wrote to his team: "No surprises with recent announcements.  DL adding flights in BOS. We need to stay close to our customers."); DX-0282 at 21 (internal JetBlue document noting that "[a]bout 90% of Delta's winter 2020 ASM growth touches JetBlue competitive markets").

105.    Delta has grown aggressively in Boston in recent years, including by designating Boston Logan one of its hubs and increasing the number of daily flights, as well as the number of domestic and international routes, to and from Boston.  DX-0111 at -024 ("Since 2015, Delta has

36

doubled the number of markets served from BOS."); DX-0290 at -004 (illustrating how "Delta [has] continue[d] to grow aggressively in Boston"); DX-0395 at -013 ("Delta more than tripled network overlap with JetBlue in BOS in past 5 years and plans to get to 150 daily flights."); Tr. Day 10 (Clark) at 57:6-23; Tr. Day 10 (Clark) at 56:22-57:23 (acknowledging that "about seven years ago, Delta both started growing aggressively in Boston and then started using very . . . aggressive rhetoric, sort of talking about the city differently and started calling it a hub, started saying they wanted to be the number one global carrier in Boston"); *see also* Tr. Day 13 (Israel) at 110:24-111:1 ("[A]s we've heard, Delta has now made Boston into a hub as of a few years ago, so we now again have a city with a hub carrier."); *id.* at 118:4-5; DX-0257 ███████████ ████████████████████████████████████████████████████████████████████████ ██████████████████.

106.    Delta recognized that ███████████████████████████████████████████ ████████████████████████████████████████████ DX-0258 at -002.

ii.    **JetBlue Had Limited Ability to Keep Up with Delta's Ascendant Growth in Boston Because It Lacked the Global Network to Compete with Delta's Global Offering**

107.    As Delta grew, JetBlue faced a significant threat from Delta in Boston.  Tr. Day 2 (Hayes) at 12:14-13:3 (explaining that, "as Delta grew Boston," Mr. Hayes "was concerned about how sustainable some of our network here would be in the face of them really focusing on [Boston] and bringing the vast benefits of their scale"); Tr. Day 10 (Clark) at 62:5-10 (explaining that Delta was "advertising their strengths and tools that we don't have," such as "being a global airline because their fleet allows that" and "having first class seating," to "point[]out . . . the gaps or weaknesses that JetBlue has in our model"); Tr. Day 10 (Clark) 62:5-10 (explaining that "[t]he threat from Delta in Boston was extremely large.  It was, as mentioned, our second largest focus city.  It was a threat to our profitability and our financial stability.  So strategically and financially,

it was important that we competed hard here and did everything we could to compete effectively against Delta"); DX-0389 at -004 (relating to an internal meeting with various JetBlue teams in light of "Delta's recent announcement to grow BOS to 150 flights" and Delta's "new strategy plan to overtake JetBlue as the number one carrier at Boston Logan"); DX-0290 at -029 (identifying weaknesses of JetBlue as compared to Delta).

108.    JetBlue became concerned about its ability to remain competitive in Boston and engaged in growth initiatives aimed at responding to Delta's actions; however, these actions were not sufficient to address Delta's threat.  Tr. Day 10 (Clark) at 66:20-67:8 (explaining progress on the "Boston 200 initiative," and noting that, "unfortunately, it wasn't addressing some of the real fundamental gaps we had, such as the ability to compete with Delta's global network"); Tr. Day 10 (Clark) at 74:22-75:5; *id.* at 75:6-13 (explaining that Project Revere "made real meaningful incremental improvements, but it wasn't sufficient" because it "was not resolving the big gaps we had, the big weaknesses, and we were sort of still stuck with those major weaknesses versus Delta"); *see* DX-0391 (presentation prepared for JetBlue's BOS 200 initiative).  Despite concerted efforts over the course of many years, prior to the NEA, JetBlue was left with "big gaps" and "major weaknesses" in its efforts to compete against Delta in Boston.  Tr. Day 10 (Clark) at 75:11-12; Tr. Day 10 (Clark) at 72:1-20 (explaining that JetBlue's comparative weaknesses to Delta "are really fundamental and very difficult to solve weaknesses," including "lack of a global route network," "how [Delta] could get their customers nearly anywhere in the world to far destinations," as well as in the U.S. to small destinations, "frequent flyer redemption program options—we're not in an alliance," "[w]e also didn't have first class products on our fleets," and "[w]e don't have lounges at a terminal"); DX-0290 at -029 (showing SWOT analysis including

38

JetBlue weaknesses in competing against Delta in Boston); *see also* Tr. Day 3 (McMenamin) at 20:20-21:20.

109.    In particular, JetBlue's "simple fleet" was disadvantaged in competing with Delta out of Boston, both internationally and domestically.  Tr. Day 10 (Clark) at 55:7-56:20.  JetBlue lacked the aircraft and global network to offer extensive international travel and lacked the regional jets that could serve smaller destinations, such as Indianapolis and Cincinnati.  Tr. Day 10 (Clark) at 55:7-56:20.

110.    This competitive dynamic was particularly true for corporate customers, who evaluate airline options on a network-wide basis.  Tr. Day 2 (Hayes) at 15:2-16:5 (explaining that Mr. Hayes "knew we had some challenges on the business travel side particularly. . . . we don't have the global frequent flyer program that Delta has, we don't have the corporate sales force of hundreds of people.  We don't have the ability to leverage domestic corporate travel contracts for international contracts.  So as Delta grew internationally, they used that to leverage domestic business travel").

111.    JetBlue had limitations to what it could offer compared to larger, global carriers, which hindered its ability to compete for corporate customers.  Tr. Day 3 (McMenamin) at 13:8-22.  In addition to lacking a global network offering, JetBlue lacked a global loyalty program and certain amenities such as airport lounge access that corporate customers value.  Tr. Day 3 (McMenamin) at 13:8-22.  This presented a significant challenge to JetBlue in competing against Delta for corporate customers.  Tr. Day 10 (Clark) at 55:17-56:20; Tr. Day 3 (McMenamin) at 14:1-14:20 (explaining that, because many corporate customers require global travel, JetBlue was "less relevant in certain programs, or [ ] didn't play the strong role we wanted to. . . . There were many markets where we couldn't compete and we didn't have the same offering").

iii.     **American Could Not Significantly Expand in Boston Because Delta Already Had A Hub Presence There, and Boston is Not Large Enough to Support Two Hub Carriers**

112.    Delta's aggressive growth in Boston also affected American's ability to compete, as Delta could market its increasing number of nonstop flights out of Boston. DX-0076 ("Delta is getting very aggressive with new [domestic] growth."); Tr. Day 8 (Swartz) at 36:21-37:6 (explaining that Delta was "a formidable competitor for corporate customers, specifically in Boston" because "[t]hey just have a bigger network, both internationally and domestic. . . [s]ince I started at American . . . we're only flying into our hubs [from Boston].  And we had very few point-to-point destinations outside of those hubs, compared to a Delta, that had an extensive network, both internationally and domestically.  So it was very hard to compete against them for local Boston accounts that were headquartered here"); Tr. Day 8 (Swartz) at 39:15-18 (explaining that Delta's growth was concerning because "it just becomes harder and harder to compete if the network is much bigger or greater than what you're offering customers"); Tr. Day 8 (Swartz) at 41:19-24 (noting that Delta "had the same premium product, had the same clubs we do in the airport, but they had the direct flights.  And it just was becoming harder and harder for my team to compete without the direct, or without the network"); Tr. Day 13 (Israel) at 151:3-7 (explaining that, as a hub carrier in Boston, Delta "just ha[s] way more resources in that market, and the ability to respond by shifting around planes and entering new routes"); DX-0021 (email explaining in 2019 that, "[i]n short term, we are in for a dog fight in Trans-Atlantic with DL/VS.  Our smaller footprint in DOM market will make it a harder sell and to keep our current position in BOSLHR market.  Long term, expect our overall market share to slip in BOS over next few years if we keep same DOM footprint and BOSLHR becomes more competitive.  We will be fighting to keep AA at a secondary or even tertiary position.  The reality of BOS").

113.    In response to Delta's growth in Boston, American introduced a handful of new routes, specifically Boston-Austin (BOS-AUS), Boston-Indianapolis (BOS-IND), and Boston to Raleigh-Durham (BOS-RDU).  Tr. Day 4 (Raja) at 118:7-21 (discussing the addition of new routes in Boston).

114.    The limited growth that American could support in Boston – adding a handful of new routes – did not materially improve American's relevance in Boston.  Tr. Day 4 (Raja) at 179:14-17; *see also* M. Mancini Dep. Tr. (4/22) at 95:13-17.

115.    Prior to the NEA, American had no major growth aspirations or overarching strategic mandate in Boston.  Tr. Day 15 (Znotins) at 66:18-67:1; *id.* at 67:9-12 (noting that he "wasn't aware of any plans for American" to grow enough in Boston to challenge Delta, and "wouldn't have supported any plans to do that" from a financial perspective);  Tr. Day 4 (Raja) at 215:6-13 (explaining that adding a small number of flights in Boston was only "going to start to get us to [ ] the same marginal spot we were in in LaGuardia," and American needed to figure out "how do we approach this in a way where we have a real relevance, a broad and deep network for customers both in New York and Boston"); Tr. Day 8 (Swartz) at 43:14-17 (noting that adding new point-to-point routes was "not at all" sufficient to allow American to compete with Delta's network in Boston); *see* Tr. Day 4 (Raja) at 177:18-178:21 (explaining that one-off emails to business people do not represent American's plans for Boston and that American never had plans to grow to above 120 departures in Boston prior to the NEA).

### iv.    Growth Options in Boston Are Limited Due to Gate Constraints

116.    As in New York City, American and JetBlue are each limited in their ability to increase their competitiveness in Boston through growth.  Tr. Day 4 (Raja) at 214:6-11.

117.    Boston Logan is gate constrained, which has the effect of limiting airline growth, similar to the slot constraints at JFK and LGA.  Tr. Day 4 (Raja)  at 214:5-215:13 (explaining that,

" [in] Boston, the critical path is not slots; it's gates.  And in Boston . . . you can't simply build more gates. . . . Its gate constraints effectively act as a form of slot constrain[t]."); *id.* at 121:23-121:3 (explaining that there are gate utilization requirements in Boston and gates can be lost if they are not used); *id.* at 121:9-122:12; *see also* Tr. Day 4 (Kirby) at 63:5-12 (explaining that, although Boston is not slot controlled, "it has very limited available capacity for growth").

### v.      Neither American Nor JetBlue Has Market Power in Boston

118.    As in New York City, American and JetBlue do not have market power in Boston. Tr. Day 13 (Israel) at 160:13-18.

119.    Even with the NEA, JetBlue accounts for approximately 31 percent of the departures from Boston.  Tr. Day 1 (Hayes) at 181:22.  There are only three nonstop routes in Boston for which American and JetBlue provide more than half of current capacity and revenue share and coordinate schedules under the NEA: Boston to Washington, DC (BOS-DCA), Boston to Miami (BOS-MIA), and Boston to Los Angeles (BOS-LAX).  PX0461 (Miller Report[6]) at Exhibit 16; DX-0736; *see also* DX-0120 (First Amendment to the Mutual Growth Incentive Agreement, which carves out six Boston nonstop overlap routes from the MGIA).  On BOS-DCA,

---

[6] At various times throughout this trial, Plaintiffs have sought the admission of the Parties' expert reports into evidence, and Defendants have consistently objected to the admission of those reports on hearsay grounds. *See, e.g.*, Tr. Day 16 at 89:22-90:9.  The Court has tentatively overruled those objections and admitted the reports into evidence, noting that it reserves the right to amend its ruling.  *See id.* at 90:12-90:14 ("I'm going to allow the request to admit the expert reports into evidence, subject to the caveat that I reserve the right to reverse myself after I've reviewed everything . . . .").

Defendants cite to some expert reports in the Proposed Findings of Fact. However, Defendants clarify that, by doing so, they are not waiving their argument that the expert reports constitute inadmissible hearsay.  It would be plainly unfair to Defendants if, for example, Plaintiffs affirmatively cited the reports in their post-trial materials, while Defendants remained unable to do so to avoid potential waiver.  Defendants further note that no citation to an expert report in this document constitutes sole support for a dispositive fact.

there is nonstop competition from Delta (and from United to Washington Dulles International Airport (IAD)).  *Id.*  On BOS-MIA, there is nonstop competition from Southwest, Spirit, and Delta. *Id.*  On BOS-LAX, Delta, United, and Alaska offer nonstop service.  *Id.*  Of the remaining routes for which American or JetBlue offered nonstop service in 2019, they did not compete on 36 of them.  DX-0736; Tr. Day 13 (Israel) at 161:13-18 (discussing Israel Demonstrative at 12, which shows that there are 36 domestic nonstop non-overlap routes in Boston).

120.    Moreover, for the past few years, JetBlue is now locked in a fierce competitive battle with Delta, which in recent years first declared Boston a global priority, and subsequently a hub city.  Tr. Day 13 (Israel) at 155:5-6; Tr. Day 10 (Clark) at 56:22-57:5 (acknowledging that, "about seven years ago, Delta both started growing aggressively in Boston and then started using very . . . aggressive rhetoric, sort of talking about the city differently and started calling it a hub, started saying they wanted to be the number one global carrier in Boston").  "Once a legacy carrier declares a city like Boston a hub, that legacy carrier becomes very strong in that city."  Tr. Day 13 (Israel) at 155:7-8.  Delta is specifically targeting competition with JetBlue.  Tr. Day 13 (Israel) at 157:12-14; DX-0259 at -0009 ███████████████████████████.

121.    JetBlue is better positioned than American to compete with Delta in Boston.  *See, e.g.*, Tr. Day 10 (Clark) at 54:9-19 (explaining that Boston is the second largest city in JetBlue's network).  But, with Delta having the advantages of a hub carrier in vying with JetBlue for the position of "number one" carrier in Boston, it is unlikely that JetBlue individually, or JetBlue and American collectively through the NEA, will be able to exercise market power.  Tr. Day 13 (Israel) at 160:9-18.

## III.   THE NORTHEAST ALLIANCE WAS DESIGNED TO OVERCOME AMERICAN'S AND JETBLUE'S RESPECTIVE CHALLENGES IN NEW YORK AND BOSTON

### A.   Background on Airline Joint Ventures

122.   Airline partnerships are common and can be structured in various ways, including simple codeshare-only partnerships, global alliances that serve as an umbrella for more extensive bilateral partnerships amongst member carriers, and integrated joint ventures or joint businesses. Tr. Day 4 (Raja) at 190:4-191:1; PX-0120 at -048 (summarizing types of airline partnerships).

123.   Integrated joint ventures or joint businesses typically feature codesharing, revenue or profit sharing, schedule and capacity coordination, and loyalty reciprocity.  *See* Tr. Day 14 (Israel) at 18:4-18:13; Tr. Day 4 (Raja) at 190:21-191:1; Esposito Dep. Tr. (06/22) at 84:10-84:13, 85:7-85:11.

124.   International joint ventures also typically involve price coordination.  Tr. Day 1 (Hayes) at 168:2-5 (explaining that "the most important part" of international joint ventures is pricing coordination); Tr. Day 6 (Parker) at 64:10-13; Tr. Day 14 (Israel) at 17:15-17 (noting that international joint ventures generally involve pricing coordination).  As a result, carriers can apply for and obtain antitrust immunity from the U.S. Department of Transportation (the "DOT") before entering into and implementing such partnerships.  *See* 49 U.S.C. §§ 41308, 41309; *see, e.g.*, Final Order at 1, *Joint Application of American Airlines, Inc., British Airways PLC, OpenSkies SAS, Iberia Lineas Aereas de Espana, S.A., Finnair OYI, and Aer Lingus Group DAC - Approval of and Antitrust Immunity for Alliance Agreement*, DOT-OST-2008-0252 (Dec. 21, 2020) (granting antitrust immunity to the addition of Aer Lingus in the **one**world alliance); Tr. Day 4 (Raja) at 190:21-191:8; *see also* Nocella Dep. Tr. (4/22) at 132:4-13, 133:4-17.

125.   In determining whether to grant antitrust immunity to international joint ventures, the DOT must find that the joint venture "is not adverse to the public interest."  49 U.S.C. § 41309

(b).  Applying this standard, the DOT has approved many international joint ventures, and in doing so, has made it a prerequisite for the airlines to implement revenue sharing in order to obtain antitrust immunity.  Tr. Day 14 (Israel) at 18:6-13; Tr. Day 11 (Miller) at 83:23-84:2; Tr. Day 7 (Raja) at 180:20-181:9.  In a retrospective study of the competitive effects of these international airline joint ventures, Dr. Israel found that they have been procompetitive, expanding output on nonstop and connecting routes and lowering prices.  *See* Tr. Day 14 (Israel) at 18:14-19:16.

126.    International joint ventures facilitate growth by enabling airlines to offer more destinations and convenient schedules, seamless travel across airlines, and the ability to earn loyalty rewards on other carriers.  Tr. Day 15 (Znotins) at 71:7-72:5 ("If you look around the world and you see partnerships being built, not just with American Airlines, but other airlines, when a partnership is launched, network growth follows that launch of a partnership."); Guenther Dep. Tr. (06/22) at 22:24-26:5 (explaining that "alliances and partnerships are an important part of Delta's business" because they enable Delta to provide a "better [ ] experience" through "connecting opportunities, lounge, loyalty agreements, coordination if we're in a joint venture on time channels"); Nocella Dep. Tr. (4/22) at 97:14-16, 97:19-98:13, 98:16-99:8, 99:110-100:12; Esposito Dep. Tr. (06/22) at 30:21-32:5 (explaining that Delta partners with other airlines to expand its network).

127.    For example, American's Vice President of Network Strategy credits American's increased number of flights to Madrid to its partnership with Iberia, as the partnership allows American's customers to connect through Madrid to other destinations and attract travelers who are loyal to Iberia to consider American's options.  Tr. Day 15 (Znotins) at 71:16-72:5 (explaining that, due to its partnership, "passengers in Spain that would otherwise just be loyal to Iberia but are now willing to consider American Airlines").  American similarly attributes its frequency of

flights to London to its partnership with British Airways.  Tr. Day 15 (Znotins) at 71:16-18; *see also* Tr. Day 15 (Znotins) at 71:24-72:5 (explaining that this is "not just true for us. . . . Delta, for example, flies heavily to Amsterdam and Paris where they have partnerships").

**B.      The NEA Unlocked American's and JetBlue's Respective Strengths and Addressed Their Weaknesses to Better Compete with Delta and United**

128.    From American's perspective, the NEA offered an innovative solution for American to address its historically weaker position in New York City due to slot and other infrastructure constraints.  DX-0037 at -002 ("Goals" for the NEA include: "Address AA/B6 'incomplete' customer proposition relative to DL/UA in NYC"; "Maximize customer value and connectivity in JFK, LGA, and BOS"; and "Improve overall customer relevance / competitiveness in the Northeast region"); PX0369 at -006 ("Partnerships with Alaska and JetBlue enable us to provide customers with both network breadth and depth across our domestic system"; "We build upon our organic network by improving the quality of service we offer customers through schedule depth (e.g., flight frequency, nonstop vs one-stop routes) and expanded network access to new city pairs."); Tr. Day 4 (Raja) at 222:25-223:18 ("[T]he project charter of what we called Project Garland, which was what later turned into the NEA . . . [was] how do we go and create a real customer proposition that can go and compete, one that drives connectivity . . . , be able to cover the largest markets with a competitive schedule pattern, similar number of frequencies, and be able to potentially even open new markets that play to the strengths of these two respective carriers."); Tr. Day 5 (Isom) at 29:4-30:5 (explaining that the NEA was a "really smart move" because American "had a historically weaker New York, and [the NEA] is an opportunity for us to [im]prove that and [im]prove it quickly. . . . [a]nd [work around] a lot of constraints that didn't allow us to address the shortfalls in the New York region on our own").  This, in turn, would enable American to compete more effectively against Delta and United.  Tr. Day 5 (Isom) at 29:15-16 (explaining that

the NEA enabled American and JetBlue "to actually be a really viable competitor, versus Delta and United"); Tr. Day 15 (Znotins) at 64:17-23 (explaining that "the NEA really gave me hope that being able to combine our schedules and our frequent flyer programs and have reciprocity among our frequent flyer programs with JetBlue gave us the schedule depth and breadth to compete with Delta and United in the New York market when we otherwise had no way to do that"). Similarly, in Boston, the NEA offered American the opportunity to respond to Delta's aggressive growth and grow its Boston network despite infrastructure restraints.  Tr. Day 4 (Raja) at 214:5-216:7 (explaining that, as Delta was accumulating gates in Boston, American was losing them and American "need[ed] to figure out how [it] can get ahead").

129.    JetBlue saw the NEA as a "generational" opportunity to grow in New York City, after having tried unsuccessfully for years to obtain slots.  Tr. Day 2 (Hayes) at 12:7-9 ("[T]he NEA presented a generational opportunity, particularly coming out of COVID, to accelerate . . . growth, and people in New York are happy."); *id.* at 12:25-13:3, *id.* at 13:20-14:8; Tr. Day 5 (Laurence) at 239:20-240:5 (explaining that the NEA "enabled . . . JetBlue growth at LaGuardia from about 15 to 55 flights at LaGuardia. . . . our ability to grow and gain real traction had a real presence at LaGuardia.  It allowed us to grow at JFK, but more importantly be able to grow at the critical times of the day, particularly utilizing afternoon slots"); Tr. Day 6 (Laurence) at 10:15-24 (explaining that the NEA offered "a path to recover . . . quickly [from COVID] and recover faster than other airlines. . . . I saw the NEA as a path to really turbo charge JetBlue's growth out of COVID"); Tr. Day 6 (Laurence) at 26:9-14 (noting that "[t]he Northeast Alliance increased the growth opportunities that . . . JetBlue would have, in addition to those that were noted in that quarterly network review"); Tr. Day 9 (Friedman) at 44:19-45:6 (explaining that, "[a]t the end of the day, the NEA creates a unique opportunity for JetBlue and American to better compete for its

customers against Delta and United, to create a third competitor. . . .   The NEA allows us the slot opportunity in New York and the commercial incentive and the operational flexibility in Boston to continue to grow"); DX-0233, at -012-014 ███████████████████

██████████████████████████████████████████████

████████████████████████████████████████████ ;

Tr. Day 8 (Friedman) at 300:2-20 (stating that JetBlue's plans to obtain JFK slot pairs were "aspirational" and that, while JetBlue has "always built into these five year plans [] growth into JFK," it was "never really clear how that growth into JFK would actually manifest" as "[i]t's extremely difficult to grow at JFK").

130.    JetBlue also viewed the NEA as an opportunity to continue to grow in Boston and stay relevant for both business and leisure travel, especially in the face of the competitive threat from Delta.  Tr. Day 2 (Hayes) at 12:25-13:3 (explaining that JetBlue "wanted to stay large in Boston, we wanted to stay relevant in Boston for both business and leisure travel, and the NEA was critical to that"); 16:1-5, 19:23-20:2; Tr. Day 8 (Friedman) at 306:22-307:9 (explaining that "the ultimate goal" of the NEA was to "to create the most competitive network in New York City and Boston, as possible.  Certainly to compete better against Delta and United"); Tr. Day 3 (McMenamin) at 20:7-11 (explaining that the NEA "does more to help [JetBlue] than we could ever achieve on our own" to improve JetBlue's position versus Delta); Tr. Day 3 (McMenamin) at 22:8-10; Tr. Day 10 (Clark) at 75:14-77:7 (explaining that the NEA allows JetBlue to "fulfill[] all those major gaps and weakness[es] that we were unable to do on our own, and . . . compete for these customers that historically we couldn't win because of our lack of tools that we now can really compete for," becoming "a second option for these corporations and these individuals who have global needs," which normally requires "a global network [that] takes decades and decades

and . . . billions of capital investment" and "could not have [been accomplished], with any global feasibility, . . . by ourselves in any reasonable amount of time").

131.    In addition, the NEA provided JetBlue with an opportunity to grow its overall brand awareness, which was important to JetBlue's national growth strategy.  Tr. Day 3 (McMenamin) at 20:21-21:20 ("[The NEA gives JetBlue] global relevance and having a truly global network."); Tr. Day 3 (McMenamin) at 20:7-22:10 ("[The NEA] has definitely given us more relevance, and people who may not have looked at JetBlue on their own are definitely giving us a second look."). By growing its footprint, JetBlue is able to better compete with the legacy airlines, enhancing overall industry competition.  Tr. Day 2 (Hayes) at 12:3-9; *id.* at 85:14-22 (explaining that "the NEA is enabling us to do more of what we do best," which is "think outside the box and be creative in order to have sustainable, competitive business models to . . . compete with these four large legacy airlines"); Tr. Day 2 (Hayes) at 85:23-86:1 (agreeing that "the NEA has helped the state of competition in the US airline industry," and noting that "a bigger JetBlue is good for competition").

132.    JetBlue further believed that the NEA enabled JetBlue to attract leisure and corporate customers by offering an expanded network, with the ability to earn and burn travel points on American's global network.  Tr. Day 2 (Hayes) at 16:14-21 (noting that "one of the attractive elements of the NEA for us was American's commitment to grow some of those long-haul markets so we could offer those benefits to our customers, including our TrueBlue members, who . . . want enough destinations that [they] can fly . . . [and] other airlines that [they] can redeem on"); Tr. Day 2 (Hayes) at 29:20-24 (explaining that "we don't fly to Hawaii . . . so the . . . ability to redeem your points to Hawaii on American . . . will be a huge benefit"); Tr. Day 6 (Laurence) at 20:13-24 (describing the benefits of the NEA to consumers, including "the frequent traveler, the ability for customers to connect globally on American[,]" "JetBlue's ability to actually

49

grow in LaGuardia" by "tripling service there," "the ability to see Newark at 70 flights a day, [and] the growth in the afternoon at JFK").

133.    Though the NEA positioned American and JetBlue to improve its competitive position in New York and Boston, it did so without changing either airline's business model.  Tr. Day 2 (Hayes) at 9:4-10:15 (testifying that JetBlue has no plans to stop teaching new crewmembers about "how different we are," including with respect to JetBlue's "unique positioning of commitment to competitive prices, , . . also customer centric service"), 53:16-54:21 (testifying that JetBlue has not changed nor will change its "unique business model"); PX0536 (orientation materials for new crewmembers containing slides about JetBlue's unique business model); Tr. Day 7 (Raja) at 102:3-103:16 (explaining that the goal of the NEA was to "lean into the fact that we're really different," and "JetBlue should be more like JetBlue, American should be more like American"); PX0369, at 60 (describing seamlessness as "[l]everaging the unique competitive advantage offered by each partner").  This aligns with American's general "Partnership 2.0" strategy.  Tr. Day 7 (Raja) at 88:6-9; *id.* at 99:16-100:16; *see also* PX0369 at -0007, -0010, -0035; PX0369 at -0055-57 (explaining that, "outside of the contours of the partnership, carriers can be unaligned . . . so long as they are credibly committed to enhancing network value within the scope of the partnership.").

134.    The terms, core features, and benefits of the NEA are described in detail in Section III.E, below.

## C.    Development and Negotiation of the NEA

135.    Vasu Raja, American's Chief Commercial Officer, conceived the NEA in late 2019 and initiated discussions with JetBlue executives shortly thereafter.  Tr. Day 4 (Raja) at 95:6-95:14, 206:12-206:19.

136.    After Mr. Raja proposed the NEA to JetBlue, American and JetBlue began to negotiate the NEA in earnest in the first half of 2020.  Tr. Day 4 (Raja) at 95:13-95:18.

137.    In April 2020, American and JetBlue formed a diligence team known as the "Clean Team," comprised of several American and JetBlue employees, to evaluate the business case for the NEA.  DX-0042, at -0002 (proposal for the NEA prepared by the Clean Team in April 2020 that "contains revenue-sharing and capacity governance to ensure mutual benefit for the carriers and enhanced experience for our customers"); DX-0317 at -0001 (email chain from April 8, 2020 scheduling a Clean Team meeting between American and JetBlue); Tr. Day 5 (Laurence) at 108:12-15; Tr. Day 4 (Raja) at 219:8-220:1.  The carriers used a Clean Team to prevent the exchange of potentially competitively sensitive information to individuals who are engaged in day-to-day network planning.  Tr. Day 5 (Laurence) at 108:22-109:10.

138.    The goal of the Clean Team was to create a combined network that would be at least on par with competitors in New York and Boston.  Tr. Day 12 (Schweinzger) at 243:1-6; DX-0038 at -008 ("Network Optimization Mission: Offer NYC and BOS customers a combined network that is on par with competitors").

139.    For this exercise, American proposed five "joint network principles:"  (1) to expand network coverage in the largest New York O&Ds to better compete with Delta and United; (2) to play to each airline's strengths by, for example, leveraging American's presence in the Midwest and JetBlue's "home carrier" presence in New York and Boston and optimizing use of aircraft; (3) to create transatlantic connectivity; (4) to launch new flights where success would be enabled by the partnership; and (5) to evaluate how to optimize the parties' offering in Boston.  Tr. Day 12 (Schweinzger) at 243:21-246:20; DX-0038 at -009.  These principles were agreed upon by

51

members of the American and JetBlue Clean Team to guide the process of iterating upon and ultimately finalizing a consensus "optimized schedule." Tr. Day 12 (Schweinzger) at 247:13-17.

140.    The Clean Team engaged in this schedule optimization exercise assuming the following parameters. First, the Clean Team assumed a baseline using an actual September 2019 schedule. Tr. Day 8 (Fintzen) at 180:21-24. The Clean Team relied on September 2019 as the baseline because the COVID-19 ("COVID") pandemic significantly impacted industry demand in 2020. Tr. Day 14 (Israel) at 107:11-19; Tr. Day 8 (Pack) at 227:7-9 (explaining that this decision was made because "we were doing this [exercise] in spring of 2020, and it was [] the most recent comfort that we had of a schedule"). From that baseline, the Clean Team built the optimized schedule assuming a post-COVID world in which demand returned to pre-COVID levels. Tr. Day 14 (Israel) at 107:11-19 (noting that "[t]he goal is to compare a post-COVID world, which is generally called 2023 throughout the discussions, using 2019 as the best estimate we have of that. Because . . . everyone in the industry has been to try[ing] to get back to 2019 by 2023"); Tr. Day 8 (Fintzen) at 92:12-15 (noting that he "felt the right financial analysis would be to look at that 2019 starting point and that . . . NEA world in . . . 2023."); Tr. Day 8 (Fintzen) at 104:9-23.

141.    As part of that assumption, the Clean Team ensured that it had sufficient funding of aircraft for the optimized schedule using each airline's existing fleet and order book (i.e., the planes ordered by an airline and the expected delivery dates). Tr. Day 8 (Fintzen) at 69:13-70:10; Tr. Day 8 (Pack) at 188:9-17.

142.    The final optimized schedule was referred to as the "v2" schedule. Tr. Day 12 (Schweinzger) at 248:5-17; Tr. Day 8 (Pack) at 181:7-16. The "v2" schedule was completed by May 20, 2020. Tr. Day 13 (Schweinzger) at 24:1-8; Tr. Day 8 (Pack) at 189:10; PX-0288 at -001 ("v2 Optimized Schedule Data Pack-Clean Team-20 May"). The schedule showed that the NEA

could create 13 more domestic nonstop markets and more long-haul international markets, offer more daily seats and better coverage, and improve the frequency of flights.  Tr. Day 4 (Raja) at 223:25-224:24; PX0279 at -003.

143.    The Clean Team compared the "v2" schedule to the September 2019 flown schedule to determine the incremental value of the NEA using American's proprietary "Raven" forecasting tool.  Tr. Day 13 (Schweinzger) at 24:22-25; Tr. Day 8 (Pack) at 181:13-20.  Raven takes schedules as inputs and runs a series of demand forecasting and optimization algorithms to create an output file, which predicts how traffic will flow across the new schedule compared to the prior schedule.  Tr. Day 12 (Schweinzger) at 248:5-17; Tr. Day 8 (Pack) at 181:13-20.

144.    At American, members of the Clean Team presented the results of the Clean Team exercise to its executives in May 2020.  Tr. Day 13 (Schweinzger) at 24:1-6 (explaining that the results of the v2 schedule optimization exercise and its corresponding Raven analysis were presented to Vasu Raja and the senior leadership team "somewhere between the 22nd of May and probably the 26th or 27th").

145.    Upon reviewing the results of the Clean Team exercise, which showed significant benefits from the NEA's optimized schedule, Mr. Raja recommended to American's management that American should enter into the NEA, concluding that schedule optimization would be a critical component in creating customer value necessary for its success.  Tr. Day 4 (Raja) at 225:25-227:6; Tr. Day 4 (Raja) at 223:23-224:1 ("Well, look, I jokingly called it the eureka slide . . ."); PX0279 at -0030.

146.    Robert Isom, American's Chief Executive Officer, also supported the NEA based on his review of the summary of the outputs of the v2 optimized schedule.  *See, e.g.,* Tr. Day 5 (Isom) at 77:8-15; DX-1075A at -009.

147.    American presented the results of the Clean Team's v2 optimization exercise to the Board of Directors in July 2020.  Tr. Day 4 (Raja) at 242:5-19; DX-0025 at -066.  American explained that "[s]eparately, AA and B6 are distant 3rd/4th place competitors in major NYC segments[,]" meaning "[n]either AA nor B6 can offer customers a network that is competitive with DL or UA" because "[s]lot/gate constraints prevent both from organically developing a competitive network."  DX-0025 at -063.  The Board presentation explained that the NEA allows American "to rectify [its] uncompetitive position in ways not possible with a simple codeshare" and that schedule optimization could improve American's "Transcons" and "Transatlantic" product offerings out of JFK, better serve business and leisure customers and upgauge flights at LGA, and grow presence to the "Mid-con" destinations from Boston.  DX-0025 at -064.  Mr. Raja also explained to the Board the outputs of the Clean Team, highlighting the schedule improvements, new flights, and increased competitiveness against Delta and United, all of which were enabled by the NEA.  Tr. Day 4 (Raja) at 243:7-245:14; DX-0025 at -064, –065.

148.    JetBlue presented the NEA to its Board of Directors in June 2020 based on the Clean Team's v2 optimization work.  Tr. Day 2 (Hayes) at 16:22-17:2; DX-0356, at -058. JetBlue's strategic rationale for entering the NEA was three-fold.  Tr. Day 2 (Hayes) at 17:3-10; DX-0356 at 0058.  First, JetBlue concluded that the "combined network" as a result of the NEA would "turbocharge JetBlue Focus City strategy" by accelerating JetBlue's standalone growth plans in Boston through "increased breadth and depth" of network, expanding customer utility at JFK through "asset pooling and schedule optimization," and "gain[ing] traction with corporate accounts."  DX-0356 at 0058.  Second, JetBlue concluded that the NEA would "increase customer utility" by providing customers with "more new 2023 destinations than JetBlue standalone plans," "additional international and domestic connections," and "earn-and-burn capabilities on linked

Loyalty programs," along with allowing JetBlue to bring fares down and add "seats to more destinations from BOS and NYC" and create "[a] more relevant competitor in Legacy-heavy NYC markets." DX-0356 at -058. Third, JetBlue concluded that incentives provided in the NEA would encourage "both carriers to grow capacity in relevant markets" and "[d]rive capital-light earnings growth for JetBlue through 2023 and beyond." DX-0356 at -058. JetBlue estimated the total benefit from the alliance to be over USD 200 million annually. DX-0356 at -059. These strategic benefits "would allow [JetBlue] to disrupt more." Tr. Day 2 (Hayes) at 32:25-33:4.

149.     Following this validation effort and continued negotiations, the core NEA agreements were signed on July 15, 2020, and the transaction was publicly announced the next day. *See* PX-0001-a at -0002; Tr. Day 4 (Raja) at 95:13-95:23.

### D.     In the Midst of NEA Negotiations, COVID Created Massive Disruption to the Entire Airline Industry

150.     From time to time, world events can cause significant decline in demand—also known as negative demand shocks—for airline travel. Tr. Day 12 (Lee) at 70:5-16. Notable examples include the 9/11 terrorist attacks, the 2008 global financial crisis, the 2008 fuel shock, and most recently, COVID. *See*, *e.g.*, Tr. Day 6 (Parker) at 92:20-93:1 (explaining that, "starting in 2005, . . . half of the capacity of the US airline industry was in bankruptcy[,] . . . the result of some extraordinarily difficult times. September 11th, of course, the startup of a number of low cost and ultra low cost carriers, the global financial crisis, SARS, all of these things that effect our industry"); Tr. Day 15 (Znotins) at 88:18-89:1 (explaining that airline schedules constantly require optimization because "the world changes . . . there's a volcano in Iceland that's impacting transatlantic travel, there's a MAX grounding, there's SARS in Asia, there's a pandemic[;] we have to be continually rewriting our schedules and continually changing our plans to address where demand is and is going to be"); Tr. Day 12 (Lee) at 70:1-4 (noting that, "during the Great

Recession, which was a really, really bad time, [LCCs] slowed their capacity growth, as would be expected, because demand was so bad"); Tr. Day 12 (Lee) at 70:9-16 (acknowledging the impact of "9/11, the fuel shock of 2008" on the industry); Tr. Day 12 (Lee) at 177:11-15 (explaining that 2020 was a "pretty rotten year for the airline industry" due to COVID); DX-0034 at -0001 (summarizing significant capacity reductions across airlines necessitated by COVID).

