**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN AIRLINES GROUP INC. and JETBLUE AIRWAYS CORPORATION, <br><br> Defendants. | Civil Action No. 1:21-cv-11558-LTS |

**DEFENDANTS' MEMORANDUM ADDRESSING THE IMPACT OF
TERMINATION OF THE NORTHEAST ALLIANCE AND
SUPPORTING ISSUANCE OF THEIR REVISED PROPOSED FINAL JUDGMENT
AND ORDER ENTERING PERMANENT INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

LEGAL STANDARD................................................................................................................4

I.     THE WINDDOWN OF THE NEA CAN BE FULLY ACCOMPLISHED
       PURSUANT TO THE CONTRACTUAL TERMINATION PROCESS ...........................5

II.    BURDENSOME OVERSIGHT IS UNNECESSARY AND INAPPROPRIATE.............7

       A.     The Court Should Not Impose A Five-Year Monitor ...............................................7
       B.     The Court Should Not Impose Restrictions On Defendants' Ability To
            Enter Agreements With Other Domestic Air Carriers...........................................10

CONCLUSION.......................................................................................................................14

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re AMR Corp.*,
477 B.R. 384 (Bankr. S.D.N.Y. 2012) ..................................................................... 12

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ............................................................................................... 13

*Brown v. Trs. of Bos. Univ.*,
891 F.2d 337 (1st Cir. 1989) .................................................................................... 4

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ................................................................................................. 4

*EEOC v. Aviation Port Servs., LLC*,
No. 18-10909-FDS, 2020 WL 1550564 (D. Mass. Apr. 1, 2020) .......................... 10

*Hartford-Empire Co. v. United States*,
323 U.S. 386 (1945) ............................................................................................... 13

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*,
516 F. Supp. 2d 324 (D. Del. 2007), *aff'd*, 602 F.3d 237 (3d Cir. 2010) ............... 8

*Latas Libby's, Inc. v. United Steelworkers of Am.*,
609 F.2d 25 (1st Cir. 1979) ...................................................................................... 4

*Major League Baseball Props., Inc. v. Salvino Inc.*,
542 F.3d 290 (2d Cir. 2008) ................................................................................... 10

*Milwaukee Towne Corp. v. Loew's, Inc.*,
190 F.2d 561 (7th Cir. 1951) .................................................................................. 13

*NBA Props., Inc. v. Gold*,
895 F.2d 30 (1st Cir. 1990) ..................................................................................... 10

*New York v. Microsoft Corp.*,
224 F. Supp. 2d 76 (D.D.C. 2002) .............................................................. 4, 8, 13

*Paramount Film Distrib. Corp. v. Vill. Theatre, Inc.*,
228 F.2d 721 (10th Cir. 1955) ................................................................................ 12

*United States v. Apple Inc.*,
992 F. Supp. 2d 263 (S.D.N.Y. 2014), *aff'd*, 787 F.3d 131 (2d Cir. 2015) ............. 8

*United States v. Apple, Inc.*,
   No. 12-2826 (S.D.N.Y. Sept. 5, 2013) ..................................................................9

*United States v. AU Optronics Corp.*,
   No. 09-0110 (N.D. Cal. Oct. 2, 2012) ...................................................................9

*United States v. Bazaarvoice, Inc.*,
   No. 13-133 (N.D. Cal. Dec. 2, 2014) .....................................................................9

*United States v. Imperial Chem. Indus., Ltd.*,
   105 F. Supp. 215 (S.D.N.Y. 1952) .........................................................................9

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .................................................................................4

*United States v. Thales S.A.*,
   No. 1:19-cv-00569 (D.D.C. Feb. 28, 2019) ...........................................................7

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
   395 U.S. 100 (1969) .............................................................................................10

## STATUTES

15 U.S.C. § 18a(e)(B)(i)(II) ..............................................................................................11

49 U.S.C. § 41720(b) ........................................................................................................12

## TREATISES

2 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* (2d ed. 2000) ............................4

3 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* (1996) ..................................4, 5

## OTHER AUTHORITIES

Antitrust Div., U.S. Dep't. of Just., *Merger Remedies Manual* (2020),
   https://www.justice.gov/atr/page/file/1312416/download ......................................7

