# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA et al.,

*Plaintiffs*,

v.

AMERICAN AIRLINES GROUP INC. and
JETBLUE AIRWAYS CORPORATION,

*Defendants*.

Case No. 1:21-cv-11558-LTS

---

### ~~PLAINTIFFS~~ DEFENDANTS' REVISED [PROPOSED] FINAL JUDGMENT AND ORDER ENTERING PERMANENT INJUNCTION

Plaintiff United States of America and Plaintiff States filed a Complaint on September 21, 2021; Defendants filed a Motion to Dismiss on November 22, 2021, which this Court denied on June 9, 2022; Defendants filed their Answers on July 11, 2022; this Court having conducted a full month-long trial on all issues of liability and issued its Findings of Fact and Conclusions of Law on May 19, 2023, holding that the NEA violated Section 1 of the Sherman Act, 15 U.S.C.

§ 1, permanently enjoining Defendants from continuing, and restraining Defendants from further implementing, the NEA, and ordering that the parties submit a proposed order regarding the text of the Permanent Injunction ordered by the Court.

On June 28, 2023, pursuant to Sections 5.9 and 5.11.3 of the NEA Agreement, JetBlue provided notice of termination of the Northeast Alliance Agreement and the Related Agreements to American (the "Notice of Termination"), such termination effective July 29, 2023.

The purpose of this Permanent Injunction is the prompt and certain termination of the NEA, while minimizing disruption to passengers as a result of the termination~~, and preventing the recurrence of similar anticompetitive conduct~~.

It is hereby ORDERED, ADJUDGED, AND DECREED:

## I. Definitions

As used in this Final Judgment and Order Entering Permanent Injunction:

A.      "Airport Infrastructure" means gates, ground facilities, or other airport infrastructure.

B.      "American Airlines" means American Airlines Group Inc.

C.      "BSPA" means the Bilateral Special Prorate Agreement for Passengers between American Airlines and JetBlue executed on or about November 1, 2021, or as subsequently amended.

D.      "Codeshare Agreement" means the Codeshare Agreement between American Airlines and JetBlue executed on or about July 15, 2020, or as subsequently amended.

E.      "Codeshare Cutoff Date" shall be on or before July 21, 2023.

F.      "Competitively Sensitive Information" means any non-public information of Defendants relating to scheduled air passenger services, including without limitation non-public information relating to network plans, pricing or pricing strategies, frequent flyer programs, corporate customer negotiations, tactics or strategy, costs, revenues, profits, margins, output, marketing, advertising, promotion, or research and development."

G.      "Covered Agreements" means any agreement, partnership, or joint venture that provides, in whole or in part, for any or all of the following:

        a.      Codesharing;

        b.      Sharing or pooling of revenues earned from air passenger services (except for pro rata or other allocation of revenues from industry standard compensation arrangements);

   c.  Discussion or any other communications about the routes on which to offer air passenger service, or of the frequency or capacity of air passenger service flights on any route or routes;

   d.  Sale, lease, or sharing of Slots that will last longer than one IATA season.

H. "Defendant" means separately or collectively American Airlines and JetBlue.

G.I. "Domestic Air Carrier" means Alaska Airlines, Allegiant Air, American Airlines, Avelo Airlines, Breeze Airways, Delta Air Lines, Frontier Airlines, Hawaiian Airlines, JetBlue, Southwest Airlines Co., Spirit Airlines, Inc., Sun Country Airlines, and United Airlines, Inc.

H.J. "Effective Date" means twenty-one (21) days following the date of entry of this Permanent Injunction.

I.K.     "Final Judgment" means this Final Judgment and Order Entering Permanent

Injection.

J.L.     "Frequent Flyer Agreements" means the AAdvantage Participating Carrier

Agreement and the TrueBlue Participating Carrier Agreement between American Airlines

and JetBlue executed on or about October 21, 2020, or as subsequently amended.

K.M.     "Frequent Flyer Cutoff Date" shall be on or before July 21, 2023.

L.N.     "JetBlue" means JetBlue Airways Corporation.

M.O.     "MGIA" means the Mutual Growth Incentive Agreement between American

Airlines and JetBlue executed on or about July 15, 2020, and all amendments thereto.

