# Exhibit C

**Defendants' Proposed Changes to Plaintiffs' Proposed Final Judgment**

| Section from Plaintiffs' RPFJ | Issue | Defendants' Proposed Changes[1] | Reasoning |
|---|---|---|---|
| Preamble | Purpose of injunction | The purpose of this Permanent Injunction is the prompt and certain termination of the NEA, while minimizing disruption to passengers as a result of the termination~~, and preventing the recurrence of similar anticompetitive conduct~~. | The purpose of the relief should be to enjoin the conduct that the Court has found unlawful, not to provide the Government broad authority to unilaterally prohibit Defendants from engaging in otherwise lawful activities with the vague purpose of preventing "similar anticompetitive conduct." |
| I.G | "Covered Agreement" definition | "Covered Agreements" means any agreement, partnership, or joint venture that provides, in whole or in part, for any or all of the following:<br><br>a. Codesharing<br>b. Sharing or pooling of revenues earned from air passenger services (except for pro rata or other allocation of revenues from industry standard compensation arrangements);<br>c. Discussion or any other communications about the routes on which to offer air passenger service, or of the frequency or capacity of air passenger service flights on any route or routes;<br>d. Sale, lease, or sharing of Slots that will last longer than one IATA season. | Plaintiffs seek to require Defendants to provide burdensome and time-consuming notice and approval processes for a wide range of standard commercial agreements with both the other Defendant and with third-party domestic airlines that have no nexus to this case.  There are countless agreements needed in the ordinary course to ensure efficient operation of the U.S. airline industry (*e.g.*, equipment leases between airlines to avoid operational disruptions), and Plaintiffs' overbroad notice and approval provisions would introduce overreaching government oversight into this industry—which could have a host of unintended consequences—even though many agreements that would be covered by Plaintiffs' required notices have no bearing on competition at all.  The practical impact of such an onerous notice requirement would be that Defendants would not be able to enter into various standard agreements and would be at a competitive disadvantage. *See* Section II.B of Defendants' Memorandum. |

---

[1] Language in this column is marked to show Defendants' proposed changes, with red/strike-though language representing proposed deletions and **bold/blue** language representing proposed additions.

| Section from Plaintiffs' RPFJ | Issue | Defendants' Proposed Changes[1] | Reasoning |
|---|---|---|---|
| II. | Entities covered by the injunction | This Permanent Injunction applies to American Airlines, JetBlue, and each of their affiliates, subsidiaries, officers, directors, agents, employees, successors, and assigns~~, and to any successor to any substantial part of the business~~. | The stricken passage is surplusage and ambiguous. "Successors" are already covered. "Any substantial part of the business" is vague and raises questions regarding whether an airline that may in the future purchase fleet (*e.g.*, 50 aircraft) or other parts of Defendants' business may become subject to the Permanent Injunction. If this is retained, it should be clarified to apply to "substantially all of each Defendant's business" which would provide more clarity. |
| III.B. | Prohibited activities – schedule coordination | On or before the entry of this Final Judgment, Defendants shall cease all coordination of schedules and routes~~, and any effort to allocate markets~~. | "And any effort to allocate markets" is vague and unnecessary given the remainder of this provision, which explicitly prohibits coordination of schedules and routes—terms that have readily understood meanings in the airline industry. A prohibition on "any effort to allocate markets" is ambiguous and could go so far as to cover even independent decisionmaking by the airlines. |
| III.C. | Prohibited activities – MGIA | On or before the Effective Date, the Defendants shall cease revenue sharing pursuant to the MGIA, except to settlement payments for ~~codeshare~~ tickets or itineraries issued prior to the Codeshare Cutoff Date, **consistent with the termination clause of the NEA (Section 5.11)**. | Plaintiffs have recognized during the parties' meet and confers that the airlines should be compensated for their respective flying activities (*e.g.*, by receiving reimbursement for codeshare flying). Now that the NEA has been terminated, and both parties are winding it down, the termination provisions should apply to the settlement of any outstanding payments for tickets or itineraries issued prior to the Codeshare Cutoff Date, including in connection with the frequent flyer programs. |
| III.H | Future partnerships | ~~Neither Defendant shall enter into any new alliance, partnership, joint venture, or other agreement with another Domestic Major Air Carrier if such agreement provides for revenue sharing, or for coordination of routes or capacity, in a manner substantially similar to the NEA. This provision shall expire on the second anniversary of the Effective Date.~~ | This provision effectively treats all agreements involving revenue sharing or coordination of routes and capacity as presumptively illegal when that is not the law and is not consistent with the Court's decision. "Substantially similar to the NEA" is vague and provides no coherent limitation on the prohibition. *See* Section II.B of Defendants' Memorandum. |

