# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>AMERICAN AIRLINES GROUP INC. and JETBLUE AIRWAYS CORPORATION,<br><br>*Defendants*. | Case No. 1:21-cv-11558-LTS |

**DEFENDANTS' REVISED [PROPOSED] FINAL JUDGMENT AND
ORDER ENTERING PERMANENT INJUNCTION**

Plaintiff United States of America and Plaintiff States filed a Complaint on September 21, 2021; Defendants filed a Motion to Dismiss on November 22, 2021, which this Court denied on June 9, 2022; Defendants filed their Answers on July 11, 2022; this Court having conducted a full month-long trial on all issues of liability and issued its Findings of Fact and Conclusions of Law on May 19, 2023, holding that the NEA violated Section 1 of the Sherman Act, 15 U.S.C. § 1, permanently enjoining Defendants from continuing, and restraining Defendants from further implementing, the NEA, and ordering that the parties submit a proposed order regarding the text of the Permanent Injunction ordered by the Court.

On June 28, 2023, pursuant to Sections 5.9 and 5.11.3 of the NEA Agreement, JetBlue provided notice of termination of the Northeast Alliance Agreement and the Related Agreements to American (the "Notice of Termination"), such termination effective July 29, 2023.

The purpose of this Permanent Injunction is the prompt and certain termination of the NEA, while minimizing disruption to passengers as a result of the termination.

It is hereby ORDERED, ADJUDGED, AND DECREED:

1

I. Definitions

As used in this Final Judgment and Order Entering Permanent Injunction:

A. "Airport Infrastructure" means gates, ground facilities, or other airport infrastructure.

B. "American Airlines" means American Airlines Group Inc.

C. "BSPA" means the Bilateral Special Prorate Agreement for Passengers between American Airlines and JetBlue executed on or about November 1, 2021, or as subsequently amended.

D. "Codeshare Agreement" means the Codeshare Agreement between American Airlines and JetBlue executed on or about July 15, 2020, or as subsequently amended.

E. "Codeshare Cutoff Date" shall be on or before July 21, 2023.

F. "Competitively Sensitive Information" means any non-public information of Defendants relating to scheduled air passenger services, including without limitation non-public information relating to network plans, pricing or pricing strategies, frequent flyer programs, corporate customer negotiations, tactics or strategy, costs, revenues, profits, margins, output, marketing, advertising, promotion, or research and development.

G. "Covered Agreement" means any agreement, partnership, or joint venture that provides, in whole or in part, for any or all of the following:

   a. codesharing or arrangements functionally similar to codesharing (for the avoidance of doubt, this provision does not include interline agreements);

   b. sharing or pooling of revenues earned from air passenger services (for avoidance of doubt, sharing or pooling of revenues does not include allocation of revenues from interline agreements, or otherwise

2

        compensating another carrier for services rendered, such as for carrying a customer pursuant to a re-protect agreement);

    c.    discussion or any other communications about the routes on which to offer air passenger service, or of the frequency or capacity of air passenger service flights on any route or routes; or

    d.    sale, lease, or sharing of Slots, excluding arrangements that will last up to one IATA season and do not include a renewal provision.

H.    "Defendant" means separately or collectively American Airlines and JetBlue.

I.    "Domestic Air Carrier" means Alaska Airlines, Allegiant Air, American Airlines, Avelo Airlines, Breeze Airways, Delta Air Lines, Frontier Airlines, Hawaiian Airlines, JetBlue, Southwest Airlines Co., Spirit Airlines, Inc., Sun Country Airlines, and United Airlines, Inc.

J.    "Effective Date" means twenty-one (21) days following the date of entry of this Permanent Injunction.

K.    "Final Judgment" means this Final Judgment and Order Entering Permanent Injunction.

L.    "Frequent Flyer Agreements" means the AAdvantage Participating Carrier Agreement and the TrueBlue Participating Carrier Agreement between American Airlines and JetBlue executed on or about October 21, 2020, or as subsequently amended.

