```
 1                   UNITED STATES DISTRICT COURT

 2                    DISTRICT OF MASSACHUSETTS

 3

 4     _____

 5     UNITED STATES OF AMERICA, et al.

 6           Plaintiffs,                    Civil Action No.
                                            1:21-cv-11558-LTS
 7         v.

 8     AMERICAN AIRLINES GROUP, INC.,
       et al.,
 9
             Defendants.
10

11     _____

12

13       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

14
                         MOTION HEARING
15

16

17                  Wednesday, July 26, 2023
                          10:00 a.m.
18

19

20
       John J. Moakley United States Courthouse
21     Courtroom 13
       One Courthouse Way
22     Boston, Massachusetts

23
       Rachel M. Lopez, CRR
24     Official Court Reporter
       raeufp@gmail.com
25
```

```
1                        A P P E A R A N C E S

2

3      On behalf of the Plaintiff United States of America:

4          UNITED STATES DEPARTMENT OF JUSTICE
           BY:  WILLIAM H. JONES, III; KATE M. RIGGS;
           JAMES H. CONGDON; AND PATRICIA C. CORCORAN
5          450 Fifth Street, Northwest
           Suite 8000
6          Washington, D.C.  20530
           (202) 514-0230
7          bill.jones2@usdoj.gov
           kate.riggs@usdoj.gov
8          james.congdon@usdoj.gov
           patricia.corcoran@usdoj.gov
9

10
       On behalf of the Plaintiff Commonwealth of Massachusetts:
11
           ATTORNEY GENERAL'S OFFICE
12         BY:  DANIEL H. LEFF
           One Ashburton Place, 18th Floor
13         Boston, Massachusetts  02108
           (617) 727-2613
14         daniel.leff@mass.gov

15

16     On behalf of the Defendant American Airlines Group, Inc.:

17         LATHAM & WATKINS, LLP
           BY:  DANIEL M. WALL; CHRISTOPHER S. YATES;
18         MARGUERITE M. SULLIVAN; AND FARRELL J. MALONE
           505 Montgomery Street
19         Suite 2000
           San Francisco, California  04111
20         (415) 391-0600
           dan.wall@lw.com
21         chris.yates@lw.com
           marguerite.sullivan@lw.com
22         farrell.malone@lw.com

23

24

25
```

1                    **A P P E A R A N C E S ,   C o n t.**

2

     On behalf of the Defendant JetBlue Airways Corporation:

3

         SHEARMAN & STERLING LLP
4        BY:  RICHARD F. SCHWED AND MATTHEW L. CRANER
         599 Lexington Avenue
5        New York, New York  10022
         (212) 848-4000
6        richard.schwed@shearman.com
         matthew.craner@shearman.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (In open court.)
 3              THE DEPUTY CLERK:  The United States District Court
 4      for the District of Massachusetts is now in session, the
 5      Honorable Leo T. Sorokin presiding.
 6              THE COURT:  Please be seated.
 7              THE DEPUTY CLERK:  Today is Wednesday, July 26,
 8      2023, and we are on the record in civil case number 21-11558,
 9      the United States of America, et al., versus American
10      Airlines Group, Inc., and JetBlue Airways Corporation.
11              And would counsel please identify themselves for
12      the record.
13              MR. JONES:  Good morning, Your Honor, Bill Jones
14      for the United States.  And I have with me Mr. Jack Congdon,
15      Ms. Kate Riggs, Ms. Patricia Corcoran, and Mr. Aaron Goodman.
16      Mr. Goodman is a paralegal with our office.
17              THE COURT:  All right.  Welcome.
18              MR. LEFF:  Good morning, Your Honor, Daniel Leff
19      with the Commonwealth of Massachusetts.
20              THE COURT:  Good morning.
21              All right.
22              MR. WALL:  Good morning, Your Honor, Dan Wall for
23      American Airlines.  And I have with me Christopher Yates,
24      Maggie Sullivan, Farrell Malone, and Bruce Wark from American
25      Airlines.
```

1          THE COURT:  Good morning.  Welcome.

2          MR. SCHWED:  Good morning, Your Honor, Richard

3     Schwed, Shearman & Sterling for JetBlue.  And with me is

4     Matthew Craner.

5          THE COURT:  Good morning.  All right.  Good to see

6     you all again.

7          So I've looked over -- I've received the latest

8     iteration, what you did yesterday.  So that's resolved and

9     narrowed all of this quite a lot.  I thank you for that, for

10    all of that.  I know that you've all put in a lot of time and

11    effort since my decision, talking to each other about the

12    form in terms of the order, and I appreciate that.  I think

13    it's, from my perspective, time well spent by all of you,

14    because you are all intimately familiar with the

15    ramifications and implications of particular words and

16    language and what that means in terms of from an operational

17    perspective for the airlines and for a regulatory perspective

18    from the government.  And so that you've done all of that, I

19    appreciate that.

20         It may come as no particular surprise to you that

21    as to the language that you've agreed upon, I am likely to

22    adopt that language.