151.    COVID posed a "mortal threat" to the airline industry by completely collapsing demand for airline travel.  Tr. Day 5 (Isom) at 31:18-32:1; *see also* Tr. Day 1 (Hayes) at 124:4-7 (stating that COVID had a "devastating impact . . . on our industry"); DX-0041A at -0045 (noting that the "[p]andemic has created unprecedented uncertainty in demand and revenue."); *see also* Burse Dep. Tr. (6/22) at 141:5-7, 141:11-142:25, 143:3.

152.    By March 2020, American's passenger revenue had declined by 90 percent.  Tr. Day 4 (Raja) at 216:17-217:12.  American was losing as much as $100 million per day.  Tr. Day 5 (Isom) at 31:21-25; *see also* Tr. Day 1 (Hayes) at 226:23-227:3 (explaining that, by "five months into COVID[,] [t]he airline industry was clinging from its fingertips . . . losing millions of dollars a day").

153.    American feared that it could take five years to overcome the effects of the pandemic.  Tr. Day 5 (Isom) at 32:4-9.

154.    In the face of demand for airline travel collapsing overnight, American had to enter "survival mode" and was forced to reevaluate its pre-pandemic plans.  Tr. Day 15 (Znotins) at 61:6-14; Tr. Day 4 (Raja) at 202:4-7.  The Northeast, in particular became "unsustainable" for American.  Tr. Day 4 (Raja) at 219:1-6.

155.    The pandemic similarly changed demand for flying at JetBlue overnight.  Tr. Day 5 (Laurence) at 178:23-25.  JetBlue had no choice but to greatly reduce flying and significantly rework its network.  Tr. Day 5 (Laurence) at 178:25-179:1.

156.    The effects of COVID have remained for longer than many in the industry expected.  Tr. Day 15 (Znotins) at 61:12-14 ("No one knew how long it would be at that time; and, actually, most of us thought it would be much shorter than it ended up being."); Tr. Day 6 (Laurence) at 10:21-22 ("I had assumed a more linear recovery than we actually experienced"); Tr. Day 5 (Laurence) at 220:23-221:1 ("We would think we were on the road to recovery and then we would hit a variant or something else would come up, and so every time we thought we were recovering we would fall down a month later").

157.    In particular, corporate business travel still has not recovered.  Tr. Day 1 (Hayes) at 124:8-9; Tr. Day 2 (Hayes) at 44:14-47:8 (explaining that the specific challenges that JetBlue faced coming out of the Omicron variant of COVID – schedule reductions and capacity reductions – are related to pilot attrition levels, among other things); *see* Tr. Day 7 (Raja) at 141:7-142:7 (explaining that "3 percent of our business demand was . . . same day travel," but now it is "less than 1 percent and trended down . . . .[W]e're starting to square ourselves up to the reality that our true competitor in this market . . . is not the train, but the Zoom call," and noting that demand for the Boston-LaGuardia route is down by 30 percent post-COVID, and "seems pretty unlikely that it comes back . . . in the Northeast especially, high-frequency business travel, same day stuff has changed a lot").

**E.    Core Features of the NEA and the NEA Agreements**

158.    In July 2020, American and JetBlue publicly announced that they had entered into the Northeast Alliance.  DX-0261 at -0002; Tr. Day 4 (Raja) at 95:21-95:23.

159.    The NEA was established through several agreements, which together create a relationship based on codesharing, schedule optimization, revenue sharing, reciprocal loyalty benefits, and joint corporate customer benefits: (1) the Northeast Alliance Agreement (DX-0128), as amended (DX-0116; DX-0122; DX-0123) ("NEA Agreement"); (2) the Mutual Growth Incentive Agreement (DX-0093), as amended (DX-0120) ("MGIA"); (3) the Codeshare Agreement (DX-0114); (4) the Bilateral Special Prorate Agreement (DX-0115); (5) two Frequent Flyer Program Agreements (DX-0117; DX-0118); and (6) multiple Slot Lease Agreements (DX-0124; DX-0125; DX-0140; DX-0144).

### i.    Geographic Scope of the NEA

160.    The NEA includes American's and JetBlue's flights to/from Boston's Logan Airport and to/from JFK, LaGuardia, and Newark airports (collectively, the "NEA Airports"), except JetBlue transatlantic flights.  DX-0128 ¶ 2.1 (Section 2.1 of the NEA Agreement states: "The NEA will cover all NEA Services [i.e., flying on NEA Routes]," which are defined as "(a) all routes for all Short-Haul Services of JetBlue . . .; (b) all routes for all Short-Haul Services of American . . .; and (c) all routes for all Long-Haul Services of American[.]"[7]).

161.    American and JetBlue narrowed the scope of schedule optimization and revenue sharing in the NEA in an effort to alleviate competitive concerns expressed by the U.S. Department of Justice and the DOT.  *See* DX-0185 at -0001-0004 (listing and describing six major modifications to the NEA to alleviate competitive concerns); Tr. Day 7 (Raja) at 163:17-164:17.

---

[7] "Long-Haul Services of JetBlue . . . between an NEA Airport and an airport in the European Region may be included in the NEA upon commencement of such Scheduled Passenger Services by JetBlue . . . following good faith discussions by the Parties and agreement in writing upon the terms of such inclusion and subject to any necessary regulatory review.  Until such written agreement and the Parties' mutual determination that inclusion would not entail unreasonable regulatory or litigation conditions or risks, any such Scheduled Passenger Services of JetBlue . . . will be excluded from [the NEA] for all purposes."  DX-0128 at -0004.

Specifically, American and JetBlue excluded from schedule optimization and revenue sharing routes on which there is only one or no non-NEA carriers serving the same city pair.  DX-0120 at ¶ 1.1 ("[T]he revenues, costs and Capacity associated with the Excluded Services will be excluded from the calculation of the Mutual Growth Incentive Payments," where "'Excluded Service' means . . . any non-seasonal non-stop Service between two cities (each, a 'City Pair'). . . in which, (a) American . . . and JetBlue . . . are the only carriers providing Non-Stop Passenger Flights for such City Pair, or (b) American . . . and JetBlue . . . both offer Non-Stop Passenger Flights for such City Pair . . . and there is only one other carrier providing Non-Stop Passenger Flights for that City Pair."); Tr. Day 7 (Raja) at 164:22-165:5; Tr. Day 13 (Israel) at 146:11-23.  These routes are referred to as the "carve out" routes (the "Carve Out Routes").  Tr. Day 7 (Raja) at 163:17-23; 164:22-165:2.

162.    At the time of implementation, American and JetBlue identified and excluded from the NEA six Carve Out Routes: Boston-Charlotte (BOS-CLT), Boston-Dallas/Fort Worth (BOS-DFW), Boston-Philadelphia (BOS-PHL), Boston-Phoenix (BOS-PHX), Boston-Rochester (BOS-ROC), and Boston-Syracuse (BOS-SYR).  DX-0120 at ¶ 1.2; *see also* Tr. Day 9 (Friedman) at 25:16-17.

163.    Pursuant to the NEA Agreement, American and JetBlue continuously evaluate whether additional routes should be carved out of revenue sharing and joint scheduling.  DX-0120 at ¶ 1.2 ("The Parties will assess whether any changes to the list of City Pairs is needed from time to time during each calendar year . . . ."); Tr. Day 13 (Israel) at 146:19-23.  Through this process, the carriers have added New York to/from Antigua (JFK/LGA/EWR- ANU) as a seventh Carve Out Route.  Tr. Day 13 (Israel) at 146:14-23.

### ii.      Codesharing

164.     Codesharing is an arrangement in which one carrier (the "marketing carrier") places its airline "code" on another carrier's (the "operating carrier's") operated flight, allowing the marketing carrier to sell seats on the operating carrier's flight.  *See* Tr. Day 4 (Raja) at 82:18-22; DX-0114 at ¶ 2.3, -034-35 (defining "marketing carrier" and "operating carrier").

165.     Within the NEA, codesharing enables American to market and sell seats on in-scope JetBlue's flights and vice versa.  DX-0114 at ¶ 2.1 ("The Parties shall mutually designate certain flights on which the Parties shall place their respective Codes (each, a 'Codeshared Flight'), which may include flights operated by their Authorized Affiliates and Authorized Wet Lessors, serving the city-pairs (each city-pair, a 'Codeshared Route') identified in writing via email concurrence by the Parties from time to time without formally amending this Agreement."); *see also* Tr. Day 8 (Fintzen) at 130:22-131:3.

166.     Codesharing increases the available travel options for consumers, since American can list all of JetBlue's NEA flights for sale on American's website and JetBlue can list all of American's NEA flights for sale on JetBlue's website.  *See* Tr. Day 7 (Harrison) at 27:21-24 ("[W]hen you have code on each other's flights, they display more prominently and corporate travelers can see all the offering, and so that's why [codesharing] was important.").

167.     Codesharing also can facilitate new connecting flight options and itinerary possibilities that neither carrier could offer on its own.  Tr. Day 4 (Raja) at 82:15-20 (confirming that codesharing "means that you can market your flight and then that passenger can fly it on another airline").

### iii.      Schedule Optimization

168.     Another core feature of the NEA is the optimization of American's and JetBlue's route networks and scheduling of flight times and frequencies at the NEA Airports.  Pursuant to

Section 3 of the NEA Agreement, American and JetBlue agreed to "use commercially reasonable efforts to coordinate the NEA Services, particularly with regard to Codeshared Flights, in order to minimize connecting passenger waiting time and to maximize passenger convenience and service, subject to the Parties' respective operational constraints and commercial considerations." DX-0128 at ¶ 3.1.1; *see also* DX-0114 at ¶ 2.4 (the Codeshare Agreement provides that "[t]he Parties shall use commercially reasonable efforts to coordinate their service schedules to maximize the convenience, and minimize the waiting time, of passengers making connections between the Codeshared Flights and other flights operated by the Parties; *provided, however*, that neither Party is obligated to operate specific flights or service schedules and each Party retains the right to determine the service schedules of its own flights."). American and JetBlue agreed to coordinate the NEA services by, "for the benefit of consumers: endeavor[ing] in good faith to optimize their respective, individual network plans regarding the NEA Services throughout the term of [this] Agreement after due consultation on all aspects of its network plans related to the NEA Services, including with respect to each Party's usage of terminal facilities." DX-0128 at ¶ 3.1.2.

169.     To facilitate these schedule and network changes, American and JetBlue agreed to pool airport infrastructure, such as takeoff and landing slots (essentially rights to operate) and airport gates. DX-0128 at ¶¶ 3.1.2, 3.4.1 ("Each Party may temporarily lease or sublease Slots to the other Party at the NEA Airports from time to time during the term of this Agreement . . . ."). In effect, slots at the NEA Airports are pooled to ensure that the most efficient schedule can be developed. Tr. Day 4 (Raja) at 233:20-234:2. There is no cash remuneration or compensation required for the use of slots at the NEA Airports. Tr. Day 4 (Raja) at 234:7-22.

170.     Section 3.3 of the NEA Agreement also provides that "[t]he Parties will consider opportunities to better utilize assets for the NEA at the NEA Airports and other facilities to obtain

operational efficiencies or other benefits of the NEA and for passengers using services included in the NEA, including, perhaps, having co-located facilities at agreed airports."  DX-0128 at ¶ 3.3. American and JetBlue coordinate their airport facilities and services at the NEA airports to provide customers a more seamless NEA experience.  Tr. Day 4 (Raja) at 231:4-7 (explaining that "there could be a lot of benefits to [American and JetBlue] to use gates more [and] to make it more convenient for customers to be able to connect [across airports]").

171.     Schedule optimization is central to the NEA's facilitation of enhanced competition with Delta and United in the Northeast.  PX0279 at -0027 ("Codeshare-alone does not maximize customer connectivity, nor does it provide . . . the most compelling schedule offering required to be competitive with DL/UA"), at -0028 ("Optimizing the East Coast JV will achieve our goals by creating better customer benefit, combined carrier value, and competitive position"), at -0030 ("A combined network creates a new ability to compete with DL and UA"); Tr. Day 4 (Raja) at 224:18-21 (explaining that "[n]ew patterns provide optimal customer offering"), 225:18-20 (describing the "eureka slide," which shows that "this thing together now creates something which is competitive with Delta and United"); Tr. Day 2 (Hayes) at 20:14-20 (noting that, "by pooling assets with American, we were able to use some of their slots in that period to create better schedules for JetBlue.  And schedule optimization really talks about . . . partnering with American to create connective schedules, so customers who would fly on a mix of JetBlue and American would now have schedules that work"); Tr. Day 2 (Hayes) at 43:23-44:3 (identifying the "real value for this connectivity [as] the optimization of the schedules that come with it.  So that we can make sure that we can create meaningful connectivity, meaningful schedules"); Tr. Day 1 (Hayes) at 173:18-24 (explaining that "jointly optimiz[ing] capacity in the Northeast Alliance scope" "was important" for JetBlue "because we were trying to create a more compelling global alternative to

compete with Delta and United," and "as part of the NEA, American had offered to make investments in certain local markets that we just couldn't fly ourselves"); Tr. Day 6 (Laurence) at 9:18-23 (describing the NEA "as a key [ ] growth engine for us, largely because we could coordinate so that we could connect more customers, but also . . . the opportunities that were there to utilize a pool of slots"); *see also*, Nocella Dep. Tr. (4/22) at 197:6-22.

### iv.    Reciprocal Loyalty Benefits

172.    As part of the NEA, American and JetBlue entered into reciprocal FFP Agreements. DX-0117; DX-0118.  Sections 4 and 5 of both FFP Agreements provide the ability for loyalty customers of JetBlue and American to accrue miles and redeem those miles when flying on either carrier.  *See* DX-0117 at 6-10; DX-0118 at 6-10.

173.    Through these Agreements, American and JetBlue have expanded their frequent flyer programs to provide reciprocal benefits so that American's AAdvantage members can earn miles while flying on JetBlue's NEA flights and JetBlue's TrueBlue members can earn miles while flying on American's NEA flights.  DX-0117; DX-0118; Tr. Day 4 (Raja) at 241:9-23; Tr. Day 2 (Hayes) at 16:14-21; *id.* at 26:6-25; *id.* at 28:13-29:3 (explaining that "earning means I'm flying on an airline, and I'm earning JetBlue TrueBlue points," and "[w]ith the NEA, we can now be flying on American.  So we can bring to our customers markets and routes that we weren't able to do before.  And then the burn part of this is the ability for our TrueBlue members to now redeem on both JetBlue, but also redeem on the American network. . . . And so as a result of that, our True Blue members will have a lot more options," which "will make them feel that they want to stay and grow in our program, maybe switch from another credit card to the JetBlue credit card.  And hopefully [over] time, help us close [the gap to legacy airlines] in operating revenues and loyalty programs"); DX-0057 (NEA customer pitch deck) at -0002 (explaining that the NEA provides "[e]nhanced frequent flyer benefits and reciprocal elite benefits for you and your travelers."); DX-

0055 at -0006 ("AAdvantage status members and TrueBlue Mosaic members have already begun receiving their benefits when traveling either carrier. These benefits include: priority boarding, priority security, and free checked bag allowances.").

174.     Frequent flyer program (or "FFP") integration is particularly important for corporate travelers (and corporate travel programs), which place significant value on frequent flier programs, accruing points, and redeeming benefits. Tr. Day 12 (Carter) at 190:18-20 (explaining that "it's all about discounts, recognition for the travelers, and, frankly, loyalty and services for the travelers, as well."); Tr. Day 12 (Carter) at 200:14-21 (explaining that DX-0057, the NEA corporate customer pitch deck, emphasizes that "this Northeast Alliance was about the traveler," with "more flights, more destinations, more ways to earn and burn on frequent flyer programs, better connectivity, and . . . loyalty benefits that you could accrue across each other's flights."); DX-0057 at -0008 ("Better loyalty benefits for your business travelers."); Tr. Day 12 (Carter) at 199:18-200:1 (explaining that, "if you have status with JetBlue and you're flying on American, we'll know that. You'll . . . have priority security. You'll have priority boarding. You'll have priority baggage, meaning if today you receive free bags because of your status, you would get that on JetBlue and vice versa."); Tr. Day 3 (McMenamin) at 21:5-12.

175.     Both carriers have retained independent interests in their FFP programs and compete to grow their own FFP programs and related products, despite the FFP Agreements. *See* Tr. Day 8 (Fintzen) at 134:17-23 ("[JetBlue] want[s] to grow [its] customer base[]," "bring them to [its] website," "join[] [its] loyalty program," and "get[] [its] co-brand credit card").

176.     To that end, certain portions of the FFP programs, such as branded credit cards, are excluded from the terms of the NEA. Tr. Day 1 (Hayes) at 198:9-198:19 (explaining that, when travelers "are flying on us and they sign up into our loyalty program, TrueBlue, or they become a

Mosaic customer and they get the JetBlue credit card, or they buy one of our vacations or hotels, because they're on a JetBlue flight, all of those revenues sit outside of the partnership with American and are retained by JetBlue, and those are very substantial"); Tr. Day 2 (Hayes) at 59:7-59:12 (explaining that "the earn and burn related to that specific flight goes into the MGIA.  But credit card revenues, which is where, frankly, you make most of your money, do not"); DX-0093, Appendix 2.

### v.    Corporate Customer Contracting

177.    Airlines regularly enter into agreements with corporate customers that provide a system-wide discount on routes flown by the customer in exchange for flying commitments by the customer.  Tr. Day 12 (Carter) at 193:14-193:18; Tr. Day 2 (McMenamin) at 216:9-216:16.  A carrier may be a primary, secondary, or tertiary carrier, depending on the extent to which the customer intends to use the carrier for its corporate travel needs.  Tr. Day 8 (Swartz) at 38:1-38:7.  Corporate customer agreements typically last two to three years, with options for renewal.  Tr. Day 12 (Carter) at 188:3-188:19, 191:1-9.

178.    In pitching to potential corporate customers, the scope of the carrier's network is a "foundational" selling point because it allows the customer to determine the extent to which the carrier can be relied on to fulfill travel needs.  Tr. Day 12 (Carter) at 188:12-188:19.

179.    The NEA expands American and JetBlue's network offering to corporate customers by including NEA codeshare flights in each airline's unilateral corporate sales program, which enables both carriers to independently offer a bigger network to corporate customers and allows those customers to earn more loyalty points that can be redeemed with either carrier.  Tr. Day 8 (Swartz) at 45:3-45:22; Tr. Day 8 (Swartz) at 46:17-47:9 (describing the NEA "sales pitch" as that American and JetBlue "can offer your corporate customers a lot more point-to-point destinations whether you fly on us or American. . . . We can get you where you need to be and direct," and

65

noting that American was "excited to reach out to customers" because the NEA "gave . . . us a much bigger network that we could really promote to corporate customers, something that we hadn't seen for years, and we were really excited, especially everyone on the sales team"); DX-0049 at -001 ██████████████████████████████████████████████

██████████████████████████████████████; Tr. Day 8 (Swartz) at 49:1-49:6 (testifying that he believes American won the opportunity discussed in DX-0049 because of the NEA); DX-0056 at -002 ("I get the feeling the relationship has changed [with the NEA], and we have a real shot at primary"); Tr. Day 12 (Carter) at 212:22-213:11 (explaining that he believed "the NEA particularly had changed . . . the landscape at this particular customer. Again, when we talk about network fit, this is what matters most for a customer. . . . And that's what, I think, Frank was really kind of honing in on, is that we had a chance to engage again with this customer"); Tr. Day 2 (McMenamin) at 20:21-21:20 (testifying that the NEA addressed the lack of "global relevance and having a true global network" and that JetBlue is now able to offer flights to Toronto and Vancouver, in addition to a "lot more domestic locations purely due to the NEA," improving relevance and ability to compete with legacy carrier loyalty programs); Tr. Day 8 (Swartz) at 45:3-45:22 (explaining that American "has . . . added more flights out of Boston to more destinations because of the NEA," which has made American more competitive in Boston, especially with corporate customers who "don't have time to connect.  They much prefer to fly direct.  So it just gives more direct destinations that we can offer with our combined Northeast Alliance").

180.    Section 3.2 of the NEA Agreement sets forth guidelines for "Sales and Marketing Cooperation," whereby American and JetBlue agree to "explore opportunities, where commercially reasonable, to implement certain sales and marketing activities to enable the Parties to facilitate the delivery of improved customer benefits and to provide customers with greater

availability of discounted fares and a broader range of benefits." DX-0128 at -005. For example, under the NEA Agreement, American and JetBlue may "develop[] joint customer bids incorporating discounts for mutual corporate customers to encourage flying on both airlines and including each carrier's metal into agency commission programs." DX-0128 at -005. As of today, however, American and JetBlue are not jointly bidding or contracting with corporate customers. Tr. Day 12 (Carter) at 204:14-15 (explaining that American and JetBlue are "not joint[ly] contracting").

181.    Importantly, corporate customers retain the power to choose whether to opt into the benefits that American and JetBlue are offering under the NEA by amending their existing flying agreements or not. DX-0128 at -005; Tr. Day 12 (Carter) at 194:8-194:15 (explaining that American offered customers a "letter of consent" to add the NEA to existing discounts, "[m]eaning, this all new value, all new markets, taking your existing discounts today with a corporation, and just placing them in the NEA markets").

182.    Each airline has offered corporate customers the option to apply existing discounts to codeshare flights operated by the other—an option the customers have overwhelmingly chosen. DX-0057, at -0002 ("[W]e're offering to add your existing discounts to codeshares with JetBlue."); DX-0057, at -0009 ("NEA term will align with current discount strategy excluding Transatlantic"); DX-1086 at 13 (showing discount proposal to a customer); Tr. Day 12 (Carter) at 205:16-206:19 (describing the "overwhelmingly positive" response to the NEA because "our customers appreciate that, particularly in New York and Boston, . . . we now have a network that we can compete against Delta. In New York, we now have a network we can complete against Delta and United. So we have become a lot more relevant, and our customers have noticed that. We're seeing it in the . . . number of renewals that we're . . . processing and the number of customers are making

sure that the NEA is part of their renewal.  And we're seeing it in some early data as well that the NEA is beginning to move market share as well for us"); Tr. Day 12 (Carter) at 206:20-206:25 (explaining that roughly 80 percent of the initial tranche of 250 customers accepted the letter of consent offered by American).

#### vi.      Revenue Sharing

183.    American and JetBlue entered into a revenue sharing arrangement, the MGIA, designed to sufficiently align interests such that the carriers will work together to jointly plan their network in the NEA airports and to simultaneously incentivize growth and an improved overall network offered by both airlines in the NEA airports.  DX-0120; PX0369, at -166 ("Partnerships succeed when there is a common commitment to increasing network value for consumers by identifying and addressing opportunities for using complementary assets to create better schedules and services."); Tr. Day 14 (Israel) at 16:3-16:22 (explaining that the purpose of the MGIA is to facilitate revenue sharing, which serves two functions: "One is . . . to create enough alignment of interests on the network itself, 'metal neutrality' is a term you've heard that I can talk more about, such that the parties . . .  have enough alignment of interest that they can work together to jointly plan their network.  . . . [F]unction two, the parties are trying to do that in a way that . . . gives them incentives to grow").

184.    Revenue sharing encourages "metal neutrality," or a willingness for the airlines when making network planning decision to have passengers fly on either partner's aircraft (or "metal").  Tr. Day 14 (Israel) at 17:3-17:13 ("[Metal neutrality] generally means that there's some form of revenue sharing such that there's some indifference . . . about whose plane the people fly on. . . .  [M]etal neutrality has [ ] come to mean that we are sharing enough revenue that we are willing to try to plan the best networks, even if it means some people will fly [on] your plane instead of mine."); Bhargava Dep Tr. (6/22) at 187:17-187:25 (explaining that metal neutrality

means that the parties "would provide the right pattern to the customer so that we can be effective in . . . providing the best proposition to our customer"); PX-0793 at -503 ("Metal neutral – the philosophy that offering a Customer choice is the guiding principle and letting them choose [JetBlue] or [American] is in the overall best interest as we'd rather offer the Customer an option between [JetBlue] and [American] than have them choose another airline or set of airlines."); Tr. Day 4 (Raja) at 235:9-12 (explaining that the MGIA is "designed [to create] common incentives . . . for us to be able to grow and make the right capacity choices"); Tr. Day 4 (Raja) at 235:17-236:7 (explaining that revenue sharing aligns airline incentives to enable "AA and JetBlue [to] work together to fly the best schedule").  Metal neutrality does not require pricing coordination, homogenization of business models, or lessening of competition for loyalty.  Tr. Day 14 (Israel) at 17:14-23; Tr. Day 7 (Raja)  at 100:17-101:9; PX0369 at slide 57.

185.    Revenue sharing is commonly used in airline alliances and other joint ventures to align the incentives of airline partners.  *See, e.g.,* Nocella Dep. Tr. (4/22) at 194:21-195:14 (explaining that ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████ ); Esposito Dep. Tr. (6/22) at 35:6-36:3 (explaining that Delta works with its partners "for the common good of the consumer and the customer, not each of our individual needs" to "build[ ] a network to maximize consumer benefit").

186.    A mechanism like the MGIA is an important feature of creating a long-term and sustainable partnership, as it incentivizes the carriers to be able to grow and make the right capacity choices for the partnership.  Tr. Day 4 (Raja)  at 235:5-12.  Because the MGIA incentivizes joint growth, American and JetBlue are both incentivized to support new flying.  Tr. Day 4 (Raja)  at

237:6-25 (explaining that, under the MGIA, "what you want is you want to generate more revenue. . . . if we were to just go start a route like JFK-Tel-Aviv on our own, [we're] not guaranteed anything," but "[w]hen we go to do this now we know that we'll be able to hit our base position of revenue. And then everything else is a function of what we can do together. . . .JetBlue wants to go and support Tel-Aviv because they want the incremental pool to get big"); Tr. Day 4 (Raja) at 237:6-25.

187.    American and JetBlue chose to structure the MGIA mechanisms in this way based on prior international alliances.  Tr. Day 4 (Raja)  at 239:3-21; Tr. Day 4 (Raja) at 239:3-21 (revenue sharing mechanisms have "been significant for [American's international alliances]. . . . [S]ince entering into [American's] transatlantic joint venture, we've grown at a greater rate than we grew before it," and "frankly, it facilitates a growth in just product innovation").  Tr. Day 4 (Raja) at 239:3-21.

188.    The MGIA covers certain revenues and expenses associated with (i) "[a]ll AA domestic and international flying operated out of JFK, LGA, EWR, and BOS" and (ii) "B6 domestic and non-transatlantic international flying operated out of JFK, LGA, EWR and BOS." PX0450 at -017.  The MGIA excludes JetBlue flights to Europe.  PX0450 at -017; DX-0093 at -003 (¶ 2.1).  The MGIA also excludes the Carve-Out Routes from revenue sharing routes.  DX-0120 at -001 (¶ 1.2).  The MGIA does not contain any caps or limits on capacity expansion.  DX-1091 (Israel Report) at ¶ 20.

189.    The Net Revenue in the MGIA is the sum of the passenger-related revenue less the selling expenses, within the geographic scope.  Tr. Day 14 (Israel) at 23:4-23:6.  Passenger-related revenue includes (i) passenger revenue; (ii) carrier surcharges; (iii) Net Frequent Flyer Revenue (calculated by "subtracting values associated with passengers earning miles or points (i.e.,

accruals) from values associated with passengers redeeming miles or points on uplift (i.e., redemptions), except as otherwise covered in (i) above"); (iv) pre-paid seating; and (v) any other sources of revenue driven directly by incremental passenger volume and mutually agreed by the Parties to be included in Included Revenue.  DX-0093 at -020, App. 2 ¶ B.  Selling expenses include (i) travel agency commissions and incentives; (ii) computer reservation system (CRS) and global distribution system (GDS) fees; (iii) credit card processing fees attributable to NEA Routes; and (iv) any costs driven directly by incremental passenger volume and mutually agreed by the Parties.  DX-0093 at -020-21 (App. 2 ¶ B).

190.    From the pool of the combined Net Revenue, each of American and JetBlue recovers a "Base Revenue" and "Incremental Revenue" for each year.  PX0450 at -018; DX-0093 at -003 (¶ 2.1).

191.    The Base Revenue is calculated by multiplying the Base Unit Revenue and the Current Year Capacity.  PX0450 at -018.  The Base Unit Revenue, or Base "RESM" (Revenue per Equivalent Seat Mile), is a measure of each carrier's unit revenue performance prior to the NEA. Tr. Day 4 (Raja) at 236:15-236:24 ("The concept behind [RESM] is, prior to us doing any kind of a deal, everybody generated some kind of unitized revenue performance.").  Current Year Capacity is calculated by multiplying an agreed upon measure of seats and distance flown by each carrier during the most recent year.  DX-0093 at -15-16.

192.    Multiplying the Base Unit Revenue by the Current Year Capacity rather than the starting capacity to calculate the Base Revenue distinguishes the MGIA from fixed proportion revenue sharing.  Tr. Day 14 (Israel) at 27:12-27:18.  Specifically, the use of Current Year Capacity in the formula creates an incentive to grow because as a carrier adds capacity from year to year, the Base Revenue increases.  Tr. Day 14 (Israel) at 27:18-28:1.  Furthermore, because the capacity

in the Current Year is multiplied by the Base Unit Revenue rather than its actual unit revenue, the formula further incentivizes growth. Tr. Day 14 (Israel) at 28:2-3; Tr. Day 14 (Israel) at 28:11-17. In normal circumstances, additional capacity would be expected to put downward pressure on unit revenue from the starting position – however, by fixing the unit revenue to the Base Year, carriers are guaranteed a Base Revenue payment for added capacity without the downside on unit revenue, which "de-risks" growth.  Tr. Day 14 (Israel) at 28:11-29:10; Tr. Day 4 (Raja) at 237:12-18 (explaining that this "de-risks . . . project flying, or taking experiments. . . . [I]f we were to just go start a route like JFK-Tel-Aviv on our own, you're not guaranteed anything. When we go to do this now we know that we'll be able to hit our base position of revenue").

193.    The Base Revenue for each carrier is also "stage-length adjusted."  Tr. Day 14 (Israel) at 29:11-30:15.  Stage length refers to the distance on average that an aircraft flies on a route. Tr. Day 10 (Clark) at 28:17-20.  The MGIA applies a stage-length adjustment to slightly down-weight capacity growth associated with flying greater distances relative to the capacity growth associated with flying more seats. Tr. Day 14 (Israel) at 30:7-15.  For American-operated flights, this is accomplished by multiplying a different stage length adjustor for flights equal or greater than 3,000 miles ("Long-Haul Services") and flights fewer than 3,000 miles ("Short-Haul Services").  DX-0093 at 0017, 0019.  For Short-Haul Services operated by American, the Base Revenue is multiplied by the carrier's Base Period Stage Length divided by its Current Period Stage Length raised to 0.62.  DX-0093 at -003 (¶ 2.5.1).  For Long-Haul Services operated by American, the Base Revenue is multiplied by the carrier's Base Period Stage Length divided by its Current Period Stage Length raised to 0.33.  DX-0093 at -004 (¶ 2.7.1).  For JetBlue, whose primary flying is less than or equal to 3,000 miles, the same stage length adjustor applies regardless of the distance of the flight, which is Base Period Stage Length divided by its Current Period Stage

Length raised to 0.62.  DX-0093 at -003 (¶ 2.5.1); Tr. Day 14 (Israel) at 29:20-25 (clarifying that "you end up with three buckets, a short and long-haul for American, and one for JetBlue").  In the Worked Example portion of the MGIA, the calculated stage length adjustor for American's Short-Haul Services is 0.986, for American's Long-Haul Services is 0.996, and for JetBlue's flights is 0.997, illustrating that the magnitude of the adjustment will generally be very small (i.e., very close to multiplying by 1).  DX-0093 at -029-30 (App. 4); Tr. Day 14 (Israel) at 40:11-41:7.

194.    Once accounting for each carrier's stage-length adjusted Base Revenue ("Adjusted Base Revenue"), what is left from the Net Revenue pool is the Incremental Revenue, which is simply the total Net Revenue minus the sum of each carrier's Adjusted Base Revenue.  PX0450 at -019; DX-0093 at -004 (¶ 2.9.2).

195.    The Incremental Revenue is then shared based on each carrier's proportional share of the total current NEA capacity, defined as the "Attributed Portion."  PX0450 at -019; DX-0093 at -004 (¶ 2.9).

196.    The distribution of Incremental Revenue creates two key incentives.  First, it creates an incentive for American and JetBlue to work together to maximize the attractiveness of each other's flying, whether through codesharing, schedule optimization, or frequent flyer cooperation, in order to generate increased demand and increase the overall Incremental Revenue.  Tr. Day 4 (Raja) at 237:20-237:25 (explaining that American and JetBlue want to support each other's NEA flying because the MGIA ensures "we have every incentive to go and both add capacity and grow . . . the revenue that we share from it").

197.    Second, because the share of each carrier's Incremental Revenue depends on the carrier's capacity for the current period, the formula creates an additional incentive to grow.  Tr. Day 14 (Israel) at 32:11-33:7.  That is, because the NEA is expected to create revenue upside by

generating greater demand for American and JetBlue flights, the carriers are incentivized to add capacity to maintain or increase their share of the revenue upside.  Tr. Day 14 (Israel) at 32:25-33:5.  In essence, the formula creates competition between American and JetBlue on capacity to determine which carrier captures a bigger share of the revenue upside of the NEA.  Tr. Day (Israel) at 33:5-33:7.

198.    Thus, each carrier's Retained Revenue, which is the total amount that each carrier is entitled to for the current year under the MGIA, is the sum of the carrier's Base Revenue and their Attributed Share of the Incremental Revenue.  PX0450 at -020; DX-0093 at -004-05 (¶ 2.10).  Since revenue is not generated by each carrier in the NEA exactly in line with how the MGIA calculates Retained Revenue, the MGIA provides for a "true-up" in the form of a Transfer Payment on the back end every year.  PX-0450 at -021; Tr. Day 14 (Israel) at 34:25-35:5.

199.    Following the first year of NEA implementation, American and JetBlue negotiated a modification of the transfer payment owed under the MGIA to account for the lingering effects of COVID.  DX-0143.  Specifically, in 2021, the pandemic continued to dramatically and negatively impact international travel, which depressed the performance of American's long-haul flights from JFK.  Tr. Day 5 (Laurence) at 219:21-220:17.  As a result, JetBlue owed American a large transfer payment under the MGIA.  Tr. Day 5 (Laurence) at 219:9-220:20.

200.    American and JetBlue calculated a modified transfer payment accounting for the unforeseen impact of COVID on international travel in 2021.  DX-0143.  This modification was a recognition that the long-term benefits of the NEA were worth making an accommodation in the first year to account for the unforeseen, and unique, short-term effects of COVID.  Tr. Day 5 (Laurence) at 219:21-220:4 (explaining that the parties view the NEA as "a long-term agreement," and thus wanted to address "the unintended consequence of COVID, of American adding a great

deal of long-haul capacity into JFK that didn't perform as well as I think we would have expected"); Tr. Day 5 (Laurence) at 220:15-220:17; Bhargava Dep. Tr. (06/22) at 214:3-12 (noting that "international flying had been impacted and had not started to see the recovery from the COVID," and "it didn't seem right . . . for B6 to be paying for the . . . underperformance of the long-haul routes").