Bill Baer, Ass't Att'y Gen., Antitrust Div., U.S. Dep't. of Just., *Prosecuting Antitrust Crimes:
   Remarks as Prepared for the Georgetown University Law Center Global Antitrust
   Enforcement Symposium* (2014), https://www.justice.gov/atr/speech/prosecuting-antitrust-
   crimes ......................................................................................................................8

JetBlue Airways Corp., Form 8-K (July 5, 2023), https://d18rn0p25nwr6d. cloudfront.net/CIK-
   0001158463/bf7f2d30-b3d9-4482-a613-ccae4da192f0.pdf ....................................1

Press Release, American Airlines, *Northeast Alliance Update for Customers* (July 14, 2023),
   https://news.aa.com/news/news-details/2023/Northeast-Alliance-update-for-customers-NET-
   ALP-07/default.aspx ...............................................................................................2

Press Release, JetBlue, *JetBlue Announces Next Steps of Wind Down Plan for Its Northeast Alliance With American Airlines* (July 14, 2023), https://www.news. jetblue.com/latest-news/press-release-details/2023/JetBlue-Announces-Next-Steps-of-Wind-Down-Plan-for-Its-Northeast-Alliance-with-American-Airlines/default.asp..........................................................2

## INTRODUCTION

In accordance with the Court's Order, *see* Dkt. 368, Defendants submit this brief and a Revised Proposed Final Judgment and Order Entering Permanent Injunction (<u>Exhibit A</u>),[1] modified to reflect the termination of the Northeast Alliance ("NEA") by JetBlue Airways Corporation. JetBlue's decision to terminate the NEA due to the Court's May 19, 2023, decision fundamentally changes the scope of the injunctive relief warranted—and moots much of the Parties' previous submissions regarding the Final Judgment in this case. *See* Dkts. 353, 353-1, 354, 354-1, 354-2, 356, 356-1, 356-2, 358, 358-1, 359, 359-1, 359-2, 359-3.

On June 28, 2023, JetBlue notified American Airlines Group Inc. of its decision to terminate the NEA under Section 5.9 of the Northeast Alliance Agreement ("NEA Agreement"), which gives either party a unilateral right to terminate if any part of the NEA Agreement is declared unlawful.[2] The NEA Agreements include comprehensive terms governing termination, which contemplate the realities of unwinding the agreement and have not been challenged as inappropriate or anticompetitive. JetBlue's notice set in motion the contractually agreed termination process. The NEA Agreement (and Related Agreements) will now terminate on July 29, 2023—just three days after the July 26 hearing, *see* Dkt. 366. Defendants are already engaged in the complicated process of winding down the NEA Agreement and Related Agreements. In particular:

- **Codesharing**. On July 21, 2023, Defendants will stop filing codeshare fares, which will have the practical effect of ending any new codeshare bookings pursuant to the

---

[1] Defendants submit a redline, attached as <u>Exhibit B</u>, that identifies the key differences between Plaintiffs' Revised Proposed Final Judgment and Order Entering Permanent Injunction and Defendants' proposal (Ex. A).

[2] *See* JetBlue Airways Corp., Form 8-K (July 5, 2023) at 2, 6, https://d18rn0p25nwr6d. cloudfront.net/CIK-0001158463/bf7f2d30-b3d9-4482-a613-ccae4da192f0.pdf.

NEA; however, the airlines will continue to honor flying purchased before this date. This was publicly announced on July 14.[3]

- **Frequent Flyer**.  On July 21, 2023, Defendants will terminate the ability to redeem frequent flyer miles for travel on each other's airline (*i.e.*, AA passengers will no longer be able to use AAdvantage miles to book seats on JetBlue flights).  Tickets purchased with miles (mileage redemption) by July 20 will be honored by the airlines.  This was publicly announced on July 14.  Consumers may continue to accrue frequent flyer benefits, including mileage accrual for tickets purchased or issued by July 20, through January 31, 2024.

- **Slots.**  Defendants are actively working on a slot winddown plan and will submit a proposed agreement to Plaintiffs no later than 21 days after the Effective Date.