N.P.     "NEA" means the partnership between the Defendants governed by the NEA

Agreement and Related Agreements executed on or after July 15, 2020.

O.Q.     "NEA Agreement" means the Northeast Alliance Agreement between

American Airlines and JetBlue executed on or about July 15, 2020, and all amendments

thereto.

P.R.     "Plaintiffs" means collectively the United States and the Plaintiff States.

Q.S.     "Plaintiff States" means the States and Commonwealths of Arizona, California,

Florida, Massachusetts, Pennsylvania, and Virginia and the District of Columbia.

R.T.     "Related Agreements" means the MGIA, the Frequent Flyer Agreements, the

Codeshare Agreement, and the BSPA.

S.U.     "Slot" means the right and operational authority to conduct a landing or take-off

operation at a specific time or during a specified time period at a specific airport, including

without limitation slots, arrival authorizations, and operating authorizations, whether pursuant to

federal regulations or orders pursuant to Title 14, Title 49, or other federal statutes or regulations

now or hereinafter in effect.

4

V.      "Slot Lease Agreement" means any agreement entered between American

Airlines and JetBlue under which one Defendant temporarily leases or subleases Slots to the

other

Defendant.

## II. Applicability

This Permanent Injunction applies to American Airlines, JetBlue, and each of their

affiliates, subsidiaries, officers, directors, agents, employees, successors, and assigns, and to any

successor to any substantial part of the business.

## III. Required Conduct

A.      On or before the Effective Date, Defendants shall terminate the NEA Agreement

and the Related Agreements, or if already terminated shall not revoke the previously issued

Notice of Termination.

B.      On or before the entry of this Final Judgment, Defendants shall cease all

coordination of schedules and routes, and any effort to allocate markets.

C.      On or before the Effective Date, the Defendants shall cease revenue sharing

pursuant to the MGIA, except to settle payments for codeshare tickets or itineraries issued prior

to the Codeshare Cutoff Date, consistent with the termination clause of the NEA (Section 5.11).

D.      Each Defendant may continue to use any slots it is currently using as of the June

28, 2023, Notice of Termination until a date that shall be established by subsequent order of the

Court.  No later than 21 days after the Effective Date, Defendants shall submit to Plaintiffs a

proposed wind-down plan for expeditious and orderly termination of all Slot Lease Agreements

related to the NEA and Airport Infrastructure sharing agreements related to the NEA.  The

parties shall submit their joint or separate positions to the Court no later than 45 days after the

Effective Date, at which point the Court shall order such additional relief as shall be necessary. Defendants will stop sharing Airport Infrastructure no later than the return of all leased Slots.

E.      As of the Codeshare Cutoff Date, each Defendant shall not sell flights operated by the other Defendant pursuant to the Codeshare Agreement or any other agreement between the Defendants related to the NEA Agreement.  Notwithstanding this provision, the Defendants may honor the terms of existing tickets or itineraries valid at the time of the Effective Date, and may continue to place their respective airline code on (but not sell new tickets for) flights operated by the other Defendant, including for travel that will take place after the Codeshare Cutoff Date.

F.      As of the Frequent Flyer Cutoff Date, neither Defendant shall allow passengers to redeem rewards for new ticket purchases pursuant to its frequent flyer program for flights operated by the other Defendant pursuant to the Frequent Flyer Agreements or any other agreement between the Defendants related to the NEA Agreement.  Each Defendant may enable travelers to continue to accrue benefits through its respective frequent flyer program for travel on flights operated by the other Defendant that occurs on or before January 31, 2024, for existing tickets valid at the time of the Frequent Flyer Cutoff Date.  Each Defendant may honor reciprocal elite recognition benefits in existence as of the Frequent Flyer Cutoff Date through January 31, 2024.

G.      Neither Defendant shall enter into any new alliance, partnership, joint venture, or other agreement with each other, if such agreement provides for revenue sharing, or for coordination of routes or capacity, in a manner substantially similar to the NEA.  This provision shall expire on the tenth anniversary of the Effective Date.

H.      Neither Defendant shall enter into any new alliance, partnership, joint venture, or other agreement with another Domestic Air Carrier if such agreement provides for revenue

6

sharing, or for coordination of routes or capacity, in a manner substantially similar to the NEA.