| Section from Plaintiffs' RPFJ | Issue | Defendants' Proposed Changes[1] | Reasoning |
|---|---|---|---|
| V.B. | Future partnerships | ~~Neither Defendant may enter into any new agreement, partnership, or joint venture with another Domestic Major Air Carrier, or enter into an amendment thereto, without prior notification to the Plaintiffs. Such notification shall be provided to the Chief of the Transportation, Energy, and Agriculture Section of the Antitrust Division of the Department of Justice (or any successor to that Section), and to the Attorney General of each of the Plaintiff States. This provision shall expire on the fifth anniversary of the Effective Date of this Final Judgment.~~ | The Government already has ample opportunity to receive notice and investigate any new major agreements between domestic airlines. The provision is extremely broad to cover even the most mundane agreements and would chill day-to-day cooperation among airlines that help to minimize travel disruption and benefit consumers. This provision is also vastly overbroad and would defeat the stated purpose of injunctions to be narrowly tailored. *See* Section II.B of Defendants' Memorandum. |
| V.D. | Future partnerships | Any agreements, partnerships, joint ventures, or amendments subject to Section V.A ~~or V.B~~, above, may not be implemented or otherwise enter into force or effect until at least 30 calendar days following notification to the Plaintiffs and submission of the materials required under Section V.C, unless representatives of the Department of Justice Antitrust Division agree in writing to a shorter period. If, within 30 calendar days following notification and submission of the materials required under Section V.C, representatives of the Department of Justice Antitrust Division issue one or more Civil Investigative Demands seeking information related to the agreement, partnership, joint venture, or amendment thereto, a Defendant who received a Civil Investigative Demand may not implement the proposed agreement, partnership, joint venture, or amendment until 60 calendar days after ~~submitting all information required under~~ **substantially complying with** the Civil Investigative Demand. | It is well-accepted in the context of Hart-Scott-Rodino pre-merger notification regulatory regime that "substantial compliance" is the right standard for parties subject to an extensive and burdensome investigation from the Department of Justice. A requirement to submit all information required is often an impossibility and would effectively allow the Department of Justice to filibuster otherwise lawful agreements with Civil Investigative Demands that are impossible to fully comply with. *See* Section II.B of Defendants' Memorandum. |

| Section from Plaintiffs' RPFJ | Issue | Defendants' Proposed Changes[1] | Reasoning |
|---|---|---|---|
| V.E | Future partnerships | ~~Notwithstanding the foregoing, the Defendants are not required to provide notice or observe a waiting period for any agreement solely constituting short-term (less than 90 days) sharing of Airport Infrastructure. In addition,~~ The Department of Justice, in writing to the Defendants, may exclude from the Notice requirements of this Section certain other classes of agreements that the Department of Justice in its sole discretion determines to be unlikely to raise competitive concerns. | Given Defendants' definition of "Covered Agreements," this sentence is not necessary under Defendants' proposal. |
| VI.A. – K. | Monitoring trustee | **Defendants propose omitting these provisions, which provide for a monitoring trustee.** | Requiring oversight by a monitoring trustee for five years is a radical departure from DOJ's policies in prior cases and is particularly inappropriate in this case, given Defendants' transparency and cooperation with the Government, including before the NEA was implemented, and the fact that the NEA is in the process of being expeditiously wound down by Defendants pursuant to a plan that Plaintiffs have memorialized in their own proposed Final Judgment. *See* Section II.A of Defendants' Memorandum. |