M.    "Frequent Flyer Cutoff Date" shall be on or before July 21, 2023.

N.    "JetBlue" means JetBlue Airways Corporation.

O.  "MGIA" means the Mutual Growth Incentive Agreement between American Airlines and JetBlue executed on or about July 15, 2020, and all amendments thereto.

P.  "NEA" means the partnership between the Defendants governed by the NEA Agreement and Related Agreements executed on or after July 15, 2020.

Q.  "NEA Agreement" means the Northeast Alliance Agreement between American Airlines and JetBlue executed on or about July 15, 2020, and all amendments thereto.

R.  "Plaintiffs" means collectively the United States and the Plaintiff States.

S.  "Plaintiff States" means the States and Commonwealths of Arizona, California, Florida, Massachusetts, Pennsylvania, and Virginia and the District of Columbia.

T.  "Related Agreements" means the MGIA, the Frequent Flyer Agreements, the Codeshare Agreement, and the BSPA.

U.  "Slot" means the right and operational authority to conduct a landing or take-off operation at a specific time or during a specified time period at a specific airport, including without limitation slots, arrival authorizations, and operating authorizations, whether pursuant to federal regulations or orders pursuant to Title 14, Title 49, or other federal statutes or regulations now or hereinafter in effect.

V.  "Slot Lease Agreement" means any agreement entered between American Airlines and JetBlue under which one Defendant temporarily leases or subleases Slots to the other Defendant.

## II. Applicability

This Permanent Injunction applies to American Airlines, JetBlue, and each of their affiliates, subsidiaries, officers, directors, agents, employees, successors, and assigns.

III. <u>Required Conduct</u>

A.     On or before the Effective Date, Defendants shall terminate the NEA Agreement and the Related Agreements, or if already terminated shall not revoke the previously issued Notice of Termination.

B.     On or before the entry of this Final Judgment, Defendants shall cease all coordination of schedules and routes.

C.     Defendants shall not share revenues pursuant to the MGIA with respect to flights flown after July 18, 2023. For avoidance of doubt: (1) With respect to tickets or itineraries issued or sold before July 18, 2023 by one Defendant for any flight or segment flown by the other Defendant after July 18, 2023, Defendants may compensate one another pursuant to their Special Prorate Agreement or Frequent Flyer Agreements; (2) Defendants may complete the audit, reconciliation and payment processes set forth in the NEA Agreements in order to settle their obligations to one another with respect to flights flown on or before July 18, 2023, consistent with the relevant terms of the NEA Agreements.

D.     Each Defendant may continue to use any slots it is currently using as of the June 28, 2023, Notice of Termination until a date that shall be established by subsequent order of the Court. No later than 21 days after the Effective Date, Defendants shall submit to Plaintiffs a proposed wind-down plan for expeditious and orderly termination of all Slot Lease Agreements related to the NEA and Airport Infrastructure sharing agreements related to the NEA. The parties shall submit their joint or separate positions to the Court no later than 45 days after the Effective Date, at which point the Court shall order such additional relief as shall be necessary. Defendants will stop sharing Airport Infrastructure no later than the return of all leased Slots.

E. As of the Codeshare Cutoff Date, each Defendant shall not sell flights operated by the other Defendant pursuant to the Codeshare Agreement or any other agreement between the Defendants related to the NEA Agreement. Notwithstanding this provision, the Defendants may honor the terms of existing tickets or itineraries valid at the time of the Effective Date, and may continue to place their respective airline code on (but not sell new tickets for) flights operated by the other Defendant, including for travel that will take place after the Codeshare Cutoff Date.

F. As of the Frequent Flyer Cutoff Date, neither Defendant shall allow passengers to redeem rewards for new ticket purchases pursuant to its frequent flyer program for flights operated by the other Defendant pursuant to the Frequent Flyer Agreements or any other agreement between the Defendants related to the NEA Agreement. Each Defendant may enable travelers to continue to accrue benefits through its respective frequent flyer program for travel on flights operated by the other Defendant that occurs on or before January 31, 2024, for existing tickets valid at the time of the Frequent Flyer Cutoff Date. Each Defendant may honor reciprocal elite recognition benefits in existence as of the Frequent Flyer Cutoff Date through January 31, 2024.