23         So I have a couple of questions.  I'm just working

24    through the document that was submitted yesterday, the

25    redline version, because that seems the most useful way to

1    go.  And my thought would be I have a couple of specific

2    questions on different provisions, I'll fire them off.  And

3    then I'll give you each an opportunity to say anything else

4    you wish to say about it more generally, if you do.

5           And then my plan is to take it under advisement,

6    but I anticipate being able to resolve all of this very fast,

7    and you will get something very soon.  It will resolve the

8    remaining -- the language that you dispute.

9           So I understand some of the things, and I don't

10   have a question about a -- a specific question to ask you

11   about everything.  That doesn't mean, when you get the

12   chance, you can't address some of those things or anything

13   else that you want to say.

14          But the first question that I have, on page 6, with

15   respect to the -- and I don't know who it is on the

16   government's side, but whomever is speaking for you, the

17   language, "And to any successor, to any substantial part of

18   the business," the defendants object to that.  I'm just

19   wondering, like, what you are trying to capture there?  What

20   are you thinking about?  What would that mean?

21          And for the defendants, what are you worried about,

22   and what is the concern?

23          MR. JONES:  Thank you, Your Honor.

24          There we're simply trying to ensure that there's no

25   change in corporate form in such a way that's not a complete

1    sale of a business, that still protects competition, protects
2    the integrity of the order.  It's nothing more than --
3            THE COURT:  Well, I get that's your general goal.
4    But, like, I guess what I'm wondering, like what happens if
5    they sell, you know -- they sell ten planes.  American or
6    JetBlue, you know, they have a bunch of planes, and they
7    think they can make a lot of money because somebody's coming
8    into the market and the supply is tight.  And they can sell
9    these ten planes, and they can -- they can reap a lot of
10   money.  And it's a good business move for them.  Like, is
11   that -- and whoever is buying them is going to fly some route
12   or whatever.
13           I assume that's not what you're thinking about,
14   right?
15           MR. JONES:  It is not, Your Honor.  That's
16   certainly, given the size of the fleets of both companies,
17   would not be substantial.
18           THE COURT:  So what's an example of something that
19   would not be covered if a -- there was a period after the
20   word "assigns," but would be covered if the additional
21   language that you're proposing is added?
22           MR. JONES:  Your Honor, what we're -- we're aiming
23   at is some type of, say, corporate restructuring, splitting
24   of a business, for example, where half of it is -- is moved
25   to someone else.  That's what we had in mind to protect

1    against, Your Honor.

2                THE COURT:  So you mean like American splits into

3    American, like, part A, which is international and domestic

4    east of the Mississippi River, and American B is domestic

5    west of the Mississippi River?

6                MR. JONES:  That would be a type of scenario that

7    we would want to protect against.  We recognize that the

8    likelihood of something like that is -- is relatively low,

9    Your Honor, but we also don't want to end up back in front of

10   you somewhere down the line, arguing about something like

11   that, either.

12               THE COURT:  Okay.  All right.  Okay.

13               Anything defendants want to say about that

14   language?

15               MR. WALL:  Your Honor, I think you already sort of

16   picked up on it.  It already says "successors and assigns."

17   That's common language.  People understand that language.

18   People know what to do with that language.

19               THE COURT:  Right.

20               MR. WALL:  Under the usual rule that things aren't

21   superfluous, this has to mean something else, and there's

22   been no ability to articulate, in any concrete terms, what

23   that something else might be.  What's substantial?  What's a

24   substantial part of the business?  This is not a defined

25   term.  And we just thought -- I mean, this is not the biggest

1    point here we have to argue about, but it's why can't we just

2    use kind of the normal language of successors and assigns.

3         THE COURT:  I guess the concern that I have is I

4    don't want -- the injunction should be clear, and clear so

5    that the defendants know what it means and can conform their

6    conduct to it and without excessive consultation with

7    counsel.  And so the concern that I have, I'm just struggling

8    with, is that it's not like agents, employees, successors and

9    assigns.  I see that all the time in injunctions and

10   contracts and -- there are disputes about the meaning of

11   those things.  I'm not saying that there can't be disputes

12   about the meaning of that, but at least it's something that

13   we all understand.

14        And I'm just trying to figure out what would not be

15   covered by that language that would be covered by this, and

16   to have some understanding of what it means clearly enough

17   that -- not so much that you won't be here, like in a perfect

18   world, that you won't be here, not that I mind seeing you,

19   but it -- I just -- that's what I'm wondering about.  That's

20   why I'm asking, well, what's a scenario of an example?  What

21   is the content of these words that is somehow not captured by

22   the first part?

23        MR. JONES:  Your Honor, certainly it's not to --

24   it's not meant to be extraneous or --

25        THE COURT:  I know.

1          MR. JONES:  -- or unnecessary.  But it certainly,

2    also may be a low likelihood scenario.  It's a matter of --

3    of protection here in going forward.  That was the intent

4    with the language.

5          THE COURT:  I understand the intent.  I'm trying to

6    figure out what the language means.  Right?  I'm -- okay.