**F.     The NEA Is Entirely Consistent with JetBlue's Past Criticisms of Airline Alliances**

201.    JetBlue has previously been critical of the regulatory process for granting antitrust immunity to international airline alliances.   Tr. Day 1 (Hayes) at 160:21-161:5.   JetBlue consistently has maintained three specific criticisms of this regulatory process: (1) any grant of antitrust immunity should be for a finite period of time subject to regulatory review to ensure that benefits of the alliance are materializing; (2) there should not be exclusivity provisions that prevent members from collaborating with other airlines; and (3) slots should be divested to competitor airlines when the alliance involves constrained airports.  Tr. Day 1 (Hayes) at 161:15-162:10; PX0428 (Answer of JetBlue Airways Corporation dated February 6, 2019 for DOT Docket No. DOT-OST-2013-0068-0057) at -907 ("JetBlue does not oppose limited grants of antitrust immunity ('ATI') per se, but under applicable law, the Department cannot grant ATI without completing a thorough review and reaching a reasoned, on-the-record determination that applicants for ATI have satisfied the requisite statutory test."); PX0428 at -938, ("DOT Should Limit Any ATI Award to No More Than Five Years' Duration and Make Renewal Subject to an On-the-Record, De Novo Review"); PX0428 at -941, Heading B ("DOT Should Impose a Condition Assuring New Entrant Access to Slots at LHR and AMS, Which are Primary Hub Airports for the Applicants"), and PX428 at -945 ("DOT Should Impose and Strictly Enforce an Anti-Exclusivity Condition"); Land Dep. Tr. (4/22) at 170:2-4; 170:7-16 (explaining that

"JetBlue's belief is [the DOT was not] monitoring the JVs that had been approved to ensure that the promises made by those JVs in a pro-consumer prospective were promises kept").

202.     The NEA is entirely consistent with JetBlue's positions on alliances and, in fact, incorporates even more protections.  The NEA does not have antitrust immunity and is subject to ongoing regulatory review by the DOT.  *See* DX-0063 at -002-003 (Section III(D)).  JetBlue and American reached an agreement with the DOT that included the divestiture of valuable, well-timed slot pairs at JFK that were selected to promote LCC entry and success, *see* Tr. Day 7 (Raja) at 107:25-108:14, and evergreen leases of six slot pairs at DCA, and they also agreed to additional springing slot divestitures if they do not meet certain specific growth requirements, *see* Section IV.C, below.  Additionally, the NEA does not prevent either carrier from maintaining and entering into a variety of new partnerships with other airlines.  *See* Tr. Day 1 (Hayes) at 253:16-18 (discussing JetBlue's independent decision to bid to acquire Spirit Airways).   In addition to addressing each of the three criticisms JetBlue has historically raised regarding airline alliances, the NEA expressly forbids price coordination, incorporates information sharing guardrails, and requires detailed annual reporting to the DOT.  DX-0128; Tr. Day 1 (Hayes) at 167:23-168:10 ("When I think about international joint ventures, it has three elements.  It has schedule coordination, which is in the NEA, on the markets that are not carved out.  It includes pricing coordination, which is absolutely not in the NEA. And to me, that is usually, I think, the most important part of one of the international joint ventures. And then we have an incremental revenue or a revenue model that incentivizes growth, and that's very different to the profit sharing model that exists in many of these international joint ventures.").

## IV.    REGULATORY REVIEW

### A.    Parties Reported the NEA to the DOJ and DOT upon Signing

203.    In July 2020, shortly after the NEA was announced, Defendants submitted copies of the NEA agreements to the DOJ and DOT.  The DOJ conducted a regulatory review pursuant to 15 U.S.C. § 1312 (DOJ's civil investigative authority), and the DOT conducted one pursuant to 49 U.S.C. § 41720 (DOT's statutory waiting period allowing for review of airline alliances), respectively.

### B.    DOT/DOJ Investigations

204.    Defendants fully cooperated with both agencies to facilitate their review of the NEA, including by producing significant volumes of data and documents concerning the NEA and competition in the Northeast.  *See* DX-0063 at -001 ("DOT reviewed the agreements and supporting documentation submitted by the two carriers.").

205.    By November 2020, the DOT was prepared to allow the NEA to proceed with certain commitments, and discussions with the DOT culminated in a letter agreement in January 2021 (the "DOT Agreement").  DX-0063; Tr. Day 5 (Laurence)  at 166:13-15, 23-25.

### C.    DOT Agreement

#### i.    Negotiation & Terms

206.    The DOT Agreement requires American and JetBlue to commit to divestitures of seven well-timed and valuable slot pairs at JFK and evergreen leases of six slot pairs at Washington Regan National Airport (DCA).  DX-0063 at -003-05 (Section III (E)(1)).  Potential additional slot divestitures will be triggered if American and JetBlue fail to meet substantial growth commitments in the initial years of NEA implementation.  DX-0063 at -005-08 (Section III (E)(2)).  The slots divested were specifically selected so as to enable a low cost or point-to-point carrier to build a

"full line," which enables the carrier to have efficient scheduling that goes to and from New York through the course of the day.  Tr. Day 7 (Raja)  at 107:12-24.

207.    The DOT Agreement requires capacity growth of 5 percent for 2022, 10 percent for 2023 and 2024, and 15 percent for 2024, against a baseline negotiated with DOT.  DX-0063 at -006 (Section III (E)(2)(b)(1)).  Specifically, American and JetBlue agreed to compare their growth to a "hybrid baseline," which accounted for slot waivers that American had utilized in the past and the slots that were to be divested pursuant to the DOT Agreement.  DX-0063 at -006; Tr. Day 13 (Schweinzger) at 33:5-11 (explaining that the "hybrid mode" relied on JetBlue's 2019 usage at JFK and LaGuardia, and 2019 usage for American at LaGuardia but 2018 for American at JFK); Tr. Day 13 (Schweinzger) at 33:22-34:2 (explaining that the DOT agreement required divestiture of seven slot pairs or 14 slots [at JFK]," and DOT credited those to the baseline at AA's minimum gauge at that time and JetBlue's minimum gauge at that time).  These adjustments resulted in the hybrid baseline being about two percent higher than the previous baseline, meaning that even more growth was required than originally contemplated.  Tr. Day 13 (Schweinzger) at 34:14-35:23. American considered these growth commitments to be very aggressive.  Tr. Day 13 (Schweinzger) at 38:24-39:7 (noting that the growth commitments were "very aggressive," and "a pretty scary commitment to grow that fast that quickly in the middle of [COVID]").

208.    Failure to achieve these growth commitments yields significant ramifications: Falling even three points short of the 15 percent growth commitment target for 2025 would result in the full divestiture of all ten valuable conditional slots.  Tr. Day 13 (Schweinzger) at 41:5-42:7; DX-0501 at -008 (███████████████████████████████████████████████████ ████████████████████████████).

209.     The DOT Agreement entails various other requirements.  Specifically, American and JetBlue agreed (a) that JetBlue will not exit any non-seasonal, nonstop route from JFK that it served as of February 2020 (with limited exceptions), (b) to implement mandatory limitations on out-of-scope communications including no communications regarding fares or out-of-scope flying, (c) to amend the NEA to ensure that slot leases will be in place for sufficiently long duration, and (d) to maintain and provide to DOT detailed data and records regarding the implementation, operation, and performance of the NEA.  DX-0063 at -001-002 (Sections III(A)-(D)).

210.     The DOT Agreement governs the operation of the NEA in Boston and New York. The slot-related terms, of course, only implicate JFK and LaGuardia because Boston is not a slotted airport and the restriction prohibiting JetBlue from exiting any non-seasonal, nonstop route that it served as of February 2020 (with limited exceptions) applies to JFK routes only.  DX-0063 at -003-08 (Section III(E)); DX-0063 at -001 (Section III(A)).  All other provisions apply to the NEA generally, including operations to and from Boston.  *See generally* DX-0063.

### ii.     Status of Meeting Commitments

211.     As part of the implementation of the NEA, American and JetBlue have developed a plan to meet and exceed the DOT growth commitments.  Tr. Day 15 (Znotins) at 102:24-25.

212.     Even in the 20 months that the NEA has been in place, the network optimization that it has enabled has allowed American and JetBlue to exceed the DOT's growth commitments. Today, capacity is materially above the commitment for 2022 and actually exceeds the commitment as far out as 2025.  Tr. Day 15 (Znotins) at 103:5-103:19 (noting that American is "roughly . . . five million seats above our commitment for 2022," and approximately "2 million seats above our commitment where this would extend out through 2025").

## V.      WHAT THE NEA IS NOT

### A.      The NEA Is Not A Merger

213.    The NEA is a narrowly-tailored joint venture.  It is not a merger.  Tr. Day 5 (Isom) at 98:5-14 (explaining that the NEA is not a *de facto* merger:  "We have our own gates, we have our own planes.  Again, we have our own services that make us distinct. . . We're clearly not trying to merge our carriers or trying to make, you know, JetBlue identical to American"); Tr. Day 1 (Hayes) at 111:13-15 ("[JetBlue hasn't] merged with another airline."); Tr. Day 11 (Miller) at 96:1-3 (conceding that the NEA is not a merger).

214.    First, the NEA Agreements make clear that the airlines remain independent.  Tr. Day 4 (Raja) at 230:4-16; *see also* Tr. Day 7 (Raja) at 102:3-103:12 (testifying that the NEA "lean[s] into the fact that we're really different [carriers]" by emphasizing and complementing each other's strengths).    Specifically, Section 3.1.1 of the NEA Agreement states: "Notwithstanding this Article 3 or Article 4, each Party will continue to make independent decisions regarding pricing, capacity, and network management for its Scheduled Passenger Services and will provide guidance to its business personnel responsible for implementation and management of the NEA to ensure such independent decision-making."  DX-0128 at -005. Elsewhere in the NEA Agreement, "[b]oth Parties acknowledge and agree that each will retain full control over all aspects of their respective businesses, including setting pricing for their services and making decisions regarding their capacity and their route networks."  DX-0128 at -002.

215.    The airlines continue to own their respective assets.  The two carriers have their own gates, their own planes, and their own distinct service offerings.  Tr. Day 5 (Isom) at 98:2-14; Tr. Day 11 (Miller) at 96:6-15 (conceding that the NEA "has no impact on the parties' brands," "doesn't affect any control of assets" and does not entail any "permanent transfer of assets"); *see* Tr. Day 2 (Hayes) at 53:16-54:21 (testifying that JetBlue has not and will not change its business

model); Tr. Day 2 (Hayes) at 42:9-24 (testifying that more customers are now able to benefit from the "most leg room, free live TV, free WiFi" offered on JetBlue planes); Tr. Day 6 (Laurence) at 12:11-13:3 (describing customer "appreciation of the attributes of [JetBlue's] product" and how the NEA allows more customers to experience JetBlue's flight experience).

216.    Second, American and JetBlue do not discuss or coordinate their aggregate capacity decisions or decisions around how much capacity to allocate to the Northeast.  Tr. Day 9 (Friedman) at 8:13-15 ("Q. And do you ever discuss capacity outside the Northeast Alliance with American? A. Absolutely not.").  Moreover, American and JetBlue's network teams remain independent and are not bound to accept recommendations from the joint planning teams.  *See* DX-0128 at -002 ("Both Parties acknowledge and agree that each will retain full control over all aspects of their respective businesses, including setting pricing for their services and making decisions regarding their capacity and their route networks."); Tr. Day 4 (Raja) at 229:18-23.

217.    Third, the carriers do not coordinate pricing in any respect and their pricing strategies or practices have not changed in any way since the implementation of the NEA.  Tr. Day 11 (Miller) at 96:21-23 (conceding that the NEA does not include pricing coordination); Tr. Day 3 (Jarashow) at 102:7-12 (testifying that JetBlue's pricing strategy has not changed as a result of the NEA).  Neither carrier's pricing and revenue management teams consider the NEA in their decisionmaking.  Tr. Day 10 (Clark) at 53:13-54:3 (testifying that "the pricing team and the revenue management team doesn't consider the NEA at all, and they're competing against American just as hard for those customers as they were before the NEA," that JetBlue does not consider the MGIA in pricing and setting fares, and that American is viewed as any other competitor); Tr. Day 3 (Jarashow) at 101:6-102:12 (explaining that "there's no difference and there's no[] consideration given to the NEA with respect to our pricing strategies").

218.   Lastly, the NEA is only in effect for a five-year term (with the possibility of extension) and can be terminated.  Tr. Day 11 (Miller) at 97:2-6 (conceding that "there are conditions under which it can be terminated); DX-0128 at -008-14.  Section 5.1 of the NEA Agreement states: "This Agreement will commence on the Effective Date and will continue in effect until the fifth anniversary of the Effective Date."  DX-0128 at -008.

## B.   The NEA Does Not Require American or JetBlue to Change Their Business Models

219.   JetBlue is known as a disruptive low cost carrier.  Tr. Day 1 (Hayes) at 126:18-19 (identifying JetBlue as a disruptive carrier); *id.* at 109:1-2 (agreeing that JetBlue is a low cost carrier).   The NEA does not and *cannot* change that.  *See generally infra* ¶¶ 221 – 234.

220.   Coopting JetBlue was never a goal of the NEA for American, and American has no plan to try to take control of JetBlue or attempt to change its business model.  Tr. Day 6 (Parker) at 99:11-16 ("Q.  Did anyone ever suggest in any of the meetings that you attended regarding the NEA, either in substance or effect, that the NEA was a way for American to take over and control JetBlue?  A.  Absolutely not.  And if they had, I would have told them that wouldn't work."); DX-0356 at -0058; DX-0372 at -002 ("And speaking of Europe, this does not change our plans to disrupt the transatlantic market with JetBlue's low fares and great service."); DX-0381, at -003 ("We remain competitors with American in many markets including the transatlantic."); DX-0384 at -002 (describing strategy for pricing disruption in the transatlantic market); Tr. Day 7 (Raja) at 102:3-12 ("Well, the idea here [for the NEA is], and we always used to say the goal isn't -- JetBlue should be more like JetBlue, American should be more like American, that, actually, we should lean into the fact that we're really different.").

221.   JetBlue remains independent, notwithstanding its participation in the NEA, and it has no intention of changing its business model because of the NEA.  Tr. Day 2 (Hayes) at 11:13-19

(explaining that JetBlue did not enter the NEA to change the JetBlue business model, and rather "because it would allow JetBlue to accelerate our business model in the northeast"); *id.* at 41:17-42:8 (explaining that "we were working to create schedules that compete with Delta and United, however our business models remain very different"); *id.* at 54:19-21 (confirming that JetBlue does not plan to change its business model); Tr. Day 1 (Hayes) at 195:12-21 (explaining that he wanted to "make sure that this NEA did not change who we were," and noting that "entering into this agreement with American and not having them grow would not have met the needs of JetBlue or its customers"); Tr. Day 3 (Jarashow) at 91:4-92:1; *id.* at 96:5-97:1 (testifying that JetBlue continues to "disrupt[] the pricing landscape," including with respect to transatlantic fares); *id.* at 101:6-25; *id.* at 102:7-12 (testifying that JetBlue's pricing strategy has not changed as a result of the NEA); Tr. Day 10 (Clark) at 75:14-76:21; Tr. Day 1 (Hayes) at 206:10-207:11 (testifying that JetBlue "wouldn't have certainly entered into the NEA if [it] didn't feel [it] had adequate alleviations to mitigate" such risks and that this "isn't something that [it] has been concerned about since [JetBlue has] been in the NEA."); Tr. Day 8 (Fintzen) at 133:13-20 (explaining that the transfer payment has not "impacted JetBlue's implementation of the NEA in any way," and no one has told Mr. Fintzen of any "plans to change [JetBlue's] business strategy because of the transfer payments in the NEA").

222.    Indeed, JetBlue will "continue to disrupt" because "it's [JetBlue's] DNA."  Tr. Day 2 (Hayes) at 54:8-18; Tr. Day 2 (Hayes) at 53:16-54:6 (explaining that JetBlue can't change its business model "in terms of the sweet spot of high quality product and low fares" because this "unique model here in the US, which is to focus on being a very efficient airline and keep our cost down, offer low fares, offer customers a better service and grow" has been successful for JetBlue, and noting that "there's a huge need for an airline like JetBlue, we just need to be bigger"); *id.* at

9:21-10:15 ("Q. Is this something you talk about with new hires? A. Yes.  Q. Why is that?  A. Because a lot of them have either come from outside our airline industry, or they come from another airline, and it's very important that they understand how different we are.  And we're different because fundamentally we want to attract new customers with lower fares, retain their loyalty, because of the service that they get on JetBlue will be better than what we believe they will get on another airline. . . Q.  Have you stopped talking about this with new crew members now that JetBlue is in the Northeast Alliance?  No, not only is this something we discussed with new crew members at orientation, it's something that we discuss almost every day.  Q. And are you planning to change that?  A. Not at all."); Tr. Day 12 (Lee) at 80:19-81:6.

223.    Under the NEA, JetBlue retains the ability to price independently, and make independent decisions as to which airplanes it flies or does not fly.  Tr. Day 2 (Hayes) at 41:17-42:8 (confirming that JetBlue continues to price independently, and does not discuss pricing with American); Tr. Day 1 (Hayes) at 177:3-6 (confirming that "ultimately JetBlue will make independent decisions as to what we fly and what we don't fly"); Tr. Day 3 (Jarashow) at 101:6-25 (explaining that "JetBlue's pricing strategy has not changed with respect to the NEA. There's no consideration given to the NEA"); Tr. Day 2 (Hayes) at 11:20-23 (confirming that the NEA will not change the JetBlue Effect, and "in fact, it will allow us to bring the JetBlue effect to more customers in more markets"); Tr. Day 2 (Hayes) at 32:25-33:4 (explaining that these strategic benefits "would allow [JetBlue] to disrupt more").  JetBlue's pricing strategy is also independent of the MGIA and the calculation of any payments under it.  Clark Tr. at 53:13-54:3 (10/12) (explaining that JetBlue's pricing strategy has not changed "at all" since the implementation of the NEA and that the pricing and yield management team do not consider the MGIA when making their decisions about pricing and setting fares).

224.    Despite the partnership, JetBlue still prefers that travelers fly on its own planes to enhance its brand.  Tr. Day 1 (Hayes) 197:7-9 (noting that "I would rather that they fly JetBlue, but if they're not going to fly JetBlue, then I want them to fly American in the NEA markets"); Tr. Day 3 (McMenamin) at 9:7-11 (explaining that "[w]e're not indifferent.  We would always want our customers booking JetBlue; but if that option doesn't exist, booking with a partner is preferred over a nonpartner"); Tr. Day 6 (Laurence) at 12:8-13:12 (explaining that, "[w]ithin the NEA I wanted customers on the JetBlue airplanes, when possible . . . what we found was that customers, when they flew on JetBlue, they actually had a greater appreciation of the attributes of the product that we offered, more so than they did if they had never flown JetBlue. . . . And we were eager to have customers trying our product, in part because they might fly on an NEA route on a Monday, from say Boston to Miami, and two weeks later, might fly JetBlue between Miami and Los Angeles. You know, we were eager, you know, to not only have customers on the airplane in the NEA, but we thought they were more likely to come back to us in places where we might be competing. . . . [A]nd the data suggested that the customers, once they tried JetBlue, were likely to come back, and they thought those attributes were important."); Tr. Day 8 (Fintzen) at 134:2-135:4 ("[W]e absolutely want and need customers on JetBlue planes experiencing JetBlue. . . . [W]e're a little bit of a different animal in the industry.  We have a different value proposition. We can market that.  We can advertise that, but if customers don't know us, the best way for them to understand and learn what we are is to get on the airplane to see why it's different. . . . We bring them to our website. They're joining our loyalty program. They're getting our co-brand credit card. We've made an enormous amount of initiatives around what we call JetBlue travel products, so selling a hotel, a car, trip insurance. . . . [A]ll of that is really important to . . . JetBlue's growth

and JetBlue's strategy in the industry.  So . . . we want customers to . . . experience and live in that ecosystem."); *see* Nocella Dep. Tr. (4/22) at 121:22-24, 124:5-8.

225.    American and JetBlue retain independent control over their networks both outside the NEA region as well as regarding the ultimate decisions for New York and Boston.  DX-0128 at §3.1.1. JetBlue crewmembers consistently testified that they intend to use that control to make network planning decisions that are in the interests of JetBlue and its shareholders.  *See, e.g.,* Tr. Day 2 (Hayes) at 52:23-53:15 (confirming that JetBlue does not "consult with American in any way, about any decision outside the Northeast Alliance" and has not "limited in any way its aggressiveness in competing with American outside the Northeast Alliance . . . So outside of the NEA, we are full blooded competitors"); Tr. Day 2 (Hayes) at 54:8-54:18 (disagreeing with Plaintiffs' assertion that "JetBlue lacks an incentive to be a disruptive independent competitor," and explaining that "we continue to disrupt, because it's our DNA.  It's called our business model"); Tr. Day 8  (Fintzen) at 140:8-14 ("Q. And up on that point, does the NEA in any way change the fact that JetBlue has discretion over the flights and routes that it flies?  A. No.  Q. And does it—does it change in any way the overall business strategy? A. Oh, no.").

226.    The fact that American and JetBlue jointly set schedules within the NEA does not change each airline's independence.  American and JetBlue sit as equals at the NEA table and have the ability to resolve any disagreements with the benefits of their own customers in mind.  Tr. Day 9 (Friedman) at 6:2-11 (describing that, in the event of a disagreement between the airlines, which has "happened a few times," "there is usually a hearty debate. It's very civil. And we go back and forth on the facts and ultimately either airline will deal with what's ultimately in the best interest of that airline"); Tr. Day 5 (Laurence)  at 135:9-15 ("Q. And at the time of your deposition in June of 2022, you weren't aware of any disputes between the parties that were elevated to the

management committee, correct? A. In areas where we disagreed, I think it had become a sort of

less formal, and we didn't formally convene a management committee, because we sort of -- we

were urging the teams to be able to work through disagreements.").  A concrete example of this

independence is JetBlue's decision to continue to serve Miami because of its South Florida focus

strategy, despite American's disagreement.  Tr. Day 9 (Friedman) at 11:2-15 ("When you get into

some of the leisure and hub-to-hub routes, there's legitimate debate about which carrier should

serve which route. Ultimately, in the case of Miami, because of our South Florida focus of the

strategy, and obviously they have a hub in Miami, we made the decision that both carriers should

serve it, even though American disagreed.").   Another example is JetBlue's decision to enter into

a merger agreement with Spirit Airlines, which will further expand the reach of JetBlue's unique

business model.  Tr. Day 2 (Hayes) at 52:33-53:15, 54:8-45:18.

227.    JetBlue has faced some operational difficulties post-COVID.[8]  Tr. Day 2 (Hayes)

at 44:9-47:2 (explaining that the specific challenges that JetBlue faced coming out of Omicron—

schedule reductions and capacity reductions—are related to pilot attrition levels, among other

things); Nocella Dep. Tr. (4/22) at 123:20-124:7.  As a result of recent operational issues, JetBlue

independently decided to suspend its service on two Carve Out Routes:  Boston-Rochester and

Boston-Syracuse.

228.    JetBlue continues to make independent decisions regarding network plans,

including as to the Carve Out Routes.  JetBlue did not consult with American regarding JetBlue's

decision to temporarily suspend the carveout routes of Boston to Rochester (BOS-ROC) and

Boston to Syracuse (BOS-SYR).  Tr. Day 9 (Friedman) at 25:21-23 ("Q. Does your team discuss

---

[8] These difficulties are unrelated to the NEA.  Tr. Day 1 (Hayes)  at 243:19-244:6 (explaining
JetBlue' capacity cuts were due to operational issues, not the NEA)

the carve-out routes with American? A. Absolutely not."), at 29:16-18 ("Q. Did you discuss the decision to suspend Boston-Rochester with American in advance? A. No. We were not legally allowed to do so."), at 31:4-6 ("Q. And did you discuss Syracuse-Boston with American in advance? A. Absolutely not."); Tr. Day 9 (Friedman) at 26:7-15 (explaining that JetBlue has "temporarily suspended Boston-Rochester"), at 30:11-17 (explaining that JetBlue similarly exited Boston-Syracuse temporarily).

229.    JetBlue unilaterally made the decision to temporarily suspend service to Rochester (ROC) and Syracuse (SYR) from Boston to address temporary operational challenges and efficiency issues.  Tr. Day 9 (Friedman) at 27:20-29:18, 30:23-31:6.  JetBlue served these BOS-ROC and BOS-SYR routes with one flight per day in part so that planes could "remain overnight" ("RON") in Rochester and Syracuse rather than Boston, which has had limited RON availability. Tr. Day 9 (Friedman) at 26:10-27:3, 30:23-31:3.  The planes servicing these routes departed Boston late at night and returned to Boston early in the morning, which does not allow for sufficient rest time for crewmembers, including pilots, to service both flights.  Tr. Day 9 (Friedman) at 26:23--27:9, at 30:24-31:3.  Those crewmembers thus were required to spend more than a full day in Rochester or Syracuse before they could return to Boston.  Tr. Day 9 (Friedman) at 27:15-28:16, at 28:17-29:9 (explaining that Boston-Rochester was one of the "markets that had a higher propensity for pilots to call out" on paid sick leave).  This inefficient use of pilots and other crewmembers became particularly problematic when JetBlue began experiencing operational issues in 2022.  Tr. Day 9 (Friedman) at 28:17-29:14.

230.    American and JetBlue never discussed JetBlue's decision to suspend service from Boston to Rochester and Syracuse.  Tr. Day 9 (Friedman) at 25:21-23, at 29:16-18.  To the extent there are discussions regarding implementation of codesharing on the carve-out routes, those

discussions do not involve JetBlue's network planners that made the decision to suspend the routes. Tr. Day 9 (Friedman) at 54:6-18; *id.* at 53:23-24 ("To my knowledge, we do not have a marketing code on American's metal on Boston-Rochester").  American and JetBlue continue to treat those routes as carve-out routes.  Tr. Day 7 (Raja) at 166:20 ("We don't cooperate on those routes.").  JetBlue will be offering both of these routes for sale in May 2023.  Tr. Day 9 (Friedman) at 30:11-22.

### C.   The NEA Does Not End Competition Between American and JetBlue on Routes within the Scope of the NEA

231.   Through the NEA American and JetBlue coordinate on NEA route scheduling but otherwise still compete, including on routes within the scope of the NEA.  Tr. Day 2 (Hayes) at 41:17-42:8; Tr. Day 2 (McMenamin) at 225:23-226:4 (explaining that American and JetBlue still compete, even on routes within the NEA); Mehoke Dep. Tr. (06/22) at 172:12-22 (explaining that "[w]e are still competitors.  Whether we're in New York or Boston or the West Coast, we fiercely compete with American as we always have"), 189:15-16, 189:18, 189-20-190:4; Tr. Day 10 (Clark) at 49:23-25 (JetBlue still competes with American for frequent flyer customers), 53:19-54:3 (JetBlue still competes with American on price); *see also* Tr. Day 3 (Jarashow) at 102:7-12 (testifying that there is no difference in how JetBlue prices or in its pricing strategy between NEA routes and non-NEA routes).

232.   Dr. Israel emphasized the large degree to which competition is preserved between American and JetBlue, outlining at least five key aspects of airline competition: (1) overall business model, including (2) capacity, (3) pricing; (4) network/route planning; and (5) loyalty. Four of those, all but network/route planning, continue notwithstanding the NEA.  *See* Tr. Day 14 (Israel) at 6:12-8:18.

233.    The first three aspects of competition that are preserved in the NEA relate to each airline's business models.  GNCs operate a significantly more complex business model than LCCs. *See* Tr. Day 12 (Lee) at 51:18-53:5; DX-0856 (Taxonomy of Airline Business Model).  The difference in operational complexity necessitates that each of American and JetBlue retain full control over all business decisions, including those related to capacity (fleet size) and pricing.  As a result, the NEA agreement emphasizes that both parties "will retain full control over all aspects of their respective businesses, including setting pricing for their services and making decision regarding their capacity and their route networks."  DX-0128, Recital 5; Tr. Day 4 (Raja) at 230:4-16 (explaining that Recital Five of the NEA Agreement exists "[t]o make it very clear to everybody that we are still two independent airlines. We're coming together just to serve a very particular purpose in the NEA markets").  Therefore, both airlines price their services independently.  Tr. Day 2 (Hayes) at 41:20-23.  Furthermore, American and JetBlue do not discuss or coordinate their aggregate capacity decisions or decisions regarding how much capacity to allocate to the Northeast. *See supra* Section V.A, above.

234.    The fourth aspect of competition that is preserved is customer loyalty.  The MGIA revenue sharing provisions exclude revenue growth from stronger loyalty programs and branded credit cards not directly related to NEA services. *See* Section III.E.iv, above; Tr. Day 1 (Hayes) at 196:6-18 (explaining that JetBlue "care[s] very much" whether customers fly on its planes because "there a benefit within the NEA when a customer flies on JetBlue over American. . . . Whilst there is revenue . . . . in the MGIA, there's other revenue benefits such as our loyalty program, our co-brand credit card program, our vacations business, where we can sell additional revenue if that customer is flying on JetBlue").

235.    Competition based on network/route planning is partially preserved.   Under the NEA, the parties have "agree[d] to use commercially reasonable efforts to coordinate the NEA Services," to form an effective network in New York and Boston.  DX-0128 at ¶ 3.1.1.  However, "each Party will continue to make independent decisions regarding . . . network management."  DX-0128 at ¶ 3.1.1.  Neither American nor JetBlue are bound to accept recommendations from the joint planning team.  Tr. Day 4 (Raja) at 229:18-230:3.  Therefore, although there is some coordination, the airlines ultimately maintain control over their networks everywhere outside of the NEA region and even with respect to network planning decisions within the scope of the NEA.  Tr. Day 14 (Israel) at 7:16-8:2; *see supra* Section V.B, above.

236.    These five areas of competition that continue to exist post-NEA would not be present if the NEA were a merger.  *See* Tr. Day 14 (Israel) at 7:14-15 ("None of that would be preserved in a merger, but all of that competition is preserved.").

237.    The government itself recognizes ongoing competition between American and JetBlue post-implementation of the NEA.  The General Services Administration's ("GSA") City Pair Program procures and manages discounted air passenger transportation services for federal government travelers.  *See* Bristow Dep. Tr. (05/22) at 15:18-16:11, 18:3-20:4.  Through the City Pair Program, the GSA contends that it saved taxpayers an estimated $1.288 billion during fiscal year 2023.  DX-0575 (GSA City Pair Program Fast Fact sheet for Fiscal Year 2023).  American and JetBlue have been participating airlines in the GSA's City Pair Program both pre- and post-NEA.  DX-0575.  ██████████████████████████████████████████ ████████████████████████████████████████████████  Bristow Dep. Tr. (05/22) at 133:21-24, 134:2-135:6; 170:13-14.

238.    The BOS-DCA route is one example of how, post-NEA, continuing competition between American and JetBlue benefits the GSA.  Specifically, the GSA awarded JetBlue this City Pair route for the post-NEA fiscal year 2023 bidding cycle.  DX-0575; DX-0573 at Row 211 (showing B6 won the BOS-DCA 2023 City Pair Program award).  As the GSA touts on its Fact Sheet for fiscal year 2023, the BOS- DCA route is one of three exemplary "good news stories" cited of City Pair routes that provides cost savings to the GSA.  DX-0575.  There are numerous additional examples where either American or JetBlue have been awarded City Pair routes within the NEA based on competitive post-NEA bids on routes to and from the NEA airports.  *See, e.g.*, DX-0574 at Row 342 (showing that American won the BOS-DCA 2022 City Pair Program award); Row 7895 (showing that American won the JFK-RDU 2022 City Pair Program award); Row 7293 (showing that JetBlue won the JFK-LAX 2022 City Pair Program award); *see also* DX-0428 at -001 (showing American and JetBlue competing for awards within the NEA in the GSA's City Pair Program).

## VI.    COMPETITORS VIEW THE NEA AS COMPETITION-ENHANCING

239.    Other airlines, including United, Delta, Southwest, and Alaska, consistently view the NEA as a growth engine and a way for American and JetBlue to become more competitive. *See, e.g.,* DX-0238; DX-0507; DX-0221; DX-0498; DX-0501.

240.    In October 2020 Delta described the NEA in an internal document as a "seismic change[ ] that will reshape the New York City competitive landscape in 2021," noting that "AA's unsustainable losses as a standalone carrier in NYC has necessitated a partnership of convenience with B6, creating one relevant competitor out of two weak ones."  DX-0238 at -002.

241.    According to Delta, the ███████████████████████████████ ████████████████████████████████████████████████████████  DX-0238 at -002.  As an example, Delta noted that the NEA ████████████████████████████████████

92



DX-0238 at -002. Delta further noted that DX-0238 at -005. Specifically, prior to the NEA, DX-0238 at -005, DX-0238 at -006.

242.    United similarly recognized that the NEA has "accelerated network growth plans" for JetBlue.  DX-0507 (Mar. 2021 United internal presentation) at -050; Nocella Dep. Tr. (4/29) at 123:24-25.   Andrew Nocella, the Chief Commercial Officer for United Airlines,

. Nocella Dep. Tr. (4/29) at 121:22-24, 123:3-8, 123:20-25.

243.    Alaska characterized the NEA as a "strategic partnership focused on strengthening the competitive position of both carriers in the New York City and Boston markets" that would "facilitate[ ] the potential for further growth in NYC" and "creatively addresses strategic weaknesses in the Northeast."  DX-0221 at -001.  Alaska believes that the NEA will increase traveler choice and competition against United and Delta.  Tr. Day 7 (Harrison) at 48:3-17 ("So I think, again, for American Airlines to compete more effectively and stronger against United and Delta, forming [the NEA] is going to allow [American and JetBlue] to give their guests a lot more choice and utility than they would have on their own.").

244.    Southwest similarly views the NEA as a way for American and JetBlue to become more attractive to customers and to grow capacity in order to compete more effectively against Delta and United.  Tr. Day 2 (Watterson) at 156:25-157:6; Tr. Day 2 (Watterson) at 140:8-12 (the

NEA "improves the[] schedule quality in the northeast" for American and JetBlue); Tr. Day 2 (Watterson) at 141:1-5 (explaining that, as a result of the NEA, American and JetBlue "would become more attractive relative to Southwest Airlines because these are limited entry markets and their schedule becomes more attractive because of the combination"); 141:9-16 ("[American and JetBlue] become more attractive relative to us. . . . [T]hat airline is more attractive, compared to the other airline, being us, because we might only have a few number of flights."); DX-0503 at -005 ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████; DX-0498 at -043 ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████. In internal evaluations of the NEA, Southwest explained that for American, the NEA ███████████████████████████ ██████████████████████████████████ DX-0501 at -002; Tr. Day 2 (Watterson) at 148:4-13. Additionally, Southwest noted that the NEA ██████████████████████████ ██████████████████████████████████. DX-0501 at -006 ("Network enhancement will be greatest for JetBlue based on American's existing, extensive network and hubs along the East Coast"); Tr. Day 2 (Watterson) at 150:15-23 (noting that JetBlue "may benefit [ ] the most in the sense of American has a lot more slots, then American is giving slots to JetBlue to upgrade as part of this Northeast Alliance").

245.    Spirit's initial reaction was to view the NEA as "bad for Spirit" because the NEA would make JetBlue a "more formidable competitor."  Tr. Day 3 (Kirby) at 169:23-171:6; DX-1076 at -001.  Immediately upon learning about the NEA, John Kirby noted that JetBlue's frequent flyer program will become more attractive and that the NEA will create an "S-Curve effect in the NYC area, and to a lesser exten[t] at Logan[,]" DX-1076 at -001, meaning that the NEA will

improve "relevance" by increasing the carriers' ability to "appeal to a much broader part of the customer base" by "offer[ing] more products."  Tr. Day 3 (Kirby) at 172:7-15.  Spirit then immediately launched a crusade against the NEA, lobbying the DOT and the DOJ to extract slot divestitures from American and JetBlue.  DX-0481 at -001 ███████████████████████████████ ████████████████████████████████████████████████████████  Tr. Day 4 (Kirby) at 37:4-9 (Spirit reached out to a consultant to work on issues relating to the NEA "the same day or the next day."); Tr. Day 4 (Kirby) at 38:1-20 (Spirit sent a letter to the DOJ and DOT arguing for slot divestitures four days after announcement); Tr. Day 4 (Kirby) at 41:15-42:16 (Spirit filed a formal complaint in a public docket to the DOT requesting at a minimum 16 slot pairs to be divested by American and JetBlue in LGA, JFK, and DCA).

246.    None of the ordinary-course evidence indicates that any airline views the NEA as having the purposes or effects that Plaintiffs allege, e.g., co-opting JetBlue, reducing the JetBlue Effect, leading to capacity discipline, reducing output, or raising prices.

## VII.    NEA IMPLEMENTATION AND SUCCESS TO DATE

### A.    Implementation and Seamlessness Initiatives

247.    The Parties began to implement the NEA in early 2021.  Tr. Day 6 (Laurence) at 18:13-22 (process of implementation began after the signing of the DOT Agreement, which was around "late January, early February").  Due to its complexity, the NEA was implemented gradually.  *See generally* Tr. Day 8   (Fintzen) at 131:22-132:13 (describing the NEA implementation "road map" as a three-year implementation period and estimating that approximately 80 percent of the NEA has been implemented); Tr. Day 6 (Laurence)  at 18:23-20:12 (testifying that NEA implementation is a "heavy lift, especially from an IT perspective" and noting that "[t]here's still things that JetBlue and American continue to work today.").