The important point is that the key NEA provisions that this Court found to be unlawful will be terminated before any Final Judgment is issued, and core aspects of the commercial winddown (including ceasing new codeshare and mileage redemption bookings) will already be complete.  The Final Judgment should therefore reflect the current state of affairs—and allow the winddown process to be completed in accordance with the commercial terms of the contracts.

The Proposed Final Judgment originally drafted by Plaintiffs would have conflicted with the contractually agreed termination process in numerous respects.  Fortunately, after extensive consultations, it appears that Plaintiffs and Defendants are largely (but not entirely) in agreement

---

[3] *See* Press Release, American Airlines, *Northeast Alliance Update for Customers* (July 14, 2023), https://news.aa.com/news/news-details/2023/Northeast-Alliance-update-for-customers-NET-ALP-07/default.aspx; Press Release, JetBlue, *JetBlue Announces Next Steps of Wind Down Plan for Its Northeast Alliance With American Airlines* (July 14, 2023), https://www.news.jetblue.com/latest-news/press-release-details/2023/JetBlue-Announces-Next-Steps-of-Wind-Down-Plan-for-Its-Northeast-Alliance-with-American-Airlines/default.aspx.

that it is sufficient to mandate completion of the termination process JetBlue started.  It is for that reason that the operational winddown provisions set forth in Section III of Plaintiffs' and Defendants' respective Proposed Final Judgments are very similar.

Several important disputes remain, however. The first concerns what conduct is enjoined. Defendants proposed a Final Judgment that not only mandated (through court order) the termination of the NEA but prohibited Defendants from entering into an agreement similar to the NEA with each other for 10 years.  Instead of accepting this straightforward proposal, which accomplishes Plaintiffs' own stated goals, Plaintiffs continue to propose long-term obligations and restrictions such as notice requirements regarding a wide range of commercial agreements unrelated to the NEA that will inhibit routine agreements with other airlines.  Plaintiffs also propose an intrusive and expensive five-year-long monitorship—a type of relief never ordered in these circumstances, where a discrete transaction that was disclosed to regulators in advance of implementation simply needs to be terminated.

These terms are overreach and, as such, violate the cardinal rule that injunctions should be narrowly tailored to address conduct found unlawful.  Plaintiffs cannot meet their burden to show a connection between their proposal and the antitrust violation the Court found:  Their proposal asks the Court to proscribe conduct and impose burdensome oversight measures that far exceed the relief of termination of the NEA.[4]  Finally, Plaintiffs attempt to supplant some contractual

---

[4] Plaintiffs also seek to include ambiguous language that would require the proposed Final Judgment to govern – in addition to "successors and assigns" – "any successor to any substantial part of [either Defendant's] business."  Pls.' Revised Proposed Final Judgment and Order Entering Permanent Inj. ("RPFJ") at II.  This vague language raises questions about which entities could be covered by the proposed Final Injunction in the future.  For example, if a Defendant sold a portion of its fleet, would the acquirer become subject to the obligations in the proposed Final Judgment?

winddown provisions with their own judgment regarding how the winddown should work—which risks unintended consequences.

Accordingly, the Court should enter Defendants' Revised Proposed Final Judgment and reject Plaintiffs' efforts to give the Department of Justice ("DOJ") broad regulatory authority that is neither justified by the evidence at trial nor appropriate given the termination of the NEA. Defendants submit as <u>Exhibit C</u> a chart that reflects the key provisions in dispute and an explanation of why Defendants' proposal should be adopted.

## LEGAL STANDARD

It is blackletter law that "[a]n injunction should be narrowly tailored to give only the relief to which plaintiffs are entitled." *Brown v. Trs. of Bos. Univ.*, 891 F.2d 337, 361 (1st Cir. 1989) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Thus, "prospective injunctive relief should go as far as, but no farther than, the pattern of violations suggests is necessary," *Latas Libby's, Inc. v. United Steelworkers of Am.*, 609 F.2d 25, 31 (1st Cir. 1979) (alteration and quotation omitted), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano*, 442 U.S. at 702. Consistent with these principles, "[e]quitable relief in an antitrust case should not 'embody harsh measures when less severe ones will do,' nor should it adopt overly regulatory requirements which involve the judiciary in the intricacies of business management." *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 100 (D.D.C. 2002) (citation omitted) (quoting 2 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 325a (2d ed. 2000)), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004). Plaintiffs, as the party seeking relief, bear the burden of demonstrating that there is a "significant causal connection between the conduct [to be] enjoined or mandated and the [antitrust] violation found." *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) (quoting 3 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 653(b) (1996)).