This provision shall expire on the second anniversary of the Effective Date.

I.H.     Neither Defendant may send, receive, request, or otherwise communicate any Competitively Sensitive Information to or from the other Defendant after the Effective Date. Neither Defendant shall use in any way any Competitively Sensitive Information obtained from the other Defendant during the period when the NEA or any applicable wind-down activities were in effect.  Any of Defendant's officers, agents, directors, or employees with Competitively Sensitive Information obtained from the other Defendant shall not disclose such information to any other person, including other persons working for any Defendant or any other air carrier. Notwithstanding this paragraph, Defendants may communicate or use Competitively Sensitive Information as necessary to (i) fulfill existing bookings or benefits for travel booked consistent with Sections III.CE and III.EF of this Final Judgment, or (ii) as otherwise permitted by or necessary to comply with this Final Judgment, or other court order, protective order, law, or regulation.

J.I.     Within 30 days of the Effective Date, each Defendant shall develop, implement, and communicate to all relevant personnel a plan for complying with the terms of this Final Judgment, and shall provide copies of such plan to the Plaintiffs.

IV.Additional Provisions

A.     A.     Subject to the Notice requirements in Section V, and the prohibitions of Paragraphs III.G and III.H, nothing in this Final Judgment shall be construed to prohibit either Defendant from entering into new agreements, including with the other Defendant, that are not otherwise prohibited by the antitrust laws or other laws or regulations.

V. <u>Notice</u>

A.     Neither Defendant may enter into any new ~~agreement, partnership, or joint venture~~<span style="color:blue">Covered Agreement</span>, with the other Defendant, or enter into an amendment thereto, without prior notification to the Plaintiffs. Such notification shall be provided to the Chief of the Transportation, Energy, and Agriculture Section of the Antitrust Division of the Department of Justice (or any successor to that Section), and to the Attorney General of each of the Plaintiff States.  This provision shall expire on the tenth anniversary of the Effective Date of this Final Judgment.

~~B.     Neither Defendant may enter into any new agreement, partnership, or joint venture with another Domestic Air Carrier, or enter into an amendment thereto, without prior notification to the Plaintiffs. Such notification shall be provided to the Chief of the Transportation, Energy, and Agriculture Section of the Antitrust Division of the Department of Justice (or any successor to that Section), and to the Attorney General of each of the Plaintiff States. This provision shall expire on the fifth anniversary of the Effective Date of this Final Judgment.~~

~~C.     For agreements, partnerships, joint ventures, or amendments subject to Section~~ <span style="color:blue">B.     For Covered Agreements subject to Section</span> V.A ~~or V.B~~, above, the respective Defendant must provide Plaintiffs with copies of all related contracts or other agreements, and all studies, surveys, analyses, and reports which were prepared by or for any officer(s) or director(s) for the purpose of evaluating or analyzing the new agreement, partnership, joint venture, or amendment thereto with respect to market shares, competition, competitors, markets, potential for sales growth, or expansion into new products or geographic areas in a manner consistent with the instructions and guidance issued by the Premerger Notification Office of the Federal Trade Commission on Item 4(c) and Item 4(d) of the Notification and Report Form

9

pursuant to 16 C.F.R. § 803.1(a).

~~D.~~           Any agreements, partnerships, joint ventures, or amendments subject to Section V.A ~~or V.B~~, above, may not be implemented or otherwise enter into force or effect until at least 30 calendar days following notification to the Plaintiffs and submission of the materials required under Section V.~~C~~B, unless representatives of the Department of Justice Antitrust Division agree in writing to a shorter period.  If, within 30 calendar days following notification and submission of the materials required under Section V.~~C~~B, representatives of the Department of Justice Antitrust Division issue one or more Civil Investigative Demands seeking information related to the agreement, partnership, joint venture, or amendment thereto, a Defendant who received a Civil Investigative Demand may not implement the proposed agreement, partnership, joint venture, or amendment until 60 calendar days after ~~submitting all information required under~~substantially complying with the Civil Investigative Demand.