G. Neither Defendant shall enter into any new alliance, partnership, joint venture, or other agreement with each other, if such agreement provides for revenue sharing, or for coordination of routes or capacity, in a manner substantially similar to the NEA. This provision shall expire on the tenth anniversary of the Effective Date.

H. Neither Defendant may send, receive, request, or otherwise communicate any Competitively Sensitive Information to or from the other Defendant after the Effective Date. Neither Defendant shall use in any way any Competitively Sensitive Information obtained

from the other Defendant during the period when the NEA or any applicable wind-down activities were in effect. Any of Defendant's officers, agents, directors, or employees with Competitively Sensitive Information obtained from the other Defendant shall not disclose such information to any other person, including other persons working for any Defendant or any other air carrier. Notwithstanding this paragraph, Defendants may communicate or use Competitively Sensitive Information as necessary to (i) fulfill existing bookings or benefits for travel booked consistent with Sections III.E and III.F of this Final Judgment, or (ii) as otherwise permitted by or necessary to comply with this Final Judgment, or other court order, protective order, law, or regulation.

  I. Within 30 days of the Effective Date, each Defendant shall develop, implement, and communicate to all relevant personnel a plan for complying with the terms of this Final Judgment, and shall provide copies of such plan to the Plaintiffs.

## IV. Additional Provisions

Subject to the Notice requirements in Section V, and the prohibitions of Paragraphs III.G, nothing in this Final Judgment shall be construed to prohibit either Defendant from entering into new agreements, including with the other Defendant, that are not otherwise prohibited by the antitrust laws or other laws or regulations.

## V. Notice

  A. Neither Defendant may enter into any new Covered Agreement, with the other Defendant, or enter into an amendment thereto, without prior notification to the Plaintiffs. Such notification shall be provided to the Chief of the Transportation, Energy, and Agriculture Section of the Antitrust Division of the Department of Justice (or any successor to that Section),

and to the Attorney General of each of the Plaintiff States. This provision shall expire on the tenth anniversary of the Effective Date of this Final Judgment.

   B.  For Covered Agreements or amendments subject to Section V.A, above, the respective Defendant must provide Plaintiffs with copies of all related contracts or other agreements, and all studies, surveys, analyses, and reports which were prepared by or for any officer(s) or director(s) for the purpose of evaluating or analyzing the new agreement, partnership, joint venture, or amendment thereto with respect to market shares, competition, competitors, markets, potential for sales growth, or expansion into new products or geographic areas in a manner consistent with the instructions and guidance issued by the Premerger Notification Office of the Federal Trade Commission on Item 4(c) and Item 4(d) of the Notification and Report Form pursuant to 16 C.F.R. § 803.1(a).

   C.  Any Covered Agreements or amendments subject to Section V.A, above, may not be implemented or otherwise enter into force or effect until at least 30 calendar days following notification to the Plaintiffs and submission of the materials required under Section V.B, unless representatives of the Department of Justice Antitrust Division agree in writing to a shorter period. If, within 30 calendar days following notification and submission of the materials required under Section V.B, representatives of the Department of Justice Antitrust Division issue one or more Civil Investigative Demands seeking information related to the agreement, partnership, joint venture, or amendment thereto, a Defendant who received a Civil Investigative Demand may not implement the proposed agreement, partnership, joint venture, or amendment until 60 calendar days after substantially complying with the Civil Investigative Demand.

D.  The Department of Justice, in writing to the Defendants, may exclude from the Notice requirements of this Section certain other classes of agreements that the Department of Justice in its sole discretion determines to be unlikely to raise competitive concerns.

E.  No later than the Effective Date, Defendants shall provide to the Plaintiffs copies of (or if not previously written, shall provide written descriptions of) any agreements they have entered into with one another after June 28, 2023, and before the entry of this Final Judgment, including any amendments to any existing agreements.

## VI.  Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to address violations of its provisions.

SO ORDERED.

_____
United States District Judge