7    Fine.

8          Next question I have is, with respect -- on

9    page 6 -- page 6 on the bottom page numbering, not on ECF

10   page 6, you propose paragraph H, the -- essentially that says

11   neither defendant shall enter into a new alliance,

12   partnership, joint venture, other agreement with another

13   domestic air carrier.  This is the -- it parallels G.  G is

14   with respect to each other, and H is with either defendant

15   doing that with a different domestic air carrier, not with

16   the other one of the two of them.

17         So my question is why should I prohibit to you; and

18   to the defendants, why not?

19         MR. JONES:  Your Honor, to us that goes to a

20   fundamental point of the judgment here protecting against a

21   recurrence of the same or similar violation.  This goes to

22   the similar violation piece.

23         What we are seeking to avoid with that language a

24   is scenario where we have an NEA-like structure, something

25   substantially similar to the NEA in terms of revenue sharing

1    and coordination of capacity and routes; where you have,

2    instead of JetBlue and American, you have JetBlue and a

3    different airline or American and a different airline; where

4    we're just exporting off the model of the NEA, in terms of

5    the revenue sharing, of the capacity coordination, to a

6    different partner or different part of the country,

7    especially in this period where we have both American and

8    JetBlue with some detailed knowledge of the other partner's

9    competitively sensitive information.

10          We think that prohibiting these deals will ensure

11   that, really, we're protecting against the recurrence of

12   this, just in a slightly different form, where you're

13   scratching out the name "American" and putting in some other

14   airline or scratching out the name "JetBlue" and putting in

15   another airline.

16          THE COURT:  But -- okay.

17          Go ahead.

18          MR. WALL:  So this is the one that I think you --

19   that it's part of a series of interrelated things that are

20   the most important issue for us here today.

21          And there's -- this acts as to prohibition, and

22   then there's also a notice requirement, with obligations to

23   produce information that's related to it.  And we accepted

24   those prohibitions under, obviously, a large protest, but we

25   accepted them with respect to agreements between

1    American Airlines and JetBlue, including the onerous notice
2    and information provisions.
3              But, respectfully, we think that they're asking you
4    to do something which is beyond the authority of the Court,
5    which is to essentially bind third parties, everyone else
6    that we might deal with, to --
7              First of all, they can't deal with us for two
8    years, if there is something that is substantially similar,
9    which is undefined.  And then even after that, if they are to
10   deal with us, they have to be -- accept the burdens of the
11   notice requirement and all of the information that has to be
12   put in and the sort of Hart-Scott-Rodino-like waiting period
13   and all of this stuff.
14             Fundamental rule, of course Your Honor knows, is
15   that an injunction is supposed to be as narrow as it can be
16   consistent with providing full relief against what has been
17   proven to be the unlawful conduct.  And in the trial that we
18   had in this case, we heard the government say, constantly,
19   that there was something unique and unprecedented and
20   different about the NEA.  And, you know, we can debate that,
21   and that debate will continue.  But that was the position
22   that they took.  It is the position that you adopted.  And in
23   your opinion, particularly around pages 15 to 17, you
24   actually go out of your way to say that there are other kinds
25   of collaborations that airlines can have that don't violate

1    the antitrust laws.

2           As a matter of the most elementary antitrust

3    principles, it is easy to imagine circumstances in which we

4    could have revenue sharing that wouldn't, arguably, be

5    anticompetitive.  Two five-percent players in a very heavily

6    competitive market, whatever, I mean, it's just easy to come

7    up with that.  And yet, what they want to do here is ask you

8    to enter into an order which takes this into the realm of the

9    categorically unlawful; that things like this are

10   categorically unlawful, regardless of the circumstances,

11   regardless of our partner, regardless of the length of time

12   that they act, regardless of everything that matters to any

13   kind of an analysis.

14           THE COURT:  I understand.

15           MR. WALL:  So that's the problem.

16           THE COURT:  Okay.

17           MR. JONES:  Your Honor, if I may?

18           THE COURT:  Sure.

19           MR. JONES:  Very quickly.

20           Certainly, the substantially similar to the NEA

21   language should not be vague or unclear to defendants.  As

22   counsel indicated, they've agreed to that same language,

23   vis-a-vis agreements with each other.  So certainly the

24   vagueness point can't hold here where they understand what

25   this language means, vis-a-vis each other, substantially

1    similar to the NEA, but not vis-a-vis others.

2            Also, Your Honor, I would note that this is a

3    short-term prohibition on these types of deals with other

4    airlines, two years out of the ten year term of the decree.

5    And beyond that, Your Honor, I would note that the case law

6    certainly supports a decree that leaves some ability for the

7    Court to prohibit other types of deals, not just the narrow,

8    exact, precise one that was the subject of the trial.

9            THE COURT:  So but what underpins, I think, the

10   ruling, is not just the language of the contract -- the

11   contracts between American and JetBlue, but all of the facts

12   and circumstances that -- from which it -- which it operates

13   or the context in which it operates.