248.    Implementation began with codesharing and schedule optimization, and it has progressed to bolstering loyalty benefits and resolving technical integration issues. *See, e.g.*, Tr. Day 13 (Schweinzger) at 51:6-59:3; Tr. Day 12 (Carter) at 205:13-206:6; Tr. Day 2 (Hayes) at 32:9-32:24.

249.    The primary goal of the NEA's implementation has been—and continues to be—to provide a seamless product to all customers, meaning that customers will experience a cohesive experience across their entire journey.  Tr. Day 13 (Schweinzger) at 45:1-15; *see* Bhargava Dep. Tr. (06/22) at 29:16-18 (describing seamlessness as "an experience in which the customers don't have to go through the pain points when they connect through two carriers"); Tr. Day 5 (Isom) at 77:16-78:9 (explaining that the NEA requires a seamless experience, which is "hard to bring about" because "[y]ou can't have . . . long connections," "customers that are confused about how to use the product"); PX0369 at -170 (illustrating seamlessness as an end-to-end journey).

250.    American defines "seamlessness" as (i) "[c]reating a consistent customer experience;" (ii) "[a]ddressing critical points of friction for customers (e.g., check-in for all segments);" (iii) "[d]eploying tailored solutions for each unique partnership (e.g., free drink on plane for elites);" (iv) "[a]n achievable 'end state' with each partner, irrespective of legal structure;" and (v) "[l]everaging the unique competitive advantage offered by each partner." PX0369 at -169.  Seamlessness notably does not involve "[d]isrupting the business model [of] each partner."  PX0369 at -169; Tr. Day 7 (Raja) at 100:8-101:9 (explaining that strategic alignment on business models is not necessary, identifying American's relationship with Aer Lingus as an example); *see also* Day 8 Tr. (Fintzen) at 141:13-142:24 ("[W]e have a . . . framework we use at JetBlue called the travel ribbon, so it maps out . . . when you're shopping to managing

your reservation, getting on the airplane, moving through an airport, all the things that happen after the flight.  The concept of seamlessness is systemically looking through that travel ribbon with an eye towards the NEA and making it convenient and easy for a customer to move through that travel ribbon.").

251.    American and JetBlue have invested significant time and resources into achieving seamlessness because they believe that delivering a relatively seamless service for customers is critical to the NEA's credibility with customers.  *See* Tr. Day 8 (Fintzen) at 141:13-143:13; Tr. Day 13 (Schweinzger) at 49:12-59:3; Tr. Day 7 (Raja) at 96:12-18 (emphasizing that the goal is to have customers choose an NEA itinerary over another airline's itinerary, and to do that, "we have to actually create a truly seamless customer experience"); Tr. Day 13 (Schweinzger) at 45:6-10 (explaining that seamlessness requires "a cohesive. . . experience across the entire journey, not just on one individual stage, not just when you fly or when you shop, but holistically across the journey"); Tr. Day 8 (Fintzen) at 129:14-131:14 (explaining that JetBlue works with a "whole number of teams throughout the company" to achieve seamlessness, including partnerships, corporate sales, marketing and brand, loyalty, IT, finance, airport, systems operation control, customer support); *see also* Guenthner Dep. Tr. (06/22) at 217:14-218:15 (explaining that seamlessness "is a really important part of Delta partnerships," and cooperation is needed "to close seams, customer-facing seams"); Nocella Dep. Tr. (4/29) at 198:13-15.  Seamlessness is also an important factor in the ability for American and JetBlue to compete effectively against Delta and United.  DX-0238 at -002 (Delta noting that while the NEA "improves [AA/B6] position, DL retains the advantage of offering a seamless product"); Nocella Dep. Tr. (4/29) at 103:14-20 (expressing doubt at the ability for the NEA to compete effectively because domestic alliances have not been able to "create a seamless product").

252.     Although this process is iterative, significant progress has been made in achieving seamlessness to date.  Tr. Day 13 (Schweinzger) at 49:12-59:3; Tr. Day 13 (Schweinzger) at 65:8-65:21; Tr. Day 8 (Fintzen) at 130:19-131:14; Tr. Day 7 (Raja) at 105: 9-16.   Currently, approximately 80 percent of the seamlessness plans the parties have set for the NEA have been implemented.  Tr. Day 8 (Fintzen) at 132:9-13.

253.     As a first step, the Parties launched codesharing, which enabled customers to view flights from both carriers on their preferred carrier's website.  Tr. Day 13 (Schweinzger) at 51:5-9. American and JetBlue periodically expand and/or change the scope of codesharing within the NEA to add new routes and tailor to customer demand, indicated by the phased approach to codeshare rollout under the NEA.  Tr. Day 13 (Schweinzger) at 51:10-18; 56:24-57:4.

254.     The partners have also focused on ensuring access to services across both carriers, such as priority screening, priority access to upgrades, same-day flight changes, ease of itinerary changes, seat selection at purchase, lounge access, and access to American's first class seats on JetBlue.com. Tr. Day 13 (Schweinzger) at 56:24-58:9.  To accomplish these objectives, American and JetBlue developed a joint data-sharing platform to facilitate operational implementation.  Tr. Day 13 (Schweinzger) at 53:2-15.

255.     In May 2021, consistent with the FFP Agreement, American and JetBlue gave AAdvantage and TrueBlue customers the ability to accrue points and miles when flying on either carrier.  Tr. Day 13 (Schweinzger) at 51:25-52:9.  American and JetBlue also worked to ensure the seamlessness of reciprocal loyalty status and benefits, ensuring that AAdvantage and JetBlue Mosaic customers receive all of the perks they are accustomed to receiving with their respective loyalty status, regardless of which carrier they ae traveling on.  Tr. Day 13 (Schweinzger) at 55:1-12.  The ability to earn frequent flier miles across flights offered by American and JetBlue greatly

benefits customers by multiplying their ability to earn frequent flier points across a broader network.  Tr. Day 2 (Watterson) at 157:1-6 (explaining that the "way [ ] a schedule becomes more attractive is because of the loyalty element, the kind of repeat purchase behavior, the loyalty program helps cement that"); Tr. Day 3 (Kirby) at 171:8-12 (conceding that frequent flyer reciprocity "could be good for those consumers, yes"), 170:12-21 (noting that members of JetBlue's loyalty program would "get a benefit" if they "could basically fly on American Airlines with their global reach").

256.     Another important seamlessness project was the development of a bus connecting Terminals 5 and 8 at the JFK airport so that customers would not need to travel through security on connecting flights.  *See* Tr. Day 4 (Raja) at 231:18-232:16; Tr. Day 13 (Schweinzger) at 47:19-49:8; DX-0956.  In addition to the JFK bus, American and JetBlue invested in signs and infrastructure to help guide people through the airports from one carrier to the other.  Tr. Day 13 (Schweinzger) at 51:19-24.

## B.  Increased Capacity and New Routes

257.     Immediately upon implementation of the NEA, growth from American and JetBlue substantially outpaced growth at the NEA airports from all other carriers.  DX-0932; Tr. Day 14 (Israel) at 58:1-4; DX-0055 at 2 ("We are proudly announcing that, because of the NEA, we [are the] fastest growing international carrier in New York.  Connecting the northeast to almost 150 worldwide destinations, including 10 new international routes from American."); DX-0388, at -005 (showing +20% in NEA Peak Day Seats at LGA), -012 ("JetBlue growth and optimized connectivity" in JFK "a true testament to the power of the NEA"); -021 ("BOS will exceed 2019 frequency levels effective June 9, 2022").  In other words, at the NEA airports, American and JetBlue have grown their capacity relative to the industry and have gained share of ASMs.  DX-0935; Tr. Day 14 (Israel) at 59:6-17; Tr. Day 14 (Israel) at 62:23-63:2 ("Everything I've seen in

this case, every data I've looked at says that at – in the NEA airports, in the routes that we're focused on here, American and JetBlue have grown capacity.  They've grown relative to the industry, they've grown relative to other carriers."); DX-0932 (showing ASM growth at NEA airports).  Since the start of implementation of the NEA, Defendants have experienced more than a 200 percent increase in ASMs in the NEA region.  DX-1091 (showing a more than 200% increase in ASMs since the Parties began implementing the NEA).  Defendants have increased frequencies on more than 130 routes and codeshare on 175 routes.  DX-0055 at -0003 (stating that the NEA has resulted in "more service to customers in New York and Boston, including 58 new routes, and increased frequencies on more than 130 routes and codeshare on 175 routes").

258.    Competitors have taken note of this growth and its relationship to the NEA.  Southwest internally characterized American's growth strategy as focused on ███████████ ████████████████████████████████████████████████████ with ███████ ███████████████████████████████████████████ DX-0498 at -038.  For JetBlue, Southwest has observed that it is ████████████████████████████████ ██████████████████████████████████████.  DX-0498 at -039.  John Kirby of Spirit testified that the alliance has helped JetBlue "grow[ ] dramatically" in New York and will "bolster its position at Boston-Logan airport."  Tr. Day 4 (Kirby) at 23:5-13, 55:25-56:4.

259.    The NEA has enabled this growth in a variety of ways.  First, the NEA allows American and JetBlue to pool slots to identify opportunities for JetBlue to add flights with larger aircraft.  For example, in its August 2021 Five-Year Plan, American explained that the NEA would allow the airlines to "serve more combined seats by using AA metal to fly corporate and smaller markets with a high amount of frequency depth.  We will then leverage larger JetBlue gauge to fly to leisure and high-volume destinations."  DX-0111 at -023.

260.     American has upgauged in New York City, replacing the 50-seat regional jets with larger 65- to 76-seat dual-class planes and replacing narrowbody aircraft with widebody aircraft. Tr. Day 15 (Znotins) at 74:1-19.   Prior to the NEA, American could not financially justify upgauging planes in this manner, but the increased feed resulting from the NEA has enabled American to make this investment.   Tr. Day 7 (Raja) at 154:9-14; Tr. Day 15 (Znotins) at 74:20-77:21.  At LGA especially, the NEA enables American and JetBlue to deploy slots for larger opportunities including by using JetBlue aircraft to fly to attractive leisure destinations and using American's dual-class aircraft with First Class seating to target more business-oriented destinations.  Tr. Day 8 (Pack) at 224:15-225:9 (explaining that at LaGuardia American "wanted to take those slots, bring JetBlue in [to] . . . fly those slots on big airplanes, and they could go launch new markets like New Orleans or something like that, where they're a much bigger airplane and they could do so profitably, whereas we couldn't.  And then the second thing was that those regional jets that we talked about, the ones that were remaining for us, we would at least make sure that they were all flying on a dual cabin, which means that we would have a first class on there, too"); Tr. Day 9 (Friedman) at 10:21-11:1 ("I think one of the things with the NEA is we're always looking to figure out which airline would be best to serve a certain route. . . . if you take a regional aircraft, for example, it would be best served for a high yielding, but low customer count business market"); DX-0111 at -023 ("As we continue to execute and grow the NEA post-COVID, we plan to focus on network optimization that leverages our LGA slot portfolio to serve more combined seats by using AA metal to fly corporate and smaller markets with a high amount of frequency depth.   We will then leverage larger JetBlue gauge to fly to leisure and high-volume destinations."); DX-0388 at -005 ("AA will be the primary carrier serving business oriented

cities"; "B6 will build robust leisure network and high frequency BOS-LGA offering to complement existing service").

261.    This optimization has already introduced 3,000 seats per day at LaGuardia. DX-0736; Tr. Day 7 (Raja) at 124:7-25, with significant growth from JetBlue, in particular. Tr. Day 6 (Laurence) at 20:13-21 (noting that JetBlue has tripled service at LaGuardia through the NEA); DX-0388 at -007 ("JetBlue LGA frequency levels stepping up over the next seven months, with first phase already in effect").   The increased seats from 2019 to 2022 resulted from a combination of American upgauging its flights from "50-seaters . . . to 76-seaters [and] 300-seaters" with average seats per operation increasing from 101 to 117, DX-0736; Tr. Day 7 (Raja) at 121:10-20; increase in JetBlue departures from 17 to 40, DX-0736; Tr. Day 7 (Raja)  at 123:9-14; and overall increase in total departures with increased weekend flying from LaGuardia, Tr. Day 7 (Raja)  at 123:15-124:4.

262.    Second, in addition to flying the same slots with higher gauge aircraft, the NEA has allowed American and JetBlue to fly more departures even at slotted airports.  Tr. Day 7 (Raja) at 123:18-124:4 (explaining that "[w]e're utilizing the slots harder than we ever had before").  One of the ways the NEA has accomplished this is by adding more weekend flying to destinations like Kalispell and Florida.  Tr. Day 7 (Raja) at 123:23-124:3.

263.    Third, the NEA enables American and JetBlue to pursue different and/or riskier growth initiatives to benefit consumers they would not have pursued separately.  Specifically, American and JetBlue have launched a substantial number of new routes in both New York and Boston, including approximately 50 new routes to date.  DX-1087 (summary exhibit listing all added routes in Boston and New York since implementation of the NEA); Tr. Day 15 (Znotins) at 68:11-69:9 ("It gave us a reason to think that investing in there could actually pay off for American,

102

whereas prior to the NEA, it felt like you were just putting good money after bad in the New York market, and you would be better off as an airline investing in some other place."); *id.* at 78:11-83:16; Tr. Day 14 (Israel) at 53:20-22 ("The NEA is a growth initiative.  It builds in intentional growth inducing pieces into the contract.  It's creating growth in the Northeast."); Tr. Day 7 (Raja) at 118:24-119:2 (explaining that the NEA has enabled American to "play a lot more offense than defense.  Before, we were just trying to figure out how we can stay in the game in places like New York"); Tr. Day 15 (Znotins) at 71:1-6 (explaining that the NEA has helped American to conclude that it is "going to make these investments and be successful, whereas prior to the NEA, I wouldn't advised investing in New York like we are now if it were not for the NEA"); Tr. Day 15 (Znotins) at 85:22-25 ("[T]he level of new route activity that you see here, you wouldn't see without a real change in the perception on the viability of New York and Boston going forward."); DX-0057 (NEA customer pitch deck), at -008 ("Delivering on our promise: progress to date . . . 57 new domestic and international routes").

264.    For example, because of the NEA, American decided to launch a new flight to Tel Aviv, which costs American $180 million per year to fly.  Tr. Day 15 (Znotins) at 70:10-17.  As Mr. Znotins explained, if American were more bearish on New York, it could most likely utilize the slots dedicated to Tel Aviv to fly another, less costly, route, such as Charlotte (which he testified would cost only $17 million to fly).  Tr. Day 15 (Znotins) at 70:10-17.  American has similarly made significant investments on flights to Doha, Delhi, and new services to Latin America.  Tr. Day 15 (Znotins) at 73:17-19.

265.    The growth associated with the NEA has increased JetBlue's costs.  Tr. Day 1 (Hayes) at 228-15-229:14.  This includes the decision to keep additional aircraft to fly NEA routes as well as airport costs.  Tr. Day 1 (Hayes)  at 228:21-229:3.  These are "good costs" that will lead

to greater profitability and offering more low-cost fares to more customers.  Tr. Day 1 (Hayes)  at 228:2-20.

266.    American has been able to combine its presence in the Midwest with JetBlue's relevance with the Boston-originating customer to launch new routes from Boston to the middle of the country.  Tr. Day 7 (Raja) at 117:3-13 (new routes from Boston to Columbus, Indianapolis, Memphis).  American also has launched several routes from New York to places that no other airlines offered service to previously, such as to Little Rock and Tulsa from LaGuardia.  Tr. Day 7 (Raja) at 118:13-18.  JetBlue, for its part, has been able to greatly expand its leisure network from LaGuardia as a result of additional access to LaGuardia slots from American as well as grow its network in JFK.  DX-0388 at -0005, -0012 (showing new routes that each carrier launched out of LaGuardia and JFK as a result of the NEA); Tr. Day 9 (Friedman) at 13:14-14:5; *id.* at 15:11-17:11 (listing various new routes that were launched by American and JetBlue in JFK including New Delhi, Tel Aviv, Athens, Bogota, Cali, Santiago, Medellin, John Wayne, Bozeman, Detroit, Key West, Minneapolis, Puerto Vallarta, Cabo, San Jose, Costa Rica, and Vancouver); Tr. Day 9 (Friedman) at 13:14-14:5; *id.* at 15:11-17:11.

### C.    Improved Schedules

267.    The NEA has also enabled American and JetBlue to offer improved schedules by providing American and JetBlue the incentive and ability to deploy their assets to create the most competitive network against Delta and United.  *See* Section III.E, above.

268.    First, through the NEA, American and JetBlue are able to offer customers a greater number of nonstop options from New York and Boston.  DX-0025 at -066 (showing increases in "Domestic Nonstop OD PDEW Coverage" and "Top 50 NYC OD" as a result of the NEA).  Prior to the NEA, American and JetBlue each served only about 30 of the top 50 nonstop destinations from New York while Delta and United offered nearly all of them.  DX-0111 at -023; DX-0025 at

-066.  Absent the NEA, it was difficult to justify adding routes to make up this deficiency with limited slots and lack of relevance to attract customers away from Delta and United with only marginal improvements.  Tr. Day 7 (Raja) 133:23-134:7.  By pooling slots and offering a joint network, American and JetBlue can offer their respective customers the level of access to the top destinations out of New York that rivals the offerings for Delta and United by jointly plugging in the holes of their network.  Tr. Day 7 (Raja) at 134:13-19; Tr. Day 2 (Hayes)  at 24:18-22, 28:15-17; Mehoke Dep. Tr. at 64:1-5; *see also* Guenthner Dep. Tr. (06/22) at 27:11-7:17 ("Q. And why does Delta believe that [schedule coordination is] important to customers? A. Well, it offers utility to the customers and . . . flexibility . . . within their travel patterns.  So more connection on each side, as well as, you know, even local passengers having different options."); DX-0135 at -008 ("The NEA Network creates 19% More OD Markets than DL from NYC").

269.    Second, the NEA enables more convenient connections.  Slot and gate pooling increases the chances of American and JetBlue finding a slot and/or at the right time of day to facilitate the carriers' growth priorities, such as finding a morning time slot for leisure flights to Florida or an early afternoon slot to enable connections from international flight arrivals.  DX-0285B at -029 (indicating that slots are constrained in early morning and in peak afternoon periods); Tr. Day 2 (Hayes) at 20:8-16 (explaining that, "once we had been slotted in JFK, we were underslotted in the peak 4:00 p.m. to 8:00 p.m. period," which "created quite a few challenges for us . . . [because] those are key times a day, particularly for international flight arrivals and certain departures.  So by pooling assets with American, we were able to use some of their slots in that period to create better schedules for JetBlue"); Tr. Day 5 (Laurence) at 240:6-9 (explaining that the NEA provided access to JFK slots during the "peak period"); Tr. Day 9 (Friedman) at 31:9-20 ("Working together, we can optimize a slot portfolio.  It's not just about adding to the slot

portfolio, but also switching slots and times in them, to make sure we have good timing for both the nonstop customer, but also to create connectivity into the transatlantic markets when they otherwise couldn't exist before"); Tr. Day 9 (Friedman) 32:17-25 (explaining that "being able to also just slightly retime . . . flights and tap into the slot pool that American has, allows us to both serve the nonstop customer, and create connectivity . . . when otherwise JetBlue customers wouldn't be able to connect on to American's network").

270.    Third, the NEA has allowed American and JetBlue to offer more options by spreading schedules on routes that they both fly.  Tr. Day 9 (Friedman) at 12:1-8 (explaining that the parties "can optimize schedules accordingly, and make sure that we're not creating what we call wing tips," or nearly simultaneous departures).

271.    The Clean Team, for example, proposed that American and JetBlue optimize their schedule patterns between New York and Austin to better compete with Delta and United.  PX0279 at 30; Tr. Day 4 (Raja) at 224:25-225:10 (explaining that spreading schedules the NEA enabled a "competitive schedule" between New York and Boston, which allowed stronger competition against Delta and United which had an hourly pattern of flights).

272.    Similarly, between Boston and Washington, D.C., the NEA enabled American and JetBlue to optimize their schedule patterns to offer more time of day options to customers.  Tr. Day 7 (Raja) 137:8-18 (explaining that the NEA "greatly improved our ability to go and compete" because, "post-NEA, it's a nice hourly pattern.  You can get on any flight you want"); DX-0135 at -007.  American and JetBlue continue to optimize schedule patterns on routes they both operate to deliver more efficient and improved patterns of service.  DX-0388 at -035, -036 (showing optimization for NYC-LAX, BOS-LAX, and JFK SFO and identifying other routes prioritized for pattern optimization); Tr. Day 8 (Raja) at 98:11-22 (explaining that, "now we have an hourly

pattern to Raleigh. . . . we have greatly enhanced the utility of our schedule for a high-value or frequently flying customer").

273.    Fourth, the NEA has allowed American and JetBlue to offer higher quality of service.  Under the NEA, American and JetBlue offer "lie-flat service" on all key transcon markets.  DX-0135 at -005; *see also* DX-0055 at 2 ("We are proudly announcing that, because of the NEA, we have the most lie-flat seats of any airline on transcon flights from NYC and BOS.  Lie-flat seats are offered on all transcon flights, together with JetBlue.").  American and JetBlue plan to provide lie-flat service on all transcontinental flights in the NEA.  DX-0388 at -010; DX-0135 at -010.

### D.    Better Connectivity

274.    The NEA creates significant connectivity, particularly in JFK, where American and JetBlue had struggled to compete because it lacked sufficient connectivity to drive demand for new international routes.  Tr. Day 7 (Raja) at 131:17 (explaining that the NEA enabled "a level of connectivity in New York that nobody thought American and JetBlue [would] ever have"); DX-0037 at -012 ("Un-coordinated network produces weak [transatlantic]connection offering"); DX-0388 at -012 (illustrating optimized connectivity at JFK), -034 ("JFK Phase 1 will also enable significant connectivity on AA's transatlantic network"; "The NEA will enable [roundtrip] connectivity to 60% of total connecting demand for combined [transatlantic flights].");  PX0279 at 15 (Clean Team document identifying as an issue absent schedule optimization that "Un-coordinated network produces weak [transatlantic] connection offering").

275.    The NEA has enabled American and JetBlue to discuss re-timing flights in order to increase the connectivity of American's new long-haul international flights out of JFK.  Tr. Day 2 (Hayes) at 20:17-21:2 (explaining that schedule optimization entails "partnering with American to create connective schedules, so customers who would fly on a mix of JetBlue and American would now have schedules that work . . . two to three hour layovers in JFK, as opposed to 6 to 12 hour

layovers or not being able to fly to a market," which enables better competition against Delta and United); Tr. Day 2 (Hayes) at 21:6-19 (explaining that "we can change the timing of those flights [ ], and the slots that they fly in to allow us to connect more customers and bring new customers to both JetBlue and American"); Tr. Day 2 (Hayes) at 44:1-8; Tr. Day 7 (Raja) at 126:1-133:6; DX-0388 at -034.

    **E.**    **The NEA Created the Economic Case for American and JetBlue to Expand their Fleets**

276.    Incremental growth has already occurred as a result of the NEA and additional growth is also expected.  This is illustrated by the fact that the parties have made fleet decisions based on projected capacity increases due to the NEA.  Tr. Day 9 (Friedman) at 45:18-46:1 (explaining that "the NEA makes us competitively stronger, it provides a better solution for customers and it will increase the financial health of JetBlue.  And when the financial health of JetBlue increases, that means there's a higher likelihood of additional growth in the future"); Tr. Day 9 (Friedman) at 43:25-45:6; Tr. Day 7 (Raja) at 176:17-23; *see* Tr. Day 2 (Hayes) at 82:21-83:3.

    **i.**    **JetBlue's E190 Retirement Deferral and A220 Acceleration**

277.    JetBlue, for example, has decided to delay the retirement of its E190s for the NEA. Tr. Day 10 (Clark) at 37:19-38:2 (explaining that JetBlue reversed its plan to retire its E190s "after the NEA was announced and all the growth opportunities that it created that we realized we needed more aircraft in order to fulfill those opportunities"); Tr. Day 10 (Clark) at 29:15-19 (explaining that JetBlue delayed retirement of the E190s); Tr. Day 9 (Friedman) at 41:3-21(testifying that the retirement of the 30 E-190s was done "for the NEA specifically"); Tr. Day 2 (Hayes) at 82:21-25 ("[W]hat we did, because of the NEA, was keep airplanes actually.  We were due to retire 30 E-190s, which we announced that we would no longer retire to cover NEA flying.").

278.     Similarly, JetBlue accelerated the addition of A220s to its fleet.  Tr. Day 10 (Clark) at 43:22-44:10 (explaining that JetBlue's fleet size is "[a]bsolutely bigger" as a result of the NEA "because we very specifically ordered 30 additional A220s to help fulfill those growth opportunities," and "[i]t certainly could end up being even larger than that over time as success from the NEA fuels more growth opportunities and, therefore, allows us to order incremental airplanes in order to capture those additional growth opportunities"); Tr. Day 9 (Friedman) at 41:14-19 (describing JetBlue's decision to exercise A220 options), 44:9-12 ("We will have 30 incremental aircraft, period, as a result of the NEA."); Tr. Day 1 (Hayes) at 82:19-83:3 ("[W]e did secure extra planes because of the NEA."); PX0949 at -066 (illustrating JetBlue's accelerated A220 order book).

279.     The delayed retirement of the E190s and acceleration of the A220 options were specific to the growth opportunities unlocked by the NEA.  Tr. Day 9 (Friedman) at 45:1-6 (explaining that the NEA "justified the intense capital spend to delay the E190 retirements and then ultimately to exercise the A220 options").  While JetBlue's Revenue Management team prepared a revenue analysis for scenarios involving whether the E190 retirement would be delayed with or without the NEA, the scenario that accounted for keeping the E190s without the NEA was included for "completeness."  Tr. Day 10 (Clark)  at 37:14-16 (testifying that he believed this scenario was included because "two variables would lead to four scenarios, but only three of those scenarios were really under consideration").  This was a "theoretical calculation" because JetBlue did not intend to keep the E190s unless it was in the NEA.  Tr. Day 10 (Clark)  23:6-8; 37:14-16 (discussing PX0816); *see also id.* at 20:2-3 (explaining that scenario was "not one that was seriously under consideration"); *id.* at 18-20 ("There was no way we were going to keep the E190s if we weren't in the NEA."); Tr. Day 9 (Friedman) at 61:20-4 ("We had put together a few different

business cases with a few different growth ideas from route planning.  The one business case that actually got the job done and those E190s have been allocated for and that these A220s have been allocated was solely the NEA.").  Further, this analysis did not account for costs, *id.* at 46:17, and therefore did not measure how to optimize profitability.  *Id.* at 46:18-25.  Finally, JetBlue assumed more short-haul flying under the NEA, which potentially would yield lower revenue as well as lower costs.  *Id.* at 24:1-6; 46:10 ("The E190 would not be as efficient with longer stage length flights.");  46:14-15 (short-haul flying "lead[s] to lower costs . . . there's less crew time to pay for, there's less fuel to burn").

## ii.    American's Expanded Fleet

280.    American has steadily been adding to its future fleet, in part because the NEA provides for growth and improved performance in New York, which justifies Board approval of more airplanes.  Tr. Day 15 (Znotins) at 94:5-17, 77:22-78:8, 106:9-21, 108:4-17; 110:10-14 (explaining that "not having…a forecast for continued losses in New York [gave his team] the credibility, when [they] go to the board and argue for these investments, that they will approve it"); *see also* DX-0111 at -023.  These additions include exercising options on airplanes, sourcing new regional jets, and "bringing airplanes out of the desert."  Tr. Day 15 (Znotins) at 106:11-14.  For example, during the height of COVID, American had the option to cancel delayed 787s which would have led to "billions" in savings.  Tr. Day 7 (Raja) at 176:17-23.  These orders were retained because of the NEA.  Tr. Day 7 (Raja) at 176:17-23; *see also* Tr. Day 15 (Znotins) at 109:11-110:7 (describing various options, including "exercis[ing] options on A321 NEO aircraft in 2022," unretiring several 737-800 aircraft that may have otherwise been left on the ground, "creat[ing] a new order with Boeing for 30 additional 737-8 MAX airplanes, upgauging 50-seat aircraft to larger regional jets, and entering a contract with Air Wisconsin to add "40 CRJs to [American's] O'Hare operation").

110

### F.      The NEA is Improving American and JetBlue's Competitiveness

281.    The NEA, and the improved product that it has enabled American and JetBlue to offer, has already yielded a pro-competitive impact in the Northeast.  DX-0149 at -018; *see* Tr. Day 13 (Schweinzger) at 67:18-70:22.

282.    QSI is a common metric used in the airline industry to "measure the desirability of a schedule in a given origin and destination or a group of origins and destinations."  Tr. Day 13 (Schweinzger) at 66:17-22.  Carriers have different methods of calculating QSI, but for American, QSI is evaluated based on a set of characteristics of a given schedule or schedule pattern and calibrated versus real bookings.  Tr. Day 13 (Schweinzger) at 66:24-67:3.  American runs the QSI analysis through its proprietary Raven model and produces a benchmark of where it is expected to perform on a given schedule, all things equal.  Tr. Day 13 (Schweinzger) at 66:24-67:21.  American specifically looks at market share relative to QSI and observes that change over time.  Tr. Day 13 (Schweinzger) at 69:11-25.

283.    American analyzed QSI to determine whether the NEA was causing American and JetBlue to draw more demand than expected based on their prior market share, and concluded that there was a positive share gap for the parties relative to the 2019 baseline, while Delta and United's share gap was negative.  Tr. Day 13 (Schweinzger) at 69:18-25; Tr. Day 13 (Schweinzger) at 70:1-18.  Specifically, American's share gap relative to 2019 in the NEA markets is 1.3 points positive, and JetBlue's is 0.5 points positive.  Tr. Day 13 (Schweinzger) at 70:11-13; DX-0149 at -018; Tr. Day 13 (Schweinzger) at 71:23-72:3 (explaining that a share gap of "zero would have been good, meaning that . . . the schedule [American and JetBlue] put in place is . . . driving enough traffic to satisfy [2019 demand].  [B]ut any positive gap is exactly what [American and JetBlue are] looking for, that customers are picking AA and JetBlue over [their] competitors in [the NEA] markets.  It's a positive thing").  This share is necessarily coming from competitors and specifically

Delta and United who have a negative share gap.  Tr. Day 13 (Schweinzger) at 70:11-22; DX-0149 at -018.

284.     The NEA has also improved the carriers' competitiveness for corporate customers. American has received overwhelmingly positive feedback from its corporate customers from the NEA and has won share from its competitors as a result.  *See* Section III.E.v, above.

### G.     Observed Competitor Reactions to the NEA

285.     Competitors have responded to the NEA with heightened competition.  Southwest observed that the largest domestic increase in capacity measured by seats from June 2019 to June 2021 from Delta and United were in the territories of the Northeast Alliance, Tr. Day 2 (Watterson) at 159:17-21, and noted ███████████████████████████████████████████████ ████████████████████████████████████████████████ DX-0498 at -038; DX-0919; DX-0920.

286.     Delta recognized that the NEA ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ DX-0242 at -001.

287.     Delta thus has been monitoring the NEA in order to remain competitive.  Esposito Dep. Tr. (06/22) at 99:5-99:16 (explaining that it has become "normal course of business" for Delta to see if it is "competitive in the marketplace" with the NEA in terms of "schedule, aircraft, flight times"); *id.* at 134:25-135:10 (explaining that, "if you put both carriers together, they become stronger carrier in that city. . . . monitoring [the NEA] now is normal course of business"); DX-0238 at -002 (noting that ██████████████████████████████████████████████████ ███████████████████████).

288.     For example, Delta evaluated "the strategy and next steps to address the AA+B6 impact to the key outstations" among the "Sales," "Loyalty/lounge," "Communications," and

"Network" groups within the company.  DX-0241 at -001; Esposito Dep. Tr. (06/22) at 122:10-123:23.  In one internal analysis of the NEA from July 2020, Delta observed that the ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ PX0405 at -233.

Accordingly, Delta planned to ███████████████████████████████████████████

████████████████ *Id.* at -236.

289.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ DX-0240 at -003. ████████████████

████████████████████████████████████████████████████████

████████████████ *Id.* at -004.

290.    United similarly has been monitoring the NEA.  *See* DX-0512 at -023 ████████

████████████████████████████████████████████████████████

████████████████; DX-0507 at -049-050 (American, with "Northeast alliance with B6,

adding 18 (of 33 AA/B6 combined) new routes, focused in BOS and LGA"); Weithofer Dep. Tr.

(06/22) at 44:9-15 (explaining that ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████).  In March 2021, a presentation to United's executive team described growth

by American and JetBlue and noted that JetBlue had "accelerated network growth plans."  DX-

0507 at -049-050.  ████████████████████████████████████████████████

████████████████████████████████████████ DX-0512 at -023.

291.    Upon learning of the NEA, Alaska Airlines predicted this exact competitive

response by Delta and United Airlines.  DX-0221 at -002.  Specifically, according to an internal

Alaska memorandum, "[f]or JetBlue, the partnership facilitates the potential for further growth in New York City, via slots from AA, while fortifying their strategic position in Boston versus Delta Air Lines." DX-0221 at -001. The memorandum continues, "[f]or American, the deal creatively addresses strategic weaknesses in the Northeast where they have had a long history, but have struggled to compete over the past decade." DX-0221 at -001. The memorandum further noted that, "[f]rom a broader industry perspective, a stronger competitive proposition in the Northeast will likely necessitate a response from both Delta and United." DX-0221 at -002; *see also* Tr. Day 7 (Harrison) at 49:1-14 (explaining that the new passengers flying on NEA routes are "either going to come off of Delta and United," and Delta and United will not "just sit there and watch it and do nothing"); Tr. Day 7 (Harrison) at 49:16-23 (explaining that Delta and United could take advantage of "a lot of different tools" to compete with the NEA, including "[p]ricing levers, capacity levers, loyalty levers, marketing levers, lot of levers").

### H.    Dr. Israel's Benefits Analysis Shows More than $600 Million in Benefits from the NEA

292.    Since its inception, the NEA has resulted in substantial growth. Tr. Day 13 (Israel) at 112:19-113:2 (explaining that the NEA was "about growth, growing capacity, growing output, and it's working so far. Output is growing in that way, and it's working in terms of creating competition in these two markets"); *see generally*, DX-1091 (Israel Report) at ¶ 133-58. Defendants' expert, Dr. Mark Israel, testified that growth, or increased capacity, is a consumer benefit as it puts a downward pressure on prices. Tr. Day 14 (Israel) at 28:13-15 (explaining that, "normally when you add capacity, the standard effect is that shifts the supply fare route and it puts downward pressure on your unit revenue. It puts downward pressure on your price."); Tr. Day 9 (Town) at 171:22-25 (conceding that, "all else being equal, if there's an increase in capacity, then average consumer welfare will increase").

293.     Relying on a consumer benefit calculation methodology endorsed by the DOJ in prior airline transactions, Dr. Israel calculates consumer benefits based on (i) the results of the ordinary course business case analysis for the NEA conducted by members of the Clean Team using American's Raven forecasting tool; and (ii) actual observed share changes and passenger increases at NEA airports.  DX-1091 (Israel Report) at 141-56.

### i.     Calculation of Consumer Benefits Using Actual Observed Share Changes

294.     Dr. Israel first analyzed what the Clean Team had produced in the course of analyzing the business case for the NEA that would be presented to each airline's Board, consistent with the accepted economics approach of using ordinary course business plans to evaluate airline transactions.  Tr. Day 14 (Israel) at 64:4-14; 69:13-22.  Thus, Dr. Israel focused on analyzing and understanding the "v2" optimized schedule and its corresponding Raven run, which compared changes in passenger traffic using an actually flown September 2019 schedule as the "before" and the Clean Team optimized v2 schedule as the "after."  Tr. Day 14 (Israel) at 65:25-66:5; *see* Section III.C.

295.     At a general level, the methodology that Dr. Israel employed for calculating—or monetizing—consumer benefits based on the clean-team planning exercise is as follows:

296.     First, the clean team schedule has more seats—8.7 million more seats (or 25 planes)—that it predicts will result from the NEA.  Tr. Day 14 (Israel) at 78:1-9.

297.     The Raven forecasting tool predicted that when comparing the Clean Team's v2 optimized schedule to the September 2019 schedule, American and JetBlue will attract an additional 5.75 million passengers every year.  DX-1091 (Israel Report) at ¶ 279; *id*. at Table 8. This prediction is conservative for a few reasons.  First, the v2 optimized schedule had 8.7 million seats (or 25 more planes) than the September 2019 schedule.  Tr. Day 14 (Israel) at 78:1-9.  Thus,

an increase of 5.75 million passengers translates to an average load factor of only 65% on the added capacity, which is conservative.  Tr. Day 14 (Israel) at 78:20-25.  Additionally, the v2 optimized schedule excluded certain new international flying that would be launched in the NEA, such as JFK to Tel Aviv and Athens, because at the time the Clean Team created the v2 schedule, there were uncertainties with respect to those destinations.  Tr. Day 14 (Israel) at 82:12-16.