## I.   THE WINDDOWN OF THE NEA CAN BE FULLY ACCOMPLISHED PURSUANT TO THE CONTRACTUAL TERMINATION PROCESS

JetBlue's notice of termination set into motion several steps, outlined in detail in the NEA Agreement, to unwind the NEA.   JetBlue provided notice of termination under the NEA Agreement's Section 5.9 on June 28, 2023; the NEA Agreement therefore will end on July 29, 2023.   The Mutual Growth Incentive Agreement ("MGIA") automatically terminates on that day.  NEA Agreement § 5.11.3.   And the Defendants' related agreements providing for codesharing and frequent flyer reciprocity also will terminate on July 29.   *See id.*

Defendants immediately began the process of winding down the NEA in accordance with the commercial terms of the NEA Agreement and Related Agreements.   Defendants focused, first, on those elements of the NEA that formed the basis for the Court's decision:

All codesharing and frequent flyer mileage redemption for travel not yet booked will end on July 21—well before the injunction's Effective Date.  Ex. A at I.E, L; III.C, E.   This was announced publicly by both JetBlue and American on July 14.   This means that, by the time the Court's Final Judgment becomes effective, each Defendant will have stopped selling flights operated by the other Defendant.   *See id.* at I.E, III.E.

To attempt to minimize consumer disruption, both airlines will honor tickets bought or issued via codesharing before July 21 and will honor travel booked before July 21 using reciprocal frequent flyer rewards.   The airlines also plan to (1) recognize reciprocal elite flyer status benefits through January 31, 2024, and (2) allow passengers to earn rewards for tickets bought or issued before July 21 for travel scheduled to occur on or before January 31, 2024.[5]   This is consistent with the manner in which American has unwound other alliances when terminated.

---

[5] As was communicated to DOJ, Defendants will recognize reciprocal elite flyer status benefits and allow passengers to earn rewards for tickets bought and issued before July 21 for travel

As the Court will surely understand, it is more complicated and will take more time to unwind the slot- and airport-infrastructure-sharing aspects of the NEA.  Nevertheless, Defendants are in the process of completing a plan (which will ultimately be memorialized in an agreement to be presented to Plaintiffs) to facilitate the return of American's slots at JFK and LaGuardia Airports, currently under lease to JetBlue, and to end sharing of other airport infrastructure.  NEA Agreement app. C § 9; Ex. A at III.D.  Under Defendants' proposed Final Judgment, Defendants will submit this proposal to Plaintiffs no later than 21 days after the injunction's Effective Date. Ex. A at III.D.  The parties will submit their joint or competing positions to the Court no later than 45 days after the injunction takes effect.  *Id.*

Plaintiffs stated in their original proposed final judgment that a key purpose of a permanent injunction in this case "is the prompt and certain termination of the NEA, while minimizing disruption to passengers as a result of the termination . . . ."  Dkt. 356-1 at 1.  That is the same purpose served by the contractual termination procedures that have already been implemented to effectuate the necessary winddown.  That winddown process is far enough along that by the time of the hearing on July 26, the key conduct the Court found unlawful—specifically capacity coordination and revenue sharing—will have ended or will be within days of ending.  As noted, Plaintiffs have now largely accepted Defendants' proposal that the contractual winddown provisions should control, including specifically as set forth in Sections III A and III.D-F of the proposed Final Judgment.  However, the parties disagree on certain language in Sections III.B and C.

---

scheduled to occur on or before January 31, 2024, so long as the passengers' frequent flyer information is in the reservation system by July 20.

With respect to Section III.B, Plaintiffs propose including language that would prohibit "any effort to allocate markets"—language that is unnecessary given that the parties have already terminated, and agreed to language terminating, "all coordination of schedules and routes." Plaintiffs' proposed language is also vague and could easily encompass even lawful decision-making.