~~E.       Notwithstanding the foregoing, the Defendants are not required to provide notice or observe a waiting period for any agreement solely constituting short-term (less than 90 days) sharing of Airport Infrastructure. In addition, the~~D.        The Department of Justice, in writing to ~~the~~ Defendants, may exclude from the Notice requirements of this Section certain other classes of agreements that the Department of Justice in its sole discretion determines to be unlikely to raise competitive concerns.

~~F.~~       E.        No later than the Effective Date, Defendants shall provide to the Plaintiffs copies of (or if not previously written, shall provide written descriptions of) any agreements they have entered into with one another after June 28, 2023, and before the entry of this Final Judgment, including any amendments to any existing agreements.

~~VI. Appointment of Monitoring Trustee~~

A.      The Court will appoint a monitoring trustee selected by Plaintiffs and approved by the Court.

B.      The monitoring trustee will have the power and authority to monitor Defendants' compliance with the terms of this Final Judgment entered by the Court. The Monitoring Trustee will have no responsibility for the operation of Defendants' businesses.

C.      Defendants may not object to actions taken by the monitoring trustee in fulfillment of the monitoring trustee's responsibilities under any Order of the Court on any ground other than malfeasance by the monitoring trustee. Objections by Defendants must be conveyed in writing to the Plaintiffs and the monitoring trustee within 10 calendar days of the monitoring trustee's action that gives rise to Defendants' objection.

D.      The monitoring trustee will serve at the cost and expense of Defendants pursuant to a written agreement, on terms and conditions, including confidentiality requirements and conflict of interest certifications, approved by the United States in its sole discretion.

E.      The monitoring trustee may hire, at the cost and expense of Defendants, any agents and consultants that are reasonably necessary in the monitoring trustee's judgment to assist with the monitoring trustee's duties. These agents or consultants will be solely accountable to the monitoring trustee and will serve on terms and conditions, including confidentiality requirements and conflict-of-interest certifications, approved by the United States in its sole discretion.

F.      The compensation of the monitoring trustee and agents or consultants retained by the monitoring trustee must be on reasonable and customary terms commensurate with the individuals' experience and responsibilities. If the monitoring trustee and Defendants are unable to reach agreement on the monitoring trustee's compensation or other terms and conditions of

engagement within 14 calendar days of the appointment of the monitoring trustee, the United States, in its sole discretion, may take appropriate action, including by making a recommendation to the Court. Within three business days of hiring any agents or consultants, the monitoring trustee must provide written notice of the hiring and the rate of compensation to Defendants and Plaintiffs.

G.     The monitoring trustee must account for all costs and expenses incurred.

H.     Defendants must use best efforts to assist the monitoring trustee to monitor Defendants' compliance with their obligations under this Final Judgment. Subject to reasonable protection for trade secrets, other confidential research, development, or commercial information, or any applicable privileges, Defendants must provide the monitoring trustee and agents or consultants retained by the monitoring trustee with full and complete access to all personnel, books, records, and facilities. Defendants may not take any action to interfere with or to impede accomplishment of the monitoring trustee's responsibilities.

I.     The monitoring trustee must investigate and report on Defendants' compliance with this Final Judgment, including Defendants' compliance with the prohibitions on the exchange, further dissemination, or use of Competitively Sensitive Information contemplated in Paragraph III(J) of this Final Judgment. The monitoring trustee must provide yearly reports to the Plaintiffs setting forth Defendants' efforts to comply with their obligations under this Final Judgment. The monitoring trustee must review the compliance plans created by each Defendant pursuant to Paragraph III(K) of this Final Judgment, and may make recommendations to the Defendants regarding the content of the plan, and may recommend to Plaintiffs additional relief that should be sought from the Court to ensure compliance. The United States, in its sole discretion, will set the frequency of the monitoring trustee's reports.

J.      The monitoring trustee will serve until the fifth anniversary of the Effective Date.
K.      If the United States determines that the monitoring trustee is not acting

diligently or in a reasonably cost-effective manner, they may recommend that the Court

appoint a substitute.

## ~~VII.~~VI.    Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this ~~Permanent Injunction~~Final

Judgment to apply to this Court at any time for further orders and directions as may be

necessary or appropriate to carry out or construe this ~~Permanent Injunction~~Final Judgment, to

modify any of its provisions, to enforce compliance, and to address violations of its

provisions.

SO ORDERED.

_____
United States District Judge