14           In other words, the -- it's in a -- it arose, and I

15   think -- there are facts and circumstances that matter, the

16   facts and circumstances, all the facts and circumstances that

17   I found in the opinion.  And so I'm not sure that

18   substantially similar in paragraph G relates to each other.

19   They are, itself, not static, right?  I mean, they're in

20   businesses.  They evolve.  The circumstances evolve, the

21   systems changed.

22           But it's a reasonable inference that the world

23   hasn't -- putting aside whatever impact the decision had and

24   post-decision decisions, the world itself didn't

25   revolutionize itself between the trial and the day before I

1    issued the decision, in terms of the two companies.  We all
2    operate under the assumption that the facts are sufficiently
3    similar that I could make the ruling when I did, and I didn't
4    have to have supplemental fact finding or anything.  But it's
5    the facts that sort of matter.
6              And, I guess, one of the things that I'm wondering
7    is, like, there's certain kinds -- there are certain kinds of
8    agreements that you just can't make.  Right?  And to make
9    that agreement, A and B in a business, to make that agreement
10   is not permissible.  And A and C can't make that agreement,
11   either.  Right?  And A and D can't make that agreement.  But
12   this, at least the premises of the decision, I think is that
13   it's in part all the facts and circumstances.  That's what
14   I'm wondering about, about this provision, whether applying
15   it to the other airlines has enough similarity to make -- to
16   reach a prohibition.
17             MR. JONES:  Your Honor, I think what I would -- I
18   would say to that is, first, it is a narrow set of other
19   airlines.  We identify a specific set.  But also, beyond
20   that, Your Honor, I would say that -- that the facts laid out
21   in the opinion of the type of behavior that defendants
22   engaged in here, that resulted in the Court's ruling, kind of
23   put the onus here on preventing the recurrence of that.  And
24   you've laid out in the opinion detailed guidance for them of
25   what the revenue sharing is, what the coordination of

1    capacity and routes is that would be disallowed under your

2    opinion.

3            MR. WALL:  I just want to make this one comment

4    again.  With respect to American and JetBlue, our attitude

5    about this has been framed by the fact that as a result of

6    Your Honor's decision, JetBlue had a termination right.  They

7    have exercised the termination right.  They issued a public

8    statement about why they did that, what their future

9    intentions are.  There's -- it doesn't matter that much, at

10   least until we go through the First Circuit, what the

11   prohibition is on deals between American and JetBlue, because

12   they've chosen to exercise a termination right and move on.

13   So we didn't spend a lot of time worrying about that.

14           THE COURT:  I'm not -- I'm deciding -- I'm going to

15   accept G, because you all agreed to it and it seems perfectly

16   reasonable.

17           MR. WALL:  Right.

18           THE COURT:  I am not going to decide H because you

19   agreed to G.

20           MR. WALL:  Well, that was my point.

21           THE COURT:  I'm going to decide H on whether I

22   think H is warranted under the circumstances, not because,

23   since you agreed to G, therefore, it follows that you -- that

24   H -- each thing you dispute, I'm deciding based on the facts

25   and circumstances, not because you agreed.

1          MR. WALL:  Exactly.  Because there's argument that
2     we can understand it with respect to -- to a deal between us.
3     No, we can't understand the terminate better.  But it doesn't
4     matter that we don't understand it any better, because we're
5     not going to do anything with each other at least until we
6     have guidance from the courts of appeal about what we can do.
7          THE COURT:  Sure.
8          MR. WALL:  So that's just not a relevant
9     consideration.
10         MR. SCHWED:  Your Honor --
11         MR. JONES:  Your Honor --
12         THE COURT:  Hold on.  Let Mr. Schwed talk.
13         MR. SCHWED:  Yeah, if I may.  Just on behalf of
14    JetBlue, I obviously agree with everything that Mr. Wall has
15    said.  But I think when you think about it from a JetBlue
16    perspective, JetBlue's terminated.  It's moved on from
17    American.  And the idea that it should be categorically
18    prohibited from a number of agreements with other small, and
19    even smaller airlines, it does not at all follow from the
20    facts and circumstances that were found in this case and
21    fundamentally violates the law of injunction, which says that
22    it must be as narrow as necessary to achieve the goals and
23    the requirements, based on the Court's findings in this case.
24         MR. JONES:  Your Honor, my point simply on the
25    interpretation of substantially similar is that this is not

1    guesswork that defendants have to engage in.  The Court

2    entered detailed findings, over 94 pages.  They have a

3    roadmap of what's prohibited here and what substantially

4    similar means.

5           THE COURT:  Right.  But substantially similar

6    applied to their businesses, after I've explained myself in

7    94 pages, as you point out, is -- gives them a lot of texture

8    to understand what -- like if they decided to write a brand

9    new agreement tomorrow between them called "NEA sequel,"

10   okay, it -- applying substantially similar to that in the

11   context of the opinion and whether that is just a new deal

12   that's not -- that's outside the boundaries or not, are

13   things that I'm sure the business people at American and

14   JetBlue could figure out, with the advice of able -- as they

15   have, able and many counsel, could give them advice about,

16   and we could understand and apply that, than to apply that to

17   a deal between either JetBlue and one of those domestic

18   airlines or to American and one of those domestic airlines.