298.    Dr. Israel then took the additional passengers predicted by the Raven forecasting tool and used well-accepted methodology of determining "how much would prices have had to come down to generate that many more passengers."  Tr. Day 14 (Israel) at 79:3-5.  Dr. Israel monetized the consumer benefits of 5.75 million additional passengers by using a price-elasticity formula, which states that the price elasticity at a given point on the demand curve equals the percentage change in quantity divided by the percentage change in price.  Tr. Day 14 (Israel) 79:9-11.  Using algebra, the formula can be re-arranged into the following equation:

$$\%\Delta Price = \frac{\%\Delta Quantity}{Price\ Elasticity}$$

Tr. Day 14 (Israel) at 79:1-9.

299.    5.75 million more passengers is approximately 3 percent more passengers, meaning $\%\Delta Quantity = 3\%$.  *Id.* at 79:8-9.  The estimated value for price elasticity (the percentage change in quantity divided by the percentage change in price) is taken from economic literature on the airline industry and is 2.1.  *Id.* at 79:9-20.  So putting that all together:

$$\%\Delta Price = \frac{3\%}{2.1} = 1.5\%$$

In other words, a 1.5 percent price reduction in fares is required to stimulate the demand for 5.75 million more passengers to fly.  *Id.* at 79:21-80:8.

300.    Using arithmetic, one can take the average fare for American and JetBlue passengers in the Raven baseline scenario data of $229 and calculate that this 1.5% change in price

116

is equivalent to a $3.40 reduction. *Id.* at 80:17-20. To estimate the consumer benefits from the NEA, that $3.40 is then multiplied by the total number of passengers who *were* flying in the baseline (September 2019), and the resulting estimated benefit is $625 million on aggregate. *Id.* at 80:18-24. For his actual consumer benefits estimate, Dr. Israel conducted this analysis on a route-by-route basis (not in the aggregate that he used to explain the methodology), which changes the results marginally and results in an estimate of approximately $635 million annual consumer benefits. *Id.* at 80:25-81:11; 81:24-83:5; DX-0919.

### ii. Calculation of Consumer Benefits Using Ordinary Course Clean Team Analysis

301. The methodology for calculating consumer benefits based on the actual observed share changes and passenger increases at NEA airports is very similar, but relies on actual post-implementation data about passengers from the DOT's Domestic and International T100 Segment Data (referred to as "T100") for routes with any nonstop service in 2019 and Domestic Origin and the Destination Survey database (referred to as "DB1B") for completely new nonstop service routes. Tr. Day 14 (Israel) at 83:22-84:2. Specifically, it is looking at "[h]ow much has American and JetBlue's share gone up" in the NEA airports. *Id.* at 84:3-4. What the data shows is that in the last three quarters of 2021 (the first three quarters that the NEA was in operation), American and JetBlue's shares have increased at Northeast airports as compared to 2019 when looking at both passengers *and* seats. *Id.* at 84:7-14; DX-0920.

302. First, Dr. Israel converted the shares into total passengers. Tr. Day 14 (Israel) at 84:15-17; DX-0921. For passenger shares this is relatively straightforward: share change multiplied by the number of passengers in 2019 equals total increase in passengers. Tr. Day 14 (Israel) at 84:15-20. For converting seat shares into passenger shares, the share change is mapped

onto the number of seats in 2019, and then the increase in seats is multiplied by the average load factor to turn the number of additional seats into passengers.  *Id.* at 84:21-85:2.

303.    Once the number of incremental passengers has been determined, the same methodology as explained above is employed to convert the increase in passengers into consumer benefits.  *Id.* at 85:3-7.

304.    The calculation shows that the actual, observed share increases in passengers or seats had—as of Q4 2021—already yielded somewhere between $510 and $610 annual consumer benefits.  *Id.* at 85:8-13; DX-0922.  While this number is slightly lower than the number estimated by Raven, that is because the NEA is still not fully rolled out.  Tr. Day 14 (Israel) at 85:13-16.

305.    As Dr. Israel testified, the consumer benefits estimated based on the share changes can—and will—vary from year to year.  Tr. Day 14 (Israel) at 86:3-9.  Specifically, they will vary as the NEA is rolled out more and they will also vary if other competitors enter with stronger service.  *Id.*  It is entirely possible that, as other carriers respond, American and JetBlue's share may decrease, creating the appearance of fewer consumer benefits.  *Id.* at 86:10-15.  That would ignore, however, the consumer benefits caused by the competitive reactions to the NEA, i.e., because other carriers have improved in response to the NEA.  *Id.* at 86:10-87:5.

306.    American and JetBlue's estimates of consumer benefits from the NEA have not been refuted by Plaintiffs' experts.  At best, Plaintiffs' experts argued that the methodology for estimating benefits is flawed, but they have not presented any alternative estimates of consumer benefits.  Tr. Day 9 (Town) at 187:8-10; 191:11-18; Tr. Day 11 (Miller) at 92:13-19.  Plaintiffs' experts also acknowledge that the NEA generates benefits.  Tr. Day 16 (Town) at 168:5-7 ("Q.  So you're not saying the benefits are zero or anywhere close to zero, right?  A.  Oh, no, not at all.");

*see also* PX0957; PX0462 (Town Report) at ¶ 105 (acknowledging that JetBlue grows more with the NEA than without it).

I.      **Dr. Town's Criticisms of Comparing the v2 Schedule to the 2019 Schedule Are Unfounded**

307.    During trial, Dr. Town criticized Dr. Israel's calculation of consumer benefits using the comparison between the v2 optimized schedule and the 2019 actual schedule that the Clean Team used to present the business case to each airline's Board, suggesting that Dr. Israel should have used different comparisons to evaluate the consumer benefits of the NEA.  Tr. Day 9 (Town) at 68:12-70:9.

308.    First, Dr. Town suggested that Dr. Israel should have held resources available to American and JetBlue constant by comparing a schedule in 2019 to a "v4" schedule that certain members of the Clean Team had created to imagine NEA implementation under 2019 resource constraints.  Tr. Day 9 (Town) at 68:16-23.

309.    Using the v4 schedule to evaluate the NEA would not make sense when the v4 schedule was never intended to nor captures the primary purpose and effect of the NEA:  unlocking growth.  Tr. Day 14 (Israel) at 69:7-12, 70:3-18.  The v4 schedule that Dr. Town referred to is a schedule that, after the Clean Team had completed its task of creating the v2 optimized schedule. *See* Section III.C., above.  Jordan Pack, an analyst at American and a member of the Clean Team, considered how the optimized schedule would vary if American and JetBlue held fleet capacity retroactively constant at 2019 levels in anticipation of the DOJ's review of the transaction.  Tr. Day 8 (Pack) at 230:4-7; PX0297 at -088; Tr. Day 8 (Pack) at 228:8-10; Tr. Day 8 (Pack) at 229:3-7.

310.    The v4 schedule was never intended to replace the v2 optimized schedule nor represent what the NEA was designed to be or could do in the future since the NEA had explicitly

119

contemplated growth in the Northeast funded by aircraft in both airlines' order book and has in reality led American and JetBlue to expand their fleet sizes.  Tr. Day 8 (Pack) at 228:17-229:7; *see* Section VII.E, above.  It was strictly a hypothetical exercise to consider what the NEA would have looked like back in 2019 absent any avenues for growth.  Tr. Day 8 (Pack) at 228:5-229:7.

311.    On May 21, 2020, Jordan Pack reached out to JetBlue members of the Clean Team to provide input on what from JetBlue's perspective, an optimized schedule would look like assuming JetBlue was constrained at 2019 fleet levels.  PX0297 at -088.  JetBlue members of the Clean Team did not find the exercise useful in evaluating the NEA, but complied with the request nevertheless, sending back their attempt at creating the hypothetical schedule on May 29, 2020.  PX0297 at -087-88; Tr. Day 8 (Fintzen) at 110:4-8 (explaining that "it wasn't an analysis we were doing, so it was hard for us to understand really what . . . the purpose of what it was.  So it was just kind of imposing a constraint in an analysis that we didn't believe was useful and moving things around."), at 111:12-14 ("I remember not really understanding exactly what they were going after.  So we gave them what we could based on the inputs as best we understood.").

312.    The v4 schedule was never run through the Raven forecasting tool. Tr. Day 8 (Pack) at 217:12-14; Tr. Day 13 (Schweinzger) at 99:4-6.  There is no evidence that the Clean Team did any additional work on the v4 schedule after JetBlue provided its input into the schedule.  Tr. Day 8 (Pack) at 236:18-23; Tr. Day 13 (Schweinzger) at 98:8-10, 85:14-15 ("I don't recall looking at or seeing the v4 schedule data from JetBlue.").  Nor is there any evidence that the v4 schedule was presented to anyone in senior leadership at either airline.  Indeed, members of American's Clean Team had already presented the business case for the NEA based on the v2 schedule and its corresponding Raven run to American's senior leadership before JetBlue provided its input for the hypothetical v4 schedule.  Tr. Day 13 (Schweinzger) at 24:5-6 (update on Clean Team work

provided to Vasu Raja and senior leadership team between May 22 and May 27, 2020); PX0297 (JetBlue provided its input for the v4 schedule on May 29).

313.    Second, Dr. Town suggested that Dr. Israel should have compared what the airlines would be like individually in 2023 to a 2023 schedule that would have occurred under the NEA that's optimized.  Tr. Day 9 (Town) at 69:6-12.  Dr. Israel discussed this possibility with the Clean Team and came to the conclusion that in the middle of all the uncertainties associated with COVID-19 in the early summer of 2020, the best available prediction of what American and JetBlue would look like in a post-COVID world standalone world was what each airline flew in the year just prior to COVID-19.  Tr. Day 14 (Israel) at 76:1-7 ("But there's no 2023 schedule.  They don't have one. They can't make one during COVID.  And they're saying, If you're asking me to give you the best prediction that I can of what decision -- how it's to net out, it's going to be we know what happened in 2019 under those demand conditions, so we think it's going to net out roughly to zero because that's what we did under those demand conditions last time."); *Id*. at 65:1-12; *Id*. at 107:15-19; *Id*. at 113:8-18.

**J.      Text Messages Exchanged Between Members of American's Clean Team Reflect Frustration at How the DOJ Might Evaluate the NEA**

314.    Plaintiffs have also placed significant emphasis on text messages exchanged between Jordan Pack and Chad Schweinzger, two members of American's Clean Team, on May 29, 2020.  The Court has addressed the text messages in connection with Plaintiffs' Motion to Compel (Doc. No. 265) seeking the production of certain documents related to the text exchanges that were withheld as privileged.  *See* Order on Plaintiffs' Motion to Compel (Doc. No. 281), Oct. 20, 2022.  As the Court previously found:

> In discovery, the defendants disclosed to the plaintiffs a series of text messages among employees of American Airlines who were members of a "clean team" that was conducting analysis in connection with the negotiation of the agreement that is the subject

> of this lawsuit (the NEA).   Those text messages contained
> statements that appeared to comment on the likely regulatory fate of
> the NEA and, as produced by the defendants, bore time stamps
> suggesting the texts were sent well after normal business hours.  The
> government referenced the text messages in its opening statement,
> characterizing them as evidence of a "frenzied, worried late night"
> recognition by representatives of American that the NEA's "benefits
> weren't real."

Doc. No. 281 at 1-2.  It turns out that the texts were sent during the business day, but when

produced in discovery the time stamps were changed to UTC time, creating a false appearance that

the exchange occurred later than it did.  Tr. Day 8 (Pack) at 209-10, 215-16.

315.    The record now shows that, on May 29, 2020, Jordan Pack and Chad Schweinzger

were on a call in the late afternoon (during business hours) with outside counsel from Latham &

Watkins LLP and economists from Compass Lexecon, including Dr. Mark Israel, to discuss the

regulatory case for the NEA.  Tr. Day 8 (Pack) at 237:15-21; Tr. Day 13 (Schweinzger) at 28:10-

14.  During this call, Dr. Israel communicated to the Clean Team that he anticipated DOJ would

ask about alternative counterfactuals, including one in which any new NEA flying had to be

accomplished within the limitations of existing 2019 fleets.  Tr. Day 14 (Israel) at 126:4-9.  Dr.

Israel suggested that the so-called "v4" schedule, which Jordan Pack had developed as a thought

exercise on how the optimized schedule would vary if American and JetBlue held fleet capacity

constant at 2019 levels, should be run through American's Raven system.  Tr. Day 8 (Pack) at

230:4-7; PX0297 at -088;  Tr. Day 8 (Pack) at 228:8-10; Tr. Day 8 (Pack) at 229:3-7.

316.    Mr. Schweinzger and Mr. Pack reacted negatively to that suggestion, in part

because it would entail a great deal of work but also because they saw no value in the exercise.

Eventually, Mr. Schweinzger and Mr. Pack began texting each other expressing their frustrations

with the call.  At one point, Mr. Schweinzger wrote:  "I'm completely out of ideas.  So….  If we

show full network results … no bueno."  PX0372.  The phrase "full network results" appears to

mean that NEA traffic growth (the source of consumer benefits) would largely be canceled-out if one presumed traffic losses in 'funding' markets.  Mr. Schweinzger explained that his comment was "in reference to what was being asked of [the business] from a counterfactual measure, not only for what [they] were being asked to create, but certainly the significance or the amount of work that would be required to do so."  Tr. Day 13 (Schweinzger) at 30:8-16.

317.    A few moments later, Mr. Schweinzger sent another text:  "Based on what I'm hearing here if I was DOJ I could easily kill any deal… any deal.  No deal positive.  Ever."  PX0372.  Mr. Schweinzger explained that his comment reflected "frustration and certainly a lot of sarcasm" with the "basic premise [that] if this is how . . . deals in general were going to be considered[,]" by the DOJ, he "didn't see . . . how any deal of any magnitude . . . could be possibly approved."  Tr. Day 13 (Schweinzger) at 30:18-31:14; *see also* Trial Tr. Day 8 (Pack) at 259-60 ("[W]e were constantly being asked a lot of questions and basically being interrogated on the phone from [the consultants and the lawyers] about what we found, and I think, at least to me, I felt that oh my god, everything that you're asking was like, well, nothing was ever possible.  Like we couldn't do anything.")

318.    Jordan Pack replied a few moments later: "I think that the regulatory case for this domestic JV with ATI doesn't exist."  PX0372.  Mr. Pack explained that he was getting the impression, based on having had no experience in making a regulatory case to the DOJ for a deal, that the novelty of the NEA would make it difficult if not impossible to explain it to the DOJ.  Tr. Day 8 (Pack) at 246:7-247:21 ("[T]his was so novel, it's so gray. And on this call, we were basically being hounded that we are going to get attacked.  How can this be explained?  What is this thing?  And that was going to be really, really hard to get across, and the DOJ is not going to like it.").

319.    The Court is not convinced that the text exchanges prove anything of value about the competitive effects of the NEA.  In the first place the evidence is clear that the object of the texts was not the NEA, but rather information conveyed to Mr. Schweinzger and Mr. Pack about the DOJ's likely arguments against the NEA.  Mr. Schweinzger testified without contradiction that the business case for the NEA was based on the "v2" schedule which presumed that, within order book constraints, American and JetBlue would expand their fleets to serve increased demand and new opportunities created by the NEA.  Tr. Day 13 (Schweinzger) at 24:17:26:5.  The work analyzing that business case was substantially complete before the May 29 regulatory meeting that prompted the text exchange.  Tr. Day 13 (Schweinzger) at 23:18-24:10.  It is entirely understandable that American's regulatory team would anticipate arguments that would be made against the NEA and want to study them.  In this instance, American employees bristled at the work being asked of them to conduct an exercise they thought had no value.  That is all this episode shows.

### K.    The "Standalone" Growth Plans JetBlue's Network Planning Team Made Do Not Reflect How JetBlue Would Have Performed Absent The NEA

320.    Dr. Town has pointed to several standalone growth plans that he characterizes as JetBlue's growth plans to assert that those plans show how JetBlue would have grown without the NEA.  *See* PX0462 at Section III.B.  For multiple reasons, these plans do not show JetBlue's performance absent the NEA.

321.    First, some of the plans Dr. Town cites are pre-COVID and therefore are based on assumptions that do not include the massive disruption to air travel that COVID caused.  *See, e.g.*, PX0539 (January 2019).

322.    Second, these plans are not appropriately characterized as "JetBlue's plans."  As Eric Friedman testified, these plans reflected the growth aspirations of JetBlue's network planning

team that had often not been adopted by JetBlue leadership.  Tr. Day 8 (Friedman) at 300:2-15 (discussing the "aspirational" nature of JetBlue's standalone five-year growth plan files), at 301:23-302:3 (same).  These plans typically showed more growth than JetBlue had the capability to fly given its fleet size because the network planning team used these plans to advocate for additional aircraft.  Tr. Day 9 (Friedman) at 42:10-43:14.

323.    Third, the only "plan" that Dr. Town discussed at trial (from July 2020) that is from after the start of the pandemic suffers from similar defects.  PX-525.  Prior to this "plan," JetBlue had decided to defer a large portion of its order book because of the pandemic.  Tr. Day 8 (Friedman) at 282:6-13.  In creating the July 2020 document, the network planning team did not account for this fleet deferral because it was trying to advocate for additional aircraft.  Tr. Day 8 (Friedman) at 282:6-13 (explaining that JetBlue's July 2020 five-year plan "was created after the deferral of the initial 30 to 40 aircraft that happened as a result of COVID. This plan never accounted for those aircraft leaving. So if we as the company wanted to maintain the pre-COVID growth rates, we would have had to have done so by getting more aircraft. And with Connie, we would have needed even more aircraft."); *id.* at 275:15-21 ("This is a desired route planning plan, not necessarily the five-year plan of JetBlue officially in the eyes of executive leadership.").  Thus, the plan showed more flying than JetBlue was capable of achieving, and the plan was never adopted or accepted by management.  Dr. Town did not account for this fact in asserting that this network planning team document was a valid proxy for JetBlue's standalone growth even though he acknowledged that it was "probably" relevant to his opinion.  Tr. Day 16 (Town) at 148:6-20.  Further, this plan was built on assumptions about recovery from COVID that were uncertain at the time.  Tr. Day 8 (Friedman) at 275:22-276:10 ("There were multiple recovery scenarios that we

125

were modeling, things like a V-shaped recovery or U-shaped recovery, L-shaped recovery. So this assumed one of those types of recoveries. I can't remember offhand which one.").

## VIII.   MARKET DEFINITION

### A.   The Evidence Clearly Establishes that Newark Is Part of the New York City Market

324.   Service from Newark is part of the New York City market and a reasonable substitute to service from JFK and/or LaGuardia.

#### i.   There Is Ongoing Competition Among and Substitution Between Airlines Offering Service From Newark and JFK Airports

325.   All airlines offering service to and from New York are in active competition with one another, regardless of from which New York airport or combination of airports they operate. *See, e.g.*, Tr. Day 12 (Lee) at 111:16-19 ("I analyzed and I looked through . . . a whole array of information, all of which points in the direction of – clearly of Newark being part of the New York City market definition."); DX-0011, at -004 (American comparing its NYC Peak Day Departures to Delta, United, and other airlines using metrics from all three New York City airports); DX-0515, at -027 ("EWR offers advantages to other NYC alternatives," including access to the "Top 10 Local Market[s]."); Tr. Day 4 (Kirby) at 12:7-13:3, 13:12-18; Esposito Dep. Tr. (06/22) 162:2-5 (explaining that "NYC3" in an internal Delta competitive landscape document, DX-0238 at -005, "refers to the three major airports in the New York City metropolitan area; JFK, La Guardia, and Newark").

326.   United operates a hub from Newark, and its Newark services compete with JFK services.[9]  Nocella Dep. Tr. (04/22) at 83:10-84:11, 89:3-11; Tr. Day 13 (Israel) at 118:19-22

---

[9] Plaintiffs' market definition would lead to the absurd proposition that United effectively exited the New York City market by consolidating a significant amount of its New York City operations

(explaining that, "given the way airline competition works and what I just said, you just can't leave out United's hub in Newark"); Tr. Day 13 (Israel) at 118:14-16 ("[T]he defining feature of New York as . . . a set of airline markets . . . is that it has competition between strong hub carriers."); Tr. Day 15 (Brueckner) at 24:20-23 (noting that his model and "common sense" show "that Newark should be in the airport group with . . . LaGuardia and JFK."). In fact, Plaintiffs' expert, Dr. Nathan Miller, admitted that consumers flying to New York could choose United's services to and from Newark over others' JFK services. *See* Tr. Day 11 (Miller) at 32:8-18.

327.    The service patterns evident in OAG data confirm that for nearly every significant domestic route serviced by one or more JFK-based airlines, there are Newark alternatives. *See* Tr. Day 11 (Miller) at 31:3-33:18 (discussing Newark alternatives for passengers originating in Los Angeles and San Francisco); *see also* DX-0515 (April 2021 United Newark Global Gateway – 2021 Revision presentation), at -027 ("EWR offers advantages to other NYC alternatives," including access to the "Top 10 Local Market[s]").

328.    Jerome Bristow, a senior program analyst for government travel programs at GSA, similarly testified that Newark is included in the New York market for the purposes of the GSA's City Pair Program. Bristow Dep. Tr. (05/22) at 252:15-253:6; DX-0576. The GSA views all three airports – JFK, LGA, and EWR – as "sister airports" such that government travelers can choose among them for the purposes of traveling to and from the New York area. *Id.*

329.    Moreover, approximately 30 percent of domestic travel to and from New York City comes from outside of the 1500-mile "perimeter" for flying from LaGuardia. Tr. Day 12 (Lee) at 110:23-111:5. For those travelers, JFK and Newark offer the only options for nonstop travel to

---

at Newark. Tr. Day 11 (Miller) at 34:24-35:24; *see* Tr. Day 8 (Friedman) at 300:7-8 ("United exited JFK routes because they couldn't get more slots.").

New York City and are therefore clearly the reasonable substitutes.  *Id.* at 111:6-12; *see* Tr. Day 11 (Miller) Tr. at 28:4-32:20.

330.    There might be some "inframarginal" (most inelastic) customers who might not switch from their preferred airport flights even if fares from that airport become disproportionately expensive.  Plaintiffs have not measured these inframarginal customers in their analysis.  *See* Tr. Day 11 (Miller) at 51:22-52:5 (conceding that he has not "analyzed the price of a taxi or an Uber from one airport to the other").  On the present record there is no basis for concluding that there are too few marginal customers (those who do and would switch between airports) to make service from LaGuardia and JFK a separate market.

ii.    **Manhattan Is the Focal Point of New York City, and Its Travelers Rely on All Three New York City Airports**

331.    An important factor explaining why services from Newark and JFK compete with each other is that Manhattan—roughly equidistant to both airports—is the focal point of demand for both inbound and outbound travel to New York City.  Tr. Day 12 (Lee) at 50:8-10; *see* Tr. Day 11 (Miller) at 28:4-32:20.

332.    As the global financial capital of the world, the headquarters of numerous major corporations, and an important tourist destination, Manhattan is the principal destination of inbound traffic.  Tr. Day 12 (Lee) at 110:4-13.

333.    With regard to outbound traffic, Manhattan is the single most densely populated area in the United States, with a population of 1.7 million that swells to approximately 4 million with the influx of commuters.  Tr. Day 12 (Lee) at 110:14-22.

334.    Manhattan feeds a high volume of traffic to all three New York City airports.  Tr. Day 12 (Lee) at 114:9-21.  Specifically, data produced by the Port Authority of New York and

New Jersey shows that Manhattan is the single largest source (by county) of travelers at Newark. Tr. Day 12 (Lee) at 111:24-112:3.

335.     Data on travel in taxis and for-hire vehicles (Uber, Lyft) to airports shows that travelers in Manhattan rely on all three New York City airports.  Tr. Day 12 (Lee) at 114:9-21 (describing data showing that "across all of Manhattan, particularly Midtown, Lower Manhattan, but really all of Manhattan, people go to all three airports," which "clearly shows that passengers throughout Manhattan substitute amongst the three New York City airports").

336.     Ticket search functions on any airline website or online travel agency include Newark, LaGuardia, and JFK as a unified search term for New York City.  Tr. Day 12 (Lee) Tr. at 112:22-25.

337.     The U.S. Department of Transportation ("DOT") has routinely analyzed airline service in the New York City metro area using this three-airport system.  DX-1093 (Lee Report) at ¶ 107.  Every quarter, the DOT issues a "Domestic Airline Fares Consumer Report" to assist travelers in making informed decision by compiling and disseminating information about market shares, average fares, etc.  Tr. Day 12 (Lee) 111:16-23; *see also* DX-1093 (Lee Report) at ¶ 107. In those reports, Newark is considered part of the New York City market.  Tr. Day 12 (Lee) at 111:16-23.  Most recently, the DOT awarded takeoff and landing rights at EWR to Spirit, rather than JetBlue, based on an analysis of New York area competition that emphasized JetBlue's enhanced position at LGA and JFK because of the slots it obtains through the NEA.  *See generally* DX-1083.

### iii.     Competing Airlines and Other Third Parties Recognize that Three Airports Support New York City

338.     Competing airlines typically consider all three New York City airports when developing their network strategies.  *See, e.g.*, Nocella Dep. Tr. (04/22) at 83:10-16 (confirming

that United "compete[s] with Delta Airlines flights and American Airlines flights and JetBlue flights that are taking off and landing from Kennedy but are serving the . . . same route of New York to some other place"); Nocella Dep. Tr. (04/22) at 89:3-11 (testifying that, generally, United's "fares out of Newark are the same as JFK or LaGuardia"); DX-0560 at -009-010 (showing "NYC" as the location of one of United's hubs); DX-0515 at -0025, -0027 (showing that United compares its EWR hub with its competitors' hubs in New York); Weithofer Dep. Tr. (06/22) at 27:11-14 (explaining that United's "offering in New York City," which is centralized at its Newark hub, is "highly competitive" with Delta's offering, which is concentrated at the other New York City airports); Tr. Day 7 (Harrison) at 78:25-79:8 (explaining that Alaska considers Newark as "part of New York City" in making its network decisions); Tr. Day 2 (Hayes) at 74:14-16 (explaining that "[e]veryone in New York . . . understands" that Newark is part of the "competitive set"); Tr. Day 4 (Raja) at 208:6-20 (explaining that American "absolutely compete[s] with United Airlines at Newark" because "[i]f they lower a price, we match their price and they compete with us, too. . . . we're at much less level of scale, but we compete for corporate accounts. We compete for frequent fliers. We compete . . . on pricing. . . . We compete with them in every possible way we can at Newark"); Tr. Day 5 (Laurence) at 192:5-8 (explaining that "the traditional catchment for [JFK and LaGuardia] was drawn in by the lower fares at Newark").

339.    In analyzing the NEA, American and JetBlue focused on competition from United at Newark for the New York City market.  *See* PX0279, at slide 4.

340.    Furthermore, in reacting to the NEA and its implications for New York, other airlines made various references to United's operations at Newark.  *See* DX-0238 (October 2020 Delta NYC 2021 Competitive Landscape presentation), at -003 (stating American was forced into the NEA because "AA margins significantly underperformed [other airlines] in competitive New

York City market," including United's service from Newark); DX-0238 at -002 ("B6 has designated EWR a focus city and plans to double departures, building a leading three airport footprint in concert with AA."); DX-0498 at -043 ("JetBlue is focusing on a Northeast Alliance (NEA) with American that will grow capacity at all 3 NYC airports and BOS to compete with DL and UA"); PX0894.  This suggests that the "universal reaction" is that the NEA "is, in large part, competition with United in Newark" and that Newark *must* be a part of the New York City Market. Tr. Day 13 (Israel) at 121:11-24.

### iv.   Dr. Brueckner's Regression Analysis Supports This Conclusion

341.   Defendants' expert, Dr. Jan Brueckner, provided testimony on market definition based on updating a study originally published in 2014 with co-authors Dr. Darin Lee and Dr. Ethan Singer, titled "City-Pairs Versus Airport-Pairs: A Market-Definition Methodology for the Airline Industry."[10]  As the title suggests, Dr. Brueckner's article provided a generalized methodology for deciding which airports warrant grouping in multi-airport metropolitan areas for the purposes of defining a relevant antitrust market.[11]

342.   The original study has been cited numerous times by scholars as offering a viable market definition methodology, including by studies cited throughout Plaintiffs' expert reports. *See* Tr. Day 15 (Brueckner) at 7:22-8:1 (noting that the Brueckner, Lee, Singer paper has been cited "about 40 times in the journals" and that Dr. Brueckner is not aware of any criticisms of the paper); Tr. Day 12 (Lee) at 109:4-8 (explaining that "Professor Town and Professor Miller both cite in their report" the Brueckner, Lee, Singer paper).

---

[10] Jan K. Brueckner, Darin Lee, and Ethan Singer, "City-Pairs Versus Airport-Pairs: A Market-Definition Methodology for the Airline Industry," 44 REVIEW OF INDUSTRIAL ORGANIZATION, 1-25 (2014) ("Brueckner, Lee and Singer").

[11] *See generally*, Brueckner, Lee and Singer.

343.    The  Brueckner  methodology  determines  which  airports  in  multi-airport metropolitan areas should be considered as a single end point for purposes of assessing competitive effects.[12]  The methodology is a general purpose methodology, created to inform airline market definition  questions  generally;  it  was  not  specifically  crafted  for  this  litigation.   Tr. Day 15 (Brueckner) at 9:18-23 (explaining that "[t]he idea was to come up with a method for airport groupings that would apply generally to all metro areas. . . . New York was just one of the cases we looked at").

344.    For  New  York,  the  methodology  determines  that  all  three  airports  (Newark, LaGuardia,  and  JFK)  should  be  grouped  as  a  single  end  point  for  the  purpose  of  competition analysis.  Tr. Day 15 (Brueckner) at 9:5-17.

345.    Dr. Brueckner's update of the methodology for New York using more recent data provides a strong indication that the New York City area airports (JFK, LaGuardia, and Newark)

---

[12] Dr. Brueckner's methodology starts by designating a primary airport in the metropolitan area that is being analyzed, and a secondary airport (in the same metropolitan area) that will be tested for whether it should be included with the primary airport as a single endpoint for market definition purposes.  Tr. Day 15 (Brueckner) at 12:9-16.  The methodology essentially then estimates two effects: (a) the average fare effect of an additional carrier on travel from the primary airport to other destinations, and (b) the average fare effect of an additional carrier on travel from the secondary airport to the same other destinations from a secondary airport in the same metropolitan area as the primary airport.  Tr. Day 15 (Brueckner) at 13:4-15:2.  If the fare effect from an additional carrier from the primary airport and secondary airport are statistically indistinguishable (using a 95% confidence interval), the methodology concludes that the airports should be grouped into a single endpoint for market definition purposes.  Tr. Day 15 (Brueckner) at 16:17-17:10.  The methodology tests these effects separately for legacy carriers and LCCs, and requires (to find that the airports should be grouped) that equality be found for at least one type of carrier (LCCs or legacies) at both stages of the test to support a conclusion or grouping.  Tr. Day 15 (Brueckner) at 18:10-17.

In a market with three or more potential airports, such as New York City, the methodology proceeds in two stages.  The first stage conducts the test described above while grouping all of the non-primary airports as a secondary airport.  Tr. Day 15 (Brueckner) at 17:18-18:17.  The second stage test runs the analysis again, testing each potential secondary airport individually.  Tr. Day 15 (Brueckner) at 18:18-19:16.

should be grouped for purposes of market definition and competition analysis.  Tr. Day 15 (Brueckner) at 17:18-19:16; *id.* at 21:20-24:23; *id.* at 24:18-23 (explaining that, "regardless of which airport is viewed as primary, our method indicates that the three New York area airports should be grouped").

346.    Dr. Miller's response to Dr. Brueckner's report does not undermine its usefulness as a guide for determining whether to group airports for purposes of market definition in antitrust analysis.

347.    First, Dr. Miller argues that Dr. Brueckner's analysis does not comport with the *Horizontal Merger Guidelines'* determination of market definition analysis by measuring customer substitution.  *See* PX0461 (Miller Reply Report) at 37.  Dr. Brueckner explained that the BLS analysis looks for competitive spillovers across airports and groups airports where these spillovers exist.  Tr. Day 15 (Brueckner) at 11:12-19 (explaining that "if competition at one airport affects fares at another airport, where the fares are for travel to the same destination, then that's evidence of competitive spillover across airports").  Dr. Brueckner acknowledged that his study measures consumer substitution indirectly, not directly.  Tr. Day 15 (Brueckner) at 20:18-21:3 (explaining that, to do so, "you'd need to have a travel survey, where you ask people. . . . [T]his competitive spillover test is sort of the next best thing to looking at consumer substitution, because if we see these competitive spillovers, that means that consumers must be looking across these airports[.] [I]n other words, airlines know that, and so they're going to respond to competition at the secondary airport.").  That does not undermine its usefulness, particularly since Plaintiffs do not offer direct evidence of substitution either.

348.    Next, Dr. Miller makes two arguments related to "endogeneity."  PX0955 (Miller Reply Report) at 39-40.  The first criticism claims that Dr. Brueckner's analysis "implicitly

assumes that entries and exits at the primary and secondary airports cause changes in price at the primary airport, rather than some third factor causing both." PX0955 (Miller Reply Report) at 39. Miller points to seasonal flying as an example where certain routes are more susceptible to seasonal increases in demand and prices than others, and carriers tend to seasonally enter these routes to satisfy demand. PX0955 (Miller Reply Report) at 39-40. However, this critique and example make no sense, as Dr. Brueckner's analysis uses the average fare from all carriers across hundreds (and for some airport pairs, thousands) of observations over multiple years. DX-0953; DX-0954. Such a large sample would not in general be vulnerable to seasonality causing some skew in pricing.

349.    Next, Dr. Miller argues that "Professor Brueckner's regression approach conflates the mechanical effect of an entrant's fares on average fares with the competitive effect on competitor fares." PX0955 (Miller Report) at 40. Dr. Miller also argues that, although Dr. Brueckner distinguishes legacy carriers and LCCs, there is potential that ULCC entry could skew the average fares. PX0955 (Miller Report) at 40. However, Professor Brueckner explained that any endogeneity in his model, which "measure[es] these competition variables in a discrete manner," is unlikely to have any material effect on his results. Tr. Day 15 (Brueckner) at 28:10-11, 28:17-29:9 (endogeneity "has no effect on the competition").

350.    Regardless of their merit, these critiques prove to be inconsequential, as Dr. Miller's own corrected version of Dr. Brueckner's regressions also finds that JFK, LaGuardia, and Newark should be grouped. PX0955 (Miller Reply Report) at ¶ 88 ("I repeat Professor Brueckner's analysis, but make the two adjustments I described above. . . . The new coefficients also show that an additional legacy competitor at LaGuardia reduces fares at LaGuardia by around 10 percent, while an additional legacy competitor at Newark Liberty or JFK reduces fares at

LaGuardia by 14 percent.   The difference between these two estimates is not statistically significant.").

351.     Dr. Brueckner's testimony is valuable evidence confirming that service from Newark is already in competition with service from LaGuardia and JFK, and therefore part of the same relevant markets.

> **v.        Plaintiffs' Expert, Dr. Town, Has Previously Treated Newark As Part of the New York City Market**

352.     Plaintiffs' expert, Dr. Town, has himself treated Newark as part of the New York City market.   Tr. Day 12 (Lee) at 113:3-9 (describing Dr. Town's report on behalf of the DOJ's opposition of the American/US Airways merger and Dr. Town's 2021 merger retrospective paper).

353.     In a recent merger retrospective paper, titled "What Can We Learn from Merger Retrospectives?  Lessons from the Airline Industry," Dr. Town and his co-authors include all three airports – JFK, LaGuardia, and Newark – in the same relevant market.  *Id.* at 113:7-9; DX-1088 at -019.

> **vi.       Plaintiffs' Experts' Market Definition Analyses Are Flawed**

354.     Plaintiffs' expert, Dr. Nathan Miller, conducted two analyses that purport to show that Newark should be excluded from the New York City market: (1) a catchment analysis; and (2) purported "Hypothetical Monopolist Tests" from the *Horizontal Merger Guidelines*.  Tr. Day 10 (Miller) at 188:4-18; *see also* PX0461 (Miller Report) at ¶¶ 106-117, ¶ 139.  These analyses are flawed.