The contractual winddown provisions address the issue of payments to the flying airline, and Plaintiffs have no basis to object to those provisions—and have offered no basis for their demand to include the word codeshare within Section III.C.  That would risk being able to compensate the flying airline for FFP and other non-codeshare flights flown—and for no good reason.  Defendants' proposed language ("On or before the Effective Date, the Defendants shall cease revenue sharing pursuant to the MGIA, except to settle payments for tickets or itineraries issued prior to the Codeshare Cutoff Date, consistent with the termination clause of the NEA (Section 5.11)") is unobjectionable and should be adopted.  Indeed, as noted, the MGIA itself is terminated effective July 29, 2023.

## II.   BURDENSOME OVERSIGHT IS UNNECESSARY AND INAPPROPRIATE

### A.   The Court Should Not Impose A Five-Year Monitor

For no good cause, Plaintiffs ask the Court to appoint an antitrust compliance monitor, who *for five years*, and at Defendants' cost, would have "full and complete access to all personnel, books, records, and facilities" of Defendants, under "confidentiality requirements and conflict of interest certifications, approved by the United States in its sole discretion."  Pls.' RPFJ at VI.D-E, H, J.  The monitor would further be instructed to provide unlimited compliance reports at a "frequency" to be set by DOJ, again "in its sole discretion."  *Id.* at VI.I.

This request makes no sense, is a radical departure from DOJ's own policies regarding when and for how long antitrust compliance monitors are justified, and is particularly inappropriate

in light of JetBlue's termination of the NEA and the steps both Defendants are already taking to wind down the NEA.

Antitrust compliance monitors are not the norm. In merger decrees, monitors are utilized only in exceptional circumstances, such as "when there is an unusually high burden associated with monitoring compliance with a decree, for example in the case of a complex global asset carve-out that requires an extended transition period." *See* Antitrust Div., U.S. Dep't. of Just., *Merger Remedies Manual* 33 (2020), https://www.justice.gov/atr/page/file/1312416/download. It is DOJ's official position that "[i]n a typical merger case, a monitoring trustee's efforts would simply duplicate, and could potentially conflict with, the [Antitrust] Division's own decree enforcement efforts." *Id.* Further, if there is a need for a monitor in a merger case, the monitorship ordinarily ends as soon as the remedy is accomplished. *See, e.g.*, Competitive Impact Statement at 11, *United States v. Thales S.A.,* No. 1:19-cv-00569 (D.D.C. Feb. 28, 2019), Dkt. 3 ("The proposed Final Judgment provides that the United States may apply to the Court for appointment of a Monitoring Trustee with the power and authority to investigate and report on the parties' compliance with the terms of the Final Judgment and Stipulation and Order filed with the Court for entry *during the pendency of the divestiture*.") (emphasis added). In litigating this case, Plaintiffs repeatedly likened it to a merger challenge. Accordingly, the merger practice assumption *against* monitors should apply, and there is absolutely no reason to think that DOJ and States Attorneys General cannot oversee the winddown on their own.

Monitorships are usually reserved for antitrust cases involving deep-rooted anticompetitive conduct, especially criminal conduct. The rationale for monitors in that circumstance is to prevent

recidivism[6]—a concern not relevant here.  There have been only a handful of civil antitrust cases in which monitorships were imposed, and in each of those cases, there was a clear risk that the anticompetitive conduct would recur without monitoring.  *See, e.g., United States v. Apple Inc.*, 992 F. Supp. 2d 263, 267 (S.D.N.Y. 2014) (concealed conspiracy case imposing monitorship upon finding that Apple had failed to demonstrate "that it was seriously reforming its internal antitrust compliance policies to prevent a repeat of its violation"), *aff'd*, 787 F.3d 131 (2d Cir. 2015).  This is not that kind of case.  The NEA was not a secret.  ***Defendants approached both the Department of Transportation ("DOT") and DOJ upon signing the NEA, cooperated with the government's review of the NEA, and only implemented the NEA after entering into an agreement with the DOT addressing its concerns***.  And courts ordinarily "presume that parties will adhere to orders of the Court," absent any "history of non-compliance with judicial decrees."  *Microsoft Corp.*, 224 F. Supp. 2d at 181 & n.79.  The Court should therefore reject Plaintiffs' request to appoint a third party as "detective, prosecutor, and judge" to enforce the Final Judgment.[7]  *Id.* at 181; *see Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 516 F. Supp. 2d 324, 335 (D. Del. 2007) (rejecting private plaintiffs' request that defendant "hire an outside, independent monitor, in contrast to the employee it has designated as the antitrust compliance officer"), *aff'd*, 602 F.3d 237 (3d Cir. 2010); *cf. United States v. Imperial Chem. Indus., Ltd.*, 105 F. Supp. 215, 222 (S.D.N.Y. 1952) (court