19          It becomes -- if it's just a comparison to the

20   terms of the deal, okay, that we might all be able to figure

21   that out.  But it's the significance of the provisions of the

22   agreement, in part, depends on like the market context and

23   all of these other things.

24          So that's why I'm wondering about, like, what the

25   basis would be to prohibit all of that.

1          The last question that I have is just whatever

2     either of you want to say about the --

3          Oh, actually, before that, the difference

4     between -- on page 9, again, on the bottom page number,

5     "submitting all information required" versus "substantially

6     complying with."  And why or why not?

7               MR. WALL:  I guess that's us to start on this one.

8          So again, just to contextualize this, this is --

9     the dispute is normally just between -- about the provisions

10    with other airlines.  And we were trying to accept what they

11    wanted as between us.

12         The thing about this provision, which would apply

13    to either arrangements between American and JetBlue, or other

14    airline, is this isn't just a notice requirement that we're

15    talking about here.  This is essentially a formulation in a

16    judicial decree of a Hart-Scott-Rodino process.  It's very,

17    sort of, clearly modeled on the Hart-Scott-Rodino process

18    with notice, and then there's information that has to be

19    provided and there's a waiting period and everything like

20    that.

21         The oddity here is they've gone to the trouble of

22    recreating the Hart-Scott-Rodino environment, but then left

23    out one of the core principles of the Hart-Scott-Rodino

24    environment, which is that the waiting period starts it to

25    move again once the parties have substantially complied.  And

1    substantially complied --

2            THE COURT:  The waiting period is over after

3    substantially complied.

4            MR. WALL:  Yeah.  So you certify.  You say, "I've

5    substantially complied."  It doesn't mean you've given them

6    everything, because, in the real world, you never give them

7    everything.  It's impossible because there's so much

8    information nowadays, but you make a good faith effort.  And

9    we do this all of the time in the merger world.  Antitrust

10   lawyers understand this, what it means, and how to do it and

11   everything.

12           THE COURT:  I got it.  Let me see what the

13   government says.  I understand.

14           MR. WALL:  And then it just moves to basically some

15   sort of full compliance.  And it's just why are they doing

16   that?  It doesn't make any sense.  It's actually a dangerous

17   term for us, because, as I say, in this world where we're

18   dealing with terabytes of data and all of this stuff like

19   that, you'd never know that you fully complied.  It just

20   doesn't really exist.

21           THE COURT:  Mr. Jones, what do you have to say?

22           MR. JONES:  Your Honor, first of all, for a civil

23   investigative demand, there is no language of substantial

24   compliance with regard to a CID.

25           But holding that aside, this is modeled roughly

1    after the HSR process or is modeled after that process.  Even

2    with that process, Your Honor, I would encourage the Court to

3    look at the statute governing HSRs and would direct the Court

4    to 15, USC, 18a(e)(2).  Now, that talks about the compliance

5    process, and it talks about supplying the information asked

6    for as part of that process.

7              THE COURT:  As what?

8              MR. JONES:  Supplying the information called for as

9    part of the process.

10             THE COURT:  Oh.

11             MR. JONES:  I will concede that sometimes the

12   custom is -- it's substantial compliance, or it is the custom

13   often.  But also, Your Honor, that is a hot debate within

14   antitrust practice on that very issue, and it's kind of

15   esoteric inside-baseball-type argument.

16             I would say here that defendants --

17             THE COURT:  I like baseball.

18             MR. JONES:  Maybe I should say in an inside college

19   football or something.

20             THE COURT:  That's okay.  I understand.

21             MR. JONES:  But, Your Honor, certainly, even as

22   written, there are avenues for defendants to object to what

23   they may see as some overbroad, civil investigative command,

24   just like they could to an overbroad subpoena.  There are

25   avenues.  They are not handcuffed here to be able to not

1    have --

2              THE COURT:  Well, here's the practical question

3    that I wondered.  If I adopt your language, they -- let's say

4    they enter into a covered agreement.  There's the notice.

5    You make a CID.  They produce the information.  They say, "We

6    substantially" -- they say, "We gave everything," because I

7    adopt your language.  They say, "We've -- we have submitted

8    all information required."

9              And then you say to them, "No, you didn't, or you

10   think you didn't," whatever.  And then I am -- one of you,

11   whichever form, comes either to enforce it, you come saying,

12   "Look, they didn't give us everything," or they come and say,

13   "We gave everything."

14             And then there's, you know, not a fight over -- I

15   understand -- a duplicate copy of an e-mail.  I understand

16   nobody is going to come here with that.  But there's like a

17   range of -- I mean, this is massive amounts of information,

18   if it's anything like civil discovery in a garden variety

19   civil case.

20             And so, like, I can see the potential for

21   transforming lots of disputes over that into hearings about

22   enforcement of the injunction, and I'm wondering if that,

23   like -- is that necessary?  Is that wise?  Is that the right

24   forum?