> **(1)       Dr. Miller's Catchment Analysis Erroneously Ignores Newark**

355.     Much of Dr. Miller's market definition testimony is based on the reasoning that the combination of LaGuardia and JFK services would be a relevant market if there were a decided preference among New York-based travelers for those airports.  *See* Tr. Day 10 (Miller) at 183:22-

184:23.  From that perspective he conducts a series of what he calls "catchment" analyses.  Tr.
Day 10 (Miller) at 188:9-13.  According to Dr. Miller, airports with significant overlap in their
catchment areas are more likely to be closer substitutes for more consumers than airports with
distinct or non-overlapping catchment areas.  Tr. Day 12 (Lee) at 116:6-9 (quoting Miller report);
PX0461 (Miller Report) at ¶ 95.

356.    Dr. Miller's opinions based on his catchment area analysis are flawed and
unreliable for at least the following reasons:

357.    First, to conduct his catchment area analysis, Dr. Miller relied on incomplete ticket
and frequent flyer data from American and JetBlue (covering only a small handful of routes).  Tr.
Day 12 (Lee) at 115:8-18.  In short, he is only measuring the preferences of a small group of flyers
who, by construction, are known to prefer flying on American and JetBlue, and then only studying
the choices they make when—as is not the norm—their preferred airline serves the same origin or
destination from both Newark and one or both of LaGuardia and JFK.  *Id.* at 115:8-22.  He does
not present any catchment analysis that covers New York-based travelers in general.  *See id.* at
115:8:13.

358.    Two issues arise from Dr. Miller's use of these incomplete data.  First, American
and JetBlue predominantly serve the New York City market from JFK and LaGuardia, so the
American and JetBlue passenger flow will heavily skew towards those two airports.  Tr. Day 12
(Lee) at 115:8-18.  In other words, this is not an unbiased sample of passengers, or even New
York-based passengers.  *See id.*  These are groups that by construction exhibit a preference for
American and JetBlue, and therefore for the airports from which American and JetBlue mainly
operate (LaGuardia and JFK).  Tr. Day 12 (Lee) at 115:8-18; Tr. Day 12 (Lee) at 132:9-14
(explaining that "JetBlue and American in New York, they focus their operations at those airports,

at LaGuardia and JFK"); *id.* at 134:22-135:2 ("[F]or some of these destinations like Chicago on American . . . American from LaGuardia offers . . . something like 14 flights a day, or something like that. . . . [F]rom Newark, they offer substantially less").  That an analysis of their behavior confirms what one would expect of American and JetBlue loyalists proves nothing about market definition.  Tr. Day 12 (Lee) at 132:13-14 (explaining that "it's not surprising that you would see [a larger number of JetBlue and American passengers flying out of JFK and LaGuardia], given where they focus their service"); *see generally* Tr. Day 12 (Lee) at 50:6-8 (describing Dr. Miller's catchment area analysis as "nothing but an attempt to gerrymander the New York City market definition").

359.    Second, and relatedly, Dr. Miller's catchment area analysis does not use data from airlines that actually focus their operations at Newark (specifically, United), which would be the best source of data for trying to understand what the Newark catchment areas would be in order to sufficiently compare the catchment areas of the three airports.  Tr. Day 12 (Lee) at 115:13-18 (noting that, "if I was actually interested in understanding what the catchment area of Newark was, I would actually want to use data from airlines that actually focus their operations at Newark").  There is no explanation for why during the course of this litigation Plaintiffs did not attempt to use data from United, Alaska, Spirit and other Newark-based airlines to conduct this analysis.  Tr. Day 12 (Lee) at 115:18-22.

360.    In fact, while Dr. Miller did not conduct a catchment area analysis for Newark, Dr. Lee did, replicating Dr. Miller's methodology and using the same American and JetBlue data on which Dr. Miller relied.  Tr. Day 12 (Lee) at 117:5-8.  Dr. Lee's analysis showed that Manhattan is squarely in the Newark catchment area for both carriers, which supports the conclusion that Newark must be included in the New York City market definition.  *Id.* at 117:18-118:5.

361.     Dr. Miller also conducted a catchment analysis using 2019 New York City taxi and for-hire vehicle data.  Tr. Day 10 (Miller) at 192:17-21.  Essentially he contends that many more taxis and for-hire vehicles go between Manhattan and the LaGuardia/JFK combination than between Manhattan and Newark.  Tr. Day 10 (Miller) at 193:2-4.  There are many flaws with this analysis, beginning with comparing Newark to the *combination* of LaGuardia and JFK.  Tr. Day 12 (Lee) at 115:2-7.  As noted earlier the real dispute is whether Newark and JFK services are in the same market, in which case it makes no sense to inflate the JFK share of taxi and for-hire vehicle data by including trips to and from LaGuardia.  Tr. Day 12 (Lee) at 115:2-7.

362.     In addition, the for-hire vehicle data Dr. Miller used was incomplete, and included only one of the 12 months of 2019 data.  Tr. Day 12 (Lee) at 113:21-114:8.  Once Dr. Lee supplemented Dr. Miller's dataset with an additional 11 months of for-hire vehicle data, the results show that 24.8 percent of taxi and for-hire vehicle pick-ups in lower Manhattan went to Newark. *Id.* at 114:9-17.  And for all of Manhattan, that number was close to 18 percent, which, as Dr. Lee found, is entirely consistent with treating Newark as part of the New York City market.  *Id.* at 114:17-18.

### (2)     Dr. Miller's "Hypothetical Monopolist Test" Is Invalid

363.     The Hypothetical Monopolist Test is an exercise where one assumes that the hypothetical profit maximizing firm that was the only present and future producer of the purported relevant product located in the region imposes a small but significant non-transitory increase in price ("SSNIP"), which is "usually on the order of 5 to 10 percent."  Tr. Day 11 (Miller) at 60:9-17.  Under the *Horizontal Merger Guidelines*, if a hypothetical monopolist of the purported relevant product could profitably raise the price of that product by 5-10 percent, the purported relevant product is a relevant antitrust product market.  *Horizontal Merger Guidelines* § 4.1.2.  The *Horizontal Merger Guidelines* state that, for purposes of conducting the Hypothetical Monopolist

Test, the terms of sale of products sold outside the candidate market must be held constant. *Horizontal Merger Guidelines* § 4.1.2; Tr. Day 11 (Miller) at 60:19-22.

364.     Dr. Miller supports his market definition using what he claims are two different formulations of the Hypothetical Monopolist Test.  *See generally* PX0461 (Miller Report) at § 5.4. Neither formulation is a real Hypothetical Monopolist Test as envisioned by the *Horizontal Merger Guidelines*, for the following reasons:

365.     **737 MAX "Test."**   Under one formulation of a Hypothetical Monopolist Test, Dr. Miller analyzed airlines' responses to the Boeing 737 MAX grounding in March 2019.  *See* PX0461 (Miller Report) at ¶ 140.  Dr. Miller did not actually present this "test" at trial, but in his Report Dr. Miller argued that because the event "led to a reduction in capacity in many candidate markets with an endpoint in NYC (JFK and LaGuardia)," "[s]uch a capacity reduction would have been a potential strategy available to a hypothetical monopolist in these markets."  PX0461 (Miller Report) at ¶ 140.  Dr. Miller opined that his assessment of whether a capacity reduction strategy would have been profitable was effectively a Hypothetical Monopolist Test.  PX0461 (Miller Report) at ¶ 140.

366.     When Dr. Israel explored the impact of the Boeing 737 MAX grounding more broadly, he found that, when the Boeing 737 MAX was grounded, prices went up in Newark as much as or more than they increased at JFK and LaGuardia.  Tr. Day 13 (Israel) at 123:16-18; Tr. Day 11 (Miller) at 50:5-10 (admitting "that prices of the flights at Newark did increase").  This effect was not surprising given that Southwest had been operating out of Newark with the largest 737 Max fleet in the country.  Tr. Day 13 (Israel) at 123:19-23.

367.     Thus, assessing the capacity reductions in connection with the Boeing 737 MAX grounding is not a valid Hypothetical Monopolist Test because it fails to hold the terms of the sale

of products outside of the candidate market (e.g., Newark) constant.  Tr. Day 13 at (Israel) 123:23-124:2 (explaining that the only way to try to turn the 737 MAX grounding at JFK/LGA into a Hypothetical Monopolist Test is to keep prices constant at Newark).  It simply demonstrates that removing capacity from the market affects price.  Tr. Day 13 (Israel) at 122:17-123:5 (explaining that, "when capacity come[s] out of the market, prices go up.  But . . .  it doesn't tell me anything about what the contours of the market are").  This is because the Boeing 737 MAX grounding was not localized to the New York City candidate market of LaGuardia and JFK; it occurred throughout the United States including at Newark where Southwest, the largest U.S. operator of the 737 MAX, operated at the time.  Tr. Day 11 (Miller) at 51:1-14.  Dr. Miller ignored this, admitting he did not separately consider and identify whether price effects occurred at Newark or elsewhere.  Tr. Day 11 (Miller) at 50:16-20.

368.   **Merger Simulation "Test."**  Dr. Miller uses his simulation model to implement a second formulation of the Hypothetical Monopolist Test.  Tr. Day 13 (Israel) at 124:3-125:2; PX0461 (Miller Report) at ¶ 149.  For New York, this model simulates a merger of all of the services at JFK and LaGuardia and asks whether prices increase by 5-10 percent as a result.  Tr. Day 13 (Israel) at 124:3-125:2.  Not surprisingly, Dr. Miller's model finds that a merger of all of the services at JFK and LaGuardia does increase price by more than 5-10 percent.

369.   The problem with this analysis is that it says nothing about whether routes with LaGuardia/JFK endpoints are uniquely relevant markets.  Dr. Miller admitted that candidate markets with the combination of Newark, LaGuardia and JFK endpoints also pass this version of his Hypothetical Monopolist Test.  Tr. Day 11 (Miller) at 65:20-22 (admitting that, "if you did all three together, it would also pass the Hypothetical Monopolist Test").  Dr. Israel amplified on this, testifying that Dr. Miller's simulation model method is "uninformative" because any New York

City airport combination passes the test.  Tr. Day 13 (Israel) at 135:23-137:16.  For example, when Dr. Israel ran the simulation model for LaGuardia alone, he found that a hypothetical monopolist would impose at least a 5 percent SSNIP on 92 percent of nonstop overlap markets with a LaGuardia endpoint and at least a 10 percent SSNIP on 86 percent of the markets.  *Id.*; DX-1054.

370.    Dr. Miller counters that the *Horizontal Merger Guidelines* admit to the possibility that more than one market construct may pass the Hypothetical Monopolist Test.  Tr. Day 10 (Miller) at 184:9-10 (noting that "multiple markets can pass the hypothetical monopolist test"). While that is true, it provides no basis for the Court to adopt one market construct over another simply because one arguably passes the Hypothetical Monopolist Test.  *Cf. id.* at 184:20-185:7. In fact, as Dr. Miller explained, in that situation, "what the merger guidelines tell us to do is to select the market with the goal of illuminating the likely competitive effects of the merger and acquisition under investigation."  *Id.* at 185:3-7.  Dr. Miller made the judgment call to only include LaGuardia and JFK from those various New York City combinations in the relevant market.  Tr. Day 13 (Israel) at 137:3-6.  But that decisions is at odds with the great majority of the relevant evidence.

371.    In many respects, Dr. Miller ignores the market definition principles of the *Horizontal Merger Guidelines*.  First, leaving Newark out of the New York City market violates what is known as the "circle principle."  Tr. Day 13 (Israel) at 133:16-134:23.  Under the "circle principle," if the market includes two products, the market should also include a third product if that third product is a closer substitute for the first product than is the second product.  *Id.*; *Horizontal Merger Guidelines* § 4.1, at 9 & Example 6.

372.    Applying the circle principle to this case, Dr. Israel noted that Plaintiffs' proposed market definition would exclude United's nonstop flights from Newark from the competition for

American's flights out of JFK, but include *connecting* flights out of LaGuardia.  Tr. Day 13 (Israel) at 135:1-20.  Dr. Miller admitted to this and had no good explanation for why he violates the circle principle.  Tr. Day 11 (Miller) at 32:21-33:18; Tr. Day 17 (Miller) at 104:8-105:14.

373.    Dr. Miller also fails to follow the principles outlined in § 4.2.1 of the *Horizontal Merger Guidelines* for defining "Geographic Markets Based on the Locations of Suppliers," despite his admission that those principles apply to this case.  Tr. Day 11 (Miller) at 39:23-25 (admitting that "Section 4.2.1 is the section applicable to this case").   Section 4.2.1. of the *Horizontal Merger Guidelines* states that such markets "encompass the region from which sales are made"; "[c]ompetitors in the market are firms with relevant production, sales, or service facilities in that region"; and suppliers in the region are counted toward market shares "regardless of the location of the customer making the purchase."  *Horizontal Merger Guidelines* § 4.2.1; *see also* Tr. Day 11 (Miller) at 40:1-41:12.    Dr. Miller admitted that United and other airlines operating from Newark have relevant production, sales, or service facilities in the New York region.  *See id.* at 44:15-21.  And yet, Dr. Miller does not count United and other airlines operating from Newark when calculating market shares, despite the fact that his catchment analysis is based on "the location of the customer making the purchase."  *Id.* at 45:1-9 (explaining that his "catchment analysis is explicitly about determining preferences for one airport as compared to another as a function of their residential addresses").

374.    Finally, Dr. Miller fails to consider numerous factors that the *Horizontal Merger Guidelines* state one must consider in addition to a "Hypothetical Monopolist Test."  These include "how customers have shifted purchases in the past between different geographic locations in response to relative changes in price or other terms and conditions," Tr. Day 11 (Miller) at 49:3-51:14, "the cost and difficulty of a customer traveling to a seller's location[], in relation to [a

product's] price," Tr. Day 11 (Miller) at 51:15-56:20, and "evidence on whether sellers base business decisions on the prospect of customers switching between geographic locations in response to relative changes in price or other competitive variables," Tr. Day 11 (Miller) at 56:21-59:1. *See Horizontal Merger Guidelines* § 4.2.1. In short, Dr. Miller's market definition arguments are not a full implementation of what the *Horizontal Merger Guidelines* require to define geographic markets.

375.   ***Conclusion:*** The record as a whole clearly indicates that the relevant markets for air passenger service to and from New York includes services from Newark Liberty Airport.

## IX.   NEA HAS NOT HARMED COMPETITION

### A.   NEA Has Had No Adverse Fare Effects in Any Relevant Market

376.   Plaintiffs have neither claimed nor presented evidence that the NEA has actually resulted in any adverse fare effects (higher prices) since its implementation. Tr. Day 10 (Miller) at 211:11-212:2; Tr. Day 11 (Miller) at 82:23-25 (admitting that he did not analyze "observed post NEA price increases or other changes adverse to customers"); Tr. Day 9 (Town) at 171:5-12 (admitting that he is "not offering the opinion that the Northeast Alliance has caused consumer harm"); Tr. Day 10 (Miller) at 129:5-22 (explaining that he "considered it and I don't think analysis [that studied the actual implementation of the NEA] would be informative"); Tr. Day 17 (Miller) at 127:3-9 ("Are you saying that, in almost 20 months that the NEA partners from -- that the NEA has been in effect, American and JetBlue have not taken any action, potentially anticompetitive, that can be evaluated for actual adverse effects?  A.  I don't know the answer to that question.").

377.   In contrast, Defendants' expert, Dr. Dennis Carlton, analyzed actual fare data since implementation of the NEA and has confirmed, based on a "difference-in-differences" analysis, that the NEA has not adversely impacted fares. Tr. Day 16 (Carlton) at 11:21-12:21. The "difference-in-differences" methodology is a standard approach that economists use to analyze the

change in outcomes over time between a population affected by a specific policy intervention or transaction (the "treatment" group) and a population that is not affected by that change (the "control" group). *Id.* The control group is intended to capture the effect of general industry factors—such as inflation, high energy costs, and COVID—on fares. *Id.* at 14:17-15:20; 16:11-17:11 (explaining that, "[a]s long as the control group is adequately reflecting what's going on generally in the industry . . . in the Northeast, that should adequately allow you to isolate, on the treatment routes, what is the effect of the NEA . . . [o]n competition").

378. The "treatment" group for Dr. Carlton's analysis was the Boston and JFK/LGA routes that Dr. Miller identified as the nonstop overlap routes, which comprise over 90 percent of Dr. Miller's predicted overcharges. *Id.* at 19:17-20:1.

379. The "control" group for Dr. Carlton's analysis was the Boston and JFK/LGA nonstop, non-overlap and mixed-overlap routes, for which Dr. Miller's model predicts minimal to no price effects. *Id.* at 20:2-20. In other words, Dr. Carlton used Dr. Miller's own findings to identify passengers in the NEA region that should not have been harmed by the NEA.

380. The "base" or "pre-NEA" period is the year 2019. *Id.* at 22:22-23:2. The "after" or "post-NEA" period is the second, third, and fourth quarters of 2021, and the first quarter of 2022. *Id.* at 23:2-8.

381. Dr. Carlton found that the NEA has had no adverse effect on fares, specifically concluding that "it would be wrong to say that there's statistical support for the proposition that the NEA increased fares." Tr. Day 16 (Carlton) at 24:25-25:11. This is because the average fares on the Boston and JFK/LGA treatment routes did not increase significantly relative to average fares on the Boston and JFK/LGA control routes after the implementation of the NEA. *Id.* at 24:2-24; DX-1049 (Carlton Report, Updated Table 2); DX-1049 (Carlton Report, Updated

Table 3).  Indeed, in one version of his analysis (the "weighted" regression model), Dr. Carlton found average fares on Boston treatment routes to be lower than average fares on Boston control routes by a statistically significant amount—17 percent in the fourth quarter of 2021 and 20 percent in the first quarter of 2022.  Tr. Day 16 (Carlton) at 24:6-18; DX-1048 (Carlton Report, Updated Table 2).

382.    Dr. Carlton ran a variety of alternative specifications of the regressions and sensitivity tests to confirm his results.  Tr. Day 16 (Carlton) at 21:11-18.  Dr. Carlton placed additional conditions on the control routes to screen out routes on which fares could have changed between the pre- and post-NEA periods, for factors that would not be expected to affect the treatment routes.[13]  Additionally, Dr. Carlton ran other sensitivity tests, including: (1) using 2017 to 2019 as the "pre-NEA" period; (2) adding 2020 as part of the pre-NEA period; (3) evaluating whether any difference in the pre-NEA fare trends on the control routes and the treatment routes could explain his findings; and (4) using two different equation specifications.  *Id.* at 21:11-22:9. In all variations, Dr. Carlton found that the average fares on the Boston and JFK/LGA treatment routes did not increase significantly relative to average fares on the Boston and JFK/LGA control routes.  *Id.* at 22:14-21 ("[M]y reading of the evidence with all the experiments that I have done is that my conclusions are sound.  There is no statistical support for the claim that the NEA has raised fares so far, period, and no one has presented anything to show that I'm wrong.").

---

[13] These include limiting control routes to those on which: (1) the number of LCCs on the route was the same in both the pre- and post-NEA periods; (2) the total number of carriers on the route was the same in both the pre- and post-NEA periods; (3) the distance between cities is similar to the range of distances on the treatment routes; and (4) the total traffic between cities in 2019 is similar to the range of total traffic on the treatment routes in 2019.  *Id.* at 20:22-21:10.

383.     Dr. Carlton has found that as the effects of COVID on the airline industry diminished, his results of no adverse fare effects remain unchanged.  Tr. Day 16 (Carlton) at 26:25-28:3.

384.     Dr. Miller fails to offer any alternative control routes that would alter Dr. Carlton's conclusions.  Tr. Day 16 (Carlton) at 22:10-21; Tr. Day 17 (Miller) at 123:18-22 (admitting that he did not "even tr[y] in the course of [his] two years of study to come up with control groups that would adequately isolate the fare effects of the NEA").  Plaintiffs' only arguments against Dr. Carlton's findings concern the feasibility of an econometric analysis during the recovery from the effects of COVID, and secondarily that Dr. Carlton's control groups are invalid because they appear to respond differently than the treatment group to COVID factors in 2020.  Tr. Day 17 (Miller) at 81:14-82:14, 83:8-12, 123:7-17.  Dr. Miller concedes, however, that any differential between the two groups in 2020 collapses by approximately January or February 2021, prior to the implementation of the NEA.  Tr. Day 17 (Miller) at 124:19-22.

385.     Dr. Carlton's conclusion that there is no statistical support for adverse fare effects from the NEA since its implementation is persuasive and not contradicted by any other evidence in the record.

**B.     No Harm in Any Purported Funding Market**

386.     Plaintiffs have asserted that focusing solely on consumers in the Northeast may not fully capture the competitive effects of the NEA because "funding decisions" adding capacity to the NEA region may have come at the expense of consumers in the "funding markets" (i.e., the routes from which the planes were moved).  Tr. Day 16 (Town) 102:8-103:3.

387.     The NEA created additional demand for flying to and from the four NEA airports. To serve this additional demand, American and JetBlue implemented various strategies, including but not limited to moving aircraft into the NEA region from elsewhere.  Tr. Day 15 (Znotins) at

146

104:17-105:15.  Were the analysis to stop there, the logical conclusion would be that the NEA

consumer is better off.  More capacity is in the NEA region, creating more choices and putting

downward pressure on price.

388.    It is certainly possible that these benefits to NEA region passengers could come at

the expense of others.  But there is no evidence that there was a concomitant decrease in

competition  elsewhere matching the increase in competition in the NEA region.  The evidence

indicated that American, because of its large fleet size and order book, has had little difficulty

funding NEA growth, particularly while the effects of the COVID-19 pandemic had much of its

fleet idle.  *See* Tr. Day 7 (Raja) at 176:20-23 (explaining that American "could have canceled [its

order for 787s]. . . billions of dollars in savings.," but "[w]e kept them going because of [the

NEA]"); Tr. Day 15 (Znotins) at 108:11-17.  American's Vice President of Network Strategy

explained that, while American has allocated some resources to the Northeast in the "short term"

that otherwise might be used elsewhere in its system, the success of the NEA will position it to

seek Board approval for additional planes.  Tr. Day 15 (Znotins) at 104:17-105:6 (explaining that,

"with success in the NEA, we will go back to the board and seek to exercise fleet options or source

new airplanes to backfill those other priorities"); Tr. Day 15 (Znotins) at 77:23-78:8.  In other

words, the NEA creates the business case for more planes.  *Id.*

389.    Plaintiffs did not offer any evidence that fares rose anywhere because of some

funding decision that American made with respect to the NEA.  Tr. Day 16 (Town) at 170:13-21.

390.    Internal documents discussed by Plaintiffs that mention merely the potential for

American to reduce flying in Philadelphia do not establish that the NEA will result in competitive

harm in Philadelphia.  For example, in the presentation to the Board of Directors regarding the

NEA, the speaker notes included that "PHL-TA opportunity cost" would be "$550 million on

foregone flying."  PX0275, at slide 66; Tr. Day 7 (Raja) at 158:4-19; *see also* Tr. Day 8 (Pack) at 159:1-161:6 (discussing a request from Vasu Raja to model the opportunity cost for new JFK flying based on foregone flying in Philadelphia).  Vasu Raja explained that this was an accounting exercise that did not reflect American's actual plans with respect to Philadelphia and that, in reality, American decided not to cancel widebody aircraft during COVID because of a desire to grow both New York and Philadelphia.  Tr. Day 7 (Raja) at 158:25-159:24.

391.    American's executives explained that growth in JFK as a result of the NEA will not come at the cost of reduction in flying in Philadelphia because American's operations out of Philadelphia will be complementary to American's larger offering in New York.  Tr. Day 7 (Raja) at 176:7-12 (explaining that American is investing in "321XLRs and 787s" because Philadelphia and JFK will both "have a lot of flights in it" serving "different things").  This is because Philadelphia is an airport that allows American to get its customers anywhere in the country via Philadelphia to Europe while New York is a highly competitive market that requires nonstop service and a higher percentage of customers originating from New York to viably serve Europe. Tr. Day 15 (Znotins) at 81:8-82:19.  Thus, "a flight to Europe from JFK addresses an entirely different market than what Philadelphia does" and it is not possible to "replace Philadelphia as a connecting gate[]way with JFK."  Tr. Day 15 (Znotins) at 110:19-111:21.  Just as United used Dulles airport as more of a connecting gateway and Newark as more a local New York-focused airport for transatlantic services, American needs robust services from both Philadelphia and JFK airports in its network.  Tr. Day 15 (Znotins) at 111:21-112:1.

392.    Separate from the NEA, American has reduced its capacity in Philadelphia relative to 2019 as a result of the acute impact of COVID-19 on demand for transatlantic travel.  With significantly smaller demand for travel to Europe, American reduced capacity from Philadelphia

to international destinations and also reduced capacity in domestic flights that were dedicated to facilitating international connections prior to the pandemic.  Tr. Day 15 (Znotins) at 112:5-19. American recently had occasion to analyze whether it should reduce its footprint in Philadelphia as its lease with the airport was ending.  Tr. Day 15 (Znotins) at 113:2-10.  American determined through the course of this analysis that Philadelphia served an important role in its network and decided to renew the lease in Philadelphia.  Tr. Day 15 (Znotins) at 113:11-15.  American's latest plan, according to its head of Network Planning, is that as American emerges from the pandemic, it will "get Philadelphia back to, or exceed, its 2019 size."  Tr. Day 15 (Znotins) at 116:4-13; DX-0111 at 30.

393.     With a much smaller fleet, funding NEA growth has been more challenging for JetBlue.  Yet again, Plaintiffs did not offer any evidence that fares rose anywhere because of some funding decision that JetBlue made with respect to the NEA.  Tr. Day 16 (Town) at 170:13-21. JetBlue funded NEA growth by delaying the retirement of certain aircraft, ordering additional aircraft, and taking delivery of aircraft that would otherwise have been canceled.  *See, e.g.*, Tr. Day 10 (Clark)  at 37:19-38:2 (explaining that JetBlue "had already announced the retirement of the E190s, which "were exiting the fleet," but "after the NEA was announced and all the growth opportunities that it created," "we realized we needed more aircraft in order to fulfill those opportunities"); *id.* at 29:15-19 (noting that, "[w]e were flying more departures in this scenario with the NEA and keeping the E190s"); Tr. Day 9 (Friedman) at 41:3-21 (explaining that not only did JetBlue delay the retirement of the E190s but also exercised its A220 options and accelerated them into the order book), 44:9-12 ("We will have 30 incremental aircraft, period, as a result of the NEA"); Tr. Day 2 (Hayes) at 82:21-25; Tr. Day 10 (Clark) at 43:22-44:10 (confirming that JetBlue's fleet will be "[a]bsolutely bigger" as a result of the NEA," and elaborating that,

"[r]oughly, it would be 30 aircraft bigger with the NEA because we very specifically ordered 30 additional A220s to help fulfill those growth opportunities," and "[i]t certainly could end up being even larger than that over time as success from the NEA fuels more growth opportunities and, therefore, allows us to order incremental airplanes in order to capture those additional growth opportunities"); Tr. Day 2 (Hayes) at 82:19-83:3 ("[W]e did secure extra planes because of the NEA.").

394.    Plaintiffs' expert acknowledged that American's and JetBlue's ordering of new planes and delayed retirement of others could "alleviate" or even "eliminate" any need to fund from other parts of the network.  Tr. Day 16 (Town) at 170:23-171:12.

395.    Indeed, according to Dr. Town's analysis, American and JetBlue have both outpaced the growth of Delta and United at the four NEA airports since the NEA has been in effect, and they are keeping pace with Delta and United outside of the Northeast.  PX1069 (Town Expert Report Exhibit 22, showing American and JetBlue growing faster than Delta and United in the Northeast); PX1071 (Town Expert Report Exhibit 24, showing American and JetBlue growth on par with Delta and United outside of the Northeast).

## C.    The NEA Has Not Delayed JetBlue's Entrance into the London Market

396.    In 2019, JetBlue announced its goal of flying to London.  Tr. Day 1 (Hayes) at 244:10-12.  In order to fly to London, JetBlue needed to acquire planes capable of flying overseas and slots at one or both of the major London airports—Heathrow (LHR) and Gatwick (LGW).  Tr. Day 2 (Hayes) at 57:6-12 (describing JetBlue's current long-range fleet and efforts to get additional long-range airplanes); *id.* at 57:13-25 (describing delays in acquiring long-range airplanes).

397.    JetBlue's London strategy has been to serve both Heathrow and Gatwick airports. Tr. Day 1 (Hayes) at 246:22-25 ("[A]s I've made all my public comments about, it wasn't about

just flying to Heathrow, we sought a path to more than one London airport.  We've also been able to secure permanent slots at Gatwick."); Tr. Day 2 (Hayes) at 56:10-12.

398.    It has historically been more difficult for an airline to acquire slots at Heathrow as compared to Gatwick.  *See* Land Dep. Tr. (04/22) at 196:17-23, 197:2-6.  JetBlue had multiple, independent pathways to obtain Heathrow slots:   (1) acquisition from the London slot administrator; (2) acquisition from other airlines; (3) ad hoc slots that were available because of underutilization during the pandemic; and (4) remedy slots from the U.K. Competition and Markets Authority ("CMA").  Tr. Day 1 (Hayes) at 244:10-20; 245:9-246:7; Tr. Day 2 (Hayes) at 56:22-25.

399.    JetBlue's attempt to acquire "remedy" Heathrow slots from the CMA was not successful, but JetBlue was able to acquire slots from other sources.  Tr. Day 2 (Hayes) at 56:13-25; Tr. Day 1 (Hayes) at 246:2-7 ("We had a number of pathways and we never had all our eggs in one basket, and we -- other pathways came through. So we did not need the remedy slots. And frankly, if those remedy slots had come with conditions, we may not have taken them anyway and pursued these other pathways.").  The CMA's denial of these "remedy" slots thus did not delay or negatively impact JetBlue's London service.  Tr. Day 1 (Hayes) at 247:15-21; id. at 248:22-249:7. JetBlue has slots for, and is flying, all the planes it has that are capable of flying to London.  Tr. Day 2 (Hayes) at 57:6-12, 58:12-14; Tr. Day 1 (Hayes)  at 249:19-21.  JetBlue currently operates two flights a day from Boston to London (one to Gatwick and one to Heathrow) and three flights a day from New York to London (two to Gatwick and one to Heathrow).  Tr. Day 2 (Hayes) at 52:3-8.

### D.    JetBlue Brings Disruptive Pricing to Transatlantic Market

400.    Since launching its London service, JetBlue has brought the same approach to pricing in the transatlantic market that it is known for in the United States.  Tr. Day 2 (Hayes) at

54:11-12 (9/28) ("[W]e've rolled out London, we've launched with much lower fares."); Tr.

Day 1 (Hayes) at 250:20-22 ("[W]e have carved our own path to London and taking a very sort

of JetBlue maverick disruptor approach to do it ourself and lower fares."); *see also* DX-0384 at

-002; Tr. Day 3 (Jarashow) at 96:5-97:13.

401. JetBlue's pricing has brought the JetBlue Effect to London.  Tr. Day 2 (Hayes) at

54:12 -18 ("You [k]now, we did some work back in May that showed the impact of Mint fares to

London were 40 to 50 percent lower in New York. . . So we continue to disrupt, because it's our

DNA.  It's called our business model."); *id.* at 52:11-19 ("Again, we've taken the same approach

we've always taken [with respect to London flights], which is to lower fares, stimulate the demand,

and to operate with fuller—full airplanes.").

402. Plaintiffs did not offer any contrary evidence, *i.e.,* evidence that JetBlue abandoned

or modified its usual disruptive practices, or that there have been adverse effects on these

transatlantic markets.  There is therefore no basis on which the Court could find that the NEA has

harmed or threatens to harm competition on these markets.

### E.    No Harm on the BOS-LGA Route

403. Plaintiffs criticize the decision by American and JetBlue to have JetBlue only serve

the BOS-LGA "shuttle" market.  They provide no evidence, however, that American's exit from

this market has harmed consumers.

404. As part of scheduling coordination between American and JetBlue, JetBlue took

over American's flying on the Boston to LaGuardia route.  Tr. Day 7 (Raja) at 140:2-9.  Mr. Raja

explained that the service was not profitable for American prior to the NEA, largely because its

labor agreements with its pilots union required it to fly a large percentage of mainline aircraft (130-

seat A319s, as opposed to smaller, regional jets), which was not economically viable.  Tr. Day 7

(Raja) at 137:3-18.  The COVID-19 pandemic exacerbated that challenge by severely depressing,

perhaps permanently, demand for "day trip" flying.  *Id*. at 141:16-18 (explaining that "we're starting to square ourselves up to … the reality that our true competitor in this market, the true substitute product is not the train, but the Zoom call.").

405.    This route is now served by Delta and JetBlue.  Tr. Day 2 (McMenamin) at 225:19-22.  JetBlue operates this route with larger planes than American formerly did, so it is able to add capacity to the route using fewer frequencies and thus using fewer slots.  Tr. Day 9 (Friedman) at 48:22-49:1 (testifying that JetBlue has "added to LaGuardia" and that "when all the E190s become A220s, with the 40 percent more seats," there will be "roughly the same capacity that existed in the market beforehand"); Tr. Day 2 (Hayes) at 14:12-15:1 (testifying that prior to the NEA JetBlue was slated to reduce flying in LGA from 19 flights a day to 15-16 flights a day as a result of having been outbid by another carrier for three leased slots, but that the NEA has allowed JetBlue to now "operat[e] around 50 flights [per] day into LaGuardia," which has resulted in "more than tripling" JetBlue's service there).

406.    There is no present basis to conclude that American's withdrawal from this route is harmful to competition.  The market has been assigned to JetBlue, the LCC that not only charges lower fares generally, but which Plaintiffs argue caused substantial decreases in fares for shuttle services.  Tr. Day 1 (Hayes) at 116:19-117:23 (testifying under Plaintiffs' examination that JetBlue's entry into the BOS-LGA market had an "overnight" "immediate impact" whereby walkup ticket prices dropped about 70 percent on the first day and led to a 51 percent fare reduction over a one-year period).  Mr. Hayes testified that JetBlue continues to offer low fares on that route (among others).  Tr. Day 1 (Hayes) at 179:6-10 ("I will represent to you, and I think most people in Boston and New York know this, that market is much more competitive with JetBlue flying 15

or 16 a day, next Delta, then JetBlue flying six flights, and American and Delta competing with each other.").

407.     JetBlue's more efficient use of the slots to serve the Boston-LaGuardia route has enabled American to launch additional routes and frequencies from LaGuardia, such as Little Rock and Tulsa.  Tr. Day 7 (Raja) at 142:23-143:9 (testifying that new nonstop service to Little Rock and Tulsa was "born because American Airlines took its metal out of Boston to LaGuardia"); Tr. Day 15 (Znotins) at 96:12-97:15 (testifying that American was able to launch new routes and new frequencies as a result of exiting BOS-LGA).

**F.     Plaintiffs Have Not Offered Any Meaningful Evidence of Actual Anticompetitive Harms from the NEA**

408.     Plaintiffs have not introduced any meaningful evidence of anticompetitive harms from the NEA, and no such empirical evidence, that post-dates implementation of the NEA. Indeed, at the end of trial, Plaintiffs' last expert, Dr. Miller, was unable to identify a single anticompetitive action that Defendants had taken that could be evaluated for actual adverse effects. Tr. Day 17 (Miller) at 127:3-9 ("Are you saying that, in almost 20 months that the NEA partners from -- that the NEA has been in effect, American and JetBlue have not taken any action, potentially anticompetitive, that can be evaluated for actual adverse effects?  A.  I don't know the answer to that question."); Tr. Day 10 (Miller) at 210:10-212:10 (admitting that he had no evidence (1) "that the NEA has led to any capacity reductions anywhere in the Northeast that have resulted [in] higher fares for consumers;" (2) "of any fare increases on any of the nonstop overlap routes that are unusually higher than fare changes that may have occurred on NEA nonstop overlap routes;" (3) of "any loss of a JetBlue effect"; (4) "that JetBlue has changed its low cost carrier business model as a result of the NEA;" (5) "that, as a result of the NEA, JetBlue and American

Airlines are coordinating with other airlines;" or (6) "that, as a result of the NEA, there has been a resurgence of capacity discipline").

409.     Thus, although Plaintiffs have alluded to specific actions taken by American and JetBlue that may have resulted in competitive effects (e.g., BOS-LGA, "funding"), Plaintiffs' expert responsible for analyzing the "competitive effects of the NEA" provided no evidence that any actual harm resulted from those actions.  Tr. Day 10 (Miller) at 88:14-15 ("My assignment was to analyze the likely competitive effects of the NEA.").