---

[6] *See* Bill Baer, Ass't Att'y Gen., Antitrust Div., U.S. Dep't. of Just., *Prosecuting Antitrust Crimes: Remarks as Prepared for the Georgetown University Law Center Global Antitrust Enforcement Symposium* 8 (2014), https://www.justice.gov/atr/speech/prosecuting-antitrust-crimes.

[7] For the same reason, the Court should reject the language that Plaintiffs propose in the preamble to their proposed Final Injunction stating that a "purpose" of the injunction shall be to "prevent[] the recurrence of similar anticompetitive conduct."  Pls.' RPFJ at pmbl.; see Ex. C for additional detail.

9

"may not act entirely upon an assumption that the defendants will continue in their disregard of the law and violate the injunctions of a final judgment").[8]

### B. The Court Should Not Impose Restrictions On Defendants' Ability To Enter Agreements With Other Domestic Air Carriers

The Court should reject Plaintiffs' proposed restrictions on Defendants' ability to enter new agreements not only with each other, but also with other domestic air carriers. Plaintiffs first seek to prohibit Defendants from "enter[ing] into any new alliance, partnership, joint venture or other agreement with another Domestic Air Carrier if such agreement provides for revenue sharing, or for coordination of routes or capacity, in a manner substantially similar to the NEA" for a two-year period. Pls.' RPFJ at III.H. This restriction reaches beyond the facts here to proscribe conduct far afield from the "unlawful acts which the court has found to have been committed." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 132 (1969) (citation omitted). Rather, Plaintiffs seek to prevent Defendants from engaging in a slew of ***lawful*** conduct. This proposed term effectively treats all agreements involving revenue sharing or coordination as presumptively illegal, despite this Court's recognition that such arrangement are common in the

---

[8] At a minimum, the duration of the Plaintiffs' monitoring request is dramatically out of step with that which has been approved in prior cases. Here, Plaintiffs seek to subject Defendants to a five-year monitoring period. But to the extent courts have imposed this extraordinary remedy, they have done so only for much shorter time frames. For example, the Southern District of New York limited its appointment of an external compliance monitor in *Apple* to two years. *See* Order Entering Permanent Inj. at 10-11, *United States v. Apple, Inc.*, No. 12-2826 (S.D.N.Y. Sept. 5, 2013), Dkt. 374. Similarly, the district court in *AU Optronics*—a *criminal* case involving price-fixing—limited its monitoring period to only three years. Judgment at 2-3, *United States v. AU Optronics Corp.*, No. 09-0110 (N.D. Cal. Oct. 2, 2012), Dkt. 976.

Cases where longer-term monitors have been appointed only underscore why such a lengthy monitorship is inappropriate here. In *United States v. Bazaarvoice*, for example, the length of the monitorship (four years) matched the period during which Bazaarvoice was ordered to provide a license and access to its technology to a divestiture acquirer. *See* Third Amended Final Judgment at 3, 7, 10-13, *United States v. Bazaarvoice, Inc.*, No. 13-133 (N.D. Cal. Dec. 2, 2014), Dkt. 286. Here, by contrast, DOJ seeks a five-year monitor but the unwinding process will largely be complete this month.

airline industry and often legal.  *See* Dkt. 344 at 15-17, 91; *see also, e.g.*, *Major League Baseball Props., Inc. v. Salvino Inc.*, 542 F.3d 290, 332-34 (2d Cir. 2008) (finding it not "at all apparent" that revenue sharing is anticompetitive or unlawful).  Separately, the phrase "substantially similar to the NEA" is too vague to provide notice to Defendants of which agreements fall within the proposed injunction's ambit and imposes no coherent limitation on the prohibition.  It is therefore improper.  *See, e.g.*, *NBA Props., Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir. 1990); *EEOC v. Aviation Port Servs., LLC*, No. 18-10909-FDS, 2020 WL 1550564, at *12 (D. Mass. Apr. 1, 2020).