25             So that's, like, what -- that's where -- as to,

1    like, substantial leaves some room for, okay, they did a good

2    job, or, like, no, what the government really wants, like,

3    there's something significant here.  And, you know, you might

4    disagree, but that's sort of the stuff of disputes.  That's

5    what I'm wondering about.

6            MR. WALL:  If I could just add a point on that,

7    Your Honor.  It isn't just a matter that did the electronic

8    discovery vendor search hard enough or something like that.

9    The substantial compliance, going back to the core of this

10   law and what Representative Rodino said is intended to mean

11   that the government can't keep the clock from restarting by

12   asking for information that is of -- the quote is "of dubious

13   or marginal relevance or a request for data that could not be

14   complied or reduced to writing in a relatively short period

15   of time."

16           So there's a substantive element to it here; that I

17   have been in merger reviews, where I have gone to the

18   government and said, "I am certifying substantial compliance,

19   but I am not giving you X," because I believe that that falls

20   within that ability.

21           And what happens in the real world is we don't go

22   to court on these things, because the substantial compliance

23   means that they have a risk of losing if they go to court,

24   because the judge might decide that there was substantial

25   compliance, even though we didn't produce X or Y.  And so we

1    move on.  The disputes don't happen.  It actually works to

2    eliminate the disputes because -- because it's not an

3    absolute requirement.  And it is -- it works, since 1976,

4    successfully.  So why would it be changed if it's going to be

5    incorporated into a decree?

6            And he said, yes, it's modeled after the HSR Act.

7    So why amend the HSR Act if you're going to do that?

8            MR. JONES:  Your Honor, these same arguments will

9    happen whether the standard is full compliance or substantial

10   compliance.

11           And also, the quote from Representative Rodino,

12   Your Honor, they're going to often find what we ask for as

13   marginal or dubious value.  I don't think that really answers

14   the question.  But these arguments will happen whether the

15   standard is full compliance or substantial compliance.

16           And Your Honor, they happen over civil

17   investigative demands, just as they do over second request,

18   just as they do over subpoenas.  Has someone fully complied?

19   Has someone complied with the subpoena or the CID?  Their

20   language doesn't prevent the type of dispute that counsel

21   seeks to avoid.

22           THE COURT:  Right.  The question is what -- when

23   there is a dispute, what -- if it's brought to me, what

24   metric or what standard should I apply to determining the

25   dispute, which will then also inform all of you in your

1    predispute-, prebringing-it-to-me negotiations.  You'll know

2    that this is the standard.

3         So what I understand you to be saying is the

4    standard should be submitting all information required; and

5    you saying the standard should be substantially complying and

6    that it should pull in, essentially, the common law or the

7    history of what's been done under Hart-Scott-Rodino.

8         MR. SCHWED:  Your Honor, if I may just add one

9    thing, which I think Mr. Jones's point actually highlighted

10   the idea that there will always be disputes, highlighted the

11   problem with Section B that applies this to other airlines.

12   Because, again, it is going to make it impossible for JetBlue

13   to do transactions with other airlines, because we're going

14   to have to give notice and then wait and wait and wait and

15   give more information, more information, more information.

16   And other airlines are going to say to JetBlue, "Why would I

17   possibly do anything with you?  There are all these other

18   airlines out there who don't have this burden."

19        And as I said before, it's legally impermissible.

20   It has nothing to do with this case and will be a severe

21   burden on JetBlue and anticompetitive.

22        MR. JONES:  Your Honor, it is certainly not the

23   case that we, on the side of the plaintiffs here, the United

24   States, we have an interest in issuing a bunch of civil

25   investigative demands to slow up JetBlue or American from

1    engaging in deals.  All the stuff that they're talking about

2    having to produce, someone on our side has to get it and go

3    through it and try to read that stuff.  So, Your Honor, we

4    certainly don't have any incentive to be overly aggressive or

5    reckless, even, in issuing civil investigative demands to

6    somehow slow down deals that American or JetBlue wants to

7    enter with other airlines.

8              MR. SCHWED:  Your Honor, if I may just raise one

9    point.  Whether -- regardless of how the DOJ is going to act,

10   if I am another airline and I am faced with two transactions,

11   say, for two-year slot lease, one with JetBlue and one with

12   another airline, I am going to say, "Why would I possibly

13   enter this transaction with JetBlue?"  It may be better

14   financially for me.  It may be a much better transaction.

15   But there's a massive amount of risk.  I'm relying on the

16   good graces of whoever happens to be sitting at the

17   Department of Justice that day not to slow it down.

18             And, by the way, under 5(c), I'm having to have to

19   provide all sorts of analysis and documents and all this

20   stuff to the government before this transaction ever can

21   close.

22             MR. WALL:  Your Honor, the last point that I want

23   to make on this picks up on that, is that, I'm sorry, but in

24   the real world second requests and CIDs are used to slow down

25   transactions all the time.  And I don't know whether they

1    read the information or not.  It just happens.  It's a big

2    burden.  It's actually a big issue that's going on.  It's a

3    big point of contention right now that's going on in the

4    antitrust bar about what the current administration is doing

5    with second requests, slow down deals.