410.     American's exit from the Boston-LaGuardia route, referenced above, illustrates a broader problem with Plaintiffs' approach to the case.  Plaintiffs pointed out multiple times through the course of trial that American exited the Boston-LaGuardia route.  Tr. Day 1 (Hayes) at 180:3-5; Tr. Day 3 (McMenamin) at 5:20-23; Tr. Day 12 (Carter) at 220:14; Tr. Day 15 (Znotins) at 128:16-19.  Plaintiffs have also emphasized the positive effects JetBlue competition has had on fares for shuttle routes.  *See* Tr. Day 1 (Hayes) at 116:19-117:23 (testifying under Plaintiffs' examination that JetBlue's entry into the BOS-LGA market had an "overnight" "immediate impact" whereby walkup ticket prices dropped about 70 percent on the first day and led to a 51 percent fare reduction over a one-year period).  However, when asked to identify any competitive effects from American's exit from Boston-LaGuardia, Dr. Miller testified that he did not even consider the possibility of studying the fares on the route since American's exit.  Tr. Day 17 (Miller) at 127:23-128:3.  This does not allow the Court to conclude that this exit event, one of the few implementation decisions Plaintiffs single-out for criticism, has been anticompetitive.

411.     The evidence actually shows that JetBlue now flies 15 or 16 flights per day on this route, enhancing JetBlue's competitiveness and expanding its low-fare options.  Tr. Day 1 (Hayes) at 179:6-10.  JetBlue also has sufficient capacity and hourly service to address the demand on the

route, which has decreased 30 percent since the pandemic.  Tr. Day 1 (Hayes) at 179:5-15; Tr. Day

9 (Friedman) at 49:8-20; Tr. Day 7 (Raja) at 141:19-21.  At the same time, American's exit from

the Boston-LaGuardia route freed up slots to bolster JetBlue's low-fare presence on the route and

allowed American to launch flights to new destinations previously unserved by any carrier from

New York, such as Little Rock and Tulsa.  Tr. Day 7 (Raja) at 118:13-18, 142:19-143:9.

### G.     Dr. Miller's Merger Simulation Is Unreliable and Unpersuasive

412.    Plaintiffs' principal evidence of harm is Dr. Miller's flawed predictive merger

simulation model, which predicts fare effects that have not materialized in the more than 20 months

since the NEA was implemented.  Tr. Day 9 (Town) at 171:5-12 ("Q.  Now, you're also not

offering the opinion that the Northeast Alliance has caused consumer harm, correct?  A.  Has

caused?  Q.  Yes.  A.  I don't offer a view on that because I think it would be difficult to assess,

given the current circumstances.  You wouldn't be able to disentangle COVID from the other fact

-- from this other factor."); Tr. Day 10 (Miller) at 129:5-22 ("Q.  So you mentioned that you used

the model, but the NEA has been in effect for some time.  Why didn't you just do a comparison of

prices from before and after implementation of the NEA?  A.  I considered it and I don't think

analysis would be informative."); Tr. Day 11 (Miller) at 82:23-25 ("Q.  Okay.  You provided no

analysis of observed post-NEA price increases or other changes adverse to customers, did you?

A.  That's correct."); Tr. Day 12 (Miller) at 32:8-10 ("Q.  And you have not analyzed [actual NEA

schedules] to determine whether there are any anticompetitive reductions of output, have you, sir?

A.  I have not analyzed those schedules."); *see also* Tr. Day 17 (Miller) at 151:9-17, 127:3-128:3

("Q.  .  .  .  Are you saying that, in almost the 20 months that the NEA .  .  . has been in effect,

American and JetBlue have not taken any action, potentially anticompetitive, that can be evaluated

for actual adverse effects?  A.  I don't know the answer to that question.").

156

413.     Dr. Miller's merger simulation model predicts that the NEA will result in price changes in domestic NEA markets that, were they to come about, would raise fares for consumers by $696 million annually.  PX0461 (Miller Report) at ¶ 11; Tr. Day 10 (Miller) at 93:12-13.

414.     Although he relies on a merger simulation model to evaluate the NEA, even Dr. Miller recognizes that the NEA is not a merger.  Tr. Day 11 (Miller) at 95:24-96:3 (admitting that he is "not contending that the NEA is, in fact, a merger").  Dr. Miller nevertheless justifies predicting NEA effects through a merger simulation by contending that because Defendants share revenues they will "behave" as if they are merged, maximizing "joint" rather than unilateral profits.  Tr. Day 10 (Miller) at 120:3-123:24; Tr. Day 11 (Miller) at 110:25-111:11 (citing to PX0461 (Miller Report) at n.68).  Dr. Miller also disregards the unilateral incentives for capacity expansion that the Parties wrote into the Mutual Growth Incentive Agreement ("MGIA") on the ground that they are in conflict with joint profit maximization.  Tr. Day 11 (Miller) at 109:3-6 (admitting that "these parties negotiated an agreement between them that can create unilateral incentives to expand capacity"); 105:11-18 ("Q. So essentially, the argument is that no one should believe that the parties will behave consistent with that capacity expansion incentive because, as you put it in your initial report, on paragraph 41, those characteristics of the NEA revenue sharing highlighted by the defendants actually, if taken in isolation, create an incentive to exploit the partner airline, i.e., profit at the partner's expense?  A.  That's [what] the report says.").

415.     For the reasons that follow, the Court should not be persuaded that Dr. Miller's model is a reasonable or reliable estimate of the price effects of the NEA.

> **i.      A Merger Simulation Does Not Appropriately Estimate the Fare Effects of the NEA**

416.     Dr. Miller predicts harm from the NEA using a slightly modified version of a standard "unilateral effects" merger simulation—an economic model that estimates how much

firms can raise prices after merging given that some lost sales are "recaptured" by the merger partner.  Tr. Day 11 (Miller) at 94:7-95:23.  Dr. Miller acknowledged on direct examination that with respect to nonstop overlap traffic his model of the NEA generates outcomes nearly identical to those of a merger.  Tr. Day 10 (Miller) at 179:12-19 ("Now, for NEA nonstop overlaps . . . the NEA creates similar incentives as a full merger, even without the change in control.").

417.    At the heart of Dr. Miller's merger simulation is the idea of "recapture," which he described in his Report as follows:

> Specifically, after the merger, the merged airline maximizes its joint profit that results from sales of A's seats and sales of B's seats. Consequently, the merged firm takes into account that it recaptures some of the lost profit from customers that leave A, because some will switch to B. In this context, prior to the merger, A would have lost some sales to B had it raised its price. After the merger, these customers are not truly lost because A recaptures the sales diverted to B. Consequently, a price increase that would not have been profitable before the merger, could be profitable after the merger.

PX0461 (Miller Report) at, ¶ 34.

418.    This is the only economic effect of the conduct at issue that is captured by Dr. Miller's simulation model.  None of the other competitive effects theories that Plaintiffs have suggested (e.g., loss of JetBlue Effect, capacity discipline) are captured by his model in any way.  Tr. Day 11 (Miller) at 95:4-23.  Furthermore, as discussed in more detail in the next two sections, merger simulations such as Dr. Miller's hold capacity constant and ignore all efficiencies, consumer benefits, and other sources of downward price pressure.  Tr. Day 17 (Miller) at 115:25-116:6, 116:12-15.

419.    As a result, Dr. Miller's merger simulation model, like every merger simulation model, inevitably—and here, incorrectly—predicts adverse effects.   Tr. Day 11 (Miller) at 132:23-133:9 ("The model does not consider efficiencies" and it "does not account for the interactions of competitors"); Tr. Day 17 (Miller) at 115:25-116:6 ("[T]he model does not

incorporate any possible efficiencies that would be relevant.  It quantifies the anticompetitive side of the effect."); Tr. Day 13 (Israel) at 131:12-16 (explaining that "every merger simulation model gets positive price increases.  These models are built to only measure upward pricing pressure. You can't get a negative number, zero is the bottom, unless you build in some efficiencies or something, which he has not done."); Tr. Day 16 (Carlton) at 50:3-10 (same).

> ii.     **Dr. Miller's Simulation Model Incorrectly Holds Capacity Fixed**

420.    Dr. Miller's simulation model does not allow for changes in capacity, even though capacity growth is a primary objective of the NEA.  Tr. Day 11 (Miller) at 107:1-3 (admitting that he "do[es] not simulate at all changes in capacity over time" and instead focuses on 2019); Tr. Day 17 (Miller) at 116:12-15 ("Q.  Yes.  So your simulation model doesn't take into account and model any output expansion facilitated by the NEA, correct?  A.  That is correct.  It holds capacities fixed.").

421.    Specifically, the underlying simulation model Dr. Miller relies on is a one-shot, static estimate that only looks at the effect of the NEA *as if it were implemented in 2019—and only 2019*—and then converts that to an annual number.  Tr. Day 11 (Miller) at 107:4-8, 132:5-10.

422.    However, throughout the course of trial, significant evidence was offered by both fact and expert witnesses regarding the growth objectives and output expanding effects of the NEA.  *See, e.g.*, Tr. Day 17 (Miller) at 117:7-13 (Dr. Miller admitting that, even though JetBlue has added roughly 30 aircraft to its fleet because of the NEA, "the capacity effects of that would not be reflected in [his] model in any way, shape, or form").  Furthermore, evidence has been presented by both Plaintiffs and Defendants that capacities *are not* fixed and change year-to-year and even quarter-to-quarter.  Tr. Day 11 (Miller) at 106:11-25; DX-0932 (Israel Expert Report

Figure 9, American and JetBlue ASMs are Growing Faster than Other Carriers' ASMs at NEA Airports).

423.   And in fact, Dr. Miller agrees that the terms of the MGIA create unilateral incentives to expand capacity.  Tr. Day 11 (Miller) at 108:23-109:6 (conceding that "these parties negotiated an agreement between them that can create unilateral incentives to expand capacity"). Yet Dr. Miller's merger simulation does not capture, and cannot capture, these effects.

### iii.   Dr. Miller's Simulation Model Incorrectly Ignores Consumer Benefits

424.   A simulation like the one employed by Dr. Miller will always generate upward pricing pressure if the merging firms compete and there is no downward pricing pressure from increased capacity, efficiencies, or improved quality, to counteract that effect.  Tr. Day 13 (Israel) at 131:12-16; Tr. Day 16 (Carlton) at 50:3-10; Tr. Day 16 (Carlton) at 50:3-10.

425.   Dr. Miller's model does not incorporate any such efficiencies or consumer benefits that might introduce downward pricing pressure.  Tr. Day 17 (Miller) at 115:25-116:6 ("[T]he model does not incorporate any possible efficiencies that would be relevant.  It quantifies the anticompetitive side of the effect."); Tr. Day 17 (Miller) at, 116:12-15 (admitting that his "simulation model . . . holds capacities fixed"); *id.* at 121:19-25 (explaining that "[t]he model holds capacity fixed, and so the capacity changes [whether positive or negative] are not in the model").

426.   Dr. Miller's merger simulation model does not take into account any increased customer utility from more frequencies or better schedules facilitated by the NEA, despite acknowledging that he assumes (in his demand estimation) that consumers do value more frequencies by a carrier and its partners. Tr. Day 17 (Miller) at 117:20-23 (admitting that his "simulation results do not take into account increased customer utility from more frequencies or better schedules facilitated by the NEA"); *id.* at 117:25-118:5 (admitting that this is true "even

though . . . in [his] nested logit model, [he] assumed that consumers put a valuation on the number of frequencies offered by a carrier and its partners per quarter on the routes in question"); *id.* at 118:19-23 (admitting that his model "did not reduce [his] estimates of harm that [he] reported that lead to the $696 million figure by so much as a penny to account for the consumer value of greater frequencies").

427.     Nor does Dr. Miller's simulation model consider the improvement in American and JetBlue's "QSI" scores (which is a measure of consumer willingness to choose American or JetBlue flights, relative to other carriers, discussed in ¶ 282, above), Tr. Day 12 (Miller) at 31:5-9), since the NEA went into effect.  Tr. Day 17 (Miller) at 119:13-15 (explaining that the model "would not take into effect or model the parties' improved QSI"); DX-0149 at -018; Tr. Day 13 (Schweinzger) at 70:10-22 ("American Airlines' share gap relative to 2019 in these NEA markets is 1.3 points positive, and JetBlue's is 0.5 points positive.  And because you're looking at, you know, share gap . . . you would indicate it's coming largely from the largest competitors who we're trying to build a network to compete with, which is Delta and United."); Tr. Day 13 (Schweinzger) at 71:20-72:3 (explaining that "consumers are selecting AA and JetBlue relative to our largest competitors when you adjust for the changes in schedule. . . . [A]ny positive gap is exactly what we're looking for, that customers are picking AA and JetBlue over our competitors in these markets.  It's a positive thing").

428.     Dr. Miller's simulation model also does not take into account any consumer benefits from new international flying facilitated by the NEA, even though significant evidence regarding this new international flying was presented during the course of trial.  Tr. Day 17 (Miller) at 119:16-21 (admitting that "the model focuses on domestic traffic; therefore, it does not incorporate changes for good or bad on international routes"); *see supra* Section VII.B, above.

iv.     **Dr. Miller's Simulation Model Produces Nonsensical Marginal Cost Estimates**

429.     Marginal cost is the cost of producing one additional unit of a product or service. Tr. Day 10 (Miller) at 143:22-25; Tr. Day 16 (Carlton) at 39:24-40:24.

430.     Dr. Miller's merger simulation model generates estimates of marginal costs as part of implementing the model. Tr. Day 10 (Miller) at 143:22-25; Tr. Day 16 (Carlton) at 39:24-40:6.

431.     Many of the marginal cost estimates in Dr. Miller's simulation model are negative. Tr. Day 16 (Carlton) at 39:24-40:24. For example, JetBlue's marginal costs are negative for about 13% of the JetBlue routes. Tr. Day 16 (Carlton) at 42:9-11. Dr. Miller's explanation for this fact is that marginal costs for some products "appear negative" because not all revenue in the airline industry is captured in the data. Tr. Day 10 (Miller) at 144:2-13. According to Dr. Miller, the data does not include ancillary fees, such as baggage fees, seat fees, and change fees, or "indirect profit opportunities." Tr. Day 10 (Miller) at 144:20-145:9. Dr. Carlton explained, however, that even after accounting for these ancillary fees, approximately 10 percent of JetBlue's marginal cost estimates in Dr. Miller's model remain negative. Tr. Day 16 (Carlton) at 42:1-22 ("Q. Dr. Miller suggests that ancillary fees and what he calls other indirect profit opportunities can explain that negative marginal cost. Do you agree with that? A. I – I don't. Because in his testimony, he estimated for JetBlue that those ancillary fees were $30, about, on average . . . [a]nd 10 percent of [JetBlue's marginal costs] were more than [negative] $30. . . . So I just don't find his justification for negative numbers convincing at all.").

432.     Dr. Carlton illustrated the effect of negative marginal costs on Dr. Miller's model using the simulation results of the Boston-Charlotte route: Under the simulation, American's post-NEA fare was $625, with a -$111 marginal cost. Tr. Day 16 (Carlton) at 42:24-43:14. The model interprets the negative marginal cost as additional per passenger profit flowing to American, and

as a result, drives up the post-NEA fare on JetBlue to force a greater number of passengers to the American flight.  Tr. Day 16 (Carlton) at 43:12-44:3.  This results in a JetBlue fare of $781, which is significantly higher than the legacy fares.  Tr. Day 16 (Carlton) at 43:19-21.

433.    Dr. Carlton testified that such a result was highly peculiar, *id.* at 43:25-44:2; and likely erroneous.  *Id.* at 45:10-15 ("Q. [I]s this scenario that is implied by the Boston-Charlotte data here a plausible outcome of the NEA?  A. I don't think so.  JetBlue is a low-cost carrier.  The notion that it's going to be the highest price on Boston-Charlotte – you know, and double the price of Delta – it just doesn't strike me as credible.").

> v.      **Dr. Miller's Predicted Fare Effects Are Inconsistent with the Relevant Economic Literature**

434.    Dr. Miller's predicted fare effects are not within the realm of what the relevant literature tells us should be expected for an airline merger—let alone something *less than* a merger, like the NEA.  Tr. Day 11 (Miller) at 138:16-25 (confirming that Dr. Miller cannot identify any retrospectives finding similarly high price effects).

435.    Economists frequently rely on merger retrospectives—studies of mergers that have already taken place—to understand how prices have changed as a result of previous transactions in an industry and to provide relevant evidence regarding how the industry operates.  Tr. Day 16 (Carlton) at 45:16-46:10.

436.    In the airline industry, where data is readily available, merger retrospectives are commonplace.[14]  However, in the recent relevant literature analyzing airline mergers, there are no studies that find post-merger fare increases of the size that Dr. Miller predicts for the Boston

---

[14] They are so commonplace in the airline industry that even Plaintiffs' own experts have authored, worked on, or even referenced as relevant insight, airline merger retrospectives in their own work outside this case.  Tr. Day 11 (Miller) at 141:7-9 ("Q.  You did a retrospective of your own on the Delta/Northwest merger, right?  A.  Yes, I did."); Tr. Day 9 (Town) at 193:7-194:19.

nonstop overlap routes.  Tr. Day 11 (Miller) at 138:16-25 (confirming that Dr. Miller cannot identify any retrospectives finding similarly high price effects); Tr. Day 16 (Carlton) at 48:1-49:12; *see also* Tr. Day 11 (Miller) at 141:22-142:15.

437.    Indeed, Plaintiffs' own expert Dr. Town summarized the recent relevant literature in his reply report.  Tr. Day 9 (Town) at 203:2-12; PX0956 (Town Reply Report) at ¶ 111. Dr. Town notes that recent studies (including retrospectives) find that airline mergers have resulted in "low, single-digit price impacts one way or another."  *Id.*  The 27.8 percent weighted average fare increase predicted by Dr. Miller on the Boston nonstop overlap routes is over ten times what Dr. Town referred to in his report for price effects of an airline merger.  *Compare* PX0956 (Town Reply Report) ¶ 111, *with* PX0461 (Miller Report) at Exhibits 24 (PX1028), 25 (PX1029).[15]

### vi.    Applying Dr. Miller's Model to the American US Airways Merger Yields Results That Are Inconsistent with Reality

438.    To further test the predictive accuracy and probative value of Dr. Miller's simulation model, Dr. Israel conducted an analysis that uses Dr. Miller's merger simulation model to estimate the fare effects from the previous American/US Airways merger.  Tr. Day 13 (Israel) at 125:3-24.  The analysis estimates the predicted outcomes of that merger, again relying on Dr. Miller's model, on certain large overlap routes—Charlotte/Dallas-Fort Worth, Charlotte/Miami, Dallas-Fort Worth/Philadelphia, Dallas-Fort Worth/Phoenix, Miami/Phoenix. Tr. Day 13 (Israel) at 125:3-24; Israel Demonstrative at 4.

---

[15] In fact the only relevant literature that finds fare effects post-merger even in the realm of fare effects that Dr. Miller predicts for Boston is an article by Craig Peters, analyzing mergers in the 1980s. *See, e.g.*, Tr. Day 9 (Town) at 201:2-18.  The specific merger discussed in the Peters article related to a transaction between three firms that were pricing below cost and in financial distress and thus it is not relevant here. *See, e.g.*, Tr. Day 11 (Miller) at 140:12-141:6.

439.     Dr. Israel shows that Dr. Miller's model predicts an average of 21 percent fare increases and 19 percent passenger count decreases from the American/US Airways merger on nonstop overlap routes on which actual fares *decreased* and output *increased*.  *See* Tr. Day 13 (Israel) at 125:7-24; Israel Demonstrative at 4.  For example, on Charlotte/Dallas-Fort Worth, which was a "hub to hub" route (Charlotte was US Airways' largest hub and Dallas-Fort Worth is American's largest hub), Dr. Miller's model predicts a 37 percent increase in average fare and a 29 percent decrease in passenger count.  Tr. Day 13 (Israel) at 125:25-126:8.

440.     Research conducted by Drs. Israel and Carlton, and by Plaintiffs' expert Dr. Town and others, find the result of the merger on highly concentrated nonstop overlap routes was lower fares and expanded output.  Tr. Day 13 (Israel) at 126:18-20; Tr. Day 16 (Carlton) at 48:1-8; PX0956 (Town Reply Report) ¶ 111; Tr. Day 11 (Miller) at 141:22-142:15 (discussing other economic literature finding the same results).  In other words, Dr. Miller's model erroneously predicts large fare increases should have resulted from the American/US Airways merger, when the actual data show the opposite.

### vii.     Dr. Miller's Simulation Model Assumes No Competitive Response to Large Fare Increases

441.     Because it is a static, one-shot estimation, Dr. Miller's simulation model does not allow for the possibility of rival entry or expansion in response to the predicted fare increases— and corresponding capacity decreases—for American and JetBlue.  Tr. Day 16 (Carlton) at 38:25-39: 22.

442.     Dr. Carlton illustrated how Dr. Miller's model fails to account for competitive responses by referring to Dr. Miller's simulation results for Boston-DCA.  Tr. Day 16 (Carlton) at 38:25-39:22.  According to Dr. Miller's simulation model, United's post-NEA fare is $278, Delta's fare is $306, JetBlue's fare is $465, and American's fare is $553.  Tr. Day 16 (Carlton) at 38:25-

39:22; Tr. Day 16 (Carlton) at 36:17-37:14; Carlton Demonstrative at 9 (summarizing post-NEA

fares changes in Miller Report Exhibit 25 Backup Data).

443.     Dr. Carlton testified that such a pricing pattern does not present a stable

equilibrium." Tr. Day 16 (Carlton) at 38:25-39:22.  In this scenario, Delta, pricing at $306, has a

"tremendous opportunity" to expand.  Tr. Day 16 (Carlton) at 39:14-22.  This is particularly true

for the Boston-DCA route, on which Delta flies eight small jets and could easily upgauge.  Tr. Day

16 (Carlton) at 39:14-22; *see also id.* at 44:24-45:5 ("COURT: And that's your point, that then

Delta wouldn't really be charging 387 [on Boston-Charlotte], because they would get everybody

on the market?  A.  Well, Delta would say 'Wow, the fare is 781 or 625.  Why don't I expand?  I

could really make a lot of money.  And there's a lot of margin that I could still earn even if I stay

way under these prices.'").

444.     On cross-examination, Dr. Miller conceded that Delta could upgauge to compete

against any such exercise in market power.  Tr. Day 17 (Miller) at 113:23-114:5 ("They might do

some of that.").

445.     Yet, despite Delta's economic incentive to expand in response to the large fare

increases that Dr. Miller predicts, Dr. Miller's simulation model assumes no repositioning by

Delta.  Tr. Day 17 (Miller) at 91:23-93:9.

>            **viii.     Half of Dr. Miller's Nonstop Boston Overlaps are Carve-Outs;**
>                      **Others are Highly Trafficked and Competitive**

446.     Dr. Miller focused his attention on (and predicted most adverse effects from) just

twelve nonstop overlap routes with Boston endpoints.  Tr. Day 11 (Miller) at 79:25-80:14.  Half

of those are carved out of the revenue-sharing and capacity coordination provisions of the NEA,

which are the only features of the NEA on which Dr. Miller relies to support the use of a merger

simulation to predict fare increases.  Day 11 (Miller) at 79:25-80:14.  Three of the remaining six

routes are highly trafficked, competitive routes:  Boston-Miami (BOS-MIA), Boston-Los Angeles (BOS-LAX), and Boston-Chicago (BOS-MDW/ORD), and there are only three Boston routes (Boston-Los Angeles (BOS-LAX), Boston-Miami (BOS-MIA), and Boston-Washington Regan (BOS-DCA)) for which the parties (a) share revenue and coordinate scheduling, and (b) provide more than half of the current airline capacity.  Tr. Day 11 (Miller) at 79:25-80:14.

447.    Put another way, there are only three Boston routes (to/from Washington DCA, Miami, and Los Angeles) for which the parties (a) share revenue and coordinate scheduling, and (b) provide more than half of the current airline capacity.  PX1020 (Miller Report, Exhibit 16) (showing that the only three routes with more than 50 percent combined share between American and JetBlue with revenue sharing and schedule coordination (i.e., that are not carved out from the MGIA, as is indicated in Exhibit 16 with "[4]") are DCA, Miami, and Los Angeles).  Delta offers competing nonstop service from Boston to DCA (and United offers competing service to Washington Dulles International Airport); Southwest, Spirit, and Delta offer competing nonstop service from Boston to Miami; and Delta, United, and Alaska offer competing nonstop service from Boston to Los Angeles.  *See, e.g.*, DX-0736 (OAG database, 1998-2022).

448.    Two of the remaining Boston nonstop overlap routes (Rochester and Syracuse) are small routes that are overlaps only because JetBlue serves them to park aircraft overnight so they can be brought back to Boston early in the morning for their primary missions.  Tr. Day 9 (Friedman) at 26:12-26:19 ("Rochester, for us, Boston to Rochester is a RON market.  It's served late at night from Boston to Rochester with a late arrival into Rochester.  The plane remains overnight.  A RON, remains overnight in Rochester.");  Tr. Day 9 (Friedman) at 30:24-31:3  at ("A.   Rochester and Syracuse are very similar cities, same type of RON dynamics that existed

between the two.  I would characterize them as mirror images of each other. Q.   Same flight pattern? A.   Yes.  Both RONs.").

449.    Eighty-one percent of the parties' nonstop 2019 flights to/from Boston did not even overlap.  *See* Domestic O&D Survey Data; Sabre MIDT Data; Domestic and International T100 Segment Data (as shown in Israel Demonstrative at 12).

### ix.    Finally, Actual Fares Contradict Dr. Miller's Predictions

450.    As Defendants' expert Dr. Carlton demonstrated, Dr. Miller's predictions are inconsistent with the actual fare data for flights since the NEA has been implemented.  Tr. Day 16 (Carlton) at 28:15-29:8.

451.    Using DB1B data, Dr. Carlton calculated the actual change in average quarterly fares on a route-by-route basis between 2019 and the second, third, and fourth quarters of 2021, and the first quarter of 2022, for all Boston and JFK/LGA nonstop overlap routes.  Tr. Day 16 (Carlton) at 19:16-20:1, 22:22-23:16.  Dr. Carlton then computed "prediction errors" by comparing the actual change in average quarterly fares (based on actual data) to the fare increases predicted by Dr. Miller's merger simulation model (Dr. Carlton's "prediction errors" are calculated as the predicted fare increase minus the actual fare increase).  Tr. Day 16 (Carlton) at 28:15-29:19; 30:20-31:16; DX-1081 (Carlton Report Table 6); DX-1082 (Carlton Report Table 7).

452.    For the Boston nonstop overlap routes, the weighted prediction error between predicted and actual fare changes ranged from 20.6 percent (21.9 percent predicted vs. 1.3 percent actual) in the third quarter of 2021 to 42.1 percent (29.5 percent predicted vs. -12.6 percent actual) in the fourth quarter of 2021.  DX-1081 (Carlton Report Table 6).  For certain routes, the prediction error is significantly greater.  Tr. Day 16 (Carlton) at 34:22-35:15.  For example, on Boston-DCA, Dr. Miller's simulation model predicts that for the fourth quarter, the fares should increase by 54.7 percent.  DX-1081 (Carlton Report Table 6).  In actuality, fares in the fourth quarter of 2021 as

compared to the fourth quarter of 2019 decreased by 22.2 percent, yielding a prediction error of approximately 77 percent.  DX-1081 (Carlton Report Table 6).

| Route | 2019 Passengers | Dr. Miller Predicted | | | | Actual 2019 vs 2021 | | | Actual 2019 vs 2022 |
|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | Q4 | Q2 | Q3 | Q4 | Q1 |
| Boston (BOS) - Washington National (DCA) | 440,430 | | | | 54.7% | -16.2% | 2.6% | -22.2% | -35.1% |
| Boston (BOS) - Charlotte (CLT) | 170,100 | 98.0% | 87.3% | 87.6% | 90.7% | -0.3% | -1.6% | -10.0% | -17.5% |
| Boston (BOS) - Philadelphia (PHL) | 296,210 | 55.2% | 44.7% | 37.5% | 41.4% | 11.6% | 3.8% | -6.4% | -1.7% |
| Boston (BOS) - Los Angeles (BUR/ONT/LAX/SNA/LGB) | 382,050 | 15.4% | 9.9% | 8.7% | 11.1% | 2.1% | 3.8% | 13.0% | 27.0% |
| Boston (BOS) - Miami (MIA/FLL) | 368,380 | 17.8% | 17.4% | 18.5% | 17.5% | -36.2% | -25.9% | -12.2% | -11.8% |
| Boston (BOS) - Phoenix (AZA/PHX) | 140,690 | 30.1% | 29.3% | 37.2% | 32.8% | -11.3% | 2.2% | 7.3% | 8.3% |
| Boston (BOS) - Dallas/Fort Worth (DFW/DAL) | 252,530 | 28.3% | 20.2% | 18.6% | 21.9% | 2.5% | 11.1% | -10.9% | -9.1% |
| Boston (BOS) - NYC (JFK/LGA) | 298,590 | 15.0% | 11.8% | 11.0% | 11.7% | 1.1% | -4.6% | -42.4% | -42.1% |
| Boston (BOS) - Chicago (MDW/ORD) | 496,420 | 12.1% | 6.6% | 6.3% | 5.5% | -3.1% | 14.0% | 1.8% | -20.2% |
| Boston (BOS) - Rochester (ROC) | 17,910 | 175.7% | 39.2% | 29.9% | 44.9% | 31.0% | 25.4% | -6.5% | 11.8% |
| Boston (BOS) - Syracuse (SYR) | 8,540 | 151.3% | 29.9% | 23.8% | 19.1% | 97.6% | 69.8% | 23.6% | 34.6% |
| *Weighted Average* | | *29.5%* | *22.7%* | *21.9%* | *27.8%* | *-6.0%* | *1.3%* | *-9.2%* | *-12.6%* |
| *Weighted Prediction Error* | | | | | | *28.7%* | *20.6%* | *36.9%* | *42.1%* |

Sources: Dr. Miller's backup materials; DOT DB1B data for 2021 and 2022.

453.    Similarly, for the JFK/LGA nonstop overlap routes, the weighted prediction error between predicted and actual fare changes ranged from 6.4 percent (4.5 percent predicted vs. -2.0 percent actual) in the third quarter of 2021 to 21.2 percent (4.4 percent predicted vs. -16.8 percent actual) in the fourth quarter of 2021.  DX-1082 (Carlton Report Table 7).

| Route | 2019 Passengers | Dr. Miller Predicted | | | | Actual 2019 vs 2021 | | | Actual 2019 vs 2022 |
|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | Q4 | Q2 | Q3 | Q4 | Q1 |
| NYC (JFK/LGA) - Miami (MIA/FLL) | 1,099,720 | 11.6% | 9.3% | 9.8% | 9.9% | -34.9% | -24.9% | -24.1% | -22.9% |
| NYC (JFK/LGA) - Los Angeles (BUR/ONT/LAX/SNA/LGB) | 989,540 | 6.1% | 4.3% | 4.1% | 4.4% | -11.6% | -3.8% | -11.1% | -2.3% |
| Boston (BOS) - NYC (JFK/LGA) | 298,590 | 15.0% | 11.8% | 11.0% | 11.7% | 1.1% | -4.6% | -42.4% | -42.1% |
| NYC (JFK/LGA) - San Francisco (SJC/OAK/SFO) | 563,420 | 3.2% | 2.3% | 2.3% | 2.0% | -11.1% | -0.5% | -17.0% | -22.5% |
| NYC (JFK/LGA) - Orlando (MCO) | 577,130 | 6.4% | 3.2% | 3.5% | 3.3% | -29.0% | -12.4% | -20.2% | -3.1% |
| NYC (JFK/LGA) - Phoenix (AZA/PHX) | 184,100 | 7.6% | 5.5% | 7.3% | 8.6% | -8.7% | -2.3% | -5.5% | 12.8% |
| NYC (JFK/LGA) - Las Vegas (LAS) | 259,130 | 4.4% | 3.1% | 2.4% | 3.0% | -15.5% | 3.5% | 3.0% | -5.7% |
| NYC (JFK/LGA) - Raleigh/Durham (RDU) | 217,500 | 7.8% | 7.6% | 7.8% | 8.4% | -6.3% | 7.5% | -14.7% | -19.4% |
| NYC (JFK/LGA) - Austin (AUS) | 162,860 | 9.4% | 6.3% | 4.6% | 4.4% | 1.8% | 1.5% | -17.2% | 1.7% |
| NYC (JFK/LGA) - Chicago (MDW/ORD) | 1,001,620 | 1.5% | 1.1% | 1.1% | 0.8% | 7.8% | 23.1% | -18.0% | -4.9% |
| NYC (JFK/LGA) - San Diego (SAN) | 158,610 | 4.5% | 3.2% | 1.0% | 1.0% | -10.0% | -5.7% | -11.5% | -17.8% |
| NYC (JFK/LGA) - Atlanta (ATL) | 685,340 | 1.0% | 0.9% | 1.0% | 0.9% | -13.5% | 2.0% | -14.3% | -23.3% |
| NYC (JFK/LGA) - West Palm Beach (PBI) | 269,920 | 3.8% | 1.4% | 0.5% | 1.3% | -6.2% | 7.3% | -10.1% | -5.7% |
| NYC (JFK/LGA) - Martha's Vineyard (MVY) | 7,900 | 0.0% | 37.9% | 53.9% | 0.0% | -23.9% | -23.5% | -16.0% | -15.1% |
| NYC (JFK/LGA) - Charleston (CHS) | 114,140 | 1.6% | 3.3% | 6.8% | 6.3% | 1.2% | -6.1% | -16.7% | -12.0% |
| NYC (JFK/LGA) - Nantucket (ACK) | 13,520 | 0.0% | 5.8% | 33.1% | 0.0% | -15.2% | -27.1% | -28.5% | -4.8% |
| NYC (JFK/LGA) - Portland, ME (PWM) | 35,800 | 2.3% | 6.4% | 9.2% | 2.2% | -4.2% | -12.8% | -10.5% | 18.2% |
| NYC (JFK/LGA) - Savannah (SAV) | 89,690 | 2.4% | 1.7% | 1.6% | 1.2% | -9.6% | 3.6% | -5.4% | 5.5% |
| *Weighted Average* | | *5.8%* | *4.4%* | *4.5%* | *4.4%* | *-12.7%* | *-2.0%* | *-16.8%* | *-12.4%* |
| *Weighted Prediction Error* | | | | | | *17.0%* | *6.4%* | *21.2%* | *18.2%* |

Sources: Dr. Miller's backup materials; DOT DB1B data for 2021 and 2022.

454.    Dr. Carlton also tested whether some external factor, like COVID, rather than the model itself, was driving the prediction errors.  Tr. Day 16 (Carlton) at 35:5-36:1.  To do so, Dr. Carlton first computed prediction errors for the Boston and JFK/LGA "control" groups.  Tr.

Day 16 (Carlton) at 35:9-13.  These "control" groups consist of Boston and JFK/LGA nonstop, non-overlap, and mixed-overlap routes, for which Dr. Miller's model predicts minimal to no price effects.  Tr. Day 16 (Carlton) at 20:2-20.  Then, Dr. Carlton compared the prediction errors of the control routes to the prediction errors of the nonstop overlap routes.  If COVID, or other external factors, which affected all routes, were driving the prediction errors, the prediction errors should be similar across both the nonstop overlap routes and the control routes.  Tr. Day 16 (Carlton) at 35:14-21.  But that is not the case.  Dr. Carlton found that the prediction errors for the Boston and JFK/LGA nonstop overlap routes (i.e., the routes listed in DX-1081 and DX-1082) "are always higher than [Dr. Miller's] prediction errors for the control routes," which supports the conclusion that the model is driving the prediction errors.  Tr. Day 16 (Carlton) at 35:22-36:1.

455.    From these results, Dr. Carlton concluded that Dr. Miller's simulation model greatly "overpredict[s]" the effect of the NEA on the Boston and JFK/LGA nonstop overlap routes identified by Plaintiffs.  Tr. Day 16 (Carlton) at 34:22-35:4.

### x.      Plaintiffs' Argument that the Effects of the NEA Cannot Be Separated from the Effects of COVID Is Unfounded

456.    Plaintiffs' experts contend that the ongoing effects of the COVID pandemic cannot be separated from the effects of the NEA, making it impossible to analyze post-NEA data.  Tr. Day 17 (Miller) at 78:25-79:8; Tr. Day 9 (Town) at 171:5-12.  In fact, they go so far as to suggest that it may *never* be possible to study or separate the effects of COVID from the effects of the NEA.  Tr. Day 17 (Miller) at 125:21-126:8; Tr. Day 9 (Town) at 182:5-8.