Similarly, there is no basis in the record at trial to require Defendants to adhere to burdensome and superfluous notice requirements before entering any number of standard agreements with other Domestic Air Carriers for a five-year period.  Pls.' RPFJ at V.B.  Plaintiffs' proposal would require not only a detailed and burdensome notice to Plaintiffs, but also a lengthy waiting period that would slow down even routine industry arrangements, such as agreements to lease slots or swap gates or even share de-icing equipment for more than 90 days.  Specifically, Plaintiffs propose requiring Defendants to wait "at least 30 calendar days" following the submission to regulatory agencies of significant, confidential business information before implementing the relevant agreement.[9]  *Id.* at V.D.  And if the Antitrust Division issued a Civil Investigative Demand within that thirty-day period, Plaintiffs' proposal would impose an additional delay of "60 calendar days after submitting all information required under the Civil Investigative Demand." *Id.*

---

[9] For example, DOJ waited fourteen months after issuing a Civil Investigative Demand to file this lawsuit.

This extreme and intrusive notice requirement is unnecessary—and would go far beyond the trial or decision in this case, which relates exclusively to a joint venture between American and JetBlue.[10]

Defendants have agreed to abide by Plaintiffs' burdensome proposed notice requirements with respect to certain agreements *between Defendants*, in line with the Court's decision in this case (e.g., codesharing agreements and certain types of revenue sharing agreements). However, requiring similar notice requirements and waiting periods for agreements with other airlines is an overreach for which Plaintiffs offer no serious justification.

*First*, these sorts of agreements occur all the time and there is no reason to believe that they present competitive concerns—or that the flying public should be deprived of the benefits of those agreements while Defendants provide notice and wait up to thirty days for DOJ to respond (or longer if DOJ issues a burdensome Civil Investigative Demand, *see* Pls.' RPFJ at V.D).

*Second*, federal law already requires airlines seeking to enter joint ventures to submit a complete copy of their proposed agreement to DOT at least thirty days before the agreement takes effect. *See* 49 U.S.C. § 41720(b). And airlines provide notice of material deals—including the NEA itself—to DOJ. Domestic air carriers routinely enter codesharing and loyalty reciprocity agreements, and courts, including this one, have treated such arrangements as beneficial because they expand travel options and improve convenience for consumers. *See* Dkt. 344 at 15-16 (airlines often "adopt codesharing . . . with or without some degree of loyalty-program reciprocity"); *id.* at 16-17 (describing codesharing, revenue sharing, and loyalty reciprocity

---

[10] This exceeds even the burden set forth under the Hart-Scott-Rodino Act, 15 U.S.C. § 18a(e)(B)(i)(II), which this provision is intended to model. There, "substantial compliance" with the request – and not the provision of "all" information requested – is the applicable standard. And absent agreement to the contrary, the subsequent waiting period is only 30 days. Plaintiffs offer no reason for imposing a higher standard here. Cf. Dkt. 353 at 14 (analogizing to that Act).

agreements involving airlines other than Defendants); *id.* at 90 n.112 (acknowledging that "airlines regularly establish" agreements to engage in "codesharing and loyalty reciprocity"); *In re AMR Corp.*, 477 B.R. 384, 427 (Bankr. S.D.N.Y. 2012) (partnerships between network carriers and smaller regional airlines).   Moreover, Defendants' conduct in the run-up to this litigation underscores that the provision is unwarranted as Defendants engaged with federal regulators early and in good faith.   There is no reason to believe they would behave differently in the future.