6           This is something which, once again, we accepted as

7    for deals between us.  But to put this obligation on us with

8    all of these covered agreements -- and even though we

9    narrowed that down, because at first it was all agreements

10   and it was just completely unworkable, there's still a lot of

11   covered agreements.  And every one of them suddenly comes

12   with all of these obligations, you know.  Some are prohibited

13   for a period of time, but for five years, and then all of

14   these obligations that come on it.

15          None of these -- these aren't secret deals.  The

16   NEA wasn't a secret deal.  The airline deals have to manifest

17   in a publically available product.  They are typically

18   announced.  There's not, like, furtive behavior that is going

19   to be -- remain furtive because of any of this.  This is just

20   overreach.  And with respect to other airlines, again, I

21   don't know where the Court finds the authority to do it.

22   It's certainly not in precedent.  I mean, give us the

23   precedent where another judge did this.  It doesn't exist.

24          MR. JONES:  Your Honor, we've cited case law in our

25   opening papers that addresses just that point.

1          And also, Your Honor, I just have to circle back to

2    one thing counsel said:  The issuing of CIDs and second

3    requests to slow down deals.  I don't fully, I'll confess,

4    understand exactly what that means.  What I hope it doesn't

5    mean is some suggestion that the Department of Justice is not

6    acting properly when it's issuing second requests in civil

7    investigative demands.  I don't know that that is what the

8    suggestion is here and --

9          THE COURT:  Well, I'm not adjudicating what's

10   happening in other litigation between counsel in other deals.

11   It's not before me.  And the conduct of administrative

12   things, if someone is unhappy with that, they know how to

13   file lawsuits in front of judges to enjoin whatever or to

14   deal with it in other ways.  I understand the point.  I

15   understand the words clearly.  I'm not resolving that

16   question.

17         The last question that I have for either of you is

18   just whatever you want to say about the monitoring trustee.

19         MR. JONES:  Your Honor, let me just start on -- on

20   that topic with the notion that the monitoring provision,

21   like the other disputes that are still live here, all go to

22   our efforts to prevent a recurrence of the violation or a

23   similar violation in the future.

24         Specifically with the monitoring provision, though,

25   the monitor is to ensure that these defendants, even as they

1    wind down the NEA, that they are complying with the final

2    judgment, that they're not sharing competitively sensitive

3    information, as they're disentangling themselves.

4            As the Court will see in looking at our filing,

5    there's some matters in which defendants will be still

6    dealing with each other through the end of January of 2024.

7    They've also been in the NEA for a couple years now, started

8    implementing in 2020, so a lot of time of exchanging

9    competitively sensitive information, of working hand-in-glove

10   with each other.  We think the monitor will help ensure that

11   the Court's final judgment is complied with as this wind-down

12   process takes place.

13           And we also think, Your Honor, going to this point

14   raised that goes to, in their papers, this was not done in

15   secret, it was done in the open, Your Honor, the fact that

16   this was done out in the open, the NEA, says nothing about

17   whether a monitor is necessary here.  In fact, Your Honor, I

18   would say that defendants plowing ahead with the NEA, despite

19   recognizing the antitrust risk involved, maybe suggests

20   otherwise, not that a monitor isn't needed or that these

21   other provisions that go to kind of fencing in their conduct

22   in the future aren't needed.  In fact, I think it reinforces

23   the need for an external monitor to ensure that they are

24   complying with the law and with the final judgment.

25           MR. WALL:  Your Honor, I don't even know where this

1    is coming from, because it is not normal.  This is not the

2    normal kind of arrangement.  Antitrust monitors are

3    exceptional.  They tried this case as if it were somehow

4    analogous to a merger.  And the relief that you're ordering

5    is essentially to disentangle.  And the parties have begun

6    the contractual process.  It will be mostly completed before

7    we can ever get a monitor in place.  It takes months to get

8    one of these monitors in place.  I've been through the

9    process twice.

10           And in the situation here, when they first asked

11   for this in their original proposed final judgment, in their

12   original draft, it was supposed to monitor the process that

13   was mooted by JetBlue's termination.  Because once the

14   termination went into effect -- and again, we wish it

15   hadn't -- but once that went into effect, a set of

16   contractual processes, which they've accepted as being

17   sufficient, have gone forward.  Many are already completed.

18   Things like revenue sharing are over already.  It isn't

19   happening.  We're not, what they call coordination or market

20   allocation, we're not doing that anyone.

21           We are going to be complete with most of this in

22   days and weeks.  And the stuff that's the furthest out, which

23   is like the frequent flyer programs and the slots and things

24   like that, it's discrete and it's necessary that it takes

25   longer in the interest of the consumer.  Because if we did it

1    any faster than that, there would be adverse effects on

2    consumers.