457.    However, this argument belies history and the economic literature, which contend that one can successfully separate out the effects of similar demand shocks—such as 9/11 or the Great Recession—to analyze trends and effects of other events in the airline industry.  Tr. Day 16 (Carlton) at 14:17-15:20 ("[E]conomic factors are always changing, and that shouldn't prevent

you from looking at the data to see what you can learn from it. . . . I'm confident that I've been able to isolate the effect of the NEA, at least to date.  And I'm able to conclude that the evidence would not support a claim that the NEA has raised fares."); Tr. Day 16 (Carlton) at 16:17-17:11. Indeed, such action—isolating the effects of one event from anything else that might be affecting an industry—is part of an economist's charter.  Tr. Day 16 (Carlton) at 15:3-5.

458.    Dr. Carlton demonstrated that by appropriately selecting control groups, a difference-in-differences analysis can isolate the effects of an event—e.g., the NEA—from external factors such as COVID.  Tr. Day 16 (Carlton) at 16:17-17:11.

459.    Plaintiffs' expert, Dr. Miller, acknowledged that he did not undertake an independent analysis to disprove Dr. Carlton's findings.  Tr. Day 17 (Miller) at 123:9-124:2 (conceding that he "didn't try to come up with different business or leisure passenger control groups to see if that made a difference").

### xi.    Despite Plaintiffs' Arguments to the Contrary, the Threat of Antitrust Litigation Never Goes Away

460.    Plaintiffs' experts also argue that the current litigation has Defendants acting contrary to how they would otherwise act under the NEA specifically so that the Court will find in their favor.

461.    However, such an argument not only undermines the decision-making capabilities of the Court, but ignores reality, in which the threat of litigation continues.  Tr. Day 12 (Miller) at 33:8-34:1; Tr. Day 16 (Carlton) at 17:18-18:21, 19:11-14 ("I think the notion that . . . scrutiny is going to disappear is just wrong. I think there [will] be continual scrutiny.").  Indeed, Plaintiffs own expert confirms this truth:  that the threat of litigation under Section 1 of the Sherman Act— the very statute under which Plaintiffs brought this case—never goes away.  Tr. Day 12 (Miller) at 33:8-34:1.  The NEA is "unprecedented" in that American and JetBlue do not have antitrust

immunity and therefore have assumed that ongoing risk.  Tr. Day 4 (Raja) at 191:17-19 ("So . . . there's no application for antitrust immunity with respect to the NEA, is there? A. There's not.").

462.     Furthermore, the airline industry is well-known for having significant and publicly available data (i.e., DB1B) that would allow for easy detection of any changes in Defendants' behavior under the NEA that yields adverse effects such as those predicted by Dr. Miller's merger simulation.  Tr. Day 16 (Carlton) at 17:13-19:14.

463.     Dr. Carlton himself has indicated that, if Plaintiffs were to identify such potentially anticompetitive effects in the DB1B data, such as increased fares as a result of lost competition in the NEA region, that they could do a difference-in-differences analysis that would confirm such a result.  Tr. Day 16 (Carlton) at 18:12-21.

464.     Furthermore, such a result not only opens Defendants to subsequent antitrust litigation by the Department of Justice and the States, but also to private, class action litigation, with the potential for treble damages.  Tr. Day 16 (Carlton) at 18:22-19:5.  Plaintiffs' own expert, Dr. Miller, was unaware of this reality when he initially offered his opinion, Tr. Day 12 (Miller) at 34:2-16, nor did he factor this possibility into his model.  Tr. Day 12 (Miller) at 35:2-5.

### xii.     Plaintiffs' Argument that Partial Implementation of the NEA Means One Cannot Analyze the Data Is Baseless

465.     Plaintiffs also contend that one cannot analyze post-NEA data because of partial implementation of the NEA.  Tr. Day 10 (Miller) at 129:23-130:1.  However, that argument is entirely baseless and ignores basic intuition.

466.     As Dr. Israel explained, partial implementation only suggests that the observed effects of the NEA are conservative estimates of what the effects of the NEA will actually be.  Tr. Day 14 (Israel) at 86:3-87:5.

467.    In the current case, that means that the effects of the NEA will be larger than those already estimated.  Tr. Day 14 (Israel) at 85:10-23.  This means that Dr. Israel's analysis of the *actual, observed post-NEA data* which predicts annual benefits between $510 to $610 million, is actually conservative.  Tr. Day 14 (Israel) at 85:10-16.  And the total annual benefits of the NEA once completely implemented will be much greater.  Tr. Day 14 (Israel) at 85:10-16.

*        *        *

468.    For these reasons, the Court finds that Dr. Miller's merger simulation analysis is unreliable.  First, even before getting to the flaws in the model described above, there is no evidence that under the NEA the parties have changed their pricing behavior, including by pricing to account for lost-but-recaptured sales as predicted by Dr. Miller's merger simulation model.  *See*, *e.g.*, Tr. Day 3 (Jarashow) at 91:4-92:1, 101:6-25, 102:7-12 (testifying that JetBlue's pricing strategy has not changed as a result of the NEA), 96:5-97:4 (testifying that JetBlue continues to "disrupt[] the pricing landscape," including with respect to transatlantic fares).  Dr. Miller is therefore modeling behavior for which there is no foundation in the record.

469.    Second, Plaintiffs have offered no support from the economic literature or otherwise for using a merger simulation to estimate the effects of a collaboration, particularly one like the NEA that does not result in price coordination.  Tr. Day 11 (Miller) at 98:6-101:22.  As Dr. Israel explained, Dr. Miller is making an unwarranted leap from economic theory that fixed-proportion profit sharing may have merger-like effects to the conclusion that MGIA revenue sharing will have similar effects.  Tr. Day 14 (Israel) at 12:25-15:13.  MGIA revenue sharing, however, is dynamic[,] and has built-in incentives for unilateral capacity expansion that Dr. Miller acknowledges, but intentionally ignores in his model.");  Tr. Day 11 (Miller) at 106:11-25 ("If by dynamic, we mean that the payments change over time as capacity changes, then that would be a reasonable characterization.");  Tr. Day 11 (Miller) at 109:3-6 ("Q.  So one take away, from the

173

start, is that these parties negotiated an agreement between them that can create unilateral incentives to expand capacity.  Right?  A.  Yes, that's true.").

470.   Third, even assuming it could be appropriate to model the NEA using Dr. Miller's merger simulation, for the reasons explained above the results of the merger simulation are not reliable – the results are too implausible, generate counter-intuitive predictions, and are not consistent with the empirical evidence of fares since the NEA has been implemented.

### H.   No Evidence that the NEA Increases the Risk that "Capacity Discipline" will Return

471.   There is no evidence that the NEA was either intended to, or will, facilitate "capacity discipline."

### i.   Background on Dr. Town's Theory

472.   According to Dr. Town, airline industry consolidation, which was the result of airline mergers beginning around 2009 and ending in 2013 (Delta/Northwest, United/Continental, Southwest/AirTran, and American/US Airways), facilitated "coordinated conduct" between legacy carriers to suppress the growth of capacity (*i.e.*, to engage in "capacity discipline") and put upward pressure on airfares.  Tr. Day 9 (Town) at 77:24-78:6; Tr. Day 9 (Town) at 83:20-84:2.

473.   Under Dr. Town's "capacity discipline" theory, capacity discipline "weakened in the mid-2010s and the NEA enhances the risk that capacity discipline will be restored."  Tr. Day 9 (Town) at 77:24-78:6.  Dr. Town argues that as a result of the NEA, JetBlue, which "was mitigating the impact of the capacity discipline period by growing faster [than other carriers]," will now have its incentives aligned with American and will cease being a disruptor.  Tr. Day 9 (Town) at 111:4-13, 161:12-16.

474.   To assess "the impact and timing of capacity discipline," Dr. Town conducts a series of regressions measuring the differences between actual capacity and capacity predicted

174

based on the historical relationship between capacity, GDP, recessions, and jet fuel prices.  Tr. Day 9 (Town) at 93:10-17; *see also* Tr. Day 12 (Lee) at 85:7-13.

475.    The evidence Dr. Town has put forth in support of his theory is flawed and incomplete.

> ii.    **Dr. Town's Regressions Suffer from Omitted Variable Bias; When Corrected, Dr. Town's Regressions Show Zero Evidence of "Capacity Discipline"**

476.    At trial, Dr. Town highlighted two of those regressions—an industry-wide model PX0964 (Town Report Exhibit 8) and a legacy-only model PX0965 (Town Report Exhibit 9)—as empirical evidence of actual capacity below predicted capacity.

477.    Both regressions suffer from omitted variable bias.

478.    **Dr. Town's Legacy-only Regression.**   Dr. Town alleged that legacy carrier consolidation had facilitated "capacity discipline," so the legacy-only regression is "the only model that fits [Dr. Town's] theory."  Tr. Day 12 (Lee) at 152:12-18.

479.    Dr. Town's legacy-only regression is flawed.  As Dr. Lee testified, "roughly three quarters of all the capacity that legacy carriers eliminated came out prior to each of their mergers." Tr. Day 12 (Lee) at 68:2-18.  This capacity-shedding effort was in direct response to increasingly intense competition from lower-cost carriers.  Tr. Day 12 (Lee) at 66:23-67:23.  Yet, Dr. Town's analysis fails to control for lower-cost carrier growth.  PX0965 (Town Report Exhibit 9).

480.    Dr. Lee presented a corrected model that included a single additional variable for lower-cost carrier growth—LCC RPM share.  Tr. Day 12 (Lee) at 96:13-20.  Dr. Lee explained that the LCC RPM share variable "show[s] how many people are actually traveling on the lower cost carriers" and therefore, "captur[es] the competitive interplay between the legacy network carriers and the lower cost carriers."  Tr. Day 12 (Lee) at 98:19-25.  In Dr. Lee's corrected model, Dr. Town's capacity discipline effect "*disappears*."  Tr. Day 12 (Lee) at 99:10-15.

481.     **Dr. Town's Industry-Wide Regression.**  Despite not fitting his theory, Tr. Day 12 (Lee) at 99:16-100:5, Dr. Town also presented an industry-wide regression.

482.     As Dr. Lee testified, the explanatory variables that Dr. Town uses to predict capacity are "woefully inadequate." Tr. Day 12 (Lee) at 100:14-102:2.  In particular, the recession dummy variable in 2009, which is intended to account for the Great Recession and "spans 2008 and goes halfway into 2009," fails to capture the full extent of the Great Recession, which featured a "jobless recovery" for many years after the official recession had ended.  Tr. Day 12 (Lee) at 100:14-102:2.  Therefore, Dr. Lee added a variable for unemployment.  Tr. Day 12 (Lee) at 104:14-16.

483.     In addition to unemployment, Dr. Lee also included a variable for load factor.  Tr. Day 12 (Lee) at 103:7-104:16.  As Dr. Lee explained, "there's a trend in [the] entire airline industry of increasing load factors over time" because "airlines have figured out how to become more efficient at utilizing their capacity."  Tr. Day 12 (Lee) at 103:16-20.  Effectively, airlines have been able to harness "a whole host of technology," including the elimination of double bookings, to serve the same amount of demand with less capacity.  Tr. Day 12 (Lee) at 103:21-104:13.

484.     After correcting for these two omitted variables—unemployment and load factor—Dr. Lee finds that "the evidence of capacity discipline essentially goes away."  Tr. Day 12 (Lee) at 104:20-24.

485.     In response, Dr. Town lodges a series of attacks on Dr. Lee's corrected regressions:

486.     First, Dr. Town alleges that some of the added "omitted" variables—LCC RPM share variable and load factor—are endogenous.  Endogeneity is a *potential problem* in regression analysis if one of the explanatory or "independent" variables in fact is "determined" by the variable it is trying to explain.  *See* DX-1094 (Lee Summary of Additional Analyses, Sept. 6, 2022), at -

176

003-04; Tr. Day 12 (Lee) at 106:8-18.  To address any concerns regarding potential endogeneity, Dr. Lee employed two standard techniques: (1) Dr. Lee lagged the LCC RPM share and load factor variables, and (2) Dr. Lee used an instrumental variables estimation, "which is the standard technique to fix . . . endogeneity, if it even exists." Tr. Day 12 (Lee) at 106:21-107:12.

487.     Second, with regard to the legacy-only regression, Dr. Town argues that he performed a robustness test to adequately account for the impact of legacy carrier bankruptcies on capacity, and the results from that model indicate that "those bankruptcies really did not disrupt the relationship between GDP, fuel prices, and capacity." Tr. Day 9 (Town) at 100:8-22. However, as Dr. Lee testified, Dr. Town's robustness test does not address "the root cause of what drove these carriers to bankruptcy, which is the rise of lower cost carriers. . . .  It continues to assume that the legacy network carriers would have continued to use the same old playbook that they were using in all of the previous years that just got them into so much trouble and pushed them into bankruptcy." Tr. Day 12 (Lee) at 105:14-106:7.

### iii.        Gaps in Dr. Town's "Capacity Discipline" Theory

488.     Dr. Town's "capacity discipline" theory is also fundamentally incomplete.  At trial, Dr. Town was unable to address the following questions, *inter alia*, regarding his theory:  (1) when "capacity discipline" began to unwind, *compare* PX0462 (Town Report) ¶ 72 ("[t]he data suggest that this discipline began to unravel in 2016") *with* Tr. Day 9 (Town) at 146:1-3 ("[a]bout 2014 . . . Delta started to unwind its capacity"), *and* Tr. Day 9 (Town) at 104:22-105:9 ("around 2014, 2015, 2016, capacity discipline started to unwind"); (2) what caused "capacity discipline" to unwind, Tr. Day 9 (Town) at 136:24-137:5 ("I can't point to a specific event . . ."); 150:7-22; (3) the years Delta, United, and American participated in capacity discipline, Tr. Day 9 (Town) at 127:6-128:13; (4) when "capacity discipline" ended, Tr. Day 9 (Town) at 136:14-18; (5) why it ended, Tr. Day 9 (Town) at 137:3-5; (6) the amount by which the risk of capacity coordination has

177

increased as a result of the NEA, Tr. Day 9 (Town) at 153:25-154:13; *see also* Tr. Day 9 (Town) at 149:13-14; and (7) whether any transaction (a merger or alliance of any kind) involving any legacy carriers would increase the risk of capacity discipline returning, Tr. Day 9 (Town) at 153:11-20.

489.    Furthermore, Dr. Town admitted that he has not attempted to analyze whether there has been any evidence of "capacity discipline" since the NEA was implemented, nor has he seen any evidence that suggests that the legacy airlines have done anything to coordinate or suppress capacity since its implementation.  Tr. Day 9 (Town) at 155:2-6 ("Q.  And you admit, as you sit here today, that you have not seen any evidence that any legacy airline has done anything to coordinate or suppress capacity since the NEA was implemented more than 18 months ago?  A.  I haven't seen any such evidence. . . . "); *id.* at 156:2-5 ("Q.  You have not attempted to assess whether there has been any capacity discipline following the implementation of the NEA?  A.  No, I haven't[.]").  And he ignored evidence from key market participants suggesting capacity growth in response to the NEA.  Tr. Day 9 (Town) at 157:22-158:20 (quoting Town Dep. Tr. (08/22) at 58:20-24); Tr. Day 9 (Town) at 159:2-9.

490.    Plaintiffs have pointed to a single email communication from Robert Isom to Vasu Raja in March 2020 regarding the need to shed capacity as "evidence" of the NEA helping to facilitate capacity reductions.  PX0069 at -001.  But that email is dated March 28, 2020, at the outset of COVID, and Mr. Isom explained that it was about the impact that COVID was having on the airline industry.  Tr. Day 5 (Isom) at 31:25-32:3 ("I considered COVID to be a mortal threat and I reached out to Richard and others, too, just about anybody I could, to kind of say, hey, what are we looking at in terms of, you know, this crisis.").  As Mr. Isom testified, COVID was "threatening the viability of American" with every day of inaction costing tens or hundreds of

millions of dollars a day due to the complete loss of demand for air travel.  Tr. Day 5 (Isom) at 53:17-54:5.

491.    There is evidence that "capacity discipline" is valued by management teams at legacy airlines and discussed on earnings calls and in other investor-related forums.  But rather than describing a coordinated reduction in capacity, as Plaintiffs assert, it is a term used to describe efforts to manage capacity consistent with demand.  Casey Dep. Tr. (05/22) at 182:2-6 ("I think it was used to say that, you know, broadly competitors in an industry would grow at about the same rate, similar to demand, right."); Tr. Day 12 (Lee) at 82:14-83:8 ("[C]apacity discipline means aligning supply and demand for your product. . . .  Making sure that you're putting the right amount of your product into the marketplace, with the hopes . . . that there's going to be enough consumers out there to purchase it at prices that will cover your cost.  And this is a . . . decision that companies in every single business and every single industry make every day.").  In other words, when an airline engages in "capacity discipline," it does not grow capacity substantially in excess of anticipated demand.  *See, e.*g, Esposito Dep. Tr. (06/22) at 81:25-82:15 ("[Capacity discipline means] putting out the right level of capacity for consumer demand. So it's not oversupplying or undersupplying. We're trying to estimate the right level of seats that the market needs").

492.    Since the NEA was implemented, overall capacity has been increasing in the airline industry.  Esposito Dep. Tr. (06/22) 37:22-37:24 ("[G]enerally, capacity has increased in aggregate over the regions . . . .").  American and JetBlue have also substantially outpaced the growth at the NEA airports from all other carriers.  Tr. Day 14 (Israel) at 58:1-4; *see also* Section VII.B, above.

iv.    **Exhibit 11 From Dr. Town's Report Undermines His "Capacity Discipline" Theory**

493.    Dr. Town's theory is also inconsistent with analysis from his own report.  In Exhibit 11 of Dr. Town's report, he mapped American, Delta, and United year-over-year change in

domestic capacity against U.S. GDP from 2010 through 2019.  *See* PX0967 (Town Report Exhibit 11).  According to Dr. Town, Exhibit 11 "highlights the patterns that are consistent with capacity discipline."  Tr. Day 9 (Town) at 216:24-217:2.  Yet Exhibit 11 shows no meaningful pattern of coordinated or accommodating behavior during those years.  Tr. Day 12 (Lee) at 89:14-16.  In almost every year, at least one (and by 2016, more than one) of American, Delta, and United were growing faster than GDP, and at times they were growing at multiple times the other airlines.  Tr. Day 12 (Lee) at 89:16-90:8.  Indeed, in 2015, during which Dr. Town's regression analysis finds the largest effect of capacity discipline by the legacy carriers, Delta grew twice as fast as American and six times as fast as United.  *Id.* at 90:9-21.

494.   This is not, as Dr. Town suggested, evidence of Delta unwinding its "capacity discipline."  *See* Tr. Day 9 (Town) at 146:1-3.  Instead, as Dr. Lee explained, Delta's aggressive growth starting in 2014 was the result of a relatively quick post-merger integration (following Delta's merger with Northwest Airlines).  Tr. Day 12 (Lee) at 90:22-92:1.  Delta, which had the most comprehensive national coverage and the first-mover advantage as the airlines began climbing out of the recessionary period, was thus poised to grow.  Tr. Day 12 (Lee) at 90:22-92:1  United followed, after struggling to immediately realize some merger synergies (following United's merger with Continental Airlines) related to collective bargaining agreements and work group integration.  Tr. Day 12 (Lee) at 92:2-92:11.  And American, which was the last to merge (with US Airways), and which also struggled to negotiate a joint collective bargaining agreement with their mechanics, was last to grow.  Tr. Day 12 (Lee) at 92:12-92:25.

## X.   THERE IS NO LESS RESTRICTIVE ALTERNATIVE THAT WILL CREATE THE SAME BENEFITS AS THE NEA

495.   Although Plaintiffs have not explicitly argued that particular alternatives are "less restrictive alternatives" that would achieve the same benefits as the NEA, the record does include

reference to a number of alternative arrangements that include features of the NEA.  Plaintiffs'

experts did not calculate benefits associated with these alternatives, *see* Tr. Day 17 (Town) at

30:10-20, or compare them to the benefits of the NEA—because Plaintiffs' experts did not quantify

the benefits associated with the NEA, *see* Tr. Day 9 (Town) at 169:24-170:1, 170:15-17; Tr. Day

11 (Miller) at 92:7-19.  *See also* Tr. Day 16 (Town) at 166:4-15; Tr. Day 17 (Miller) at 135:17-

136:12.  Plaintiffs' experts also did not establish that any particular alternative to the NEA would

be commercially acceptable to either party.  Tr. Day 17 (Town) at 24:10-31:5 (confirming that

Dr. Town did not "assess[] whether a WCIA-like arrangement would have made financial sense

for JetBlue," did not "assess[],  the benefits of American doing a similar arrangement with

JetBlue," did not conduct a financial analysis of "any so-called less restrictive alternative," and

has not "offered the opinion that any so-called less restrictive alternative achieved substantially

the same benefits as the Northeast Alliance").

496.    These purported alternatives, which include codesharing, slot leases, or more

formal arrangements like the joint venture between American and Alaska Airlines (the WCIA),

would not create the same benefits as the NEA, for the reasons that follow.

### A.    Codesharing Alone Would Not Create the Same Benefits as the NEA

497.    Although codesharing would be less restrictive than the NEA because it would not

entail the same level of coordination and cooperation, even if American and JetBlue agreed to

codeshare without revenue sharing, the benefits of codesharing alone would be minimal.[16]  The

Clean Team expressly rejected a "[p]artnership with codeshare-only" because, much like the

---

[16] Interlining is an even less viable alternative.  Interlining, similar to codeshare, involves "sell[ing] an itinerary from one operating carrier to another operating carrier."  Tr. Day 4 (Raja) at 80:21-24. Interline is primarily used to facilitate and adjust for operational issues, aiding in rebooking.  Tr. Day 4 (Raja) at 80:24-81:2.

WCIA-like alternative, absent schedule optimization, the partnership "doesn't allow us to truly create optimal customer value." DX-1075A at -005; *see also* DX-0041A (July 2020 American Board of Directors Meeting), at -063 ("JV allows us to rectify our uncompetitive position in ways not possible with a simple codeshare."). The Clean Team observed that "[w]hile codeshare produces a modest revenue improvement, it doesn't rectify our uncompetitive customer proposition since DL/UA provide a deeper and broader network than either of B6 or AA. DX-1075A at -005. Additionally, absent revenue sharing, neither American nor JetBlue would be incentivized to grow their capacity for the betterment of the NEA network. Tr. Day 5 (Laurence) at 154:22-154:23 ("What I would say is the MGIA incentivizes both parties to grow . . . ."); Tr. Day 1 (Hayes) at 164:16-164:18 ("The unique thing about this, the MGIA, was it was a revenue sharing agreement that directly incentivized airlines to grow."). Indeed, both American and JetBlue executives explicitly recognized that codesharing would not create nearly the same customer value. Tr. Day 4 (Raja) at 226:21-227:6 (explaining that codesharing only "doesn't do anything if you're a customer"); Tr. Day 2 (Hayes) at 43:23-44:1 ("Co[deshare] will give you a small fraction of the benefits. You know, [codeshare] relationships are quite normal. I think the real value for this connectivity is the optimization of the schedules that come with it."); *see also* Tr. Day 6 (Laurence) 11:5-15 (explaining that the NEA is "far more robust than the other agreements that JetBlue had, not just in terms of scope with codesharing and the footprint and the relevance that we were driving with it, but also the concept of things like frequent flyer relevance and reciprocity. . . [W]ith American, we had that capability that, again, drives a level of maturity into JetBlue's frequent traveler program that didn't exist with any of the other relationships that we had with other airlines").

498.     Without revenue sharing, it is unlikely that American and JetBlue would agree to codesharing alone.  Prior airline partnerships that involved only codesharing (or codesharing with frequent flyer reciprocity) have failed because codesharing alone does not align incentives to expand output.  Tr. Day 4 (Raja) at 193:17-194:5 (explaining that American's prior codeshare relationship with Alaska failed because "there wasn't a lot of incentive for these two companies to go and work together").  Without revenue sharing, each carrier is incentivized to limit marketing codeshare seats on the other carrier's flights because there is limited financial incentive to sell the other carrier's seats, especially if supporting a partner's flight could negatively affect the performance of the carriers' own flights.  PX0756 at -701 (explaining that revenue sharing is necessary to create "[i]ncentive to sell all joint business services, regardless of metal"); Tr. Day 7 (Raja) at 87:3-87:10; *see also* Weithofer Dep. Tr. (06/22) at 144:9-145:14.

### B.     Slot Leases Would Not Create the Same Benefits as the NEA

499.     Although it is unclear whether Plaintiffs suggest that slot leases would constitute a less restrictive alternative, they have at least suggested that some of the benefits of the NEA could be achieved in the form of a slot transfer from American to JetBlue, without any revenue sharing or schedule optimization.  Tr. Day 7 (Raja) at 153:12-17.

500.     First, even assuming that is true, it is clear that simple slot leases would create a mere fraction of the benefits the carriers and customers are realizing within the NEA.  Similar to the codeshare-only scenario discussed above, absent schedule optimization and revenue sharing, the carriers would not have the incentive nor the ability to jointly improve and grow the NEA network.  Tr. Day 9 (Friedman) at 50:16-51:14 (explaining that a lease would not have yielded the same customer benefit because, "at the most basic level, if a lease deal was done, we would have to decide if it was worth it, very well could have been worth it, but the NEA is more than just the slot transfer, right?  It's the loyalty benefits, it's the codeshare.  It's the full . . . creating a third

comprehensive competitor by combining corporate sales, marketing efforts, loyalty programs.  So it's much more.  It takes much more than just a lease to create a third viable competitor in New York."); Tr. Day 7 (Raja) at 153:12-153:14; Tr. Day 5 (Laurence) at 236:6-238:3.

501.    Second, a hypothetical slot transfer or lease from American to JetBlue is improbable absent the NEA.  Slots are a valuable and scarce resource for airlines.  Tr. Day 4 (Raja) at 139:5-9.  To the extent slots are leased in New York, they are normally only temporarily leased, for six months at a time, when slot holders solicit help from other airlines to ensure that their slots are sufficiently utilized.  Tr. Day 3 (Kirby) at 139:3-18.  There is no evidence that American would have relinquished these highly valuable slots to JetBlue outside the context of a joint optimization exercise designed to improve American's competitiveness in New York and Boston with the requisite financial incentives in the form of a revenue sharing agreement – i.e., an arrangement like the NEA.

502.    There is evidence that, prior to the NEA, American and JetBlue engaged in a negotiation regarding slots.  Tr. Day 5 (Laurence) at 236:6-238:15.  But this does not suggest a willingness by American to lease slots to JetBlue on a long-term basis.  Tr. Day 5 (Laurence) at 236:15-237:20 (explaining the temporary nature of the slot leases being contemplated).  To the contrary, it involved an effort by American to enter into short-term slot leases with other airlines, including JetBlue, solely so that it could retain its valuable slots for the long-term.  *Id.*  In early 2020, after granting American a waiver for slot utilization requirements associated with slots at JFK (in recognition of the operational issues American faced because of the 737 MAX aircraft grounding), the FAA informed American that it should seek temporary slot leases to help mitigate American's inability to fully operate its JFK slots.  Tr. Day 4 (Raja) at 149:2-9 ("What this is the precursor to is a meeting that I took with some senior officials at the FAA, in which they . . . said,

before we go and do any further waivers, we want to know that you and American are doing all that you can to go and get other people to go cover slots for you, until such time that the MAX is back."). Thus, American contacted other airlines, including Delta, to try to find ones that would be willing to fly American's JFK slots for the summer 2020 season. Tr. Day 4 (Raja) at 149:11-20. As part of that effort, American leased to JetBlue 27 slot pairs for the summer 2020 season. DX-0005 at -003. In February 2020, desperate to find coverage for additional JFK slots with the summer 2020 season fast approaching, American offered ten additional slot pairs to JetBlue, for two years beginning in the Summer 2020 season and expiring after the Winter 2021 season. PX0067 at -150; DX-0005 at -003; Tr. Day 5 (Laurence) at 130:12-130:25. American and JetBlue negotiated the parameters of an agreement that would involve American transferring a total of 37 slot pairs for two years (ending in Winter 2021) for free in the first year and for a charge in the second year that would be settled in the event a revenue sharing agreement (the NEA) was executed between the Parties. DX-0029 at -001–02; *see* Tr. Day 4 (Raja) at 150:25-152:8. Thus, the slot lease was (1) never intended to last past 2021 and (2) negotiated with the prospect of the NEA in mind. Tr. Day 5 (Laurence) at 237:3-7 (testifying that JetBlue did not view leases with American as an alternative to the NEA and viewed the slot leases as "temporary and transitory in nature."). That agreement and the various other slot leases American was negotiating in early 2020 became moot when new slot waivers were issued to allow airlines to pull down flying in the face of COVID. Tr. Day 4 (Raja) at 149:15-20.

503.    Such a short-term slot lease would not have unlocked the kind of growth that JetBlue has invested in and implemented as part of the NEA, and in any event, would not have created any benefits associated with JetBlue utilizing American slots starting in 2022. Tr. Day 5 (Laurence) at 237:11-20 ("Because they were temporary and relatively short term, a year, it was

very difficult to go and then make an argument as to why we needed to acquire more aircraft for these slots, because it would take a certain period of time to acquire the aircraft. The other part of that is the aircraft are 25-year assets. So you think of something that lists for $100 or $150 million, and I've got a good use for it for a year. It's not a particular[ly] compelling argument to a CFO or a treasurer."); Tr. Day 9 (Friedman) at 50:16-51:14.

### C.     A WCIA-Like Arrangement Would Not Create the Same Benefits as the NEA

504.    A WCIA-like arrangement (i.e., an arrangement in which American and JetBlue codeshare and share revenues generated on American's long-haul international flights out of New York and Boston and non-overlap domestic routes out of New York and Boston) would not create the same benefits as the NEA because a WCIA-like arrangement would not include schedule optimization. Tr. Day 4 (Raja) at 104:12-105:7; Tr. Day 7 (Raja) at 180:11-14.

505.    Schedule optimization is at the core of the consumer benefits created by the NEA because it facilitates the improved schedules and connectivity that underpin those benefits. *See* Section III.E.iii, above. Schedule optimization was not necessary in the WCIA (outside of limited alignment of flight times to accommodate connections) because the operation of the WCIA focuses on connecting Alaska's domestic network to American's international flights from the West Coast and providing American's international passengers with expanded access to domestic locations. Tr. Day 7 (Harrison) at 28:7-13

506.    Although a WCIA-like partnership was an option that American considered as the "East Coast Int'l Alliance," the Clean Team never evaluated its "value range." DX-1075A at -004. Instead, members of American's Clean Team made clear in their presentation to American's senior leadership team that an "East Coast JV" with a "[Revenue Sharing Agreement] + Strategic Network Cooperation" should be the "Focus" of an NEA structure. DX-1075A at -004; Tr. Day 12 (Schweinzger) at 250:5-25.

186

507.    The Clean Team members' recommendation was based on their determination, after creating an optimized schedule through the Clean Team exercise, that schedule optimization was essential to "enabl[ing] new customer value."  *See,* Section III.C, above; DX-1075A at -006 (identifying the various ways schedule optimization enabled better customer proposition and growth in New York and Boston during the Clean Team optimization exercise).  The Clean Team's analysis confirmed that "[u]n-optimized schedules result in sub-par competitive position" while, in contrast, an "optimized network increases NE capacity by 23%", "creates better in-market patterns and enables new connection opportunities"; and unlocks "[n]ew opportunity for AA to create an expanded JFK-Transatlantic hub with 9 new markets."  DX-1075A at -005, -008. American presented these "Optimization Benefits," explaining that schedule optimization "maximizes utilization of aircraft and airport assets to create competitive schedule patterns" and "creates a new ability to compete with DL and UA," to the Board of Directors as the business rationale of the NEA.  DX-0025 at -064-66; Tr. Day 4 (Raja) at 243:7-245:10.

508.    The benefits of schedule optimization were also central to the business rationale for the NEA presented to the JetBlue Board of Directors.  *See* DX-0356 at -058; Tr. Day 2 (Hayes) at 24:7-22 (explaining that schedule optimization improves customer utility by "creating more JetBlue flights, direct flights, and more connectivity because of more JetBlue flights with American.").  JetBlue further explained to its Board that the "optimized network" in the NEA would increase "customer utility" by providing customers:  (i) "More new 2023 destinations than JetBlue standalone plans;" (ii) "Ability to bring lower fares and more seats to more destinations from BOS and NYC;" (iii) "A more relevant competitor in Legacy-heavy NYC market;" (iv) "Additional international and domestic connections through Connie hubs (e.g., JFK, LAX);" and (v) "Earn-and-burn capabilities on linked Loyalty programs."  DX-0356 at -058; Tr. Day 2 (Hayes)

at 43:24-44:3 ("I think the real value for this connectivity is the optimization of schedules that come with it. So that we can make sure that we can create meaningful connectivity, meaningful schedules.").

509.   None of the benefits of schedule optimization would exist in a WCIA-like transaction. Tr. Day 17 (Town) at 29:11-17 ("Q. … applying the WCIA between JetBlue and American would not allow network optimization or schedule coordination, correct? A. That is likely the case."). And Dr. Town did not produce any analysis of such an arrangement. Tr. Day 17 (Town) at 27:2-8.

510.   The only "analysis" that Dr. Town pointed to was a Raven run that American conducted to evaluate a WCIA-like transaction. Tr. Day 16 (Town) at 125:14-20. Dr. Town noted that this Raven run showed that a WCIA-like transaction would not generate passenger traffic much greater than what was predicted in the codeshare-only transaction. Tr. Day 16 (Town) at 125:21-126:7. In other words, Dr. Town's own review of American's Raven analyses of these alternative scenarios showed that both purported lesser restrictive alternatives would not generate the level of passenger growth indicative of consumer benefits that the Clean Team observed in the NEA scenario. *Id*. Dr. Town opined that the difference between these alternative scenarios and the NEA scenario was the increase in capacity in the NEA scenario. *Id*. This is consistent with the conclusions American and JetBlue made regarding the need for schedule optimization in the NEA. Absent schedule optimization, American and JetBlue are not able to unlock new opportunities for growth and therefore will be unable to deliver. PX0940 at -697 (JetBlue Board document that recognized the NEA had greater "complexity" than the WCIA because "[o]pening up growth" in the Northeast is more difficult); Tr. Day 7 (Raja) at 168:16-169:6 (comparing the WCIA and NEA is "a little bit of apples and oranges, because in the case of Seattle . . . there aren't

slots.  There isn't that constrained resource that's there.  And we don't have anywhere near a domestic system. . . . there, we can go and put the flight in, and just through the revenue sharing, . . . everybody's got skin in the game to go and support it.  If we just put the JFK-Tel Aviv flight in without the schedule optimization, . . . it's hard to go and create that effect.  I'd say it's impossible to go and create that effect, because we've tried it."); *see also* Tr. Day 17 (Town) at 30:7-12 (Dr. Town did not assess whether a WCIA-like arrangement would have made financial sense for JetBlue or American).

Dated:  November 17, 2022

Respectfully submitted,

*/s/ Daniel M. Wall*
Daniel M. Wall (*pro hac vice*)
Elizabeth C. Gettinger (*pro hac vice*)
Elise M. Nelson (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
dan.wall@lw.com
elizabeth.gettinger@lw.com
elise.nelson@lw.com

Allyson M. Maltas (*pro hac vice*)
Ian R. Conner (*pro hac vice)*
Michael G. Egge (*pro hac vice*)
Farrell J. Malone (*pro hac vice*)
Marguerite M. Sullivan (*pro hac vice*)
Tara L. Tavernia (*pro hac vice*)
Seung Wan Paik (*pro hac vice*)
Jesse A. Vella (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200

Facsimile: (202) 637-2201
allyson.maltas@lw.com
ian.conner@lw.com
michael.egge@lw.com
farrell.malone@lw.com
marguerite.sullivan@lw.com
andrew.paik@lw.com
tara.tavernia@lw.com
jesse.vella@lw.com

David C. Tolley (BBO #676222)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
david.tolley@lw.com

*Attorneys for Defendant*
*American Airlines Group Inc.*

*/s/ Richard Schwed*
Richard Schwed (*pro hac vice*)
Matthew L. Craner (*pro hac vice*)
Jessica K. Delbaum (*pro hac vice*)
Leila Siddiky (*pro hac vice*)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-5445
rschwed@shearman.com
matthew.craner@shearman.com
jessica.delbaum@shearman.com
leila.siddiky@shearman.com

Brian Hauser (*pro hac vice*)
Ryan Leske (*pro hac vice*)
Shearman & Sterling LLP
401 9th Street, NW
Washington, DC 20004
Telephone: (202) 508-8005
brian.hauser@shearman.com
ryan.leske@shearman.com

190

Glenn A. MacKinlay, BBO #561708
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
Telephone: (617) 449-6548
gmackinlay@mccarter.com

*Attorneys for Defendant*
*JetBlue Airways Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served by electronic mail on all counsel of record this 17th day of November, 2022.

*/s/ Daniel M. Wall*
Daniel M. Wall

191