*Third*, the provision would also cover simple amendments to the agreements previously reviewed by Plaintiffs pursuant to the notice provisions.   For example, under its proposal, if DOJ reviewed and approved a new codesharing agreement with an airline, a routine amendment like a modification to reimbursement rates to account for changes in the underlying costs of providing codeshare service, would require a new notice period.   Plaintiffs' Revised Proposed Final Judgment would severely restrict Defendants' practical ability to continue to enter such amendments, for no good reason.

*Fourth*, an antitrust injunction must not provide Defendants' rivals with "a positive competitive advantage" to which they would not have otherwise been entitled.   *Paramount Film Distrib. Corp. v. Vill. Theatre, Inc.*, 228 F.2d 721, 727 (10th Cir. 1955).   The purpose of antitrust law is, after all, "the protection of competition, not competitors."   *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962).   For that reason, courts routinely reject proposed injunction terms that "will provide significant benefit to competitors, but have not been shown to benefit competition."   *Microsoft Corp.*, 224 F. Supp. 2d at 185; *see also Milwaukee Towne Corp. v. Loew's, Inc.*, 190 F.2d 561, 571 (7th Cir. 1951) ("[Private] plaintiff has no right to the award of a position superior to that of other competitors.").   DOJ itself has previously affirmed this basic principle, explaining that "decree provisions should preserve competition rather than protect or favor particular

competitors." *Merger Remedies Manual, supra*, at 4-5.  Placing Defendants at a significant commercial disadvantage relative to other carriers, which are permitted to enter into similar agreements without notice or delay, would harm rather than aid competition.  Because the Court "may not . . . place the defendants, for the future, 'in a different class than other people,'" the Court should reject Plaintiffs' proposed notice provisions.  *Hartford-Empire Co. v. United States*, 323 U.S. 386, 409 (1945) (citation omitted).

There is no basis for any regulation of Defendants' ordinary course agreements with other Domestic Air Carriers—and certainly not for the extensive regulatory scheme set forth in Plaintiffs' proposed final judgment, which reaches far beyond the scope of the NEA or the findings in this case.

## CONCLUSION

For these reasons, the Court should enter Defendants' Revised Proposed Final Judgment and Permanent Injunction, which provides for the expeditious winddown of the NEA under Defendants' contractually designed termination process, minimizes consumer disruption, and is narrowly tailored to the Court's findings, legal theories, and the evidence presented at trial.

Dated: July 19, 2023                              Respectfully submitted,

                                                  /s/ Christopher S. Yates
                                                  Christopher S. Yates (*pro hac vice*)
                                                  Alfred C. Pfeiffer (*pro hac vice*)
                                                  LATHAM & WATKINS LLP
                                                  505 Montgomery Street, Suite 2000
                                                  San Francisco, CA 94111-6538
                                                  Telephone: (415) 391-0600
                                                  Facsimile: (415) 395-8095
                                                  al.pfeiffer@lw.com
                                                  chris.yates@lw.com

Farrell J. Malone (*pro hac vice*)
Marguerite M. Sullivan (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
farrell.malone@lw.com
marguerite.sullivan@lw.com

David C. Tolley (BBO #676222)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
Facsimile: (617) 948-6001
david.tolley@lw.com

*Attorneys for Defendant*
*American Airlines Group Inc.*

/s/ Richard Schwed
Richard Schwed (*pro hac vice*)
Matthew L. Craner (*pro hac vice*)
Jessica K. Delbaum (*pro hac vice*)
Leila Siddiky (*pro hac vice*)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-5445
rschwed@shearman.com
matthew.craner@shearman.com
jessica.delbaum@shearman.com
leila.siddiky@shearman.com

Brian Hauser (*pro hac vice*)
Ryan Leske (*pro hac vice*)
Shearman & Sterling LLP
401 9th Street, NW
Washington, DC 20004
Telephone: (202) 508-8005
brian.hauser@shearman.com
ryan.leske@shearman.com

Glenn A. MacKinlay, BBO #561708
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
Telephone: (617) 449-6548
gmackinlay@mccarter.com

*Attorneys for Defendant*
*JetBlue Airways Corporation*

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.

/s/ Christopher S. Yates
Christopher S. Yates

16