3            Now, what their own remedies manual says is that

4    the ordinary divestiture and remedy can be sufficiently

5    monitored by the staff of the antitrust division.  And it's

6    only when you have something that is unusually complex that

7    you need a monitor.  What they said in their initial filing,

8    Docket 353, is that, "Monitors are proper when a complex

9    decree requires administration or complex policing,

10   particularly where a party has proved resistant or

11   intransigent or special skills are needed."

12           That echos with the merger.  The remedies manual

13   says that, "A monitor is appropriate when the burden of

14   monitoring is unusually high; for example, in a case of a

15   complex global asset carveout that requires an extended

16   transition period."

17           This is at the other end of the extreme.  This is

18   going to happen quickly, definitively.  As you heard counsel

19   say, JetBlue has decided to move on.  And in those

20   circumstances, there has never -- in my experience, I've

21   never seen a court enter an order requiring an external

22   antitrust monitor in those circumstances.

23           One of the things -- this is so unusual, so rare,

24   that you could easily read all of the cases that -- where

25   it's happened, cases like the *Apple* case, where Judge Cote

1    decided that -- I mean, that was a conspiracy case, where the

2    conspiracy had involved multiple parties and a lot of private

3    conversations.  And it did not have any external

4    manifestations of the world that would have revealed what

5    they had decided to do -- for good reason, because it was

6    bad.  And they, in that instance, Judge Cotes said, "I have a

7    defendant that is not accepting the outcome here, not

8    accepting responsibility," and she put in a two-year

9    monitor -- not five year, but a two-year monitor in that

10   circumstance.

11          It became a famous mess after that.  There was

12   constant fighting over what the monitor was doing, whether he

13   was within his authority or not, and everything like that.  I

14   very much doubt Judge Cote would have done it again if she

15   had a second chance.

16          The other cases are typically cartel conduct.  It's

17   just nothing like this.  This was an out-in-the-open

18   transaction, and now we're being treated like a recidivist.

19          THE COURT:  I understand.

20          MR. JONES:  Your Honor, if I may briefly?

21          THE COURT:  Yeah.

22          MR. JONES:  The remedies manual that has been

23   cited, that's actually been withdrawn.  It's -- and I can

24   bring to Your Honor a copy of it, if you would like.  But the

25   remedies manual has been withdrawn, and the cover of it says,

"This guidance is now inactive," and the manual has been
withdrawn.  So that's -- that's certainly no longer our
position.  In fact, it was withdrawn, I believe, in 2022.

But holding that aside, Your Honor, going back to
the *Apple* case, reading Judge Cote's opinion, where she
discusses the monitor, part of the reason that she lays out
was the resistance of *Apple* there in taking the lessons of
that litigation.

Well, here, Your Honor, up until JetBlue's
termination, defendants were arguing that, okay, this piece
of the NEA was fine, and this piece of the NEA was fine; that
the Court didn't examine the whole entire agreement; that the
related agreements were somehow different.  That's not a sign
of companies that have gotten the lesson from litigation.

Your Honor, we had a trial here about the NEA and
the related agreements, not about piecemeal, section by
section litigation of those contracts.  And defendants, up
until the JetBlue termination, seemed to want to relitigate
the case.  That's not a sign of defendants that have
understood that they've done something here that's violated
the law.

MR. WALL:  I'll take his point and raise it.  We
still don't think it violates the law.  Okay.  But there is a
difference between defending yourself --

THE COURT:  You're entitled to appeal.

1          MR. WALL:  Yeah.  We are entitled to.  We will.

2          THE COURT:  I don't have any problem with that.

3    That's why we have appellate courts.

4          MR. WALL:  There is no basis for saying that we

5    will not honor the decree because we have defended a case.

6          THE COURT:  Okay.  Anything either -- I don't have

7    any other questions.  My -- if there's anything else that you

8    briefly want to address, I'm happy to give you a couple of

9    minutes, if there's something else that you want to say.  But

10   otherwise, I'm going to take it under advisement.  I'll

11   resolve these disputes and expect to issue something,

12   obviously a lot quicker than it took me to do the original

13   decision, but very fast.

14          Anything else either of you wants to say?

15          MR. WALL:  Thank you, Your Honor.

16          MR. JONES:  Nothing else from the United States,

17   Your Honor.

18          MR. SCHWED:  Nothing, Your Honor.

19          THE COURT:  All right.  Okay.  Thank you very much.

20   This has been really helpful.  Have a good day.  Have a nice

21   rest of your summer.

22          We stand in recess.

23          (Court in recess at 10:47 a.m.)

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5     and for the United States District Court for the District of

6     Massachusetts, do hereby certify that pursuant to Section

7     753, Title 28, United States Code, the foregoing pages

8     are a true and correct transcript of the stenographically

9     reported proceedings held in the above-entitled matter and

10    that the transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United States.

12

13                    Dated this 17th day of August, 2023.

14

15

16

17              /s/ RACHEL M. LOPEZ

18

19

20    _____

21    Rachel M. Lopez, CRR
      Official Court Reporter

22

23

24

25